AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

**FILED**

JUN 25 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Case No. 3-20-70834 MAG |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 15, 2016 _____ in the county of _____ San Francisco _____ in the _____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343 and 2 | Wire Fraud |
| | Maximum Sentence: 20 years |
| | Maximum Length of Supervised Release: 3 years |
| | Maximum Fine: $250,000.00 or twice the gross gain or loss. |
| | Special Assessment of $100 per felony count. |

This criminal complaint is based on these facts:

Please see the attached Affidavit of Special Agent Janak Patel in Support of an Application for a Criminal Complaint and Arrest Warrant.

☑ Continued on the attached sheet.

Approved as to form: _____
AUSA Nicholas J. Walsh

Sworn to before me by telephone.

Date:   June 24, 2020

City and state:   San Francisco, California

/s/
*Complainant's signature*

Janak Patel, Special Agent, FBI
*Printed name and title*

_____
*Judge's signature*

Thomas S. Hixson, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF SPECIAL AGENT JANAK PATEL**
**IN SUPPORT OF AN APPLICATION FOR**
**A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Janak Patel, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby declare as follows:

## INTRODUCTION AND PURPOSE OF AFFIDAVIT

1.      This affidavit is being submitted in support of an application for a criminal complaint and arrest warrant charging MICHAEL BRENT ROTHENBERG of San Francisco, California, with one count of Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2.

2.      The statements contained in this affidavit are based on: (1) information uncovered during the investigation of this matter through witness interviews and from various financial records, email communications, and other documents; (2) information provided to me by other law enforcement officers; (3) information from the United States Securities and Exchange Commission ("SEC"); as well as (4) my personal observations, training, experience, and knowledge of this investigation.

3.      Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that, on or about July 15, 2016, within the Northern District of California and elsewhere, MICHAEL BRENT ROTHENBERG, committed Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2.

## AGENT'S BACKGROUND AND EXPERTISE

4.      I am a Special Agent with the FBI assigned to investigate white-collar crimes and have been so employed since January 2019.  I am assigned to a squad investigating allegations of financial fraud, including investment fraud, money laundering, cryptocurrency fraud, wire fraud, and other frauds.  Prior to my current position as a Special Agent with the FBI, I was a lawyer for five years and graduated with a Juris Doctorate from Trinity Law School in 2013.

5.      My training included Basic Field Training Courses at the FBI Academy in Quantico, Virginia, as well as financial fraud investigations training.  As an FBI agent, I have received additional on-the-job training and experience in interview and interrogation techniques, arrest procedures, search warrant applications, and the execution of searches and seizures.

6.      As an FBI agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.  I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).


## APPLICABLE LAW

7.      Section 1343 of Title 18 of the United States Code sets forth the crime of Wire Fraud and provides a penalty of imprisonment of not more than twenty years and a fine up to $250,000 fine or twice the gross gain or loss, three years supervised release, and a mandatory $100 special assessment.

8.      The elements of the Wire Fraud relevant to this application for a criminal complaint are: (1) the defendant knowingly participated in, devised, and / or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of

false or fraudulent pretenses, representations, or promises, or omitted facts; (2) the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme. See 18 U.S.C. § 1343.

9.     Section 2 of Title 18 of the United States Code details the circumstances under which individuals may be punished for their roles in committing a crime.  It provides criminal liability for anyone who directly commits an offense, anyone who "aids, abets, counsels, commands, induces or procures its commission," and anyone who "willfully causes an act to be done which if directly performed by him or another would be an offense." 18 U.S.C. § 2.

## STATEMENT OF FACTS ESTABLISHING PROBABLE CAUSE

**A.     Overview of ROTHENBERG and His Business Enterprises**

10.     MICHAEL BRENT ROTHENBERG ("ROTHENBERG"), also known as MIKE ROTHENBERG, was a resident of San Francisco, California, in the Northern District of California.

11.     ROTHENBERG gained some notoriety as a venture capitalist between 2013 and 2016 for his investments in Silicon Valley start-ups in a variety of business segments, but particularly in virtual reality technology.

12.     In 2012, while in business school, ROTHENBERG founded Rothenberg Ventures Management Company, LLC ("RVMC"), a Delaware limited liability company.  RVMC had offices on Folsom Street in San Francisco, California, in the Northern District of California.  In

2016 and 2017, RVMC changed its name to Frontier Technology Venture Capital LLC, and then to Rothenberg Ventures LLC, respectively. In this Affidavit, "RVMC" is used to refer to the entity at any relevant time, regardless of the entity's name at that time.

