UNITED STATES DISTRICT COURT    *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Motion to Transfer Venue** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 1 - 26 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, June 24, 2022 |

### REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS

**APPEARANCES VIA ZOOM WEBINAR:**

For Plaintiff:          Stephanie M. Hinds, Esq.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        Assistant United States Attorneys


For DEFENDANT:          Moeel Lah Fakhoury LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612-1427
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

```
1    Friday, June 24, 2022                      9:33 a.m.
2                    P R O C E E D I N G S
3          THE CLERK:  And, Your Honor, now calling criminal
4    matter 20-266, United States v. Michael Brent Rothenberg.
5       If counsel could please state their appearances for the
6    record, starting with the government.
7          MR. WALDINGER:  Good morning, Your Honor.  Kyle
8    Waldinger and Nicholas Walsh for the United States.
9          MR. FAKHOURY:  Good morning, Your Honor.  Hanni
10   Fakhoury on behalf of Mr. Rothenberg.  He's present and
11   appearing by video and consents to a video appearance this
12   morning.
13         THE COURT:  Very good.
14      Good morning, gentlemen.
15      Good morning, Ms. Mercado.
16      I already said good morning to Ms. Lee.
17      We are still in the midst of the COVID pandemic.  It is
18   not safe for us to conduct the majority of our proceedings in
19   person, although we do conduct some that way.  But we can't
20   conduct all of them in person without unnecessarily
21   jeopardizing the health of the parties, the lawyers, the
22   Court, court staff, and the general public.  So it's in the
23   interests of justice that we proceed by video, and that's what
24   we're going to do.
25      Let me start by apologizing to Mr. Rothenberg and counsel
```

 1    for the informality of my attire.  I'm very much a coat and

 2    tie, a robe and tie person in court, but I'm working remotely

 3    this week, and I forgot to pack either a robe or a necktie.

 4    So this is a virtual background.

 5        The matter is on calendar this morning for a motion to

 6    transfer venue.  I have a big calendar so I can't take

 7    unlimited argument, but I would like to hear argument from the

 8    parties.

 9        Mr. Fakhoury, let me start with you.

10            **MR. FAKHOURY:**  Thank you, Your Honor.

11        And, you know, as we've laid out in the papers and I

12    assume the Court is aware, you know, Mr. Rothenberg is now

13    living in Texas, outside of Austin, Texas.  He's at his

14    brother's house temporarily before he moves into a trailer

15    that his brother is effectively letting him live in.

16        And as we've laid out in the papers, the basis for him

17    relocating, which was something that had been telegraphed to

18    the Court in general --

19            **THE COURT:**  Yeah, let me interrupt you because I

20    think the papers were drafted on an expectancy of a future

21    move.  And so you're saying "as the Court is aware,

22    Mr. Rothenberg is living in Texas."  But I actually don't

23    think that's a matter of record in the papers.  And it

24    actually -- and it has some bearing on the draft order that

25    I've been working on.

1    So you can correct me if I'm wrong, but I think that's the

2    state of the record.

3          **MR. FAKHOURY:**  No, you're -- you're correct.  And I

4    get the -- maybe the better way for me to say it is the

5    expectancy that was discussed in the papers is now a reality.

6    So --

7          **THE COURT:**  Okay.

8          **MR. FAKHOURY:**  -- as of yesterday, Mr. Rothenberg is

9    now living in Texas.

10    He actually has already been -- he's already had his

11    Pretrial Services supervision handed off to the Western

12    District of Texas.  That -- and he was supposed to meet with

13    his officer this morning, and I think due to recent events in

14    D.C., that meeting was postponed at the request of Pretrial

15    Services because the courthouse closed.

16    But in any event, he does actually have a Western District

17    of Texas Pretrial Services officer, and I've been in touch --

18    or I've seen the communications between his Pretrial Services

19    officer here in the Northern District and the officer in the

20    Western District.

21    So that expectancy that was discussed in the papers is now

22    a reality.  He's in the Western District of Texas, and that's

23    where he's going to reside.

