UNITED STATES DISTRICT COURT

**ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Pretrial Conference** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 1 - 55 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, October 6, 2022 |

<u>**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**</u>

**APPEARANCES VIA ZOOM WEBINAR:**

For Plaintiff:          Stephanie M. Hinds, Esq.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        Assistant United States Attorneys

For DEFENDANT:          Moeel Lah Fakhoury LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612-1427
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

Reported By:            Raynee H. Mercado
                        CSR. No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
1    Thursday, October 6, 2022                         9:33 A.M.

2                        P R O C E E D I N G S

3                          (Zoom Webinar)

4                             --o0o--

5         THE CLERK:  Your Honor, now calling criminal matter

6    20-266, United States v. Michael Brent Rothenberg.

7       If counsel could please state their appearances for the

8    record, starting with the government.

9         MR. WALDINGER:  Good morning, Your Honor.  Kyle

10   Waldinger and Nicholas Walsh on behalf of the United States.

11        THE COURT:  Good morning.

12        MR. FAKHOURY:  And good morning, Your Honor.  Hanni

13   Fakhoury on behalf of Mr. Rothenberg.  He's present appearing

14   by video.  We consent to a video appearance this morning.

15        THE WITNESS:  Good morning.

16        THE COURT:  The Court is going to find that it's in

17   the interest of justice to proceed by video.  We're still in

18   the midst of the COVID pandemic so it's not possible for us to

19   conduct all of our proceedings in person without unnecessarily

20   jeopardizing the health of the parties, counsel, the court,

21   court staff, and the general public.

