UNITED STATES DISTRICT COURT         **ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 1** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| Michael Brent Rothenberg, | ) | Pages 1 - 226 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, October 31, 2022 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:           STEPHANIE M. HINDS, ESQ.
                         United States Attorney
                         1301 Clay Street, Suite 340S
                         Oakland, California  94612
                   BY:   KYLE F. WALDINGER,
                         NICHOLAS J. WALSH,
                         ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:           Moeel Lah Fakhoury LLP
                         1300 Clay Street, Suite 600
                         Oakland, California  94612-1427
                   BY:   HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:             Raynee H. Mercado
                         CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
 1   Monday, October 31, 2022                           8:27 A.M.
 2                      P R O C E E D I N G S
 3                          --o0o--
 4       (The following proceedings were heard out of the presence
 5   of the jury venire:)
 6            THE COURT:  Could counsel state their appearances,
 7   please.
 8            MR. WALDINGER:  Good morning, Your Honor.  Kyle
 9   Waldinger and Nicholas Walsh for the United States.
10            MR. WALSH:  Good morning, Your Honor.
11            MR. FAKHOURY:  Good morning.  Hanni Fakhoury on
12   behalf of Mr. Rothenberg.  He's present.
13       And, Your Honor, also with me at counsel table is
14   Nathaniel Torres, who is a paralegal helping me with the case.
15            THE COURT:  Terrific.  Good morning.
16       I understand that FBI Agent Jennifer Barnard and paralegal
17   Beth Margen are both here.
18       Did I say those names correctly?
19            MR. WALDINGER:  I think it's Margin [phonetic]?
20            THE COURT:  Margin [phonetic].
21            MR. WALDINGER:  Beth Margen.
22            THE COURT:  Very good.  Good morning.
23       One of my term law clerks, Andy DeGuglielmo, is here.
24   Mr. DeGuglielmo graduated from Yale undergrad.  He graduated
25   from the Yale Law School very highly positioned.  He then
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    clerked for the United States Court of Appeals Judge Willie

2    Fletcher.  Then for reasons that are completely mysterious to

3    me, he came here.  And you'll see that he goes in and out of

4    the courtroom from time to time.

5              **MR. WALDINGER:**  Well, the District Court --

6              **THE COURT:**  There may be other members of my chambers

7    staff who come in and out.  And if they do, I'll introduce

8    them also.

9         Sorry, Mr. Waldinger.

10             **MR. WALDINGER:**  Sorry.  I was going to say the

11   District Court is where you really learn how things are done,

12   Your Honor, and that's a good reason to clerk in the District

13   Court, I think.

14             **THE COURT:**  I think that's true.

15        So I wanted to talk a little bit about time estimate.  I'm

16   sorry for springing on the parties last night this news about

17   my schedule next week.  And I know that in a criminal trial

18   there's always some mystery about the length of the trial, or

19   there often is.

20        Mr. Waldinger, how long do you expect the presentation of

21   the government's case to take?

22             **MR. WALDINGER:**  We still would say six days not

23   counting the day for jury selection.

24        So that -- that's three days this week, two days next week

25   and then one day the following week.  The issue is with --

```
 1    with a shorter week, we may have to extend that a little bit

 2    just with logistics.

 3         So that's what -- I would say the outside for the

 4    government's case would be -- I think that's Tuesday, the 15th

 5    for the government's case.

 6              THE COURT:  Okay.

 7              MR. WALDINGER:  But hopefully -- hopefully earlier

 8    than that, Your Honor.  We understand we're trying to give the

 9    jury an outside estimate.  We don't know, and Mr. Fakhoury

10    doesn't have to say whether there's going to be a defense

11    case.

12         Your Honor's order asked about deliberations, and so I

13    think deliberations could -- would start no later than the

14    17th, perhaps earlier than that.

15              THE COURT:  The 17th is a Thursday?

16              MR. WALDINGER:  Correct.

17              THE COURT:  So the question is what to tell the jury.

18    Is that following week Thanksgiving week?

19              MR. WALDINGER:  I think it might -- yes, it is.

20              THE COURT:  Okay.

21         Mr. Fakhoury, what information, if any, can you provide

22    the Court at this point?

23              MR. FAKHOURY:  Your Honor, I -- I would anticipate

24    the defense case will not prolong things.  And what I mean by

25    that is I think we will be ready to move into closings pretty
```

1    shortly once the government rests.

2        So in other words, if the Court is looking for an estimate

3    of how much time the defense case would take, I can say it's

4    not going to take much time at all.

5        In terms of the schedule more generally, my only

6    concern -- I have two concerns.  One is obviously just making

7    sure we give the jury a clear estimate.  And I worry that if

8    we've told them two weeks and it becomes three weeks,

9    particularly around the Thanksgiving holiday -- I know we're

10   not going into the week of Thanksgiving, but I'm just a little

11   worried about what availability will look like.

12       I also have some concerns -- Mr. Rothenberg's family from

13   Texas is going to be flying in and will be attending the trial

14   starting tomorrow.  And it throws a little bit of a monkey

15   wrench in their plans.  And I understand that that happens.

16            **THE COURT:**  Let me just tell you this right now.

17   That might go on the list of the Court's concerns, but it's

18   not going to be very high up.

19            **MR. FAKHOURY:**  Understood, Your Honor.

20       And so beyond that, in terms of how the Court wants to

21   handle the schedule, I'm obviously -- whatever the Court wants

22   is fine.

23       I had -- I had suggested to Mr. Waldinger over email that

24   perhaps, you know, maybe there's a way to add that time in the

25   week, either extending the day out an hour, maybe we're not

1    dark on a Friday.  I understand the Court has other things on

2    the calendar so that might not be feasible, but I wanted to at

3    least propose that.

4         And then beyond that, Your Honor, I don't have much else

5    to add beyond that.  Thank you.

6              **THE COURT:**  Thanks.

7         We could -- I do typically tell the jury that if they're

8    in deliberation, that's something they can do on a Friday

9    because it doesn't require the use of the courtroom.

10        The only question -- the question on my mind is what do I

11   tell them, if anything, about Thanksgiving week.  I'm still in

12   the process of booting up Judge White's computer so that I can

13   have a calendar in front of me.

14        But I don't want to be in a situation where I've not told

15   the jury that the case might go into Thanksgiving week or made

16   plans for that, and then that happens and then we lose -- you

17   know, and then we don't have 12 jurors.  I don't want that.

18             **MR. WALDINGER:**  Right.

19        And I think it depends on how long deliberations would

20   take.  If they were many days, then it would probably or

21   possibly go into Thanksgiving week.

22             **THE COURT:**  Yes.  I think that's not unlikely.

23             (Court and Clerk confer off-the-record.)

24             **THE COURT:**  Well, it's hard to know what to tell the

25   jurors about worst case because it really depends on the

1    length of deliberations.  I'm tempted to say the worst case is

2    the Tuesday prior to Thanksgiving.

3        If I say that, then we're really setting up a situation

4    where if, for some reason, they haven't reached a verdict by

5    that time, you've almost promised them a mistrial.

6        And maybe that's okay based on the estimates that we've

7    heard.  Maybe that's an amount of time that is right for that,

8    given the length of the evidence, you know, the amount of time

9    they will have spent listening to evidence and the amount of

10   time they will have spent deliberating.

11       It just means our hardships will go up, but I think we

12   have enough jurors so that's probably okay.  So unless anyone

13   wants to say anything further about that, that's what I'll

14   tell them.

15            MR. WALDINGER:  I think that might be wise, Your

16   Honor, with -- to tell them that that's the outside estimate.

17   Could be a week off, the way things go.

18            THE COURT:  I beg your pardon?

19            MR. WALDINGER:  I mean that could be a week -- that

20   could be a week of padding, but I think it's --

21            THE COURT:  Yes.

22            MR. WALDINGER:  -- it's fair to give them that

23   padding.

24            THE COURT:  I've only blown an estimate a couple

25   times in 20 years.  And as a result, I haven't had a lot of

1    mistrials.  So I'd rather have padding that I don't need than

2    the reverse.  So let's plan on doing that.

3        Any last thoughts on that?

4            **MR. WALDINGER:**  No, Your Honor.

5            **MR. FAKHOURY:**  No, Your Honor.

6            **THE COURT:**  Okay.  I need obviously to summarize the

7    case for the jurors so they have some idea during jury

8    selection of what it is they're here to do.

9        I think I'm just going to read them Joint Proposed Revised

10   Jury Instruction Number 2 and leave it at that unless anybody

11   has any comment about that.

12       And those are all my questions.

13       Do counsel have anything for me?

14           **MR. FAKHOURY:**  No, Your Honor, thank you.

15       Revised number 2, that was the one that was submitted --

16           **THE COURT:**  The government filed that on

17   October 28th.

18           **MR. FAKHOURY:**  Yes, that's fine.

19           **MR. WALDINGER:**  We did raise an issue last week,

20   Speedy Trial.  The Speedy Trial exclusion goes until today.

21   And the government proposed that it would be appropriate for

22   the Court to make a finding of excludable time for the rest of

23   the case between now and July 24th of 2023, and I believe

24   Mr. Fakhoury needed some time to think about that and talk

25   about that with his client.

1          **MR. FAKHOURY:**  I have no objection to that, Your

2     Honor.

3          **THE COURT:**  The Court will find that time until the

4     next trial date is excludable for the effective preparation of

5     counsel.  The trial date the Court set was closer in time than

6     the one requested by the defendant.  From that it's reasonable

7     for the Court to infer that defense counsel needs that much

8     time in order to prepare for trial.

9          As we just heard, there's no objection.

10         Let me just ask the government to prepare a time exclusion

11     order, please.

12         **MR. WALDINGER:**  We'll do that, Your Honor.

13         With respect to jury selection, Your Honor, we just want

14     to confirm that we're -- are we picking two alternates?

15         **THE COURT:**  Yes.

16         **MR. WALDINGER:**  And so that would mean 11

17     peremptories for the defense and seven peremptories for the

18     government?

19         **THE COURT:**  Yes.

20         **MR. WALDINGER:**  And finally, we raised an issue -- a

21     Rule 609 issue last week.  We just want to inform the Court

22     we've met and conferred with Mr. Fakhoury and that I think

23     we'll have to just file a motion and it may be able to be

24     resolved on the papers.  It may not be common issue with

25     respect to a witness's prior conviction.  We plan to file that

1    later today under seal.

2          THE COURT:  Okay.

3          MR. WALDINGER:  Mr. Walsh, anything else?

4      I think that's it for the government, Your Honor.

5          THE COURT:  Great.

6      Mr. Fakhoury.

7          MR. FAKHOURY:  I have nothing to add, Your Honor.

8    Thank you.

9          THE COURT:  Good.

10      Well, not everybody gets to win a trial.  Sometimes both

11    sides lose.  I love trials.  So before we start, I just wanted

12    to say congratulations, you got a trial.  We don't have enough

13    trials in the federal court.  And I hope this turns out to be

14    a good place for both of you to try a case.

15      If there's anything you can both agree on that you think

16    we should be doing differently, just let me know.

17      Would the parties and -- and by the way, when I say,

18    "Would you stipulate to X?" I just am -- I'm just asking you a

19    question, and if you don't want to stipulate to X, then don't

20    stipulate.

21      Would the parties stipulate -- and I don't remember if I

22    raised this before -- that we can conduct sidebars outside the

23    presence of the court reporter, and then later in the

24    proceedings at a time convenient to you, make a record of what

25    occurred at sidebar?

1    **MR. WALDINGER:**  That's fine with the government, Your

2    Honor.

3            **MR. FAKHOURY:**  That's fine with me as well, Your

4    Honor.

5            **THE COURT:**  Very good.  That will be the Court's

6    order.  Those opportunities will arise at each break and also

7    at the end of the day.

8        That one agreement by you is probably the single thing

9    that will make this trial go more smoothly from the jury's

10    perspective.  So that's great.

11        I'm just going to sit here and continue to attempt to get

12    this computer to work.  But we can be off the record for now

13    until the jurors come in.

14        Thank you.

15            **MR. WALDINGER:**  Thank you, Your Honor.

16            **THE CLERK:**  Court is in recess.

17        (Recess taken at 8:40 A.M.; proceedings resumed at 9:04

18    A.M.)

19        (The following proceedings were heard in the presence of

20    the jury venire:)

21            **THE COURT:**  Good morning.

22            **JURORS:**  Good morning.

23            **THE COURT:**  That was so weak.  Let's try again.  I

24    know we have masks on.

25        Good morning.

1          **JURORS:**  Good morning, Your Honor.

2          **THE COURT:**  Welcome to United States District Court

3    for the Northern District of California.  You're in the

4    federal court now.

5        My name is Judge Jon Tigar, spelled with an A, but you say

6    it like the animal.  That's what they stuck me with.

7        I want to start by thanking all of you for doing your

8    civic duty and responding to the summons and driving to

9    Oakland and appearing in court today.

10       I just have a few things I want to say before we get going

11   with the actual jury selection.

12       I want to start by saying I hope you understand how

13   important you are, you, to what we're doing here.

14       Today and over the next couple weeks, you have the

15   opportunity to be judges.  I say that because you, or a group

16   of you, is going to make the decision in this case.  Not the

17   parties, not their lawyers, not me.  That's not my job in a

18   jury trial.  I'm not the decision-maker.

19       I'll instruct you on the law.  I'll rule on objections if

20   the lawyers make objections and that kind of thing.  But I

21   don't get to deliberate to reach a verdict.  I don't even get

22   to go in the jury deliberation room.  You will do that.

23       So today you are the most important people in the

24   courtroom and in the lives of the people seated at counsel

25   table.

1    I love being a federal judge.  Before that I loved being a

2    state judge.  I work for you.  I don't have clients.  I work

3    for you.  I work for my country.

4    We're all very lucky to live in America and enjoy the

5    freedoms and privileges that we have.  And America doesn't ask

6    that much of us in return when you think about it.  There are

7    a lot of countries have a compulsory draft.  Everybody of

8    draft age has to go serve in the military for some period of

9    time.  There are countries that have compulsory national

10   service.  It's not military, but it's the same thing.  You get

11   to be a certain age, you have to give up some period of your

12   life and do whatever it is the government wants you to do.

13   We don't have all that.  But we do have jury duty.  We do

14   ask that of our citizens.

15   And the reason is because we also have the right to a jury

16   trial, and you just can't have the one without the other.

17   It's kind of like why people donate blood.  You go to the

18   hospital, they've got blood sitting there waiting for you

19   because somebody else donated blood.  If everybody stopped

20   donating blood, the thing would come to a stop immediately.

21   Jury duty works just like that.

22   And the reason we have the right to a jury trial is

23   because the founders of our country put it in the Constitution

24   more than 200 years ago.

25   I've presided over so many jury trials, and I will tell

1    you something.  The jury trial is one of the greatest

2    fact-finding machines ever devised by human beings.  You take

3    12 people from different backgrounds, different life

4    experiences, you put them in the same room after they've

5    watched all the same evidence.  They don't miss much.  They

6    don't.

7         The right to a jury trial by a fair and impartial jury is

8    one of the most important rights that we all have.  And the

9    thing about it is none of us knows when we are going to need a

10   jury trial.

11        How many people in this room are saying to themselves

12   "Exactly two years from now, I'm going to need to file a

13   lawsuit"?

14        "Four years from now, I'm going to be sued"?

15        "Some number of years from now, I or someone close to me

16   is going to be charged with a crime"?

17        No one's doing that.  How can you?  That's not how it

18   works.  You don't know when you might need to take advantage

19   of this right.

20        So for the right to stay alive, we all just need to do our

21   part when we get a jury summons.  It's not convenient.  They

22   don't consider convenience.  It's just a computer that just

23   puts the summons in the mail, or it goes on your email.

24        Maybe we could do without jury trials.  A lot of countries

25   don't have jury trials at all.  And the parties in a civil

1    case or a criminal case always have the ability to say, "We're

2    waiving a jury trial.  We just will let the judge decide.

3    He's been doing it a long time.  He seems comfortable making

4    decisions.  Let's just have him decide it."

5        I make dozens of decisions every day, and I do bench

6    trials, too.  But that's not what the parties want.  And

7    that's not what the founders wanted when they put the

8    Constitution together.  They recognized that there's a power

9    and a wisdom in having just people from the community make the

10   decision instead of a professional judge.

11       In other words, the founders didn't want and these parties

12   did not want me.  They wanted you.  That's why you're here.

13       We know that jury service imposes on your time.  And they

14   are thinking, yeah, it's imposing on my time.  When's the

15   judge going to get to the matter at hand?  I'm just about done

16   with these opening remarks.

17       I want to make you a promise.  If you were charged with a

18   crime or you were suing somebody for money or you're being

19   sued for money, here's something you would not tell your

20   lawyer:  You would not say to your lawyer, "Just find me

21   12 people with nothing better to do.  That's who I want

22   deciding my case."

23       You wouldn't pick those people.  You'd pick people just

24   like yourselves who have busy, active lives, who have a

25   variety of experiences.

1      So it's not a coincidence that you've been called here

2   today and you have other things that you also need to be

3   doing.  Because that's what makes you great jurors.  So I

4   thank you because that's a service you're providing to these

5   parties and to the country.  So thank you.

6      Let's talk about COVID for a second.  Some people don't

7   care about COVID anymore.  They just stopped caring about it.

8   They figure it's like the flu.  Other people are still very,

9   very, very concerned.

10      My job is to make everybody in the courtroom as safe as

11   possible and also everybody in the courtroom to feel as safe

12   as possible.  That's an important part of my job in a

13   pandemic.

14      There's no question the pandemic is not as severe as it

15   used to be.  There's also no question COVID is still with us.

16   So it doesn't make sense, it wouldn't make sense for me to do

17   the least safe thing because then some people in my courtroom

18   would not feel good about being here.

19      So you're all vaccinated.  We're wearing masks.  There's

20   more distance between you than there normally would be.  This

21   machine over here to my right is a high-efficiency air filter.

22   Why is it sitting there?  Because the witness is going to do a

23   lot of talking.

24      We have clear masks for our witnesses, but the witnesses

25   will be wearing masks.  And I have -- for more than a year, we

1    couldn't -- you couldn't try a case in here.  We had to close

2    our doors to trials.  And in the middle of last year, I

3    started trying cases again.

4        I've not had one person get sick in a trial with COVID.

5    And I like it that way.  So I know that restrictions are

6    loosening in some places.  But there are a lot of us in the

7    room.  If you're one of those folks who's very concerned about

8    COVID, please know I take your concerns very seriously.  If

9    you're a little less concerned, I will just say would you

10   please work with me because we've got to make sure everybody

11   in the courtroom feels good about what we're doing.

12       Okay.  Ms. Lee, have these folks already been sworn?

13            **THE CLERK:**  No, Your Honor.  They have not.

14            **THE COURT:**  Would you all stand up and raise your

15   right hands for me, please.

16                      (Jury venire sworn.)

17            **THE CLERK:**  Thank you.  You may be seated.

18            **THE COURT:**  All right.  Now, I'm going to tell you a

19   little bit about the case, explain to you what the process is

20   here today.

21       This is a federal criminal case involving a bank.  I'll

22   read to you a jury instruction about that in just a second.

23       The plaintiff in this case, and that's the suing party, is

24   the United States government.  And representing the United

25   States are two Assistant United States Attorneys, Nicholas

1    Walsh and Kyle Waldinger.

2         Gentlemen, would you stand up.  And Mr. Waldinger is

3    standing closer to me.

4         Beth Margen is their parallel.  And the case agent on this

5    case is Jennifer Barnard.  Ms. Barnard is with the Federal

6    Bureau of Investigation.

7         Thank you, folks.

8         The defendant in this case is Michael Brent Rothenberg.

9    He's represented by Hanni Fakhoury.  Mr. Rothenberg is seated

10   closest to me.  Mr. Fakhoury is the furthest.  And in between

11   them is Nathaniel Torres who as Mr. Fakhoury's paralegal.

12        Thank you.

13        Why don't I just read to you now -- well, before I do

14   that.  I know that many of you have questions about the

15   schedule, and you're not going to be able to hear anything I

16   could say until I tell you what the schedule is.  So let's

17   talk about the schedule.

18        We are in session in this trial from 8:30 in the morning

19   until 1:30 in the afternoon.  And we start at 8:30 so you've

20   got to get here in time to get parking and get through

21   security and all that.  We don't take lunch breaks.  And we

22   take two 15-minute breaks.  So 8:30 to 10:00.  We have a

23   15-minute break.  And then we go from 10:15 to 11:45.  We have

24   a 15-minute break.  And then we go from 12:00 to 1:30.

25        And then you're on your way.  You're on the road well

1    before rush hour.  You can go pick up your kids or do some

2    work or whatever it is you need to do.

3         How many of you have ever been on a jury before?

4         Thank you both.

5         So most of you have not.  A lot of judges will take

6    basically the whole day to do a trial.  I have found I get

7    almost as much evidence in on the schedule I gave you.  And

8    it's better for you, it's better for me.

9         It's better for me because I have 400 cases.  So I have

10   other things I need to be doing in the afternoons.  It gives

11   me a chance to do that.

12        It's better for you because it doesn't just take your

13   whole darn day.  And I've had uniformly jurors tell me they

14   prefer this schedule.

15        You can get a little peckish so, you know, put an energy

16   bar or something in your pocket.  But you'll see on an

17   uninterrupted basis if we do it that way, that evidence comes

18   in in a very nice way.

19        I said Monday through Thursday.  I have a big criminal

20   calendar on Fridays.  If you happen to be deliberating on a

21   Friday, you could deliberate.  And that will shorten your jury

22   service.  Otherwise, it's just Monday through Thursday, as I

23   said, 8:30 to 1:30.

24        I think probably you are going to have this case -- oh,

25   one more thing.

1    Next week, I have an obligation that will take me away

2    from the court so we'll only be in session Monday, Tuesday.

3    So this week Monday through Thursday.  Next week Monday,

4    Tuesday.  And then the following week if we need it, Monday

5    through Thursday.

6    Outside chance, I don't think this is terribly likely, but

7    outside chance it could go through Tuesday, the 22nd.  I think

8    it will be done that prior week.  I mean I think you will

9    finish your deliberations and all that.  But I've got to

10   manage your expectations so....

11   Can everybody hear me okay?  Okay.  If you have trouble

12   hearing at any time, let me know.

13   Effective immediately you're the fact-finders in this case

14   so if you can't hear, we've got a problem and I'll fix it.  We

15   have assistive listening devices if anybody needs it.

16   Let me read you a jury instruction that will tell you a

17   little bit about this case.

18   This is a criminal case brought by the United States

19   government.  The government charges the defendant with bank

20   fraud and false statements to a financial institution.

21   The charges against the defendant are contained in the

22   indictment.  The indictment simply describes the charges the

23   government brings against the defendant.  The indictment is

24   not evidence and it doesn't prove anything.

25   The defendant has pleaded not guilty to the charges and is

1    presumed innocent unless and until the government proves the

2    defendant guilty beyond a reasonable doubt.

3        In addition, the defendant has the right to remain silent

4    and never has to prove his innocence or present any evidence.

5    That burden is solely on the government.

6        To help you follow the evidence, I'll now give you a brief

7    summary of the elements of the crimes that the government must

8    prove to make its case.

9        The government has charged the defendant with two crimes

10   in this trial.  The defendant is charged in count one with

11   bank fraud.  To prove that crime, the government must prove,

12   first, that the defendant knowingly executed or attempted to

13   execute a scheme to defraud a financial institution as to

14   something of value or a scheme or plan to obtain money or

15   property from the financial institution by making false

16   statements or promises.

17       Second, that the defendant knew that the statements or

18   promises were false.

19       Third, that the statements or promises were material; that

20   is, they had a natural tendency to influence or were capable

21   of influencing a financial institution to part with money or

22   property.

23       Fourth, that the defendant did so with the intent to

24   defraud, meaning with the intent to deceive and cheat.

25       And fifth, that the financial institution was insured by

1  the Federal Deposit Insurance Corporation, which is called

2  FDIC, or was an organization which finances or references any

3  debt secured by an interest in real estate including private

4  mortgage companies and any subsidiaries of such organizations

5  and whose activities affect interstate or foreign commerce.

6          **MR. WALDINGER:**  Your Honor.

7          **THE COURT:**  Yes, sir.

8          **MR. WALDINGER:**  You -- instead of staying

9  "refinances," you said "references."

10         **THE COURT:**  Oh, excuse me.

11      Which finances or refinances any debt.

12      Apologize for that.

13      And I know that some of the language in these jury

14  instructions is very clear and obvious, and some of it is less

15  clear and less obvious.  But as the trial goes along, believe

16  me, the lawyers are going to do a very good job of explaining

17  the various terms.  And you'll find, I think, that it's all

18  very clear by the time you are applying the instructions.

19      The defendant is charged in count two with making false

20  statements to a financial institution.  To prove that crime,

21  the government must prove, first, the defendant made a false

22  statement or report to a federally insured financial

23  institution, with all the jurors agreeing as to the specific

24  false statement or report.  In other words, you have to

25  agree -- if you find the defendant made a false statement or

1    report, you'll have to agree on what that was.

2         Second, the defendant made the false statement or report

3    knowing it was false.

4         And third, the defendant did so for the purpose of

5    influencing in any way the action of the financial

6    institution.

7         It is not necessary, however, to prove that the financial

8    institution was in fact influenced or misled or that the

9    financial institution was exposed to a risk of loss.  What

10   must be proved is that the defendant intended to influence the

11   financial institution by the false statement.

12        Let me just say, just give you a quick overview of what's

13   the process of a trial.

14        This part is called voir dire.  It's old French.  I used

15   to think -- I speak some Spanish so I thought it was a Latin

16   language thing, to see, to speak.  It just means to tell the

17   truth.

18        The point of voir dire is to find out whether you'd be

19   good jurors on the case.  Every one of you would be a good

20   juror.  I know it.  The question is to figure out whether this

21   is the right case for you.

22        You answered some questions on your questionnaire.  That

23   will speed things up.  We don't need to go over all those

24   answers again, although we may want to follow up on some of

25   them.

1        Let me be clear about what we're looking for and what

2    we're not looking for.  We're not looking for 12 people that

3    don't have any opinions.  Okay?  I don't think there are

4    12 people that don't have any opinions.

5        We're not looking for 12 people that don't have any life

6    experiences.  We've all had life experiences.  And some of

7    those opinions or life experiences may touch on the subjects

8    of this trial, and that's fine.  That's not the question.

9        The question is:  Can you put aside your opinions and put

10   aside your life experiences and be fair to these parties?  Can

11   you be fair to the United States government and can you be

12   fair to Mr. Rothenberg?

13       And I know you can do it.  I'm not saying everyone is

14   qualified to be on this jury or that there might not be an

15   opinion or life experience that would prevent you from

16   serving.  And occasionally that's true.

17       But what we ask of you is the same thing that you all, as

18   taxpayers, pay me to do every day, and that is to just take my

19   life experiences and my opinions and put them to one side and

20   make a decision just based on the facts and the law.  That's

21   all.

22       And so what we're -- that's what we're looking for.  We're

23   looking for 12 people that can just decide this case based on

24   the facts and the law.

25       It's important, even if someone's not speaking to you

 1   directly, to listen carefully to the questions.  That way, if

 2   I or one of the lawyers comes back to you, we don't have to

 3   start from scratch.

 4       I'm hopeful I can get jury selection done today, and we

 5   can start with opening statements tomorrow.

 6       Nobody is trying to influence your -- influence.  No one

 7   is trying to invade your privacy.  I don't expect it will

 8   happen actually that you feel your privacy is being invaded or

 9   even that the topic is particularly personal.

10       But if you're not comfortable answering a question in

11   front of everybody, just let me know that.  At a break, we can

12   go back in the jury room with the court reporter and maybe

13   just one of the lawyers on either side, and in a small group,

14   we can finish having the conversation.

15       Who has teen-aged kids?  One guy, okay.

16       Who used to have teen-age kids?  Anybody in that group?

17   There we go.

18       Who's ever met a teenager, raise your hand.  There we go.

19       So who knows what the expression "TMI" means?

20       Yes, sir, right here.

21           **PROSPECTIVE JUROR:**  Too much information.

22           **THE COURT:**  Too much information.  My sons are grown

23   men now.  But when they were kids, if I talked at the dinner

24   table, they would say, "Dad, TMI," because they didn't want to

25   hear from their old man.

 1        We don't have TMI here today.  Here's what I mean by that.

 2   If you are not asked a question yourself, but you hear

 3   somebody else say something that reminds you of something you

 4   think the lawyers or the Court would want to know, just raise

 5   your hand and tell me about it or tell the lawyers about it.

 6   That's the first thing.  So please volume if you've got

 7   something relevant.

 8        Secondly, don't self-edit.  Okay?  Don't say, for example,

 9   "Well, you know, I used to be the -- I used to be the risk

10   manager of a bank, and that's probably -- that seems relevant,

11   but I'm not going to mention it because I can be fair anyway."

12        If there's something that's relevant, please mention it.

13   Let me follow up, let the lawyers follow up.  The fact that

14   you are confident you could be fair anyway is -- that's good,

15   but the lawyers need to have the chance to follow up with you

16   if you can think of anything that's relevant or responsive to

17   any of the questions.

18        Okay.  Toward the end of the process of your group --

19   we're broken up into many groups today because of COVID --

20   toward the end of the questioning of your group, I'll give you

21   a chance to make what are called hardship requests, and that

22   is because of your personal circumstances, you're not able to

23   serve on the jury.  There are all kinds of rules I have to

24   follow in considering hardship requests.  Extreme financial

25   hardship.  Not hardship to your employer.  Extreme financial

1    hardship to you is a ground.  Prepaid travel is a ground.

2    Prescheduled medical can be a ground.

3        And what we'll do is I'll just take those requests.  And

4    then at the end of the day after I've heard from everybody, I

5    can go back through them and rule on them, and the jury office

6    will notify you whether or not your hardship request was

7    granted or whether you are excused for some other reason.

8        I'll say just a note about hardship requests, and then

9    we'll get going with the questioning.

10       I like to be liked, which most of you probably also like.

11   So part of me wants to just grant all the hardship requests

12   because then the people would like me and they would say,

13   "Judge Tigar found about my situation and he did what I

14   wanted."

15       But I also know something else, which is some of you

16   weren't sure how to feel about jury service when you came in

17   this morning.  But you've been listening to what I've said.

18   You appreciate how important it is.  You'll hear from the

19   lawyers a little bit in the questioning.  And you'll realize

20   that this is a jury you could be on.  You could do your duty.

21   It might be interesting.  And it's your time.  So you'll just

22   move the dentist appointment or whatever it is, and you won't

23   make a hardship request.

24       And I'll never know who those people are because they

25   don't say anything, you know.  They just keep serving.  And I

 1     don't want those people to feel gamed.  So those are things I

 2     think about with hardships.

 3         Let's ask some voir dire questions.  I'm going to ask a

 4     few, and then I'm going to let the lawyers ask you.

 5         Yes, ma'am.

 6             (Court and Clerk confer off the record.)

 7         **THE COURT:**  Yeah.  This is -- let me introduce a

 8     couple folks to you also.  This is Mauriona Lee.  She's the

 9     best courtroom deputy in the Northern District of California,

10     and the good news is she works for me.  And you're going to

11     see a lot of Ms. Lee if you're selected for a jury in this

12     case.

13         Raynee Mercado is a fantastic court reporter.  That's a

14     very hard job.  That's not even -- those aren't even words on

15     her screen.  Those are just -- she just -- it's all happening

16     so fast.  She types with symbols.  And she will be reporting

17     this trial.

18         Over to the left are two of my term law clerks, Kathryn

19     Panish and Andy DeGuglielmo.  They are with me for one year,

20     and they are learning how to practice law in a federal

21     district court.

22         So Ms. Lee is going to go ahead and pass out a portable

23     microphone and some sanitizing wipes.  If you would just pass

24     that around as you need to.

25         First of all, does any of you -- has any of you ever heard

```
1    of any of the parties in this case or --

2         Mr. Waldinger?

3              MR. WALDINGER:  It looks like we're out of wipes over

4    there, Your Honor.

5              THE CLERK:  Oh.

6                        (Simultaneous colloquy.)

7              PROSPECTIVE JUROR:  They're in there.  They're just

8    not --

9              THE CLERK:  Oh, I'm sorry.

10             PROSPECTIVE JUROR:  And then I dropped the --

11             THE COURT:  Has any of you heard anything about this

12   case before?

13                        (No hands.)

14             THE COURT:  Okay.  I'm not seeing any hands.

15        I'm going to pull up the parties' pretrial statement.

16        Mr. Waldinger or Mr. Fakhoury, could I borrow your witness

17   list?  I thought I had tabbed it.

18        Oh, there we go.  Ms. Lee to the rescue.

19        Let me read you the names of persons who may be called as

20   witnesses in this case.  It's a long list.  I'm pretty sure

21   not all of them are going to testify so it's overinclusive.

22   There may be other persons who are called to testify who are

23   not on this list.  But for now just listen carefully and let

24   me know if you think you know any of these people.

25        Silicon Valley Bank witnesses, Brian Bell, Michelle Jandu,
```

 1    Frederick Kreppel, George Pires, P-I-R-E-S, Ingrid Robertson,

 2    Paolo Serna.  And there may be what's called a custodian of

 3    records from the bank.

 4        Merrill Lynch witnesses Christine Allscheid, Benjamin

 5    Bolt, Anna Jenkins, Ryan Kelty, Hapi Yamato from Chicago

 6    Title.

 7        Law enforcement witnesses, Agent Barnard that I introduced

 8    you to before.  Anthony Ghio, or Ghio, who's a Special Agent

 9    with the Internal Revenue Service.  Michael Capuzzi, who's

10    also a Special Agent with the IRS.

11        Paulette Brunk, who's a notary public.  Jefferson Robert

12    Eppler, also called J.R. Eppler, who's with Rothenberg

13    Ventures Management Company.  Thomas Leep.  James Kiss, who is

14    a field supervisor with the FDIC.  Mario Morales-Arias, from

15    American Express.  And that's it.

16        If any of you -- would you raise your hand if you think

17    you know any of those people.

18        I'm not seeing any hands.

19        The lender in this case is Silicon Valley Bank, as you

20    heard me say earlier.

21        Are any of you or any relatives or close friend or members

22    of your household employed or previously employed by

23    Silicon Valley Bank?

24        Not seeing any hands.

25        Has any of you ever obtained a loan from Silicon Valley

1    Bank or had any other dealings with them?

2        I'm not seeing any other hands.

3        Has any of you ever purchased a home or other real

4    property?  Would you raise your hand?

