UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 2** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 227 - 370 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, November 1, 2022 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
STEPHANIE M. HINDS, ESQ.
United States Attorney
1301 Clay Street, Suite 340S
Oakland, California  94612
BY:  KYLE F. WALDINGER,
NICHOLAS J. WALSH,
ASSISTANT UNITED STATES ATTORNEYS

For DEFENDANT:
Moeel Lah Fakhoury LLP
1300 Clay Street, Suite 600
Oakland, California  94612-1427
BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

Reported By:
Raynee H. Mercado
CSR. No. 8258

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

# I N D E X

| | PAGE | VOL. |
|---|---|---|
| PRELIMINARY JURY INSTRUCTIONS | 293 | 2 |
| OPENING STATEMENT BY MR. WALDINGER | 307 | 2 |
| OPENING STATEMENT BY MR. FAKHOURY | 328 | 2 |

| **GOVERNMENT'S WITNESSES** | PAGE | VOL. |
|---|---|---|
| JENKINS, ANNA | | |
| DIRECT EXAMINATION BY MR. WALSH | 355 | 2 |

--o0o--

**E X H I B I T S**

| GOVERNMENT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 2, 3, 4, 5, 6 | | | 354 | 2 |
| 7, 8, 10, 11, 12 | | | 354 | 2 |
| 13, 14, 15, 16, 18 | | | 354 | 2 |
| 19, 20, 21, 22, 23 | | | 354 | 2 |
| 24, 25, 26, 31, 34 | | | 354 | 2 |
| 47, 48, 49, 50, 51 | | | 354 | 2 |
| 52, 53, 76, 77, 78 | | | 354 | 2 |
| 72, 73, 74, 75 | | | 355 | 2 |
| 84, 85, 86 | | | 355 | 2 |
| 91, 92, 93, 100 | | | 355 | 2 |
| 107, 108, 118, 119 | | | 354 | 2 |

--oOo--

```
1    Tuesday, November 1, 2022                        8:07 a.m.

2                        P R O C E E D I N G S

3                             --o0o--

4       (The following proceedings were heard out of the presence

5    of the jury venire:)

6            THE CLERK:  Your Honor, now calling criminal matter

7    20-266, United States v. Michael Brent Rothenberg.

8       If counsel could please state their appearances for the

9    record, starting with the government.

10           MR. WALSH:  Good morning, Your Honor.  Nicholas Walsh

11   and Kyle Waldinger for the United States.

12           MR. FAKHOURY:  Good morning, Your Honor.  Hanni

13   Fakhoury on behalf of Mr. Rothenberg.  He's present before the

14   Court, Your Honor.

15           THE COURT:  Good morning.

16      And good morning to everyone else.

17      We're outside the presence of the prospective jurors.

18      Later this morning, we will resume jury selection for the

19   purpose of selecting two alternates.

20      I'll ask counsel in just a moment if there's anything they

21   would like to discuss before we get going.  I have on my list

22   only one item, which is the United States' motion to file

23   documents under seal and the underlying motion in limine

24   number four.

25      Mr. Fakhoury, do you oppose the motion to seal?
```

1          **MR. FAKHOURY:**  No, I do not, Your Honor.

2          **THE COURT:**  That motion is granted.

3      I will not, in any of my comments today, say anything that

4  would cause the need for the transcript to be sealed.  I'll be

5  speaking only in generalities.

6      Let's turn to the motion itself.

7      Mr. Fakhoury, having read the motion, I wonder whether you

8  want the right to oppose the motion?  I have some doubt about

9  whether the defense, based on this record, could ever meet its

10  burden under Rule 609.

11     Is there anything further to be said about this motion?

12         **MR. FAKHOURY:**  There's not, Your Honor.

13         **THE COURT:**  Okay.  The motion is granted.

14     Gentlemen, anything further to discuss?

15     Mr. Walsh.

16         **MR. WALSH:**  Thank you, Your Honor.

17     We do have the issue that we raised with Your Honor before

18  on I believe it was last Thursday about the introduction of

19  records by way of record certification.

20         **THE COURT:**  Yes.

21         **MR. WALSH:**  And at that time, we indicated and now

22  I'm renewing our desire to, after opening, just introduce in

23  bulk a whole bunch of exhibits that are -- fall on the

24  business records certifications that we provided to counsel.

25     I've just given those exhibit numbers to counsel, and I'm

1    just wondering if Your Honor is amenable to admitting the

2    evidence in that fashion before witnesses get on so as to

3    speed when we're actually speaking about those exhibits with

4    the witnesses.

5            **THE COURT:**  I would say that -- the question

6    usually -- I usually decide that question on a case-by-case

7    basis.  So bulk admission of documents without having them

8    come in through a witness sometimes is a good idea, sometimes

9    it's not a good idea.

10       If the foundation for admissibility has been laid using

11   certifications or things like that, sometimes it's fine.

12       Mr. Fakhoury, do you want to be heard?

13           **MR. FAKHOURY:**  Two points on that, Your Honor.  I

14   think number one, I -- I want a little bit of time -- so

15   Mr. Walsh just gave me a couple minutes ago the actual

16   specific exhibits he's talking about.

17           **THE COURT:**  Yes.

18           **MR. FAKHOURY:**  And I just need -- you know, if we

19   have a little bit of time before the jury comes in, I'll just

20   quickly make sure that the records match the certification.

21       As I indicated in the pretrial conference, I don't have an

22   issue with the certification generally.  But just to be on due

23   diligence.

24       But I do agree with the Court about the foundation issue.

25   And so, for example, my understanding is the witness today

 1   will be Ms. Jenkins who's from Merrill Lynch.  So if they want

 2   to use her to lay foundation for Merrill Lynch records that

 3   are authenticated based on the certification, I'm not going to

 4   have much of a basis to object to that.

 5       So I don't think the Merrill Lynch --

 6           THE COURT:  To be clear, Mr. Walsh is asking whether

 7   the Court would admit documents before that witness gets on

 8   the stand.  You just told me you don't have a problem with

 9   admitting the documents when she's on the stand.  I don't

10   think that's the question in front of the Court.

11           MR. FAKHOURY:  Understood.

12       So I guess my response then would be could I have ten

13   minutes to review the specific records, and then I can get a

14   better answer to the Court -- a more educated answer a little

15   closer to when the witnesses come on.

16           THE COURT:  That sounds reasonable.

17       Can I have them?  Could someone please hand me a set of

18   them so I'll know what it is that Mr. Fakhoury is reviewing.

19   Then I'll be prepared to preside --

20               (Simultaneous colloquy.)

21           THE COURT:  -- over any further hearing that's

22   necessary.

23           MR. WALSH:  Meaning the record certifications, Your

24   Honor?

25           THE COURT:  I just want everything -- I just want a

1    copy of everything I would need to read so that I could do

2    something if Mr. Fakhoury said, "I object to Mr. Walsh's

3    request."  And I don't know what all the things are.  I just

4    want a copy of all the things.

5              **MR. WALSH:**  Absolutely, Your Honor.

6                   (Pause in the proceedings.)

7              **MR. WALDINGER:**  Your Honor, Kyle Waldinger for the

8    government, handing you in separate stacks the Silicon Valley

9    Bank, Merrill Lynch, and Bank of America record

10   certifications.

11                  (Pause in the proceedings.)

12             **THE COURT:**  All right.  I have only the

13   certifications and not the documents themselves.  But based on

14   the descriptions of the underlying documents contained in the

15   certifications, they would appear to be either business

16   records or the statements of a party or both.

17        So I'll just wait to hear further from the parties when

18   Mr. Fakhoury has had a chance to review the underlying -- or

19   to read the certifications.

20        What's -- what else?

21             **MR. WALSH:**  I think we just wait for our jurors, I

22   believe, Your Honor.

23             **THE COURT:**  Yes.  Okay.  Very good.  Thanks.

24             **THE CLERK:**  Court is in --

25             **THE COURT:**  I'll step off the bench until they

```
 1    arrive.
 2              THE CLERK:  Court is in recess.
 3         (Recess taken at 8:14 A.M.; proceedings resumed at
 4    9:26 A.M.)
 5         (The following proceedings were heard out of the presence
 6    of the jury venire:)
 7              THE CLERK:  Your Honor, now calling criminal matter
 8    20-266, United States v. Michael Brent Rothenberg.
 9         All counsel are present and at counsel table.
10              THE COURT:  Very good.
11         Counsel made their appearances earlier this morning.
12         We are going to select some alternate jurors.
13         Ms. Lee, do we know if Ms. Perez in fact reappeared this
14    morning?
15              THE CLERK:  I am unsure of that, Your Honor.
16              THE COURT:  Well, we'll find out soon enough.
17              THE CLERK:  Yes.
18              THE COURT:  Are there any matters counsel need to
19    discuss before our additional prospective jurors come in?
20              MS. HAMILTON:  Just me, Judge.
21              THE COURT:  Oh, good morning, Erin.
22              MS. HAMILTON:  I've got them lined up outside and
23    I've got your copies.
24              THE COURT:  Okay.  Terrific.
25              MS. HAMILTON:  Sorry for the delay.  Both copy
```

```
 1    machines broke on me this morning.
 2             THE COURT:  Yes, machines have a way of sensing when
 3    we need them to break and then breaking at that time.
 4        So counsel are receiving these questionnaires obviously,
 5    as I also am, for the first time.
 6        My suggestion is that while I am delivering my opening
 7    remarks to the prospective alternate jurors that you heard the
 8    questionnaires.  You heard my opening remarks three times
 9    yesterday.  I don't think that you have anything left to
10    learn, if you ever did.
11        And that will be the most efficient way of our using our
12    time since it's 9:30 and we're all anxious to get going.
13        So with that, Ms. Lee, why don't we bring in our
14    prospective alternates.
15             THE CLERK:  Oh, Your Honor, I just -- did you want to
16    know who failed to appear?
17             THE COURT:  Oh, let's do that, yes.  Thank you.
18        Hang on just a moment, please.
19             THE CLERK:  Yes, sir.
20             THE COURT:  All right.  Yes.
21             THE CLERK:  Eighty-four.
22             THE COURT:  Is a failure to appear?
23             THE CLERK:  Yes.  These all are failure to appears.
24        Eighty-four.
25             THE COURT:  Yes.
```

```
 1                    THE CLERK:  Eighty-five.

 2                    THE COURT:  Yes.

 3                    THE CLERK:  Eighty-nine.

 4                    THE COURT:  Um-hmm.

 5                    THE CLERK:  Ninety-four.

 6                    THE COURT:  Yes.

 7                    THE CLERK:  Ninety-nine.

 8                    THE COURT:  Yes.

 9                    THE CLERK:  Ninety-six.

10                    THE COURT:  Going back to 96.  Okay.

11                    THE CLERK:  Oh, yes, I'm sorry.

12                    THE COURT:  Yes.

13                    THE CLERK:  And 100.

14                    THE COURT:  All right.

15                    THE CLERK:  And it's annotated on our Judge's List,

16       but 88 is also not here.  You'll see the "SS" on there, but I

17       just wanted to bring that to your attention as well.

18                    THE COURT:  Yes, was -- what does "SS" stand for?

19                    THE CLERK:  The person was sick.

20                    THE COURT:  Okay.  Very good.

21                    THE CLERK:  All right.

22                    THE COURT:  Mr. Walsh.

23                    MR. WALSH:  Your Honor, not to be greedy, but we did

24       not get a copy of the Judge's List like we did yesterday.

25                    THE CLERK:  Oh.
```

```
 1              THE COURT:  Here, hand that to Mr. Walsh.
 2    Mr. Fakhoury, did you get one?
 3              MR. FAKHOURY:  I did not.
 4              THE CLERK:  My apologies.  I'll print some.
 5                   (Off-the-record discussion.)
 6              THE COURT:  Thanks.
 7              THE CLERK:  Sorry about that.
 8                   (Pause in the proceedings.)
 9              THE COURT:  Do counsel need Ms. Lee to read those
10    numbers again now that you have the list?
11              MR. FAKHOURY:  If you don't mind.  I'm sorry.
12              THE COURT:  Let's do it.
13              THE CLERK:  Yes, sir.
14         So 84, 85, 88, 89, 94, 96, 99, and 100.
15              MR. FAKHOURY:  Thank you.
16              THE CLERK:  Thank you.
17         And, Your Honor, I'll get the jury now.
18              THE COURT:  Very good.
19                   (Pause in the proceedings.)
20              THE COURT:  While we're waiting for the jurors to
21    come in, let me just say it for efficiency's sake and because
22    I don't need to spread out the jury selection process over
23    three different groups, that I will just take challenges for
24    cause at sidebar.  I'll take hardship requests.  I'll rule on
25    them immediately.  I'll take challenges for cause at sidebar.
```

```
 1   And you will exercise your peremptories in open court, and
 2   then we'll be done.
 3              THE CLERK:  Rise for the jury, please.
 4       (The following proceedings were heard in the presence of
 5   the jury venire:)
 6              THE CLERK:  You may be seated.
 7              THE COURT:  Good morning.
 8       Wow, that was kind of weak.  Good morning.
 9              PROSPECTIVE JURORS:  Good morning.
10              THE COURT:  There we go.
11       Welcome to the United States District Court for the
12   Northern District of California.  You are now in federal
13   court.  My name is Judge Jon Tigar.
14       We have called you in here to participate in the selection
15   of some jurors for a federal criminal case.  I'll say a little
16   bit more about that in just a second.
17       But first, I want to start by thanking all of you for
18   doing your civic duty and responding to the summons and
19   appearing in court.
20       Effective immediately, you are the most important people
21   in the courtroom.  You have the opportunity to be judges.  You
22   or some number of you will help make the decision in the case.
23   The parties will not do that.  The lawyers will not do that.
24   I will not do that.
25       I get to wear a robe and sit up here a little higher than
```

1   everybody else.  I'll instruct you on the law.  I'll rule on

2   objections.  I'll do all the judge things.  But at the end of

3   the case, the jury is going to go in the jury deliberation

4   room and deliberate and I'm not going to be there.  And I'm

5   not even allowed to go in there.

6       So you're the most important people in the courtroom and

7   in the lives of the people seated at the counsel table.

8       I want to talk a little bit about jury service before I

9   tell you a little bit about the case.  It's kind of corny.

10  I'm a patriot, a little bit, about -- particularly about jury

11  service.

12      I like living in America.  That's where I want to live.

13  And I feel so lucky to enjoy the freedoms and privileges that

14  come with living in America.  And America actually doesn't ask

15  that much of us in return when you think about it.

16      So in a lot of countries, there is compulsory military

17  service.  You get to be a certain age and the country scoops

18  you up and they send you off wherever they want and you have

19  to serve in the armed forces for some amount of time.  Very

20  common.

21      Or there's other kinds of compulsory national service

22  where you have to just dig ditches or build schools or

23  whatever it is the country needs.  And that's just what

24  everybody has to do and that's how it is.

25      We don't have that.  What do we require of our citizens?

```
1    Periodically at a time that always seem inconvenient, we ask
2    them to serve on a jury.  That's what we do.  Because when the
3    country was founded, our founders baked into our Constitution
4    the right to a jury trial.  And you can't have a jury trial if
5    you don't have jurors.  So that's what your country is asking
6    of you.
7        The right to a fair trial -- the right to a jury trial by
8    a fair and impartial group of jurors is one of the most
9    important rights we all have as citizens.  It's a little bit
10   like giving blood.  And I'll tell you what I mean.
11       If you go to the hospital and you need a blood
12   transfusion, the blood is right there, and you get the blood.
13   And you don't know when you're going to need a blood
14   transfusion so we need everybody to just donate blood
15   periodically so the blood is available.
16       Well, that's a little gory, I guess, as an analogy.  But
17   jury trials are like that.
18       How many people in this room are thinking, oh, you know,
19   "exactly two years from now, someone's going to sue me?"
20   "Three years from now, I'm going to need to file a lawsuit."
21   Or "I or someone close to me is going to be charged with a
22   crime."
23       No one knows that.  You can't know that.  So just to keep
24   the right alive, we all have to do our part when we get a
25   summons.  The parties to any lawsuit didn't know that they
```

 1    were going to need a jury.  They just did.

 2         There are countries that don't have jury trials.  Actually

 3    most countries don't have jury trials.  And even in this

 4    country, in the state system and the federal system, the

 5    parties can decide they don't need a jury.  I've been a judge

 6    for more than 20 years so I've made a lot of decisions.  I'm

 7    very comfortable making decisions.  And the parties could just

 8    say, hey, Judge Tigar, why don't you make the decision.

 9         That's not what the founders wanted.  The founders who

10    wrote the Constitution could have just thought, well, you

11    know, judges can make all the decisions.  They knew something

12    that I've seen over my 20 years, and that is if you take a

13    group of people from the community with different backgrounds

14    and all different life experiences, different perspectives,

15    and you put them in the same room, they don't miss much.  And

16    they make the best possible decision.  Honestly they do.

17         I love juries.  It's my favorite part of my job.

18         So the founders knew that and the parties have figured

19    that out.  The parties have the right to waive a jury and ask

20    a judge to make the decision.  But most of the time, they

21    don't.  They want a jury because they know the result will be

22    better and it will be based on the community and it will be

23    based on common sense.  So that's what they want.

24         I know you're thinking, gosh, this is taking a while.  Is

25    the guy just going to keep talking about patriotism and jury

 1     trials?  I'm almost done.  Then we'll talk about the case.

 2        It imposes on your time.  I'll tell you about the schedule

 3     too.  Jury service imposes on your time.  There's no question

 4     about that.  I'm not in charge of the way we select jurors

 5     unfortunately.  I would make it much more systematic.  I'd

 6     also pay people more.  But anyway, I can't do anything about

 7     that, that's just opinions that I have.

 8        What I can say is that I and the parties know it imposes

 9     on your time.  But I'll make you a promise, and that is, if

10     you were suing somebody for money or you were being sued or

11     you were charged with a crime, here's something you would not

12     say to your lawyer:  You wouldn't say, "Could you please find

13     me 12 people with nothing better to do for my jury because

14     that's what I want.  I want people that have nothing going

15     on."

16        Of course you wouldn't say that because you would want

17     busy active people who have a lot going on.  That's who you'd

18     want on your jury.

19        So that's why you're sitting here because you are exactly

20     the right kind of jurors for this case.

21        Let's talk about COVID for a second.  You're sitting a

22     little further apart.  Everybody's wearing a mask.  I choke up

23     when I tell this story so maybe I shouldn't tell it, but we'll

24     see what happens.  We couldn't do jury trials in this

25     courtroom for more than a year.  An essential function of our

1    democracy shut down because it wasn't safe.  So -- and the

2    vaccines came.  That was a weird time.  I don't know if

3    everybody remembers how weird it was.  It just was weird.

4        Anyway, I got my vaccine at the Oakland Coliseum, both

5    shots actually of the first two shots.  I don't know where you

6    all got your vaccines.  To get to the Oakland Coliseum from

7    here or from where I live, you have to go south on 880, you

8    get off the off-ramp, you come up.  There's an overpass over

9    the freeway.  And while you're up there, you can look down

10   into the parking lot.  There must have been 2- or 300 National

11   Guard troops there in uniform making sure things went

12   smoothly.  And they went like clockwork.

13       I choked up.  I couldn't talk.  Because this was America

14   doing what needed to be done to fight this pandemic.  It was

15   all the organization and resources and grit, all that.

16       Well, later on that year, we opened back up for business

17   for jury trials.  And I saw the first group of people come

18   through that door just like you did.  Masks on.  That was

19   weird.  But great.  And it made me feel the same thing all

20   over again.  People saying we're just going to get this

21   democracy thing done, that's what we do, you know.

22       Well, things are a little better now.  The pandemic

23   circumstances are always changing.  Some of you probably have

24   the view what's the problem, this is like the flu, how come

25   you're making me wear a mask.

1    Some of you are at the other end of the spectrum and

2    you're nervous about COVID and you want to make sure that the

3    Court is doing everything it can to keep you safe.  I'm your

4    Judge so it's my job to keep you safe and to let you not worry

5    about things so you can focus on the trial.

6    So I've gone to the end of the spectrum where you're

7    vaccinated, you're wearing masks, we're wearing masks, the

8    witness is going to wear a mask with a clear part so you can

9    see their expression.  This is a high-efficiency air filter

10   sitting next to the witness who's going to be doing most of

11   the talking.  So we're doing what we can to keep you safe.

12   If you are in the category of people that are glad we're

13   doing all those things, it's my pleasure to do them.  If

14   you're in the category of people who think "I don't think

15   COVID's a big deal anymore," I just say work with me.  Work

16   with me.  Because you and I have an obligation together to

17   make everybody feel safe about being in here.

18   So that's what we're going to do on COVID.

19   Let's swear you in.  Would you stand up and raise your

20   right hands, please.

21                      (Jury venire sworn.)

22        **THE CLERK:**  Thank you so much.  You may be seated.

23        **THE COURT:**  Okay.  Now I'm going to tell you a little

24   bit about the case.  I'll tell you about the schedule.

25   First let me introduce you to some of the participants in

1  the trial.  This is a federal criminal case, as I indicated.

2  That means that the case is being brought by the United States

3  government.

4      Representing the government are two Assistant United

5  States Attorneys, Kyle Waldinger, who just stood up, and his

6  colleague, Nicholas Walsh.

