ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

UNITED STATES OF AMERICA,     )     **Jury Trial**
                              )
          Plaintiff,          )     **Volume 3**
                              )
   vs.                        )     NO. CR 20-00266JST
                              )
MICHAEL BRENT ROTHENBERG,     )     Pages 371 - 570
a/k/a MIKE ROTHENBERG,        )
                              )
          Defendant.          )     Oakland, California
_____)     Wednesday, November 2, 2022


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          STEPHANIE M. HINDS, ESQ.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:          Moeel Lah Fakhoury LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612-1427
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1                              <u>I N D E X</u>

2

3
       <u>GOVERNMENT'S WITNESSES</u>                    <u>PAGE</u>      <u>VOL.</u>
4

5     JENKINS, ANNA

6     DIRECT EXAMINATION (RESUMED) BY MR. WALSH     384        3

7     CROSS-EXAMINATION BY MR. FAKHOURY             457        3

8     REDIRECT EXAMINATION BY MR. WALSH             462        3

9

10    KELTY, RYAN

11    DIRECT EXAMINATION BY MR. WALDINGER           466        3

12                          <u>E X H I B I T S</u>

13

14    <u>GOVERNMENT'S EXHIBITS</u>    <u>W/DRAWN</u>      <u>IDEN</u>     <u>EVID</u>     <u>VOL.</u>

15    1, 17                                                 383        3

16    54, 55, 56, 57, 58                                    383        3

17    59, 60, 61, 62, 63                                    383        3

18    64, 65, 66, 67, 68                                    383        3

19    69, 70, AND 98                                        383        3

20    122                                                   510        3

21

22

23                          --o0o--

24

25

```
 1   Wednesday, November 2, 2022                        8:08 a.m.
 2                      P R O C E E D I N G S
 3                          --o0o--
 4       (The following proceedings were heard out of the presence
 5   of the jury:)
 6            THE CLERK:  Your Honor, now calling criminal matter
 7   20-266, United States v. Michael Brent Rothenberg.
 8       If counsel could please come forward and state their
 9   appearances for the record, starting with the government.
10            MR. WALDINGER:  Good morning, Your Honor.  Kyle
11   Waldinger and Nicholas Walsh on behalf of the United States.
12            MR. FAKHOURY:  And good morning, Your Honor.  Hanni
13   Fakhoury on behalf of Mr. Rothenberg who's present.
14            THE COURT:  Good morning, Mr. Fakhoury.  Good
15   morning, Mr. Waldinger and others.
16       What have we to discuss this morning, if anything?
17            MR. WALDINGER:  We are -- will have -- resume with
18   Ms. Anna Jenkins.  We have another witness from Merrill Lynch
19   after that, Your Honor.  And we can fill the day with somebody
20   else if we finish with Mr. Kelty.  That's the second witness.
21            THE COURT:  Terrific.
22       Couple things.  We fill our days.  We fill our days.  So
23   if it gets to be -- we always have to have somebody who's
24   ready to testify.  That's just -- we need to be so respectful
25   of our jurors' time.  They're coming from so far away and
```

1    they're giving up so much of their lives.

2        Second thing.  I should have said this earlier.  I'm not

3    aware of an evidentiary objection that takes more than five

4    words.  If you can think of one, make it.  I'll have to think

5    of what the prize will be.  I'm not aware of one.

6        I don't need explanations generally.  If I need them, I'll

7    ask for them at sidebar.  So, for example, someone would say

8    "hearsay," and they would stop right there.  "Hearsay."

9    "Objection, hearsay."

10       I'll think about it for a second.  If it seems to me like

11   it is hearsay -- well, if it seems to me it's not hearsay,

12   I'll just overrule it.  I don't need to hear from the other

13   side.  If I think it might be hearsay, I'll say to the other

14   side, "Exception?"

15       Also five words.  "Excited utterance, Your Honor."  The

16   "Your Honor" part doesn't count against the five.

17        I'll think about that.  Then we'll move on.

18            **MR. WALDINGER:**  Got it.

19            **THE COURT:**  I'm not big on sidebars.  Jurors aren't

20   either.  It's sort of a youth soccer ref attitude to presiding

21   over a trial.  You know, play on.

22       Okay.  What else do we have to discuss?

23            **MR. FAKHOURY:**  Your Honor, I don't know if

24   Mr. Waldinger had anything else.

25            **MR. WALDINGER:**  I think I'm finished.

1          **MR. FAKHOURY:**   Okay.   There's one issue, and I did

2     raise this with Mr. Waldinger and Mr. Walsh yesterday, and I

3     had a conversation with Mr. Walsh about it this morning.

4          And that is in -- in the government's opening statement,

5     they had made references to money in Fund II being used --

6     showing up in the -- the CMA account and that money was not

7     Mr. Rothenberg's and he had no entitlement to it.

8          And I raised the issue to Mr. Waldinger and Mr. Walsh that

9     I had a little bit of concern because this Court had severed

10    counts one and two specifically because it had determined --

11    and this is reading out of Court's order Docket 101, quote,

12    "The bank fraud described in counts one and two does not

13    involve the misuse or misappropriation of investor funds.  The

14    indictment alleges that Rothenberg used one of the loans

15    described in counts one and two to refinance the mortgage on

16    his condominium, a purpose wholly unrelated to the misuse of

17    investor funds," and it goes on and I know the Court can take

18    a look at its own order.

19         And so I had some concerns that, first, that that

20    potentially may be a variance from the indictment which I'm a

21    little bit convinced that might not be the issue, but rather

22    that that -- the government arguing -- either listening

23    through testimony or arguing to the jury in closing that a

24    false statement was that the funds that Mr. Rothenberg

25    represented were his were not in fact his would be

1    problematic.

2        And that I asked -- and I think that if we were to look at

3    it under Rule 404, it's effectively other criminal acts

4    evidence, and so we would, at a minimum, need a limiting

5    instruction, both before that evidence came in as well as at

6    the end of the -- at the end of the case.

7        And there's a Ninth Circuit model instruction as to both

8    of those.

9        So that was my concern and I wanted to raise it.  I don't

10   think it's going to come up --

11           **THE COURT:**  I'm going to jump in.  What do you want

12   the Court to do right now, if anything?

13           **MR. FAKHOURY:**  Exclude references to that and

14   prohibit the government from arguing that there's

15   misappropriation of investor funds and alternatively give the

16   limiting instruction that I requested.

17           **THE COURT:**  Mr. Waldinger.

18           **MR. WALDINGER:**  The government does not object to a

19   limiting instruction.  The indictment alleges that

20   Mr. Rothenberg misrepresented his assets and liabilities to

21   SVB.  I think one way to prove that is that these -- these

22   were his liabilities that he didn't disclose and the thing

23   that he said were his assets were not his assets.

24        I understand that he's not on a trial for misappropriating

25   investor funds, and so we're okay with a limiting instruction

1    on that.  But I think we should be able to prove that he

2    misrepresented his assets and liabilities.

3         THE COURT:  I'll have the parties meet and confer

4    about a limiting instruction and provide one by tomorrow

5    morning at 8:00 a.m.

6         MR. WALDINGER:  Very good, Your Honor.

7         THE COURT:  Mr. Fakhoury, you're reminding me of

8    something in your reference to opening statements.

9       Do I correctly recall that you told the jury that your --

10   it was important to do X and Y when someone's liberty was at

11   stake?

12        MR. FAKHOURY:  I did, Your Honor.

13        THE COURT:  Is it possible that that was an

14   inappropriate reference to punishment?

15        MR. FAKHOURY:  I don't believe it was.  If the Court

16   took it that way, I apologize.

17        THE COURT:  Well, I don't need apologies.  I'm just

18   trying to follow the law.

19        MR. FAKHOURY:  Absolutely.

20        THE COURT:  Well, I kicked the dog and no one's made

21   any objection so I'll just leave it there.

22        MR. WALDINGER:  I don't like to object during

23   openings and closing, Your Honor.  And but I appreciate the

24   Court's comment.

25        THE COURT:  Well, I don't -- I mean, I think I'm -- I

1    think I'm going to instruct the jury that they're not to think

2    about punishment.

3        Let me just say this.  Notwithstanding whatever I'm

4    hearing or not hearing from the government, I think it was

5    inappropriate.  And unless you want to cite me authority to

6    the contrary, Mr. Fakhoury, I'm putting you on notice that if

7    you do it again, I'll say something about it in front of the

8    jury.

9            **MR. FAKHOURY:**  Understood, Your Honor.

10           **THE COURT:**  Thank you.

11       What else do we have?  I think that's it.

12           **MR. WALSH:**  Your Honor, I do propose, given Your

13   Honor's ruling yesterday to do a bulk admission at the

14   beginning, just so you know what's coming.

15           **THE COURT:**  I see.  Fair enough.

16           **MR. WALDINGER:**  Your Honor, I do have a question.

17           **THE COURT:**  Yeah.

18           **MR. WALDINGER:**  I think I know the answer, but I was

19   unable to Google this.  We have a witness that we were

20   thinking of putting on this week who has tested positive for

21   COVID.  I think we're in a -- is it five days after the last

22   positive test that somebody can come into the courthouse?

23           **THE COURT:**  That's a different federal agency from

24   me.  I'm just a judge.

25           **MR. WALDINGER:**  Okay.  What's -- what is the rule in

1    this courtroom?

2           **THE COURT:**  The rule in this courtroom is to figure

3    out what that -- what guidance that federal agency is

4    currently providing --

5           **MR. WALDINGER:**  Okay.

6           **THE COURT:**  -- which is the Center for Disease

7    Control.  I just -- I do whatever the CDC says --

8           **MR. WALDINGER:**  Okay.

9           **THE COURT:**  -- period.  Because that -- it just

10   happens to be the most available, best expertise.  And some

11   people agree with it and some people don't, but I need to have

12   a touchstone so that's what I do.

13          **MR. WALDINGER:**  Very good.

14          **THE COURT:**  I would say that that is not the first

15   time that something like that has happened in my court since

16   we've been trying cases post -- no, I wish it was post COVID,

17   it's not post COVID -- during the pandemic.

18       And an answer has been to have the witness testify

19   remotely.  And I even had a circumstance where a lawyer was

20   exposed to COVID.  The witness could not travel to California.

21   And both the lawyer and the witness appeared on screen.

22       And I would say every instance of remote testimony that

23   I've had so far has gone very well.  And I thought that I

24   would miss, because I'm the closest person to the witness,

25   that I would miss something about demeanor and that sort of

1    thing, but it actually is the opposite.  Because the camera

2    goes directly onto the witness and everybody is virtually

3    physically very close to the witness.

4         So why don't you talk about that.

5              **MR. WALDINGER:**  Okay.

6              **THE COURT:**  It may be that Mr. Fakhoury wants to

7    interpose an objection to that.  I don't know.

8         But if CDC guidance would otherwise -- if following CDC

9    would otherwise prevent that witness from coming physically

10   into the courtroom, then I would invite the parties to take a

11   look at virtual testimony.

12             **MR. WALDINGER:**  Very good.  I'll look and see what

13   the CDC guidance is.  It could be based on the Court's trial

14   schedule and this witness's particular circumstances, we'll be

15   okay by next week.  We'll just have to see.

16             **THE COURT:**  Okay.  It's just a fact of trial life

17   now.  And I sort of bragged to the jury that none of my jurors

18   had ever gotten COVID, and really I am taking these

19   precautions, but there's a lot of luck in there, too.  So....

20             **MR. WALDINGER:**  Yep.

21             **THE COURT:**  Yes.  Okay.

22        I'm excited for today.  Am I allowed to share that?  I

23   just -- when you get into that phase of trial where you're

24   just taking evidence and you're not doing all the other stuff,

25   I just always enjoy that.

1          Gentlemen, what else can I do for you?

2               **MR. WALDINGER:**  That's it from the government, Your

3     Honor.

4               **THE COURT:**  Mr. Fakhoury.

5               **MR. FAKHOURY:**  Nothing further, Your Honor.

6               **THE COURT:**  Okay.  Very good.

7               **THE CLERK:**  Court is in recess.

8          (Recess taken at 8:16 A.M.; proceedings resumed at

9     8:36 A.M.)

10         (The following proceedings were heard in the presence of

11    the jury:)

12              **THE CLERK:**  You may be seated.

13              **THE COURT:**  Good morning.

14              **JURORS:**  Good morning.

15              **THE COURT:**  Oh, it's a quiet bunch, but that's okay.

16    I won't have a do-over.

17         Isn't the air wonderful today?  That's what happens after

18    we've had a little rain.  The air is so clear, and so that

19    fall light is very clean and the air is very clean.  It's a

20    nice way to start our day.

21         We are going to have a day full of evidence today.  We did

22    all those other things so now we can just get on to the

23    business of taking evidence.

24         When we broke yesterday -- oh, let me say one other thing

25    before we start.

 1          You'll remember my admonition that you're not to talk to

 2     anybody about the case or go on the Internet and look it up,

 3     et cetera.

 4          Well, of course the lawyers and the parties are very aware

 5     of this admonition.  So if they see you, they are not going to

 6     come up to you and say good morning.  In fact, they're not

 7     going to come up to you at all.  They're going to turn around

 8     and run the other way.

 9          And why are they doing that?  Because they know that if

10     one side sees the other side talking to a juror, it just

11     doesn't look good.  And the other side will wonder, hey,

12     what's going on there.

13          And, also, they are just so mindful of the Court's orders.

14     So please don't be offended if the lawyers or the paralegals

15     or Mr. Rothenberg or the case agent or even people in the

16     public turn the other way and walk away.  They're just trying

17     to follow the Court's orders.

18          Okay.  When we broke yesterday, Ms. Jenkins was on the

19     stand.

20          And, Mr. Walsh, will she be resuming her testimony?

21          **MR. WALSH:**  She will, Your Honor.  Although before I

22     bring her back to the stand, I wonder if I might, pursuant to

23     our earlier discussions, offer some evidence and then we can

24     resume with her direct testimony.

25          **THE COURT:**  All right.

1          **MR. WALSH:**  At this time, the United States offers by

2     agreement Exhibit 98 in evidence.

3          **THE COURT:**  Why don't you just give me a list of all

4     the numbers, and then I'll find out from Mr. Fakhoury whether

5     there's an objection.

6          **MR. WALSH:**  Certainly.

7        One, 17, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65,

8     66, 67, 68, 69, 70, and then 98 which we have started with.

9          **THE COURT:**  Mr. Fakhoury, in the light of the Court's

10    prior rulings, does the defendant have any objection?

11         **MR. FAKHOURY:**  No further objections, Your Honor.

12         **THE COURT:**  Those documents are admitted into

13    evidence.

14         **THE CLERK:**  Yes, sir.

15       (Government's Exhibits 1, 17, 54, 55, 56, 57, 58, 59, 60,

16    61, 62, 63, 64, 65, 66, 67, 68, 69, 70, and 98 received in

17    evidence.)

18         **MR. WALSH:**  Thank you, Your Honor.

19       At this time I would resume --

20                    (Off-the-record discussion.)

21         **MR. WALSH:**   -- call Anna Jenkins again.

22         **THE COURT:**  Very good.

23       Good morning, Ms. Jenkins.

24         **THE WITNESS:**  Good morning.

25         **THE COURT:**  I'm going to ask you to come back up to

```
 1    the witness stand.  Oh, look, you already have a clear mask

 2    on.  And I'll just remind you that you're still under oath.

 3              THE WITNESS:  Okay.

 4              THE CLERK:  Good morning.

 5              THE WITNESS:  Good morning.

 6              THE COURT:  Mr. Walsh, you can proceed whenever

 7    Ms. Jenkins has retaken the stand.

 8              MR. WALSH:  Thank you, Your Honor.

 9                        ANNA JENKINS,

10    called as a witness for the plaintiff, having been previously

11    duly sworn, continued testifying as follows:

12                  DIRECT EXAMINATION (Resumed)

13    BY MR. WALSH:

14    Q.  Comfortable?

15    A.  Yes, thanks.

16    Q.  You'll recall at the end of yesterday, we had -- or you

17    had just told the jury about sending out mailers to the

18    Bay Area?

19    A.  Yes.

20    Q.  And that was to acquire new clients in the Bay Area?

21    A.  Correct.

22    Q.  Did someone by the name of Michael Rothenberg respond to

23    your fliers?

24    A.  He emailed me.

25    Q.  Okay.  Now who is Michael Rothenberg?
```

1    **A.**   Well, at the time, he was a young successful venture

2    capitalist.

3    **Q.**   And did he eventually over the course of this time become

4    your client?

5    **A.**   Yes.

6    **Q.**   What else did you learn about him?

7    **A.**   Well, his auto signature had Stanford and Harvard on it.

8    So he's obviously well-educated.  And we learned that he

9    operated his own business.  And he was interested in acquiring

10   a mortgage with us.  Or at least discussing a mortgage with

11   us.

12   **Q.**   Now, you mentioned that he is a venture capitalist.  What

13   does that mean?

14   **A.**   It's a person who invests in startup companies.

15   **Q.**   All right.  So you indicated that you received an email

16   from him; is that right?

17   **A.**   Yes.

18   **Q.**   I'd like to show you what's been marked Exhibit 54.

19          **MR. WALSH:**   It's in evidence, Your Honor.

20          **THE COURT:**   Counsel may -- you don't have to do this,

21   but once a document is in evidence and not before that time,

22   you can display any exhibit on the evidence presentation

23   system without leave of Court.

24          **MR. WALSH:**   Thank you, Your Honor.

25                   (Exhibit published.)

1    **BY MR. WALSH:**

2    **Q.**   Now, this is our first piece of evidence, Ms. Jenkins.  So

3    behind you, as well, there are binders with physical copies of

4    these exhibits.  If you feel more comfortable looking at

5    those, just let me know.

6    **A.**   Okay.

7    **Q.**   But we can also use these on the screen as well.

8    **A.**   Okay.

9    **Q.**   Now, do you recognize this item?

10   **A.**   I do.

11   **Q.**   What is it?

12   **A.**   It looks like it is my response to Mike and his assistant,

13   Nellie, and I'm asking -- I'm confirming a time for us to

14   speak.

15   **Q.**   Okay.  On a much more basic level, is this an email chain?

16   **A.**   Yes.

17   **Q.**   All right.  And so in email chains, do they kind of go

18   from reverse chronological order?

19   **A.**   Yes, correct.

20   **Q.**   So in order to get the first email in this exhibit, we'd

21   have to go to the last page?

22   **A.**   Yes.

23            **MR. WALSH:**  Could we have it page 3, please.

24                     (Exhibit published.)

25   / / /

1   BY MR. WALSH:

2   Q.   All right.  Now that we're on Exhibit 54, page 3 --

3           MR. WALSH:   And forgive me, Your Honor.

4       Can all the jurors see?  This is our first exhibit so --

5           JURORS:   Yes.

6           MR. WALSH:   Yes.  So everyone can see?

7                       (Jurors nodding.)

8           MR. WALSH:   Okay, great.

9           MR. FAKHOURY:   We have a hand, Your Honor.

10          THE COURT:   Oh, yes?

11          JUROR:   When he zooms in, I can definitely read it,

12  but it's not within --

13          THE COURT:   I beg your pardon, sir.  I didn't hear

14  the last.  I heard you say when he zoom in, you can read it,

15  but...?

16          JUROR:   When it's not zoomed in, I cannot read it.

17          THE COURT:   I see.  Okay.  All right.

18      Thank you.

19          MR. WALSH:   All right.  Thank you for that

20  information.  We'll try and zoom as much as possible.

21  Q.   Now, do you recognize this email that's been zoomed in

22  here?

23  A.   Yes.

24  Q.   Okay.  And what is the date of that email?

25  A.   March 31st, 2014.

1    **Q.**  And what time was it sent?

2    **A.**  12:00 a.m.

3    **Q.**  Okay.  Now, unfortunately, if we could dezoom and go to

4    page 2 very briefly --

5                        (Exhibit published.)

6              **MR. WALSH:**  Is it page 2?  Okay.  Never mind.  We'll

7    go back to the first page.  I apologize.  Or page 3.  I

8    apologize.

9                        (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  And from whom and to whom is this sent?

12   **A.**  Sure.  This is sent from Mike to me.

13   **Q.**  And what was -- and when you say Mike, it's Michael

14   Rothenberg?

15   **A.**  Yes.

16   **Q.**  What was he asking you in this email?

17   **A.**  Sure.  Well, he indicated that he received my letter,

18   which was the goal that I was hoping for is to get responses

19   to my letter.  And he's just asking a little bit more about

20   what we require to move forward with a mortgage with us.

21   **Q.**  And in particular, what three things was he looking for?

22   **A.**  What documentation do we need, what are our underwriting

23   criteria, and how long we take to make a decision.

24   **Q.**  Now, he also indicates that he cc'd someone to this email.

25   Do you see that there on the last line?

1    **A.**   Yes.

2    **Q.**   Who is that?

3    **A.**   Nellie.  And at the time, that was his assistant.

4          **MR. WALSH:**  If we could now turn to page 2 of

5    Exhibit 54.

6                    (Exhibit published.)

7    **BY MR. WALSH:**

8    **Q.**   And at the bottom half of that page there, is there an

9    additional email that was sent in this chain?

10   **A.**   Yes.  So Nellie is sending -- there was an email from

11   Nellie to me asking me to schedule a time to speak with Mike

12   in this case, which was that Thursday at 3:00 p.m.

13   **Q.**   And what was the date and time of this email?

14   **A.**   Same day, Monday, March 31st, 2014.

15   **Q.**   At what time?

16   **A.**   10:44 a.m.

17   **Q.**   Okay.  Did you respond to these emails?

18   **A.**   I did.  This was exactly the kind of thing I was hoping

19   for.

20          **MR. WALSH:**  If we go to page 1 of Exhibit 54 then,

21   please.

22                    (Exhibit published.)

23   **BY MR. WALSH:**

24   **Q.**   And if you could just do the signature -- or the header

25   block first.

1    **A.**   Sure.  So I am sending an email to Nellie and Mike, and

2    I'm responding yes for the time to speak as well as the

3    answers to his questions.

4    **Q.**   And what is the date and time of this email?

5    **A.**   It's also Monday, March 31st, 2014.

6    **Q.**   Okay.

7              **MR. WALSH:**   Now, if we can blow up the substance or

8    the content here, please.

9                           (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**   Did you respond to those questions that Mr. Rothenberg

12   asked you?

13   **A.**   I did.

14   **Q.**   Okay.  First, you've got something here labeled

15   "Documentation."  What does that mean in this context, in the

16   context of a mortgage application?

17   **A.**   Sure.  Usually when we start to speak with someone and get

18   to know them better, we want to see some more details about

19   their net worth.  In this case, tax returns, business returns

20   if they're self-employed, and sometimes depending on the

21   property, maybe there's an HOA or something like that we need

22   to get comfortable with.

23   **Q.**   What's an HOA?

24   **A.**   Homeowners association.  So what's allowed as part of the

25   homeowners association of a condo.

1    **Q.**  All right.  And so for that heading of documentation, what

2    did you tell him that you needed from him?

3    **A.**  Two years of tax returns.  And if he's self-employed,

4    business returns.  And then once we get to know him a little

5    bit better, there might be more things we need to know.

6    **Q.**  The second item there is "Underwriting Criteria."  Do you

7    see that?

8    **A.**  Yes.

9    **Q.**  What is underwriting criteria in this context?

10   **A.**  Yeah.  That really just has to do with what is the

11   decision-making process to -- that the -- that the bank goes

12   through to get comfortable making the loan.

13   **Q.**  And in this instance, did you respond to him about what

14   the underwriting criteria were?

15   **A.**  Yeah.  I mean really income is the beginning of any

16   underwriting is -- that's the most important thing to know

17   about.  But we also need to get to know his situation better.

18   **Q.**  And then last, there's a heading here "Decision

19   Turnaround."  In this context, what does that mean?

20   **A.**  Yeah.  Well, in response to his question, you know, how

21   quickly would we need to make a decision on moving forward

22   with the loan or discussing a loan, it really just depends on

23   how complex someone's income situation is.

24        So sometimes if it's a person with a really

25   straightforward situation with W-2 income, it's a really quick

```
 1    decision.  But sometimes if they have income from many

 2    sources, it takes a few more days.

 3    Q.  And again, I assume most jurors know this, but a W-2

 4    income, in this context, what do you mean by that?

 5    A.  Just a -- person that collects wages.

 6    Q.  Okay.  And W-2 is a reference to a IRS --

 7                  (Simultaneous colloquy.)

 8          THE WITNESS:  Yes, correct.  Correct.

 9    BY MR. WALSH:

10    Q.  So you sent this email.  And then it looks like you

11    confirmed this Thursday phone call?

12    A.  Yes.

13    Q.  Did you have that Thursday phone call?

14    A.  I assume we did because we embarked on a further

15    conversation.  But I do not recall the phone call.

16    Q.  In an introductory phone call like that, what is your

17    general practice of what you talk about in that call?

18          MR. FAKHOURY:  Objection, hearsay.

19          THE COURT:  Overruled.

20          THE WITNESS:  We would just typically, you know, get

21    to know the person a little bit better, introduce ourselves,

22    explain a little bit more about how we work with the bank, you

23    know, that we're a brokerage, the brokerage arm of the bank,

24    we're referring mortgages to the bank.  And then also just get

25    to know the prospective client better.
```

1    BY MR. WALSH:

2    Q.   And because some of this is the bank and brokerage we

3    talked about yesterday, the brokerage is what?

4    A.   Merrill Lynch.

5    Q.   And when you're saying "the bank," in this context what do

6    you mean?

7    A.   Bank of America.

8    Q.   Because Bank of America is the actual entity that would do

9    a mortgage?

10   A.   Correct.

11   Q.   Now, did you actually, over the course of your time

12   dealing with Mr. Rothenberg, did you ever actually meet him?

13   A.   No.

14   Q.   And about how many times over the course of your dealings

15   with him did you speak to him on the phone?

16   A.   Only a handful.

17   Q.   How was your principal means of communication then?

18   A.   Mostly email.

19   Q.   Did you ever end up speaking with his assistant Nellie

20   Sisty, S-I-S-T-Y?

21   A.   I don't know that we ever spoke.

22   Q.   Okay.  Now, as time moved forward here in 2014, in June of

23   2014, did Mr. Rothenberg end up setting up some accounts with

24   Merrill Lynch?

25   A.   He did.

JENKINS - DIRECT / WALSH

1    **Q.**  What kind of accounts did he end up setting up?

2    **A.**  He set up a Cash Management Account and a Loan Management

3    Account.

4    **Q.**  Okay.  Let's talk about those.  Before we go into

5    Mr. Rothenberg's particular circumstances, let's just talk

6    about those two types of accounts.  Starting first with the

7    Cash Management Account, is that sometimes called CMA?

8    **A.**  Correct.

9    **Q.**  What is a CMA?

10   **A.**  It's Merrill's standard brokerage account.  So you can

11   put -- you can hold cash in the account.  You can hold stocks,

12   bonds, other investments.  It's just the boilerplate brokerage

13   account.

14   **Q.**  And what is its purpose?

15   **A.**  To hold investments.

16   **Q.**  And are investments made from that account and then put

17   into that account?

18   **A.**  Yeah, oh, correct.  Yes.  You implement -- you would use

19   that account to implement investments in.

20   **Q.**  How does -- or does Merrill Lynch make any money off of

21   having a Cash Management Account?

22   **A.**  I mean ideally, that's how I make a living.  So, yes, you

23   know, making recommendations to make investments in those

24   accounts is -- is, you know, how we make a living.

25   **Q.**  Does Merrill Lynch provide any interest to the person who

1   is putting money into the Cash Management Account?

2   **A.**   Yes.   There is a -- you can put your money into a couple

3   different money market products that are going to pay you a

4   small -- you know, not -- I don't want to say small, but it

5   will pay an interest rate to the holder of the account.

6   **Q.**   All right.   Now the second type of account that we were --

7   heard about is a Loan Management Account?

8   **A.**   Correct.

9   **Q.**   Also known as an LMA?

10  **A.**   Correct.

11  **Q.**   What is a Loan Management Account?

