**ORIGINAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 4** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 571 - 804 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, November 3, 2022 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          STEPHANIE M. HINDS, ESQ.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:          MOEEL LAH FAKHOURY LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612-1427
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1                              **I N D E X**

2

3     **GOVERNMENT'S WITNESSES**                        **PAGE**    **VOL.**

4     KELTY, RYAN

5     DIRECT EXAMINATION (RESUMED) BY MR. WALDINGER 585          4

6     CROSS-EXAMINATION BY MR. FAKHOURY                613        4

7     REDIRECT EXAMINATION BY MR.WALDINGER             643        4

8

9     KISS, JAMES

10    DIRECT EXAMINATION BY MR. WALSH                  649        4

11

12    JANDU, MICHELLE

13    DIRECT EXAMINATION BY MR. WALSH                  666        4

14

15

16                            **E X H I B I T S**

17

18    **GOVERNMENT'S EXHIBITS    W/DRAWN     IDEN    EVID    VOL.**

19    27                                               661        4

20    37, 38, 39, 40, 41                               580        4

21    42, 43, 44, 45, 46                               580        4

22    109, 110, 111                                    580        4

23    112, 113, 114                                    580        4

24

25                            --o0o--

```
 1   Thursday, November 3, 2022                      8:02 a.m.
 2                      P R O C E E D I N G S
 3                          --o0o--
 4       (The following proceedings were heard out of the presence
 5   of the jury:)
 6           THE CLERK:  Your Honor, now calling criminal matter
 7   20-266, United States v. Michael Brent Rothenberg.
 8       If counsel could please state their appearances for the
 9   record, starting with government.
10           MR. WALDINGER:  Good morning, Your Honor.  Kyle
11   Waldinger for the United States.
12           MR. FAKHOURY:  Good morning, Your Honor.  Hanni
13   Fakhoury on behalf of Mr. Rothenberg, who is present.
14           MR. WALSH:  And good morning, Your Honor.  Nicholas
15   Walsh for the United States.
16           THE COURT:  Good morning.
17       What have we to discuss this morning?
18           MR. WALDINGER:  I don't have anything, Your Honor.
19                   (Simultaneous colloquy.)
20           THE COURT:  Isn't there a -- I'm sorry.  Sorry to
21   talk over you.
22       But wasn't there a limiting instruction you were going to
23   meet and confer about?
24           MR. WALDINGER:  We did meet and confer.  We were not
25   able to reach an agreement.  We made significant progress.
```

 1    Mr. Fakhoury, on behalf of the parties, filed a notice last

 2    night saying that we had done that.  So Your Honor has

 3    probably not seen it.

 4          **THE COURT:**  I've not checked the docket yet --

 5          **MR. WALDINGER:**  Ah.

 6          **THE COURT:**  -- this morning.

 7          **MR. WALDINGER:**  And I think that in the status

 8    statement we were hoping -- we don't think the issue is going

 9    to come up today.  So we were hoping to have something on file

10    by Monday.

11          **THE COURT:**  Right.  And let me just make sure I'm

12    understanding the issue, and you can, of course, correct me if

13    I'm not understanding it.

14       On the one hand, the government has introduced testimony

15    that a lender wants to know a lot about the funds that are

16    being pledged as collateral for a loan and that if those funds

17    are subject to any other kind of obligation, the lender would

18    want to know that in determining whether to make a loan.

19       On the other hand, this trial is not about any putative

20    injury to investors in one of Mr. Rothenberg's funds.  And so

21    to the extent that the -- "impairment" is not exactly the

22    right word but I'll use it anyway -- the impairment of the

23    funds consists of the fact that those were funds invested by

24    other persons who have all the rights and obligations that go

25    along with being those investors, that's not the subject of

1    the trial and we just need a short way of explaining that to

2    the jury so they don't hold it against Mr. Rothenberg in some

3    way that they're not supposed to.

4        How am I doing?

5            **MR. WALDINGER:**  That's the government's view.  I

6    think that Mr. Fakhoury's view is different than that.

7        But so the government just believes that, yes, this trial

8    is -- he's not on trial for misappropriating funds and it's

9    fair to tell the jury that he's not on trial for those acts

10   and that here's the purpose of this evidence.

11       I think -- and this is what we're working through as -- as

12   the two parties.  I think Mr. Fakhoury's -- has a little bit

13   broader view of what the limiting instruction should be.

14           **THE COURT:**  I see.  All right.

15       And, Mr. Fakhoury, do you want to jump in here?  Or --

16           **MR. FAKHOURY:**  I'll just add one -- one brief point

17   to that, which is I think my concern is -- I -- I certainly

18   agree he's -- he's not -- this trial is not about the alleged

19   defrauding of investors.  My -- my concern is if the

20   government's claim is the false statement issued in connection

21   with obtaining this loan, is he was entitled to Fund II money

22   when he was not so entitled to it, we're sort of starting to

23   actually get into the thing we all agree is not actually at

24   issue in trial -- this trial, which is whether he was entitled

25   to the Fund II money.

1          **THE COURT:**  Right.

2          **MR. FAKHOURY:**  So that's my concern.

3          **THE COURT:**  I got it.  Sometimes it's not all one

4    thing.

5       So -- well, just one last thought on that and then I can

6    find out what else you have.

7       I say this all the time in civil cases.  I'm a baseball

8    arbitration decider fundamentally.  And I'm not that much of a

9    sports fan honestly, but as I understand it, when a player and

10   an owner in Major League Baseball get in a beef about how much

11   the player is supposed to be paid, it goes to a specialty

12   arbitration, and the arbitrators are required to pick one of

13   the positions of the parties.

14      Now they're specialty arbitrators so they know what the

15   value of baseball services in that marketplace is.  But let's

16   say that I'm a player and I think I'm -- I take the position

17   that I'm entitled to make $10 million a year and the owner

18   says, "I think Tigar is worth $4 million a year," and it goes

19   to arbitration.  And the arbitrators know that the value of my

20   services is $5 million a year, they will pick four.  They're

21   not allowed to pick five.  They have to pick one of the

22   positions of the parties, and they'd rather be wrong by

23   1 million than be wrong by 5 million.  So that's what they'll

24   do.

25      Now obviously that has limits.  I'm not going to make a

1    legally incorrect decision simply because a position was

2    asserted by one of the parties.

3        But where I have a lot of discretion and where it's what I

4    would call a -- a sort of fast-muscle-movement-type decision,

5    I'm usually going to just pick one of the positions of the

6    parties if it's legally available.

7        I say that to you because it -- making this point to

8    people sometimes prevents negotiating with the Court.

9        So I'll let you keep talking about this limiting

10   instruction.  And then when you -- at some point well in

11   advance of when you need that instruction, you can come to the

12   Court and say either we reached agreement or here are two

13   competing proposals and I'll just decide it at that point.

14       How's that?

15           **MR. WALDINGER:**  That will work.

16           **MR. FAKHOURY:**  That's fine, Your Honor.  Thank you.

17           **THE COURT:**  Great.

18       What else do we have this morning?

19           **MR. WALDINGER:**  I think Mr. Walsh has some stuff,

20   Your Honor.

21           **MR. WALSH:**  Good morning, Your Honor.

22       In continuing my tradition of wanting to do a bulk

23   admission of exhibits, there are a few more that I'd like to

24   introduce.  We've met and conferred with regard to them.

25   These are from a different -- they're from Chicago Title

1    Company.  There is a certification.

2        It's not helpful to give you a copy because it's says all

3    the right words but it was just -- it's all of their documents

4    that they produced.  So though I can give you a copy if Your

5    Honor is so inclined to look at it.

6        There are a number of exhibits that I plan to offer.  Some

7    of them include email that are in the same nature as the ones

8    that Your Honor reviewed for other purposes, that is, emails

9    from the defendant or are otherwise subject to a hearsay

10   exception.  And I just want to raise it in front of the -- you

11   before we raise it in front of the jury.

12           **THE COURT:**  You're moving documents into evidence?

13           **MR. WALSH:**  Yes.

14           **THE COURT:**  Okay.  Do it.

15           **MR. WALSH:**  Well, I believe my brother wishes to make

16   an objection on the same grounds, and so I just wanted to

17   front it with you so that we can deal with it ahead of time.

18           **THE COURT:**  Right.  We're not there yet.

19           **MR. WALSH:**  Okay.

20           **THE COURT:**  Just move them into evidence, and let's

21   see what happens.

22           **MR. WALSH:**  Thank you, Your Honor.

23           **THE COURT:**  You haven't done it.  What are the

24   exhibit numbers?

25           **MR. WALSH:**  Oh, I'm sorry --

```
 1              (Simultaneous colloquy.)
 2         THE COURT:  "The government moves into evidence the
 3    following exhibits."
 4         MR. WALSH:  Yes, sorry.
 5         THE COURT:  Just tell me what they are.
 6         MR. WALSH:  I'm sorry.  I was misunderstanding, Your
 7    Honor.
 8       They are Exhibits 37 to 46, and 109 to 114.
 9         THE COURT:  Mr. Fakhoury, is there an objection?
10         MR. FAKHOURY:  The only objection, Your Honor, would
11    be around -- again, as Mr. Walsh indicated, regarding the
12    emails.  I have the specific -- within those sets of exhibits
13    I can tell the Court the specific emails.  Given the Court's
14    prior ruling, I can also omit those and we can move from
15    there.  But other than the emails, I don't have objection to
16    anything else.
17         THE COURT:  I never begrudge anybody the right to
18    make an objection.  I'm assuming I make mistakes sometimes.  I
19    think they ought to be in the record.
20         MR. FAKHOURY:  Sure.
21         THE COURT:  So my question for you is the government
22    just moved into evidence Exhibits 37 through 46 and 109 to
23    114.
24       To which of those exhibits, if any, does the defendant
25    object?
```

1      **MR. FAKHOURY:**  So, Your Honor, within Exhibit 37, we

2   would object to items 37-002 through 37-012.

3          **THE COURT:**  All right.

4      **MR. FAKHOURY:**  37-106 through 37-111, 37-156, 37-266

5   through 267, Exhibits 44, 45, and then 109 through 114.

6          **THE COURT:**  Do you -- I'm picking up on something you

7   said a moment ago.  Do you believe that if the Court were to

8   apply to these exhibits the same principles that it applied in

9   its earlier order concerning disputed email exhibits, that it

10   would reach the same result?

11          **MR. FAKHOURY:**  Yes.

12          **THE COURT:**  Is it adequate to your purposes if the

13   Court simply notes your objection to the record and, on the

14   basis of my prior ruling, overrules the objection?

15          **MR. FAKHOURY:**  Yes, that's fine.

16          **THE COURT:**  That's the Court's order.

17       The documents -- Exhibits 37, 38, 39, 40, 41, 42, 43, 44,

18   45, 46, 109, 110, 111, 112, 113, and 114 are admitted into

19   evidence.

20          **THE CLERK:**  Yes, sir.

21       (Government's Exhibits 37, 38, 39, 40, 41, 42, 43, 44, 45,

22   46, 109, 110, 111, 112, 113, and 114 received in evidence.)

23          **MR. WALSH:**  Thank you, Your Honor.  That's it.

24          **THE COURT:**  Gentlemen, what else do we have?

25          **MR. FAKHOURY:**  Your Honor, I have one thing just --

1    this is just to note for the record just to perfect my record,

2    and amongst the -- and I know we had -- I had filed a brief on

3    the COVID issue.  I just wanted to raise one other issue that

4    was not raised in that brief, which is I understand the Court

5    has been enforcing a limit on the number of attendees, and I

6    believe that number is 35.

7        And I just wanted to put on the record that that would

8    amount to a partial courtroom closure which under Ninth

9    Circuit law, the most recent case is *Allen*, 34 F.4th 789, from

10   this year.  The Ninth Circuit said there has to be both a

11   substantial interest and the closure has to be narrowly

12   tailored.  And our issue is the -- that limit -- that number

13   limit is not narrowly tailored.

14       I would propose either we increase that number or we have

15   some alternative means for other people outside of those 35 to

16   come in either by audio or video.  And I don't need to be

17   heard further on that, Your Honor.  Thank you.

18           **THE COURT:**  Ms. Lee, is this trial being broadcast

19   over the court's audio channel?

20           **THE CLERK:**  Yes, sir, it is.

21           **THE COURT:**  Well, that request is granted *nunc pro*

22   *tunc*.

23       With regard to the limit on the number of people here,

24   this court engaged a public health expert during the pandemic

25   to determine the maximum number of persons that could safely

 1    be in any courtroom during a trial.  The number is larger for

 2    bigger rooms and smaller for smaller rooms because that's how

 3    COVID works.

 4        That is the basis of the court's limitation on the number

 5    of persons in the room.  And I think that creates an adequate

 6    record both to establish the substantial interest being

 7    furthered by the limit and the fact that it's narrowly

 8    tailored.

 9        I wish I could have more people in court because I love

10    the fact that our proceedings are open to the public.  I would

11    just say that the limiting factor here is the size of the

12    room, which is something over which I have no control.

13        And there are plenty of trials in this district, for

14    example both of the recent Theranos trials, in which there

15    aren't enough seats for all the people that want to be there,

16    COVID or not.  And so -- that's the Court's record on that.  I

17    perceive no error.

18            **MR. WALDINGER:**  The government does have a question

19    on -- I didn't catch, has the -- have the proceedings been

20    broadcast over a phone line or anything during this point, or

21    is it just starting today?

22            **THE CLERK:**  Your Honor, not during jury selection,

23    but since then, yes, sir.

24            **THE COURT:**  And I believe that fact is noted on the

25    docket which is where I got the idea.

```
 1              MR. WALDINGER:  Yeah.  I -- it's just that we were

 2    speaking with an attorney who's actually in the courtroom

 3    today who tried to listen in I believe yesterday and was not

 4    able to hear anything.  So I don't know.

 5              THE COURT:  Oh, I appreciate your bringing that to my

 6    attention.

 7              MR. WALDINGER:  Yeah.

 8              THE COURT:  We'll notify our IT folks.  Thank you.

 9         Gentlemen, what else is there?

10              MR. WALDINGER:  I don't think the government has

11    anything more, Your Honor.

12         I am -- we have more questions for Mr. Kelty.  I was just

13    going to leave some paper exhibits up there.  I expect that

14    that's fine for me to do that, but I just wanted to let you

15    know I'm going to leave some exhibits for him that I'm going

16    to go through.

17              THE COURT:  Any objection?

18              MR. FAKHOURY:  Assuming that these are admitted

19    exhibits?

20              MR. WALDINGER:  Yeah.

21              MR. FAKHOURY:  Oh, then no, that's fine.

22              THE COURT:  Good.  I think probably the way to smooth

23    the path on that is just to tell opposing counsel which

24    exhibits are up there.  They have the right to know what's in

25    front of the witness anyway.
```

1          **MR. WALDINGER:**  Yeah.

2          **THE COURT:**  And then we can take it from there.

3     All right.  Very good.

4          **MR. WALDINGER:**  And that's it.

5          **THE COURT:**  Let's wait for our jurors.  Thank you.

6          **MR. WALDINGER:**  Thank you, Your Honor.

7          **THE CLERK:**  Court is in recess.

8     (Recess taken at 8:16 A.M.; proceedings resumed at

9     8:34 A.M.)

10     (The following proceedings were heard in the presence of

11     the jury:)

12          **THE CLERK:**  You may be seated.

13          **THE COURT:**  Good morning.

14          **JURORS:**  Good morning.

15          **THE COURT:**  You are an incredibly punctual and

16     diligent group.  This is what Ms. Lee tells me.  So thank you

17     for that.  It means that we can proceed efficiently here this

18     morning.

19     We continue to know that we are imposing on your time, and

20     we really appreciate your hard work and attention.

21     We are back on the record.  All of our jurors are in their

22     assigned seats.  Mr. Kelty is still on the witness stand.

23     Good morning, Mr. Kelty.

24          **THE WITNESS:**  Morning.

25          **THE COURT:**  And he's still subject to examination by

 1    the government.

 2         Mr. Waldinger, your witness.

 3              **MR. WALDINGER:**  Thank you, Your Honor.

 4                        **<u>RYAN KELTY</u>,**

 5    called as a witness by the plaintiff, having been previously

 6    duly sworn, continued testifying as follows:

 7                   **DIRECT EXAMINATION (Resumed)**

 8    **BY MR. WALDINGER:**

 9    **Q.**  Mr. Kelty, I'd like to circle back to a document that we

10    showed you yesterday.

11              **MR. WALDINGER:**  Ms. Margen, could you pull up United

12    States Exhibit 61, which is already in evidence, and just go

13    to the first page.

14                        (Exhibit published.)

15    **BY MR. WALDINGER:**

16    **Q.**  If you'll recall, Mr. Kelty --

17              **MR. WALDINGER:**  Ms. Margen, please blow up the top of

18    that page.

19                        (Exhibit published.)

20    **BY MR. WALDINGER:**

21    **Q.**  Remind the jury what this document is, Mr. Kelty.

22    **A.**  This is the LMA application that we are communicating

23    about regarding getting initials on a section that was -- that

24    was missed when I originally sent it to Michael.

25    **Q.**  So let's move to that initials section.

 1          **MR. WALDINGER:**  Ms. Margen, could you go to the top

 2     half of page 12.

 3                          (Exhibit published.)

 4     **BY MR. WALDINGER:**

 5     **Q.**  Is this part of the LMA application, Mr. Kelty?

 6     **A.**  Yes.

 7     **Q.**  I mean you said initials.  It actually looks like a

 8     signature.  Is that what -- is that the signature or the

 9     initials you were trying to get from Mr. Rothenberg?

10     **A.**  Yes.

11     **Q.**  I believe you testified yesterday about what the

12     securities account was or is.  Could you please remind the

13     jury what the securities account is in the context of the LMA?

14     **A.**  Yes.  The securities account is the -- also known as

15     collateral account, and it's the account where deposits are

16     held in that account to secure or collateralize the loan, also

17     known as LMA.

18     **Q.**  What's the name of that collateral or securities account

19     in this case?

20     **A.**  The CMA, Cash Management Account.

21     **Q.**  Why is this area blank?

22     **A.**  It's blank because we have not produced a CMA yet.  We're

23     opening up the CMA simultaneously with the LMA.

24     **Q.**  Was the account number later added by Merrill Lynch

25     employees?

 1   **A.**  Yes.

 2          **MR. WALDINGER:**  Ms. Margen, could you --

 3   **Q.**  Well, let me ask you.  Is that common, Mr. Kelty, for the

 4   form to not have the LMA application form, to not have the

 5   securities account, account number at the time that the LMA

 6   application is signed?

 7   **A.**  Yes, that is uncommon.

 8   **Q.**  That is common or uncommon?

 9   **A.**  It's uncommon to have the securities account blank at the

10   time the application is sent.

11   **Q.**  Do you have an explanation for why that happened here?

12   **A.**  Yes.

13   **Q.**  What is that?

14   **A.**  Because we were in a situation where the deposit account,

15   also known as the CMA, was being set up simultaneously with

16   the LMA.  And the goal, the need that was instructed to me was

17   that this loan needed to be opened immediately.  We were being

18   rushed.

19   **Q.**  Who gave you those instructions?

20   **A.**  Michael Rothenberg.

21          **MR. WALDINGER:**  Ms. Margen, could you go to the top

22   60 percent of page 10.

23                       (Exhibit published.)

24          **MR. WALDINGER:**  That's fine.  Thank you.

25   **Q.**  Mr. Kelty, do you recognize this as another page of the

1    LMA account application?

2    **A.**   Yes.

3    **Q.**   Is there -- would this (indicating) area also be filled in

4    later once an account number was generated?

5    **A.**   Yes.

6    **Q.**   If you recall, I believe I asked you some questions about

7    the checkmarks on this document, including this one

8    (indicating).

9        Do you know whether you placed that checkmark there or

10   whether that was placed by someone else or by Mr. Rothenberg?

11   **A.**   I placed it.

12   **Q.**   That's the only checkmark on that page, correct?

13   **A.**   That I placed, correct.

14           **MR. WALDINGER:**   Ms. Margen, could you now go to

15   United States Exhibit 98 which is in evidence.

16       And let's -- let's first go to page 7, the top.

17                   (Exhibit published.)

18   **BY MR. WALDINGER:**

19   **Q.**   Can you just -- this is somewhat obvious, but can you just

20   tell the jury what's happened since the last version of this

21   document?

22   **A.**   Yes.  The securities account number was placed in full --

23   it's redacted of course -- but the securities account was

24   placed in full on this document upon submission internally to

25   our LMA back office to open the LMA.

1          **MR. WALDINGER:**  Ms. Margen, could you now go to the

2     top 60 percent of page 13 of this exhibit.

3                       (Exhibit published.)

4     **BY MR. WALDINGER:**

5     **Q.**  Same question here.  Do you see anything added to this

6     page of the LMA application?

7     **A.**  Yes.  The LMA account number was added to the application

8     once it was created.

9     **Q.**  When we looked at a -- at the version of this document

10    that had been sent to you in Exhibit 61, I believe that the

11    only checkmark on that document was -- was the one that I've

12    circled regarding general liquidity purposes.

13         This later document, or a document that has had the

14    account numbers added, also has a checkmark for real estate

15    purchase.

16         Do you recall whether you added that?  And -- well, let me

17    start with that question.  Do you recall whether you added

18    that?

19    **A.**  Yes, I added it.

20    **Q.**  And why did you add that?

21    **A.**  I added it because when we're submitting an LMA rush

22    request to our back office, when there's a real estate

23    transaction, it lights a fire underneath the back office to

24    open the LMA quicker.

25    **Q.**  Was there really a real estate transaction going on that

1    day?

2    **A.**   No.   Not to my knowledge.

3    **Q.**   Was -- fair to say that you were working the system at

4    Merrill Lynch to get it open?

5    **A.**   I was working the system at Merrill Lynch to get it open,

6    yes.

7    **Q.**   And you represented to the back office folks that this LMA

8    was needed for a real estate purchase?

9    **A.**   Correct.

10   **Q.**   All right.   Thank you.

11            **MR. WALDINGER:**   You can take that down, Ms. Margen.

12       Let's go to United States Exhibit 62, which is also in

13   evidence.

14       Ms. Margen, if you could just highlight or blow up the top

15   half so that Mr. Kelty can see the time frame we're talking

16   about.

17                    (Exhibit published.)

18   **BY MR. WALDINGER:**

19   **Q.**   What is this email, Mr. Kelty?

20   **A.**   This is an email correspondence between Mike and I

21   regarding getting the LMA wire completed, as well as some

22   other items around pricing that he inquired about.

23   **Q.**   When you say "LMA wire," are you speaking about a wire

24   going out of or into the LMA?

25   **A.**   Out of the LMA.

1     **MR. WALDINGER:**  Ms. Margen, could you go to the

2     bottom half of the second page.

3                    (Exhibit published.)

4     **BY MR. WALDINGER:**

5     **Q.**  With respect to this -- this is part of an email chain,

6     correct, Mr. Kelty?

7     **A.**  Yes.

8     **Q.**  Who sent that email?

9     **A.**  Michael Rothenberg sent that email.

10    **Q.**  What is Mr. Rothenberg telling you in this email?

11    **A.**  He is providing wire instructions for funds to be placed

12    upon being able to get the LMA funding complete, which was in

13    question at this time because it was in process of being

14    opened.

15    **Q.**  What were the instructions he gave you for the wire that

16    was going to come out of the LMA?

17    **A.**  The instructions were to move the proceeds of the LMA

18    funding to his Bank of America checking account.

19    **Q.**  That's an account ending 2573?

20    **A.**  Yes.

21    **Q.**  I believe you -- you've testified that Merrill Lynch is

22    owned by Bank of America; is that correct?

23    **A.**  We are the same company, yes.

24    **Q.**  When you're working with somebody on a loan, is it your

25    practice to examine the activity in their personal Bank of

```
 1    America checking accounts?

 2    A.  No, it is not.

 3         MR. WALDINGER:  Ms. Margen, could you please blow up

 4    the -- this middle email?

 5                   (Exhibit published.)

 6    BY MR. WALDINGER:

 7    Q.  The previous email we looked at was from Mr. Rothenberg.

 8    Is this email also from Mr. Rothenberg to you?

 9    A.  Yes, it is.

10    Q.  What does Mr. Rothenberg say or ask in this email?

11    A.  Mike is looking to get an update on when the wire can be

12    sent and also if there's any factors that would preclude it

13    from happening.

14    Q.  In fact, he asks is there anything stopping it from going

15    out now?

16    A.  Correct.  As well as confirming what the interest rate and

17    all -- you know, pricing would be on the -- on the wire we're

18    discussing.

19         MR. WALDINGER:  Let's go, Ms. Margen, to the first

20    page of this Exhibit 62, the email on the bottom two thirds

21    from Mr. Kelty.

22                   (Exhibit published.)

23    BY MR. WALDINGER:

24    Q.  Mr. Kelty, did you respond to Mr. Rothenberg's questions?

25    A.  I did.
```

1    **Q.**  And in summary, what did you tell him?  First with respect

2    to the question of is there anything stopping it from going

3    out today.

4    **A.**  Regarding that question, is there anything stopping it

5    from going out today, I'm trying to set proper expectations to

6    Michael that there's a possibility this does not occur today

7    using percentages that I'm coming up with but stating that

8    there's a 5 percent chance that this does not take place

9    because we're still in the process of opening it and I can't

10   control every variable, but that if it were not to come out

11   today, which that day -- "today" was Friday, June 20th, that

12   there would virtually be a hundred percent likelihood that

13   this would happen on Monday, the 23rd of June.

14   **Q.**  We've already talked about, I believe, the interest rate

15   structure on the LMA.  Does the second paragraph of your email

16   set that out?

17   **A.**  Yes.

18   **Q.**  What's the difference -- so what is -- what is 1M LIBOR?

19   **A.**  That is one month LIBOR.

20   **Q.**  Is this the number I'm circling or putting a square around

21   or rectangle around, the 3.625 percent, what you referred to,

22   I believe, as the spread?

23   **A.**  That is the spread, correct.

24   **Q.**  How does that relate to this other number that you

25   referred to as a starting rate of 3.875 percent?

 1    **A.**   The starting rate is the standard or starting spread for

 2    the size of the LMA that Michael was opening up.  So, you

 3    know, think of it as the -- you know, the list price of a car

 4    when you're going to buy a car, and, you know, of course

 5    that's potentially negotiable at that point forward, or not.

 6    But that's the starting price of the spread.

 7    **Q.**   Did you give him a discount -- or did Merrill Lynch give

 8    him a discount on that spread?

 9    **A.**   We did.

10    **Q.**   What was the discount?

11    **A.**   It states here in the email it was 25 basis points.

12    That's also 0.25 percent.

13    **Q.**   You do the math and subtract 0.25 from 3.875, you arrive

14    at what number?

15    **A.**   3.625.

16    **Q.**   Finally, I just want to note for the record --

17            **MR. WALDINGER:**   If you go to the top email,

18    Ms. Margen.

19                        (Exhibit published.)

20    **BY MR. WALDINGER:**

21    **Q.**   And I'll ask you, Mr. Kelty, if in that email

22    Mr. Rothenberg provided you with a telephone number?

23    **A.**   He did.

24    **Q.**   Could you read that for the jury, please?

25    **A.**   The whole email?

1    **Q.**  Just the -- just the number, for the record.

2    **A.**  The telephone number, (415) 774-6468.

3           **MR. WALDINGER:**  And thank you, Ms. Margen.  We're

4    going to move to United States Exhibit 63.  This -- this is

5    also in evidence.

6        If you could just blow up real quickly the top so that

7    Mr. Kelty can see the last email.

8                        (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**  The last email here is what date, Mr. Kelty?

11   **A.**  July 10th, 2014.

12   **Q.**  And who was on the From, To, and bcc lines?

13   **A.**  I sent the email.  It's from me.  And I sent it to Michael

14   Rothenberg, his Gmail, and copied one of the financial

15   advisors on the account, Benjamin Bolt.

16   **Q.**  Why did you do a BCC on that one, do you remember?

17   **A.**  I don't recall exactly why, no.

18           **MR. WALDINGER:**  Ms. Margen, if you could just go to

19   the top of page 3 of this exhibit.

20                        (Exhibit published.)

21   **BY MR. WALDINGER:**

22   **Q.**  Mr. Kelty, I believe this might be an email that we saw in

23   another exhibit during your testimony yesterday.  And so I

24   just wanted to use that as an anchor point.

25       If you could read that email, then we'll go to the bottom

 1   of the second page so that you can see the date of that email.

 2   **A.**  Yeah.  The email says:

 3      "Ryan, can we pick this back up next week to move to the

 4   ball forward?  I'm assuming the June statement will show the

 5   $350,000 cash and then we'll be in good shape after 7/31."

 6          **MR. WALDINGER:**  Let's go to the bottom of page 2 so

 7   that Mr. Kelty and the jury can see the date of that email.

 8                      (Exhibit published.)

 9   **BY MR. WALDINGER:**

10   **Q.**  What's the date of that email that Mr. Rothenberg sent to

11   you?

12   **A.**  Friday, June 27, 2014.

13   **Q.**  All right.  So then following up.

14          **MR. WALDINGER:**  Let's -- let's go back, then, to the

15   email that's at the top of page 1.

16                      (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**  So with that context and the context of your testimony

19   yesterday about -- about the mortgage application or the

20   mortgage that you were talking with Mr. Rothenberg about, I

21   wanted to ask you about this email.

22      And particularly, this is an email, as you said, from you,

23   correct, Mr. Kelty?

24   **A.**  Correct.

25   **Q.**  You were -- is it fair to say that you were asking him to

1    collect certain items?

2    **A.**  Yes.

3    **Q.**  The question I have is on the second sentence, what you

4    meant by saying:

5        "It's important we get the loan process started ASAP for

6    purposes of meeting your LMA/reserve requirements we discussed

7    a couple of weeks ago."

8        My question is what does it mean to meet your LMA reserve

9    requirements?

10   **A.**  Yeah.  The reserve requirements and tied to the LMA link

11   back to the four legs of the stool we discussed yesterday,

12   and -- and that is establishing two consecutive months of

13   personal unencumbered liquidity.  So liquid assets in Mike's

14   name, no leverage.

15       At this point in time, there's a loan outstanding.  And I

16   am stressing the importance that we address this immediately

17   because it's my expectation that we are still doing a mortgage

18   at Merrill Lynch at this time.

19   **Q.**  Were you concerned about the fact that there was an

20   outstanding balance on the LMA at this time?

21   **A.**  Yes.

22   **Q.**  Why were you concerned about that in -- with respect --

23   was it with respect to the mortgage loan?

24   **A.**  Concern in respect of getting a semblance of any

25   approvable deal for the mortgage loan upon submission, yes.

1    **Q.** Did you express those concerns -- were those -- as you

2    read this email, is that expressing those concerns to

3    Mr. Rothenberg?

4    **A.** Yes. I would define that as me expressing them in this

5    email.

6    **Q.** You said that we discussed -- that you had discussed those

7    LMA reserve requirements a couple of weeks ago.

8        Do you recall whether those discussions were on the phone

9    or in email?

10   **A.** I had spoken to Michael over the phone numerous times.

11   I -- I don't recall any specific phone calls, but it -- as I

12   discussed yesterday, it's customary for me to have

13   conversations with prospective mortgage clients about

14   requirements and essentially creating a pathway of least

15   resistance in order to gain mortgage approval.

16       And so, yes, that was likely discussed over the phone

17   regarding having an LMA.

18           **MR. FAKHOURY:** Sorry. Objection, speculation. He

19   said he couldn't recall the phone call. Move to strike.

20           **THE COURT:** Overruled.

21   **BY MR. WALDINGER:**

22   **Q.** Were you finished, Mr. Kelty?

23   **A.** Yeah, it is customary for me to have these conversations.

24   So even though I do not recall the specific phone call, there

25   was likely a discussion regarding my concern regarding this

 1    loan as it related to getting mortgage approval, yes.

