UNITED STATES DISTRICT COURT          *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 5** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 805 - 1032 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, November 7, 2022 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:            STEPHANIE M. HINDS, ESQ.
                          United States Attorney
                          1301 Clay Street, Suite 340S
                          Oakland, California  94612
                   BY:  KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:            Moeel Lah Fakhoury LLP
                          1300 Clay Street, Suite 600
                          Oakland, California  94612-1427
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:              Raynee H. Mercado
                          CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1                          **I N D E X**

2

3

      **GOVERNMENT'S WITNESSES**                    **PAGE**      **VOL.**

4

5     JANDU, MICHELLE

6     DIRECT EXAM (RESUMED) BY MR. WALSH             815          5

7     CROSS-EXAMINATION BY MR. FAKHOURY              832          5

8

9     BRUNK, PAULETTE

10    DIRECT EXAMINATION BY MR. WALDINGER            895          5

11    CROSS-EXAMINATION BY MR. FAKHOURY              927          5

12

13    ROBERTSON, INGRID

14    DIRECT EXAMINATION BY MR. WALSH                932          5

15    CROSS-EXAMINATION BY MR. FAKHOURY              992          5

16

17    YAMATO, HAPI

18    DIRECT EXAMINATION BY MR. WALSH               1002          5

19                        **E X H I B I T S**

20

21    **GOVERNMENT'S EXHIBITS**    **W/DRAWN**     **IDEN**     **EVID**    **VOL.**

22    29                                                        912          5

23    30                                                        916          5

24

25                         --o0o--

```
 1    Monday November 7, 2022                         8:08 A.M.

 2                        P R O C E E D I N G S

 3                            --o0o--

 4        (The following proceedings were heard out of the presence

 5    of the jury:)

 6            THE CLERK:  Your Honor, now calling criminal matter

 7    20-266, United States v. Michael Brent Rothenberg.

 8        If counsel could please state their appearances for the

 9    record, starting with the government.

10            MR. WALDINGER:  Good morning, Your Honor. Kyle

11    Waldinger and Nicholas Walsh on behalf of the United States.

12            MR. FAKHOURY:  Good morning, Your Honor.  Hanni

13    Fakhoury on behalf of Mr. Rothenberg.  He's present.

14            THE COURT:  Good morning to you.  Good morning to

15    everyone else.

16        The parties filed something on Sunday at Docket number 184

17    called Joint Request for Guidance Re Evidence of Movement of

18    Money.

19        Would anyone like to be heard in addition to what's

20    contained in that document?

21            MR. WALDINGER:  No, Your Honor.  Other than just to

22    say that, you know, the evidence that we intend to present

23    will show the -- these movements of money.  And the government

24    is -- is intending to present that evidence.  And we think a

25    limiting instruction is appropriate to the extent that's --
```

 1    the evidence is going to show that some of it originated from

 2    one of the funds.  But otherwise we think it's relevant to

 3    prove certainly the scheme to defraud.

 4            **THE COURT:**  Mr. Fakhoury?

 5            **MR. FAKHOURY:**  Think the only thing I'll add, Your

 6    Honor, beyond what's in the brief is the issue is not so much

 7    that there's evidence of movement of money, but rather how

 8    that gets characterized.  And that's what I think my primary

 9    concern is.

10        And so beyond, that, Your Honor, I'll submit on what's on

11    the brief.

12            **THE COURT:**  I think this evidence is admissible.  And

13    I don't think the admission of this evidence contravenes or

14    violates the Court's prior rulings.

15        This is not 404 evidence.  This isn't evidence of some

16    other act or some other crime.  This is evidence, if it's

17    accepted by the jury, of the crime he's on trial for here.  He

18    made representations concerning his net worth and liquidity,

19    and if those representations included relying on money that he

20    did not have a lawful unencumbered ownership interest in, that

21    goes in the pot.  And it's not about misleading or defrauding

22    the investors.  It's about misleading or defrauding the bank.

23        So I think it's admissible.  I do think there needs to

24    be -- I agree with the parties there needs to be a limiting

25    instruction.

1        I don't think the defendant's modified disputed jury

2   instruction 18 captures it because this evidence is not being

3   admitted for one of the purposes described in that proposed

4   modified instruction.

5        And I would say the same thing about modified

6   instruction 20.  This isn't, you know, motive or opportunity

7   evidence, I don't think.

8        So my -- I think my question for Mr. Fakhoury would be is

9   there something about the limitations expressed in the

10  government's modified disputed jury instruction number 19 that

11  does not capture the purposes for which this evidence is being

12  offered?  And normally in this instruction we don't tell the

13  jury -- and definitely don't think about it for this other

14  reason, we just make it general -- but is there language like

15  that the defendant wants the Court to consider?

16            **MR. FAKHOURY:**  I think, Your Honor, with respect

17  to -- oh, I guess maybe the way -- I hope this answers the

18  Court's -- Your Honor's question, which is the instruction

19  proposed by the government, the concern I have with it is it

20  effectively within the instruction makes the argument for

21  them, which they can argue it in closing.  So I'm specifically

22  referring to the last sentence that says, "I instruct you that

23  this evidence is admitted only for the limited purpose of

24  showing that the defendant acted with the intent to defraud

25  Silicon Valley Bank, devised a scheme to defraud

1    Silicon Valley Bank, and/or executed a scheme to defraud

2    Silicon Valley Bank, and therefore you must consider it only

3    for that limited purpose and not for any other purpose.

4        I guess I would prefer a more general instruction.  The

5    one that I proposed I think was number -- I know the Court

6    said it was not inclined for number 20 or number 18.  I would

7    propose my instruction number 19.

8        The only other thing I would add is I think we should have

9    the instruction both before the evidence comes in with the

10   specific witness, and then I'll ask again for it in the

11   closing instructions given in the charge to the jury.

12           **THE COURT:**  Well, the problem I have with the

13   defendant's instruction 19 is that it doesn't say what the

14   limited purpose is.  It strikes out that language.  And if I'm

15   not considering the defendant's proposed 18 or 20, I'm left

16   with nothing.  So that's not going to work.

17       What I if I take the government's proposed modified 19 on

18   page 12 of your joint brief and change the language of the

19   last sentence so that it reads, "You may consider this

20   evidence only for the limited purpose of determining whether

21   the defendant acted," et cetera.

22           **MR. FAKHOURY:**  That would be preferable to what's

23   proposed by the government, Your Honor.

24           **THE COURT:**  Mr. Waldinger, do you have any objection

25   to that?

1    **MR. WALDINGER:**  No, Your Honor.

2        **THE COURT:**  That will be the Court's order.

3    Mr. Waldinger, could I ask your office, please, just to

4    type up that instruction with those modifications as a

5    separate document?

6        **MR. WALDINGER:**  We'll do that, Your Honor.  Later

7    today is fine?

8        **THE COURT:**  That's fine.  I'll keep my annotated copy

9    at the bench.  I'll have this available to me whenever I need

10   it, but I just think it'd be nice to have a clean document.

11       When do we think this evidence will come in?  Do we think

12   it will come in today?

13       **MR. WALDINGER:**  I don't think so unless we go

14   amazingly fast.  The witnesses would be Mr. Thomas Leep and

15   Mr. J.R. Eppler.  Mr. Leep was the director of finance of

16   Rothenberg Ventures when Mr. Rothenberg was there.  And

17   Mr. Eppler now is the manager of that company.  And so I don't

18   think we'll get to them today.  I think it will be tomorrow.

19       **THE COURT:**  Okay.  As far as when I give the

20   instruction, I don't know that I have a strong view.

21   Mr. Waldinger, the defendant has asked that I give the

22   instruction both before and after the testimony.  I think

23   my -- I'll modify that -- I'll modify the defendant's proposal

24   slightly to say do you object to my giving the instruction

25   before the testimony comes in, and then at the end whatever

 1    day the testimony is received?

 2           **MR. WALDINGER:**  That's fine with the -- with the

 3    government.  Are you --

 4           **THE COURT:**  Actually I don't even like that proposal.

 5    I don't like my own proposal.

 6           **MR. FAKHOURY:**  To be clear, Your Honor, what I had

 7    requested was before the evidence comes in and in the final

 8    jury instructions, meaning --

 9           **THE COURT:**  Oh, I see, okay.  Well, that's -- then I

10    don't need to have any further discussion.  That's what I

11    would do in the ordinary course.  Fine.

12           **MR. WALDINGER:**  And when you say before the evidence

13    comes in, should I -- should we do it before the witness?  Or

14    should I signal to the Court and counsel that here's where I

15    think we're getting into this evidence with this witness at

16    this time?

17           **THE COURT:**  I think the latter so that the jury can

18    attach the one to the other more easily.

19           **MR. WALDINGER:**  That's what I intend to do.

20           **THE COURT:**  Okay.  Terrific.

21        Gentlemen, what else do we have to do before the jury

22    comes in?

23           **MR. WALDINGER:**  I think that's it, Your Honor.  We

24    have Ms. Jandu we'll finish up with today.  We're hoping to

25    get through her and three other witnesses today.

 1              **THE COURT:**  Terrific.

 2              **MR. WALDINGER:**  Yes.

 3              **THE COURT:**  I thank you both for this brief.  It was

 4     very clear.  It was very well written on both sides.  It

 5     wasn't too long.  And you did it on the weekend so that we

 6     could just resolve all this first thing Monday morning.  So

 7     thank you.

 8         All right.  I will get off the bench and wait for the

 9     jurors.

10              **MR. FAKHOURY:**  Thank you, Your Honor.

11              **MR. WALDINGER:**  Thank you, Your Honor.

12              **THE CLERK:**  Court in recess.

13         (Recess taken at 8:17 A.M.; proceedings resumed at

14     8:35 A.M.)

15         (The following proceedings were heard in the presence of

16     the jury:)

17              **THE CLERK:**  You may be seated.

18              **THE COURT:**  All right.  Good morning.

19              **JURORS:**  Good morning.

20              **THE COURT:**  That was good.

21         Welcome back to this trial.  As you know, it's a short

22     week.  We're just in session on Monday and Tuesday this week.

23         We got some more rain.  That was great.  We really need

24     the rain.  Makes me happy.  And the best is when it rains and

25     then you wake up and it's sunny.  So you've got the rain but

 1   then you get that clean air.  That's what happened this

 2   morning.  So it's supposed to rain a little bit off and on

 3   this week.  We'll see what happens.

 4        On Friday we were in the midst of Ms. Jandu's testimony.

 5   Is she here?

 6             **MR. WALSH:**  She waiting.

 7             **THE COURT:**  She's waiting.  Very good.  Let's bring

 8   her in.  Then we'll resume with the testimony.

 9        Any college football fans in the jury?

10        Not really.  That's interesting.  A little bit.

11        Yeah, I don't watch that much, but I clerked in Alabama.

12   So I had to watch the Alabama-LSU game.  That was sad how that

13   turned out, I thought.

14        Good morning, Ms. Jandu.

15             **THE WITNESS:**  Good morning.

16             **THE COURT:**  You already know what to do with that

17   mask.  You're an old hand at that now.

18             **THE WITNESS:**  I think I did that right.

19             **THE COURT:**  Yeah, perfectly.  Okay.

20        Ms. Jandu, I'll just remind you that you're still under

21   oath.

22        Mr. Walsh, your witness.

23             **MR. WALSH:**  Thank you very much.

24   /////

25   / / /

1          **MICHELLE JANDU**,

2     called as a witness by the plaintiff, having been previously

3     duly sworn, continued testifying as follows:

4                    **DIRECT EXAMINATION (Resumed)**

5     BY MR. WALSH:

6     **Q.**   Good morning, Ms. Jandu.

7     **A.**   Good morning.

8     **Q.**   You'll recall that on Thursday, we had just walked through

9     the loan approval form for Mr. Rothenberg's proposal for two

10    different loans.

11         Do you recollect all that testimony?

12    **A.**   Yes.

13    **Q.**   And as a result of that form, did you approve it and send

14    it on?

15    **A.**   Yes.

16    **Q.**   To whom does it go, after you do your approval?

17    **A.**   It goes to the credit administrator who was Buzz Kreppel

18    at the time.

19              **THE COURT:**  Would you say that name again, please?

20              **THE WITNESS:**  Buzz Kreppel.

21              **THE COURT:**  Thanks.

22    BY MR. WALSH:

23    **Q.**   K-R-E-P-P-E-L?

24    **A.**   Yes.

25    **Q.**   And as a result of that, did the capital call line of

1    credit actually end up getting funded?

2    A.   Yes.

3    Q.   However, are you aware of whether or not an appraisal came

4    in during this time period?

5    A.   Yes.

6    Q.   And was that for a higher amount than had been expected?

7    A.   Yes.

8    Q.   As a result of that, what had to happen?

9    A.   We would inform the borrower if he had the option to

10   increase his loan amount or if they wanted to keep it the

11   same.

12   Q.   All right.  And in this instance, do you recollect what

13   happened?

14   A.   I believe we increased the loan amount by 200,000.

15   Q.   And once that's done, is there a new approval form that

16   needs to get completed by Silicon Valley Bank?

17   A.   Yes.  They usually have to put an addendum together and

18   give the reasons why the loan was increased and if it -- if it

19   was within the metrics of our approval guidelines.

20   Q.   I'd like to show you what's been admitted in evidence as

21   Exhibit 23, please.

22                        (Exhibit published.)

23   BY MR. WALSH:

24   Q.   And before we zoom in on anything, do you recognize this

25   document?

JANDU - DIRECT (RESUMED) / WALSH

1    **A.**   Yes.

2    **Q.**   What is this document?

3    **A.**   It's the addendum approval to increase the cash-out

4    refinance mortgage for Mike Rothenberg.

5    **Q.**   All right.

6           **MR. WALSH:**   And if we could just zoom in on the top

7    part there, please.

8                       (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**   So you basically already told the jury this, but for whom

11   is it?

12   **A.**   Michael Rothenberg.

13   **Q.**   And what is the date of creation there?

14   **A.**   August 18th, 2014.

15   **Q.**   And your name's on there.  Why is that again?

16   **A.**   Because I recommended it for approval.

17          **MR. WALSH:**   Okay.  If we could dezoom that, please.

18       And then if we could blow up the request section.

19                       (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**   Okay.  Now, again, let's -- what is this section for?

22   **A.**   It's an addendum to change the previously approved loan

23   amount from a million 280 to a million 480 based on the higher

24   appraised value of the home that we were using as collateral.

25   **Q.**   Now, in the prior form, there had actually been two

1    facilities listed; is that right?

2    **A.**   Yes.

3    **Q.**   In this one, why is there only one?

4    **A.**   Because there was no change in approval to the second

5    request which was the capital line of credit.

6    **Q.**   All right.  And if you could just read this first

7    paragraph, please (indicating)?

8    **A.**   Addendum approval to previously approved credit action

9    report 20 -- 254630, borrower was preapproved for a mortgage

10   refinance up to a million 280.  The subject property's

11   appraised value came in higher than expected.  Borrower would

12   like to maximize the loan-to-value on the refinance and

13   increase the loan amount to a million 480 based on an

14   80 percent loan-to-value on a 1.85 million appraised value.

15   **Q.**   Okay.  And so that is then the purpose of this form; is

16   that right?

17   **A.**   Yes.

18           **MR. WALSH:**  If we could please dezoom that.

19        And turn to the next page, please.

20                        (Exhibit published.)

21   **BY MR. WALSH:**

22   **Q.**   So this again is the form --

23           **MR. WALSH:**  And if we could blow up the top part

24   here, please.

25                        (Exhibit published.)

1    BY MR. WALSH:

2    Q.  This continues the request section of this document; is

3    that right?

4    A.  Yes.

5           MR. WALSH:  And if we could dezoom that, please.

6       And then if we could just scroll forward here, we're

7    eventually going to end up on page 9, please.  But slowly

8    scroll through.

9                    (Exhibit published.)

10   BY MR. WALSH:

11   Q.  These are the same categories and types of information

12   that were included on the original form; is that right?

13   A.  Yes.

14   Q.  All right.  We've landed on page 9 here.  And before we

15   zoom in on anything, what is page 9?  What's the slang or term

16   for this page?

17   A.  It's called a spread.

18           MR. WALSH:  And if we could zoom in on the top part

19   here, please, (indicating).

20                    (Exhibit published.)

21   BY MR. WALSH:

22   Q.  What is being described here in the Facility A and B

23   section again?

24   A.  It's the amount -- the terms of both loan requests.

25   Q.  Okay.

 1          And so this information is changed in -- in only one

 2      respect; is that right?

 3      **A.**   Yes.

 4      **Q.**   And what is that?

 5      **A.**   The loan amount for the cash-out refinance.

 6      **Q.**   And then over here on this side, some of these numbers

 7      have changed as well; is that right?

 8      **A.**   Yes.

 9      **Q.**   And those numbers changed why?

10      **A.**   Because the loan amount for the cash-out refinance is

11      higher.  And I believe there wasn't -- I don't believe it was

12      determined that there was a use of funds necessarily for the

13      extra -- or additional cash-out refinance.  So when that

14      happens, we typically just increase the post-close liquidity.

15          The gross income -- debt to income would also be affected

16      due to the higher loan amount.  So that -- that number most

17      likely changed.

18          And then on the bottom, the month's contractual reserves

19      would have also changed due to the increase in the post-close

20      liquidity.

21      **Q.**   Thank you.

22          **MR. WALSH:**   If we could dezoom that, please.

23          And then if we could do the assets and liabilities section

24      here, please.

25                       (Exhibit published.)

1    BY MR. WALSH:

2    Q.  Now, this looks very similar to the prior document, but

3    it's changed; is that right?

4    A.  Yes.

5    Q.  And could you describe what has -- does it still list the

6    assets in Merrill Lynch at three hundred seventy sixty-two

7    dollars?

8    A.  Yes.

9    Q.  And it still lists these other assets as well; is that

10   right?

11   A.  Correct.

12   Q.  Post-purchase, does it now also change the liabilities

13   section?

14   A.  Yes.

15   Q.  And in what way?

16   A.  It increases the loan amount of Facility A.

17           MR. WALSH:  All right.  If we could dezoom that,

18   please.

19       And then let's do this -- hold on a second, please.

20                  (Exhibit published.)

21   BY MR. WALSH:

22   Q.  Did these values change -- this is the same sections as

23   the prior spread; is that right?

24   A.  Yes.

25   Q.  But the values have changed in some ways?

1    **A.**   Yes.

2    **Q.**   In this instance here, how has the capital call line of

3    credit been calculated?

4    **A.**   Typically when -- oh, on the interest-only side?

5    **Q.**   Yep.

6    **A.**   It would just be the interest estimated on an annual basis

7    that's due on the line of credit.

8    **Q.**   Got it.

9         And now on this form here in the liabilities side -- or

10   the expenses side (indicating), is there now this capital call

11   line of credit reflected?

12   **A.**   Yes.

13   **Q.**   And that adds expenses here for 2014; is that right?

14   **A.**   Yes.

15   **Q.**   And as a result of all of these changes, does the ultimate

16   debt-to-income ratio change here at the bottom as compared to

17   the earlier original approval?

18   **A.**   Yes.  But not by the line of credit debt service.  It's by

19   the mortgage payments for the -- for the new increase of the

20   cash-out refinance.

21   **Q.**   So it's just because there's a higher loan so there's a

22   higher debt payment --

23   **A.**   Yes.

24   **Q.**   -- for that?  Monthly payment?

25   **A.**   Correct.

 1   **Q.**  And what is the debt-to-income ratio that is calculated

 2   now with the $1.48 million cash-out refi mortgage?

 3   **A.**  74 percent.

 4   **Q.**  All right.  And did you then approve this addendum and

 5   send it on as well?

 6   **A.**  Yes.

 7   **Q.**  And again was it sent to the same person?

 8   **A.**  Yes.

 9   **Q.**  Who is that?

10   **A.**  The credit administrator Buzz Kreppel.

11   **Q.**  And to be clear, what is the role of the credit

12   administrator?

13   **A.**  He's the final approval authority for all of our loans up

14   to a certain dollar amount.

15   **Q.**  Thank you.

16           **MR. WALSH:**  If we could dezoom that.

17   **Q.**  And was the loan approved?

18   **A.**  Yes.

19   **Q.**  I'd like to show you what's been marked in evidence as

20   Exhibit 24.

21           **MR. WALSH:**  If we could blow up the text.

22                   (Exhibit published.)

23   **BY MR. WALSH:**

24   **Q.**  Do you recognize this document?

25   **A.**  Yes.

1   Q.  What is this document?

2   A.  It's a notice of loan approval.

3   Q.  And what does that mean?

4   A.  It's letting the borrower know that their loan is

5   approved.

6   Q.  What is the date of this document?

7   A.  August 18th, 2014.

8   Q.  And this was sent to Mr. Rothenberg; is that right?

9   A.  Correct.

10  Q.  Okay.  Now from your --

11          MR. WALSH:  We could dezoom that.

12  Q.  As a result of all of that happening, from your

13  perspective, what happens next in the loan process?

14  A.  At that point, the documents are ordered and generated for

15  the borrower to sign.

16  Q.  And then there's a signing at some point?

17  A.  Yes.

18  Q.  And you're not involved in any of that?

19  A.  I'm usually there at the loan signing unless the borrowers

20  are out of town.

21  Q.  And in this instance, were you present for the loan

22  signing with Mr. Rothenberg.

23  A.  I don't believe so.

24  Q.  Is that because he was in New York?

25  A.  I believe so.

 1    Q.   You don't recollect being at the signing?

 2    A.   I don't, from eight years ago, no.  But that's what I've

 3    been told.

 4    Q.   After that signing happens, do you receive any notice that

 5    the signing occurred --

 6    A.   Yes.

 7    Q.   -- and things were under way?

 8         Now when the capital call line of credit is approved,

 9    where does the money go typically?

10    A.   Capital call lines, they're typically funded directly to

11    the fund.

12    Q.   And is it the full amount or -- or how are the fees

13    accounted for?

14    A.   We usually deduct the fees from the loan proceeds.

15    Q.   And so we showed the jury last week that this was -- the

16    capital call line of credit here was what amount of money?

17    A.   300,000.

18    Q.   And the fees were one percent of that?

19    A.   Correct.

20    Q.   And so doing some math, that's $3,000?

21    A.   Yes.

22    Q.   And so what amount of money would go directly into Fund II

23    in this instance from the capital call line of credit?

24    A.   We would fund 297,000.

25    Q.   Similarly when the cash-out mortgage refi is approved,

1    where does the money go?

2    **A.**  Typically in the borrower's bank account unless we're

3    instructed otherwise.

4    **Q.**  That's one -- what about the prior mortgage?  Does money

5    go there?

6    **A.**  Yeah, that's paid -- we're usually paying off another

7    bank.  So in this case it was Stanford Credit Union.

8    **Q.**  And then the cash-out portion goes to the borrower?

9    **A.**  Yes.

10          **THE COURT:**  Ms. Jandu, would you sit just a little

11   bit closer to the microphone, please.

12          **THE WITNESS:**  Sure.

13          **THE COURT:**  Thanks.

14   **BY MR. WALSH:**

15   **Q.**  All right.  Now I'd like the bring up Exhibit 10 again and

16   circle back here and ask you a few questions.

17          **MR. WALSH:**  And if we could blow up

18   the --(indicating), please.

19                (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**  Now, on the two forms we're looking at, Exhibits 22 and

22   23, that would be the first approval and the addendum approval

23   we just walked through, it listed as an asset Merrill Lynch in

24   the amount of $370,062.  Do you recollect that?

25   **A.**  Yes.

1    **Q.**  On this document, though, it says "CMA pledged."  Do you

2    see that?

3    **A.**  Yes.

4    **Q.**  Why would those two forms still put that dollar figure in

5    the assets section?

6    **A.**  Because that's the value of their investments within that

7    account, and that it doesn't seem to be an outstanding balance

8    on the Merrill credit line.

9    **Q.**  And what does that mean to you?

10   **A.**  So typically when clients have investment accounts,

11   they're automatically given the option of establishing a line

12   of credit against their investment portfolio.

13   **Q.**  Do they -- and what typically happens with that, in your

14   experience?

15   **A.**  It's a line of credit.  So a lot of the times clients

16   don't use it and it's more of a -- an emergency line of

17   credit.  In the event that -- I think the most common reason

18   is they don't want to sell their securities due to timing, and

19   so as a stopgap, they would use the line of credit instead of

20   liquidating if they needed cash.

21   **Q.**  All right.  Now, on this document, if this line of credit

22   had been drawn down, where -- would it have shown a different

23   figure here in the outstanding balance?

24   **A.**  Yes.

25   **Q.**  And it could go as high as the credit available; is that

1  right?

2  **A.**  Correct.

3  **Q.**  So in this instance, what would be the highest amount that

4  that could be?

5  **A.**  350,529.13.

6  **Q.**  If this document -- I'm asking you a hypothetical -- had

7  had that at $350,529.13, would it have changed the information

8  that was put into those two spreads in the -- Exhibit 22 and

9  23?

10 **A.**  Yes.

11 **Q.**  In what way?

12 **A.**  The liabilities section would have increased by that

13 amount, and then we would have had to calculate or recalculate

14 the debt-to-income to take into account what the interest

15 payments would have been required for this line of credit.

16        **MR. WALSH:**  All right.  If we could dezoom that,

17 please, and pull up Exhibit 22, page 19.

18     And if we could zoom in here, please (indicating).

19              (Exhibit published.)

20 **BY MR. WALSH:**

21 **Q.**  Exhibit 22 that we're in right now, this is the original

22 application, loan approval form.

23     Where -- where on here would have that $350,000 appeared

24 had it been listed on the Exhibit 10?

25 **A.**  It would be reflected in the column under 7/29/2014, which

1    I believe is the date of the application.

2    Q.   Okay.  It would have been reflected in that column.  And

3    would it have been in a particular section?

4    A.   Yes, in that section highlighted.

5    Q.   Okay.  And that's the liabilities section there?

6    A.   Yes.

7    Q.   It's not listed there, is that right?

8    A.   No.

9    Q.   Would you have wanted to know at the time of this original

10   loan approval form that there was an additional $350,000 debt?

11   A.   Yes.

12   Q.   Why?

13   A.   Because it's considered a material change in the

14   borrower's personal financial condition.

15   Q.   What do you mean by that?

16   A.   It's just a significant piece of information that we would

17   want to know when we make an assessment of whether or not to

18   approve the loan.

19   Q.   And as a result of that being -- I think you've already

20   told the jury, but if it was included in there --

21          MR. WALSH:  If we could dezoom, please.

22                (Exhibit published.)

23   BY MR. WALSH:

24   Q.   -- would it have changed all the calculations or at least

25   some of the calculations in the bottom section?

1    A.   Yes.

2    Q.   And would it have ultimately affected this bottom number

3    in some way, the debt-to-income ratio?

4    A.   Yes.

5    Q.   In what way would it have done so?

6    A.   It would have likely increased it slightly.

7    Q.   Likewise --

8         MR. WALSH:   If we could turn to Exhibit 23, page 9.

9                        (Exhibit published.)

10   BY MR. WALSH:

11   Q.   This is the spread for the addendum approval?

12   A.   Yes.

13        MR. WALSH:   And, again, if we could just blow this up

14   (indicating).

15                        (Exhibit published.)

16   BY MR. WALSH:

17   Q.   Is this the section in which, if there had been an

18   additional $350,000 debt at this time, would it have appeared

19   on this form?

20   A.   Yes.

21   Q.   And I'm -- would it have appeared in the same column as

22   before?

23   A.   Yes.

24   Q.   And in the same section under "Total Liabilities" as

25   before?

1    **A.**   Correct.

2    **Q.**   Does it appear on this form?

3    **A.**   No.

4          **MR. WALSH:**   And if we could dezoom, please.

5       And just blow up this part again.

6                         (Exhibit published.)

7    **BY MR. WALSH:**

8    **Q.**   Had it appeared on this form, would it have affected the

9    calculations that are on this bottom part of the addendum loan

10   approval?

11   **A.**   Yes.

12   **Q.**   And in what way?

13   **A.**   It would have likely increased the debt-to-income ratio.

14   **Q.**   And that's, again, the bottom line number down here at the

15   bottom?

16   **A.**   Correct.  As well as under the "Interest Only" section.

17   **Q.**   Over here as well.  And in what way would it have affected

18   it?

19   **A.**   It would have likely increased the debt-to-income due to

20   the increase in debt service payments.

21   **Q.**   And at this one here, I don't think we've said it, I've

22   just been circling, that's at 74 percent currently?

23   **A.**   Yes.

24   **Q.**   So it would have gotten higher than that; is that right?

25   **A.**   Yes.

1   **Q.**  And, again, you already answered this in the prior form,

2   but would you have wanted to know that when you were reviewing

3   the loan application?

4   **A.**  Yes.

5   **Q.**  And, again, why would you want to know it when you're

6   doing this addendum loan application?

7   **A.**  Because it would be considered a material change in the

8   personal financial condition of the borrower.

9          **MR. WALSH:**  If I may just have a moment, Your Honor.

10         **THE COURT:**  Yes.

11                (Pause in the proceedings.)

12         **MR. WALSH:**  I have no further questions for this

13   witness at this time.

14         **THE COURT:**  Thank you, Mr. Walsh.

15      Cross-examination?

16         **MR. FAKHOURY:**  Yes, Your Honor.

17                (Pause in the proceedings.)

18         **MR. WALDINGER:**  I just need to convey some

19   information real quick to Mr. Fakhoury.

20         **THE COURT:**  Please.

21             (Counsel confer off the record.)

22                   **CROSS-EXAMINATION**

23   BY MR. FAKHOURY:

24   **Q.**  Good morning, Ms. Jandu.

25   **A.**  Good morning.

1    Q.  Am I saying that correctly?

2    A.  Yes.

3    Q.  Okay.  Perfect.

4        And -- and much like Mr. Walsh, I'm going to show you some

5    documents in a minute here and I'm going to apologize ahead of

6    time.  The parties have heard this.  The jury has heard this.

7    I don't have the fancy presentation software so you're going

8    to have to bear with me a little bit.  Okay?

9    A.  Okay.

10   Q.  All right.

11       So I wanted to start by talking a little bit about

12   Silicon Valley Bank.  Okay?

13       And now you currently work for Comerica Bank, right?

14   A.  Yes.

15   Q.  And you also previously worked for City National Bank?

16   A.  Yes.

17   Q.  And obviously you've worked for Silicon Valley Bank?

18   A.  Yes.

19   Q.  Okay.

20       Banks can have different niches, right?

21   A.  Yes.

22   Q.  And Silicon Valley Bank had a specific niche, right?

23   A.  Yes.

24   Q.  It's primarily a commercial bank?

25   A.  Yes.

1    **Q.**   Though as you've testified, it does have a private banking

2    side as well, right?

