UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 6** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 1033 - 1213 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, November 8, 2022 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          STEPHANIE M. HINDS, ESQ.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                BY:  KYLE F. WALDINGER,
                     NICHOLAS J. WALSH,
                     ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:          Moeel Lah Fakhoury LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612-1427
                BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1

**I N D E X**

2

3    **GOVERNMENT'S WITNESSES**                    **PAGE**    **VOL.**

4    YAMATO, HAPI

5    DIRECT EXAM (RESUMED) BY MR. WALSH            1052       6

6    CROSS-EXAMINATION BY MR. FAKHOURY             1074       6

7

8    EPPLER, JEFFERSON ROBERT

9    DIRECT EXAMINATION BY MR. WALDINGER           1082       6

10   CROSS-EXAMINATION BY MR. FAKHOURY             1157       6

11   REDIRECT EXAMINATION BY MR. WALDINGER         1171       6

12   RECROSS-EXAMINATION BY MR. FAKHOURY           1174       6

13

14   GHIO, ANTHONY

15   DIRECT EXAMINATION BY MR. WALSH               1176       6

16

17

**E X H I B I T S**

18

19   **GOVERNMENT'S EXHIBITS**   **W/DRAWN**   **IDEN**   **EVID**   **VOL.**

20   94                                                 1111       6

21   101                                                1116       6

22   124                                                1145       6

23   125                                                1136       6

24

25

--o0o--

```
 1   Tuesday, November 8, 2022                          8:08 A.M.
 2                     P R O C E E D I N G S
 3       (The following proceedings were heard out of the presence
 4   of the jury:)
 5           THE COURT:  Good morning.  Counsel and the parties
 6   are at counsel table.  We're outside the presence of the jury.
 7   Mr. Fakhoury, Mr. Torres, Mr. Rothenberg, Mr. Walsh,
 8   Mr. Waldinger, Ms. Margen, and Ms. Barnard are all here.
 9       Christopher Farajian's toddler or infant child has become
10   sick with RSV.  He is also experiencing symptoms of RSV.
11   Unless I hear an objection in the next second, the Court's
12   ruling will be to excuse him for cause for participating
13   further in this jury because he'll make all of our jurors
14   sick.  Anyone want to be heard?
15           MR. WALDINGER:  No, Your Honor.
16           MR. FAKHOURY:  No, Your Honor.
17           THE COURT:  That's the Court's order.
18           THE CLERK:  Yes, sir.
19           THE COURT:  Mr. Cizmar -- I don't know if Ms. Lee
20   told you this.  His wife had to go to the hospital briefly
21   last week.  She's very pregnant.  Anyway he's just soldiering
22   on.  At the moment he's stuck in traffic.  And he called
23   chambers just a second ago to say that his current ETA is
24   8:30, traffic's getting worse.  He just wanted to keep us
25   updated.  As soon as we know more, we'll tell you.
```

1   I can't say I'm terribly surprised that we lost one juror

2   this far in at the beginning of cold and flu season.  So I'll

3   just keep my fingers crossed regarding the number of jurors.

4       Mr. Waldinger, anything else for the Court this morning?

5           **MR. WALDINGER:**  Your Honor, the government did submit

6   a proposed instruction consistent with Your Honor's statements

7   yesterday regarding the limiting instruction.

8           **THE COURT:**  Very good.  I'm holding that.

9       Mr. Fakhoury, any reason to think that this proposed

10  instruction does not reflect the Court's ruling yesterday?

11          **MR. FAKHOURY:**  No, Your Honor.

12          **THE COURT:**  Okay.  Very good.  I'll just keep that at

13  the bench for later use.

14      Mr. Fakhoury, anything to bring up with the Court this

15  morning?

16          **MR. FAKHOURY:**  No, Your Honor.

17      Could the Court just say the name of the juror who was

18  excused?

19          **THE COURT:**  Yes, I'd be happy to do that.  I thought

20  I did.  I'm sorry.

21          **MR. FAKHOURY:**  You did.  I just --

22          **THE COURT:**  It's Christopher Farajian.  He's

23  currently our Juror Number 9.

24          **MR. FAKHOURY:**  Thank you.

25          **THE COURT:**  And I'll just advise the rest of the

1  jurors of that this morning and tell them to keep drinking

2  orange juice and getting a good night's sleep.

3          **MR. WALDINGER:**  Yes.

4          **THE COURT:**  Mr. Waldinger, the jurors, as a group,

5  yesterday asked Ms. Lee for -- asked the question where are we

6  in this trial in terms of time?  Which doesn't surprise me.

7      So I'll ask you that question, and then I'll provide an

8  answer when they come out.

9          **MR. WALDINGER:**  We would like to get most of our

10  witnesses in today.  I think it's probable that we will have

11  to spill over at least till Monday.  And I -- I think very

12  likely we will close -- or finish our evidence on Monday.

13          **THE COURT:**  Okay.  That is good.  And that seems to

14  me -- that's about a day better than the estimate we were

15  working with during jury selection.  So I think they'll be

16  pleased to hear that.

17      Mr. Fakhoury, if you had to make a determination right now

18  as to how much longer than sometime on Monday the evidence

19  portion of the trial would go, what would you say?

20          **MR. FAKHOURY:**  If the government finishes, let's say

21  Monday like 12:30 or 1:00 o'clock --

22          **THE COURT:**  Yes.

23          **MR. FAKHOURY:**  -- I think -- I would imagine we would

24  be closing on Tuesday.

25          **THE COURT:**  Okay.

 1    So I will tell the jurors, no promises, I told you Tuesday

 2   before Thanksgiving, it's still on the table.  But currently

 3   counsels' estimate is that closing arguments will occur on

 4   Tuesday.

 5    Now bear in mind I'm going to instruct them before

 6   closing.  I've always done it that way.  It's much more

 7   interesting for them to hear from you as the last thing than

 8   me.

 9    Would you still say, given that, that closings are likely

10   to occur on Tuesday if the government rests on Monday?

11         **MR. FAKHOURY:**  Yes.

12         **THE COURT:**  Okay.

13    So are there -- I'll go back and look at the jury

14   instructions.  I'm going to be on a plane tomorrow.  I'll have

15   plenty of time to do that.  Are there more disputes that the

16   Court needs to resolve in those instructions beyond those I

17   resolved at the beginning?

18         **MR. WALDINGER:**  I'm not sure, Your Honor.  I -- I

19   think we're concerned about perhaps wanting an additional

20   instruction about negligence, specifically related to

21   negligence on the part of the bank.  I think we've heard some

22   questions that suggest that SVB was at fault.  I don't know --

23   I think Mr. Fakhoury's response would be that it just shows

24   materiality to the bank.  I'm not sure what the argument is.

25   But I think it's a fine -- a fine line that's being walked.

1   And I -- I think the government may want an instruction that's

2   consistent with -- I'm now blanking on the case from the Ninth

3   Circuit.

4            **MR. FAKHOURY:**  Muncie [phonetic].

5            **MR. WALDINGER:**  That says that negligence is not a

6   defense in this regard.

7            **THE COURT:**  Yes.  Well, it sounds like that at the

8   moment is a -- it sounds like you're raising that topic for

9   the group and that you've not yet had any discussion with

10  Mr. Fakhoury.

11       I'll just say a couple of things.  I would like to be able

12  to resolve any outstanding issues concerning the jury

13  instructions, if time permits, before the jury takes their

14  seats on Monday morning.  So at 8:00 o'clock, we could convene

15  if nothing else was more pressing, we could work out the jury

16  instructions.  And then the Court would be ready to instruct

17  the jury at any time that it -- that was -- that it makes

18  sense.

19       So, for example, let's say -- let's say you finish all

20  your evidence today and Mr. Fakhoury stands up and says the

21  defense rests, and then that's it.  And that happens sometime

22  today.

23       If that happens, I'll turn to the jurors and say, "I have

24  to tell you this happened much faster than I thought.

25  Normally we give you a full day.  But, you know, that's not

1    going to happen today.  So everybody can go home, come back on

2    Monday."

3        It seems -- that doesn't seem terribly likely from what

4    you've said.  It's possible.

5        It does seem much more likely that I might need to

6    instruct the jury on Monday because the evidence will conclude

7    at some point on that day.  Mr. Fakhoury is signaling that his

8    case, if he puts one on, will not be long.  And generally it

9    takes about 40 minutes to instruct the jury, round numbers.

10       So if I look up at the clock and I see that we've got an

11   hour to go, I'm just going to instruct them, if I can.

12       So let's do this.  And, Andy, I'm looking at you.  Let's

13   go through the instructions today, and when we leave -- when

14   we finish trial today, let's just have a plan for how we're

15   going to resolve any disputes.  Let's have a deadline for the

16   government to propose an instruction on this issue if the

17   parties have not been able to reach agreement.

18       And then we can keep your trial on track.  How's that

19   sound?

20           MR. WALDINGER:  I think that sounds good, Your Honor.

21   And I get the timing.

22       Could I give you a hypothetical?  Say we only -- say we --

23   the government's witness spills over till Monday, we finish by

24   10:30 or 10:00, something like that.  Would Your Honor -- so

25   under what I've heard, you'd like to instruct them.  Should we

1    be ready to go with closings if we finish that early on

2    Monday?

3             **THE COURT:**  I would like to do that.

4        I can -- I'm looking at the clock on the back wall, and we

5    still have some time this morning before the jurors come in,

6    particularly given Mr. Cizmar's situation.  So let's map that

7    out a little bit.

8        First of all, it would be useful for me to hear from the

9    lawyers what their estimate is of their length of their

10   closing arguments.

11       The other thing I can tell you is that Friday is a court

12   holiday so I'm not allowed to set hearings on that day.  Or it

13   would be weird if I did that and -- and annoying to people.

14       But I have a -- but I could set a hearing on Thursday

15   morning quite easily, a phone hearing or a video.  I'll be

16   speaking on a panel in Montreal.  But so that's available to

17   us.  It's a change of topic from what you just said, but I

18   just wanted to make that available to the parties in case we

19   needed argument on jury instructions.

20       So let's come back to your question about closing.  How

21   long do you think the government's closing arguments,

22   including rebuttal, will be in totality?

23       Good morning, Paula.

24             **THE COURT SECURITY OFFICER:**  Good morning, Your

25   Honor.

1        **MR. WALDINGER:**  I think the government's, for the

2   closing and rebuttal, roughly an hour and a half for the whole

3   thing.

4        **THE COURT:**  Mr. Fakhoury.  Same question for you.

5        **MR. FAKHOURY:**  I would anticipate probably an hour

6   for me.

7        **THE COURT:**  Yeah.

8        **MR. FAKHOURY:**  Maybe a little longer than that.  But

9   I would think no shorter than an hour.

10       **THE COURT:**  So I would say maybe the two of you could

11  just talk to each other and share views with each other about

12  what a sensible order of proceedings is.

13       Here are the considerations that we're balancing.  I know

14  you already know this.  We're not a state court so our jurors

15  don't just come from Alameda County.  They come from hither

16  and yon.  And it's a real imposition on them every day to do

17  their jury service.  I would say in this case they're doing it

18  willingly and almost happily.  They're very engaged.  But it's

19  a big burden on them just to come in.

20       So if you let your jurors go, you know, if they got the

21  child care, gassed up the car, drove an hour and 15 minutes,

22  had a very bad slowdown at American Canyon, got here on time,

23  and then you let them go at 10:30, that's not a good

24  experience for them.  So I'm mindful of that.

25       There are other considerations.  So why don't the two of

1   you talk, and this will be part of our game plan at the end of

2   day that we'll work out.

3       Does that make sense?

4       **MR. WALDINGER:**  I think that makes sense, Your Honor.

5   And I know Your Honor has promised the jury that they get to

6   leave at 1:30, but I wonder if it makes sense to poll them to

7   see, hey, if we think we can get everything done by 2:00 on a

8   particular day.

9       **THE COURT:**  I'm a hundred percent behind that

10  proposal, and I've done that.  And jurors, ten times out of

11  ten, will usually tell you fine.

12      And there is an issue with our court staff.  That's a lot

13  of typing for Ms. Mercado.  And our court reporters here have

14  a culture of never complaining about anything.  So I very

15  rarely get asked for breaks.  I try to remember to offer

16  breaks.  But I would want to have a side conversation with

17  Ms. Mercado about that and see if she feels okay about that.

18  And maybe we need to sub somebody in.  But let me -- I'll talk

19  to her about that on the side.

20      **MR. WALDINGER:**  Very good.

21      **THE COURT:**  Good.  And maybe -- well, I don't want to

22  forget.  There are so many different topics now that we have

23  to discuss.

24      Should we have a Thursday hearing about jury instructions

25  and closing schedule slash Monday schedule, and potential

 1   negligence instruction.

 2       On the issue of that, the negligence instruction -- again

 3   I'm telling you what you already know.  My guess, based on our

 4   pretrial work together, is that in every single one of these

 5   cases, the government makes it clear to the jury, as clear as

 6   it possibly can, it doesn't matter whether they would have

 7   given him the loan anyway, and the defendant sails as close to

 8   the wind as they possibly can and they come just as close as

 9   they can to telling the jury "They would have given him the

10   loan anyway."

11       So you'll -- you'll figure out what operating instructions

12   I need.

13       Further matters before our jurors come in this morning?

14           **MR. WALSH:**  Your Honor, just one quick question.

15       With regard to this Thursday hearing, Your Honor indicated

16   maybe in the morning.  Is the whole day available?  I don't

17   know what your speaking schedule or whatever, and this --

18           **THE COURT:**  Let me bring that up.  I can tell you

19   that.

20       And by the way, if my plane is on time, I should have time

21   tomorrow too, but that seems too soon for the parties to talk,

22   file something, all that.

23                   (Pause in the proceedings.)

24           **THE COURT:**  So I could be available --

25       Ms. Lee, how early are you comfortable starting your work

1    day?

2           **THE CLERK:**  As early as you need, Your Honor.

3    That's -- I'm fine.

4           **THE COURT:**  Well, I don't want to impose too much.

5    So let's say 8:30.  From 8:30 a.m. Pacific Time through

6    10:00 a.m. Pacific Time, I'm available.  I'm -- I'm scheduled

7    to speak at 10:30 a.m. Pacific Time.

8        I become available -- and this is actually better because

9    I will have concluded my presentation.  I become available at

10   12:00 p.m. Pacific Time, and then I'm free until 2:30.

11       I might suggest from 1:00 p.m. to 2:30 on Thursday, I

12   think.  Also bearing in mind the more time that lapses until

13   the hearing, the more time all of you have to be ready for the

14   hearing.

15       So I'd sort of like to give you Thursday morning also.

16   How does that sound?

17          **MR. WALSH:**  That was why I asked because I thought it

18   might behoove everyone to have a little more time, so --

19          **THE COURT:**  Yeah.  And I -- I wish -- frankly I wish

20   Friday were available for all of our sakes, but it just isn't.

21       So here's what I'd like to do.  Let's plan on having

22   anything that needs to be filed by 4:00 p.m. tomorrow.

23       Anything additional, let's plan on conducting a hearing --

24       Ms. Lee, you can go ahead and calendar this.

25          **THE CLERK:**  Yes, sir.

1      **THE COURT:**  -- at 1:00 p.m., Pacific Time on

2   Thursday.  I'm not anticipating that hearing will take longer

3   than an hour, but if it needs to take 90 minutes, it could.

4      And before we leave court today, we'll just discuss with

5   each other what issues we think still need to be resolved so

6   everybody can make sure and tie those off.

7      **MR. FAKHOURY:**  I'm sorry, Your Honor.  What was the

8   time of the hearing on Thursday?

9      **THE COURT:**  It will be at 1:00 p.m.

10     **MR. FAKHOURY:**  Thank you.

11     **THE COURT:**  Okay.  Anything else?

12     **MR. WALSH:**  Your Honor, I do anticipate the

13  government using some demonstratives for the first time in

14  this trial today.  And I just want to inquire what Your

15  Honor's practice was, whether you give any instruction about

16  whether it's going to go back with them, how you'd like to --

17  how you'd like us to, you know, refer to it, just what Your

18  Honor's practice is so that we don't do it in front of the

19  jury.

20     **THE COURT:**  It's been a little while since I looked

21  at the federal criminal instructions for demonstrative

22  exhibits.  I have recently done more civil trials so I have

23  those instructions in mind.  I assume that they're not that

24  different.

25     There isn't a set rule with regard to demonstrative

1    exhibits in terms of whether or not they go back with the jury

2    based -- the fact that an exhibit is demonstrative does not by

3    itself tell you whether it goes back with the jury.

4        I think the usual practice is not to admit them if they're

5    purely demonstrative.  In some cases, a demonstrative exhibit

6    also functions as a summary of voluminous evidence and is

7    subject to that exception and counsel will offer it on that

8    basis.

9        I think you should meet and confer with Mr. Fakhoury.

10       I very rarely get objections about demonstrative evidence.

11   I don't know if there will be any today.  So I don't know if

12   those remarks are helpful.

13            **MR. WALSH:**  They are.  Thank you, Your Honor.

14            **THE COURT:**  Gentlemen, anything further?

15            **MR. FAKHOURY:**  I have nothing.  Thank you, Your

16   Honor.

17            **MR. WALDINGER:**  I don't believe so, Your Honor.

18   Thank you.

19            **THE COURT:**  Okay.  Thanks.  Let's stand in recess

20   until our jurors get here.

21            **THE CLERK:**  Court is in recess.

22       (Recess taken at 8:28 A.M.; proceedings resumed at

23   8:56 A.M.)

24       (The following proceedings were heard in the presence of

25   the jury:)

| 1 | **THE CLERK:**  You may be seated. |

1         **THE CLERK:**  You may be seated.

2         **THE COURT:**  All right.  Ms. Lee, would you -- is it

3 Ms. Perez who was our first -- was the first alternate seated,

4 correct?

5         **THE CLERK:**  Correct.

6         **THE COURT:**  Okay.  Good morning, members of the jury.

7         **JURORS:**  Good morning.

8         **THE COURT:**  It's a little cold out there.  It's just

9 the earth doing what it needs to do.  So as I told you, I love

10 the rain and our state deeply needs it.

11    Traffic was a little crazy this morning.  That happens

12 sometimes when it rains.  So we're getting off to a little bit

13 later start, not too bad.

14    Juror Number 9, Mr. Farajian, has a very small child who

15 is very sick with, I think it's called RSV.  Mr. Farajian also

16 is experiencing the symptoms of RSV.  Because he's a trooper,

17 he called in very early and said he was happy to still come

18 in.  And I thought I don't want all of my jurors to get RSV.

19 So he's been excused for illness reasons.

20    I told you during jury selection, statistically it's very

21 likely that at least one alternate will be seated with the

22 rest of the jury.

23    And so now, Ms. Perez, would you raise your hand.  Where

24 are you?  Oh, there you are.  Good morning.

25    Ms. Perez, you are now part of the 12 regularly empaneled

```
1    jurors.  I'm substituting you in for Mr. Farajian.
2         Mr. Sosa, where are you?  Drink your orange juice, eat
3    your Wheaties.  We have to have 12 jurors in order to finish
4    this trial.
5         And I'm not worried about it.  So that's where we are.
6         Sensibly, you asked Ms. Lee a question yesterday about
7    schedule.  I want to update you on that.  During jury
8    selection, I told you that worst case was that the trial would
9    go through the Tuesday before Thanksgiving and best case it
10   would wrap up at some point next week.
11        Currently -- things can always change -- currently the
12   lawyers are estimating that closing arguments in this case
13   will occur not later than Tuesday of next week.  And just a
14   reminder about schedule, that means that you will then have
15   the case to deliberate.
16        And since that's true, let me just say a few things about
17   court schedule and deliberations so that you can begin
18   planning and discussing -- it's a little too early for you to
19   discuss it among yourselves, but just so you know what's
20   coming down the road.
21        The order of proceedings is we pick a jury.  We have
22   opening statements.  We have -- we pick a jury.  The Court
23   instructs the jury.  We have opening statements.  We take
24   evidence.  The Court instructs the jury again.  This is a
25   longer set of instructions.  You'll have a copy to read along
```

1    as I instruct you.  And then you hear closing arguments from

2    the lawyers.

3        And it's the government's burden of proof.  And since it's

4    the government's burden of proof, they get to make a closing

5    argument.  Then Mr. Fakhoury makes a closing argument.  And

6    then the government has what's called rebuttal because it's

7    their burden of proof so they get the first word and the last

8    word.  And then the case is yours to decide, and you go into

9    the deliberation room and deliberate.

10       Now, our schedule except, for when we picked the jury, our

11   schedule has been 8:30 to 1:30.  And that's for a couple

12   reasons.  One is for your schedules, but the other is for my

13   schedule because I have so many other cases.  So in the

14   afternoon after you go home, I'm doing hearings and things in

15   other cases.

16       Once you're deliberating, that's not an issue because

17   you're in the deliberation room, and I can go about my

18   business.  There's nothing more important than a deliberating

19   jury.  So if the jury has a question or reaches a verdict, I

20   just stop what I'm doing and then I tend to the jury and then

21   I go back.

22       But my point is if the jury wanted to, it could stay later

23   when it's deliberating.  Deliberations are going to take a

24   certain number of hours.  We don't know what those are.

25   Obviously if you have more hours in day one, you're going to

1    reach the finish line, whatever that finish line is, sooner.

2    So that's a decision that you will make.

3        Once you have the case, once your deliberations begin, I

4    will ask you to send back a note, sign -- pick a foreman, pick

5    a presiding juror, and then send back a note signed by that

6    person just saying here's our deliberation schedule.

7        We want you to still start at 8:30 in the morning.  But

8    what your time of day that you end is, that will be decided by

9    your group, not me.  You'll tell me what that is.  It

10   shouldn't be before 1:30, but if it's available to you to go

11   later during deliberations, you'll tell me that and the

12   lawyers that.

13       Similarly, we've not been in session on Fridays, and

14   that's because I have so many things on Fridays, I can't have

15   a morning trial session.  I have a bunch of calendars I do on

16   that day.

17       But, again, if your group wanted to deliberate next

18   Friday, if you were still in deliberations, you could do that

19   too.  So I'm telling you this so far in advance because I know

20   you have busy lives and you have obligations to your employer

21   and you have family obligations.  And my guess is the more

22   notice you get from the Court about these things, the better.

23       So I just wanted to give you that information.

24       Overall it's very good news frankly.  The lawyers in this

25   case on both sides are very skilled, and they have been -- I

1    know some of this evidence is dry, but they've been very

2    efficient in the way they've presented it to you.

3        And so if we do end on the earlier side, as I indicated,

4    it's not because of anything I did, it's because the lawyers

5    in this case on both sides are so good.

6        So that's the good word.

7        I'm forgetting who was examining yesterday.

8            **MR. WALSH:**  I am, Your Honor.

9            **THE COURT:**  Very good.

10       Mr. Walsh, your witness.

11                          <u>**HAPI YAMATO**</u>,

12   called as a witness by the plaintiff, having been previously

13   duly sworn, continued testifying as follows:

14                 <u>**DIRECT EXAMINATION (RESUMED)**</u>

15   BY MR. WALSH:

16   **Q.**  Ms. Yamato --

17   **A.**  Good morning.

18   **Q.**  -- we left off yesterday, I believe you had just walked

19   the jury through the preliminary title report package.  Do you

20   recollect that?

21   **A.**  Yes.

22   **Q.**  And if I follow your explanation of how or what happens

23   next from the title company's perspective here is there's a --

24   there's a waiting period while the bank is doing stuff; is

25   that right?

1    **A.**   Yes.

2    **Q.**   Okay.  In this instance, was there a waiting period after

3    the submission of the preliminary title report to

4    Silicon Valley Bank?

5    **A.**   Yes, there was.

6    **Q.**   At some point did you learn that there had been an

7    increase in the loan amount that was going to be sought?

8    **A.**   Yes.

9    **Q.**   I'd like to show you what's marked Exhibit 107.

10           **MR. WALSH:**  And go to page 5, please.

11       And if we could please blow up the middle section there

12   (indicating).

13                       (Exhibit published.)

14   **BY MR. WALSH:**

15   **Q.**   Do you recognize this document?

16   **A.**   I do.

17   **Q.**   And what is this document?

18   **A.**   This is an email from Ingrid to myself and my assistant,

19   Carol Steck.

20   **Q.**   And because we're making a record here, Ingrid who?

21   **A.**   I'm sorry.  Ingrid Robertson.

22   **Q.**   What is the date of that email?

23   **A.**   Friday, August 15th, 2014, at 4:51 p.m.

24   **Q.**   And is this how you learned that there was an increase of

25   the loan amount?

 1  **A.**   Yes.

 2  **Q.**   And in particular, what was the loan amount going from and

 3  to?

 4  **A.**   They were increasing the loan amount from 1,280,000 to

 5  1,480,000.

 6  **Q.**   And as a result of that, what was Ingrid asking you to do?

 7  **A.**   She wanted us to send her updated title and escrow fees so

 8  that she could redisclose the information to the borrower.

 9  **Q.**   Why would there be a possible change of those fees?

10  **A.**   Whenever there's an increase or a decrease in a loan

11  amount, the escrow and title fees may change.

12          **MR. WALSH:**   If we could dezoom that.

13  **Q.**   Did you respond to Ms. Robertson?

14  **A.**   Yes.   I sent her an email back with a copy of the fee

15  statement, the updated fee quote.

16          **MR. WALSH:**   If we could go forward to page 4 of

17  Exhibit 107, please.

18      And if you could blow up the bottom email there, please.

19                    (Exhibit published.)

20  **BY MR. WALSH:**

21  **Q.**   Do you recognize this part of Exhibit 107, page 4?

22  **A.**   Yes.

23  **Q.**   What is it?

