**ORIGINAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 8** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 1224 - 1419 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, November 14, 2022 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:          STEPHANIE M. HINDS, ESQ.
                        United States Attorney
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:          Moeel Lah Fakhoury LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612-1427
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1

## I N D E X

2

3  **GOVERNMENT'S WITNESSES**                              **PAGE**    **VOL.**

4  GHIO, ANTHONY

5  DIRECT EXAM (CONT'D.) BY MR. WALSH          1230        8

6  CROSS-EXAMINATION BY MR. FAKHOURY           1262        8

7

8  KREPPEL, FREDERICK

9  DIRECT EXAMINATION BY MR. WALDINGER         1286        8

10  CROSS-EXAMINATION BY MR. FAKHOURY           1352        8

11  REDIRECT EXAMINATION BY MR. WALDINGER       1403        8

12  RECROSS-EXAMINATION BY MR. FAKHOURY         1409        8

13

14

15                          --o0o--

16

17

18

19

20

21

22

23

24

25

```
 1   Monday, November 14, 2022                              8:03 a.m.

 2                      P R O C E E D I N G S

 3                           --o0o--

 4      (The following proceedings were heard out of the presence

 5   of the jury:)

 6           THE CLERK:  Your Honor, now calling criminal matter

 7   20-266, United States v. Michael Brent Rothenberg.

 8      If counsel could please state their appearances for the

 9   record, starting with the government.

10           MR. WALDINGER:  Good morning, Your Honor.  Kyle

11   Waldinger and Nicholas Walsh on behalf of the United States.

12           MR. FAKHOURY:  Good morning, Your Honor.  Hanni

13   Fakhoury on behalf of Mr. Rothenberg.  He's present, Your

14   Honor.

15           THE COURT:  Good morning.  Good morning also to

16   Ms. Margen and Ms. Barnard and Mr. Torres.

17      Gentlemen, what do we have to discuss?  Mr. Fakhoury.

18           MR. FAKHOURY:  You know, the only thing, Your Honor,

19   and I talked to Mr. Waldinger and Mr. Walsh about it and they

20   don't have any issue with it, is I was going to ask if the

21   Court could give the limiting instruction before Agent Ghio

22   resumes his testimony just because it's been a couple days

23   since the jury heard it.  And beyond that, I have nothing else

24   to add.

25           THE COURT:  Mr. Waldinger, any objection?
```

1      **MR. WALDINGER:**  No objection, Your Honor.

2          **THE COURT:**  The Court will do that.

3      It's also a reminder for me to make sure that that

4  instruction made its way into the final set we'll be

5  distributing.  So I'll do that when I get off the bench.

6      Mr. Waldinger, anything to discuss from the government's

7  perspective?

8          **MR. WALDINGER:**  I don't believe so, Your Honor.

9          **THE COURT:**  What is your current estimate, making a

10  generous assumption about cross-examination, as to when the

11  government will conclude its case?

12          **MR. WALDINGER:**  I think we perhaps have another hour

13  with Agent Ghio.  Then we have one last witness.  It's

14  Mr. Frederick, or Buzz, Kreppel.  And I'm hoping to finish

15  direct in an hour and a half or less with Mr. Kreppel.  So I

16  think that we should be resting today.

17          **THE COURT:**  Okay.  It sounds like there might be

18  room -- it depends -- there could be room for instruction

19  also.

20      Last week, I invited the parties to discuss what the

21  timing of closing arguments would be.  Have the parties had

22  that discussion?

23          **MR. WALDINGER:**  I -- I think in concept we

24  anticipated doing it on Tuesday morning.

25          **THE COURT:**  Okay.

1    Well, we're going to have two and a half hours of direct
2    testimony today plus cross-examination plus instruction so
3    that probably makes sense.
4        Fine.  All right.  Well, if there's nothing further, then
5    I will get off the bench in just a moment and we can wait for
6    our jurors.  Thanks.
7            **MR. FAKHOURY:**  Thank you, Your Honor.
8            **MR. WALDINGER:**  Thank you.
9            **THE CLERK:**  Court is in recess.
10       (Recess taken at 8:06 A.M.; proceedings resumed at
11       .M.)
12       (The following proceedings were heard out of the presence
13   of the jury:)
14           **THE COURT:**  We're outside the presence of the jury.
15       I have the limiting instruction in front of me.
16   Mr. Fakhoury, can you tell me when it is your wish that I read
17   this to the jury again?
18           **MR. FAKHOURY:**  Yes, Your Honor.  And I guess I would
19   just say because -- because Agent Ghio is sort of in the
20   middle of his testimony, I would just say before he gets
21   started today.
22           **THE COURT:**  I see.  All right.
23           **MR. WALSH:**  No objection.  Whenever.  Whenever works.
24           **THE COURT:**  Okay.  Perfect.  Thank you.
25           **MR. FAKHOURY:**  Thank you, Your Honor.

 1          (The following proceedings were heard in the presence of

 2     the jury:)

 3          **THE CLERK:**  You may be seated.

 4          **THE COURT:**  Good morning.

 5          **JURORS:**  Good morning.

 6          **THE COURT:**  I hope everybody had a good long weekend.

 7     We are, as I said last week, on schedule still to finish the

 8     evidence today or perhaps early tomorrow, and then instruction

 9     of the jury and then closing arguments.

10          So that's where we were.  When we broke last week, Agent

11     Ghio was on the stand, and we will resume with that testimony.

12          Good morning, Mr. Ghio -- or Agent Ghio, I should say.

13          Members of the jury, while Agent Ghio is putting on his

14     witness mask, I'm just going to read to you again an

15     instruction that I read last week and that will be included in

16     the instructions I give you at the end of the trial.

17          You heard and you will hear evidence that the defendant

18     transferred or caused to be transferred money from the bank

19     account of Rothenberg Ventures Fund II LLC to the bank account

20     of Rothenberg Ventures Management Company LLC and then on to

21     his personal Bank of America and Merrill Lynch accounts, or

22     that the defendant transferred or caused to be transferred

23     money from one of his Merrill Lynch accounts to his personal

24     Bank of America account and then on to the bank account of

25     Rothenberg Ventures Management Company LLC and/or the bank

 1   account of Rothenberg Ventures Fund II LLC.

 2        I instruct you that you may consider this evidence only

 3   for the limited purpose of determining whether the defendant

 4   acted with the intent to defraud Silicon Valley Bank, devised

 5   a scheme to defraud Silicon Valley Bank, and/or executed a

 6   scheme to defraud Silicon Valley Bank.  You must consider it

 7   only for that limited purpose and not for any other purpose.

 8        Good morning, Agent Ghio.

 9             **THE WITNESS:**  Good morning.

10             **THE COURT:**  Are you ready to proceed this morning?

11             **THE WITNESS:**  Yes.

12             **THE COURT:**  Mr. Walsh, your witness.

13             **MR. WALSH:**  Thank you, Your Honor.

14                         **ANTHONY GHIO**,

15   called as a witness by the plaintiff, having been previously

16   duly sworn, continued testifying as follows:

17                  **DIRECT EXAMINATION (CONTINUED)**

18   **BY MR. WALSH:**

19   **Q.**  Special Agent Ghio, at the end of our last day you had

20   just concluded walking through a demonstrative,

21   Demonstrative A, and you'll recall that detailed a series of

22   transactions in June of 2014?

23   **A.**  Correct.

24   **Q.**  Have you also seen another demonstrative that will show a

25   series of transactions in July and August of 2014?

1    **A.**   Yes.

2    **Q.**   Do you believe that that demonstrative would aid the jury

3    in understanding the transactions at -- and the discussion in

4    this matter?

5    **A.**   Yes.

6            **MR. WALSH:**   Your Honor, I propose to publish to the

7    jury Demonstrative B.

8            **THE COURT:**   Any objection?

9            **MR. FAKHOURY:**   No objection to publication.

10           **THE COURT:**   All right.

11                   (Demonstrative published.)

12   **BY MR. WALSH:**

13   **Q.**   Do you recognize Demonstrative B?

14   **A.**   Yes.

15   **Q.**   And what is it?

16   **A.**   It's a -- it depicts a series of transactions between bank

17   and investment accounts.

18   **Q.**   All right.  And just so we're all on the same page, there

19   are a series of blue boxes here, light blue boxes.  What do

20   those represent?

21   **A.**   Those represent bank and Merrill Lynch investment

22   accounts.

23   **Q.**   And additionally there are a series of boxes with little

24   arrows.  What do those represent?

25   **A.**   Those represent transfers between the accounts.

1    **Q.**   All right.

2         Now, in order to explain to the jury the exact --

3         There we go.

4                        (Demonstrative published.)

5              **MR. WALSH:**   Thank you very much.

6    **Q.**   In order to walk the jury through these, are there bank

7    statements that support these -- this chart?

8    **A.**   Yes.

9    **Q.**   And with each transfer, is there an outgoing bank account

10   and an incoming bank account statement?

11   **A.**   Yes.

12   **Q.**   All right.  Let's just go through and walk through with

13   the jury this chart.

14        And let's start with the very first transaction here in

15   the upper left on July 29th.

16        Do you see that transaction there?

17   **A.**   Yes.

18   **Q.**   And from what bank account to what bank account was a

19   transfer being made?

20   **A.**   The -- so there were two transfers, the 75,000 and the

21   $25,000 transfers that went from the Rothenberg Ventures Fund

22   Silicon Valley Bank account ending in 7483, to the Rothenberg

23   Ventures Management Company Silicon Valley Bank account ending

24   in 8931.

25   **Q.**   And I think you said it was from a fund.  Is it a

 1   particular fund that this comes from?

 2   **A.**   Yeah.   I'm sorry.   It's Fund II.

 3   **Q.**   Okay.   I'd like to draw your attention now to Exhibit 85

 4   starting at page 28.

 5        Do you recognize this document?

 6   **A.**   Yes.

 7   **Q.**   What is this document?

 8   **A.**   This is a Silicon Valley Bank account number ending in

 9   7483, statement for Rothenberg Ventures Fund II for July of

10   2014.

11   **Q.**   And I'd like to turn your attention then to page 30 of

12   this exhibit.

13                        (Exhibit published.)

14   **BY MR. WALSH:**

15   **Q.**   What is, just generally speaking, depicted on page 30 of

16   the exhibit?

17   **A.**   Account activity within Silicon Valley Bank account ending

18   in 7483.

19        **MR. WALSH:**   And if we could please blow up this lower

20   section here (indicating).

21                        (Exhibit published.)

22   **BY MR. WALSH:**

23   **Q.**   Now we're focused in on July 29th, 2014.   That's the box

24   that we're explaining to the jury on Demonstrative B.

25        Do you see two outgoing transfers on July 29th of 2014?

1    **A.**   Yes.

2    **Q.**   Could you -- what is the first one that you see?

3    **A.**   It's a $75,000 transfer to the Silicon Valley Bank account

4    ending in 8931.

5    **Q.**   Okay.  And is there a second transfer?  What's the amount

6    of the second transfer?

7    **A.**   $25,000 to the Silicon Valley Bank account ending in 8931.

8           **MR. WALSH:**  And if we could dezoom that, please.

9    Oh, wait.

10   Could we just rezoom that?  I apologize.

11                       (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**   And just so we're clear, on July 25th of 2014, what was

14   the balance of the account there?

15   **A.**   Zero.

16   **Q.**   And on July 31st of 2014 after those two transfers, what

17   was the balance of the Fund II bank account?

18   **A.**   Zero.

19          **MR. WALSH:**  All right.  Now if we could dezoom that.

20   My apologies.

21   **Q.**   And if we could turn your attention to Exhibit 86 starting

22   on page 117.

23          **MR. WALSH:**  I think you've got 118 there.

24                       (Exhibit published.)

25   / / /

1   **BY MR. WALSH:**

2   **Q.**   Do you recognize this document?

3   **A.**   Yes.

4   **Q.**   What is this document?

5   **A.**   This is Silicon Valley Bank account number ending in 8931,

6   the Rothenberg Ventures Management Company account, for July

7   of 2014, the statement.

8   **Q.**   Okay.  And if we could turn your attention to page 123.

9                    (Exhibit published.)

10  **BY MR. WALSH:**

11  **Q.**   And again we're focusing in on July 29th of 2014

12  (indicating).

13          **MR. WALSH:**  And if we could blow up this portion,

14  please.

15                    (Exhibit published.)

16  **BY MR. WALSH:**

17  **Q.**   Do you see two incoming credits on that day, July 29th of

18  2014?

19  **A.**   Yes.

20  **Q.**   And just -- what is the amount of the first credit?

21  **A.**   $75,000.

22  **Q.**   And what is the description of that credit in the -- on

23  the bank statement?

24  **A.**   It's a book transfer credit from account number ending in

25  7483.

1  Q.  And what account is that?

2  A.  That's the Rothenberg Ventures Fund II account.

3  Q.  Is there a second credit that day?

4  A.  Yes.

5  Q.  In what amount?

6  A.  $25,000.

7  Q.  And what is the description of that credit or deposit?

8  A.  It's another book transfer credit from the account ending

9  in 7483.

10  Q.  All right.  And then if we could just say before those two

11  credits came in, what was the balance of the Rothenberg

12  Ventures Management Company LLC account?

13  A.  $251,018.44.

14  Q.  And then after those two credits, what was the balance of

15  the account?

16  A.  $351,018.44.

17          MR. WALSH:  All right.  If we could dezoom those,

18  please.

19      And if we could return to Demonstrative B, please.

20              (Demonstrative published.)

21  BY MR. WALSH:

22  Q.  We've been focusing on this.  Have we now just shown the

23  jury the outgoing and the incoming bank account statements

24  that substantiate that box?

25  A.  Yes.

1    **Q.**  And that's the transfer of two -- $75,000 and $25,000?

2    **A.**  Correct.

3    **Q.**  Let's move on to the next box.

4          July 29th again.  And from what account and to what

5    account is this transfer?

6    **A.**  It goes from the Rothenberg Ventures Management Company

7    Silicon Valley Bank account ending in 8931 to Michael

8    Rothenberg's Bank of America account in 2573.

9          **MR. WALSH:**  Okay.  If we could pull up Exhibit 86 and

10   again go to page 117.

11                        (Exhibit published.)

12   **BY MR. WALSH:**

13   **Q.**  Do you recognize this document?

14   **A.**  Yes.

15   **Q.**  Is this a document we were just explaining to the jury?

16   **A.**  Yes.

17   **Q.**  And what is it again?

18   **A.**  It's the Silicon Valley Bank account ending in 8931 for

19   Rothenberg Ventures Management Company for the statement of

20   July 2014.

21          **MR. WALSH:**  And if we could then turn to page 123.

22                        (Exhibit published.)

23   **BY MR. WALSH:**

24   **Q.**  And again we're focusing on July 29th.

25          **MR. WALSH:**  And if we could just blow up this portion

 1    here at the bottom, please (indicating).

 2                        (Exhibit published.)

 3    BY MR. WALSH:

 4    Q.  Do you see a large transfer out of this account?

 5    A.  Yes.

 6    Q.  In what amount?

 7    A.  $300,000.

 8    Q.  And what is the date?

 9    A.  July 29th, 2014.

10    Q.  What does the description indicate that transfer out?

11    A.  It says wire out.  It gives a long code and then what

12    appears to be a date code, and then it says beneficiary

13    Michael Rothenberg.

14    Q.  After that transfer occurred, what was the balance in the

15    account there at the end of July 2014?

16    A.  $43,042.85.

17            MR. WALSH:  If we could dezoom that, please.

18    Q.  And I'd like to turn your attention to Exhibit 72

19    beginning on page 53.

20                        (Exhibit published.)

21    BY MR. WALSH:

22    Q.  Do you recognize this document?

23    A.  Yes.

24    Q.  What is it?

25    A.  It's Michael Rothenberg's Bank of America account

1   statement for the account ending in 2573.

2   **Q.**   What is the time period for this statement (indicating)?

3   **A.**   From July 24th, 2014, through August 21st, 2014.

4   **Q.**   And I'd like to draw your attention in particular to

5   page 55 of this exhibit.

6                      (Exhibit published.)

7   **BY MR. WALSH:**

8   **Q.**   Before we do any zooming, what in general is being

9   described on page 55 of this statement?

10  **A.**   These are deposits and additions to the BofA account

11  ending in 2573.

12  **Q.**   And since we're focusing in on July 29th of 2014, I'd like

13  to draw your attention --

14           **MR. WALSH:**   If we could blow that up, please

15  (indicating).

16                      (Exhibit published.)

17  **BY MR. WALSH:**

18  **Q.**   Do you see a large $300,000 credit that day?

19  **A.**   Yes.

20  **Q.**   And what was the description -- and when I say "that day,"

21  is that July 29th of 2014?

22  **A.**   Correct.

23  **Q.**   What is the description for that transfer?

24  **A.**   It's a "Wire Type:  Wire In," gives the date, the time,

25  the transaction number, sequence number, originator Rothenberg

1   Ventures Management, gives the account ending in 8931, and

2   then says the sending bank is Silicon Valley Bank and then it

3   gives an ID number.

4          **MR. WALSH:**  Okay.  If we could dezoom that, please.

5      And go back to page 53.

6                          (Exhibit published.)

7   **BY MR. WALSH:**

8   **Q.**  What was the opening balance as of July 24th of 2014?

9   **A.**  $13,474.02.

10         **MR. WALSH:**  And if we could now go back to

11  Demonstrative B, please.

12                       (Demonstrative published.)

13  **BY MR. WALSH:**

14  **Q.**  Have we now just shown the jury the outgoing bank account

15  statement and the incoming bank account statement for this

16  $300,000 July 29th transfer?

17  **A.**  Yes.

18  **Q.**  Okay.  Let's move on to the next transfer, also on

19  July 29th of 2014.

20      From what bank account and to what bank account are -- and

21  there's actually two transfers that day going?

22  **A.**  From Michael Rothenberg's Bank of America account ending

23  in 2573 to his Merrill Lynch Loan Management Account ending in

24  6054, also Michael Rothenberg's.

25  **Q.**  Okay.  In order to look at the bank account statements

1    there, let's return to Exhibit 72 on page 53.

2                        (Exhibit published.)

3    **BY MR. WALSH:**

4    **Q.**  Do you recognize this document?

5    **A.**  Yes, sir.

6    **Q.**  What is this document?

7    **A.**  This is Michael Rothenberg's Bank of America account

8    statement ending in 2573.

9    **Q.**  And it's that same statement that we've just been looking

10   at; is that right?

11   **A.**  Correct.

12   **Q.**  And what are the date range?

13   **A.**  July 24th, 2014 through August 21st, 2014.

14   **Q.**  If we could turn your attention now, please, to page 56 of

15   72.

16                        (Exhibit published.)

17   **BY MR. WALSH:**

18   **Q.**  And this is part of the statement we were just looking at?

19   **A.**  Yes.

20   **Q.**  And before we do anything else, what in general is going

21   on on this page of this statement?

22   **A.**  Withdrawals and other subtractions from the BofA account

23   ending in 2573.

24   **Q.**  Okay.  And we're focused on July 29th.

25            **MR. WALSH:**  So let's focus in on July 29th

 1   (indicating), if we could blow up that portion there, please.

 2                        (Exhibit published.)

 3   **BY MR. WALSH:**

 4   **Q.**  And do you see a large transfer out of this bank account

 5   on July 29th of 2014?

 6   **A.**  Yes.

 7   **Q.**  In what amount?

 8   **A.**  $350,404.13.

 9   **Q.**  And what does the description indicate?

10   **A.**  It says "Online Banking transfer to BRK 6054," and then it

11   gives a confirmation number.

12   **Q.**  Okay.  Is there a second transfer for a much smaller

13   amount that day?

14   **A.**  Yes.

15   **Q.**  What amount is that?

16   **A.**  $1,029.77.

17   **Q.**  And what does the description indicate for that transfer?

18   **A.**  "Agent assisted transfer to BRK6054," and then it provides

19   a confirmation number.

20   **Q.**  Thank you.

21            **MR. WALSH:**  If we could now pull up -- and dezoom

22   this, please -- and pull up Exhibit 48, page 1.

23        And maybe we can blow up this portion here (indicating).

24                        (Exhibit published.)

25   / / /

1   **BY MR. WALSH:**

2   **Q.**  Do you recognize this document?

3   **A.**  Yes.

4   **Q.**  What is this document?

5   **A.**  This is Michael Rothenberg's Merrill Lynch Loan Management

6   Account ending in 6054 for July of 2014.

7   **Q.**  All right.  It's for the month of the July, July 1st to

8   July 31st?

9   **A.**  Correct.

10  **Q.**  And before we go anywhere here, what was the opening

11  monthly balance in this account?

12  **A.**  $350,000.

13          **MR. WALSH:**  If we could then turn to page 3 of this

14  Exhibit 48.

15      And since we're focusing on -- yeah, right.

16      Thank you.

17                  (Exhibit published.)

18  **BY MR. WALSH:**

19  **Q.**  Since we're focusing in on the 29th, are there two

20  transfers in, or credits, to this 6054 account on July 29th of

21  2014?

22  **A.**  Yes.

23  **Q.**  And what was the amount of the first credit?

24  **A.**  $350,404.13.

25  **Q.**  And what is the description of that transfer on this bank

1    statement?

2    **A.**  "Funds Transfer FR BAC," the number, and then it's the

3    2573 account.

4    **Q.**  Got it.  And this is -- this is not absent here

5    (indicating), this has been redacted?

6        Yes?

7    **A.**  Yes.

8    **Q.**  And is there a second transfer that day as well, credit?

9    **A.**  Yes.

10   **Q.**  What is the amount?

11   **A.**  It's $1,029.77.

12   **Q.**  And what is the description of where that transfer is

13   coming from?

14   **A.**  It's a fund transfer and it's "FR BAC," the number, and

15   then the account ending in 2573.

16   **Q.**  And that is whose account?

17   **A.**  Michael Rothenberg's Bank of America account.

18   **Q.**  Thank you.

19       **MR. WALSH:**  If we could dezoom that there.

20       And go to page 2, so one up, please.

21       And if we could blow up the --

22              (Exhibit published.)

23   **BY MR. WALSH:**

24   **Q.**  And so we've already indicated the opening balance on

25   July 1st of 2014 was what?

1   **A.**   $350,000.

2   **Q.**   And then for the period of July 29th through the close,

3   what is the balance of this account?

4   **A.**   Zero.

5   **Q.**   Was there an interest charge over the course of July?

6   **A.**   Yes.

7   **Q.**   And what was that amount?

8   **A.**   $1,029.77.

9        **MR. WALSH:**   Okay.  If we could dezoom that, please,

10   and if we could go back to Demonstrative B.

11                  (Demonstrative published.)

12   **BY MR. WALSH:**

13   **Q.**   Have we now described both the outgoing and incoming

14   account bank statements for this July 29th, two transfers?

15   **A.**   Yes.

16   **Q.**   And that's the green box there in the upper right?

17   **A.**   Yes.

18   **Q.**   And have we also shown the balances in these first two

19   boxes as of July 28th and July 29th through 31st on that --

20   that statement?

21   **A.**   Yes.

22   **Q.**   All right.

23       Let's now turn to the next transfer, which is on

24   August 1st.  Do you see that box?

25   **A.**   Yes.

1   Q.   And from what account to what account is that transfer

2   being made?

3   A.   It's going from Michael Rothenberg's Merrill Lynch Loan

4   Management Account ending in 6054 to Michael Rothenberg's Bank

5   of America account ending in 2573.

6   Q.   Okay.  And in order to show the bank statements to the

7   jury, let's turn to Exhibit 49 in evidence, starting on

8   page 1.

9           MR. WALSH:  If we could just blow up the text

10  portion, please.

11                  (Exhibit published.)

12  BY MR. WALSH:

13  Q.   Do you recognize this document?

14  A.   Yes.

15  Q.   What is this document?

16  A.   This is Michael Rothenberg's Merrill Lynch account ending

17  in 6054 for -- well, for the period of August 1st, 2014,

18  through August 29th, 2014.

19  Q.   Okay.  And in particular, let's turn to page 2 on

20  Exhibit 49, please.

21          MR. WALSH:  And if we could blow up the -- thank you.

22                  (Exhibit published.)

23  BY MR. WALSH:

24  Q.   Let's focus first on August 1st of 2014.  Do you see

25  entries there on the loan activity?

GHIO - DIRECT (CONT'D.)/ WALSH

1    **A.**  Yes.

2    **Q.**  And foremost, do we see a loan advance that day?

3    **A.**  Yes.

4    **Q.**  What is the amount of the loan advance that day?

5    **A.**  $350,000.

6    **Q.**  Now, we also see some other transactions there.  What is

7    the opening loan balance on August 1st of 2014?

8    **A.**  Zero.

9    **Q.**  There's also a finance payment charge.  Do you see that?

10   **A.**  Yes.

11   **Q.**  And what amount is that?

12   **A.**  $1,029.77.

13   **Q.**  Now, what was the balance of this Loan Management Account

14   as of August 7th, 2014?

15   **A.**  $350,000.

16   **Q.**  What was the balance on August 12th of 2014?

17   **A.**  $350,000.

18   **Q.**  What was the loan balance on August 19th of 2014?

19   **A.**  $350,000.

20   **Q.**  Critically, what was the balance on August 21st of 2014?

21   **A.**  $350,000.

22          **MR. WALSH:**  All right.  If we could dezoom that,

23   please.

24   **Q.**  And I'd like to show you Exhibit 72, again, page 53.

25                    (Exhibit published.)

1   **BY MR. WALSH:**

2   **Q.**  Do you recognize this document?

3   **A.**  Yes.

4   **Q.**  What is this document?

5   **A.**  This is Michael Rothenberg's Bank of America account

6   ending in 2573.

7   **Q.**  This is the same bank statement that we've been looking at

8   repetitively this morning with the jury?

9   **A.**  Yes.

10  **Q.**  And what's the statement dates for it?

11  **A.**  July 24th, 2014, through August 21st, 2014.

12          **MR. WALSH:**  And if we could turn to page 55 of this

13  document, please.

14                        (Exhibit published.)

15  **BY MR. WALSH:**

16  **Q.**  What's being shown in general on page 55?

17  **A.**  These are deposits and other additions to the BofA account

18  ending in 2573.

19  **Q.**  All right.  And let's focus in on August 1st.  That's the

20  date we're focused on.

21                        (Exhibit published.)

22  **BY MR. WALSH:**

23  **Q.**  Do you see a deposit or other addition on August 1st of

24  2014?

25  **A.**  Yes.

1   **Q.**   In what amount?

2   **A.**   $350,000.

3   **Q.**   And what is the description of that deposit?

