UNITED STATES DISTRICT COURT   *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 9** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | Pages 1420 - 1560 |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, November 15, 2022 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

**APPEARANCES:**

For Plaintiff:        STEPHANIE M. HINDS, ESQ.
United States Attorney
1301 Clay Street, Suite 340S
Oakland, California  94612
        BY:  KYLE F. WALDINGER,
NICHOLAS J. WALSH,
ASSISTANT UNITED STATES ATTORNEYS


For DEFENDANT:      Moeel Lah Fakhoury LLP
1300 Clay Street, Suite 600
Oakland, California  94612-1427
        BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW


Reported By:        Raynee H. Mercado
CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

# I N D E X

|  | **PAGE** | **VOL.** |
|---|---|---|
| JURY INSTRUCTIONS | 1425 | 9 |
| CLOSING ARGUMENT BY MR. WALSH | 1444 | 9 |
| CLOSING ARGUMENT BY MR. FAKHOURY | 1487 | 9 |
| CLOSING ARGUMENT BY MR. WALDINGER | 1542 | 9 |

--o0o--

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1    Tuesday, November 15, 2022                        8:05 A.M.

2                     P R O C E E D I N G S

3                          --o0o--

4         (The following proceedings were heard out of the presence

5    of the jury:)

6              THE CLERK:  Your Honor, now calling criminal matter

7    20-266, United States v. Michael Brent Rothenberg.

8         If counsel could please state their appearances for the

9    record, starting with the government.

10             MR. WALDINGER:  Good morning, Your Honor.  Kyle

11   Waldinger and Nicholas Walsh on behalf of the United States.

12             MR. FAKHOURY:  Good morning, Your Honor.  Hanni

13   Fakhoury on behalf of Mr. Rothenberg.  He's present.

14             THE COURT:  Good morning, everyone.

15        Do we have anything to talk about this morning?

16             MR. WALDINGER:  I don't have anything, Your Honor.

17             MR. FAKHOURY:  I have nothing, Your Honor.

18             THE COURT:  Mr. Walsh is on his feet.

19             MR. WALSH:  My apologies, Your Honor.

20        I know Your Honor has a very definite plan for breaks.  Do

21   you intend today to modify those so that it's between

22   instructions and the various closings?  Or how do you --

23             THE COURT:  Yes.

24             MR. WALSH:  -- how do you anticipate doing that?

25             THE COURT:  I do.  I intend to do exactly that thing.
```

1     So I'll read the instructions.  I'll tell the jury, "Now

2  we're going to take a break," and the government will give its

3  closing argument.  And then I'll tell them we're going to take

4  another break.  And then Mr. Fakhoury will go.

5     And we'll see how long that his closing is.  Just as a

6  hypothetical, if his closing were an hour, I probably would

7  invite the government just to stand up and give its rebuttal

8  because this jury is used to sitting for 90 minutes at a time.

9     But that's -- with that kind of exception, yes, just

10  breaking between events.

11          **MR. WALSH:**  Thank you, Your Honor.

12          **THE COURT:**  Very good.  See you at 8:30.

13          **MR. WALDINGER:**  Thank you, Your Honor.

14          **MR. FAKHOURY:**  Thank you, Your Honor.

15          **THE CLERK:**  Court is in recess.

16     (Recess taken at 8:07 A.M.; proceedings resumed at

17  8:35 A.M.)

18     (The following proceedings were heard in the presence of

19  the jury:)

20          **THE CLERK:**  You may be seated.

21          **THE COURT:**  Good morning.

22          **JURORS:**  Good morning.

23          **THE COURT:**  I won't go over our schedule today

24  because I did that yesterday before we left.

25     I'm just going to instruct you on the law right now.

1    Can we pass out copies of jury instructions and verdict

2    forms to our jurors, please.

3    As I instructed you earlier and as I'll say again in a

4    minute, you have notebooks to take whatever notes you think

5    might be helpful to you.  And those notes are personal to you.

6    You can write anything you want there.  No one is going to

7    read your notes.  And at the conclusion of the trial, I'll

8    have your notes collected and destroyed.

9    The same thing is true with these copies of the jury

10   instructions and verdict forms that I'm passing out now.  You

11   may find it helpful to make notes on those or underline

12   certain things or whatever else is helpful to you.

13   As with your note pads, no one else is going to read

14   whatever you write on these jury instructions, and at the

15   conclusion of the trial, they will be collected and destroyed.

16   At the beginning of the trial, I read you a much shorter

17   set of jury instructions.  Those are included in the back

18   under a page that says "Preliminary Instructions."

19   During the trial, I gave you a couple of instructions that

20   were relevant to whatever was happening at that moment in the

21   trial.  Those are just part of the larger set so I'll be

22   reading those to you again also.

23   You'll see that for the most part I'll have my head down

24   and I'll just be reading.  That's because even though these

25   instructions are written in a sort of conversational style,

1    they represent the law, and it's important that I give you the

2    law exactly as it's written.  From time to time, I might

3    depart from the written text just to make a comment that I

4    think will be helpful to you, but for the most part I'm just

5    going to be reading.

6        You can look at me while I'm reading them.  You cannot

7    look at me at all, you can just read your copy of the

8    instructions.  You can do both.  It doesn't matter.  One of

9    the reasons that I pass out copies of instructions to my

10   jurors is that everybody has a different learning style.  Some

11   people absorb information better if they just hear it, some

12   people if they read it, and some people if there's a

13   combination.  Someday maybe I'll come into the 21st century

14   and also have it on the screen, but I haven't gotten that far

15   yet.

16       So with all that having been said, I will now instruct you

17   on the law.

18                          **JURY INSTRUCTIONS**

19          **THE COURT:**  Members of the jury, now that you've

20   heard all the evidence, it's my duty to instruct you on the

21   law that applies to this case.  A copy of these instructions

22   will be available in the jury room for you to consult.  Well,

23   there's the first typo.  You already have a copy.

24       It is your duty to weigh and to evaluate all the evidence

25   received in the case and, in that process, to decide the

1    facts.  It is also your duty to apply the law as I give it to

2    you to the facts as you find them whether you agree with the

3    law or not.

4        You must decide the case solely on the evidence and the

5    law.  You'll recall that you took an oath promising to do so

6    at the beginning of the case.

7        You should also not be influenced by any person's race,

8    color, religious beliefs, national ancestry, sexual

9    orientation, gender identity, gender, or economic

10   circumstances.

11       Also do not allow yourself to be influenced by personal

12   likes or dislikes, sympathy, prejudice, fear, public opinion

13   or biases, including unconscious biases.  Unconscious biases

14   are stereotypes, attitudes, or preferences that people may

15   consciously reject but may be expressed without conscious

16   awareness, control, or intention.

17       You must follow all these instructions and not single out

18   some and ignore others.  They're all important.  Please do not

19   read into these instructions or into anything I may have said

20   or done as any suggestion as to what verdict you should

21   return.  That is a matter entirely up to you.

22       The indictment is not evidence.  The defendant has pleaded

23   not guilty to the charges.  The defendant is presumed to be

24   innocent unless and until the government proves the defendant

25   guilty beyond a reasonable doubt.

1          In addition, the defendant does not have to testify or

2     present any evidence.  The defendant does not have to prove

3     innocence.  The government has the burden of proving every

4     element of the charges beyond a reasonable doubt.

5          A defendant in a criminal case has a constitutional right

6     not to testify.  In arriving at your verdict, the law

7     prohibits you from considering in any manner that the

8     defendant did not testify.

9          Proof beyond a reasonable doubt is proof that leaves you

10    firmly convinced the defendant is guilty.  It is not required

11    that the government prove guilt beyond all possible doubt.

12         A reasonable doubt is a doubt based upon reason and common

13    sense and is not based purely on speculation.  It may arise

14    from a careful and impartial consideration of all the evidence

15    or from lack of evidence.

16         If after a careful and impartial consideration of all the

17    evidence you are not convinced beyond a reasonable doubt that

18    the defendant is guilty, it is your duty to find the defendant

19    not guilty.  On the other hand, if after a careful and

20    impartial consideration of all the evidence you are convinced

21    beyond a reasonable doubt that the defendant is guilty, it is

22    your duty to find the defendant guilty.

23         The evidence you are to consider in deciding what the

24    facts are consists of:

25         First, the sworn testimony of any witness;

1    Second, the exhibits received in evidence;

2    And third, any facts to which the parties have stipulated.

3    In reaching your verdict, you may consider only the

4    testimony and exhibits received in evidence and the parties'

5    stipulations.  The following things are not evidence and you

6    may not consider them in deciding what the facts are.

7    One, questions, statements, objections, and arguments by

8    the lawyers are not evidence.  The lawyers are not witnesses.

9    Although you must consider a lawyer's questions to understand

10   the answers of a witness, the lawyer's questions are not

11   evidence.  Similarly, what the lawyers have said in their

12   opening statements, will say in their closing arguments, and

13   have said at other times is intended to help you interpret the

14   evidence, but it's not evidence.  If the facts as you remember

15   them differ from the way the lawyers state them, your memory

16   of them, that is, your memory of the facts, controls.

17   Any testimony that I have excluded, stricken, or

18   instructed you to disregard is not evidence.  In addition,

19   some evidence was received only for a limited purpose.  When I

20   have instructed you to consider certain evidence in a limited

21   way, you must do so.

22   Anything you may have seen or heard when court was not in

23   session is not evidence.  You are to decide this case based

24   solely on the evidence received at the trial.

25   Evidence may be direct or circumstantial.  Direct evidence

1    is direct proof of a fact such as testimony by a witness about

2    what that witness personally saw or heard or did.

3    Circumstantial evidence is indirect evidence, that is, it is

4    proof of one or more facts from which you can find another

5    fact.

6        You are to consider both direct and circumstantial

7    evidence.  Either can be used to prove any fact.  The law

8    makes no distinction between the weight to be given to either

9    direct or circumstantial evidence.  It is for you to decide

10   how much weight to give to any evidence.

11       In deciding the facts in this case, you may have to decide

12   which testimony to believe and which testimony not to believe.

13   You may believe everything a witness says or part of it or

14   none of it.

15       In considering the testimony of any witness, you may take

16   into account the following:

17       First, the opportunity and ability of the witness to see

18   or hear or know the things testified to;

19       Second, the witness's memory;

20       Third, the witness's manner while testifying;

21       Fourth, the witness's interest in the outcome of the case,

22   if any;

23       Fifth, the witness's bias or prejudice, if any;

24       Sixth, whether other evidence contradicted the witness's

25   testimony;

1     Seventh, the reasonableness of the witness's testimony in

2   light of all the evidence;

3     And eighth, any other factors that bear on believability.

4     Sometimes a witness may say something that is not

5   consistent with something else he or she said.  Sometimes

6   different witnesses will give different versions of what

7   happened.  People often forget things or make mistakes in what

8   they remember.  Also, two people may see the same event but

9   remember it differently.  You may consider these differences,

10  but do not decide that testimony is untrue just because it

11  differs from other testimony.

12    However, if you decide that a witness has deliberately

13  testified untruthfully about something important, you may

14  choose not to believe anything that witness said.  On the

15  other hand, if you think the witness testified untruthfully

16  about some things but told the truth about others, you may

17  accept the part you think is true and ignore the rest.

18    The weight of the evidence as to a fact does not

19  necessarily depend on the number of witnesses who testify.

20  What is important is how believable witnesses were and how

21  much weight you think their testimony deserves.

22    You are here only to determine whether the defendant is

23  guilty or not guilty of the charges in the indictment.  The

24  defendant is not on trial for any conduct or offense not

25  charged in the indictment.

1        A separate crime is charged against the defendant in each

2   count.  You must decide each count separately.  Your verdict

3   on one count should not control your verdict on any other

4   count.

5        You heard evidence that the defendant transferred, or

6   caused to be transferred, money from the bank account of

7   Rothenberg Ventures Fund II LLC to the bank account of

8   Rothenberg Ventures Management Company LLC and then on to his

9   personal Bank of America and Merrill Lynch accounts, or that

10  the defendant transferred, or caused to be transferred, money

11  from one of his Merrill Lynch accounts to his personal Bank of

12  America account and then on to the bank account of Rothenberg

13  Ventures Management Company LLC and/or the bank account of

14  Rothenberg Ventures Fund II LLC.  I instruct you that you may

15  consider this evidence only for the limited purpose of

16  determining whether the defendant acted with the intent to

17  defraud Silicon Valley Bank, devised a scheme to defraud

18  Silicon Valley Bank, and/or executed a scheme to defraud

19  Silicon Valley Bank.  You must consider it only for that

20  limited purpose and not for any other purpose.

21       During the trial, certain charts and summaries were shown

22  to you to help explain the evidence in the case.  These charts

23  and summaries were not admitted into evidence and will not go

24  into the jury room with you.  They are not themselves evidence

25  or proof of any facts.  If they do not correctly reflect the

1    facts or figures shown by the evidence in the case, you should

2    disregard these charts and summaries and determine the facts

3    from the underlying evidence.

4         The defendant is charged in Count One of the indictment

5    with bank fraud in violation of Section 1344(1) and 1344(2) of

6    Title 18 of the United States Code.  For the defendant to be

7    found guilty of that charge, the government must prove each of

8    the following beyond a reasonable doubt:

9         First, the defendant knowingly executed or attempted to

10   execute a scheme to defraud Silicon Valley Bank, a financial

11   institution, as to something of value, or a scheme or plan to

12   obtain money or property from Silicon Valley Bank by making

13   false statements or promises.

14        Second, the defendant knew that the statements or promises

15   were false.

16        Third, the statements or promises were material, that is,

17   they had a natural tendency to influence or were capable of

18   influencing a financial institution to part with money or

19   property.

20        Fourth, the defendant acted with the intent to defraud

21   Silicon Valley Bank, that is, with the intent to deceive and

22   cheat.

23        Fifth, Silicon Valley Bank was insured by the Federal

24   Deposit Insurance Corporation, called the FDIC, or was an

25   organization which finances or refinances any debt secured by

an interest in real estate, including private mortgage companies and any subsidiaries of such organizations and whose activities affect interstate or foreign commerce.

An act is done "knowingly" if the defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident.  The government is not required to prove that the defendant knew that his acts or omissions were unlawful.  You may consider evidence of the defendant's words, acts, or omissions along with all the other evidence in deciding whether the defendant acted knowingly.

A scheme to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive and cheat a financial institution and deprive it of something of value.  It isn't necessary for the government to prove that a financial institution was the only or sole victim of the scheme to defraud.  It also isn't necessary for the government to prove that the defendant was actually successful in defrauding any financial institution.  Finally, it is not necessary for the government to prove that any financial institution lost any money or property as a result of the scheme to defraud.

It is not a defense that Silicon Valley Bank may have been gullible or careless or that Silicon Valley Bank could have been more diligent.  Whether Silicon Valley Bank should have known that submissions to Silicon Valley Bank were false or

1    fraudulent, if at all, is not a defense.

2        Finally, whether Silicon Valley Bank was motivated --

3    excuse me.  Whether Silicon Valley Bank was motivated by

4    profit or did, in fact, profit from the loans or other

5    transactions involved in this case also is not a defense.

6        The defendant is charged in Count Two of the indictment

7    with making a false statement to a federally insured financial

8    institution, Silicon Valley Bank, for the purpose of

9    influencing Silicon Valley Bank in violation of Section 1014

10   of Title 18 of the United States Code.

11       For the defendant to be found guilty of that charge, the

12   government must prove each of following elements beyond a

13   reasonable doubt.

14       First, the defendant made a false report -- excuse me --

15   the defendant made a false statement or report to a financial

16   institution ensured by the Federal Deposit Insurance

17   Corporation, specifically Silicon Valley Bank.

18       Second, the defendant made the false statement or report

19   to Silicon Valley Bank knowing it was false, with all of the

20   jurors agreeing as to the specific false statement or report.

21       And third, the defendant did so for the purpose of

22   influencing in any way the action of Silicon Valley Bank.

23       I'm going to depart from the script for just a moment to

24   talk about the second element.  I mentioned this before.  I

25   think it deserves a little bit of explanation.

1     Let's say, hypothetically -- I don't know what the

2  government will argue in closing argument -- but let's just

3  pick a number and say that the government says Mr. Rothenberg

4  made six false statements or reports to Silicon Valley Bank.

5  And as you're going through the elements, you are, as a jury,

6  deciding whether the statements were false and all the other

7  elements of this charge.

8     You have to agree on which statement or statements were

9  false.  So to take an easy hypothetical, let's say that there

10  were only two statements at issue in the case.  And six jurors

11  thought that one of the statements was false and the other was

12  not.  And the other six jurors go the other way.  They thought

13  the first statement was not false, they thought the second

14  statement was false.  In that hypothetical, all the jurors

15  would not have agreed on the same false statement.

16     However, to take another hypothetical, let's say there

17  were six false statements.  All 12 jurors agreed that one of

18  them was false and that the government had proven the

19  remaining elements beyond a reasonable doubt.  That jury would

20  return a verdict of guilty because they all agreed on one

21  false statement, even if they disagreed as to the other five.

22     But if all the jurors cannot agree on at least one

23  statement being false or one report being false, and all the

24  other elements that are set forth in this instruction, then

25  the verdict must be not guilty.

1    Hopefully that explanation is helpful.

2    Returning to the instruction.

3    It is not necessary, however, to prove that Silicon Valley

4    Bank was, in fact, influenced or misled, or that

5    Silicon Valley Bank was exposed to a risk of loss.  What must

6    be proved is that the defendant intended to influence

7    Silicon Valley Bank by the false statement.

8    An act is done "knowingly" if the defendant is aware of

9    the act and does not act or fail to act through ignorance,

10   mistake, or accident.

11   The government is not required to prove that the defendant

12   knew that his acts or omissions were unlawful.  You may

13   consider evidence of the defendant's words, acts, or

14   omissions, along with all the other evidence, in deciding

15   whether the defendant acted knowingly.

16   The indictment charges that the offense alleged -- should

17   be -- offenses alleged in Counts One and Two were committed on

18   or about certain dates.

19   Although it is necessary for the government to prove

20   beyond a reasonable doubt that the offense was committed on a

21   date reasonably near the date alleged in Counts One and Two of

22   the indictment, it is not necessary for the government to

23   prove that the offense was committed precisely on the date

24   charged.

25   A defendant may be found guilty of the crimes charged even

1    if the defendant did not personally commit the acts

2    constituting the crime if the defendant willfully caused an

3    act to be done that if directly performed by him would be an

4    offense against the United States:  A defendant who puts in

5    motion or causes the commission of an indispensable element of

6    the offense may be found guilty as if he had committed this

7    element himself.

8        When you begin your deliberations, elect one member of the

9    jury as your foreperson who will preside over the

10   deliberations and speak for you here in court.

11       You will then discuss the case with your fellow jurors to

12   reach agreement if you can do so.  Your verdict, whether

13   guilty or not guilty, must be unanimous.

14       Each of you must decide the case for yourself.  But you

15   should do so only after you have considered all the evidence,

16   discussed it fully with the other jurors, and listened to the

17   views of your fellow jurors.

18       Do not be afraid to change your opinion if the discussion

19   persuades you that you should.  But do not come to a decision

20   simply because other jurors think it is right.

21       It is important that you attempt to reach a unanimous

22   verdict, but of course only if each of you can do so after

23   having made your own conscientious decision.  Do not change an

24   honest belief about the weight and effect of the evidence

25   simply to reach a verdict.

1    Perform these duties fairly and impartially.  You should

2    also not be influenced by any person's race, color, religious

3    beliefs, national ancestry, sexual orientation, gender

4    identity, gender, or economic circumstances.  Also do not

5    allow yourself to be influenced by personal likes or dislikes,

6    sympathy, prejudice, fear, public opinion, or biases,

7    including unconscious biases.  Unconscious biases are

8    stereotypes, attitudes, or preferences that people may

9    consciously reject but may be expressed without conscious

10    awareness, control, or intention.

11    It is your duty as jurors to consult with one another and

12    to deliberate with one another with a view toward reaching an

13    agreement if you can do so.  During your deliberations, you

14    should not hesitate to reexamine your own views and change

15    your opinion if you become persuaded that it's wrong.

16    Because you must base your verdict only on the evidence

17    received in the case and on these instructions, I remind you

18    that you must not be exposed to any other information about

19    the case or to the issues it involves.

20    Except for discussing the case with your fellow jurors

21    during your deliberations, do not communicate with anyone in

22    any way and do not let anyone else communicate with you in any

23    way about the merits of the case or anything to do with it.

24    This restriction includes discussing the case in person,

25    in writing, by phone, tablet, computer, or any other means, by

email, text messaging, or any Internet chat room, blog,

website, or any other forms of social media.  This restriction

applies to communicating with your family members, your

employer, the media or press and the people involved in the

trial.  If you're asked or approached in any way about your

jury service or anything about this case, you must respond

that you've been ordered not to discuss the matter and to

report the contact to the court.

     Do not read, watch, or listen to any news or media

accounts or commentary about the case or anything to do with

it.  Do not do any research such as consulting dictionaries,

searching the Internet, or using other reference materials;

and do not make any investigation or in any other way try to

learn about the case on your own.

     The law requires these restrictions to ensure the parties

have a fair trial based on the same evidence that each party

has had an opportunity to address.  A juror who violates these

restrictions jeopardizes the fairness of these proceedings and

a mistrial could result that would require the entire process

to start over.  If any juror is exposed to any outside

information, please notify the court immediately.

     Some of you have taken notes during the trial.  Whether or

not you took notes, you should rely on your own memory of what

was said.  Notes are only to assist your memory.  You should

not be overly influenced by your notes or those of fellow

1    jurors.

2       The punishment provided by law for this crime is for the

3    court to decide.  You may not consider punishment in deciding

4    whether the government has proved its case against the

5    defendant beyond a reasonable doubt.

6       A verdict form has been prepared for you.

7       Do you have a copy of the verdict form with you?  Good,

8    okay.

9       After you've reached unanimous agreement on a verdict,

10   your foreperson juror should complete the verdict form

11   according to your deliberations, sign and date it, and advise

12   the courtroom deputy that you are ready to return to the

13   courtroom.

14      If it becomes necessary during your deliberations to

15   communicate with me, you may send a note through the courtroom

16   deputy signed by any one or more of you.  No member of the

17   jury should ever attempt to communicate with me except by a

18   signed writing, and I will respond to the jury concerning the

19   case only in writing or here in open court.

20      If you send out a question, I will consult with the

21   lawyers before answering it which may take some time.  You may

22   continue your deliberations while waiting for the answer to

23   any question.  Remember that you're not to tell anyone,

24   including me, how the jury stands numerically or otherwise on

25   any question submitted to you including the question of the

1  guilt of the defendant until after you've reached a unanimous

2  verdict or have been discharged.

3      I'll say a couple of things about this instruction and

4  then the jury instructions will be completed.

5      First, where it says remember that you're not to tell

6  anyone including me how the jury stands, that means when you

7  send out a note or if you're back in open court and I'm

8  discussing something with the foreperson or another juror,

9  you're not to indicate what the vote is on any question.  We

10 don't want to know that.  Your deliberations are confidential,

11 and they're confidential for good reason.

12     So you might -- it might come to pass, it occasionally

13 happens, that a jury will say, "We cannot reach agreement on

14 the following element."  That's all I want to know.  I don't

15 want to know that the vote is one thing or another.  Or that

16 we can't reach agreement -- having difficulty reaching

17 agreement on a certain count.  Again, I don't want to know the

18 number.  So please don't provide that information.

19     Secondly, and this is more likely to happen, I think,

20 where it says continue deliberating after you send out a note.

21 As I'm sure you're tired of hearing me say by now, I've been

22 doing this for 20 years, done a lot of jury trials.  And it

23 happens with some frequency that the jury will send out a note

24 with a question.  Say we have a question about this word in

25 the instructions, or whatever the question is.  And they

1    continue to deliberate.  And while I'm talking to the lawyers

2    and we're trying to put together a good answer to the

3    question, the jury reaches a verdict.

4        And that's because one of a couple things happened.  The

5    first is they figured out the answer themselves.  They came up

6    with an answer that they liked and they didn't need an answer

7    from the judge and the lawyers to whatever their question is.

8        The other thing that happens is that the jurors sometimes

9    realize they didn't need to answer that question because this

10   is just a decision path.  That's what this is, it's a decision

11   path, and they were able to make a decision with -- they

12   decided that they didn't need the answer to a particular

13   question to make a decision.  So that's why the instruction

14   says to keep deliberating.

15       The last thing I'll say about this instruction is it takes

16   time to answer your question.  I promise you that while a jury

17   is deliberating, there is nothing more important happening in

18   my life, the life of my staff, the life of the parties, and

19   the life of lawyers.  Nothing.

20       So when a question comes out, we all get together as

21   quickly as we possibly can and we start trying to figure out

22   an answer to the question.

23       Sometimes legal research needs to be performed.  Sometimes

24   the lawyers need to go through the evidence.  It will not

25   surprise you to learn that the lawyers often don't agree on

1   what the answer should be, and so they need time to put their

2   positions in front of me.  And then sometimes I need to make a

3   decision about what the answer is.  So all of that takes time.

4        I don't want you to think after you send out a question

5   and you don't get an answer back right away, I don't want you

6   to think, well, what are they doing.  Because I promise you we

7   have dropped everything and we are trying to get you an answer

8   just as quickly as we can.

9        So that concludes the instructions.

10       Our break schedule is going to go a little differently

11   today just because it will improve the flow and also I think

12   make it more enjoyable to listen to.

13       We'll take a break now.  The government will make its

14   closing argument.  We'll take a break then after that.  And

15   Mr. Fakhoury will make his closing argument.  And then we'll

16   see.

17       So we're going to go ahead and take a break.  I'll say

18   15 minutes.  If everybody gets back a minute or two earlier,

19   then we'll start a minute or two earlier.

20       So let's go ahead and take our first break of the day.

21            THE CLERK:  Please rise for the jury.

22       (The following proceedings were heard out of the presence

23   of the jury:)

24            THE COURT:  Court is in recess.

25

