1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  KYLE F. WALDINGER (CABN 298752)
   NICHOLAS J. WALSH (CABN 314290)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7200
        Fax: (415) 436-7234
8       Email: Kyle.Waldinger@usdoj.gov
        Email: Nicholas.Walsh@usdoj.gov
9
   Attorneys for the United States of America
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                         OAKLAND DIVISION
13

14  UNITED STATES OF AMERICA,            )  CASE NO. 20-CR-00266 JST
                                         )
15          Plaintiff,                   )  UNITED STATES' OPPOSITION TO
                                         )  DEFENDANT'S RULE 29(c) MOTION FOR
16      v.                               )  JUDGMENT OF ACQUITTAL ON COUNTS ONE
                                         )  AND TWO
17  MICHAEL BRENT ROTHENBERG,            )
            a/k/a MIKE ROTHENBERG,       )
18                                       )  Hearing Date:    February 10, 2023
            Defendant.                   )  Hearing Time:    9:30 a.m.
19  _____ )

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND ........................................ 1

LEGAL STANDARD ...................................................................................................... 3

ARGUMENT ................................................................................................................ 5

I.     Rothenberg Has Failed to Show "Good Cause" for the Late Filing of His Motion ............................................................................................................. 5

         A.     Although Rothenberg Filed His Motion 43 Days Late, the Prejudice is Not Great .......................................................................................... 6

         B.     Rothenberg's Counsel Acted in Good Faith ............................................. 6

         C.     Rothenberg's Reason for Missing the Deadline was Entirely Within His Control and Does Not Amount to "Good Cause" to Extend the Deadline Based on Excusable Neglect ................................................. 7

II.    The Evidence Has Not Changed Since the Court Denied Rothenberg's Rule 29 Motions After the Close of the Government's Evidence and After the Close of Rothenberg's Evidence ............................................................................. 8

III.    The Evidence Introduced at Trial Proved Every Element of Counts One and Two of the Indictment .................................................................................... 9

         A.     There was Sufficient Evidence for a Rational Factfinder to Conclude that Rothenberg Knowingly Made a False Statement to SVB .................... 10

         B.     There was Sufficient Evidence to Conclude that Rothenberg's Misrepresentations and False Statements were Material ........................ 16

         C.     There was Sufficient Evidence to Conclude that Rothenberg Intentionally Executed a Scheme to Defraud .......................................... 19

CONCLUSION .......................................................................................................... 21

1

## <u>TABLE OF AUTHORITIES</u>

2

### <u>Cases</u>

3

*California Advocates for Nursing Home Reform, Inc. v. Chapman*,
4     2014 WL 2450949 (N.D. Cal. June 2, 2014) (Tigar, J.) ........................................................ 8

5     *Eberhart v. United States*,
      546 U.S. 12 (2005) ................................................................................................................. 4
6

*Engleson v. Burlington N.R. Co.*,
7     972 F.2d 1038 (9th Cir. 1992) .............................................................................................. 8

8     *Gonzalez v. Wells Fargo Bank, N.A.*,
      2014 WL 93930 (N.D. Cal. Jan. 9, 2014) (Tigar, J.) ............................................................ 7
9

*Holland v. United States*,
10    348 U.S. 121 (1954) .............................................................................................................. 12

11    *Jackson v. Virginia*,
      443 U.S. 307 (1979) ............................................................................................................... 4
12

*Pincay v. Andrews*,
13    389 F.3d 853 (9th Cir. 2004) ................................................................................................ 7

14    *Pioneer Investment Services Co. v. Brunswick Associates*,
      507 U.S. 380 (1993) ............................................................................................................... 6
15

*Rahimi v. San Francisco Municipal Transp. Agency*,
16    2017 WL 5665405 (N.D. Cal. Nov. 27, 2017) (Tigar, J.) ................................................ 7, 8
17

*United States v. Andrino-Carillo*,
18    63 F.3d 922 (9th Cir. 1995), *cert. denied*, 516 U.S. 1064 (1996) ....................................... 4
19

*United States v. Eaglin*,
20    571 F.2d 1069 (9th Cir. 1977) .............................................................................................. 4

21    *United States v. Gomez-Gutierrez*,
      140 F.3d 1287 (9th Cir. 1998) ............................................................................................ 13
22

*United States v. McGowan*,
23    2012 WL 13109973 (C.D. Cal. Apr. 16, 2012) .................................................................. 6

24    *United States v. Nelson*,
      419 F.2d 1237 (9th Cir. 1969) .............................................................................................. 4
25

26    *United States v. Nevils*,
      598 F.3d 1158 (9th Cir. 2010) .............................................................................................. 4
27

28    *United States v. Powell*,
      164 Fed. Appx. 720 (10th Cir. 2006) .................................................................................. 15

*United States v. Prairie Pharmacy, Inc.*,
   921 F.2d 211 (9th Cir. 1990) ................................................................................................ 7

*United States v. Reyes-Alvarado*,
   963 F.2d 1184 (9th Cir. 1992) ............................................................................................. 4

*United States v. Santos*,
   527 F.3d 1003 (9th Cir. 2008) ........................................................................................... 12

*United States v. Snider*,
   180 F. Supp. 3d 780 (D. Or. 2016) .................................................................................... 13

*United States v. Sosa*,
   608 Fed. Appx. 464 (9th Cir. 2015) ................................................................................... 13

*United States v. Wiseman*,
   274 F.3d 1235 (9th Cir. 2001) ........................................................................................... 13

*United States v. Wong*,
   2014 WL 923347 (N.D. Cal. Mar. 5, 2014) (Chen, J.) ...................................................... 12

*United States v. Wong*,
   603 Fed. Appx. 639 (9th Cir. 2015) ................................................................................... 12

*United States v. Zhang*,
   590 Fed. Appx. 663 (9th Cir. Nov. 5, 2014) ...................................................................... 13

## **Statutes**

18 U.S.C. § 1014 ...................................................................................................................... 9

18 U.S.C. § 1344 ...................................................................................................................... 9

## **Rules**

Fed. R. Crim. P. 29 ....................................................................................................... 1, 3, 4, 5, 13

Fed. R. Crim. P. 45 ............................................................................................................. 4, 5, 6

## INTRODUCTION

The United States respectfully submits its Opposition to the Defendant's Rule 29(c) Motion for Judgment of Acquittal on Counts One and Two. *See* Dkt. 219. In November 2022, the Court denied Defendant Michael Rothenberg's prior two motions for acquittal made pursuant to Federal Rule of Criminal Procedure 29 because the Court found that the United States had introduced sufficient evidence at trial for a rational jury to find that it had proved all of the elements of Counts One and Two. Nothing has changed since the Court made those rulings except that Rothenberg failed to meet the procedural deadline to renew his Rule 29 motion. Thus, as explained below, the Court should deny Rothenberg's untimely motion.

## RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Rothenberg is charged with 23 counts in the Indictment. *See* Dkt. 15 ("Indict."). On October 25, 2021, after briefing and argument, the Court granted Rothenberg's motion to sever certain counts in part, and severed Counts One and Two from Counts Three to Twenty-Three. *See* Dkt. 101. Separate trial dates were set thereafter.

