**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>                              )<br>          Plaintiff,         )<br>                              )<br>  VS.                         )<br>                              )<br> MICHAEL BRENT ROTHENBERG,    )<br>                              )<br>          Defendant.          )<br> _____) | NO. CR 20-00266-JST-1 |

Oakland, California
Friday, February 10, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
        OFFICE OF THE UNITED STATES ATTORNEY
        450 Golden Gate Avenue
        San Francisco, California  94102
  **BY: KYLE F. WALDINGER**
        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
        MOEEL LAH FAKHOURY LLP
        1300 Clay Street, Suite 600
        Oakland, CA  94612
  **BY: HANNI M. FAKHOURY, ESQUIRE**

Reported By:  Pamela Batalo-Hebel, CSR No. 3953, RMR, FCRR
             Official Reporter

| | |
|---|---|
| 1 | **Friday - February 10, 2023**                                              **10:44 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:** Now calling CR 20-266, United States vs. |
| 5 | Michael Brent Rothenberg. |
| 6 | Will counsel please state your appearances for the record, |
| 7 | starting with the Government. |
| 8 | **MR. WALDINGER:** Good morning, Your Honor.  Kyle |
| 9 | Waldinger for the United States.  Mr. Walsh is like |
| 10 | Mr. Goldrosen:  He has court this morning; he's on duty in |
| 11 | magistrate court so he could not join us at this moment. |
| 12 | **THE COURT:** That's fine.  I saw Mr. Walsh briefly last |
| 13 | night at the investiture of Judge Cisneros, so I've gotten my |
| 14 | quota of Mr. Walsh, and I'm good. |
| 15 | **MR. FAKHOURY:** Good morning, Your Honor.  Hanni |
| 16 | Fakhoury on behalf of Mr. Rothenberg.  He is present, and we |
| 17 | consent to a video appearance this morning. |
| 18 | **THE COURT:** Very good.  Good morning to both of you. |
| 19 | Good morning, Mr. Rothenberg. |
| 20 | The matter is on calendar -- that comment about Mr. Walsh |
| 21 | was intended as a joke, and it really came off rather sharp. |
| 22 | Some day I will get a do-over on that. |
| 23 | Turning to the matter at hand, the matter is on calendar |
| 24 | for the defendant's motion of a directed verdict of acquittal |
| 25 | under Rule 29.  I've read the papers on both sides, and I'm |

1   ready to proceed.

2       Mr. Fakhoury, you have the microphone.

3       **MR. FAKHOURY:**  Thank you, Your Honor.

4       And I won't -- I won't belabor the point.  I think --

5   obviously, the Court sat through the trial, and obviously the

6   Court has read the papers, so our motion is primarily based on

7   three discrete elements, and I think to a large degree, they

8   sort of all kind of hinge on the same factual issue, which is

9   what the -- the proof regarding the purported knowledge of a

10  purported false statement.  And the proof presented at trial,

11  in our view, was insufficient to show either a knowingly made

12  false statement and a -- which I think relatedly adds to

13  whether there was sufficient proof of an intent to defraud or

14  scheme to defraud or intent to influence the bank.

15      And I think ultimately at the trial, SVB witnesses said a

16  couple of important facts.  The first was -- the crux of the

17  Government's case, which has primarily been about the statement

18  that Mr. Rothenberg only had $73,000 in liabilities, I think

19  the evidence at trial demonstrated that that was effectively --

20  well, it was -- not effectively -- it actually was a bank error

21  because the bank did not put down the complete list of

22  creditors from the credit report into the Form 1003.  And I

23  believe it was Ms. Robertson, the loan processor, who testified

24  that generally a processor puts that information in the form

25  and that generates those form -- that Form 1003 that was signed

1   at closing.

2       And it's very clear to me that the reason that Form 1003
3   signed at closing said $73,000 on it was because they just ran
4   out of room on the first page of the form and didn't put the
5   rest of the creditors, which Mr. Rothenberg had disclosed
6   initially when he -- when the very first Form 1003 was
7   submitted, and I think importantly, which the bank did not rely
8   at all on any information in the Form 1003 whatsoever in
9   determining whether or not to issue the loan.

