1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5   SECURITIES AND EXCHANGE COMMISSION,)
                                       )
6           Plaintiff,                 )
                                       ) Case No.
7       vs.                            ) 3:18-cv-05080-JST-DMR
                                       )
8   MICHAEL B. ROTHENBERG and          )
    ROTHENBERG VENTURES LLC (f/k/a     )
9   FRONTIER TECHNOLOGY VENTURE        )
    CAPITAL, LLC and ROTHENBERG        )
10  VENTURES MANAGEMENT COMPANY LLC),  )
                                       )
11          Defendants.                )
    _____)

12

13

14

15

16        DEPOSITION OF MICHAEL B. ROTHENBERG

17            San Francisco, California

18             Tuesday, May 7, 2019

19

20

21

22

23

    Reported by:
24  JOANNE M. FARRELL, RPR, CRR
    CSR Nos. 4838(CA), 506(HI), 507(NM)
25  Job No. 190507VL

                                                    1

US-001601

1        UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5   SECURITIES AND EXCHANGE COMMISSION,)
                                        )
6          Plaintiff,                   )
                                        ) Case No.
7       vs.                             ) 3:18-cv-05080-JST-DMR
                                        )
8   MICHAEL B. ROTHENBERG and           )
    ROTHENBERG VENTURES LLC (f/k/a       )
9   FRONTIER TECHNOLOGY VENTURE          )
    CAPITAL, LLC and ROTHENBERG          )
10  VENTURES MANAGEMENT COMPANY LLC),    )
                                        )
11         Defendants.                   )
    _____ )

12

13

14        Deposition of Michael B. Rothenberg, taken

15  on behalf of Defendants, at Securities and Exchange

16  Commission, 44 Montgomery Street, Suite 2800, San

17  Francisco, California 94104, beginning at 9:44 a.m.,

18  on Monday, May 7, 2019, before Joanne M. Farrell,

19  Certified Shorthand Reporter No. 4838.

20

21

22

23

24

25

                                                    2

US-001602

```
 1   APPEARANCES:

 2   For Plaintiff:

 3     SECURITIES AND EXCHANGE COMMISSION

 4     By:  E. BARRETT ATWOOD, ESQ.

 5          ANDREW J. HEFTY, ESQ.

 6     44 Montgomery Street, Suite 2800

 7     San Francisco, California 94104

 8     415.705.2500

 9     atwoode@sec.gov

10     heftya@sec.gov

11

12   For Defendant Michael B. Rothenberg:

13     ILLOVSKY LAW OFFICE

14     By:  EUGENE ILLOVSKY, ESQ.

15     1611 Telegraph Avenue, Suite 806

16     Oakland, California 94612

17     510.394.5885

18     eugene@illovskylaw.com

19

20

21

22

23

24

25
```

3

US-001603

```
 1   Appearances:  (Continued)
 2   For Defendant Rothenberg Ventures:
 3     SHARTSIS FRIESE LLP
 4     By:  JAHAN P. RAISSI, ESQ.
 5     One Maritime Plaza, Eighteenth Floor
 6     San Francisco, California 94111
 7     415.421.6500
 8     jraissi@sflaw.com
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

US-001604

```
 1                            INDEX

 2   WITNESS

 3   Michael B. Rothenberg

 4   EXAMINATION                                        PAGE

 5   BY MR. ATWOOD                                         9

 6

 7                           EXHIBITS

 8   NUMBER                                             PAGE

 9   Exhibit 3       Letter dated May 7, 2019 to          14
                     Mr. Atwood from Mike
10
     Exhibit 4       Defendant Michael B.                 26
11                   Rothenberg's Response to
                     Plaintiff SEC's First Set of
12                   Interrogatories

13   Exhibit 5       Handwritten note re Fifth            29
                     Amendment privilege
14
     Exhibit 6       Email from Michael Rothenberg        30
15                   to Barrett Atwood, Andrew
                     Hefty, subject line "Mike
16                   Rothenberg's discovery
                     responses," sent on May 1st,
17                   2019

18   Exhibit 7       Document entitled "Defendant         31
                     Michael B. Rothenberg's
19                   Responses to Plaintiff SEC's
                     Second Set of
20                   Interrogatories."

21   Exhibit 8       Document entitled "Defendant         32
                     Michael B. Rothenberg's
22                   Responses to Plaintiff SEC's
                     First Set of Requests for
23                   Admission."

24

25
                                                            5
```

US-001605

```
 1                          EXHIBITS (Cont.)
 2   NUMBER                                              PAGE
 3   Exhibit 9      Document entitled  "Defendant        33
                    Michael B. Rothenberg's
 4                  Responses to Plaintiff SEC's
                    First Set of Requests for
 5                  Production."
 6   Exhibit 10     Document entitled "Declaration       36
                    of Michael Rothenberg in
 7                  Support of Defendant Ben
                    Reality LLC's Motion for
 8                  Summary Judgment."
 9   Exhibit 11     Document entitled "Rothenberg        46
                    Ventures 2016 Fund LP, Second
10                  Amended and Restated Limited
                    Partnership Agreement."
11
     Exhibit 12     Document entitled "Rothenberg        47
12                  Ventures 2016 Feeder Fund LP."
13   Exhibit 13     Document entitled "Document          48
                    Packet for Amendment to
14                  Rothenberg Ventures to 2015
                    Fund."
15
     Exhibit 14     Document entitled "The               50
16                  Company's Law 2013 Revision of
                    the Cayman Islands Company
17                  Limited by Shares Memorandum
                    and Articles of Association of
18                  Rothenberg Ventures 2016
                    Feeder Fund GP LTD."
19
     Exhibit 15     Document entitled "Amended and       51
20                  Restated Limited Liability
                    Company Agreement for
21                  Rothenberg Ventures Management
                    Company LLC."
22
     Exhibit 16     Document entitled "Notice of         58
23                  Resignation (for now)."
24   Exhibit 17     Irrevocable Trust Agreement          59
25
```

6

US-001606

```
 1                    EXHIBITS (Cont.)

 2   NUMBER                                      PAGE

 3   Exhibit 18    Document entitled "Interest     64
                   Transfer Agreement."
 4
     Exhibit 19    Email thread, top one dated     73
 5                 April 5, 2016

 6   Exhibit 20    Email thread, top email from    109
                   mikerothenberg@gmail.com sent
 7                 on Monday, December 21st,
                   2015, to Brian McDaniel,
 8                 copied to
                   amy@archinacapital.com and
 9                 Neil Devani

10   Exhibit 21    Email thread; top email is      110
                   from Neil Devani dated
11                 December 27th, 2015.  Subject
                   is "Re Finish Line."  It was
12                 sent to Amy Huang

13   Exhibit 22    Printout from an Excel          112
                   spreadsheet
14
     Exhibit 23    Stock Purchase Agreement        114
15
     Exhibit 24    Screenshot for an account in    128
16                 Silicon Valley Bank

17   Exhibit 25    Warrants                        131

18   Exhibit 26    Compilation of agreements       132
                   entitled "Warrant Purchase and
19                 Sale Agreement by and between
                   Frontier Technology Venture
20                 Capital LLC and Rothenberg
                   Ventures 2015 Fund LLC" dated
21                 December 31st, 2016

22   Exhibit 27    Summary of the valuations       138

23   Exhibit 28    Email from Marc Fagel/SH        147
                   regarding a draft financial
24                 statement dated February 28th,
                   2019
25
                                                     7
```

US-001607

EXHIBITS (Cont.)

| NUMBER | | PAGE |
|---|---|---|
| Exhibit 29 | Statement from Bank of America, account ending in 2573 | 153 |
| Exhibit 30 | Bank statement covering the time period from February 21 to March 21, 2019 | 160 |
| Exhibit 31 | Bank statement for the time period March 1 to March 31, 2017, for account ending in 1761 | 164 |
| Exhibit 32 | Bank statement from Bank of America for the time period July 1 to July 31st, 2018, for an account ending in 0264 | 165 |
| Exhibit 33 | Email thread | 174 |
| Exhibit 34 | Email from Mr. Rothenberg to Mr. Rothenberg | 181 |

8

**GRADILLAS COURT REPORTERS**
**(310) 859-6677**

US-001608

1          San Francisco, California, Monday, May 7, 2019

2                          9:44 a.m.

3                          ---o0o---

4                  Michael B. Rothenberg,

5     having been administered an oath, was examined and

6     testified as follows:

7                          EXAMINATION

8     BY MR. ATWOOD:

9          Q.   Good morning, Mr. Rothenberg.  It's 9:44 and we

10    are on the record here.

11              Could you please state your full name.

12         A.   Michael Brent Rothenberg.

13         Q.   My name is Barrett Atwood.  I'm trial counsel

14    for the Securities and Exchange Commission.

15              If I could just have other counsel introduce

16    themselves for the record.

17              MR. HEFTY:   Andrew Hefty for the Securities and

18    Exchange Commission.

19              MR. RAISSI:   Jahan Raissi of Shartsis Friese for

20    defendant Rothenberg Ventures.

21              MR. ILLOVSKY:   Eugene Illovsky for the witness

22    for the purpose of this deposition.

23              MR. ATWOOD:   Thank you, gentlemen.

24    BY MR. ATWOOD:

25         Q.   Mr. Rothenberg, I'm just going to go over some

                                                              9

US-001609

1   guidelines and rules for a deposition.  If you have any

2   questions just let me know.

3          You were just sworn in and you're under oath.

4   Just to let you know, even if we take a break during the

5   deposition, you come back, you will still be under oath

6   once we go on the record.

7          Do you understand that?

8      A.  I do.

9      Q.  And being under oath and testifying here is just

10  like testifying in court.

11         Do you understand that?

12     A.  I do.

13     Q.  Have you been deposed before?

14     A.  The question is ever in my life?

15     Q.  Yes.

16     A.  Yes.

17     Q.  How many times?

18     A.  Fewer than ten.

19     Q.  More than five?

20     A.  I don't remember the exact number.

21     Q.  Would you say you're somewhat familiar with the

22  process?

23     A.  I believe I have the basic lay of the land.

24     Q.  Okay.  So you have the basic lay of the land,

25  but just some pointers I'd like to point out.  You have

                                                          10

US-001610

```
 1   to verbalize any of your responses today so our court
 2   reporter can hear them and she can enter them into the
 3   record.  Any nonverbal responses we will need you to
 4   restate verbally.
 5            Does that make sense to you?
 6       A.  It does.
 7       Q.  One thing I will do today, I'm sure, is ask some
 8   poor questions.  However, if I ask a question and you
 9   answer it, I'm going to assume you understood the
10   question.
11            Is that fair to you?
12       A.  Makes sense.
13       Q.  If you don't understand my question, please let
14   me know and I'll do my best to restate it.  Okay?
15       A.  Okay.
16       Q.  If you need to take a break at any time, you're
17   welcome to do so.  My only ask is that if there's a
18   pending question, you answer it before that break.
19            Is that okay?
20       A.  Okay.
21       Q.  Do you have any questions about the deposition
22   process today?
23       A.  I do not.
24       Q.  Is there any reason why you can't answer
25   truthfully and completely today?
```

                                                              11

US-001611

```
 1        A.   Yes.   I'm -- as I mentioned in the letter to you
 2   this morning, I'm extremely fatigued.
 3        Q.   Okay.  Well, with that -- actually, let's circle
 4   back to that in a second.
 5             I did want to note, Mr. Illovsky, he entered his
 6   appearance here.  For the purposes of this deposition,
 7   he's representing you here.
 8             Just so we have a record of it, you are
 9   proceeding representing yourself, or what's also known as
10   "pro se" in this litigation; is that right.
11             THE WITNESS:  There's no attorney of record at
12   the moment.
13   BY MR. ATWOOD:
14        Q.   At the moment.  Okay.
15             Do you intend to hire counsel for this matter?
16        A.   I would sure like it if that happened.  It has
17   not happened at this moment.
18        Q.   All right.  I want to talk a little bit about
19   your preparation for today.  Excluding conversations with
20   counsel, including Mr. Illovsky, but anyone else, have
21   you spoken about your planned testimony with anyone?
22        A.   Just with counsel.
23        Q.   What did you do to prepare for testimony here
24   today besides speaking with counsel?
25        A.   I mean all of the preparation for a deposition
```

12

US-001612

```
 1   that happens under the guidance of counsel.  For me,
 2   anyway.
 3        Q.  Did you review any documents?
 4        A.  Once again, I mean it's all part of the -- you
 5   know, I mean I've been in communication with you for
 6   weeks about particular documents, so I've certainly
 7   looked at those.  And, you know, almost all of the
 8   specific types of things that happens with my
 9   conversations with counsel.
10        Q.  Okay.  I understand that and I don't want you to
11   reveal your conversations with counsel, but my question
12   is trying to get at whether you looked at any specific
13   documents to prepare for today's deposition.
14        A.  I do not feel like I had time to fully prepare
15   for today's deposition.
16        Q.  Okay.  Well, could you elaborate on that?
17        A.  What's the question?
18        Q.  You said you felt like you have not had enough
19   time to prepare for today's deposition?
20        A.  Uh-huh.
21        Q.  Could you please elaborate on that?
22        A.  That's what I meant to say.  I don't have
23   anything further to add about that.
24        Q.  Okay.  Circling back to what you said about not
25   being able to answer truthfully and completely, you
```

                                                            13

US-001613

1    referred to a letter, which we will mark as Exhibit 3.

2              (Exhibit 3 was marked for identification by the

3              court reporter and is attached hereto.)

4    BY MR. ATWOOD:

5         Q.   Mr. Rothenberg, you now have Exhibit 3 in front

6    of you.  Is this the letter you're referring to?

7         A.   It is.  There's a couple marks on this paper,

8    but I don't think they affect the language of the letter.

9         Q.   Could you --

10        A.   Like, I don't know what that is over the G.

11   This is the letter.  I'm not sure what -- that seems to

12   be something separate.

13        Q.   My guess it is printer ink.  But this is the

14   letter you've been referring to?

15        A.   Yes, it is.

16        Q.   And it is dated May 7th, 2019, which is today.

17   My name is in the introduction, and it's signed

18   "Sincerely, Mike," and that would be you, correct?

19        A.   This is me.  I sent this, yeah; this is what I'm

20   talking about.

21        Q.   And you authored this letter?

22        A.   Yes.

23        Q.   Getting back to my question about answering

24   truthfully and completely, you mentioned -- well, at

25   least in this letter you mention not getting enough

14

US-001614

 1  sleep.  Could you tell us about your sleep problems?
 2       A.  Well, how many different rogs in our phase --
 3            (Reporter clarification.)
 4       Q.  Interrogatories, right?
 5       A.  Interrogatories.
 6           You know, I believe there's more than a hundred,
 7  you know, all due in the same week as my deposition was
 8  scheduled and now, so I think it's the equivalent of --
 9  it's certainly more difficult than any final exam period
10  by a factor of at least ten that I've ever experienced in
11  my life, and during those times I also didn't get to
12  sleep much because you take these things seriously.  They
13  are -- the standard of care has to be very high -- very
14  high -- and, you know, you don't get the luxury of
15  guessing.  So when it comes to these types of things,
16  they are quite overwhelming in total, and the way I try
17  to handle an overwhelming situation is to work as hard as
18  possible.  So that comes out of my sleep and it means
19  that, you know, I just do my best.
20       Q.  I appreciate that.  And we will talk about that
21  discovery and interrogatories and the requests for
22  admissions later today.
23           How much sleep did you get last night?
24       A.  So my -- I believe it was fewer than four hours.
25       Q.  Are you taking any medication for your sleep?

                                                          15

US-001615

1    A.   I would really prefer not to talk about my

2  medication.   I think that seems to be out of bounds for

3  what I feel comfortable talking about.   My health and my

4  medication, things that I talk about with my doctor, I

5  don't prefer to talk about here.

6    Q.   Okay.   Are you taking any medication that would

7  interfere with your ability to testify completely and

8  truthfully today?

9    A.   What would examples of that be?

10    Q.   I don't know.

11    A.   I don't know how to answer that, then.

12    Q.   Do you believe you're taking any medication that

13  would affect your memory?

14    A.   Affect my memory.   I believe that, you know,

15  lack of sleep affects my memory.   That's why I stated

16  that in this letter.

17    Q.   How long have you been suffering from lack of

18  sleep?

19    A.   How long has the SEC been involved?

20    Q.   So your testimony today is that you've had sleep

21  problems since the SEC's investigation of you?

22    A.   I wouldn't even characterize it as sleep

23  problems.   I'm making priorities.   I have to make

24  decisions.   And when there are outstanding things, I have

25  to continue to try to work on them.   So it's not even

16

US-001616

1   really a problem.  When I am able to, you know, put my

2   head down, I typically don't have problems falling

3   asleep.  It's a matter of how much time -- how much time

4   there is in a week.

5        Q.   What were you working on yesterday related to

6   this matter that kept you up late?

7        A.   Well, I've already mentioned that talking about

8   the preparations for my deposition are not something I

9   feel, you know, like, that I did with my attorneys are

10  something that I feel is appropriate to talk about.

11       Q.   And we don't want to know the substance of those

12  conversations, but we are entitled to know the length of

13  those meetings.  So are you testifying that you've spent

14  long hours yesterday meeting with counsel?

15                 (Discussion off the record.)

16            THE WITNESS:  So you're talking about in person

17  as opposed to preparation I'm doing at the advice of

18  counsel, is that the question?

19  BY MR. ATWOOD:

20       Q.   Let's start with meetings in person yesterday.

21       A.   Approximately three hours.

22       Q.   And who did you meet with?

23       A.   Rob Lott.  He's also an attorney but not an

24  attorney of record here.

25       Q.   What does Mr. Lott represent you in?

                                                        17

US-001617

 1      A.   He's a personal attorney.

 2      Q.   For what matters?

 3      A.   What does that -- so, once again, every time you

 4  ask me a question about what my counsel talks to me

 5  about, I feel very uncomfortable and I prefer not to, you

 6  know, try to -- I don't want to do anything that could

 7  possibly violate any privileged communications.

 8      Q.   Okay.

 9      A.   And my understanding is that talking about my

10  conversations with counsel is getting very close to that,

11  and I don't want to violate that.

12      Q.   And I want to be clear, I don't want to ask any

13  questions that will have you reveal the substance of your

14  conversations with counsel.  My question is going to what

15  matters Mr. Lott represents you in.

16          For example, Mr. Illovsky represents you today

17  for the purposes of this deposition.  That's not

18  privileged.

19          So if there's any answer that you can give with

20  respect to Mr. Lott, I'd like to know.

21          MR. ILLOVSKY:  If you want to take a short

22  break, we can just talk about the privilege stuff.

23          THE WITNESS:  Yeah, all their questions are

24  about my attorneys so maybe we can talk about that.

25          MR. ATWOOD:  We can go off the record.

                                                        18

US-001618

```
 1              MR. ILLOVSKY:  Let's go off the record briefly.
 2                   (Recess taken at 9:56 a.m.)
 3                 (Proceedings resumed at 10:00 a.m.)
 4              MR. ATWOOD:  Back on the record.
 5    BY MR. ATWOOD:
 6       Q.  Mr. Rothenberg, I'll just have the court
 7    reporter read back my last question.
 8              THE COURT REPORTER:  "Question:  What does
 9              Mr. Lott represent you in?"
10              THE WITNESS:  So Mr. Lott has -- yesterday we --
11    he was talking to me in conjunction with this
12    investigation, and he has been doing that really ever
13    since I hired him.  I think the first time I hired him
14    was August or September of 2016 as a direct result of
15    this investigation.  And he has also helped out
16    Rothenberg Ventures and he's helped out the funds, but
17    currently he's helping me with this investigation and
18    would help me if there were other litigations.
19    BY MR. ATWOOD:
20       Q.  Thank you.  And you said you met with Mr. Lott
21    for three hours yesterday?
22       A.  That's the in-person part of it.
23       Q.  Okay.
24       A.  We also spoke on the phone.
25       Q.  How much time did you spend on the phone
```

19

US-001619

```
 1  together, approximately?
 2       A.  Less than three hours.  More than an hour.  I'm
 3  not sure of the amount.
 4            And let me say I'm not sure it's more than an
 5  hour.  It felt like more than an hour, felt like less
 6  than three hours.
 7       Q.  And you alluded to the fact that you did other
 8  preparation for your deposition today; is that correct?
 9       A.  That is correct.
10       Q.  Okay.  What else did you do yesterday?
11       A.  So I have reviewed documents.  I don't believe
12  I've had the opportunity to review every document that
13  could ever relate to today's investigation, but I have
14  attempted to review documents of which there are many.
15       Q.  Did you do that yesterday?
16       A.  I have done that many days including yesterday.
17       Q.  Okay.  How much time did you spend doing that
18  yesterday?
19       A.  Also a substantial amount of time.  I don't
20  clock my hours.  I don't get to charge by the hour so I
21  don't know, but it was substantial.
22       Q.  Okay.  More than two hours?
23       A.  Yes.
24       Q.  More than four hours?
25       A.  It could have been.
```

                                                                20

US-001620

1      Q.   Less than five?

2      A.   I don't know.  It could have been more than

3  five.   I don't track the hours that specifically.

4      Q.   I want to get back to talking about your sleep

5  issue, and I want to be clear about this.  Do you have

6  any reason to believe that you cannot answer truthfully

7  today?

8      A.   Well, to the extent that it has to do with

9  specific memory recall about facts, I have -- it's my

10  understanding that sleep is very directly related to that

11  so I don't want to make any representations about having,

12  you know, full sleep, you know -- you know, full health

13  in my sleep capacity that would make my memory as good as

14  I would like it to be.

15      Q.   Okay.  And I think that response -- that

16  response is helpful.  I think it goes more to the

17  question of whether or not you can testify completely

18  today.

19           I'm asking is there any reason why you cannot

20  testify truthfully today?

21      A.   No, there's not -- there's nothing that should

22  affect the ability to tell the truth.  I might have

23  missed the distinction, but I don't think that there's

24  anything that impedes that.

25      Q.   Okay.  Thank you.

                                                         21

US-001621

1          Are you under any medication here today during

2   this deposition?

3       A.   So I did mention I prefer not to talk about

4   medication prescribed by, you know, a doctor, and so

5   outside of that I have nothing, but inside of that I may.

6       Q.   So to the extent you're on -- are you under the

7   influence of any medication here today?

8       A.   So nothing that would affect my ability to tell

9   the truth if that's what you're getting at.

10      Q.   Thank you.

11          Are you under the influence of any alcohol

12   today?

13      A.   No, certainly not.

14      Q.   All right.  Let's get back to Exhibit 3, which

15   is the letter you sent.  In the letter you assert that

16   you're not inclined to waive any Fifth Amendment right

17   today.  Could you explain what you mean by that?

18      A.   You asked me very directly on -- you know, in a

19   previous conversation, and so at that time I believe I

20   told you that I did intend to waive it.  So I felt as a

21   courtesy to you, having learned some new information that

22   I characterized here, that based on that evolution of

23   thinking that I felt like it was appropriate to give you

24   a courtesy update to that answer since it was different

25   now.

                                                        22

US-001622

1     Q.   Okay.  Mr. Rothenberg, what is your home

2  address?

3     A.   I live at 712 Bryant Street, and that's Unit 6,

4  San Francisco, California.

5     Q.   And is that your only residence?

6     A.   Yes.  How would I have -- well, yes.

7     Q.   I mean, do you have a second home?  That's what

8  I'm getting at.

9     A.   No.

10     Q.   Are you currently employed?

11     A.   How do you -- what does that mean?  I have to be

12  my own counsel or I have to be my own -- whatever that

13  means to be pro se.  That's my -- I spend more time doing

14  that than anything else.

15     Q.   Do you have any sources of income?

16     A.   No, I do not.

17     Q.   When was the last time you were employed and

18  received income from that employment?

19          MR. ILLOVSKY:  Okay.  So Mr. Rothenberg has

20  previously informed the commission this morning that he

21  was going to be asserting his Fifth Amendment privilege.

22  So he's going to do that with a little note that he's

23  going to rely on to make sure that he properly invokes it

24  and just wanted to let you know.

25          MR. ATWOOD:  Certainly.  Appreciate it.

                                                          23

US-001623

```
 1              Can we read back my last question.
 2              MR. ILLOVSKY:  Do you remember the last
 3   question?
 4              THE WITNESS:  I remember it.
 5              MR. ILLOVSKY:  So just so you know, he's going
 6   to be looking at the note.
 7              MR. ATWOOD:  Yeah.  That's fine.
 8              THE WITNESS:  So on the advice of my attorney, I
 9   respectfully decline to answer the question on the
10   grounds of my Fifth Amendment privilege.
11   BY MR. ATWOOD:
12       Q.  Now I have something to read from.
13            "I am not authorized to compel you to give
14            evidence or testimony as to which you assert
15            your Fifth Amendment privilege against
16            self-incrimination and I have no intention of
17            doing so.  You should also understand that I do
18            not have the authority to compel your testimony
19            by granting you immunity from criminal
20            prosecution.  Any question that I ask hereafter
21            will be with the understanding that if you wish
22            to assert your privilege, you need merely state
23            that you intend to assert your Fifth Amendment
24            privilege.  In other words, you're not compelled
25            to answer any further questions if you believe
```

                                                          24

US-001624

1            that a truthful answer to the question might

2            tend to show that you committed a crime and you

3            wish to assert your Fifth Amendment privilege

4            against self-incrimination.  Accordingly, if you

5            answer any questions instead of asserting your

6            Fifth Amendment privilege, you will be doing so

7            voluntarily."

8            Do you understand that?

9       A.   Yes.

10      Q.   "You should be aware that if you refuse to

11           answer a question based on your Fifth

12           Amendment privilege, it is the commission's

13           position that a judge or a jury may take an

14           adverse inference against you in any civil

15           action, including this one, that the commission

16           may later determine to bring against you.

17           That means that the judge or jury would be

18           permitted to infer that your answers to the

19           questions would have tended to incriminate you."

20           Do you understand the commission's position on

21   this?

22      A.   Is the judge permitted to have an adverse

23   inference or obligated to?

24      Q.   We will make the argument the judge must.  That

25   is our position.

                                                        25

US-001625

1      A.   Okay.  So it will be the judge's discretion?

2      Q.   It is a legal question.

3      A.   Okay.  So I understand that you would make that

4  argument.

5      Q.   Okay.  Do you intend to assert your Fifth

6  Amendment privilege to all further questions concerning

7  your prior employment?

8      A.   Yes.

9      Q.   Mr. Rothenberg, since we've talked about some of

10 the discovery that has been issued in this case today, I

11 wanted to turn to that now.

12          We will mark this as Exhibit 4.

13          (Exhibit 4 was marked for identification by the

14          court reporter and is attached hereto.)

15          MR. ILLOVSKY:  Mr. Atwood, since it's safe to

16 assume that Mr. Rothenberg is going to be asserting his

17 privilege throughout, I would ask that -- I took a look,

18 I noticed that there was a protective order entered in

19 the case, so I would ask to designate the transcript

20 going forward as confidential per protective order.

21          MR. ATWOOD:  You're entitled to make that

22 request.  We would disagree with that assertions of Fifth

23 Amendment privilege would qualify for protection under

24 that protective order.  We can send you a copy of that

25 protective order later today, and there are procedures in

26

US-001626

