FOIA CONFIDENTIAL TREATMENT REQUESTED BY MICHAEL ROTHENBERG

## BEFORE THE UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION

| | | |
|---|---|---|
| | : | |
| In the Matter of | : | |
| ROTHENBERG VENTURES MANAGEMENT | : | No. SF-4094 |
| COMPANY, LLC. | | |

## WELLS SUBMISSION ON BEHALF OF MICHAEL ROTHENBERG
## AND ROTHENBERG VENTURES MANAGEMENT COMPANY

### APRIL 27, 2018

Marc J. Fagel
Elizabeth Dooley
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

## TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT .................................................................................... 1

II. BACKGROUND ..................................................................................................... 3

    A.    Mr. Rothenberg Launches Rothenberg Ventures ..................................... 3

    B.    Rothenberg Ventures' Early Success And Expansion ............................ 4

    C.    Subsequent Events ................................................................................. 8

III. ARGUMENT ....................................................................................................... 10

    A.    RVMC Did Not Retaliate Against A Whistleblower Who Had Already
            Quit The Company ............................................................................... 10

    B.    RVMC Did Not Improperly Advance Fees From The 2015 Fund ....... 12

          1.    The Fee Structure ..................................................................... 13

          2.    The Management Company Was Authorized To Borrow Against
               Its Future Fees ......................................................................... 15

          3.    The Funds Placed in Escrow as Collateral Remain an Asset of the
               2015 Fund ................................................................................ 18

          4.    The SVB Loan Did Not Constitute a Conflict of Interest ......... 20

          5.    The Credit Line Was Not Used to Pay Management Fees ........ 22

    C.    RVMC Made Appropriate, Disclosed Investments In The River
            Accelerator And River Studios ............................................................ 23

          1.    RVMC Invested in Bend Reality dba River Studios, as Repeatedly
               Disclosed to Investors ............................................................. 23

           2.    Investments by the 2015 Fund in the River Accelerator Warrants
               Were Similarly Disclosed and Appropriately Documented ...... 29

    D.    The Delayed Reimbursement Of Unity Co-Investors Resulted From
            Unforeseen Circumstances ................................................................... 31

    E.    Other Claims ........................................................................................ 34

          1.    Appropriate Management Fees Were Charged to the 2013 and
               2014 Funds ............................................................................... 34

          2.    Purported Violations of Section 206(3) ................................... 35

IV. CONCLUSION ..................................................................................................... 36

    FOIA Confidential Treatment Requested

US-000756

# I. PRELIMINARY STATEMENT

This matter provides an unfortunate case study in how a prolonged SEC investigation, however well-intentioned, can have a devastating impact on a promising start-up and its investors.

Rothenberg Ventures Management Company (RVMC), a small San Francisco-based venture capital firm, was founded in 2012 by a then-28-year-old student at Harvard Business School, Michael Rothenberg. Mr. Rothenberg closed an initial fund in September 2013 with approximately $5 million. The fund, like those that followed, focused on financing new high-tech start-ups, particularly in the emerging fields of virtual reality and augmented reality. Mr. Rothenberg demonstrated an early knack for identifying promising technology; early investments included Elon Musk's SpaceX in 2012 and popular investment app Robinhood in 2013, which has experienced 500-times growth since Mr. Rothenberg initially helped seed the company.

RVMC's 2015 Fund (referenced herein as the Fund), the focus of the Staff's attention, had raised around $20 million when a series of events outside Mr. Rothenberg's control brought operations to a grinding halt. It appears that certain company personnel had double-counted a $4 million bank line of credit and erroneously concluded that funds were missing. (These "missing" funds are still sitting in cash at the bank today.) These mistaken fears of missing cash precipitated personnel departures, negative press in the Silicon Valley tech media, and this inevitable SEC investigation. Personnel illegally extracted gigabytes of documents and privileged emails from company servers and turned them over to the SEC; and the principals of an affiliated virtual reality start-up, in which the RVMC funds had invested, decamped with assets and intellectual property to start a new company with nineteen of the RVMC affiliate's first twenty hires.

FOIA Confidential Treatment Requested

US-000757

Despite the dire straits the firm suddenly found itself in, RVMC took steps to cooperate with the Staff's investigation, including retaining a forensic accountant to verify that the purportedly missing cash was still sitting in the bank and that investor funds had, in fact, been properly invested.  RVMC candidly self-reported information about problems that had arisen, such as a planned co-investment which fell through in the midst of (and as a result of) the impending crisis, only to find such matters (which the firm subsequently remedied) cited as a basis for the Staff's proposed charges.  The Staff left no stone unturned – interviewing limited partners and subpoenaing every conceivable bank record (including Mr. Rothenberg's personal credit card bills, despite the absence of any allegation of personal misappropriation).

RVMC was reduced to essentially a one-man shop—Michael Rothenberg—with a handful of supporting individuals to manage not just a venture firm with an investment portfolio of over 150 start-up tech companies valued at around $100 million, but also the informational needs of the firm's limited partners and the government.

Ultimately, the Staff took the admittedly underdeveloped documentation and cash management practices of a fledgling start-up—the inexperience of which was not just well-known to the funds' sophisticated investors, but publicly proclaimed—and inflated them into a contention that the proposed respondents, with scienter, had breached their fiduciary duties to investors.

Yet the Staff's claims are belied by the Fund's disclosures.  The Staff contends that fees were charged prematurely, but the Fund disclosures prominently explained that all fees and expenses were charged up-front upon investment.  The Staff contends that RVMC improperly borrowed against the prepaid fees; but the Fund disclosures clearly stated that the manager could encumber Fund assets.  The Staff faults (or disregards) RVMC's investments in certain related

US-000758

parties, but the Fund disclosures disclosed both the affiliation of these entities and the Fund's intention of investing in them.

At most, the Staff's allegations amount to unintentional errors by a nascent private fund in full view of its investors, personnel and counsel.  Recognizing such issues, Mr. Rothenberg has tried to resolve the matter with the Staff, offering to stipulate to the entry of an order that would impose relief short of an associational bar, but the Staff has declined such overtures. Unfortunately, the Staff's insistence on pursuing scienter-based charges and draconian relief would only penalize RVMC's investors.  Mr. Rothenberg and RVMC have assembled a portfolio of highly promising tech start-ups valued at tens of millions of dollars which the funds may ultimately be unable to realize in the wake of the Staff's threatened action.

## II. BACKGROUND

### A.      Mr. Rothenberg Launches Rothenberg Ventures

In 2012, while still a full-time student at Harvard Business School, then-twenty-eight-year-old Mike Rothenberg founded Rothenberg Ventures.  The idea behind the venture was simple—relying upon the youth of the firm and its staff, Mr. Rothenberg and his team would understand both the products and the mentality of young founders and their promising tech companies.  Given both the ramp-up costs of the venture and the desire to quickly access and finance attractive high-tech start-ups that were often courting far more established Silicon Valley venture capital sources, RVMC deliberately (and quite explicitly) structured its funds to require all payments (including fees and expenses) up-front, without ongoing capital calls.

The youth (and attendant inexperience) of Mr. Rothenberg and the team he assembled were neither hidden from investors nor downplayed—in fact, they were a key selling point.  A presentation that accompanied the offering materials for the firm's third fund (the Rothenberg

US-000759

Ventures 2015 Fund, which is the primary subject of the Staff's attention) was entitled "The Millennial Venture Firm" and highlighted the relative youth of the firm and its network of start-up contacts.  As a TechCrunch article from early 2013 reported:  "The LPs believe in Rothenberg's value proposition, which partly relates to his age.  'Almost all my deal flow comes from entrepreneurs, people at Stanford with me, people at Harvard with me. I know a lot of people our age. The average age of my LPs is significantly older than me, and they don't necessarily have access to these deals.'"[1]

Some of the firm's original employees were classmates of Mr. Rothenberg from Stanford and Harvard; the San Francisco office head was Mr. Rothenberg's undergraduate roommate, while the firm's minority owner and original CFO was the roommate's father.

