# Exhibit A



**ROTHENBERG VENTURES, LLC**

September 11, 2018

Dear Burke:

Rothenberg Ventures, LLC, a Delaware limited liability company (the "**Company**"), is pleased to appoint you, Burke Robinson ("**you**"), to serve as a manager (the "**Appointment**") of the Company as of the date first stated above (the "Effective Date"). If you accept this offer, you will become a manager of the Company on the terms set forth herein (as accepted, the "**Agreement**").

Your Appointment and service to the Company as a manager is subject to the terms and conditions of the Company's Operating Agreement, which is attached hereto as Exhibit A. You are permitted to engage in any outside activity that does not directly compete with the business of the Company. By accepting this appointment, you agree to refrain from engaging in any other fund management or investment advisory activity for the duration of your tenure as a manager. The rights and obligations granted under this Agreement are not assignable by either party.

Over the course of the Company's tenure as a general partner to several venture funds, the initial manager of the Company has made numerous decisions derived from a highly iterative process and intended to be in the best interests of the funds for which the Company serves as general partner. You agree to be mindful of this managerial legacy and refrain from making hasty decisions regarding initiatives put in place prior to your Appointment.

In exchange for your services as a manager to the Company, you shall be compensated as follows: an annual salary of $180,000 per year to be paid on a regular schedule to the extent possible, the frequency and timing of which may be subject to the availability of cash in the Company, and (ii) annual grants of carry equity units ("CEUs") or equivalent compensation equal in value to $300,000. Additionally, as manager you may be eligible for certain additional incentive bonuses. If you choose to work part-time, these numbers may be adjusted on a pro-rata basis.

This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of California. The parties hereto agree to the exclusive jurisdiction of the state and federal courts of San Francisco County, California.

Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, nor prevent that party from thereafter enforcing any other provision of this Agreement. The rights granted both parties hereunder are cumulative and shall not constitute a waiver of either party's right to assert any other legal remedy available to it.

Should any provision of this Agreement be found to be illegal or unenforceable, the other provisions shall nevertheless remain effective and shall remain enforceable to the greatest extent permitted by law.

This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same agreement. Facsimile copies of signed signature pages shall be binding originals.

1

SEC-DELOITTE-E-0012673
SEC-USAO-EPROD-000012673



**ROTHENBERG VENTURES**

If you find the terms of this offer acceptable and agree to accept the Appointment, please sign and date this letter below and return it to me, and such terms as described herein shall constitute the terms of your employment with the Company.

Sincerely,

**ROTHENBERG VENTURES, LLC**
a Delaware limited liability company

By: _____
        Mike Rothenberg, Manager

I hereby accept the Appointment on the terms and conditions set forth in this Agreement.

Date: __11 SEP 2018__     _____
                                        Burke Robinson

2

SEC-DELOITTE-E-0012674
SEC-USAO-EPROD-000012674

# Exhibit B

# Cybercrime is predict
# the world                                              th

## Secure your organization.

Source: Cybersecurity Ventures, 2022

Business

# The Valley's Party Animal

Rothenberg Ventures stands out by throwing bashes for entrepreneurs

     Gift this article

By Adam Satariano
May 28, 2015 at 1:43 PM PDT

🎧 Listen  6:19

🔒 This article is for **subscribers only**.

Get Bloomberg's most popular newsletters.Get Bloomberg's most popular newsletters.Get Bloomberg's most popular newsletters.

Subscribe now to get the Evening Briefing, Five Things, and Matt Levine's Money Stuff.Subscribe now to get the Evening Briefing, Five Things, and Matt Levine's Money Stuff.Subscribe now to get the Evening Briefing, Five Things, and Matt Levine's Money Stuff.

  Sign up to this newsletter

In his San Francisco office, Mike Rothenberg , a self-described "millennial venture capitalist," is sipping an iced coffee surrounded by three Apple computer screens, an Apple Watch on his wrist and an iPhone within reach. He's explaining what he means when he talks about "the transitive power of amazing." Roughly translated, the idea is that the best way for Rothenberg's venture firm to find promising startups and attract capital is to throw lots of parties for young technology workers. Rothenberg's not a character from the HBO comedy *Silicon Valley,* but he's been an inspiration to the makers of the show.

His three-year-old firm, Rothenberg Ventures, has made a name for itself by sparing few expenses. Its rotating list of invitees have ridden hot-air balloons on wine tours of Napa Valley, eaten at San Francisco's trendy Samovar Tea Lounge, and gotten free seats to Giants and Golden State Warriors games in Rothenberg's luxury boxes. Another regular Rothenberg gathering is Puppy Hour, which brings together puppies and booze. For its biggest event, called Founder Field Day, the firm rents AT&T Park, the Giants' stadium, each April. Startup founders take batting practice on the field and get free massages. *Silicon Valley* co-creator Mike Judge shot a similar-looking scene for the show's second-season premiere, which aired shortly before Rothenberg's 2015 ballpark outing.

Rothenberg, 31, shrugs off the parody as though he's in on the joke. "When you're doing something different, people will have fun with it," he says. During his gatherings, he sets up demos for the bevy of virtual reality startups he backs. Introducing the guys (they're mostly guys) behind those enterprises to other budding entrepreneurs and potential investors could ultimately bolster his portfolio. Widening his in-person social network may also help Rothenberg meet up-and-comers before more established investors do. "Semantics do matter to us. These are not parties–they have business agendas," he says. "The way we build a scalable network is by hosting a lot of events."

## 60

## The approximate number of startups Rothenberg Ventures has invested in to date

While some of Rothenberg's events are sponsored by the likes of Hewlett-Packard and Lyft, his company has raised about $20 million, not a big sum by Valley standards. It's backed more than 60 companies, but typically for about $100,000 each. Filings with the Securities and Exchange Commission first reported by *Re/code* show Rothenberg Ventures tried to raise $50 million for its second fund in late 2013 and secured only $850,000. Rothenberg says the firm raised more money after those initial filings and has more than $30 million in assets under management if you account for the value of its investments.

Rothenberg grew up north of Austin, Texas, a national math Olympian in a land of football obsessives. He got a master's in management science and engineering from Stanford, then an MBA from Harvard, where he decided to become a venture capitalist —or, in his formulation, an "entrepreneur talent scout." A bunch of friends from college had started companies by then. Rothenberg says there's a lot of overlap between good startup founders and the kind of people he wants to hang out with. Instagram co-founder Kevin Systrom "is one of my best friends," he says. "I introduced Kevin to Mark Zuckerberg in my dorm room." Through a spokesman, Systrom confirmed that account.



In 2012, Rothenberg declined a summer job at a New York hedge fund to raise $5 million from friends, family, and former classmates. One of his investors is Michael Cronin, founder of private equity firm Weston Presidio. Cronin's son was one of Rothenberg's Harvard classmates and rooms with one of his co-founders. "When I went out there to check in on my son, I met them and they gave me the pitch," Cronin says.

About a quarter of Rothenberg's investments are in people he met at Stanford, where he organized a series of talks that featured Zuckerberg, LinkedIn co-founder Reid Hoffman, and former Apple executive Tony Fadell. That's where he learned, he says, that "with entrepreneurship, one plus one can be 100." Robinhood, a stock-trading app that raised $50 million in May, was founded by a Stanford friend with some money from Rothenberg. Revel Systems, which makes software to turn an iPad into a cash register, also got money from Rothenberg, as did clothing startup Chubbies.

Rothenberg is part of the gold rush to invest in companies just as they're getting off the ground. So-called seed investing increased 49 percent, to a record $1.3 billion, last year, estimates researcher CB Insights. The money is inflating valuations at a pace that "has just gotten out of control," says Mike Maples, an early backer of companies including Twitter and Lyft. Rothenberg has succeeded in distinguishing his firm from others, says Maples. "If you're just another me-too microfund, you have no chance," he says. "Being different in this environment is really important." As for making the right calls on which startups to back: "That's a higher-order bet."

While most seed funds have a handful of employees, Rothenberg has about 25. They

US Edition        Kyle

Live Now
Markets
Economics
Industries
Tech
AI
Politics
Wealth
Pursuits
Opinion
Businessweek
Equality
Green

CityLab
Crypto
More

We've updated the dispute procedures in our <u>Terms of Service</u> ("Terms"). By continuing to use the site, you accept and agree to these updated Terms.

---

For Game 5 of the NBA playoffs between the Warriors and Memphis Grizzlies on May 13, Rothenberg's firm rented a luxury box at midcourt. About 20 startup founders, investors, and friends watched the action over Heinekens, Johnnie Walker Red, quesadillas, and fried chicken. For most of the game, Rothenberg was stuck at the office. Colleagues said he's often held up by a steady stream of calls and e-mails. When he gets here, one predicted, he'll joke about his boss being a jerk.

Rothenberg arrived midway through the fourth quarter and made the joke. People still laughed. Shortly after the final buzzer sounded, he jumped into a Lyft. Later, he sent an e-mail to say the next Puppy Hour is planned for June 3.

***The bottom line:*** *Rothenberg Ventures' lavish parties are the firm's primary strategy, but it's unclear if the plan is sustainable.*

Follow all new stories by **Adam Satariano**

Get Alerts





Gift this article

Have a confidential tip for our reporters? **Get in Touch**

Before it's here, it's on the <u>Bloomberg Terminal</u>

Up Next

**US Consumers Near Day of Reckoning as Pandemic Cash Stash Shrinks**

## More From Bloomberg

 **Lab-Grown Meat Startup Raises Funds for Speedy Pork Sausages**

 **US Puts $235 Million in Startup Making Low-Emission Jets**

 **Former FTX US Head of Partnerships Sina Nader Joins Web3 Startup Mysten Labs**

Sponsored Content
Wealth is more than money

 **Meta-Backed Meesho Becomes Rare India Startup to Manage a Profit**

## Top Reads

# Exhibit C

From:     mikerothenberg@gmail.com on behalf of Mike Rothenberg
Sent:     Mon 6/01/2015 11:20 AM (GMT-07:00)
To:       Mike Rothenberg
Cc:       Tommy Leep; Fran Hauser; Brandon Farwell
Bcc:
Subject: Rothenberg Ventures in the media


Dear Founders and LPs,

I'd like to share a media learning moment I experienced this week, explain the background and solicit
feedback/advice from you, my trusted advisors.

Recently, in the spirit of sharing our story and success, I agreed to cooperate on a story with a tech reporter
from Bloomberg. As part of my cooperation, I gave the reporter access to a small group event we hosted at
Rothenberg Ventures.  Unfortunately, that event became the cornerstone of a biased and not well researched
article. Clearly, I should have checked on other articles this reporter had written and done more homework on
his expected tone. It was very alarming to give this reporter time and attention and then to see him position what
we've built into a caricature.

Here's the article.


I have a lot of respect for Bloomberg and expected a more balanced and business-minded approach with a lens toward what our company
really is.  If I was cooperating with a goofy tech blog I would get the fascination with events - but from Bloomberg?  If the article
intelligently covered our success in engaging and understanding millennials, I could understand using our example of entertainment.  But he
portrayed us as superficial with little substance, and even when he chose to highlight the events, he omitted the primary events we host--our
luminary series with thought leaders, our panels, and our founder/business leader dinners--apparently to prioritize sensationalism over
journalistic integrity.


It is also important to clear up some factual inaccuracies as well:


1) Our SEC filings for $21M collectively raised for Fund 1, Fund 2, and the initial close of the 2015 Fund are all live and online, but the
reporter neglected to follow a most basic principle of journalism: fact-checking. The assets under management for these three funds is now
over $30M based on the market value of invested holdings thanks to our amazing founders.

2) Rothenberg Ventures has 13 employees, not over 25 as was reported.

3) We are fortunate to have partners that cover ALL the costs of every event we host.  To be clear, these events were NOT funded with
money our LPs entrusted with us.


Fortunately, we also have had a lot of great press recently as well, from CNBC to speaking at Stanford as a thought leader, or Ad
Age, Millennial Magazine, HBS, and Wired with pieces in BBC and PBS coming out soon.


As we put this behind us, we continue to work hard for our founders, LPs, and community and I'd like to
apologize to anyone who may have been impacted by my decision to give this reporter more access than he
deserved.  We are working on a strategic media plan to course correct with focus on our core values, founders

FOIA CONFIDENTIAL TREATMENT REQUESTED BY BRANDON FARWELL                       B015357

and results, with the hope that articles such as this will be recognized for the inaccurate and lazy journalism it represents.

I sincerely appreciate your continued faith and belief in our community. Please do not hesitate to share your thoughts and any advice moving forward.


Sincerely,
Mike


--

**Mike Rothenberg**
**ROTHENBERG VENTURES**
Founder & CEO / Entrepreneur

# Exhibit D

| | |
|---|---|
| **From:** | Pascal Levensohn |
| **Sent:** | Monday, August 22, 2016 12:16 AM |
| **To:** | Andrew Krowne |
| **Subject:** | Fwd: Rothenberg Ventures LP Update Letter #1 |

Pascal Levensohn
Managing Director
Dolby Family Ventures

Begin forwarded message:

> **From:** Mike Rothenberg <mike@rothenbergventures.com>
> **Date:** August 21, 2016 at 4:39:06 PM PDT
> **To:** Mike Rothenberg <investors@rothenbergventures.com>
> **Cc:** "Counsel (Rothenberg Ventures)" <counsel@rothenbergventures.com>, "Dado, John"
> <DADOJA@cooley.com>
> **Subject: Rothenberg Ventures LP Update Letter #1**
>
> Dear Rothenberg Ventures Limited Partners,
>
> Please excuse my mass emailing.  I would have liked to have discussed with you individually but
> since time is of the essence, I wanted to get this letter out in order for you not to get further
> offended by my delayed response.
>
> Rothenberg Ventures is extremely fortunate to have 175 extraordinary LPs, and in the upcoming
> days and weeks I'd like to speak to each and every one of you individually.  I have spoken to
> many of you in the past few days and have heard the following questions:
>
> Where is the money?
>
> Is management considering changing or adding managers?
>
> Will there be an LP meeting?
>
> How accurate is the Techcrunch article?
>
> Is there an SEC investigation?
>
> What is being done to safeguard our investment?