13.     Documents and email communications show that ROTHENBERG was the Founder and CEO of RVMC.

14.     According to RVMC employees interviewed by the FBI and involved investors interviewed by the FBI, ROTHENBERG in fact controlled RVMC and presented himself to investors as the owner and manager of RVMC.

15.     Through RVMC and other entities, ROTHENBERG raised and managed various investment funds. These investment funds included but were not limited to the following:

> a.     Rothenberg Ventures Fund I, LLC (later known as Rothenberg Ventures 2013 Fund, LLC) (the "2013 Fund");
>
> b.     Rothenberg Ventures Fund II, LLC (later known as Rothenberg Ventures 2014 Fund, LLC) (the "2014 Fund");
>
> c.     Rothenberg Ventures 2015 Fund, LLC (the "2015 Fund"); and
>
> d.     multiple related funds named Rothenberg Ventures 2016 Fund, LP, Rothenberg Ventures 2016 Feeder Fund, LP, and Rothenberg Ventures 2016 Accredited Fund, LP (collectively the "2016 Fund").

16.     These four annual funds are referred to hereafter as the four "main funds." All of the main funds were located in San Francisco, California, in the Northern District of California.

17.     ROTHENBERG also created a series of companies designed to further his interests in various other arenas, such as race cars, a business accelerator, and, importantly, virtual reality content production. These companies were named River Sports, River

Accelerator, River Studios (also known as Bend Reality, LLC), and similar, and therefore formed a group of entities known collectively as the "River Ecosystem."

18. RVMC employees indicated in interviews with the FBI that only ROTHENBERG and a small number of employees had the ability to transfer money from and between RVMC, River Ecosystem entities, and fund bank accounts. One employee who worked closely with ROTHENBERG in 2016 indicated that ROTHENBERG would tell him when and where to transfer money, sometimes by text message, and he would have an assistant execute the transactions. Another employee who worked closely with ROTHENBERG in 2016 told the FBI that ROTHENBERG was a "control freak" and had to be involved with all actions that occurred at RVMC, including money movement and payroll, even though RVMC had a Chief Finance Officer.

**B.    Overview of the SEC Lawsuit Against ROTHENBERG and RVMC**

19. In August 2018, the SEC filed a civil suit in the Northern District of California against ROTHENBERG and RVMC. The SEC's complaint asserted two claims for relief against ROTHENBERG and RVMC: (1) Defendants violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2); and (2) Defendants violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

20. As part of the SEC investigation, the SEC hired a financial expert to review, among other things, the transactions of RVMC and the four main funds. That expert, Gerald T. Fujimoto, prepared a report for the SEC.

21.     In that report, Fujimoto determined, as of approximately September 2018,

ROTHENBERG had raised a net amount of approximately $45.9 million from approximately

200 investors and received another approximately $13.0 million from the sale of investment

positions and advances from investors.  During that time, approximately $30.9 million had been

invested in various early-stage companies, RVMC was entitled to $6.7 million in management

and administrative fees under the terms of RVMC's agreements with the Funds, approximately

$1.7 million had been distributed to investors, and approximately $0.7 million remained.  The

approximately $58.9 million of inflows, $39.3 million of outflows, and $0.7 million in remaining

cash left a shortfall of more than $18 million, which Fujimoto asserted that ROTHENBERG

misappropriated and spent on various business expenses, personal expenses, and legal fees.

22.     In particular, Fujimoto determined there was "in the aggregate, an asset shortfall

across the Rothenberg Investment Funds of approximately $18.8 million, nearly all of which was

(i) transferred to Mr. Rothenberg personally (approximately $3.8 million)[,] (ii) utilized to fund

other entities under Mr. Rothenberg's control (approximately $8.8 million), and (iii) used to pay

RVMC expenses over and above the management and administrative fees to which RVMC was

entitled under the terms of the Management Agreements (approximately $5.7 million)."

23.     Ultimately, ROTHENBERG did not contest the allegations against him in the

SEC's lawsuit, though he did contest the amount of ill-gotten gains attributed to him.  On

December 20, 2019, United States District Judge Jon S. Tigar entered a disgorgement order of

$18,776,800, plus prejudgment interest of $3,663,323.47, for a total of $22,440,123.47.  Judge

Tigar further ordered ROTHENBERG to pay an additional civil penalty of $9 million.