24    And that move, as I laid out in the papers, was sort of

25    telegraphed both to the government and to the parties and to

1  the Court at least, you know, at least the magistrate court at

2  the initial appearance when there was a discussion that this

3  may happen.

4      It took a little while for it to happen because

5  Mr. Rothenberg wasn't evicted until just in the last few, you

6  know, last few days basically.  Part of the reason for the

7  delay in the eviction was the eviction moratorium imposed

8  statewide in 2020.

9      So it was always sort of lurking.  It was discussed at his

10  initial appearance.  It's now happened.  It's now a reality.

11  So Mr. Rothenberg is in Texas.

12     And I think that in terms of the transfer factors under

13  Rule 21, that's, I think, one of the -- if not one of the, it

14  is the, I think, biggest factor here because it puts a

15  significant strain on Mr. Rothenberg to have to transfer --

16          **THE COURT:**  Well, let me ask you a question --

17          **MR. FAKHOURY:**  Sure.

18          **THE COURT:**  -- because I think your -- your motion

19  does rest predominantly on that factor.

20     If I were to grant this motion, would I be creating a rule

21  that says you can move the venue of your case anytime you want

22  to by moving during the pendency of the case?  And if I would

23  be creating that rule, is that a good rule?

24          **MR. FAKHOURY:**  So, no, you would not be creating that

25  rule because the rule -- the factors are necessarily case

1  dependent.  So I do not believe you'd be making that rule and

2  it would --

3          **THE COURT:**  Then if -- then if that's not rule, what

4  makes this case special?

5          **MR. FAKHOURY:**  What makes this case special is a

6  couple factors.  Number one is the -- is Mr. Rothenberg's

7  indigency.  And to be clear, I'm not proposing a rule that

8  says --

9          **THE COURT:**  Most of the defendants in our court are

10  indigent.

11          **MR. FAKHOURY:**  That's true.

12          **THE COURT:**  So that does not make this case -- I

13  mean, that's a significant change in circumstances for

14  Mr. Rothenberg.  But that fact, if it is a fact, does not

15  distinguish him from the vast majority of defendants on our

16  docket.

17          **MR. FAKHOURY:**  That's true regarding indigency.  But

18  I think when we think about the transfer piece of it, in other

19  words, what is the burden on a defendant to transport himself

20  from one -- from where he lives to the courthouse where he's

21  being prosecuted.

22     I do think the fact of his indigency is important and it

23  distinguishes him -- let's start by it distinguishes him from

24  a non-indigent defendant, we could start with that, in the

25  sense that a non-indigent defendant who has the means to

1  transport himself at his own expense from one courthouse to

2  another courthouse is obviously in a different situation than

3  an indigent defendant who does not have those means.

4       And I do think that is a -- that is a factor.  It goes to

5  the costs of the parties factor which -- and I've cited a

6  district court case on this, that the cost is not so much in

7  an absolute it costs X amount of dollars, but who can bear the

8  costs.  So I do think that has a role to play on that factor.

9       I think another thing that distinguishes this case is this

10  is a much more complex and complicated case than, you know, a

11  run-of-the-mill felon-in-possession case where maybe there's a

12  three-day jury trial.  Okay, that would be one thing.

13       In this case, this is two separate trials.  The first one

14  is the more discrete one, although the Court's -- the

15  government's indicated it's five court days, which is not huge

16  but not minor either.

17       And then the remainder of the case is much more

18  significant.  And so there's a -- to require him to get back

19  and forth from the Western District of Texas to the Northern

20  District of California, and then, you know, the government has

21  cited, well, the marshals could pay for his transportation.  I

22  don't think that's an adequate substitute.  That's -- it

23  covers one-way transportation.  It doesn't cover living

24  expenses.  He needs a place to stay while he's in -- while

25  he's standing trial.

1    It doesn't cover travel for anything other than a court

2    appearance.  So if he -- if I want to meet with him in person,

3    I'm flying to him, which I'm happy to do, or he's flying to me

4    which is going to be hard for him to do.  So that is another

5    factor there.