22      Today is our pretrial conference.  We have several things

23   to go over.  Let me tell you what -- what things I think we

24   need to talk about, and then you can tell me if we need to add

25   to the list.  And then we'll come back and address the things
```

1   on the list.

2       I apologize if there are pauses from time to time in the

3   proceedings.  I have to toggle back and forth on my screen

4   between you all and my notes and the papers and so forth.

5   Sometimes that takes a second.

6       I also apologize for the very poor video quality on my end

7   and the fact that I appear to be sitting in darkness.  I'm not

8   sitting in darkness, but I'm working from a remote location

9   where I was not able to find a space with the right kind of

10  lighting.

11      Motions in limine I think will take the bulk of our time

12  this morning.  My process will be just to tell you what my

13  tentative ruling on each motion is, and then either have the

14  parties argue it if they want to or they can submit to the

15  tentative ruling.

16      The other matters on the list that I got from the pretrial

17  statement and the other documents the parties filed are the

18  United States included in the pretrial conference statement a

19  summary of the case to be read to the jurors or the

20  prospective jurors as the Court wishes.  I just want to find

21  out if the defendant has any objection to the Court reading

22  that.

23      There is -- there are what I would describe as standard

24  requests by the United States regarding defense discovery

25  under Rule 16(b) and witness statements under Rule of Criminal

1    Procedure 26.2.  I'll just ask the parties whether there's

2    anything they want me to do about that or anything that we

3    need to do together today.

4        There was a question about whether to redact documents

5    provided to Silicon Valley Bank by the defendant.

6        There is a question by the United States about when

7    opening statements are likely and when witnesses are likely to

8    begin testifying.

9        There's a question about voir dire or -- there is a

10   question or an assumption from the parties about the use of a

11   jury questionnaire.  I can talk about that.

12       And then there's the -- parties agreed-upon voir dire.

13       Let me just take some low-hanging fruit and take the last

14   three things I just identified right now because they're

15   quick.

16       I also anticipate the jury selection will be completed on

17   October 31.  It will not -- the trial day will not end at 1:30

18   that day.  We will not be done by 1:30 unless fate shines upon

19   us unusually.  But the chances that we will be done that day

20   are 90 percent.

21       I don't have any problem agreeing now that even if we do

22   finish early, opening statements will not be given on

23   October 31st.  So that resolves the government's question

24   about whether they would need to have any witnesses available

25   before November 1st because the answer is clearly no.

1      Regarding a jury questionnaire, I have not solicited from

2  you all case-specific questions to be included in the jury

3  questionnaire, but we do have a generic questionnaire that we

4  send out to all of our jurors in every case now.  I don't even

5  have to ask for it.

6      So you will have those responses.  And I do not myself

7  anticipate asking all that many questions because I don't need

8  to.  I don't need to ask someone where they live or what kind

9  of job they have or whether they're married because we'll know

10  the answers to all of those things.

11      Now, if there are questions that you want me to ask rather

12  than you asking them, you should meet and confer about that,

13  and on the morning of jury selection you can just tell me what

14  those are.  I'm assuming that those would come from the

15  parties agreed-upon voir dire.  I may choose to ask some of

16  them anyway even if you don't want me -- you don't

17  specifically request me to do that.

18      But as a default, my expectation would be we'll be

19  bringing in the jurors 20 at a time.  We're still using all

20  our same COVID protocols in my courtroom.  Everyone's going to

21  be masked up.  Okay.

22      And for each group, I'm going to give a set of opening

23  remarks that are designed to explain the process to them and

24  also to get them more excited about the possibility they could

25  be selected as jurors.

1    I know that sounds corny.  It doesn't work for everybody.

2    But it works for a lot of people.  And immodestly, I'll tell

3    you a story actually.  I can't remember if it was our first or

4    second trial after the resumption of trials following the

5    COVID shutdown, but I asked for hardship requests.

6    And a woman who I'd estimate to be maybe in her forties or

7    thirties got up to the microphone and said -- I said, "Ma'am,

8    what's your hardship request?"  She said, "Well, my mother's

9    in her seventies and she won't take the vaccine and I'm very

10   worried about my mother."  And then she paused and she said,

11   "But I really, really want to be on this jury."  And she

12   started crying.

13   So I don't want my jurors to cry, but I do try to generate

14   a level of civic duty.  So that's a big part of the remarks

15   also.  And after I do those remarks, I probably turn it over

16   to you.

17   In addition to your deciding that there's a question or

18   category of questions from the voir dire that you submitted

19   that you want the Court to ask as opposed to the lawyers, it

20   may also be that there is a response from a juror that the

21   parties think deserves further inquiry and they would be more

22   comfortable if the Court made that inquiry.

23   Now, that's something that you should agree on.  We don't

24   have the time for you to have contested requests for the Court

25   to ask a particular voir dire question.  So you need to meet

1   and confer.

2        But I can imagine, for example, in an employment

3   discrimination case, which this isn't, that a juror might

4   say -- might describe an experience that they had suffering

5   discrimination in the workplace, and it feels like a little

6   bit of a hot potato to the lawyers and they'd really just

7   rather have the Court find out more about it.  So in any

8   situation like that, I'm happy at the ask voir dire.

9        Okay.  So those are the last three items.

10       Why don't we turn to the motions in limine.  Oh, before I

11  do that, let me do what I said I would and ask if the parties

12  have additional things they want to discuss this morning?

13       Mr. Waldinger?

14       **MR. WALDINGER:**  Your Honor, I apologize.  I know you

15  probably said it before, but I just want to confirm.  You want

16  the lawyers there at 8:00 and witnesses ready to go at 8:30 on

17  a typical trial day?

18       **THE COURT:**  Correct.

19       **MR. WALDINGER:**  Okay.  Did you want to bring up jury

20  instructions at all today, or are we going to wait on that?

21       **THE COURT:**  We'll wait.

22       **MR. WALDINGER:**  Okay.

23       **THE COURT:**  Unless there's something you need the

24  Court to resolve in order to make an opening statement.

25  Typically what I do is I just wait a couple days or a few days

1    to see what's happening in the case so that I have some

2    context for what the instructions are.

3         **MR. WALDINGER:**  Right.

4         **THE COURT:**  Unless someone tells me there's a reason

5    I can't wait that long.

6         **MR. WALDINGER:**  There -- there -- on the preliminary

7    instructions, although I think it should have been disputed

8    because some of the preliminary instructions set out the

9    elements which the parties have not agreed to --

10        **THE COURT:**  Yes.

11        **MR. WALDINGER:**  -- I think if we're going to wait on

12   figuring out the substantive instructions, Mr. Walsh and I may

13   need to put our head together with -- our heads together with

14   Mr. Fakhoury to see, I think like jury instruction number 2

15   talks about the charges which set out the elements.  So we may

16   need to -- to amend those if we haven't got the elements

17   nailed down by the time the trial starts.

18        **THE COURT:**  Good point.

19        **MR. WALDINGER:**  And I apologize.  We should have --

20        **THE COURT:**  No, no, no.  This is -- this is something

21   that anybody could have caught or not caught, including me.

22        What is the sensible way of resolving that dispute?  So

23   for example, do you think there's more meeting and conferring

24   to be done?  Or have the parties simply -- they are where they

25   are and they just need some guidance from the Court as to what

1    the elements are?

2          **MR. WALDINGER:**  I guess I would look at the -- at the

3    model instructions again to see how detailed that instruction

4    needs to be when the Court lets the -- the jury know about it.

5    I think it might be okay for it to be more vanilla, but I'd

6    like to look at it.  And I think, you know, I think we should

7    talk with Mr. Fakhoury.  We may be able to resolve this.

8       That's my thought.  I don't know if Mr. Fakhoury or

9    Mr. Walsh have any thoughts on that.

10         **THE COURT:**  Mr. Fakhoury, what do you think?

11         **MR. FAKHOURY:**  Well, I -- we have gone back and forth

12   on the instructions.  We've met and conferred both by email

13   and by telephone about them.  So I'm actually not so sure

14   we'll -- we'll work it out at least in terms of the elements.

15   And perhaps it would be better to just get a ruling from the

16   Court.

17      I was also going to add -- and this is less about the

18   specific preliminary instruction and more about the potential

19   opening statement, which is, you know, one of the disputed

20   instructions is on the false statement charge, and I've asked

21   for a specific unanimity instruction because in my feeling

22   there is one false statement that is alleged in that count,

23   and I feel like that is the statement the government has

24   alleged and must prove.  And I know there is a bit of a

25   disagreement in the briefs about whether that's an example or

1    that is the statement.

2        And I think we should probably have some clarity about

3    that before opening statement just so that either, A, the

4    government has guidance and, B, I have guidance in terms of

5    what I can and can't say about that.  So --

6            **THE COURT:**  So here's -- go ahead, sorry.

7            **MR. FAKHOURY:**  No, that's all I have to say, Your

8    Honor.  Thank you.

9            **THE COURT:**  So I think what I'm hearing from the

10   parties is that they -- what I'm hearing particularly from

11   Mr. Fakhoury is he doesn't think that further negotiation

12   between the parties is going to provide the answer.  And so my

13   suggestion would be that I just take this question under

14   submission, that I try to have an answer to the parties by --

15   let's see -- I just want to bring up my calendar -- yeah, that

16   I try to have an answer to the parties by, say, Wednesday, the

17   19th.

18       I'm starting a trial a week from Monday.  And I'll be in

19   trial for those two weeks leading right up to your trial.  So

20   just in back-to-back trials going on.  But if I can get it --

21   if I can get the instructions out before that, of course I

22   would.  So but we would make the 19th a hard deadline.

23       And what the Court would be providing to the parties, it's

24   not a final set of instructions because that would be

25   impossible if the Court hasn't even heard -- or the jury

1    hasn't even heard the evidence yet, but it would be the

2    Court's -- the instructions the Court intends to give unless

3    the evidence in the case, as it comes in, would require

4    modification.

5        How does that sound?

6            **MR. WALDINGER:**  That would --

7                        (Simultaneous colloquy.)

8            **MR. WALDINGER:**  -- work for the government.

9            **MR. FAKHOURY:**  And that's fine with me, Your Honor.

10   Thank you.

11           **THE COURT:**  Okay.  So let's do that.  And if I had

12   thought through this -- this preliminary instruction question,

13   perhaps I would have been closer to an answer today.  But I'm

14   not.  But that seems like a good solution.

15       Mr. Waldinger, other items on your list?

16           **MR. WALDINGER:**  I don't see anything on the list

17   that's probably not going to be covered in what you've already

18   said that we're going to talk about today, Your Honor.

19           **THE COURT:**  Very good.

20       Mr. Fakhoury, other items for the list?

21           **MR. FAKHOURY:**  I think I'm in the same position as

22   Mr. Waldinger.

23       I did want to ask a question about the questionnaires, the

24   generic one that the clerk's office issues, the online Survey

25   Monkey one.

1          **THE COURT:**  Yes.

2          **MR. FAKHOURY:**  And I guess I was curious, when would

3 those be available to the parties?  Is that like as we're

4 walking into court, or do we get it the Friday before?

5                    (Simultaneous colloquy.)

6          **THE COURT:**  No.  My belief is that you get them

7 either the Friday or perhaps even the Thursday before.

8          **MR. FAKHOURY:**  Okay.

9          **THE COURT:**  And I think -- well, you should -- you

10 can -- you can take to the bank, and perhaps that's not the

11 best aphorism in this particular case, but you can take to the

12 bank that you'll have them by Friday.  So you'll have the

13 weekend to look at them.  But my actual belief is that you're

14 going to get them on Thursday.

15          **MR. FAKHOURY:**  Very good.  Thank you.

16          **THE COURT:**  Thursday before jury selection.

17          **MR. FAKHOURY:**  Is that -- and maybe the Court doesn't

18 know the answer to this.  Is that electronic?  Do I got to go

19 pick them up at the clerk's office?

20          **THE COURT:**  Oh, my goodness, no.  No, no, no.

21          **MR. FAKHOURY:**  Okay.

22          **THE COURT:**  No.  You'll receive a pdf.

23          **MR. FAKHOURY:**  That's what I was hoping for, but I

24 figured I --

25          **THE COURT:**  A pdf in juror number order.

 1          **MR. FAKHOURY:**  Got it.  Thank you, Your Honor.

 2          **THE COURT:**  And we'll all be singing from the same

 3    songbook.  And I'll have my printout of it highlighted up at

 4    the bench with me.  And you'll have that too.

 5        One thing that I will ask you, because I'm in trial, I'm

 6    not going to specially set another conference.  If I wasn't in

 7    trial, I would do that.  But one thing I would like you to do

 8    is to meet and confer with each other about whether there are

 9    jurors who clearly are not going to be good jurors.  And I

10    don't mean that you have to give up your leverage in forcing

11    the other side to exercise a challenge.  I'm not asking you to

12    do that.

13        But it does happen in almost every case that there simply

14    are jurors who so clearly are not going to be able to survive

15    a cause challenge that we might as well just get rid of them

16    today before we start jury selection.

17        If you haven't already done jury selection in COVID, it is

18    extremely tiring, for you and for all the prospective jurors.

19    And so getting rid of the low-hanging fruit makes it possible

20    for all of us and our prospective jurors to have enough energy

21    to have a really productive voir dire.

22        So if you see somebody in that category, I would invite

23    you to tell me when you come in on that Monday morning, and

24    we'll just let people go before they ever reach our courtroom.

25          **MR. WALDINGER:**  Your Honor, on that topic of voir

```
 1    dire, we did get from the clerk's office a copy of the

 2    standard questionnaire that goes out which does have a

 3    question about COVID-19 vaccination status.  And I don't know

 4    whether Your Honor has adopted a practice about excusing

 5    jurors who are not vaccinated or who refuse to say and --

 6            THE COURT:  All of your jurors will be vaccinated.

 7    All of your jurors will be vaccinated.  And I've not, in this

 8    trial, issued an order requiring that everybody in the

 9    courtroom be vaccinated because it's a criminal case and I

10    just want to not to -- I just want to have as few issues as

11    possible.

12        But everybody will be wearing masks.  There will be a

13    high-efficiency air filter sitting next to the witness.  And

14    all of your jurors will be vaccinated.

15        And if anybody objects to anything I just said, this is

16    the time to make that objection.

17            MR. FAKHOURY:  Well, Your Honor, just so the record

18    is clear, I would object to a requirement that all jurors be

19    vaccinated.  I would also object to witnesses wearing masks

20    during their testimony.  And I have to think through if there

21    are other COVID objections I would want to raise, but at a

22    minimum, I would object to vaccination requirement for jurors

23    a -- and a requirement that witnesses wear masks during

24    testimony.