5                        (Hands raised.)

6            **THE COURT:**  Okay.  About half roughly.

7        Of that group, how many of you applied for a mortgage loan

8    from a lender?

9        Same number.

10       Knowing that this trial is going to involve testimony

11   about someone obtaining a mortgage loan and testimony from

12   people who work for a lender, is there anything about your

13   experience in applying for a mortgage loan that would affect

14   your ability to be fair and impartial here?  Anybody have a

15   particularly negative or positive experience?

16       I'm not seeing any hands.

17       Has any of you ever had a mortgage loan that was in

18   default or you faced foreclosure or you've been through a

19   foreclosure?  Would you raise your hand if you've been in that

20   circumstance.

21       No.

22       This is a federal criminal case, meaning this is a

23   prosecution brought by the United States against the

24   defendant.

25       Does any of you have feelings or opinions about the United

1   States government or federal law enforcement that you think

2   would affect your ability to be fair and impartial toward the

3   government or toward the defendant in this case?

4                          (No response.)

5           **THE COURT:**  Still not seeing any hands.

6       Has any of you or anyone in your close circle of family or

7   friends worked for law enforcement?

8                        (Hands raised.)

9           **THE COURT:**  Okay.  Sir, would you tell me your name.

10          **PROSPECTIVE JUROR:**  My name is David Yee.

11          **THE COURT:**  Mr. Yee, tell me more about that.

12          **PROSPECTIVE JUROR:**  My brother-in-law was the

13  Assistant District Attorney in San Diego for 30 or 40 years.

14          **THE COURT:**  You said brother-in-law?

15          **PROSPECTIVE JUROR:**  Yes.

16          **THE COURT:**  All right.

17                   (Off-the-record discussion.)

18          **THE COURT:**  And, Mr. Yee, I think you put that

19  information in your written questionnaire response.

20          **PROSPECTIVE JUROR:**  Yes, I did.

21          **THE COURT:**  Would you be able to evaluate law

22  enforcement witnesses in this case using the same credibility

23  factors you would apply to any other witness?

24          **PROSPECTIVE JUROR:**  I believe I would.

25          **THE COURT:**  Okay.

1          And folks, the lawyers may follow up on any of the

2     questions that I ask or any of the answers that you give.

3          Is there any of you that would give the --

4          Yes, Mr. Walsh.

5          **MR. WALSH:**  Your Honor, I believe that Juror Number 4

6     also raised her hand in response to that question.

7          **THE COURT:**  I see.  Oh, very good.

8          Ma'am, would you tell me your name.

9          **PROSPECTIVE JUROR:**  Sandra Phillips.

10         **THE COURT:**  Ms. Phillips, I'm sorry for missing that.

11    Tell me who you had in mind.

12         **PROSPECTIVE JUROR:**  My father served as a probation

13    officer for the County of Los Angeles before he retired.

14         **THE COURT:**  Okay.  And so that sounds like that was a

15    career job for him?

16         **PROSPECTIVE JUROR:**  Yes.

17         **THE COURT:**  And same question that I asked Mr. Yee.

18    Would you be able to judge law enforcement witnesses using the

19    same credibility factors that you would apply to any witness?

20         **PROSPECTIVE JUROR:**  Yes.

21         **THE COURT:**  Yes, sir.  And then --

22         Thank you, ma'am.

23         There's a gentleman in front of you also raised his hand.

24         **PROSPECTIVE JUROR:**  Yes, Your Honor.  Was your

25    question in regards to are you currently law enforcement or --

1    or at all?

2                **THE COURT:**  Could be in the past.

3                **PROSPECTIVE JUROR:**  I personally -- I worked for the

4    Department of Corrections at San Quentin for almost 14 years.

5    And I currently have a cousin that's in the FBI.  I currently

6    have another cousin that's in the Fresno Police Department.

7                **THE COURT:**  Okay.  Would you tell me your name.

8                **PROSPECTIVE JUROR:**  George McMaster.

9                **THE COURT:**  Oh, sure, Mr. McMaster.  I have a case

10   involving the state prison system, so I have spent a lot of

11   time around correctional officers.

12       Were you a correctional officer at San Quentin?

13               **PROSPECTIVE JUROR:**  Yes, sir.

14               **THE COURT:**  And it sounds like you have retired from

15   that job?

16               **PROSPECTIVE JUROR:**  Yes, I have, Your Honor.

17               **THE COURT:**  And, sir, when did you retire?

18               **PROSPECTIVE JUROR:**  From -- I left San Quentin in

19   1991.

20               **THE COURT:**  Okay.

21               **PROSPECTIVE JUROR:**  But I currently -- and then I

22   went to work for Home Depot, and I retired that five years

23   ago.

24               **THE COURT:**  Okay.  Well, congratulations on the

25   retirement.

1    So you were a correctional officer for -- did you say

2    14 years?

3              PROSPECTIVE JUROR:  Yes, sir.

4         THE COURT:  And then also you had the other law

5    enforcement family members you mentioned.

6       Did I cut you off?  Are there additional persons?

7              PROSPECTIVE JUROR:  No, Your Honor.

8         THE COURT:  Same question that you heard me ask other

9    jurors.  Are you going to be able to evaluate the testimony of

10   law enforcement witnesses the same as you would the testimony

11   of anybody else?

12             PROSPECTIVE JUROR:  These are federal officers that

13   will be testifying, not city or county?

14        THE COURT:  My belief is that they will be federal,

15   they'll be either from the Internal Revenue Service or the FBI

16   or maybe FDIC, although that's not really law enforcement.

17             PROSPECTIVE JUROR:  I can -- I can work with that,

18   Your Honor.

19        THE COURT:  Okay.  Very good.

20      Yes, ma'am.  In the back corner.

21      Would you pass the microphone back.

22      And, ma'am, would you start by saying your name.

23             PROSPECTIVE JUROR:  Leah Vulic.

24        THE COURT:  Yes, ma'am.

25             PROSPECTIVE JUROR:  My cousin is a prosecutor in

```
 1    Ohio.
 2         THE COURT:  Okay.  Anything about that you think
 3    would affect your ability to evaluate the testimony of all the
 4    witnesses using the same credibility criteria?
 5         PROSPECTIVE JUROR:  It would not affect it.
 6         THE COURT:  Okay.  Terrific.
 7       Oh, again.  More and more hands.
 8         PROSPECTIVE JUROR:  David Yee.
 9       I apologize, I didn't list out everybody.
10       So in addition to my brother-in-law, my sister-in-law was
11    a judge in San Diego.  I have a cousin that was the -- in the
12    Ottawa Police force.  And I currently -- my current cousin --
13    or I have a cousin that's currently volunteering for the
14    Fremont Police Department.
15         THE COURT:  Fremont right here in Alameda County?
16         PROSPECTIVE JUROR:  Correct.
17         THE COURT:  Okay.
18         PROSPECTIVE JUROR:  But my answer to your other
19    question, I still believe I can be fair and impartial.
20         THE COURT:  Very good.  Just out of curiosity, who's
21    your sister-in-law?
22         PROSPECTIVE JUROR:  Lillian Lim.
23         THE COURT:  Okay.  I don't know her.  I was a state
24    court judge for 11 years.  It's a big state though.
25       The gentleman over there on the rail also had his hand up.
```

1        **PROSPECTIVE JUROR:** John Hailey. Sorry. I thought
2   initially this relationship I'm going to mention was too
3   remote. But my sister-in-law's father, who is deceased, was a
4   police chief in the City of Richmond.
5        **THE COURT:** Richmond, California?
6        **PROSPECTIVE JUROR:** Yes.
7        **THE COURT:** Okay. Well, this goes back to what I
8   said before. Always better to volunteer than self-edit. So I
9   appreciate that.
10      Would that fact in any way affect your ability to judge
11  all of the witnesses with the same -- using the same
12  credibility factors?
13       **PROSPECTIVE JUROR:** It would not affect it.
14       **THE COURT:** Okay. Thank you, sir.
15      Has any of you ever had a negative experience with law
16  enforcement? A bad personal experience with law enforcement?
17      Sure. Let's get the microphone over to Ms. Vulic.
18       **PROSPECTIVE JUROR:** Thank you.
19      It wasn't me personally, but someone I'm very close to was
20  arrested and treated very badly by law enforcement.
21       **THE COURT:** You said this is a friend?
22       **PROSPECTIVE JUROR:** It's -- it's someone very close
23  to me, yes.
24       **THE COURT:** Okay. And can you tell me what law
25  enforcement agency was involved in that situation?

1            **PROSPECTIVE JUROR:**  The Daly City Police.

2            **THE COURT:**  Did that person's circumstance finally

3    get resolved?

4            **PROSPECTIVE JUROR:**  Funny you should ask that.

5    Actually there's -- they ended up not bringing any charges.

6    But there's still the arrest record out there.  They actually

7    have a hearing in -- on November 16th to try to get that

8    sealed pursuant to the Penal Code.

9        But -- and it doesn't affect -- it -- it sits really badly

10   with him.  And I don't think it affects my ability to evaluate

11   and -- and make judgments.  But I had to tell you so....

12           **THE COURT:**  Good.  I appreciate that.

13       I mean this is sort of -- this is a perfect example

14   actually of what we were talking about before.  And that is

15   good things can happen to people, bad things can happen to

16   people.  The question is are you going to generalize from

17   that, right, and start holding those experiences against

18   people that were not involved.  And I'm hearing from you that

19   that's not going to be a problem for you.  So I appreciate --

20           **PROSPECTIVE JUROR:**  Right.

21           **THE COURT:**  -- your volunteering.

22       The defendant in this case is presumed innocent until

23   proven guilty by the government beyond a reasonable doubt.

24   That's how it works.

25       Does the fact that the defendant has been charged with

1    crimes and now has to stand trial affect your view about

2    whether the defendant is presumed innocent?

3        Let me state that question a slightly different way.

4        The defendant doesn't have to prove anything ever.  The

5    government has the burden of proving the defendant's guilt

6    beyond a reasonable doubt.  And that's the law that I will

7    instruct you on at the end of the trial and also at the

8    beginning of the trial.

9        Is there any of you here who thinks, well, I'm already

10   deciding that the defendant is at least a little bit guilty

11   because he's here?  Is any of you of that frame of mind?

12       Okay.  I'm not seeing any hands.

13       Also -- and I know you answered some of these questions on

14   the questionnaire, but I just want to ask you as a group.  The

15   defendant in this case not only doesn't to have put on any

16   evidence.  He also doesn't have to testify.  And the decision

17   about whether to testify is totally up to him.

18       And my question is -- oh, and let me back up.  And that's

19   in the United States Constitution.  The founders decided that

20   they didn't want the defendant in a criminal case to have to

21   testify against him- or herself.  That wasn't the kind of

22   system of justice we wanted to have.  We wanted to have a

23   system of justice where we wanted the government to have to

24   prove its case without making someone testify against

25   themselves.

1      So the defendant has the right to testify if they want,

2   but they also have the right not to testify if they don't want

3   to.

4      So my question is:  Is any of you going to hold it against

5   the defendant if he doesn't testify?  Would you raise your

6   hand.

7      Mr. McMaster.

8      **PROSPECTIVE JUROR:**  Your Honor, I don't want to

9   initially say I will hold it against him for not testifying.

10  But my view, I believe that he should testify.

11     And I say that because the understanding of -- through my

12  dealings with the court system and with the judicial system is

13  that I understand he's innocent until proven guilty.  I

14  totally agree with that.  I've been taught that all my life.

15     But, however, when he's interviewed by the police

16  department and things like that, or the sheriff, who's ever

17  investigating, then I believe do not say anything until you

18  talk to your lawyer, let your lawyer be there with you.  Don't

19  just spout out.  I understand that and I totally agree with

20  that.

21     However, all the information that's been gathered by the

22  accusing department, and now it's gone to trial, and that

23  trial, it's gone for maybe two days or maybe three months, but

24  the jury has sat there.  And because of this, I -- I've been

25  on two juries, and one of them did not testify, the other one

1    did.  And one was a civil case, one was a criminal case.  The

2    criminal case is the one that did not testify.

3        And then I was involved in cases at San Quentin where

4    inmates --

5              **THE COURT:**  Grievance -- grievance cases.

6              **PROSPECTIVE JUROR:**  Excuse me?

7              **THE COURT:**  You mean grievances?

8              **PROSPECTIVE JUROR:**  No.  I mean murder charges and

9    things of that nature.

10             **THE COURT:**  Okay.

11             **PROSPECTIVE JUROR:**  And through the investigations,

12   clearly these guys -- these were gang activity murders and

13   taking place and within the prison system.  And then it comes

14   time for their -- to not testify, and they're not going to --

15   they won't testify.

16             **THE COURT:**  Right.

17             **PROSPECTIVE JUROR:**  And the reason they won't is

18   because, in my view, it's the only thing they're going to do

19   is just ruin their case.  Let the lawyer do all the talking.

20       And then there's the aspect of other gang members that

21   might -- whose names might come out if the guy testifies.

22       So I see an element of not testifying to protect yourself,

23   not so much as to clear yourself.

24             **THE COURT:**  Okay.  Mr. McMaster, I'm going to thank

25   you for that because you're not the only person that feels

 1    that way, is my guess.  So I just want to say a word about

 2    that.

 3        I want to say really two things.  I think you did a good

 4    job of explaining how you feel.

 5        The two things are this:  First, all of us -- and I'm

 6    putting myself in your group now because I'm the legal

 7    decision-maker also, just like the jurors are -- all of us

 8    take an oath to follow the law.

 9        When the Governor of California appointed me to be a state

10    court judge or when the President of the United States

11    nominated me to be a federal judge and I was confirmed by the

12    Senate, the point of that was not let's let Jon Tigar apply

13    the law according to Jon Tigar.  That's not how it goes.  If I

14    did that, I would not be doing my job.

15        My job used to be to apply the law of the State of

16    California.  Now my job is to apply the law of the United

17    States of America, the Constitution, the statutes, and the

18    common law decisions of other courts, whether I agree with

19    them or not.

20        And I will tell you most of the time I don't care how a

21    case comes out.  I really don't.  I'm just a referee.  But of

22    course I have feelings.  And sometimes a case comes through

23    the front door and it lands on my desk and I do have a

24    feeling.  In a civil case, I might think, gosh, it really

25    seems like a wrong has been done here.  But for whatever

 1    reason, the law tells me that I can't help the plaintiff in

 2    the case.  I cannot rule in that party's favor.

 3         Sometimes a case comes through the front door and I think

 4    this looks like a ridiculous case.  But the law does not allow

 5    me to dismiss it at that point.  So I don't.  That's because

 6    that's the oath I took.  I just follow the law.  It makes it

 7    easy.

 8         If you're on this jury, that's what you have to do.

 9    You're allowed to have feelings about the law.  Of course you

10    are.  But you have to follow it.  So that's the first thing.

11         The second thing is about this question of not testifying.

12    The founders of our country believe -- and it's been a

13    cornerstone of our criminal law ever since -- that if the

14    government doesn't have enough evidence to prove somebody

15    guilty beyond a reasonable doubt, they cannot be convicted.

16    They cannot.

17         And one reason for that rule is that we -- Benjamin

18    Franklin said this -- we want to make sure that we are not

19    convicting anybody who isn't guilty.  That's where we want the

20    needle to be.  And we don't want to use the power of the state

21    to make somebody testify against themselves.  We're just

22    willing to give that up.

23         And once you say we're not going to use the power of the

24    state to make somebody testify against themselves, that means

25    they get to choose whether they're going to testify or not.

1    So I understand what -- Mr. McMaster, you are entitled to

2    your opinion and you're not the only one that has that

3    opinion.

4          **PROSPECTIVE JUROR:**  I just firmly believe that if you

5    didn't do anything wrong, and your presentation was made and

6    you know there's people in the framework of the courtroom that

7    clearly have --

8          **THE COURT:**  Right.  I'm going to cut you off because

9    I heard you the first time --

10          **PROSPECTIVE JUROR:**  Okay.

11          **THE COURT:**  -- and I've got to move on.

12    My -- my question for you is if Mr. Rothenberg doesn't

13    testify, are you going to hold that against him?

14          **PROSPECTIVE JUROR:**  I can say that at -- that I would

15    not be happy with him not testifying.

16          **THE COURT:**  Okay.  I'm going to stop there just for

17    time reasons.

18    Okay.  I actually think, also for time reasons -- thank

19    you for that.  I think I should turn it over to counsel so

20    that they can do some questioning.

21    Mr. Waldinger, who will be questioning these jurors for

22    the government?

23          **MR. WALDINGER:**  It will be me, Your Honor.

24          **THE COURT:**  All right.  Please.

25          **MR. WALDINGER:**  And can I stand right here, Your

1    Honor?

2              **THE COURT:**  You may.

3              **MR. WALDINGER:**  Good morning, ladies and gentlemen.

4    Again, my name is Kyle Waldinger.

5       I'm going to touch on some of the questions that -- that

6    Judge Tigar had already asked you.

7       Ms. Vulic, I had some questions for you that are also more

8    general.  I see that you're an attorney.

9              **PROSPECTIVE JUROR:**  Yes.

10             **MR. WALDINGER:**  What kind of law do you practice?

11             **PROSPECTIVE JUROR:**  Internet law.

12             **MR. WALDINGER:**  Internet law.

13             **PROSPECTIVE JUROR:**  Yes.

14             **MR. WALDINGER:**  Okay.  What does that mean?

15             **PROSPECTIVE JUROR:**  Basically anything that can be

16   good or bad on the Internet.  We do intellectual property like

17   trademarks, copyrights, online defamation, e-commerce, website

18   terms and conditions, privacy policies, stuff like that.

19             **MR. WALDINGER:**  Okay.  Any exposure to criminal law

20   in the course of your practice?

21             **PROSPECTIVE JUROR:**  Not in the course of my practice,

22   no.

23             **MR. WALDINGER:**  And you talked about somebody that

24   you knew being treated badly by law enforcement.  I think I

25   know what you're talking about based on your questionnaire,

1     and so I won't -- was that the incident you talked about in

2     your questionnaire?

3            **PROSPECTIVE JUROR:**  So, well, actually let me back up

4     for a second to go back to your question before that about any

5     exposure to criminal law.  In my practice, I don't have any

6     but we have represented a client in a civil matter where he

7     was criminally charged, and that involved -- I think it

8     involved something to do with wire fraud, mail fraud,

9     something like that.  So I just want to let you know that.

10           And then regarding incidents with law enforcement, so

11    there was the incident that I talked about with the Daly City

12    Police.  There was also -- and I don't know why I didn't

13    mention this before.  But my father and mother in Ohio had

14    some disputes with their neighbors.  And he -- they

15    basically -- they sent him a demand letter, like a very

16    amicable demand letter about because he was trespassing on

17    their property and making a nuisance.  So they sent him a

18    one-page letter saying can you please stop doing this, you

19    know, get yourself off our property.

20           He -- they sent it to him by certified mail.  He refused

21    to accept it.  So they sent it by regular mail.  He didn't

22    read either of these letters at all but then filed for a

23    protective order against my dad.  He got the protective order.

24    They had to appeal it, which they won.  The court of appeals

25    said it never should have been granted.

1       But while that protective order was in place, the neighbor

2   called the sheriff and lied to him and said that my dad was on

3   his property.  So they arrested my dad.  He was in jail for

4   three days in November of 2020 during, you know, one of the

5   COVID peaks.  And he's 80 years old.

6       I have no -- so I mentioned that on my questionnaire.  So

7   I have nothing against law enforcement for that.  They were

8   just responding to his -- the neighbor's call.

9       I do have bad feelings toward that neighbor.  But so....

10          MR. WALDINGER:  Okay.  So then on the Daly City

11  incident, when the person that you knew who's close to you was

12  treated badly, what -- what happened to them?  Why were they

13  treated badly?

14          PROSPECTIVE JUROR:  He was dragged out of his

15  apartment.  He was shut in a police car for a very long time

16  in the hot sun, not given any water.  They were questioning

17  him without a lawyer present.  He -- they were basically

18  trying to force him to say things that he wouldn't say, you

19  know.  And I mean, so that's -- that's about it.

20          MR. WALDINGER:  Well, again I guess I'll just circle

21  back.  Is there anything about that incident in Daly City or

22  the incident with your parents which both related to

23  interactions with law enforcement that would affect your views

24  of this particular case which is a bank fraud case and a false

25  statements to a financial institution case?

1          **PROSPECTIVE JUROR:**  Would not affect it.

2          **MR. WALDINGER:**   Okay.

3       I wanted to ask a few questions of Mr. McMaster.

4          And I don't want to -- I guess the question that I have is

5    do you believe, setting aside your personal opinions,

6    Mr. McMaster, are you able to follow Judge Tigar's

7    instructions at the end of the case and apply the law as he

8    gives it to you?

9          **PROSPECTIVE JUROR:**  Oh, yes.  I have no problem doing

10   what the Judge tells me.

11         **MR. WALDINGER:**  And you understand -- and you talked

12   about juries that you were on, one being a civil jury and one

13   being a criminal jury, correct?

14         **PROSPECTIVE JUROR:**  Yes, sir.

15         **MR. WALDINGER:**  You understand that in a criminal

16   case, it's the government has the burden and there's -- and

17   the defendant has no burden to bring.  It's entirely the

18   government's burden.  Do you understand that?

19         **PROSPECTIVE JUROR:**  I do understand that, but there

20   was circumstances within that framework -- this was during

21   the -- well, when we were all the jury -- the trial had ended.

22   All the jury was deliberating where there was problems that

23   arisen because of things that I knew about prison that --

24   that -- see, they didn't know that I worked at San Quentin.

25   It never came up during the trial and never came up during the

1    jury selection.

2        And when it got time for deliberation, then people were

3    talking about, well, he's just being afraid because he doesn't

4    know what's going on, or he doesn't want to go back to

5    San Quentin, that's why he's not testifying, he's going to let

6    his lawyer do everything.

7            **MR. WALDINGER:**  So let me stop you there.  It sounds

8    like you just felt that you knew things that the other jurors

9    didn't know.

10           **PROSPECTIVE JUROR:**  I didn't feel it.  I knew it.

11           **MR. WALDINGER:**  Let me ask you.  What were the

12   circumstances -- did you -- did you retire from San Quentin?

13   Why did you leave that job in the early '90's?

14           **PROSPECTIVE JUROR:**  I just -- it just ran out.  After

15   14 years -- I worked on death row for five years.  And it

16   just -- it just got to my -- me personally, it got to my

17   family, and it was time to get out of there before -- I was

18   president of the union.  And it was time just to get away from

19   that type of work.

20           **MR. WALDINGER:**  And that's when you went to Home

21   Depot?

22           **PROSPECTIVE JUROR:**  Well, I was driving a truck for a

23   while.  And then while I was driving a truck, I ended up at a

24   Home Depot.  And I met the manager.  And then at that point I

25   got out of trucking and went right to work for Home Depot.

1          **MR. WALDINGER:**  Okay.  All right.  While I have you,

2    I see you have a Marines shirt on.  Did you serve in the

3    Marines?

4          **PROSPECTIVE JUROR:**  Yes, I did.

5          **MR. WALDINGER:**  Okay.  And how long were you in?

6          **PROSPECTIVE JUROR:**  Six and a half years.  Six and a

7    half years during the Vietnam War.

8          **MR. WALDINGER:**  And were you in Vietnam?

9          **PROSPECTIVE JUROR:**  No.  I did not go to Vietnam.  I

10   was in at that time, but I didn't go.  I was stationed at MCRD

11   San Diego.  I was a drill instructor at the recruit depot.

12         **MR. WALDINGER:**  Okay.  Very good.

13      If you could hand it to Mr. Latimer to your left.

14      As long as we're talking about T-shirts, I see you have a

15   Shenandoah National Forest.  Is that -- is that someplace that

16   you've been?  And is that something that you do hiking and

17   backpacking in your free time?

18         **PROSPECTIVE JUROR:**  I used to when I was a lot

19   younger.  It was a long time ago.  But no.  Actually my

20   parents were visiting my older brother who was living in

21   Washington, D.C. at the time.  And they happened to go there,

22   they got me the shirt.

23         **MR. WALDINGER:**  Is there -- and so you've sat here,

24   Mr. Latimer, and I wanted to talk to you because we haven't

25   heard from you.  Is there any -- anything that you've heard

```
 1    from any of the other jurors or the questions that Judge Tigar
 2    has asked that you think that you need to bring up at this
 3    point?
 4              PROSPECTIVE JUROR:  Not that I can think of.
 5              MR. WALDINGER:  Okay.  Very good.
 6         And I understand you're a teacher.
 7              PROSPECTIVE JUROR:  Yes.
 8              MR. WALDINGER:  What grade level do you teach?
 9              PROSPECTIVE JUROR:  I now teach sixth, seventh, and
10    eighth grade social studies.
11              MR. WALDINGER:  Middle school.
12              PROSPECTIVE JUROR:  Yes.
13              MR. WALDINGER:  Okay.  And where is that?
14              PROSPECTIVE JUROR:  San Lorenzo Unified, Edendale
15    Middle School.  So not too far from here.
16              MR. WALDINGER:  Have you always taught that grade
17    level?
18              PROSPECTIVE JUROR:  Yes.
19              MR. WALDINGER:  Let's -- let's pass the baton or the
20    microphone down here to, I believe it's Ms. Street.
21         Over here.
22         I want to ask you about your clothes as well.  So it looks
23    like you work in the medical industry.
24              PROSPECTIVE JUROR:  Yes.
25              MR. WALDINGER:  Okay.  And what do you do?
```

1          **PROSPECTIVE JUROR:**  I'm a clinical medical assistant.

2          **MR. WALDINGER:**  Okay.  And is there anything you've

3    heard so far about this case, Ms. Street, that indicates to

4    you that you would not be able to be a fair and impartial

5    juror to both the government and to Mr. Rothenberg?

6          **PROSPECTIVE JUROR:**  The discussion about not being

7    able to testify touched on me a little bit.

8          **MR. WALDINGER:**  What about that?

9          **PROSPECTIVE JUROR:**  More like if you have -- if

10   you're not guilty, why would you not want to testify?

11         **MR. WALDINGER:**  And you -- well, you understand that

12   you'll be given an instruction from the Judge that you're not

13   to hold that against the defendant if the defendant chooses

14   not to testify?

15         **PROSPECTIVE JUROR:**  I understand.

16         **MR. WALDINGER:**  Yeah.  Do you think you'll be able to

17   follow that instruction?

18         **PROSPECTIVE JUROR:**  Sure.

19         **MR. WALDINGER:**  I saw on a couple of the

20   questionnaires -- let's pass to it Mr. Yee who's right here.

21      Mr. Yee, you're retired right now; is that correct?

22         **PROSPECTIVE JUROR:**  Yes, sir.

23         **MR. WALDINGER:**  But you used to work as a technology

24   scout.

25         **PROSPECTIVE JUROR:**  Yes.

1          **MR. WALDINGER:**  What is that?

2          **PROSPECTIVE JUROR:**  So I look at new upcoming

3    technologies in Silicon Valley to see if our company wanted to

4    invest or partner with them to develop it further.

5          **MR. WALDINGER:**  I'm sorry.  I didn't quite catch

6    that.

7          **PROSPECTIVE JUROR:**  So I investigated new

8    technologies in the area, Silicon Valley, so like startups,

9    incubators, and determined if it's a technology that my

10   company would want to invest or partner in to bring it to --

11   you know, include it into our product line.

12         **MR. WALDINGER:**  And what kind of company did you

13   have?

14         **PROSPECTIVE JUROR:**  So it was Eaton Corporation.  So

15   it was a diversified industrial.  So a lot of electrical

16   components, vehicle components, aerospace components,

17   basically like a widget maker, like a tier one supplier to

18   major OEM's.

19         **MR. WALDINGER:**  Okay.  And so I guess I can ask you

20   about your clothes.  Is that the name of the company that you

21   work for on your jacket?

22         **PROSPECTIVE JUROR:**  Yes.

23         **MR. WALDINGER:**  And that's Eaton Corporation?

24         **PROSPECTIVE JUROR:**  Correct.

25         **MR. WALDINGER:**  Okay.  And so you would look for

1    technology that Eaton would like to invest in?

2              **PROSPECTIVE JUROR:**  Potentially invest in, yes.

3              **MR. WALDINGER:**  So you -- it sounds like you had a

4    lot of interaction with startup companies in the -- in the

5    Silicon Valley area.

6              **PROSPECTIVE JUROR:**  Yes.

7              **MR. WALDINGER:**  How about with venture capital firms?

8              **PROSPECTIVE JUROR:**  Not in that role.  But in my --

9    earlier in my career, we -- I was with a startup.  Ultimately

10   went public.  Then we tried to split the company up.  And we

11   had at that time my -- my group, we -- interacted with some

12   venture capitalists to potentially sell our portfolio to them.

13             **MR. WALDINGER:**  Okay.  What was the name of that

14   startup that went public?

15             **PROSPECTIVE JUROR:**  It was called Catalytica,

16   C-A-T-A-L-Y-T-I-C-A.

17             **MR. WALDINGER:**  What kind of technology was that?

18             **PROSPECTIVE JUROR:**  It was a -- I'll call it clean

19   tech, but primarily pollution prevention using catalyst

20   technology to try and prevent the formation of pollutants

21   or -- or just get higher yield in fine chemicals,

22   pharmaceuticals, that kind of things.

23             **MR. WALDINGER:**  In that experience where you were

24   dealing with venture capitalists, is there anything about your

25   interactions with people in the venture capital industry that

1   you think would affect you in this case if I were to tell you

2   that there will be evidence that the defendant is involved in

3   the venture capital industry?

4          **PROSPECTIVE JUROR:**  So can you repeat the question?

5          **MR. WALDINGER:**  Is there anything about your

6   interaction with venture capitalists that would affect your

7   ability to be a fair and impartial juror in this case if

8   there's evidence that -- if you hear evidence that the

9   defendant or other witnesses are involved in venture capital?

10         **PROSPECTIVE JUROR:**  So I -- I guess there's a certain

11  understanding that there is a certain amount of risk taking on

12  their part and risk taking on my part to try and, you know,

13  secure the funding.  So I -- so I guess with that

14  understanding, I guess I could still be fair?

15         **MR. WALDINGER:**  Okay.

16         **PROSPECTIVE JUROR:**  But I might be, you know, for --

17  for me working in new technology for so long, risk -- risk

18  assessment, taking risks, you know, I might have a higher --

19  personally just have a higher level of risk-taking than other

20  people.

21         **MR. WALDINGER:**  Okay.

22         **PROSPECTIVE JUROR:**  So that may -- I mean, may bias

23  my decision, but I'll try not to.

24         **MR. WALDINGER:**  All right.

25     Is there anybody else who has any exposure or experience

1   in the venture capital industry?

2       Yes, sir.  So --

3           PROSPECTIVE JUROR:  Ashwin Manekar.

4           MR. WALDINGER:  Mr. Manekar.

5           PROSPECTIVE JUROR:  Yeah.

6           MR. WALDINGER:  Yes.  What's your experience with

7   venture capital?

8           PROSPECTIVE JUROR:  So I worked at a startup before.

9   And I used to go to the VC firms quite a bit.  I mean I can

10  name a couple of them.  Greylock, Lightspeed, Kleiner Perkins.

11  So I visited them.  I've done lots of presentations for those

12  companies representing my company.

13          MR. WALDINGER:  And is there anything about your

14  experience with, you know, interacting with people in the

15  venture capital industry that you think would affect your

16  ability to be a fair and impartial juror in this case?

17          PROSPECTIVE JUROR:  I -- I don't think so.

18          MR. WALDINGER:  Anybody else who's had

19  interactions -- in the back?

20          PROSPECTIVE JUROR:  I used to work for Fortify

21  Software which was a --

22          MR. WALDINGER:  Let me stop you there.

23      You're Mr. Lee?

24          PROSPECTIVE JUROR:  Yes.

25          MR. WALDINGER:  Okay.

1              **THE COURT:**  Mr. Lee, did you say Fortify?

2              **PROSPECTIVE JUROR:**  Yeah, Fortify Software.

3              **THE COURT:**  Thanks.

4              **PROSPECTIVE JUROR:**  And it was funded by Kleiner

5      Perkins.  I don't think it would affect --

6              **MR. WALDINGER:**  All right.  Thank you, Mr. Lee.

7      Anybody else?

8              **THE COURT:**  Ms. Lee, how much time does Mr. Waldinger

9      have remaining?

10             **MR. WALDINGER:**  Just a couple more questions, Your

11     Honor.

12             **THE COURT:**  That's fine.  Ms. Lee is going to answer

13     my question before you ask your next question.

14                 (Court and Clerk confer off the record.)

15             **THE COURT:**  I see.  All right.  Well, then it looks

16     like your next couple questions would be fine.

17             **MR. WALDINGER:**  Just one second, Your Honor.

18                      (Pause in the proceedings.)

19             **MR. WALDINGER:**  I think it's Ms. Sumandal?  Okay.

20       I have on your jury questionnaire that you're a freelance

21     event manager.

22             **PROSPECTIVE JUROR:**  Yeah, event technology manager.

23             **MR. WALDINGER:**  And what does that entail?

24             **PROSPECTIVE JUROR:**  So I project-manage event

25     registration websites and mobile apps for conferences.  Mainly

1    my big two clients are in the Bay Area.

2         **MR. WALDINGER:**  Okay.  And you raised some issues on

3    your questionnaire.  I don't know if you're comfortable

4    talking about those in front of the rest of the jurors or not.

5         **PROSPECTIVE JUROR:**  Which ones?

6         **MR. WALDINGER:**  What's that?

7         **PROSPECTIVE JUROR:**  Which ones?

8         **MR. WALDINGER:**  Well, there -- about some

9    medications, I believe.

10        **PROSPECTIVE JUROR:**  Yeah.  So I have been dealing

11   with a lot of family things this past year, so there's been a

12   lot of depression.  A lot of the pressure goes on me, so

13   looking to start medication within the end of mid-November to

14   end of November.  So I'm not sure how that's going to look

15   like or what's that's going to be like since it's like the

16   first time.  So I don't want that to affect any kind of

17   decision-making.

18        **MR. WALDINGER:**  Okay.  And obviously nobody in the

19   courtroom wants that either.  I mean how are you doing today?

20        **PROSPECTIVE JUROR:**  I'm doing good.

21        **MR. WALDINGER:**  Okay.  And I mean is it just you're

22   thinking about worst-case scenario?