7      Also at their counsel table are Beth Margen who is a

8  paralegal for the government and an FBI Special Agent named

9  Jennifer Barnard.

10      Thank you.

11      The defendant in this case is Michael Brent Rothenberg.

12  He just stood up.  Representing him in this trial is attorney

13  Hanni Fakhoury.  And assisting them is paralegal Nathaniel

14  Torres.

15      Thank you, gentlemen.

16      Let's talk a little bit about schedule.  Some of you are

17  waiting so hard to hear about the schedule.  You will not be

18  able to listen until I tell you what it is so now I'll tell

19  you what it is.

20      We start court at 8:30 in the morning meaning you're in

21  the box, you cleared security, you got your parking space,

22  used the restroom, whatever you needed to do, and we just

23  start taking evidence at 8:30.  We stop at 1:30.

24      And then you go back out and you can work or pick up your

25  kids or be with your family or whatever you need to do.  We

 1   don't take a lunch break.  We take two 15-minute breaks, 90
 2   minutes apart.  So that adds up to the five hours between
 3   8:30 and 1:30.
 4       I adopted that schedule a long time ago.  When I was a
 5   lawyer, I tried a case on that schedule.  I actually ate
 6   dinner with my family sometimes while I was in trial.  I just
 7   couldn't believe it.
 8       As soon as I adopted this schedule, I realized two things.
 9   First, the jurors like it better than the schedule where you
10   occupy their whole day.  Secondly, I get almost as much
11   evidence in on my schedule as I do on the other one.  So it's
12   just a better and efficient schedule.
13       Last thing is I have 400 cases so I need some time to work
14   on the other ones.  I can't just be in trial all the time.
15       So it's 8:30 to 1:30 Monday through Thursday.  We are not
16   in schedule on Friday unless you are deliberating and that's
17   what you want to do to shorten your jury service.
18   Deliberations are when the jury comes together at the end of
19   the case to make a decision.
20       Who's been on a jury before?  Raise your hand.
21       All right.  Thank you.
22       So that's the schedule.  I'll give you a likely case and
23   worst case in terms of time, or longest case.
24       We will be in session this week, Monday through Thursday.
25   Next week we will only be in session Monday and Tuesday.  The

1    trial will go into the following week.  I think it probably

2    will be done that week.  If you are to deliberate on Friday,

3    that would be November 18th.  If you didn't, that would be

4    November 17th.

5        Worst case I think is it goes into the following week

6    which is November 22nd which is that following Tuesday.

7        Let me tell you what the case is about.  I'm going to read

8    you from a jury instruction.  If you're selected for the jury,

9    I will read the instruction to you again later this morning.

10       This is a criminal case brought by the United States

11   government.  The government charges the defendant with bank

12   fraud and false statements to a financial institution.  The

13   charges against the defendant are contained in the indictment.

14   The indictment simply describes the charges the government

15   brings against the defendant.  The indictment is not evidence

16   and it doesn't prove anything.

17       The defendant has pleaded not guilty to the charges and is

18   presumed innocent unless and until the government proves the

19   defendant guilty beyond a reasonable doubt.

20       In addition, the defendant has the right to remain silent

21   and never has to prove his innocence or present any evidence.

22       For clarity, I will say that also means he does not have

23   to testify.

24       To help you follow the evidence, I will now give you a

25   brief summary of the elements of the crimes that the

1    government must prove to make its case.

2        The government has charged the defendant with two crimes

3    in this trial.

4        The defendant is charged in count one with bank fraud.  To

5    prove that crime, the government must prove five elements.

6        First, that the defendant knowingly executed or attempted

7    to execute a scheme to defraud a financial institution as to

8    something of value or a scheme or plan to obtain money or

9    property from the financial institution by making false

10   statements or promises.

11       Second, that the defendant knew that the statements or

12   promises were false.

13       Third, that the statements or promises were material; that

14   is, they had a natural tendency to influence or were capable

15   of influencing a financial institution to part with money or

16   property.

17       Fourth, that the defendant did so with the intent to

18   defraud meaning with the intent to deceive and cheat.

19       And fifth, the financial institution was insured by the

20   Federal Deposit Insurance Corporation, which you may know as

21   the FDIC, or was an organization which finances or refinances

22   any debt secured by an interest in real estate including

23   private mortgage companies and any subsidiaries of such

24   organizations and whose activities affect interstate or

25   foreign commerce.

1          The defendant is charged in count two with making false

2     statements to a financial institution.  To prove that crime,

3     the government must prove three elements.

4          First, the defendant made a false statement or report to a

5     federally insured financial institution with all of the jurors

6     agreeing as to the specific false statement or report.

7          What that part means is that if the government puts on

8     evidence that the defendant made more than one statement or

9     report to the financial institution that the government says

10    was false, then in order to find the defendant guilty, all the

11    jurors have to agree on which statement was false.

12         Second, the defendant made the false statement or report

13    knowing it was false.

14         And third, the defendant did so for the purpose of

15    influencing in any way the action of the financial

16    institution.

17         It is not necessary, however, to prove that the financial

18    institution was in fact influenced or misled or that the

19    financial institution was exposed to a risk of loss.

20         What must be proved is that the defendant intended to

21    influence the financial institution by the false statement.

22         So that is what the case is about.

23         Can everybody hear me okay?

24              (Prospective jurors nodding.)

25              **THE COURT:**  Good.  If that changes, wave your hand

 1   around.  You are the ones who are going to determine the facts

 2   so you need to be able to hear.  If you can't hear, we have

 3   assistive listening devices for you.

 4       Okay.  We're going to ask you some questions in just a

 5   second.

 6       Some of you are thinking:  Wait, I can't serve on this

 7   trial, it's impossible.  When can I make a request of you that

 8   I not serve on this trial?

 9       At the of this session this morning, I'll give you that

10   opportunity.  That's called a hardship request.  There are

11   rules around hardship requests that I have to follow so

12   sometimes I can grant them, sometimes I can't.

13       Examples are hardship are extreme financial hardship to

14   you, not your employer, to you.  Prepaid medical -- excuse

15   me -- prepaid travel plans, personal travel plans that you

16   have.  Previously scheduled medical procedure, that kind of

17   thing.  The need to take care of very small children and no

18   one else can do it.  Those are some examples.

19       I'm of two minds about hardship requests.  Of course I

20   like it when the jurors like me.  So if I grant your hardship

21   request, you say, Judge Tigar's a really good judge because he

22   granted my hardship request.

23       On the other hand, here's something that I know is

24   happening right now.  Some of you came in the room a little

25   bit on the fence about jury service, but having listened this

1    morning and then as you go through the morning listening to

2    the lawyers and finding out what the case is about, you've

3    concluded, you know what, I can do this and it's my time.

4    Today is the day I am going to do my duty as a citizen, and I

5    can make it work, and I'll just reschedule the dentist

6    appointment, or whatever it is.

7        And whoever you are, I will never know who you are because

8    you will not say any of that out loud.  You'll just agree to

9    participate in jury selection and to serve as a juror if

10   you're selected.  And whoever you are, I don't want you to

11   feel gamed.  So I bear that in mind as I consider the hardship

12   requests.

13       I don't -- I'm going to ask a few questions.  Then the

14   lawyers are going to ask a few questions.  Nobody is trying to

15   invade your privacy.  I don't think it will come up, but it

16   may, that you're just not comfortable answering in front of

17   everybody.  And if we touch on something that's very personal

18   or private to you, just let me know that.  And then you and I

19   and a couple of the lawyers and the court reporter will go

20   back in the jury room and you can tell me back there.

21       This process is called voir dire.  I've heard conflicting

22   things about the phrase "voir dire."  I think it's an old

23   Anglo-Norman phrase.  It just means to tell the truth.

24       So that's what we're going to do.  We're going to find out

25   if you're a good fit for this case.

1        We're not looking for 12 people and two alternates that

2   don't have any opinions.  I couldn't find 14 people that don't

3   have opinions.  I'm not looking for 14 people that don't have

4   any life experiences.  I couldn't find that either.

5        What I'm looking for are jurors who can be fair, who can

6   take their opinions and their life experiences and just put

7   that to one side and decide this case based on the evidence

8   and the law.

9        I know you can do it because that's what I do every day.

10  When the Governor of California put me on the state court

11  20 years ago, or the President nominated me to this job

12  nine-and-a-half years ago, they did that not so that I could

13  just apply the law according to Jon Tigar.  That's not the

14  job.

15       The job is to apply the law of the State of California or

16  the United States whether I agree with it or not.  And just to

17  apply it to the facts that the parties have given me and not

18  to let my opinions or my life experiences get in the way.  And

19  I work for all of you.  So that's this job.

20       When you're on a jury, that's your job also.  Very

21  occasionally, someone just is not able to put their opinion or

22  their life experience to one side.  We'll find about that if

23  it happens but for those of you who've not been on juries

24  before, that's the job.

25       Who has teenage children?

1    Who has ever had teenage children?  That's me.  I know

2    they're not teenagers anymore.

3    Who has ever met a teenager?  Okay.

4    Who knows what the expression "TMI" means?

5    Yes, ma'am, what does that mean?

6    **PROSPECTIVE JUROR:**  Too much information.

7    **THE COURT:**  Too much information.

8    When my sons were teenagers, we'd be sitting at a family

9    dinner, and if I talked, they would say, "Dad, it's TMI,"

10   because they didn't want to hear from their old man.

11   We don't have TMI in this process.  Here's what I mean by

12   that.  If you think of something that you think the lawyers or

13   I would like to know, just volunteer it.  Hey, this might be

14   relevant.  Err on the side of telling us.

15   Secondly, even if you don't think it would affect your

16   ability to be fair and impartial, tell us.  So I'll give you

17   an example.  This is a federal criminal case.  We have an FBI

18   agent sitting right there.  Maybe your brother is an FBI

19   agent.  Okay.  But you think, "That's fine.  I'm not going to

20   evaluate the law enforcement witnesses any differently.  It's

21   not going to affect me."

22   Tell us anyway.  Because the lawyers need a chance to

23   follow up with you about that relevant fact or opinion or

24   whatever it is.

25   So don't do any self-editing.  Please volunteer.  If I

```
 1    need to move things along for time reasons, I'll be the one to
 2    do that.
 3        Okay.  Let me ask you a few questions, and then I'll let
 4    the lawyers ask.
 5        First of all, as I -- well, first of all, does any of you
 6    know or have had any interaction with Silicon Valley Bank?
 7    Which will be a bank -- the bank to which Mr. Rothenberg
 8    provided some information.
 9        I'm not seeing any hands.
10        Does any of you -- has any of you heard of Mr. Rothenberg
11    before today?
12        I'm also not seeing any hands.
13        Let me read you the names of some persons who may be
14    called as witnesses in this case and see if any of those names
15    are familiar to you.
16        From Silicon Valley Bank, Brian Bell, Michelle Jandu,
17    Frederick Kreppel, George Pires or Pires, Ingrid Robertson,
18    and Pablo Serna.
19        Would you raise your hand if those names are familiar.
20        I'm not seeing any hands.
21        From Merrill Lynch, the brokerage firm, Christine
22    Allschied, Benjamin Bolt, Anna Jenkins or Ryan Kelty.
23        I'm still not seeing any hands.
24        From Chicago Title Company, Hapi Yamato.
25        Still not seeing any hands.
```

1          Law enforcement witnesses:  In addition to Agent Barnard,

2    Special Agent Anthony Ghio and Special Agent Michael Capuzzi

3    of the Internal Revenue Service.

4          Still not seeing any hands.

5          Other witnesses:  Paulette Brunk, who is a notary public.

6    Jefferson Robert Eppler, also known as J.R. Eppler, from

7    Rothenberg Ventures Management Company.  Thomas Leep.  James

8    Kiss, who's with the FDIC.  And Mario Morales-Arias from

9    American Express.

10         Do you know any of those people?

11         I'm not seeing any hands.

12         This is a federal criminal case.  And you heard me say

13   earlier that the burden of proof is with the government all

14   the time.  In our country, the defendant doesn't have to prove

15   anything.  The government has the burden of proving the

16   defendant's guilt beyond a reasonable doubt, and if the

17   government can't do that, the defendant is entitled to be

18   acquitted, found not guilty.

19         Does any of you -- is any of you going to have any

20   difficulty applying that law as I just gave it to you?

21         All right.  I'm not seeing any hands.

22         The other thing I want to ask about is that the -- as you

23   heard me say, the defendant does not have to testify in this

24   case.  This also is something the founders put in the

25   Constitution, and that is, a defendant never has to take the

1      stand although they can if they want to.  And the jury is not

2      to hold that against the defendant in determining whether or

3      not the government has proven its case.

4          So I'll ask you two questions.

5          The first is does that bother anybody?  As you sit here

6      right now, are you thinking, hey, I just think the defendant

7      ought to have to testify?

8          Okay.  So let me get my reading glasses back on and start

9      taking some notes.

10         Yes, sir, right here in the front row.  Tell me your name.

11                 **PROSPECTIVE JUROR:**  Jeff.

12                 **THE CLERK:**  Sorry, Your Honor.

13                 **THE COURT:**  Hold on, sir.  My courtroom deputy is

14     going to bring a microphone over to you.

15                 **PROSPECTIVE JUROR:**  Jeff Pilisuk.

16                 **THE COURT:**  Okay.  Mr. Pilisuk, expand on that for

17     me.

18                 **PROSPECTIVE JUROR:**  Well, I just think hearing from

19     the defendant in a case lends some credibility to the whole

20     defense, being able to hear the direct story from the

21     defendant, and that seems like a miss not being able to hear

22     from them.

23                 **THE COURT:**  All right.  It's just information you'd

24     like to have.

25                 **PROSPECTIVE JUROR:**  Yeah.

1          **THE COURT:**  Yeah.  Okay.

2      Well, I ask -- you notice I didn't ask can you all just

3   follow the law.  I didn't just ask that.  I asked this

4   question, which is, I wanted to get underneath that and just

5   hear about people's feelings.

6      So I am going to instruct the jury in this case, as I

7   indicated a minute ago, to say you cannot hold that against

8   the defendant.  The defendant has the right not to testify.  I

9   need to be more of a historian about this, but I think the

10  founders' thinking was that we don't want the power of the

11  state to compel somebody to give evidence against himself.

12     And of course there are all kinds of reasons why a

13  defendant could testify or not testify, but that one reason

14  was enough for them to say forget it, we're just not going

15  to -- we're just not -- there's never going to be any

16  obligation on the defendant to testify.  And if you're going

17  to -- if you're going to give the defendant that right, you

18  also have to tell the jury you can't hold it against the

19  defendant.

20     So my question is:  Can you follow that instruction?  You

21  get into the jury room, and just if the defendant winds up not

22  testifying, not hold it against him in the case?

23          **PROSPECTIVE JUROR:**  I think so.

24          **THE COURT:**  Okay.  And I don't want to put words in

25  anybody's mouth.  I'm just trying to get a fair jury.  Is

1   there anything I should have asked you?  You know what I mean?

2             **PROSPECTIVE JUROR:**  No, think I -- I think I said how

3   I feel about it but....

4             **THE COURT:**  Okay.  Terrific.

5       I think that the woman in the -- I want to call it pink.

6   It might not be, it could a different shade.  If we could pass

7   the microphone down to that prospective juror.

8       Ma'am, would you say your name, please.

9             **PROSPECTIVE JUROR:**  Menbere Tequame.

10            **THE COURT:**  Ms. Tequame, am I pronouncing that

11  correctly?

12            **PROSPECTIVE JUROR:**  Yes.

13            **THE COURT:**  Ms. Tequame, tell me how you feel.

14            **PROSPECTIVE JUROR:**  I think it would bother me not to

15  hear from the defendant.

16            **THE COURT:**  So you heard what I said, my conversation

17  with Mr. Pilisuk so you know what I'm going to ask you.  And

18  that is, let's say you were selected for the jury, you're in

19  the deliberation room, you are trying to decide whether the

20  government proved its case.  Are you going to hold it against

21  the defendant if he exercises his right not to testify?

22            **PROSPECTIVE JUROR:**  I'm not sure.

23            **THE COURT:**  You're not sure.

24      Okay.  Just for the sake of time, I think I'll let the

25  lawyers follow up with you if they want.  Okay?

 1         And there was someone else on the bench over three who

 2    also had his hand up.  Oh, and maybe the gentleman next to

 3    you.

 4         Yes, sir.

 5              PROSPECTIVE JUROR:  Hi.  My name is Robert.  Yeah --

 6              THE COURT:  Robert, is your last name Kwak?

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Am I pronouncing that correctly?

 9              PROSPECTIVE JUROR:  Yeah.

10              THE COURT:  Mr. Kwak, what's on your mind?

11              PROSPECTIVE JUROR:  Just to what the other two

12    prospective jurors alluded to, I kind of have the same

13    viewpoint.  Maybe it's just because I'm not too familiar with

14    the law.  But I feel like I would like that information.

15              THE COURT:  Sure.

16              PROSPECTIVE JUROR:  And I understand what you're

17    saying about whether you can kind of put that aside.

18              THE COURT:  Yeah.

19              PROSPECTIVE JUROR:  And, yeah, I can do that to the

20    best of my ability.  But, yeah, I mean everyone I feel like

21    has inherent biases so -- it -- I think it's -- I think it

22    certainly is possible.  But it is I feel like one thing that's

23    kind of out there that kind of would make me question why --

24    why wouldn't he want to, you know?  That's just my inherent

25    bias so....

```
 1            THE COURT:  Well, and that's a fair -- these are all
 2     fair points.  That's why I asked the question the way I did.
 3     I'm not trying to run away from it.  I'm trying to run into
 4     it.
 5            So you're a physician.
 6            PROSPECTIVE JUROR:  I am, yes.
 7            THE COURT:  My sister is also a physician.  And she
 8     was on a jury and she told me the way she thought about -- she
 9     became the foreperson.  She told me the way she thought about
10     the decision was the government needed to prove certain
11     things, and she just made that the inquiry.  What evidence did
12     the government put in.  Consider that evidece.  I don't think
13     there was a defense case so she didn't have to consider that
14     evidence in the light of the defendant's evidence.  But she
15     did sort of -- it was like an ingredient list or a scale or,
16     you know, however you want to think about it.
17            And I thought that was a very useful metaphor.  It's a
18     very useful way of thinking about the process.
19            So at the end of the case, let's say the defendant doesn't
20     testify.  Then you will be asked to look at all the other
21     evidence, regardless of who put it in, and just ask yourself
22     the question:  Did that prove the case beyond a reasonable
23     doubt?  That's all.
24            And so the question becomes would your feelings about the
25     defendant not testifying get in the way of just doing that
```

```
 1    process?  Does that make sense?
 2              PROSPECTIVE JUROR:  (Nods head.)
 3              THE COURT:  Do you think you could do that?
 4              PROSPECTIVE JUROR:  Yeah, I would hope so.  Yes,
 5    but --
 6              THE COURT:  Okay.
 7              PROSPECTIVE JUROR:  -- I'm just --
 8              THE COURT:  All right.
 9              PROSPECTIVE JUROR:  -- answering the question
10    truthfully.  So --
11              THE COURT:  No, I appreciate that.
12         Ms. Tequame -- would you pass the microphone back to
13    Ms. Tequame.
14         Ms. Tequame, now that I've explained it that way so you're
15    just going to have whatever evidence the parties put in,
16    you're just going to ask yourself whether that evidence
17    satisfied the government's burden or not, is that something
18    that you could do?
19              PROSPECTIVE JUROR:  To be honest, I don't know.
20              THE COURT:  You don't know.  Okay.
21         Would you pass the microphone over to this gentleman on
22    the bench over there.
23         Good morning, sir.
24              PROSPECTIVE JUROR:  Morning.  Andrew Nacion.
25              THE COURT:  Mr. Nacion, am I saying that right?
```

1    **PROSPECTIVE JUROR:**  Yes.  There's like three

2    different pronunciations of it so....

3    **THE COURT:**  Well, the correct one is the one you were

4    to use if we never met each other and we were at a picnic and

5    I walked up to you and I said "Jon Tigar," and I put my hand

6    out, and you would say?

7    **PROSPECTIVE JUROR:**  Nacion.

8    **THE COURT:**  That's how I'm going to say it.

9    So, Mr. Nacion, what's on your mind about this topic?

10    **PROSPECTIVE JUROR:**  It's just it's not within my

11    nature to come to a conclusion about something if I'm like --

12    if I feel like I'm perpetually in the dark.  And I feel like

13    not having that testimony, I wouldn't be able to wrap my head

14    around the whole thing.  If that makes sense.  It's not in my

15    nature.

16    **THE COURT:**  Okay.  You're in e-commerce?

17    **PROSPECTIVE JUROR:**  Yes.

18    **THE COURT:**  What do you do specifically?

19    **PROSPECTIVE JUROR:**  I just kind of manage the

20    inventory that comes in.  It's kind of like a librarian but

21    with collectibles.

22    **THE COURT:**  So I haven't -- the lawyers are looking

23    at your questionnaire.  I'm not doing that.  I'm just talking

24    to you.