12  **A.**   So what that is, is it's a loan that uses a CMA account as

13  collateral.   And so it's a -- it's a -- what you call a

14  securities-based loan.   But it -- it's basically just a -- a

15  very simple account -- it's a loan using a CMA as collateral.

16  **Q.**   Okay.   You've used the term "collateral."   What does

17  collateral mean?

18  **A.**   Sure.   So it's a borrower needs to pledge property as

19  terms of their loan.

20  **Q.**   Now, the LMA loan that you're talking about, is that a

21  loan -- who is that a loan between?

22  **A.**   Sure.   It's a loan between Merrill and the client.

23  **Q.**   Is it a private loan, then?

24  **A.**   Yes.

25  **Q.**   Why would -- and when that loan is out, does Merrill Lynch

JENKINS - DIRECT / **WALSH**

1    charge interest for the loan?

2    **A.**  We do.

3    **Q.**  Is that interest -- how is that interest determined?

4    **A.**  Sure.  Well, our friend LIBOR is back in the conversation.

5    But it's -- I'll bring up LIBOR again.  But it's just -- it's

6    a -- it's a loan and it's a -- Merrill will charge its profit

7    spread over a 30-day LIBOR.  And depending on the net worth

8    and values of the client -- client's account, that determines

9    on how much we charge.

10   **Q.**  And I know you told us yesterday, but what is LIBOR again?

11   **A.**  Sure.  It's a -- it's a -- it's an -- it's a reference

12   rate.

13   **Q.**  And so the bank charges some on top of that LIBOR rate?

14   **A.**  Correct.

15   **Q.**  Now, can that Loan Management Account -- how does the loan

16   get drawn on or used in an LMA?

17   **A.**  It's very streamlined.  A client would just call my

18   assistant and draw -- make a draw on the account and draw

19   dollars out of the account.

20   **Q.**  Is there -- and can they repay it as well?

21   **A.**  Yes.

22   **Q.**  How do they do that?

23   **A.**  Just transfer dollars back into the brokerage account and

24   then have the dollars moved over.

25   **Q.**  Is there a relationship between the amount of loan that

 1    you can take out in an LMA as compared to the CMA collateral?

 2    **A.**   Yeah.  So depending on your collateral, it depends on the

 3    advance rate that we're willing to give you on the loan.  So

 4    if you have very conservative collateral, we'll give you a

 5    high release rate.  If you have a little more risky, you know,

 6    collateral, maybe a single stop position or -- or something

 7    like that, we'll give you less.  Or we're willing to advance

 8    less.

 9    **Q.**   So what is the lowest amount that could be taken out at

10    this, what you're calling the release --

11                        (Simultaneous colloquy.)

12          **THE WITNESS:**   Sure.  Well, the minimum size for an

13    LMA is a hundred thousand dollars.

14    **BY MR. WALSH:**

15    **Q.**   And but for the release rate, the amount of that loan that

16    can be taken out as compared to the collateral, what's the --

17    is there -- is it done by percentages?

18    **A.**   Yes.

19    **Q.**   What is the lowest amount that is generally allowed?

20    **A.**   So the most conservative LMA, kind of --

21    **Q.**   Or how about the least conserva- -- well, either way.  You

22    pick.

23                        (Simultaneous colloquy.)

24          **THE WITNESS:**   I would say anywhere between 50 to

25    60 percent up to 95 percent.

JENKINS - DIRECT / WALSH

1    **BY MR. WALSH:**

2    **Q.**   What is the most conservative type of CMA?

3    **A.**   Something that's in cash or cash equivalents.

4    **Q.**   And so something that was a hundred percent cash would

5    have that 95 percent withdrawal rate that you were talking

6    about?

7    **A.**   Yes.  Most likely, yes.

8    **Q.**   And I said withdrawal date [sic], but it's actually

9    release rate?

10   **A.**   Correct.

11   **Q.**   Now, for -- why would someone want an LMA?

12   **A.**   Well, there's a lot of reasons that it's convenient for

13   people to use.  So couple things.  It's really easy to set up.

14   Just takes about a day to set up.  As long as you have a

15   brokerage account with us and you're in good standing, there's

16   a good collateral on the account.  It's a private loan between

17   you and Merrill so it doesn't show up on your credit reports.

18       A client doesn't have to sell investments out of the

19   account to potentially incur taxes.  So maybe they have gains

20   in their account and they don't want to pay capital gains

21   taxes.

22       And then finally, for me, it's -- I have a win because my

23   client isn't liquidating the account and they don't -- they

24   get to remain my client instead of liquidating their account

25   and paying for that beach house or whatever they want to do.

JENKINS - DIRECT / WALSH

1    **Q.** You said something about taxes and not wanting to

2    liquidate a stock.  Where is that stock held again?

3    **A.** At Merrill.

4    **Q.** And is it in the CMA?

5    **A.** Correct.

6    **Q.** And this may be obvious to everyone, but what do you

7    exactly mean by that?

8    **A.** Well, just, you know, you wouldn't want -- so say you've

9    held a stock for this past decade and it's increased in value

10   quite a bit so you wouldn't want to have to sell it and incur

11   capital gains taxes.

12   **Q.** And so you would then use the LMA money for whatever

13   purposes you want?

14   **A.** Correct.

15   **Q.** If -- now here's a question.  Is the interest rate that

16   Merrill Lynch pays on a CMA account higher or lower than what

17   the borrower is required to pay Merrill Lynch on the LMA?

18   **A.** I mean, it's typically going to be lower.

19   **Q.** And so is it common to have a CMA have exclusively cash in

20   it when there's an LMA being used?

21   **A.** I would say it's not typical, but I've seen it before.

22   **Q.** And what would be the purpose of that?

23   **A.** I don't know.  You know, people have their own reasons for

24   doing things and being liquid.  I mean on the face of it,

25   sometimes decisions aren't always something that I'm

 1    completely comfortable -- or that know about, but maybe a

 2    person just wants to be very liquid.

 3    **Q.**   Okay.  And in this context, what does "liquid" mean?

 4    **A.**   Just have a very -- their net worth callable quickly

 5    within a day's notice.  Or available quickly within a day's

 6    notice.

 7    **Q.**   Now, you indicated one of the benefits of setting up an

 8    LMA is it's easy to do?

 9    **A.**   Yes.

10    **Q.**   And you also indicated that it doesn't show up on your

11    credit report.  What's a credit report?

12    **A.**   So really your -- your record as a borrower.  So all tied

13    to your Social Security number, all of your borrowings,

14    whether it's credit cards or mortgages or really anything.

15    **Q.**   Why doesn't it show up on a credit report?

16    **A.**   Because it's a -- a private loan between you and Merrill,

17    and we're -- we're comfortable -- if you have your collateral

18    pledged to us, we're comfortable giving you an advance on

19    that.  And we'll call it if you're not adhering to the terms

20    of the loan, paying it back on time or paying your interest

21    payments on time.  But it's a -- it's a very -- it's a

22    no-brainer, I think, for Merrill.

23    **Q.**   Do you tell your clients that it doesn't appear on the

24    credit report?

25          **MR. FAKHOURY:**  Objection.  Hearsay.

1    **THE COURT:**  Overruled.

2       Members of the jury, the question is not whether the

3    witness told Mr. Rothenberg that.  The question is what her

4    general practice is.

5          **THE WITNESS:**  I'm pretty upfront about things.  So,

6    yes, I would have brought it up when someone's setting up an

7    account.

8          **THE COURT:**  Just for the record, I think it

9    wouldn't -- even -- even were the question posed with regard

10   to the defendant, it would not be offered for the truth and

11   the objection would still be overruled.

12      Go ahead.

13   **BY MR. WALSH:**

14   **Q.**  Do you have a recollection of telling Mr. Rothenberg that?

15   **A.**  I do not.

16   **Q.**  Now, there's one more item that might -- that I think you

17   maybe left out of your list of why a person might open up a

18   CMA and LMA.  Is there some sort of a discount on mortgages

19   that is offered as well?

20   **A.**  Oh, yes, and that's the most important thing in this

21   context of, you know, trying to get new business through

22   mortgages.  But, yes.  So Merrill will offer -- or we will --

23   B of A will offer discounts for Merrill clients as an

24   incentive to do their mortgage business with Bank of America.

25   **Q.**  And when you say a discount, what is the discount in this

```
 1    context?

 2    A.   Just a discount off of your mortgage rate.

 3    Q.   And, again, mortgage rate means the interest rate?

 4    A.   Oh, the interest rate paid on your mortgage.

 5    Q.   Now, having spent some time explaining what a CMA and an

 6    LMA are, are you aware of whether or not Mr. Rothenberg did in

 7    fact open up a CMA and an LMA?

 8    A.   He did.

 9    Q.   And that was in June of 2014?

10    A.   Correct.

11    Q.   Were you the principal person that help set those accounts

12    up for Mr. Rothenberg?

13    A.   I was not.

14    Q.   Who was that person?

15    A.   Ryan Kelty and Chris Allscheid did it.

16    Q.   And, again, it was yesterday.  Who is Ryan Kelty?

17    A.   Ryan Kelty was the mortgage loan officer on the account.

18    Q.   And who is Christine or Chris Allscheid?

19    A.   She was my sales assistant.

20    Q.   And the two of them would have set it up.

21         All right.  Now, as a result of setting up those accounts,

22    does Merrill Lynch end up generating documents?

23    A.   Yes.

24    Q.   And is there an application for each of those types of

25    loans -- accounts, rather?
```

1    A.    Yes.

2    Q.    I'd like to show you what's in evidence at Exhibit 76.

3          MR. WALSH:    And in particular I'd like to start on

4    page 9, please.

5          Let's blow that up, please.

6                          (Exhibit published.)

7    BY MR. WALSH:

8    Q.    Let's start first with the CMA.  Do you recognize this

9    document?

10   A.    Yes.

11   Q.    What is this document?

12   A.    So this is our new account agreement for establishing a

13   CMA account.

14   Q.    And if we could -- does it have various sort of general

15   information about the applicant there?

16   A.    Yes.

17   Q.    And the client information in the header there?

18   A.    Correct.

19   Q.    Who is this application for?

20   A.    Michael Rothenberg.

21   Q.    When blown up, it doesn't do such a good job unfortunately

22   but --

23                          (Exhibit published.)

24   BY MR. WALSH:

25   Q.    -- does it give his address as well?

JENKINS - DIRECT / WALSH

1    **A.**   Yes.

2    **Q.**   Is that his condominium 712 Bryant Street in

3    San Francisco?

4    **A.**   Yes.

5    **Q.**   Now up in the right-hand corner there, there seems to be

6    some hand-filled-out items.  What are those?

7    **A.**   Well, we're discouraged from writing in a client's date of

8    birth, Social Security Number, so we ask a client to do that

9    themselves.

10   **Q.**   And is that -- so those are the -- the ones with the

11   little asterisks next to them?

12   **A.**   Yeah.  I mean although I didn't generate this form or have

13   him sign it, I'm sure that Chris would have put an asterisk,

14   having him put in his date of birth and his Social Security

15   Number.

16   **Q.**   And there's a box in the very upper right-hand corner.

17   What's that?

18   **A.**   It appears to be an internal use -- some internal numbers

19   and it -- the right side would be the pool number, which is

20   just the number that Ryan -- or that Ben and I shared, our

21   business -- where we shared our business together.  And then

22   the other part of it looks like an account number.

23   **Q.**   All right.

24   **A.**   That's -- that's X'd out -- or that's blanked out.

25   **Q.**   Okay.

 1           **MR. WALSH:**  So -- and, Your Honor, if I may, I

 2   just --

 3      Members of the jury, various things have been redacted

 4   here for privacy purposes.  So if you see those redacted

 5   boxes, those are not in the original.

 6           **THE COURT:**  Members of the jury, I'll instruct you

 7   that very often, in all kinds of trials, when there's document

 8   evidence, portions of the documents might either be whited out

 9   or blacked out.  Those are just called redactions.  Those of

10   you who have had any contact with the legal system may have

11   seen things like that before.

12      When they're redacted, it's usually by agreement of the

13   parties.  And it's for one of two reasons.  The information

14   there is private or confidential to somebody, or it's just

15   totally irrelevant.  And so putting it in front of you would

16   just waste your time and make it harder for you to make a

17   decision.

18      In either event, you shouldn't speculate about why

19   something is redacted or really pay it any mind because it's

20   not relevant to whatever decision you need to make.

21      Thanks.

22           **MR. WALSH:**  Thank you, Your Honor.

23      Now, this document, it's not just a one-page document.  If

24   we could go to page 10, please.

25                      (Exhibit published.)

```
 1    BY MR. WALSH:

 2    Q.   And at the bottom of page 10 there, is --

 3              MR. WALSH:   If we could blow that up.

 4                        (Exhibit published.)

 5    BY MR. WALSH:

 6    Q.   Is there a signature there?

 7    A.   Yes.

 8    Q.   Whose signature is that?

 9    A.   Mike Rothenberg's.

10    Q.   And is there a date of that signature?

11    A.   June 18th, 2014.

12    Q.   Thank you.

13              MR. WALSH:   If we could then go to page -- the next

14    page, please.

15         And here, if you could again blow up just the top part

16    here.

17                        (Exhibit published.)

18    BY MR. WALSH:

19    Q.   Do you recognize this document?

20    A.   Yes.

21    Q.   Is that the same form that we were just looking at?

22    A.   Yes.

23              MR. WALSH:   If we could go up to the highlighted

24    yellow, the internal use box area there.

25                        (Exhibit published.)
```

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

 1          THE WITNESS:  Yes.

 2   BY MR. WALSH:

 3   Q.  That's different than page 9 that we were just looking at;

 4   is that right?

 5   A.  Yeah.  So it looks like two numbers are crossed out.

 6   Q.  Does it look -- do you have an explanation?  Does that

 7   look like they're transposed?

 8   A.  That's what it appears to be, that two numbers were

 9   flipped.

10   Q.  Got it.  So the last four of this actual CMA account are

11   what numbers?

12   A.  Five, two.

13   Q.  Six, zero --

14                  (Simultaneous colloquy.)

15          THE WITNESS:  Yeah, 6052.

16   BY MR. WALSH:

17   Q.  Okay.  Now, once that's done, is there some sort of

18   internal processing that occurs at Merrill Lynch?

19   A.  Yes.

20          MR. WALSH:  I'd ask that we turn to page 1 of

21   Exhibit 76, please.

22                  (Exhibit published.)

23   BY MR. WALSH:

24   Q.  Do you recognize what's on the first page here of

25   Exhibit 76?

JENKINS - DIRECT / WALSH

1   **A.**   Yes.  This appears to be our internal sort of screens when

2   we establish a new relationship.

3   **Q.**   Okay.  So this is a paper printout of an internal computer

4   screen?

5   **A.**   Yes.

6   **Q.**   So this is a program that Merrill Lynch uses?

7   **A.**   Yes.

8   **Q.**   And is this the -- what's filled out for Merrill Lynch to

9   open up the CMA account?

10  **A.**   Yes.

11          **MR. WALSH:**  If we could dezoom.

12  **Q.**   And that's also a page or two there?

13          **MR. WALSH:**  Please.

14                      (Exhibit published.)

15  **BY MR. WALSH:**

16  **Q.**   So that's page 1, page 2.

17                      (Exhibit published.)

18  **BY MR. WALSH:**

19  **Q.**   Page 3.

20                      (Exhibit published.)

21          **THE WITNESS:**  Yes.

22  **BY MR. WALSH:**

23  **Q.**   Page 4.

24                      (Exhibit published.)

25  / / /

```
 1    BY MR. WALSH:

 2    Q.   Page 5.

 3                        (Exhibit published.)

 4    BY MR. WALSH:

 5    Q.   Page 6.

 6                        (Exhibit published.)

 7    BY MR. WALSH:

 8    Q.   Page 7.

 9                        (Exhibit published.)

10    BY MR. WALSH:

11    Q.   And page 8; is that right?

12    A.   Yes.

13    Q.   Those are all the internal forms there?

14    A.   Yes.

15    Q.   And on page 8 here, now that we've landed there, there are

16    a number of different signatures and other approvals noted; is

17    that right?

18    A.   That's correct.

19    Q.   And as you already indicated, you weren't involved in the

20    precise setting up of this?

21    A.   I am not.

22    Q.   All right.

23         Let's turn to the LMA and the documents for that.

24              MR. WALSH:   And if we could have Exhibit 98, also in

25    evidence, and in particular, page 5.
```

1          And if we could blow that up so that our jurors can see

2     it.

3                          (Exhibit published.)

4     BY MR. WALSH:

5     Q.   Do you recognize that document?

6     A.   Yes.

7     Q.   What is that document?

8     A.   So this is our -- similar to that last form, this is our

9     form that we have clients sign when they establish an LMA

10    account.

11    Q.   And in this instance, can you see what the account number

12    this is for this account?

13    A.   It ends in 6054.

14    Q.   Okay.

15            MR. WALSH:   And if we can then scroll.

16    Q.   This is also more than one page; is that right?

17    A.   Yes.

18            MR. WALSH:   If we can scroll to page 6, please, and

19    highlight that there.

20                          (Exhibit published.)

21    BY MR. WALSH:

22    Q.   For whom is this LMA application completed?

23    A.   It's for Michael Rothenberg.

24    Q.   All right.

25            MR. WALSH:   And if we can dezoom and go to the next

 1    page.

 2                        (Exhibit published.)

 3    BY MR. WALSH:

 4    Q.   More items are being filled out here.

 5            MR. WALSH:   If we go to the next page, on page 8.

 6                        (Exhibit published.)

 7            MR. WALSH:   And the next page.

 8                        (Exhibit published.)

 9            MR. WALSH:   And when we get to page 10 here, if we

10    could zoom in on the signature block again, please.

11                        (Exhibit published.)

12    BY MR. WALSH:

13    Q.   Whose signature is that there?

14    A.   It's Mike Rothenberg's.

15    Q.   And what is the date of this application for a Loan

16    Management Account?

17    A.   June 18, 2014.

18            THE COURT:   Ms. Jenkins, if you'd just wait a half a

19    heartbeat after Mr. Walsh finishes asking his question before

20    you answer, you'll make the court reporter's job a little

21    easier.

22            THE WITNESS:   Okay.

23            THE COURT:   Mr. Walsh.

24            MR. WALSH:   Thank you, Your Honor.

25    Q.   And again, you were not -- you didn't sign these

1    documents; is that right?

2    **A.**   No.

3    **Q.**   I'd now like to show you what's marked Exhibit 77, also in

4    evidence.

5            **MR. WALSH:**   If we could just blow up the first part

6    of this here.

7                         (Exhibit published.)

8    BY MR. WALSH:

9    **Q.**   Do you recognize this item?

10   **A.**   I do.

11   **Q.**   What is it?

12   **A.**   This is some disclosure documents that we send out to our

13   clients when they establish this type of account.

14   **Q.**   And this is a long set of disclosures; is that right?

15   **A.**   Yes.

16           **MR. WALSH:**   If we could dezoom and go to the last

17   page -- well, I guess we can just highlight the page numbers

18   there at the bottom.

19       Or we can go all the way to the last page.  Why don't we

20   go to page 13, please.

21                         (Exhibit published.)

22   BY MR. WALSH:

23   **Q.**   This document has 13 pages.  Can you see that?

24   **A.**   Yes.

25   **Q.**   Okay.

1      Is that disclosure -- what happens with that disclosure

2   when someone opens up a Loan Management Account?

3   **A.**  We typically send it to a client.

4   **Q.**  Is any signatures acquired on this document?

5   **A.**  No.

6   **Q.**  All right.  Now once a CMA and an LMA are created, those

7   accounts, for any client including Mr. Rothenberg, does

8   Merrill Lynch generate monthly statements for those accounts?

9   **A.**  Yes.

10  **Q.**  And do they do so for Mr. Rothenberg?

11  **A.**  Yes.

12  **Q.**  I'd like to focus in first on the CMA account and some

13  statements that were generated by Merrill Lynch.

14  **A.**  Okay.

15  **Q.**  And I'd like to show you what's been marked Exhibit 50, in

16  evidence.

17                          (Exhibit published.)

18  **BY MR. WALSH:**

19  **Q.**  Do you recognize that first page of this exhibit?

20  **A.**  Yes.

21  **Q.**  Not for the specifics for who this is, but what is this

22  type of document?

23  **A.**  This is our standard account statement for our CMA

24  account.

25  **Q.**  And "our," to be clear, is Merrill Lynch?

1   **A.** Of -- yes, Merrill.

2   **Q.** And is this particular account statement for someone in

3   particular?

4   **A.** Yes.  It's for Mike Rothenberg.

5              **MR. WALSH:** And if we could highlight -- that's

6   great.

7                         (Exhibit published.)

8   **BY MR. WALSH:**

9   **Q.** If -- and the account number there, what account number

10  does it bear?

11  **A.** The -- the account ending in 6052.

12  **Q.** And that matches with the application we were just looking

13  at; is that right?

14  **A.** Yes.

15             **MR. WALSH:** If we could dezoom that, please.

16                        (Exhibit published.)

17  **BY MR. WALSH:**

18  **Q.** Now before we get into the specifics of this one, I just

19  want to orient the jury to this document because there's

20  several of these they're going to be looking at.

21      What -- what is just generally depicted on this first

22  page?

23  **A.** You can see that there is cash or cash equivalents held in

24  the account of $370,015.20.

25  **Q.** Okay.  I don't want to get into specifics.  I just want to

1    just walk through the various sections, and then we can go

2    back and do the specifics for this particular account.  Is

3    that all right?

4        So what is listed on this first page?

5    **A.**   The date activity for the month of June 2014.

6    **Q.**   That's what one is specifically for.  But are there a list

7    of assets in this -- is there a section for assets?

8    **A.**   Yes.

9    **Q.**   And is there is a section for liabilities as well?

10   **A.**   Yes.

11   **Q.**   And then there's a section entitled "Cash Flow."  What is

12   that?

13   **A.**   Just debits and credits in the account throughout the

14   month.

15            **MR. WALSH:**   Okay.  If we could turn to page 2.

16                 (Exhibit published.)

17   BY MR. WALSH:

18   **Q.**   There are some different headings here.  What are --

19   what's depicted in the -- your CMA bank deposit interest

20   summary, not the specifics, just what is that category for?

21   **A.**   It just -- it gives you an estimated annual income amount,

22   how much you would expect to earn on your cash had you --

23   should you keep it for a year.  Interest is usually an

24   annualized number.

25   **Q.**   All right.  And then there's another CMA assets heading

1    there section.  Do you see that?

2    **A.**  Yes.

3    **Q.**  And is that just another version of -- what's depicted in

4    that section?  Again not the specifics, just in this section.

5    **A.**  It shows that the cash is in what we call the preferred

6    deposit which is our -- it's our -- it's our money market that

7    earns a little bit more interest.

8    **Q.**  Okay.  Not specific to this one, but this is where assets

9    are listed on this form?

10   **A.**  Yes.

11          **MR. WALSH:**  If you could turn to the third page,

12   please.

13                      (Exhibit published.)

14   **BY MR. WALSH:**

15   **Q.**  Okay.  There's a heading here that says "Your CMA

16   transactions."  Do you see that?

17   **A.**  Yes.

18   **Q.**  What is listed in that section?  Not the specifics, just

19   in general on a form like this.

20   **A.**  Yeah, just, you know, dollars in and out, income earned.

21          **MR. WALSH:**  Okay.  If we go to page 4.

22                      (Exhibit published.)

23   **BY MR. WALSH:**

24   **Q.**  And then 5.

25                      (Exhibit published.)

1    **BY MR. WALSH:**

2    **Q.**  And 6.

3                          (Exhibit published.)

4    **BY MR. WALSH:**

5    **Q.**  On pages 4, 5, and 6, what kind of stuff is listed there?

6    What are -- what's the purpose of those pages?

7    **A.**  Standard disclosure.

8    **Q.**  Okay.  And is this format generally the type format that

9    is used for CMA accounts at Merrill Lynch?

10   **A.**  That is correct.

11   **Q.**  Okay.  Now let's go back to page 1.  And let's talk about

12   this specific form.

13                          (Exhibit published.)

14   **BY MR. WALSH:**

15   **Q.**  So you've already indicated that this is a form for Cash

16   Management Account for Michael Rothenberg; is that right?

17   **A.**  Yes.

18   **Q.**  What is the time period for this statement?

19   **A.**  June 2014.

20   **Q.**  All right.  And is -- in the asset section there, what

21   does it say the cash management or -- or cash or money

22   accounts are for June 30th of 2014?

23   **A.**  Three -- at the end of the month, the account value was

24   $370,015.20.

25   **Q.**  Okay.  Is there, on the cash transaction page, on 3 --

 1  page 3, is that a better way to see how the account was used?

 2  A.  Yes.

 3         MR. WALSH:  If we could turn to page 3.

 4     So if we could highlight this -- or not highlight, blow

 5  up, please.  Thank you.

 6                    (Exhibit published.)

 7  BY MR. WALSH:

 8  Q.  All right.  Do you see there the date of June 18th in the

 9  middle of the page?

10  A.  Yes.

11  Q.  What happened on that date?

12  A.  The account received a wire of $370,000.

13  Q.  And that June 18th date, does that correspond with the

14  date that we were looking at for the opening of the account?

15  A.  Yes.

16  Q.  When you say it's a wire transfer in, how do you -- how do

17  you know that?

18  A.  It's listed in the description of the activity.

19  Q.  All right.  And there's actually two lines there for the

20  wire -- I take it "TRF" means transfer?

21  A.  Yes.

22  Q.  And the second line there says "org" and has something

23  listed after it.  Do you see that?

24  A.  Yes.

25  Q.  What is that?

1    **A.**   It references an account number and the start of a name.

2    **Q.**   All right.  And --

3    **A.**   Which appears to be Michael.

4    **Q.**   Okay.  And in this instance, what are the last four of

5    that account number?

6    **A.**   2573.

7            **MR. WALSH:**  Gesundheit, Your Honor.

8            **THE COURT:**  Thank you.

9    BY MR. WALSH:

10   **Q.**   All right.  So I'm -- so what is represented here?  On

11   June 18th, what happened again?

12   **A.**   The account received a wire for $370,000.

13   **Q.**   Okay.  Then on June 20th, there's a couple of notations.

14   Do you see those two?

15   **A.**   Yes.

16   **Q.**   And one of them is talking about, if you take the second,

17   it's talking about an LMA loan advance?

18   **A.**   Yes.

19   **Q.**   Do you understand why the LMA loan advance would be listed

20   on the CMA account?

21   **A.**   I am not sure why we did it this way, but it appears that

22   we transferred --

23           **MR. FAKHOURY:**  Objection, speculation.

24           **THE COURT:**  Sustained.

25   / / /

| | |
|---|---|
| 1 | BY MR. WALSH: |
| 2 | **Q.** Do you know why that is listed that way, yes or no? |
| 3 | **A.** Yes. |
| 4 | **Q.** Okay.  What is your answer why was it done that way? |
| 5 | **MR. FAKHOURY:** Objection, speculation. |
| 6 | **THE COURT:** Overruled. |
| 7 | BY MR. WALSH: |
| 8 | **Q.** You may answer. |
| 9 | **A.** Okay.  This entry is listed this way because there is a |
| 10 | credit identified as LMA loan advance. |
| 11 | **Q.** Okay. |
| 12 | **A.** For 350,000. |
| 13 | **Q.** All right. |
| 14 | All right.  So if we can go back to page 1, then.  At -- |
| 15 | just so we're all on the same page, this -- what was the |
| 16 | balance in the CMA at the end of June 2014? |
| 17 | **A.** $370,015.20. |
| 18 | **MR. WALSH:** And if we could go to the signature |
| 19 | block, please -- or not the signature block, the address block |
| 20 | in the top corner there. |
| 21 | (Exhibit published.) |
| 22 | **THE WITNESS:** Yes. |
| 23 | BY MR. WALSH: |
| 24 | **Q.** What does it say about -- underneath his name, |
| 25 | Mr. Rothenberg's name? |

1    **A.**   It says "pledge to ML lender."

2    **Q.**   What does that mean?

3    **A.**   It -- it means that it was -- it's a pledged account as

4    collateral for the LMA.