 2    **Q.**  To maybe use a sports analogy, fair to say you have a

 3    playbook that you use with putting together mortgage

 4    applications?

 5    **A.**  Correct.

 6         **MR. WALDINGER:**  Ms. Margen, we can take that down.

 7    And let's move to United States Exhibit 66 which I believe is

 8    in evidence but we did not discuss yesterday.

 9         And, Ms. Margen, could you go to the bottom of page 3 and

10    then we'll move over to the top of page 4.

11                     (Exhibit published.)

12    **BY MR. WALDINGER:**

13    **Q.**  So the bottom of page 3 is the beginning of an email from

14    July 29th, correct?

15    **A.**  Correct.

16         **MR. WALDINGER:**  And then let's go to the top of

17    page 4, Ms. Margen, just to remind the jurors and Mr. Kelty of

18    what we were looking at yesterday.

19                     (Exhibit published.)

20    **BY MR. WALDINGER:**

21    **Q.**  So, Mr. Kelty, this is a different version.  I believe

22    that we saw this email in United States Exhibit 64 yesterday.

23    But this is the same email that's part of a different chain

24    between you and Mr. Rothenberg, correct?

25    **A.**  Correct.

1    Q.   All right.   With -- with that context, I believe yesterday

2    I asked whether you had ever responded to any of the questions

3    that Mr. Rothenberg had asked in this email chain.   And I

4    believe --

5             MR. WALDINGER:   We'll go to the top of page 5,

6    Ms. Margen.

7                        (Exhibit published.)

8    BY MR. WALDINGER:

9    Q.   One of the questions that Mr. Rothenberg had asked you is

10   what is the exact payoff.   Do you recall that?

11   A.   Yes.

12   Q.   Did you respond to that question at some point?

13   A.   Yes.   In email I responded.

14             MR. WALDINGER:   Ms. Margen, could you now go to the

15   top -- well, let's start at the bottom of page 2, which is the

16   beginning of the email, bottom of page 2.

17   BY MR. WALDINGER:

18   Q.   The last email here is from who?

19   A.   It looks -- there's an email from me.

20   Q.   All right.

21             MR. WALDINGER:   And now, Ms. Margen, let's go to the

22   top of page 3.

23                        (Exhibit published.)

24   BY MR. WALDINGER:

25   Q.   What information were you providing to Mr. Rothenberg in

1    that email?

2    **A.**  The full payoff of the LMA through July 29th, 2014,

3    including principal and all accrued interest, as well as per

4    diem interest if we were to pay the loan off after July 29th,

5    2014.

6    **Q.**  So if it were -- if the payoff was on July 30th, you'd add

7    $36.80 cents?

8    **A.**  Correct.

9    **Q.**  Did Mr. Rothenberg respond to that email?

10   **A.**  He did.

11        **MR. WALDINGER:**  Ms. Margen, let's go to the middle

12   email on the prior page.

13                    (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**  How did Mr. Rothenberg respond, Mr. Kelty?

16   **A.**  He responded stating he spoke to someone already on -- at

17   Merrill.  And that the payoff quote that he received was a

18   thousand dollars less than what I was stating to him and what

19   we could do to remedy the difference.

20        **MR. WALDINGER:**  Let's go back -- or let's go to the

21   first page.

22                    (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**  And then I'll just ask you whether you did remedy the

25   difference.

1    **A.**  We did.  I suggested we put an extra thousand dollars into

2    the LMA to pay it off because that was the full payoff amount

3    including that extra 1,000 -- approximating.  It's more than a

4    thousand, but approximately a thousand.

5    **Q.**  All right.

6           **MR. WALDINGER:**  Thank you, Ms. Margen.  I would like

7    to now move to Exhibit 48.

8    **Q.**  Mr. Kelty, I left some paper exhibits in front of you so

9    that you can leaf through them.  So let's -- if you could just

10   look at Exhibit 48, it might be quicker for you to find what

11   I'm asking about.  And then Ms. Margen can catch up.

12          What is this document, Exhibit 48?

13   **A.**  It's an LMA account statement for Michael Rothenberg.

14   **Q.**  For what period?

15   **A.**  July 1st to July 31st, 2014.

16   **Q.**  What was the closing loan balance that month on the LMA?

17   **A.**  Zero.

18   **Q.**  With respect to the prior email that we saw, Exhibit 66,

19   did Exhibit 66 relate to the payoff of the LMA at that time?

20   **A.**  Yes.

21          **MR. WALDINGER:**  Let's go, Ms. Margen, to the next

22   page.

23                      (Exhibit published.)

24   **BY MR. WALDINGER:**

25   **Q.**  And, Mr. Kelty --

 1          You can turn to the next page.

 2                         (Exhibit published.)

 3    **BY MR. WALDINGER:**

 4    **Q.**  -- what was the -- what was the actual loan balance at the

 5    time that Mr. Rothenberg sent -- sent the first payment to pay

 6    it off?

 7    **A.**  $350,404.13.

 8    **Q.**  Was that enough money to fully pay the LMA account off at

 9    that time?

10    **A.**  No.  Not if you include accrued interest.

11    **Q.**  I don't know if you've testified to this before.  But when

12    does interest -- when is interest assessed on an LMA

13    statement?

14    **A.**  It's assessed usually within the first and third business

15    day of the following month in arrears.

16    **Q.**  Is it fair to say that interest had accrued on the account

17    but it had not yet been assessed?

18    **A.**  Correct.  It had not -- it had not been assessed because

19    the first, second, or third business day of the following

20    month hadn't existed yet.

21    **Q.**  What were the accrued total finance charges as of the end

22    of July?

23    **A.**  $1,029.77.

24            **MR. WALDINGER:**  Let's go to the next page.

25                         (Exhibit published.)

1   BY MR. WALDINGER:

2   **Q.**  Can you tell from this page how the LMA balance and

3   accrued interest were paid in July of 2014?

4   **A.**  Yeah.  There was a -- a large sum moved from Michael's

5   Bank of America account on July 29th, that's the 350,404.13.

6   And in those email discussions with Michael, we identified

7   that there is that accrued interest factor that was not

8   factored in for purposes of fully paying off the LMA.  And so

9   there was an additional $1,029.77 transferred from Mike's Bank

10  of America account to his LMA to pay it off.

11  **Q.**  What do those two amounts add up to?

12  **A.**  It's -- it's blocked, but 351 -- excuse me -- it's not

13  blocked.  351,433.90.

14  **Q.**  There's a different number below.  And I -- do you -- is

15  the difference something that has to do with the finance

16  charge?

17  **A.**  Yeah.  It's netting out that first finance charge in July,

18  but -- that 351,433.90 is essentially the total principal and

19  accrued interest for the month of July.

20  **Q.**  If you recall on Exhibit 66, that's the number that you

21  gave him, correct?

22  **A.**  That's the number I gave him, correct.

23  **Q.**  I apologize.  I've -- I didn't listen to your answer.

24      Can you tell where these payments came from?

25  **A.**  Yes.

1   **Q.**  Where did they come from?

2   **A.**  From, it says BAC, that's Bank of America Corp., number

3   2573.  I recall that being Michael's checking account at Bank

4   of America.

5          **MR. WALDINGER:**  Ms. Margen, we're going to now move

6   to Exhibit 49.

7                          (Exhibit published.)

8   **BY MR. WALDINGER:**

9   **Q.**  And, Mr. Kelty, you can look at that document.

10      What is Exhibit 49, Mr. Kelty?

11  **A.**  This is another LMA statement for Michael Rothenberg for

12  the month of August.

13  **Q.**  The prior exhibit that we looked at was Exhibit 48 which

14  was for the month of July, correct?

15  **A.**  Correct.

16  **Q.**  The LMA balance at the end of July again was what number?

17  **A.**  Zero.

18  **Q.**  That's because Mr. Rothenberg had made those two transfers

19  or authorized those two transfers from his Bank of America

20  account?

21  **A.**  Correct.

22  **Q.**  What happened with -- we'll turn to page 2 of this

23  exhibit.  What happened on August 1st of 2014?

24                          (Exhibit published.)

25          **THE WITNESS:**  On August 1st, 2014, a new loan advance

1    for 350,000 was drawn against Michael's LMA.

2    **BY MR. WALDINGER:**

3    **Q.**  Also I think you testified this is the date and within the

4    first couple days of the month that finance charges are

5    assessed?

6    **A.**  Correct.

7    **Q.**  These had already been paid?

8    **A.**  There was a credit in his account because we essentially

9    moved it before it exited.  So, yes, it was paid in advance.

10   **Q.**  Can you tell from this page of the document where the loan

11   advance was sent?  And I'll direct you to the bottom of the

12   page.

13   **A.**  Yes.  It was sent again to a BAC number ending in 2573, as

14   I recall, Michael's checking account at Bank of America.

15   **Q.**  What was -- so on August 1st or at the close of business

16   on August 1st, what was the balance, setting aside any accrued

17   finance charges, of Mr. Rothenberg's LMA?

18   **A.**  350,000.

19   **Q.**  Can you tell from this statement, from this document, what

20   the balance was on August 21st of 2014?

21   **A.**  I can -- no, not on this.

22   **Q.**  Well, let me ask you, what was the balance on August 25th?

23   **A.**  350,000.

24   **Q.**  What was the balance on August 18th?

25   **A.**  350,000.

1   Q.  Does that help you determine what the balance was on

2   August 21st?

3   A.  It can be ascertained that it's likely 350,000.

4   Q.  Do you see any other activity on the LMA other than rate

5   changes between August 1st and August 28th of 2014?

6   A.  No, I do not.

7   Q.  What happened on August 28th of 2014?

8   A.  Mike's loan was fully paid off again.

9                         (Exhibit published.)

10  BY MR. WALDINGER:

11  Q.  Turning to the next page of this Exhibit 49, to the top,

12  can you tell the source of funds that were used -- that was

13  used to pay off the LMA balance on August 28th?

14                        (Exhibit published.)

15          THE WITNESS:  Yes.  It's a transfer from an account

16  ending in 6052.

17  BY MR. WALDINGER:

18  Q.  Do you recall what account is numbered 6052?

19  A.  Yes.  It's Michael's CMA.

20          MR. WALDINGER:  Ms. Margen, could you now go to

21  United States Exhibit 52, which is also in evidence.

22      Let's go to the third page of this exhibit.

23                        (Exhibit published.)

24  BY MR. WALDINGER:

25  Q.  What is this document beginning on page 3 of Exhibit 52,

1    Mr. Kelty?

2    **A.**   This is a consolidated statement where we issue

3    consolidated asset and liability information.  This is the

4    consolidated statement for Michael Rothenberg for the month of

5    August.

6    **Q.**   Does it relate to the account number ending 6052?

7    **A.**   Correct.

8           **MR. WALDINGER:**   Ms. Margen, let's please go to the

9    fifth page of this exhibit.

10   **Q.**   Does this page list the transactions?

11   **A.**   Yes.

12          **MR. WALDINGER:**   Let's blow up this transactions area,

13   Ms. Margen.

14                      (Exhibit published.)

15   **BY MR. WALDINGER:**

16   **Q.**   Can you tell from reviewing page 5 of Exhibit 52 what

17   transactions occurred in the 6052 account in August of 2014?

18   **A.**   Yes.  It -- yes, I can tell.

19   **Q.**   Let's just walk through them.  What was the first one?

20   **A.**   On August 22nd, there was a funds transfer from Mike's

21   Bank of America checking account for $51,000.  That was a

22   credit.

23   **Q.**   What happened next?

24   **A.**   That money was then transferred out for the same amount.

25   **Q.**   Same day?

1    **A.**    Same day.

2    **Q.**    What happened next?

3    **A.**    On August 27th, there was a wire transfer in, a credit,

4    for $608,104.47.

5    **Q.**    Do you recall having any telephone discussions or email

6    communications with Mr. Rothenberg about that transfer?

7    **A.**    No, I do not recall.

8    **Q.**    That -- unlike the prior transfer from the 2573 account,

9    this does not have the wire detail, or the description of this

10   transaction does not have the 2573 account in it; is that

11   correct?

12   **A.**    Correct.

13   **Q.**    Can you tell just by looking at this exactly where this

14   transfer came from?

15   **A.**    No.  It's not clear exactly, but it is certainly not from

16   internal.  It would have shown if it was internally coming

17   from an account.  It's coming from outside of Merrill Lynch

18   and Bank of America.

19   **Q.**    And I'll just note, just if you read the last three

20   letters of the wire transfer description, what are those three

21   letters?

22   **A.**    CHI.

23   **Q.**    What was the next transaction?  So there was a deposit of

24   $608,000?  Excuse me.  $608,104.47 on August 27th of 2014.

25          What was the next transaction?

1    **A.**   The next transaction is on August 28th.   There was a funds

2    transfer to Michael's Bank of America checking account ending

3    in 2573 for $257,000.

4    **Q.**   At this time, had the CMA -- the CMA was paid off the same

5    day, correct?

6    **A.**   The CMA was paid off the same day?

7    **Q.**   Correct.

8    **A.**   You mean the LMA?

9    **Q.**   Oh, excuse me.   Thank you for correcting me.

10       Was the LMA paid off the same day?

11   **A.**   Yes.   August 28th.   Same day.

12           **MR. WALDINGER:**   Thank you, Ms. Margen.   We're now

13   going to move to Exhibit 68.

14                       (Exhibit published.)

15   **BY MR. WALDINGER:**

16   **Q.**   Mr. Kelty, this is a document that I believe is in

17   evidence.   We did not look at it yesterday.

18           **MR. WALDINGER:**   Ms. Margen, could you just slowly

19   page through so that Mr. Kelty can see that exhibit.

20                       (Exhibit published.)

21           **MR. WALDINGER:**   And then we'll go back to the -- to

22   the first page to the email on the top.

23                       (Exhibit published.)

24   **BY MR. WALDINGER:**

25   **Q.**   This was an email chain involving you, Anna Jenkins,

1   Christine Allscheid, and Mr. Rothenberg, correct?

2   **A.**   Correct.

3   **Q.**   In the last email, what is happening in the email that is

4   blown up at the top of page 1?

5   **A.**   Michael is sending documents that -- that I need for the

6   mortgage application we're attempting to submit.

7   **Q.**   Did you need to get the application from him in order to

8   move the application forward?

9   **A.**   Well, this -- this is a bank statement, I believe.  Our

10  own bank statement, as I recall.  And, no, we did not need

11  Michael to send us our own bank statement, no.

12          **MR. WALDINGER:**   Let's move to page 5, Ms. Margen.

13                       (Exhibit published.)

14  **BY MR. WALDINGER:**

15  **Q.**   I think you said this is a bank statement.  Is this --

16  we're putting up the first page of the attachment.

17  **A.**   Correct.  This is the statement that Michael sent.

18          **MR. WALDINGER:**   With respect to this email chain, I

19  would like to go to the middle of the second page, Ms. Margen.

20                       (Exhibit published.)

21  **BY MR. WALDINGER:**

22  **Q.**   Mr. Kelty -- excuse me.

23          **MR. WALDINGER:**   Yeah, the second page of Exhibit 68,

24  Ms. Margen.

25                       (Exhibit published.)

1    BY MR. WALDINGER:

2    Q.   The date of this email is August 1st of 2014, correct?

3    A.   Correct.

4    Q.   At this time, was Mr. Rothenberg seeking to get any

5    documentation from Merrill Lynch regarding his accounts at

6    Merrill Lynch?

7    A.   Yes.

8    Q.   What was he seeking?

9    A.   He's looking for what he wrote here "official bank

10   statement."

11   Q.   I think you just testified that you had access to those

12   official bank statements; is that correct?

13   A.   We do.

14   Q.   Did he tell you whether -- why he wanted the official bank

15   statement?

16   A.   No.

17            MR. WALDINGER:   Okay.   One second, Your Honor.

18                 (Off-the-record discussion.)

19            MR. WALDINGER:   And, Your Honor, I have no further

20   questions at this time for Mr. Kelty.

21            THE COURT:   Thanks, Mr. Waldinger.

22       Mr. Fakhoury, questions for Mr. Kelty?

23            MR. FAKHOURY:   Yes, Your Honor.   One second.

24   / / /

25   / / /

1                              CROSS-EXAMINATION

2      BY MR. FAKHOURY:

3      **Q.**  Okay.  Good morning, Mr. Kelty.

4      **A.**  Good morning.

5      **Q.**  I wanted to start sort of generally, and then we'll move

6      in a little bit more narrowly into your specific interactions

7      with Mr. Rothenberg.  Okay?

8      **A.**  Okay.

9      **Q.**  So you've worked with Merrill Lynch since 2005, I believe?

10     **A.**  Correct.

11     **Q.**  Okay.  And I think you testified that in 2009 Bank of

12     America bought Merrill Lynch, right?

13     **A.**  Correct.

14     **Q.**  Bank of America is a pretty big bank, right?

15     **A.**  One of the largest in the world, yes.

16     **Q.**  And I think you testified they have about 200,000

17     employees?

18     **A.**  It's my understanding across the enterprise, yes.

19     **Q.**  Okay.  And you think you testified Merrill Lynch has about

20     15- or 16,000 just wealth advisors; is that a -- is that about

21     right?

22     **A.**  That goes up and down, but, yes, that's my

23     understanding --

24     **Q.**  Okay.

25     **A.**  -- around 15,000, yeah.

1   **Q.**   Now, you testified that your -- you work as a -- well, I

2   want to make sure I'm saying it right.  Okay?  So you

3   testified that your role is a wealth management advisor,

4   right?

5   **A.**   Currently, yes.

6   **Q.**   Yeah.

7       And you talked a little bit about working with financial

8   advisors.  Do you recall that?

9   **A.**   Yes.

10  **Q.**   You mentioned Anna Jenkins being a financial advisor you

11  worked with?

12  **A.**   Correct.

13  **Q.**   And Benjamin Bolt also?

14  **A.**   Yes.

15  **Q.**   And if I understand it correctly -- and if I don't, please

16  correct me -- folks reach out to financial advisors like

17  Ms. Jenkins or Mr. Bolt, and if a potential client is

18  interested in a mortgage product, for example, Ms. Jenkins or

19  Mr. Bolt would sort of pass them on to you; is that right?

20  **A.**   That's correct.

21  **Q.**   Okay.  You're the one with the experience dealing with

22  mortgages, correct?

23  **A.**   Specialty and mortgage, correct.

24  **Q.**   Okay.

25  **A.**   And how that deal would -- would transpire, yes.

1   **Q.**   Okay.  And in fact, it's not just mortgages, but basically

2   any -- other kinds of lending products, right?

3   **A.**   Correct.  Including the LMA as well.

4   **Q.**   Right.

5   **A.**   Which is also a lending product.

6   **Q.**   Okay.

7        And so we're all on the same page, you know, a lending

8   product, that's sort of another way of saying a loan, right?

9   **A.**   Yes.

10  **Q.**   And most banks make money off loans by charging interest,

11  right?

12  **A.**   Correct.

13  **Q.**   And as a wealth management advisor, one of your -- well, I

14  guess maybe one way to think about your job is you're sort of

15  like a salesman, right?

16  **A.**   At that time, yes, my job was to sell and promote the

17  utilization of credit products.

18  **Q.**   Okay.  And so we're clear going forward, the questions I'm

19  going to be asking really focused on 2014, okay?

20       So -- yeah, we'll just leave it at that.

21       Let me actually ask you a question now.

22       So you said that your job was to sell loan products,

23  right?

24  **A.**   Correct.

25  **Q.**   You want to make sure a deal gets done, right?

1   **A.**  The goal is to have a viable deal that gets done, for the

2   financial advisor, yes.

3   **Q.**  Okay.  Obviously there's a benefit to the client to get a

4   deal done, right?  They get a product that they want, right?

5   **A.**  Correct.

6   **Q.**  So we've been talking about mortgages.  For a mortgage,

7   the benefit would be person can buy a house, right?

8   **A.**  Correct.

9   **Q.**  Okay.

10      There's also a benefit to the bank obviously, right?

11  **A.**  There is.

12  **Q.**  We've already talked that banks make money by charging

13  interest, right?

14  **A.**  Correct.

15  **Q.**  As a wealth management advisor, perhaps -- and again, you

16  can correct me if I'm wrong -- you're sort of expected to make

17  deals, right?

18  **A.**  We're expected to essentially have an optimistic approach

19  to getting deals done, yes.

20  **Q.**  Okay.

21      That might be a way your -- your job performance is

22  evaluated, for example, right?

23  **A.**  We were not paid on a per deal basis.  But certainly,

24  yeah, the amount of deal flow and amount of deals that closed

25  at the end of the year was a part of compensation, absolutely.

1    **Q.**  Okay.  So you -- so in other words, you're not paid like

2    on commission, right?

3    **A.**  No.

4    **Q.**  But it may impact a bonus or job promotion opportunities,

5    right?

6    **A.**  It would be very unlikely that one deal would impact bonus

7    or job opportunity.  The totality of deals throughout the

8    course of the year, sure.

9    **Q.**  Oh, absolutely.  So your bonus isn't going to rise and

10   fall on one deal, but if you're a good dealmaker, you're more

11   likely to get a bonus, right?

12   **A.**  That's fair to say, yes.

13   **Q.**  Okay.  Now, you testified that Merrill Lynch offered a

14   wide variety of mortgages.

15       Do you recall that testimony?

16   **A.**  I do.

17   **Q.**  I want to talk through that step by step.  Okay?

18   **A.**  Okay.

19   **Q.**  The first thing you testified about was a distinction

20   between a secondary market mortgage and a portfolio mortgage.

21       Do you recall that testimony?

22   **A.**  I do.

23   **Q.**  Okay.  So -- and again, so we're all on the same page

24   here, a secondary market mortgage is one that is basically

25   later to be sold from Merrill Lynch to perhaps -- and I want

1   to make sure I'm saying it right -- Fannie Mae or Freddie Mac,

2   right?

3   **A.**  That is one example, yes.

4   **Q.**  Okay.  And so to use the Fannie Mae or Freddie Mac

5   examples, those are government agencies, right?

6   **A.**  They are.

7   **Q.**  And they purchase loans -- or excuse me -- they purchase

8   mortgages?

9   **A.**  Mortgage-backed securities, correct.

10  **Q.**  Okay.

11      A term that's sometimes used to describe these mortgages

12  sold to Fannie Mae or Freddie Mac is a conforming mortgage,

13  right?

14  **A.**  That's correct.

15  **Q.**  And "conforming" means it conforms to the lending

16  guidelines that have been established by Fannie Mae and

17  Freddie Mac, right?

18  **A.**  That's correct.

19  **Q.**  Okay.  And again, just so we're all on the same page, the

20  most common kind of mortgage that fits that criteria would be

21  like a 30-year fixed mortgage, right?

22  **A.**  A 30-year fixed principal and interest mortgage would be

23  the most common, yes.

24  **Q.**  Okay.  And that means you make 360 monthly payments of

25  principal and interest at a set interest rate?

1    **A.**  That's correct.

2    **Q.**  Okay.  And in order for a bank to issue that kind of

3    mortgage in the hopes of having Fannie Mae or Freddie Mac buy

4    it, the -- the loan provider has to meet the criteria set

5    forth by Fannie Mae and Freddie Mac, right?

6    **A.**  Yes.

7    **Q.**  Now, you also testified about a portfolio mortgage.

8    **A.**  Correct.

9    **Q.**  Okay.  And a portfolio mortgage is one that the bank keeps

10   for its own books, right?

11   **A.**  It is one that's intended to stay on the books.  It

12   doesn't mean it permanently stays on the books, but the

13   intention is that when it's issued, it's on our books.

14   **Q.**  Okay.  Now portfolio mortgages, if you're not trying to

15   sell it off to Fannie Mae or Freddie Mac, it doesn't have to

16   meet the Fannie Mae or Freddie Mac guidelines, right?

17   **A.**  Correct.

18   **Q.**  Another way to describe that kind of mortgage is -- is as

19   a nonconforming mortgage, right?

20   **A.**  Yes.

21   **Q.**  Okay.

22       Now, within the Merrill Lynch portfolio products, you

23   mentioned a couple different kinds of products and I wanted to

24   go through them a little bit.  Okay?

25       So the first one you mentioned was a PrimeFirst® LIBOR

1    mortgage.  Do you recall that?

2    **A.**  I do.

3    **Q.**  And that was the product that was advertised in the mailer

4    that was sent to Mr. Rothenberg, correct?

5    **A.**  That's correct.

6    **Q.**  And if we sort of remove the branding for a minute, that's

7    basically a 25-year mortgage that requires the borrower to pay

8    interest for the first ten years at a rate of 1.75 percent,

9    right?

10   **A.**  Those were the terms at that time, yes.

11   **Q.**  Okay.  And you mentioned a couple other mortgages in your

12   testimony yesterday.  One was a 30-day LIBOR -- LIBOR

13   mortgage; is that right?

14   **A.**  Yes.

15   **Q.**  You mentioned a three-year ARM?

16   **A.**  Yes.

17   **Q.**  And an ARM mortgage is an adjustable rate mortgage where

18   the rate is fixed for a certain period of time and then can

19   fluctuate in the future, right?

20   **A.**  Correct.

21   **Q.**  You mentioned a five-year ARM?

22   **A.**  Correct.

23   **Q.**  A seven-year ARM?

24   **A.**  Correct.

25   **Q.**  A ten-year ARM?

KELTY - CROSS / FAKHOURY

1    **A.**   Correct.

2    **Q.**   And then you also mentioned that within the ARMs you could

3    have a mortgage this is interest only, right?

4    **A.**   Yes.

5    **Q.**   You could a have a mortgage that you pay -- or the

6    borrower pays both principal and interest as well, right?

7    **A.**   Correct.

8    **Q.**   And all of those would be examples of nonconforming loans,

9    right?

10   **A.**   Yes.

11   **Q.**   And they don't -- those kinds of loans don't have to meet

12   Fannie Mae or Freddie Mac guidelines, right?

13   **A.**   Well, principal and interest ARM is a loan that Fannie and

14   Freddie would buy.  So if it's under the conforming limit,

15   Fannie or Freddie would buy it.

16   **Q.**   Okay.

17   **A.**   So it depends on the loan size.  So there's other

18   variables just beyond product.

19   **Q.**   Got it.  Okay.  So in other words, some of those loans

20   could be conforming, some could not be, right?

21   **A.**   That's correct.

22   **Q.**   It depends on the value of the property, right?

23   **A.**   Correct.

24   **Q.**   It depends on the product that's being offered by the

25   bank, right?

KELTY - CROSS / FAKHOURY

1    **A.**   Correct.

2    **Q.**   And each of those products are going to have their own

3    lending criteria, right?

4    **A.**   That's correct.

5    **Q.**   I already mentioned briefly -- and I should add now we're

6    going to shift a little bit to talk about Mr. Rothenberg more

7    specifically.  Okay?

8    **A.**   Okay.

9    **Q.**   So we've already heard that Merrill Lynch had solicited

10   Mr. Rothenberg through a mailer.  Do you recall that?

11   **A.**   I do.

12   **Q.**   And again, this -- that specific product advertised in the

13   mailer was this PrimeFirst® mortgage, right?

14   **A.**   Correct.

15   **Q.**   Okay.

16       Now, your understanding is that Mr. Rothenberg responded

17   to that solicitation, right?

18   **A.**   Yes.  He sent an email to Anna Jenkins --

19   **Q.**   Okay.

20   **A.**   -- responding to it.

21   **Q.**   Okay.  And Ms. Jenkins, you testified she's one of the

22   financial advisors you work with, right?

23   **A.**   Yes.

24   **Q.**   And when she got the message from -- or the email from

25   Mr. Rothenberg, right, she effectively kind of sent him

```
 1    towards you, right?

 2    A.   Eventually, yes.

 3    Q.   Okay.

 4         MR. FAKHOURY:   Let me ask Mr. Torres to pull up

 5    Exhibit 54.

 6         And I said this to Ms. Jenkins when she was here

 7    yesterday.  You're going to have to forgive me.  I don't have

 8    the super high-tech presentation software so we're going to

 9    have to do it a little more old school.

10         You can leave it there like that.

11                       (Exhibit published.)

12    BY MR. FAKHOURY:

13    Q.   Okay.  Have you seen this email before.  This is -- this

14    is Exhibit 54 that's been admitted into evidence.

15         Have you seen this email before?

16    A.   I have.

17    Q.   You have?  Okay.

18         So this is the email -- well, let me back up a second.

19         This email is from Ms. Jenkins to Mr. Rothenberg and

20    another person named Nellie.

21         Do you see that?

22    A.   Yes.

23    Q.   Okay.  And the date of that email is March 31st, 2014,

24    right?

25    A.   Correct.
```

1  **Q.**  The subject talks about a custom rate sheet for 712 Bryant

2  Street.  Do you see that?

3  **A.**  I do.

4  **Q.**  And 712 Bryant Street, you're aware that that's the

5  address of Mr. Rothenberg's home he was trying to get a

6  mortgage for, right?

7  **A.**  Yes.  That's the subject property.

8  **Q.**  Okay.

9        What's a custom rate sheet?

10 **A.**  It's a rate sheet that's produced for a specific property.

11 **Q.**  Okay.  So a rate sheet meaning here's the interest rate

12 and here's what the payments would look like, that sort of

13 thing?

14 **A.**  That's what it could be, correct.

15        **MR. FAKHOURY:**  Could -- Mr. Torres, could you scroll

16 down a little bit.

17    A little bit more.  Perfect.

18                    (Exhibit published.)

19 **BY MR. FAKHOURY:**

20 **Q.**  Okay.  So you've testified you've seen this email before,

21 right?

22 **A.**  Yes.

23 **Q.**  Okay.  Now --

24        **MR. FAKHOURY:**  And maybe, Mr. Torres, if you could

25 zoom out.

1    Perfect.

2                        (Exhibit published.)

3    BY MR. FAKHOURY:

4    Q.  So this -- this is Ms. Jenkins sending an email

5    Mr. Rothenberg, right?

6    A.  Correct.

7    Q.  And it appears to be answering some questions that he had

8    posed to her, correct?

9    A.  Yes, it does.

10   Q.  Okay.  One of the things on here says "Decision

11   Turnaround."  Do you see that?

12   A.  I do.

13   Q.  Okay.  And in the Decision Turnaround section, Ms. Jenkins

14   notes that "If you have a straightforward situation usually it

15   is a couple of days."  And but it can "take longer if the

16   borrower has complicated factors that merit additional

17   clarification."

18       Do you see that?

19   A.  I do.

20   Q.  Okay.  Now, again, this email was sent in March of 2014,

21   right?

22   A.  Correct.

23   Q.  This email is sent before the LMA account was opened,

24   right?

25   A.  Correct.

 1    **Q.**  It's sent before the CMA account was opened, right?

 2    **A.**  Correct.

 3         **MR. FAKHOURY:**  Okay.  Mr. Torres, could you pull up

 4    Exhibit 55, please.

 5         Perhaps you could zoom out a little bit.

 6                         (Exhibit published.)

 7    **BY MR. FAKHOURY:**

 8    **Q.**  Okay.  Have you seen this email before?

 9    **A.**  I don't recall seeing it, no.

10    **Q.**  Okay.

11         **MR. FAKHOURY:**  Can you go to page 2 of this exhibit,

12    Mr. Torres.

13         Perfect, right there.

14                         (Exhibit published.)

15    **BY MR. FAKHOURY:**

16    **Q.**  Do you see sort of down -- and I'm like pointing here --

17    you know, I forgot I can annotate this thing.

18         Okay.  I feel like I'm John Madden (indicating).

19         Okay.  Do you see this part here I've sort of drawn a line

20    around?

21    **A.**  Yes.

22    **Q.**  Okay.  Now you testified earlier you worked with Mr. Bolt,

23    right?

24    **A.**  Yes.

25    **Q.**  And in this email, Mr. Bolt is sending a message to

 1    Mr. Rothenberg and says, "I have a bit of good news for you."

 2        You see that part I'm talking about?

 3    **A.**  I do.