3    **A.**   Yes.

4    **Q.**   I believe you testified it focuses on the innovation

5    economy, right?

6    **A.**   Correct.

7    **Q.**   That's maybe a -- another way of saying technology

8    industry?

9    **A.**   Yes.

10   **Q.**   You testified it focuses on venture capital funds, right?

11   **A.**   Yes.

12   **Q.**   And we've been talking a lot about some loans that

13   Mr. Rothenberg obtained sort of in his own individual

14   capacity.

15       But you're aware that his fund, Rothenberg Ventures, sort

16   of had a preexisting relationship with Silicon Valley Bank

17   before these loans, right?

18   **A.**   I believe so, yes.

19   **Q.**   So in other words, Rothenberg Ventures, the -- the VC fund

20   was doing business with Silicon Valley Bank before these

21   loans, right?

22   **A.**   Yes.

23   **Q.**   Okay.  You testified a little bit about what a VC fund is,

24   and I wanted to ask a couple more questions about that.

25   **A.**   Okay.

JANDU – CROSS / FAKHOURY

1    Q.   So basically a VC fund is an investment fund that

2    investments in smaller startup companies, right?

3    A.   Yes.

4    Q.   And those smaller companies are called portfolio

5    companies, right?

6    A.   Yes.

7    Q.   Now, you testified at the time you were working for

8    Silicon Valley Bank, the time we've been talking about here,

9    you were the managing director in the private bank side; is

10   that right?

11   A.   Yes.

12   Q.   And part of your responsibilities is to bring in new

13   customers, correct?

14   A.   Correct.

15   Q.   Part of your focus was on general partners of venture

16   capital funds, right?

17   A.   Yes.

18   Q.   And the idea was sort of to get the GP's, the general

19   partners, of the funds to bank with Silicon Valley Bank,

20   right?

21   A.   Yes.

22   Q.   And then ideally those general partners would then

23   recommend the bank to the portfolio companies, right?

24   A.   Yes.

25   Q.   And in fact, Silicon Valley Bank has a division who sort

JANDU - CROSS / **FAKHOURY**

1  of develops relationships with general partners for that

2  specific purpose, right?

3  **A.**  Yes.

4  **Q.**  You mentioned a gentleman by the name of Jim Marshall; do

5  you recall that testimony?

6  **A.**  Yes.

7  **Q.**  And he was a -- he was the bank's venture capital relation

8  manager, right?

9  **A.**  Yes.

10  **Q.**  So his job is sort of to wine and dine GP's of venture

11  capital funds, right?

12  **A.**  It's to strengthen, yeah, their relationships with the

13  VC's, correct.

14  **Q.**  Okay.  And he was the one who introduced you to

15  Mr. Rothenberg, right?

16  **A.**  Yes.

17  **Q.**  Now you testified that Mr. Rothenberg was sort of an

18  up-and-coming general partner of a venture capital fund,

19  right?

20  **A.**  Yes.

21  **Q.**  He was young, right?

22  **A.**  Yeah.

23  **Q.**  He's a bit younger than some of the other GP's you had

24  tended to work with in the past?

25  **A.**  Yes.

```
 1    Q.   We've already established his fund was called Rothenberg

 2    Ventures, right?

 3    A.   Yes.

 4    Q.   And -- and the fund itself was focused on technology

 5    companies, right?

 6    A.   Yes.

 7    Q.   And the fund itself was actually pretty young, right?

 8    A.   Yes.

 9          MR. FAKHOURY:   I'm going to ask Mr. Torres to pull up

10    Exhibit 12.

11    Q.   Let's talk about the fund for a few minutes, and he's

12    going to full up Exhibit 12.

13                    (Exhibit published.)

14    BY MR. FAKHOURY:

15    Q.   Do you remember seeing this document?

16    A.   Yes.

17    Q.   And I think Mr. Walsh asked you a couple questions about

18    this document.

19    A.   Yes.

20    Q.   So this is the Offering Memorandum for Rothenberg Ventures

21    Fund II, right?

22    A.   Yes.

23    Q.   And we've talked a little bit already about one of the

24    loan products that Mr. Rothenberg was seeking to get from the

25    bank was a capital call line of credit, right?
```

1   A.   Yes.

2   Q.   And a capital call -- and just so we're all on the same

3   page, the -- the capital call line of credit was to

4   effectively fund Mr. Rothenberg's investment into this

5   specific fund, Fund II, right?

6   A.   Yes.

7   Q.   Okay.

8          MR. FAKHOURY:   I'm going to ask Mr. Torres to jump to

9   page 7 of this exhibit.

10                     (Exhibit published.)

11  BY MR. FAKHOURY:

12  Q.   Okay.  I want you to take a look right here.  I'm also

13  going to use the screen here.  Okay (indicating).

14      This portion of the fund document states -- well, let

15  me -- let me strike that.  Let me ask a better question.

16      There's a couple different entities sort of referenced in

17  this section, right?  There's a Rothenberg Ventures Management

18  Company.  There's a "Manager" and there's a "Fund."  Do you

19  see that?

20  A.   Yes.

21  Q.   Okay.  Let's -- I wanted to kind of pull them out piece by

22  piece.  Okay?

23      So the manager of the fund -- the fund -- well, first of

24  all, the fund is Fund II, right?

25  A.   Yes.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**

1  Q.  Rothenberg Ventures Management Company is the manager of

2  Fund II, right?

3  A.  Yes.

4  Q.  And here it says the founder of the fund and the owner of

5  the manager is Michael Rothenberg, right?

6  A.  Yes.

7  Q.  And throughout this document it refers to an operator.

8  That would be Mr. Rothenberg, right?

9  A.  Yes.

10        MR. FAKHOURY:  Okay.  Mr. Torres, can you go to

11  page 8.

12      And you can stop right there.

13                    (Exhibit published.)

14  BY MR. FAKHOURY:

15  Q.  Just in the interest of time, I'm going to annotate this

16  as we go along.  Okay?

17      And here it indicates that the fund is managed by the

18  manager, which is Rothenberg Ventures Management Company,

19  right?

20  A.  Yes.

21  Q.  And that the manager, meaning the management company, is

22  nearly a hundred percent owned by Mr. Rothenberg, right?

23  A.  Yes.

24  Q.  Okay.  Last thing I'm going to ask you about this

25  document --

 1          **MR. FAKHOURY:**  Can you go to page 13, Mr. Torres?

 2    And can you kind of scroll down a little bit and I'll tell you

 3    when to stop.

 4        Okay, perfect.

 5                        (Exhibit published.)

 6    **BY MR. FAKHOURY:**

 7    **Q.**  Here it explains that neither the manager nor the operator

 8    has significant experience in managing a fund, right?

 9    **A.**  Yes.

10    **Q.**  And -- and that's consistent with a fund that's relatively

11    young, right?

12    **A.**  Yes.

13          **MR. FAKHOURY:**  You can close that document,

14    Mr. Torres.

15        And could you pull up Exhibit 15, please.

16                        (Exhibit published.)

17    **BY MR. FAKHOURY:**

18    **Q.**  Okay.  We're talking a minute ago about portfolio

19    companies.  And this is a listing of some of the portfolio

20    companies within Rothenberg Ventures Fund II, right?

21    **A.**  Yes.

22    **Q.**  Okay.  And so in a general sense, just to kind of bring it

23    on home, one thing that -- one thing Silicon Valley Bank was

24    interested in was meeting GP's and having access to these

25    kinds of portfolio companies, right?

1    **A.**   Yes.

2              **MR. FAKHOURY:**   Okay.  You can -- you can close that

3    exhibit.

4    **Q.**   Now you testified that it was Mr. Marshall who introduced

5    you to Mr. Rothenberg, right?

6    **A.**   Yes.

7    **Q.**   And that the three of went to lunch --

8    **A.**   Yes.

9    **Q.**   -- at some point in time in San Francisco?

10   **A.**   Yes.

11   **Q.**   Okay.  And at that meeting, you learned -- or at that

12   lunch, you learned that Mr. Rothenberg wanted a capital call

13   line of credit and to do a cash-out refinance of his house,

14   right?

15   **A.**   Yes.

16   **Q.**   Now a capital call line of credit is -- is a loan, right?

17   **A.**   Yes.

18   **Q.**   And -- and it fits within the niche of Silicon Valley Bank

19   sort of catering to or doing business with venture capital

20   funds, right?

21   **A.**   Yes.

22   **Q.**   Now, these lines of credits are custom loans, right?

23   **A.**   Yes.

24   **Q.**   And actually you testified you're an expert on custom

25   financing solutions, right?

1    **A.**   Yes.

2    **Q.**   And you testified that sometimes these lines of credit

3    could be secured, right?

4    **A.**   Yes.

5    **Q.**   Sometimes they could be unsecured?

6    **A.**   Yes.

7    **Q.**   Basically varies depending on the specifics of the fund,

8    right?

9    **A.**   Yes.

10   **Q.**   And the specifics of the borrower, right?

11   **A.**   Yes.  And the loan amount.

12   **Q.**   And the loan amount.  Okay.  Thank you for clarifying

13   that.

14        And, you know, these kinds of loans don't have the same

15   lending criteria as a mortgage does, right?

16   **A.**   Correct.

17   **Q.**   They're a little -- little more flexible in terms of

18   what's required, right?

19   **A.**   Yes, in that they usually provide two different scenarios.

20   One is in the worst-case scenario when the loan is unsecured

21   and it needs to be termed out, I believe we used a three-year

22   amortization.  And then the second scenario would be the more

23   likely scenario, and that would be the interest-only required

24   payments --

25   **Q.**   Okay.

1    **A.**    -- on the line.  So that's what you see is the

2    difference -- the main difference in debt-to-income on the

3    spread if you're --

4    **Q.**  Well, we'll get there.  I don't mean to cut you off.

5    We're going to --

6    **A.**  Okay.

7    **Q.**  -- get there in a minute.  Let's just take it one step at

8    a time.  Okay?

9    **A.**  Sure.

10   **Q.**  Let me -- let me -- let me try a different example.

11       A mortgage is typically a secured loan, right?

12   **A.**  Yes.

13   **Q.**  It's secured by a lien that the bank puts on the property,

14   right?

15   **A.**  Yes.

16   **Q.**  Whereas you just testified a line of credit doesn't

17   necessarily have to be secured, right?

18   **A.**  Yes.

19   **Q.**  If -- if the capital call line of credit was secured,

20   there'd be more stringent lending requirements, right?

21   **A.**  Not necessarily.

22   **Q.**  Okay.

23   **A.**  Actually, when it's secured, there's typically less

24   requirements.

25   **Q.**  Oh, because the -- it's secured so the bank has sort of a

1    fallback, right?

2    **A.**   Yes.

3    **Q.**   Okay.

4        The specific capital call line of credit for

5    Mr. Rothenberg, just so we're all on the same page on the

6    terms, was a three-year line of credit, right?

7    **A.**   I believe so.

8    **Q.**   And it was going to be interest-only for those three

9    years, right?

10   **A.**   Correct.

11   **Q.**   So what that meant was during those three years of the

12   loan, the borrower, Mr. Rothenberg, would just pay the

13   interest amount for three years, right?

14   **A.**   Yes.

15   **Q.**   And the principal or the remaining amount would be due at

16   the end of the three years in one lump sum payment?

17   **A.**   Yes.

18   **Q.**   Okay.

19           **MR. FAKHOURY:**   Mr. Torres, can you pull up Exhibit 1,

20   please.

21                       (Exhibit published.)

22   BY MR. FAKHOURY:

23   **Q.**   Okay.  You've seen this --

24           **MR. FAKHOURY:**   That's fine.  You can leave it there.

25   **Q.**   You've seen this -- you recall this exhibit, right?

JANDU – CROSS / FAKHOURY

1    A.   Yes.

2    Q.   This is an email sent from Mr. Rothenberg to you on

3    July 29, 2014, right?

4    A.   Yes.

5    Q.   And this is sort of documenting the kinds of loan products

6    he's looking for, right?

7    A.   Yes.

8    Q.   Okay.

9         And sort of towards the end here (indicating), this is

10   talking specifically about the capital call line of credit,

11   right?

12   A.   Yes.

13   Q.   And it's saying ideally he would like to have the loan

14   disbursed in two weeks by August 12, right?

15   A.   Yes.

16   Q.   And I believe you testified earlier that that is sort of

17   an accelerated time frame?

18   A.   Yes.

19   Q.   But it was certainly feasible, right?

20   A.   Yes.

21   Q.   And also -- and you just testified about this a minute

22   ago -- this is not your first interaction with Mr. Rothenberg,

23   right?

24   A.   No.

25   Q.   You've already had a lunch with him and Mr. Marshall,

 1    right?

 2    **A.**   Yes.

 3    **Q.**   And that was a couple weeks before this email?

 4    **A.**   I believe so.

 5    **Q.**   Okay.

 6        And in fact, you'd already emailed him specific items that

 7    you needed in order to get the loan process moving, right?

 8    **A.**   Yes.

 9    **Q.**   Okay.

10        **MR. FAKHOURY:**   Okay.  You can pull that down,

11    Mr. Torres.

12    **Q.**   We're going to now start to go through some of the loan

13    documents that Mr. Walsh showed you.  I'm also going to show

14    them to you.  Okay?

15    **A.**   Okay.

16    **Q.**   And I'll try to be quick.

17        Let's start with Exhibit 2.

18        **MR. FAKHOURY:**   Okay.  Can you zoom that out a little

19    bit, please.

20        Thank you.

21                       (Exhibit published.)

22    **BY MR. FAKHOURY:**

23    **Q.**   Okay.  So this is the, what we call the Form 1003 which

24    was submitted by Mr. Rothenberg, right?

25    **A.**   Yes.

1   **Q.**  And this one is -- I know you can't see the date here, but

2   this says -- I believe it was submitted July 29 of 2014.

3       Does that sound about right to you?

4   **A.**  Yes.

5           **MR. FAKHOURY:**  Okay.  Mr. Torres, can you go to

6   page 2, please.

7       Scroll down a little bit more.  Perfect.

8                       (Exhibit published.)

9   **BY MR. FAKHOURY:**

10  **Q.**  Okay.  Down here in the Assets and Liabilities section,

11  under Assets there's some handwriting that says "see assets,"

12  right?

13  **A.**  Yes.

14  **Q.**  And then there's -- on the section that's labeled

15  "Liabilities," there's some handwriting there that says "see

16  credit report."  You see that?

17  **A.**  Yes.

18          **MR. FAKHOURY:**  Okay.  Can you -- can you leave that

19  exhibit up but also pull up Exhibit number 3?

20                      (Exhibit published.)

21  **BY MR. FAKHOURY:**

22  **Q.**  I'm going to hop back and forth between these exhibits.

23      So, again, you've seen this exhibit before, right?

24  **A.**  Yes.

25  **Q.**  In the section on Exhibit 2, the Form 1003 where it says

```
 1    "see assets," it's referring to this Exhibit 3, right?

 2    A.  Yes.

 3    Q.  Okay.

 4        Mr. -- well, hold on.

 5        Okay.  And this sheet lists a liability of $210,000 for

 6    student loans, right?

 7    A.  Yes.

 8    Q.  It also lists a second liability, correct?  Right here.

 9    For the outstanding mortgage balance, right?

10    A.  Yes.

11    Q.  Okay.

12          MR. FAKHOURY:  Okay.  Mr. Torres, can you keep those

13    two exhibits up and pull up Exhibit 16, please.

14                   (Exhibit published.)

15    BY MR. FAKHOURY:

16    Q.  Now, that handwritten Form 1003 said "see credit report,"

17    right?

18    A.  Yes.

19    Q.  And it's referring to this specific credit report here on

20    Exhibit 16, right?

21    A.  Yes.

22    Q.  Okay.

23        Now, this credit report was received on August 1st, 2014,

24    right?

25    A.  Yes.
```

1      **MR. FAKHOURY:**  Okay.  Mr. Torres, can you go to

2    page 2, please.

3         Actually, I'm sorry, stop there.  Can you scroll up a

4    little bit.

5         Thank you.

6                         (Exhibit published.)

7    **BY MR. FAKHOURY:**

8    **Q.**  Again, I apologize for not having the fancy software.

9         In Exhibit 3, the listing of assets and liabilities, we

10   talked about it indicated that Mr. Rothenberg reported

11   $210,000 in student loans.  You recall that?

12   **A.**  Yes.

13   **Q.**  And that would basically be this amount right here under

14   "Installment Balances," right?

15   **A.**  Yes.

16   **Q.**  Okay.  Now you're familiar with credit reports, right?

17   **A.**  Yes.

18   **Q.**  So I wanted to ask you a couple other questions about this

19   specific credit report while we have it up.  Okay?

20   **A.**  Okay.

21         **MR. FAKHOURY:**  Can you scroll down, Mr. Torres -- or

22   actually go to page 2.

23         Go down a little bit more.

24         Perfect, that's fine.  Thank you.

25                         (Exhibit published.)

1   **BY MR. FAKHOURY:**

2   **Q.**  Now, here under "Credit History," talking about right

3   here, this is a listing of all prior credit accounts in

4   Mr. Rothenberg's name, or that match up with his Social

5   Security Number, correct?

6   **A.**  Yes.

7   **Q.**  The first creditor listed here is Stanford Federal Credit

8   Union, right?

9   **A.**  Yes.

10  **Q.**  And it lists that this is a real estate mortgage type of

11  debt, correct?

12  **A.**  Yes.

13  **Q.**  And then further down -- I won't go through every single

14  one of them with you -- it looks like there's student loans,

15  right?

16  **A.**  Yes.

17  **Q.**  And -- and the credit report indicates the kind of debt it

18  is, right?

19  **A.**  Yes.

20  **Q.**  So for example, this item, the one immediately under

21  Stanford Federal Credit Union, this one right here

22  (indicating) --

23  **A.**  Uh-huh.

24  **Q.**  -- looks like it's a student loan because it says

25  "educational," right?

 1    **A.**  Yes.

 2         **MR. FAKHOURY:**  Okay.  Let's go to the third page of

 3    this exhibit.  And can we actually scroll all the way down to

 4    the bottom of this page.

 5         Thank you.  Perfect.  You can stop there.

 6                        (Exhibit published.)

 7    **BY MR. FAKHOURY:**

 8    **Q.**  Here's another type of creditor.  This is Amex, right?

 9    **A.**  Yes.

10    **Q.**  That would be American Express?

11    **A.**  Yes.

12    **Q.**  And that is a credit card debt, right?

13    **A.**  Yes.

14    **Q.**  Okay.

15         **MR. FAKHOURY:**  Can we go to the fourth page, please.

16         Okay.  You can stop there.

17                        (Exhibit published.)

18    **BY MR. FAKHOURY:**

19    **Q.**  Now credit reports are a credit history, right?

20    **A.**  Yes.

21    **Q.**  So it also shows not just outstanding debts but debts that

22    have been fully paid off, right?

23    **A.**  Yes.

24    **Q.**  So for example, an account that says "paid account zero

25    balance" means at some point in time there was a loan and that

1   loan was paid off, right?

2   **A.**   Yes.

3   **Q.**   And similarly, you can see the kind of loan that it is,

4   right?  For example --

5   **A.**   Correct.

6   **Q.**   -- this one here is an educational loan, right?

7   **A.**   Yes.

8   **Q.**   If there was a previous mortgage, that would show up on

9   here as well, right?

10  **A.**   Yes.

11          **MR. FAKHOURY:**  Can we go to page 7.

12      Yes, sorry.  Perfect.  Right -- right there.

13                      (Exhibit published.)

14  **BY MR. FAKHOURY:**

15  **Q.**   Up here it shows inquiries in the last 120 days, right?

16  **A.**   Yes.

17  **Q.**   And it looks like Bank of America had pulled

18  Mr. Rothenberg's credit on June 20th of 2014, right?

19  **A.**   Yes.

20  **Q.**   Okay.

21          **MR. FAKHOURY:**  And then let's go to page 8.

22      Okay.  You could stop right there.

23                      (Exhibit published.)

24  **BY MR. FAKHOURY:**

25  **Q.**   Here it says "Derogatory Summary," right?

1   **A.**   Yes.

2   **Q.**   And that's basically if there's any problems with his

3   credit, right?

4   **A.**   Yes.

5   **Q.**   If he has a delinquent loan or a late payment or something

6   like that, right?

7   **A.**   Yes.  Tax liens, foreclosures as well.

8   **Q.**   Okay.  And here there's no derogatory information, right?

9   **A.**   Right.

10  **Q.**   Okay.  Last -- last part of this exhibit is page 12.

11                        (Exhibit published.)

12  **BY MR. FAKHOURY:**

13  **Q.**   And here it lists the credit scores, right?

14  **A.**   Yes.

15  **Q.**   And I think you testified there's usually three scores,

16  right?

17  **A.**   Yes.

18  **Q.**   And they take the average of all three?

19  **A.**   Depends on the bank sometimes.  And I think with

20  Silicon Valley Bank, they used the middle score.

21  **Q.**   Okay.  So the middle score being 776?

22  **A.**   Yes.

23  **Q.**   Okay.  And that's a pretty good score, right?

24  **A.**   Yes.  That's a very good score.

25               **MR. FAKHOURY:**  Okay.  You can close exhibit -- you

1    can close those three exhibits.

2         And, Mr. Torres, if you could open Exhibit 4.

3                   (Exhibit published.)

4    **BY MR. FAKHOURY:**

5    **Q.**  Okay.  This is Exhibit 4.  You recall this exhibit, right?

6    **A.**  Yes.

7    **Q.**  Okay.  And so we're all on the same page, this is a

8    certification and authorization form, right?

9    **A.**  Yes.

10   **Q.**  Now, you testified that this form is what allows

11   Silicon Valley Bank to run a credit report on Mr. Rothenberg,

12   right?

13   **A.**  This form as well as a signed 1003.

14   **Q.**  Okay.  The 1003 being the -- the URLA form we just looked

15   at?

16   **A.**  Yes.

17   **Q.**  Okay.

18        Now, just so we're all -- again, all on the same page

19   here -- and I want to start by focusing on the top part of

20   this form which says "Certification," okay?

21   **A.**  Okay.

22   **Q.**  It says "Applicant," and that means Mr. Rothenberg, right?

23   **A.**  Yes.

24   **Q.**  Okay.  And the lender here, that's Silicon Valley Bank,

25   right?

JANDU - CROSS / FAKHOURY

1    **A.**   Yes.

2    **Q.**   Okay.

3        Now, paragraph 2 of this form on the top part here where

4    it says "Certification" says the applicant understands and

5    agrees that the lender may verify any information, right?

6    **A.**   Yes.

7    **Q.**   Again, the applicant is Mr. Rothenberg, right?

8    **A.**   Yes.

9    **Q.**   And the lender is the bank, correct?

10   **A.**   Yes.

11   **Q.**   And it includes verifications from financial institutions,

12   right?

13   **A.**   Yes.

14   **Q.**   And it also indicates that that's including but without

15   limitation, right?

16   **A.**   Yes.

17   **Q.**   So it's pretty broad and open-ended, right?

18   **A.**   Yes.

19   **Q.**   Okay.

20            **MR. FAKHOURY:**   Mr. Torres, could you scroll down,

21   please.

22                       (Exhibit published.)

23   **BY MR. FAKHOURY:**

24   **Q.**   So Mr. Walsh, I think, spoke to you a bit about the top

25   half of this form.  I want to all actually ask you a couple

```
 1    questions about bottom half of this form.

 2                    (Exhibit published.)

 3    BY MR. FAKHOURY:

 4    Q.  Now, here it says, "Authorization To Release Information."

 5    Do you see that?

 6    A.  Yes.

 7    Q.  Okay.  And it's addressed "To Whom It May Concern," right?

 8    A.  Yes.

 9    Q.  The first paragraph, we're going to start here

10    (indicating), the first paragraph is basically explaining to

11    someone else, right --

12    A.  Uh-huh.

13    Q.  -- that the applicant, Mr. Rothenberg's applied for a loan

14    with Silicon Valley Bank, right?

15    A.  Yes.

16    Q.  And it's instructing whoever receives this form that they

17    may verify information that Mr. Rothenberg provided to the

18    lender, right?

19    A.  Yes.

20    Q.  Let's take a look at paragraph 2.  Paragraph -- in

21    paragraph 2, the applicant -- so again, Mr. Rothenberg -- is

22    authorizing whatever third party gets this form to release

23    information, right?

24    A.  Yes.

25    Q.  And sort of like on the top half of that form, this lists
```

1    some examples of information that could be verified, right?

2    A.   Yes.

3    Q.   So it includes -- and we're kind of talking about the

4    bottom part of that paragraph -- income, bank, money market,

5    similar account balances, credit history, and tax returns,

6    right?

7    A.   Yes.

8    Q.   And again, it's -- it's pretty broad, right?  It says the

9    information may include but is not limited to that

10   information, right?

11   A.   Yes.

12   Q.   Now, Mr. Rothenberg signed this form, right?

13   A.   Yes.

14        **MR. FAKHOURY:**  Okay.  You can close that exhibit,

15   Mr. Torres.

16   Q.   Now, you testified that in connection with -- and correct

17   me if I've -- if I've gotten it wrong -- either in connection

18   with refinance or the capital call line of commitment or

19   perhaps for both that you obtained tax records from Rothenberg

20   Ventures Management Company, right?

21   A.   Yes.

22   Q.   So -- and you also obtained Mr. Rothenberg's personal tax

23   returns, right?

24   A.   Yes.

25   Q.   The records you obtained from Rothenberg Ventures

1    Management Company, you referred to it as a K-1 --

2    A.   Yes.

3    Q.   -- do you recall that testimony?

4         And so we're all on the same page, a K-1 is effectively a

5    form that's generated by a partnership --

6    A.   Yes.

7    Q.   -- that lists every individual partner's share of income

8    from the partnership, right, for a given tax year, right?

9    A.   Right.

10   Q.   And I believe you testified that Silicon Valley Bank gets

11   those kinds of documents when the borrower owns more than

12   25 percent of the partnership, right?

13   A.   Yes.

14        Oh, are you speaking specifically about K-1s?

15   Q.   Well --

16   A.   Or the tax documents of the corporation?

17   Q.   Well, you tell me.  I mean --

18   A.   We -- we require K-1's no matter what as long as the --

19   actually, no.  They -- they don't to have own 25 percent or

20   more.  We usually require all K-1's.

21   Q.   Okay.  Thank you for clarifying that.

22   A.   Sure.

23            MR. FAKHOURY:  Let's pull up Exhibit 10 now.

24                     (Exhibit published.)

25   / / /

1    BY MR. FAKHOURY:

2    Q.  This was the last document that Mr. Walsh showed you

3    before I started asking you questions.

4    A.  Yes.

5    Q.  And you testified that the indication here, "CMA pledged,"

6    means that this checking account is pledged as collateral to

7    some other account, correct?

8    A.  Correct.

9    Q.  This form indicates balances as of July 31st, 2014, right?

10   A.  Yes.

11          MR. FAKHOURY:  Okay.  You can close that, Mr. Torres.

12   Q.  Now, you testified that after you obtained documents from

13   the borrower, you start the process of -- of verifying ALIENS.

14   Do you recall that testimony?

15   A.  Yes.

16   Q.  It's a great movie, maybe not the best acronym.  But the

17   "A" stands for "address," right?

18   A.  Yes.

19   Q.  "L" is for "loan amount"?

20   A.  Yes.

21   Q.  "I" is for "income"?

22   A.  Yes.

23   Q.  "E" for "estimated value of property."

24       Is that a "yes"?

25   A.  Yes.

1   Q.   Okay.  "N" is for "name"?

2   A.   Yes.

3   Q.   And "S" for "Social Security Number"?

4   A.   Yes.

5   Q.   Now, after the ALIENS is collected, at that point the bank

6   can lock the interest rate for the borrower, right?

7   A.   Yes.

8   Q.   And by locking the rate, we mean that the rate that's been

9   offered to the borrower is good for a period of time, right?

10  A.   Yes.

11  Q.   Usually 60 days?

12  A.   Yes.

13  Q.   Once the ALIENS is collected and the rate is locked, at

14  that point in time, the bank sends its initial disclosures,

15  right?

16  A.   Yes.

17          MR. FAKHOURY:  I'm going to ask Mr. Torres to pull up

18  Exhibit 19.

19                    (Exhibit published.)

20  BY MR. FAKHOURY:

21  Q.   And these are -- have you seen these disclosures before?

22  A.   Yes.

23  Q.   Okay.

24      And these are the disclosures that -- well, let's start

25  from a general point of view.  This is typical of the kinds of

 1    disclosures that would be sent to a borrower after the rate is

 2    locked and the ALIENS information was obtained, right?

 3    **A.**   Yes.

 4    **Q.**   And these are the specific disclosures that were sent to

 5    Mr. Rothenberg, right?

 6    **A.**   Yes.

 7              **MR. FAKHOURY:**   Okay.  Let's go to page 2 of this

 8    exhibit.

 9         Okay.  You can stop there for a second.

10                         (Exhibit published.)

11    **BY MR. FAKHOURY:**

12    **Q.**   Now, this is another Form 1003, right?

13    **A.**   Yes.

14    **Q.**   We saw the first Form 1003 had some handwriting on it,

15    right?

16    **A.**   Yes.

17    **Q.**   This second Form 1003 that's within the disclosures is

18    typed up.  Do you see that?

19    **A.**   Yes.

20    **Q.**   Now, again, the disclosures go from the bank to

21    Mr. Rothenberg, right?

22    **A.**   Yes.

23    **Q.**   And someone at the bank typed up this Form 1003 to send to

24    Mr. Rothenberg, right?

25    **A.**   Yes.

 1          **MR. FAKHOURY:**  Okay.  Let's go to the third page of

 2    this exhibit.

 3          And scroll down a little bit more.  Perfect -- we can

 4    stop -- actually, can you zoom out a little bit.  I'm sorry.

 5          That's fine.  Thank you.

 6                          (Exhibit published.)

 7    **BY MR. FAKHOURY:**

 8    **Q.**  Okay.  Here lists assets and liabilities, right?

 9    **A.**  Yes.

10    **Q.**  And the first Form 1003 we saw had handwriting that said

11    "see assets," "see credit report," right?