24  **A.**   It's an email from myself back to Ingrid Robertson with

25  the updated fees.

1    **Q.**  What is the date of this email?

2    **A.**  Monday, August 18th, at 10:11 a.m.

3           **MR. WALSH:**  And if we could dezoom that, please.

4        And go forward to page 3 of this exhibit.  And if we could

5    blow up the text part, please.

6                          (Exhibit published.)

7    **BY MR. WALSH:**

8    **Q.**  Do you recognize what's depicted here on page 3 of

9    Exhibit 107?

10   **A.**  Yes.

11   **Q.**  What is this?

12   **A.**  This -- these are the updated fees that I sent over to

13   Ingrid.

14   **Q.**  All right.  Did the fees change for this change in the

15   loan amount?

16   **A.**  No.  They were the same.

17          **MR. WALSH:**  Okay.  If we could dezoom page 3, please,

18   and go forward to page 1.

19       Oh, sorry, page 2.  Apologize.  Page 2.  And blow up the

20   email please -- sorry.  This is not the right --

21       Sorry, could we dezoom that.

22       Go to page 4, I guess is the right page.  I went the wrong

23   direction.

24       All right.  If we could blow up the top email there,

25   please, and the second one, too.

1     Sorry.  If we could dezoom and do the top two emails,

2  please.

3                    (Exhibit published.)

4  **BY MR. WALSH:**

5  **Q.**  Do you recognize -- let's start, because we're in an email

6  chain, with the bottom one.  Do you recognize that item?

7  **A.**  Yes.

8  **Q.**  What is that item?

9  **A.**  That's an email from Ingrid Robertson to myself.  She's

10  asking if the fees were the same since the loan amount was

11  increased.

12  **Q.**  And what's the date of that email?

13  **A.**  Monday, August 18, 2014, at 10:39 a.m.

14  **Q.**  All right.  And did you respond to Ingrid Robertson later

15  that day?

16  **A.**  I did.  And I confirmed that they were in the same tier so

17  the fees were the same.

18  **Q.**  Okay.  What do you mean by -- or what did you mean then

19  and what does it mean now, the same tier?

20  **A.**  Title and escrow fees are fees that are posted at the

21  insurance commissioner and they have to follow in a certain

22  loan amount tier.  In this case, between the loan amount of

23  1.28 and 1.48 million, the rate schedule was the same.

24  **Q.**  All right.  And I don't think we did this, but we are

25  making a record, that, you responded in an email at the top of

1    this page; is that right?

2    **A.**  Yes, I -- yes, I did.

3    **Q.**  All right.  And what was the date of that email?

4    **A.**  Monday, August 18th, 2014, at 10:58 a.m.

5            **MR. WALSH:**  All right.  We could dezoom that, please.

6    Thank you.

7    **Q.**  Additionally, I think you told us that the title company

8    is responsible for setting up a notary; is that right?

9    **A.**  Yes.  That's correct.

10   **Q.**  And did you set up a notary in this matter?

11   **A.**  I did.

12   **Q.**  I'd like to turn your attention to Exhibit 109 in

13   evidence.

14           **MR. WALSH:**  And if we could blow up the bottom

15   portion here.

16                        (Exhibit published.)

17   **BY MR. WALSH:**

18   **Q.**  Do you recognize this item?

19   **A.**  Yes.

20   **Q.**  What is this item?

21   **A.**  This is an email from Mikki Kong at SVB to myself and

22   Carol Steck.

23   **Q.**  What is the date of that email?

24   **A.**  Tuesday, August 19th, 2014, at 8:57 a.m.

25   **Q.**  And what did you learn -- what did Mikki tell you about

1   the setting up of a notary in this particular instance?

2   **A.**  She informed us that she wanted to request a signing at

3   the Warwick Hotel for the borrower.

4   **Q.**  All right.  And it gave a date of what date there, if you

5   looked at the second one (indicating)?

6   **A.**  August 21st at 11:30 a.m.

7   **Q.**  All right.  And once you received this information, what

8   did you do?

9   **A.**  I reached out to one of our signing services that we

10  utilize in that area and coordinated the notary.

11          **MR. WALSH:**  If we could dezoom this and blow up the

12  top half of page 1 of 109.

13                          (Exhibit published.)

14  **BY MR. WALSH:**

15  **Q.**  Do you recognize this item?

16  **A.**  I do, yes.

17  **Q.**  What is this item?

18  **A.**  This is an email from myself back to Mikki Kong, and I

19  confirmed that the notary was in place.

20  **Q.**  And what was the name of the notary that had been hired by

21  Chicago Title in this instance?

22  **A.**  It was Paulette Brunk.

23          **MR. WALSH:**  Okay.  If we could dezoom that, please.

24  **Q.**  Now, in order to have a signing, there needs to be

25  documents to sign; isn't that right?

1    **A.**   That's correct.

2    **Q.**   Did you receive documents from Silicon Valley Bank?

3    **A.**   I did.

4    **Q.**   And what do you do once you receive those?

5    **A.**   Once we receive the final documents, I prepare any

6    additional escrow documents that are required for the

7    transaction and put together what we call a signing package

8    for the borrower.

9    **Q.**   What do you do with that -- what did you do in this

10   instance with that signing package?

11   **A.**   I emailed it over to Paulette prior to --

12                    (Technical audio interference.)

13                    (Off-the-record discussion.)

14              **THE COURT:**  This is the AT&T conference call line?

15              **THE CLERK:**  Yes, sir.

16              **THE COURT:**  Yes, let's do that.

17        Members of the public who might be listening in using our

18   AT&T conference line, that line is causing some technical

19   difficulties with the presentation of evidence in the trial,

20   and we're going to disconnect you temporarily in order to

21   address those difficulties.

22        Ms. Lee, go ahead.

23              **THE CLERK:**  Yes, sir.

24        Members of the jury, we have to stop and wait.  This is a

25   public proceeding.  And because COVID -- because of COVID,

1   we're limiting the number of people who we allow in any of our

2   courtrooms.  And we're the federal court.  We do our work in

3   plain view of everybody.  So in order to make sure that we

4   could be publicly available, we're streaming through an AT&T

5   conference call line.  Occasionally for reasons that I don't

6   know because I don't know anything about it, that causes that

7   weird staticky sound that you heard.  So we're just resetting

8   that line.

9                   (Pause in the proceedings.)

10          **THE CLERK:**  I think that's resolved the issue, Your

11  Honor.

12          **THE COURT:**  Okay.  Very good.  Thank you, Ms. Lee.

13      Mr. Walsh, your witness.

14  **BY MR. WALSH:**

15  **Q.**  I think we had just had you telling the jury that you

16  assemble various documents, is that right, and you emailed

17  them to Ms. Brunk?

18  **A.**  Yes, that's correct.

19  **Q.**  What's your next involvement with those documents?

20  **A.**  Once the documents are emailed over to the notary, the

21  notary completes the signing with the borrower.  And then the

22  original documents will be sent FedEx back to us.

23  **Q.**  And in this case, did you receive a FedEx with those

24  documents back?

25  **A.**  I did, yes.

1    **Q.**  What did you do next?

2    **A.**  We then process all the documentation by keeping the

3    originals that we're required to keep, sending the originals

4    to SVB that they require, and then sending any recording

5    documents to the County Recorder's office to place on hold

6    until we're ready to close.

7    **Q.**  You indicated that you sent a series of documents back to

8    SVB; is that right?

9    **A.**  Yes, that's correct.

10   **Q.**  I'd like to turn your attention to Exhibit 31.

11           **MR. WALSH:**  If we could blow up the text portion,

12   please.

13                          (Exhibit published.)

14   **BY MR. WALSH:**

15   **Q.**  Do you recognize this document?

16   **A.**  Yes, I do.

17   **Q.**  What is this document?

18   **A.**  This is the cover page, cover letter for a funding package

19   back to Silicon Valley Bank.

20   **Q.**  Okay.  You just introduced a new term somewhat, a funding

21   package.  What's the difference between a signing package and

22   a funding package?

23   **A.**  A signing package is what we put together in order for the

24   borrower to sign everything.  So it's typically unsigned.  A

25   funding package will be something that we put together once

1    all the loan documents are signed and it goes back to the

2    lender.

3    Q.   So this is a funding package we're looking at here?

4    A.   The cover page to the funding package, yes.

5    Q.   To whom and from whom is this letter sent?

6    A.   This is to Ingrid Robertson at Silicon Valley Bank, and

7    it's from myself.

8    Q.   What is the date of this letter?

9    A.   August 22nd, 2014.

10   Q.   Does that make sense in connection with the signing that

11   might have occurred on August 21st, 2014?

12   A.   Yes.

13   Q.   Why is that?

14   A.   Once the documents are signed and FedEx'd back to us the

15   following business day, we would then process everything

16   and -- and typically we complete that within 24 hours of

17   receiving the signed documents back.

18   Q.   In the content of this email, what do you inform

19   Ms. Robinson -- Robertson?  Sorry.

20   A.   We're -- I'm letting her know that we are providing them

21   with the fully executed loan documents and we are requesting

22   funds for August 26th in order to close the transaction.

23   Q.   Why did August 26th get picked?

24   A.   That was the day after the notice of right to cancel

25   expires.

1   **Q.**  And although we talked about this yesterday, what is the

2   notice of right to cancel?

3   **A.**  A borrower has three days to decide if they want to cancel

4   a transaction once they sign everything.  And that's the --

5   that would be after the third business day.

6   **Q.**  And that's only for a refinance mortgage; is that right?

7   **A.**  It's only for a refinance of a primary home, yes.

8   **Q.**  And then you provide some wiring instructions; is that

9   right?

10  **A.**  Yes.

11  **Q.**  Why are you providing wiring instructions to

12  Silicon Valley Bank?

13  **A.**  We're asking them to send all the funds to us as that's

14  part of the our escrow function is to obtain all the funds

15  required to pay off any existing loans or liens on the

16  property as well as closing costs associated and then disburse

17  our transaction.

18  **Q.**  And in this instance, did Silicon Valley Bank end up

19  funding the loan?

20  **A.**  Yes, they did.

21          **MR. WALSH:**  If we could dezoom this, please.

22      And if we could pull up Exhibit 110.

23                  (Exhibit published.)

24  **BY MR. WALSH:**

25  **Q.**  Do you recognize this document?

1   **A.**   Yes, I do.

2   **Q.**   What is this document?

3   **A.**   This is an email notification from my accounting

4   department telling me that the wire from Silicon Valley Bank

5   was received in our bank.

6   **Q.**   All right.

7          **MR. WALSH:**   And I suppose we should just zoom up --

8   zoom this portion here (indicating).

9                         (Exhibit published.)

10  **BY MR. WALSH:**

11  **Q.**   What is the date of this email?

12  **A.**   Tuesday, August 26th, 2014, at 2:28 p.m.

13  **Q.**   And does it indicate a property address that the wire was

14  for?

15  **A.**   Yes, it does.  712 Bryant Street, number 6, in

16  San Francisco, California.

17  **Q.**   And that's the address that we've been talking about

18  throughout the course of your testimony; is that right?

19  **A.**   Correct.

20  **Q.**   And is there a wire amount indicated?

21  **A.**   Yes.  The wire amount is $1,478,592.51.

22  **Q.**   Thank you.

23          **MR. WALSH:**   We can dezoom that.

24  **Q.**   And as a result of receiving this wire, what did you do

25  next?

1  **A.**  After the wire was received, we reached out to our title

2  department to release the documents for recording the

3  following day.

4  **Q.**  Which would have been what date?

5  **A.**  August 27th.

6  **Q.**  Once that -- those documents are recorded, what do you do

7  next?

8  **A.**  Once the documents are recorded, then we will disburse the

9  file and send out any wires or checks that are required to be

10  cut.

11  **Q.**  You said "disburse the file."  What does that exactly

12  mean?

13  **A.**  We would wire the payoff to the existing mortgage.  If the

14  borrower's getting cash-out proceeds, we would then wire to

15  the borrower if that's what we were instructed to do.  And

16  then pay off any other invoices or fees that are associated

17  with the transaction.

18  **Q.**  I'd like to have you take a look at Exhibit 111 in

19  evidence.

20          **MR. WALSH:**  And if we could -- let's just blow up the

21  first part here (indicating).

22     Thank you.

23                  (Exhibit published.)

24  **BY MR. WALSH:**

25  **Q.**  Do you recognize this document?

1    **A.**   Yes.

2    **Q.**   What is this document?

3    **A.**   This is another notification from my accounting department

4    that's informing me that the wire we sent out was confirmed

5    sent.

6    **Q.**   And what is the date of that email?

7    **A.**   August 27th at 11:53 a.m.

8    **Q.**   Of 2014?

9    **A.**   Yes.

10          **MR. WALSH:**  And if we could dezoom that, please.

11       And do this portion here (indicating).

12                      (Exhibit published.)

13   **BY MR. WALSH:**

14   **Q.**   What is this wire -- to whom is the money going in this

15   wire?

16   **A.**   This is going to Stanford Federal Credit Union.

17   **Q.**   And what do you understand Stanford Federal Credit Union's

18   role was in this whole process?

19   **A.**   They had the existing loan on the property that we paid

20   off.

21   **Q.**   What was the amount that was sent to Stanford Federal

22   Credit Union?

23   **A.**   $868,079.89.

24   **Q.**   You also indicated that --

25          **MR. WALSH:**  And we can dezoom that, please.

1    **Q.**   -- additional payoffs were made in a cash-out refinance;

2    is that right?

3    **A.**   That's correct.

4    **Q.**   I'd like to show you what's in evidence as Exhibit 112.

5           **MR. WALSH:**   And if we could just do the top part

6    again, please.

7                         (Exhibit published.)

8    **BY MR. WALSH:**

9    **Q.**   Do you recognize this document?

10   **A.**   Yes.

11   **Q.**   What is this document?

12   **A.**   This is another notification from our accounting

13   department for another wire that we sent out.

14   **Q.**   And what is the date of that?

15   **A.**   August 27th, 2014, at 11:54 a.m.

16          **MR. WALSH:**   If we could dezoom and then do the bottom

17   chunk, please.

18                         (Exhibit published.)

19   **BY MR. WALSH:**

20   **Q.**   And in this instance, who is the wire sending money to?

21   **A.**   We were sending money to Michael Rothenberg's account at

22   Merrill Lynch.

23   **Q.**   Okay.  It says here, though, Bank of America.  Why is

24   that?

25   **A.**   Merrill Lynch is an investment firm as opposed to a bank.

1    And so we're required to send funds directly to a banking

2    institution for further credit to the bank and then the

3    account holder at the bank.

4    **Q.**   And so although it went to Bank of America, did it

5    ultimately end up at a particular account?

6    **A.**   Yes.  Michael Rothenberg's account ending in 6052.

7    **Q.**   What was the amount of money that was sent that day?

8    **A.**   $608,104.47.

9    **Q.**   And that's the cash-out part of a cash-out mortgage

10   refinance?

11   **A.**   That's correct, yes.

12   **Q.**   And in this instance, that's the amount that Mike

13   Rothenberg got as a result of this loan?

14   **A.**   Yes, that's correct.

15   **Q.**   Now, did you receive any confirmation from Michael

16   Rothenberg about the wire?

17   **A.**   Yes.  He sent an email inquiring about the wire and its --

18   the status of the wire.

19   **Q.**   I'd like to show you what's in evidence as Exhibit 113.

20        **MR. WALSH:**  And if we could go to page 2, please.

21       And if we could focus in on this one here (indicating).

22                    (Exhibit published.)

23   BY MR. WALSH:

24   **Q.**   Do you recognize this document?

25   **A.**   I do.

1   **Q.** And it's actually two emails that have been blown up here,

2   but taking the first one, what is -- from whom and to whom is

3   this sent?

4   **A.** This is from Mike Rothenberg to Carol Steck and myself.

5   **Q.** You're cc'd there?

6   **A.** Yes.

7   **Q.** And what is the date of this email?

8   **A.** August 27th, 2014, at 10:55 a.m.

9   **Q.** And what was -- what did Mike Rothenberg ask in this

10  email?  Or say in this email?

11  **A.** He stated that he will let us know when the wire was

12  received and asked us if we had a reference number for

13  sending.

14          **MR. WALSH:**  All right.  If we could dezoom that,

15  please.

16      And if we could go up to page 1, please.

17      And if we could blow up this bottom portion here

18  (indicating).

19                      (Exhibit published.)

20  **BY MR. WALSH:**

21  **Q.** Do you recognize what's on page 1 of Exhibit 113?

22  **A.** Yes.

23  **Q.** What -- is this an email from someone to --

24  **A.** Yes.  It's an email from Mike Rothenberg to Carol Steck

25  and George Pires, Michael Conway at SVB, and myself.

1    Q.   And what is the date and time of this email?

2    A.   Wednesday, August 27th, 2014, at 1:17 p.m.

3    Q.   And what did Mike Rothenberg say, if you could just read

4    it?

5    A.   It said, "Wire received.  Thanks all."

6         MR. WALSH:  Okay.  And if we could dezoom that.

7    Q.   And did he actually send yet one more email on this item;

8    is that right?

9    A.   Yes, he did.

10                    (Exhibit published.)

11   BY MR. WALSH:

12   Q.   And what is -- do you recognize what's here at the top of

13   page 1?

14   A.   Yes.  An email from Mike Rothenberg with the same parties

15   involved in the previous email chain.  And he thanked everyone

16   for getting this done on time.

17   Q.   And what was the date and time of that email?

18   A.   August 27th at 1:31 p.m.

19        MR. WALSH:  We can dezoom that.  Thank you.

20   Q.   Now, from the title company's perspective, that's the bulk

21   of the work, but is there a little extra that needs to get

22   done?

23   A.   Once the transaction is disbursed and we have all the

24   confirmations that the funds were sent out, we then issue a

25   final closing statement to the borrower and to the lender.

1   **Q.**  All right.  And is there a name for a final closing

2   statement?

3   **A.**  There's technically two versions.  There's a final

4   refinance summary statement and then there's a HUD-1

5   Settlement Statement.

6   **Q.**  All right.  I'd like to show you what's been marked and

7   entered in evidence as Exhibit 37 at page 112.

8          **MR. WALSH:**  And if we could blow up the relevant

9   portion there.

10     Oop, could we do it so that we get title at the top?

11  Sorry.

12                    (Exhibit published.)

13  **BY MR. WALSH:**

14  **Q.**  Do you recognize this document?

15  **A.**  Yes, I do.

16  **Q.**  What is this document?

17  **A.**  This is the final HUD-1 Settlement Statement, and this is

18  page 1 of it.

19  **Q.**  Got it.  And it's actually several pages long?

20  **A.**  Yes.  Yes.

21                    (Simultaneous colloquy.)

22  **BY MR. WALSH:**

23  **Q.**  And is this the final settlement statement that is

24  calculated at the end of everything?

25  **A.**  Yes.

1   **Q.**  And sent to the bank and --

2   **A.**  Yeah.  We -- we send a copy over to the borrower as well

3   as the lender.

4   **Q.**  And we don't need to walk through this in great detail,

5   but in general what is contained within this document?

6   **A.**  It's going to show the final loan amount and then any

7   closing costs, charges, payoffs that were completed in the

8   transaction and those final numbers.

9           **MR. WALSH:**  Okay.  If we could dezoom that.

10      And then if we could just scroll forward one page.

11                  (Exhibit published.)

12  **BY MR. WALSH:**

13  **Q.**  Is this the second page of that HUD-1?

14  **A.**  Yes.

15          **MR. WALSH:**  And if we could scroll forward one more

16  page.

17  **Q.**  Is this the next page on this document?

18  **A.**  Yes, that's page 3.

19  **Q.**  Is there a fourth page there?  I'm not sure.

20          **MR. WALSH:**  Let's go to the next page.

21                  (Exhibit published.)

22          **THE WITNESS:**  There is typically the attachment.

23  **BY MR. WALSH:**

24  **Q.**  Okay.  What is this attachment?

25  **A.**  This is a detail summary.  Some of the fees are itemized

1    on this page because on the previous pages, they're, you know,

2    added together.  So anything that was added together are going

3    to show a detailed itemization on this page.

4    **Q.**  Got it.

5         **MR. WALSH:**  If we could just blow up the relevant

6    portion real quick.

7                        (Exhibit published.)

8    **BY MR. WALSH:**

9    **Q.**  These are all the fees for Chicago Title Company; is that

10   right?

11   **A.**  The line 1102 and 1104 detail is for both the escrow and

12   the title portion.  Since the notary was a third-party

13   company, we paid them separately, which is line 1101 -- I'm

14   sorry -- 1109.

15   **Q.**  And then at the conclusion, you -- approximately 30 to

16   45 days, does the title company send something to the bank?

17   **A.**  Yes.  The final title insurance policy.

18   **Q.**  And was that done in this case?

19   **A.**  Yes.

20        **MR. WALSH:**  If I may have a moment, Your Honor.

21        **THE COURT:**  Yes.

22        **MR. WALSH:**  I have no further questions for this

23   witness.

24        **THE COURT:**  Thanks, Mr. Walsh.

25    Mr. Fakhoury, questions for Ms. Yamato?

1          **MR. FAKHOURY:**  Yes.  Thank you.

2                        **CROSS-EXAMINATION**

3    **BY MR. FAKHOURY:**

4    **Q.**  Good morning, Ms. Yamato.

5    **A.**  Good morning.

6    **Q.**  Am I saying that correctly?

7    **A.**  Yes.

8    **Q.**  Okay.

9          I wanted to show you two documents or two exhibits that

10   you -- that Mr. Walsh has walked through with you, okay?  The

11   first is here on the screen.

12                        (Exhibit published.)

13   **BY MR. FAKHOURY:**

14   **Q.**  This is Exhibit 21.  Do you recall this exhibit?

15   **A.**  Yes.

16   **Q.**  Okay.  This is the preliminary title report.  You recall

17   that?

18   **A.**  Yes.

19   **Q.**  Okay.

20          **MR. FAKHOURY:**  Mr. Torres, can you scroll to the

21   second page, please.  Zoom out just a little bit.

22          Perfect.  Thank you.

23                        (Exhibit published.)

24   **BY MR. FAKHOURY:**

25   **Q.**  I wanted to talk to you about this portion right here

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    (indicating) that says effective date of July 15, 2014.   Okay?

2    A.   Uh-huh.

3    Q.   Now, Chicago Title Company opened this title account or

4    this escrow account sometime in either very late July or very

5    early August, right?

6    A.   Correct.

7    Q.   Sometime after July 15, right?

8    A.   That's correct.

9    Q.   Okay.   And you testified that the reason this preliminary

10   report says effective date of July 15 is because the

11   information in the title report is current as of July 15,

12   2014, right?

13   A.   That's correct.

14   Q.   Because there's a lag in getting records from the County

15   Recorder's office, right?

16   A.   Um-hmm.   Yes.

17   Q.   Now, once this preliminary report is generated, it's sent

18   to the lender, right?

19   A.   Yes.

20   Q.   And it's titled the preliminary report, right?   There's --

21   not a final title report that gets issued after this

22   preliminary report, correct?

23   A.   No.

24   Q.   And the bank generally doesn't ask for a new report to be

25   run sometime after this preliminary report is issued, correct?

1   **A.**  They will sometimes ask for an updated title report if

2   they feel it's out of date.

3   **Q.**  Okay.  They didn't do that in this case, correct?

4   **A.**  No.  The file is always dated down at the time of

5   recording.  So we inform them that at the time of recording

6   the final documents, that everything is up-to-date and there's

7   no changes on the title report.

8   **Q.**  Okay.

9          **MR. FAKHOURY:**  I'm now going to ask Mr. Torres to

10  jump to page 23 of this exhibit.

11      Could you scroll down a little bit.

12      Okay.  Perfect thank you.

13                      (Exhibit published.)

14  **BY MR. FAKHOURY:**

15  **Q.**  Towards the end of your testimony towards the end of the

16  day yesterday, you testified about this is like a map of the

17  property that's at issue in the title report.  Do you recall

18  that?

19  **A.**  Yes.

20  **Q.**  And usually this is -- this is generated by like the

21  engineers or the developer of the property to kind of show

22  where on the street this property is, right?

23  **A.**  Yes.

24  **Q.**  Okay.  Now, the property we've been discussing is

25  712 Bryant Street, unit number 6, right?

1   **A.**   Yes.

2   **Q.**   Okay.  And yesterday, actually, Judge Tigar asked you a

3   question about what PIQ meant, and you testified that meant

4   the property in question, right?

5   **A.**   Yes.

6   **Q.**   So on this map, it means unit number 6, right?

7   **A.**   Yes.

8   **Q.**   And here, this is -- this is the -- the -- the unit at

9   issue, right, number 6, correct?

10  **A.**   I'm sorry.  Here as in...?

11                      (Simultaneous colloquy.)

12  **BY MR. FAKHOURY:**

13  **Q.**   Where this little purple arrow is.

14  **A.**   Yes.

15  **Q.**   Okay.  And it looks to be like it's a corner unit, right?

16  **A.**   It appears that way.

17  **Q.**   Okay.  And here is another example.  I'll just kind of

18  highlight it there (indicating).  Towards the bottom, that's

19  the same unit in question, right?

20     Would it be helpful if I zoomed in a little bit?  It's not

21  the clearest.

22  **A.**   Yeah, it appears it says lower level of that unit --

23  **Q.**   Okay.

24  **A.**   -- yeah.  Yes.

25  **Q.**   Okay.  So this unit is the same as this unit, right

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    (indicating)?

2        You see the little purple dots I've marked this?

3    **A.**   I can't confirm that because in some cases they'll show,

4    you know, the parking structure or the storage unit as well.

5    **Q.**   Okay.  But at least based on the markings, the location,

6    it looks like it's a corner unit, right?

7    **A.**   Correct.