4   **A.**   "Agent Assisted Transfer from BRK 6054," and then it gives

5   a confirmation number.

6          **MR. WALSH:**   Thank you very much.  We can dezoom that,

7   please.

8          And if we could return to Demonstrative B.

9                          (Demonstrative published.)

10  **BY MR. WALSH:**

11  **Q.**   Have we just shown the outgoing and incoming bank

12  statements for this August 1st transfer?

13  **A.**   Yes.

14  **Q.**   And also shown that the August 1st balance of the LMA

15  became what?

16  **A.**   $350,000.

17  **Q.**   Let's turn to the next box, the next transfer here, also

18  on August 1st of 2014.

19         From what account to what account is that transfer being

20  made?

21  **A.**   It goes from Michael Rothenberg's Bank of America account

22  ending in 2573 to the Rothenberg Ventures Management Company

23  Silicon Valley Bank account ending in 8931.

24          **MR. WALSH:**   All right.  And in order to look at the

25  bank statements, the outgoing and ingoing, we need to return

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    to that same Exhibit 72 at page 53.

2                       (Exhibit published.)

3    BY MR. WALSH:

4    Q.   Do you recognize this document?

5    A.   Yes.

6    Q.   What is it?

7    A.   It's Michael Rothenberg's Bank of America account ending

8    in 2573.

9    Q.   All right.  And it's the same statement we've been looking

10   at for a particular time period?

11   A.   Yes.

12   Q.   What time period is it?

13   A.   From July 24th, 2014, to August 21st, 2014.

14   Q.   And I'd like to turn your attention this time to page 56

15   of Exhibit 72.

16                       (Exhibit published.)

17   BY MR. WALSH:

18   Q.   In general, just on this page in general, what's being

19   depicted?

20   A.   Withdrawals and other subtractions from the Bank of

21   America account in 2573.

22   Q.   Okay.  And in particular we're now focused on August 1st.

23          MR. WALSH:  If we could blow that up, please.

24                       (Exhibit published.)

25   / / /

1  BY MR. WALSH:

2  Q.  Do you see a large transfer out of this account on

3  August 1st of 2014?

4  A.  Yes.

5  Q.  In what amount?

6  A.  $225,000.

7  Q.  What is the description of this transfer on this bank

8  statement?

9  A.  It's "Wire Type:  Wire Out," gives the date, time,

10  transaction number, service reference number, and it's

11  beneficiary Rothenberg Ventures Management ID ending in 8931,

12  beneficiary bank, Silicon Valley Bank, gives an ID and a

13  payment detail code.

14  Q.  All right.

15     Do you know what bank account is the 8931?

16  A.  Yes.  That's the Rothenberg Ventures Management Company

17  account at Silicon Valley Bank.

18       MR. WALSH:  Let's turn then to Exhibit 86, please,

19  starting on page 125.

20                (Exhibit published.)

21  BY MR. WALSH:

22  Q.  Do you recognize this document?

23  A.  Yes.

24  Q.  What is this document?

25  A.  This is Silicon Valley Bank account ending in 8931 for

1    Rothenberg Ventures Management Company.  It's the August of

2    2014 account statement.

3    Q.  And I'd like to turn your attention just to the bottom of

4    this very page because we're on August 1st.

5          MR. WALSH:  And if we could just blow up this portion

6    down here, please (indicating).

7                    (Exhibit published.)

8    BY MR. WALSH:

9    Q.  We're looking for a large credit in.  Do you see a large

10   credit in that day?

11   A.  Yes.

12   Q.  In what amount?

13   A.  $225,000.

14   Q.  And when we say that day, what day are we talking about?

15   A.  August 1st, 2014.

16   Q.  And what is the description of that credit?

17   A.  "Wire In," gives a number and then it gives what appears

18   to be a date code, and then it says originator Michael Brent

19   Rothenberg and then gives a reference number.

20   Q.  All right.  And while we're here, what was the opening

21   balance on August 1st of 2014 of this bank account?

22   A.  $43,042.85.

23          MR. WALSH:  All right.  If we could dezoom this,

24   please.

25          And return to Demonstrative B.

 1                    (Demonstrative published.)

 2   **BY MR. WALSH:**

 3   **Q.**   Have we now just shown the jury the outgoing and incoming

 4   bank account statements that substantiate this August 1st,

 5   2014 transfer?

 6   **A.**   Yes.

 7   **Q.**   We've got one left, this last August 1st transfer.  Do you

 8   see that?

 9   **A.**   Yes.

10   **Q.**   From what bank account to what bank account was that

11   transfer made?

12   **A.**   It's from the Rothenberg Ventures Management Company

13   Silicon Valley Bank account ending in 8931 to the Rothenberg

14   Ventures Fund II Silicon Valley Bank account ending in 7483.

15   **Q.**   Okay.  And in order to show the jury the bank accounts

16   relevant for that, let's turn to Exhibit 86, 125, please.

17                      (Exhibit published.)

18   **BY MR. WALSH:**

19   **Q.**   Do you recognize this document?

20   **A.**   Yes.

21   **Q.**   Is this the same document we were just looking at moments

22   ago with the jury?

23   **A.**   Yes.

24   **Q.**   And in particular, what is it?

25   **A.**   It's Rothenberg Ventures Management Company's

1  Silicon Valley Bank account ending in 8931, the account

2  statement for August of 2014.

3  **Q.**  And this time we're looking for a debit out on August 1st.

4         **MR. WALSH:**  If we could blow up this last bottom

5  section (indicating).

6                        (Exhibit published.)

7  **BY MR. WALSH:**

8  **Q.**  Is there a large debit indicated on this statement?

9  **A.**  Yes.

10  **Q.**  In what amount is it?

11  **A.**  $100,000.

12  **Q.**  And what is the date of that debit?

13  **A.**  August 1st, 2014.

14  **Q.**  And does it indicate an account number -- or what is the

15  description, rather, of that debit?

16  **A.**  "Book Transfer Debit to Account" ending in 7483.

17  **Q.**  And what is the 7483 account?

18  **A.**  That's the Rothenberg Ventures Fund II account at

19  Silicon Valley Bank.

20         **MR. WALSH:**  Okay.  If we could dezoom that, please.

21  **Q.**  I'd like to turn your attention now to Exhibit 85 starting

22  on page 32.

23                        (Exhibit published.)

24  **BY MR. WALSH:**

25  **Q.**  Do you recognize this document?

1    **A.**   Yes.

2    **Q.**   What is it?

3    **A.**   This is Rothenberg Ventures Fund II Silicon Valley Bank

4    account ending in 7483.  It's the August 2014 statement.

5    **Q.**   Okay.  And in particular, we're looking at the August 1st

6    date.

7            **MR. WALSH:**  So if we could blow up the bottom of

8    page 32, please (indicating).

9                       (Exhibit published.)

10   **BY MR. WALSH:**

11   **Q.**   And before we do anything, what was the balance on

12   August 1st of 2014?

13   **A.**   Zero.

14   **Q.**   And do we see a credit of some amount on August 1st of

15   2014?

16   **A.**   Yes.

17   **Q.**   In what amount?

18   **A.**   $100,000.

19   **Q.**   And what does the description indicate for that credit?

20   **A.**   "Book transfer credit from account" ending in 8931.

21   **Q.**   And 8931 is what again?

22   **A.**   That's the Rothenberg Ventures Management Company account

23   at Silicon Valley Bank.

24           **MR. WALSH:**  If we could dezoom this, please, and

25   return to Demonstrative B.

 1                     (Demonstrative published.)

 2   **BY MR. WALSH:**

 3   **Q.**  Have we now just shown the jury the outgoing and incoming

 4   bank statements for this last August 1st transfer of $100,000?

 5   **A.**  Yes.

 6             **MR. WALSH:**  All right.  I think we can take down

 7   Demonstrative B, please.

 8   **Q.**  I'd like to turn to a new topic.

 9        You're aware, are you not, that Michael Rothenberg did in

10   fact refinance his condominium in August of 2014?

11   **A.**  Yes.

12   **Q.**  And it was a cash-out refinance?

13   **A.**  Yes.

14   **Q.**  And have you looked at the documents with regard to that

15   cash-out?

16   **A.**  Yes.

17   **Q.**  I'd like to turn your attention to Exhibit 112 on page 1.

18             **MR. WALSH:**  And if we could blow up the text portion,

19   I guess.

20                     (Exhibit published.)

21   **BY MR. WALSH:**

22   **Q.**  Do you recognize this document?

23   **A.**  Yes.

24   **Q.**  What is this document?

25   **A.**  This is an outgoing wire confirmation for Chicago Title

 1   Company confirming the wire to Bank of America and then

 2   forwarding to his Merrill Lynch -- to Rothenberg's Merrill

 3   Lynch account ending in 6052.

 4   **Q.** Okay.  You got a lot in there.  Let's just step by step so

 5   that it's clear.  What is the date of this wire?

 6   **A.** It's August 27th, 2014.

 7   **Q.** And what does the comment section indicate with regard to

 8   the -- what this wire is for?

 9   **A.** "Excess cash to close CASH TO BORROWER."  And then in

10   parentheses "303."  And then it says $608,104.47 and then it

11   gives a batch ID.

12   **Q.** All right.  And if we then look at the receiving bank,

13   what is the receiving bank?

14   **A.** Bank of America.

15   **Q.** And it's the same 608,104.47 that's being sent?

16   **A.** Yes.

17   **Q.** Okay.  What does it indicate with regard to where this

18   ultimately was headed, this money?

19   **A.** To the Michael Rothenberg account ending in 6052.

20   **Q.** And what do you understand the 6052 account to be?

21   **A.** That's his Merrill Lynch Cash Management Account.

22   **Q.** And is there an originating account of note here?  What

23   are the last four on that document?

24   **A.** 5771.

25           **MR. WALSH:** Okay.  If we could dezoom out of here and

1    turn to Exhibit 52, page 1, please.

2                         (Exhibit published.)

3    **BY MR. WALSH:**

4    **Q.**  Do you recognize this document?

5    **A.**  Yes.

6    **Q.**  What is this document?

7    **A.**  This is Michael Rothenberg's Merrill Lynch account ending

8    in 6052, that Cash Management -- Cash Management Account.

9    **Q.**  And what is the time period for this account?

10   **A.**  August 1st, 2014, through August 29th, 2014.

11   **Q.**  And if we could turn to page 5 of Exhibit 52.

12             **MR. WALSH:**  And if we could blow up this bottom

13   section here (indicating).

14                         (Exhibit published.)

15   **BY MR. WALSH:**

16   **Q.**  What's being depicted in the section that we've just

17   highlighted and blown up on page 52 -- sorry -- Exhibit 52,

18   page 5?

19   **A.**  Transactions within the account, the 6052 account.

20   **Q.**  And let's focus in because we are focused in on July --

21   sorry -- August, August 27th of 2014.

22        Is there a wire transfer that day?

23   **A.**  Yes.

24   **Q.**  And in what amount?

25   **A.**  $608,104.47.

1   **Q.**   Is it a credit?

2   **A.**   Yes.

3   **Q.**   What does it indicate in the description about what --

4   that credit?

5   **A.**   Wire transfer in, gives a -- a "D" number.  And then it

6   says "ORG" equals and then it gives a number ending in 5771.

7   **Q.**   And then there are three letters there after the 5771.  Do

8   you see those?

9   **A.**   CHI.

10  **Q.**   What is the sending organization?

11  **A.**   Chicago Title.

12  **Q.**   And so "CHI" then would, by inference, be the first part

13  of Chicago?

14  **A.**   I believe so.

15  **Q.**   All right.  Now are you aware of what happens on the very

16  next day, August 28th of 2014?

17  **A.**   Yes.

18  **Q.**   And if we just stay right on this page, is there a

19  transfer out -- there's two transfers out; is that right?

20  **A.**   Yes.

21  **Q.**   Let's focus in on the second of those two transfers.  Is

22  there a transfer in the amount of $350,992.45?

23  **A.**   Yes.

24  **Q.**   What is indicated as the description of that transfer?

25  **A.**   Transfer to 605 -- the account ending in 6054, "N/O

1   Michael Rothenberg."

2   Q.   And what is the 6054 account?

3   A.   That's the Michael Rothenberg Merrill Lynch Loan

4   Management Account.

5   Q.   Thank you.

6         MR. WALSH:   If we could dezoom that, please, and pull

7   up Exhibit 49, page 1.

8        And if we could blow up the text portion, please.

9                        (Exhibit published.)

10  BY MR. WALSH:

11  Q.   Do you recognize this document?

12  A.   Yes.

13  Q.   What is this document?

14  A.   This is Michael Rothenberg's Merrill Lynch Loan Management

15  Account ending in 6054.

16  Q.   And for what time period is it?

17  A.   It's a statement for August 1st, 2014, through

18  August 29th, 2014.

19        MR. WALSH:   And if we could, then, turn to -- dezoom

20  and then turn to page 3 of this exhibit.

21       And blow up -- yes, thank you.

22                        (Exhibit published.)

23  BY MR. WALSH:

24  Q.   Is there a transaction detail on August 28th of 2014?

25  A.   Yes.

1   **Q.**   And in what amount is that transaction?

2   **A.**   $350,992.45.

3   **Q.**   Is that a credit or a debit?

4   **A.**   That's a credit.

5   **Q.**   What does the description indicate for that credit?

6   **A.**   Transfer from 6052.

7   **Q.**   If we could then -- and what is the 6052 account?

8   **A.**   That's the Michael Rothenberg Merrill Lynch Cash

9   Management Account.

10          **MR. WALSH:**  If we could dezoom this, please, and go

11  to page 2 of this exhibit.

12          And if we could blow up this center section -- well,

13  actually, let's just do the whole thing, please.  Thank you.

14                      (Exhibit published.)

15  **BY MR. WALSH:**

16  **Q.**   Let's focus first in here.  Is there a finance charge for

17  that month of August?

18  **A.**   Yes.

19  **Q.**   What is the amount of that finance charge?

20  **A.**   $992.45.

21  **Q.**   And to be clear, then, as of August 28th effective date or

22  August 29th, is there an indication of activity on this

23  account?

24  **A.**   Yes.

25  **Q.**   And what is it?

1    **A.**   The loan payment comes in.  And then -- yeah, the loan

2    payment comes --

3    **Q.**   There's a loan payment in what amount?

4    **A.**   350,000.

5    **Q.**   What does that leave the account balance at the end of

6    that month then?

7    **A.**   Zero.

8         **MR. WALSH:**  Thank you.

9         If we could dezoom that, please.

10              (Pause in the proceedings.)

11         **MR. WALSH:**  Your Honor, I have no further questions

12    for this witness.

13         **THE COURT:**  Thank you, Mr. Walsh.

14         Mr. Fakhoury, questions for Agent Ghio?

15         **MR. FAKHOURY:**  Yes.  Thank you.

16                   **CROSS-EXAMINATION**

17    BY MR. FAKHOURY:

18    **Q.**  Good morning, Agent Ghio.

19    **A.**  Good morning.

20    **Q.**  I want to start by talking a little bit about

21    Demonstratives A and B -- or 1 and 2, I can't remember the

22    exact number -- but the chart you put together.

23         Were you the one who put that chart together?

24    **A.**  No.

25    **Q.**  Okay.

1     Now, that chart -- and you testified from that chart --

2     had approximately 12 transactions, correct?

3     **A.**  I haven't counted them but -- okay.

4     **Q.**  Okay.

5     And Mr. Walsh walked you through a number of statements --

6     bank statements, right?

7     **A.**  Yes.

8     **Q.**  And it's from those bank statements that the demonstrative

9     was generated, right?

10    **A.**  Yes, bank statements and investment statements.

11    **Q.**  Okay.  I want to walk through those statements with you.

12    Okay?

13    The first set of statements were Bank of America records.

14    Do you recall that?

15    **A.**  Yes.

16    **Q.**  This would be Exhibit 72.  Do you recall that?

17    **A.**  Yes.

18    **Q.**  Okay.  That was the account that ends in 2573, right?

19    **A.**  Yes.

20    **Q.**  Now, you've reviewed those Bank of America records, right?

21    **A.**  Yes.

22    **Q.**  You've reviewed all of those Bank of America records,

23    correct?

24    **A.**  No.

25    **Q.**  Okay.

1          You haven't reviewed all those records.

2     **A.**  I don't know when the account was opened, and I haven't

3     looked at anything current.  I don't know the entire life of

4     the account.

5     **Q.**  Okay.

6          You've got a binder of exhibits behind you, because I

7     think it's going to be a little bit easier to do this with the

8     paper.  So why don't you grab the binder that is going to have

9     Exhibits -- yes, I think that's the one.  There you go.  Okay.

10         So let's start by talking about Exhibit 72.  Why don't you

11    turn there.

12         Have you got that in front of you?

13    **A.**  Yes.

14    **Q.**  Okay.

15         Now, those are the Bank of America records that end in

16    numbers 2573, right?

17    **A.**  Yes.

18    **Q.**  And those records are about a hundred pages, right, in

19    that exhibit?

20    **A.**  (Reviewing document.)

21         Yes.

22    **Q.**  Okay.  Those records in that exhibit start at the

23    statement ending December 21st of 2013, right?

24    **A.**  Yes.

25    **Q.**  And they go all the way through to statements ending on

1    January 22nd, 2015, right?

2    **A.**   Yes.

3    **Q.**   So about a year's worth of Bank of America statements,

4    right?

5    **A.**   (Reviewing document.)

6        Yes.

7    **Q.**   Okay.

8        Now, did you review all of those statements before your

9    testimony today?

10   **A.**   No.

11   **Q.**   Okay.

12       Let's turn to Exhibit 85.

13   **A.**   (Reviewing document.)

14   **Q.**   Okay.  Do you have Exhibit 85 in front of you?

15   **A.**   Yes.

16   **Q.**   Okay.  Those are statements concerning Rothenberg Ventures

17   Fund II, correct?

18   **A.**   Yes.

19   **Q.**   That's the account ending in 7483, right?

20   **A.**   Yes.

21   **Q.**   Now, these are bank statements generated by Silicon Valley

22   Bank, correct?

23   **A.**   Yes.

24   **Q.**   And there's about 47 pages of statements in there, right?

25   / / /

1   **A.**   (Reviewing document.)

2        Yes.

3   **Q.**   Those records start on September 5th of 2013, correct?

4   **A.**   Yes.

5   **Q.**   And they go all the way through till the end of

6   October 2014, right?

7   **A.**   (Reviewing document.)

8        Yes.

9   **Q.**   Did you review all those statements?

10  **A.**   No.

11  **Q.**   Well, let's turn now to Exhibit 86.

12  **A.**   Okay.

13  **Q.**   You've got that in front of you?

14  **A.**   Yes.

15  **Q.**   Okay.   Those are bank records concerning Rothenberg

16  Ventures Management Company, right?

17  **A.**   Yes.

18  **Q.**   That's the account that ends in 8931, right?

19  **A.**   Yes.

20  **Q.**   And those statements are also bank statements from

21  Silicon Valley Bank, right?

22  **A.**   Yes.

23  **Q.**   It's about 152 pages of records in there, right?

24  **A.**   (Reviewing document.)

25        Yes.

1  Q.  Those records start September 7 of 2012, correct?

2  A.  (Reviewing document.)

3      Yes.

4  Q.  Okay.  And they go all the way through till the end of

5  October of 2014, right?

6  A.  (Reviewing document.)

7      Yes, end of October.

8  Q.  Is it safe to say you didn't look through all those

9  records either?

10 A.  Yes.

11         MR. FAKHOURY:  Can I have one quick minute, Your

12 Honor?

13         THE COURT:  Yes.

14             (Pause in the proceedings.)

15         MR. FAKHOURY:  Okay.  I'm going to ask Mr. Torres to

16 pull up Exhibit 72, please.

17             (Exhibit published.)

18 BY MR. FAKHOURY:

19 Q.  I want to walk through these statements in a little bit of

20 detail.  Okay?

21 A.  Okay.

22         MR. FAKHOURY:  And, Mr. Torres, if you could go to

23 page 43 of Exhibit 72, please.

24     You can just leave it there for now.

25             (Exhibit published.)

1  **BY MR. FAKHOURY:**

2  **Q.** Agent Ghio, this is -- so we're all on the same page here,

3  this is the statement for the period of May 22nd, 2014, to

4  June 20th of 2014, concerning the Bank of America account.

5      Do you see that?

6  **A.** Yes.

7  **Q.** So that's the account ending in 2573, right?

8  **A.** Yes.

9  **Q.** Now on the top here, on the date of May 22nd, 2014,

10  there's a wire in to this Bank of America account.

11      Do you see that?

12  **A.** Yes.

13  **Q.** And that's a wire in from Rothenberg Ventures Management

14  Company, correct?

15  **A.** Yeah.

16  **Q.** That's the originator?

17  **A.** Yes.

18  **Q.** Okay.

19      And that's in the amount of $53,413.  Correct?

20  **A.** And 3 cents.

21  **Q.** You're right.  I'm sorry.  And 3 cents.

22  **A.** Yes.

23  **Q.** Okay.  The next line under it is a wire in of exactly

24  $32,000, correct?

25  **A.** Yes.

1   Q.  And that's from -- the originator of that is a Thomas

2   Elwood Leep.

3       Do you see that?

4   A.  Yes.

5   Q.  And you see here it has a little memo that says "company

6   investment."  Do you see that?

7   A.  Yes.

8   Q.  The next line is a wire in of exactly $75,000.  Do you see

9   that?

10  A.  Yes.

11  Q.  And that's originating from Burke Robinson.

12      Do you see that?

13  A.  Yes.

14          MR. FAKHOURY:  Okay.  Mr. Torres, can you go to

15  page 71 of this exhibit.

16      And you can just leave it there.

17                  (Exhibit published.)

18  BY MR. FAKHOURY:

19  Q.  This is the Bank of America account -- excuse me -- Bank

20  of America account statement for the period of September 23rd,

21  2014, to October 23rd, 2014, correct?

22  A.  Yes.

23  Q.  And again, this is the account ending in 2573, right?

24  A.  Yes.

25  Q.  And up here on September 29, 2014, there is a $70,000 wire

 1    in.  Do you see that?

 2    **A.**  Yes.

 3    **Q.**  And that's a wire in from Rothenberg Ventures Management

 4    Company, correct?

 5    **A.**  Yes.

 6    **Q.**  The next line under it shows a wire in of exactly $50,000.

 7         Do you see that?

 8    **A.**  Yes.

 9    **Q.**  And that's a wire in From Tom Leep.

10         Do you see that?

11    **A.**  Yes.

12         **MR. FAKHOURY:**  Okay.  Mr. Torres, can you pull up

13    Exhibit 85.

14         And you can Just leave it there for a second.

15         Let's go to page 12.

16                        (Exhibit published.)

17    **BY MR. FAKHOURY:**

18    **Q.**  Okay.  And just so we're all on the same page, this is --

19    Exhibit 85, of course, is the bank account statements for

20    Rothenberg Ventures Fund II, right?

21    **A.**  Yes.

22    **Q.**  That's the account ending in 7483, right?

23    **A.**  Yes.

24    **Q.**  And these statements are generated by Silicon Valley Bank,

25    correct?

1    **A.**  Yes.

2          **MR. FAKHOURY:**  Okay.  Mr. Torres, can you scroll down

3    a little bit.

4        That's fine, you can leave it there.

5                    (Exhibit published.)

6    **BY MR. FAKHOURY:**

7    **Q.**  I want to walk through a couple items here.  Okay?

8        On March 6, 2014, there is a $100,000 debit that has a

9    memo that says "FII to FI repay advance," right?

10       Do you see that?

11   **A.**  Yes.

12   **Q.**  Okay.  And you're aware that there's a Rothenberg Ventures

13   Fund I, right?

14   **A.**  Yes.

15   **Q.**  On March 7, 2014, there's a $150,000 credit that says "RV

16   LLC RE to F2 advance."  Do you see that?

17   **A.**  Yes.

18          **MR. FAKHOURY:**  Mr. Torres, can you go to page 14,

19   please.

20       And scroll down till we get to March 11, 2014, please.

21       Can you scroll down a little bit more.  Thank you.

22                    (Exhibit published.)

23   **BY MR. FAKHOURY:**

24   **Q.**  Okay.  Now, on March 10 -- now, again, this is the Fund II

25   account, right?  The Fund II account statement, correct, that

1    we're looking at?  This is Exhibit 85.

2    **A.**  I'd have to see the top.

3          **MR. FAKHOURY:**  Okay.  Mr. Torres, could you scroll up

4    to the top, please.  You could stop there.

5                        (Exhibit published.)

6    **BY MR. FAKHOURY:**

7    **Q.**  So this is account numbers ending in 7483, and that's the

8    Fund II account, correct?

9    **A.**  Correct.

10          **MR. FAKHOURY:**  Okay.  Mr. Torres, can you scroll

11   down.  Thank you.

12                        (Exhibit published.)

13   **BY MR. FAKHOURY:**

14   **Q.**  So on March 10 of 2014, there was a debit out of the

15   Fund II account of $150,000.  Do you see that?

16   **A.**  Yes.

17   **Q.**  And the memo here says "from Rothenberg Ventures fund,"

18   and it doesn't indicate more than that.  Do you see that?

19   **A.**  Yes.

20   **Q.**  Okay.  The next line says, on March 11, a $20,000 debit of

21   a management fee FR Fund II to management company.  Do you see

22   that?

23   **A.**  Yes.

24   **Q.**  The next date has a $38,000 debit for management fee FR

25   Fund II to management company.  Do you see that?

 1      **A.**  Yes.

 2              **MR. FAKHOURY:**  Could you Scroll down a little bit

 3      more, Mr. Torres.

 4          Okay.  You can stop there.

 5                          (Exhibit published.)

 6      **BY MR. FAKHOURY:**

 7      **Q.**  On March 13 of 2014, there's a wire in of $100,000.

 8          Do you see that?

 9      **A.**  Yes.

10      **Q.**  And the originator of that wire is Michael Brent

11      Rothenberg.  Do you see that?

12      **A.**  Yes.

13      **Q.**  The next line shows on March 26 a $20,000 debit.

14          Do you see that?

15      **A.**  Yes.

16      **Q.**  And it says a repayment from FII to RV LLC.

17          Do you see that?

18      **A.**  Yes.

19              **MR. FAKHOURY:**  Okay.  Mr. Torres, can you go to

20      page 44 of this exhibit.

21          And can you -- well, before you scroll down.

22                          (Exhibit published.)

23      **BY MR. FAKHOURY:**

24      **Q.**  And just what we're looking at now is -- again, this is

25      the account ending in 7483 which is the Fund II account,

1    correct?