```
 1        (Recess taken at 9:04 A.M.; proceedings resumed at 9:23

 2   A.M.)

 3        (The following proceedings were heard in the presence of

 4   the jury:)

 5             THE CLERK:  You may be seated.

 6             THE COURT:  All right.  Let's go back on the record.

 7        All the jurors are in their assigned seats.  The parties

 8   and counsel are at counsel table.

 9        Mr. Walsh, would you like to make a closing argument on

10   behalf of the United States?

11             MR. WALSH:  I would, yes, Your Honor.

12             THE COURT:  Please.

13                 GOVERNMENT'S CLOSING ARGUMENT

14             MR. WALSH:  Members of the jury, in the summer of

15   2014, Michael Rothenberg, the man sitting right over there at

16   that table, deliberating and intentionally defrauded

17   Silicon Valley Bank when he submitted a loan application and

18   supporting materials that contained misrepresentations and

19   half-truths designed to deceive Silicon Valley Bank as to his

20   true financial condition at that time, all with an eye towards

21   getting money from the bank in the form of two loans, a

22   capital call line of credit in the amount of $300,000 and a

23   $1.48 million cash-out mortgage refinance.

24        There was nothing requiring Mr. Rothenberg in the summer

25   of 2014 to refinance his condominium in San Francisco,
```

 1   number 6 on Bryant Street.  There was nothing requiring him to

 2   get a capital call line of credit in the summer of 2014.  He

 3   chose to do that, and he chose to do it in a particular way.

 4   And when he did, he committed two crimes, bank fraud and

 5   making false statements to a financial institution.

 6       The government asks that you find Mr. Rothenberg guilty of

 7   both of those counts because he is in fact guilty of those two

 8   counts beyond a reasonable doubt.

 9       Now, my presentation to you today has a number of

10   sections, and so I've prepared an agenda so that you can

11   follow along so that you know where I am so you're not

12   wondering when's he going to stop.

13                   (Demonstrative published.)

14       MR. WALSH:  So let's talk about what we're going to

15   walk through over the course of this closing.

16       First, the most important thing, number one,

17   Mr. Rothenberg's scheme to defraud Silicon Valley Bank that

18   forms the basis of Count One.

19                   (Demonstrative published.)

20       MR. WALSH:  Second, the basis of Count Two, the false

21   statements he made to Silicon Valley Bank that form the basis

22   of Count Two.

23                   (Demonstrative published.)

24       MR. WALSH:  Third, we're going to talk about what was

25   the significance of the scheme to defraud the Silicon Valley

 1    Bank and of his false statements.

 2                   (Demonstrative published.)

 3        **MR. WALSH:**  Fourth, we're going to touch briefly on

 4    what Mr. Rothenberg's excuses and explanations might be in his

 5    closing argument.

 6                   (Demonstrative published.)

 7        **MR. WALSH:**  And then, fifth, I would be remiss if I

 8    did not walk you through the elements of the crimes that

 9    you're going to deliberate on.  Because presumably when you go

10    back into the jury room to deliberate, that's exactly what

11    you'll do, walk through the elements.

12                   (Demonstrative published.)

13        **MR. WALSH:**  So let's get started.

14        Agenda item number 1, the first thing here, the most

15    important part of the case:  What was Michael Rothenberg's

16    scheme to defraud?

17        Well, in a nutshell, Michael Rothenberg deceived

18    Silicon Valley Bank by making various misrepresentations and

19    deceived Silicon Valley Bank into thinking that he had more

20    assets than he really had and fewer debts or liabilities than

21    he really had.

22        That's his scheme, and it was designed to get him the

23    $1.48 million and $300,000 in the form of two loans from

24    Silicon Valley Bank.

25        How did he do it?

 1            (Demonstrative published.)

 2        **MR. WALSH:**  Well, he used another financial

 3   institution to do it, Merrill Lynch.

 4        Now Merrill Lynch is not a bank, it's a brokerage, but it

 5   feels like a bank, right?  He used Merrill Lynch in order to

 6   deceive Silicon Valley Bank.

 7        And this is where those two accounts that we've been

 8   talking -- or you have heard a great deal about over the

 9   course of this trial, come into play, the Cash Management

10   Account and the Loan Management Account, a CMA and the LMA.

11   Those represent his misrepresentations with regard to how many

12   assets he had and how many liabilities he had.

13        And what exactly did he do?

14            (Demonstrative published.)

15        **MR. WALSH:**  Well, he opened up that Cash Management

16   Account at Merrill Lynch and then misrepresented to

17   Silicon Valley Bank that the $370,000 in that account was

18   liquid.  That's the first half.  That's the misrepresenting

19   his assets.

20            (Demonstrative published.)

21        **MR. WALSH:**  The second half is that he opened up the

22   LMA, the Loan Management Account, and misrepresented to

23   Silicon Valley Bank that it was not used, that it had a zero

24   balance.  That is his misrepresentation, his half-truth, with

25   regard to the other -- the second part, his liabilities.

1    Now, when he submitted his loan application, you'll recall

2    that it was on July 29th of 2014.  He submitted his

3    application to Silicon Valley Bank.

4        And he attached a whole bunch of stuff.  You heard from

5    many different witnesses about the same documents over and

6    over again.  They each had their own perspective on them.

7        But one of the documents he submitted was Exhibit 3.

8                    (Demonstrative published.)

9        **MR. WALSH:**  You'll recall that this was his own

10   personal worksheet of his assets and liabilities.

11       Exhibit 3 includes a statement, what Mike Rothenberg

12   presented of his assets, his liquid investments.

13       Cash.  It says "Fidelity."  He meant Merrill Lynch.  How

14   do you know that?  Because the $370,000 -- $370,015 is exactly

15   the end balance on the Merrill Lynch CMA account at the end of

16   June 2014.  He represented it was a liquid investment to

17   Silicon Valley Bank.

18                    (Demonstrative published.)

19       **MR. WALSH:**  What did he say about his liabilities at

20   the time?  He told them that he had $210,000 of student loans.

21   He did not tell them that he had drawn down for the prior

22   month $350,000 of a Loan Management Account balance, that line

23   of credit.

24       Now, as you heard, Silicon Valley Bank wants backup, wants

25   backup documentation for representations made by a borrower

1    like Michael Rothenberg.  So Michael Rothenberg knew he needed

2    to get a bank statement to back up what he had represented to

3    Silicon Valley Bank.

4        What did he do?

5                    (Demonstrative published.)

6        **MR. WALSH:**  He turned in Exhibit 10.  This statement,

7    Merrill Lynch statement, which is as of July 31st, 2014, is

8    what Michael Rothenberg spent a considerable period of time

9    making it look the way it did.

10       This is his backup documentation and the only backup

11   documentation that he gave to Silicon Valley Bank with regard

12   to his Merrill Lynch bank accounts, brokerage accounts.  This

13   document, as you can see, represents that he has 370,000 and,

14   at this point, 62 dollars, he'd earned some more interest.

15   And it represents that he had a zero outstanding balance in

16   his Loan Management Account.  This is exactly what Michael

17   Rothenberg wanted to tell Silicon Valley Bank and deceive

18   Silicon Valley Bank with.

19       It's true.  It says "CMA Pledged."  It does say that.

20       You'll recall, though, the testimony of Michelle Jandu.

21   Michelle Jandu told you that often brokerage accounts will be

22   opened up like this and they'll automatically have a Loan

23   Management Account that's not used, and that's what she

24   believed when she saw this statement.

25       Now, let me just take a moment.  The Judge has already

1    instructed you on this.  But over the course of this

2    presentation, I'm going to be telling you what witnesses said

3    and what the evidence was.  Remember, what I'm saying right

4    now is not evidence.  If you remember it differently than I

5    do, go with your memories.

6        Now, let's talk about this CMA and LMA, the Cash

7    Management Account and the Loan Management Account.

8                    (Demonstrative published.)

9        **MR. WALSH:**  Why did Michael Rothenberg open up those

10   accounts?

11                   (Demonstrative published.)

12       **MR. WALSH:**  You've seen this chart.  You'll remember

13   that Special Agent Ghio walked through the chart, a more

14   complete version of it, at great Length with you.  But you'll

15   recollect this portion of it here.  The way that Michael

16   Rothenberg set up his CMA and LMA makes no sense on its face.

17   So let's talk about it for a little bit.

18       He sent $370,000 from his personal bank account at Bank of

19   America to set up the CMA, right?  This is the first half of

20   his fraud.  He's setting up the impression that he has assets

21   that he really doesn't have.

22       When you give money to a bank or a brokerage, they pay you

23   interest.  And you saw on the bank account statements that he

24   was making 40 or 50 bucks a month by having $370,000 stored at

25   Merrill Lynch.

1      You also saw, though, that he, three days later, drew down

2   the full $350,000 he could from the Loan Management Account.

3   You'll recall that you can only take out 95 percent.  It has

4   to be secured by the Cash Management Account.  So 350 was the

5   max he could take out.

6      When you take money from a bank, when you get a loan, you

7   have to pay them interest.  You'll recall from the bank

8   statements that he was paying about $1,000 a month to take

9   $350,000 out in this line of credit.  One month, it was

10   1,029.77.  Another month it was $992.45 or 44 cents perhaps.

11      On its face, then, he's paying about $950 a month to put

12   $370,000 into Merrill Lynch's account and get back $350,000 a

13   month.

14      That, on its face, makes no sense.  Why would you do that?

15      The great thing about juries is that when you come and sit

16   in all these chairs, you don't leave behind your life

17   experiences.  You have common sense.  Apply your common sense

18   to this setup.  This makes no sense.  Why would anyone do

19   this?  He must have had another purpose.

20      Now, you heard from various witnesses including Anna

21   Jenkins, that sometimes this is set up the normal way, the

22   most common way, is that you put -- instead of cash into a

23   Cash Management Account, you put in stocks and bonds.  And

24   then sometimes people don't want to sell those stocks because

25   they don't want to pay the taxes and so they set this scheme

CLOSING ARGUMENT \ WALSH

1   up.

2       But this is not what Michael Rothenberg was doing.  He did

3   none of that.  You heard Anna Jenkins says that this is rare,

4   rare to have a system where cash is securing a line of credit.

5       So why did he do it?  Now you also heard that you can get

6   a discount on a mortgage at Merrill Lynch by setting these up.

7   Maybe that's why.

8       But there's no requirement that you max out the credit to

9   get that discount.  You just have to set these up.

10      In truth, back in the summer of 2014, the reason Michael

11  Rothenberg set up this nonsensical system was to ultimately

12  defraud Silicon Valley Bank.  That's why he did it.

13                      (Demonstrative published.)

14          MR. WALSH:  So let's talk about the two halves,

15  right?  He created the false impression of a CMA balance.  And

16  that's what he deceived Silicon Valley Bank with.

17      How did he do it?

18                      (Demonstrative published.)

19          MR. WALSH:  You've seen this chart.  You heard

20  Anthony Ghio walk through and what I will acknowledge is

21  painstaking detail, statement by statement.  What was the

22  point of that?  The point was that you can look at this chart

23  and know that the evidence in this case proves beyond a

24  reasonable doubt by looking at the outgoing and incoming bank

25  statements for every single one of these transactions that

1  this chart is accurate.  It is exactly what happened in 2014.

2  In June of 2014, you know that that is how the money moved.

3      So what did he do?  As you've already heard, he starts off

4  by taking $225,000 from Fund II.  You heard from JR Eppler

5  that is -- that is the investors' money.  It is not Mike

6  Rothenberg's money.  He sends it to the Silicon Valley --

7  sorry -- the Rothenberg Ventures Management Company account,

8  adds some money to it, sends it to his personal bank account,

9  and with that money, he ends up establishing the $370,000 Cash

10  Management Account at Merrill Lynch.

11      $225,000 of that was not Mike Rothenberg's.  How do you

12  know he knows that?  Because of what he did immediately

13  afterwards.  He immediately, three days later, sends it all

14  the way back to Fund II.  He sends the $350,000 he takes out

15  of Loan Management Account, sends it to his personal bank

16  account, sends back just the 310 to the management company,

17  and the 225 back to Fund II.

18      He knows that money is not his.  And he deliberately

19  engaged in this series of transactions knowing full well what

20  it would make that Cash Management Account appear like

21  eventually to Silicon Valley Bank when he turns in the

22  statements.

23      Okay.  That's the first half.  The cash, the asset side.

24                    (Demonstrative published.)

25          **MR. WALSH:**  How did he create the loan management

1    balance of zero?  Because we just saw he just maxed out the

2    loan management on June 20th of $350,000.  That's not going to

3    work for his scheme to work to deceive Silicon Valley Bank.

4    He needed to do something.

5                     (Demonstrative published.)

6         **MR. WALSH:**  Here's the second chart.  You also heard

7    Special Agent Ghio walk through this in painstaking detail.

8    The point of that was just as before.  You saw the outgoing

9    and incoming bank statements that are all in evidence.  You

10   can look at them when you're back in the jury's deliberation

11   room.

12        But the point was that you now know that the evidence in

13   this case has proven beyond a reasonable doubt that the money

14   went exactly as depicted on this chart.  There is no doubt

15   that this is how the money flowed at the end of July and the

16   beginning of August 2014.

17        How did he zero out that Loan Management Account?  For the

18   purpose of creating Exhibit 10, that single statement that he

19   gave to Silicon Valley Bank?  He starts off with $100,000 from

20   Fund II, the same fund as before.  That $100,000 is the

21   investors', not Mike Rothenberg's.

22        He then adds, as before, he adds money to it, once he

23   sends it to the management company, to his personal bank

24   account.  And then on July 29th, a critical day in this case,

25   he has to make two payments.  You'll remember the testimony

CLOSING ARGUMENT \ WALSH

1    about that.  He had what he thought was the payoff balance,

2    which was 350,404.13.  But then it turns out there was July so

3    he had to pay an additional 1,029.77.  He sends those two to

4    make it zero out.

5        Now you know from the bank records that from June 20th,

6    2014, all the way up until July 29th, that Loan Management

7    Account had been maxed out at $350,000 and was accruing some

8    interest.

9        As of June 29th, however, he pays it off, down to zero.

10   It stays there for a scant three days.  And then on

11   August 1st, he takes it all right back out.

12       How do you know that he knows that's not his money?  Same

13   as before.  He sends the money back to his personal bank

14   account.  This time he doesn't quite do the full amount to

15   Rothenberg Ventures Management Company.  And then sends the

16   hundred thousand dollars back on August 1st to Fund II.  He

17   knew it wasn't his money.

18       Now I'd like to turn to another exhibit that shows exactly

19   how deliberate and intentional and knowing this plan was by

20   Mike Rothenberg.

21                   (Demonstrative published.)

22        **MR. WALSH:**  You'll recollect Exhibit 64.  This is an

23   email from Mike Rothenberg to Ryan Kelty, the banker at

24   Merrill Lynch.  And it spells out in detail exactly the scheme

25   that we were just looking at in that chart, Demonstrative B.

1          (Demonstrative published.)

2          **MR. WALSH:**  And in particular, in bold, he spells out

3     what he wanted to have happen.  He's telling his banker, or

4     his brokerage officer at Merrill Lynch, exactly what he wants

5     to do.  There's no accident.  There's no mistake.  This is

6     deliberate, intentional conduct by Michael Rothenberg.  He

7     spells it out.  He's going to -- he says -- he instructs

8     Mike -- or sorry -- Mike instructs Ryan to let him know the

9     payoff amount on July 29th.

10         And then he's going to authorize the wire to pay it off.

11    And then Ryan is going to submit the wire to take it all out

12    of the line of credit the next day.

13         What's amazing about this is he can't even wait until late

14    in the day -- sorry, wrong one -- late in the day on

15    August 1st.  He wants it at 8:00 a.m. the next day,

16    August 1st.

17         All of which is ultimately to get him the July 31st bank

18    statement which he's going to use, not for Merrill Lynch

19    because of course Merrill Lynch already has this information,

20    right?  These are Merrill Lynch accounts.  They don't need a

21    bank statement.  He needs that statement for a different bank,

22    Silicon Valley Bank.  That's why he did all of this.

23         Interestingly enough, that same day, this email,

24    Exhibit 64, is sent on July 29th.

25                 (Demonstrative published.)

1    **MR. WALSH:**  That's also the same day that he was

2    corresponding with Michelle Jandu at Silicon Valley Bank.

3    You'll recall it's Exhibit 1.  It's the beginning of that

4    relationship.  They had had lunch before.  But this is the day

5    in which they started shooting back emails in which Michael

6    Rothenberg was slowly sending various documents including his

7    loan applications to Silicon Valley Bank.

8        Mr. Rothenberg badly wanted that July -- end of July

9    statement.

10                    (Demonstrative published.)

11       **MR. WALSH:**  How do you know that?  Well, you saw

12   those series of emails, Exhibit 60 and 68, with Merrill Lynch

13   in which he's asking for the statement.  Chris Allscheid, who

14   you heard from Anna Jenkins was her assistant, sent one

15   version of it.  But that was no good.  Mr. Rothenberg wrote

16   back there on August 1st:  No, no, no, I really need the

17   official one.  Is there a way you can run me special?

18       And Anna Jenkins from Merrill Lynch had to write back and

19   said:  Look, we don't do single statement runs for

20   individuals.  The brokerage, Merrill Lynch, does everyone at

21   the same time.  Everyone that's at Merrill Lynch gets their

22   statement run at the same time.  It's done in a giant batch.

23   If you really need something today, I can get you something

24   called a verification of deposit letter.

25       But that's not what Michael Rothenberg was looking for.

1    You'll recall he needed backup documentation for Exhibit 3.

2    He had told them he had $370,000 of liquid assets and no Loan

3    Management Account debt.  He needed a bank statement.

4         And as it turns out, the next day, Saturday, he writes

5    back saying:  Hey, it's on -- it's available online, I got it,

6    thanks.

7         What happened between or during this time period, though?

8                    (Demonstrative published.)

9         MR. WALSH:  Why did he want that statement so badly?

10   Well, first of all, because it was core to his scheme to

11   defraud Silicon Valley Bank.  That's ultimately why he wanted

12   it.  But you'll recall Exhibit 1, these are the emails back

13   and forth with Michelle Jandu, his banker at Silicon Valley

14   Bank.

15                    (Demonstrative published.)

16        MR. WALSH:  And at approximately 4:03 on July 29th,

17   he had sent -- this was a series of emails.  He'd been slowly

18   sending various materials to Silicon Valley Bank that they

19   were requesting.  What did he tell about the bank statements?

20   He had told Silicon Valley Bank that he was going to send them

21   on Friday.  Friday is August 1st.  Tuesday is the 29th.  You

22   do the math.  Turns out Friday is August 1st.

23        That's why he was frantically trying to get that statement

24   because he had told Silicon Valley Bank he was going to give

25   them the statement on August 1st.

1    And what statement did he give them?

2              (Demonstrative published.)

3         **MR. WALSH:**  Exhibit 10.  It's created on August 1st.

4    You can see down in the bottom corner there.  When you look at

5    the actual one back in the jury room, you'll be able to see

6    that.  It's not contiguous like that.  It's just down at the

7    bottom.  And it's as of July 31st, 2014.

8         All of those movements of money, everything in his scheme

9    to defraud here was designed around creating this document to

10   back up his assertions and to deceive Silicon Valley Bank as

11   to his true assets and true liabilities.

12        He knew exactly what he was doing.  He was frantic to get

13   this document to them.  He needed to get it to them.  And he

14   told them he was going to do it.  And he got it online.

15        Is this his official statement, by the way?  No.  You've

16   seen the official statements.  This is a summary.  The

17   official statement, if he'd given the official statement, it

18   would have shown all this loan balance activity in the LMA.

19   He did not give them that document because it doesn't help his

20   scheme to defraud.  He would have gotten caught.

21              (Demonstrative published.)

22        **MR. WALSH:**  Now, now that we've walked through that,

23   when you look at the timeline of events, his scheme to defraud

24   becomes crystal clear.  There is no mistake.  It is entirely

25   intentional.  He had the intent to defraud Silicon Valley

1   Bank.

2                    (Demonstrative published.)

3        **MR. WALSH:**  You'll recollect in opening that

4   Mr. Waldinger here presented a timeline of events.  The

5   evidence has now come in.  There's now evidence supporting

6   this timeline.

7                    (Demonstrative published.)

8        **MR. WALSH:**  And so the evidence is, as we walk our

9   way through, that back in September of 2012, Michael

10  Rothenberg was already banking with Silicon Valley Bank.  He

11  had opened up the management company account at Silicon Valley

12  Bank and Fund I's bank account.

13       And the evidence has shown, in August of 2013, he bought

14  his condominium in San Francisco, 712 Bryant Street, number 6.

15  And he used his alma mater's federal credit union, Stanford

16  Federal Credit Union, for the mortgage to do so.

17       And as far as Silicon Valley Bank was concerned, the next

18  thing that happened was on July 29th, Exhibit 1, Michael

19  Rothenberg just started submitting applications for his loans,

20  both the capital call line of credit and the cash-out mortgage

21  refinance.

22                    (Demonstrative published.)

23       **MR. WALSH:**  What Silicon Valley Bank did not know is

24  that back in March, he had begun discussing similar things

25  with Merrill Lynch, getting a mortgage.  You recall he was one

 1   of the few people that responded to that just bulk letter that

 2   was sent out to the Bay Area by Michelle -- by Anna Jenkins.

 3        Silicon Valley Bank did not know about the mechanism of

 4   how he set up the CMA and the LMA.  Totally hidden from

 5   Silicon Valley Bank.  Silicon Valley Bank doesn't have access

 6   to either Bank of America or Merrill Lynch statements.