Counts One and Two of the Indictment allege that Rothenberg engaged in a scheme to defraud, and made false statements to, Silicon Valley Bank ("SVB"). Those charges relate to two loans that Rothenberg applied for and received from SVB in August 2014. One of those loans was a $1.48 million "cash out" mortgage refinancing loan for Rothenberg's condominium located on Bryant Street in San Francisco. The other loan was a $300,000 cash loan intended to help Rothenberg make a capital contribution to one of the venture capital funds he managed and for which he acted as the general partner. *See* Indict. ¶¶ 28.a & 28.g. Both loans are the subject of Count One. Only the mortgage refinancing loan is at issue in Count Two.

Trial as to Counts One and Two of the Indictment commenced on October 31, 2022. *See* Dkt. 175. The government presented testimony from 10 witnesses and admitted 95 exhibits. Count One alleges that Rothenberg engaged in a scheme to defraud SVB by misrepresenting his liabilities and assets to SVB. *See* Indict. ¶ 28. The government proved at trial that Rothenberg took actions in order to create an end-of-month Merrill Lynch statement – the much-discussed Exhibit 10 – that falsely gave

SVB the impression that Rothenberg had personal wealth sufficient to justify issuing him the two loans under particular terms. Rothenberg's movement of funds between bank accounts – not all of which were his – made it appear that he had more unrestricted assets and fewer liabilities than he actually had. In particular, Rothenberg made many transactions to obtain Exhibit 10 (a summary Merrill Lynch statement), which he then provided to SVB in early August 2014. Exhibit 10 purported to show that Rothenberg had a $370,062.33 positive balance in his Merrill Lynch cash management account (CMA) and an outstanding balance of $0 in his Merrill Lynch loan management account (LMA), neither of which was an accurate depiction of his personal financial status at the time he submitted Exhibit 10.

Numerous Bank of America, Merrill Lynch, and SVB bank and brokerage statements were admitted at trial to demonstrate Rothenberg's movement of funds between accounts. These trial exhibits included (1) Exhibits 73 through 75 and 91 (showing movements of money in and out of Rothenberg's personal Bank of America account between May and September 2014); (2) Exhibits 47 through 52 (showing movements of money in and out of Rothenberg's Merrill Lynch CMA and LMA between June and August 2014); and (3) Exhibits 85 and 86 (showing movements of money in and out and between the bank accounts of Rothenberg Ventures Fund II and Rothenberg Ventures Management Company).

Rothenberg also made additional misrepresentations to SVB. Among other things, he submitted a series of financial documents to SVB, including a couple of Uniform Residential Loan Applications (or "Form 1003"), the last of which was signed by Rothenberg on August 21, 2014. *See, e.g.*, Exs. 2 and 25. Also on August 21, 2014, Rothenberg submitted to SVB a Financial Status Affidavit affirming that the financial status that Rothenberg had previously represented to SVB had not changed. *See* Ex. 26.

Count Two related to Rothenberg's false representations to SVB that he had but $73,000 in non-real-estate-related liabilities and $370,000 in "liquid" assets, and that his financial status had not significantly changed. At trial, the government presented substantial evidence that in fact Rothenberg had an additional undisclosed liability to Merrill Lynch in the amount of about $350,000, that his deposits at Merrill Lynch were nearly entirely illiquid, and that his financial situation on August 21, 2014, was markedly different that at the beginning of the month. This evidence came, again, in the form of numerous Bank of America, Merrill Lynch, and SVB statements. Significantly, the United States introduced Exhibit 49 and Exhibit 52, which were Rothenberg's Merrill Lynch statements for his LMA

and CMA that covered the period of Rothenberg's loan application. Those records showed that, despite the representations made by Rothenberg to SVB in the documents he signed on August 21, 2014, Rothenberg had a $350,000 balance in his LMA, meaning that he had a liability of that amount to Merrill Lynch. *See also* Tr. at 606-07 (Kelty testimony that LMA balance was likely $350,000 on August 21, 2014). Moreover, that liability meant that Rothenberg's CMA balance of roughly $370,000 was entirely or nearly entirely encumbered and that he would not be able to withdraw the vast majority of the funds in his CMA. *See* Tr. at 485, 492-94 (Kelty testimony that Merrill Lynch would allow individuals to borrow up to 95% of value of cash on deposit). Applying the math means that more than $368,400 of Rothenberg's CMA was not liquid because that amount was needed to secure his LMA. Rothenberg made these false representations to SVB for the purpose of influencing the bank.

The United States rested on November 14, 2022. *See* Dkt. 200. As described below in greater detail, Rothenberg then moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Rothenberg did not present a defense. *See* Tr. at 1410. He renewed his Rule 29 motion at the close of the defense case. *See id.* The Court denied both motions and sent the case to the jury. *See* Tr. at 1412-13.

On November 17, 2022, after three days of deliberations, the jury could not reach a verdict, and the Court declared a mistrial and discharged the jury. *See* Dkt. 205.

On December 16, 2022, Rothenberg raised with the Court at a status hearing his desire to file a new Rule 29 motion. Pursuant to a stipulated briefing schedule, *see* Dkt. 217, Rothenberg filed his pending Rule 29 Motion on January 13, 2023, 57 days after the Court discharged the jury. *See* Dkt. 219.

## LEGAL STANDARD

Rule 29(c) of the Federal Rules of Criminal Procedure states in pertinent part as follows:

> A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later. . . . If the jury has failed to return a verdict, the court may enter a judgment of acquittal.

Fed. R. Crim. P. 29(c)(1) & (2). The standard for judgment of acquittal is the same regardless of when the motion is made. The Court is to direct acquittal if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

It is well settled that the Court must deny the defendant's Rule 29 motion if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (quoting *Jackson*); *United States v. Andrino-Carillo*, 63 F.3d 922, 924 (9th Cir. 1995), *cert. denied*, 516 U.S. 1064 (1996) ("All reasonable inferences from the facts must be drawn in favor of the Government.") (citing *Jackson*). Under this standard, a district court must bear in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969). This means that "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164 (citing *Jackson*, 443 U.S. at 326); *see also id.* at 1165 ("'[i]n determining the sufficiency of circumstantial evidence, the question is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion'") (quoting *United States v. Eaglin*, 571 F.2d 1069, 1076 (9th Cir. 1977)); *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992) ("circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction") (citation omitted). However, "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element." *Nevils*, 598 F.3d at 1167.

The 14-day period for the filing of a Rule 29 motion after discharge of the jury is not jurisdictional. Rather, it is a claims-processing rule. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) ("Rule 33, like Rule 29 and Bankruptcy Rule 4004, is a claim-processing rule – one that is admittedly inflexible because of Rule 45(b)'s insistent demand for a definite end to proceedings. These claim-processing rules thus assure relief to a party properly raising them, but do not compel the same result if the party forfeits them."). The 14-day time limit under Rule 29 may be extended under Federal Rule of Criminal Procedure 45, which provides that the "court on its own may extend the time." Fed. R. Crim. P. 45(b)(1). Rule 45 also provides that a court may extend the time "for good cause" on a

1   defendant's motion brought "after the time expires if the party failed to act because of excusable

2   neglect." Fed. R. Crim. P. 45(b)(1)(B). The specific standards that courts apply in determining whether

3   such "good cause" exists are discussed in more detail in the Argument Section, *infra*.