10      And so that's the crux of the Government's case to prove
11  both a false statement and to prove intent to defraud and a
12  scheme to defraud, and, frankly, the evidence didn't support
13  that claim.

14      I think on materiality, the point I wanted to make there
15  was that basically the two relevant forms -- so I've talked a
16  little bit about the Form 1003, but also in addition to that,
17  the Financial Status Affidavit -- that those forms carried no
18  weight whatsoever with the bank, either SVB specifically or,
19  frankly, any bank, period, on its decision whether or not to
20  issue a loan.

21      And the Government, in their opposition, had made the
22  point that, you know, what matters is how the bank views a
23  person's net worth and their assets and liabilities, which I
24  don't quibble with as a general matter, but I think the bottom
25  line is in the context of this case, a bank, as a general

1   matter, does not rely on any statements or assertions in the
2   Form 1003 or a Financial Status Affidavit signed at closing in
3   making the decision to issue a loan or not.
4        And so, you know, I think that the Government hasn't
5   carried its burden, even under the deferential Rule 29 burden,
6   to carry its -- its burden to show that there is sufficient
7   evidence to support the convictions on Counts 1 and 2.
8        And I think the fact that Mr. Rothenberg's -- that the
9   first Form 1003 completely disclosed the full extent of his
10  liabilities in terms of student loans and the fact that he
11  authorized the bank to obtain whatever records it wanted to
12  obtain and assumed that the bank would obtain whatever records
13  it needed to make its decision.  And that he did not know at
14  all, and no borrower knows at all, the bank's formula for
15  debt-to-income ratio or how or when to issue a loan and under
16  what circumstances demonstrates that there is no intent to
17  defraud or scheme to defraud or purpose to influence the bank
18  when he, you know, I think quickly signed the forms at closing
19  like just about every borrower who has ever closed on a
20  mortgage would have done.
21       So I think the judgment of acquittal should be granted on
22  Counts 1 and 2.
23       And then I'll briefly just talk about the timeliness
24  issue.  I know that's something that had been fronted by myself
25  when we appeared in December, and I know the Government's

1  raised it as its position, and I've tried to proactively front
2  that in my brief.
3      Frankly, I blew the deadline.  It's embarrassing to admit
4  it on a Zoom in open court, that I blew the deadline, but I
5  blew it.  I've never been in this situation where I'm seeking a
6  judgment of acquittal after a hung jury, and so I think that
7  there exists excusable neglect under Rule 45 to allow the late
8  filing of the motion.
9      The Government's already admitted that there is really no
10 prejudice, and there is certainly no bad faith, and the delay
11 is just really a mere matter of weeks.  It hasn't put any
12 monkey wrench in any of the other trial preparation work for
13 the case.
14     So I would ask the Court to consider the merits, and as
15 I've said in the brief, this is very humbling and embarrassing
16 to admit this in open court to Your Honor and to everybody else
17 who is paying attention, but, you know, experience is the best
18 teacher, so it's not going to happen again if I'm ever in this
19 position again.  So I just wanted to just recognize and
20 acknowledge that as well, Your Honor.
21     And I'm happy to answer any questions the Court has.
22         **THE COURT:**  I don't have any.  Thank you,
23 Mr. Fakhoury.
24     Mr. Waldinger.
25         **MR. WALDINGER:**  Yes, Your Honor.

1          I first want to start off with talking about the statutes
2  here which do not require reliance by the bank, and I think one
3  of the things that the defendant's motion focuses on are the
4  statements that are made on August 21st.  It is true that those
5  are the statements that are at issue in Count 2, but those are
6  just -- those do not require reliance.  Those do not require
7  materiality in the false statement charge.
8          Count 1 relates not only to those statements but to an
9  entire course of conduct and to Mr. Rothenberg's scheme to
10 defraud.  And I think that the evidence was sufficient to
11 support a -- the conclusion that sometime before July-- excuse
12 me -- before August, Mr. Rothenberg decided that he needed to
13 show SVB that he had greater assets and fewer liabilities than
14 he actually had and engaged in a scheme to defraud at that
15 time.
16         With respect to counsel's argument about the -- the
17 apparently mistake that SVB made on putting the totality of
18 Mr. Rothenberg's student loans on the -- on the Form 1003, it
19 is true that the bank -- it was a bank error not to put
20 apparently 210,000, but it was not the bank's error to not add
21 the additional 350 that Mr. Rothenberg knew he had as of
22 August 1st and deceived the bank into believing that he didn't
23 have $350,000 in debt at Merrill Lynch when he, in fact, did.
24 And so I don't think that really wins the day.
25         The other thing that I would -- that I would point out is