```
 1   there for how to designate information confidential per
 2   protective order and there are procedures in there about
 3   how to resolve any disputes.  So we will note that for
 4   the record.  I can tell you now we are not going to agree
 5   with that the assertion of Fifth Amendment privilege
 6   makes testimony subject to the protective order.  We can
 7   talk about that further off the record.
 8            MR. ILLOVSKY:  Yes.
 9   BY MR. ATWOOD:
10       Q.  Mr. Rothenberg, you've been handed what's been
11   marked as Exhibit 4.  Do you recognize that document?
12       A.  I'm going to answer this to all questions, as my
13   counsel mentioned, from this point onward, so I don't
14   how -- if you want me to read this every time, I will.
15   Or how you want to do that or do you have a suggestion?
16   But that's why we said that.
17       Q.  I'm more than happy for us to come up with a
18   shorthand so you don't have to read that same sentence,
19   whatever shorthand works for you.  But I am going to be
20   asking you a lot of questions today, and if you're going
21   to be asserting your privilege, there needs to be
22   something on the record about it.  So if you want to take
23   a moment to confer with counsel, you're more than welcome
24   to do so.
25            MR. ILLOVSKY:  Can we -- so I know that
```

27

US-001627

1  sometimes people use a shorthand.  I tend not to like the

2  shorthand.  If we could agree that the court reporter

3  could -- that Mr. Rothenberg could use a shorthand but

4  that the court reporter could, instead of writing his

5  shorthand response -- that doesn't work?  Then he'll just

6  have to read this.

7       MR. ATWOOD:  All right.

8  BY MR. ATWOOD:

9       Q.  If you're taking your attorney's advice, you'll

10 need to read that every time I ask you a question that

11 you don't want to answer.  I would be more than willing

12 to stipulate that we can say "Fifth Amendment" or

13 something like that and we would have the understanding

14 that it meant what's on that piece of paper.

15      MR. ILLOVSKY:  All right.  Let's do it that way.

16 Otherwise, it will just take an exceedingly long time.

17      THE WITNESS:  Well, does it matter what the

18 record looks like?

19      MR. ATWOOD:  Why don't we go off the record

20 right now.

21            (Recess taken at 10:13 a.m.)

22           (Proceedings resumed at 10:22 a.m.)

23      MR. ATWOOD:  Back on the record.

24 BY MR. ATWOOD:

25      Q.  Mr. Rothenberg, I'll remind you that you're

28

US-001628

1   under oath.  We had some discussions with counsel

2   regarding assertion of your Fifth Amendment privilege

3   while we were off the record.  And now there's a document

4   that will be marked as Exhibit 5.

5            (Exhibit 5 was marked for identification by the

6            court reporter and is attached hereto.)

7   BY MR. ATWOOD:

8        Q.   And, Mr. Rothenberg, you've been handed what's

9   been marked as Exhibit 5.  Can you please read that into

10  the record.

11       A.   "On the advice of my attorney, I respectfully

12            decline to answer that question on the grounds

13            of my Fifth Amendment privilege."

14       Q.   And it's my understanding going forward if you

15  are going to assert your Fifth Amendment privilege, you

16  will reference Exhibit 5; is that correct?

17       A.   That works.

18       Q.   Mr. Illovsky, gossiping like to add anything?

19            MR. ILLOVSKY:  No, I think you captured it

20  accurately.

21  BY MR. ATWOOD:

22       Q.   So turning back to Exhibit 4, Mr. Rothenberg, do

23  you recognize Exhibit 4?

24       A.   I refer you to my answer on Exhibit 5.

25       Q.   Okay.  I'll note for the record that Exhibit 4

                                                          29

US-001629

```
 1   is defendant Michael B. Rothenberg's responses to
 2   plaintiff SEC's first set of interrogatories.
 3          If we could turn to page 3 of Exhibit 4, there
 4   is a response here provided by defendant Rothenberg.
 5          Mr. Rothenberg, did you draft this response to
 6   interrogatory number 1?
 7       A.  I refer you to Exhibit 5.
 8       Q.  Let's turn to page 7 of Exhibit 4.
 9          Mr. Rothenberg, is that your signature on page 7
10   of Exhibit 4?
11       A.  I refer you to Exhibit 5.
12       Q.  Mr. Rothenberg, do you intend to assert your
13   Fifth Amendment privilege to all further questions
14   concerning Exhibit 4?
15       A.  On the advice of my attorney I will be asserting
16   my Fifth Amendment privilege for all further questions.
17       Q.  And specifically that includes Exhibit 4?
18       A.  All questions does include Exhibit 4.
19       Q.  Thank you.
20          MR. ATWOOD:  Let's mark this as Exhibit 6.
21          (Exhibit 6 was marked for identification by the
22          court reporter and is attached hereto.)
23   BY MR. ATWOOD:
24       Q.  Mr. Rothenberg, you've now been handed what's
25   been marked as Exhibit 6.  Do you recognize this
```

30

US-001630

 1  document?

 2      A.   I refer you to Exhibit 5.

 3      Q.   I'll note for the record that Exhibit 6 is an

 4  email from Michael Rothenberg to Barrett Atwood, Andrew

 5  Hefty, subject line "Mike Rothenberg's discovery

 6  responses," and it was sent on May 1st, 2019, at

 7  11:56 p.m.

 8           And I'll note that attached to this email were

 9  rog responses and RFA responses.

10           And I'll represent to you, Mr. Rothenberg, that

11  we did receive those attachments.

12           In this email you write that you plan to

13  supplement these objections with responses where relevant

14  within the next week.

15           Do you still intend to do that?

16      A.   I refer you to Exhibit 5.

17      Q.   If I ask you any further questions regarding

18  Exhibit 6, will you assert your Fifth Amendment

19  privilege?

20      A.   Exhibit 6 is within the universe of all future

21  questions, so yes.

22           MR. ATWOOD:   Let's mark this as Exhibit 7.

23           (Exhibit 7 was marked for identification by the

24           court reporter and is attached hereto.)

25

                                                            31

US-001631

1   BY MR. ATWOOD:

2       Q.   Mr. Rothenberg, you've been handed what's been

3   marked as Exhibit 7.

4           And I'll note for the record that it is

5   captioned "Defendant Michael B. Rothenberg's Responses to

6   Plaintiff SEC's Second Set of Interrogatories."

7           Mr. Rothenberg, do you recognize this document?

8       A.   I refer you to Exhibit 5.

9       Q.   Mr. Rothenberg, if you could look at page 8 of

10  Exhibit 7, is that your signature on page 8?

11      A.   I refer you to Exhibit 5.

12      Q.   Mr. Rothenberg, do you intend to assert your

13  Fifth Amendment privilege as to all further questions

14  concerning Exhibit 7?

15      A.   As stated before, yes.

16          MR. ATWOOD:   I'll mark this as Exhibit 8.

17          (Exhibit 8 was marked for identification by the

18          court reporter and is attached hereto.)

19  BY MR. ATWOOD:

20      Q.   Mr. Rothenberg, you've been handed what's now

21  been marked as Exhibit 8.

22          I'll note for the record that it is captioned

23  "Defendant Michael B. Rothenberg's Responses to Plaintiff

24  SEC's First Set of Requests for Admission."

25          Do you recognize Exhibit 8, Mr. Rothenberg?

                                                          32

US-001632

1        A.   I refer you to Exhibit 5.

2        Q.   If we could turn to page 27 of Exhibit 8.

3             Mr. Rothenberg, is that your signature on

4   page 27 of Exhibit 8?

5        A.   I refer you to Exhibit 5.

6        Q.   Do you intent to assert your Fifth Amendment

7   privilege to all further questions concerning Exhibit 8?

8        A.   I refer you to Exhibit 5.

9             MR. ATWOOD:   We will mark these as Exhibit 9.

10            (Exhibit 9 was marked for identification by the

11            court reporter and is attached hereto.)

12   BY MR. ATWOOD:

13       Q.   Mr. Rothenberg, you've now been handed a

14   document that's been marked as Exhibit 9.

15            I'll state for the record that the caption is

16   "Defendant Michael B. Rothenberg's Responses to Plaintiff

17   SEC's First Set of Requests for Production."

18            Mr. Rothenberg, do you recognize Exhibit 9?

19       A.   I refer you to Exhibit 5.

20       Q.   If we could turn to page 11 of Exhibit 9,

21   please.  Mr. Rothenberg, is that your signature on

22   page 11 of Exhibit 9?

23       A.   I refer you to Exhibit 5.

24       Q.   Do you intend to assert your Fifth Amendment

25   privilege to all further questions concerning Exhibit 9?

                                                        33

US-001633

1       A.   I refer you to Exhibit 5.

2       Q.   Mr. Rothenberg, are you familiar with the

3  California limited liability company with the name

4  Rothenberg Group LLC?

5       A.   I refer you to Exhibit 5.

6       Q.   Do you own all or nearly all of Rothenberg Group

7  LLC?

8       A.   I refer you to Exhibit 5.

9       Q.   Do you control Rothenberg Group LLC?

10       A.   I refer you to Exhibit 5.

11       Q.   Did you form Rothenberg Group LLC?

12       A.   I refer you to Exhibit 5.

13       Q.   Mr. Rothenberg, are you familiar with a Delaware

14  limited liability company River Ecosystems, LLC?

15       A.   I refer you to Exhibit 5.

16       Q.   Are you aware that River Ecosystems, LLC, was

17  formerly known as Rothenberg Venture Events LLC?

18       A.   I refer you to Exhibit 5.

19       Q.   Mr. Rothenberg, do you currently hold any equity

20  interest in River Ecosystems, LLC?

21       A.   I refer you to Exhibit 5.

22       Q.   Have you at any time held an equity interest in

23  River Ecosystems, LLC?

24       A.   I refer you to Exhibit 5.

25       Q.   Do you control River Ecosystems, LLC, at this

34

US-001634

```
 1   time?
 2        A.   I refer you to Exhibit 5.
 3        Q.   Have you ever controlled River Ecosystems, LLC?
 4        A.   I refer you to Exhibit 5.
 5        Q.   Who is Nicholas Canafax?
 6        A.   Barrett, I refer you to Exhibit 5.
 7        Q.   Mr. Rothenberg, are you familiar with a Delaware
 8   limited liability company known as River Studios LLC?
 9        A.   I refer you to Exhibit 5.
10        Q.   Are you aware that River Studios LLC, a Delaware
11   limited liability company, was originally incorporated as
12   Ben Reality LLC?
13        A.   I refer you to Exhibit 5.
14        Q.   Do you currently hold any equity interest in
15   River Studios LLC?
16        A.   I refer you to Exhibit 5.
17        Q.   Have you at any time held an equity interest in
18   River Studios LLC?
19        A.   I refer you to Exhibit 5.
20        Q.   Do you currently or have you ever controlled
21   River Studios LLC?
22        A.   I refer you to Exhibit 5.
23        Q.   Mr. Rothenberg, are you familiar with Ben
24   Reality LLC, a California limited liability company?
25        A.   I refer you to Exhibit 5.
```

                                                      35

US-001635

1    Q.   Have you ever held an equity interest in Ben

2   Reality LLC, a California limited liability company?

3    A.   I refer you to Exhibit 5.

4    Q.   Do you now or have you ever controlled Ben

5   Reality LLC, a California limited liability company?

6    A.   I refer you to Exhibit 5.

7         MR. ATWOOD:   Let's mark this as our next

8   exhibit.

9         (Exhibit 10 was marked for identification by the

10        court reporter and is attached hereto.)

11  BY MR. ATWOOD:

12   Q.   Mr. Rothenberg, you've now been handed what has

13  been marked as Exhibit 10.

14        And I'll note for the record that it is

15  captioned "Declaration of Michael Rothenberg in Support

16  of Defendant Ben Reality LLC's Motion for Summary

17  Judgment."

18        Mr. Rothenberg, do you recognize Exhibit 10?

19   A.   I refer you to Exhibit 5.

20   Q.   On page 2 of Exhibit 10 there's a signature.   Is

21  that your signature, Mr. Rothenberg?

22   A.   I refer you to Exhibit 5.

23   Q.   Do you intend to assert your Fifth Amendment

24  privilege to all further questions concerning Exhibit 10?

25   A.   I refer you to Exhibit 5.

36

US-001636

1       Q.  Do you intend to assert your Fifth Amendment

2   privilege to all further questions concerning Rothenberg

3   Group LLC?

4       A.  I refer you to Exhibit 5.

5       Q.  Do you intend to assert your Fifth Amendment

6   privilege to all further questions concerning River

7   Ecosystems, LLC?

8       A.  I refer you to Exhibit 5.

9       Q.  Do you intend to assert your Fifth Amendment

10  privilege to all further questions concerning River

11  Studios LLC, a Delaware limited liability company?

12      A.  I refer you to Exhibit 5.

13      Q.  Do you intend to assert your Fifth Amendment

14  privilege to all further questions concerning Ben Reality

15  LLC, a California limited liability company?

16      A.  I refer you to Exhibit 5.

17      Q.  Mr. Rothenberg, are you familiar with Folsom

18  Property LLC, a Delaware limited liability company?

19      A.  I refer you to Exhibit 5.

20      Q.  Mr. Rothenberg, are you aware that that same

21  entity was formerly known as Rothenberg Ventures, LLC?

22      A.  I refer you to Exhibit 5.

23      Q.  Do you now or have you ever held an equity

24  interest in Folsom Property LLC?

25      A.  I refer you to Exhibit 5.

US-001637

1     Q.  Do you now or have you ever controlled Folsom
2  Property LLC?
3     A.  I refer you to Exhibit 5.
4     Q.  Do you intend to assert your Fifth Amendment
5  privilege to all further questions concerning Folsom
6  Property LLC?
7     A.  I refer you to Exhibit 5.
8     Q.  Mr. Rothenberg, are you familiar with River
9  Accelerator LLC?
10    A.  I refer you to Exhibit 5.
11    Q.  Do you now or have you ever held any equity
12  interest in River Accelerator LLC?
13    A.  I refer you to Exhibit 5.
14    Q.  Do you now or have you ever controlled River
15  Accelerator LLC?
16    A.  I refer you to Exhibit 5.
17    Q.  Do you intend to assert your Fifth Amendment
18  privilege to all further questions concerning River
19  Accelerator LLC?
20    A.  I refer you to Exhibit 5.
21    Q.  Mr. Rothenberg, are you familiar with an entity
22  known by Rothenberg Management LLC, a Delaware limited
23  liability company?
24    A.  I refer you to Exhibit 5.
25    Q.  Mr. Rothenberg, do you now or have you ever held

38

US-001638

1 an equity interest in Rothenberg Management LLC?

2     A.  I refer you to Exhibit 5.

3     Q.  Do you now or have you ever controlled

4 Rothenberg Management LLC?

5     A.  I refer you to Exhibit 5.

6     Q.  Do you intend to assert your Fifth Amendment

7 privilege to all further questions concerning Rothenberg

8 Management LLC?

9     A.  I refer you to Exhibit 5.

10     Q.  Mr. Rothenberg, are you familiar with a Texas

11 limited partnership with the name Rothenberg Investments,

12 LP?

13     A.  I refer you to Exhibit 5.

14     Q.  Do you intend to assert -- actually, let me back

15 up.

16         Do you now or have you ever held an equity

17 interest in Rothenberg Investments, LP?

18     A.  I refer you to Exhibit 5.

19     Q.  Do you now or have you ever controlled

20 Rothenberg Investments, LP?

21     A.  I refer you to Exhibit 5.

22     Q.  Do you intend to assert your Fifth Amendment

23 privilege concerning Rothenberg Investments, LP?

24     A.  I refer you to Exhibit 5.

25     Q.  Mr. Rothenberg, are you familiar with a Texas

39

US-001639

1   corporate entity with the name Rothenberg Investments MG,

2   Inc.?

3        A.   I refer you to Exhibit 5.

4        Q.   Mr. Rothenberg, do you now or have you ever

5   controlled Rothenberg Investments MG, Inc.?

6        A.   I refer you to Exhibit 5.

7        Q.   Do you now or have you ever held an equity

8   interest in Rothenberg Investments MG, Inc.?

9        A.   I refer you to Exhibit 5.

10       Q.   Do you intend to assert your Fifth Amendment

11  privilege to all further questions concerning Rothenberg

12  Investments MG, Inc.?

13       A.   I refer you to Exhibit 5.

14       Q.   Mr. Rothenberg, are you familiar with a Texas

15  corporate entity with the name Rothenberg Realty PLLC?

16       A.   I refer you to Exhibit 5.

17       Q.   Mr. Rothenberg, do you now or have you ever

18  controlled Rothenberg Realty PLLC?

19       A.   I refer you to Exhibit 5.

20       Q.   Do you now or have you ever possessed an equity

21  interest in Rothenberg Realty PLLC?

22       A.   I refer you to Exhibit 5.

23       Q.   Do you intend to assert your Fifth Amendment

24  privilege to all further questions concerning Rothenberg

25  Realty PLLC?

                                                          40

US-001640

1       A.   I refer you to Exhibit 5.

2       Q.   Mr. Rothenberg, are you familiar with an entity

3  with the name Rothenberg Investment Co. LLC?

4       A.   I refer you to Exhibit 5.

5       Q.   Do you now or have you ever controlled

6  Rothenberg Investment Co. LLC?

7       A.   I refer you to Exhibit 5.

8       Q.   Do you now or have you ever held an equity

9  interest in Rothenberg Investment Co. LLC?

10      A.   I refer you to Exhibit 5.

11      Q.   Do you intend to assert your Fifth Amendment

12  privilege to all further questions concerning Rothenberg

13  Investment Co. LLC?

14      A.   I refer you to Exhibit 5.

15      Q.   Now, Mr. Rothenberg, I want to turn to the

16  venture capital funds that are at issue in this

17  litigation.

18           I do have a number of those agreements here but

19  I don't think we need to enter them all into the record,

20  given today's circumstances, but I wanted to make sure to

21  get on the same page with some terminology.

22           If I refer to "Rothenberg Ventures Fund I LLC"

23  as the "2013 fund," do you understand what I mean?

24      A.   I'll go with yes.

25      Q.   And if I refer to "Rothenberg Ventures Fund II

                                                        41

US-001641

1   LLC" as the "2014 fund," do you understand what I mean?

2        A.   Yes.

3        Q.   If I refer to "Rothenberg Ventures 2015 Fund

4   LLC" as the "2015 fund," do you understand what I mean?

5        A.   Yes.

6        Q.   And if I refer to "Rothenberg Ventures 2016 Fund

7   LP" as the "2016 fund," do you understand what I mean?

8        A.   I refer you to Exhibit 5.

9        Q.   Okay.  So we had agreement on 2013 fund, 2014

10  fund, and the 2015 fund, correct?

11       A.   2016 fund has a --

12       Q.   Yeah.  You asserted your Fifth Amendment

13  privilege to my question regarding the 2016 fund,

14  correct?

15       A.   Yes.

16       Q.   If I ask you any further questions regarding the

17  2016 fund, do you intend to assert your Fifth Amendment

18  privilege?

19       A.   I refer you to Exhibit 5.

20       Q.   Mr. Rothenberg, are you familiar with RVF I

21  Co-investor Fund I LLC?

22       A.   I refer you to Exhibit 5.

23       Q.   Do you intend to assert your Fifth Amendment

24  privilege to all further questions concerning RVF I

25  Co-investor Fund I LLC?

                                                        42

US-001642

1      A.  I refer you to Exhibit 5.

2      Q.  Mr. Rothenberg, there are a number of entities

3   with the name RVF I Co-investor Fund I through VII LLC,

4   appear to be eight different entities.  If I ask you any

5   questions regarding those entities, do you intend to

6   assert your Fifth Amendment privilege?

7      A.  I refer you to Exhibit 5.

8      Q.  Mr. Rothenberg, I'm going to refer to those

9   entities in my last question as the "2013 co-funds."

10         If I ask you any questions about the 2013

11   co-funds, do you intend to assert your Fifth Amendment

12   privilege to all of those questions?

13      A.  I refer you to Exhibit 5.

14      Q.  Mr. Rothenberg, the 2013 fund invested in the

15   2013 co-funds, correct?

16      A.  I refer you to Exhibit 5.

17         Let the record show gossipping has commenced.

18             (Discussion off the record.)

19      Q.  So one thing I've observed when I asked do you

20   intend to assert your Fifth Amendment privilege to all

21   further questions, you assert your Fifth Amendment

22   privilege.  You may want to talk to counsel about this,

23   but it probably would help things if you said "yes."  But

24   if you all want to go off the record to talk about that,

25   we can do that.

                                                          43

US-001643

```
 1              MR. ILLOVSKY:  Right.
 2              THE WITNESS:  So is that what we are doing?
 3              MR. ILLOVSKY:  Just take a quick second.
 4                   (Discussion off the record.)
 5   BY MR. ATWOOD:
 6        Q.  Are you done conferring with counsel?
 7        A.  Uh-huh.
 8              MR. ILLOVSKY:  Mr. Atwood, I think in the prior
 9   instances where Mr. Rothenberg provided that answer, I
10   think he was meaning to say "yes," that is, that he was
11   going to.
12              MR. ATWOOD:  Okay.
13   BY MR. ATWOOD:
14        Q.  So the record is clear, when I've previously
15   asked you if you intend to assert your Fifth Amendment
16   privilege to all further questions regarding a certain
17   subject, you intended your response to be "yes"?
18        A.  Yes.
19        Q.  Thank you.  And if there's any question about
20   that going forward, feel free to ask.
21              Mr. Rothenberg, are you aware whether the 2014
22   fund agreement was amended?
23        A.  I refer you to Exhibit 5.
24        Q.  Are you aware if the 2014 fund management
25   agreement was amended?
```

                                                              44

US-001644

1      A.   I refer you to Exhibit 5.

2      Q.   Do you intend to assert your Fifth Amendment

3  privilege to all further questions concerning amendments

4  to the 2014 fund agreement?

5      A.   Yes.

6      Q.   Do you intend to assert your Fifth Amendment

7  privilege to all further questions concerning the 2014

8  fund management agreement being amended?

9      A.   Yes.

10      Q.   Mr. Rothenberg, are you aware of three co-funds

11  relating to the 2014 fund?

12      A.   Refer you to Exhibit 5.

13      Q.   Are you familiar with RVF II Co-investor Fund I

14  LLC?

15      A.   I refer you to Exhibit 5.

16      Q.   Are you familiar with RVF II Co-investor Fund II

17  LLC?

18      A.   I refer you to Exhibit 5.

19      Q.   Are you familiar with Rothenberg Ventures

20  Co-fund I LLC?

21      A.   I refer you to Exhibit 5.

22      Q.   Mr. Rothenberg, for ease of reference I'm going

23  to refer to those three LLCs I just asked you about as

24  "the 2014 co-funds."

25           Are you aware of the purpose of the 2014

                                                              45

US-001645

1   co-funds?

2        A.   I refer you to Exhibit 5.

3        Q.   Did the 2014 fund invest in the 2014 co-funds?

4        A.   I refer you to Exhibit 5.

5        Q.   Do you intend to assert your Fifth Amendment

6   privilege to all further questions concerning the 2014

7   co-funds?

8        A.   Yes.

9        Q.   Moving on to the 2015 fund, Mr. Rothenberg, are

10  you aware whether the 2015 fund agreement was amended?

11       A.   I refer you to Exhibit 5.

12       Q.   Do you intend to assert your Fifth Amendment

13  privilege to all further questions concerning the 2015

14  fund agreement?

15       A.   Yes.

16       Q.   Do you intend to assert your Fifth Amendment

17  privilege to all further questions concerning the

18  amendment of the 2015 fund agreement?

19       A.   Yes.

20       Q.   All right.  So now let's move on to the 2016

21  fund.  We will mark this as our next exhibit.

22            (Exhibit 11 was marked for identification by the

23            court reporter and is attached hereto.)

24  BY MR. ATWOOD:

25       Q.   Mr. Rothenberg, you've been handed what has been

                                                              46

US-001646

1   marked as Exhibit 11.

2           And I'll note for the record that on its title

3   page it is called "Rothenberg Ventures 2016 Fund LP,

4   Second Amended and Restated Limited Partnership

5   Agreement."

6           Mr. Rothenberg, do you recognize Exhibit 11?

7       A.   I refer you to Exhibit 5.

8       Q.   Mr. Rothenberg, do you intend to assert your

9   Fifth Amendment privilege to all further questions

10  concerning Exhibit 11?

11      A.   Yes.

12              (Discussion off the record.)

13      MR. ATWOOD:   I've got a very voluminous exhibit

14  coming up we will mark as Exhibit 12.

15          (Exhibit 12 was marked for identification by the

16          court reporter and is attached hereto.)

17  BY MR. ATWOOD:

18      Q.   Mr. Rothenberg, you've been handed what's been

19  marked as Exhibit 12, which I'll note for the record is

20  entitled "Rothenberg Ventures 2016 Feeder Fund LP."

21      MR. HEFTY:   One moment.

22      MR. ILLOVSKY:   I'm missing a cover page or

23  something.   Sorry, I wrote Exhibit 12 on there.

24      MR. ATWOOD:   Andy, will you just give him your

25  copy?

                                                           47

US-001647

```
 1            MR. HEFTY:   Yeah.
 2   BY MR. ATWOOD:
 3       Q.  All right.   Exhibit 12 is now in front of you,
 4   Mr. Rothenberg.   Do you recognize Exhibit 12?
 5       A.  I refer you to Exhibit 5.
 6       Q.  Okay.   Mr. Rothenberg, do you intend to assert
 7   your Fifth Amendment privilege to all further questions
 8   concerning Exhibit 12?
 9       A.  Yes.
10            MR. ATWOOD:   Let's mark this as Exhibit 13.
11            (Exhibit 13 was marked for identification by the
12            court reporter and is attached hereto.)
13   BY MR. ATWOOD:
14       Q.  Actually, before I get to Exhibit 13,
15   Mr. Rothenberg, if I ask you any further questions
16   concerning the 2016 fund, do you intend to assert your
17   Fifth Amendment privilege?
18            MR. ILLOVSKY:   I think you asked that question
19   already.   You mean the feeder fund?
20            MR. ATWOOD:   Well, I'm going to start with the
21   2016 fund.   If I asked him previously, I apologize.   I
22   just want to make sure I covered all of this.
23            THE WITNESS:   I don't believe I agreed to that
24   shorthand for that one, so could you be more specific?
25
```

                                                              48

US-001648

1   BY MR. ATWOOD:

2       Q.   If I ask you any further questions regarding the

3   2016 fund, do you intend to assert your Fifth Amendment

4   privilege?

5       A.   I mean, what do you mean by "the 2016 fund"?

6       Q.   What's your understanding of what the 2016 fund

7   means?

8       A.   You asked to define it earlier, and I declined

9   to agree to that shorthand so I don't know what you mean

10  by "the 2016 fund."

11      Q.   When someone at Rothenberg Ventures uses the

12  term "2016 fund," what do they mean?

13      A.   I'll refer you to Exhibit 5 for that question.

14      Q.   If I asked you any further questions regarding

15  the use of the term "2016 fund at Rothenberg Ventures,"

16  do you intend to assert your Fifth Amendment?

17      A.   Yes.  Yes.

18      Q.   Mr. Rothenberg, what's the relationship between

19  Rothenberg Ventures 2016 Feeder Fund LP and Rothenberg

20  Ventures 2016 Fund LP?

21      A.   I refer you to Exhibit 5.

22      Q.   If I ask you any further questions regarding

23  your relationship between those two entities, do you

24  intend to assert your Fifth Amendment privilege?

25      A.   Yes.

49

US-001649

1     Q.   I know we marked Exhibit 13, but put that aside

2   for the moment and we are going to mark Exhibit 14.

3             (Exhibit 14 was marked for identification by the

4             court reporter and is attached hereto.)

5   BY MR. ATWOOD:

6     Q.   I'll note that Exhibit 14 has been marked

7   "Confidential per PO," which means it is subject to the

8   protective order in this matter.

9             And the title of Exhibit 14 is "The Company's

10  Law 2013 Revision of the Cayman Islands Company Limited

11  by Shares Memorandum and Articles of Association of

12  Rothenberg Ventures 2016 Feeder Fund GP LTD."

13            Mr. Rothenberg, do you recognize Exhibit 14?

14    A.   I refer you to Exhibit 5.

15    Q.   Mr. Rothenberg, if I ask you any further

16  questions regarding Exhibit 14, do you intend to assert

17  your Fifth Amendment privilege?

18    A.   Yes.

19    Q.   What is your understanding of the relationship

20  between the Rothenberg Ventures 2016 Feeder Fund GP and

21  the Rothenberg Ventures 2016 Fund LP?

22    A.   I refer you to Exhibit 5.

23    Q.   Do you intend to assert your Fifth Amendment

24  privilege to all further questions regarding the

25  relationship of those two entities?

                                                      50

US-001650

1      A.   Yes.

2      Q.   Now we can go to Exhibit 13.  And I'll note for

3  the record that the title on the first page of this

4  document is "Document Packet for Amendment to Rothenberg

5  Ventures to 2015 Fund."

6           Mr. Rothenberg, do you recognize Exhibit 13?

7      A.   I refer you to Exhibit 5.

8      Q.   Do you intend to assert your Fifth Amendment

9  privilege to all further questions concerning Exhibit 13?

10     A.   Yes.

11           (Exhibit 15 was marked for identification by the

12           court reporter and is attached hereto.)

13  BY MR. ATWOOD:

14     Q.   I'm handing you what's been marked as

15  Exhibit 15.

16           And I'll note for the record that Exhibit 15 is

17  entitled "Amended and Restated Limited Liability Company

18  Agreement for Rothenberg Ventures Management Company

19  LLC."

20           Mr. Rothenberg, do you recognize Exhibit 15?

21     A.   I refer you to Exhibit 5.

22     Q.   Let's turn to the page ending in Bates

23  Number 025.  Mr. Rothenberg, do you recognize the

24  signatures that are on page ending in Bates Number 025?

25     A.   I refer you to Exhibit 5.

51

US-001651

1     Q.   If you could turn to the page ending in 027.

2          For the record, I'll note that that page is

3     entitled "Exhibit A, Capital Contributions, Number of

4     Units and Percentage Interest of Members as of

5     December 28th, 2012."

6          Mr. Rothenberg, are those percentages identified

7     on the page ending in Bates Number 027 accurate?

8     A.   I refer you to Exhibit 5.

9     Q.   Mr. Rothenberg, if I ask you any further

10    questions concerning Exhibit 15, do you intend to assert

11    your Fifth Amendment privilege?

12    A.   Yes.

13    Q.   Mr. Rothenberg, while you were employed at

14    Rothenberg Ventures Management Company LLC and any

15    subsequent names thereto, what were your roles and

16    duties?

17    A.   I refer you to Exhibit 5.

18    Q.   Just so we can have a little bit of shorthand

19    and hopefully speed this process, if I refer to the

20    entity formerly known as "Rothenberg Ventures Management

21    Company LLC" also formerly known as "Frontier Technology

22    Venture Capital LLC" and currently known as "Rothenberg

23    Ventures LLC," if I refer to that entity as "RVMC," do

24    you understand?

25    A.   Yes.

                                                          52

US-001652