The funds' offering materials emphasized Mr. Rothenberg's limited experience and the firm's lack of an established track record.  For example, the 2015 Fund offering circular plainly disclosed that Mr. Rothenberg had only four years of work experience (as an associate of a private equity firm and a large management consulting firm) before grad school; it also clearly delineated as a risk factor that "[n]either the Manager nor the Operator [Mr. Rothenberg] has significant experience in managing a fund." (Exhibit 1, Confidential Private Offering Memorandum, pp. 1, 8).

### B.     Rothenberg Ventures' Early Success And Expansion

As one otherwise critical industry article noted last fall: "Overall, the Rothenberg portfolio seems to be doing well.  It's seen multiple exits at what appear to be favorable returns,

---

[1] Josh Constine, *Meet Mike Rothenberg, The 28-Year-Old Whose Seed Fund Could Be The Best Bang For Your Cap Table Buck*, TechCrunch (Jan. 6, 2013), *available at* https://techcrunch.com/2013/01/06/meet-mike-rothenberg-the-27-year-old-whose-seed-fund-could-be-the-best-bang-for-your-cap-table-buck/ (quoting Mr. Rothenberg).

US-000760

a lot of up rounds and not too many high-profile flops."[2]  At least twenty RVMC-backed

companies have already had exits, including an IPO for a twenty-times cash-on-cash return, and

the acquisition of Hello-Giggles, which sold to Time, Inc. for $30 million (a return of four to five

times initial investment in less than two years).

In addition to these exits, at least eighty of RVMC's portfolio companies have gone on to

raise much larger follow-on rounds, predominantly at marked-up valuations.  Of these,

Robinhood, a stock trading platform that allows customers to buy and sell U.S.-listed stocks with

zero commission, is the most successful.   An early fund investment, Robinhood's last round of

financing was raised at a $5.6 billion valuation.[3]  And more than fifteen companies in the RVMC

portfolio are now valued in excess of $100,000,000.

Looking to further expand opportunities, in late 2014, RVMC announced the launch of

"River"—a virtual reality accelerator intended to provide fledgling VR companies with financial

support, mentorship, and access to RVMC's growing network of investors.[4]  The Accelerator

thus has a dual purpose—benefitting Accelerator companies while also opening investment

opportunities in VR and frontier technology for RVMC's funds and limited partners.

In early 2015, the Accelerator selected thirteen companies to fill the first class and

receive the aforementioned benefits: funding, office space, mentorship, access to a broad

---

[2]  Joanna Glasner, *Do VC Woes Extend to Portfolio Companies for Rothenberg? Probably Not*, TechCrunch (Nov. 11, 2017), *available at* https://techcrunch.com/2017/11/25/do-vc-woes-extend-to-portfolio-companies-for-rothenberg-probably-not/.

[3]  *See* Julie Verhage, *Robinhood Raises Funds Valuing Startup at $5.6 Billion*, Bloomberg (Mar. 15, 2018), *available at* https://www.bloomberg.com/news/articles/2018-03-15/robinhood-is-said-to-raise-funds-valuing-startup-at-5-6-billion; Glasner, *VC Woes*.

[4]  The Accelerator lined up an impressive array of mentors from Dropbox, Zynga, and Mozilla, as well as the Founders & CEOs of VR pioneers like AltspaceVR (Eric Romo) and Sixense (Amir Rubin).  *See* Josh Constine, *Rothenberg Ventures Opens Virtual Reality Accelerator Offering 10 Startups $100K And A Clubhouse*, TechCrunch (Dec. 19, 2014), *available at* https://techcrunch.com/2014/12/19/rothenberg-river-virtual-reality-accelerator/.

FOIA Confidential Treatment Requested

US-000761

network of investors, and networking opportunities with other VR startups that could be potential partners.[5]

Between May 2015 and the close of 2015, River continued to evolve. River added a virtual reality production house, River Studios, brought on a team of technologists and animators, and launched the second Accelerator class, known as "River 2." River 2 reflected RVMC's continued commitment to virtual reality and its understanding of the diversity of fields—big data, 3D development, microprocessing, graphics, and optics—that contribute to this sector. Consequently, the River 2 class included "frontier technology" companies, including but not limited to those specifically focusing on virtual and augmented reality.[6]

Many of these Accelerator companies have already proven successful—there have been more than 20 follow-on financings at increased valuations, raising more than $100,000,000 of capital from top venture investors including Sequoia, Accel, and Google Ventures, as well as a number of successful exits. For example, a River 3 company, Auro Robotics, was acquired by RideCell for $17 million in stock. Similarly, HTC acquired a majority stake in one of the River 2 companies, VRChat, for $4 million in a Series A round. This acquisition was the result of River accelerating VRChat, including facilitating an introduction between VRChat and HTC (HTC is also an LP in the 2015 Fund).

The production company, River Studios, completely owned by Mr. Rothenberg initially, was a logical offshoot of the River Accelerator and the funds' continued investments in frontier technologies. River Studios was established to develop virtual reality programming. For

---

[5] *See* Josh Constine, *Rothenberg Ventures' First Virtual Reality Accelerator Emphasizes Health And Education*, TechCrunch (Jan. 30, 2015), *available at* https://techcrunch.com/2015/01/30/vr-as-medicine/.

[6] Dylan Flinn, *The River Accelerator: Virtual Reality to Frontier Tech*, Medium (Feb. 17, 2016), *available at* https://medium.com/@flinndustries/the-river-accelerator-virtual-reality-to-frontier-tech-7dbf02f7db45.

US-000762

example, in June 2016 it worked with the Sacramento Kings to unveil their new uniforms.

River Studios also created and produced Coldplay's official video for "Hymn For The

Weekend," featuring Beyoncé, which attracted more than 900 million views on YouTube.[7]

Rothenberg Ventures' San Francisco office also houses the River Accelerator and River Studios'

headquarters.

River Studios' initial purpose was to provide real-time industry feedback to RVMC for

determining investment selection criteria, as well as to provide a VR lab experience for

accelerator clients.  By having this revenue-generating commercial entity within the accelerator

program, RVMC could experiment with dozens of startups to find the best solutions to a host of

industry bottlenecks.  River Studios was thus an essential part of the River program and proved

to be useful in the attraction of high caliber accelerator clients as well as in securing additional

portfolio investments for the 2015 Fund.

As detailed further below, River Studios was intended by RVMC, alongside the

accelerator program companies, to serve as a potential investment for the RVMC funds.  And, in

April 2016, River Studios became a portfolio company of the 2015 Fund.  This interrelationship

among these entities was broadcast to potential investors in River Studios, as indicated by the

slide below, which is drawn from a deck sent to such investors in February 2016.  (*See* Exhibit

12, presentation sent to Pilot Grove on February 17, 2016, slide 16).

---

[7] *See Coldplay – Hymn For The Weekend (Official Video)*, YouTube (Jan. 29, 2016), *available at* https://www.youtube.com/watch?v=YykjpeuMNEk&feature=youtu.be

US-000763



(Exhibit 12, slide 16).

Overall, across the four funds established by RVMC between 2012 and 2016, the firm has deployed over $50 million in capital to over 150 start-up technology companies (both on and off the accelerator platform) on behalf of about 175 limited partners.

### C.    Subsequent Events

Unfortunately, despite the firm's early success and rapid growth, it encountered serious setbacks beginning in early 2016. While the proposed respondents have incomplete information and have had to piece the story together from documents, it appears that the catalyst for many of the firm's problems was a simple math error coupled with an unauthorized transfer among RVMC-managed accounts by the firm's bank. As detailed below, at the end of December 2015, RVMC obtained a $4 million line of credit from Silicon Valley Bank (SVB). As collateral for

US-000764

the loan, RVMC agreed to escrow about $4.25 million in future management fees prepaid by the 2015 Fund—which, unbeknownst to the proposed respondents, SVB moved into a separate account.  It appears that an RVMC employee erroneously added these figures together and concluded that RVMC had obtained an $8.25 million loan from the bank, and that half of it was "missing"—which was simply never the case.  Nonetheless, an apparent whisper campaign about purported cash management issues precipitated morale issues and staff turnover.