FOIA CONFIDENTIAL TREATMENT REQUESTED                    ROTHENBERG_DOLBY_001834

What is the current state of the company's finances?

Contact information for the Funds' accountants and legal advisors?

The purpose of this letter is to address the first three questions, and the remaining questions will be answered in subsequent communications that I will be rolling out over the next 1-2 days.

Of the funds raised to date, below is the breakdown of where the money is.  These numbers are not precise and may be revised, but it's the best I can do without the help of an accountant. Efforts are under way to get LP's a more detailed report on financial matters, but in the interest of time I wanted to be sure you had this to start with.

Over the four year period spanning September 2012 to July 2016, Rothenberg Ventures Funds collectively have raised $48.1m with another $9.7m committed but unfunded.  The 2016 Fund target is $50m with $22.8m raised including $9.7m committed but unfunded.

--Rothenberg Ventures has invested $33.2m in over 100 startups with current market value of $56.0m, based on our internal data tracking system, excluding the Fund's River Studios investments.  $1.6m of this has been distributed to LPs from exits.

--$5.7m over 4 years was taken as management fees, admin fees, or River Accelerator costs per the agreements for Rothenberg Ventures & the River Accelerator.  The Funds received an additional $5.0m in securities in the startups in the River Accelerator with that value calculated based on the latest funding round, in the form of warrants to help offset the management expenses.  Additionally, $4.25m of cash is reserved for future fees and serves as collateral for a management company credit line, which the company has used.

--$5m over 2 years has been invested in River Studios, which the Rothenberg Ventures funds have the economic rights to.  Rothenberg Ventures management believes there could be meaningful upside potential in River Studios for Fund investors if it continues with its external fundraising efforts.  River Studios received a $94m investment / buy-out offer earlier in 2016 contingent on me joining full-time, which was a non-starter as a fiduciary. We now value River Studios at cost since the future of the company depends on what the LPs would like to have happen.

On the manager front, I am willing to take any role that you as LPs would like me to take, whether it's continuing on the management team and giving the reins of the finances to someone else, departing from the management team, or possibly help run River Studios to capture the maximum value for your investment in that company.

2

We will schedule a meeting Monday, August 29, 2016 so that you can ask questions and give input on any of this.  Thank you for your support and your patience.


Respectfully,

Mike Rothenberg

FOIA CONFIDENTIAL TREATMENT REQUESTED

ROTHENBERG_DOLBY_001836

# Exhibit E

| | |
|---|---|
| **From:** | Pascal Levensohn |
| **Sent:** | Tuesday, August 23, 2016 6:56 PM |
| **To:** | Andrew Krowne |
| **Subject:** | FW: Rothenberg Ventures LP Update Letter #2 |

Pascal N. Levensohn | Dolby Family Ventures
999 Brannan Street, Penthouse
San Francisco, California 94103
pascal@dolbyventures.com | voice 415.449.1004
efax 415-723-7331

**From:** Investor Relations <investors@rothenbergventures.com>
**Date:** Tuesday, August 23, 2016 at 11:51 AM
**To:** Mike Rothenberg <investors@rothenbergventures.com>
**Cc:** "Counsel (Rothenberg Ventures)" <counsel@rothenbergventures.com>, Brandon Farwell <brandon@rothenbergventures.com>, Justin Grooms <justin@rothenbergventures.com>, "Dauchy, Craig" <cdauchy@cooley.com>, "Dado, John" <DADOJA@cooley.com>, "Gibbs, Patrick" <pgibbs@cooley.com>, "Goodhart, Kathleen" <kgoodhart@cooley.com>
**Subject:** Rothenberg Ventures LP Update Letter #2

Dear Rothenberg Ventures Limited Partners,

We are in the unfortunate position of having people who are trying to take us down, and they're doing a good job. Juicy gossip sells clicks, and this is your update letter #2 this week.

First of all, our website has been up since Saturday. It was unfortunate timing to be sure.

We work very hard to invest the funds you entrusted to us, and Rothenberg Ventures has many great investments.

**Rothenberg Ventures examples**

--1-Page Co: 20x cash exit from the 2013 Fund
--Hello Giggles: 4x cash exit from the 2014 Fund
--Revel Systems: 10x from the 2013 Fund with 1x cash out

1

 ROTHENBERG_DOLBY_001447

--Patreon: 10x from the 2013 Fund
--Dronebase: 4x from the 2014 Fund
--AltspaceVR: 7x from the 2014 Fund
--Homebase: 2x with a 1x cash exit from the 2014 Fund

--EmergentVR, Emblematic, and Fove: 4-10x each from the 2015 Fund


These numbers are not precise and may be revised, but it's the best I can do without the help of an accountant. Efforts are under way to get LP's more detailed report on financial matters, but in the interest of time I wanted to be sure you had this to start with.


**As technology venture investors, we were the first to "call" Virtual Reality and Frontier Technology, and have consistently topped the rankings for both categories.**


**At Rothenberg Ventures, we built a valuable ecosystem – and, in particular, the River Accelerator and River Studios** are valuable as - and only as - a going concern.  These previously valuable enterprises are both in jeopardy due to current press, attrition, and working capital needs.


## River Accelerator

Through the River Accelerator, we operated 3 Frontier Technology programs so far, yielding approximately $5m in incremental value to LPs from warrants from the startups to Rothenberg Ventures to join the program in 2015-2016.


## River Studios

Rothenberg Ventures funds invested approximately $5m into River Studios to create the world's leading creative studio for Premium VR Experiences, including VR, AR, live-action, and CGI.  The valuable team, relationships, brand, and production pipeline require River Studios to be a going concern.   Over the last few weeks, this has been put in serious jeopardy by the vicious, tabloid-style press attacks and internal uncertainty.


However, it is recoverable.  **To protect your funds - including those invested in River Studios - we need your help stemming the tide of these attacks and helping to rebuild the brand, especially for River Studios and the River Accelerator.**

FOIA CONFIDENTIAL TREATMENT REQUESTED                                                    ROTHENBERG_DOLBY_001448

I am willing to lead this charge to make sure the River Studios investment is protected for the LPs, and ultimately the largest driver for success.  The alternative is to avoid action and allow this investment to disappear unnecessarily.

## Accounting, Lessons Learned, Marketing Strategy, and Techcrunch

We have an important accounting, allocation, and audit issue. I am bringing on board a new independent accounting firm to address this important issue.

I was not focused enough on lean spending, particularly when it came to staff.  I was too quick to hire and too slow to fire.  I enjoy giving people opportunities and creating jobs, which may have impacted our runway.  I hired very young and aggressive people and we moved very fast.  I have not taken adequate time to offboard employees, leaving open the possibility for disgruntled employees and then brutal press attacks.

I believe that marketing such as Founder Field Day is what put us on the map.  Acting on this belief led to significant marketing expenses, which allowed us to connect some of the world's experts in technology, startups, and investing on a regular basis and building an ecosystem.  We have also offset our marketing expenses with hundreds of thousands of dollars in sponsorship and partnership revenue annually, not including a $1m pending purchase order for the next two River Programs pending resolution of the current crisis.

The Techcrunch article missed the point or the facts on almost everything.  I sold a small percent of shares of Rothenberg Ventures carry to help offset marketing expenses, such as our Warriors box, which we share continuously with our LPs, founders, and business development contacts.  I rarely had the opportunity to watch the games because I spent the time at the games in discussions. We do not have SurfAir memberships.  As CEO I fly both first class and coach.  The company experimented with a private driver for a few weeks to see if it reduced overall transportation and uber costs, but I do not have a private driver.  River Studios was paid (not vice versa) to executive produce a Coldplay video because the video was our idea.  Similarly, InStyle provided River Studios with Golden Globes tickets because River Studios shot a VR piece there as a paid gig.  The most expensive marketing expenditures, including a Superbowl Suite for 80% off the week of the event, generated tangible and trackable business outcomes in Rothenberg Ventures and our portfolio companies.  The Techcrunch articles did not fact check or find anyone inside the company to speak, or even almost anyone outside the company to speak on the record.

I am not trying to be famous, act like a billionaire, or focus on managing my reputation (although it needs some work now).  I am, however, focused on working to make money for my investors, build value, and create jobs.  I think the last 4 years have unequivocally shown that.

**Because we were successful in raising the profile of the firm, we became vulnerable to attack.**  We did not tell enough of our story or strategy first, allowing the press to strike.  We moved too quickly and did not stop for enough 1:1s so that each and every one of you knew what we were doing and had a chance to weigh in.

## SEC

The firm received a request for documentation from the SEC, per their duty as federal securities laws enforcers, and we are cooperating.  Despite the fact that **the SEC's request stated explicitly to be confidential and non-public**, it is now quite the opposite, causing material damage to the firm's reputation, LP confidence, and public

3

opinion.  It is in the best interest of you as LPs to let the SEC know that this is an internal accounting issue that we are handling so that we can take the time necessary to sort everything out.


## Management Transition


In venture, reputation and confidence are paramount.  **In order to protect the firm's investments, reverse the trends, and regain momentum, I plan to step down as the Manager of Rothenberg Ventures at Monday's LP meeting.**  In the meantime, I will be working on presenting options to our LPs for that meeting


I invested $5m into River Studios on your behalf.  I believe **River Studios still has the potential to be the largest driver of returns for you**.  River Studios invested in hiring the best talent in VR, building an amazing pipeline, and creating content.  This resulted in a $94m buyout offer earlier this year, dependent on me joining, and subsequently began a  Series A raise.  However, the recent press has slowed down the Series A raise and the ability to access capital.  **If the LPs and new management of the fund allow me the opportunity to work to make more money for you, I would love to join River Studios to rebuild the value we lost there this month.**


## Next steps


Let's work together to facilitate an orderly transition of leadership.  My Partner Brandon Farwell and COO Justin Grooms are excellent leaders and would be good fiduciaries, if you as LPs supported that and if they wanted that.  I believe they could also recruit back a small number of key departures.  I am actively working with them to create a transition plan that maximizes your investment value. Whoever the LPs decide to take over management, I will work in the interim to help get the new team up to speed imminently.


Let's continue the accounting work, as well as considering merging all of the fund assets into a single fund, with one or more representatives of each fund to negotiate what share of the new fund each member has in behalf of the group.  New management could focus on liquidating smaller positions in the fund to help buy out smaller investors to simplify the fund structure and to provide working capital to the organization to streamline operations.


Let's keep calm and maintain patience so that the assets do not fall in value, and let's have a **Thursday** call to discuss the options and create a better plan for **Monday**'s LP meeting.

## LP Meeting / Conference calls
**Thursday (8/25)** 3:00pm PST - Pre-LP Meeting Conference Call

4

ROTHENBERG_DOLBY_001450

*Dial-in to be distributed prior to the call*


**Monday (8/29)** 3:00pm PST - LP Meeting & Conference Call

**Location**: 1062 Folsom St Suite 300, San Francisco CA, 94103

*Dial-in to be distributed prior to the call*


I'm very much looking forward to seeing you on Monday and continuing our discussions of how we can all work together to maximize the value of your investments.


Respectfully,
Mike


**<u>Rothenberg Ventures Management Co counsel (Cooley Godward LLP)</u>**

"Dauchy, Craig" <<u>cdauchy@cooley.com</u>>

"Dado, John" <<u>DADOJA@cooley.com</u>>
"Gibbs, Patrick" <<u>pgibbs@cooley.com</u>>
"Goodhart, Kathleen" <<u>kgoodhart@cooley.com</u>>

FOIA CONFIDENTIAL TREATMENT REQUESTED                                                                ROTHENBERG_DOLBY_001451

# Exhibit F

Teleconference transcription on 8/25/2016 of Investors call with Rothenberg Ventures

Most of the investors or almost all of them have more capital and more connections and so in order to stand out then we took a community approach and _____ marketing.

So our first founder field date, which was, we have done 3 now, so that was in 2014, we rented out AT&T park and the entire operation was funded by approximately 15 sponsors. So with that putting us on the map and getting us a name it allowed us to leverage that into when it started to have _____ from VR and frontier technology.

And so, the most tangible outset of that was the River Accelerator which we invested in approximately 40 virtual reality and frontier technology companies and, such as, in our first group, we had a company called FOVE which has grown 10 times and is backed by Samsung since we've invested in it. It's an eye tracking hardware, software, virtual reality headset. So with those types of investments, we have worked our way to the top ranking in virtually every virtual reality and frontier technology rankings, including anything from CV Insights and Pitchbook to Goldman Sachs.

So, what is the situation today? Well, the company in 2015 and 2016 grew to 20 – 25 people or so and then River Studios which works very closely with us grew to another 20 people or so, not including contractors and so when you have that many people we have had a higher burn rate, as River Studios had a higher burn rate. We were investing in River Studios through the funds as disclosed in our _____.

And, so we were also, telling the market and our investors that our intention was to get a 50 to 100 earned dollar 2016 front and although that remains our intention, we have not yet met that goal. Over the last month or so, we have had a combination of downsizing in the hopes to get the right size at Rothenberg Ventures and at the River Accelerator and we have also had some key personnel leave and so those received quite a bit of press attention. So, we have, I think gotten to the right now.