**C.      ROTHENBERG's Scheme to Defraud Investors in an Opportunity to Purchase Untraded Shares in a Software Company in July 2016**

24.      In the middle of 2016, ROTHENBERG came upon an opportunity to purchase privately held shares of a successful software company, hereinafter referred to as the "Software Company." Software Company was headquartered in San Francisco, California, and designed and developed games and applications.

25.      Software Company had not had an initial public offering ("IPO"), meaning its shares were not publicly traded, but instead, were owned by private investors, venture capital firms, employees, and others.

26.      ROTHENBERG was given the ability to purchase one million shares of the company at approximately $14 per share. Therefore, to purchase the one million shares, ROTHENBERG had to raise approximately $14 million.

27.      ROTHENBERG created a "co-fund" investment entity, named the Rothenberg Ventures 2016 Co-Fund [Software Company] LLC (the "Software Company Co-Fund"), with a separate bank account, to raise the money. The investment was not structured through one of ROTHENBERG's four main funds.

28.      Ultimately, five investors decided to participate in the Software Company Co-Fund investment opportunity.

29.      The largest of the investors was an existing investor in the 2015 Fund, hereinafter referred to as "G, Inc." G, Inc. was a family office incorporated in the Cayman Islands. One purpose of G, Inc. was to invest capital in venture capital funds and in private companies.

30.      On or about Wednesday, July 13, 2016, the Chief Operating Officer and Chief Revenue Officer of RVMC emailed a representative of G, Inc. In the email, he stated a valuable co-invest opportunity with "a short fuse" had come up and RMVC wanted to make sure G, Inc.

had an opportunity to take advantage of it. He ended the solicitation email by saying it was possible the opportunity would be "allocated before the weekend."

31.     The following day, on or about Thursday, July 14, 2016, the same RVMC employee sent a representative of G, Inc. an email attaching a "Rothenberg Ventures [Software Company] Co-Fund" presentation and a document entitled "Rothenberg Ventures 2016 Fund Co-Fund [Software Company] LLC Summary of Principal Terms" (the "Summary of Principal Terms"). He recommended G, Inc. wire its money that evening or the following day due to "the demand we are seeing." That RVMC employee later indicated in an interview with the FBI that ROTHENBERG created the two documents.

32.     The Summary of Principal Terms purported to be a summary of the terms of the Operating Agreement of the Software Company Co-Fund. Per the Summary of Principal Terms, the Software Company Co-Fund "will invest in a special purpose vehicle that will purchase equity securities of [Software Company]."

33.     That same day, on or about Thursday, July 14, 2016, ROTHENBERG sent an email with the subject "[Software Company] Co-Invest" to a representative of G, Inc. ROTHENBERG stated his employee had let him know G, Inc. was interested in the Software Company investment, and then proceeded to say, in substance and in part, "It's our most popular co-investment since SpaceX," "it's an amazing opportunity that we worked for months to get into, and got there by developing a personal relationship with the CEO at a Warriors game," and "It will be our largest overall investment and is a monopoly in mobile development software growing at 50-100% per year…on hundreds of millions of annual revenue." ROTHENBERG stated G, Inc. could secure its spot in the Software Company Co-Fund investment if its wire was received before the weekend.

34.     G, Inc. representatives in contemporaneous email communications with RVMC, and in later interviews with the FBI, stated that they had reviewed the materials provided by RVMC and decided to invest $1 million.  A representative from G, Inc. stated that the particular amount was chosen because of the favorable terms given to investments of $1 million or more, as described in the Summary of Principal Terms.

35.     On July 15, 2016, G, Inc. wired $1 million to a Silicon Valley Bank account located in the Northern District of California in the name of Rothenberg Ventures Co-Fund 1, LLC (the "Software Company Co-Fund bank account").  The wire transfer was processed through Federal Reserve System computers.  Based on my training and experience, I know that Federal Reserve System computers are located in New Jersey and Texas.

36.     The same day G, Inc. wired $1 million to the Software Company Co-Fund bank account, July 15, 2016, $1 million was transferred from the Software Company Co-Fund bank account to RVMC's main bank account at Silicon Valley Bank.  The majority of the $1 million was then used for various expenses, including fund expenses, fund investments, River Studios expenses, ROTHENBERG's personal expenses, and other miscellaneous expenses.  For example, on the same day, July 15, 2016, $450,000 was transferred from RVMC's main bank account to the 2016 Fund, which ROTHENBERG then used for 2016 Fund investments.  None of the $1 million was used to purchase shares of Software Company.