6    I think what also makes this case different is the

7    government itself has acknowledged that witnesses in this case

8    are really spread out all over the place.  And -- and that is

9    a factor that weighs for transfer in the sense that this is

10   not a case where the -- the witnesses are all concentrated

11   here.  This is not a case where the scene of the crime or the

12   location of the crime is -- is sort of tangible to some

13   degree.

14   This is not -- to use kind of a stark example -- it's not

15   a murder case where there's a body in a specific location and

16   the characteristics of that location are important, where it's

17   a hassle for witnesses to travel or what not.

18   We're dealing with sophisticated investor witnesses.  A

19   bank who's been very aggressive in evicting Mr. Rothenberg

20   from his house.  All of their travel expenses are reimbursed

21   by either their company or the government.  Mr. Rothenberg

22   does not get that courtesy.  He has to bear the -- he alone

23   would have to bear all the costs.  If I travel to anywhere for

24   court-related purposes, I get paid for my travel time.

25   Mr. Rothenberg is not compensated for any travel time or

1   travel expenses.

2       And again he's the one who's indigent, right, he's got the

3   $30 million judgment over his head.  And so that's another

4   factor that I think makes it different.

5       I think another factor that makes it different is -- and

6   this is an important one, and the government and I have sort

7   of disagreed on what the numbers mean, but I think the bottom

8   line is we're not proposing a transfer to a venue that's far

9   flung in the middle of nowhere.  This is not Juneau, Alaska.

10  It's very easy to get to the Austin area.

11      And importantly, it wouldn't be a burden on The Western

12  district of Texas.  And -- and I say that with the full

13  understanding that --

14          **THE COURT:**  Can I just say something?

15          **MR. FAKHOURY:**  Absolutely.

16          **THE COURT:**  Can I say something?  The argument in

17  your papers that the question of docket delay has to do with

18  burden on the transferee or transfer of court, I just think

19  that's not correct.  It isn't.

20      These factors that were first articulated that included

21  relative docket size are all about early trial, I think.

22      And so -- and so -- I mean you can tell me I'm wrong, and

23  if I'm wrong you should tell me.  But I'm just saying having

24  looked at the case law, that's the conclusion I reach.

25      And I just do not think it is realistic to say that this

1   case gets tried more quickly in the Western District of Texas

2   than it does here.  They're not going to give you an October

3   trial date on the first trial.  They're not.

4       You've been sitting with this data for months.  More than

5   a year.  You've never said to me, "Judge, I enthusiastically

6   join the government in wanting to set a trial date on that

7   second trial in the spring of 2023."

8       And I'll tell you right now I'm fixing to do it.  You tell

9   me when you want a trial date, and I'll give it to you if I

10  can.  And if I can't, it's only going to be because I'm off by

11  three or four weeks.

12      So anyway I'm pushing back.  Look, you write a great brief

13  in general and you wrote a great brief in this case, but on

14  that docket size thing, I just think that factor is not a

15  winner for you.

16          **MR. FAKHOURY:**  I understand, Your Honor.  And I --

17  and I hear what the Court is saying.

18      I want to clarify one thing just so it's very clear.  The

19  basis for the request is not because we cannot get a fast

20  enough trial in the Northern District.  And I want to be

21  crystal clear about that.

22      And the Court is absolutely right.  I have not pushed for

23  a quick trial date, and I will continue to not push for a

24  quick trial date because I don't think it's in

25  Mr. Rothenberg's interest and I can't be prepared to defend

1    him effectively if I rush to it.  So I want to be crystal

2    clear that that's not the basis of the request.

3        I hear -- what I had tried to lay out in the briefs was

4    there is obviously going to be some tension when one court

5    sends a case to another court.  And there will obviously be,

6    you know, some concern, am I -- what am I doing to my

7    colleagues in the -- in the other district?  Am I putting a

8    huge burden upon them?

9        You know, and -- and I -- and I'm just trying to say I

10   recognize that is there.  And what I'd hoped to do by the

11   statistics is to show, you know, it's not going to do that.