25            THE COURT:  For the -- just so you know, and you can
```

1    incorporate this fact in any future objection you raise, the

2    witnesses wear clear masks.  So they're wearing a piece of

3    clear plastic, and there is a foam band that goes across the

4    bridge of the nose and there's a foam band that goes across

5    the bottom of the chin, but the mouth and -- and the

6    predominant part of the witness's expression are visible to

7    the jury.

8         **MR. FAKHOURY:**  I'm familiar.  I did a trial in front

9    of Judge Gilliam in November 2020, and those were the masks

10   that were used.  And so I'm familiar with them.  And I

11   appreciate the -- the clarification.

12        And, again, I'm just making a record here, Your Honor,

13   that I would -- I would object to that.  I think my preference

14   would be masks -- no mask, even a clear one, for witnesses.

15        And again, just raising as an objection, an objection to a

16   requirement that jurors be vaccinated.  I can put -- I don't

17   know if the Court wants me to just file something just so the

18   record's clear or if the minutes will reflect that I've

19   objected to that, but I just want to put that objection on the

20   record.

21        **THE COURT:**  I think the objection is clear in the

22   record.  I never want anyone to file anything on any topic

23   because I have enough work to do.  I leave it to the lawyers

24   to decide whether they need to file something in order to

25   protect their client's interests.

1    Just so that any appellate court doesn't think that my

2    rulings are not well considered, I am not aware of any

3    evidence that would suggest that by imposing a vaccination

4    requirement on jury service, I would be disadvantaging the

5    defendant in any way.

6    If such evidence were brought to my attention, then I

7    would -- which it hasn't been -- I would ask the question

8    whether the protection of the public health and the protection

9    of the jurors and the protection of the parties and counsel

10   and the Court, whether -- and the protection of an orderly

11   trial, because the Court wants to increase to the greatest

12   extent possible the likelihood that the trial can go from

13   start to finish without interruption of a COVID outbreak,

14   whether all of those interests were outweighed by the

15   defendant's interest in a particular venire.

16   And as I started by saying, I'm not aware of any injury to

17   that venire from this ruling in terms of statistics or

18   anything else.  But I make the ruling for the protection of

19   all those other interests that I just identified.

20   With regard to the question of masking, I have now myself

21   and Ms. Lee, and I have, ourselves, done many jury trials with

22   these masks.  And it is my judgment that the use of clear

23   masks permits the jury to see the witness's expression and

24   demeanor and to judge the witness's credibility and that any

25   diminution in that ability is trivial.

1    So those are my findings.

2          **MR. WALDINGER:**  Your Honor --

3          **THE COURT:**  I would also say I welcome appellate

4    guidance on all of these topics.  So I think if there were

5    clear law, I would be citing it.

6          **MR. FAKHOURY:**  Your Honor, the only thing I'll add,

7    and thus avoiding my need to file a brief, is just the --

8    our -- my specific claim would be it would violate

9    Mr. Rothenberg's right to a jury pool that is a fair

10   reflection of the community because it is, for better, for

11   worse, are people in the community who choose not to be

12   vaccinated.  So it's like not a fair cross-section of the

13   community.

14      I don't need to be heard on that, but I just wanted to --

15   again, so I don't have to file a brief, and the record -- the

16   transcript is clear if and when the case ever goes up on

17   appeal that that's the basis of my request.

18      Thank you, Your Honor.

19          **THE COURT:**  Fair enough.

20      Mr. Waldinger or Mr. Walsh, does either of you want to

21   make any kind of record on this before we move on?

22          **MR. WALDINGER:**  I would.  I'm not trying to give Your

23   Honor more to read, but we have inherited and improved on, I

24   hope, a very helpful brief that my office has filed with the

25   court on findings that -- that we suggest the Court make,

1    particularly with respect to the last point that Mr. Fakhoury

2    made, which I think rings bells in appellate courts when we're

3    talking about excluding people from the jury pool.

4        And so we may finalize that brief and file that later

5    today.  I do think it -- it essentially says what Your Honor

6    said.  If you look at 28 United States Code Section 1866, the

7    court may exclude jurors if it will disrupt the proceedings.

8    There -- and on any other host of reasons.

9        So we'd like to submit that brief, Your Honor, and to

10   perhaps give Your Honor some guidance if you need any.  It's a

11   short brief.  And I think we'll file it either today or

12   tomorrow.

13           **THE COURT:**  Very good.  Consistent with my prior

14   comments, I leave you to your devices.

15       Let's turn to the motions in limine.  A motion -- and I'll

16   start with the government's motions.  It's just my practice in

17   any case over a criminal to start with the plaintiff.

18       The government's motion in limine number one seeks to,

19   quote, preclude Mr. Rothenberg from arguing or introducing

20   evidence suggesting that Silicon Valley Bank and its employees

21   should have been more diligent in their dealings with

22   Mr. Rothenberg or that Mr. Rothenberg schemed to defraud or

23   false statements could only have deceived a negligent,

24   gullible, or incompetent lender.

25       I won't summarize the briefing.  The parties know what

1    that says.

2         The Court's tentative ruling would be that under the

3    *Lindsey* case, Rothenberg may argue or introduce evidence to

4    suggest that pursuant to lending standards generally applied

5    in the industry at the time of his allegedly false statements,

6    such statements would not be material to, that is, capable of

7    influencing, the decision of a lender.

8         But he may not argue or introduce evidence, for example,

9    that SVB's lending practices were faulty, that SVB had

10   previously approved incomplete or false loan applications, or

11   that SVB was negligent with respect to his particular loan

12   application.

13        In other words, industry standards are fair game, specific

14   SVB transactions are not.

15        Does anyone wish to argue the Court's ruling?

16        Mr. Waldinger?

17            **MR. WALDINGER:**  Submitted, Your Honor.  Thank you.

18            **THE COURT:**  Mr. Fakhoury?

19            **MR. FAKHOURY:**  No, Your Honor.  Thank you.

20            **THE COURT:**  The Court will adopt its tentative

21   ruling.

22        The United States motion in limine number two is to

23   permit -- strike that -- is to exclude all fact witnesses from

24   the trial except when testifying with two exceptions.  First,

25   Federal Bureau of Investigation Special Agent Jennifer Barnard

1     and Internal Revenue Service Criminal Investigation Special

2     Agent Anthony -- does he pronounce it Geo [phonetic]?

3             **MR. WALDINGER:**  I believe it's Ghio.

4             **THE COURT:**  Ghio.  Thank you.  I was just in Italy.

5     One would think I could remember that.

6          The motion is not disputed in two respects, but it's

7     disputed in one respect.  The defendant joins the government

8     in moving for an exclusion order under section 615.  And the

9     Court must issue such an order upon request anyway.

10         Also, the -- the defendant does not object to the

11    government's designation of Agent Barnard as its designated

12    representative under Rule 15(b).  The parties' only dispute

13    has to do with Special Agent Ghio.  All the United States has

14    to say on the subject of Agent Ghio is that, quote, it is

15    Agent Ghio that the government expects will testify about some

16    of the bank records and movements of money in this case, close

17    quote.

18         I do not think that is sufficient to meet the government's

19    burden of demonstrating that Agent Ghio is essential within

20    the meaning of Rule of Evidence 615(c).  And so I would deny

21    that part of the government's motion.

22         This order does not bar the United States from describing

23    to Agent Ghio during the trial what happened at the trial for

24    the purpose of asking Agent Ghio to conduct additional

25    investigation relevant to the trial which is a capacity that

1    the government wishes to reserve for itself if the Court

2    otherwise denies its request.

3        Does anyone wish to argue that tentative, Mr. Waldinger?

4            **MR. WALDINGER:**  No, Your Honor.

5            **THE COURT:**  Mr. Fakhoury?

6            **MR. FAKHOURY:**  No, Your Honor.  Thank you.

7            **THE COURT:**  The Court will adopt its tentative

8    ruling.

9        The United States motion in limine number three is to move

10   the Court for an order pursuant to Federal Rule of Evidence

11   section -- excuse me -- Federal Rule of Evidence 104 that

12   certain documents obtained by the United States in the course