23        **PROSPECTIVE JUROR:**  Yeah.  I have family that have

24   also dealt with similar -- similar conditions without

25   medication and with, and I've just seen kind of variables and

1    I don't know how I would react to it.

2         **MR. WALDINGER:**  Does the fact that the -- the

3    schedule that Judge Tigar has described to you where 8:30 to

4    1:30 Monday through Thursday this week, couple days next week,

5    and then picking up again Monday through Thursday the

6    following week at 8:30 to 1:30, does that seem like that's

7    going to be something you're going to be able to handle?

8         **PROSPECTIVE JUROR:**  I'm a little concerned, to be

9    honest, yeah.

10        **MR. WALDINGER:**  And your concern is just about the

11   medication?

12        **PROSPECTIVE JUROR:**  Yeah, and also work.  Compared

13   to -- I'm a freelancer.  So a lot of my work falls on me, and

14   I don't really have a backup.  And I also provide for my

15   family back in New Jersey.  So if I don't work for more than a

16   week or two, it's a lot -- a lot of pressure.

17        **MR. WALDINGER:**  Okay.  Understood.

18        **PROSPECTIVE JUROR:**  I mean --

19               (Pause in the proceedings.)

20        **MR. WALDINGER:**  Mr. -- right next to you, Mr. Burgan.

21        **PROSPECTIVE JUROR:**  Yes, hello.

22        **MR. WALDINGER:**  Good morning.  I think, Mr. Burgan,

23   your initial -- you were born in France?

24        **PROSPECTIVE JUROR:**  That's correct.

25        **MR. WALDINGER:**  How long you been in the United

```
1    States?
2              PROSPECTIVE JUROR:  Thirty-one years.
3              MR. WALDINGER:  Okay.  And have you ever served on a
4    jury before?
5              PROSPECTIVE JUROR:  First time.
6              MR. WALDINGER:  Okay.  I think you indicated in your
7    jury questionnaire that --
8                   (Clarification by the court reporter.)
9              MR. WALDINGER:  I think Mr. Burgan said in his
10   questionnaire that he didn't feel he was equipped to serve on
11   a jury.  Equipped.
12       And I just wanted to explore why you feel that way,
13   particularly after Judge Tigar told you that all of you will
14   be great jurors.  Is that -- are you -- have you changed your
15   mind about that?
16             PROSPECTIVE JUROR:  Yes and no.  I have to say some
17   of the legal terms that are used are difficult for me.  You
18   know, I'm -- I've been here 31 years.  English is my second
19   language.  I am fluent everything.  But everything legal, you
20   know, it -- I don't have the -- the full vocabulary to
21   understand exactly all the nuances that are, you know, voiced
22   in legal terms.  You know, I would -- if -- if I have an issue
23   with legal matters, I always ask for help.
24             MR. WALDINGER:  Well, if -- if I told you that the
25   lawyers in this case are going to try to make -- at least the
```

1  government is going to make the case as simple as possible to

2  understand.  And I'm sure that the defense will make the

3  defenses easy to understand, if there is one, that give you

4  some comfort that you're going to be able to understand what's

5  going on in the courtroom.  You've been here for 31 years.

6          **PROSPECTIVE JUROR:**  Yes.

7          **MR. WALDINGER:**  All right.  Thank you, Your Honor.

8  I don't think we have any more questions.

9          **THE COURT:**  All right.

10  Mr. Burgan, is it just a coincidence?  I'm almost exactly

11  your age.  I am exactly your age.  And one of my very best

12  friends studied engineering in France and came here about

13  31 or 32 years ago, and he loved it so much he became a

14  citizen.

15  And anyway I'm always glad to meet people who have come

16  here from other places.  They bring their expertise and their

17  experience and they've joined us in their American

18  citizenship.

19          **PROSPECTIVE JUROR:**  Thank you, Your Honor.  I'm

20  actually a mechanical engineer by trade.

21          **THE COURT:**  Yeah, I saw that on the questionnaire.

22  That's why I thought it was an interesting coincidence.

23          **PROSPECTIVE JUROR:**  But I've been in sales.

24          **THE COURT:**  My friend also is engineering, but he's

25  not an engineer either.  He went into consulting.

1        Okay.  Enough of Judge Tigar's chitchat.

2        Mr. Fakhoury, questions for these prospective jurors.

3          **MR. FAKHOURY:**  Thank you, Your Honor.  Hopefully

4   everybody can hear me.

5          **THE COURT:**  Yeah, I think the mic needs to be turned

6   on.  We can do that.

7          **MR. FAKHOURY:**  Is that better?

8          **THE COURT:**  There we go.

9          **MR. FAKHOURY:**  Okay.  Great.

10       Good morning, ladies and gentlemen.  Thank you for being

11   here.

12       I'm Hanni Fakhoury.  I represent Mr. Rothenberg.

13       I have a couple questions.  I'm going to hopefully get

14   everybody's name right.  My last name is Fakhoury.  I'm very

15   sensitive to that so -- but you'll forgive me if I get it

16   wrong.

17       And I wanted to start with an easy one, which is,

18   Mr. Waldinger had talked a little bit about venture capital

19   funds, and that's going to be sort of an issue in this case.

20   And I'm curious if anyone here has ever heard of Rothenberg

21   Ventures?  Or has had any experience or dealing with

22   Rothenberg Ventures, which is a venture capital fund?

23       Okay.  I see no hands.

24       Judge Tigar had a very interesting conversation with

25   Mr. McMaster.  And I -- and thank you first for your military

1    service.  And thank you for answering the questions.  And

2    Mr. McMaster had said that he would not be happy if

3    Mr. Rothenberg didn't testify.  And Judge Tigar had mentioned

4    he thought there may be other jurors who maybe feel the same

5    way.

6        So I guess my question is:  Are there other jurors who

7    feel that same way, who understand that the law places no

8    burden on Mr. Rothenberg to testify or to present any evidence

9    or defense but would still feel a little unhappy or bothered

10   by that fact?

11       Is there anybody out there who thinks that would be

12   something that they -- kind of gnaw at them or make them feel

13   a little bit irritated or upset?

14       Ms. Street, you had -- you had said that that was

15   something that sort of had come to mind.  And I was wondering

16   if you could elaborate on that a little bit.

17       Yes, with the microphone, of course.  Thank you.

18           **PROSPECTIVE JUROR:**  I thought I already covered that.

19       **MR. FAKHOURY:**  Okay.  And so I guess then I'll ask,

20   and you feel confident that you understand that Mr. Rothenberg

21   has no obligation and you could put that aside?

22           **PROSPECTIVE JUROR:**  I understand that's the law, yes.

23       **MR. FAKHOURY:**  Okay.  Thank you.

24       Anybody else?

25                       (No hands.)

1          **MR. FAKHOURY:**  I'm going to ask Ms. Phillips, on your

2    questionnaire you had put that you may have some difficulty

3    with a defendant's decision to not testify.

4          And so again, sort of the same question I've asked the

5    larger group.  After the conversation and the back-and-forth,

6    do you still feel that way?  Or have you kind of thought about

7    it and changed your mind on that?

8          **PROSPECTIVE JUROR:**  Yeah, I thought about it more and

9    I better -- have better perspective on that.

10         **MR. FAKHOURY:**  Okay.  And is that perspective --

11         **PROSPECTIVE JUROR:**  That I would be fine, I would not

12   hold it against the witness.

13         **MR. FAKHOURY:**  Okay.  And it wouldn't -- it wouldn't

14   make you unhappy if Mr. Rothenberg chose not to testify?

15         **PROSPECTIVE JUROR:**  No.

16         **MR. FAKHOURY:**  Okay.  Thank you so much.

17         And again I'm going to ask that the microphone go back to

18   Mr. Burgan.

19         **THE COURT:**  Could we pass those sanitizing wipes down

20   in case someone wants to give the mic a pass with that.

21   Thanks very much.

22         **MR. FAKHOURY:**  And for -- and Mr. Burgan, it's sort

23   of the same question for you.  On your questionnaire, you had

24   some concerns about why a defendant wouldn't want to present

25   his story.  And I'm just curious.  After hearing sort of the

1    conversation we've had this morning, do you still feel that

2    way?  Or do you understand and accept that Mr. Rothenberg has

3    no burden of proof, has no obligation to present evidence, and

4    has no obligation to testify?

5             **PROSPECTIVE JUROR:**  Yeah, I'm -- I'm not sure exactly

6    what you're referring to on my questionnaire.  Personally, I

7    feel like -- for example, if I was in the case of

8    Mr. Rothenberg, if it was me, if I cannot testify, I would

9    surely not testify in a sense that I wouldn't want to put

10   myself through the -- through the process of testifying, be

11   interviewed, and then people from -- what is it called, the --

12   the -- not the defense but the --

13            **THE COURT:**  The prosecutor?

14            **PROSPECTIVE JUROR:**  The prosecutor ask you,

15   cross-examining you and things like that, you know.  So if I

16   can get out of it for myself, you know, if I was in his place,

17   I would surely not testify if I hadn't to.

18            **MR. FAKHOURY:**  Thank you for that answer.

19       Okay.  I'm going to ask you to pass the microphone to

20   Mr. Yee again.  And this is sort of a question on a different

21   topic.

22       You mentioned that you have a sister-in-law who's a judge

23   and a brother-in-law who's a prosecutor.  And I'm just -- I

24   wanted to make sure you understand that as tempting as it

25   might be to pick up the phone and call your sister-in-law or

1   your brother-in-law, you understand that Mr. Rothenberg has a

2   right to have his trial be based on what's presented here in

3   court?

4        Right?  Do you understand that?

5             **PROSPECTIVE JUROR:**  Correct.  I understand that.

6             **MR. FAKHOURY:**  Okay.

7             **PROSPECTIVE JUROR:**  My brother-in-law has passed away

8   and I --

9             **MR. FAKHOURY:**  Oh, I'm sorry to hear that.

10             **PROSPECTIVE JUROR:**  I just saw my sister-in-law, but

11   I didn't say anything.  She told me just tell the truth.

12             **MR. FAKHOURY:**  That's generally a good rule to live

13   by.

14        For others who have family, whether they're cousins or

15   siblings or who are in law enforcement, I know Ms. Phillips

16   has a father who was a probation officer, and I know that

17   Ms. Vulic -- and I apologize if I'm saying that wrong -- has a

18   cousin who's a prosecutor, is there anybody who's going to be

19   tempted to talk to someone about their experiences serving as

20   a juror in a criminal case?

21        In other words, are -- is everyone comfortable with the

22   idea that the case -- that Mr. Rothenberg has a right to a

23   trial based on the evidence presented in this case, not based

24   on talking to people outside of court or Internet research,

25   right?

 1          That's okay?

 2          All right.

 3          Okay.  I'm going to ask the microphone be passed to

 4     Mr. Hailey.

 5          And this is will be my last question, Your Honor.

 6          Mr. Hailey, you had a very interesting comment in your

 7     jury questionnaire which was about in this age of

 8     disinformation, it's sort of harder to govern and when asked

 9     for opinions or rely on whatever facts are available and

10     discernible.  And I'm just kind of curious if you could

11     elaborate on what you meant there.

12          **PROSPECTIVE JUROR:**  Well, I don't think it's a secret

13     that our current form of government is struggling a bit

14     because there are parties that find it easier to believe

15     information that's not verifiable.

16          So what makes it difficult is that it takes more

17     discerning and more time to figure out what's really the truth

18     and what are really the facts.

19          So I just wanted to make it clear that I would always be

20     looking for the facts and what is proveable and believable.

21          **MR. FAKHOURY:**  Okay.  Thank you so much for that

22     answer.

23          And I don't think I have any follow-up on that.  Thank

24     you.

25          Can I just have one quick minute, Your Honor?

1          **THE COURT:**  Sure.

2          **MR. FAKHOURY:**  I have no further questions.  Thank

3     you very much.

4          **THE COURT:**  Thanks, Mr. Fakhoury.

5       Okay.  Members of the jury, because of COVID we had to

6     break our jury pool up into groups.  So you're group one.  And

7     I'm going to wrap it up with you except for hardship requests,

8     which I'll talk about in just a second.  I'm going to wrap it

9     up with you, and then group two will come in.

10      I love my job.  I hope that comes through.  My favorite

11    thing about my job is jurors.  Not everybody is happy to be a

12    juror.  There's nothing I can do about that.  That's just how

13    it is.

14      I will say this:  We have good data on juror satisfaction.

15    More than 80 percent of people, their opinion of the justice

16    system goes up after they've served on a jury.  They see how

17    it works.

18      So if you're selected from the -- for the jury, you won't

19    have to take my word for it.  You'll see for yourself what an

20    amazing machine it is.

21      And if you're not selected --

22      I'll call on you in just a second, ma'am.

23      And if you're not selected or your hardship is granted,

24    I'll just say to you how lucky I was to meet you today, and I

25    hope maybe I'll get the chance to work with you in the future.

1          There is a thread of patriotism in my remarks.  It's

2      intentional.  I think jury service is one of the best things

3      about our country and I think it works very well.

4          I need to give you an admonition, and then I'll call on

5      the juror who raised her hand a second ago.

6          I need you to keep an open mind.  Okay?  Unless and until

7      you hear from the jury office that you were not selected from

8      the jury, or if you are selected, I need you to wait until

9      it's time to deliberate in the case.  We don't know anything

10     about this case.  We don't know anything about this case.  And

11     we won't know everything we need to know until all the

12     evidence is in.  So keep an open mind.

13         Secondly, following up on something Mr. Fakhoury said,

14     don't communicate with anybody in any way about the merits of

15     this case or anything to do with it until you're excused by me

16     or the jury office.  If you're asked by friends or family

17     what's going on, you can say I'm in -- been called for jury

18     duty, and if I'm selected this is about how long it's going to

19     last.  And it's a criminal case.  And that's it.

20         And if you're excused by the jury office, you're free to

21     talk about your experience here today.  But unless and until I

22     or the jury office excuses you, don't communicate with

23     anybody.  Don't look anything up on the Internet.  You'll get

24     a longer version of that instruction.  But I know you know

25     what I mean.

1          One of the things that makes trials fair is that jurors

2    only consider the evidence that's come in in court and it can

3    be tested.  And you will have the tools to evaluate whether

4    that evidence is any good.  But we have to keep it here in

5    court.

6          Yes, ma'am?  You had your hand up.

7              **PROSPECTIVE JUROR:**  Yes, hi.  I'm just curious how

8    everybody knows who we are sitting here.  How did you know?

9    Like how --

10             **THE COURT:**  Sure.  I'll tell you.

11             **PROSPECTIVE JUROR:**  All right.  That would be great.

12             **THE COURT:**  Here's how it works.  Our jury office

13   sends out a whole bunch of summons to people.  You all got a

14   summons.  And that's all a software process.  So there's a

15   culling process from driver's licenses, and I don't know where

16   we get all the different sources.  And then the wheel turns

17   and your name comes up.  And everybody gets a summons.

18         And there are also -- so a group is identified that could

19   be -- that could serve as a juror, as a jury for this trial.

20         Those prospective jurors, which is what you all are, get

21   questionnaires.  The questionnaire responses come back into

22   the jury office.  And the jury office then generates a list

23   with all of your names on it.  It gives you a random juror

24   number.  And it attaches that number to a questionnaire.

25         And that's honestly to save everybody time.  So that's not

```
 1     publicly available information.  That's not on the docket of
 2     the case.  If you went onto the court's public website, you
 3     would not see that information.
 4         But those lists and questionnaires are given to me.
 5     They're given to Ms. Lee.  And they're given to the lawyers in
 6     the case.  So they have that information.  And that's why you
 7     just really heard follow-up questions today.
 8         At the end of the case, all that information is just going
 9     to be destroyed.
10         I hope that answered your question.
11             PROSPECTIVE JUROR:  No, it didn't.  How did he know
12     that my name was Toni Street and not her --
13             THE COURT:  Oh.
14                 (Simultaneous colloquy.)
15             THE COURT:  Because -- because you were seated in
16     order.
17         Do you understand what I'm saying?  We know -- we have
18     jurors from one through whatever it is.
19             PROSPECTIVE JUROR:  Yeah.
20             THE COURT:  And they're all seated in order.  So he
21     sees someone sitting next to Hailey, and Hailey identified
22     himself at Mr. Hailey.  He just has to look at his list and
23     say who comes before Hailey.  It's Ms. Street.
24             PROSPECTIVE JUROR:  Oh, okay.
25             THE COURT:  Okay.  Yeah, I hope it's --
```

1        **PROSPECTIVE JUROR:**  I just was curious because they

2    just handed us numbers at random out there.

3        **THE COURT:**  I see, okay.

4              (Simultaneous colloquy.)

5        **PROSPECTIVE JUROR:**  -- how you guys know who we were.

6        **THE COURT:**  There are names attached to the numbers.

7    That's all.

8        **PROSPECTIVE JUROR:**  Okay.

9        **THE COURT:**  Yeah.

10        **PROSPECTIVE JUROR:**  Thank you.

11        **THE COURT:**  Let me talk about hardships for a second.

12    I have found that given the way I structure the schedule,

13    often people are able to serve even if they thought they might

14    not be able to.  But I recognize that sometimes that's just

15    still not the case.

16    As I told you before, there are rules about when I can

17    grant hardships.  And I'm not able to grant all of them.

18    Because I have two more groups coming in, this is what we're

19    going to do.  If you are not able to serve, if you feel you're

20    not able to serve on this jury for some reason, stick around

21    right now.  If you're not making a hardship request, you're

22    free to go.  The jury office will tell you at the end of the

23    day whether or not you were selected.  You'll get a call one

24    way or the other.

25    If you made a hardship request, the jury office will tell

 1    you whether or not that request was granted.  I have to wait

 2    until I've talked to everybody before I can decide the

 3    hardship requests.

 4        I'm going to say this again because it's so important.  If

 5    you are making a hardship request, you need to stay and make

 6    it.  If you're not making a hardship request, you are free to

 7    go.

 8        I have had it be the case that people left, and then they

 9    said, well, when am I going to make my hardship?  I say, well,

10    that ship sailed.

11        Thank you all again so much for your participation today.

12    And I'm sure I'll be seeing some of you again in the future.

13    Thanks.

14              **THE CLERK:**  Please rise.

15              **THE COURT:**  Let's all rise.

16              **THE CLERK:**  Please rise for the jury.

17        If you're not making a hardship request, please leave.

18              **THE COURT:**  Yeah, we're standing for you.

19              (Prospective jurors exited the courtroom.)

20              **THE COURT:**  Okay.  Why don't we get going.

21        Is it Ms. Sumandal?

22              **PROSPECTIVE JUROR:**  Yes, sir.

23              **THE COURT:**  Tell me what's happening with you.

24              **PROSPECTIVE JUROR:**  I mentioned it a little bit

25    earlier, but I have concerns about medical and also financial.

1    I am a freelancer and I -- I built this business on my own.  I

2    have two clients that I landed last month.  And we have

3    launches within the next three weeks.  There's nobody to

4    replace me.

5        And then on top of that, with the medication, because it's

6    a work-from-home position, I can kind of balance the two if

7    there are any medical aversions to the medication.

8        But I -- I don't want to guarantee that I'll be a hundred

9    percent, you know, throughout the whole trial.  And I don't

10   think that's fair.

11           **THE COURT:**  Okay.  Thanks for sharing that.

12       Mr. Burgan -- am I pronouncing that correctly?

13           **PROSPECTIVE JUROR:**  Yes, Your Honor.  In French, it's

14   Burgan, but it's impossible to say.

15           **THE COURT:**  My friend that I told you about, his name

16   is Olivier.  But there are certain places in California when

17   we go there, he introduces himself as Oliver.

18           **PROSPECTIVE JUROR:**  I understand that very well.

19           **THE COURT:**  Yes.  Mr. Burgan, what's happening?

20           **PROSPECTIVE JUROR:**  Yeah, for me, it's mainly a

21   financial hardship and some medical.  But in terms of

22   financial, the -- the work that I do, 40 percent of my

23   business is in the fourth quarter, which we're in the middle

24   of.  I'm in sales, retail -- not in stores, I sell to

25   retailers, major retailers.  And as I said, 40 percent of the

1    business is right now.

2        I have to tamper that now that you've -- you've given the

3    8:30 to 1:30.  So that leaves me a little time.  I would not

4    get paid by my company if I'm here, but the -- that's not --

5    not really the issue.  The issue is the business that I would

6    lose.  But I think 1:30 gives me the afternoons.  So that

7    would be good.

8        And in terms of physical condition, I'm wearing a heart

9    monitor right now.  I've got a few heart issues.  It's just

10   monitoring right now so....

11            THE COURT:  Do you have a tachycardia or some kind of

12   irregular heartbeat?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  Arrhythmia or --

15            PROSPECTIVE JUROR:  No.  I have calcification of the

16   arteries.

17            THE COURT:  Hmm.

18            PROSPECTIVE JUROR:  And I have -- I used to be a

19   smoker, and I quit finally 11 months ago now.

20            THE COURT:  Congratulations.

21            PROSPECTIVE JUROR:  So anyway I'm dealing with the

22   repercussion of that.  And so calcification of the arteries

23   and heart issues in my family.

24            THE COURT:  Okay.

25            PROSPECTIVE JUROR:  Yeah.

1          **THE COURT:**  Mr. Burgan, I don't want to put words in

2     your mouth, but I hear you saying that you thought the trial

3     would block you entirely from doing your work.  You now

4     understand it won't block you entirely.  And it would -- it

5     would be -- well, I don't want -- I don't want to put words in

6     your mouth.

7          It's not the most ferocious hardship request I've ever

8     heard.  You know what I mean?

9          **PROSPECTIVE JUROR:**  I understand.

10         I work with people in the East Coast and the UK so morning

11    is usually busy.

12         **THE COURT:**  Right.

13         **PROSPECTIVE JUROR:**  And afternoon is when I could

14    catch up.  But, yeah, anyway, that -- that's what I think.

15    But I really do appreciate, you know, being here today and

16    having, you know, being called on and --

17         **THE COURT:**  And I appreciate your being so

18    forthcoming about your circumstances.

19         Let me think about those.

20         **PROSPECTIVE JUROR:**  All right.  Thank you.

21         **THE COURT:**  Okay.  Thanks.

22         Is it Mr. Yee?

23         **PROSPECTIVE JUROR:**  Yes, David Yee.

24         **THE COURT:**  Yes, sir.

25         **PROSPECTIVE JUROR:**  So I've been -- I have a hip

1    flexor injury for the past two months that I've been trying to

2    recover from which makes it very difficult for me to sit

3    still.  I don't know if you notice me stretching and fidgeting

4    in my seat.

5        I do have a doctor's appointment on the 3rd and the 15th.

6    I am getting better.  I am on the road to recovery.  I can

7    move the appointments if needed.  But I've been dealing with

8    this for over two months now so I do want to try to recover as

9    fast as I can.

10             **THE COURT:**  Okay.  Let me give you an answer.  And

11   just tell me candidly if it solves your problem or not.

12       First of all, I love it when someone says I can reschedule

13   that appointment.  And it shows that people are really working

14   hard.  You didn't have to say that.  I appreciate that you're

15   doing that.

16       I've had -- I had a blind juror once.  Okay.  I've had

17   pregnant jurors.  I've had jurors recovering from back

18   surgery.  You have to meet people where they are.  We could --

19   if you were selected for this jury, we could seat you in such

20   a way that you could stand up whenever you needed to.  And

21   that would be fine.  I'll just put you on the back toward the

22   end.  So you would not be required to sit for any long, long

23   period of time.

24       I don't know if that --

25             **PROSPECTIVE JUROR:**  If that's not a distraction,

 1    then, okay.

 2          **THE COURT:**  Yeah.  No, it's not.  And I've had

 3    many -- you know, we all do too much sitting.  So lots of

 4    jurors have had lower back issues, and that's an easy problem

 5    for me to solve.

 6          **PROSPECTIVE JUROR:**  Okay.

 7          **THE COURT:**  Okay?  Thanks very much.

 8       Would you pass the microphone back to Ms. Phillips.

 9          **PROSPECTIVE JUROR:**  Thank you.

10          **THE COURT:**  Yes, ma'am.

11          **PROSPECTIVE JUROR:**  Yes, Your Honor.  The schedule

12    you provided is actually much more flexible with my concerns

13    than I -- as I had originally stated in my questionnaire.

14          **THE COURT:**  Let me get your questionnaire in front of

15    me.  Just give me one second if you wouldn't mind.

16          **PROSPECTIVE JUROR:**  Okay.

17          **THE COURT:**  Oh, there we go.

18       Okay.  Go ahead, yeah.

19          **PROSPECTIVE JUROR:**  Yeah, so I think it -- in my

20    questionnaire it stated that I am a primary health care agent

21    for my -- my parents who are elderly.  I was able to

22    reschedule something today to be able to make it, with my

23    sister who's also a primary care agent for them.

24       And the appointments that I do have that are important for

25    me sequentially fall outside of the time.

1          **THE COURT:**  Oh, okay.

2          **PROSPECTIVE JUROR:**  So for the most part, I can

3     reschedule if I am selected.

4          However, at the -- on the week of the 16th, so

5     November 17th --

6          **THE COURT:**  Yes, ma'am.

7          **PROSPECTIVE JUROR:**  -- I am -- I have prepaid travel

8     for a work conference where I'm presenting.  And I would

9     not -- need to not -- need to depart on November 17th.

10          **THE COURT:**  Let me ask you if this solves your

11    problem.  I've done this also many times.  I don't know if the

12    trial is going to go that long.  We'll have a couple

13    alternates.

14          What I if -- and I can't make you this promise yet.  I'm

15    asking would this promise solve your problem?  That is, if we

16    get to the 17th, it's my problem.  You'll be on the plane.  Do

17    you understand what I'm saying?

18          **PROSPECTIVE JUROR:**  Yeah.  That's reasonable to me.

19          **THE COURT:**  Okay.

20          **PROSPECTIVE JUROR:**  I just wouldn't want to --

21          **THE COURT:**  Well, I just need to talk with the

22    lawyers about that.

23          **PROSPECTIVE JUROR:**  Okay.

24          **THE COURT:**  See if I'm able to make that promise.

25    And you are the HR director at the San Francisco Unified

1   School District.

2           **PROSPECTIVE JUROR:**  Yes.

3           **THE COURT:**  That's a big job.  What's your head count

4   over there?

5           **PROSPECTIVE JUROR:**  We have over 11,000 employees.

6   But I -- I am not responsible for all of the functions --

7           **THE COURT:**  Right.

8           **PROSPECTIVE JUROR:**  -- related to them, just the

9   talent acquisition and development.

10          **THE COURT:**  Oh, I see.  Okay.  That always strikes me

11  as the good part of that job.

12          **PROSPECTIVE JUROR:**  It is, yes.

13          **THE COURT:**  And what's the conference you're going

14  to?

15          **PROSPECTIVE JUROR:**  It's the UCEA conference in

16  Seattle.

17          **THE COURT:**  Okay.  All right.

18      Well, I'm going to -- so really just to manage your

19  expectations, the request is in two parts:  Can I -- can I

20  grant the hardship by making you that promise or not, and not

21  would be that I am making you miss that conference, which I

22  don't want to do.  But it's just -- there is some possibility

23  of that so --

24          **PROSPECTIVE JUROR:**  There is a possibility...?  I'm

25  sorry?

```
 1              THE COURT:  There's a possibility I would not grant
 2   the hardship request.
 3              PROSPECTIVE JUROR:  Hmm.
 4              THE COURT:  Do you understand what I'm saying?
 5              PROSPECTIVE JUROR:  I am a primary facili- --
 6   presenter at that conference.  So I would -- you know, and my
 7   travel is purchased.  So I would like to avoid missing it.
 8              THE COURT:  Me too.  Me too.  Okay.  Thanks.
 9         Would you pass the microphone to Mr. -- I want to say
10   McMaster.
11              PROSPECTIVE JUROR:  Yes, Your Honor.
12              THE COURT:  Just waiting to hear about the hardship.
13              PROSPECTIVE JUROR:  The reason I'm asking is I have
14   had two prostate surgeries.  I can't stay a length of time
15   without urinating.  I constantly have to urinate, and
16   sometimes when I go urinate and I come back and go about what
17   I'm about to do, then I have to go back and urinate more.
18              THE COURT:  Yes, sir.
19              PROSPECTIVE JUROR:  It's just --
20              THE COURT:  How long -- what's the longest -- well,
21   let me ask -- I don't need to -- the question is:  Our periods
22   of time are 90 minutes long.
23              PROSPECTIVE JUROR:  I've been trying -- I've been
24   sitting here with my legs crossed waiting for you to say let's
25   take a break, all this kind of stuff.  Since I got in the
```

1    building, I've already urinated four times between when I got

2    in here before I even saw you.

3         **THE COURT:**  I'll tell you what.  I think I've got all

4    the information I need.  So I'm just going to let you go.  I

5    mean I'll consider the hardship request, but I don't need to

6    keep you here any longer.

7         **PROSPECTIVE JUROR:**  Thank you, Your Honor.

8         **THE COURT:**  Yes, sir.

9       And there's a men's room --

10        **PROSPECTIVE JUROR:**  Yes, I saw it on the way in.  I

11   know where it is.

12        **THE COURT:**  Terrific.

13      Yes, sir, Mr. Latimer, what's happening?

14        **PROSPECTIVE JUROR:**  Your Honor, my concerns in terms

15   of a hardship would be it's not about money or my employer,

16   anything like that, but I do work in a Title I school.  These

17   kids have a very low reading level.  In my experience, it's

18   very important that it's me there because I am the

19   professional, that I know these kids.  I would be afraid that

20   if they had a substitute for a long period of time, that these

21   substitutes would not be familiar with the IEP needs for

22   special education students or things like that.

23      It would become more of a playtime if there's a sub there

24   rather than me.  And these kids would not be developing the

25   critical thinking skills, reading skills, those kinds of

1   things if I'm not the one there administering the lessons.

2          **THE COURT:**  I have a great deal of respect for your

3   profession.

4          **PROSPECTIVE JUROR:**  Thank you.

5          **THE COURT:**  And I think I've got the information that

6   I need.

7          **PROSPECTIVE JUROR:**  Thank you.

8          **THE COURT:**  Would you pass the microphone back to

9   prospective Juror Number 1, Ms. Vulic.

10          **PROSPECTIVE JUROR:**  Thank you, Your Honor.

11      My hardship, it's sort of twofold.  I am the sole income

12   in my household right now.  So having to take time off to do

13   jury duty would be a bit of a hardship.  Now knowing your

14   schedule, that makes it a lot better because I can just, you

15   know, work from 2:00 in the afternoon until whenever and --

16   and still -- still get things done.

17      But the other thing is that I do have a hearing on

18   November 16th at 8:30 in the morning in San Mateo Superior

19   Court, and I don't know that I can -- I don't think I can

20   change it.

21          **THE COURT:**  And is that a hearing in which you are

22   representing a client, or are you a party in that case?

23          **PROSPECTIVE JUROR:**  Representing a client.

24          **THE COURT:**  Uh-huh.  What is the nature of the

25   hearing?

1          **PROSPECTIVE JUROR:**  It's the hearing on the petition

2    to seal that arrest record that I --

3          **THE COURT:**  I see.

4          **PROSPECTIVE JUROR:**  -- talked about.  So --

5          **THE COURT:**  Okay.  Thank you.

6          **PROSPECTIVE JUROR:**  Thank you.

7          **THE COURT:**  Okay.  Thank you all for sticking around

8    and giving that information.  You can all also go.

9       Let's all rise for these prospective jurors, please.

10         **THE CLERK:**  Please rise for the jury.

11      (Remaining prospective jurors exited the courtroom.)

12      (The following proceedings were heard out of the presence

13   of the jury venire:)

14         **THE CLERK:**  You may be seated.

15         **THE COURT:**  All right.  We're outside the presence of

16   any prospective jurors.

17      We had, even for our COVID times, a much higher level of

18   failures to appear and sick and that sort of thing than is

19   customary.  Although our failures to appear have gone up

20   substantially during COVID.

21      I was pleased to see, though, that many prospective jurors

22   who had expressed hardship concerns in their questionnaires

23   did not actually wind up making a hardship request.

24   Mr. Burgan, it was kind of funny actually, he was essentially,

25   I think, trying to tell us that he was available to serve.

 1    But he was so -- had so prepared himself to make a hardship

 2    request that he stuck around anyway.

 3         Mr. Waldinger, I think, took about 45 minutes which is

 4    longer than I think I had stated.  But that's on us.  We were

 5    not keeping track of the time.

 6         Maybe Ms. Lee could give us information about which jurors

 7    are going to be in our next group.  And then we could take

 8    five or ten minutes for a bathroom break before our next group

 9    comes in.

10         Ms. Lee.

11              **THE CLERK:**  Yes, sir.

12         For group two, we have 27, 28, 30, 31, 32, 34, 35, 37, 38,

13    39, 40, 43, 46, 47, and 48.

14              **THE COURT:**  43, then it goes to 46?

15              **THE CLERK:**  Yes, sir.  And then 47.

16              **THE COURT:**  And we do have 47.

17              **THE CLERK:**  Yes, sir.

18              **THE COURT:**  And do we have 48?

19              **THE CLERK:**  Yes, sir.

20              **THE COURT:**  Okay.  Do we know what is -- do we know

21    anything about Jurors 29, 41, 44, or 45?

22              **THE CLERK:**  So I do know that failure to appear for

23    number 29.

24              **THE COURT:**  Okay.

25              **THE CLERK:**  Numbers 44 and 45 are sick.

1      And as an add-on, Juror Number 61, who is set to come in

2   at the noon group, is here but wanted to know if she could be

3   seen with the 10:00 a.m. group.

4           **THE COURT:**  Seems fine to me.

5           **THE CLERK:**  Okay.  And I will --

6           **THE COURT:**  Still random.

7           **THE CLERK:**  I will follow up with Denisa about 41

8   because she did not give me a code for that person.

9           **THE COURT:**  Okay.  Terrific.

10      Does anyone want to put anything on the record before we

11   take a bathroom break?

12           **MR. WALDINGER:**  No, Your Honor.

13           **MR. FAKHOURY:**  No, Your Honor.

14           **THE COURT:**  Okay.  Let's be in recess for ten minutes

15   or as soon as everyone can get back.

16           **THE CLERK:**  Yes, sir.

17      Court is in recess.

18      (Recess taken at 10:49 A.M.; proceedings resumed at

19   11:00 A.M.)