25    **PROSPECTIVE JUROR:**  Yes.

```
1            THE COURT:  So I don't know who your employer is.
2    Who is it?
3            PROSPECTIVE JUROR:  Goodwill Industries.
4            THE COURT:  Oh, fantastic.
5            PROSPECTIVE JUROR:  Yeah.
6            THE COURT:  Talk about constantly getting more
7    inventory.  Right?
8            PROSPECTIVE JUROR:  Yeah.
9            THE COURT:  Yeah.  So are you, when you're managing
10   inventory, ever required to think about transportation systems
11   or any kind of supply chainy-type things?
12           PROSPECTIVE JUROR:  I mean, yeah, like every day is
13   like a whole different thing.  But those are like definitely
14   things that happen, for sure.
15           THE COURT:  Sure.  Are you required to make estimates
16   about things?
17           PROSPECTIVE JUROR:  Yeah, like in terms of time and
18   all of that, like -- like what could get done by a certain
19   time, like lunch or whatever, by the end of the shift.
20           THE COURT:  Okay.  Are you ever required to make
21   decisions in your job without having perfect information?
22           PROSPECTIVE JUROR:  Well, I mean I could kind of gain
23   a certain -- it's like a play by ear sort of thing.
24           THE COURT:  Right.
25           PROSPECTIVE JUROR:  So yeah.
```

1          **THE COURT:**  So you do?

2          **PROSPECTIVE JUROR:**  Yeah.

3          **THE COURT:**  Because you have to?

4          **PROSPECTIVE JUROR:**  Yeah.

5          **THE COURT:**  So, you know, I don't know that it's --

6     I'm not trying to quarrel with you.

7          **PROSPECTIVE JUROR:**  Yeah, yeah, yeah.

8          **THE COURT:**  I'm just saying that it's not just about

9     whether the defendant testifies or not.  In any trial, it's

10    pretty common that there are things the jurors kind of wish

11    they knew but there just isn't any evidence about it.  And so

12    people just have to make the decision with -- with what they

13    have.

14        You've indicated it's not within your nature to come to a

15    conclusion if there are things you don't know.  I think you

16    and I both know now that in your day-to-day job you actually

17    have to do that sometimes.

18        My question is, let's say you got selected for the jury

19    and it became your civic duty.  Could you follow the law and

20    make a decision without considering the fact that the

21    defendant hadn't testified?

22         **PROSPECTIVE JUROR:**  I mean I probably could if I

23    worked at it, but it would always kind of dwell on me that

24    I'm -- I don't have the whole picture.

25         **THE COURT:**  Okay.

```
 1              PROSPECTIVE JUROR:  Yeah.

 2              THE COURT:  Anybody else have a feeling about this?

 3    Anybody I haven't talked to already?

 4         Okay.

 5         Well, I don't need to get to part two because I talked

 6    about part two with everybody.

 7         Just give me one second.

 8                   (Pause in the proceedings.)

 9              THE COURT:  I think I will stop there and let the

10    lawyers ask questions.  The lawyers are just as entitled as I

11    am to ask questions, and you should not -- you should give

12    their questions exactly the same consideration that you gave

13    mine.

14         Mr. Waldinger?

15              MR. WALDINGER:  We have a question here, Your Honor.

16              THE COURT:  Oh, thanks.  Yes, I'm sorry, ma'am.  I

17    didn't see your hand up.

18              PROSPECTIVE JUROR:  Hi, Judge.  Who are these people

19    over here?

20              THE COURT:  Beats me.

21              PROSPECTIVE JUROR:  Okay.  I'm just curious before we

22    start talking.

23              THE COURT:  So this is a public proceeding.

24              PROSPECTIVE JUROR:  Okay.

25              THE COURT:  That's the way we do it in America.  We
```

1    just throw our doors open and we let the public come in and

2    see how we do our justice stuff.

3        And, yeah, I don't know who they are either.

4        But I welcome all of you.

5        Okay.  Mr. Waldinger.

6        **MR. WALDINGER:**  Thank you.

7        Again my name is Kyle Waldinger.  I'm one of the Assistant

8    United States Attorneys on the case.

9        Can everybody hear me?

10       Is it Ms. Bucher?  How do you pronounce your last name?

11       **PROSPECTIVE JUROR:**  Oh.  Bucher.

12       **MR. WALDINGER:**  Ms. Bucher, could you pass that

13   microphone all the way down to the very first gentleman.

14   Thank you very much.

15       You're Mr. Mendoza?

16       **PROSPECTIVE JUROR:**  Yes, sir.

17       **MR. WALDINGER:**  Mr. Mendoza, good morning.

18       I saw in your questionnaire that you wrote something about

19   having difficulty judging people, and I just wanted to inquire

20   a little bit about that.

21       **PROSPECTIVE JUROR:**  Correct, yes.  I believe it was

22   asking about like a religious point of view.  So like the only

23   reason I put that is I believe in a higher power.  And, well,

24   I don't see myself as someone that can judge others.  You

25   know, I think that's only for God to do.  So I wouldn't be

1   able to -- or I wouldn't feel comfortable judging another

2   person and saying, oh, you deserve this for your actions or

3   saying that person did it or not.  That's just the way I see

4   it.

5          **MR. WALDINGER:**  And I can't recall from your

6   questionnaire, but have you served on a jury before?

7          **PROSPECTIVE JUROR:**  No, sir.

8          **MR. WALDINGER:**  Okay.  And so if you were chosen to

9   be on the jury in this case, do you think you would be able to

10  follow Judge Tigar's instructions to look at the evidence

11  that's been presented to you and to come up to a decision

12  which the decision in a criminal case is, is the defendant

13  guilty or innocent?  Do you think that you can come to that

14  kind of judgment based on your -- on what you just told me?

15         **PROSPECTIVE JUROR:**  Well, going off what Judge Tigar

16  said and explanations he was giving and the -- and the

17  information we just went over, I kind of look at -- I look at

18  it at a different way.  So I don't see it being an issue.

19         **MR. WALDINGER:**  You don't -- you don't believe it to

20  be an issue.

21         **PROSPECTIVE JUROR:**  Correct, yes.

22         **MR. WALDINGER:**  Thank you very much.

23         **THE COURT:**  Let me just edit slightly what

24  Mr. Waldinger just said.  You will not be called -- the jury

25  will not, in this case, be called upon to determine whether

1    the defendant is guilty or innocent.  The jury will be called

2    upon to determine whether the defendant's guilt has been

3    proven beyond a reasonable doubt.

4        And in the light of further instructions, what I just said

5    will make more sense to you.

6        **MR. WALDINGER:**  Thank you for correcting my inartful

7    description, Your Honor.

8        Mr. Mendoza, could you pass the microphone all the way

9    down to the end of your row.

10       Is it Ms. Coss?

11           **PROSPECTIVE JUROR:**  Yeah.

12           **MR. WALDINGER:**  Ms. Coss, on your questionnaire, you

13   stated that you felt that you had some distrust of law

14   enforcement officers.  And I just wanted to see whether the

15   fact that this is a case brought by the United States

16   government, by a law enforcement entity, and -- and whether

17   the -- the presence of the FBI in this case or other law

18   enforcement agencies would affect your ability to be a fair

19   and impartial juror in this case?

20           **PROSPECTIVE JUROR:**  I feel more strongly about police

21   officers than I do about FBI agents in terms of veracity of

22   words and actions.

23           **MR. WALDINGER:**  Okay.  Would you tend to believe --

24   how about just witnesses that are called by the government in

25   general that are not law enforcement witnesses?

1      **PROSPECTIVE JUROR:** I -- you know, it would depend on
2   their statements and --

3      **MR. WALDINGER:** Okay.

4      **PROSPECTIVE JUROR:** -- how they present themselves
5   when they answer the questions.

6      **MR. WALDINGER:** So you wouldn't -- just because they
7   were being called by the government, you wouldn't -- you
8   wouldn't put them into I'm-probably-going-to-disbelieve
9   column?

10     **PROSPECTIVE JUROR:** No.  Very clearly I want to say
11  that I am more apt to not believe the testimony of a police
12  officer because there have been too many instances of police
13  officers having lied or stretched the truth about things that
14  they're testifying on.

15     **MR. WALDINGER:** Okay.  Very good.  Thank you very
16  much.

17     Could you pass the microphone to Ms. Tequame.

18     Did I pronounce that correctly -- correctly?

19     **PROSPECTIVE JUROR:** Yes.

20     **MR. WALDINGER:** I saw your questionnaire this
21  morning.  And it -- I have to -- I'm going to ask you a
22  question, which is I'm a *New York Times* crossword puzzle guy
23  almost every morning.  And last week or the week before, one
24  of the questions was world capital that means -- whose name
25  means new flower.  Can you tell the rest of the people in this

```
 1   room what world capital that is?
 2            PROSPECTIVE JUROR:  You mean Addisababa?
 3            MR. WALDINGER:  Addisababa means new flower.
 4            PROSPECTIVE JUROR:  Um-hmm.
 5            MR. WALDINGER:  Is that where you're from?
 6            PROSPECTIVE JUROR:  Yes, I'm from Ethiopia.
 7            MR. WALDINGER:  How long have you been in the
 8   United States?
 9            PROSPECTIVE JUROR:  Oh, 30 years.
10            MR. WALDINGER:  Thirty years.  And so Judge Tigar's
11   asked you some questions about your ability to be a fair and
12   impartial juror in the case if the defendant did not testify.
13   And it sounds to me like you would have a very hard time and
14   you don't think that you would be able to be fair and
15   impartial; is that correct?
16            PROSPECTIVE JUROR:  Correct.
17            MR. WALDINGER:  Thank you.
18      I've asked some questions of -- of some prospective jurors
19   about, you know, Mr. Mendoza, I asked about the ability to
20   judge other people.
21      Is there anybody else who has that reticence and is --
22   doesn't feel comfortable judging other people?
23      That's you, Ms. Tequame?
24            PROSPECTIVE JUROR:  (Nods head.)
25            MR. WALDINGER:  Anybody else?
```

```
 1          And that's -- could you pass to it Mr. Nacion.
 2          Okay.  So, yeah, I've got to talk to you too.  You work at
 3   Goodwill.  My brother-in-law works at Goodwill.  Do you have
 4   as many stories about treasures that people donate to Goodwill
 5   that are worth thousands of dollars as my brother-in-law does?
 6               PROSPECTIVE JUROR:  Yes.
 7          MR. WALDINGER:  Yeah.  And so is that -- and Goodwill
 8   puts those online, and you're an e-commerce guy.
 9               PROSPECTIVE JUROR:  Yes.  Well, like I sort that.  I
10   don't appraise anything.  I'm just, like I said, kind of like
11   a librarian.
12          MR. WALDINGER:  What's the most expensive thing that
13   you've put for sale?
14               PROSPECTIVE JUROR:  I saw like an Nintendo game that
15   sold for like a couple thousand.
16          MR. WALDINGER:  Okay.  All right.
17      And so you're also not comfortable judging people?
18               PROSPECTIVE JUROR:  That's correct.  I just feel like
19   I need the whole story before I come to a complete concrete
20   sort of the decision about anything.
21          MR. WALDINGER:  Okay.  But that's a little different
22   of a question.  Say you got -- say that the lawyers in this
23   case and the government, the government does an amazing job of
24   giving you every angle, and so you've got all the angles.
25          Are you going to have a problem then determining whether
```

```
1    the government has met its burden in the case about making a
2    judgment in this case?
3             PROSPECTIVE JUROR:  Well, like I said, without that
4    testimony, it will always kind of eat at me whether or not I
5    came to the right decision.
6             MR. WALDINGER:  Okay.  But that's about the
7    defendant's testimony.  And the question I had was you seemed
8    to have some discomfort in just making judgments about people
9    in general.
10            PROSPECTIVE JUROR:  Yeah.
11            MR. WALDINGER:  Did I miss that?
12            PROSPECTIVE JUROR:  No.  That's true.
13            MR. WALDINGER:  Okay.
14       Do you think that you're going -- that you'd be able to
15    get over that obstacle in the case considering if we get over
16    the obstacles that we've already talked about, can you get
17    over that last obstacle of just having to judge?
18            PROSPECTIVE JUROR:  I mean it's one of those things
19    where like when I know I have that power, that kind of psychs
20    me out even more that I would kind of hit a wall.
21            MR. WALDINGER:  And is that a -- is that a brick wall
22    or is that a paper wall?
23            PROSPECTIVE JUROR:  I mean, a wall is a wall.  I
24    mean, I don't know.
25            MR. WALDINGER:  All right.
```

1    We have no further questions, Your Honor.

2         **THE COURT:**  Thanks, Mr. Waldinger.

3    If no one asked you any questions, don't let it hurt your

4    feelings.  Okay?  We're just trying to get through this as

5    quickly as we can.  The lawyers have the information in your

6    questionnaires, and so really it's fine if that happens.

7    Mr. Fakhoury, questions for these prospective jurors?

8         **MR. FAKHOURY:**  Just a few.  Thank you, Your Honor.

9    Good morning, everyone.  I'm Hanni Fakhoury and I have the

10   privilege of representing Mr. Rothenberg.

11   You'll forgive me if I get your name mispronounced.  My

12   last name is Fakhoury.  I'm very sensitive to that.

13   I wanted to start by asking Mr. Mendoza -- I believe

14   you're over there, yes.

15   If you can pass the microphone.  Thank you.

16   You know what.  I'm sorry.  Not Mr. Mendoza.  Mr. Sosa.

17   No disregard, Mr. Mendoza.

18   Mr. Sosa, you had mentioned in your questionnaire -- you

19   made a note about -- I understand you work for PG&E; is that

20   correct?

21        **PROSPECTIVE JUROR:**  That is correct.

22        **MR. FAKHOURY:**  Okay.  And you'd indicated that there

23   was some involvement in a lawsuit regarding one of the -- the

24   fires.  Is that -- are you a witness essentially to that

25   lawsuit?

1              **PROSPECTIVE JUROR:**  No.  My in-laws lost their home

2     during the fire in --

3              **MR. FAKHOURY:**  Oh, okay.

4              **PROSPECTIVE JUROR:**   -- county.

5              **MR. FAKHOURY:**  Oh, okay.  I'm very sorry to hear

6     that.  Thank you.

7         I wanted to turn back to the topic that Judge Tigar had

8     mentioned and Mr. Waldinger asked a couple questions about,

9     which is that in a criminal case a defendant has no burden to

10    present any evidence or to testify and in fact is presumed not

11    guilty, meaning he starts -- if no evidence has been admitted,

12    no one's heard any evidence yet, right now Mr. Rothenberg is

13    not guilty.

14        And we've had a little bit of a discussion, a really

15    thoughtful and illuminating discussion this morning on that

16    topic.  And I think everybody who raised their hands or had --

17    had a concern about it had an opportunity to speak.

18        But I wanted to actually talk to Mr. Kimble.  I don't know

19    where Mr. Kimble is.  There, okay.  If we could have the

20    microphone head down his way.

21        Good morning, Mr. Kimble.

22             **PROSPECTIVE JUROR:**  Good morning.

23             **MR. FAKHOURY:**  And so in your questionnaire, you had

24    some -- you raised some of the concerns that had been raised

25    by other jurors about having difficulty with the fact that a

 1    defendant in a criminal case is not required to testify or

 2    present evidence and is presumed not guilty.

 3        And I just wanted to know if -- and you'd indicated that

 4    in the questionnaire.  And I just wanted to know has anything

 5    in our conversation this morning on that topic changed your

 6    mind about that, or do you still sort of have that kind of

 7    unease or difficulty with that?

 8            **PROSPECTIVE JUROR:**  I think it will always still be

 9    in my head that, you know, someone's claiming not guilty and

10    don't want to show and have everybody else see their story.

11    It just kind of puts in the back of my head like, you know,

12    based on the full decision of it just would always be on my

13    head about it.  So --

14            **MR. FAKHOURY:**  Okay.

15            **PROSPECTIVE JUROR:**  -- not wanting to be up there and

16    get everybody to see the person tell their side, it just kind

17    of would always be on my head about it.

18            **MR. FAKHOURY:**  Okay.  Now you've heard that Judge

19    Tigar would instruct you that even though that may be your

20    feeling, that you ultimately have to follow the instructions

21    he gives you and sort of put that belief to the side and --

22    and apply the law which says you can't hold that against

23    Mr. Rothenberg.

24        Do you think that's something you can do?  Or is that

25    going to be something you're still going to struggle with a

1    little bit?

2          **PROSPECTIVE JUROR:**  I think I would definitely

3    struggle with it.

4          **MR. FAKHOURY:**  Okay.  Thank you so much.

5      I don't have any other questions, Your Honor.  Thank you.

6          **THE COURT:**  Thank you, Mr. Fakhoury.

7      All right, members of the jury, so what we're going to do

8    now is I'm going to take hardship requests.

9      We actually picked most of our jury yesterday.

10     Oh, let me see counsel at sidebar.

11               (Sidebar off the record.)

12         **THE COURT:**  Okay.  Apologies for the interruption.

13   I'll give you an instruction about this at some point.  When I

14   have a conference with the lawyers over there outside of your

15   hearing, it's called a sidebar conference.  That's why we play

16   a white noise machine.

17     The purpose of a sidebar conference generally speaking is

18   to figure out some evidence admissibility question or some

19   other administrative question that is not relevant to your

20   decision.  And so just to keep things neater, we have those

21   conferences over there outside your hearing.

22     We're now going to come to the stage of the proceedings

23   where I'm going to take hardship requests.  I'll give those of

24   you who are not making a hardship request a little bit of a

25   break.  You can wander around while I'm doing that.  And then

1    everybody will come back, and the lawyers will get to exercise

2    what are called peremptory challenges.

3        You'll see when the lawyers exercise those, they don't

4    have to give a reason.  They'll just say we're asking the

5    Court to thank and excuse Juror X, and then I'll say, okay,

6    and that juror will be excused.

7        Peremptory challenges are an important part of our system.

8    They make -- they allow the parties to have the greatest

9    possible confidence in the jurors that are ultimately seated

10   in the case.

11       When I was a lawyer, I promise you I exercised plenty of

12   peremptory challenges.  There's nothing weird about it.  It's

13   just a standard part of our process.

14       At this time, I'm going to thank and excuse a few jurors

15   before we go any further.

16       So Ms. Tequame, you're excused from the jury.  You're free

17   to go.

18       Mr. Kimble, where are you?  Yes, Mr. Kimble, you are free

19   to go.

20       And Mr. Nacion, also you are free to go.

21       I thank you both for your participation this morning.  And

22   you're excused from this jury.

23       Would you raise your hand if you are going to be making a

24   hardship request?  I see three hands.

25       So the rest of you are free to wander around outside.  I

1     don't think this is going to take very long.  So let's just

2     take ten minutes.  If you'll come back in ten minutes, we will

3     finish up this part of our jury selection, and then our trial

4     will begin today.

5             **THE CLERK:**  Please rise for the jury.

6             **THE COURT:**  So just to be clear, if you're making a

7     hardship request, please stay.  If you're not making a

8     hardship request, you can exit the courtroom if you like.  You

9     don't have to.  And you need to be back by 10:40.  Thanks.

10              (Prospective Jurors exited the courtroom.)

11            **THE CLERK:**  You may be seated.

12            **THE COURT:**  All right.  And before I inquire of these

13    prospective jurors, Ms. Lee, do we know whether Ms. Perez came

14    back this morning?

15            **THE CLERK:**  I do not know yet, Your Honor.

16      I will check that right now.

17            **THE COURT:**  Okay.  Very good.

18      There's no particular order to this.

19      Ms. Coss, since I remember your name, I'll start with you.

20    If you could just get the microphone and tell me what's

21    happening with you, please.

22            **PROSPECTIVE JUROR:**  I'm a small business owner.  I'm

23    in fact the only person working for the business right now.

24            **THE COURT:**  What's the business, just out of

25    curiosity?

1          **PROSPECTIVE JUROR:**  It is a media events and

2    consulting business.  And fall and spring are the two busiest

3    times.  I have an event Thursday, Saturday.  And then next

4    week, I have events from Tuesday through Sunday.  And I am

5    also leaving for Mexico on the evening of November 28th.

6          **THE COURT:**  Okay.

7          **PROSPECTIVE JUROR:**  So if I'm not working --

8          **THE COURT:**  Right.

9          **PROSPECTIVE JUROR:**  -- then I'm losing money.  And

10   also I just want to clarify that the pandemic nearly took out

11   my business because it is 80 percent of the revenues --

12         **THE COURT:**  I was thinking that when you told me what

13   you did for work.  Certain industries really took a hit during

14   the pandemic.

15         **PROSPECTIVE JUROR:**  So, you know, I'm working already

16   a lot to make up for the year and a half of no revenues.

17         Also, I -- I want to be honest and say that as a

18   woman-owned business and somebody who struggled to get

19   financial assistance when I launched the business, and then

20   also during the pandemic, I take things like financial fraud

21   very seriously because it's so unfair for the rest of us who

22   did everything by the books.

23         **THE COURT:**  Yes.

24         **PROSPECTIVE JUROR:**  And may not have been given

25   financial assistance, and having seen money go to people who

1    lied or did not deserve it.

2              THE COURT:  Yes, ma'am.

3         I'm not -- I'll tell you I'm not so worried about that.  I

4    think -- and I hear what you're saying about the financial

5    burden on you.  I note you also have a child in college now,

6    and I'm sure that places an additional financial burden on

7    you.

8         On your second point, you strike me as somebody who -- who

9    feels very strongly about justice in general.