5    **Q.**   Okay.  I'd now like to show you what's been marked

6    Exhibit 51 in evidence.

7                          (Exhibit published.)

8    **BY MR. WALSH:**

9    **Q.**   Do you recognize this item?

10   **A.**   Yes.

11   **Q.**   What is this item?

12   **A.**   This is another account statement, a CMA account

13   statement.

14            **MR. WALSH:**  If we could go to the next page, which it

15   might be page 3.

16                          (Exhibit published.)

17   **BY MR. WALSH:**

18   **Q.**   Does page 3 look similar to or -- though it's for a

19   different time period, the statement that we were just looking

20   for -- at in Exhibit 50?

21   **A.**   Yes.

22   **Q.**   So this is the same form statement that we were just

23   looking at; is that right?

24   **A.**   Yes.

25   **Q.**   And for what account is this?

1    **A.**   It is for the CMA account holding the collateral.

2    **Q.**   For whom?

3    **A.**   Michael Rothenberg.

4    **Q.**   And for what time period?

5    **A.**   The month of July 2014.

6    **Q.**   Now, there are a couple of pages that we skipped -- or

7    skipped over -- we saw pages 1 and 2.  Why are -- what are

8    those pages?

9            **MR. WALSH:**  If we can go back to page 1.

10                    (Exhibit published.)

11   **BY MR. WALSH:**

12   **Q.**   What's depicted here on page 1 of Exhibit 51?

13   **A.**   It's just -- this is our sort of cover page for accounts

14   helping you track your account value over time.

15   **Q.**   And is there a reason that it was not on Exhibit 50?

16   **A.**   No.  I -- I don't think there's a reason.  It's just --

17   it's -- once you have your -- start to string a series of

18   months together, you can start to have some history to reflect

19   on these accounts to show the value going up or down over

20   time.

21   **Q.**   So for the June 2014 statement, there was no history to

22   reflect?

23   **A.**   Correct.

24   **Q.**   And now that we're in July, there is a history to reflect?

25   **A.**   Yes.

1    **Q.**   Okay.

2            **MR. WALSH:**  If we can go then back to page 3, and we

3    look at -- if we do the asset stage there.

4                        (Exhibit published.)

5    **BY MR. WALSH:**

6    **Q.**   What was the cash balance on June 30th of 2014?

7    **A.**   $370,015.20.

8    **Q.**   And that corresponds to what the prior statement had said;

9    is that right?

10   **A.**   Yes.

11   **Q.**   What was the balance as of July 31st, 2014?

12   **A.**   $370,062.33.

13   **Q.**   Now, where is this extra money coming from?

14   **A.**   The account is earning interest.

15           **MR. WALSH:**  All right.  If we can go to the next

16   page, please.

17        And if we could highlight the interest summary there, the

18   section, CMA interest summary.

19                        (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**   What's depicted in the "Your CMA Bank Deposit Interest

22   Summary" section?

23   **A.**   It shows the opening balance of -- in the account, the

24   current yield, interest earned, and closing balance.

25   **Q.**   Is that the interest that we were just talking about?

1    **A.**   Yes.

2    **Q.**   What is the yield percentage rate?

3    **A.**   It just means the amount -- dollar amount depicted as a

4    percentage to inform you what you will earn -- or what you're

5    earning on your cash.

6    **Q.**   That's the interest rate that's being paid by

7    Merrill Lynch, right?

8    **A.**   Yes.

9    **Q.**   And in this instance, it is what?

10   **A.**   .15.

11   **Q.**   And I think you said, is that an annual or a monthly rate?

12   **A.**   It's actually quoted as an annualized.

13   **Q.**   And so in the month of July, then, it appears that

14   .15 percent yields you $47.13?

15   **A.**   Yes.

16           **MR. WALSH:**  If we can dezoom that, please.  And if

17   you do the next page, please.

18       If you could highlight the "Your CMA Transactions."

19                   (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**   Did anything happen in the month of July 2014 with the CMA

22   account other than the payment of interest?

23   **A.**   There was no activity aside from that, aside from payment

24   of interest.

25   **Q.**   All right.  I'd like to show you what's been marked

1    Exhibit 52 in evidence.

2                         (Exhibit published.)

3    **BY MR. WALSH:**

4    **Q.**   Do you recognize this document?

5    **A.**   Yes.

6    **Q.**   What is this document?

7    **A.**   This is another CMA account statement for the month of

8    August 2014.

9    **Q.**   And for who is this account statement?

10   **A.**   For Michael Rothenberg.

11   **Q.**   And what is the account number?

12   **A.**   It ends in 6052.

13           **MR. WALSH:**   And if we could go to the page -- I think

14   it's 3.  No.  Yeah, I was right.

15       And if we could again highlight the assets section,

16   please.

17                         (Exhibit published.)

18   **BY MR. WALSH:**

19   **Q.**   What was the balance of the CMA account on July 31st of

20   2014?

21   **A.**   $370,062.33.

22   **Q.**   Does that match what the prior statement said?

23   **A.**   It does.

24   **Q.**   And what was the balance at the end of August -- or at

25   least it was August 29th of 2014?

1    **A.**   $370,218.45.

2    **Q.**   All right.  And again, what's the -- going to account for

3    the difference between those two values?

4    **A.**   Interest earned over the course of the month.

5         **MR. WALSH:**   All right.  If we can turn to the next

6    page, please.  And highlight the interest summary, please.

7    That section, "Deposit Interest Summary."

8                     (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**   Does that again show the additional interest?

11   **A.**   Yes.

12   **Q.**   And in this --

13        **MR. WALSH:**   If we could dezoom, please.  If we could

14   go to the whole -- the whole section.

15                     (Exhibit published.)

16   **BY MR. WALSH:**

17   **Q.**   It appears there are two different accounts here.  What

18   are those two accounts?

19   **A.**   Sure.  So we have the money fund that's earning the bulk

20   of the interest, which is -- it's called "money account

21   description" on here.  And that's what we call the preferred

22   deposit.  And that has the 370,106 for closing balance.

23        And then as interest is accumulating in the account, it

24   isn't being reinvested in that preferred deposit so it's

25   staying in this other sweep, and it's earning that de minimis

1   yield dollar amount of .02.

2       And the -- and reason for the difference is we have to

3   manually buy the preferred deposit.

4   **Q.**  Okay.  And so now that we've walked through Exhibits 50,

5   51, and 52, does it -- the balance remained approximately

6   $370,000 throughout that whole time period; is that right?

7   **A.**  Yes.  Or slightly greater than, but yes.

8   **Q.**  And does that make sense given the way the CMA was being

9   used?

10  **A.**  Yes.

11  **Q.**  Why is that?

12  **A.**  Because it was invested in the preferred deposit.

13  **Q.**  Was it also acting as collateral to Mr. Rothenberg's LMA?

14  **A.**  Yes.

15  **Q.**  All right.  Let's turn to the LMA account statements.  And

16  I'd like to show you what's in evidence as Exhibit 47.

17          **MR. WALSH:**  All right.  And if we could blow that up

18  so we can see it.  I think we got to do the -- little bit

19  more, please, Beth.  Thank you.

20      We get this block up there, yeah.

21                      (Exhibit published.)

22  **BY MR. WALSH:**

23  **Q.**  Do you recognize this document?

24  **A.**  Yes.

25  **Q.**  What is this document?

1    **A.**   This is a LMA account statement for the month of

2    June 2014.

3    **Q.**   And for whom is it?

4    **A.**   Michael Rothenberg.

5    **Q.**   And what is the account -- last four of the account?

6    **A.**   6054.

7    **Q.**   Does that match the account number that was on the LMA

8    application Mr. Rothenberg completed?  The last four --

9    **A.**   Yes.

10   **Q.**   -- that is.

11        All right.  And again, let's not talk specifics.  I just

12   want to walk through this form because we're going to walk

13   through several of them, and then we'll go back through the

14   specifics.

15        What is depicted on this first page, what types of

16   information?

17                        (Exhibit published.)

18           **THE WITNESS:**  It reflects the dollar amount that was

19   borrowed for the month of June.

20   **BY MR. WALSH:**

21   **Q.**   Okay.  And there's an account activity section there; is

22   that right?

23   **A.**   Yes.

24   **Q.**   What types of information is recorded on this part of the

25   form?

1    **A.**  How much -- how much was drawn on the account for the

2    month of June.

3    **Q.**  Okay.

4    **A.**  Or how -- what debit was incurred in the month of June.

5         **MR. WALSH:**  All right.  If we could go to the next

6    page, please.  I'm going to have to blow that up again,

7    please.

8                   (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**  Not as to the specifics here, but what is the type of

11   information that is shown in these sections?

12        First there's a section called "Your LMA Transactions."

13   what type of information is usually put into an LMA statement

14   in that section?

15   **A.**  Yes.  It would show the debit activity and any rate

16   changes that occur throughout the month.

17   **Q.**  And when you say "rate changes," what do you mean by that?

18   **A.**  Changes in interest charged throughout the month.

19   **Q.**  And that is that interest rate you were talking about

20   that's based on LIBOR?

21   **A.**  Correct.

22   **Q.**  And it appears to be changing.  Does LIBOR change?

23   **A.**  It does.

24   **Q.**  How often does that change?

25   **A.**  It could change daily.  It usually doesn't change daily,

1    but it could.

2    Q.  And then if you do the next section down there that says

3    "Accrued Finance Charges Revolving Line of Credit," what type

4    of information, not specific to this one, but is contained in

5    that section?

6    A.  It is -- it just shows the amount of time for each

7    interest rate charged throughout the month.

8    Q.  And then the dollar figure that that corresponds to?

9    A.  Yes.

10         MR. WALSH:  All right.  If we could go to the third

11   page, please.

12       And if we highlight that section.

13       Not highlight.  Blow up.  Sorry.

14                    (Exhibit published.)

15   BY MR. WALSH:

16   Q.  What is put in the "Your Collateral" section of this form?

17   A.  This collateral references the CMA account where the cash

18   is being held.

19   Q.  Okay.  Not specific to this -- well, though, what is the

20   type of information that goes into that section?

21   A.  The type of information that goes into this section is it

22   references the account number that is used as collateral for

23   the loan.

24   Q.  All right.

25         MR. WALSH:  If we can go to the next page, please.

1                              (Exhibit published.)

2      BY MR. WALSH:

3      Q.   And then there's a blank page.

4           So that is -- is that a typical LMA statement from

5      Merrill Lynch?

6      A.   Yes.

7                MR. WALSH:   Okay.   If we can go back to the first

8      page.

9                              (Exhibit published.)

10     BY MR. WALSH:

11     Q.   Now let's talk about the specifics of this particular

12     Exhibit 50 -- 47.

13          All right.   You've already told us that it was Michael

14     Rothenberg on the account.

15          And what was the date again?

16     A.   June 2014.

17     Q.   And you can see that in the right-hand corner -- upper

18     right there?

19     A.   Yes.

20     Q.   Okay.   And does it indicate what the opening monthly loan

21     balance was on the left-hand side of that form?

22     A.   Yes.

23     Q.   What was the opening monthly loan balance?

24     A.   Zero.

25     Q.   It doesn't actually say zero, it's got a little dash.

1    What does that mean?

2    **A.**   The equivalent of zero.

3    **Q.**   And then the next line down, it says "Your Borrowings."

4    **A.**   Yes.

5    **Q.**   What are -- what did Michael Rothenberg borrow in the

6    month of June 2014 from this LMA?

7    **A.**   $350,000.

8    **Q.**   The next line down says "Your Repayments."

9    **A.**   There was a dash implying there was no activity.

10   **Q.**   Well, that means zero, right?

11   **A.**   Yes, zero.

12   **Q.**   And then the last line there, "Closing Monthly Loan

13   Balance."  What is the closing monthly loan balance in

14   June 30th, 2014 for the LMA account for Mr. Rothenberg?

15   **A.**   $350,000.

16          **MR. WALSH:**  If we can turn to page 2, please.

17      And blow up that section there.

18                  (Exhibit published.)

19   BY MR. WALSH:

20   **Q.**   You indicated that this -- your LMA transactions would

21   show the transactions during that month.

22      What are -- if we look to June 20th, 2014, is that the

23   date at which -- or approximate date around when these

24   accounts were opened?

25   **A.**   Yes.  A couple days later, yes.

1    Q.   Right.  They were opened on what date?

2    A.   June 18th.

3    Q.   So two days later, on June 20th, what happened with this

4    LMA?

5    A.   The rate fluctuated.

6    Q.   Okay.  That's the first one, but the second one is what?

7    That same date.

8    A.   Say that again?

9    Q.   So let's -- let's do this.

10        There's a transaction date and an effective date column.

11   Do you know the difference between those two?

12   A.   I mean, not really.  I -- I can say that it's likely

13   that --

14             MR. FAKHOURY:  Objection, speculation.

15             THE COURT:  I'll allow the witness to answer.  Go

16   ahead.

17             THE WITNESS:  I mean I can make a presumption that

18   sometimes transactions come in late in the day after a batch

19   period has occurred, and then it falls into the following day.

20             THE COURT:  I'm going to -- it is speculation.

21                  (Simultaneous colloquy.)

22             MR. FAKHOURY:  Renew the objection.

23             THE COURT:  I'm going to strike the answer and

24   instruct the jury to disregard it.

25             MR. WALSH:  If we could look at --

1          **THE COURT:**  I would also note that -- that besides

2     the fact that I think it's speculation, there's a transaction

3     date of June 23 with an effective date that's actually three

4     days earlier.  And so the witness's answer, even if it was

5     based on a foundation of knowledge, would not be able to

6     explain that entry.

7     **BY MR. WALSH:**

8     **Q.**  If we look at the effective date of June 20th, 2014, was a

9     loan advance taken that day?

10    **A.**  It actually appears the loan balance was advanced

11    June 23rd of 2014.

12    **Q.**  That's the transaction date?

13    **A.**  Yes.

14    **Q.**  Okay.  So transaction date of June 23rd, effective date of

15    June 20th, there was a loan advance?

16    **A.**  It appears that way, yes.

17    **Q.**  And what is the amount?

18    **A.**  $350,000.

19    **Q.**  And that comports with what was on page 1 of this

20    statement; is that right?

21    **A.**  Correct.

22    **Q.**  And then on June 23rd, both transaction and effective

23    date, what happened?

24    **A.**  Funds were advanced against the line.

25          **MR. WALSH:**  Well, if we highlight June 23rd,

1    June 23rd, the second one from the bottom.

2                    (Exhibit published.)

3    BY MR. WALSH:

4    **Q.**   What happened on that day?

5    **A.**   Oh.  There was a slight change in interest rate.

6    **Q.**   And the same again on June 30th?

7    **A.**   Yes.

8    **Q.**   And then those interest rates then are reflected in the

9    section that you described below there, entitled "Accrued

10   Finance Charges."

11   **A.**   Correct.

12   **Q.**   And over the -- the month of June -- whoa.

13       Okay.

14           **MR. WALSH:**  If you could blow that up again, please.

15       Not that part, the -- sorry -- the next section, please.

16                    (Exhibit published.)

17   BY MR. WALSH:

18   **Q.**   Over the month of June, then, how many dollars of accrued

19   finance charges were accrued on this account?

20   **A.**   $404.13.

21           **MR. WALSH:**  Okay.  I'd like to turn now to

22   Exhibit 48, in evidence.

23       And if you could blow that up, please.

24                    (Exhibit published.)

25   / / /

1    **BY MR. WALSH:**

2    **Q.**   Do you recognize this document?

3    **A.**   Yes.

4    **Q.**   What is this document?

5    **A.**   This is our LMA account document for the month of July

6    2014.

7    **Q.**   For who?

8    **A.**   Michael Rothenberg.

9    **Q.**   And what is the account number?

10   **A.**   It ends in 6054.

11   **Q.**   And if we look at the account activity section on the

12   left-hand side, what was the opening monthly loan balance?

13                        (Exhibit published.)

14        **THE WITNESS:**  $350,000.

15   **BY MR. WALSH:**

16   **Q.**   Does that comport with what we were just looking at in

17   Exhibit 47 for the month of June 2014?

18   **A.**   Yes.

19   **Q.**   The second line down says "Your Borrowings."  What is that

20   is in this context?

21   **A.**   In this context, it means there was a debit in the account

22   for the interest expense that was accrued.

23   **Q.**   Why would that be?

24   **A.**   So you can either pay off interest by transferring money

25   into the account over time to cover the loan, or you could

1   just let the loan increase to include the accrued interest

2   that you're being charged.

3   **Q.**  And in this instance, what is happening?

4   **A.**  The latter.  The accrued interest is -- or the interest is

5   accruing.  The interest charge is accruing and being added

6   onto the original dollar -- original loan dollar amount.

7   **Q.**  All right.  And then if we go to the next line there, your

8   repayments, what does that line indicate happened in the month

9   of July 2014?

10  **A.**  You show that the line is being repaid to the amount of

11  including opening balance and the borrowings throughout the

12  month.

13  **Q.**  Okay.  Now that number has little parentheses on either

14  side of it.  What does that mean?

15  **A.**  It just means that it's paying down the loan.

16  **Q.**  Is that, in effect, a negative number?

17  **A.**  Yes.

18  **Q.**  And then the closing monthly loan balance for July 31st,

19  2014, what does it show?

20  **A.**  It shows a line, meaning zero.

21          **MR. WALSH:**  Okay.  If we can go to page 2.

22      And if we could blow up that section, please.

23                      (Exhibit published.)

24  **BY MR. WALSH:**

25  **Q.**  All right.  If we look at transaction and effective date

1   of July 1st, 2014, what was the opening loan balance again?

2   **A.**  $350,000.

3   **Q.**  And if we go to the next line there for the finance charge

4   payment, what is indicated?

5   **A.**  $350,000.

6   **Q.**  Sorry.  If you look in the transaction description.

7   **A.**  Oh.  You show the finance charge of $404.13.

8   **Q.**  And that's the interest for the month of June 2014?

9   **A.**  Yes.

10  **Q.**  On July 1st then, there it says loan advance, the next

11  line down.  Is that the transaction that you were just

12  describing about how the interest is added to the loan amount?

13  **A.**  Yes.

14  **Q.**  And then we have a series of rate changes here; is that

15  right?

16  **A.**  That's correct.

17  **Q.**  Those are on July 7th, 14th, 21st, and 28th; is that

18  right?

19  **A.**  Yes.

20  **Q.**  And then on transaction date July 30th, effective date

21  July 29th, what happened?

22  **A.**  The loan was repaid in the amount of $350,404.13.

23  **Q.**  And what did that bring the loan balance to?

24  **A.**  Zero.

25  **Q.**  Now you can go to the next section here, accrued finance

1    charges revolving line of credit.

2        Over the course of July of 2014, what was the total amount

3    of interest charged on this account?

4    **A.**   $1,029.77.

5    **Q.**   And that's for the month of July, not June, right?

6    **A.**   Correct.

7    **Q.**   Okay.

8            **MR. WALSH:**   I'd now like to Turn to Exhibit 49,

9    please.

10       And if you could blow it up again, please.

11                        (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**   All right.  Do you recognize this document?

14   **A.**   Yes.

15   **Q.**   What is this document?

16   **A.**   This is a Loan Management Account document for the month

17   of August 2014 for Merrill Lynch.

18   **Q.**   And for whom is this document or statement?

19   **A.**   Michael Rothenberg.

20   **Q.**   And what is the account number?

21   **A.**   Ending in 6054.

22   **Q.**   And if we can look at the account activity then, what was

23   the opening monthly loan balance?

24   **A.**   Zero.

25   **Q.**   All right.  And that's again with a dash, but dash means

1   zero?

2   **A.**   Yes.

3   **Q.**   Does it indicate borrowings in the month of August 2014?

4   **A.**   Yes.

5   **Q.**   What is the amount of the borrowing?

6   **A.**   $350,000.

7   **Q.**   And then does it indicate repayments in the month of

8   August 2014?

9   **A.**   Yes.

10  **Q.**   What is that amount?

11  **A.**   $350,000.

12  **Q.**   And then for the month of August 2014, what is the closing

13  monthly loan balance again?

14  **A.**   Zero.  Yeah, zero.

15  **Q.**   And again the dash means zero?

16  **A.**   Yes.

17        **MR. WALSH:**  If we can turn to page 2, please.

18  And blow up the section there.

19  Not all the way down.  Well, okay, that's great.

20                (Exhibit published.)

21  **BY MR. WALSH:**

22  **Q.**   If we then take a look in the "Your LMA Transactions" and

23  start off on August 1st, 2001, what was the opening loan

24  balance?

25  **A.**   Zero.

1   **Q.**   Also on August 1st, 2014, what was the finance charge

2   payment?

3   **A.**   909 -- oh, on that date?  $1,029.77.

4   **Q.**   Okay.  Does that number correspond to the interest for

5   July of 2014?

6   **A.**   Yes.

7   **Q.**   On August 1st of 2014, was there also a loan advance?

8   **A.**   Yes.

9   **Q.**   And in what amount?

10  **A.**   $350,000.

11  **Q.**   Then on August 18th and 25th, were there rate changes,

12  interest rate changes?

13  **A.**   Yes.  Small changes, but yes.

14  **Q.**   And then on transaction date August 29th and effective

15  date August 28th, was there another loan payment?

16  **A.**   Yes.

17  **Q.**   And what was the amount?

18  **A.**   $350,000.

19  **Q.**   Over the month of August, if we go to the next section for

20  accrued finance charges, was there a total amount of interest

21  charged?

22  **A.**   Yes.

23  **Q.**   And how much was that?

24  **A.**   $992.45.

25  **Q.**   If we then go to this transaction detail on the bottom

1    here, do you see that section?

2    **A.**   Yes.

3    **Q.**   It indicates some transactions on August 1st.  Do you see

4    those?

5    **A.**   Yes.

6    **Q.**   What is that first transaction?

7    **A.**   The first transaction is repayment -- or a funds transfer

8    of $350,000.

9    **Q.**   And that's the money coming out of the LMA to a different

10   account?

11   **A.**   Yes.  It says to Bank of America account number ending in

12   2573.

13   **Q.**   How do you know that it says Bank of America?

14   **A.**   Because it says BAC.

15   **Q.**   And you know that to be Bank of America's abbreviation?

16   **A.**   Yes.

17   **Q.**   Thank you.

18         **MR. WALSH:**  If we go to the next August 1st -- sorry

19   there.

20       Can we just go back one page.  Sorry.

21       And blow up just the transaction detail at the bottom.

22                    (Exhibit published.)

23   **BY MR. WALSH:**

24   **Q.**   There's a second transaction that occurs on 8/1 of 2014?

25   **A.**   Yes.

1    **Q.**   And is that the payment that we've already discussed of

2    interest in the amount of the $1,029.77?

3    **A.**   Yes.

4          **MR. WALSH:**   And if we can go to page 3, please.   And

5    do the transaction detail or -- the whole thing works, too.

6                    (Exhibit published.)

7    **BY MR. WALSH:**

8    **Q.**   There's another transaction on 8/28 listed there.   Do you

9    see that?

10   **A.**   Yes.

11   **Q.**   And what is described there?

12   **A.**   A transfer from the brokerage account ending in 6052 of

13   $350,992.45.

14   **Q.**   And that's the payment that we already discussed earlier

15   on this document; is that right?

16   **A.**   Yes.

17   **Q.**   And then finally, last but not least, in the "Your

18   Collateral" section, what is listed as the collateral for this

19   LMA?

20   **A.**   Account number ending in 6 -- brokerage account number

21   ending in 6052 in the amount of $370,218.

22   **Q.**   And that is -- you know that to be Michael Rothenberg's

23   CMA; is that right?

24   **A.**   Yes.

25          **MR. WALSH:**   Now, thank you very much.   We can take

JENKINS - DIRECT / WALSH

```
 1    that down.

 2    BY MR. WALSH:

 3    Q.  Now in the end of July 2014, did you exchange some emails

 4    with Mr. Rothenberg and others at Merrill Lynch about

 5    obtaining an end-of-month statement?

 6    A.  Yes.

 7    Q.  And can you just describe in general the context of those

 8    emails?

 9    A.  Yes.  Mike was looking for an account statement reflecting

10    his month-end balance.

11    Q.  For July of 2014?

12    A.  Yes.  Correct.

13    Q.  I'm going to show you what's been marked and admitted as

14    Exhibit 68.

15                        (Exhibit published.)

16           MR. WALSH:  If I might just have a moment, Your

17    Honor.

18           THE COURT:  Sure.

19                   (Pause in the proceedings.)

20    BY MR. WALSH:

21    Q.  Do you recognize this document?

22    A.  Yes.

23    Q.  And what is -- not with the specifics, what type of

24    document is this?

25    A.  This is an email chain.
```

1   **Q.**   And at the top of this page, what is the date of the email

2   being sent?

3   **A.**   August 2nd, 2014.

4   **Q.**   And to whom and from whom is this being sent?

5   **A.**   Sure.  It's sent from Mike Rothenberg to me copying Ryan

6   Kelty and Chris Allscheid.

7   **Q.**   Okay.  Now if we can then go back in time, because this is

8   an email chain, if we go to page 2 of this document.

9                      (Exhibit published.)

10  **BY MR. WALSH:**

11  **Q.**   And do you see there, there's an initial email of

12  August 1st, 2014?

13  **A.**   Yes.

14  **Q.**   And is it talking about -- is it a -- what is it?

15  **A.**   It is an email from Christine Allschied to Mike asking if

16  an attachment would work until the statements are produced.

17  **Q.**   And if we could turn then to -- oh, no.

18      And then if we go up one there to the middle of the

19  screen.

20                      (Exhibit published.)

21  **BY MR. WALSH:**

22  **Q.**   Is that another email in this email chain?

23  **A.**   Yes.

24  **Q.**   From whom is it?

25  **A.**   It's from Mike to Chris, copying Ryan and myself.

 1    **Q.**  And what did Mike Rothenberg write in this email?

 2    **A.**  He's --

 3    **Q.**  If you could just read it, probably easiest.

 4    **A.**  "Thank you, Chris.  I do appreciate that.  But I am

 5    looking for the official bank statement.  Is there a way to

 6    put in a request to process that today?  Thank you.  Mike."

 7    **Q.**  Okay.  And if we could go up again.

 8                         (Exhibit published.)

 9    **BY MR. WALSH:**

10    **Q.**  On August 1st -- whoa.  Sorry about that.

11            **MR. WALSH:**  If we could do the -- sort of the page 1,

12    please.  And the bottom half of that, the email there.

13                         (Exhibit published.)

14    **BY MR. WALSH:**

15    **Q.**  Did you write back to Mr. Rothenberg on August 1st of

16    2014?

17    **A.**  Yes.

18    **Q.**  What did you write to him?

19    **A.**  I wrote to him that we don't have the flexibility to

20    isolate a client's account statement, that we have many

21    account statements that we generate, and we should have them

22    in the next couple of days.

23    **Q.**  Okay.  Now what does that actually mean, isolate a client?

24    What are you telling him here?

25    **A.**  I'm basically saying wait for the account statements to be

1    generated.

2    **Q.**  And what did you indicate is an alternative?

3    **A.**  I suggested a verification of deposit letter.  It's an

4    official looking letter that we generate to reflect an

5    account -- account's value.

6    **Q.**  Got it.

7         And what is the purpose of a verification of deposit

8    letter?

9    **A.**  Sometimes we have clients, maybe they're going to a

10   country where they have to demonstrate a certain net worth to

11   even go into the country.  So we have to say they are worth

12   $5,000 so they can get out or something like that.  Or -- or

13   they need to demonstrate their net worth.  So we will present

14   a letter for them to take.

15   **Q.**  And in this instance, then, you offered that as a

16   substitute for a statement?

17   **A.**  Yes.

18   **Q.**  If we could then go back to the top half there, and the

19   email that we started with.

20                       (Exhibit published.)

21   **BY MR. WALSH:**

22   **Q.**  What is Mike -- if you could just read it.  What does Mike

23   write back do you?

24   **A.**  Yes.

25        "Anna, the statement is already available.  Ryan, please

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1   see attached for my mortgage application.  Thanks all.  Mike."

 2              MR. WALSH:  All right.  If we could turn to page 5 of

 3   this exhibit, please.