 4    **Q.**  Okay.  It says, "Ryan our banker believes you'll be able

 5    to recapture your cash from your improvements..."  And it goes

 6    on.

 7    **A.**  Uh-huh.

 8    **Q.**  Is "Ryan our banker," is that you?

 9    **A.**  That's me.

10    **Q.**  Okay.  And the date of this email is April 16, 2014,

11    right?

12    **A.**  Right.

13    **Q.**  That's before the LMA was opened?

14    **A.**  Yes.

15    **Q.**  And before the CMA was opened?

16    **A.**  Yes.

17            **MR. FAKHOURY:**  Okay.  You can close that, Mr. Torres.

18    **Q.**  Now, there was some discussion about how the LMA and the

19    CMA accounts were opened simultaneously.

20        Do you recall that?

21    **A.**  I do.

22    **Q.**  And you mentioned that there was a bit of a rush to -- to

23    get them opened simultaneously.

24        Do you recall that?

25    **A.**  I do.

1    **Q.**   And yesterday, you had testified that you had to request a

2    couple rushes from the back office to make that happen, right?

3    **A.**   Correct.

4    **Q.**   Mr. Waldinger had shown you some of the statements that

5    indicated a transaction date that was different than an

6    effective date.

7          Do you recall that?

8    **A.**   I do.

9    **Q.**   And you testified that because you manually pushed the

10   loan, that's why the dates sort of didn't line up.

11         Do you recall that?

12   **A.**   I do.

13   **Q.**   And today you also -- you mentioned in your testimony this

14   morning that you, quote, worked the system, end quote.

15         Do you recall that testimony?

16   **A.**   I do.

17   **Q.**   Now your testimony was that it was Mr. Rothenberg

18   instructing you to move things along quickly, right?

19   **A.**   Yes.

20   **Q.**   Okay.  Now you work for Merrill Lynch, right?

21   **A.**   I do.

22   **Q.**   You're not employed by Mr. Rothenberg?

23   **A.**   No.

24   **Q.**   You never worked for Rothenberg Ventures?

25   **A.**   No.

1    **Q.**   Mr. Rothenberg can't fire you?

2    **A.**   No.  Not directly.

3    **Q.**   You've only ever worked for Merrill Lynch, right?

4    **A.**   I've had other jobs, but for the last 17 years, yes, I've

5    worked for Merrill Lynch.

6    **Q.**   Okay.  And you testified at the beginning your job is sort

7    of like a salesman, right?

8    **A.**   Um-hmm.  Sorry.

9    **Q.**   You want to get the deal done, right?

10   **A.**   Goal is to have a happy client, happy financial advisor,

11   that's the goal.

12   **Q.**   Okay.  Now, Mr. Waldinger mentioned your title.  I think

13   he kind of -- he made a little bit of a joke about it, but at

14   that time in 2014, you were a vice president, right?

15   **A.**   Vice president of Merrill Lynch.

16   **Q.**   And you're not a teller who cashes checks at the front end

17   of the bank, right?  At that time?

18   **A.**   That was not my role at that time.

19   **Q.**   Okay.

20        You primarily work on portfolio mortgages, right?

21   **A.**   Yes.

22   **Q.**   Okay.  These are, again, specialized mortgages, right?

23   **A.**   Yes.

24   **Q.**   You're in wealth management, right?

25   **A.**   Right.

KELTY - CROSS / FAKHOURY

1   **Q.**   That sort of was catering to more affluent people, right?

2   **A.**   Absolutely.

3   **Q.**   So you're working with people who have money?

4   **A.**   You could define it that way, yes.

5   **Q.**   Okay.  You testified that -- and you saw an exhibit

6   talking about giving Mr. Rothenberg a discount on his rate,

7   right?

8   **A.**   Right.

9   **Q.**   And you -- I wanted to understand with the financial

10  advisors, is it like they report to you or you sort of work in

11  tandem with each other?

12  **A.**   Think of it as the financial advisor is the specialist --

13  or excuse me -- the generalist, I apologize.  Generalist in

14  retirement planning, trust and estate planning, lending, asset

15  allocation, investments.  And there's a specialist at Merrill

16  Lynch to represent each and every one of those.  I was the

17  banking specialist.  In fact, you could make the case I, in a

18  way, reported to them.

19  **Q.**   Okay.

20  **A.**   It was my job to keep those financial advisors happy with

21  my work.

22  **Q.**   Got it.  Thank you for clarifying it.

23      Okay.  Let's talk about the LMA a little bit more

24  specifically.  Now, we've talked a bit -- or you've testified

25  a bit about how the LMA needs some form of collateral, right?

1    **A.**   Correct.

2    **Q.**   And that most of the time an LMA is collateralized with

3    stock or other investments, right?

4    **A.**   Correct.

5    **Q.**   Now it can be collateralized with cash, though, right?

6    **A.**   Sure.

7    **Q.**   That's an option that's available if a person wants it,

8    right?

9    **A.**   Correct.

10   **Q.**   There's nothing necessarily unusual about that?

11   **A.**   There is if it's held for long period of -- periods of

12   time.

13   **Q.**   Okay.

14   **A.**   Given the rate -- negative rate arbitrage, but it is an

15   option.

16   **Q.**   Okay.  Let's talk about negative arbitrage.  That's -- and

17   you -- you're the banker.  You tell me if I got it wrong.

18        My understanding is that negative rate arbitrage means you

19   pay more in interest than you earn in interest, right?

20   **A.**   Correct.

21   **Q.**   Okay.  Now, as the mortgage advisor, the mortgage

22   specialist, right, it's not really your role to tell a person,

23   hey, this is a bad financial move, right?

24   **A.**   It is not at that time, no.

25   **Q.**   Okay.  Sort of not in the bank's best interest to point

1    that out to a customer either, right?

2    **A.**   Well, any -- any advisor or banker, the goal is to have

3    very candid, transparent conversations around what's in their

4    best interests and --

5    **Q.**   By "their," you mean the customer, right?

6    **A.**   Customer, correct.

7    **Q.**   Sure.

8    **A.**   That's in our best interest, to disclose the client's best

9    interest.

10   **Q.**   Okay.

11       You talked yesterday about something called a margin call.

12   Do you recall that testimony?

13   **A.**   Yes, I do.

14   **Q.**   Okay.  And so again so we're all on the same page, would

15   to LMA, if the pledged asset depreciates, so in other words,

16   if the collateral -- the value of the collateral depreciates,

17   the bank can request on demand that more collateral be added

18   to keep the collateral amount sufficient for the LMA, right?

19   **A.**   That is one remedy event, yes.

20   **Q.**   Okay.  One of -- and there are other remedies, right?  But

21   that's one specific remedy, right?

22   **A.**   That is one specific, correct.

23   **Q.**   And usually if a margin -- and that's called a margin

24   call, right?

25   **A.**   If we were to be in a position where the bank is

 1    requesting more collateral, that would mean the LMA is in a

 2    margin call, correct.

 3    Q.  Okay.  And when Merrill Lynch -- if an LMA gets into that

 4    kind of situation, usually the bank acts within two or three

 5    days, right?

 6    A.  Two business days, correct.

 7    Q.  Okay.  Two business days.

 8        Now, there was never any margin call situation with

 9    Mr. Rothenberg, was there?

10    A.  No, there was not.

11             MR. FAKHOURY:  Mr. Torres, could you pull up

12    Exhibit 61, please.

13                       (Exhibit published.)

14    BY MR. FAKHOURY:

15    Q.  I'm going to show we -- you -- Mr. Waldinger asked you

16    some questions about this yesterday --

17    A.  Uh-huh.

18    Q.  -- and maybe even this morning.

19             MR. FAKHOURY:  Can you scroll down to the bottom,

20    Mr. Torres.

21        I'm sorry.  Page 2 of that exhibit.

22        Perfect.  Or a little bit further down.

23        Okay.  Perfect.

24                       (Exhibit published.)

25    / / /

1   BY MR. FAKHOURY:

2   Q.   So we talked about this email yesterday.  This was an

3   email you sent to Mr. Rothenberg in connection with the

4   opening of the CMA and LMA accounts, right?

5   A.   Correct.

6   Q.   Okay.  And you sent him some forms that he needed to take

7   a look at, right?

8   A.   Yes.

9   Q.   And a couple of those forms he needed to sign and date and

10  send back to you, right?

11  A.   Correct.

12  Q.   All right.  Let's go through them one by one.

13       So the first one, number one is the Client Relationship

14  Agreement.  Do you see that?

15  A.   I do.

16  Q.   Okay.  The second is a loan -- and let me back up a

17  second.

18       For this Client Relationship Agreement, that's one of the

19  forms that Mr. Rothenberg has to fill out and then send back

20  to you, right?

21  A.   Correct.

22       MR. FAKHOURY:   Mr. Torres, can you pull up

23  Exhibit 122.

24       And let's go to page 19 of that exhibit.

25                        (Exhibit published.)

 1  BY MR. FAKHOURY:

 2  Q.  Okay.  This is that Client Relationship Agreement form,

 3  right?

 4  A.  That's what I sent him, yes.

 5  Q.  Okay.  Perfect.

 6       MR. FAKHOURY:  All right.  Let's go back to

 7  Exhibit 61.

 8               (Exhibit published.)

 9  BY MR. FAKHOURY:

10  Q.  The second thing was the LMA application.  That's item

11  number 2 there.

12       Actually, I take that back.  I'm sorry.  Item 2 says

13  there's an LMA application and a U-1 form.  Right?

14  A.  Correct.

15  Q.  And those are two separate things, right?

16  A.  They're separate documents.

17  Q.  Okay.  And each of those needed to be signed, initialed

18  and sent back to you, right?

19  A.  The application and the U-1, yes.

20  Q.  Perfect.

21       MR. FAKHOURY:  So if you can to go to page 10 of

22  Exhibit 61, Mr. Torres.

23               (Exhibit published.)

24  BY MR. FAKHOURY:

25  Q.  This is the LMA application, right, that you sent?

1    **A.**   That is page of the LMA.

2    **Q.**   Page 1 of the LMA application.  And it's a couple pages,

3    right?

4    **A.**   Approximately five, yes.

5    **Q.**   Okay.  And a person has to sign and send that back to you,

6    right?

7    **A.**   Correct.

8            **MR. FAKHOURY:**  And then, Mr. Torres, if you could go

9    to page 8 of that same exhibit.

10       And you can zoom it out so we can see the whole thing.

11                        (Exhibit published.)

12   **BY MR. FAKHOURY:**

13   **Q.**   This is the U-1 form, right?

14   **A.**   That's correct, that's the U-1.

15   **Q.**   And that's the one -- again, a form that needs to be

16   signed and sent back to you, right?

17   **A.**   Yes.

18   **Q.**   Okay.

19           **MR. FAKHOURY:**  Mr. Torres, can you go to page 2 of

20   this exhibit, please.

21                        (Exhibit published.)

22   **BY MR. FAKHOURY:**

23   **Q.**   So the final thing in your -- your list was item number 3,

24   the LMA loan agreement.  Do you recall that?

25   **A.**   Yes.

1    **Q.**   And Mr. Waldinger spent some time with you yesterday going

2    through that exhibit.  Do you recall that?

3    **A.**   I do.

4    **Q.**   That's the exhibit that has a reference to a telegraph,

5    right?

6    **A.**   Yes.

7    **Q.**   Okay.  And that one was for Mr. Rothenberg's records only,

8    right?

9    **A.**   Correct.

10   **Q.**   He didn't need to sign and send that back to you?

11   **A.**   No, it's not required.

12   **Q.**   Okay.  Now you know that these forms were sent to

13   Mr. Rothenberg, right?

14   **A.**   Yes.

15   **Q.**   And he obviously signed and sent back the forms you asked

16   him to sign and send back, right?

17   **A.**   He did.

18       It's worth noting the LMA loan agreement is noted several

19   times in the LMA application.

20   **Q.**   Okay.

21   **A.**   So upon reviewing and executing the LMA application,

22   you're acknowledging that you have seen certain sections of

23   the loan agreement, which is why it's required.

24   **Q.**   Okay.  Right.

25   **A.**   It's not --

1    Q.   Now we've talked about the LMA, we've talked about the

2    CMA.   Let's talk about the underwriting process.

3          **MR. FAKHOURY:**   And you can put this down, Mr. Torres.

4    Q.   Now, you testified yesterday you're -- you're not an

5    underwriter, right?

6    A.   That's correct.

7    Q.   You're ultimately not deciding whether the loan will get

8    approved or not, right?

9    A.   Right.

10   Q.   You testified yesterday your role is to be an advocate,

11   right?

12   A.   Absolutely.

13   Q.   For the financial advisor?

14   A.   Yes.

15   Q.   For the client?

16   A.   For the client, yes.

17   Q.   To try and facilitate their objectives?

18   A.   Correct.

19   Q.   And ultimately your goal is to get the loan through

20   underwriting, right?

21   A.   That's the ultimate goal, yes.

22   Q.   Now you mentioned PHH, those were the underwriters that

23   Merrill Lynch used, right?

24   A.   It's a third party that Merrill Lynch hired for processing

25   and underwriting mortgages.

1    Q.   Okay.  They're not a subsidiary of Merrill Lynch?

2    A.   They are not.

3    Q.   Okay.  Now an underwriter, they're not a salesman, right?

4    A.   No, they are not.

5    Q.   They usually don't have any interactions with the

6    client -- or the customer, rather?

7    A.   No interaction.

8    Q.   Part of your job is to figure out how to get a loan

9    application through underwriting, right?

10   A.   One part of my job, yes.

11   Q.   Okay.  You talked about the four legs of a stool that

12   every mortgage is built on.  Right?

13   A.   Correct.

14   Q.   I like that analogy.

15        You mentioned one of those legs was credit score and

16   liabilities, correct?

17   A.   Correct.

18   Q.   Now you testified that underwriters rely on the accuracy

19   of the credit report, right?

20   A.   They do, yes.

21   Q.   And you also testified there are some liabilities that

22   don't show up on a credit report, right?

23   A.   It's possible, yes.

24   Q.   You testified if the underwriter is aware of that, they'll

25   have -- they can ask follow-up questions, right?

KELTY - CROSS / FAKHOURY

1    **A.**   Absolutely.

2    **Q.**   You talked about shocking the balance sheet.

3          Do you recall that testimony?

4    **A.**   I do.

5    **Q.**   And so we're all on the same page, that means simulating a

6    more strict, difficult environment than real market conditions

7    in order to hopefully get that loan through underwriting,

8    right?

9    **A.**   That's correct.

10   **Q.**   Okay.  We've already established that the -- the loan

11   product sort of at issue with Mr. Rothenberg was this

12   PrimeFirst® mortgage, right?

13   **A.**   That was the initial loan we -- we discussed, correct.

14   **Q.**   Okay.  And you testified for a loan like the PrimeFirst®

15   mortgage, that would be the kind of loan you would do this

16   shock therapy, if you will, with.  Right?

17   **A.**   Correct.

18   **Q.**   With that mortgage, you'd have maybe some higher income

19   requirements than you would require for a different kind of

20   mortgage, right?

21   **A.**   Every leg of the stool has more strict requirements for

22   that mortgage.

23   **Q.**   Okay.  And by "more strict requirements," you mean more

24   strict compared to other kinds of mortgage products offered by

25   Merrill Lynch, right?

KELTY - CROSS / FAKHOURY

1    **A.**   That's correct.

2    **Q.**   All right.  Let's talk about Mr. Rothenberg specifically.

3         You testified that when a person applies for a loan, they

4    need to show unencumbered liquidity, right?

5    **A.**   Personal unencumbered liquidity, correct.

6    **Q.**   Okay.  And when you and Mr. Rothenberg were -- well, let

7    me back up a second.

8         When Mr. Rothenberg reached out about a refinance -- we've

9    seen the emails, right?  That was back in the spring of 2014,

10   right?

11   **A.**   Right.

12   **Q.**   March and April of 2014?

13   **A.**   Right.

14   **Q.**   The LMA and the CMA get in the picture in like June of

15   2014, right?

16   **A.**   Correct.

17   **Q.**   And sort of towards the end this morning, Mr. Waldinger

18   showed you some exhibits about communicating with

19   Mr. Rothenberg about the balance on the LMA.

20        Do you recall that testimony?

21   **A.**   Yes.

22   **Q.**   Now, you also testified that if the LMA balance was zero

23   at the end of the month, there was still some risk that a

24   mortgage would not get approved if the LMA was drawn down the

25   next month.

1      Do you recall that testimony?

2   **A.**   I do.

3   **Q.**   So a closing LMA balance of zero meant -- well, let me

4   back -- let me strike that.

5      You testified that if an LMA had a balance of zero, an

6   underwriter would not necessarily look into it, right?

7   **A.**   It's possible they would not look into it.

8   **Q.**   Okay.  And when you were talking -- when you were

9   testifying about some of the risks -- I think Mr. Waldinger

10  asked you about risks -- one of your concerns was the

11  underwriter could ask for anything, right?

12  **A.**   That's correct.

13  **Q.**   And they could ask for specific statements, right?

14  **A.**   They could ask for anything.

15  **Q.**   Sort of depends on the underwriter, right?

16  **A.**   Depends on the underwriter, their comfort level with the

17  deal.  Also what goes in this is length of the customer being

18  a customer.  There's a variety of factors.  But yes.

19  **Q.**   Okay.

20  **A.**   All variables are on the table when the loan is submitted

21  to an underwriter.

22  **Q.**   Okay.

23          **MR. FAKHOURY:**  Can I have a minute, Your Honor?

24          **THE COURT:**  Sure.

25                  (Pause in the proceedings.)

 1          **MR. FAKHOURY:**  I don't have any further questions.

 2    Thank you so much.

 3          **THE COURT:**  Thank you, Mr. Fakhoury.

 4       Mr. Waldinger, redirect?

 5          **MR. WALDINGER:**  Just a few questions, Your Honor.

 6                     <u>**REDIRECT EXAMINATION**</u>

 7    **BY MR. WALDINGER:**

 8    **Q.**  Mr. Kelty, just so that your role is -- is clear here,

 9    Mr. Fakhoury initially asked you -- suggested that maybe

10    Ms. Jenkins and Mr. Bolt worked for you.  And I believe you

11    clarified that, if anything, you worked for them?

12    **A.**  That's correct.

13    **Q.**  Like they -- in your testimony or in Mr. Fakhoury's

14    questions, there was the phrases "happy client" and a "happy

15    financial advisor"?

16    **A.**  Correct.

17    **Q.**  And it reminded me of -- of a saying from where I come

18    from which is "happy spouse, happy house."  And so in that

19    context, what was your role here in the summer of 2014 to make

20    happen with respect to Mr. Rothenberg and with respect to

21    Ms. Jenkins and Mr. Bolt?

22    **A.**  My role was to be their credit specialist.  And when a

23    deal for an existing client or a new client arose, to approach

24    that deal with optimism and gain understanding of that client

25    and ultimately do everything in my power and ability in my

1  role as a wealth management banker to facilitate that deal and

2  close that deal.

3  **Q.**  Okay.  And keep everybody happy?

4  **A.**  You said "spouse and house."  It's wife and life, happy

5  wife, happy life.

6  **Q.**  When Mr. Fakhoury asked you -- I think he asked you the

7  question that had the phrase "unencumbered liquid assets."

8  And I believed when you responded you added the word

9  "personal."  And you responded "personal unencumbered liquid

10  assets."

11     And I wanted to ask you why you added that word,

12  "personal"?

13          **MR. FAKHOURY:**  Objection, relevance.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  Because the borrower is Michael.  We

16  are underwriting Michael personally.  His personal

17  unencumbered liquid assets are what we're interested in.  None

18  other.

19  **BY MR. WALDINGER:**

20  **Q.**  And one of the last questions that Mr. Fakhoury asked you

21  related -- I think he brought up the fact that we had -- you

22  had testified earlier about there being some risk of even if

23  the LMA was paid down at the end of the month, Mr. Rothenberg

24  drawing the LMA down again at the beginning of the next month.

25  Do you remember that?

1   **A.**   I do.

2   **Q.**   Well, just taking a step back, and I think this is a good

3   place to end redirect.  Were there any -- based on your

4   interactions with Mr. Rothenberg, did he have any interests

5   that were competing, in your mind, in what he was trying to do

6   with respect to the LMA at the end of the month and then at

7   the beginning of the month?

8        **MR. FAKHOURY:**  Objection, beyond the scope and

9   relevance.

10        **THE COURT:**  Hold on.

11   Overruled.

12        **THE WITNESS:**  Could you repeat the question?

13   **BY MR. WALDINGER:**

14   **Q.**   Were there -- were there any competing interests, in your

15   mind, with what Mr. Rothenberg was attempting to do by paying

16   down the LMA at the end of the month and taking it out again

17   at the beginning of the month?  Did that represent any

18   competing interest in your mind?

19   **A.**   Yes.

20   **Q.**   What were those?

21   **A.**   We had a conversation the first time he did this with Ben

22   Bolt, with Michael, and the explanation as to why Michael

23   needed to draw the LMA shortly after deposit was that he had

24   business interest needs.  He needed the funds for his

25   business.  That was the competing interest.

 1   **Q.**   Okay.

 2          **MR. WALDINGER:**  Just one second, Your Honor.

 3      No further questions on redirect, Your Honor.

 4          **THE COURT:**  Thanks.

 5      Recross?

 6          **MR. FAKHOURY:**  No, Your Honor.  Thank you.

 7          **THE COURT:**  Mr. Kelty, thanks for your testimony.

 8  You're excused.

 9          **THE WITNESS:**  Thank you.

10          **THE COURT:**  Members of the jury, it's just five or

11  six minutes before 10:00 o'clock.  So why don't we go ahead

12  and take our first break of the day for 15 minutes.  Remember

13  my prior admonitions.  Thanks.

14          **THE CLERK:**  Please rise for the jury.

15      (The following proceedings were heard out of the presence

16  of the jury:)

17          **THE COURT:**  We're outside the presence of our jurors.

18      Gentlemen, anything for the record?

19      Mr. Waldinger.

20          **MR. WALDINGER:**  Not from the government, Your Honor.

21          **THE COURT:**  Mr. Fakhoury.

22          **MR. FAKHOURY:**  No, Your Honor, thank you.

23          **THE COURT:**  Mr. Waldinger, at the end of the day,

24  I'll ask the government how it's doing with regard to its time

25  estimate, and you can expect a question like that at the end

 1    of every day just so -- what I'll be seeking is a prediction

 2    as to when the government will be concluding its

 3    case-in-chief.  Thanks.

 4        Let's be in recess.

 5        (Recess taken at 9:56 A.M.; proceedings resumed at

 6    10:15 A.M.)

 7        (The following proceedings were heard in the presence of

 8    the jury:)

 9            **THE CLERK:**  You may be seated.

10            **THE COURT:**  All right.  Let's go back on the record.

11        All the jurors are in their assigned seats.

12        Mr. Walsh, the government's next witness.

13          **MR. WALSH:**  Thank you, Your Honor.

14        At this time, the government calls James Kiss.

15            **THE COURT:**  All right.

16        Good morning, Mr. Kiss.

17            **THE WITNESS:**  Good morning.

18            **THE COURT:**  Let me ask you to come over here to this

19    area next to me and just remain standing for a moment, raise

20    your right hand, and face my courtroom deputy.

21                            **JAMES KISS,**

22    called as a witness by the plaintiff, having been duly sworn,

23    testified as follows:

24            **THE WITNESS:**  I do.

25            **THE CLERK:**  Thank you.

1    If you could please state and spell your last name for the

2    court reporter.

3            THE WITNESS:  My Last name is Kiss, and it's spelled

4    K-I-S-S.

5            THE COURT:  Very good.

6            THE CLERK:  Take a seat.

7            THE COURT:  Mr. Kiss, my courtroom deputy, Ms. Lee,

8    has a mask for you.  It's got two straps that go behind your

9    head.  It's that kind.  And it's clear so the jurors will be

10   able to see your expression while you're testifying.

11      Perfect.

12      Mr. Kiss, have you ever testified in a courtroom before?

13           THE WITNESS:  I have not.

14           THE COURT:  It's pretty similar to a conversation,

15   but there are a couple of differences.  It might help you if I

16   just identify those.

17      One is in day-to-day conversation, we interrupt each other

18   all the time constantly.  Because you know where the other

19   person is going so then you jump in.

20      We have a court reporter who's making a record of what's

21   said here.  She can only take down one person at a time.  So

22   if you'll wait till the lawyers finish their questions,

23   they'll wait until you've finished your answer.  It will just

24   make it much easier on the court reporter.

25      Another thing we do is we use noises and physical

 1   gestures.  So we go like this (indicating) or we say "uh-uh"

 2   or "uh-huh."  The court reporter can only take down whole

 3   words.  So if you'll answer "yes" or "no" or whatever the

 4   right word is, that will also be helpful.

 5       Last thing is that because we're in the COVID pandemic,

 6   our jurors extend all the way out into the gallery so people

 7   can be a letter further apart.  If you can remember to keep

 8   your voice up and stay reasonably close to the microphone,

 9   then all of our jurors will be able to hear your testimony.

10   Does that all make since?

11           **THE WITNESS:**  It does.

12           **THE COURT:**  Very good.

13       Mr. Walsh, your witness.

14           **MR. WALSH:**  Thank you, Your Honor.

15                    <u>**DIRECT EXAMINATION**</u>

16   **BY MR. WALSH:**

17   **Q.**  Where do you work?

18   **A.**  I work for the FDIC.

19   **Q.**  What is the FDIC?

20   **A.**  The FDIC is the Federal Deposit Insurance Corporation.  We

21   are the insurer for banks.

22   **Q.**  How long have you worked there?

23   **A.**  Just over 30 years.

24   **Q.**  And we can circle back on that, but about when, what year

25   did you start?

1  **A.**  I started in 1992.

2  **Q.**  Before you came to the FDIC, did you go to college?

3  **A.**  I'm sorry.  I didn't hear that.

4  **Q.**  Before you came to the FDIC, did you go to college?

5  **A.**  I did.

6  **Q.**  Where did you go?

7  **A.**  I went to California State University at Chico.

8  **Q.**  What sort of a degree did you get?

9  **A.**  A degree in business, finance specialty.

10  **Q.**  And was working at the FDIC essentially your first job out

11  of college?

12  **A.**  I had multiple internships in securities and in

13  accounting.

14  **Q.**  But when you got to the FDIC, what did you do?  What was

15  your first position there?

16  **A.**  I was an assistant examiner.

17  **Q.**  And where physically were you working?

18  **A.**  Located in Sacramento.

19  **Q.**  What is an assistant examiner?

20  **A.**  It's a journeyman-like situation where we learn from our

21  senior examiners.  We study the various aspects of banking and

22  prepare to take a test that will certify us to be commissioned

23  examiners.

24  **Q.**  Is that some sort of like it's an apprenticeship mode?

25  **A.**  Correct.

KISS - DIRECT / WALSH

1   **Q.**  How long does an assistant examiner stay in this

2   apprenticeship mode?

3   **A.**  We'll stay in that apprenticeship mode for three to four

4   years.

5   **Q.**  And is that what you did?

6   **A.**  And that's what I did.

7   **Q.**  Were you still in the Sacramento office when you became a

8   commissioned examiner?

9   **A.**  No.  I had transitioned to San Francisco by then.

10   **Q.**  What does one do in order to become a commissioned

11   examiner?

12   **A.**  In order to become a commissioned examiner, you'll need to

13   study all aspects of banking, including Bank Secrecy Act,

14   anti-money laundering, all aspects of -- we call them CAMEL

15   component analysis, which is capital asset quality management,

16   earnings, liquidity, sensitivity to market risk.  And we'll

17   learn how to rate those various components.

18   **Q.**  Okay.  And then is there an exam or something?  What

19   happens?

20   **A.**  Sure.  We'll -- we'll consolidate all of that analysis

21   into a report of investigation or a report of examination.

22   **Q.**  Well, hold on.  For just becoming a certified examiner,

23   what do you do?  Do you take an exam to become --

24              (Simultaneous colloquy.)

25            **THE WITNESS:**  Yes, I'm sorry.

1   **BY MR. WALSH:**

2   **Q.**  -- certified?

3   **A.**  Yes.  We'll take an examination.  We call it the technical

4   evaluation that will certify our ability to function as a

5   commissioned examiner.

6   **Q.**  And then no matter what you do thereafter while working

7   for the FDIC, forevermore you're a commissioned examiner?

8   **A.**  Yes, that's true.

9   **Q.**  For your career yourself, when did you become a

10  commissioned examiner?

11  **A.**  That would be roughly 1996.

12  **Q.**  And how did your career progress after that?  Did you stay

13  a commissioned examiner?

14  **A.**  Sure.  I've got -- always a commissioned examiner, but I

15  transitioned into a -- a supervisory examiner.  I moved into

16  management about 15 years ago.  And roughly just over ten

17  years ago, I became the field supervisor responsible for

18  the -- I think it's now 75 examiners in the San Francisco

19  field office.

20  **Q.**  A supervisory examiner, what do they do?

21  **A.**  A supervisory examiner will -- will coach and mentor and

22  supervise a team of anywhere from eight to 14 examiners.

23  **Q.**  And then what does the field supervisor do?

24  **A.**  Then the field supervisor will -- will essentially be

25  responsible for the -- for the supervisory examiners as well

1   as having overall responsibility for the entire staff.

2   Q.   Now, you indicated you are presently what?

3   A.   And I'm presently the field supervisor for San Francisco.

4   Q.   Where does the jurisdiction of the San Francisco field

5   office of the FDIC extend to?  What is it?

6   A.   So for the San Francisco field office specifically, we do

7   banks north roughly to Santa Rosa, south down to Gilroy,

8   Monterey, and -- and then we also have responsibility for the

9   South Pacific including Guam, Micronesia, and Hawaii.

10  Q.   Now, you've been using this term "examiner" and you sort

11  of a little bit started talking about it.

12       What exactly does an FDIC examiner examine?

13  A.   So, again, we'll examine the financial components of -- of

14  a bank.  We assess capital adequacy.  We assess asset quality,

15  which -- which includes both the loan portfolio and securities

16  portfolio.  We'll assess the management team, specifically the

17  strategic planning capacity and as well as their ability to

18  manage day-to-day operations.

19       We assess the level and the quantity of earnings.  We

20  assess the level of liquidity and the potential strains on

21  liquidity from potential loan growth.  We'll also look at

22  sensitivity to market risk, which in today's environment is

23  largely interest rate risk, given significant changes in -- in

24  interest rates.

25  Q.   What is the point of examining all of that when you're

 1   examining it at a bank?  What's the ultimate goal of the FDIC

 2   when they're doing all of those things, conducting an

 3   examination?

 4   **A.**   Right.  We're trying to assess their -- the bank's safety

 5   and soundness, you know, their ability to weather downturns

 6   and -- and, you know, service their community.

 7   **Q.**   Did the FDIC grow out of a financial crisis?

 8   **A.**   It did.  The FDIC was formed in 1933.  The significant

 9   quantity of bank failures during that time and the government

10   wanted to help encourage savings and investments and so they

11   guaranteed depositors' monies so that in the event that the

12   bank failed, they would get that money back.

13   **Q.**   And that's the Great Depression that you're talking about?

14   **A.**   And that's the Great Depression, yes.

15   **Q.**   It sounds like there are at least two roles for the FDIC,

16   there's a regulatory component and then an insurance

17   component; is that right?

18   **A.**   Correct.

19   **Q.**   Let's talk about the regulatory component first.

20   **A.**   Um-hmm.

21   **Q.**   What -- what does the FDIC regulate?

22   **A.**   So the FDIC will regulate -- we are the primary federal

23   regulator for state nonmember banks.

24   **Q.**   Okay.  Let's just stop right there.  A lot of terms in

25   there.  What is a nonmember bank?

1   **A.**   So a nonmember bank means that it is not a member of the

2   Federal Reserve System.

3   **Q.**   Okay.  So are there other than regulatory entities out

4   there than just the FDIC?

5   **A.**   Yes.  There are other federal regulators.