12    **A.**  Yes.

13    **Q.**  This one again is typed up, correct?

14    **A.**  Yes.

15    **Q.**  Now, under "Assets" on this disclosure form, this

16    Form 1003, the only asset that's filled out is the real estate

17    that's owned, correct?  Down here?

18    **A.**  Yes.

19    **Q.**  Okay.  And that's estimated to be worth $1.6 million,

20    right?

21    **A.**  Yes.

22    **Q.**  The rest of the "Assets" is blank, right?

23    **A.**  Yes.

24    **Q.**  Okay.  Let's take a look at the "Liabilities" section now.

25    The "Liabilities" section lists creditors, right?

1    A.   Yes.

2    Q.   And these -- this information comes directly from the

3    credit report, right?

4    A.   Yes.

5    Q.   So, for example, the first creditor is the existing

6    mortgage owed to Stanford Federal Credit Union, right?

7    A.   Yes.

8    Q.   And that's in the amount of $866,000 approximately?

9    A.   Yes.

10   Q.   Okay.

11        We saw the credit report itself listed other creditors,

12   for student loans, for example, right?

13   A.   Yes.

14   Q.   And so these amounts come, again, directly out of that

15   credit report, right?

16   A.   Yes.

17        **MR. FAKHOURY:**  Can you scroll down on this page a

18   little bit, Mr. Torres.

19        Actually can you zoom out just one -- one little bit.

20        Thank you.

21                      (Exhibit published.)

22   BY MR. FAKHOURY:

23   Q.   Okay.  Now, this form is sort of like a preprinted form,

24   right?

25   A.   Yes.

1   **Q.**  And these forms are standardized, right?

2   **A.**  Yes.

3   **Q.**  The forms have only a certain amount of space for

4   creditors on it, right?  On this page at least, right?

5   **A.**  Yes.

6   **Q.**  It looks like there's enough space for about seven

7   creditors, correct?

8   **A.**  Yes.

9   **Q.**  Okay.  If there are other creditors, there's -- there's

10  space on the back where those creditors could be added in,

11  right?

12  **A.**  Yes.

13          **MR. FAKHOURY:**  Mr. Torres, could you go to page 5,

14  please.

15      You can stop there.

16                      (Exhibit published.)

17  **BY MR. FAKHOURY:**

18  **Q.**  This would be where you could put other creditors, right?

19  **A.**  Yes.

20  **Q.**  And in fact, one other creditor is added in here, correct?

21  **A.**  Correct.

22  **Q.**  That would be Citibank which is a credit card is what it

23  looks like?

24  **A.**  Yes.

25          **MR. FAKHOURY:**  Can you go back to page 3, Mr. Torres.

1              Okay, you can stop there.

2                          (Exhibit published.)

3    BY MR. FAKHOURY:

4    Q.  This amount right here -- oh, that looks horrible.  Let's

5    try that again.

6        This amount right here of $73,272, that's a listing of the

7    at the total liabilities on this form, correct?

8    A.  It should be, yes.

9    Q.  Okay.  In other words, if you -- well, it's not counting

10   the -- the mortgage, right?

11   A.  It doesn't appear to be in this case, no.

12   Q.  Okay.  But it's adding up -- basically if we forget the

13   mortgage, it's basically adding these numbers up, right?

14   A.  Yes.

15   Q.  As well as that Citibank creditor on page 5, right?

16   A.  Yes.

17   Q.  And if you add up those amounts, it adds up to $73,272,

18   right?

19   A.  Yes.

20              MR. FAKHOURY:  Okay, you can close this exhibit,

21   Mr. Torres.

22       And can you please open Exhibit 22.

23                          (Exhibit published.)

24   BY MR. FAKHOURY:

25   Q.  Okay.  We talked quite a bit about this form, right?

1    **A.**   Yes.

2    **Q.**   This is the "Loan Approval Sheet," correct?

3    **A.**   Correct.

4    **Q.**   And your name is on this approval sheet because you're the

5    one who has to approve it, right?

6    **A.**   Recommend it for approval, yes.

7    **Q.**   Okay.  Thank you for correcting me.

8         Recommended to the next layer of review, or Mr. Kreppel,

9    right?

10   **A.**   Yes.

11   **Q.**   You didn't -- you didn't write this form, correct?

12   **A.**   No.

13   **Q.**   But you've seen it.  You've obviously seen the form,

14   right?

15   **A.**   Yes.

16   **Q.**   Now, this form was created on August 6, 2014, right?

17   **A.**   Yes.

18   **Q.**   Now a minute ago we were going through the loan

19   disclosures that were sent to Mr. Rothenberg, do you recall

20   that?

21   **A.**   Yes.

22   **Q.**   And that was also dated August 6, 2014, right?

23   **A.**   I believe so.

24   **Q.**   Okay.  Now this Loan Approval Sheet doesn't go with those

25   disclosures, right?

1    **A.**   No.

2    **Q.**   This is internal bank use only, right?

3    **A.**   Yes.

4    **Q.**   No borrower is ever given this sheet?

5    **A.**   No.

6          **MR. FAKHOURY:**  All right, let's scroll down a little

7    bit, Mr. Torres, please.

8       Okay.  And we can stop here.

9                    (Exhibit published.)

10   **BY MR. FAKHOURY:**

11   **Q.**   So, again, just so we're all on the same page, this

12   approval sheet is for two different loan products, right?

13   **A.**   Yes.

14   **Q.**   Facility A is the cash-out refinance.  And Facility B is

15   the capital call line of credit, right?

16   **A.**   Yes.

17          **MR. FAKHOURY:**  Can you go to second page, please.

18   And you can just stop right there.

19                    (Exhibit published.)

20   **BY MR. FAKHOURY:**

21   **Q.**   So up here it lists some reasons for recommending that

22   these loans be approved, right?

23   **A.**   Yes.

24   **Q.**   So it talks about a loan-to-value ratio of 80 percent,

25   right?

JANDU - CROSS / FAKHOURY

1    **A.**   Yes.

2    **Q.**   It talks about a qualifying income amount of $440,000

3    being Mr. Rothenberg's salary as detailed in that letter from

4    his financial -- director of finance, right?

5    **A.**   The annualized income from that letter, yes.

6    **Q.**   You're right.  I'm sorry.  That letter stated his income

7    for half the year.

8    **A.**   Yes.

9    **Q.**   Annualized it would be $440,000?

10   **A.**   Correct.

11   **Q.**   Okay.  Thank you for correcting me.

12        It lists the good credit score, right?

13   **A.**   Yes.

14   **Q.**   And talks about contractual reserves of 43 months,

15   correct?

16   **A.**   Yes.

17   **Q.**   And so again we're all on the same page, reserves is the

18   idea that if Mr. Rothenberg lost all his income, there would

19   be 43 months' worth of money sitting around to pay off his

20   expenses, right?

21   **A.**   Yes.

22   **Q.**   Now it also talks about a debt-to-income ratio of

23   69 percent.  Do you see that?

24   **A.**   Yes.

25   **Q.**   And it notes that that ratio exceeds the recommended

1   50 percent guideline, right?

2   **A.**  Yes.

3   **Q.**  I wanted to talk a little bit about this part right here.

4   (indicating).

5       This is information about Rothenberg Ventures, right?

6   **A.**  Yes.

7   **Q.**  And it's talking about firm balances and portfolio

8   balances.  Do you see that?

9   **A.**  Yes.

10  **Q.**  That's basically money that the management company holds

11  at Silicon Valley Bank, right?

12  **A.**  Yes, as well as the portfolio companies.

13  **Q.**  Okay.  So let's go through that one at a time.

14      The firm balance, meaning Rothenberg Ventures Management

15  Company's balance, is $390,000 -- approximately $390,000 at

16  the bank, right?

17  **A.**  The management company as well as any funds that we bank.

18  Yes.

19  **Q.**  Okay.  That -- that Silicon Valley Bank has the account

20  for, correct?

21  **A.**  Yes.

22  **Q.**  Okay.  And the portfolio balance is the estimated value of

23  the companies within the fund, correct?

24  **A.**  Correct.

25  **Q.**  And those are estimated to be worth about $8.6 million,

1  right?

2  **A.**  Yes.

3  **Q.**  This firm balance -- oops, I keep wanting to circle, I

4  can't really circle that great here (indicating).

5      Okay.  This firm balance of $390,000, that wasn't included

6  within any of the documents that Mr. Rothenberg gave you,

7  correct?

8  **A.**  No.

9  **Q.**  The bank can see that information because the bank --

10  services and has the Rothenberg Ventures Management Company

11  bank accounts, right?

12  **A.**  Yes.

13      **MR. FAKHOURY:**  Okay.  Let's go to page 4 of this

14  exhibit.  And scroll down a little bit.

15      Okay.

16                  (Exhibit published.)

17  **BY MR. FAKHOURY:**

18  **Q.**  I wanted to talk about right here where it says "Credit

19  Risk Rating."

20      Credit risk rating is basically an evaluation of how risky

21  it is to lend someone money, right?

22  **A.**  Yes.

23  **Q.**  And I mean maybe it goes without saying, but obviously

24  every loan has some inherent risk in it, right?

25  **A.**  Yes.

1   Q.   Now, this credit risk analysis here is based on data as

2   of -- as of July 29, 2014, right?

3   A.   Yes.

4   Q.   And it lists some of the factors that go into assessing

5   how risky these loans are, right?

6   A.   Yes.

7   Q.   So, for example, here with Facility A, saying one of the

8   ways that the risk is mitigated is that the bank will have a

9   deed of trust on the property, right?

10  A.   Yes.

11  Q.   Like a lien basically?

12  A.   Yes.

13  Q.   Okay.   Another mitigating factor is Mr. Rothenberg's

14  excellent credit history, right?

15  A.   Yes.

16  Q.   The bank has identified repayment sources, right?  Meaning

17  money that will used to pay off these loans, right?

18  A.   Yes.

19  Q.   Now, I wanted to talk about this section right here

20  (indicating).   And again this is referencing debt-to-income

21  ratio, right?

22  A.   Yes.

23  Q.   And it notes that there's a debt-to-income ratio of

24  69 percent, correct?

25  A.   Yes.

 1    Q.   Now, it also talks about a second debt-to-income ratio,

 2    48 percent.  Do you see that?

 3    A.   Yes.

 4    Q.   And essentially the capital call line of credit is an

 5    interest-only loan, right?

 6    A.   Yes.

 7    Q.   And so if you're only paying interest instead of principal

 8    and interest, your debts are going to be lower than if you

 9    were paying both principal and interest, correct?

10    A.   Correct.

11    Q.   And that affects that debt-to-income ratio number, right?

12    A.   Yes.

13         MR. FAKHOURY:  Can you scroll down bit, Mr. Torres.

14    Okay.  Perfect.

15                    (Exhibit published.)

16    BY MR. FAKHOURY:

17    Q.   Now, another thing listed here is sensitivity to external

18    factors.  Do you see that?

19    A.   Yes.

20    Q.   And it talks about SVB wishes to expand its relationship

21    with Rothenberg Ventures portfolio companies, right?

22    A.   Yes.

23    Q.   And that sort of, again, fits within the niche of what

24    Silicon Valley Bank is trying to do, right?

25    A.   Yes.

 1          MR. FAKHOURY:  Let's go to page 16.

 2     Okay.  You can -- you can leave it right there.

 3                    (Exhibit published.)

 4   BY MR. FAKHOURY:

 5   Q.  This -- this section is labeled or titled "Credit

 6   Memorandum."  Do you see that?

 7   A.  Yes.

 8   Q.  And again, this is sort of an analysis of the loan by the

 9   underwriters, right?

10   A.  Yes.

11          MR. FAKHOURY:  Let's go to page 17 of -- actually, go

12   to the next page, please.

13     And we're going to focus right here (indicating).

14                    (Exhibit published.)

15   BY MR. FAKHOURY:

16   Q.  Now, this paragraph is talking about Mr. Rothenberg's

17   financial condition and credit history, right?

18   A.  Yes.

19   Q.  And again, it sort of summarizes some of that same

20   information that we've already seen and we've already talked

21   about, right?

22   A.  Yes.

23   Q.  And in fact, it includes the -- the differing

24   debt-to-income ratios, right, the 69 percent up here?

25   A.  Yes.

1    **Q.**  And then the 48 percent down here?

2    **A.**  Yes.

3    **Q.**  Okay.  One of the things that Mr. Walsh asked you about

4    was whether the bank considered the valuation of the venture

5    capital fund.  Do you recall that testimony?

6    **A.**  Yes.

7    **Q.**  And you said the bank typically doesn't consider that

8    because it's a bit speculative, right?

9    **A.**  Yes.

10   **Q.**  Okay.  Here, Mr. Rothenberg had valued the company being

11   worth 47-1/2 million dollars.  Do you recall that?

12   **A.**  Yes.

13   **Q.**  And it also indicates sort of here in the middle, where

14   that evaluation comes from, right, that he basically sold a

15   quarter of a percent, .25 percent, stake in the company for a

16   $125,000.  Right?  Do you see that?

17   **A.**  Yes.

18        **MR. FAKHOURY:**  Let's go to page 18 of this exhibit.

19        And you can leave it there.

20                    (Exhibit published.)

21   BY MR. FAKHOURY:

22   **Q.**  Now, this credit memorandum is talking about risks and

23   mitigating factors, right?

24   **A.**  Yes.

25   **Q.**  And it's specifically talking about Facility B in this

1  instance, right?

2  **A.**  Yes.

3  **Q.**  And again, Facility B is the capital call line of credit?

4  **A.**  Yes.

5  **Q.**  It list two risks, right?  Number one, the facility is

6  unsecured, right?  And then number two, that the firm, meaning

7  Rothenberg Ventures, is new, right?

8  **A.**  Yes.

9  **Q.**  And it lists, again, factors that mitigate those risks,

10 right?

11 **A.**  Yes.

12 **Q.**  So that includes up here for facilities unsecured, it

13 includes some conditions that were sort of put on the loan --

14 on the capital call line of credit, I should say, right?

15 **A.**  Yes.

16 **Q.**  And for the fact that the firm is new, it lists again sort

17 of the performance of the VC fund, right?

18 **A.**  Yes.

19 **Q.**  Talks about a strong performance with an IRR of

20 34 percent.  IRR, that's an individual rate of return, right?

21 Is that what that stands for?

22 **A.**  Investment rate of return.

23 **Q.**  Investment rate of return.  Thank you.

24      And an investment rate of return means -- of 34 percent,

25 that means if somebody had invested a thousand dollars, their

1   thousand dollars would now be worth $1,340, right?

2   A.   Yes.

3   Q.   If I did my math, right?

4   A.   Three hundred forty thousand dollars [sic], yes.

5   Q.   Okay.

6          MR. FAKHOURY:  Let's go to page 19 of this exhibit.

7             (Exhibit published.)

8   BY MR. FAKHOURY:

9   Q.   Now, we've talked quite a bit about this, and I think you

10  referred to it as "the spread," right?

11  A.   Yes.

12  Q.   This is sort of a snapshot of the loan and the factors

13  that go into the loan, right?

14  A.   Yes.

15  Q.   Okay.  I want to start by looking here at assets.

16      Now under assets, it lists cash at Merrill Lynch, right,

17  of $370,062?

18  A.   Yes.

19  Q.   It also lists some other assets, right?  It lists a

20  partnership business interest of $66,800.

21  A.   Yes.

22  Q.   And it lists private investments in Audax Equity and

23  Private Holdings of about $46,000?

24  A.   Yes.

25  Q.   It obviously lists the real estate at issue in the -- in

1    the mortgage?

2    **A.**   Yes.

3    **Q.**   Okay.  Let's turn to liabilities now.

4                          (Exhibit published.)

5    **BY MR. FAKHOURY:**

6    **Q.**   Within the liabilities, it lists the $210,000 in student

7    loans, right?

8    **A.**   Yes.

9    **Q.**   It lists credit card debt of $3,000, correct?

10   **A.**   Yes.

11   **Q.**   It also lists contingent liabilities; do you see that?

12   **A.**   Yes.

13   **Q.**   And a contingent liability is a liability that may arise

14   in the future but has not necessarily arisen yet, correct?  Do

15   I have that right?

16   **A.**   Sometimes it's contingent debt because the borrower either

17   has guaranteed the loan for a firm.  So if the firm doesn't

18   have the ability to pay, then they would go after the

19   guarantor.

20   **Q.**   That's called a recourse liability, right?

21   **A.**   Correct.

22   **Q.**   That would be this $123,000, that's what you're

23   specifically referring to, right?

24   **A.**   Yes.

25   **Q.**   And the remaining contingent liabilities is this $400,000,

JANDU – CROSS / FAKHOURY

1    right?

2    **A.**  Right.

3    **Q.**  Okay.  And that's actually the investment into Fund II,

4    right?  That's what it appears to be, right?

5    **A.**  The 123,000?

6    **Q.**  No, I'm sorry.  I'm talking about this amount right here,

7    $400,000?

8    **A.**  Oh, yes.

9    **Q.**  Okay.

10       The spread lists Mr. Rothenberg's total liabilities as --

11   as $1,603,067, right?

12   **A.**  Yes.

13   **Q.**  And that's including the existing mortgage loan owed to

14   Stanford Federal Credit Union, right?

15   **A.**  Yes.

16   **Q.**  Okay.

17          **MR. FAKHOURY:**  Okay.  Mr. Torres, can you scroll down

18   to the bottom of this page.

19       Okay.  Perfect.

20                      (Exhibit published.)

21   **BY MR. FAKHOURY:**

22   **Q.**  I'd like to talk a little bit more about debt-to-income

23   ratio.

24       I'm just going to draw a little line there (indicating).

25       Okay.  Now, we've talked already about this a little bit.

1    The debt-to-income ratio was calculated as 69 percent, right?

2    **A.**   Yes.

3    **Q.**   Now that number is generated by taking the total number

4    of -- the total amount of expenses, which here is $175,612.

5    Do you see that?

6    **A.**   Yes.

7    **Q.**   That's this number right here (indicating), right?

8    **A.**   Yes.

9    **Q.**   And then dividing it by net income, right?

10   **A.**   Yes.

11   **Q.**   And the net income amount is $254,036, right?

12   **A.**   Yes.

13   **Q.**   And if you -- if you divide those numbers, you come back

14   with 69 percent, right?

15   **A.**   Yes.

16   **Q.**   One way to think about net income is your income minus

17   your taxes, right?

18   **A.**   Yes.

19   **Q.**   And here, it lists gross income of $440,000 and then it

20   lists federal and state taxes of $172,000, property tax of

21   $13,000.  And that's how the net income amount is generated,

22   right?

23   **A.**   Yes.

24   **Q.**   Gross income would be the amount of money you have before

25   you pay taxes, right?

JANDU – CROSS / FAKHOURY

 1    **A.**   Yes.

 2    **Q.**   So in this instance, gross income would be $440,000.

 3    Correct?

 4    **A.**   Correct.

 5              **MR. FAKHOURY:**   Okay.  Mr. Torres, can you scroll up

 6    to the top of this page, please.

 7                          (Exhibit published.)

 8    **BY MR. FAKHOURY:**

 9    **Q.**   Up here it has a number for a gross income debt-to-income

10    ratio.  Do you see that?

11    **A.**   Yes.

12    **Q.**   And that's 43 percent, correct?

13    **A.**   Yes.

14    **Q.**   So in other words, the gross debt-to-income ratio is

15    taking the expenses and dividing it by the gross income, not

16    the net income, correct?

17    **A.**   Correct.

18    **Q.**   And whether to use gross income or net income can have a

19    pretty significant impact on your debt-to-income ratio, right?

20    **A.**   Yes.

21    **Q.**   Most banks use gross income to calculate the

22    debt-to-income ratio, correct?

23    **A.**   Specifically for mortgages, yes.

24    **Q.**   Okay.  And that's this form has a box up here for gross

25    income debt-to-income ratio, correct?

1    **A.**   Correct.

2              **MR. FAKHOURY:**   Could you pull up Exhibit 23,

3    Mr. Torres?

4                          (Exhibit published.)

5    **BY MR. FAKHOURY:**

6    **Q.**   Now Mr. Walsh asked you about this document.  This is the

7    Addendum Approval, right?

8    **A.**   Yes.

9    **Q.**   Basically because the house appraised for more than

10   anticipated, the loan amount was increased, right?

11   **A.**   Yes.

12   **Q.**   Now, this was created on August 18, 2014, right?

13   **A.**   Yes.

14   **Q.**   Again, it's addressed to you because you're sort of

15   reviewing it to decide whether it should go up for further

16   review, correct?

17   **A.**   Correct.

18   **Q.**   And, you know, just to be clear, like that first addendum

19   or -- I'm sorry -- like that first approval sheet, this one is

20   not sent to the borrower either, correct?

21   **A.**   No.

22   **Q.**   So Mr. Rothenberg's never -- the bank did not send this to

23   Mr. Rothenberg, correct?

24   **A.**   Correct.

25              **MR. FAKHOURY:**   Can you scroll down, Mr. Torres.

1    **Q.**  Okay.  Even though the loan amount increased by $200,000,

2    the terms of the loan had not changed, correct?

3    **A.**  Other than the loan amount, no.

4    **Q.**  Okay.  So same type of loan, same interest rate, just the

5    increased amount?

6    **A.**  Yes.

7    **Q.**  And then down here towards the bottom, it again lists

8    reasons for recommending the loan, right?  It talks about am

9    80 percent loan-to-value ratio.

10   **A.**  Yes.

11            **MR. FAKHOURY:**  Can you scroll to the next page,

12   Mr. Torres.

13        Perfect.  You can stop there.

14                    (Exhibit published.)

15   **BY MR. FAKHOURY:**

16   **Q.**  It talks about qualifying income, correct?

17   **A.**  Yes.

18   **Q.**  Good credit score?

19   **A.**  Yes.

20   **Q.**  Post-close liquidity is actually increased, right?

21   **A.**  Yes.

22   **Q.**  Because there's more -- because the proceeds from the

23   cash-out refinance are added towards the liquidity to pay off

24   that loan in the future, right?

25   **A.**  Yes.

1   **Q.**  And again, it notes the debt-to-income ratio has increased

2   to 74 percent but that's -- and that's higher than the

3   recommended 50 percent guideline, right?

4   **A.**  Yes.

5   **Q.**  But that's mitigated by credit history, right?

6   **A.**  Yes.

7   **Q.**  And again, that post-close liquidity, right?

8   **A.**  Correct.

9   **Q.**  And again, it repeats the information about -- financial

10  information that Silicon Valley Bank has about Rothenberg

11  Ventures Management Company, correct?

12  **A.**  Correct.

13          **MR. FAKHOURY:**  Let's go to page 3 of this exhibit.

14                  (Exhibit published.)

15  **BY MR. FAKHOURY:**

16  **Q.**  Okay.  And again this is updated or amended credit risk

17  rating, right?

18  **A.**  Yes.

19  **Q.**  And again, it notes that there's a deed of trust, right?

20  **A.**  Yes.

21  **Q.**  Excellent credit history?

22  **A.**  Yes.

23  **Q.**  Sufficient cash flow?

24  **A.**  Yes.

25          **MR. FAKHOURY:**  Can you scroll down, Mr. Torres.

 1                    (Exhibit published.)

 2    **BY MR. FAKHOURY:**

 3    **Q.**  Again it notes in a SVB wants to expand its relationship

 4    with the portfolio companies, right?

 5    **A.**  Yes.

 6            **MR. FAKHOURY:**  And actually if we could just scroll

 7    up just a tad.

 8         Oh, right here.  Perfect.

 9                         (Exhibit published.)

10    **BY MR. FAKHOURY:**

11    **Q.**  And again it noted that on the debt-to-income ratio that

12    if you -- if you accounted for the fact that the capital call

13    line of credit was interest-only, the debt-to-income ratio

14    would be 53 percent, right?

15    **A.**  Correct.

16            **THE COURT:**  Mr. Fakhoury, anytime in the next five

17    minutes.

18            **MR. FAKHOURY:**  You know, this would actually be a

19    good time, Your Honor.

20            **THE COURT:**  Very good.

21         Members of the jury, let's go ahead and take our first

22    break.  Remember my prior admonitions.  Don't make your mind

23    up about anything.  Don't talk to anybody.  Don't look

24    anything up.

25         I'll see you all in 15 minutes.

```
 1              THE CLERK:  Please rise for the jury.
 2         (The following proceedings were heard out of the presence
 3    of the jury:)
 4              THE COURT:  All right.  We're outside the presence of
 5    the jury.
 6         Is there anything for the record, Mr. Fakhoury?
 7              MR. FAKHOURY:  No, Your Honor.  Thank you.
 8              THE COURT:  Mr. Walsh?
 9              MR. WALSH:  No, Your Honor.
10              THE COURT:  All right.  Thanks.  Let's be in recess.
11         (Recess taken at 9:57 A.M.; proceedings resumed at
12    10:19 A.M.)
13         (The following proceedings were heard in the presence of
14    the jury:)
15              THE COURT:  All right.  Let me welcome Ms. Jandu back
16    up to the witness stand.  I don't see her.
17              MR. WALSH:  She's right outside.
18              THE COURT:  Okay.
19         Members of the jury, are they putting pastries in that
20    jury room for you before you get there.
21                        (Jurors nodding.)
22              THE COURT:  They are doing that.  And how do we feel
23    about that?  Are people sad because it's a lot of carbs and
24    it's making them sleepy?  Or are you happy when you see the
25    pastries?  What do you think, thumbs up, thumbs downs on the
```

 1   pastries?

 2          Thumbs up.  Okay.  Good.

 3          All right.  We'll resume with the cross-examination of

 4   Ms. Jandu.

 5          Mr. Fakhoury, your witness.

 6              **MR. FAKHOURY:**  Thank you, Your Honor.

 7          Mr. Torres, can you jump to page 9 of this exhibit.

 8                         (Exhibit published.)

 9   **BY MR. FAKHOURY:**

10   **Q.**  I just have a couple more questions, Ms. Jandu.

11          So we were looking at Exhibit 23, which is the addendum

12   approval report after the house appraised for more than

13   originally anticipated.  Okay?

14   **A.**  Okay.

15   **Q.**  And this is page 9 of that exhibit.  This is the sort of

16   revised spread, right?

17   **A.**  Yes.

18              **MR. FAKHOURY:**  And if you could scroll down,

19   Mr. Torres, a little bit.

20                         (Exhibit published.)

21   **BY MR. FAKHOURY:**

22   **Q.**  And again, Mr. Walsh had asked you --

23              **MR. FAKHOURY:**  Oh, that's fine.  Actually, can you go

24   up just a little bit.  Thank you.

25                         (Exhibit published.)

 1   BY MR. FAKHOURY:

 2   Q.  Mr. Walsh had asked you about this section right here,

 3   about the assets and liabilities section.

 4   A.  Yes.

 5   Q.  Okay.  And the assets here are the same from the -- the

 6   first exhibit, Exhibit 22, the first approval, right?

 7   A.  Yes.

 8   Q.  Okay.  And the same with the liabilities, correct?

 9   A.  Correct.

10   Q.  Which again include $210,000 in student loans, right?

11   A.  Yes.

12   Q.  And includes contingent liabilities, right?

13   A.  Yes.

14   Q.  And I believe you testified about this.  The -- the

15   post-close liquidity would be higher because there would be an

16   extra $200,000 in cash being removed as equity from the house,

17   right?

18   A.  Yes.

19        MR. FAKHOURY:  Okay.  Could we scroll down,

20   Mr. Torres.

21        Perfect.

22                    (Exhibit published.)

23   BY MR. FAKHOURY:

24   Q.  Now, here is again debt-to-income ratio, right?

25   A.  Yes.

1    Q.   This is what this section is basically about, right?

2    A.   Yes.

3    Q.   Okay.  And again, it calculates a debt-to-income ratio as

4    74 percent, correct?

5    A.   Correct.

6    Q.   And again, that's looking at the expenses, right?

7    A.   Yes.

8    Q.   Divided by the net income, correct?

9    A.   Correct.

10   Q.   Now, when we account for the fact that the capital call

11   line of credit is only interest only, right, that

12   debt-to-income ratio changes, right?  It's actually

13   53 percent, correct?

14   A.   Correct.

15   Q.   And this Exhibit 23 has this little table here that's not

16   on Exhibit 22, right (indicating)?

17   A.   Yes.

18           MR. FAKHOURY:  Mr. Torres, can you scroll up, please.

19       Actually all the way up to the top.  Thank you.  Perfect.

20                     (Exhibit published.)

21   BY MR. FAKHOURY:

22   Q.   And similarly, in terms of contractual reserves -- we just

23   talked about this, right? -- the post-close liquidity would be

24   higher because there'd be more cash out than anticipated,

25   right?

1    **A.**   Yes.

2    **Q.**   And so it's 53 months, right?

3    **A.**   Yes.

4    **Q.**   And again, if you're considering that the capital call

5    line of credit is only interest -- is interest only for three

6    years, actually that contractual reserves is 72 months of

7    reserves, right?

8    **A.**   Yes.

9    **Q.**   And then again we had talked before the break about the

10   difference between a gross -- using gross income for

11   debt-to-income ratio versus using a net income for

12   debt-to-income ratio.  And here, the gross debt-to-income

13   ratio is 46 percent, correct?

14   **A.**   Correct.

15   **Q.**   Okay.  We -- so we've now gone through quite a bit of

16   detail on these two loan approval sheets, right, Exhibit 22

17   and 23?  And you testified that after you've reviewed them,

18   you recommended to the credit administrator that these loans

19   be approved, right?

20   **A.**   Yes.

21   **Q.**   Okay.

22         **MR. FAKHOURY:**  Mr. Torres, can you pull up

23   Exhibit 24.

24                     (Exhibit published.)

25   / / /

1    BY MR. FAKHOURY:

2    Q.  Now, once -- once that happens, once -- once you've

3    recommended that the loan be approved, a notice of loan

4    approval is sent to the borrower, right?

5    A.  Yes.

6    Q.  And Mr. Walsh showed you this.  This is Exhibit 24.  This

7    is the notice of approval sent to Mr. Rothenberg, correct?

8    A.  Correct.

9    Q.  And it's dated August 18 of 2014?

10   A.  Yes.

11          MR. FAKHOURY:  Mr. Torres, can you pull up

12   Exhibit 25.

13                    (Exhibit published.)

14   BY MR. FAKHOURY:

15   Q.  Now, you testified that once the loan is formally

16   approved, a closing is scheduled, right?