8    **Q.**   Okay.

9        **MR. FAKHOURY:**   Mr. Torres, can you go to the next

10   page, please.

11       And perhaps you can scroll in and kind of zoom in on this

12   portion right here (indicating).

13                       (Exhibit published.)

14   **BY MR. FAKHOURY:**

15   **Q.**   Okay.  So, again, the unit at issue here was unit number 6

16   right?

17   **A.**   Yes.

18   **Q.**   And we said that that was a corner unit, right?

19   **A.**   Correct.

20   **Q.**   And the PIQ mark, that's added by the title company,

21   right?

22   **A.**   Yes.

23   **Q.**   Now here they've marked the middle unit as the unit in

24   question, right?

25   **A.**   Correct.

1   **Q.**  Okay.  And that's -- that would be unit number 5, right?

2   (indicating)?

3   **A.**  I can't determine if that says 5.

4   **Q.**  Okay.  Well, it's certainly not the corner unit, right?

5   **A.**  That's correct.

6   **Q.**  Okay.  So it could be a mistake.  Happens, right?

7   **A.**  Um-hmm, yeah, sometimes.

8   **Q.**  Okay.

9           **MR. FAKHOURY:**  Can I have a minute, Your Honor?

10          **THE COURT:**  Yes.

11                  (Pause in the proceedings.)

12          **MR. FAKHOURY:**  I don't have any other questions.

13  Thanks, Your Honor.

14          **THE COURT:**  Thanks, Mr. Fakhoury.

15      Mr. Walsh?

16          **MR. WALSH:**  No questions.

17          **THE COURT:**  Oh, very good.

18      Ms. Yamato, thanks for your testimony.  You're excused.

19      Mr. Waldinger, the government's next witness, please.

20          **MR. WALDINGER:**  Your Honor, the government at this

21  time will call Mr. Jefferson Robert Eppler.

22                  (Pause in the proceedings.)

23          **THE COURT:**  Hello, Mr. Eppler.  Let me ask you to

24  make your way over here to my right where you can see my

25  courtroom deputy is standing.  And if you also could stand and

1  face her and raise your right hand, please.

2                    **JEFFERSON ROBERT EPPLER**,

3  called as a witness by the plaintiff, having been duly sworn,

4  testified as follows:

5            THE WITNESS:  Yes.

6            THE CLERK:  Thank you.

7      If you could please state and spell your last name for the

8  court reporter.

9            THE WITNESS:  Yes.  It's Jefferson R. Eppler.  That's

10  J-E-F-F-E-R-S-O-N, middle initial R, Eppler, E-P-P-L-E-R.

11            THE CLERK:  Thank you.  If you could have a seat.

12            THE COURT:  Good morning, Mr. Eppler.

13      My courtroom deputy is going to hand you a mask.  These

14  are the masks our witnesses use when they're testifying.

15      There's a little piece of protective film on there.  You

16  could leave it on there or peel it off, as you like.  The

17  straps go behind your head as opposed to over the ears.  And

18  you can take off the mask you're wearing now.

19            THE WITNESS:  Thank you.

20            THE COURT:  Great.  Perfect.

21      Mr. Eppler, have you ever testified in a courtroom before?

22            THE WITNESS:  I have not.

23            THE COURT:  Well, it's mostly just like having a

24  conversation, but it's different in a few ways which I'll tell

25  you now.

1          First of all, we have a jury sitting here.  They're the

2    ones deciding the case so they need to be able to hear the

3    testimony.  And because they're sitting a little further apart

4    because of COVID, they actually are sitting all the way into

5    the gallery there.  So if you could keep your voice up and

6    stay reasonably close to the microphone, as I'm doing now,

7    that will help them hear you.

8          Secondly, in day-to-day conversation, we interrupt each

9    other all the time.  Because we know what the other person's

10   going to say.  So we finish their sentence for them.  We ask

11   the question -- we answer the question before they finished

12   asking it, and that sort of thing.

13         Our court reporter, Ms. Mercado, is making a record of

14   everything.  And she can't take down two people at a time.  So

15   if you'll wait until counsel have finished their questions

16   completely before answering, they'll wait till you finish your

17   answer before they ask the next question.

18         The last thing is in day-to-day conversation, we use

19   noises and gestures all the time.  We say "uh-huh" or we go

20   like this or we go like this (indicating).  The court reporter

21   can't take down any of that either.  So if you could just make

22   sure and answer with whole words, that will make her job a lot

23   easier.

24         Does that all make sense?

25              **THE WITNESS:**  Yes, Your Honor.

1      **THE COURT:**  Very good.

2         Mr. Waldinger, your witness.

3                      **DIRECT EXAMINATION**

4   **BY MR. WALDINGER:**

5   **Q.**  Mr. Eppler, you stated your name as Jefferson R. Eppler.

6   Do you go by that name?

7   **A.**  I generally go by JR Eppler.

8   **Q.**  What's your primary occupation, Mr. Eppler?

9   **A.**  I'm an attorney.

10  **Q.**  And what kind of practice do you have?

11  **A.**  I do business law and corporate transactions.

12  **Q.**  Do you work for a firm, or are you a sole practitioner?

13  **A.**  I'm a sole practitioner.

14  **Q.**  How long have you been a sole practitioner?

15  **A.**  Since 2015.

16  **Q.**  Have you always -- were you associated with a law firm

17  before that?

18  **A.**  Yes.  Prior to that time, I was associated with law firms

19  from the time period of 2007 through the end of 2014.

20  **Q.**  Did you graduate from law school in 2007?

21  **A.**  Yes, I did.

22  **Q.**  Sounds like you've been a member of the bar since that

23  time?

24  **A.**  Yes, since December of 2007.

25  **Q.**  Is that the California bar?

EPPLER - DIRECT / WALDINGER

1    **A.**   That's correct.

2    **Q.**   Where did you go to law school?

3    **A.**   I went to UCLA.

4    **Q.**   You got what's called a JD degree?

5    **A.**   Yes, that's correct.

6    **Q.**   Did you get any other degrees when you went to UCLA?

7    **A.**   Yes.  I also got a master's in business administration.

8    **Q.**   Did you go somewhere else for your undergraduate degree?

9    **A.**   Yes.  I went to Stanford University.

10   **Q.**   When did you graduate from Stanford, and what did you

11   major in there?

12   **A.**   I graduated in 2002.  My major was in economics and

13   history.

14   **Q.**   Mr. Eppler, do you live and work here in the Bay Area?

15   **A.**   Yes, I do.

16   **Q.**   Besides running a law practice, do you have any other

17   business or occupation -- do you have any other business or

18   occupation?

19   **A.**   Yes.  I serve as the manager of Rothenberg Ventures.

20   **Q.**   Did -- and is Rothenberg Ventures a limited liability

21   company?

22   **A.**   The -- yes, Rothenberg Ventures LLC is a limited liability

23   company.

24   **Q.**   Did Rothenberg Ventures used to be known as Rothenberg

25   Ventures Management Company?

EPPLER - DIRECT / WALDINGER

1    **A.**   Yes.

2    **Q.**   Was it known as Rothenberg Ventures Management Company

3    back in the summer of 2014?

4    **A.**   Yes.

5    **Q.**   How long have -- strike that.

6         Are you the only manager of Rothenberg Ventures?

7    **A.**   No.  I have a co-manager.

8    **Q.**   Who is the co-manager?

9    **A.**   His name is Burke Robinson.

10   **Q.**   How long have you been a co-manager of Rothenberg

11   Ventures?

12   **A.**   Since October of 2018.

13   **Q.**   Do you know When Mr. Robinson started as a manager of

14   Rothenberg Ventures?

15   **A.**   September 2018.

16   **Q.**   So that's just before you started?

17   **A.**   Yes.

18   **Q.**   I also understand that you did some legal work for what

19   was then known as Rothenberg Ventures Management Company

20   starting back in August of 2016; is that correct?

21   **A.**   Yes, it is.

22   **Q.**   Did you work as what is commonly called outside general

23   counsel at that time?

24   **A.**   Yes.

25   **Q.**   To be clear, though, your current position as co-manager

1   is not as Rothenberg Ventures' lawyer?

2   **A.**   That is correct.

3   **Q.**   When you worked as Rothenberg Ventures' outside general

4   counsel back in around August of 2016, who was running -- or

5   what was the name of the company at that time?

6   **A.**   The name of the -- the company was Rothenberg Ventures

7   Management Company LLC.

8   **Q.**   Who -- and so we'll call that RVMC.  Who was running RVMC

9   at that time?

10   **A.**   Michael Rothenberg was.

11   **Q.**   Do you see Michael Rothenberg in the courtroom today?

12   **A.**   Yes, I do.

13   **Q.**   And could you identify him for the record?

14   **A.**   Yes.  He's the gentleman sitting nearest to me at the

15   defense counsel's desk.

16          **MR. WALDINGER:**  Your Honor, if the record could

17   reflect that Mr. Eppler identified the defendant,

18   Mr. Rothenberg.

19          **THE COURT:**  It shall.

20   **BY MR. WALDINGER:**

21   **Q.**   Yes or no, Mr. Eppler, has Mr. Rothenberg run Rothenberg

22   Ventures -- run or managed Rothenberg Ventures after you

23   became co-manager in August of 2018 with Mr. Robinson?

24   **A.**   I became co-manager in October of 2018, not August.

25          And Mr. Rothenberg resigned approximately two weeks after

1    I was hired as a co-manager.

2    **Q.**  Sorry, I apologize.  My notes said October, but I --

3    something happened in my brain and I said August.

4         Based on your position as co-manager of Rothenberg

5    Ventures, do you know who founded Rothenberg Ventures which

6    was previously known as Rothenberg Ventures Management

7    Company?

8    **A.**  Yes.

9    **Q.**  Who is that?

10   **A.**  Michael Rothenberg.

11   **Q.**  Do you know when the company was founded?

12   **A.**  In 2012, I believe.

13   **Q.**  With respect to the name, the company used to have

14   "management" in the title.  It no longer has the word

15   "management" in the title, and I just want to explore that.

16   Does that mean that Rothenberg Ventures does not manage

17   anything anymore?

18   **A.**  No, it does not mean that.

19   **Q.**  Okay.  What does Rothenberg Ventures manage?

20   **A.**  Rothenberg Ventures manages a number of entities that we

21   refer to as "the funds."  The funds are either limited

22   liability companies or limited partnership that make

23   investments with money that has been taken together and put

24   into a pot from various other investors.

25   **Q.**  When you refer to funds, is it fair to call those funds

1    venture capital funds?

2    **A.**   Yes.

3    **Q.**   In general, can you describe for the jury what a venture

4    capital fund is?

5    **A.**   Yes.  So a venture capital fund is an entity.  In our

6    case, we have either limited liability companies or limited

7    partnerships that solicits investments from -- from investors,

8    and they put that money together.

9         And then the fund, under the direction of the manager, so

10   in this case, Rothenberg Ventures or Rothenberg Ventures

11   Management Company as it was formerly known, investments are

12   made into startup companies, technology companies, companies

13   that have high growth potential.

14   **Q.**   The ultimate goal is for those investments to give returns

15   to the fund that is invested in those companies, correct?

16   **A.**   Yes, that's correct.

17   **Q.**   Are two of the venture capital funds that Rothenberg

18   Ventures is currently managing named currently "Rothenberg

19   Ventures 2013 Fund" and "Rothenberg Ventures 2014 Fund"?

20   **A.**   Yes.  They are.

21   **Q.**   So I'll just be asking you about those today and mostly

22   about what is currently called Rothenberg Ventures 2014 Fund.

23        Did those funds, the 2013 Fund and the 2014 Fund, used to

24   go -- used to have different names?

25   **A.**   Yes, they did.  The 2013 Fund was originally named

1    Rothenberg Ventures Fund I LLC, and the 2014 Fund was

2    originally named Rothenberg Ventures Fund II, LLC.

3    **Q.**  When you say "one" and "two," are those Roman numerals?

4    **A.**  Those are Roman numerals, yes.

5    **Q.**  Those funds are also limited liability companies, or

6    LLC's?

7    **A.**  Yes, they are.

8    **Q.**  Just to be clear then, you and Mr. Robinson, as

9    co-managers of Rothenberg Ventures, are managing those two

10   venture capital funds which are -- which used to be known as

11   Fund I and Fund II?

12   **A.**  Yes, that -- that's correct.  The structure is, you know,

13   a little bit, you know, complicated for -- but we are the

14   managers of Rothenberg Ventures and that entity itself is then

15   the manager for the two funds.

16   **Q.**  Correct.  So I mean -- thank you for clarifying.  So

17   you're the managers of the manager?

18   **A.**  Correct.

19   **Q.**  Based on your position as the manager of Rothenberg

20   Ventures, are you familiar with the books and the records of

21   Rothenberg Ventures, formerly known as Rothenberg Ventures

22   Management Company?

23   **A.**  Yes, I am.

24   **Q.**  In your position as the manager of Rothenberg Ventures,

25   formerly known as Rothenberg Ventures Management Company, are

1   you also familiar with the books and the records including the

2   financial books and records of what were formerly called

3   Fund I and Fund II?

4   **A.**   Yes, I am.

5   **Q.**   As for those books and records of those entities of

6   Fund I, of Fund II, and of Rothenberg Ventures Management

7   Company, did you and Mr. Robinson inherit those books and

8   records?

9   **A.**   We did receive those books and records from prior

10  management, yes.

11  **Q.**   Who was prior management?

12  **A.**   That would be Mr. Rothenberg.

13  **Q.**   Do the books and records for those entities, those three

14  entities that you have, cover a period that goes through at

15  least August of 2014?

16  **A.**   Yes, they do.

17  **Q.**   When I -- when I say "books and records," I want to

18  explore that a little bit.  How were the -- the financial

19  records kept at Rothenberg Ventures Manage -- let me start

20  over.

21      How were the books and records kept financially for

22  Rothenberg Ventures and what we're calling Fund I and Fund II?

23  **A.**   The records were kept in a program called QuickBooks,

24  computer program called QuickBooks.  It's accounting software.

25  **Q.**   That's a -- a common -- commonly used accounting --

1    off-the-shelf accounting software, correct?

2    **A.**   Yes.

3    **Q.**   Have you provided the government with QuickBook exports

4    for Fund II and Rothenberg Ventures Management Company for the

5    period of June 2014 through August of 2014?

6    **A.**   Yes, I have.

7    **Q.**   When I say exports and when you say exports, what do you

8    mean by -- by exports from QuickBooks?

9    **A.**   So the exports would be comma-deliminated [sic]

10   spreadsheets of the records that are within the QuickBooks.

11   **Q.**   And do they get exported -- what do they get exported to,

12   what kind of document?

13   **A.**   It's -- it's called a CSV, but that is read by Microsoft

14   Excel when put into spreadsheet format.

15   **Q.**   In general, we talked about this a little bit, but can you

16   again clarify a little bit more about the relationship between

17   Rothenberg Ventures Management Company and Fund I and Fund II?

18   What is the -- what is the legal relationship and the

19   operational relationship?

20   **A.**   So the legal relationship is that the management company

21   Rothenberg Ventures or Rothenberg Ventures Management Company,

22   is the manager of the limited liability companies Fund I and

23   Fund II.  That's what is set out in the operating agreements

24   for the two funds, Fund I and Fund II.  It names the manager.

25   The manager is the person that has the authority to operate

1    the company.

2    **Q.**  Just to bring us back to the time frame, we're back in the

3    summer of 2014, June, July, and August.  Are the two venture

4    capital funds that we're talking about, were they -- did they

5    still have the Roman numerals in their names?

6    **A.**  Yes, they did.

7    **Q.**  So they were known as Fund I and Fund II at that time?

8    **A.**  Yes, they were.

9    **Q.**  Back in that -- back in the summer of 2014 all the way

10   through today, does Rothenberg Ventures, the management

11   company, own Fund I and Fund II?

12   **A.**  No.  The management company does not own the funds.

13   **Q.**  Are those funds separate legal entities?

14   **A.**  Yes, the funds are separate legal entities.

15   **Q.**  Did Rothenberg Ventures own the money that was in the

16   Fund II and Fund I bank accounts?

17   **A.**  No.  It did not own the money.  It had contractual -- a

18   contractual rights to certain funds or certain monies of the

19   funds.

20   **Q.**  I will -- I will show you some documents about that.

21       Is it fair to say, then, the management company has and

22   has had the right to obtain certain payments from the funds?

23   **A.**  Yes, this would be correct.

24   **Q.**  As the co-manager of Rothenberg Ventures, are you familiar

25   with some of the organizing and operating documents of --

1    let's just do Fund II?

2    **A.**   Yes.

3    **Q.**   I'd like to start with a document that's already in

4    evidence as trial Exhibit 12.

5        Mr. Eppler, this will come up on your screen.

6                    (Exhibit published.)

7    **BY MR. WALDINGER:**

8    **Q.**   This is a -- this is a 20-page document.

9        From the first page of Exhibit 12, can you tell what this

10   document is?

11   **A.**   Yes, I can.

12   **Q.**   What is it?

13   **A.**   It is the Offering Memorandum for Fund II.

14   **Q.**   What is an offering memorandum in the context of a venture

15   capital fund?

16   **A.**   So the offering memorandum is the marketing and disclosure

17   document for a venture capital fund as it goes out to seek

18   investors.  It is something that is given to the investors.

19   It explains in more, I guess you'd say, standard English than

20   you might find in a purely legal document how the fund will

21   operate.

22   **Q.**   So fair to say that this -- this is the type of document

23   or one of the documents that a potential investor in a fund

24   would look at in determining whether to make an investment?

25   **A.**   Yes, that is correct.

1      **MR. WALDINGER:**  Ms. Margen, if we could go to page 7

2    of this exhibit.  And let's blow up the top of the page all

3    the way to right before it says "the offering."

4                        (Exhibit published.)

5    **BY MR. WALDINGER:**

6    **Q.**  Mr. Eppler, this section is called Executive Summary,

7    correct?

8    **A.**  Yes.

9    **Q.**  You've already testified about the management of Fund II.

10    But if you could just read or summarize for the jury what the

11    operate -- excuse me -- the Confidential Private Offering

12    Memorandum says about the management, the proposed management

13    of the fund (indicating)?

14    **A.**  Yes.  It says:  Management.  Rothenberg Ventures

15    Management Company, LLC, is the manager of the Fund.  Defined

16    term is "Manager" or "RV."  The Founder of the Fund and Owner

17    of the Fund -- or excuse me -- the owner of the Manager,

18    Michael Rothenberg, will make all final decisions regarding

19    the strategy, investments, and day-to-day operations of the

20    Fund on behalf of the Manager, defined term, the "Operator."

21    **Q.**  So does that look like Mr. Rothenberg is defined here as

22    the operator (indicating)?  Or is it -- is this -- operator,

23    is that just another term for RVMC, if you know?

24    **A.**  So I don't know how that term is used in -- in the rest of

25    the document.  But, you know, within the context there, since

 1    we already have defined manager, I would say that Michael

 2    Rothenberg would then be the operator.

 3    **Q.**  Did this executive summary also include a short biography

 4    of Mr. Rothenberg?

 5    **A.**  Yes, it does.

 6    **Q.**  Is there anything in there that you believe is incorrect?

 7    **A.**  No.  That's what I understand about Mr. Rothenberg's

 8    biography as well.

 9              **MR. WALDINGER:**  Ms. Margen, could you then blow up

10    the bottom part of the page that starts at the "The Offering."

11                         (Exhibit published.)

12    **BY MR. WALDINGER:**

13    **Q.**  There are some -- some terms that are defined here.  I

14    particularly want to just refer you to what people who put

15    money into the fund are called.  And this says investors or

16    members, correct?

17    **A.**  Yes, it does.

18    **Q.**  And does the term "members" relate to the legal structure

19    of -- of what Fund II was?

20    **A.**  Yes, it does.

21    **Q.**  And how is that?

22    **A.**  So a limited liability company is a type of entity.  It's

23    different than a corporation or -- or a partnership in it has

24    special terminology for the people that own it and the people

25    that operate it.

1    And so members are the people that have an ownership

2   interest in a limited liability company.  They're analogous to

3   stockholders who have ownership interest in a corporation.

4   **Q.**  Is there a term of art or a term that's often used in the

5   venture capital industry to refer to investors regardless of

6   whether they are members of an LLC?

7   **A.**  Yes, there is.  And so traditionally, venture capital

8   funds were organized as entities called limited partnerships.

9   There has been more of a mix of entities used like LLC's as

10   the venture capital industry has evolved.

11    In a limited partnership, the owners are referred to as

12   limited partners or abbreviated as LP's.

13    And so regardless of the structure of a fund entity, you

14   will often hear investors referred to as LP's because that's

15   what they used to be all the time.

16   **Q.**  The term LP has become sort of a generic term?

17   **A.**  Yes, it is.

18   **Q.**  Just like that box over there, we're going to call this a

19   Kleenex even if it's not a Kleenex (indicating), correct?

20   **A.**  Yes.

21       **MR. WALDINGER:**  All right.  Ms. Margen, if you could

22   go to page 8.  And let's do the middle where it says "Capital

23   Contributions."

24                   (Exhibit published.)

25   / / /

1    BY MR. WALDINGER:

2    Q.  Did the Confidential Private Offering Memorandum have a

3    section called Capital Contributions?

4    A.  Yes, it did.

5    Q.  What does that relate to?

6    A.  So that -- capital contributions are the investments that

7    the members or the investors or the LP's make into the fund.

8    Q.  Does the offering memorandum say what the manager will use

9    the capital to -- for -- let me start over.

10        Does the offering memorandum say what the manager will do

11   with the capital that's raised?

12   A.  Yes, it does.

13   Q.  What does it say?

14   A.  It says that it will make investments in one or more

15   portfolio companies.

16            MR. WALDINGER:  Ms. Margen, if you could now go to

17   the bottom of page 9 where it says "Management Fees."

18                     (Exhibit published.)

19   BY MR. WALDINGER:

20   Q.  Mr. Eppler, I asked you some questions earlier about -- I

21   believe or at least one question about whether the management

22   company was entitled to certain payments from the fund.  Do

23   you remember that?

24   A.  Yes.

25   Q.  Does this section of the offering memorandum discuss

1   management fees?

2   **A.**  Yes, it does.

3   **Q.**  In general, is there an easy way to summarize what the

4   management fee structure was for Fund II?

5   **A.**  Yes, there is.  So for Fund II, Fund II had a -- a right

6   to management fees that averaged 2 percent of the capital

7   raised by the fund.

8   **Q.**  Let me stop you there.  You said Fund II had the right --

9   **A.**  Oh, excuse me, I apologize.  Looking at the fund so --

10  that the management company, so that would be Rothenberg

11  Ventures Management Company, had a right to 2 percent of the

12  aggregate of each member's capital contribution in the fund.

13  And then that got paid out on a 2 percent per quarter for the

14  first two years of the fund, and then .5 percent per quarter

15  for each year thereafter.

16  **Q.**  For a total of how many years?

17  **A.**  Oh, for -- for eight years.

18  **Q.**  And if you add that, eight plus two is?

19  **A.**  So, well, that's a ten-year time period.

20  **Q.**  Okay.  And at the end of ten years, what would that mean

21  for total -- total amount of management fees that the fund

22  would have paid to the management company?

23  **A.**  So that would have been -- that would have been

24  20 percent.

25  **Q.**  It is fair to say that this portion of the offering

 1    memorandum talks about one way that money could flow from the

 2    fund to the management company?

 3    A.  Yes.

 4    Q.  Are there other ways under the, at least this document, as

 5    to how money could flow from the fund to the management

 6    company?

 7    A.  Yes.  There was -- this document would have talked about

 8    carried interest.

 9              MR. WALDINGER:  Ms. Margen, if we could go to

10    page 10, which is the next page, and if you could highlight

11    where it says "Manager Carry" and "Distributions."

12                        (Exhibit published.)

13    BY MR. WALDINGER:

14    Q.  Mr. Eppler, is this what you were talking about just now?

15    A.  Yes, it is.

16    Q.  What's the term "carry"?

17    A.  So the term "carry" refers to the amount that is returned

18    to the fund.  The -- you know, the point of the fund is to

19    invest money and then to have those investments pay off in

20    terms of more money coming back to the fund than was

21    originally invested.

22         After -- with respect to each investment in the 2014 Fund,

23    after a particular investment repaid the amount of the initial

24    investment to the limited partners, the management company

25    would then have a right to 20 percent of anything above the

1    initial investment.  So I mean --

2    **Q.**  Go ahead.

3    **A.**  -- just a brief example.  I know that sounds a little bit

4    complicated.

5        If we had an investment, we invested $10 in a company.

6    And that $10, you know, became $100 when that company grew,

7    and that $100 came back to us, the original $10 would go to

8    the limited partners.  And then out of the $90 that are left,

9    the management company would have a right to 20 percent of

10   that, or $18.  The rest of that money would then be

11   distributed to the limited partners.

12   **Q.**  So under this structure, the management company gets paid

13   management fees along the way, correct?

14   **A.**  Yes.

15   **Q.**  And then if there are earnings from the portfolio

16   companies, the investors get their principal back first.

17   Correct?

18   **A.**  Yes.

19   **Q.**  And then there's a split, the 80/20 split that you just

20   talked about?

21   **A.**  Yes.

22   **Q.**  So that -- is that another way that money can flow to the

23   management company?

24   **A.**  Yes, it is.

25           **MR. WALDINGER:**  And then finally, Ms. Margen, if you

1    go to the bottom of the page where it says "Expenses."

2                     (Exhibit published.)

3    BY MR. WALDINGER:

4    Q.   Now this -- there's a typo here, correct (indicating)?

5    A.   No, I don't -- I don't believe that's a -- a typo.  The

6    manager --

7              THE COURT:  Mr. Eppler, if you'll read the word aloud

8    that's circled.