2    **A.**  Yes.

3    **Q.**  And this is a statement for a period -- for basically

4    October of 2014, right?

5    **A.**  Yes.

6    **Q.**  Okay.

7         **MR. FAKHOURY:**  Mr. Torres, can you scroll down a

8    little bit.

9         Okay.  You could stop there.

10                   (Exhibit published.)

11   **BY MR. FAKHOURY:**

12   **Q.**  Here on October 6 of 2014, it shows a $300,000 debit.

13        Do you see that?

14   **A.**  Yes.

15   **Q.**  And that's a debit to an account ending in 8931.

16        Do you see that?

17   **A.**  Yes.

18   **Q.**  8931 is the Rothenberg Ventures Management Company

19   account, right?

20   **A.**  Correct.

21        **MR. FAKHOURY:**  Okay.  Mr. Torres, can you go to

22   Exhibit 86, please.

23        And can you just scroll down to the first page.

24        Okay.  You can stop there.

25                   (Exhibit published.)

1  BY MR. FAKHOURY:

2  Q.  And again just so we're all on the same page, this exhibit

3  is the bank account for -- or sorry, let me -- strike that.

4      This exhibit is -- are the statements for Rothenberg

5  Ventures Management Company, right?

6  A.  Correct.

7  Q.  That's the account ending in 8931, right?

8  A.  Yes.

9        MR. FAKHOURY:  Okay.  Let's go to page 90 of this

10  exhibit.

11                    (Exhibit published.)

12  BY MR. FAKHOURY:

13  Q.  And we can just start here at the top.

14      Again, this is the 8931 account.  And this is for the

15  reporting period or the statement period of April of 2014,

16  right?

17  A.  Yes.

18  Q.  And it shows a $30,000 wire in to the account, right?

19  A.  Yes.

20  Q.  On April 8, 2014?

21  A.  Yes.

22  Q.  Okay.  And that's -- the originator of that wire in is

23  Michael Brent Rothenberg, correct?

24  A.  Yes.

25        MR. FAKHOURY:  Let's scroll down a little bit,

1    Mr. Torres, please.

2        You can stop there.

3                      (Exhibit published.)

4    **BY MR. FAKHOURY:**

5    **Q.**  Here on April 9 of 2014, there's another wire in of

6    exactly $10,000.  Do you see that?

7    **A.**  Yes.

8    **Q.**  And that is again originated by Michael Brent Rothenberg,

9    right?

10   **A.**  Yes.

11           **MR. FAKHOURY:**  Can you scroll down a little bit,

12   Mr. Torres.

13       You can stop there.

14                      (Exhibit published.)

15   **BY MR. FAKHOURY:**

16   **Q.**  I want to direct you to this item here on April 10 of

17   2014.  It shows a debit of $8,690.03.

18       Do you see that?

19   **A.**  Could you say that again?

20   **Q.**  Sure.  On April 10, 2014, there's a debit of $8,690.03,

21   correct?

22   **A.**  Yes.

23   **Q.**  Okay.  And it says here "Expensify."

24       Are you familiar with Expensify?

25   **A.**  No.

1          **MR. FAKHOURY:**  Let's go to page 91 of this exhibit,

2     please.

3                        (Exhibit published.)

4     **BY MR. FAKHOURY:**

5     **Q.**  And right here on April 15 of 2014, there's a $10,000 wire

6     in to the RVMC account.  Do you see that?

7     **A.**  Yes.

8     **Q.**  And do you see that the originator is Michael Brent

9     Rothenberg?

10    **A.**  Yes.

11         **MR. FAKHOURY:**  Let's go to page 92 of this exhibit,

12    please.

13         We're going to scroll down -- okay.  That's -- that's fine

14    right there.

15                        (Exhibit published.)

16    **BY MR. FAKHOURY:**

17    **Q.**  On April 22nd of 2014, there's a $75,000 credit.  Do you

18    see that?

19    **A.**  Yes.

20    **Q.**  That's a wire in, right?

21    **A.**  Yes.

22    **Q.**  And that's originating from Michael Brent Rothenberg,

23    right?

24    **A.**  Yes.

25         **MR. FAKHOURY:**  Can you scroll down a little bit.

```
 1        Okay.

 2                        (Exhibit published.)

 3   BY MR. FAKHOURY:

 4   Q.  And here on April 22nd, 2014, there's a wire out of

 5   $50,000.  Do you see that?

 6   A.  Yes.

 7   Q.  And that's to the -- the beneficiary of that is Michael

 8   Rothenberg.

 9        Do you see that?

10   A.  Yes.

11   Q.  And that's a -- and there's a little memo that says

12   compensation management company.  Do you see that?

13   A.  Yes.

14           MR. FAKHOURY:  Let's go to page 120 of this exhibit.

15   And let's get to July 15 of 2014.

16        You can stop there.  That's fine.  Thank you.

17                        (Exhibit published.)

18   BY MR. FAKHOURY:

19   Q.  Okay.  I'm going to direct your attention to this portion

20   here (indicating).

21        Now, this shows a $300,000 credit to the account.

22        Do you see that?

23   A.  Yes.

24   Q.  And that's on July 15th of 2014.  Do you see that?

25   A.  Yes.
```

1    **MR. FAKHOURY:**  Let's go to page 140 of this exhibit.

2                    (Exhibit published.)

3    **BY MR. FAKHOURY:**

4    **Q.**  And before you scroll down, this is again -- again, this

5    is a Silicon Valley Bank statement ending in 8931, right?

6    **A.**  Yes.

7    **Q.**  And 8931, that's again RVMC's -- or Rothenberg Ventures

8    Management Company's bank account, correct?

9    **A.**  Yes.

10   **Q.**  And this is the period of September 2014, right?

11   **A.**  Yes.

12          **MR. FAKHOURY:**  Okay.  Can you scroll down a little

13   bit, Mr. Torres?

14       Okay.  Perfect.

15                    (Exhibit published.)

16   **BY MR. FAKHOURY:**

17   **Q.**  And here on September 29 of 2014, there's -- there's a --

18   a wire out of exactly $70,000, right?

19   **A.**  Yes.

20   **Q.**  And the beneficiary of that wire is Michael Rothenberg,

21   right?

22   **A.**  Yes.

23          **MR. FAKHOURY:**  Mr. Torres, can you pull up

24   Exhibit 49.

25                    (Exhibit published.)

1  BY MR. FAKHOURY:

2  Q.  Okay.  Before -- before we go any further, you testified a

3  little bit about this exhibit.  And just so we're all on the

4  same page, this is the Merrill -- this is a Merrill credit

5  line statement, right?

6  A.  Yes.

7  Q.  And we've sort of used the shorthand of "LMA" to refer to

8  this statement.  Do you recall that?

9  A.  Yes.

10  Q.  Okay.  Now, this is for the period covering August 1st to

11  August 29 of 2014, right?

12  A.  Yes.

13        MR. FAKHOURY:  Okay.  Mr. Torres, can you go to

14  page 2.

15     You can stop there.

16                    (Exhibit published.)

17  BY MR. FAKHOURY:

18  Q.  Mr. Walsh asked you a couple questions about the -- the

19  loan balance amount.  Do you recall that testimony?

20  A.  Yes.

21  Q.  And he'd asked you about what the loan balance was on

22  August 1st and August 18 and August 21st.  Do you recall that?

23  A.  Yes.

24  Q.  Okay.  And I wanted to just make clear the loan balance on

25  August 29th was zero, right?

1    A.   Yes.

2            MR. FAKHOURY:   Mr. Torres, can you pull up

3    Exhibit 50.

4                        (Exhibit published.)

5    BY MR. FAKHOURY:

6    Q.   This exhibit is a Merrill Lynch bank statement for an

7    account ending in 052.   Do you see that?

8    A.   Yes.

9    Q.   That is -- we've been referring to that as the CMA

10   account, correct?

11   A.   Yes.

12   Q.   Okay.   Now, this exhibit covers the period of May 31st to

13   June 30th of 2014, right?

14   A.   Yes.

15   Q.   And it shows up on the top here that the net portfolio

16   value for -- for that period of time -- or let me rephrase

17   that.   I'm sorry.

18       This shows that as of June 30th, 2014, the net portfolio

19   value of the CMA account was $370,015.20, right?

20   A.   Yes.

21           MR. FAKHOURY:   Mr. Torres, can you pull up

22   Exhibit 51.

23                        (Exhibit published.)

24   BY MR. FAKHOURY:

25   Q.   And before you go any further, this exhibit is showing a

1    Merrill Lynch statement for an account ending in 052.  Do you

2    see that?

3    **A.**  Yes.

4    **Q.**  And again that's the CMA account, right?

5    **A.**  Yes.

6    **Q.**  This is the statement for the period between July 1st,

7    2014, and July 31st, 2014, right?

8    **A.**  Yes.

9              **MR. FAKHOURY:**  Mr. Torres, can you go to page 3.

10                        (Exhibit published.)

11   **BY MR. FAKHOURY:**

12   **Q.**  And this shows that as of July 31st, 2014, the net

13   portfolio value in that account was $370,062.33, right?

14   **A.**  (Reviewing document.)

15        Yes.

16              **MR. FAKHOURY:**  Mr. Torres, can you pull you up

17   Exhibit 52, please.

18                        (Exhibit published.)

19   **BY MR. FAKHOURY:**

20   **Q.**  Okay.  And just so we're all on the same page, this is a

21   Merrill Lynch statement for an account ending in 052, right?

22   **A.**  Yes.

23   **Q.**  That's the CMA account, correct?

24   **A.**  Yes.

25   **Q.**  And this is for the period of August 1st to August 29th of

1   2014, right?

2   A.   Yes.

3        MR. FAKHOURY:   Okay.  Mr. Torres, can you go to

4   page 3, please.

5                  (Exhibit published.)

6   BY MR. FAKHOURY:

7   Q.   And this shows that as of August 29th, 2014, the net

8   portfolio value was $370,218.45, right?

9   A.   Yes.

10       MR. FAKHOURY:   Mr. Torres, can you pull up

11  Exhibit 53, please.

12                 (Exhibit published.)

13  BY MR. FAKHOURY:

14  Q.   Last one.  This is the Merrill Lynch statement for the

15  account ending in 052, right?

16  A.   Yes.

17  Q.   That's again the CMA account, correct?

18  A.   Yes.

19  Q.   And this is for the period of August 30th to

20  September 30th of 2014, right?

21  A.   Yes.

22       MR. FAKHOURY:   Mr. Torres, can you go to page 3.

23                 (Exhibit published.)

24  BY MR. FAKHOURY:

25  Q.   And this shows that on September 30th of 2014, the net

 1    portfolio value was $370,267.11, right?

 2  **A.**  Yes.

 3          **MR. FAKHOURY:**  Can I have a minute, Your Honor.

 4          **THE COURT:**  Yes.

 5          **MR. FAKHOURY:**  I don't have any other questions.

 6    Thank you.

 7          **THE COURT:**  Thanks, Mr. Fakhoury.

 8       Mr. Walsh, further questions for Agent Ghio?

 9          **MR. WALSH:**  No further questions.

10          **THE COURT:**  Agent Ghio, thanks very much for your

11    testimony.  You can step down.

12       Government's next witness?

13          **MR. WALDINGER:**  Your Honor, the government would call

14    Mr. Frederick Kreppel at this time.

15          **THE COURT:**  All right.

16       Good morning, Mr. Kreppel.  If you could just come up to

17    this area to my right where you can see my courtroom deputy

18    standing up.  And when you got there, if you could remain

19    standing and raise your right hand and face her, please.

20                          **FREDERICK KREPPEL,**

21    called as a witness by the plaintiff, having been duly sworn,

22    testified as follows:

23          **THE WITNESS:**  I do.

24          **THE CLERK:**  Thank you.  If you could please state and

25    spell your last name for the court reporter.

1        **THE WITNESS:** Sure. Kreppel, K-R-E-P-P-E-L.

2        **THE CLERK:** Thank you. You can have a seat.

3        **THE COURT:** Sir, my courtroom deputy is going to hand

4   you a mask our witnesses use. It's clear so the jurors can

5   see your expression. It's got two straps go behind your head,

6   an upper strap and a lower strap.

7              (Clerk and witness confer off the record.)

8        **THE CLERK:** There you go.

9        **THE COURT:** Great. If you put that top strap up over

10  your ear, it probably will stay on a little better. There you

11  go.

12     Sir, have you ever testified in a court before?

13        **THE WITNESS:** No.

14        **THE COURT:** Okay. Well, there's not that much to it.

15  There are a couple things that are different about testifying

16  in a court than having just day-to-day conversation.

17     One is it's a jury trial so we have a jury sitting here.

18  And they all need to hear what you're saying. And because of

19  COVID, the jurors actually extend out into the gallery. So if

20  you could keep your voice up and stay close to the microphone,

21  you'd really be helping them.

22     The second thing is in day-to-day conversation, we

23  interrupt each other all the time because we know where the

24  other person is going with their sentence, you know. So we

25  start answering the question before they're even done.

 1          Our court reporter is trying to make a record of

 2     everything that happens here.  And she can only take down one

 3     person at a time.  So if you'll wait until the lawyers have

 4     absolutely finished what they're asking you, they'll wait

 5     completely for you to finish your answer.

 6          Very last thing is in day-to-day conversation, sometimes

 7     we don't use words, we use gestures or noises.  We might say

 8     "uh-huh" or "uh-uh" or go like this (indicating) or shake our

 9     head.  The court reporter can't take down any of that.  So if

10     you could use whole words when you answer, I'd appreciate that

11     too.

12          Mr. Waldinger, your witness.

13               **MR. WALDINGER:**  Thank you, Your Honor.

14                         **DIRECT EXAMINATION**

15     **BY MR. WALDINGER:**

16     **Q.**  Mr. Kreppel, good morning.

17     **A.**  Good morning.

18     **Q.**  First of all, let's start with your name.  Your true name

19     is Frederick; is that correct?

20     **A.**  That's correct.

21     **Q.**  You go by a nickname?

22     **A.**  Yes.

23     **Q.**  And what's that?

24     **A.**  Buzz.

25     **Q.**  That's B-U-Z-Z?

KREPPEL - DIRECT / WALDINGER

1    **A.**  That's right.

2    **Q.**  Can you tell the jury how you got that nickname?

3    **A.**  Sure.  When I was about two months old, my sister who was

4    about two years old couldn't pronounce "brother."  She'd tell

5    everybody I was her little buzzer.  So --

6    **Q.**  So you've been Buzz since that time?

7    **A.**  Two months old.

8    **Q.**  Where do you work, Mr. Kreppel?

9    **A.**  Silicon Valley Bank.

10   **Q.**  What is your current position at Silicon Valley Bank?

11   **A.**  I'm a credit risk manager.

12   **Q.**  And are you a credit risk manager in a particular part of

13   Silicon Valley Bank?

14   **A.**  Yes.

15   **Q.**  What part is that?

16   **A.**  The private bank.

17   **Q.**  So what's a private bank?

18   **A.**  Sure.  Private bank provides banking and lending services

19   to individuals.

20   **Q.**  Would the other -- another part of Silicon Valley Bank

21   then be the commercial bank?

22   **A.**  That's correct.

23   **Q.**  Okay.

24        How long have you been a credit risk manager in the

25   private bank at Silicon Valley Bank?

1    **A.**   Since October of 2021.

2    **Q.**   What do you do as a credit risk manager?

3    **A.**   I manage three senior credit officers.

4    **Q.**   And where do you work out of?

5    **A.**   San Diego.

6    **Q.**   In your role as a manager of those senior credit officers,

7    do you do any loan approvals, or is that done by the people

8    that you supervise?

9    **A.**   I do loan approvals at a certain dollar level.

10   **Q.**   And is that above a threshold that the senior credit

11   officers don't have authority to approve?

12   **A.**   Correct.

13   **Q.**   You said you became a credit risk manager in October of

14   2021, correct?

15   **A.**   Correct.

16   **Q.**   What were you before that?

17   **A.**   I was a senior credit officer.

18   **Q.**   So you were in the position of the people that you now

19   supervise?

20   **A.**   That's correct.

21   **Q.**   How long have you -- were you a senior credit officer at

22   SVB?

23   **A.**   Eight years.

24   **Q.**   And did you start in approximately 2014?

25   **A.**   That's correct.

1   **Q.**   When -- do you recall when in 2014 you started as a senior

2   credit officer?

3   **A.**   January.

4   **Q.**   Was that also in the private bank?

5   **A.**   Yes.

6   **Q.**   Taking -- were you a senior credit officer in the summer

7   of 2014?

8   **A.**   I was.

9   **Q.**   Could you briefly describe for the jury what you did as a

10  senior credit officer for SVB in the summer of 2014?

11  **A.**   I would maintain the underwriting guidelines as well as

12  the credit risk rating matrix.  And I would also approve

13  loans, both mortgages and personal loans up to $15 million.

14  **Q.**   Okay.  And just to give a bit of a preview, you understand

15  you're testifying today because you were the senior credit

16  officer who approved two loan applications with respect to the

17  defendant Michael Rothenberg, correct?

18  **A.**   Correct.

19  **Q.**   I just want to go, before we go into that, a little bit

20  more of your background.

21      You've been -- from your testimony, the jury can see

22  you've been at SVB since at least 2014.  How long have you

23  actually been at Silicon Valley Bank?

24  **A.**   Twenty-nine-and-a-half years.

25  **Q.**   And so is that sometime in 1993?

1    **A.**   Correct.

2    **Q.**   Where did you work before that?

3    **A.**   I worked at Comerica Bank.

4    **Q.**   When did you work at Comerica?

5    **A.**   From 1991 to 1993.

6    **Q.**   What kind of work did you do at Comerica?

7    **A.**   I would audit commercial bank clients' financial

8    statements.

9    **Q.**   What did you do before you worked at Comerica?

10   **A.**   I worked at a smaller bank in the mail room while I was

11   going to college.

12   **Q.**   Where did you go to college?

13   **A.**   San Jose State.

14   **Q.**   Did you graduate from San Jose State?

15   **A.**   Yes.

16   **Q.**   When did you graduate?

17   **A.**   In May of 1991.

18   **Q.**   What was your degree in?

19   **A.**   Economics.

20   **Q.**   Is it fair to say that for most of your career, from 1993

21   to right now, you've worked for Silicon Valley Bank?

22   **A.**   Correct.

23   **Q.**   For the period 1993 to 2014 when you became a senior

24   credit officer, what was the arc of your career at SVB for

25   that time period?

 1    **A.**   I was an auditor.  And then I became a lender within the

 2    commercial bank, and was a lender within the commercial bank

 3    and also managed our San Diego office up to 2014.

 4    **Q.**   Did you join the private bank then when you became a

 5    senior credit officer in January of 2014?

 6    **A.**   Yes.

 7    **Q.**   You mentioned San Diego.  Have you worked both in

 8    San Diego and the Bay Area for Silicon Valley Bank?

 9    **A.**   Yes.

10    **Q.**   And as -- if I recall, you worked -- you originally

11    started in the Bay Area?

12    **A.**   Yes.

13    **Q.**   When was -- when did you move to San Diego?

14    **A.**   2006.

15    **Q.**   And have you been in San Diego that entire time, or have

16    you come back to the Bay Area?

17    **A.**   In 2014, I came back to the Bay Area for three years,

18    moved back to San Diego in 2017.

19    **Q.**   And you're still there?

20    **A.**   Correct.

21    **Q.**   So you've -- you've been in banking since the early '90s?

22    **A.**   Correct.

23    **Q.**   How many of the years since that time have you been making

24    credit decisions as part of your job?

25    **A.**   Since 2014.

1   **Q.**  Okay.

2       And when I say credit decisions, what do you understand

3   that to mean?

4   **A.**  That means that I'm ensuring that loans that are presented

5   for approval adhere to the bank's private bank underwriting

6   guidelines and credit risk rating matrix.

7   **Q.**  I'd like to ask you some questions in general about SVB.

8   Is SVB, Silicon Valley Bank, insured by any government

9   insurance programs?

10  **A.**  FDIC insured.

11  **Q.**  Has it been insured by the FDIC since you started working

12  there?

13  **A.**  Correct.

14  **Q.**  Was it insured by the FDIC in August of 2014?

15  **A.**  Yes.

16  **Q.**  Again taking you to August of 2014, do you recall whether

17  SVB had locations, offices or branches located outside of the

18  state of California?

19  **A.**  Yes.

20  **Q.**  That -- in 2000 -- excuse me.  In August of 2014?

21  **A.**  Yes.

22  **Q.**  Did SVB in August of 2014 make loans secured by interest

23  in real estate?

24  **A.**  Yes.

25  **Q.**  Again taking you back to the period of August of 2014, you

1    were a senior credit officer at that time.

2    **A.**   Yes.

3    **Q.**   Approximately how many loans were coming through or --

4    that you saw coming through the private bank at that time?

5    **A.**   There were about a hundred a month.

6    **Q.**   Was there a limit back in 2014 to what you could approve

7    as a senior credit officer?

8            **THE COURT:**   You mean an individual loan?

9            **MR. WALDINGER:**   Correct.

10           **THE COURT:**   Yeah.

11           **THE WITNESS:**   Yes.

12   BY MR. WALDINGER:

13   **Q.**   And do you recall what that limit was?

14   **A.**   Fifteen million.

15   **Q.**   One of the things that you've testified to, Mr. Kreppel,

16   is about maintaining the bank's underwriting guidelines and

17   credit risk rating matrix; is that right?

18   **A.**   Yes.

19   **Q.**   Did you have any -- did you have any involvement in

20   developing either those guidelines or the credit risk rating

21   matrix?

22   **A.**   I did.

23   **Q.**   And when were those developed?

24   **A.**   From -- early 2014.

25   **Q.**   Were they -- were they developed in response to any

1    government regulations?

2    **A.**   Yes.

3    **Q.**   And what regulations are you thinking of when you say

4    that?

5    **A.**   What -- in 2013, early 2014, the Consumer Financial

6    Protection Bureau came out with the rule which was guidelines

7    for underwriting mortgages that had a variety of different

8    regulations that the bank would need to adhere to, to

9    originate mortgage loans.

10           **THE COURT:**   Mr. Waldinger, anytime in the next five

11   minutes.

12           **MR. WALDINGER:**   I think we're going to get into an

13   area here that will take up a little bit of time so I think

14   this might be a good breaking point, Your Honor.

15           **THE COURT:**   All right.  Very good.

16       Members of the jury, don't make up your mind about

17   anything.  Don't talk to anybody about the case or look

18   anything up.

19       And court will be in recess for 15 minutes.

20           **THE CLERK:**   Please rise for the jury.

21       (The following proceedings were heard out of the presence

22   of the jury:)

23           **THE COURT:**   All right.  We're outside the presence of

24   the jury.

25       Mr. Fakhoury, anything for the record?

1          **MR. FAKHOURY:**  No, Your Honor.

2          **THE COURT:**  Mr. Waldinger?

3          **MR. WALDINGER:**  No, Your Honor.

4          **THE COURT:**  All right.  Let's be in recess.  Thanks.

5      (Recess taken at 10:01 A.M.; proceedings resumed at 10:19

6    A.M.)

7      (The following proceedings were heard in the presence of

8    the jury:)

9          **THE CLERK:**  You may be seated.

10         **THE COURT:**  All right.  Let's go back on the record.

11    All the jurors are in their assigned seats.

12    Mr. Waldinger, your witness.

13   BY MR. WALDINGER:

14   **Q.**  Mr. Kreppel, when we left off, I believe you had just

15   testified about a new regulation that had come into effect in

16   either 2013 or early 2014.

17      Do you recall that?

18   **A.**  I do.

19   **Q.**  What was that regulation again?

20   **A.**  It was known as "the rule," and it was focused on mortgage

21   lending.

22   **Q.**  Who issued that regulation?

23   **A.**  The CFPB, the Consumer Financial Protection Bureau.

24   **Q.**  That's a relatively new agency that regulates your

25   industry?

1    A.   Yes.  I'm not exactly sure how long it's been around.

2    Q.   Okay.

3         The -- the thing that you were referring to as the rule,

4    did that contain regulations regarding determining potential

5    borrower's ability to repay loans?

6    A.   Yes.

7    Q.   Did the rule require SVB and other banks to consider

8    certain factors in determining whether to grant a loan?

9    A.   Yes.

10   Q.   And did those things that you're supposed to consider have

11   to do with determining whether the potential borrower had the

12   ability to repay?

13   A.   They did.

14   Q.   And do you recall -- I know that you have some documents

15   in front of you, but without looking at them, do you -- do you

16   recall what some of those factors include?

17   A.   Sure.  It all revolved around third-party verification of

18   assets, income, liabilities, credit score.

19   Q.   Okay.  And so one of the things that SVB was required to

20   consider is income?

21   A.   Correct.

22   Q.   Did the rule require SVB to consider a person's assets if

23   they were going to be used to repay the loan?

24   A.   Yes.

25   Q.   Did the rule require an inquiry into the potential

1    borrower's current debts?

2    A.   Yes.

3    Q.   And did that include revolving debt?

4    A.   Yes.

5    Q.   And did it require -- one thing that you did not mention

6    was what's called debt-to-income ratio.  Is there any

7    requirements about looking at what's called debt-to-income

8    ratio?

9    A.   Yes.  The income was again verified through third-party

10   sources, as well as the -- the debt.

11   Q.   Okay.

12        Did the -- was the rule optional?

13   A.   No.

14   Q.   Do you -- SVB has to -- has to follow it?

15   A.   Correct.

16   Q.   And so fair to say that one of the things it has to

17   consider is a borrower's assets?

18   A.   Yes.

19   Q.   And another thing that it has to consider are a borrower's

20   liabilities?

21   A.   Yes.

22   Q.   The reason I'm asking you about the CFPB's or the Consumer

23   Financial Protection Bureau's rule is that I think you said

24   that you were -- you were developing things within SVB in

25   response to that; is that correct?

1   **A.**   That's right.

2   **Q.**   And what did you develop in response to that rule?

3   **A.**   Underwriting guidelines that adhered to the eight-tenths

4   of the ability to repay.

5   **Q.**   I'm going to move on to a different topic.

6        Again, though, in the summer of 2014 when you were a

7   senior credit officer, how would things come to you -- how

8   would credit decisions come to you for your decision?

9   **A.**   They would come through a bank system called Turbo CAR.

10  **Q.**   And that's Turbo CAR, C-A-R?

11  **A.**   Yes.

12  **Q.**   Does CAR stand for something?

13  **A.**   Yes.  Credit Action Request.

14  **Q.**   So CAR stands for Credit Action Request; is that correct?

15  **A.**   Correct.