 7        Merrill Lynch does.  Merrill Lynch knew this.

 8                     (Demonstrative published.)

 9        **MR. WALSH:**  And on the very same day he starts

10   submitting application and with supporting materials to

11   Silicon Valley Bank, Michael Rothenberg does that second

12   series of transactions, right, where he pays off the loan

13   account, all unknown to Silicon Valley Bank.

14        What's he do with Exhibit 10?

15                     (Demonstrative published.)

16        **MR. WALSH:**  Turns it in.  Here's my bank statement,

17   Silicon Valley Bank.  This is my true financial condition.

18   These are my liquid assets.  These are my debts.

19                     (Demonstrative published.)

20        **MR. WALSH:**  But on that exact same day, he hoped as

21   early as 8:00 a.m. that day, he had drawn out the full

22   $350,000 from the Loan Management Account.

23        By the time he got that statement, Exhibit 10, to

24   Silicon Valley Bank, it was not accurate.  It was accurate in

25   the sense that it said as of July 31st.  But the very next day

1    it was no longer accurate.  The $370,000 was completely

2    unavailable to him because it was securing the Loan Management

3    Account because he had drawn down the full $350,000.  He knew

4    what he was doing.  And he deliberately and intentionally

5    misled Silicon Valley Bank.

6        Well, what happens next?

7                    (Demonstrative published.)

8            **MR. WALSH:**  A couple days passed, and Silicon Valley

9    Bank -- you saw this Exhibit 22 which is another document that

10   you spent a lot of time hearing about -- the loan approval

11   form that Michelle Jandu looked over, prepared by the

12   underwriters, and was ultimately approved by Buzz Kreppel.

13      As of that date, the Loan Management Account balance,

14   clear as day on those statements, was $350,000.

15                    (Demonstrative published.)

16           **MR. WALSH:**  What happened next?

17      On August 12th, the capital call line of credit was

18   funded.  That $300,000.  But the first of the two facilities

19   that he was seeking, the two loans, you saw the bank

20   statement.  $297,000 went into Fund II's bank account on

21   August 12th.  You heard the explanation for why.  They took a

22   1 percent fee.  That's $3,000.  So the $300- became 297-.

23                    (Demonstrative published.)

24           **MR. WALSH:**  As of August 12th, the Loan Management

25   Account balance was still $350,000.

 1                    (Demonstrative published.)

 2          **MR. WALSH:**  What happens next?

 3      Well, you'll recall the various testimony about how the

 4   appraisal came in, and happily for Mr. Rothenberg the

 5   appraisal was higher than he thought.  Right?  So they had to

 6   rerun the numbers.  And Mr. Rothenberg increased his request

 7   from $1.28 million cash-out refinance to $1.48 million.

 8                    (Demonstrative published.)

 9          **MR. WALSH:**  And you saw in Exhibit 23, that's the

10   addendum approval, that the next day, August 18th -- sorry --

11   August 19th, 2014, Buzz Kreppel again approved the loan with

12   the new numbers reflected in the spread.

13      On that date, the balance of the Loan Management Account

14   remained $350,000.

15                    (Demonstrative published.)

16          **MR. WALSH:**  Now, you heard the next step in this

17   process.  You heard it from various people including Hapi

18   Yamato who worked at Chicago Title Company.  She tells you --

19   told you, rather, that when everything was ready to go, the

20   bank sends documents to the title company.  The title company

21   then hires a notary and sets up the signing.

22      And in fact that's what happened here.  On August 21st,

23   2014, in New York City, Michael Rothenberg, the guy sitting

24   right over there, met with Paulette Brunk, the notary, and

25   signed all the documents.  Notarized with ID.

1    And you heard from Hapi Yamato what happens next.  It gets

2    FedExed back to the title company.  The title company sends

3    some documents to Silicon Valley Bank, sends other documents

4    to the County Recorder's office, and then waits those three

5    days for the right to rescission.

6                    (Demonstrative published.)

7         **MR. WALSH:**  On August 21st of 2014, the Loan

8    Management Account balance remained $350,000 when he signed

9    all of those documents.

10                    (Demonstrative published.)

11        **MR. WALSH:**  What happened next?  The three days

12   passed.  And on the 27th of August 2014, Silicon Valley Bank

13   funds the loan.  It sends the money, the 1.48 million, to an

14   escrow account.  Chicago Title then pays off the Stanford

15   Federal Credit Union prior mortgage and sends the cash-out

16   part, the money that Mike Rothenberg was getting, to him,

17   $608,000.

18       What does Michael Rothenberg do with that $608,000?  You

19   heard from Anthony Ghio, Special Agent Ghio, the very next

20   day, unbeknownst to Silicon Valley Bank, Michael Rothenberg

21   takes approximately half of the $608,000 of Silicon Valley

22   Bank's loan to him to pay off the Loan Management Account that

23   Silicon Valley Bank didn't know he had.

24                    (Demonstrative published.)

25        **MR. WALSH:**  It is abundantly clear when you look at

1    this timeline of events that Michael Rothenberg deliberately

2    and intentionally with the intent to defraud engaged in a

3    scheme to defraud Silicon Valley Bank in August of 2014.

4                    (Demonstrative published.)

5          MR. WALSH:  We're on to agenda item number 2.  This

6    deals with Count Two, and these are the false statements.

7        There are three false statements that we're asking you to

8    consider with regard to Count Two.

9                    (Demonstrative published.)

10         MR. WALSH:  Now, Count Two is different than Count

11   One.  Count One is bank fraud.  You're entitled to consider

12   all of the evidence over this entire time period to discern

13   whether or not Michael Rothenberg committed a scheme to

14   defraud and indeed committed the offense of bank fraud.

15       Count Two is more narrow.  You're still entitled to

16   consider all of the evidence, but it is focused on August 21st

17   of 2014.  That's, you'll recall, the closing date when he

18   signs all the documents.  It's focused on that date and the

19   false statements made on that date.  There are three.

20                    (Demonstrative published.)

21         MR. WALSH:  First he represented on August 21st,

22   2014, that he had $370,000 of liquid assets in his Cash

23   Management Account.  When in truth and in fact, on

24   August 21st, 2014, they were encumbered because he had drawn

25   down the full 350- on his Loan Management Account.

1              (Demonstrative published.)

2         **MR. WALSH:**   Second, he represented that he only had

3    $73,000 in liabilities on August 21st of 2014.  When in truth

4    and in fact, he had a Loan Management Account balance of

5    $350,000 of liability debt.

6              (Demonstrative published.)

7         **MR. WALSH:**   Third, on August 21st of 2014, he

8    represented and told Silicon Valley Bank that his financial

9    condition had not significantly changed since his July 29th

10   initial application and that the materials that Silicon Valley

11   Bank was getting that day accurately reflected his current,

12   current financial status.

13        When in truth and in fact, his financial condition had

14   changed since July 29th of 2014, deliberately, because he had

15   concealed the fact that he took the $350,000 out.  And indeed

16   on August 21st of 2014, it was not accurate to say he did not

17   have $350,000 of loan management debt.

18        All three of those statements are false, and he knowingly

19   made them to Silicon Valley Bank.

20        Let's talk about them in a little more detail.

21              (Demonstrative published.)

22        **MR. WALSH:**   The first one.  On August 21st, 2014, he

23   submitted and signed the third version of the 1003.  You'll

24   recollect the first one that he turned in on July 29th, and it

25   just said in handwriting "see assets, see liabilities."

1        There was another version in the interim, on August 6th.

2        And then there's this version here, the final, the

3   complete, the accurate one, allegedly, on August 21st of 2014.

4   And it contains, among other things, a statement as to assets.

5                    (Demonstrative published.)

6        **MR. WALSH:**  That's the point of this document, right?

7   What are your assets?  What are your liabilities?

8        And in particular, he represented that he had $370,062 in

9   his Merrill Lynch account.  That's his Cash Management

10  Account.  You've seen the balance on his statement.  And he

11  represented that they were liquid.  The reason the number is

12  different is because it adds in his Bank of America account.

13       Now when he submitted all of that, it's true, he didn't

14  fill this form out, the bank did.  But he signed it.  He knew

15  what his account balances were.  He had engaged in this entire

16  scheme to defraud.  He didn't need to read it to know exactly

17  what his account balances were and whether or not this 370-

18  was liquid because he had constructed an entire scheme to

19  prevent Silicon Valley Bank from knowing that it wasn't.

20                   (Demonstrative published.)

21       **MR. WALSH:**  And he signed it.  They've got this big

22  long signature block at the end.

23       And what did he represent to them?

24                   (Demonstrative published.)

25       **MR. WALSH:**  It's a little hard to read, but if you

1    start right here at 1:  The information provided in this

2    application is true and correct as of the date set forth

3    opposite my signature.  August 21st of 2014.  Not July 29th,

4    not July 31st.  August 21st of 2014.

5        The second statement, it too goes off of Exhibit 25, the

6    third of those, the final version of his 1003.  And as before,

7    just like there's an asset section, there's a liability

8    section.

9        And in that liability section, it represents that he only

10   has debt of $73,000.

11       Let me be very clear.  This case is not about the fact

12   that he told them he had $210,000 of student debt and it

13   didn't show up on this.  That's not what this case is about.

14       This case is about the fact that he purposefully hid the

15   $350,000 of the Loan Management Account balance from

16   Silicon Valley Bank.

17                   (Demonstrative published.)

18       **MR. WALSH:**  We know -- you correct me -- that you

19   know that Silicon Valley Bank knew about the $210,000.  How do

20   you know that?  Well, Exhibit 22.  Right?  This is the first

21   approval form.  You'll recollect this one.

22                   (Demonstrative published.)

23       **MR. WALSH:**  It had the spread which sort of totaled

24   everything out at the end.

25                   (Demonstrative published.)

1    MR. WALSH:  And in that document, it very clearly

2    listed the $210,000 of student loans.

3        It also very clearly did not list $350,000 of Loan

4    Management Account debt.  And it also very clearly indicated

5    liquid assets of $370,000.

6                    (Demonstrative published.)

7        MR. WALSH:  The addendum, right, the appraisal comes

8    in, they got to do a new one.  Same thing.  Exhibit 23.  It

9    has the same spread -- not the same because it had to be

10   reworked for different numbers.

11       As before, Silicon Valley Bank knew about the 210-, but it

12   did not know about the 350- that Michael Rothenberg

13   intentionally concealed from Silicon Valley Bank.

14                    (Demonstrative published.)

15       MR. WALSH:  And so on August 21st, when he signed

16   that loan application, he represented once again that:  The

17   information provided in this application is true and correct

18   as of the date set forth opposite my signature.  August 21st

19   of 2014.

20       As of August 21st, 2014, this statement was not true.  He

21   had purposefully concealed $350,000 of debt.  And he knew that

22   his $370,000 of Cash Management Account balance was not

23   liquid.

24       The third false statement.

25                    (Demonstrative published.)

1          **MR. WALSH:**  This one is a different document.  You'll

2     recollect that in among the documents he signed that day, he

3     signed something called a financial status affidavit, required

4     by Silicon Valley Bank in order to complete this mortgage

5     loan.

6          What does it represent?  It's Exhibit 26.

7                    (Demonstrative published.)

8          **MR. WALSH:**  This one is even notarized.  Paulette

9     Brunk notarized this one.

10         And what does it provide?  Michael Rothenberg represented

11    as of August 21st, 2014, that borrower, Michael Rothenberg,

12    understands that lender is making the loan based upon

13    statements and representations contained in or made in

14    connection with the residential mortgage loan application

15    taken from and signed by borrower and given by borrower to

16    lender.  The loan application.

17         Borrower hereby certifies that the information provided by

18    borrower contained in the loan application and related to

19    borrower's financial status, such as borrower's employment,

20    income -- here comes the important part -- assets, debts,

21    expenses, credit obligations, et cetera, has not changed

22    significantly and accurately reflects borrower's current

23    financial status.

24         Members of the jury, both of those statements were false.

25    It did -- his financial status had changed significantly since

1     the original application on July 29th of 2014.  And as of

2     August 21st of 2014, what he was telling Silicon Valley Bank

3     was not an accurate statement of his current August 21st,

4     2014, financial status.

5          We're on to number 3, agenda item number 3.

6               (Demonstrative published.)

7          **MR. WALSH:**  What was the significance of Rothenberg's

8     scheme and false statements?

9          Now, this goes to an issue with regard to the jury

10    instructions.  Now, before I start talking about any jury

11    instructions, the Judge has given you jury instructions.  His

12    word is the law.  If for some reason, I say something

13    different than what the Judge says or what's in your packet,

14    go with the Judge.  Okay?  What I've attempted to do is just

15    cut and paste, but if there's something wrong, go with the

16    Judge.

17         The two counts that you have to consider have a different

18    standard as to this issue.

19              (Demonstrative published.)

20         **MR. WALSH:**  For Count One, the scheme to defraud has

21    to be material, or the statements have to be material.  And as

22    you've been instructed, material means this:  That they had a

23    natural tendency to influence or were capable of influencing a

24    financial institution to part with money or property.

25         It does not mean that the bank would or would not have

1    issued the loan.  It just means that it had a natural tendency

2    to influence the bank's decision-making.

3         Count Two is different.

4                   (Demonstrative published.)

5         **MR. WALSH:**  Count Two is the false statements to the

6    financial institution.  Here, it's entirely what the defendant

7    intended.  The defendant made the false statements for the

8    purpose of influencing in any way the action of Silicon Valley

9    Bank.  They're related but not the same.

10        In the second count, it just has to be Michael Rothenberg

11   intended to influence the bank in some way, in any way.

12                  (Demonstrative published.)

13        **MR. WALSH:**  Well, what is the evidence about meeting

14   those two standards?

15        Critically you have testimony from two people, the two

16   most important people in the whole process at Silicon Valley

17   Bank, Michelle Jandu and ultimately Buzz Kreppel.

18        What did Michelle Jandu tell you about whether or not this

19   $350,000 debt in an LMA meant?  Would she have wanted to know

20   about an additional $350,000 debt?

21                  (Demonstrative published.)

22        **MR. WALSH:**  And, again, your memory controls here.

23   But I submit to you that she told you that it would be

24   considered a material change in the borrower's personal

25   financial condition to have an additional $350,000 of debt.

1    That doesn't make sense.  And it would be a significant piece

2    of information that the bank would have wanted to know in

3    making assessment of whether or not to approve the loan.

4        And on cross-examination, she told Mr. Fakhoury that it

5    could affect whether or not the loan was issued.  Or just

6    whether or not the terms of the loan might have to have been

7    amended.  They might have still given the loan, just at a

8    different value perhaps or with a different interest rate, but

9    they certainly would have wanted to know about it.

10                    (Demonstrative published.)

11        **MR. WALSH:**  What did Buzz Kreppel tell you?  Buzz

12   Kreppel, of course, is the individual who reviews the stuff

13   and makes the ultimate final decision.  Will we give this loan

14   or not from Silicon Valley Bank?

15       He told you that if he had gotten a phone call saying,

16   hey, there's an additional $350,000 debt, he would have

17   stopped everything, sent the whole spread back to the

18   underwriters and made them recalculate everything.

19       He used the term "re-underwrite," which I don't think is a

20   word, but apparently for bankers it is.  It means that he was

21   going to recalculate everything.  If you have to recalculate

22   everything, clearly it is material to their decision.

23                    (Demonstrative published.)

24       **MR. WALSH:**  And indeed, Buzz Kreppel, with that back

25   of the envelope calculation with Mr. Waldinger, reran the

 1     numbers as if there had been a $350,000 debt.  He used a

 2     3.77 percent interest rate because that is slightly less than

 3     what Merrill Lynch was charging on the LMA at the time.

 4              THE COURT:  Mr. Walsh, I'm sorry for the

 5     interruption.  Could you slow down just a tad.

 6              MR. WALSH:  Certainly.

 7              THE COURT:  Thank you.

 8              MR. WALSH:  He used the 3.77 percent interest rate

 9     because on the statements, the bank statements from Merrill

10     Lynch, at that time in July and August of 2014, that was the

11     interest rate that was being charged, right?  It was that

12     LIBOR plus.

13         And Buzz Kreppel calculated that it would have bumped up

14     the debt-to-income ratio to 79 percent.  And he told you that

15     the 75 percent was a hard threshold.  No matter how many

16     months of extra money you had, they did not lend if the

17     debt-to-income ratio was above that.

18         It is not the government's burden to prove, however, that

19     they wouldn't have issued the loan.  It's just that it was

20     material, that it mattered to them.  Surely it mattered to

21     them.

22              (Demonstrative published.)

23              MR. WALSH:  There's additional evidence, though,

24     independent of what those two bankers told you.

25              (Demonstrative published.)

 1    **MR. WALSH:**  Foremost, on those two approval sheets,

 2  Exhibits 22 and 23, with regard to the capital call line of

 3  credit, you'll recollect that there is a provision in there

 4  that says Michael Rothenberg cannot get a new debt in excess

 5  of $100,000 without Silicon Valley Bank approval.

 6    There could be no more clear evidence that a debt of

 7  100,000 or more mattered to Silicon Valley Bank than them

 8  putting right in these various documents that they wanted to

 9  have approval authority over 100,000.  $350,000 is a lot more

10  than 100,000.  It was plainly material to Silicon Valley Bank.

11    But there's more evidence.  And this is again the great

12  part about juries.  You have your common sense.  You get to

13  apply it.

14                    (Demonstrative published.)

15    **MR. WALSH:**  Mr. Rothenberg's yearly income, his --

16  that year was $440,000.  $350,000 is basically most of his

17  entire annual salary.  It's not salary.  It's distributions.

18  It's income.

19    Surely a bank would want to know that they're lending

20  money to someone who has a debt equal to 80 percent of his

21  entire yearly income.  That's just common sense.  They would

22  of course want to know that.

23    Moreover, the loan he was applying for was $1.48 million.

24  $350,000 is about a quarter of that.  Surely any bank,

25  including Silicon Valley Bank, would want to know that there

1   was an additional debt out there equal to about 25 percent of

2   the debt that they -- or the loan that they were issuing.

3                    (Demonstrative published.)

4        **MR. WALSH:**  The capital call line of credit.  The

5   entire loan was only $300,000.  $350,000 of additional debt is

6   more than the entire loan he was asking for in that -- for

7   that capital call line of credit.  Surely a bank would want to

8   know that.

9        Mr. Waldinger has very helpfully pointed out that the

10  capital call line of credit is only on Exhibit 22 because of

11  course that was -- what that was approved with.  Exhibit 23 is

12  the addendum and that only deals with the cash-out mortgage

13  refi.

14                   (Demonstrative published.)

15       **MR. WALSH:**  We're on to number 4, Mr. Rothenberg's

16  excuses and explanations.

17       It is the government's burden 100 percent.  We must prove

18  our case beyond a reasonable doubt.  He doesn't have to say a

19  thing at all.

20       However, I did listen, like you, to the opening statement

21  and the various questioning.  And he may say none of this and

22  he's not required to say a thing.

23                   (Demonstrative published.)

24       **MR. WALSH:**  But if he suggests that Silicon Valley

25  Bank made mistakes or was not diligent, if he says they should

1   have looked up, they should have asked for more bank

2   statements, they should have investigated more, anything like

3   that, two points to be made here.

4       Number one, the Judge has instructed you that that's not a

5   defense.  And number two, the reason it's not a defense is

6   because we don't look at the victim's conduct.  We look at the

7   defendant's conduct.  What did Mike Rothenberg do?  Did he

8   commit a crime?

9                   (Demonstrative published.)

10          **MR. WALSH:**  You might also hear something along the

11  lines of:  Silicon Valley Bank wanted his business so badly

12  that they just threw everything -- they would have approved

13  anything, they just didn't care.

14      Two things about that.  Number one, the Judge has

15  instructed you that's not a defense.  And number two is of

16  course Silicon Valley Bank wanted his business.  Every bank

17  wants business.  That's their whole purpose.  They want

18  business from everyone.

19      But every bank is also entitled to not be defrauded when

20  they seek business.  And that's precisely what Mike Rothenberg

21  did.  He defrauded Silicon Valley Bank.

22                  (Demonstrative published.)

23          **MR. WALSH:**  Third, there have been a few suggestions

24  that he's young and inexperienced.

25      Michael Rothenberg is no ordinary individual.  As one

 1   witness said, he's a math wizard, a math Olympian.  He went to

 2   Stanford.  He worked at Bain & Company.  He worked in private

 3   equity.  He went to Harvard Business School and got an MBA.

 4   He was running a venture capital company.

 5      This is an individual who's not afraid of math.  It's not

 6   like the numbers got him worried, couldn't keep up with the

 7   math.  This is not an individual who didn't know how business

 8   worked.  He had years of experience, degrees in exactly the

 9   topics that would be required to know exactly what was going

10   on.  He was comfortable and knew exactly what he was doing.

11                    (Demonstrative published.)

12          MR. WALSH:  In the opening, there's a suggestion he

13   was just in a rush, who reads that stuff anyway, he was in a