4

5                                                    **ARGUMENT**

6           This Court presided over the jury trial, as well as the pretrial motion practice. The Court

7   is, therefore, extremely familiar with the legal issues in this case and the evidence presented at

8   trial. Simply put, the evidence at trial was sufficient to sustain a conviction on both Count One and

9   Count Two, particularly if, as they must be, all reasonable inferences from the facts are drawn in favor

10  of the government.

11          Rothenberg's current Rule 29 Motion fails to follow the legal standard for evaluating a motion

12  for a judgment of acquittal. He ignores evidence and routinely casts evidence he does not ignore in the

13  light most favorable to himself. Doing so is plainly wrong. Thus, Rothenberg's motion for a judgment of

14  acquittal should be denied for all of the following reasons. First, Rothenberg's pending Rule 29 Motion

15  missed the deadline for submission set out in Rule 29, and while the deadline can be extended for good

16  cause, Rothenberg did not miss the deadline as a result of excusable neglect. Second, the evidence has

17  not changed from when the Court denied Rothenberg's prior Rule 29 motions, first made at the close of

18  the government's case and then renewed after Rothenberg declined to present a case. Thus, the reasons

19  the Court found convincing and that justified denial in November 2022 remain unchanged. Finally, on

20  the merits, a rational jury, taking the evidence introduced at trial in the light most favorable to the United

21  States, could have found that the United States proved every element of both counts at trial.

22  **I.      Rothenberg Has Failed to Show "Good Cause" for the Late Filing of His Motion**

23          As noted above, Rule 29 provides that a defendant must make a motion for judgment of acquittal

24  after a mistrial "within 14 days . . . after the court discharges the jury." Fed. R. Crim. P. 29(a). In this

25  case, the Court discharged the jury on November 17, 2022. Accordingly, Rule 29 required Rothenberg

26  to file his Rule 29 motion by December 1, 2022.[1] Instead, Rothenberg filed his new Rule 29 motion 57

27

28          [1] Rothenberg states that the deadline for filing his Rule 29 motion was December 2, 2022. *See*
    Dkt. 219, at 3:22-23. Although the Rule "exclude[s] the day of the event that triggers the period" (*i.e.*,

1    days after the court discharged the jury, making it 43 days late. Rothenberg argues, however, that the

2    Court should extend the time to file a motion for judgment of acquittal because his failure to file such a

3    motion timely was due to his trial counsel's "excusable neglect." *See* Dkt. 219, at 3-7.

4           Under Rule 45 of the Federal Rules of Criminal Procedure, "[w]hen an act must or may be done

5    within a specified period, the court on its own may extend the time, or for good cause may do so on a

6    party's motion made . . . after the time expires if the party failed to act because of excusable neglect."

7    Fed. R. Crim. P. 45(b). In determining whether a defendant has demonstrated "excusable neglect,"

8    courts in the Ninth Circuit have looked to the Supreme Court's decision in *Pioneer Investment Services*

9    *Co. v. Brunswick Associates*, 507 U.S. 380 (1993). For purposes of the instant motion, those factors can

10   be set forth as follows: (1) the reason for delay and whether the delay was within the defendant's

11   control; (2) prejudice to the government; (3) the length of the delay and its impact on judicial

12   proceedings; and (4) good faith. *See United States v. McGowan*, 2012 WL 13109973, at *3 (C.D. Cal.

13   Apr. 16, 2012). As set forth below, a balancing of the *Pioneer* factors in light of the facts of this case

14   demonstrates that the defendant has not demonstrated excusable neglect for his tardy filing.

15       **A.**   **Although Rothenberg Filed His Motion 43 Days Late, the Prejudice is Not Great**

16          The United States concedes that the length of delay – even though 57 days is four times Rule

17   29's 14-day deadline – was not so great as to prejudice the government significantly. Nevertheless, with

18   respect to prejudice, the government is endeavoring to prepare for the next trial in this case. Responding

19   to Rothenberg's untimely motion requires the expenditure of time that could otherwise be spent

20   preparing for that July 2023 trial, as well as preparing other investigations for charging or declination

21   and other cases for trial.

22       **B.**   **Rothenberg's Counsel Acted in Good Faith**

23          With respect to good faith, there is no evidence from which either the government or the Court

24   could conclude that defense counsel is acting in bad faith, or that counsel purposefully ignored looking

25   at Rule 29 in order to gain some tactical advantage.

26   ─────────────────────

27   November 17, 2022), it provides that all following days (including every intermediate Saturday, Sunday, and legal holiday) are counted. *See* Fed. R. Crim. P. 45(a)(1); *see also* Fed. R. Crim. P. 45(a)(4) (providing that "last day" of period ends, "for electronic filing, at midnight of the court's time zone").

28   Accordingly, December 1, 2022, was Rothenberg's deadline to file a timely Rule 29 motion.

1

### C.   Rothenberg's Reason for Missing the Deadline was Entirely Within His Control and Does Not Amount to "Good Cause" to Extend the Deadline Based on Excusable Neglect

2

3   That leaves the first factor set forth above: the reason for the delay and whether the delay was in

4   the control of the defendant. In considering this factor, other courts have noted that "[g]enerally,

5   counsel's carelessness or ignorance of the law does not constitute excusable neglect." *Pincay v.*

6   *Andrews*, 389 F.3d 853, 857 (9th Cir. 2004) ("[I]nadvertence, ignorance of the rules, or mistakes

7   construing the rules do not usually constitute 'excusable' neglect.") (citing *Pioneer*). In fact, the Ninth

8   Circuit has specifically held that "a mistake of counsel does not constitute excusable neglect." *United*

9   *States v. Prairie Pharmacy, Inc.*, 921 F.2d 211, 213 (9th Cir. 1990). The Ninth Circuit in *Pincay*

10   nevertheless noted that, in determining whether a lawyer's carelessness constituted "excusable neglect,"

11   a district court could consider "factors such as whether the lawyer had otherwise been diligent, the

12   propensity of the other side to capitalize on petty mistakes, the quality of representation of the

13   lawyers . . . , and the likelihood of injustice." *Pincay*, 389 F.3d at 859. *But see id.* at 859-60 (stating that

14   "a lawyer's failure to read an applicable rule is one of the least compelling excuses that can be offered"

15   and that "a lawyer's mistake of law in reading a rule of procedure is not a compelling excuse").

16   This Court has previously noted that the reason for the delay in making a required filing can be

17   an "important factor" in applying *Pioneer* and determining whether a litigant has shown excusable

18   neglect. *See Rahimi v. San Francisco Municipal Transp. Agency*, 2017 WL 5665405, at *3 (N.D. Cal.