1  that in Mr. Fakhoury's arguments, he really wants the Court to
2  put a lot of facts into Mr. Rothenberg's head and make it --
3  have the Court conclude that only -- the jury could only
4  conclude that Mr. Rothenberg assumed acts or assumed why, but
5  that's not really the standard here.
6      And, you know, one of the things that I'll point out, the
7  Government cited a number of cases just about what a signature
8  on a document can hold or can be used for.  Mr. Fakhoury
9  distinguished some of those cases but didn't touch two of them,
10 and he didn't address the Government's citation to the Ninth
11 Circuit's opinion in either the *Sosa* case or the *Wiseman* case
12 which were clearly on point, that it's absolutely reasonable
13 for a fact-finder to conclude that if you put your name on a
14 document, if you sign a document, you can -- it's reasonable
15 for a fact-finder to conclude that you knew what was in the
16 document that you signed.
17     Those are my high-level points, Your Honor.  I think the
18 briefing is pretty complete on both sides here.  So unless
19 Your Honor has more questions, I'll submit.
20     **THE COURT:**  Mr. Fakhoury, last words.
21     **MR. FAKHOURY:**  Your Honor, on the point about the
22 signatures, I think ultimately the signature issue is really a
23 factual one so it's going to have -- you're going to have to
24 look at the totality of the circumstances surrounding the
25 signature, so I can certainly understand the Government's point

1   that a signature in some circumstances would certainly lend,
2   you know -- support a reasonable inference that the person who
3   signed understood what they were signing.  I just think in this
4   case that's absent, both because, number one, it just doesn't
5   make sense to sign a Form 1003 that incorrectly lists your
6   liabilities when you've already correctly reported your
7   liabilities earlier.  That is an indication of circumstances
8   supporting an inference that you didn't understand or sign, so
9   that's sort of as to the Form 1003.
10       As to the Financial Status Affidavit, I suppose the
11  signature on the authorization allowing the bank to obtain
12  whatever records it wants undermines, in my view, the
13  Government's theory that he was trying to be deceptive and
14  signed forms thinking that the bank was never going to find --
15  do its due diligence or, you know, reach out for its own
16  records if it wanted to do so.  And I think all of that really
17  speaks to materiality and scheme to defraud.
18       On the point about the changeover and whether the $350,000
19  was treated as an asset or a liability, I think, again, that
20  really hinges on Mr. Rothenberg's knowledge.  And in the
21  circumstances of this specific case where Mr. Rothenberg was
22  never advised of what the bank's lending criteria was, because
23  there was no evidence whatsoever that the bank had ever
24  communicated to Mr. Rothenberg what it considered acceptable
25  debt-to-income ratio, what it considered -- that it ever

1  considered that Mr. Rothenberg was at a threshold that he was
2  very close to exceeding, where there was uncontroverted
3  testimony that the bank never produces to either Mr. Rothenberg
4  or any borrower, for that matter, the exhibits -- I think they
5  were 19 and 18, if I recall correctly, but the big loan
6  approval sheet and the addendum and the big spreadsheet.  There
7  was a lot of testimony about that.  None of that is disclosed
8  to the borrower.
9       And so in those circumstances, Mr.-- there is no evidence
10 that Mr. Rothenberg knew that the change -- the drawing down of
11 the line of credit would be considered a -- a changed financial
12 circumstance for the bank as indicated in the -- both the Form
13 1003 and the Financial Status Affidavit.  In other words, if
14 you tie the change -- the Government's theory that there is a
15 swing in assets and liabilities, there is a swing in net
16 worth -- if you tie that to the relevant documents where the
17 statements are made, which Mr. Waldinger says only speaks to
18 Count 2, but I would submit it speaks to Count 1 as well --
19 when you consider that whole universe, I think there's clear
20 proof that there is no knowing false statement and no scheme to
21 defraud because he had no way of knowing that the bank was
22 going to consider that change in the drawing down of the line
23 of credit as a significant change in financial circumstances,
24 particularly where Mr. Rothenberg and the bank, to some degree,
25 you know, value the property at X amount and Mr. Rothenberg's