```
 1        Q.   What was Tom Leep's role at RVMC?
 2        A.   I refer you to Exhibit 5.
 3             Can I confer with counsel?
 4        Q.   Sure.  Do you need to go off the record?
 5        A.   Yeah.  Will that be okay?  In fact, ideally if I
 6   could go get a coffee at Starbucks.
 7        Q.   Okay.  Just so you know, Mr. Rothenberg, the
 8   deposition is limited to seven hours on the record, so
 9   the more breaks we take --
10        A.   I also have a doctor's appointment at 2:15.  So
11   I'm assuming by doing this Fifth thing that that is, you
12   know, not going to be a problem.
13        Q.   Well, if you want to be done by 2:15, I suggest
14   that we limit the number of breaks.
15        A.   I mean, there's no way you can get through --
16   you know, if I wasn't doing this, there's no way you
17   would have gotten through that by 2:15.
18        Q.   All right.  Let's go off the record at
19   11:00 o'clock a.m.
20                    (Recess taken at 11:00 a.m.)
21               (Proceedings resumed at 11:09 a.m.)
22             MR. ATWOOD:   We will go back on the record at
23   11:09 a.m.
24   BY MR. ATWOOD:
25        Q.   Mr. Rothenberg, what was the role of Tommy Leep
```

53

US-001653

1  at RVMC?

2      A.  I refer you to Exhibit 5.

3      Q.  If I ask you any further questions regarding

4  Tommy Leep, do you intend to assert your Fifth Amendment

5  privilege?

6      A.  Yes.

7      Q.  If I ask you any further questions regarding Tom

8  Leep, do you intend to assert your Fifth Amendment

9  privilege?

10     A.  Yes.

11     Q.  Are Tom and Tommy Leep father and son?

12     A.  I refer you to Exhibit 5.

13     Q.  If I ask you any further questions regarding the

14 relationship between Tom and Tommy Leep, do you intend to

15 assert your Fifth Amendment privilege?

16     A.  They are -- yes.

17     Q.  What was Lynn McMillan's role at RVMC?

18     A.  I refer you to Exhibit 5.

19     Q.  Do you intend to assert your Fifth Amendment

20 privilege to all further questions concerning Lynn

21 McMillan?

22     A.  Yes.

23     Q.  What was David Hossen's role at RVMC?

24     A.  Dave Hoss- -- I refer you to Exhibit 5.

25     Q.  Do you intend to assert your Fifth Amendment

                                                    54

US-001654

```
 1   privilege to all further questions concerning David
 2   Hossen?
 3        A.   Yes.
 4        Q.   What was Martin Mayo's role at RVMC?
 5        A.   I refer you to Exhibit 5.
 6        Q.   Do you intend to assert your Fifth Amendment
 7   privilege to all questions concerning Martin Mayo?
 8        A.   Yes.
 9        Q.   What was Brandon Farwell's role at RVMC?
10        A.   Before he was fired for cause, I believe he was
11   an investment analyst or some kind of investor.
12        Q.   What do you mean by "some kind of investor"?
13        A.   Well, I don't specifically recall the name
14   that's on his employment agreement, but he spent some
15   time on the investment team.
16        Q.   What were his duties on the investment team?
17        A.   I refer you to Exhibit 5.
18        Q.   Why was Mr. Farwell fired for cause?
19        A.   I refer you to Exhibit 5.
20        Q.   What were Mr. Farwell's duties as an investment
21   analyst?
22        A.   I refer you to Exhibit 5.
23        Q.   Do you intend to assert your Fifth Amendment
24   privilege to all further questions concerning
25   Mr. Farwell?
```

                                                              55

US-001655

1      A.   Yes.

2      Q.   What was Hanna Han's role at RVMC?

3      A.   I refer you to Exhibit 5.

4      Q.   And I believe Ms. Han's first name is spelled

5  X-U.   Do you know how to pronounce that?

6      A.   I believe it may be something like "Shou," like

7  S-H-O-U, in terms of how it sounds.

8      Q.   But she went by Hanna?

9      A.   Those are the same person, as far as I know.

10      Q.   And what was her role at RVMC?  Did you assert

11  your Fifth Amendment to that?

12      A.   Yes.

13      Q.   Do you in intend to assert your Fifth Amendment

14  privilege to all further questions regarding Ms. Han?

15      A.   Yes.

16      Q.   What was Todd Tindall's role with respect to

17  RVMC?

18      A.   I refer you to Exhibit 5.

19      Q.   Do you intend to assert your Fifth Amendment

20  privilege to all further questions regarding Mr. Tindall?

21      A.   Yes.

22      Q.   Other than the people I've asked you about

23  today, is there anyone else that's ever worked on the

24  accounting records of RVMC?

25      A.   That question presumes that all the people you

                                                          56

US-001656

1   mentioned worked on accounting so I don't accept the

2   premise, but to that extent, I'll -- I mean, I don't want

3   to respond in any way that accepts the premise.  I don't

4   accept the premise.

5        Q.  Okay.  With the caveat -- and I totally

6   understand what you're saying -- aside from anyone that

7   I've mentioned that may have worked on accounting or the

8   records of RVMC, is there anyone else?

9        A.  Okay.  So I refer you to Exhibit 5.

10       Q.  If I ask you any further questions regarding the

11  individuals who maintain the accounting records of RVMC,

12  do you intend to assert your Fifth Amendment privilege?

13       A.  Yes.

14       Q.  Okay.  I'm going to butcher this name but

15  hopefully you'll know who I'm talking about.  What role

16  did Ferdad Abdon Nazeroff's role have at RVMC?

17       A.  Abdon Nazeroff.

18       Q.  Thank you for that.

19       A.  I refer you to Exhibit 5.

20       Q.  If I ask you any further questions regarding

21  Abdon Nazeroff, do you intend to assert your Fifth

22  Amendment privilege?

23       A.  Yes, and that was pretty good.

24       Q.  While you were employed at RVMC, what role, if

25  any, did J.R. Eppler have with respect to RVMC?

                                                        57

US-001657

1      A.   I refer you to Exhibit 5.

2      Q.   If I ask you any further questions regarding

3  Mr. Eppler and his involvement with RVMC while you were

4  employed there, do you intend to assert your Fifth

5  Amendment privilege?

6      A.   Yes.

7      Q.   What role did Burke Robinson have with RVMC

8  during the time that you were employed there?

9      A.   I refer you to Exhibit 5.

10      Q.   If I ask you any further questions regarding

11  Mr. Robinson during the time period that you were

12  employed by RVMC, do you intend to assert your Fifth

13  Amendment privilege?

14      A.   Yes.

15           MR. ATWOOD:   Let's mark this as Exhibit 16.

16           (Exhibit 16 was marked for identification by the

17           court reporter and is attached hereto.)

18  BY MR. ATWOOD:

19      Q.   Mr. Rothenberg, you've been handed what's been

20  marked as Exhibit 16.

21           And I'll note for the record that it's a letter

22  on Rothenberg Ventures' letterhead dated October 17th,

23  2018.   The title of the document appears to be "Notice of

24  Resignation (for now)."

25           Mr. Rothenberg, do you recognize Exhibit 16?

                                                              58

US-001658

1          A.   I refer you to Exhibit 5.

2          Q.   Mr. Rothenberg, is that your signature on

3     Exhibit 16?

4          A.   I refer you to Exhibit 5.

5          Q.   In this letter you mention a jet stream

6     proposal.  What does that mean?

7          A.   I refer you to Exhibit 5.

8          Q.   If I ask you any further questions regarding

9     Exhibit 16, do you intend to assert your Fifth Amendment

10    privilege?

11         A.   Yes.

12              MR. ATWOOD:  Let's mark this as Exhibit 17.

13              (Exhibit 17 was marked for identification by the

14              court reporter and is attached hereto.)

15    BY MR. ATWOOD:

16         Q.   Mr. Rothenberg, you've been handed what's been

17    marked as Exhibit 17.  It's an irrevocable trust

18    agreement.  Do you recognize Exhibit 17?

19         A.   I refer you to Exhibit 5.

20         Q.   Mr. Rothenberg, is that your signature on page 2

21    of Exhibit 17?

22         A.   I refer you to Exhibit 5.

23         Q.   What is the purpose of this trust agreement,

24    Mr. Rothenberg?

25         A.   I refer you to Exhibit 5.

                                                              59

US-001659

1      Q.  Are you familiar with the entity River
2  Ecosystems, LLC, identified on page 1 of Exhibit 17?
3      A.  I refer you to Exhibit 5.
4      Q.  If I ask you any further questions regarding
5  Exhibit 17, do you intend to assert your Fifth Amendment
6  privilege?
7      A.  Yes.
8      Q.  Mr. Rothenberg, I want to talk in general terms
9  about Rothenberg Ventures' management company during the
10  time you were employed there.
11      Who was responsible for making investment
12  decisions at the management company?
13      A.  I refer you to Exhibit 5.
14      Q.  Who was responsible for -- excuse me.
15      Were you responsible for making investment
16  decisions at RVMC?
17      A.  I refer you to Exhibit 5.
18      Q.  If I ask you any further questions regarding
19  decision making involving investments at RVMC, do you
20  intend to assert your Fifth Amendment privilege?
21      A.  Yes.
22      Q.  Who was responsible for authorizing the payment
23  of expenses at RVMC?
24      A.  I refer you to Exhibit 5.
25      Q.  While you were employed there, were you

60

US-001660

1   responsible for making decisions about the payment of

2   expenses at RVMC?

3        A.   I refer you to Exhibit 5.

4        Q.   If I ask you any further questions regarding the

5   payment of expenses while you were employed at RVMC, do

6   you intend to assert your Fifth Amendment privilege?

7        A.   Yes.

8        Q.   While you were employed at RVMC, who was

9   responsible for deciding whether or not to issue a

10   distribution to investor?

11        A.   I refer you to Exhibit 5.

12        Q.   Were you responsible for authorizing

13   distributions to investors while you were employed at

14   RVMC?

15        A.   I refer you to Exhibit 5.

16        Q.   If I ask you any further questions regarding

17   distributions to investors while you were employed at

18   RVMC, do you intend to assert your Fifth Amendment

19   privilege?

20        A.   Yes.

21        Q.   While you were employed at RVMC, were there any

22   other board members besides you?

23        A.   I refer you to Exhibit 5.

24        Q.   If I ask you any further questions regarding the

25   board members of RVMC or any Rothenberg fund, do you

61

US-001661

```
 1   intend to assert your Fifth Amendment privilege?
 2        A.  Yes.
 3        Q.  What is your understanding of the guaranteed
 4   payment provisions of the various Rothenberg fund venture
 5   agreements?
 6        A.  I refer you to Exhibit 5.
 7        Q.  If I ask you any further questions regarding the
 8   guarantee payment provisions of the various Rothenberg
 9   venture fund agreements, do you intend to assert your
10   Fifth Amendment privilege?
11        A.  Yes.
12        Q.  While you were employed at RVMC, did you make
13   any decisions regarding guaranteed payments?
14        A.  I refer you to Exhibit 5.
15        Q.  If I ask you any further questions regarding
16   your decision making around guaranteed payments while you
17   were employed at RVMC, do you intend to assert your Fifth
18   Amendment privilege?
19        A.  Yes.
20        Q.  What is your understanding of the
21   indemnification provisions of the Rothenberg Ventures
22   venture capital funds at RVMC?
23        A.  I refer you to Exhibit 5.
24        Q.  While you were employed at RVMC, were you the
25   person responsible for making decisions regarding
```

62

US-001662

1    indemnification?

2         A.   I refer you to Exhibit 5.

3         Q.   While you were employed at RVMC, you did in fact

4    make distributions from the 2015 fund for the purposes of

5    indemnification; is that correct?

6         A.   I refer you to Exhibit 5.

7         Q.   While you were employed at RVMC, you did make

8    payments for the purposes of indemnification from the

9    2014 fund; is that correct?

10        A.   I refer you to Exhibit 5.

11        Q.   Same question regarding the 2013 fund.

12        A.   I refer you to Exhibit 5.

13        Q.   The same question regarding the entity that I've

14   been referring to as the "2016 fund."

15        A.   Well, I haven't acknowledged what that is.

16   Perhaps restating the question.

17        Q.   Okay.  I think we are okay without that.

18            If I ask you any further questions regarding the

19   payment of expenses under the indemnification clause of

20   any venture capital fund managed by Rothenberg Ventures

21   Management Company while you were employed there, do you

22   intend to assert your Fifth Amendment privilege?

23        A.   Yes.

24        Q.   Mr. Rothenberg, when you were employed at RVMC,

25   was it -- were you the person that authorized the

                                                            63

US-001663

```
1   reimbursement of out-of-pocket expenses?
2        A.   I refer you to Exhibit 5.
3        Q.   Was there anyone else at RVMC that played a role
4   regarding the payment of out-of-pocket expenses while you
5   were employed at RVMC?
6        A.   I refer you to Exhibit 5.
7        Q.   If I ask you any further questions concerning
8   the payment of out-of-pocket expenses at RVMC during your
9   employment there, do you intend to assert your Fifth
10  Amendment privilege?
11       A.   Yes.
12       Q.   Are you familiar with the term "carry equity
13  units"?
14       A.   I refer you to Exhibit 5.
15       Q.   Are you familiar with the term "carried
16  interest"?
17       A.   I refer you to Exhibit 5.
18       Q.   And if I ask you any further questions regarding
19  carried interest or carry equity units, do you intend to
20  assert your Fifth Amendment privilege?
21       A.   Yes.
22            MR. ATWOOD:  If we could mark this as
23  Exhibit 18, please.
24            (Exhibit 18 was marked for identification by the
25            court reporter and is attached hereto.)
```

64

US-001664

1  BY MR. ATWOOD:

2      Q.  Mr. Rothenberg, you've been handed what's been

3  marked as Exhibit 18, which is on its first page titled

4  "Interest Transfer Agreement."

5          Are you familiar with this document?

6      A.  I refer you to Exhibit 5.

7      Q.  If you could turn to the last page of

8  Exhibit 18, please.  Is that your signature -- I guess

9  there's two of your signatures.

10          Are those two signatures yours on the last page

11  of Exhibit 18?

12      A.  I refer you to Exhibit 5.

13      Q.  Who is Regina Scully?

14      A.  I refer you to Exhibit 5.

15      Q.  Did Ms. Scully cause a transfer of approximately

16  $2.25 million to a bank account controlled by RVMC while

17  you were employed there?

18      A.  Yes.

19      Q.  What was the purpose of that transfer?

20      A.  Well, it appears to be in behalf of Mike

21  Rothenberg.

22      Q.  So I understand your response, you're saying

23  Ms. Scully transferred approximately 2.25 million to an

24  RVMC bank account for the benefit of you personally?

25      A.  That's what this document says.

65

US-001665

1      Q.   And was that --

2      A.   It's for the credit of Mike Rothenberg's

3   account.   That's what this would be.   Because otherwise

4   this would go to him directly.   So if the seller wanted

5   that to go to the management co, that would be for the

6   credit of his personal account.

7      Q.   Okay.   I'm not sure I'm understanding.

8           Are you saying this money was intended to be

9   your money or the management company's money?

10      A.   What this document looks to me to be is an

11   interest transfer agreement, which means that the

12   purchase would be for -- from -- would be Regina Scully

13   purchasing an interest from Mike Rothenberg, so that's

14   Mike Rothenberg's personal stake.   So for her to receive

15   that, then Mike Rothenberg would get the funds.   And if

16   the funds were transferred to the management co, that

17   would be at the direction of the seller, so for the

18   credit of their account.

19      Q.   And the seller in this situation is you,

20   Mr. Rothenberg?

21      A.   Yes, I am the Michael Rothenberg in this

22   agreement.

23      Q.   And what was Ms. Scully purchasing for

24   $2.25 million?

25      A.   Well, at this time in March 2015, she is

66

US-001666

 1   purchasing a minority interest of four-and-a-half

 2   percent.

 3        Q.   That minority interest was in Rothenberg

 4   Ventures Management Company LLC?

 5        A.   Yes, it does appear to be that.

 6        Q.   What's your understanding of what that entitled

 7   Ms. Scully to receive?

 8        A.   I am not sure that this is the only agreement

 9   relating to Ms. Scully.

10        Q.   Okay.  Just based on your understanding and

11   experience with Ms. Scully, what is your understanding of

12   what she was intending to purchase?

13        A.   Well, I can't speak to the intent of Ms. Scully,

14   but I know that from what I recall she had an interest in

15   helping build -- helping us get -- helping me get enough

16   funds to help build the -- you know, things like the

17   river program.  And so I had the money in this case, you

18   mentioned it went to RVMC.  I have no reason to think

19   that's not true.

20             So I wanted to use those funds to help build --

21   build things like the river program, and I know that she

22   was very interested in helping build those things.  So I

23   know that she expressed an interest in providing funds to

24   me that I could use for working capital to build -- to

25   build up essentially more services and marketing ability

67

US-001667

 1   for both RV and -- you know, RV start-ups, related

 2   companies, things like that.

 3        Q.   Okay.   That's helpful.

 4             You mentioned that this may not be the only

 5   agreement.   What are the other agreements that may

 6   relate?

 7        A.   I would be willing to do a search for that to

 8   the extent the commission doesn't have the full history

 9   of this.

10        Q.   I can represent to you that we do not have a

11   different type of agreement executed by you and

12   Ms. Scully.

13        A.   I will be happy to agree to do a full search for

14   that.

15        Q.   What if any were the subsequent agreements

16   regarding?

17        A.   I do recall that this agreement did change

18   eventually, so that's why I'm not really sure what her

19   intent was at the time because I don't think this is -- I

20   don't think this captures the full extent of it.

21        Q.   Do you recall what the ultimate agreement was?

22        A.   Well, given the nature of the sensitivity here,

23   I do want to not overstate what I remember, but I know

24   that -- well, I believe that she wanted to help us grow

25   these things.   This agreement looks like it's structured

                                                            68

US-001668

1    for me personally.

2         However, as you mentioned, I do actually think

3    those funds went to RVMC.  And so I believe that we may

4    have done a better job in a subsequent agreement or

5    revision of this to capture that those funds were

6    ultimately used at RVMC instead of me personally.

7         Q.   Was it a loan from you to RVMC?

8         A.   Well, this is -- well, could you clarify what

9    that means?

10         Q.   Well, so we do have documents indicating that

11    there was a loan for this amount and we can get to those,

12    but we don't have any related agreements.  And my

13    understanding, based on your prior answer, was that this

14    2.25 million was yours personally but it was sent to the

15    management company.

16         A.   That's why I believe that -- I believe this

17    isn't the only agreement.  I think that this did not

18    capture the -- at least, you know -- at least what I

19    wanted to do with the funds, which was use it to build

20    RV.  This doesn't really have that in here, and I think

21    there's at least one other document that was executed

22    with Ms. Scully that helped clarify that.

23         So I -- to the extent that the commission

24    doesn't have that document, that's something I can -- I'm

25    sure I can locate.

                                                        69

US-001669

1      Q.   Okay.  The agreement, which is Exhibit 18, has

2  on the first line is "Made and entered into as of

3  March 26, 2015" date.

4          The agreement that you're referring to, was that

5  subsequent to this date?

6      A.   Yes.  Yes, I believe it was.

7      Q.   Do you know whether this agreement that is

8  Exhibit 18 is still a valid agreement?

9      A.   I believe it was, at a very minimum,

10  supplemented if not superseded by the subsequent one.

11      Q.   Do you know if there was a loan involved with

12  that subsequent agreement?

13      A.   By Ms. Scully?

14      Q.   By any party that's part of this agreement,

15  either you, the management company, or Ms. Scully.

16      A.   I don't know that there was a loan in that

17  subsequent agreement, but that is something that we can

18  even find out potentially today, depending what time we

19  get out of here.

20      Q.   So you've expressed, I believe, it's your

21  understanding of what happened subsequently.

22          Do you know, was it your intent to sell

23  Ms. Scully an interest in the management company through

24  these series of agreements?

25      A.   To sell her a piece of the management company?

                                                        70

US-001670

1          Q.   Uh-huh.   Yes.

2          A.   I think that the distinction in my mind is

3    economic interest.   You know, I -- meaning, you know,

4    participation and upside in the future over time as

5    opposed to necessarily, you know, voting rights and

6    things like that.   She had no -- to my recollection, she

7    had no interest in governance on her part or voting

8    rights.   She was interested in supporting us and having

9    some economic rights to the upside over time.

10          So that's -- I don't know if that answers your

11   question, but that's what I believed was happening.

12         Q.   Okay.   Would that be what is addressed in

13   section 2.1 on Exhibit 18, which is titled "Profit

14   Rights"?

15         A.   Because I'm not sure this encapsulates the full

16   agreement with her, I'm going to say I'm not sure.

17         Q.   Do you know whether Ms. Scully currently has any

18   membership interest in RVMC?

19         A.   Well, I do not believe that RVMC ever, to my

20   knowledge, paid back that full amount of money to her to,

21   like, fully buy her out, but I know, like I said before,

22   I do think there is, you know, a history after this with

23   her that it does exist.   So I do think the nature of her

24   relationship changed over time.

25         Q.   Do you know approximately when that subsequent

                                                            71

US-001671

1    agreement or agreements were entered into?

2        A.  I believe that -- I believe there was an

3    agreement on or around April of 2016.  I could be off by

4    a little bit but probably not by a lot.  And then I don't

5    know the exact date, but I believe there was one other --

6    at least one other transaction with her.  There was --

7            Let me not speculate anymore on that because I'm

8    not positive, but I believe there was at least one

9    payment if not two made to her, small payments.  They may

10   have corresponded with the documents too.

11       Q.  Do you know who drafted Exhibit 18?

12       A.  I do not.  I can't remember who drafted this

13   from looking at this.

14       Q.  And I realize we don't have the subsequent

15   agreement or agreements with us, but is it your

16   understanding that the current status of the relationship

17   between Ms. Skully and the management company is that

18   this amount was a loan?

19       A.  Well, this says it was a membership interest or

20   like an economic interest-type arrangement.  I believe

21   that the other documents will help us answer that

22   question.

23       Q.  Read my mind.  Okay.

24           Before I get to the next exhibit, though, do you

25   have Ms. Skully's contact information?

                                                          72

US-001672

1      A.   Well, that seems to be something I can -- I can

2    at least get whatever my last contact information for her

3    was.

4      Q.   That would be helpful.

5           When was the last time you communicated with

6    Ms. Skully?

7      A.   I have communicated with Ms. Skully maybe two to

8    three times a year every year since 2015.

9      Q.   And the most recent communication?

10      A.   I'm not positive that I communicated with her in

11   2019.  But -- so what is this, May?  I don't think I've

12   communicated with her in the last three months, but I

13   believe I did, you know, in the last six.

14      Q.   How do you know Ms. Skully?

15      A.   Ms. Skully I believe is also -- well, she's an

16   LP in at least one of the -- I believe one of the funds.

17           MR. ATWOOD:  All right.  We will go ahead and

18   mark this as Exhibit 19.

19           (Exhibit 19 was marked for identification by the

20           court reporter and is attached hereto.)

21   BY MR. ATWOOD:

22      Q.   Mr. Rothenberg, you've been handed what's been

23   marked as Exhibit 19.  I'll note for the record that it

24   is an email thread of which you are one of the authors

25   and recipients on, and on the first page it's dated

                                                          73

US-001673

1   April 5, 2016.  If you could turn to the last page on the

2   exhibit, which ends in Bates Number 313, you'll see an

3   email that appears to be sent by you from a gmail.com

4   account on April 1, 2016.

5          If you'd just review that email and let me know

6   when you're done.

7          A.   Okay.

8          Q.   You're done reviewing the email?

9          A.   Yeah.

10         Q.   Do you recognize Exhibit 19?

11         A.   Yeah.  I mean, this looks like, you know, just

12  preliminary discussions about, you know, potential

13  structures that may not have ultimately been at all

14  relevant to what I know ultimately was decided.  But this

15  is April 2016, so this is about the same time that I

16  believe that there was a subsequent agreement with

17  Regina.

18         This is partly the same kind of time period I'm

19  thinking of for that being revisited and potentially more

20  accurately documented to reflect the nature of the

21  transaction.

22         Q.   Okay.  Well, let me point you directly to the

23  second-to-the-last paragraph on page ending in Bates

24  Number 313, and I'll read that into the record.  It

25  states:

                                                            74

US-001674

1           "Additionally, the Regina Skully $2.25 million

2           transaction that was credited as advances from

3           me to the management co," company I would

4           assume, "should instead be a loan from Regina

5           Skully to the management company and increase

6           the amount that Rothenberg Group LLC owes the

7           management co LLC accordingly."

8           Do you see where I was reading there,

9  Mr. Rothenberg?

10      A.   I see where you're reading.

11      Q.   Does that refresh your recollection as to any

12  subsequent agreement with Ms. Skully?

13      A.   Well, so yeah, this predates -- I mean, if the

14  transaction I'm thinking of was in April, this would

15  predate that because this is the 1st in April.  So this

16  is exactly the type of, you know, internal communication.

17  I don't believe we even ended up using this financial

18  firm that is on this thread for any actual filings of any

19  kind.

20          So this is the kind of, like -- looks like

21  there's, you know, still structuring decisions that are

22  being worked out, and the timing also suggests that this

23  is before some of those things were worked out.

24      Q.   Okay.  And I appreciate that response, but I'm

25  focused on Regina Skully.

                                                          75

US-001675

1          I understand that paragraph to say that this --

2    at this stage by April 1, 2016, the transaction with

3    Ms. Skully should be characterized as a loan.

4          Does that refresh your recollection at all?

5      A.  Well, once again, the way we used, you know,

6    email is not ever definitive.  Emails for us were never

7    final products, so this is a, you know, just an internal

8    discussion about potential structure.  It doesn't mean

9    that that's what we ultimately decided.

10     Q.  That's not my question, though.

11         My question is do you -- does reading this

12   refresh your recollection that you entered into a loan

13   agreement with Regina Skully?

14     A.  I'm not sure if that happened, but it may have.

15   I do think the other document will clarify that.

16     Q.  Okay.

17     A.  Like, this is just -- you know, even this is

18   probably what I am at the time possibly thinking may be

19   the case, but it doesn't mean that it is.  I mean, that's

20   why I have attorneys.  They look through things and try

21   to make sure that things are, you know, up to speed,

22   accurate, all that.  And then when we are having emails,

23   I mean to some extent it's just internal conversations

24   about -- you know, you can always take things out of

25   context like this.

76

US-001676

1    Q.  Well, I mean, I'm giving you the opportunity

2  here to provide context.  So if you're saying you don't

3  recall whether you entered into a loan agreement with

4  Regina Skully, that's fine.  I'm just trying to ask.

5    A.  I do believe there was a subsequent, at least

6  update to the Regina Skully transaction around this time.

7       And, you know, part of what I'm reacting to is

8  that these people, especially like Jeff and Julia, were

9  not people we actually ended up doing anything with, so

10  they didn't actually do any -- as far as I remember they

11  didn't become the primary, you know, accountants or

12  things like that.  So this seems to me to be kind of a

13  one-off because these aren't the people that we went

14  with.

15    Q.  And I understand that.  I'm reading your email

16  to them and your characterization of the agreement with

17  Regina Skully and you telling them it should be a loan.

18       So if you don't recall anything further, you can

19  just tell me that.  I'm just trying to make sure.

20    A.  Well, in the emails I cut out the shorthand of,

21  like, what do you think and how about this and, you know,

22  is this what the documents say, you know, when I'm

23  doing -- that's why these are drafts or informal

24  discussions whereas like when we execute things, like

25  this, then this is where it's codified.  So this

77

US-001677

1  refreshes my recollection that this time period we did

2  something different with Regina.  Now, what that was I

3  believe was actually after this date.

4          But this is the same time period I'm thinking of

5  for sure.  I mean, there's a lot of things that happened

6  in April of 2016.

7          Q.  And just so the record is clear, who are Jeff

8  and Julia that you are referring to?

9          A.  Again, to the best of my recollection, these are

10 people that we did not end up actually, you know, doing

11 anything meaningful with, meaning I don't remember even

12 talking to them for more than a few days.  Maybe possibly

13 a couple weeks at most.  I just don't remember these

14 people as a factor for us.

15         Q.  But you mentioned they worked at some firm.  Do

16 you know what the name of that firm is?

17         A.  Right here it says Bregante+Company but, once

18 again, that's not -- I don't believe that -- I don't

19 believe that, you know, any entity I'm involved with had

20 any kind of sustained relationship with them.

21         Q.  Is mikerothenberg@gmail.com your email address?

22         A.  That -- yes.  Well, it's not my -- you know,

23 it's like a personal one.  But --

24         Q.  It's one that you have access to?

25         A.  Yes.  Yeah.

                                                          78

US-001678

1      Q.  Do you have any reason to believe that you did

2  not send this email that's dated April 1, 2016, on

3  page -- on the page ending in Bates Number 313 on

4  Exhibit 19?

5      A.  So like I said before, we have internal -- I

6  mean, there's all kinds of like drafts that we may have

7  or internal discussions, where this literally even says

8  in the email itself "I'm taking a guess."  So this is

9  like a sort of a -- this is a -- yes, I have reason to

10  believe I didn't send it.  This is something like we

11  might send so I don't have any reason to believe I

12  didn't.  I do have reason to believe that this is not

13  indicative of where we ended up deciding to structure

14  things, because it just isn't.

15          So this is not a -- I would definitely not

16  regard this as anything close to, you know, a legitimate

17  company document in terms of describing, you know, where

18  things ended up.  That's not what this is.

19      Q.  I appreciate that.

20          So the page ending in Bates Number 312, there's

21  an email from Jeff to you, and that's dated April 2nd,

22  2016.  And you'll see in his numbered paragraph 4 he

23  writes "Regarding the $1 million of salary that you want

24  to show on your 2015 tax return (not mentioned in your

25  structure memo below but mentioned in our conference call

79

US-001679

1  on Wednesday)," a few comments and the email goes on.

2         Do you recall having that conversation with Jeff

3  regarding your salary for 2015 tax return?

4      A.  I don't remember the specific conversation,

5  but -- you know, I think -- I did not receive, you know,

6  biweekly stipends or, you know, I was not on the Gusto

7  Payroll, which is what we had for a lot of the time.  So

8  to some extent, you know, I was probably learning at this

9  time how they think of that because, you know, I just

10 didn't receive a, you know, biweekly type of thing.  So

11 it looks like he's trying to explain to me how that

12 works.

13     Q.  Was it your understanding that you did have a

14 salary from RVMC in 2015?

15     A.  Well, that goes to the nature of what he's

16 describing, which is he's trying to educate me I think on

17 what does constitute a salary versus, you know, other

18 types of transactions.  So I do think that it looks like

19 how I thought about what is or isn't may have evolved at

20 this time.

21     Q.  Well, sitting here today, is it your

22 understanding whether you had a salary from RVMC in 2015?

23     A.  Let me be more direct.  To the extent that a

24 salary is a payroll, you know, Gusto-initiated type of

25 thing that comes to your account, you know, once or twice

80

US-001680

1    a month, I did not have that.

2            It doesn't mean that there wasn't any

3    compensation of any kind.  It just means that the way

4    that that was defined did not pertain to me.

5        Q.  What was your understanding of compensation that

6    was paid to you by RVMC in 2015?

7        A.  I don't recall specifically how -- the

8    characterization.  I think that's part of what was in

9    question here.  This document doesn't jog my memory on

10   where that landed.

11       Q.  To the extent that RVMC paid you money in 2015,

12   is it your understanding that that's your compensation?

13       A.  I actually think that's the heart of the matter,

14   which is that -- was that one of the arguments they were

15   making to me was that to the extent that I had

16   compensation, it appeared that I invested a hundred

17   percent back of it into RVMC.  So they were saying that

18   there may be tax advantages or disadvantages to someone

19   who is not actually taking money out of a company but

20   characterizing some of it as compensation.

21           So these are tax -- these guys I think were tax

22   experts and they were saying that if I was investing

23   everything back in to RV, that it may not be the best tax

24   characterization to call it compensation.

25           And tax is not my expertise, by any stretch, so

81

US-001681

1 this is why, you know, they were noticing that -- I mean,

2 that may have even been why we wanted to revisit all

3 these other things, because if I'm just using, like,

4 anything that I may have thought of as compensation back

5 to invest in the company, it may not be a very efficient

6 way to think about it.

7   Q. What was the basis for you earning compensation

8 from RVMC in 2015?

9   A. The basis?

10   Q. Uh-huh.

11   A. What does that mean?

12   Q. Like in what manner were you entitled to

13 compensation from RVMC in 2015?

14   A. Well -- what manner was I.

15   So I had -- there was a company credit card that

16 was an American Express that had several people's names

17 on it.  In the first three years -- I believe that it

18 takes a company at least a couple of years sometimes to

19 establish its own credit history.  That was my

20 understanding.  So the company's credit card was taken

21 out in my personal name, and there were multiple people

22 at the company that also had this American Express from

23 at least 2015 onward if not before that.

24   And so the way that that credit card was paid

25 was by essentially I would make the payments from my

US-001682

1    personal account and RV would pay me.  And so I think

2    what was happening here was that these tax experts were

3    noticing that when you take into account the company

4    expenses, that it appeared that I may have actually not

5    received anything net.  And so the heart of this

6    discussion is was there money paid to me that was -- I

7    reinvested or was there potentially very little to no

8    money paid to me.  And I think that's why they were --

9    that's why the tax experts had opinions about that.

10        Q.   Okay.  I appreciate that answer.  There was a

11   lot there, though, so maybe we can break it down a little

12   bit.

13        So I had asked about compensation, and it sounds

14   like this credit card was used to pay expenses of the

15   business; is that right?

16        A.   There was a company -- there was a company card

17   that was in my name that other people at the company had

18   also.  Like, it would say their name on it, but it was

19   really attached to a master account in my name.  And

20   that's an American Express.  And it's primarily a

21   platinum American Express.  I think it evolved, like it

22   might have been like a -- you can ask that.

23        I'm sorry, what is the question you asked?

24        Q.   I'll ask a different question.

25        Was the purpose of that American Express card to

                                                          83

US-001683

1  pay business expenses?

2       A.   That was the primary purpose, which was also why

3  other people at the company had that in their name too.

4       Q.   Do you know who else at the company had access

5  to using that same account?

6       A.   That would be very easy to look up.  I don't

7  recall the specific names off the top of my head.  I mean

8  it's just a matter of -- it's probably on the American

9  Express bank statements that we provided.

10       Q.   If you yourself used that American Express

11  credit card to charge a business expense, whose decision

12  would it be at Rothenberg Ventures to reimburse you for

13  that expense?

14       A.   I think that to that question I already referred

15  to Exhibit 5 in the past so I should stay consistent with

16  that for that question since I've already gone here.

17       Q.   Okay.  So just to be clear, you're asserting

18  your Fifth Amendment privilege in response to that

19  question?

20       A.   I mean, this is still something I'm learning how

21  this works.  I could use a second with him, if that's

22  okay.

23       Q.   You're allowed to confer with your counsel.

24  That's no problem.

25       A.   Okay.

84

US-001684