Capitalizing on these issues arising at the firm, other employees began courting potential RVMC investors and business partners for their own competing enterprises, with some agitating for a proposed takeover of the firm (or at least its enviable investment portfolio).  Contemplated investment opportunities and business partnerships collapsed, leaving the firm facing an unanticipated cash crisis.  The management team of River Studios departed and formed a competing company.  One employee gave notice and, on his way out the door, surreptitiously broke into the company's servers and downloaded gigabytes of data, including deliberately collecting all emails sent to or from the company's in-house and external lawyers.  This information was provided to the SEC Staff, who began calling employees and investors alike, precipitating a mass exodus of remaining personnel.[8]  And all of this played out publicly in the Silicon Valley tech press, curtailing any hope of further financing or deal flow.

Since the SEC's arrival, Mr. Rothenberg has continued to operate with a skeleton crew, working to respond to the Staff's inquiries while doing whatever could be done with scarce

---

[8]  Mr. Rothenberg was handicapped in his ability to share his side of the story with the Staff directly during the investigation due to the background presence of the U.S. Attorney's Office (USAO).  Despite repeated attempts, the USAO has been unwilling to discuss the status of its investigation with counsel or to consider a witness proffer. As such, Mr. Rothenberg followed the advice of counsel when he invoked his Fifth Amendment privilege under the U.S. Constitution during SEC testimony.  Should this matter proceed into litigation, however, Mr. Rothenberg anticipates presenting a zealous defense and hopes to be in a position where he is able to defend himself in a manner that the government prevented during the investigation.

        FOIA Confidential Treatment Requested

US-000765

resources to maintain RVMC's ability to maximize value on its portfolio of investments and fulfill its duties to its funds' limited partners.

### III. ARGUMENT

**A.      RVMC Did Not Retaliate Against A Whistleblower Who Had Already Quit The Company**

While the Staff's purported charge of improper whistleblower retaliation is somewhat peripheral, it is so factually off-base—while providing valuable insight into the veracity (or lack thereof) of the Staff's "witnesses"—that we dispose of it first before turning to the more serious charges.

The Staff has alleged that the proposed respondents engaged in unlawful retaliation by terminating RVMC web developer Cisco Riordan, who the Staff has disclosed is an SEC whistleblower.  According to the Staff, Mr. Riordan was terminated on July 29, 2016, shortly after RVMC received a document request from the Staff and learned of the investigation for the first time.

In fact, Mr. Riordan had already resigned from the company *before* the Staff's July 21, 2016 letter disclosing the investigation to RVMC.  Mr. Riordan gave notice to RVMC CEO Mr. Rothenberg on July 12—nine days earlier.  This is corroborated by an email from Mr. Rothenberg to RVMC Chief Legal Officer Martin Mayo dated July 15, 2016 (a week before the SEC surfaced), in which Mr. Rothenberg writes:

> Martin - here is a partial list of separation agreements that may be outstanding. Note that Cisco's last day will be 8/26/16.
>
> Can you please help us wrap up all of these loose ends in the next 2 weeks?

FOIA Confidential Treatment Requested

US-000766

(Exhibit 11, email from Mike Rothenberg to RVMC Legal Officer Martin Mayo dated July 15, 2016).[9]

While Mr. Riordan had agreed to stay on for several weeks following his resignation, RVMC determined to accelerate his final date to July 29, 2016.  The company did so upon discovering that, in the days following his resignation, Mr. Riordan had illegally accessed the company's email server and searched for all email sent or received by Mr. Rothenberg, inside counsel Martin Mayo, RVMC's outside counsel at the law firm of Manatt Phelps, and various other individuals.  A log of Mr. Riordan's unauthorized email searches, created at the time, are attached at Exhibits 2 and 3.

(Notably, the scope of Mr. Riordan's unauthorized intrusion into the company's servers was confirmed when the SEC Staff shared a copy of a hard drive Mr. Riordan had provided them, which contained over 42 gigabytes of data, including numerous emails to which he was not a party as well as communications protected by RVMC's attorney-client privilege.[10])

Additionally, when confronted by RVMC's counsel about his unauthorized access to other personnel's (and company lawyers') email, Mr. Riordan declined to explain his actions, and he further refused to return his company laptop (and ultimately destroyed all its data).

As documented in a July 29, 2016 letter to Mr. Riordan (Exhibit 4), his departure date was accelerated based on his illegal actions.  Either Mr. Riordan failed to apprise the Staff of these facts, or the Staff—which we believe has a copy of the July 29 letter referencing both Mr. Riordan's prior resignation and his illegal actions—has chosen to disregard them.

---

[9]  Subsequent communications between Mr. Rothenberg and Mr. Mayo provide additional details about the time, place, and circumstances of Mr. Riordan's July 12 resignation.  While such communications are privileged, counsel would be happy to discuss them further with the Staff if necessary.

[10]  The Staff informed counsel that they did not access these materials given the presence of privileged information.

<u>FOIA Confidential Treatment Requested</u>

US-000767

We are aware of no support for the contention that a company can improperly "retaliate" against an employee who has *already resigned* simply by accelerating his departure date.[11]  And we would be surprised to learn that it is the SEC's position that a company is required by Section 21F to retain and allow on the premises an employee found to have broken into the company's servers and illicitly downloaded confidential (and privileged) information.

### B.    RVMC Did Not Improperly Advance Fees From The 2015 Fund

The Staff's concerns relate primarily to the 2015 Fund.  The Staff contends that RVMC charged fees to the 2015 Fund before it was entitled to do so.  The basis for this contention appears to be RVMC's obtaining a $4 million line of credit collateralized by the management company's future fees.  But the contention that this financing arrangement constituted a breach of fiduciary duty is belied by the Fund's repeated disclosures to its investors.  Under the terms of the management agreement, the limited partners opted to pay the entirety of the management fees due over the 10-year life of the Fund—27.5% of their capital contribution—up-front.  Additionally, the Fund's operating agreement specifically authorized RVMC to encumber the Fund's assets for the benefit of the Fund.

Based on these contractual terms, disclosed and agreed to by all limited partners, RVMC made the good faith determination to obtain a line of credit against those fees—which remain escrowed—and to put the capital to use for the benefit of the Fund, rather than simply leaving the portion of the Fund dedicated to future fee payments sitting dormant as the Staff seems to believe should have happened.

---

[11]  The Staff has not suggested that Mr. Riordan's resignation was prompted by any adverse actions by RVMC or that RVMC was aware of the SEC's nonpublic investigation (much less Mr. Riordan's whistleblower status) at the time he resigned.

    FOIA Confidential Treatment Requested

US-000768

This use of capital was both prudent and supported by a plain reading of the management agreement. The Staff's contrary interpretation ignores basic principles of contract law in reading the provision allowing for Fund assets to be encumbered at the discretion of the manager out of the agreement. Even if that interpretation were plausible, however, it is hardly evidence of a scienter-based fraud on investors.

### 1. The Fee Structure

Unlike a more established private investment fund, RVMC did not assess management fees over time through capital calls to its limited partners. Rather, the 2015 Fund's operative agreements required investors to pay all fees and expenses up-front. (The agreements did give certain investors an option to pay the fees over time, but this option was not taken by any of the limited partners. For a sample subscription agreement stipulating to full up-front payment of all expenses, *see* Exhibit 13, RVMC00024726, RVMC00024727.)