But further made bad interest to the situation, as we mentioned in our last letter, we have received a FTC letter of inquiry and we are cooperating and there is no further comment that we are able to give, but wanted to be sure to address that for you. We have also hired an accounting specialist from BDO. We will be happy to put you in touch directly with them as well if you're interested and we have started that audit and the reports will be provided as soon as they are ready.

We are also pursuing management team additions and there are a bit of opportunity there to help instill controls and to have a plan that involves more of the LPs input as far as more experienced venture capitalists and additions to the team.

And finally, we have some lacking in communication at times about with our LPs and we have communicated primarily through emails and through our investor portal and we would like to make sure that we are communicating in meeting fashion and phone calls more often going forward.

In particular, one of our investments has caused questions about what it is and how it works and so we would like to address River Studios and in particular we will be having an open house in LA at a very soon date to be determined in order for investors that would like to not only see River Studios, but also see the most cutting edge virtual reality conference in the world period if you haven't seen this at all, this is something that is pretty important to view. River Studios is also is _____ us again for our _____ tomorrow and some of you have come by our office to see and it's called QV Snap.

So in terms of the fund itself, we would like to continue getting to our goal of the $50 Million fund which we believe with finishing our prospects of adding more controls, finishing our audits and adding to the management team we believe it attainable and we would like your help in doing that. We would like to open up the line of communication for more feedback throughout and not only do we have a lot of LPs, but we have extremely experienced LPs who are experts in not only _____ venture capital, but also in start-ups in particular industries and we would like your help in how to better leverage your time in ways that can benefit you and the funds and the companies themselves. Our sales and brand awareness has worked perhaps too well and so we are considering having a much lower profile and we are also considering and open to brand changes to the extent that that helps the fund. And, finally we would like to do a better job with mentioning specific companies that could use help at various times or could be exciting investments or current investments. So from the Space X co-investment in 2012 to today more recently whether it's a FOVE or a Jaunt or a Matterport we would like to be sure we are sharing our idea flow more often but also for the benefit of our companies which fundraise for the first several years of their life and can use all the support that they can get. And we are working more towards more exit liquidity even if it's prior to the final exit as we found that the secondary market is alive and well. Especially when Level Systems allowed us the dividends or when Home Base did and of course we like to work towards more IPOs and acquisitions like Hello Giggles 4x acquisitions, One Pages 20x IPO from Fund One and then some of our stronger acquisitions such as Robin Hood at above 15x to 17x in terms of its growth thanks to NEAs support now.

So with that, I would like to open it up for questions and I would like to remind everybody that the purpose of this call is to allow there to be questions and input for Monday's meeting and that we will do the best we can to get those answered. Thank you.

_____

Thank you. At this time we will be conducting a question and answer session.

Q: Our first question comes from Pascal Levinson from _____ Ventures – Hi there. I appreciate if you are not ready to talk about it today for you to speak on Monday on exactly what has been invested and how much capital came into the 2016 fund so that we can get an accounting of exactly where is the money and also how much money has actually been called and what percentage of total commitments?

A: Yes, we will be – this is the very important questions that relate to everybody from every fund for the 2016 fund I'll give you a partial answer that we have raised $23 M for that fund, approximately ½ of which has been called and ½ of which is due in February. And, we are taking notes of all of the questions that will apply to all of the funds and in particular will relate to the accounting work that is now underway. Thank you.

Q: Thank you. Our next question comes from Taib Warde from Newcode Advisors – Hi Mike. I just wanted to ask about River Studios investments. Which fund exactly has invested River Studios?

A: The 2014, 2015 and 2016 funds have some investment in River Studios.

Can you breakdown the amounts for each?

A: Yes, that will be part of the accounting work as well.

Q: Thank you. Our next question comes from Evan Shapiro from Seeso – Hi. I was curious as to the valuations of River Studios what's our investment level?

A: Well River Studios is holding at cost which is $5 M across the 3 funds. There were 2 market events that have happened this year. One of which was an acquisition offer on 2/2 that would have required me to have left Rothenberg Ventures to run it, so as a fiduciary that was a non-starter. That particular company would have benefited from, it was a public company in China, it would have benefited from probably from a small bump in the market that may have actually paid for the cost of the acquisition to help explain why it might pay close to a $100 M for that. And, then, more recently, we have River Studios has been in the market at closer to the $10M to $20M pre-money valuation and we took a pause on the fund raising in order to address the more recent issues that we are on the phone talking about now. So, in terms of how we are accounting for it, we hold it at cost, and my personal belief as the manager is that it is significantly discounted to what it could be if the investor base in particular and if we would like it to grow, I think it could be our best investment.

But for the offer was $100M?

A: It was $94M for a controlling stake and to _____ that head on, the Chinese public market, at the time, was very favorable on virtual reality companies and my personal belief and somebody would have to substantiate it, that some of that value was in the uptick in the market that they anticipated receiving by having invested. And so obviously, which companies that they are interested in has to do with relative marketed positioning in which River Studios has some of the most talented people in content production and virtual reality from Disney and from Pixar and things like that, and so, however, my personal belief is that it's not it's not worth anywhere near $100M in the US market, but that based on the team and the product pipeline and the market positioning that it was worth considerably more than the amount invested in it.

Q: Thank you. Our next question comes from Amy Walling from Arterial Capital – Hi, my question is River Studio, can you disclose the ownership structure of River Studio. You said it's

held at cost, but $5M is invested and what is the cost? And, also, you said that River Studio investment was laid across 3 funds – 2014, 2015 and 2016 – so I actually have your 2014 and 2015 annual report and River Studio was nowhere to be shown. It wasn't in the investment schedule and it is a $5M investment and your regular check size is a 6 figure and for an investment this mature it should somehow be shown on your annual report.

A: This is right. That's right. So starting in March and April we started a process by which we were reviewing all of our disclosures and reports. This is a process we have been spending months on because of, in part, the point that you mentioned and we were intending to finish the process of identifying any issues like that in time for our tax extension, which was October 15. And, so our timeline has been accelerated, obviously, because of the things that have happened recently so the thing that I would like to acknowledge is that with so many moving pieces and so few people, our business model is challenging. And, at this point, I think, 150 investments, 175 investors, 4 funds, 13 co-funds and it is quite challenging to do that, so in the 2016 funds, which has invested, I believe, the most in River Studios, it is very clear in the documents that that is our intention but in a fund that doesn't reach $50M to $100M when even a $2M or $3M investment becomes too big of a fund. So, part of our challenge is that if we don't complete our 2016 fund raise, then the allocation distribution in particular in the most recent fund would not align with our intention.

What is the ownership structure of the fund? How much do you personally have interest in River Studio? Cause in your letter, I remember the update letter #2, all I could see was River Studio and for that that's $5M out of $50M it's about 10% and you spent a disproportional amount of time talking about that investment in particular. So that makes me think that, how much do you own in River Studio and how much, if all of the funds are invested in River Studios, how much economic stake do the funds own?

A: The funds have all the economic rights except for any particular outside investors to River Studios and the management company controls it and the economic rights are for the investors and I personal do not have any economic rights to River Studios.

Q: Thank you. Our next question comes from Brett Hurt, a private investor – Hi Mike. I actually had the same question, so you just covered it. My question was just what percentage of River Studios do the funds own and you said that was going to be cleared up in the accounting. Do you even know approximately what percentage that is?

A: Can you repeat the question?

FUQ: Approximately what percentage of River Studios do the funds own? Is it 100% you're saying?

A: It's 100% before taking outside investors and one of our LPs has also invested in a convertible note into River Studios and so that was, you know, outside investors obviously own it as well, but zero of the economic rights here for me personally and they're all for the funds.

Q: Thank you. Our next question comes from Nick DuCross, a private investor – Hey Mike. This is a follow-up to the last 2 questions. I know that River Studios was staffed. How are they compensated? Did they have an employee option pool and if so, then that would mean that investors didn't own 100% of the company.

A: They have no employee option pool and what was communicated to them was that they would get one upon equity financing, which as recently as a few weeks ago we were starting to go into the market to do.

FUQ: Is anyone still employed there?

A: Yes. Of course. But, it's probably, we did do layoffs throughout River Studios as well and River Studios has always had a partially contractor model, so today it has around 10 full time people, whereas, at its peak, it had close to 20 full time people and 15 contractors.

Q: Thank you. Our next question comes from Norman Poston, a private investor – Yes, can you talk a bit about what's going on with management at Rothenberg Ventures? The various reports that have been in the media don't really spell out sort of who has left of their own volition and who has been laid off and what is left of a management structure at the company and I assume, but if I'm wrong, please explain to me that when you talk in your update #2 and you say that people are trying to take you down are you referring to former employees or is there some other group that is trying to take you down?

A: Thanks for the question, Norm. I'm not really sure who that may be who has those intentions, but when I read, for example the TechCrunch article it did read to me like it was not intending to be a balanced view point and I think that when it comes to our own management team I believe that some of the recent departures where some of the people left of their own volition is a sign that I could be having better leadership and I have been working over the past several weeks in particular to be listening and trying to understand those things and one of the interesting things there has been over commitment. That I am stretched too thin and that I have an insufficient amount of time with one on one vs perhaps more group and community type approach. And, Norm, you are very generous to reach out to me recently and I'm very grateful for that and I have stretched myself too thin and one of the things I would like to see happen personally is a better structure where as the sole GP currently – phone beep interruption – to bother sticking around a firm if there's much _____ daytime and I think that's what a good partnership structure would be is to be sure there is not only more people thinking about this issue and balancing each other out, but also having more of an incentive to weather storms and when it comes to certain talented people at the _____ skills I believe that the confidence of the LPs is what would allow us to bring on more GPs and strengthen the investments and perhaps counter balance my strengths which I've been told is things like vision, recruiting and counter balance my weaknesses by which almost everyone on this call has speculated about to me openly and constantly for the last couple of weeks. So, I do believe there is an opportunity to seize this moment, nix negative feedback, bring on talented people to balance that and continue the positive moments we have had all but 2 weeks of our 4 years existence.

Q: Thank you. Our next question comes from Dennis Mullins from More Capital – Yes, Mike we're in Fund 13 and will you confirm the size of Fund 13 Investments and whether or not we are in River Studio? Either today or if we will be soon?

A. The size of that fund is $4.7M. It is not invested in River Studios in LA, so (unintelligible)

FUQ: And how many investments? Do you know off hand or will that be in the accounting?

A: How many investments has it made? It's made probably, at least, all of the _____ funds at least 20 thousand investments so it's made. The way we allocate it just is ____ we ____ try to _____ 80% of the value in 20 companies so that we can get the benefit of some portfolio ____ that we do have a longer tail of investments where we do a combination of option value and dipping our toe in the water to see a company that we like, but we feel has a lot of potential, but hasn't shown it yet we are going to cut a much smaller check and the _____ that comes to the River Accelerator we _____ have the same approach. So there may be a lot of investments in a particular fund, but we do a concentration as well.

Q: Thank you. Our next question comes from Karen Ebron of Tridon Investors – Hi. So, at this point, are there any funds in the bank in terms of ongoing _____?

A: Well, we do have some funds and we are, however, we are not currently fund raising. And, that is partly also the reason for downsizing and we are trying to make our burn rate is extremely low. But, I think that counting questions that everybody has will be addressed most appropriate by the forensic accountant that we are definitely still operating, just at a very lean pace.

FUQ: is there anyone on the management team disappointed about you?

A: There is, but there is a, I would say that these calls are set to instill investor confidence and I am very interested in convincing certain members of the management team to stay and become partners and I think that the risk for somebody who is not currently a partner to become one at this point would determine, would be determined by investors' confidence and if I were not the only one who was a GP, I certainly would be sympathetic to that viewpoint.

Q: Thank you. Our next question comes from Chris Ericson from Hurricane Investments – Hey Mike. If the cash from the bank account is sufficient, then why am I getting rumors that you are trying to sell holdings from Fund 1 and Fund 2 at a discount to what they are worth right now and how does that conflict with LP interest?

A: I have not even heard those rumors and we don't, we can't comment on rumors.

FUQ: Then what is the cash balance in the bank right now?

A: As I said before we are going to let that and other accounting questions be deferred.

Q: Thank you. Our next question comes from Nicholas Hardy from Selly Oak Investments – Hi Mike. Nico here. I hope you are weathering the storm well. I have a quick question – tape ends.

(Question was being asked by a woman when the next side taping started, but it was very garbled and hard to hear) …securing that team whatever that means. Did you ever discuss that with anybody within the company or with any of the investors?

A: Well there is a little bit more to that as you might imagine. I would you know, being interested in arriving at a positive return for investors, that's the point of what we are doing anyway is to make money for you and help these startups. As I mentioned before, I want to de-emphasize the Studio may have actually been worth that in an objective sense. I think that there was a period of time where acquiring startups that had a virtualized component is particularly interesting to China's stock markets. We did not have a call like this to debate auctioning off me and River Studios to China, but I also believe that my fiduciary duty to not look for the first opportunity to be auctioned off but if that becomes something interesting to the investors I am open to it.

Q: Thank you. Our next question comes from Mark Keffernen, a private investor – Hey Mark. So you had indicated that part of your goal is to reach out to your LPs and improve confidence levels and get feedback and seek kind of an understanding of _____. In the case that that doesn't materialize are you willing to step aside and allow another team to in and take the reins?