37.     In an interview with the FBI, a representative for G, Inc. stated G, Inc. expected the $1 million to be invested in Software Company exclusively.  No one told representatives of G, Inc. its money would be used for other purposes, nor did anyone tell representatives of G, Inc. its money would be moved out of the bank account the same day it was received.

38.    Thereafter, July 19, 2016, July 21, 2016, August 1, 2016, and August 6, 2016, representatives of G, Inc. made inquiries about the status of the Software Company Co-Fund deal.

39.    In email communications dated July 21, 2016, and August 3, 2016, the Chief Operating Officer and Chief Revenue Officer of RVMC wrote representatives of G, Inc., stating, "We expect this will close next week. Our legal team is processing the paperwork now," and "We do expect the deal to close soon," respectively.

40.    On August 6, 2016, a representative of G, Inc. sent an email addressed to ROTHENBERG, the Chief Operating Officer and Chief Revenue Officer of RVMC, and another RVMC employee stating, "We wired the money over three weeks ago. The process was quite rushed and we expected the deal to close rapidly." The representative of G, Inc. asked for an update on the Software Company deal.

41.    On August 18, 2016, G, Inc. requested by email that RVMC wire G, Inc.'s $1 million back, citing delays in the closing. In that email, a representative of G, Inc. stated G, Inc. was still interested in participating in the Software Company Co-Fund deal and was prepared to wire the money back once there was confirmation the deal was closing.

42.    On August 19, 2016, ROTHENBERG emailed G, Inc., assuring it that "The [Software Company] deal is still in process as of Thursday and we'll provide an update ASAP on that as well."

43.    On or about August 21, 2016, a representative of G, Inc. had a telephone call with ROTHENBERG. On that call, ROTHENBERG for the first time represented that G, Inc.'s $1 million Software Company Co-Fund investment may have been transferred to the 2016 Fund. (As noted in paragraph 37, however, law enforcement authorities' review of bank records shows

that G, Inc.'s $1 million investment was used to pay a variety of expenses, and that, contrary to

ROTHENBERG's assertion, was not simply invested into the 2016 Fund.)

44.    On or about August 22, 2016, the G, Inc. representative wrote a follow-up email

to ROTHENBERG stating: "I was extremely surprised to hear from you tonight that the $1M we

wired you for the [Software Company] co-investment has apparently instead been invested into

Rothenberg's 2016 fund. This is a serious problem and needs to be corrected ASAP. This is a

breach of our trust as limited partners and a misappropriation of our funds. We need the $1M to

be wired back to us in the next 24 hours."  The representative of G, Inc. attached the wire

instructions for G, Inc.'s investment to show the money was intended for the Software Company

Co-Fund, not the 2016 Fund.  The email went on to state, "We also have a very long, crystal

clear email chain back and forth that specifies the money being used for the [Software Company]

investment... There was no ambiguity about this."

45.    In another email dated on or about August 22, 2016, a representative of G, Inc.

wrote ROTHENBERG, "we have repeatedly asked for our funds to be returned. You told us last

night that the funds we wired you may have been incorrectly invested in Rothenberg's 2016

fund, and you have not yet been able to verify that our funds are still held in escrow after

repeated inquires. As discussed, this is a serious breach of our trust and a big problem. We gave

you 24 hours to wire us back our money 22 hours ago. The fact that you have not gotten back in

touch with us today is extremely concerning."

46.    G, Inc. was not paid back until approximately a year later, in August 2017, with a

transfer of money from the 2016 Fund's bank account.  However, the money used to pay back G,

Inc. came from the sale of an investment in a separate company by the 2015 Fund (an "exit," in

industry parlance) in April 2017, and an exit from yet another company by the 2013 Fund in May

2017. Thus, the source of money to repay G, Inc. was neither from the sale of Software Company shares nor from any investment by the 2016 Fund.

47.     In addition to G, Inc., four other investors transferred money to invest in the Software Company deal based on ROTHENBERG's /or RVMC's representations the money would be used to purchase the untraded stock of Software Company. As identified by their initials, those included: (1) a July 14, 2016, $50,000 investment and a July 18, 2016, $50,000 investment by N.H.; (2) a July 19, 2016, $100,000 investment by B.F. Limited Partnership; (3) a July 21, 2016, $50,000 investment by RVMC employee E.J. and his wife; and (4) a July 21, 2016, $100,000 investment by L.G. and her husband.