12   And --

13            **THE COURT:**  Quoting -- quoting back my comment about

14   300 cases to me had the opposite effect of what you intended.

15   It just makes me want to roll up my sleeves and demonstrate to

16   these parties that I'm prepared to try their case at the

17   earliest available opportunity.  And I'm -- and I -- and so

18   the question of relative burden doesn't even enter my mind.

19            **MR. FAKHOURY:**  Understood.

20       Well, then I'll -- I'll -- I'll move from that point and

21   just finish on this final point, Your Honor.

22       The final thing I wanted to say is one of the other issues

23   that the Court -- that the government's raised is like -- is

24   the continuity of counsel issue, which I think is obviously an

25   important factor.

1    And I take the government's briefs to read like

2    Mr. Waldinger and Mr. Walsh will keep the case with them.  And

3    that I do think will help -- and if I'm wrong about that,

4    obviously they'll have an opportunity to correct it -- to

5    correct me if I'm wrong.

6    But if that is case, then the -- really, the -- that is a

7    factor in my view that weighs towards transfer because it

8    doesn't burden another U.S. Attorney's Office with having to

9    get up to speed.

10    Now, of course lurking behind that is the defense attorney

11    issue.  And I've laid out in the briefs that, you know, look,

12    the case is complicated and I've had it for a while, about 14

13    or 15 months or 16 months or so.  And it's taken me a bit of

14    time to get up to speed because the materials are voluminous.

15    But I don't think that the case is one where, you know,

16    a -- if there is a new attorney brought on, which is what I

17    would expect would happen in the Western District of Texas, I

18    mean I think there's been enough work done between all of the

19    parties, both the government, myself, and obviously Your Honor

20    to help sort of narrow the issues, focus the issues, organize

21    the materials.

22    So it's not -- I don't view it as somebody would be

23    literally starting from scratch having to start everything all

24    over.  Yes, there'll be a new defense attorney who will need

25    some time to get up to speed.  But the work that's been done

1   and put into the case so far can transfer over to that new

2   attorney.

3       So to the extent that there's concern about the continuity

4   of counsel issue or the availability of counsel, I think is

5   the way the language talks about, you know, I think that that

6   shouldn't be an impediment to the transfer when considering

7   all of the other factors.

8       And then final -- the final thing I'll say is again, you

9   know, we're asking for a transfer to a major metropolitan

10  area, three humongous airports.  It will not be difficult for

11  people to, you know, get to the district.

12      And as I noted in the brief, in the first trial, the

13  government's already acknowledged that they have witnesses

14  outside of the Northern District including one in Denver,

15  Colorado which is actually closer to Austin than it is to

16  Oakland.

17      And so I just think that when you consider all of the

18  factors and particularly when you consider Mr. Rothenberg's

19  situation and the need for him to travel back and forth as the

20  case continues here while he's living in Texas, I do think the

21  Rule 21 factors weigh in favor of a transfer.

22          **THE COURT:**  Thank you, Mr. Fakhoury.

23      Mr. Waldinger or Mr. Walsh?

24          **MR. WALDINGER:**  Good morning, Your Honor.

25      The government doesn't have a lot to add to its brief.

1    I -- I think the factors here, if you're just tallying them

2    up, they go to keeping the case here.  The witnesses, yes,

3    they are all over.  But I think a mathematical term is the

4    mode, that the most number of witnesses are in the Bay Area,

5    and really none are in Texas.

6         There's two possible witnesses on the government's bill of

7    particulars that live in the state of Texas or have ties

8    there.  But none of the victims -- I'm not aware of any of

9    Mr. Rothenberg's former employees that live in Texas.  So if

10   the case is transferred, it means every witness is going to

11   have to fly to the Western District of Texas.

12        This is the place that things happened in San Francisco,

13   in the Bay Area and Silicon Valley.  And, you know, the *Testa*

14   case from the Ninth Circuit says that the government's --

15   inconvenience to the government does matter, and it will be an

16   inconvenience to the government.