13   of its investigation are, A, authentic and, B, admissible as

14   business records.

15       I won't identify the records now.  They're clearly

16   identified in the government's motion.

17       The defendant concedes that the documents are authentic

18   but does not concede that they're admissible.

19       My tentative ruling is really a question which is:  Is

20   there any reason -- and I think the question is directed at

21   Mr. Fakhoury:  Is there any reason the Court could not, in

22   addition to determining that the documents are authentic, also

23   determine that they are business records without admitting

24   them and preserving any objection under Rule 403 or any other

25   objection to admissibility that the defendant wants to raise

 1    when the government seeks admission?

 2         And let me explain my question a little bit.  The

 3    defendant says, for example -- I don't remember the exact

 4    number -- but something like there are 9500 pages, something

 5    like that, that are perhaps described by the exhibits that are

 6    listed in the government's motion.

 7         And Mr. Fakhoury says, well, it might be that there is a

 8    good undue consumption of time or prejudice argument just

 9    given the volume of these documents.

10         That doesn't seem like a terrible objection to me.  But I

11    don't know.  I don't have the exhibits.  And I'm not going to

12    read 9500 pages in order to rule on a motion in limine.

13         So here's what I think is actually going to happen in real

14    time.  The government will select the portions of those

15    records that it wants to give to the jury, and they'll say --

16    if the Court follows the procedure I just identified --

17    everyone will know that they're business records so the Court

18    will not need -- the government will not need to put on a

19    witness to convince anybody that they're business records.

20    They'll just say, "We'd like to move these documents in

21    evidence."  Or the -- said, move these in evidence.

22         And Mr. Fakhoury, at that time, will assert an objection

23    if he has one.  And my guess is you won't have one.

24         Mr. Waldinger?

25             **MR. WALDINGER:**  I think that's fine, Your Honor.

1    We -- we've, you know, provided our exhibit list.  I can work

2    through this again.  We'd rather not have the objection.  I --

3    I understand Your Honor's ruling, and I -- I -- in my opinion

4    it sounds like if we have records that are supported by a

5    business records certification, they're coming in unless the

6    Court sustains an objection under relevance or 403 grounds.

7         **THE COURT:**  That is essentially what I'm saying.

8         Mr. Fakhoury, do you want to be heard?

9         **MR. FAKHOURY:**  Briefly Your Honor.

10        I -- as a general matter, I don't have an issue with that

11   proposal.  Basically the Court can find they're authenticated,

12   there's no custodian necessary, and could find they're

13   business records so they're not barred by the hearsay rule

14   without me waiving any opportunity to raise other objections

15   outside of those two issues.

16        The one caveat to that is something I raised in my

17   pretrial conference statement and something Mr. Waldinger --

18   Waldinger and I and Mr. Walsh and I have discussed, which is

19   there is one particular exhibit, it's Exhibit 97, which

20   involves correspondence involving Merrill Lynch.  And that

21   specific exhibit, I know the Court may -- has not seen it, but

22   the exhibit effectively consists of pages of internal

23   correspondence about Mr. Rothenberg by Merrill Lynch

24   employees.

25        Some of that correspondence, Mr. Rothenberg is the one --

1    it's like emails effectively, and Mr. Rothenberg is

2    communicating with folks over email.

3        However, within the exhibit are also communications

4    between Merrill Lynch employees directly.  And so what I've

5    raised in my pretrial conference statement is notwithstanding

6    the fact that there is some universe of business records,

7    internal correspondence between Merrill Lynch employees would

8    not be a business record.

9        But my understanding from Mr. Waldinger is they will

10   likely pull out the specific communications with

11   Mr. Rothenberg, which I think would resolve my concerns, and

12   that they don't intend to admit the internal correspondence

13   though they may seek to, you know, refresh a witness's

14   recollection.

15       And so I -- you know, without waiving that objection, I

16   think the Court's tentative is fine, and I can raise issues as

17   they come.  But I agree I don't want to -- I'd rather we sort

18   it out ahead of time and not have to waste a lot of time

19   raising objection or sifting through what records should come

20   in or not come in while we have a jury waiting.

21       So I'm sorry that's a long answer, but I hope I have --

22            **THE COURT:**  No, that's fine.

23            **MR. FAKHOURY:**   -- answered the question.

24            **THE COURT:**  For the sake of a clear record, I now

25   find that the documents are authentic and I find that they are

1    business records and therefore not subject to a hearsay

2    objection.

3        The reason that I order counsel to be in court at

4    8:00 a.m., one half hour before the jury comes in, is so we

5    can resolve issues like this.

6        So if what we're down to is a series of pages consisting

7    of Merrill Lynch emails, I'm very confident we'll be able to

8    handle that at the trial after counsel have had an additional

9    opportunity to meet and confer.

10       And so I think that resolves that motion.

11       Mr. Waldinger, is there anything further to be said?

12           **MR. WALDINGER:**  Yeah, I'm confident that this is not

13   going to be an issue at -- at trial, this Exhibit 97.  So I

14   don't think we need to do anything more on this motion.

15           **THE COURT:**  All right.  Mr. Fakhoury, anything

16   further on this?

17           **MR. FAKHOURY:**  No, Your Honor, thank you.

18           **THE COURT:**  Okay.  Very good.

19       Those are all of the government's motions in limine.

20       That brings me to the defendant's motion in limine

21   number one in which it's not clear to me exactly what evidence

22   is sought to be excluded.  The way the defendant describes the

23   requested relief is that he wants to exclude evidence that,

24   quote, prior to obtaining both loans from Silicon Valley Bank,

25   Mr. Rothenberg regularly faced large cash requirements in his

1    personal accounts.

2        And but then in opposition, what the government says is

3    the evidence the United States intends to introduce at trial

4    is simply the tracing of funds.  Put simply, the United States

5    will introduce evidence Rothenberg had personal and business

6    bills and then moved funds around between bank accounts to

7    deceive Silicon Valley Bank into issuing him two loans.

8        As a side note, Mr. Rothenberg, according to the

9    government, used the proceeds of those loans to meet his

10   capital contribution commitment to one of the venture capital

11   funds managed by Mr. Rothenberg's Ventures Management Company.

12       That is not the subject of this -- of this motion.  The

13   subject of the motion, according to the opposition -- excuse

14   me, yeah.  The other evidence mentioned in the government's

15   opposition that is the subject of the motion is that

16   Mr. Rothenberg used the proceeds of the loans to pay his

17   personal and business bills such as American Express.

18       And the point the opposition makes is:  Who cares?  The

19   transactions that are the subject of the indictment have

20   already taken place by the time those bills are paid off.  So

21   what -- and -- and any determination that the jury is going to

22   make will be as to acts or states of mind that will have

23   concluded at the time those bills are paid.  So what relevance

24   does the payment of things like an American Express bill have

25   to the trial?

1    And let me just open it up for argument.  I don't really

2    have a tentative on this.

3        Mr. Waldinger.

4        **MR. WALDINGER:**  The government's concern here, Your

5    Honor, is that there are bank records that are marked as

6    exhibits that are going to show movements of funds, as we've

7    said, from venture capital funds to the management company to

8    Mr. Rothenberg's personal Bank of America account and then to

9    Merrill Lynch.

10       The jury is definitely going to see these Bank of America

11   statements which have -- they have American Express payments

12   on those same statements.  And it's going to be obvious to the

13   jury that Mr. Rothenberg was -- was also paying, at the same

14   time that he's trying to get these loans, large payments to

15   any number of entities including American Express.

16       I looked last night.  United States Exhibit 74 shows some

17   of this movement of money through Mr. Rothenberg's BofA

18   account to his Merrill Lynch account.  On that same statement,

19   there are 11 American Express payments totaling $49,000.

20       And so I think although the cases say that it's not

21   appropriate to allege that somebody had a motive to commit a

22   crime because they are poor, it is, I think, permissible to

23   say that they were facing financial pressure.