20      (The following proceedings were heard out of the presence

21   of the jury venire:)

22           **THE COURT:**  All right, ladies and gentlemen.  Joining

23   Mr. DeGuglielmo at this table over here is Bianca Rey -- she's

24   called "B." -- Ms. Rey, also went to Yale and is going to

25   clerk for Judge Paez after she finishes here.

```
 1          All right.  Let's bring in group number two.
 2          THE CLERK:  Yes, sir.
 3          THE COURT:  As you will have observed, it isn't
 4   possible for me to get through the parties' proposed voir dire
 5   and still go through three groups of jurors today.  So I
 6   didn't.
 7      (The following proceedings were heard in the presence of
 8   the jury venire:)
 9          THE COURT:  Good morning.
10          JURORS:  Good morning.
11          THE COURT:  That was so weak.  Let's try it again.
12   Good morning.
13          JURORS:  Good morning.
14          THE COURT:  That was good.
15      Welcome to the United States District Court for the
16   Northern District of California.  You're in federal court now.
17   My name is Judge Jon Tigar.  It's spelled with an A, but you
18   say it like the animal.  That's just what they stuck me with.
19      I want to start by thanking you, all of you, for doing
20   your civic duty and appearing in court today.  We'll get to
21   the questioning in a few minutes.  I just wanted to say a few
22   things, kind of make everybody comfortable, and, you know, set
23   the table, as it were.
24      This is a federal criminal trial.  I'll tell you a little
25   bit more about that in a second.  But I wanted to start by
```

1   just saying how important you are, how important all of you

2   are.  Because today you have the opportunity to be a kind of

3   judge.

4        You or a group of you is going to make a decision in this

5   case.  I'm not going to make the decision even though I'm the

6   judge.  The parties are not going to make the decision.  The

7   lawyers are not going to make the decision.  I'm not going to

8   make the decision.

9        I'll rule on objections.  I'll instruct you as to the law.

10  But I don't deliberate to reach a verdict.  In fact, I'm not

11  even allowed in the jury room.  So the thing that you came

12  here to do is very important, and you are very important.

13  Certainly you're the most important people in the lives of the

14  people seated at the counsel table.

15       I'm pretty patriotic.  I just am.  I feel that we're all

16  so lucky to live in America and enjoy all the freedoms and

17  privileges that we have.

18       And America doesn't actually ask that much of us in return

19  when you think about it.  And a lot of countries that have

20  compulsory military service, you get to be a certain age, and

21  for a year or two or three, you just have to do whatever the

22  military says.  You have to be in the military and you --

23  that's what you do.

24       Some countries have compulsory national service, not

25  military service, but again for a fixed period of time, you

1    just -- you live where the country tells you to live and you

2    do what needs to be done for the country.

3        We don't have any of that.  We are so rich in so many

4    ways.  But we don't have that.  What we do have is jury duty.

5        Now I'm not in charge of how jury duty works.  Certainly

6    we could make it more convenient for people than we do.  And

7    certainly we could pay more.  Especially in the state court

8    system where I used to work, we could pay our juries more.

9    That's not up to me.

10       But that is what we ask of our citizens.  And the reason

11   we do that is because we have the right to a jury trial which

12   is one of the greatest fact-finding machines that has ever

13   been invented.

14       I have been a judge for more than 20 years.  I served in

15   the state court for 11 years.

16       Who here is from Alameda County?

17       Okay.  I used to work for you.  Now I work for all of you

18   because the federal district is bigger.  It has a lot of

19   counties.  And I've presided over a lot of jury trials, and I

20   want to tell you something.  You get 12 people, put them in a

21   room, and they have different backgrounds and life experiences

22   and all that, they don't miss much.  They don't.  It's really

23   amazing.

24       But you can't have jury trials if you don't have jurors.

25   It's like when you go to the hospital because you got in a car

1  accident, you need blood.  That's because people gave blood.

2  Okay, that's how it works.  People stop giving blood, that

3  would be it, we wouldn't be having any blood transfusions.

4      If we didn't have people showing up for jury service, we

5  couldn't have jury trials.  And the right to a jury trial has

6  been part of this country since the country was founded.  It's

7  right there in the Constitution.  And it's one of the most

8  important rights we have.

9      Now, the thing about a jury trial is none of us knows when

10  we're going to need a jury trial.  Kind of like giving blood,

11  in that way, too.

12      How many people in this room are saying, you know,

13  "Exactly two years from now, I'm going to need to file a

14  lawsuit."  "Three years from now someone's going to sue me."

15  "Five years from now, I or someone close to me is going to

16  be charged with a crime."

17      You can't do that.  We don't know.  So to keep this

18  important right alive, we just need to do our part when we get

19  a jury summons.  That's just how it works.

20      Maybe we could do without jury trials.  A lot of countries

21  don't have jury trials actually.  The parties could just

22  submit their case to me to decide.

23      In our system, you have the right to a jury trial.  The

24  parties can waive that right and just ask the judge to make

25  the decision.  Civil or criminal.  But for the most part, they

1    don't.  They don't waive that right.

2         I just told you I've been a judge for 20 years.  How many

3    decisions do you think I've made?  I'm really comfortable

4    making decisions.  But the founders of the country didn't want

5    me.  These parties and the parties in other jury trials didn't

6    want me.  They wanted you.  They wanted you.  Because that

7    life experience and common sense is better than anything.

8    Especially when you get a group of people together.

9         So that's what makes that machine so powerful.  And that's

10   why these parties are looking forward to your service.

11        I also recognize and the parties recognize jury service

12   imposes on your time, right?  Let's be honest.  It does.

13        But I'll tell you what.  I'll make you a promise.  If you

14   were suing someone for money or you were being sued for money

15   or you were charged with a crime, here's something you would

16   not tell your lawyer.  You would not tell your lawyer, "Please

17   find me 12 people with nothing better to do.  That's who I

18   want deciding my case.  I want 12 people that have nothing

19   going on."

20        Why wouldn't you say that?  Because you would want

21   12 people just like you who lead busy lives, who have had a

22   variety of life experiences, and all the common sense that

23   comes from that.

24        So I thank you again because that's the service that

25   you're providing to the people of the Northern District of

1    California.

2        I want to talk about COVID for a second.  The trajectory

3    of the COVID pandemic keeps changing.  For about a year and

4    change, we couldn't do any trials in this building at all.  So

5    we were not able to serve the public the way we're supposed

6    to.

7        And then we opened back up again.  And it's amazing

8    really.  It's -- when I look around, I see all these masked

9    faces.  It used to choke me up the first few trials I did.

10   Because it's America showing its resilience.  It's the key

11   institution of democracy.  We're not going to let this disease

12   stop us.  We're going to keep doing our work.

13       You can hear in my voice it still chokes me up a little

14   bit.

15       Anyway, the pandemic is not as severe as it used to be.

16   No question.  But it's still with us.  And my job is to keep

17   all of you as safe as I can and to keep you as comfortable as

18   I can so you can focus on the evidence in this case and doing

19   your job as jurors.

20       Now, there are some of you that are thinking, "Why do I

21   have to wear a mask?  This thing's like the flu now.  I'm

22   vaccinated.  I'm not worried about it."

23       But there are some of you who are thinking that you are

24   still worried.  And when you go to the Safeway or you go to

25   the ballgame, you're putting on a mask.

 1        And so what we're going to do in here is we are going to

 2    make sure that everybody feels good about the situation, and

 3    that means that we're all going to wear masks even if we

 4    don't -- even if we might not choose to do that in our

 5    day-to-day lives.

 6        It's my belief that you're all vaccinated.  We're going to

 7    sit a little further apart.  The witness is going to have a

 8    mask.  We have special clear masks for the witnesses.  This is

 9    a high-efficiency air filter over here which we put next to

10    the witness because the witness does most of the talking.  And

11    that's just what we're going to do.

12        I've been trying so many cases since we started up again.

13    I have not had one juror get sick with COVID.  And if I can

14    keep it that way, I'll be very happy.

15        I don't believe you all have been sworn in yet.

16        Would you stand up and raise your right hands, please.

17                        (Jury venire sworn.)

18            **THE CLERK:**  Thank you so much.  You may be seated.

19            **THE COURT:**  All right.  Now it's official.

20        I want to introduce you to some of the participants in the

21    case.  I have so many pieces -- oh, here they are.  Okay.

22        I told you a second go this is a federal criminal case.

23    I'll tell you what the charge is in just a second.

24        First, though, I want to just introduce you to some of the

25    participants in the trial.  We refer to -- often refer to the

1    prosecution in a criminal case as the government.  And you'll

2    often hear me say the government this, the government that,

3    and what I mean is the United States government because that's

4    who brings a federal prosecution.

5        Representing the government in this case are lawyers Kyle

6    Waldinger and Nicholas Walsh.

7        Gentlemen, would you stand up?  Mr. Waldinger is closer to

8    me and Mr. Walsh is on the other side.

9        Also they're being assisted by a paralegal Beth Margen.  I

10   don't see her at the table right now.

11       **MR. WALDINGER:**  She had to attend to something, Your

12   Honor, but she will be back.

13       **THE COURT:**  Very good.  And you'll see Ms. Margen

14   maybe going in and out of the courtroom.  A paralegal assists

15   the lawyers in the presentation of the case.

16       And with them also is case agent Jennifer Barnard.

17   Ms. Barnard is with the Federal Bureau of Investigation.

18   Thank you.

19       The defendant in this case is Michael Brent Rothenberg.

20   Mr. Rothenberg is standing now.  He's represented by Hanni

21   Fakhoury.  Mr. Fakhoury is in the gray suit.  And between them

22   is their paralegal, Nathaniel Torres.

23       While I'm at it, I'll introduce to you some of my court

24   staff.  Mauriona Lee is my ambassador to the world.  I'm not

25   allowed to talk to any of you directly.  Any communications

1    you have will be with Ms. Lee.  She's the best courtroom

2    deputy in the Northern District of California.  It's part of

3    my good luck that she works for me.

4        And our court reporter here is Raynee Mercado.  Raynee

5    Mercado doesn't miss much.  It is hard to report in real time

6    what everybody is saying.  But that's what she does.  And I've

7    worked with Ms. Mercado many, many times.  So I'm glad she's

8    assisting us in this trial.

9        Also you will see from time to time there will be young

10   people -- well, I think everyone is young.  But anyway you'll

11   see young people seated over here.  The two that are seated

12   there now are Andy DeGuglielmo and Bianca Rey, who is called

13   B.  And they both graduated from Yale Law School.

14       And they -- one of them has had and one of them will have

15   clerkships with a Court of Appeal judge.  Those are the people

16   that have the power to reverse me if I make a mistake so I

17   have to be very nice to them while they're sitting here.

18       All right.  Let me tell you what the case is about.

19   Actually before that, let me talk about schedule.  Because I

20   know for some of you, you're wondering about schedule, and

21   until I tell you, you're not going to be able to hear anything

22   else I say.  So I'll tell you about schedule.

23       In this courtroom, our trial day goes from 8:30 in the

24   morning until 1:30 in the afternoon.

25       So you've got to clear security and park your car and all

1    that so you can be seated right there by 8:30.  And at 1:30 in

2    the afternoon, you can go about your business.

3        Also, we are not in session on Fridays.  If you're

4    deliberating at the end of the case, you can deliberate on

5    Friday.

6        Presentation of the evidence, 8:30 to 1:30, Monday through

7    Thursday.  That's it.  So you'll have time to get out there

8    before the rush hour, go pick up your kids, do some work, all

9    that kind of thing.  We're not going to take up your whole

10   day.

11       This week we'll be in session through Thursday.  Next

12   week -- next week we'll be in session Monday and Tuesday.

13   Wednesday and Thursday we'll be dark.

14       Following week we'll be in session Monday through

15   Thursday.  I think we're going to be done that week.  There is

16   a small chance that the trial would spill over into that

17   following week.  We'd be done by Tuesday, the 22nd.

18       So if that wasn't clear, you can feel free to ask

19   questions later if you need to.  But that's the schedule, and

20   that's as long as I think it could -- that's how long I think

21   it's probably going to go and that's as long as I think it

22   could possibly go.

23       Who's been a juror before?  Raise your hand.

24       One person.  Thank you for your jury service.

25       If you -- if you know some people who have done jury

1    service, often the court takes the whole day.  And you might

2    say why are you just doing 8:30 to 1:30?  I'll tell you what.

3    You get as much done on my schedule as you do in the other

4    schedule.

5        I don't take a lunch break.  And every juror I've ever

6    asked tells me they like my schedule better because it allows

7    them to keep doing at least some of their work or any of their

8    family responsibilities or that kind of thing.

9        Also, I have 400 cases.  So I've got to have some time in

10   the afternoon to work on the other 399.  So that's why we have

11   that.

12       I'm going to read to you from a jury instruction.  Jury

13   instructions are just statements of the law.  This particular

14   jury instruction tells you what this case is about.  So it's a

15   good instruction to read right now at the beginning of the

16   process.

17       This is from what we are currently calling Stipulated Jury

18   Instruction Number Two.

19       This is a criminal case brought by the United States

20   government.  The government charges the defendant with bank

21   fraud and false statements to a financial institution.  The

22   charges against the defendant are contained in the indictment.

23       The indictment simply describes the charges the government

24   brings against the defendant.  The indictment is not evidence

25   and does not prove anything.  The defendant has pleaded not

1    guilty to the charges and he is presumed innocent unless and

2    until the government proves him guilty beyond a reasonable

3    doubt.

4        In addition, the defendant has the right to remain silent

5    and never has to prove his innocence or present any evidence.

6    For the sake of clarity, I will tell you that means the

7    defendant has no obligation to testify in this case.

8        To help you follow the evidence, I will now give you a

9    brief summary of the elements of crimes that the government

10   must prove to make its case.

11       The government has charged the defendant with two crimes

12   in this trial.  The defendant is charged in count one with

13   bank fraud.  To prove that crime, the government must prove

14   first that the defendant knowingly executed or attempted to

15   execute a scheme to defraud a financial institution as to

16   something of value or a scheme or plan to obtain money or

17   property from the financial institution by making false

18   statements or promises.

19       Second, that the defendant knew that the statements or

20   promises were false.

21       Third, that the statements or promises were material; that

22   is, they had a natural tendency to influence or were capable

23   of influencing a financial institution to part with money or

24   property.

25       Fourth, that the defendant did so with the intent to

1    defraud, meaning with the intent to deceive and cheat.

2         And fifth, that the financial institution was insured by

3    the Federal Deposit Insurance Corporation, also called FDIC,

4    or was an organization which finances or refinances any debt

5    secured by an interest in real state including private

6    mortgage companies and any subsidiaries of such organizations

7    and whose activities affect interstate or foreign commerce.

8         That's count one.

9         The defendant is charged in count two with making false

10   statements to a financial institution.

11        To prove that crime, government must prove three elements:

12        First, that the defendant made a false statement or report

13   to a federally insured financial institution with all of the

14   jurors agreeing as to the specific false statement or report.

15   In other words, if the government alleges that the defendant

16   made more than one statement, the jurors to have all agree on

17   which statement it was that constituted this element of the

18   crime before the jurors could find the defendant guilty.

19   That's the first element.

20        Second element, that the defendant made the false

21   statement or report knowing it was false.

22        And third, that the defendant did so for the purpose of

23   influencing in any way the action of the financial

24   institution.  It isn't necessary to prove that the financial

25   institution was in fact influenced or misled or that the

 1    financial institution was exposed to a risk of loss.  What

 2    must be proved is that the defendant intended to influence the

 3    financial institution by the false statement.

 4         So that's what the case is about.

 5         Some of you are thinking about hardships.  A hardship

 6    request is when a juror asks the judge to excuse that juror

 7    from service on the jury because it would be a hardship for

 8    them to serve.

 9         Examples of hardship are extreme financial hardship.  The

10    word "extreme" is right there in the rule.  I'm not allowed to

11    consider hardship to your employer, it has to be to you.  A

12    preplanned medical procedure.  Certain kinds of preplanned

13    travel.  Care for very young children or care for an elderly

14    relative.  These are some examples.

15         I have to follow the rules on hardship requests just like

16    everything else.  That's what judges do.  We follow the rules.

17         At the end of this process, I'll give you a chance to make

18    a hardship request before everybody leaves for the day.  And

19    at the end of the day, I'll go through all the hardship

20    requests and I'll decide them.  And the jury office will tell

21    you whether or not your hardship request was granted.

22         I'm of two minds about hardship requests.  Of course it's

23    never the right time to get a jury summons.  I get that.

24         I like to be liked.  I like to be liked.  So I want you to

25    say, "Oh, Judge Tigar granted my hardship request.  He's an

1    excellent judge."

2        But I also know this:  Some of you came into this room

3    thinking that you might make a hardship request.  And you're

4    listening to what I have to say about jury service.  And on

5    the one hand, maybe it sounds kind of interesting, the trial.

6    And on the other hand, you're thinking, you know what, this is

7    my time.  This is my time to do my part, step up.  So I'm

8    going to move the dentist appointment, or whatever it is, and

9    I'm not going to make a hardship request.  And I'm going to do

10   my civic duty.  I'm going to step up.

11       And I don't want those people to feel gamed.

12       So, anyway, make your request if you have one, and I'll

13   decide it fairly.

14       Can everybody hear me okay?

15                     (Jurors nodding.)

16       **THE COURT:**  Okay.  If that changes at any time, wave

17   your hand around.  I'll turn the mic up.  And if that doesn't

18   work, we have assistive listening devices.  You're the judges

19   of the facts.  So you've got to be able to hear, and if you

20   have any trouble, let me know.

21       In just a second, I'm going to ask you a few questions and

22   then the lawyers are going to ask you some questions.  This

23   process is called a voir dire.  I used to think that was

24   Latin.  It turns out it's not.  It's old French.  It just

25   means we're going to ask you some questions and we need you to

1    tell the truth.

2        The questions are designed to find out if you would be

3    good jurors on this case.  You all would be good jurors,

4    period.  The question is, is this the right case for you.  So

5    we'll ask you some questions about your life experiences and

6    your opinions about things just to get at that question.

7        Now, we're not trying to find 12 people that don't have

8    any opinions.  I don't think there are 12 people that don't

9    have any opinions.  We're also not trying to find 12 people

10   that don't have any life experience.  We're not going to find

11   12 people like that either.

12       What we're looking for, not just me, but the parties and

13   the lawyers, we're looking for 12 people that can put aside

14   their opinions and their life experiences and just decide this

15   case based on the law and the evidence.  And I know you can do

16   it because that's what I do every day.

17       I was not appointed to the state court 20-plus years ago

18   or appointed to the federal court almost ten years ago to

19   apply the law according to Jon Tigar.  That's not the job.

20   The job is to apply the law according to the legislature, the

21   democratically elected legislature, whether that's a state

22   legislature or Congress or whatever it is, and the decisions,

23   the binding decisions of other courts.

24       And I'll tell you, it doesn't happen very often, but every

25   now and then there's a law I don't agree with personally.  It

1      doesn't happen very often, but every now and then there's a

2      case that I think, gosh, it would be the right thing for this

3      one side to win, you know.  But I've got to put that to one

4      side.  That's the job.  That's the job.

5          And so you have an opinion about one thing or the other,

6      that's fine.  The question will be:  Can you put that opinion

7      to one side and just decide the case based on the facts or the

8      law?  That's what it means to be a juror.  So I'm going to ask

9      you some questions about that.

10         I don't think this is going to happen in this particular

11     case, but if you're asked a question and you just don't feel

12     answering in front of all these people, let me know that.  At

13     a break, we can go into the jury room with our court reporter

14     and a couple of the lawyers, and then you can tell me there.

15     Okay?

16         It does happen occasionally.  We're not -- again we're not

17     trying to invade anybody's privacy.  We're just trying to find

18     out if you'd be a good juror for this case.

19         So let me just ask a few preliminary questions, and then

20     I'll turn it over to the lawyers.

21         First of all, has any of you heard anything about this

22     case, about Mr. Rothenberg or Silicon Valley Bank before

23     today?

24         I'm not seeing any hands.

25             **THE CLERK:**  There is one.

1              **THE COURT:**  Oh, is there one?  Was there a hand?

2              **PROSPECTIVE JUROR:**  Yes.

3              **THE COURT:**  Oh, all right.  So I missed it.

4         Would you please -- first of all, my courtroom deputy is

5    going to hand you a microphone.

6         Would you tell me your name.

7              **PROSPECTIVE JUROR:**  Karen Loewenstern.

8              **THE COURT:**  Ms. Loewenstern, tell me.

9              **PROSPECTIVE JUROR:**  I'm a shareholder of

10   Silicon Valley Bank.

11             **THE COURT:**  That's a direct hit.

12             **PROSPECTIVE JUROR:**  Yeah.

13             **THE COURT:**  Okay.  You own shares of stock in

14   Silicon Valley Bank?

15             **PROSPECTIVE JUROR:**  Correct.

16             **THE COURT:**  And that fact by itself of course is

17   relevant.  Were you aware of this case before today?

18             **PROSPECTIVE JUROR:**  No.

19             **THE COURT:**  Okay.

20        So I actually -- what Ms. Loewenstern just did is a great

21   lesson and something that I forgot to tell everybody.  And

22   that is please volunteer -- I didn't ask who's got shares in

23   Silicon Valley Bank, but Ms. Loewenstern figured out, well,

24   the Judge probably ought to know this.  Okay.

25        So if you have something in your mind that's a "probably

 1    ought to know," the lawyers probably ought to know this, the

 2    Judge probably ought to know this, raise your hand and share.

 3    Okay?  That's very helpful.

 4        Relatedly, who here has teenage children or has ever had

 5    teenage children, raise your hand.  Okay.

 6        Who's ever met a teenager?  Raise your hand.  Okay.

 7        Who knows what "TMI" means?  Raise your hand if you've

 8    heard that expression.

 9        Ms. Loewenstern, what does MI mean?

10            **PROSPECTIVE JUROR:**  Too much information.

11            **THE COURT:**  Yeah, too much information.

12        When my sons, who are now adult men, when they were

13    teenagers, if I talked at the dinner table, they would say,

14    "Oh, dad, TMI."  Right?  They didn't want to hear anything dad

15    had to say.

16        We don't have TMI in here.  So we like volunteering.

17        Similarly I might say, has any of you ever had a negative

18    or a positive experience with the FBI?  Okay.  And you might

19    think, well, I had an experience, but it's not going to affect

20    me as a juror so I'm not going to raise my hand.

21        I don't want that.  I want you to raise your hand.  Even

22    though you know you can be fair, we want the information.  And

23    the lawyers have the right to be able to follow up with you.

24        So, again, there's no TMI, we like volunteering, and we

25    don't like self-editing.

 1          Ms. Loewenstern, thank you for sharing that fact.

 2          So anybody else -- on that subject, has anyone else had

 3     any interaction with Silicon Valley Bank?

 4          Has anyone heard before today of Mr. Rothenberg or any

 5     fund called the Rothenberg Fund of any kind?

 6          Okay.  I'm not seeing any hands.

 7          Has any of you ever worked in investment banking or any

 8     similar field?

 9          Okay.  I have two hands.  The juror in the front.

10          Is the microphone -- would you pass the microphone to this

11     gentleman.

12          Yes, sir, what's your name?

13               **PROSPECTIVE JUROR:**  Joseph Mooney.

14               **THE COURT:**  Mr. Mooney.

15               **PROSPECTIVE JUROR:**  I don't -- I didn't work directly

16     in investment banking, but I was in IT and I supported -- I

17     was at Wells Fargo for like 13 years.

18               **THE COURT:**  Okay.  And you were not -- I gather from

19     that you were not in a position of reviewing information that

20     was provided -- financial information that was provided --

21               **PROSPECTIVE JUROR:**  No.

22               **THE COURT:**  -- to the bank?

23               **PROSPECTIVE JUROR:**  But I worked with people --

24               **THE COURT:**  Okay.

25               **PROSPECTIVE JUROR:**  -- of different groups.

1          **THE COURT:**  That's a good example of raise your hand

2     and disclosing even though it wasn't a direct hit.  Thank you.

3          Would you pass the microphone back to this gentleman in

4     the back row.

5          Yes, sir.

6          **PROSPECTIVE JUROR:**  Yeah, my name is Aayush Sharma.

7          **THE COURT:**  Mr. Sharma, tell me.

8          **PROSPECTIVE JUROR:**  Yeah, I spent two years interning

9     at a private equity fund.  So doing investment probably

10    similar to --

11         **THE COURT:**  Okay.  What was the name of the fund?

12         **PROSPECTIVE JUROR:**  Vista Equity Partners.

13         **THE COURT:**  And just out of curiosity, I don't know

14    where Vista was located.  Did they have any relationship with

15    Silicon Valley Bank?

16         **PROSPECTIVE JUROR:**  Not that I know of.

17         **THE COURT:**  Okay.

18         **PROSPECTIVE JUROR:**  They were in Austin.

19         **THE COURT:**  Okay.

20         So there will be testimony in this case, I think, that

21    Mr. Rothenberg provided financial information to

22    Silicon Valley Bank that they evaluated in the course of

23    making loan decisions.  Is there anything about your prior

24    experience at Vista Equity Partners that you think would

25    affect your ability to be fair and impartial?

1          **PROSPECTIVE JUROR:**  Not that I could think of.

2          **THE COURT:**  Does anybody, as you sit here right now,

3     have any feelings about the United States government or the

4     United States justice system that you think would affect your

5     ability to be fair and impartial?  Anybody in that category?

6          No?  Okay.

7          Does any of you know or think you might know any of the

8     persons who are seated at counsel table that I introduced you

9     to?

10          Also not seeing any hands.

11          Let me read you some additional names of persons who are

12     involved in some way in the trial who might be involved.

13          First of all, in addition to the people at the

14     government's table I introduced you to, there is a paralegal

15     named Jasmine Sanders who goes by J. Sanders you may see from

16     time to time.

17          Also the following persons may be witnesses in the case.

18     They're not all going to testify, I don't think.  There just

19     isn't time for all these people to testify.  Also other

20     persons may testify that I am not going to name.  But for now,

21     here are the prospective witnesses.

22          Silicon Valley Bank witnesses Brian Bell, Michelle Jandu,

23     Frederick Kreppel, K-R-E-P-P-E-L, George Pires or Pires.

24     Ingrid Robertson, and Pablo Serna, with an "S."

25          Merrill Lynch witnesses:  Christine Allscheid, Benjamin

1    Bolt, Anna Jenkins, Ryan Kelty.  Chicago Title Company witness

2    Hapi Yamato.

3        And in addition to Ms. Barnard -- excuse me.  In addition

4    to Special Agent Barnard, law enforcement witnesses, Special

5    Agent Anthony Ghio, or Ghio -- it's G-H-I-O -- with the

6    Internal Revenue Service.  And Michael Capuzzi, also with the

7    Internal Revenue Service.

8        And then other witnesses:  Paulette Brunk, who's a notary

9    public, Jefferson Robert Eppler, who goes by J.R. Eppler, from

10   Rothenberg Ventures Management Company, Thomas Leep, L-E-E-P,

11   James Kiss, the field supervisor for the San Francisco Field

12   Office of the Federal Deposit Insurance Company.  And Mario

13   Morales-Arias from American Express.

14       Does anyone here feel that he or she knows any of the

15   persons I just identified?

16       No.  Okay.

17       Mr. Waldinger, questions for these prospective jurors?

18          **MR. WALDINGER:**  I have a few, Your Honor.

19       Mr. Sharma, you worked -- when did you work at Vista

20   Equity Partners?

21          **PROSPECTIVE JUROR:**  2018 to 2020.

22          **MR. WALDINGER:**  And you're a -- you're a consultant

23   now?

24          **PROSPECTIVE JUROR:**  Yeah.

25          **MR. WALDINGER:**  Do you consult -- what industry do

1    you consult in?

2            **PROSPECTIVE JUROR:**  It's split between private equity

3    and -- probably tech.

4            **MR. WALDINGER:**  Okay.  With respect to the private

5    equity part of your life, including Vista Equity Partners, did

6    you take -- or were those -- was Vista Equity Partners

7    something that took investments from outside investors?

8            **PROSPECTIVE JUROR:**  They had LP's, yes.

9            **MR. WALDINGER:**  Limited partners?

10           **PROSPECTIVE JUROR:**   (Nods head.)

11           **MR. WALDINGER:**  Okay.  And what was your involvement?

12   Were you doing -- were you an analyst?  Were you seeking

13   investments?  What were you doing at Vista Equity Partners?

14           **PROSPECTIVE JUROR:**  Yeah, I was in an intern.  So I

15   sat between the portfolio team and the investment team, mainly

16   on the portfolio side so working with the companies they

17   acquired.

18           **MR. WALDINGER:**  Okay.  So you were working with

19   the -- the companies to which the Vista Equity Partners was

20   getting investments?

21           **PROSPECTIVE JUROR:**  Yes.

22           **MR. WALDINGER:**  Okay.  Did you have much contact with

23   limited partners or investors?

24           **PROSPECTIVE JUROR:**  Never.

25           **MR. WALDINGER:**  Okay.

```
 1                    (Off-the-record discussion.)

 2              THE COURT:  Mr. Waldinger, I just want to advise you

 3       that you're audible.

 4              MR. WALDINGER:  Thank you, Your Honor.

 5              THE COURT:  Yeah.

 6              MR. WALDINGER:  I think that will be it for us.

 7              THE COURT:  Wow.  Okay.

 8         Mr. Fakhoury?

 9              MR. FAKHOURY:  Thank you, Your Honor.

10         Still morning.  Good morning, ladies and gentlemen.  I'm

11       Hanni Fakhoury.  I have the privilege of representing

12       Mr. Rothenberg.

13         Forgive me if I mispronounce your name.  My last name is

14       Fakhoury so I try to be sensitive to that.

15         Ms. Loewenstern -- oh, and I should actually, before I ask

16       the question, because this came up in the last panel.

17       Obviously you've all filled out questionnaires so we sort of

18       have some information about you already.  So that might be

19       where some of these questions are coming from.

20         Ms. Loewenstern, you mentioned on your questionnaire that

21       your spouse or partner is a banker.  And I was curious what --

22       what bank that was.

23              PROSPECTIVE JUROR:  He does consulting for hedge

24       funds.

25              MR. FAKHOURY:  Okay.
```

1          **PROSPECTIVE JUROR:**  But he's worked for various banks

2     in the past.

3          **MR. FAKHOURY:**  Okay.  And, yes, we should pass the

4     microphone.  So maybe for the benefit of the court reporter,

5     we could -- if you could repeat your question, thank you.

6          **PROSPECTIVE JUROR:**  Okay.  My husband has worked for

7     various banks in the past, but he's not employed by a bank

8     right now.  He's --

9          **MR. FAKHOURY:**  Okay.

10          **PROSPECTIVE JUROR:**  -- a consultant.

11          **MR. FAKHOURY:**  Okay.  Thank you so much.

12          **THE COURT:**  And members of the jury, while

13    Mr. Fakhoury is considering his next question, let me just say

14    don't let your feelings get hurt if no one asks you a

15    question.  Okay?  It just means that they got enough

16    information from the questionnaire.  They're satisfied that

17    you are capable of serving on the jury, and that sort of

18    thing.  And they're very, very respectful of your time.

19          So it's everyone's wish to try to get through this jury

20    selection process today, if we can, so we can start with the

21    evidence tomorrow.

22          Mr. Fakhoury.

23          **MR. FAKHOURY:**  Thank you, Your Honor.

24          And then -- and then of course the flip side is if I do

25    ask you a question, I'm also not picking on you, I'm just

1  trying to get some clarification of things that I -- that

2  would be helpful.

3      So let me ask that we transfer the microphone to Mr. Dao.

4  Where is Mr. Dao?

5      Good morning, Mr. Dao.

6          **PROSPECTIVE JUROR:**  Good morning.

7          **MR. FAKHOURY:**  I just wanted to confirm, you listed

8  on your questionnaire you work as a transportation security

9  officer.  Does that mean you're -- you work at an airport?  Or

10  what does that mean exactly?

11          **PROSPECTIVE JUROR:**  We contracted for TSA.

12          **MR. FAKHOURY:**  Okay.

13          **PROSPECTIVE JUROR:**  San Francisco Airport.

14          **MR. FAKHOURY:**  Okay.  So you work for the TSA -- as a

15  contractor for TSA at SFO?

16          **PROSPECTIVE JUROR:**  Yes, correct.

17          **MR. FAKHOURY:**  How long have you done that for?

18          **PROSPECTIVE JUROR:**  For 13 years.

19          **MR. FAKHOURY:**  Oh, that's a thankless job.  So thank

20  you very much.

21      Okay.  Let's -- I'm going to ask the microphone be

22  transferred to Mr. Kungu.  Where -- there you are, sir.

23      Good morning, Mr. -- Mr. Kungu.  Am I saying that

24  correctly?

25          **PROSPECTIVE JUROR:**  Yes.  Good morning.  Yeah.

1              **MR. FAKHOURY:**  Okay, good.

2       You mentioned on your questionnaire that your partner or

3    spouse works at CEIAA.  And I was just curious what that was.

4              **PROSPECTIVE JUROR:**  Basically she takes care of the

5    elderly.

6              **MR. FAKHOURY:**  Okay.

7              **PROSPECTIVE JUROR:**  She's an assistant and she's been

8    there for years.

9              **THE COURT:**  Mr. Kungu, I just missed that important

10   word.  Works with...?

11             **PROSPECTIVE JUROR:**  The elderly.

12             **THE COURT:**  Oh, the elderly.  Thank you, sir.

13             **MR. FAKHOURY:**  Okay.  Now I'm going to ask we pass

14   the microphone to Ms. Combs.

15       Good morning.  On your questionnaire, you mentioned that

16   your brother is an FBI agent.

17             **PROSPECTIVE JUROR:**  Correct.

18             **MR. FAKHOURY:**  Does he work here in the Bay Area?

19             **PROSPECTIVE JUROR:**  No.  In San Antonio.

20             **MR. FAKHOURY:**  San Antonio, Texas.  What is his -- if

21   you know and if you can answer, is he --

22             **PROSPECTIVE JUROR:**  I believe it's domestic

23   terrorism.