10             PROSPECTIVE JUROR:  Um-hmm.

11             THE COURT:  And no one likes fraud, but I'm not

12   worried that if the government didn't prove its case, that

13   you'd convict somebody anyway.  You just don't seem like that

14   kind of person.  You know what I mean?

15             PROSPECTIVE JUROR:  I'd hope not.

16             THE COURT:  Yeah, I don't think you are.

17        Would you pass the microphone to the gentleman to your

18   left.

19        Good morning, sir.

20             PROSPECTIVE JUROR:  Good morning, Judge.  My name is

21   Robin Singh.

22             THE COURT:  Yeah, Mr. Singh, I don't think anybody

23   asked you any questions this morning.  Welcome to the

24   microphone.  What is happening with you?

25             PROSPECTIVE JUROR:  Yeah, so I'm a student at

```
 1    university.  I go to school on Monday and Wednesday, and I
 2    stay there throughout the day.  You mentioned that --
 3              THE COURT:  Where are you in school?
 4              PROSPECTIVE JUROR:  San Jose State University.
 5              THE COURT:  Oh, good.  Okay.  What are you studying?
 6              PROSPECTIVE JUROR:  Finance.
 7              THE COURT:  Okay.
 8              PROSPECTIVE JUROR:  Oh, and since you mentioned
 9    the -- the trial is going to be from Monday to Thursday --
10              THE COURT:  Right.
11              PROSPECTIVE JUROR:  -- I have school on Monday and
12    Wednesday, and I stay there throughout the day.
13              THE COURT:  And so it sounds like you stacked your
14    course work so you just have to be there those two days?
15              PROSPECTIVE JUROR:  Yes.
16              THE COURT:  And those must be long days for you, I'm
17    imagining.
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  Yeah, okay.  I got it.
20         Would you pass the microphone down to this gentleman in
21    the corner.
22              PROSPECTIVE JUROR:  Hi.  My name is Robert Kwak.
23              THE COURT:  Yes, right, okay.  I was just looking
24    that up.  Mr. Kwak, what's happening?
25              PROSPECTIVE JUROR:  Yeah, so I mean all these are a
```

```
 1    bit minor, but I did just want to mention them.
 2        So one is I actually work as an independent contractor so
 3    if I -- I don't get any sort of benefits or paid leave.  So if
 4    I -- if I don't work my shift, I don't get paid.
 5            THE COURT:  Interesting.  You're -- I don't -- I have
 6    your questionnaire up here, I haven't read it.  The lawyers
 7    were reading them while I asked my questions.  You, I know,
 8    are a physician because I saw that on my Judge's List.
 9        Where are you working?
10            PROSPECTIVE JUROR:  So a few different hospitals.
11    I -- so that's kind of the independent contractor status of
12    it.  So as an emergency physician, I'm able to do this type of
13    practice which is actually not uncommon but --
14            THE COURT:  Sure.  I have a friend who did that.
15            PROSPECTIVE JUROR:  Yeah.
16                     (Simultaneous colloquy.)
17            THE COURT:  Are you at Highland sometimes?
18            PROSPECTIVE JUROR:  No, not Highland, but I work at
19    Kaiser in Modesto and Manteca.  Sometimes I do shifts at
20    Kaiser in San Jose as well.  And I've worked at Valley Care in
21    Pleasanton as well.  But I haven't been there recently.  But
22    mostly Kaiser in the Central Valley actually.
23        So I live out in Dublin so it's actually not too bad of
24    a -- just kind of a reverse commute most of the time so....
25            THE COURT:  Got it.
```

```
1              PROSPECTIVE JUROR:  Yeah, so it's not too bad.

2                        (Simultaneous colloquy.)

3              PROSPECTIVE JUROR:  So I mean -- I know a lot of

4      physicians, you know, are kind of full-time, salaried, W-2

5      benefits and whatnot, but that's just not the case with me.

6          And although, you know, I'm not going to be destitute or

7      anything if I missed a few -- couple weeks -- couple weeks of

8      work but --

9              THE COURT:  Your wife is a pediatrician at

10     Kaiser Permanente?

11             PROSPECTIVE JUROR:  Yeah.  So she -- she works at

12     Kaiser in Pleasanton, yes.  Um-hmm.

13         Yeah, so that's one thing I wanted to mention.

14         The other thing is we -- we have two young kids.  So I

15     have a one-year-old and a three-year-old.  And while the

16     three-year-old is in daycare so that's -- that's not really

17     a -- a huge deal, my wife and I were still kind of the primary

18     caretakers for our one-year-old.  So typically I watch her by

19     myself a couple days a week.  It depends on our work

20     schedules, but usually Tuesdays and Wednesdays.  And then my

21     wife watches her typically on Thursdays and -- and Mondays.

22     But, again, that does vary a little bit with our work

23     schedules.

24         We do have some outside help.  So my parent -- my wife's

25     parents live in Castro Valley.  So they do help out one, two,
```

```
 1   if necessary, days out of the week.  But, you know, they're in
 2   their seventies and, you know, they have some health problems
 3   so we try not to ask, you know, too much from them.  So --
 4            THE COURT:  I think I got it.
 5            PROSPECTIVE JUROR:  It's just kind of a busy time,
 6   you know, with the young kids.
 7            THE COURT:  Mr. Kwak, thanks.
 8        Could I see counsel at sidebar, please.
 9                      (Sidebar off the record.)
10            THE COURT:  Each of your hardship requests is
11   granted.  Thank you.
12            PROSPECTIVE JUROR:  (Kwak) Thank you.
13            THE COURT:  All right.
14        Our remaining prospective jurors are presumably coming in
15   any minute.  Maybe, Ms. Lee, you could go out and see if
16   they're lingering outside.
17            THE CLERK:  Yes, sir.
18        MR. WALDINGER:  Your Honor, one critical detail
19   before Ms. Lee leaves, did you determine the status of
20   Ms. Perez.
21            THE CLERK:  Oh, yes, she's in the courtroom with the
22   jurors.
23            MR. WALDINGER:  That courtroom.
24            THE CLERK:  Yes.
25            MR. WALDINGER:  Got it.  Thank you.
```

 1            THE COURT:  At ease.  If you want to stand up and

 2     stretch or do something else until the prospective jurors come

 3     in, please feel free to do that.

 4                      (Pause in the proceedings.)

 5            THE COURT:  Yes.  Mr. Fakhoury asked the Court if he

 6     could --

 7            THE CLERK:  Please rise for the jury.

 8        (The following proceedings were heard in the presence of

 9     the jury venire:)

10            THE CLERK:  You may be seated.

11            THE COURT:  All right.  So we have completed the

12     hardship request process.  And let me just fill those of you

13     who remain in on where we are.

14        We actually had a full day of jury selection yesterday,

15     and we got very close, but -- and I can't remember the last

16     time this happened to me, we didn't quite get there so we had

17     to resume jury selection today.

18        We have selected 12 jurors yesterday, and today our task

19     is to select two alternates.

20        I don't remember, I think most of you have not been on a

21     jury so let me tell you what that means.

22        Alternate jurors are bound by the same rules that govern

23     the conduct of jurors who are sitting on the panel.  They

24     observe the same trial.  And if a juror needs to be excused

25     for illness or some other reason, the alternate is selected to

```
 1      take that juror's place.
 2          Statistically the chances are of the two alternates, one
 3      of them will be deliberating.  I can just tell you that.  So
 4      you are not shooting with blanks.
 5          And that's the process that we're going to engage in here.
 6      That's why you'll hear me say two of your names over and over
 7      again to the lawyers because that's what I'm focused on.
 8          Ms. Perez is here from yesterday.
 9              THE CLERK:  Did you want her brought into the
10      courtroom?
11              THE COURT:  That's not necessary.  Thanks.
12              THE CLERK:  Okay.
13              THE COURT:  I just need a second to organize my
14      paperwork.
15              THE CLERK:  Yes, sir.
16                      (Pause in the proceedings.)
17              THE COURT:  Okay.  Right now, assuming my notes are
18      correct, our alternate jurors are Ms. Perez and Mr. Mendoza.
19          Mr. Waldinger, does the government wish to exercise a
20      peremptory challenge?
21              MR. WALDINGER:  Yes, we do, Your Honor.
22          The government would thank and excuse Mr. Mendoza.
23              THE COURT:  Mr. Mendoza, thanks for your
24      participation this morning.  You are excused from this jury.
25      Hopefully I'll get a chance to work with you on a different
```

```
 1    case.
 2         Mr. Fakhoury, right now your prospective -- excuse me.
 3    Yes, right now the alternates consist of Ms. Perez and
 4    Mr. Sosa.
 5         Does the defendant wish to exercise a peremptory?
 6              MR. FAKHOURY:  We do not, Your Honor.
 7              THE COURT:  All right.  So Mr. -- well, I'll wait to
 8    swear Mr. Sosa in until Ms. Perez comes back in the courtroom
 9    and we can do it at the same time.
10         To the rest of you, I am so sorry that I don't get to work
11    with you on this trial.  As I'm sure you have figured out, I
12    really love my job, and I think jury trials are great.
13         And we have good data on jury trial participation.  About
14    80 percent or more of people who serve on a jury, their
15    opinion of the justice system goes up because they see how it
16    works.
17         I know you drove here a long way to get here, some of you,
18    and I know it was an inconvenience in your day.  I hope you
19    learned something and that in the future, you'll have the
20    opportunity to serve as jurors.
21         And I thank you.  And you're excused.
22         Mr. Sosa, if you would remain, we're going to get
23    Ms. Perez in here and swear both of you in.
24         All rise for these jurors.
25              THE CLERK:  Please rise for the jury.
```

```
 1            THE COURT:  Oh, no, we're doing that for you.  You
 2   can leave.
 3       (Remaining Prospective Jurors existed the courtroom.)
 4            THE COURT:  Ladies and gentlemen, Mr. Sosa, if you'd
 5   follow Ms. Lee, she's going to bring you to be with the other
 6   jurors.  I'll swear you in when you get back.
 7       And everybody else, court will be in recess until
 8   11:00 o'clock.  That's about 14 minutes from now.
 9            THE CLERK:  Yes.
10            THE COURT:  And then we'll resume with our trial.
11   Thank you.
12            THE CLERK:  Court is in recess.
13       (Recess taken at 10:46 A.M.; proceedings resumed at
14   11:15 A.M.)
15       (The following proceedings were heard in the presence of
16   the jury:)
17            THE CLERK:  You may be seated.
18            THE COURT:  All right.  Let's go back on the record.
19       All the jurors are in their assigned seats.  I can't tell
20   you how much pleasure it gives me to say that.  Yesterday we
21   were not able to finish jury selection in one day.  I can't
22   remember the last time that happened.  We had a huge number of
23   illnesses and failures to appear yesterday.
24       So we're going to swear you in just a second.  But I just
25   wanted to say thanks for waiting around a little bit this
```

1    morning.  I had a choice to make for my jurors that were

2    selected yesterday.  The choice was do I finish jury selection

3    today and then immediately get going with my trial, knowing

4    that it would make you drive all the way here for less than a

5    complete day.  Or do I start up again on Wednesday.  And I

6    concluded I'm more likely to get this trial done earlier if I

7    bring you in for half a day.

8        So I appreciate your coming in.  Let's swear them in.

9    Let's just swear them in.  I got a couple more things to say.

10       Would you all rise, please.

11           **THE CLERK:**  Please raise your right hand.  Thank you.

12                         (Jurors sworn.)

13           **JURORS:**  (In unison) Yes.

14           **THE CLERK:**  Thank you so much.  Please be seated.

15           **THE COURT:**  Okay.  Now you're the jurors in the case.

16       I told you during jury selection you were the most

17   important people in the room.  That's still true.

18       The reason we were standing up when you came in this

19   morning and the reason we'll be standing up when you depart is

20   a small way of our showing you that I and the lawyers and the

21   parties really want to honor your service on this jury.  And

22   we're going to do that in the way we use your time and in

23   every other way.

24       I just wanted to tell you what's going to happen today and

25   just give you a little bit of a roadmap for the day and what's

1    coming in the next couple days.

2         First, I need to instruct you on the law.  It's a shorter

3    set of instructions.  You'll get a longer set at the end of

4    the trial.  It's just some instructions on how to listen to

5    the evidence and do the other things that you need to do as

6    jurors.

7         When I have finished instructing you on the law, the

8    parties will have the right, if they want to, to make opening

9    statements.  I'll tell you this in the instructions, but

10   opening statements are not evidence.  It's just the chance for

11   the lawyers to tell you what they think the evidence is going

12   to show.

13        Remember, we're going to be here for several days.  The

14   evidence can only come in one piece at a time.  So it's useful

15   at the beginning of the case for the lawyers to tell you what

16   they think the totality is going to show or not show so that

17   you can keep that in mind while you're listening to the trial.

18        As I said, though, what the lawyers say in their opening

19   statements is not evidence.

20        That might be it for the day if we get through all that.

21   If there's time, though, we'll start with the presentation of

22   evidence which is the next stage after the lawyers make their

23   opening statements.

24        Before we go any further, I want to introduce you to some

25   of the people in the courtroom.  I did not do that with my

1    alternate jurors, and I think I did do it with at least some

2    of the rest of you, but I don't want to forget to do it.

3        Raynee Mercado is our court reporter here.  It's an

4    incredibly hard job.  She's actually taking down in real time

5    using symbols what everybody says in the case.  And she's

6    really fantastic.  I've worked with her many times.

7        This is my courtroom deputy, Mauriona Lee.  She's the best

8    courtroom deputy -- excuse me -- in the Northern District.  So

9    I'm lucky to have her on my team.

10       Sitting over here on the left is Andy DeGuglielmo.  Andy

11   did very well at Yale Law School.  He came to clerk with me

12   and spend a year seeing what happens inside a court.

13       I have other law clerks that you may see from time to time

14   sitting at that table.

15       Let me go ahead and give you these instructions.

16       Oh, let me say one other thing.

17       So I told you that normally we go 8:30 to 1:30 and we take

18   two 15-minute breaks.  In between, I'll instruct you and the

19   government will make an opening statement, and then we'll take

20   a break.  And then if he wishes to, Mr. Fakhoury will make an

21   opening statement on behalf of Mr. Rothenberg.  And then we'll

22   just go until 1:30.  That's what we're going to do today.

23       At the break, you are going to make your first decision as

24   jurors, and here's the decision:  Whether it's okay to drink

25   water and coffee in the courtroom.  In the COVID time, we're

1   all wearing masks.  So in order to drink water or coffee,

2   you've got to pull the mask down.  And so I let the jurors

3   decide that question, is that something that you're

4   comfortable doing.

5        And actually, in order to decide it fairly so nobody feels

6   coerced into going along with the group, we'll do it right

7   before the break, you can just write down "yes" or "no" on a

8   piece of paper, fold it over, we'll give all the pieces of

9   paper to Ms. Lee.  And that way if you were a "no," nobody

10  will know you were a "no" and we'll just leave all our masks

11  on.  And I'm fine either way.

12       If you write "yes," then that means people can bring in

13  things to drink and they can stay hydrated in the courtroom

14  while we're doing the trial.

15       Okay.  Let me go ahead and read these instructions to you.

16  I am required to read them.  They are a statement of the law

17  even though they're a little conversational.  So I have to

18  read them as they're printed.

19       Everybody hear me okay?

20       As I told you yesterday and again this morning, if that

21  changes and you have trouble hearing me, please let me know.

22  I'll speak more loudly or we'll get you an assistive listening

23  device.

24            **PRELIMINARY JURY INSTRUCTIONS**

25            **THE COURT:**  Jurors, you are now the jury in this

 1    case.  And I want to take a few minutes to tell you something

 2    about your duties as jurors and to give you some preliminary

 3    instructions.  At the end of the trial, I will give you more

 4    detailed written instructions that will control your

 5    deliberations.

 6         When you deliberate, it will be your duty to weigh and to

 7    evaluate all the evidence received in the case and, in that

 8    process, to decide the facts.

 9         To the facts as you find them, you will apply the law as I

10    give it to you whether you agree with the law or not.  You

11    must decide the case solely on the evidence and the law before

12    you.

13         Perform these duties fairly and impartially.  You should

14    not be influenced by any person's race, color, religious

15    beliefs, national ancestry, sexual orientation, gender

16    identity, gender, or economic circumstances.

17         Also, do not allow yourselves to be influenced by personal

18    likes or dislikes, sympathy, prejudice, fear, public opinion,

19    or biases, including unconscious biases.  Unconscious biases

20    are stereotypes, attitudes, or preferences that people may

21    consciously reject but may be expressed without conscious

22    awareness, control, or intention.  Like conscious bias,

23    unconscious bias can affect how we evaluate information and

24    make decisions.

25         This is a criminal case brought by the United States

1   government.  The government charges the defendant with bank

2   fraud and false statements to a financial institution.  The

3   charges against the defendant are contained in the indictment.

4   The indictment simply describes the charges the government

5   brings against the defendant.  The indictment is not evidence

6   and it doesn't prove anything.

7       The defendant has pleaded not guilty to the charges and is

8   presumed innocent unless and until the government proves the

9   defendant guilty beyond a reasonable doubt.

10      In addition, the defendant has the right to remain silent

11  and never has to prove his innocence or present any evidence.

12      To help you follow the evidence, I'll now give you a brief

13  summary of the elements of the crimes that the government must

14  prove to make its case.  If this sounds familiar, it's because

15  I read you this instruction during jury selection.

16      The government has charged the defendant with two crimes

17  in this trial.  The defendant is charged in count one with

18  bank fraud.  To prove that crime, the government must prove

19  five elements.

20      First, that the defendant knowingly executed or attempted

21  to execute a scheme to defraud a financial institution as to

22  something of value or a scheme or plan to obtain money or

23  property from the financial institution by making false

24  statements or promises.

25      Second, that the defendant knew that the statements or

1    promises were false.

2         Third, that the statements or promises were material; that

3    is, they had a natural tendency to influence or were capable

4    of influencing a financial institution to part with money or

5    property.

6         Fourth, that the defendant did so with the intent to

7    defraud, meaning with the intent to deceive and cheat.

8         Fifth, the financial institution was insured by the

9    Federal Deposit Insurance Corporation, which is also called

10   the FDIC, or was an organization which finances or refinances

11   any debt secured by an interest in real estate including

12   private mortgage companies and any subsidiaries of such

13   organizations and whose activities affect interstate or

14   foreign commerce.

15        The defendant is charged in count two with making false

16   statements to a financial institution.  To prove that crime,

17   the government must prove three elements.

18        First, the defendant made a false statement or report to a

19   federally insured financial institution with all of the jurors

20   agreeing as to the specific false statement or report.

21        Second, the defendant made the false statement or report

22   knowing it was false.

23        And third, the defendant did so for the purpose of

24   influencing in any way the action of the financial

25   institution.

1      It is not necessary, however, to prove that the financial

2   institution was in fact influenced or misled or that the

3   financial institution was exposed to a risk of loss.  What

4   must be proved is that the defendant intended to influence the

5   financial institution by the false statement.

6      The evidence you're to consider in deciding what the facts

7   are consists of, first, the sworn testimony of any witness;

8   second, the exhibits that are received in evidence; and third,

9   any facts to which the parties have stipulated.

10      A stipulation is just an agreement between the lawyers.

11   So if the lawyers agree that a certain fact has been

12   established, I'll let you know that, and then you can just

13   take that fact as having been proven.

14      The following things are not evidence and you must not

15   consider them as evidence in deciding the facts in this case.

16   First, statements and arguments of the attorneys; second,

17   questions and objections of the attorneys; third, testimony

18   that I instruct you to disregard; fourth, anything you may see

19   or hear when the court is not in session even if what you see

20   or hear is done or said by one of the parties or by one of the

21   witnesses.

22      Evidence may be direct or circumstantial.  Direct evidence

23   is direct proof of a fact such as testimony by a witness about

24   what that witness personally saw or heard or did.

25      Circumstantial evidence is indirect evidence, that is,

it's proof of one or more facts from which you can find another fact.

I'll give you an example.  A witness may testify that she saw a jet plane flying across the sky.  That would be direct evidence because that's something the witness personally observed.

A witness might also testify that she saw the white trail that jet planes sometimes leave when they fly across the sky. And you may but would not be required to find that a jet plane flew across the sky.  That would be an example of indirect or circumstantial evidence.

You're to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give any evidence.

There are rules of evidence that control what can be received in evidence.  When a lawyer asks a question or offers an exhibit in evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered or the exhibit cannot be received.

When I sustain an objection to a question, you must ignore

1   the question and mustn't guess what the answer would have

2   been.

3       Sometimes I may order that evidence be stricken from the

4   record and that you disregard or ignore the evidence.  That

5   means that when you are deciding the case, you must not

6   consider the evidence that I told you to disregard.

7       In deciding the facts in this case, you may have to decide

8   which testimony to believe and which testimony not to believe.

9   You may believe everything a witness says or part of it or

10  none of it.

11      In considering the testimony of any witness, you may take

12  into account:

13      First, the witness's opportunity and ability to see or

14  hear or know the things testified to.

15      Second, the witness's memory.

16      Third, the witness's manner while testifying.

17      Fourth, the witness's interest in the outcome of the case,

18  if any.

19      Fifth, the witness's bias or prejudice, if any.

20      Sixth, whether other evidence contradicted the witness's

21  testimony.

22      Seventh, the reasonableness of the witness's testimony in

23  light of all the evidence.