 4        Well, hold on.  I'm sorry.  Can we go just back to page 1.

 5   BY MR. WALSH:

 6   Q.  And does it indicate there in the header block --

 7              MR. WALSH:  If you could zoom that, please.

 8                    (Exhibit published.)

 9              THE WITNESS:  Yes.

10   BY MR. WALSH:

11   Q.  Does it indicate that there's an attachment?

12   A.  Yes.  There's a PDF attachment.

13   Q.  Great.  If we could now turn to page 5 of this exhibit.

14                    (Exhibit published.)

15   BY MR. WALSH:

16   Q.  Do you recognize that document?

17   A.  Yes.

18   Q.  What is that document?

19   A.  This is our July 2014 Merrill CMA account statement.

20   Q.  For whom?

21   A.  For Michael Rothenberg.

22   Q.  And it's for the month of July 2014?

23   A.  Yes.

24   Q.  And this is -- this was the attachment that he sent for

25   his month-end statement; is that correct?

JENKINS - DIRECT / WALSH

1    **A.**  Yes.

2          **MR. WALSH:**  If we could scroll back or dezoom, and if

3    we scroll through the next few pages here slowly.

4                    (Exhibit published.)

5          **THE COURT:**  Mr. Walsh, anytime in the next five

6    minutes that's convenient to your outline.

7          **MR. WALSH:**  Okay.  Thank you very much.

8                    (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**  Is that the complete statement that we've been looking

11   for -- looking at as Exhibit 51 earlier for Mr. Rothenberg?

12   The CMA account for July of 2014?

13   **A.**  Yes.

14   **Q.**  Is there -- there's no additional pages of the exhibit.

15   Is the LMA statement attached?

16   **A.**  I don't see it.  No.

17         **MR. WALSH:**  I think this is a good place to take a

18   break, Your Honor.

19         **THE COURT:**  Very good.

20      Members of the jury, we're going to go ahead and take our

21   first 15-minute break of the day.  Remember my prior

22   admonitions.  Keep an open mind.  Don't communicate with

23   anybody.  Don't look anything up.

24      We'll see you in 15 minutes.

25         **THE CLERK:**  Please rise for the jury.

```
 1        (The following proceedings were heard out of the presence
 2   of the jury:)
 3        THE COURT:  I don't know what happened to that door.
 4   It used to close in such a loud way, I could be sure that
 5   there were no jurors in the room.  But I don't think there are
 6   any jurors, and I'll just say we're outside the presence of
 7   the jury.
 8     Ms. Jenkins, you can step down and take a break too if
 9   you'd like to.
10     Is there anything anybody wants to put on the record?
11   Mr. Walsh.
12        MR. WALSH:  No, Your Honor.
13        THE COURT:  Mr. Fakhoury.
14        MR. FAKHOURY:  No, Your Honor.
15        THE COURT:  I just would like to put on the record
16   that my prior admonition to Mr. Fakhoury was consistent with
17   the parties' stipulated jury instruction number 39, and in
18   some ways consistent with the Ninth Circuit case called
19   Kallins, K-A-L-L-I-N-S, vs. Superior Court, 74 F.App'x 707 at
20   page 710.  That's Ninth Circuit 2003.
21     Thank you.
22        MR. WALDINGER:  Thank you, Your Honor.
23        MR. WALSH:  Thank you, Your Honor.
24        THE CLERK:  Court is in recess.
25     (Recess taken at 9:59 A.M.; proceedings resumed at
```

```
 1    10:20 A.M.)

 2        (The following proceedings were heard in the presence of

 3    the jury:)

 4              THE CLERK:  You may be seated.

 5              THE COURT:  All right.  Mr. Walsh, your witness.

 6         MR. WALSH:  Thank you, Your Honor.

 7        Ms. Jenkins, I'd like to show you what's been marked

 8    Exhibit 10 that's in evidence.

 9                        (Exhibit published.)

10         MR. WALSH:  And if we could -- well, first of all

11    before we blow anything up.

12    Q.  Do you recognize this document?

13    A.  Yes.

14    Q.  What is this document?

15    A.  This is a statement of account values.

16    Q.  And is it -- it's -- down in the bottom right-hand corner,

17    it says it's one of three pages; is that right?

18    A.  Yes.

19    Q.  As we scroll through, what are on pages 2 and 3?

20    A.  Disclosures.

21    Q.  Okay.  So if we go all the way back to page 1.

22                        (Exhibit published.)

23    BY MR. WALSH:

24    Q.  What is this statement of balances -- what is the -- the

25    date of it?
```

1    **A.**   It is as of the close of business July 31st, 2014.

2    **Q.**   Okay.  And if -- and can you tell, is a name of -- of the

3    owner of these accounts listed on this sheet?

4    **A.**   No.  There's no name.

5    **Q.**   Is there a way to determine by looking at the account

6    numbers here to whom this statement belongs?

7    **A.**   The account numbers are disguised slightly, but you can

8    identify the account numbers by the last several digits.

9    **Q.**   All right.  And so there's a CMA pledged with 052?

10   **A.**   Yes.

11   **Q.**   And a LMA with 054?

12   **A.**   Yes.

13   **Q.**   And then -- and those are under a heading for which

14   entity?

15   **A.**   Merrill.

16   **Q.**   Okay.

17   **A.**   There's a -- you can see the title next to it, Merrill

18   Checking, Merrill Credit Line.

19   **Q.**   All right.  And if you look at the -- let's see if I can

20   do this.

21   **A.**   Oh, yes, and accounts held at Merrill, correct.

22   **Q.**   Okay.  There's a separate section here with a different

23   entity.  What entity is that?

24   **A.**   Bank of America.

25   **Q.**   And then there's a separate account listed there.  What

 1    are the last four of those?

 2    **A.**   2573.

 3    **Q.**   All right.  Based on that information, can you determine

 4    for whom this account statement is?

 5    **A.**   Yes.

 6    **Q.**   Who?

 7    **A.**   Michael Rothenberg.

 8           **MR. WALSH:**  Now, if we dezoom this for a second,

 9    please.

10        In the lower right-hand corner, is there -- if we could

11    zoom the lower right-hand corner with the -- lower -- nope,

12    nope.  Literally the lower -- this part over here

13    (indicating).

14                      (Exhibit published.)

15    BY MR. WALSH:

16    **Q.**   Is there a "Report Created" date on this document?

17    **A.**   Yes.

18    **Q.**   What is that date?

19    **A.**   August 1st, 2014.

20           **MR. WALSH:**  Now dezoom that, please.

21                      (Exhibit published.)

22    BY MR. WALSH:

23    **Q.**   Do you recognize this type of document?  Is it the type of

24    document that's made at Merrill Lynch?

25    **A.**   Yes.

1    **Q.**   How is that document generated?

2    **A.**   You can generate it on the website.  I can generate it for

3    you or a client can generate it if they have access to the

4    website.

5    **Q.**   Okay.  When you say the website, what's the website?

6    **A.**   My Merrill.

7    **Q.**   And what is My Merrill?

8    **A.**   My Merrill is the portal and the way that clients are able

9    to access their account values.

10   **Q.**   And so you said that you can create this document?

11   **A.**   Yes.

12   **Q.**   And also a client, through My Merrill, can create this

13   document; is that right?

14   **A.**   Yes.

15   **Q.**   Do you have any memory of creating this document?

16   **A.**   I don't think I would -- no, I do not.  I would have

17   wanted a client to wait for their account statement.

18   **Q.**   Okay.  Now, let's just focus in on the contents.

19           **MR. WALSH:**  So let's blow it up so our jurors over

20   here can see, just the top half or --

21                       (Exhibit published.)

22   **BY MR. WALSH:**

23   **Q.**   So we've already indicated the various accounts.

24       If we take first the Merrill checking, what's called

25   quote-unquote Merrill checking there, what does it indicate as

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   the money -- the market value of the money in the accounts as

2   of the close of business July 31st, 2014?

3   **A.**   $370,062.33.

4   **Q.**   Does that match up with the statement that we looked at

5   before, the full formal complete statement?

6   **A.**   Yes.

7   **Q.**   And does it, right on this account page here, say CMA

8   pledged?

9   **A.**   Yes.

10   **Q.**   What does that mean?

11   **A.**   It means that the account is pledged as collateral for a

12   loan.

13   **Q.**   If we go down to the next account number there, the 054

14   Merrill credit line.

15          **MR. WALSH:**   If we could highlight that.

16                   (Exhibit published.)

17   **BY MR. WALSH:**

18   **Q.**   What does it say the credit available is as of July 31st,

19   2014?

20   **A.**   $350,529.13.

21   **Q.**   And what does it say for the outstanding balance?

22   **A.**   Zero.

23   **Q.**   If we go down to the Bank of America 2573 account, what

24   does it indicate the current balance in that is as of

25   July 31st, 2014?

1    **A.**   Current balance $9,332.33.

2    **Q.**   And then it says "Available Balances."  Is there a higher

3    figure there?

4    **A.**   Yes.

5    **Q.**   What is that balance?

6    **A.**   $133,760.17.

7    **Q.**   What is an available balance as opposed to a current

8    balance?

9    **A.**   You know, it could be that there was an amount that -- or

10   I shouldn't say could be.  Perhaps there's an amount that was

11   recently transferred in the account.

12          **MR. FAKHOURY:**  Objection.  Move to strike,

13   speculation.

14          **THE COURT:**  Granted.  Sustained.

15          **MR. WALSH:**  If I may have a moment, Your Honor?

16          **THE COURT:**  Yes.

17                 (Pause in the proceedings.)

18          **MR. WALSH:**  Thank you very much, Your Honor.

19      I have no further questions for this witness.

20          **THE COURT:**  Thank you, Mr. Walsh.

21      Mr. Fakhoury, cross-examination?

22          **MR. FAKHOURY:**  Yes.  Just a few questions.  And I

23   just need one minute to get my computer set up.

24   / / /

25   / / /

**CROSS-EXAMINATION**

1

2  **BY MR. FAKHOURY:**

3  **Q.**  Good morning, Ms. Jenkins.

4  **A.**  Good morning.

5  **Q.**  I just have a few questions for you.  Okay?

6      I wanted to talk a little bit about the LMA account, okay?

7  You testified one purpose of an LMA account is to have

8  liquidity.  Do you recall that?

9  **A.**  Yes.

10 **Q.**  Okay.  And liquidity is essentially like having cash

11 available to use?

12 **A.**  Correct.

13 **Q.**  Okay.

14      **MR. FAKHOURY:**  I'm going to ask Mr. Torres to pull up

15 Exhibit 98.

16                    (Exhibit published.)

17 **BY MR. FAKHOURY:**

18 **Q.**  And you'll have to forgive -- I don't have the fancy trial

19 presentation software so we're just going to do with it Adobe.

20 So forgive me.

21 **A.**  No problem.

22      **MR. FAKHOURY:**  Now, if we could -- if you could

23 scroll down, Mr. Torres, a little bit.

24                    (Exhibit published.)

25 / / /

1   BY MR. FAKHOURY:

2   Q.  This is -- this has been admitted as Exhibit 98.  This

3   was -- if you recall, this was the LMA application that you

4   were shown and you discussed concerning Mr. Rothenberg.

5       Do you recall that?

6   A.  Yes.

7   Q.  Okay.  And here, on section 1, and I know it's a little --

8   little fuzzy to read, it talks about the purpose of applying

9   for an LMA account.  Do you see that?

10  A.  Yes.

11  Q.  And there are two items checked off.  Are you able to see

12  that?

13  A.  Yes.

14  Q.  So one is for general liquidity purposes, right?

15  A.  Correct.

16  Q.  And the second is for real estate purchase.  Do you see

17  that?

18  A.  Yes.

19  Q.  Okay.

20      And you testified that the collateral used to secure an

21  LMA can be any asset for the most part, right?

22  A.  Correct.

23  Q.  It can be -- and that's typically stocks or other sorts of

24  investments?

25  A.  That's the way I see it most frequently.

1   Q.   Okay.  But it can be cash, right?

2   A.   Yes.

3   Q.   It's not that common, but it's not unheard of?

4   A.   Correct.

5   Q.   Okay.  You even testified there might be some potential

6   tax benefits for some folks to -- to do it that way?

7   A.   Correct.

8   Q.   Okay.

9        So there's no red flags necessarily with the fact that

10  Mr. Rothenberg wanted an LMA account secured by cash.

11  A.   No.

12  Q.   Okay.

13           MR. FAKHOURY:   Okay.  I want to shift to Exhibit 68,

14  Mr. Torres.

15                    (Exhibit published.)

16  BY MR. FAKHOURY:

17  Q.   Do you recall this exhibit?

18  A.   Yes.

19  Q.   Okay.  And so we're all on the same page, if -- this was

20  an email exchange between you and Mr. Rothenberg in August of

21  2014?

22  A.   Correct.

23  Q.   It was about the certificate of deposit, right?

24  A.   Yes.

25  Q.   And his ability to access financial statements online,

1    correct?

2    **A.**   That's correct.

3    **Q.**   Okay.  Now, Mr. Walsh had asked about the attachment to

4    this exhibit.  I think it started on page 5.  Let me go back

5    through my notes.

6                        (Exhibit published.)

7    **BY MR. FAKHOURY:**

8    **Q.**   Yes, there we go, perfect.

9         And so he had asked you about Exhibit -- that one of the

10   attachments to this email was a Merrill Lynch statement,

11   right?

12   **A.**   Yes.

13   **Q.**   And this was the statement that was attached as a -- or

14   let me -- let me rephrase that.

15        This was the Merrill Lynch statement attached to the email

16   as an exhibit, correct?

17   **A.**   Yes.

18   **Q.**   This is for the CMA account, correct?

19   **A.**   That is correct.

20   **Q.**   Okay.  And you testified that even though he had attached

21   the statement for the CMA account, he had not attached the

22   statement for the LMA account, correct?

23   **A.**   Correct.

24        **MR. FAKHOURY:**   Okay.  Mr. Torres, if you could jump

25   to page 1, please.

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1              (Exhibit published.)

2      **BY MR. FAKHOURY:**

3      **Q.**  Okay.  I wanted to very quickly talk about some of the

4      other folks cc'd on this email.

5          So the -- so one person on this email is -- is Ryan Kelty.

6      Do you see that?

7      **A.**  Yes.

8      **Q.**  Now Mr. Kelty was someone you -- you worked with at

9      Merrill Lynch?

10     **A.**  Correct?

11     **Q.**  He's primarily in charge of mortgages.  Do I have that

12     right?

13     **A.**  Yes.

14     **Q.**  Okay.

15     **A.**  Correct.

16     **Q.**  And then there's Chris Allscheid, correct?

17     **A.**  Yes.

18     **Q.**  And Ms. Allschied is, I think you testified she's your

19     assistant?

20     **A.**  Correct.

21     **Q.**  And she also works for Merrill Lynch obviously.

22     **A.**  Yes.

23     **Q.**  And Merrill Lynch employees have the ability to access

24     other Merrill Lynch statements or documents in connection with

25     financial applications, right?

1    **A.**   Yes.

2              **MR. FAKHOURY:**  I may be done, Your Honor.

3        Can I just have one quick minute?

4              **THE COURT:**  Sure.

5                   (Pause in the proceedings.)

6              **MR. FAKHOURY:**  You know, I don't have any other

7    questions, Your Honor.  Thank you.

8              **THE COURT:**  All right.  Thanks very much.

9        Redirect?

10             **MR. WALSH:**  Extraordinarily short, Your Honor.

11                    **REDIRECT EXAMINATION**

12   BY MR. WALSH:

13   **Q.**   Ms. Jenkins, Mr. Fakhoury just asked you a question, and

14   this is actually a point of clarification more than anything.

15   I think you indicated that there might be tax benefits to

16   having a cash-only CMA account; is that true?

17   **A.**   I mean I don't think there are tax benefits to having a

18   cash-only CMA account, but I can attest that I've heard that

19   clients can sometimes deduct interest expense from their LMA

20   if it's aligned with an investment.  But I don't know if

21   there's a tax benefit to having cash in an LMA.

22   **Q.**   So when you were talking before about tax benefits for

23   having an LMA and a CMA, that was generally in the context of

24   stock, not cash?

25   **A.**   Correct.  So I would say a typical use of this, for me, is

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    clients have investments in their accounts, and so in order

2    for them to continue to invest with me, they will borrow to

3    get their liquidity versus -- versus having to sell their

4    accounts -- account out and turn it into cash.

5        So I would say that's a more typical use of the LMA.

6            **MR. WALSH:**  Thank you very much.  I have no further

7    questions.

8            **THE COURT:**  Recross?

9        **MR. FAKHOURY:**  No, Your Honor.  Thank you.

10           **THE COURT:**  Ms. Jenkins, thanks for your testimony.

11   You're excused.

12           **THE WITNESS:**  Thank you.

13           **THE COURT:**  Government's next witness, please.

14       **MR. WALDINGER:**  Your Honor, at this time, the

15   government would call Mr. Ryan Kelty.

16           **THE COURT:**  All right.

17       Members of the jury, this would be an excellent time to

18   stand up and stretch if you were so inclined.

19                  (Pause in the proceedings.)

20           **THE COURT:**  Okay.  If you could retake your seats,

21   please.

22       Good morning, Mr. Kelty.

23       May I ask you to come up to the witness stand over here.

24   You'll see my courtroom deputy is there.  When you get there,

25   if you could just remain standing, raise your right hand and

1    face my courtroom deputy, please.

2              THE WITNESS:  Good morning.

3                      **RYAN KELTY**,

4    called as a witness by the plaintiff, having been duly sworn,

5    testified as follows:

6              THE WITNESS:  I do.

7              THE CLERK:  Thank you.  If you could state and spell

8    your last name for the court reporter.

9              THE WITNESS:  Ryan Kelty.  K-E-L-T-Y.

10             THE COURT:  Very good.  Mr. Kelty, if you would just

11   go ahead and have a seat on the witness stand there.

12        My courtroom deputy is going to give you a clear mask that

13   we're using for witnesses because of the COVID pandemic.  That

14   way people will be able to see your expression.

15        It's got two straps that go behind your head, top and a

16   bottom one.

17                  (Off-the-record discussion.)

18             THE COURT:  Perfect.  Those masks have worked --

19   they've worked pretty well for us.  We've been doing this for

20   a while now.

21        Occasionally the glue will fail and then the little foam

22   strip comes off.  If that happens, we'll just get you a new

23   one.

24        Have you ever testified in a courtroom before?

25             THE WITNESS:  I have not.

1          **THE COURT:**  Okay.  It's mostly like just having a

2     conversation.  A couple things are different.

3          First, because of the pandemic, our jurors are spread out

4     all the way into the gallery.  So if you could stay close to

5     the microphone and keep your voice up, that'd be great.

6          **THE WITNESS:**  Sure.

7          **THE COURT:**  Second thing is in day-to-day

8     conversation, we interrupt each other all the time.  So you

9     might say to me, "Hey, did you see what happened on that

10     Warriors game last night?  Do you remember?"

11          And I'll just say, "Oh, yeah, Steph Curry da-da-da-da."

12     You know, I won't even let you finish the sentence.

13          In court, we have to wait for each other.  So the lawyers

14     will wait for you to finish talking completely before they ask

15     their next question.  If you could just pause a half a second

16     after they're done before you answer, that will make it easier

17     for our court reporter.

18          Last thing is day-to-day conversation, we use noises and

19     gestures all the time.  We say uh-huh, uh-uh.  We shake our

20     head back and forth.  The court reporter can only take down

21     whole words.  So if you could say "yes" or "no" or whatever

22     the word is, that'd be great.

23          Mr. Waldinger, your witness.

24          **MR. WALDINGER:**  Thank you, Your Honor.

25     / / /

1      **DIRECT EXAMINATION**

2      **BY MR. WALDINGER:**

3      **Q.**   Mr. Kelty, could you please tell the jury where you work?

4      **A.**   I work at Merrill Lynch.

5      **Q.**   And what's your position there?

6      **A.**   My current position is a financial advisor.

7      **Q.**   What do you do as a financial advisor for Merrill Lynch?

8      **A.**   I manage a book of assets for mainly families that work

9      out of the Colorado market.

10     **Q.**   You mentioned Colorado.  Do you work in Colorado?

11     **A.**   Yes, I do.

12     **Q.**   Where is your office in Colorado?

13     **A.**   It's in a district known as Cherry Creek in southeast

14     Denver.

15     **Q.**   Do you work in the same office as Anna Jenkins?

16     **A.**   Two blocks down the road.

17     **Q.**   Are there two Merrill Lynch offices in Cherry Creek?

18     **A.**   Yes, there are.

19     **Q.**   Fair to say that as a financial advisor for Merrill Lynch,

20     you said you managed a book of business, that's for -- you are

21     a wealth management advisor?

22     **A.**   That's correct.

23     **Q.**   How long have you been working at Merrill Lynch?

24     **A.**   I've been working at Merrill Lynch since 2005.

25     **Q.**   What did you do before that?

KELTY - DIRECT / WALDINGER

1   **A.**   Before that I was a, what was known as a wealth management

2   banker focused on mainly --

3   **Q.**   Let me stop you there.  Before 2005 --

4   **A.**   Oh, excuse me.

5   **Q.**   -- what did you do?

6   **A.**   I was in school.  I was a student.

7   **Q.**   So you've worked for Merrill Lynch your entire career?

8   **A.**   Yes.

9   **Q.**   Is Merrill Lynch owned by another entity?

10  **A.**   Yes.  They are owned by Bank of America.

11  **Q.**   How long has Merrill Lynch been owned by Bank of America?

12  **A.**   Since 2009.

13  **Q.**   Did that happen -- did that purchase happen during the

14  financial crisis that was going on at that time period?

15  **A.**   Yes, it did.

16  **Q.**   How long -- have you had the same job the whole time at

17  Merrill Lynch as a financial advisor?  Or have you had

18  different roles since you started there after college?

19  **A.**   I've had different roles since starting there after

20  college.

21  **Q.**   Let's -- let's just go back to college.  Where did you go

22  to college?

23  **A.**   I went to a state school in northeast Pennsylvania called

24  Bloomsburg University.

25  **Q.**   Are you from that area?

1    **A.**   Yes, I am.

2    **Q.**   From that part of the Pennsylvania or from another part of

3    Pennsylvania?

4    **A.**   From about an hour, hour and a half south -- southeast

5    Pennsylvania.

6    **Q.**   Okay.  And I understand you're a Phillies fan?

7    **A.**   I am.

8    **Q.**   Okay.  And Eagles?

9    **A.**   I am.

10   **Q.**   That make it hard to live in Denver?  The people in Denver

11   are pretty heavily Broncos fans.

12   **A.**   Broncos and Rockies, but we find our way.  We find our

13   places to watch games.

14   **Q.**   So you went to Bloomsburg University; is that right?

15   **A.**   Yes.

16   **Q.**   What was your degree in?

17   **A.**   Psychology.

18   **Q.**   It sounds like based on your testimony that you got a job

19   either as an employee or some kind of worker at Merrill Lynch

20   right out of college?

21   **A.**   A few months out of college, correct.

22   **Q.**   What did you start as when you started working at Merrill?

23   **A.**   In the fall of 2005.

24   **Q.**   What was your job at that time?

25   **A.**   My job at that time was to be a document specialist for

---

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    a -- a credit -- a credit platform designed to help

2    individuals borrow against assets at -- at Merrill Lynch.

3    **Q.**  When did you -- and where were you working physically when

4    you worked for Merrill at that time?

5    **A.**  Worked in an office outside of -- in central New Jersey,

6    Plainsboro, New Jersey, if I recall the exact town.

7    **Q.**  And let me just take a moment.  In my questions to you, I

8    think I've probably used the term both Merrill and Merrill

9    Lynch.  Does the company go by both names?  Do you call it by

10   both names?

11   **A.**  We do.  We've since been branded just Merrill.  But

12   historically we've been known as Merrill Lynch or Merrill

13   Lynch Pierce Fenner and Smith.  Different legal variations of

14   our name.

15   **Q.**  I believe your testimony was that when you started there,

16   you worked in central New Jersey.  You're now in Denver.  When

17   did that happen?  And then my follow-up question will be how

18   did that happen?

19   **A.**  Yeah, that -- that happened in 2013 at an opportunity to

20   interview for a -- a what was known at the time as a wealth

21   management banking position.  And that was to essentially the

22   role that I was doing in New Jersey, do it in an office in

23   front of, you know, a group of advisors.

24        And so that -- that process took place in -- in April/May

25   of 2013.

KELTY - DIRECT / WALDINGER

1    **Q.**   Guessing you got that job?

2    **A.**   I did.

3    **Q.**   And you started working as a wealth management banker in

4    Denver sometime in 2013.

5    **A.**   Correct.

6    **Q.**   You said -- you explained that you were basically doing

7    that role in New Jersey, but that it was going to be slightly

8    different in Denver.  What was the difference, if you could

9    reexplain that?

10   **A.**   Yeah.

11         The difference would have been more just face-to-face

12   interaction, directly meeting with advisors in a specific

13   branch office, in this case the Cherry Creek branch office

14   that Anna and I had worked at at the time, the one that is

15   currently a few blocks from my office right now.

16         So the main difference was just doing what I'm doing

17   internally in an office in New Jersey, externally assigned to

18   one branch.

19   **Q.**   And then when you say working with advisors, working with

20   financial advisors?

21   **A.**   Correct.

22   **Q.**   People like your position today?

23   **A.**   Correct.

24   **Q.**   So you were back in 2013, you were not a financial

25   advisor?

1   **A.**   I was not.

2   **Q.**   When did you become a financial advisor at Merrill Lynch?

3   **A.**   In mid 2015, I started that process.

4   **Q.**   What does that process entail?

5   **A.**   It entails getting several licenses, some of which I had

6   at the time, but I needed a few more to complete licensing to

7   become a financial advisor per Merrill Lynch's guidelines.

8   And also going through a training program that Merrill

9   Lynch offers, a three-year training program that took place

10   between 2015 and 2017.

11   **Q.**   I'm a lawyer, as you know, but I know people who are in

12   your industry, and I hear these terms "series something,"

13   series X, series Y.  Are those the kinds of certifications

14   that you are talking about having to get?

15   **A.**   Yes.

16   **Q.**   And -- and what -- whether you described the numbers -- or

17   like what are those certifications that you have to get to

18   become a financial advisor?

19   **A.**   They are -- there's a series of exams and you hear maybe

20   the most common is series 7 or 66 or 65.  They're licensing

21   exams to ensure that you understand not only rules and

22   regulations of the SEC and FINRA, but how to actually execute

23   trades, suitability standards, ethic and moral standards for

24   trading, and execution of, you know, stocks, publicly traded

25   stocks.

1    **Q.**   I don't think these acronyms are going to come up in this

2    case, but the SEC is the Securities and Exchange Commission?

3    **A.**   Correct.

4    **Q.**   And is FINRA the Financial Industry Regulatory Agency?

5    **A.**   Yes.  Correct.

6    **Q.**   The time period that we're going to talk about today is

7    the summer of 2014.  You understand that?

8    **A.**   Yes.

9    **Q.**   Could you remind, then, the jury what your position was at

10   Merrill Lynch in the summer of 2014?

11   **A.**   In the summer of 2014, I was a wealth management banker.

12   **Q.**   Who did you support?

13   **A.**   I supported financial advisors that were located in the

14   200 Josephine office where I worked in Cherry Creek.

15   **Q.**   200 Josephine is the street address?

16   **A.**   Yes.

17   **Q.**   Was Anna Jenkins one of those financial advisors that you

18   supported?

19   **A.**   Yes.

20   **Q.**   And was a man named Benjamin Bolt, or Ben Bolt, another

21   financial advisor that you supported?

22   **A.**   Yes.

23   **Q.**   So when you say you supported financial advisors who were

24   working in the 200 Josephine Street office, what does that

25   mean in terms of what you did for the financial advisors and

1    for the financial advisors' wealth management clients?

2    **A.**   To support the financial advisors in my role and capacity

3    was to represent mainly certain credit products, credit

4    meaning there's loans tied to those products, specifically

5    representing our mortgage platform.