6   **Q.**   Okay.  How many other federal regulators are there?

7   **A.**   The two other primary federal regulators are the OCC and

8   the FRB.

9   **Q.**   Okay.  Again, lots of terms.  What is the OCC?

10  **A.**   That is the Office of the Comptroller of the Currency.

11  **Q.**   Is that part of the Treasury Department?

12  **A.**   It is part of the Treasury.

13  **Q.**   Let's talk about them for a little bit.  What is their

14  regulatory -- I guess jurisdiction is the right -- who do they

15  regulate?

16  **A.**   The OCC is a primary federal regulator for national banks.

17  **Q.**   What constitutes a national bank?

18  **A.**   Those are just banks that are able to do business

19  throughout coast to coast, and you'll know them as the Wells

20  Fargos, the Bank of Americas, JP Morgan Chase.  But there are

21  also some smaller national banks that operate, strangely,

22  locally.

23  **Q.**   Okay.  And you said there's the FDIC and there's a second

24  entity that also makes -- regulates banks?

25  **A.**   Sure.  The other primary federal regulator the Federal

1    Reserve.

2    **Q.**   Okay.

3    **A.**   And --

4    **Q.**   What's the Federal Reserve?

5    **A.**   Okay.  So the Federal Reserve is the primary federal

6    regulator for state member banks, member of the Federal

7    Reserve.

8    **Q.**   So that's the distinction when you're talking about a

9    member bank, it's either a member of the Federal Reserve or

10   not?

11   **A.**   Correct.

12   **Q.**   And so what types of banks then turn out to be Federal

13   Reserve member state banks?

14   **A.**   Those are -- those are state chartered banks.  And -- and

15   it's -- I'm not really certain what the rationale would be for

16   going with a Fed member status versus a nonmember status.  I

17   know that the FDIC is primarily the regulator of choice for

18   most of the community banks up to larger regional banks.  And

19   I think the Federal Reserve probably has a few more of the

20   regional banks, though I'm not certain of that.

21   **Q.**   Okay.  So let's now bring it back to the FDIC, which is

22   where you work.  And you were saying that it is the primary

23   regulator for state nonmember banks; is that right?

24   **A.**   Correct.

25   **Q.**   What does that turn out to mean?  Who are -- what kind of

1    banks are those?

2    **A.**   Largely community banks.  You know, we have some within a

3    couple hundred yards of the courthouse.

4    **Q.**   And could you just give us some names, like what's the

5    biggest nonmember bank that the FDIC --

6    **A.**   So the largest, most well-known nonmember bank would be

7    First Republic Bank, Bank of the West.  UBS is -- is -- we're

8    the primary federal regulator for their bank as well.  The

9    largest state nonmember bank in the country is Truist.

10   **Q.**   All right.  So, and those are the regulatory things.

11         And that examination that you were talking about, that's

12   part of the regulatory function; is that right?

13   **A.**   Yes.  Yeah.

14   **Q.**   You said there was a -- a second thing that the FDIC does

15   which is insures insurance?

16   **A.**   Um-hmm, right.

17   **Q.**   What kind of insurance are we talking about?

18   **A.**   So this is deposit insurance.

19   **Q.**   What is deposit insurance?

20   **A.**   So deposit insurance will insure the depositors for each

21   individual depositor.

22   **Q.**   And what does that actually functionally mean?

23   **A.**   What that means is that if the bank fails, $250,000, and

24   it's -- it's -- it depends on various structures, but it's

25   roughly $250,000 per account is insured by the FDIC.  So if

1   the bank fails, the FDIC will cover that deficiency if

2   necessary.

3   **Q.**   And that all arose out of the Great Depression?

4   **A.**   Yes.

5   **Q.**   And the Federal Deposit Insurance Act?

6   **A.**   Yes.

7   **Q.**   And the point of that is what?  Why -- why does the

8   government want to back banks' deposits?

9   **A.**   To encourage savings and thus investment.  Stimulate the

10  economy.

11  **Q.**   All right.  And now I'd like to turn your attention to a

12  particular entity called the Silicon Valley Bank.

13       Are you familiar with that bank?

14  **A.**   I am, yes.

15  **Q.**   What kind of bank is it?

16  **A.**   This is a state member bank.

17  **Q.**   So who is its primary regulator?

18  **A.**   Primary federal regulator will be the Federal Reserve.

19  **Q.**   What do you know about it nonetheless?

20  **A.**   You know, I know that it's a -- a reasonably successful

21  bank.  It's not part of my portfolio, but I am familiar with

22  their -- with their performance.

23  **Q.**   And so on the regulatory side, not within your portfolio.

24  Does the FDIC nonetheless insure the deposits at

25  Silicon Valley Bank?

1    **A.**   Yes, we still insure the deposits.

2    **Q.**   Now, how does a bank, any bank, go about getting FDIC

3    insurance?

4    **A.**   You have to apply for your banking certificate, and -- and

5    that's done before the bank opens to the general public.

6    **Q.**   How long does that process take?

7    **A.**   It can take -- it can take quite a while.  But it

8    typically is at least a year from start to finish.

9    **Q.**   And what sorts of things are happening during that

10   application process?

11   **A.**   So during that process, the founders will put together a

12   business plan.  They will put together a management team.

13   They'll put together some assessments of what's happening in

14   the community that they expect to serve.  And they'll try to

15   prove to us that a -- a federally insured bank will be

16   successful in that territory.

17   **Q.**   All right.  Now, are you -- I think you've already

18   indicated, but are you aware of whether or not Silicon Valley

19   Bank is insured by the FDIC?

20   **A.**   Yes, I am.

21   **Q.**   And is it?

22   **A.**   It is insured.

23   **Q.**   When did its insurance with the FDIC commence?

24   **A.**   That insurance commenced in 1983.

25   **Q.**   And is it insured to present day?

```
 1    A.   It is, yes.

 2    Q.   And in particular, was it insured in August of 2014?

 3    A.   Yes, it was.

 4    Q.   Sir, I'd like to show you what's been marked as --

 5          MR. WALSH:   This is not in evidence so just the

 6    witness, please.

 7          Exhibit 27, page 2.

 8          (Exhibit published to witness, counsel, and the Court.)

 9    BY MR. WALSH:

10    Q.   Is there something on your screen?

11    A.   Uh-huh.

12    Q.   Do you recognize that item?

13    A.   I do.

14    Q.   What is it?

15    A.   That is the certificate of deposit insurance.

16    Q.   Okay.  And what is that?

17    A.   That -- that essentially tells us when -- it essentially

18    tells us that the bank is federally insured.

19    Q.   All right.  And for this particular item, what is the

20    bank?

21    A.   Silicon Valley Bank.

22          MR. WALSH:   Your Honor, I move this evidence.

23          THE COURT:   Any objection?

24          MR. FAKHOURY:   No, Your Honor.

25          THE COURT:   Exhibit number again, please?
```

 1          **MR. WALSH:**  Exhibit 27, only page 2.

 2          **THE COURT:**  Exhibit 20 -- well, hence forth

 3   Exhibit 27 will consist of page 2.  And if we need the other

 4   pages to come in, they'll be something else.

 5        Exhibit 27 is admitted.

 6          **THE CLERK:**  Yes, sir.

 7        (Government's Exhibit 27 received in evidence)

 8          **MR. WALSH:**  And, Your Honor, might we publish that to

 9   the jury now?

10          **THE COURT:**  Yes.  Anytime -- once an exhibit's been

11   admitted, counsel can publish it to the jury whenever they

12   want to.

13          **MR. WALSH:**  Thank you.

14                  (Exhibit published.)

15   BY MR. WALSH:

16   **Q.**  Now that the jury can see this, can you describe what's on

17   the certificate?

18   **A.**  So, you know, this is the certificate that's issued to all

19   banks once they've passed our investigation and we have opined

20   favorably on their ability to succeed in the industry.

21   **Q.**  All right.  And it provides that there is insurance

22   pursuant to the Federal Deposit Insurance Act?

23   **A.**  Correct.

24   **Q.**  Now, I notice that down in the corner there, it's got a

25   signature date of December 2nd, 1986.  Do you see that?

1   **A.**   I do.

2   **Q.**   Your testimony earlier is that insurance commenced in

3   1983.  Do you know why that certificate says 1986?

4   **A.**   A new certificate was issued when they moved their

5   headquarters from San Jose to Santa Clara.

6   **Q.**   All right.  And so on this certificate there, it does

7   provide Santa Clara as the location of Silicon Valley Bank?

8   **A.**   Yes.

9        **MR. WALSH:**  If I may have a moment, Your Honor.

10   I have no further questions for this witness.

11        **THE COURT:**  Thank you, Mr. Walsh.

12   Mr. Fakhoury, questions for Mr. Kiss?

13        **MR. FAKHOURY:**  No, Your Honor.  Thank you.

14        **THE COURT:**  Mr. Kiss, thanks for your brief but

15   elucidating testimony.  You're excused as a witness.

16        **THE WITNESS:**  Thank you.

17   Government's next witness.

18        **MR. WALSH:**  [At this time, the government calls

19   Michelle Jandu.

20        **THE COURT:**  Let's take a stretch break.

21             (Pause in the proceedings.)

22        **THE COURT:**  All right.  Let's retake our seats.

23   Good morning, Ms. Jandu.

24        **THE WITNESS:**  Good morning.

25        **THE COURT:**  Am I pronouncing your name correctly?

                             KISS - DIRECT / WALSH

 1              THE WITNESS:  Yes.

 2              THE COURT:  Would you come over to this area right

 3     next to me and just remain standing and raise your right hand,

 4     face my courtroom deputy, please.

 5                           **MICHELLE JANDU**,

 6     called as a witness by the plaintiff, having been duly sworn,

 7     testified as follows:

 8              THE WITNESS:  I do.

 9              THE CLERK:  If you could please state and spell your

10     last name for the court reporter.

11              THE WITNESS:  Michelle Jandu.  My last name is

12     J-A-N-D-U.

13              THE COURT:  Terrific.  Ms. Jandu, if you just come up

14     here and have a seat, please.

15         And, Ms. Lee, there's a plastic protective film on these

16     masks.

17              THE CLERK:  Oh, there is.

18              THE COURT:  Yes, let's remove that.  I noticed that

19     when Mr. Kelty was testifying.  It sort of came off a little

20     bit.

21              THE CLERK:  So I don't want to touch it a lot because

22     it's going on her face.

23              THE COURT:  Oh, there we go.  Look at that.

24              THE CLERK:  Oh, yeah.

25              THE COURT:  It just might improve the transparency of

 1    the plastic, I was thinking.

 2              THE CLERK:  After so many years, Judge.

 3              THE COURT:  Yeah.

 4              THE CLERK:  I just noticed that.  Thank you.

 5              THE COURT:  Everything is always in the process of

 6    becoming something else.

 7         So anyway, thanks for doing that.

 8         A little self-help.  It's got a top strap and a bottom

 9    strap that go behind the head.  They're not ear straps.

10    They're behind-the-head straps.  So grab in the center and

11    pull that out.

12              THE WITNESS:  Grab it in the middle?

13              THE COURT:  Yeah, there you go.  And there's one on

14    the bottom too.

15              THE CLERK:  And then put it behind your head.

16              THE COURT:  Take off the mask you have now.

17                   (Off-the-record discussion.)

18              THE WITNESS:  Oh, pull it over?

19              THE COURT:  Yeah.

20              THE WITNESS:  Okay.

21              THE COURT:  Fantastic.  Okay.

22         Ms. Jandu, have you ever testified in a courtroom before?

23              THE WITNESS:  No.

24              THE COURT:  It's not that different from having a

25    conversation.

 1            **THE WITNESS:**  Okay.

 2            **THE COURT:**  But it is different in a couple ways.  So

 3    one is we're in the COVID pandemic and so our -- we have

 4    spread our jurors out a little more.  They go all the way into

 5    the gallery.  And it's important that they hear everything the

 6    witness is saying.  So if you could keep your voice up and

 7    stay close to the mic, that'd be really helpful.

 8            **THE WITNESS:**  Okay.

 9            **THE COURT:**  The next thing is that in regular

10    conversation, we interrupt each other all the time because

11    that's just how we do it.  We know what the other person's

12    going to say so we start answering the question before the

13    other person's even finished.

14        But in court, we have a court reporter making a record of

15    what people are saying.  So it's important for the lawyers to

16    wait until you finish totally before they ask you a question,

17    and it's important for you to let them really finish their

18    question before you answer so the court reporter can take down

19    everything.

20        The last thing is that in day-to-day conversation, we use

21    noises and gestures instead of words.  But the court reporter

22    can't take down noises or gestures.  So, for example, we might

23    say "uh-huh" or "uh-uh."  She can't type that.  Or we might go

24    like this (indicating) or this (indicating).  But, again, she

25    can't take down a gesture.  So if you could use words in your

 1    answers, that will be really helpful.

 2              **THE WITNESS:**  Okay.

 3              **THE COURT:**  Does that all make sense?

 4              **THE WITNESS:**  Yes.

 5              **THE COURT:**  Terrific.

 6         Mr. Walsh, your witness.

 7              **MR. WALSH:**  Thank you.

 8                         **DIRECT EXAMINATION**

 9    BY MR. WALSH:

10    **Q.**  Where do you work?

11    **A.**  I work for Comerica Bank.

12    **Q.**  And in this iteration, how long have you worked there?

13    **A.**  I've been there since 2019.  So almost three years.

14    **Q.**  And what's your current title there?

15    **A.**  I'm a vice president within the private banking group.

16    **Q.**  Now, we'll circle back to that.  But first where are you

17    from?

18    **A.**  I was born in the Philippines, and then I moved to

19    Australia when I was five.

20    **Q.**  When did you end up in the United States?

21    **A.**  In 1992.

22    **Q.**  And did you go to college?  Did you go to college?

23    **A.**  Yes.  I went to Santa Clara University.

24    **Q.**  When did you graduate?

25    **A.**  2000.

1   Q.   And what was your degree in?

2   A.   Economics.

3   Q.   Out of college, what was your first job?

4   A.   It was at Comerica Bank where I was a -- in the part of

5   the credit analyst training program.

6   Q.   So it sounds like you've had two spells at Comerica?

7   A.   Yes.

8   Q.   Your first job and now your current job; is that right?

9   A.   Yes.

10  Q.   All right.  So let's talk about your first stint there.

11  How long were you -- did you end up working at Comerica Bank?

12  A.   I was there for 13 years.

13  Q.   And what was your job when you started at Comerica Bank?

14  A.   I was the credit analyst.

15  Q.   What is a credit analyst?

16  A.   It's a program that teaches you how to basically

17  underwrite commercial loans.  And you're rotated between

18  different business units within the bank.

19  Q.   Now, you've used a couple of terms I think are worth

20  spending a little time on, one of which is a private bank and

21  a commercial loan.

22       Within banks, are -- is there a division between a

23  commercial side and a private side?

24  A.   Yes.

25  Q.   Okay.  Could you explain that difference for our jurors?

 1   **A.**   Sure.   The commercial side is when you're providing

 2   banking and lending services to companies.   And private

 3   banking is where I am now, and we help individuals and

 4   families that are high net worth.

 5   **Q.**   Okay.   So your first job then, you were a credit analyst

 6   on the commercial side of Comerica?

 7   **A.**   Yes.

 8   **Q.**   How long did you stay in that position?

 9   **A.**   A year and a half.

10   **Q.**   Then what happened?

11   **A.**   And then I was promoted to become a lender in a business

12   banking group in San Jose.

13   **Q.**   What does that mean?

14   **A.**   Business banking?

15   **Q.**   Well, how about "lender" first?

16   **A.**   Lender.   It's where I manage a portfolio of clients that

17   have banking needs.

18   **Q.**   And then business banking, maybe it's obvious by its term,

19   but what is it?

20   **A.**   Business banking is -- well, I was -- I'm an expert on the

21   financing side.   So I provided custom financing solutions for

22   businesses that range from lines of credit to term loans,

23   acquisition financing, commercial real estate financing.

24   **Q.**   How long were you in that position?

25   **A.**   I was there for seven years.

JANDU - DIRECT / WALSH

1    **Q.**  What happened next in your career?

2    **A.**  I switched over to become a lender on the private banking

3    side.

4    **Q.**  Okay.  Now, so what did that mean you ended up doing?

5    **A.**  I switched from providing financing from companies to

6    individuals and families.

7    **Q.**  How long were you in that position?

8    **A.**  Two years.

9    **Q.**  Then what happened?

10   **A.**  And then I switched jobs to Silicon Valley Bank where I

11   joined their private banking group.

12   **Q.**  Okay.  What year did you join Silicon Valley Bank?

13   **A.**  2012.

14   **Q.**  And for how many years were you there before you left?

15   **A.**  I was there for four years.

16   **Q.**  So left in 2016?

17   **A.**  Yes.

18   **Q.**  And you already indicated you were in the private bank

19   side then?

20   **A.**  Yes.

21   **Q.**  In 2016 -- and we'll circle back to Silicon Valley Bank.

22   But in 2016, what happened in your career?

23   **A.**  I took time off.  I had my third child.  And also had a

24   big construction project at home and wanted to manage that so

25   I took some time off.

1    **Q.**   Afterwards, did you get a new job?

2    **A.**   I did.  I worked for City National Bank.

3    **Q.**   And approximately when did you start working there?

4    **A.**   I think it was 2017 in April.

5    **Q.**   And you stayed there until 2019 when you rejoined

6    Comerica?

7    **A.**   Correct.

8    **Q.**   While you were at City National, what was your position

9    there?

10   **A.**   I was a private banker there.

11   **Q.**   Same job that you had held at Silicon Valley Bank?

12   **A.**   I was an individual contributor at City National.  At --

13   at Silicon Valley Bank, I managed a team, a small team.

14   **Q.**   Got it.

15   **A.**   Slightly different.

16   **Q.**   All right.  And now we're up to Comerica again in 2019.

17   What's your job now at Comerica?

18   **A.**   I'm a private banker at Comerica.

19   **Q.**   All right.  Now, let's -- now that we've got your career

20   timeline laid out, let's talk about Silicon Valley Bank.

21        And if I understand correctly, you were there from

22   approximately 2012 to 2016?

23   **A.**   Yes.

24   **Q.**   What is Silicon Valley Bank?

25   **A.**   It's primarily a commercial bank that focuses on the

 1    innovation economy.  So they --

 2    **Q.**   What does that mean?

 3    **A.**   They focus on companies that are mostly technology-driven.

 4    But more importantly, they focus on companies that capitalists

 5    tend to invest in.

 6    **Q.**   Okay.  What is a venture capitalist?

 7    **A.**   That's a firm that has a specific focus on investing in a

 8    certain segment --

 9    **Q.**   A certain segment --

10                      (Simultaneous colloquy.)

11            **THE WITNESS:**  -- within the technology industry.

12    **BY MR. WALSH:**

13    **Q.**   Does a venture capitalist have to be in the technology

14    industry?

15    **A.**   No.

16    **Q.**   But Silicon Valley Bank's venture capitalists tend to be?

17    **A.**   Yes.

18    **Q.**   And I think you said that it was -- its main business was

19    a commercial bank?

20    **A.**   Yes.

21    **Q.**   And so to these companies?

22    **A.**   Correct.

23    **Q.**   Did it at some point open up a private bank side?

24    **A.**   Yes.

25    **Q.**   Do you know approximately when that was?

1   **A.**   They had what was called private client services before I

2   joined, and then they rebranded right when I joined.

3   **Q.**   And --

4   **A.**   So it was around 2012, 2011.

5   **Q.**   And in 2014, did -- I take it Silicon Valley Bank made

6   loans to both businesses and individuals?

7   **A.**   Yes.

8   **Q.**   Did it make loans secured by an interest in real estate in

9   2014?

10  **A.**   Yes.

11  **Q.**   Did it make loans inside of California?

12  **A.**   Yes.

13  **Q.**   And did it make loans outside of California?

14  **A.**   Yes.

15  **Q.**   And in -- during the time period you were there from 2012

16  to 2016, was Silicon Valley Bank insured by the FDIC?

17  **A.**   Yes.

18  **Q.**   Now, let's focus in on your job while you were at

19  Silicon Valley Bank.

20       When you started in 2012, what was your title and what was

21  your job?

22  **A.**   I was managing director in the private bank.

23  **Q.**   What does that mean?

24  **A.**   That basically means I managed a small team that manages

25  the same portfolio of clients, and we're also responsible for

 1    acquiring new clients.

 2        And specifically, it was to focus on, at the time, venture

 3    capital general partners.  And then eventually they opened it

 4    up to the CEO's of the companies that the venture capitalists

 5    would invest in.

 6    **Q.**  When you say a general partner of venture capital

 7    companies, what does that mean?

 8    **A.**  They're the decision-makers within the fund or the firm,

 9    and they -- they decide what -- what investments are to be

10    made.

11    **Q.**  Did you stay in that role the whole four years that you

12    were at Silicon Valley Bank?

13    **A.**  Yes.

14    **Q.**  Now, while you were at Silicon Valley Bank, did you end up

15    meeting a client by the name of Michael Rothenberg?

16    **A.**  Yes.

17    **Q.**  Who is Michael Rothenberg?

18    **A.**  He headed the venture capital firm Rothenberg Ventures,

19    and they were focused on investing in startup companies.  I

20    believe it was focused on virtual reality and augmented

21    reality.

22    **Q.**  Those are --

23    **A.**  Tech companies.

24    **Q.**  Those are types of technologies?

25    **A.**  Yes.

```
 1    Q.   Did you -- and did he eventually over the course of your

 2    time there become your client?

 3    A.   Yes.

 4              THE COURT:   Mr. Walsh, would you slow down a bit.

 5              MR. WALSH:   Certainly.

 6              THE COURT:   Thanks.

 7         Oh, would you repeat your question for the witness?   I

 8    interrupted.

 9              MR. WALSH:   Certainly.

10    Q.   Did he eventually become your client at Silicon Valley

11    Bank?

12    A.   Yes.

13    Q.   What does it mean to be a client to you?

14    A.   It's either he'll open a bank account or we fund a loan.

15    Q.   How is it that you first met Michael Rothenberg?

16    A.   I was introduced to him by a colleague, Jim Marshall.   He

17    was a venture capital relationship manager at Silicon Valley

18    Bank.

19    Q.   What is a venture capital relationship manager?

20    A.   They're responsible for fostering relationships with

21    venture capital general partners and with the focus of getting

22    to know their firms and what companies they invest in, to seek

23    opportunities for commercial banking for their portfolio

24    companies, as well as funding and banking on the fund side as

25    well.
```

1    **Q.**  Does that mean that Jim Marshall then was sort of between

2    the commercial bank and the private bank?

3    **A.**  Yes.

4    **Q.**  How is it --

5         **THE COURT:**  And just for the jury's edification.  I

6    almost never ask questions because it's not my case to

7    present.  If I ask a question, it's because I think, well,

8    maybe the jurors also have this question or this is also not

9    clear to the jurors.

10        So anyway, Ms. Jandu, you said responsible for funding and

11   banking on the fund side.  Right?

12        **THE WITNESS:**  Yes.

13        **THE COURT:**  Does that mean providing liquidity or

14   extending loans --

15        **THE WITNESS:**  Yes.

16        **THE COURT:**  -- to the funds themselves that are being

17   managed by these general partners?

18        **THE WITNESS:**  Correct.  As well as the management

19   companies of those funds.

20        **THE COURT:**  Right, because -- okay.  Terrific.  I'll

21   stop there.  Thanks.

22   **BY MR. WALSH:**

23   **Q.**  So you indicated that Jim Marshall introduced you.  Did --

24   what did he tell you about Mike Rothenberg when he said he was

25   going to introduce you?

 1             **MR. FAKHOURY:**  Objection, hearsay.

 2             **THE COURT:**  Exception?

 3             **MR. WALSH:**  Not for the truth.

 4             **MR. FAKHOURY:**  It's irrelevant.

 5             **THE COURT:**  Well, I'll allow the testimony subject to

 6     a motion to strike.

 7         Go ahead.  You can answer the question.

 8             **THE WITNESS:**  I'm sorry.  Repeat the question again.

 9     **BY MR. WALSH:**

10     **Q.**  When Jim Marshall said he was going to introduce you to

11     Michael Rothenberg, what did he tell as a -- to prepare for

12     that meeting?

13     **A.**  That he was an up-and-coming venture capitalist that had a

14     strong network with young entrepreneurs.

15     **Q.**  And after you met him, did you confirm that to be the

16     case?

17     **A.**  Yes.

18     **Q.**  What else did you -- after you met him, what else did you

19     learn about Michael Rothenberg?

20     **A.**  That he went to Stanford, that he was a math wizard, had

21     some -- was awarded some different accolades in regards to

22     math.  And that he had -- he was very well connected with the

23     young entrepreneurs, specifically in -- in the companies that

24     he was looking to invest in.

25     **Q.**  When was it or how did Jim Marshall actually connect you?

1    What kind of a meeting was it?

2    **A.**  We met for lunch, the three of us.

3    **Q.**  Do you remember approximately when that was?

4    **A.**  It must have been in July.

5    **Q.**  Of what year?

6    **A.**  2014?

7    **Q.**  Do you remember were you went to lunch?

8    **A.**  No, I don't remember.

9    **Q.**  Just the three of you?

10   **A.**  Yes.

11   **Q.**  And what happened at that lunch?

12   **A.**  We discussed his fund and --

13   **Q.**  When you say "his fund," let's just be clear because we're

14   making a record.

15   **A.**  Rothenberg Ventures.  I believe he was in his second fund

16   at that time.  So we more discussed his personal needs, which

17   was a capital call line of credit to fund his obligations into

18   the second fund.  And then we also discussed a re -- a

19   cash-out refinance of his primary residence.

20   **Q.**  Okay.  Let's talk about those in the generic, first of

21   all.

22       What is a capital call line of credit?

23   **A.**  It's when a general partner finances his commitment into

24   the fund.  It's often called putting skin in the game.  It's

25   kind of showing investors that he's also bullish about the

1    investments that the fund will be making and puts his own

2    personal money into it.

3    **Q.**  So that's a capital commitment into a -- a venture capital

4    fund; is that right?

5    **A.**  Yes.

6    **Q.**  Right.

7    **A.**  And so the capital call line of credit helps fund a

8    portion of that commitment.

9    **Q.**  When a bank provides a line of credit to provide some of

10   that amount, does it provide all of it, some of it?  How

11   does -- how does a bank go about deciding that?  Or -- and in

12   particular, how did Silicon Valley Bank decide to do that in

13   2014?

14   **A.**  It depends on the fund and the fund dynamics, but

15   typically we wouldn't finance more than 80 percent of his

16   total commitment into the fund.  And so that the remaining

17   20 percent would need to be funded by the partner through his

18   cash or liquid assets.

19   **Q.**  And is that another form of making sure that the general

20   partner has skin in the game?

21   **A.**  Yes.

22   **Q.**  So in addition to the fund investors wanting the general

23   partner to have skin in the game, if the bank was making an

24   investment, a line of credit, they also wanted the general

25   partner to have skin in the game?

1   **A.**   Correct.

2   **Q.**   Was -- did Silicon Valley Bank offer these capital call

3   lines of credit?  Were they secured?

4   **A.**   Sometimes they were secured and sometimes they were

5   unsecured.  It really varied.  They were all pretty much

6   custom to depending on what type of fund it is.

7   **Q.**   What would be a determining factor of whether or not

8   security would be necessary?

9   **A.**   Loan amount would be a big factor.

10  **Q.**   Was there a threshold amount at which security became

11  something Silicon Valley Bank would generally want?

12  **A.**   I would say if it was above a million is when they would

13  prefer to be fully secured --

14  **Q.**   And --

15  **A.**   -- with the general partner's holdings.

16  **Q.**   And for capital call lines under a million, Silicon Valley

17  Bank would not require a security interest?

18  **A.**   It depends on the situation, but there were times where we

19  didn't require to be secured.

20  **Q.**   In this context, what would be a security for this line of

21  credit?

22  **A.**   For -- for Michael Rothenberg?

23  **Q.**   Not for Michael Rothenberg in particular, but for just any

24  venture capitalist seeking a capital call line of credit.  If

25  the bank decided they needed a security, what would typically

1    be the security for this type of loan?

2    **A.**   It would be the ownership in the fund.

3    **Q.**   What does that mean?

4    **A.**   So if a venture capitalist owned a certain percentage of

5    the fund, then that -- that ownership would be pledged to the

6    bank.

7    **Q.**   And so at this lunch, it was discussed that Michael

8    Rothenberg needed -- well, what did Michael Rothenberg say

9    about his need for a capital call line of credit?

10   **A.**   That he was raising Fund II and needed to make

11   arrangements to fund -- finance a portion of his capital call

12   commitment into the second fund.

13   **Q.**   All right.

14        You also indicated that he wanted to refinance his

15   condominium?

16   **A.**   Yes.

17   **Q.**   Is that all that you discussed at that lunch?

18   **A.**   And just the fund in general.

19   **Q.**   And --

20   **A.**   What their focus was and --

21   **Q.**   Do you recollect what you learned about the fund at that

22   time?

23   **A.**   Oh, gosh, that was a long time ago.  But I mean generally

24   it was to invest in technology startups that were focused on

25   virtual reality and I think augmented reality.

1   **Q.**  All right.  Now, let's turn again to a generalized

2   description of a refinance mortgage or a cash-out refinance

3   loan.

4       For our jurors, some of whom may have bought houses before

5   but some of whom may not have, what is the general -- at a

6   high level, the steps in the process that occur when a person

7   wants to either get a mortgage or get a -- refinance their

8   mortgage?

9   **A.**  So we meet or discuss over the phone --

10  **Q.**  When you say "we," who is we?  Who does that turn out to

11  be?

12  **A.**  Usually the borrower.

13  **Q.**  And who?

14  **A.**  And the banker, so me.

15  **Q.**  Okay.  Then what happens?

16  **A.**  We would discuss what it is they're looking for.  So in

17  particular, we'd want to know the value of his property, any

18  mortgages against it, and trying to see if there's equity

19  available to pull funds out.  And that's what we consider a

20  cash-out refinance.

21      So you're essentially refinancing the first mortgage and

22  adding the equity that they want to pull out into a new

23  mortgage.

24  **Q.**  After you have that discussion, and just in the generic

25  sense, what happens next in the loan mortgage process?

1   **A.**   I typically send an email with all of the -- a list of

2   items that I would need.  And in particular, it would be the

3   mortgage application, often referred to as the 1003.  And then

4   we'd collect two years of tax returns with all of the

5   schedules and K-1's, two months of bank statements, paycheck

6   stubs, the last two paycheck stubs.

7        Sometimes venture capitalists don't take a typical salary

8   that they're paid every two weeks.  So they usually derive

9   income in form of a distribution.  And so when that's the

10  case, sometimes we have it verified by the CFO if there's no

11  pay stubs available.

12  **Q.**   Would you also get an appraisal of the property?

13  **A.**   Correct.

14  **Q.**   Look for insurance documents and similar things?

15  **A.**   Yes.  So property and casualty insurance.

16  **Q.**   Okay.

17  **A.**   And then title insurance.

18  **Q.**   So that's the second phase, the collection of documents.

19  Then what would happen?

20  **A.**   Once I have the documents, I would verify that we had

21  everything we need to make it a live application.

22  **Q.**   Is there something that you need -- what -- what -- what

23  is it, like the bare minimum that makes it a live application?

24  **A.**   Yeah, it's an acronym called ALIENS.

25  **Q.**   ALIENS?

1   **A.**   ALIENS.

2   **Q.**   Okay.

3   **A.**   And that stands for address, loan amounts, income,

4   estimated value of the property -- what is the --

5   **Q.**   I think you're up to N.

6   **A.**   N.  Sorry.

7   **Q.**   Is that name?

8   **A.**   Sorry.  Name.  Name of the borrower, and Social Security

9   Number.

10          **THE COURT:**  Aliens like the second movie in the

11   Sigourney Weaver franchise?

12          **THE WITNESS:**  Yes.