17   A.  Yes.

18   Q.  And I'm showing you what's been -- actually, let me back

19   up a second.

20       When a closing happens, a number of documents are

21   generated in order -- so that the borrower can sign them,

22   correct?

23   A.  Yes.

24   Q.  And that's usually called a closing package, right?

25   A.  Yes.

1  **Q.**  Okay.  And have you looked at the closing package that was

2  issued in this case?

3  **A.**  No.

4  **Q.**  Okay.

5          **MR. FAKHOURY:**  You can close Exhibit 25.

6      You can close all these exhibits.  You can -- I don't need

7  any more exhibits actually.  You can unplug the computer.

8  **Q.**  Just a couple more questions.

9      Toward the end of your testimony on direct examination,

10  Mr. Walsh asked you if the bank would have wanted to know

11  whether the cash was pledged to the line of credit.

12      Do you recall that testimony?

13  **A.**  Yes.

14  **Q.**  And you testified it would -- it would have impacted that

15  debt-to-income ratio, right?

16  **A.**  Yes.

17  **Q.**  And ultimately that could affect whether the loan is

18  issued or not, right?

19  **A.**  Or amended, yes.

20  **Q.**  Okay.  "Amended" meaning that the terms of the loan could

21  change, right?

22  **A.**  Right.

23          **MR. FAKHOURY:**  Can I have a minute, Your Honor?

24          **THE COURT:**  Yes.

25                  (Pause in the proceedings.)

 1              **MR. FAKHOURY:**  I don't have any further questions.

 2    Thank you.

 3              **THE COURT:**  Thanks, Mr. Fakhoury.

 4        Mr. Walsh, further questions for Ms. Jandu?

 5              **MR. WALSH:**  No, Your Honor.

 6              **THE COURT:**  Ms. Jandu, thanks for your testimony.

 7    You're excused.

 8              **THE WITNESS:**  Thank you.

 9              **THE COURT:**  Mr. Waldinger, the government's next

10    witness, please.

11              **MR. WALDINGER:**  Your Honor, the government now calls

12    Ms. Paulette Brunk.

13              **THE COURT:**  I know she'll spell it for the court

14    reporter, but would you spell her last name for my benefit.

15              **MR. WALDINGER:**  B-R-U-N-K.

16              **THE COURT:**  V- as in victor?

17              **MR. WALDINGER:**  B- as in boy.

18              **THE COURT:**  Oh, Brunk.  Okay.  Very good.  Thanks.

19                     (Pause in the proceedings.)

20              **THE COURT:**  Good morning, Ms. Brunk.

21        Let me ask you to come up here to this area to my right.

22    You can see my courtroom deputy is there.  When you get there,

23    if you'd just remain standing, face her, and raise your right

24    hand, please.

25    /////

1                         **PAULETTE BRUNK**,

2      called as a witness by the plaintiff, having been duly sworn,

3      testified as follows:

4                  **THE WITNESS:**  Yes.

5                  **THE CLERK:**  Thank you.  If you could please state and

6      spell your last name for the court reporter.

7                  **THE WITNESS:**  Last name, Brunk.  B-R-U-N-K.

8                  **THE CLERK:**  Thank you.

9                  **THE COURT:**  Great.  Ma'am, if you'd just have a seat

10     right here on the witness stand.

11         My courtroom deputy is going to give you a clear mask

12     which is what our witnesses are wearing in court.  It's got

13     the straps that go behind your head as opposed to over your

14     ear.  There's two straps on there.  The thin one goes on your

15     nose and the thick one goes on your chin.

16                       (Off-the-record discussion.)

17                 **THE WITNESS:**  Like this?

18                 **THE CLERK:**  There you go.

19                 **THE WITNESS:**  Oh, okay.

20                 **THE COURT:**  COVID.

21                 **THE WITNESS:**  There we go.  Good?

22                 **THE COURT:**  That's what we're doing.  Yeah, perfect.

23                 **THE WITNESS:**  Oh, okay.

24                 **THE COURT:**  And you might be a little more

25     comfortable if you have the bottom strap under your ear, but

 1    it's up to you what feels comfortable.  We've had a lot of

 2    success with these masks actually.  We haven't had any problem

 3    at all.

 4        Ms. Brunk, first of all, good morning.  Have you ever

 5    testified in a court before?

 6            **THE WITNESS:**  No.

 7            **THE COURT:**  Okay.  It's mostly like having a

 8    conversation, but it's different in a couple ways.  It's

 9    usually helpful to people if I tell them the ways.

10        First is that because it's COVID, our jurors extend all

11    the way out into the gallery.  They're sitting a little

12    farther apart.  So if you could keep your voice up, stay close

13    to the microphone, that will be great because they all need to

14    be able to hear you.

15        Second thing is the lawyers are going to ask you

16    questions.  You're going to answer them.  But it's important

17    that we not interrupt each other.  And I say that because in

18    day-to-day conversation, we constantly interrupt each other

19    because we know what the other person is going to say and so

20    we kind of finish the thought for them before they can do

21    that.

22        But our court reporter here is trying to make a record of

23    the proceedings.  The jurors need to hear everybody clearly.

24    So if you'll wait till the lawyers have totally finished their

25    question before you answer, they'll wait until you've totally

1    finished your answer before they ask the next question.

2         Last thing is in day-to-day conversation, we use noises

3    and physical gestures all the time.  We go (indicating), or we

4    say "uh-huh" or "uh-uh."  The court reporter can't take down

5    any of that.  So if you could just answer "yes" or "no" or

6    whatever the word is, that would be great.

7         Does that all make sense?

8              **THE WITNESS:**  Yeah.

9              **THE COURT:**  Terrific.

10        Mr. Waldinger, your witness.

11                        <u>**DIRECT EXAMINATION**</u>

12   BY MR. WALDINGER:

13   **Q.**  Ms. Brunk, your first name is Paulette?

14   **A.**  Yes.

15   **Q.**  That's with one L and two T's?

16   **A.**  That's correct.

17   **Q.**  Ms. Brunk, could you tell the jury where you live?

18   **A.**  New York City.

19   **Q.**  What neighborhood do you live in?

20   **A.**  West Village.

21   **Q.**  Is that Lower Manhattan?

22   **A.**  Yes, Lower Manhattan.

23   **Q.**  More or less?

24   **A.**  More or less.

25   **Q.**  What do you do for a living?

BRUNK - DIRECT / WALDINGER

1   **A.**   I'm a notary signing agent.   Okay?

2   **Q.**   You do anything else for -- for compensation?

3   **A.**   I dog sit on the side.

4   **Q.**   Okay.   And so you keep the dogs in your apartment in the

5   West Village?

6   **A.**   I do.

7   **Q.**   How long have you been a notary?

8   **A.**   Since 2004.

9   **Q.**   Before that, what did you do for a living?

10  **A.**   I was in retail corporate for 16 years in the

11  merchandising division.

12  **Q.**   What kind of companies did you work for?

13  **A.**   I worked for Saks Fifth Avenue, the Off 5th outlet

14  division.   And I worked for Brylane Incorporated.   It was a

15  catalog company.

16  **Q.**   Are those the jobs that -- well, let me ask you first.

17  Are you originally from New York?

18  **A.**   No.   No.   Originally from Florida.

19  **Q.**   Were -- were the jobs in -- at Saks and the other company,

20  is that what brought you to New York City?

21  **A.**   Yes.

22  **Q.**   You said you lived in the West Village.   And I understand

23  from speaking with you before that you live near a landmark

24  that people who are certain fans of a certain sitcom from the

25  1990s flock to?

BRUNK - DIRECT / WALDINGER

1   **A.**   Yes.

2   **Q.**   And what's that?

3   **A.**   *Friends*.

4   **Q.**   Okay.  And the *Friends* apartment is near were you live?

5   **A.**   Yes.

6   **Q.**   Have you ever taken a selfie with the *Friends* apartment

7   behind you?

8   **A.**   No.

9   **Q.**   And do you -- but do you see people doing that?

10  **A.**   Yes.

11  **Q.**   So let's talk about your job as a notary.  What is a

12  notary?

13  **A.**   It's a public officer that is certified to witness the

14  signing of legal documents.

15  **Q.**   You said you've been a notary, I think, since 2004?

16  **A.**   Um-hmm.

17  **Q.**   Is that correct?

18  **A.**   Yes.  Yes.

19  **Q.**   Do you work for yourself, or do you work for a company?

20  **A.**   I work for myself, independent contractor.

21  **Q.**   Do you have a license?

22  **A.**   A notary license, I'm commissioned.

23  **Q.**   Who gives you your notary commission?

24  **A.**   The Department of State.

25  **Q.**   Is that the U.S. Department of State?

1    **A.**   I'm not sure.

2    **Q.**   Or the New York --

3    **A.**   I believe it's the -- the New York Department of State,

4    yeah.

5    **Q.**   Do you have to take a test to become a notary?

6    **A.**   Yes.

7    **Q.**   Is that a test given by the State of New York?

8    **A.**   Yes.

9    **Q.**   Do you just take that once, or do you take it multiple

10   times?

11   **A.**   Just once unless I allow my license to expire.

12   **Q.**   Do you take any other kind of annual exam or

13   certification?

14   **A.**   I do.

15   **Q.**   What's that?

16   **A.**   It's the National Notary Association recertification test

17   every year.

18   **Q.**   I looked up some sample questions from the New York State

19   notary exam.  And is that like a multiple choice exam?  Do you

20   remember?

21   **A.**   It is.

22   **Q.**   I'm just going to give you an example of one that I found

23   which is:  If your neighbor that you know well asks you to

24   notarize something, can you just sign the -- the document

25   that's notarized without doing more?

1    **A.**   No.

2    **Q.**   Why not?  You know the person.

3    **A.**   I need to see government-issued I.D. that's valid.

4    **Q.**   Do you do that for all your notarizations?

5    **A.**   Yes.

6    **Q.**   How do you get your notary work?  And specifically let's

7    go back to the summer of 2014.  How did you get your notary

8    work at that time?

9    **A.**   Are you -- are you talking about the company that hired

10   me?

11   **Q.**   That's correct.  How -- how do people know how to hire

12   Ms. Paulette Brunk to do -- to do notarizations?

13   **A.**   Okay.  I'm listed on the Internet on notarycafe.com and

14   notaryrotary.com and that's where they initially find me.

15   **Q.**   Back in the summer of 2014, would you say that you did a

16   particular -- like what were most of the notarizations that

17   you did, if there was something that you mostly did?

18   **A.**   I -- I will not recall.

19   **Q.**   Okay.

20   **A.**   Without going back and doing research.

21   **Q.**   Okay.

22        Well, I'm talking specifically what kinds of documents do

23   you typically notarize?

24   **A.**   They can be a refinance, a purchase, equity line of

25   credit, there's seller transaction, there's reverse mortgages,

1    there's commercial loans.

2    Q.  So is it fair to say that those -- you mostly work on real

3    estate loans?

4    A.  That's correct.

5    Q.  Or real estate transactions?

6    A.  Yes.

7    Q.  Can you explain to the jury, Ms. Brunk, what an

8    acknowledgment is in the notary world?

9    A.  The acknowledgment is a certificate that indicates that

10   the signer appeared before me, they've been identified, and

11   they willingly signed the document.

12   Q.  When you say "identified," what do you mean by that?

13   A.  Identification.  Government-issued I.D. that's valid.

14   Q.  I want to ask you briefly about, when you have a real

15   estate transaction, the steps that you took back in the summer

16   of 2014.

17   A.  Um-hmm.

18   Q.  So say that Paulette Brunk has been hired.  Somebody got

19   on notaryrotary.com, found you and hired you, and you've been

20   retained to do the notarization on a real estate closing.

21   A.  Yes.

22   Q.  Okay?

23   A.  Yes.

24   Q.  What's -- what's the typical process back in the summer of

25   2014?

1    **A.**   Typically, I get a phone call.  I take the assignment.

2    And then I confirm with the person, the signer that I'm

3    meeting, where we're signing.  And I ask them to bring a valid

4    government-issued I.D.  I ask them to have anyone who is on

5    title to the property there to sign.  And we confirm the

6    appointment.

7    **Q.**   When you go to the appointment, do you bring anything with

8    you?

9    **A.**   I bring the loan documents with me, okay, if they've been

10   sent to me via Internet, and I have a notary log journal and

11   everything that I need to do the signing.

12   **Q.**   Was that true back in the summer of 2014?

13   **A.**   Yes.

14   **Q.**   You said that -- you talked about whether the documents

15   were sent to you electronically.  Do you print them out?

16   **A.**   I do.

17   **Q.**   When you meet with the person who's signing, what was the

18   procedure that you used back in the summer of 2014?

19   **A.**   I always introduce myself and say who I'm there on behalf

20   of, which is generally the title company.  And then we proceed

21   from there.  I ask them for their government-issued valid I.D.

22   I fill out my notary log journal entry.  And then we start

23   going over the documents.  I present the documents.

24   **Q.**   Very good.

25        As you're going through the documents, do you present the

1    whole stack or do you do something else?

2    **A.**  I do not present the whole stack.  We go page by page,

3    okay, so we're both looking at it and then we're flipping it

4    over.

5    **Q.**  As you go through each document page by page, do you

6    give -- or -- and again back in the summer of 2014, did you

7    give the signer any legal advice?

8    **A.**  No.

9    **Q.**  Are you allowed to do that?

10   **A.**  No.

11   **Q.**  What if the signer has questions about the documents?

12   **A.**  We will first call the loan officer, their loan officer,

13   and if they're not available, we'll call someone from the

14   title company.

15   **Q.**  Is it your practice -- or was it your practice back in the

16   summer of 2014 to tell signers that the documents that they

17   were signing were not important?

18   **A.**  No.

19   **Q.**  Are they important?

20   **A.**  Yes.

21   **Q.**  Why is that?

22   **A.**  It's a mortgage.  You're -- you're securing a loan for

23   probably 15 or 30 years where you have to make a monthly

24   mortgage payment each month.  It's a -- it's a huge thing.

25   **Q.**  Have you ever told a signer that the documents were not

1    important?

2    **A.**  No.

3    **Q.**  Is it your practice to ever -- or was it your practice

4    back in the summer of 2014 to ever tell a signer that the

5    documents were really just form over substance?

6              **MR. FAKHOURY:**  Objection, hearsay.

7              **THE WITNESS:**  No.

8              **THE COURT:**  Hold on.  I'm sorry, ma'am.  When one of

9    the lawyers says "Objection" --

10             **THE WITNESS:**  Uh-huh.

11             **THE COURT:**  -- I need a second to think about whether

12   I'm going to allow the question.

13             **THE WITNESS:**  Oh, okay.

14             **THE COURT:**  In this case, I'm going to allow it.  I

15   think it's being offered for the fact that was said.

16   Overruled.

17   **BY MR. WALDINGER:**

18   **Q.**  So the question again was back in the summer of 2014, had

19   you ever told anybody or did you have the practice of saying

20   that the documents that they were signing were form over

21   substance?

22   **A.**  No.

23   **Q.**  Have you ever said that to a signer?

24   **A.**  No.

25   **Q.**  I'd like to ask you a few questions about timing.  How

 1   long can it take to sign the typical real estate closing

 2   package?

 3   **A.**  Depending on the type of loan package, 30 minutes to an

 4   hour.

 5   **Q.**  Is it your practice -- or was it your practice back in the

 6   summer of 2014 to inform people approximately how long it

 7   would take?

 8   **A.**  That's correct.

 9   **Q.**  Was it your practice to tell people that they could not

10   read the documents that you were going through?

11   **A.**  No.

12   **Q.**  What if somebody wanted to read a document back in the

13   summer of 2014 before they signed it, what would you do?

14   **A.**  I allowed them to read.  Still do.

15   **Q.**  You mentioned when you go to a real estate closing,

16   Ms. Brunk, that you bring the documents that you printed out,

17   correct?  And then I think you said you brought some kind of

18   other book that you have?

19   **A.**  Yes.  I have a notary log journal.

20   **Q.**  So that's called a notary log journal?

21   **A.**  Yeah.

22   **Q.**  Are you required to keep that by the State of New York?

23   **A.**  No, but it's -- it's suggested.

24   **Q.**  Is it your practice to keep that notary log journal for

25   each notarization that you do?

1    **A.**   Yes.

2    **Q.**   And in general, what kind of information do you record?

3    **A.**   The day that we met, the date of the signing, the

4    notarizations, the company who hired me, the identification

5    used with all the information printed in from the I.D., and

6    the signature of the person that I'm meeting.

7    **Q.**   Did you provide the government with copies of your records

8    regarding a notarization that you did with respect to Michael

9    Rothenberg in August of 2014?

10   **A.**   It was included in the loan package, yes.

11   **Q.**   And did you -- did you provide your records from your

12   notary log journal to the government?

13   **A.**   Yes.

14         **MR. WALDINGER:**   Your Honor, may I approach the

15   witness?

16         **THE COURT:**   You may.

17      Counsel may approach a witness for proper purpose at any

18   time without seeking the Court's permission.

19         **MR. WALDINGER:**   Thank you, Your Honor.

20   **Q.**   Ms. Brunk, I'm showing you what is not in evidence but

21   which has been marked as trial Exhibit 28, which is a

22   three-page document.

23      Do you recognize those documents, Ms. Brunk?

24   **A.**   Yes.

25   **Q.**   What are they?

1    **A.**   It's my entry for my notary log journal.

2    **Q.**   The first page of this document is black and white,

3    correct?

4    **A.**   Yes.

5    **Q.**   And then the second and the third pages are better

6    photographs of the left and right side; is that right?

7    **A.**   Yes.  Yes.

8    **Q.**   Did you make this record -- what is the date of this

9    record?

10   **A.**   8/21/14.

11   **Q.**   Did you make this record at or near that time based on

12   knowledge that you had?

13   **A.**   At the time of the signing.

14   **Q.**   So it's a "yes"?

15   **A.**   Yes.

16   **Q.**   And did you keep this then in the ordinary course of your

17   regular business activity as a notary?

18   **A.**   Yes.

19   **Q.**   And was keeping this record like this part of your regular

20   practice as a notary?

21   **A.**   Yes.

22        **MR. WALDINGER:**   Your Honor, I'd move to admit at this

23   time trial Exhibit 28.

24        **THE COURT:**   Is there an objection?

25        **MR. FAKHOURY:**   No, Your Honor.

 1            **THE COURT:**  Exhibit 28 is admitted.

 2        (Government's Exhibit 28 received in evidence.)

 3            **MR. WALDINGER:**  Ms. Margen, let's publish that to the

 4    jury, just the first page for now.

 5                        (Exhibit published.)

 6    **BY MR. WALDINGER:**

 7    **Q.**  This is the first page where I think -- I think my

 8    question was whether it was in black and white?

 9    **A.**  Yes.

10    **Q.**  Are the next two pages, then page 2, is this side of this

11    page 1 on the -- on the left side and page 3 is the right side

12    of what we see on page 1 of Exhibit 28?

13    **A.**  Yes.

14            **MR. WALDINGER:**  So let's move, Ms. Margen, to page 2.

15        And if we can -- I don't know if it can be blown up any

16    more.  It's pretty big.  That's great.

17                        (Exhibit published.)

18    **BY MR. WALDINGER:**

19    **Q.**  Can you see that okay, Ms. Brunk?

20    **A.**  Yes.  Yes.

21    **Q.**  If you could just tell the jury then what each of these

22    entries is.  And let's start with this on the left where it

23    says "Dates and Fees."

24    **A.**  Okay.  It's the date that I met the signer.  And then

25    below is the date on the document or could be the date that

BRUNK - DIRECT / WALDINGER

 1    the loan disbursed.

 2    Q.   How about this next section that says "Description of

 3    Documents or Proceeding"?

 4    A.   That's my notarizations.

 5    Q.   Typically in a -- in a loan package where you're doing

 6    notarizations, are there other documents that the signer is

 7    signing that are not notarized by you?

 8    A.   Yes.

 9    Q.   Despite the fact that you're not notarizing them, are you

10    still -- do you still walk through all those documents, and

11    did do that in the summer of 2014, and have them sign those

12    non-notarized documents?

13    A.   Yes.

14    Q.   With respect to the documents that were notarized here or

15    that are indicated as having been notarized, what do your

16    records indicate you notarized?

17    A.   That it's a deed of trust or mortgage, an owner's

18    affidavit, a signature name affidavit, and a financial status

19    affidavit.

20    Q.   In some states, what we call a deed of trust in California

21    is just called the mortgage, right?

22    A.   Yes.

23    Q.   What's it called in New York?

24    A.   A mortgage.

25    Q.   There is then a box called "Additional Information."   What

1   does it say there, Ms. Brunk?

2   **A.**   Vista National LLC.

3   **Q.**   What's Vista National LLC?

4   **A.**   It's the signing company that hired me.

5   **Q.**   And -- and ultimately paid you, I assume?

6   **A.**   Yes.

7           **MR. WALDINGER:**   Ms. Margen, let's go to page 3 of

8   Exhibit 28.

9       If we could blow that up in the same manner.

10                       (Exhibit published.)

11  **BY MR. WALDINGER:**

12  **Q.**   Page 3 of Exhibit 28 has a box on the left that says

13  "Signer Name and Address."  What is that area?

14  **A.**   That is the -- what I print in from the valid

15  government-issued I.D., the information.

16  **Q.**   The next section, again this is pretty self-explanatory,

17  but what is method of identification?

18  **A.**   It's actually driver's license.  But I have "passport"

19  checked, but it is a driver's license.

20  **Q.**   And why do you think it was actually a driver's license?

21  **A.**   Because it's redacted.  It typically would say

22  "California" with the driver's license number, expiration, and

23  date of birth.

24  **Q.**   You remember -- so these redactions were put on by the

25  government?

BRUNK - DIRECT / WALDINGER

1    **A.**   Yes.

2    **Q.**   And you remember your record actually started off

3    indicating it was California; is that right?

4    **A.**   Yes, I believe so.  Let me see.  Let me just double-check.

5    Well --

6    **Q.**   You don't have --

7    **A.**   -- I believe so.

8    **Q.**   Okay.

9    **A.**   I thought it said CA with the driver's license number.

10   **Q.**   Okay.  And this records expiration date and date of birth,

11   correct?

12   **A.**   Correct.

13   **Q.**   Finally, again, the last -- it's -- this section is pretty

14   self-explanatory, but it says "signature and thumbprint."

15   What's this section?

16   **A.**   It's the signer's signature.

17   **Q.**   Does New York require a thumbprint?

18   **A.**   No.

19   **Q.**   Very good.

20        With respect to this notary log journal, where do you --

21   where do you purchase that?  You get that at Staples or --

22   **A.**   I order this through notaryrotary.com where I'm listed as

23   a notary.

24   **Q.**   Okay.  So notaryrotary.com is kind of one-stop shop for

25   notaries?

1    **A.**  Yes.

2            **MR. WALDINGER:**  We can take that down, Ms. Margen.

3        Ms. Margen, if you could -- if we could just put on -- is

4    it possible just to put on Ms. Brunk's screen Exhibit 29?

5        (Exhibit published to witness, counsel, and the Court.)

6    **BY MR. WALDINGER:**

7    **Q.**  This document is not yet admitted as an exhibit.

8        Do you recognize what Exhibit 29 is, Ms. Brunk?

9    **A.**  Yes.

10   **Q.**  What is it?

11   **A.**  It's my work ledger.

12   **Q.**  Does this just show the particular transaction that you

13   were subpoenaed to testify about today?

14   **A.**  Yes.

15   **Q.**  Again, same questions that I asked you with respect to

16   your notary log journal.  Do you make this record at or near

17   the time of the events based on your own knowledge?

18   **A.**  The same day.

19   **Q.**  Do you keep this in the ordinary course of your regular

20   business as a notary?

21   **A.**  Yes.

22   **Q.**  And was making this record a regular practice of your

23   business?

24   **A.**  Yes.

25           **MR. WALDINGER:**  Your Honor, I'd move to admit United

1    States Trial Exhibit 29?

2            **THE COURT:**  Is there an objection?

3            **MR. FAKHOURY:**  No, Your Honor.

4            **THE COURT:**  Exhibit 29 is admitted.

5        (Government's Exhibit 29 received in evidence)

6            **MR. WALDINGER:**  Ms. Margen, if we could just blow up

7    the top part there which has the information.

8                    (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**  Very briefly, Ms. Brunk, I'd like to go through some of

11   these columns.

12       What sort of information -- I want to go through some of

13   the columns and record the information -- or go through the

14   information that you record.

15       What is this column on the left, the FWPS number?

16   **A.**  It's the file number that's attached to the loan package.

17   **Q.**  Whose number is that?

18   **A.**  Chicago Title.

19   **Q.**  So it's the title company's?

20   **A.**  Yes.

21   **Q.**  I guess I should ask you when you get the documents to

22   print out, are you getting them from the lender or are you

23   getting them from a title company?

24   **A.**  Title company.

25   **Q.**  Can you -- does your record indicate who the lender was?

BRUNK - DIRECT / WALDINGER

1    **A.**   Yes.

2    **Q.**   What was the lender?

3    **A.**   Silicon Valley Bank.

4    **Q.**   What does the "L" next to Silicon Valley Bank's --

5    **A.**   I believe it means loan.

6    **Q.**   This records who the title company was?

7    **A.**   Yes.

8    **Q.**   So you know that to be Chicago Title Company, correct?

9    **A.**   Yes.

10   **Q.**   Who was the borrower?

11   **A.**   That is Michael B. Rothenberg.

12   **Q.**   There's a phone number.  Is that Mr. Rothenberg's phone

13   number or someone else's?

14   **A.**   His.  Mr. Rothenberg's.

15   **Q.**   How did you get that number?

16   **A.**   I typically get it from the signing company or the title

17   company that hires me.

18   **Q.**   The last column is Notes Comment.  Could you explain to

19   the jury what the entry there is for?

20   **A.**   Okay.  These are just notes for myself.  The "E" means

21   e-docs which means I received the documents via Internet.

22       And FedEx with a FedEx number is the tracking number of

23   the package that was sent back to Chicago Title.

24   **Q.**   Let's stop a moment on that.  Let's go to the end of the

25   signing process.  When you get the -- when you finish the

1   signing process, what did you do with the documents then back

2   in the summer of 2014?

3   A.  I reviewed them, and then I went to FedEx and shipped them

4   out.

5   Q.  When you review documents, what are you looking for?

6   A.  I'm looking for any misses like in signatures, initials,

7   and dates and notarizations.  I review everything to make sure

8   nothing is missed.

9   Q.  Do you do that after you leave the signer's presence, or

10   do you do it while you're still with the signer?

11   A.  I do it at the time, and then I will do it one more time

12   before I drop, just to double-check.

13   Q.  So that's a measure twice, cut once, before you send it?

14   A.  Yes.

15   Q.  So you review -- back in the summer of 2014 after this

16   signing was completed, would you have checked all the

17   documents in Mr. Rothenberg's presence?

18   A.  Yes.

19   Q.  Can you tell from this record the date that the signing

20   occurred on?

21   A.  Yes.  It's August 21, 2014.

22   Q.  I asked you previously whether you got paid.  Does this

23   indicate when you get paid and how much?

24   A.  Yes.

25   Q.  What was that?

1    **A.**   Okay.  It paid October 15th, 2014, for a hundred dollars.

2    **Q.**   Very good.

3          **MR. WALDINGER:**  Let's take that down, Ms. Margen.

4    **Q.**   And now, Ms. Brunk, I would --

5          **MR. WALDINGER:**  If we could just show Ms. Brunk and

6    not the jury, United States Exhibit 30.

7                         (Exhibit published.)

8    **BY MR. WALDINGER:**

9    **Q.**   Ms. Brunk, do you recognize this exhibit?

10   **A.**   Yes.

11   **Q.**   What is it?

12   **A.**   It's my invoice for this particular job.

13   **Q.**   And what is an invoice?

14   **A.**   It's just a record of the amount of my fee that I send to

15   the company that hires me.

16   **Q.**   Again, did you make this invoice at or around the time of

17   the events that it memorializes?

18   **A.**   Same day.

19   **Q.**   Was it your practice to make this record and then to keep

20   it in the regular course of your business?

21   **A.**   Yes.

22          **MR. WALDINGER:**  Your Honor, I'd move to admit trial

23   Exhibit 30.

24          **THE COURT:**  Any objection?

25          **MR. FAKHOURY:**  No, Your Honor.

 1              **THE COURT:**  Exhibit 30 is admitted.

 2         (Government's Exhibit 30 received in evidence)

 3                        (Exhibit published.)

 4    **BY MR. WALDINGER:**

 5    **Q.**  Ms. Brunk, does this invoice memorialize also the FedEx

 6    tracking number?

 7    **A.**  Yes.

 8    **Q.**  Where do you get that Fedex tracking number from?  Do you

 9    generate that?

10    **A.**  No.  The -- the company that hires me, typically the

11    signing company or the title company.

12    **Q.**  Do they provide you with the airbill?

13    **A.**  Yes.

14    **Q.**  Does this record indicate where you actually did the

15    signing with Mr. Rothenberg?

16    **A.**  Yes.

17    **Q.**  What was that location?

18    **A.**  65 West 54th Street, New York, New York 10019.

19    **Q.**  This also indicates, correct, that it was a case in which

20    you got the documents electronically?

21    **A.**  That's correct.

22    **Q.**  Do you -- do you go to Kinko's to print them out, or do

23    you have your own printer?

24    **A.**  I have my own printer.

25    **Q.**  Does that get heavy use during parts of the year?

1  A.  Yes.

2  Q.  So if you were to -- would you recommend that printer to

3  everybody here?

4  A.  Yes.

5  Q.  What's the brand?

6  A.  It's a Brother laser printer.  Highly recommend.

7                          (Laughter.)

8  BY MR. WALDINGER:

9  Q.  All right, Ms. Brunk.  I want to go through another

10  exhibit.  I believe Exhibit 31 is already in evidence, and so

11  I would like to put that up on the screen.  If you would like

12  a paper copy to look through as well --

13  A.  No, I can see.  Thank you.

14                      (Exhibit published.)

15  BY MR. WALDINGER:

16  Q.  You've -- you've seen this.  This is a -- Exhibit 31 is

17  a -- or an 84-page document.

18      Have you reviewed this package before, this exhibit?

19  A.  Yes.

20          MR. WALDINGER:  And we'll just page through a little

21  bit, Ms. Margen.

22                      (Exhibit published.)

23  BY MR. WALDINGER:

24  Q.  Ms. Brunk, what's -- what is Exhibit 31?

25  A.  This says 002.  These are closing instructions.

1  Q.  But in general, what is -- what are in these 84 --

2  84 pages?