9              THE WITNESS:  Oh, I'm sorry.  I see.  The major.

10   Yes.  Thank you.

11      I'm a corporate transactional attorney.  Typos do

12   sometimes happen.

13   BY MR. WALDINGER:

14   Q.   And your brain inserted an "A" in there?

15   A.   Yes.

16   Q.   So is it fair to say that this portion of the -- of the

17   offering memorandum indicates that the manager, with the typo

18   "manger" here, will pay all of its normal operating expenses,

19   and does that mean that those operating expenses are going to

20   be paid from what the management company got in management

21   fees?

22   A.   Yes.  That its operating expenses would be paid out of

23   funds that it receives, out of monies that it receives from

24   its management of the funds.

25   Q.   And that's for normal operating expenses?

1    **A.**   Yes.

2    **Q.**   Does on the next page --

3              **MR. WALDINGER:**   If we could go to the first two

4    full -- two paragraphs, Ms. Margen.

5                        (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**   Was there, however, a provision for payment of other

8    expenses?

9    **A.**   Yes.

10   **Q.**   And that would be for transfer, capital and other taxes,

11   duties and costs incurred in acquiring, holding, selling or

12   otherwise disposing of fund assets, and costs of financial

13   statements and other reports?

14   **A.**   Yes.   That's correct.   We would refer to those as fund

15   expenses.   Those are, you know, the expenses incurred by the

16   fund by virtue of having to conduct business.   They're not

17   related to the management of the fund per se.   They're just,

18   you know, expenses that belong to the fund itself.

19   **Q.**   Expenses that come along with the mere fact of the fund's

20   existence?

21   **A.**   Yes.

22              **MR. WALDINGER:**   Ms. Margen, if we could go to page 13

23   and there's three paragraphs under heading "Reliance on

24   Management."

25                        (Exhibit published.)

1    BY MR. WALDINGER:

2    Q.  Mr. Eppler, I just want to point out here, the offering

3    memorandum states that's the manager will make all final

4    decisions regarding the strategy, investments, and day-to-day

5    operations of the fund.

6        Do you recall in this agreement who the manager is?

7    A.  Yes.  The manager is Rothenberg Ventures Management

8    Company.

9    Q.  Earlier on -- let's see what page that was -- on page 7 of

10   this document, we saw the defined term "operator" --

11           MR. WALDINGER:  Just leave it here, Ms. Margen.

12                      (Exhibit published.)

13   BY MR. WALDINGER:

14   Q.  We had seen the defined -- the -- the three paragraphs

15   here.  Mr. Eppler, we had seen the defined term "operator."

16   Now that you see "manager" and "operator" being used in

17   sequential sentences and in fact in the same sentence, who do

18   you think the operator relates to in this?

19   A.  The operator would be the manager of the manager, or at

20   this time, Mr. Rothenberg.

21   Q.  And this document says that the operator, or

22   Mr. Rothenberg, will make all such decisions on behalf of the

23   manager?

24   A.  Yes, that's correct.

25           MR. WALDINGER:  All right.  Thank you, Ms. Margen.

1    You can take down this document.

2        I have a document that is not in evidence that I would

3    like to go through.

4            MR. FAKHOURY:  Your Honor, could we have a sidebar

5    before we go down this road?

6            THE COURT:  Yes.

7                    (Sidebar off the record.)

8            THE COURT:  All right.  Members of the jury, it's

9    still disorienting to me to see the clock that says 11:14 when

10   it's 10:10.  But GSA will come by and fix that at some point.

11       We got a little bit of a later start today because of

12   traffic issues.  So normally we actually would be in the

13   middle of a break, right?  Now we're going to go ahead and

14   take our first morning break.  Let's take 20 minutes instead

15   of 15.  I have something I need to talk to the lawyers about

16   outside of your presence for a few minutes.

17       So that's what we'll do.  It's 10:11 now on the clock so

18   we will reconvene at 10:31.  Thank you.

19           THE CLERK:  Please rise for the jury.

20       (The following proceedings were heard out of the presence

21   of the jury:)

22           THE COURT:  Okay.  Mr. Eppler, it's just our practice

23   to rise every time the jury comes in and out, that's all.  But

24   now that we are on recess and we are outside the presence of

25   the jury, you're welcome to go ahead and take a break also if

1    you like.  Thanks.

2         **THE WITNESS:**  Thank you, Your Honor.  My apologies.

3         **THE COURT:**  So we were having a discussion at

4    sidebar.  And I think the gist of the discussion was that

5    Mr. Fakhoury wanted to alert counsel and the Court that he

6    believes that we are getting into the territory where the

7    modified disputed jury instruction number 19 would be

8    appropriate to give to the jury.  And as the discussion

9    unfolded, it turns out maybe it will be at some later time.

10        So I thought we might just do a little dress rehearsal on

11   what we think is going to happen so that Mr. Fakhoury is able

12   to make the record he wants and Mr. Waldinger is able to

13   conduct the examination he wants.

14        So, gentlemen, why don't you take it from there.

15        **MR. WALDINGER:**  Yes.  So I am going to do another

16   couple of organizing documents, an operating agreement and a

17   management agreement.  I think those will not take too long.

18   And then I'll probably get into the bank statements for the

19   fund, Fund II.

20        The first time I'm going to deal with the bank statement

21   is just really about when Mr. Rothenberg made his initial

22   contribution.  So I don't think that we're going to ring the

23   bell yet.

24        But then right after that, about when Mr. Rothenberg first

25   made his first contribution to Fund II, I think we are going

```
 1    to then start looking at the movements of money that we've

 2    been talking about.  And that at that point, it would be

 3    appropriate for the Court to give the limiting instruction.

 4         MR. FAKHOURY:  I think that's fine.  And -- and I can

 5    live with that, so...

 6         THE COURT:  Okay.  So let's do this:  Mr. Waldinger

 7    will just simply say, "Your Honor, the government believes or

 8    I believe this is an appropriate time for you to give the

 9    instruction that we were discussing at sidebar."

10      I picked that vocabulary because it signals to the jury

11    this is not your personal -- or this is not an instruction the

12    government is asking for, this is something we all agreed is

13    appropriate.

14      And that probably will obviate the need for any sidebar

15    for the record.  But obviously, Mr. Fakhoury, if you feel

16    otherwise, you can object or ask for a sidebar.

17         MR. FAKHOURY:  The only other issue I had was there

18    was an exhibit the government produced last night along with

19    some 302 interview statements for Mr. Eppler last night and it

20    involves the QuickBook records.  And if the government's going

21    to -- those have not been admitted as an exhibit.

22         THE COURT:  Have they been produced?

23         MR. FAKHOURY:  They were last night, yes.

24         THE COURT:  I see.  Okay.

25         MR. FAKHOURY:  And so I'm going to have an objection
```

1   to the QuickBooks records coming in through this witness.  And

2   I can elaborate on that now, or we can wait till it becomes an

3   issue.  Or if the government is not going to put it in, then

4   it's not an issue.  But I just also want to make a record on

5   that.

6           **THE COURT:**  Mr. Waldinger, will the government be

7   seeking to admit the QuickBooks records?

8           **MR. WALDINGER:**  Yes, we will.  We actually just --

9           **THE COURT:**  Okay.  Hang on.  That was the answer,

10  yes.

11          **MR. WALDINGER:**  Okay, yes.

12          **THE COURT:**  So, Mr. Fakhoury, what's the objection

13  going to be?

14          **MR. FAKHOURY:**  Well, Mr. Eppler wasn't working at RV

15  in 2014.  And to the extent that the records purport to show

16  records made at the time of -- time and place of -- in other

17  words, he can't -- he can't lay the foundation for a business

18  records hearsay exception because he wasn't there in 2014

19  when -- which is the relevant time frame and which is the

20  snapshot of records they want to produce.

21          **MR. WALDINGER:**  I would say that Mr. Eppler is the

22  custodian of the records and this is what he inherited.

23          **THE COURT:**  Excuse me just a second, Mr. Waldinger.

24      Mr. Eppler, we're talking a lot about you and what you

25  know and what you did.  And this might be a great time for you

1    to just stretch your legs out in the hallway.

2         **THE WITNESS:**  Yes, sir.

3         **THE COURT:**  Thank you.

4    Counsel will notify you when our discussion is concluded.

5         **THE WITNESS:**  Thank you, Your Honor.

6         **THE COURT:**  Thank you, Mr. Eppler.

7              (Witness exited the courtroom)

8         **THE COURT:**  Mr. Waldinger, please continue.

9    The witness has now left the courtroom.

10        **MR. WALDINGER:**  My -- these are the books and records

11   that Mr. Eppler -- that Mr. Eppler inherited.  And I think

12   they come in for that, for being -- Mr. Rothenberg was the

13   manager of the company before Mr. Eppler.  And this is what

14   Mr. Eppler inherited from Mr. Rothenberg.  So I think --

15        **THE COURT:**  Do you think Mr. Eppler will testify that

16   Mr. Rothenberg created those records?

17        **MR. WALDINGER:**  No, I don't think he'll say that.

18        **THE COURT:**  Uh-huh.

19        **MR. WALDINGER:**  The alternative on the QuickBooks

20   records is I think it's relevant to what they say.  And

21   whether the document is admitted, it would be something that I

22   think it's relevant to show him to refresh his recollection if

23   he recalls as to what -- if he doesn't recall as to what the

24   books and records, again that he's inherited, say about a

25   particular transaction.

1          **THE COURT:**  I think this -- this issue probably comes

2     up all the time.  I don't know whether that means that a court

3     has decided how it comes out.

4          It must frequently be the case that there are historical

5     records of a company and that the persons working there now --

6     let me say this:  I would be surprised if the records were not

7     admissible as business records, but I could easily be wrong.

8     I think I'd just like to look it up.

9          So the other things you said, Mr. Waldinger, I don't know

10    how to fit those into any category of evidence ruling that I'm

11    familiar with.  It's not effect on the listener or whatever

12    you were doing.

13         So let's take our break.  You all can look up this point

14    on this legal point if you want.  And I also will try to do

15    that.  So let's be in recess.

16         **THE CLERK:**  Court is in recess.

17         (Recess taken at 10:19 A.M.; proceedings resumed at

18    10:38 A.M.)

19         (The following proceedings were heard in the presence of

20    the jury:)

21         **THE COURT:**  Thanks for everyone's patience.

22         Mr. Waldinger, Mr. Eppler is still on the stand.  Your

23    witness.

24    **BY MR. WALDINGER:**

25    **Q.**  All right, Mr. Eppler.  I am going to show you a document

1    that is not yet admitted into evidence.  This is trial

2    Exhibit 94.

3             **MR. WALDINGER:**  And if we could put that up for

4    Mr. Eppler.

5        (Exhibit published to witness, counsel, and the Court.)

6    **BY MR. WALDINGER:**

7    **Q.**  Mr. Eppler, this is trial Exhibit 94.  It's a 36-page

8    exhibit.  By looking at the first page, can you tell what this

9    document is?

10   **A.**  Yes, I can.

11   **Q.**  What is it?

12   **A.**  It is the First Amended and Restated Operating Agreement

13   of Rothenberg Ventures Fund II LLC.

14   **Q.**  Is it true that this operating agreement has since been

15   amended again?

16   **A.**  Yes, it has.

17   **Q.**  Was this the operating agreement in effect in the summer

18   of 2014 for Fund II?

19   **A.**  From my understanding, yes.

20   **Q.**  Does this document -- do you recall whether this document

21   contains provisions regarding capital contributions?

22   **A.**  I believe it does, yes.

23   **Q.**  And before I ask you about that, let me ask you in

24   general, what is an operating agreement in terms of when we're

25   talking about a venture capital fund?

1   **A.**   The operating agreement, and this would apply not just for

2   the venture capital fund but for any limited liability

3   company, it's the document that sets forth how the entity, the

4   limited liability company, is going to operate, in who -- you

5   know, what the rights of the members, the managers, how

6   capital is treated, how distributions are made.

7        Just the ins and outs and gets of how the company will

8   operate.

9            **MR. WALDINGER:**   And if we could, Ms. Margen, if you

10  could just page through this document on Mr. Eppler's screen

11  so that he can see it.

12       Just keep going, at least a few pages.

13       (Exhibit published to witness, counsel, and the Court.)

14  **BY MR. WALDINGER:**

15  **Q.**   Have you reviewed this document before your testimony

16  today and in preparation for your testimony?

17  **A.**   I have.

18  **Q.**   And I asked you this question already.  Does this

19  represent the operating agreement that was in place in June of

20  2014 for Fund II?

21           **MR. WALDINGER:**   And we can go through the whole --

22  the whole thing.

23       (Exhibit published to witness, counsel, and the Court.)

24           **THE WITNESS:**   Yes.

25  / / /

1   BY MR. WALDINGER:

2   Q.  We also have paper copies if you'd just like to look at

3   one of those.

4   A.  Thank you for that.

5       Yes.  This was the document that was -- that was in place

6   at that time.

7           MR. WALDINGER:  Your Honor, I would move to admit

8   United States trial Exhibit number 94.

9           THE COURT:  Is there an objection?

10          MR. FAKHOURY:  Yes, Your Honor.  There's insufficient

11  foundation.

12          THE COURT:  Regarding this agreement?  Overruled.

13      (Government's Exhibit 94 received in evidence.)

14          MR. WALDINGER:  If we could publish that to the jury.

15  On the second page, Ms. Margen, I would like to just

16  highlight -- I'm sorry -- third page where it says "Capital

17  Contribution" and "Company."

18                  (Exhibit published.)

19  BY MR. WALDINGER:

20  Q.  Mr. Eppler, could you explain to the jury what a capital

21  contribution is in terms of a venture capital fund?

22  A.  Yes.  It is the money that is invested into the fund by

23  the investors.

24  Q.  This agreement has a defined term which is "company."  In

25  the context of this agreement, what does "company" refer to?

1    **A.**   That would be Rothenberg Ventures Fund II LLC.

2           **MR. WALDINGER:**   Ms. Margen, if we could actually go

3    back to the top of page 2.   This right here (indicating).

4                    (Exhibit published.)

5    **BY MR. WALDINGER:**

6    **Q.**   What is the date of this First Amended and Restated

7    Operating Agreement of Rothenberg Ventures Fund II?

8    **A.**   November 1, 2013.

9           **MR. WALDINGER:**   Now, Ms. Margen, could we go to the

10   middle of page 4 starting at section 1.18 through 1.20.

11                    (Exhibit published.)

12   **BY MR. WALDINGER:**

13   **Q.**   How does the operating -- let me start over.

14        How does the operating agreement define "Management

15   Company"?

16   **A.**   It defines it as Rothenberg Ventures Management Company.

17   **Q.**   There's also the term "Manager" which ties out to another

18   section, correct?

19   **A.**   Yes, section 5.3.

20   **Q.**   Based on your knowledge of Fund II, who was the manager --

21   do you know who the manager was in the summer of 2014?

22   **A.**   Well, as defined here, it's the manager of each of the

23   managers elected.   And so I would say that the manager of the

24   manager in this case was Michael Rothenberg.

25   **Q.**   You've already talked about what a member is in this

1    context, but could you remind the jury what a member is?

2    **A.**   Yes.   A member is a person that has an ownership interest

3    in the company.   They would have been the people that invested

4    money into the company.

5            **MR. WALDINGER:**   Let's go to the bottom of page 6, the

6    names and addresses of the managers and -- managers and

7    members.

8                    (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**   And this says that the name and the address of the manager

11   are set forth in Exhibit B; is that correct?

12   **A.**   Yes, that is what it says.

13           **MR. WALDINGER:**   So, Ms. Margen, let's go to Exhibit B

14   which is page 33.

15        Page 33.

16                    (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**   This is Exhibit B.   What does it give as the name and

19   addresses of the managers as of September 4th, 2013?

20   **A.**   The manager is named as Rothenberg Ventures Management

21   Company LLC.   The address is care of Michael Rothenberg,

22   900 San Mateo Drive, Menlo Park, California 94025.

23   **Q.**   Very good.

24        Do you know what the San Mateo Drive in Menlo Park,

25   California is?

1    **A.**   That is the address of Thomas Leep.

2    **Q.**   Who is or was Thomas Leep?

3    **A.**   Thomas Leep served as the director of finance for

4    Rothenberg Ventures.

5            **MR. WALDINGER:**   Ms. Margen, if we could now go to the

6    bottom of Page 7.

7                         (Exhibit published.)

8    **BY MR. WALDINGER:**

9    **Q.**   Mr. Eppler, this section is entitled -- or this article is

10   entitled "Capital Contributions," correct?

11   **A.**   Yes, it is.

12   **Q.**   Now, this says that the minimum capital contribution for

13   each member is $200,000.  Is that correct?

14   **A.**   It says that except as set forth in a different section

15   the minimum capital contribution is $200,000 subject to waiver

16   by the manager in its sole discretion.

17   **Q.**   Okay.  And then section 3.8 relates to the capital

18   contribution of the manager; is that right?

19   **A.**   I would need to have my recollection refreshed.

20   **Q.**   Let's go to that.

21           **MR. WALDINGER:**   That's on page 10 at section 3.8,

22   Ms. Margen.

23                         (Exhibit published.)

24           **THE WITNESS:**   Yes, section 3.8 refers to the capital

25   contribution of the manager.

1   **BY MR. WALDINGER:**

2   **Q.**  It says that the manager or Mike Rothenberg individually

3   shall make a capital contribution as a member of at least

4   $100,000 in connection with the purchase of units.

5   **A.**  Yes, that is correct.

6   **Q.**  What's a unit in this context?

7   **A.**  So a unit is a -- is a -- how do I say -- is a

8   representation of a membership interest in the limited

9   liability company.  It's analogous to stocks, but it is a way

10  of representing the respective membership interest of the

11  various members in the company.

12          **MR. WALDINGER:**  We can take that down, Ms. Margen.

13  And let's go to page 14 of this -- of this agreement.  And

14  let's highlight subsection (e), page 14, please.

15                    (Exhibit published.)

16  **BY MR. WALDINGER:**

17  **Q.**  Was -- did the operating agreement that was in place in

18  the summer of 2014 authorize the -- the company, meaning the

19  fund, to enter into a management agreement?

20  **A.**  Yes.  This section says that the -- the manager is

21  authorized to enter into a management agreement that's

22  attached as Exhibit C.

23  **Q.**  Was there a management agreement in place in the summer of

24  2014?

25  **A.**  To my understanding, yes, there was.

1    **MR. WALDINGER:**  I'd like to go to an exhibit that has

2    not been yet admitted into evidence, but show it to Mr. Eppler

3    only, please.

4    **Q.**  And I'd like to show you what's been marked as trial

5    Exhibit 101.

6         Let's just page through that agreement.  This is a -- or

7    excuse me -- this document.

8         (Exhibit published to witness, counsel, and the Court.)

9    **BY MR. WALDINGER:**

10   **Q.**  This is a four-page exhibit.

11        Mr. Eppler, do you recognize that document?

12   **A.**  Yes.  It is the management agreement for Rothenberg

13   Ventures Fund II.

14   **Q.**  Was this the agreement that was in place in the summer of

15   2014?

16   **A.**  Yes, I believe it was.

17        **MR. WALDINGER:**  Your Honor, I would move the United

18   States trial Exhibit 101 into evidence.

19        **THE COURT:**  Is there an objection?

20        **MR. FAKHOURY:**  Same objection as the prior one.  Lack

21   of personal knowledge and lack of foundation.

22        **THE COURT:**  The objection is overruled.

23        (Government's Exhibit 101 received in evidence.)

24                  (Exhibit published.)

25   / / /

1    BY MR. WALDINGER:

2    Q.  This document contains some similar provisions that I

3    won't go into, but it includes such things as payment of

4    expenses, correct?

5    A.  Yes, it does.

6    Q.  And it also sets forth on the next page, page 2, the fee

7    structure (indicating)?

8    A.  Yes, it does.

9    Q.  All right.

10          MR. WALDINGER:  Ms. Margen, we can take that down.

11   Q.  Mr. Eppler, have you reviewed the financial books and

12   records of both Fund II and Rothenberg Ventures or Rothenberg

13   Ventures Management Company before your testimony today?

14   A.  Yes, I have.

15   Q.  In the course of managing both Rothenberg Ventures and in

16   the course of Rothenberg Ventures management of Fund II, do

17   you rely on those books and records?

18   A.  I do, yes.

19   Q.  And based on your review of those books and records, do

20   they appear -- do the entries in the records appear to have

21   been made on or about the time of the event that they

22   memorialize?

23   A.  Yes, they do.

24   Q.  And I think you hesitated there because there -- there may

25   be changes that are subsequently made to entries after they

1   are initially made.

2   **A.**   The way that the accounting software works is that it

3   pulls transactions from the bank accounts, and those

4   transactions, when pulled, are made -- are pulled at, you

5   know, roughly the same time as they're made or within a day's

6   delay.

7   **Q.**   Okay.  So when you were -- let's explain this to people

8   who may not have QuickBooks.  But it's -- is it your

9   understanding that QuickBooks can download transactions

10  directly from a bank account?

11  **A.**   Yes.

12  **Q.**   Do you -- do you have personal knowledge that that's how

13  the -- the books were created back in the summer of 2014?

14  **A.**   I do not.

15  **Q.**   Is that how you are able to update the QuickBooks now,

16  though, is by downloading information from the bank?

17  **A.**   Yes, that is correct.

18  **Q.**   Back in the summer of 2014, where did Fund II and the

19  management company do their banking?

20  **A.**   They did their banking at Silicon Valley Bank.

21  **Q.**   Do you still bank at Silicon Valley Bank?

22  **A.**   No, we do not.

23  **Q.**   Where do you bank?

24  **A.**   We bank at Farmers & Merchants Bank, a bank located in

25  Orange County, California.

EPPLER - DIRECT / WALDINGER

1   **Q.**   Based on your review of the books and records of

2   Rothenberg Ventures Management Company and of Rothenberg

3   Ventures Fund II, does it appear that the books and records,

4   in terms of the actual transaction, reflect what was in the --

5   in the bank statements for the fund and the management company

6   at that time period?

7   **A.**   Yes, they do.

8   **Q.**   And I think you've already said that it appears that the

9   entries were -- were put into the QuickBooks either usually

10   shortly -- shortly after the transaction was made?

11   **A.**   Yes.

12   **Q.**   Can you tell who made the entries into the QuickBooks?

13   **A.**   Well, they're -- the actual transaction entries themselves

14   would largely have been autopopulated from the download.

15   **Q.**   Okay.

16       Based on your reviews of the books and the records that

17   were kept or that you inherited regarding Rothenberg Ventures

18   Fund II and the management company, does it appear that those

19   records were kept in the ordinary course of business?

20   **A.**   Yes, it does.

21   **Q.**   And does it appear that it was a practice of the business

22   to keep that record?

23   **A.**   Yes, it does.

24   **Q.**   I'm going to ask you some questions about -- just ask you

25   about capital contributions and capital contribution of the --

1    of the manger [sic] or the manager.  Can you tell from your

2    review of Rothenberg Ventures Fund II's books and records when

3    and if Mr. Rothenberg or RVMC ever made a capital contribution

4    to Fund II?

5    **A.**  Yes, I can do that.

6    **Q.**  And do you -- as you're -- as you're sitting here today,

7    do you recall when the first contribution was?

8    **A.**  According to the accounting records, the first

9    contribution was made on August 12th, 2014.

10   **Q.**  And I'm not going to show you that record.  What I'm going

11   to show you instead is something that's been admitted into

12   evidence as trial Exhibit 85.

13       And, in fact, I'm going to come up to you and just get you

14   that exhibit.

15                         (Handing documents.)

16   **BY MR. WALDINGER:**

17   **Q.**  So, Mr. Eppler, I've put before you what's already been

18   admitted into evidence as United States Exhibits 85 and 86.

19       And I would just like you to look at Exhibit 85 first.

20                         (Exhibit published.)

21   **BY MR. WALDINGER:**

22   **Q.**  This is a long exhibit totaling 46 pages, correct?

23   **A.**  (Reviewing document.)

24       My last page ends with 047 so 47 pages.

25   **Q.**  Okay.  Thank you.  My quality control has fallen apart.

1    Yes 04 -- this goes to 047.  And that's a blank page,

2  correct?

3  **A.**  Yes, that is correct.

4  **Q.**  What are these documents?  What is trial Exhibit 85?

5  **A.**  These are the monthly bank statements for Rothenberg

6  Ventures Fund II.

7          **MR. WALDINGER:**  Let's go to the -- the first page --

8  or the next page, Ms. Margen.

9                    (Exhibit published.)

10  **BY MR. WALDINGER:**

11  **Q.**  Can you tell from this document and do you know when the

12  account for Fund II was established at Silicon Valley Bank?

13  **A.**  (Reviewing document.)

14    So it appears to have been made on September 5th, 2013

15  because of the date of the previous balance being zero.  The

16  rest of these transactions go from the first of the month to

17  the last of the month.  So that appears to be a stub month.

18          **MR. WALDINGER:**  And now I'd like to move ahead to

19  page 34, Ms. Margen, the top half of the page.

20    And let's -- let's just do this part here (indicating).

21                    (Exhibit published.)

22  **BY MR. WALDINGER:**

23  **Q.**  The reason I'm showing this to you, Mr. Eppler, is because

24  you just testified, I believe, that Mr. Rothenberg's initial

25  contribution to Fund II was on or about August 12th of 2014?

EPPLER - DIRECT / WALDINGER

1   **A.**   Yes.

2   **Q.**   Is that what you see in the books and records of Fund II?

3   **A.**   Yes.  The August 12, 2014, described regarding Michael

4   Rothenberg for $297,000 is what we have recorded as a capital

5   contribution by Mr. Rothenberg.