16  **Q.**   I think you said that that's a bank system.  So that's --

17  when you say "system," a computer system?

18  **A.**   Yes.

19  **Q.**   That you could access internally?

20  **A.**   That's right.

21  **Q.**   What did a Credit Action Request look like?

22  **A.**   It would have a loan approval sheet.  It has the first

23  page that outlines the borrower's address, any deposit or

24  other lending relationship we had with the borrower.  It would

25  have a request section.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   Q.   All right.   Let me stop you there.

2   A.   Sure.

3        **MR. WALDINGER:**   Why don't we pull up Exhibit 22 in

4   evidence.

5   Q.   And I have a copy of that in front of you in paper form if

6   you need look at it, but it should also be on your screen, or

7   coming up.

8                          (Exhibit published.)

9   **BY MR. WALDINGER:**

10  Q.   Have you reviewed this document before today?

11  A.   Yes.

12  Q.   Exhibit 22 happens to be a -- I think a 22-page document,

13  correct?

14  A.   Yes.

15  Q.   So in general, is this what a Credit Action Request would

16  look like when it came to you?

17  A.   Yes, it would.

18  Q.   Did you review it on the computer, or was it something

19  that you would print off in some -- in some fashion?

20  A.   Typically on the computer.

21  Q.   Was there an ability to create a PDF or other kind of

22  document from the Credit Action Request?

23  A.   Yes.

24  Q.   And that's -- your understanding is that's what we're

25  looking at in trial Exhibit 22, a PDF that was created?

KREPPEL - DIRECT / WALDINGER

1   **A.**  Yes.

2   **Q.**  So just in -- in general, let's -- let's walk through

3   the -- the various sections.  This is entitled "loan approval

4   sheet" is that just another name for Credit Action Request?

5   **A.**  Yes.

6   **Q.**  What kinds of information is set forth in the loan

7   approval sheet starting on the first page?

8   **A.**  There's the Customer Information File, or CIF number,

9   which is how you identify the borrower in our system.

10   **Q.**  Just hold one second.

11         **MR. WALDINGER:**  Ms. Margen, if you could blow up the

12   top portion.

13                 (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**  So you I think you said something that relates to this

16   acronym that I'm -- the CIF acronym.  What is that?

17   **A.**  Customer Information File.

18   **Q.**  And is that the -- what's the number that starts 2000?  Is

19   that the credit information file -- or Customer Information

20   File?

21   **A.**  Yes.

22   **Q.**  Does that relate to a unique borrower?

23   **A.**  Yes.

24   **Q.**  With respect to this document, Exhibit 22, who does it

25   relate to?

1    **A.**   Michael Rothenberg.

2    **Q.**   Who creates the loan approval sheet?

3    **A.**   The underwriting group.

4    **Q.**   What is your -- when you're reviewing a loan approval

5    sheet, what is your role -- or what was your role when you

6    were a senior credit officer?

7    **A.**   To ensure that all the underwriting was adhering to the

8    underwriting guidelines, as well as ensure that the loan was

9    risk graded correctly based on our credit risk rating matrix.

10   **Q.**   Did this loan approval sheet and other pages of this

11   exhibit contain information derived from other documents?

12   **A.**   Yes.

13   **Q.**   Did you ever -- as part of your review, did you review the

14   underlying documents?

15   **A.**   No.

16   **Q.**   If you had questions during the course of your review of a

17   loan approval sheet, what would you do?

18   **A.**   I would inquire -- I would ask the underwriting group any

19   questions I might have.

20   **Q.**   In your role as a senior credit officer, in reviewing the

21   loan approval sheets, did you expect the information in the

22   loan approval sheet to be correct?

23   **A.**   Yes.

24   **Q.**   And as -- as a senior credit officer at SVB in the summer

25   of 2014, did you expect loan applicants to provide accurate

 1   information to be fed into the loan approval sheet?

 2   A.   Yes.

 3   Q.   Can you tell when this loan approval sheet was created?

 4   A.   Yes.  August 6th, 2014.

 5   Q.   There's -- and that's the date created (indicating)?

 6   A.   Yes.

 7   Q.   There's a name here, Michelle Jandu.  Who is Michelle

 8   Jandu?

 9   A.   She was the relationship manager for Michael Rothenberg at

10   the time.

11          MR. WALDINGER:  Ms. Margen, if we could take down

12   that blowup, and then blow up the bottom half of this

13   document.

14                      (Exhibit published.)

15   BY MR. WALDINGER:

16   Q.   Is this -- the last section we looked at said "Client

17   Info."  This says "Request."  Is this a new section of the

18   loan approval sheet?

19   A.   Yes.

20   Q.   And what does this section -- what does this section do?

21   A.   It summarizes the loan requests.

22          MR. WALDINGER:  Ms. Margen, if you could take this

23   down and make sure it's -- that this down here, the whole --

24   just this whole thing is blown up (indicating).  Thank you.

25                      (Exhibit published.)

1    BY MR. WALDINGER:

2    Q.  Does the -- does this document contain any information in

3    the footer about the loan approval or the Credit Action

4    Request?  And then I'm specifically directing your attention

5    here in the middle of the -- of the footer (indicating).

6    A.  Yes.

7    Q.  What is that?  What is that information?

8    A.  That is the CAR number.  So there's a Credit Action

9    Request number.  And the status would be where it is in the

10   loan process.

11   Q.  Is each Credit Action Request given a separate CAR number?

12   A.  Yes.

13   Q.  When it's -- so it says the CAR status equals CAR booked,

14   what does that mean?

15   A.  That the CAR -- or that the loan was actually booked on

16   the system.

17   Q.  What does "booked" mean?

18   A.  Means that all the pertinent information to onboard the

19   loan to the bank's systems has been input into the systems and

20   it's either funded or ready to fund.

21   Q.  The date we saw at the top of this page was August 6th of

22   2014.  Do you recall that?

23   A.  Yes.

24   Q.  Do you know why there's a date from September of 2017 in

25   the footer?

1    A.   That could be when it was printed.

2    Q.   Very good.

3         Is it -- do you have any knowledge as to whether CAR,

4    separate CAR numbers can be edited once they're -- once

5    they're booked?

6    A.   No.  There's --

7    Q.   You don't have knowledge, or they can't be changed?

8    A.   They -- they don't -- they're not changed.  There's a few

9    different ways to do what we call a correction CAR which may

10   reflect the -- the similar CAR number.  But for the most part,

11   once a CAR is approved and booked, the CAR number wouldn't

12   change.

13   Q.   All right.  Thank you.

14        **MR. WALDINGER:**  You can take that down, Ms. Margen.

15   Q.   I would just like to walk through the various sections

16   before we come back and -- and talk about them in detail.  So

17   right now we're -- we just talked about the request section.

18        **MR. WALDINGER:**  Ms. Margen, if you could go to the

19   next page.

20                     (Exhibit published.)

21   **BY MR. WALDINGER:**

22   Q.   Is this that's at the top of page 2 still part of the

23   request section?

24   A.   Yes.

25   Q.   There's -- and then there's another header here called

1  "Commitments."  Do you see that?

2  **A.**  Yes.

3  **Q.**  Does that start a new section?

4  **A.**  Yes, it does.

5  **Q.**  And does the information regarding commitments begin

6  actually on the next page?

7  **A.**  Yes.

8         **MR. WALDINGER:**  Ms. Margen, let's go to page 3.

9                (Exhibit published.)

10  **BY MR. WALDINGER:**

11  **Q.**  And just in general, what is the "Commitment" section?

12  **A.**  It outlines the loans that are being contemplated for the

13  individual and has the dollar amount as well as the loan type

14  or facility type, and some other codes that are important for

15  booking purposes.

16         **MR. WALDINGER:**  While we're here, Ms. Margen, let's

17  just go ahead and blow up this part (indicating), the top

18  half.

19                (Exhibit published.)

20  **BY MR. WALDINGER:**

21  **Q.**  There were two loans that were contemplated in this Credit

22  Action Request; is that right?

23  **A.**  Correct.

24  **Q.**  Is one called Facility A?

25  **A.**  Yes.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **Q.**  And is one called Facility B?

2    **A.**  Yes.

3    **Q.**  In general, what -- what was Facility A and what was

4    Facility B?

5    **A.**  Facility A was a mortgage, real estate loan.  And

6    Facility B was an unsecured capital call line of credit.

7    **Q.**  I want to ask you while we're here, is it true that the --

8    the very top part where it says "Facility A" relates to the

9    mortgage loan?

10   **A.**  Yes.

11   **Q.**  There's a section here that says "Loan Held for Sale."

12   What is that section about?

13   **A.**  Some lenders sell their mortgage loans.  SVB does not.

14   SVB holds mortgage loans on their books.

15   **Q.**  When mortgage originators sell loans, who do they sell

16   them to in general?

17   **A.**  Investors.

18   **Q.**  And does that include investors who are going to package

19   them up into mortgage-backed securities?

20   **A.**  Yes.

21   **Q.**  And do you know whether government-sponsored agencies

22   called Freddie Mac and Fannie Mae purchase some of those

23   securities?

24   **A.**  Yes.

25   **Q.**  Do they?

1    **A.**  I believe they do.

2    **Q.**  This loan, however, was not being sold?

3    **A.**  Correct.

4    **Q.**  Because SVB was keeping the loan on its books, did that

5    mean that SVB did not have to follow the Consumer Financial

6    Protection Bureau's rule regarding determining ability to

7    repay?

8    **A.**  No.

9    **Q.**  And -- and did SVB have to follow that rule and look at

10   things like income, assets, and liabilities?

11   **A.**  Yes.

12          **MR. WALDINGER:**  Let's go to the bottom of this page,

13   Ms. Margen.

14                       (Exhibit published.)

15   **BY MR. WALDINGER:**

16   **Q.**  Can you -- I'm just going to direct your attention to the

17   section that says "Recommender's/Approvers."

18      Can you tell from this whether you had any involvement in

19   the approval process and when that occurred?

20   **A.**  Yes.

21   **Q.**  And --

22   **A.**  Where it says "Approved Outside Loan Committee" and you

23   see my name under "SCO/CRM," I was the approving senior credit

24   officer.  And below that you'll see a date of August 7th, 2014

25   which is the date in which I approved the loans.

1   **Q.**  For "SCO/CRM," you were an SCO at that time, correct?

2   **A.**  Correct.

3   **Q.**  Now you're a CRM?

4   **A.**  Correct.

5        **MR. WALDINGER:**  All right.  Ms. Margen, if we could

6   go to the next page.

7        So we're just walking through the various sections of the

8   Credit Action Request.

9        Up a little bit, Ms. Margen, where it starts to say "CRR."

10       That's fine there.

11                    (Exhibit published.)

12  **BY MR. WALDINGER:**

13  **Q.**  Is this where a new section of the CAR starts?

14  **A.**  Yes.

15  **Q.**  What is this section, Mr. Kreppel?

16  **A.**  This is our credit risk rating section.

17  **Q.**  What is the credit risk rating section?

18  **A.**  It's where we outline the various qualification criteria

19  and in connection with the borrower's financial information.

20  **Q.**  To be clear on all of the sections that we're looking at,

21  you're reviewing information that's been put in by people on

22  the underwriting team, correct?

23  **A.**  Correct.

24       **MR. WALDINGER:**  Ms. Margen, let's go to the next

25  section, the next page.

1          (Exhibit published.)

2     BY MR. WALDINGER:

3     Q.  Mr. Kreppel, there -- there looks again to be three

4     sections in all caps.  What are those?  And do they have any

5     relevance to this CAR?  Start with "Criticized Loan Status."

6     A.  Criticized loan status has to do with a loan that is not

7     performing.  It's a criticized loan that's not a pass credit.

8     So you would have various information if the loan was not a

9     pass credit in that section.

10    Q.  That's not relevant in this --

11    A.  No.

12    Q.   -- in this CAR?

13    A.  Correct.

14    Q.  What about the other two sections?  Is "Non-accrual Charge

15    Off" part of criticized loan status, or is that separate?

16    A.  It's part of it, yes.

17    Q.  How about "BDA Worksheet," what's that?

18    A.  That's actually part of a commercial bank calculation

19    that's not applicable to this loan.

20    Q.  These loan requests were part of the private bank,

21    correct?

22    A.  Correct.

23          MR. WALDINGER:  Let's go to the next section, next

24    page, Ms. Margen.

25                 (Exhibit published.)

1   BY MR. WALDINGER:

2   Q.   This is titled "Terms and Conditions," is that correct?

3   A.   Correct.

4   Q.   Are there separate terms and conditions for each of the

5   loan facilities?

6   A.   Yes.

7           MR. WALDINGER:   Ms. Margen, if we could then go --

8   we're now on page 6.  Let me --

9   Q.   Before we do that, which loan do these terms and

10  conditions relate to?

11  A.   These are related to the mortgage or real estate loan.

12  Q.   And it says "Real Estate Secured – RET – Facility A,"

13  correct?

14  A.   Um-hmm.

15  Q.   Are there two parts to the terms and conditions for each

16  facility?

17  A.   (Reviewing document.)

18       Yes.  If there's an existing mortgage, you would outline

19  the various terms there.  And then you would outline the

20  proposed terms if there was any -- any changes.

21  Q.   So I've circled, it says "Part 1, Structure" (indicating).

22       What is structure?

23  A.   Structure has to do with all the terms and conditions of

24  the loan, so the maturity date, the interest rate, and the

25  loan-to-value.

1          **MR. WALDINGER:**  Ms. Margen, if we could go to the

2     bottom of page 8.

3                         (Exhibit published.)

4     **BY MR. WALDINGER:**

5     **Q.**   Is this then Part 2 of the Terms and Conditions set out

6     for the real estate mortgage loan?

7     **A.**   Yes.

8     **Q.**   What does Part 2 relate to?

9     **A.**   The collateral, as well as some other codes that are

10    important for booking it on the system.

11         **MR. WALDINGER:**  Ms. Margen, if we could go to now

12    page 11.

13                         (Exhibit published.)

14    **BY MR. WALDINGER:**

15    **Q.**   Mr. Kreppel, we're seeing more terms and conditions.  Are

16    these the terms and conditions that relate to the Facility B?

17    **A.**   Yes.

18    **Q.**   Could you remind the jury what Facility B was?

19    **A.**   Facility B was an unsecured line of credit for $300,000.

20         **MR. WALDINGER:**  I'd like to move forward, Ms. Margen,

21    to page 16.

22                         (Exhibit published.)

23    **BY MR. WALDINGER:**

24    **Q.**   Mr. Kreppel, do you see that on your screen?

25    **A.**   Yes.

1    **Q.**   This says "Credit Memorandum" at the top.

2         What is this document?

3    **A.**   This document is part of the underwriting package where we

4    outline the various -- summarize the terms of the two loans,

5    as well as speak to the borrower's financial condition and

6    where they are employed.

7    **Q.**   Is this also written by the underwriters who -- or --

8    yeah.  Let me ask you that again.

9         Is this also written by the underwriters?

10   **A.**   Yes.

11   **Q.**   This is a -- the credit memorandum goes on for three

12   pages.

13        **MR. WALDINGER:**   Let's page forward, Ms. Margen.

14   Oops, wrong way.

15   There's page 16, page 17, and page 18.

16                      (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**   Are you reviewing all of that, Mr. Kreppel, when you -- in

19   August of 2014 when you reviewed a Credit Action Request?

20   **A.**   Yes.

21        **MR. WALDINGER:**   Let's turn to page 19.

22                      (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**   What is this section called?

25   **A.**   This is the financial spread.

1   **Q.**   What is this section?

2   **A.**   This section is where we outline the two loan facilities,

3   speak to the borrower's assets, liabilities, income, and

4   expenses.

5   **Q.**   We'll come back to this.

6       Just going forward, then, the next page, page 20.

7           **MR. WALDINGER:**   If you could just blow up this

8   section, Ms. Margen.

9                       (Exhibit published.)

10  **BY MR. WALDINGER:**

11  **Q.**   What is this section, Mr. Kreppel?

12  **A.**   This section outlines income as well as the borrower's

13  liquidity and the source of the liquidity in -- in brokerage

14  and bank statements.

15  **Q.**   It also appears to list -- so -- let me ask this again.

16      It lists what are called K-1's?  What are K-1's,

17  Mr. Kreppel?

18  **A.**   Those are part of a tax return that outline distribution

19  income.

20  **Q.**   Those would be -- and do you understand that the column

21  with -- that says "Guaranteed Payments" to relate to

22  distributions that have been made to the proposed borrower?

23  **A.**   Yes.

24  **Q.**   Does it also list "Recourse Liabilities" from the K-1's?

25  **A.**   Yes.

1   **Q.**  The section at the bottom says "Liquid Asset Holdings."

2   Again, what is that?

3   **A.**  That's the borrower's cash and investment account

4   balances.

5   **Q.**  Why does SVB care about liquid asset holdings?

6   **A.**  As part of our underwriting criteria and our credit risk

7   rating matrix, we assess the borrower's cash reserves, which

8   is a function of the liquidity or cash reserves they have

9   based -- based on their expenses.  And so essentially without

10  any income, how long can they continue to fulfill their

11  obligations with the cash they're holding.

12  **Q.**  If -- if a borrower's -- if a borrower had cash in an

13  account, but that cash was encumbered or pledged to another

14  loan, would it be included in this section for Liquid Asset

15  Holdings?

16  **A.**  No.  We would net out the -- the loan balance from the

17  cash balance.

18          **MR. WALDINGER:**  Ms. Margen, if we can then just page

19  through the next two pages.

20  **Q.**  And, Mr. Kreppel, I would just ask you whether -- what

21  these two pages are at the end of the Credit Action Request.

22          **MR. WALDINGER:**  And show Mr. Kreppel the last page.

23                   (Exhibit published.)

24  **BY MR. WALDINGER:**

25  **Q.**  So I believe both of those say "CRA Worksheet" at the top.

1    What are those pages, Mr. Kreppel?

2    **A.**   Again those are really for tracking within the bank

3    different codes that end up in our systems.

4    **Q.**   Very good.

5         **MR. WALDINGER:**   Ms. Margen, if we could go back to

6    page 1 of this document.

7    **Q.**   So we're now back on page 1 of Exhibit 222.

8         **MR. WALDINGER:**   And I will ask Ms. Margen to blow up

9    the bottom half of that page.

10                        (Exhibit published.)

11   **BY MR. WALDINGER:**

12   **Q.**   If you could remind the jury, then, what the two

13   facilities were that were the subject of this Credit Action

14   Request, Mr. Kreppel?

15   **A.**   Sure.   Facility 1 [sic] was a $1,280,000 mortgage.   And

16   facility number 2 [sic] was a $300,000 capital call line of

17   credit, unsecured capital line of credit.

18   **Q.**   Both of those descriptions have a parenthetical that says

19   Facility B.   Does one of those look like a typo?

20   **A.**   Yes.

21   **Q.**   Which one?

22   **A.**   The $1,280,000 30-year mortgage should be Facility A.

23   It's a typo.

24   **Q.**   On -- where it says "Facility B" near the bottom

25   (indicating), there are some initials or an acronym that says

1   CCLOC.  Could you remind the jury what CCLOC would be?

2   **A.**  Capital call line of credit.

3   **Q.**  With respect to capital call lines of credit, at this

4   time, was providing individuals who were general partners of

5   venture capital funds a loan to help meet that -- a loan to

6   help them meet their capital call commitment something that

7   SVB did?

8   **A.**  Yes.

9   **Q.**  Were there general guidelines for how much of a general

10  partner's capital call commitment SVB would fund or loan?

11  **A.**  Yes.

12  **Q.**  What -- what were those general guidelines?

13  **A.**  Those would be anywhere between 50 and 80 percent.

14          **MR. WALDINGER:**  Ms. Margen, if we could go to the --

15  well, before we --

16  **Q.**  Before we go there, we're on what's called the "Request"

17  section, correct?

18  **A.**  Correct.

19  **Q.**  Does the Request section continue to the top of page 2?

20  **A.**  Yes.

21                  (Exhibit published.)

22          **MR. WALDINGER:**  Let's go to that page, Ms. Margen,

23  and blow up the top half.

24                  (Exhibit published.)

25  / / /

1    BY MR. WALDINGER:

2    Q.   There is as phrase here that says "Reasons for

3    Recommendation."  The recommendation is to grant the loans,

4    correct?

5    A.   Correct.

6    Q.   What is the information that's listed below the phrase

7    "Reasons for Recommendation"?

8    A.   The mortgage loan amount of a million 280, the estimated

9    value of the property prior to the appraisal, the

10   loan-to-value, the maximum loan-to-value we would allow, the

11   80 percent.

12   Q.   Let me stop you there.  So that's the ratio between the

13   loan amount and the value of the property.

14   A.   Correct.

15   Q.   And the maximum loan-to-value is 80 percent.

16   A.   Correct.

17   Q.   Then the next line is "D/I Ratio."  What's that?

18   A.   That's debt-to-income ratio.

19   Q.   And what is that?

20   A.   That's a calculation that is the borrower's annual

21   expenses divided by their net income.

22   Q.   I believe you testified about this before, but was

23   calculating debt-to-income ratio something that was required

24   under the CFPB's rule?

25   A.   Yes.

1    **Q.**  What's the next section after the debt-to-income ratio?

2    **A.**  The qualifying income of 440,000.  The discretionary

3    income, which is the qualifying income less expenses, of

4    78,000.  The FICO score or credit score of 766.  Post close

5    liquidity, 683,000.

6    **Q.**  Let me stop you there.

7        What generally does that -- well, back in August of 2014,

8    what did that number include for post-close liquidity?

9    **A.**  That would be whatever the borrower disclosed as far as

10   their bank and brokerage statements, as well as any cash-out

11   proceeds from the mortgage loan.

12   **Q.**  Moving on.  "Contractual Reserves," what's that?

13   **A.**  That is a calculation that takes the borrower's liquidity

14   divided by their monthly expenses and gives you a number that

15   reflects the number of months they can support their expenses

16   without income.

17   **Q.**  Finally, what's "CRR"?

18   **A.**  Credit risk rating.

19   **Q.**  Now, I'll ask you some more questions about that in a bit.

20       Are all of these things that are listed under "Reasons for

21   Recommendation" something that's considered or was considered

22   by SVB in determining whether to make the loans at issue?

23   **A.**  Yes.

24   **Q.**  In other words, are all of these part of the bank's

25   decision-making process in August of 2014?

1    **A.**   Yes.

2    **Q.**   Do -- do some of these relate to the value of the bank's

3    security, such as the estimated value?

4    **A.**   Yes.

5    **Q.**   And do other factors relate to the potential borrower's

6    ability to repay?

7    **A.**   Yes.

8    **Q.**   Setting aside the CFPB's rule which required the bank to

9    consider ability to repay, correct?

10   **A.**   Um-hmm.

11   **Q.**   Setting aside that rule, is ability to repay an important

12   consideration for the bank?

13   **A.**   Yes.

14   **Q.**   Why is that?

15   **A.**   It's outlined in the regulations, the -- the mortgage

16   lending regulations, and as a bank, we've got to adhere to

17   those regulations or we could be subject to fines,

18   disciplinary action from federal examiners, and a host of

19   other audit-type groups.

20   **Q.**   Let me ask the question in a different way.

21       One of the things that the bank gets with a mortgage loan

22   is a lien on the property, correct?

23   **A.**   Correct.

24   **Q.**   So if you have good security in terms of a piece of

25   property that's worth -- I'm probably not articulating this

1    correctly -- but 20 percent more than that LTV value of

2    80 percent, why does the bank care whether a person can

3    actually repay if the bank can just -- has a good security?

4    **A.**   Mortgage values -- I mean property values can fluctuate so

5    you want to have some mortgage -- or margin built into the

6    collateral.  And then as far as the ability to repay and the

7    importance of the individual being able to meet their

8    obligations, there's various regulations around fair lending

9    which require the bank to make decisions that don't put the

10   borrower in a precarious financial position.

11   **Q.**   Moving on, there's a note here that says "D/I of

12   69 percent exceeds recommended 50 percent guideline."

13        What is that, Mr. Kreppel?

14   **A.**   Sure.  The guidelines we had at the time allowed for up to

15   50 percent loan-to-value based on a certain level of

16   contractual reserves.  If you exceeded the 50 percent, we

17   viewed it as an exception, but you would need to have

18   additional contractual reserves to exceed that 50 percent but

19   you could never go over 75 percent.

20   **Q.**   Let me break down what you just said.  You had a general

21   50 percent guideline, correct?

22   **A.**   Correct.

23   **Q.**   But if the borrower had sufficient assets, you could go

24   above that.

25   **A.**   Yes.

1    Q.  Correct?

2        Is -- I want to make sure the court reporter got that.

3    Correct?

4    A.  Correct.

5    Q.  Is -- is debt-to-income ratio, is -- is that calculated

6    using somebody's liquid assets or their -- their income, their

7    cash flow?

8    A.  Debt-to-income ratio is using their income, their cash

9    flow.

10   Q.  So in this case, it would have been looking at the -- the

11   net -- or the 440,000.

12   A.  Correct.

13   Q.  You also mentioned 75 percent.  At this time, what was the

14   relevance of the 75 percent number that you just testified

15   about?

16   A.  That was the maximum debt-to-income ratio that we could

17   allow.

18   Q.  Did you make any loans when the debt-to-income ratio as

19   calculated by the bank exceeded 75 percent?

20   A.  No.

21   Q.  Finally, the bottom section -- we're still on what's

22   called the "Request" section -- has information about

23   Rothenberg Ventures, correct?

24   A.  Correct.

25   Q.  So let me ask you.  This CAR, this Credit Action Request,

1  relates to a client by the name of Michael Rothenberg.  Why is

2  there information about Rothenberg Ventures here?

3  **A.**  The income that was derived from Rothenberg Ventures is

4  what we used to qualify the individual for the mortgage loan.

5  And the bank also worked with Rothenberg Ventures on the

6  commercial side of the bank as well.

7  **Q.**  Where does the fact that the bank worked with Rothenberg

8  Ventures on the commercial side, where did that come into your

9  credit determination in August of 2014?

10  **A.**  It -- it did not come into any part of the individual loan

11  qualification requirements.

12  **Q.**  Does the -- did the bank, in August of 2014, change its

13  underwriting guidelines to accommodate commercial bank

14  clients?

15  **A.**  No.

16  **Q.**  And did -- was there leeway in -- under the CFPB's, quote,

17  unquote, rule to stray from that rule in your ability to repay

18  determinations in order to get business from a commercial bank

19  customer?

20  **A.**  No.

21      I have a correction.

22  **Q.**  Go ahead.  What did you need to correct?

23  **A.**  Qualifying income of 440,000, that's actually not the

24  income number we used to qualify the individual.