14   rush when he signed all the documents --

15                    (Off-the-record discussion.)

16          MR. WALSH:  Duly noted.  Duly noted.

17      There was a suggestion in opening that Mr. Rothenberg was

18   in a rush when he signed the documents.  Who reads these

19   things anyways?

20      Two things to say about that.

21                    (Demonstrative published.)

22          MR. WALSH:  Number one, what I'm saying up here right

23   now and what was said at opening statement is not evidence.

24   There is no evidence in this case whatsoever that Michael

25   Rothenberg was in a rush on August 21st of 2014.  None.

 1    That's just lawyers talking, not evidence.

 2                    (Demonstrative published.)

 3         **MR. WALSH:**  Number two, you'll recall Ingrid

 4    Robertson.  Ingrid Robertson was one of the people who

 5    prepared, assembled a lot of the documents and sent out the

 6    initial disclosures.  She sent them out on August 6th of 2014.

 7    It's Exhibit 19.

 8                    (Demonstrative published.)

 9         **MR. WALSH:**  She prepared this letter, she told you

10    personally, and it was mailed on August 6 of 2014.

11       What was in there?  The middle 1003.  Not the first one,

12    not the final one, the middle one.

13                    (Demonstrative published.)

14         **MR. WALSH:**  It contained a statement of liabilities,

15    the same statement of liabilities that ends up in the final

16    one that he signs, 73,000 and change.

17       This letter was mailed on August 6th of 2014.  That's

18    before the pandemic.  The mail was working.  However many days

19    you think it takes the mail to go, people often say three

20    days, give them five days, it arrived at his house.  Five days

21    from August 6th, 2014, is August 11th, 2014.  That's ten days

22    before August 21st when he signs these documents.  He had ten

23    days to take a look at what the bank was providing him in his

24    1003.

25       There was no rush.  He had ten days to look it over.  It's

1    true this form is not completely filled out, but the part --

2    or one of the parts that's extraordinarily relevant to this

3    case was filled out.  He had ten days to look it over.

4                    (Demonstrative published.)

5         MR. WALSH:  Last, the theme of the opening was form

6    over substance, or at least one theme.  What is form over

7    substance?  Form over substance is to have a piece of paper, a

8    document that says one thing, but the reality, the truth

9    behind it, the substance, is something else.

10        You've looked at and seen and been presented in evidence

11   many forms in the course of this trial.  There is only one

12   form that truly fits the concept of form over substance.

13                    (Demonstrative published.)

14        MR. WALSH:  Exhibit 10.  This is the form that says

15   one thing on August -- sorry -- July 31st of 2014, a liquid

16   balance of 370-, zero LMA balance.  That's the form.  But the

17   substance, as you know from all of the evidence in this case,

18   was wildly different from this.

19        This is a document that Mike Rothenberg made into a form

20   over substance because he deliberately manipulated monies

21   through his accounts and others to make this form appear to be

22   true.  And it perhaps technically as of July 31st was true,

23   but the substance of what was going on with his financial

24   status was much, much different.  And as you recall, this was

25   created on August 1st.  He wanted his wire out as early as

1    8:00 a.m. on August 1st.

2        This is form over substance.  This is intent to defraud.

3    This is guilt as to bank fraud.

4                    (Demonstrative published.)

5        **MR. WALSH:**  Last item.  We're getting there.

6        I need to walk through the counts, the elements of the

7    counts.

8        Bank fraud, Count One.  We'll start with Count One.

9                    (Demonstrative published.)

10       **MR. WALSH:**  The first element -- and again, the Judge

11   has given you the instructions so if there's anything

12   different here, go with what the Judge said -- is that the

13   defendant knowingly executed or attempt to execute a scheme to

14   defraud Silicon Valley Bank, a financial institution, as to

15   something of value or a scheme or plan to obtain money or

16   property from Silicon Valley Bank by making false statements

17   or promises.

18       I put some spaces in here just to break it up into parts.

19   There are two different ways to do it.  There's an "or."

20                    (Demonstrative published.)

21       **MR. WALSH:**  What's a scheme to defraud?  The Judge

22   has instructed you:  Any deliberate plan of course of

23   action -- any plan of action or course of conduct by which

24   someone intends to deceive and cheat a financial institution

25   and deprive it of something of value.

1     This is what agenda item number 1 was about.  All of the

2     evidence in this case goes to this.  Mike Rothenberg engaged

3     in a scheme to defraud.

4                    (Demonstrative published.)

5          MR. WALSH:  And he did so knowingly.  There's not a

6     shred of evidence that would suggest anything other than

7     deliberate, calculated actions by Michael Rothenberg.  This

8     wasn't a mistaken series of transactions.  He didn't

9     mistakenly turn over only Exhibit 10.

10                   (Demonstrative published.)

11         MR. WALSH:  The second element.  The defendant knew

12    the statements or promises were false.

13         Of course he did.  He orchestrated this entire plan to

14    make sure that the Silicon Valley Bank didn't know what his

15    actual assets and what his actual debts were.

16                   (Demonstrative published.)

17         MR. WALSH:  Third, the statements or promises were

18    material.  This is what I was talking to you about earlier in

19    agenda item number 3, right?  Did it matter to the bank?  Yes.

20    Surely it did.  It does not mean that the bank wouldn't have

21    given a loan.  It just means that the bank would have wanted

22    to know and have taken it into account.

23                   (Demonstrative published.)

24         MR. WALSH:  Fourth, that the defendant acted with the

25    intent to defraud Silicon Valley Bank.  Every scrap of

CLOSING ARGUMENT \ WALSH

1    evidence in this case shows that this is purposeful and

2    intentional conduct.  There's no need to make all of these

3    fancy transactions and move money around if you're not doing

4    it intentionally with the intent to defraud Silicon Valley

5    Bank.

6        Remember, Silicon Valley Bank does not have access to the

7    Merrill Lynch statements.  It doesn't know anything about

8    those.  He engaged in all these transactions with Merrill

9    Lynch and then just gave a selected piece of information to

10   Silicon Valley Bank.  He intended to defraud Silicon Valley

11   Bank.

12                  (Demonstrative published.)

13        **MR. WALSH:**  And if there's no piece of evidence

14   that's more clear about that, it's Exhibit 64.  Right?

15                  (Demonstrative published.)

16        **MR. WALSH:**  This is his email spelling out exactly

17   what he wants to do.

18        And you heard Ryan Kelty say after this occurred, the

19   latter part of this email where it's like, oh, and then I'm

20   going to apply to Merrill Lynch for a brokerage -- for a

21   mortgage, it didn't happen because he never intended to do it

22   with Merrill Lynch.  He intended to defraud Silicon Valley

23   Bank.

24        Fifth, this is a new one for us.

25                  (Demonstrative published.)

1          **MR. WALSH:**  Silicon Valley Bank was insured by the

2     Federal Deposit Insurance Corporation, the FDIC.

3          There's two ways to do this one.  This one, I think, as a

4     jury you probably don't need to spend much time on.  You heard

5     the testimony of James Kiss that Silicon Valley Bank was

6     insured by the FDIC, in particular insured in August of 2014,

7     which is the time that would matter.  And he even gave you a

8     certificate to take a look at.  It's Exhibit 27.

9          There's a second way to do it, to meet this element which

10    is:  Did Silicon Valley Bank finance or refinance debt secured

11    by an interest in real estate that ultimately affects

12    interstate commerce?

13         This whole transaction is an example of that.

14    Silicon Valley Bank was refinancing Michael Rothenberg's debt

15    secured by an interest in his condominium, and at the time

16    Silicon Valley Bank had businesses, branches outside of

17    California.

18         Two ways to make it.  One is sufficient though.  You

19    probably needn't spend much time on this.

20                    (Demonstrative published.)

21         **MR. WALSH:**  The elements of Count Two.  We're getting

22    there.  Making false statements to a financial institution.

23                    (Demonstrative published.)

24         **MR. WALSH:**  First, the defendant made a false

25    statement or report to a financial institution insured by the

1    FDIC.  Well, same evidence that just worked in element 5 for

2    bank fraud works again here for element 1 for making a false

3    statement.  Same FDIC insurance.

4                         (Demonstrative published.)

5            MR. WALSH:  And he made false statements.  You do, as

6    the Judge instructed you, have to agree on which false

7    statements.

8         And he knew they were false.  What are the three false

9    statements?

10                        (Demonstrative published.)

11           MR. WALSH:  These three.  That was agenda item

12   number 2.  We walked through the three false statements.  He

13   made those three statements.  All three of them were false.

14   He knew all three of them were false.

15                        (Demonstrative published.)

16           MR. WALSH:  Third, the defendant did so for the

17   purpose of influencing in any way the action of Silicon Valley

18   Bank.

19        Recall this is the difference from bank fraud.  Bank fraud

20   requires materiality.  Making a false statement has a

21   different standard here.

22        Again, use your common sense.  Why would Michael

23   Rothenberg engage in all of these transactions, make all of

24   these statements, do anything similar to any of what he did if

25   he did not intend to influence Silicon Valley Bank?  He wanted

 1    to get a capital call line of credit, and he wanted to get a

 2    cash-out mortgage refinance.  He submitted these documents

 3    intending to influence Silicon Valley Bank.

 4                    (Demonstrative published.)

 5         **MR. WALSH:**  We've reached the end.

 6         Thank you for your service.  And at this time, the

 7    government asks, after you've heard defense closing and go

 8    back in your room to deliberate, that you find Michael

 9    Rothenberg guilty of both bank fraud and making false

10    statements to a financial institution because he is

11    unquestionably and in fact guilty beyond a reasonable doubt.

12         Thank you.

13         **THE COURT:**  Thank you, Mr. Walsh.

14         **MR. WALSH:**  Thank you.

15         **THE COURT:**  Members of the jury, let's go ahead and

16    take our second morning recess.  Please remember my prior

17    admonitions.

18         **THE CLERK:**  Please rise for the jury.

19         (Recess taken at 10:31 A.M.; proceedings resumed at

20    10:49 A.M.)

21         (The following proceedings were heard in the presence of

22    the jury:)

23         **THE CLERK:**  You may be seated.

24         **THE COURT:**  All right.  Let's go back on the record.

25    All the jurors are in their assigned seats.

1    Mr. Fakhoury, would you like to make a closing argument on

2    behalf of the defendant?

3         **MR. FAKHOURY:**  I will, Your Honor.  Thank you.

4              **DEFENDANT'S CLOSING ARGUMENT**

5         **MR. FAKHOURY:**  When you strip this case down to its

6    core, when you look past the way Michael Rothenberg looks, his

7    pedigree, his industry, we see a hard-working, self-employed

8    small business owner and employer trying to do the best he

9    can.

10   A young and inexperienced but successful investor who

11   banks want to do business with.  A man solicited by Merrill

12   Lynch in the spring of 2014 for a mortgage and sold a product

13   he didn't ask for, he didn't want, and he didn't need.

14   And when that process drags out and he moves to

15   Silicon Valley Bank to get a mortgage loan through them, he

16   kept in constant communication with them.  He gave these

17   sophisticated and experienced bankers every document they

18   asked for.  He emailed clarifying questions.  And he said

19   thank you repeatedly.

20   Yet here he is now if federal court.  He's not sued

21   civilly.  He's charged criminally.  The minute details of a

22   transaction that took place almost a decade ago, a transaction

23   that did not stand out at the time, that did not raise red

24   flags, that was as routine as it gets, being dissected and

25   scrutinized long after the fact.

1    This case is not about our country's economic problems.

2    We're not going to solve economic inequality in this courtroom

3    today.  This is not the forum to get back at tech companies,

4    venture capitalists, ivy league alumni.

5    I told you two weeks ago in my opening statement that this

6    was a case about form over substance.  And, boy, have we seen

7    a lot of forms over the last two weeks.

8    This case has ultimately boiled down to this, whether the

9    government can convict someone of a crime based on two

10   irrelevant forms in a closing package neither read by nor

11   explained to the borrower and which had no impact whatsoever

12   on the loans at issue.  And whether the government can convict

13   someone of a crime based on a bank's imaginary criteria and

14   internal assumptions on a spreadsheet, never explained to the

15   borrower, that turned real three-year interest-only loans into

16   imaginary five-year amortized loan.

17   Michael Rothenberg is a real man.  And the heavy decision

18   of whether the government has proven these crimes beyond a

19   reasonable doubt falls on your shoulders.

20   Ladies and gentlemen, you were selected to be jurors by

21   the parties to serve on this case because everyone agreed you

22   were the right jurors for this case.  And it's been a

23   privilege for Mike and I to spend the last two weeks with you.

24   And we've noticed you've paid close attention to the

25   documents, the testimony, even though everyone can agree that

1    it's been a little bit dry.

2        We know it's inconvenient to serve as jurors, to leave

3    your families, your work commitments, leave that behind for a

4    period of time, to commute here, maybe have to sit in traffic,

5    get on BART.  But like Judge Tigar said during jury selection,

6    I don't think any of us here in this courtroom want jurors

7    without something better to do.

8        You're here because you promised to scrutinize their case.

9    And because you could use your common sense and follow the

10   instructions that the Judge has given you to come to a

11   conclusion.

12       It is absurd to think that people read every single word

13   of a document put in front of them.  And people should not be

14   accused of crimes on assumptions not based on fact or

15   disclosed to the borrower that the bank uses in deciding

16   whether -- in deciding whether to approve or deny a loan.

17       So the only verdict supported by the evidence and lack of

18   evidence in this case is that Mr. Rothenberg is not guilty.

19       Mr. Rothenberg and I, we respect your time.  I've tried my

20   best not to waste your time.  In the time I get to speak with

21   you this morning, I'm going to walk through this case in

22   detail.

23       The government's gone through page after page and document

24   after document.  And I have to do the same thing.  So we're

25   going to have to go into the weeds, into the details of things

1    a little bit.

2        And I'm going you show you all the problems and the

3    deficiencies with the government's case.  And it might be a

4    little tedious.  But we got to do it.  This is an important

5    decision that's in your hands.

6        And before we dive in, I want to talk a little bit about

7    proof beyond a reasonable doubt.  It's the highest standard we

8    have in the legal system, and it's for good reason.

9                      (Demonstrative published.)

10          MR. FAKHOURY:  Again, like I said earlier, this is

11   not a civil case.  That is a criminal case brought by the

12   United States government.

13       And our Constitution recognizes there's a power imbalance

14   when the government prosecutes an individual so it places the

15   burden of proof on the government as to each and every element

16   of the crime.  Mr. Rothenberg is not required to present any

17   evidence.  The law says he does not have to prove or disprove

18   a thing.

19       And similarly, again recognizing the power imbalance, our

20   Constitution says that Mr. Rothenberg doesn't have to say a

21   single word.  He doesn't have to testify.  And you shouldn't

22   use his silence or the fact he didn't testify against him.

23       And I mentioned the government bears the burden of proof,

24   and it bears that burden of proof beyond a reasonable doubt.

25   So what does reasonable doubt mean?

1         (Demonstrative published.)

2         **MR. FAKHOURY:**  And this comes right out of the jury

3    instruction.  Like Mr. Walsh said, you have a copy of those

4    instructions so I urge you to look at them.

5         Proof beyond a reasonable doubt is proof that leaves you

6    firmly convinced that the defendant is guilty.  And it is not

7    required that the government prove guilt beyond all possible

8    doubt.

9         Reasonable doubt can be based on reason and common sense,

10   and it's not based purely on speculation.  And it may arise

11   from both a careful and impartial consideration of all the

12   evidence or from a lack of evidence.

13        (Demonstrative published.)

14        **MR. FAKHOURY:**  Again, Mr. Walsh said something

15   similar.  You're here because of your life experiences.  And

16   you don't check your common sense at the door to the

17   courtroom.

18        Now, again, reasonable doubt can arise from a careful and

19   impartial consideration of the evidence.  And there's a lot of

20   evidence in this case.  We've seen a lot of documents.

21        But the government has given you selective, cherry-picked

22   parts of it that fit its narrative.  You can't just solve a

23   puzzle with a few pieces.  You've got to look at the whole

24   picture.

25        So I encourage you, when you're in that deliberation room,

1    to go back, review all the evidence, all the exhibits, all the

2    documents, go back through your notes and look at all your

3    notes, think through all the witness testimony.

4        And like it says up here, reasonable doubt can also arise

5    from a lack of evidence.  So if there's something you wish you

6    had, a nagging question you want answered, something that

7    doesn't sit right with you, somebody you wish you heard from,

8    the blame is on this table.

9                        (Demonstrative published.)

10          MR. FAKHOURY:  I'm going to give you a little roadmap

11   similar to what Mr. Walsh did to kind of -- to start with the

12   elements of the crimes, and then we're going to dig deeper and

13   deeper into them as we go along.

14       Count One is bank fraud, and there are five elements to

15   this crime.

16       First, that the defendant knowingly executed or attempted

17   to execute a scheme to defraud Silicon Valley Bank, a

18   financial institution, as to something of value or a scheme or

19   plan to obtain money or property from Silicon Valley Bank by

20   making false statements or promises.

21       And I'm going to tell you that the evidence has shown that

22   Mr. Rothenberg had no scheme or plan, period, let alone a

23   scheme or plan to defraud Silicon Valley Bank.

24                        (Demonstrative published.)

25          MR. FAKHOURY:  Second, the defendant knew that the

 1    statements or promises were false.

 2              (Demonstrative published.)

 3         **MR. FAKHOURY:**  And an act is done knowingly if the

 4    defendant is aware of the act and does not act or fail to act

 5    through ignorance, mistake, or accident.

 6         And I think the evidence has shown through witnesses and

 7    exhibits that Mr. Rothenberg did not make a false statement

 8    and did not know that any statement that was made was false.

 9              (Demonstrative published.)

10         **MR. FAKHOURY:**  The third element is that the

11    statements or promises are material, that is, they had a

12    natural tendency to influence or were capable of influencing a

13    financial institution to part with money or property.

14              (Demonstrative published.)

15         **MR. FAKHOURY:**  And I think we've seen the statements

16    that Mr. Rothenberg made in the Form 1003 and the financial

17    status affidavit were just simply immaterial, and in fact they

18    were irrelevant to Silicon Valley Bank's decision to extend

19    the loans to Mr. Rothenberg.

20              (Demonstrative published.)

21         **MR. FAKHOURY:**  Fourth, the defendant acted with the

22    intent to deceive -- to defraud, excuse me -- Silicon Valley

23    Bank.  That is with the intent to deceive and cheat.

24              (Demonstrative published.)

25         **MR. FAKHOURY:**  And I think the evidence shows that

1  there is no scheme to defraud.  Well, just like that, the

2  evidence does not show a scheme to defraud, it's also shown

3  that Mr. Rothenberg had no intent to defraud, which means he

4  had no intent to deceive Silicon Valley Bank and no intent to

5  cheat it out of money.

6              (Demonstrative published.)

7         **MR. FAKHOURY:**  And the fifth element is the FDIC

8  status.  I'm not going to spend any time talking about this.

9  We're going to skip past that one.  Okay?

10              (Demonstrative published.)

11         **MR. FAKHOURY:**  For Count Two, false statements, that

12  requires first that the defendant made a false statement or

13  report to a financial institution.  And again just like with

14  the FDIC status for the bank fraud statute, not going to talk

15  today about FDIC status for false statements.  Okay?

16      But like with Count One, the evidence has shown that

17  Mr. Rothenberg did not make a false statement to

18  Silicon Valley Bank.

19      Second, the defendant made the false statement or report

20  to Silicon Valley Bank knowing it was false with all you

21  jurors agreeing as to the specific false statement or report.

22  And has the same definition of "knowingly" that we saw for

23  Count One.

24      And again, like with Count One, there's no evidence beyond

25  a reasonable doubt that Mr. Rothenberg knowingly made a false

1    statement.

2              (Demonstrative published.)

3         **MR. FAKHOURY:**   The third and final element for the

4    false statement charge is that the defendant did so for the

5    purpose of influencing in any way the actions of

6    Silicon Valley Bank.

7              (Demonstrative published.)

8         **MR. FAKHOURY:**   And I think the evidence has shown

9    that any statements made by Mr. Rothenberg were not done to

10   influence the bank because by the time the statements were

11   made, the bank had already made its decision and the loan was

12   a done deal.

13        So that's my roadmap of where we're going to go today in

14   my time with you.  And I just want to emphasize again that it

15   just takes one element.  If you're not convinced beyond a

16   reasonable doubt on just one element -- and look, you're all

17   reasonable people so your doubts are reasonable -- but if

18   you're not convinced beyond a reasonable doubt as to one

19   element, then Mr. Rothenberg is not guilty.

20        All right.  Let's get into the weeds.

21        The first reason the government has failed to prove that

22   Mr. Rothenberg is not guilty is that he didn't make a false

23   statement.  This goes to both Counts One and Two, both of

24   which require a false statement.

25        Now, Mr. Walsh, with respect to Count Two, talked about