19   Nov. 27, 2017) (Tigar, J.); *see also Gonzalez v. Wells Fargo Bank, N.A.*, 2014 WL 93930, at *4 (N.D.

20   Cal. Jan. 9, 2014) (Tigar, J.) (noting that, "[w]hile courts certainly should consider all of the *Pioneer*

21   factors in finding whether excusable neglect is established, *Pioneer* contemplates a balancing test in

22   which no one factor is determinative") (citing *Pincay*, 389 F.3d at 860 (Berzon, J., concurring)); *id.*

23   (concluding that Bankruptcy Court did not abuse its discretion in concluding that "failure to satisfy the

24   third [*Pioneer*] factor [*i.e.*, the reason for the delay] outweighed the other three factors").

25   In *Rahimi*, this Court found that a plaintiff had not established excusable neglect for his failure to

26   file an opposition to the defendant's summary judgment motion. The Court made that no-excusable-

27   neglect finding despite the plaintiff's dyslexia, inability to afford proper legal representation, and need to

28   care for his sick father, and despite the fact that the plaintiff's family members did not have the time or

1   experience to assist him. *See Rahimi*, 2017 WL 5665405, at *3. The Court held that such hardships "do

2   not excuse the failure to meet a court deadline or seek an extension." *Id.* Significantly, the Court also

3   noted that the plaintiff had prior "experience with filing deadlines." *Id.*

4        Similarly, in *California Advocates for Nursing Home Reform, Inc. v. Chapman*, 2014 WL

5   2450949 (N.D. Cal. June 2, 2014) (Tigar, J.), this Court held that the plaintiffs' argument that they were

6   "unaware of the pleading and standing requirements of federal law," *id.* at *2, and that the Court should

7   therefore find excusable neglect for their failure to plead causation with specificity, *see id.* at *1-*2,

8   were insufficient to support a finding of excusable neglect. The Court noted that "[i]t is well settled that

9   ignorance of the law does not constitute excusable neglect." *Id.* at *2 (citing *Engleson v. Burlington N.R.

10  Co.*, 972 F.2d 1038, 1043 (9th Cir. 1992)).

11       In this case, the reason for the delay – counsel's ignorance of the precise provisions of Rule 29 –

12  cannot establish excusable neglect under *Pioneer* and the jurisprudence applying the factors set forth in

13  that case. It is undisputed that Rothenberg's counsel is a very experienced lawyer who has abundant

14  case, litigation, and trial experience. Counsel had long been aware of Rule 29, and he made Rule 29

15  motions at the appropriate junctures during the course of the trial. Indeed, upon re-reading the specifics

16  of Rule 29, counsel recognized that its dictates were clear; in other words, Rule 29's 14-day time limit is

17  not vague or arguably indeterminate. Simply put, if this factual situation supports a finding of *excusable*

18  neglect, then there is arguably no situation where excusable neglect could not be found where a

19  defendant does not act in bad faith.

20       For all of these reasons, the government requests that the Court find that Rothenberg has not

21  established excusable neglect and deny his Rule 29 motion as untimely.

22  **II.    The Evidence Has Not Changed Since the Court Denied Rothenberg's Rule 29 Motions
23           After the Close of the Government's Evidence and After the Close of Rothenberg's
             Evidence**

24       On November 14, 2022, the United States ended its presentation of evidence at trial and rested.

25  *See* Tr. at 1410, ln. 2. When the Court asked whether Rothenberg wished to present a defense,

26  Rothenberg moved for a judgment of acquittal, rested without presenting evidence, and moved again

27  pursuant to Rule 29: "Your Honor, first I would make a motion under Rule 29. And then second, no, we

28  do not have any witnesses to call. And I would renew my Rule 29 motion." Tr. at 1410, lns. 8-10. As

1    these motions were made in front of the jury, the Court deferred consideration of both motions. *See* Tr.

2    at 1410, lns. 11-12.

3    Shortly thereafter, outside the presence of the jury, the Court returned to Rothenberg's two Rule

4    29 motions. *See* Tr. at 1412. Rothenberg then argued for a judgment of acquittal pursuant to Rule 29 "as

5    to each and every element, and beyond that I don't wish to be heard on that." Tr. at 1412, lns. 13-15.

6    The United States briefly replied, and the Court concluded: "The defendant has not made any argument

7    regarding any specific element, and the Court will deny the motion. I don't think you need to be heard

8    further." Tr. at 1412, ln. 24 to 1413, ln. 1.

9    The evidence has not changed in any way since the Court denied Rothenberg's prior Rule 29

10   motions. All that has happened is that the sitting jury failed to reach a verdict. The Court should

11   therefore follow its prior ruling and deny the pending Rule 29 motion. As explained below, the Court's

12   prior denial of Rothenberg's Rule 29 motion was correct in every way.

13   **III.   The Evidence Introduced at Trial Proved Every Element of Counts One and Two of the**
14   **Indictment**

15   As described below, a rational jury could have found that the United States had introduced

16   evidence at trial that proved every element of Bank Fraud[2] and Making False Statements to a Financial

17   Institution[3] beyond a reasonable doubt. In his pending Rule 29 Motion, Rothenberg does not challenge

18   many of the elements, but contends that no rational factfinder could have found a few of those elements,

19

---

20   [2] Count One alleged Bank Fraud, pursuant to 18 U.S.C. § 1344. The elements of Bank Fraud are:
     (1) the defendant knowingly executed, or attempted to execute, a scheme to defraud Silicon Valley
21   Bank, a financial institution, as to something of value, or a scheme or plan to obtain money or property
     from Silicon Valley Bank by making false statements or promises; (2) the defendant knew that the
22   statements or promises were false; (3) the statements or promises were material; that is, they had a
     natural tendency to influence, or were capable of influencing, a financial institution to part with money
23   or property; (4) the defendant acted with the intent to defraud Silicon Valley Bank, that is, with the
     intent to deceive and cheat; and (5) Silicon Valley Bank was insured by the Federal Deposit Insurance
24   Corporation ("FDIC"), or was an organization which finances or refinances any debt secured by an
     interest in real estate, including private mortgage companies and any subsidiaries of such organizations,
25   and whose activities affect interstate or foreign commerce.
     [3] Count Two alleged Making False Statements to a Financial Institution, pursuant to 18 U.S.C.
26   § 1014. The elements are: (1) the defendant made a false statement or report to a federally insured
27   financial institution; (2) the defendant made the false statement or report knowing it was false; and
     (3) the defendant did so for the purpose of influencing in any way the action of the financial institution.
28

namely: (1) that Rothenberg made false statements or reports to SVB knowing they were false; (2) that any of the statements, if false, were material to SVB; and (3) that Rothenberg had the intent to defraud SVB or executed a scheme to defraud SVB. He is wrong: the admitted evidence as to each of these elements was sufficient for a finding of guilt beyond a reasonable doubt, particularly if all inferences are drawn, as they must be, in favor of the United States.