1    stake in his company is in the millions of dollars -- there's
2    just no way for Mr. Rothenberg to know that the bank would have
3    cared and would have understood that there was a change -- that
4    that change in net worth would have mattered to the bank.  In
5    other words, there is no scheme to defraud.
6        So, again, unless the Court has specific questions, that's
7    all I have to add.
8            **THE COURT:**  I don't.  I'm going to rule from the bench
9    right now, and anyone who wants a copy of the Court's order can
10   obtain the transcript.
11       I'm going to turn first to the question of waiver and the
12   question of whether the defendant has shown excusable neglect
13   for the fact that the motion was filed 43 days after the
14   deadline for such a motion.
15       In determining whether excusable neglect exists, the Court
16   considers four factors:  First, the danger of prejudice to the
17   non-moving party; second, the length of delay and its potential
18   impact on judicial proceedings; third, the reason for the
19   delay, including whether it was within the reasonable control
20   of the movement -- excuse me -- the movant; and, fourth,
21   whether the moving party's conduct was in good faith.
22       The parties agree, and the Court finds, that three of the
23   four factors weigh in favor of a finding of excusable neglect.
24   As the Government concedes, the prejudice to it is not great,
25   nor did the length of the delay have an appreciable effect on

1  the judicial proceedings.  And the Court finds that counsel
2  acted in good faith.
3       With respect to the third factor, however, the Court finds
4  that the reason for the delay, which is that counsel apparently
5  failed to consult the controlling rule of criminal procedure,
6  weighs heavily against a finding of excusable neglect.  That
7  failure was easily avoidable and entirely within counsel's
8  control.
9       *Bateman vs. U.S. Postal Service*, 231 F.3d 1220 at Page
10 1224, Ninth Circuit, 2000, cited by the defendant in reply does
11 not help Mr. Rothenberg.  In that case, counsel was required to
12 travel out of the country for a family emergency.  No such
13 exigent circumstances are present here.
14      Weighing these factors together, the Court finds that the
15 defendant has not established excusable neglect.
16      I do agree with the Government's argument that if a
17 factual situation like the one before the Court supports a
18 finding of excusable neglect, then there is arguably no
19 situation where excusable neglect could not be found where a
20 defendant does not act in bad faith.
21      So I find the motion was untimely.  Nonetheless, I don't
22 think there is any prejudice to the defendant because I will
23 reach the motion on the merits, and on the merits, I will deny
24 the motion.
25      I'm going to start by noting that Mr. Rothenberg invites

1   the Court in his brief to apply a different standard to this
2   Rule 29 motion than it would normally apply if Mr. Rothenberg
3   had been convicted by the jury given that the jury in this case
4   was unable to reach a verdict.
5       There is no authority for the argument, and the only
6   authority that's been cited to me by the defendant -- and I
7   appreciate it -- is an out-of-circuit case finding that there
8   is no different standard.
9       So I'm just going to apply the standards set forth in
10  Rule 29, which is that I am to direct acquittal if the evidence
11  is insufficient to sustain a conviction.  That's the language
12  of Rule 29.  And as the Supreme Court said in *Jackson vs.*
13  *Virginia*, 443 U.S. 307 at Page 319, I must deny that motion if,
14  after viewing the evidence in the light most favorable to the
15  prosecution, any rational trier of fact could have found the
16  essential elements of the crime beyond a reasonable doubt.
17  Furthermore, in applying that standard, I must draw all
18  reasonable inferences from the facts in favor of the
19  Government.
20      In this case, Mr. Rothenberg is charged with bank fraud
21  and making false statements to a bank.  Bank fraud consists of
22  five elements or contains five elements:  First, the defendant
23  knowingly executed a scheme to defraud a bank; secondly, the
24  defendant knew statements or promises made to the bank were
25  false; third, the statements or promises made to the bank were