```
 1              MR. ILLOVSKY:  Take a minute.
 2              THE WITNESS:  Thank you.
 3                   (Recess taken at 11:59 a.m.)
 4              (Proceedings resumed at 12:04 p.m.)
 5              MR. ATWOOD:  We will go back on the record.
 6    It's 12:04 p.m. and there's a pending question and I'll
 7    ask the court reporter to read it back for you,
 8    Mr. Rothenberg.
 9              THE COURT REPORTER:  "Question:  If you
10              yourself used that American Express credit
11              card to charge a business expense, whose
12              decision would it be at Rothenberg Ventures to
13              reimburse you for that expense?"
14              THE WITNESS:  It would be my decision.
15    BY MR. ATWOOD:
16         Q.  And did you make those decisions while you were
17    employed at Rothenberg Ventures Management Company?
18         A.  Yes.  So I didn't necessarily approve every
19    expense that happened across the whole organization at
20    all times; but for when I was using the American Express
21    that was also in my name, that would be me.
22              And then if other people had them, there were
23    policies in place that would dictate how they could use
24    those.  So it wasn't the case that I was involved in
25    every transaction, but the policies in place would be
```

85

US-001685

```
 1   there for them to follow.
 2        Q.   If an expense was above a certain threshold, an
 3   expense incurred by another employee, gossiping be the
 4   person to authorize the payment of that expense?
 5        A.   Not a hundred percent of the time.
 6        Q.   Were there, like, guidelines or procedures in
 7   place?
 8        A.   Yes.
 9        Q.   Okay.  Could you tell us what those were?
10        A.   To the extent I, you know, can recall, yes.
11             So it depended on -- so there could be budgets
12   that would be preapproved if things operate in a
13   certain -- so Tommy Leep, for example, might have a
14   budget that he could use for an event.  And if he stayed
15   within that budget he would approve all of the
16   sub-expenses.  So he was the -- you know, to the best of
17   my recollection, he was the head of the SF office.  He
18   was also the -- you know, as part of that role there was
19   some HR and some kind of events -- events
20   responsibilities, and so he would approve the -- once
21   there was an overall budget, he would approve a lot of
22   the sub-expenses, for example.
23        Q.   So he would be the one that would approve
24   budgets for particular events?
25        A.   Once there was a budget in place for an event,
```

86

US-001686

1   then, you know, he could -- he could operate within that

2   budget to approve all the subitems.

3        Q.   Okay.   I think I'm following you there.   Who

4   would approve that initial budget?

5        A.   So typically in that case he would make a

6   proposal, and then that would require my sign-off if --

7   to have it in place.   So he would initiate and advocate

8   for a proposal, and then I would sign off.

9            In fact, you know, in 2014, I think around the

10  time he joined, we initially called that -- called the

11  events that Tommy was, you know, leading for the

12  start-ups and for the -- you know, connecting the

13  investors and the portfolio companies is one of the

14  primary ways that we helped the companies grow

15  disproportionately, because what -- this is a quick

16  tangent.   Because what the start-ups need more than

17  almost anything else, you know, besides capital is, you

18  know, a valuable network.   You need to meet the right

19  people to help you grow your businesses.

20           Tommy, one of his -- one of the names he called

21  himself was "chief connector," and so he believed, and I

22  do too, that events can be an efficient way to connect

23  these types of people.

24           And so the initial name we had for that strategy

25  in 2014, for example, was "jet stream."   It's a name that

87

US-001687

1    we've seen since.  And Tommy would have -- you know,

2    would propose budgets, and I would sign off on them.

3         Q.  Would anyone other than you be the employee at

4    RVMC that would sign off on such budgets?

5         A.  So if it was a, you know, a decision about, you

6    know, financial software at that time, it would be Tom

7    Leep, and he would make a decision on that.  So depending

8    on people's roles and responsibilities, they would

9    have -- they would have an ability to do that.

10           I think, for example, for a lot of 2015, maybe

11   the entire 2015, Neil Devani was the general counsel.  So

12   any time we were talking to, for example, Cooley and

13   Orrick, he would negotiate directly with them to

14   determine budgets.  So that would be Neil Devani would

15   help set the legal budget for a particular fund formation

16   exercise or whatever we were engaging them for.

17        Q.  If it was business related gossiping be the

18   person authorizing the budget?

19        A.  Once again, it still depended on whose

20   responsibility it was to do a particular activity.  But

21   at a high level I would, you know, always be involved.  I

22   can't remember one time that Neil said this is the amount

23   of money we need for Cooley or Orrick that I said no.

24   So -- but I was certainly involved in the decision.

25        Q.  So we kind of have gone down a path here that

                                                        88

US-001688

1    originally started talking about your compensation and

2    then we got into the reimbursement of the credit card

3    expenses.

4         Was it your understanding that your compensation

5    was being reimbursed for credit card expenses?

6         A.  Well, a company expense that -- for anybody.

7    So, you know, other people could use cards that were not

8    even company cards, at times, in their own names.  They

9    could submit it -- that was through Expensify.

10        You know, that's a typical business thing.  You

11   can have an expense that you have a reason to believe is

12   approved, or part of, like, what would automatically be

13   approved for whatever reason.  And anybody in the company

14   could do that and then submit an expense report and then

15   be reimbursed.  And we never viewed that as compensation.

16   If it's a business expense, it's reimbursed; it's not

17   compensation.

18        So, no, it's not my position that business

19   expenses paid for on that Amex that were reimbursed

20   through my account, that was not compensation.

21        Q.  So you viewed those types of charges on the

22   American Express credit card as charges made for business

23   purposes; and if you were paid by RVMC to reimburse you

24   for those expenses, that was not your compensation?

25        A.  I think I agree with that.  I would probably

                                                          89

US-001689

1    word it as RV paid for RV expenses.  Most often via my

2    account.  But you can look at the amount that was paid to

3    the American Express and you can look at the amount that

4    came from RV, and it's reconcilable.

5        Q.   Did you ever use that American expense credit

6    card for any personal expenses?

7        A.   Yes, yes, there were times.

8        Q.   How gossiping know, looking at the bank records,

9    whether something was a personal expense or a business

10   expense?

11       A.   It, you know, fit in the policies or it didn't.

12       Q.   Whose decision would that be to make?

13       A.   Well, if it wasn't in the, you know, categories

14   of the business expenses then it was personal.  For

15   anybody.  Me too.

16       Q.   What were the categories that were business

17   expenses?

18       A.   You know, there's a lot to that question.  I

19   mean, I don't have a way of characterizing everything in

20   one response.

21       Q.   Well, in the 2015 time frame, who would be the

22   RVMC employee who would review those statements and make

23   those decisions?

24       A.   The responsibility of reviewing the statements

25   to make sure that people were not being reimbursed for

90

US-001690

1  inappropriate things was primarily Tom Leep.

2      Q.  So I've asked about Tom and Tommy Leep

3  previously and you asserted your Fifth Amendment

4  privilege, so if you're going to do that again, let me

5  know.

6          Who is Tom and who is Tommy Leep?

7      A.  Part of -- I still have the same desire to

8  answer every single question that I had when I told you

9  that a few weeks ago.  I'm under the awareness that

10  there's a whole other kind of thing going on that I don't

11  understand, so that's kind of what you're seeing me

12  struggle with.  So I'm going to answer that even though I

13  didn't before.

14          There is no Tommy Leep, but his name is Thomas

15  Leep also.  There's two Thomas Leeps.  And I know who

16  you're talking about because everyone called him Tommy

17  Leep.  So -- and, yes, they are father and son.  So the

18  older -- the elder Thomas Leep was -- ran the finance

19  during the time period he was there, and the younger

20  Thomas Leep was the head of the SF office.  And their

21  middle names are also somewhat similar, maybe.  Well, I

22  don't know.  But the difference in their names -- there

23  is a legal difference in their names, like, I think one

24  of them is an Elwood or something.  I'm just saying that

25  because they are both Thomas Leep.

91

US-001691

1      Q.   And if we refer to Tom or Thomas Leep, we can
2   agree that's the elder Mr. Leep, and Tommy Leep is the
3   junior?
4      A.   Yes.   That's almost entirely how they were
5   distinguished.
6      Q.   Okay.   And your resignation letter that we
7   entered as an exhibit earlier -- for the record I will
8   note that that was Exhibit 16 -- there is a discussion of
9   the jet stream proposal which you were just talking about
10  a few answers ago with respect to Tommy Leep.
11           Gossiping care to elaborate on what the jet
12  stream proposal is?
13     A.   I'll still assert my Fifth, but like the Regina
14  thing, I do think that there may be some -- to the extent
15  you don't have some more recent documents about that,
16  that would be something I would be able to commit to
17  looking for for you.   Because I mean this refers to
18  something more recent than 2014.
19     Q.   So I think we are on the same page that money
20  paid by RVMC to you for the purposes of reimbursing
21  expenses charged to the American Express credit card is
22  not compensation, right?
23     A.   Right.
24     Q.   In 2015, what sources of compensation did you
25  have from River Management Company -- excuse me, not

                                                          92

US-001692

1   River Management.   Rothenberg Ventures Management
2   Company.
3       A.   This goes back to what the definition of
4   compensation is where the vast majority of the people who
5   had employment contracts with RVMC received once or twice
6   a month -- and it was sometimes once or twice.   Like, at
7   the same time there might be somebody who got once,
8   somebody who got twice.   That almost everybody received
9   compensation on a regular basis like that, except for me.
10       So some of what I was I believe learning in
11   April 2016 was how -- how different kinds of payments are
12   characterized, because it's -- even now I still don't
13   fully understand all the nuances of this, but I think one
14   of the things that they are reacting to in this thread is
15   that because I wasn't getting paid in that way, it's
16   possible that I wasn't paid at all because I think they
17   are saying, you know, transactions that counteract may
18   not be counted as, you know, compensation.
19       So there was -- there was -- to the extent that
20   the nature of how you're paid affects, like, what your
21   compensation is, then it goes into the hands of basically
22   the accountants.
23       Q.   Okay.   So I don't want to get into an accounting
24   or tax discussion.   I just want to know what was your
25   understanding in the 2015 time frame, how were you being

93

US-001693

1   compensated?

2       A.   My understanding was I wasn't receiving any net

3   cash from RVMC, but that there were pros and cons about

4   whether or not it was advantageous from a -- like a tax

5   standpoint or a credit standpoint, there were differing

6   things about how to best structure it.  Because my intent

7   was to leave money, you know, in RVMC so that it could

8   grow, which is what it did.

9           In terms of how it was characterized, one of the

10  things that's a factor is that, you know, creditors like

11  it if you receive compensation, even if you reinvest it

12  back in.  So that's another factor which is that it may

13  be necessary to characterize that as such.

14          So I know I wasn't receiving, you know, net

15  cash, but we're -- to the extent that it was important

16  for creditors for other reasons to have compensation,

17  then, you know, that's partly what they were trying to

18  figure out here is, like, where does this need to land.

19      Q.   So I'm having a hard time understanding what

20  you're getting at, Mr. Rothenberg, and I appreciate you

21  testifying and giving us your view of the world, but I'm

22  just trying to get at what entitled you to take money

23  from -- excuse me.  Let me start over.

24          What entitled you to receive money from

25  Rothenberg Ventures Management Company in 2015?

94

US-001694

1      A.   Well, you know, I also had a compensation
2 agreement.   I don't know if that's what you're referring
3 to.
4      Q.   That would be great if you could talk about
5 that.
6      A.   So I -- well, you know, everybody, including me,
7 had a compensation agreement.   So to the extent you're
8 wondering, like, if the question is how -- you know, what
9 agreement enables that, I mean the answer for literally
10 everybody was a document.
11      Q.   And I want to stay focused on your compensation,
12 not the other employees.
13           So what did your compensation agreement with
14 RVMC entitle you to earn?
15      A.   You don't have a copy of that?
16      Q.   Not in front of me.
17      A.   Okay.   I think I went through at least one
18 revision as well, so I would like to commit to, you know,
19 producing any of those documents that you don't already
20 have and then going from there because I don't know if I
21 can recall the specifics.
22           Let me put it this way.   At would be time it
23 seemed -- well, there were creditors that wanted to see
24 compensation to me.   And so even if I -- explicitly they
25 said even if I reinvested all of it.   So you'll see like

95

US-001695

1  a transaction like from me and RV and back.  And so the

2  tax guys would say, Well, you know, you may not have

3  gotten any net money, and the creditors may have said

4  that's fine.  But then there might be a tax implication.

5  So that was the -- that was the question.

6          And, you know, in terms of, you know, whether I

7  was entitled to take money and then keep it, sure; but my

8  goal was always to grow the business.

9          So there's compensation agreements that will

10 speak to that.

11     Q.   Okay.  Do those compensation agreements give you

12 a salary?

13     A.   So to the extent that salary is defined as a

14 biweekly or monthly-type stipend, it was never set up to

15 be a regular payment like that.

16     Q.   How gossiping characterize that payment, the

17 payments that you were to receive under these

18 compensation agreements?

19     A.   More as a, you know, an amount I was entitled to

20 take for my, you know, role and contributions in the

21 company, not as a, you know, biweekly or monthly-type

22 thing like everybody else had.

23     Q.   What entitled you to take money from the

24 management company?

25     A.   My agreement, just like anybody else's.

96

US-001696

1     Q.   So what would determine the amounts of money
2   that you were permitted to take from the management
3   company?
4     A.   It's -- I believe it's all outlined in there.
5   And, you know -- so I gave pretty much everything to my
6   prior counsel, like, so much, and my understanding is he
7   kind of did his best to choose to -- I suppose to deliver
8   what he thought was appropriate.  So to the extent
9   there's any gaps in there, I'll be happy to fill them.
10    Q.   Okay.  We don't have the agreements.  I
11  definitely don't have them here today.  We can go confirm
12  whether or not we do have it.  But I'm just trying to get
13  my head around what the structure was for your
14  compensation.  So it wasn't a set salary.  And I
15  understand it wasn't paid biweekly or monthly or any
16  other regular term.
17         Was it, like, a certain amount of profits?  What
18  was the source of that compensation?
19    A.   Well, in 2015 it was primarily, you know,
20  third-party revenue, at least in terms of kind of helping
21  to determine the amount.
22    Q.   And could you clarify what you mean by
23  "third-party revenue"?
24    A.   Yeah.   I mean, there were times when we'd have,
25  you know, we had programs and events and things like that

97

US-001697

1   that we were just doing, and then we would try to get

2   partners and things like that.  And so to the extent that

3   we would bring in partners who would pay extra revenue

4   above what our costs were, things like that, that would

5   be what I would call third-party revenue.

6        Q.  And so --

7        A.  Sponsorships, partnerships.  They have a few

8   different types of words.

9        Q.  So this revenue that would come in from third

10  parties, whatever revenue exceeded RVMC expenses, you

11  were entitled to take as compensation?

12       A.  If you go back to what I was saying earlier, you

13  know, on a net basis, I think my -- these accountants

14  were saying it didn't appear that I took anything.  So

15  they were questioning, you know, how that was potentially

16  structured.

17            So I didn't -- you know, in terms of, like, what

18  I was entitled to take, yes.  In terms of what actually,

19  you know, net came out of the business is not necessarily

20  even related.

21       Q.  Well, I'm just trying to stay focused on your

22  compensation and what you -- how you were authorized to

23  take money from the management company under these

24  compensation agreements, and your example was third-party

25  revenue could be a source.

                                                          98

US-001698

1          So are you saying that you believe you had

2    compensation agreements that stated if there was any

3    excess revenue contributed by a third party for some kind

4    of business expense, that you were personally entitled to

5    take that excess as your personal compensation?

6          A.   I'm saying that not necessarily blanketly across

7    the board, but I'm saying that there were times when

8    there was extra revenue above what we had budgeted and

9    planned on, things like that, that would otherwise, you

10   know, be attributed to nothing.  So as the primary owner,

11   as the person, you know, who started the company and all

12   that, that's the kind of thing that can go to me as

13   compensation.  That's kind of like a -- I don't know what

14   they call it, like it can be a partner distribution or

15   something like that to the extent that it's, you know,

16   third-party revenue above what we budgeted for.  And that

17   would often come in the form of, you know, a partnership

18   or a sponsorship.

19        Q.   So I think I'm following you.  But let's talk

20   specifically about RVMC.

21          It's set up as an LLC, right?  It's not a

22   partnership.  Do you understand that?

23        A.   It's an LLC, RVMC is.

24        Q.   So any excess revenue that the management

25   company earned, wouldn't that money have to be divided up

                                                          99

US-001699

1  according to the economic interests behind the LLC, like

2  those that made up the management agreement?

3      A.  Well, that's what the whole discussion, you

4  know, I think at this time was about was the -- once

5  again going back to where does the money end up.  So if

6  it's paid to me and then paid back, that's the question.

7  It's not -- like on a net basis there weren't

8  necessarily, you know, profit distributions paid out like

9  that.  It has to do more with what -- you know, what's

10 important from a compliance standpoint.  Like, what is it

11 that we need to do.  It's not really -- so there's, like,

12 conceptual, which is how much am I net taking out of

13 RVMC, and that's nothing.

14      And then there's the what's important from, you

15 know, whether it's creditors, whether it's, I mean, maybe

16 even the SEC, IRS.  Like, that's why I had experts work

17 on that and figure that out, because they look at all the

18 agreements, they look at all the different things in

19 place, rules, all that, and they will say this is, you

20 know, the what happened, the accounting, and they will

21 say, you know, this is the answer.  So that's why those

22 are kind of two different questions.

23      But, you know, everybody else at the company

24 could just take their salary and do what they wanted.

25 That wasn't -- that wasn't my approach.

                                                        100

US-001700

1     Q.  So you're familiar with the allegations of our

2   complaint.  And I'll assume you're familiar; if you're

3   not, tell me I'm wrong.  The main thrust of our complaint

4   is RVMC was entitled to take a certain amount of money

5   from the funds in the form of management fees and

6   administrative expenses.

7         Are you with me so far?

8     A.  Yes, yeah.

9     Q.  And we've alleged, and for purposes of this

10   litigation it's not in dispute, that RVMC at your

11   direction took more money from the funds than they were

12   entitled to earn in management fees or administrative

13   expenses.

14         Do you understand --

15     A.  Well, I never agreed with that.  I just

16   understand that's what you've alleged and I also --

17         MR. ILLOVSKY:  Wait.  So if it's not in dispute

18   for purposes of this litigation, why is the government

19   asking about it now, I guess?

20         MR. ATWOOD:  It goes to this whole line of

21   questioning about compensation and Mr. Rothenberg taking

22   money.  I'm just saying, like, the facts about what our

23   allegations aren't in dispute.  I'm trying to get to what

24   you've been explaining about, what the difference is,

25   like the reality of you being able to take money and how

101

US-001701

```
 1    the lawyers and accountants were looking at it.  I'm
 2    leading to a question; I just want to make sure you
 3    understand --
 4           MR. ILLOVSKY:  Yeah, okay.  So the government's
 5    saying that the questions that it's asking about are not
 6    things that are foreclosed by the allegations of the
 7    complaint.  That's fine.
 8           MR. ATWOOD:  I'm just making sure he
 9    understands -- when I get to my ultimate question, that
10    he understands the framework that I'm asking for.
11           MR. ILLOVSKY:  Okay.  But the ultimate question
12    is something that's not foreclosed by the allegations of
13    the complaint, otherwise there wouldn't be any need to
14    ask the question since it's supposed to be assumed for
15    purposes of --
16           THE WITNESS:  And I'll rescind my last half
17    sentence because I was interrupted by counsel while I was
18    saying that.  So let's reset on that.
19    BY MR. ATWOOD:
20       Q.  Okay.  So with that framework that's set forth
21    in our complaint, and I understand you don't agree with
22    that framework; but you understand that framework,
23    correct?
24       A.  I have never fully understood how you got to
25    what you got to.
```

102

US-001702

1      Q.  Okay.  Well, I'll tell you, just to make the

2   question easier, our position is the management company

3   was allowed to take a certain amount of money, and it

4   took more than it was entitled to take and that money was

5   never paid back to investors.  And that's why we are

6   going through an accounting and that's why we have an

7   expert witness that will show you the math on all that.

8          So where I was headed with all this is who was

9   responsible at RVMC when you were employed there for

10  tracking how much money had been taken from the funds and

11  how much the management company was entitled to earn as

12  management fees and administrative expenses?

13     A.  Part of the challenge with that premise again is

14  that you -- from everything I've seen, the government

15  does not actually even take into consideration how we did

16  characterize things.  So it's pretty hard to even follow

17  your premise because, you know, most of it looks like a

18  guess, whereas in terms of very basic questions like

19  what's the amount -- like what's the fund size, what's

20  the amount of money that we are supposed to invest, and

21  how much did we invest, these are all very clear-cut.

22          And where it gets -- where it gets frustrating

23  is when, after the fact, the government wants to ascribe

24  different types of meaning to transactions that were

25  made, because it's hard for me to engage on that premise.

103

US-001703

 1          MR. ILLOVSKY:  Okay.  So I don't want to

 2    interrupt, but when the question starts with "who," if

 3    you're going to testify, the answer involves a name.  The

 4    SEC's question, if I understand it, is you're taking

 5    people's money, you got an agreement, who's tracking how

 6    much money versus how much is entitled under the

 7    agreement.  That was a who.  If you're going to testify,

 8    give a who.  Or assert your -- sorry.

 9          THE WITNESS:  Okay.

10    BY MR. ATWOOD:

11      Q.  I appreciate that.  It was a who question, so if

12    you know the answer to that and if you're willing to

13    testify on that, we'd love to hear the answer.

14      A.  So is the question about -- okay.

15          MR. ILLOVSKY:  The court reporter can read the

16    question back to you if you want.

17          THE WITNESS:  That would be helpful.

18          MR. ILLOVSKY:  It was who kept track of them.

19          THE COURT REPORTER:  "Question:  So where I

20          was headed with all this is who was

21          responsible at RVMC when you were employed there

22          for tracking how much money had been taken from

23          the funds and how much the management company

24          was entitled to earn as management fees and

25          administrative expenses?"

                                                        104

US-001704

1          THE WITNESS:  So the final sign-off that I gave

2    in 2018 was from me.  There were what I would call, you

3    know, interim tracking to try to keep accounting up to

4    the extent that, you know, we could but without big

5    interferences.  Like, for example, one person asserted

6    that -- the person who was not at the government asserted

7    that the government, something to the extent the

8    government wanted everyone to leave RV, something like

9    that was spread as a rumor, and I lost almost everybody,

10   including people who had key records and things like

11   that, in August of 2016.

12         So I was not able to -- personally I was not

13   even in a position to sign off on the stated financials

14   without even having my infrastructure dismantled, and it

15   took a little while.

16         But by 2018 there was a -- there was a -- you

17   know, a place we got to with the accounting with the

18   funds that was the basis of the LP updates that I

19   provided before, you know, right at the end of my time as

20   the manager.  So that's a -- you know, there was an

21   interrupted period where, you know, I think there was

22   sort of just a lot to handle all at once.  But by 2018

23   that was me.

24   BY MR. ATWOOD:

25         Q.  Okay.  And I appreciate that.

                                                          105

US-001705