Initial investors in the 2015 Fund agreed to pay an up-front management fee of 20%. As set forth in the Summary of Principal Terms dated January 15, 2015, "For Members making Capital Contributions equal to their Capital Commitment up front, there will be no need to contribute additional capital in the future and **the Fund will pay upfront the cumulative management fee of 2% each year over 10 years**." (Exhibit 1, Summary of Principal Terms, p. 2, emphasis added.) The accompanying Private Offering Memorandum similarly disclosed that investors (other than those investing more than $500,000, who had the option of paying over time) "must pay the entire Management Fee on the date of their initial purchase of Units." (Exhibit 1, Confidential Private Offering Memorandum, p. 4). As further explained to investors, this up-front payment "reflects the business model of the Fund, which is to complete diligence and make investments during the first two years of the Fund and to administer the Fund the final eight years." *Id.*

US-000769

Certainly for these early investors, we remain in the dark how the Staff can contend that fees were improperly advanced when investors were told flat-out that the Fund was paying the entirety of the lifetime fees to the management company upon the initial investment.

Later investors in the 2015 Fund, while still being required to make the entire fee payment at the time of their investment, were provided with a different fee structure. These limited partners agreed to pay a total of 27.5% in fees, divided between management expenses and administrative expenses. First, the Fund "will pay the Management Company an expense fee ('Management Expenses') on capital raised by the [Fund] equal to 1.75% per year for ten years on the sum of each Member's Capital Contributions"—i.e., 17.5% over the life of the Fund. Each LP who did not opt to defer such payments "pays in full its Management Expenses on the date it invests" in the Fund. (Exhibit 14, RVMC00014766.)

Second, the Fund "will pay the Management Company a fee to cover administrative expenses . . . on capital raised by the [Fund] equal to 1.00% per year for ten years on the sum of each Member's Capital Commitment"—i.e., 10% over the life of the Fund. "Such expense will be payable from each Member's initial Capital Contribution to the [Fund], by the [Fund] to the Management Company in the year of a Member's initial investment." (Exhibit 14, RVMC00014766.)

Hence, these later investors agreed that they would be paying a total of 27.5% of their capital commitment in expenses over the life of the Fund.

For these investors, there is admittedly some ambiguity regarding when such fees could actually be assessed by the management company. The management agreement provides that the first two years of management expenses (3.5%) are paid to the management company in the first year, while the entirety of the 10% administrative expense is due to the management company in

US-000770

the first year—i.e. 13.5% of all capital commitments are immediately due from the Fund to the management company as fees, with the remainder due over the life of the Fund.  However, the Summary of Principal Terms included with the operative agreements characterized the fee structure differently.  Specifically, the Summary described a 9.5% up-front fee associated with expenses of the River Accelerator Program, plus a management expense of 4% per year for the first two years, plus the 1% per year administrative expense.  (Exhibit 14, RVMC00014694 - RVMC00014695.)  Under this disclosure, the same 27.5% total fee is collected upon investment, but investors are put on notice that 14.5% may be assessed by management in year one.

In short, all 2015 Fund investors agreed to pay the cumulative fees due over the life of the Fund at the time of their initial investment.  For the earlier investors, they were unequivocally informed that the entirety of such fees were paid by the Fund to the management company on day one, and the Staff's theory of improper fee advances simply makes no sense.  For the later investors, while some component of their 27.5% fee was payable over time, the issue remains whether there was anything improper in the management company escrowing such fees and obtaining a line of credit against them.  As discussed next, there was not.

2.      **The Management Company Was Authorized To Borrow Against Its Future Fees**

The Staff appears to argue that RVMC exceeded the 14.5% (or 13.5%) in fees it could charge during the first year of the 2015 Fund (setting aside the fact that earlier 2015 Fund investors expressly agreed that the entire fee would be charged in the first year).  According to the Staff, the line of credit obtained by RVMC from Silicon Valley Bank constituted an impermissible advance of fees.  However, as addressed below, the limited partners expressly authorized the management company to borrow against the future fee stream.

US-000771

There is no question that the 2015 Fund Operating Agreement allows the Chief Executive Officer of the management company, i.e. Mr. Rothenberg, to encumber the Fund's assets. The operating agreement plainly provides that the CEO has "the right, power and authority to manage the day-to-day operations of the Company and to do on behalf of the Company all things determined by the Chief Executive Officer to be necessary or desirable to carry out his duties and responsibilities." These powers expressly include the authority "to borrow money in the name and on behalf of the Company, and to secure any such loans by a mortgage, pledge or other encumbrance upon any assets of the Company." (Exhibit 14, RVMC00014746, Section 5.4(a)(i).)

The Staff seems to suggest that there was some limitation on this provision, though it is unclear what limitation the Staff believes is imposed, and what basis they have for making such a claim. The agreement does not prohibit the encumbrance of the 27.5% of the Fund paid up-front for future management and administrative expenses. Nor does the agreement state that such loan proceeds must be invested directly in portfolio company investments.

To the contrary, the express language of the agreement allows the loan proceeds to be used "to manage the day-to-day operations" of the Fund to the extent deemed "necessary or desirable" by the CEO. The Staff's attempt to read some implicit limitation on management's authority into the agreement is simply made up out of whole cloth. A purported breach of fiduciary duty claim under the Advisors Act is ultimately grounded in non-disclosure of material information. As the Supreme Court held in *SEC v. Capital Gains*, the Advisers Act of 1940 was intended to impose an affirmative duty to provide "full and fair disclosure of all material facts." 375 U.S. 180, 194 (1963) (citation omitted). The plain disclosure of the manager's authority to

16       FOIA Confidential Treatment Requested

US-000772

pledge the Fund's assets in order to borrow money for the day-to-day operation of the Fund ends the inquiry.

Even if the SEC were to impose some broad fiduciary duty at odds with the specific language of the agreement entered into by the limited partners, there would be no basis to contend that the proposed respondents acted with scienter in interpreting the agreement to allow the management company to borrow money collateralized by its future fees.  Mr. Rothenberg reasonably understood the unambiguous language of the operating agreement to allow for the transaction.  And he was not operating in a vacuum.

The SVB loan was arranged in large part by Lynne McMillan, RVMC's then-Director of Finance, who raised no concerns about structuring the loan in this manner.  And when the bank's labelling of the escrow account holding the encumbered assets became a point of contention between RVMC and the bank several months later (as discussed below), RVMC's then-General Counsel, Geoff Rapoport, expressly confirmed to the bank that "[t]he management company can pledge its right to receive the money from the fund as collateral."  (Exhibit 15, RVMC00021128, email from G. Rapoport to M. Rothenberg and SVB, dated March 30, 2016.)   Several weeks later, SVB again asked Mr. Rapoport to confirm that the company "is permitted to make [the] pledge under its LPA," to which Mr. Rapaport responded simply, "Confirmed.  (This fund is actually structured as an LLC, but yes.)"  (Exhibit 5, email from G. Rapoport to SVB, cc'ing M. Rothenberg, dated April 18, 2016).

In short, even if the Staff could prevail in establishing that the credit line was somehow improper, a plain reading of the Fund disclosures (in combination the concurrence of Fund counsel in that same reading) renders the Staff unable to demonstrate that the proposed respondents acted with scienter.

US-000773

### 3.     The Funds Placed in Escrow as Collateral Remain an Asset of the 2015 Fund

The Staff has further suggested that, even if the encumbrance was permitted, the future fee stream used as collateral is no longer the property of the Fund.  The Staff is mistaken.  The future management fee stream that has been encumbered by the SVB line of credit remains in escrow and continues to be treated as an asset of the Fund.  Unfortunately, the Staff's confusion arises as a result of the bank's unilateral decision to move the escrow account into the name of RVMC rather than the 2015 Fund.  But this was done without RVMC's authorization, and is in any event a moot point insofar as, from RVMC's perspective, the collateral remains and is being treated as the property of the 2015 Fund (subject to the gradual earn-down of management and administrative expenses).

From the inception of RVMC's discussions with SVB regarding a line of credit, Mr. Rothenberg was clear in expressing his intent that the collateral would remain an asset of the 2015 Fund, not the management company.  On December 24, 2015, SVB sent an email to Mr. Rothenberg confirming that the future fees used as collateral would remain in the 2015 Fund, writing:  "The collateral account will be Rothenberg Ventures **2015 Fund**, LLC—3300148782?" (Exhibit 16, RVMC00025669.)