A: I thank you for that. I am committed to what is best for LPs. I think that there are a lot of nuances to that question, since this is not a binary thing. The institutional memory for example of having relationships with the founder is, obviously, the only person who has been here the whole time, so, I believe that – and I also don't believe that the best management structure is having just me. So, I think that there is a system that is optimal, if you will, where there can be a true partnership structure. There can be controls in place and there can be different and various roles and I think that to your point there the investor confidence is incredibly important and we are reacting to the recent events by having two calls when we haven't had any in the past in order to start the rebuilding process. I am perfectly aware that when everyone on this call invested in the fund, you were not anticipating an unfavorable news storm like the one that we just sustained, and is ongoing, I agree. So, to your point, we do have a very important position to instill investor confidence and we recognize that as a very important area of growth and I personally have been over-extended and need to be sure that when, you know, when you make the effort, for example, to make time first thing one on one, but that I can do that or we can do that. And I do feel like our system was close to 400 business relationships does not work with one GP. So, I'm going to go one step further and say that I'm really asking for your commission to add partners to the structure. I don't believe this a one person job.

Q: Our next question comes from Rob Hetting, a private investor – Yeah, Mike. Is there a way for all of the LPs to connect? Is there some sort of list with all our names on it that is shared? Is that possible?

A: Yes. We could do that. There is not one yet. We could get one.

OK, thank you.

Q: Thank you. Our next question comes from Dominic Polizzotto, a private investor – My question has already been answered. Thanks, Mike.

A: Thank you

Q: Thank you. Our next question is a follow-up from Chris Ericson from Hurricane Investments – Yeah, I just want some clarity, Mike. Are you saying that the current balance in our bank accounts is an accounting question?

A: What I'm saying is that we are getting back to that question, along with the attorney.

FUQ: But, you are saying that you can't answer that question currently?

A: I'm saying that I'm not going to answer that question currently.

Q: Thank you. Our next question comes from Jen Sing, a private investor – Hi Mike. You said that the fund is in auditing ownership interests in River Studios. Does that mean that legally it is owned by someone else not by the fund?

A: Could you please repeat the question:

FUQ: My question is the fund has _____ interests in the fund 100%. My question is, who really owns the legal rights?

A: So the control is the management company and the economic rights are the fund investors.

FUQ: That is you, right?

A: Rothenberg Venture Management Company is majority owned by me, yes.

Q: Thank you. Our next question comes from Fernando Pentada from Invacorp – Hi. In the American Inclusion there was some mention about the emerging ___fund backs into a single fund as well as maybe liquidating smaller investors. Could you expand a little bit on that?

A: Sure. This is a proposition that feels very difficult to pursue, but back to the very point that the fund having 175 investors and 150 investments and many of the LPs are across more than one fund and some of the investments are across, sometimes even more than one fund as well. I believe that any management team, whether it is still me solo or ideally a group, would continue to have challenges logistically of that many moving pieces. Since that started with a, you know, $5M fund with 25K - 20 thousand to 100 thousand dollar investments – and 50 LPs and I sense that when I take a step back and look at the last 4 years it looks like a lot of funds that have 3 to 4 years and raise $50 M. And, I think when it comes to having LPs that have invested $10,000 or investments we've made that are $25,000 and if you look at the whole thing those become actually relatively difficult to manage. But, the ideal here – and I don't have any idea how that would mechanically work, but the idea would be that each fund would appoint one or more representatives and have essentially a negotiation about the ratio that each fund would convert

TVR-0000951
TVR-0000951

into and then there would be one cap table and one investment crunch and you would call that a Rothenberg Ventures fund and then perhaps the next fund would not be annual and perhaps would be named something else to the extent that people really want to continue enjoying reading these TechCrunch articles in which case I would be happy to continue extending my name out there were that _____.

Q: Thank you. Our next question comes from Amy Wong from Artuna Capital – no one spoke

Q: We will go to our next question and it comes from Karen Ephron, a private investor – Mike, I'm sorry. I'm sorry to be so direct, but, the competence this year is around the financial decisions you made in terms of over extending yourself around your operational expenses. My understanding is that basically the entire team has left, there is no money in the bank and this has nothing to do with the media and everything to do with decisions that were made by you. Now, I could be wrong and if I'm wrong, please tell me that I am, but I think that's what my understanding is.

A: Well, I appreciate you being so direct. There has been some like serious departures and there have been I absolutely have been over-extended and I do take responsibility for decisions I made and I do believe that the last several weeks have collectively from the series of events constituted a very important moment to address. I want to also mention that by having essentially only raised $50M approx. in this time period that we have not made the jump to even a medium sized fund. So, I do think it is very difficult for people to want to continue at somewhere that doesn't reach it goals or hasn't yet and I do think also that a lot of times in good times it's easy to have everybody to be happy and then when goals are not met it becomes the leaders obligation to help address that. So, I'm attempting on this call to address those things. To right the ship and I am not very happy about some of the departures that happened and I would have loved for those wonderful people to stay. And so the departures are certainly not all the loss and some of the key departures were people I would have very much liked to stay. We are still at a juncture though where it's possible for there to still be a management team in place and not just me and there are certainly some decisions by other people on the team that have not been permanent, or that are not permanent. So, I think that your question is fair and I do think that the media has not actually made contact with anybody currently at the company and so I think that it's important to take that with a grain of salt. I know that you are close to people in the company and I know that we have taken perhaps too long to have this call in terms of a quicker response would have been really nice and I do think, once again, that an adjustors sentiment will help determine what we do going forward.

Q: Thank you. Our next question comes from Alexander Sheshu, a private investor – What was the final size of the 2015 fund? What percentage of the investment capital raised is already invested?

A: The 2015 fund was about $20M and in the first 3 funds the structure contemplated for all 3 was as approximately annual funds of 12 to 18 month deployments and so those first 3 funds are deployed.

Thank you very much.

Q: Thank you. Our next question comes from Dan Amu, a private investor – Hi Mike. This isn't really a question. It's more an inquiry. Until the (totally unintelligible).

A: Can you elaborate on and to repeat the last part of the question

FUQ: Who left and were they voluntary or were they laid off?

A: Ummm, your question is about the departures and where they all layoffs?

FUQ: Yeah.

A: There not all layoffs. There were key departures that left of their own volition.

FUQ: OK, and going forward?

A: Going forward we intend to be very lean and small and once again, I believe that the report of LPs is very important and what we have built so far is a portfolio of __________ companies that need our help and there is a reasonably high number of them that are performing very well and just like any early stage portfolio. I think it will need some ongoing support. So, we intend to continue providing that whether it's 10 people or just me. I think that right now, by being the only GP, there is a lot on my shoulders and my sincere goal is that we can expand that pool. But, I also understand that by being the only GP that I'm the one responsible for the success of the funds and to the extent that their support I would like to expand that group and I believe there are capable people that are very interested in helping manage this portfolio.

Q: Thank you. Our next question comes from Georgie Cotanobe, a private investor – Hi Mike. You mentioned in the second letter that you would step down as the GP at the Monday meeting and some other people would take over. I just want to check if this still the plan and what is the transition between today and Monday.

A: Alright. I think there is still a very wide discussion happening and there's multiple view points and it is my sincere goal to not be the only GP and to not have – to step down from having full control and I do hope that that's what happens. There's different ways that that can happen, but I - ultimately what matters is protecting and growing your money and so we are obviously pursuing those options and although we would never do something like sell the funds as was mentioned earlier in the call without LP approval, I think that all options should be considered as well. So, to answer your question directly – all options are on the table, but if you are trying to maximize your investments then I believe the optimal solution is a group of people and one which that you would not want it to lose its institutional memory or the relationships with the companies its invested in or that there is an advantage here. Because, what I think you are suggesting is whether or not you in fact – are you suggesting a management structure that does not involve me? Is that the suggestion?

(No one said anything then there was some background talking that was too low to hear)

OK. We are continuing to consider all options, including that one and I would like to hear everybody afterwards as well who hasn't had a chance to speak. I do believe we have time for at least one more question now.

Q: Thank you. Our next question comes from Paul Wilson, a private investor – Hi Mike. A few other times you talked about a market quote from LPs and I know the markets success. I was just wondering if you guys are really talking about financial support or what you are talking about.

A: Currently, I'm talking about _____. Fortunately we do not have a shy group of people. Currently, I've had - I've received quite a few emails, maybe from as many as a third to half of you and I really appreciate that and I really appreciate that, just over the last week. And so, at the moment that I'm talking about support, I'm talking about continuing keeping those lines of communication open. I'm also talking about participation and helping us find the right structure and I'm acknowledging that as a sole, essentially sole, GP, and managing 300 to 400 relationships is untenable and positions. It's so, I realized that it may not even be a very realistic option as merging the funds, but when I suggest things like that, that's partly _____ that whatever the management team is that takes this over, if there is one, assuming it's not just me at this firm going forward as the GP, I think there still has to be some addressing of the complex issue and I think that that is a fundamental challenge that extends from day one and I'm sure there are experienced people who advised me at the time that could be a challenge down the road and I think extends that as starting the Venture fund as more as a start-up, you know, raising funds pointed at individuals and credited investors as opposed to institutional investors and dealing with it in a way that was more like a start up from the beginning. And, I think the crossroads here is that $4M may be appropriate for a start-up and $50M is more appropriate for an institutional and those are the kinds of decisions and things that I would like to see happen as much, or more, as everybody on the call.

Thank you, that's all the time we have for questions. I will turn the call back over to Mr. Rothenberg for closing comments.

Thank you. I really appreciate everybody making the time to be on this call. I know that everybody is busy and in certain time zones and it's not a particularly efficient and I know there are some people who have dialed in from around the world. I look forward to seeing everybody who can be there Monday in person, I look forward to seeing you. I would really like to ask for more comments and questions if there was not time for them to be emailed as well and to the extent that you feel strongly about suggestions, proposals, next steps, I hope to be very active on that with you and going forward I am happy to connect to more frequent communications, so thank you to everybody for making the time and I really appreciate your interest, your care and your support. Thank you again. I hope to see you Monday.

Thank you, this now concludes our teleconference.

TVR-0000954

# Exhibit G



Lauren Smiley  ( Follow )

San Francisco journalist studying humans in the Tech Age. Contributor to Backchannel, California ...

Sep 13 · 23 min read

## TROUBLE IN

# THE HOUSE OF
# ROTHENBERG



**Mike Rothenberg's VC firm was young, splashy, cutting-edge and loaded with investor cash. Now it's all come crashing down.**

*By Lauren Smiley and Jessi Hempel*

RVMC00003616

**On** **the last Monday in August,** Mike Rothenberg—millennial venture capitalist, virtual reality check-writer, unhappy title-holder of "The Valley's Party Animal"—called an emergency meeting with his investors.

More than one hundred limited partners in his venture funds showed up; they were invited to dial in by phone, but many flew in for the meeting, including his dad. Forty people crowded into the firm's offices above a pizza shop in San Francisco's SoMa district, passing the sign detailing a three-part plan to "Build Awesome Startups" and "Profit."

Rothenberg, 32, greeted them with the confidence that comes from accomplishing significant things at a young age. A sandy-haired smiler with a firm handshake, he'd rocketed to prominence on a pedigree that touched all the bases in tech. He paired an Ivy League-endorsed intelligence with a star-studded network of college friends, many of whom had already started companies worth millions. When he founded Rothenberg Ventures in 2012, he leaned on this network for both investors and companies to invest in. He set out to bolster his new firm with spectacular events: BBQs with tutu-ed ponies or luau dancers, puppy parties, luxury boxes at Warriors and Giants games, a sponsored race car, and an all-day founder-and-investor soiree that involved renting out the Giants stadium every year. To keep his culture of "awesome" —a favorite adjective—he hired scores of millennials for sometimes below-market paychecks, once doling out VR headsets instead of bonuses, and relied on his instincts, aided by his team's diligence, to get equity in companies with auspicious projections. To a degree, the strategy seemed to be working. The firm's 100-company investment portfolio includes stakes in promising companies Robinhood, SpaceX, and Revel Systems.


henberg kicks off Founder Field Day 2016. Photo Credit: Rothenberg Ventures

But by this summer, Rothenberg Ventures' culture of awesome evaporated as it apparently ran out of operating money and came under federal scrutiny. The future of the firm —and the $50 million it has under management—is now up in the air as his investors wonder if he has lost control of his business. Rothenberg's finance director quit in February. In late August, her replacement filed a lawsuit alleging that Rothenberg had asked him to charge business expenses on his

FOIA Confidential Treatment Requested

personal AmEx—and then refused to reimburse him for charges totaling $109,000. The SEC is investigating the firm, triggering an exodus of employees. In mid-August, Rothenberg put every remaining employee except his lawyer on unpaid leave. On September 12 the firm dropped Rothenberg's name from its title, replacing it with Frontier Tech Venture Capital.

Most troublesome are questions about how Rothenberg managed investors' money. Specifically, in 2015 he founded a virtual reality production company called River Studios to create virtual reality videos for the likes of Coldplay and Björk, funding it with $5 million from Rothenberg Ventures. Many investors say they did not know—nor was it disclosed in annual reports—that he was founding and funding his own business with their dollars, despite the fact that the investment was roughly 50 times the size of the seed investments the firm normally makes.

Rothenberg insists that his accounting is in order, and he has hired an outside auditing firm to help him back up this claim. As for the mismanagement, he concedes, he wasn't a very good manager. "I was overextended," he said in one of three interviews with Backchannel. "I was putting too much focus on our portfolio companies and connecting the companies with our advisors and LPs, and not enough internally. I didn't have the right controls. I didn't hire and fire well."

For all of the concerns that have been raised, Rothenberg kept his investor meeting to just 30 minutes, and did not invite people listening by phone to ask questions. He sketched out a plan for how he hoped to address the turmoil. "We have a portfolio we're proud of, and there's a better future," he says that he told them. He also offered the rankled investors a VR demo if they were interested, a moment one person present described as "surreal"

FOIA Confidential Treatment Requested

RVMC00003618

—"like you're in a divorce court and they're like, we should get a big family picture."