48.     In total, the five investors wired approximately $1.35 million to bank accounts controlled by ROTHENBERG.

49.     ROTHENBERG did not use the $1.35 million as he and/or RVMC represented it would be used. Rather than purchasing the Software Company shares – as ROTHENBERG and RVMC employees told all five investors ROTHENBERG would do – ROTHENBERG diverted, or caused to be diverted, the money for other purposes.

50.     In an interview with the FBI, one fundraiser working closely with ROTHENBERG in July 2016 told the FBI that ROTHENBERG closed off access to the electronic folder storing information about the Software Company deal from access to employees.

51.     The relevant bank statements show that ROTHENBERG quickly took the five investors' money from the Software Company Co-Fund bank account and used it for purposes other than the purchase of Software Company stock.

52.     As noted above, G, Inc. invested $1 million on July 15, 2016, but that money was transferred to RVMC's main bank account the same day.  None of the money was used to purchase Software Company shares.

53.     N.H.'s initial $50,000 tranche on July 14, 2016, went into the main RVMC account and never made its way to the Software Company Co-Fund bank account.  N.H.'s second tranche on July 18, 2016, was combined with the July 19, 2016, B.F. Limited Partnership $100,000 investment, and sent to the main RVMC bank account on July 19, 2016.  None of the money was used to purchase Software Company shares.

54.     The E.J. and L.G. investments on July 21, 2016, were pooled together and sent from the Software Company Co-Fund account to the main RVMC account on August 1, 2016. None of the money was used to purchase Software Company shares.

55.     In sum, none of the money raised to be invested in Software Company shares was ever used to purchase Software Company shares.  Instead, it was used for the main funds' investments and expenses, River Studios expenses, and ROTHENBERG's personal expenses.

## ROTHENBERG'S WIRE FRAUD

56.     As set out in detail above, there is probable cause to believe ROTHENBERG committed Wire Fraud on or about July 15, 2016.

57.     Foremost, ROTHENBERG knowingly participated in and devised a scheme or plan to defraud and a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts.  ROTHENBERG represented, and/or caused to be represented, to his investors, and specifically G, Inc., that its money would be used to purchase Software Company stock.  However, ROTHENBERG used

the money he raised using this misrepresentation for the main funds' investments and expenses, River Studios expenses, and ROTHENBERG's personal expenses.

58.     The statements ROTHENBERG made, as well as those he caused to be made by RVMC employees, as part of the scheme, were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property. ROTHENBERG's misrepresentations did in fact cause G, Inc. to send $1 million to the Software Company Co-Fund bank account controlled by ROTHENBERG on July 15, 2016.

59.     ROTHENBERG, as detailed above, acted with the intent to defraud, that is, the intent to deceive and cheat. Among other things, the facts that: (1) G, Inc.'s $1 million was sent from the Software Company Co-Fund bank account to the main RVMC bank account the same day it arrived, (2) on the same day, $450,000 was immediately sent from the main RVMC bank account to the 2016 Fund bank account; and (3) the total $1 million was used for other purposes than purchasing Software Company stock, evince ROTHENBERG's knowledge that the money would not be used to make purchase of Software Company stock at the time he made his representations to G, Inc. The fact that he did similarly for five separate investors showed the absence of mistake.

60.     Finally, ROTHENBERG caused G, Inc. to send the $1 million by interstate wire communication because the wire transfer was processed through Federal Reserve System computers. Based on my training and experience, I know that Federal Reserve System computers are located in New Jersey and Texas. The $1 million wire transfer was an essential part of the scheme.

## CONCLUSION

61.     Based on the foregoing facts, my training and experience, and consultation with other agents and officers experienced in financial investigations, there is probable cause to believe that on or about July 15, 2016, MICHAEL BRENT ROTHENBERG knowingly and voluntarily committed Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2.

62.     For the reasons stated above, I respectfully request that the Court issue the requested criminal complaint and arrest warrant.

> I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.


/s/
_____
Janak Patel
Special Agent
Federal Bureau of Investigation


Sworn to before me this  24th   day of June 2020.


_____
THE HONORABLE THOMAS S. HIXSON
UNITED STATES MAGISTRATE JUDGE