17        I think Mr. Walsh and I would keep the case.  And our

18   practices and our offices are here, and the government would

19   have to transport all of those witnesses to wherever this case

20   ends up in the Western District of Texas, which may not be

21   Austin.

22        You know, we talked a little bit this morning about docket

23   conditions.  It seems to me based on what the Court is saying

24   that this is a factor that doesn't -- it comes as a wash

25   because I think we can talk about the statistics all day, but

1    I think at the end of the day, if it is about Speedy Trial Act

2    and Mr. Rothenberg's not asking for one, the docket conditions

3    is real something that's not a factor.

4         **THE COURT:**  I would say this:  The *Platt* factors, if

5    you go back all the way back to *Platt*, what that court does is

6    it looks at what the district court did.  And what the

7    district court did is articulate the bases for its decision

8    and it attaches to this consideration of the docket the

9    question of early trial.

10        I don't want to say there's a very strong record about

11   that.  I don't want to -- you know, I don't want to claim the

12   record is stronger.  But I don't see -- I don't see any

13   support for the idea that it's something else.  So -- and I --

14   and I do read *Platt* as indicating that's the basis for that.

15        And on the question of relative expense, there is an

16   Eastern District of California case that has some pretty good

17   language for Mr. Rothenberg.  I don't think that case is

18   right.

19        There's a Ninth Circuit case that has never been overruled

20   or even significantly criticized that says that the court is

21   entitled to consider the expense to the government as well as

22   the expense to the defendant.  So I think I have to do that.

23        **MR. WALDINGER:**  The last two things that I would say,

24   you know, one of the last points that Mr. Fakhoury made was

25   about continuity of counsel and the work having been done, and

1    I suppose that's true.

2        But one of the things that Mr. Fakhoury mentioned in his

3    reply brief was about the law of the case.  And again, I think

4    that there is somewhat the law of the case, and a judge in the

5    Western District of Texas would probably respect a lot of the

6    Court's decisions, but it's a different circuit and a

7    different set of laws.  And I don't think that Mr. Rothenberg

8    would be precluded from revisiting all of this Court's

9    rulings.

10       And so I think there's been lot of efficiencies and work

11   done on the case already, and I think it's very possible it

12   could just be starting over if it gets sent to the Western

13   District of Texas.

14       The last point I want to make is I obviously recognize

15   that Mr. Rothenberg does live in Texas now.  It's going to be

16   an inconvenience for him to come here.  But I think that there

17   are creative ways that the Court can deal with that situation.

18   It's never convenient to be a defendant in a criminal case.

19       And I don't know, the Court may have more experience with

20   this than Mr. Walsh and I, but, you know, in our discussions

21   leading up to the hearing today -- and I apologize for not

22   having done this work before our opposition -- but we

23   understand now that that Pretrial has told us that there are

24   certain things called second chance funds that may or may not

25   available to help pay for Mr. Rothenberg's expenses.

1    Ms. Weiss from the CJA coordinator, suggested that it's

2    possible to get an order from the court to pay for some

3    expenses and as well as for CJA to help pay for some of

4    Mr. Rothenberg's expenses.

5    So I think that there are creative ways.  We haven't

6    explored them all.

7    I think at the end of the day, you know, Mr. Rothenberg,

8    wherever he goes to trial, he's going to be working on that

9    trial full-time.  He's not going to be working.  And I think

10   that in the scheme of things, whether it's in Austin or -- or

11   here, is the -- is negligible with respect to all of the other

12   factors that weigh for keeping the case here in this district.

13   And with that, I'd submit, Your Honor.

14   **THE COURT:**  Thank you, Mr. Waldinger.

15   Mr. Fakhoury, I know all the lawyers always say "Very

16   briefly, Your Honor."  Would you like the last word?  And

17   really very briefly.