24       Then after -- after Mr. Rothenberg obtained the loan from

25   SVB, both loans, one of the loans, the mortgage loan, went to

 1    his Merrill Lynch account.

 2        From there, Mr. Rothenberg sent, I believe it was

 3    approximately $257,000 back to that Bank of America account.

 4    If you look at the tracing, without those funds that

 5    Mr. Rothenberg sent to himself from Merrill Lynch which are

 6    traceable to the SVB --

 7            **THE COURT:**  Mr. Waldinger, I'm appreciating your

 8    argument.  I want to jump in.

 9            **MR. WALDINGER:**  Okay.

10            **THE COURT:**  Is what you're saying that as you

11    perceive the motion, the issue is not how the government is

12    going to characterize the evidence because the government

13    doesn't intend to say anything about the payments that do not

14    assist in proving counts one and two.  It's just that there

15    will be notations on the bank statements and other financial

16    documents that are presented to the jury that will show these

17    other payments.

18            **MR. WALDINGER:**  It will show these other payments,

19    but I think it's -- I mean I think the government can -- can

20    comment on them.  It's what the defendant did with the money.

21    It's what the defendant needed the money for.

22            **THE COURT:**  Um-hmm.

23            **MR. WALDINGER:**  But I -- but setting aside that last

24    point, you're exactly right on the first point which is, like,

25    then I don't know what to do.  If -- if Mr. Fakhoury says that

1    it's prejudicial to show that he made payments to

2    American Express and had to, you know, make 49,000 payments --

3    $49,000 in payments in one month, then I don't know how we

4    hide that from the jury because that's what evidence is going

5    to be.

6              **THE COURT:**  Yes.

7         Mr. Fakhoury?

8              **MR. FAKHOURY:**  Thank you, Your Honor.

9         I guess I would start by saying, you know, this -- it

10   actually kind of speaks to the business records issue, which

11   is, when there's 10,000 pages of business records and it

12   covers a broad swath of time, that prejudice is even greater.

13        So I think that to the extent that there are business

14   records that show immediately after the loan was disbursed in

15   the summer of 2014 that money was moved from one account to

16   another account, that's probably okay.

17        But to have it go out farther and farther and show kind of

18   a regular need for cash payments and then try to link that to

19   the purpose of obtaining the loan I think is where the problem

20   is.

21        So I guess to go to the very first question the Court

22   asked which is what am I trying to exclude, I guess I would

23   say it would be two things.  One would be extensive amounts of

24   business records that are solely designed to show that

25   Mr. Rothenberg had payments of certain amounts of money into

1    the foreseeable future, past the time of the loan, and second

2    to preclude argument from the government that the purpose of

3    obtaining the personal loan or doing the refinance was to make

4    payments on the American Express or other bills.

5        I don't have an issue with the -- the capital contribution

6    piece of it because there's clear evidence in the record and

7    there are statements by Mr. Rothenberg that that's the

8    purpose, and we're not going to quibble with that.

9        But I think it's that second piece of it that is

10   problematic on our end.

11       And, you know -- and maybe it's my fault for not briefing

12   it well, but, you know, I know the -- that we've sort of

13   framed it about evidence of poverty or poor financial

14   condition, and I'm not necessarily saying Mr. Rothenberg is

15   poor or had poor financial condition.

16       I think actually the court cases take a bit of a broader

17   approach to it, which is to say, you know, every fraud case is

18   motivated by money for the most part.  Everybody has an

19   interest in having more money than they would otherwise have.

20   And so to draw motive from the need to pay bills is very

21   dangerous.  And it has to really be tied to some specific bill

22   or transaction or need.

23       And so, again, I think the capital contribution is a good

24   contrast.  I think it's clear that there's evidence that

25   supports that.

1    As to the American Express bills and other things like

2    that, I -- I don't necessarily agree that that connection is

3    there.

4    I would also add part of the issue is in the government's

5    own discovery and in their own 302 reports, there is many

6    references to the fact that there are multiple people

7    associated with RVMC who are making payments on the

8    American Express card.  In other words, even if the card is in

9    Mr. Rothenberg's name, it's not entirely clear who incurred

10   what expense and how Mr. Rothenberg, you know, what -- to what

11   degree did he know who was paying for what.  And it becomes

12   sort of speculative at that point as well.

13   And so I think my view is the government shouldn't be

14   allowed to argue that he had, quote, unquote, large cash

15   requirements.  That's their language, not mine.

16   And I don't think they should be allowed to, you know, get

17   in months' worth of bank statements that solely prove that

18   point or support that point.  If they want to show that, you

19   know, in September of 2014, the proceeds from the refinance

20   went to X account or Y account, okay, I can't quibble with

21   that.

22   But beyond that, I think it's going into that evidence of

23   financial condition more generally.  And the Ninth Circuit's

24   been very clear that we have to be extremely careful with how

25   that kind of evidence gets presented to a jury.

1            **THE COURT:**  All right.

2      Mr. Waldinger, Mr. Fakhoury started by road mapping --

3 road signing his argument to say there are two main

4 objections -- or there are two objections, excuse me, that

5 Mr. Rothenberg would make.  He would object to the -- to

6 extensive amounts of business records that originated

7 following the transfers that are the subject of the

8 indictment.

9      And secondly, he is moving to preclude argument from the

10 government that the purpose of doing the loan or the refinance

11 was to make these later payments to American Express and so

12 forth.

13      I don't need further argument as to the first point.  I'll

14 address that in a second.

15      My question is whether you would want the ability to argue

16 that the purpose of doing the loan or the refinance was to

17 make those payments?

18          **MR. WALDINGER:**  I would, Your Honor.  And I think

19 we're going to have evidence that without the loan -- one of

20 the loans, Mr. Rothenberg would not have been able to cover at

21 least two American Express payments in August of 2014.  And so

22 I think that meets what the Ninth Circuit has said about

23 showing specific and immediate financial need.

24      So I think we would want to argue that based on what the

25 evidence is.

 1        I mean this -- this may be something that -- I know that

 2   Your Honor wants to resolve things before trial, but it could

 3   be something that we can see how the evidence develops and

 4   what the actual exhibit looks like so that Your Honor can see

 5   it rather than talking about it sort of in isolation.

 6        **THE COURT:**  All right.  Does anyone have anything

 7   further to be said on this motion?

 8             **MR. WALDINGER:**  No, Your Honor.  Submitted.

 9             **MR. FAKHOURY:**  No, Your Honor.  Thank you.

10        **THE COURT:**  The first objection is overruled.  I

11   can't -- when the defendant says that he would object to

12   extensive amounts of business records, I can't now determine

13   what an unextensive, if that's a word, amount of business

14   records is.  In other words, I can't now say, well, too much

15   has been introduced on this point.

16        So I'll overrule that objection.

17        I will take under submission today the question of whether

18   the government will have the ability at trial to argue that

19   the purpose of these transactions was to allow Mr. Rothenberg

20   to make, for example, these two American Express payments.

21        It's possible, as Mr. Waldinger has suggested, that the

22   Court's ruling -- ultimate ruling will be that I'm reserving

23   on the question until trial.  But my goal would be to take a

24   harder look at the case authority the parties have cited and

25   see if I can't determine that question in advance.

1    I will say to the government that unless and until I've

2    provided a ruling, you cannot argue to the jury that that was

3    the purpose of these transactions.  But you're welcome to prod

4    me for a ruling as much as you want.

5         **MR. WALDINGER:**  Got it, Your Honor.

6         **THE COURT:**  That's what we'll do on that.

7    I felt there was one other thing I wanted to say.

8    Well, perhaps it will come to me, perhaps it won't.

9    Let's turn next to motion in limine number three by the

10   defendant, which is to exclude evidence about the remaining

11   charges, the severed charges, and the superseding indictment.

12   That motion is not opposed.  It will be granted.

13   That evidence will be excluded unless the defendant opens