24             **MR. FAKHOURY:**  Domestic terrorism.  Okay.  Thank you

25   so much.

```
1          Do you know if he's ever worked on financial crimes or

2    fraud-related criminal allegations?

3               PROSPECTIVE JUROR:  Not that I'm aware of.

4               MR. FAKHOURY:  Okay.

5          Okay.  I wanted to raise an issue with the whole group,

6    and then we can go into more specific questions with specific

7    jurors.

8          One of the things that Judge Tigar already mentioned is

9    that in a criminal case, the defendant has no obligation to

10   present any evidence and has no obligation to speak or

11   testify.  In fact, the burden is always on the government to

12   prove the defendant's guilt, and so the defendant does not

13   have any right [sic] to testify.

14         Is there anything about that that maybe makes you feel

15   uncomfortable or you're unhappy about that?

16         I don't see any hands.

17         And in the -- oh, yes, sir.

18              PROSPECTIVE JUROR:  I mean, I wouldn't say it's

19   unhappy or so --

20              THE COURT:  Could we get the microphone to this

21   gentleman, please.

22         And, sir, when the microphone gets there, if you would

23   just start by just stating your name.

24              PROSPECTIVE JUROR:  Absolutely.

25              THE COURT:  Thank you.
```

```
 1              PROSPECTIVE JUROR:  Ray Nishimura.

 2              THE COURT:  Mr. Nishimura, if you could start from

 3      the beginning, that'd be great.

 4              PROSPECTIVE JUROR:  Yes.  To answer the question,

 5      it's not that -- well, what I kind of thought is whenever

 6      you're going to present your case, whether you're innocent or

 7      not, it's just that all parties should actually be able to

 8      testify in a situation defending themselves or -- or not.

 9      That's just -- that was just my personal opinion.

10              MR. FAKHOURY:  Okay.  Thank you -- thank you very

11      much for sharing that.  And so that I can make sure I

12      understand your answer correctly, it sounded like your thought

13      was a person should have the opportunity to defend

14      themselves --

15              PROSPECTIVE JUROR:  Yes.

16              MR. FAKHOURY:  -- accused of a crime.  Is that a yes?

17              PROSPECTIVE JUROR:  Yes.

18              MR. FAKHOURY:  Okay.

19              THE COURT:  Mr. Fakhoury, I asked the first group

20      this similar question, and I think I should have done it

21      before.  Let me just jump in here because I -- this is -- this

22      is something that -- that I could have raised earlier in my

23      questioning of you.  And there may be other persons here

24      besides Mr. Nishimura who feel similarly even though they

25      didn't raise their hands.
```

1          So I just -- I'll start by setting the table, and then

2     I'll ask all of you.

3          As Mr. Fakhoury just said, as you heard me say earlier, in

4     our system of justice, first, the defendant doesn't have to

5     prove anything.  They've no burden of proof.  They don't have

6     to put on any evidence ever.  The government has to prove the

7     defendant's guilt beyond a reasonable doubt.  The defendant

8     can put on evidence if they want to, but they don't have to.

9     They have no burden.  That's the law.

10         Is any of you going to have any trouble following that law

11    if you're selected for this jury?  Would you raise your hand?

12         Okay.

13         Now, the second part of that is the defendant in a

14    criminal case has no obligation to testify at all.  Again,

15    they can if they want to.  But when our founders put together

16    the Constitution, they decided in our Constitution that the

17    government ought to be able to prove its case beyond a

18    reasonable doubt without making a person give evidence against

19    themselves.  And if the government couldn't do that, we just

20    decided that then there shouldn't be a conviction.  That's the

21    kind of justice system they decided we want to have.  And

22    we've had it for a long time.

23         So I have two different questions.  One, I know you think,

24    well, he's going to say can I follow the law.  That's my

25    second question.  My first question is:  Does it bother you?

```
 1          Because I hear Mr. Nishimura saying, you know, hey, I
 2     think if you're charged with a crime, I sort of want to hear
 3     from you.
 4          So my question is:  Are there any of you that it just
 5     bothers you?  You think the Constitution shouldn't have this
 6     right?  Raise your hands if you feel that way.
 7          Okay.  I'm seeing three people.
 8          Ma'am, would you say your name.
 9               PROSPECTIVE JUROR:  Carrie Wasson.
10               THE COURT:  Is it Wasson?
11               PROSPECTIVE JUROR:  Wasson, with a W.
12               THE COURT:  Okay.  Yes, ma'am.  You feel that way?
13               PROSPECTIVE JUROR:  I mean, I -- yeah, I kind of feel
14     like we should hear from both sides.
15               THE COURT:  Okay.  Well, that's not the law.
16               PROSPECTIVE JUROR:  Right.
17               THE COURT:  So if you're picked for the jury, just
18     like all the other jurors, just like me, your Judge, you've
19     got to follow the law.
20          Are you, if you're picked for this jury, and
21     Mr. Rothenberg, you know, uses his Constitutional right not to
22     testify, doesn't talk in the trial, are you going to hold that
23     against him?
24               PROSPECTIVE JUROR:  If it's the law, no.  I mean I
25     have to put that -- my feelings aside.
```

1          **THE COURT:**  That was a pretty good answer.

2       Okay.  But when I say to Ms. Wasson that's a pretty good

3    answer, I'm not trying to make anybody in the room feel a

4    particular way.  Okay.  The reason it's a good answer because

5    it sounds like that's actually the textbook job of a juror.

6    But if this would really be impossible for you, I need to know

7    that too.

8       Would you pass the microphone down to the woman at the

9    front of the jury box.

10      Good morning, ma'am.

11          **PROSPECTIVE JUROR:**  Good morning.

12          **THE COURT:**  Would you tell me your name, please.

13          **PROSPECTIVE JUROR:**  Cristina Fargas.

14          **THE COURT:**  Ms. Fargas, so I gather this bothers you.

15   If the defendant is not testifying in the case, if that

16   happens that would bother you?

17          **PROSPECTIVE JUROR:**  It doesn't bother me.  I'll just

18   wonder why if you're innocent, why don't you say something.  I

19   mean if it's your right to say something, maybe it would clear

20   you.  If you're innocent, they having nothing to hide.

21          **THE COURT:**  Okay.  So let's not use the word "bother"

22   then.  Let's just say big question.  That would be a big

23   question for you.  Is that fair?  I'm just trying to figure

24   out a shorthand that captures what you're saying.

25          **PROSPECTIVE JUROR:**  Well, I don't think it's a

1    question.  I think it's like my feeling or the way I was

2    brought up that --

3              **THE COURT:**  Feeling.

4              **PROSPECTIVE JUROR:**  -- if you're -- didn't do

5    anything wrong, you have to be truthful about it.  And just

6    say, you know, why.

7              **THE COURT:**  Okay.  Fair enough.  I've done a lot of

8    cases.  Okay.  A lot of people in the world feel the way you

9    feel.  That's not unusual.

10       So the question is -- to use your word, that's your

11   feeling, you have this feeling.  Are you going to hold it

12   against the -- so the law is Mr. Rothenberg doesn't have to

13   testify if he doesn't want to, and the jurors can't consider

14   that fact in determining whether he's guilty.  They have to

15   look at the evidence the government put on and see if it's

16   enough.

17       If Mr. Rothenberg chooses not to testify, are you going to

18   hold it against him and think, well, he must be -- maybe he's

19   guilty?

20             **PROSPECTIVE JUROR:**  Hmm, no.  I -- I think I'll

21   listen to everything before making any decisions.

22             **THE COURT:**  Okay.  All right.

23             **PROSPECTIVE JUROR:**  And talk about it with everybody

24   else.

25             **THE COURT:**  Well, that's another part of the job.

1    Did you guys read my script before you came in?

2              **PROSPECTIVE JUROR:**   I mean as a jury.

3              **THE COURT:**   No, but I mean that's actually a big part

4    of the job is, when you are deliberating, to talk with

5    everyone else and get their views before making a decision.

6    So I'm just noting that's something interesting you said.

7         Okay.   And, again, I'm not trying to talk anybody into

8    anything.   It's true that part of the job is to -- and you can

9    have an opinion, and then to be on the jury, you have to be

10   able to put it to one side.   Some people are not able to put

11   it to one side.

12        But I hear you saying you could follow the law.

13             **PROSPECTIVE JUROR:**   Of course.

14             **THE COURT:**   Okay.

15        Is there anybody -- and Mr. Nishimura, we kind of took the

16   stage away from you.

17             **PROSPECTIVE JUROR:**   That's fine.

18             **THE COURT:**   Could you pass the microphone back to

19   Mr. Nishimura.

20        I think there was a gentleman over on the bench who also

21   raised his hand.   So I'll get to you in just a second.

22        Mr. Nishimura, same question.   Obviously it raises a

23   question in your mind, defendant didn't testify, would you be

24   capable of not holding that against him and just evaluating

25   the case based on the evidence?

```
 1              PROSPECTIVE JUROR:  Yeah, sure.  Separate and aside,
 2      I should be able to do that.
 3              THE COURT:  Except for...?
 4              PROSPECTIVE JUROR:  I should be able to do that.
 5              THE COURT:  Okay.  Okay.
 6              PROSPECTIVE JUROR:  Yeah, just -- an ideology that I
 7      have, I guess.  I mean --
 8              THE COURT:  It's not uncommon.
 9              PROSPECTIVE JUROR:  I actually worked for the state
10      for 35 years in management, and I --
11              THE COURT:  State of California?
12              PROSPECTIVE JUROR:  A lot of appeals --
13              THE COURT:  Yeah.
14              PROSPECTIVE JUROR:  -- at my level as administrator
15      and supervisor.  And of course made decisions based on what
16      the regulations CCRs, CFRs, by the state versus a client, and
17      they may have abused the system, and had to make decisions.
18      And I was able to get information from both sides obviously.
19              THE COURT:  Right.  And this is different.
20              PROSPECTIVE JUROR:  Totally different.
21              THE COURT:  This is totally different.
22                        (Simultaneous colloquy.)
23              THE COURT:  If this was a civil case, we wouldn't be
24      having this conversation.
25              PROSPECTIVE JUROR:  Right.  I understand that.  It's
```

```
 1    just that it's my mindset seems to be able to understand it
 2    logically.  But actually given the information, putting that
 3    aside, will I make an informed choice?  Probably.  But
 4    still -- it still bothers me.  That's all.
 5            THE COURT:  Yeah.  Okay.
 6        Would you pass the microphone to this gentleman over here?
 7    We call that bench "the rail."
 8        And by the way, if you're selected for the jury and you
 9    wind up sitting over there, we have stadium seats for you so
10    you don't have to sit on that hard wood for several hours.
11        Sir, would you tell me your name.
12            PROSPECTIVE JUROR:  Yeah, it's Eric Rasmussen, Your
13    Honor.
14            THE COURT:  Mr. Rasmussen, tell me -- first of all,
15    tell me how you feel about this issue.
16            PROSPECTIVE JUROR:  Yeah.  My feel or preference of
17    course would be to have as many inputs as possible which would
18    include hearing from the defendant.
19        In terms of would it -- could I still be objective without
20    that?  Sure.  You know, follow the law, of course.  But just a
21    personal preference, it's another, you know, numerable verbal,
22    you know, instead of just carefully crafted statements from
23    the -- the lawyers.  So just a personal preference.
24            THE COURT:  You -- so you're a software engineer by
25    training?
```

1          **PROSPECTIVE JUROR:**  Yeah.

2          **THE COURT:**  So you're good at sorting data probably.

3          **PROSPECTIVE JUROR:**  I'm good at data.

4          **THE COURT:**  You're good at data.

5      Let me see if I can summarize your position and you

6   correct me if I misstate it in any way.  Okay?

7      You think it would be a useful input if you could hear

8   from the defendant about what happened.  And it would be your

9   preference to get that information if you could.  But you

10   understand that the law does not require the defendant to

11   testify, and you won't hold it against him if he doesn't.

12          **PROSPECTIVE JUROR:**  Very succinct.  Yep.

13          **THE COURT:**  Okay.  Good.

14      I think I got all the hands.  Did I miss anybody?

15      Okay.  As I said, I covered this with the first group and

16   not the second.  And I appreciate Mr. Fakhoury letting me

17   interrupt him.

18      Mr. Fakhoury.

19          **MR. FAKHOURY:**  Thank you, Your Honor.

20      One moment.

21                  (Pause in the proceedings.)

22          **MR. FAKHOURY:**  So just to sort of close the loop on

23   this topic, I know Judge Tigar asked the questions better than

24   I could ask them.  And a couple people raised their hands.

25   But there were a couple people who I don't think we've heard

1    from but who had indicated in their questionnaires that they

2    may have some issues with that.  So I'm just going to go

3    through my list.

4         And I guess I'll start with Ms. Shak.  Am I saying that

5    right?  And did I say it correctly?

6              **PROSPECTIVE JUROR:**  Yeah.

7              **MR. FAKHOURY:**  Okay.  Perfect.

8         So and I'll try my best to be succinct, and I'm a lawyer

9    so that's a challenge.

10        So again on your questionnaire, you sort of indicated you

11   thought it would be important to hear all sides of the

12   situation.  But as you heard sort of the conversation and as

13   you've heard the instructions from Judge Tigar, do you still

14   feel that way?  Or do you understand or have a -- accept that

15   you'd have to not require -- or rather not hold it against

16   Mr. Rothenberg if he chose not to testify or present any

17   evidence?

18             **PROSPECTIVE JUROR:**  Yeah.  I think just in general in

19   like everyday situations, if there's a conflict, I'd like to

20   hear as much as I can from all parties.  But in this specific

21   case, where it's the law that the defendant doesn't have to, I

22   understand that as well.  And I will listen to all the pieces

23   that are shared with me.

24             **THE COURT:**  Ma'am, would you say your name again.

25             **PROSPECTIVE JUROR:**  Christina Shak.

 1              **THE COURT:**  Thanks, Ms. Shak.  I just forgot to make

 2     a note.  Thanks.

 3              **MR. FAKHOURY:**  Thank you for that answer.

 4         And so I'll ask if we could pass the mic to Mr. Mooney, I

 5     believe the gentleman down there.

 6         And again, similar question.  Your questionnaire had

 7     indicated sort of the --

 8              **PROSPECTIVE JUROR:**  Yes.  It would be nice to hear,

 9     but I wouldn't hold it against him.

10              **MR. FAKHOURY:**  Okay.

11              **PROSPECTIVE JUROR:**  I understand it's --

12              **MR. FAKHOURY:**  Okay.  Thank you.

13         Let me see if there's anybody I missed.

14                     (Pause in the proceedings.)

15              **MR. FAKHOURY:**  So there was two other people I'm

16     going to and then I'll stop talking.

17         So I'm going to ask we send the mic back this way to

18     Mr. Kungu.

19         I'm saying that right?

20              **PROSPECTIVE JUROR:**  Yeah.

21              **MR. FAKHOURY:**  Okay.  Good.

22         So again, the same -- same question.  Your questionnaire

23     had indicated you felt like the defendant should defend

24     himself in court.  And again hearing this conversation, you

25     understand that a defendant can defend himself in court by

1   just simply challenging the government's case.  Is that --

2           **PROSPECTIVE JUROR:**  Yes.

3           **MR. FAKHOURY:**  -- something you understand and are

4   comfortable with?

5           **PROSPECTIVE JUROR:**  Now I understand, yes.

6           **MR. FAKHOURY:**  And that's something you're okay with,

7   or is there still something about that that makes you feel

8   like, well, that's not a very efficient way to get to the

9   truth or shouldn't be that way?

10          **PROSPECTIVE JUROR:**  No, I'm good.

11          **MR. FAKHOURY:**  You're good.  Okay.  Thank you so

12  much.

13      And then the last -- the last person I'm going to ask is

14  Ms. Shapiro.  So -- there you go.

15      And again, you had indicated on your questionnaire, you

16  know, people should be -- a defendant should be expected to

17  denied themselves.

18      And just again, the same questions that I've been asking.

19  You understand that a person in a criminal case can defend

20  themselves by not saying anything at all and putting the

21  burden -- well, not putting the burden -- the burden solely is

22  on the government, and that's a -- that's a perfectly okay way

23  to defend yourself.  Is that okay with you?

24          **PROSPECTIVE JUROR:**  It's okay with me.  It -- it's

25  kind of like what a lot of other people were saying that it's

 1   just like a personal opinion that, you know, people should be

 2   able to -- should be -- feel comfortable speaking if they

 3   don't have anything to hide.

 4              **MR. FAKHOURY:**  Okay, great.  Thank you for your

 5   answer.

 6        I have nothing further, Your Honor.  Thank you.  Thank

 7   you.

 8              **THE COURT:**  Mr. Waldinger, you have the look of a man

 9   who wants a sidebar.

10              **MR. WALDINGER:**  I was just going to ask if Your Honor

11   would let me ask one or two questions to one of the jurors.

12              **THE COURT:**  Any objection?

13              **MR. FAKHOURY:**  No, that's fine, Your Honor.

14              **THE COURT:**  That's fine.

15              **MR. WALDINGER:**  Thank you, Your Honor.  And thank

16   you, Mr. Fakhoury.

17        Mr. Kungu, you indicated on your questionnaire, in

18   addition to the question that Mr. Fakhoury asked you, that you

19   didn't think that you would be a good judgment -- or a good

20   candidate to make a judgment of anyone.

21        And do you remember -- do you remember answering that

22   question?  And --

23              **PROSPECTIVE JUROR:**  Yeah.  Basically I basically

24   don't like to judge, but now it's -- it's in this courtroom, I

25   have no choice but for the law.  So I'm good.

1              **MR. WALDINGER:**  You're good?

2              **PROSPECTIVE JUROR:**  Yeah.

3              **MR. WALDINGER:**  So you feel like you could make a

4      decision in this case?

5              **PROSPECTIVE JUROR:**  Yeah.  Basically just I don't

6      like to judge anyone.  So but now in the courtroom, I'll do

7      what's asked by the Court to do.  It's okay.

8              **MR. WALDINGER:**  Very good.

9          Thank you, Your Honor.

10             **THE COURT:**  Thank you, Mr. Waldinger.

11         Well, members of the jury, we got to this point a little

12     faster than I thought we would.  That's good.  We had some

13     time to make up and I know you all are very busy.

14         Let me explain to you what happens next.

15         So it used to be we'd bring everybody into the courtroom

16     all at once, and we can't do it that way because of COVID.  So

17     there's another group sitting right behind you that the

18     lawyers and I have to talk to.

19         If you are making a hardship, then you should stay and

20     make it.

21         A hardship request is a request to the judge that you be

22     excused from jury service because it would be a hardship for

23     you to serve.

24         Examples of hardship are extreme financial hardship.  The

25     word "extreme" is right there in the rule.  It's not hardship

1    to your employer.  Prepaid travel.  A medical procedure that's

2    been scheduled.  The need to take care of an infant and nobody

3    else can do it.  These are the kinds of things that are a

4    hardship.  Some I can grant, some I can't.

5        Those of you who are making a hardship will stick around.

6    You'll have the microphone.  You'll explain to me what the

7    facts are.

8        I'll take all the hardship requests through the course of

9    the day.  At the end of the day, I'll go through them and I'll

10   grant or deny them as the case may be.

11       The jury office will call you at the end of the day and

12   let you know whether you've been selected for this jury.  I

13   think they'll let you know whether or not your hardship was

14   granted.  They might just say you're not on the jury.  But

15   you'll know one way or another.

16       I used to be able to do it right there on the spot, and

17   with broken up into groups like this I can't.  I just can't do

18   it that way.  So I'm sorry you have to wait a little bit.

19       I love working for you.  I feel so lucky to be part of

20   this system.  It's not perfect.  It has a lot of

21   imperfections.  It just has fewer imperfections than all the

22   other ones.  So that's why I like it so much.

23       We have good data on jury service.  More than 80 percent

24   of people who serve on a jury, their opinion of the justice

25   system goes up because they see how it works for real.  And

1    they're able to forge decision-making bonds with other people

2    that are not like anything that most people have ever done

3    before.

4        So you can't all be on the jury obviously.  Some of you

5    won't be.  I've really enjoyed talking to you and getting to

6    know you.  Some of you I got to know only through your

7    questionnaires.  But I appreciate your time.  If you're not

8    picked for this jury, I hope I get a chance to work with you

9    some other time.  Juries are my favorite part of my job.

10       Let me give you an admonition before you go out the door.

11   It's two things that are very important.

12       The first is keep an open mind.  You might get picked for

13   the jury in this case.  I don't know.  We haven't heard any

14   evidence.  We don't have actually any idea what's going on in

15   this case or what the result ought to be.  If you are picked,

16   the evidence will come in one piece at a time.  You've got to

17   keep an open mind until all the evidence is in.  That's the

18   first thing.

19       The second thing is do not communicate with anybody about

20   anything related to this trial, the merits or otherwise, not

21   the people in it.  When you've been told by the jury office

22   you're excused, or you're on the jury and I excuse you at the

23   end of the trial, at that point you can talk to anybody.

24   Okay?

25       But until that happens, you can tell your family and

1    friends that you're in the middle of jury selection.  You can

2    tell them how long the trial might go.  You can tell them it's

3    a criminal case.  That's it.

4        Also, when I say don't communicate, don't go on the

5    Internet.  Do not go on the Internet.  Do not go on any social

6    media.  Do not go on any blogs or chat rooms.  It's not that

7    interesting, but don't look me up on the Internet.  Don't look

8    anything up on the Internet.  Certainly don't look up any of

9    these lawyers or the defendant or any of that thing, or

10   Silicon Valley Bank, nothing.  Because you might be selected

11   for the jury in this case.  And if you are, I need you to make

12   the decision just based on the evidence that comes into the

13   courtroom that gets tested using cross-examination and all the

14   other things we do in here.  And if you're exposed to outside

15   information, then there's a risk that all that gets spoiled.

16   So I just need to tell you that before you walk out the door.

17       If you're making a hardship, stay.  I'll say it again.

18   It's so important.  If you're making a hardship, stay.

19   Tomorrow is too late.  If you're not, I thank you so much for

20   coming in today.  You are free to go for now, and the jury

21   office will let you know at the end of the day whether you've

22   been selected for this jury.

23       We're all going to stand up now for you, and you can leave

24   if you're not making a hardship.

25           **THE CLERK:**  Please rise for the jury.

```
 1              (Prospective jurors exited the courtroom.)

 2         THE CLERK:  You may be seated.

 3         THE COURT:  All right.  Where'd that portable

 4    microphone get to?  Does somebody have that?

 5       Okay.  Mr. Kungu, since you have the microphone, let me

 6    start with you.

 7         PROSPECTIVE JUROR:  Yes, Your Honor.

 8       I have a second grader who I take care of in the morning

 9    and I take her to school.  So my wife works -- I work the

10    night shift and I work the morning shift.  So the morning is

11    my responsibility for me to take my daughter to school in the

12    morning.  So I got to get up at 6:30, get her ready, and she

13    needs to be in school by 7:40 in the morning.  That's what I

14    do every day Monday through Friday.

15         THE COURT:  You and your wife are working different

16    shifts?

17         PROSPECTIVE JUROR:  Yes, because we have nobody else

18    to take care of --

19         THE COURT:  No, no, I got it.  There's a lot of

20    people in America in that circumstance.  And that's just a

21    hard place to be.  I'm just expressing some sympathy for your

22    situation.

23       Okay.  I think I got the facts.

24       Somebody will let you know.  Thank you.

25       Yes, sir.  You've got to remind me of your name.
```

 1          **PROSPECTIVE JUROR:**  Eric Rasmussen, Your Honor.

 2          **THE COURT:**  That's right.  Mr. Rasmussen, what's

 3   happening with you?

 4          **PROSPECTIVE JUROR:**  So I also have two young kids.  I

 5   have a two-year-old and a six-year-old.  Kind of twofold.  One

 6   is everyone's actually sick right now.  My kids have pink

 7   eyes.  This is actually not a great week for anything.

 8          **THE COURT:**  Been there.

 9          **PROSPECTIVE JUROR:**  So hopefully next week we'll be

10   on the up and up.

11      And then also I heard you mention that court starts, I

12   think you said 8:30.

13          **THE COURT:**  It does.

14          **PROSPECTIVE JUROR:**  Yeah, my older daughter has to be

15   at school at 8:00.  My wife and I kind of tend to alternate

16   days.  So if it's over an extended period of time, I'd say

17   that's especially more of a difficulty, if you're projecting

18   it to go several weeks, to the 22nd, I think you said.

19          **THE COURT:**  Right.  Let me -- I just want to unspool

20   that a little bit.  So your younger -- are they both girls?

21          **PROSPECTIVE JUROR:**  Yes.

22          **THE COURT:**  Okay.  So your younger daughter is two.

23   And what's her care situation during the day?

24          **PROSPECTIVE JUROR:**  She goes to a daycare.  She --

25   her routine is a little more flexible in the morning.  We

1    usually drop her off at 8:00.

2              THE COURT:  Okay.  And the six-year-old is in

3    elementary school.

4              PROSPECTIVE JUROR:  Yep.

5              THE COURT:  And she's got to be dropped off at 8:00.

6              PROSPECTIVE JUROR:  8:00 a.m.  Yeah, 7:50 to 8:00.

7              THE COURT:  And I don't have your questionnaire in

8    front of me.  What city is that in?

9              PROSPECTIVE JUROR:  In Clayton.

10             THE COURT:  Oh, I see.  Okay.  You're coming in a

11   ways.

12             PROSPECTIVE JUROR:  Yeah.  So it would be -- I don't

13   think I can make it in time for 8:30 --

14             THE COURT:  Got it.

15             PROSPECTIVE JUROR:  -- would be the issue.

16             THE COURT:  And are you the one who's normally taking

17   your daughter to school?

18             PROSPECTIVE JUROR:  We -- yeah, usually we'll try to

19   alternate days that we do it.  My wife tends to have more

20   morning meetings.

21             THE COURT:  I see.  What line of work is your wife

22   in?

23             PROSPECTIVE JUROR:  She works -- she's a senior park

24   manager.

25             THE COURT:  Senior park manager?

1          **PROSPECTIVE JUROR:**  Sorry.  Senior program manager.

2          **THE COURT:**  Oh, that's a different thing.  Okay.

3    Program manager.  And what entity does she work for?

4          **PROSPECTIVE JUROR:**  She works for Workday.

5          **THE COURT:**  And I'm not -- I never want to

6    unnecessarily put stress on anybody.  I just have to get

7    specifics, right, about what their day looks like.

8          **PROSPECTIVE JUROR:**  Yeah.

9          **THE COURT:**  So let's say that you were selected for

10   the jury, and tomorrow normally it would have been your day to

11   drop off your six-year-old, but you're on the jury.  What's

12   going to happen in your family?  What happens?

13         **PROSPECTIVE JUROR:**  So I think -- because I'm trying

14   to play it in my mind.  I think what we would have to do is

15   any meetings that she would have, she would need to cancel all

16   those, ask for them to be moved over the duration.  And then,

17   yeah, the morning duties --

18         **THE COURT:**  We're just kind of carving about

19   45 minutes off the bottom of your wife's day every day if we

20   put you on the jury.  That's what I'm hearing.

21         **PROSPECTIVE JUROR:**  And the morning routine is

22   difficult for -- even for two.

23         **THE COURT:**  Sure.

24         **PROSPECTIVE JUROR:**  But I'm sure that's the case for

25   everybody.

| | |
|---|---|
| 1 | **THE COURT:**  And is your older daughter, is she in |
| 2 | school a full day, or when does she get out? |
| 3 | **PROSPECTIVE JUROR:**  She goes to daycare after school. |
| 4 | **THE COURT:**  Right there at the school? |
| 5 | **PROSPECTIVE JUROR:**  There's a shuttle that picks her |
| 6 | up and takes her to the day care. |
| 7 | **THE COURT:**  Okay.  I got it. |
| 8 | **PROSPECTIVE JUROR:**  We have after care. |
| 9 | **THE COURT:**  So it's really that morning dropoff |
| 10 | that's creating the issue for you. |
| 11 | **PROSPECTIVE JUROR:**  Yeah. |
| 12 | **THE COURT:**  Plus the pink eye that I can't do |
| 13 | anything about.  Right. |
| 14 | Okay.  I appreciate that.  I think I -- did you tell me -- |
| 15 | have you told me -- I asked you all the questions I wanted to |
| 16 | ask you.  Did you tell me everything you wanted to tell me? |
| 17 | **PROSPECTIVE JUROR:**  Yeah, I think so. |
| 18 | **THE COURT:**  Okay.  Terrific. |
| 19 | Would you pass the microphone to the juror to your left. |
| 20 | **PROSPECTIVE JUROR:**  Yeah, thank you.  Thank you. |
| 21 | **THE COURT:**  Thanks. |
| 22 | Hello, ma'am. |
| 23 | **PROSPECTIVE JUROR:**  My name is Katie Yim. |
| 24 | **THE COURT:**  Y-I-M? |
| 25 | **PROSPECTIVE JUROR:**  Correct. |

```
 1              THE COURT:  Ms. Yim, what's happening?

 2              PROSPECTIVE JUROR:  I have a scheduled medical

 3    procedure on November 15.  And I mean if I get selected, I

 4    will need to reschedule it.  I mean, it's not like

 5    life-threatening procedure.  But I just want to, you know, let

 6    the Court know that I do have a procedure scheduled.

 7              THE COURT:  I appreciate that.  I appreciate

 8    everything about the way you said that.  You are -- you can

 9    tell me, but I would not require you ever to tell me what the

10    procedure was.

11              PROSPECTIVE JUROR:  It's a colonoscopy.

12              THE COURT:  Okay.  All right, ma'am.  Thank you for

13    that information.

14        And the gentleman to your left.

15        Yes, sir.  Would you tell me your name, please.

16              PROSPECTIVE JUROR:  Yes.  It's Alan Woo.

17              THE COURT:  W-O-O?

18              PROSPECTIVE JUROR:  Um-hmm.

19              THE COURT:  Mr. Woo, what's happening?

20              PROSPECTIVE JUROR:  Well, this is more of a health

21    thing.

22              THE COURT:  You said health?

23              PROSPECTIVE JUROR:  Health.

24              THE COURT:  Okay.  I'm listening.

25              PROSPECTIVE JUROR:  I have diabetes, and I don't know
```

1  how it's going to work out in this environment because my

2  blood sugars fluctuate up and down, and it's unpredictable.

3  Some days it's okay, but there are -- you know, once in a

4  while without explanation, I would get a blood sugar low, and

5  if I don't snack or take in some carbohydrate right away --

6          THE COURT:  Yeah.

7          PROSPECTIVE JUROR:  -- I got shaky and jittery.  My

8  mind starts to wander and --

9          THE COURT:  Wow.

10          PROSPECTIVE JUROR:  -- sweaty.

11                  (Simultaneous colloquy.)

12          PROSPECTIVE JUROR:  -- eat something.

13          THE COURT:  I've had two -- in two different years

14  I've had diabetic law clerks.  So I've been down that path.  I

15  mean we're all in a small chambers back there together.

16      Let me ask you if this would solve your problem.  If you

17  knew that anytime you were in the courtroom, you could eat

18  anytime it was medically necessary, would that solve your

19  problem?

20          PROSPECTIVE JUROR:  Yeah, I think like let's say if I

21  was sitting in the jury box --

22          THE COURT:  Yeah.

23          PROSPECTIVE JUROR:  And I'm allowed to just like, you

24  know, pop like a piece of candy or something.

25          THE COURT:  Yes.

1          **PROSPECTIVE JUROR:**  Usually I can feel it coming on.

2          **THE COURT:**  That's what I'm talking about.

3      And I'll just say to everybody.  We're not drinking water

4   or anything now, but the first vote we take in our trial is do

5   you want it to be the case that you can pull your mask down

6   and have a drink of water or coffee whenever you need it.  And

7   the jurors always vote yes.

8      So that's the first thing.

9      The second thing is you have a medical need.  So if I were

10  to just issue an order that says regardless of what's

11  happening with everybody else, Mr. Woo gets to eat when he

12  needs to, would that allay your concerns?

13         **PROSPECTIVE JUROR:**  Yeah.  I do -- the only other

14  factor there is usually a piece of candy would just solve the

15  problem right away.

16         **THE COURT:**  Yes.

17         **PROSPECTIVE JUROR:**  But I do need to eat like very

18  shortly after that.

19         **THE COURT:**  Yeah.

20         **PROSPECTIVE JUROR:**  Like a regular meal.  So, again,

21  it just depends on the timing.  But, you know, if it can be

22  accommodated while sitting in the jury, I'm okay with that.

23         **THE COURT:**  I need you to feel comfortable if you're

24  on the jury because I need you to pay attention to the

25  evidence.  Right?  That's the job.

1       So I'll just tell you right now.  I've had -- there's very

2   few medical problems I've -- I mean, it's not a problem.

3   There are very few conditions that I've not been able to work

4   with.  I've had a blind juror.  I had two pregnant jurors.

5   I've had all kinds of back issues.

6       If what you need is just the knowledge that if you need to

7   eat something, you'll be able to do it, and that if there ever

8   comes to be an emergent circumstance like it's insulin time, I

9   mean, I just got to step out of here, done.  I'll make you

10  that promise right now.  It's in my interest to have you not

11  worried about that.

12              **PROSPECTIVE JUROR:**  Yeah.  I'll leave it up to you.

13                      (Simultaneous colloquy.)

14          **THE COURT:**  All right.  Terrific.  Well, thank you

15  for telling me that.  It sounds like that's something we can

16  accommodate.

17      Would you pass the microphone back to the woman just

18  behind you?

19      Yes, ma'am.  Would you say your name, please.

20              **PROSPECTIVE JUROR:**  Juror Alexa Combs.

21          **THE COURT:**  Ms. Combs, what's happening?

22              **PROSPECTIVE JUROR:**  I have prepaid travel plan for

23  the Thanksgiving holiday starting on Friday, the 18th.  I'll

24  be going to Southern California.

25              **THE COURT:**  Okay.

1    I don't know if it will come to this, but would it solve

2    your problem if I said "denied with promise," meaning I'm not

3    going to excuse you from the jury, but on the morning of

4    November 18th it becomes my problem, not your problem?  In

5    other words, you'd be able to just get on the plane and take

6    off and I have to figure out what to do.  Does that solve your

7    problem?

8          **PROSPECTIVE JUROR:**  Yes.  Or like I guess enough --

9    having a sense in advance if the trial was going to go past

10    the 18th.  So then I could also just cancel before being

11    penalized.

12          **THE COURT:**  I see.  Okay.  Well, let me think about

13    that.  I'll talk about it with the lawyers.  As I said, I did

14    extend the possible -- I said out to the 22nd.  There's some

15    hope.  We have a lot of hope it's not going to go into that

16    week.

17       So let me talk about that with them.  And then I'll make a

18    decision.  Somebody will let you know.

19       Great.  Would you pass the microphone over to your right.

20       Yes, sir.

21          **PROSPECTIVE JUROR:**  My name is Raymond Skryja.

22          **THE COURT:**  Mr. Skryja, what's happening?