24      And eighth, any other factors that bear on believability.

25      You must avoid bias, conscious or unconscious, based on a

 1   witness's race, color, religious beliefs, national ancestry,

 2   sexual orientation, gender identity, gender, or economic

 3   circumstances in your determination of credibility.

 4       The weight of the evidence as to a fact does not

 5   necessarily depend on the number of witnesses who testify

 6   about it.  What is important is how believable the witnesses

 7   are and how much weight you think their testimony deserves.

 8       I'll now say a few words about your conduct as jurors.

 9       First, keep an open mind throughout the trial and do not

10   decide what the verdict should be until you and your fellow

11   jurors have completed your deliberations at the end of the

12   case.

13       Just an editorial note.  This is very important.  There's

14   a reason that this is instruction is written down and given to

15   you at the beginning of the trial.  It's human nature to try

16   to figure out what the answer is.  But you can only figure out

17   what your verdict should be in this case after you've heard

18   all the evidence.  And so I need you to resist the urge to try

19   to figure out what the answer is right in the middle of the

20   trial.  Just pay attention to the evidence as it comes in.

21       Returning to the instruction.

22       Second, because you must decide this case based only on

23   the evidence received in the case and on my instructions as to

24   the law that applies, you must not be exposed to any other

25   information about the case or to the issues it involves during

 1    the course of your jury duty.

 2        Thus, until the end of the case or unless I tell you

 3    otherwise, do not communicate with anyone in any way and do

 4    not let anyone else communicate with you in any way about the

 5    merits of the case or anything to do with it.

 6        This restriction includes discussing the case in person,

 7    in writing, by phone, tablet, or a computer or any other means

 8    via email, text messaging, Internet chat room, blog, website,

 9    or application, including but not limited to Facebook,

10    YouTube, Twitter, Instagram, LinkedIn, Snapchat, Tiktok, or

11    any other form of social media.

12        This restriction also applies to communicating with your

13    fellow jurors until I give you the case for deliberation.  And

14    it applies to communicating with everyone else, including your

15    family members, your employer, the media or press, and the

16    people involved in the trial, although you may notify your

17    family and your employer that you have been seated as a juror

18    in the case and how long you expect the trial to last.

19        Now just for clarity, that means that you cannot

20    communicate with your fellow jurors in the middle of the

21    trial:  Hey, what do you think about this case?  Hey, did you

22    see that witness?  What did you think of that?

23        You're not to have any discussion with each other about

24    the evidence or the merits of the case or anything to do with

25    it until you're in the deliberation room making a decision.

1          Picking up the instruction.

2          It also applies to communicating with everyone else,

3     including your family members, your employer, the media or

4     press, and the people involved in the trial, although you may

5     notify your family and your employer that you've been seated

6     as a juror in the case and how long you expect the trial to

7     last.

8          But if you are asked or approached in any way about your

9     jury service or anything about the case, you must respond that

10    you have been ordered not to discuss the matter and you must

11    report that contact to the Court.

12         Because you will receive all the evidence and legal

13    instruction you properly may consider to return a verdict, do

14    not read, watch, or listen to any news or media accounts or

15    commentary about the case or anything to do with it.  Although

16    I have no information at the moment that there will be news

17    reports about this case.

18         Do not do any research such as consulting dictionaries,

19    searching the Internet, or using other reference materials.

20    And do not make any investigation or in any other way try to

21    learn about the case on your own.

22         Do not visit or view any place discussed in this case.

23    And do not use the Internet or any other resource to search

24    for or view any place discussed during the trial.

25         Also, do not do any research about the case, the law, or

1    the people involved including the parties, the witnesses, or

2    the lawyers until you've been excused as jurors.

3        If you happen to read or hear anything touching on this

4    case in the media, turn away, and report it to Ms. Lee as soon

5    as possible.

6        I'm not allowed to talk to you directly.  So if there's

7    something you need to bring to the Court's attention, you

8    should do that through Ms. Lee.

9        These rules protect each party's right to have this case

10   decided only on evidence that has been presented here in

11   court.  Witnesses here in court take an oath to tell the

12   truth, and the accuracy of their testimony is tested through

13   the trial process.  If you do any research or investigation

14   outside the courtroom, or gain any information through

15   improper communication, then your verdict may be influenced by

16   inaccurate, incomplete, or misleading information that has not

17   been tested by the trial process.

18       Each of the parties is entitled a fair trial by an

19   impartial jury.  And if you decide the case based on

20   information not presented in court, you will have denied the

21   parties a fair trial.  Remember, you took an oath to follow

22   the rules, and it's very important that you follow the rules

23   I'm giving you now.

24       A juror who violates these restrictions jeopardizes the

25   fairness of these proceedings, and a mistrial could result

 1    that would require the entire trial process to start over.

 2         If any juror is exposed to any outside information, please

 3    notify the Court immediately.

 4         At the end of the trial, you will have to make your

 5    decision based on what you recall of the evidence.  You will

 6    not have a written transcript of the trial.  I urge you to pay

 7    close attention to the testimony as it is given.

 8         On that note, if you wish, you may take notes to help you

 9    remember the evidence.  If you do take notes, please keep them

10    to yourself until you and your fellow jurors go to the jury

11    room to decide the case.

12         Do not let note-taking distract you from being attentive.

13         When you leave court for recesses, your notes should be

14    left in the jury room.  And because of COVID we're using my

15    whole courtroom as a jury room.  No one will read your notes.

16    At the end of the trial, your notes will be collected and

17    destroyed pursuant to my order.  So these notes are just

18    personal to you.

19         Whether or not you take notes, you should rely on your own

20    memory of the evidence.  Notes are only to assist your memory.

21    You should not be overly influenced by your notes or the notes

22    of your fellow jurors.

23         The next phase of the trial will begin in a few minutes.

24    First, each side may make an opening statement.  They're not

25    required to.  An opening statement is not evidence.  It's

1    simply an outline to help you understand what that party

2    expects the evidence will show.

3        The government will then present evidence, and counsel for

4    the defendant may cross-examine.  Then if the defendant

5    chooses to offer evidence, counsel for the government may

6    cross-examine.

7        After the evidence has been presented, I'll instruct you

8    on the law that applies to the case and the attorneys will

9    make closing arguments.

10       After that, you'll go to the jury room to deliberate on

11   your verdict.

12       Only the lawyers and I are allowed to ask questions of

13   witnesses.  A juror in this trial is not permitted to ask

14   questions of witnesses.

15       If, however, you're unable to hear a witness or a lawyer,

16   please raise your hand and I'll correct that situation.  As I

17   told you, you're the most important people in the room.

18   You're the ones deciding what the facts are so you have to be

19   able to hear everybody clearly.

20       During the trial, I may need to take up legal matters with

21   the attorneys privately either by having a conference over

22   here next to the bench, which is called the sidebar, while

23   you're here in the courtroom or by calling a recess.

24       Please understand that while you are waiting, we are

25   working.  The purposes of these conferences is not to keep

 1    relevant information from you, but to decide how certain

 2    evidence is to be treated under the rules of evidence and to

 3    avoid confusion and error.

 4        Of course we will do what we can to keep the number and

 5    length of these conferences to a minimum.  I may not always

 6    grant an attorney's request for a conference or sidebar.  Do

 7    not consider my granting or denying a request for a conference

 8    as any indication of my opinion of the case or what your

 9    verdict should be.

10        That concludes the reading of the preliminary jury

11    instructions.  As I said at the beginning, at the end of the

12    case, I'll give you a longer set of instructions and I'll give

13    you the set in writing, and it will include all the

14    instructions that I just gave you.

15        So if you were taking notes and you weren't able to get

16    everything down, don't worry about it.  At the end of the

17    case, you'll each have your own private -- or personal,

18    rather, set of the instructions to use as you like.

19        Mr. Waldinger or Mr. Walsh, would the government like to

20    make an opening statement in this case?

21            **MR. WALDINGER:**  Yes, Your Honor.

22            **THE COURT:**  Thank you, Mr. Waldinger.  You have the

23    floor.

24            **MR. WALDINGER:**  Thank you, Ms. Lee.

25

1         **OPENING STATEMENT**

2         **MR. WALDINGER:**  Good morning, ladies and gentlemen of

3    the jury.  I think the first question --

4         Oh, could we have the --

5                   (Demonstrative published.)

6         **MR. WALDINGER:**  I think the first question that you

7    have about this case is what it's about.  Why are we here?

8         We are here because the evidence in this case is going to

9    show that back in July and August of 2014, the defendant,

10   Michael Rothenberg, who's sitting right here, provided false

11   and misleading information to a financial institution in the

12   Northern District of California called Silicon Valley Bank.

13        And during the course of the trial, we'll refer to

14   Silicon Valley Bank as Silicon Valley Bank, as SVB, or as "the

15   bank."

16        You'll hear that the defendant provided that false and

17   misleading information to SVB when applying for two different

18   loans from SVB in July and August of 2014.

19        One of those loans was a $300,000 personal loan that he

20   was using to make a capital contribution to a venture capital

21   fund that he managed.  And the second loan was a mortgage

22   loan.  And it was a specific type of mortgage loan.  It was a

23   mortgage refinancing loan to replace a prior mortgage and to

24   take cash out related to the increased value or the equity

25   that he had accrued in his home which was a condominium

1      located on Bryant Street in San Francisco just across the Bay.

2          Ultimately, you'll hear that that loan that the defendant

3      obtained from Silicon Valley Bank with respect to his condo

4      was a $1.48 million loan.

5          The evidence is going to show that the defendant told SVB

6      and deceived SVB into believing that he had more cash on hand

7      than he actually did.  And the evidence will also show that

8      the amount of assets, in other words, the amount of cash that

9      a borrower has on hand, the amount of liquid, unencumbered

10     cash, is something that mattered to SVB when considering

11     whether to grant any kind of loan.

12         The evidence is also going to show that the defendant

13     falsely represented his debts to SVB.  And the evidence will

14     show that a borrower's level of debt, in other words, how much

15     money the borrower owed other lenders, was again something

16     that mattered to Silicon Valley Bank in considering whether to

17     grant a loan.

18         The evidence is going to show that the defendant engaged

19     in a series of complex movements of money for the purpose of

20     deceiving SVB regarding his assets and regarding his

21     liabilities, regarding his assets, his cash, and regarding his

22     liabilities, his debts, all in order to deceive SVB and for

23     the purpose of getting those two loans from SVB and for the

24     purpose of influencing SVB's decisions on his loan

25     applications.

1   Good morning again.  Let me take a moment to introduce

2   myself again.  My name is a Kyle Waldinger.  I'm an Assistant

3   United States Attorney in the Northern District of California.

4   I'm joined at counsel table today by Assistant United

5   States Attorney Nicholas Walsh who is my co-counsel.  We are

6   ably assisted by a paralegal from our office, Beth Margen.

7   And the case agent on the case, the agent who is assisting us

8   and has helped investigate the case, is Special Agent Jennifer

9   Barnard.  Special Agent Barnard works for the FBI.

10                    (Demonstrative published.)

11          MR. WALDINGER:  I want to take a few moments this

12  morning to tell you what we expect the evidence to be in this

13  case, what we expect the facts to be, the facts that will come

14  out, and also what we expect the evidence to show.  What the

15  evidence will be and what the evidence will show.

16      Earlier I mentioned July and August of 2014.  So the

17  summer of 2014, more than eight years ago now, is the time

18  period that we're looking at.

19      I expect that the evidence will show that in the summer of

20  2014, the defendant, Michael Rothenberg, was well-educated and

21  had work experience and was running a company that managed

22  venture capital funds.

23      Specifically, the defendant -- the evidence will show the

24  defendant had a bachelor's degree and a master's degree from

25  Stanford.  He'd worked in the consulting and private equity

 1   industries.  He'd received an MBA, or a master's of business

 2   administration, from Harvard.  He'd started a venture capital

 3   fund.

 4       And by the summer of 2014, the time period that we're

 5   talking about in this case, he was managing and running what's

 6   called Rothenberg Ventures Management Company and at least two

 7   funds called Rothenberg Ventures Fund I and Rothenberg

 8   Ventures Fund Two.

 9       I'm not sure on which of the panels yesterday and today

10   the term "venture capital" came up.  The reason that it may

11   have come up is that this case will have something to do a

12   little bit with venture capital.  You may have some

13   familiarity with venture capital, and you will hear more about

14   it in this trial.

15       This is a bank fraud case, and this is a false statements

16   to a financial institution case.  But you will hear evidence

17   about funds -- about Mr. Rothenberg's venture capital

18   management company and about venture capital funds.

19       So I want to highlight some facts and concepts that I

20   expect will come up in this trial and that will be important.

21       I expect that the venture capital aspect of this case will

22   be important because of the fact that one of the loans that

23   the defendant applied for and got from SVB was related to his

24   capital contribution to one of those funds.

25       So, again, in the summer of 2014, the evidence will show

1    that Mr. Rothenberg was managing two venture capital funds,

2    Rothenberg Ventures Fund I and Rothenberg Ventures Fund II.

3        The evidence will show that those funds were managed by

4    Rothenberg Ventures Management Company.  Rothenberg Ventures

5    Management Company was compensated for managing those funds

6    through the payment of fees, specifically defined fees from

7    those funds.

8        What Rothenberg Ventures Management Company did was raise

9    money from investors, and you'll hear investors referred to as

10   that term, or perhaps as limited partners or LP's, and that

11   the money that was raised by Rothenberg Ventures Management

12   Company to be put in these funds was to be used for

13   investments in what are called portfolio companies, in startup

14   companies.

15       The evidence will show that the money raised for those

16   funds belonged to the funds and the fund investors, not to

17   Rothenberg Ventures Management Company and not to the

18   defendant.

19       As I just mentioned, the defendant had a capital

20   contribution requirement.  And part of the evidence in this

21   case will be that he obtained a loan in the amount of $300,000

22   from SVB in order to make that capital contribution.

23       I think Judge Tigar used the term "roadmap," and I'm going

24   to use the term roadmap, too.

25       You remember roadmaps?  They used to be folded up?  We

 1    don't use them anymore.  But I still think in terms of

 2    roadmaps.  And I think it's important -- I like looking at

 3    them when I'm going on a long trip.  You see where you are.

 4    You see where you're going to.  And you see where you're going

 5    to be in between.

 6        And so one of the purposes of an opening statement is to

 7    give the jurors -- excuse me -- a roadmap so that you can see

 8    where the attorneys expect to go and what we expect you to see

 9    along the way.

10        And I'll tell you another thing that I think about in a

11    case like this in addition to roadmaps.  In a case where you

12    have events that happen over a short period of time, couple

13    months, a few significant events, I also think in terms of

14    timeline which is a kind of a roadmap.

15        And so part of what I'm going to do this morning is go

16    through a timeline of the evidence that I think that you'll

17    see during the course of this case.

18        So that -- and as you see the evidence as it comes in, you

19    will understand where it fits in, into the -- into the

20    timeline.

21        Can everybody -- is everybody's screen working?  And can

22    everybody hear me fine?

23        Okay.

24        The evidence is going to show in this case that

25    Mr. Rothenberg's relationship with Silicon Valley Bank started

1    back in the fall of 2012 when he opened up some accounts.  And

2    that's just back story for you to understand.  More back story

3    is that he bought the condo -- you'll hear evidence that he

4    bought the condo that's at issue that's related to one of the

5    loans in about August of 2013, and that he purchased that

6    condo with a loan from the Stanford Federal Credit Union of

7    about $880,000.

8        Fast forward to the end of July of 2013 -- excuse me --

9    2014, the evidence is going to show that that is about the

10   date in which the defendant initiated his applications with

11   Silicon Valley Bank to take out what was at that time a

12   $1.28 million mortgage loan to pull cash out of his condo and

13   another $300,000 personal loan.

14       At that time, the defendant began providing information to

15   SVB, and that's what this case is about, the information that

16   the defendant provided.

17       On or after August 1st of 2014, the evidence will show

18   that the defendant provided a printout from a brokerage called

19   Merrill Lynch, or Merrill, showing that he had $370,000 in

20   cash in what's called a Merrill Cash Management Account.

21   We'll call that a cash account.  You'll hear it called the

22   CMA, kind of like a checking account.  And that he had a

23   zero dollar balance in what's called an LMA, which is a Loan

24   Management Account.

25       The evidence will show that the defendant presented this

1    information in early August of 2014 as part of showing SVB

2    what his assets were and what his liabilities were.

3        I'm going to keep up with the -- with the roadmap analogy.

4    And, you know, you can -- when you're on a highway, and I'm

5    thinking of this timeline as everything above being the

6    interstate highway.  Back in the old days in the Rand McNally

7    Atlas, it was the heavy black line, and that was the main

8    route that you followed.

9        There was a book that was written back in the '80s that

10   maybe I'm the only one that remembers, called *Blue Highways*.

11   It was about a guy who drove all around this country on not

12   the interstates but on the blue highways.

13       And so part of what the government is going to do in this

14   case is take us off the interstate.  You'll hear from SVB

15   witnesses, from Silicon Valley Bank witnesses, everything that

16   they knew about these loan applications.  That's the

17   interstate.

18       The government is also going to show you what happened on

19   the blue highways, what was going on off of the interstate,

20   out of the sight of SVB that the defendant was doing,

21   particularly with his accounts at Merrill Lynch.

22       And so you'll hear testimony from witnesses from

23   Merrill Lynch that the defendant began discussions with

24   Merrill Lynch in March or April of 2014 about getting a

25   mortgage loan, a mortgage refinancing loan through

1    Merrill Lynch.

2         In around the middle of June of 2014, the evidence will

3    show the defendant opened up the CMA and LMA accounts that I

4    just mentioned.  And what he did at that time relates to

5    ultimately the Merrill Lynch printout or statement that he

6    provided to SVB a little over a month later.

7         The evidence is going to show that in June of 2014, the

8    defendant moved money from a personal Bank of America account

9    that he had at Bank of America in the amount of $370,000.

10   That is what the evidence will show established the CMA

11   account.

12        Near the same time, he established the line of credit with

13   Merrill Lynch.  As soon as the CMA was funded, which secured

14   or was pledged to whatever balance was on the line of credit,

15   the evidence will show that the defendant borrowed $350,000

16   from the line of credit.

17        But that's not all that went on.

18        The evidence is going to show, as I indicated, complex

19   movements of money that the defendant engaged in to make this

20   situation happen.

21        He ran money -- the evidence will show he ran money

22   through Rothenberg Ventures Management Company and ran money

23   from Rothenberg Ventures Fund Two.  The evidence will show

24   that on these dates, starting on June 17th of 2014, the

25   defendant began moving money from the venture capital fund

1    account, money that was not his, through the management

2    company to his Bank of America account and ultimately to the

3    Merrill Lynch account.

4         Once the Merrill Lynch account was -- the Loan Management

5    Account was pulled down, once he took the advance from that

6    account, he sent the money back, and the 225,000 that was

7    taken here was put back here (indicating).

8         So at the end of June, the evidence will show that the

9    defendant had $370,000 on deposit at Merrill Lynch.  The

10   evidence will also show that that money was not liquid.  It

11   was encumbered and it was illiquid.

12        And it was encumbered and illiquid because it was pledged

13   to secure the line of credit of $350,000.

14        So then how does the defendant come up with a

15   Merrill Lynch printout at the beginning of August of 2014 that

16   shows a zero dollar Merrill Lynch LMA balance?

17        Again, the evidence will show that at the end of July of

18   2014, the defendant again collected money from various

19   accounts, moving money from Rothenberg Ventures Fund Two to

20   Rothenberg Ventures Management Company, to his personal bank

21   account, to Merrill Lynch.

22        These payments of $350,000 and change, and $1,000 and

23   change, paid off his Loan Management Account, paid off his

24   line of credit.  And the evidence then will show that that is

25   how the defendant was able to create the Merrill Lynch

1    printout showing that in fact he had $370,000 of unencumbered

2    cash and zero dollars in debt.

3        As I said at the beginning, the evidence is going to show

4    that a borrower's -- a potential borrower's assets,

5    unencumbered liquid assets is something that a bank considers

6    in determining whether to grant a loan.  And the amount of

7    debt that a borrower has is something that a bank looks at in

8    determining whether to grant a loan.

9        The evidence will show that at the time that the defendant

10   engaged in these movements of money, he was already planning

11   to take -- to pull down the $350,000 line of credit, to borrow

12   $350,000 again on August 1st.

13       The evidence will show that that was his plan at the end

14   of July.  And the evidence will show that that's what he did

15   at the end of July.

16       By the time that the defendant presented this printout to

17   Merrill Lynch, he had already taken out the advance.  By the

18   time that the defendant -- the evidence will show that by the

19   time the defendant represented to SVB that he had $370,000 in

20   cash and no debts at Merrill Lynch, by that time, that

21   situation no longer existed.

22                        (Demonstrative published.)

23            **MR. WALDINGER:**  And this is a slide that shows that

24   on August 1st, just as you saw in June, the evidence will show

25   that the defendant on August 1st took down, borrowed $350,000

1    and sent it back from where he borrowed it.

2         You will hear that he had no authority to borrow money

3    from this account, the Rothenberg Ventures Fund Two account.

4         The rest of the timeline relates to SVB approving these

5    loans.  And you'll hear testimony from SVB witnesses that they

6    took the facts that I set out to you that are on the top of

7    this timeline, that are on the interstate part, not on the

8    blue highways part, that they looked at these facts, the fact

9    that the defendant had $370,000 of cash and no liabilities,

10   into account in determining whether to grant the loans.