6        So if a wealth management client of Anna or Ben was

7    interested in acquiring a mortgage on a piece of particularly

8    residential real estate, I would be their main point of

9    contact to analyze the deal and make, you know, upfront, you

10   know, kind of guideline decisions on whether that deal was

11   viable and interface with the client directly.

12   **Q.**   Okay.  Now, you said before that Merrill Lynch is owned --

13   is now owned by Bank of America, correct?

14   **A.**   Correct.

15   **Q.**   When -- with respect to the loan products that you're

16   talking about, and let's talk about mortgage loans, where does

17   that money coming from?  Is that money coming from Merrill

18   Lynch?  Or is it coming from Bank of America?  Or is it coming

19   from some other corporate entity?

20            **THE COURT:**  Do you mean who's funding the loan?

21            **MR. WALDINGER:**  Correct.

22            **THE WITNESS:**  Yeah, the funding entity of the loan is

23   Bank of America NA.  We were Merrill Lynch employees, so, you

24   know, of course we have a certain arm we're -- we're

25   processing that loan under.  But the actual funding entity of

1  all of our mortgages at that time would have been Bank of

2  America.

3  **BY MR. WALDINGER:**

4  **Q.**  You also used -- and I -- not sure I know the answer.  You

5  used the initials NA, bank of America NA.  What does NA mean?

6  **A.**  National Association.

7  **Q.**  So when you -- just to -- for clarity, when you were

8  selling a mortgage loan product, the -- the entity that was

9  originating or providing the money was Bank of America?

10  **A.**  Correct.

11  **Q.**  Which was a corporate parent or affiliate of Merrill?

12  **A.**  Correct.

13  **Q.**  I'm not sure how you conceive of the organization where

14  you work, but I just wanted to see if you'd give the jurors a

15  sense of how big Merrill is, how -- how many employees, how

16  much business, or if you think about it in terms of the whole

17  entity including Bank of America, that's fine too.  Just --

18  that's my question, and you just clarify your answer when you

19  describe the organization that you work for.

20  **A.**  A very large organization.  The Bank of America is a

21  global enterprise, has several hundreds of thousands of

22  employees, 200,000-plus.  Bank -- excuse me -- Merrill Lynch

23  is a private wealth management arm.  There's approximately 15-

24  to 16,000 financial advisors that do what I do across --

25  across the country and globe.

KELTY - DIRECT / WALDINGER

1  Q.  Okay.  Thank you.

2      And in general, you've been working at Merrill since

3  2000 -- mid-2000's?

4  A.  Yes.

5  Q.  Do you have a pretty good sense of the range of wealth

6  management clients that those 15- to 16,000 financial advisors

7  have?

8  A.  Yes.

9  Q.  Be fair to say that the wealth management clients of

10 Merrill Lynch represent a broad range of -- of families and

11 individuals?

12 A.  Yes.

13 Q.  And in other words, Merrill doesn't specialize, for

14 example, on people in the tech industry?

15 A.  Not as specific -- no.  No, do not.

16 Q.  I guess when I say specialize, I mean restrict.  It

17 doesn't restrict itself to people in the tech industry?

18 A.  No.

19 Q.  Okay.  Going back to your role in 2014, I think you called

20 it a wealth management banker?

21 A.  Correct.

22 Q.  You spoke about lending products.  I believe that one of

23 the lending products that you talked about was mortgages,

24 correct?

25 A.  Correct.

1   Q.   What kind of mortgages in the summer of 2014 was Merrill

2   offering?

3   A.   We offer a wide variety of mortgages, but specifically

4   where we were spending a lot of time were our portfolio

5   mortgages.  And that's another way of saying loans that we

6   would fund or lend off our -- our balance sheet, and -- and

7   don't sell in a secondary market like a -- a secondary market

8   mortgage is also known very commonly in the industry as a

9   Fannie Mac [sic] or Freddie Mae [sic] mortgage.  We were not

10  generally doing those mortgages.

11  Q.   I think you may have mixed it up.  I think you said Fannie

12  Mac and Freddie Mae.

13  A.   Fannie Mae, Freddie Mac, excuse me.

14  Q.   Typically or commonly, mortgage originators after they --

15  after a bank originates the loan, they will package them up

16  and there are these federal entities called Fannie Mae and

17  Freddie Mac that --

18          MR. FAKHOURY:  Objection.  Counsel is testifying.

19          MR. WALDINGER:  Let me --

20          THE COURT:  Sustained.

21  BY MR. WALDINGER:

22  Q.   Can you explain about Fannie Mae and Freddie Mac?

23  A.   Yeah.  Fannie Mae and Freddie Mac are government agencies

24  that will buy and sell mortgage-backed government securities.

25  And they have certain guidelines and thresholds.  Generally

KELTY - DIRECT / WALDINGER

1    those are lower thresholds or smaller loan amount thresholds.

2        And those were mortgages that Merrill and B of A offered

3    at that time that I could offer.  But most of my time was

4    spent selling mortgages that were not associated with programs

5    like that.

6    **Q.**  I believe you called those then portfolio mortgages.

7    **A.**  Correct.

8    **Q.**  Meaning that those were mortgages that either Merrill

9    or -- or Bank of America was not going to sell to Fannie Mae

10   or Freddie Mac?

11   **A.**  Correct.

12   **Q.**  And does that mean that those are mortgages that were

13   going to be kept on the company's books?

14   **A.**  Correct.

15   **Q.**  So let's -- I want to just talk about -- let's talk about

16   the summer of 2014.

17       This case is United States vs. Michael Rothenberg.  Did

18   you have discussions either on the phone or through email with

19   somebody named Michael Rothenberg about a mortgage product in

20   the summer of 2014?

21   **A.**  Yes.

22   **Q.**  Did you ever meet Mr. Rothenberg in person?

23   **A.**  No.

24   **Q.**  Did you speak with him on the phone?

25   **A.**  Yes.

1    Q.   And did you have email communications with him?

2    A.   Yes.

3    Q.   Do you recall or do you now recall the kinds of -- the

4    kinds of or the kind of mortgage product -- let me back up.

5         Were you speaking with Mr. Rothenberg and communicating

6    with him about a mortgage product?

7    A.   Yes.

8    Q.   What mortgage product was that?

9    A.   Initially it was -- the mortgage product that Michael was

10   aware of and was solicited was our PrimeFirst® LIBOR-based

11   mortgage, which is a mortgage that is also -- portfolio

12   mortgage held on our balance sheet with a very low interest

13   rate at that time.  That interest rate was 1.75 percent.

14        And also that mortgage carried a ten-year interest-only

15   function that allowed anyone who qualified to have a very low

16   and attractive monthly payment commensurate to the size of the

17   mortgage they were requesting.

18   Q.   So that -- and PrimeFirst®, was that the -- the branding

19   on the type of loan?

20   A.   It was the branding on the loan, correct.

21   Q.   Just want to make sure I got it -- I have it.  So it was

22   1.75 percent interest-only option for the first ten years.

23   A.   That's correct.

24   Q.   What would happen with that product after ten years?

25   A.   It was a 25-year total mortgage.  So after year ten, it

1    would amortize on a 15-year schedule.  Or there would be a

2    required principal and interest payment, in other words.

3    **Q.**  Was that mortgage product, PrimeFirst®, tied to a person's

4    brokerage holdings at Merrill Lynch?

5    **A.**  No, it was not.  They were independent.

6    **Q.**  Was there an incentive provided if the person who wanted

7    to take out the mortgage also had a brokerage account at

8    Merrill?

9    **A.**  There was a pricing incentive.

10   **Q.**  I'll ask you some more questions about the mortgage

11   product in a little bit.  But I wanted to talk about other

12   kinds of loan products.

13       And were there other loan products that you were selling

14   at that time as a Merrill wealth management banker?  When I

15   say that time, in the -- I mean the summer of 2014.

16   **A.**  Yes, there were other programs.

17   **Q.**  What were those?

18   **A.**  A variety of programs, but I mentioned Fannie and Freddie

19   programs.  So conventional mortgages.  On the portfolio side,

20   we would offer 30-day LIBOR loans.  In this example, the

21   PrimeFirst®, we would offer three-, five-, and seven-,

22   ten-year ARM programs.  Or what you would probably know as an

23   adjustable rate mortgage.  And we offered those both with

24   interest-only payment and principal and interest payment

25   options.

1        We also --

2   Q.  Let me stop you there and unpack it.

3        So you just, I think, were talking about different kinds

4   of mortgage products?

5   A.  Correct.

6   Q.  And you talked about different period of ARMs.  You then

7   went and defined what ARM is, but I want to make sure that the

8   jury got it.

9        What's an ARM, A-R-M?

10  A.  An arm is a loan that has an adjustable rate feature

11  eventually to it, but generally with an upfront lock.  So if

12  you were to hear a five-year ARM, what that generally means is

13  the interest rate is fixed for five years, and then from that

14  point thereafter it is adjustable based off certain pricing

15  terms.

16  Q.  When you were speaking with Mr. Rothenberg or

17  communicating with Mr. Rothenberg about mortgages, was it

18  about one of those ARM mortgages or about the PrimeFirst®

19  mortgage?

20  A.  It was about both.

21  Q.  And why is that?

22  A.  When we meet someone interested in a mortgage, one of the

23  first things we do is understand what the goal and objective

24  is and what -- what type of loan they're interested in.  And

25  in this particular example with Michael, it started with the

1   PrimeFirst® because that was the program that we had put on a

2   letter that was sent to him.  So it was our starting point.

3       But over time, you know, those discussions -- those

4   discussions regarding other programs took place based off of

5   qualification and what -- what the objective was.

6   **Q.**  Do you have a recollection as to what his objective was in

7   obtaining a mortgage through Merrill Lynch?

8   **A.**  Yes.  Initially, it was to obtain cash-out equity and do

9   what's known as a cash-out refinance.  That was the main

10  objective, as I recall.

11  **Q.**  Okay.  And you've talked about the different loan

12  products.  And I -- 1.75 is a -- is a pretty good interest

13  rate, correct?

14  **A.**  It would be considered a pretty good interest rate for the

15  market, yes.

16  **Q.**  I heard today on the news that the 30-year mortgages were

17  above 7 percent now.

18  **A.**  That's correct.

19  **Q.**  So with -- even though with respect to the PrimeFirst®

20  product, would there be a reason -- would there be any risk

21  factors with the PrimeFirst® that would say to a potential

22  borrower I'd rather just get a higher interest rate on an ARM

23  mortgage rather than get into in this ultra low 1.75 percent

24  interest rate?

25  **A.**  Yeah, there -- there are additional risks.  And we

1    would -- we would underwrite and profile a prospective

2    individual interested in this product a certain way

3    differently than we would an ARM.

4    **Q.**  What are the risks involved in that 1.75 percent

5    PrimeFirst® mortgage?

6    **A.**  The mortgages -- the risks are the mortgage is tied to a

7    short-term index.  That index, LIBOR, is a London Interbank

8    Offered Rate.  And that's another way of saying it's the

9    overnight lending rate, like the Fed fund rate that we're

10   hearing a lot about these days.

11       And so the risk is inherent in that there's a rate reset

12   every month.  So in a rising rate environment, it poses -- it

13   poses certain risks.

14   **Q.**  So in like a five-year ARM where you're locked into a

15   mortgage, the PrimeFirst® could go -- could change every

16   month?

17   **A.**  Correct.

18   **Q.**  And it was tied to LIBOR, and if LIBOR went up, the

19   PrimeFirst® mortgage would go up?

20   **A.**  That's correct.

21   **Q.**  I'm going to -- I'm going to direct the next question.

22       In addition to mortgages, was there any other kind of

23   short-term line of credit loan product that Merrill offered at

24   this time?

25   **A.**  Yes.

1    **Q.**   What was that?

2    **A.**   That product was called a Loan Management Account.

3    **Q.**   And can you describe that for the jury?

4    **A.**   Yeah.  Loan Management Account is essentially a line of

5    credit that would be collateralized by an account that you'd

6    deposit funds into at Merrill Lynch.  That account is

7    generally a brokerage account.  And a brokerage account is

8    very similar to a checking account in that you have the

9    ability to move money in and out, ACH and bill pay and wires

10   and write checks.  But you also have the ability to invest and

11   buy stocks and bonds and mutual funds.

12        And so that line of credit was a product we offered to

13   allow clients to borrow, also tied to LIBOR, against their

14   taxable assets held in a brokerage account at Merrill Lynch.

15   **Q.**   Thank you.  I want to unpack a little of what you said

16   again just for clarity's sake.

17        I think you said that the LMA is collateralized?

18   **A.**   Correct.

19   **Q.**   What does collateralized mean?

20   **A.**   Collateralized means security guarantee or pledge.  Kind

21   of the simplest way to describe it, just like a home

22   collateralizes a mortgage, the liquid assets in this account

23   would collateralize this line of credit.

24   **Q.**   And when you refer to liquid assets, those would be liquid

25   assets in I think what you referred to as a brokerage account?

1    **A.**   Correct.

2    **Q.**   Were the brokerage accounts also referred to as Cash

3    Management Accounts, or CMA's?

4    **A.**   Yes.

5    **Q.**   Can you just describe generally, Mr. Kelty, if you have an

6    LMA that is collateralized by a CMA, what the relationship

7    between the -- the balance held or the balance drawn down in

8    the LMA or line of credit, and the holdings that have to be in

9    the brokerage account is.  And -- and in your answer, feel

10   free to explain the differences on the different kinds of

11   holdings in the CMA account.

12   **A.**   Sure.  Your CMA, you have the ability to hold cash.  And

13   collateralize cash to an LMA.  You could also buy, you know, a

14   publicly traded stock.  You could buy a bond, a muni bond, a

15   municipal bond, a corporate bond, a mutual fund.  All -- all

16   these asset classes are systematically valued every day based

17   off the, you know, close of business day prior pricing.

18        And Merrill Lynch assigns certain security risk rating to

19   each instrument.  And as, you know, you could imagine, the

20   riskier the asset, the less we would allow to borrow.

21        So if it was a stock like Apple stock, we would generally

22   allow 50, upwards to potentially 60 percent of the value of

23   that stock to be borrowed against.

24        As you go up in risk or down in risk, up in credit quality

25   to a bond, that would increase to, say, 75-ish or 80 percent.

1      And then by the time you got to cash, which is, you know,

2   there's no fluctuation in value, it's FDIC insured cash, we

3   would -- we would allow individuals to borrow up to 95 percent

4   of the value of that cash.

5   **Q.**  So an example.  If I had $100,000 on deposit in my CMA

6   account, and I had -- and that collateralized an LMA

7   account -- or excuse me -- I guess just an LMA, how much

8   credit could I pull out of my LMA?

9   **A.**  With 100,000 cash, your credit available would be 95,000.

10  **Q.**  I've asked you whether you had conversations with

11  Mr. Rothenberg about mortgage products.  And the jury has your

12  answer.  And I'll ask you some more questions about that.

13      But now I want to ask you about whether you had

14  conversations with him and did any work for him in setting up

15  an LMA and a CMA.

16  **A.**  Yes, I did.

17  **Q.**  Thank you.  That wasn't the -- that wasn't the best

18  question in the world.

19      So I want to -- Mr. Kelty, we're going to be putting

20  some -- some exhibits on the screen to -- that's sort of right

21  in front of you.

22          **MR. WALDINGER:**  And we're going to start with

23  Exhibit 61, Ms. Margen.  This is in evidence.  If you can just

24  page through the first four pages, Ms. Margen, so that

25  Mr. Kelty can see the exhibit.

1        And then go back to the second page.

2                        (Exhibit published.)

3    BY MR. WALDINGER:

4    Q.   Do you recognize in general what kind of document this is?

5    A.   Yes.

6    Q.   What is it?

7    A.   This is an email between Mike Rothenberg and I regarding

8    documents I need to set up his CMA and LMA.

9    Q.   Is this an email chain, looking on this page, starting on

10   June 18th, and then going back to the first page, ending on

11   June 18th?

12   A.   Yes.

13           MR. WALDINGER:  So going back to this -- to the

14   second page -- or in fact, let's go, Ms. Margen, to page 4.

15                        (Exhibit published.)

16   BY MR. WALDINGER:

17   Q.   Do you recognize what these are (indicating) in this email

18   chain on page 4?

19   A.   That is Mike's email signature.

20   Q.   Is the Gmail address that's listed here at least one of

21   the email addresses that you communicated with Mr. Rothenberg

22   on during the summer of 2014?

23   A.   Yes.

24           MR. WALDINGER:  Ms. Margen, now you could go back to

25   page 2, please.  And let's blow up the bottom half of the

1    screen starting there.

2                        (Exhibit published.)

3    BY MR. WALDINGER:

4    **Q.**   Is this an email from you or from Mr. Rothenberg?

5    **A.**   That is from me.

6    **Q.**   What are you asking Mr. Rothenberg for?

7    **A.**   I'm asking him to complete what's known as a Client

8    Relationship Agreement, CRA, which is needed to open up his

9    CMA.  And I'm also asking him to complete the Loan Management

10   Account application, the LMA app.

11   **Q.**   They're -- and the LMA application includes something

12   called a U-1; is that correct?

13   **A.**   Correct.

14   **Q.**   I'd like to walk through some of the -- the documents

15   that -- did you send him those documents in this email?

16   **A.**   I did send them in this email, yes.

17   **Q.**   Would those have been attached as a PDF?

18   **A.**   Yes.

19           **MR. WALDINGER:**  Ms. Margen, let's go to Exhibit 77.

20       Oh, wait, let's stopt right here.

21                        (Exhibit published.)

22   BY MR. WALDINGER:

23   **Q.**   So one of the things that you send is in number 3, LMA

24   loan agreement for your records only.

25       What does it mean "for your records only"?

1    **A.**   It means we need to provide it upon presenting the app,

2    but there's no signature required.

3          **MR. WALDINGER:**   So let's go to Exhibit 77, which is

4    in evidence.

5                    (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**   This is a 17-page exhibit.   Just by looking at the first

8    page, can you tell what this is, Mr. Kelty?

9    **A.**   Yes.

10   **Q.**   What is it?

11   **A.**   This is the LMA loan agreement.

12   **Q.**   The name itself may be fairly -- fairly self-explanatory,

13   but can you explain what -- what it is?   It's -- what does

14   this LMA agreement do?

15   **A.**   It -- it establishes the -- the terms of the account, what

16   the LMA is, what it also is not.   And particularly terms

17   around what's eligible to be used as collateral, pricing,

18   repayment, and terms of, you know, liquidation, should we run

19   into a situation where the loan had to be liquidated and paid

20   off.

21   **Q.**   I'm circling in the second paragraph (indicating), not

22   very well, a phrase that says "uncommitted revolving line of

23   credit account."   What does that mean?

24   **A.**   It means the -- the LMA account is not fully committed or

25   in other words, uncommitted, meaning the bank can -- the bank

1    can revoke or change the line and close it at any point in

2    time.

3    **Q.**   So even though you described earlier the LMA being

4    collateralized, despite the fact of that collateralization,

5    are you saying that the bank can still take back the -- the

6    LMA or close the LMA at any time?

7    **A.**   Correct.

8    **Q.**   And in fact, the second sentence says what?

9    **A.**   That the LMA is payable on demand.

10            **MR. WALDINGER:**   If we can highlight paragraph 2,

11   section 2, Ms. Margen.

12                         (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.**   In the paragraph we were just looking at, it used the term

15   "borrower."   Borrower is defined in the section, correct?

16   **A.**   Correct.

17   **Q.**   Who's the borrower to the extent -- let -- just make --

18   for clarity's purposes, you did -- did you set up an LMA for

19   Mr. Rothenberg?

20   **A.**   Yes.

21   **Q.**   For Mr. Rothenberg's LMA, who's the borrower?

22   **A.**   Mike Rothenberg individually.

23   **Q.**   Then there's a definition down here that we're going to

24   see later called "loan party."

25            Is it true that the agreement defines "loan party" as

1    being the borrower and somebody called the pledgor?

2    **A.**   Correct.

3    **Q.**   As well as -- okay.  Strike that.

4            **MR. WALDINGER:**   Ms. Margen, if we can go to the

5    bottom of page 2.

6                        (Exhibit published.)

7    **BY MR. WALDINGER:**

8    **Q.**   Mr. Kelty, you used the term "LIBOR" before, and this

9    section, section 4, bottom of page 2, of Exhibit 77 has that

10   acronym.  Is this where the LIBOR rate is set in the

11   agreement?

12   **A.**   Yes.

13   **Q.**   What is a variable rate advance?

14   **A.**   It's an advance that has a variable rate component tied to

15   the interest rate that generates interest on the loan.

16   **Q.**   How -- how often did the interest rate vary on an LMA?

17   **A.**   Weekly.

18   **Q.**   Where did LIBOR come in in determining the total interest

19   rate?  And I'm highlighting the phrase at the end of the first

20   sentence of the second paragraph of section 4.

21   **A.**   Yeah, LIBOR was one of two components of the LMA rate.

22   The index or LIBOR being component one.  And then the second

23   component to find here is the spread.  It's also called

24   margin.  But the -- the spread is the additional interest

25   that's tacked on by the bank.  In addition to the index.

1    **Q.**   The spread is -- is what the bank's making on this money?

2    **A.**   Correct.

3          **MR. WALDINGER:**   Ms. Margen, if we could go to the

4    bottom of page 5, section 6.

5                    (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**   Mr. Kelty, this section is entitled "Security Entrance" --

8    excuse me -- "Security Interest and Maintenance Requirements."

9          First I want to -- I think you may have testified earlier

10   to something that fits into this piece (indicating).

11         What is MLPF&S?

12   **A.**   It stands for Merrill Lynch Pierce Fenner & Smith.

13   **Q.**   That's the old-timey name for Merrill Lynch?

14   **A.**   The old -- the old five owners, correct.  The old timey

15   name.

16   **Q.**   There's some -- a reference here to a securities account.

17   In terms of the LMA agreement, what is the securities account?

18   **A.**   It's the collateral account, the account where the assets

19   are used to pledge to the LMA.

20   **Q.**   Starting at the beginning of this section, what does

21   the -- this section of the LMA do vis-a-vis that securities

22   account?  What sort of security instrument is provided?

23   **A.**   This paragraph substantiates what -- what takes place in

24   terms of security interests and maintenance requirements

25   for -- for securities accounts.  But the answer is -- it's

1    first lien, first priority lien.

2              **MR. WALDINGER:**  Ms. Margen, if you could go to the

3    first full paragraph at the top of the next page.

4                        (Exhibit published.)

5    **BY MR. WALDINGER:**

6    **Q.**  Mr. Kelty, I believe you testified earlier in the context

7    of a securities account or collateral account that had cash in

8    it, I believe your testimony was that for every hundred

9    thousand dollars of cash, a borrower could take up to 95,000

10   out of their LMA, correct?

11   **A.**  Correct.

12   **Q.**  There's a -- there's a term here that's used called

13   "maintenance requirement."  Does that term, "maintenance

14   requirement" relate in any way to that 95 percent figure that

15   you just talked about?

16   **A.**  Yes.

17   **Q.**  What is the -- what is the relationship then between the

18   two?

19   **A.**  The 95 percent figure in this example is what's called the

20   advance requirement.  It's what the bank will advance or will

21   allow the customer to borrow.

22       The maintenance requirement is -- is what's set to secure

23   the loan to ensure that the loan does not exceed a certain

24   value where the bank would deem that loan in a risk position

25   where we would have to take action.  It's also known as a

KELTY - DIRECT / WALDINGER

1     margin call.

2     Q.   So in an example that we've been using where I have a

3     hundred -- or a person has $100,000 of cash on deposit and has

4     taken out a $95,000 advance from an LMA, is -- is the person

5     who has $100,000 on deposit able to draw any more cash out of

6     the LMA?

7     A.   No.

8     Q.   Is the person in that situation who has $100,000 in cash

9     and a $95,000 balance on the LMA able to withdraw any money

10    from the CMA, the $100,000 account?

11    A.   Not -- no, not unless they paid the loan off.

12    Q.   You described the CMA account earlier as being a little

13    bit like a checking account.

14    A.   Correct.

15    Q.   So what if the -- what if that person just wrote a check

16    and the check came in to Merrill for, in the -- in the

17    hypothetical I've been giving you, for $10,000?

18    A.   We would receive the check and identify that there's an

19    LMA at that threshold of 95 percent securing the CMA.  And the

20    likely outcome in this hypothetical is we decline the check

21    because there's not enough excess.

22    Q.   Does Merrill offer the ability to its clients of

23    initiating transactions directly out of a CMA?

24    A.   Yes.

25    Q.   Like you used a term -- another term I didn't have you

1    define, ACH?

2    **A.**   Correct.

3    **Q.**   What's that stand for?

4    **A.**   I think it's Automated Clearing House, yeah.

5    **Q.**   Under the scenario I've just given you with 100,000 in the

6    CMA and $95,000 balance on the LMA, if a borrower went in --

7    or a customer went in and tried to send more money out of

8    the -- out of the CMA account, would they be able to do that

9    at Merrill?

10   **A.**   The ACH?  No, it would be blocked as well.

11          **MR. WALDINGER:**  Ms. Margen, let's go to the next page

12   and the first paragraph under the "Rights and Remedies"

13   section.

14                    (Exhibit published.)

15   **BY MR. WALDINGER:**

16   **Q.**   This is as rights and remedies section.  And is it true,

17   Mr. Kelty, that the first paragraph here relates to what's

18   called a remedy event?

19   **A.**   Yes.

20   **Q.**   It has Roman numeral one subsection all the way to Roman

21   numeral 15.  The good news is that I'm not going to have you

22   go through all of those.

23       But in general, what does this section provide for?  What

24   is a remedy event?

25   **A.**   A remedy event is any event that cures or remedies what we

1    would define as a margin call, when the loan advance exceeds a

2    certain level and essentially violates that maintenance

3    requirement function, the piece of the loan agreement we just

4    looked at.

5    Q.  When we started talking about this LMA agreement on

6    page 1, you -- you noted that the -- that the LMA is

7    uncommitted.

8    A.  Correct.

9    Q.  Which -- which I believe means that Merrill could revoke

10   it at any time.

11   A.  Correct.

12   Q.  And that would include for any of the reasons set forth

13   here?

14   A.  Correct.

15   Q.  And in fact, I will talk about one of these subsections,

16   Roman seven.  If the value of the financial assets in the

17   securities accounts -- I'll start that over.

18       If the value of the financial assets in the securities

19   account or other collateral is in the sole judgment of bank

20   insufficient.

21   A.  Correct.

22   Q.  Here "bank" might mean Bank of America, Merrill Lynch's

23   corporate parent?

24   A.  Yes.

25   Q.  If -- if any one of these remedy events occurs, does this

1    section of the LMA also provide for remedies?

2          **MR. WALDINGER:**  And, Ms. Margen, I'll have you

3    highlight the next section -- or the next paragraph of

4    section 7.  Or blow it up.

5                     (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**  Does this paragraph -- now we're back to sub --

8    subparagraph -- the line items are letters instead of Roman

9    numerals.  We start at A and go to J, correct?

10   **A.**  Correct.

11   **Q.**  Would you read, just for example, the first couple of

12   remedies that the bank may take if a remedy event occurs?

13   **A.**  Letter A, demand immediate payment.  I won't read that

14   whole sentence, but demand payment.

15       B, which is also common, demand that borrower and/or

16   pledger provide additional collateral to bank.  That's --

17   that's very common.

18   **Q.**  Let me stop you there.

19       We sort of went through one of these already.

20       G is decline payment of any checks?

21   **A.**  Correct.

22   **Q.**  The bank or Merrill could liquidate the CMA?

23   **A.**  That's correct.

24   **Q.**  All right.  Thank you.

25          **MR. WALDINGER:**  You can take that blowup down,

KELTY - DIRECT / WALDINGER

1    Ms. Margen.

2        I think that we'll go now to the -- the next page of

3    sections -- of Exhibit 77.  And let's just blow up the top

4    half of paragraph -- or section -- section 8, top half of

5    paragraph -- section 8.

6                        (Exhibit published.)

7    **BY MR. WALDINGER:**

8    **Q.**  Are there any representations, warranties, and covenants

9    made by each loan party which we saw defined earlier?

10   **A.**  Yes.