13   **BY MR. WALSH:**

14   **Q.**   All right.  So that's a little acronym that apparently

15   doesn't work as well as we'd like, at least on the stand, to

16   remember all of those different things.

17          And once you've collected ALIENS from a client, then it's

18   a live application?

19   **A.**   Correct.

20   **Q.**   And when it's a, quote, unquote, live application, what

21   happens?

22   **A.**   I package it up and send it to the mortgage consultant.

23   And then he basically takes it from there.

24   **Q.**   Okay.  What happens in that process though?

25   **A.**   It's sent to the underwriters.

1  **Q.**  Okay.  Who are the underwriters?

2  **A.**  They are basically credit analysts that put together all

3  of the financial information into what's called a recap.  And

4  it's usually submitted to me for recommendation for approval.

5        And then once I recommend approval, it is sent to our

6  credit administrator.  And he would have the final

7  authority -- or he or she would have the final authority to

8  approve the loan.

9  **Q.**  So this credit administrator is the person who actually

10  says yes, it's a go, or no?

11  **A.**  Yes.

12  **Q.**  Assume that the credit administrator says yes.  Then what

13  happens?

14  **A.**  Then we wait for the appraisal to come.  We make sure that

15  the loan amount is within policy.  So typically it's

16  80 percent loan-to-value in a primary residence.

17        And then if there are any changes to that, we change the

18  dollar amount of the loan.  And at that point, any disclosures

19  are sent out if there's any material changes to the loan

20  terms.

21  **Q.**  Okay.  At some point, then does all of that stuff get sent

22  to the borrower?

23  **A.**  Yes.

24  **Q.**  Okay.  What happens then?

25  **A.**  We schedule a notary through the title company, and they

1    sign their loan documents.

2    **Q.**  Okay.  And let's just take a pause here.

3        You've mentioned title insurance and now a title company.

4        What is a title company?

5    **A.**  It basically provides the bank insurance that we're in a

6    first lien position on the property.

7    **Q.**  Do they also check the -- what's called the chain of

8    title?

9    **A.**  Yes.

10   **Q.**  What --

11   **A.**  So they make sure that our deed of trust documents reflect

12   the name -- the correct name of the borrower.  Or sometimes

13   our clients hold their vesting in a trust or in an LLC.  It

14   depends.

15   **Q.**  All right.  Now you've interjected a new term called deed

16   of trust.  What is a deed of trust?

17   **A.**  It's basically the bank -- or I mean it could be an

18   individual too, but the bank's right to the property if there

19   was some type of default.

20   **Q.**  Is that the California name for mortgage -- for a

21   mortgage?

22   **A.**  Yes.

23   **Q.**  So deed of trust and a mortgage, same thing?

24   **A.**  Yes.

25   **Q.**  Different name.

 1          Is that right?

 2   **A.**   Yes.

 3   **Q.**   And then once all the signed documents come back, what

 4   happens in this mortgage process?

 5   **A.**   Well, with primary residences, there's a three-day

 6   rescission period where the borrower has an option to decline

 7   the loan.  And so we have to wait three days.

 8          And then once the deed of trust is recorded and confirmed

 9   by the title company, that's when we fund the loan.

10   **Q.**   Okay.  Deed of trust recorded.  What does that mean?

11   Where is it being recorded?

12   **A.**   At the county.

13   **Q.**   And what is -- what does recording mean?

14   **A.**   The deed of trust is recorded within the county documents.

15   **Q.**   Placing it within this chain of title?

16   **A.**   Yes.

17   **Q.**   And is the money then sent out?

18   **A.**   Correct.

19   **Q.**   Similarly for a capital call line of credit, do you also

20   gather a number of documents?

21   **A.**   Yes.

22   **Q.**   Okay.

23          All right.  Now, after this lunch with Mike Rothenberg in

24   July of 2014, did you end up following up with Mike

25   Rothenberg?

 1    **A.**   Yes.

 2    **Q.**   And did you send him an email, or do you recollect what

 3    you did?

 4    **A.**   I'm pretty sure I sent him an email.

 5    **Q.**   I'd like to show you what's been marked Exhibit 1 and

 6    entered in evidence.

 7                         (Exhibit published.)

 8    **BY MR. WALSH:**

 9    **Q.**   And if you could just take a look here at this first page.

10    It is -- do you recognize this document?

11    **A.**   Yes.

12    **Q.**   What is this document?

13    **A.**   It's an email from Mike Rothenberg to myself.

14    **Q.**   Okay.  If we -- do you see at the bottom there that there

15    are -- there's another email.  Is this --

16              **MR. WALSH:**  If we scroll to the next page 2, please.

17                         (Exhibit published.)

18    **BY MR. WALSH:**

19    **Q.**   Is this actually a chain of emails?

20    **A.**   Yes.

21              **MR. WALSH:**  And if we go to page 3.

22         And then page 4.

23                         (Exhibit published.)

24    **BY MR. WALSH:**

25    **Q.**   At least in the chain, is this the -- because it's in

 1   reverse chronological order, is this the first one in time

 2   that exists?

 3   **A.**   There might have been a separate email that I sent with

 4   the actual application because I don't -- I can't tell if the

 5   application is attached to this.

 6   **Q.**   Got it.

 7   **A.**   But I believe I may have initiated it.

 8   **Q.**   Right.

 9   **A.**   I -- usually I'm the one initiating the email.

10   **Q.**   So you sent an email, and this appears to be a response to

11   that email; is that right?

12   **A.**   Yes.

13   **Q.**   Okay.

14         **MR. WALSH:**   If we go to page 3, please.

15                  (Exhibit published.)

16   **BY MR. WALSH:**

17   **Q.**   Do you see there on the screen, from whom and to whom is

18   this first email sent?

19   **A.**   It's from Mike Rothenberg to George Pires and myself.

20   **Q.**   Who's George Pires?

21   **A.**   He's the mortgage consultant.

22   **Q.**   What is the date and time of this email?

23   **A.**   It's July 29th, 2014.

24   **Q.**   And does that comport then with your memory of when the

25   lunch was?

 1   **A.**   Again, it was a long time ago, but I do recall that there

 2   was some time sensitivity.  So I would think that after the

 3   initial meeting, that we had followed up within a couple weeks

 4   of that time.

 5          **MR. WALSH:**  If we could go to page 4, please.

 6      Just note that that's the email header for this email.

 7                      (Exhibit published.)

 8   **BY MR. WALSH:**

 9   **Q.**   What is Mike Rothenberg telling you in this email?  What

10   did he write to you?

11   **A.**   That he wants to start collecting all of the information

12   that I need.  And it looks like for both the mortgage

13   application and the capital call line of credit application.

14   **Q.**   This list, one through eight, does that look familiar to

15   you?

16   **A.**   Yes.

17   **Q.**   Do you think perhaps that's what you had sent him in your

18   first email that we don't have?

19   **A.**   I believe so.

20          **MR. WALSH:**  All right.  If we could dezoom this.

21      And go to page 3, please.

22      And then up to page 4 -- sorry, page 2.  Wrong direction.

23                      (Exhibit published.)

24   **BY MR. WALSH:**

25   **Q.**   If you'd look at the last email -- the last email there.

1    Did you write him back?

2    A.   Yes.

3    Q.   Okay.  On what date did you write him back?

4    A.   July 29th, 2014.

5    Q.   At 11:00 in the morn -- 11:09 a.m.?

6    A.   Yes.

7    Q.   What are -- you indicated -- what did you tell him when

8    you received some of those documents from the prior email?

9    A.   That the credit application looked good in terms of the

10   information that I would need, and -- and more importantly

11   needed to be signed.

12        And --

13   Q.   All right.  And so you were asking for additional

14   documents as well?

15   A.   Yes.

16   Q.   If we then go to later that day, did Mike Rothenberg write

17   you back?

18   A.   Yes.

19   Q.   And at what time did he write you back?

20   A.   At 3:53 p.m.

21   Q.   What did Mike Rothenberg tell you about his -- Rothenberg

22   Ventures Management Company?

23   A.   That he owns the firm and that he pays himself

24   distributions instead of the regular payroll.  And that his

25   CFO will be providing a letter to confirm that.

1   **Q.**   All right.   Is that the type of situation that you

2   referred to in the generic before?

3   **A.**   Yes.

4   **Q.**   With venture capitalists?

5   **A.**   Correct.

6   **Q.**   And just so we're clear, do some venture capitalists not

7   get paid?  By salary, like a regular paycheck?

8   **A.**   Correct.  Sometimes.  It depends on the fund.

9   **Q.**   And so how do they get paid if they're not being paid by

10   like a regular paycheck?

11   **A.**   Through a distribution.

12   **Q.**   What's a distribution?

13   **A.**   It's an irregular -- I mean they could be regular, but

14   most of the time, it's a regular -- irregular payments to the

15   partners.

16          **MR. WALSH:**   Okay.  Now, I -- Mr. Waldinger is giving

17   me a very helpful hint which is that it's hard for some of our

18   jurors to see this.  So if we could just blow up this email

19   here so that everyone can see.

20                    (Exhibit published.)

21   **BY MR. WALSH:**

22   **Q.**   That's the 11:09 a.m. email that you were talking about

23   shortly ago?

24   **A.**   Yes.

25          **MR. WALSH:**   Just going to give a pause for our jurors

 1     to take a look at it and catch up with us.

 2              THE WITNESS:  Oh, okay.

 3                     (Pause in the proceedings.)

 4              MR. WALSH:  And if we could dezoom that one.  And

 5     then go to this -- zoom -- pull up the next one, please.

 6                     (Exhibit published.)

 7     BY MR. WALSH:

 8     Q.  That is the email we were just talking about with regard

 9     to the distributions and Mr. Rothenberg's owning Rothenberg

10     Ventures Management Company?

11     A.  Yes.

12              MR. WALSH:  All right.  If we dezoom that.

13                     (Exhibit published.)

14     BY MR. WALSH:

15     Q.  Later that day, did he send another email to you?

16     A.  It appears so, yes.

17     Q.  Apparently only three minutes later at 3:56?

18     A.  Yes.

19              MR. WALSH:  If we could blow that up so people can

20     see.

21                     (Exhibit published.)

22     BY MR. WALSH:

23     Q.  What did he send you at 3:56?

24     A.  Tax returns.

25              MR. WALSH:  And if we could dezoom that, please.

 1       And then you'll see that there's an email that's going off

 2    the top of this page, if we can go to page 1, please.

 3       And that starts down at the bottom there, if we could just

 4    zoom that up.

 5                    (Exhibit published.)

 6    **BY MR. WALSH:**

 7    **Q.**  On July 29th at 4:03 p.m. just a few minutes later, did he

 8    send something else?

 9    **A.**  He sent the 1003 application which is for the --

10    specifically for the mortgage request.

11    **Q.**  Okay.  What's a 1003?

12    **A.**  It's -- it's a -- I think it's a federal document that

13    all -- all financing institutions use for --

14            **THE COURT:**  Ms. Jandu, would you just get a little

15    bit closer to the microphone?  Your voice is dropping just a

16    bit.  Thanks.

17            **THE WITNESS:**  Okay.

18       It's specifically an application that financial

19    institutions use specifically for mortgage applications.

20    **BY MR. WALSH:**

21    **Q.**  And it's also sometimes called a Uniform Residential Loan

22    Application?

23    **A.**  Yes.

24    **Q.**  People also sometimes call it a URLA?

25    **A.**  Yes.

1    **Q.**   Is there any other ways to refer to this form that you

2    know of?

3    **A.**   I mean sometimes they refer to mortgages as a Freddie or

4    like a Freddie Mac loan.

5    **Q.**   Got it.  But for this particular form, URLA or a 1003 is

6    what people will say?

7    **A.**   Yes.

8    **Q.**   Okay.

9             **MR. WALSH:**  If we dezoom that, please.

10        And then we have -- we've gotten to the front here.  If we

11   could pull up this -- the whole first email here.

12                        (Exhibit published.)

13   **BY MR. WALSH:**

14   **Q.**   And from whom and to whom is this first email on page 1 of

15   Exhibit 1 is?

16   **A.**   From Mike Rothenberg to myself.

17   **Q.**   And what was the date and time of that?

18   **A.**   July 29th at 4:14 p.m.

19   **Q.**   What did Mike Rothenberg tell you about his property that

20   he wants to refinance?

21   **A.**   That he purchased the home for a million one, had an --

22   eight hundred sixty-five thousand one hundred ninety thousand

23   [sic] first mortgage in which he paid down 15,000 of that

24   loan.  He invested 320,000 of his own cash into the home.  And

25   he -- he equated a five hundred fifty-four thousand eight

1  hundred ten thousand [sic] cash invested into the home.

2  **Q.**  Okay.  Then in the second paragraph, what did Mike

3  Rothenberg tell you about his property?

4  **A.**  That it's a 2100 square foot, three-bedroom, three-bath

5  home in South of Market district.

6  **Q.**  That's what SOMA stands for?

7  **A.**  Yes.

8  **Q.**  Is South of Market a neighborhood in San Francisco?

9  **A.**  Correct.

10  **Q.**  All right.  Please continue.

11  **A.**  And he estimated it to be worth about a million six at the

12  time.  And he wanted to refinance 80 percent loan-to-value of

13  that home based on the current value at the time.

14  **Q.**  What does loan-to-value mean?

15  **A.**  It's the loan divided by the market value of the home.

16  **Q.**  And so in this instance, 80 percent of 1.6 is what he's

17  thinking?

18  **A.**  Yes.

19  **Q.**  Okay.  What did he want to take out as cash?

20  **A.**  400,000.  Or at least 335,000 which was the cash invested

21  into the home.

22  **Q.**  Okay.  When he's talking about cash invested into the

23  home, what does that mean in this context?

24  **A.**  I would assume that it was a combination of either his

25  down payment or maybe he renovated the home after he purchased

 1    it.

 2            **MR. FAKHOURY:**  Objection, speculation, move to

 3    strike.

 4            **THE COURT:**  Sustained.  The testimony is stricken.

 5    BY MR. WALSH:

 6    **Q.**  Let's go to the third paragraph.

 7        What's he talking about in that third paragraph?

 8    **A.**  The insurance?

 9    **Q.**  Yes.

10    **A.**  The annual insurance is a thousand dollars a year.

11    Property taxes are 13,000 a year.  And HOA is 6,000 a year.

12    **Q.**  What is HOA?

13    **A.**  Homeowners insurance.

14    **Q.**  Insurance?

15    **A.**  Homeowners association.  Sorry.

16    **Q.**  What is a homeowners association?

17    **A.**  It's typically if the home is part of a condo association,

18    and there are certain common -- common areas that the other

19    condos share.

20    **Q.**  And so for their shared areas, there's a contribution from

21    all the owners of the individual condominiums?

22    **A.**  Yes.

23    **Q.**  Let's move on to the -- the next paragraph.

24        What does Mike Rothenberg tell you about his capital call

25    line of commitment?

JANDU - DIRECT / WALSH

1  **A.**  That he'd like to fund through financing a 300,000 loan to

2  invest in Fund II.  And that he would personally invest a

3  hundred thousand of his own money as part of his GP

4  commitment.  And then he wanted to take out 335,000 to 400,000

5  in cash from the equity of his home.

6  **Q.**  And then he ends with he wants to continue doing business

7  with SVB as his fund size grows?

8  **A.**  Yes.

9  **Q.**  Now, at this time, was Michael Rothenberg already doing

10  business with Silicon Valley Bank?

11  **A.**  I don't remember the timing, but I believe it happened

12  at -- at the same time or maybe before the accounts were

13  opened with our equity funds group at the time.

14  **Q.**  Okay.  Who's equity funds group?

15  **A.**  So they provide banking and financing services for venture

16  capital and private equity firms.

17  **Q.**  And so are these accounts meaning that Rothenberg Ventures

18  Management Company was doing business with Silicon Valley

19  Bank?

20  **A.**  I -- yes.

21  **Q.**  And the funds as well?

22  **A.**  Correct.

23  **Q.**  And as -- to the best of your knowledge, those already

24  existed at Silicon Valley Bank on the commercial side?

25  **A.**  I don't recall if it was -- if they were established

1    before I had started working on his personal requests.

2    **Q.**   Okay.  In this last paragraph here, what is he telling

3    you?

4    **A.**   That he wants to disburse the GP commitment loan in two

5    weeks.  And then that the refinance would follow shortly after

6    that.

7    **Q.**   Okay.  And in fact, does he give you exact dates of when

8    he'd like to conduct this business?

9    **A.**   Yes.

10   **Q.**   Does it -- when does he want to get his GP commit loan?

11   **A.**   On August 12th.  And then he wanted to have the mortgage

12   funded by August 26th.

13   **Q.**   Now, this is in an email on July 29th of 2014.  Is the

14   time frame between July 29th and August 12th a typical amount

15   of time for a GP -- what he's calling the GP commit loan or

16   the capital commitment line of credit?

17   **A.**   That's an accelerated time frame.

18   **Q.**   And when you say accelerated, what does that mean?

19   **A.**   Well, for GP loan commitments, it usually takes about a

20   month from the time we receive a full package to funding.  But

21   that also depends on whether or not the loan is secured or

22   not.

23        And then for mortgages, it usually takes about 30 days as

24   well with all the disclosures that need to happen and all the

25   regulatory requirements --

1    **Q.**   Okay.

2    **A.**   -- required of a loan, a mortgage loan specifically.

3    **Q.**   And I want to focus you in on this section right here

4    (indicating).

5        What do you understand Mr. Rothenberg to be saying about

6    what he wants to do with his personal loan for the capital

7    call?

8    **A.**   So it looks like he has a GP commitment of a total of

9    400,000 of which a hundred thousand would be his own personal

10   money and then the 300,000 would be funded by the bank.

11   **Q.**   And is that typical for what you -- does that comport with

12   what you described in the typical example of a capital call

13   line of commitment --

14   **A.**   Yes.

15   **Q.**   -- credit?  I keep saying it wrong.

16   **A.**   Yes.

17   **Q.**   So the 100,000 there is the skin in the game for Michael

18   Rothenberg?

19   **A.**   Correct.

20   **Q.**   All right.  Now that we've walked through this document

21   where a lot of documents had been attached, let's turn to the

22   actual documents that were submitted by Mike Rothenberg to

23   Silicon Valley Bank starting on July 29th of 2014.

24       And I'd like to show you what's been marked Exhibit 2,

25   please.

1              (Exhibit published.)

2         **MR. WALSH:**  This is in evidence.

3      If we could just who up the top part here.

4      Could we do it again so that we get that title fully?

5      Thank you.  Sorry.

6              (Exhibit published.)

7  **BY MR. WALSH:**

8  **Q.**  Do you recognize this document?

9  **A.**  Yes.

10 **Q.**  What is this document?

11 **A.**  It's the mortgage application or the 1003 or the URLA.

12 **Q.**  All right.  This is a typical form that's used for all

13 mortgages in the United States?

14 **A.**  Yes.

15 **Q.**  And we're just -- because we're going to be talking about

16 these and you're the first person that's really spent some

17 time on them, I think we're going to walk our way through this

18 form.  All right?

19      In this top section here, does it identify who the

20 borrower is going to be?  And I'm not talking specific to this

21 form but --

22 **A.**  Yes.

23 **Q.**  -- just is there a section for that?

24 **A.**  Yes.

25 **Q.**  And then what is the type of information that is gathered

1    in section -- do you see how it's section 1 here?

2    **A.**   Um-hmm.

3    **Q.**   What is the type of information that's gathered in that

4    first section?

5    **A.**   It's usually the desired loan amount and the type of

6    mortgage that they're seeking.

7    **Q.**   In section 2, then, what type of information is gathered

8    on a URLA?

9    **A.**   The subject property, the purpose of the loan, just

10   information about the property itself, as well as the purpose

11   of the loan.

12          **MR. WALSH:**   All right.  If we could dezoom that,

13   please.

14       And then let's do the second -- bottom half of this here.

15                  (Exhibit published.)

16   **BY MR. WALSH:**

17   **Q.**   What's collected in section 3 on this form?

18   **A.**   The borrower's information.  So Social Security, address,

19   date of birth, address, former address.

20   **Q.**   Okay.  And then --

21   **A.**   And if there's a co-borrower.

22   **Q.**   What would a co-borrower be in this context?

23   **A.**   Someone that owns the property jointly typically.

24   **Q.**   How about section 4, what -- what type of information is

25   gathered there?

 1    **A.**   His employment information.

 2    **Q.**   And then if we look down on the bottom, do we see where

 3    that 1003 is coming from?

 4    **A.**   Yes.

 5    **Q.**   Fannie Mae Form 1003.  That's where that nickname comes

 6    from.

 7            **MR. WALSH:**  All right.  If we could turn to page 2,

 8    please, of this document.

 9        And let's blow up the top part.

10                       (Exhibit published.)

11    **BY MR. WALSH:**

12    **Q.**   What is section 4 -- gather -- is that a continuation of

13    the earlier section 4 on the first page?

14    **A.**   Yes.

15    **Q.**   How about section 5?

16    **A.**   The income and expense section.

17            **MR. WALSH:**  All right.  If we can dezoom, do the

18    bottom part.

19                       (Exhibit published.)

20    **BY MR. WALSH:**

21    **Q.**   What's collected in section 6?

22    **A.**   Assets and liabilities.

23    **Q.**   In this context, what constitutes an asset?

24    **A.**   So it's typically liquid assets such as cash, publicly

25    traded marketable securities, retirement accounts, other

 1    properties that they own, ownership in various businesses.

 2    **Q.**   And then the second part of that is -- sorry, you were --

 3    **A.**   A wide range of different types of assets.

 4    **Q.**   The second part here is liabilities.  What constitutes

 5    liabilities in this context?

 6    **A.**   So if he has -- or the borrower has any debt outstanding

 7    on any of those assets.

 8           **MR. WALSH:**  Okay.  If we could dezoom this, please.

 9       Go to the third page.

10       Do the top part again.

11                   (Exhibit published.)

12    **BY MR. WALSH:**

13    **Q.**   And the top part of this form continues the assets and

14    liabilities; is that right?

15    **A.**   Yes.

16    **Q.**   And it has in fact a number of different subgroups for it

17    to be filled out; is that right?

18    **A.**   Yes.

19    **Q.**   Including stocks and bonds, real estate owned.  These are

20    the things that you were listing as types of assets?

21    **A.**   Yes.

22    **Q.**   And on the liability side, it has things like alimony and

23    expenses, child care, et cetera.

24    **A.**   Correct.

25           **MR. WALSH:**  Okay.  If we could dezoom this, please.

1   Take up, I think we got a -- let's do the whole bottom.

2                   (Exhibit published.)

3   BY MR. WALSH:

4   Q.   This top section here continues the assets and

5   liabilities.   What is described or supposed to be listed in

6   this form?

7   A.   Real estate owned.

8   Q.   What does that mean?

9   A.   Any ownership that the borrower has in any real state.

10   Q.   All right.   We've got next a -- a section 7 here.

11        What is supposed to be included in section 7 of this form?

12   A.   The details of the transaction.   So typically, that's not

13   usually filled out unless it's a purchase.

14   Q.   Okay.   So a refinance wouldn't fill that out, but a

15   purchase would?

16   A.   Yes.

17   Q.   How about section 8, what gets done in section 8?

18   A.   The declarations of the borrower and co-borrower.

19   Q.   Okay.   What are these declarations for?

20   A.   Just to state that if they have any outstanding judgments,

21   if they've declared bankruptcy, if there's any -- been any

22   foreclosures, and if there's any lawsuits pending, as well as

23   obligations that resulted in a foreclosure transfer or a

24   judgment.

25   Q.   Why are these included in declarations?

1      Put another way, why does the bank want to know about this

2    stuff?

3    **A.**  We'd want to know if there is anything that would prevent

4    the borrower from repaying the loan.

5         **MR. WALSH:**  And if we could dezoom that, please.

6      Go to page 4.  And those -- if we can do the top to there,

7    please.  Yeah.

8                       (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**  And it looks like there are additional declarations.

11   These are continuations of section 7 and section 8; is that

12   right?

13   **A.**  Yes.

14        **MR. WALSH:**  Okay.  If we could dezoom that, please.

15      And then do this section here (indicating.)

16      And in fact about if we could just -- just do the top

17   section, section 9, please.

18                       (Exhibit published.)

19   **BY MR. WALSH:**

20   **Q.**  Section 9 here is entitled "Acknowledgment and Agreement."

21   What is this section for?

22   **A.**  That the borrower or applicant acknowledges that they're

23   applying for a mortgage.

24   **Q.**  Okay.

25      And I'd like you to read this first sentence here all the

```
 1   way up and until this section (indicating).  So that part.  If

 2   you could just start with the "Each of."

 3   A.  Each of the undersigned specifically represents to lender

 4   and to lender's actual or potential agents, brokers,

 5   processors, attorneys, insurers, services, successors, and

 6   assigns and agrees and acknowledges that, one, the information

 7   provided in this application is true and correct as of the

 8   date set forth opposite my signature and that any --

 9   Q.  Ah, that was my line there to stop, please.

10       All right.  And then it's signed there.  When it's

11   completed, there's a space for the borrower to sign; is that

12   right?

13   A.  Yes.

14           MR. WALSH:  All right.  If we could dezoom that.

15       And do this last box, the last section here.

16                   (Exhibit published.)

17   BY MR. WALSH:

18   Q.  This is section 10, Roman ten.  What is this section for?

19   A.  It's for government monitoring purposes.

20   Q.  Okay.  And is this information filled out with regard to

21   the identity of the borrower?

22   A.  Yes.

23   Q.  All right.  And it looks like it's signed not by the --

24   borrower but by someone at the bank; is that right?  Is that

25   what the --
```

 1    **A.**   Correct.

 2    **Q.**   -- loan originator is for?

 3              **MR. WALSH:**   Okay.   Dezoom that.

 4                          (Exhibit published.)

 5    **BY MR. WALSH:**

 6    **Q.**   Now that we've walked through the form in the generic,

 7    let's go back to page 1.

 8                          (Exhibit published.)

 9    **BY MR. WALSH:**

10    **Q.**   And this particular -- Exhibit 2, this particular Uniform

11    Residential Loan Application, this particular 1003, for whom

12    is this 1003?

13              **THE COURT:**   Do you mean on whose behalf was it

14    admitted submitted?

15              **MR. WALSH:**   Yes.

16              **THE COURT:**   Uh-huh.

17              **THE WITNESS:**   For Michael Rothenberg.

18    **BY MR. WALSH:**

19    **Q.**   And he's identified.

20              **MR. WALSH:**   If we could blow up the top section,

21    please.

22                          (Exhibit published.)

23    **BY MR. WALSH:**

24    **Q.**   He's identified as the borrower in this document?

25    **A.**   Yes.

 1   **Q.**  And in fact it appears that he signed over his name there?

 2   **A.**  Yes.

 3   **Q.**  And what is listed as the property information and purpose

 4   of loan?

 5   **A.**  Do you want me the read the address?

 6   **Q.**  Yes, please.

 7   **A.**  Oh.  712 Bryant Street, Unit 6, in San Francisco,

 8   California 94107.

 9   **Q.**  All right.  So that is the property.  And what is the

10   purpose of the loan that's checked in this application?

11   **A.**  It's a refinance.

12   **Q.**  All right.

13          **MR. WALSH:**  If we could unzoom that, please.

14      And then if we go down to the section 3.

15                      (Exhibit published.)

16   **BY MR. WALSH:**

17   **Q.**  What is represented there as to the identity of the

18   borrower?

19   **A.**  As -- I'm sorry.  Repeat that again.

20   **Q.**  Who -- who is listed as the borrower in this section?

21   **A.**  Michael Rothenberg.

22   **Q.**  And there was other personal identifying information

23   entered into that document?

24   **A.**  Correct.

25          **MR. WALSH:**  All right.  If we could zoom out of the

 1    that.

 2        And then if we could go to the employment information at

 3    the bottom, the last section.

 4                         (Exhibit published.)

 5    BY MR. WALSH:

 6    Q.   What does it indicate the borrower's employer is?

 7    A.   Rothenberg Ventures.

 8    Q.   All right.  And it has a little box checked here.  What

 9    does that mean?

10    A.   That he's self-employed.

11    Q.   And what does it list as the position, title, and type of

12    business?

13    A.   He's the CEO of a venture capital firm.

14    Q.   And all that information comports with what Michael

15    Rothenberg told you when you had lunch with him?

16    A.   Yes.

17            MR. WALSH:  All right.  If we could dezoom this,

18    please, and go to the next page.

19        If we blow up this top section, please.

20                         (Exhibit published.)

21    BY MR. WALSH:

22    Q.   In the continuation of 4 and 5, is anything filled out on

23    this form?

24    A.   No.

25    Q.   Is that unusual for this -- at this stage in the loan

1    application process?

2    **A.**  No.  A lot of the times our borrowers don't completely

3    fill out the form.

4            **MR. WALSH:**  All right.  If we could dezoom that,

5    please.

6        And do the part -- the bottom half there.

7                    (Exhibit published.)

8    **BY MR. WALSH:**

9    **Q.**  For the assets and liabilities section, is there something

10   handwritten on this document?

11   **A.**  Yes.

12   **Q.**  What does it say?

13   **A.**  It says "see assets."  Which typically means there was

14   another document submitted with this loan application that

15   specifically details all the assets.  A lot of the times, this

16   form doesn't fit -- quite fit all of the assets of our

17   borrowers.

18   **Q.**  Okay.  How about liabilities?

19   **A.**  We usually refer to the credit report.

20   **Q.**  Okay.  And in this instance, what does it say on this

21   initial application?

22   **A.**  See credit report.

23           **MR. WALSH:**  Okay.  If we could dezoom that, please.

24       Go to page 3.  And if we do the top.

25   / / /

JANDU - DIRECT / WALSH

```
 1    BY MR. WALSH:

 2    Q.  Is there anything filled out in the assets and liabilities

 3    on this second page?

 4    A.  No.

 5            MR. WALSH:  Okay.  If we could dezoom it.

 6                        (Exhibit published.)

 7    BY MR. WALSH:

 8    Q.  However, in the declarations page down -- or section at

 9    the bottom, there are checks -- boxes checked; is that right?

10    A.  Yes.

11            MR. WALSH:  If we could go to the next page, please.

12                        (Exhibit published.)

13    BY MR. WALSH:

14    Q.  And those checks continue on the second page of

15    declarations that we've seen; is that right?

16    A.  Correct.

17            MR. WALSH:  Finally, if we could blow up the middle

18    section -- well, not finally.  I guess almost finally.

19                        (Exhibit published.)

20    BY MR. WALSH:

21    Q.  Is this document signed by anyone?

22    A.  Yes.

23    Q.  Who is it signed by?

24    A.  It appears to be Mike Rothenberg.

25    Q.  What is the date of this document?
```

1          **MR. FAKHOURY:**  Sorry, objection.  Speculation.  Move

2     to strike.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  July 29th, 2014.

5     BY MR. WALSH:

6     **Q.**  And does that comport with the emails we were looking at

7     on Exhibit 1 of July 29th when he submitted an application

8     that was signed?

9     **A.**  Yes.

10         **MR. WALSH:**  Okay.  If we could dezoom that.

11    **Q.**  And then at the bottom here, someone has signed this here

12    under -- right over the loan originator identifier.  Do you

13    see that in the middle of the page?

14    **A.**  Yes.

15    **Q.**  Whose signature is that?

16    **A.**  George Pires.

17    **Q.**  And that was someone that worked at Silicon Valley Bank?

18    **A.**  Yes.

19    **Q.**  What was the date of his signature?

20    **A.**  August 8th, 2014.

21    **Q.**  You said August 8th.  Take another look.

22    **A.**  I'm sorry.  August 2nd.  Sorry.

23    **Q.**  Thank you very much.

24         Okay.  So this form was one of the documents that was

25    submitted to you then in that series of emails that we talked

1    about in Exhibit 1; is that right?

2    **A.**   Yes.