3  A.  It's the complete loan package.  Usually they include

4  title documents and lender documents.

5  Q.  Let me just show you Exhibit 31.

6  A.  Okay.

7       MR. WALDINGER:  And let's go back to the first page,

8  Ms. Margen.

9                 (Exhibit published.)

10  BY MR. WALDINGER:

11  Q.  Would these have been the documents, except for the first

12  page, that you sent to Chicago Title Company?

13  A.  Yes.

14  Q.  Those -- and were these the documents that Mr. Rothenberg

15  signed on August 21st of 2014?

16  A.  Yes.

17       MR. WALDINGER:  Ms. Margen, if we could go to

18  page 16.

19                 (Exhibit published.)

20  BY MR. WALDINGER:

21  Q.  This document is titled "Deed of Trust, correct,

22  Ms. Brunk?

23  A.  Yes.

24  Q.  Is the deed of trust typically a document that has to be

25  notarized?

1   **A.**   Yes.

2   **Q.**   Is the last page -- or is the page the deed of trust that

3   has the borrower's signature page 28?

4   **A.**   (Reviewing document.)

5        Yes.

6           **MR. WALDINGER:**  So let's go to that, Ms. Margen.

7                    (Exhibit published.)

8   **BY MR. WALDINGER:**

9   **Q.**   So that's page 28 that's up on the screen now?

10       Ms. Brunk, is that page 28 up on the screen?

11  **A.**   Yes.

12  **Q.**   Is this signature notarized?

13  **A.**   Yes.

14  **Q.**   Is that the next page of Exhibit 31?

15  **A.**   Yes.

16  **Q.**   I just want to take a minute to walk through this one

17  acknowledgment.

18       Do all of the acknowledgments in Exhibit 31 basically

19  follow this same format?

20                    (Exhibit published.)

21  **BY MR. WALDINGER:**

22  **Q.**   To your knowledge?

23  **A.**   Pretty much so, yes.

24  **Q.**   There's some handwriting.  The "California" is crossed off

25  and "New York" is written in.  Do you know who did that?

1    **A.**   I did.

2    **Q.**   Are those your initials next to "New York"?

3    **A.**   Yes.

4    **Q.**   County of New York means Manhattan Island?

5    **A.**   Yes.

6    **Q.**   Is this your handwriting where it says the borrower's name

7    as well?

8    **A.**   Yes.

9    **Q.**   Is that your signature?

10   **A.**   Yes.

11   **Q.**   Is this the -- or is this what a -- what a notary

12   acknowledgment or notarization is required to look like in the

13   State of New York?

14   **A.**   Yes.

15   **Q.**   What's this right here, the thing in the middle on the

16   right (indicating)?

17   **A.**   That's my notary stamp.  It authenticates my signature and

18   makes this acknowledgment official.

19   **Q.**   At that time in August of 2014, your commission didn't

20   expire until May, end of May, of 2017, correct?

21   **A.**   Yes.

22   **Q.**   Do you get the stamp from notaryrotary.com also?

23   **A.**   Yes, I do.  Yes.

24         **MR. WALDINGER:**  If we could now go to page -- let's

25   go to page 30 -- or excuse me, 41, Ms. Margen.

```
 1                         (Exhibit published.)

 2   BY MR. WALDINGER:

 3   Q.   What is this document, Ms. Brunk?

 4   A.   It's a financial status affidavit.

 5   Q.   Was this document notarized?

 6   A.   Yes.

 7            MR. WALDINGER:  If we could turn to the next page.

 8                         (Exhibit published.)

 9   BY MR. WALDINGER:

10   Q.   Is your notarization on page 40?

11   A.   It's page 42.

12   Q.   Oh, excuse me.  Sorry.

13            MR. WALDINGER:  Let's -- let's go to page 42, Ms. --

14       Got it.

15                         (Exhibit published.)

16   BY MR. WALDINGER:

17   Q.   So this is your notarization of the financial status

18       affidavit?

19   A.   Yes.

20   Q.   As my prior question indicated, this notarization looks

21       very similar to the last one we saw?

22   A.   Yes.

23            MR. WALDINGER:  Ms. Margen, then if we could go back

24       to then page 41 of Exhibit 31.

25                         (Exhibit published.)
```

1    BY MR. WALDINGER:

2    Q.  Based on your review of Exhibit 31 then, was the financial

3    status affidavit a document that Mr. Rothenberg signed in your

4    presence on August 21st of 2014?

5    A.  Yes.

6    Q.  Did you notarize this document?

7    A.  Yes.

8          MR. WALDINGER:  All right, thank you, Ms. Margen.

9    You can take that down.

10         Let's look very quickly at --

11         Excuse me.  Just one second.

12                    (Pause in the proceedings.)

13   BY MR. WALDINGER:

14   Q.  I believe you testified earlier, Ms. Brunk, that in

15   addition to notarizations, there are also other documents that

16   you walk through with the borrower and have them sign even if

17   they don't require your notarization?

18   A.  Yes.

19   Q.  Does that typically include what's called the loan

20   application?

21   A.  Yes.

22         MR. WALDINGER:  Ms. Margen, could we turn to page 52.

23                    (Exhibit published.)

24   BY MR. WALDINGER:

25   Q.  We are now on page 52 of Exhibit 31, Ms. Brunk.

1           In general, what is this document?

2      **A.**   It's the final typed loan application.

3      **Q.**   Is there a common name for this?

4      **A.**   It's a 1003.

5      **Q.**   Do you use that term when you're speaking with the

6      borrower?

7      **A.**   No.

8      **Q.**   1003 is sort of a real estate lingo for this form?

9      **A.**   Yes.

10     **Q.**   But you don't use that lingo with the borrower, correct?

11     **A.**   No.  They wouldn't -- I don't believe they would

12     understand.

13     **Q.**   Is this a document that's signed during the final closing

14     process?

15     **A.**   Yes.

16     **Q.**   Back in the summer of 2014, then, would Mr. Rothenberg

17     have signed the loan application, the 1003, at the top of

18     page 52?

19     **A.**   Yes.

20     **Q.**   Would he also have signed it in at least two other places?

21     **A.**   Yes.

22             **MR. WALDINGER:**  Let's turn to page 54.

23                      (Exhibit published.)

24     **BY MR. WALDINGER:**

25     **Q.**   Does this page of Exhibit 31 also show Mr. Rothenberg's

BRUNK - DIRECT / WALDINGER

1   signature?

2   **A.**   Yes.

3   **Q.**   And finally, the next page, is there also a signature of

4   Mr. Rothenberg --

5   **A.**   Yes.

6   **Q.**   -- on page 55?

7   **A.**   Yes.

8   **Q.**   Then taking you back to the summer of 2014 and your

9   practice in general, if a borrower or whoever it is that's

10  signing the documents, has a question that you can't answer,

11  you remind the jury or tell the jury what you -- you would do

12  in that situation?

13  **A.**   I recommend that they call their loan officer, and if they

14  can't reach them, then we'll contact the title company.

15  **Q.**   Have there been times when signings don't finish or -- or

16  aren't completed for whatever reason?

17  **A.**   Yes.

18  **Q.**   Are there times when numbers have to be changed on the

19  1003?

20  **A.**   It only happened once.  Yes, once.

21  **Q.**   Okay.  So that's happened?

22  **A.**   That I recall.

23  **Q.**   That you recall.

24  **A.**   Yeah.

25  **Q.**   Okay.  And have there been times when signings had to be

1  adjourned for one reason or another?

2  **A.**  Yes.

3  **Q.**  Do you have any specific recollection of this particular

4  signing session from August of 2014?

5  **A.**  No.

6          **MR. WALDINGER:**  Just one second, Your Honor.

7                  (Pause in the proceedings.)

8  **BY MR. WALDINGER:**

9  **Q.**  Let me -- let me ask you a couple more questions.

10     You say -- is it true that you require identification?

11 **A.**  Yes.

12 **Q.**  And what is that typically?

13 **A.**  It's a government-issued valid I.D.

14 **Q.**  Do you record that somewhere in the -- in the signing

15 documents usually?

16 **A.**  Yes.  The U.S. Patriot Act form.

17         **MR. WALDINGER:**  Ms. Margen, if we could put back up

18 trial Exhibit 31 and go to page 43.

19                     (Exhibit published.)

20 **BY MR. WALDINGER:**

21 **Q.**  Is this the form that you're talking about?

22 **A.**  Yes.

23 **Q.**  What does this record as the identification that was

24 presented to you, Paulette Brunk, on August 21st of 2014?

25 **A.**  State-issued driver's license and an American Express

BRUNK - DIRECT / WALDINGER

1    credit card.

2    Q.  You recorded the full number of the American Express card?

3    A.  Yes.

4    Q.  And it looks like it's redacted but the last four digits

5    of the driver's license?

6    A.  Yes.

7    Q.  Did you indicate the state?

8    A.  Yes.  Under county and state, it says United States,

9    California CA.

10   Q.  Do you take -- do you take photographs -- or back in the

11   summer of 2014, did you take photographs of the

12   identification?

13   A.  No.

14   Q.  What did you do?

15   A.  I asked the signer to make a photocopy for me, or if they

16   couldn't, then they would find somebody to make a photocopy of

17   it for them.

18   Q.  Did you keep -- did you then put that into the FedEx

19   envelope that you sent to the title company?

20   A.  Yes.

21   Q.  Again, you don't have any specific recollection of whether

22   you got photocopies of Mr. Rothenberg's driver's license and

23   American Express card, correct?

24   A.  If I --

25   Q.  You don't have a specific recollection of whether --

1   **A.** No, I don't have a -- no.

2   **Q.** But if he had given you photocopies of his driver's

3   license and American Express card, what would you have done

4   with those?

5   **A.** I would include them with the loan package and FedEx them

6   back to the title company.

7   **Q.** Very good.

8           **MR. WALDINGER:** No further questions, Your Honor.

9           **THE COURT:** Thank you, Mr. Waldinger.

10      Mr. Fakhoury, questions for this witness?

11          **MR. FAKHOURY:** Just a few. Thank you.

12                      **CROSS-EXAMINATION**

13  **BY MR. FAKHOURY:**

14  **Q.** Still morning. Good morning, Ms. Brunk.

15  **A.** Good morning.

16  **Q.** I just have a few questions for you. Okay?

17      You testified you primarily do real estate documents in

18  your notary business, right?

19  **A.** Yes.

20  **Q.** And in 2014, you were probably doing quite a bit of loan

21  signings and loan documents and that sort of thing?

22  **A.** I don't recollect.

23  **Q.** Okay.

24      Fair to say more than -- more -- more than -- than today

25  with the high interest rates we've got?

1    **A.**   I'm not working much this year.

2    **Q.**   Okay.  Fair enough.

3    **A.**   Right.

4    **Q.**   Now, Mr. -- Mr. Waldinger showed you Exhibit 31 which was

5    the closing packet.  Do you recall?

6    **A.**   Yes.

7    **Q.**   Okay.  And he mentioned there's about 84 pages in there,

8    right?

9    **A.**   Yes.

10   **Q.**   You mentioned that you print out the documents that are

11   sent to you by the title company and bring them to the

12   closing, right?

13   **A.**   And the signing company, yes.

14   **Q.**   Okay.  And so that 84-page exhibit, you would have printed

15   out that entire packet and brought it with you to the closing

16   that we've been talking about here in this case, right?

17   **A.**   Yes.

18   **Q.**   And you testified that if a borrower wanted to read that

19   whole packet, you'd -- you'd obviously let them have all the

20   time they need to do that, correct?

21   **A.**   Yes.

22   **Q.**   And you also testified that about, on average, a closing

23   is usually between 30 and 45 minutes, right?

24   **A.**   Yes.

25   **Q.**   And that's including verifying the identification, right?

1    **A.**   Yes.

2    **Q.**   Reviewing the documents with the signer?

3    **A.**   Yes.

4    **Q.**   Filling out your journal -- the information in the

5    journal, right?

6    **A.**   Yes.

7    **Q.**   A lot of borrowers see those documents for the first time

8    at a closing, right?

9    **A.**   Yes.

10   **Q.**   You mentioned that if there's incorrect information on the

11   Form 1003, it could be changed, right?

12   **A.**   Only if it's authorized --

13   **Q.**   Okay.

14   **A.**   -- by the lender.

15   **Q.**   Okay.

16       And I think you testified that you've only had one time

17   that you can recall where a Form 1003 was changed, right?

18   **A.**   Yes, with a number.

19   **Q.**   Got it.

20       Is it safe to say that most people want to get their

21   documents signed and be on their way?

22   **A.**   Yes.

23           **MR. FAKHOURY:**  Can I have one quick minute, Your

24   Honor?

25           **THE COURT:**  Yes.

```
 1                    (Pause in the proceedings.)

 2           MR. FAKHOURY:  I have nothing further.  Thanks, Your

 3    Honor.

 4           THE COURT:  Thanks, Mr. Fakhoury.

 5       Mr. Waldinger?

 6           MR. WALDINGER:  No further questions, Your Honor.

 7           THE COURT:  Ms. Brunk, did you come all the way out

 8    here to testify?

 9           THE WITNESS:  Uh-huh.

10           THE COURT:  Thanks for your testimony.  You're

11    excused.

12           THE WITNESS:  Thank you.

13           THE COURT:  Yeah.

14       Mr. Walsh, government's next witness?

15           MR. WALSH:  Your Honor, the government calls Ingrid

16    Robertson.

17           THE COURT:  All right.

18       Ladies and gentlemen, you can stand up and stretch if you

19    want.  It would be a good time for that.  I'm going to do it.

20       Good morning, Ms. Robertson.

21       You can see my courtroom deputy standing up right over

22    here.  If you would just come over to that area, remain

23    standing, and raise your right hand, please.

24    /////

25    / / /
```

1                         **INGRID ROBERTSON**,

2       called as a witness by the plaintiff, having been duly sworn,

3       testified as follows:

4              **THE CLERK:**  Thank you.  If you could please state and

5       spell your last name for the court reporter.

6              **THE WITNESS:**  Ingrid Robertson, I-N-G-R-I-D, last

7       name, R-O-B-E-R-T-S-O-N.

8              **THE COURT:**  Thanks, Ms. Robertson.

9          My courtroom deputy has got a clear mask for you.  It's

10      what our witnesses are wearing so folks can see your

11      expression.  It's got two straps that go behind the head.  So

12      you just grab them both in one hand.  And pull them over your

13      head and behind your head just like that.  Yeah.

14         Great.  And then if you put that lower strap below your

15      ear, it might be a little more comfortable.  There you go.

16      How's that feel?

17             **THE WITNESS:**  I think good.

18             **THE COURT:**  Good.

19         Have you ever testified in a courtroom before?

20             **THE WITNESS:**  No.

21             **THE COURT:**  Okay.  It's mostly like a conversation.

22      The lawyers will ask you questions, you'll answer.

23         A couple things are a little different.  So first of all,

24      we have a jury.  And they all need to be able to hear you.

25      And because it's COVID, they're further apart, they go all the

1    way out into the gallery.  So if you could keep your voice up,

2    stay close to the microphone, they'll be able to hear you.

3    They'll appreciate that.

4        Also, our court reporter here is making a record of the

5    proceedings.  And she can only take down one person at a time.

6    And in day-to-day conversation, we interrupt each other all

7    the time because we know what the other person is going to say

8    so we just finish the question or we just start answering

9    before they're done, that kind of thing.

10       In court, we have to wait until the person has totally

11   finished their question.  And then they'll wait till you've

12   totally finished your answer.  And then only one person will

13   be talking at a time.

14       The last thing is in day-to-day conversation, we use

15   noises and gestures to communicate.  So you might go like this

16   or like this (indicating) or you might say "uh-huh" or

17   "uh-huh," and the court reporter can't take down any of that.

18   So if you could use whole words to answer the questions, she'd

19   appreciate it.

20            **THE WITNESS:**  Yes, sir.

21            **THE COURT:**  All right.  Thank you.

22       Mr. Walsh, your witness.

23                         **DIRECT EXAMINATION**

24   **BY MR. WALSH:**

25   **Q.**  Where do you work?

1   **A.**   Silicon Valley Bank.

2   **Q.**   How long have you worked there?

3   **A.**   Since 2010.

4   **Q.**   And what's your current title at Silicon Valley Bank?

5   **A.**   A mortgage operations analyst.

6   **Q.**   Okay.  And we'll circle back to that in a little bit.  But

7   where are you from?

8   **A.**   Originally Texas.

9   **Q.**   Whereabouts in Texas?

10  **A.**   Temple.

11  **Q.**   And did you eventually end up here somewhere in the

12  Bay Area?

13  **A.**   Yes.

14  **Q.**   About when was that?

15  **A.**   Early '90s, San Jose.

16  **Q.**   And at some point, did you end up working in the mortgage

17  industry?

18  **A.**   Yes.

19  **Q.**   About when was that?

20  **A.**   1993, Accredited Mortgage was my first job.

21  **Q.**   What is Accredited Mortgage?

22  **A.**   It's a mortgage broker.

23  **Q.**   What's a mortgage broker?

24  **A.**   It is a company that works with various lenders on behalf

25  of the borrower to find them the best program and rate for

ROBERTSON - DIRECT / WALSH

1   their financial needs.

2   **Q.** How long were you at Accredited Mortgage?

3   **A.** A couple years, until their -- their -- they went out of

4   business, and then they referred me to Gregory Financial.

5   **Q.** During those couple years you were there at Accredited

6   Mortgage, what were you doing?

7   **A.** I was a loan processor.

8   **Q.** Okay.  We'll circle back to what that is in a little bit.

9       So you ended up after a couple years at Gregory Financial,

10  you said?

11  **A.** Yes.

12  **Q.** What's that?

13  **A.** Also a mortgage broker.

14  **Q.** And what was your role there at Gregory Financial?

15  **A.** A loan processor.

16  **Q.** How long were you at Gregory Financial?

17  **A.** They merged with a company called Broker One which became

18  ACCESSbank Mortgage, and I was there till about 2002.

19  **Q.** What was ACCESSbank Mortgage?

20  **A.** Also a mortgage broker.

21  **Q.** And what was your job at ACCESSbank mortgage?

22  **A.** A loan processor.

23  **Q.** All right.  In about 2008, did you end up rejoining the

24  mortgage industry?

25  **A.** Yes.  That is correct.

1   **Q.**  And where was that?

2   **A.**  ACCESSbank Mortgage.

3   **Q.**  What was your job when you came back in 2008?

4   **A.**  A loan processor.

5   **Q.**  And I think you've already told us, but how long were you

6   there until you started working at SVB?

7   **A.**  A couple years, and then I moved over to Silicon Valley

8   Bank in 2010.

9   **Q.**  And during that time period, those two years there, you

10  were doing loan processing?

11  **A.**  Yes.

12  **Q.**  When you get to Silicon Valley Bank in 2010, what was your

13  first job there?

14  **A.**  I was basically still a loan processor.  They had a

15  different name for it.  I was a real estate loan associate, I

16  believe was the name.

17  **Q.**  How many people were you -- were at Silicon Valley Bank in

18  that position?

19  **A.**  I believe it started with two of us.

20  **Q.**  You and one other person?

21  **A.**  Yes.

22  **Q.**  And over the -- I guess it's now been 12 years there at

23  Silicon Valley Bank, have you always held the same position?

24  **A.**  No.

25  **Q.**  What have your positions been over that time frame?

1   **A.**  I have been -- I've done the initial disclosures.  I was a

2   preprocessor.  I was a doc specialist.  And now I'm a funder.

3   **Q.**  Okay.  So let's talk a little bit about those various

4   items that you just -- or roles that you were just saying.

5      Do those all, at Silicon Valley Bank, have different

6   titles or the same title?

7   **A.**  The same title.

8   **Q.**  And what is that same title?

9   **A.**  At that time, real estate loan associate.

10  **Q.**  And what's its current version of that title?

11  **A.**  Mortgage operations analyst.

12  **Q.**  Two names, same jobs?

13  **A.**  Yes.

14  **Q.**  Within those titles, though, there are apparently some

15  different functions?

16  **A.**  Correct.

17  **Q.**  How many are there?

18  **A.**  I would say four.

19  **Q.**  If you've got to adjust that, adjust away.

20  **A.**  Sorry.

21  **Q.**  It's okay.

22  **A.**  I just feel like -- sorry.

23  **Q.**  Adjust away.  I don't want to distract you.  I want to

24  make sure you're paying attention.

25  **A.**  Yes.

1   **Q.**   So -- you're good?  Okay.

2       So there were -- you're saying there were four different

3   functions or teams.  What were they?

4   **A.**   The initial disclosures team.  The preprocessing team.

5   The doc specialist.  And then the funder.

6   **Q.**   Okay.  What is the initial disclosures team?  What's their

7   job?

8   **A.**   They -- once the application comes in, they prepare the

9   initial disclosures that go -- like the good-faith estimate

10  and some additional documentation that gets sent to the

11  borrower.

12  **Q.**   Okay.  And this is all in the context of mortgage

13  applications?

14  **A.**   Yes.

15  **Q.**   What's the second, the preprocessor, what's -- what's

16  that?

17  **A.**   They are the person in between.  They're gathering

18  documentation such as appraisal, preliminary title report,

19  payoffs, if any.

20  **Q.**   We'll get to that.

21  **A.**   Okay.

22  **Q.**   So they gather a bunch of documents?

23  **A.**   Yes.

24  **Q.**   Okay.  The third group is document specialist, I think you

25  said?

1    **A.**   That's right.

2    **Q.**   What is that?

3    **A.**   They prepare the loan documents to be sent to title for

4    the borrower's signing.

5    **Q.**   Last but not least, there is funders?

6    **A.**   Yes.

7    **Q.**   What's that job role?

8    **A.**   Once the borrower signs all of the loan documents, they

9    come back and the funder reviews everything.  And once all --

10   everything is signed and dated correctly notarized, and all

11   the conditions of the loan are met, we fund the loan, which is

12   basically send the wire to title.

13   **Q.**   Over the course of your career at Silicon Valley Bank,

14   have you been on more than one of those teams or had more than

15   one of those functions?

16   **A.**   Yes.  I've been on all four of them, actually.

17   **Q.**   Now, I'd like to turn you back in time --

18   **A.**   Okay.

19   **Q.**    -- to August of 2014.

20   **A.**   Okay.

21   **Q.**   And if I'm following your career trajectory, you're at

22   Silicon Valley Bank at that time?

23   **A.**   Yes.

24   **Q.**   What was your title?

25   **A.**   Real estate loan associate.

1    Q.  Where were you physically working at the time?

2    A.  I believe in Menlo Park at the time.

3    Q.  Real estate loan associate is the then title for those

4    four roles that we were just talking about?

5    A.  Yes.

6    Q.  At that time, what was -- of those four roles, what were

7    you doing?

8    A.  I believe I was doing initial disclosures.

9    Q.  Okay.  Did you also have a role as a preprocessor in 2014?

10   A.  I believe I did help with that as well.

11   Q.  And you said there were two people doing that at the time?

12   A.  Yes.

13   Q.  What was the name of the other person doing it?

14   A.  Le'Nita Juniel.

15   Q.  And could you spell that for us?

16   A.  Sure.  L-E apostrophe N-I-T-A.  And then Juniel is

17   J-U-N-I-E-L.

18   Q.  And at that time, then, there were also people working as

19   document specialists and funders?

20   A.  Yes.

21   Q.  Let's focus in particular on this preprocessing role that

22   you had at the time.

23   A.  Okay.

24   Q.  And you had started to do this for our jury.  You said

25   they collect a bunch of documents; is that right?

 1    **A.**   Yes.

 2    **Q.**   What are the documents that the preprocessor collects for

 3    a mortgage application?

 4    **A.**   The loan application, for one.  The appraisal, the

 5    preliminary title report, payoffs if any, credit report,

 6    income and asset documentation, to place in the file.

 7    **Q.**   Does that role also include verification of employment?

 8    **A.**   Yes.

 9    **Q.**   And the collection of tax documents?

10    **A.**   Yes.

11    **Q.**   Turning to the second role, the initial disclosures role?

12    **A.**   Um-hmm.

13    **Q.**   Would you explain what that job was?

14    **A.**   Once the loan application comes in, we have -- as long as

15    we have six pieces of information, we are required within

16    three days to disclose what's called initial disclosures to

17    the borrower.

18    **Q.**   What are those six pieces of information?

19    **A.**   It's remembered by ALIENS, which I believe is address,

20    loan amount, income, estimated value, Social -- or name and

21    Social.

22    **Q.**   And estimated value is the estimated value of the

23    property?

24    **A.**   The property, yes.

25    **Q.**   Now, in August of 2014, were you involved in a cash-out

```
 1   mortgage refinance on -- with a borrower by the name of

 2   Michael Rothenberg?

 3   A.  Yes.

 4   Q.  And let's take first your participation there as your --

 5   in your role as a preprocessor.  You collected a bunch of

 6   documents, I take it?

 7   A.  Yes.

 8   Q.  I'm showing you what --

 9           MR. WALSH:  Could we bring up Exhibit 2, please.

10                   (Exhibit published.)

11   BY MR. WALSH:

12   Q.  And if you could look at your screen there, on Exhibit 2,

13   it's in evidence.

14       Do you recognize this document?

15   A.  Yes.

16   Q.  What is this document?

17   A.  That's the Uniform Residential Loan Application.

18   Q.  What is that?

19   A.  That is what a borrower would submit to a lender to apply

20   for a mortgage loan.

21   Q.  And this particular Uniform Residential Loan Application

22   is on behalf of --

23           MR. WALSH:  If we could just zoom this first part up

24   here.

25                   (Exhibit published.)
```

 1   **BY MR. WALSH:**

 2   **Q.**  Is it on anyone in particular's behalf?

 3   **A.**  Yes.

 4   **Q.**  Who is the borrower?

 5   **A.**  Michael Rothenberg.

 6           **MR. WALSH:**  If we could dezoom that, please.

 7       And if we go to page, I think it's 4.

 8       And blow this part up, please.

 9                   (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  Was this document signed by anyone in particular?

12   **A.**  Yes.

13   **Q.**  Who was it signed by?

14   **A.**  Michael Rothenberg.

15   **Q.**  What is the date of the signature of this document?

16   **A.**  July 29th, 2014.

17   **Q.**  And is this the initial loan application that you

18   collected as part of this transaction back in 2014?

19   **A.**  Yes.

20           **MR. WALSH:**  If we could dezoom that.

21   **Q.**  Now, over the course of this whole process, is there a

22   series of Uniform Residential Loan Applications that is

23   completed by the borrower or -- or --

24   **A.**  I would -- yes.  As we gather more information, there

25   becomes a typed version --

ROBERTSON - DIRECT / WALSH

 1    **Q.**   Okay.

 2    **A.**    -- that gets signed later.

 3    **Q.**   At the closing?

 4    **A.**   At the closing.

 5    **Q.**   All right.  Now I'd like to show you what's been marked as

 6    Exhibit 4.

 7                           (Exhibit published.)

 8    **BY MR. WALSH:**

 9    **Q.**   Do you recognize this document?

10    **A.**   Yes.

11    **Q.**   What is this document?

12    **A.**   The certification and authorization form.

13    **Q.**   At a very high level, what does this document do?

14    **A.**   It basically authorizes the lender to verify information

15    on the loan application, as well as certifies that the

16    information provided is true and complete.

17    **Q.**   And this particular form, is it on behalf of someone in

18    particular?

19    **A.**   Yes.

20    **Q.**   Who is it on behalf of?

21    **A.**   Michael Rothenberg.

22    **Q.**   And did he sign that document?

23    **A.**   Yes.

24    **Q.**   Is that down at the bottom?

25    **A.**   Yes.

1    **Q.**   What is that date of that signature?

2    **A.**   July 28th, 2014.

3    **Q.**   I'd like to direct your attention to down on the corner

4    here, there's a couple of handwritten letters there.  What are

5    those?

6    **A.**   That would be my initials, IR.

7    **Q.**   Ingrid Robertson?

8    **A.**   Yes.

9    **Q.**   Did you put those on that document?

10   **A.**   I did.

11   **Q.**   Do you recollect why you put them on there?

12   **A.**   I don't.  I'm sorry.

13   **Q.**   As a result of getting this certification and

14   authorization, did you do something in order to -- did you do

15   something?

16   **A.**   Probably would have ordered the credit report.

17   **Q.**   All right.  I'd like to show you what's been marked as

18   Exhibit 16.

19                       (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**   Do you recognize this document?

22   **A.**   Yes.

23   **Q.**   What is this document?

24   **A.**   That is the credit report.

25   **Q.**   And is this a credit report --

1            **MR. WALSH:**  If we could just blow up that top.

2                        (Exhibit published.)

3    **BY MR. WALSH:**

4    **Q.**  Is this a credit report for someone in particular?

5    **A.**  Yes.

6    **Q.**  Who is it for?

7    **A.**  Michael Rothenberg.

8    **Q.**  And what is the date of this credit report?

9    **A.**  August 1st, 2014.

10   **Q.**  Now, also in this --

11           **MR. WALSH:**  If we could dezoom that, please.

12   **Q.**  Also at this time, do you get involved with something

13   called a title company?

14   **A.**  Yes.

15   **Q.**  What's a title company?

16   **A.**  They are a third party that -- that a lender works with to

17   obtain title insurance and fees and to basically work to close

18   the transaction with us.

19   **Q.**  Was there, back in August of 2014, one or more title

20   companies that you regularly worked with?

21   **A.**  There were, yes.

22   **Q.**  Was one of them Chicago Title Company?

23   **A.**  Yes.

24   **Q.**  Was there anyone in particular at Chicago Title Company

25   that you worked with regularly?

1    **A.**   Hapi Yamato.

2    **Q.**   Now I'd like to show you what's been marked Exhibit 109,

3    and in particular page 2.

4          **MR. WALSH:**   And if we could blow up this part, please

5    (indicating).

6                    (Exhibit published.)

7    **BY MR. WALSH:**

8    **Q.**   Do you recognize this document?

9    **A.**   Yes.

10   **Q.**   What is this document?

11   **A.**   It's an email from myself to Hapi.

12   **Q.**   And what is the date of this email?

13   **A.**   August 4th, 2014.

14   **Q.**   And looks like there's to Hapi Yamato, but there's also to

15   someone else there, to Carol Steck; is that right?

16   **A.**   Um-hmm.

17   **Q.**   Do you know who Carol Steck is?