6   **Q.**   There is another entry on August 12th for $103,000 that

7   also has Mr. Rothenberg's name in the detail.  What is that?

8   **A.**   That I -- we've also accounted as a capital contribution

9   for Mr. Rothenberg.

10         **MR. FAKHOURY:**  Your Honor, I'm sorry to interrupt.

11   Could we have a quick sidebar?

12         **THE COURT:**  Yes.

13      Ms. Lee, am I able to print something on your printer from

14   this computer, do you know?

15         **THE CLERK:**  I do believe so, Your Honor.

16         **THE COURT:**  I don't see it here and I don't want to

17   delay things.  I'll deal with this later.

18         **THE CLERK:**  Yes.

19         **THE COURT:**  Thank you.

20               (Sidebar off the record.)

21         **THE COURT:**  Before Mr. Waldinger asks his next

22   question, I'll allow Mr. Fakhoury to place an objection on the

23   record.

24         **MR. FAKHOURY:**  Thank you, Your Honor.

25      I just want to lodge a hearsay and foundation objection.

1      Thank you.

2              **THE COURT:**  Thank you, Mr. Fakhoury.

3          I'm going to overrule the objection.  The evidence that --

4      the witness is testifying about the contents of documents that

5      are not yet in evidence that the Court concludes that, based

6      on some legal research I've done over the break and right now,

7      I conclude that the records are going to be admissible if the

8      government -- are going to be admissible.  And therefore I'm

9      going to overrule the objection.  I'll make a fuller record

10     outside the presence of the jury so we can get on with the

11     testimony.

12         Mr. Waldinger.

13             **MR. WALDINGER:**  Thank you, Your Honor.

14     **Q.**  Just to remind the jury where we were, Mr. Eppler, we're

15     looking at Fund II's bank account statement at SVB for the

16     period that covered August 12th of 2014, correct?

17     **A.**  Yes, we are.

18     **Q.**  The statements have an entry for 297,000, correct?

19     **A.**  Yes, they do.

20     **Q.**  And a statement for 100 -- or excuse me -- an entry for

21     103,000?

22     **A.**  Yes, that is correct.

23             **MR. WALDINGER:**  If we could publish this to the jury.

24             **THE COURT:**  Is this document in evidence?

25             **MR. WALDINGER:**  I believe it was admitted pursuant to

 1    certification, Your Honor.

 2              **THE COURT:**  Oh, I see.  Earlier.  Okay, that's fine.

 3    Thanks.

 4                        (Exhibit published.)

 5    **BY MR. WALDINGER:**

 6    **Q.**  All right.  So the -- there's going to be a lot of numbers

 7    here.  But the account number for Fund II ended 7483, correct?

 8    **A.**  Yes.  Yes, it did.

 9    **Q.**  These two entries for 297,000 and 103,000 are recorded in

10    Rothenberg Ventures Fund II's books again as what?

11    **A.**  As capital contributions of the manager.

12    **Q.**  Do the records indicate whether Mr. Rothenberg had made

13    any capital contributions before August 12th to this fund?

14    **A.**  We did not identify any, no.

15              **MR. WALDINGER:**  All right.  Thank you, Ms. Margen.

16    You can take that down.

17    **Q.**  We just looked at Rothenberg Ventures Fund II's bank

18    account.  Do you currently have control over where that

19    bank -- that account where it is held now at Farmers &

20    Merchants Bank?

21    **A.**  Yes.

22    **Q.**  Did Fund II still bank at Silicon Valley Bank when you

23    were the manager of the management company?

24    **A.**  It did, yes.

25    **Q.**  At that time, did you have control, along with

1    Mr. Robinson, of Fund II's bank account?

2    **A.**  Yes.

3    **Q.**  Based on your review of records, does it appear that the

4    management company also had control of that bank account back

5    in the summer of 2014?

6    **A.**  Yes.

7    **Q.**  Why does the manager of a venture capital fund need to

8    have access and control of a venture capital fund's bank

9    account?

10   **A.**  So that it can take in investments, receive fees, and then

11   make investments in portfolio companies.

12   **Q.**  And if a venture capital management company is managing a

13   venture capital fund, why -- let me -- let me start over.

14       Does a venture capital fund need to have a separate bank

15   account from the management company?

16   **A.**  Yes, it does.

17   **Q.**  Why?

18   **A.**  Because they're separate entities that have their own

19   ownership of their own cash.

20          **MR. WALDINGER:**  Ms. Margen, if we could turn to

21   United States Exhibit 86, which I believe is also in evidence.

22                      (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**  And I put that in paper copy in front of you, Mr. Eppler,

25   for your ease of review.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1          I may get this wrong, but I think Exhibit 86 is a 152-page

 2    document.

 3    **A.**   (Reviewing document.)

 4          I have 152 pages, yes.

 5    **Q.**   What is Exhibit 86?

 6    **A.**   Exhibit 86 is the Silicon Valley Bank records for

 7    Rothenberg Ventures Management Company LLC.

 8               **MR. WALDINGER:**   Let's go to page 2, Ms. Margen.

 9                         (Exhibit published.)

10    **BY MR. WALDINGER:**

11    **Q.**   If you can tell, what's the date of this statement?

12               **MR. WALDINGER:**   Let's do the top half, Ms. Margen.

13                         (Exhibit published.)

14               **THE WITNESS:**   It is September 30, 2012.

15    **BY MR. WALDINGER:**

16    **Q.**   What was the previous balance on this account as of this

17    statement date, November 30th, 2012?

18    **A.**   Well, the previous balance which was measured on

19    September 7th, 2012, was zero.

20    **Q.**   What does that indicate to you?

21    **A.**   That indicates that on September 7th, 2012, this account

22    was created.

23               **MR. WALDINGER:**   Ms. Margen, if we could now turn to

24    page 111 of Exhibit 86.

25          And once you get it up, I will show you --

1          (Exhibit published.)

2    **BY MR. WALDINGER:**

3    **Q.**  First of all, from -- from this document, can you tell

4    what statement period this page covers?

5    **A.**  Yes.  This would cover the month of June in 2014.

6    **Q.**  The page we're on is page 5 of 10; correct?

7    **A.**  Yes.

8          **MR. WALDINGER:**  Your Honor, this is where I think it

9    would be appropriate for the Court to give the instruction

10   that we discussed at sidebar.

11         **THE COURT:**  Very good.

12      Members of the jury, I instructed you on the law in

13   certain respects at the beginning of the case.  And as you

14   know, I'll give you a much longer or a somewhat longer set of

15   instructions at the end.

16      Occasionally it makes sense for me to instruct you in the

17   middle of the trial as to a particular point.  I'm about to do

18   that.  When I do that, I will make sure to include the

19   instruction also in the written set that you'll get at the end

20   of the case.  As with anything that happens in the trial,

21   you're free to take notes, but you should just know that, as I

22   say, you'll get a written copy of this.  So if you don't write

23   it down, that's fine too.

24      You're about to hear evidence that the defendant

25   transferred or caused to be transferred money from the bank

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    account of Rothenberg Ventures Fund II LLC to the bank account

2    of Rothenberg Ventures Management Company LLC and then on to

3    his personal Bank of America and Merrill Lynch accounts, or

4    that the defendant transferred or caused to be transferred

5    money from one of his Merrill Lynch accounts to his personal

6    Bank of America account and then on to the bank account of

7    Rothenberg Ventures Management Company LLC and/or the bank

8    account of Rothenberg Ventures Fund II LLC.

9         I instruct you that you may consider this evidence only

10   for the limited purpose of determining whether the defendant

11   acted with the intent to defraud Silicon Valley Bank, devised

12   a scheme to defraud Silicon Valley Bank, and/or executed a

13   scheme to defraud Silicon Valley Bank.

14        You must consider it only for that limited purpose and not

15   for any other purpose.

16        Mr. Waldinger.

17            **MR. WALDINGER:**   Thank you, Your Honor.

18   **Q.**   So again, to remind the jury, Mr. Eppler, this is page 5

19   of 10 (indicating) of a June 2014 statement, correct?

20   **A.**   Yes, it is.

21   **Q.**   The account number for -- well, the account number at

22   issue here is what?

23   **A.**   That is the 8931 account.

24   **Q.**   What entity had an account ending numbered 8931 at SVB in

25   June of 2014?

1    **A.**   Rothenberg Ventures Management Company.

2    **Q.**   So this is Rothenberg Ventures Management Company's SVB

3    statement for June of 2014?

4    **A.**   Yes, it is.

5          **MR. WALDINGER:**   Ms. Margen, if we could blow up this

6    section here (indicating).

7                     (Exhibit published.)

8    **BY MR. WALDINGER:**

9    **Q.**   Mr. Eppler, I'm just going to ask you to read out a few

10   transactions that happened in this account in June of 2014.

11   The ones that I'm going to have you walk through are this one

12   (indicating), this one (indicating).

13        When I say "this one," there's a June 17th for $225,000,

14   another June 17th transaction for 310-, a June 20th

15   transaction for $225,000, and a June 20th transaction for

16   310,000.

17        If we could just walk through these in order that I read

18   them, and just without remarking what the books and records of

19   Rothenberg Ventures Management Company say, just say what the

20   transaction was as reflected in the bank statement.

21        So let's go with number one.

22   **A.**   Okay.

23        Number one is a credit -- a book transfer credit from an

24   account ending 7483, that's the account number for Rothenberg

25   Ventures Fund II, of $225,000.

1   **Q.**   Is this a -- we can't see the -- the heading on the

2   column, but is this a debit or a credit column?

3   **A.**   It's a credit.  So it's an addition of money to the

4   account.

5   **Q.**   Fair to say then that this represents a transfer of money

6   from Fund II to the management company?

7   **A.**   Yes, that is correct.

8   **Q.**   On what date?

9   **A.**   On the 16th of June 2014.

10  **Q.**   This verbiage here is book transfer credit.

11  **A.**   Yes.

12  **Q.**   Do you -- are you familiar with how the SVB bank

13  statements would come to have that kind of verbiage?

14  **A.**   It's transfer from one SVB held account to another SVB

15  held account.

16  **Q.**   The second transaction that I want you to describe is this

17  one (indicating), that is in the -- in the other column for

18  $310,000.  What is that transaction?

19  **A.**   That is a June 17th, 2014, wire out, so money leaving the

20  account, the management company account.  It is $310,000.

21  **Q.**   On what date?

22  **A.**   On the 17th of June, 2014.

23  **Q.**   From the wire detail that is in the bank record only, are

24  you able to tell what bank account that transfer ended up in?

25  **A.**   It's a wire out to an account for the benefit of Michael

EPPLER - DIRECT / WALDINGER

1    Rothenberg.

2    **Q.**   What does BNF mean in bank parlance?

3    **A.**   So my understanding, that's the benefit line in a wire.

4    And I'm not sure exactly what that -- if that's a three-letter

5    shortening or what that is.

6    **Q.**   But I think what you're saying is you read that as being

7    for the benefit of or the beneficiary?

8    **A.**   Yes.

9    **Q.**   Is that correct?

10   **A.**   Yes.

11   **Q.**   These transactions are listed as occurring on the same

12   day, the 225- and the 310-?

13   **A.**   Yes, they are.

14   **Q.**   The third transaction that I want you to describe is this

15   one that I circled that has -- it says minus 225,000

16   (indicating).

17   **A.**   Yes.  That transaction occurs on June 20th, 2014.  It is a

18   book transfer debit that is a reduction from the management

19   company account to the account ending 7483, that is, the

20   Fund II account.  It is a transfer to the Fund II account of

21   $225,000.

22   **Q.**   So this is money -- the first one you described was money

23   coming from Fund II going into the management company,

24   correct, on June 17th?

25   **A.**   Yes.

1    **Q.**  The one that you just discussed is 225,000 going back to

2    Fund II?

3    **A.**  Yes.

4    **Q.**  The way that these transactions are listed on the

5    statement, that transaction shows that the balance ended up in

6    the management company's statement as what kind of balance?

7    **A.**  It is a negative balance.

8    **Q.**  Were there -- in your experience, do banks like -- like it

9    when account holders go into negative balance?

10   **A.**  In my experience, they have not.

11   **Q.**  During the course of that day, June 20th, were there

12   deposits that took the balance above zero?

13   **A.**  Yes, there was.

14   **Q.**  There was one for 27,000.  Where did that come from?

15   **A.**  That is a book transfer credit, again from the 7483

16   account, from the Fund II account.

17   **Q.**  Then the next one is one of the -- is the fourth one that

18   I had highlighted before is 310,000, correct?

19   **A.**  Yes, that's correct.

20   **Q.**  Is that a deposit or a debit?

21   **A.**  That is a deposit.

22   **Q.**  Can you tell the date that that was made?

23   **A.**  Yes.  That was made on June 20th, 2014.

24   **Q.**  How was that deposit made?  Or what does the bank

25   statement say that -- how that deposit was made?

 1  **A.**  The bank statement indicates that it was a wire of funds.

 2  **Q.**  Is there any detail in the wire detail as to the origin,

 3  the bank origin of that wire?

 4  **A.**  Yes.  It says Michael Rothenberg.

 5  **Q.**  But otherwise it doesn't identify a banking institution,

 6  to your knowledge?

 7  **A.**  No.  That -- I can't decipher that code.

 8  **Q.**  Maybe the -- maybe those numbers mean something to

 9  somebody but not to you?

10  **A.**  Correct.

11  **Q.**  Are all of these transactions that we just discussed also

12  reflected in the company's books and records?

13  **A.**  Yes.

14          **MR. WALDINGER:**  At this time, I'd like to go through

15  an exhibit that is not yet admitted into evidence so should

16  not be shown to the jury.

17      And that will be Exhibit 125.

18      (Exhibit published to witness, counsel, and the Court.)

19  **BY MR. WALDINGER:**

20  **Q.**  Mr. Eppler, do you see that on your screen?

21  **A.**  Yes, I do.

22  **Q.**  Do you recognize what that is?

23  **A.**  This appears to be an excerpt from the general ledger as

24  kept in QuickBooks of Rothenberg Ventures Management Company

25  LLC.

1    **Q.**  Through Rothenberg Ventures' attorney, did you produce to

2    the government Rothenberg Ventures Management Company's

3    general ledger entries for the period June through August of

4    2014?

5    **A.**  I was not the attorney handling the disclosure of

6    materials to the government.

7    **Q.**  Okay.

8         **THE COURT:**  Sir, I believe Mr. Waldinger's question

9    was did you -- understanding that you were not the lawyer who

10   was dealing with the government, did whatever lawyer that was

11   dealing with the government on your behalf make this

12   disclosure to the government?

13        **THE WITNESS:**  Oh, yes.  I -- I apologize.  My timing

14   of the question was -- I misunderstood.

15        Yes.  Our attorney did disclose this information to the

16   government.

17   **BY MR. WALDINGER:**

18   **Q.**  And this -- it was not disclosed -- the general ledger for

19   Rothenberg Ventures Management Company has, if not hundreds of

20   rows, thousands of rows for this period June through August of

21   2014?

22   **A.**  Yes, it has a significant number of entries.

23   **Q.**  Do you recognize this as an excerpt from that general

24   ledger that was made by the government and color-coded by the

25   government?

EPPLER - DIRECT / WALDINGER

1   **A.**   Yes.

2   **Q.**   Are these entries accurate excerpts from the general

3   ledger of the management company that you produced to the

4   government?

5   **A.**   They appear to be.

6   **Q.**   And I had asked you a bunch of questions previously about

7   the books and records and -- but just to be clear, let's --

8   let's start with the 225,000.  And, again, this is -- this is

9   not in evidence, only you can see this.

10       But is the information that we just saw in Exhibit 86

11   reflected in this exhibit (indicating), and I'm just circling

12   two $225,000 entries?

13   **A.**   Yes.

14   **Q.**   Is the information that's here consistent with what you

15   saw in the bank statement?

16   **A.**   Yes, it is.

17   **Q.**   And based on your review of this ledger, were these

18   entries at least initially made at or around the time of the

19   transaction?

20   **A.**   Yes.

21   **Q.**   And is that true for all of the entries that are listed on

22   this page?

23   **A.**   Yes, it is.

24           **MR. WALDINGER:**   Your Honor, I would move trial

25   Exhibit 125 into evidence as an excerpt from a business

```
 1   record.

 2              THE COURT:  Any objection?

 3              MR. FAKHOURY:  Yes, Your Honor.  Lack of personal

 4   knowledge, lack of foundation, and hearsay.

 5              THE COURT:  The objection's overruled.

 6        (Government's Exhibit 125 received in evidence.)

 7              MR. WALDINGER:  All right.  So let's publish that to

 8   the jury, please.

 9                        (Exhibit published.)

10   BY MR. WALDINGER:

11   Q.  You do have an MBA, correct?

12   A.  Yes.

13   Q.  But you're not an accountant?

14   A.  No, I am not.

15   Q.  And I'm not an accountant.  But I mean to ask you

16   generally about what's -- is this reflective of what's called

17   double-entry bookkeeping?

18   A.  Yes.  Yes, it is.

19              MR. FAKHOURY:  Objection, foundation.

20   BY MR. WALDINGER:

21   Q.  Let me ask you questions about 9 --

22              MR. FAKHOURY:  Sorry to interrupt.  Objection,

23   foundation.  Move to strike.

24              THE COURT:  I'll sustain the foundation objection.

25        Do you want to inquire further of the witness?
```

1    BY MR. WALDINGER:

2    Q.   How are Rothenberg Ventures management -- what -- strike

3    that?

4              THE COURT:   I think the only question is whether he

5    knows what double-entry bookkeeping is.

6    BY MR. WALDINGER:

7    Q.   Do you know what double-entry bookkeeping is?

8    A.   Yes, I do.

9    Q.   Are Rothenberg Ventures Management Company's books kept

10   using that principle of bookkeeping?

11   A.   Yes, they are.

12   Q.   How is that reflected here, Mr. Eppler?  So there are nine

13   color-coded transactions at the top of the page (indicating).

14   And their color coding is -- is matched in the bottom two

15   sections.  Is there an easy way to explain that?

16   A.   Yes.  In double-entry bookkeeping, every entry requires a

17   debit to an account and an offsetting credit to an account.

18   That's why it's called double entry because there are two

19   entries.

20        The way that this appears to be organized is to match the

21   debits and credits for each double entry across the accounts

22   from which they were made.

23   Q.   So let me ask you a question.  One of the -- one of the

24   transactions -- if you can just look in your paper copy of

25   Exhibit 86, page 111, just to remind you.  There was a wire

1    out on June 17th of $310,000 that had the words "BNF Michael

2    Rothenberg."  Do you see that?

3    **A.**   Let me get back to that page, please.  One moment.

4         (Reviewing document.)

5         This is the $310,000 on June the 17th; is that correct?

6    **Q.**   Correct.

7    **A.**   Yes, that is correct.

8    **Q.**   So how is -- can we just walk through Exhibit 125 as to

9    how that's reflected in the books and records of Rothenberg

10   Ventures Management Company?  And let's start with -- of

11   the -- the first entry of the double entry, where is that

12   shown?

13   **A.**   That is shown in the third row in the blue color as a

14   debit.  Yeah, right there.

15   **Q.**   Okay.  And then it -- does there need to be --

16        Oh, that's correct.  Sorry about this.  I'm looking --

17   it's confusing to me.

18        I'm going to point you to another 310 (indicating).

19        So the question I asked you was about June 17th?

20   **A.**   Oh, I'm sorry.  I apologize, my apologies.  I was looking

21   at the wrong -- there's a lot of information to process.  My

22   apologies.  Yes.

23   **Q.**   Me too.

24        So there was the bank statement, Exhibit 86, had on

25   June 17th a $310,000 wire out with the "BNF Michael

1  Rothenberg."  How is that reflected in Rothenberg Ventures

2  Management Company's books?

3  **A.**  So this is shown in the lighter green color, as you

4  have -- have indicated here.  It is a credit out to the SVB

5  8931.  It is shown as a debit with the memo "Advance to M.

6  Rothenberg" on the same date from the other current asset

7  account.

8  **Q.**  The -- so how does that work?  How is it that -- and if

9  you know, through accounting principles, why a wire out would

10 be listed under a credit in this account at the top?

11 **A.**  Well, it -- because it balances -- it balances the books

12 and it tells where the money went to as opposed to from whence

13 it came.

14 **Q.**  Okay.  So it's -- the accounting software and the

15 accounting principles run a little bit differently than I run

16 my checkbook register, correct?

17 **A.**  Yes, that is correct.

18 **Q.**  The 310,000 is on the first row.  Where is the second

19 entry -- you may have already said this, but let's be clear.

20 Where is the second entry, the corresponding entry, in the

21 double-entry bookkeeping?

22 **A.**  It is the first entry under 12,000, other current

23 asset-other.

24 **Q.**  Do the books and records of the management company have a

25 further description of that transaction?

1    **A.**   Yes.  In the memo portion of the record.

2    **Q.**   And that is?

3    **A.**   That is labeled as "Advance to M. Rothenberg."

4          **MR. WALDINGER:**  You can take that down, Ms. Margen.

5          Oh, I'm sorry.  Yes.

6          We'll actually now move to the same exhibit, trial

7    Exhibit 86, the -- this is the bank statements, page 123.

8                    (Exhibit published.)

9          **MR. WALDINGER:**  Let's -- before -- before we blow it

10   up, are we --

11   **Q.**   Which bank statement, if you remind the jury, which

12   entity's bank statement this is.

13   **A.**   Yes, this is the 8931 account that is the account for

14   Rothenberg Ventures Management Company.

15   **Q.**   For what statement period?

16   **A.**   It is for the month of July 2014.

17          **MR. WALDINGER:**  Ms. Margen, if we could just blow up

18   this part here (indicating).

19                    (Exhibit published.)

20   **BY MR. WALDINGER:**

21   **Q.**   The -- the column all the way to the right is the running

22   balance; is that correct, Mr. Eppler?

23   **A.**   Yes, it is.

24   **Q.**   What is this column in the middle?

25   **A.**   That column is the credits or the deposits into the

1  account.

2  **Q.**  I'm directing you to observe two deposits that are made on

3  July 29th.  Could you describe those and what they are and

4  where they came from, for the jury?

5  **A.**  Yes.  Those are book transfers from the account ending

6  7483, that's the bank account for Fund II.

7  **Q.**  Then the other transaction that I would like you to

8  describe occurs later -- or occurs also on July 29th

9  (indicating) for $300,000.

10      Could you please describe what the bank statement says

11  about that transaction?

12  **A.**  Yes.  On the 29th, there is a wire out for $300,000,

13  account, the beneficiary which is Michael Rothenberg.

14  **Q.**  Are -- are those three transactions also reflected on that

15  crazy color-coded exhibit that we just saw, Exhibit 125?

16  **A.**  I would need to see it to verify but --

17            **MR. WALDINGER:**  Let's -- let's pull that up.

18                  (Exhibit published.)

19  BY MR. WALDINGER:

20  **Q.**  So we're looking for a $75,000, a $25,000, and a $300,000.

21  **A.**  Yes.  I see those transactions.

22  **Q.**  So the -- the $25,000 one is the fifth row down; correct?

23  **A.**  Yes, that is correct.

24  **Q.**  The $75,000 is seven rows down?

25  **A.**  Yes.  That is correct.

1    **Q.**   And the $300,000 transaction is in the royal purple color

2    six rows down?

3    **A.**   Yes, that is correct.

4    **Q.**   How are -- how are each of those transactions booked in

5    Rothenberg Ventures Management Company's books?

6    **A.**   The two debits were booked as book transfers from -- from

7    the account -- from the -- from the Silicon Valley account.

8    **Q.**   And how about the 300,000?

9    **A.**   The $300,000 was booked as a wire that went -- was booked

10   as a wire that went -- was booked as a wire looks like the

11   same bank information as was in the banking account.

12   **Q.**   The -- the prior -- the $310,000 wire that we looked for

13   before had some detail in the memo line.  And I think what

14   you're saying is that the 300,000 just has what's in the bank

15   statement?

16   **A.**   Yes.  Although that's not an exact match of what's in the

17   bank statement.  It's slightly different information.

18   **Q.**   Got it.

19       With respect to the funds that are coming into the

20   management company from Fund II, were any of those recorded as

21   payment of management fees?

22   **A.**   No.  We did not have those recorded as payments of

23   management fees.

24   **Q.**   Were any of those recorded as reimbursement for expenses?

25   **A.**   No.  Those were not recorded as reimbursement for

 1   expenses.

 2   **Q.**   And were any of those recorded as distribution of carry?

 3   **A.**   No.  We don't have those recorded as distribution of

 4   carry.

 5   **Q.**   With respect to the two wire transfers that had

 6   Mr. Rothenberg's name in the wire detail -- let me circle

 7   those, that's 310,000 and 300,000 -- do the books and records

 8   of the management company record those as being salary or

 9   compensation to Mr. Rothenberg?

10   **A.**   No.  No, they do not.

11   **Q.**   And in fact, have you reviewed the books and records to

12   determine for calendar year 2014 what was recorded as

13   compensation to Mr. Rothenberg?

14   **A.**   Yes.  Yes, I have.

15   **Q.**   Let me show you -- this is not yet admitted.

16          **MR. WALDINGER:**   Counsel, this is Exhibit -- this is

17   Exhibit 124.

18       So this again has not been admitted yet.

19       And I -- once we get it up for Mr. Eppler, we may have to

20   blow it up because it's pretty small.

21       Let's just try to do that and see if that's big enough for

22   Mr. Eppler.

23       (Exhibit published to witness, counsel, and the Court.)

24   **BY MR. WALDINGER:**

25   **Q.**   Now, Mr. Eppler, this is an exhibit that the government

1   made, correct?

2   **A.**  Yes, it is.