25  **Q.**  Got it.

1    **A.**  We used the net income number.  That's the gross income

2    number.

3    **Q.**  Very good.  And we'll get to that on the spread, correct?

4    **A.**  Correct.

5    **Q.**  Thank you.

6         And so what you're saying is when you -- when you

7    calculate debt-to-income ratio, you used net income.

8    **A.**  Yes.

9    **Q.**  That was in August of 2014?

10   **A.**  Yes.

11   **Q.**  Do you still use net income today?

12   **A.**  No.

13   **Q.**  What do you use?

14   **A.**  We use gross income.

15   **Q.**  I'll ask you some more questions about that when we get to

16   the spread, Mr. Kreppel.

17        In the meantime, thank you for your correction on that.

18             **MR. WALDINGER:**  If we could turn, Ms. Margen, to

19   page 4.

20        Yeah, and let's blow up this section here (indicating)

21   where it says "CRR."

22                        (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**  I assume the "MGT" stands for management.  Is that what

25   "MGT" stands for?

1   **A.**   (Reviewing document.)

2   **Q.**   Risk MGT?

3   **A.**   Oh, yeah.   Management.

4   **Q.**   What is this section again, Mr. Kreppel?

5   **A.**   This is the "Credit Risk Rating" section.

6   **Q.**   Why is this here?   In other words, what's its importance

7   in determining whether to approve these loans?

8   **A.**   It outlines the various financial qualification criteria

9   that is embedded in our underwriting guidelines and also our

10  credit risk rating matrix where we use the credit risk rating

11  matrix to grade the loan.

12  **Q.**   There's a number here that says "Recommend a CRR-4."   Is

13  that the credit risk rating?

14  **A.**   Yes.

15  **Q.**   Could you briefly describe what the various -- what the

16  credit risk rating numbers were?   Did they go from one to

17  four, one to five, one to some other number?

18  **A.**   At the time, the credit risk ratings went from one, which

19  would be the safest, highest performing loan, to a ten, which

20  would be a loss or a chargeoff of the loan.

21  **Q.**   With respect to originating loans, was there a credit --

22  credit risk rating number that you would not go above?

23  **A.**   Yes.

24  **Q.**   And what was that?

25  **A.**   We would not originate a new mortgage loan or -- or a

1    personal loan that was risk rated CR-5, -6, -7, -8,

2    -9, or -10.

3    Q.  If you would not -- if SVB would not have originated those

4    loans, why do you even have those numbers?

5    A.  As loans continue to sit on our books, they have various

6    contractual requirements of making timely payments or perhaps

7    meeting financial covenants.  And the situations where the

8    loan isn't meeting financial covenants, or payments are late,

9    we would assess the loan for downgrade on an ongoing basis.

10   Q.  So it's possible that a loan that is credit risk rating at

11   four to start gets downgraded to a different number; is that

12   what you're saying?

13   A.  Yes.

14   Q.  This also mentions a qualifying debt-to-income of less

15   than 75 percent.  I believe you've already testified as to the

16   relevance of 75 percent, but if you could remind the jury

17   again why that figure is there.

18   A.  Yes.  The 75 percent was the maximum debt-to-income ratio

19   based on our underwriting guidelines as well as the maximum

20   debt-to-income ratio based on our credit risk rating matrix.

21   Q.  This also -- you looked at the amount of contractual

22   reserves, correct?

23   A.  Correct.

24   Q.  What is the -- what are contractual reserves based on,

25   Mr. Kreppel?

1    **A.**  It's the borrower's liquidity, their bank, brokerage

2    statements, their investments, divided by their monthly

3    expenses.

4        So in this case, the borrower could meet their expense

5    obligations for 43 months without income.

6    **Q.**  That's the calculation that's done by the bank?

7    **A.**  Yes.

8    **Q.**  Based on the information provided by the borrower?

9    **A.**  Yes.

10   **Q.**  I want to just talk about this section (indicating) a

11   little bit.  There's a sentence there that says, "This assumes

12   five-year amortization on the CCLOC...."

13       Can you explain what that assumption is about,

14   Mr. Kreppel?

15   **A.**  Yes.  Personal loans, the primary source of repayment for

16   mortgage and personal loans is cash flow of the individual.

17   So when you look at a personal loan, all of our personal loans

18   for qualification purposes, we amortize over five years to

19   show the ability to repay the loan over five years at a

20   reasonable debt-to-income ratio.

21   **Q.**  Is that -- is that assumption coming out of the CFPB's

22   rule?

23   **A.**  For personal loans, the five-year amortization is more of

24   an SVB calculation.

25   **Q.**  Very good.  But that's -- was this CCLOC, was this capital

1    call line of credit, actually a five-year loan, or was it

2    something different?

3    A.   I believe it was a three-year interest-only loan.

4    Q.   So even though it was a three-year interest-only loan, the

5    calculations done by SVB as part of its approval process

6    assumed for these types of loans a five-year amortization?

7    A.   Yes.

8    Q.   And when we say "amortization," what does that mean in

9    terms of the assumptions regarding payment of principal and

10   interest?

11   A.   That the borrower can meet equal principal and interest

12   payments over a five-year period to bring the loan down to a

13   zero balance.

14   Q.   At the end of the five years?

15   A.   At the end of the five years, yes.

16   Q.   Just to clarify, I think you referred to -- you talked

17   about personal loans.  Is this capital call line of credit a

18   personal loan?

19   A.   Yes, unsecured line of credit.  It has a business purpose

20   in that it's used for making investments into Rothenberg

21   Ventures, but we would view it as a personal loan.

22   Q.   There's a section here under "Performance to Expectations/

23   New Borrower Covenants required."  And for Facility B, I'm

24   directing your attention to (indicating), there's a line that

25   says, "No new debt of $100.0 without SVB approval."

1    What is that, Mr. Kreppel?

2    **A.**  That is a no new debt covenant where we allow the borrower

3    to borrow up to another hundred thousand dollars with another

4    lender.  If they exceed that hundred thousand, they must come

5    to SVB for approval.

6    **Q.**  This line item, it's written as a hundred dollars so

7    it's -- what you're saying this is in -- in thousands?

8    **A.**  It's in thousands.

9    **Q.**  So the -- was it important for SVB in -- in determining

10   whether to approve this loan that the borrower would not incur

11   new debt in excess of $100,000 without SVB's approval?

12   **A.**  Yes.

13   **Q.**  Again, I want to highlight this section here.  It says at

14   the bottom of this section that "SVB wishes to expand its

15   relationship with Rothenberg Ventures portfolio companies."

16   Do you see that?

17   **A.**  Yes.

18   **Q.**  What role did that play in your credit decision?

19   **A.**  It did not play a role in the credit decision.

20   **Q.**  Is this true?

21   **A.**  Yes.

22   **THE COURT:**  Do you mean is the statement true that

23   SVB wishes to expand its relationship with Rothenberg

24   Ventures?  When you said, "Is this true?"

25   **MR. WALDINGER:**  Yes, I did.  Thank you, Your Honor.

1    **Q.**  Is that statement true that SVB wished to expand its

2    relationship with Rothenberg Ventures portfolio companies?

3    **A.**  Yes.

4            **MR. WALDINGER:**  Ms. Margen, if we could go to page 6.

5                       (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**  This is the terms and conditions for the real estate loan.

8    Is that correct, Mr. Kreppel?

9    **A.**  Yes.

10           **MR. WALDINGER:**  Let's go to the next page,

11   Ms. Margen.

12                      (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.**  And there's something called "Indicative Rate" or

15   "Indicative Rate."  What's that, Mr. Kreppel?

16   **A.**  The indicative rate would be the rate that is actually

17   charged the borrower.  Part of the underwriting regulations

18   for a five-year adjustable rate mortgage required that you add

19   2 percent to the rate for qualification.  So it's just

20   differentiating between the qualification rate and the

21   indicative rate.  Or the actual rate.

22   **Q.**  And here, what was the -- what was the loan terms?

23   **A.**  The loan terms, this was a 30-year mortgage that had a

24   fixed rate for five years.  And after five years, it would

25   move to an adjustable rate.

1    **MR. WALDINGER:**  Ms. Margen, if we could then now go

2    to page 11.

3                         (Exhibit published.)

4    **BY MR. WALDINGER:**

5    **Q.**  Mr. Kreppel, are these the "Terms and Conditions" for the

6    capital call line of credit?

7    **A.**  Yes.

8    **Q.**  Can you tell from the next page what the rate was?

9                 **MR. WALDINGER:**  Can we go to the next page,

10   Ms. Margen.

11                        (Exhibit published.)

12   **BY MR. WALDINGER:**

13   **Q.**  Is this the rate?  Or is it something different?

14   **A.**  That's the rate.

15   **Q.**  4.75?

16   **A.**  Yes.

17   **Q.**  There's a loan fee at the bottom.  What is that,

18   Mr. Kreppel?

19   **A.**  We typically charge a loan fee based on a percentage of

20   the loan commitment for this type of loan.

21   **Q.**  Was that 1 percent?

22   **A.**  Yes.

23   **Q.**  How -- with respect to capital call lines of credit, how

24   were those funded?  In other words, where would the money be

25   sent?

1    **A.**   The money would -- would be sent to the borrower's account

2    or could be sent directly to the fund, depending on how it's

3    set up.

4    **Q.**   Are the loan -- are the loan fees taken out of the

5    principal?

6    **A.**   Yes.   They can be funded through the loan proceeds.

7    **Q.**   In this case, if there were a $300,000 loan and the loan

8    fees were taken out of the loan principal, what does that mean

9    in terms of how much money would have been sent to the

10   borrower or to the fund?

11   **A.**   It would have been the 300,000 less the 3,000 which would

12   have been $297,000.

13           **MR. WALDINGER:**   Ms. Margen, let's go to page 16,

14   please.

15                     (Exhibit published.)

16   **BY MR. WALDINGER:**

17   **Q.**   We looked at this before.   This is the "Credit

18   Memorandum"; is that right?

19   **A.**   Correct.

20   **Q.**   This has a date of August 7th.   Was that also the date

21   that you approved the loan?

22   **A.**   I -- yes, I believe so.

23   **Q.**   Is that a typical turnaround, back in August of 2014?

24   **A.**   Yes.   It could be definitely that turnaround.

25   **Q.**   I just want to note a couple of things.   This also has no

1  new debt in excess of a hundred thousand, where it says $100

2  without SVB approval, correct?

3  **A.**  Correct.  It's in thousands.  So a hundred thousand

4  dollars.

5           **MR. WALDINGER:**  If you could go to the next page of

6  the credit memorandum, Ms. Margen, and the next -- we need to

7  go forward to page 17.

8      All right, let's blow up the "Personal Financial

9  Condition" section.

10                    (Exhibit published.)

11  **BY MR. WALDINGER:**

12  **Q.**  Does this set forth the amount of cash that the borrower

13  currently had?

14  **A.**  Yes.

15  **Q.**  And this says 303 there, which means 303,000, correct?

16  **A.**  Correct.

17  **Q.**  There's also a sentence that begins "His current debt...."

18      Do you see that?

19  **A.**  Yes.

20  **Q.**  Is current debt something that SVB considered in

21  determining whether to grant or deny a loan back in August of

22  2014?

23  **A.**  Yes.

24  **Q.**  As a senior credit officer for SVB in August of 2014, did

25  you want to know about all significant debts that a borrower

1    had?

2    **A.**  Yes.

3    **Q.**  Back in August of 2014, would $350,000 have been a

4    significant debt?

5    **A.**  Yes.

6          **MR. WALDINGER:**  Let's go forward now, Ms. Margen, to

7    page 19.

8          And let's -- let's blow up this (indicating) so that

9    everybody can see it hopefully a little better.  This is about

10   the top two-thirds of the page.

11                    (Exhibit published.)

12   **BY MR. WALDINGER:**

13   **Q.**  This document, this page of Exhibit 22 is called what,

14   Mr. Kreppel?

15   **A.**  It's the financial spread.

16   **Q.**  What is -- what does this page do again?

17   **A.**  It outlines the borrower's assets, liabilities, income,

18   and expenses.

19   **Q.**  Did you review this page in determining whether to approve

20   or deny Mr. Rothenberg's loan applications?

21   **A.**  Yes.

22   **Q.**  There's a section up here, a box that's four down from the

23   top on the right-hand side that says "Gross Income DTI."

24   What's that?

25   **A.**  That's just an ancillary calculation that doesn't really

1    drive any of our lending criteria.  It's the gross income --

2    the gross income used in the debt-to-income ratio.

3    **Q.**  Did you consider at this time net debt-to-income ratio?

4    **A.**  Yes.

5    **Q.**  There's a section here called "Assets & Liabilities."

6        Did you consider that in determining whether to grant or

7    deny the loans?

8    **A.**  Yes.

9    **Q.**  Do you see the second line where it says "Other Cash"?

10   **A.**  Yes.

11   **Q.**  What does it say there?

12   **A.**  "Other Cash, Merrill Lynch, $370,062."

13   **Q.**  What do you take that to mean?

14   **A.**  That the borrower had $370,062 in their Merrill Lynch

15   account.

16   **Q.**  And that was added with other things to come up with a

17   total assets of $2,083,604?

18   **A.**  Yes.

19   **Q.**  What were the total liabilities calculated by SVB based on

20   the information provided by Mr. Rothenberg?

21   **A.**  There was the existing mortgage facility, some credit card

22   debt, student loan, remaining callable capital, and other

23   contingent liabilities of 123,000.

24   **Q.**  That 123,000 came from K-1's; is that right?

25   **A.**  That's right.

1   **Q.**  With respect to the contingent remaining callable capital,

2   that's the capital commitment that one of the loan facilities

3   related to, correct?

4   **A.**  Correct.

5   **Q.**  Let me give you a hypothetical.  I think you just said

6   that you looked at assets and liabilities in determining

7   whether to approve or grant this loan, correct?

8   **A.**  Correct.

9   **Q.**  While you were looking at this page, which you've referred

10  to as the financial spread, if one of the underwriters or

11  Michelle Jandu had called you while you were reviewing it and

12  said, "Hey, we just talked to the borrower, just talked to

13  Mr. Rothenberg, and he told us that this 370,000 was pledged,

14  was encumbered, and that he also had a $350,000 liability,

15  what would -- what would your response have been?

16  **A.**  That the underwriting team would need to re-underwrite the

17  loan based on that obligation.

18  **Q.**  Why is that?

19  **A.**  There's -- for that loan obligation, there would be

20  interest expense associated with it which would affect the

21  debt-to-income radio and -- and potentially push it higher.

22  **Q.**  And this figure here, the 370, is listed as other cash,

23  correct?

24  **A.**  Correct.

25  **Q.**  If -- assume that all of that was encumbered, Mr. Kreppel.

 1   Would that have affected the borrower's ability to make a

 2   capital call contribution to Fund II?

 3        **MR. FAKHOURY:**  Objection, speculation.

 4        **THE COURT:**  Overruled.

 5        **THE WITNESS:**  Yes.

 6   **BY MR. WALDINGER:**

 7   **Q.**  Why is that?

 8   **A.**  Technically -- if the money wasn't there?

 9   **Q.**  Or if it was encumbered.

10   **A.**  Oh, if it was encumbered.  As far as then using it for

11   capital calls, the bank wouldn't allow that money to leave the

12   bank if it was encumbered.

13   **Q.**  And so because the way this worksheet works is that it

14   assumes that of that 370, 100 is going to be used for the

15   capital call commitment, correct?

16   **A.**  Correct.

17   **Q.**  Would that have been another reason to have to redo this

18   Credit Action Request?

19   **A.**  Yes.  We view the capital calls as an expense.

20   **Q.**  What was --

21        **MR. WALDINGER:**  Ms. Margen, let's blow up the bottom

22   half here where it says "Income & Expenses," all the way down

23   here.

24                    (Exhibit published.)

25   / / /

KREPPEL - DIRECT / WALDINGER

1    BY MR. WALDINGER:

2    Q.  Is this the section from which the debt-to-income ratio is

3    derived, Mr. Kreppel?

4    A.  Yes.

5    Q.  What was the debt-to-income ratio that was calculated by

6    the bank?

7    A.  69 percent.

8    Q.  That's right here in the -- in the bottom of that grid

9    (indicating)?

10   A.  Yes.

11   Q.  Could you explain to the jury how those numbers come

12   about.

13   A.  Yes.  We take the total expenses of $175,612 divided by

14   the net income of $254,036.  And that's how you get to the

15   debt-to-income ratio.

16   Q.  Of 69 percent?

17   A.  69 percent.

18   Q.  All right.  This was approved -- these loan facilities

19   were approved, I believe you said, on August 7th of 2014; is

20   that correct?

21   A.  Correct.

22   Q.  Have you reviewed the file to see that the mortgage loan

23   was not immediately disbursed after your August 7th approval?

24   A.  Did I -- no, I -- as far as knowing when the -- the date

25   of the disbursement of the mortgage?

1    **Q.**   Well, let me ask it a different way.

2          Was there a later request for a higher mortgage loan

3    amount?

4    **A.**   Yes.

5    **Q.**   In the meantime, did the bank disburse the capital call

6    line of credit?

7    **A.**   I believe so.

8    **Q.**   Do you recall, sitting there today, what date that was?

9    **A.**   I believe that was August 17th or August 26th.

10   **Q.**   Let me -- for the capital call line of credit?

11   **A.**   Yes.

12          **MR. WALDINGER:**   Let's pull up trial Exhibit 85,

13   Ms. Margen.

14          And let's go to -- first to the second page.

15          Let's blow up the top.

16                    (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**   Mr. Kreppel, these are SVB bank statements.  Do you see

19   who the account holder is?

20   **A.**   Yes.

21   **Q.**   And what is the account holder?

22   **A.**   Rothenberg Ventures.

23   **Q.**   What's the account number -- what are the digits that it

24   ends?

25   **A.**   7483.

1    **Q.**  And when you said the account holder is Rothenberg

2    Ventures.  It's actually Rothenberg Ventures Fund II?

3    **A.**  Correct.

4              **MR. WALDINGER:**  Ms. Margen, let's go to page 34.

5                        (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**  Mr. Kreppel, we're showing you page 34 of Exhibit 85.

8              **MR. WALDINGER:**  And, Ms. Margen, let's -- let's blow

9    up this section here (indicating).

10                       (Exhibit published.)

11   **BY MR. WALDINGER:**

12   **Q.**  This is again a page from the account -- an account

13   statement for the account ending 7483, correct?

14   **A.**  Correct.

15   **Q.**  And directing your attention to -- there's an entry on

16   August 12th for 297,000 and another one on August 12th for

17   103,000.

18       Does that refresh your recollection based on the research

19   you've done as to when the capital call line of credit was

20   funded by SVB?

21   **A.**  Yes.

22   **Q.**  And when was that?

23   **A.**  August 12th.

24   **Q.**  Does this $297,000 amount comport with the $300,000

25   principal minus the loan fees?

1    **A.**  Yes.

2           **MR. WALDINGER:**  All right.  Thank you.  You can take

3    that down, Ms. Margen.

4    **Q.**  Mr. Kreppel, you testified that there was a request, I

5    believe, to increase the mortgage loan amount; is that right?

6    **A.**  Yes.

7    **Q.**  Was there a subsequent CAR, or Credit Action Request,

8    related to that?

9    **A.**  Yes.

10          **MR. WALDINGER:**  Ms. Margen, if we could put up what's

11   in evidence as United States Exhibit 23.

12   **Q.**  And you also have that exhibit in front of you,

13   Mr. Kreppel.

14                    (Exhibit published.)

15   **BY MR. WALDINGER:**

16   **Q.**  This is the 12-page exhibit.

17       In general, what is this document, Mr. Kreppel?

18   **A.**  This is an addendum approval to the original CAR that

19   requests the increase in the mortgage facility.

20          **MR. WALDINGER:**  Let's just blow up the bottom

21   including all the way to the bottom.

22                    (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**  Does this CAR have the same or a different CAR number as

25   Exhibit 22?

KREPPEL - DIRECT / WALDINGER

1    **A.**   Different.

2    **Q.**   So each Credit Action Request is given a separate CAR

3    number?

4    **A.**   Correct.

5    **Q.**   What is the request here?

6    **A.**   To increase the originally approved mortgage by $200,000.

7    **Q.**   And is that -- what was that based on?

8    **A.**   The appraised value of the property came back to be more

9    than 1.6 million.  It was a million 850.  And it -- the

10   80 percent loan-to-value, that enabled us to lend more on the

11   cash-out refinance of the property.

12   **Q.**   Can you tell --

13            **MR. WALDINGER:**  Ms. Margen, just go to the top of

14   this document.

15                       (Exhibit published.)

16   **BY MR. WALDINGER:**

17   **Q.**   Can you tell when this addendum approval came in, in

18   general?

19   **A.**   August 18th of 2014.

20   **Q.**   Would you have reviewed -- would you have had to review

21   and approve this Credit Action Request?

22   **A.**   Yes.

23   **Q.**   Can you tell from this document -- and we'll go to the --

24   the bottom of page 2 and top of page 3 -- whether you did

25   approve it?

 1                    (Exhibit published.)

 2    BY MR. WALDINGER:

 3    Q.   Let's start there (indicating) at the bottom of page 2.

 4    A.   Yes.

 5    Q.   So there the computer forgot that you go by Buzz and not

 6    Frederick.

 7    A.   Correct.

 8    Q.   And does then the next page of this document at the top

 9    have the date of your approval or denial?

10                    (Exhibit published.)

11         THE WITNESS:  Yes.

12    BY MR. WALDINGER:

13    Q.   And what's -- what was that date?

14    A.   August 19th, 2014.

15         MR. WALDINGER:  Ms. Margen, if we could go to the top

16    of page 2.

17                    (Exhibit published.)

18    BY MR. WALDINGER:

19    Q.   This is the same information that we went through in

20    Exhibit 22, correct?

21    A.   Correct.

22    Q.   And in fact, on the bottom --

23         MR. WALDINGER:  I'm sorry, Ms. Margen, if we could go

24    back to the bottom of page 1.

25                    (Exhibit published.)

1    BY MR. WALDINGER:

2    Q.   It -- it has this phrase "Reasons for Recommendation" and

3    starts off again with mortgage loan amount, appraised value,

4    and LTV, correct?

5    A.   Correct.

6    Q.   Does that continue on the top of page 2?

7                     (Exhibit published.)

8             THE WITNESS:   Yes.

9             MR. WALDINGER:   So let's blow up the top of page 2,

10   Ms. Margen.

11                    (Exhibit published.)

12   BY MR. WALDINGER:

13   Q.   Is it true that the debt-to-income ratio is now different?

14   A.   Yes.

15   Q.   What has that gone up to?

16   A.   74 percent.

17   Q.   Please remind the jury what your ceiling was at SVB at

18   this time?

19   A.   75 percent.

20   Q.   Does that mean that it could go to 75 but it couldn't go

21   to 76, or was 74.99 the highest?

22   A.   It could go to 75.   It could not exceed 75.

23   Q.   Could it be 75.1?

24   A.   No.

25   Q.   So it's 75.00?

1    A.   Yes.

2    Q.   All right.  Let's -- let's move to the spread on this

3    document, which is on page 9.

4                         (Exhibit published.)

5    BY MR. WALDINGER:

6    Q.   Mr. Kreppel, on page 9 of Exhibit 23, is that the spread

7    on the addendum approval?

8    A.   Yes.

9         MR. WALDINGER:  Ms. Margen, let's blow up this

10   section here (indicating).

11                        (Exhibit published.)

12   BY MR. WALDINGER:

13   Q.   Again, Mr. Kreppel, this lists a gross DTI up here

14   (indicating).  Is that part of the decision-making process?

15   A.   No.

16   Q.   Was the DTI down at the bottom part where it says

17   74 percent, was that what was part of the decision-making

18   process?

19   A.   Yes.

20   Q.   I'm going to ask you the same question that I asked you

21   with respect to Exhibit 22.  If while you were reviewing the

22   spread, Michelle Jandu or somebody on the underwriting team

23   called you and said, "Hey, the borrower just told me that this

24   $370,000 is encumbered, and the borrower also told me that

25   they had a $350,000 line of credit balance," what would you

1    have done at that point during your review of this addendum

2    approval?

3    **A.**   I would have sent it back to the underwriting group to

4    recalculate the spread based on the discovery of the loan to

5    include the interest due on that loan and the debt-to-income

6    ratio.

7    **Q.**   And that never happened, correct?

8    **A.**   Correct.

9    **Q.**   In preparation for your testimony today, have I asked you

10   to make some assumptions about debt-to-income ratio and about

11   calculations?

12   **A.**   Yes.

13          **MR. WALDINGER:**   And so I would like, Your Honor, to

14   show Mr. Kreppel and the jury another demonstrative exhibit

15   which we will call Demonstrative C.

16          **THE COURT:**   All right.  Does Mr. Fakhoury already

17   have a copy?

18          **MR. WALDINGER:**   Yes, he does, Your Honor.

19          **THE COURT:**   All right.

20      Mr. Fakhoury, do you have any objection to counsel

21   publishing this?

22          **MR. FAKHOURY:**   Not to publication, Your Honor.

23          **THE COURT:**   All right.  That's fine.

24                (Pause in the proceedings.)

25          **MR. WALDINGER:**   I'm sorry.  That's not it,

1    Ms. Margen.

2         There we go.

3                    (Demonstrative published.)

4    **BY MR. WALDINGER:**

5    **Q.**  All right.  So, Mr. Kreppel, these are -- the calculations

6    at the top (indicating) are what?

7    **A.**  The calculation at the top is the borrower's expenses of

8    $187,951 divided by their net income of $254,036 which gives

9    you a debt-to-income ratio of 74 percent.

10   **Q.**  The 187,951 comes from page 9 of Exhibit 23 from the

11   spread, correct?

12   **A.**  Correct.

13   **Q.**  That's what SVB calculated as total expenses?

14   **A.**  Correct.

15   **Q.**  The 254,036 also comes from page 9 of Exhibit 23; is that

16   right?

17   **A.**  Yes.

18   **Q.**  And that's the net income.

19   **A.**  Yes.

20   **Q.**  I would like you to make the assumption that there was

21   another $350,000 of debt at a 3.77 percent interest rate.

22        Is the number that is on the demonstrative correct?  Is

23   that a correct calculation?

24   **A.**  Yes.

25   **Q.**  Is that -- would that be a -- strike that.

1      What's that number?

2   **A.**   That's the interest expense associated with the $350,000

3   loan.

4          **THE COURT:**   I think Mr. Waldinger wants you to just

5   say the amount of money out loud.