```
 1    three specific false statements.  And I think those three

 2    false statements matter a lot for Count One as well.  They

 3    really are the heart of the government's case.  So let's go

 4    through those three false statements one by one, taking each

 5    in turn.

 6        So the first alleged false statement is that

 7    Mr. Rothenberg had liquid assets of $370,000 in the CMA

 8    account when in truth the assets were encumbered.

 9        Well, remember, there's no question, it is not in dispute,

10    that the cash in the CMA account was unencumbered as long as

11    the LMA account was not drawn down.

12        And don't forget that there is no question that

13    Mr. Rothenberg told Silicon Valley Bank that the CMA was

14    pledged to the LMA from day one.

15                 (Demonstrative published.)

16        MR. FAKHOURY:  This is Exhibit 10.  Mr. Walsh

17    actually ended on this exhibit so it kind of fits nicely to

18    what I want to start with.

19        And I want to be crystal clear about something.  There is

20    not even evidence -- that there is not even an allegation that

21    this statement is inaccurate or that this statement was

22    generated by anyone other than Merrill Lynch.

23        This is a genuine, authentic Merrill Lynch balance

24    statement for all accounts that you see on the sheet.  That

25    includes the CMA account, which is clearly marked as pledged.
```

1    It includes the LMA account, the line of credit.  And it even

2    includes Mr. Rothenberg's personal Bank of America account,

3    his checking account.

4        Michelle Jandu testified that this exhibit, this statement

5    makes clear on its face that the CMA account was pledged.

6        So this -- again, I said it in opening.  There's no secret

7    bank accounts here.  This completely supports what I said.

8        The second false statement the government hinges its

9    entire case on is that Mr. Rothenberg had only $73,000 in

10   liabilities when he actually had a $350,000 liability to

11   Merrill Lynch.

12       Well, here's the thing.  Mr. Rothenberg never said he only

13   had $73,000 in liabilities.  Mr. Rothenberg said "see my

14   credit report."  This is Exhibit 2.  This is the first

15   Form 1003.  You recall this is just a little snapshot of it,

16   you'll have the whole exhibit.  It's handwritten.  And it says

17   "see credit report."

18       Here's the credit report.

19                     (Demonstrative published.)

20           MR. FAKHOURY:  It lists $210,000 in student loan

21   debts.  And here's the asset and liability summary sheet that

22   Mr. Rothenberg prepared for the bank.  And it too lists

23   $210,000 in student liabilities.

24       In fact, it also lists an $865,000 liability here in the

25   middle, 865,190, being the outstanding mortgage balance on the

1    how he was trying to refinance.

2         Where is the government getting the idea that

3    Mr. Rothenberg said he only had $73,000 in liabilities?  It's

4    getting it -- whoops.

5                     (Demonstrative published.)

6         **MR. FAKHOURY:**  It's getting it from the final -- oh,

7    actually, I'm sorry, let me back up a second.

8         The government is getting the alleged statement that

9    Mr. Rothenberg had $73,000 in liabilities from the final

10   Form 1003, the one that was signed at the closing and included

11   in the closing package.

12        And you'll have to forgive me.  I didn't manage to get

13   that one in here.  We'll look at it a little later.

14        But, remember, we heard the testimony from Ingrid

15   Robertson.  She's the one who prepared that form.  And we saw

16   exactly what happened with that form.  They ran out of room on

17   the form to put creditors.  And so the form was wrong.

18        That's not Mr. Rothenberg's fault.  That's the bank's

19   fault.  Look, she made a mistake.  It happens.  But no one is

20   accusing Ms. Robertson of making a criminal false statement.

21        The other thing, and that goes to this exhibit --

22                     (Demonstrative published.)

23        **MR. FAKHOURY:**  -- the government keeps harping over

24   and over that Mr. Rothenberg claimed he had $73,000 in

25   liabilities, but they're actually the only people in this

1      courtroom who think that.  The bank doesn't think that.  This

2      is Exhibit 23.  The bank says Mr. Rothenberg has $210,000 in

3      student loan liabilities.  In fact, it calculated his

4      liabilities at being $1.6 million when it considered his

5      contingent liabilities.  They're the only ones who think that

6      Mr. Rothenberg said he only had $73,000 in liabilities.

7          The next alleged false statement is that Mr. Rothenberg's

8      financial situation had not changed significantly when he

9      signed the loan application and loan affidavit during the

10     closing when in truth it changed and didn't reflect his

11     current financial status.

12         And the government's main argument is that a $350,000

13     difference in net worth, meaning a difference in your assets

14     and liabilities, meant that his financial status had changed

15     significantly.

16         Well, look, $350,000, that's a lot of money.  I don't have

17     any dispute with that.  But at the same time, the phrase

18     "significantly changed" is relative.  $350,000 was

19     insignificant for this specific transaction.

20         Remember, the bank increased loan amount by $200,000 when

21     the appraisal came up higher.  They didn't ask for a single

22     other document.  They didn't change a single other term.  They

23     didn't do a thing other than cross off one loan amount and

24     write a different loan amount.

25         The $350,000 swing -- I'm going to call it the swing, the

1    difference between treating it as a debt -- as an asset versus

2    a liability -- is insignificant because the evidence shows

3    that Mr. Rothenberg's financial station was static, meant it

4    unchanged in the summer of 2014.

5        We're going you to go through these one by one.  This is

6    Exhibit 50.

7                    (Demonstrative published.)

8            MR. FAKHOURY:  This is for the CMA account.  This is

9    the CMA account ending -- statement ending June 30th of 2014.

10   And it shows the net portfolio value of the cash in the CMA

11   was $370,000.

12       On July 31st 2014, that value was $370,000.  On

13   August 29th, 2014, that value was $370,000.  And on

14   September 30th of 2014, that value was $370,000.

15       And by the way, just in case you're wondering, you look at

16   his Bank of America statements, you're going to see the same

17   thing.

18       Now, this is Exhibit 72.  These are Mr. Rothenberg's Bank

19   of America statements.  I'm holding them up here.  It's a

20   hundred pages.  This is double-sided.

21       We saw a very selective snapshot of those statements.  But

22   this is the exhibit, and you'll have all of these.  You should

23   take the time to go through them one by one, line by line.

24   Look at them carefully.

25       It's actually pretty remarkable.  Take a second here.

1    This is the exhibit.  It's 100 pages.  The government put this

2    in evidence.  And then called Agent Ghio to the stand to

3    testify about some transactions from it, and he admitted he

4    hadn't even bothered to read the whole thing before he came

5    here to testify in front of you, that he didn't know what was

6    in here.

7        Well, if you look through those statements, you're going

8    to see the same thing that you see in the CMA.

9    Mr. Rothenberg's financial situation hadn't changed at all

10   really in the summer of 2014.

11       Here's what I mean.  Here a statement.  This is

12   Exhibit 72, page 31.

13                    (Demonstrative published.)

14       **MR. FAKHOURY:**  Ending balance on May 21st was

15   $10,395.  On June $20, 2014, it was $13,735.37.  On July 23rd,

16   2014, it was $13,474.02.

17       And really the only big change happened in the --

18   whoops -- the following month, in August, and I apologize for

19   not having the -- the statement up here, where Mr. Rothenberg

20   received a cash distribution from RVMC, his management

21   company, and so the ending balance on August 21st was

22   $86,594.42.

23                    (Demonstrative published.)

24       **MR. FAKHOURY:**  This is the financial status

25   affidavit, this is Exhibit 26.  And I know it's a little hard

 1   to read the language, but I've blown it up here.  This

 2   affidavit asks if events or circumstances in the foreseeable

 3   future would have an adverse effect on borrower's ability to

 4   fulfill the borrower's loan obligation.  That's what this form

 5   is all about.

 6                    (Demonstrative published.)

 7        **MR. FAKHOURY:**  Well, if your account balance doesn't

 8   change and doesn't move for four months and has basically the

 9   same closing balance, then there has not been a significant

10   change to your financial situation.  So there's no false

11   statement.

12        And that means that Mr. Rothenberg is not guilty on both

13   Counts One and Two because that by itself is enough for you to

14   go into the jury room, check off not guilty, turn the form in,

15   and we can all be on our way.

16        But there's more.  There's so, so, so much reasonable

17   doubt in this case.  So we're going to keep going.

18        Reason number two that Mr. Rothenberg is not guilty is

19   that he had no knowledge that the statements were false.

20   Remember, it's not enough for the government to prove beyond a

21   reasonable doubt that a false statement was made.  They have

22   to prove beyond a reasonable doubt that Mr. Rothenberg

23   knowingly made a false statement, which means they have to

24   prove that he did not act through ignorance, mistake, or

25   accident.  And this is as to both counts.

1     (Demonstrative published.)

2     **MR. FAKHOURY:**  There is plenty of evidence that shows

3     the statements made by Mr. Rothenberg in the Form 1003 and the

4     financial affidavit were made through either ignorance or

5     mistake.

6     Now, remember Judge Tigar instructed you that in

7     determining whether somebody acts knowingly, so in determining

8     whether Mr. Rothenberg's statements are made knowingly, you

9     can consider his words, acts, omissions, and all the other

10    evidence, including the circumstances under which the

11    statement was made.

12    Well, we already talked about this.  We know the Form 1003

13    was prepared by mistake.

14     (Demonstrative published.)

15    **MR. FAKHOURY:**  We have heard already, and I already

16    explained this, that Ingrid Robertson or another

17    Silicon Valley Bank loan processor was the one who manually

18    typed in the information into the Form 1003.  And we know

19    again, and we've seen it, it had an incorrect liabilities

20    amount because Ms. Robertson, or whoever the loan processor

21    was, mistakenly did not put in all of the information out of

22    the credit report, and thus the form generated the incorrect

23    liabilities amount.

24    The other thing is, you know, Mr. Rothenberg signed the

25    first form, the first page of the Form 1003 at the closing.

1    And he signed the third page of the Form 1003 at closing.  But

2    the statement about the liabilities that's here on the bottom,

3    that's right down here (indicating), is not signed by

4    Mr. Rothenberg.

5        Now, I'm not advocating any sort of conspiracy theory.

6    Don't misunderstand what I'm saying.  Okay?  But there's no

7    proof, period, let alone proof beyond a reasonable doubt that

8    Mr. Rothenberg actually knew what was in this Form 1003 when

9    he signed the first and the third pages of that form.

10       Look, it's obvious what happened.  He didn't read the

11   form.  He had no idea what was in the form.  And he acted

12   through ignorance.

13       Look, Silicon Valley Bank sent the loan disclosures on

14   August 6th, 2014.  And this is that initial -- this is the

15   cover sheet of that initial disclosure.  And this disclosure

16   included the first typed Form 1003, the one that listed

17   $73,000 in liabilities.

18       Now, Mr. Walsh made the point that, well, the mail was

19   being delivered in August of 2014.  And, yeah, I don't mean

20   quibble with that.  Okay?  But that's not a substitute for

21   proof that Mr. Rothenberg received these disclosures, that he

22   read the disclosures, that he knew what was in the

23   disclosures, that he knew there was a mistake in the

24   disclosures.

25       And actually Ms. Robertson testified that the bank sends

1   an envelope for people to send in corrections.  Which, by the

2   way, is not listed as something that's on this initial

3   disclosure list or explained anywhere on this cover sheet.

4   And I asked her, I said:  I take it a lot of people don't do

5   this -- send them in.  She said hardly ever.

6       The evidence about the closing package is even less

7   compelling.  There's no evidence whatsoever that the closing

8   packet containing the actual form signed by Mr. Rothenberg

9   were ever sent to him ahead of time.  In fact, Paulette Brunk,

10  the notary, testified that most borrowers see the documents

11  for the first time at the signing.

12      So there's no evidence that Mr. Rothenberg read those

13  disclosures or any of those documents at the signing or ahead

14  of time.  And there's no evidence he understood what any

15  document in the packet meant.

16      And you know what?  That's consistent with not only what

17  Ms. Brunk testified about, but just common sense.  Again, you

18  don't check your common sense when you walk in through these

19  courtroom doors.  It's absurd to think that people read every

20  page or every single word of every single page of every

21  document that they sign.

22      We all sign up for all sorts of things online, and we just

23  scroll to the bottom, check the check box, click agree.

24  There's a whole bunch of legal language in there.  And people

25  don't pay attention or read it.

1      And it's naive to think that people wouldn't do that with

2   mortgage documents.  In fact, I think the bank and the title

3   company count on the fact that people don't read these

4   documents ahead of time.  That's why they don't send them to

5   the borrower ahead of time.  That's why they send a notary to

6   review the packet with the borrower instead of a lawyer.

7      Look, Ms. Brunk was very nice, but she said it's herself,

8   she's not a lawyer.  She can't give legal advice.  Any

9   questions have to be addressed to the loan officer or the

10  title company.

11     And think about it for a second.  If they send the docs

12  ahead of time, then the borrower would be more likely to read

13  them and come to the signing with prepared questions,

14  questions the notary can't answer.  You saw, the notary is

15  getting paid $100.  You can infer a cost way more than $100 to

16  have a lawyer or loan advisor available to answer any

17  questions at a closing.

18     And that's why, as Ms. Brunk testified, most closings take

19  30 to 45 minutes from start to finish, including signing the

20  book, verifying identification, and actually signing the

21  document.

22     Again, this is the closing packet, Exhibit 31.

23                  (Demonstrative published.)

24          **MR. FAKHOURY:**  You're going to have this whole

25  document set with you in the jury room.  This one is also

1    double-sided so it looks a little smaller than it actually is.

2        When you're in that jury room with these exhibits, have

3    someone read these.  Have someone read every single word in

4    this form, in this packet of information here.  And time

5    yourself and see how long it takes.  I bet it's going to take

6    more than 30 minutes.

7        Look, the only way someone is getting through all of that

8    in 30 minutes is they're not bothering to read it.  They're

9    skimming it, if at all.  And they're just signing to get out

10   of there and to go on their way.

11       And frankly, why would Mr. Rothenberg read any of these

12   forms?  Especially the Form 1003.  He's counting on the bank

13   to fill it out correctly with all the information he's given

14   them.

15       And even more importantly, why on earth would

16   Mr. Rothenberg sign a form that says he has $73,000 in

17   liabilities when he's already told the bank he has $210,000 in

18   student loan debt.  It doesn't make any sense whatsoever.

19       The only reason he would sign a form like that and the

20   only reason any borrower would sign a form like is because

21   they didn't know the form was typed up incorrectly and they

22   figured this was a foregone conclusion.

23       Look, lots of people make mistakes.

24       Again, Ms. Robertson or another loan processor made a

25   mistake in preparing the Form 1003.  Ms. Brunk, the notary,

1   made a mistake in putting "passport" instead of "driver's

2   license" as the form of identification that she verified for

3   Mr. Rothenberg.  The title report has a mistake.  It

4   identified the wrong unit in the title report.

5      Mr. Kreppel testified that the loan approval sheet, the

6   first loan approval sheet, Exhibit 22, was missing information

7   that was on the second loan approval sheet and should have

8   been there, which is basically accounting for the

9   interest-only capital call line of credit.

10      All of these mistakes happened.  No one is accusing any of

11  these people.  I'm not accusing any of these people of

12  knowingly making a criminal false statement.  And we should

13  give Mr. Rothenberg the same benefit of the doubt.

14      Now everything I said right now about the Form 1003 is

15  equally true about the financial status affidavit, which was

16  again a document in the closing package.

17               (Demonstrative published.)

18      **MR. FAKHOURY:**  The circumstances show he didn't sign

19  the form before -- sorry -- he didn't read the form before he

20  signed it.

21               (Demonstrative published.)

22      **MR. FAKHOURY:**  And again that's this Exhibit 26.

23      Now there's a second point about knowledge and this form

24  in particular that I want to talk about.

25      And, again, we talked about the fact that the bank is

1    using the term the borrower's financial situation has not,

2    quote, changed significantly, end quote.

3        There is no proof beyond a reasonable doubt that

4    Mr. Rothenberg knows what the bank is talking about when it

5    uses the term "changed significantly."

6        Now, I mean as a general matter, what does that mean?

7    What does it mean for a borrower's situation to change

8    significantly?  Again, there's no evidence that Mr. Rothenberg

9    was explained what that meant to Silicon Valley Bank.  The

10   form doesn't define it.  It gives some examples, but it's very

11   broad.  You can tell it was written by a lawyer.

12       And there's no evidence that anyone from the bank told him

13   what that meant or the kinds of information they were looking

14   for.  There's no email correspondence about it.  There's no

15   testimony from Michelle Jandu, from Ingrid Robertson, from

16   Frederick Kreppel about it.  There's no evidence that Brunk,

17   the notary, explained it to him.  She wouldn't be qualified to

18   do so anyway.

19       Now, look, Mr. Walsh said something that I want to respond

20   to.  He said this case is not about what SVB did and it's not

21   about whether the bank was supposed to tell Mr. Rothenberg

22   something or should have asked for something or whatever.

23       But the bottom line is that this case requires you to get

24   into and get inside Mr. Rothenberg's head.  It requires you to

25   figure out what he knows.  And it requires you to decipher his

1    intent.  And that will always be dependent, when we're talking

2    about a financial transaction between two parties, what a

3    person does and what a person knows and what a person's

4    intentions are, are always going to be dictated to some degree

5    by what the other person is telling them, or in this case,

6    what the other person, the other side, what the bank is not

7    telling him.

8                   (Demonstrative published.)

9            **MR. FAKHOURY:**  In fact, it's not even obvious that

10   the bank wanted to know line item transactions that had

11   occurred since the start of the loan application.

12        In fact, there's no evidence whatsoever that

13   Silicon Valley Bank ever wanted or asked for specific,

14   up-to-the-minute, day-by-day details of Mr. Rothenberg's

15   financial situation.  It never asked for the specific CMA and

16   LMA statements.  And they were perfectly fine with those

17   end-of-month balances.

18        In fact, Kreppel, Mr. Kreppel testified he didn't look at

19   the ins and outs of bank statements.  And, look, if SVB wanted

20   that kind of granular detail, then they would have asked for

21   it.  They would have asked for updated statements or rerun

22   Mr. Rothenberg's credit report.  And it's fair for

23   Mr. Rothenberg to assume they were going to do that because

24   they didn't even need to ask for his permission to do that.

25   He'd already granted it to them.

1          (Demonstrative published.)

2          **MR. FAKHOURY:**  This is Exhibit 4.  This is -- this is

3     a two -- kind of a form with two parts, a certification and an

4     authorization.

5          This authorization is extremely broad.  It allows the bank

6     to get any information it wants from any borrower, from any

7     bank, from the IRS, from anyone whatsoever, without

8     limitation, no time limitation, no subject matter limitation,

9     nothing.  And Mr. Rothenberg signed this form.

10          I mean, does this authorization not mean anything?  Is

11     this just another example of form over substance, I suppose?

12     You know, frankly, again, they could have asked Mr. Rothenberg

13     for that information specifically because every single

14     document they asked for Mr. Rothenberg gave them.

15          Now, the crux of the government's case is that a $350,000

16     difference in assets and liabilities was this, quote,

17     significant change, end quote, because it would affect

18     Mr. Rothenberg's debt-to-income ratio and he would no longer

19     qualify for the loan.

20          But let's talk about form over substance.  There's

21     conflicting information about the debt-to-income ratios.  And

22     we've seen in the government's own exhibit the bank's spread.

23     This is Exhibit 23 at page 9.

24          (Demonstrative published.)

25          **MR. FAKHOURY:**  Three different ratios on this form

1    itself.  A debt-to-income using net income.  A debt-to-income

2    using gross income.  And a debt-to-income that accounts for

3    the fact that the capital call line of credit was an

4    interest-only loan.

5        We're going to talk about this more a little later, but I

6    think for this point I'm trying to make, which is what did

7    Mr. Rothenberg know, what evidence is there that

8    Mr. Rothenberg knew that the bank was going to calculate these

9    numbers or the way it was going to calculate these numbers?

10       There's no evidence that he knew how the bank calculated

11   debt-to-income ratio.  There's no evidence he knew what his

12   specific debt-to-income ratio was.  There's no evidence he

13   knew what debt-to-income ratio the bank wanted.

14       And remember, both Michelle Jandu and Buzz Kreppel

15   testified that that underwriting analysis, I think the two

16   most important exhibits in this case, frankly, Exhibits 22 and

17   23, the end of which had that spread, they both testified that

18   that's not given to any borrower.  It's not given to

19   Mr. Rothenberg.  Not even the credit report is given to a

20   borrower or Mr. Rothenberg.

21       So don't --

22       And again, you have -- this is Exhibit 19.  You'll have

23   this with you.  This is the initial disclosures.  And this is

24   Exhibit 31, this is the closing packet.  None of them talk

25   debt-to-income ratios either.  So again how is Mr. Rothenberg

1    supposed to know that that swing in assets and liabilities

2    would then affect his debt-to-income ratio which would then

3    have a bearing on the loan?

4         Look, don't lose sight of the fact that Mr. Rothenberg is

5    young and inexperienced.  It's sort of -- well, we'll get to

6    what Mr. Walsh said in a minute.

7         But, you know, Mr. Rothenberg is not 30 years old yet.

8    There's no other mortgages on his credit report, either open

9    or paid off.  This is the first and only piece of property he

10   owns.  This is his first refinance.  He's not a realtor.  He's

11   not a banker.  He's not a lawyer.  Of course he's smart.

12        This is where I was getting to Mr. Walsh here.  He

13   mentioned that he went to Stanford and Harvard, he's a math

14   Olympian.  Of course he's a very bright person.  You don't get

15   into Stanford and Harvard without being bright.  You don't

16   start your own venture capital fund and have a 34 percent

17   investment rate of return without being intelligent.  But just

18   because you're smart doesn't mean you know everything.  I'm a

19   lawyer, but I don't think you want to get medical advice from

20   me.  And I don't think you'd ask your doctor for legal advice

21   either.

22        So just because Mr. Rothenberg is educated and bright

23   doesn't mean he was a mind reader, doesn't mean he knew what

24   information the bank thought was important, or he knew what

25   the bank's lawyers had in mind when they wrote the phrase

1    "changed significantly."

2         And in fact, you've seen his emails.  He's constantly

3    asking for guidance.  This is Exhibit 1, page 4.

4                   (Demonstrative published.)

5         **MR. FAKHOURY:**  "Could you let me know if what I've

6    sent so far attached is on track?"

7         Here's Exhibit 17.  Towards the bottom here.

8                   (Demonstrative published.)

9         **MR. FAKHOURY:**  "George, policy attached.  Please let

10   mow know if you need anything else."

11                  (Demonstrative published.)

12        **MR. FAKHOURY:**  Exhibit 56, this is to Ryan Kelty.

13   "Is this what you mean?"

14        Mr. Rothenberg wants to get this right.  He wants to get

15   the deal done.  He wants to give Silicon Valley Bank the

16   information they asked for.  But they never tell him a thing

17   about this financial affidavit.

18        Instead they outsource that task to a notary who met

19   Mr. Rothenberg for 30 minutes in a hotel lobby on the other

20   side of the country and who would not have been equipped to

21   answer any questions he had anyway.

22        So I mentioned there are many reasonable doubts in this

23   case so let's recap where we are.

24        Number one, the first reasonable doubt was there's no

25   false statement.  The second reasonable doubt is that

1    Mr. Rothenberg did not knowingly make a false statement.

2        Let's talk about the third reason the government has

3    failed to prove its case beyond a reasonable doubt.  And that

4    is the statements were immaterial.  This is about Count One,

5    the bank fraud statute.

6        Now, materiality means that the statement had a natural

7    tendency to influence or were capable of influencing a

8    financial institution to part with money or property.  Natural

9    tendency to influence.

10       Now, look, throughout trial we've heard testimony about a

11   whole bunch of different kinds of loans.

12       Sorry about that.  One second.

13                   (Pause in the proceedings.)

14           MR. FAKHOURY:  Now, I mentioned we've heard testimony

15   about different kinds of loans.  We've heard about

16   conventional or conforming loans or mortgages that are sold to

17   Fannie Mae and Freddie Mac which are government agencies, and

18   that these mortgages have strict lending criteria.

19       So the $350,000 difference in your assets and liabilities

20   may make a difference for a Fannie Mae or Freddie Mac loan

21   because there's specific and strict lending criteria.

22       The loans at issue in this case are not those kinds of

23   loans.  The loans that we've been looking at throughout this

24   trial are custom loans.  Specifically a mortgage that

25   Silicon Valley Bank was not going to resell but keep for its

1  own books, and an unsecured interest-only capital call line of

2  credit, which is sort of a unique product to Silicon Valley

3  Bank given its niche and clientele.

4      For custom loans, every bank is going to have its own

5  unique and specific lending criteria that informs its

6  decisions.  And that criteria will differ from lender to

7  lender depending on the product and the borrower.

8      Remember, banks are a business.  They sell products at a

9  profit.  Each bank has its own niche, it has its own products,

10  it has its own clientele.

11      A Dodge pickup truck and a Tesla are both cars.  They'll

12  both get you from point A to point B, but they're pretty

13  different.  They have different functions and different

14  features, different prices, and Dodge and Tesla market them to

15  different kinds of people.

16      Banks are exactly the same.  By its very definition, a

17  custom loan is one that is tailored specifically to the

18  borrower.  There's more flexibility when you're dealing with a

19  custom loan.

20      So whether a statement has a natural tendency to influence

21  a bank to issue a loan is not going to just depend on one

22  specific metric like a debt-to-income ratio.  It's going to

23  depend on all the other circumstances and factors at issue in

24  the decision-making process.  And this is very clear in the

25  Silicon Valley Bank loan approval sheets.

1          (Demonstrative published.)

2          **MR. FAKHOURY:**  This is Exhibit 22-2, for the first

3     loan sheet.

4          Look at all the different things mentioned by the

5     underwriter.  Loan-to-value ratio.  Debt-to-income ratio.

6     Qualifying income.  Discretionary income.  FICO credit score.

7     Post-close liquidity.  Contractual reserves.  The CRR, that's

8     the credit risk rating, which we're going to talk about in a

9     minute.

10         The underwrites notes Silicon Valley Bank's business

11    relationship with Rothenberg Ventures.  And it cites to a

12    credit memo that has paragraphs of details about

13    Mr. Rothenberg and his venture capital fund.

14         In Exhibit 23, this is the credit risk rating.

15         (Demonstrative published.)

16         **MR. FAKHOURY:**  This has additional features listed,

17    factors like source of repayment, performance to expectation

18    and covenant compliance, loss in the event of default,

19    sensitivity to external factors, which includes the fact on

20    this specific loan that SVB wishes to expand its relationship

21    with Rothenberg Ventures portfolio companies.  It talks about

22    management abilities and investor economics, which again

23    references that lengthy credit memo.

24         Look, there's the unmistakable fact that Silicon Valley

25    Bank's niche, explicitly noted in the loan approval sheets,

1    was the bank's interest in getting access to venture capital

2    portfolio companies.  Fannie Mae and Freddie Mac don't care

3    about that.  But in the world of custom mortgages and capital