**A.     There was Sufficient Evidence for a Rational Factfinder to Conclude that Rothenberg Knowingly Made a False Statement to SVB**

Rothenberg first argues that there was insufficient evidence that he "knowingly" made any false statement to SVB. Dkt. 219, at 7:13-14. Indeed, he spends the bulk of the merits portion of his motion discussing why there was insufficient evidence to conclude that he acted "knowingly." *See id.* at 7-11.

**1.     There Was Sufficient Evidence of Falsity**

To begin, the United States notes that Rothenberg makes virtually no argument contending that his statements to SVB were not, in fact, false. Most of what he says on this score is in Section B.1's last paragraph, where he avers that "the government failed to prove . . . that any false statement was made." *Id.* at 11:26; *see also id.* at 10:16-18 (stating that evidence showed that Rothenberg's "financial situation had not changed significantly"). But Rothenberg cannot seriously contend that there was insufficient evidence to conclude that he made multiple false and misleading statements to SVB. For example, the government presented evidence that showed that, in early August 2014, Rothenberg provided SVB with Exhibit 10, which was a Merrill Lynch printout showing that he had a $370,062.33 positive balance in his Merrill Lynch CMA and an outstanding balance of $0 in his Merrill Lynch LMA. In truth, the evidence presented shows that, by the time Rothenberg submitted Exhibit 10 to SVB in early August 2014, he had already drawn down his LMA to the tune of $350,000 and that the state of affairs displayed in Exhibit 10 had lasted for only a few days. *See* Exs. 48 & 49. These transactions meant that nearly all of the $370,000 in Rothenberg's CMA was not "liquid" and that he had $350,000 in liabilities at Merrill Lynch as of August 21, 2014. Yet, the Uniform Residential Loan Application (URLA) (Exhibit 25) that Rothenberg signed on that date stated that he had $370,000 in "liquid" assets at Merrill Lynch and that all of his liabilities amounted to only about $73,000. Accordingly, a rational finder of fact could conclude that the URLA contained multiple false statements.

Similarly, Rothenberg signed a Financial Status Affidavit on August 21, 2014, averring that his "financial status (such as [his] employment, income, assets, debts, expenses, credit obligations, etc.) ha[d] not changed significantly and accurately reflect[ed his] current financial status." Ex. 26. Again, because Rothenberg's liabilities to Merrill Lynch had increased by $350,000 since he began the loan application with SVB in early August 2014, *see, e.g.*, Ex. 2 (first Form 1003), and because he no longer had $370,000 in liquid assets in his Merrill Lynch CMA, a rational factfinder could conclude that his financial status had, in fact, changed significantly, and that, therefore, Rothenberg's Affidavit constituted another false statement.

There are several problems with Rothenberg's suggestion that his financial status had not significantly changed and that Rothenberg always carried a "liquid" cash balance in his CMA. *See* Dkt. 219, at 10:16-28. As an initial matter, Rothenberg is simply wrong that his CMA month-end balance was always "liquid"; his CMA was decidedly not "liquid" at the end of June 2014. *See* Exs. 47 & 50 (showing $350,000 month-end LMA balance, which would have rendered CMA balance illiquid). Moreover, the fact that Rothenberg's *month-end* LMA balance in August was $0 is irrelevant to the question of what that balance was at the time he signed the loan documentation on August 21, 2014. The evidence clearly shows that that balance was then $350,000. *See* Ex. 40, at 2; Tr. at 606-07 (Kelty testimony that LMA balance was likely $350,000 on August 21). Indeed, the evidence showed that Rothenberg paid off the LMA balance (which SVB did not know he had) with SVB's money. *See* Ex. 52, at 5 (deposit of $608,104.47 in loan proceeds, followed by payment of $350,992.45 to LMA); *see also* Ex. 49, at 2-3 (transfer of $350,992.45 toward payment of LMA balance and accrued interest).

In short, Rothenberg cannot contend, and does not really attempt to contend, that there was insufficient evidence for a jury to conclude that his statements to SVB on August 21, 2014, were false under both of the charged statutes. Indeed, there was sufficient evidence upon which a jury could conclude that Rothenberg's *entire* course of conduct vis-à-vis SVB was false and misleading, contained false statements and statements of half-truths, and was devised and intended to deceive SVB into believing that he had more cash on hand and fewer liabilities than he actually had because of the way that Rothenberg moved money (that was not his) out of the Rothenberg Ventures Fund II bank account in order to create the $0 LMA balance that he portrayed to SVB in Exhibit 10.

### 2.      There Was Sufficient Evidence of Rothenberg's Knowledge of the Falsity

As noted above, the main thrust of Rothenberg's argument is that he did not "knowingly" make any false statement to SVB. Of course, knowledge and intent are classically incapable of direct proof and often have to be inferred from a defendant's conduct, statements, and all of the surrounding circumstances. *See United States v. Santos*, 527 F.3d 1003, 1009 (9th Cir. 2008) (noting that "direct proof of fraudulent intent is rarely available") (citation and quotation omitted); *United States v. Wong*, 2014 WL 923347, at *5 (N.D. Cal. Mar. 5, 2014) (Chen, J.), *aff'd*, 603 Fed. Appx. 639 (9th Cir. 2015) ("Intent or knowledge is rarely provable with direct evidence") (citing cases); *cf. Holland v. United States*, 348 U.S. 121, 139-40 (1954) (circumstantial evidence need not conclusively exclude every other reasonable hypothesis). Here, there was sufficient evidence upon which a rational finder of fact could conclude that Rothenberg knew that the statements that were made to SVB were false.

As an initial matter, Rothenberg's argument that there was "no evidence" that he "read and understood the documents he signed" that contained the false statements or that he received those "documents before the signing session," Dkt. 219, at 7:24-26, fails to consider the actual evidence presented. Rothenberg ignores that a factfinder could rely on Rothenberg's own signature on the documents to conclude that he in fact had "read and understood" those documents. Indeed, one of Rothenberg's signatures appears below the attestation that he "specifically represents to Lender . . . and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature." Ex. 25, at 3. It is rational for a factfinder to conclude that Rothenberg's signature was evidence of his knowledge both of that attestation and of the substance of the document to which he was affixing his signature. Moreover, Rothenberg also attested by his signature that he "fully underst[ood] that it is a Federal crime . . . to knowingly make any false statements concerning any of the above facts . . . ." *Id.* at 4. Given the additional evidence that was presented that Rothenberg had Bachelor's and Master's degrees from Stanford, an MBA from Harvard, was a "math wizard," and was an "up-and-coming venture capitalist" who ran his own firm, Tr. at 673, 676, and 747, a jury could conclude that Rothenberg was sophisticated and careful enough to make himself aware of the substantive content of any documents he signed in which he was incurring a debt of $1.48 million and exposing himself to potential criminal liability.