1  material; fourth, the defendant acted with the intent to
2  defraud the bank; and, fifth, the bank was insured by the FDIC.
3       Making a false statement to a bank has three elements:
4  First, the defendant made a false statement or report to a
5  bank; secondly, the defendant knew the statement was false;
6  and, thirdly, the defendant did so for the purpose of
7  influencing the bank.
8       In his motion, Mr. Rothenberg first contests whether he
9  made any false statements, quote, knowingly, close quote, as
10 required for both bank fraud and making a false statement to a
11 bank.
12      False statements for purposes of this motion appear on at
13 least two forms.  The first is the Uniform Residential Loan
14 Application called a Form 1003, which lists Mr. Rothenberg's
15 assets and liabilities and, secondly, a Financial Status
16 Affidavit in which Mr. Rothenberg certified that his financial
17 status such as borrowers, employment, income, assets, debts,
18 expenses, credit obligations, etc., had not changed
19 significantly and accurately reflects borrower's current
20 financial status.
21      Mr. Rothenberg argues that there was insufficient evidence
22 that he read and understood these forms.  I am not persuaded by
23 that argument.  Mr. Rothenberg was the founder and general
24 partner of a venture capital firm, has an undergraduate degree
25 from Stanford University, he is a self-described math whiz, and

1   he has a master's in business administration from Harvard
2   Business School.  I'm tempted to stop there.  I do -- I am
3   required to draw inferences in favor of the Government, but to
4   those facts I would add that the testimony of the notary public
5   was that it was her practice to go through each document page
6   by page with a signatory and make sure they had whatever time
7   they needed or wanted to review the document, and
8   Mr. Rothenberg signed the document after having been given an
9   opportunity to read it.
10       I am comfortable concluding that the totality of that
11  evidence was more than sufficient for a rational trier of fact
12  to conclude that Mr. Rothenberg knew he was making false
13  statements on those documents.
14       With regard to the argument that Mr. Rothenberg -- with
15  regard to Mr. Rothenberg's arguments that there was no evidence
16  that Mr. Rothenberg knew or understood that Silicon Valley Bank
17  would conclude that his financial condition had changed and his
18  related arguments about his alleged lack of understanding of
19  what the lending criteria were at Silicon Valley Bank and these
20  sorts of things, these are not matters that the Government has
21  to prove, and so I don't need to address those arguments
22  further, I don't think, or discuss whether they were or were
23  not established by the evidence.
24       Mr. Rothenberg next argues that the Government failed to
25  prove the statements in the Form 1003 and Financial Status

1   Affidavit were material to SVB's decision to issue a loan.
2   Three witnesses testified that this type of information would,
3   in fact, be material to such a decision, and the jury was
4   entitled to credit that testimony.  Ryan Kelly, Michelle
5   Jandu -- Madame Reporter, J-A-N-D-U -- and Buz -- Madame
6   Reporter, B-U-Z -- Kreppel, K-R-E-P-P-E-L.
7       Mr. Kreppel in particular testified that if he had known
8   of the additional liabilities Rothenberg concealed from Silicon
9   Valley Bank, the bank would have moved Rothenberg's
10  debt-to-income ratio to 79 percent, and Kreppel would not have
11  approved the mortgage loan.
12      I don't need to itemize the remaining witnesses' testimony
13  here, but that testimony is accurately summarized in the
14  Government's opposition to the motion.  In their totality,
15  these witnesses' testimony was adequate to allow a rational
16  jury to convict Mr. Rothenberg.
17      Lastly, Mr. Rothenberg argues that the Government failed
18  to prove either a scheme or intent to defraud through the
19  statements in the Form 1003 and Financial Statement Affidavit
20  signed on August 21, 2014, as required to convict
21  Mr. Rothenberg of bank fraud as charged in Count 1 or that
22  Mr. Rothenberg's purpose was to influence the bank, as required
23  to convict Mr. Rothenberg of making a false statement to a bank
24  as charged in Count 2.
25      Exhibit A to the Government's opposition, which was a