```
 1          What about in 2015, who was responsible at that
 2   stage?
 3       A.   I think we filed a tax extension, I think; and
 4   so we were planning to file our 2015 taxes by, I think
 5   that's October of 2016.  And so the interruption I'm
 6   talking about of having a lot of -- you know, people even
 7   deleted -- wiped computers.  So that interruption
 8   happened before we got to that filing.  So the
 9   interruption started with the year 2015, 2016, so on.
10          MR. ILLOVSKY:  That was a who question.
11   BY MR. ATWOOD:
12       Q.   Yeah.  So I'm asking who at RVMC in 2015 was
13   responsible for tracking how much capital had been raised
14   and how much the management company was entitled to earn
15   as management fees and administrative expenses?
16       A.   The primary tracking was Tom Leep in 2015.
17          Once again, he had to go through a process that
18   involved legal before getting final sign-off before it
19   would go to the, you know, accountants for final K-1s and
20   tax forms.  That didn't -- Tom Leep did not stick around
21   for that process, so even Tom Leep didn't finish the 2015
22   process.
23       Q.   So a fact in our complaint that's not in dispute
24   in this case is that you were told at some point that the
25   management company had taken more from the Rothenberg
```

106

US-001706

```
 1   funds than it was entitled to earn.
 2          What did you do after learning that?
 3       A.   It was immediately brought to that person's
 4   attention, I believe by counsel, that -- my recollection
 5   is that counsel informed that person at that time that
 6   the -- that the 2015 fund, if we are talking about 2015,
 7   was four -- there was a provision put in place, I believe
 8   by Cooley, where at the very beginning of the investor
 9   packet, maybe in the first page or two, the investors
10   could elect, they had to actually check a box I think --
11   it was something like that.  They had to do something
12   proactive.  This is my understanding of what Cooley put
13   in place -- where an investor could elect to prepay all
14   their lifetime of fees.  And so the question was, you
15   know, which investors did that.
16          And to the extent that investors did that, that
17   amount of money could be taken by the management company,
18   you know, at any time.  And so if no one had checked that
19   box, if no one elected to do that, then, you know, there
20   would be some kind of payment on a schedule, is my
21   understanding, and for any investor that checked that
22   box, it could be taken up front.
23          So I believe that's how the bank read it.  I
24   believe that's how -- well, everybody read that.  So I
25   think that the subsequent question from that kind of a
```

                                                              107

US-001707

1   thing was how many people checked that box, and then

2   doing that calculation, which I believe was then done.

3        Q.   Okay.   Who was the counsel you're referring to?

4   What is the person's name?

5        A.   Well, Cooley is a firm, and I don't know the

6   individuals that necessarily drafted the documents and

7   did each thing.

8        Q.   And who was the person you're referring to that

9   they were -- that Cooley was speaking with at RVMC?

10       A.   This is -- this goes into specifics.   I don't

11  remember the actual, like, who talked to who, but I

12  remember there was consensus.

13       Q.   I understand what you're saying about the

14  election to pay off fees up front or not.

15            What about the issue of taking more fees than

16  management company would have been allowed to take over

17  the lifetime of a fund?

18       A.   My recollection is that that was determined to

19  not have happened.

20       Q.   And who was responsible for figuring that out at

21  RVMC?

22       A.   So there was -- in terms of actually giving, you

23  know, accounting for numbers, it would still be the

24  finance department would account for it.   The legal

25  department would read the contracts to weigh in on how

108

US-001708

 1  many people had checked the box.

 2      Q.  And who has worked in the finance department

 3  over the years at RVMC?

 4      A.  Well, I'll go back to the Fifth on that one

 5  because I did answer that one with the -- you know, I'll

 6  refer you to Exhibit 5 for that question again.

 7      Q.  During the time you worked at RVMC, were you the

 8  ultimate executive in charge of the business operations?

 9      A.  I'll refer you to Exhibit 5 again.

10      Q.  Did the finance department report to you at

11  RVMC?

12      A.  I'll refer you to Exhibit 5.

13      Q.  Okay.  Let's go off the record.

14              (Discussion off the record.)

15        (Luncheon recess was taken at 12:42 p.m.)

16  AFTERNOON SESSION

17  1:28 p.m.

18              (Exhibit 20 was marked for identification by the

19              court reporter and is attached hereto.)

20          MR. ATWOOD:  We are back on the record at

21  1:28 p.m.

22  BY MR. ATWOOD:

23      Q.  Mr. Rothenberg, you've been handed what's been

24  marked as Exhibit 20.  If you could take a look at that

25  and let me know if you recognize it.

                                                        109

US-001709

 1      A.   Okay.   I direct you to Exhibit 5.

 2      Q.   I'll note for the record that Exhibit 20 is an

 3  email thread.   The first page is an email from

 4  mikerothenberg@gmail.com sent on Monday, December 21st,

 5  2015, to Brian McDaniel, copied to amy@archinacapital.com

 6  and Neil Devani.   Subject line is "Rothenberg Ventures

 7  LPA."

 8          Mr. Rothenberg, if I ask you any further

 9  questions with regard to Exhibit 20, do you intend to

10  assert the Fifth Amendment privilege?

11      A.   Yes.

12      Q.   Do you know who amy@archina is?

13      A.   Is that about this exhibit again?

14      Q.   I'm just asking if you know who Amy is, this

15  particular Amy.

16      A.   I think it might be "Archina," but Archina

17  Capital is an LP in one of the funds, and I believe Amy

18  works there.

19          MR. ATWOOD:   Let's go ahead and mark this as

20  Exhibit 21.

21          (Exhibit 21 was marked for identification by the

22          court reporter and is attached hereto.)

23  BY MR. ATWOOD:

24      Q.   Mr. Rothenberg, you've been handed what has been

25  marked as Exhibit 21.   I see you've taken a look at it.

                                                        110

US-001710

1   Do you recognize this document?

2        A.   This looks to be a continuation of Exhibit 20,

3   so I'll direct you to Exhibit 5 again.

4        Q.   I'll note for the record that Exhibit 21 is an

5   email thread.  Top email is from Neil Devani dated

6   December 27th, 2015.  Subject is "Re Finish Line."  It

7   was sent to Amy Huang, I believe the name is.  Email

8   address is amy@archinacapital.com.  A number of cc's on

9   this first email.

10       Mr. Rothenberg, if I ask you any further

11  questions regarding Exhibit 21, do you intend to assert

12  your Fifth Amendment privilege?

13       A.   I mean, I'll note for the record that I'm not

14  even on at least the first few of these emails, but yes.

15       Q.   Okay.  You're correct; you're not on the email

16  that's at the top of the thread.  But if you go to the

17  first page, the last email that starts on that page

18  you're on the cc line, and I believe you're on all prior

19  emails as well.

20       Let's talk about Robinhood.  Mr. Rothenberg, do

21  you know which of the funds managed by RVMC invested in

22  Robinhood Markets Inc.?

23       A.   The initial investment was made in 2013, I

24  believe, so that would be the 2013 fund.

25       Q.   Is that the only venture capital fund managed by

111

US-001711

```
 1   RVMC that invested in Robinhood?
 2        A.   From the direct investment into the company, I
 3   believe yes.
 4             MR. ATWOOD:  Let's mark this as Exhibit 22.
 5             (Exhibit 22 was marked for identification by the
 6             court reporter and is attached hereto.)
 7   BY MR. ATWOOD:
 8        Q.   Mr. Rothenberg, you've been handed what's been
 9   marked as Exhibit 22.  Do you recognize this document?
10        A.   Is there any additional context?
11        Q.   I can represent to you that it was produced to
12   us by the management company.  I don't know if it was
13   while you were at the management company or subsequent to
14   that.  And it was from an Excel spreadsheet.  This is a
15   printout.
16        A.   I don't have a specific recollection of this
17   particular set of calculations.
18        Q.   Okay.  Well, let's walk through the document a
19   little bit and maybe we can get some clarity on that.
20             It starts off by saying "Initial investment
21   $100,000" for a number of shares of 133,787.
22             Does that sound approximately like the amount of
23   money that was invested by the 2013 fund in Robinhood?
24        A.   On the advice of my attorney I respectfully
25   decline to answer that question on the grounds of my
```

                                                            112

US-001712

```
 1    Fifth Amendment privilege.
 2         Q.   Okay.   Next in the document there's a line
 3    stating "Sale of shares" on May 12th, 2017, and then
 4    there's some numbers after that, including a price per
 5    share amount and an amount liquidated.
 6              Do you understand what that section purports to
 7    represent, Mr. Rothenberg?
 8         A.   I will direct you to Exhibit 5.
 9         Q.   To clarify for the record, I translated "PPS" to
10    "price per share."   Do you have that same understanding
11    of what PPS means, Mr. Rothenberg?
12         A.   That's typically what that is.
13         Q.   Next in the document there's a 20 to 1 stock --
14    it says "spit," but I believe it should be "stock split"
15    on April 4th, 2018.
16              Do you have any knowledge of that transaction,
17    Mr. Rothenberg?
18         A.   I'll direct your attention to Exhibit 5.
19         Q.   Next in the document there's a sale of shares on
20    June 8th, 2018.   And, again, has more financial
21    information below that.
22              Mr. Rothenberg, are you familiar with that
23    transaction?
24         A.   There may be a better spreadsheet than this, but
25    I'll direct your attention to Exhibit 5.
```

113

US-001713

 1      Q.   And below that section I just directed you to

 2   there's a box, the header "Residual value as of June 8th,

 3   2018."

 4         Do you have any knowledge about the financial

 5   information inside that box, Mr. Rothenberg?

 6      A.   I forget the language I'm using here.

 7         MR. ILLOVSKY:   Exhibit 5.

 8         THE WITNESS:   Exhibit 5.

 9   BY MR. ATWOOD:

10      Q.   Mr. Rothenberg, if I ask you any further

11   questions regarding Exhibit 22, do you intend to assert

12   your Fifth Amendment privilege?

13      A.   Yes.

14         MR. ATWOOD:   Let's mark this as Exhibit 23.

15         (Exhibit 23 was marked for identification by the

16         court reporter and is attached hereto.)

17   BY MR. ATWOOD:

18      Q.   Mr. Rothenberg, you've been handed what's now

19   been marked as Exhibit 23, which I'll note for the record

20   is a stock purchase agreement.   Do you recognize this

21   document?

22      A.   Exhibit 5.

23      Q.   I'll describe for the record that Exhibit 23 on

24   the first page, which ends in Bates Number 001, notes

25   "Seller is Rothenberg Ventures 2013 Fund LLC."

                                                          114

US-001714

1          Mr. Rothenberg, do you have any knowledge

2    regarding Rothenberg Ventures 2013 Fund LLC selling

3    Robinhood stock in June of 2018?

4          A.   Exhibit 5.

5          Q.   Mr. Rothenberg, on the first page of this

6    Exhibit 23, the purchaser is identified as A-RH, a series

7    of A-ST Opportunity Funds, LLC."

8          Are you familiar with that entity?

9          A.   Exhibit 5.

10         Q.   Mr. Rothenberg, there are -- on the first page

11   of Exhibit 23 there's a share count of 541,700 and a

12   price per share of $9.97 and a purchase price of

13   $5,400,749.

14         Are you familiar with any of those amounts?

15         A.   They are the same amounts as Exhibit 22, I

16   notice, but I mean --

17         Q.   Outside of that do you have any familiarity with

18   those numbers?

19         A.   Exhibit 5.

20         Q.   Let's turn to page 3 of the document, which ends

21   on Bates Number 003.  You can just see that there's a

22   footer that notes it's an Equidate document.

23         Mr. Rothenberg, are you familiar with Equidate?

24         A.   Exhibit 5.

25         Q.   Let's turn to page 14 of Exhibit 23, which ends

115

US-001715

 1    in Bates Number 014.

 2          For the record I'll note that this is a

 3    signature page and there's two signature blocks.

 4          Mr. Rothenberg, is that your electronic

 5    signature that appears on page 14 of Exhibit 23?

 6        A.   Exhibit 5.   I need to ask him a quick question.

 7    We don't need to leave or anything.

 8        Q.   Okay.   That's fine.

 9                 (Discussion off the record.)

10        A.   Thanks.

11        Q.   Do you have anything to add to your answer?

12        A.   No.

13        Q.   And I'll note for the record that on page 14,

14    the date next to what appears to be Mr. Rothenberg's

15    electronic signature is June 10, 2018.   And the

16    Rothenberg Ventures 2013 Fund LLC is identified as the

17    seller, and the signature is by Rothenberg Ventures LLC

18    and by Michael Rothenberg.   And the purchaser is also

19    identified in the signature and block above that, and

20    that signature was added as of June 11th, 2018.

21          Mr. Rothenberg, if I ask you any further

22    questions regarding Exhibit 23, do you intend to assert

23    your Fifth Amendment privilege?

24        A.   Yes.

25        Q.   Mr. Rothenberg, did you direct the 2013 fund to

                                                          116

US-001716

```
 1  sell shares of Robinhood Markets Inc. in June 2018?
 2       A.   Is that still on Exhibit 23?
 3            Okay.  Exhibit 5.
 4       Q.   Mr. Rothenberg, did you direct the 2013 fund to
 5  sell shares of Robinhood Markets Inc. on or about
 6  May 12th, 2017?
 7       A.   Exhibit 5.
 8       Q.   Mr. Rothenberg, the proceeds from the Robinhood
 9  Markets Inc. sale in June of 2018, do you know what
10  happened to them?
11       A.   Exhibit 5.
12       Q.   Do you know if the 2013 fund made any
13  distributions to investors relating to the sale of
14  Robinhood Markets Inc. in June of 2018?
15       A.   I do know when we made an announcement to the
16  LPs that we were going to make a distribution, that I was
17  informed that the SEC would not allow us to do that.
18       Q.   Who informed you that the SEC would not allow
19  you to make --
20       A.   My counsel at the time.  We made an announcement
21  on the LP call, and then I was subsequently informed that
22  that would not be allowed by the commission.
23       Q.   And that was all communicated to by your former
24  counsel, Marc Fagel?
25       A.   Yes.
```

117

US-001717

 1      Q.  From what source -- let me restart that.

 2          We've seen in Exhibit 23 that the June 2018 sale

 3  of Robinhood Markets Inc. for a purchase price of

 4  approximately $5.4 million.  How much of that were you

 5  intending to distribute to investors?

 6      A.  Exhibit 5.

 7      Q.  Do you know what happened to the approximately

 8  $5.4 million that was received on June 2018 for the sale

 9  of Robinhood Markets Inc. stock?

10      A.  I mean I've already mentioned that I will answer

11  Exhibit 5 for all other questions relating to this

12  exhibit.

13      Q.  Did you cause proceeds of that stock sale to be

14  sent to Gibson Dunn?

15      A.  Exhibit 5.

16      Q.  Did you cause proceeds of that stock sale to be

17  sent to River Studios?

18      A.  Exhibit 5.

19      Q.  Did you cause proceeds of that stock sale to be

20  sent to Quinn Emanuel?

21      A.  I will say that there are indemnification

22  provisions across all the funds that allow for payments

23  to attorneys such at Gibson Dunn and Quinn Emanuel.  But

24  for the purposes of anything related to Exhibit 23, I

25  will refer you to Exhibit 5.

                                                        118

US-001718

 1      Q.   Okay.   I don't want to -- I don't want to ask
 2   you a question that's going to have you waive your Fifth
 3   Amendment privilege, but you did answer partially there
 4   so I want to follow up and ask:   The money that you
 5   sent -- or excuse me.   Money that was sent to Gibson Dunn
 6   or Quinn Emanuel, are you saying that that was done
 7   subject to the indemnification provisions?
 8      A.   I'm saying that I believe that the commission is
 9   once again trying to get involved in things related to,
10   you know, either discussions or payments with my counsel,
11   which is obviously what these questions are, and I'm
12   pointing out that to the extent that that, you know,
13   touches upon or could touch upon my privilege with those,
14   I'm drawing a line.
15          So I'm -- you know, those were a series of
16   questions all related to my counsel in a row and, so I
17   was responding to that portion, the privileged portion
18   that I don't want to even pretend to touch, and then
19   separately I have already said that anything related to
20   23 I'm referring you to Exhibit 5.   That's why I answered
21   it like that.
22      Q.   Okay.   And I want to be clear, I'm not asking
23   for any privileged communications between you and any
24   attorney at Gibson Dunn or Quinn Emanuel.   I'm talking
25   merely about the payment of funds.

                                                          119

US-001719

```
 1              And my question was did you cause money that was
 2   obtained from the sale of Robinhood stock in June of 2018
 3   to be sent to Quinn Emanuel?
 4       A.   All payments to my counsel are part of -- I
 5   mean, it's hard to have conversations with counsel
 6   without them asking for payments, so it's all part of
 7   discussions with them.  So I'm not going to, you know,
 8   pontificate on payments to counsel.
 9       Q.   So I'm not asking you to pontificate, it's a yes
10   or no question.
11              Did you cause proceeds from the Robinhood
12   Markets sale of stock to be sent to Quinn Emanuel?
13       A.   As I've answered before, that relates to
14   Exhibit 23 so I'll refer you to Exhibit 5.
15       Q.   To the extent that money was sent to Quinn
16   Emanuel or that you caused to be sent to Quinn Emanuel,
17   are you invoking indemnification provisions to authorize
18   that expenditure?
19       A.   No, not all of the expenditure to Quinn Emanuel
20   was that, but some of it could have been.
21       Q.   Is there any record of those authorizations that
22   were made subject to indemnification?
23       A.   Yes.
24       Q.   And who maintained those records?
25       A.   At the time, I mean -- you know, RV.
```

120

US-001720

1      Q.  Well, at the time, which was July and August of
2  2018, who would have been that person?
3      A.  Well, I was definitely involved in that.  I had
4  access to those records.
5      Q.  Where are those records located?
6      A.  I presume RV has them but I have a copy as well.
7      Q.  Do you have a hard copy, paper copy?
8      A.  I could print one.  It's not on me.
9      Q.  So where are they stored electronically?
10      A.  I mean, you know, I think RV has RV's records
11  now, but I don't know exactly where they keep their
12  records.
13      Q.  Where are the electronic records that -- well,
14  electronic copies that you have?
15      A.  I have an external hard drive that I've provided
16  to my previous counsel that I believe he used to produce
17  those documents prior, and I believe it's -- you know, I
18  believe it has integrity.
19      Q.  Well, the documents, to the extent they relate
20  to this issue, I assume they would have been created in
21  July or August 2018.
22      A.  Right.
23      Q.  And we have not received any such documents
24  here.  I'm trying to get at where they are located now.
25      A.  Okay.  Yeah, I don't think the complaint

121

US-001721