SVB subsequently sent a loan agreement to RVMC which used a different account number, but which did not state that the account would be in the name of the management company.  (*See* Exhibit 17, RVMC00026060, Exhibit A to loan agreement, explaining collateral account).  In fact, at no time prior to issuing the line of credit did SVB inform RVMC that the collateral would be held in the name of the management company; nor did RVMC authorize SVB to transfer the funds out of the 2015 Fund account.

RVMC did not discover that SVB had unilaterally made the decision to put the escrow account in the name of the management company until March 2016.  On March 30, 2016, Mr.

     FOIA Confidential Treatment Requested

US-000774

Rothenberg contacted SVB requesting a copy of loan paperwork, and reiterated his understanding from the December discussions that the "**2015 Fund has $4.25m cash in an account** that's 'locked'. All of these funds are prepaid fees and will ultimately be owed and paid to the Management Co." (Exhibit 18, RVMC00021142 (emphasis added)).

Upon reviewing the documents sent by SVB and seeing that the escrow account was instead in the name of RVMC, Mr. Rothenberg promptly reached out to SVB:

> The $4.25m cash is still owned by the 2015 Fund. It looks like the bank account online for the cash that's being used as collateral may not be labeled correctly. Can you please confirm that SVB's records reflect the correct ownership of the $4.25m cash collateral as belonging to the 2015 Fund? This $4.25m is obligated to the Mgmt Co and will be paid overtime, but before it's paid out it belongs to the 2015 Fund (hence the reason to borrow against it; which would be non-sensical if the Mgmt Co already had the cash and was paying interest to borrow against its own cash).

(Exhibit 18, RVMC00021141).

SVB asked if the account ownership should be switched, to which Mr. Rothenberg responded the same day: "Yes, please proceed. We don't have a choice here b/c the cash is owned by the 2015 Fund, even though it will be paid to the Management Company over time." (Exhibit 18, RVMC00021140 – RVMC00021141). However, SVB demanded significant legal fees to process the change, and RVMC ultimately took no further action, recognizing that as long as the funds remained escrowed and were treated as assets of the 2015 Fund until earned as fees—which in fact is exactly how they have been treated—the point was moot.

It was not until the SEC investigation that RVMC realized that SVB's mis-labelling of the account was causing confusion about the holdings of the 2015 Fund—and the misperception that RVMC had somehow "misappropriated" these funds had apparently become the foundation of employee concern that ultimately precipitated staff defections and this very investigation— and RVMC re-initiated conversations with SVB about fixing the error. During the course of

US-000775

these discussions, counsel for SVB admitted, in an email to RVMC's counsel, that "it is factually accurate to attribute the original structure of the transaction as a mistake by SVB." (Exhibit 6, email from SVB's counsel to RVMC's counsel, dated August 21, 2017). RVMC and SVB have continued to discuss the issue as part of a broader renegotiation of the loan terms.

In short, the Staff's contention that the proposed respondents have somehow acted improperly in connection with the encumbered future fee stream is belied by the evidence and puts form over substance. RVMC had always intended these funds to be an asset of the 2015 Fund until earned by the management company and has always treated these funds as an asset of the Fund; the only reason they are held in an account in the name of RVMC rather than the Fund is due to admitted bank error.

### 4.    The SVB Loan Did Not Constitute a Conflict of Interest

The Staff has further argued that, even if the collateralization of 2015 Fund assets as security for a line of credit was permissible, doing so presented a conflict of interest vis-à-vis the 2016 Fund, which invested about $3 million into the 2015 Fund shortly before the SVB loan was obtained. According to the Staff, 2016 Fund investors were not told that the cash moved into the 2015 Fund would be used to fund the escrow account that collateralized the line of credit. However, the Staff disregards the basic fact that cash itself is fungible—2016 Fund investors received the same investment interest in the 2015 Fund holdings regardless of which dollars were used in connection with the loan.

As an initial matter, there does not appear to be any dispute that the 2016 Fund was permitted (indeed, *required*) to invest in the 2015 Fund. As the 2016 Fund Limited Partnership Agreement expressly provides:

US-000776

> each Limited Partner hereby acknowledges and agrees that the General Partner:
> (i) Will cause the Partnership to invest in Rothenberg Ventures Fund 2015 [], a
> Related Entity and an Affiliate of the General Partner, on a pro-rata basis with any
> Parallel Fund based on their respective aggregate capital commitments, up to the
> Partnership's pro rata share of Ten Million Dollars.

Exhibit 7, 2016 Fund LPA, p. 31 (§ 8.4(c)).  This was done because, while RVMC had

established a practice of launching a new fund each year, at the time the 2016 Fund launched in

late 2015, some investors expressed an interest in the 2015 Fund investment portfolio.[12]

Nor is there any basis to contend that RVMC had an undisclosed conflict of interest in

making this investment in the 2015 Fund around the time of the SVB loan.  Regardless of

whether the 2016 Fund invested in the 2015 Fund shortly before the loan or sometime thereafter,

its position was not impacted—the 2016 Fund limited partners obtained the same pro rata

investment interest in the 2015 Fund portfolio.  Either way, these investors, like the direct 2015

Fund investors, simply had the portion of their capital which would have otherwise been left

dormant in the account for future fees collateralized for the benefit of the Fund, as the manager

was authorized to do.[13]

The Staff's theory relies on the existence of some sort of dollar-for-dollar allocation of

investor funds among investments and fees.  But nothing in the operating agreement of the Fund

requires the manager to take each dollar received by the Fund and invest 72.5 cents in portfolio

---

[12]   The 2016 Fund LPA further provided that any fees charged by the 2015 Fund would be offset against fees
charged to the 2016 Fund; 2016 Fund investors were not double-charged for the Fund's investments in the 2015
Fund. *Id.*

[13]   The 2016 Fund limited partnership agreement gave similar authority to the manager to encumber the Fund
capital, up to the amount of future fees; indeed, the LPA specifically disclosed that the manager could borrow
from the Fund. (*See* Exhibit 7, 2016 Fund LPA, p. 33 (§ 8.4(g)) ["the General Partner may, from time to time,
cause the Partnership to guaranty indebtedness of the General Partner and/or the Management Company
incurred with respect to loans to the General Partner and/or the Management Company, the aggregate principal
amounts of which shall not exceed the aggregate amount of unpaid Management Expenses and Administrative
Expenses payable to the General Partner and/or the Management Company"]).

US-000777

companies and reserve 27.5 cents for expenses.  On any given day during the period in which the Fund holds liquid capital, funds may be allocated based on the investment opportunities of the Fund and the expense needs of the manager, as long as, over the life of the Fund, no limited partner is charged more than the total expenses set forth in the applicable agreement.  Hence, it does not matter when the 2016 Fund invested in the 2015 Fund or how the actual cash was utilized.  The 2016 Fund limited partners were given an appropriate interest in the 2015 Fund's portfolio holdings commensurate with their investment—the Staff has pointed to no evidence to the contrary—and nothing more is required under the operative fund agreements.

### 5.        The Credit Line Was Not Used to Pay Management Fees

Ultimately, the Staff's objection to RVMC's encumbrance of the future fee stream in order to secure a line of credit boils down to an assertion that the proposed respondents were withdrawing management fees before they were due.  But even aside from the fact that the collateralization of the fees for the benefit of the Fund was plainly authorized by the operative Fund agreements, the Staff's contention fails for the simple fact that the line of credit was *not* used to pay management fees.  Rather, as was the very thesis of the venture fund, RVMC was using the loan proceeds to reimburse the manager for, among other things, its advances to the River accelerator program and River Studios, which inured to the benefit of the Fund when it acquired an investment interest in these entities as disclosed in the operative Fund documents. These investments are described in further detail below.[14]

---

[14]   Factually, the present matter stands in marked contrast to the SEC San Francisco Regional Office's recent case against Bay Area private fund manager Steven Burrill.  In that matter, the SEC instituted settled proceedings alleging that the adviser had advanced itself over $17 million in management fees.  The SEC found that Burrill, among other things, had misappropriated funds for personal use (i.e. family vacations, jewelry, etc.), and had sent capital call letters to investors falsely stating that cash was needed for investments, rather than fees and personal expenses. In contrast, in this case, all payments were made up front as plainly disclosed to investors, and there were no fraudulent capital calls.  And far from personal misappropriation, all financing obtained by RVMC went towards Fund investments.  *See* In re Burrill Capital Management, Admin. Proc. File No. 3-17186 (March 30, 2016).