Left: River Studios team gives VR demos at SXSW 2016 Frontier Tech Ranch (hosted by Rothenberg Ventures). Right: A person immersed in VR. Credit: Rothenberg Ventures

Rothenberg's investors, many of them shaken by the events in August, are weighing their next moves, as is he. To understand how he rose to fame as a prominent backer of virtual reality startups before becoming mired in allegations of fraud and mismanagement, Backchannel interviewed more than two dozen former employees, limited partners, portfolio company CEOs, and other people who knew and worked with Rothenberg.

The story of how Rothenberg built, nearly destroyed, and now hopes to save the startup that, until recently, bore his name is a morality tale for this generation of Silicon Valley's investors and entrepreneurs. Money remains cheap. Founding a company has become the stuff of entrepreneurial myth in which everyone ends up a billionaire. And the very gifts that enabled Rothenberg to start his fund and carve out a name for himself in the crowded valley venture scene—his youth, his Stanford and Harvard degrees, and his dense social network and splashy events—may have set the course for his fiasco.

The question before Rothenberg now is whether he can restore the faith of his investors—or whether he will botch his chance to make things right, leaving

RVMC00003619

him to stare at the company's former logo he had inscribed in his home
bathroom's tile.

<p align="center">⬩⬩⬩⬩⬩⬩⬩⬩⬩⬩⬩⬩ ⨯ ⬩⬩⬩⬩⬩⬩⬩⬩⬩⬩⬩⬩<br>⨯ ⨯</p>

**A** **picture in a recent** *Fortune* shows Mark Zuckerberg at a Stanford frat
BBQ surrounded by Fritos, Budweiser cans, and a canoodling couple. It's
2006, around the time Zuck has come to Stanford to speak to aspiring
entrepreneurs. To his side sits his host, a bro of mid-aughts vintage—
peroxided tips, Lacoste polo, wraparound shades—chatting on a flip phone as
if he were mid-way through a deal.

FOIA Confidential Treatment Requested



Photo Credit: Robyn Twomey

It's Mike Rothenberg.

By the time Rothenberg hosted Zuck at Sigma Nu, he was already a master networker at Stanford—he calls that time "the foundational experience of my life." He introduced his frat brother Kevin Systrom to Zuckerberg years before Facebook acquired Systrom's Instagram for $1 billion. He headed up a lecture series of startup founders that brought not only Zuck but also Reid Hoffman and Marissa Mayer to campus—and ran a tutoring business on the side to help pay his tuition.

Rothenberg had grown up in a tight-knit Jehovah's Witness family in Georgetown, Texas, an Austin suburb best known for being one of the filming

RVMC00003621

sites for the high school football flick "Varsity Blues." He'd later tell staff that his loving-yet-strict parents—a residential real estate agent father and a mother who taught math at his high school—edited PG-13 VHS movies for him and his three siblings to watch. In high school, Rothenberg was one of 30 students invited to the 2001 Math Olympiad in Washington, DC. At Stanford, he earned the nickname (unbeknownst to him, he says) "the Machine," for his workaholic drive as much as his stiff demeanor back then.

After getting a bachelor's and master's in management science and engineering, Rothenberg consulted at Bain & Company, one of a series of finance-related jobs he held before enrolling at Harvard Business School. At Harvard, a professor noted that Rothenberg already had a 10-year record of identifying talent—50 of his friends had companies of their own worth $50 to $100 million each, Rothenberg says. So, the summer before his final year of business school, Rothenberg couch-surfed across the country, recruiting 14 limited partners from among his network of professors, family, and friends to invest a total of $5 million in his first fund. At summer's end, Rothenberg says the only money he had was the fund money. He couldn't afford a trademark, he said in a speech he'd later give at Stanford, but found out he could name the company after himself for free.

**AT STANFORD, ROTHENBERG EARNED THE NICKNAME "THE MACHINE," FOR HIS WORKAHOLIC DRIVE AS MUCH AS HIS STIFF DEMEANOR BACK THEN.**

Upon graduation in 2013, Rothenberg opened his San Francisco office, determined to make Silicon Valley believe in him as a late 20-something head of a venture capital firm: not just a young imitation of the mature firms along Sand Hill Road, but something he considered different. In a Harvard Business School case study about his firm, he explained it this way: "What if you could combine the service-model approach of Andreessen Horowitz, and the founder-first community building offline and online approach of First Round Capital, with the processing power and reach of Silicon Valley Angels, and the discretion of Floodgate and the judgment of Sequoia? No one else can make the claim that they are even building those pieces. That's what we're doing."

RVMC00003622

A critical component of this model, it turned out, was swagger. That summer, he invited his early staffers to have an office "Mad Men Day." Members of his staff donned their '60s finest, and gathered to reenact a cast picture from the show, one of Rothenberg's favorites. In the resulting photo, Rothenberg was no longer the unnamed dude to the side of Mark Zuckerberg.

He'd moved to the center of the frame, posing, naturally, as Don Draper.

**In** the firm's early days of 2013 and early 2014, staffers saw Rothenberg as an earnest and boot-strapping leader. For a period before getting its Folsom Street HQ, the team worked out of Rothenberg's new three-bedroom live-work condo, which he shared with colleagues.

To secure more operating capital for a firm just getting on its feet with a relatively small first fund, Rothenberg decided on an unusual measure: he would take a one-time 17.75 percent management fee upfront, instead of the industry's standard of a two percent annual fee over a typical 10-year fund. This gave him the capital to get started, but not the annual revenue that would allow him to sustain his operations—locking him into the time-consuming process of raising money for a new fund every year he has been in business. (The management fees have descended with each fund to land at two percent in the 2016 fund.)

RVMC00003623

Founders appreciated that Rothenberg—the chief (and only) investment officer—liked to act fast. Kegan Schouwenburg cold-called Rothenberg to invest in her New York-based startup SOLS, a 3D printer of custom shoe insoles. One 30-minute phone conversation and an hour-long meetup later, she had $100,000. "It's so much work to go from the initial stage of nothing to something, and to have someone who was like, 'I'm not going to waste your time, I'll make a decision,'" was crucial, she says.

By 2014, Rothenberg had trained the firm's energy on virtual reality and other emerging areas he calls "frontier technologies." It was a strategic decision. "Early-stage venture capital is not a good business; the returns are close to zero," he says now, looking back. "If you're going to beat the market, you have to be different. Did I have more experience than others? No. Did I have more money? No. Do I have a bigger network? No. So I had to choose a different group of companies. That's why I chose frontier technologies." The firm launched an accelerator called River: companies would receive a $100,000 investment, workspace in Rothenberg Ventures' 8,000-square-foot headquarters, and the opportunity to get mentored by industry experts, all culminating in a swank demo day.

Earlier that year, Rothenberg had also held his first Founder Field Day—renting out AT&T park so founders and VCs could hit balls from home plate while drones zoomed overhead in a day of keynotes and networking, race car rides through Soma, and a private concert that evening at the Fillmore by Third Eye Blind. It was an audacious event, later parodied by HBO's *Silicon Valley*, intended to drum up attention, networking, and investments. Rothenberg says he never got to hit a baseball because he was so busy doing business. And he stresses that all the costs were covered by sponsors that contributed around $25,000 each, give or take.



# MILLENNIALS DON'T STAY IN A JOB FOR MORE THAN LIKE 18 MONTHS OR SOMETHING," SAID ROTHENBERG.

FOIA Confidential Treatment Requested

As Rothenberg's public stature grew, some of his earliest employees, who recall their early months with him fondly, became restless. They describe him as a demanding boss who needed to sign off on all decisions including investments, yet rarely made himself available to do so. He had set a goal of hosting 100 networking events a year. By the end of the year, much of the core group that had produced Founder Field Day had left.

Rothenberg chalks up the staff departures to his inability to compete on salary with bigger companies, and his employees' age: "It is somewhat well-known that millennials don't stay in a job for more than like 18 months or something," he says. He sees himself as giving them a first toehold in venture capital. "If you were to ask them whether they would have gotten so far so fast without Rothenberg Ventures, I would hope they would answer you truthfully."

**R**othenberg quickly made a name for his firm in the field, investing in more VR companies than any other outfit. But he wanted to do even more. So, in May 2015, Rothenberg announced River Studios, a virtual reality production house that would film content in the new medium. From the start, he says, the point of River Studios was to provide support for the portfolio VR companies. "The studio model of building content was symbiotic with the accelerator. If a company asks, 'What's the best VR player for us to have?'" he says, referring to the headset viewer, "I have no idea, but we have the people here who could build it for us. That's how the idea was born."

The $5 million that went into launching River Studios came from Rothenberg Ventures' second and third funds. It was a significant figure for a firm that on average invested $100,000 per company. (The combined total of Rothenberg Ventures' second and third funds was $36.32 million according to SEC filings, so $5 million represented 14 percent of the total capital raised.) Yet no mention of the investment was made in the 2014 or 2015 annual reports shared with investors that listed the firm's portfolio companies. One LP says that in a phone call with investors in August after Rothenberg had told them about the River Studios investment in an email, one grilled him on why River Studios wasn't in the annual reports, and says Rothenberg responded that he was still getting around to the disclosures. Rothenberg's employees also say they were kept in the dark. Two former employees tell Backchannel that when they asked Rothenberg how River Studios was funded, he told them only that

RVMC00003625

there were outside investors. Another recalls Rothenberg saying he paid for it himself. Rothenberg disputes this, saying that all investors had been made aware, adding, "We've been very public about it."



River Studio's sponsored race car. Photo Credit: Lauren Smiley

In order to build up River—"the brand for everything awesome," as Rothenberg put it in his Stanford speech—he hired several people to help him land corporate sponsorships. One such person was Collete Davis, a pro race car driver who came on in February 2015, initially to land sponsorships. Soon after, her role flipped; Rothenberg made her the driver of a River Studios-sponsored race car, which River Studios transported around the country to

RVMC00003626

Global Rallycross meets. Rothenberg Ventures employees would sometimes fly to the races to give VR demos. "Both founders and investors like being at race tracks and being in race cars," Rothenberg told Stanford students, "and it helps us be awesome and engage our community." (Rothenberg directed Backchannel to interview Davis, but she didn't respond to emails.)

Several former Rothenberg Ventures and River Studios employees now say they didn't understand why River Studios was green-lit. One former employee noted that River Studios also competed for clients and market share with at least two of Rothenberg Ventures' portfolio companies that were already in VR film production, Triggar and vantage.tv. (Triggar didn't respond to requests for comment, and vantage.tv's CEO Juan Santillan wrote in an email, "I don't agree with many of the things that were going on at RV…" but added, "RV['s] extended team has been great to us.")

What's more, Rothenberg had no experience building or running a content studio, and the early days of River Studios were marked by a series of rookie mishaps. River Studios' first contract was a project with Birchbox, a subscription home delivery service for lifestyle goods. The studio would produce VR content for the studio's own app and give away a VR-viewing cardboard phone holder in Birchbox boxes. Yet the team lacked competency on the new equipment, spending weeks filming only to end up with useless footage, says one person on the project. They had to ask Triggar to bail them out and complete the project. Rothenberg has a different take on this, saying that River Studios helped Triggar because it created work for the company. In general, Rothenberg wanted to work with big names over big paychecks, says one former River Studios worker: "We'd pick the sexier projects over the paying ones."

---

 **FrontierTechVentures**      Follow
@TheFrontierVC

eally proud of @rivervr for their piece
nouncing the new @SacramentoKings
seys! A great day for VR!
chcrunch.com/2016/06/15/the…

:34 AM - 15 Jun 2016

Though River has produced VR content for an impressive lineup of gigs— Coldplay, Björk, the Denver Broncos, and the Sacramento Kings—it's not clear how the River Studios business is doing. River paid for a team of engineers in Canada, and a production team in Los Angeles. In an August 23 email to investors warming up to the emergency meeting, Rothenberg wrote that he'd tried to open a Series A fundraising round for River Studios specifically—but said the bad press had slowed it down. He defended moving the fund's money

into his production company: "I invested $5m into River Studios on your behalf. I believe River Studios still has the potential to be the largest driver of returns for you."

And while he told them he was amenable to stepping aside from management of the firm, Rothenberg was gunning to head River Studios. "I am willing to lead this charge to make sure the River Studios investment is protected for the LPs, and ultimately the largest driver for success. The alternative is to avoid action and allow this investment to disappear unnecessarily," he wrote.

> " "I INVESTED $5M IN RIVER STUDIOS ON YOUR BEHALF. I BELIEVE RIVER STUDIOS STILL HAS THE POTENTIAL TO BE THE LARGEST DRIVER OF RETURNS FOR YOU," ROTHENBERG WROTE TO HIS INVESTORS.

Rothenberg said in his email that River received a buyout offer for $94 million from a company earlier this year, but it was contingent on him being hired on full time, which was a nonstarter for him. A former employee with knowledge of the company's finances said that more recently, River Studios has not been profitable, and that when he left the company, the studio was at least two months behind on the $29,000 rent it pays for its office.

It was Rothenberg's turn as neophyte producer, with his new access to celebrities and the world of show business, that caused him to lose his way, according to many people who worked or invested with him. "The turning point," one former staffer says, "was him getting hooked up with the fucking Hollywood people."