18   **MR. FAKHOURY:**  Only thing I'll say, Your Honor, is,

19   is the government cited the Ninth Circuit -- the Ninth Circuit

20   case the government cited *Testa*, was a case where the

21   defendant moved for a transfer eight days before his jury

22   trial was set to begin in a case where there was a

23   co-defendant and severing -- moving it would have required two

24   separate trials of the defendants who would otherwise be tried

25   together.  And the Ninth Circuit found it was not an abuse of

1    discretion for the District Court to deny the transfer.

2         And I just think this case is not that -- is not

3    comparable to that one.  And the request is being made early.

4    The request, you know, we're not going to create more trials

5    than there would be otherwise.  It's just a different, I

6    think, set of facts.  And -- and kind of goes back to the

7    question the Court had about whether I'm asking for a -- a

8    kind of a blank rule that every defendant who moves can get

9    a -- a venue transfer.

10             **THE COURT:**  No, no, no, I don't -- just to correct

11   you quickly.  I don't think you're asking for a blank rule.  I

12   just wonder what the practical consequences --

13             **MR. FAKHOURY:**  Sure.

14             **THE COURT:**  -- of the ruling would be.

15             **MR. FAKHOURY:**  I understand, Your Honor.  And I'm

16   sorry if I mischaracterized that.

17        But I just think that's, again, another example that it's

18   ultimately very fact- and case-specific.  And I think in this

19   case where witnesses are everywhere, that they're, you know,

20   sort of like institutional witnesses in the sense that they

21   are getting their travel costs reimbursed.  You know, these

22   are sophisticated, savvy witnesses.  Not to denigrate other

23   kinds of witnesses, but it's sort of a different -- it's a

24   different ballgame, I think, in this case than it would be in

25   other cases.

 1    So I would ask for the transfer, Your Honor.  Thank you.

 2         **THE COURT:**  Thank you.

 3    I'm going to pause for just a second.  I'm operating by

 4    Zoom as you know.  I need to just type a couple of notes about

 5    the hearing before I do anything else.

 6    So you'll hear me not talk and when I'm done typing, I'll

 7    let you know.  It will just be a moment.

 8              (Pause in the proceedings.)

 9         **THE COURT:**  Okay.  Thank you, gentlemen.

10    So I understand from the government's case management

11    conference statement that it does intend to ask this morning

12    for a trial for the remaining -- a trial date, excuse me, for

13    the remaining count.  And Mr. Fakhoury previewed his response

14    to that request earlier in the course of his argument.

15    So have the parties had any discussions about this?  Or --

16    or will I be hearing the parties' positions more or less for

17    the first time?  Will the parties be hearing each other's

18    positions more or less for the first time, Mr. Waldinger?

19         **MR. WALDINGER:**  Your Honor, I was on vacation when

20    Mr. Walsh and Mr. Fakhoury finished the joint case management

21    statement.  I don't know if they've had more detailed

22    conversations than I had with Mr. Fakhoury.  But I think it

23    sounds like no.  We're -- we'd be asking for an April 2023

24    date.