14   the door in some way.  And if the government believes the

15   defendant has opened the door, it needs to seek relief from

16   the Court finding that the door has been opened and it needs

17   to seek that relief outside the presence of the jury.

18   Motion in limine number four is to exclude any references

19   to the civil SEC case.  The government does not oppose that

20   motion.  The Court's ruling would be the same.  It applies to

21   both parties, I think, in this instance --

22   Well, all the rulings apply to both parties.  If one party

23   or the other believes the door has been opened such that the

24   Court should relieve the parties of this ruling, then you can

25   seek that relief from the Court outside the presence of the

 1    jury.

 2         Motion in limine number five was very interesting to me.

 3    This is the defendant's motion that the government not be

 4    allowed to refer to Silicon Valley Bank as a victim.  And --

 5         Oh, there's one other point that I wanted to make.  I now

 6    remember what it is.  Regarding motion in limine number two.

 7         I actually take the defendant's point about antipathy.  I

 8    don't know how well grounded or how robust it is.  But I think

 9    as a general matter, without saying how much weight it gets,

10    it is a true fact that most -- I don't know if I can say

11    most -- that at least some jurors would have some -- are less

12    likely to feel empathy for -- I don't know that I would say

13    believe -- are less likely to feel empathy for somebody who is

14    very financially well off.  That doesn't strike me as a

15    controversial point.

16         But I also have to say that if I had to make a conclusion

17    based on the very little I know about Mr. Rothenberg and what

18    the evidence in this case is going to be, they're going to

19    think he's financially well off.

20         And so I just -- I just don't -- even though I concede the

21    possibility, I just didn't give that any weight at all in my

22    ruling because I don't think the fact that, for example, he

23    could pay $40,000, or whatever it is, a month in the debt

24    obligations is going to materially change whatever the jury

25    was going to think about him.

1          So I'm not inviting further argument.  I just wanted to

2     make a further record.

3          **MR. WALDINGER:**  And, Your Honor, if I could

4     interrupt, you -- you did skip over motion in limine

5     number two.  I don't know if you want to come back to that

6     one.  That was the foreclosure process motion.  We went

7     directly from motion in limine number one --

8          **THE COURT:**  Oh, my goodness.

9          **MR. WALDINGER:**   -- to number three.

10          **THE COURT:**  This is just an error in my notes

11     about -- you know, about the titles I gave within the body of

12     my notes.

13          Yes, I did exclude -- I did skip over defendant's motion

14     in limine number two.

15          That motion asked for an order excluding references to

16     SVB's foreclosure of the property.  You really have to read

17     through all the briefs on both sides to understand the

18     parties' positions about this.

19          Nobody -- the government does not object -- well, let me

20     back up.  Mr. Rothenberg is really focused on three exhibits.

21     What the government says is we don't intend to put the

22     foreclosure process in front of the jury.  And Mr. Fakhoury

23     says, well, that's what you say, but on your exhibit list, you

24     have Exhibit 79, Exhibit 80, and Exhibit 81, all of which are

25     County-Recorder-type documents that pertain to this

 1   foreclosure.  To which the government says, well, those are on

 2   our exhibit list, but right now we don't plan on using them,

 3   in so many words.

 4       So I think my tentative would be to say I'm granting the

 5   motion subject to the government making a showing outside the

 6   presence of the jury that somehow these documents have become

 7   relevant.

 8       Does anyone want to be heard?  Mr. Waldinger?

 9            **MR. WALDINGER:**  No.  Submitted, Your Honor.

10            **THE COURT:**  Mr. Fakhoury?

11            **MR. FAKHOURY:**  No, Your Honor.  Thank you.

12            **THE COURT:**  Very good.  Mr. Waldinger, thanks for

13   pointing me in the right direction.

14       That brings us back to motion in limine number five.

15       Mr. Waldinger?

16            **MR. WALDINGER:**  Yes.  I -- as we said in our brief,

17   Your Honor, I don't anticipate that we're going to be

18   referring to Silicon Valley Bank as a victim in the

19   questioning of the witnesses.  It's possible that that word

20   may slip out, but I do -- the important thing for the

21   government, I think, is to be able to make an opening

22   statement that tells the jury what the evidence is going to

23   show and certainly in closing arguments, to be able to use the

24   term "victim."

25       So I don't know that the parties are that far apart.  I

1    don't know that Mr. Fakhoury is objecting to the government's

2    use of the term "victim" in opening or closing.  And I don't

3    anticipate that we're going to be questioning witnesses about

4    it.  But I don't control the witnesses and I don't know what,

5    you know, they may say in response to questions.

6          THE COURT:  Well, I could -- I can't -- of course

7    there's never perfect witness control.  But I could, for

8    example, order that -- if I were to adopt Mr. Waldinger's

9    request today essentially -- order that the government

10   instruct its witnesses not to use the word "victim," that

11   government counsel themselves not use the word, but that

12   Mr. Waldinger be permitted to use that term in opening and

13   closing.

14       So I'm not adopting that as a tentative, but let's put

15   that up as a target for Mr. Fakhoury to shoot at.

16       Mr. Fakhoury, what would be wrong with doing that?

17         MR. FAKHOURY:  Well, as I laid in the -- in the

18   motion in limine, you know, "victim" is sort of like it

19   presupposes -- it's sort of like that's what the jury has to

20   decide, first of all.  And second of all, it's a pretty loaded

21   term, and there are times where it's appropriate to use it

22   and, you know, I understand how that goes.

23       I think in the middle of a jury trial is not the

24   appropriate time to use it.  And I think particularly in this

25   case where there's plenty of other ways to refer to SVB, as

1      the bank, the lender, the mortgagor.

2          There's a million ways to refer to them that is not

3      loaded, that is factual, that is accurate, and it's not

4      prejudicial to Mr. Rothenberg and presupposes that they've,

5      you know, lost millions of dollars on this deal, which is just

6      flatly not correct as a factual matter.

7          And so that would be my basis.  And so I actually would

8      ask that a witness -- the Court instruct the government to

9      instruct its witnesses not to refer to the bank as a victim

10     and that they not use that term in either opening or closing

11     statement.

12         The bank is the subject of the loan.  The lender paid out

13     money it should not have paid out to on the basis of

14     statements that Mr. Rothenberg made or things that

15     Mr. Rothenberg did.  Those are all perfectly acceptable ways

16     for them to make the point and prove their case without using

17     that loaded term.

18             **THE COURT:**  Is the matter submitted?

19             **MR. WALDINGER:**  Submitted, Your Honor.

20             **MR. FAKHOURY:**  Yes, Your Honor.  Submitted.

21             **THE COURT:**  So I am going to order that the

22     government -- the government counsel not use the word in their

23     questioning and that they instruct their witnesses not to use

24     the word.

25         I'm not going to get very excited -- I mean, I'm not

1    shouldn't say that.  We'll see how excited I get if the

2    witness messes up.  But I will issue that order.  And in my

3    experience, government counsel actually do a very good job

4    advising their witnesses of the Court's pretrial ruling.

5        I'll take under submission the question of opening and

6    closing argument.  It's pretty likely I'm going to let the

7    government do this in closing argument just because I really

8    don't see the prejudice.  By that point, the jury has heard

9    all the evidence.

10        They, in their own minds, will have -- will have begun to

11    form an impression as to whether the government has proven its

12    case.  If they feel the government has proven its case,

13    they're going to think SVB was a victim, whether someone uses

14    that word or not.

15        And by the same token, if they feel the government has not

16    proven its case, they are not going to see SVB as a victim

17    because they will not see that Mr. Rothenberg has done

18    anything wrong to them.

19        I also don't -- the word just doesn't excite me as much as

20    it does others.

21        In other words, even putting aside what I just said, I

22    don't know that I see -- that I see the word as being as

23    potentially inflammatory as I might.

24        But there's some case law out there discussing the use of

25    the word.  So let me just take that last question, and that is