23          **PROSPECTIVE JUROR:**  Similar to what one of the other

24    potential jurors said.  I have two young children, one five

25    and eight, who I take to school in the morning.  And we have

```
 1   one reliable vehicle.

 2              THE COURT:  Oh, yeah.

 3              PROSPECTIVE JUROR:  Because I also have a beater that

 4   I don't use.  And --

 5              THE COURT:  Where are you coming in from?

 6              PROSPECTIVE JUROR:  San Francisco.  And they have to

 7   be at school at 8:30 a.m.

 8              THE COURT:  And what is the earliest you could drop

 9   them off?

10              PROSPECTIVE JUROR:  What's the earliest we could drop

11   them off, that's a good question.  I've never asked that

12   question.

13              THE COURT:  Right.  They've got to be there by 8:30,

14   that's the outside.  I'm just wondering what's the inside, do

15   you know?

16              PROSPECTIVE JUROR:  Not offhand, Your Honor.  I think

17   it might be a little bit before that, maybe 30 minutes.

18   Sorry, I don't know the answer to that question.

19              THE COURT:  Okay.  And any other adults in your

20   household?

21              PROSPECTIVE JUROR:  Yeah, my wife is there.

22              THE COURT:  I see.

23        Are you driving over here or taking BART, or how'd you get

24   here this morning?

25              PROSPECTIVE JUROR:  Driving.  Yeah.
```

 1          **THE COURT:**  Driving, um-hmm.  What neighborhood do

 2   you live in?

 3          **PROSPECTIVE JUROR:**  Sunset.

 4          **THE COURT:**  Okay.  I think I'm getting it.

 5      I don't have any more questions for you.  Did you tell me

 6   everything you wanted to tell me?

 7          **PROSPECTIVE JUROR:**  Yeah.

 8          **THE COURT:**  Great.

 9      Would you pass the microphone over to your right.

10      Yes, ma'am.

11          **PROSPECTIVE JUROR:**  Hi.  My name is Marni Shapiro.  I

12   am a kindergarten teacher in a small private school.  And I

13   don't -- they weren't able -- you know, I know that people

14   know that there's a really lack of substitutes currently, and

15   they weren't able to find anyone.  I don't know who is with my

16   students today.  But it would be very difficult to figure out

17   how we could get somebody to be with them for the length of

18   this trial.

19          **THE COURT:**  Very good.  I mean it's not very good,

20   but I mean I understand what you're saying.

21      What's the name of the school?

22          **PROSPECTIVE JUROR:**  Brandeis Marin.

23          **THE COURT:**  Okay.  Thanks for telling me that.

24      Would you -- can we have this microphone make its way over

25   to the jury box, please.

```
 1              PROSPECTIVE JUROR:  Hi.  My name is Cristina Fargas.

 2              THE COURT:  Okay.  What's happening?

 3              PROSPECTIVE JUROR:  I take care of my mother.  She's

 4     88 years old.  She cannot eat regular food.  I have to

 5     Osterize her food for breakfast, lunchtime.  In the

 6     afternoons, somebody else comes in to take care of her, but in

 7     the mornings I am the sole provider.

 8              THE COURT:  Okay.

 9              PROSPECTIVE JUROR:  And she lives with me so --

10              THE COURT:  Thank goodness she has you.  Not

11     everybody has family.

12              PROSPECTIVE JUROR:  It's not easy, but you have to do

13     it.  You know.  It's sad that she -- COVID really affected

14     her.  She -- aside from her health issues, anxiety has set in.

15     So she cannot decide anything, you know, what to wear, where

16     to go, what to do.

17              THE COURT:  Right.

18              PROSPECTIVE JUROR:  So I'm really -- I need to be

19     there with her.

20              THE COURT:  Yes, ma'am.

21              PROSPECTIVE JUROR:  It's really hard.

22              THE COURT:  As I get older, more and more of my

23     friends find themselves in that same situation.

24              PROSPECTIVE JUROR:  And she does not want anybody --

25     because of her anxiety, she doesn't want anybody she doesn't
```

 1    know.  So today was hard to leave her.

 2         **THE COURT:**  Yeah, I bet.  Thanks for telling me that.

 3    Would you pass the microphone back to this gentleman in

 4    the back row.

 5    I know you already said your name.  And, wait, maybe if I

 6    can get it in my notes.

 7    Well, I don't want to take up too much time.

 8    Would you just remind me of your name, please.  Sharma?

 9         **PROSPECTIVE JUROR:**  Yeah.

10              (Simultaneous colloquy.)

11         **THE COURT:**  Mr. Sharma, what's happening?

12         **PROSPECTIVE JUROR:**  Yeah.  So I have a preplanned

13    trip from November 2nd to 7th.  I think I submitted the

14    evidence to the clerk, the jury clerk.  And then actually

15    recently had a business trip from the 8th to the 10th get

16    booked as well.  So those are two preplanned trips.

17         **THE COURT:**  Okay.  Where are you going on the 2nd?

18         **PROSPECTIVE JUROR:**  Miami.

19         **THE COURT:**  It's the right time of year to do that.

20         **PROSPECTIVE JUROR:**  Hope so.

21         **THE COURT:**  Okay.  Thanks.

22    Would you pass the microphone over to the woman to your

23    left.

24    Yes, ma'am.

25         **PROSPECTIVE JUROR:**  I'm Carrie Wasson.

```
 1              THE COURT:  Ms. Wasson, what's happening?

 2              PROSPECTIVE JUROR:  I'm -- I own my own business.

 3   I'm a clinical psychologist in private practice.  And when you

 4   said three-week trial, the thought of rescheduling all my

 5   patients and giving them a three-week break from their

 6   therapist doesn't sound like a great --

 7              THE COURT:  Yeah.

 8              PROSPECTIVE JUROR:  -- continuity of care for them.

 9   And if I'm not there, I don't get paid.

10              THE COURT:  Yeah.  I'm sensitive to that.

11              PROSPECTIVE JUROR:  I work -- about half my practice

12   is peripartum mood disorders and anxiety.  So I have lots of

13   new moms who have postpartum depression.

14              THE COURT:  All right.  Thank you.

15         Ms. Loewenstern.

16              PROSPECTIVE JUROR:  Hi.  I have two kids, a

17   10-year-old and a 13-year-old.  And I share one car with my

18   husband.  And I have to get my -- my older son to school every

19   morning at 8:00.  And I live in San Francisco.  So I'm not

20   sure I could be here at 8:30.  And then I have a 10-year-old

21   whose school starts at 9:30, but I could put him on the bus,

22   the Muni, and he's okay doing that.

23              THE COURT:  Okay.  Thanks very much.

24         All right.  Thank you all --

25         Oh, yes, ma'am.
```

1          **PROSPECTIVE JUROR:**  Can I add one thing?

2          **THE COURT:**  Yeah, let's wait till the microphone gets

3    down there and then I can hear you.

4          **PROSPECTIVE JUROR:**  I did also want to note I also

5    only have one car in my family, and I have a two-year-old and

6    a six-year-old that need to get to school around like 8:15.

7       And I live in Menlo Park so --

8          **THE COURT:**  Is it Ms. Yim?  No.  That's Ms. Yim in

9    front of you.

10          **PROSPECTIVE JUROR:**  No.  Combs.  Sorry.

11          **THE COURT:**  Koh.  I didn't hear your name.  Okay.

12    Ms. Koh.  Spell it for me.

13          **PROSPECTIVE JUROR:**  C-O-M-B-S.

14          **THE COURT:**  Okay.  Ms. Combs.  Yeah.  One car.  Go

15    ahead, say it again.

16          **PROSPECTIVE JUROR:**  Two small children, two and six,

17    who also need to be at school around, you know, kind of 8:00,

18    8:15 in the morning.  And I live in Menlo Park.  So to get

19    here today I've rented a car and would need to do that for the

20    duration of the trial.

21          **THE COURT:**  Okay.  Thanks for letting me know.

22       Yes?

23          **PROSPECTIVE JUROR:**  Can I add something as well?

24          **THE COURT:**  Sure.

25          **PROSPECTIVE JUROR:**  This is Mr. Woo.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          So my situation right now is I am seeking employment.   And

2     I do have some leads coming up, but if the length of trial

3     is -- is -- is long, that, you know, I hate to see those

4     opportunities pass by, so I --

5               **THE COURT:**  Yeah.

6               **PROSPECTIVE JUROR:**  -- wanted to add that as well.

7               **THE COURT:**  All right.   Thank you.

8          Yeah?

9               **PROSPECTIVE JUROR:**  I don't know if this will be

10     helpful, Your Honor.   But I was trying to remember what -- if

11     my kids could go to school earlier, and I think it's actually

12     a paid program you have to sign up for with the Y or something

13     like that.   I don't know if that's helpful at all, but I was

14     trying to see if I could remember for you.   It's a maybe.   I'm

15     not sure.

16               **THE COURT:**  It's Mr. Skyrja, right?

17               **PROSPECTIVE JUROR:**  Correct.   The school just

18     encourages parents to drop off between 8:30 and 8:40.

19               **THE COURT:**  Got it.   Okay.   Very good.

20          Well, thank you all for all this information.   As I said,

21     I'm not able to answer -- or not able to decide these requests

22     on the spot.   I have to wait until the end of the day to do

23     that.   Thank you so much for your participation today.   I

24     almost said this morning, but it's 12:30.   And we will be in

25     touch with you.   Thank you very much.

1              THE CLERK:  Please rise for the jury.

2          (Remaining prospective jurors exited the courtroom.)

3          (The following proceedings were heard out of the presence

4      of the jury venire:)

5              THE CLERK:  You may be seated.

6              THE COURT:  Okay.  We're outside the presence of any

7      prospective jurors.

8          In just a moment, I will invite us all to take a somewhat

9      longer break just so that people can eat a little something

10     before we continue on.

11         It occurs to me that I might ask you if you have any cause

12     challenges to the first two groups of jurors that have come

13     through while that issue is fresh in everybody's mind.

14         I have in my own notes only one cause challenge that I

15     definitely expect, and I will just say that the Court would be

16     inclined to grant Mr. McMaster's hardship request due to his

17     medical condition.

18         And so unless anybody wants to be heard, that's what's

19     going to happen with Mr. McMaster.  He made it clear during

20     his hardship presentation that he would not be able to focus

21     on the evidence in the proceeding because of his need to

22     urinate frequently.  So I don't think anyone needs to worry

23     about Mr. McMaster.

24         Putting Mr. McMaster to one side, and let me know if you

25     need a minute to consult your notes, let me ask Mr. Waldinger

1    if there's anybody that the government wants to -- is

2    requesting to be excused for cause?

3          **MR. WALDINGER:**  Could we just have a moment, Your

4    Honor?

5          **THE COURT:**  Sure.

6                (Pause in the proceedings.)

7          **MR. WALDINGER:**  The government doesn't have any

8    suggestions for cause at this point, Your Honor.

9          **THE COURT:**  Does the government object to my simply

10   granting Mr. McMaster's hardship?

11         **MR. WALDINGER:**  Does not, Your Honor.  The government

12   does not object to that.

13         **THE COURT:**  Mr. Fakhoury?

14         **MR. FAKHOURY:**  Regarding number 7, McMaster, no

15   objection to excusing him for hardship.

16      For cause challenge, we would raise number 27,

17   Ms. Loewenstern.  She's a Silicon Valley Bank shareholder.  So

18   she sort of has a financial interest in this -- in this case.

19   So I don't think she should serve on this jury.

20      And then --

21         **THE COURT:**  Yeah, go ahead.

22         **MR. FAKHOURY:**  I'm sorry.  The only other cause

23   challenge was number 34, Mr. Nishimura.  He was the -- the

24   juror in the second panel who we sort of had extended

25   discussion about the right to remain -- to not testify in

1    trial.

2        And he sounded like he'd maybe been an administrative

3    hearing officer of some sort in the Department of

4    Rehabilitation.  And so I think he -- I think there was an

5    effort to rehabilitate him, but I think ultimately he made it

6    pretty clear he wanted to have -- he wanted to hear from the

7    defendant and to have them -- sort of hear from both sides,

8    have the defendant defend themselves, that was his ideology.

9        And then in his questionnaire -- as an alternative, in his

10   questionnaire he did mention that his wife had Parkinson's and

11   mobility issues.  I know that didn't come up during the voir

12   dire.

13           THE COURT:  Mr. Waldinger, the Court's tentative

14   ruling would be to grant the challenges to Ms. Loewenstern,

15   the shareholder of the victim in this case.  Do you want to be

16   heard?

17           MR. WALDINGER:  Submitted on that, Your Honor.

18           THE COURT:  Yeah, the defendant's cause challenge to

19   Ms. Loewenstern is granted.

20           THE CLERK:  Yes, sir.

21           THE COURT:  I don't need to hear from the government.

22   The challenge as to Mr. Nishimura denied.  I heard a

23   different -- I just heard Mr. Nishimura differently.  I heard

24   him say that he is -- he does have a lot of experience as an

25   administrative hearing officer in his role as a state manager,

1    but that he understands that that's a different system than

2    the one we have here, and he's prepared to follow the law.

3        With regard to the issue of his wife, it was his

4    opportunity to raise that as a hardship challenge if he

5    wanted.  The questionnaire is simply informational.  He didn't

6    raise it as a hardship, and it doesn't provide me with a basis

7    to excuse him from the jury.

8        So the Court will deny the challenge to Juror Nishimura.

9        Okay.  Would you all like a chance to eat a Builder Bar or

10   something else?  Mr. Waldinger, I have to tell you, your

11   teammate was nodding vigorously behind you.  You might not

12   have been able to see that.

13            MR. WALDINGER:  Mr. Walsh, I've learned, is a lunch

14   guy, Your Honor.  And he is a lunch guy that doesn't eat lunch

15   at his desk, which is maybe a good rule.  So I know that he

16   will want to take a lunch break.

17            THE COURT:  We're not doing terribly on time.  I mean

18   we always get somewhat behind.

19       What do the parties think they -- how little time can we

20   get away with here as a lunch break?

21            MR. FAKHOURY:  I'm a Kind Bar kind of guy, so I -- I

22   could be ready to go in 25 minutes.  But if the Court wants to

23   make it longer or to have time for people to grab a sandwich,

24   I'm fine with that.  Whatever the Court's preference is.

25            THE COURT:  I don't know that I have a huge interest

1    in making it a lot longer than 25 minutes.

2         Mr. Waldinger, what do you think?

3              **MR. WALDINGER:**  I think that will work.

4              **THE COURT:**  All right.  Let's say 25 minutes.  Just a

5    few minutes past 1:00 o'clock.  And we'll get going as soon as

6    everyone has reconvened.  Thank you.

7              **MR. FAKHOURY:**  Thank you, Your Honor.

8              **THE CLERK:**  Court is in recess.

9         (Recess taken at 12:35 P.M.; proceedings resumed at

10   1:06 P.M.)

11        (The following proceedings were heard out of the presence

12   of the jury venire:)

13             **THE COURT:**  All right.  Let's go on the record.

14        We're outside the presence of any prospective jurors.

15        If everyone exercises their peremptories, we need

16   32 jurors to choose from.

17        It was noteworthy to me that in round two of jury

18   selection, when I said if you're not making a hardship

19   request, you can leave the room.  And five people left.

20        So I have not done it yet, but I anticipate letting the

21   jury office know today that we need additional jurors

22   tomorrow.  Of course you may not exercise all your

23   peremptories, and then I won't need them.

24        But I don't want to be in a situation where I have to blow

25   up the trial date.

1        So I just wanted to let you know I had my eye on that ball

2   and that those are the steps I'm going to take.

3        I haven't gone back to count anything from round one or

4   make adjustments based on hardships from round two that I'm

5   unlikely to grant, but I don't need to do that to know that we

6   have an issue.

7        Anything else counsel want to raise before our third group

8   of jurors comes in?

9              **MR. WALDINGER:**  I don't think so, Your Honor.  Thank

10   you.

11              **MR. FAKHOURY:**  No, Your Honor.  Thank you.

12              **THE COURT:**  Okay.  If they're ready, we can bring

13   them in.

14              **MR. FAKHOURY:**  Do we know which numbers are here?

15              **THE COURT:**  Oh, thank you.

16              **THE CLERK:**  I do not.  Hold on one moment.

17                    (Pause in the proceedings.)

18              **THE COURT:**  Oh, I've forgotten how many we have.  Oh,

19   my goodness.  Or that we started with.  Maybe we'll be okay.

20   I don't know.

21        I see this last group is much bigger.

22                    (Pause in the proceedings.)

23              **THE CLERK:**  So, Your Honor, I just wanted to give you

24   the list of who will be coming in before they do come in.

25        So we will have Jurors 49, 52, 56.

| | |
|---|---|
| 1 | **THE COURT:**  Hold on just a moment. |
| 2 | **THE CLERK:**  Yes. |
| 3 | **THE COURT:**  Forty-nine, 52, not 55 though. |
| 4 | **THE CLERK:**  Not 55. |
| 5 | **THE COURT:**  Okay. |
| 6 | **THE CLERK:**  Fifty-six. |
| 7 | **THE COURT:**  Okay. |
| 8 | **THE CLERK:**  Fifty-seven, 60 -- |
| 9 | **THE COURT:**  Interesting.  Oh, right, because the |
| 10 | trial goes over.  Yes. |
| 11 | **THE CLERK:**  Sixty-two. |
| 12 | **THE COURT:**  Not 61.  Oh, we already did 61. |
| 13 | **THE CLERK:**  Yes, 61 came in earlier. |
| 14 | **THE COURT:**  Right. |
| 15 | **THE CLERK:**  Sixty-three, 64. |
| 16 | **THE COURT:**  Yes. |
| 17 | **THE CLERK:**  Sixty-seven. |
| 18 | **THE COURT:**  Um-hmm. |
| 19 | **THE CLERK:**  Sixty-eight. |
| 20 | **THE COURT:**  Um-hmm. |
| 21 | **THE CLERK:**  Sixty-nine, 70, 71, 72, 74, 76, 77, 78, |
| 22 | 79, and 81. |
| 23 | **THE COURT:**  Very good.  Thank you. |
| 24 | **THE CLERK:**  Yes, sir.  And I will bring the jurors |
| 25 | in. |

```
 1                        (Pause in the proceedings.)

 2           (The following proceedings were heard in the presence of

 3      the jury venire:)

 4               THE CLERK:  You may be seated.

 5               THE COURT:  Good afternoon.

 6      That was so weak.

 7      Good afternoon.

 8               JURORS:  Good afternoon, Judge.

 9               THE COURT:  Much better.

10      Thanks for your patience.  You're the last group of the

11      day.  I know you had to wait a little while.

12      I just want to welcome you to the United States District

13      Court for the Northern District of California.  You're in

14      federal court now.

15      My name is Judge Jon Tigar.  It's spelled with an A, but

16      you say it like the animal.  That's what they stuck me with.

17      I just want to start by thanking all of you for doing your

18      civic duty and responding to the summons and appearing in

19      court today.

20      I love court.  I'm a little bit of a patriot when I think

21      about court and you and your role.  So I just want to say a

22      few things before we ask you some questions about the case.

23      I want to start by saying I hope you understand how

24      important you are.  Today I'm the one that's wearing the black

25      robe and sitting up on the bench, but you have the opportunity
```

```
 1    to be judges.  Some number of you will make the decision in
 2    this case.  I will not do that.  This is a federal criminal
 3    case, and I do not get to decide it.
 4        I'll give you instructions on the law, I'll rule on
 5    objections, and that sort of thing.  But you will make the
 6    decision, not the parties, not their lawyers.  I won't even
 7    get to go in the deliberation room.  I'll never know what
 8    happened in there.
 9        You will deliberate to reach a verdict in this case.  So
10    today you are the most important people in the lives of the
11    persons that are seated at the counsel table.
12        I want to talk a little bit about jury service.  I wish I
13    was in charge of how jury service works.  We could make it a
14    little more convenient for people.  We could pay them more
15    certainly.  There's never a really convenient time or almost
16    never the really convenient time for jury service.  I know
17    that.
18        This is what your country asks of you.  And we're so lucky
19    to live in America and enjoy all the freedoms and privileges
20    we enjoy.  I think most of us feel there's nowhere we'd rather
21    live.  Not even close.  That's how I feel.
22        And America just doesn't ask that much of us in return.
23    We don't have a draft.  Many countries, you get to be a
24    certain age, you have to go serve in the military, some branch
25    of the armed forces for some number of years.  Some countries
```

1    have a form of national service.  So you don't have to go to

2    the military, but you have to go build schools or dig ditches,

3    or whatever it is the country needs doing, for a couple of

4    years.

5        We don't have compulsory service.  But we do have jury

6    duty.  So every now and then, your country or your state asks

7    you to step up and serve the justice system.

8        We have that because the founders put it in the

9    Constitution more than 200 years ago.  And so we have the

10   right to a jury trial.  That's why we need jurors.

11       It's like donating blood.  You go to the hospital, you're

12   in an accident, you need a blood transfusion, the blood is

13   sitting right there, they give you the blood.  Why is the

14   blood sitting there?  Because other people donated their

15   blood.  Jury trial works the same way.

16       I have been a judge for more than 20 years so I come by

17   all this white hair honestly.  And I will tell you I've done

18   so many jury trials.  Jury trial is one of the greatest

19   fact-finding machines ever devised by people.  Because what

20   you do is you take a group of people, it will be 12 people in

21   this case, they come from different backgrounds, they have

22   different life experience, they have different perspective,

23   and they all saw the same evidence and they all heard the same

24   arguments.  And they put their minds together.  They don't

25   miss much.  They don't.

1    And they're bringing their common sense from every

2    different angle.  And it's a wonder actually.  It's an

3    amazing, amazing decision-making machine.  And you can't have

4    jury trials if you don't have jurors.  So that's why you're

5    here.

6    It's kind of like the blood donating thing in another way,

7    too.  And that is it's one of the -- the right to a trial by a

8    fair and impartial jury is one of the most important rights we

9    have.  But none of us ever knows when we're going to need it.

10   So how many people in this room right now could say, you know,

11   "Two years from now, I'm going to need to file a lawsuit"?

12   Right?  "Three years from now I'm going to get sued."  Or, "I

13   or someone close to me is going to be charged with a crime."

14   You don't know.  No one knows.  So and the parties in

15   other lawsuits don't know either.  No one ever knows.  So for

16   the jury trial right to stay alive, we just all need to do our

17   part when we get a jury summons.  So, again, I thank you for

18   being here today.

19   And I know you're thinking it's kind of late in the day.

20   Is this guy going to keep talking about jury trials and

21   politics forever?  I'm not.  I just have a little bit more.

22   Because it's important.  We could do without jury trials.

23   And there are people that think why do you need jury trials

24   anyway.  A lot of countries don't have jury trials.  And I'll

25   tell you what.  The parties that have the right to a jury

1    trial can waive jury.  They say, well, you've been a judge for

2    20 years, why don't you make the decision?  But for the most

3    part, they don't.  They don't waive a jury.

4         And the founders, when they were putting together the

5    Constitution, they also did not want judge trials, which are

6    called bench trials.  The parties do not want me.  The

7    founders did not want me.  They want you.  They want you.

8         So don't for a second think that you're not indispensable

9    because you are.  I know it imposes on your time.  And if

10   you're selected for this jury, I promise you we're going to

11   use your time very efficiently.

12        But I'll also make you a promise, and here's the promise.

13   If you were charged with a crime or you were suing somebody

14   for money or you're being sued for money, here's something you

15   would not tell your lawyer.  You would not say, "Please find

16   me 12 people with nothing better to do because that's who I

17   want deciding my case.  I want people that have nothing going

18   on."

19        Nobody would pick that jury.  Instead, you would want busy

20   people who lead active lives who've had a variety of different

21   life experiences, who have a lot going on.  You would want

22   people just like you.  So that is why you're here.

23        I'll talk about COVID for just a second.  For more than a

24   year, we could not do jury trials.  We had to shut our doors.

25   And then slowly we started back up again less than a year and

 1   a half ago, spring of last year.  And I've tried a lot of

 2   cases since then.

 3       Pandemic is constantly changing.  So there are some of you

 4   who are thinking, what's the big deal?  Why is the guy

 5   wearing -- making us wear masks?  It's just like the flu.  I

 6   got a shot, I'm good.

 7       And there are others of you who are still wearing a mask

 8   if you go into the Safeway or you go to the ballgame or what

 9   have you.

10       My job is to do two things on COVID.  The first is to keep

11   you safe.  I've done a lot of trials.  I've not had one juror

12   get sick from COVID.  Now there's some luck there.  But in

13   addition to luck, I'm doing what I can to keep people safe.

14   That's the first thing I'd say.

15       Second thing is I need you to not be distracted.  I need

16   you to pay attention to the evidence.  So for those of you who

17   want us to have as many precautions as we can, I say we got

18   you.

19       We're going to sit a little further apart.  We're going to

20   wear masks.  The witness is going to wear masks.  That's a

21   high-efficiency air filter sitting over there near the

22   witness.  We're going to have a separate courtroom will be

23   your jury deliberation room.

24       For those of you who are less concerned, I say to you work

25   with me.  Let's you and I join hands -- excuse me -- let's you

1    and I join hands and just make everybody feel safe and just

2    wear the mask and don't worry about it.

3         So that's how I'm dealing with COVID.

4         Let's swear you in.  Why don't you stand up and raise your

5    right-hands for me.

6                        (Jury venire sworn.)

7              **THE CLERK:**  Thank you.  You may be seated.

8              **THE COURT:**  Okay.  Let me introduce you to some of

9    the people in the case.  Then I'll tell you what the schedule

10   is.  And then I'll tell you more about the case.

11        Sorry, I have so many different pieces of papers and

12   scripts up here.  Okay.

13        I told you a second go this is a federal criminal case.

14   That's a case brought by the United States government against

15   the defendant.

16        So the persons seated closest to the jury box are with the

17   prosecution team.  The government is represented by two

18   Assistant United States Attorneys, Kyle Waldinger and Nicholas

19   Walsh.

20        Gentlemen, would you stand up.

21        Mr. Waldinger is closer to me.  Mr. Walsh is on the other

22   side of him.

23        They are being assisted in this case by a case agent from

24   the Federal Bureau of Investigation, Jennifer Barnard.

25   Ms. Barnard -- excuse me.  Agent Barnard, would you stand up.

1   And their paralegal Beth Margen.

2        Ms. Margen.  There we go.  Thank you.

3        The defendant in this case is Michael Brent Rothenberg.

4   Mr. Rothenberg just stood up.  He's represented by attorney

5   Hanni Fakhoury.  And they're being assisted by a paralegal

6   whose name is Nathaniel Torres.

7        Gentlemen, thank you.

8        Let me tell you about schedule because for a lot of you

9   that's the dominant thing on your mind.  And until I tell you

10  about that, you're going to have a hard time hearing me.

11       We are in trial from 8:30 in the morning until 1:30 in the

12  afternoon.  And then I've got 400 other cases I've got to work

13  on.  So I'll do that.

14       We do not take a lunch break.  We go from 8:30 for 90

15  minutes and we take a 15-minute break.  We go from 10:15 to

16  11:45, take a 15-minute break.  We go from 12:00 to 1:30.

17       I have found with that schedule, I can get almost as much

18  testimony in as a judge that runs a more traditional day.  And

19  all my jurors tell me they like that schedule a lot better.

20  Because if you're out of here at 1:30, you can get some work

21  done, you can do your family obligations.  Jury service

22  doesn't have to be a complete blocker of the rest of your

23  life.

24       We are not in session on Fridays, unless you're

25  deliberating.  It gets to the end of the case, jurors want to

1   shorten up their time, deliberate on Friday, they can do that.

2   I don't need the courtroom on -- I mean, the jurors don't need

3   the courtroom so I can be doing my criminal calendar.

4       So 8:30 to 1:30, Monday through Thursday, except

5   deliberations and that could be on Friday.

6       This week, we'll be in trial until -- Monday through

7   Thursday.  Next week only Monday, Tuesday.  The four days of

8   that following week.  That will probably be it.  There's some

9   chance the case spills over until Tuesday of the following

10  week.  I don't think that will happen, but it might, so I want

11  to give you the worst case.

12      So again, four -- four days, two days, four days, two

13  days.  November 22nd would be that Tuesday.  If we didn't go

14  that far, it would be -- I'm bad with math -- 18th,

15  November 18th.

16      Okay.

17      What is the trial?  I'm going to read you a jury

18  instruction.  Jury instructions are just a statement of the

19  law that the judge gives to the jurors.  In this case, this is

20  a jury instruction, right now it's Jury Instruction Number 2,

21  and it just summarizes what the case is about.  So I can read

22  it to you as kind of a summary.

23      This is a criminal case brought by the United States

24  government.  The government charges the defendant with bank

25  fraud and false statements to a financial institution.  The

1    charges against the defendant are contained in the indictment.

2        The indictment simply describes the charges the government

3    brings against the defendant.  The indictment is not evidence.

4    It doesn't prove anything.

5        The defendant has pleaded not guilty to the charges and is

6    presumed innocent unless and until the government proves the

7    defendant guilty beyond a reasonable doubt.

8        In addition, the defendant has the right to remain silent

9    and never has to prove his innocence or present any evidence.

10        Just for clarity, I'll tell you that also means the

11    defendant doesn't have to testify in this case.

12        To help you follow the evidence, I will now give you a

13    brief summary of the elements of the crimes that the

14    government must prove to make its case.  The government has

15    charged the defendant with two crimes in this trial.

16        The defendant is charged in count one with bank fraud.  To

17    prove that crime, the government must prove five elements.

18    First, that the defendant knowingly executed or attempted to

19    execute a scheme to defraud a financial institution as to

20    something of value or a scheme or plan to obtain money or

21    property from the financial institution by making false

22    statements or promises.

23        Second, that the defendant knew that the statements or

24    promises were false.

25        Third, that the statements or promises were material; that

1    is, they had a natural tendency to influence or were capable

2    of influencing a financial institution to part with money or

3    property.

4         Fourth, that the defendant did so with the intent to

5    defraud, meaning with the intent to deceive or cheat.

6         Fifth, the financial institution was insured by the

7    Federal Deposit Insurance Corporation, which is also called

8    the FDIC, or was an organization which finances our refinances

9    any debt secured by an interest in real estate, including

10   private mortgage companies and any subsidiaries of such

11   organizations and whose activities affect interstate or

12   foreign commerce.

13        The defendant is charged in count two with making false

14   statements to a financial institution.  To prove that crime,

15   the government must prove three elements.

16        First, the defendant made a false statement or report to a

17   federally insured financial institution, with all of the

18   jurors agreeing as to the specific false statement or report.

19        I'll explain what that means.  I don't know what the

20   evidence in the case is going to be, but let's say the

21   evidence was that the defendant made four different

22   statements.  And the jurors are deliberating in the case and I

23   get to this element.

24        In order to find the defendant guilty of this charge, the

25   jurors have to find that the defendant made a false statement

1    or report, and they all have to agree which statement or

2    report it was.

3        Turning to the second element.  Second, the defendant made

4    the false statement or report knowing it was false.

5        And third, the defendant did so for the purpose of

6    influencing in any way the action of a financial institution.

7        It is not necessary, however, to prove that the financial

8    institution was in fact influenced or misled or that the

9    financial institution was exposed to a risk of loss.

10       What must be proved is that the defendant intended to

11   influence the financial institution by the false statement.

12       So that's a little bit of a long instruction, but it does

13   a good job of telling you what the trial is about.  And those

14   are the two charges at issue.

15       So here's what's going to happen this afternoon.  I'm

16   going to ask you all a few questions.  You answered a lot of

17   questions on the questionnaire so we know a lot about you

18   already.  And then the lawyers will have a chance to ask you

19   some questions.

20       Nobody's trying to invade your privacy.  We're just trying

21   to figure out would you be a good juror for this case.  You

22   would all be good jurors.  That's how it works.  That's how it

23   works.  The question is are you the right juror for this case.

24   And so we're going to ask you about some life experiences and

25   opinions you might have as it relates to this case and whether

1    you'd be a good fit.

2        Now we're not trying to find 12 people that don't have any

3    opinions about anything.  I don't think there are 12 people

4    like that.  But if there are, those are not the ones we're

5    looking for.  We're not looking for 12 people that haven't had

6    any relevant life experiences.

7        What we're looking for is 12 people and two alternates

8    that can put those things to one side and be fair.

9        Now, you may be asking yourselves how am I supposed to do

10   that?  I have a very strong opinion about something related to

11   this case.  I'm very opinionated.  What does that mean, put it

12   aside?

13       Well, I know about that because I do that every day.  I

14   work for you.  I literally work for all of you.  And when the

15   President nominated me to this job and the Senate confirmed

16   me, they didn't do that because they wanted me to apply the

17   law according to Jon Tigar.  That's not how it works.

18       Most of the time I don't care how a case comes out.  I

19   really don't care.  But occasionally I have a feeling about

20   just human nature.  And I might think, boy, this person really

21   got a bad injury to their money or their health or something.

22   I'm going to see how I do something for that person.  Or I

23   might see a case come in and I might say, well, this is

24   frivolous.  I'll just -- I'd like to dismiss this right away.

25   Again, it doesn't -- I don't have those feelings very often.

1    But my point is I just have to take those opinions and put

2    them to one side and look at the evidence in front of me and

3    apply the law fairly.  That's the job of a judge every day.

4        That's the job of a juror the days that they're serving as

5    a juror.  And so we're just trying -- we're trying to find out

6    if you've had relevant life experiences or opinions, and then

7    we just want to see if you can put those to one side and just

8    decide the case based on the law and evidence that's in front

9    of you.

10       I don't expect any of our questions -- I don't expect

11   anybody is going to be made uncomfortable by any of our

12   questions.  Occasionally someone has had a life experience

13   they just don't feel comfortable talking about it in front of

14   the whole room.  If that happens, let me know that.  We'll go

15   in the jury room with the court reporter, and you can answer

16   with a little more privacy.

17       Who has teenage kids?  Raise your hand.

18       Who has ever had teenage kids?  Raise your hand.

19       Okay.  Who's ever met a teenager?  Raise your hand.

20       Okay.  Who knows what "TMI" is?

21       TMI.

22       Ma'am right here, what's TMI mean?

23              **PROSPECTIVE JUROR:**  Too much information.

24              **THE COURT:**  Too much information.

25       My sons are grown men now, but they used to be teenagers.

1    At the dinner table if I talked at all, they would say, "Oh,

2    dad, TMI."  They didn't want to hear it, whatever it was I was

3    going to say.

4       We don't have TMI here.  Here's what I mean.  If you have

5    information that you think bears on the trial, raise your hand

6    and volunteer it.  Just because somebody didn't ask you the

7    right question.  I'll give you a perfect example.