11        SVB first approved the $300,000 personal loan.  The day it

12   approved his personal loan, the evidence will show that the

13   defendant owed $350,000 to Merrill Lynch.

14        SVB then, the evidence will show, funded the personal loan

15   at a different time than the mortgage loan.  The evidence will

16   show that an appraisal came in, which the appraisal of the

17   condo was higher than initially anticipated.  And so SVB

18   witnesses will say that they gave a greater loan of

19   $1.48 million.

20        And finally on August 21st, the evidence will show the

21   defendant was out of the state, was in New York.  And

22   notarized documents -- if you've ever purchased a home, you

23   know that there's a day when you have to either go to the

24   notary -- go to the title company or a notary comes to your

25   home.  And that's what happened on August 21st of 2014.  The

1   defendant signed numerous documents representing his financial

2   status to SVB.

3       They included what's called a Uniform Residential Loan

4   Application, or URLA.  You'll hear witnesses call that a 1003.

5   That's because it's a form number, a Fannie Mae form number.

6       You'll see that he signed a financial status affidavit

7   representing his financial status.  And he signed other loan

8   documents.

9       Again, on that day, the evidence is going to show,

10  contrary to what the defendant represented to SVB, is that he

11  had a $350 [sic] liability on his LMA account.

12      After signing, as you may know, a few days later the bank

13  funds the loan if everything is still kosher.  And that's what

14  happened.  The evidence will show that on August 27th,

15  Silicon Valley Bank funded the $1.48 million loan.  There was

16  enough equity, according to the appraisal in that condo, that

17  $608,000 came out of escrow.

18      Mr. Rothenberg had the escrow company, which is Chicago

19  Title Company, send that cash to Merrill Lynch.

20      What did the defendant do with that money?  The evidence

21  is going to show that with some of it he used it to pay out --

22  pay off the loan that he never told SVB that he had.

23      So that's it.  You will see that this case at bottom is

24  very simple.  The evidence will show that the defendant wanted

25  to get a $300,000 personal loan from SVB to use to invest in

1    one of the venture capital funds, and he wanted to get a

2    mortgage refinancing loan so that he could get cash out of his

3    condo.

4        The evidence is going to show that the defendant acted

5    knowingly and with the intent to defraud and that he provided

6    false and misleading and fraudulent information to

7    Silicon Valley Bank.

8        Now, I don't know what Mr. Fakhoury is going to say to you

9    now or what questions he's going to ask.  But he doesn't have

10   to give an opening statement and he doesn't have to ask any

11   questions on cross-examination.  It's entirely our burden.

12       However, to the extent that Mr. Fakhoury suggests to you

13   in his opening statement or in the kinds of questions he asks

14   the witnesses that the defendant did not act with the intent

15   to defraud, or that his actions represent somebody who had too

16   many papers to sign on August 21st, didn't know what -- didn't

17   know what he was doing, didn't know that the papers that he

18   was signing contained false statements, I would ask you to pay

19   attention to the evidence.

20       Pay attention to the evidence showing the movements of

21   money, the complex movements of money through the various

22   accounts that were orchestrated by the defendant.

23       Pay attention to the pains, the pains that the defendant

24   took to create the illusion to Silicon Valley Bank that he had

25   zero dollars in debt in his Merrill Lynch line of credit, and

 1    that he had $370,000 of cash sitting there unencumbered and

 2    liquid.

 3                        (Demonstrative published.)

 4           MR. WALDINGER:   As Judge Tigar told you before -- as

 5    Judge Tigar told you before, the defendant is charged in two

 6    counts in this case, a bank fraud charge in count one and a

 7    false statements to a financial institution charge in count

 8    two.

 9        At the end of this case, Mr. Walsh and/or I will stand up

10    again and ask you to return a verdict of guilty on both of

11    those counts.

12        Thank you for your attention today.  And thank you for

13    your attention throughout the trial.

14           THE COURT:   Thank you, Mr. Waldinger.

15        Ladies and gentlemen of the jury, as I told you before,

16    we'll go ahead and take a break for 15 minutes.  And then when

17    we come back, if Mr. Fakhoury wishes to, he'll provide an

18    opening statement on behalf of the defendant.

19        All rise for these jurors, please.

20           THE CLERK:   Please rise for the jury.

21           THE COURT:   Oh, wait.  One more thing.  Sorry.  I got

22    ahead of myself.

23        Let's answer the all-important question of whether it's

24    okay to take down your mask and have a drink of water or some

25    coffee.  This will be a slight advantage to the defendant if

1    he gives an opening statement because Mr. Waldinger wasn't

2    allowed to sip any water while he gave his.

3          **MR. WALDINGER:**  I won't object, Your Honor.

4          **THE COURT:**  Anyway so what I want you to do is just

5    take a piece of note paper and write "yes" if it's okay and

6    "no" if it's not okay.  Fold it over.  Ms. Lee will collect

7    the pieces of paper.  If there's a single "no," we'll just

8    leave our masks on.  We won't hydrate during the trial.  If

9    everyone says "yes," then that's what we'll go ahead and do.

10   And it's your first vote as jurors.

11       And for those of you who are on the bench there, let me

12   say I think we've got some stadium seating pads in the

13   courthouse here.  And I'm going to try to track those down so

14   you can have some padding where you're sitting.

15         **THE CLERK:**  Your Honor, we will not be allowed to

16   drink in the courtroom.

17         **THE COURT:**  All right.  Very good.  Thanks very much.

18   Let's be in recess.

19         **THE CLERK:**  Please rise for the jury.

20       (The following proceedings were heard out of the presence

21   of the jury:)

22         **THE COURT:**  I'm waiting for the sound of the door to

23   close, but it's not closing.  I see.  There it is.

24       Oh, hello, Tracy.

25       Okay.  So on the record, but we're outside the presence of

1   our jurors.  I just wanted to make a brief record.

2       Three challenges for cause were exercised at sidebar.  All

3   of them -- all of those challenges were granted as reflected

4   in the clerk's minutes.

5       There was an additional challenge for cause made to Juror

6   Kwak.  I denied that challenge, but I subsequently excused

7   that juror on hardship grounds.

8       I just wanted that to be in the transcript.

9       Does -- I'm understanding also that counsel want to

10  discuss with the Court the question of these declarations of

11  custodian of records and so forth.

12      Does anyone want to address the Court on that topic?

13      Mr. Walsh.

14          **MR. WALSH:**  Yes, Your Honor.  I do think we have a

15  substantial agreement but not perfect agreement.

16      I guess Mr. Fakhoury actually is probably better to show

17  the area where we disagree.

18          **THE COURT:**  All right.  Mr. Fakhoury.

19          **MR. FAKHOURY:**  Thank you, Your Honor.

20      The only issue I have is that there are a couple items

21  within the exhibits that are emails.  And I had mentioned this

22  in my pretrial conference statement that I don't believe

23  emails fall within the business records exception to the

24  hearsay rule.  And thus --

25          **THE COURT:**  Show me.

```
1            MR. FAKHOURY:  I'm sorry?

2            THE COURT:  Show me.

3            MR. FAKHOURY:  Show -- okay, sure.

4            THE COURT:  Show me.  I was given some declarations.

5    They contain enumerations of various documents.  I'd like to

6    see what we're talking about.

7            MR. FAKHOURY:  Sure.  So one example would be

8    Exhibit 54.

9         Let me grab my computer.  I'm sorry.

10           MR. WALSH:  So, Your Honor, the relevant declaration

11   is the one that's signed by Lawrence Hundley.

12           THE COURT:  On behalf of what entity?

13           MR. WALSH:  Merrill Lynch.

14           THE COURT:  All right.

15           MR. WALSH:  So --

16           THE COURT:  I have it.

17           MR. WALSH:  Got it.

18           THE COURT:  Mr. Fakhoury, on what page of

19   Mr. Hundley's declaration do these items appear?

20           MR. WALSH:  Do you need a copy?

21           MR. FAKHOURY:  Yes, sorry.

22           THE COURT:  My guess is page 2.

23           MR. FAKHOURY:  That is correct, Your Honor.

24           THE COURT:  All right.  To which specific exhibits do

25   you make objection?
```

```
 1              MR. FAKHOURY:  One, 17, 54, 55.

 2              MR. WALSH:  Whoa.  Sorry.

 3              THE COURT:  Did you say 1 and 17?

 4              MR. FAKHOURY:  Those are the other -- I'm sorry --

 5   let me -- if we're going to just do the Merrill Lynch exhibit,

 6   it would be 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65,

 7   66, 67, 68, 69, 70, and 71.

 8              THE COURT:  All right.  And you had indicated a

 9   moment ago that there were additional exhibits.  I think to

10   the -- that are listed on the SVB declaration signed by Pablo

11   Serna.  And those are 1 and 17, correct?

12              MR. FAKHOURY:  Yes.  Yes, Your Honor.

13              THE COURT:  Are there other exhibits to which you're

14   making objection?

15              MR. FAKHOURY:  No, Your Honor.

16              THE COURT:  How many of these -- so what -- is the

17   basis of objection hearsay or something else?

18              MR. FAKHOURY:  It's -- it's hearsay in that an email

19   is not a business record.

20              THE COURT:  I know what hearsay is.

21              MR. FAKHOURY:  Understood.

22              THE COURT:  I'm not meaning to be curt with anybody.

23   We only have 15 minutes.

24              MR. FAKHOURY:  Understood.

25              THE COURT:  And we need to use the bathroom and eat
```

1    something.

2              **MR. FAKHOURY:**  Sure.

3         **THE COURT:**  So I know what hearsay is.  Is that the

4    objection, or is it something else?

5              **MR. FAKHOURY:**  That's the objection, Your Honor.

6         **THE COURT:**  Okay.  Some of these are emails from

7    Mr. Rothenberg.  Is it possible those are party statements?

8              **MR. FAKHOURY:**  Those are definitely party statements.

9    I don't have an issue with that.  To the extent that there's

10   emails from --

11        **THE COURT:**  Okay.  So we're going to exclude all the

12   things that Mr. Rothenberg wrote from our discussion.  I

13   think.

14      So then that brings us to emails that he received because

15   all of these notations that I see -- and I'm happy to read the

16   exhibits if I need to.  I can do that probably after court

17   tonight.

18      But then that leaves the emails that he didn't send, he

19   just received.  And as to those, my question would be are we

20   confident that those are being introduced for the truth of the

21   matter asserted as opposed to notice to him or something else?

22             **MR. FAKHOURY:**  I don't have a good answer to that

23   second question.

24        **THE COURT:**  Okay.  Here's what we're going to do.

25   Because if we don't know the answer to that question, then

1  we're talking about a hearsay objection that may or may not

2  have any validity.

3     Can the government give me a copy of the emails that

4  Mr. Fakhoury just identified?

5         **MR. WALSH:**  Yes, Your Honor.  We do have a number of

6  binder exhibits, and I can give you a binder with those in

7  them because they're sequential.  So, yes.

8         **THE COURT:**  Great.  Yes.

9     My proposal would be, unless it injures somebody's

10 interests, that I simply read these emails this afternoon or

11 tonight, and we discuss it first thing in the morning.

12        **MR. WALSH:**  That's fine, Your Honor.

13        **MR. FAKHOURY:**  Fine.

14        **THE COURT:**  Good.  Anything else?

15        **MR. WALSH:**  Your Honor, with -- exculpating or

16 removing from our discussion those emails, will it be

17 appropriate after closing for me to introduce then just in

18 bulk the remainder that were agreed upon?

19        **THE COURT:**  Is there any objection?

20        **MR. FAKHOURY:**  No.

21        **THE COURT:**  Fine.

22        **MR. WALSH:**  Thank you, Your Honor.

23        **THE COURT:**  Thanks.

24        **THE CLERK:**  Court is in recess.

25     (Recess taken at 12:17 P.M.; proceedings resumed at

```
 1      12:30 P.M.)

 2

 3          (The following proceedings were heard in the presence of

 4      the jury:)

 5              THE CLERK:  You may be seated.

 6              THE COURT:  All right.  All the jurors are in their

 7      assigned seats.  We're back on the record.

 8          Mr. Fakhoury, does the defendant wish to make an opening

 9      statement?

10              MR. FAKHOURY:  Yes, Your Honor.

11              THE COURT:  You may proceed whenever you're ready.

12              MR. FAKHOURY:  Thank you.

13                          OPENING STATEMENT

14              MR. FAKHOURY:  Good morning, ladies and gentlemen.

15      Hopefully everyone can hear you me.

16              THE COURT:  Is that microphone on?  I can hear you

17      just fine, but is it on?  Okay, it's on.  Thank you.

18              MR. FAKHOURY:  Hopefully that's better.  I'll speak

19      up a little louder.

20          Good -- it's afternoon.  Good afternoon, ladies and

21      gentlemen.  I'm Hanni Fakhoury, and I have the privilege of

22      representing Michael Rothenberg.

23          Form over substance.  That's what this case is about.  Two

24      forms in fact.  These two forms (indicating).  Which you will

25      see when you go back into that jury room to deliberate.
```

1          These two forms have been elevated above all else.  These

2     two forms will be used by the government to portray

3     Mr. Rothenberg as a liar, as a fraudster, and as a felon.

4          Some trials are a battle over competing facts.  What

5     happened?  Did he have an alibi?  Who shot first?

6          Not this case.  No facts are in dispute.  There's no

7     secret bank accounts.  There's no straw purchasers.  There's

8     no side deals.  Nothing about this transaction raised red

9     flags or stood out to anyone in 2014.

10         As Judge Tigar said yesterday, you've been chosen as

11    jurors to bring your opinions and your life experiences into

12    this courtroom to review the evidence and resolve what the

13    facts mean.

14         Now, the government thinks the facts show that

15    Mr. Rothenberg defrauded and lied to Silicon Valley Bank.  And

16    you'll see the evidence shows the government is completely

17    wrong.

18         You'll see that Mr. Rothenberg gave Silicon Valley Bank

19    every single document and piece of information it asked for.

20         You'll learn that Mr. Rothenberg told Silicon Valley Bank

21    the checking account was pledged to the line of credit from

22    day one.

23         And you'll see that Mr. Rothenberg's financial situation

24    never changed significantly.  And you'll learn that

25    Mr. Rothenberg would have qualified for the loans regardless

1  of whether the $350,000 was treated as an asset or a

2  liability.

3      What you're really going to see is the government

4  elevating form over substance.  One form you'll see was not

5  prepared by Mr. Rothenberg.  The second form, you'll

6  understand based on your own experiences with a mortgage, was

7  signed hastily without being examined closely.  And two

8  firm -- two forms you'll learn through the testimony and the

9  documents themselves that Silicon Valley Bank did not rely on

10  when it decided to issue the loans to Mr. Rothenberg.

11      So I'm certain after you hear the evidence and see the

12  documents, you'll find that the only verdict supported by the

13  evidence and the lack of evidence is that Mr. Rothenberg did

14  not commit a crime and he's not guilty.

15      So let me tell you a little bit more about Mr. Rothenberg.

16      Mike is a son, a brother, an uncle, a partner, a dog

17  owner, a man of humble roots from central Texas who is bright

18  and motivated.  By 17, he's a math olympian.  As you've

19  already heard, he's accepted into Stanford right out of high

20  school.  And he graduates in five years in 2007 with both a

21  bachelor's and a master's degree.

22      He works in the financial industry for a few years.  And

23  he's accepted into Harvard business school in 2011.

24      And in 2012, as a full-time MBA student, he launches

25  Rothenberg Ventures, or Rothenberg Ventures Management Company

1  also here referred to in this trial, which is a venture

2  capital fund.  And I'll talk about that more in a minute.

3      Mr. Rothenberg obtains his MBA in 2013.  And he moves back

4  to the Bay Area to work on his fund full-time.  He's just

5  29 years old.

6      Now keep in mind, Mr. Rothenberg is not a trust fund baby.

7  Don't be misled by the way he looks or the fact he has degrees

8  from prestigious universities.

9      When he graduates, like so many young people in this

10  country, he has over $210,000 in student loan debt.

11      Now I mentioned he ran a venture capital fund.  And I want

12  to explain a little bit what that is.  And I know a couple

13  jurors have some experience with VC funds, as they're sort of

14  referred to in shorthand.  But I want to make sure we're all

15  on the same page.

16      A VC fund, or venture capital fund, solicits money to

17  invest in startup companies.  They're looking for the newest

18  and most exciting companies to invest in early.  And when it

19  works, it's a win-win for the company and the investors.

20      Startup gets the money it needs to grow, become larger,

21  more valuable, contribute to the economy, great jobs, provide

22  a service to consumers.  The investors make a return for

23  believing in small companies early.

24      And Rothenberg Ventures was focused on technology

25  startups.  And some of its early investments were in SpaceX,

1    Robinhood and Patreon.  You're going to hear that

2    Mr. Rothenberg was a good investor, that by 2014, Rothenberg

3    Ventures was pretty successful.  It had invested in more than

4    50 companies, had 80 limited partners, and a rate of return of

5    34 percent.

6        Now, Mr. Rothenberg was the CEO and founder of the fund,

7    or what's sometimes referred to as a general partner, or GP.

8    And you're going to hear that in the VC world, it's expected

9    that the general partner, or the GP, will invest their own

10   money into the fund.  It's called a capital commitment.  And

11   it's a way to show other investors you have skin in the game.

12   It shows investors you're confident not only in your ability

13   to pick winning startups, but your firm's ability to

14   officially and effectively manage investor money.

15       Now that upcoming capital commitment is what takes us into

16   the summer of 2014 and the transactions at issue in this case.

17   You're going to hear that in the summer of 2014,

18   Mr. Rothenberg had an upcoming capital commitment to

19   Rothenberg Ventures of $400,000.  That means he was required

20   to invest $400,000 of his own money into his fund.

21       And a year earlier, you're going to learn or you've

22   already learned, that in August of 2013, Mr. Rothenberg moved

23   back to the Bay Area after he graduated from Harvard.  And he

24   bought a condo in San Francisco at 712 Bryant Street in the

25   SOMA neighborhood.  And like most homeowners, Mr. Rothenberg

1    put down a 20 percent down payment.  And he refinanced the

2    rest of the purchase through a mortgage he obtained from

3    Stanford Federal Credit Union which lends money to Stanford

4    alumni.

5        In 2014, as the housing market's taken off after several

6    years of recession, Mr. Rothenberg wanted to refinance the

7    mortgage on his condo, and he was specifically looking to do a

8    cash-out refinance.

9        And I suspect everybody knows what a cash-out refinance

10   is.  But just so, again, we're all on the same page, cash-out

11   refinance means renegotiating the mortgage on your property to

12   take advantage of equity, which is the amount of your home's

13   value you've paid off that's built up over time.

14       I'll give you a simple example.  Let's say your house is

15   valued at $200,000.  You can assume for this assumption, this

16   example, this is not in the Bay Area.  Your mortgage balance

17   is $100,000, which gives you $100,000 of equity in your home.

18       You could refinance your $100,000 loan balance for a

19   $150,000, and you have $50,000 in cash back at closing.  And

20   that allows you to basically take a portion of your equity and

21   add that on to your new mortgage principal, and then with that

22   cash, you can use it for other things like renovations or

23   sending your kids to college or, something I did, paying off

24   my student loans.

25       In 2014, Mr. Rothenberg's home had gone up in value.

1    There's obviously an increase in real estate prices,

2    particularly in the Bay Area.  His home had increased in value

3    because of improvements he'd made to it.  And he was looking

4    to find a lower interest rate, which would ultimately allow

5    him to save money in the long run and invest his money in

6    other ways.

7        And like any savvy consumer, Mr. Rothenberg shopped around

8    to find the best deal, meaning the best terms and the lowest

9    interest rate.

10       And ultimately you're going to hear about two different

11   banks in this case, both of which solicited Mr. Rothenberg,

12   hoping to earn his business, make money off of him through

13   interest and fees, and have access to the -- his portfolio

14   companies, Merrill Lynch and Silicon Valley Bank.

15       So let's start by talking about Merrill Lynch.

16       You're going to hear they were the ones who reached out to

17   Mr. Rothenberg.  They sent him a mailer sometime in the spring

18   of 2014.  And he responds to them.

19       Now it's no accident that Merrill Lynch is soliciting him.

20   Remember, Mr. Rothenberg is young.  Rothenberg Ventures is

21   successful.  The bank wants to do business with him.  And

22   remember, banks are businesses.  They sell products to their

23   customers at a profit.

24       So in response to Merrill Lynch's solicitation, they make

25   it clear to him there are other products they can offer him

1    which would help lower the interest rate on any mortgage he

2    may get with them.

3        The first is called a brokerage checking account.  It's

4    been referred to as a CMA account.  So you're going to hear

5    that acronym quite a bit during this trial.  And the second is

6    a secured line of credit, and that's going to be -- that's

7    been referred to so far as the LMA account.

8        And, again, I want to make sure we're all on the same

9    page.  If you know this, I'm sorry if this is repetitive, but

10   just again so we can all operate on the same universe of facts

11   here.

12       The line of credit is a predetermined set amount of money

13   you can borrow as you need, and you pay interest only on what

14   you use.  It's different than a car loan or a student loan.

15   Okay.  With a car loan or student loan, the bank gives you all

16   the money up front, and you pay a set amount of principal and

17   interest every month.