11   **Q.**  Just read the first -- again, we have multiple

12   subsections.  Just read number A, please, or letter A.

13   **A.**  Such loan party owns the securities account and other

14   collateral under this agreement listed in the records of bank.

15       Securities intermediary, or Bank of America group, as

16   belonging to such loan party free of any lien or security

17   interest other than the lien and security interest established

18   under this agreement and any lien and security interest in

19   favor of applicable securities intermediary.

20   **Q.**  All right.  Thank you.

21           **MR. WALDINGER:**  Ms. Margen, if you could just --

22   there's something here that I want to ask Mr. Kelty -- blow up

23   this bottom half now of this same paragraph.

24                        (Exhibit published.)

25   / / /

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

 1   BY MR. WALDINGER:

 2   Q.  There's talking -- there's talk about notification to

 3   Merrill including at a phone number or a telegraph.  Have you

 4   ever received a telegraph?

 5   A.  I have not.

 6   Q.  Oh.  That's the -- that must be when it was Merrill Lynch

 7   Pierce Fenner & Smith, right?

 8   A.  Likely, yes.

 9        MR. WALDINGER:  Let's -- Ms. Margen, I believe that

10   we can take down Exhibit 77.

11      And I would like to go back, I believe -- just one second.

12      Let's go back, Ms. Margen, to Exhibit 61.

13                    (Exhibit published.)

14   BY MR. WALDINGER:

15   Q.  This was an email chain, Mr. Kelty, if you recall?

16   A.  Yep, I do.

17        MR. WALDINGER:  Ms. Margen, would you go to the

18   bottom of section -- or excuse me -- of page 2?

19                    (Exhibit published.)

20   BY MR. WALDINGER:

21   Q.  Do you recall, Mr. Kelty, you sent Mr. Rothenberg,

22   according to this email, numerous documents.  We've just gone

23   through one of them.

24   A.  Right.  Correct.

25        MR. WALDINGER:  Ms. Margen, could you then now blow

KELTY - DIRECT / WALDINGER

1    up the top half of this page.

2                    (Exhibit published.)

3    BY MR. WALDINGER:

4    Q.   Did Mr. Rothenberg send those documents back to you?

5    A.   Yes, he did.

6    Q.   Based on your review of the email correspondence, did you

7    have to go back and forth with him several times to get -- or

8    at least a couple of times to get the right signatures?

9    A.   As I recall, I did have to go back.

10          MR. WALDINGER:   Let's -- Ms. Margen, if we could then

11   go to the first page.

12                   (Exhibit published.)

13   BY MR. WALDINGER:

14   Q.   And in the top of the first page, are you responding to

15   the email that Mr. Rothenberg sent you that's -- that is shown

16   in the top of the next page?

17   A.   Yes, I am.

18   Q.   You say:  "Sorry, I need you to initial page 3 of the

19   attached LMA application."

20   A.   Correct.

21   Q.   And he sends -- he sends it back to you.

22   A.   He does, yes.

23          MR. WALDINGER:   All right.  Ms. -- Ms. Margen.

24   Q.   And you can -- can you tell from looking at this -- the

25   email headers that there was an attachment to Mr. Rothenberg's

1   email?

2   **A.**   Yes.

3   **Q.**   The -- the name of that PDF file is Loan Management

4   Account paren LMA application and U-1.

5        Are those typically -- or at this time were they typically

6   sent in the same PDF?

7   **A.**   It really was whatever the discretion of the individual

8   signing it.  It wasn't necessarily a -- a rule one way or the

9   another.

10  **Q.**   Okay.

11           **MR. WALDINGER:**   Ms. Margen, could we just exit out of

12  the blowup.  I think this is possibly big enough and it

13  doesn't necessarily need to be blown up.

14  **Q.**   Your -- you said you were a wealth management banker at

15  this time.  Were you also, like many bank employees, a vice

16  president?

17  **A.**   Yes.

18  **Q.**   How -- were there a lot of vice presidents at the time?

19  Nothing against you, but I've met a lot of bankers and I seem

20  like I meet a lot of vice presidents of banks?

21  **A.**   Yeah, it's a shiny title, right.  It's just a title, a

22  functional title internally that is used, you know, that --

23  that was assigned to me at that time.

24  **Q.**   What is NMLS number?

25  **A.**   National Mortgage Licensing System number.

1    **Q.**  What is that?

2    **A.**  It's a national registry where, if you are assisting in

3    and/or directly originating mortgage business, you know, where

4    you're soliciting products like -- like I was at the time,

5    that you need to be registered under a national registry.

6    **Q.**  Is that number unique to you?

7    **A.**  It is.  That is my NMLS number.

8    **Q.**  So you -- you probably have that memorized?

9    **A.**  I do.

10   **Q.**  Like I have my bar number memorized.

11        **MR. WALDINGER:**  Ms. Margen, could we turn to page 8

12   of Exhibit 61.

13                     (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**  If you recall this email chain, Mr. Kelty, there was some

16   back and forth, and the last email was Mr. Rothenberg sending

17   you a PDF that had both LMA account application and the word

18   U-1 in it.

19        Is this one of the documents that was in the attachment?

20   **A.**  Yes.

21   **Q.**  What is a U-1?

22   **A.**  It's a form that's -- I believe it's a Federal Reserve

23   form that is required for us to get signed if we're issuing

24   a -- a bank product that's tied to some sort of a stock

25   interest.  Public, you know, buying stock, tying it against,

1    you know, the purchaser or collateralization of stock.

2    Q.  And when you talk about collateralization of stock, would

3    this form have to be filled out even if the collateral was

4    just cash?

5    A.  Yes.

6    Q.  So there's some handwriting and a signature on the first

7    page.  Is that your signature?

8    A.  No.

9    Q.  Do you know whose signature that is?

10   A.  That is Michael Rothenberg's signature.

11   Q.  Did he send you this document?

12   A.  He did.

13   Q.  How about the printing?  Is that Mr. Rothenberg's

14   printing, or is it someone else's?

15   A.  That is my handwritten print, to print his name so I

16   indicated where to sign.

17   Q.  Did you prefill some of the sections of both the U-1 and

18   the LMA account application.

19   A.  I did for convenience, yes.

20          MR. WALDINGER:  Let's move, Ms. Margen, to page 10 of

21   Exhibit 61.

22                     (Exhibit published.)

23   BY MR. WALDINGER:

24   Q.  What is this document, Mr. Kelty?

25   A.  This is page 1 of the loan application, LMA application.

1    **Q.**  Did you put this checkmark on page 10 of Exhibit 61?

2    **A.**  Yes, I did.

3         **MR. WALDINGER:**  Let's move to the next page,

4    Ms. Margen.

5                      (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**  Same question with respect to the handwriting and the

8    checkmarks on page 11.

9    **A.**  Those are -- that's my handwriting and checkmark.  That is

10   not my signature in the middle of the page.

11   **Q.**  I'm circling, it's under -- it's in the sort of the second

12   box from the bottom on the right where it says "Initial Here"

13   and it says "Applicant" under the line.  Correct?

14   **A.**  Correct.

15        **MR. WALDINGER:**  Ms. Margen, let's go to the next

16   page.

17                      (Exhibit published.)

18   **BY MR. WALDINGER:**

19   **Q.**  And you've reviewed this email correspondence with -- that

20   you had with Mr. Rothenberg before today, correct?

21   **A.**  Yes.

22   **Q.**  And was -- was this the area where you were having

23   miscommunication with Mr. Rothenberg as to where he needed to

24   sign?

25   **A.**  Yes.

1    **Q.**  Did this version fix what you needed to have signed?

2    **A.**  Yes.

3    **Q.**  What's the purpose of this section?

4    **A.**  The purpose of this section is to receive written initials

5    from the client acknowledging that they're going to be using,

6    as titled here, a securities account, which securities account

7    they're going to be using.

8               **MR. WALDINGER:**  Let's blow that top half up,

9    Ms. Margen.

10                    (Exhibit published.)

11   **BY MR. WALDINGER:**

12   **Q.**  Again you've reviewed your correspondence, and Merrill

13   Lynch Pierce Fenner & Smith's records on this.  What was the

14   securities account with respect to Mr. Rothenberg's LMA?

15   **A.**  The securities account was going to be his CMA.

16   **Q.**  Do accounts at Merrill Lynch have numbers?

17   **A.**  Yes.

18   **Q.**  Can you explain to the jury why there's no number listed

19   here, given -- given the timing or the sequence of events?

20   **A.**  Yeah.  It was because we were setting up both

21   simultaneously.  In a more non-rushed traditional scenario, we

22   would open up the CMA, have time to receive that request, and

23   then properly open up the LMA thereafter.  And that would

24   prefill the securities account.

25        In this case, we were doing both simultaneously.  We were

1   rushing it.

2   Q.  Do you know why you were doing it simultaneously and why,

3   in your words, you were rushing it?

4   A.  Because that's what I was instructed to do.

5   Q.  By whom?

6   A.  By Michael Rothenberg.

7   Q.  Did you -- and in fact did you have to -- in order to get

8   the CMA and the LMA set up at the -- at both times -- or at

9   the same time, did you have to -- I'm trying to think of the

10  word -- grease the skids or -- or get people to do favors for

11  you?

12  A.  I did.  I had to request rushes from our back office to

13  open up not only the -- the LMA, but link the CMA to it

14  quicker than -- than we normally would allow.  Yeah.

15  Q.  Okay.  Did you have an understanding or do you recall --

16  strike that.

17      Do you recall the urgency and why -- whether

18  Mr. Rothenberg explained why he needed both of these set up at

19  the same time?

20  A.  The explanation that we received was that he needed the

21  funds for business -- business liquidity, business use.  So

22  although he was depositing the funds, he needed access to

23  those funds back immediately via this LMA.

24  Q.  And this may seem obvious, but I think your testimony was

25  typically what happens is a CMA is established, correct?

KELTY - DIRECT / WALDINGER

```
1    A.   Correct.

2    Q.   You get a number?  Correct?  An account number, correct?

3    A.   Correct.

4    Q.   And then an LMA is set up.

5    A.   Correct.

6    Q.   In this case, those things happened at the same time?

7    A.   Correct.

8              THE COURT:  Mr. Waldinger, anytime in the next five

9    minutes that's convenient to your outline.

10             MR. WALDINGER:  Very good.  Thank you, Your Honor.

11        Ms. Margen, if we could just move to the top of the next

12   page, there's something called a risk disclosure agreement.

13                       (Exhibit published.)

14   BY MR. WALDINGER:

15   Q.   Again, there are multiple Roman numeral subsections here,

16   correct, Mr. Kelty?

17   A.   Yes.

18   Q.   Does one of those -- this -- this section is entitled

19   "Risk Disclosure Statement."

20   A.   Correct.

21   Q.   Is it fair to say that this has the LMA account applicant

22   acknowledge the risks involved in the LMA?

23   A.   Yep.  Correct.

24   Q.   Did one of those risks include that the bank can force the

25   sale or other liquidation of any securities or other
```

1    investment property in the securities account?

2    **A.**   Correct.   That's included here.

3    **Q.**   Remind the jury, please, what -- in this context, what the

4    securities account was.

5    **A.**   Securities account was the CMA which is holding cash.

6         **MR. WALDINGER:**   Finally, let's go, Ms. Margen, to the

7    last page which is page 15.

8                         (Exhibit published.)

9    BY MR. WALDINGER:

10   **Q.**   I think I know what the answer is going to be, but who

11   signed it and whose handwriting is on the last page?

12   **A.**   That is Michael's signature, and I printed his name below

13   his signature so he knew where to sign.

14        **MR. WALDINGER:**   I think this would be a good place

15   for a break, Your Honor.

16        **THE COURT:**   Let's do it.

17     All right.   Members of the jury, let's take our second

18   15-minute break of the day.   Remember my prior admonitions,

19   and I'll see you in 15 minutes.

20        **THE CLERK:**   Please rise for the jury.

21     (The following proceedings were heard out of the presence

22   of the jury:)

23        **THE COURT:**   All right.   There we go.

24     All right.   We're outside the presence of the jury.

25     Mr. Waldinger, anything for the record?

```
 1              MR. WALDINGER:  Not -- no, Your Honor.  Thank you.

 2              THE COURT:  Mr. Fakhoury.

 3              MR. FAKHOURY:  No, Your Honor, thank you.

 4              THE COURT:  Very good.  Thanks.  Let's be in recess.

 5         Mr. Kelty, you can step down and take a break too.

 6              THE WITNESS:  Thank you.

 7         (Recess taken at 11:45 A.M.; proceedings resumed at

 8    12:05 P.M.)

 9         (The following proceedings were heard in the presence of

10    the jury:)

11              THE CLERK:  You may be seated.

12              THE COURT:  All right.  Let's go back on the record.

13         All the jurors are in their assigned seats.  Parties and

14    counsel are at counsel table.

15         Just a reminder to those persons in the courtroom.  We do

16    have a masking requirement.  The mask only works if you keep

17    it over your nose and mouth.  Earlier this morning somebody

18    pulled down their mask to sneeze, which is profoundly

19    counterproductive because the point of the mask is to block

20    the passage of air from your body into the air.  And the

21    sneeze involves the forceful exhalation of air.

22         If you don't want to sneeze in your mask, you should go in

23    the hallway or you should have an extra mask in your pocket.

24         Mr. Waldinger, your witness.

25              MR. WALDINGER:  Thank you, Your Honor.
```

KELTY - DIRECT / WALDINGER

1           Your Honor, I have an exhibit that I -- has not been

2    admitted.  I was just -- I think I can authenticate it through

3    Mr. Kelty.  May I approach the witness and show him the

4    document?

5           **THE COURT:**  Counsel may approach a witness for a

6    proper purpose at any time without seeking leave of Court.

7        So yes, you may.

8           **MR. WALDINGER:**  Thank you, Your Honor.

9    **Q.**  Mr. Kelty, I'm showing you what's been marked as United

10   States Exhibit 122.

11       In general, without specifics, what is this document?

12   **A.**  This is an email between Mike Rothenberg and I.  And it's

13   requesting documents to open up the CMA and LMA.

14   **Q.**  What is the date of the email?

15   **A.**  June 18th, 2014.

16   **Q.**  Did this -- does this exhibit, Exhibit 122, attach to the

17   email the documents that you sent to Mr. Rothenberg on

18   June 18th of 2014?

19   **A.**  Yes.

20   **Q.**  Does Exhibit 122, is that an accurate printout of your

21   email and the attachments that you sent to Mr. Rothenberg on

22   that date?

23   **A.**  Yes.

24          **MR. WALDINGER:**  Your Honor, I would move to admit

25   Exhibit 122.

```
 1              THE COURT:  Any objection?

 2              MR. FAKHOURY:  No, Your Honor.

 3              THE COURT:  Exhibit 122 is admitted.

 4         (Government's Exhibit 122 received in evidence.)

 5    BY MR. WALDINGER:

 6    Q.  And just in general --

 7              MR. WALDINGER:  Ms. Margen, do you have that?

 8              MS. MARGEN:  Yes.

 9              MR. WALDINGER:  Put that first page up.

10         If you don't have it, I can switch to the ELMO,

11    Ms. Margen.

12              MS. MARGEN:  Okay.

13                   (Pause in the proceedings.)

14              MR. WALSH:  It's not popping up.

15              THE CLERK:  Sorry, it's takes just one second.

16              MR. WALDINGER:  There we go.

17                   (Exhibit published.)

18    BY MR. WALDINGER:

19    Q.  Is this the first page of Exhibit 122, Mr. Kelty?

20    A.  Yes.

21    Q.  You discussed --

22                   (Off-the-record discussion.)

23              MR. WALDINGER:  All right.  So we're having some tech

24    problems.

25    Q.  Is the actual exhibit more legible than what you can see
```

1  on the screen?

2  **A.**  Yes.

3  **Q.**  And jury may have seen other versions of these documents.

4  Particularly I'm going to turn to page -- could you turn to

5  page 19.  It's in the bottom right corner, it will say trial

6  Exhibit 122-019.

7  **A.**  (Reviewing document.)

8                          (Exhibit published.)

9  **BY MR. WALDINGER:**

10 **Q.**  What is that document?

11 **A.**  It's page 1 of the client relationship agreement.

12 **Q.**  And the document you have in your hand, as you said, is

13 much -- is quite legible, correct?

14 **A.**  Correct.

15 **Q.**  These were all the documents that you sent to

16 Mr. Rothenberg on June 18th of 2014, correct?

17 **A.**  Correct.

18 **Q.**  Now, you can put that exhibit to the side, Mr. Kelty.

19         **MR. WALDINGER:**  And if we can, Ms. Lee, please move

20 back to the -- to our computer.  And we'll see how the sausage

21 is made.

22         **MR. WALSH:**  What exhibit number?

23         **MR. WALDINGER:**  98, please.

24 **Q.**  So I'm pulling up what's already been admitted into

25 evidence as Exhibit 98.

 1          And, Mr. Kelty, I'm not going to show you all the pages of

 2     this exhibit, but I wanted to use one of the pages to

 3     illustrate something that you testified about.

 4               **MR. WALDINGER:**  And that would be on page 58,

 5     Ms. Margen.

 6     **Q.**  And that should be coming up on your screen shortly,

 7     Mr. Kelty.

 8                         (Exhibit published.)

 9     **BY MR. WALDINGER:**

10     **Q.**  Does this appear to be some type of summary of accounts?

11     **A.**  Yes.

12     **Q.**  Ms. Margen, first, there are names listed here:  Bolt,

13     Jenkins, Bhalla.  Do you know who those people are?

14     **A.**  Yes.  They're financial advisors that were see assigned to

15     Michael Rothenberg's accounts at Merrill Lynch.

16               **MR. WALDINGER:**  Ms. Margen, could you blow up

17     Section 2.

18                         (Exhibit published.)

19     **BY MR. WALDINGER:**

20     **Q.**  From looking at this section, can you tell what account

21     that this page relates to, Mr. Kelty?

22     **A.**  Yes.  The LMA we set up for Michael Rothenberg.

23     **Q.**  That is the LMA with an account number ending 6054,

24     correct?

25     **A.**  Correct.

1  **Q.**  You spoke before about the LIBOR rate and the spread.

2  Does this document, document what those were at the time that

3  it was created, that the -- at least at the time that the

4  document was created?

5  **A.**  Yes, it does.

6  **Q.**  And what is that?

7  **A.**  It shows LIBOR rate at .5 -- .154 percent.  This is as of

8  June 26th, 2014.  And also the spread which is that additional

9  interest that is added on at 3.625.  And adding those two

10 together shows the total variable interest rate of

11 3.779 percent.

12 **Q.**  Okay.  And is this 3.779 percent, that would -- that would

13 change potentially as LIBOR changed?

14 **A.**  Correct.

15 **Q.**  But the spread would stay the same.

16 **A.**  Correct.

17 **Q.**  All right.  Thank you.

18       **MR. WALDINGER:**  We can take that down, Ms. Margen.

19 **Q.**  Mr. Kelty, you testified previously that there was some --

20 I believe some time pressure in getting the CMA and LMA set

21 up; is that correct?

22 **A.**  Yes.

23 **Q.**  Were you -- if I showed you bank statements, would that

24 reflect the -- the times when the LMA and the CMA were set up?

25 **A.**  Yes.

 1              **MR. WALDINGER:**  Ms. Margen, let's go to trial

 2    Exhibit 50, which I believe is in evidence.

 3                        (Exhibit published.)

 4    **BY MR. WALDINGER:**

 5    **Q.**  And we can take a minute.  Can you identify in general

 6    what this document is, the type of document it is by looking

 7    at the first page?

 8    **A.**  It's a CMA statement for Mike -- Michael Rothenberg.

 9    **Q.**  What period is this for?

10    **A.**  May 31st to June 30th, 2014.

11              **MR. WALDINGER:**  Ms. Margen, could we go to page 3.

12        And let's just -- to start with, let's blow up the --

13    these first two sections here (indicating).

14                        (Exhibit published.)

15    **BY MR. WALDINGER:**

16    **Q.**  Based on your review of this statement, can you tell when

17    the CMA was opened and funded?

18    **A.**  I can tell here when it was -- when it was funded, which

19    was on June 18th.

20    **Q.**  That's that date right there, correct (indicating)?

21    **A.**  Correct.

22    **Q.**  How was it funded?

23    **A.**  It was funded with a wire transfer in.

24    **Q.**  Can you tell where that wire transfer came from just by

25    looking at this statement?

KELTY - DIRECT / WALDINGER

1    **A.**   Yes.   Under the line item it has an ORG equal, and it

2    shows an account number.   ORG standing for origination.   And

3    that -- that is Michael's Bank of America account number.

4    **Q.**   Ending 2573?

5    **A.**   Correct.

6    **Q.**   What are the next transactions that occurred out of the

7    CMA on this account statement ending June 30th, 2014?

8    **A.**   There was a subsequent wire transfer out on June 20th for

9    350,000, which is 95 percent of the deposit.   And then

10   subsequently on the same day, June 20th, a LMA loan advance

11   booked, which have been the loan tied to that $350,000 wire.

12   **Q.**   So logically -- I'm just going to ask you.   Logically it

13   seems that the LMA should happen before the transfer out.   Do

14   you have any -- or -- do you have any reaction to the order of

15   transactions that just -- that are shown on the CMA?

16   **A.**   Yeah.   Generally, the advance shows and then the wire

17   thereafter.   But we were rushing this, and we did what was

18   called a -- internally a backdoor funding where we were

19   actually funding the loan before it was systematically ready

20   to fund.

21   **Q.**   Okay.   Very good.

22      In general, are the statements like this CMA statement

23   mailed to the -- to the customer or made available online?

24   **A.**   Both are an option.   Whatever is preferable to the

25   customer is offered.

1    **Q.**   Okay.

2           **MR. WALDINGER:**   Ms. Margen, could you take that down.

3    And now we're going to have Mr. Kelty look at trial

4    Exhibit 47, which I believe is in evidence.

5        Let's just -- let's blow up the part that just shows --

6    since we're formatted weirdly here, let's just blow that up.

7                      (Exhibit published.)

8    **BY MR. WALDINGER:**

9    **Q.**   Do you recognize in general what type of document this is,

10   Mr. Kelty?

11   **A.**   Yes.

12   **Q.**   What is it?

13   **A.**   It's an LMA statement for Mike Rothenberg.

14   **Q.**   What is the period that it relates to?

15   **A.**   Same period as the last statement, May 31st to June 30th

16   of 2014.

17   **Q.**   Just so that there's no confusion, what was the opening

18   monthly loan balance on this account?

19   **A.**   Nothing.  Zero.

20   **Q.**   What was the closing loan or -- closing loan balance on

21   June 30th, 2014?

22   **A.**   350,000.

23   **Q.**   You testified before about this -- the 95 percent.  And I

24   apologize for making you have to do math possibly, but what

25   is -- what is this available credit line here of $1,110?

1    **A.**  It would have been the exact amount in excess of

2    availability above the 350,000.  So 350,000 is just slightly

3    under 95 percent loan-to-value.  So that would have been the

4    difference, $1,110.12.

5            **MR. WALDINGER:**  Ms. Margen, could we please turn to

6    the next page.

7        And let's blow that up again.

8                    (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**  Does this show a loan advance in June?

11   **A.**  Yes.

12   **Q.**  And what date was that loan advance?

13   **A.**  June 20th.

14   **Q.**  Do you know why there's a different date for transaction

15   date?

16           **THE COURT:**  Do you mean different from "effective

17   date"?

18           **MR. WALDINGER:**  Yes.  Thank you, Your Honor.

19   **Q.**  The transaction date says 6/23, Mr. Kelty, and the

20   effective date says 6/20.  Do you know why that might be?

21   **A.**  It's likely because we manually pushed the loan through

22   before it was systematically available.

23   **Q.**  Do you know what day of the week June 20th was?

24   **A.**  I think it was a Friday.

25           **MR. WALDINGER:**  Let's go back, Ms. Margen, to

1    Exhibit 61.  Just do the -- and let's just show the top of --

2    of that, the email headers.

3                          (Exhibit published.)

4    **BY MR. WALDINGER:**

5    **Q.**  In looking at this, does this tell you what day of the

6    week June 20th was?

7          **MR. FAKHOURY:**  Objection, there's no foundation laid

8    that the date and time is correct.

9          **THE COURT:**  Overruled.

10   **BY MR. WALDINGER:**

11   **Q.**  You may answer.

12   **A.**  Yes.  It indicates that it's likely Friday, June 20th.

13   **Q.**  Have you found that Merrill Lynch's email system is

14   correct in placing the correct day with respect to the

15   applicable date?

16   **A.**  Yes.

17   **Q.**  If -- if June 18th was a Wednesday, does that mean -- what

18   does that mean with respect to June 20th?

19   **A.**  It means that June 20th was a Friday.

20   **Q.**  What does that mean with respect to June 23rd?

21   **A.**  That June 23rd is a Monday.

22         **MR. WALDINGER:**  Let's go back, Ms. Margen, then to

23   Exhibit 47, page 2.

24                          (Exhibit published.)

25   / / /

1  BY MR. WALDINGER:

2  Q.  We've talked about LIBOR a little bit, Mr. Kelty.  Does --

3  is the -- can you explain the -- the relationship between this

4  point -- 0.15 percent and -- and then the 3.77 percent and how

5  that relates to the interest rate here?

6  A.  Yeah.  The -- the .15 is the index, the LIBOR index, which

7  is subject to change and resets systematically weekly.  But it

8  is subject to change in theory daily if rates move drastically

9  within a week.

10      And as it relates to this line item on June 20th, it's a

11  notice to Michael on his statement on June 20th that his rate

12  is moving in -- all in capacities index and spread to

13  3.77925 percent.

14  Q.  That rate, then, changes a couple of more times in June of

15  2014, correct?

16  A.  Correct.

17  Q.  Can you tell from reviewing this statement how much

18  interest accrued on the $350,000 loan advance that had an

19  effective date of June 20th during the month of June?

20  A.  Yes.

21  Q.  How much?

22  A.  $404.13.

23  Q.  Under the terms of LMA, is a borrower required to pay that

24  amount?

25  A.  No.

1    **Q.**  Would the borrower be required to pay that amount if it

2    went above that 95 percent ceiling?

3    **A.**  No.  It would -- no.

4    **Q.**  It wouldn't.  Okay.  So -- and what happens if the

5    borrower does not pay that interest?

6    **A.**  It would -- it would be added in or capitalized into the

7    loan principal.

8    **Q.**  All right.  Mr. Kelty, I'm going to -- I'm going to kind

9    of switch gears a little bit and ask you about your time as a

10   wealth management banker at -- at Merrill Lynch.

11        Did you make lending decisions at that time?  In other

12   words, were you, Ryan Kelty, deciding whether to grant a loan

13   or deny a loan application?

14   **A.**  No.

15   **Q.**  Who made those decisions?

16   **A.**  Our underwriting department.

17   **Q.**  And were those people -- was the underwriting department

18   part of Merrill or part of another organization?

19   **A.**  It was a part of a third-party organization.

20   **Q.**  What's the name of that third-party organization?

21   **A.**  PHH.

22   **Q.**  And that's the letter PHH?

23   **A.**  Correct.

24   **Q.**  What was your role -- let me back up.

25        What is an underwriter?

1    **A.**   An underwriter is an individual that's employed to analyze

2    all aspects, in this case of a mortgage transaction.  And that

3    would be the individual in control of the decision to -- to

4    approve or deny a loan.

5    **Q.**   As a banker at Merrill Lynch in the summer of 2014, were

6    you aware of the types of considerations that Merrill's

7    underwriters took into account in determining whether to grant

8    or deny a loan request?

9    **A.**   Yes.

10   **Q.**   What was your role in -- in marshaling loan applications

11   through the underwriting process, if -- if any?

12   **A.**   Yeah.  My -- my role was to be an advocate for our

13   financial advisors and for our financial advisors' clients,

14   and to not only understand the client and what their needs are

15   and what their objectives are, but to facilitate whatever

16   those needs and objectives are.

17        And that -- in the context of a mortgage underwriting,

18   it's really understanding and having an idea of what that

19   mortgage underwriter would ask for, understanding the credit

20   and underwriting landscape that -- that I'm operating in,

21   and -- and communicating with our clients as to what the best

22   way to gain approval through that underwriting process.