3    **Q.**   Additionally, I'd like to show you now what's been marked

4    Exhibit 4.

5                         (Exhibit published.)

6    **BY MR. WALSH:**

7    **Q.**   Do you recognize this document?

8    **A.**   Yes.

9    **Q.**   What is this document?

10   **A.**   It's authorizing --

11   **Q.**   Just what's the title of it before we get to what it is.

12   What -- what is the title of this document?

13   **A.**   Certification Authorization Form.

14   **Q.**   And what is the purpose of this document?

15   **A.**   It's -- basically gives the bank the ability to run credit

16   reports and other information that we might need to require

17   the release of.

18           **MR. WALSH:**  All right.  If we could blow up the top

19   section, please.

20                         (Exhibit published.)

21   **BY MR. WALSH:**

22   **Q.**   This particular form in Exhibit 4 is on behalf of Michael

23   Rothenberg; is that right?

24   **A.**   Yes.

25   **Q.**   And in paragraph 2 there, is this the paragraph that

1   you're talking about that authorizes the bank to acquire

2   informations like the credit report?

3   **A.**   Yes.

4   **Q.**   And in section 1, is there a certification by the

5   applicant about the contents of the loan application?

6   **A.**   That the applicant made no misrepresentations to the

7   lender or omit any important information.

8   **Q.**   All right.  And the -- could you just read the sentence

9   that starts right here?  Sorry (indicating).

10  **A.**   "Applicant certifies that all of the information is true

11  and complete.  Applicant made no misrepresentations to lender,

12  nor did applicant omit any important information."

13          **MR. WALSH:**  Okay.  If we could dezoom that, please.

14      And at the bottom -- well, there's another section here so

15  let's do the middle section.

16                      (Exhibit published.)

17  **BY MR. WALSH:**

18  **Q.**   Okay.  And in paragraph 2 of this, is this also talking

19  about the -- obtaining a credit report?

20  **A.**   Yes.

21  **Q.**   And here, I guess is better.  It's that this is the

22  applicant authorizes you to acquire that?

23  **A.**   Correct.

24          **MR. WALSH:**  Okay.  If we could dezoom this again,

25  please.

1   **Q.** And then who signed this particular document?

2   **A.** Michael Rothenberg.

3   **Q.** What is the date of this document?

4   **A.** July 28th, 2014.

5   **Q.** Thank you very much.

6          **MR. WALSH:** Now if we could dezoom that.

7                     (Exhibit published.)

8   **BY MR. WALSH:**

9   **Q.** Do you see down in the corner here --

10  **A.** Yes.

11  **Q.** -- there's something that's handwritten. Do you

12  recognize what that is?

13  **A.** No, I don't. And it looks likes initials.

14  **Q.** Okay. All right. So is this another one of the documents

15  that was sent to you as part of Mike Rothenberg's application

16  for these two loans from Silicon Valley Bank?

17  **A.** Yes.

18  **Q.** As a result of obtaining this certification and

19  authorization form which has the authorization to obtain a

20  credit report, did you or did Silicon Valley Bank, at least,

21  obtain a credit report from Michael Rothenberg?

22  **A.** Yes.

23  **Q.** I'd like to show you what's marked Exhibit 16 which is in

24  evidence.

25                     (Exhibit published.)

1    BY MR. WALSH:

2    Q.   Before we zoom on anything, do you recognize this

3    document?

4    A.   Yes.

5    Q.   What type of document is this?

6    A.   It's a credit report.

7         MR. WALSH:   Let's zoom in on the top half here so we

8    can see it in more particularity.

9                      (Exhibit published.)

10   BY MR. WALSH:

11   Q.   Is this is a credit report for someone in particular?

12   A.   Yes.

13   Q.   Who is it for?

14   A.   Michael Rothenberg.

15   Q.   And what is the date that this credit report was received

16   and completed?

17   A.   August 1st, 2014.

18   Q.   Now, let's step back and talk about credit reports.  What

19   is a credit report?

20   A.   It's a score that's assessed to a borrower that's --

21   provides an indication of their repayment history and their

22   repayment obligations and whether or not they're late, if

23   they're paying on time, but the mix of loans that are out

24   there for a particular borrower.

25   Q.   And you said there's a score.  So it sounds like there's a

 1    score that tries to summarize all of that; is that right?

 2    **A.**  Yes.

 3    **Q.**  But the report itself is more than just one number.  It's

 4    not just a number, correct?

 5    **A.**  Correct.  It's a -- I think it's the average of three

 6    different credit bureaus that have assessed their own credit

 7    score.

 8              **MR. WALSH:**  Okay.  If we could dezoom that, please.

 9                      (Exhibit published.)

10    **BY MR. WALSH:**

11    **Q.**  This document, as you can see down here at the bottom, is

12    11 pages long.  Does it list a whole lot of information that

13    ends up being calculated into those scores?

14    **A.**  Yes.

15              **MR. WALSH:**  If we could just turn to page 2.

16        And let's just blow up this part here (indicating), down

17    for a little bit.

18                      (Exhibit published.)

19    **BY MR. WALSH:**

20    **Q.**  This is a section entitled "Credit History."  And is this

21    where it's listing a whole bunch of different loans and

22    things?

23    **A.**  Yes.

24    **Q.**  All right.

25              **MR. WALSH:**  If we could dezoom that, please.

1           And if we go to page 3.

2                         (Exhibit published.)

3    BY MR. WALSH:

4    Q.   That continues; is that right?

5    A.   Yes.

6    Q.   Page 4 continues.

7           Page 5.

8                         (Exhibit published.)

9    BY MR. WALSH:

10   Q.   Six.

11                        (Exhibit published.)

12   BY MR. WALSH:

13   Q.   Okay.  And then at some point it ends here.

14           MR. WALSH:  If we could blow up this little bottom

15   section, please, on page 6 of Exhibit 16.

16                        (Exhibit published.)

17   BY MR. WALSH:

18   Q.   This is a section entitled "Inquiries in the last 120

19   days."  What is this?

20   A.   The credit report usually details when a financial

21   institution -- or -- I mean, if they're applying for a credit

22   card or if they're applying for -- to rent a property, if the

23   credit report has been pulled.

24           MR. WALSH:  Okay.  If we could dezoom that, please.

25           And go to page 7.

```
 1                         (Exhibit published.)

 2      BY MR. WALSH:

 3      Q.   Okay.  I guess in the middle here there's some additional

 4      information (indicating).

 5      A.   Yes.

 6      Q.   Looks like just nicknames --

 7      A.   Nicknames and aliases, yes.

 8              MR. WALSH:  And then if we -- we can dezoom that,

 9      please.

10                         (Exhibit published.)

11      BY MR. WALSH:

12      Q.   And then it looks like it says end of report here

13      (indicating).

14              MR. WALSH:  If we can just take a look at what's the

15      next page here.

16                         (Exhibit published.)

17      BY MR. WALSH:

18      Q.   Derogatory summary.  What is the next page -- page on

19      here?  What does that mean?

20      A.   That if there's any derogatory information, it would be

21      contained within this page.

22      Q.   And derogatory information is like failed loans and other

23      things like that?

24      A.   Correct.

25      Q.   Failure to pay.
```

 1                    MR. WALSH:  If you'd go to the next page, please.

 2                              (Exhibit published.)

 3     BY MR. WALSH:

 4     Q.   There's some information here about identification; is

 5     that right?  On that page?

 6     A.   Yes.

 7                    MR. WALSH:  Go to the next page.

 8                              (Exhibit published.)

 9     BY MR. WALSH:

10     Q.   And this is all going to verify who -- they have the right

11     person; is that right?

12     A.   Correct.

13     Q.   Including at the bottom half of this page.

14                    MR. WALSH:  If you could just blow it up.

15                              (Exhibit published.)

16     BY MR. WALSH:

17     Q.   These are different nicknames or names and prior addresses

18     associated?

19     A.   Correct.

20     Q.   Okay.

21                    MR. WALSH:  If we go to the next page, please.

22                              (Exhibit published.)

23     BY MR. WALSH:

24     Q.   And for further information about verification of

25     identity?

1   A.   Yes.

2   Q.   Is that right?

3   A.   Correct.

4        MR. WALSH:   If you go to the next page, please.

5             (Exhibit published.)

6   BY MR. WALSH:

7   Q.   What's contained in this section here?

8        MR. WALSH:   And if in fact, let's just blow up the

9   top part.

10            (Exhibit published.)

11       THE WITNESS:   It's a summary of the credit scores

12  between the three different credit bureaus.

13  BY MR. WALSH:

14  Q.   I see.  So in this instance here, the three bureaus are

15  which three?  What are their three names?

16  A.   Equifax, Experian, and TransUnion.

17  Q.   And the -- those are all dated as of what?

18  A.   August 1st, 2014.

19  Q.   And each one of those entities has got a different

20  three-digit number associated with it; is that right?

21  A.   Yes.

22  Q.   That is the credit score that you were talking about

23  before?

24  A.   Yes.

25  Q.   That's the number that attempts to summarize everything

 1    about the credit history of an individual into just one simple

 2    number?

 3    **A.**  Correct.

 4    **Q.**  Those three numbers are all different.  Why is that?

 5    **A.**  I'm sure it depends on each credit bureau and how they

 6    assess the information that's on the credit reports.

 7         **MR. WALSH:**  All right.  If we could dezoom that,

 8    please.

 9                    (Exhibit published.)

10    **BY MR. WALSH:**

11    **Q.**  And it looks likes there's some information about

12    understanding your credit score that follows.

13    **A.**  Yes.

14         **MR. WALSH:**  You go to the next screen down.

15                    (Exhibit published.)

16    **BY MR. WALSH:**

17    **Q.**  And that continues then.  It looks like the disclosures on

18    that page, on page 13, does that look that to be the case?

19    **A.**  Yes.

20    **Q.**  And the next section down, there's a notice here; is that

21    right?

22    **A.**  Yes.

23    **Q.**  So this is a credit report in its whole; is that right?

24    **A.**  Correct.

25    **Q.**  Okay.  If we can go all the way back to page 1, you

1   indicated already that this is Michael Rothenberg's in

2   particular.  And is there -- in this middle section here a --

3           **MR. WALSH:**  You can blow that up.

4                       (Exhibit published.)

5   **BY MR. WALSH:**

6   **Q.**  -- a credit summary?

7   **A.**  Yes.

8   **Q.**  What are these different -- if I can make a little arrow.

9   This column (indicating).  What -- what's being listed in that

10  column there?  What's revolving?

11  **A.**  So those are the different credit mixes.  A revolving debt

12  is typically credit cards, things that -- or financing that

13  you can pay down and draw back up.

14  **Q.**  How about installment?

15  **A.**  Installment is term loans like a car payment, student loan

16  debt, things of that nature.

17  **Q.**  How about real estate?

18  **A.**  Real estate secured mortgages.

19  **Q.**  All right.  And then --

20  **A.**  Sometimes equity lines as well.

21  **Q.**  What's an equity line in that context?

22  **A.**  It's typically a second deed of trust on a home, and it's

23  secured by a line of credit.  And the borrower has the ability

24  to draw from that line and pay it back whenever they like to

25  within a ten-year period.

 1              **THE COURT:**  Mr. Walsh, anytime in the next five

 2     minutes.

 3              **MR. WALSH:**  Sure.  Thank you, Your Honor.

 4     **Q.**  I think you said -- maybe I just misheard you.  Did you

 5     say it's secured by a line of credit?  Or it's a line of

 6     credit secured by a deed of trust?

 7     **A.**  A line of credit secured by a deed of trust.

 8     **Q.**  And then it makes an effort to total up all of those

 9     various items; is that right?

10     **A.**  Correct.

11     **Q.**  In this particular credit summary, across the top here --

12     see if I can do a little arrow.

13          What is the payments column representing?

14     **A.**  It's the monthly payments of each obligation.

15     **Q.**  What is the balances column representing?

16     **A.**  The loans outstanding.

17     **Q.**  And do you understand what the difference between the

18     balances in this third column, the limits is?

19     **A.**  Yes.

20     **Q.**  What's the difference?

21     **A.**  Limits is their -- the availability that they have to draw

22     on those revolving debts.

23          Or sometimes -- limits can also refer to the original loan

24     amount as well.

25     **Q.**  And what's --

 1   **A.**  So for installment debt, they don't have the ability to

 2   borrow back and forth.  So if the limit's higher than the

 3   balance, it typically means it started at a higher amount and

 4   has been paid down over time.

 5          **MR. WALSH:**  All right.  I think this is a good time

 6   to take a break.

 7          **THE COURT:**  Very good.  Members of the jury, let's

 8   take our second 15-minute break of the day.  Please remember

 9   my prior admonitions.

10          **THE CLERK:**  Please rise for the jury.

11      (The following proceedings were heard out of the presence

12   of the jury:)

13          **THE COURT:**  Okay.  We're outside the presence of the

14   jury.

15      Ms. Jandu, you can stretch your legs too if you want.

16      Mr. Walsh, anything for the record?

17          **MR. WALSH:**  No, Your Honor.

18          **THE COURT:**  Mr. Fakhoury?

19          **MR. FAKHOURY:**  No, Your Honor.  Thank you.

20          **THE COURT:**  Very good.  Thanks.  Let's be in recess.

21      (Recess taken at 11:49 A.M.; proceedings resumed at

22   12:07 P.M.)

23      (The following proceedings were heard in the presence of

24   the jury:)

25          **THE CLERK:**  You may be seated.

 1          **THE COURT:**  All right.  Ms. Jandu is back on the

 2     stand.  All the jurors are in their assigned seats.

 3          Mr. Walsh, your witness.

 4          **MR. WALSH:**  Thank you very much, Your Honor.

 5     **Q.**  Now, as we're walking through the various documents that

 6     Michael Rothenberg submitted, some of them dealt with income;

 7     is that right?

 8     **A.**  Correct.

 9     **Q.**  I'd like to show you what's in evidence as Exhibit 8.

10          **MR. WALSH:**  And if you could please blow up the top

11     part.

12               (Exhibit published.)

13     BY MR. WALSH:

14     **Q.**  Do you recognize this document?

15     **A.**  Yes.

16     **Q.**  What is this document?

17     **A.**  It's a CFO verification of his income from January

18     through -- January 1st through June 30th in 2014 and that he

19     earned 220,000.

20     **Q.**  Okay.  This is a letter dated July 28th of 2014?

21     **A.**  Correct.

22     **Q.**  And it's signed by who?

23     **A.**  Thomas Leep, who was the director of finance for

24     Rothenberg Ventures.

25     **Q.**  All right.  And you sort of already, in the -- the

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   description of what it was, told us.

2       But what is the letter?  Could you just read the sentence

3   so we have it?

4   **A.**  This letter is to confirm that Michael Rothenberg's

5   compensation from Rothenberg Ventures Management Company from

6   January 1st through June 30th, 2014, is 220,000.

7   **Q.**  Now, you already said a little bit about this.  Is this

8   the type of letter that Silicon Valley Bank would acquire when

9   someone doesn't have a regular salary?

10  **A.**  Correct.

11  **Q.**  Did you also, though, seek other information about the

12  income of Mr. Rothenberg?

13  **A.**  Sometimes we request bank statements to show that the

14  deposit was made into his account.

15  **Q.**  Do you also look at tax documents to find out information

16  about --

17  **A.**  Yes.

18  **Q.**  Okay.

19  **A.**  So for historical information, we look at the W-9 or the

20  tax return.

21          **MR. WALSH:**  All right.  If we can dezoom this,

22  please, and turn to what's been marked Exhibit 11 in evidence.

23      And if we could just do the top section here on page 1 of

24  this document.

25                      (Exhibit published.)

1    **BY MR. WALSH:**

2    **Q.**  Do you recognize what this document is?

3    **A.**  Yes.

4    **Q.**  What is it?

5    **A.**  It's Michael Rothenberg's personal federal tax return for

6    2012.

7    **Q.**  And then there are a number of pages that go on.  This is

8    not just a one-page document; is that right?

9    **A.**  Right.

10          **MR. WALSH:**  If we could dezoom that and if we could

11   go to page 30 of this exhibit.

12      And again if we could just do the top little section

13   there.

14                      (Exhibit published.)

15   **BY MR. WALSH:**

16   **Q.**  Do you recognize this document as well, page 30 of

17   Exhibit 11?

18   **A.**  Yes.

19   **Q.**  What is this document?

20   **A.**  It's Michael Rothenberg's personal federal tax return for

21   2013.

22   **Q.**  So there was the 2012 and now the 2013 tax years?

23   **A.**  Yes.

24   **Q.**  And this likewise has many pages that follow; is that

25   right?

 1   **A.**   I'm sorry.  Say that again.

 2   **Q.**   Likewise the 2013 1040 individual tax return has many

 3   pages, it's not just a one-page --

 4   **A.**   Yes.

 5   **Q.**   -- document?

 6        **MR. WALSH:**   Okay.  We could take that down, please.

 7   **Q.**   Did you also undertake an effort to get tax documents from

 8   RVMC, Rothenberg Ventures Management Company?

 9   **A.**   I believe if he owned more than 25 percent of that entity,

10   yes, we would have required it.

11   **Q.**   I'd like to show you what's been marked Exhibit 7, in

12   evidence.

13        **MR. WALSH:**   And if we could just do the top portion

14   here.

15                      (Exhibit published.)

16   **BY MR. WALSH:**

17   **Q.**   Do you recognize this document?

18   **A.**   Yes.

19   **Q.**   What is this document?

20   **A.**   It's a K-1 schedule for 2012 --

21   **Q.**   For what entity?

22   **A.**    -- for Rothenberg Ventures Management Company.

23   **Q.**   What's a K-1?

24   **A.**   It's the -- well, for the bank's perspective, it's how we

25   calculate cash flow.  So it -- it helps us determine what our

 1   borrower actually took in distributions as well as what

 2   they've contributed to that particular investment.

 3   **Q.**  Okay.  And this is for the 2012 year, although it does

 4   specify September 5th to December 31st?

 5   **A.**  Yes.

 6          **MR. WALSH:**  All right.  If we turn to page 5 of

 7   Exhibit 7, please.

 8       And do again that same top block there, please.

 9                         (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  Is -- do you recognize this document?

12   **A.**  Yes.

13   **Q.**  What is this document?

14   **A.**  It's the 2013 K-1 for Rothenberg Ventures Management

15   Company.

16   **Q.**  So this as before, there was a 2012, and now there's a

17   2013; is that right?

18   **A.**  Yes.

19   **Q.**  And these are some of the documents that you also obtained

20   from Mike Rothenberg in connection with his application for

21   those two loans?

22   **A.**  Yes.

23          **MR. WALSH:**  Okay.  We can take that off the screen,

24   please.

25       Entirely off.  Thank you.

1    **Q.**   Now did you also have to collect some information for the

2    capital call line of credit?

3    **A.**   Yes.

4    **Q.**   And were there specific documents you needed to gather in

5    order to fill that loan as well?

6    **A.**   Yes.

7    **Q.**   I'd like to show you what's been marked Exhibit 5 in

8    evidence.

9                              (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**   Do you recognize this document?

12   **A.**   Yes.

13           **MR. WALSH:**   And if we could highlight the top,

14   please, or zoom.

15                              (Exhibit published.)

16   **BY MR. WALSH:**

17   **Q.**   What is this document?

18   **A.**   It's a personal financial statement.

19   **Q.**   What does that mean?

20   **A.**   It lists the assets and liabilities of the borrower.

21   **Q.**   Okay.  And in this instance, this particular form is for

22   who?

23   **A.**   For Michael Rothenberg.

24   **Q.**   And what is the date of this documents?

25   **A.**   July 28th, 2014.

 1                 **MR. WALSH:**  And if we could then dezoom this, please.

 2                         (Exhibit published.)

 3    **BY MR. WALSH:**

 4    **Q.**  This form -- this is a form, is it not?

 5    **A.**  Yes.

 6    **Q.**  Whose form is it?

 7    **A.**  It's Silicon Valley Bank's form.

 8                 **MR. WALSH:**  If we could then just slowly scroll

 9    through this.  If we can go to the next page, please.

10                         (Exhibit published.)

11    **BY MR. WALSH:**

12    **Q.**  Is there anything filled out on page 2?

13    **A.**  No.

14                 **MR. WALSH:**  Go to page 3.

15                         (Exhibit published.)

16    **BY MR. WALSH:**

17    **Q.**  Is there anything filled out on page 3.

18    **A.**  No.

19                 **MR. WALSH:**  Go to page 4.

20                         (Exhibit published.)

21    **BY MR. WALSH:**

22    **Q.**  Is there anything filled out on page 4?

23    **A.**  No.

24                 **MR. WALSH:**  If we can we go to page 5.  It looks

25    likes it's turned sideways.  That's why it got small.

 1                      (Exhibit published.)

 2     BY MR. WALSH:

 3     Q.   Is there anything filled out on page 6 -- sorry, 5?

 4     A.   No.

 5     Q.   Is there anything on page 6?

 6     A.   No.

 7              MR. WALSH:   And if we go to the last page of this

 8     document.

 9                      (Exhibit published.)

10     BY MR. WALSH:

11     Q.   Is there anything filled out on page 7?

12     A.   No.

13                  (Off-the-record discussion.)

14          THE COURT:   Sorry.  Go ahead.

15     BY MR. WALSH:

16     Q.   All right.  Is it unusual to have a form like this not

17     completed?

18     A.   No, because typically our private bank clients have their

19     own form that they complete themselves.

20     Q.   Okay.  I'd like to show you what's been marked Exhibit 3.

21              MR. WALSH:   And if we could blow up the part that --

22     including the date, please.

23          Sorry.  There we go.

24                      (Exhibit published.)

25     / / /

1  **BY MR. WALSH:**

2  **Q.**  Do you recognize this document?

3  **A.**  Yes.

4  **Q.**  What is this document?

5  **A.**  It's a personal financial statement that's been prepared

6  by the borrower.

7  **Q.**  Okay.  And in this instance, which borrower?

8  **A.**  Michael Rothenberg.

9  **Q.**  And what is the date of this item up here in the top

10  left-hand corner?

11  **A.**  July 29th, 2014.

12  **Q.**  Okay.  Is this the type of document that typically is

13  submitted when someone does not complete Exhibit 5?

14  **A.**  Yes.

15  **Q.**  And was that done so in this case?

16  **A.**  Yes.

17  **Q.**  Let's walk through this document.  It appears that there

18  are headings of assets, liabilities, equity; is that right?

19  **A.**  Yes.

20  **Q.**  Let's talk first about assets.

21                    (Exhibit published.)

22  **BY MR. WALSH:**

23  **Q.**  What did Michael Rothenberg disclose to Silicon Valley

24  Bank about what he termed -- this is his firm -- form, rather.

25  He created this; is that right?

JANDU - DIRECT / **WALSH**

1    **A.**   Yes.

2    **Q.**   Under investments, what does he indicate is liquid

3    investments?

4    **A.**   That he has cash at Fidelity for $370,015 and an E-Trade

5    IRA account with $5,102.

6    **Q.**   What is an IRA account?

7    **A.**   It's a type of retirement fund.

8    **Q.**   An individual retirement account --

9    **A.**   Yes.

10   **Q.**   -- that's what it stands for?

11       Okay.  And then he's got a -- so a separate category he's

12   calling equity portfolio.  What's listed there?

13   **A.**   It's his estimate of the value of his ownership in those

14   funds.

15   **Q.**   Okay.  So what does he say for Rothenberg Ventures Fund I?

16   **A.**   10,000.

17   **Q.**   How about Fund II?

18   **A.**   Zero.

19   **Q.**   Let's pause there for a second.

20       Does that make sense that it would be zero at this time in

21   2014?

22   **A.**   I believe so because he was raising funds at the time.

23   **Q.**   And he was trying to get a loan to put in money into

24   Fund II?

25   **A.**   Yes.

1  Q.  If we could go to the next Rothenberg investments-equity,

2  what does he say that he has in that?

3  A.  56,800.

4  Q.  And then last but not least, he's got an Audax Equity and

5  Private Holdings.  What does he indicate his assets are there?

6  A.  $46,742.

7  Q.  Do you know what Audax Equity and Private Holdings is?

8  A.  I don't recall, no.

9  Q.  What does he then total up as his total investments at

10  that time?

11  A.  $488,659.

12  Q.  His next topic here is real estate equity.  What does he

13  indicate about his real estate equity?

14  A.  That he purchased his home for a million-one.  There's

15  loans outstanding of $865,190 and cash home improvements of

16  320,000.

17  Q.  Okay.  Now the 712 Bryant Street, that's the property that

18  is the subject of this refinance application; is that right?

19  A.  Correct.

20  Q.  What do you understand the loan outstanding to mean in

21  this context?

22  A.  The first mortgage that's outstanding on the property.

23  Q.  And then cash home improvements, do you understand what

24  that means?

25  A.  I would guess that it's a combination of the down payment

1    that he paid when he purchased the home as well as some

2    improvements that it seems to indicate he did on his property.

3              **MR. FAKHOURY:**  Objection, speculation, move to

4    strike.

5              **THE COURT:**  Overruled.

6    **BY MR. WALSH:**

7    **Q.**  What does he indicate his net real estate equity is on the

8    form dated July 29th, 2014?

9    **A.**  $554,810.

10   **Q.**  Next, there's a section under his assets here for

11   Rothenberg Ventures Management Company.

12        What does he indicate there in that section?

13   **A.**  That he owns 95 percent of that entity and that he

14   estimates the worth to be 47,500,000.

15   **Q.**  Okay.  And that's 95 percent.  What does he estimate the

16   value of Rothenberg Ventures Management Company is in total?

17   **A.**  50 million.

18   **Q.**  And that's what the 50M is there?

19   **A.**  Yes.

20   **Q.**  Now, this type of information here, is that something that

21   Silicon Valley Bank relied on in determining the assets of a

22   venture capitalist in 2014?

23   **A.**  No.

24   **Q.**  Why is that?

25   **A.**  Because the estimated value is considered highly

1   speculative, and we don't have any type of sales comparisons

2   to support that value.  And it's often not very liquid in

3   terms of being able to sell the asset to a broader public.

4   **Q.**  And that matters to the bank why?

5   **A.**  Because we're really focused on tangible assets that

6   are -- can somewhat be liquidated.

7   **Q.**  All right.  That concludes his assets section.  He now has

8   a section he entitles liabilities.  Do you see that section?

9   **A.**  Yes.

10  **Q.**  What does he indicate as all of his liabilities?

11  **A.**  That he has student loans for 210,000.

12  **Q.**  And then he nets it all up there, is that right, at still

13  210,000?

14  **A.**  Yes.

15  **Q.**  And then at the very bottom of this form that he submitted

16  to Silicon Valley Bank, what does he indicate according to him

17  his net equity is?

18  **A.**  48,333,469.

19  **Q.**  Okay.  And from Silicon Valley Bank's perspective, is

20  47.5 million of that not going to be looked at?

21  **A.**  Correct.

22  **Q.**  Because that's all the value of Rothenberg Ventures

23  Management Company?

24  **A.**  Correct.

25          **MR. WALSH:**  Okay.  If we could take this down,

 1    please.

 2        And if we could have Exhibit 6 in evidence.

 3                    (Exhibit published.)

 4    **BY MR. WALSH:**

 5    **Q.**   Do you recognize this form?

 6    **A.**   Yes.

 7            **MR. WALSH:**   Please blow up the square.

 8                    (Exhibit published.)

 9    **BY MR. WALSH:**

10    **Q.**   What is this form?

11    **A.**   It's a capital call commitments worksheet that details all

12    of the capital committed in various funds.

13    **Q.**   What does that mean?

14    **A.**   It's basically trying to understand what he's committed

15    into a particular fund, the capital call to date, what it's

16    worth, the time frame that he needs to fund the commitment,

17    and the capital that needs to be funded within the next

18    12 months and how he would go about doing that.

19    **Q.**   And this is relevant because this is in fact the capital

20    call that he's seeking a loan for; is that right?

21    **A.**   Correct.

22    **Q.**   So let's just walk through here and take, starting with

23    Exhibit -- or sorry -- as he numbered it, 1, Rothenberg

24    Ventures Fund II LLC, Roman two.

25        What is the first column here indicating his "Capital

1  Committed" is?

2  **A.**   400,000.

3  **Q.**   And that is the total amount that he owes the fund; is

4  that what that is meant to represent?

5  **A.**   Yes.

6  **Q.**   What is the "Capital Called to Date" column for?

7  **A.**   What he's invested into the fund to date.

8  **Q.**   And in this instance, what is the figure that he's put in

9  to Fund II?

10  **A.**   Zero.

11  **Q.**   "Current Capital Account Value/as of date," what is that

12  column supposed to represent?

13  **A.**   It indicates the value of the capital account for that

14  particular fund.

15  **Q.**   So a fund might go up or down in value over time?

16  **A.**   Yes.

17  **Q.**   And so if you put in $100, it might be more on a certain

18  date or less on a certain date?

19  **A.**   Correct.

20  **Q.**   And if there was a difference, that's where it would be

21  put?

22  **A.**   Yes.

23  **Q.**   Let's go to the next column, "Timeframe to call unfunded

24  commitment."  What does that mean?

25  **A.**   That he has two months to fund the remaining unfunded

JANDU - DIRECT / **WALSH**

 1    commitment.

 2    **Q.**  Okay.  So this column is for how long it is before these

 3    commitments are due?

 4    **A.**  Yes.

 5    **Q.**  And in this instance, for Fund II, what does he indicate

 6    how long he has before he needs to pay at least some of his

 7    capital call?

 8    **A.**  Two months.

 9    **Q.**  The next column is "Capital to be called in next

10    12 months."  What does that mean, just the column?

11    **A.**  His commitment that's due in the next 12 months.

12    **Q.**  And in this instance, how much does he indicate that he is

13    required to put into Fund II within the next 12 months?

14    **A.**  400,000.

15    **Q.**  And does that comport with what he told by email and at

16    your lunch about how much he owed in the near term?

17    **A.**  Yes.

18    **Q.**  "How satisfied?"  Sort of obvious.  How it's going to be

19    paid, I suppose; is that right?  The next column?

20    **A.**  Yes.

21    **Q.**  And in this instance, what does he indicate how he's going

22    to pay that commitment?

23    **A.**  Through cash.

24    **Q.**  Row 2 indicates a Fund III.  At this time, did a Fund III

25    exist to your knowledge?

JANDU - DIRECT / **WALSH**

1  **A.**  No.

2  **Q.**  But he was formulating that he might in the future, it

3  appears; is that right?

4  **A.**  Correct.

5  **Q.**  And in that, what was he speculating as to what his

6  capital commitment would be?

7  **A.**  A million dollars.

8  **Q.**  And what was the timeframe that he thought he would have

9  to make that in?

10  **A.**  Two years.

11  **Q.**  And what was he predicting in the next 12 months for

12  Fund III?

13  **A.**  500,000.

14  **Q.**  And how was he planning to pay it?

15  **A.**  Cash.

16  **Q.**  To be clear, though, he was seeking a -- a line of credit

17  for what is listed here as line 1, Fund II; is that right?

18  **A.**  Yes.

19  **Q.**  Okay.  And this was a form that Michael Rothenberg

20  completed and to Silicon Valley Bank; is that right?

21  **A.**  Yes.

22        **MR. WALSH:**  Okay.  If we could zip that away.

23  **Q.**  Now when a person is seeking a capital call line of

24  credit, does the bank also acquire information about the funds

25  themselves?

1    **A.** Yes.

2    **Q.** I'd like to show you what's been marked Exhibit 12.

3                    (Exhibit published.)

4    **BY MR. WALSH:**

5    **Q.** Do you recognize that document?

6    **A.** Yes.

7    **Q.** What is that document?

8    **A.** It's the private offering memorandum for Rothenberg

9    Ventures Fund II.

10        **MR. WALSH:** Okay. And if we could just zoom on the

11   text part here.

12        No, sorry, the whole -- sorry.

13        Yeah, just the whole text part. Thank you.

14                    (Exhibit published.)