18   **A.**   I believe she was her assistant at the time, Hapi's

19   assistant.

20   **Q.**   What was the -- the content of this message that you sent?

21   **A.**   I was asking them to open title and to send fees for a new

22   refinance.

23   **Q.**   In essence, this is your hiring email to --

24   **A.**   Yes.

25   **Q.**    -- Chicago Title?

1    As a result of sending this email, did Chicago Title open

2    up a case for you?

3    **A.**   Yes.

4    **Q.**   And you indicated earlier the type of document that you

5    assemble is something called a preliminary title report?

6    **A.**   Yes.

7    **Q.**   What is a preliminary title report?

8    **A.**   It's basically a report that has all the details about the

9    property such as current owner, previous owner, property

10   taxes, legal description, liens on the property, things of

11   that nature.

12   **Q.**   Was a preliminary title report compiled by Chicago Title

13   and did you -- in this case?

14   **A.**   Yes.

15   **Q.**   I'd like to show you what's been marked Exhibit 21.

16                  (Exhibit published.)

17   **BY MR. WALSH:**

18   **Q.**   And do you recognize this document?

19   **A.**   Yes.

20   **Q.**   What is this document?

21   **A.**   That is the preliminary title report.

22        **MR. WALSH:**   And if we could scroll to the second

23   page.  And blow up that part, please.

24                  (Exhibit published.)

25   / / /

 1    BY MR. WALSH:

 2    Q.   Who does it indicate the escrow officer is in this matter?

 3    A.   Hapi Yamato.

 4    Q.   Do you know what an escrow officer is?

 5    A.   Yes.  She is the primary contact that the -- that works

 6    with both the borrower and the lender to facilitate the

 7    transaction of the loan.

 8    Q.   And this preliminary report, is it for a particular

 9    property address?

10    A.   Yes.

11    Q.   What address is that?

12    A.   712 Bryant Street, number 6, San Francisco, California

13    94107.

14    Q.   And is this document referencing who the current owner is

15    at this time?

16    A.   Yes.

17    Q.   Who is that?

18    A.   Michael B. Rothenberg.

19    Q.   Does that make sense because this is a refinance

20    transaction?

21    A.   Yes.

22            MR. WALSH:  If we could dezoom that, please.

23        And then if we could go to page 3.

24                      (Exhibit published.)

25    / / /

 1    BY MR. WALSH:

 2    **Q.**  Is this -- what's on page 3 here?

 3    **A.**  That would be the legal description.

 4    **Q.**  Of...?

 5    **A.**  The property.

 6         **MR. WALSH:**  Could you scroll onto the next page.

 7              (Exhibit published.)

 8    BY MR. WALSH:

 9    **Q.**  And that continues there --

10    **A.**  Yes.

11    **Q.**  -- on page 4 of Exhibit 21?

12         And then you indicated that this document contains a bunch

13    more information relevant for the determination of whether to

14    issue a mortgage; is that right?

15    **A.**  Yes.

16    **Q.**  Did you collect this document as part of this mortgage

17    application?

18    **A.**  Yes.

19    **Q.**  Now, I think you also indicated in the list of things that

20    were assembled in a typical transaction, an appraisal?

21    **A.**  Yes.

22    **Q.**  Did -- was it part of your job at that time to hire a

23    company to do an appraisal?

24    **A.**  Yes.

25    **Q.**  I'd like to show you what's been marked Exhibit 119 in

1    evidence.

2              **MR. WALSH:**  And if we could blow up the --

3         Thank you.

4                      (Exhibit published.)

5    **BY MR. WALSH:**

6    **Q.**  Do you recognize this item?

7    **A.**  I do.

8    **Q.**  What is this item?

9    **A.**  That is the appraisal order.

10   **Q.**  Okay.

11        First of all, though, it's an email; is that right?

12   **A.**  Yes.

13   **Q.**  And what's the date of the email?

14   **A.**  August 1st, 2014.

15   **Q.**  Is it being sent to you?

16   **A.**  Yes.

17   **Q.**  And a number of other individuals listed there?

18   **A.**  Correct.

19   **Q.**  Are all of those people employees at Silicon Valley Bank?

20   **A.**  Yes.

21   **Q.**  From whom is this coming?

22   **A.**  From Property Sciences.

23   **Q.**  What is Property Sciences?

24   **A.**  They are the appraisal vendor.

25   **Q.**  Did you have -- did Silicon Valley Bank have more than one

1    appraisal company that it used at this time?

2    **A.**   Yes.

3    **Q.**   Was Property Sciences one of them?

4    **A.**   Yes.

5    **Q.**   And what is the content then of this email?  What is it

6    telling you?

7    **A.**   Just "thank you for your recent order" and the order

8    details such as the report type, loan number, borrower, and

9    property, and the fee.

10   **Q.**   All right.  And this is a -- then the order for a

11   particular appraisal of a particular location; is that right?

12   **A.**   That's correct.

13   **Q.**   What is it for?

14   **A.**   The property, you mean?

15   **Q.**   Yes, please.

16   **A.**   712 Bryant Street, Unit 6, San Francisco California,

17   94107.

18   **Q.**   And that is then the appraisal for the property that is

19   going to be refinanced that we've been talking about?

20   **A.**   Yes.

21   **Q.**   As a result of hiring Property Sciences, did Property

22   Sciences conduct an appraisal of that property?

23   **A.**   Yes.

24          **MR. WALSH:**  I'd like to show you Exhibit 18, please,

25   in evidence.

 1                    (Exhibit published.)

 2   **BY MR. WALSH:**

 3   **Q.**   Do you recognize this document?

 4   **A.**   Yes.

 5   **Q.**   What is this document?

 6   **A.**   The appraisal report.

 7   **Q.**   Is this the one that was prepared for 712 Bryant Street?

 8   **A.**   Yes.

 9           **MR. WALSH:**   And if we could go to page 2 and blow up

10   the text part, please.

11                    (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**   What is this second page providing information about?

14   **A.**   It describes the property address that the report is for,

15   the date, and the value of the property.

16   **Q.**   What is the date on this document?

17   **A.**   August 5th, 2014.

18   **Q.**   And what does it conclude about the estimated worth of the

19   property?

20   **A.**   1,850,000.

21           **MR. WALSH:**   We can dezoom that.

22   **Q.**   Is that the bottom line that the bank is most interested

23   in?

24   **A.**   Yes.

25   **Q.**   The following and subsequent pages then, of this document,

ROBERTSON - DIRECT / WALSH

1    contain all sorts of information about the property that's

2    being appraised; is that right?

3    **A.**  Yes.

4    **Q.**  Including photographs and other things?

5    **A.**  Correct.

6    **Q.**  In the hiring email, it indicated that there was a cost.

7    How does that cost for doing the appraisal get paid?

8    **A.**  Through closing.

9    **Q.**  What does that mean?

10   **A.**  Basically at the end, when all the -- the loan's been

11   approved, the loan documents have been signed, and we're

12   getting ready to fund, it gets added to a preliminary HUD

13   statement, and that gets paid through closing.

14   **Q.**  Is there an invoice generated so that you know the final

15   cost?

16   **A.**  Yes.

17   **Q.**  I'd like to show you what's been marked Exhibit 108,

18   please, in evidence.

19                    (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**  Do you recognize this document?

22   **A.**  Yes.

23   **Q.**  What is this document?

24   **A.**  That is the appraisal invoice.

25              **MR. WALSH:**  And if we could zoom in on this part

```
 1    first (indicating).

 2                       (Exhibit published.)

 3    BY MR. WALSH:

 4    Q.   Who is this appraisal being billed to?

 5    A.   Silicon Valley Bank.

 6    Q.   And though it looks like it got shipped to you?

 7    A.   Yes.

 8    Q.   And so this is the invoice for that appraisal; is that

 9    right?

10    A.   Correct.

11            MR. WALSH:   And if we could dezoom that, please.

12    Thank you.

13    Q.   That's ultimately the cost that gets tacked on, as you

14    were explaining, at closing?

15    A.   Yes.

16    Q.   You also indicated in your role as a preprocessor that you

17    would verify employment?

18    A.   Correct.

19    Q.   I'd like to show you what's in evidence as Exhibit 118.

20                       (Exhibit published.)

21    BY MR. WALSH:

22    Q.   Do you recognize this document?

23    A.   Yes.

24    Q.   What is this document?

25    A.   That is a Silicon Valley Bank form that verifies
```

 1   employment for self-employed individual.

 2           **MR. WALSH:**  If we could blow up the text part a

 3   little bit.  Not that much bigger.

 4                     (Exhibit published.)

 5   **BY MR. WALSH:**

 6   **Q.**  And what is -- did you complete the form?

 7   **A.**  I did.

 8   **Q.**  Is the handwriting on this form yours?

 9   **A.**  Yes.

10   **Q.**  Could you describe how you complete this form and what

11   happens?

12   **A.**  Basically I look at the application to see that his

13   company name is Rothenberg Ventures.  To verify that, I would

14   call, in his case, the CPA which was in his tax returns, and

15   which I did so.

16   **Q.**  And when you called the CPA, what happens?

17   **A.**  I just verify the existence of the business.

18   **Q.**  And then you complete this form?

19   **A.**  Yes.

20           **THE COURT:**  Mr. Walsh, anytime in the next five

21   minutes.

22           **MR. WALSH:**  Great.  Thank you.

23   **Q.**  You indicated that you look at the tax returns in order to

24   complete this verification of employment?

25   **A.**  Yes.

```
 1            MR. WALSH:  If we could dezoom this, please.

 2                      (Exhibit published.)

 3   BY MR. WALSH:

 4   Q.  And I'd like to show you what's been marked Exhibit 11.

 5            MR. WALSH:  And if we could just blow up the top part

 6   here, please (indicating).

 7                      (Exhibit published.)

 8   BY MR. WALSH:

 9   Q.  Do you recognize this item?

10   A.  Yes.

11   Q.  What is this item?

12   A.  That is his 2012 1040 individual tax return.

13   Q.  And when you say "his," whose is it?

14   A.  Michael Rothenberg's.

15            MR. WALSH:  And if we could dezoom that, please.

16        And turn to page 2, and blow up this lower portion here

17   (indicating).

18                      (Exhibit published.)

19   BY MR. WALSH:

20   Q.  Is there some information there that is relevant to your

21   completing the verification of employment form?

22   A.  Yes.  The preparer's name.  John Volk.

23   Q.  That's where you got that number from?

24   A.  Correct.

25   Q.  And made the phone call to him?
```

 1    **A.**   That's right.

 2            **MR. WALSH:**   I think now is a good place to stop, Your

 3    Honor.

 4            **THE COURT:**   Very good.

 5        Members of the jury, let's take our second break.   Court

 6    will be in recess for 15 minutes.

 7            **THE CLERK:**   Please rise for the jury.

 8        (The following proceedings were heard out of the presence

 9    of the jury:)

10            **THE COURT:**   Mr. Walsh, anything for the record?

11            **MR. WALSH:**   No, Your Honor.

12            **THE COURT:**   Mr. Fakhoury?

13            **MR. FAKHOURY:**   No, Your Honor.

14            **THE COURT:**   Thanks.   We're in recess.

15        (Recess taken at 11:47 A.M.; proceedings resumed at

16    12:05 P.M.)

17        (The following proceedings were heard out of the presence

18    of the jury:)

19            **THE COURT:**   Let's go back on the record.

20        This will take just a moment or less.   We are outside the

21    presence of the jury.

22        I know that United States Attorneys Office lawyers did not

23    initiate it, but it's not good to fist bump a witness in front

24    of a jury.

25        I can explain why that is, but I think you know why it is.

1    I -- she started it.  And that put -- I think -- I don't

2    remember if it was you or Mr. Walsh in an awkward position

3    because there you are right in front of the jury.  What are

4    you going to do?  Have a conversation about it?  I don't think

5    so.

6         So I'm not sure, I don't think anything can be done.  I

7    don't see any fault with the U.S. Attorney's Office.  I just

8    wanted to note that it happened.  And for the record, I'm

9    referring to Ms. Brunk who gave -- offered a gentle fist bump

10   on her way out the door.  That's all.

11             **THE CLERK:**  Please rise for the jury.

12        (The following proceedings were heard in the presence of

13   the jury:)

14             **THE CLERK:**  You may be seated.

15             **THE COURT:**  Okay.  Let's go back on the record.

16        All the jurors are in their seats.  Counsel and the

17   parties are at counsel table.

18        Mr. Walsh, your witness.

19             **MR. WALSH:**  Thank you very much, Your Honor.

20        One moment.

21   **BY MR. WALSH:**

22   **Q.**  Ms. Robertson, we were just walking through the various

23   documents that you assembled in this matter for this cash-out

24   mortgage refi by Mr. Rothenberg.

25        And I think you also indicated that you assembled some

1    insurance information; is that right?

2    **A.**   Yes.

3    **Q.**   I'd like to turn your attention to Exhibit 17, please, in

4    evidence.

5                            (Exhibit published.)

6    **BY MR. WALSH:**

7    **Q.**   And first of all, do you recognize this document?

8    **A.**   Yes.

9    **Q.**   What is this document?

10   **A.**   It's an email from George to, looks like the processing

11   group.

12   **Q.**   What's the date of this email?

13   **A.**   August 2nd, 2014.

14   **Q.**   Okay.  Now first of all, you said George.  Who's George?

15   What's his last name?

16   **A.**   He -- Pires.  He's a loan officer.

17   **Q.**   What is the "Group PB Processing"?

18   **A.**   That is just a team email that reaches all of us at once.

19   **Q.**   Were you one of the recipients as a result?

20   **A.**   Yes.

21   **Q.**   There's an attachment described here for this email.  Do

22   you see that?

23   **A.**   Um-hmm.

24   **Q.**   You have to say "yes" or "no."

25   **A.**   Yes.  Sorry.

 1  **Q.**  And if you look at the email in this email chain before,

 2  do you see a second email?

 3  **A.**  Yes.

 4  **Q.**  From whom and to whom is that sent?

 5  **A.**  From Mike Rothenberg to George Pires.

 6  **Q.**  What is the date of that email?

 7  **A.**  August 2nd, 2014.

 8  **Q.**  And what is the time?

 9  **A.**  11:31 a.m.

10  **Q.**  It's about three minutes before the -- the top email that

11  we were discussing?

12  **A.**  Yes.

13  **Q.**  And what does Mike Rothenberg tell George in that email?

14  **A.**  "George — policy attached.  Please let me know if you need

15  anything else."

16         **MR. WALSH:**  If we could then go to the attachment in

17  the exhibit which is on page 6.

18                       (Exhibit published.)

19  **BY MR. WALSH:**

20  **Q.**  Do you recognize this item?

21  **A.**  Yes.

22  **Q.**  What is this item?

23  **A.**  That looks to be his -- like his insurance.

24  **Q.**  And is this one of the items --

25  **A.**  Homeowners.

1    **Q.**  Sorry.

2    **A.**  I'm sorry?

3    **Q.**  It looks like --

4    **A.**  No.  The homeowner's insurance.

5    **Q.**  And is this one of the items that you collected as part of

6    your role as a preprocessor?

7    **A.**  Yes.

8    **Q.**  All right.  I'd now like to turn your attention to your

9    role as providing initial disclosures on the initial

10   disclosures team.

11   **A.**  Okay.

12   **Q.**  Again, what was the purpose of that job or role?

13   **A.**  To send out the preliminary initial disclosures such as

14   the good-faith estimate to the borrower.

15   **Q.**  I'd like to turn your attention now to what's been

16   admitted in evidence as Exhibit 19.

17            **MR. WALSH:**  If we could blow up the text part,

18   please.

19                      (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**  Do you recognize this document?

22   **A.**  Yes.

23   **Q.**  What is this document?

24   **A.**  That is a cover letter --

25   **Q.**  And --

1    **A.**   -- to the initial disclosures.

2    **Q.**   What is the date of this letter?

3    **A.**   August 6th, 2014.

4    **Q.**   To whom is this letter being sent?

5    **A.**   To Mr. Michael Rothenberg.

6    **Q.**   And it has a signature line there of no particular person.

7    Does it -- do you see that?

8    **A.**   Yes.

9    **Q.**   Did you, in fact, create this document?

10   **A.**   Yes.

11   **Q.**   This is a cover letter; is that right?

12   **A.**   Yes.

13   **Q.**   And could you just describe what the -- what does the

14   cover letter say in it?

15   **A.**   It just says:  Enclosed please find the initial

16   disclosures pertaining to your request for a new mortgage

17   loan.

18   **Q.**   And then it lists a whole bunch of things with little

19   boxes and x's in them?

20   **A.**   Yes.

21   **Q.**   And those are meant to convey that each of those things is

22   attached?

23   **A.**   Correct.

24   **Q.**   Let's just take a pause.

25        This documents needs to be sent when?

1     **A.**   Within three days of receiving those six pieces of

2     information.

3     **Q.**   The ALIENS information?

4     **A.**   The ALIENS, yes.

5     **Q.**   And the ALIENS information is -- constitutes an active

6     mortgage application?

7     **A.**   Yes.

8     **Q.**   These various items here are -- there's 16 different

9     items, it appears, approximately, listed here.  I'd like to

10    turn your attention to the first of those items.

11              **MR. WALSH:**  Maybe we can dezoom, please, and go to

12    page 2.

13                        (Exhibit published.)

14    **BY MR. WALSH:**

15    **Q.**   Do you recognize this item?

16    **A.**   Yes.

17    **Q.**   What is this item?

18    **A.**   That is the Uniform Residential Loan Application, typed

19    version.

20    **Q.**   All right.

21              **MR. WALSH:**  And let's just focus in -- zoom in on

22    this top part.

23                        (Exhibit published.)

24    **BY MR. WALSH:**

25    **Q.**   Does it indicate the property that is being -- the subject

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    of this loan?

2    A.   Yes.

3    Q.   In this top section here, though, there's no name; is that

4    right?

5    A.   Correct.

6    Q.   That distinguishes this version from the July 29th version

7    that you looked at before as Exhibit 2?

8    A.   Yes.

9    Q.   What has happened --

10            MR. WALSH:   Or we can dezoom this, please.

11                        (Exhibit published.)

12   BY MR. WALSH:

13   Q.   What happens between that initial application and this

14   initial disclosure version of this application?

15   A.   It gets typed into the system.

16   Q.   By whom?

17   A.   By either myself or the loan coordinator.

18   Q.   And so where is the information that gets typed into here

19   coming from?

20   A.   Just different documents that we receive at that time,

21   what we have at that time, one of which is the credit report.

22   Q.   All right.

23            MR. WALSH:   If we turn to page 2 -- I guess it's now

24   page 3 of this document.  And if we could blow up this section

25   here (indicating).

1          (Exhibit published.)

2    BY MR. WALSH:

3    Q.  In this section here, are there -- is there any

4    information filled out in the "Assets" column?

5    A.  Not at this time.

6    Q.  Other than the real estate itself?

7    A.  Correct.

8    Q.  And then in the "Liabilities" column here, is there

9    information put in there (indicating)?

10   A.  Yes.

11   Q.  Where did this information come from?

12   A.  The credit report.

13   Q.  When someone runs out of the space here, what -- what

14   happens with a URLA?

15   A.  There is a continuation page.  The last page will usually

16   have additional information.

17          MR. WALSH:  If we could dezoom that, please.

18      And go to page -- one more page, please.  And if we could

19   just blow up this top portion here (indicating).

20          (Exhibit published.)

21   BY MR. WALSH:

22   Q.  Is -- do you recognize what's here on page 5 of

23   Exhibit 19?

24   A.  Yes.

25   Q.  What is this?

 1   **A.**  That's another liability from the credit report.

 2   **Q.**  And this is this extra form that you're talking about that

 3   can be added on?

 4   **A.**  That's correct.

 5          **MR. WALSH:**  Thank you.  We can dezoom that, please,

 6   and if we could go back one page.  And if we could focus in

 7   here on this section (indicating).

 8                         (Exhibit published.)

 9   **BY MR. WALSH:**

10   **Q.**  Is this particular form signed by anyone?

11   **A.**  No.

12   **Q.**  Why is that?

13   **A.**  It's just the preliminary -- preliminary loan application

14   that is mailed out to the borrower.

15   **Q.**  Okay.

16          **MR. WALSH:**  If we could dezoom that, please.

17   **Q.**  If we then -- when you say it's mailed out to the

18   borrower, that's this letter that you sent; is that right?

19   **A.**  Yes.

20   **Q.**  When you mail it out, is it just this information or is

21   there anything else included?

22   **A.**  What -- I'm sorry.  What do you mean?

23   **Q.**  Let me rephrase.  When you mail out this packet to the

24   borrower, do you do anything to encourage it to be returned?

25   **A.**  Yes, we would supply a return envelope, paid.

1  **Q.**  Are they returned at all cases?

2  **A.**  Hardly ever.

3  **Q.**  Do they need to be?

4  **A.**  No.

5        **MR. WALSH:**  All right.  If we could turn now to

6  page 6 of this document.

7                    (Exhibit published.)

8  **BY MR. WALSH:**

9  **Q.**  What is this page?

10  **A.**  That appears to be the ARM program disclosure.

11  **Q.**  What is that?

12  **A.**  It probably lays out the terms of the loan.

13        **MR. WALSH:**  All right.  If we go to the next page.

14                    (Exhibit published.)

15  **BY MR. WALSH:**

16  **Q.**  Do you recognize this document, page 7?

17  **A.**  The Federal Truth in Lending Disclosure statement.

18        **MR. WALSH:**  And if we could just zoom in that part,

19  please (indicating).

20                    (Exhibit published.)

21  **BY MR. WALSH:**

22  **Q.**  You've referenced this a couple of times when describing

23  the initial disclosure packet in the abstract.  What is this

24  document?

25  **A.**  It also talks about the terms of the loan, this being an

 1    ARM product, the rate changes, things of that nature, APR.

 2    Q.   And what is APR?  Just so we're --

 3    A.   The annual percentage rate.

 4    Q.   And is this required to be sent as part of the initial

 5    disclosures?

 6    A.   Yes.

 7    Q.   What is the purpose overall of sending this to a borrower?

 8    A.   To describe the details of his adjustable rate program.

 9         MR. WALSH:  Okay.  If we could dezoom that, please.

10    Go to the next page.

11                    (Exhibit published.)

12    BY MR. WALSH:

13    Q.   I think you also referenced this good-faith estimate a

14    couple times whilst you were describing this in the generic.

15         MR. WALSH:  If we could zoom up that part

16    (indicating).

17                    (Exhibit published.)

18    BY MR. WALSH:

19    Q.   To whom is this good-faith estimate being sent?

20    A.   Michael Rothenberg.

21    Q.   And what is the date of the good-faith estimate?

22    A.   August 6th, 2014.

23    Q.   And what is a good-faith estimate?  What is this -- what

24    is this document doing?

25    A.   It provides the -- an estimate of the settlement charges,

 1    terms of the loan.

 2    Q.  When you say "settlement charges," what do you mean in

 3    particular?

 4    A.  Title and escrow fees as well as the lender's fees.

 5         MR. WALSH:  Okay.  If we could dezoom that there,

 6    please.

 7                        (Exhibit published.)

 8    BY MR. WALSH:

 9    Q.  And that document actually goes on from page 8 onto

10    page 9, it appears and onto page 10.

11                        (Exhibit published.)

12    BY MR. WALSH:

13    Q.  Is that right?

14    A.  Yes.

15         MR. WALSH:  If we could scroll, page 11 here.

16                        (Exhibit published.)

17    BY MR. WALSH:

18    Q.  This is another version of the borrower's certification

19    and authorization that we described before; is that right?

20    A.  Yes.

21    Q.  And because this is going from the bank to Mr. Rothenberg,

22    is it signed by Mr. Rothenberg?

23    A.  No.

24         MR. WALSH:  If we could go to the next page.

25                        (Exhibit published.)

 1    **BY MR. WALSH:**

 2    **Q.**  What is this document here?

 3            **MR. WALSH:**  If we could blow up the --

 4            **THE WITNESS:**  It looks like it's the disclosure of

 5    right to receive a copy of the appraisal report.

 6    **BY MR. WALSH:**

 7    **Q.**  And what is it disclosing exactly?

 8    **A.**  Well, if I may read it.

 9    **Q.**  Yes, you may.

10    **A.**  "We may order an appraisal to determine the property's

11    value and charge you for this appraisal.  We will promptly

12    give you a copy of any appraisal even if your loan does not

13    close."

14        And it does proceed to say you can pay for an additional

15    appraisal for -- for your own use at your own cost.

16    **Q.**  And this document is showing that he acknowledges that

17    right; is that right?  The borrower?

18    **A.**  Yes.

19    **Q.**  And again, not signed because it was sent from

20    Silicon Valley Bank to Mr. Rothenberg?

21    **A.**  Correct.

22            **MR. WALSH:**  Okay.  We can dezoom that.

23        And then I'm just going to scroll through this slowly

24    here, if we can, Ms. Margen.

25                        (Exhibit published.)

 1   **BY MR. WALSH:**

 2   **Q.**   There's some additional forms on pages 13.

 3          **MR. WALSH:**   Scroll to the next page.

 4                  (Exhibit published.)

 5          **MR. WALSH:**   Fourteen.

 6                  (Exhibit published.)

 7          **MR. WALSH:**   Fifteen.

 8                  (Exhibit published.)

 9          **MR. WALSH:**   Sixteen.

10                  (Exhibit published.)

11          **MR. WALSH:**   Seventeen.

12                  (Exhibit published.)

13   **BY MR. WALSH:**

14   **Q.**   Okay.  Now starting on 17, is there a -- a four-page

15   disclosure from the Consumer Financial Protection Bureau?

16   **A.**   Yes.

17          **MR. WALSH:**   If we can go four pages forward.

18       One more page, please.  Page 21.  Whoa.

19       Page 21 there.

20                  (Exhibit published.)

21   **BY MR. WALSH:**

22   **Q.**   Here we have some additional disclosures; is that right?

23   **A.**   Yes.

24          **MR. WALSH:**   And if we can keep going.

25       Keep going.

 1          And to page 24, please.

 2                      (Exhibit published.)

 3   BY MR. WALSH:

 4   Q.   Here are some -- well, starting on page 24, what -- what

 5   is going on in this document?

 6   A.   I believe this is the privacy notice.

 7   Q.   From who?

 8   A.   From Silicon Valley Bank --

 9   Q.   Is it --

10   A.   -- to the borrower.

11   Q.   Is it saying what will be used of the information?

12   A.   Yes.

13   Q.   Given in the course of this mortgage application?

14   A.   Correct.

15          MR. WALSH:   If we can scroll through that form.

16   One more, please.

17                      (Exhibit published.)

18   BY MR. WALSH:

19   Q.   Okay.  Additional forms here.

20          MR. WALSH:   If we can go to page 27, please.

21                      (Exhibit published.)

22   BY MR. WALSH:

23   Q.   What is hazard insurance disclosure?

24          MR. WALSH:   Do you want to blow it up, please?

25                      (Exhibit published.)

 1            **THE WITNESS:**  Do you mind if I read it?

 2   **BY MR. WALSH:**

 3   **Q.**  Yeah, go right ahead.

 4   **A.**  "Lender cannot require you as a condition of receiving or

 5   maintaining a loan secured by real property to provide hazard

 6   insurance coverage against risks to the improvements on that

 7   real property in an amount exceeding the replacement value of

 8   the improvements on the property."

 9            **MR. WALSH:**  Okay.  We can dezoom that.

10        And if then if we go to the next page, page 28.

11                       (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**  It looks like there's a longer document from Consumer

14   Financial Protection Bureau.

15   **A.**  Yes.

16            **MR. WALSH:**  And if we could scroll through that

17   quickly.  I believe this might be go to the end, but let's

18   take a look.

19        Keep going, please.

20                       (Exhibit published.)

21            **MR. WALSH:**  Keep going.

22                       (Exhibit published.)

23            **MR. WALSH:**  Keep going, please.  Thank you.

24                       (Exhibit published.)

25   / / /

1   **BY MR. WALSH:**

2   **Q.**  And that long document then ends on the last page of

3   Exhibit 19, page 68.

4   **A.**  Yes.

5   **Q.**  All right.  So all of that information is included in the

6   initial disclosure package; is that right?

7   **A.**  Yes.

8   **Q.**  And that's what you prepared and sent to Michael

9   Rothenberg?

10  **A.**  Yes.

11  **Q.**  On August 6th of 2014?

12  **A.**  Um-hmm, yes.

13  **Q.**  Now at some point in the course of this application by

14  Michael Rothenberg for a cash-out mortgage refi, did you learn

15  that there was going to be a new amount of the mortgage loan?

16  **A.**  Yes.

17  **Q.**  I'd like to turn your attention to Exhibit 107, page 2.

18                    (Exhibit published.)

19  **BY MR. WALSH:**

20  **Q.**  Do you recognize this item?

21  **A.**  Yes.

22  **Q.**  What is this item?

23  **A.**  An email from Pablo Serna to myself.

24  **Q.**  What is the date of that email?

25  **A.**  August 15th, 2014.

1    **Q.**  And what is the content of this email?

2    **A.**  It's basically to notify me that they are increasing his

3    loan amount.

4    **Q.**  Okay.  And why were they increasing it?

5    **A.**  I don't know exactly why they were increasing it.  I

6    just --

7    **Q.**  You were notified that they were; is that right?

8    **A.**  Exactly.

9    **Q.**  It indicates here "please redisclose."  What does that

10   mean?

11   **A.**  That means with a higher loan amount, the fees -- the

12   title fees and lender fees may increase, thus we are required

13   to redisclose to the borrower.

14   **Q.**  And that's the same disclosure packet we just walked

15   through but with new terms?

16   **A.**  Yes.

17   **Q.**  So in order to determine whether -- are you always

18   required to do so?

19   **A.**  Not always.  It depends on a few items.

20   **Q.**  Okay.  And what would be the items to consider?

21   **A.**  I believe if our -- any fees were over 10 percent

22   tolerance, the APR fee increased greater than $100, or the APR

23   rate actually increased more than an eighth in percent.

24   **Q.**  Okay.

25   **A.**  One of those three.

 1          **MR. WALSH:**  If we could scroll back here to page 5 of

 2   this document, dezoom, please, and go to page 5.

 3                    (Exhibit published.)

 4   **BY MR. WALSH:**

 5   **Q.**  And how did you determine whether or not any of those fees

 6   that you were just talking about might change?

 7   **A.**  I reached out to title to -- to notify them that the loan

 8   amount was increasing.