3   **Q.**  Have you reviewed this in terms of whether it corresponds

4   with the information that you have in the books and records of

5   the management company?

6   **A.**  Yes.  This -- this corresponds to the information that we

7   have from the books and records.

8   **Q.**  Does this capture what the books and records say were fees

9   paid to partners with the subcategory fees to Michael

10  Rothenberg for calendar year 2014?

11  **A.**  Yes, they do.

12          **MR. WALDINGER:**  Your Honor, I would move United

13  States Exhibit 124 into evidence.

14          **THE COURT:**  Is there an objection?

15          **MR. FAKHOURY:**  Yes, Your Honor.  Both hearsay,

16  personal knowledge, foundation.  And there's also a *Crawford*

17  issue with this specific exhibit since it was prepared by the

18  government.  Particularly because Mr. Eppler did not create

19  this record.

20          **THE COURT:**  I'll see counsel at sidebar.

21                  (Sidebar off the record.)

22          **THE COURT:**  The *Crawford* objection is -- for the

23  record, the *Crawford* objection is to the underlying QuickBooks

24  record, and the objections will be overruled.

25          **MR. WALDINGER:**  And so this exhibit is admitted, Your

1    Honor?

2                **THE COURT:**  It is.

3         (Government's Exhibit 124 received in evidence.)

4             **MR. WALDINGER:**  If we could publish this to the jury,

5    please.

6         And I apologize for the smallness of the -- of the

7    writing.

8         Ms. Margen, let's just -- let's just blow up the left half

9    so that the jury and that Mr. Eppler can see what are the

10   dates that we're talking about.

11                            (Exhibit published.)

12   **BY MR. WALDINGER:**

13   **Q.**  Mr. Eppler, this lists dates of January 2nd, January 2nd,

14   January 13th, April 22nd, and August 12th.

15        Are those the dates that the books and records of the

16   management company show that salary or compensation was paid

17   to Mr. Rothenberg?

18   **A.**  Yes, they are.

19   **Q.**  And if we're just talking in the first half of 2014, that

20   would just be the first four entries?

21   **A.**  Yes.  That is correct.

22             **MR. WALDINGER:**  So, Ms. Margen, let's then go to the

23   far right side and do same thing.  Well, let's just --

24   right here, let's just do that (indicating).

25                            (Exhibit published.)

1    BY MR. WALDINGER:

2    **Q.**  So this was -- I think there were three January dates and

3    an April date were the first four, correct?

4    **A.**  Yes.

5    **Q.**  Sorry to make you do the math.  What is that amount total

6    to for the first half of 2014?

7    **A.**  Well, to be clear, we're -- we're looking at the -- the

8    column in the middle there.

9                        (Simultaneous colloquy.)

10           **THE WITNESS:**  Not the one on the far right.

11   BY MR. WALDINGER:

12   **Q.**  Not the far right.  I'm sorry.  Thank you.

13   **A.**  Okay.  So that is $220,000.

14   **Q.**  And then is it true then, in August, Mr. Rothenberg

15   received additional compensation of 180,000?

16   **A.**  Yes, on August 12th, 2014.

17   **Q.**  So we've just seen two wire transfers to Mr. Rothenberg in

18   June and July of 2014, one for $310,000 and one for $300,000.

19   And I think you've already said this, but were those recorded

20   as compensation or salary to Mr. Rothenberg?

21   **A.**  No, they were not.

22   **Q.**  Do you have personal knowledge as to what those were?

23   **A.**  I do not.

24   **Q.**  Okay.  Thank you.

25           **MR. WALDINGER:**  You may take that down, Ms. Margen.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    Let's go back to Exhibit 86, and let's go to page 123

2    which is where we left off.

3                    (Exhibit published.)

4    BY MR. WALDINGER:

5    Q.  So we left off with this exhibit at this $300,000 wire to

6    Mr. Rothenberg, correct?

7    A.  I believe so, yes.

8    Q.  Is it true that then shortly thereafter, if you turn to

9    the beginning of August on page 125, that money then is

10   transferred or wired back to the management company?

11       First of all, before we blow this up, we're still on whose

12   bank statement?

13   A.  We are still on the bank statement for the management

14   company, Rothenberg Ventures Management Company.

15   Q.  For what time period?

16   A.  We are now looking at August of 2014.

17            MR. WALDINGER:  And, Ms. Margen, let's just blow this

18   part up (indicating).

19                    (Exhibit published.)

20   BY MR. WALDINGER:

21   Q.  There are two transactions that I want you to focus on

22   here, for $100,000 and 225,000.

23       Let's start with the $100,000 transaction.

24   A.  Okay.  The $100,000 transaction was a debit that occurred

25   on August 1st, 2014.  It was sent to the 7483 account, that's

1    the Fund II account.

2    Q.   Does that amount equal the two transfers that occurred on

3    July 29th from Fund II to the management company?

4    A.   Yes.  The -- the July 29th transfers were of $75,000 and

5    $25,000.  So in the aggregate that would be $100,000.

6    Q.   Was there -- the way this is listed on the bank statement,

7    that transfer results in a negative balance, correct?

8    A.   It does.

9    Q.   Was there, however, a deposit on that day that brought the

10   balance above zero?

11   A.   Yes, there was.

12   Q.   What -- could you describe that?

13   A.   It was a wire in that originated from -- it says an

14   account of Michael Rothenberg's of $225,000.

15   Q.   You testified earlier in your testimony that

16   Mr. Rothenberg's first capital contribution to Fund II was on

17   August 12th, correct?

18   A.   Yes, I did.

19   Q.   And typically, would a capital contribution be made

20   directly into a fund?

21   A.   Yes, it would be made directly into the fund.  Unless the

22   manager of the management company wanted the management

23   company to be the member of the fund.  I believe that both the

24   management company and the manager had the power to satisfy

25   the manager's capital contribution.

1   **Q.**  Was this wire transfer that has Mr. Rothenberg's name in

2   it recorded in the books and records of the management company

3   as any kind of capital contribution?

4   **A.**  It was not.

5           **MR. WALDINGER:**  Let's go back to Exhibit 125,

6   Ms. Margen.

7   **Q.**  So let's keep in your mind, Mr. Eppler, the 100,000 and

8   the 200- and 25,000.

9                   (Exhibit published.)

10  **BY MR. WALDINGER:**

11  **Q.**  Are those also recorded in the books and records of the

12  management company?

13  **A.**  Yes.  Yes, they are.

14  **Q.**  And I think I'm doing the counting correctly.  That's the

15  eighth and the ninth row in the -- the first entry in the

16  double-entry bookkeeping.

17  **A.**  Yes, that is correct.

18  **Q.**  Is there any more detail in the books and records as to

19  what those two transfers were for, the 100,000 and the

20  225,000?

21  **A.**  No.  The only substantive information relates to the

22  $100,000 transaction which was memorialized as being

23  management company to Fund II.  But otherwise, no.

24          **MR. WALDINGER:**  Ms. Margen, on this document -- or

25  excuse me.  If we could go back to trial Exhibit 86 and go to

 1    page 111.  And let's -- once I get there -- let's blow it up

 2    in this section (indicating).

 3                        (Exhibit published.)

 4    **BY MR. WALDINGER:**

 5    **Q.**  So we're going back to the June time period, correct,

 6    Mr. Eppler?

 7    **A.**  Yes.  We are back in the month of June.

 8    **Q.**  This was where there had been a transfer from Fund II to

 9    the management company for $225,000 on June 17th, correct?

10    **A.**  Yes, there was.

11    **Q.**  I'm going to point you now to this transaction.

12    (indicating).

13         On June 20th, was 225,000 then sent back to Fund II?

14    **A.**  Yes, it was.

15              **MR. WALDINGER:**  All right.  Now, Ms. Margen, if we

16    could go to Exhibit 85, which is the bank statements for

17    Fund II.  And let's go to page 27.

18                        (Exhibit published.)

19              **MR. WALDINGER:**  And let's just --

20    **Q.**  Again, whose bank statement is this, Mr. Eppler?

21    **A.**  This is Fund II's bank statement, the 7483 account.

22    **Q.**  For what period?

23    **A.**  For the month of June 2014.

24              **MR. WALDINGER:**  Ms. Margen, let's just blow up the

25    top part here (indicating).

1                          (Exhibit published.)

2      **BY MR. WALDINGER:**

3      **Q.**  I just asked you questions about these two $225,000

4      transactions, correct?

5      **A.**  Yes.

6      **Q.**  I want to ask you what -- there's a transaction that

7      occurs on June 27th for 300,000.  What do the bank records

8      indicate that that transaction was?

9      **A.**  The bank records indicate that that was an investment into

10     a portfolio company.

11     **Q.**  What's the name of that portfolio company?

12     **A.**  Qualia3D.

13     **Q.**  Is that still a portfolio company?

14     **A.**  No.  The -- the entity changed its name and then went into

15     receivership.  It's one of the ones that didn't work out.

16     **Q.**  But this -- based on your understanding and your review of

17     Fund II's records, this was an investment?

18     **A.**  Yes.

19     **Q.**  Could this investment have been made absent the deposit of

20     $225,000 on June 20th?

21              **MR. FAKHOURY:**  Objection, irrelevant.

22              **THE COURT:**  Sustained.

23              **MR. WALDINGER:**  All right.  I'll move on.

24     **Q.**  Mr. Eppler, I would like to just show you some other

25     exhibits just to confirm a few things.

1        **MR. WALDINGER:**  Ms. Margen, if you could pull up

2   what's already been admitted into evidence as trial Exhibit 3.

3                         (Exhibit published.)

4   **BY MR. WALDINGER:**

5   **Q.**  Mr. Eppler, you may not have seen this document before,

6   but I'm just going to ask you -- it's dated July 29th, 2014.

7        Based on your testimony today, was it correct on July 29th

8   of 2014 that Mr. Rothenberg's equity interest in Fund II was

9   zero dollars?

10       **MR. FAKHOURY:**  Objection, personal knowledge.

11       **THE COURT:**  Overruled.

12       **MR. FAKHOURY:**  He's never seen the document.

13       **THE COURT:**  Overruled.

14       **THE WITNESS:**  That's -- that's correct.  The -- the

15  capital contribution did not occur until after that date,

16  according to our records.

17       **MR. WALDINGER:**  And now, Ms. Margen, if you would put

18  what's been marked as -- excuse me -- trial Exhibit 8.  And it

19  is marked and admitted.

20                         (Exhibit published.)

21  **BY MR. WALDINGER:**

22  **Q.**  Again, this is -- this is not a letter that you created,

23  correct?

24  **A.**  That is correct.  It is not.

25  **Q.**  Based on your review of the books and records of the

1    management company, including ones that we went through today,

2    is it correct that Mr. Rothenberg's compensation from the

3    management company for the first half of 2014 was $220,000?

4    **A.**  Yes, that is correct.

5            **MR. WALDINGER:**  If I could have one -- one moment,

6    Your Honor.

7            **THE COURT:**  Yes.

8                    (Pause in the proceedings.)

9            **MR. WALDINGER:**  I have no further questions, Your

10   Honor.

11           **THE COURT:**  Thanks, Mr. Waldinger.

12       Members of the jury, rather than extend the break a little

13   bit to catch up from this morning and that sort of thing,

14   we're between counsel so why don't we just go ahead and take

15   our second break right now.

16       Court will be in recess for 15 minutes.  Please remember

17   my prior admonitions.  Thanks.

18           **THE CLERK:**  Please rise for the jury.

19       (The following proceedings were heard out of the presence

20   of the jury:)

21           **THE COURT:**  Okay.  We're outside the presence of

22   jury.

23       I just wish to make a brief record of the reason why the

24   Court overruled the hearsay and foundation objections to the

25   QuickBooks records and related materials that were admitted

1   during this morning's trial.

2       And my United States District Court server has decided all

3   of a sudden to virtually freeze.

4       Okay.  Here we go.

5       I can't claim in the few minutes that were available to me

6   to have performed a comprehensive research into these

7   questions, but I would just state the following:

8       First from *United States v. Franco*, a Seventh Circuit case

9   from 1989 -- it appears to still represent good law -- the

10  court said, "It is within the trial court's discretion to

11  determine whether a proper foundation was laid for application

12  of the business records exception to a particular document and

13  whether the circumstances of the document's preparation

14  indicate trustworthiness.  When making preliminary factual

15  inquiries about the admissibility of evidence under a hearsay

16  exception, the district court must base its findings on the

17  preponderance of the evidence.  That evidence, however, may

18  include hearsay and other evidence normally inadmissible at

19  trial."

20      I wanted to look into that question because of course when

21  Mr. Eppler assumed his management role at Rothenberg, he had

22  to have received information from other persons about these

23  records.

24      That case, the *Franco* case, appears at 874 F.2d 1136 at

25  page 1139.

1    In that case and in all the other cases I'll refer to, I'm

2    omitting any internal citations or quotations.

3    The Ninth Circuit wrote in *United States v. Childs*,

4    5 F.3d 1328, at page 1334, a Ninth Circuit 1993 case:  "A

5    witness does not have to be the custodian of documents offered

6    into evidence to establish Rule 803(6)'s foundational

7    requirements.  The phrase 'other qualified witness' is broadly

8    interpreted to require only that the witness understand the

9    recordkeeping system.  A review of the record indicates that

10   the former employees were familiar with the contents and

11   preparation of the exhibits in question.  It was not an abuse

12   of discretion to allow the former employees to lay the

13   foundation for these exhibits."

14   "Rule 803(6) does not require that the records be created

15   by the business having custody of them.  In other words, even

16   a successor business representative could testify to the

17   foundation for a business record.

18   "And a qualified witness need not have personally

19   participated in the creation of the document nor know who

20   actually recorded the information.  All that is required of

21   the qualified witness is that he or she be familiar with the

22   recordkeeping procedures of the organization.  The qualified

23   witness must be able to testify that the record was kept in

24   the course of a regularly conducted business activity and also

25   that it was a regular practice of that business activity to

1  make the record."

2      That concludes -- oh, I'm sorry.

3      After the words "for these exhibits," it turns out the

4  case I was reading from was a Fourth Circuit case called

5  *General Insurance Company of America v. United States Fire*

6  *Insurance*, 886 F.3d 346 at 358.  That's a Fourth Circuit 2018

7  case.

8      I would also call to the parties' attention a case called

9  *Phoenix Associates*, 60 F.3d 95 at pages 101 to 102.  That's a

10 Second Circuit case from 1995.

11     In their totality these cases stand for the proposition

12 that it's fine that Mr. Eppler was not there at the time that

13 these records were created.  Although he did not use in his

14 testimony the magic word -- the magic words from the rule of

15 evidence itself, the court takes it as circumstantial evidence

16 that he -- that the record was kept in the course of regularly

17 conducted business activity and that it was a regular practice

18 of that business activity to make the record.

19     So for all those reasons, the Court overruled the hearsay

20 and foundation objections and received the evidence in

21 question.

22     Does anyone wish to be heard?

23         **MR. WALDINGER:**  No, Your Honor.

24         **MR. FAKHOURY:**  No, Your Honor.  Thank you.

25         **THE COURT:**  Thank you.  Let's be in recess.

| | |
|---|---|
| 1 | **THE CLERK:**  Court is in recess. |
| 2 | (Recess taken at 11:54 A.M.; proceedings resumed at |
| 3 | 12:10 P.M.) |
| 4 | (The following proceedings were heard in the presence of |
| 5 | the jury:) |
| 6 | **THE CLERK:**  You may be seated. |
| 7 | **THE COURT:**  All right.  Let's go back on the record. |
| 8 | All of our jurors are in their seats. |
| 9 | Mr. Eppler is still on the witness stand. |
| 10 | Mr. Fakhoury, questions for this witness? |
| 11 | **MR. FAKHOURY:**  Yes.  Thank you, Your Honor. |
| 12 | Just one second.  Let me get plugged in here. |
| 13 | **CROSS-EXAMINATION** |
| 14 | BY MR. FAKHOURY: |
| 15 | **Q.**  All right.  Good morning, Mr. Eppler.  Is it still |
| 16 | morning?  Or good afternoon, I guess.  Good afternoon. |
| 17 | **A.**  Good afternoon. |
| 18 | **Q.**  You testified that you started working for Rothenberg |
| 19 | Ventures in 2016, correct? |
| 20 | **A.**  Yes, that's correct. |
| 21 | **Q.**  And we've been primarily talking about events in the |
| 22 | summer of 2014, correct? |
| 23 | **A.**  Yes, that is correct. |
| 24 | **Q.**  Now, you weren't working -- obviously you weren't working |
| 25 | for Rothenberg Ventures in 2014, right? |

 1    **A.**   No, I was not.

 2    **Q.**   You weren't in the Rothenberg Ventures office in 2014,

 3    correct?

 4    **A.**   That is correct.

 5    **Q.**   You -- you had made mention to someone named Tom Leep, who

 6    was the director of finance at Rothenberg Ventures.

 7         You know who Mr. Leep is?

 8    **A.**   Yes.

 9    **Q.**   Okay.  We're going to get to the screen in a second.  I'm

10    sorry for putting that up there.  I don't have the fancy

11    software they have.  Okay?

12    **A.**   Understood.

13    **Q.**   Thank you.

14         You didn't know Mr. Leep in 2014, did you?

15    **A.**   No, I did not.

16    **Q.**   You didn't know Mr. Rothenberg in 2014, did you?

17    **A.**   No, I did not.

18    **Q.**   You didn't have any access to bank accounts pertaining to

19    Rothenberg Ventures in 2014, did you?

20    **A.**   No, I did not.

21    **Q.**   You didn't have access to the QuickBooks at that time in

22    2014, correct?

23    **A.**   No, I did not.

24    **Q.**   Okay.  Let's start -- let's talk a little bit about some

25    of the exhibits that we saw today.  And I'm primarily going to

```
 1    focus on some of the -- the -- I think I'm using

 2    Mr. Waldinger's words now -- complicated legal documents.

 3    Okay?

 4        So I'm showing you -- this is up here as Exhibit 12.  You

 5    see that on your screen?

 6    A.  Yes, I do.

 7                        (Exhibit published.)

 8    BY MR. FAKHOURY:

 9    Q.  Okay.  And this is the private offering memorandum for

10    Rothenberg Ventures Fund II, correct?

11    A.  Yes, it is.

12    Q.  And we've kind of been using a shorthand of Fund II to

13    refer to this -- this fund, right?

14    A.  Yes.

15    Q.  Okay.

16        Now, in 2014, Mr. Rothenberg was the manager of Rothenberg

17    Ventures Management Company, correct?

18    A.  Yes.

19            MR. FAKHOURY:  Mr. Torres, can you go to page 7 of

20    this exhibit.

21        And just scroll down.  We could zoom it up a little bit.

22    I want to look at this part (indicating).

23        Okay.  That's fine.  Thank you.

24                        (Exhibit published.)

25    / / /
```

 1    BY MR. FAKHOURY:

 2    Q.   So we talked a little bit -- or you talked with

 3    Mr. Waldinger a little bit about the way this was sort of

 4    structured.

 5         So the manager of Fund II is Rothenberg Ventures

 6    Management Company, right?

 7    A.   Yes.

 8    Q.   And the operator or the manager of the manager is

 9    Mr. Rothenberg, right?

10    A.   Yes.

11    Q.   And here in this little description, it explains that it's

12    Mr. Rothenberg who will make all final decisions regarding the

13    strategy, investments, and day-to-day operations of the fund,

14    right?

15    A.   Yes, that is correct.

16    Q.   Now, a little further down, I'm going to talk here

17    (indicating), the little biography of Mr. Rothenberg.  And I

18    think Mr. Waldinger asked you if everything in there sounded

19    about right to you.  And your testimony was that everything in

20    there is correct, right?

21    A.   Yes.

22    Q.   Okay.

23         It, you know, doesn't say that Mr. Rothenberg is an

24    attorney, right?

25    A.   That is correct.  It does not.

1   Q.   Now, you're the -- you're the current manager of

2   Rothenberg Ventures, right?

3   A.   Yes.

4   Q.   And you're also an attorney, right?

5   A.   I am.

6   Q.   Okay.

7                    (Pause in the proceedings.)

8   BY MR. FAKHOURY:

9   Q.   This document as a whole, this exhibit, this document was

10  written by some attorneys, correct?

11  A.   Yes.  I would anticipate that it was.

12  Q.   Okay.  Do you happen to know which attorneys wrote it?

13  It's okay if you don't.

14  A.   If I saw the -- the number on the bottom, I might be able

15  to identify the law firm.  But I do not know the attorney that

16  drafted it.

17  Q.   Okay.  That's all right.

18        MR. FAKHOURY:   Let's go to page 8 of this exhibit.

19  And let's look here at the "Management" part so --

20  (indicating).

21                    (Exhibit published.)

22  BY MR. FAKHOURY:

23  Q.   Okay.  Now, this section here, the "Management" part,

24  again restates that the fund is going to be managed by

25  Rothenberg Ventures Management Company, right?

1    **A.**   Yes.

2    **Q.**   And that the manager, which in this case is Rothenberg

3    Ventures Management Company, right?

4    **A.**   Yes.

5    **Q.**   Okay.  That it's nearly a hundred percent owned by

6    Mr. Rothenberg, right?

7    **A.**   Yes.

8          **MR. FAKHOURY:**  Okay.  Can you scroll down a little

9    bit, Mr. Torres.

10        Okay.

11                         (Exhibit published.)

12   **BY MR. FAKHOURY:**

13   **Q.**   Over here where it says "Capital Contributions," it

14   indicates that the manager will use the capital to make

15   investments in portfolio companies, right?

16   **A.**   Yes.  Less the management fee described below.

17   **Q.**   Okay.  And -- thank you for clarifying that.

18        And again, just so we're all on the same page, the manager

19   here is Rothenberg Ventures Management Company, right?

20   **A.**   Yes.

21   **Q.**   And the operator of that management company is

22   Mr. Rothenberg, right?

23   **A.**   Yes.

24          **MR. FAKHOURY:**  Okay.  Let's go to page 10 of this

25   exhibit.

1          Actually, can you scroll up a little bit -- oh, actually,

2     no, I'm sorry.  Go down here (indicating).

3          Okay.  Perfect.

4                         (Exhibit published.)

5     BY MR. FAKHOURY:

6     Q.   Here under "Expenses," and I know Mr. Waldinger talked to

7     you a little bit about this.  Again, this is making clear that

8     the manager -- and, again, the manager is Rothenberg Ventures

9     Management Company, right?

10    A.   Yes, it is.

11    Q.   That it will pay operating expenses, right?

12    A.   Its normal operating expenses, yes.

13    Q.   Correct.  And it will pay certain expenses for the fund,

14    right?

15    A.   Yes.

16    Q.   And which are listed down here, correct?

17    A.   Yes, sir.

18         MR. FAKHOURY:  Can we go to the top of the next page,

19    please.

20         Actually, I'm sorry, can you go back up a little bit.

21                         (Exhibit published.)

22    BY MR. FAKHOURY:

23    Q.   I'm going to try to have us look at kind of all of the

24    expenses.  They kind of spill over into two pages, okay?

25    A.   Um-hmm.

1  **Q.**  So up here it lists some of the examples of expenses,

2  right?

3  **A.**  Yes.

4  **Q.**  So it talks about compensation.  That's like salaries,

5  right?

6  **A.**  Yes.

7  **Q.**  Expenses for administrative clerical-related support

8  services, right?

9  **A.**  Yes.

10  **Q.**  Office space facilities?

11  **A.**  Yes.

12  **Q.**  Right?  Okay.

13       **MR. FAKHOURY:**  And then now we can go down to the

14  next page.

15                 (Exhibit published.)

16  **BY MR. FAKHOURY:**

17  **Q.**  Talks about telephones, normal operating expenses, right?

18  **A.**  That's correct.

19  **Q.**  Talks about filing fees, taxes, right?

20  **A.**  Yes.  That's correct.

21  **Q.**  And it makes clear that these expenses include certain

22  things without limitation, right?

23  **A.**  Yes.

24  **Q.**  And then down here at the end, it again indicates that the

25  fund will pay all other expenses including without limitation,

 1   and it lists a whole -- number of different items, right?

 2   **A.**   Yes.

 3   **Q.**   Okay.  So it's a pretty broad -- it's written pretty

 4   broadly, right?

 5   **A.**   Yes.

 6          **MR. FAKHOURY:**  Let's go to page 13 of this exhibit.

 7   Sorry.  The exhibit page 13.

 8       Oh, sorry.  Yes.  I'm sorry.  My fault.

 9       Okay.

10                       (Exhibit published.)

11   **BY MR. FAKHOURY:**

12   **Q.**   I wanted to show you this part right here (indicating).

13       Okay.  This part indicates that neither the manager, which

14   in this case would be Rothenberg Ventures Management Company,

15   right?

16   **A.**   Yes.

17   **Q.**   Okay.  Or the operator, that would be Mr. Rothenberg,

18   correct?

19   **A.**   Yes.

20   **Q.**   Has significant experience in managing a fund, right?

21   **A.**   Yes.

22   **Q.**   Now, you testified --

23       Sorry.  I'm just catching up on my notes here.  One

24   second.

25       Okay.  Now we've already established that Mr. Rothenberg

 1    is the operator of the management company, right?

 2    **A.**   Yes.

 3    **Q.**   And the management company sort of manages the funds of

 4    Fund II, right?

 5    **A.**   It does manage it, yes.

 6    **Q.**   Okay.

 7         Now, we've also established that Mr. Rothenberg is the

 8    owner of the management company, right?

 9    **A.**   Yes.

10    **Q.**   And, again, we're talking about in 2014, right?  So we're

11    not -- not today.  We're talking about in 2014, okay?

12    **A.**   Yes.