6   **BY MR. WALDINGER:**

7   **Q.**   Yes.   So we need it for the record because this exhibit is

8   just a demonstrative that's not going into evidence.   And so I

9   wanted you to say.

10      What was your interest calculation when you were given a

11   3.7 percent interest rate on a $350,000 principal?

12   **A.**   $13,195.

13   **Q.**   Did you then add that amount, 13,195, to the total

14   expenses that the bank had calculated?

15   **A.**   Yes.

16   **Q.**   Is that the next section of this demonstrative, which is

17   entitled "Adjustment To Total Expenses in Trial Exhibit 23

18   Based on Assumption"?

19   **A.**   Yes.

20   **Q.**   What number did you get when you added those two numbers

21   together?

22   **A.**   $201,146.

23   **Q.**   Did you then recalculate the debt-to-income ratio based on

24   that assumption?

25   **A.**   Yes.

1    Q.   Is that the last part of this demonstrative?

2    A.   Yes.

3    Q.   What did you find when you -- when you included that

4    13,195?

5    A.   The debt-to-income ratio increased to 79 percent.

6    Q.   And you got 79 percent by dividing $201,146 by $254,036,

7    correct?

8    A.   Correct.

9    Q.   Is the 79 percent figure relevant, back in August of 2014,

10   to the loan decision?

11   A.   Yes.

12   Q.   How is it relevant to the loan decision back in August of

13   2014?

14   A.   In August of 2014, we had a max debt-to-income ratio --

15   maximum debt-to-income ratio of 75 percent.  If -- if it was

16   above 75 percent, it would have been a non-pass loan that we

17   would not have originated.

18   Q.   Even for a venture capitalist whose business that you were

19   trying to get?

20   A.   Correct.

21   Q.   You -- I think you said earlier, Mr. Kreppel, that the

22   bank now uses a gross debt-to-income ratio?

23   A.   Yes.

24   Q.   Is -- under the gross debt-to-income ratio analysis, do

25   you still use the 79 percent -- or excuse me -- 75 percent

1    ceiling?  Or is there a different ceiling now that you've

2    changed the ratio?

3    **A.**   There's a different ceiling of 55 percent.

4    **Q.**   Back in August of 2014, was there any requirement that you

5    used net versus gross debt-to-income ratio?

6    **A.**   We used net debt-to-income ratio.

7    **Q.**   But was there any requirement outside of the bank, like

8    for example from the CFPB?

9    **A.**   No.

10   **Q.**   Did you look at what other lenders were doing in

11   determining what kind of ratio you used at that time?

12   **A.**   I don't recall.

13   **Q.**   Okay.

14       And what -- do you know why you moved to gross

15   debt-to-income ratio?

16   **A.**   Yes.  In 2018, we installed a new mortgage loan

17   origination system, and it was recommended that we use the

18   gross debt-to-income ratio based on the -- the program that --

19   that we were adopting.

20   **Q.**   Okay.  And so because you went to gross debt-to-income

21   ratio, you changed the percentage which became the new

22   ceiling.

23   **A.**   Correct.

24           **MR. WALDINGER:**  If I could have just one second, Your

25   Honor.

1          THE COURT:  Okay.

2                     (Pause in the proceedings.)

3          MR. WALDINGER:  If we could go back, let's just go

4     back to Exhibit 23, Ms. Margen, to page 9.

5        Let's just blow up this section here, Ms. Margen,

6     (indicating).

7                     (Exhibit published.)

8     BY MR. WALDINGER:

9     Q.  Mr. Kreppel, the answer may be subsumed in the

10    hypothetical that I gave you, but when a number is put in here

11    in cash, is that -- is there any assumption made about the

12    liquidity of the cash by SVB?

13    A.  Yeah, yes.  It's assumed to be unencumbered.

14    Q.  And what do you mean by "unencumbered"?

15    A.  That it's not pledged to another bank.

16          MR. WALDINGER:  All right.  I don't have any further

17    questions for Mr. Kreppel, Your Honor.

18          THE COURT:  All right.  Thanks.

19        Members of the jury, we're just a few minutes before our

20    normal breaking time.  So as not to interrupt Mr. Fakhoury's

21    cross-examination just as he's getting started, we're going to

22    go ahead and take our morning recess.  Thank you.

23          THE CLERK:  Please rise for the jury.

24        (The following proceedings were heard out of the presence

25    of the jury:)

```
 1              THE COURT:  That door is particularly slow today.
 2         We're outside the presence of jury -- there we are.
 3         Mr. Fakhoury, the only question I have -- a question I
 4    have is should I have the physical copies of the jury
 5    instructions present in the courtroom during our last segment
 6    of the morning?
 7              MR. FAKHOURY:  I think so, Your Honor.  I think
 8    that's a good idea.
 9              THE COURT:  Okay.  All right.
10         Then we shall.
11         Anything else for the record, Mr. Fakhoury?
12              MR. FAKHOURY:  No, Your Honor, thank you.
13              MR. WALDINGER:  No, Your Honor.
14              THE COURT:  All right.  Thanks.  Let's be in recess.
15              THE CLERK:  Court is in recess.
16         (Recess taken at 11:41 A.M.; proceedings resumed at
17    12:00 P.M.)
18         (The following proceedings were heard in the presence of
19    the jury:)
20              THE CLERK:  You may be seated.
21              THE COURT:  All right.  Let's go back on the record.
22    All the jurors are in their assigned seats.
23         Mr. Fakhoury, cross-examination?
24              MR. FAKHOURY:  Thank you, Your Honor.
25    / / /
```

**CROSS-EXAMINATION**

**BY MR. FAKHOURY:**

**Q.**   All right.  Good afternoon, Mr. Kreppel.

Am I saying that correctly?

**A.**   Yes.

**Q.**   Okay.  Now, you've testified you've worked for

Silicon Valley Bank since 1993, correct?

**A.**   Correct.

**Q.**   And SVB is primarily a commercial bank, right?

**A.**   Correct.

**Q.**   And it does have a private lending side, though, right?

**A.**   It does.

**Q.**   And that's were you primarily work?

**A.**   Yes.

**Q.**   On the private lending side, one of the products the bank

issues are personally tailored loans, right?

**A.**   Correct.

**Q.**   So a capital call line of credit would be a personally

tailored loan, correct?

**A.**   Correct.

**Q.**   Another potential personally tailored loan would be a

nonconforming mortgage, right?

**A.**   We wouldn't differ -- we would differentiate the two --

**Q.**   Okay.

**A.**    -- from tailored lending to mortgage lending.

1  **Q.**  Okay.  Well, let me ask you a couple questions about

2  mortgages specifically.  Okay?

3  **A.**  Um-hmm.

4  **Q.**  Mr. Waldinger had asked you about whether Silicon Valley

5  Bank sells its mortgages, right?

6  **A.**  Right.

7  **Q.**  And I believe your testimony was the bank doesn't sell its

8  mortgages, right?

9  **A.**  Correct.

10  **Q.**  He specifically asked about Fannie Mae and Freddie Mac.

11  Do you recall that testimony?

12  **A.**  Yes.

13  **Q.**  And so we're all on the same page, Fannie Mae and

14  Freddie Mac are government agencies that buy mortgage-backed

15  securities, right?

16  **A.**  Correct.

17  **Q.**  And they have pretty specific lending requirements in

18  order to purchase the mortgage, correct?

19  **A.**  Correct.

20  **Q.**  And that's what we would -- and it's -- sorry, let me --

21  let me rephrase this.

22     A qualifying mortgage would be a mortgage that meets the

23  requirements set by Fannie Mae and Freddie Mac to be

24  repurchased by them?

25  **A.**  Correct.

1    **Q.**   Okay.

2         You testified that in about -- in 2014, the bank was --

3    well, in 2014, you were reviewing about 100 mortgages a month.

4    Does that sound about right?

5    **A.**   Yes.  Yes.

6    **Q.**   Okay.  Now, part of the reason that Silicon Valley Bank

7    keeps its mortgages is because it's interested in growth

8    opportunities, right?

9    **A.**   Correct.

10   **Q.**   And one of the purposes of the private banking side is to

11   grow a personal relationship with the borrower, right?

12   **A.**   Right.

13   **Q.**   SVB is focused on venture capitalists and entrepreneurs,

14   right?

15   **A.**   Right.

16   **Q.**   And so part of the bank's growth strategy is to develop

17   relationships with the VC general partner, right?

18   **A.**   Correct.

19   **Q.**   And then get the VC's commercial business hopefully,

20   right?

21   **A.**   Right.

22   **Q.**   And then ideally get access to the VC's portfolio company,

23   right?

24   **A.**   Right.

25   **Q.**   And you already testified that for these loans

1  specifically, Silicon Valley Bank already had a

2  relationship -- a banking relationship with Rothenberg

3  Ventures before these loans were sent to you for approval,

4  right?

5  **A.**  Right.

6  **Q.**  Okay.  Let's jump into the loans that you've testified

7  about.

8      And I want to make sure I get your title right.  So why

9  don't you tell me again.  In 2014, what -- what was your title

10  at the bank?

11  **A.**  Senior credit officer.

12  **Q.**  Okay.  And at that time in 2014, you weren't dealing with

13  clients or borrowers specifically, right?

14  **A.**  Correct.

15  **Q.**  Or I'm sorry, let me rephrase that.  I meant to say

16  directly.

17  **A.**  Very rare.

18  **Q.**  Okay.  You're not -- you're not meeting banking clients

19  for lunch, right?

20  **A.**  No.

21  **Q.**  Your job is to decide whether the bank should approve or

22  deny the loan, right?

23  **A.**  Right.

24  **Q.**  And I believe you testified you could approve loans up to

25  $15 million, right?

1    **A.**   Right.

2    **Q.**   So any loan above that needed to go through a higher layer

3    of review above -- above you, right?

4    **A.**   Correct.

5    **Q.**   So for these two loans at issue here, you were the final

6    approval?

7    **A.**   Correct.

8    **Q.**   Now, you testified that there's a lot of work that goes

9    into -- well, let me strike that.

10       There's a lot of work that takes place before you have a

11   chance to review the loan and decide whether to approve it or

12   not, right?

13   **A.**   Correct.

14   **Q.**   And that process is usually overseen by an account

15   manager, correct?

16   **A.**   Correct.

17   **Q.**   And on these loans, it was Michelle Jandu who was the

18   account manager; is that correct?

19   **A.**   That's right.

20   **Q.**   Okay.

21       She's the one who -- well, more generally, an account

22   manager is the one who deals with the client directly, right?

23   **A.**   That's right.

24   **Q.**   And in this specific -- on these specific loans, it was

25   Michelle Jandu that dealt with Mr. Rothenberg directly, right?

1    **A.**   Right.

2    **Q.**   It's the account manager or their staff that collects the

3    financial information from the borrower, right?

4    **A.**   Correct.

5    **Q.**   And that financial information can include things like

6    bank statements, for example.

7    **A.**   Correct.

8    **Q.**   Right?  Okay.

9         Now, the bank also verifies independently information it

10   gets from the borrower, right?

11   **A.**   Right.

12   **Q.**   You talked a little bit about the rule.  Do you recall

13   that testimony?

14   **A.**   Yes.

15   **Q.**   That's the Consumer Financial Protection Bureau's rule

16   regarding ability to repay on a mortgage.  Do you recall that?

17   **A.**   Yes.

18   **Q.**   And -- and one of the criteria in that rule is that

19   creditors, meaning a bank, right, have to use reliable

20   third-party records to verify information, right?

21   **A.**   Correct.

22   **Q.**   One of the ways the bank verifies financial information is

23   by running a credit report, correct?

24   **A.**   Correct.

25   **Q.**   We've heard some testimony in the trial about something

1  called a Form 1003.  And I'm just curious.  Are you familiar

2  with what a Form 1003 is?

3  **A.**   Yes.

4  **Q.**   Okay.  And that's a Uniform Residential Loaning

5  Application -- Loan Application, right?

6  **A.**   (Nods head.)

7  **Q.**   Is that a "yes"?

8  **A.**   Yes.

9  **Q.**   Okay.  And a Form 1003 authorizes the bank to pull a

10  borrower's credit history, right?

11  **A.**   Right.

12       **MR. FAKHOURY:**  Mr. Torres, can you pull up Exhibit 4.

13  It's already here on the tab.

14      You can just leave it right there.

15                    (Exhibit published.)

16  **BY MR. FAKHOURY:**

17  **Q.**   Have you seen a form like this?

18  **A.**   Yes.

19  **Q.**   Okay.  And this is Exhibit 4.  This is a form that says

20  "Certification and Authorization," right?

21  **A.**   Yes.

22  **Q.**   Okay.

23       **MR. FAKHOURY:**  Mr. Torres, can you scroll down.

24      Perfect.

25                    (Exhibit published.)

 1   BY MR. FAKHOURY:

 2   Q.   I want to talk about this section right here.  This is

 3   labeled an "Authorization To Release Information," correct?

 4   A.   Correct.

 5   Q.   Okay.  And -- and you're aware that this authorizes the

 6   bank to pull on its own any relevant records it wants to see

 7   about a borrower's financial situation, right?

 8   A.   Correct.

 9   Q.   And this form also authorizes the bank to pull a

10   borrower's credit report, too, right?

11   A.   Correct.

12           MR. FAKHOURY:  Mr. Torres, can you pull up

13   Exhibit 34, and go to page 177.

14        And you can zoom out a little bit.

15                       (Exhibit published.)

16   BY MR. FAKHOURY:

17   Q.   Another thing the bank does is it independently verifies a

18   borrower's employment, right?

19   A.   Yes.

20   Q.   Okay.  Have you seen a form like this before?

21   A.   I don't work with this form regularly, so --

22   Q.   Okay.

23   A.   -- no, I haven't seen them.

24   Q.   Okay.  But it looks like it's at Silicon Valley Bank

25   "Verification of Employment" form?

```
 1    A.   Yes.

 2    Q.   Okay.

 3         MR. FAKHOURY:   Okay.  Mr. Torres, can you pull up

 4    Exhibit 22.

 5        And you can just leave it here for now.

 6                       (Exhibit published.)

 7    BY MR. FAKHOURY:

 8    Q.   Okay.  Mr. -- Mr. Waldinger asked you a lot of questions

 9    about this exhibit.  And just so we're all on the same page,

10    this is Exhibit 2 -- 22, excuse me.  This is a "Loan Approval

11    Sheet," right?

12    A.   Correct.

13    Q.   All of that account information that the underwriters and

14    the account manager gather are put into this approval sheet,

15    correct?

16    A.   Yes.

17         MR. FAKHOURY:   Can you get to page 19 of this

18    exhibit, Mr. Torres.  And we can just leave it here now.

19                       (Exhibit published.)

20    BY MR. FAKHOURY:

21    Q.   We're going to dig into this little deeper a little later.

22    But for now, you testified this was the financial spread,

23    right?

24    A.   Yes.

25    Q.   And sometimes it's referred to as "the spread"?
```

 1    **A.**   Yes.

 2    **Q.**   Okay.  And this again has all of these detailed numbers

 3    pulled by the account manager and from statements and whatnot,

 4    right?

 5    **A.**   Yes.

 6    **Q.**   Now, this -- this whole exhibit, this -- this Exhibit 22,

 7    this loan approval sheet, that is not given to the borrower,

 8    correct?

 9    **A.**   Correct.

10    **Q.**   This spread here, so page 19 of Exhibit 22, that's not

11    given to the borrower, right?

12    **A.**   Right.

13    **Q.**   It's for the bank's internal use only, right?

14    **A.**   Right.

15            **MR. FAKHOURY:**  Can you go to page 2 of this exhibit,

16    Mr. Torres?

17                        (Exhibit published.)

18    **BY MR. FAKHOURY:**

19    **Q.**   Here it says a reason for recommendation.  And

20    Mr. Waldinger talked to you about this.  This is not given to

21    the borrower, correct?

22    **A.**   Correct.

23    **Q.**   Now, generally, and you just said it a second ago, you

24    don't tend to see the specific forms, your first real exposure

25    to the loan is when you get this approval sheet, correct?

1    **A.**   Correct.

2    **Q.**   And when your -- and your review of the loan is based

3    solely on the information in the approval sheet, right?

4    **A.**   Yes.

5    **Q.**   You're not looking at specific statements.

6    **A.**   No.

7    **Q.**   You're looking at an individual's balance over time,

8    right?

9    **A.**   Right.

10   **Q.**   You're not looking at the ins and outs of the bank

11   statements?

12   **A.**   No.

13   **Q.**   You don't look at the Form 1003 when you're reviewing the

14   loan, right?

15   **A.**   No.

16   **Q.**   And you don't look at that financial status -- well, let

17   me strike that.

18            **MR. FAKHOURY:**   May I have one quick minute, Your

19   Honor.

20            **THE COURT:**   Yes.

21                    (Pause in the proceedings.)

22            **MR. FAKHOURY:**   I'm going to pull up here what's been

23   admitted as trial -- as Exhibit 26.

24                    (Exhibit published.)

25   / / /

 1    BY MR. FAKHOURY:

 2    **Q.**  Have you seen a form like this before?

 3    **A.**  No.  I don't tend to work with this form.

 4    **Q.**  Okay.  So when you're -- when you're reviewing the -- the

 5    loan, you're not looking or considering this financial status

 6    affidavit, right?

 7    **A.**  Right.

 8    **Q.**  Okay.

 9          **MR. FAKHOURY:**  Can you go back to Exhibit 22,

10    Mr. Torres, and go to page 19.

11                    (Exhibit published.)

12    BY MR. FAKHOURY:

13    **Q.**  So again, to recap, your approval is based on the Loan

14    Approval Sheet and the spread, right?

15    **A.**  Right.

16    **Q.**  And you testified that if you had questions about any of

17    the information here, you could reach out to the account

18    manager and get more information, right?

19    **A.**  Right.

20    **Q.**  You testified a little bit about some of the internal

21    systems used by the bank, and you mentioned a CAR, which I

22    believe was a Credit Action Report.  Do I have the acronym

23    right?

24    **A.**  No.  It's Credit Action Request.

25    **Q.**  Got it.  Okay.  Thank you for correcting me.  Credit

1    Action Request.

2        And I believe you testified you can convert a Credit

3    Action Request into a PDF, right?

4    A.   Correct.

5            MR. FAKHOURY:   Can we go to page 1 of this exhibit,

6    Mr. Torres.

7                        (Exhibit published.)

8    BY MR. FAKHOURY:

9    Q.   And that's what this appears to be, right?   This is

10   Exhibit 22, page 1, right?

11   A.   Correct.

12   Q.   And -- and in the process of creating that PDF document,

13   you can add comments into the document if you wanted to,

14   right?

15   A.   Correct.

16   Q.   Okay.   Now, in deciding whether to approve a loan, there

17   are a lot of factors that go into the -- that decision, right?

18   A.   (Nods head.)

19   Q.   Is that a "yes"?

20   A.   Yes.

21   Q.   Okay.   We got a court reporter so we got to make sure she

22   can get your answers.   Okay?

23       Now, one way of organizing and assessing those factors is

24   through a credit risk rating, right?

25   A.   Yes.

 1    **Q.**   That's basically an evaluation of how risky it is to lend

 2    to someone, right?

 3    **A.**   Yes.

 4    **Q.**   And of course every loan has some level of risk involved,

 5    right?

 6    **A.**   Yes.

 7    **Q.**   Now, you testified that the bank's credit risk rating

 8    system was on a scale of one to ten, right?

 9    **A.**   Yes.

10    **Q.**   And obviously the higher that score, the more risky it is

11    to lend to someone, right?

12    **A.**   Yes.

13            **MR. FAKHOURY:**   Okay.  Can you go to page 4 of this

14    exhibit, Mr. Torres?

15        And scroll down just a little bit.

16        Okay.

17                        (Exhibit published.)

18    **BY MR. FAKHOURY:**

19    **Q.**   Here (indicating), this is, in the Loan Approval Sheet,

20    sort of a run-through of the credit risk rating factors,

21    right?

22    **A.**   Yes.

23    **Q.**   And I think you already testified that this loan was rated

24    at a level 4, right?

25    **A.**   Yes.

1    Q.  Okay.  So let's go through those factors sort of one at a

2    time, okay?

3                        (Exhibit published.)

4    BY MR. FAKHOURY:

5    Q.  So one factor is -- well, let me strike that.

6        One factor is here, source of repayment, right?  That's

7    one of the factors that goes into a credit risk rating

8    analysis, right?

9    A.  Yes.

10   Q.  Okay.  And that's basically how is the bank going to get

11   its money back that it lent, right?

12   A.  Yes.

13   Q.  And that number is primarily -- well, the source of

14   repayment for most loans is generally cash flow, right?

15   A.  Yes.

16   Q.  And cash flow is the idea that people have a certain

17   amount of money that comes in and they have a certain amount

18   of money that comes out, right?

19   A.  Yes.

20   Q.  Now for this loan at the original loan -- mortgage loan

21   amount, the primary source of repayment was cash flow, right?

22   A.  Yes.

23   Q.  That's for Facility A, which is the mortgage, correct?

24   A.  Correct.

25   Q.  And here it indicates an income of $440,000, right?

1    A.   Yes.

2    Q.   That's gross income, correct?

3    A.   Correct.

4    Q.   Which means before taxes are taken out, right?

5    A.   Correct.

6    Q.   And that yields a debt-to-income ratio of 69 percent,

7    right?  Right?

8    A.   Not necessarily.

9    Q.   Okay.

10   A.   The -- the calculation that's in the spread is based on

11   net income.

12   Q.   Um-hmm.

13   A.   So the net income is what yields the debt-to-income ratio

14   of 69 percent.

15   Q.   Okay.  So in other words, even though it says income of

16   $440,000, which means gross income, this debt-to-income ratio

17   is talking about net income, right?

18   A.   Yes.

19   Q.   Okay.

20          **THE COURT:**  Mr. Kreppel, I want to follow up on

21   something that Mr. Fakhoury just asked you that's not clear to

22   me.

23       He asked you about taxes.  He said that mean -- gross

24   income means before taxes are taken out and then that yields

25   the debt-to-income ratio.  And you said, no, it's net.  But

1    I'm not sure whether "net" to you means net of debt

2    obligations, or it also means net of taxes.

3            **THE WITNESS:**  It would be net income or -- net income

4    would be net of taxes.

5            **THE COURT:**  Okay.

6            **THE WITNESS:**  So it would be net of taxes.

7            **THE COURT:**  Thanks.

8        Sorry, Mr. Fakhoury.

9            **MR. FAKHOURY:**  No problem.  Thank you, Your Honor.

10   **Q.**  Okay.  Now, under cash flow here, it talks about -- this

11   sentence here says this assumes five-year amortization on the

12   capital call line of credit.  Do you see that sentence?

13   **A.**  Yes.

14   **Q.**  Okay.  And when that's taken into account, that results in

15   a debt-to-income ratio of 48 percent.  Do you see that?

16   **A.**  No.  It says:  This assumes a five-year amortization of

17   the capital call line of credit.  However, contractual

18   payments are interest-only for the duration of the loan

19   resulting in a debt-to-income ratio of 48 percent.

20       So what that is saying is it's a debt-to-income ratio

21   based on interest only.

22   **Q.**  You're right.  And I asked a bad question.  So let me try

23   to ask it again.

24       Here under "Primary Source of Repayment," it is saying

25   that -- well, let me back up a second.

1    The capital call line of credit is a three-year personal

2    loan, correct?

3    **A.**  Correct.

4    **Q.**  And it is an interest-only personal loan, correct?

5    **A.**  Correct.

6    **Q.**  We talked about that this 69 percent debt-to-income ratio

7    is looking at net income, correct?

8    **A.**  Correct.

9    **Q.**  And in calculating that ratio, you have to look at

10   expenses, right?

11   **A.**  Correct.

12   **Q.**  And within this 69 percent calculation of expenses, it is

13   assuming a five-year amortization on the capital call line of

14   credit, right?

15   **A.**  Correct.

16   **Q.**  And we're going to talk about that in a lot of detail a

17   little later on.

18      Now, it also says that, however, contractual payments are

19   interest-only for the duration of the loan, the loan being the

20   capital call line of credit, correct?

21   **A.**  Correct.

22   **Q.**  And so the expense amount for the actual line of credit

23   under its actual terms creates a debt-to-income ratio of

24   48 percent, right?

25   **A.**  Correct.

1    **Q.**   Okay.  Thank you for clarifying that up with me.

2              **MR. FAKHOURY:**  Can you scroll down a little bit,

3    Mr. Torres.

4                        (Exhibit published.)

5    **BY MR. FAKHOURY:**

6    **Q.**   Oh, actually, let's talk about Facility B for a minute.

7    Facility B is the capital call line of credit, right?

8    **A.**   Yes.

9    **Q.**   And so the primary source of repayment for the capital

10   call line of credit is a fund distribution from Rothenberg

11   Ventures II.  Do you see that?

12   **A.**   Yes.

13   **Q.**   And what that means is that the bank is envisioning that

14   already Mr. Rothenberg will pay interest only on a regular

15   schedule and then at the end of the loan, at the end of the

16   three years, it will get a distribution from Fund II; is that

17   right?

18   **A.**   Yes.

19   **Q.**   Okay.

20        The next thing in this credit risk rating analysis is

21   "Performance to Expectations" and "Covenant Compliance."

22        Do you see that?

23   **A.**   Yes.

24   **Q.**   That's sort of a fancy way of saying did the borrower ever

25   violate any of the terms of their prior financial conditions.

```
 1    That's what "covenant compliance" would mean, right?

 2    A.  Correct.

 3         MR. FAKHOURY:  Okay.  Let's scroll down a little bit.

 4    Okay.  You could stop there were.

 5                    (Exhibit published.)

 6    BY MR. FAKHOURY:

 7    Q.  The next thing is "Loss in the Event of Default/Secondary

 8    Source of Repayment."

 9         Do you see that?

10    A.  Yes.

11    Q.  And that's basically saying here's our -- here's the

12    backup way in which we would recover our money if we made this

13    loan, right?

14    A.  Yes.

15    Q.  And for Facility A, the -- the -- it says low, which I'm

16    sort of taking to mean, but you can correct me if I'm wrong,

17    that the chance of loss is low because in a mortgage, the bank

18    gets basically a lien on the house, right?

19    A.  Correct.

20    Q.  For Facility B, that's the capital call line of credit,

21    that's unsecured, right?

22    A.  Right.

23    Q.  So -- so the risk of loss is a little higher because

24    it's -- there's no security for the bank, right?

25    A.  Correct.
```

1   **Q.**   The next factor is "Sensitivity to External Factors."

2   Do you see that?

3   **A.**   Yes.