4    call lines of credit, that's a factor that weighs into the

5    decision whether to approve or deny a loan.  For good reason,

6    I might add.  Mr. Rothenberg is a good investor.

7        Just look at what Silicon Valley Bank said about him in

8    RVMC.  And you can see that down here.

9                    (Demonstrative published.)

10        **MR. FAKHOURY:**  He has a deep relationship with the

11   venture community.  He's built the firm from a one-person

12   startup to a ten-person venture firm.  They've raised money

13   from high-quality limited partners.  They have -- portfolio

14   has strong performance with a IRR of 34 percent and two exits

15   in 2014.

16        In fact, Buzz Kreppel testified the bank wants this

17   business, and the credit risk rating includes it as a factor.

18   The credit memo has a detailed analysis of Rothenberg

19   Ventures.

20                    (Demonstrative published.)

21        **MR. FAKHOURY:**  And remember, Mr. Rothenberg is not

22   getting solicited by Silicon Valley Bank with a blind mailer

23   like Merrill Lynch did.  He's been taken out to lunch by

24   Michelle Jandu and Jim Marshall.

25        Now, Buzz Kreppel testified it just did not matter in the

1   loan approval process that the bank would not approve a loan

2   solely in the interest of access to portfolio companies.

3       But, look, don't forget that Kreppel has a vested interest

4   in the outcome of this case.  He's worked for Silicon Valley

5   Bank for almost 30 years.

6       Judge Tigar instructed you that when you consider a

7   witness's credibility, you can consider their interest in the

8   outcome of the case and their bias or prejudice.

9       And, look, we've heard throughout jury selection the

10  jurors have concerns about police officers and worry about

11  bias.  Everybody is biased, consciously or unconsciously.  And

12  that's why the jury instructions repeatedly ask jurors to not

13  be influenced by bias.

14      Well, high ranking corporate employees can be biased

15  towards their employer.  Kreppel spent his entire career and

16  owes his livelihood to Silicon Valley Bank.  And, remember,

17  his job is to protect the interests of the bank.  He's not a

18  salesperson.  He's not wining and dining potential clients.

19  He's not trying to foster business relationships necessarily.

20      So his testimony that these factors didn't matter frankly

21  is contradicted by the exhibits themselves, the documents that

22  I've just shown you.

23      Again, look closely at these exhibits.  This is

24  Exhibit 23-3.  Look at all the language in there.  And if

25  these things weren't a factor, then why on earth are they in

1    the credit risk rating section?  I mean, isn't this the place

2    to analyze the bank's decision-making process?

3        We know these forms don't go to the borrowers.  And you

4    know, frankly, where are the bank's guidelines?  The

5    government's shown you many, many, many, many forms and

6    documents.  I mean, I'm not quite sure what the point of

7    putting the notary's invoice into evidence was, or the

8    preliminary title report was.  And frankly who cares?  How

9    does that help you decide whether the government's proven its

10   case beyond a reasonable doubt?

11       But where are the guidelines?  According to Buzz Kreppel,

12   it not these factors contained in the loan approval sheet that

13   we've seen ad nauseam for two weeks.

14       Look, remember, a reasonable doubt can arise from a lack

15   of evidence.  And it's actually pretty disingenuous if you

16   think about it.  The government's entire case is based on

17   Mr. Rothenberg's signature on forms they claim means

18   something.

19       Like here's a form generated by the bank for its own

20   internal use that details the bank's thought process.  It has

21   a ton of different factors on it.  And Mr. Kreppel came and

22   testified and said, well, this actually didn't matter, these

23   other factors didn't matter.  It was all about debt-to-income

24   ratio.

25       Well, I guess if you believe that, then the government

1    agrees with me.  These forms don't matter one bit, and it

2    really is form over substance.

3        So I just -- I just -- I would just dismiss Kreppel's

4    after-the-fact justifications that are contradicted by the

5    actual documents at the time and stated only here in court in

6    criminal case after he's been subpoenaed by the United States

7    government and flown from San Diego to the Bay Area to

8    testify.

9        So the evidence has shown that $350,000 change in net

10   worth in and of itself would not have a natural tendency to

11   influence or be capable of influencing a bank, whether SVB or

12   not, or any other bank, when we're talking about a custom loan

13   for a borrower in the same position, meaning with the same set

14   of circumstances as Mr. Rothenberg.

15       If this was a Fannie Mae or Freddie Mac mortgage, maybe

16   it's a different story.  But that's not how SVB was treating

17   these mortgages, and obviously the capital call line of credit

18   is not a mortgage at all.

19       Now there's a second reason why these statements were not

20   material.  And again the statements we're talking about are

21   the statements made in the Form 1003 that listed $73,000 in

22   liabilities that was signed in closing, and the financial

23   status affidavit that Mr. Rothenberg's financial situation had

24   not changed significantly.

25       And the reason for that is that at the time he signed

1  those documents on August 21st, 2014, the loan was already a

2  done deal.

3      And that's actually what the bank explicitly told

4  Mr. Rothenberg.

5                  (Demonstrative published.)

6      **MR. FAKHOURY:**  On August 18th, the bank said:  Your

7  request for the refinance has been approved.

8      This is three days before the signing in New York City.

9  Now, this approval letter doesn't say approved pending you

10  signing a financial status affidavit.  It doesn't say approved

11  pending you signing a new Form 1003.  It doesn't say approved

12  pending you sending us updated statements or balance sheet.

13  It doesn't say approved pending you explaining the financial

14  transactions you entered into in the last three weeks.

15     Look, you don't check your common sense at the courtroom

16  doors.  There's a reason the signing is before a notary, who

17  doesn't know anything about the loan, the borrower, or the

18  details of the transaction.  There's a reason no one from the

19  bank is there.  There's a reason no one from the title company

20  is there.  These two specific forms, the Form 1003 and the

21  financial status affidavit, are pro forma.  They're literally

22  form over substance.  And I think that's particularly true

23  when it comes to the Form 1003.

24     We've already established that Mr. Rothenberg didn't type

25  up or prepare this form.  Either Exhibit 25, which is the form

1    at the closing, or Exhibit 19, the form that was prepared in

2    the initial disclosures.  And we know that this earlier

3    version of the form contained the same mistake about the

4    liabilities.

5        And we've already talked many times, and I won't go over

6    it -- into it again, that the bank prepared a third Form 1003

7    that said Mr. Rothenberg had 73,000 in liabilities, and yet at

8    the same time its spreadsheet, the spread, showed that

9    Mr. Rothenberg had $1.6 million in liabilities.  And actually

10   if you discounted the mortgage off of that, about $700,000 in

11   liabilities.

12       Look, you heard from it Brunk herself.  In all her years

13   of being a notary and doing God knows how many signings, she's

14   only seen one person amend a Form 1003.  So the Form 1003 did

15   not make one bit of difference to this loan, this bank, or any

16   bank.

17       Think about it.  The Form 1003 lists credit card

18   liabilities.  The credit card balance could change daily.

19   Actually in my house it changes hourly based on the number of

20   Amazon packages that come to my house.

21       A Form 1003 will probably never be a hundred percent

22   accurate.  But if you credit the government's theory, the

23   borrower who signs a Form 1003 --

24                  (Demonstrative published.)

25            **MR. FAKHOURY:**  -- after they bought a $5 coffee from

CLOSING ARGUMENT \ FAKHOURY

1    Starbucks on their way to their signing is guilty of bank

2    fraud and making a false statement to the bank.  And that is

3    just nonsense.

4         So again to recap.

5         Mr. Rothenberg did not make a false statement.  He did not

6    knowingly make a false statement.  Number 3, any statements,

7    whether false or not, were not material to these custom loans.

8         That takes me to my last argument.  Reasonable doubt

9    number four that Mr. Rothenberg is not guilty is that the

10   government has failed to prove he had an intent to deceive and

11   cheat the bank and no purpose to influence the bank.

12        And there's a couple different concepts in here, and I

13   want to pull them all out so we can talk about them very

14   clearly.

15        Count One requires the government prove beyond a

16   reasonable doubt that Mr. Rothenberg executed a scheme to

17   defraud, which means a deliberate plan of action or course of

18   conduct intended to deceive and cheat the bank.

19        And that itself really requires you to look at two

20   different things.  Mr. Rothenberg's actions.  Did he have a

21   plan or plot?  And Mr. Rothenberg intent.  Were those actions

22   intending to deceive and cheat the bank?

23        That ultimately requires the government to get inside of

24   Mr. Rothenberg's head.  And I want to be clear.  It is not

25   deceive or cheat.  It is deceive and cheat.  It is not one or

1     the other.   In plain English, what that means is that

2     Mr. Rothenberg has to deceive the bank to cheat it out of

3     money.

4         Now, Count Two uses different language.   It requires

5     Mr. Rothenberg's purpose be to influence Silicon Valley Bank.

6     But again that requires you to again get inside of his head.

7         So let's start with the fact that the government has

8     failed to prove beyond a reasonable doubt that Mr. Rothenberg

9     engaged in a scheme to defraud.

10        And actually, before I go into that in detail, I want to

11    address something that Mr. Walsh had mentioned in his closing

12    argument.   He said there was no requirement for Mr. Rothenberg

13    to get a refinance and there was no requirement for him to get

14    a capital call line of credit.

15        Well, look, no one is required to refinance the mortgage

16    on their house.   But again, common sense says people will do

17    it if they can get better terms for it.   It's probably not a

18    great idea to refinance your house today with interest rates

19    what they are if you bought your house 15 years ago.

20        But we've already seen for Mr. Rothenberg his house went

21    up significantly in value from the time he bought it.   So

22    there was ample reason for him to do it.   He wasn't required

23    to do it, but it's not evidence of some nefarious criminal

24    plot.   He's trying to be a conscientious borrower.

25        It's the same thing with the capital call line of credit.

1    Mr. Rothenberg is an investor.  He runs his own venture

2    capital firm.  He's got to put -- we've heard this phrase a

3    lot -- skin in the game.

4        So, sure, he does not require to put $400,000 into the

5    capital call line of credit.  But he certainly seems motivated

6    to do so.  That's his industry.  He started his own fund and

7    the fund is doing well.

8        So let's talk about the scheme to defraud.  One of the

9    government's arguments on this point is the movement of money

10   between different bank accounts.

11       And I said in my opening statement that this was a red

12   herring.  And everything that came out in trial completely

13   supported my prediction.  Like I said a little while ago, the

14   government gave you a selective cherry-picked snapshot of

15   financial records, having Agent Ghio testify about

16   12 financial transactions put onto a flow chart that he didn't

17   prepare.

18       Now don't take my word for it that it's cherry-picked.

19   Again, he got on the witness stand in a criminal trial in

20   front of a jury who's taken time out of their schedules to sit

21   here, commute into Oakland and listen to evidence.  And he

22   couldn't be bothered to read or review all the records, all

23   the records that the government's put into evidence.

24       Well, again, I keep coming back to my accordion here.

25   These are the records.  There's 300 pages of financial

1    records.  This is the evidence.  Not the flow chart, not the

2    arguments I make or Mr. Walsh or Mr. Waldinger make.  This is

3    the evidence.

4        And you're going to have this evidence with you in the

5    jury room to look at, to pore over, to analyze, and to think

6    about as you're reviewing the elements and the evidence you've

7    heard in this case.

8        And actually I encourage you to go through all of them,

9    look through them.  And I've shown you some snapshots that

10   sort of show my side of -- my view of the statements.  And

11   that's, you know -- and that's -- that looks like this.

12                    (Demonstrative published.)

13        MR. FAKHOURY:  There's transfers of money in and out

14   the accounts all the time, both before there's any loan

15   application --

16                    (Demonstrative published.)

17        MR. FAKHOURY:  Here's an example.  This is the Bank

18   of America statement from May to June 20th of 2014.  On

19   May 22nd, well before any loan application, well before the

20   CMA and LMA were opened up in June of 2014, showing a wire in

21   from Rothenberg Ventures Management Company of $53,413.03.

22                    (Demonstrative published.)

23        MR. FAKHOURY:  Here's a Bank of America statement

24   from September of 2014, after the loans have closed, showing a

25   wire in from the Rothenberg Ventures Management Company of

1    $70,000.

2                    (Demonstrative published.)

3              **MR. FAKHOURY:**  Here's another exhibit.  This is

4    Fund II, the Silicon Valley Bank account statements for

5    Fund II.  This is Exhibit 85.  Here is a transfer of money

6    between accounts.  This is actually between Fund II to Fund I,

7    okay, which is another account that you have the statements

8    of.  We haven't heard a single thing about it, which should

9    tell you something.  Just, again, money being moved back and

10   forth.

11       Here's another one.  This is 8690.  This is RVMC's bank

12   account in April 2014 showing Mr. Rothenberg wiring in money

13   to his business.  I'll go back to that in a minute.

14       So, look, the fact that money is being transferred between

15   accounts both before the CMA and LMA accounts were opened and

16   after the loans are closed, it's proof that the transfer of

17   money has nothing to do with the loans at issue in this trial.

18       Or in the language of the jury instruction, the transfer

19   of money between accounts is not evidence of a scheme or plan

20   or plot connected to the refinance or the capital call line of

21   credit.

22       And by the way, the government hasn't presented any

23   evidence to suggest there was any problem with the movement of

24   this money.  Look, don't forget Mr. Rothenberg is a

25   controlling owner of the management company.  And the

1     management company -- and this is in Exhibit 12.  This is the

2     offering memo, sort of like the public version of the -- sort

3     of like advertising materials for the fund, for the management

4     company, excuse me.  And this was given to Silicon Valley Bank

5     in the loan process.  And you'll have this exhibit to look at.

6          And again, it talks about that the founder of the fund and

7     owner of the manager, the manager being Rothenberg Ventures,

8     Michael Rothenberg, will make all final decisions regarding

9     the strategy, investments, and day-to-day operations of the

10    fund on behalf of the manager.  The manager, again, being

11    Rothenberg Ventures.

12         There's all sorts of terms in here that talk about the

13    transfer of money between the fund and the management company.

14    And Mr. Rothenberg owns the management company -- or almost

15    all of the management company.

16         We talked about management fees.  Here's another one about

17    expenses.

18         Look, the bottom line is this:  The government is inviting

19    you to speculate that Mr. Rothenberg is not entitled to this

20    money.  But speculation is not evidence of anything, let alone

21    proof beyond a reasonable doubt.

22         And to be sure, all they can present is speculation.

23    Because they witness -- the witness they brought to kind of

24    dip your toes into this, JR Eppler, he can't testify about

25    what was going on at Rothenberg Ventures in 2014 because he

1    has no idea.  He wasn't there.  He didn't prepare the books.

2    He doesn't know who prepared the books.  He doesn't know who

3    logged the entries.  He doesn't know why the entries were

4    logged the way they were logged.

5         I mean, think about that for a second.  The government can

6    fly a notary -- and I don't mean to pick on Ms. Brunk, but,

7    you know, she lives in New York City.  They flew a notary all

8    the way from New York City to sit here and testify for

9    20 minutes about a notary -- a notarization she doesn't

10   remember, a borrower she doesn't remember, a loan she doesn't

11   remember.  And they can't be bothered to bring you anybody who

12   could explain what was going on at the fund in 2014.

13        So don't get distracted, ladies and gentlemen.  This case

14   is not at all about RVMC or Fund II.  This case is about

15   Silicon Valley Bank, nothing else.

16                    (Demonstrative published.)

17        **MR. FAKHOURY:**  There's a second point that speaks to

18   both Mr. Rothenberg's actions, meaning whether there's a

19   scheme to defraud.  And his mind state, meaning whether he had

20   the intent to defraud.  And that is that every single one of

21   these transactions is out in the open.  I told you in opening

22   statement there would be no secret bank accounts in this case.

23   And you didn't -- and that's exactly what happened.  You did

24   not hear about any secret back accounts.

25        Even the transactions involving monies between Fund II and

1    RVMC and back, they were logged in the RVMC QuickBooks

2    account.  And it would have been transparent to Silicon Valley

3    Bank if it bothered to look at the specific statements.

4        But, frankly, it just didn't care.  They never asked for

5    updated statements or account balances from when the loan was

6    approved to when it was closed.

7        And again, Buzz Kreppel testified that the bank -- that

8    was the bank's practice.  They didn't get into the weeds of

9    statements.

10        In fact, Mr. Rothenberg gave Silicon Valley Bank -- and

11    I've said this many times, and one of the last few times I'll

12    say it -- Mr. Rothenberg gave the bank every single piece of

13    information they asked for.

14        And he never got -- and he never -- by the way, we've seen

15    the emails.  He never said no to any request that they made.

16                    (Demonstrative published.)

17        **MR. FAKHOURY:**  So Exhibit 10, which I already talked

18    a little bit about, the Merrill Lynch statement, it's all

19    here.  It has the Merrill Lynch account number, the CMA

20    account number, the LMA account number, the Bank of America

21    account number.

22        Now, Mr. Walsh complained that -- or he mentioned the fact

23    that Mr. Rothenberg was trying to get a balance statement on a

24    certain day and, you know -- but just think about that for a

25    second.  This was what he could get.  And this is what he

1    submitted.  The bank never said this was not good enough or

2    give us more.

3        And in fact, if he was actually going to Merrill Lynch and

4    saying can you get me a statement, that is proof that he's not

5    trying to hide anything from Silicon Valley Bank.

6        I mentioned that at the time of the -- the loan

7    applications with Silicon Valley Bank, that they know that

8    Rothenberg Ventures banks at Silicon Valley Bank.  The firm

9    balance sheet actually is right on there.

10       And again, remember what Kreppel and Jandu testified.

11   This information about portfolio balances, it did not come

12   from Mr. Mr. Rothenberg.  He did not give them RVMC or Fund II

13   financial statements.  The bank went and got this information

14   on its own from the bank itself.

15                   (Demonstrative published.)

16       **MR. FAKHOURY:**  And again not only was every

17   transaction in the open, Mr. Rothenberg authorized the bank to

18   get whatever records it wanted.

19       Mr. Walsh had said that, well, Silicon Valley Bank didn't

20   have access to Bank of America and Merrill Lynch statements.

21   Well, that's -- that's not true.  They could have gotten it if

22   they wanted it.  They just chose not to.  And they chose not

23   the ask Mr. Rothenberg for that information either.

24       The government's case hinges entirely on the bank being

25   entitled to rely on Mr. Rothenberg statements in the Form 1003

1    and the financial status affidavit.  Well, Mr. Rothenberg

2    should be entitled to rely on the bank statements to him that

3    it might independently verify information.  I mean, this is

4    not a hypothetical.  Here's Exhibit 34.

5                    (Demonstrative published.)

6         MR. FAKHOURY:  They verified his employment with RVMC

7    after -- on August 21st after they had already issued a

8    capital call line of credit on August 12th for his investment

9    into his company.

10        Mr. Rothenberg gave the bank every document it asked for.

11   He disclosed every account that existed.  He authorized the

12   bank to get whatever information it wanted.  This is the exact

13   opposite of trying to deceive someone.

14                   (Demonstrative published.)

15        MR. FAKHOURY:  If you're trying to deceive someone,

16   you would not be responsive and ask for clarification.  If

17   you're trying to deceive someone, you hide the accounts.  If

18   you're trying to deceive someone, you wouldn't sign an

19   authorization form that you think the bank means what they say

20   and will actually go get the records.  If you're trying to

21   deceive someone, you would not be an open book.

22        All the evidence points clearly that Mr. Rothenberg did

23   not have either a scheme to defraud or an intent to defraud.

24        And a third point that speaks to both Count One scheme and

25   intent to defraud, as well as Count Two's requirement that

1    Mr. Rothenberg's statement be done for the purpose of

2    influencing the bank, and again I mentioned this earlier, I'll

3    say it quickly, but it's absolutely fair for Mr. Rothenberg to

4    assume the loan was approved on August 21st, 2014, before he

5    sat down to sign the Form 1003 and financial affidavit.  And

6    again, here's Exhibit 24 --

7                        (Demonstrative published.)

8         MR. FAKHOURY:   -- that shows on August 18th the bank

9    is telling him the loan's been approved.  And it didn't say

10   approved pending some other thing.

11        Signing these documents is a formality.  It's not

12   something he had to do to keep up some purported scheme to

13   defraud the bank.

14        And in the language of Count Two, the false statement

15   charge, signing these forms was not going to influence the

16   bank to do anything because it had already made up its mind.

17        Now, an intent to defraud means an intent to deceive and

18   cheat.  This is going to be my final point.  So far I've been

19   talking about deceit.  We still have to talk about cheat.

20        A cheater is someone who gets something they're not

21   entitled to.  And nobody likes a cheater.  But at the end of

22   the day, even if you accept the government's premise that the

23   $350,000 was a liability, not an asset, there's no cheating.

24   And that's because Mr. Rothenberg would have qualified for the

25   loan anyway.  Or in the language of -- or he's not cheating,

1    he's not getting something he's not entitled to.

2        Now the government's argued, and the jury instruction

3    says, and I don't quibble with the jury instruction, that they

4    don't have to prove that the loan would have been approved.  I

5    agree.  That's what the law says.  You have to follow the law.

6        But they have to prove an intent to defraud.  And they

7    have to prove an intent to deceive and an intent to cheat.

8        So evidence that Mr. Rothenberg would have gotten the loan

9    or could have gotten the loan anyway undermines his intent to

10   cheat.  What would be the purpose of trying to cheat if you're

11   going to win anyway?

12       So like I said, Mr. Rothenberg would have qualified for

13   the loan anyway.  And you heard it from Buzz Kreppel himself.

14   Under any scenario, whether you look at the original loan

15   amount or the higher loan amount, if you treated the $350,000

16   as a liability, Mr. Rothenberg had enough reserves to qualify

17   for the loan.

18       There would be more, far more, than the six to 12 months

19   in reserves that the bank wanted.  He said, I think, it would

20   be between 20 to 30 months.

21       There's no cheating when it comes to reserves.  So, again,

22   the government's case hinges entirely on a debt-to-income

23   ratio.  That the higher loan amount, if the $350,000 had been

24   a liability, would have pushed his debt -- Mr. Rothenberg's

25   debt-to-income ratio above 75 percent and thus he would not

1   have gotten the loan.

2         There are so many problems with that premise, and I'm

3   going to go through them one by one.

4         But before I do that, I want to take a step back and think

5   about this for a second in a broader sense.

6         Mr. Rothenberg had nothing to do with the increased loan

7   amount.  He underestimated the value of his home.  That in and

8   of itself undermines the government's case.  If he qualified

9   under the original loan amount, as Buzz Kreppel says he does,

10  then there's certainly no plan or scheme to defraud and

11  certainly no intent to defraud the bank when they agreed to a

12  higher loan amount without changing the term or discussing it

13  at any length with Mr. Rothenberg.

14        Now let's get back to debt-to-income ratio.

15        Now, again, as a general matter there's been so many

16  debt-to-income ratios, it's hard to keep track of which one

17  matters and which one doesn't.  And again I'm skeptical of

18  Kreppel's testimony the bank only cared about net

19  debt-to-income.

20        First, the fact that the spread lists net debt-to-income,

21  gross debt-to-income, and the interest-only capital call line

22  of credit debt-to-income suggests that all three of these

23  numbers meant something to the bank.

24        And that's actually particularly true with the capital

25  call line of credit debt-to-income ratio, which is not just

1    mentioned in the spread, but also mentioned in the

2    underwriter's recommendation.

3        And that is at Exhibit 23, 2 or page 3.  And, again, I

4    apologize, I didn't have the slide there to show you.  But

5    when you go through that Exhibit 23 which has the

6    underwriter's analysis, you'll recall there's a paragraph

7    there that says the debt-to-income ratio was -- I think for

8    Exhibit 23, the higher loan amount, that it was 74 percent.

9    But that is assuming a five-year amortization.  And if you

10   took the capital call line of credit as an interest-only line

11   of credit for three years, the debt-to-income ratio was

12   actually 53 percent.

13       So at its core, the government's entire case rests on a

14   false premise that a three-year interest-only capital call

15   line of credit is really a five-year amortized loan for

16   purposes of debt-to-income ratio only, but not for reserves.

17       And in fact, Kreppel testified about a hypothetical.  He

18   calculated a debt-to-income ratio if the $350,000 was treated

19   as a liability instead of an asset.  He determined -- here are

20   his calculations.  Right?

21                     (Demonstrative published.)

22           **MR. FAKHOURY:**  This is taken straight out of that

23   demonstrative that you saw the other day.

24       If you recall -- this is the original debt-to-income

25   calculation.  It's $187,000 and expenses.  254,000.  I'm using

1    approximate numbers.  $254,000 in net income.  And that

2    generates a debt-to-income ratio of 74 percent.

3        He then assumed a $350,000 loan at 3.77 percent interest

4    would generate a $13,195 interest payment for a year.  And

5    even that is speculation.  Because as I asked him, that would

6    be the case if you were dealing with an installment loan like

7    a mortgage or a car payment.

8        But the line of credit is a revolving credit like a credit

9    card which means the interest is only accrued when you draw

10   down from it.

11       But let's accept his assumption for the sake of argument.

12   If you add this interest amount to the expenses, you get that

13   amount of 201,000 approximately.

14                   (Demonstrative published.)

15       **MR. FAKHOURY:**  And that creates a new debt-to-income

16   ratio of 79 percent.

17       Now I asked him, well, what if we actually considered this

18   loan like a three-year interest-only loan.  In other words,

19   what if we looked at this loan as in -- as it actually existed

20   in the real world?  What would those numbers be?

21                   (Demonstrative published.)

22       **MR. FAKHOURY:**  Well, you can see right away, the big

23   change is the amount of expenses went down to $134,000

24   approximately.  That creates a 53 percent debt-to-income

25   ratio.  We keep his same assumption that the $350,000 is a

1    liability.  That increases the expenses.  You divide it by net

2    income, and you have a 58 percent debt-to-income ratio based

3    on his own assumptions.

4        And so what has happened is the bank basically gave

5    Mr. Rothenberg $53,275 in hypothetical imaginary expenses when

6    it decided whether to approve the loan or not.

7        Talk about moving goal posts.

8        The bottom line and the whole point of going through this

9    exercise is how is Mr. Rothenberg supposed to know any of

10   this?  He doesn't get the spread.  He doesn't get the CRR

11   analysis.  He doesn't know that the bank calculates

12   debt-to-income using net income instead of gross income like

13   most banks.  He doesn't know the bank is treating a three-year

14   interest-only loan as a five-year amortized loan.  And in fact

15   no borrower knows that.

16       Look, a borrower who knows the thresholds, who knows the

17   bank's unique interpretation of expenses, who tried to

18   structure payments in a way to get under those thresholds,

19   would certainly have a scheme and intent to defraud.  That's

20   cheating.