The Ninth Circuit has held that similar signature-related evidence is sufficient to conclude that a defendant acted "knowingly." *See, e.g.*, *United States v. Sosa*, 608 Fed. Appx. 464, 467 (9th Cir. 2015) ("According to Sosa, the evidence at trial was insufficient to establish that his false statements were made knowingly. However, a rational juror could have inferred from the completed application bearing Sosa's signature that Sosa's omission of his past crimes was deliberate."); *United States v. Zhang*, 590 Fed. Appx. 663, 665-66 (9th Cir. Nov. 5, 2014) (holding that evidence was sufficient to prove that defendant acted "knowingly" with respect to provisions of non-disclosure agreement (NDA), where evidence showed defendant's familiarity with NDA in question and where evidence showed that defendant had signed similar NDA on prior occasion); *United States v. Wiseman*, 274 F.3d 1235, 1242 (9th Cir. 2001) (concluding that evidence was sufficient to show that defendant knowingly concealed material facts in statement of ERISA plan assets, relying, in part, on fact that defendant "signed and filed the Form"); *United States v. Gomez-Gutierrez*, 140 F.3d 1287, 1288-89 (9th Cir. 1998) ("we have held that the affixing of a signature is not a mere formality, but rather signifies that the signer has read the document and attests to its accuracy" (citation omitted)). Similarly, courts commonly rely on the fact that a defendant has signed a document related to his or her guilty plea to conclude that he or she acted "knowingly." *See, e.g.*, *United States v. Snider*, 180 F. Supp. 3d 780, 790 (D. Or. 2016) (finding that defendant knowingly and voluntarily waived right to file a Section 2255 motion based, in part, on fact that defendant "signed a statement that he 'freely and voluntarily accept[s] the terms and conditions of this plea offer, after first reviewing and discussing every part of it with [his] attorney'").

The civil securities fraud cases that Rothenberg cites in support of his argument that there was insufficient proof of his knowledge of falsity – *In re Downey Securities Litigation* and *In re American Apparel, Inc. Shareholder Litigation* – are inapposite. *See* Dkt. 219, at 7-8. Those cases were not decided in the context of a Rule 29 motion in a criminal case, but rather considered whether the plaintiffs had satisfied Civil Rule 9's and the Private Securities Litigation Reform Act's heightened notice pleading requirements. In short, the cases upon which Rothenberg relies considered an entirely different question than the one that is now before the Court.

The government also presented evidence upon which a factfinder could conclude that this was not the first time that Rothenberg had seen a URLA (also known as a Form 1003) like the one in Exhibit

25, and that he was thus familiar with the document he was signing. The evidence at trial showed that he had submitted at least one prior version of the URLA to SVB. *See* Ex. 2; Tr. at 699-713 (Jandu testimony re: Ex. 2); Ex. 1, at 2 (noting that initial "1003 app" in Ex. 2 was "signed" and "ATTACHED"). There was also testimony that Rothenberg had received an updated URLA in the mail, *see* Ex. 19; Tr. at 860-61 (Jandu testimony re: Ex. 19); Tr. 961-967 (Robertson testimony re: Ex. 19). (Although the version of the URLA in Exhibit 19 did not include the Merrill Lynch CMA assets that were later listed on Exhibit 25, it did state that Rothenberg's total liabilities amounted to only about $72,000, which was not the situation at the time that Exhibit 19 was mailed to him.) Thus, the fact that Rothenberg had encountered the URLA on prior occasions also constitutes evidence upon which a finder of fact could conclude that he was aware of its strictures and contents.

Similarly, the fact that Rothenberg signed the Financial Status Affidavit (and that notary Paulette Brunk notarized his signature on that Affidavit) constitutes evidence upon which a jury could conclude that Rothenberg "knowingly" made a false statement by signing that document. Brunk explained at trial that she went through the signing packet "page by page" and that it was her practice to give borrowers the time needed to read the documents they were signing. Tr. at 902, 904; *see also* Tr. at 928 (Brunk testimony agreeing that she let borrowers "have all the time they need[ed]" to read signing packets).[4] The Financial Status Affidavit required not only Rothenberg's signature, but also required Brunk and Rothenberg to take the time to notarize that signature. And Rothenberg's signature on that document attested that he had been "duly sworn on oath" and that SVB was "making the Loan based upon statements and representations contained in, or made in connection with, the residential mortgage loan application taken from and signed by" him. *See* Ex. 26. In short, this constitutes sufficient evidence for a finder of fact to conclude that Rothenberg knew and was aware of the representations to which he was attesting in the Affidavit.

Although Rothenberg claims that there was inadequate proof that he "knew what information was contained in the forms he signed on August 21," Dkt. 219, at 9:6-9, a rational factfinder could

---

[4] Accordingly, Rothenberg's contention that he was "in a hurry" to sign the documents is, again, simply an example of the defendant drawing all inferences from the evidence in his favor. *See* Dkt. 219, at 10:1-6.

UNITED STATES' OPP. TO RULE 29(c) MOT.
20-CR-00266 JST                                        14

conclude that Rothenberg *knew* what liquid assets would be disclosed on his URLA in Exhibit 25 and what liabilities would *not* be listed. This is because there was abundant evidence of Rothenberg's actions and efforts in July 2014 that were intended to create Exhibit 10, which Rothenberg gave to SVB to initiate the loan application process and to provide SVB with a snapshot of his assets and liabilities. A rational factfinder could conclude that Rothenberg knew that these actions and efforts on his part had successfully deceived SVB into adopting those figures in assessing Rothenberg's creditworthiness.

Directly on point for this proposition are Exhibits 64, 65, and 66. These exhibits showed a series of emails between Rothenberg and Ryan Kelty and Ben Bolt at Merrill Lynch. On July 29, 2014, Rothenberg sent an email to both Kelty and Bolt going through in detail the movement of funds that Rothenberg wanted to achieve, which included Rothenberg paying off his LMA on July 29, 2014, and then having Ryan Kelty draw down the LMA by $350,000 two days later. *See* Ex. 64. The intent was clearly to create a situation in which Rothenberg could convince SVB that his LMA balance was $0 at the end of July 2014 and that the $370,000 in his CMA was unencumbered. Immediately after the end of July 2014, Exhibits 60, 67, and 68 show that Rothenberg also engaged in great efforts to obtain his end-of-July Merrill Lynch statement. Based on the testimony of Michelle Jandu from SVB and documents submitted to SVB at around this time, a factfinder could rationally conclude that – given the great efforts to which Rothenberg had gone to create the month-end balance situation at Merrill Lynch, Rothenberg's concomitant efforts to obtain a bank statement showing the fruit of those efforts, and his subsequent provision of Exhibit 10 to SVB – Rothenberg knew very well that any URLA that had been prepared for his signature would certainly *not* list his $350,000 LMA balance, and would treat his $370,000 CMA balance as a "liquid" asset. *See United States v. Powell*, 164 Fed. Appx. 720, 723 (10th Cir. 2006) (holding that, because jury reasonably could determine that defendant actively solicited false information contained in the loan application, evidence "would support the inference that [the defendant] knew the application contained the false statements at the time she signed it or knew they would be inserted prior to the application being submitted to HUD").[5]

---

[5] The same evidence supports the conclusion that Rothenberg knew his CMA funds were not liquid and that he had a debt to Merrill Lynch in the amount of $350,000. A factfinder could rationally conclude that Rothenberg understood that carrying a $350,000 LMA balance meant that his CMA was encumbered and not liquid. *See* Exs. 63-64; Tr. at 595-98 (Kelty testimony discussing need for Rothenberg to establish "two consecutive months of personal unencumbered liquidity" and fact that

1    Rothenberg argues that he could not possibly have known that his liabilities were understated on

2    the URLA he signed, because, in addition to not including his $350,000 LMA balance, that document

3    did not include the full $210,000 that he had disclosed to SVB in student loans. *See* Dkt 219, at 9:19-24.