1  demonstrative the Government used at trial, accurately
2  summarizes the evidence regarding the series of monetary
3  transfers Mr. Rothenberg made.  From that evidence, a rational
4  jury could conclude that Mr. Rothenberg was engaged in a scheme
5  to defraud and had the intent to defraud Silicon Valley Bank.
6  　　　　So for those reasons, the Court will deny the Rule 29
7  motion on the merits.
8  　　　　Gentlemen, further matters for us to discuss today since I
9  have you all in front of me?
10 　　　　**MR. WALDINGER:**  Your Honor, we had discussed -- our
11 next date right now before you is June 30th for the pretrial
12 conference.  Mr. Fakhoury and I had discussed perhaps setting
13 another status date before that.  We had talked about
14 April 21st, if Your Honor would like to see us then.
15 　　　　**THE COURT:**  I would.  I'm not going to disclose
16 anything that is particular to the trial itself.  I'm in trial
17 right now with Mr. Fakhoury's law partner, Ms. Moeel, and there
18 have been some questions in that trial about the timeliness of
19 disclosure and that sort of thing, and that experience has led
20 me to, A, ask the Federal Defender's office, the United States
21 Attorney's office, and the CJA rep to jointly make a
22 recommendation to me about modifying my standing order to make
23 sure that these issues are dealt with adequately in advance,
24 and, secondly, to have more status conferences in my criminal
25 cases once I know they're going to trial.

1    So I'm happy to set a status conference, and I would
2 encourage counsel to look at Rule 16 -- and I can never
3 remember the 12 series; there is some additional disclosures in
4 the Rule 12 and 12 point this and 12 point that -- just to make
5 sure that they are comfortable with the disclosure requirements
6 that already exist and that they're asking the Court to set
7 additional intermediate deadlines where they have any concerns.
8    I think I'm widely available in April, so if you want to
9 suggest a particular date, I'm happy to set one.
10    **MR. WALDINGER:**  I think we were looking at the 21st.
11 The alternate would be the 7th, earlier in the month.
12    **MR. FAKHOURY:**  The 21st works a little bit better for
13 my schedule, Your Honor.  And what I had anticipated was
14 reaching out to Mr. Waldinger and Mr. Walsh about attempting to
15 come up with a detailed disclosure deadline, obviously for the
16 concerns the Court raised, but just also this -- this second
17 trial is going to be a bit more involved and complicated, I
18 think, and bigger, so I think it would be useful to have a bit
19 more of a detailed specific disclosure deadline, including
20 exhibits and witnesses and *Jencks* and all that.
21    But I can -- let me talk to Mr. Waldinger and Mr. Walsh
22 about it, and we can, I think by the 21st, either have a
23 proposed disclosure deadline and schedule to propose to the
24 Court, and if we are having any issues with that, we can raise
25 them with the Court.  But that would be my request.  And I

1    would prefer the 21st, if that's available.
2            **THE COURT:**  Mr. Waldinger, shall we just set the 21st?
3            **MR. WALDINGER:**  That's fine, Your Honor.  Yes.
4            **THE COURT:**  All right.  The Court will set this for an
5    intermediate -- I don't need to say that.
6        The Court will set this for a status conference on
7    April 21, 2023, at 9:30 a.m.  That date will be in person.
8        Mr. Rothenberg, you are ordered to be present.  I've
9    already entered a time exclusion order so I don't need to
10   address that topic further.
11           **MR. WALDINGER:**  I think that's it for today,
12   Your Honor.
13           **THE COURT:**  All right.  Very good.  Thank you,
14   gentlemen.  I will see you in April.
15                  (Proceedings adjourned at 11:10 a.m.)

```
 1
 2
 3                    CERTIFICATE OF REPORTER
 4        I certify that the foregoing is a correct transcript
 5   from the record of proceedings in the above-entitled matter.
 6
 7   DATE:   Tuesday, July 18, 2023
 8
 9   [signature: Pamela Batalo Hebel]
10   _____
     Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```