```
 1   mentions any of this stuff, so it doesn't surprise me.
 2   But, once again, to the extent there's any documents that
 3   are follow-up requests, I'll be prompt with those.
 4        Q.  Okay.  And I'm asking where do you store those
 5   documents?
 6        A.  And I already mentioned on an external hard
 7   drive.
 8        Q.  Okay.  Is that the only location you have
 9   copies?
10        A.  Well, I've also produced thousands of documents
11   to RV, so I assume that they have them somewhere too.
12        Q.  Do you know how RV maintains those documents?
13        A.  I do not.
14        Q.  Do you recall what form this document
15   authorizing indemnification payments was made in?
16        A.  What does that mean?
17        Q.  Like, was it a Word document?  Was it some other
18   kind of program you used?  I'm just trying to get at what
19   we are looking for here.
20        A.  What kind of software was used?
21        Q.  Yeah.
22        A.  I don't recall that specifically.
23        Q.  Was it a document you created?
24        A.  I mean, I don't recall the specifics of a
25   document like that because sometimes counsel would create
```

122

US-001722

1    those documents and sometimes finance would.  So I don't
2    remember the specifics of that one.
3         Q.  Okay.  Well, in July or August of 2018, who else
4    was working at RVMC?
5         A.  I mean, there hasn't been a single time in RV's
6    entire existence I didn't have some kind of support.
7    Sometimes it was external, so, you know, that -- it's not
8    really relevant, you know.  At RV, you know, when I was
9    manager I would always, you know, be involved in the
10   tracking process and so on.  And in terms of who would
11   help me with that, it could be external and here.  It may
12   have been some combination of finance and legal.  I don't
13   remember specifically.
14        Q.  Okay.  And I appreciate the history there, but
15   I'm trying to focus in on the indemnification payments
16   that were made in July and August time frame of last
17   year.
18        Do you have any recollection of who may have
19   authored those documents?
20        A.  I recall the SEC putting inappropriate pressure
21   on my counsel to pretend like our indemnification
22   provisions were not there, and of course they were, as
23   you've now reviewed and understand.  So I'm particularly
24   sensitive to this kind of, you know, inquiry into that
25   because you've already expressed an interest in cutting

                                                        123

US-001723

1   me off.  In fact, it's really sensitive because I'm pro

2   se right now, partly because of your aggressiveness to

3   this particular provision that I'm entitled to.

4           So if you -- you know, I would request that you

5   honor the provisions in place between, you know, RV, the

6   LPs and me and pick different battles, please.

7       Q.   I don't believe you answered my question.

8           MR. ATWOOD:  Could you read it back, please.

9           THE COURT REPORTER:  "Question:  And I

10          appreciate the history there, but I'm trying

11          to focus in on the indemnification payments that

12          were made in July and August time frame of last

13          year.

14          "Do you have any recollection of who may have

15          authored those documents?"

16          THE WITNESS:  That's been asked and answered.

17   BY MR. ATWOOD:

18       Q.   You have not answered.

19       A.   I did.  I already said I don't recall

20   specifically who made those particular documents.  You

21   did ask that.  I did answer that.  We can have her read

22   that back if you'd like.

23       Q.   Did you sign those documents?

24       A.   So 23?  Which exhibit are we referring to right

25   now?

124

US-001724

1        Q.   The documents that you've been referring to that

2   you have on a hard drive that relate to these

3   indemnification payments in July and August of 2018.

4        A.   You know, if it's not in front of me, I'm not

5   going to speculate on, you know, my -- I'm not going to

6   rely on my memory for that.  I don't know.

7        Q.   Gossiping have been the person at RVMC that

8   would have had authority to authorize payments for

9   indemnification purposes in July and August of 2018?

10       A.   Well, the part of the point of having the LPAs

11  is that the LPs have already approved indemnification

12  payments, so that approval comes from them in the form of

13  the LPAs.  So that's already -- that's an external thing.

14       Q.   Well, I understand that there's contractual

15  rights between the entity and the investors.  But when it

16  comes to actual movement of money, someone has to

17  authorize that and I'm asking if that person was you.

18       A.   Well, those are two separate things.  If it's

19  the approval, that came from the LPs; and if it's, you

20  know, causing money to move in accordance with the

21  approvals with the LPs, I was involved in that.

22       Q.   So --

23       A.   I didn't always do the actual transactions of

24  the wires, but I'd be involved in approving that.

25       Q.   When you say the LPs approve it, you're just

                                                              125

US-001725

1   talking about the investor agreements, right?  Not a

2   specific transaction?

3        A.   The way that the LPs give the approval is

4   through the LPAs, yes, which they did.

5        Q.   Mr. Rothenberg, is it your position that any

6   expenditure of funds received from the Robinhood sale of

7   stock of the 2013 fund in June of 2018 for the purposes

8   of paying attorneys was covered by the indemnification

9   provisions of the various investor agreements?

10       A.   Could you ask that again?

11            MR. ATWOOD:  We can read it back.

12            THE COURT REPORTER:  "Question:  Mr. Rothenberg,

13            is it your position that any expenditure of

14            funds received from the Robinhood sale of stock

15            of the 2013 fund in June of 2018 for the

16            purposes of paying attorneys was covered by the

17            indemnification provisions of the various

18            investor agreements?"

19            THE WITNESS:  Oh, I see.  You're rephrasing

20   questions you asked earlier.  I'll direct you to

21   Exhibit 5 again.

22   BY MR. ATWOOD:

23       Q.   Mr. Rothenberg, do you know whether there was a

24   distribution of funds from the May 2017 sale of Robinhood

25   stock by the 2013 fund to its investors?

126

US-001726

1      A.   Exhibit 5.   This is all the same category.

2      Q.   If I ask you any further questions regarding

3  sales of Robinhood stock by the 2013 fund, do you intend

4  to assert your Fifth Amendment privilege?

5      A.   Yes.

6      Q.   And if I ask you any further questions regarding

7  payments for indemnification purposes related to money

8  received from the Robinhood stock, do you intend to

9  assert your Fifth Amendment privilege?

10     A.   Yes.

11     Q.   Are you aware that at the end of August 2018,

12 after selling Robinhood stock in June of 2018, that there

13 was approximately $31,000 left in the bank account of the

14 2013 fund?

15     A.   It seems like a very specific date.   I think

16 when I -- to the best of my recollection, in September

17 when I stopped being on the bank accounts there was a lot

18 more than that.   I think maybe at least half a million or

19 700,000.   So I'm not sure where that date comes from.

20     Q.   That's fair.   Through your former counsel we did

21 discuss a transfer of $732,000 back to the 2013 fund that

22 occurred in September 2018.   Does that sound remotely

23 what you're talking about?

24     A.   I don't believe I was on that phone call.

25          MR. ATWOOD:   Let's mark this as our next

                                                          127

US-001727

 1  exhibit, which I think is 24.

 2         THE WITNESS:  You asked my counsel to move

 3  money, is that what you're saying?

 4  BY MR. ATWOOD:

 5     Q.  No, no.  Let's have her mark this so she can

 6  transcribe while --

 7     A.  You're not going to tell me?

 8     Q.  I'll get back to you.

 9         (Exhibit 24 was marked for identification by the

10         court reporter and is attached hereto.)

11  BY MR. ATWOOD:

12     Q.  Mr. Rothenberg, you've been handed what's been

13  marked as Exhibit 24.

14         You were asking a question and I asked you to

15  pause for the benefit of the transcript and our court

16  reporter here.

17         What was your question to me?

18     A.  In your previous question you made some kind of

19  a premise about a discussion with my former counsel, and

20  I was looking for clarification for what you're referring

21  to.

22     Q.  Sure.  So we became -- we, the SEC, became aware

23  of a certain amount of money movement in July and

24  August 2018 all related to this Robinhood sale that we've

25  been discussing.  As we communicated to your former

                                                          128

US-001728

1  counsel, it's our position that that money belonged to

2  the 2013 fund and the investors in that fund and it

3  should be returned.

4         Subsequently, Mr. Fagel told us that a

5  significant amount of that money was being returned and

6  he provided us with a screenshot, which has now been

7  marked as Exhibit 24.

8         Do you recognize Exhibit 24?

9     A.  Not particularly.  This looks like, you know,

10 some specific thing he pulled.  I mean, it's just a

11 random screenshot.

12    Q.  Okay.  Does it look like this is a screenshot

13 for an account in Silicon Valley Bank?

14    A.  It says at the top that it is.  I have no reason

15 to doubt that.

16    Q.  Okay.  And it seems to identify a bank account

17 ending in 2623 with the title "Rothenberg Ventures 2013

18 Fund LLC-2013 Fund (Fund I)."

19    A.  I see that.

20    Q.  Are you familiar with that account?

21    A.  I mean, I'm positive the 2013 fund has an

22 account at SVB, or at least it did at this time.

23    Q.  For the record, SVB is Silicon Valley Bank?

24    A.  Yes.  And at the top of the page it says "SVB"

25 and I referred to it as such.

129

US-001729

1      Q.   So on this page it identifies a single

2   transaction dated September 5, 2018.

3           Do you see that?

4      A.   I see that, yep, right in the middle.

5      Q.   And it indicates that it's a wire in from

6   Rothenberg Group LLC.

7           Do you see that?

8      A.   It says that.

9      Q.   And the amount is $732,000?

10      A.   This is the amount you were instructing Fagel to

11   send?

12      Q.   We did not instruct Mr. Fagel to send any

13   amount.  This is what he provided to us.

14      A.   Okay.

15      Q.   Do you have any recollection of this

16   transaction?

17      A.   I'll direct you to Exhibit 5.

18      Q.   Do you control the bank accounts belonging to

19   Rothenberg Group LLC?

20      A.   Exhibit 5.

21      Q.   Do you recall whether you obtained this document

22   for Mr. Fagel or provided it to him?

23      A.   There were a number of people that could have

24   provided this document, but I don't have a specific

25   recollection of that.

                                                      130

US-001730

 1      Q.   If I ask you any further questions regarding

 2   this transfer of $732,000 into the bank account of

 3   Rothenberg Ventures 2013 fund, do you intend to assert

 4   your Fifth Amendment privilege?

 5      A.   Yes.

 6      Q.   Let's talk about warrants.  We will mark this as

 7   Exhibit 25.

 8           (Exhibit 25 was marked for identification by the

 9           court reporter and is attached hereto.)

10   BY MR. ATWOOD:

11      Q.   Mr. Rothenberg, you've been handed what's been

12   marked as Exhibit 25.  Do you recognize this document?

13      A.   Exhibit 5.

14      Q.   If you could turn to the second page of

15   Exhibit 25, there's two signature blocks.  They both

16   appear to be your signature, Mr. Rothenberg.

17           Do you recognize that signature as yours?

18      A.   Exhibit 5.

19      Q.   Mr. Rothenberg, did you provide this document to

20   Mr. Fagel in the course of the investigation preceding

21   this litigation?

22      A.   I provided a tremendous number of documents to

23   Mr. Fagel.  I don't have a specific memory of, you

24   know -- I mean, I provided all my documents to Mr. Fagel.

25   So it's -- if you're asking -- if you got this from him,

                                                          131

US-001731

 1   it seems unlikely to me that he invented it.

 2        Q.   You don't have any specific recollection with

 3   respect to this document?

 4        A.   You asked if I provided it to Mr. Fagel.   I

 5   attempted to provide him everything.

 6        Q.   Okay.   Could you explain the transaction that's

 7   contemplated by Exhibit 25?

 8        A.   Exhibit 5.

 9        Q.   If I ask you any further questions regarding

10   Exhibit 25, do you intend to assert your Fifth Amendment

11   privilege?

12        A.   Yes.

13             MR. ATWOOD:   Let's mark this as Exhibit 26,

14   please.

15             (Exhibit 26 was marked for identification by the

16             court reporter and is attached hereto.)

17   BY MR. ATWOOD:

18        Q.   Mr. Rothenberg, do you recognize Exhibit 26?

19        A.   Exhibit 5.

20        Q.   Mr. Rothenberg, I'll represent to you that

21   Exhibit 26 is a compilation of a number of agreements

22   that are titled "Warrant Purchase and Sale Agreement by

23   and between Frontier Technology Venture Capital LLC and

24   Rothenberg Ventures 2015 Fund LLC."   And I believe they

25   are all dated December 31st, 2016.

                                                          132

US-001732

1        As we've previously discussed, you understand

2   Frontier Technology Venture Capital LLC to be RVMC; is

3   that correct?

4        A.   Yes, in December of 2016 it was.

5        Q.   If you could turn to the second page of

6   Exhibit 26, which ends in Bates Number 289.  This appears

7   to be a warrant purchase and sale agreement relating to

8   warrant purchased from GOCV, a portfolio company of the

9   purchaser, which is identified as Rothenberg Ventures

10  2015 Fund.

11        Do you have any recollection of this

12  transaction, Mr. Rothenberg?

13        A.   Exhibit 5.

14        Q.   Let's turn to the next page of Exhibit 26.  It

15  ends in Bates Number 290.  Under section 1(a), which is

16  titled "Sale of Warrant," there's a purchase price of

17  $130,000.

18        Mr. Rothenberg, are you aware of how that

19  purchase price came to be?

20        A.   It refers to Schedule 1 for that.

21        Q.   Okay.  Let's turn to Schedule 1.  I believe that

22  is on the page ending in Bates Number 298.

23        A.   Well, this one is not.  There isn't a Schedule 1

24  in mine.  It just has the heading.

25        Q.   Right, it has the heading of Schedule 1, and

                                                           133

US-001733

1  what does it say underneath that?

2      A.  This copy you have says "To Be Completed."

3      Q.  All right.  I'll read it into the record.  It

4  says:

5          "To be completed for each warrant by

6          business/finance team (Valuation methodology and

7          calculations used by the manager to determine

8          the purchase price)."

9          Is it your understanding the purchase price,

10 that would have been based on a valuation that should

11 have been inserted here?

12     A.  I'm sure it was -- it was.  There's no -- you

13 know, this transaction would certainly have been

14 accompanied by a valuation.

15     Q.  Okay.  Let's turn to page ending in Bates

16 Number 295.

17         Is that your signature there?

18     A.  Exhibit 5.

19     Q.  I'll note there's two signature blocks, one for

20 seller, one for purchaser.  And it appears that your

21 signature is on both signature lines there.

22         Do you agree with that?

23     A.  It seems to be the same question, so Exhibit 5.

24     Q.  I'm not trying to ask the same question, but at

25 a particular point of time you signed on behalf of the

                                                    134

 1   seller and purchaser, would you agree with that?

 2        A.   It is the same question, so Exhibit 5.

 3        Q.   Gossiping agree that this document has been

 4   executed?

 5        A.   Exhibit 5.

 6        Q.   Okay.  So despite being signed, you feel like

 7   Schedule 1 was completed at the time of execution here?

 8        A.   So I'm speaking more generally when I comment to

 9   that, which is that we've tracked valuations of any

10   investments that have been held by the funds really at

11   all times.  So if this is a valid document, then it has

12   corresponding valuations for those transactions.

13        Q.   Do you know why the signed copy of this

14   agreement would have a "to be completed" valuation

15   section?

16        A.   So without commenting specifically on this

17   document, most documents, you know, have drafts.  So it

18   makes sense that while you're drafting, especially the

19   lawyers, especially while they are doing that, they would

20   have to be completed.  That's pretty common, especially

21   for exhibits.

22        Q.   Let's speak specifically to this document.  I

23   don't want to talk in generalities of other documents.

24   My question is specific.

25             This one has been executed.  Are you stating

                                                           135

US-001735

1    that it would have been executed without a schedule?

2         A.   No.   I think this is in the category of to the

3    extent that's the latest document you have for this, I

4    should do a search for you; and I'm willing to do that.

5         Q.   Do you have any recollection whether or not such

6    evaluation was completed by December 31st, 2016, which is

7    the date of this agreement?

8         A.   I don't think there was any time at RV where we

9    didn't have somewhat up-to-date valuations for all

10   holdings.   So I have no reason to believe that that would

11   be any different if this -- you know, if this is valid.

12        Q.   Okay.   In December of 2016, who would have been

13   the RVMC employees responsible for conducting this

14   valuation methodology and calculation reference in

15   Schedule 1?

16        A.   I mean, ultimately the manager's always

17   responsible for, you know, determining the valuation.   I

18   was the manager at this time.

19        Q.   So I just want to be clear on the record.

20   You've give some responses to my questions and you've

21   asserted your Fifth Amendment right in response to

22   others.

23        A.   No, I've been clear.   When I'm specific, I'm

24   doing the Fifth; when I'm doing general, I'm trying to

25   help you out.

                                                          136

US-001736

1    Q.  And I completely agree with you.  I'm not trying

2  to say you have not been clear.

3        I just want to know if I ask you any further

4  questions regarding this transaction between Frontier

5  Technology Venture Capital LLC and Rothenberg Ventures

6  2015 Fund dated December 31st, 2016, whether you intend

7  to assert your Fifth Amendment privilege.

8    A.  Yes.  But I will be happy to follow up with you

9  too.

10    Q.  And by "follow up," you will look for a

11  valuation that would be inserted as Schedule 1 for this?

12    A.  Yes.  This is at least the second time.  I'm not

13  sure that what you have is complete.

14    Q.  Okay.  That's fine.  We would love to get it.

15        And for remedies' sake, I'm not going to go

16  through it, but I'll tell you that this is a compilation

17  of agreements and it goes through warrant purchase and

18  sales for a number of portfolio companies.  There's

19  GOCV -- I'm sure I'm going to butcher a lot of these

20  names -- Immersv, Retinad, Rival Theory is another one,

21  VRChat, Waygate, OBE, inVR, and Fringefy.  So if you're

22  looking for valuations, it would be helpful to get them

23  for all of those and close the loop on this.

24        If I ask you any questions regarding

25  transactions between the Frontier Technology Venture

137

US-001737

1 Capital LLC and the Rothenberg Ventures 2015 Fund and the

2 purchase or sale of any warrants relating to those

3 companies I just identified, do you intend to assert your

4 Fifth Amendment privilege?

5     A.  Yes.

6         MR. ATWOOD:  Let's mark this as Exhibit 27.

7         (Exhibit 27 was marked for identification by the

8         court reporter and is attached hereto.)

9 BY MR. ATWOOD:

10     Q.  Mr. Rothenberg, do you recognize Exhibit 27?

11     A.  Not specifically, but this does look like the

12 kind of -- this is how I would expect the -- the summary

13 of the valuations to look for this kind of document.

14     Q.  And just so the record is clear, when you say

15 "this kind of document," you're referring to Exhibit 26?

16     A.  Yes.  I can tell you I recognize the

17 presentation of this but not necessarily the specifics.

18     Q.  Do you know who would have authored Exhibit 27?

19     A.  Well, every one of these companies, as far as I

20 can remember -- oh, it says -- it says River Accelerator

21 2017, but all of these companies that are listed look

22 like they're all members of the River program, which

23 would be River I through III from 2015 into the first

24 half of 2016.  And so the initial valuations for these,

25 you know, I don't remember exactly when we started

                                                                       138

US-001738

1  tracking these, but we try to start tracking companies

2  from the moment we invest in them.

3        And then I have no real way of determining when

4  this was updated as far as I can tell from looking at

5  this.  So this could have been made by, really, any one

6  of a number of, you know, investment analysts.

7        Q.  Maybe it would help.  I don't know if this is

8  the date of the document but I will point out that along

9  the top row, there's all the headers there towards the

10  right hand, and there's one called "Warrant Value

11  June 30th, 2017."

12        Was it your normal practice at RVMC to make

13  these kind of valuations, these documents on or about

14  that date that was identified as warrant value?

15        A.  I think that that tells me that this is probably

16  a version that was made in 2017.

17        Q.  So this wouldn't have been something that would

18  have been attached to Schedule 1 to Exhibit 26?

19        A.  Well, I should clarify my previous comment.

20  This looks like that particular column was added in 2017,

21  but it certainly could be the case that the rest of

22  this -- well, the rest of this could have been made

23  really even in 2015.  In terms of how we would, you know,

24  update documents, they'd have revisions over time.  So

25  that particular column doesn't supersede other columns,

                                                        139

US-001739

1   it looks additive.

2       Q.  Let's go through the columns.  We'll just use

3   Rival Theory, which is the top entry, as an example.

4           What is "Assigned to"?  What does that column

5   indicate?

6       A.  Well, it tells me that this company either is

7   intending to be owned by the 2015 fund or already is.

8       Q.  And "Purchase Price Date," what does that mean?

9       A.  I assume it means the purchase price date.

10      Q.  Okay.  I would assume the same.  I don't know if

11  you had another meaning for it.

12          The next one is "Warrant Exercise Price," and

13  for rival theory that's $200,000.  Could you explain for

14  the explain what warrant rival price means?

15      A.  It looks like it relates to Exhibit 25, if I was

16  trying to connect these dots.

17      Q.  Okay.  So why -- I believe you asserted your

18  Fifth Amendment privilege over Exhibit 25, so do you want

19  to talk about Exhibit 25 now?  I don't want you to waive

20  your privilege.

21      A.  That's fair.  I guess I'll just leave it at

22  that.  It looks like it refers to that one.  But...

23      Q.  Okay.  Not speaking specifically about this

24  amount, $200,000, what does "Warrant Exercise Price" mean

25  to you in relation to this type of spreadsheet at RVMC?

                                                    140

US-001740

1    A.  Well, an exercise price is the price at which

2  something can be bought.  So that implies to me that, you

3  know, if this transaction occurred by the time this was

4  made or that's what it's trying to do, then it would be

5  that price.

6    Q.  Okay.  Then we have a column "Warrant

7  Percentage."  Do you know what that column indicates?

8    A.  Let me look.  This does look like a companion to

9  Exhibit 26 as I mentioned before, so I'm looking through

10  26.

11    Okay.  I didn't see in there at first glance,

12  but that's -- it seems very likely that that is the

13  percent of the company that the warrant covers.

14    Q.  And then "Company Valuation," safe to assume

15  that's the valuation of the company whose warrants are

16  identified here?

17    A.  Almost -- I mean, it's got to be.

18    Q.  Okay.  Then we have a column titled "Warrant

19  Strike Price."  What's your understanding as far as this

20  document goes as what warrant strike price means?

21    A.  It looks like the previous two columns

22  multiplied together get that column.

23    Q.  Do you know what the basis for that formula

24  would be?

25    A.  Well, kind of already said this before, but it

141

US-001741

 1  looks like it's referred to in Exhibit 25.

 2      Q.  And Exhibit 25, do you intend to assert your

 3  Fifth Amendment privilege over?

 4      A.  I guess so.  I mean, you know, I would certainly

 5  not rule out a follow-up conversation about some of this

 6  stuff, but, I mean, I'm not -- in my preparation I didn't

 7  find or review a lot of these things.

 8      Q.  So the Exhibit 26 agreements and the spreadsheet

 9  we've been looking at, which is Exhibit 27, they all

10  relate to 2015 fund, I guess investments.  On the

11  spreadsheet there's a long list of the companies, most of

12  which I've already identified for the record, but there's

13  two at the bottom here.  I'm sure I'll get these names

14  wrong, but Atawarp and GitBoom, are you familiar with

15  those?

16      A.  I remember those companies.

17      Q.  Okay.  So according to the spreadsheet, those

18  call options were not exercised.

19          Do you have any recollection of those

20  transactions?

21      A.  What makes it hard to comment is that I believe

22  the commission has stated that they don't believe that

23  these transactions occurred, so it's hard for me to

24  comment on them at all in the context of that.  If you

25  acknowledge these transactions occurred we could have a

                                                        142

US-001742

 1   real conversation.

 2        Q.   All right.   Are you familiar with any

 3   transactions similar to these between the 2016 fund,

 4   which I know we don't have an agreement on -- I don't

 5   know what that -- I should rephrase.

 6             Actually, your time --

 7             MR. ILLOVSKY:   Yeah, I was going to interrupt

 8   before --

 9             MR. ATWOOD:   Mr. Illovsky needs to take a break

10   for a phone call so we will go off the record.

11             MR. HEFTY:   Thank you very much, Peter.

12                  (Recess taken at 2:27 p.m.)

13             (Proceedings resumed at 2:56 p.m.)

14             MR. ATWOOD:   We will go back on the record.

15   It's 2:56 p.m.

16   BY MR. ATWOOD:

17        Q.   Mr. Rothenberg, before the break we had wrapped

18   up a series of questions regarding warrants between the

19   2015 fund and entity, which I've been referring to as

20   RVMC.   We haven't agreed on a shorthand name for the 2016

21   fund, and I want to be respectful of your Fifth Amendment

22   privilege.   When I -- I'll use the phrase "2016 fund" to

23   loosely refer to the group of funds that raised money and

24   capital in 2016 and thereafter and were managed by RVMC.

25   And recognizing that this isn't legally binding as to

                                                         143

US-001743

 1    what that entity is, are you comfortable discussing 2016
 2    fund using that phrase?
 3         A.   Yeah, I think I can surmise what you're trying
 4    to do with that.
 5         Q.   Okay.  Are you an aware of the similar warrant
 6    purchase and sale agreements between RVMC and the 2016
 7    fund?
 8         A.   I'll refer to Exhibit 5 for that.
 9         Q.   Did you know if there were actual agreements
10    executed that relate to the purchase of warrants between
11    the 2016 fund and RVMC?
12         A.   I'll refer to Exhibit 5, but I will add that if
13    that's on the wish list I'll make sure that anything
14    Mr. Fagel provided is complete as far as I'm aware of.
15         Q.   I want to circle back to that response real
16    quick but before I do that, let me just close out.
17              If I ask you any further questions regarding the
18    purchase or sale of warrants between the 2016 fund and
19    the RVMC, do you intend to assert your Fifth Amendment
20    privilege?
21         A.   Yes.
22         Q.   So earlier in your testimony you referenced a
23    hard drive and a few times you've talked about giving all
24    your documents over to Mr. Fagel, who is your former
25    counsel in this case.

                                                            144

US-001744

1          Some of the documents we talked about I think
2    were created in July or August of last year, and I don't
3    know if those documents ever made their way to us.  And
4    you referenced a hard drive.
5          Am I summarizing this accurately?
6     A.   Yes.
7     Q.   Is that hard drive in your possession now?
8     A.   I have a hard drive in my possession.  I mean,
9    like I said before, the records of RVMC are maintained by
10   different people at this point.
11    Q.   All right.  But you believe you may have copies
12   of documents on that hard drive that relate to this
13   matter?
14    A.   I have not destroyed any documents at any time;
15   so yes, I believe that to the extent you're missing
16   anything, then I assume it still exists.
17    Q.   Okay.  And just to be clear, your copies are on
18   actual hard drive, they are not stored in the cloud
19   anywhere?
20    A.   There are also some documents stored in the
21   cloud, but, you know, that would be redundant.
22    Q.   Okay.  So is the hard drive you're referring the
23   best source for these types of documents that may or may
24   not have been produced?
25    A.   You know, I used to have backups on a hard drive

                                                          145

US-001745

1   that would kind of back it up over time.  So whenever --

2   the cloud is a very good way to share documents, but it

3   is definitely imperfect and the way it tracks stuff is

4   kind of weird.  I did buy the provision that also is

5   supposed to preserve all of the backups so that it's not

6   possible to ever delete anything.  But that said, it's

7   not that easy to navigate.

8          So when something is hard to find on the cloud,

9   then it's certainly in a backup on a hard drive.  That's

10  kind of why I answered that way sometimes.  I hope those

11  things are on the cloud.  They are not always there.

12  That's why we had the redundancy.

13      Q.  Okay.  What cloud storage services are you still

14  using, at least that relate to RVMC documents?

15      A.  My understanding is that there are still RVMC

16  documents on Dropbox.  And we've used various cloud

17  services in the past, but most of them are not still

18  active.

19      Q.  And the hard drive that has copies of some

20  relevant documents, that's in your personal possession?

21      A.  Well, I'm referring to a personal hard drive

22  that I have.

23      Q.  Okay.  All right.  I appreciate that.

24          To the extent you have any documents relating to

25  these transactions between the 2016 fund and RVMC, we

146

US-001746

```
 1   will obviously follow up with an email, but we would be
 2   interested in obtaining those:
 3               MR. ATWOOD:  We will mark this as Exhibit 28.
 4               (Exhibit 28 was marked for identification by the
 5               court reporter and is attached hereto.)
 6   BY MR. ATWOOD:
 7       Q.  Mr. Rothenberg, you've been handed what's been
 8   marked as Exhibit 28.  Do you recognize this document?
 9       A.  Yes, I do.
10       Q.  Okay.  What is it?
11       A.  Well, it says it's an email from Marc Fagel/SH
12   regarding a draft financial statement.
13       Q.  Okay.  And I'll note that it's dated
14   February 28th, 2019, and it looks like you were copied on
15   this; is that correct?
16       A.  Down here?
17       Q.  Yes.
18       A.  Okay.  I see that.
19       Q.  Is that your email address, mike@rothenberg.co?
20       A.  I can receive emails at that email box.  I mean,
21   mrothenberg@rothenberg.co is preferable.
22       Q.  But this is one of your email addresses?
23       A.  I would be very likely to receive email from the
24   one here.
25       Q.  Okay.  So you have access to emails sent to
```

147

US-001747

```
 1   mike@rothenberg.co?
 2        A.   Yeah.  With Gmail accounts you can set up an
 3   alias so you can catch emails that go to different, you
 4   know, different names like that.
 5        Q.   All right.  And you've done that for this email
 6   address?
 7        A.   Yeah, I mean, like I said, I should get emails
 8   at this address.
 9        Q.   Okay.  Do you recall if you received this
10   particular document?
11        A.   I've -- I mean, for all practical purposes, yes.
12        Q.   So there's this cover letter on page 1 of
13   Exhibit 28, and then you have what I'll refer to as the
14   draft sworn financial statement attached to it.
15             What was your role if any in preparing this
16   draft statement of financial condition?
17        A.   To -- well, I mean, that's very directly and
18   specifically a question about communications between me
19   and Mr. Fagel who was my counsel at the time, so I don't
20   feel comfortable describing to you the inner workings of
21   that for reasons discussed earlier.
22        Q.   Okay.  Did you provide documents -- and I don't
23   want to ask about conversations, but did you provide
24   documents to Mr. Fagel to be submitted as backup with
25   this draft?
```

148

US-001748

 1      A.   I've testified earlier that I gave Mr. Fagel

 2   what could be characterized as unrestricted access to my

 3   documents.   So that would encompass really anything here.

 4      Q.   Okay.   I'll get back to that.

 5           Let's turn to the second page of the exhibit,

 6   which is page 1 of the statement of financial condition.

 7           And I'll note for the record that section 1 is

 8   statement of assets and liabilities as of February 28th,

 9   2019.

10           Mr. Rothenberg, did you review this document

11   before Mr. Fagel provided it to the Securities and

12   Exchange Commission?

13      A.   I don't think this is an appropriate line of

14   questioning because at the same time you've asked me to

15   provide another -- you know, you gave me a letter that

16   had -- I think it was a four- or five-page letter that

17   had some specific requests that I have not had time to

18   respond to, so this is not, you know, the forum for that.

19           Like, if you want me to respond to that letter,

20   I'll do that, but not on the fly, off the cuff in a

21   manner that is not, you know, fitting for the level of

22   detail that something like this deserves.

23      Q.   Well, I think I understand what you're saying

24   there, and I don't intend to ask you to address the items

25   that were in that letter that you're referring to.   I

                                                        149

US-001749

1   want to talk about this particular draft here and what

2   went into preparing it.

3         And my question to you was did you review this

4   document before Mr. Fagel submitted it to the Securities

5   and Exchange Commission?

6         MR. ILLOVSKY:  I noted in the cover letter that

7   Mr. Fagel did provide this as a confidential settlement

8   communication under rule 408, so I assume that the

9   Securities and Exchange Commission is not planning to try

10   to use this or testimony about it in evidence, I guess.

11         MR. ATWOOD:  We will abide by Federal Rule of

12   Evidence 408.  But I don't think that applies to my

13   question.

14         THE WITNESS:  Why am I being deposed about the

15   confidential settlement discussions while they are

16   actually underway?

17         If you intend to continue to ask me about

18   communications that are obviously from my lawyer about

19   confidential settlement communications that are ongoing

20   with you right now, then I'd like to take a break to talk

21   to my counsel, because this seems very inappropriate on

22   pretty much every level.

23   BY MR. ATWOOD:

24     Q.  I'm happy to take a break if you want to confer

25   with counsel, but there's a pending question, and that

US-001750

1  was whether or not you reviewed this document before

2  Mr. Fagel submitted it to the Securities and Exchange

3  Commission.

4      A.  I mean, once again, you're specifically trying

5  to break my privilege between me and my counsel.  I'm not

6  going to take that bait.  No, thank you.

7           To the extent you're literally asking about my

8  communications with Mr. Fagel, I'm not going to answer

9  those questions.  And it would be really great if you

10 would stop asking me those types of questions.

11     Q.   Your response is that the answer to that

12 question is privileged; is that right?

13     A.  Mr. Atwood, I would appreciate if you would

14 honor very simple things like not asking me what I talked

15 about with my counsel.  You know that that's like a very

16 basic rule of this stuff and it's -- you know, not only

17 are you asking for my entire day, you're asking me again

18 and again to break privilege.  And please stop doing

19 that.

20     Q.  I'm not asking you to break privilege; I'm

21 asking you did you review this document before Mr. Fagel

22 submitted it to the Securities and Exchange Commission?

23     A.  This entire thing, once again, is a -- to the

24 extent Mr. Fagel talked to me about this, which is the

25 only way to answer that question, I'm not going to answer

                                                    151

US-001751

1  it for reasons of privilege that I've stated so many

2  times before.  That's the best way I can answer that.

3      Q.  Did you review this document before Mr. Fagel

4  submitted it to the Securities and Exchange Commission?

5      A.  Asked and answered.

6          MR. ILLOVSKY:  Why don't we go off the record

7  for a minute and I can talk to Mr. Rothenberg.

8          MR. ATWOOD:  Okay.  We will go off the record at

9  3:09 p.m.

10              (Recess taken at 3:09 p.m.)

11              (Proceedings resumed at 3:15 p.m.)

12          MR. ATWOOD:  We will go back on the record.

13  It's 3:15 p.m.

14  BY MR. ATWOOD:

15      Q.  Mr. Rothenberg, you had an opportunity to confer

16  with your counsel during the break.  I'll repeat my

17  question.

18          Did you have an opportunity to review Exhibit 28

19  before it was submitted to the Securities and Exchange

20  Commission by Mr. Fagel?

21      A.  I have seen this.

22      Q.  Before it was submitted to the Securities and

23  Exchange Commission?

24      A.  Yes.

25      Q.  And was it different than what is contained in

                                                    152

US-001752

1    Exhibit 28?

2        A.   I don't know.   There's a lot of things in it,

3    and I am not going to talk about specific things related

4    to confidential settlement communications that are going

5    on right now.

6        Q.   Okay.   What are your current sources of income?

7        A.   I believe you asked me that earlier.   And my

8    answer is the same.

9            Can you read back whatever my answer to that

10   question was earlier?   It was a lot earlier in the

11   deposition.

12       Q.   Yeah, I don't know if we can go back that far.

13   I honestly don't remember asking you that one.   I'm not

14   saying I didn't.

15           Let's actually just go to some bank statements,

16   and that will be easiest.

17           We are on Exhibit 29, I believe, so let's mark

18   this as 29.

19           (Exhibit 29 was marked for identification by the

20           court reporter and is attached hereto.)

21   BY MR. ATWOOD:

22       Q.   Mr. Rothenberg, I've handed you what's been

23   marked as Exhibit 29, which appears to be a bank

24   statement from Bank of America addressed to you with an

25   account ending in 2573.

153

US-001753

1          Do you recognize Exhibit 29?

2      A.   Well, it looks like a bank statement.   I mean,

3   there's not a reason for me to have any particular bank

4   statement in mind.

5      Q.   Okay.   Well, is this a bank statement for your

6   bank account at Bank of America?

7      A.   It says it is.

8      Q.   Do you have any reason to doubt the accuracy of

9   the document?

10      A.   I mean, unless the SEC has a history of

11   providing false documents, no.

12      Q.   Okay.   I can represent to you that we obtained

13   this document by issuing a subpoena to Bank of America

14   during the course of this investigation.

15          Do you have -- do you know if the account number

16   identified on page 1 of Exhibit 29 is an accurate bank

17   account?

18      A.   I'll refer you to Exhibit 5.

19      Q.   Also on page 1 of Exhibit 29 you have what I

20   believe is your full name, Michael Brent Rothenberg, and

21   your current home residence; is that correct?

22      A.   Is the question is my name Michael Brent

23   Rothenberg?   I also answered that earlier in this

24   deposition.

25      Q.   I'm just confirming that's your name and your

                                                          154

US-001754

1   home address on this bank statement.

2          Is that accurate?

3      A.   Mr. Atwood, I have answered the questions about

4   my address and my name and you know that that's accurate.

5      Q.   Thank you.

6          This bank statement covers a time period

7   January 24, 2019, to February 20, 2019.

8          If you turn to page 3 of Exhibit 29, which ends

9   at Bates Number 360.

10         Mr. Rothenberg, there are two deposits, one on

11  February 6, 2019, and one on February 7th, 2019, totaling

12  $16,500.  Do you know the source of that income to your

13  bank account?

14     A.   I will refer to Exhibit 5.

15     Q.   Okay.  The bank statement next to the

16  February -- excuse me.  Let me start over.

17         The bank statement next to you, February 6,

18  2019, for this deposit of $8,500 identifies Rothenberg

19  Investment Co. LLC as the sender.

20         Are you familiar with that entity?

21     A.   Next time you should ask me these questions

22  before a deposition and see if I want to answer before

23  just going right to a deposition.  This is a low blow and

24  you're catching me off guard.  You didn't say we were

25  going to go to 2019, so I have to refer you to Exhibit 5

155

US-001755

1  because, once again, the commission did not afford me the

2  courtesy or the respect of allowing me a chance to have a

3  discussion with you outside of this high-stakes

4  environment.

5      Q.  So just to be clear, you're asserting your Fifth

6  Amendment privilege in response to my question?

7      A.  Yes.  You are asking things that are once again

8  not in the complaint, that are not reasonable for me to

9  have spent time preparing for, especially as a pro se,

10  you know, defendant here, and you're asking me under the

11  highest-of-stakes conditions.  So I would ask you to at

12  least attempt to ask me these questions outside of this

13  environment in the future.

14      Since I have not had time to prepare or to

15  review any of these things, I will refer you to

16  Exhibit 5.

17      Q.  Well, let me just say, Mr. Rothenberg, we've

18  attempted talking to you both through counsel and through

19  letters and through discovery regarding your income,

20  assets and liabilities, and we have not received

21  satisfactory answers so that's one of the reasons we are

22  having a deposition is to talk about those issues.

23      A.  Well, Mr. Atwood, it took you one month to

24  respond to Mr. Fagel's letter that you just gave me, and

25  that's totally inexcusable.

156

US-001756

1      Q.   Okay.   So if I ask you any further questions

2   regarding sources of income relating to Rothenberg

3   Investment Co. LLC, do you intend to assert your Fifth

4   Amendment privilege?

5      A.   Well, so you've been asking me about a bank

6   statement.   So now the question is about an entity, a

7   different entity than this?

8      Q.   No.   If you want to take out the bank statement,

9   which is Exhibit 29, and turn to the third page.

10     A.   Yeah, I mean, I haven't had time to review this,

11   but okay.

12     Q.   You can take all the time you want right now to

13   review it.   It's only a four-page bank statement.

14     A.   What's the question?

15     Q.   Well, I'm asking you about two deposits made

16   into your bank account.   And you're saying you need time

17   to prepare.   So if you want to look at the exhibit, I'm

18   offering you time right now.

19     A.   It's a matter of principle.   This is not an

20   acceptable ambush and I don't appreciate it, so I will

21   refer you to Exhibit 5.

22     Q.   Okay.   If I ask you any further questions

23   regarding transfers of money into your personal bank

24   account at Bank of America ending in account number 2573

25   from an entity with an account name of Rothenberg

157

US-001757