US-000778

**C.**     **RVMC Made Appropriate, Disclosed Investments In The River Accelerator And River Studios**

**1.**     **RVMC Invested in Bend Reality dba River Studios, as Repeatedly Disclosed to Investors**

RVMC invested approximately $3.7 million of the 2015 Fund into Bend Reality, the firm's affiliated virtual reality studio doing business as River Studios.  The Staff has intimated that there was something nefarious about this investment.  However, the evidence confirms both that RVMC repeatedly disclosed its intent to invest in this related entity, and that the Fund's investment was bona fide and appropriately documented.

**a.**     **RVMC Was Authorized to Invest the 2015 Fund in River Studios by the Fund Disclosures**

The Staff has stridently characterized the investment in River Studios as "self-dealing" by the proposed respondents.  Yet the Fund disclosures plainly identify River Studios/Bend Reality as a related party in which Mr. Rothenberg had personally invested and in which the Fund itself could invest.  This is not the typical SEC enforcement action in which a private fund manager, unbeknownst to investors, invests money in a company which he secretly operates on the side. *Compare, e.g., SEC v. Spangler*, Case 2:12-cv-00856 (W.D.Wash., filed May 18, 2012) (alleging manager of private funds "advised that the funds would invest in publicly traded securities," but secretly "funneled the proceeds primarily to two private companies" for which he served as Chairman, without any disclosure whatsoever).

To the contrary, RVMC repeatedly disclosed the relationship between the RVMC Funds, its River accelerator program, and its offshoot studio, as well as Mr. Rothenberg's personal interest in the studio.  They were housed in the same building.  Prospective investors visited the office suite and previewed the products.  The entire strategy was designed to build synergies

US-000779

between start-up companies funded and built through the accelerator program and the in-house studio which would develop content for the start-ups' products.  River Studios, a start-up virtual reality company, fell squarely within the type of investments that RVMC informed investors it would be making.  If the proposed respondents were trying to conceal the interrelationship among the entities, they were doing so in plain sight.  Far from a funneling investors funds into side businesses secretly owned by the fund manager, as was the case in *Spangler* and other SEC conflict of interest cases, Mr. Rothenberg literally broadcast these affiliations on the office wall that greets guests as they enter the front door of the building:



The 2015 Fund's offering documents repeatedly disclosed Rothenberg Ventures' (and Michael Rothenberg's) ownership of and management of River Studios and the fact that the Fund may likewise invest in this related party.

FOIA Confidential Treatment Requested

US-000780

The initial Term Sheet dated January 15, 2015, in a section prominently titled

"**Information on Related Entities**," disclosed to investors: "**Bend Reality**. The Manager

manages Bend Reality LLC, a Delaware corporation formed for the purpose of enhancing the

Manager's branding and positioning in the virtual reality sector." (Exhibit 1, Summary of

Principal Terms, p. 4). The next sentence of the Term Sheet provided that the manager and its

affiliates may make investments on their own behalf, and that the Fund would derive no benefits

from those investments "**except to the extent the Fund invests in such investments**"—i.e.

plainly contemplating that the Fund may invest in these Related Entities in which the manager is

investing. (*Id.* (emphasis added).)

These same disclosures were repeated in the accompanying offering circular, under the

heading "**Risk Factors Relating to Potential Conflicts of Interest**." That section disclosed that

the Operator (i.e. Mr. Rothenberg) "is working on numerous ideas for start-up ventures in which

he has an economic interest . . . . **The Fund may invest in some of these investments and the**

**start-up ventures in which the Operator individually already has a stake**." (Exhibit 1,

Private Offering Memorandum, pp. 10-12 (emphasis added)).

Similarly, the 2015 Operating Agreement, under a section entitled Competing Activities,

expressly disclosed that the manager and its affiliates might invest in Bend Reality LLC. The

provision went on to disclose:

> Each Member acknowledges that the Manager and the other Members and their
> respective Affiliates conduct other businesses... and (ii) that the **Company may**
> **invest in such Portfolio Companies in which the Managers or Members have**
> **already invested** if the Manager determines that the Company should so invest.

(Exhibit 14, RVMC00014742, Operating Agreement, § 4.4 (emphasis added)).

The 2016 Fund (which, as noted above, invested partially in the 2015 Fund) likewise

disclosed in its offering documents that the manager would invest Fund assets in the River

US-000781

Program as well as in affiliated companies, expressly defined to include both Bend Reality and the management company itself.  (*See* Exhibit 7, Summary of Principal Terms, pp. 3, 5).

The Staff has represented to counsel that the limited partners they interviewed claim to have been unaware of the River Studios investment.  If Mr. Rothenberg had intended to conceal his intent to invest the Fund in the very start-ups he himself was founding and investing in—including, specifically, Bend Reality/River Studios—we posit that he would not have disclosed it *over and over again* in the offering materials.

Even if the Staff were to contend that these disclosures were somehow inadequate, the Staff would be unable to demonstrate that, as a legal matter, the proposed respondents acted with scienter. To the contrary, they reasonably believed that investors were on ample notice of the relationship between the management company and Mr. Rothenberg and their affiliated entity River Studios and the potential for River Studios to be an investment holding of the Fund.

### b.    In April 2016, The 2015 Fund Obtained An Ownership Interest in River Studios

In mid-2015, RVMC began advancing funds to the River accelerator program (to assist in developing its portfolio companies), and later in River Studios, with the intent to ultimately convey investment interests to the Fund as provided for in the Fund's disclosures.  (A portion of these advances were financed through the SVB loan which the Staff has mischaracterized as improperly paying for management fees.)  The actual conveyance of an investment in River Studios was consummated through a promissory note executed on April 4, 2016.  All told, approximately $3.7 million in capital transferred from the 2015 Fund to RVMC has been invested in River Studios on behalf of the Fund.

The Staff has, for reasons unknown, questioned the veracity of the April 4 note, though there is a clear paper trail (supported by electronic metadata) corroborating its legitimacy.

      FOIA Confidential Treatment Requested

US-000782

The convertible note was first drafted in February 2016.  The initial draft of the note identifies the Rothenberg Ventures 2015 Fund, LLC as the Holder of the note, with a maximum investment of $1,000,000.  Associated metadata for the electronic version of this document shows a February 12, 2016 creation date (by the law firm of Gunderson Dettmer) and a last modified date also of February 12, 2016 (by then-General Counsel Neil Devani).  (Exhibit 19, RVMC00038674).  The date of the draft note is corroborated by a contemporaneous email also dated February 12 from then-GC Devani to himself documenting the proposed terms of the note (e.g. "$1M note for Bend Reality," etc.).  (Exhibit 20, RVMC00038557).

RVMC's contemplation of the River Studios note at that time is further confirmed by the company's inadvertent mailing of the draft 2015 Fund note to Pilot Grove, an entity which was separately negotiating an investment in River Studios.  This email, sent to Pilot Grove by Mr. Rothenberg on February 17, 2016, erroneously attached a draft of the River Studios note identifying the 2015 Fund (rather than Pilot Grove) as the Holder of the note.  (*See* Exhibit 21, RVMC00038559, RVMC00038561).