Just this summer, Rothenberg suggested that River Studios start an official River Club to invite investors, athletes, musicians, and celebrities to company

RVMC00003628

seats at iconic stadiums and Rothenberg events. (It didn't come to pass.) The idea seemed to many like the crystallization of what he'd already been doing informally. In addition to traveling to some of Davis's car races, Rothenberg kept a growing calendar of events that his employees sometimes joined, but if not, watched on the social media streams of their often-absent boss: the Golden Globes, Sundance, Warriors, Giants and Stanford games from a luxury box. At Gossip Girl star Chace Crawford's 30th birthday party, River Studios gave away 10 Samsung Gear VR headsets with accompanying phones (around $800 a pop). It was all enough to get Rothenberg labeled "The Valley's Party Animal" in a 2015 Bloomberg story.

"You're out spending this money trying to impress all these people," a former employee said of his boss. "We could have gotten investments without all this shit."

But what looked to annoyed employees and outsiders as Rothenberg wanting the totems of a successful #FounderLife, Rothenberg defends as building community and attention around a nascent industry, and marketing that would eventually have a positive return on investment. As Rothenberg tells it, at the 2014 Founder Field Day, SF-based online recruiter 1-Page met Rick Marini, a Rothenberg Ventures LP; later that year, 1-Page acquired Marini's startup, BranchOut. The Golden Globes tickets were provided by *InStyle Magazine* so River Studios could shoot a VR piece there. Rothenberg wrote to investors that they'd experimented with a private company car to see if it would be less expensive than everyone hailing Ubers.

Not all LPs see it that way: "He definitely was very enthused and excited about the fact he could do a 360 degree video shoot with Coldplay, but it was a big distraction to what limited partners would want you to do: find big companies, and not build VR content," said one investor.

RVMC00003629

Rothenberg was getting overextended. While staffers say he was almost always tardy to meetings, other times he'd simply flake. For example, he was supposed to go with an intern to pitch Coldplay's reps, but Rothenberg never arrived—leaving the college student to step up and conduct the meeting herself.

But the biggest issues were always over money. The firm had several moneymaking strategies apart from the management fees in the funds: Rothenberg says it landed hundreds of thousands of dollars in sponsorship and partnership revenue annually. In an unusual move, Rothenberg sold a "small percent of shares" of Rothenberg Ventures' future profit in the funds— or "carry" in venture lingo—to finance its operations. The firm rented out desks in the coworking space of its Folsom Street building. And ex-staffers say Rothenberg was relentless in negotiating deals on anything from TVs to office accoutrement—Rothenberg told his investors in an email that he got his Super Bowl suite the week of the event for 80 percent off, and then filled it with Warriors players and celebrities. For a period in early 2016, Rothenberg created a policy that all the staff's expenses must be pre-approved by him via text: from a $3.15 gas reimbursement to run an errand or a $5 Uber to a $25 keyboard. ("We were treated like children," says one employee who was there at the time.)

Meanwhile, the fundraising for the funds themselves often fell short of goals stated on SEC filings. In 2015, Rothenberg had a goal of raising $60 million. By May of that year, he'd only raised $5 million. By July, Rothenberg called a "War Room." He says it wasn't distinct from other times the staff buckled down to reach a goal. Yet according to two staffers there, this one had a different flavor—they had the sense they might lose their jobs if it didn't succeed. Rothenberg had his assistants fill the conference room with fake pirate swords, coins, and a gong to bong each time they brought in money. For 15 days, Rothenberg called on the staff to stay after a regular workday to put in a second shift until 10:30 at night, some staying as late as 1:00 am. Staffers who didn't know how to fundraise instead hit up their friends to like the firm's Facebook page, according to three people present, since they said Rothenberg was irked they

RVMC00003630

had fewer social media followers than other firms. "I'd be embarrassed to tell my friends about it," says one person put to the task. Come fall, Rothenberg made three separate trips to fundraise, among other things, in Beijing, Shenzhen, Shanghai, and Hong Kong. Those efforts fell short as well. By May 2016, they'd accumulated $24.6 million for the 2015 fund—enough to keep people on staff, but far below the original $60 million goal.

Rothenberg admits in his interview with Backchannel that by then he was having trouble keeping all the plates spinning: "We'd gotten well into more than 100 active portfolio companies and I'm the sole GP [general partner]. I've been overstretched for more than a couple months." Yet come late spring of this year, Rothenberg had registered even more offshoots of River in the state of California, including River Enterprises, which was meant to salvage failing startups to return some money to investors. It kept growing: in June, the company announced they had rented space at The Culver Studios, the iconic production facility where "Citizen Kane" and "Gone With the Wind" were filmed, and paperwork was filed for yet another wing of River, the River Institute, a purported think tank. At a July all-office meeting, many members of the San Francisco staff were stunned to see how big the ranks of RV and River had become as some 80 people entered the headquarters who worked in some capacity for Rothenberg, either as contractors or employees.

RVMC00003631

## "I'VE BEEN OVERSTRETCHED FOR MORE THAN A COUPLE MONTHS," SAID ROTHENBERG

Operating capital was short. According to a lawsuit filed in San Francisco Superior Court, a new chief financial officer started in April—David Haase— who had overlapped with Rothenberg at Stanford. In May, Rothenberg asked him to open an American Express card in Haase's name for business expenses, which would be relayed to him by one of Rothenberg's three executive assistants. Rothenberg paid him back for a $140,000 bill. Haase says he then racked up another $109,352 in business expenses—and he's still waiting for the payment. Haase claims that the expenses for Rothenberg Ventures and River Ventures were commingled, and that Rothenberg "treated such accounts as personal accounts, to such an extent that such business entities were in fact his alter ego." (Rothenberg wouldn't speak to the specifics of the suit but responded, "Rothenberg has always reimbursed our staff for legitimate, approved business expenses.")

Haase isn't the only one complaining about money owed to him. In August and September, three former employees filed unpaid wage claims with the California Division of Labor Standards Enforcement against various Rothenberg business entities. The highest claim for more than $70,000 was filed by Ewan Johnson, the former creative director of River Studios, asking for unpaid wages since March, as well as unpaid vacation days, and unpaid business expenses. (All three employees have been assigned a conference date in the upcoming months overseen by a deputy labor commissioner. One says that he has since received a wire transfer of his final check amount.)

While Rothenberg had been able to wave off specifics about financials to staff, his wall of silence started crumbling after a whistleblower complaint was made to the SEC in July. (The SEC does not comment on investigations.) The agency sent a request for documentation to the firm, according to an email Rothenberg sent to investors. Rothenberg had always held financial details away from his staffers. But in July, Rothenberg began to open up to top employees, including revealing how River Studios had been paid for, and the exodus began. "A lot of people left because they felt he lied to them," says a

RVMC00003632

former top-level employee who had knowledge of the company's financial situation. "Other executives felt it was inappropriate, and the third group left because he couldn't pay them."

TechCrunch wrote about the exodus and the SEC complaint, and Rothenberg Ventures' website stopped working soon after. Rothenberg put all staff on "unpaid leave." A week later, a simpler website was back up in its place—featuring no employees, but hosting an application for River's fall 2016 accelerator and a video produced two years earlier, with soaring music and endorsements from founders the firm had backed, with one saying, "Failure's not failure; it's just thinking about it a different way."

**W**ith the unsavory press, Rothenberg's emails to his investors took on the us-versus-them tone of a bunker news reel: "We are in the unfortunate position of having people who are trying to take us down, and they're doing a good job. Juicy gossip sells clicks, and this is your update letter #2 this week," he wrote in an August 23 email. He blamed many of his woes on all the shit-talking employees and the press that talked to them: "I have not taken adequate time to offboard employees, leaving open the possibility for disgruntled employees and then brutal press attacks." Remarking on the SEC inquiry, he told investors: "It is in the best interest of you as LPs to let the SEC know that this is an internal accounting issue that we are handling so that we can take the time necessary to sort everything out."

Rothenberg Ventures' drama has had little impact on the companies in its portfolio—they received their investments upfront. Rothenberg's mismanagement has hurt the company he built, his employees, and himself for sure.

The effect on the limited partners is still hanging in the balance. They are anxious to find out what happens next. Some investors say they are pleased with the information they have received about how their investments were doing—Rothenberg approximated the fund's successes in his emails: "Rothenberg Ventures has invested $33.2m in over 100 startups with current market value of $56.0m, based on our internal data tracking system, excluding the Fund's River Studios investments." Rothenberg went on to tell

investors that $1.6 million had been distributed to them from successful exits already.

One limited partner reported feeling confident Rothenberg would sort things out. "I went into this knowing that VC funds over past decades typically don't return that much to investors," said the investor, who was made available to Backchannel through Rothenberg, and who was not authorized by his employer to speak on the record. "I wasn't expecting five-to-ten times guaranteed returns. I was expecting something better than what the average VC would do out there."

But others grow more concerned each day that they wait for the firm's future management structure to be determined. Says one investor, "LPs are getting very antsy. I'm getting very antsy." And they question how Rothenberg spent their money—specifically the $5 million invested in River Studios, apparently without explicitly telling them.

Even if there was no wrongdoing, it's clear Rothenberg's strengths don't lie in management. All of the limited partners with whom we spoke said they'd rather see the day-to-day operations of the firm handed over to someone else.



The Most Active AR/VR Investors



**Kris Kolo** *
@kriskolodziej

Follow

ost active VR AR #venturecapital
tartups @rothventures @BoostVC
intelcapital @techstars
QualcommVenture

:9 PM - 10 Aug 2016

25     43

RVMC00003634



Left: River Studios Team creating VR content during Founder Field Day 2016. Photo Credit: Rothenberg Ventures. Center, Right: Equipment stored at Rothenberg Ventures offices.

And then there's Rothenberg—framing all the tumult as a typical hiccup in startup life, offering VR demos at his emergency LP meeting, signing off the email in which he tells staffers they're getting put on unpaid leave with "Thank you again!" At one point in an interview with Backchannel, he quoted one of the valley's more successful venture capitalists: "Mike Maples once said that he had never seen a successful startup without a near-death experience," he said. "Expect that and then continue to push through. And listen to advisors and supporters and keep giving it your all."

At 6:30 on a recent Wednesday night, Rothenberg offered to give one of Backchannel's reporters, Lauren Smiley, a tour of his Folsom Street office. I rang the doorbell, but there was no answer. An inbox check yielded an email just then from Rothenberg's crisis communications flack: "Mike just called me and is slammed with some deadlines. He'd love to show you the office but overcommitted himself." Soon after, an executive assistant I recognized from LinkedIn answered the door, and asked if I had an appointment. She showed me upstairs to the lobby. Rothenberg came out briefly in office casual to politely say he was on a call with an investor, and retreated to his corner office. The assistant gave me a quick tour of their compact main office space —there was the gong in the conference room the ex-staffers had told me about, there were Polaroids of the team pinned up on a tackboard. All the work stations at three desk islands seemed to be empty except for the

RVMC00003635

assistant's and one standing desk, where another young woman was working quietly.

Waiting for Rothenberg to get off the phone, the assistant handed me a HTC Vive VR headset, and cued a video by Wevr, one of the fund's portfolio companies. Fitting it over my head, I found myself undersea in an underwater cage, surrounded by fish. I turned my head slightly and…jumped. A blue whale's eye looked right at me. Its gigantic body stretched out to my left as I looked to the side—giving a real sense of its intimidating, hulking mass. As it turned to swim away, its gigantic tail swooshed near enough to pique a jolt of adrenaline. I realized it was the first time I actually had enjoyed VR.

I took the headset off, and was back in a nearly abandoned Rothenberg office, where I told the assistant I'd show myself out. Rothenberg remained behind his office door, talking away.

⁂

*Creative Art Direction:* Redindhi Studio

*Portrait Hero Image of Mark Rothenberg by:* Peter Earl McCollough

RVMC00003636

FOIA Confidential Treatment Requested

RVMC00003637

# Exhibit H

**From:** Investor Relations <investors@frontier.tech>
**Date:** Tuesday, September 13, 2016 at 7:54 AM
**To:** "investors@frontier.tech" <investors@frontier.tech>
**Cc:** "counsel@frontier.tech" <counsel@frontier.tech>, "eric.poer@fticonsulting.com"
<eric.poer@fticonsulting.com>, "martin@rothenbergventures.com"
<martin@rothenbergventures.com>
**Subject:** Frontier Tech Ventures (Rothenberg Ventures) - LP Update Letter (9/13/16)

Dear Frontier Tech Limited Partners,

What follows is an update of the latest LP meeting, an update on our process and our new name, and information on how you can help. Many of you have reached out individually over the last several weeks, and we would like to respond to every inquiry. In the meantime, time constraints make general responses like this more practical.

Our first priority continues to be to protect investors. We have made good investments and those are performing for you.

**LP Meeting Recap**

Recently we assembled more than 100 investors for a meeting and simultaneous conference call on Monday, Aug. 29th. Key points covered were:

1.  Financing the companies in a much leaner, more focused organization
2.  Restructuring the management team
3.  Developing additional strategic resources to further facilitate this process
4.  Creating advisory boards for each annual fund to address matters unique to each fund

**Process Updates**

Today we announce the firm's new name "Frontier Tech Ventures" (Frontier Technology Venture Capital LLC), previously "Rothenberg Ventures Management Company". I believe the current transition is an appropriate time for a rebranding to reflect the firm's focus and thought leadership on Frontier Technology. Frontier Technology is a term and concept we helped develop and invest in. For simplicity, the individual funds will remain as named "i.e. Rothenberg Ventures 2016 Fund".

We acknowledge the unfortunate press coverage over the past few weeks as well as employee departures. We continue to focus on the fund instead of reacting to the press. Like other small venture capital firms, Frontier Tech Ventures now has a lean model that can relying primarily on contractors as-needed for the time being.

Independent accountant FTI is now analyzing our financials and advising on best practices. CFO Dave Haase, who oversaw financial administration and reporting at the firm, is no longer with the company. We continue to cooperate with the SEC inquiry as well.