25    This will be probably be the first that Mr. Fakhoury

```
 1    heard.  But I would say April 23rd later in the month, I think
 2    that was the date, or 24th, excuse me.
 3        And I think it makes sense to try to get it on calendar.
 4    If Mr. Fakhoury needs a little more time than that, I think
 5    that that's fine, but we would like to get it on calendar.
 6            THE COURT:  Mr. Fakhoury, two separate questions.
 7    Isn't it time to set these other counts for trial?  That's the
 8    first question, which is totally unrelated to when it's set.
 9        The question second question is when should it be set?
10            MR. FAKHOURY:  Those are -- let's see if I can handle
11    the two.  I'm not opposed to setting a trial date.  I just
12    don't want it set for April 2023 because I think I'm not going
13    to be ready to go then considering the scope of material.
14        Mr. Waldinger had previously told me that he anticipated
15    the -- the second chunk of the case to take a month.  And
16    given that we still have the first trial is set in October,
17    and that one's going to take a week and I'm preparing for that
18    one, I just don't see how I can prepare for a month-long trial
19    after I finish the first trial --
20            THE COURT:  We've already made progress.
21            MR. FAKHOURY:  Yeah.  We've made a lot of progress.
22            THE COURT:  You said, Judge, I don't -- I don't
23    dispute that it might be time to set this -- these other
24    counts for trial.  I don't like April 24th."  So then the next
25    logical question is what date is more attractive to you?
```

```
 1          MR. FAKHOURY:  I would say the fall of 2023.

 2          THE COURT:  All right.  Why don't you pick a

 3   particular date, just so we have something to put a pin in.

 4          MR. FAKHOURY:  I mean at that point, I'm really just

 5   going to pick a random date.  My suggestion would be

 6   October 16th.  I have -- I have no affinity to that date.  I

 7   just looked at my calendar.  I'm thinking like a year from the

 8   first trial gives me enough time to process all the discovery

 9   and all of the other outstanding materials that need to be

10   reviewed that are not related to the first set of counts set

11   for trial.

12      That also gives, you know, if -- it also allows

13   Mr. Rothenberg a chance to sort of figure out how he is going

14   to come to the district.  So I know there's lot of time

15   between now and then, but at least, you know, I think more

16   time is better given the complexity of the case and the

17   situation with him living in a different state.

18          THE COURT:  Mr. Waldinger, the parties are six months

19   apart.

20          MR. WALDINGER:  Yeah, we are.

21          THE COURT:  And there are four of us.  And we're all

22   pretty smart.  So it seems to me we ought to be able to work

23   this out.  What do you think?

24          MR. WALDINGER:  I think we should.  I think there's a

25   temptation to split the baby.  I don't know if I want a trial
```

1   in the middle of the summer.

2              THE COURT:  I don't usually have that temptation.

3   I'm a baseball arbitration guy.  But in this case I sort of do

4   have that temptation.

5              MR. WALDINGER:  Yeah.

6              THE COURT:  As it happens, July 24th is a Monday.

7              MR. WALDINGER:  Let me look at my calendar real

8   quick.  I don't think I'm scheduled out that far, Your Honor.

9   And obviously scheduling something that far in advance, I mean

10  that's a year out, gives all the parties time to avoid --

11             THE COURT:  It's actually 13 months exactly from

12  today.

13             MR. WALDINGER:  Um-hmm.

14             THE COURT:  And it would be -- now -- yeah.  I don't

15  have -- I don't have a vested interest -- that's the wrong

16  phrase.  I have no particular attachment to any date over any

17  other date.  I don't want the case to go on longer than it

18  needs to.  I also want to make sure that Mr. Fakhoury has

19  enough time to be ready.

20     And honestly, 13 months from today, sort of regardless of

21  what else is going on in everyone's personal or professional

22  life, seems to me to accomplish those goals.

23             MR. WALDINGER:  I'm going to come up with a creative

24  solution and say let's grab that date, Your Honor.  And then

25  Mr. Walsh and I can talk with Mr. Fakhoury, and if there's

1    some wiggle room on either side of it that's better for the

2    three of us and for Mr. Rothenberg, maybe we can come back to

3    the Court with a stipulation if the Court has an opening.

4         But I guess I'm inclined -- we've been asking for a trial

5    date, the Court's giving us one, and we should take it.

6              **THE COURT:**  Mr. Fakhoury, other further words on this

7    topic?

8              **MR. FAKHOURY:**  No, Your Honor.

9              **THE COURT:**  Yeah, I'm going to set that date.

10        Let's go ahead and set a pretrial conference date just so

11   we have one on the books.  Consistent with what Mr. Waldinger

12   just said we can, you know, move that around.  Even if the

13   July 24th date doesn't move, we can move the pretrial

14   conference date around consistent with whatever the needs of

15   the case turn out to be as that date gets closer.

16        Gentlemen, let me suggest that we put that, you know, a

17   little ways ahead of the 24th so that we can -- if we need to

18   set an intervening evidentiary hearing or whatever, we have

19   the bandwidth to do that.