```
1    opening statement and closing arguments, under submission.
2         And let me just make sure I've -- I'm keeping track of my
3    own homework.
4         There is -- you need a ruling with regard to the
5    government's motion in limine number one specifically as to
6    the question of whether -- there it is -- whether the
7    government can argue that Mr. Rothenberg would not have been
8    able to make these payments to creditors if he hadn't done the
9    transactions that are subject of the indictment.  And you're
10   waiting for ruling now on this motion in limine about the word
11   "victim."
12        Okay.  That brings us to motion in limine number six.
13   I've already resolved that motion because it's a companion to
14   a government's motion about excluding witnesses.
15        Defendant's motion in limine number seven is that the
16   superseding indictment should not be sent to the jury room.
17   The government does not oppose that motion and so it's
18   granted.
19        So let's come back to the other items on my to-do list
20   that are not motions in limine.
21        United States requests that I read a summary of the case
22   to the jurors and prospective jurors.
23        Mr. Fakhoury, does the defendant object to the reading of
24   that summary?
25             MR. FAKHOURY:  I -- you know, I had emailed with
```

1    Mr. Waldinger last night about it.  I had missed that -- I had

2    missed that they wanted me to comment on that.

3        What I told him was I think generally it's okay.  I think

4    it's a little long.  And what we had proposed was we would

5    kind of work on it and submit a joint statement that would be

6    acceptable.

7        So I think the one they produced is very close to being

8    okay with me.  I want -- I do want a little bit of extra time,

9    and I think we will agree on one.  And we could submit --

10   submit it in writing to the Court if that's okay with the

11   Judge -- with Your Honor.

12           **THE COURT:**  That sounds fine to me.

13       Mr. Waldinger, is that fine?

14           **MR. WALDINGER:**  Yep, that's fine, Your Honor.

15           **THE COURT:**  Great.

16       I would just say this.  In the absence of an agreement,

17   then there will be competing proposals.  And the Court retains

18   its right to reject both proposals and just use the one that

19   was in the pretrial conference statement.  So I will look at

20   all three of those if there's not an agreement, and I'll just

21   choose one.

22       Is there anything further to be said by anyone about the

23   question of Rule 16 reciprocal discovery or witness

24   statements?

25           **MR. WALDINGER:**  I don't think at this time, Your

 1    Honor.  I don't know if there's going to be a defense.  I

 2    trust that we'll get what we need from Mr. Fakhoury at a

 3    reasonable time.  But I do want to preserve the government's

 4    request.

 5             **THE COURT:**  Fair enough.  That's the way I read the

 6    case management statement.

 7        Mr. Fakhoury, I won't ask you to be heard because

 8    Mr. Waldinger's not asking for any relief right now.

 9        That leaves only the question of whether certain

10    Silicon Valley Bank documents should be redacted or not.

11        I am not -- if the question is personal identifying

12    information like Social Security Number, I don't want a

13    document with that information on the Court's evidence display

14    system.  Because Ms. Lee is peerless in her control of that

15    system, but even the best of us can slip.

16        And let's not have -- let's set ourselves up for success

17    and just eliminate the possibility of the gallery or even

18    persons that might be on the court side of the bar for one

19    reason or another from seeing, for example, Mr. Rothenberg's

20    Social Security Number.

21        On the other hand -- and this I guess would be my

22    tentative and I'll ask the parties to respond -- I don't have

23    any objection to the government being able to show witnesses

24    unredacted hard copies and -- well, actually, let me ask this.

25    I'm sort of changing my mind as I go along.

 1      Why does the jury need to see Mr. Rothenberg's Social

 2  Security number?  Why couldn't you just redact it to the last

 3  four digits, for example?  Or why do you need to show it at

 4  all?

 5      I guess I'm sort of at a loss as to why -- what's in it

 6  for the government?  Why are we having a hard time just

 7  figuring this out without the Judge?

 8          MR. WALDINGER:  Well, I think it's a good question,

 9  Your Honor.  It's just my preference to use documents that

10  haven't been changed.  The other thing is although

11  Mr. Fakhoury has now said that identity is not going to be an

12  issue, I don't know that for sure.  To the extent that that

13  kind of identity information, you know, helps to show identity

14  of the person who -- who --

15          THE COURT:  Let me -- I need to interrupt you.

16      If -- if identity -- if identity is not the subject of a

17  stipulation, the government is entitled to use every means at

18  its disposal to prove identity.  And the Court will then adopt

19  the government's alternative proposal so that there are

20  unredacted copies of the documents in evidence.

21      And, for example, the government could ask -- well, I

22  won't say -- I won't start doing questions people can do at

23  trial.

24      Anyway, at that point, I begin to see some relevance.  So

25  perhaps in a moment Mr. Fakhoury will shed some light on that.