8       The entity that Mr. Rothenberg applied for a loan from is

9    called Silicon Valley Bank.  Okay.  You're going to hear

10   Silicon Valley Bank a lot of times.

11       The last round -- because we have to have our jurors in

12   groups now, can't do it all at once -- the last round a juror

13   said, by the way, I own shares of stock in Silicon Valley

14   Bank.  Okay, I would like to know that.  So that was a good

15   example of volunteering.

16       Also -- and no one said -- no one asked the question do

17   you have shares of stock in Silicon Valley Bank.  She just

18   volunteered that.

19       Also don't self-edit.  And by that I mean you might have a

20   relevant opinion or life experience and you might think "but

21   it doesn't matter.  I can be fair.  It's not going to affect

22   me."

23       Even in that circumstance, raise your hand and let us

24   know.  I'll give you an example.

25       So you know this is a federal criminal case.  We have an

1    agent from the Federal Bureau of Investigation sitting there,

2    prosecution table.  Maybe you have a sibling who is an agent

3    with the Federal Bureau of Investigation.  And you say to

4    yourself, "It doesn't matter.  I'm going to judge all the

5    witnesses the same credibility factors including law

6    enforcement."

7         Well, it's still relevant.  So if you're asked the

8    question does any of you have any relatives who are in law

9    enforcement, for example, you'd raise your hand anyway.  And

10   then let the lawyers ask you would it interfere with your

11   ability to be fair and impartial, and you can say no at that

12   time.

13        Can everybody hear me okay?  Good.  If that changes, let

14   me know.  You're going the decide the case.  You've got to be

15   able to hear.  We have assistive listening devices if anybody

16   needs that.

17        I'm hoping I can finish jury selection today.  That's my

18   goal.  So I'm going to get right to it in just a second.

19        Some of you are wondering about hardships.  A hardship is

20   when a juror cannot serve on a trial because of something like

21   a preplanned medical procedure, extreme financial hardship.

22   I'm not allowed to consider hardship to your employer, by the

23   way, just to you.  The need to take care of infant children

24   and you don't have any other way of doing the caretaking, that

25   kind of thing.

1      At the end of our questioning today, I'll give you an

2  opportunity to make a hardship request.

3      Let me just say one thing about that.  On the one hand, I

4  like to be liked.  So it would be great, I could just grant

5  all the hardships.  And you'd say, boy, that Judge Tigar,

6  he's -- that guy's really on the ball, he granted my hardship,

7  I like him.

8      But there are two other things.  One is I've got to have a

9  certain amount of jurors.  And just applying the rules, not

10  everyone is going to qualify for a hardship.

11      The other thing is this:  Some of you came in today kind

12  of on the fence about how you felt about jury service.  Who's

13  been on a jury before, by the way?  Raise your hand.

14      Thank you.  Oh, that's good.  Thank you all for your

15  service.

16      Some of you are sort on the fence.  How do I feel about

17  jury service?  And you'll listen and you'll say, it's my turn,

18  you know, and I'm going to step up and do my duty.  And I'm

19  going to move the dentist appointment or whatever it is.

20  Because that's the right thing to do.  Plus the case seems a

21  little interesting.

22      I'll never know who those people are.  Because they're the

23  ones who don't make a request to be excused.  I love those

24  people, and I don't want them to feel gamed.

25      So these are some of the things I think about when I'm

1    analyzing hardship requests.  As I said, you'll definitely

2    have an opportunity to make hardship requests before you

3    leave.

4        Okay.  Let me just ask a few questions, and then the

5    lawyers will have a few questions for you.

6        First of all, this is a case involving Mr. Rothenberg and

7    Silicon Valley Bank.  Has anybody heard anything about this

8    case before today?  Would you raise your hand before if you

9    have.

10       Okay.  I'm not seeing any hands.

11       Has any of you ever had any interaction with

12   Mr. Rothenberg or any fund called the Rothenberg Fund or

13   Silicon Valley Bank?  Anybody in that category?

14       I'm not seeing any hands.

15       Let me read you the names of some witnesses and ask you in

16   addition to the persons at counsel table that I've already

17   introduced to you whether you know any of the following:

18       Silicon Valley Bank witnesses Brian Bell, Michelle Jandu,

19   Frederick Kreppel, George Pires or Pires, Ingrid Robertson,

20   Pablo Serna.

21       Merrill Lynch witnesses, Christine Allscheid, Benjamin

22   Bolt, Anna Jenkins, Ryan Kelty.

23       Chicago Title Company witness Hapi Yamato.

24       Additional law enforcement witnesses in addition to

25   Ms. Barnard, Anthony Ghio, Michael Capuzzi, both from the

1    Internal Revenue Service.

2        And other witnesses Paulette Brunk, who's a notary public,

3    Jefferson Robert Eppler, who goes by J.R. Eppler from the

4    Rothenberg Ventures Management Company.

5        Thomas Leep, L-E-E-P.  James Kiss, who is a supervisor

6    with the Federal Deposit Insurance Company.  And Mario

7    Morales-Arias from American Express.

8        Anybody think they know any of those people?

9        I'm not seeing any hands.

10       Most of the questions that I absolutely need to know the

11   answers to are in the questionnaire.  But I'm going to follow

12   up on just a couple of topics that were addressed in the

13   questionnaire.

14       The first is the fact that the defendant doesn't have to

15   put on any evidence in a criminal case at all.  It is not the

16   defendant's burden to prove anything.

17       This is something that the founders of our country baked

18   into the Constitution.  And they felt that if the government

19   couldn't prove its case beyond a reasonable doubt, then there

20   shouldn't be a conviction.  That's just kind of where they

21   wanted the needle to be on the dial.

22       And I'll instruct you on that, and I'll say that the

23   government has a burden of proof and there's no burden on the

24   defendant.

25       Is anybody in this room going to have any trouble

1   following that instruction?  And by that I mean is anybody

2   going to put the burden on the defendant to in some way prove

3   his innocence in this case?  Or hold it against him if he

4   doesn't put on any evidence?

5        Still not seeing any hands.

6        Let me ask you about a related thing.  Mr. Rothenberg

7   might testify in this case.  He might not testify.  He has no

8   obligation to testify.

9        And so let me ask you two different questions.  The first

10  is:  Is that going to bother you if he doesn't testify?  You

11  say to yourself, well, how come the guy didn't testify?  Just

12  presented a case against him.

13       And the second is if you're in that category where it is

14  going to bother you, can you nonetheless not hold it against

15  him?  Can you follow the instruction I'm going to give you

16  that you're not to hold against -- you're not to hold it

17  against the defendant that he didn't testify, or wonder what

18  he might have said?

19       Okay.  So let's -- hopefully that question was clear.

20  Let's start with part one.  Is anybody here bothered by the

21  fact that the defendant in this criminal case doesn't have to

22  testify?

23       Well, I'm not seeing any hands.  So I guess we don't get

24  to number two.  That takes care of that.

25       Let me go through my notes for just one second quickly and

1    see if there's anything else I want to ask you, and then I'll

2    ask the lawyers in the case if there's anything they want to

3    ask you.

4                    (Pause in the proceedings.)

5        **THE COURT:**  I think I'll turn it over to counsel.

6        Mr. Waldinger.

7        **MR. WALDINGER:**  Thank you, Your Honor.  I do have a

8    few questions.  The reason that I know your name is that we've

9    got copies of your questionnaires.  And so I'm going to

10   hopefully get your names right.  And the first question I have

11   is for Ms. Volgamore.  And you indicated on your questionnaire

12   that you thought that the police shaded their testimony.

13       **PROSPECTIVE JUROR:**  (Nods head.)

14       **MR. WALDINGER:**  And I just wanted to -- I just wanted

15   to follow up on that a little bit.

16       Is there anything about those feelings that you have that

17   would make it hard for you to judge the testimony of the

18   government's witnesses in this case which will include the

19   people that Judge Tigar just listed to you, individuals from

20   Silicon Valley Bank, Merrill Lynch, as well as possibly Agent

21   Barnard, and agents -- one or more agents from the

22   Internal Revenue Service?

23       **PROSPECTIVE JUROR:**  I just feel like I've seen so

24   many things -- I think I can say two words, George Floyd.  I

25   feel that that is just at the most, you know, poster child for

1    the fact that police shade their -- I just lost my daughter

2    and the police were involved in that.  And I read the police

3    report, and it had quite a bit of fabrication in it.  And I

4    really have a problem with them.

5            **MR. WALDINGER:**  Okay.  But in coming back to my

6    question, understanding your feelings, are you -- are you

7    going to be able to judge the government's evidence in this

8    case as a fair and impartial jury -- juror, or do you think

9    that you're going to reject the testimony of people that

10   testify on behalf of the prosecution?

11           **PROSPECTIVE JUROR:**  I would -- I would doubt my

12   ability to do that, to judge -- to listen to them and not

13   think they're making it up as they go.

14           **MR. WALDINGER:**  All right.  Thank you.

15       If you could -- let's just stay on this row and pass it

16   down, I believe it's Ms. Smith.

17           **PROSPECTIVE JUROR:**  You skipped me.

18           **MR. WALDINGER:**  I hope you're not offended that I

19   don't have any questions for you.

20           **PROSPECTIVE JUROR:**  No, that's fine.

21           **MR. WALDINGER:**  You want me to ask you some

22   questions?

23                        (Laughter.)

24           **PROSPECTIVE JUROR:**  (Shakes head.)

25           **MR. WALDINGER:**  What -- what's your job, Ms. Smith?

1                   **PROSPECTIVE JUROR:**  I'm a behavioral aide.

2                   **MR. WALDINGER:**  A behavioral aide.  And what is that?

3                   **PROSPECTIVE JUROR:**  I help a special needs student at

4      an elementary school.  I'm like their teacher.

5                   **MR. WALDINGER:**  Okay.  And where is that?

6                   **PROSPECTIVE JUROR:**  In Vallejo.

7                   **MR. WALDINGER:**  I'm sorry.  Where is it?

8                   **PROSPECTIVE JUROR:**  Vallejo.

9                   **MR. WALDINGER:**  Oh, okay.  What -- where is that

10     located?

11                  **PROSPECTIVE JUROR:**  It's like near -- it's right --

12     it's like right next to Napa.

13                  **MR. WALDINGER:**  Oh, I see.  Okay.

14        And are you also a student at this time?  Or --

15                  **PROSPECTIVE JUROR:**  No, I'm not a student.

16                  **MR. WALDINGER:**  Okay.  Do you work full-time?

17                  **PROSPECTIVE JUROR:**  Yeah.

18                  **MR. WALDINGER:**  Okay.

19        All right.  I will ask you to pass the -- and I hope

20     you're not offended, Mr. Farajian, but I'm going to have

21     Ms. Smith pass it to Mr. Tam.

22        Mr. Tam, I saw from your questionnaire that your wife is a

23     banker.

24                  **PROSPECTIVE JUROR:**  Yes.

25                  **MR. WALDINGER:**  And she works at First Republic Bank.

1          **PROSPECTIVE JUROR:**  Yes.

2          **MR. WALDINGER:**  And do you know that -- is First

3    Republic Bank a competitor of Silicon Valley Bank?

4          **PROSPECTIVE JUROR:**  I have no idea.

5          **MR. WALDINGER:**  You have no idea?  The fact that

6    Silicon Valley Bank is at issue in this case, you think that's

7    going to affect your ability to be fair and impartial in this

8    case?

9          **PROSPECTIVE JUROR:**  No.

10          **MR. WALDINGER:**  Thank you.

11       If you could pass it to Ms. Mack who's next to you.

12       Ms. Mack, you're -- you're an attorney.

13          **PROSPECTIVE JUROR:**  That's right.

14          **MR. WALDINGER:**  And you work at Lexis?

15          **PROSPECTIVE JUROR:**  LexisNexis.

16          **MR. WALDINGER:**  Have you ever been in private

17    practice, or have you been at Lexis?

18          **PROSPECTIVE JUROR:**  No.  I recently joined.  I

19    practiced for about 15 years.

20          **MR. WALDINGER:**  And what was your practice?

21          **PROSPECTIVE JUROR:**  I've been an in-house counsel for

22    about 12 years, and I've been with a law firm -- with a major

23    law firm for about four.  I've also been a prosecutor in

24    San Francisco.

25          **MR. WALDINGER:**  Were you a litigator?  Or was it in

1   transactional work?  Or some other kind of work that I'm not

2   describing?

3   　　　　PROSPECTIVE JUROR:  I've been a litigator for four

4   years at Wilson Sonsini, and I've been a prosecutor in

5   San Francisco District Attorney's Office for about a year.

6   　　　　MR. WALDINGER:  Oh, you were a prosecutor at the --

7   　　　　PROSPECTIVE JUROR:  At the San Francisco District

8   Attorney Office under Kamala Harris.

9   　　　　MR. WALDINGER:  Okay.  And does that experience as a

10   litigator and as a prosecutor affect your ability to be fair

11   and impartial in this case to both sides of the case?

12   　　　　PROSPECTIVE JUROR:  I -- I don't think so.

13   　　　　MR. WALDINGER:  Okay.  Very good.

14   　　If we could --

15   　　Your Honor, may I just carry the microphone for the folks?

16   　　　　THE COURT:  Sure.  There's not any objection to that.

17   　　　　MR. WALDINGER:  I have a question.

18   　　　　THE COURT:  Well, let me ask you.  I need you to

19   come -- you can pass the microphone, but then you have to come

20   back to a mic so the court reporter can hear you.

21   　　I think let's just let the jurors pass the mic, the more I

22   think about it.

23   　　　　MR. WALDINGER:  That's better 'cause I -- as you see

24   I didn't think very well on my feet there.

25   　　I was going to ask a question of Mr. Nyhan.  All right.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1          I was just -- I'm trying to figure out exactly what you

2     do.  Is it in -- is it in stocks, securities?

3          **PROSPECTIVE JUROR:**  Yeah.  I'm a -- I've had a lot of

4     years in financial.  So right now I'm working as a trade

5     official at the New York Stock Exchange options floor, Barca

6     [phonetic], so --

7          **MR. WALDINGER:**  Okay.  And so even though you work

8     for the New York Stock Exchange, you're here in the Bay Area?

9          **PROSPECTIVE JUROR:**  Yeah, they have an options floor

10    in San Francisco.  That's where I work.

11         **MR. WALDINGER:**  And is your trading day tied to

12    East Coast time?

13         **PROSPECTIVE JUROR:**  Yeah.

14         **MR. WALDINGER:**  So what time do you get up in the

15    morning?

16         **PROSPECTIVE JUROR:**  Like at, let's see, 4:30.

17         **MR. WALDINGER:**  Okay.

18         And do you -- have you had any experience with

19    Silicon Valley Bank?

20         **PROSPECTIVE JUROR:**  No.

21         **MR. WALDINGER:**  How about Merrill Lynch or Bank of

22    America?

23         **PROSPECTIVE JUROR:**  Merrill Lynch, one of -- when I

24    was at a hedge fund was our clearing firm.

25         And then Bank of America, you know, just another bank.  I

1   think we used them as a trading platform or something way back

2   when, but nothing significant.

3          **MR. WALDINGER:**  Okay.  So the fact that you may hear

4   testimony from Merrill Lynch witnesses, that's just -- the

5   testimony of any other person in your mind?

6          **PROSPECTIVE JUROR:**  Right.

7          **MR. WALDINGER:**  Okay.  Thank you.

8      If you could pass it down to Ms. Kourakina.

9      Did I pronounce that correctly?

10         **PROSPECTIVE JUROR:**  Yes.

11         **MR. WALDINGER:**  Or close enough?

12         **PROSPECTIVE JUROR:**  It was perfect.

13         **MR. WALDINGER:**  I saw on your -- on your

14  questionnaire that you made a comment -- I can't remember the

15  exact question, but your comment did relate to testimony by

16  the defendant, I think.  Your comment was that people have to

17  speak for themselves.

18         **PROSPECTIVE JUROR:**  Right.

19         **MR. WALDINGER:**  And I just wanted to explore what you

20  meant by that.

21         **PROSPECTIVE JUROR:**  I think it's a little bit what

22  the Judge was talking about.  I'm not sure how would I react

23  to if defendant is not there --

24         **THE COURT:**  Ms. Kourakina, you're a little soft

25  spoken.  If you could speak up a bit, that would be helpful.

1    **PROSPECTIVE JUROR:**  I think it was more towards what

2    the Judge was talking about.  If the defendant is not here to

3    talk or answer the questions, I'm not sure how I would think

4    about it.  But with the right guidance from a Judge, maybe

5    I'll be able to overcome that.

6    **MR. WALDINGER:**  Okay.  Well, do you -- the Judge's

7    instructions -- I'll summarize -- would be that you can't hold

8    it against the defendant if the defendant does not testify.

9    Are you able to do that?

10    **PROSPECTIVE JUROR:**  Probably.  It's my first time.  I

11    don't -- I don't know.  I -- I don't know how to judge intent.

12    **MR. WALDINGER:**  Okay.

13    **PROSPECTIVE JUROR:**  If --

14    **MR. WALDINGER:**  And I detect an accent.  Where are

15    you originally from?

16    **PROSPECTIVE JUROR:**  From Russia.

17    **MR. WALDINGER:**  Okay.  How long have you been in the

18    United States?

19    **PROSPECTIVE JUROR:**  Since 2000, so....

20    **MR. WALDINGER:**  Okay.  So about 22 years?

21    **PROSPECTIVE JUROR:**   (Nods head.)

22    **MR. WALDINGER:**  Ms. Kourakina, if you could pass the

23    microphone back to, I think it's Mr. Carl who's with the Red

24    Sox hat.

25    **MR. WALSH:**  It's Mr. Bruce, I think.  It might be

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1    Mr. Bruce.
 2            MR. WALDINGER:  It's Mr. Bruce.
 3            PROSPECTIVE JUROR:  Yes, sir.
 4            MR. WALDINGER:  First name is Carl.
 5            PROSPECTIVE JUROR:  Yes, sir.
 6            MR. WALDINGER:  And what do you do for a living,
 7    Mr. Bruce?
 8            PROSPECTIVE JUROR:  I'm currently unemployed.
 9            MR. WALDINGER:  Okay.
10        And I saw something on the list that we had that you had
11    some experience as a wireless engineer.
12            PROSPECTIVE JUROR:  Correct.
13            MR. WALDINGER:  Okay.  And where do you currently
14    live?
15            PROSPECTIVE JUROR:  Belmont.
16            MR. WALDINGER:  Okay.  And is there anything about
17    what you heard about the case being a bank fraud case and
18    false statements to a financial institution case that gives
19    you pause that you would not be able to be a fair and
20    impartial juror in this case?
21            PROSPECTIVE JUROR:  No, sir.
22            MR. WALDINGER:  Thank you.
23                 (Discussion off the record.)
24            MR. WALDINGER:  Okay.  I got to pick on the lawyers.
25        Mr. -- is it Cizmar?
```

1          So I -- Mr. Cizmar, I see you're a general counsel of a

2     company?

3               **PROSPECTIVE JUROR:**  Yes.

4          **MR. WALDINGER:**  How long have you done that?

5               **PROSPECTIVE JUROR:**  Since 2016.

6          **MR. WALDINGER:**  What kind of company is it?

7               **PROSPECTIVE JUROR:**  General contracting, mechanical

8     services and manufacturing.

9          **MR. WALDINGER:**  Okay.  Were you in private practice

10    before you became the general counsel of that company?

11              **PROSPECTIVE JUROR:**  Very briefly.  Maybe a year or

12    two.

13         **MR. WALDINGER:**  What's the name of the company where

14    you're employed?

15              **PROSPECTIVE JUROR:**  Innovative.

16         **MR. WALDINGER:**  Okay.

17         When you -- do you have any experience in criminal law,

18    for example, were you ever a prosecutor or defense attorney?

19              **PROSPECTIVE JUROR:**  No.

20         **MR. WALDINGER:**  Okay.  And anything about the fact

21    that this is a criminal case that relates to criminal law that

22    gives you pause or concern that you would not be able to be a

23    fair and impartial juror in this case?

24              **PROSPECTIVE JUROR:**  No.

25         **MR. WALDINGER:**  Okay.  And you could follow the

1    Judge's instructions?

2              **PROSPECTIVE JUROR:**  Yes.

3              **MR. WALDINGER:**  Your Honor, I don't think we have any

4    other questions.

5              **THE COURT:**  Thanks, Mr. Waldinger.

6         Ladies and gentlemen, as you saw, Mr. Waldinger did not

7    have questions for every single person.  The questionnaires

8    fortunately eliminate the need for that.  And the lawyers are

9    very mindful of your time.  So don't take offense if nobody

10   asks you anything.  They're just trying to get this done in a

11   reasonable amount of time.

12        Mr. Fakhoury, questions for these prospective jurors?

13             **MR. FAKHOURY:**  Yes.  Thank you, Your Honor.

14        Good afternoon.  And -- and like Judge -- I'm -- I'm Hanni

15   Fakhoury, and I have the privilege of representing

16   Mr. Rothenberg.  And like Judge Tigar said, I may not have a

17   question for everyone.  And if I get your last name wrong, I

18   apologize.  My last name is Fakhoury.  You can -- I try to be

19   sensitive about it.

20        And I guess if Mr. -- Mr. Cizmar has the microphone.  I

21   guess I'll start with you, sir.

22        And again, we've gotten everyone's questionnaire so we

23   have that to go on as well.

24        In your questionnaire, you wrote you believe the standard

25   of proof in criminal matters is almost a philosophical issue

1    for what that's worth.  And I'm very -- I thought that was

2    very eloquent, but also a little -- I was also a little

3    curious what you meant by that, if you don't mind sharing.

4           **PROSPECTIVE JUROR:**  Yeah.  My criminal law course in

5    law school was very -- it was taught by -- I think he was also

6    in the philosophy department as well as the law department.

7    And the beyond a reasonable doubt standard I think is just

8    interesting, difficult.  I always found it interesting that

9    you can't put a number on it.  You can't say like you're

10   99 percent sure or 75 percent sure.  So I think it's a

11   philosophical type of question.

12          **MR. FAKHOURY:**  Okay.  Thank you for that answer.

13       Okay.  I'm going to ask that we turn the mic over to

14   Mr. Dalton.  I'm not sure where Mr. Dalton is sitting.

15       Oh, there you are.

16          **PROSPECTIVE JUROR:**  Good afternoon.

17          **MR. FAKHOURY:**  Good afternoon.  Thank you.  Thank you

18   for being here.

19       In your questionnaire, you wrote you would tend to give

20   law enforcement the benefit of the doubt but also use logic.

21   And so similar to the last question, curious what you mean --

22   I mean I know what "use logic" means, but I'm sort of curious

23   what you meant by that on the questionnaire.

24          **PROSPECTIVE JUROR:**  Pretty much exactly what it says.

25   You know, I'll tend to believe law enforcement, you know,

1    initially, give them the benefit of the doubt.  But that being

2    said, based on what I learn and what I know over time, that

3    could change that.

4           MR. FAKHOURY:  Okay.  So -- and I don't want to put

5    words in your mouth but if I hear that correctly, basically,

6    even if law enforcement says something, you would tend to look

7    at the evidence and kind of use your own logic to assess

8    without -- what that means to you.  Is that a safe statement?

9           PROSPECTIVE JUROR:  Yes.

10          MR. FAKHOURY:  Okay.  Thank you so much.

11      Okay.  I wanted to ask -- I wanted to sort of preface -- I

12   had some other questions to follow up on a topic that Judge

13   Tigar has already sort of talked about.  And so I'll just kind

14   of throw this out to the whole group and then I'll ask more

15   specifics.

16      But Judge Tigar's already made clear that in a criminal

17   case, the defendant has no obligation to present any evidence,

18   to defend themselves in the sense of getting on the witness

19   stand and saying they didn't do it.  And Mr. Rothenberg has

20   the right not to testify.

21      And I know that Judge Tigar asked sort of for a show of

22   hands if people had issues with that.  Or one of the jurors in

23   our earlier group mentioned he didn't like that.

24      And so -- and I know that no one really raised their

25   hands.  But on the questionnaires, a couple folks did raise

 1    some concerns about that, for good reason, and I understand

 2    that.

 3        But I wanted to just kind of go through juror by juror who

 4    had raised some concerns with that in their questionnaire to

 5    make sure that they were comfortable with what they've heard

 6    from the Judge now that we've -- we're here in court and

 7    you're starting to see the parties and the shape of the

 8    courtroom.

 9        So I guess I will start with Ms. Pasquinelli.

10        Way -- way all the way on the other side there.  Thank

11    you.

12            **PROSPECTIVE JUROR:**  Thank you.

13        **MR. FAKHOURY:**  Good afternoon.

14            **PROSPECTIVE JUROR:**  Good afternoon.

15        **MR. FAKHOURY:**  And on your questionnaire, you had

16    indicated you may have some difficulty understanding why a

17    defendant wouldn't want to testify.

18        Have the -- have the statements that Judge Tigar has given

19    you and sort of our conversation about that topic so far

20    today, has that sort of changed your mind on that?  Or is that

21    still something you're having a little bit of a hard time

22    understanding?

23            **PROSPECTIVE JUROR:**  It's -- yeah, you know, I

24    probably watch too much *Law & Order*.  It's just the feeling,

25    but I do understand and what the Judge spoke to and what we've

1    heard here, you know, I do get that it's the right, you know,

2    that you don't have to testify.  So I can -- you know, I can

3    be fair.

4          **MR. FAKHOURY:**  Okay.  So -- so in other words,

5    notwithstanding *Law & Order* or -- or whatever, you're

6    comfortable with the fact that Mr. Rothenberg neither has to

7    testify nor has any burden to prove his innocence to anyone?

8          **PROSPECTIVE JUROR:**  Yes.

9          **MR. FAKHOURY:**  Okay.  Thank you so much.

10               (Pause in the proceedings.)

11         **MR. FAKHOURY:**  Just one minute, Your Honor.

12   I have nothing further.  Thank you, Your Honor.

13         **THE COURT:**  Thank you, Mr. Fakhoury.

14   Well, that went much quicker than I thought it would.  And

15   I think that's in some ways probably a vote of confidence in

16   all of you from the lawyers.

17   So let me tell you what's going to happen next.

18   First of all, I don't think it's possible to watch too

19   much *Law & Order*.  I hope it's not.  Because if I'm traveling,

20   and that's -- if I can get it on the hotel TV, that's what I

21   watch.

22   So in just a second, if you need to make a hardship

23   request, you can stay and make one.  Maybe it will be granted

24   and maybe it won't.  I've also received hardship requests

25   earlier today.  I have to consider all of those as a group.

1        If you're not going to make a hardship request --

2        Yes, ma'am, you had your hand up?

3            **PROSPECTIVE JUROR:**  Yeah, I want to --

4            **THE COURT:**  Could someone get this juror --

5        Yeah, can I tell you something?  We're not doing hardships

6    right now.  We will do them.  So let me finish talking about

7    the day.

8        If you're not going to make a hardship request, in just a

9    minute you'll be free to go.

10        And the jury office, one way or another, will let you

11    know -- I hope later today if we can get this process done

12    today if we have enough jurors -- will let you know whether or

13    not you're going to be on the jury, whether you were selected,

14    whether your hardship was granted or denied, all that.

15        I think you've probably figured out that I mean it about

16    all that patriotism stuff.  And I can't let you go without

17    just saying thank you so much for coming in.  And also saying

18    not every case is right for every juror.  Not all of you are

19    going to get picked obviously.  If I don't get a chance to

20    work with you this time, I hope I'll get the chance to work

21    with you next time.

22        I get the most extraordinary letters from jurors after

23    their service.  And we also do good polling of jurors.  I

24    don't just mean in my trials.  I mean just generally.  In more

25    than 80 percent of the cases after people have been on a jury,

1   their opinion of the justice system goes up because they got

2   to see it for themselves, how powerful it is to make a

3   decision with somebody else.

4        It's the only time we don't hire somebody else in our

5   democracy to make the decision.  We just scoop up some people

6   from the community and let them do it.

7        So I've appreciated very much your time today.  If you

8   don't need to make a hardship request, we'll stand up in a

9   second and you're free to walk out the door.

10       If you need to make a hardship request, you must stay.

11   I'll say it again, you must stay.

12       Yes, you had your hand up you?

13            **PROSPECTIVE JUROR:**  (Kourakina) Can the dates be

14   repeated?

15            **THE COURT:**  Yes.  The question was can the dates be

16   repeated.

17       We will be in session this week, Monday through Thursday.

18   We will be in session next week Monday and Tuesday.  We are

19   very likely to be in session the following week Monday through

20   Thursday.  It is not likely but it is also not impossible that

21   we would be in session November 21st and 22nd which are Monday

22   and Tuesday of that following week.

23       In managing your expectations, I'm telling you as long as

24   I think it could go.  In 20 years I've only blown an estimate

25   twice.  So I'm not saying I'm not going to blow it this time.

1    I'm just saying I'm usually pretty good.

2        And the reason I try to be so good is because I know how

3    important your time is.  And I know you're here as citizen

4    volunteers.

5        All right.  Thank you so much.  Those of you who are not

6    making a hardship are free to go, unless you're selected in

7    which case I'll see you tomorrow.  Thanks.

8              **THE CLERK:**  Please rise for the jury.

9        (Prospective jurors exited the courtroom.)

10             **THE COURT:**  You may be seated.  All right.

11       So there's no magic to this.  We're just going to pass

12   around the microphone.  I'm almost certainly going to ask you

13   to repeat your name, I just don't want to make a mistake.

14       And then you can just tell me the circumstances that make

15   you want to request a hardship.  I'll just make a note of

16   that.  And then we'll go on to the next person.

17       So let me start with you, ma'am.  Would you remind me of

18   your name?

19             **PROSPECTIVE JUROR:**  My name is Katrina Volgamore.

20   The reason I need to be excused from this, I work for a very,

21   very, very small company.  I am literally the accounting

22   department.  As you know, today is the end of the month.  My

23   boss is really upset I'm not there.  And tomorrow is the 1st

24   and I'm not going to be there.

25       I'm also set up -- I'm also being a poll worker on

1    Tuesday, the 8th, because I think the election is kind of

2    important.

3        I'm also getting over -- my daughter took her life a

4    couple months ago, and I'm not in a very emotionally stable

5    place right now.

6        So --

7            **THE COURT:**  Ms. Volgamore, that's horrible and I'm

8    just sorry to hear that and I'm sorry you had to say it out

9    loud.

10           **PROSPECTIVE JUROR:**  Yes, not something that -- yeah,

11   thank you.

12       And that's pretty much all I have to say.  I also work a

13   second job too so I need -- financially to keep coming here is

14   just -- I can't do it.

15           **THE COURT:**  All right, ma'am.  Thank you.

16       Is it Ms. Mack?

17           **PROSPECTIVE JUROR:**  Olga Mack, O-L-G-A, M-A-C-K.

18       I have concerns with the dates.  I'm traveling November 13

19   through 18th.  I will be in North Carolina.  That's the

20   primary concern.

21       The secondary concern, I indicated on my form that I'm not

22   a primary child giver [sic].  I'm usually not.  My husband on

23   travel through the end of the week, early next week in Taiwan.

24   Two children, 11 and 13, and elderly mother of almost 70.  No

25   relatives anywhere close.  The travel is being the primary

1    concern.

2              **THE COURT:**  All right.  Thanks very much.

3         Would you walk the microphone over to this gentleman in

4    the front row, please.

5              **PROSPECTIVE JUROR:**  Hi, Your Honor.  My name is

6    Matthew Dalton.

7              **THE COURT:**  Mr. Dalton, what's on your mind?

8              **PROSPECTIVE JUROR:**  I'm requesting not to do this

9    because I'm currently a student at SFSU, and it takes --

10             **THE COURT:**  What are you studying?

11             **PROSPECTIVE JUROR:**  I'm trying to become a teacher,

12   actually, an elementary school teacher.  So it takes a lot of

13   time, as I'm sure everyone here knows, studying.

14        So I'm also a father of a little girl.  Like it's not the

15   exceptional but -- and I'm working two and a half jobs as well

16   on top of that, to make up for the schooling.

17             **THE COURT:**  Wow.  All right.  I think some of this

18   was in your jury questionnaire actually.

19             **PROSPECTIVE JUROR:**  I had mentioned it, yes.

20             **THE COURT:**  Yeah.  Okay.  Thanks.

21             **PROSPECTIVE JUROR:**  Thank you.

22             **THE COURT:**  Yeah, that's fine.

23             **PROSPECTIVE JUROR:**  Hi.  I'm Rebecca Smith.  And my

24   hardship -- I'm retired so I don't have a -- an employment

25   thing to worry about.  But I cannot see to drive after dark.

1    I have one of those stupid eye things.  So it's about --

2            THE COURT:  Oh, I saw that in the questionnaire.  Let

3    me ask you about that.

4            PROSPECTIVE JUROR:  Yes.  Yes.  I can --

5            THE COURT:  So -- we're going to be done at 1:30.

6            PROSPECTIVE JUROR:  Yeah.

7            THE COURT:  If you were selected for the jury, the

8    jurors can decide when deliberations end, and if they don't --

9    if they decide it doesn't go past 1:30, it doesn't.  So I

10   think we got you covered at the end of the day.  The beginning

11   of the day I wanted to talk to you about.

12           PROSPECTIVE JUROR:  Thank you.

13           THE COURT:  We're about to flip into standard time.

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  And so I want to keep you safe.  I saw

16   this in the questionnaire.  I want to keep you safe.  I'm

17   wondering does this -- does my particular trial schedule solve

18   your problem or not?

19           PROSPECTIVE JUROR:  It could.  My issue is it takes

20   about two hours to get here if I take BART.

21           THE COURT:  Remind me where you're coming from.

22           PROSPECTIVE JUROR:  I'm coming from Redwood City, not

23   too far -- yeah, so I'm way over on the peninsula.  And

24   driving is just not going to be an option for me.  I would

25   loved to do this.  It's just it's my terror about like driving

```
 1     and taking two hours each way.  That's -- I mean --

 2             THE COURT:  The two hours each way is horrible.  But

 3     I do have to inflict it on people occasionally.  We just have

 4     this huge federal district.

 5             PROSPECTIVE JUROR:  Right.

 6             THE COURT:  It's that driving in the dark thing.

 7             PROSPECTIVE JUROR:  Yeah.

 8             THE COURT:  That's -- that's -- I'm not wild about

 9     the two hours either.  But the driving in the dark thing is

10     what gets me.

11             PROSPECTIVE JUROR:  Yeah.

12             THE COURT:  You -- oh, you didn't have to report

13     today until later.