18       A line of credit is different.  It's a revolving account.

19   Again, we can use a simple example.  If the bank gives you a

20   $10,000 line of credit on January 1st.  You pull out $2,000 on

21   February 1st.  You only pay interest on the $2,000 you draw,

22   not the full amount of $10,000.  And if you repay the $2,000

23   on March 1st and you don't draw the line of credit afterwards,

24   you don't owe them any interest.

25       Now there are secured and unsecured lines of credit.  And

1    I think everybody has experience with an unsecured line of

2    credit.  That's a credit card.  It doesn't require you to post

3    any collateral to get credit from the bank.  The secured line

4    of credit means there's an asset connected to the loan that

5    the bank can seize if you fail to pay.

6         So a very common type of line of credit is a home equity

7    line of credit where your house is the collateral for the line

8    of credit.

9         And Merrill Lynch convinces Mr. Rothenberg to open both

10   the CMA brokerage checking account, so to speak, and the line

11   of credit.  And for the CMA account, on June 18, 2014, you'll

12   see Mr. Rothenberg deposits $370,000 of cash into that

13   account.

14        Now, for the line of credit, the security or the

15   collateral can be any asset.  Mr. Rothenberg decides to use

16   the cash in the brokerage checking account.  This was no

17   secret to anyone.  You'll see for yourself the Merrill Lynch

18   statements for the CMA account clearly state the cash and the

19   checking account is pledged as collateral to the line of

20   credit.

21        And just because the checking account was pledged as

22   collateral to the line of credit did not mean the money in the

23   checking account was unavailable.

24        You will hear directly from Merrill Lynch employees that

25   lines of credit are dynamic and flexible and that they pitch

1    lines of credit to business owners all the time.

2        And you'll hear from them directly that as long as the

3    line of credit balance was zero, the cash pledged as

4    collateral to the line of credit was freely available for the

5    customer to use however they wanted.

6        And you will see that is exactly what happened with

7    Mr. Rothenberg.  You will see the monthly statements for both

8    the Merrill Lynch brokerage checking account and the line of

9    credit accounts from June, July, and August 2014.

10       And those statements will show that at the end of every

11   month, Mr. Rothenberg -- Mr. Rothenberg had a checking account

12   portfolio value of approximately $370,000, meaning he had

13   $370,000 of available cash in the account.

14       You will also see the line of credit accounts statements.

15   And every single one of those statements for June, July, and

16   August will show that at the time the statement closed, the

17   balance owed on the line of credit was approximately zero.

18       Now, after opening those accounts, Mr. Rothenberg moves to

19   discuss refinancing his condo through Merrill Lynch.  Now as I

20   mentioned earlier, banks are a business.  There's a lot of

21   competition.  And Mr. Rothenberg, like any smart customer,

22   shops around.  He wants to make sure he's getting the best

23   deal and paying the lowest interest rate.  And so although

24   he's talking to Merrill Lynch about a refinance, he's also

25   talking to Silicon Valley Bank as well.

1        So let's talk about the second bank in this case, SVB.

2    SVB knows Mr. Rothenberg.  They're Rothenberg Ventures' bank.

3        SVB is a different kind of bank from Merrill Lynch.

4    Merrill Lynch is actually owned by Bank of America.  So

5    they're sort of like pretty big traditional kind of bank.

6    Silicon Valley Bank is smaller.  They're regional.  It's in

7    their name.  They're focused on the Valley.  They're focused

8    on VC funds and the executives of technology startups.

9        And because Silicon Valley Bank knows Mr. Rothenberg and

10   knows Rothenberg Ventures and knows that Mr. Rothenberg has a

11   capital commitment coming up, you will hear that once they

12   found out that Mr. Rothenberg was pursuing a refinance with

13   Merrill Lynch, they saw an opportunity to expand its business

14   with Mr. Rothenberg, and they aggressively pursue him.

15       They offered to refinance his home at a lower interest

16   rate than offered by Merrill Lynch.  And they offer him a

17   second product unique to a bank focused on high-tech VC fund

18   clientele, a personal loan that would cover 75 percent of his

19   $400,000 capital commitment to RV, or Rothenberg Ventures.

20       So in July 2014, Mr. Rothenberg begins the formal process

21   of applying for a cash-out refinance of his home with

22   Silicon Valley Bank and a personal loan to partially fund his

23   capital commitment, also with Silicon Valley Bank.

24       Now this case is going to ultimately come down to what

25   documents Silicon Valley Bank asked Mr. Rothenberg to give

1    them and what information he provided in response to the bank

2    during the loan application.

3        And you're going to see all the documents.  You're going

4    to look at the entire loan file.  And you're going to hear a

5    whole lot of testimony about Silicon Valley Bank's loan

6    process in general and this loan in particular.

7        So let's go through the events of July and August 2014

8    concerning this refinance.

9        The first step in the loan process is that Mr. Rothenberg

10   submits what's called a Uniform Residential Loan Application,

11   or a URLA.  I think Mr. Waldinger referred to it as a

12   Form 1003.  This is a form that basically is an application

13   for a mortgage.

14       You're going to see the first version of this form that

15   Mr. Rothenberg signed himself.  It's dated July 29, 2014.  And

16   the form asks him to list his assets and liabilities.  And the

17   first Form 1003 he submits says in handwriting, and you'll see

18   it, says see assets.  And under liabilities, it says, see

19   credit report.

20       Now, attached to the Form 1003 is a spreadsheet that lists

21   Mr. Rothenberg's assets and liabilities.  And that form lists

22   $370,000 cash, meaning the money in the Merrill Lynch CMA

23   account, as an asset.  Which to be clear, it is.  You will see

24   there is actual cash deposited by Mr. Rothenberg in the CMA

25   account on that day that is freely available because the line

1    of credit has not been drawn down.

2         Now the form lists other assets including investments

3    Mr. Rothenberg had at his own firm -- in his own funds, as

4    well as investments he had at a prior employer, includes the

5    value of his home which is measured as the equity in his home,

6    the value of improvements and renovations done in the home,

7    and includes his ownership stake in his own fund.

8         That spreadsheet also lists Mr. Rothenberg's liabilities,

9    and it specifically noted he had $210,000 in outstanding

10   student loans.

11        Now, the bank doesn't just rely on that spreadsheet.  It

12   also runs a credit report which confirms exactly what

13   Mr. Rothenberg says, that there is $210,000 in outstanding

14   student loans.

15        Now critically the credit report does not include the line

16   of credit as a liability.  In fact, credit report doesn't

17   mention Merrill Lynch at all.  Nor would or should it.  You're

18   going to hear that lines of credit don't show up on credit

19   reports.

20        And more importantly, on the day that Form 1003 was

21   submitted, as I mentioned a minute ago, the balance on the

22   line of credit was zero, meaning there was no liability from

23   the line of credit and the cash in the Merrill Lynch brokerage

24   checking account was available for Mr. Rothenberg to use as he

25   wished.

1          To confirm that, Mr. Rothenberg gave Silicon Valley Bank a

2     Merrill Lynch account balance sheet that showed as of

3     July 31st, 2014, the checking account had approximately

4     $370,000 in it.  The line of credit had no balance, meaning it

5     had not been drawn down.  And you'll see because you'll see

6     this document itself, this document makes clear that the

7     checking account was pledged to the line of credit.

8          So after submitting these documents, the mortgage process

9     continues.  The interest rate is locked.  The title company

10    prepares a title report.  Makes sure Mr. Rothenberg really

11    owns the property.  There's no liens or claims to the property

12    and everything checks out fine.  An appraisal is ordered to

13    make sure the house is worth as much money as all the parties

14    are assuming.

15         Now as that process is going forward, Silicon Valley Bank

16    mails Mr. Rothenberg a loan disclosure package.  Now, I

17    suspect if you've ever done a -- had a mortgage or done a

18    refinance, you've seen a package like this before.  And you're

19    going to see the package given to Mr. Rothenberg.  It has a

20    lot of boilerplate legal disclosures, the kinds you get in the

21    mail, probably throw them away without reading or clicking

22    through on the Internet or on your computer without reading a

23    word.  The lawyer requires these disclosures because of the

24    reckless behavior of banks during the financial crisis of the

25    2000s.

1    And those disclosure forms contain important things, like

2    the terms of the loan, the interest rate.

3        Now, importantly, it included a cleaned-up and typed

4    Form 1003.  If you recall, that first Form 1003 had some

5    handwriting on it.  This second Form 1003, which you'll see,

6    is all typed up.

7        You're going to see that this updated Form 1003 was wrong.

8    It was wrong because it said Mr. Rothenberg's liabilities was

9    only $73,000.

10       Now, I mentioned earlier, Mr. Rothenberg himself told the

11   bank he had $210,000 in student loans.  And that's what the

12   credit report shows is $210,000 in student loans.  But you'll

13   see this updated and wrong Form 1003.  And you'll learn

14   this -- that form was not prepared by Mr. Rothenberg.  That

15   form was prepared by someone at Silicon Valley Bank.

16       And it's going to be very obvious to you why that form is

17   wrong.  Because you're also going to see Mr. Rothenberg's

18   credit report.  What that Form 1003, you'll see, had taken

19   some of Mr. Rothenberg's student loan liabilities from the

20   credit report, but it didn't include all of them because there

21   wasn't enough room on the form.

22       So you'll see that part of the reason we're here is

23   because Silicon Valley Bank couldn't be bothered to completely

24   and correctly fill out its own form.

25       So what happens next after these loan disclosures are

 1    given to Mr. Rothenberg?  Well, next the loan application is

 2    sent to Silicon Valley Bank's underwriter.  You're going to

 3    see the underwriter's loan approval sheet.  It's dated

 4    August 6, 2014.  It's 23 pages.  It explains the loan to the

 5    bank and why the bank should make the loan.

 6        Towards the end of this document, it reads almost like an

 7    essay or a report, you're going to see a spreadsheet.  It's

 8    going to be called "the spread" by Silicon Valley Bank

 9    employees when they testify.

10        And you're going to see right away that the spread notes

11    that Mr. Rothenberg has $210,000 in student loans, not $73,000

12    as listed in the Form 1003.

13        In fact, you're going to see that the spread lists other

14    liabilities not in the Form 1003.  It lists more than $500,000

15    in contingent liabilities, which are potential liabilities

16    that could theoretically arise in the future.  By the way,

17    that includes Mr. Rothenberg's capital commitment which is the

18    entire purpose of the loan to begin with -- or the personal

19    loan, I should add.

20        You're going to see in those -- in that memorandum that it

21    notes Mr. Rothenberg has good credit, he has no derogatory

22    accounts, which means he's never defaulted on a loan or missed

23    a payment.  And it notes that Mr. Rothenberg has enough cash

24    reserves, meaning money in the bank, to pay his expenses if he

25    were to lose his income the day after the loan closes.

1        Now Silicon Valley Bank is counting the $370,000 in the

2    brokerage checking account, the Merrill Lynch account.

3    They're not counting Mr. Rothenberg's stake in his own

4    company.

5        The form you'll see will note that Mr. Rothenberg has 43

6    months of reserves.  And you're going to learn that the bank

7    generally wants between six and 12 months of reserves.

8        Now this is an important point here.  The memo notes that

9    Mr. Rothenberg's debt-to-income ratio is 69 percent.

10       Now, just again to define some terms, a debt-to-income

11   ratio is the percentage of your income that goes towards

12   paying your debts.  The higher that number, the more of your

13   income is used to pay debts and the less disposable income or

14   leftover money is available to pay for anything else.

15       And you're going to see in the memo the underwriter notes

16   that a 69 percent debt-to-income ratio is higher than the

17   recommended 50 percent threshold.  But you're also going to

18   hear that's just a recommendation.

19       And the underwriter says the higher ratio is mitigated by

20   Mr. Rothenberg's good credit, by his cash reserves.  And most

21   importantly, you're going to see for yourself that it was

22   mitigated by the fact -- and this is a direct quote from a

23   document you'll see -- that, quote, SVB wishes to expand its

24   relationship with Rothenberg Ventures portfolio companies, end

25   quote.

```
 1              You're going to learn that this was a business decision.
 2      SVB wanted access to the portfolio companies in
 3      Mr. Rothenberg's ventures fund to sell them banking services.
 4              Now while this loan has gone to underwriting, the
 5      appraiser has gone and examined the house and determined it
 6      was worth $200,000 more than anticipated.  So Mr. Rothenberg
 7      and the bank agree to increase the loan amount by $200,000.
 8      That means Mr. Rothenberg would get back an additional
 9      $200,000 in cash when the loan closed.
10              And you'll see the correspondence and the documents
11      authorizing the increased loan amount.  You'll notice the bank
12      approved the increased loan amount without changing a single
13      term of the loan, not a higher interest rate, not a request
14      for greater reserves, no change whatsoever.
15              So an addendum is prepared for the new higher loan amount.
16      And you'll see that form too.  And you'll see that even though
17      the higher mortgage increased Mr. Rothenberg's debt-to-income
18      ratio to 74 percent, the loan was still approved without
19      change because of the same reasons as before, Silicon Valley
20      Bank's desire to do more business with Mr. Rothenberg and
21      Rothenberg Ventures portfolio companies.  Mitigated by
22      Mr. Rothenberg's good credit.  And importantly, the fact that
23      he would still have enough reserves, which had actually
24      increased from 43 to 53 months because with a new loan,
25      Mr. Rothenberg would have an extra $200,000 cash as a reserve.
```

1    The loan is approved, and Mr. Rothenberg prepares to sign

2    the closing documents, which is the final step in the process.

3    And you'll see those documents.  You'll hear -- you're going

4    to even hear from the notary that did the signing.  And you're

5    going to find out that the notary is from New York City.  And

6    that's because on August 21st, the day of the closing,

7    Mr. Rothenberg is not at home in San Francisco, he's on the

8    opposite end of the country for work, and the signing was at a

9    hotel lobby.

10    Now I'm sure some of you have sat through a loan closing

11    and know there are a ton of documents to sign.  And you'll

12    basically see that this entire case hinges on these two

13    documents I started with that are part of that package,

14    documents that were signed when Mr. Rothenberg was out of town

15    and in a hurry.

16    The first document, this one right here, this is going to

17    be Exhibit 25.  You'll get this so I'm not -- I know you can't

18    see it now, but you're going to get it in the jury room.

19    This is a third Form 1003, typed up, and again not

20    prepared by Mr. Rothenberg.  Similar to the second Form 1003

21    in the disclosure package, but has the increased loan amount

22    because of the higher appraisal.  And, again, this form

23    incorrectly states that Mr. Rothenberg's liabilities are

24    $73,000.

25    The second document is a financial status affidavit.

1    That's this form.  It's Exhibit 26.  You're going to see this

2    form when you -- as the trial progresses.  And this is a form

3    that says Mr. Rothenberg is promising that his financial

4    status has not changed significantly.

5        So Mr. Rothenberg signs the documents as well as the other

6    documents in the closing package, and the loan closes on

7    August 27, 2014.  The old mortgage with Stanford is paid off.

8    A new mortgage with SVB is instituted.  The check is issued to

9    Mr. Rothenberg representing the cash out of his equity and the

10   personal loan to fund the capital commitments issue.

11       Now, only one thing has happened between July 29 when

12   Mr. Rothenberg signed the first Form 1003 and August 27 when

13   the loan closed that the government claims has turned this

14   rather mundane and routine transaction into an alleged

15   criminal fraudulent scheme.

16       And before I get to that fact, I want to be clear about

17   one thing.  You're going to hear from many witnesses in this

18   case.  And they're going to all tell you that nothing about

19   this transaction stood out at the time.  The documents didn't

20   raise any red flag.  The notary doesn't remember

21   Mr. Rothenberg.  Neither do most of the bank employees you're

22   going to hear from.

23       So what this case hinges on entirely is that on

24   August 1st, 2014, Mr. Rothenberg drew down the entire line of

25   credit.

1          To the government, that means on August 21st, when

2     Mr. Rothenberg signed the closing documents and the financial

3     affidavit, his financial situation had significantly changed.

4     He no longer had $370,000 in cash reserves.  And he had more

5     than $73,000 in liabilities as detailed in the Form 1003.

6          Now, the government is going to spend a lot of time, and

7     they did that in their opening, talking about what they call

8     this quote-unquote complex movement of money.  But I'm just

9     going to tell you now it's a red herring and it's utterly

10    irrelevant.

11         Because as I said at the beginning, this is not a case

12    about secret bank accounts.  Every single transaction was in

13    the open.  Every statement was available for anyone who wanted

14    to see them.  You will see them yourself, the transactions and

15    the statements.

16         You will see that the line of credit was drawn down on

17    August 1st.  You will also see the line of credit was repaid

18    in full on August 29.  And that means when the line of credit

19    account and the checking -- the brokerage checking accounts

20    closed two days later on August 31st, 2014, the line of credit

21    balance was zero.  There was $370,000 in available cash just

22    like on the June 30, 2014 statement, before he applied for the

23    loan, just like on the July 31st, 2014 statement, when he

24    applied for the loan with SVB.

25         In other words, you're going to see throughout the loan

1   application the Merrill Lynch end-of-month statements showed

2   Mr. Rothenberg's portfolio value, his assets, and his

3   liabilities never changed.

4       Most importantly, you're going to see the government's

5   claimed false statements did not matter whatsoever to the

6   underwriters or specifically to Silicon Valley Bank.

7       You're going to hear testimony that a bank issuing a

8   mortgage looks at the end-of-month statement in assessing

9   liquidity.  If underwriters see a line of credit paid off, it

10   considers the cash as unencumbered, liquid, and available.

11       You're going to see that was exactly what happened with

12   Silicon Valley Bank.  The underwriter's loan approval

13   worksheet, you're going to see it yourself, it didn't rely on

14   the Form 1003, the mistaken Form 1003.  It reflected his

15   student loan balance was $210,000.  And actually they reported

16   his liabilities as almost $2 million.

17       You're going to hear directly from Silicon Valley Bank

18   employees that even if SVB disregarded the $370,000 in cash,

19   that is, if it just doesn't consider that amount as a cash

20   reserve but instead as a liability, Mr. Rothenberg would have

21   still qualified for the loan under the bank's own lending

22   criteria.

23       And you're going to hear that even a higher than

24   recommended debt-to-income ratio is not fatal to a mortgage if

25   there were other factors in play, like the bank wants your

OPENING STATEMENT \ FAKHOURY

1    business.

2        Like I said at the beginning, ladies and gentlemen, it's

3    going to be up to you to listen to the evidence carefully and

4    to scrutinize the government's case closely.

5        The government's claim that Mr. Rothenberg committed a

6    crime is absolutely and unequivocally wrong.  The facts show

7    Mr. Rothenberg gave Silicon Valley Bank every single piece of

8    information and every document it asked for and that

9    everything he submitted to SVB in connection with this loan

10   was accurate.

11       The facts will show it was SVB that made the mistake on

12   the form this entire case is built upon, even though the loan

13   itself wasn't built upon that information from that form.

14   Form over substance does not work when a person's liberty is

15   at stake.

16       I'm confident beyond any doubt that the substance shows

17   that Mr. Rothenberg did not engage in bank fraud, did not

18   submit a false statement to the bank.  And at the end of the

19   trial when I get back up here to give my closing argument, I'm

20   going to ask you to return the only correct verdict in this

21   case which is to find that Mr. Rothenberg is not guilty.

22       Thank you very much.

23           THE COURT:  Thank you, Mr. Fakhoury.

24       Members of the jury, that concludes the attorneys' opening

25   statements.  We now come to the presentation of the evidence.

 1          Mr. Waldinger or Mr. Walsh, the government's first

 2     witness, please.

 3              **MR. WALSH:**  Your Honor, should we disassemble this

 4     or --

 5              **THE COURT:**  That's fine.  Yeah, probably better to

 6     question from the lectern.

 7          Members of the jury, let's just stand up and stretch our

 8     arms.

 9          A lot of sitting in the trial.  I'll try to take advantage

10     of the stretch breaks when I find them.

11          Let me also just say a word about what I'm doing up here.

12     As you heard me say during instructions, you shouldn't develop

13     any view of the case or the evidence based on what you think

14     my view of the evidence is.  Because it's not relevant.  I'm

15     not a juror.  I don't get to make the decision.  So my opinion

16     is not relevant.

17          Sorry to leave you hanging there.  I'm almost done.

18              **THE WITNESS:**  That's okay.

19              **THE COURT:**  And not only that, but whatever you think

20     might be happening in my state of mind probably isn't

21     happening.  Because as I mentioned, I have hundreds of other

22     cases, and I am required to keep thinking about those while

23     I'm up here presiding over your trial.

24          On that note, you will see I have a computer screen in

25     front of me.  Some of the information there is about the case.

```
 1    Some of it's about other things.  I promise you I'm not

 2    looking at ESPN or buying shirts on Amazon or any of that.

 3    I'm doing the court work that you -- that I do on your behalf

 4    as citizens.

 5        So just a note about that.

 6        Good morning -- or good afternoon.

 7            THE WITNESS:  Hello.

 8            THE COURT:  Would you raise your right hand and face

 9    my courtroom deputy, please.

10            THE WITNESS:  Yes.

11                         ANNA JENKINS,

12    called as a witness by the plaintiff, having been duly sworn,

13    testified as follows:

14            THE WITNESS:  Yes.

15            THE CLERK:  Could you please state and spell your

16    last name for the court reporter.

17            THE WITNESS:  Yes, it's Anna, and the last name is

18    Jenkins, J-E-N-K-I-N-S.

19            THE COURT:  So one N or two N's in Anna?

20            THE WITNESS:  Oh, two N's.

21            THE COURT:  Very good.  Would you have a seat,

22    please.

23            THE WITNESS:  Yes.

24            THE COURT:  We have special clear masks for our

25    witnesses.  Ms. Lee is giving you one of those now.  The bands
```

 1    go behind the head, not over the ears.