23   **Q.**   At this time, were you aware of things that Merrill's

24   underwriters took into account in determining whether to grant

25   or deny a loan application?

1    **A.**    Yes.  It was four main things we were looking for.

2    **Q.**    And I think you've -- you may have a furniture analogy

3    that you can use with that?

4    **A.**    I do.  I've used four legs of a stool as an analogy.

5    **Q.**    Okay.  What are those four legs?

6    **A.**    The four legs are a part of every mortgage, and that is,

7    one, first leg would be the -- the property itself.  So the

8    profile to the property, the value of the property, the loan

9    tied to the property.

10        The second would be establishing someone's income as a,

11    you know, primary source of repayment for the mortgage.  So

12    looking at generally a two-year history of that individual's

13    income.

14        The third is establishing liquid assets or verified assets

15    to approve the lien, in particular, personal unencumbered

16    liquid assets.

17        And then the fourth, which is maybe the most common, is

18    your credit score, your FICO score, your credit history, your

19    FICO score, and specifically your debts and your liabilities

20    on your credit report.

21    **Q.**    Okay.  What if you have a liability that doesn't show up

22    on your credit report?  Did Merrill's underwriters care about

23    that at this time?

24    **A.**    Well, we would rely on the accuracy of the credit report,

25    but if it did not come up on a credit report, the only way our

1    underwriter or I would be aware of it is if it somehow was

2    identified on a statement of some sort, a payment to a

3    creditor that was not on the credit report.  And then we would

4    have, you know, follow-up questions regarding that.  But

5    generally if it was not on the credit report, it was likely

6    not reviewed.

7    **Q.**  And in collecting information for a loan application,

8    then, did you collect information from prospective borrowers

9    regarding property, the property, their income, their -- I

10   think you said verified liquid assets, and did you collect

11   credit information?

12   **A.**  Yes.  I -- I facilitated gathering mainly those first

13   three.  FICO, I -- I would never pull someone's credit

14   directly.  I would be on the line with an agent with PHH and

15   get verbal authorization from the individual to do that.

16       But I would certainly have an idea of what types of credit

17   scores we needed in order to qualify a mortgage, yes.

18   **Q.**  Would all of these things, based on your experience at

19   that time, affect a decision as to whether to grant or deny a

20   loan?

21   **A.**  Yes, it would.

22   **Q.**  Why are things like assets important?

23   **A.**  To show another source of repayment.  As I mentioned,

24   income, that is our primary source of repayment, having a -- a

25   paycheck we can verify, or if it's a business, income from the

1    business that we can verify.

2        But our portfolio loans, specifically the ones that I was

3    doing at that time, we would -- we would -- we would shock a

4    customer's balance sheet pretty drastically and -- and by

5    design.  Because we wanted to simulate if that primary source

6    of repayment went away, your income, do we have sufficient

7    secondary sources of liquidity.

8    **Q.**  So you just used the term "shocking the balance sheet."

9    And --

10           **THE COURT:**  I thought he said "shopping" with a P.

11   Did you say shocking?

12           **THE WITNESS:**  I'm sorry.  I said shocking.

13           **THE COURT:**  Oh, shocking, okay.

14       Oh, I see.  Very good.  Go ahead.

15           **MR. WALDINGER:**  Thank you, Your Honor.

16   **Q.**  So it's shock like an electric shock?

17   **A.**  Correct.

18   **Q.**  What do you mean by shocking their balance sheet?

19   **A.**  What I mean is simulating an environment that is stricter,

20   more difficult, higher -- higher qualification measurements

21   than actual real market conditions.

22   **Q.**  Was -- and was this shocking done for all of your mortgage

23   products or just the PrimeFirst® one?

24   **A.**  Primarily the PrimeFirst® one, not all of them.  There

25   were others, but primarily this PrimeFirst® one.

1   Q.  In general, did you have a rule of thumb for every -- did

2   you have a rule of thumb as to how much liquid unencumbered

3   assets a borrower needed in order to qualify for, say, a

4   million-dollar loan?

5   A.  Yes.

6   Q.  What was that?

7   A.  Generally we wanted to see $250,000 of liquid unencumbered

8   personal liquidity per million dollars requested to borrow.

9   Q.  And when you say -- what do you mean by liquid?

10  A.  Can be sold within a short period of time, short period of

11  time defined as under three days.

12  Q.  What do you mean by unencumbered?

13  A.  There's no debt.  There's no lien tied to those assets.

14  It is not leveraged.  It's free and clear.  It's unencumbered.

15  Q.  Okay.  So that's what you mean by -- with respect to

16  assets, shocking their balance sheet, making sure, as I

17  understand it, they have $250,000 in liquid unencumbered

18  assets for every million dollars of loan principal?

19  A.  Correct.  That's how we would approximately calculate.

20  Q.  Did you do anything with respect to shocking the other

21  side of that equation, the -- the credit or the liabilities?

22  A.  Yeah.  We would very similarly to the assets, we'd have

23  higher income requirements for a loan like this.  Where a more

24  traditional loan would have a lower income requirement.

25      And, yes, our FICO minimum score was higher on this

1    PrimeFirst® than it was for other programs.

2        So, yes, there was a -- there was a shock or a higher

3    qualification requirement applied to all four legs of the

4    stool for this one program.

5    Q.  Did the Merrill underwriters add any percentage figure to

6    outstanding liabilities in order to calculate what's called

7    debt-to-income ratio?

8    A.  Yes.

9    Q.  What was that?

10   A.  We would add five percentage points above the actual

11   market rate, essentially almost quadruple the rate in order --

12   and then use that rate as the qualifying rate, not the real

13   rate the client would get, but that would be our qualifying

14   rate to calculate debt-to-income.

15   Q.  I see.  And so that's adding 5 percent to the loan product

16   that you're going to give to the borrower.

17   A.  Correct.

18   Q.  How about on their current liabilities, did you do

19   anything to shock that part of the balance sheet?

20   A.  No.  Their current liabilities we would take at face value

21   from the credit report.

22   Q.  Got it.

23        MR. WALDINGER:  Ms. Margen, if we could go back to

24   Exhibit 50 which is the CMA statement for the end of

25   June 2014.  And let's go to page 3, please.

1          Let's just blow up the central section.

2                    (Exhibit published.)

3    **BY MR. WALDINGER:**

4    **Q.**   Mr. Kelty, you previously testified about setting up --

5    getting the applications for the CMA and LMA for

6    Mr. Rothenberg, correct?

7    **A.**   Correct.

8    **Q.**   Was there any relationship between the conversations that

9    you were having with him about setting up the CMA and the LMA

10   on the one hand and the possibility of a mortgage loan on the

11   other?

12   **A.**   Yes.  Those were happening simultaneously.

13   **Q.**   What was the relationship, if any, between those two

14   conversations other than the -- the temporal relationship?

15   **A.**   The relationships between those two conversations is the

16   money that was being deposited in the CMA was being encumbered

17   almost immediately upon deposit, which was essentially

18   breaking off one of those legs of the stool.

19        And the reason why it's a stool analogy, if you knock a

20   leg off, the stool may fall to the ground.  So we're looking

21   for all four legs.  And so it was prohibiting one of the four

22   requirements to qualify the mortgage.

23   **Q.**   Let's back up.  What's your memory of the purpose of the

24   deposit of the 300 -- strike that.

25        Did the 370,000, in your mind, relate to any of those four

 1    legs of the stool that you were trying to build for

 2    Mr. Rothenberg at Merrill Lynch?

 3    **A.**   Yes.

 4    **Q.**   Which -- which leg of the stool?

 5    **A.**   The liquid assets, unencumbered liquid assets.

 6    **Q.**   Before that question, your answer to my previous question

 7    had been that I think you mentioned that the LMA was drawn

 8    down soon after the deposit, and then you -- you talked about

 9    the analogy of knocking out one of the legs of the stool.

10        Can you explain what you mean by that in more detail?

11    **A.**   Yeah.

12        This -- this borrowing of 350, you do the math, the

13    difference between the deposit and the loan is now 20,000.

14    But because that LMA rate can fluctuate, because in theory an

15    individual can compound interest until it hits that 97 percent

16    threshold, Merrill has a rule that any loan that's issued

17    against a deposit that we are aware of internally, not an

18    external loan, but an internal loan, in this case it being the

19    LMA, we would add a 30 percent premium to the loan balance.

20        And so if you take 350,000 and times it by 1.3, you get a

21    number in the 400 range.  And so in theory, this loan was

22    creating negative liquidity in the eyes of the underwriter as

23    it relates to the mortgage.

24    **Q.**   This -- this -- did you ever send a loan application to

25    underwriting at PHH?

1   **A.**  We never submitted a formal application, no.

2   **Q.**  At this time, at the end of June, did Mr. Rothenberg have

3   liquid unencumbered -- what were Mr. Rothenberg's liquid

4   unencumbered assets in his account at Merrill Lynch?

5   **A.**  There were none.  They were all encumbered.

6   **Q.**  We'll see some statements later.  Do you recall that

7   Mr. Rothenberg, at the end of July, paid down his LMA?

8   **A.**  I do recall that, yes.

9   **Q.**  And in fact, let's --

10          **MR. WALDINGER:**  Beth, if we could actually go to

11   Exhibit 49 which is the statement for August.

12                      (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.**  This shows at the beginning of August of 2014 that

15   Mr. Rothenberg's LMA balance was what?

16   **A.**  Zero.

17          **MR. WALDINGER:**  Beth, could you go to page 2, please.

18   Ms. Margen.

19                      (Exhibit published.)

20   **BY MR. WALDINGER:**

21   **Q.**  How soon after the beginning of the month -- or let me ask

22   you this question:  Did Mr. Rothenberg take an advance on his

23   LMA in the month of August?

24   **A.**  Yes.

25   **Q.**  How soon after the beginning of the month did he do that?

1    **A.**   The first day, August 1st.

2    **Q.**   Was this still a time period when you were working with

3    Mr. Rothenberg and talking with him about getting a mortgage

4    loan?

5    **A.**   Yes.

6    **Q.**   Was there any risk to this kind of activity where -- in

7    which the prior month showed a zero balance but the -- the LMA

8    was drawn down on the first of the next month?

9    **A.**   Yes.  Risks to the mortgage getting approved and

10   qualified, yes.

11   **Q.**   Why is there a risk to that if the loan balance was zero,

12   the month -- at the end of July?

13   **A.**   Because even though we're intermonth, within a month, our

14   underwriter could ask me for anything, could ask me for a

15   statement from June, July, and August, and then give me the

16   statement in September when it's available.

17       And any outcome was possible.  So at the end of the day,

18   the loan being outstanding in general tied to the personal

19   liquidity, we're looking to qualify the mortgage as a risk.

20           **MR. WALDINGER:**   Thank you.

21       Ms. Margen, could you go back to Exhibit 50, please.

22       And let's go back to the third page, please.

23                   (Exhibit published.)

24   **BY MR. WALDINGER:**

25   **Q.**   You previously testified, Mr. Kelty, that the way that the

1    relationship between the CMA and the LMA was -- was that at

2    least with respect to Mr. Rothenberg's assets at Merrill Lynch

3    at the end of June of 2014, he had zero unencumbered liquid

4    assets, correct?

5    A.   Correct.

6    Q.   Let's just assume for a minute that he had not taken out

7    the loan advance on or about June 20th.  Under that

8    hypothetical scenario, what would his unencumbered liquid

9    assets at Merrill Lynch have been?

10   A.   370,000.

11   Q.   Okay.  And was that money that you, Ryan Kelty, were

12   hoping to use to show to Merrill Lynch's underwriters to

13   qualify Mr. Rothenberg for a loan?

14   A.   Yes.

15   Q.   Where did you think -- so this money, I think you

16   testified, came in from a bank account ending 2573, correct?

17   A.   Correct.

18   Q.   Where did you think that money came from?

19   A.   Well, it came from his Bank of America account.  But where

20   do I think it came from prior to Bank of America?

21   Q.   Where -- well, so you -- did you think at that time that

22   it was coming from another account that Mr. Rothenberg owned?

23   A.   Yes.

24            MR. FAKHOURY:  Objection, relevance.

25            THE COURT:  Overruled.

1    BY MR. WALDINGER:

2    Q.   Mr. Kelty, I'm going to give you a hypothetical.  If the

3    defendant had told you that a friend, in the same

4    conversations you were having on June 18, if he had told you

5    that a friend had just sent him 225,000 of that 370-, would

6    you have had a reaction?

7    A.   Yes.

8    Q.   What would your reaction have been?

9    A.   One, it's not in his, quote, name yet.  It's not his

10   money.

11   Q.   Let me stop you there.  All he said is my friend sent me

12   some money.  So could be his money, correct?

13   A.   In theory, yes.

14   Q.   All right.

15        Why -- why would you have cared?

16   A.   It would have required a -- sourcing.  It would add a

17   layer to what I'm trying to accomplish, and that is assist

18   Michael in getting a mortgage refinance done.

19        And so if -- if I had been notified that this was a gift

20   or a transfer or a deposit of some sort, whatever we want to

21   define it, from a friend, it would require sourcing,

22   documentation, of which maybe my underwriter wouldn't even

23   like because it's a substantial part, component, of the

24   liquidity.

25   Q.   Did you --

1   **A.**   It's over half of it.

2   **Q.**   The 225 that I'm giving you as a hypothetical?

3   **A.**   Correct.

4   **Q.**   And it's common -- I'm an old guy, and hopefully -- but

5   someday I hope to, you know, maybe help my kids buy a house,

6   maybe not in the Bay Area, and I probably hope to give them

7   some money to do that.  Do you come across those situations?

8   **A.**   We do.

9   **Q.**   And what do you do in that situation if somebody gets

10  money from a relative as part of a mortgage process?

11  **A.**   We source it, which means we identify where it came from,

12  specifically what bank, ask for statements.

13       And then if it's above the Uniform Gift limit, which in

14  this case this dollar amount would be, we would ask for a gift

15  letter, an internal document acknowledging that this was a

16  gift for purposes of X, Y, Z.  And have that documented on

17  file as well as the origination of the funds, and that would

18  mean the statement, the title, all of the -- all of the

19  aspects of what we would define as sourcing it.

20  **Q.**   So let's talk about that.  So you referred to the gift

21  letter as an internal letter.  Is that like a form that

22  Merrill has?

23  **A.**   Yeah.  Yeah.

24  **Q.**   And what does that gift letter say?

25  **A.**   It states that this is a true representation of what took

1    place.  So it's identifying the dollar amount of the gift, who

2    the gift came from, who the gift went to, and what the purpose

3    of the gift was.

4    Q.   Does it also -- I want to make sure we don't skip over it.

5    Is this gift letter also supposed to actually establish that

6    the money that moved from person A to the prospective borrower

7    was in fact a gift?

8    A.   Correct, yes.

9    Q.   Why is it important from Merrill's perspective that it's

10   not a gift as opposed to an advance or a loan from the other

11   party?

12   A.   It's a critical important piece because if we're using

13   that gift for a source of liquidity for our mortgage, and

14   ultimately a home or asset were tied to, we want to ensure

15   that there's no secondary, tertiary, primary, whatever, level

16   of claim against those assets.

17        Meaning there wouldn't be a recall or some sort of

18   litigation related to that deposit we accepted for purposes

19   of, say, a down payment.

20   Q.   You're talking about, as I understand it, the asset leg of

21   your four-legged stool?

22   A.   Correct.

23   Q.   If -- in our hypothetical, if the 225,000 from the friend

24   is a loan, what you're saying is that relates to whether the

25   370,000 is actually a liquid unencumbered asset?

1   **A.**   Correct.

2   **Q.**   Does it also relate to another leg of the stool if the

3   225,000 from the friend is a loan or an advance or something

4   else?

5   **A.**   Yes.

6   **Q.**   What is -- what other leg of the stool does it relate to?

7   **A.**   Credit report, the list of debts, proper accurate list of

8   all debts.

9   **Q.**   Do you expect people to tell you when they have -- when

10  they get cash that is a loan like that?

11          **MR. FAKHOURY:**  Objection, relevance.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  Yes.

14  **BY MR. WALDINGER:**

15  **Q.**   I just want to hit it on it real quickly.  Setting

16  aside -- setting aside the question of the stools of the

17  mortgage --

18          **MR. WALDINGER:**  Ms. Margen, could you go to

19  Exhibit 77.

20                     (Exhibit published.)

21  **BY MR. WALDINGER:**

22  **Q.**   Setting aside the stools of the --

23          **MR. WALDINGER:**  We're going to go page 8, Ms. Margen.

24                     (Exhibit published.)

25  / / /

1    BY MR. WALDINGER:

2    Q.   I believe this is the third time I've started this

3    sentence.

4         Setting aside the two legs of the stool that we've talked

5    about, with respect to the CMA and the LMA, remind the jury

6    again, in terms of the securities account, which one of those

7    two accounts relates to --

8              MR. WALDINGER:   The top half of paragraph 8,

9    Ms. Margen.

10                        (Exhibit published.)

11   BY MR. WALDINGER:

12   Q.   Which of the CMA and LMA is called the securities account?

13   A.   The CMA.

14   Q.   And under the loan management agreement, is there an

15   understanding on Merrill's part as to whether the person who

16   is borrowing under the LMA has good title to the money in the

17   CMA?

18   A.   Yes.  It's listed here.

19   Q.   That's in subsection A of paragraph 8?

20   A.   Correct.

21             MR. WALDINGER:   You could take that down, Ms. Margen.

22        Ms. Margen, if we could go back to -- I think one of the

23   first exhibits that we dealt with, which is Exhibit 61.

24   Q.   Mr. Kelty, I'm going to move to asking some more specific

25   questions about your interactions with Mr. Rothenberg

```
 1    regarding the mortgage discussions.

 2             MR. WALDINGER:  Ms. Margen, could you go to page 3 --

 3    or stop.  Let's go back to page 2.  Sorry.

 4                        (Exhibit published.)

 5    BY MR. WALDINGER:

 6    Q.  Page 2 is your initial email to Mr. Rothenberg that we saw

 7    in -- in this exhibit, in Exhibit 122, correct?

 8    A.  Correct.

 9    Q.  At the end of this email on the next page, did you make a

10    reference to having to send Mr. Rothenberg an additional

11    email --

12             MR. WALDINGER:  Ms. Margen, could you go to the next

13    page, please.

14                        (Exhibit published.)

15    BY MR. WALDINGER:

16    Q.  At the top of page 3.

17    A.  Yes, I'm referencing I'm going to send him a separate

18    email because it's pretty lengthy regarding what I need for

19    the mortgage.

20    Q.  All right.  Very good.

21        And did you -- did you do that?

22    A.  I did.

23             MR. WALDINGER:  All right.  Let's go, Ms. Margen, to

24    Exhibit 58, please.

25                        (Exhibit published.)
```

1   BY MR. WALDINGER:

2   Q.  If you look, this is a multi-page exhibit.  I believe this

3   is in evidence.

4           MR. WALDINGER:  If you just show Mr. Kelty the second

5   page here.

6                        (Exhibit published.)

7   BY MR. WALDINGER:

8   Q.  This page only includes your name and your signature

9   block.

10  A.  Correct.

11          MR. WALDINGER:  And let's go back to the first page,

12  Ms. Margen.

13      And let's do the bottom half.

14                        (Exhibit published.)

15  BY MR. WALDINGER:

16  Q.  What are you asking Mr. Rothenberg for in this email?

17  A.  I'm asking to clarify some assets that we're going back

18  and forth of whether they exist in Michael's B of A checking

19  account at that time.  So looking to verify liquid assets.

20      I'm also looking for two years of various documentation

21  regarding income, particularly tax returns for Michael

22  personally as well as his venture capital firm, Rothenberg

23  Ventures.

24      And then Michael had also indicated that he had done work

25  to the home and was interested in taking cash out.  And at

1    that time that we were doing this loan, I recall it being

2    within a year of Michael purchasing the property.  And so if

3    it's within a year, we cannot use a higher loan amount than --

4    or excuse me -- a higher value than the purchase price unless

5    there is substantial change to the property, specifically

6    square footage change.

7        And so that was discussed at some point, and I'm asking

8    Michael to show me receipts of that work.

9    Q.  So even in San Francisco, California, where people buy a

10   home and six months later it's worth $300,000 more, I think

11   what I hear you're saying is that's not -- if it's within a

12   year, you're not going to be able to take that cash out

13   without showing something more?

14   A.  Correct.  We're -- we're not in any market in the United

15   States following a screaming hot market.  So we will give you

16   market value one year and a day after purchase price unless

17   there was substantial change.

18   Q.  And I think the example that you used for substantial

19   change is more -- more square footage?

20   A.  More beds, more baths, more square footage.

21   Q.  All right.

22       And with respect to the -- the first question here that

23   you were asking, you said that the asset pull came over from

24   your BOA checking account.  What's BOA?

25   A.  Bank of America.

1   **Q.**  At this time, were you able to look and see what -- if

2   the -- if they were a customer of Merrill Lynch, what

3   customers had in their BofA checking accounts?

4   **A.**  We were able to see that.  Since Mike had given us

5   authorization to open up a Merrill Lynch account, that asset

6   pool across business lines, in this case, being Bank of

7   America/Merrill Lynch, it was tied via tax ID or Social

8   Security Number.  So if it had the same tax ID or

9   Social Security Number, it would pull over automatically.

10  **Q.**  There's a reference here to a mid-August closing.  Was

11  that the time period -- or what's a closing?

12  **A.**  The closing is the date we would fund the mortgage, sign

13  and fund the mortgage.

14  **Q.**  I want to remind you of the date here, June 18th.  Do you

15  recall that being the date that the CMA was opened?

16  **A.**  It was around -- it was the same day or around the same

17  time I had sent the CMA documents.  So, yes, on or around that

18  time, yes.

19  **Q.**  And do you recall from what account the CMA was funded?

20  **A.**  Yes.

21  **Q.**  What account was that?

22  **A.**  Michael's Bank of America checking account.

23  **Q.**  Do you think your question here had anything to do with --

24  with the fact that the funding of the CMA was coming from that

25  BofA account?

```
 1              MR. FAKHOURY:  Objection, leading.

 2              THE COURT:  Sustained.

 3   BY MR. WALDINGER:

 4   Q.  So let me ask you.

 5              MR. WALDINGER:  Let's go back to Exhibit 50,

 6   Ms Margen, page 3.

 7                       (Exhibit published.)

 8   BY MR. WALDINGER:

 9   Q.  This was a transaction that I was just asking you about?

10   A.  Yep.

11   Q.  And would knowing that the deposit is from -- or the

12   transfer is from a 2573 account at BofA, do you know why you

13   were then in Exhibit 58 --

14              MR. WALDINGER:  If we could go back to 58,

15   Ms. Margen, page 1.

16                       (Exhibit published.)

17   BY MR. WALDINGER:

18   Q.  Do you know why you were asking Mr. Rothenberg about his

19   BofA balance on June 18th?

20   A.  Yeah.  It was my understanding the funding of that CMA was

21   going to be coming from the Bank of America checking account.

22   That's why I'm asking.

23   Q.  Mr. Rothenberg responds at the top of the page?

24   A.  He does.

25   Q.  What does he say?
```

1    **A.**  He asked me to recheck it because he's stating there's

2    more money in there than I can see at that time.

3            **MR. WALDINGER:**  Ms. Margen, could you pull up

4    Exhibit 56.

5        Is 56 in evidence?

6            **MR. WALSH:**  Yes.

7            **MR. WALDINGER:**  Let's go to the second page.

8                        (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**  All right.  And so at the bottom of the second page is an

11   email from Mr. Rothenberg that we saw before when he's sending

12   you a document, correct, when he says "Is this what you mean?"

13   **A.**  Yes.

14   **Q.**  I want to focus on the email from Mr. Rothenberg that's at

15   the top of the page.

16                        (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**  This is about nine days after the wire from Bank of

19   America.  This is dated June 27th, correct?

20   **A.**  Correct.

21   **Q.**  And in this email, Mr. Rothenberg says:

22       "Ryan, can we pick this back up next week to move the ball

23   forward?  I'm assuming the June statement will show the

24   350" -- start over -- "will show the $350,000 cash and then

25   we'll be in good shape after 7/31."

KELTY - DIRECT / WALDINGER

1      Do you recall what he was referring to here?

2   **A.**   Yeah.  He's looking to substantiate that there would be

3   cash available to move out shortly after it was deposited.

4           **MR. WALDINGER:**  Okay.  And let's go back to the first

5   page, Ms. Margen.

6                    (Exhibit published.)

7   **BY MR. WALDINGER:**

8   **Q.**   Did you respond to him at the top of this page?

9   **A.**   I did.

10  **Q.**   What did you say?

11  **A.**   I first referenced some additional tax returns I may need

12  for the mortgage.  And reference I'll compile a list for him

13  next week.  And then that yes, provided the loan is paid off

14  before July 31st that we are in good shape and that shape

15  meaning we're getting two months of liquidity statements that

16  I'm looking for.

17      That's what I'm referencing.

18  **Q.**   Well, at the end of June, he was not liquid, correct?

19  **A.**   No, he's not.

20  **Q.**   And you're -- you're saying that at the end of -- if he

21  paid the loan off at the end of July, he would be in good

22  shape.  What do you think you meant by that?

23  **A.**   What I meant is we have two statements with Merrill Lynch

24  statements in assets, balances.  And so what I'm stating is

25  that we would at least have something to submit to the

1    underwriter.  We -- we have some semblance of a deal.

2    Certainly not ideal given the -- the loan being funded against

3    the -- the assets quite quickly.

4         But we at least have an account established for two

5    consecutive statement months.

6    **Q.**   And then at least at the end of July, the loan paid off.

7    **A.**   Correct.

8    **Q.**   And at that point, presumably, there would be unencumbered

9    liquid assets in the CMA?

10   **A.**   In theory, yeah, correct.

11            **MR. WALDINGER:**  I'd like to go to Exhibit 65,

12   Ms. Margen.

13                        (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**   Now, this is in evidence.  What is this document?

16   **A.**   This is an email from Mike to -- to me and Ben Bolt.

17   **Q.**   Why was Ben Bolt involved?

18   **A.**   He was partnered with Anna as a financial advisor at that

19   time.  And this was their joint account, as well as that third

20   advisor Bhalla who's based here in San Francisco.

21   **Q.**   Was -- did Mr. Bolt and Ms. Jenkins manage the client

22   relationship with Mr. Rothenberg -- or -- or maybe put a

23   better way, own that relationship?

24   **A.**   Yes.

25   **Q.**   What is Mr. Rothenberg telling you in this email?

1    **A.**  He's going through a timeline of how he envisions things

2    kind of progressing and/or addressing items that we've

3    requested in the past.  But it's somewhat of a timeline as

4    well as a list of to-do's that have been pending, that Michael

5    was addressing.

6    **Q.**  So the first bullet point -- or I'm going to call them

7    bullet points.  Let me -- let me cover something else first.

8        Was there anything attached to this email, Mr. Kelty?

9    **A.**  Yes, there were some tax documents I was waiting for.

10        **MR. WALDINGER:**  And Ms. Margen, let's -- let's just

11   page through those documents.

12   **Q.**  Does that include something from an accountant on page 3

13   cover sheet?

14   **A.**  Yes.

15   **Q.**  And then some IRS documents related to Rothenberg Ventures

16   Management Company LLC?

17   **A.**  Yes.

18        **MR. WALDINGER:**  Move forward, Ms. Margen.  Just keep

19   paging through all the way to the last page.

20                    (Exhibit published.)

21   **BY MR. WALDINGER:**

22   **Q.**  Is this last page an IRS document or some other document?

23   **A.**  This was a profit and loss that was self-created by

24   someone on Rothenberg's team or by Michael Rothenberg himself.

25   It came from Michael Rothenberg.

1    **Q.**  Are profit and loss -- it's a profit and loss statement,

2    correct?

3    **A.**  Profit and loss statement, correct.

4    **Q.**  Are profit and loss statements something that you

5    typically get in situations like this?

6    **A.**  Yes.

7    **Q.**  And what is a profit and loss statement?