15   **BY MR. WALSH:**

16   **Q.** Does it indicate who the manager of Fund II was?

17   **A.** Yes.

18   **Q.** Who is that?

19   **A.** Rothenberg Ventures Management Company.

20   **Q.** What is a confidential private offering memorandum?

21   **A.** It's summary that they usually provide to investors and

22   bankers that provides specific details about the fund, who's

23   managing it, what their focus is, the amount of the fund, all

24   of the terms that investors and banks would typically need to

25   know before making a decision.

 1   **Q.**  Okay.  For an investor to invest in it or for a bank to --

 2   I guess bank could invest too, but to also --

 3   **A.**  Approve --

 4   **Q.**  -- approve --

 5   **A.**  -- a loan for the fund.

 6   **Q.**  Yeah.  Okay.

 7           **MR. WALSH:**  If we could dezoom that.  And that

 8   document then, if we could just slowly scroll through.

 9                        (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  It provides a lot of details here on page 2, 3, it goes

12   on.

13                        (Exhibit published.)

14   **BY MR. WALSH:**

15   **Q.**  Four.

16                        (Exhibit published.)

17   **BY MR. WALSH:**

18   **Q.**  Five.

19                        (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**  There's a table of contents on page 6; is that right?

22   **A.**  Yes.

23                        (Exhibit published.)

24           **MR. WALSH:**  Go to page 7.

25       And if we could just blow up the top paragraph there under

1    the fund.

2                        (Exhibit published.)

3    BY MR. WALSH:

4    **Q.**   What does it indicate about where Rothenberg Ventures

5    Fund II LLC was incorporated?

6    **A.**   It's a Delaware limited liability company.

7    **Q.**   And what does it say the purpose of that fund is?

8    **A.**   It's an early stage seed investment firm --

9    **Q.**   And --

10   **A.**   -- to invest in one or more early stage companies that are

11   often referred to as portfolio companies.  Focused on

12   technology-enabled companies such as e-commerce, mobile,

13   digital media, social networking, and software.

14   **Q.**   Okay.  So that's just a brief summary.

15             **MR. WALSH:**  If we could dezoom that, please.

16        And if we could do the management, just the first

17   paragraph of management.

18        Something is -- good, yes, please.

19                        (Exhibit published.)

20   BY MR. WALSH:

21   **Q.**   What does it indicate about the manager -- you already

22   said from the first page, but what does it say the manager of

23   Fund II is?  If you can just read the first sentence, please.

24   **A.**   Oh.  Rothenberg Ventures Management Company is the manager

25   of fund --

```
 1                        (Simultaneous colloquy.)

 2     BY MR. WALSH:

 3     Q.   -- if you could read the next sentence, too, please.

 4     A.   "The founder of the Fund and owner of the manager, Michael

 5     Rothenberg, will make all final decisions regarding the

 6     strategy, investments, and day-to-day operations of the fund

 7     on behalf of the manager."

 8     Q.   Okay.

 9          And then in the second paragraph here, it gives some of

10     these details about Mr. Rothenberg in particular; is that

11     right?

12     A.   Yes.

13     Q.   And as you already noted, he said he graduated from

14     Stanford, but it appears he also graduated --

15                        (Clarification by the reporter.)

16              MR. WALSH:   Sorry.  I will do.  My apologies.

17              MR. FAKHOURY:   Could counsel also ask a question

18     instead of testifying?

19              MR. WALSH:   Will do.

20              THE COURT:   If you have an objection, you can make

21     it.

22              MR. FAKHOURY:   Objection, counsel is testifying.

23              THE COURT:   There's no question pending.  The

24     objection is overruled.

25          Go ahead.
```

1    BY MR. WALSH:

2    Q.   Where does it indicate Michael Rothenberg went to school?

3    A.   That he graduated from Harvard Business School and from

4    Stanford where he received a bachelor of science in management

5    science and engineering.

6    Q.   And does it indicate where Mr. Rothenberg worked in the

7    past?

8    A.   Yes.

9    Q.   What does it say about at least one place he worked in the

10   past?

11   A.   That he worked as an associate at Audax Private Equity for

12   two years.

13   Q.   And that Audax Private Equity, is that something that

14   showed up on the Exhibit 3 with his assets?

15   A.   Yes.

16   Q.   So that must be related; is that right?

17   A.   It seems to be, yes.

18   Q.   Also does it indicate a second location where

19   Mr. Rothenberg worked at some point?

20   A.   Yes.

21   Q.   What does it say about how long he worked at a particular

22   other entity?

23   A.   That he spent two years at Bain & Company.

24   Q.   Do you know what Bain & Company is?

25   A.   Yes.

JANDU - DIRECT / WALSH

1   Q.   What is Bain & Company?

2   A.   It's a private equity firm.

3   Q.   Are you sure about that?

4   A.   Yes.

5   Q.   Okay.

6        MR. WALSH:   All right.   If we could dezoom this,

7   please.

8        If we could go on to the next page, please.

9                    (Exhibit published.)

10  BY MR. WALSH:

11  Q.   And then it goes through and lays out on page 8, does it

12  not, the Summary of Principal Terms.

13  A.   Yes.

14  Q.   All right.   And there are a number of pages of additional

15  information; is that right?

16  A.   Yes.

17  Q.   Were there other additional documents obtained about the

18  fund in Rothenberg Ventures Management Company that the bank

19  obtained in connection with this application for loans?

20  A.   Yes.

21  Q.   I'd like to show you what's been marked Exhibit 13,

22  please.

23                    (Exhibit published.)

24        MR. WALSH:   This is in evidence.

25  Q.   Do you recognize this document?

1   **A.**   Yes.

2   **Q.**   What is this document?

3   **A.**   It's a slide show presentation for Rothenberg Ventures

4   Fund II.

5   **Q.**   And if you could just read, apparently it has a little

6   moniker of some kind.  What does it say?

7   **A.**   "The Millenial Venture Firm for Millennial Founders."

8   **Q.**   All right.  This is a slide deck, you said.  Or slide

9   show, I think you might have said.

10          **MR. WALSH:**  If we could go to the next slide, please,

11   page 2.

12                        (Exhibit published.)

13   **BY MR. WALSH:**

14   **Q.**   What is the purpose of a document like this?

15   **A.**   It's to basically summarize what's on the -- the previous

16   document, the memorandum.  But it also has very specific

17   information about current investments, usually the performance

18   year-to-date.

19          **MR. WALSH:**  All right.  If we could scroll to the

20   next slide, please.

21                        (Exhibit published.)

22          **MR. WALSH:**  And we could go to the next slide,

23   please.

24                        (Exhibit published.)

25   / / /

 1    BY MR. WALSH:

 2    Q.   On Slide 4 here, what's being indicated about Rothenberg

 3    Ventures?

 4    A.   That it has 25 value increases and two exits in two years.

 5    Q.   All right.  And is this essentially showing off about how

 6    great his fund is?

 7    A.   Essentially, yes.

 8         MR. WALSH:  We keep going down, the next slide,

 9    please.

10                        (Exhibit published.)

11    BY MR. WALSH:

12    Q.   There's a timeline; is that right?

13    A.   Yes.

14    Q.   I'd like to direct your attention to 2001 in that

15    timeline.

16         MR. WALSH:  And if we could just blow that up.

17                        (Exhibit published.)

18    BY MR. WALSH:

19    Q.   Does that refresh your recollection about the types of

20    awards you mentioned about him being, I think you said a math

21    wizard?

22    A.   Yes.

23    Q.   And in fact it appears he was a math olympian?

24    A.   Yes.

25         MR. WALSH:  All right.  If we could dezoom that,

1    please.

2        If we could go to the next slide, please.

3                    (Exhibit published.)

4    **BY MR. WALSH:**

5    **Q.**   What's here on slide 6 of Exhibit 13?

6    **A.**   It's the venture team that supports the fund.

7    **Q.**   All right.  And over here, is that Mr. Rothenberg?

8    **A.**   Yes.

9    **Q.**   And that's the individual that became your client for a

10   period of time; is that right?

11   **A.**   Correct.

12   **Q.**   Additionally, here, do you see that individual?

13   **A.**   Yes.

14   **Q.**   Who is that individual?

15   **A.**   The director of finance, Tom Leep.

16   **Q.**   Is that the guy that sent the letter that we were looking

17   at as Exhibit 8?

18   **A.**   Correct.

19          **MR. WALSH:**  If we could go on here to the next slide,

20   please.

21       And just keep scrolling here for a little bit here.

22   Slide 7.

23                    (Exhibit published.)

24          **MR. WALSH:**  Slide 8, please.

25                    (Exhibit published.)

 1              MR. WALSH:  Slide 9.

 2                      (Exhibit published.)

 3  BY MR. WALSH:

 4  Q.  What's happening here in Slide 9?

 5  A.  Looks like it's highlighting their limited partners, that

 6  there's 80 of them and that they're world-class industry

 7  experts and venture legends.

 8              MR. WALSH:  Could you go to the next slide, please.

 9                      (Exhibit published.)

10              MR. WALSH:  The next slide.

11                      (Exhibit published.)

12              MR. WALSH:  The next slide.

13                      (Exhibit published.)

14  BY MR. WALSH:

15  Q.  Does this photograph ring a bell with you?

16  A.  Yes.

17  Q.  What is this photograph of?

18  A.  It's an event that Rothenberg Ventures throws, I think

19  annually.  It's a founder field day that they host for

20  entrepreneurs as well as other investors.

21  Q.  And whether or not it's annually, this picture at least is

22  from when?

23  A.  May 2014.

24  Q.  And it appears to be at AT&T Park?

25  A.  Yes.

1      **MR. WALSH:**  All right.  If you go to the last page.

2   That's the end of that document.

3   **Q.**  I'd like to show you what's been marked 14 and is in

4   evidence.

5                         (Exhibit published.)

6   **BY MR. WALSH:**

7   **Q.**  Is this another document -- well, first of all, do you

8   recognize this document?

9   **A.**  Yes.

10  **Q.**  What is this document?

11  **A.**  It's a portfolio summary.

12  **Q.**  And is this one of the documents that Mr. Rothenberg

13  submitted to Silicon Valley Bank at some point in connection

14  with this loan --

15  **A.**  Yes.

16  **Q.**  -- application?

17       And what do you take a portfolio summary to be?

18  **A.**  I would say that it was most likely specific details of

19  each portfolio company that the fund has invested in so far

20  and the metrics and the value of the company and the stage

21  that it's at.

22  **Q.**  And let's make sure we have the same right terms.

23       For a venture capital fund, what -- when it invests in a

24  company, is that called -- what is that called?

25  **A.**  A portfolio company.

 1            MR. WALSH:   Okay.  So if we can go to page 2.

 2                     (Exhibit published.)

 3   BY MR. WALSH:

 4   Q.   This here is two different funds that are summarized here;

 5   is that right?

 6   A.   Yes.

 7            MR. WALSH:   And if we continue on to the next page.

 8                     (Exhibit published.)

 9   BY MR. WALSH:

10   Q.   Are these examples of companies, portfolio companies?

11   A.   Yes.

12            MR. WALSH:   Go on to the next page.

13                     (Exhibit published.)

14   BY MR. WALSH:

15   Q.   Page 4 is indicating what?

16   A.   Where the investments are located.

17            MR. WALSH:   In we go to the next page, please.

18                     (Exhibit published.)

19            MR. WALSH:   And the next page.

20                     (Exhibit published.)

21   BY MR. WALSH:

22   Q.   Here, on this page, page 6, please, what is being

23   represented about what the fund is investing in?

24   A.   It's the percentage of what companies lie within a

25   specific sector.

1   Q.  And in this instance, what is the leading sector?

2   A.  Disruptive technology.

3   Q.  And then you see it's got a little asterisk there?

4   A.  Yes.

5          MR. WALSH:  If we could blow up this little section

6   down here where the asterisk ends up.

7                      (Exhibit published.)

8   BY MR. WALSH:

9   Q.  What does the little asterisk indicate "disruptive

10  technology" means?

11  A.  That it includes virtual reality, 3D printing, electronic

12  currency, space travel, and digital eyewear.

13  Q.  And this first part, digital reality, does that comport

14  with what you learned from Mike Rothenberg at that lunch?

15  A.  Yes.

16         MR. WALSH:  All right.  If we could dezoom that,

17  please, and go to the next page.

18                      (Exhibit published.)

19  BY MR. WALSH:

20  Q.  The end of that -- I'd now like to show you what's been

21  marked and admitted as Exhibit --

22         MR. WALSH:  Is that 14?  Did we just do 14 or --

23         MR. WALDINGER:  We just did 13.

24         MR. FAKHOURY:  That was 14.

25         MR. WALDINGER:  That was 14.

 1              MR. WALSH:  That was 14.  Can I have 15, please.

 2                         (Exhibit published.)

 3    BY MR. WALSH:

 4    Q.  Do you recognize this document?

 5    A.  Yes.

 6    Q.  What is this document?

 7    A.  It's the portfolio companies for Fund II slide show.

 8    Q.  All right.  And so this is now specific to Fund II?

 9    A.  Yes.

10              MR. WALSH:  And if we could then scroll to the next

11    slide, please.

12         I don't think we need to tarry very long here, but if we

13    could just slowly slide through and publish to the jury slides

14    2 --

15                         (Exhibit published.)

16              MR. WALSH:  Three.

17                         (Exhibit published.)

18              MR. WALSH:  Four.

19                         (Exhibit published.)

20              MR. WALSH:  Five.

21                         (Exhibit published.)

22              MR. WALSH:  Six.

23                         (Exhibit published.)

24              MR. WALSH:  Seven.

25                         (Exhibit published.)

 1              **MR. WALSH:**  Eight.

 2                        (Exhibit published.)

 3              **MR. WALSH:**  Nine.

 4                        (Exhibit published.)

 5              **MR. WALSH:**  Ten.

 6                        (Exhibit published.)

 7              **MR. WALSH:**  Eleven.

 8                        (Exhibit published.)

 9              **MR. WALSH:**  Twelve.

10                        (Exhibit published.)

11              **MR. WALSH:**  Thirteen.

12                        (Exhibit published.)

13              **MR. WALSH:**  And 14.

14                        (Exhibit published.)

15     BY MR. WALSH:

16     Q.  Is this another document that Michael Rothenberg submitted

17     to Silicon Valley Bank?

18     A.  Yes.

19     Q.  And all of those documents, the slide shows we just walked

20     through, those are all relevant for the capital call line of

21     credit; is that right?

22     A.  Correct.

23     Q.  All right.  I'd now like to return briefly to the

24     refinance application.

25         Was there also an appraisal done in connection with that?

1    **A.**   Yes.

2    **Q.**   I'd like to show you what's been marked Exhibit 18 in

3    evidence.

4           **MR. WALSH:**  And if we could blow up the text part,

5    please.

6           Sorry, all the way down to the --

7                     (Exhibit published.)

8    **BY MR. WALSH:**

9    **Q.**   Do you recognize this document?

10   **A.**   Yes.

11   **Q.**   What is this document?

12   **A.**   It's the appraisal on Mike Rothenberg's primary residence.

13   **Q.**   Okay.  And again, it indicates the location is where?

14   **A.**   712 Bryant Street in San Francisco.

15   **Q.**   And this picture here then is the condominium building?

16   **A.**   Yes.

17           **MR. WALSH:**  If we could dezoom that.

18                     (Exhibit published.)

19   **BY MR. WALSH:**

20   **Q.**   What is the date as of date of this appraisal?

21   **A.**   August 5th, 2014.

22           **MR. WALSH:**  All right.  Do you just want to zoom that

23   up so everyone can see.

24                     (Exhibit published.)

25           **MR. WALSH:**  All right.  If we could dezoom that.  And

 1    go to page 2 of this document.

 2         And if we could zoom in on the text portion, please.

 3                    (Exhibit published.)

 4    **BY MR. WALSH:**

 5    **Q.**  What is -- what is going on in this first page of -- after

 6    the title page of the appraisal report?

 7    **A.**  It indicates the current market value at the time to be a

 8    million 850.

 9    **Q.**  Okay.  For that property, for 712 Bryant Street --

10    **A.**  Yes.

11    **Q.**  -- condominium 6?

12    **A.**  Yes.

13    **Q.**  All right.  Is this -- from the bank's perspective, is

14    this the piece of information that's most of value to the bank

15    in making a determination?

16    **A.**  It's one of the main factors, yes.

17    **Q.**  From the appraisal only, that's what I mean to say.

18    **A.**  Oh, yes.

19            **MR. WALSH:**  All right.  If we could dezoom that.

20         And then if we can just --

21    **Q.**  Are you aware that appraisals have a number of pages --

22    you've seen this appraisal, right?

23    **A.**  Yes.

24    **Q.**  It has many pages associated with it?

25    **A.**  Yes.

1    MR. WALSH:  And if we could just go to page 3,

2    please.

3                        (Exhibit published.)

4            MR. WALSH:  And page 4.

5                        (Exhibit published.)

6    BY MR. WALSH:

7    Q.  There are all sorts of information that is used -- is

8    there all sorts of information used here to generate that

9    value?

10   A.  Yes.

11           MR. WALSH:  If we could then scroll forward just

12   slowly.

13      Keep going, please.

14                       (Exhibit published.)

15   BY MR. WALSH:

16   Q.  At some point, are there photographs attached to this?

17   A.  Yes.

18           MR. WALSH:  Let's keep going, please.

19                       (Exhibit published.)

20           MR. WALSH:  Next slide, please.

21                       (Exhibit published.)

22           MR. WALSH:  Next slide, please.

23                       (Exhibit published.)

24           MR. WALSH:  Next slide, please.

25                       (Exhibit published.)

```
 1              MR. WALSH:  Keep going, please.

 2                    (Exhibit published.)

 3              MR. WALSH:  Keep going please.

 4                    (Exhibit published.)

 5              MR. WALSH:  All right.  Could we stop here.

 6    Q.  We're now at page 17.  And is this where photographs begin

 7    in this appraisal report?

 8    A.  Yes.

 9              MR. WALSH:  All right.  And if we can just slowly go

10    through these slides here, please, or these pages on page 17.

11       Move on to page 18.

12                    (Exhibit published.)

13              MR. WALSH:  Page 19.

14                    (Exhibit published.)

15              MR. WALSH:  Page 20.

16                    (Exhibit published.)

17              MR. WALSH:  Page 21.

18                    (Exhibit published.)

19              MR. WALSH:  Page 22.

20                    (Exhibit published.)

21              MR. WALSH:  Page 23.

22                    (Exhibit published.)

23              MR. WALSH:  Page 24.

24                    (Exhibit published.)

25              MR. WALSH:  Page 25.
```

```
 1                          (Exhibit published.)

 2            MR. WALSH:  Page 26.

 3                          (Exhibit published.)

 4            MR. WALSH:  Page 27.

 5                          (Exhibit published.)

 6            MR. WALSH:  Page 28.

 7                          (Exhibit published.)

 8   BY MR. WALSH:

 9   Q.  These last two pages, 27 and 28, are those comparable

10   properties that were used as a comparison?

11   A.  Yes.

12   Q.  All right.  Now you also indicated --

13            MR. WALSH:  We can take this down, please.

14   Q.  You also indicated that some of the information that

15   Silicon Valley Bank acquires is information about insurance.

16   A.  Yes.

17   Q.  I'd like to show you what's been marked Exhibit 17 in

18   evidence.

19                          (Exhibit published.)

20   BY MR. WALSH:

21   Q.  This is an email here on the top, as you can see.  Do you

22   recognize there the email at the bottom of this page here?

23   A.  Yes.

24            MR. WALSH:  And if we could just blow up the bottom

25   of the page.  There we go.
```

```
1              (Exhibit published.)

2   BY MR. WALSH:

3   Q.  From whom and to whom is this email sent?

4   A.  It's from Mike Rothenberg to George Pires.  And it cc'd my

5   team, which is Michael Conway and Ryan Ficks, as well as

6   myself.

7   Q.  When you say your team, who's Michael Conway?

8   A.  He was on my team at the time when I worked at

9   Silicon Valley Bank.

10  Q.  What did he do?

11  A.  He was vice president and was part of the underwriting as

12  well as managing the portfolio.

13  Q.  How about Ryan Ficks?

14  A.  Same.

15          MR. WALSH:  Okay.  And if we can then --

16          THE WITNESS:  Actually, I think his role was director

17  which is a level below a VP.

18          MR. WALSH:  All right.  If we can dezoom that,

19  please.

20      And, well, I forgot to ask the most important question.

21  Can we zoom that up again.  Just that bottom part.  Sorry.

22              (Exhibit published.)

23  BY MR. WALSH:

24  Q.  What did Mike Rothenberg say in this email?

25  A.  That he's referring to George that the -- a policy
```

JANDU - DIRECT / WALSH

1     attached.

2              **MR. WALSH:**  Okay.  If we can then scroll further,

3     dezoom this, and then go to the next page.

4                        (Exhibit published.)

5              **MR. WALSH:**  Next page down, please.

6                        (Exhibit published.)

7              **MR. WALSH:**  The next page down, please.

8                        (Exhibit published.)

9              **MR. WALSH:**  And the next page down.

10                       (Exhibit published.)

11             **MR. WALSH:**  One more, please.

12                       (Exhibit published.)

13    **BY MR. WALSH:**

14    **Q.**  All right.  Attached here on page 6 of this exhibit, is

15    this beginning to show a -- insurance policy?

16    **A.**  Yes.

17    **Q.**  And is this something that was submitted by Mike

18    Rothenberg in connection with his application for a cash-out

19    mortgage refi- --

20    **A.**  Yes.

21    **Q.**   -- with Silicon Valley Bank in 2014?

22    **A.**  Yes.

23    **Q.**  All right.  Additionally, did you -- or did Mike

24    Rothenberg submit any information from his bank accounts?

25    **A.**  Yes.

```
 1   Q.  I'd like to show you what's been marked Exhibit 10 in

 2   evidence.

 3                    (Exhibit published.)

 4   BY MR. WALSH:

 5   Q.  Do you recognize this document?

 6   A.  Yes.

 7   Q.  What is this document?

 8   A.  It's a Merrill Lynch bank statement.

 9         MR. WALSH:  And if we could zoom on the top part

10   here.

11      Sorry.  The whole -- the whole -- yes, exactly.  Thank

12   you.

13                    (Exhibit published.)

14   BY MR. WALSH:

15   Q.  What does it indicate -- is this a document that -- that

16   Mike Rothenberg submitted to Silicon Valley Bank in connection

17   with his application for two loans?

18   A.  Yes.

19   Q.  And if we could look over on the upper left-hand side,

20   does it indicate a -- when this statement or -- is -- what the

21   date of the statement is effective as?

22   A.  Yes.  July 31st, 2014.

23   Q.  And what does it indicate as a first account on this

24   balance statement?

25   A.  That he has a Merrill checking account.
```

1   **Q.** All right. And what does it indicate, if we go all the

2   way over to the other side, as the market value of that

3   checking account?

4   **A.** $370,060.33.

5   **Q.** And that's because money in the account is similar?

6   **A.** Yes.

7   **Q.** 33 cents off?

8   **A.** Yes.

9   **Q.** Now it indicates that it is a CMA pledged. What does that

10  mean to you?

11  **A.** That he likely has a -- a line of credit on the account.

12  **Q.** All right. And so if we take a look now at the second

13  account here, what does it indicate on this form?

14  **A.** That he has what appears to be credit available of

15  350,529.13.

16  **Q.** Let's just before we even get to that, what is the

17  account, though?

18  **A.** Oh, the Merrill credit line.

19  **Q.** All right. And it has an "as of" date of what?

20  **A.** July 31st, 2014.

21  **Q.** What does it indicate about the available line of credit

22  at that time?

23  **A.** That there's 350,529.13 that's available.

24  **Q.** What does it indicate about the outstanding balance as of

25  July 31st, 2014?

1   **A.**   That there's a zero balance.

2   **Q.**   And then -- now, there's a last account listed here at the

3   bottom.  Do you see that account?

4   **A.**   Yes.

5   **Q.**   What does it indicate -- what is that account?

6   **A.**   It's a personal checking and savings account.

7   **Q.**   All right.  And does it indicate current balance as of

8   July 31st, 2014?

9   **A.**   Yes.  For 9,332.33.

10  **Q.**   And then it has an available balance as well; is that

11  right?

12  **A.**   Yes.

13  **Q.**   What is that balance?

14  **A.**   133,760.17.

15         **MR. WALSH:**   All right.  Now we can take that down.

16  **Q.**   After you collected all of those documents -- and we

17  started off with Exhibit 1, those emails that were submitting

18  all of those documents -- what did you do with them?

19  **A.**   I reviewed them and then when I determined that we had a

20  full package, I sent it to George Pires.

21  **Q.**   Okay.  And the underwriters as well?

22  **A.**   Yes.

23  **Q.**   And did they, following your timeline of how things work,

24  did they produce a summary document of some kind?

25  **A.**   Yes.

1    **Q.**  And then what happened to that summary document?

2    **A.**  It gets submitted to my team and we review it to make sure

3    that everything that we understand to be is accurate before we

4    submit it for final approval to the credit administrator.

5    **Q.**  And the credit administrator is the person who does what?

6    **A.**  Is the final approval authority for the loan requested.

7    **Q.**  All right.  I'd like to show you what's been marked

8    Exhibit 22 in evidence.

9                          (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  Before we zoom in on anything, do you recognize this

12   document?

13   **A.**  Yes.

14   **Q.**  What is this document?

15   **A.**  It's the loan approval sheet for Michael Rothenberg's two

16   requests.

17   **Q.**  And is this the summary document that you were just

18   referring to?

19   **A.**  Yes.

20   **Q.**  And if we look down in the bottom corner, is it 22 pages

21   long at least?

22   **A.**  Correct.

23          **MR. WALSH:**  So let's zoom in on the first part of

24   this, the top little section up here, please.

25                          (Exhibit published.)

 1    **BY MR. WALSH:**

 2    **Q.**   You've half already answered this, but for -- who is the

 3    borrower for this loan approval sheet?

 4    **A.**   Michael Rothenberg.

 5    **Q.**   And what was date this particular document was created?

 6    **A.**   August 6, 2014.

 7    **Q.**   And then your name is in the right-hand corner.  Why is

 8    your name there?

 9    **A.**   Because it requires my recommendation for approval.

10    **Q.**   And why you, in particular, have to make that

11    recommendation?

12    **A.**   Because I managed the portfolio of clients and

13    prospects --

14    **Q.**   And Michael --

15    **A.**   -- for Silicon Valley Bank.

16    **Q.**   Sorry.

17          And is Michael Rothenberg one of those clients?

18    **A.**   Yes.

19              **MR. WALSH:**  All right.  If we can dezoom that.

20          And go down and zoom the request section here.

21                      (Exhibit published.)

22    **BY MR. WALSH:**

23    **Q.**   Now, this form, you're saying -- this is a standard form

24    that Silicon Valley Bank uses for all of its loans?

25    **A.**   Yes.

1    **Q.**   Okay.

2          Under the request section, what is being discussed -- at a

3    high level, what gets into this request section on this form?

4    **A.**   It provides the loan amount, the type of loan, and the

5    structure for each loan request.

6    **Q.**   Okay.  And in this instance, is it seeking -- are there

7    two requests?

8    **A.**   Yes.

9    **Q.**   And let's take the first request.  What is the first

10   request?

11   **A.**   A million 280,000 for a 30-year mortgage.

12   **Q.**   And what is its purpose?  If you could just read the

13   rest --

14   **A.**   To refinance the borrower's existing Stanford Credit Union

15   mortgage.

16   **Q.**   Okay.  Is this the loan that we've been discussing, that

17   application that was submitted; is that right?

18   **A.**   Yes.

19   **Q.**   And this is Mr. Rothenberg's mortgage refinance; is that

20   right?

21   **A.**   Yes.

22   **Q.**   Okay.  And then underneath that request, what does it say

23   about it?

24   **A.**   That we're providing a five-year fixed rate of 2.625.

25   It's secured by a first deed of trust on the property located

1   at 712 Bryant Street, unit 6 in San Francisco.  And it's fixed

2   for five years.  And resets for the next six to 30 years of

3   the loan based on a one-year LIBOR plus two and a quarter.

4   Q.  Okay.  Now let's just -- there's a lot of terms in there.

5   The jury's heard some of them, but let's just walk us through

6   this.

7        What is this first part here that says 5/1 ARM?  What does

8   that mean?

9   A.  It indicates that the first five years is based on a fixed

10  rate, and that after that five-year period is over, it becomes

11  a floating rate and the rate is adjusted once a year.

12  Q.  Got it.  And so that's what's explained in this second

13  sentence here about the fixed rate for five years?

14  A.  Yes.

15  Q.  And how long is this loan for, apparently, with the "6 to

16  30"?

17  A.  It's a 30-year mortgage.

18  Q.  And jury -- the jury has heard this before, but let's just

19  be clear.  What does a one-year LIBOR plus 2.25 percent mean?

20  A.  That's the rate that's -- will be used to determine what

21  the rate will be once the loan converts from fixed to

22  floating.

23  Q.  And LIBOR is what?

24  A.  It's a -- it's a rate that the bank uses for -- for

25  mortgages as well as commercial loans.

1    Q.   Is that a reference rate that's used by a lot of banks?

2    A.   Yes.

3    Q.   That was used in 2014?

4    A.   Correct.

5    Q.   Let's go to the second bullet point here.

6         Could you just read that to the jury?

7    A.   Approval is subject to receipt of appraisal yielding --

8    satisfactory appraisal yielding an LTV of 80 percent with a

9    maximum loan amount of one million two eighty.

10   Q.   Okay.  Couple of things here, one of which is LTV.  You, I

11   think, read it out, but what does LTV stand for?

12   A.   Loan-to-value.

13   Q.   And what does that mean?

14   A.   It's the loan divided by the appraised value of the home.

15   Q.   And then at the end here, you used the term 1.28 million,

16   but that's not actually what's written there.  What's --

17   what's going on on this document here?

18   A.   They omit the thousands.

19   Q.   So it's a -- like an abbreviated portion of it?  Okay.

20   A.   Yes.

21   Q.   Okay.

22        Let's talk about number 2, the second request in this

23   form.  What's described in that?

24   A.   Approval for a new 300,000 capital call line of credit to

25   assist the borrower with his GP commitment to his new Fund II.

1    Q.   Okay.  And is that the capital call line of credit that

2    we've been discussing at length this morning?

3    A.   Correct.

4    Q.   And what does it say about what the terms of that loan

5    will be?

6    A.   That it's a three-year maturity requiring monthly

7    interest-only payments with principal due at maturity.  And

8    that the facility will be priced at Wall Street Journal prime

9    plus one and a half percent with a one percent loan fee of

10   $3,000.

11   Q.   Okay.  Let's just take a moment and unpack a lot of that

12   stuff.

13        So what does maturity mean in this context?

14   A.   That the loan expires in three years.

15   Q.   And how long is the -- or what is being paid during the

16   term of those three years?

17   A.   Interest-only payments monthly.

18   Q.   What does that mean?

19   A.   That every month he's required to pay interest based on

20   the amount outstanding on the line at the time.  And it would

21   be based on the Wall Street Journal prime plus one-and-a-half.

22   Q.   Okay.  That's -- is the Wall Street prime another variant

23   of the LIBOR?

24   A.   It's another --

25   Q.   It's not the same thing, not the same?

 1  **A.**   It's not the same thing, but it's a rate index.

 2  **Q.**   Serves the same purpose?

 3  **A.**   Correct.

 4  **Q.**   It's just a different number?

 5  **A.**   Yes.

 6  **Q.**   What is this 1 percent loan fee that's referenced here?

 7  **A.**   Typically there's a loan fee based on the loan amount.

 8  **Q.**   Okay.  What is that loan fee for?

 9  **A.**   It's an upfront fee that we charge for time involved in

10  processing these types of requests.

11  **Q.**   So that 1 percent goes to Silicon Valley Bank?

12  **A.**   Yes.