 9   **Q.**  Okay.  If we could just hold on for one second.

10          **MR. WALSH:**  Could we blow that up.

11                    (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**  Do you recognize this item?

14   **A.**  Yes.

15   **Q.**  What is this item?

16   **A.**  An email from myself to Hapi.

17   **Q.**  And Hapi works at the title company?

18   **A.**  Yes.

19   **Q.**  What is the date of that email?

20   **A.**  August 15th, 2014.

21   **Q.**  And could you just read us what you sent to Hapi and

22   Carol?

23   **A.**  Yes.

24          Oh, read it?

25   **Q.**  Can you read it?  Yep.

1    A.   "We are increasing the loan amount from 1,280,000 to

2    1,480,000.  Please send us revised fees so we may redisclose."

3    Q.   Okay.  And I take it that's the process that you were just

4    talking about, you need to find out whether or not you need to

5    redisclose?

6    A.   Yes.

7              MR. WALSH:  If we could dezoom this, please.

8         And we could go to page 4 of -- forward one, I believe.

9         And if we could blow up the -- this part here

10   (indicating).

11                      (Exhibit published.)

12   BY MR. WALSH:

13   Q.   And did Hapi Yamato write back to you?

14   A.   Yes.

15   Q.   When did she write back to you?

16   A.   On Monday, August 18th, 2014.

17   Q.   And did -- what did she indicate with regard to updated

18   fees?

19   A.   Just:  Here are the updated fees.

20   Q.   Okay.  And did you respond to her that same day?

21   A.   Yes.

22   Q.   And is that the middle email there?

23   A.   It -- it is.

24   Q.   What does it indicate you wrote back to her?

25   A.   I was asking her to confirm that the fees are exactly the

 1   same.  Just want to confirm since we increased the loan amount

 2   by 200,000.

 3   Q.  And does she then indicate at the very top email here on

 4   what the answer is?

 5   A.  Yes.

 6   Q.  And what is the answer?

 7   A.  Yes, it is in the same tier.

 8            MR. WALSH:  If we can turn to page -- I think it's 3.

 9   Go forward one page, page 3 of 107.

10        And blow that up.

11                      (Exhibit published.)

12   BY MR. WALSH:

13   Q.  Is that the estimated refinance statement that Hapi Yamato

14   sent you?

15   A.  Yes.

16   Q.  And there's some handwriting down here in the bottom.

17   Whose handwriting is that?

18   A.  That would be mine.

19            MR. WALSH:  If we can then turn to page 1 of this

20   document.  And if we could blow up the text part here.

21                      (Exhibit published.)

22   BY MR. WALSH:

23   Q.  Do you recognize this item?

24   A.  Yes.

25   Q.  What is this item?

1    **A.**   That is a Silicon Valley Bank form which is the change in

2    terms request notification form.

3    **Q.**   What does that mean?

4    **A.**   I would -- based on the information received from title

5    with the new loan amount and fees, I would complete this to

6    determine whether or not a new -- new disclosures would need

7    to be remailed.

8    **Q.**   Okay.   And the handwriting on this particular form, is it

9    yours?

10   **A.**   Yes.

11   **Q.**   You completed this?

12   **A.**   Yes.

13   **Q.**   And what did you conclude at the end of it all about

14   whether or not new disclosures were required?

15   **A.**   They were not required.

16   **Q.**   And why is that?

17   **A.**   Because the fees were the same.

18   **Q.**   Okay.

19         **MR. WALSH:**   Thank you very much.   We can take that

20   exhibit down.

21   **Q.**   Now, once all sorts of documents have been assembled by

22   Silicon Valley Bank as a part of the preprocessing, what would

23   happen in that Silicon Valley Bank?   Where would they go?

24   **A.**   Like physically?

25   **Q.**   Physically, yes, or electronically.   But where would those

1    documents be sent?

2    **A.**   In a physical folder and on a drive, a shared drive.

3    **Q.**   All right.  And to whom would they go?

4    **A.**   When you say "to whom"?

5    **Q.**   Who within Silicon Valley Bank would look at these -- all

6    these forms that you had collected over the course of --

7    **A.**   Oh, the underwriters.

8    **Q.**   Who are the underwriters?  Not their identities, but

9    what's their job?

10   **A.**   Huh?  I'm sorry?

11            **THE COURT:**  What do underwriters do?

12            **THE WITNESS:**  They basically look at all of the

13   income asset documentation, property information, and

14   determine whether the loan may -- can be approved.

15            **THE COURT:**  Thanks.

16   **BY MR. WALSH:**

17   **Q.**   And once a loan is approved by the Silicon Valley Bank, is

18   a letter sent out?

19   **A.**   Yes.

20   **Q.**   I'd like to turn your attention to Exhibit 24.

21                     (Exhibit published.)

22   **BY MR. WALSH:**

23   **Q.**   Do you recognize this document?

24   **A.**   Yes.

25   **Q.**   What is this document?

1   **A.**   The notice of loan approval.

2   **Q.**   And what's the date of this document?

3   **A.**   August 18th, 2014.

4   **Q.**   It's typed, signed by George Pires.  Did he actually

5   prepare this document?

6   **A.**   No.

7   **Q.**   Who prepares this document?

8   **A.**   Either myself or the loan coordinator.

9   **Q.**   Okay.  Once that goes out, does the title company get a

10  bunch of documents from the bank?

11  **A.**   Once the loan is approved and all conditions are met, then

12  yes.

13  **Q.**   Okay.  And the purpose of that is for the documents to get

14  signed by the borrower; is that right?

15  **A.**   Correct.

16  **Q.**   I'd like to turn your attention to -- Exhibit 109 in

17  evidence, page 1.

18         **MR. WALSH:**  And if we could blow up the bottom part

19  here, please (indicating).

20                       (Exhibit published.)

21  **BY MR. WALSH:**

22  **Q.**   Do you recognize this document?

23  **A.**   Yes.

24  **Q.**   What is this?

25  **A.**   It is -- it looks like an email from Mikki to Hapi Yamato,

ROBERTSON - DIRECT / WALSH

1   Mikki Kong and --

2   **Q.**   Are you cc'd on this email?

3   **A.**   Yes.

4   **Q.**   Who is Mikki Kong?

5   **A.**   I believe the loan -- another loan coordinator at the

6   time.

7   **Q.**   Okay.  What's a loan coordinator, in case we've missed

8   that?

9   **A.**   They -- they work closely with the loan officer and the

10  borrower to facilitate the loan transaction.

11  **Q.**   And what did you learn by receipt of this email?

12  **A.**   That the loan signing -- basically where the loan signing

13  will be.

14  **Q.**   All right.  And it looks like it was going to be in

15  New York City?

16  **A.**   Correct.

17          **MR. WALSH:**  If we could dezoom that, please.

18      And if we could go up to the -- blow up the top part,

19  please.

20                  (Exhibit published.)

21  **BY MR. WALSH:**

22  **Q.**   And do you recognize what this is?

23  **A.**   Yes.

24  **Q.**   And is it an email?

25  **A.**   Yes.

1    Q.   What is the date of the email?

2    A.   August 19th, 2014.

3    Q.   And from whom and to whom is it sent?

4    A.   From Hapi Yamato to Mikki Kong.

5    Q.   And are you CC'd on this email?

6    A.   Yes.

7    Q.   And what is the information conveyed in this email?

8    A.   That the notary is in place, that it's been set up.

9    Q.   And it gives who's the name of the notary?

10   A.   Yes, I believe so.

11   Q.   Who is that?

12   A.   Paulette Brunk.

13   Q.   And her contact information?

14   A.   Three -- her phone number is --

15   Q.   Not to read it, but it includes that.

16   A.   Oh, yes, sorry.

17            MR. WALSH:   All right.  So we can dezoom that.

18   Q.   Thereafter do the people in those four groups you were

19   talking about, the real estate loan analysts, wait for

20   documents to come back from the signing?

21   A.   Yes.

22   Q.   I'm going to show you what's in evidence as Exhibit 31.

23                     (Exhibit published.)

24   BY MR. WALSH:

25   Q.   Do you recognize this document?

1   **A.**   Yes.

2   **Q.**   What is this document?

3   **A.**   This is a cover letter from title to me.

4   **Q.**   All right.

5        And when you say "from title," precisely who sent this

6   letter?

7   **A.**   Hapi Yamato.

8   **Q.**   And you said it was addressed to yourself?

9   **A.**   Yes.

10  **Q.**   What is the date of this letter?

11  **A.**   August 22nd, 2014.

12  **Q.**   All right.  And then in this -- center part here, the

13  content of this letter, what does it indicate is being done by

14  virtue of this letter.  What does it say in that first

15  sentence?

16  **A.**   It's just they're just telling us enclosed are the fully

17  executed loan documents.

18  **Q.**   And then what is this second portion here, the "we request

19  funds" for?

20  **A.**   That's the date they're looking to fund, and those are the

21  wiring instructions of where to send the lender funds.

22            **MR. WALSH:**   Okay.  We can dezoom that.

23  **Q.**   And attached to this letter then are a whole bunch of

24  signed loan documents; is that right?  Or mortgage application

25  documents; is that right?

 1    **A.**   Yes.

 2    **Q.**   I'd like to turn your attention in particular to page 52

 3    of this document, please.

 4                        (Exhibit published.)

 5    **BY MR. WALSH:**

 6    **Q.**   And while it's pulling up page 52 of that document, this

 7    whole thing -- do you have a name for this whole thing?

 8    **A.**   The Uniform Residential Loan Application.

 9    **Q.**   So there's that.  But this whole packet of information, is

10    there like a --

11    **A.**   Oh, funding package.

12    **Q.**   It's called the funding package.  Okay.

13       Let's now focus in on page 52 of Exhibit 31.  And you

14    already indicated that it was a Uniform Residential Loan

15    Application.

16             **MR. WALSH:**   If we could zoom in on the top part.

17                        (Exhibit published.)

18    **BY MR. WALSH:**

19    **Q.**   Is there a borrower there?

20    **A.**   Yes.

21    **Q.**   And who is the borrower?

22    **A.**   Michael Rothenberg.

23    **Q.**   And that's his signature there?

24    **A.**   Yes.

25    **Q.**   And it's for that same 712 Bryant Street that we've been

1      talking about?

2      **A.**   Correct.

3            **MR. WALSH:**   If you could dezoom that, please.

4         And if we could go to the second page of this document.

5      So it's page 53.  And if we could zoom in this portion

6      (indicating).

7                          (Exhibit published.)

8      **BY MR. WALSH:**

9      **Q.**   In the "Assets" column here --

10     **A.**   Uh-huh.

11     **Q.**    -- are there now assets listed in this form?

12     **A.**   Yes.

13     **Q.**   And what are those assets that are listed?

14     **A.**   They have to -- they must have come from his, like, bank

15     statements that were provided.

16     **Q.**   Okay.  And so it's two different accounts for Merrill

17     Lynch --

18     **A.**   Correct.

19     **Q.**   -- in the box?

20         And then again, it contains the value of the real estate

21     at the bottom?

22     **A.**   Correct.

23     **Q.**   On the "Liabilities" side, does it list liabilities again?

24     **A.**   Yes.

25     **Q.**   And do those appear to be the same liabilities that were

1   listed on the August 6th version of this document?

2   **A.**  Yes, most likely.

3           **MR. WALSH:**  If we could dezoom that, please.

4       And could we go to the next page, please, which would be

5   54 of this exhibit.  And could we blow up that, please

6   (indicating).

7                           (Exhibit published.)

8   **BY MR. WALSH:**

9   **Q.**  Is this document signed?

10  **A.**  Yes.

11  **Q.**  Who is it signed by?

12  **A.**  Michael Rothenberg.

13  **Q.**  What is the date of his signature?

14  **A.**  August 21st, 2014.

15  **Q.**  All right.  And can you read this information?  Is it

16  possible for you to read it?  Can you see it?

17  **A.**  Yeah, I can read it.

18          **MR. WALSH:**  You know what we might do just to make it

19  a little better, could we just zoom in on the top portion of

20  this.  It might make it a little bigger, just the -- like that

21  or something (indicating).

22                          (Exhibit published.)

23          **MR. WALSH:**  Best laid plans.

24  **Q.**  If you could just read this first sentence all the way to

25  here.  So the first sentence until it stops at "my signature."

1    **A.**   Okay.

2         Starting at number 1 or at the very beginning where it

3    says "each of."

4    **Q.**   Starting with "each of."

5    **A.**   Okay.

6         This is under acknowledgment and agreement, it says each

7    of the undersigned specifically represents to lender and to

8    lender actual or potential agents, brokers, processors,

9    attorneys, insurers, services, servicers, successors, and

10   assigns and agrees and acknowledges that, one, the information

11   provided in the application is true and correct as of the date

12   set forth opposite my signature.

13   **Q.**   Right there.  That's great.

14   **A.**   Okay.

15   **Q.**   Okay.  I'd also like to turn your attention now --

16        **MR. WALSH:**  We can dezoom, please.  Thank you.

17        One more page 4 to page 55 of Exhibit 31.

18        And thank you.

19                     (Exhibit published.)

20   **BY MR. WALSH:**

21   **Q.**   What is on this last page here?

22   **A.**   Just another -- the last of his liabilities.

23   **Q.**   Right.  And is this the same page we were talking about

24   earlier that's the continuation page?

25   **A.**   Correct.

 1             **MR. WALSH:**  If we could dezoom that, please, and zoom

 2     in on this bottom portion here (indicating).

 3                     (Exhibit published.)

 4     **BY MR. WALSH:**

 5     **Q.**  Is this page signed?

 6     **A.**  Yes.

 7     **Q.**  Who is it signed by?

 8     **A.**  Michael Rothenberg.

 9     **Q.**  What is the date of that signature?

10     **A.**  August 21st, 2014.

11     **Q.**  Thank you very much.

12             **MR. WALSH:**  We can dezoom that now.  Thank you.

13         And I'd like to turn within this funding package to

14     page 41, 31-041.

15         And if we could blow it up, please.

16                     (Exhibit published.)

17     **BY MR. WALSH:**

18     **Q.**  Do you recognize this item?

19     **A.**  Yes.

20     **Q.**  What is this item?

21     **A.**  It is the financial status affidavit.

22     **Q.**  Is this signed by anyone?

23     **A.**  Yes.

24     **Q.**  Who is it signed by?

25     **A.**  Michael Rothenberg.

1  Q.  What is the date of that signature?

2  A.  August 21st, 2014.

3        MR. WALSH:  And if -- we could now dezoom this and

4  let's just zoom in on this portion here (indicating).

5      If we could just zoom this portion (indicating), please.

6  Thank you.

7                        (Exhibit published.)

8  BY MR. WALSH:

9  Q.  And if you could, please, just read to the jury what it

10 says starting with financial status.  And I'll stop you when

11 you needn't go further.

12 A.  Borrowers understand that lender is making the loan based

13 upon statements and representations contained in or made in

14 connection with the residential mortgage loan application

15 take -- taken from and signed by the borrowers and given by

16 borrower to lender.  And, in parentheses, the loan

17 application.  Borrowers hereby certify that the information

18 provided by borrowers contained in the loan application and

19 related to borrowers' financial status such as borrowers'

20 employment, income, assets, debts, expenses, credit

21 obligations, et cetera, has not changed significantly and

22 accurately reflects borrowers' current financial status.

23 Q.  You can stop right there.  Thank you.

24       MR. WALSH:  We can dezoom that, please.

25                        (Exhibit published.)

1    BY MR. WALSH:

2    **Q.**  Now, once all of this information in the funding package,

3    Exhibit 31, comes to the bank, where does it go within the

4    bank?

5    **A.**  Do you mean when the loan documents signed come back?

6    **Q.**  Correct.  The funding package signed, come back to the

7    bank with -- if we go to page 1 here in this letter.

8    **A.**  It would get handed off to the funder.

9    **Q.**  What's the job of the funder?

10   **A.**  The funder reviews all of the documents to make sure that

11   they're signed and dated and notarized.  And once all of the

12   conditions have been met of the loan, we fund the loan on the

13   day anticipated, and that's when you send the wire to title.

14   **Q.**  And fund the loan, just brass tacks, what does that

15   actually mean?

16   **A.**  To send the wire to title.

17   **Q.**  Okay.  And that's your current job now?

18   **A.**  Yes.

19   **Q.**  Is to be a funder?

20   **A.**  Yes.

21          **MR. WALSH:**  If I may have a moment, Your Honor.

22          **THE COURT:**  Yes.

23                  (Pause in the proceedings.)

24          **MR. WALSH:**  I have no further questions for this

25   witness.

 1          **THE COURT:**  Thank you, Mr. Walsh.

 2      Mr. Fakhoury?

 3          **MR. FAKHOURY:**  Just a few questions, Your Honor.

 4                    **CROSS-EXAMINATION**

 5  BY MR. FAKHOURY:

 6  **Q.**  Good afternoon, Ms. Robertson.

 7  **A.**  Good afternoon.

 8  **Q.**  I wanted to show you a couple documents that Mr. Walsh

 9  reviewed with you as well.  Okay?

10  **A.**  Okay.

11  **Q.**  I'm going to start with Exhibit 19.  And there's already a

12  tab here.

13      And I'll apologize.  The jury has heard this already.  I

14  don't have the same fancy software the government has so we're

15  going to do it a little more old school.  Okay?

16  **A.**  That's okay.

17  **Q.**  So you testified that these are the initial loan

18  disclosures that are issued once you have the ALIENS

19  information, right?

20  **A.**  Yes.

21  **Q.**  Okay.  Now these disclosures were sent out on August 6,

22  2014, right?

23  **A.**  Yes.

24          **MR. FAKHOURY:**  And actually, Mr. Torres, can you zoom

25  out a little bit.

 1              That's perfect.  Thank you.

 2                        (Exhibit published.)

 3    **BY MR. FAKHOURY:**

 4    **Q.**  Now this first page, you testified this is a cover letter

 5    right?

 6    **A.**  Uh-huh.

 7    **Q.**  And it lists all the items that are contained within the

 8    disclosure packet, right?

 9    **A.**  Correct.

10    **Q.**  Including the residential loan application, right?

11    **A.**  Yes.

12    **Q.**  That we've been -- we've been referring to that as a

13    Form 1003 or a URLA, right?

14    **A.**  Correct.

15    **Q.**  Okay.  As well as a couple other documents that Mr. Walsh

16    reviewed with you, right?

17    **A.**  Yes.

18    **Q.**  Okay.  You testified that within the disclosure package

19    is -- is like a return envelope.  Do you recall that

20    testimony?

21    **A.**  Yes.

22    **Q.**  Okay.  And that return envelope isn't listed here, right,

23    amongst the items contained in the disclosure packet, right?

24    **A.**  Correct.

25    **Q.**  You testified that it's hardly ever returned, right?

 1    **A.**   Correct.

 2    **Q.**   Okay.  Let's go to page 2 of this exhibit.

 3               **MR. FAKHOURY:**  That's fine.  Right there.  Thank you,

 4    Mr. Torres.

 5                          (Exhibit published.)

 6    **BY MR. FAKHOURY:**

 7    **Q.**   Now, just a second ago I asked you about a Form 1003.

 8    This is an example of a Form 1003, right?

 9    **A.**   Correct.

10    **Q.**   And you testified that typically the very first Form 1003

11    sort of is not totally filled out, right?

12    **A.**   Correct.

13    **Q.**   And that someone at the bank is then responsible to fill

14    out the remaining information -- or to type it in, rather, on

15    the Form 1003 that's included in the disclosures?

16    **A.**   Correct.

17    **Q.**   And I believe in 2014, that person may have been you in

18    some instances, right?

19    **A.**   Correct.

20    **Q.**   Were you the one who filled out this Form 1003, do you

21    know?

22    **A.**   It was either myself or the loan coordinator.

23    **Q.**   Okay.  And remind me the name of the loan coordinator at

24    that time?

25    **A.**   I -- it could have been Mikki Kong or Sheri Fong.

1    **Q.**  Okay.

2       Okay.  I'm going to show you a different exhibit now.

3    Let's jump to Exhibit 31.  And it's open there on the tab.

4                     (Exhibit published.)

5    **BY MR. FAKHOURY:**

6    **Q.**  You testified a little while ago that this is the -- all

7    of the loan documents that are returned back after they've

8    been notarized and signed, right?

9    **A.**  Correct.

10            **MR. FAKHOURY:**  Okay.  And can we go to page 52 of

11   this exhibit.  And you can leave it there.

12                     (Exhibit published.)

13   **BY MR. FAKHOURY:**

14   **Q.**  Mr. Walsh asked you about this document.  Do you recall

15   that testimony?

16   **A.**  Yes.

17   **Q.**  Okay.  And this is again a typed-up Form 1003, right?

18   **A.**  Correct.

19   **Q.**  And it's typed up by someone from the bank, correct?

20   **A.**  Correct.

21   **Q.**  And this one is different than the -- the Form 1003 I just

22   showed you a moment ago, right?

23   **A.**  Yes.

24   **Q.**  It has the higher loan amount, correct?

25   **A.**  Yes.

1    Q.   And it has a signature on it, right?

2    A.   Yes.

3    Q.   And again, this would have been typed up by either you or

4    one of the other loan processors, correct?

5    A.   Correct.

6    Q.   Okay.

7         Okay.  Let's --

8              MR. FAKHOURY:   Mr. Torres, can you open Exhibit 4,

9    please.

10        And can you zoom out all the way.  Perfect.

11                       (Exhibit published.)

12   BY MR. FAKHOURY:

13   Q.   So this is Exhibit 4.  This is a certification and

14   authorization form.  You -- you were asked a couple questions

15   about this.  Do you recall that form?

16   A.   Yes.

17   Q.   Okay.

18              MR. FAKHOURY:   Can you scroll down to the bottom,

19   Mr. Torres.

20                       (Exhibit published.)

21   BY MR. FAKHOURY:

22   Q.   And you testified that -- I'll use my little fancy finger

23   pen here.  Those are your initials down there, right?

24   A.   Yes.

25   Q.   And you testified that with -- by obtaining this form,

1    you're able to run Mr. Rothenberg's credit report, right?

2    **A.**   Yes.

3            **MR. FAKHOURY:**   Okay.  Let's take a look at

4    Exhibit 118.

5        We can zoom that out a little bit.

6        Perfect.  That's fine like that.

7                        (Exhibit published.)

8    **BY MR. FAKHOURY:**

9    **Q.**   Now, this form, you testified, was a form that the bank

10   uses to verify employment for self-employed individuals.  You

11   recall that testimony?

12   **A.**   Yes.

13   **Q.**   Okay.  And this form is basically documentation that you

14   verified Mr. Rothenberg's employment by calling his -- by

15   calling his CPA, correct?

16   **A.**   Correct.

17   **Q.**   And the date of this form is August 21st, 2014, right?

18   **A.**   Correct.

19   **Q.**   Okay.

20       Okay.  Let's go to Exhibit 107.

21       Just a few more questions and then I'll be done.

22   **A.**   Sure.

23                        (Exhibit published.)

24   **BY MR. FAKHOURY:**

25   **Q.**   And again, Mr. Walsh asked you about this.  These are

1    the -- some of the documentation concerning the change in the

2    loan amount.  Do you recall --

3    **A.**  Yes.

4    **Q.**  -- that testimony?

5    **A.**  Yes.

6    **Q.**  Okay.  And so -- and again, Mr. Walsh asked you -- you --

7    part of what you did was to confirm that the fees were the

8    same as they were under the terms of the original loan,

9    correct?

10   **A.**  Correct.

11   **Q.**  And thus there was no need to reissue any disclosures

12   because the fees did not change, right?

13   **A.**  Correct.

14        **MR. FAKHOURY:**  Can you go to page 4 of this exhibit,

15   Mr. Torres.

16        Actually, I'm sorry, to the -- to the next page, page 5.

17   You know what?  I'm sorry.  My bad.

18        Actually, can you pull up Exhibit 117.

19        117.

20        No, no, no.  Sorry.  No, nope, nope.  My bad.

21        Can I have one minute, Your Honor?

22        **THE COURT:**  Yes.

23        **MR. FAKHOURY:**  I'm having a moment here.  Excuse me.

24              (Pause in the proceedings.)

25        **MR. FAKHOURY:**  Okay.  I figured it out.  I couldn't

 1    read my own handwriting.

 2         I'm sorry about that.

 3              **THE WITNESS:**  No problem.

 4                        (Exhibit published.)

 5    **BY MR. FAKHOURY:**

 6    **Q.**  So this is Exhibit 107, page 2.

 7         And I -- and Mr. Walsh showed you this exhibit, if you

 8    recall.

 9    **A.**  Yes.

10    **Q.**  Right?  This is the email correspondence concerning the

11    change in the loan amount, right?

12    **A.**  Correct.

13    **Q.**  Okay.  And here (indicating), Mr. Serna is telling you

14    that the loan amount is increasing to $1.48 million, right?

15    **A.**  Okay, yes.

16    **Q.**  And -- and he's made clear that the loan and the rate

17    terms remain the same, right?

18    **A.**  Yes.

19    **Q.**  Okay.

20              **MR. FAKHOURY:**  Can I have one more minute, Your

21    Honor?

22              **THE COURT:**  Okay.

23                        (Pause in the proceedings.)

24              **MR. FAKHOURY:**  I have nothing further.  Thank you,

25    Your Honor.

```
 1                    THE COURT:  Thank you.
 2          Mr. Walsh?
 3                    MR. WALSH:  No further questions, Your Honor.
 4                    THE COURT:  All right.  Ms. Robertson, thanks for
 5     your testimony.
 6                    THE WITNESS:  Thank you.
 7                    THE COURT:  You're excused.
 8                         (Pause in the proceedings.)
 9                    THE COURT:  Government's next witness.
10                    MR. WALSH:  Your Honor, at this time, the government
11     calls Hapi Yamato.
12                    THE COURT:  Okay.
13                         (Pause in the proceedings.)
14                    THE COURT:  Hello, Ms. Yamato.
15                    THE WITNESS:  Hi.
16                    THE COURT:  Would you face my courtroom deputy.
17     She's right behind you there.  Raise your right hand.
18                              HAPI YAMATO,
19     called as a witness by the plaintiff, having been duly sworn,
20     testified as follows:
21                    THE WITNESS:  I do.
22                    THE CLERK:  Thank you.  If you could please state and
23     spell your last name for the court reporter.
24                    THE WITNESS:  Yamato, Y-A-M-A-T-O.
25                    THE COURT:  Is Hapi H-A-P-I?
```

1          **THE WITNESS:**  H-A-P-I, yes.

2          **THE COURT:**  Very good.  Go ahead and have a seat,

3     please.

4       And my courtroom deputy has got a mask for you, a clear

5     mask that our witnesses are using while testifying.

6                    (Off-the-record discussion.)

7          **THE COURT:**  The straps go behind your head.  She can

8     show you.  The easiest thing is just grab both straps and,

9     there you go, put them over your head at one time.

10                    (Clerk and Witness confer off the record.)

11         **THE COURT:**  Boy, it would be really hard if we made

12    people wear both masks.

13      Perfect.  Ms. Yamato, have you ever testified in a

14    courtroom before?

15         **THE WITNESS:**  I have not.

16         **THE COURT:**  Okay.  Well, it's pretty simple.  It's

17    very similar just to having a conversation with somebody.

18      There are a few differences.  We have a jury here, for one

19    thing, and they're listening to everything we're saying.

20      Because of COVID, they're more spread out and they go all

21    the way into the gallery.  So it would be great if you could

22    keep your voice up and stay close to the mic so they can hear

23    you.

24      Another thing that's different is in day-to-day

25    conversation, we interrupt each other all the time.  So

1   someone's saying something to you, and you know how they're

2   going to finish the sentence, you just start responding.  And

3   it makes conversation go easier, more easily in day-to-day

4   life.

5       But in the courtroom, it doesn't work very well because

6   the court reporter is trying to take down everything everybody

7   says.  So only one person can talk at a time.

8       So if you'll wait until the lawyers finish their questions

9   before you answer, they'll do vice versa, and the court

10   reporter will be happy and she can do her job.

11       The last thing is in conversation, we use noises and

12   gestures to communicate.  We say "uh-huh" or "huh-uh," or we

13   go like this (indicating).  The court reporter can't take down

14   any of that.  So if you'll use whole words like "yes" or "no,"

15   again that will be much appreciated.

16       Does that all make sense?

17           **THE WITNESS:**  Yes.

18           **THE COURT:**  All right.  Mr. Walsh, your witness.

19       **MR. WALSH:**  Thank you, Your Honor.

20               **DIRECT EXAMINATION**

21   **BY MR. WALSH:**

22   **Q.**  Where do you work?

23   **A.**  I work at Chicago Title Company.

24   **Q.**  What's your title there?

25   **A.**  Escrow operations manager.

1    **Q.**  And what does that actually mean?  What do you do as the

2    escrow operations, manager?

3    **A.**  I oversee the escrow officers within our operation.

4    **Q.**  Okay.  And we'll circle back to some of those details in a

5    little bit.

6         But where are you from?

7    **A.**  I was born in San Jose but raised in Idaho.

8    **Q.**  And you go to high school in Idaho?

9    **A.**  I did, yes.

10   **Q.**  Did you move back to California at some point?

11   **A.**  Yes, right after high school.

12   **Q.**  And did you go to college for a while?

13   **A.**  Just, yeah, a little bit.

14   **Q.**  Where'd you go?

15   **A.**  San Jose City College.

16   **Q.**  At some point then did you enter the real estate industry?

17   **A.**  I did, yes.

18   **Q.**  When was that?

19   **A.**  I started in the real estate industry in 2001.

20   **Q.**  Where did you -- where was your first job?

21   **A.**  At Old Republic Title.

22   **Q.**  What is Old Republic Title?

23   **A.**  It's another title company.

24   **Q.**  And --

25   **A.**  About the same thing as Chicago Title, just a different

1    company.

2    **Q.**   What was your job there at Old Republic Title Company?

3    **A.**   I started out in the title department.  And then I

4    transitioned into escrow, escrow assistant, escrow officer,

5    and -- and left Old Republic in 2011.

6    **Q.**   Okay.  And we're going to talk a little bit about all

7    those names and titles that you were just talking about, but

8    when you left Old Republic in -- Title Company in 2011,

9    where'd you go?

10   **A.**   I went to Chicago Title Company.

11   **Q.**   And you've been there ever since?

12   **A.**   Yes.

13   **Q.**   When you started at Chicago Title Company, what was your

14   title?

15   **A.**   Escrow officer.