13    **Q.**   So as the owner of the management company, Mr. Rothenberg

14    could lend the management company money, correct?

15    **A.**   I would need to see the operating agreement for the

16    management company to verify any provisions with respect to

17    loans from its manager.

18    **Q.**   Okay.

19         Mr. Rothenberg could make distributions to himself from

20    the management company if he wanted to, right?

21    **A.**   Yes, he could.

22                        (Pause in the proceedings.)

23              **MR. FAKHOURY:**   Okay.  Let's go to Exhibit 94 now.

24    And let's go specifically to page 10.

25         And we're going to look right here at capital contribution

 1     of the manager (indicating).

 2                        (Exhibit published.)

 3     BY MR. FAKHOURY:

 4     Q.   Now, I believe you testified about this, that -- and

 5     actually let me back up a second.

 6          This -- this Exhibit 94, this is the operating agreement

 7     of Fund II, correct?

 8     A.   Yes, it is.

 9     Q.   Okay.  And in that operating agreement, it indicates that

10     Mr. Rothenberg was obligated to make a $100,000 capital

11     contribution into the fund, right?

12     A.   Yes, either individually or through Rothenberg Ventures

13     Management Company.

14     Q.   Okay.  And that amount is at least $100,000; right?

15     A.   Yes, at least.

16     Q.   So what that means is he's obligated to put $100,000;

17     right?

18     A.   Yes.

19     Q.   He could put more if he wanted to, right?

20     A.   Yes, he could.

21     Q.   It's up to him, right?

22     A.   That is correct.

23     Q.   And Mr. Waldinger showed you an exhibit -- I won't put it

24     up on the screen for the sake of time -- but with some bank

25     statements that showed a contribution from Mr. Rothenberg into

1   Fund II and on August 12th of 2014.  Do you recall that?

2   A.  Yes, I do.

3   Q.  Okay.  And that was a contribution of -- well, it was two

4   transactions, right?

5   A.  Yes.

6   Q.  There was a -- a $297,000 contribution, right?

7   A.  Yes.

8   Q.  And then there was a $103,000 contribution into Fund II as

9   well, right?

10  A.  That is correct.

11  Q.  And I guess it goes without saying, but let me just ask it

12  anyway.  The -- just like the -- the first exhibit I showed

13  you, Exhibit 12, was written by lawyers, this Exhibit 94 was

14  also written by lawyers, correct?

15  A.  Yes.

16  Q.  Okay.  Do you know -- do you happen to know which lawyers

17  wrote those?

18  A.  Having seen the -- I believe it was the law firm of

19  Orrick, Herrington & Sutcliffe, but I do not know the actual

20  attorneys that drafted it.

21  Q.  Okay.  But it was some lawyers from the -- from the Orrick

22  law firm?

23  A.  Yes.

24  Q.  Okay.

25      Let's jump to Exhibit 101 now.

 1                        (Exhibit published.)

 2   BY MR. FAKHOURY:

 3   Q.  I'm going to ask -- I'll start with the same question I

 4   just asked you.  And again -- actually, let me strike that.

 5       This is the -- an amended management agreement for

 6   Fund II, right?

 7   A.  Yes.

 8   Q.  And this was in place in the summer of 2014, correct?

 9   A.  Yes.

10   Q.  And just like the -- the other two documents I've shown

11   you, this too was written by lawyers, correct?

12   A.  Yes.

13   Q.  Was this written by lawyers from the Orrick law firm?

14   A.  I haven't seen the tag on it, but I can assume that they

15   were all drafted by the same law firm.

16   Q.  Okay.

17           MR. FAKHOURY:  And let's scroll down to the middle

18   here (indicating).

19                        (Exhibit published.)

20   BY MR. FAKHOURY:

21   Q.  And, again, this is --

22       Well, let's look at the section here that says "Payment of

23   Expenses," okay?

24                        (Exhibit published.)

25   / / /

 1    BY MR. FAKHOURY:

 2    **Q.** Now, it says "the management company" and, again, so we're

 3    all on the same page, that's Rothenberg Ventures Management

 4    Company, right?

 5    **A.** Yes.

 6    **Q.** And it talks about certain expenses that it agrees to

 7    incur, correct?

 8    **A.** Yes.

 9    **Q.** And, again, it's a pretty broad list, right?

10    **A.** Yes, it is.

11    **Q.** Okay.  Now towards the end of your --

12         **MR. FAKHOURY:**  You can take these down.

13    **Q.** Towards the end of your testimony with Mr. Waldinger, he

14    had asked you about some transfers of money that -- and he had

15    you take a look at some bank account statements, right?

16    **A.** Yes, he did.

17    **Q.** Okay.

18         And you testified that you weren't really sure what those

19    transfers were for, right?

20    **A.** That's roughly accurate, yes.

21    **Q.** Okay.

22         **MR. FAKHOURY:**  May I have a minute, Your Honor?

23         **THE COURT:**  Yes.

24              (Pause in the proceedings.)

25         **MR. FAKHOURY:**  I have no further questions.  Thank

 1    you.

 2            THE COURT:  Thank you.

 3        Mr. Waldinger, further questions for the witness?

 4            MR. WALDINGER:  Yes, a few, Your Honor.

 5                    **REDIRECT EXAMINATION**

 6            MR. WALDINGER:  Ms. Margen, can we put up

 7    Exhibit 125.

 8                    (Exhibit published.)

 9    BY MR. WALDINGER:

10    Q.  Mr. Eppler, do you recall this exhibit?

11    A.  Yes, I do.

12    Q.  Mr. Fakhoury asked you just general questions about

13    distributions of funds.  With respect to -- and when I say

14    distributions, I mean distributions of earnings.

15        Are any of the transactions that are listed here

16    memorialized in the books and records as distributions of

17    capital or carry or anything like that?

18    A.  No, none of those are.

19    Q.  You testified about the fact that the management company

20    was entitled to a certain amount of fees, correct?

21    A.  Yes.

22    Q.  Are any of the transactions that are listed in Exhibit 125

23    categorized in the books and records of the management company

24    as payment of management fees?

25    A.  They were not, no.

1   Q.   Is there a category in QuickBooks for management fees?

2   A.   Yes.   There's -- there was a -- the ability to memorialize

3   a payment as a payment of management fees.

4   Q.   Have you seen in the books and records of the management

5   company that entry being made when something is being

6   characterized as the payment of a management fee?

7   A.   Yes, I have.

8   Q.   Based -- and if you need to look at the document, we

9   can -- we can pull it up and pull it out of the binder for

10  you.   But I think your answer with respect to Mr. Fakhoury's

11  question about loans and whether the -- the fund could make a

12  loan to the management company was you'd have to look at the

13  management -- or the operating agreement; is that correct?

14  A.   Yes.

15  Q.   Are you aware of any provision in the operating agreement

16  allowing the fund to make a loan to the management company?

17  A.   Again, I'd have to refresh my recollection, but I do not

18  recall one from the fund to the management company.

19  Q.   Let me grab it for you because I think it will be easier

20  for you to look through it on a paper copy.

21  A.   Thank you.

22                     (Handing document.)

23            **MR. WALDINGER:**   I'm showing Mr. Eppler what's been

24  marked and admitted as United States Exhibit 94.

25  Q.   Could you remind the jury what that document is?

1    **A.**   Yes.   The title of the document is "First Amended and

2    Restated Operating Agreement of Rothenberg Ventures Fund II,

3    LLC."

4    **Q.**   And just in your review of that, take -- you know, take a

5    moment and let me know if there's a provision providing for

6    the fund to make a loan to the management company that you can

7    identify.

8    **A.**   (Reviewing document.)

9        I do not, in my review of the document, see a specific

10   provision related to loans made by the fund to the manager.

11           **MR. WALDINGER:**   And again if we could put Exhibit 125

12   up.

13                       (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**   None of the transactions that memorialize funds being

16   moved from Fund II to the management company are memorialized

17   in the books and records as a loan?

18   **A.**   No, they were not.

19   **Q.**   And in fact, with respect to the specific instances that

20   are referred to here, which is the $225,000 (indicating)

21   transfer, the $25,000 transfer, and the $75,000 transfer, each

22   of those was later returned in an equal amount to the fund

23   from the management company, correct?

24   **A.**   Yes.   They were.

25           **MR. WALDINGER:**   No further questions, Your Honor.

1   **THE COURT:**  Mr. Fakhoury, anything within the scope.

2   **MR. FAKHOURY:**  Very limited.

3   You can actually leave that exhibit up.

4   **THE CLERK:**  Oh, sorry.

5   **MR. FAKHOURY:**  No, that's okay.

6   <u>**RECROSS-EXAMINATION**</u>

7   (Exhibit published.)

8   BY MR. FAKHOURY:

9   **Q.**  Mr. Waldinger was asking you questions about this

10  QuickBooks excerpt, right?

11  **A.**  Yes.

12  **Q.**  And we've already established you were not at Rothenberg

13  Ventures in 2014, correct?

14  **A.**  That is correct.

15  **Q.**  That would be at the time these entries were made,

16  correct?

17  **A.**  Yes, that is correct.

18  **Q.**  These entries were made by Tom Leep, right?

19  **A.**  I don't have direct knowledge of who made the entries.

20  **Q.**  So you don't know who made these entries?

21  **A.**  That is correct.

22  **Q.**  You don't know what conversations took place before these

23  entries were made, correct?

24  **A.**  That is correct.

25  **MR. FAKHOURY:**  Nothing further.  Thank you.

 1              THE COURT:  Mr. Waldinger?

 2              MR. WALDINGER:  No further questions, Your Honor.

 3              THE COURT:  Mr. Eppler, thanks for your testimony.

 4     You're excused.

 5              THE WITNESS:  Thank you, Your Honor.

 6              THE COURT:  Government's next witness.

 7              MR. WALSH:  Your Honor, the United States calls

 8     Anthony Ghio, G-H-I-O.

 9              THE COURT:  All right.  Thanks.

10          Members of the jury, you can stretch even if I don't

11     extend that invitation when we get to these places between

12     witnesses.

13          Good afternoon, Mr. Ghio.

14              THE WITNESS:  Good afternoon.

15              THE COURT:  Sir, let me ask you to come up to this

16     area to my right.  You'll see my courtroom deputy is standing

17     up.  She's going to raise her right hand.  If you would face

18     her and raise your right hand, please.

19                            **ANTHONY GHIO**,

20     called as a witness by the plaintiff, having been duly sworn,

21     testified as follows:

22              THE WITNESS:  I do.

23              THE CLERK:  Thank you.

24          If you could please state and spell your last name for the

25     court reporter.

1          **THE WITNESS:**  It's Anthony Ghio, A-N-T-H-O-N-Y.  Last

2     name is G-H-I-O.

3          **THE CLERK:**  Thank you.  You can have a seat, sir.

4          **THE COURT:**  Mr. Ghio, my courtroom deputy is going to

5     hand you a clear mask.  Those are masks our witnesses are

6     using so that their expression is more visible.

7        There's a little protective film on there.  You can peel

8     that off if you want.  You don't have to.  And it's -- it has

9     two straps that go behind the head instead of over your ears.

10         **THE WITNESS:**  Oh, okay.

11         **THE COURT:**  Perfect.

12       Mr. Ghio, have you ever testified in a courtroom before?

13         **THE WITNESS:**  Yes.

14         **THE COURT:**  Okay.  Well, then I won't give you any

15    pointers.

16       Mr. Walsh, your witness.

17         **MR. WALSH:**  Thank you, Your Honor.

18                      **DIRECT EXAMINATION**

19    BY MR. WALSH:

20    **Q.**  Where do you work?

21    **A.**  Internal Revenue Service, Criminal Investigation.

22    **Q.**  And do you have a title there?

23    **A.**  Special Agent.

24    **Q.**  How long have you been with the IRS?

25    **A.**  Over 28 years.

GHIO - DIRECT / WALSH

1    **Q.**  We'll circle back to that, but where are you from?

2    **A.**  Oakland, California.

3    **Q.**  Did you go to college?

4    **A.**  Yes.

5    **Q.**  Where did you go to college?

6    **A.**  Cal State Hayward.

7    **Q.**  And what degrees did you earn there?

8    **A.**  I received a bachelor's of science in business

9    administration with an option in accounting.

10   **Q.**  What's an option?

11   **A.**  It's -- it's a concentration, it's a little bit more than

12   a minor.

13   **Q.**  And out of college, where'd you go to work?

14   **A.**  Internal Revenue Service.

15   **Q.**  Straight to the IRS?

16   **A.**  Yes.

17   **Q.**  When you started working at the IRS, what was your first

18   job there?

19   **A.**  I worked in taxpayer service.  The job title, I believe,

20   was data transcriber, but it didn't really describe the job

21   that well.

22   **Q.**  What is taxpayer service?

23   **A.**  It's where the IRS helps taxpayers, fields phone calls,

24   and things like that.

25   **Q.**  How long were you there?

1    **A.**   A little over a year.

2    **Q.**   Where'd you go next?

3    **A.**   I went to the examination division of the Internal Revenue

4    Service.

5    **Q.**   What's that division for?

6    **A.**   It's where the Internal Revenue Service audits

7    individuals, corporations, partnerships.

8    **Q.**   And is that what you were doing there in the examination

9    division?

10   **A.**   Yes.

11   **Q.**   Did you have a title there?

12   **A.**   Revenue agent.

13   **Q.**   And what does a revenue agent do exactly?

14   **A.**   They audit individuals, corporations, partnerships.

15   **Q.**   Did you, in order to get that job, have to go through any

16   sort of training?

17   **A.**   Yes.  There were four phases of training.  There was like

18   a two-part individual taxation, sole proprietorships, that

19   dealt a little bit with the employment taxes.  And then

20   corporate income tax.  And then the final phase was

21   partnerships.

22   **Q.**   How long were you there as a revenue agent in the

23   examination department?

24   **A.**   About three years.

25   **Q.**   At that point, where did you go?

1   **A.**   Internal Revenue Service criminal investigation.

2   **Q.**   And you might -- there's a microphone in front of you.

3   You might just scoot it a tad closer to you or scoot yourself

4   closer, either way.

5   **A.**   Okay.

6   **Q.**   And -- what is the Internal Revenue Service criminal

7   investigation?  What is that?

8   **A.**   It's the criminal function of the Internal Revenue Service

9   where we investigate people for United States Code Section

10   Title 26 having to do with income tax crimes; Title 18, money

11   laundering crimes; and then Title 31, monetary financial

12   transactions.

13   **Q.**   To become a Special Agent in the IRS CI, do you get any

14   training?

15   **A.**   Yes.  You go to the Federal Law Enforcement Training

16   Center in Glynco, Georgia for about a little over five months.

17   **Q.**   What do you learn there?

18   **A.**   It's a two-part training where you -- you learn about

19   firearms, defensive tactics.  There's a legal section that

20   goes over the federal code and that and just different aspects

21   of being a Special Agent.

22   **Q.**   Okay.  That's the first part there.  Is that done -- is

23   this -- you said it was the Federal Law Enforcement Training

24   Center.  Is it not just IRS Special Agents, but other Special

25   Agents in the federal government go there as well?

1    **A.**  Correct.  It's -- it's kind of changed over time, but

2    Secret Service goes -- there -- there's a criminal

3    investigator training program, that that's the first half of

4    the training of the five months.  And Secret Service goes

5    there.  It used to be Customs, now it's HSI.  Different

6    segments of Treasury.

7    **Q.**  And you said there was a second part to the training as

8    well.  What was that?

9    **A.**  That was the concentration in Internal Revenue Service,

10   investigating tax crimes, money laundering, monetary crimes,

11   and -- and that.

12   **Q.**  All right.  Once you completed that training, what was

13   your first assignment as a Special Agent with the IRS?

14   **A.**  I was assigned to San Jose, California as a Special Agent.

15   **Q.**  And how long were you in San Jose?

16   **A.**  For nine years.

17   **Q.**  What were you doing during those nine years in San Jose?

18   **A.**  Performing investigations of individuals for tax, money

19   laundering, and structuring-type crimes.

20   **Q.**  After those nine years, where did you head?

21   **A.**  To Oakland.

22   **Q.**  And what year approximately was that?

23   **A.**  2007.

24   **Q.**  Have you been in the Oakland office ever since?

25   **A.**  Yes.

1    **Q.**  And since 2007, what have your duties been in the Oakland

2    office as a Special Agent with IRS CI?

3    **A.**  The same, investigating tax, money laundering, and then

4    monetary transaction crimes.

5    **Q.**  All right.  Now, are you involved in the investigation of

6    Michael Rothenberg's cash-out mortgage refinance in 2014?

7    **A.**  Yes.

8    **Q.**  And what has your participation been in that

9    investigation?

10   **A.**  I participated in the investigation.  I reviewed

11   documents.

12   **Q.**  And are -- have you seen some charts that have been

13   prepared to summarize some complex financial transactions?

14   **A.**  Yes.

15   **Q.**  And do you believe that those would assist the jury in

16   understanding the various movements of money at different

17   times in this investigation?

18   **A.**  Yes.

19          **MR. WALSH:**  Your Honor, may we show just to Special

20   Agent Ghio a Demonstrative A.

21          **THE COURT:**  Yes.

22   (Demonstrative A published to witness, counsel, and the Court.)

23   **BY MR. WALSH:**

24   **Q.**  Is this Demonstrative A here one of the charts that you

25   have observed that you believe would be an assist to the jury

 1    in understanding a series of transactions?

 2    **A.**   Yes.

 3             **MR. WALSH:**   Your Honor, I propose to publish

 4    Demonstrative A to the jury for their use.

 5             **THE COURT:**   Is there any objection?

 6             **MR. FAKHOURY:**   To publication no, but not to

 7    admission.

 8             **THE COURT:**   All right.  Very good.

 9        Members of the jury, let me just read you a couple of

10    other instructions.  It will take me just a second to bring

11    these up.

12        There are two kinds of demonstrative exhibits.  You've

13    heard the lawyers use the word "demonstrative exhibits."

14        So earlier in the day there was a demonstrative exhibit

15    that was admitted into evidence.  It was in the nature of a

16    summary.  There may be other exhibits like that.

17        As to that exhibit, I will -- and any other exhibits that

18    are like that, I will read you the following instruction:

19        Certain charts and summaries have been admitted into

20    evidence.  Charts and summaries are only as good as the

21    underlying supporting material.  You should therefore give

22    them only such weight as you think the underlying material

23    deserves.

24        Counsel have agreed that you may see this demonstrative

25    exhibit.

1        And if you'd go ahead and publish it, please, Ms. Lee, to

2   everybody.

3               **THE CLERK:**  Yes, sir.

4                    (Exhibit published.)

5               **THE COURT:**  And it may be during the course of the

6   trial that the lawyers will show you demonstrative exhibits

7   that are just intended to illustrate a point but that will not

8   be admitted into evidence.

9        With regard to any exhibits like that, I would read you

10  the following instruction:  During the trial, certain charts

11  and summaries may be shown to you to help you explain --

12  excuse me -- to help explain the evidence in the case.

13       These charts and summaries will not be admitted into

14  evidence and will not go into the jury room with you.  They

15  are not themselves evidence or proof of any facts.  If they do

16  not correctly reflect the facts or figures shown by the

17  evidence in the case, you should disregard the charts and

18  summaries and determine the facts from the underlying

19  evidence.

20       Thanks.  Mr. Walsh, go ahead.

21               **MR. WALSH:**  Thank you, Your Honor.

22  **Q.**  Now, at a very high level, what is this chart explaining

23  or showing?

24  **A.**  It depicts monetary transactions between bank and

25  investment accounts.

1   **Q.**  And it's for a particular time period; is that right?

2   **A.**  Yes.  In June of 2014.

3   **Q.**  And there are on this chart, just so we're oriented,

4   there's a series of light blue boxes.  What do those generally

5   represent?

6   **A.**  Bank accounts and investment accounts.

7   **Q.**  And then there are additional series of boxes.  What do

8   those represent?

9   **A.**  Those represent the movement of -- of money between the

10  accounts.

11  **Q.**  Okay.  So, and this summarizes what a lot of bank

12  statements show; is that right?

13  **A.**  Correct.

14  **Q.**  Let's start and explain to the jury in order how all of

15  this comes together.  And if we can start with this first

16  June 17th transaction.  Do you see that there (indicating)?

17  **A.**  Yes.

18  **Q.**  That June 17th transaction, from which account to which

19  account is that money being transferred?

20  **A.**  It starts out in the Rothenberg Ventures Fund II

21  Silicon Valley Bank account number ending in 7483.

22      And then it goes to the Rothenberg Ventures Management

23  Company Silicon Valley Bank account number ending in 8931.

24  **Q.**  Okay.  Let's -- and for any such transfer, will there be

25  an entry on the outgoing and -- account and then a second one

 1    on the incoming bank statement?

 2    **A.**  Yes.

 3    **Q.**  All right.  So let's take a look at these.

 4        If you -- I'd like to now show you Exhibit 85 in evidence

 5    starting on page 24, please.

 6                        (Exhibit published.)

 7              **MR. WALSH:**  And if I may just have a moment, Your

 8    Honor?

 9              **THE COURT:**  Yes.

10              **MR. WALSH:**  Thank you, Your Honor.

11        Just take a moment here.

12                        (Exhibit published.)

13              **MR. WALSH:**  Two four.  I'm sorry.  If you can go to

14    page 24.  Okay.

15                        (Exhibit published.)

16    **BY MR. WALSH:**

17    **Q.**  Okay.  And on the right-hand side there is Exhibit 85,

18    page 24, do you see that?

19    **A.**  Yes.

20    **Q.**  Do you recognize that document?

21    **A.**  Yes.

22    **Q.**  What is that document?

23    **A.**  This is the Silicon Valley Bank statement for account

24    number 7483, which is the Rothenberg Ventures Fund II account

25    for June of 2014.

 1        **MR. WALSH:**  And if we could turn to page 27 now,

 2   please.

 3                    (Exhibit published.)

 4   **BY MR. WALSH:**

 5   **Q.**  And if we're focusing in on June 17th, this first

 6   transaction (indicating), is there a -- first of all, on

 7   page 27, what's being depicted in general on this page?

 8   **A.**  Account activity in the Silicon Valley Bank account number

 9   ending in 7483.

10        **MR. WALSH:**  And can we just blow up this little

11   section here (indicating).

12                    (Exhibit published.)

13   **BY MR. WALSH:**

14   **Q.**  Is there a debit on June 17th in the amount of $225,000?

15   **A.**  Yes.

16   **Q.**  What is the description of -- what is the date of that

17   transfer?

18   **A.**  June 17th, 2014.

19   **Q.**  And what is the description on this bank account?

20   **A.**  Book -- the description of the transaction?

21   **Q.**  Yes, I'm sorry.  I misspoke.  Yes.

22   **A.**  The -- it says book transfer debit to account ending in --

23   I'm sorry -- 8931.

24   **Q.**  It looks like you have the ability to make little marks as

25   well.

1    **A.**   Sorry.

2    **Q.**   So be careful.

3        Ending in 8931.  Are you familiar with the bank account

4    that ends with 8931?

5    **A.**   Yes.

6    **Q.**   What is that bank account?

7    **A.**   That's the Rothenberg Ventures Management Company account

8    at Silicon Valley Bank ending in 8931.

9    **Q.**   And what is the balance of the Fund II account at the end

10   of June 17th, 2014?

11   **A.**   $3,832.21.

12   **Q.**   All right.  If we can take down just the -- the bank

13   statement on the right-hand side.

14       And I'd now like to show you Exhibit 86 starting on

15   page 107 in evidence.

16       I think we've got to go to 86-107, not 007.

17                    (Exhibit published.)

18   **BY MR. WALSH:**

19   **Q.**   All right.  Now do you recognize this document?

20   **A.**   Yes.

21   **Q.**   What is it?

22   **A.**   This is Silicon Valley Bank account ending in 8931 for

23   Rothenberg Ventures Management Company for June of 2014.

24           **MR. WALSH:**  And if we could now focus in on page 111.

25                    (Exhibit published.)

 1  BY MR. WALSH:

 2  Q.  And in particular because we're focused here again on

 3  June 17th, let's go June 17th.  And is there a --

 4          MR. WALSH:  Do that little section there

 5  (indicating).

 6                      (Exhibit published.)

 7  BY MR. WALSH:

 8  Q.  And before you click zoom on this, what is being depicted

 9  on this page in general?

10  A.  Account activity for Silicon Valley Bank account ending in

11  8931 for June of 2014.

12          MR. WALSH:  Okay.  And if we could now do that zoom,

13  please.

14                      (Exhibit published.)

15  BY MR. WALSH:

16  Q.  And if we focus in on June 17th, do we see a $225,000

17  credit?

18  A.  Yes.

19  Q.  And what is the description of that transfer in this bank

20  account?

21  A.  Book transfer credit from account ending in 7483.

22  Q.  All right.  And although we haven't quite blown it up,

23  what was the balance before that transfer in this account?

24          MR. WALSH:  We might have to shrink it out so he can

25  take a look?

 1              **THE WITNESS:**  I can -- I can see it.

 2    BY MR. WALSH:

 3    **Q.**  You can read it?

 4    **A.**  Yeah.

 5    **Q.**  Okay.  What is it?

 6    **A.**  It's $111,146.19.

 7    **Q.**  And then after that transfer, what was the balance in the

 8    account?

 9    **A.**  $336,146.19.

10    **Q.**  All right.

11              **MR. WALSH:**  Now, if we could dezoom that, please.

12                        (Exhibit published.)

13    BY MR. WALSH:

14    **Q.**  Does that now -- have we now just walked through for

15    Demonstrative A and shown the outgoing bank statement and the

16    incoming bank statement for that transaction?

17    **A.**  Yes.

18    **Q.**  Let's turn to the next June 17th transaction.

19        Again, there should be an outgoing and an incoming; is

20    that right?