4   **Q.**   And -- and there, it says that "SVB wishes to expand its

5   relationship with Rothenberg Ventures portfolio companies."

6   Do you see that?

7   **A.**   Yes.

8   **Q.**   And you testified that the bank did want to increase or

9   expand its relationship with Rothenberg Ventures, right?

10  **A.**   Yes.

11  **Q.**   The next section is "Management Ability."  Do you see that

12  part?

13  **A.**   Yes.

14  **Q.**   And that's basically can the borrower manage their credit,

15  right?

16  **A.**   Yes.

17  **Q.**   And that's -- it lists the credit score, which is sort of

18  a way to tell is this a person who's not had problems with

19  credit, right?

20  **A.**   That's right.

21  **Q.**   Okay.  The final thing, the final factor is "Investor

22  Economics and Incentives."  Do you see that?

23  **A.**   Yes.

24  **Q.**   Okay.  And that is sort -- the investor being the

25  borrower, right?

 1    **A.**   Yes.  The one thing to remember is that the Credit Action

 2    Request is -- is a form that's -- lives in the commercial bank

 3    as well as the private bank.  So our commercial bank partners

 4    would use this much more as it relates to how you would

 5    describe that section.

 6    **Q.**   Okay.

 7    **A.**   It's not as applicable to the private bank.

 8    **Q.**   Okay.  But it's -- it's here on this Exhibit 22, right?

 9    **A.**   Yes.

10    **Q.**   And -- and this is the Loan Approval Sheet for

11    Mr. Rothenberg, right?

12    **A.**   Yes.

13    **Q.**   This is the Loan Approval Sheet you reviewed, right?

14    **A.**   Yes.

15    **Q.**   Now, it says here "see credit memo."

16              **MR. FAKHOURY:**  Mr. Torres, can you go to page 16,

17    please.

18                         (Exhibit published.)

19    **BY MR. FAKHOURY:**

20    **Q.**   This is the credit memo that it's referring to, right?

21    **A.**   Yes.

22              **MR. FAKHOURY:**  And can you zoom out a little bit.

23    And then just scroll down, and we'll go through this quick.

24                         (Exhibit published.)

25    / / /

1   BY MR. FAKHOURY:

2   Q.  It -- the top part lays out the terms of the two loans at

3   issue, right?

4   A.  Yes.

5   Q.  And then down here, it has "Deal Summary," right

6   (indicating)?

7   A.  Yes.

8          MR. FAKHOURY:  Okay.  Can you scroll down,

9   Mr. Torres.

10  Q.  And then it has some information here about the borrower

11  and the firm, right?

12  A.  Yes?

13  Q.  The borrower being Mr. Rothenberg?

14  A.  Yes.

15  Q.  And the firm being Rothenberg Ventures?

16  A.  Yes.

17         MR. FAKHOURY:  Can you go to the next page,

18  Mr. Torres?

19                   (Exhibit published.)

20  BY MR. FAKHOURY:

21  Q.  Okay.  And then here it has a section called "Personal

22  Financial Condition" and "Credit History."  Do you see that?

23  A.  Yes.

24         MR. FAKHOURY:  Can you go to page 18 of this exhibit.

25     Okay.  You could stop there.

1          (Exhibit published.)

2    BY MR. FAKHOURY:

3    **Q.**  Now, here in the credit memo, it lists some risks and

4    mitigating factors.  Do you see that?

5    **A.**  Yes.

6    **Q.**  And this is specific to Facility B which is the capital

7    call line of credit, right?

8    **A.**  Yes.

9    **Q.**  And one of the risks is that the facility is unsecured.

10   Do you see that?

11   **A.**  Yes.

12   **Q.**  And the mitigating factor are some of the conditions that

13   would be placed on the line of credit, right?

14   **A.**  Yes.

15   **Q.**  Okay.  And then another risk is that the firm is new and

16   doesn't have a lot of operating history.  You see that?

17   **A.**  Yes.

18   **Q.**  And then some of the -- what mitigates that is some of the

19   facts about Rothenberg Ventures, right?

20   **A.**  Yes.

21   **Q.**  So, for example, that the borrower, being Mr. Rothenberg,

22   has deep relationships within the venture community, right?

23   **A.**  Yes.

24   **Q.**  That he built Rothenberg Ventures from a one-person

25   startup to a ten-person firm, right?

 1   **A.**   Yes.

 2   **Q.**   The investment rate of return of 34 percent, right?

 3   **A.**   Yes.

 4          **MR. FAKHOURY:**   Can we go to Exhibit 23, please?

 5       And could we go to page 3.

 6                          (Exhibit published.)

 7   **BY MR. FAKHOURY:**

 8   **Q.**   Now, this is the amended approval sheet when the house

 9   appraised for higher than anticipated, right?  You recall you

10   testified about this, right?

11   **A.**   Yes.

12   **Q.**   Okay.  And again, here on the credit risk rating, it lists

13   the same factors, right?

14   **A.**   Yes.

15   **Q.**   So source of repayment?  Yes?

16   **A.**   Yes.

17   **Q.**   Performance to expectations and covenant compliance,

18   right?

19   **A.**   Yes.

20   **Q.**   Loss in the event of default?

21   **A.**   Yes.

22          **MR. FAKHOURY:**   Can you scroll down, Mr. Torres.

23                          (Exhibit published.)

24   **BY MR. FAKHOURY:**

25   **Q.**   Sensitivity to the external factors?

1     A.   Yes.

2     Q.   Management ability?

3     A.   Yes.

4     Q.   Investor economics and incentives?

5     A.   Yes.

6     Q.   And it again has a reference to the credit memo, right?

7     A.   Yes.

8     Q.   Okay.

9             MR. FAKHOURY:   Can you go to the first page of this

10    exhibit, Mr. Torres.

11        And scroll down a little bit, please.   Thank you.

12        Actually, I'm sorry, can you go to the second page.

13        Thank you.

14                      (Exhibit published.)

15    BY MR. FAKHOURY:

16    Q.   Now, we were talking a little bit about the -- the

17    underwriter's reasons for recommendation.   And the

18    recommendation also lists here, right, it lists the fact that

19    Rothenberg Ventures banks already with Silicon Valley Bank,

20    correct?

21    A.   Correct.

22    Q.   And actually this information about the firm balance

23    deposit, that's coming from the bank's own internal records,

24    right?

25    A.   Yes.

1   **Q.**   That's not coming from the borrower, right?

2   **A.**   Correct.

3          **MR. FAKHOURY:**   Okay.   Can we go to Exhibit 22, and

4   page 19.

5       Okay.   You can just leave it up there for now.

6                        (Exhibit published.)

7   **BY MR. FAKHOURY:**

8   **Q.**   Okay.   I want to talk about two specific factors that go

9   into this credit risk rating.   Okay?

10      And the first factor I want to talk about is reserves.

11  Okay?   And am I right that reserves means the amount of money

12  a borrower has left over if they were to lose their income the

13  day after the loan closed.

14      Is that an accurate way of saying -- of defining that

15  term?

16  **A.**   No.   I -- I would -- the amount of cash and investments

17  that the borrower has to support obligations in the event that

18  they had no income.

19  **Q.**   Okay.   Thank you for clarifying that.

20      Now, generally speaking, the higher a debt-to-income ratio

21  is, the more reserves are needed to get the loan approved,

22  right?

23  **A.**   Correct.

24  **Q.**   And in -- and in 2014, for -- for a loan that has a credit

25  risk rating of 4, if that borrower had a debt-to-income ratio

1  of less than 65 percent, the bank wanted six months of

2  reserves, right?

3  **A.**  Correct.

4  **Q.**  Okay.  And if the debt-to-income ratio was less than

5  75 percent, the bank required 12 months of reserves, right?

6  **A.**  Correct.

7  **Q.**  Twelve months was the maximum amount of reserves that a

8  bank -- that the back wanted to see in the loan approval

9  process, right?

10  **A.**  That's right.

11        **MR. FAKHOURY:**  Okay.  I'm going to -- maybe we can

12  zoom in like -- I'm going to look at this part right here

13  (indicating).

14     Okay.  That's fine thank you.

15                    (Exhibit published.)

16  **BY MR. FAKHOURY:**

17  **Q.**  So this is the first loan approval sheet for the lower

18  loan amount.  Here it says that there is monthly contractual

19  reserves of -- doing a horrible job here with this marker

20  thing.  Here, we'll do it like that.

21     This shows that there was 43 months of contractual

22  reserves for this specific loan write-up, right?

23  **A.**  Correct.

24  **Q.**  And that's based on a post-close liquidity amount of

25  $683,504, right?

1    A.   Yes.

2    Q.   Now that's obviously -- 43 months is obviously more than

3    12 months of reserves, right?

4    A.   Yes.

5    Q.   If we assumed that the post-close liquidity was $350,000

6    less, there would still be enough contractual reserves for

7    this loan, right?

8    A.   Yes.

9    Q.   There would be about 20 months of contractual reserves,

10   right?

11   A.   Yes.

12   Q.   And that's still above the 12 months of reserves required

13   under the credit risk rating, right?

14   A.   Yes.

15        MR. FAKHOURY:   Okay.  Let's go to Exhibit 23.

16   And let's go to page 9.  And again we're going to look

17   over here.  We don't need to zoom in.  It's fine.

18   Let's do it like this (indicating).

19                      (Exhibit published.)

20   BY MR. FAKHOURY:

21   Q.   Now here it says this is for the higher loan amount, the

22   loan that was ultimately funded, right?

23   A.   Yes.

24   Q.   And here, the post-close liquidity has increased to

25   $883,504, right?

1    **A.**   Yes.

2    **Q.**   And that's because if the value of the house is greater

3    than anticipated, then there's more cash out from the

4    mortgage, right?

5    **A.**   Yes.

6    **Q.**   And those cash-out proceeds get added -- or considered in

7    the post-close liquidity amount, right?

8    **A.**   Yes.

9    **Q.**   So we've got 53 months of contractual reserves, right?

10   **A.**   Yes.

11   **Q.**   And just sort of building off the last hypothetical I gave

12   you, if we subtracted $350,000 off of that amount, there would

13   still be more than 12 months of contractual reserves, right?

14   **A.**   Correct.

15   **Q.**   There'd be more than 20 months of contractual reserves,

16   right?

17   **A.**   Yes.

18   **Q.**   There's a second reserve number here.  And it says

19   interest-only 72 months of contractual reserves.

20       Do you see that?

21   **A.**   Yes.

22       **MR. FAKHOURY:**  Okay.  Mr. Torres, can you scroll down

23   to the bottom of the page.

24                       (Exhibit published.)

25   / / /

BY MR. FAKHOURY:

Q.   Now, that number is coming out of (indicating) this little box right here, right?

A.   Yes.

Q.   Now, we talked a little bit about this.  And you -- you corrected me when I misspoke.  There's basically two different expense calculations on this spread, right?

A.   Yes.

Q.   Okay.  The first expense calculation is this one sort of right here (indicating)?

A.   Yes.

Q.   Okay.  Or actually the expense portion of it is the bottom portion, right?

     So in this first expense calculation, right, it's calculated total expenses of a $187,951.  Do you see that?

A.   Yes.

Q.   And in that scenario, that is accounting for the capital call line of credit being a five-year amortized loan, right?

A.   Right.

Q.   There's a second calculation.  That's this one right here (indicating).  And that calculation is accounting for the fact that the capital call line of credit was an interest-only loan for three years, right?

A.   Right.

Q.   And under that scenario, if you're accounting for the

1    interest only -- if you're accounting for the capital call

2    line of credit being interest-only, it generates a different

3    debt-to-income ratio, right?

4    **A.**   Correct.

5    **Q.**   53 percent, right?

6    **A.**   Correct.

7    **Q.**   We'll talk about that more later.

8              **MR. FAKHOURY:**   And can you scroll up, Mr. Torres.

9                        (Exhibit published.)

10   **BY MR. FAKHOURY:**

11   **Q.**   And it generates 72 months of contractual reserves, right?

12   **A.**   Yes.

13   **Q.**   Okay.  And again, building off that hypothetical, if we

14   subtracted $350,000 off the contractual reserves amount and we

15   were looking at the interest only -- or if we were treating

16   the capital call line of credit as an interest-only loan for

17   three years, there would be more than 12 months of contractual

18   reserves, right?

19   **A.**   Correct.

20   **Q.**   There'd be more than 20 months of contractual reserves.

21   **A.**   Correct.

22   **Q.**   Okay.  I said there were two things, two parts of the

23   credit risk rating I wanted to talk about.  Reserves.

24        So now let's talk about the second part, and that's

25   debt-to-income ratio which we've already talked a little bit

KREPPEL - CROSS / FAKHOURY

1    about.

2        Now, you testified that the bank had a set -- had to set a

3    debt-to-income ratio in order to comply with this CFPB rule,

4    right?

5    **A.**   Correct.

6    **Q.**   Okay.  And I believe Mr. Waldinger asked you if the rule

7    dictated any set amount of debt-to-income ratio.  And I

8    believe your testimony was it did not.  Correct?

9    **A.**   Correct.

10   **Q.**   The bank could set whatever debt-to-income ratio it

11   wanted, right?

12   **A.**   If it's a nonqualified mortgage, yes.

13   **Q.**   Okay.  And for -- and that's because for a nonqualified

14   mortgage, that debt-to-income ratio had to be 43 percent,

15   right?

16   **A.**   That would be a qualifying.

17   **Q.**   You got me again.  Thank you.  For a qualified mortgage,

18   the rule said the debt-to-income ratio had to be 43 percent,

19   right?

20   **A.**   Correct.

21   **Q.**   And so we're all on the same page, in this -- in the

22   context of the rule, a qualified mortgage means the government

23   says it satisfies ability to re -- repay obligations, right?

24   **A.**   That -- the ability to repay is applicable to qualified

25   and nonqualified mortgages.

1    **Q.**  Right.  But if a mortgage is a qualified mortgage, it's

2    presumptively satisfied the ability to repay provisions.  Does

3    that sound right to you?

4    **A.**  Yes.

5    **Q.**  Okay.

6        Now, we've been talking about a 50 percent debt-to-income

7    ratio and a 75 percent debt-to-income ratio.  So obviously the

8    mortgage we're -- we're talking about here is a non-qualifying

9    mortgage, right?

10   **A.**  Yes.

11   **Q.**  And I should make clear, the -- the CFPB rule is about

12   mortgages only, correct?

13   **A.**  Correct.

14   **Q.**  It is not about personal loans, right?

15   **A.**  Correct.

16          **MR. FAKHOURY:**  Okay.  Mr. Torres, can you --

17   actually, let's go to Exhibit 22.

18       And let's scroll down to the bottom.

19                    (Exhibit published.)

20   **BY MR. FAKHOURY:**

21   **Q.**  Now, the bottom of this spread lists a debt to -- this is

22   the first -- so we're all on the same page, this is

23   Exhibit 22.  This is the first Loan Approval Sheet, okay?

24       This lists the debt-to-income ratio of 69 percent.  Do you

25   see that?

1   **A.**   Yes.

2   **Q.**   Okay.  And that number is taken by -- I'm going to make

3   sure I say this right -- taking the total expenses of $175,612

4   and dividing it by the net income amount of $254,036.  Right?

5   **A.**   Right.

6   **Q.**   And that generates a 69 percent ratio, correct?

7   **A.**   Correct.

8           **MR. FAKHOURY:**   Okay.  Can you scroll up to the top,

9   Mr. Torres.

10                     (Exhibit published.)

11  **BY MR. FAKHOURY:**

12  **Q.**   And here it lists a gross income debt-to-income ratio.

13  You see that?

14  **A.**   Yes.

15  **Q.**   And that number is 43 percent, right?

16  **A.**   Yes.

17  **Q.**   That number would be taken by looking at the gross income

18  amount --

19          **MR. FAKHOURY:**   Actually, can we scroll down a little

20  bit.

21                     (Exhibit published.)

22  **BY MR. FAKHOURY:**

23  **Q.**   So that would be -- that debt-to-income ratio would be

24  based on an income amount of $440,000, right?

25  **A.**   Yes.

1    Q.   You testified that in 2014 the bank was using net income

2    to calculate that debt-to-income ratio, right?

3    A.   Yes.

4    Q.   And that today it uses gross debt-to-income, right?

5    A.   Yes.

6    Q.   And that's actually what most banks use today, right?

7    A.   I believe so.

8         MR. FAKHOURY:   Can we go to Exhibit 23, please.

9         Okay.  And just to do the same exercise here, can you

10   scroll down, Mr. Torres.

11                     (Exhibit published.)

12   BY MR. FAKHOURY:

13   Q.   The debt-to-income ratio using net income for the higher

14   loan amount is 74 percent, right?

15   A.   Yes.

16        MR. FAKHOURY:   And can we scroll back to the top.

17                     (Exhibit published.)

18   BY MR. FAKHOURY:

19   Q.   But the gross income debt-to-income ratio is 46 percent,

20   right?

21   A.   Yes.

22   Q.   Now, both of those numbers are based on the capital call

23   line of credit being treated as a five-year amortized loan,

24   right?

25   A.   Yes.

1          **MR. FAKHOURY:**  Can you scroll down, Mr. Torres?

2                          (Exhibit published.)

3      **BY MR. FAKHOURY:**

4      **Q.**  Now we already talked a little bit about that if we

5      treated the interest-only -- if we treated the capital call

6      line of credit as an interest-only loan, the debt-to-income

7      ratio would be 53 percent, right?

8      **A.**  Yes.

9      **Q.**  And that would be based on net income, correct?

10     **A.**  Correct.

11     **Q.**  So theoretically if that number was based on gross income,

12     it would be even lower than 53 percent, correct?

13     **A.**  Correct.

14     **Q.**  We talked a little bit about the -- the rule, the CFPB

15     rule.  And -- and you mentioned that part of the ability to

16     repay looks at debt-to-income ratio, right?

17     **A.**  Yes.

18     **Q.**  That comes out of the rule, correct?

19     **A.**  Yes.

20     **Q.**  Now, the rule lists a number of factors to be considered,

21     right?

22     **A.**  Yes.

23     **Q.**  In ability to repay determinations, right?

24     **A.**  Yes.

25     **Q.**  Those include current or reasonably expected income or

1   assets, right?

2   **A.**   Yes.

3   **Q.**   Current employment status?

4   **A.**   Yes.

5   **Q.**   The monthly payment on the covered transaction?

6   **A.**   Yes.

7   **Q.**   The monthly payment on any simultaneous loan?

8   **A.**   Yes.

9   **Q.**   The monthly payment for mortgage-related obligations?

10  **A.**   Yes.

11  **Q.**   Current debt obligations, alimony, and child support?

12  **A.**   Yes.

13  **Q.**   The monthly debt-to-income ratio or residual income?

14  **A.**   Yes.

15  **Q.**   And credit history?

16  **A.**   Yes.

17  **Q.**   The rule doesn't say whether to -- to use net

18  debt-to-income, correct?

19  **A.**   Correct.

20  **Q.**   It doesn't say to use gross debt-to-income.

21  **A.**   Correct.

22  **Q.**   You talked about your -- your credit risk rating analysis.

23  And you -- you testified about the bank creating a set of

24  guidelines.  Do you recall that testimony?

25  **A.**   Yes.

1    Q.   Okay.  And -- and the bank has put all of that into a

2    matrix, right?

3    A.   Yes.

4    Q.   Sort of like a spreadsheet, correct?

5    A.   Yeah.

6    Q.   And -- and that spreadsheet talks about debt-to-income

7    ratio, correct?

8    A.   Correct.

9    Q.   And it does not indicate gross debt-to-income, correct?

10   A.   I mean, off the top of my head, I don't think it does.

11   Q.   Okay.  It doesn't say to use net debt-to-income either

12   though, right?

13   A.   The underwriting guidelines state that, but the credit

14   rating matrix I do not believe says that.

15   Q.   Okay.  So the credit risk rating matrix does not

16   differentiate between net or gross debt-to-income, right?

17   A.   It's assumed that it's net.

18   Q.   Okay.

19        MR. FAKHOURY:  Let's go to Exhibit 22, please.

20        And actually let's go to page 4.

21                   (Exhibit published.)

22   BY MR. FAKHOURY:

23   Q.   Okay.  I want to go back to this -- this portion which I

24   asked you about and you sort of the corrected me.

25        MR. FAKHOURY:  And maybe we could zoom in a little

1    bit.

2                    (Exhibit published.)

3    BY MR. FAKHOURY:

4    Q.  I want to talk about this portion in some detail.  Okay.

5    And we already talked about why there's two different

6    debt-to-income ratio numbers in this paragraph, right?

7         So a 69 -- the 69 percent debt-to-income ratio is based

8    on, number one, that's based on net income, correct?

9    A.  Correct.

10   Q.  And number two, it's assuming that the capital call line

11   of credit is a five-year amortized loan, right?

12   A.  Correct.

13   Q.  The 48 percent debt-to-income ratio is again assuming net

14   income, right?

15   A.  Correct.

16   Q.  But it is assuming that the capital call line of credit is

17   interest-only for three years, right?

18   A.  Right.

19   Q.  And actually, those are the terms of the capital call line

20   of credit, right?

21   A.  Yes.

22   Q.  It's three years, right?

23   A.  Yes.

24   Q.  Not five years, right?

25   A.  Correct.

1   Q.  It's an interest-only loan, correct?

2   A.  Correct.

3   Q.  It's not a fully amortized loan, correct?

4   A.  Correct.

5   Q.  I want to talk about what it means to be fully amortized

6   just so we're all on the same page.

7       Amortization is a schedule of debt payments over time

8   through regular payments.  Is that an accurate way of saying

9   it?

10  A.  Yes.

11  Q.  Okay.  And basically in a fully amortized loan, the bank

12  looks at how much money it lent the borrower, it calculates

13  the amount of interest over the life of the loan, takes that

14  number, divides it by the length of the loan, and generates a

15  monthly payment.  Right?

16  A.  Right.

17  Q.  It's basically like a mortgage, right?

18  A.  Right.

19  Q.  You have a 30-year fixed mortgage, you pay the same amount

20  of money 360 times, right?

21  A.  That's right.

22  Q.  Okay.  Or a car loan or a student loan, the same sort of

23  thing.  Yes?  Okay.

24  A.  (No audible response.)

25  Q.  So when this 69 percent debt-to-income ratio is assuming a

 1    five-year amortized loan, it is assuming that the principal of

 2    the loan is being repaid in regular installments, correct?

 3    **A.**   Correct.

 4    **Q.**   And it makes clear that if you actually looked at the

 5    terms of the loan, which are an interest-only payment, that

 6    the debt-to-income ratio would be 48 percent, right?

 7    **A.**   That's right.

 8    **Q.**   Because in an interest-only loan, your principal payment

 9    is basically zero, right?

10    **A.**   Correct.

11              **MR. FAKHOURY:**   Let's go to Exhibit 23.

12         And let's go to page 3 of this exhibit.

13                        (Exhibit published.)

14    **BY MR. FAKHOURY:**

15    **Q.**   And I'll just direct your attention here.  Same

16    discussion.  I won't ask so many questions this time.

17         But, again, with this debt-to-income ratio of 74 percent

18    (indicating), that's a net income, right?

19    **A.**   Yes.

20    **Q.**   And B, it's assuming the capital call line of credit is a

21    five-year amortized loan, right?

22    **A.**   Yes.

23    **Q.**   The source of repayment section says that, however,

24    contractual payments are interest-only for the duration of the

25    loan resulting in a debt-to-income ratio of 53 percent.

1      Do you see that?

2   **A.**   Yes.

3   **Q.**   So, again, that means if you account for the fact that the

4   line of credit is interest-only, and you're looking at net

5   income, that number is actually -- the ratio is actually

6   53 percent, right?

7   **A.**   That's right.

8          **MR. FAKHOURY:**  Let's go to page 9 of this exhibit.

9      And let's scroll down to the bottom.

10                 (Exhibit published.)

11   **BY MR. FAKHOURY:**

12   **Q.**   And, again, we've already done this so I'll be quick.

13      The fact of the capital call line of credit being

14   interest-only is specifically called out here, right?

15   **A.**   Yes.

16   **Q.**   Now, this box was not on Exhibit 22, right?

17   **A.**   Right.

18   **Q.**   It should have been on Exhibit 22, though, right?

19   **A.**   Yes.

20   **Q.**   Now, the way -- the difference between these two boxes,

21   meaning this box (indicating) and this box (indicating), okay,

22   I'm going to compare these two boxes, all right?  The -- the

23   difference between these two boxes is this item right here

24   (indicating), SVB debt service CCLOC.  Am I right about that?

25   **A.**   Yes.

1    **Q.**   Okay.  And the difference is if you assume a five-year

2    fully amortized loan, that expense amount comes out to

3    $67,525.  Right?

4    **A.**   Yes.

5    **Q.**   But given the fact that the loan is an interest-only loan

6    for three years, the actual debt service amount is $14,250.

7    Right?

8    **A.**   That's correct.

9    **Q.**   Now, I want to talk a little bit about what debt service

10   means.  Okay?

11        Debt service means the amount of money that is required to

12   pay the principal and interest of an outstanding debt.  Does

13   that sound about right to you?

14   **A.**   Yes.

15   **Q.**   And it's calculated by looking at the actual amount of

16   money that has to be given by a borrower to a lender under the

17   terms of their loan, right?

18   **A.**   For qualification purposes, for unsecured loans, the --

19   the term of the loan is interest only, but we qualify the loan

20   on a five-year amortization because cash flow and the ability

21   to repay that loan over five years is an important factor in

22   us qualifying them.

23        So I would say that the debt service, according to our

24   underwriting guidelines for a tailored loan would include the

25   five-year amortization.

KREPPEL - CROSS / FAKHOURY

1   **Q.** Okay.  Let's -- let's do it this way.  Let's go through --

2   let's go through these items one by one (indicating).

3        So in the list of expenses here, it says here:  Other real

4   estate expense, homeowners insurance $987.  Do you see that?

5   **A.** Yes.

6   **Q.** So that's the cost of the annual premium for a homeowner's

7   insurance, right?

8   **A.** Yes.

9   **Q.** And that's based on the actual cost usually by looking at

10  the prior year's bill, right?

11  **A.** Yes.

12  **Q.** The next item is HOA dues of $6,000.  Do you see that?

13  **A.** Yes.

14  **Q.** Okay.  And HOA, that's a homeowner association?

15  **A.** Yes.

16  **Q.** So this is -- this number is calculated by looking at the

17  amount of HOA dues that have to be paid in the year, right?

18  **A.** Yes.

19  **Q.** The next section is credit card payments and has an amount

20  of $2,052.