21       That's not what Mr. Rothenberg did at all.  He didn't know

22   any of this at all.  And thus he could not have schemed to

23   manipulate that ratio to get a loan he would otherwise have

24   not been able to get.

25       So one final recap.  Mr. Rothenberg did not make a false

1    statement.  He had not knowingly make a false statement.  Any

2    statements, whether false or not, were not material to these

3    loans.  There was no scheme to defraud, no intent to defraud,

4    and in the language of Count Two, no purpose to influence a

5    bank.  And since the government's failed to prove these four

6    things, Mr. Rothenberg is not guilty on both counts.

7        We should demand more from our government.  We should

8    demand more than hurried signatures on two irrelevant forms,

9    not read by any borrower, one of which is filled out

10   incorrectly by the bank, before we allow banks to drag

11   hardworking small business owners and employers into court and

12   accuse them of a crime.

13       We should demand that when a criminal case hinges entirely

14   on the bank's decision-making, that that process be based on

15   reality, not fake assumptions that magically turned five-year

16   loans into three-year loans, interest-only loans or amortized

17   loans and that saddle borrowers with additional expenses that

18   exist solely on paper and not in the real world.

19       Ladies and gentlemen, it has been my absolute privilege to

20   represent Michael Rothenberg.  It's been an honor and a

21   privilege to spend these last two hours -- these last two

22   weeks digging into the weeds of these documents and these

23   loans.

24       And Mike and I are thankful and appreciative of the time

25   you've taken out of your busy lives and schedules to sit as

1    jurors in this case.  And we're particularly grateful for your

2    attentiveness throughout this trial and what probably seemed

3    like a two-hour closing argument by me.

4        We're confident that when you go into that deliberation

5    room and when you review all the evidence -- little snapshot

6    here for you -- but when you review all the evidence, not the

7    cherry-picked parts that the government wants you to look at,

8    and when you look at the lack of evidence, that you're going

9    to find the government has failed to prove its case beyond a

10   reasonable doubt on both counts.

11       So I ask you to return a not guilty verdict as to both

12   counts.  Thank you very much.

13           **THE COURT:**  Thank you, Mr. Fakhoury.

14       Members of the jury, we're going to go ahead and take our

15   final break of the day.  When we come back, we will hear the

16   government's rebuttal closing argument.  And then the case

17   will be yours.

18       As I indicated to you before, I will be -- I don't -- I

19   don't know how long Mr. Waldinger is going to take, but I

20   don't think he's going to go till 1:30.  So you will have time

21   today to at least select a foreperson and tell us what your

22   deliberation schedule will be.  And so that might be something

23   that you can start thinking about now.

24       Let's be in recess.  Thank you.

25           **THE CLERK:**  Please rise for the jury.

1    (Recess taken at 12:08 P.M.; proceedings resumed at

2    12:27 P.M.)

3       (The following proceedings were heard in the presence of

4    the jury:)

5           **THE CLERK:**  You may be seated.

6           **THE COURT:**  All right.  Let's go back on the record.

7    All the jurors are in their assigned seats.  The parties and

8    counsel are at counsel table.

9       Mr. Waldinger, does the government wish to give a rebuttal

10   closing?

11          **MR. WALDINGER:**  Yes, Your Honor.

12          **THE COURT:**  Whenever you're ready.

13              **GOVERNMENT'S REBUTTAL ARGUMENT**

14          **MR. WALDINGER:**  Ladies and gentlemen, I would like to

15   be as brief as possible, but I'm going to start off with

16   saying that I would like to give a little bit of a roadmap.  I

17   started the case with giving a roadmap.  And so just so that

18   you know what I'm going to hit in my rebuttal argument, I'm

19   going to give you a little bit of a roadmap for that.

20      You heard a lot in Mr. Fakhoury's closing argument about

21   debt-to-income ratios and how SVB crunched the numbers.  I'd

22   like the address that.

23      Mr. Fakhoury talked about the bias of witnesses,

24   particularly of Mr. Kreppel.  I want to address that.

25      He talked about SVB's behavior, tried to shift the focus,

1   your focus from the defendant's behavior, his behavior, to the

2   bank's behavior.  I'd like to talk about that.

3       I'd like to talk about the same timeline that Mr. Walsh

4   showed you and that I showed you at opening because I think

5   the timeline tells the story here.  And that the timeline

6   addresses a lot of arguments that Mr. Fakhoury made.

7       Embedded in that, I'd like to talk about some of the

8   movements of money that you've seen, and then I'll conclude.

9       I hope to be short.

10      The first thing that I'd like to talk about is this

11  debt-to-income ratio.  And Mr. Fakhoury attacked -- basically

12  attacked the loan criteria that Silicon Valley Bank used and

13  how Silicon Valley Bank crunched its numbers.

14      And he also said on top of that, and I'm paraphrasing what

15  Mr. Fakhoury said, on top of that Mr. Rothenberg didn't know

16  how they crunched the numbers.

17      So take that last part first.  The instructions are not

18  going to require you to find that Mr. Rothenberg knew the ins

19  and outs of what SVB considered.

20      The jury instructions are going to require you to find

21  that the false statements and representations that

22  Mr. Rothenberg made to SVB were material.  And the point of

23  going through in excruciating detail the loan approval sheet

24  and the spread and the loan approval addendum and the spread

25  in that was to help show you what's material, what the bank

1    considered, what had a natural tendency to affect its

2    decision.

3        The evidence shows what the bank relied upon.  And it's

4    common sense.  It's a loan that has to be repaid.  Two loans,

5    in fact.  It is common sense that a bank would look at a

6    borrower's assets and would look at a borrower's liabilities.

7    That's your materiality inquiry.  The instruction and the law

8    don't require you to find that the defendant had to know the

9    minute details of SVB's number crunching.

10       The other thing that I think I need to point out is that

11   at some -- at some point when Mr. Fakhoury was talking about

12   how SVB crunched the numbers and how it calculated

13   debt-to-income ratio and what debt-to-income ratio was

14   relevant, he said, "I'm skeptical."  Let's be clear.  What I

15   say, what Mr. Walsh says, and certainly -- and what

16   Mr. Fakhoury says about the case matters zilch, nil.  It's you

17   who have to decide.  You're the judge of the facts.  You take

18   the law provided by Judge Tigar and apply them.

19       But I just want to take a step back in terms of the

20   numbers that Mr. Fakhoury -- or the calculations Mr. Fakhoury

21   was attacking.  And part of it was on this what they assumed

22   in terms of the capital call line of credit and it's really an

23   interest-only loan and it was unfair of them.

24       Doesn't matter.  You heard that this is -- it's typical

25   for banks to do that.  You heard that that's what SVB does.

1    This is how they calculate the numbers.

2        And even Ryan Kelty, who worked at a different bank, told

3    you that in order to qualify borrowers for certain loans, they

4    would shock the numbers.  And there was a part there where it

5    sounded like maybe he said chop the numbers.  But it was he

6    shocked the numbers, increased it.

7        And so that's basically you look at what SVB was doing,

8    they were shocking the balance sheet, they were shocking the

9    numbers, and that was their qualification criteria.

10       It's not -- it's not a defense that the defendant

11   disagrees or thinks that some other qualification criteria

12   would have been better.  As Mr. Kreppel said on -- on the

13   stand, the borrowers don't get to choose their underwriting

14   criteria.  He gets to choose the underwriting criteria.  And

15   those are the criteria that the bank had.

16       Related to that, Mr. Fakhoury talked about Mr. Kreppel's

17   bias.  And by implication I think he was maybe impugning

18   Ms. Robertson's testimony.  They both work for Silicon Valley

19   Bank still.  But there's really no evidence from which you can

20   conclude that they're biased in any way against the defendant.

21   This is not a case brought against the defendant by

22   Silicon Valley Bank.  And there's no evidence that

23   Silicon Valley Bank is out to get Mike Rothenberg.

24       You should -- you should -- you have to judge the

25   credibility of the witnesses that you heard from.  But I

1    submit to you that all of the witnesses you heard from, the

2    former SVB employee Michelle Jandu, Ms. Robertson, and

3    Mr. Kreppel, I submit to you that their testimony is credible

4    and that there's nothing from which you conclude -- can

5    conclude that they're biased against the defendant or biased

6    unfairly toward the bank.

7         So let's talk about the bank.  The defendant talked

8    repeatedly about what the bank did, what the bank didn't do.

9    And he even suggested that Silicon Valley Bank and Chicago

10   Title Company purposely set up Mr. Rothenberg to sign

11   documents on August 21st that he hadn't read before.

12        So let's start with that.  There's no evidence from which

13   you can conclude that Silicon Valley Bank is Octopus

14   International or some other character from a Bond film.  You

15   have no evidence from which you can reasonably conclude that

16   SVB was trying to take advantage of the defendant.

17        With respect to the other things that Mr. Fakhoury said

18   about the bank's behavior, Judge Tigar just read you the

19   instructions.  And one of those instructions is specifically

20   about what is a defense and what is not a defense to the bank

21   fraud charge.

22        And it is not a defense that Silicon Valley Bank may have

23   been gullible or careless or that Silicon Valley Bank could

24   have been more diligent.  Whether Silicon Valley Bank should

25   have known that submissions to Silicon Valley Bank were false

1    or fraudulent, if at all, is not a defense.

2        And whether Silicon Valley Bank was motivated by profit

3    and did in fact profit from the loans or other transactions

4    involved in this case is also not a defense.

5        The instructions also tell you that it's not necessary for

6    the government to prove that the defendant was actually

7    successful in his scheme.  So whether the bank ultimately

8    granted the loan or loans or would have granted the loans is

9    not your focus.  Your focus is on the defendant's behavior and

10   whether he engaged in a scheme to defraud, whether he made

11   false statements, and with respect to Count One, whether he

12   acted with the intent to defraud, among other things, and

13   again, you'll have the elements of these charges.

14        I want to take a minute while we're talking about the

15   bank again to repeat what materiality is.  In this context, it

16   does not mean that if the defendant had told the truth, the

17   bank would have went ahead and given the loan anyway.  And it

18   doesn't mean that the government has to prove that the bank

19   would have denied the loan.

20        Again, materiality simply means whether the false

21   statements or promises made by the defendant had a natural

22   tendency or were capable of influencing a financial

23   institution to part with money or property.

24        You have abundant testimony that the representations that

25   the defendant made about his assets and his liabilities were

1    material to SVB under that definition.

2        They were material because they were things that you've

3    heard from multiple witnesses that banks rely on in

4    determining whether to grant a loan.

5        And in fact yesterday, Buzz Kreppel told you that this

6    Consumer Financial Protection Bureau, the CFPB, directs banks

7    to consider these things.

8        So let's take a time out here.  I don't think that the

9    testimony from Mr. Kreppel -- again, this is for you to

10   remember -- was that just because this mortgage loan was not

11   going to be sold, that did not mean that the bank still didn't

12   have to follow the rules and regulations set forth.

13       And I believe the testimony -- or I submit to you that the

14   testimony was that Silicon Valley Bank still had to assess a

15   borrower's ability to repay and ask for things like assets and

16   liabilities.

17       The first week of trial, you heard Ryan Kelty testify.

18   And I hope you understand the purpose and I know that you

19   understand the purpose of why the Merrill Lynch witnesses were

20   brought here.  But Ryan Kelty gave you all a tutorial on how

21   banks make credit decisions.  And he talked about a piece of

22   furniture, kind of like this in front of me, a four-legged

23   stool and about how two of those legs are assets and credit.

24       So you have abundant testimony from which you can conclude

25   that the things that the bank got, the information that the

1   bank got from the defendant and the false statements that he

2   made about his assets and liabilities were material to the

3   bank.

4       Setting aside all of that, you know these things based on

5   your common sense.

6       So the fourth thing that I wanted to talk about which I

7   think really cuts across a lot of the arguments that

8   Mr. Fakhoury made is the timeline.

9                   (Demonstrative published.)

10          **MR. WALDINGER:**  And it's the -- similar timeline.  I

11  think some of the dates and details may have been changed from

12  the opening argument that I gave to you two weeks ago today.

13  But it's basically the same.  And it's -- this is the timeline

14  that Mr. Walsh showed you this morning.

15      In fact I've changed -- I changed the title of the slide

16  because I think that the timeline does tell the story here.

17  The timeline tells the story in many different ways, in many

18  different respects.

19      One of the things that Mr. Fakhoury told you when he gave

20  his closing argument was to look past certain things.  For

21  example, look past Mr. Rothenberg's pedigree.  And he told you

22  that this case -- this loan transaction or these loan

23  transactions were as routine as it gets.  And he told you to

24  look at the whole picture.

25      But I submit to you that the picture that Mr. Fakhoury

1    wants you to look at is just what happened here at the top of

2    the timeline (indicating).  And he just wants you to look at

3    what the defendant did on August 21st.

4        You should look at the whole picture.  The government

5    submits that you should.

6        The evidence in this case shows that Silicon Valley Bank

7    did not have the whole picture.  It was entitled to the whole

8    picture about Mr. Rothenberg's assets and liabilities.

9        The other part of the picture that Mr. Fakhoury doesn't

10   want you to focus on, he commented that at the end of July --

11   I guess I should circle this -- at the end of July, what's the

12   big deal?  Mr. Rothenberg had $370,000 of unencumbered cash in

13   his Merrill Lynch CMA account and no balance in his LMA.

14       And there's evidence and you'll see that by the end of

15   August, a situation was the same because, as Mr. Walsh said,

16   Mr. Rothenberg took the cash-out money from the mortgage and

17   used it to pay off the loan that SVB didn't know about it.

18       So it's true at the end of July there was 370,000 on the

19   asset side and zero on the liability side.  Same thing

20   happened at the end of August.  That's true.  What the

21   defendant doesn't want you to look at is all this in the

22   middle (indicating).  That's a weird thing that I just drew.

23   All this in the middle (indicating).

24       He doesn't want you -- let me back up.

25       What you should look at is what happened.  The timeline

1   does tell the story.  Let's just focus at the end of July

2   (indicating).  You saw the complex movements of money that the

3   defendant engaged in.  I'll move ahead.  This is at the end of

4   July.  These are the complex movements of money that the

5   defendant engaged in, in order to create a zero loan balance

6   in his LMA account at the end of July.

7       This was not an accident.  One of the other things, the

8   timeline helps tell the story in terms of whether

9   Mr. Rothenberg acted by ignorance or mistake.  This was no

10  mistake.  These movements of money are purposeful.  They're

11  not accidental.  They're specifically designed to achieve one

12  goal, which is to get this LMA loan balance to zero at the end

13  of July.  He borrows money from Fund I and runs it through

14  one, two other accounts before it ends up in his LMA.

15      This is not a mistake or an accident.  And in fact, these

16  movements of money help show that the defendant acted with the

17  intent to defraud.  He engaged in these movements in order to

18  create Exhibit 10.  It was all with that design.

19                  (Demonstrative published.)

20          **MR. WALDINGER:**  The timeline tells the story.

21      This happens also at the end of July.

22      Should there be any doubt about what the defendant was

23  doing or whether he acted by mistake or accident, you just

24  need to look at Exhibit 64.  And this is his email to Ryan

25  Kelty.

1    And this is not part of the blow-up, but I think -- but

2    I -- this email -- excuse me.  Strike.

3    As I said, what I think is not evidence.

4    The top of this email says:  Ryan, thanks for the call and

5    the coaching.  Will take your advice and register the loan

6    first thing on 8/25.

7    And then Mr. Rothenberg proceeds to give Ryan Kelty

8    detailed instructions as to how to move money.

9    And so by the time Exhibit 10 is created, the defendant

10   knows that it is only that situation --

11                  (Demonstrative published.)

12        **MR. WALDINGER:**  -- he knows is only going to exist

13   for three days max.  Because on July 29th, he set it up to

14   exist for only three days.  And that by the time -- likely by

15   the time he provided Exhibit 10 to SVB, the situation no

16   longer existed.  And it did not exist all the way until the

17   defendant got SVB's money and paid off the LMA.

18   The timeline tells the story.

19   The other -- one of the other things that Mr. Fakhoury

20   said is that how does Mr. Rothenberg know what "changed

21   significantly" means?  Again, his actions show that he

22   understood that having a $350,000 loan balance was a

23   significant issue that he needed to hide from SVB.

24   We spent a lot of time talking about the loan -- excuse

25   me -- the monetary transactions.

1          (Demonstrative published.)

2          **MR. WALDINGER:**  And I'll just touch briefly on the

3    July and August ones.

4          Mr. Fakhoury, in his cross-examination of Special Agent

5    Ghio and in his closing, showed you other transactions.  Those

6    are not part of this case.  I submit to you that these are the

7    transactions that you should be looking at and that you should

8    be looking at them for a number of reasons.

9          First of all, the evidence that you can conclude -- the

10   evidence before you shows that you should conclude that the

11   money that the defendant is taking out of Rothenberg Ventures

12   Fund II was not his money.

13         JR Eppler testified as to what the books said.  And the

14   books did not list it as a payment of a management fee.  The

15   books did not list it as payment of expenses.  And I believe

16   that's Exhibit 125.

17         On that day, on July 29th when Rothenberg Ventures

18   Management Company's account sent $300,000 to the defendant's

19   account, we know how that was characterized.  And you'll

20   see -- you see that in Exhibit 125.  It was not characterized

21   as income to Mr. Rothenberg.  In fact, Exhibit 124 lists all

22   of the income that Mr. Rothenberg had received in all of 2014.

23   And if you recall, Exhibit 8 was a letter -- whoops --

24          (Demonstrative published.)

25         **MR. WALDINGER:**  -- from Tom Leep, the director of

1    finance, saying that Mr. Rothenberg had earned only $220,000

2    in the first half of 2014.

3                (Demonstrative published.)

4          MR. WALDINGER:   This is Exhibit 124 that I just

5    talked about.  And this also shows that from January to April

6    of 2014, Mr. Rothenberg only earned in fees to Michael

7    Rothenberg from Rothenberg Ventures Management Company

8    $220,000.

9       Now what's the significance of that?  Well, the

10   significance is that is evidence for you to conclude that that

11   $300,000 that's going from the management company to

12   Mr. Rothenberg on July 29th is not income.  It's not income

13   because it's not listed as a fee paid to him in Exhibit 124.

14      The same goes for the money that flows in June.

15                (Demonstrative published.)

16         MR. WALDINGER:   The $310,000 on June 17th is also not

17   listed as income to Mr. Rothenberg.  And indeed if it were

18   considered income, then it would have -- it would have been

19   included in Tom Leep's letter presumably.

20      The other reason that you know that this is not

21   Mr. Rothenberg's money, or at least not all of it, and that

22   he's running it through just to create -- just to create these

23   accounts -- or these account balances is that he sends the

24   money back.  And there's a little bit of a delta here of

25   75,000.  But the key here is when it comes back to Rothenberg

1    Ventures Fund II, it's replacing it.

2        That is -- that is good evidence to show that

3    Mr. Rothenberg had no claim on this money, that he was

4    borrowing it in order to create a false impression of his

5    assets and liabilities so that he could create, again,

6    Exhibit 10.

7                  (Demonstrative published.)

8            MR. WALDINGER:  I went -- I think I've gone through

9    the five things that I said that I was going to go through.

10   And then I -- and I think that I said I was going to do a

11   conclusion.

12       And so here's my conclusion.

13       At the beginning of the case, when I gave the opening

14   statement, I asked you -- I think there was a slide where I

15   imagined what you might be thinking and said what is this case

16   about?  And then I proceeded -- I proceeded to tell you why we

17   were here.

18       And so it's -- it is now time for you to determine whether

19   the government has met its burden beyond a reasonable doubt

20   for each of the elements of two counts.

21       And, again, the Judge's instructions control.  And your

22   memory of the facts controls.  I've given you already one tool

23   to think about the evidence in this case, and that's the

24   timeline.

25       I'm going to give you another way to maybe -- to maybe

1    look at this in sifting through the evidence.  And I submit to

2    you that maybe one way to look at it is to ask yourself three

3    questions.  Who created this situation?  Who tried to control

4    it?  And who stood to benefit from it?

5        Who created it?  Who tried to control it?  And who stood

6    to benefit from it?

7        So for example, in the context of the Form 1003 and the

8    financial status affidavit that the defendant signed on

9    October -- excuse me -- on August 21st of 2014, whether or not

10   the defendant read those documents that day, I submit to you

11   that three weeks before that, on July 29th of 2014, the

12   defendant took actions in such a way that he knew what those

13   documents were going to say on August 21st of 2014.

14       He set it all in motion earlier that summer.  He created

15   it.  He controlled it.  He controlled what he gave to SVB.

16   And whether SVB, looking back -- and hindsight is 20/20 --

17   whether SVB should have asked for more information is not a

18   defense.  It's what the defendant gave.  He didn't have to

19   give Exhibit 10.

20                    (Demonstrative published.)

21       **MR. WALDINGER:**  He had access to all of his

22   statements at Merrill Lynch, both the CMA and the LMA.  He

23   didn't give SVB those statements because he didn't want SVB to

24   see the movements of money.  He didn't want SVB to know that

25   he'd been carrying a loan balance and indeed was carrying a

1   loan balance during the time of his loan application.

2                      (Demonstrative published.)

3            **MR. WALDINGER:**   The defendant orchestrated this whole

4   thing.   And he did so, so that he could get two loans from SVB

5   totaling more than $1.7 million.

6       The evidence in this case has shown that the defendant

7   told SVB and deceived SVB into believing that he had more

8   liquid cash on hand than he actually did and fewer debts than

9   he actually had.

10      The evidence has shown that the amount of assets that the

11  borrower has, has a natural tendency to influence a bank's

12  decision.   Same goes for liabilities.

13      The evidence shows that the liquid assets and liabilities

14  are both part of the decision-making process.   And the

15  evidence is that the banks need accurate information when

16  making loan decisions.

17      At the end of the day, I submit to you that the evidence

18  is very clear.   The defendant wanted to get two loans from

19  SVB.   To get those two loans, he knowingly and with intent to

20  defraud provided false, misleading, and fraudulent information

21  to SVB.

22      As Mr. Walsh asked you, I'm going to end with asking you

23  to apply the law as given to you by Judge Tigar to the facts

24  of this case and to return a verdict of guilty on Count One,

25  bank fraud, and on Count Two, making false statements to a

1    financial institution.

2        Thank you.

3        **THE COURT:**  Thank you, Mr. Waldinger.

4        Members of the jury, we've gotten to that point in the

5    proceedings where the case will be given to you for a

6    decision.

7        I have so much gratitude for you.  When all is said and

8    done, I'll say more about that.  But it has required a lot of

9    your time to get to this point.  And now it's deliberation

10   time.

11       So I'm going to administer an oath to Ms. Lee.  That's

12   just a ritual we have here in the federal courts.  We're going

13   to convert her from being a courtroom deputy into being a

14   bailiff.  You'll see, it's magical.

15       And then she's going to escort you into the jury room, and

16   she'll give you some instructions and then you can begin your

17   deliberations.

18       As I told you, we are very curious to know what your

19   deliberation schedule will be.  We'd like you to come in at

20   8:30 as you've been doing.  You can just go until 1:30 and

21   leave then if you want.

22       How late could this jury stay, if they wanted, Ms. Lee?

23       **THE CLERK:**  4:30, Your Honor.

24       **THE COURT:**  You can stay as late as 4:30.  Obviously

25   your deliberations are going to take a certain amount of time.

1    The more time you spend on one day is hopefully less time

2    you'd have to spend in the future.

3        But you have other obligations, and I know you've been

4    attending to those during the afternoons.  So you'll talk

5    about it amongst the group and you'll make the decision that's

6    best for all of you.

7        Also, I don't think you have to decide this yet, but if

8    you were still deliberating on Thursday, we would want to know

9    whether you wanted to deliberate on Friday.  Trial is not in

10   session on Friday, but juries can deliberate on that day

11   because it doesn't occupy our courtroom for you to deliberate.

12   So just have that in the back of your mind also.

13       And then the last thing is that of course the schedules

14   don't have to be the same.  You may have already made plans

15   for today.  Today I might get a note back from your foreperson

16   saying the jury's going to stop today at 1:30 but tomorrow

17   it's going to be a different stopping time.  So you can adjust

18   that note and your decision to whatever your circumstances are

19   as a group.

20       Ms. Lee, would you hand me that oath, please.  And would

21   you remain standing and raise your right hand, please.

22                       (Bailiff sworn)

23           **THE COURT:**  Ms. Lee, do you solemnly swear or affirm

24   that you will well and truly keep every person sworn on this

25   jury in some private and convenient place and not suffer any

 1    person to speak to them nor speak to them yourself without

 2    leave of the Court except to ask them whether they have agreed

 3    upon their verdict or until they have been discharged by the

 4    Court, so help you God or so you affirm?

 5              **THE CLERK:**  Yes, sir.

 6              **THE COURT:**  Very good.

 7        Would everyone in this courtroom please rise for this

 8    jury.

 9         (The following proceedings were heard out of the presence

10    of the jury:)

11              **THE COURT:**  Okay.  We're outside the presence of the

12    jury.

13        So, Mr. Waldinger, I'm assuming you have offices in the

14    building somewhere.

15              **MR. WALDINGER:**  (Nods head.)

16              **THE COURT:**  Beg your pardon?

17              **MR. WALDINGER:**  We've been camped out here.  Yes,

18    Your Honor.

19              **THE COURT:**  And, Mr. Fakhoury, I have an attorney

20    lounge to recommend to you.

21              **MR. FAKHOURY:**  Very, very familiar with the lounge.

22              **THE COURT:**  And Mr. Torres.

23        Of course I don't know how quickly we'll get a note or

24    whether we will.  But if -- gentlemen, if you would please

25    give your cell phone numbers to Ms. Lee.  If and when we get a

1   note of any kind, we will notify you right away.

2       Is there anything anyone would like to place on the record

3   before we recess pending the next communication from the jury?

4           MR. WALDINGER:  Nothing, I think, from the

5   government.

6           MR. FAKHOURY:  Nothing to put on the record.

7       I did have a question as to whether the exhibits are

8   there.  And perhaps we just need to make sure that they're

9   getting only the admitted exhibits.

10          THE COURT:  So what I think is going to happen

11  subject to Ms. Lee correcting me is that she's going to hand

12  both of you or all of you the exhibits.  You'll jointly go

13  through those and satisfy yourselves that they're appropriate

14  to go back to the jury.  Then we'll send them back.

15          MR. FAKHOURY:  Sounds good.

16      Nothing further than that, Your Honor.  Thank you.

17          THE COURT:  Hold on, gentlemen.

18                  (Off-the-record discussion.)

19          THE COURT:  Oh, yes.

20      Alternate Juror, I need to bring the alternate juror in

21  and keep them on phone standby.  I just need to have that

22  conversation in open court.

23      If you could bring that person back in.

24      Could you remind me of that person's name.

25          THE CLERK:  That's Mr. Sosa.