4    This argument, however, reads the evidence and draws all inferences in the light most favorable to the

5    defendant. It is just as rational to conclude that Rothenberg was aware that the total amount of his

6    liabilities were understated on the URLA *both* because the bank had made a mistake and because he had

7    hidden his LMA balance. A jury could rationally conclude that Rothenberg decided not to rock the boat

8    by correcting the bank's mistake, which might call the bank's attention to Rothenberg's actual liabilities.

9    Finally, Rothenberg makes the point that he was unaware of SVB's loan approval and

10   underwriting guidelines, and that, thus, there was insufficient evidence to conclude that he "knew that a

11   $350,000 change in net worth would be a significant change to *his* financial situation or impact the

12   mortgage under the bank's lending criteria." Dkt. 219, at 11. But there was no need to prove that

13   Rothenberg had perfect knowledge of SVB's lending criteria. Rather, there was sufficient evidence for a

14   factfinder to conclude that Rothenberg knew that a $350,000 swing in his assets and liabilities might

15   affect his chances of getting the loans. Rothenberg's own actions in hiding his LMA balance are

16   evidence that he thought this. Furthermore, by the time that Rothenberg approached SVB about getting

17   the loans, he had already been schooled by Ryan Kelty at Merrill Lynch about the importance of

18   unencumbering his CMA assets when applying for a mortgage loan. *See, e.g.*, Tr. at 595-98.

19   In sum, Rothenberg's argument that there was insufficient evidence upon which a jury could

20   conclude that he "knowingly" made a false statement to SVB asks this Court to ignore large swaths of

21   evidence, to take the evidence presented in the light most favorable to Rothenberg, and to draw all

22   conclusions in favor of Rothenberg. This approach is contrary to what Rule 29 and the law provides.

23   **B.     There was Sufficient Evidence to Conclude that Rothenberg's Misrepresentations**
         **and False Statements were Material**

24

25   Rothenberg contends, as to the Bank Fraud count only, that none of the false statements he made

26   were material to SVB, in chief because of his narrow reading of the evidence as to when the decision to

27

28   _____

Kelty had expressed his concerns to Rothenberg about outstanding LMA balance as of July 10, 2014).

make the mortgage loan occurred and the effect of false statements in his final Form 1003 and Financial

Status Affidavit. He goes so far as to assert that "no evidence supports" the claim that any documents in

a mortgage closing package – including the final URLA/Form 1003 and Financial Status Affidavit – are

material. Dkt. 219 at 12: 9-10. But Rothenberg's view of the evidence is too charitable to himself: the

United States, in the Bank Fraud count, did not contend that solely Rothenberg's false statements in the

final Form 1003 and Financial Status Affidavit made up Rothenberg's scheme to defraud. Instead, the

United States contended at trial that all of his false and misleading statements to SVB about his assets

and liabilities throughout the mortgage application process were part of his scheme to defraud. Thus,

Rothenberg forgets that no less than three witnesses testified that the information about his assets and

liabilities would be material to a bank during a mortgage loan application process.

First, Ryan Kelty at Merrill Lynch testified that, at least at Merrill Lynch, everything about a

mortgage applicant's financial status was relevant to the bank's decision-making process; as he

succinctly put it, "It would all matter. All the activity matters." Tr. at 558, ln. 11. Thus, the more specific

information of assets and liabilities would matter to a bank as well:

> Q. … A person's liabilities matter in a loan application, correct?
>
> A. Correct.
>
> Q. A person's assets matter in a loan application, correct?
>
> A. Correct.

Tr. at 558, lns. 13-17. A rational jury would be entitled to credit Kelty's testimony.

Second, when SVB banker Michelle Jandu testified about the Loan Approval Form (Ex. 22) that

SVB used as a way to assess whether to approve Rothenberg's mortgage loan application, she made

clear that additional liabilities were material to SVB. Her testimony:

> Q. Would you have wanted to know at the time of this original loan
> approval form that there was an additional $350,000 debt?
>
> A. Yes.
>
> Q. Why?
>
> A. Because it's considered a material change in the borrower's personal
> financial condition.
>
> Q. What do you mean by that?

1    A. It's just a significant piece of information that we would want to know
2    when we make an assessment of whether or not to approve the loan.

3    Tr. at 829, lns. 9-18. She continued to make that assertion when she testified about the Loan Approval

4    Form Addendum (Ex. 23):

5    Q. And, again, you already answered this in the prior form, but would you
6    have wanted to know that when you were reviewing the loan application?

7    A. Yes.

     Q. And, again, why would you want to know it when you're doing this
8    addendum loan application?

9    A. Because it would be considered a material change in the personal
10   financial condition of the borrower.

11   Tr. at 832, lns. 1-8. A rational jury would be entitled to credit Jandu's testimony.

12        Third, Frederick "Buzz" Kreppel, the executive at SVB who ultimately approved Rothenberg's

13   mortgage application, testified that SVB was required to consider assets and liabilities by regulation of

14   the Consumer Financial Protection Bureau. His testimony:

15   Q. And so fair to say that one of the things [SVB] has to consider [under
16   the CFPB rule] is a borrower's assets?

     A. Yes.
17
     Q. And another thing that [SVB] has to consider [under the CFPB rule] are
18   a borrower's liabilities?

19   A. Yes.

20   Tr. at 1297, lns. 16-21. Most critically, Kreppel testified at that if he had known of the additional

21   liabilities Rothenberg concealed from SVB, it would have moved Rothenberg's debt-to-income ratio to

22   79%. *See* Tr. at 1347-48. Kreppel then stated that he would not have approved the mortgage loan[6]:

23   Q. Is the 79 percent figure relevant, back in August of 2014, to the loan
24   decision?

     A. Yes.
25
     Q. How is it relevant to the loan decision back in August of 2014?
26
27   A. In August of 2014, we had a max debt-to-income ratio -- maximum

---

28   [6] The United States was not required to prove that Rothenberg's scheme defraud and false
     statements in support of the scheme actually made a difference; it need only prove materiality.

1    debt-to-income ratio of 75 percent. If -- if it was above 75 percent, it
2    would have been a non-pass loan that we would not have originated.

3    Tr. at 1348, lns. 9-17. A rational jury would be entitled to credit Kreppel's testimony.

4        In short, a rational factfinder would be entitled to credit those witnesses and find that

5    Rothenberg's misrepresentations about his assets and liabilities were material to SVB. Thus,

6    Rothenberg's Rule 29 motion should be denied.

### C.    There was Sufficient Evidence to Conclude that Rothenberg Intentionally Executed a Scheme to Defraud

9        Rothenberg's final argument is that there was insufficient evidence that he engaged in a scheme

10    to defraud or that he had the requisite intent to defraud. Dkt. 219, at 13-15; *see also id.* at 13:14-17

11    (arguing that there was "no evidence or testimony" that movements of funds "were part of a plan to

12    defraud SVB"). Again, Rothenberg asks this Court – contrary to the law – to view the evidence in the

13    light most favorable to him and to draw all inferences in his favor.