```
 1   Investment Co. LLC, do you intend to assert your Fifth
 2   Amendment privilege?
 3        A.   I'll make this even easier.  Any questions
 4   you're asking about 2019, which is outside the scope of
 5   your complaint, I'll refer you to Exhibit 5.
 6        Q.   Well, I think we are going to have to get more
 7   specific on that, but I can take your response to mean a
 8   yes?
 9        A.   That's a yes.
10        Q.   Thank you.
11             Also on the same page of Exhibit 29 there's a
12   transfer out on February 6, 2019, of $6,000 to Michael
13   Brent Rothenberg.  Do you know what account that is?
14        A.   I'll refer you to Exhibit 5.  But, once again, I
15   am Michael Brent Rothenberg.
16        Q.   And I'm asking you what account that is.
17        A.   You've subpoenaed all my banks so many times
18   that some of them have actually ended relationships with
19   me over that.  I had a banking relationship with Bank of
20   America for more than a decade.  After this particular
21   round of subpoenas, they ended their relationships
22   unilaterally with me and it cost me quite a bit of time
23   and inconvenience, and that's because you continue to
24   harass these banks.
25        Q.   When you close your --
```

158

US-001758

1      A.   I did not close them.   You did.

2      Q.   So you just said Bank of America unilaterally

3  closed your accounts; is that right?

4      A.   I received -- after this round of subpoenas I

5  received a notice from Bank of America that that was it.

6      Q.   Okay.   Where did you transfer the funds

7  remaining in your accounts to?

8      A.   There was almost nothing left in the funds at

9  the time I received that letter.   In fact, I don't even

10  know what this one states, but you can see that the

11  account probably dips down very close to zero on a number

12  of occasions.   So it's a -- you're asking which accounts

13  can you subpoena to close now so that you can harass that

14  bank?   Is that what you are asking?

15     Q.   I'm asking you where did you transfer the money

16  that was in your accounts at Bank of America?

17     A.   They did not allow a transfer.   They just closed

18  the account.   There was no access to online after that.

19         You don't really realize the inconvenience and

20  harassment that this entails, do you?

21     Q.   Where did the money go that was left in your

22  Bank of America accounts?

23     A.   Once again, they just closed the account and

24  they just, you know, sent me a check.   They would not

25  allow a transfer.

                                                        159

US-001759

1    Q.   So they issued you paper checks for the --

2    A.   There was not much in there.  If there was

3  anything in there, then that's how they did that.

4    Q.   Okay.  It probably makes sense to mark this as

5  Exhibit 30.

6         (Exhibit 30 was marked for identification by the

7         court reporter and is attached hereto.)

8  BY MR. ATWOOD:

9    Q.   Mr. Rothenberg, you've been handed what's been

10  marked as Exhibit 30, which is the bank statement

11  following Exhibit 29, covers the time period February 21

12  to March 21, 2019, for the same account, which ends in a

13  number of 2573, is in your name, and you can turn to

14  page 3 and you can see that there's an account closing

15  transaction.

16         Is that the closing of the account that you're

17  referring to?

18    A.   Yes, that is the moment you succeeded in getting

19  them to close my account.  Congratulations.

20    Q.   So Bank of America issued you a check in the

21  amount of $7,600 -- I can't talk now.  $7,665.14?

22    A.   I have no reason to believe that that's false.

23    Q.   And they mailed you that check?

24    A.   Almost certainly.

25    Q.   Okay.  And where did you deposit that check?

160

US-001760

1      A.   I do not remember if I have deposited it, and I

2   don't know.

3      Q.   Have you opened any bank accounts since Bank of

4   America closed your accounts?

5      A.   Are you going to try to harass any bank accounts

6   that I opened into closing?

7      Q.   Have you opened any bank accounts since Bank of

8   America closed your accounts?

9      A.   I'm not -- I'm trying to understand if the

10  government intends to continue this harassment that has

11  cost me my banking relationships.  If that is what you're

12  getting at, then I would like to respectfully ask you to

13  stop that harassment.  It's been going on for three

14  years.  And if that's what you're trying to do, to

15  continue to figure out how to do that, I would ask you to

16  stop that, please.

17     Q.   Have you opened any bank accounts since Bank of

18  America closed this account?

19     A.   It is possible.

20     Q.   So you're saying you don't remember?

21     A.   That's not what I said.  I said "it's possible."

22     Q.   It's a yes or a no --

23     A.   I am very reluctant to give you a name because

24  you have not told me that you will not harass them.  So

25  the harassment you did with these subpoenas -- I provided

                                                        161

US-001761

```
 1   you bank statements that are accurate, and you
 2   continue -- how many times did you subpoena these guys?
 3   A lot.  So what I'm trying to understand is I want an
 4   assurance from you that you will not continue to harass
 5   my banking relationships into closing; and without that,
 6   it's hard for me to honestly try to enable you.
 7        Q.  So it's a yes or no question.
 8            Have you opened any bank accounts since Bank of
 9   America closed your accounts?
10        A.  It's possible.
11        Q.  Okay.  Where did you open a bank account?
12        A.  Are you not going to give me any kind of
13   assurance that the government won't continue this
14   harassment?
15        Q.  Where did you open a bank account?
16        A.  What is your intention?  You realize this is
17   personal, that you've caused me great suffering with this
18   particular point.  So if you have any other intention
19   besides harassment, this would be the time to assure me
20   of that.
21        Q.  Well, Mr. Rothenberg, as you said earlier, I
22   disagree with your premise that this is harassment.
23            The simple question is where have you opened
24   bank accounts since Bank of America closed these
25   accounts?
```

162

US-001762

1       MR. ILLOVSKY:  If it enters into your thinking,
2    I think there's a discovery cut-off, so I don't know that
3    there would necessarily be more discovery.
4       THE WITNESS:  It does in terms of my thinking.
5    Didn't that already happen?  When was the discovery
6    cut-off?  May 1st?
7       MR. ILLOVSKY:  Early May, I think.
8       THE WITNESS:  Capital One.
9    BY MR. ATWOOD:
10      Q.  Thank you.
11          How many accounts did you open at Capital One?
12      A.  One.
13      Q.  And that's in your name?
14      A.  That's right.
15      Q.  Did you open any accounts at Capital One in the
16   name of any other entities?
17      A.  I did not.
18      Q.  Mr. Rothenberg, when is the last time you bought
19   a suite for the Golden State Warriors at Oracle Arena?
20      A.  I have personally never done that.
21      Q.  What about for any of your businesses, when is
22   the last time you did that?
23      A.  So that conflates, that pretends like I am my
24   businesses, so I reject the premise of that question.
25      Q.  Okay.

                                                      163

US-001763

1          MR. ATWOOD:  We will mark this as Exhibit 31.

2          (Exhibit 31 was marked for identification by the

3          court reporter and is attached hereto.)

4    BY MR. ATWOOD:

5      Q.  Mr. Rothenberg, you've been handed what has been

6    marked as Exhibit 31, which is a Bank of America bank

7    statement for the time period March 1 to March 31, 2017,

8    for account ending in 1761, and it is for -- the account

9    holder name is Rothenberg Investment Co. LLC at the

10   address of 1062 Folsom Street, Suite 200, San Francisco,

11   California 94103.

12         Mr. Rothenberg, is that one of your entities?

13     A.  I refer you to Exhibit 5.

14     Q.  Is that address the business address that you've

15   used for RVMC?

16     A.  I refer you to Exhibit 5.

17     Q.  If I ask you any further questions regarding

18   this bank statement, do you intend to assert your Fifth

19   Amendment privilege?

20     A.  Yes.

21     Q.  Okay.  Let's turn to page 3 of the exhibit, 31.

22   There's an entry, the first entry under withdrawals and

23   other debits on March 16, 2017, there's a wire out to the

24   Golden State Warriors.

25         Did you authorize that transfer?

                                                            164

US-001764

1      A.   I refer you to Exhibit 5.

2           MR. ATWOOD:   We will mark this as Exhibit 32.

3           (Exhibit 32 was marked for identification by the

4           court reporter and is attached hereto.)

5   BY MR. ATWOOD:

6      Q.   Mr. Rothenberg, you've been handed what's been

7   marked as Exhibit 32, which is a bank statement from Bank

8   of America for the time period July 1 to July 31st, 2018,

9   for an account ending in 0264.

10          Do you recognize this document?

11     A.   I refer you to Exhibit 5.

12     Q.   The account name on the bank statement is River

13  Ecosystems LLC.  Is that one of your entities?

14     A.   Exhibit 5.

15     Q.   And the address on the bank statement is that

16  same address at 1062 Folsom Street.  Is that the address

17  that you used in relation to this business entity?

18     A.   Exhibit 5.

19     Q.   Let's turn to page 4 of Exhibit 32.  The first

20  entry on page 4 is dated July 20th, 2018.  It's a wire

21  out to Golden State Warriors for an amount of $77,000.

22          Did you authorize that transfer, Mr. Rothenberg?

23     A.   Exhibit 5.

24     Q.   Mr. Rothenberg, if I ask you any further

25  questions regarding Exhibit 32, do you intend to assert

                                                         165

US-001765

1    your Fifth Amendment privilege?

2        A.   Yes.

3        Q.   So we've just gone through two bank statements

4    showing significant transfers of money to the Golden

5    State Warriors.

6             Do you know what those transfers were for?

7        A.   What transfers were for to the Warriors?

8        Q.   Yeah.

9        A.   Okay.  Sure.  Exhibit 5.

10       Q.   Based on your facial expression, I take it that

11   you understand that that was kind of a ridiculous

12   question?

13       A.   Yeah, it seems like you are really reaching.

14       Q.   "Really reaching."  What do you mean?

15       A.   Well, you're asking about entities that are not

16   Rothenberg Ventures or the funds or mentioned in your

17   complaint.  You know, you're going way outside the

18   bounds.  So I understand that you, you know, have as wide

19   of a mandate as you want, and it's starting to, you know,

20   really just feel like harassment.

21       Q.   Okay.  Well, we did look at a bank statement

22   where Rothenberg Investment Co. LLC sent at least $16,000

23   to your personal bank account, so there is a relationship

24   there that the documents show.

25            Gossiping like to testify about that

                                                           166

US-001766

1  relationship?

2      A.  Once again, even, you know, that entity is not

3  Rothenberg Ventures or the funds.  So, you know, you are

4  the SEC.  There's the funds.  There's something that

5  you're -- have an oversight over, and you're going into

6  other things completely.  So I don't see the relation and

7  you haven't established that.

8      Q.  We are following the money.  That's what we do.

9          Gossiping like to testify regarding the

10 relationship between yourself and Rothenberg Investment

11 Co. LLC?

12     A.  As I've mentioned, this is another blindside and

13 I haven't had any time to prepare, so I will not be able

14 to testify.  I'll refer you to Exhibit 5 for all of these

15 ambushes.

16     Q.  Okay.  So if I ask you any further questions

17 regarding your relationship with Rothenberg Investment

18 Company LLC, do you intend to assert your Fifth Amendment

19 right?

20     A.  That's a question you asked earlier and the

21 answer is still yes.

22     Q.  Mr. Rothenberg, do you currently -- or excuse

23 me, within the last year have you sold access to any

24 season tickets to the Golden State Warriors?

25     A.  I don't personally have a suite, as we've

167

US-001767

```
 1    already established, so the answer to that could never be
 2    yes.
 3         Q.   Have you participated in any sales of tickets to
 4    the Golden State Warriors game in the last year?
 5         A.   This is just so outside the bounds of anything
 6    related to this case.   I'll just refer you to Exhibit 5.
 7    These are not appropriate questions.
 8         Q.   Well, let's be clear.   There's a difference
 9    between what's an appropriate question and whether or not
10    it's admissible or if you're asserting your Fifth
11    Amendment privilege.   So I want the record to be clear,
12    you're not answering my question because you're asserting
13    your Fifth Amendment privilege, correct?
14         A.   That is what I said.
15         Q.   Okay.
16         A.   I don't know the difference between all these
17    objections.   As you know, I'm not very -- you know, I'm
18    not a lawyer.
19         Q.   That's right, but you do have counsel here today
20    representing you, correct?
21         A.   Well, he's not saying much, is he?
22              Sorry.   You're not.   So if you have objections
23    to things, please say them.   I don't know what they are.
24              MR. ILLOVSKY:   Do you want to take a break so
25    that we can discuss it?
```

                                                                168

US-001768

 1              THE WITNESS:  That would be great.

 2              MR. ILLOVSKY:  All right.  Can we go off the

 3  record, please.

 4              MR. ATWOOD:  We will go off the record at

 5  3:38 p.m.

 6                   (Recess taken at 3:38 p.m.)

 7                   (Proceedings resumed at 3:51 p.m.)

 8              MR. ATWOOD:  We will go back on the record.  It

 9  is 3:51 p.m.

10  BY MR. ATWOOD:

11     Q.  Mr. Rothenberg, we talked about your personal

12  residences.  One thing that's been disclosed in some of

13  the fund agreements are other real estate interests.  In

14  particular, Texas real estate.

15          Could you tell me about those, please?

16     A.  I've been here more than six hours now and I'm

17  going to direct you to Exhibit 5.

18     Q.  If I ask you any further questions about your

19  real estate interests in Texas, do you intend to assert

20  your Fifth Amendment privilege?

21     A.  Yes.

22     Q.  Do you have any other real estate interests

23  besides your personal residence and those in Texas?

24     A.  I'll direct you to Exhibit 5.

25     Q.  And if I ask you any further questions regarding

                                                      169

US-001769

1  your real estate interests located anywhere, do you
2  intend to assert your Fifth Amendment privilege?
3      A.  If you ask me any questions, I'll direct you
4  to 5, so that's what I'll do now.
5      Q.  Okay.  How much is your equity interest in Audax
6  currently worth?
7      A.  Exhibit 5.
8      Q.  If I ask you any further questions regarding
9  your equity interest in Audax, do you intend to assert
10  your Fifth Amendment privilege?
11      A.  Sure.  Yes.
12      Q.  What other equity stakes do you have in any
13  private companies?
14      A.  These are all parts of our ongoing settlement
15  discussions that we've talked about earlier.  This is the
16  same thing.  So as I've said before, I'll direct you to
17  Exhibit 5 for that.  Whatever.  I mean, we've already
18  gone over this.
19      Q.  Okay.  If I ask you any further questions
20  regarding your equity interest in any private company, do
21  you intend to assert your Fifth Amendment privilege?
22      A.  Mr. Atwood, the same thing.  This agreement
23  about the, you know, sworn financials encompasses all of
24  the things about equity interests, real estate, all this
25  stuff that you're, you know, trying to phrase in

170

US-001770

1   different ways.  So yes.

2       Q.   Okay.  Well --

3       A.   You're going to get all that information.  It's

4   something worth discussing in private con- -- you know,

5   this is not the forum for it.  So I have to do that

6   because this is, you know, trying to catch me live with

7   my memory instead of, you know, the right process.  So

8   this is not appropriate and I'll have to direct you to 5

9   because I don't have any other realistic options.

10      Q.   Well, I want to be clear on the record that

11  there is no agreement that we would not seek discovery on

12  your assets.  That was never an agreement between us and

13  Mr. Fagel or you, so I don't know what you're referring

14  to.

15      A.   I agree that.  But we are having those

16  discussions already in an otherwise civilized manner.

17      Q.   Do you have any loans currently owed to you by

18  individuals?

19      A.   This is the same exact, you know, category of

20  things.  So exhibit 5.

21      Q.   If I ask you any further questions regarding

22  your current assets, do you intend to assert your Fifth

23  Amendment privilege?

24      A.   Yes.

25      Q.   Mr. Rothenberg, do you have -- or excuse me,

                                                         171

US-001771

```
 1   I'll rephrase.
 2          Do you possess any cryptocurrency?
 3      A.   Just for the sake of it, what does that
 4   encompass?
 5      Q.   Any cryptocurrency.  There's over a hundred of
 6   them out there.
 7      A.   Okay.  Well --
 8      Q.   Whether it's a token or any other type of
 9   cryptocurrency.
10      A.   Okay.  Well, Exhibit 5.
11      Q.   Do you intend to assert your Fifth Amendment
12   privilege for all further questions concerning
13   cryptocurrency?
14      A.   Yes, and I don't disagree with your
15   characterization that that may or may not be an asset.
16      Q.   Do you have an account at Coinbase?
17      A.   Exhibit 5.
18      Q.   Do you know what Coinbase is?
19      A.   I do.  I've heard of Coinbase, yes.
20      Q.   What is Coinbase?
21      A.   Exhibit 5.
22      Q.   Do you have an account at PayPal?
23      A.   Exhibit 5.
24      Q.   Do you have an account at Venmo?
25      A.   Exhibit 5.
```

172

US-001772

1      Q.   Do you have an account at Robinhood?

2      A.   Exhibit 5.

3           Let the record show more gossiping by the SEC.

4               (Discussion off the record.)

5      Q.   Mr. Rothenberg, who is Brandon Molina?

6      A.   Well, what does that mean?  Like, Brandon Molina

7   is a person.

8      Q.   Do you know Brandon Molina?

9      A.   I definitely have met a Brandon Molina.

10     Q.   Okay.  And who is he?

11     A.   Well, what does that mean?  I mean, he's not a

12  family member.  What's the --

13     Q.   What's your relationship with Mr. Molina?

14     A.   I'm not a hundred percent certain but I think he

15  may have gone to Harvard Business School, which is a

16  school I went to, and he has been -- certainly been

17  associated with a company that I invested in at

18  Rothenberg Ventures.  He may have been one of the

19  cofounders or he joined.  I think maybe he joined after

20  it was founded but in an executive position.

21     Q.   Do you recall the name of that company?

22     A.   Swing by Swing I think it was.  I don't know if

23  that's the legal name.  That's the name it was referred

24  to as.

25     Q.   Do you know or do you recall whether Mr. Molina

173

US-001773

1    invested in any of the Rothenberg funds?

2        A.   Exhibit 5.

3        Q.   If I ask you any further questions regarding

4    Mr. Molina investing in any of the Rothenberg venture

5    capital funds, do you intend to assert the Fifth

6    Amendment privilege?

7        A.   Yes, in this setting.  If you ask me in a less

8    contentious setting, I'll be more than happy to help you

9    to the extent I can.

10        Q.   Do you recall Mr. Molina sending $15,000 to your

11   personal bank account?

12        A.   Exhibit 5.

13             You really should try asking these questions in

14   a normal setting.

15        Q.   Do you know whether Mr. Molina was allowed to

16   invest in the 2014 fund?

17        A.   I don't have a specific recollection of that.

18        Q.   Do you know if Mr. Molina was later excluded by

19   RVMC from the 2014 fund?

20        A.   I don't have a specific recollection of that.

21   The -- yeah.

22             MR. ATWOOD:  We will mark this as Exhibit 33.

23             (Exhibit 33 was marked for identification by the

24             court reporter and is attached hereto.)

25

                                                          174

US-001774

```
 1    BY MR. ATWOOD:
 2        Q.  Mr. Rothenberg, you've been handed a document
 3    that's been marked as Exhibit 33.  Do you recognize this
 4    email thread?
 5        A.  No.  I can't remember any threads that had
 6    portions redacted.  I don't think we did that as a rule.
 7    I don't remember ever doing that.
 8        Q.  I can represent to you that the redactions on
 9    Exhibit 33 were done by your former counsel at Gibson
10    Dunn.
11        A.  Okay.
12        Q.  Let's turn to the second page of Exhibit 33.
13    There's an email sent by you, Mr. Rothenberg, on
14    April 1st, 2016, to Tom Leep, Geoff Rapoport, Katie
15    Fanelli, and the subject is "LP Items."
16            First, who is Geoff Rapoport?
17        A.  It says right here he's general counsel.
18        Q.  General counsel of?
19        A.  Well, it says "Rothenberg Ventures General
20    Counsel."
21        Q.  Okay.  So is it your understanding that he was
22    general counsel of Rothenberg Ventures in April of 2016?
23        A.  That sounds about like the time he joined.  He
24    may have joined in April of 2016.
25        Q.  And who is Katie Fanelli?
```

175

US-001775

1          A.   Exhibit 5.

2          Q.   Okay.  So going back to Exhibit 33, we have this

3    email header on the bottom of the second page.  Also,

4    your email begins on the next page of Exhibit 33, which

5    ends in Bates Number 642.

6               And you write:

7               "Tom and Jeff,

8               "Can you please help me get to the bottom line

9               on this?  It affects K-1s.  I am listed as

10              having 600,000 in fund II/2014 fund, but

11              actually I have 500,000 and the following people

12              together have a hundred thousand.  Can we please

13              update our cap table, our portal, and let

14              Cisco/Katie bill the amounts to issue us

15              dividends?"

16         Q.   Mr. Rothenberg, do you understand what you meant

17    by that?

18         A.   I think that we had an internal tracker that had

19    my stake in that fund as incorrect.  It sounds like it

20    was overstated and I wanted to get that corrected.

21         Q.   Okay.  So there's a thousand-dollar difference

22    between what you believe you had invested in the 2014

23    fund and what these other individuals may have invested?

24         A.   I think you said "a thousand" but you meant a

25    hundred thousand; is that right?

                                                          176

US-001776

1        Q.   That's right.  Thank you.

2        A.   I think we ended up finding out that it was, you

3   know, may have even been a $200,000 difference.  I think

4   recently looked through that and I think the amount that

5   I had may have been 400,000.  That's the best of my

6   recollection.  And at the time I think this tracker said

7   600,000.

8        Q.   Do you know how that discrepancy happened?

9        A.   Well, a hundred thousand -- there was -- there

10  was an investor, I think it was Supans, Julie and

11  somebody, you know, Supan family I believe had invested a

12  hundred thousand.  And then I don't remember the

13  specifics, but it may have been that I purchased it from

14  them and then sold it or something like that.  That's why

15  there was some confusion over who was holding it.  Like I

16  think I may have briefly held their stake.

17       Q.   Okay.

18       A.   Something like that.

19       Q.   Okay.  But the Supans aren't on this list.  And

20  Brandon Molina, he's one of the individuals on this list.

21       A.   That's my point.  So they were at one time.

22  Then I think I had purchased their stake and then I think

23  I had sold it to other people.  I believe that's the

24  basic crux of it.

25       Q.   Okay.  So are you saying you purchased the

                                                        177

US-001777

1  Supans' stake and then you sold it to these individuals

2  that are identified on Exhibit 33?

3      A.  I'd have to check on that.  That's -- that's the

4  gist of the -- like, what I think this is referring to.

5          Because this also predates like a little bit of

6  investigation work by our team to determine what

7  happened.  Because I think where this landed was, you

8  know, somewhere I think I had 4 to 500,000, not 600.

9      Q.  That discovery into that difference, I mean when

10 was that?

11     A.  Well, this says in April 2016 thing, right?  So

12 it must have been, you know, April, May.

13     Q.  This was internal work at RVMC?

14     A.  It looks like it.  I mean, Geoff Rapoport was

15 the counsel at Rothenberg Ventures.  He had just joined,

16 though.  He came from Cooley.  He was the fund counsel of

17 the 2016 fund.

18     Q.  Let's turn to the first page of Exhibit 33.  The

19 top email is from Tom Leep.  It's dated April 15th, 2016.

20 It's sent to Katie Fanelli, Geoff Rapoport, and yourself,

21 Mr. Rothenberg.

22         In that email Mr. Leep writes "We have excluded

23 Eric McKean and Brandon Molina from the fund II."

24         Do you have any recollection of that?

25     A.  I don't have any reason to disbelieve this, but

                                                        178

US-001778

1    it also seems to answer one of your previous questions.

2         Q.  Do you recall ever telling Mr. Molina that you

3    would hold equity in his name?

4         A.  I do not have a specific recollection of that.

5    I mean, that this is implying that there was some kind of

6    contemplation of it, but it doesn't look like it

7    necessarily came to fruition.

8         Q.  So, Mr. Rothenberg, I'm happy to make the bank

9    statements or the bank statement an exhibit if that would

10   help, but I can represent to you that in October 2014,

11   Mr. Molina sent you two bank transfers totaling $15,000

12   to your Bank of America account ending in 2573.

13        Do you recall what the purpose of that was for?

14        A.  I think there was also some transaction that

15   went the other way and I don't remember the details of

16   it, but I think they may have been related.

17        Q.  Do you recall why Mr. Molina sent you $15,000 in

18   October 2014?

19        A.  It may have been a repayment of a loan or it may

20   have had something to do with his company, Swing by

21   Swing.

22        Q.  So you just don't recall?

23        A.  No.

24        Q.  And then your answer previous to that, you

25   believe you sent that money back to Mr. Molina?

                                                           179

US-001779