RVMC determined not to consummate the 2015 Fund's investment in River Studios at that time.  However, following the closing of Pilot Grove's investment, RVMC determined that because the value of River Studios had been validated by an independent third-party investor, it would be an appropriate time to convey an interest to the 2015 Fund.  A revised draft of the note, in the amount of $3,000,000 and identifying the 2015 Fund as the Holder, was generated on April 1 by Mr. Rothenberg (as confirmed by electronic metadata).  (Exhibit 22, RVMC00038647).  This was further revised the following day (again, as confirmed by electronic metadata) to reflect an investment of up to $5,000,000.  (Exhibit 23, RVMC00038656).  A hard

US-000783

copy of the $5,000,000 convertible note was executed and scanned to .pdf by Mr. Rothenberg on or around April 4, 2016. (Exhibit 24, RVMC00038628).

To be sure, there was some time lag between RVMC's initial decision to provide financing to River Studios and the documentation of an investment interest held by the 2015 Fund, during which period the advances to RVMC represented a receivable owed to the Fund. Yet the Staff has pointed to nothing in the investment agreements which prohibits this practice or that requires committed capital to be directly invested into portfolio companies. To the contrary, as noted above, the operating agreement negotiated by the limited partners conveyed broad authority on the manager and its CEO to "manage the day-to-day operations of the [Fund] and to do on behalf of the [Fund] all things determined by the Chief Executive Officer to be necessary or desirable to carry out his duties and responsibilities." (Exhibit 14, RVMC00014746). Such authorization included the express ability for the CEO "to make any and all expenditures which he deems necessary or appropriate in connection with… the management of the affairs of the [Fund] and the carrying out of his obligations and responsibilities under this Agreement." (*Id.* at RVMC00014746-RVMC00014747).

We appreciate that the firm's advances of capital from the 2015 Fund to the management company, and later determinations of how to allocate an ownership interest in the River-related investments to the Fund, would have benefitted from additional controls and documentation. This was a new start-up venture capital firm with inexperienced management and lacking the formalities of a more seasoned firm. But this was hardly a secret to the Fund's limited partners, all accredited investors who made an informed decision to try out a young, untested entrepreneur and a start-up venture firm that would by design be investing in high-risk start-up companies, including related parties.

US-000784

Nor, again, did Mr. Rothenberg operate in a vacuum. As noted above, the initial River Studios note was drafted by RVMC's then GC; the payments to River Studios were all transparent to finance personnel. The offering documents describing RVMC's strategy of investing in affiliated entities were drafted by and reviewed by some of the most respected law firms in the Bay Area. Mr. Rothenberg believed in good faith that his approach to building value in the River Accelerator program and associated studio, designed to provide optionality to the manager regarding when and how to allocate capital among hard-to-value and high-risk start-up enterprises, was both legal and in the best interests of his investors.

The Staff may second-guess the wisdom of this approach, but at no time did the proposed respondents misappropriate investor funds or intentionally contravene the express disclosures of the operative fund agreements.

### 2.      Investments by the 2015 Fund in the River Accelerator Warrants Were Similarly Disclosed and Appropriately Documented

In addition to its direct investments in portfolio companies (some of which were part of the River accelerator program), the 2015 Fund has also invested about $1.7 million in warrants issued by certain accelerator program companies. It is unclear whether the Staff is challenging such investments, but insofar as the Staff is characterizing these payments as improperly-advanced management fees, the Staff is again mistaken.

As described in the offering materials and other communications, one core thesis of the Rothenberg Ventures enterprise was the firm's provision of support to start-up companies through its accelerator program, with the resulting ability to provide investment opportunities in these companies to the RVMC funds. In furtherance of this disclosed investment strategy, RVMC paid advances to the accelerator program beginning in 2015 in order to support these start-ups – providing not just capital, but services and access to a pool of like-minded virtual

US-000785

reality entrepreneurs and a growing network of potential investors.  In exchange, RVMC in 2015 acquired warrants in the accelerator program companies.  Each warrant specifically provided that "Rothenberg Ventures is defined to include each fund or entity managed by Rothenberg Ventures," and specifically contemplated the transfer of the warrants to the funds.  (*See* Exhibit 25, RVMC00038363 – RVMC00038537).  Relatedly, by letter agreement dated May 14, 2015, RVMC provided the 2015 Fund an option to purchase any warrants obtained by the management company in the accelerator program companies.  (Exhibit 26, RVMC00038286).

Effective December 31, 2016, based on its assessment of the performance of each accelerator program company, RVMC determined to exercise the warrants for 9 companies for a total of $1.675 million.  (Five of these were exercised outright, four subject to a put option.)  An Excel spreadsheet prepared by RVMC for purposes of this investigation also reflects such warrant exercises.  (Exhibit 27, RVMC00038275).  These investments, as originally contemplated by the warrants referenced above, became the holdings of the 2015 Fund.  (*See* Warrant Purchase and Sale Agreements, Exhibit 28, RVMC00038288 – RVMC00038362).

The strategy of building the accelerator program in this manner was a core concept behind the 2015 Fund (and the 2016 Fund which partially invested in the 2015 Fund) and repeatedly disclosed to investors.  As the 2015 Fund Offering Memorandum disclosed, "The Fund will specifically focus investment in virtual reality through ordinary investments as well as through a proprietary accelerator program."  (Exhibit 1, Private Offering Memorandum, p. 8).  Likewise, the 2016 Fund LPA described its "primary purpose" as generating returns "through direct investments in portfolio companies, and through indirect investments in portfolio companies through investment in the General Partner's and its Affiliates' River Program frontier technology accelerator (the 'River Program')."  (Exhibit 7, 2016 Fund LPA, p. 9 (§ 1.2)).

US-000786

Again, as with the River Studios investment, we appreciate that the practice of advancing capital to the management company for development of the accelerator program and the subsequent allocation of investments in accelerator portfolio companies to the Fund would have benefitted from additional formalities. But once again, this at most raises a question of controls at a small start-up fund, and there is no support for any allegation of fraud or misappropriation. RVMC did exactly what it represented to its investors it would do with their investment capital: Built an accelerator program to help develop virtual reality start-up companies which would serve as an investment portfolio for the Fund.

### D.   The Delayed Reimbursement Of Unity Co-Investors Resulted From Unforeseen Circumstances

Separate and apart from the 2015 Fund matters, the Staff has also raised concerns about the delayed repayment to potential co-investors in Unity Technologies, an investment opportunity which fell through in the wake of the SEC's investigation. We note as an initial matter that this was a private dispute between RVMC and several individuals, long since resolved, which had nothing to do with the fund management issues under investigation, yet it was the proposed respondents who self-reported the issue to the Staff. In another example of no good deed going unpunished, the proposed respondents' extensive cooperation with the Staff, including proactively reporting peripheral issues far afield from the investigation which almost certainly would never have come to the Staff's attention, is now being used as a basis for the Staff's claims.

In mid-July 2016, RVMC staff, including Mr. Rothenberg and others, reached out to several individuals about a potential co-investment opportunity in Unity, a private technology company based in San Francisco in which the 2016 Fund was considering an investment. Five individuals wired a total of about $1.3 million for the Unity co-investment. Unfortunately, in an

US-000787

instance of inopportune timing, this transaction was initiated literally days before the adverse chain of events detailed above – the surfacing of the SEC Staff, the rapid outflow of RVMC personnel, and the flurry of negative press.  These events slowed down the discussions with Unity.

Nonetheless, Mr. Rothenberg diligently worked to close the Unity deal on behalf of the co-investors, corresponding closely with Unity throughout the month of August 2016. (*See* Exhibit 29, RVMC00006697-00006703; Exhibit 30, RVMC00002843, RVMC00002847). Ultimately, citing the negative publicity about RVMC's issues, Unity pulled the deal and declined to go forward.  As a representative of Unity wrote to Mr. Rothenberg on August 25, "the media article/PR on your firm has caused concern on our end and at this point I think it's challenging for this to happen without a [right of first refusal] being exercised by our existing investors . . . .  My sense is we should part ways." (Exhibit 29, RVMC00006698 – RVMC00006699).  Mr. Rothenberg's continuing efforts to revive the deal, alas, proved futile.