**How You Can Help**

**1. LP Advisory Board.** We are creating LP Advisory Boards for each fund. Please let us know if you would like to be on an Advisory Board or nominate an LP to sit on an Advisory Board for a fund you are invested in.

**2. Experienced Chairman.** Please let us know if you would like to nominate an experienced chairman of the board - including potentially an LP - to help us with the current transition.

**3. Working capital.** If you are interested in joining the GP or learning about other ways to invest in or support the transition please let us know.

Thank you for your continued support and patience.

Sincerely,
Mike Rothenberg

Founder & CEO
Frontier Tech Ventures

# Exhibit I

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   SECURITIES AND EXCHANGE COMMISSION,)
                                       )
6          Plaintiff,                  )
                                       ) Case No.
7      vs.                             ) 3:18-cv-05080-JST-DMR
                                       )
8   MICHAEL B. ROTHENBERG and          )
    ROTHENBERG VENTURES LLC (f/k/a      )
9   FRONTIER TECHNOLOGY VENTURE        )
    CAPITAL, LLC and ROTHENBERG        )
10  VENTURES MANAGEMENT COMPANY LLC),  )
                                       )
11         Defendants.                 )
    _____)

12

13

14

15

16          DEPOSITION OF MICHAEL B. ROTHENBERG

17              San Francisco, California

18              Tuesday, May 7, 2019

19

20

21

22

23

    Reported by:
24  JOANNE M. FARRELL, RPR, CRR
    CSR Nos. 4838(CA), 506(HI), 507(NM)
25  Job No. 190507VL

                                                    1

1    there for them to follow.

2         Q.   If an expense was above a certain threshold, an

3    expense incurred by another employee, gossiping be the

4    person to authorize the payment of that expense?

5         A.   Not a hundred percent of the time.

6         Q.   Were there, like, guidelines or procedures in

7    place?

8         A.   Yes.

9         Q.   Okay.  Could you tell us what those were?

10        A.   To the extent I, you know, can recall, yes.

11             So it depended on -- so there could be budgets

12   that would be preapproved if things operate in a

13   certain -- so Tommy Leep, for example, might have a

14   budget that he could use for an event.  And if he stayed

15   within that budget he would approve all of the

16   sub-expenses.  So he was the -- you know, to the best of

17   my recollection, he was the head of the SF office.  He

18   was also the -- you know, as part of that role there was

19   some HR and some kind of events -- events

20   responsibilities, and so he would approve the -- once

21   there was an overall budget, he would approve a lot of

22   the sub-expenses, for example.

23        Q.   So he would be the one that would approve

24   budgets for particular events?

25        A.   Once there was a budget in place for an event,

86

1  then, you know, he could -- he could operate within that

2  budget to approve all the subitems.

3      Q.   Okay.  I think I'm following you there.  Who

4  would approve that initial budget?

5      A.   So typically in that case he would make a

6  proposal, and then that would require my sign-off if --

7  to have it in place.  So he would initiate and advocate

8  for a proposal, and then I would sign off.

9          In fact, you know, in 2014, I think around the

10 time he joined, we initially called that -- called the

11 events that Tommy was, you know, leading for the

12 start-ups and for the -- you know, connecting the

13 investors and the portfolio companies is one of the

14 primary ways that we helped the companies grow

15 disproportionately, because what -- this is a quick

16 tangent.  Because what the start-ups need more than

17 almost anything else, you know, besides capital is, you

18 know, a valuable network.  You need to meet the right

19 people to help you grow your businesses.

20         Tommy, one of his -- one of the names he called

21 himself was "chief connector," and so he believed, and I

22 do too, that events can be an efficient way to connect

23 these types of people.

24         And so the initial name we had for that strategy

25 in 2014, for example, was "jet stream."  It's a name that

87

1   we've seen since.  And Tommy would have -- you know,

2   would propose budgets, and I would sign off on them.

3        Q.  Would anyone other than you be the employee at

4   RVMC that would sign off on such budgets?

5        A.  So if it was a, you know, a decision about, you

6   know, financial software at that time, it would be Tom

7   Leep, and he would make a decision on that.  So depending

8   on people's roles and responsibilities, they would

9   have -- they would have an ability to do that.

10           I think, for example, for a lot of 2015, maybe

11   the entire 2015, Neil Devani was the general counsel.  So

12   any time we were talking to, for example, Cooley and

13   Orrick, he would negotiate directly with them to

14   determine budgets.  So that would be Neil Devani would

15   help set the legal budget for a particular fund formation

16   exercise or whatever we were engaging them for.

17        Q.  If it was business related gossiping be the

18   person authorizing the budget?

19        A.  Once again, it still depended on whose

20   responsibility it was to do a particular activity.  But

21   at a high level I would, you know, always be involved.  I

22   can't remember one time that Neil said this is the amount

23   of money we need for Cooley or Orrick that I said no.

24   So -- but I was certainly involved in the decision.

25        Q.  So we kind of have gone down a path here that

88

1      Q.   Okay.  Well, I'll tell you, just to make the

2  question easier, our position is the management company

3  was allowed to take a certain amount of money, and it

4  took more than it was entitled to take and that money was

5  never paid back to investors.  And that's why we are

6  going through an accounting and that's why we have an

7  expert witness that will show you the math on all that.

8           So where I was headed with all this is who was

9  responsible at RVMC when you were employed there for

10 tracking how much money had been taken from the funds and

11 how much the management company was entitled to earn as

12 management fees and administrative expenses?

13     A.   Part of the challenge with that premise again is

14 that you -- from everything I've seen, the government

15 does not actually even take into consideration how we did

16 characterize things.  So it's pretty hard to even follow

17 your premise because, you know, most of it looks like a

18 guess, whereas in terms of very basic questions like

19 what's the amount -- like what's the fund size, what's

20 the amount of money that we are supposed to invest, and

21 how much did we invest, these are all very clear-cut.

22          And where it gets -- where it gets frustrating

23 is when, after the fact, the government wants to ascribe

24 different types of meaning to transactions that were

25 made, because it's hard for me to engage on that premise.

103

1          MR. ILLOVSKY:  Okay.  So I don't want to

2    interrupt, but when the question starts with "who," if

3    you're going to testify, the answer involves a name.  The

4    SEC's question, if I understand it, is you're taking

5    people's money, you got an agreement, who's tracking how

6    much money versus how much is entitled under the

7    agreement.  That was a who.  If you're going to testify,

8    give a who.  Or assert your -- sorry.

9          THE WITNESS:  Okay.

10   BY MR. ATWOOD:

11      Q.  I appreciate that.  It was a who question, so if

12   you know the answer to that and if you're willing to

13   testify on that, we'd love to hear the answer.

14      A.  So is the question about -- okay.

15         MR. ILLOVSKY:  The court reporter can read the

16   question back to you if you want.

17         THE WITNESS:  That would be helpful.

18         MR. ILLOVSKY:  It was who kept track of them.

19         THE COURT REPORTER:  "Question:  So where I

20         was headed with all this is who was

21         responsible at RVMC when you were employed there

22         for tracking how much money had been taken from

23         the funds and how much the management company

24         was entitled to earn as management fees and

25         administrative expenses?"

                                                          104

1            THE WITNESS:  So the final sign-off that I gave

2    in 2018 was from me.  There were what I would call, you

3    know, interim tracking to try to keep accounting up to

4    the extent that, you know, we could but without big

5    interferences.  Like, for example, one person asserted

6    that -- the person who was not at the government asserted

7    that the government, something to the extent the

8    government wanted everyone to leave RV, something like

9    that was spread as a rumor, and I lost almost everybody,

10   including people who had key records and things like

11   that, in August of 2016.

12            So I was not able to -- personally I was not

13   even in a position to sign off on the stated financials

14   without even having my infrastructure dismantled, and it

15   took a little while.

16            But by 2018 there was a -- there was a -- you

17   know, a place we got to with the accounting with the

18   funds that was the basis of the LP updates that I

19   provided before, you know, right at the end of my time as

20   the manager.  So that's a -- you know, there was an

21   interrupted period where, you know, I think there was

22   sort of just a lot to handle all at once.  But by 2018

23   that was me.

24   BY MR. ATWOOD:

25        Q.  Okay.  And I appreciate that.

                                                         105

1        What about in 2015, who was responsible at that

2   stage?

3        A.   I think we filed a tax extension, I think; and

4   so we were planning to file our 2015 taxes by, I think

5   that's October of 2016.  And so the interruption I'm

6   talking about of having a lot of -- you know, people even

7   deleted -- wiped computers.  So that interruption

8   happened before we got to that filing.  So the

9   interruption started with the year 2015, 2016, so on.

10        MR. ILLOVSKY:  That was a who question.

11   BY MR. ATWOOD:

12        Q.   Yeah.  So I'm asking who at RVMC in 2015 was

13   responsible for tracking how much capital had been raised

14   and how much the management company was entitled to earn

15   as management fees and administrative expenses?

16        A.   The primary tracking was Tom Leep in 2015.

17        Once again, he had to go through a process that

18   involved legal before getting final sign-off before it

19   would go to the, you know, accountants for final K-1s and

20   tax forms.  That didn't -- Tom Leep did not stick around

21   for that process, so even Tom Leep didn't finish the 2015

22   process.

23        Q.   So a fact in our complaint that's not in dispute

24   in this case is that you were told at some point that the

25   management company had taken more from the Rothenberg

106

1  funds than it was entitled to earn.

2       What did you do after learning that?

3       A.  It was immediately brought to that person's

4  attention, I believe by counsel, that -- my recollection

5  is that counsel informed that person at that time that

6  the -- that the 2015 fund, if we are talking about 2015,

7  was four -- there was a provision put in place, I believe

8  by Cooley, where at the very beginning of the investor

9  packet, maybe in the first page or two, the investors

10  could elect, they had to actually check a box I think --

11  it was something like that.  They had to do something

12  proactive.  This is my understanding of what Cooley put

13  in place -- where an investor could elect to prepay all

14  their lifetime of fees.  And so the question was, you

15  know, which investors did that.

16       And to the extent that investors did that, that

17  amount of money could be taken by the management company,

18  you know, at any time.  And so if no one had checked that

19  box, if no one elected to do that, then, you know, there

20  would be some kind of payment on a schedule, is my

21  understanding, and for any investor that checked that

22  box, it could be taken up front.

23       So I believe that's how the bank read it.  I

24  believe that's how -- well, everybody read that.  So I

25  think that the subsequent question from that kind of a

107

1  thing was how many people checked that box, and then

2  doing that calculation, which I believe was then done.

3       Q.  Okay.  Who was the counsel you're referring to?

4  What is the person's name?

5       A.  Well, Cooley is a firm, and I don't know the

6  individuals that necessarily drafted the documents and

7  did each thing.

8       Q.  And who was the person you're referring to that

9  they were -- that Cooley was speaking with at RVMC?

10      A.  This is -- this goes into specifics.  I don't

11  remember the actual, like, who talked to who, but I

12  remember there was consensus.

13      Q.  I understand what you're saying about the

14  election to pay off fees up front or not.

15           What about the issue of taking more fees than

16  management company would have been allowed to take over

17  the lifetime of a fund?

18      A.  My recollection is that that was determined to

19  not have happened.

20      Q.  And who was responsible for figuring that out at

21  RVMC?

22      A.  So there was -- in terms of actually giving, you

23  know, accounting for numbers, it would still be the

24  finance department would account for it.  The legal

25  department would read the contracts to weigh in on how

108

1  many people had checked the box.

2       Q.  And who has worked in the finance department

3  over the years at RVMC?

4       A.  Well, I'll go back to the Fifth on that one

5  because I did answer that one with the -- you know, I'll

6  refer you to Exhibit 5 for that question again.

7       Q.  During the time you worked at RVMC, were you the

8  ultimate executive in charge of the business operations?

9       A.  I'll refer you to Exhibit 5 again.

10      Q.  Did the finance department report to you at

11 RVMC?

12      A.  I'll refer you to Exhibit 5.

13      Q.  Okay.  Let's go off the record.

14               (Discussion off the record.)

15          (Luncheon recess was taken at 12:42 p.m.)

16 AFTERNOON SESSION

17 1:28 p.m.

18               (Exhibit 20 was marked for identification by the

19               court reporter and is attached hereto.)

20          MR. ATWOOD:  We are back on the record at

21 1:28 p.m.

22 BY MR. ATWOOD:

23      Q.  Mr. Rothenberg, you've been handed what's been

24 marked as Exhibit 20.  If you could take a look at that

25 and let me know if you recognize it.

                                                      109

1    it seems unlikely to me that he invented it.

2        Q.   You don't have any specific recollection with

3    respect to this document?

4        A.   You asked if I provided it to Mr. Fagel.  I

5    attempted to provide him everything.

6        Q.   Okay.  Could you explain the transaction that's

7    contemplated by Exhibit 25?

8        A.   Exhibit 5.

9        Q.   If I ask you any further questions regarding

10   Exhibit 25, do you intend to assert your Fifth Amendment

11   privilege?

12       A.   Yes.

13            MR. ATWOOD:  Let's mark this as Exhibit 26,

14   please.

15            (Exhibit 26 was marked for identification by the

16            court reporter and is attached hereto.)

17   BY MR. ATWOOD:

18       Q.   Mr. Rothenberg, do you recognize Exhibit 26?

19       A.   Exhibit 5.

20       Q.   Mr. Rothenberg, I'll represent to you that

21   Exhibit 26 is a compilation of a number of agreements

22   that are titled "Warrant Purchase and Sale Agreement by

23   and between Frontier Technology Venture Capital LLC and

24   Rothenberg Ventures 2015 Fund LLC."  And I believe they

25   are all dated December 31st, 2016.