20        So perhaps Friday afternoon, June 30th at 2:00 p.m.

21             **MR. WALDINGER:**  That should work for the government,

22   Your Honor.

23             **THE COURT:**  Mr. Fakhoury?

24             **MR. FAKHOURY:**  That's fine, Your Honor.

25             **THE COURT:**  All right.

1      Gentlemen, thank you very much.  I'm going to take the

2  motion to transfer under submission.

3      Your argument this morning was very useful.

4          **MR. WALDINGER:**  One thing, Your Honor --

5          **THE COURT:**  Oh, we should set another -- I think we

6  should set another status conference in this case before the

7  October trial, don't you?

8          **MR. FAKHOURY:**  I agree.

9          **THE COURT:**  Do we have a pretrial conference date?

10          **MR. FAKHOURY:**  We do have a pretrial conference.  I

11  wonder if it would be useful to just set a status before that,

12  and if we don't need it we can take it off the calendar.

13          **THE COURT:**  Mr. Waldinger?

14          **MR. WALDINGER:**  That's fine, Your Honor.

15      July or August, Mr. Fakhoury?

16          **THE COURT:**  Yeah, I'm not here much of September, but

17  July or August would be fine.  I'm away one week in July.

18  Otherwise I'm around.

19      What about just picking a date almost at random?  What

20  about -- oh, I'm in 2023 still.

21      That's why my calendar is so light.

22      Perhaps the morning of August the 12th at 9:30.

23          **MR. FAKHOURY:**  That's fine with me, Your Honor.

24      And I would request that if -- that hearing be by Zoom

25  just because of Mr. Rothenberg's living situation.

 1          **THE COURT:**  That's a Zoom date, I believe.

 2          **MR. FAKHOURY:**  Okay.  That's fine.  Thank you, Your

 3    Honor.

 4          **MR. WALDINGER:**  Your Honor, I'm hoping to be, if it's

 5    not on fire, in Yosemite that week.  So I would ask for the --

 6    depending on Mr. Walsh's availability that the prior week or

 7    the next week, August 19th.

 8          **THE COURT:**  Well, the 19th is an in-person date, and

 9    also I'm not here.  I'm officiating a wedding for a former law

10    clerk.  But August 26th we could do.

11          **MR. FAKHOURY:**  That's also fine with me, Your Honor.

12          **MR. WALDINGER:**  That works for -- that works for me,

13    Your Honor.

14       Mr. Walsh?

15          **MR. WALSH:**  (Nods head.)

16          **THE COURT:**  All right.  Very good.  Let's set a

17    status conference on August 26th at 9:30 a.m.  That'll be by

18    Zoom.

19          **MR. WALDINGER:**  And, Your Honor, there's a pending

20    motion, but once Your Honor rules on it, time will no longer

21    be excluded.  So I would ask that we exclude time for

22    Mr. Fakhoury's effective preparation.  I don't know if we've

23    done it to the trial date already or not.

24          **THE COURT:**  I would be both surprised and

25    disappointed in myself if we had not already excluded time to

1    the trial date.  But I'm happy to enter a redundant, if it

2    will be redundant, time exclusion order through August 26th on

3    grounds of effective preparation of counsel.  Mr. Fakhoury has

4    already articulated the basis for that.

5        And unless there's an objection by Mr. Fakhoury, I would

6    ask the government to prepare a time exclusion order.

7            **MR. FAKHOURY:**  And there's no objection to that, Your

8    Honor.

9            **THE COURT:**  Very good.

10           **MR. WALDINGER:**  Thank you, Your Honor.

11           **THE COURT:**  All right, gentlemen.

12           **MR. WALDINGER:**  I think that that's it for today.

13           **THE COURT:**  Very good.  I need to get to the rest of

14   my calendar.  Have a good weekend.  Thank you.

15           **MR. WALDINGER:**  Thank you, too, your Honor.

16           **MR. FAKHOURY:**  Thank you, Your Honor.

17           **MR. WALSH:**  Thank you, Your Honor.

18           (Proceedings were concluded at 10:06 A.M.)

19                           --o0o--

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Thursday, October 20, 2022