```
 1          But let's say that identity is not at issue.  Then what
 2   relevance would it have to show Mr. Rothenberg's Social
 3   Security number to anybody, including a juror?
 4          And let me also tell the parties.  I would say 70 percent
 5   of trials over which I preside have some redacted documents.
 6   And I just tell the jury:  You'll see that there are white
 7   spaces or black bars -- I think white spaces work better, by
 8   the way.  But, anyway, you'll see there are white spaces or
 9   blackout sections of these documents, and you may wonder
10   what's -- what used to be there or what's underneath the
11   blackout.
12          And the answer is it doesn't matter.  It's totally
13   irrelevant.  You have enough evidence in front of you -- you
14   have enough things to think about without a lot of irrelevant
15   information.
16          And sometimes it's irrelevant.  Sometimes it would be a
17   little bit confusing because it just makes the thing more
18   complicated than it has to be.  Most of my trials have
19   redacted documents so don't pay it any mind.
20          That always seems to resolve it satisfactorily.  If what
21   was being redacted here was personal identifying information,
22   I think I would just tell the jurors that.  That would
23   actually make them feel better about the redactions.
24          I would just say:  You'll see that some information has
25   been redacted.  As you all know, there's a lot of personal
```

1    information that gets exchanged when you're dealing with

2    financial institutions, and that's not relevant to this trial

3    so we took it out.

4        So I'm -- I understand that you have a personal preference

5    based on your historical practice, Mr. Waldinger, but if I

6    were to give the jury that instruction, I don't know -- I

7    don't know what the purpose of unredacting would be.

8            MR. WALDINGER:  Setting aside the identity issue,

9    given what Your Honor -- the talk that you're going to give to

10   the jurors, I think that that's probably fine, Your Honor.

11       I don't -- I'm not on the fence, but I don't have a strong

12   preference.  So I -- I will bend to your will on this one.

13       But I do -- but I am concerned about the identity issue

14   because I don't know what the defense is going to be.

15           THE COURT:  Mr. Fakhoury, will the defendant be

16   stipulating to identity in this case?

17           MR. FAKHOURY:  We're not -- we've declined to enter

18   into any stipulations.  With that being said, this is not

19   going to be an identity case.  I don't -- there's -- you know,

20   I have to make good-faith defenses, and that's not a

21   good-faith defense.  So I don't plan to go into that.  And --

22           THE COURT:  I --

23           MR. FAKHOURY:  -- I don't think it will be an issue,

24   and I don't think -- and I think the Court's tentative is a

25   hundred percent correct.

1        And I'll add two things real quick.

2        One is some of the exhibits that have been marked and

3    produced by the government are already redacted with that

4    information removed.

5        And second, I think you're exactly right that jurors will

6    absolutely understand why a Social Security Number and date of

7    birth are redacted.  And that the actual rules of criminal

8    procedure require documents -- you know, publicly filed

9    documents on PACER have to be redacted.  And every time I file

10   something, I get -- I have to check that little check box that

11   I've removed it.  So I don't see why we would treat this

12   differently.

13        And I have nothing else to add beyond that.

14        **THE COURT:**  Yeah.  Well, I am -- I tell my law clerks

15   and my externs, you know, you could develop a reputation for

16   credibility with the court if you appear in front of the same

17   judge enough.  And really, you find out whether it helps you

18   at the margin.  Because for the most part, the Court is

19   deciding motions and other things based on the factual record

20   and decisions by other courts and things of that nature.

21        But every now and then, it's just the credibility of the

22   lawyer is enough.  And I'm -- Mr. Fakhoury hasn't promised me

23   anything because he's not going to enter into any

24   stipulations, but I'm going to go ahead and ask that

25   Mr. Rothenberg's personal identifying information be redacted

1   from any documents that are provided to the jury.

2       I will assume that the parties are going to be able to

3   resolve between themselves what I mean by personal identifying

4   information.  I don't have the documents in front of me.

5       If there are any disputes about, the parties should raise

6   those disputes with me not later than the beginning of opening

7   statement.

8       And I probably will say to the jury what I just said

9   unprompted, but if I fail to do that, I'm happy to be

10  prompted.

11      More to be said on that subject?  Mr. Waldinger?

12          **MR. WALDINGER:**  No, Your Honor.  Thank you.

13          **THE COURT:**  Mr. Fakhoury?

14          **MR. FAKHOURY:**  No, Your Honor.  Thank you.

15          **THE COURT:**  All right.  That's all I had on my list.

16  Gentlemen, anything on your end?  Mr. Waldinger?

17          **MR. WALDINGER:**  I don't believe so, Your Honor.

18          **THE COURT:**  Mr. Fakhoury?

19          **MR. FAKHOURY:**  I think we covered everything, Your

20  Honor.

21          **THE COURT:**  Mr. Waldinger --

22          **MR. FAKHOURY:**  Oh, actually -- I'm sorry to

23  interrupt.  And the Court did say it was going to issue the

24  preliminary jury instruction by the 19th.

25          **THE COURT:**  I did say that.

1          **MR. FAKHOURY:**  Okay.  That was the only other thing

2     was regarding the specific unanimity, but that will be dealt

3     with in the instructions.

4          So, no, I have nothing further.  Thank you.

5          **THE COURT:**  Okay.

6          **MR. WALDINGER:**  I would raise one issue, Your Honor.

7          Since we filed our motions in limine, the government's

8     received, you know, additional records certifications,

9     business record certifications that weren't listed out there.

10    Again, I think I understand Your Honor's ruling even though

11    those were not part of the exact motion.

12         The other thing that we received is Mr. Fakhoury said

13    there won't be any stipulations in this case.  One of the

14    things the government has to prove or may have to prove is

15    that Silicon Valley Bank was insured by the FDIC.

16         We have recently obtained record certifications from the

17    FDIC on that issue.  I'm hoping not to have to call someone

18    from the FDIC, but that may be something that I bring up with

19    the Court at one of our 8:00 a.m. appearances.  I think that

20    certification can come in on practically any day of the trial.

21    And so -- but I may talk with Mr. Fakhoury about that and

22    raise that at one of our pretrial meetings before court begins

23    someday.

24         **THE COURT:**  Well, I would say two things then.

25         First, I'm optimistic the Court will not need to revisit

1  this issue -- or visit it, for that matter.

2      Number 2, the government needs to prepare, you know, hope

3  for the best and prepare for the worst.  If there's something

4  you need to prove, you need to call somebody from the local

5  FDIC office or whatever it is you need to do to prove that

6  fact.  It's -- it sounds boring, honestly.  But Mr. Fakhoury

7  is not under any obligation to help you prove a boring fact.

8      So if there are records that are not reasonably subject to

9  a hearsay or other objection, and the only question is whether

10  the Court would require you to provide a sponsoring witness

11  before admitting them, assuming that the proper certifications

12  were provided, well, perhaps that's the way it -- it gets

13  resolved.

14      But I actually have a feeling that between you and

15  Mr. Walsh and Mr. Fakhoury, you'll figure something out.

16      **MR. WALDINGER:**  Yep, I am too, Your Honor.  I just

17  wanted to give you the heads-up on that one, as you said,

18  boring issue but yet important.  I don't want to be the

19  attorney who has a case reversed for not proving FDIC status.

20      **THE COURT:**  Nor do I wish to be the judge who has a

21  case reversed for that reason.  So now we have something in

22  common.  But you're all smart, you'll figure something out.

23      Good.  Anything else?

24      **MR. WALDINGER:**  I think that's it.  I don't --

25  Mr. Walsh, do you have anything else on your list?

1          **MR. WALSH:**  Good morning, Your Honor.

2          One thing I have noticed with every trial I've ever done

3     is that each judge has a very certain way in which they go

4     about picking a jury.  And I'm just wondering if Your Honor

5     might just give us a thumbnail sketch of Your Honor's

6     particular practice.

7          I know you've already indicated that 20 jurors will come

8     in at a time and you'll give a speech and -- and --

9          **THE COURT:**  Yes.

10         **MR. WALSH:**  -- from there, but I'm not sure what

11    happens next in Your Honor's particular practice.

12         **THE COURT:**  Sure.  Let me address that.

13         My jury selection practice has changed slightly with

14    COVID.  Because instead of having a big room full of people

15    and then being able to put 12 of them in the jury box and six

16    of them in front, which is commonly referred to as a six-pack

17    method of jury selection, I don't have a big room full of

18    people.  I have 20 people or fewer.

19         Our no-show rate has gone way up in COVID.  So we have

20    people who respond to the summons, they complete the

21    questionnaire, and they just don't come to the courthouse.

22         As a consequence of that, we sometimes have groups that

23    are smaller than 20 because the divisions into groups take

24    place before people show up.  And sometimes we backfill and

25    sometimes we don't.

1          Given that, the most number of people that I have at one
2     time of -- excuse me -- of prospective jurors is 20.  Often, I
3     have less.  So essentially with each group, I have a six-pack,
4     and I don't need to worry about refilling and all that.
5     They're just -- there they are.
6          Now, I'm still -- I have tried other methods.  But I
7     usually revert to we fill up the jury box, we -- I always have
8     to go back and look at the rule about the number of
9     alternates, so I'll do that.  And we take hardship requests --
10    no, that's not right.
11         Hardship -- I know this sounds odd, but the order of
12    hardship requests and peremptories -- no, that's not right.
13         Sorry, I'm thinking about too many things at once.
14         At some point, we'll do hardships.  We'll do challenges
15    for cause.  We will fill in the jury box from the jurors who
16    are remaining in the room after a challenge for cause has been
17    granted.
18         The last thing we'll do is peremptories.
19         The one thing I've gone back and forth about is when do
20    you have to exercise those challenges.  Ms. Lee might need to
21    help me out in a second.
22         But, for example, on the question of hardships, one thing
23    I discovered is I got too worried so I don't have everybody at
24    once.  I have groups of 20 coming in.  So I have to ask group
25    number one about their hardship requests before I have any

1    idea of what group number two is going to be like.

2         And in past trials, I got worried that I wasn't going to

3    have enough jurors, and so I denied one or two hardship

4    requests that in any other trial I would have granted.  And I

5    felt terrible about it.  Because these are people -- I don't

6    remember the particular circumstances, but I'm confident that

7    I know -- and actually I can picture the juror.  I took one

8    juror away from a long-planned family trip.  And I empaneled

9    another juror for whom it was something of a financial

10   hardship.

11        So as we're -- I'm still thinking about this.  But as

12   we're picking a jury in your trial, I'm trying to figure out

13   how can I wait until later in the process to deal with

14   hardships.  If I'm going to do that, I need to think about

15   what is the order of peremptories.

16        I think challenges for cause we have to deal with in the

17   moment because the juror is sitting right there, the other

18   side makes a challenge for cause.  It may be that there's some

19   follow-up question I want to ask or -- it's very rare, but

20   maybe I want to give the other side the chance to rehabilitate

21   a juror.  I don't know.  I don't want to resolve challenges

22   for cause with the jurors not sitting there.

23        So I apologize for this long-winded, digressive, and

24   unhelpful answer.  But based on my experience the last couple

25   trials, it's something that I'm still thinking about.  I'll be

 1    much clearer about it when you come in the door.  There's not
 2    going to be any mystery.
 3        But I'd like to talk to my colleagues because I think my
 4    process could use some improvement -- my COVID process could
 5    use some improvement.
 6        Did that make any sense?
 7            **MR. WALSH:**  I followed, Your Honor.  And I share all
 8    of those concerns.  It's the -- the process is always tricky
 9    and that's why I asked the question because it -- nuances make
10    a difference, as Your Honor knows.
11            **THE COURT:**  Yeah.
12            **MR. WALSH:**  So.
13            **THE COURT:**  And I -- I don't begrudge lawyers being
14    strategic about jury selection.  I assume they're going to be
15    strategic.  I think that's part of the process.
16        And being strategic about jury selection entails having a
17    very clear understanding about the order in which those three
18    things I just said are decided.  And also how much you know
19    about who is going to be put in place of any vacancy that's
20    created by the exercise of a challenge.
21        Since my very first trial in the state court 20 years ago,
22    I've always given the lawyers every piece of information I
23    have about the jurors.  So even if there are no
24    questionnaires, I give the lawyers the random list.  I don't
25    want anybody to exercise a blind peremptory.

1        So I mean I can make -- regardless of what I do, I can

2    make you that promise.  All of you will know exactly who's

3    going into a slot.  If I -- if I would know, you will know.

4        But beyond that, as I said, I just -- I'm not satisfied

5    that I -- that I did it as well as it could be done, and I

6    just need to think about that a little more.

7              **MR. WALSH:**  Thank you, Your Honor.

8              **THE COURT:**  Other issues?  No?

9              **MR. WALDINGER:**  Not from me, Your Honor.

10             **THE COURT:**  Okay.  Well, gentlemen, I look forward to

11   seeing you in two and a half weeks.  Thank you.

12             **THE CLERK:**  Thank you, Judge.

13             **MR. WALDINGER:**  Very good, Your Honor.

14             **MR. FAKHOURY:**  Thank you, Your Honor.

15             **MR. WALSH:**  Thank you, Your Honor.

16             (Proceedings were concluded at 10:51 A.M.)

17                           --o0o--

18

19

20

21

22

23

24

25

1

2

3          **CERTIFICATE OF REPORTER**

4

5              I certify that the foregoing is a correct transcript

6      from the record of proceedings in the above-entitled matter.

7      I further certify that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in which this

9      hearing was taken, and further that I am not financially nor

10     otherwise interested in the outcome of the action.

11

12     _____

13             Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14                     Thursday, October 20, 2022

15

16

17

18

19

20

21

22

23

24

25