14             PROSPECTIVE JUROR:  Right.  So today was great.

15             THE COURT:  Sure.

16        So really, you know, to be in the seat at 8:30, you've got

17     to be shooting for 8:10, 8:15, leave yourself some wiggle

18     room.  What time -- well, you'd have to get into your car at

19     6:15.

20             PROSPECTIVE JUROR:  At least.  At least.

21             THE COURT:  I see.

22             PROSPECTIVE JUROR:  I'm so sorry about that because I

23     had love to do this.  And I don't have a ride.

24             THE COURT:  Man.

25             PROSPECTIVE JUROR:  Could you move it to San Mateo?
```

 1              **THE COURT:**  A retired, smart, articulate prospective

 2     juror.

 3              **PROSPECTIVE JUROR:**  Hey, and I used to be --

 4              **THE COURT:**  I'm trying to think of everything I can.

 5     But I can't -- yeah, it's nothing I can do.  I'm not in charge

 6     of the sun.  You know what I mean?

 7              **PROSPECTIVE JUROR:**  I know.  Darn.  Darn.

 8              **THE COURT:**  Okay.  I think I got the facts.

 9              **PROSPECTIVE JUROR:**  Okay.

10              **THE COURT:**  Thanks.

11              **PROSPECTIVE JUROR:**  Hi.  My name is Steve Nani.

12     And --

13              **THE COURT:**  Mr. Nani, what's going on?

14              **PROSPECTIVE JUROR:**  Not a lot.  I -- in fear of my

15     wife getting pissed off at me 'cause I had a vacation

16     scheduled.  Not to make light of anything.

17              **THE COURT:**  What -- when's the vacation scheduled?

18              **PROSPECTIVE JUROR:**  The 16th through the 20th.  I

19     didn't -- this is going to go a couple weeks, I guess, this

20     trial?

21              **THE COURT:**  Yeah.  Okay.

22              **PROSPECTIVE JUROR:**  And I --

23              **THE COURT:**  I'm trying to think --

24              **PROSPECTIVE JUROR:**  -- refundable, I'm not sure if it

25     is or not.

1    **THE COURT:**  Well, it's prepaid travel.  I mean it

2    sort of falls in that category so....

3    **PROSPECTIVE JUROR:**  Yeah.  I don't know if I should

4    have said something different on the questionnaire at the

5    beginning.

6    **THE COURT:**  That's fine.

7    Would you pass the microphone to the woman to your left?

8    Yeah, right there.

9    **PROSPECTIVE JUROR:**  Right here?

10   **THE COURT:**  Yeah, that's good.

11   **PROSPECTIVE JUROR:**  Hi.  My name is May Kinhung Lee.

12   I just receive -- sorry, I'm emotional.  I received a message

13   from Kaiser today that I need to continue with the cancer

14   treatments.  So I don't think I can.

15   **THE COURT:**  Hey, Ms. Lee --

16   **PROSPECTIVE JUROR:**  Yes.

17   **THE COURT:**  -- you can take off right now.  You don't

18   even have to sit there.  Okay, you go take care of yourself.

19   **PROSPECTIVE JUROR:**  Thank you.

20   **THE COURT:**  Yeah.

21   Yes, sir.

22   **PROSPECTIVE JUROR:**  My name is Carl Bruce.  I was --

23   **THE COURT:**  Oh, yeah.

24   **PROSPECTIVE JUROR:**  -- hoping would it be possible

25   for us to have a word in private about my hardship, and maybe

1    let the rest of the folks --

2              THE COURT:  Yeah.  I'll let everybody else go in just

3    a second.  And then it will just be you and -- and you, me,

4    and the lawyers.  And you can tell me then.  How about that?

5        I think we've got one more prospective juror who wanted to

6    make a hardship request though.

7              PROSPECTIVE JUROR:  I just wanted to -- sorry, my

8    voice is kind of gone since Friday.  But I -- my clinical

9    health systems specialist, which is in the medical department.

10             THE COURT:  Would you tell me your last name, please.

11             PROSPECTIVE JUROR:  Oh, I'm sorry.  Perez.

12             THE COURT:  Okay.  Ms. Perez, now you have my

13   undivided attention.

14             PROSPECTIVE JUROR:  Sorry about that.

15       We are doing a full EMR upgrade so our electronic health

16   record is going to be, I believe December 13th is when it's

17   scheduled for.

18       And so in these next few weeks, I'm responsible for

19   learning the system inside and out and doing all the training

20   for all our departments, whether medical, dental, behavioral

21   health.  And so I'm just worried about falling behind on what

22   I need to know for when we go live in December.  And so I

23   just -- I wanted to mention that to you guys.

24       And then the second thing is after I did my questionnaire,

25   I believe one of the questions was something about if I'm like

1   a part of a -- or if I'm in a trial or anything like that

2   right now.  I actually got served with papers for an accident

3   that happened years ago that my ex-husband was involved in.

4   And so I'm going -- I'm starting paperwork on all that stuff.

5   So I just don't know if it makes a difference for you guys.

6        It won't impact my judgment in any way of what's going on

7   in here, but I just wanted to let you guys know because I

8   didn't put it in the questionnaire.  So I just wanted to make

9   sure you guys were aware.

10           THE COURT:  I appreciate that.  And thank you for

11  telling me all that information.  I really appreciate it.

12  Okay.

13       Well, thank you all for your participation today.  I'm

14  going to excuse all of you.  We're going to stand up just one

15  more time for you folks.

16       And Mr. Bruce can hang out, and then we're going to get

17  some information from him.

18           THE CLERK:  Please rise for the jury.

19           (Prospective jurors exited the courtroom.)

20       (Prospective Juror Carl Bruce present in the courtroom.)

21           THE CLERK:  You may be seated.

22           THE COURT:  Okay.  Mr. Bruce, you do see a few other

23  people in the audience.  They all work for me.  Trials are

24  kind of an exciting time in a judge's chambers.  So I have two

25  young law students and one lawyer sitting there.  So all the

```
 1   people who are here in the court now either work for the court
 2   or they're -- you know, they represent the government or the
 3   defendant.
 4        Do you have that microphone?
 5             PROSPECTIVE JUROR:  Yes.
 6             THE COURT:  Okay.  Tell me what's happening.
 7             PROSPECTIVE JUROR:  Sure.  So right now, I'm very
 8   uncomfortable being in or around any metropolis with a -- a
 9   very serious threat of nuclear war.
10             THE COURT:  Where do you think that threat
11   originates?
12             PROSPECTIVE JUROR:  Russia.
13             THE COURT:  Uh-huh.  Where do you live?
14             PROSPECTIVE JUROR:  I live in Belmont.
15             THE COURT:  Where -- would you remind me where's
16   Belmont?
17             PROSPECTIVE JUROR:  So it's about 30 miles south of
18   San Francisco, 30 miles north of San Jose.
19             THE COURT:  So you're not that far from San Mateo.
20   I'm just trying to place where that is on the peninsula.
21   Pretty close to San Mateo, sounds like?
22             PROSPECTIVE JUROR:  Yeah.  Yeah.  It's about 10 to
23   15 minutes from San Mateo.
24             THE COURT:  I see.  And I'm not -- just want to sort
25   of unpack this a little bit.  Do you perceive that the risk of
```

1   imminent -- well, never mind.

2       Do you perceive that the risk of harm from nuclear war,

3   whenever that occurs, is lower in Belmont than it is in

4   Oakland?

5           **PROSPECTIVE JUROR:**  Yes.

6           **THE COURT:**  All right.

7       Mr. Bruce, thanks.  I think I got it.

8           **PROSPECTIVE JUROR:**  Where did you want me to --

9           **THE COURT:**  Ms. Lee will come get the microphone from

10  you.

11      All right.  Let's all rise for Mr. Bruce.

12          **PROSPECTIVE JUROR:**  Thank you, sir.

13          **THE COURT:**  Thank you, sir.

14      (Prospective Juror Carl Bruce exited the courtroom)

15      (The following proceedings were heard out of the presence

16  of the jury venire:)

17          **THE CLERK:**  You may be seated.

18          **THE COURT:**  Okay.  So we're now outside the presence

19  of any prospective jurors.

20      The Court is going to make an executive decision that if

21  you want to take your masks down and drink some water, you can

22  do that.  That's fine.

23      And then why don't you put your masks back on after you've

24  done that.  But I have a feeling that we're all pretty

25  thirsty.  And it is my practice once the trial is underway to

1    allow -- I should have said just pull your mask down.  But

2    anyway to allow the participants in a trial to stay hydrated.

3        What I want to do now is just do a head count.  So I'd

4    like to know, Ms. Lee, before I get to hardships and

5    understanding that I've already excused Mr. McMaster and

6    Ms. Loewenstern, how many prospective jurors do I have?

7            **THE CLERK:**  One moment, Your Honor.

8            **MR. WALSH:**  And, Your Honor, I'm sure you recollect

9    the woman just now, Ms. Lee, as well.

10           **THE COURT:**  Yes, thank you.

11       Mr. Walsh is correct that Ms. Lee indicated that she

12   received a message from her health care provider today that

13   she needed to continue with her cancer treatment.  And the way

14   she said it, it was obvious that that question had been open

15   until earlier today.  And so I effectively granted her

16   hardship request on the spot.

17           **THE CLERK:**  Your Honor, I count 44.

18           **THE COURT:**  All right.

19       I think what I'll do now is this:  I'll rule on the

20   hardship requests.  I'll have to strike that.

21       Yeah, I'll rule on the hardship requests.  I'll take any

22   challenges for cause to this last group.  And then I'll take

23   peremptories.  Peremptories to be exercised in the order of

24   the listing in the judge's random list except modified that

25   number 61 -- why don't we just put her at the end of group

1   one, whatever that is.  Ms. Lee will tell me that in a second.

2   Because that's the group she appeared in.

3       I don't know whether we'll have 32 or not after I've ruled

4   on hardships.  But given that it's only 2:30, we should be

5   able -- I should be able to take all of your peremptories and

6   then see if I need to bring more jurors in tomorrow.  So I'll

7   see.

8       Does anyone have any questions about that process?

9           **MR. WALDINGER:**  I don't think so, Your Honor.

10          **MR. FAKHOURY:**  No, Your Honor.

11          **THE COURT:**  Does anyone wish to be heard about any of

12  the hardship requests that were made?  Or are the parties

13  comfortable with the Court simply exercising its discretion?

14          **MR. WALDINGER:**  The government is comfortable with

15  your discretion, Your Honor.

16          **MR. FAKHOURY:**  That's fine, Your Honor.

17          **THE COURT:**  All right.

18      I'll go through the persons that I identified as making a

19  hardship challenge.  If I missed somebody, of course I'd

20  appreciate the parties or the courtroom deputy telling me

21  that.

22          **THE CLERK:**  Yes, sir.

23          **THE COURT:**  Ms. Lee, I wrote the name phonetically.

24  I wasn't always looking at the juror list.  So if you have

25  trouble identifying the juror, please let me know.

```
 1              THE CLERK:  Yes, sir.
 2              THE COURT:  Juror Sumandal is on medication -- is,
 3    among other things, on medication that may affect her mood and
 4    ability to participate in the trial fully.  That request is
 5    granted.
 6        I can't really tell if Juror Burgan was making a hardship
 7    request or not, but in any event it's denied.
 8        Juror Yee, the request is denied.
 9        Juror Phillips, the request is granted.
10        Juror Latimer, the request is granted.
11        Juror Vulic, the request is denied.
12        Juror Loewenstern was already excused for cause.
13        Juror Kungu, the request is granted.
14              MR. WALDINGER:  What was that name, Your Honor?
15              THE COURT:  Kungu.
16              MR. WALDINGER:  Okay.
17              THE COURT:  Kungu.
18              THE CLERK:  Your Honor, I'm so sorry, for the
19    first -- before number 21, what was that juror's name?
20              PROSPECTIVE JUROR:  Who is number 21?
21              THE CLERK:  Before 21.
22              THE COURT:  No.  Who is 21?
23              THE CLERK:  Oh, Burgan.
24              THE COURT:  Oh, it's -- hang on, I'll tell you.
25              MR. WALDINGER:  That was Mr. Burgan.
```

```
 1              THE CLERK:  No, the juror that the Judge excused

 2      prior to 26.

 3                      (Simultaneous colloquy.)

 4              THE COURT:  Sumandal.  S-U-M-A-N-D-A-L.  Juror 26.

 5              THE CLERK:  Thank you.

 6              THE COURT:  Yeah.

 7          Rasmussen is a close case, but I'm going to grant it.

 8      There's just something about the family logistics, the young

 9      age of the kids and the fact that he's starting from Clayton

10      that makes me think it's just not going to work.

11          Yim is denied.

12          Combs, I'm going to grant.  I just think this denied with

13      promise thing is not going to work if I only have two

14      alternates.

15              MR. WALDINGER:  What was that one again, Your Honor?

16              THE COURT:  Combs.

17              MR. WALSH:  Forty-seven.

18              THE CLERK:  Thank you.

19              THE COURT:  Yeah, Alexa Combs, number 47.

20              THE CLERK:  Forty-seven.  Thank you.

21              THE COURT:  Mr. Skryja is granted.  Same issue about

22      child transportation.

23          Shapiro is granted.

24          I'm having trouble interpreting my own notes.  Is it

25      Cristina Fargas who has the 88-year-old mother?
```

1          **MR. WALDINGER:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  I miswrote her last name.  Anyway

3     her hardship request is granted.

4       Juror Sharma's request is granted.

5       Juror Wasson's request is granted.

6       I believe --

7          **THE CLERK:**  I'm sorry, Your Honor.  The last person?

8          **THE COURT:**  I believe the last one I stated was

9     Wasson, W-A-S-S-O-N, the clinical psychologist.

10      Mr. Woo's request is denied.

11      Ms. Volgamore's request is granted.  I don't know that I

12    need to make a record, but most of the things she said were --

13    not did not entitle her to be -- did not entitle her to a

14    hardship request, but I think the fact that she just lost her

15    daughter means that she would not be able to pay attention to

16    the evidence in this case to the extent necessary.

17      Juror Mack's request is granted.

18      I hate to lose juror Smith, but I have to grant that

19    request.  She really wants to be on this jury, by the way.

20    She really wants to serve.  But it wouldn't be safe.

21               (Off-the-record discussion.)

22          **THE COURT:**  Ms. Lee just advised me that the Court

23    has available the ability to purchase hotel rooms for jurors.

24    Had I known that, I could have had that discussion with

25    Ms. Smith.  Since I didn't have that discussion, I don't want

1    the jury office to say, "By the way, we're taking you out of

2    your home and sequestering you in a hotel."  So I'm just going

3    to go ahead and grant that request.

4         And then Mr. Nani's, N-A-N-I, request is granted.

5         Mr. Bruce's request is denied.  Oh, wait a second.

6         Ms. Perez's request is denied.

7         Mr. Bruce's request -- I keep skipping them.

8         Mr. Dalton's request is granted.

9         Ms. Lee, I'm sorry.

10              **THE CLERK:**  No problem.

11              **THE COURT:**  Dalton is granted.

12        Perez is denied.

13        Mr. Bruce's request also is denied.

14        Based on the Court's understanding of the science, the

15   Court does not believe that it presents more of a hardship

16   that the risk of nuclear war, whatever that risk may be,

17   presents more of a hardship in Alameda County than it does in

18   San Mateo County.

19        Ms. Lee, would you please tell me, after annotating your

20   jury list, how many jurors we have available.

21              **THE CLERK:**  Yes, sir.  Can I have just one moment,

22   please?

23              **THE COURT:**  You can have all the time you need.

24              **THE CLERK:**  Thank you.

25                   (Pause in the proceedings.)

 1          **THE CLERK:**  Your Honor, I have that we have 34 left.

 2          **THE COURT:**  Now let's go through them.  So if you

 3   could just in order -- well, before we do that, does anyone

 4   have any challenges for cause to the remaining jurors now that

 5   I have dealt with hardship requests?

 6          **MR. WALDINGER:**  Just one second, Your Honor.  I

 7   think --

 8                   (Pause in the proceedings.)

 9          **MR. WALDINGER:**  No, Your Honor, not from the

10   government.

11          **THE COURT:**  Did I already grant a hardship as to

12   Ms. Shapiro, Ms. Lee?

13          **THE CLERK:**  Yes, you did, Your Honor.

14          **THE COURT:**  So that issue of where she sits in the

15   order is no longer relevant.

16      Very good.

17      I'm sorry.  Mr. Waldinger, you indicated you do not have

18   any challenges for cause?

19          **MR. WALDINGER:**  I don't.  But we did come up with a

20   final number of jurors that I thought we had a total of 48.

21          **THE COURT:**  We're going to get to that in just a

22   second because we're all going to go through the list

23   together.

24          **MR. WALDINGER:**  Very good.

25          **THE COURT:**  Mr. Fakhoury, do you have any challenges

1    for cause to anyone in group number three?

2        **MR. FAKHOURY:**  I do, Your Honor.  It would be juror

3    number 69, Ms. Kourakina.  She was the one who -- there was

4    some questioning actually by Mr. Waldinger about whether she

5    would be comfortable with the fact that there's no right --

6    the defendant does not have to testify.  And she said she was

7    unsure how to answer the question, unsure how she felt about

8    it, not sure how to judge intent.  She said she could probably

9    follow the instructions, but she seemed a little tentative

10    with that response.

11      So I think she should be struck for cause.

12      But other than that, I don't have any other cause

13    challenges amongst the remaining jurors.

14        **THE COURT:**  Ms. Kourakina, in the -- in a very

15    conversational back-and-forth with Mr. Waldinger, stated that

16    it's her belief that people should have to speak up for

17    themselves, but she said she could overcome that with the

18    right guidance from the Court.  I believed her when she said

19    it.  I'll overrule the challenge.

20      Okay.  Ms. Lee, let's take it from the top.  And if you

21    would just tell me which numbers are still in play, starting,

22    I believe, with number 2.

23        **THE CLERK:**  Yes, sir.

24      Number 2.

25        **THE COURT:**  Yes.

| | |
|---|---|
| 1 | **THE CLERK:**  Three.  Five.  Ten. |
| 2 | **THE COURT:**  Hold on, please. |
| 3 | **THE CLERK:**  Yes, sir. |
| 4 | **THE COURT:**  Ten.  All right. |
| 5 | **THE CLERK:**  Eleven, 13, 19, 21. |
| 6 | Oh, wait, did you excuse 21?  I'm sorry. |
| 7 | **THE COURT:**  I did not excuse 21. |
| 8 | **THE CLERK:**  Okay.  Just a second. |
| 9 | **THE COURT:**  He made what might have been a hardship |
| 10 | request and I denied it. |
| 11 | **THE CLERK:**  Okay. |
| 12 | Twenty-one, 26. |
| 13 | **MR. WALDINGER:**  I'm sorry.  21, then 26? |
| 14 | **THE CLERK:**  Correct. |
| 15 | Thirty-one. |
| 16 | **THE COURT:**  Did I not grant Ms. Sumandal's hardship |
| 17 | request? |
| 18 | **THE CLERK:**  You did. |
| 19 | **THE COURT:**  I did grant it. |
| 20 | **THE CLERK:**  That's where I got confused.  My |
| 21 | apologies, Your Honor. |
| 22 | **THE COURT:**  All right.  Not 26.  All right. |
| 23 | **THE CLERK:**  So 21, 31. |
| 24 | **THE COURT:**  Yes. |
| 25 | **THE CLERK:**  Thirty-two, 34, 35, 38, 39, 46, 49, 55, |

```
 1    56, 57, 60, 63, 64, 67, 68, 69, 71, 72, 73, 74.
 2            THE COURT:  Hold on just a moment.
 3            THE CLERK:  Yes, sir.
 4            THE COURT:  Seventy-three, I thought it was indicated
 5    earlier, was not going to appear.
 6            THE CLERK:  If that is the case, I did not write that
 7    down, Your Honor.
 8            THE COURT:  I put an X next to names when I didn't
 9    hear you read them earlier.  So I just want to make sure we're
10    confident that 73 appeared.  Mr. Waldinger?
11            MR. WALDINGER:  We did not have a 73.
12            THE COURT:  Okay.
13            THE CLERK:  Sorry.
14            MR. WALDINGER:  And 74 was excused for a hardship.
15            THE COURT:  He was.  Yes, that's Mr. Nani.
16        So the question is what comes after 72.
17            THE CLERK:  Seventy-five.
18            THE COURT:  Seventy-five also I marked as not
19    reporting in that group.
20        Do counsel have a different note?
21            MR. WALDINGER:  No, Your Honor.
22            MR. FAKHOURY:  We had the same with regards to Juror
23    Number 55, Mr. Chee.  We had that he did not appear.
24            THE COURT:  I had that also actually.
25            THE CLERK:  Okay.  So he -- I'm sorry, 72.  It goes
```

1   to 77.

2          THE COURT:  That's what I have.  Okay, good.

3          THE CLERK:  Seventy-nine and 81.

4          THE COURT:  Okay.  So let's just count those up.

5      MR. WALDINGER:  Your Honor, did Ms. Lee read number

6   11?  I thought that was a hardship.

7          THE CLERK:  I did not read --

8      MR. FAKHOURY:  That was denied.

9          THE CLERK:  Yeah, it was denied.

10     MR. WALDINGER:  Oh, it was denied.  Okay.

11         THE COURT:  Well, we have -- I've got 29.  So it's

12  possible that we might not need to call in more jurors for

13  tomorrow.  And the Court will proceed as follows:  I'll just

14  ask you to exercise your peremptory challenges.  And if I need

15  to extend jury selection, I will.  And if I don't, I won't.

16     As Mr. Waldinger I think correctly identified earlier, the

17  defendant has ten peremptory challenges.  The government has

18  six.  And that's to the first group of -- that's to the group

19  of 12.

20     I'm just going to go --

21             (Off-the-record discussion.)

22         THE COURT:  We'll go as follows:  The government will

23  exercise a challenge.  The defendant will exercise two

24  challenges.  The government will exercise a challenge.  The

25  defendant will exercise a challenge.  The government will

1    exercise a challenge.  The defendant will exercise two

2    challenges.  Government one, the defendant one.  Government

3    one, the defendant two.  Government one, the defendant two.

4        At the end of that process, the government will have

5    exercised six challenges if it uses them all.  The defendant

6    will have exercised ten challenges.

7        Does anyone have any questions about or objections to that

8    procedure?

9            **MR. WALDINGER:**  No, Your Honor.

10           **MR. FAKHOURY:**  That's fine, Your Honor.

11           **THE COURT:**  All right.  Mr. Waldinger -- also the

12   12 jurors will be comprised of the persons who appear earliest

13   in the order who have not been the subject of a challenge.

14       So for clarity, your jurors right now, if no one exercised

15   a challenge, would be numbers 2 through 35 on the list that

16   Ms. Lee and I and you went over a moment ago.

17       You may exercise a peremptory challenge to any person in

18   that group.  The Court will then strike that juror.  And then

19   we will go to the next juror in the list.  So your group of 12

20   at that point would include Mr. Woo who's Juror 38.

21       Does anyone have any questions about that process?

22           **MR. WALDINGER:**  No, Your Honor.

23           **MR. WALSH:**  Your Honor, one quick question, Your

24   Honor.  Within that group of 12, if you skip over like, for

25   example, the first juror is number 2, if we picked a later

1    one, are we still able to go back to 2 in that initial period?

2    Or once it is skipped over, it is waived?

3              THE COURT:  You may exercise a peremptory to any

4    juror in the 12 at any time while that juror is still in the

5    12.

6              MR. WALSH:  Okay.

7              THE COURT:  I know that some judges have this theory

8    about you passed.  I don't have that theory.  So you may use

9    your peremptories until the peremptories are exhausted or the

10   jurors are exhausted, whichever -- whichever.

11       All right.  Let's proceed since I need to notify the jury

12   office fairly quickly if I need to bring in additional jurors.

13       Mr. Waldinger, the government's -- does the government

14   wish to exercise a peremptory?

15             MR. WALDINGER:  Yes, we do, Your Honor.  That would

16   be number 13, Ms. Street.

17             THE COURT:  Juror 13 is excused.

18       And juror 38 now joins our pool.

19       Mr. Fakhoury.

20             MR. FAKHOURY:  Sorry, Your Honor, one -- one second.

21             THE COURT:  I got a little bit of a hot mic there

22   just so you know.

23             THE CLERK:  If you press the little button on the

24   mic.

25             MR. FAKHOURY:  Got it, thank you.

```
1              (Pause in the proceedings.)

2         THE COURT:  Mr. Fakhoury, normally I give people all

3    the time they need, but I have 80 prospective jurors who need

4    me to figure out whether they have to come in tomorrow.

5         MR. FAKHOURY:  Will do, Your Honor.

6      Your Honor, we would thank and excuse Juror Number 35.

7         THE COURT:  That's Paul Dao.  That juror is excused.

8    We're now up to 39.

9      And Mr. Fakhoury, you get the next challenge.

10        MR. FAKHOURY:  Your Honor, we would thank and excuse

11   Juror Number 3.

12        THE COURT:  That's Robert Masuda.  Mr. Masuda is

13   excused.

14     And that takes us up to number 46.

15     Mr. Waldinger.

16        MR. WALDINGER:  The government will thank and excuse

17   number 21, Mr. Burgan.

18        THE COURT:  Juror 21 is excused.

19     And that takes us up to number 49.

20     Mr. Fakhoury.

21        MR. FAKHOURY:  Your Honor, we would thank and excuse

22   Juror Number 32.

23        THE COURT:  Joseph Mooney is excused.

24     That takes us up to Juror 56.

25     Yes, it's the government's turn.  I'm sorry, yeah.
```

1          **MR. WALDINGER:**  The government would thank and excuse

2     number -- Juror Number 2, Ms. Vulic.

3          **THE COURT:**  Ms. Vulic is excused.

4       That takes us up to Juror 57.

5       Mr. Fakhoury, the defendant has the next two challenges.

6          **MR. FAKHOURY:**  Your Honor, we would thank and excuse

7     Juror Number 34.

8          **THE COURT:**  That takes us to Juror 60.

9       Juror Raymond Nishimura is excused.

10      Mr. Fakhoury, the defendant also has the next challenge.

11         **MR. FAKHOURY:**  And we would thank and excuse Juror

12    Number 60.

13         **THE COURT:**  Ms. Pasquinelli is excused.

14      That takes us up to Juror 63.

15      Mr. Waldinger.

16         **MR. WALDINGER:**  Your Honor, the government would --

17    Your Honor, the government would thank and excuse number 56,

18    Ms. Minot.

19         **THE COURT:**  Ms. Minot is excused.

20      I believe that takes us up to Juror 64, Christopher

21    Farajian.

22      Hold on.

23      Mr. Fakhoury, the defendant has one peremptory at this

24    point.

25         **MR. FAKHOURY:**  Your Honor, we would thank and excuse

1    Juror Number 63.

2          **THE COURT:**  David Tam is excused from this jury.

3      That takes us up to 67, Damon Nyhan.

4      The next challenge is to the government.

5          **MR. WALDINGER:**  Your Honor, the government would

6    thank and excuse number 57, Ms. Smith.

7          **THE COURT:**  Kendrae Smith is excused.

8      That takes us up to Juror 68, Sharmistha Sen.

9      Mr. Fakhoury, the defendant has two challenges if he

10   wishes to use them.

11         **MR. FAKHOURY:**  One moment, Your Honor.

12     Your Honor, we would -- we would thank and excuse Juror

13   Number 38.

14         **THE COURT:**  Alan Woo is excused.

15     The jury pool now goes -- the jurors -- the jury box goes

16   to Kourakina now, number 69.

17     Defendant has the next challenge also if he wishes to use

18   it.

19         **MR. FAKHOURY:**  Oh, we would thank and excuse Juror

20   69.

21         **THE COURT:**  Juror Kourakina is excused.

22     We're now at Juror 71.

23     The government's last peremptory.

24         **MR. WALDINGER:**  The government will thank and excuse

25   number 71, Mr. Bruce.

1            **THE COURT:**  We're now at 72, beyond which you have

2    three prospective jurors for any purpose.

3        Mr. Fakhoury.

4        You have --

5            **MR. FAKHOURY:**  Three more?

6            **THE COURT:**  No.  Two more.

7            **MR. FAKHOURY:**  Two more?

8            **THE COURT:**  Yeah.

9            **MR. FAKHOURY:**  You're right.  I'm sorry.

10       Your Honor, we would thank and excuse Juror 68.

11           **THE COURT:**  Sharmistha Sen is excused.

12       That takes us to 77.

13       Mr. -- hang on a second.

14       Oh, this is just advising of a fact.  The defendant of

15   course is entitled to exercise whatever peremptories he

16   wishes.

17       You have two prospective jurors beyond number 77.

18       So we're going to have to give some thought to how to

19   proceed tomorrow.  We likely are going to have to give some

20   thought to how to proceed tomorrow.

21       Mr. Fakhoury.

22           **MR. FAKHOURY:**  Could I just have one minute, Your

23   Honor?

24           **THE COURT:**  Yes.

25                   (Pause in the proceedings.)

1          MR. FAKHOURY:  Your Honor, we would thank and excuse

2     Juror Number 77.

3          THE COURT:  That takes us to number 79.

4          And that's -- those are our jurors.  But we only have one

5     other juror available to serve as an alternate, and that's

6     Ms. Perez, number 81.

7          Absent a stipulation that 11 jurors could decide this

8     case, I'm going to call the jury office and instruct them to

9     send us enough jurors that tomorrow morning, we can select two

10    alternates.

11         Not hearing such a stipulation forthcoming, that will be

12    the Court's order.

13         Ms. Lee, why don't you make that phone call now?  They're

14    waiting to hear from us.  We can talk about how else to

15    proceed tomorrow in just a moment.

16         THE CLERK:  Yes, Your Honor.

17              (Pause in the proceedings.) oh

18         THE COURT:  Actually let's tell them that we'll give

19    them a hard number in just a moment.  Tell them we're going to

20    need some number of jurors.

21         THE CLERK:  Yes, sir.

22         THE COURT:  We don't need 60 or 80 jurors to pick two

23    alternates when counsel have a total of two peremptories among

24    them.

25              (Pause in the proceedings.)

1          **THE CLERK:**  Okay.  Ms. Lee just left a message for

2     the jury office so that transaction will be concluded later

3     this afternoon.

4          How -- let's do this collaboratively.  What are counsels'

5     estimates of how many jurors need to be summoned tomorrow

6     morning at 8:00 a.m. for us to pick two alternates?

7          How about 20?

8          **MR. WALDINGER:**  I was going to say I feel like we

9     could have got that today.  We could have easily gotten two,

10    and we have gotten two out of every group.  In terms of

11    between hardships and cause, I think that that might work, 20.

12         **MR. FAKHOURY:**  I think 20 makes sense.  That's just

13    basically an extra panel.

14         **THE COURT:**  Twenty is too many, but it's the right

15    amount of too many.

16         So we'll ask the jury office to bring in 20 jurors.  And

17    I'll ask them to report at 8:00 a.m. which is when the

18    earliest group reported this morning.

19         **MR. WALDINGER:**  I guess the question is if we have

20    no-shows in that group like we did today.

21         **THE COURT:**  Yes, I was just about to say the earliest

22    group often has the most no-shows.

23         Twenty is how many we ordered to report at 8:00 o'clock

24    anyway.  I think it's just the number I'm going to use.

25         If I really wanted to be belt-and-suspenders, I suppose I

1    could order a second group at 10:00 and then let them go.  In

2    fact, that's what I will do.

3        I was about to say, comma, but I don't wish to

4    inconvenience those 20 people, but what I also don't wish to

5    do is inconvenience the jurors that we've already selected in

6    our case by tacking on an additional day to their jury service

7    unnecessarily.

8        So let's have a group of 20 at 8:00 and a group of 20 at

9    10:00, assuming the jury office can accommodate us, which we

10   don't yet know.  If that happens, it's my belief that we will

11   be in a position to do opening statements at 10:30, even

12   providing for a break between the selection of alternates and

13   your opening statements.

14       In fact, what I'd like to do is ask our jurors to report

15   at 10:00 a.m. and for you to be ready to go with your opening

16   statements as early as 10:00 a.m. because I actually think

17   it's possible -- that's possible.  I think probably more

18   realistic estimate is 10:30.  But I think we'll have more than

19   half a trial day available to us tomorrow.

20           **MR. FAKHOURY:**  Your Honor, for the -- for the jurors

21   that are coming tomorrow, do they fill out a questionnaire

22   ahead of time?  Or are we going to have to do that?

23           **THE COURT:**  Oh, my goodness.

24           **MR. FAKHOURY:**  Because that might make it take a

25   little bit longer if we're doing it in court.

```
 1              THE CLERK:  They will likely take a little bit longer

 2   in the jury office because they can give them the

 3   questionnaires when they arrive.

 4              THE COURT:  I see.  So, okay.  So we're going to have

 5   less of a trial day than I had anticipated.

 6      We're probably looking at -- first of all, I hope we don't

 7   need to go into that second group in light of what we now

 8   know.  I don't think we will.

 9      But we may be looking more at a 10:30 or 11:00 because

10   they will be able to give them the standard questionnaire.

11   But then we'll be reading those on the fly.  Of course, we

12   only need two jurors.

13      All right.  I think we have the outline of a plan.

14      Does anyone want to add anything or ask any questions

15   about that?

16              MR. WALDINGER:  No, Your Honor.

17              MR. FAKHOURY:  No, Your Honor.  Thank you.

18              THE COURT:  Does anyone wish to make a record of

19   anything that occurred earlier in today's proceedings as to

20   which there has not already been a record made?

21              MR. WALDINGER:  No, Your Honor.

22              MR. FAKHOURY:  No, I don't believe so, Your Honor.

23              THE COURT:  All right.  Very good.  Well --

24              THE CLERK:  Your Honor, just one question.

25              THE COURT:  Yes, ma'am.
```

1          THE CLERK:  Just in my message to the jury office,

2     for the jurors that are selected from the group from today --

3          THE COURT:  Yes.

4          THE CLERK:  -- we should have them report at 11:00

5     tomorrow?  Or what time would you --

6          THE COURT:  Let's have them come in at 10:30.

7          THE CLERK:  Yes, sir.

8          THE COURT:  Optimism in all things.

9          THE CLERK:  Thank you.

10          THE COURT:  Very good.  Have a good night's sleep.

11     See you in the morning.

12          MR. WALSH:  Thank you.

13          MR. WALDINGER:  Thank you, Your Honor.

14          (Proceedings were concluded at 3:12 P.M.)

15                    --o0o--

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Monday, October 31, 2022