 2                      (Off-the-record discussion.)

 3              **THE COURT:**  Terrific.

 4              **THE CLERK:**  There you go.

 5              **THE COURT:**  Thank you, Ms. Jenkins.

 6              **THE WITNESS:**  Okay.  Thanks.

 7              **THE COURT:**  Ms. Jenkins, have you ever testified in

 8    court before?

 9              **THE WITNESS:**  I have not.

10              **THE COURT:**  Okay.  Just a couple things.

11        It's COVID so our jurors are spread out.  They go all the

12    way into the gallery there.  If you'll make sure you keep your

13    voice up, then they'll all be able to hear your testimony.

14              **THE WITNESS:**  Okay.

15              **THE COURT:**  This matter is being reported by a court

16    reporter.  So only one person can talk at a time.  So if

17    you'll wait until the lawyers have finished with their

18    questions before you answer, then they will wait for you to

19    finish before they ask their next question.

20        I think that's really it.

21        Mr. Walsh, your witness.

22              **MR. WALSH:**  Thank you, Your Honor.

23        And there is one matter I need to attend to before I start

24    questioning Ms. Jenkins, which is at this time the United

25    States is offering into evidence a series of documents.

 1          And I would like to just read them slowly so that everyone

 2     gets them.

 3          At this time, the United States offers Exhibits 47, 48,

 4     49, 50, 51, 52, 53, 76, 77, 78.  I offer those.  And there's a

 5     series of other ones, but that's the first batch.

 6               **THE COURT:**  All right.  Any objection?

 7          **MR. FAKHOURY:**  No, Your Honor.

 8               **THE COURT:**  Those exhibits are admitted into

 9     evidence.

10          (Government's Exhibits 47, 48, 49, 50, 51, 52, 53, 76, 77,

11     78 received in evidence.)

12               **MR. WALSH:**  The next batch of exhibits that the

13     United States offers are Exhibits 2, 3, 4, 5, 6, 7, 8, 10, 11,

14     12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 31,

15     34, 107, 108, 118, and 119.  That is the next batch of

16     exhibits.

17               **THE COURT:**  Any objection?

18          **MR. FAKHOURY:**  No, Your Honor.

19               **THE COURT:**  Those documents are admitted into

20     evidence.

21          (Government's Exhibits 2, 3, 4, 5, 6, 7, 8, 10, 11, 12,

22     13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 31, 34,

23     107, 108, 118, and 119 received in evidence)

24          **MR. WALSH:**  The next batch of exhibits are 84, 85,

25     and 86.

1          **THE COURT:**  Any objection?

2          **MR. FAKHOURY:**  No, Your Honor.

3          **THE COURT:**  Eighty-four, 85, and 86 are admitted into

4     evidence.

5          (Government's Exhibits 84, 85, and 86 received in

6     evidence)

7          **MR. WALSH:**  And the last batch, Your Honor, are 72,

8     73, 74, 75, 91, 92, 93, and 100.

9          **THE COURT:**  Any objection?

10         **MR. FAKHOURY:**  No, Your Honor.

11         **THE COURT:**  Those documents also are admitted.

12         (Government's Exhibits 72, 73, 74, 75, 91, 92, 93, and 100

13    received in evidence)

14         **MR. WALSH:**  Thank you, Your Honor.

15                       <u>**DIRECT EXAMINATION**</u>

16    BY MR. WALSH:

17    **Q.**   All right.  Ms. Jenkins, my apologies for that delay.

18         Where do you work?

19    **A.**   Merrill Lynch.

20    **Q.**   And how long have you worked at Merrill Lynch?

21    **A.**   Well, I have been there or predecessor organizations for

22    26 years.

23    **Q.**   Where are you presently physically working?

24    **A.**   Denver, Colorado.

25    **Q.**   Okay.  And we'll circle back to Merrill Lynch in a little

1   bit.  But where are you from?

2   **A.**   Rapid City, South Dakota.

3   **Q.**   Did you go to college?

4   **A.**   Yes.  Colorado State in Fort Collins.

5   **Q.**   What did you study there?

6   **A.**   Speech communication.

7   **Q.**   And I think you indicated you've been in the investment

8   industry for a long time.

9   **A.**   I have.

10   **Q.**   About when did you start working the investment industry?

11   **A.**   June 1996.

12   **Q.**   When you started, where's the first place you went to

13   work?

14   **A.**   It was called Montgomery Securities, and it was in

15   downtown San Francisco.

16   **Q.**   What is Montgomery Securities?

17   **A.**   It was an investment bank.

18   **Q.**   What's that mean?

19   **A.**   It was a firm that would raise money for companies and

20   take them public.

21   **Q.**   Okay.  And again, part of what we're going to be doing is

22   explaining a lot of terms to our jurors.  What does "taking

23   public" mean in this context?

24   **A.**   Sure.  It's just taking a private company and making its

25   shares available to the public for purchase and -- and

1   creating liquidity for the company.

2   Q.   In 1996 when you started working at Montgomery Securities,

3   what was your job?

4   A.   I was a sales assistant.  And I was assisting C-level

5   executives helping them diversify out of their company stock.

6   So exercising stock options for folks and selling restricted

7   stock for them.

8   Q.   Okay.  Now you've been in the industry since '96, but

9   maybe not everyone on our jury.  So you're saying C-level

10  executives.  What does that mean?

11  A.   So CEO, CFO, CIO, et cetera.

12  Q.   Got it.

13  A.   A management team.

14  Q.   The highest level of managers; is that right?

15  A.   Yes.

16  Q.   And you said diversifying their stock.  Could you just

17  explain that?

18  A.   Yeah.  It's just helping them sell their company stock and

19  then helping them invest in other things.

20  Q.   Now, how long were you at Montgomery Securities?

21  A.   Well, it was called that for about a year, and then it was

22  acquired by Bank of America.

23  Q.   I suspect most people have heard of Bank of America, but

24  what is Bank of America?

25  A.   Yes.  It's a bank.  It is founded in San Francisco and

1    it's been around for many years.

2    Q.  And did you continue at your same sales assistant position

3    there once it was -- Montgomery Securities was acquired by

4    Bank of America?

5    A.  Well, in about the year 2001, I became a financial

6    advisor.  And it was called Bank of America Investments -- or

7    Bank of America Securities at the time.

8    Q.  Okay.  In 2001.  How did -- before we get to what is an

9    advisor, how did you become an advisor?

10   A.  So I had a mentor.  She was a woman that I worked for and

11   she recommended that I go through the training program and

12   join her and join her team.

13   Q.  And did you go through that training program?

14   A.  I did.

15   Q.  What's that training program?

16   A.  It was, you know, four -- it was a several-month training

17   program just learning about sales practices and things like

18   that.

19   Q.  All right.  Now, you said you became an advisor.  What is

20   an advisor in this context?

21   A.  Sure.  So a financial advisor, I would assist and provide

22   advice and assist with implementation of investments,

23   discussing life insurance, borrowing money, and all things

24   financial.

25   Q.  Did you have a specialty?

1    **A.**   I don't know that I have a specialty.  I'm more of a

2    generalist.

3    **Q.**   What happened in around 2008 or 2010?

4    **A.**   So Bank of America was acquired -- or Bank of America

5    acquired Merrill Lynch.  So I became a Merrill Lynch employee.

6    **Q.**   Now, is that -- could you just describe that?  You were at

7    Bank of America investments; is that right?

8    **A.**   Correct.

9    **Q.**   And how did -- what exactly happened to that unit within

10   Bank of America?

11   **A.**   So we -- we were absorbed into Merrill Lynch.

12   **Q.**   Okay.  Now this is where we're going to circle back to

13   Merrill Lynch which is where you're at right now.

14   **A.**   Yes.

15   **Q.**   What is Merrill Lynch?

16   **A.**   So Merrill Lynch is a brokerage firm.  It's been around

17   for over a hundred years, and it's a well-known brokerage

18   firm.  And you probably know it, the bull is its advertising

19   icon or logo.

20   **Q.**   Got it.  Now, Merrill Lynch has got a bunch of different

21   names; is that right?

22   **A.**   Yes.

23   **Q.**   Okay.  What's its actual formal name?

24   **A.**   Merrill or Merrill Lynch.

25   **Q.**   Okay.  Does it have a longer one that it went by for a

JENKINS - DIRECT / WALSH

```
 1    long time?

 2    A.   It does.

 3    Q.   Okay.  No you remember what that was?

 4    A.   Merrill Lynch Pierce Fenner & Smith.

 5    Q.   You mentioned something about a bull symbol?

 6    A.   Yes.

 7    Q.   Is there some sort of a nickname or something that's

 8    called for the financial advisors?

 9    A.   Yeah.  I mean they call the financial advisors that work

10    for Merrill the thundering herd.

11    Q.   Okay.  What is your current title at Merrill Lynch?

12    A.   I'm a senior financial advisor.

13    Q.   What's that mean?

14    A.   It just means a financial advisor with experience, that

15    I've been there for a number of years.

16    Q.   Do you have the same responsibilities therefore?

17    A.   Yes.

18    Q.   All right.  I'd like to now turn back in time to 2014.

19         At that time, where physically were you working?

20    A.   I was working in Denver.

21    Q.   When had you left San Francisco?

22    A.   I left at the end of 2012.

23    Q.   And what happened to your clients in San Francisco?

24    A.   So I -- I was able to transition them all to be supervised

25    out of the Denver office.  So I still come to Bay Area on a
```

1   regular basis to visit clients and friends since I lived here

2   for so long.  But I actually service my same Bay Area clients

3   out of the Denver office.

4   **Q.**  In your position, I take it you're always trying to get

5   more clients; is that right?

6   **A.**  Yes.  Yeah.  That's a kind of a core tenet is bringing in

7   new relationships and having new clients and growing your

8   business.

9   **Q.**  When you moved to Denver, were you focused still on the

10  Bay Area or on Denver or some other place?

11  **A.**  All of the above.

12  **Q.**  And if you wanted to generate clients, did -- what did you

13  do in 2014 to try and generate new clients?

14  **A.**  Well, one thing that I was doing is I partnered with

15  another financial advisor who had a mortgage background, and

16  we were sending out mailers to try to drum up business.

17      And the reason we did that is sometimes it's easier to

18  start a conversation with someone about investing if you start

19  talking about actually giving the person money, which is a --

20  if the person wants to borrow money.

21      So people are more willing to just talk to you if they

22  were talking about borrowing money from you versus giving you

23  money to invest.

24      So we had a mailer that we were sending out to kind of get

25  people to call us to talk about mortgages.  And as a result,

1    we were hoping that they might open brokerage accounts with

2    us.

3    **Q.**   Okay.  Now, you said partnered with someone.  Who was

4    that?

5    **A.**   At the time, it was Ben Bolt and Ravi Bhalla.

6    **Q.**   Okay.  Who's Ben Bolt?

7    **A.**   Ben Bolt was a financial advisor that sat about 10 feet

8    away from me.

9    **Q.**   And who is Ravi Bhalla?

10   **A.**   He was a -- a financial advisor here in the San Francisco

11   office, and the reason that we partnered with him is just in

12   case someone needed a local presence.

13   **Q.**   And for our court reporter, that's R-A-V-I, last name

14   B-H-A-L-L-A; yes?

15   **A.**   Yeah, Ravi Bhalla, yeah.

16   **Q.**   Okay.  The -- now why did you partner with Ben Bolt in

17   particular on this mailer concept?

18   **A.**   Just because he used to be a mortgage loan officer, and so

19   he was very conversant on the mortgage process.  So when

20   someone would call us, we could have an educated conversation

21   about the process and what next steps would be and have him on

22   the phone with us.

23   **Q.**   Had he used this mailer concept before?

24   **A.**   He had, and he did it with a lot of success.

25   **Q.**   Where had he sent mailers?

1   **A.**   He was doing that around the Denver area.

2   **Q.**   Now, the mailer that you're talking about, what was its

3   contents?  What was it pitching to the people it was being

4   sent to?

5   **A.**   Sure.  It was a -- a floating rate loan product.  And it

6   was sort of enticing because it was a floating rate loan where

7   the first ten years, it was the bank would charge a kind of

8   a -- a spread over 30-day LIBOR, and as a result, it was a

9   pretty low rate.  And so it had a very low monthly payment,

10   which was pretty -- you know, it was a nice thing to talk

11   about and got people's attention.

12          **THE COURT:**  Ms. Jenkins, there are probably people in

13   the jury that don't know what LIBOR is.  Could you tell them,

14   please.

15          **THE WITNESS:**  Yes.  So LIBOR is a -- it's a reference

16   rate that the financial industry uses quite a bit.  And so

17   it's just -- it was a reference rate that the loan was based

18   on.

19   **BY MR. WALSH:**

20   **Q.**   Okay.  There are a lot of terms that you're using in there

21   so let's -- let's just go slow through them because we just

22   want to get everyone on the same page.

23       Was there -- first of all, you're calling this a product.

24   Was there a name for this product?

25   **A.**   It was called the prime first mortgage.

1  **Q.**  Okay.  And let's just talk about mortgages in general.

2  When someone wants to buy a home and they don't have enough

3  money to get a home, what do they do?

4  **A.**  So they would apply for a mortgage with a bank or a credit

5  union, and, you know, throngh the process get the dollars from

6  the bank to have the ability to buy the home.

7  **Q.**  And in this context then it's the -- the bank is lending

8  money to the buy --

9  **A.**  That's correct.

10  **Q.**  What does the bank do in order to make itself feel like

11  it's going to get repaid?

12  **A.**  Sure.  It -- it has an underwriting process to determine

13  how creditworthy a potential borrower might be.

14  **Q.**  And in the specific instance of a mortgage loan, does the

15  bank require a security in something?

16  **A.**  Yes.  So it -- you know, in exchange for extending the

17  mortgage, the -- the house becomes the collateral.

18  **Q.**  Now you indicated -- well, why does a bank do this?  Does

19  the bank make money off of a mortgage --

20  **A.**  Yes.

21  **Q.**  -- loan?

22  **A.**  It charges interest and makes money that way.

23  **Q.**  And that's, to circle back, the interest rate you're

24  talking about that was based on this LIBOR?

25  **A.**  That's correct.

1    **Q.**  In this particular product, you indicated that it was a

2    low interest rate; is that right?

3    **A.**  That's correct.

4    **Q.**  In this context, what does a low interest rate mean to a

5    borrower?

6    **A.**  I mean, it was lower than the prevailing interest rates at

7    the time.  So it was -- I want to say it was something like

8    1.75 percent, which especially now since interest rates are

9    much higher, that sounds very low.  So yes.

10   **Q.**  And for a borrower, a lower interest rate means paying

11   less money to the bank?

12   **A.**  That's correct.

13   **Q.**  Now, you sort of went over this quickly.  Why was it that

14   you decided to use a mortgage as an enticement for developing

15   clients?

16   **A.**  It -- it just -- it was more likely that someone would

17   call us or want to speak to us about a mortgage than to

18   discuss investing with us.  So it was -- it was just an

19   entree.

20   **Q.**  Now, you indicated that you were working with Ben Bolt and

21   Ravi Bhalla.  Was there anyone else on your team at that time

22   in 2014?

23   **A.**  So I had a sales assistant.  Her name was Chris Allschied.

24   And I had a gentleman that worked strictly on the loans.  His

25   name was Ryan Kelty.  And we would refer all of our mortgage

1    business to Ryan.

2        And the reason for that is the bank is this huge, you

3    know, huge organization, and so we wanted to -- it's -- we

4    have a mortgage loan officer to make the experience a little

5    better.  So when you refer business to the -- the bank, they

6    sort of can explain to the client what to expect, you know,

7    and sort of be that main point of contact.

8    **Q.**  Okay.  And that was Ryan Kelty's job?

9    **A.**  Yes, correct.

10   **Q.**  K-E-L-T-Y.

11   **A.**  That's correct.

12   **Q.**  You mentioned, though, a Chris Allscheid.  Is that

13   Christine Allscheid?

14   **A.**  Yes.

15   **Q.**  And A-L-L-S-C-H-E-I-D.

16       What was her position?

17   **A.**  Sure.  Her position was she was my assistant and she just

18   handled money movements.  You know, client had trouble with

19   the website.  Different things like that.

20   **Q.**  All right.  Now, did you, in fact, send out these mailers?

21   **A.**  I did.

22   **Q.**  Just to the Bay Area?

23   **A.**  In this -- just -- that's correct.  I just sent them to

24   the Bay Area.

25   **Q.**  How did you pick the people that were going to get these

1  mailers?

2  **A.**  There was some kind of a public database that we used with

3  people that had existing mortgages, and -- and then we sent it

4  to those people.

5  **Q.**  Did you get any responses?

6  **A.**  We did.  Not as many as I would have hoped, but we did get

7  some.

8          **MR. WALSH:**  Now, Your Honor, I'm about to embark on a

9  larger new topic, and I'm mindful of our time.  I'm happy to

10  go right until the last minute, but it might be a good

11  stopping point as well.

12          **THE COURT:**  That's fine.

13      Members of the jury, you'll see when we go through the

14  trial, when it gets to be just a few minutes away from our

15  normal breaking time, I'll say to the lawyers, "Anytime that's

16  convenient to your outline," meaning I don't want to interrupt

17  them in the middle of something if they've got a topic they

18  want to discuss discretely.

19      It's just exactly five minutes away from our breaking time

20  so it's perfect.

21      I want to thank you for commuting over here to do this.  I

22  want to thank you for your close attention.  I really

23  appreciate your service.  You did it.  You finished your first

24  day of service in a federal criminal case.  Good job.

25      Tomorrow we're going to have a full day.  So get on the

1  road in time to get parking and use the restroom and all that

2  so that we can start right on time at 8:30.

3      Remember my prior admonitions.  You'll hear me say that a

4  lot.  Keep an open mind.  Don't go on the Internet.  Don't

5  communicate with everybody -- with anybody.  Have a restful

6  evening.  See you tomorrow.

7          **THE CLERK:**  Please rise for the jury.

8      (The following proceedings were heard out of the presence

9  of the jury:)

10         **THE COURT:**  Okay.  We're outside the presence of the

11  jurors.  We're still on the record.

12     Ms. Mercado, my Bridge works great.  So I don't know what

13  the problem was before.

14     Do we have anything to discuss before we conclude for the

15  day?  Mr. Walsh?

16         **MR. WALSH:**  I don't believe we do, Your Honor.

17         **THE COURT:**  Mr. Fakhoury?

18         **MR. FAKHOURY:**  No, Your Honor.  Thank you.

19         **THE COURT:**  Terrific.

20     There are some exhibits you all needed me to look at.  If

21  you have those, I'll take them now.  If not, you can provide

22  them to Ms. Lee when she gets back.  Or you can tell me how

23  I'm going to get them.

24         **MR. WALSH:**  Your Honor, we'll just take a moment and

25  give you a couple binders.  I can give them to Ms. Lee or I

```
 1    can do it right now, your choice.

 2            THE COURT:  I'll take them now.  Ms. Lee has always

 3    got other things she needs to be doing.

 4                    (Pause in the proceedings.)

 5            THE COURT:  Ma'am, would you say your last name

 6    again?

 7            THE WITNESS:  Jenkins.

 8            THE COURT:  Oh, it is Jenkins.  Good.  I did it from

 9    memory when I said it before and I thought maybe I got it

10    wrong.  Thank you.

11        Would you hand those to Mr. DeGuglielmo, the gentleman

12    with the fresh haircut and the gray suit right there.

13        All right.  Very good.  We can go off the record.  I'll

14    see everyone tomorrow.  Thank you.

15            MR. WALSH:  See you tomorrow.

16            MR. WALDINGER:  Thank you, Your Honor.

17            THE CLERK:  Court is in recess.

18                    (Off-the-record discussion.)

19            THE COURT:  Am I ready to go?

20        Okay.  Let's go back on the record, please.

21        We're outside the presence of the jury.

22        I just want to confirm with counsel the exhibits that the

23    Court needs to review to provide a ruling with regard to the

24    defendant's hearsay objection.

25        I have the following numbers in mind:  1, 17, 54 through
```

1    71.   That's what I have.

2          **MR. WALSH:**  That's it, Your Honor.

3          **MR. FAKHOURY:**  That's what I have too, Your Honor.

4          **THE COURT:**  Okay.  Thank you, gentlemen.

5    I'll see you tomorrow.

6          **MR. WALSH:**  Thank you.

7          **MR. FAKHOURY:**  Thank you.

8          **THE CLERK:**  Court is in recess.

9            (Proceedings were concluded at 1:30 P.M.)

10

11

12

13                    **CERTIFICATE OF REPORTER**

14

15          I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17   I further certify that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in which this

19   hearing was taken, and further that I am not financially nor

20   otherwise interested in the outcome of the action.

21

22   _____

23   Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24                Tuesday, November 1, 2022

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*