8    **A.**  You know, given we're doing loans every month of the year,

9    a profit and loss statement is a statement that we would

10   request when a business is within their calendar year, their

11   business calendar year.

12        And we ask for it to substantiate or verify that income in

13   the current year we're requesting that loan is consistent with

14   historical prior year income.

15   **Q.**  So this profit and loss statement sets out numbers for the

16   period January to December of '13?

17   **A.**  Yes.  And -- and another time, also January to June of

18   2014, correct.

19   **Q.**  That's the second column?

20   **A.**  Correct.

21   **Q.**  Again, this email was from Mr. Rothenberg to you?

22   **A.**  Correct.

23   **Q.**  Or -- so he sent you this document?

24   **A.**  He did.

25   **Q.**  What does this document represent as of June of 2014 that

1    the distributions were that he had received from his company

2    that year?

3    **A.**   It's representing that in the year of 2014, at least

4    through January -- from January to June of 2014, that Michael

5    has taken distributions at the level of 220,000.

6    **Q.**   Okay.  That's one of the legs of the stool that you're

7    interested in?

8    **A.**   Income.  Correct.

9         **MR. WALDINGER:**  Ms. Margen, could we go back to the

10   first page.

11        And let's blow that up.

12                    (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.**   We just went through the attachments.  Mr. Rothenberg says

15   to you and Ben Bolt:

16        "Ben and Ryan, here's the status of my understanding of

17   what we need to move forward.  Let me know if I'm missing

18   anything."

19        So let me ask you first, Mr. Kelty, had you had email or

20   telephone communications before this date with Mr. Rothenberg

21   of what you all needed to move forward?

22   **A.**   Yes.  We had spoken over the phone prior to this email.

23   **Q.**   All right.  And did you ever send him an email that

24   sent -- let me strike that.

25        What is bullet number 1?

1          (Exhibit published.)

2          **THE WITNESS:**  Michael was emailing an outline of

3   items he needs to get his LMA or loan paid off.  So

4   particularly the date he would wire the money in to pay it

5   off, which is Thursday, July 31st, and that Ben to confirm

6   that he can wire it out essentially the -- the following

7   business day.

8   **BY MR. WALDINGER:**

9   **Q.**  Okay.  And so in other words, Mike to wire 350K by

10  Thursday, 7/31, means Mike is doing what on that date?

11  **A.**  Mike is wiring in money to pay off his LMA.

12          **THE COURT:**  What was the last word after "pay off"?

13          **THE WITNESS:**  His LMA.

14          **THE COURT:**  Thanks.

15  **BY MR. WALDINGER:**

16  **Q.**  Then what is this reference to that "Ben to confirm that

17  Mike can complete wire by Thursday and withdraw Friday"?

18  **A.**  Mike is requesting Ben to confirm that if he could wire

19  the money back out either Thursday or complete it by Friday.

20  **Q.**  When we looked at Mr. Rothenberg's end of June 2014

21  statement, I think that was when I asked you whether there's

22  any risk involved in having a CMA in which -- that's supposed

23  to be the asset leg of the stool, correct?

24  **A.**  Correct.

25  **Q.**  In which there's an associated LMA that's being drawn down

1   and paid off.  Do you remember that?

2   **A.**  Yes, I do.

3   **Q.**  Is there any risk -- so same question.  Any risk at all

4   from Ryan Kelty's perspective in terms of getting a loan

5   application approved with respect to activity in which the LMA

6   is paid off on 7/31 and then drawn down the next day?

7            **MR. FAKHOURY:**  Objection, irrelevant.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  Yes, there's risk because now we have a

10   loan outstanding.

11   **BY MR. WALDINGER:**

12   **Q.**  There -- the next bullet is about an appraiser.  What's

13   that about?

14   **A.**  The -- looks -- this is a request from Mike to ensure that

15   the property can be appraised on August 25th of 2014.  But

16   that's not -- that's something we never -- we even came close

17   to doing because we never submitted an application.

18   **Q.**  Okay.

19   **A.**  So it appears to be a timeline that Mike is setting out

20   three weeks in advance.

21   **Q.**  This talks about more than one year -- August 25th, 2000

22   and -- I guess August 25th being more than one year from the

23   settlement date of 8/23/14.  How do you read that?

24   **A.**  Well, one, that -- the -- we're in July of 2014, so I

25   believe there's a typo here.  This is one year from the

1  settlement date.  But I believe that settlement date was

2  August 23rd of 2013.

3  **Q.**  What do you take to mean by settlement date?

4  **A.**  The date Mike acquired the property that we're looking to

5  refinance.

6  **Q.**  Could you remind the jury how that timeline of having the

7  appraisal be on August 25th might affect the mortgage loan

8  application?

9  **A.**  Yeah.  Well, what it would do, it would -- it would

10  trigger in current market values.  So instead of, you know,

11  using the value of the property approximately a year prior to

12  this email, the market values in San Francisco as well as many

13  markets move very quickly.

14      And so Michael's goal was to acquire cash out on this

15  refi.  And that cash out prior to the one year required us to

16  document his -- his receipts on contracting, the square

17  footage that he claimed he had added.

18      So this -- this date being a year and one day plus into

19  the future allowed us to just have to avoid all that

20  documentation for work done to the home, and we could just

21  appraise the home as business as usual and get the current

22  market value, which in theory would have been a higher, more

23  favorable market value.

24  **Q.**  So how does that relate to number 4?  It was -- which

25  relates to contractor receipts?  Did -- did you need those

1    under that timeline?

2    **A.**  If we were to -- if we were to do things -- no.  The

3    answer is no.  If we were to begin this loan one year after

4    settlement date, no, we would not need number 4, the

5    contractor receipts.

6         **MR. WALDINGER:**  All right.  Let's take that down,

7    Ms. Margen.

8         And we're going to move to -- is United States Exhibit 64

9    in evidence?

10        **MR. WALSH:**  Yes.

11        **MR. WALDINGER:**  Let's move to Exhibit 64.  And if --

12   let's go to the last page, Ms. Margen -- or excuse me, second

13   page.

14                      (Exhibit published.)

15   **BY MR. WALDINGER:**

16   **Q.**  This exhibit is an email chain that continues after --

17        **MR. WALDINGER:**  Let's go ahead and blow that up,

18   Ms. Margen.

19                      (Exhibit published.)

20   **BY MR. WALDINGER:**

21   **Q.**  -- that continues after the email that we just looked at

22   in United States Exhibit 65, correct, Mr. Kelty?

23   **A.**  Correct.  Correct.

24        **MR. WALDINGER:**  Ms. Margen, then let's go to the

25   bottom of page 1.

 1                         (Exhibit published.)

 2     BY MR. WALDINGER:

 3     Q.  Is that a second email sent by Mr. Rothenberg the same day

 4     as the first email?

 5     A.  Yes.

 6     Q.  What does he say in this email?

 7     A.  He's stating he's almost ready to wire the money in to pay

 8     the loan off, the 350,000.  But, before, he wants to know what

 9     the exact payoff is including accrued interest and any fees.

10         So he's looking to -- he's giving us heads-up that he may

11     wire the money in and -- but, before that, is looking for the

12     exact payoff details.

13     Q.  The sentence is cut off on the first page so I'm going to

14     ask, have you remembered what the beginning of that sentence

15     says?

16             MR. WALDINGER:  And I'll ask Ms. Margen to go to

17     page 2 of Exhibit 64.

18                         (Exhibit published.)

19             THE WITNESS:  Yeah.

20     BY MR. WALDINGER:

21     Q.  The prior page ended:  "Is it exactly" -- and can you

22     finish my phrase?

23     A.  Is it exactly 350,000?

24     Q.  Okay.  In this -- this second email that Mr. Rothenberg

25     sends you on July 29th, he --

 1          **MR. WALDINGER:**  Could we put that back up,

 2    Ms. Margen?

 3                          (Exhibit published.)

 4    **BY MR. WALDINGER:**

 5    **Q.**  At the top of the -- in the second bullet that appears on

 6    this page, he asks:  If I send the wire today, when will you

 7    grab the snapshot?

 8          Do you know what that is a referral to or a reference to?

 9    **A.**  Yeah.  Michael was looking to not only pay the mor -- pay

10    the loan off -- excuse me -- but wanted documentation showing

11    that it was paid off.  And he was referring to it as a

12    snapshot.  Is there a way to show evidence that it -- that

13    it's paid off?

14    **Q.**  Okay.  And then his second question in that bullet was:

15    What is the first time you can transfer it back?

16          Correct?

17    **A.**  Correct.

18    **Q.**  Have you seen in your review of the records that are

19    available to you whether you responded to either of those two

20    emails that we just -- have just seen in Exhibits 65 and 64,

21    in an email?

22    **A.**  Yes, I did.

23    **Q.**  Okay.  And did you -- did you respond in an email?

24    **A.**  I believe I broke down the interest for him at some

25    point --

KELTY - DIRECT / WALDINGER

1    **Q.**  Okay.

2    **A.**   -- via email, yes.

3    **Q.**  Got it.

4               **MR. WALDINGER:**  Okay.  Let's go back to the first

5    page.

6                        (Exhibit published.)

7    **BY MR. WALDINGER:**

8    **Q.**  And what I'm going to focus on is this email that's at the

9    top.

10        Did Mr. Rothenberg send you another email on July 31st?

11   **A.**  Yes.

12   **Q.**  This email, is it true that he says:  "Ryan, thanks for

13   the call and the coaching."

14                   (Off-the-record discussion.)

15   **BY MR. WALDINGER:**

16   **Q.**  Excuse me.  I misspoke.  This a July 29th email.  Correct,

17   Mr. Kelty?

18   **A.**  This is July 29th, correct.

19   **Q.**  In this July 29th email, Mr. Rothenberg asks you or says

20   to you:  "Ryan, thanks for the call and the coaching.  Will

21   take your advice and register the loan first thing on 8/25."

22        So I'd like to break that down.

23        Do you recall having a conversation or a call with him

24   at -- after he sent that previous email?

25   **A.**  I don't directly remember the call, but it was very

1   customary in my job to have many calls with prospective

2   mortgage clients.  So there was likely a call --

3   **Q.**  Okay.

4   **A.**   -- after this email, yes.

5   **Q.**  Do you know what he was talking about when he refers to

6   coaching?

7   **A.**  My recollection of the coaching is exactly his next

8   sentence, is essentially trying to substantiate the higher

9   loan value, waiting several weeks to register the loan so that

10  we could get that year -- year and one day value.

11  **Q.**  What do you mean by register?

12  **A.**  Register is when we submit a -- a loan application, a

13  formal loan application.

14  **Q.**  Is that what's called a Uniform Residential Loan

15  Application?

16  **A.**  Yes.

17  **Q.**  Is there a form number that you refer to that to?

18  **A.**  Yes.

19  **Q.**  What's that?

20  **A.**  Also known as a Form 1003.

21  **Q.**  That's a Fannie Mae form number?

22  **A.**  Yes.

23  **Q.**  Do lenders -- I'll use the term uniformly generally use

24  that loan application?

25  **A.**  Exclusively and uniformly, yes.

1   **Q.** Even if they're not selling their loans to Fannie Mae and

2   Freddie Mac?

3   **A.** Correct.  There's a standardized format for all loans.

4   **Q.** What is Mr. Rothenberg -- well, did you ever register this

5   loan, Mr. Kelty?

6   **A.** No.

7   **Q.** Did you ever -- did you ever submit a URLA?

8   **A.** No.

9   **Q.** A uniform --

10                    (Simultaneous colloquy.)

11  **BY MR. WALDINGER:**

12  **Q.** A 1003?

13  **A.** No.

14  **Q.** The next paragraph, Mr. Rothenberg says:  "Here are the

15  next steps as I understand them.  This week's items in bold.

16  I'm looking to you for help to the finish line here

17  expediently."

18      What is Mr. Rothenberg directing or asking or expecting

19  you to do in this email?  You tell me.

20  **A.** Yeah.  Particularly in bold it's a day-by-day breakdown on

21  paying off his LMA and then redrawing his LMA.

22  **Q.** Let me stop you there.

23      Can you tell from this email approximately what the

24  balance of the LMA was on 7/29 of 2014?

25  **A.** Yeah, it was the principal of that month, 350- plus

1   accrued interest so approximately 351,000.

2   Q.  Did he explain how he was going to pay that, from what

3   account?

4   A.  Yes, from his Bank of America account.

5   Q.  Okay.

6       Did you understand or -- based on your review of the

7   documents, did Mr. Rothenberg, in fact, pay off his loan

8   balance on or about July 29th?

9   A.  He did.

10  Q.  And did you -- was it your understanding that those were

11  his funds that were coming from his Bank of America account?

12          MR. FAKHOURY:  Objection, relevance.  And the issue

13  we raised this morning.

14          THE COURT:  Overruled.

15          THE WITNESS:  It was my understanding it was coming

16  from his account in his name.

17  BY MR. WALDINGER:

18  Q.  If the funds had been -- let me back up.

19      This -- this email correspondence is not about just about

20  the CMA and the LMA, correct?

21  A.  No.

22  Q.  This is about overall putting together the circumstances

23  so that Ryan Kelty can submit a loan application to Merrill's

24  lenders on behalf of Mike Rothenberg, correct?

25  A.  Correct.

1    **Q.**  And you -- I've -- we've talked about those legs of the

2    stool, correct?

3    **A.**  Correct.

4    **Q.**  If -- would it have -- would it have mattered to you if

5    the LMA is getting paid off with, I'll use the friend analogy,

6    with money that's borrowed from a friend?

7                 **MR. FAKHOURY:**  Objection, relevance.

8                 **THE COURT:**  Overruled.

9                 **THE WITNESS:**  It -- it could potentially become --

10   yeah, problematic as it relates to the mortgage.  Yes, it

11   would matter.  It would all matter.  All the activity matters.

12   **BY MR. WALDINGER:**

13   **Q.**  And just to take a step back.  A person's liabilities

14   matter in a loan application, correct?

15   **A.**  Correct.

16   **Q.**  A person's assets matter in a loan application, correct?

17   **A.**  Correct.

18   **Q.**  The next -- the next date here is 7/31.  What does

19   Mr. Rothenberg say about 7/31?

20   **A.**  Michael was looking to resubmit the wire from his line of

21   credit back to his Bank of America account, but process it on

22   8/1.  So after the -- after the month statement has cycled.

23   **Q.**  And so why -- why wouldn't -- why did he want it to happen

24   not till 8:00 a.m. on 8/1?

25   **A.**  So that we would have a paid-off LMA at the end of July.

1    **Q.**  That's what ended up happening, correct?

2    **A.**  Yes.

3    **Q.**  Is there any danger -- I've asked you about danger -- any

4    risk, any danger to operating the CMA in that way, the CMA and

5    the LMA in that way when you're in the middle of a loan

6    application process with the bank at which the CMA and the LMA

7    are -- are being held?

8    **A.**  Yeah, there's risk in that even though we're doing all of

9    this to show month-end paid-off balances, I could receive a

10   request from the underwriter to document any level of detail.

11        And in that case, we'd have to document why we were -- why

12   Michael was lending -- borrowing and paying off in such short

13   period of time.  And that means we would have to source

14   these -- these transactions.

15        So all of it mattered.  All of it posed risk.

16   **Q.**  In the summer of 2014, had you had the experience of what

17   happened when you said no to an underwriter?

18   **A.**  Yes.

19   **Q.**  What happened?

20   **A.**  The loan is declined.  The loan doesn't move forward.

21   **Q.**  You don't say no when the underwriter asks for more

22   information?

23   **A.**  You have a decision to say no.  If you say no, then you're

24   not interested in doing a loan.  But if you say no, there's no

25   loan.

1   **Q.**   The next bullet point here is 8/1.  And that just says:

2   "350K wire hits Mike's Bank of America account."

3   **A.**   Correct.

4   **Q.**   Did he also express to you that he wanted his month-end

5   bank statement?

6   **A.**   Yes.

7   **Q.**   So again taking a step back, you're having discussions

8   with Mr. Rothenberg at this point about you, Ryan Kelty,

9   submitting a mortgage loan application to Merrill on behalf of

10  him, correct?

11  **A.**   Correct.

12  **Q.**   Did you have access to his July 31st bank statement to do

13  that for him if he wanted you to?

14  **A.**   Sure.  Yeah.

15  **Q.**   Did he need to submit it himself to you?

16  **A.**   No.

17  **Q.**   Did he tell you why he wanted a copy of his July 31st bank

18  statement?

19  **A.**   I -- no.  No.  I knew I needed it for the mortgage.  But

20  that was the only reason that I knew that it was a --

21  requested item because I -- we needed that statement for his

22  mortgage that he was requesting through Merrill.

23  **Q.**   Based on your review of Merrill's records, after the last

24  bolded entry here, did anything else on Mr. Rothenberg's

25  timeline happen at Bank of America?

1    **A.**   No.   This is when things moved in a different direction,

2    and from this point forward, no.  From 8/2 to 17, all those

3    things forward throughout this email did not take place, to my

4    knowledge.

5    **Q.**   During this time period, did Mr. Rothenberg ever tell you

6    that he was -- that he was submitting another loan application

7    to another lender?

8    **A.**   Yes.  I did find out in mid-August that he -- he did that.

9    **Q.**   How did you find that out?

10   **A.**   Via email.

11   **Q.**   And so just going back to the end of July, I want to look

12   at those -- those statements.

13         **MR. WALDINGER:**  Ms. Margen, could you pull up trial

14   Exhibit 48, please.

15        And please blow that first page up, Ms. Margen.

16                    (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**   Do you recognize this document, Mr. Kelty?

19   **A.**   Yes.

20   **Q.**   What is it?

21   **A.**   It's Michael's LMA statement from July 1st to July 31st,

22   2014.

23   **Q.**   What was the opening balance that month?

24   **A.**   350,000.

25   **Q.**   There -- and that's listed right here (indicating),

1    correct?

2    **A.**   Correct.

3    **Q.**   What is the reference to "your borrowings"?

4    **A.**   It's the money that was borrowed plus accrued interest or

5    finance charges just aggregated.

6    **Q.**   What did those amount to?

7    **A.**   $350,404.13.

8    **Q.**   What was the closing balance on this account at the end of

9    July of 2014?

10   **A.**   Zero.  It was paid off.

11          **MR. WALDINGER:**  Ms. Margen, let's please go to the

12   next page.

13                       (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**   I'm going to go through some of the loan detail here.

16          You just testified about $404.13.  That is listed here,

17   correct (indicating)?

18   **A.**   Yes.

19   **Q.**   What does that relate to?  It's listed as a loan advance

20   that is put onto the account balance on July 1st of 2014.

21   **A.**   That is the accrued interest that capitalized into the

22   loan on the first day of the month.

23   **Q.**   So this -- is it fair to say that this would be the

24   interest that had accrued from the time the LMA was first

25   drawn down in June and the end of the month of June?

1    **A.**  Correct.

2    **Q.**  Can you tell from reviewing the statement what the -- how

3    many finance charges or how much of finance charges had

4    accrued during the month of July?

5    **A.**  Yes.

6    **Q.**  How much was that?

7    **A.**  It's $1,029.70 for the month of July.

8            **MR. WALDINGER:**  Ms. Margen, could you please switch

9    over to Exhibit 51.

10           **THE COURT:**  Mr. Waldinger, anytime in the next five

11   minutes.

12           **MR. WALDINGER:**  Okay.  Very good, Your Honor.

13                       (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**  Do you recognize this document, Mr. Kelty?

16   **A.**  Yes.

17   **Q.**  What is that?

18   **A.**  It's a summary statement for Michael Rothenberg's

19   accounts --

20   **Q.**  In fact --

21   **A.**  -- as of July 1st.

22           **MR. WALDINGER:**  And let's -- let's, Ms. Margen, let's

23   turn to page 3 of Exhibit 51.

24                       (Exhibit published.)

25   / / /

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    BY MR. WALDINGER:

2    Q.   What is this part of Exhibit 51, Mr. Kelty?

3    A.   It shows a -- a comparison of assets and liabilities.

4    Q.   And does this specifically relate to the CMA account?

5    A.   Correct.  Yes.

6            MR. WALDINGER:   Ms. Margen, if we could go to page 4.

7                    (Exhibit published.)

8    BY MR. WALDINGER:

9    Q.   We've talked about -- I expect you remember, and it shows

10   on this page, what the approximate balance of Mr. Rothenberg's

11   CMA was after it was established in June of 2014.

12   A.   Correct.

13   Q.   And what is that?

14   A.   Approximately 370,000.

15   Q.   During the --

16           MR. WALDINGER:   Let's blow up the interest section,

17   Ms. Margen, CMA bank -- CMA bank deposit interest summary.

18   Q.   I believe that you testified when you looked at

19   Exhibit 48, that during the course of July, Mr. Rothenberg had

20   accrued $1,029.77 in interest charges on his credit line.

21       Do you remember that?

22   A.   I do.

23   Q.   How much interest did he earn in his CMA during that same

24   period?

25   A.   About $47.

1    **Q.**  Did you -- were you ever present on the phone or in

2    person -- or I guess you never met Mr. Rothenberg in person?

3    **A.**  No.

4    **Q.**  Were you ever present for a conversation with

5    Mr. Rothenberg in which the difference here in interest that

6    he could earn on the CMA versus interest that he would pay on

7    the LMA was discussed?

8         **MR. FAKHOURY:**  Objection.  It's calling for hearsay.

9    BY MR. WALDINGER:

10   **Q.**  I asked if -- were you ever at any discussions with

11   Mr. Rothenberg in which --

12        **MR. WALDINGER:**  I'm sorry.  Your Honor, could I

13   rephrase the question so that --

14        **THE COURT:**  You can.  You can.  Sure.

15   BY MR. WALDINGER:

16   **Q.**  Were you present for any conversations in which this

17   difference in interests earned and paid was -- was explained

18   to Mr. Rothenberg?

19        **MR. FAKHOURY:**  Objection.  That's the hearsay.

20        **THE COURT:**  I don't think it is.

21      Go ahead.

22        **THE WITNESS:**  Yes, I had a direct conversation with

23   Mike about this.

24   BY MR. WALDINGER:

25   **Q.**  When was that?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**   It was over the phone sometime in the end of June when we

2    started this.

3    **Q.**   And who else was on that phone call?

4    **A.**   Ben Bolt.

5    **Q.**   And who -- who explained to him this difference in amount

6    earned versus amount he'd have to pay?

7    **A.**   Generally that was something I'd rely on the financial

8    advisor to do at that time because it's -- you know, it's

9    regarding what you could buy in your -- your collateral

10   account, your brokerage account, and that related -- that

11   could be related to all types of security instruments.

12       So I generally just represented the loan side.  So it was

13   a combination of Ben and I, but it was primarily Ben.  But I

14   was on that phone call.

15   **Q.**   Okay.  And do you recall whether there was any explanation

16   for why Mr. Rothenberg was willing to pay much more in

17   interest on -- on the LMA side than he would earn on the CMA

18   side?

19               **THE COURT:**  And, counsel, do you mean did

20   Mr. Rothenberg himself give a reason for that?

21               **MR. WALDINGER:**  Correct.

22               **THE COURT:**  Yeah.  Do you have the question in mind?

23               **THE WITNESS:**  Yeah.  The -- the explanation I

24   received from Michael was that he needed liquidity for his

25   business.  He wanted cash flow for his company.

1    BY MR. WALDINGER:

2    **Q.**  So did you -- do you understand how Mr. Rothenberg would

3    have more liquidity by putting in $370,000 of cash and getting

4    a loan for only 350-?

5    **A.**  It would be 5 percent less, but nonetheless it is

6    95 percent of his liquid position so it is more liquidity than

7    zero.

8    **Q.**  Okay.

9         But 350- is less than 370-, correct?

10   **A.**  Yes, it is.

11            **MR. WALDINGER:**  Your Honor, I think this is a good

12   place to stop.  I'm sorry I went over a little bit today.

13            **THE COURT:**  No, it's just about exactly five minutes.

14   Very good.  Members of the jury, thanks for a full day's

15   work.  You've been listening closely to the evidence.  I'm

16   sitting up here so I can see you.  And I appreciate your close

17   attention.

18        Please keep an open mind.  Evidence can only come in one

19   little bit at a time.  Don't talk to anybody about the case.

20   Don't look anything up on the Internet or otherwise.  Have a

21   restful evening.  I will see you tomorrow morning.

22            **THE CLERK:**  Please rise for the jury.

23        (The following proceedings were heard out of the presence

24   of the jury:)

25            **THE COURT:**  All right.  We're outside the presence of

1    the jury.

2        Mr. Waldinger, is there anything the government wants to

3    discuss or place on the record?

4        **MR. WALDINGER:**  My colleague has something, Your

5    Honor.

6        **THE COURT:**  All right.

7        Mr. Fakhoury, why don't you come up to the microphone

8    right here next to government counsel, and then everybody will

9    be in position.

10       Mr. Walsh, what's on your mind?

11       **MR. WALSH:**  Your Honor, this is in the spirit of your

12   admonition to us to provide any suggestions for the better

13   running of the courtroom.

14       **THE COURT:**  I believe I specified they should be

15   joint suggestions, but go ahead.

16       **MR. WALSH:**  Okay.  Fair enough.  If I may have a

17   moment to confer.

18       **THE COURT:**  No, no, just go ahead and talk.  Next

19   time, though.  Here's the point.

20       **MR. WALSH:**  Yes.

21       **THE COURT:**  Individual suggestions -- just the way

22   incentives work, okay.  Individual suggestions, there's a risk

23   that they would just benefit one side.

24       In fact, if you're doing your job as an advocate, there's

25   a likelihood that they would just benefit one side.  And

1    that's why I say I'm just interested in joint suggestions.

2       But go ahead, speak your piece.

3          **MR. WALSH:**  So this is not meant to benefit one side

4    or the other.  It's -- we have jurors who are struggling, at

5    least one of which is struggling to view the exhibits.

6          **THE COURT:**  Yes, this is the gentleman, I don't know

7    his name, on the --

8          **MR. WALSH:**  Number 12.

9          **THE COURT:**  -- my left, your folks' right, all the

10   way over on the bench there.  That guy.

11         **MR. WALSH:**  Right.  And so it just occurred to me,

12   and this may anger the other jurors so I raise it as a

13   possibility, that we -- rather doing four and two, we could do

14   three and three, bringing all the jurors closer to the screen.

15   But --

16         **THE COURT:**  Oh, I see.  I don't know why it would

17   make anybody angry.

18         **MR. WALSH:**  Well, I don't know if Juror Number 12,

19   though, having difficulty seeing is enjoying his corner seat.

20   I just don't know.  But I raise it as a possibility, bringing

21   them all closer.

22         **THE COURT:**  Yeah.  Any thoughts on that,

23   Mr. Fakhoury?

24         **MR. FAKHOURY:**  That's fine.  I have no issue with

25   that.

1       **THE COURT:**  Yeah.  Normally these kind of issues get

2    handled in the jury room informally by Ms. Lee because that's

3    a comfortable place for them just to let her know what they

4    think.

5       So when she's next in the jury room, we can have her ask

6    the group what they think and ask that juror if that's

7    something that appeals to him.  It's not a bad suggestion.

8    Good.

9       Anything else?

10      **MR. WALSH:**  Not from the government, Your Honor.

11      **THE COURT:**  Mr. Fakhoury?

12      **MR. FAKHOURY:**  No, Your Honor.  Thank you.

13      **THE COURT:**  Okay.  Very good.  Thanks, folks.

14   Court is in recess.

15      **MR. WALDINGER:**  Thank you.

16      And I think I don't have that many more questions for

17   Mr. Kelty, but Mr. Kelty will have to return tomorrow, and

18   going to be --

19      **THE COURT:**  He will.

20      **MR. WALDINGER:**  -- on cross-examination.

21      (Proceedings were concluded at 1:38 P.M.)

22                      --o0o--

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4

5          I certify that the foregoing is a correct transcript

6     from the record of proceedings in the above-entitled matter.

7     I further certify that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in which this

9     hearing was taken, and further that I am not financially nor

10    otherwise interested in the outcome of the action.

11                    *Raynee H. Mercado*

12    _____

13          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14                Wednesday, November 2, 2022

15

16

17

18

19

20

21

22

23

24

25