13  **Q.**   And in this instance, then, if you do the math, 1 percent

14  of -- well, and let's just be clear here, that's 300.0.  How

15  much is that actually meant?

16  **A.**   300,000.

17  **Q.**   And so 1 percent of that turns out to be?

18  **A.**   $3,000.

19         **MR. WALSH:**  Okay.  If we can dezoom that, please.

20      And go to page 2.  And blow this up here.

21                   (Exhibit published.)

22  **BY MR. WALSH:**

23  **Q.**   Okay.  This section continues on to page 2; is that right?

24  **A.**   Yes.

25  **Q.**   Okay.  What is it indicating here under the topic "Reasons

1    for Recommendation"?

2    A.  The mortgage amount is a million 280.  Do you want me to

3    keep going?

4    Q.  Well, before you read it out, what is the purpose of this

5    section here?

6    A.  It's to outline the reasons for recommending approval for

7    the loan request.

8    Q.  So then things that are listed under here would then be

9    those reasons listed out?

10   A.  Yes.

11   Q.  Okay.  And in here, there is a lot of information; is that

12   right?

13   A.  Yes.

14   Q.  Is this information here generated from any particular

15   source?

16   A.  Yes.

17   Q.  What is that source?

18   A.  It's from the personal financial statement, the tax

19   returns, the mortgage application, the letter confirming the

20   income, credit -- the credit report, and verification of

21   liquidity through bank and brokerage statements.

22   Q.  Okay.  So all of this information here is generated from

23   the documents that we've just been looking at?

24   A.  Yes.

25   Q.  And those documents come from Michael Rothenberg?

1    **A.**    Yes.

2    **Q.**    With the exception of this credit report?

3    **A.**    Yes.

4    **Q.**    Now, there's a notation here.  What does that note say?

5                        (Exhibit published.)

6              **THE WITNESS:**  That the debt-to-income of 69 percent

7    exceeds recommended 50 percent guideline.

8    **BY MR. WALSH:**

9    **Q.**    Okay.  So D/I means debt to income?

10   **A.**    Yes.

11   **Q.**    What is -- let's just explain so we're on the same page.

12   What does that mean?

13   **A.**    It's the debt divided by the income.

14   **Q.**    Is that on a monthly basis or overall basis?

15   **A.**    Either monthly or annually.

16   **Q.**    And what is this figure, 69 percent, that appears?

17   **A.**    That's the debt-to-income ratio that's calculated using

18   the tax returns and the projected payments of the loans that

19   he's applying for.

20   **Q.**    Okay.  And it indicates this (indicating).  It's exceeds

21   recommended 50 percent guideline.

22       What does that mean?  Where is that recommended 50 percent

23   guideline coming from?

24   **A.**    It's a typical requirement that most mortgage lenders have

25   that they don't want the debt-to-income to exceed a certain

 1    percentage of their income.

 2              **MR. WALSH:**  Okay.  If we could dezoom this, please.

 3                        (Exhibit published.)

 4              **MR. WALSH:**  Actually before you dezoom.  Okay.  Well,

 5    that's fine.

 6    **Q.**  Do you see at the bottom there it says, "Please see credit

 7    memo for additional details"?

 8    **A.**  Yes.

 9    **Q.**  Is the credit memo part of this document as well?

10    **A.**  Yes.

11              **MR. WALSH:**  Okay.  Now dezoom that.

12         If you go to page 3.

13                        (Exhibit published.)

14    **BY MR. WALSH:**

15    **Q.**  Without going into details here, what is listed in this

16    section of the form?

17              **MR. WALSH:**  If we could just blow up the top part.

18                        (Exhibit published.)

19              **THE WITNESS:**  It's the terms of each loan request,

20    specific terms.

21    **BY MR. WALSH:**

22    **Q.**  And that's what we were just walking through describing in

23    the request section?

24    **A.**  Yes.

25              **MR. WALSH:**  Okay.  Dezoom that.  And go to the next

 1    page.

 2                    (Exhibit published.)

 3    **BY MR. WALSH:**

 4    **Q.**  All right.  What is contained in this CRR risk

 5    management -- or risk leverage section?

 6    **A.**  It provides the risk rating, the justification for the

 7    risk rating, payment status, and probability of new borrower

 8    payment default, the primary sources of repayment for each

 9    facility.

10    **Q.**  This section here, what is the purpose of this section?

11    **A.**  It's to summarize the credit risks and the mitigants of

12    the loan requests.

13    **Q.**  Okay.  And so a credit risk from a bank's perspective is

14    what?  What is that risk?

15    **A.**  It could be a variety of things, but if you are looking at

16    things like debt-to-income, if you want -- if the bank

17    requires the guideline to be 50 percent or less, then a

18    perceived credit risk would be that the debt-to-income is

19    above that.  And so we would need to find a way to mitigate.

20    **Q.**  Okay.  In the end, though, what is the bank worried about?

21    **A.**  Being repaid back.

22    **Q.**  Okay.  And so this is an assessment of whether or not

23    they're going to get repaid?

24    **A.**  Yes.

25    **Q.**  Okay.  With regard to this, there is a section entitled

1    "Primary Source of Repayment for Facility A."

2        What was facility A?

3    **A.**  The mortgage.

4    **Q.**  Okay.  And then there's a subsection here for facility B;

5    is that right?

6    **A.**  Yes.

7    **Q.**  Okay.  Oh, sorry, it's up here.  I missed it.

8        Okay.

9                    (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  Then underneath it, there is:  Performance to

12   expectations, new borrower covenants required.

13       What is that?

14   **A.**  Sometimes we have certain financial covenants required on

15   more customized lending facilities.

16   **Q.**  What is a covenant?

17   **A.**  It's a requirement that the bank has documented and that

18   the borrower agrees to maintain that covenant throughout the

19   life of the loan.

20   **Q.**  And in this instance here, are there any covenants for

21   facility A?

22   **A.**  No.

23   **Q.**  How about facility B?

24   **A.**  There's a negative pledge on Rothenberg Ventures Fund II.

25   **Q.**  What does that mean?

1   **A.**   That basically means that he agrees to not encumber his

2   ownership in Rothenberg Ventures Fund II.

3   **Q.**   Why is that important to a bank?

4   **A.**   Because it's one of our sources of repayment.

5   **Q.**   How about the next one here?

6   **A.**   No new debt in excess of 100,000 without SVB approval.

7   **Q.**   Why is that important to Silicon Valley Bank?

8   **A.**   Because when we assess debt-to-income, we want the

9   debt-to-income to be maintained so that we can ensure our loan

10   is repaid.

11   **Q.**   We've got another one.  Irrevocable letter of instruction.

12   What's that say?

13   **A.**   Irrevocable letter of instruction.

14          **THE COURT:**   Two-thirds of the way down the page.

15   There's a little purple dot next to it, ma'am.

16          **THE WITNESS:**   Oh, no.  I just -- I'm trying to

17   remember what it was.

18      I don't recall.

19   **BY MR. WALSH:**

20   **Q.**   You don't recall what that is in this instance?

21   **A.**   No.

22      I think it might be the way that the -- the funds are --

23   how the funds are directed.

24   **Q.**   If you don't remember right now, that's fine.

25   **A.**   Okay.

1   **Q.**   And then we've got 75 percent distribution recapture on

2   Fund II.  What does that mean?

3   **A.**   That means that when he receives distributions from

4   Fund II, that 75 percent of it will be used to pay back the

5   loan, the capital call line of credit specifically.

6   **Q.**   All right.  And again at the bottom of this summary page,

7   there's a "see credit memo"?

8   **A.**   Yes.

9   **Q.**   Okay.  Let's keep going here.

10          **MR. WALSH:**   Could we go to the next page, please.

11                          (Exhibit published.)

12  **BY MR. WALSH:**

13  **Q.**   That continues.  More information there.

14          **MR. WALSH:**   If we go to the next, please.

15                          (Exhibit published.)

16  **BY MR. WALSH:**

17  **Q.**   There's a terms and conditions part of this form.  What --

18  what is -- what is in general the high level contained in this

19  section?

20  **A.**   It just shows the security, if there is any, for the loan,

21  as well as other items like repayment terms.

22  **Q.**   And in this instance, it's largely not filled out except

23  for the top part?

24  **A.**   (Reviewing document.)

25          Right.  That's correct.

```
 1              MR. WALSH:  If we could go to the next page, please.

 2                      (Exhibit published.)

 3   BY MR. WALSH:

 4   Q.  All right.  And there's additional information here

 5   contained in this.

 6              MR. WALSH:  I'd like to just scroll down again.  I

 7   don't want to focus on these pages right now.  If we could go

 8   to page 8.

 9                      (Exhibit published.)

10              MR. WALSH:  And then nine.

11                      (Exhibit published.)

12              MR. WALSH:  Ten.

13                      (Exhibit published.)

14              MR. WALSH:  And 11.

15                      (Exhibit published.)

16   BY MR. WALSH:

17   Q.  This is now for Facility B, this is the capital call line

18   of credit.

19   A.  Yes.

20   Q.  Same terms and conditions; is that right?

21   A.  Yes.

22              MR. WALSH:  In we could scroll through those again.

23                      (Exhibit published.)

24              MR. WALSH:  Next page, please.

25                      (Exhibit published.)
```

```
 1              MR. WALSH:  Next page, please.

 2                   (Exhibit published.)

 3              MR. WALSH:  Next page, please.

 4                   (Exhibit published.)

 5              MR. WALSH:  And next page.

 6                   (Exhibit published.)

 7   BY MR. WALSH:

 8   Q.  Okay.  Now that we're at page 16 of Exhibit 22, what's

 9   this part?

10   A.  The credit memorandum.

11   Q.  Okay.  So this is the credit memorandum that various other

12   earlier pages has referred to?

13   A.  Yes.

14              MR. WALSH:  Let's blow up the top here (indicating).

15                   (Exhibit published.)

16   BY MR. WALSH:

17   Q.  And let's -- okay.  Sure.

18       It has a date of 8/7 of 2014; is that right?

19   A.  Yes.

20   Q.  All right.  And it has requests again are restated here.

21       Who prepares this credit memorandum?

22   A.  The underwriters.

23   Q.  And is this another summary of everything that's being

24   discussed and whether or not to approve the loans that are

25   being requested by Michael Rothenberg?
```

```
 1    A.   Yes.

 2    Q.   And this section here under request one, this restates

 3    what we just walked through; is that right?

 4    A.   Correct.

 5         MR. WALSH:   If we could dezoom that.  And highlight

 6    Section 2 here again.

 7                    (Exhibit published.)

 8    BY MR. WALSH:

 9    Q.   And this again summarizes what we've already walked

10    through with regard to the capital call line of credit?

11    A.   Yes.

12         MR. WALSH:   Okay.  We can dezoom that.

13    Q.   And then starting here, there's something called a deal

14    summary.

15         MR. WALSH:   Could we blow that up?

16                    (Exhibit published.)

17    BY MR. WALSH:

18    Q.   What starts happening here?  Or what's being done in this

19    form?

20    A.   It summarizes the requests.

21    Q.   All right.  And this is like more in a written form than

22    in a bullet point form?

23    A.   Correct.

24         MR. WALSH:   If we can dezoom that, please.

25                    (Exhibit published.)
```

 1              MR. WALSH:  "Borrower & Firm."

 2                      (Exhibit published.)

 3     BY MR. WALSH:

 4     Q.   Is this again a -- well, what is this?

 5     A.   It's a summary of the borrower and the firm.

 6              MR. WALSH:  All right.  If we can dezoom that.

 7                      (Exhibit published.)

 8     BY MR. WALSH:

 9     Q.   And is some of that information the type of information

10     that's generated from those slide shows that we were just

11     looking at earlier, Exhibits --

12     A.   Correct.

13     Q.   -- 13 through 15, I believe?

14     A.   Yes.

15              MR. WALSH:  If we can go to page 17 of Exhibit 22.

16          And do the Personal Financial Condition section, please.

17                      (Exhibit published.)

18     BY MR. WALSH:

19     Q.   All right.  What is this section detailing?

20     A.   It's just describes in length the personal financial

21     condition of the borrower as well as the credit history.

22     Q.   All right.  Is there a section or a sentence here, could

23     you read to the jury starting right there (indicating), about

24     his debt?

25     A.   Yes.  It's his current debt is comprised of a mortgage on

 1   his existing primary residence which will be refinanced by the

 2   proposed SVB mortgage.  210.4 thousand in student loans.

 3   **Q.**  And let me just stop you real quick.  There's a letter

 4   tilde in front of that.  What does that mean?

 5   **A.**  Approximately.

 6   **Q.**  Okay.  Great.  If you could continue on?

 7   **A.**  3.1 thousand in credit card debts and residual callable

 8   capital.

 9   **Q.**  Okay.  Most of that, I think, is intelligible.  What does

10   this residual callable capital mean?

11   **A.**  That he still has an obligation to the fund that will be

12   called upon.

13          **MR. WALSH:**  All right.  If we could dezoom that,

14   please.

15       Now, if we could turn to the next page, please.

16                    (Exhibit published.)

17          **MR. WALSH:**  And to the next page.

18                    (Exhibit published.)

19   **BY MR. WALSH:**

20   **Q.**  Okay.  On page 19 of Exhibit 22, is there a name for this

21   page, this particular page in this form?

22   **A.**  Yes.

23   **Q.**  What's it called?

24   **A.**  It's referred to as a spread.

25   **Q.**  Okay.  The spread or a spread?

1    **A.**  The spread, yes.

2    **Q.**  Right.

3          **MR. WALSH:**  If we could zoom in on the boxed part

4    here.

5       We're going to have to do more zooms than that.

6       Okay.  Let's dezoom that and let's just start at the top

7    and so it's -- let's just do this part (indicating.)

8                    (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**  Okay.  Well, let's walk through the -- well, first of all,

11   what is the spread?  Other than this form.  What is its

12   purpose?  What does it do?

13   **A.**  It pulls together all of the key factors that we look at

14   when analyzing whether or not we'd like to approve a loan.

15   **Q.**  And so here, at this top part that I've blown up for

16   the -- currently, there are a couple of things here.  A

17   facility A and a facility B.  What is the facility A in this

18   instance?

19   **A.**  The mortgage for a million 280.

20   **Q.**  And what is facility B?

21   **A.**  The capital call line of credit for 300,000.

22   **Q.**  And then it has a series of rows that are labeled on the

23   side.  Do you see that?

24   **A.**  Yes.

25   **Q.**  And those are -- then filled out as we've described

```
 1   already by looking at an earlier portion of this document; is

 2   that --

 3   A.   Correct.

 4   Q.   What's going on over here on this side?

 5   A.   It shows the real estate equity available.

 6   Q.   What is that?

 7   A.   The equity available on the property.

 8   Q.   And again, just so we're on the same page, what does

 9   equity available mean?  Equity available on the property mean?

10   A.   So when we obtain an appraisal, we usually can advance up

11   to 80 percent of that appraised value.  And then when you take

12   into account the first mortgage, what -- what is -- what is

13   left is the real estate equity available to borrow for

14   320,000.

15   Q.   And that's most relevant in the context of a cash-out

16   refi?

17   A.   Correct.

18   Q.   Because that's the cash that might be coming out?

19   A.   Yes.

20   Q.   What are the -- just so we're on the same page, what does

21   first DOT LTD mean?

22   A.   The first deed of trust loan to value.

23   Q.   And what does CLTV mean?

24   A.   Combined loan to value.

25   Q.   What's the difference between those two?
```

1   **A.**   Sometimes there's an equity line, and so we would need to

2   take that into account.

3   **Q.**   Are you talking about a home equity line of credit?

4   **A.**   Yes.

5   **Q.**   Those are sometimes called a HELOC?

6   **A.**   Correct.

7   **Q.**   All right.  What does gross income DTI mean?

8   **A.**   It's the gross income based on the gross income on the tax

9   returns.

10  **Q.**   And what is DTI?

11  **A.**   Debt to income.

12  **Q.**   Credit score, is that taken from the credit report that we

13  were looking at?

14  **A.**   Correct.

15  **Q.**   And then in the bottom corner down here, what's being

16  discussed?

17  **A.**   It's the post liquidity estimate.

18  **Q.**   What does that mean?

19  **A.**   So we take what we verified as liquid assets, so bank

20  statements and brokerage statements, and then we add any

21  cash -- cash-out funds to that balance to derive a monthly

22  contractual reserve number.

23  **Q.**   Okay.  Now, let's -- there's a lot in there.  The -- first

24  of all, it's post close.  So what is it assuming happens?

25  **A.**   That after we fund the loan, that that's what the

1    borrower's liquidity looks like.

2    Q.   So that's what close means, funding the loan?

3    A.   Yes.

4    Q.   And so --

5    A.   After funding.

6    Q.   Sorry.  What?

7    A.   After funding, yes.

8    Q.   And this number is the sum of current liquidity plus any

9    cash out?

10   A.   Yes.

11   Q.   And then what -- what does this monthly contractual

12   reserves mean?

13   A.   We divide the debt into either monthly or annualized.  And

14   we divide it into the liquidity to come up with a contractual

15   reserve number.  And the bank usually requires between six to

16   12 months.

17   Q.   Okay.  Now, when you're saying contractual reserves, is

18   that how many months this liquidity gives to pay the monthly

19   due on a mortgage loan?

20   A.   Yes.  But not just the mortgage loan.  All -- it includes

21   all of his debts.

22   Q.   So all of his debts with this much money left behind would

23   allow him to pay his debts for 43 months?

24   A.   Correct.

25   Q.   Is that the calculation?

 1    A.   Yes.

 2              MR. WALSH:   All right.  Let's dezoom that, please.

 3         And let's do this next section here.

 4                        (Exhibit published.)

 5    BY MR. WALSH:

 6    Q.   All right.  There are a number of boxes here.  One of them

 7    is entitled "Assets and Liabilities."

 8         What's supposed to be included in that section?

 9    A.   It's typically what's been stated on the either personal

10    financial statement or the mortgage application.

11    Q.   All right.  And so in this instance, there are columns

12    here.  There's "Assets and liabilities."  There's a

13    "Comments."  What's included in the comments?  What type of

14    information?

15    A.   Oh, the details of each asset and liability.

16    Q.   And then there's a date, 7/29/14.  Why is that date there?

17    A.   That's the date of the application that we received.

18    Q.   And then on the far side there's a "Post Purchase," right?

19    A.   Yes.

20    Q.   Is that assuming that the purchase goes through?

21    A.   Yes.

22    Q.   Okay.

23    A.   Or the refinance.

24    Q.   All right.

25         So let's just walk through these.  What's -- what was

1   listed here?  What's under cash at SVB?

2   **A.**  There's 413,442 post purchase.

3   **Q.**  Got it.  And so that's post purchase.  But beforehand it's

4   zero?

5   **A.**  Yes.

6   **Q.**  Other cash, it says.  What is listed in the comments?

7   **A.**  So he has the Merrill Lynch account that had $370,060.

8   And post purchase, we expected that to be $270,062.  And that

9   would be based on his funding of the -- his portion of the

10  capital call commitment.

11  **Q.**  So the capital call commitment he told you was how much

12  money?

13  **A.**  400,000 total.

14  **Q.**  And how much of that he was going to contribute

15  personally?

16  **A.**  100,000.

17  **Q.**  And so the difference there accounts for that?

18  **A.**  Correct.

19  **Q.**  There's a little V next to that number.  What does that

20  little V mean?

21  **A.**  That it's been verified through bank and brokerage

22  statement.

23  **Q.**  And is that the Exhibit 10 that we were looking at before,

24  that Merrill Lynch balance statement?

25  **A.**  Correct.

 1    **Q.**   There's no marketable securities listed.

 2          And then there's a partnership business interest.   What is

 3    indicated there?

 4    **A.**   I believe that's the capital that he owns in Rothenberg

 5    Ventures Management.

 6    **Q.**   And that goes from what figure to what figure?

 7    **A.**   From 66,800 to 466,800.

 8    **Q.**   What explains that?

 9    **A.**   His $400,000 commitment into the fund.

10    **Q.**   Under private investments, we again see this Audax Equity

11    and private holdings appear?

12    **A.**   Yes.

13    **Q.**   Is that taken from that Exhibit 3, the assets and

14    liabilities sheets that Mr. Rothenberg submitted?

15    **A.**   Yes.

16    **Q.**   And that apparently stays at the same value of what to

17    what?

18    **A.**   46,742.

19    **Q.**   Listed as an asset here is something called RE-Primary.

20    What is that?

21    **A.**   Real estate primary.

22    **Q.**   What does primary mean in that context?

23    **A.**   It's the borrower's primary residence.

24    **Q.**   And then it lists the 712 Bryant Street; is that right?

25    **A.**   Correct.

1    **Q.**   And this figure here is what?

2    **A.**   A million six.

3    **Q.**   Where is that coming from?

4    **A.**   That comes from the personal financial statement and the

5    borrower's estimate of the value of the property.

6    **Q.**   And then that's all totaled up.  What is the total

7    representation of his assets?

8    **A.**   $2,083,604.

9    **Q.**   And after the loans are -- the two loans would be

10   funded -- sorry -- what is it estimated that it will be?

11   **A.**   $2,797,046.

12   **Q.**   Okay.  Those are the assets.

13         Now in this second column here, it's the liabilities; is

14   that right?

15   **A.**   Yes.

16   **Q.**   What -- you've got SVB Mortgage Facility A and SVB CCLOC

17   Facility B listed.  Do you see those?

18   **A.**   Yes.

19   **Q.**   So we're all clear, what are those?

20   **A.**   The two loans that the applicant has applied for.

21   **Q.**   All right.  And therefore they don't exist at present, but

22   they do after the fact; is that right?

23   **A.**   Yes.

24   **Q.**   And at this time, it's the 1.28 and the 300,000; is that

25   right?

JANDU - DIRECT / **WALSH**

1  **A.**  Yes.

2  **Q.**  What is the third line here?

3  **A.**  Real estate debt on existing primary residence.

4  **Q.**  And what is listed as that?

5  **A.**  It's the existing Stanford Credit Union loan for 866,558.

6  **Q.**  So that's the existing mortgage?

7  **A.**  Yes.

8  **Q.**  And it's apparently held by Stanford Federal Credit Union?

9  **A.**  Yes.

10 **Q.**  And it exists at the time of this application, but what

11 happens to it if the loans go through?

12 **A.**  It's paid off with the first request which is the

13 mortgage, cash-out refinance.

14 **Q.**  What does this form indicate about credit card debt?

15 **A.**  That he has an Amex and Citibank credit card with $3,060

16 outstanding.

17 **Q.**  And that's projected to stay the same?

18 **A.**  Yes.

19 **Q.**  How about the student loans?

20 **A.**  He has two hundred ten thousand four hundred forty

21 thousand [sic] outstanding.

22 **Q.**  And that is also projected to remain outstanding, is that

23 right?

24 **A.**  Correct.

25 **Q.**  Here comes that remaining callable capital that was

1  discussed on an earlier page.  What is that?

2  **A.**  That's his obligation to the fund for 400,000.

3  **Q.**  And you can just --

4  **A.**  And specifically for Fund II.

5  **Q.**  Got it.

6  And it exists before the loan, but after the loan, what

7  happens?

8  **A.**  It's no longer there because he would have funded it with

9  our loan as well as his portion.

10 **Q.**  All right.  And that again, just so we're on the same

11 page, that's the 300,000 loan plus --

12 **A.**  Plus the hundred thousand.

13 **Q.**  Plus the hundred thousand.

14 All right.  And then there are some -- something called

15 "Other Contingent Liabilities" listed.

16 **A.**  Recourse liabilities per the K-1 statements --

17                     (Simultaneous colloquy.)

18 **BY MR. WALSH:**

19 **Q.**  Before you go any further, those are the K-1 tax forms

20 that we were looking at before?

21 **A.**  Correct.

22 **Q.**  Is that right?

23 Those are exhibit, I believe it's 7.  Let me make sure I

24 have the right exhibit.  Yes, Exhibit 7.

25 **A.**  Yes.

1    Q.   And the bank looked at those and concluded how much was a

2    liability?

3    A.   $123,009.

4    Q.   And that's projected to remain the same as well?

5    A.   Yes.

6    Q.   All told then, what are the liabilities before the loan?

7    A.   A million six hundred three dollars and sixty-seven cents.

8    Q.   And after the loan?

9    A.   A million nine hundred sixteen thousand five hundred nine

10   dollars.

11   Q.   And then we've got a net worth calculation here; is that

12   right?

13   A.   Yes.

14   Q.   What does that mean?

15   A.   It's his assets less his liabilities.

16   Q.   So asset number minus his liabilities?

17   A.   Yes.

18   Q.   Before the loan is how much?

19   A.   480,537.

20   Q.   And after?

21   A.   880,537.

22   Q.   Does that make sense?

23   A.   Yes.

24   Q.   Why is that?

25   A.   Because he's taking out a cash-out refinance which

 1    replenishes some of his liquidity.  But he's also gaining the

 2    asset of his commitment into Fund II.

 3            MR. WALSH:  All right.  If we can close out this

 4    zoom, please.

 5        And then do this section down here (indicating).  Thank

 6    you.

 7                        (Exhibit published.)

 8    BY MR. WALSH:

 9    Q.  Okay.  What happens in this section?  Just again before we

10    get into any details, what's going on in this section of this

11    form, the spread?

12    A.  It takes into account all of what we've verified through

13    bank statements, tax returns, K-1's, and verification of

14    income, and to derive a debt-to-income number.  And it also

15    lists all of his monthly obligations.

16    Q.  Okay.  So this is -- so this first section here, income

17    and expenses, what type of information is listed there?

18    A.  His employment salary from Rothenberg Ventures, his income

19    from Golden Opportunity LLC, his rental income that he

20    receives that's on his Schedule E on his tax returns, and the

21    partnership distributions that he receives through the K-1's.

22    Q.  Okay.  Now let's just take a pause here.

23        There are different years being reflected here; is that

24    right?

25    A.  Correct.

1   **Q.**   And so this is trying to trace over time; is that right?

2   **A.**   Yes.

3   **Q.**   This figure up here in the top right (indicating), where

4   did that come from?

5   **A.**   That's an annualized figure that was verified through

6   Thomas Leep's -- or the director of finance for Rothenberg

7   Ventures.

8   **Q.**   Okay.  That was Exhibit 8, that letter?

9   **A.**   Yes.

10  **Q.**   And it said for the first half of 2014, it was 220?

11  **A.**   Yes.

12  **Q.**   So when you say annualized, what did you do?  Or what did

13  the bank do?

14  **A.**   We're estimating that he earns the same amount of income

15  for the remaining part of the year.

16  **Q.**   All right.  And for 2014, no other figures are listed in

17  that category; is that right?

18  **A.**   Yes.

19  **Q.**   And then there's taxes due.

20      And then there's a net income figure that's derived for

21  2014; is that right?

22  **A.**   Yes.

23  **Q.**   What is that figure?

24  **A.**   254,036.

25  **Q.**   Now, let's go to the expenses categories here.

1          What ends up in that category?

2                          (Exhibit published.)

3    **BY MR. WALDINGER:**

4    **Q.**  What type of information?

5    **A.**  The first mortgage payments, his homeowners insurance

6    payments, homeowners' association dues, credit card payments,

7    and student loan debt payments.

8               **THE COURT:**  Mr. Walsh, anytime in the next five

9    minutes.

10              **MR. WALSH:**  Okay.  Thank you.

11              **THE WITNESS:**  It also includes the projected payments

12   or annual payments for the two loan requests that are in

13   consideration.

14   **BY MR. WALSH:**

15   **Q.**  Got it.  So for the 2013 year, those don't exist, but for

16   the 2014 year they would exist?

17   **A.**  Yes.

18   **Q.**  And what is the projected total expenses -- well, let's

19   start with 2013 beforehand?

20   **A.**  $78,015.

21   **Q.**  And once these loans, if they were to be approved, what

22   does it end up being?

23   **A.**  $175,612.

24   **Q.**  And -- okay.  So then what happens?  How does these last

25   two items get completed?  How does those numbers get worked

1  out?

2  **A.**  So you're dividing the annual debt obligations by the

3  annual income projected, to come up with a debt-to-income

4  ratio.

5  **Q.**  So it's this 175 divided by the income, the debt divided

6  by the income; is that right?

7  **A.**  Correct.

8  **Q.**  And that gives you a percentage?

9  **A.**  Yes.

10  **Q.**  And then the 2014 year, does it -- what percentage does

11  that come out to be?

12  **A.**  69 percent.

13  **Q.**  Right above that there's a number that is associated with

14  discretionary income.

15  **A.**  Yes.

16  **Q.**  What does that mean?

17  **A.**  That's the income available once expenses have been paid.

18  **Q.**  So that's your expenses subtracted from your income?

19  **A.**  Yes.

20  **Q.**  That leaves you money that you can go to the movies with?

21  **A.**  Yes.

22  **Q.**  Okay.

23        **MR. WALSH:**  If we'd dezoom this, please.

24  I think this is a great place to stop.

25        **THE COURT:**  Very good.

1    Members of the jury, thanks for all your close attention.

2    It's Thursday, which means that you all get a break.  So I

3    hope you have a great weekend.  And I look forward to seeing

4    you bright and early Monday morning at 8:30.

5    Remember, the evidence is still coming in so please keep

6    an open mind.  Don't talk to anybody about the case.  Don't

7    look anything up on the Internet.

8    Thanks so much.  See you in a few days.

9         THE CLERK:  Please rise for the jury.

10   (The following proceedings were heard out of the presence

11   of the jury:)

12        THE COURT:  All right.  Ms. Jandu, you can step down

13   if you want.  I'll order you back on the stand on Monday

14   morning.

15   What have we to discuss, if anything, Mr. Waldinger?

16        MR. WALDINGER:  The only thing, Your Honor said you

17   were going to discuss about estimate of time, and I can give

18   my best prognostication on that.

19   We didn't get as far with Ms. Jandu as we'd hoped.  We'd

20   hoped to start with another SVB witness.  I still think, given

21   the way that the evidence is coming in, we'll likely be able

22   to cut some witnesses off of our list.  Definitely we'll go

23   through Monday and Tuesday of next week.  And I feel like we

24   could certainly finish by Wednesday of the following week, try

25   to shoot for Tuesday of the following week.  But if everything

```
1    goes swimmingly.

2              THE COURT:  Okay.  Anything else for the record?

3              MR. WALDINGER:  That's it.

4         Mr. Fakhoury and I need to continue to discuss a limiting

5    instruction.  And we can give more information now if Your

6    Honor wants it, or we can continue to work on that.

7              THE COURT:  I think you can just tell me when it's

8    done.

9         Mr. Fakhoury, anything else for the record?

10             MR. FAKHOURY:  No, Your Honor.  Thank you.

11             THE COURT:  Are you able at this time to shed any

12   further light on the potential length of trial?

13             MR. FAKHOURY:  I would imagine if the government

14   finishes with witnesses on Tuesday -- I think that's what you

15   said -- of the following week, not next week --

16             THE COURT:  Yes.

17             MR. FAKHOURY:  -- but the week after, I would imagine

18   we'd be closing on Wednesday.

19             THE COURT:  Okay.  Which would leave Thursday and

20   potentially Friday for deliberations.

21             MR. FAKHOURY:  Correct.

22             THE COURT:  Without having to spill into that

23   Thanksgiving week.  But we left that open as a possibility.

24        All right.  Very good.  Thank you all.  Have a good

25   weekend.
```

1          **MR. FAKHOURY:**  Thanks, Your Honor.

2          **THE COURT:**  We'll see everyone on Monday.

3          **THE CLERK:**  Court is in recess.

4            (Proceedings were concluded at 1:35 P.M.)

5                         --o0o--

6

7

8                   **CERTIFICATE OF REPORTER**

9

10          I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12   I further certify that I am neither counsel for, related to,

13   nor employed by any of the parties to the action in which this

14   hearing was taken, and further that I am not financially nor

15   otherwise interested in the outcome of the action.

16

17   _____

18          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

19                 Friday, November 4, 2022

20

21

22

23

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**