16   **Q.**   And have you had different jobs since then within Chicago

17   Title?

18   **A.**   I started out as an escrow officer in 2011.  And in 2019,

19   I became an escrow officer/branch manager of our Cupertino

20   location.  And then since then, now I am the escrow operations

21   manager.

22   **Q.**   Okay.  And for the escrow operations manager, do you have

23   a particular jurisdiction that you cover?

24   **A.**   I oversee all of our branches in Santa Clara and San

25   Benito Counties.

1    **Q.** All right. Now, the jurors have heard about a title

2    company, but you're actually from a title company so what does

3    a title company do in real estate transactions?

4    **A.** They insure the transaction -- the title to the

5    transaction. So when a buyer and seller sell or buy a home,

6    we insure and issue title insurance to the buyer and to the

7    lender that might be involved.

8    **Q.** And when you say "title," what does title mean?

9    **A.** Title is the deed to the home.

10   **Q.** And so what are you insuring then?

11   **A.** We are insuring the -- the past history of a property. If

12   there's any liens on the property, we insure that they're paid

13   off and clear. And we want to make sure that the buyer coming

14   on the property has clear title to the property and full

15   ownership. And if we are insuring the lender on the property,

16   that the lender has the first priority on the property to

17   foreclose if in the event they need to do that.

18   **Q.** How does one -- does a title company go about figuring out

19   whether or not there is clean title in all these things you're

20   just talking about?

21   **A.** Once the -- once we know we have a transaction that we're

22   working on, we will pull all the past recorded documents on a

23   property and produce a -- a report that tells the parties

24   involved everything that's listed on the property and its

25   history.

YAMATO - DIRECT / WALSH

1   **Q.**  And you said you pull them, all the documents that are

2   recorded.  Where are documents like these recorded?

3   **A.**  They're recorded with the county where the property is

4   located.

5   **Q.**  Is there some sort of an office that holds all of these

6   items?

7   **A.**  Yeah.  So, for example, Alameda County would hold all the

8   documents for any city in Alameda County, and we would work

9   with Alameda County in order to pull those documents for any

10  specific property.

11  **Q.**  What's the name of the entity that holds those?

12  **A.**  The County Recorder's office.

13  **Q.**  Now, also though, from your titles, I think that the title

14  company also plays an escrow function?

15  **A.**  Yes.

16  **Q.**  What is escrow?

17  **A.**  Escrow is the neutral third party in a transaction that

18  facilitates the closing process.  We will take the instruction

19  from all the parties involved and prepare all the legal

20  documents, handle the -- the funds for the transaction, and

21  ultimately work through the closing in order to clear title

22  and issue our title insurance policy.

23  **Q.**  Why does there need to be escrow in a real estate

24  transaction?

25  **A.**  Well, if you wanted to buy a home, you wouldn't just give

1    a million dollars to a seller and say give me the keys.  You'd

2    want to make sure that there's -- the title is clear and that

3    you're not acquiring their loan or other liens that might be

4    on the property, the taxes are paid current.

5         And so the escrow company will make sure that there's a

6    valid ratified contract between the two parties, make sure

7    that everything is reviewed and all parties are abiding by the

8    contract and the buyer is ready to give the money and the

9    seller is ready to give the home.

10   **Q.**  Okay.  So now that we've got that description of the title

11   company's role both as a title company and as escrow function,

12   you have had a number of jobs that involve those words, like

13   escrow officer.  What is the job of an escrow officer?

14   **A.**  So I'll work with the clients, the principals in the

15   transaction, the buyer, seller, the lender.  We prepare all

16   the legal documents that are needed in order to transfer title

17   from the seller to the buyer.  We'll work with a lender that's

18   involved in the transaction so that we can issue their title

19   policy to them and record any documents that they require for

20   their loan.

21        I'll work with the loan officers in order to prepare any

22   other additional fee quotes, documents that are required in

23   order to close the transaction.

24   **Q.**  And if I've followed your trajectory, it sounds like you

25   were on the title side for a brief period.  But who is the

1    title officer?

2    **A.**   A title officer is who the escrow officer will work with

3    on a transaction.

4    **Q.**   I'm sorry.  The -- who would work with?

5    **A.**   So the title officer is the person that the escrow officer

6    would work with in order to make sure that I'm clearing

7    everything that they need me to clear on the property.

8        So the escrow is really forward facing with the clients,

9    and I work with title to make sure I'm meeting all the

10   requirements to clear those, to clear title.

11   **Q.**   All right.  So the jury has heard a lot about mortgage

12   refinance applications and transactions, but not from the

13   title company's perspective, which is what you can give the

14   jury.

15       Could you tell us how does a title company get involved in

16   a mortgage process, in a mortgage application process?  And in

17   particular, let's limit it to a refinance.

18   **A.**   So from the escrow side, if we get a new refinance

19   transaction, we typically get a notification, email or phone

20   call from the loan officer, mortgage broker or lender involved

21   in the transaction, and they ask us to open escrow.

22   **Q.**   Okay.  And when -- that's the bank essentially calls you?

23   **A.**   Correct.

24   **Q.**   Okay.  And what happens next from the title company's

25   perspective?

1    **A.**   We will open the transaction and request a preliminary

2    title report.

3    **Q.**   And what is that, just a high level?

4    **A.**   Title report will show everything that's -- that's on the

5    property.  It shows the current owner of a property.  It shows

6    if there's any unpaid taxes, any liens, anything that needs to

7    be addressed on a property.

8    **Q.**   From the title perspective, then, what do you do with that

9    report?

10   **A.**   We will provide it to the -- to the lender or the loan

11   officer that requested it.

12   **Q.**   And then what do you do?  What's the next step?  Is there

13   a waiting period?

14   **A.**   Yeah, there's a bit of a waiting period on the escrow

15   side.  Once the order's opened and we issue the prelim,

16   they'll sometimes ask us for initial fees for the transaction

17   based on whatever loan amount that they opened the escrow

18   with.

19        But other than that, we have kind of a couple-week waiting

20   period until the lender does what they need.  And then they

21   reach out to us for the final closing process.

22   **Q.**   You referenced fees.  What kind of fees are we talking

23   about?

24   **A.**   Escrow and title fees specifically.

25   **Q.**   And that's how you get paid?

1   **A.**  Right.

2                          (Simultaneous colloquy.)

3   **BY MR. WALSH:**

4   **Q.**  -- gets paid?

5   **A.**  Right, yeah.

6   **Q.**  Once the bank has done whatever it needs to do, how does

7   the title company get reinvolved in the transaction?

8   **A.**  Once the lender is ready to move forward with the

9   transaction, they will reach out to us and let us know that

10  they're ready to issue loan documents.

11      And so typically, they'll ask us for updated fees and

12  certain conditions in order to get to what they call prior to

13  doc conditions.

14  **Q.**  Sorry.  You said that very quickly.  What kind of doc?

15  **A.**  I'm sorry.  Prior to document conditions, which means loan

16  documents that are being issued for the closing.

17      And so they will ask us for a laundry list of items, fee

18  quote, updated copy of a title report sometimes.

19      And then we, what we call balance with them so that we can

20  finalize all the numbers before we -- we receive the final

21  loan documents.

22  **Q.**  And at some point, then, do you receive the final loan

23  documents?

24  **A.**  Yes.

25  **Q.**  Why are you getting those loan documents?

1   **A.**   The lender will provide us with the loan documents so that

2   we can then coordinate the signing of all the final paperwork.

3   We have to prepare some escrow documents that go along with

4   the loan documents.

5          **THE COURT:**   Ms. Yamato, if you take the top strap and

6   you pull it all up over your ears a little bit, you might not

7   have to keep straightening the thing up quite so much.

8          **THE WITNESS:**   Thank you.

9          **THE COURT:**   Okay.

10          **THE WITNESS:**   Thank you.

11   **BY MR. WALSH:**

12   **Q.**   Better?

13   **A.**   Yeah.

14   **Q.**   We were saying you set up the -- the signing, the title

15   company does?

16   **A.**   Yes.   The title company will coordinate the signing.

17   **Q.**   Does there have to be someone present at the signing other

18   than the borrower?

19   **A.**   Yes.   The notary does.

20   **Q.**   Who hires the notary?

21   **A.**   We do, the escrow company does.

22   **Q.**   Why can't the bank hire -- or the borrower?

23   **A.**   We require that we hire an approved notary that goes

24   through a specific background check in order to ensure that

25   the notary is qualified to perform the signing.

1          But also so that there's no, you know, favoritism towards,

2     you know, the mortgage broker hiring the notary that, you

3     know, they're -- they're known to have signed documents.  So

4     we always hire the notary as a requirement of our title

5     insurance policy.

6     **Q.**  All right.  Then I take it the signing occurs.  How does

7     the notary -- or the title company get involved after the

8     signing has occurred?

9     **A.**  How does the title company get involved?

10    **Q.**  What's the next thing from the title company's perspective

11    that happens after the signing with the notary?

12    **A.**  After the signing, we will provide a Fedex return label to

13    the notary to send the documents straight back to us in

14    escrow.  And we will then process all the signed documents.

15    We make copies of the documents that we need to keep for our

16    file.  And then we send the original documents to their

17    appropriate places.

18    **Q.**  Okay.  So where do some of those documents go?

19    **A.**  The mortgage document or deed of trust will get sent to

20    the County Recorder's office in order to prepare it for

21    recording.

22         And the original loan documents will go back to the bank.

23    **Q.**  And when you say that the deed of trust goes to the

24    recorder's office, is it actually recorded at that time?  Or

25    what's it doing at that moment?

1    **A.**  We have it at the recorder's office on what we call a hold

2    until we're ready to release the documents for recording

3    until -- we have to have the money in order to record the --

4    the transaction.  So until we get the money, we can't record

5    the -- the document.

6    **Q.**  All right.

7        Is there some sort of a waiting period during this phase

8    of the transaction from the title company's perspective?

9    **A.**  Yes.  So for a primary residence, for a refinance

10   transaction, there's a notice of right to cancel and the

11   borrower has three days to decide if they want to cancel the

12   transaction.

13   **Q.**  And during that time period, nothing happens?

14   **A.**  Yes.  Nothing happens.  It's just kind of a waiting period

15   of time until the lender can fund the loan.

16   **Q.**  Assuming that the notice or the right to cancel is not

17   used, the transaction's not canceled by the borrower, what

18   happens next?

19   **A.**  The lender will do their final review and reach out to us

20   to let us know that they're ready to fund.  Once they're ready

21   to fund a loan, they provide us with the loan amount -- the

22   detail of the wire amount.  Once that wire is received, then

23   we can move forward with recording.

24   **BY MR. WALDINGER:**

25   **Q.**  Okay.  And received -- the bank sends the title company

1    money?

2    **A.**   Correct.

3    **Q.**   And then what do you do once you have the money?

4    **A.**   We then release the documents to record with the County

5    Recorder's office.

6    **Q.**   That's the first step.  And then what do you do with the

7    money once it's recorded at the County Recorder's office?

8    **A.**   Then we disburse the file based on the estimated statement

9    that was signed and reviewed by the borrower.

10   **Q.**   And for a refinance, where does at least some of the money

11   go?

12   **A.**   For a refinance transaction, in some cases we have a

13   payoff of an existing mortgage on the property.  And then the

14   remaining funds will be distributed to the borrower if it was

15   a cash-out transaction.

16   **Q.**   After that money has been disbursed, is there any sort of

17   paperwork follow-up that the title company performs?

18   **A.**   We typically issue a final closing statement that

19   references all of the final numbers of the payoff and the

20   cash-out proceeds to the borrower and any closing costs that

21   were paid.

22   **Q.**   And then what about this title insurance you're talking

23   about, is there a policy?

24   **A.**   Yes.  We typically issue the title insurance policies

25   30 days after, 30 to 45 days after the closing.

1   **Q.**   And to whom in a refinance does that title insurance go?

2   **A.**   It goes to the lender that was insured, the bank.

3   **Q.**   Okay.  So now that we have that process down from the

4   perspective of the title company, I'd like to turn you back in

5   time to the summer of 2014.

6       And if I follow your trajectory here, your career, you

7   were working at Chicago Title at that point; is that right?

8   **A.**   Yes.

9   **Q.**   What was your job in the summer of 2014?

10  **A.**   I was an escrow officer.

11  **Q.**   Where were you physically working that summer?

12  **A.**   Our Los Altos branch.

13  **Q.**   Did you have a team leader you were working with, or were

14  you all on your own?

15  **A.**   I did.  I had an assistant.

16  **Q.**   Who was your assistant?

17  **A.**   Carol Steck.

18  **Q.**   S-T-E-C-K?

19  **A.**   Yes.

20  **Q.**   And now I'd like to turn in particular your attention to

21  that summer of 2014 to August of 2014.

22      And in August of 2014, were you involved in a cash-out

23  mortgage refinance by Michael Rothenberg?

24  **A.**   Yes.

25  **Q.**   What bank was involved in that transaction?

1   **A.**   Silicon Valley Bank.

2   **Q.**   Did you -- at that time in August of 2014, had you worked

3   with Silicon Valley Bank in the past?

4   **A.**   Yes.

5   **Q.**   Frequently, rarely?

6   **A.**   Often.  I was one of their preferred escrow officers for

7   their transactions.

8   **Q.**   And did you know someone by the name of Ingrid Robertson

9   there at Silicon Valley Bank?

10  **A.**   Yes.

11  **Q.**   Who's she?

12  **A.**   One of their loan processors.

13  **Q.**   Now, if I follow the trajectory of how this would have

14  worked, I guess Silicon Valley Bank would have hired you in

15  August of 2014?

16  **A.**   Yes.

17  **Q.**   How would they do that?

18  **A.**   Typically they'd send an email notifying us that they have

19  a new escrow to open.

20  **Q.**   All right.  I'd like to show you what's in evidence as

21  Exhibit 109, page 2.

22        **MR. WALSH:**  And if we could blow up the bottom part,

23  please.

24                     (Exhibit published.)

25  / / /

1    **BY MR. WALSH:**

2    **Q.**   Do you recognize that item?

3    **A.**   Yes.

4    **Q.**   What is that item?

5    **A.**   That's an email from Ingrid.

6    **Q.**   Ingrid Robertson to whom?

7    **A.**   To myself and my assistant, cc'ing a couple of people at

8    SVB, it looks like.

9    **Q.**   And what was the date of that email?

10   **A.**   Monday, August 4th, 2014, at 4:48 p.m.

11   **Q.**   And what did Ingrid tell you with the content of that

12   email?

13   **A.**   She's asking us to open escrow and send fees for the

14   refinance for Michael Rothenberg at 712 Bryant Street,

15   number 6, in San Francisco.

16   **Q.**   And for a loan amount of what?

17   **A.**   Loan amount of 1.28 so 1,280,000.

18   **Q.**   This is the hiring email that you're speaking of?

19   **A.**   Yes.

20   **Q.**   So once you receive that, what do you do?  What did you do

21   back in 2014?

22   **A.**   We opened the escrow transaction and requested a title

23   report.

24   **Q.**   I'd like to show you what's in evidence as Exhibit 37,

25   page 129.

 1                    (Exhibit published.)

 2   BY MR. WALSH:

 3   Q.   Do you recognize this document?

 4   A.   Yes.

 5   Q.   And what is this document?

 6   A.   This is our open order sheet.

 7   Q.   What is an open order sheet?

 8   A.   Once we open an escrow transaction in our system, we print

 9   this document ultimately to create a file for ourselves.

10          MR. WALSH:   And if we could just scroll forward to

11   130 and 131.

12                    (Exhibit published.)

13   BY MR. WALSH:

14   Q.   Is it a three-page document?

15   A.   Yes.

16          MR. WALSH:   If we go back to -- two pages forward,

17   the first page, 129.

18       And if we could blow up the top portion, please.

19                    (Exhibit published.)

20   BY MR. WALSH:

21   Q.   It indicates there you are as the escrow officer; is that

22   right?

23   A.   That's correct.

24   Q.   Who is the title officer examiner for this order?

25   A.   John Giambrone.

1    Q.   That's G-I-A-M-B-R-O-N-E?

2    A.   Yes.

3    Q.   And who's John Giambrone?

4    A.   He is the title officer for this county.

5    Q.   And when you say "this county," what county do you mean?

6    A.   San Francisco.

7    Q.   And it indicates that this was opened on what date?

8    A.   August 5th of 2014.

9    Q.   And when is this product due?  What does that mean?

10   A.   We typically quote a three-day turnaround for a title

11   report to be issued.  So it's just a reference for me to know

12   that I need to make sure that title report is completed by

13   August 8th.

14           MR. WALSH:  All right.  If we could dezoom this,

15   please.

16      And the property and borrower, if we could just zoom that

17   up.

18                      (Exhibit published.)

19   BY MR. WALSH:

20   Q.   What property and what borrower is this title being --

21   escrow being opened?

22   A.   It's for the property at 712 Bryant Street, number 6, in

23   San Francisco, California 94107.  And borrower is Michael

24   Rothenberg.

25           MR. WALSH:  All right.  If we could dezoom that,

1       please.

2       Q.  And you indicated that usually at this time or often at

3       this time, fees are sent along?

4       A.  Yes.

5       Q.  Okay.  What -- and the fees are again what?

6       A.  The escrow and title fees for the refinance transaction.

7       Q.  All right.  And did you send fees in this instance to

8       Silicon Valley Bank?

9       A.  Yes.

10      Q.  Now, you indicated the first thing that has to occur, and

11      I guess you said it quoted within three days there --

12      A.  Uh-huh.

13      Q.  -- is the preparation of a preliminary title report?

14      A.  Uh-huh.

15      Q.  You have to say --

16              THE COURT:  Is that a "yes"?

17              THE WITNESS:  Oh, I'm sorry.  Yes.  I apologize.

18      Yes.

19              THE COURT:  It just give me something to do when you

20      do that.  So that's fine.

21              THE WITNESS:  Just trying to keep you on your toes.

22      BY MR. WALSH:

23      Q.  Was a preliminary title report created me in this

24      instance?

25      A.  Yes, it was.

1    **Q.**   I'd like to show you what's marked Exhibit 21 in evidence.

2                        (Exhibit published.)

3    **BY MR. WALSH:**

4    **Q.**   Do you recognize this document?

5    **A.**   Yes, I do.

6    **Q.**   What is this document?

7    **A.**   This is a preliminary title report.

8            **MR. WALSH:**   And if we turn to page 2 of this document

9    for what -- and maybe we could blow it up.

10        Thank you very much.

11                        (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**   For what property is this preliminary report generated?

14   **A.**   712 Bryant Street, number 6, in San Francisco, California

15   94107.

16   **Q.**   And again, you're the escrow officer on this transaction?

17   **A.**   That's correct.

18   **Q.**   And the title officer is John Giambrone?

19   **A.**   Yes.

20   **Q.**   This preliminary report, though, is on the title side; is

21   that right?

22   **A.**   Yes.  Yes.

23   **Q.**   So really this is somewhat the work product of John

24   Giambrone; is that right?

25   **A.**   Yes.

1    **Q.**   What is it -- there's a date here of -- it says "Effective

2    Date."   What does it say for effective date?

3    **A.**   July 15th, 2014, 7:30 a.m.

4    **Q.**   Why is there an effective date rather than this -- one of

5    the August dates when this was actually being created?

6    **A.**   The way the documents are pulled from the County

7    Recorder's office, there's always a bit of a lag time.   The

8    title company has a system called a title plant and they --

9    they pull this information directly from the title plant, but

10   it's typically two to three weeks behind the actual date we're

11   on.

12       And that's because the County Recorder only uploads

13   documents, you know, after a certain amount of time.   So

14   there's -- there's typically a two- to three-week lag time

15   between when we issue a report and the effective date.

16       So we're letting Silicon Valley Bank know that this

17   information is only good through that July 15th date.

18   **Q.**   Who does it indicate the owner of this property is?

19   **A.**   Michael B. Rothenberg, an unmarried man.

20   **Q.**   And does that make sense in the context of a refinance

21   transaction?

22   **A.**   Yes.

23   **Q.**   And why is that?

24   **A.**   It typically will show the current vested owner of the

25   property, and since he's already purchased it, that's the

1    current owner.

2            **MR. WALSH:**  Okay.  If we could dezoom this, please.

3        If we could go to the next page, please, page 3.

4                        (Exhibit published.)

5    BY MR. WALSH:

6    **Q.**  What begins on page 3 here?  What is this?

7    **A.**  That's what I call an Exhibit A, or a legal description.

8    And it's the description of the property according to a map.

9    So it shows the lot and the unit number of the -- of the condo

10   as well as the defining description of the actual property

11   itself.

12           **MR. WALSH:**  And if we could go to the next page,

13   page 4.

14                       (Exhibit published.)

15   BY MR. WALSH:

16   **Q.**  Is that a continuation of Exhibit A?

17   **A.**  Yes.

18   **Q.**  If we?

19           **MR. WALSH:**  If we can go to the next page, page 5.

20                       (Exhibit published.)

21   BY MR. WALSH:

22   **Q.**  What's this page for?

23   **A.**  This is where the exceptions of a prelim begin.  And it

24   will tell the lender if there's any outstanding taxes,

25   supplemental taxes, any liens or HOA dues that might be on a

1    property.

2    **Q.**   And those are enumerated out if any exist?

3    **A.**   Yes.

4         **MR. WALSH:**   If we could go to page 6 of Exhibit 21.

5              (Exhibit published.)

6    **BY MR. WALSH:**

7    **Q.**   And let's focus in on 8.  What's -- what's in exception 8

8    here?

9    **A.**   Item number 8 is telling us that there is a current deed

10   of trust on the property, also a mortgage for the -- recorded

11   on the property.

12   **Q.**   And you said deed of trust, also a mortgage.  Those are

13   interchangeable words for the same thing?

14   **A.**   Correct.

15   **Q.**   Okay.  And what is the amount and who is that deed of

16   trust -- the beneficiary -- who is the beneficiary of that

17   deed of trust?

18   **A.**   The loan amount is 880,000.  And the beneficiary at the

19   time was Stanford Federal Credit Union.

20   **Q.**   And does it indicate the date at which that originated and

21   it was recorded?

22   **A.**   Yes.  The recording date of that document was August 23rd

23   of 2013.

24         **MR. WALSH:**   Okay.  We can dezoom that, please.

25       If we go to page 7 of this preliminary title report.

1              (Exhibit published.)

2    BY MR. WALSH:

3    Q.   There's a notes page.  What's this notes page for?

4    A.   The notes show kind of basic history of the property and

5    then any updated information that we might need to tell a

6    lender.

7         In this case it shows some previous taxes.  It also has

8    what we call a chain of title.  So if there's any recorded

9    documents, deeds specifically, in the last 24 months or two

10   years, we reference it there.

11   Q.   Okay.  If we can go to the next page, page 8, and the

12   notes continue here.  What's being discussed here on the page?

13   A.   Note 7 specifically states that we can only utilize an

14   approved notary for the transaction for the title insurance

15   purposes.  So it's letting the lender know that we need to

16   choose the notary.

17        And then note 8 is just a specific note to escrow so that

18   we can send the documents to the proper recording service

19   company in order to record the final documents for the

20   transaction.

21   Q.   Okay.  And what does that mean?

22   A.   So our title department -- our title officer, John

23   Giambrone, wouldn't go down directly to the county and hand

24   over the document for recording.  We work with a recording

25   service company that then goes to the county and -- and does

 1   that.  So that recording service company is listed there.

 2            **MR. WALSH:**  Okay.  If we go to the next page, please,

 3   page 9.

 4                      (Exhibit published.)

 5   BY MR. WALSH:

 6   **Q.**  What's this notice about?

 7   **A.**  This notice is regarding any specific discounts.  It looks

 8   like there was a $20 discount for escrow services if any

 9   individual refinance purchase or sold between a certain

10   timeline.  So at one point in time Chicago Title had to

11   reimburse clients for overcharging of notary -- I'm sorry --

12   of recording fees.

13            **MR. WALSH:**  Okay.  If we could dezoom that, please,

14   and go to the next page, page 10 of this document.

15                      (Exhibit published.)

16   BY MR. WALSH:

17   **Q.**  This appears to be a privacy notice; is that right?

18   **A.**  Yeah.  It's required to issue with all of our title

19   records.

20            **MR. WALSH:**  If we can go to the next page, please.

21   It continues on page 11.

22                      (Exhibit published.)

23            **MR. WALSH:**  Go to the next page.

24                      (Exhibit published.)

25            **MR. WALSH:**  And on to page 12.

 1                        (Exhibit published.)

 2              **MR. WALSH:**  And on to the next page.

 3                        (Exhibit published.)

 4    **BY MR. WALSH:**

 5    **Q.**  There's an attachment 1 here on page 13 of Exhibit 21.

 6    Just at a high level, what's being disclosed here?

 7    **A.**  This is descriptions of what the title insurance policy

 8    will cover and not cover.

 9              **MR. WALSH:**  Can you go to the next page, please.

10                        (Exhibit published.)

11    **BY MR. WALSH:**

12    **Q.**  And that continues on to page 14?

13    **A.**  Yes, continues on.

14              **MR. WALSH:**  And if we can continue on to page 15,

15    please.

16                        (Exhibit published.)

17              **THE WITNESS:**  And it's the same thing.  It continues

18    on.

19              **MR. WALSH:**  We can go to the next page, 16.

20                        (Exhibit published.)

21    **BY MR. WALSH:**

22    **Q.**  What's being discussed here?

23    **A.**  For an ALTA loan policy, American Land Title Association

24    policy, the exclusions within that type of policy.

25    **Q.**  Is an ALTA or American Land Title Association policy a

 1    type of title insurance?

 2    **A.**  Yes.

 3    **Q.**  Is it the most common or --

 4    **A.**  It's the most common with the most coverage.  So most

 5    lenders will request an ALTA loan policy, yeah.

 6          **THE COURT:**  Mr. Walsh, anytime in the next five

 7    minutes.

 8          **MR. WALSH:**  Thank you.

 9       If we can go on to the next page, page 17 here.

10                   (Exhibit published.)

11    **BY MR. WALSH:**

12    **Q.**  This is a continuation of that ALTA loan policy

13    disclosure?

14    **A.**  Yes.

15    **Q.**  Gone on to page 18.

16                   (Exhibit published.)

17    **BY MR. WALSH:**

18    **Q.**  That continues on that, I take it?

19    **A.**  Yes, that's correct.

20    **Q.**  Page 19.

21                   (Exhibit published.)

22          **THE WITNESS:**  Correct.  Continues.

23          **MR. WALSH:**  Page 20.

24                   (Exhibit published.)

25    / / /

1    BY MR. WALSH:

2    Q.   What's here?  This appears to be different.

3    A.   This is an attachment to the title report that will

4    describe any discounts that might be available to specific

5    borrowers or lenders.

6             MR. WALSH:   If we can we go on to page 21.

7                   (Exhibit published.)

8    BY MR. WALSH:

9    Q.   What's going on here?  This is -- looks like a photocopy

10   of something?

11   A.   Yes.

12   Q.   What is all that?

13   A.   This is -- this is the part of the map that was recorded

14   when the property was developed.  So there's multiple

15   signatures on here from engineers, developers, architects.

16   And it's -- its from when the property was originally

17   developed.

18             MR. WALSH:   If we can go to the next page, page 22,

19   and maybe we need to reorient again.

20                   (Exhibit published.)

21   BY MR. WALSH:

22   Q.   Is this is the map that accompanies that cover page there?

23   A.   Yes.  It's -- it's still part of the map.

24             MR. WALSH:   All right.  If we can go to page 23.  We

25   might have to reorient as well.

 1                      (Exhibit published.)

 2   **BY MR. WALSH:**

 3   **Q.**  Is this a map of the actual condominium within the condo

 4   building?

 5   **A.**  That's correct, yes.

 6             **MR. WALSH:**  Go to page 24.

 7                      (Exhibit published.)

 8   **BY MR. WALSH:**

 9   **Q.**  We could --

10             **THE COURT:**  Ms. Yamato, what's PIQ stand for?

11             **THE WITNESS:**  PIQ stands for property in question.

12             **THE COURT:**  Thanks.

13             **MR. WALSH:**  Can we zoom it so it's just more there.

14                      (Exhibit published.)

15   **BY MR. WALSH:**

16   **Q.**  And I think we're at the last page.

17        Page 24, again, the continuation of the map; is that

18   right?

19   **A.**  Yes, that's -- that's correct.

20   **Q.**  And that's the totality of the preliminary title report?

21   **A.**  Yes.

22   **Q.**  When that's generated, what did you do with it back in

23   2014?

24   **A.**  We sent a copy over to the Silicon Valley Bank team.

25             **MR. WALSH:**  I think now is a good time to stop, Your

 1   Honor.

 2           **THE COURT:**  All right.  1:29 p.m.  Perfect.

 3       Thanks for your attention today, members of the jury.

 4       As I told you during your jury selection and reminded you

 5   this morning, we only have one more day of testimony this

 6   week.  That day occurs tomorrow.

 7       So remember my prior admonitions.  Keep an open mind,

 8   don't talk to anybody or communicate in any way.  Don't look

 9   anything up.  Keep paying that close attention I can see you

10   paying sitting up here.  And have a restful evening.  I'll see

11   you tomorrow morning at 8:30.

12           **THE CLERK:**  Please rise for the jury.

13       (The following proceedings were heard out of the presence

14   of the jury:)

15           **THE COURT:**  Okay.  We're outside the presence of the

16   jury.

17       Anything to put on the record or any preview of coming

18   attractions?

19       Mr. Walsh?

20           **MR. WALSH:**  Nothing to put on the record for today.

21           **THE COURT:**  Mr. Fakhoury?

22           **MR. FAKHOURY:**  No, Your Honor.

23           **THE COURT:**  All right.  Ms. Yamato, thanks for your

24   testimony.  You will need to come back tomorrow morning to

25   finish up.

1    Everyone have a restful evening.  Court is in recess.

2              MR. WALDINGER:  Thank you, Your Honor.

3              MR. WALSH:  Thank you, Your Honor.

4              (Proceedings were concluded at 1:31 P.M.)

5                         --o0o--

6

7

8                    **CERTIFICATE OF REPORTER**

9

10             I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12   I further certify that I am neither counsel for, related to,

13   nor employed by any of the parties to the action in which this

14   hearing was taken, and further that I am not financially nor

15   otherwise interested in the outcome of the action.

16

17        _____ *Raynee H. Mercado* _____

18        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

19             Monday, November 7, 2022

20

21

22

23

24

25