21    **A.**  Yes.

22    **Q.**  And let's start here on this same page that we're

23    currently at.  Is this that same June statement for the

24    Rothenberg Ventures Management Company account?

25    **A.**  Yes.

 1            MR. WALSH:   And if we focus here on page 111 of

 2    Exhibit 86, and in particular, focus in on the middle of the

 3    page for June 17th there.

 4                        (Exhibit published.)

 5    BY MR. WALSH:

 6    Q.   Is there a transaction on June 17th of a large debit?

 7    A.   Yes.

 8    Q.   And what is the amount of that debit?

 9    A.   $310,000.

10    Q.   What is indicated in the description section of what that

11    debit was?

12    A.   It's a wire out, and then it gives a code and then it

13    gives kind of a date code and then it says beneficiary Michael

14    Rothenberg.

15            MR. WALSH:   Okay.  And if we could zoom out of that.

16                        (Exhibit published.)

17    BY MR. WALSH:

18    Q.   That will be going into a second account here.  What

19    account would that be?

20    A.   That's Michael Rothenberg's personal Bank of America

21    account ending in 2573.

22            MR. WALSH:   If we could pull up Exhibit 72, please,

23    and on page 41.

24        Sorry.

25                        (Exhibit published.)

1    **BY MR. WALSH:**

2    **Q.**   Do you recognize this document?

3    **A.**   Yes.

4    **Q.**   What is this document?

5    **A.**   This is Bank of America account ending in 2573 for Michael

6    Rothenberg.

7    **Q.**   What is the date range for this particular bank statement?

8    **A.**   From May 22nd, 2014, through June 20th, 2014.

9    **Q.**   And before we get off of this page, what's the account

10   balance at the beginning of the month there?

11   **A.**   $10,395.06.

12   **Q.**   And what is the ending -- it's not really the month but of

13   this period statement?

14   **A.**   $13,735.37.

15   **Q.**   All right.  I'd like to turn your attention to page 43 of

16   this statement.

17                         (Exhibit published.)

18   **BY MR. WALSH:**

19   **Q.**   And before we zoom anything, what is being depicted in

20   general on page 43 of this exhibit?

21   **A.**   Deposits and other additions to the Bank of America

22   account ending in 2573.

23   **Q.**   And again, we're focused on June 17th.

24            **MR. WALSH:**   So if we could blow up the June 17th area

25   here.

1                         (Exhibit published.)

2     BY MR. WALSH:

3     Q.   Do you see a transaction of a deposit or other addition on

4     June 17th of 2014?

5     A.   Yes.

6     Q.   What is the amount of that deposit?

7     A.   $310,000.

8     Q.   And what is the description on this bank account for the

9     source of that?

10    A.   It goes through, it says it's a wire in, it gives the

11    date, time, transaction number, sequence number.  Then it says

12    originator Rothenberg Ventures management.  And then it gives

13    an ID number that the last four is 8931.  And then it says

14    sending bank, Silicon Valley Bank, and then it has a number.

15             MR. WALSH:  Okay, and so we can zoom out of that,

16    please.

17        And if we could close that out and you go back to

18    Demonstrative A.

19                      (Demonstrative published.)

20    BY MR. WALSH:

21    Q.   And have we now just described the outgoing and incoming

22    transactions, bank statements for that June 17th transfer of

23    $310,000?

24    A.   Yes.

25    Q.   Let's turn to the next transaction.  And between what two

 1   accounts is that going to be from?

 2   **A.**  It's going from Michael Rothenberg's Bank of America

 3   account ending in 2573 to Michael Rothenberg's Merrill Lynch

 4   Cash Management Account ending in 6052.

 5   **Q.**  All right.  And in the first document would be the

 6   outgoing bank.

 7           **MR. WALSH:**  So could we turn to Exhibit 72, starting

 8   on page 41.

 9                    (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**  And this is a document we were just looking at; is that

12   right?

13   **A.**  Yes.

14   **Q.**  And it's -- what is it?

15   **A.**  It's Michael Rothenberg's Bank of America account ending

16   in 2573.

17   **Q.**  And for what statement period is it?

18   **A.**  From May 22nd, 2014, through June 20th, 2014.

19           **MR. WALSH:**  If we could now turn to page 45 of this

20   exhibit.

21                    (Exhibit published.)

22   **BY MR. WALSH:**

23   **Q.**  And on the top half of this page, what is, in general,

24   being described in this bank statement?

25   **A.**  Withdrawals and substractions from the Bank of America

 1   account ending in 2573.

 2   **Q.**   All right.  And I'd like to focus in here on June 18th.

 3          **MR. WALSH:**   Right there (indicating), if we could

 4   blow that up.

 5                         (Exhibit published.)

 6   **BY MR. WALSH:**

 7   **Q.**   Is there a large withdrawal or other subtraction on

 8   June 18th of 2014?

 9   **A.**   Yes.

10   **Q.**   And what amount is that?

11   **A.**   $370,000.

12   **Q.**   What is the description on this bank statement of what

13   that transaction was?

14   **A.**   It's wire type bookout, it gives date, time, transaction

15   number, related reference number.  Then it says beneficiary

16   Merrill Lynch, and gives an ID number.  And then farther down

17   it's payment, and then at the very end right there, it's the

18   6052 account.  And then it says below that Michael Rothenberg

19   Merrill Lynch.

20          **MR. WALSH:**   All right.  If we could dezoom that and

21   pull up Exhibit 50 in evidence.

22       And in particular starting on page 1.

23                         (Exhibit published.)

24   **BY MR. WALSH:**

25   **Q.**   Do you recognize this document?

1    **A.**   Yes.

2    **Q.**   What is this document?

3    **A.**   This is Merrill Lynch account number ending in 6052.  It's

4    the Cash Management Account for Michael Rothenberg.

5    **Q.**   And for what time period is this statement?

6    **A.**   From May 31st, 2014 through June 30th, 2014.

7    **Q.**   And while we're on this page, was there a balance on

8    May 30th or 31st of 2014 on this account?

9    **A.**   No.

10   **Q.**   So it was zero?

11   **A.**   Zero.

12   **Q.**   And at the end of this period, June 30th, what is the

13   account balance?

14   **A.**   $370,015.20.

15   **Q.**   Now, I'd like to turn your attention in this exhibit to

16   page 3.

17                        (Exhibit published.)

18   **BY MR. WALSH:**

19   **Q.**   And just in general, what is being described here in this

20   central section?

21   **A.**   These are transactions within the account.  And

22   specifically in the middle, it says cash and other

23   transactions.

24   **Q.**   And since we're focused on June 18th, let's --

25            **MR. WALSH:**  If we could blow up the June 18th

1    transaction here.

2                              (Exhibit published.)

3    BY MR. WALSH:

4    Q.   Is there a transaction on June 18th?

5    A.   Yes.

6    Q.   And what type of transaction is it?

7    A.   It's a -- it's a deposit into the account in the amount of

8    $370,000.

9    Q.   And under the description, what is indicated?

10   A.   Well, it's -- it's kind of cut off with the way --

11   Q.   Okay.  If we want to --

12            MR. WALSH:  We could just briefly --

13            THE WITNESS:  I can -- I can read it from here.

14   BY MR. WALSH:

15   Q.   Well, but the jurors can't see it.  So let's make sure.

16                              (Exhibit published.)

17            MR. WALSH:  Thank you.

18   Q.   So again, we're just focused on the --

19   A.   June 18.

20   Q.   -- the June 18th portion.  What does it indicate in the

21   description?

22   A.   So it's a wire transfer into the 6052 account, originator,

23   the end part is the account ending in 2573, Michael Roth -- or

24   let's just say it's partially Michael.

25            MR. WALSH:  All right.  If we could zoom out of 50

1    here, please.

2    Q.  And have we now just described the in -- or the outgoing

3    and the incoming transactions as reflected on the bank

4    statements for those two accounts?

5    A.  Yes.

6    Q.  Let's go the next transaction right down here on

7    Exhibit -- on Demonstrative A which is a June 20th

8    transaction.  This one's a little funkier than the prior ones;

9    is that right?

10   A.  Correct.

11   Q.  And why is that?

12   A.  Because it -- the money goes out of the 6052 account and

13   then is replenished by the line of credit, the LMA account

14   6054.

15   Q.  Okay.  So let's focus in then on Exhibit 50 here.  And

16   we're already -- this is the same exhibit we were looking at.

17   That's the Cash Management Account of Michael Rothenberg for

18   the month of June 2014?

19   A.  Correct.

20       MR. WALSH:  And if we could focus in and blow up this

21   portion here (indicating).

22                    (Exhibit published.)

23   BY MR. WALSH:

24   Q.  Is there a June 20th, because that's the date we're

25   looking at, is there a June 20th wire transfer on this account

1  statement?

2  **A.**   Yes.

3  **Q.**   And in what amount?

4  **A.**   $350,000.

5  **Q.**   And additionally, as you were saying before, is there a

6  second entry on this Cash Management Account statement that

7  day?

8  **A.**   Yes.

9  **Q.**   And what is that description?

10  **A.**   It's an LMA loan advance in the amount of 350,000.  It's

11  deposited into this account.  The 6052 account.

12         **MR. WALSH:**  Okay.  If we could zoom out of that.

13  **Q.**   And I'd like to turn your attention to Exhibit 47 starting

14  on page 1.

15                  (Exhibit published.)

16  **BY MR. WALSH:**

17  **Q.**   Do you recognize this statement?

18  **A.**   Yes.

19  **Q.**   What is it?

20  **A.**   It's the Merrill Lynch account ending in 6054, the -- it's

21  a Loan Management Account for Michael Rothenberg.

22         **MR. WALSH:**  And if we -- I think we need to blow it

23  up so we can see it a little better, please.

24                  (Exhibit published.)

25  / / /

1    BY MR. WALSH:

2    Q.   And is there an open monthly -- opening monthly loan

3    balance on this account?

4    A.   Well, it's zero.

5    Q.   And -- and is there a closing month loan balance on this

6    account?

7    A.   Yes.

8    Q.   What is it?

9    A.   $350,000.

10   Q.   If we could turn to page 2 of this statement.

11        Oh, and I think we did not quite do, but what is the time

12   period for this LMA account?

13   A.   It's May 31st, 2014, through June 30th, 2014.

14        MR. WALSH:   If we could go to page 2, please.

15        And let's just blow up the --

16                    (Exhibit published.)

17   BY MR. WALSH:

18   Q.   If we focus in on the effective date of June 20th, is

19   there a loan advance indicated on this sheet?

20   A.   Yes.

21   Q.   And in what amount is that?

22   A.   $350,000.

23   Q.   And does that also reflect later with a transaction detail

24   of June 23rd?

25   A.   Yes.

1    **Q.**  All right.  Now let's turn --

2            **MR. WALSH:**  If we can zoom out of that.

3    **Q.**  And we've done this side of the transaction that we're

4    doing.  Let's turn to the incoming side, which is what

5    account?

6    **A.**  It's the Bank of America account ending in 2573 in the

7    name of Michael Rothenberg.

8                       (Exhibit published.)

9    **BY MR. WALSH:**

10   **Q.**  And I'd like to turn your attention to Exhibit 72 starting

11   on page 41 in evidence.

12                      (Exhibit published.)

13   **BY MR. WALSH:**

14   **Q.**  Do you recognize this document?

15   **A.**  Yes.

16   **Q.**  And is this the same bank statement we've been discussing

17   earlier with the jury?

18   **A.**  Yes.

19   **Q.**  Bank of America.  And just so we're all clear, who's it

20   for?

21   **A.**  Michael Rothenberg.

22   **Q.**  And what is the time period?

23   **A.**  May 22nd, 2014 through June 20th, 2014.

24   **Q.**  And what are the last four of the account?

25   **A.**  2573.

 1    **Q.**  And if we could turn, in particular, to page 43 of this

 2    exhibit.

 3                              (Exhibit published.)

 4    **BY MR. WALSH:**

 5    **Q.**  What, before we blow anything up, in general is being

 6    depicted on this page?

 7    **A.**  Deposits and other additions.

 8              **MR. WALSH:**  And if we could blow up this last portion

 9    here (indicating).

10                              (Exhibit published.)

11    **BY MR. WALSH:**

12    **Q.**  Is there a deposit or other addition on June 20th of 2014?

13    **A.**  Yes.

14    **Q.**  In what amount?

15    **A.**  $350,000.

16    **Q.**  What is the description of that deposits or other

17    addition?

18    **A.**  It's wire type book in, gives the date, time, transaction

19    number, sequence, and then it says originator Michael

20    Rothenberg.  And then it says -- it has the 6052 there, and

21    then it says Merrill Lynch and Company, from the originating

22    bank.

23              **MR. WALSH:**  All right.  If we could dezoom that,

24    please.

25    **Q.**  And so now we have shown the incoming and outgoing of this

 1    box here on Demonstrative A; is that right?

 2    **A.**   Yes.

 3    **Q.**   Let's just keep trucking along.  If we move to June 20th,

 4    this red box here in the center on the bottom, is that another

 5    transaction?

 6    **A.**   Yes.

 7    **Q.**   From what account to what account?

 8    **A.**   From the Bank of America account ending in 2573 to Michael

 9    Rothenberg account to the Silicon Valley Bank account ending

10    in 8931, the Rothenberg Ventures Management Company account.

11    **Q.**   Now, fortunately, we can keep up Exhibit 72 here, on

12    page 72, which is the Michael Rothenberg's 2573 account; is

13    that right?

14    **A.**   Yes.

15    **Q.**   And if we could go to page 45 of that exhibit.

16                       (Exhibit published.)

17    **BY MR. WALSH:**

18    **Q.**   On this account statement, what is being depicted on the

19    top portion here, in general?

20    **A.**   Withdrawals and other subtractions.

21    **Q.**   And in particular we're interested in June 20th.

22            **MR. WALSH:**   So if we could blow up the portion of

23    withdrawals and other subtractions for --

24                       (Exhibit published.)

25    / / /

GHIO - DIRECT / WALSH

BY MR. WALSH:

**Q.**  Is there a large withdrawal or other subtraction on June 20th of 2014?

**A.**  Yes.

**Q.**  And in what amount is that?

**A.**  $310,000.

**Q.**  And what is the description of the withdrawal or other subtractions on this Bank of America bank statement?

**A.**  It's a wire type -- wire out, gives the date, time, transaction number, service reference number.  Then it says beneficiary Rothenberg Ventures Management.  And then it gives the ID number which is the last four ending in 8931.

And the beneficiary bank of Silicon Valley Bank, and then it goes through and gives some other ID stuff.

**Q.**  And I think we said, but I've forgotten at this precise moment, what's the amount again?

**A.**  $310,000.

**Q.**  Let's turn to the incoming side of this transaction.

**MR. WALSH:**  And if we could dezoom there and pull out Exhibit 86 starting on page 107.

(Exhibit published.)

BY MR. WALSH:

**Q.**  Do you recognize this document?

**A.**  Yes.

**Q.**  What is this document?

1   **A.**   This is the bank statement for Silicon Valley Bank account

2   number ending in 8931, Rothenberg Ventures Management Company,

3   for June of 2014.

4          **MR. WALSH:**   And in particular, if we could focus in

5   on page 111 of Exhibit 86.

6       And because we're focusing here on June 20th, let's blow

7   up the lower portion here that includes June 20th.

8                    (Exhibit published.)

9   **BY MR. WALSH:**

10   **Q.**   And in general, on this page what's being depicted?

11   **A.**   Transactions within the account.

12   **Q.**   And in particular, I'd like to draw your attention to a

13   large deposit into this account on June 20th of 2014.  Do you

14   see that?

15   **A.**   Yes.

16   **Q.**   In what amount was that deposit?

17   **A.**   $310,000.

18   **Q.**   And what is the description on this Silicon Valley Bank

19   statement of what that deposit was?

20   **A.**   It's a wire in, gives a -- what appears to be a date code

21   going in farther, and then again -- then it says originator,

22   Michael Brent Rothenberg, and gives a reference number.

23          **MR. WALSH:**   Okay.  If we dezoom that, please.

24   **Q.**   And just by way of reference, the day before June 20th,

25   what was the account balance in this particular account?

1   **A.**   $26,261.42.

2   **Q.**   Okay.  Have we now described both the outgoing and

3   incoming bank statements for this June 20th transaction of

4   $310,000?

5   **A.**   Yes.

6   **Q.**   Let's go to our last but -- actually it is our least.  No.

7   Both last and least in terms of dollar figures, the

8   transaction here in the bottom right corner -- or left corner,

9   on June 20th.

10                        (Exhibit published.)

11  **BY MR. WALSH:**

12  **Q.**   And in particular, I'd like to focus on the bank from out

13  of which that money is coming.  Is that Silicon Valley Bank

14  statement ending in -- account ending in 8931?

15  **A.**   Yes.

16  **Q.**   Fortunately we're on the correct page here in Exhibit 86,

17  111, and I'd like to focus in on again June 20th because

18  that's our time frame that we're looking at here, June 20th.

19                        (Exhibit published.)

20  **BY MR. WALSH:**

21  **Q.**   Is there a large outgoing debit on that day?

22  **A.**   Yes.

23  **Q.**   In what amount?

24  **A.**   $225,000.

25  **Q.**   And what is the description of that debit on the bank

1   statement?

2   A.   Book transfer debit to account, and then ending in 7483.

3   Q.   Are you familiar with the 7483 account?

4   A.   Yes.

5   Q.   What is that account?

6   A.   That's the Rothenberg Ventures Fund II Silicon Valley Bank

7   account.

8          MR. WALSH:   All right.  If we could dezoom that and

9   pull up Exhibit 85 starting on page 24.

10                     (Exhibit published.)

11  BY MR. WALSH:

12  Q.   Do you recognize this document?

13  A.   Yes.

14  Q.   What is this document?

15  A.   It is the bank statement for Silicon Valley Bank account

16  number ending in 7483, Rothenberg Ventures Fund II, for June

17  of 2014.

18  Q.   And in particular, I'd like to turn your attention to

19  page 27 of this exhibit.

20                     (Exhibit published.)

21  BY MR. WALSH:

22  Q.   What, before we zoom anything, is being depicted in

23  general on this page?

24  A.   Account activity for the Silicon Valley Bank account

25  number ending in 7483.

 1              **MR. WALSH:**  And because we're interested in

 2     particular on June 20th, could we blow up that section there,

 3     please (indicating).

 4                         (Exhibit published.)

 5     BY MR. WALSH:

 6     **Q.**  All right.  And do you see a large credit on June 20th of

 7     2014?

 8     **A.**  Yes.

 9     **Q.**  In what amount?

10     **A.**  $225,000.

11     **Q.**  And what is the description of that credit?

12     **A.**  It's a book transfer credit from account ending in 8931.

13     **Q.**  Okay.

14         And the -- before --

15              **MR. WALSH:**  We could zoom out of that.

16     **Q.**  What was the balance in the Fund II account before it

17     received that $225,000 deposit?

18     **A.**  $3,832.21.

19     **Q.**  Okay.  Have we now described and shown the jury bank

20     statements for each and every one of these transactions on

21     Demonstrative A?

22     **A.**  Yes.

23              **MR. WALSH:**  Your Honor, I am about to engage in

24     similar endeavor, but I don't think I'm going to end, I'm not

25     going to finish.  And I'm wondering whether this might be a

1    good time to break today so that it's presented as a whole on

2    Monday.

3           **THE COURT:**  I see.

4        Let me see counsel at sidebar for just a second.

5                    (Sidebar off the record.)

6           **THE COURT:**  All right.  Let's go back on the record.

7        I'm going to grant the government's request to be done a

8    few minutes early.  We have some work to do outside your

9    presence anyway.  So it just makes it easier for us to do

10   that.

11       As you've now heard me already say twice, we're not going

12   to be in session this week on Wednesday and Thursday.  So

13   we'll be coming back together next week on Monday.

14       It is still my expectation that at some point on Monday,

15   the evidence in this case will conclude.  I think it is likely

16   that I will also instruct you on the law on that date.  And

17   whether we actually get to opening statements [sic] or not, I

18   don't know.  These are not promises.  Underpromise and

19   overdeliver, that's my motto.

20       So I'm standing firm with my estimate that this could go

21   until the Tuesday before Thanksgiving, but I have to say as I

22   sit here now that doesn't look very likely.  So the

23   information that I have at the moment is what I gave you.  And

24   if I am -- if that prediction turns out to be true, then you

25   would have this case, meaning you would be deliberating to try

1    to reach a verdict, sometime on Tuesday of next week.

2        I continue to be so grateful for your service in this case

3    and your close attention.  I hope you have a great weekend.  I

4    hope that you can take these couple of additional days and

5    spend them with your family or get some work done.

6        Remember my prior admonitions.  We are still waiting for

7    all the evidence to come in.  So we can't make up our mind

8    about anything.  We have to resist the temptation to look

9    anything up on the Internet or anywhere else or talk to

10   anybody about the case.

11       Have a restful few days.  I'll see everyone Monday morning

12   at 8:30.

13           **THE CLERK:**  Please rise for the jury.

14       (The following proceedings were heard out of the presence

15   of the jury:)

16           **THE COURT:**  I'm just waiting for the sound of that

17   door to close.  Is it closed?

18           **THE MARSHAL:**  Closed, Your Honor.

19           **THE COURT:**  There we go.  Very good.

20       Mr. Ghio, you can step down if you like.  You'll be back

21   on the stand next week on Monday morning.

22       I just wanted to let counsel know that one of the reasons

23   I've been typing so furiously up here this morning is I have

24   now prepared a set of jury instructions to give you.  I am

25   hoping to be able to circulate those to you.  I'll file them

1    on the docket as proposed instructions.

2         And I would just ask that by 5:00 o'clock tomorrow, you,

3    A, file whatever you need to regarding any additional

4    instructions that you think you need, including the negligence

5    instruction that the government was talking about earlier.

6    And, B, just let me know if there are any mistakes or missing

7    items or instructions out of order or anything like that in

8    the set that I circulate tonight.

9         I will then review all that information and be prepared to

10   discuss the issue further with you, whatever issues we have on

11   Thursday.

12        If the parties realize at the end of the day tomorrow that

13   they don't need a hearing on Thursday because the government

14   has decided that it's not going to be proposing an instruction

15   or the parties agree on whatever changes need to be made, if

16   you could just include that in whatever you file, I would

17   appreciate it and I can take that hearing off calendar.

18             **MR. WALDINGER:**  We will, Your Honor.

19             **THE COURT:**  I went back and looked at the proposed

20   verdict form that had been filed by the government.  Verdict

21   forms in a criminal case generally are so anodyne as to not be

22   able to bear the weight of any discussion.  And the

23   government's verdict form looked like every other verdict form

24   I've ever seen in a criminal case.

25        But I don't know, Mr. Fakhoury, if you want to let me know

1    now if you have any comments regarding that verdict form.  If

2    not, you could also just file those by the end of day

3    tomorrow, as you like.

4           **MR. FAKHOURY:**  Thank you.  I'll -- let me think about

5    it.  I -- the only issue, and I'll just flag it, is just as to

6    the specific unanimity piece that I had thought of proposing

7    something.  But I don't have anything put in place yet.  So I

8    can -- we can include it when we meet and confer, and if I

9    need to file something, I will.  And if I don't, we'll include

10    that in the status we send with the Court.

11           **THE COURT:**  Terrific.  I didn't see any other

12    disputes between the parties that were not resolved by the

13    Court's prior jury instruction order.  So as I sit here now, I

14    believe the only potential disputes are this negligence

15    instruction and maybe something about the verdict form.

16           **MR. WALDINGER:**  That's what I conceive of.

17    Your Honor, the parties, as will happen, we all missed a

18    typo, and we can give you that now in the instructions if you

19    want to fix that.

20    We changed the form instruction.

21           **THE COURT:**  Give me just one moment.  Give me one

22    moment, please.

23    Yes, okay.  I have the instructions in front of me now.

24           **MR. WALDINGER:**  We changed the form instruction based

25    on Ninth Circuit law to say "deceive and cheat" in most places

 1   except one.  And it still says "deceive or cheat" in one

 2   place.

 3           **THE COURT:**  Yes, it does.

 4           **MR. WALDINGER:**  And we need to fix that.

 5           **THE COURT:**  I have.

 6           **MR. WALDINGER:**  Very good.  One less thing to fix.

 7      It's amazing how many typos get past numerous sets of

 8   eyes, and then you look at it and it pops right out at you a

 9   week later.

10           **THE COURT:**  I think it's not an exaggeration to say

11   that I've probably tried a hundred jury trials.  I mean

12   something in that -- could be more, could be less.  I have

13   never ever instructed a jury from beginning to end without

14   finding at least some little typo in the instructions.  So it

15   happens.

16      All right.  Very good.  Anything else for the record

17   today?

18           **MR. WALDINGER:**  I don't think so, Your Honor.

19           **MR. FAKHOURY:**  No, Your Honor.

20           **THE COURT:**  All right.  Thanks.  Enjoy your days off.

21   We'll see everybody on Monday.

22           **MR. FAKHOURY:**  Thank you, Your Honor.

23           **THE COURT:**  And maybe I'll see counsel on Thursday.

24      Court's in recess.

25           **MR. WALDINGER:**  Thank you, Your Honor.

1          **THE CLERK:**  Court is in recess.

2          (Proceedings were concluded at 1:25 P.M.)

3                      --o0o--

4

5

6              **CERTIFICATE OF REPORTER**

7

8          I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10   I further certify that I am neither counsel for, related to,

11   nor employed by any of the parties to the action in which this

12   hearing was taken, and further that I am not financially nor

13   otherwise interested in the outcome of the action.

14

15   _____

16        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

17              Tuesday, November 8, 2022

18

19

20

21

22

23

24

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*