21       How is that number generated?

22  **A.** We typically take a percentage of the outstanding credit

23  card balance.  I think at that time it might have been 30 or

24  35 percent of the outstanding credit card balance, and apply

25  it as an expense.

1    **Q.**  Okay.  So you're not including the whole credit card

2    balance in calculating that number, right?

3    **A.**  No.

4    **Q.**  Okay.  The next section is student loans, which are

5    $20,000 -- $20,076.

6        Does the bank do something similar with student loans like

7    it does with credit cards?  Or does it tally up all of the

8    monthly payments for the credit cards and say this is the

9    minimum monthly payment -- or minimum annual payment, I

10   suppose, for the loans?

11   **A.**  Yeah, I believe that it would be on a credit report.

12   **Q.**  Okay.

13   **A.**  So we would get that number from the credit report most

14   likely.

15   **Q.**  Okay.

16       And then we're going to skip CCLOC for a second.  We're

17   going to go to debt service first mortgage.  And it says

18   $91,311.  That's the amount of principal and interest paid on

19   the mortgage for the year, right?

20   **A.**  Correct.

21   **Q.**  So basically take the monthly payments and multiply it by

22   12, and that's how much that cost is.  Right?

23   **A.**  Yes.

24   **Q.**  Okay.

25       Now, you testified that for the -- the capital call line

1    of credit, the bank is -- is making an -- an assumption,

2    right, that the loan is five years instead of three years,

3    right?

4    A.   Correct.

5    Q.   That it's principal and interest instead of interest only,

6    right?

7    A.   Yes.

8    Q.   And -- and you say you're doing that for qualifying

9    purposes, right?

10   A.   Yes.

11   Q.   Okay.  The bank doesn't give its underwriting criteria to

12   borrowers, does it?

13   A.   No.

14   Q.   Doesn't give the spread to borrowers, does it?

15   A.   No.

16   Q.   These ratios, there's three different debt-to-income

17   ratios on this sheet.  They're not given to the borrower,

18   right?

19   A.   No.

20           **MR. FAKHOURY:**  Okay.  Mr. Torres, can you pull up the

21   tab that says "DTI Calculation."

22                      (Exhibit published.)

23   **BY MR. FAKHOURY:**

24   Q.   Okay.  I want to end on asking you a couple questions

25   about this.  Okay?  You remember Mr. Waldinger asked you some

1  questions about a debt-to-income ratio based on some

2  assumptions.  Do you recall that?

3  **A.**  Yes.

4  **Q.**  Okay.  And so we're all on the same page, this first

5  debt-to-income calculation up here (indicating), which comes

6  out of trial Exhibit 23, is the 74 percent debt-to-income

7  ratio listed on the spread, right?

8  **A.**  Yes.

9  **Q.**  And that's based on net income, correct?

10  **A.**  Correct.

11  **Q.**  And that's based on the five-year amortization of the

12  capital call line of credit, correct?

13  **A.**  Correct.

14  **Q.**  Okay.  Now he asked you to assume that there was a

15  $350,000 loan at 3.77 percent interest, right?

16  **A.**  Right.

17  **Q.**  Okay.  Now, as an initial point -- or let me back up a

18  second.  And that generates an annual interest payment of

19  $13,195.  Right?

20  **A.**  Correct.

21  **Q.**  Okay.  Now that's assuming that that's an installment

22  loan, right?

23  **A.**  I don't know what that assumption was as far as

24  installment loan as in an amortizing loan.

25  **Q.**  Okay.  Let me ask it like this:  There's -- there's a

KREPPEL - CROSS / FAKHOURY

1   difference between an installment loan and a revolving loan or

2   a revolving credit, right?  Is that a "yes"?

3   **A.**   Yes.

4   **Q.**   Okay.  And an installment credit would be something like a

5   mortgage, right?  It has an amortized schedule, right?

6   **A.**   Yes.

7   **Q.**   It has a set amount to be paid every month, right?

8   **A.**   Yes.

9   **Q.**   Okay.  A revolving credit would be like a credit card,

10   right?

11   **A.**   Yes.

12   **Q.**   And a credit card, you can borrow money at a certain

13   interest rate, right?

14   **A.**   (Nods head.)

15   **Q.**   Is that a "yes"?

16   **A.**   Yes.

17   **Q.**   Okay.  And if you pay -- you only pay interest on what you

18   borrow, right?

19   **A.**   Yes.

20   **Q.**   So if I use my credit card to buy a TV on black Friday,

21   and I, you know, only pay half of the TV off, I pay interest

22   on that half.  And then the next month I pay off my -- my TV,

23   I don't pay any interest as long as I don't draw the credit,

24   right?

25   **A.**   Correct.

1   **Q.**  That was not the most eloquent example, but I think you

2   got the point.  Okay.

3       So in a revolving credit, if this was a revolving credit,

4   it's not necessarily the case that the $13,195 in interest

5   would be paid in the year, right?

6   **A.**  Correct.

7   **Q.**  Because if the borrower borrowed the money for one day or

8   two days, they wouldn't pay a year's worth of interest on it,

9   right?

10  **A.**  Correct.

11  **Q.**  Okay.  Now, in this example --

12          **MR. FAKHOURY:**  Can we go to Exhibit 23 for a minute.

13                  (Exhibit published.)

14  **BY MR. FAKHOURY:**

15  **Q.**  Mr. Waldinger asked you to take this (indicating) expense

16  amount, right?

17  **A.**  Yes.

18  **Q.**  And add that $13,195 of interest, right?

19  **A.**  Yes.

20  **Q.**  And that generated a total expense amount of $201,146.

21  Right?

22  **A.**  Yes.

23  **Q.**  Would it help you to have the sheet up?  Do you have one

24  in front of you?

25  **A.**  (indicating).

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **Q.**  Perfect.  Okay.

2        And then he asked to you take that new number, that

3    $201,146, and divide it by the net income of $254,036.  Right?

4    **A.**  Yes.

5    **Q.**  And that generates a 79 percent debt-to-income ratio,

6    correct?

7    **A.**  Correct.

8    **Q.**  Okay.

9            **MR. FAKHOURY:**  Can we go back to the DTI calculation.

10       Actually, no.  I'm sorry.  I'm sorry.

11       Can you go back to 23?

12                       (Exhibit published.)

13   **BY MR. FAKHOURY:**

14   **Q.**  I'd like to try to calculate that number using this number

15   (indicating).  Okay?

16       I'm sorry I'm going to ask you to do some math.  I don't

17   have a calculator for you.  I could pull one up, but we'll

18   figure it -- we'll work through it together, okay?

19       So we talked about for the interest-only capital call line

20   of credit, Exhibit 23 shows that the total expenses is

21   $134,676.

22       Do you see that?

23   **A.**  Yes.

24   **Q.**  Okay.  Let's add the $13,195 into that amount to create a

25   new expense amount.  Okay?

1    I'm going to pull out my calculator and you can tell me if

2  my numbers sound about right.  Okay?

3  **A.**  Okay.

4  **Q.**  So that would be a number of $147,871.

5    Does that sound right?

6  **A.**  Yes.

7  **Q.**  Okay.  And if we divided 147,000 -- $147,871 by $254,036,

8  that would generate a debt-to-income ratio of 58 percent.

9    Does that sound right to you?

10  **A.**  Yes.

11    **MR. FAKHOURY:**  Can I have one minute, Your Honor.

12    **THE COURT:**  Sure.

13    (Pause in the proceedings.)

14    **MR. FAKHOURY:**  I have nothing further.  Thank you.

15    **THE COURT:**  Thanks, Mr. Fakhoury.

16    Redirect?

17    **MR. WALDINGER:**  Yes, Your Honor.

18    <u>**REDIRECT EXAMINATION**</u>

19    **MR. WALDINGER:**  Ms. Margen, if you could pull up

20  trial Exhibit 23 and go to page 9.

21    Let's -- let's blow up this part (indicating).

22    (Exhibit published.)

23  **BY MR. WALDINGER:**

24  **Q.**  Mr. Kreppel, you've been asked a lot of questions about

25  these boxes here (indicating) and what the bank did in coming

1    up with its numbers.  I think you testified that in order to

2    qualify somebody for a loan, it was -- tell me if I'm wrong --

3    it was the bank's practice to look at capital call lines of

4    credit and assume a five-year amortization; is that correct?

5    **A.**  That's correct.

6    **Q.**  That's what SVB did to qualify somebody for a loan?

7    **A.**  Correct.

8    **Q.**  More general question.  People who want to borrow money --

9    with respect to people who wanted to borrow money from SVB

10   back in August of 2014, did they get to choose what

11   underwriting guidelines SVB applied, or did Buzz Kreppel get

12   to choose what underwriting guidelines to apply?

13   **A.**  I -- I chose what underwriting guidelines would apply.

14   **Q.**  And SVB's underwriting guidelines looked at net

15   debt-to-income ratio based on these calculations (indicating)

16   that I'm circling, with real estate expenses, homeowner's

17   insurance, the student loans, the revolving credit, and the

18   five-year amortization of the capital call line of credit,

19   correct?

20   **A.**  That's correct.

21   **Q.**  Mr. Fakhoury asked you whether borrowers saw the spread,

22   and it's correct that they didn't, correct?

23   **A.**  Correct.

24   **Q.**  Going back to this document --

25        **MR. WALDINGER:**  If you'd take that zoom down,

1    Ms. Margen.

2                       (Exhibit published.)

3    **BY MR. WALDINGER:**

4    **Q.**  Is the information on the spread something that you, Buzz

5    Kreppel, considered in determining whether to grant the loan?

6    **A.**  Yes.

7    **Q.**  Mr. Fakhoury asked you about this -- the hypothetical

8    assumption that I had you -- that I had you do.  And with

9    respect to the -- to the 350,000, let me ask you another

10   hypothetical.  I'd give you a hypothetical of Michelle Jandu

11   or somebody on her team calling you and saying, hey, the

12   borrower has a $350,000 loan.  Do you remember that?

13   **A.**  Yes.

14   **Q.**  And I asked you then for your testimony today to assume a

15   $350,000 balance, correct?

16   **A.**  Yes.

17   **Q.**  And that would be a balance for the -- if somebody had a

18   $350,000 loan that was requiring loan payments of north of

19   $13,000, is that the figure that would be included in debt

20   service for the spread?

21   **A.**  Yes.

22   **Q.**  Mr. Fakhoury asked you, you know, some question about

23   looking at -- at borrower's information over time.  And I

24   wanted to just confirm, though, in addition to look at

25   information over time, in August of 2014 was the bank also

1  concerned with getting an accurate snapshot of the borrower's

2  financial condition at the time of the loan application?

3  **A.**  Yes.

4  **Q.**  Mr. Fakhoury -- if you could -- asked you some questions

5  about the Uniform Residential Loan Application and the

6  Financial Status Affidavit.

7           **MR. WALDINGER:**  And if we could just pull up

8  Exhibit 25, followed by 26.

9                    (Exhibit published.)

10  **BY MR. WALDINGER:**

11  **Q.**  So 25 is the 1003, the Uniform Residential Loan

12  Application; is that correct?

13  **A.**  Correct.

14  **Q.**  And then 26.

15                    (Exhibit published.)

16  **BY MR. WALDINGER:**

17  **Q.**  You'll see this document is dated August 21st.  Do you

18  know that both the financial status affidavit and the 1003 are

19  forms that the bank requires be signed as part of the loan

20  closing?

21  **A.**  Yes.

22  **Q.**  So you, Buzz Kreppel, don't need them in order to approve

23  the loan, correct?

24  **A.**  Correct.

25  **Q.**  Does the bank need them in order to actually go through

1    and fund the loan?

2    A.   Yes.

3         **MR. WALDINGER:**  You can take those down, Ms. Margen.

4         Let's -- if we could go, for example, Ms. Margen, to

5    Exhibit 22, page 2.

6                        (Exhibit published.)

7    **BY MR. WALDINGER:**

8    Q.   Mr. Kreppel, Mr. Fakhoury asked you some questions about

9    the fact that Rothenberg Ventures, the business, already had

10   accounts at SVB.

11        Do you recall that?

12   A.   Yes.

13   Q.   The loans at issue in this case were personal loans; is

14   that right?

15   A.   Correct.

16   Q.   Would it be typical for the bank to examine the contents

17   of business accounts in qualifying a borrower for a personal

18   mortgage and a personal line of credit?

19   A.   No.

20   Q.   And in fact, if you look at the spread in this case --

21        **MR. WALDINGER:**  Let's go to page 19.

22                        (Exhibit published.)

23   **BY MR. WALDINGER:**

24   Q.   Does the spread contain any financial information about

25   the financial condition of Mr. Rothenberg's business?

1    **A.**   No.

2    **Q.**   This is his personal financial condition?

3    **A.**   Correct.

4            **MR. WALDINGER:**   If I could just have one second, Your

5    Honor.

6            **THE COURT:**   Yes.

7                    (Pause in the proceedings.)

8    BY MR. WALDINGER:

9    **Q.**   Mr. Fakhoury asked you about these terms "qualifying

10   mortgage."  Do you remember that?

11   **A.**   Yes.

12   **Q.**   Was this a qualifying mortgage under this Consumer

13   Financial Protection Bureau's definition?

14   **A.**   No.

15   **Q.**   Even though it was not a qualifying mortgage, did the bank

16   still have to follow the Consumer Financial Protection

17   Bureau's ability-to-repay guidelines?

18   **A.**   Yes.

19   **Q.**   And did that require the bank to consider things like

20   assets?

21   **A.**   Yes.

22   **Q.**   Did it require the bank to consider things like

23   liabilities?

24   **A.**   Yes.

25           **MR. WALDINGER:**   I have no further questions, Your

1    Honor.

2            THE COURT:  Thanks, Mr. Waldinger.

3        Mr. Fakhoury, recross?

4            MR. FAKHOURY:  Very brief.

5                    **RECROSS-EXAMINATION**

6    BY MR. FAKHOURY:

7    Q.  Mr. Waldinger asked you about the -- the CFPB, the

8    Consumer Financial Protection Bureau, and their requirements

9    for ability to repay.

10       And I guess my question is those -- those -- that rule

11   required the bank to consider debt-to-income ratio, correct?

12   A.  Correct.

13   Q.  It did not require the bank to consider net debt-to-income

14   versus gross debt-to-income, correct?

15   A.  Correct.

16   Q.  It did not require the bank to assume that the three-year

17   interest-only loan was actually a five-year amortized loan,

18   correct?

19   A.  Correct.

20           MR. FAKHOURY:  Nothing further.  Thank you, Your

21   Honor.

22           THE COURT:  Mr. Waldinger?

23           MR. WALDINGER:  No further questions, Your Honor.

24           THE COURT:  Mr. Kreppel, thanks for your testimony.

25   You're excused.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1        Mr. Waldinger, the government's next witness.

 2              **MR. WALDINGER:**  Your Honor, the government rests.

 3              **THE COURT:**  Thank you, Mr. Waldinger.

 4        Mr. Fakhoury, does Mr. Rothenberg wish to present a

 5   defense?

 6              **MR. FAKHOURY:**  May I have one minute, Your Honor.

 7              **THE COURT:**  Yes.

 8              **MR. FAKHOURY:**  Your Honor, first I would make a

 9   motion under Rule 29.  And then second, no, we do not have any

10   witnesses to call.  And I would renew my Rule 29 motion.

11              **THE COURT:**  The Court will discuss the Rule 29 motion

12   outside the presence of the jury.

13        Members of the jury, you've now heard all the evidence in

14   this case.  As I instructed you at least twice already, the

15   defendant in a criminal case has no obligation whatsoever to

16   present evidence.  The burden of proof to prove the case

17   beyond a reasonable doubt remains with the government at all

18   times.

19        I'll say more about that, a little bit more about that,

20   when I fully instruct you.

21        Instructions take longer than 15 minutes.  So as not to

22   break up that process, I'm going to let you go 15 minutes

23   early.

24        I can now give you some very clear scheduling information

25   because I know exactly what's going to happen.  I will

1    instruct you first thing when you get here in the morning.

2    I'll read the jury instructions to you.

3        You'll have a written set, your own written set that you

4    can put your initials on and make notes on.  In the back of

5    the set will be the preliminary instructions that I read you

6    at the beginning of the case.  So you'll have everything in

7    one place.

8        Following my instructions to you will come the closing

9    arguments of the lawyers.  As I told you before, the

10   government has the burden of proof in this case so they will

11   make a closing argument.  And then Mr. Fakhoury will make a

12   closing argument.  And then the government has the opportunity

13   to make what's called a rebuttal argument.  So they get the

14   last word.

15       Closing arguments, as you heard me say, are not evidence.

16   They're just lawyers telling you what they thought the

17   evidence in the case showed.

18       Nonetheless, I love closing argument.  It's one of the few

19   things I miss about practicing law from the time I was a

20   lawyer.  And I have almost always found that a lawyer's

21   closing arguments help me to identify particular evidence that

22   might bear on the case or think about evidence in a new way.

23   So I hope you'll pay close attention tomorrow.

24       My admonitions still apply.  Even though the evidence is

25   over, you're not deliberating, we haven't heard the closing

 1   arguments of the lawyers.  Keep an open mind, please.

 2       Don't talk about the case with anyone.  Continue not to

 3   look anything up on the Internet.

 4       Have a safe drive home and a restful evening, and I'll see

 5   you all bright and early tomorrow morning at 8:30.  Thank you.

 6           THE CLERK:  Please rise for the jury.

 7       (The following proceedings were heard out of the presence

 8   of the jury:)

 9           THE COURT:  Mr. Fakhoury -- first of all, we're

10   outside the presence of the jury.

11       Mr. Fakhoury, do you wish to be heard further in support

12   of your motion under Rule 29?

13           MR. FAKHOURY:  I would just say I would raise it as

14   to each and every element, and beyond that I don't wish to be

15   heard on that.

16           THE COURT:  Mr. Waldinger.

17               (Simultaneous colloquy.)

18           MR. FAKHOURY:  Unless -- has questions.

19           THE COURT:  Mr. Waldinger, do you wish to be heard?

20           MR. WALDINGER:  I think the government has met its

21   burden at this point under Rule 29 for the case to go to the

22   jury.  And I can -- I can address some of the specific

23   elements if Your Honor would like me to.

24           THE COURT:  The defendant has not made any argument

25   regarding any specific element, and the Court will deny the

1     motion.  I don't think you need to be heard further.

2         Okay.  So closing arguments.  It's not my practice to

3     impose time limits of any kind in a criminal trial, but I

4     wonder if counsel would accept time limits of 90 minutes all

5     in, which is what you told me you thought you might need.  I

6     think, if my memory serves.  So that we could all know that at

7     the end of the day tomorrow, the jury would have the case.

8         It's just a thought.  It's not -- I'm not urging you to do

9     this.

10            MR. WALDINGER:  When you say 90 minutes all in, you

11    mine for each side?

12            THE COURT:  I do.  I did.  I might also be

13    misrecollecting what you told me last week.  So feel free to

14    comment on that.

15            MR. FAKHOURY:  From my point of view, 90 minutes is

16    fine -- I will be done in 90 minutes.  So I don't have an

17    issue with that.

18        In terms of whether to impose equal -- equal allotment,

19    I -- I've actually never had that come up.

20            THE COURT:  I see.  This is -- this is too hard.

21    Here's what we're going to do.  I'll just tell you.  Your jury

22    really doesn't want to not have the case at the end of the day

23    tomorrow.  That's my personal view based on my observation of

24    the jury and 20 years of doing this.  But you can talk as long

25    as you want.

 1        I think that's it from the Court's point of view.

 2        Mr. Waldinger, anything else?

 3            **MR. WALDINGER:**  I don't think so, Your Honor.

 4        Are there a new set of instructions?  Or we should just

 5    swap in any --

 6            **THE COURT:**  We can -- I want to say that the set that

 7    I'm going to provide to the jury is the same as the set that I

 8    previously published except that instruction 2.12, evidence

 9    for a limited purpose, has been modified consistent with our

10    discussion and the Court's ruling.

11        And I don't -- I don't -- I'm happy to put it on -- put

12    the new set on the docket.  Or it might just be sufficient for

13    your purposes if Ms. Lee were to email you an updated set so

14    that you can have them all in one place.

15            **MR. WALDINGER:**  I think there was also a change based

16    on the hearing on Thursday to what's numbered 15.36, the

17    instruction for bank fraud.  So that's different than what's

18    on the docket now.

19            **THE COURT:**  Oh, hold on a second.  Let me get that in

20    front of me.

21        Yes, I just wanted to check, make sure the set I had had

22    been changed.  Fortunately it has.  So that change also has

23    been made.

24            **MR. WALDINGER:**  Great.

25            **THE COURT:**  The question still is, is it adequate to

1  your purposes if Ms. Lee just emails everybody an updated set?

2  Once I've given the instructions, of course, they'll be on the

3  docket.  Ms. Lee will put those and the verdict form on the

4  docket.

5      MR. WALDINGER:  An email is fine for the government,

6  Your Honor.

7      THE COURT:  Mr. Fakhoury, is that all right?

8      MR. FAKHOURY:  Yes, that's fine.

9      THE COURT:  Great.  And on the verdict form, I think

10  I just told Mr. Fakhoury it looked fine to me.  And I

11  reformatted the government's proposed verdict form so that it

12  was consistent with other verdict forms that I've used.  But

13  otherwise, it's verbatim what the government proposed.

14   Do you want to be heard on that, Mr. Fakhoury?

15      MR. FAKHOURY:  I don't -- I don't need to be heard on

16  that.

17      THE COURT:  Okay.  So tomorrow everybody will get a

18  set.  Actually we can just pass them out now.  So each of the

19  two sides will get two copies of the instructions and two

20  copies of the verdict form.  And we'll pass those out to the

21  jurors first thing in the morning.

22      MR. WALDINGER:  I've already -- I've identified a

23  typo on the verdict form, Your Honor.

24      THE COURT:  I don't have the verdict form in front of

25  me.  Could someone hand me a copy, please.  Thanks.

```
 1         Yes.
 2              MR. WALDINGER:  It should be count one and count two.
 3              THE COURT:  Oh, yeah, it should be.  Okay.
 4              MR. FAKHOURY:  Your Honor -- actually, let me ask --
 5                 (Counsel confer off the record.)
 6              THE COURT:  I'll make that change.  Thanks.
 7              MR. FAKHOURY:  So, Your Honor, on page 14 of the jury
 8    instructions, this would be number 3.17.
 9              THE COURT:  Hang on just a second so I can catch up
10    with you.
11         Yes, thanks.  I'm there.
12              MR. FAKHOURY:  So there were no charts and summaries
13    admitted into evidence.  There was summaries -- there were
14    demonstratives that were shown but not admitted.  So I think
15    this one may need to come out.
16              THE COURT:  All right.  Mr. Waldinger, do you agree
17    with that?
18              MR. WALDINGER:  I concur with that, Your Honor.
19              THE COURT:  3.17 will be deleted.  Good.
20              MR. WALDINGER:  I don't see anything else right now,
21    Your Honor.  But if we do, we'll -- we'll let you know before
22    you instruct.
23              THE COURT:  Thanks.  Okay.
24         Any changes that get made tomorrow will get made by pen.
25    You know, and I'll just tell the jurors, hey, cross that word
```

1  out, or wherever.  Just because it can take some time to make

2  all the copy sets for everybody.

3     Just out of curiosity, because of course I would learn

4  this tomorrow even if I didn't ask you, who will be giving the

5  closing argument for the government?

6         **MR. WALSH:**  I will, Your Honor.

7         **MR. WALDINGER:**  And I will -- I plan to do rebuttal,

8  Your Honor, unless you don't like lawyers to split it.

9         **THE COURT:**  I have no rule on that subject.

10        **MR. WALDINGER:**  Yeah, so Mr. Walsh will do the first

11 closing, and I'll do the rebuttal.

12        **THE COURT:**  All right.  Very good.

13    Gentlemen, can the Court do anything else for you before

14 you repair to your offices?

15        **MR. FAKHOURY:**  I just was curious what the Court's --

16 is there -- does the Court -- some judges don't like lawyers

17 going, you know, past the podium or -- so I'm just kind of

18 curious what the Court's preference is.

19    By the way, I don't anticipate doing that, but just

20 figured I'd and figure, you know --

21        **THE COURT:**  It's a good question to ask because

22 judges do tend to have strong feelings about this.  The bigger

23 issue is that you need to stay near a microphone.

24        **MR. FAKHOURY:**  Okay.

25        **THE COURT:**  So that -- that limiting principle will

1    supervene anything else that I could tell you.

2        If -- if by magic, all of a sudden it didn't matter how

3    close you were to a microphone, I wouldn't have any objection

4    to your walking around the well, but I wouldn't want you to

5    break the line between the edge of the court reporter's desk

6    and the seatback of the chair at government counsel table.

7        I say that because I think the jurors are entitled to a

8    certain amount of respectful distance.

9            **MR. FAKHOURY:**  Sure.

10           **THE COURT:**  I was a big pacer when I was a lawyer.  I

11   just felt that I had too much energy and I couldn't use it all

12   if I were standing still.

13       I tried a big -- this is a war story, but it's mercifully

14   brief.  I tried a big case in Los Angeles.  We were in trial

15   for more than a month.  9/11 happened while we were in trial.

16   I was living in a hotel room.  My client was being sued for

17   $400 million plus punitive damages.  It was a good case, it

18   was pretty interesting.  Anyway, we should have lost that

19   case.  I got one juror away from winning.  The hung jury.

20       We had all the jurors interviewed afterwards.  One of them

21   said, "I didn't like it when Jon Tigar came over and touched

22   the rail of the jury box."

23       They can't tell you about things like that.  They rely on

24   the court to err on the side of caution.  I tell the lawyers

25   this just because I let you be someplace in the courtroom

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   doesn't mean they like it.  But you can make that judgment.

2        Anyway, I think -- I think what you'll find is that both

3   lawyers will wind up arguing from the microphone where

4   Mr. Waldinger and Mr. Walsh are standing.  Or didn't we have

5   some kind of podium with a microphone stand thing at the

6   beginning of the case?

7             **THE CLERK:**  Yes, sir.

8             **THE COURT:**  Right.  Or that.  And that will operate

9   as a natural limiter.

10        Good question.  Other questions or issues?

11        Very good.  I'll see you tomorrow morning.

12            **MR. WALDINGER:**  Thank you, Your Honor.

13            **MR. FAKHOURY:**  Thank you, Your Honor.

14            **MR. WALSH:**  Thank you, Your Honor.

15            **THE CLERK:**  Court is in recess.

16          (Proceedings were concluded at 1:30 P.M.)

17                        --o0o--

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Monday, November 14, 2022