```
 1              THE COURT:  Oh, yes.  Okay.  I didn't bring my jury
 2    chart out.
 3              THE CLERK:  I have an extra one here.
 4              THE COURT:  I have Mr. Sosa's questionnaire at the
 5    bench.
 6       Okay.
 7                        (Pause in the proceedings.)
 8              (Alternate Juror Sosa entered the courtroom.)
 9              THE COURT:  Hello, Mr. Sosa.
10              A JUROR:  Hello.
11              THE COURT:  Would you come up front here and just
12    stand next to one of these microphones for a second.
13              A JUROR:  Here?
14              THE COURT:  Yeah.
15       First of all, I want to thank you.  And also I just want
16    to note from your questionnaire, you were born in Guatemala,
17    you became an American citizen, you've been working at PG&E
18    for 15 years.
19              A JUROR:  That's correct.
20              THE COURT:  Ideal.  Ideal.  I thank you for coming in
21    to do your jury service.  I have spoken at immigration
22    ceremonies to new citizens and told them how much I wish they
23    would have an opportunity to serve on a jury.  And I hope your
24    service thus far has been rewarding, and I really want to
25    thank you.
```

```
 1            A JUROR:  My pleasure.
 2            THE COURT:  You're still in alternate status, but
 3    you've got to hang in there.  We don't know.  You know, we
 4    could lose a juror.  It's cold and flu season.  Somebody could
 5    have a family emergency.
 6         So you're essentially on phone standby.  And if something
 7    happens that makes it necessary for me to excuse one of the 12
 8    jurors, you'll be substituted in, and they'll be instructed
 9    they have to start from scratch.  Okay?  And then you'll just
10    become a member of the jury.
11         Unless and until that happens, I'd just like you to give
12    your cell phone number to Ms. Lee.  She might already have it.
13            THE CLERK:  I do.
14            THE COURT:  She's already got it.  And she will just
15    call you.
16         Could you -- if you go back to work at PG&E, is it
17    possible that you could tell them that you might have to leave
18    over the next few days on an hour's notice if that happened?
19            A JUROR:  Yes, it is.
20            THE COURT:  Okay.  Very good.
21         So then that will just be our understanding, your and my
22    understanding.  If we need you, Ms. Lee will call you up and
23    you'll just come down here.
24         If that doesn't happen, I'm not going to see you again.
25    I'm going to write you a letter.  I'm going to write you a
```

1   thank you letter on very fancy judge stationary that has a

2   gold seal on the top.  You can wave that around, see if it

3   impresses anybody.

4       But fortunately, I have the opportunity to say thanks in

5   person.  I hope it comes through how much I love my jurors.

6   And how much I like this process.

7       And I hope if you're not substituted in this time, that at

8   some convenient point in your life in the future, you get the

9   chance to deliberate because I think jury service is a

10  marvelous thing.

11      So anyway thank you very much, Mr. Sosa.  Maybe we'll be

12  in touch.  We'll see.

13          **A JUROR:**  All right.  Thank you.

14          **THE COURT:**  Thank you, sir.

15      (The following proceedings were heard out of the presence

16  of the jury:)

17          **THE COURT:**  All right.  We're once again outside the

18  presence of all of our jurors.  Gentlemen, until we hear

19  further from the jury, court is now in recess.  Thank you.

20          **MR. FAKHOURY:**  Thank you, Your Honor.

21          **MR. WALSH:**  Thank you, Your Honor.

22      (Court in recess at 1:07 P.M. while the jury deliberates.)

23              (Proceedings resumed at 4:40 P.M.)

24      (The following proceedings were heard out of the presence

25  of the jury:)

1          **THE COURT:**  All right.  We're outside the presence of

2     the jury.  The jurors have gone home for the day.

3          At 4:30 p.m. they sent out their first note.

4          The jury indicates that it has the following three

5     questions.  First, what is the legal definition of cheat?

6     Second, are there any restrictions on Mike Rothenberg moving

7     funds from Fund II to his personal account?

8          Number 3.  Are funds from Fund II encumbered?

9          Ms. Lee, who is the presiding juror in this case?

10          **THE CLERK:**  Your Honor, we -- they did not select a

11     presiding juror, but this was signed by Mr. Hailey.

12          **THE COURT:**  I see.  Thank you.

13          **THE CLERK:**  Yes, sir.

14          **THE COURT:**  Well, counsel is just receiving this note

15     now.  So my suggestion would be that we break for the day.

16     It's 4:45.  That counsel work independently to come up with

17     some answers to these questions.  And that you meet and confer

18     with each other to see if you can't negotiate something that

19     you like to eliminate the risk that I'll do something that you

20     don't like as much.  And that we meet tomorrow at 8:00 a.m. to

21     try to arrive at an answer before our jurors get here at 8:30.

22          I got the note before you did.  And I looked very quickly

23     on Westlaw to see if I could find something in the Ninth

24     Circuit that addressed the first question, which is what is

25     the legal definition of "cheat"?

1    It's my view that "cheat" is not a legal word.  So I would

2    take the word "legal" out of the analysis in determining what

3    a definition is.  It's not a term like "intervenor" that --

4    whose definition lives in the law.  The word "cheat" is a word

5    whose definition lives ubiquitously.

6    The only thing I was able to find is this passage from

7    *United States v. Avery*, a 2021 case, although it looks like it

8    was filed in 2007.  And this order was issued by Senior Judge

9    Beistline.  I'll just read it out loud so that it's part of

10   our record.  I've passed out this quotation to everyone in the

11   courtroom.

12   The order says "cheat" is not defined in the model jury

13   instructions.  However, the Supreme Court in *Shaw* equated

14   "cheat" with depriving the bank of something of value.

15   *Merriam-Webster* defines "cheat" as the act or an instance of

16   fraudulently deceiving to violate rules dishonestly and the

17   obtaining of property from another by an intentional act of

18   distortion of the truth.

19   The *Cambridge Dictionary* defines "cheat" as to behave in a

20   dishonest way in order to get what you want.

21   The *Oxford English Dictionary* defines "cheat" as to act

22   dishonestly or unfairly in order to gain an advantage,

23   especially in a game or examination.

24   That quote is from *United States v. Avery*, case number

25   07CR00028, 2021 Westlaw 149676 at page star 3, District of

1    Alaska 2021.

2        I must use a different *Merriam-Webster Dictionary* than

3    Judge Beistline.  The *Merriam-Webster Dictionary* that I keep

4    in chambers is the *Merriam Webster's Collegiate Dictionary*

5    Eleventh Edition.

6        I chose that edition because I took, as part of my

7    judicial education, a writing class from Bryan Garner.  I

8    don't agree with everything Mr. Garner says about writing, or

9    a lot of the other things, for that matter.  But he has a very

10   sensible suggestion which is let's all use the same

11   dictionary.  Let's just have a dictionary that we all agree

12   will serve the purposes of defining our language.  Now, this

13   is the one he recommended.

14       So one week after the class, I bought it.  And it's the

15   dictionary that I keep in chambers.  Although I also have the

16   two volume *Oxford Dictionary* from the late '80s whose

17   relevance dissipates mildly with each passing year.

18       The *Merriam Webster's Collegiate Dictionary*, in its first

19   definition of "cheat," says "to deprive of something valuable

20   by the use of deceit or fraud."

21       Not having thought about it for very long, it seems to me

22   that definition is better than any of the definitions in

23   Judge Beistline's order.  So I'll say it again.

24       To deprive of something valuable by the use of deceit or

25   fraud.

1    I say that with no finality because of course I haven't

2  heard from any of you.

3    Is there anything else anybody wants to put on the record,

4  including any comment about my proposal that we meet tomorrow

5  at 8:00 a.m.?

6        **MR. WALDINGER:**  We will be prepared to be -- we will

7  be here at 8:00 a.m., Your Honor.  We'll try to meet and

8  confer with Mr. -- we will meet and confer with Mr. Fakhoury

9  before then.

10        **THE COURT:**  I'll say one more thing, one more off the

11  cuff thing, and then you'll straighten me out at 8:00 a.m.

12  tomorrow.

13    The second two questions just seem like disputes of fact.

14  I mean there's some judicial way of saying to the jury, "I

15  don't know, what do you think?"  But maybe you see another

16  path.

17    Mr. Fakhoury, anything further?

18        **MR. FAKHOURY:**  No, Your Honor.  I think meeting at

19  8:00 a.m. is just fine.  And I'll -- I'll definitely -- we'll

20  meet and confer tonight before then.

21        **THE COURT:**  Very good.  I apologize if you were

22  looking forward tomorrow finally to being able to spend a few

23  more minutes on the Peloton before you got to court.  But

24  we'll all meet up at 8:00 a.m.  Court's in recess.

25        **THE CLERK:**  Your Honor?

1          **THE COURT:**  Oh, wait a second.

2      Ms. Lee.

3          **THE CLERK:**  Just wanted to make a point of

4  clarification that juror note number two is the one that we

5  were discussing.  The first one was their schedule.

6          **THE COURT:**  I see.

7          **THE CLERK:**  I gave to the parties off the record.

8          **THE COURT:**  I see.  Yeah, it says note number one.

9          **THE CLERK:**  Yes.  He -- two different jurors filled

10  out the first and second notes.  So of course they have

11  different --

12          **THE COURT:**  I see.

13          **THE CLERK:**  I apologize for that, Your Honor.

14          **THE COURT:**  For the record, the note delivered at

15  4:30 p.m. is note number two.

16      Now court is in recess.

17          **MR. WALDINGER:**  Thank you, Your Honor.

18          **MR. FAKHOURY:**  Thank you, Your Honor.

19          **THE CLERK:**  Court is in recess.

20          (Proceedings were concluded at 4:54 P.M.)

21                              --o0o--

22

23

24

25

1

2

3          **CERTIFICATE OF REPORTER**

4

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7    I further certify that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in which this

9    hearing was taken, and further that I am not financially nor

10   otherwise interested in the outcome of the action.

11

12   _____

13         Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14                Tuesday, November 15, 2022

15

16

17

18

19

20

21

22

23

24

25