14        Although it is true that Rothenberg may have first started taking money out of the Rothenberg

15    Ventures Fund II's bank account and shuttling it through to his Merrill Lynch accounts before he

16    approached SVB about obtaining loans from SVB, there was also evidence that he took money out of

17    Fund II's account to pay off his LMA balance at the end of July 2014, *after* he begin discussing the

18    possibility of obtaining loans from SVB. *See* Tr. at 688-89 (Jandu testimony that her end-of-July follow-

19    up with Rothenberg would have occurred "within a couple weeks" of early lunch between Rothenberg,

20    Jandu, and Marshall); *see also* Ex. A hereto (demonstratives used at trial to illustrate movements of

21    funds). A jury could reasonably conclude that Rothenberg's misappropriation of money from Fund II in

22    July 2014, his subsequent efforts to pay off his LMA at the end of July and then immediately draw it

23    back down on August 1 (*see* Exs. 64-66), his efforts to immediately obtain a month-end Merrill Lynch

24    statement for July (*see* Exs. 60, 67, and 68), and his subsequent provision of such a statement (Exhibit

25    10) to SVB, all showed that Rothenberg devised and intended to devise a scheme to defraud SVB and

26    that he intended to deceive and cheat SVB by giving SVB a false impression of his assets and liabilities.

27    The fact that it may have been Rothenberg's habit to misappropriate money from Fund II or, put more

28    charitably, to move money around both before and after July 2014, does not mean that a jury could not

1    rationally conclude that he took those actions in July 2014 to defraud SVB (even though he may have

2    taken those actions on other dates for other reasons, benign or not).

3         Rothenberg's argument that "there was no evidence that . . . [he] hid any of these transactions

4    from any financial institution," Tr. at 219, at 14:5-6, reflects a deep misunderstanding of the evidence.

5    Of course there was evidence that Rothenberg attempted to hide his misappropriation from Fund II and

6    his shuttling of money through the RVMC account to his Bank of America and Merrill Lynch accounts,

7    because there was evidence that Rothenberg did not provide the Fund II, RVMC, or Bank of America

8    statements to SVB. It is true that the Fund II and RVMC accounts were held by SVB. However,

9    Rothenberg never represented to SVB that those were his *personal* accounts that SVB should consider in

10   assessing his creditworthiness. Moreover, without being able to see his full Bank of America and Merrill

11   Lynch statements, SVB would have been unable to do the analysis that the government presented at trial

12   regarding how Rothenberg used Fund II investor money to pay off his LMA.

13        Rothenberg's arguments about his lack of knowledge of SVB's lending criteria are unavailing.

14   *See* Dkt. 219, at 14-15. First, Rothenberg's ignorance of SVB's exact decision-making process does not

15   forestall the conclusion that he nevertheless intended to deceive and cheat SVB. People engaged in

16   fraudulent schemes rarely know for certain exactly what misstatements will motivate their victims to act.

17   Second, Rothenberg's argument ignores that, when Rothenberg began the loan application process with

18   SVB, he had already spent the months of June and July discussing how to get a mortgage loan through

19   Merrill Lynch with Ryan Kelty and Ben Bolt. A jury could rationally conclude that Rothenberg's

20   experiences at Merrill Lynch led him to understand that underwriters might have a problem with

21   Rothenberg's financial situation, and what those problems might be. *See, e.g.*, Tr. at 595-98 (Kelty

22   testimony discussing need for Rothenberg to establish "two consecutive months of personal

23   unencumbered liquidity" and fact that Kelty had expressed his concerns to Rothenberg about

24   outstanding LMA balance as of July 10, 2014); Tr. at 531 (Kelty testimony that plan was to use

25   Rothenberg's $370,000 CMA balance as "unencumbered liquid assets" but that, at end of June 2014,

26   Rothenberg had no such assets). Accordingly, a rational factfinder could conclude that, when

27   Rothenberg started the loan application process with SVB, he had already gained some sophistication

28   regarding the ins and outs of mortgage loans, and knew that there would be headwinds if SVB

1   discovered that his CMA balance was encumbered.

2         For all of these reasons, there was sufficient evidence for the jury to conclude that Rothenberg

3   engaged in a scheme and artifice to defraud SVB and that he possessed the requisite intent to defraud.

4

5                                           **CONCLUSION**

6         The Court should reaffirm its earlier rulings and again deny Rothenberg's Rule 29 motion

7   because (1) it was untimely and the reason it was untimely was not from "excusable neglect," and (2)

8   because a rational factfinder, taking all inferences in favor of the government, could find the United

9   States met its burden as to each and every element of Counts One and Two.

10

11  DATED: January 27, 2023                    STEPHANIE M. HINDS
                                               United States Attorney

12

13                                             ___/s/_____

14                                             KYLE F. WALDINGER
                                               NICHOLAS J. WALSH

15                                             Assistant United States Attorneys

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT A</u>**



# June 2014 Transactions Creating CMA Balance



July and August 2014 Transactions Creating LMA Balance

ii

# Rothenberg's Scheme to Defraud to Silicon Valley Bank

**9/2012**
Opens SVB accounts for RVMC and Fund I

**8/2013**
Purchases condo with $880K Stanford Federal Credit Union mortgage loan

**3/2014**
Begins discussions with Merrill Lynch about getting mortgage loan

**6/17 to 6/20/2014**
• Opens Merrill CMA (cash account) with $370K collected from various sources, including from Fund II
• Takes $350K loan advance from Merrill LMA (loan account)
• Sends money back through various accounts

**7/29/2014**
Collects ~$351K from various sources and pays down LMA balance to $0

**On or After 8/1/2014**
Provides SVB with Merrill Lynch printout showing $370K in Merrill CMA and $0 Merrill LMA balance

**7/29/2014**
• Initiates application with SVB for $1.28M "cash out" mortgage re-fi loan and $300K personal loan
• Begins providing income & other documentation to SVB

**8/1/2014**
Takes $350K advance from LMA

**8/7/2014**
LMA balance = ~$350K

**8/7/2014**
SVB initial approval of both loans

**8/12/2014**
SVB funds $300K personal loan

**By 8/18/2014**
Requests higher mortgage loan ($1.48M)

**8/19/2014**
SVB additional approval of $1.48M mortgage loan

**8/21/2014**
Signs final mortgage loan application, financial status affidavit, and other loan documents

**8/21/2014**
LMA balance = ~$350K

**8/27/2014**
• SVB funds $1.48M mortgage loan
• "Cash out" of $608K sent to CMA

**8/28/2014**
Uses some of $608K "cash out" of proceeds from SVB loan to pay off LMA balance

**2012**  **2013**  **March 2014**  **June 2014**  **July 2014**  **August 2014**

iii