```
 1        A.  Well, I just said -- there's definitely more to
 2   that.  That's not the only transaction related to him.
 3        Q.  Sitting here today, do you purport to hold any
 4   equity in 2014 fund on behalf of Mr. Molina?
 5        A.  I mean, I have to go back and look at documents.
 6   I mean, there's at least 175 LPs, and I don't keep in my
 7   head, like, the specifics of, you know, everybody.
 8        Q.  It probably was a bad question on my part.  I
 9   don't mean whether Mr. Molina is an investor in the 2014
10   fund, but whether any equity that's in your name you're
11   actually holding for the benefit of Mr. Molina?
12        A.  That seems unlikely.
13        Q.  You don't know one way or the other?
14        A.  Well, you know, I've mentioned before that when
15   it comes to -- like, you know -- what did you say the
16   amount was, 15,000?
17        Q.  Yes.
18        A.  Total amount of money in the funds and values
19   like 50 million plus, so anything of that level I'd have
20   to go back and look and see.  It's just too small to
21   remember.
22        Q.  Okay.
23            MR. ATWOOD:  Let's mark this as Exhibit 34,
24   please.
25
```

180

US-001780

1          (Exhibit 34 was marked for identification by the

2          court reporter and is attached hereto.)

3    BY MR. ATWOOD:

4       Q.  Mr. Rothenberg, you've been handed what's been

5    marked as Exhibit 34.  Do you recognize this document?

6       A.  This looks like an email from my own account to

7    my account, so this is not -- this is not anything of

8    value.

9       Q.  Could you explain what you mean by that, an

10   email from your account to your account doesn't have any

11   value?

12      A.  Yeah.  I have various software programs that

13   scrape words from different types of digital things that

14   I have and it auto generates things.  This is not a

15   document that should be relied on for anything

16   whatsoever.  This is not a communication with anybody.

17   So this is not -- I'm not even going to, you know, look

18   at this.

19      Q.  Could you explain what you mean by you have

20   programs that scrape and create emails?

21      A.  Well, yeah, sure.  I mean, it's like there's

22   different types of, you know, pieces of information,

23   notes, and whatever that come in through whatever it is,

24   you know, Messages and Slack and Word and all that kinds

25   of stuff and sometimes I'll try to, you know, capture

                                                        181

US-001781

1   those pieces.  But this is not a finished document for

2   myself.  There's never -- any email from myself to myself

3   is never a document that any third party is ever supposed

4   to read, rely on, or anything.  So the fact that it's

5   even here is offensive.

6        Q.  You mentioned previously, though, that you had

7   software that scraped and pulled it together?

8        A.  The point is that this is not something that

9   means anything.

10        Q.  I'm trying to get at whether or not you're

11   saying software created this document or not.

12        A.  I'm not going to engage on a document from

13   myself to myself.  This is not a representation to any

14   third parties, it's not intended to be, and I'm not going

15   to entertain it.

16        Q.  Did a piece of software create this document?

17        A.  I don't know.  I don't know.  I don't know even

18   why the commission has this.

19        Q.  Is it your testimony that you did not author

20   Exhibit 34?

21        A.  No, it's not.  It's my testimony that this is an

22   inappropriate thing for you to have in your possession.

23        Q.  So did you author Exhibit 34?

24        A.  I don't know.  I don't know what this is.

25        Q.  Well, why don't you take a look at it?

                                                           182

US-001782

1          A.   Because it's an email from myself to myself.

2     That's not ever -- obviously, it's not intended for any

3     third party.

4          Q.   Well, so the record's clear, the email addresses

5     on Exhibit 34, the from is mikerothenberg@gmail.com.   And

6     we have established already that that's your email

7     address, correct?

8          A.   I just stated on the record just now this is an

9     email from myself to myself.

10         Q.   Okay.   And Exhibit 34 was sent on Wednesday,

11    May 11th, 2016.   I still don't believe you've answered my

12    question.

13              Was this document created by a piece of software

14    or did you author it?

15         A.   I don't know.   It's an email from myself to

16    myself.   It's not -- it's not intended for any third

17    party and it's certainly not intended for the commission.

18    That's not what this is.

19         Q.   When gossiping talk about software that can

20    scrape and create these types of documents, please

21    identify which software you're referring to.

22         A.   I don't have anything further to say on an email

23    to myself.   This is not a third-party representation of

24    any kind.   It's not a company -- it's not a, you know,

25    company document.   It's not anything related to your

                                                            183

US-001783

```
 1   investigation, and it's not anything.
 2       Q.  What software do you use that creates documents
 3   by scraping other documents as you've testified?
 4       A.  I don't really understand what you're trying to
 5   get at at this point.  I have nothing further to say on
 6   this document.
 7       Q.  I'm trying to understand your testimony.  You
 8   said you have software that scrapes documents and creates
 9   documents, and I'm asking you what software is that?
10       A.  There's a number of programs that use email as a
11   way of processing things.  So if you'd like, I'll try to
12   get a little list for you afterwards.  I use at least 20
13   different types of software.  I don't know -- like, once
14   again, there's nothing about this that is -- that anyone
15   can rely on for anything.  That's not what this is.  Any
16   types of emails to myself from myself are not intended
17   for any consumption of any other person.  That's why
18   there's no one else on these threads.  To the extent this
19   is intended for somebody else, it would go to somebody
20   else.
21       Q.  What software do you use to scrape and create
22   other documents?
23       A.  I use at least 20 different types of software,
24   most of which that interact with Gmail or email in some
25   way.
```

184

US-001784

1    Q.  And I'm asking you to identify the software that

2  you alluded to earlier that scrapes your various

3  documents to create --

4    A.  Sure, I'll be happy to follow up with you on

5  that.

6    Q.  I need an answer --

7    A.  I don't recall what generated this email because

8  I don't know what this is.

9    Q.  Okay.  We are talking in general terms here.

10      What software do you use that scrapes your other

11  documents to create documents?

12    A.  I have nothing further to say on an email from

13  myself to myself about software or otherwise.

14    Q.  Are you refusing to answer my question?

15    A.  No, I've answered your question and you're

16  continuing to harass me.

17    Q.  You yet to tell me a name of a software that

18  does --

19    A.  I said I'd be happy to follow up with you but

20  there's 20 different ones and I don't recall them.

21  That's a very specific answer to your question.

22    Q.  So you can't recall a single piece of software

23  that does what you --

24    A.  No, I can't recall the one that did this,

25  because I don't know what this is, and it's another one

                                                      185

US-001785

1    of these cases where you're going down a rabbit hole of

2    something that is not ever intended for a third party.

3    There's no third party on here so what you're trying to

4    get at with this is obviously inappropriate, and I don't

5    know the answer to, you know, a specific question.

6         Q.  Well, now your last answer contradicted what you

7    said earlier which was you didn't know how this document

8    was created, and now you're saying it was definitely one

9    of these pieces of software that you use?

10        A.  No, I'm not.  I'm saying I don't know what --

11   I'm saying that you're providing me with something that

12   was never intended for a third party, so it's not

13   something that I have an opinion on or know.  I just know

14   that it's not meant for any third party and can't be

15   relied on.

16        Q.  Well, when I showed you this document you

17   immediately started talking about software that

18   scrapes --

19        A.  I'm offended that you showed me a document

20   that's obviously not intended for a third party and that

21   you continue to ask about it.  It is the type of thing

22   that is an overreach, as you've demonstrated you're so

23   willing to do.

24             MR. ILLOVSKY:  Can we just --

25             MR. ATWOOD:  Do you have an objection?

                                                          186

US-001786

1          MR. ILLOVSKY:  I was just going to ask to go off
2   the record.
3          MR. ATWOOD:  I want to ask my next question.
4   BY MR. ATWOOD:
5      Q.  For the last time, please name software used
6   that scrapes your other programs and creates documents.
7      A.  I'd be happy to follow up with you on that.
8   Like I said, as I've testified, I have a ton of programs
9   that interact with Gmail.
10     Q.  And you can't --
11     A.  And this isn't something that I remember
12  providing to you.  If my counsel did, then my counsel
13  did; but this is not something that I have a specific,
14  you know, recollection of and you're asking how -- which
15  software programs interact with it.  It's not something
16  I'll be able to just recall.
17     Q.  Okay.  So sitting here today, you can't think of
18  a single piece of software that you use that does what
19  you testified --
20     A.  You misstated my testimony again.
21     Q.  Well, can you name one of these pieces of
22  software that you use?
23     A.  I would be happy to follow up with you.  As I
24  mentioned, there's a lot of different things that I use.
25     Q.  Name them.  Which are the ones you recall?

                                                    187

US-001787

1        A.   This is harassment.

2        Q.   Are you refusing to answer my question?

3        A.   No, I'm not.   I already offered to follow up

4   with you on that.

5        Q.   That's not going to do us any good.   We need

6   your answer while we're here --

7        A.   I'll sit here as long as you like.   I mean, this

8   is harassment.

9        Q.   I'm asking a question and I'm just waiting for

10  your answer.

11       A.   I've already answered you.   You're clearly

12  badgering me.

13            MR. ILLOVSKY:   Why don't we take a short break,

14  go off the record for a second, for a minute.

15            THE WITNESS:   And we have been here seven hours.

16  BY MR. ATWOOD:

17       Q.   We can talk time if you want, and we can do it

18  on the record.   If you want to take a break, we can do

19  that.   It's your call.

20       A.   My counsel asked for that.

21            MR. ATWOOD:   Okay.   We'll take a break.

22            MR. ILLOVSKY:   Can we take two minutes.

23            MR. ATWOOD:   We will go off the record at

24  4:22 p.m.

25                 (Recess taken at 4:22 p.m.)

                                                         188

US-001788

```
 1                (Proceedings resumed at 4:33 p.m.)
 2           MR. ATWOOD:  We are back on the record.  It's
 3    4:33 p.m.
 4    BY MR. ATWOOD:
 5        Q.  Mr. Rothenberg, you've been away conferring with
 6    your counsel.
 7           Can you answer my last question, please.
 8        A.  This is harassment, and I will answer that to
 9    all of your questions about this.
10        Q.  What is exactly harassment here?
11        A.  You continuing to badger me on this set of
12    questions is harassment.
13        Q.  What I'm really trying to get at is your answer
14    saying that this was created by software and I'm trying
15    to get your response to that.  And you've yet to identify
16    any software that you use that does that.  So I'm going
17    to ask it one more time.
18           What software do you use that scrapes your
19    documents to create what is Exhibit 34?
20        A.  This is still harassment no matter how many
21    times you ask the question.
22        Q.  Okay.  So you're refusing to answer my question?
23        A.  No, I'm not.  I've already answered it, and
24    that's why when you continue to ask the same question it
25    is harassment.
```

                                                        189

US-001789

1        Q.   Well, I'll --

2        A.   I have conferred with counsel and I am convinced

3   that this is harassment.

4        Q.   Well, I'll tell you from the SEC's perspective,

5   your refusing to answer --

6        A.   I'm not.  You know about that, that I've

7   answered your question already and this is harassment.

8        Q.   Have you named any software that you use that

9   does scraping, to use your word, to create documents,

10  Exhibit 34?

11       A.   I have -- as I've mentioned before, there are

12  quite a few pieces of software that I use to interact

13  with it and that I can't be sure about which one made

14  this document.  As I've testified, which is an answer to

15  your question, and you asking it for, I don't know, a

16  tenth time is still harassment.

17       Q.   You've yet to identify any software.

18            So is it your testimony that you don't know the

19  name of any software --

20       A.   I've already provided an answer to that

21  question, and you are continuing to harass me.

22       Q.   Can you name any software that does what you're

23  testifying it can do?

24       A.   Are you able to stop harassing me?

25       Q.   So, Mr. Rothenberg, just so we have a clear

                                                          190

US-001790

1  record, in our view, and I know you disagree, you are
2  refusing to answer these questions.
3      A.  I do disagree.  That's just a false thing to
4  say.
5      Q.  Okay.  Isn't it more likely that Exhibit 34 is a
6  note to self that you authored and sent to your own email
7  address?
8      A.  Are you trying to assume that you have some kind
9  of special knowledge of this document that I'm not aware
10  of?
11      Q.  No, I'm asking you.
12      A.  On a brief look at it, it looks to be a series
13  of totally disjointed things, that some of which have
14  obviously have absolutely nothing to do with Rothenberg
15  Ventures, some of which may fall into the category of
16  privileged.  And this hodgepodge of things is, you know,
17  totally inappropriate for the context of the ostensible
18  purpose of trying to, you know, determine disgorgement.
19  This is totally off topic, like many of the things you
20  have insisted on wasting our time on here today.
21      Q.  Did you author Exhibit 34?
22      A.  Once again, this is a hodgepodge of a ton of
23  different things, so I wouldn't even call it a thing to
24  be authored.  I don't recognize this as a company
25  document of any kind.

191

US-001791

```
 1        Q.   Did you author Exhibit 34?

 2        A.   I have no way to be sure if I authored it,

 3   whatever that means.

 4        Q.   Do you not understand what "author" means in the

 5   context of my question?

 6             MR. ILLOVSKY:  Objection.

 7   BY MR. ATWOOD:

 8        Q.   You can answer.

 9        A.   I've already answered your question.

10        Q.   Did you author Exhibit 34?

11        A.   I have no way to know if I've authored this.

12   You say that like it's a coherent thing.  It's obviously

13   a bunch of different things.

14        Q.   Does anyone besides yourself have access to

15   mikerothenberg@gmail.com?

16        A.   I mean, you know, as the commission is fully

17   aware, I was hacked by somebody who took tons of my

18   emails and delivered them to you, so you're quite aware

19   that other people have had access to my email.

20        Q.   Could you identify the individuals you're

21   referring to?

22        A.   I think that the commission is almost certainly

23   aware of individuals that provided my emails to it, and

24   it's a little bit surprising that you would pretend

25   otherwise.
```

                                                         192

US-001792

1    Q.  Can you identify individuals who may have hacked

2  your email, Mr. Rothenberg?

3    A.  So you're wondering if I know that Cisco Riordan

4  hacked my email?  I'm happy to confirm that for you.

5  Yes, that's a known fact that we've disclosed to you

6  before, that you were probably aware of before we

7  disclosed it to you.

8    Q.  So is it your testimony that on May 11, 2016,

9  Francisco Riordan --

10   A.  Francisco Riordan was the primary email tech guy

11  from around February of 2016 to around July.  So May

12  falls in that window.  He would probably have access to a

13  lot of things, including email.

14   Q.  Do you believe he had access to your

15  mikerothenberg@gmail.com email account?

16   A.  We know he obtained himself access.  I'm not

17  saying he had legal access or permitted access, but we

18  know that he had helped himself to all kinds of email

19  accounts, including this one.

20   Q.  You say "we know."  Who are you referring to?

21   A.  You know as well.  I mean, the way that you guys

22  introduced yourself to my world was through a bunch of

23  emails provided to you from Mr. Riordan, which the

24  commission itself disclosed to us the very week he did

25  it.  So I think this is a charade at this point.  We all

                                                        193

US-001793

1   have already had these discussions.

2           You know that Mr. Riordan was committing a

3   number of cyber crimes, and there even had to be

4   discussions of taint teams because it appeared the

5   commission was using attorney-client privileged

6   communications as a justification for starting an

7   investigation into Rothenberg Ventures, which was totally

8   inappropriate then and continues to be inappropriate now.

9       Q.   Mr. Rothenberg, how do you know that Francisco

10  Riordan had access on May 11, 2016, to your

11  mikerothenberg@gmail.com email account?

12      A.   It is my understanding that Mr. Riordan

13  confessed to cyber crimes to Martin Mayo and Justin

14  Grooms on or around July 25th of 2016 about having,

15  including among other things, accessing Gmail accounts

16  specifically.  And there is every reason to believe that

17  that extended for some period of time, which May is very

18  close to July, so we have no idea how long he had that

19  access.

20      Q.   You said Mark Mayo.  Who is the other

21  individual?

22      A.   Justin Grooms.

23           My understanding is Cisco Riordan confessed to

24  that in a meeting with them on or around July 25th.  It

25  was a very disturbing thing to find out.

194

US-001794

1    Q.  And who relayed that so-called confession to

2    you?

3    A.  So-called?  I mean, he hasn't disputed it.  This

4    is something that was discussed with the commission at

5    that time.  It's silly for you to believe otherwise.

6    Q.  Who told you about it?

7    A.  I don't remember if I learned from Justin,

8    Martin.  But it was almost certainly one of them.

9    Q.  Did they tell you that Mr. Francisco Riordan had

10   access to your mikerothenberg@gmail.com email account on

11   May 11, 2016?

12   A.  The way it was presented to me was that he had

13   helped himself to virtually any and all email accounts

14   associated with me.

15   Q.  Even your Gmail accounts which are outside of

16   Rothenberg Ventures?

17   A.  It was subsequently determined by tech people

18   that what he had done was more sinister than just the

19   email accounts.  He had come from Meraki.  And Meraki,

20   that was the company he worked at prior.  And he had

21   inserted himself into the WiFi at both the home and the

22   office, at my home and the office, in order to do what I

23   learned was massive data dumps daily of all

24   communications that went through the WiFi in my home or

25   the office.  And it was in the order of gigabytes per day

195

US-001795

1   of emails.  So it was comprehensive and it seems to be --

2   it seems to have been invasive as well.

3        It does appear from the work that they did that

4   he was actually in the G-suite accounts too, which means

5   that he could access the accounts directly.  So he could

6   author emails.  He could spoof emails, which we know he

7   did.  He talked about that when he was here, or he was at

8   Rothenberg Ventures, and he could also download and spy

9   on everyone.

10       Mr. Riordan, we are aware, has committed dozens

11  and dozens of cybercrimes, and this is something the SEC,

12  the commission, did not deny and still did nothing about

13  this criminal.

14       Q.  Who conducted this investigation that you said

15  revealed that Mr. Riordan conducted this type of

16  cybercrimes to use your word?

17       A.  It is my understanding that in February of 2017,

18  Ms. Dulce Baerga, who is a tech wizard, met with the DOJ

19  to disclose not only what she learned and found out from

20  her investigation into Mr. Riordan but also her methods.

21       Q.  Could you spell that name?

22       A.  D-U-L-C-E, B-A-E-R-G-A, maybe.  I might have to

23  check on the exact spelling.

24       Q.  And she's the one that did the investigation

25  that you've been discussing?

                                                        196

US-001796

1     A.   There was a number of people contributed or

2  found clues or whatnot.  She's the one who synthesized

3  some of the findings and presented them to the

4  government.  And I believe that I think Miranda Kane was

5  present in that meeting.

6     Q.   Is Dulce, was she a Rothenberg Ventures employee

7  at the time?

8     A.   Not at any time.  She's never worked at

9  Rothenberg Ventures.

10    Q.   What was the relationship between her and

11 Rothenberg Ventures?

12    A.   I mean, at that time she was essentially in a

13 consulting capacity.  She was doing tech work and, you

14 know, this was one of the projects.  She looked at the

15 Meraki, you know, WiFi situation to see what kinds of --

16 what she could learn.

17    Q.   And Miranda Kane, I believe she was one of your

18 former counsel during the investigation, the SEC

19 investigation; is that right?

20    A.   Right.  And she, you know, believed that it was

21 appropriate -- I believe that she understood these to be

22 cybercrimes and, you know, advised that the appropriate

23 thing to do was to report it to the authorities.

24    Q.   Was there a written report related to this?

25    A.   I'm not sure what was generated or submitted.  I

197

US-001797

```
 1  actually wasn't in those meetings.
 2      Q.  Okay.  Getting back to Exhibit 34, is it your
 3  position that Mr. Riordan could have authored this?
 4      A.  Of course he could have.  We are still learning
 5  the extent of the damage he caused.
 6      Q.  I'm asking you is it your position?  Not is it
 7  possible.  Do you think he did it?
 8      A.  I don't know.  This is -- you know, this is
 9  obviously a hodgepodge of things.
10      Q.  Right.  And to me it seems like a hodgepodge of
11  things that you put together.
12          Is that accurate?
13      A.  I have no reason to believe that's accurate.  I
14  don't know.
15      Q.  There's actually quite a few of these documents
16  that were produced, and I'll note for the record
17  Exhibit 34 bears a Bates Number of RVMC 00009196 on the
18  first page and it goes through the same Bates prefix
19  ending in Bates Number 212.
20          That Bates prefix means it's produced by
21  Rothenberg Ventures Management Company, and I can tell
22  you that this was produced when Gibson Dunn and Marc
23  Fagel were your counsel, so it came from your files.  And
24  I can tell you that there's at least -- there are other
25  examples of these types of documents.  I just want to be
```

198

US-001798

 1  clear on your testimony here.

 2        Did you author Exhibit 34 or any other similar

 3  emails to self as keeping notes for yourself?

 4       A.  I have no way to determine that.  I mean, like

 5  most people, I do keep notes for myself, but there is

 6  no -- there was no, like, organization or way for me to

 7  even determine whether or not, you know, these are my

 8  notes because these are clearly not synthesized, these

 9  are clearly shorthand.  There's no way to determine if

10  this is, you know, all authored by me or partly or not.

11        And the fact that Mr. Fagel may have produced

12  this is, you know, just evidence of me giving him full

13  access to my personal files.  And, you know, to the

14  extent he did take any of my personal files to present, I

15  don't think that was appropriate.

16       Q.  Well, you said there's no way you can determine

17  whether or not he authored it.  Why don't we actually

18  look at the document?

19       A.  No, because it's got several pages with many

20  different hodgepodge of things.  So for us to go through

21  each thing, that would be tantamount to me saying this is

22  an appropriate thing to go through and it's not.

23       Q.  Well, you're saying there is no way we can

24  determine that.  I think we can probably determine

25  whether or not you're an author by looking at some

                                                      199

US-001799

 1  specific examples.

 2      A.   No.  So when someone authors something, that

 3  implies they authored the whole thing, every line.  And

 4  there isn't a way to determine that, no.  You know, the

 5  ease of which somebody like Cisco could put some lines

 6  into emails or not is not only obvious, but the guy had

 7  an agenda of creating havoc and misleading people and the

 8  commission is Exhibit A.  So there isn't -- you know,

 9  without getting him to actually admit what he was doing,

10  there isn't a way to know.

11      Q.   Okay.  So you don't want to go through this

12  document at all.

13          Why don't we go to the page ending on Bates

14  Number 199.

15      A.   You can go to whatever page you want to, but I

16  will continue to maintain that you have no business doing

17  this.

18      Q.   So you're refusing to answer any further

19  questions about this document?

20      A.   No, I've continued to answer all your questions,

21  even though more than seven hours have passed.

22      Q.   Mr. Rothenberg, I've been incredibly patient

23  with you today.  We have seven hours on the record.  You

24  are not even remotely close to seven hours.  So you

25  either start answering the questions --

                                                      200

US-001800

```
 1        A.   Wait.  It's 4:50.

 2        Q.   Seven hours on the record.

 3        A.   Okay.

 4        Q.   Okay?  All right.

 5        A.   Don't act like it's not close.

 6        Q.   You got here 45 minutes late.  You've taken

 7   numerous breaks.  Every time we take a break, it's longer

 8   than you said it would be.  And frankly --

 9        A.   I have not called every break.

10        Q.   -- I have other stuff to do.  Everyone at this

11   table has other stuff to do.

12        A.   Then what's in this?

13        Q.   Answer my questions then.

14        A.   What are we doing here?

15             I am.  I'm doing the best -- you have continued

16   to talk about this same document for who knows how long.

17        Q.   Because you refuse to talk about it.

18             Take Exhibit 34 --

19        A.   This is not appropriate.

20        Q.   Take Exhibit 34, turn to the page ending --

21        A.   Let's talk about something related to the funds,

22   not something that Marc Fagel submitted that was outside

23   the bounds of this investigation.

24        Q.   Please take Exhibit 34 and turn to page ending

25   Bates Number 199.
```

US-001801

 1      A.   No.

 2      Q.   Okay.  So you're refusing to testify?

 3      A.   No.  I've already been talking about this

 4 particular document for --

 5           Is that something we can determine?  It's put on

 6 the record how long we've been talking about this one

 7 document?

 8           See.  I can see right here.  This is David

 9 Herzog sending me an email.  That is an attorney.  So

10 this document obviously relates to attorney-client

11 privilege.  I mean, the first thing I even notice is

12 this.  So if you are trying to get me to dissect a

13 document -- this says Martin Mayo.  That's also my

14 counsel.

15           So you are trying to get me to get to the

16 communications with my attorney-client -- you know, my

17 attorneys about things -- who knows what you have in

18 mind.  But the point is this is not an appropriate thing

19 to be talking about here.  This is obviously a document

20 that covers my notes with my attorneys.

21      Q.   Mr. Rothenberg, one, if there's anything

22 privileged in here, you're welcome to point it out and we

23 can discuss that.

24           Two, are you now acknowledging that this is your

25 document and contains notes with your attorneys?

                                                         202

US-001802

1        A.   I've never said that it was not my document.   I

2   said there's no way to tell that the entire thing was

3   authored by me, and there isn't a way to tell that, even

4   if pieces of it are.

5        What I can confirm for you is that there's

6   clearly attorney-client privileged notes, whether I wrote

7   them or somebody else did.

8        Q.   Okay.  Let's turn to the page ending in Bates

9   Number 207.  You have an exhibit copy right in front of

10  you, Mr. Rothenberg.  Please use that.

11       A.   The one that says "Wesley Snipes"?

12       Q.   "Wesley Snipes" is on that page.

13       Do you recall writing anything about Wesley

14  Snipes?

15       A.   I had a conversation with Wesley Snipes once.

16  So that could be relating to that.

17       Q.   Okay.  Right under the Wesley Snipes there's an

18  entry dated May 7th, 2016.  Do you recall writing any of

19  that?

20       A.   I don't -- there's no way for me to recall these

21  specific notes, no.  This is all shorthand.  So this is

22  not going to be something I'm going to remember.

23       Q.   Did you write "Use 2015 fund as piggy bank?"

24       A.   I have no idea.  See, this is exactly what I'm

25  talking about.  This is not an appropriate thing to be

                                                      203

US-001803

1  talking about here.

2       Q.  Mr. Rothenberg, unfortunately, you don't get to

3  decide what's appropriate or not.  We have a judge in

4  this case.

5       A.  Don't forget, too, that shorthand notes can

6  encapsulate many things.  If someone hears a rumor that

7  is a problem that needs to be squashed, that can be

8  written down.  It doesn't have context.  If somebody said

9  a vicious rumor like "something could be a piggy bank,"

10 that would be the exact kind of thing that we'd write

11 down to investigate to see where that came from and to

12 determine how to make sure that that did not spread.

13       So the reason why this is an inappropriate

14 document is because there isn't a way, even for me now,

15 to tell you with any certainty four years ago what the

16 context for any particular line is.  Any kind of thing

17 like that could be an intention, it could be something

18 that somebody has said that is a big problem.  And those

19 things would look exactly the same.  It could be

20 attorney-client privileged communications or it could be

21 nothing to do with anything like a conversation with

22 Wesley Snipes.

23       That's why spending any time on this is a

24 problem because it is almost a Rorschach test.  Like

25 whatever you want something to look like, you can make it

                                                        204

US-001804

1  look like for a document that's out of context but
2  shorthand notes.
3          Now, when you spent a lot of the time talking
4  about things that looked like documents with third
5  parties that were contracts or agreements, that made
6  sense.  And I wasn't always able to recall those specific
7  things for the purposes of this right now, but that makes
8  sense to me as something for the commission to spend its
9  time on.
10         MR. ATWOOD:  Okay.  Let's go off the record for
11  a minute.
12              (Discussion off the record.)
13         MR. ATWOOD:  We will go back on the record.
14  BY MR. ATWOOD:
15     Q.  Mr. Rothenberg, thank you for your time today.
16  We have no further questions.
17         (Whereupon, the proceedings were concluded at
18  4:55 p.m.)
19
20
21
22
23
24
25

                                                    205

US-001805

Michael B. Rothenberg                                          May 7, 2019

Page 206

1       I, the undersigned, a Certified Shorthand Reporter

2    of the State of California, do hereby certify:

3       That the foregoing proceedings were taken before me

4    at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were administered an oath; that a record of

7    the proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction; that

9    the foregoing transcript is a true record of the

10   testimony given.

11      Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal Case,

13   before completion of the proceedings review of the

14   transcript { } was {X} was not requested.

15       I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any party to this action.

18       IN WITNESS WHEREOF, I have this date subscribed my

19   name.

20

21   Dated:  May 13, 2019

22

23            *Joanne M. Farrell*

24            Joanne M. Farrell, CSR No. 4838

25

US-001806

```
 1                  CERTIFICATE OF WITNESS

 2

 3

 4

 5        I, MICHAEL B. ROTHENBERG, do hereby declare under

 6        penalty of perjury that I have read the entire

 7        foregoing transcript of my deposition testimony,

 8        or the same has been read to me, and certify that

 9        it is a true, correct and complete transcript of

10        my testimony given on May 7, 2019, save and except

11        for changes and/or corrections, if any, as indicated

12        by me on the attached Errata Sheet, with the

13        understanding that I offer these changes and/or

14        corrections as if still under oath.

15

16        _____ I have made corrections to my deposition.

17        _____ I have NOT made any changes to my deposition.

18

19

20   Signed

21   _____

22   MICHAEL B. ROTHENBERG

23   Dated this _____ day of _____ of 20____.

24

25
                                                        207
```

US-001807

```
                            ERRATA SHEET

     Deposition of: MICHAEL B. ROTHENBERG
     Date taken:  May 7, 2019
     Case:  SEC v. Michael B. Rothenberg, et al.

     PAGE   LINE
     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____

     _____ _____    CHANGE: _____
                      REASON: _____


     Signed_____
     Dated_____
```

208

US-001808

EXHIBIT

PENGAD 800-631-6989

5

5-7-19

On the advice of my attorney,
I respectfully decline to answer
that question on the grounds of
my Fifth Amendment privilege