In the interim, RVMC had placed the funds into a management company account.  With the benefit of hindsight, this was undeniably not a best practice.  However, RVMC had no reason to believe the investors would object; to the contrary, at least one co-investor expressly authorized RVMC to use the funds for working capital until Unity closed.  (*See* Exhibit 31, RVMC00002720).  Moreover, at the time, RVMC understood it would have ample cash on hand for the Unity co-investments when the deal closed.  The firm had multiple transactions underway.  For example, on June 28, 2016, two weeks before the $1.3 million in Unity co-investments were received, RVMC personnel emailed Mr. Rothenberg informing him that General Motors had agreed to a $1 million sponsorship of the River Accelerator program.  The email informed Mr. Rothenberg that "[t]his project is fully funded and approved by the CTO."

(*See* Exhibit 32, RVMC00012643).  Similarly, in an August 17, 2016 email, RVMC personnel
confirmed to Mr. Rothenberg that "*GM signed $1m*, PO in process to be paid." (Exhibit 33,
RVMC00006601, emphasis added).

What RVMC did not and could not anticipate was the liquidity crisis that arose at that
time as a result of the SEC investigation, the tidal wave of bad press, and an exodus of
employees that led to cancelled deals (including the $1 million commitment from General
Motors and more than $200,000 from HP and G-Tech).

Additionally, the proposed respondents had the reasonable belief that the co-investors
would not object to their capital remaining in the funds in the event the Unity co-investment
opportunity did not materialize.  For example, the principal of an entity called GHF, whose $1
million payment comprised the lion's share of the planned Unity co-investment, had previously
invested $1 million in the 2015 Fund and expressed an intention to invest in the 2016 Fund as
well.  (*See* Exhibit 8, email from John Melas-Kyriazi to Mike Rothenberg, dated April 27, 2015).
In subsequent communications at the time of the Unity co-investment, Mr. Rothenberg had been
led to believe that GHF would be amenable to investing in the 2016 Fund if Unity did not go
through.

As noted above, counsel for RVMC proactively shared the failed Unity co-investment
with the Staff, who we understand immediately contacted the co-investors, including GHF.  Not
surprisingly, between the SEC's involvement and the public scrutiny of RVMC, these investors
were now insistent on the return of their funds.  While RVMC's unexpected liquidity crisis
slowed the return of their money, all of these co-investors were ultimately repaid.  The delayed
return of GHF's $1 million payment in particular owed in part to the ongoing negotiations

33          <u>FOIA Confidential Treatment Requested</u>

between RVMC and GHF regarding whether GHF preferred to retain its investment in the 2016 Fund; RVMC subsequently elected to simply wire back the funds.

The proposed respondents acknowledge that the Unity co-investment was not handled ideally.  However, the facts are inconsistent with the suggestion that there was an intentional breach of fiduciary duty.  The timing of the co-investment, on the literal eve of a catastrophic series of events at the firm, resulted in a cash management problem that was ultimately remediated; there was no misappropriation or deliberate misconduct, and the proposed respondents acted in good faith (including candidly disclosing the issue to the Staff at the onset of their investigation).

### E.   Other Claims

#### 1.   Appropriate Management Fees Were Charged to the 2013 and 2014 Funds

We further understand that Staff is concerned that excess management fees were taken for both the 2013 and 2014 Funds.  First, the Staff alleges an overcharge of $63,000 in fees from the $5 million 2013 Fund.  Our review and calculations do not yield the same result.  The 2013 Fund Management Agreement allows 17.75% in fees to be taken up front.  (*See* Exhibit 9, 2013 Fund First Amended and Restated Management Agreement, p. A-2.)  This entitles RVMC to $887,500 in fees.  Based on our review of the 2013 Fund financial records, RVMC has charged to date well within the authorized amount.  To the extent that Staff's calculations are different, an amount this negligible could be explained by a variety of factors from an accounting error to a misreading of an entry.

Similarly, limited partners invested $11.7 million in the 2014 Fund.  Under the Management Agreement, the 2014 Fund was authorized to take 8% per year for the first two years of the fund and .5% each year thereafter.  (*See* Exhibit 10, Fund II Amended and Restated Management Agreement, p. 2).  Consequently, at this point, the Fund is authorized to have taken

US-000790

17.5% in fees, and over the lifetime of the fund, it may take 20% in fees. The Staff has indicated that they believe RVMC has taken $3.3 million in fees from the 2014 Fund, approximately $1 million more than the $2,340,000 million lifetime authorized by the Management Agreement. By our calculations, based on a review of the fund's financial records, RVMC has again stayed within the amount authorized by the Management Agreement. Once again, Staff's disagreement with this number may be due to a misreading or misunderstanding of the Management Company's accounting. (Indeed, the Staff has subsequently explained that its calculation of a purported overcharge includes a large withdrawal that was returned to the fund the following month.)

More significantly, the Staff has cited no evidence that Mr. Rothenberg was ever made aware that either of these funds had been charged excess fees. As noted above, the proposed respondents have expressed a willingness to resolve this matter on terms that do not include scienter-based charges or call for a limitation on Mr. Rothenberg's ability to associate with an investment adviser; the Staff has provided no basis for scienter-based claims in connection with the 2013 or 2014 Funds.

### 2.    Purported Violations of Section 206(3)

Finally, the Staff contends that, through the 2015 Fund's investment in River Studios, RVMC violated section 206(3) of the Advisers Act, which prohibits principal transactions absent written disclosure by the adviser and consent by the client. This theory was shared with counsel in a phone call following issuance of the Wells notices, with no opportunity to discuss the matter with the Staff.

The Staff has failed to provide any evidence in support of its assertion that RVMC was acting as a principal in connection with the execution of a convertible note between River Studios and the 2015 Fund. Moreover, RVMC's offering materials, which consistently disclosed

    FOIA Confidential Treatment Requested

US-000791

RVMC's authority and intent to invest the 2015 Fund in its affiliated entities, including River Studios, were drafted and reviewed by competent counsel, including several preeminent Bay Area law firms as well as in-house legal personnel. The Staff has cited no evidence that Mr. Rothenberg had any basis to believe that the Fund's investments in River Studios presented compliance issues. Even if the Staff could establish a violation of the provision, it would not support the relief demanded by the Staff.

In any event, once again, the proposed respondents have proposed a resolution of the proposed action on a non-scienter basis, consistent with other SEC matters alleging violations of Section 206(3). *See In re Paradigm Capital Management and Candace King Weir*, Admin. Proc. File No. 3-145930 (June 16, 2018) (settling section 206(3) charge, and the accompanying Section 21F(h) retaliation charge, with monetary penalties and an agreement to employ an independent monitor); *In re WFG Advisors, L.P.*, Admin. Proc. File No. 3-17320 (June 28, 2016) (settling 206(2) and 206(3) charges with $100,000 and other assurances from the investment advisor).

## IV. CONCLUSION

The evidence at trial will confirm that, at all times, Mr. Rothenberg acted in good faith and with the best interests of his funds and his limited partners in mind. That a team of enthusiastic young upstarts may have gotten in over their heads from a logistical standpoint is inescapable. But the investment strategy followed by the proposed respondents was plainly contemplated by the offering materials, and the Staff's allegations at most amount to a failure to contemporaneously document investment decisions and communicate them clearly within the firm.

US-000792

The proposed respondents have made clear their willingness to resolve this action on terms that would recognize and remedy acknowledged deficiencies while leaving them in a position to realize value from the portfolio of investments they have amassed for the limited partners.  Unfortunately, by insisting on limitations on Mr. Rothenberg's associational rights, the Staff is all but guaranteeing to do real damage to the funds' investors.  Given the highly illiquid nature of the investments in high-tech start-ups, and the proposed respondents' close familiarity with the entities they have funded, it seems highly unlikely that any new manager—if one could be found—would have the same ability to deliver returns to investors.  In the interests of investor protection, the Commission would be ill-served by pursuing claims and remedies that will directly damage investors when far more appropriate alternatives have been presented.

US-000793