                                                        132

1              As we've previously discussed, you understand

2    Frontier Technology Venture Capital LLC to be RVMC; is

3    that correct?

4         A.  Yes, in December of 2016 it was.

5         Q.  If you could turn to the second page of

6    Exhibit 26, which ends in Bates Number 289.  This appears

7    to be a warrant purchase and sale agreement relating to

8    warrant purchased from GOCV, a portfolio company of the

9    purchaser, which is identified as Rothenberg Ventures

10   2015 Fund.

11             Do you have any recollection of this

12   transaction, Mr. Rothenberg?

13        A.  Exhibit 5.

14        Q.  Let's turn to the next page of Exhibit 26.  It

15   ends in Bates Number 290.  Under section 1(a), which is

16   titled "Sale of Warrant," there's a purchase price of

17   $130,000.

18             Mr. Rothenberg, are you aware of how that

19   purchase price came to be?

20        A.  It refers to Schedule 1 for that.

21        Q.  Okay.  Let's turn to Schedule 1.  I believe that

22   is on the page ending in Bates Number 298.

23        A.  Well, this one is not.  There isn't a Schedule 1

24   in mine.  It just has the heading.

25        Q.  Right, it has the heading of Schedule 1, and

133

1    what does it say underneath that?

2        A.   This copy you have says "To Be Completed."

3        Q.   All right.  I'll read it into the record.  It

4    says:

5             "To be completed for each warrant by

6             business/finance team (Valuation methodology and

7             calculations used by the manager to determine

8             the purchase price)."

9             Is it your understanding the purchase price,

10   that would have been based on a valuation that should

11   have been inserted here?

12       A.   I'm sure it was -- it was.  There's no -- you

13   know, this transaction would certainly have been

14   accompanied by a valuation.

15       Q.   Okay.  Let's turn to page ending in Bates

16   Number 295.

17            Is that your signature there?

18       A.   Exhibit 5.

19       Q.   I'll note there's two signature blocks, one for

20   seller, one for purchaser.  And it appears that your

21   signature is on both signature lines there.

22            Do you agree with that?

23       A.   It seems to be the same question, so Exhibit 5.

24       Q.   I'm not trying to ask the same question, but at

25   a particular point of time you signed on behalf of the

                                                        134

1  seller and purchaser, would you agree with that?

2      A.  It is the same question, so Exhibit 5.

3      Q.  Gossiping agree that this document has been

4  executed?

5      A.  Exhibit 5.

6      Q.  Okay.  So despite being signed, you feel like

7  Schedule 1 was completed at the time of execution here?

8      A.  So I'm speaking more generally when I comment to

9  that, which is that we've tracked valuations of any

10 investments that have been held by the funds really at

11 all times.  So if this is a valid document, then it has

12 corresponding valuations for those transactions.

13     Q.  Do you know why the signed copy of this

14 agreement would have a "to be completed" valuation

15 section?

16     A.  So without commenting specifically on this

17 document, most documents, you know, have drafts.  So it

18 makes sense that while you're drafting, especially the

19 lawyers, especially while they are doing that, they would

20 have to be completed.  That's pretty common, especially

21 for exhibits.

22     Q.  Let's speak specifically to this document.  I

23 don't want to talk in generalities of other documents.

24 My question is specific.

25          This one has been executed.  Are you stating

                                                      135

1   that it would have been executed without a schedule?

2       A.   No.   I think this is in the category of to the

3   extent that's the latest document you have for this, I

4   should do a search for you; and I'm willing to do that.

5       Q.   Do you have any recollection whether or not such

6   evaluation was completed by December 31st, 2016, which is

7   the date of this agreement?

8       A.   I don't think there was any time at RV where we

9   didn't have somewhat up-to-date valuations for all

10  holdings.   So I have no reason to believe that that would

11  be any different if this -- you know, if this is valid.

12      Q.   Okay.   In December of 2016, who would have been

13  the RVMC employees responsible for conducting this

14  valuation methodology and calculation reference in

15  Schedule 1?

16      A.   I mean, ultimately the manager's always

17  responsible for, you know, determining the valuation.   I

18  was the manager at this time.

19      Q.   So I just want to be clear on the record.

20  You've give some responses to my questions and you've

21  asserted your Fifth Amendment right in response to

22  others.

23      A.   No, I've been clear.   When I'm specific, I'm

24  doing the Fifth; when I'm doing general, I'm trying to

25  help you out.

                                                        136

1     Q.  And I completely agree with you.  I'm not trying

2  to say you have not been clear.

3          I just want to know if I ask you any further

4  questions regarding this transaction between Frontier

5  Technology Venture Capital LLC and Rothenberg Ventures

6  2015 Fund dated December 31st, 2016, whether you intend

7  to assert your Fifth Amendment privilege.

8     A.  Yes.  But I will be happy to follow up with you

9  too.

10    Q.  And by "follow up," you will look for a

11 valuation that would be inserted as Schedule 1 for this?

12    A.  Yes.  This is at least the second time.  I'm not

13 sure that what you have is complete.

14    Q.  Okay.  That's fine.  We would love to get it.

15         And for remedies' sake, I'm not going to go

16 through it, but I'll tell you that this is a compilation

17 of agreements and it goes through warrant purchase and

18 sales for a number of portfolio companies.  There's

19 GOCV -- I'm sure I'm going to butcher a lot of these

20 names -- Immersv, Retinad, Rival Theory is another one,

21 VRChat, Waygate, OBE, inVR, and Fringefy.  So if you're

22 looking for valuations, it would be helpful to get them

23 for all of those and close the loop on this.

24         If I ask you any questions regarding

25 transactions between the Frontier Technology Venture

                                                      137

1   Capital LLC and the Rothenberg Ventures 2015 Fund and the

2   purchase or sale of any warrants relating to those

3   companies I just identified, do you intend to assert your

4   Fifth Amendment privilege?

5        A.   Yes.

6             MR. ATWOOD:   Let's mark this as Exhibit 27.

7             (Exhibit 27 was marked for identification by the

8             court reporter and is attached hereto.)

9   BY MR. ATWOOD:

10       Q.   Mr. Rothenberg, do you recognize Exhibit 27?

11       A.   Not specifically, but this does look like the

12  kind of -- this is how I would expect the -- the summary

13  of the valuations to look for this kind of document.

14       Q.   And just so the record is clear, when you say

15  "this kind of document," you're referring to Exhibit 26?

16       A.   Yes.  I can tell you I recognize the

17  presentation of this but not necessarily the specifics.

18       Q.   Do you know who would have authored Exhibit 27?

19       A.   Well, every one of these companies, as far as I

20  can remember -- oh, it says -- it says River Accelerator

21  2017, but all of these companies that are listed look

22  like they're all members of the River program, which

23  would be River I through III from 2015 into the first

24  half of 2016.  And so the initial valuations for these,

25  you know, I don't remember exactly when we started

138

1  tracking these, but we try to start tracking companies

2  from the moment we invest in them.

3          And then I have no real way of determining when

4  this was updated as far as I can tell from looking at

5  this.  So this could have been made by, really, any one

6  of a number of, you know, investment analysts.

7      Q.  Maybe it would help.  I don't know if this is

8  the date of the document but I will point out that along

9  the top row, there's all the headers there towards the

10 right hand, and there's one called "Warrant Value

11 June 30th, 2017."

12          Was it your normal practice at RVMC to make

13 these kind of valuations, these documents on or about

14 that date that was identified as warrant value?

15     A.  I think that that tells me that this is probably

16 a version that was made in 2017.

17     Q.  So this wouldn't have been something that would

18 have been attached to Schedule 1 to Exhibit 26?

19     A.  Well, I should clarify my previous comment.

20 This looks like that particular column was added in 2017,

21 but it certainly could be the case that the rest of

22 this -- well, the rest of this could have been made

23 really even in 2015.  In terms of how we would, you know,

24 update documents, they'd have revisions over time.  So

25 that particular column doesn't supersede other columns,

                                                    139

1    it looks additive.

2         Q.  Let's go through the columns.  We'll just use

3    Rival Theory, which is the top entry, as an example.

4              What is "Assigned to"?  What does that column

5    indicate?

6         A.  Well, it tells me that this company either is

7    intending to be owned by the 2015 fund or already is.

8         Q.  And "Purchase Price Date," what does that mean?

9         A.  I assume it means the purchase price date.

10        Q.  Okay.  I would assume the same.  I don't know if

11   you had another meaning for it.

12             The next one is "Warrant Exercise Price," and

13   for rival theory that's $200,000.  Could you explain for

14   the explain what warrant rival price means?

15        A.  It looks like it relates to Exhibit 25, if I was

16   trying to connect these dots.

17        Q.  Okay.  So why -- I believe you asserted your

18   Fifth Amendment privilege over Exhibit 25, so do you want

19   to talk about Exhibit 25 now?  I don't want you to waive

20   your privilege.

21        A.  That's fair.  I guess I'll just leave it at

22   that.  It looks like it refers to that one.  But...

23        Q.  Okay.  Not speaking specifically about this

24   amount, $200,000, what does "Warrant Exercise Price" mean

25   to you in relation to this type of spreadsheet at RVMC?

140

1      A.  Well, an exercise price is the price at which

2  something can be bought.  So that implies to me that, you

3  know, if this transaction occurred by the time this was

4  made or that's what it's trying to do, then it would be

5  that price.

6      Q.  Okay.  Then we have a column "Warrant

7  Percentage."  Do you know what that column indicates?

8      A.  Let me look.  This does look like a companion to

9  Exhibit 26 as I mentioned before, so I'm looking through

10  26.

11      Okay.  I didn't see in there at first glance,

12  but that's -- it seems very likely that that is the

13  percent of the company that the warrant covers.

14      Q.  And then "Company Valuation," safe to assume

15  that's the valuation of the company whose warrants are

16  identified here?

17      A.  Almost -- I mean, it's got to be.

18      Q.  Okay.  Then we have a column titled "Warrant

19  Strike Price."  What's your understanding as far as this

20  document goes as what warrant strike price means?

21      A.  It looks like the previous two columns

22  multiplied together get that column.

23      Q.  Do you know what the basis for that formula

24  would be?

25      A.  Well, kind of already said this before, but it

141

1  looks like it's referred to in Exhibit 25.

2      Q.  And Exhibit 25, do you intend to assert your

3  Fifth Amendment privilege over?

4      A.  I guess so.  I mean, you know, I would certainly

5  not rule out a follow-up conversation about some of this

6  stuff, but, I mean, I'm not -- in my preparation I didn't

7  find or review a lot of these things.

8      Q.  So the Exhibit 26 agreements and the spreadsheet

9  we've been looking at, which is Exhibit 27, they all

10 relate to 2015 fund, I guess investments.  On the

11 spreadsheet there's a long list of the companies, most of

12 which I've already identified for the record, but there's

13 two at the bottom here.  I'm sure I'll get these names

14 wrong, but Atawarp and GitBoom, are you familiar with

15 those?

16     A.  I remember those companies.

17     Q.  Okay.  So according to the spreadsheet, those

18 call options were not exercised.

19         Do you have any recollection of those

20 transactions?

21     A.  What makes it hard to comment is that I believe

22 the commission has stated that they don't believe that

23 these transactions occurred, so it's hard for me to

24 comment on them at all in the context of that.  If you

25 acknowledge these transactions occurred we could have a

                                                      142

1 real conversation.

2      Q.  All right.  Are you familiar with any

3 transactions similar to these between the 2016 fund,

4 which I know we don't have an agreement on -- I don't

5 know what that -- I should rephrase.

6           Actually, your time --

7           MR. ILLOVSKY:  Yeah, I was going to interrupt

8 before --

9           MR. ATWOOD:  Mr. Illovsky needs to take a break

10 for a phone call so we will go off the record.

11           MR. HEFTY:  Thank you very much, Peter.

12                (Recess taken at 2:27 p.m.)

13           (Proceedings resumed at 2:56 p.m.)

14           MR. ATWOOD:  We will go back on the record.

15 It's 2:56 p.m.

16 BY MR. ATWOOD:

17      Q.  Mr. Rothenberg, before the break we had wrapped

18 up a series of questions regarding warrants between the

19 2015 fund and entity, which I've been referring to as

20 RVMC.  We haven't agreed on a shorthand name for the 2016

21 fund, and I want to be respectful of your Fifth Amendment

22 privilege.  When I -- I'll use the phrase "2016 fund" to

23 loosely refer to the group of funds that raised money and

24 capital in 2016 and thereafter and were managed by RVMC.

25 And recognizing that this isn't legally binding as to

                                                        143

1  what that entity is, are you comfortable discussing 2016

2  fund using that phrase?

3      A.   Yeah, I think I can surmise what you're trying

4  to do with that.

5      Q.   Okay.  Are you an aware of the similar warrant

6  purchase and sale agreements between RVMC and the 2016

7  fund?

8      A.   I'll refer to Exhibit 5 for that.

9      Q.   Did you know if there were actual agreements

10 executed that relate to the purchase of warrants between

11 the 2016 fund and RVMC?

12     A.   I'll refer to Exhibit 5, but I will add that if

13 that's on the wish list I'll make sure that anything

14 Mr. Fagel provided is complete as far as I'm aware of.

15     Q.   I want to circle back to that response real

16 quick but before I do that, let me just close out.

17          If I ask you any further questions regarding the

18 purchase or sale of warrants between the 2016 fund and

19 the RVMC, do you intend to assert your Fifth Amendment

20 privilege?

21     A.   Yes.

22     Q.   So earlier in your testimony you referenced a

23 hard drive and a few times you've talked about giving all

24 your documents over to Mr. Fagel, who is your former

25 counsel in this case.

                                                        144