UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    *ORIGINAL*

Before The Honorable JON S. TIGAR, Judge

```
UNITED STATES OF AMERICA,    )    Jury Trial
                             )
            Plaintiff,       )    Volume 4
                             )
   vs.                       )    NO. CR 20-00266JST
                             )
MICHAEL BRENT ROTHENBERG,    )    Pages 680 - 888
a/k/a MIKE ROTHENBERG,       )
                             )
            Defendant.       )    Oakland, California
_____)    Tuesday, October 10, 2023
```


### REPORTER'S TRANSCRIPT OF PROCEEDINGS

<u>APPEARANCES</u>:

For Plaintiff:            THOMAS A. COLTHURST, ESQ.
                          Attorney for the United States
                          Acting under Authority conferred by
                          28 USC §515
                          1301 Clay Street, Suite 340S
                          Oakland, California  94612
                     BY:  BENJAMIN K. KLEINMAN,
                          KYLE F. WALDINGER,
                          NICHOLAS J. WALSH,
                          ASSISTANT UNITED STATES ATTORNEYS

For Defendant:            MOEEL LAH FAKHOURY LLP
                          1300 Clay Street, Suite 600
                          Oakland, California  94612
                     BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

                          Law Office of Nathaniel J. Torres
                          338 Fillmore Street #4
                          San Francisco, California  94117
                     BY:  NATHANIEL J. TORRES, ATTORNEY AT LAW

Reported By:              Raynee H. Mercado
                          CSR. No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

# I N D E X

**PLAINTIFF'S WITNESSES**                              **PAGE**      **VOL.**

LEEP, THOMAS ELWOOD

DIRECT EXAM (CONT'D.) BY MR. KLEINMAN        709          4

CROSS-EXAMINATION BY MR. FAKHOURY            744          4

REDIRECT EXAMINATION BY MR. KLEINMAN         785          4

RECROSS-EXAMINATION BY MR. FAKHOURY          787          4


MCMILLAN DIMMICK, LYNNE

(SWORN)                                      788          4

DIRECT EXAMINATION BY MR. WALDINGER          790          4

--o0o--

**E X H I B I T S**

| PLAINTIFF'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 22 | | | 853 | 4 |
| 62 THROUGH 95, 186 | | | 686 | 4 |
| 97 THROUGH 111 | | | 688 | 4 |
| 112 THROUGH 115, 219, 230 | | | 687 | 4 |
| 132, 559, 560, 562 | | | 689 | 4 |
| 375 | | | 865 | 4 |
| 526 | | | 714 | 4 |
| 530 | | | 728 | 4 |
| 535 | | | 734 | 4 |
| 536 | | | 732 | 4 |
| 554 | | | 716 | 4 |
| 557 | | | 725 | 4 |
| 561 | | | 807 | 4 |
| 567 | | | 868 | 4 |
| 569 | | | 877 | 4 |

--o0o--

| | |
|---|---|
| 1 | **Tuesday, October 10, 2023**                    **8:02 A.M.** |
| 2 |                    **P R O C E E D I N G S** |
| 3 |                        --o0o-- |
| 4 | |
| 5 |     (The following proceedings were heard out of the presence |
| 6 | of the jury:) |
| 7 |         **THE COURT:**  Let's go on the record, please. |
| 8 |     You'll be able to hear in my voice that whatever virus I |
| 9 | had at the end of last week has established a good beachhead |
| 10 | and isn't going anywhere.  But it's not COVID, and I know that |
| 11 | because I tested again this morning. |
| 12 |     We're outside the presence of the jury. |
| 13 |     I issued an order last night resolving some objections |
| 14 | that were made to the government's trial exhibits. |
| 15 |     Also over the weekend, the defendant filed a motion |
| 16 | concerning evidence about a trip to Mexico.  Does the |
| 17 | government oppose the motion? |
| 18 |         **MR. WALDINGER:**  We do, Your Honor.  We -- we'd like |
| 19 | an opportunity to respond.  I don't think that the witness who |
| 20 | will testify about that is testifying either this week or next |
| 21 | week, and so we'd like an opportunity to give Your Honor |
| 22 | additional briefing. |
| 23 |         **THE COURT:**  Have you spoken to Mr. Fakhoury about a |
| 24 | sensible briefing schedule? |
| 25 |         **MR. WALDINGER:**  Mr. Walsh has. |

```
 1              MR. WALSH:  Your Honor, we did discuss.  We didn't
 2    actually establish a briefing schedule.  We just discussed the
 3    fact that because that witness is not going to come on for
 4    several weeks, that we would get something filed in plenty of
 5    time for Your Honor to rule in advance of that witness taking
 6    the stand.
 7         If you'd like, we can pick some dates and tell you at --
 8    later today.
 9              THE COURT:  That seems fine.  It doesn't seem like
10    anything that would be very long.
11              MR. WALSH:  Correct.
12              THE COURT:  It's not a complicated issue.
13         You all get along so well, let's establish a practice from
14    now on.  If someone files a motion, at the time of filing or
15    shortly beforehand, why don't you talk about what a briefing
16    schedule should be.  Then you can just tell me when something
17    gets filed.
18         Of course that -- of course there might be emergencies in
19    which that wouldn't be workable, but most of the time I think
20    that will work.
21         Mr. Walsh, you're at the microphone.  What else does the
22    government have this morning?
23              MR. WALSH:  We have two matters, at least two matters
24    to discuss, one of which is just a very basic scheduling
25    issue, which is, at a prior hearing some time ago, Your Honor
```

1    indicated that you would be traveling to -- I think to

2    officiate a wedding and perhaps other things and may or may

3    not be available on the 16th.

4        Subsequent to that there was an issue -- an order issued

5    indicating that trial might be going forward on the 16th.  I

6    just want to confirm where Your Honor landed in all of that.

7              **THE COURT:**  Trial will be going forward on the 16th.

8              **MR. WALSH:**  Right.  Thank you, Your Honor.

9              **THE COURT:**  There was a -- that's all.

10             **MR. WALSH:**  Thank you, Your Honor.

11       And then last we have an issue to follow up on, and

12   Mr. Waldinger is going to address with regard to the

13   referencing of the SEC investigation that occurred in this

14   matter.

15             **THE COURT:**  All right.  Mr. Waldinger.

16             **MR. WALDINGER:**  Yeah, we have -- I have actually have

17   two things.  There's an issue regarding referencing the SEC

18   inquiry.

19       And I'm also going to be moving in, pursuant to record

20   certifications, a bunch of bank records.  I can do that first

21   since it's, I think, going to be more straightforward.

22             **THE COURT:**  Okay.

23             **MR. WALDINGER:**  And, Ms. Margen, can you keep track

24   of what I'm admitting here?

25       So, Your Honor, we have record certifications that I had

 1    provided to counsel.  And I can provide an extra copy to the
 2    Court.  But we have a record certification regarding
 3    Silicon Valley Bank's records, bank statements that would
 4    cover Exhibits 62 through 95.  And pursuant to that, we would
 5    also move to admit Exhibit 186, which is a bank statement that
 6    is a subset of Exhibit 66.
 7        So, again, moving to admit pursuant to the record
 8    certification by Silicon Valley Bank Exhibits 62 through 95
 9    and Exhibit 186.
10            **THE COURT:**  Any objection?
11          **MR. FAKHOURY:**  Not to the form of the certification.
12        I did file an in lim, Your Honor, objecting to records
13    that I felt were beyond the scope of the allegations in the
14    indictment, which I think the Court overruled.  So I'd just
15    renew that objection.
16        And nothing further on that point, Your Honor.
17            **THE COURT:**  Exhibit 62 through 95 and 186 are
18    admitted.
19        (Government's Exhibits 62 through 95, 186 received in
20    evidence.)
21            **MR. WALDINGER:**  With respect to Bank of America, we
22    would also move to admit, pursuant to a record certification,
23    bank records of Transcend VR and Pilot Grove Management.
24    Those are at Exhibits 112 through 115, 219 and 230.
25            **THE COURT:**  These are all subject to a record

```
 1    certification?

 2            MR. WALDINGER:  Correct.  We have -- I have an

 3    affidavit of a record certification.  Mr. Fakhoury has that,

 4    and I have an extra copy in court for him today.

 5            THE COURT:  Any objection?

 6            MR. FAKHOURY:  Same objection, Your Honor.  Just

 7    renewing my in lims.  No objection to the form of the

 8    certification, though.

 9            THE COURT:  Exhibits 112 through 115, 219 and 230 are

10    admitted.

11            THE CLERK:  Yes, sir.

12        (Government's Exhibits 112 through 115, 219, 230 received

13    in evidence.)

14            MR. WALDINGER:  Then we have multiple record

15    certifications for other Bank of America accounts, Your Honor,

16    that are generally associated with Mr. Rothenberg and

17    Rothenberg Ventures.  Those record certifications cover

18    Exhibits 97 through 111.  And again I provided a copy of all

19    of those certifications to Mr. Fakhoury before court and

20    another copy to him today.

21            THE COURT:  Any objection?

22            MR. FAKHOURY:  Same objection as with respect to the

23    other records, Your Honor.

24            THE COURT:  Exhibits 97 through 111 are admitted.

25    / / /
```

1      (Government's Exhibits 97 through 111 received in

2   evidence.)

3          **MR. WALDINGER:**  And finally, we have records from the

4   Bank of San Francisco that are covered by two record

5   certifications.  Again I provided both of those record

6   certifications to Mr. Fakhoury.  I will give him copies of

7   those in court.

8      Those two record certifications relate both to bank

9   statements and other records in Bank of San Francisco's loan

10  files.

11     These record certifications cover Exhibits 132,

12  Exhibit 559, Exhibit 560, and Exhibit 562.

13         **THE COURT:**  May I read those numbers back to you,

14  please?

15         **MR. WALDINGER:**  Yes.

16         **THE COURT:**  132, 559, 560 and 562.

17         **MR. WALDINGER:**  That's correct, Your Honor.

18         **THE COURT:**  Any objection?

19         **MR. FAKHOURY:**  The same objection, Your Honor.  I had

20  also -- one of those exhibits, I believe it's 562, was also

21  the subject of the in lim -- or the objections that were filed

22  on Friday which the Court already resolved.  So that's just an

23  additional basis for an objection which the Court already

24  overruled.

25     So other than those prior objections, there's no objection

1    to the form of the certification.

2           **THE COURT:**  Thank you, Mr. Fakhoury.

3       Exhibits 132, 559, 560, and 562 are admitted.

4       (Government's Exhibits 132, 559, 560, 562 received in

5    evidence.)

6           **MR. WALDINGER:**  That covers the record certifications

7    that -- that we're covering today, Your Honor.

8           **THE COURT:**  All right.  You indicated that you had at

9    least one additional issue.

10          **MR. WALDINGER:**  We do, Your Honor.

11      It's been the government's understanding that the

12   government should not put in evidence about the fact that

13   there was an SEC case pending before Your Honor, the

14   resolution of that case, any -- any other details about that

15   case.

16      However, what the government would like to do is put in

17   evidence that there had been an SEC inquiry of Mr. Rothenberg.

18   That inquiry began in late July of 2016.  This was at around

19   the time that Mr. Rothen- -- that some of the crimes that are

20   alleged to have been committed occurred.  There were a number

21   of employees that left Mr. Rothenberg's company at that time,

22   and that's when the articles started coming out about

23   Mr. Rothenberg in August of 2016.

24      In response to those articles or because of those

25   articles, Mr. Rothenberg told people, for example, the witness

 1   who's currently on the stand, Tommy Leep, that he'd received

 2   an inquiry from the SEC.

 3       And he also sent two blast emails to the LP's, to the

 4   investors in the venture capital funds.  One simply asked the

 5   question, you know, some of you may be wondering is there an

 6   SEC investigation.  In that email, Mr. Rothenberg did not

 7   answer that.  And then in the second email, he talks --

 8       **THE COURT:**  In other words, he posed the question but

 9   does not answer the question.

10       **MR. WALDINGER:**  Correct.

11       We have copies of these emails for Your Honor today.

12       In the second email, Mr. Rothenberg discussed the SEC

13   inquiry in more detail.

14       These statements about the SEC inquiry are intertwined

15   with his other statements to investors, including statements

16   that are related to his prior undisclosed investments in River

17   Studios and about other things.

18       And so we don't think that there's any prejudice or much

19   prejudice to the fact of an SEC inquiry, and we're not really

20   going to go beyond that.

21       **THE COURT:**  What's the probative value?

22       **MR. WALDINGER:**  The probative value is it's -- it's

23   part of the story.  It -- it relates to what Mr. Rothenberg

24   was responding to.  And I think with respect to these emails

25   that go to investors, it's part of his entire statement.

```
1              THE COURT:  Use it in closing argument.
2              MR. WALDINGER:  We wouldn't -- we would say in August
3    of 2016, Mr. Rothenberg -- Mr. Rothenberg's financial
4    situation was this.  He was -- he was taking money from Peter
5    to pay Paul.  The Securities and Exchange Commission had sent
6    him a letter.  Despite the fact of this inquiry, he continued
7    to make misrepresentations to investors, to lull investors in
8    at least the Unity investment.
9         And in addition, with respect to the witness who's on the
10   stand, he told the witness that he had received this SEC
11   inquiry.  This is part of a string of conversations that
12   Mr. Rothenberg had with Mr. Leep.
13        I believe that the testimony will be in the second
14   conversation with Mr. Leep.  After he told Mr. Leep about the
15   SEC inquiry, he said something along the lines of, "I think
16   I'm in trouble.  I think I did something wrong."
17        So I think that even though it's a separate investigation
18   by a separate agency, it's probative of his intent, it's
19   probative of his consciousness of guilt.
20        We're not going to make a lot of it.  One of the big
21   concerns, Your Honor, is that to -- these emails to investors
22   will have to be redacted.  And it's just -- I think that
23   the -- the Court can cure any potential prejudice with a
24   limiting instruction.  I think for the lack of a better word,
25   it's going to look weird that these emails are redacted, to
```

1  the jury, and it's not what happened.  He sent these emails in

2  which he mentioned the SEC inquiry.  It's part of his entire

3  statements to his investors in August of 2016.

4                    (Pause in the proceedings.)

5          **MR. WALDINGER:**  The other thing that Mr. Leep will

6  say is Mr. Rothenberg attempted to get Mr. Leep to sign a new

7  agreement, a new employment agreement or consulting agreement,

8  with Rothenberg Ventures at around this time in August of 2016

9  or thereabouts.

10     Mr. Leep responded in a text message that I think has been

11  admitted that he's not going to sign based on everything that

12  is going on including the SEC letter.

13     So it goes into, you know, sort of the falling apart of

14  the relationship between Mr. Leep and his -- his separation

15  from Mr. Rothenberg and Rothenberg Ventures.

16     And I do have copies of these emails, Your Honor, if you

17  would like to see them.

18          **THE COURT:**  It might be helpful.

19          **MR. WALDINGER:**  So these have been marked as trial

20  Exhibits 428 and 429.

21                    (Off-the-record discussion.)

22          **MR. WALDINGER:**  And then I'm also passing up the text

23  message that I referred to.  That's Exhibit 533, page --

24          **MR. WALSH:**  Forty-four.

25          **MR. WALDINGER:**  -- page 44.

```
 1                MR. WALSH:  There's an extra copy for you.

 2                MR. FAKHOURY:  Oh, thank you.

 3                     (Pause in the proceedings.)

 4                THE COURT:  Mr. Fakhoury.

 5                MR. FAKHOURY:  Your Honor, I do think a reference to

 6      the SEC inquiry even in -- in the context of the email

 7      exhibits, particularly the second -- the second email, so this

 8      would be the exhibit marked as trial Exhibit 429.

 9                THE COURT:  Yes.

10                MR. FAKHOURY:  I think that one is a little more

11      problematic than even the -- the Exhibit 428 reference.

12           But overall I think the reference is prejudicial.  It sort

13      of begs the question, I think, in the jurors' mind of if there

14      was a SEC inquiry, what was the result of that inquiry.  And I

15      don't -- I don't think it's necessary for the government to

16      make the points it wants to make.  And this was an issue that

17      I did raise in limine as well, Your Honor.

18           More -- I did raise it -- well, I did raise it in limine.

19           And -- and I -- I would think if the Court overrules my

20      objection to it, I would definitely ask for a limiting

21      instruction, but my hope obviously would be that the Court

22      would exclude those references.

23           I think there's a way for the government to tell the story

24      it wants to tell without getting into those kinds of details.

25                THE COURT:  So I gather from your argument that
```

1    Exhibit 4 -- your request be that 428 be redacted so that the

2    single sentence "Is there an SEC investigation" would simply

3    be whited out and perhaps it would indicate that it were

4    redacted, and that similarly on Exhibit 429, the portion

5    labeled "SEC" at the bottom of page 3 and the top of page 4

6    would be whited out?

7              **MR. FAKHOURY:**  Correct, Your Honor.

8              **THE COURT:**  What would your proposed remedy be with

9    regard to trial Exhibit 533 and Mr. Leep's testimony?

10   Because, you know, he resigned for both of these reasons at

11   the same time.  What are you recommending the Court do?

12             **MR. FAKHOURY:**  Well, for 533 --

13             **MR. WALDINGER:**  And I think to be clear, I think he

14   may have --

15             **THE COURT:**  Let Mr. Fakhoury finish, please.

16             **MR. WALDINGER:**  I'm sorry, Your Honor.

17             **MR. FAKHOURY:**  So with respect to 533, I think we

18   can -- I think the jury has been -- I can't recall if the jury

19   has been shown that portion of the exhibit yet.

20             **THE COURT:**  Well, my question also goes to what

21   Mr. Leep is to say on the stand.  The question of why he

22   resigned from the company is, I think, material.  And he -- I

23   don't -- I gather -- I don't think based on 533 that these are

24   necessarily separate and independent reasons.

25        What do you want him to say?

1              **MR. FAKHOURY:**  Well, I mean I want him to say the

2     truth obviously.  I think there's a way for him to say --

3     first -- actually at the end of the testimony on Thursday,

4     toward -- as we were getting ready to break, he was talk -- he

5     was testifying that part of the reason he left was exhaustion

6     and he -- he had concerns with Mr. Rothenberg's behavior.

7         The witness 302's that I've seen summarizing Mr. Leep's

8     statements to the government don't actually, in my opinion,

9     don't actually dwell on the SEC as being a major reason why he

10    resigned.  I think he had issues he was bothered by and he was

11    exhausted and he resigned for those purposes.

12        I think the jury --

13             **THE COURT:**  You're arguing with an exhibit that was a

14    contemporaneous record of exactly what he said at the time he

15    resigned.  So your telling me, hey, judge, let me tell you why

16    he really resigned is interesting, but it doesn't accommodate

17    this fact.  I think you're sort of driving around this thing

18    instead of driving right into it.

19             **MR. FAKHOURY:**  Well, let me -- let me try --

20             **THE COURT:**  And let me just tell you nothing that you

21    just said convinces me that he shouldn't be able to tell the

22    jury why he actually resigned.

23             **MR. FAKHOURY:**  Well, to be clear, the -- the portion

24    of Exhibit 533 is -- that references the SEC is not in

25    connection with resignation.  It's -- its in connection with

 1    his hesitation to sign some new employment agreement.

 2             THE COURT:  Yes.

 3             MR. FAKHOURY:  Which --

 4             THE COURT:  Yes, that's true.

 5             MR. FAKHOURY:  So -- so that is not necessarily -- I

 6    mean, it's similar, but it's not exactly the same as a

 7    resignation.  And I think the resignation came a little --

 8    actually my recollection -- and I -- I may need to go back and

 9    double-check this, but my recollection is there was actually a

10    discussion --

11             THE COURT:  We're getting too far afield for

12    8:24 a.m.  This gentleman sent a text to somebody saying, "I

13    don't like this and it's undermining my desire to keep working

14    here."  And what do you want me to do about that?  That

15    happened.

16             MR. FAKHOURY:  He could talk about it in a general

17    way.  He doesn't have to say the SEC specifically.  He could

18    say I had concerns, I had issues with things that were going

19    on.

20         And I'm trying to keep out the SEC inquiry so I'm not

21    going to really question him -- I'm not going to tell -- you

22    know, that's not going to be a very -- I'm not going to

23    cross-examine him on that point.  And I'll just leave it vague

24    as it is because I would rather the jury not hear about the

25    SEC inquiry.

1             THE COURT:  Yeah.  Mr. Waldinger.

2             MR. WALDINGER:  I think it's relevant, Your Honor.

3     And, you know, even going -- looking more closely at

4     Exhibit 429 and what he's -- what the defendant tells

5     investors, he's telling investors to let the SEC know that

6     this is an internal accounting issue that we are handling.

7         By this time, Mr. Rothenberg knows -- the evidence will

8     show he knows that he is deep in it, deep in financial

9     trouble.  This is part of him lying -- the government's going

10    to argue that this is a lie to investors.  This is not an

11    internal accounting issue.  This affects these investors.

12    People who had just given him money in July had to wait months

13    and years to get it back with respect to the Unity investment.

14        So I just think it's relevant.  A limiting instruction can

15    fix it.  You know, I have found some cases that allow this

16    kind of testimony.  Not many.  But I think the immediate

17    question is what Mr. Leep can say today.  And we can deal with

18    these exhibits later.

19        I don't think that these exhibits are going to be admitted

20    today.  But this witness may go on tomorrow, Mr. Levensohn.

21            THE COURT:  Pascal Levensohn?

22            MR. WALDINGER:  Correct.

23            THE COURT:  Is he the Dolby guy?

24            MR. WALDINGER:  Yes, he is, Your Honor.

25            THE COURT:  Anything further on this point,

1    Mr. Waldinger?

2              **MR. WALDINGER:**  No, Your Honor.

3              **THE COURT:**  Mr. Fakhoury, anything further on this

4    point?

5              **MR. FAKHOURY:**  No, Your Honor.

6              **THE COURT:**  Well, I think the -- the communications

7    among Rothenberg Ventures employees -- I'm not sure whether

8    "employee" is the right term for Mr. Leep, but I'll use it in

9    this context anyway -- and between Mr. Rothenberg and the

10   investors means there is some relevance to Mr. Rothenberg's

11   state of mind and his consciousness of guilt.

12       So I think it's fair game, but I think that the defendant

13   is entitled to a limiting instruction.  And it would be great

14   if we could figure out what that looks like before Mr. Leep

15   gives this testimony.  I don't know if the parties have given

16   that any thought.

17       I'm assuming that's when -- that is at least the first

18   time that the defendant would want the instruction to be

19   given.

20             **MR. FAKHOURY:**  You know, we haven't given thought

21   to -- I haven't given thought to a limiting instruction.  I

22   can sit and look at the Ninth Circuit model instruction on

23   that topic more generally in a -- in the few minutes we have

24   before the jury comes in and hopefully come up with something

25   quickly.  Unless -- unless -- if the government has a

```
 1     suggestion, I'm happy to hear it.  I don't know if I'd agree
 2     with it, but I'll hear it out.
 3             MR. WALDINGER:  We -- we could try to draft something
 4     up real quick.  I mean I think -- it could just be as simple
 5     as:  Ladies and gentlemen of the jury, you've heard about an
 6     SEC inquiry.  You're not to consider the -- the -- whether or
 7     not the SEC had an inquiry is not relevant to your
 8     determination of whether the defendant is guilty or innocent
 9     of the charges in this case.
10             THE COURT:  It might be a little broad.
11                   (Pause in the proceedings.)
12             MR. WALSH:  We could --
13                   (Off-the-record discussion.)
14             THE COURT:  How about something like this:  You have
15     heard testimony that the Securities and Exchange Commission
16     conducted an inquiry into the finances of Rothenberg
17     Ventures -- we might need to use the full name of the firm but
18     anyway -- into the finances of Rothenberg Ventures.  This
19     evidence is being admitted solely as it pertains to
20     Mr. Rothenberg's motive or intent and is to be considered by
21     you solely for that purpose.  The fact that the SEC conducted
22     an inquiry is not evidence that Mr. Rothenberg did any of the
23     acts charged in the indictment.
24             MR. WALDINGER:  I think thumbs up from the government
25     on that, Your Honor.
```

```
 1              THE COURT:  I'm happy to read it again.
 2              MR. FAKHOURY:  That would be great if Your Honor --
 3              THE COURT:  Or I could even just tear off this and --
 4              MR. FAKHOURY:  That also works fine.
 5              THE COURT:  Well, why don't I read it, and then tell
 6      me if you want to try to read my handwritten version.
 7          You have heard testimony that the Securities and Exchange
 8      Commission conducted an inquiry into the finances of
 9      Rothenberg Ventures.  This evidence is being admitted solely
10      as it pertains to Mr. Rothenberg's motive or intent and is to
11      be considered by you solely for that purpose.  The fact that
12      the SEC conducted an inquiry is not evidence that
13      Mr. Rothenberg did any of the acts charged in the indictment.
14          And perhaps I could add a sentence:  The results of the
15      SEC inquiry are not relevant here.  Or something like that.
16      But that has a little bit of a don't think about pink
17      elephants quality.  So I could go either way.
18              MR. FAKHOURY:  Yeah.
19              MR. WALDINGER:  I would say Your Honor's used the
20      word "conducted" --
21              THE COURT:  Yes.
22              MR. WALDINGER:  -- which is -- I mean I don't even
23      know that we'll get that far.  I think "initiated" will be
24      probably --
25              THE COURT:  I like "initiated" better anyway.  Okay.
```

1    All right.  Mr. Fakhoury.

2         **MR. FAKHOURY:**  I would, you know, without waiving any

3    objection that's been overruled, I can live with that

4    instruction.

5         **THE COURT:**  Okay.  Very good.  I'll just keep that at

6    the bench, and that's what I'll give.  I will give that

7    shortly after Mr. Leep says whatever he says.  If I forget,

8    please remind me.

9         **MR. WALDINGER:**  And do you want to have it just in

10   past tense?  Or you have heard or may hear?  Or have it in the

11   past tense and give it each time the SEC issue comes in?

12        **THE COURT:**  I think this time I should say:  You have

13   heard testimony that the Securities and Exchange Commission

14   initiated an inquiry into the finances of Rothenberg Ventures,

15   and you may hear additional such evidence in the future.  And

16   then continue.

17       And then simply give the instruction in the future if

18   counsel request it.  I don't want be to in charge of that

19   because it's a question -- it's important that they remember

20   it, but -- but then you also don't want to overemphasize it.

21   So I would take my cue from counsel.

22        **MR. WALDINGER:**  That seems fine to the government,

23   Your Honor.

24        **MR. FAKHOURY:**  That's fine, Your Honor.

25        **THE COURT:**  Okay.  Gentlemen, do we have other things

```
 1   to talk about before the jury comes in?

 2          MR. WALDINGER:  There's one thing, and I've asked

 3   Mr. Fakhoury about this.

 4          THE COURT:  Ms. Margen, I apologize.  Lady and

 5   gentlemen, do we have other things to talk about?

 6          MR. WALDINGER:  Well, that goes to my issue.  We have

 7   neglected to introduce Ms. Margen in opening statement.  And I

 8   don't know that Your Honor introduced her.  I've asked

 9   Mr. Fakhoury if it's okay for me to ask you to just tell the

10   jury who she is.

11          THE COURT:  Sure.  Yeah.  Makes sense.  Any

12   objection?

13          MR. FAKHOURY:  No, Your Honor.

14          THE COURT:  Yeah.  That's fine.

15          MR. WALDINGER:  Thank you, Your Honor.

16          THE COURT:  Okay.  Anything else?

17          MR. FAKHOURY:  No, Your Honor.  Thank you.

18          THE COURT:  Let's -- let's all take five minutes so

19   that we -- so that our bodies can be ready to sit in one place

20   for 90 minutes.

21          THE CLERK:  Court is in recess.

22      (Recess taken at 8:34 A.M.; proceedings resumed at

23   8:43 A.M.)

24          THE COURT:  Let's go on the record for a second.

25      Counsel, I received a letter from Juror Garcia.  It's
```

1   long.  And so I think the most efficient thing would be for me

2   to have Ms. Lee hand it to you, and you can just both read it

3   over each other's shoulders at the same time.

4                   (Pause in the proceedings.)

5           **THE COURT:**  The letter makes two points.  I'm not

6   concerned about the second one.

7       You can just keep it as an exhibit.  I can remember what

8   it says.

9           **THE CLERK:**  Yes.

10          **MR. WALDINGER:**  It seems to me that based on the --

11  the Court's granting of hardships during voir dire, this would

12  have been a hardship request that the Court would have

13  granted.

14          **THE COURT:**  Easily.

15          **MR. WALDINGER:**  And we have six alternates.

16          **THE COURT:**  Correct.

17          **MR. WALDINGER:**  So I -- you know, again, Your Honor

18  pointed out several times we don't want jurors who don't want

19  to be here.  And if Mr. Garcia is thinking about his

20  livelihood and how he's going to keep his business going, he's

21  not likely to be an effective juror in the case.

22          **THE COURT:**  I think the letter expresses a great deal

23  of sincere distress.

24      Mr. Fakhoury?

25          **MR. FAKHOURY:**  I don't have anything else to add,

 1    Your Honor.

 2         **THE COURT:**  I don't like it, but I think I have to

 3    let him go.  The reason I don't like it is not because -- the

 4    reason I don't like is it because sometimes these -- in this

 5    situation the Court can send a message unintentionally to the

 6    remaining jurors that there's an exit ramp.  But I just don't

 7    see how we can keep him.

 8         I mean of course I see how we could keep him.  I could

 9    simply say, "Keep going."  But his -- the -- his personal and

10    financial circumstances are likely to deteriorate over the

11    course of the trial, and that will -- and he will broadcast

12    that to the other jurors.  And so the situation of the trial I

13    think will worsen rather than improve.

14         So I think that we should -- unless anyone feels I need to

15    bring him out into open court, which I don't feel, I would

16    just ask that Ms. Lee be able to go in the jury room and let

17    Mr. Garcia know that he is -- let me think through this.  Let

18    me think this through before I -- let me finish the sentence

19    in my own mind before I begin it.

20                   (Pause in the proceedings.)

21         **THE COURT:**  I think a judge needs to say it,

22    actually.  I think we should bring him into the courtroom.  I

23    should say, "Mr. Garcia, I've read your letter.  I don't

24    normally excuse anybody after a trial has begun, but I think

25    in this circumstance it's the right thing to do."

1    I'll ask him without further discussion to go into the

2    jury room and collect his belongings and leave.  And we'll

3    bring in the remaining jurors.

4        As you know from our voir dire process, alternates are

5    seated in order of selection.  And so Ms. Holloway will then

6    be seated -- will then -- I'll move her into that seat so it

7    will be clear to everyone what -- what the deal is.

8        Am I missing anything?

9            **MR. WALDINGER:**  I don't think so, Your Honor.

10           **THE COURT:**  All right.  Let's remain standing and

11   bring in Mr. Garcia.

12              (Juror Garcia enters the courtroom.)

13           **THE COURT:**  All right.  Let's go on the record.

14       Good morning, Mr. Garcia.

15           **JUROR:**  Good morning.

16           **THE COURT:**  I read your letter.  I don't normally

17   excuse anybody after a trial has started, but in this case I

18   think it's the right thing to do.  So I'm going to excuse you

19   from this jury.  And good luck with all those projects.

20           **JUROR:**  Thank you.

21           **THE COURT:**  What I want to say is this:  You made it

22   all the way through and -- to being seated on the jury, I

23   mean.  That's a huge vote of confidence from the lawyers.  I

24   didn't have anything to do with it.  I'm not the chooser.

25   They are.  And it's a sign to me that you project a lot of

1    fairness and common sense.

2              **JUROR:**  Thank you.

3              **THE COURT:**  And I know that this trial is not a good

4    fit for you.  Have you served on a jury before?

5              **JUROR:**  No.  This was my first time, and that's why I

6    just didn't know what the logistics of it was.

7              **THE COURT:**  Well, you'll be called again.  That's how

8    statistics work.

9              **JUROR:**  Yeah.

10             **THE COURT:**  And when you are, I hope it's an

11   enjoyable experience for you.

12             **JUROR:**  It's been enjoyable.  I just feel like

13   it's -- I don't know that I can --

14             **THE COURT:**  Yeah.  I'm a little nervous that other

15   jurors, when they see that you're excused, that their resolve

16   might falter, if you catch my meaning.  So I'm going to ask

17   you simply to go into the jury room, don't say a word to

18   anybody, collect your belongings and go back to your business.

19             **JUROR:**  Okay.

20             **THE COURT:**  Okay?  And then I'll substitute in one of

21   the alternates.

22       Anyway, thanks for the service that you -- that you did

23   do, and perhaps we'll work together again.

24             **JUROR:**  Thank you.  And I apologize for not being

25   able to --

1      **THE COURT:**  That's all right.  Thanks.

2      **THE CLERK:**  Please rise for the jury.

3      (Juror Garcia excused and left the courtroom.)

4      (The following proceedings were heard in the presence of

5      the jury:)

6      **THE CLERK:**  You may be seated.

7      **THE COURT:**  Good morning.

8      **JURORS:**  Good morning.

9      **THE COURT:**  Well, we had an exciting development that

10     we'll get to in a second.  It's not that exciting, but we need

11     to talk about it.

12        When you have been doing this as long as I have -- and I

13     should mention all of the jurors, save Juror Garcia, are in

14     their assigned seats.  The parties and counsel are at counsel

15     table.  Mr. Leep is on the stand.  He's still under oath.

16        When you've been doing this as long as I have, you start

17     to look for signs about how things are going.  And two of the

18     best signs you can ever get are a jury that just shows up on

19     time -- and I heard the traffic out there this morning was a

20     beast -- a jury that shows up on time and when you can hear

21     laughter from the jury room before court starts.

22        And you might think, well, I understand the first thing,

23     but why is the second thing such a good indicator?  It's a

24     good indicator because people have already sort of relaxed

25     into the team, you know.  And you are a team.  And so I just

1    wanted to say I noticed that.  I really appreciated it.

2        I wanted to introduce someone to you that I forgot to

3    introduce last week.  This is Ms. Beth Margen who's seated at

4    the end of the government's table over there.  Ms. Margen is a

5    legal assistant with the government.  And so she's assisting

6    the lawyers in presenting this case, and you will probably see

7    a lot of her.

8        I told you during jury selection that we were selecting

9    alternates, that it might become necessary during the trial

10   because of illness or family emergency or some other reason to

11   replace one of the regularly impaneled jurors.  That happened

12   this morning.  Mr. Garcia is not able to serve on this jury.

13       Ms. Holloway, you have been selected to take Mr. Garcia's

14   place.  I'm actually going to ask you to move back into that

15   seat because that's just optics are -- are the way that we

16   sort of think about the trial.  I don't know if you can

17   squeeze in between those chairs.  Well done.  Okay.

18        I think that concludes my opening remarks.

19       When we -- thanks for all of your service last week.  This

20   week it's just going to be evidence, evidence, evidence.

21   We're not going to do all those other things that we did last

22   week.

23       Mr. Leep was on the stand last week.  I think he was in

24   the midst of his direct examination.  He's still on the stand.

25       Mr. Leep, I'll remind you you're still under oath.

1          Mr. Kleinman, your witness.

2               **MR. KLEINMAN:**  Thank you.

3

4                      **THOMAS ELWOOD LEEP**,

5     called as a witness for the PLAINTIFF, having been previously

6     duly sworn, continued testifying as follows:

7

8                **CONTINUED DIRECT EXAMINATION**

9     **BY MR. KLEINMAN:**

10    **Q.**  Good morning, Mr. Leep.

11    **A.**  Good morning.

12    **Q.**  So when we ended last week, we were discussing 2015 and

13    the beginning of 2016 at Rothenberg Ventures.  I want to ask

14    you a few more questions about 2015.

15         Did Rothenberg Ventures host a Founder Field Day event in

16    2015?

17    **A.**  Yes.

18    **Q.**  And you testified previously that when you first began

19    working, the Founder Field Day event was your first event in

20    2014, correct?

21    **A.**  Yes.

22    **Q.**  What was the event for Founder Field Day 2015?

23    **A.**  Similar to the 2014 event, it -- we rented out the Giants

24    ballpark, at the time called AT&T Park.  We hosted founders,

25    investors, and other people in the tech community at the -- at

THOMAS ELWOOD LEEP - DIRECT (CONT'D.) / KLEINMAN

 1   the stadium and for some programming in the morning and then

 2   some networking in the afternoon.

 3   **Q.**  And just as a reminder, what is Founder Field Day?

 4   **A.**  Founder Field Day is basically an event for the Rothenberg

 5   Ventures community, a network to get together, work together,

 6   and network together.

 7           **MR. KLEINMAN:**  If we could show what is in evidence

 8   as Government's Exhibit 533, page 10.

 9                   (Pause in the proceedings.)

10           **THE CLERK:**  We might be having technical

11   difficulties.  It should be on all of the screens.

12       It says you're not plugged in.

13           **THE COURT:**  Ms. Lee, does that ELMO work?  Have we

14   tested that?

15           **THE CLERK:**  It does, Your Honor.

16           **THE COURT:**  So, counsel, as a backup, members of the

17   jury, it's called an ELMO which reminds me of Sesame Street,

18   but there's a device in between the two podia that also can

19   project documents.  So if this PDF projector is not working,

20   maybe we can use that as a backup.  I'm not sure what the

21   problem is.

22           **MR. KLEINMAN:**  Yes, Your Honor.  Maybe we'll give it

23   30 more seconds and then, if not, move to paper.

24           **THE COURT:**  All right.

25                   (Pause in the proceedings.)

 1                    (Exhibit published.)

 2    BY MR. KLEINMAN:

 3    Q.   Mr. Leep, is this a text message -- group text message

 4    between yourself, Mike Rothenberg, and Holly Wesselhoft?

 5    A.   Yes.

 6    Q.   And this is on April 8th of 2015, correct?

 7    A.   Yes.

 8    Q.   If you could please read these -- this text chain into the

 9    record.

10    A.   Mike writes, "What is the status of zip line and parachute

11    man?"  That's at 12:23 a.m.

12         Mike responds, "Okay, thanks."

13         Holly writes, "FAA regulations on someone parachuting in

14    are super intense and complicated.  Jasmine said it's really

15    hard to get this and from looking on their site, it seems

16    unlikely that they'd say yes to us."

17    Q.   Who is Holly Wesselhoft?

18    A.   Holly was the head of events for Rothenberg Ventures.

19    Q.   Please continue.

20    A.   Holly then says, "Actually having someone parachute in

21    with a huge zip line" --

22                    (Off-the-record discussion.)

23              THE WITNESS:  Yes.

24         Holly said -- okay.  I'll start there.

25         Holly says, "Actually having someone parachute in with a

 1   huge zip line crossing the center of the field might actually

 2   be a bit dangerous.  Now that I'm thinking that through as

 3   well."

 4         It's 12:28 a.m.

 5         Holly then says, "Although if we got him to land right on

 6   the zip line and then proceed to walk the tight rope," dot dot

 7   dot.  12:29 a.m.

 8         Mike Rothenberg responds, "Cool."  12:31 a.m.

 9         Mike Rothenberg writes, "Ask them what the craziest thing

10   they've ever seen at the park and price those things out."

11   12:35 a.m.

12         Mike Rothenberg then writes:  "James Taylor said a race

13   car for 15K," or $15,000, "is still possible."  That's

14   12:35 a.m.

15             **MR. KLEINMAN:**  And we can -- we can minimize this.

16   **Q.**  Now, to be clear, Mr. Leep, was there the actual parachute

17   man event at Founders Field Day?

18   **A.**  There was not.

19   **Q.**  But what was the -- what was the business purpose of

20   exploring aspects of the event like this?

21   **A.**  The idea was to do something exciting, maybe impressive,

22   just kind of grandiose that would look -- that would be fun

23   for our guests to experience.

24   **Q.**  And whose idea was it to be something grandiose and fun?

25   **A.**  In this case, you know, I'd say in -- in conversation with

1  Mike, it was Mike and me.

2  **Q.**  Now, I want to also ask you about the -- the size of

3  Rothenberg Ventures at this time.

4      When you testified last week, you said when you started

5  there were approximately ten members of Rothenberg Ventures;

6  is that correct?

7  **A.**  Correct.

8          **MR. KLEINMAN:**  If we could show what has been marked

9  for identification as government's 526.

10     (Exhibit published to witness, counsel, and the Court.)

11 **BY MR. KLEINMAN:**

12 **Q.**  Mr. Leep, do you see -- withdrawn.

13     Mr. Leep, what is this an exhibit of?

14 **A.**  This is an email with an attachment, a calendar invitation

15 for a team meeting.

16 **Q.**  And is this a Rothenberg Ventures email?

17 **A.**  Yes.

18 **Q.**  And do you see your name on this email chain?

19 **A.**  (Reviewing document.)

20 **Q.**  In the second-to-last line of "Required --

21 **A.**  Thank you.

22 **Q.**  -- Attendees"?

23 **A.**  Yes.

24 **Q.**  And do you see Mike's Rothenberg's?

25 **A.**  Yes.

1    Q.   And was the information in this document created around

2    the time of this email's and calendar invite?

3    A.   Yes.

4    Q.   And is it -- was it the regular practice of Rothenberg

5    Ventures to make such records while conducting its business?

6    A.   Yes.

7    Q.   And was this email and calendar invite kept in the regular

8    course of business at Rothenberg Ventures?

9    A.   Yes.

10         MR. KLEINMAN:   The government moves to admit

11   Exhibit 526.

12         THE COURT:   Any objection?

13         MR. FAKHOURY:   No, Your Honor.

14         THE COURT:   526 is admitted.

15       (Government's Exhibit 526 received in evidence.)

16         MR. KLEINMAN:   And if we could go to the second page

17   as well.

18                     (Exhibit published.)

19         MR. KLEINMAN:   And now if we could publish to the

20   jury the first page.

21                     (Exhibit published.)

22   BY MR. KLEINMAN:

23   Q.   Do you recognize the people listed in this invitation,

24   Mr. Leep?

25   A.   Yes.

1   **Q.**  Who are they?

2   **A.**  They are members of the Rothenberg Ventures team and the

3   River Studios team.

4   **Q.**  Now, turning your attention to November of 2015, when you

5   testified last, you -- you were testifying about the use of

6   fund decks.

7   **A.**  Yes.

8   **Q.**  Can you please remind the jury what a fund deck is?

9   **A.**  A fund deck is a presentation, usually a PDF, that is used

10  to invite or persuade investors to invest in the fund.

11          **MR. KLEINMAN:**  If we could show for identification

12  what has been marked as Government's Exhibit 554.

13      (Exhibit published to witness, counsel, and the Court.)

14  **BY MR. KLEINMAN:**

15  **Q.**  Mr. Leep, prior to your testimony today, did you review

16  this document?

17  **A.**  Yes.

18  **Q.**  And what is this document?

19  **A.**  This is the fundraising deck for the 2016 Fund.

20  **Q.**  And was the information in this document created around

21  the time the fund deck was created?

22  **A.**  Yes.

23  **Q.**  Is it the regular practice of Rothenberg Ventures to make

24  such records while conducting its business?

25  **A.**  Yes.

1    **Q.**  And is this fund deck kept in the regular course of

2    Rothenberg Ventures' business?

3    **A.**  Yes.

4    **Q.**  And is this a fair and accurate copy of that -- of that

5    deck?

6    **A.**  Yes.

7           **MR. KLEINMAN:**  The government moves to admit

8    Government's Exhibit 554.

9           **THE COURT:**  Any objection?

10          **MR. FAKHOURY:**  No, Your Honor.

11          **THE COURT:**  554 is admitted.

12       (Government's Exhibit 554 received in evidence.)

13          **THE COURT:**  Members of the jury, you can hear me

14   coughing.  I told you at the end of last week I was starting

15   to get a cold.  The cold is still winning.  But I take a COVID

16   test every day.  And it's always been negative.  I just

17   thought -- I didn't want anybody to worry about that.

18      Mr. Kleinman, go ahead.

19          **MR. KLEINMAN:**  Thank you, Your Honor.

20   **Q.**  Mr. Leep, drawing your attention to the bottom of this

21   exhibit, when was this fund deck used?

22   **A.**  November 2015.

23          **MR. KLEINMAN:**  And if we could go to page 2 of this

24   exhibit.

25                    (Exhibit published.)

1  BY MR. KLEINMAN:

2  Q.  Drawing your attention to the bottom left of this exhibit,

3  what is this a fund deck for?

4  A.  The 2016 Fund.

5  Q.  And can you please remind the members of the jury what --

6  what is it -- what was the 2016 Fund?

7  A.  The 2016 Fund was a fund that Rothenberg Ventures was

8  fundraising for, was raising to invest in technology startups

9  with a focus on what we called frontier tech and virtual

10 reality startups.

11 Q.  I want to ask you another question about that.

12     So frontier tech and VR firm, that's the middle sentence

13 in -- in this slide, correct?

14 A.  Correct.

15 Q.  What is -- let's -- let's take those in order.  What is

16 frontier tech?

17 A.  Sure.  Frontier tech is cutting edge technology at the

18 time that encapsulated a new technology such as drones,

19 cryptocurrency, virtual reality, augmented reality, space

20 technology, kind of any technologies that were at the frontier

21 of development.

22 Q.  And was a major focus of the portfolio in fact virtual

23 reality and augmented reality companies?

24 A.  Yes.

25 Q.  What is virtual reality?

1    **A.**  Virtual reality is a way to experience computing through a

2    headset that you put on your head and look through goggles.

3    **Q.**  And what is augmented reality?

4    **A.**  Augmented reality is similar except with augmented

5    reality, you often look through the goggles so that you see

6    images kind of displayed on top of what you would also see in

7    the real world.  So it's, in a way, like a heads-up display.

8          **MR. KLEINMAN:**  And if we could turn to page 6 of this

9    exhibit.

10                       (Exhibit published.)

11   **BY MR. KLEINMAN:**

12   **Q.**  Mr. Leep, what is being conveyed in this slide?

13   **A.**  These are examples of startups that Rothenberg Ventures

14   has invested in based on their different categories.

15   **Q.**  Is River Studios listed as one of the companies the

16   Rothenberg Venture funds had invested in?

17   **A.**  No.

18   **Q.**  And as a reminder, what -- what was River Studios?

19   **A.**  River Studios was a virtual reality production studio and

20   media company.

21   **Q.**  And who owned River Studios --

22   **A.**  Mike.

23   **Q.**  -- to your understanding?

24   **A.**  Mike Rothenberg.

25   **Q.**  And what was the relationship between the 2014 and '15

1   Funds and 13 Funds, for that matter, and River Studios?

2   **A.**  There's --

3   **Q.**  According to Mike Rothenberg?

4   **A.**  Yeah.  According to Mike, there's no relationship, they

5   were separate entities.

6   **Q.**  And what do you mean by no relationship?

7   **A.**  The funds -- those funds that you mentioned did not invest

8   in River Studios.  River Studios did not participate in those

9   funds.

10  **Q.**  And is that what Mike Rothenberg told you?

11  **A.**  Yes.

12       **MR. KLEINMAN:**  Now, if we could turn to page 13 of

13  this exhibit.

14                  (Exhibit published.)

15  **BY MR. KLEINMAN:**

16  **Q.**  Mr. Leep, what is being conveyed in this slide?

17  **A.**  This slide explains a program called River which is an

18  accelerator.  And an accelerator -- or this program is a --

19  a -- basically a way for frontier tech startups to receive

20  investment from Rothenberg Ventures and mentorship and advice

21  and have an option to work out of the Rothenberg Ventures

22  office.

23  **Q.**  And if you could direct your attention to the top right of

24  this slide.  It says Rothenberg Ventures 30 plus, and then it

25  replied a variety of companies.

1          What's being conveyed in that aspect of the slide?

2     A.   Yeah.  This is showing that Rothenberg Ventures has made

3     over 30 investments in frontier tech-type startups.  And then

4     it's showing -- and then on the right it lists -- it shows the

5     logos of those companies.

6          And then right below the Rothenberg Ventures line, it

7     shows Andreessen Horowitz, which is a prominent venture

8     capital firm, that's listed as having six investments in

9     frontier tech startups.

10    Q.   And -- oh, excuse me.

11    A.   And then it shows those logos of the companies that

12    Andreessen Horowitz has invested in.

13    Q.   And focusing on the Rothenberg Ventures slide, how many --

14    is River Studios listed as one of the companies that

15    Rothenberg Ventures invested in?

16    A.   No.

17    Q.   And this slide was dated November 2015, correct?

18    A.   Correct.

19    Q.   Now, turning your attention to December of 2015, Mr. Leep,

20    was there a -- were there additional events in December of

21    2015?

22    A.   Yes.  We had a holiday party or end-of-year party.

23    Q.   And what was your involvement in -- in that?

24    A.   I helped organize and plan the event.

25    Q.   And approximately how much was -- was that event?

1    **A.**   I believe it was -- it cost about 30- to $40,000.

2    **Q.**   And what did that event entail?

3    **A.**   It entailed renting a venue in San Francisco.  It entailed

4    a dinner for some dozens, if not a hundred, guests ballpark.

5    It involved some entertainment including a comedian and a DJ.

6    **Q.**   I want to ask you about the fundraising aspects of -- of

7    Rothenberg Ventures in and around this time.

8        Was there an attempt to raise funds in Asia in the last

9    quarter of 2015?

10   **A.**   Yes.

11   **Q.**   And what was your involvement in that effort?

12   **A.**   I participated in one of the trips to China.

13   **Q.**   And whose decision was it to focus on attempting to raise

14   funds in China?

15   **A.**   Mike Rothenberg's.

16   **Q.**   And when you say you participated, what does that entail?

17   **A.**   I got on the airplane, I flew to China with Mike and maybe

18   other people on the team.  I don't remember who exactly went.

19   **Q.**   And what did you do when you got there?

20   **A.**   I -- I was in some meetings, some kind of pitch meetings,

21   which were presentations that Mike made to groups of potential

22   investors.

23   **Q.**   And by "potential investors," that means people who you're

24   attempting to get to invest in your fund, correct?

25   **A.**   That's correct, yes.

1    Q.   Now, you mentioned that you went on one trip to China,

2    correct?

3    A.   Yes.

4    Q.   Did Mike Rothenberg take multiple trips to China during

5    this time period?

6    A.   Yes.

7              MR. KLEINMAN:   And if we could show what is in

8    evidence as Government's Exhibit 533, page 23.

9                      (Exhibit published.)

10   BY MR. KLEINMAN:

11   Q.   If you could read this text message into the record.

12   A.   This is a text message from Mike Rothenberg.  He writes,

13   "China was rough, man.  We'll debrief."  That's on

14   December 18th, 2015.

15   Q.   And did you go on a trip to China with Mike Rothenberg in

16   December?

17   A.   I don't think so.

18   Q.   Was your trip in fact earlier?

19   A.   I believe so.

20   Q.   You testified last week regarding a Super Bowl event in

21   February of 2016, correct?

22   A.   Right, yes.

23   Q.   And you read text messages regarding that event into the

24   record, correct?

25   A.   Yes.

1             **MR. KLEINMAN:**  Now, if we could pull up trial

2   Exhibit 533, page 33.

3                       (Exhibit published.)

4   **BY MR. KLEINMAN:**

5   **Q.**  Can you please read this text message into the record?

6   **A.**  This is a message from Mike Rothenberg.  He writes, "And

7   can you think of super-VIP's to invite to the Super Bowl

8   and/or Warriors' Friday.  It's a big moment for us.  Smiley

9   face."  That's on February 2nd, 2016 at 8:08 p.m.

10      He then writes, "dot dot dot, to raise money."  At the

11  same time.

12  **Q.**  And as a reminder, the Super Bowl in 2016 was held at

13  Levi's Stadium in the Bay Area, correct?

14  **A.**  Yes.

15  **Q.**  I want to ask you about the spending in now 2016.

16            **MR. KLEINMAN:**  If we could pull up what has been

17  marked for identification as Government's Exhibit 557.

18      (Exhibit published to witness, counsel, and the Court.)

19  **BY MR. KLEINMAN:**

20  **Q.**  Mr. Leep, was Founder Field Day also held in 2016?

21  **A.**  Yes.

22  **Q.**  And what was the -- what did that event entail?

23  **A.**  It entailed renting out the Giants Stadium, at the time

24  AT&T Park, inviting, I believe, a couple hundred people to

25  attend the event, hosting food, some programming or events,

1    kind of working sessions in the morning, and then some

2    networking in the afternoon, very similar to previous Founder

3    Field Day events.

4    **Q.**   Mr. Leep, turning your attention to Government's

5    Exhibit 557 which has been marked for identification, do you

6    recognize this exhibit?

7    **A.**   Yes.

8    **Q.**   What is it an exhibit of?

9    **A.**   It's an email from Skye to -- to one -- yeah, to Alexandra

10   Capitolo.

11   **Q.**   And Alexandra Capitolo appears to be a representative from

12   the San Francisco Giants, correct?

13   **A.**   That's correct.

14   **Q.**   Do you see your name on this email chain?

15   **A.**   Yes.

16   **Q.**   Do you see Mike Rothenberg's name on this email chain?

17   **A.**   Yes.

18   **Q.**   And were emails kept in the regular course of business at

19   Rothenberg Ventures?

20   **A.**   Yes.

21   **Q.**   Was this writing made contemporaneous to the events

22   outlined in the email?

23   **A.**   Yes.

24   **Q.**   Is this a fair and accurate copy of the email?

25   **A.**   Yes.

1    **Q.**  And was it the regular practice of Rothenberg Ventures to

2    make such records while conducting its business?

3    **A.**  Yes.

4           **MR. KLEINMAN:**  The government moves to admit

5    Government's Exhibit 557.

6           **THE COURT:**  Any objection?

7           **MR. FAKHOURY:**  No, Your Honor.

8           **THE COURT:**  557 is admitted.

9           (Government's Exhibit 557 received in evidence.)

10   BY MR. KLEINMAN:

11   **Q.**  If you could read the first sentence of -- of this

12   email --

13   **A.**  Yes.

14   **Q.**  -- Mr. Leep.

15   **A.**  "Final payment due today $117,796.22.  Please see wire

16   transfer and invoice attached."

17   **Q.**  And if you could read the next sentence as well.

18   **A.**  "This does not include items on the event order that are

19   based on consumption."

20           **MR. KLEINMAN:**  And if we could go to the next page of

21   this exhibit.

22       Excuse me.  The third page.

23               (Exhibit published.)

24           **MR. KLEINMAN:**  Fourth page.

25               (Exhibit published.)

 1    BY MR. KLEINMAN:

 2    Q.   What is -- what is this?

 3    A.   These are wire transfer instructions for Rothenberg

 4    Ventures -- well, for the Giants enterprise to receive a wire

 5    into their bank account.

 6            MR. KLEINMAN:   And if we can go to the next page.

 7                    (Exhibit published.)

 8    BY MR. KLEINMAN:

 9    Q.   What is -- what is this showing?

10    A.   This is the event order form that's referred to in the

11    email.

12            MR. KLEINMAN:   And if we can go to page 7, the final

13    page.

14        If we can blow up the financials line item.

15                    (Exhibit published.)

16    BY MR. KLEINMAN:

17    Q.   Can you please explain what's being shown in -- on -- in

18    this page?

19    A.   Yes.   This is a summary of all the costs for renting out

20    the ballpark for Founder Field Day.

21    Q.   Now, what -- what is the initial subtotal?

22    A.   The subtotal is $171,036.59.

23    Q.   But it does appear that you received a discount, correct?

24    A.   Yes.

25    Q.   Could you please read the amount of the discount?

1   **A.**   $49,000.

2   **Q.**   So fair to say that the discount does not offset the cost?

3   **A.**   Correct.

4   **Q.**   And you testified last week that part of your role was to

5   attempt to get sponsorships to further offset the cost of

6   these events, correct?

7   **A.**   Correct.

8   **Q.**   Were you able to get enough sponsorships to offset the

9   cost of this event?

10  **A.**   No.

11          **MR. KLEINMAN:**   If we could show what has been marked

12  for identification as Government's Exhibit 530.

13      (Exhibit published to witness, counsel, and the Court.)

14  **BY MR. KLEINMAN:**

15  **Q.**   Mr. Leep, do you recognize this exhibit?

16  **A.**   Yes.

17  **Q.**   What is this an exhibit of?

18  **A.**   This is an email I wrote to the team about an upcoming

19  event at Angel Island.

20  **Q.**   And prior to your testimony today, have you reviewed this

21  exhibit?

22  **A.**   Yes.

23  **Q.**   And was the information created in this exhibit around the

24  time this email was sent?

25  **A.**   Yes.

1  **Q.**  And was it the regular practice of Rothenberg Ventures to

2  make such records while conducting its business?

3  **A.**  Yes.

4  **Q.**  And was this email in fact kept in the regular course of

5  Rothenberg Ventures' business?

6  **A.**  Yes.

7  **Q.**  Is this a fair and accurate copy of that email?

8  **A.**  Yes.

9         **MR. KLEINMAN:**  The government moves to admit

10  Exhibit 530.

11         **THE COURT:**  Any objection?

12         **MR. FAKHOURY:**  No, Your Honor.

13         **THE COURT:**  530 is admitted.

14      (Government's Exhibit 530 received in evidence.)

15              (Exhibit published.)

16  **BY MR. KLEINMAN:**

17  **Q.**  Mr. Leep, can you please explain what you're outlining in

18  this exhibit?

19  **A.**  Yes.  I'm inviting the team at Rothenberg Ventures to RSVP

20  for the -- and attend the upcoming event that we are hosting

21  with the Rothenberg Ventures -- excuse me -- with founders in

22  the Rothenberg Ventures portfolio at Angel Island.

23  **Q.**  And how does the event at Angel Island relate to Founder

24  Field Day?

25  **A.**  Yes.  This event happens the day before, I believe,

1   Founder Field Day, and as a way for -- the intent is for the

2   founders in our portfolio to get together and spend time

3   together ahead of attending Founder Field Day the next day.

4   **Q.**  And what does the event at Angel Island entail?

5   **A.**  It entails a boat ride to the island.  It entails a

6   barbecue and then a hike around the island.

7   **Q.**  And when you say a boat ride, what do you mean by that

8   regarding the spending at Rothenberg Ventures?

9   **A.**  Right.  So we charter or rent a boat to transport the

10  attendees from San Francisco to Angel Island.

11  **Q.**  Now I want to ask you about the spending decisions and

12  approval processes in place at Rothenberg Ventures.

13      How would that work in 2016?

14  **A.**  Basically a request would be made to Mike for any upcoming

15  expenditures, and he would approve it either by email or text

16  message.  But in some form Mike wanted to have a written

17  record of approvals for spending.

18  **Q.**  And did this approval process encompass big expenditures

19  as well as small expenditures?

20  **A.**  Yes.

21       **MR. KLEINMAN:**  If we could show trial exhibit in

22  evidence 533, page 1.

23                    (Exhibit published.)

24  **BY MR. KLEINMAN:**

25  **Q.**  If you could read this text message into the record.

1    **A.**   This is a message written by me, Tommy Leep.  I write,

2    "full-color print on expedited notice is $1900."  Sent on

3    May 15, 2016, 8:29 p.m.

4        Mike Rothenberg responds, "Approved."  Within a minute.

5    **Q.**   So, Mr. Leep, regarding the approximately $117,000 bill,

6    who approved that spending?

7    **A.**   Mike Rothenberg.

8    **Q.**   And regarding this $1,900 bill, Mike Rothenberg approved

9    that as well, correct?

10   **A.**   Correct.

11   **Q.**   I also want to ask you about the size of the team in July

12   of 2016.

13              **MR. KLEINMAN:**  If we could show 533, page 5.

14                      (Exhibit published.)

15   **BY MR. KLEINMAN:**

16   **Q.**   Mr. Leep, what is being conveyed in this text message?

17   **A.**   In this message, Mike is asking to add an email address,

18   mike@river.co, to our Google administrative panel.  Yeah.

19   **Q.**   And what's your response?

20   **A.**   I respond with, "You have 46 employees and will be charged

21   $3 per employee on July 17, 2016."

22   **Q.**   So now in July 18, 2016, there are approximately

23   46 employees; is that correct?

24   **A.**   Correct.

25              **MR. KLEINMAN:**  And if we can go back to go that

1     exhibit.

2  **Q.**  There was an email, mike@river.co.

3       Whose email address was that?

4  **A.**  Mike Rothenberg's.

5  **Q.**  So fair to say Mike Rothenberg had multiple email

6  addresses?

7  **A.**  Yes.

8  **Q.**  Correct?

9  **A.**  Yes.

10 **Q.**  Now, in thinking about the 2013, 2014, and 2015 Funds, you

11 were also a limited partner, correct?

12 **A.**  Correct.

13 **Q.**  And as reminder, what's a limited partner?

14 **A.**  A limited partner is someone who invests in the funds.

15          **MR. KLEINMAN:**  Now if we could show what's been

16 marked for identification as Government's Exhibit 536.

17     (Exhibit published to witness, counsel, and the Court.)

18 **BY MR. KLEINMAN:**

19 **Q.**  Mr. Leep, do you recognize this exhibit?

20 **A.**  Yes.

21 **Q.**  What do you recognize it to be?

22 **A.**  An email from Mike Rothenberg to me.

23 **Q.**  And when you say to you, you see your email address,

24 correct?

25 **A.**  Correct.

1    **Q.**  And you see Mike Rothenberg's email address, correct?

2    **A.**  Correct.

3    **Q.**  And your email is this -- this is your personal email

4    address, correct?

5    **A.**  That's correct.

6    **Q.**  Now, was the information sent in this email created around

7    the time the -- this event occurred?

8    **A.**  Yes.

9    **Q.**  And was it the regular practice of Rothenberg Ventures to

10   make such records while conducting its business?

11   **A.**  Yes.

12   **Q.**  And is this email kept in the regular course of Rothenberg

13   Ventures' business?

14   **A.**  Yes.

15   **Q.**  And is this a fair and accurate copy of the email that you

16   received?

17   **A.**  Yes.

18           **MR. KLEINMAN:**  The government moves to admit

19   Exhibit 536.

20           **THE COURT:**  Any objection?

21           **MR. FAKHOURY:**  No, Your Honor.

22           **THE COURT:**  536 is admitted.

23       (Government's Exhibit 536 received in evidence.)

24           **MR. KLEINMAN:**  And if we could enlarge this email.

25                   (Exhibit published.)

 1    BY MR. KLEINMAN:

 2    Q.  So starting from the top of this email, the "From"

 3    section, whose email address is that?

 4    A.  It's from -- it's Mike Rothenberg's.

 5    Q.  And it's from Mike Rothenberg's Rothenberg Ventures email

 6    address, correct?

 7    A.  Correct.

 8    Q.  Now, it's sent to your -- you just testified that it's

 9    sent to your personal address, right?

10    A.  Yes.

11    Q.  Why was this email sent to your personal address?

12    A.  Because as an investor, or LP, in the fund, I received

13    communication from Rothenberg Ventures to my personal email

14    address.

15    Q.  And what is being conveyed in this email?

16    A.  Mike is explaining that the Rothenberg Ventures Fund I is

17    being renamed to Rothenberg Ventures 2013 Fund.

18    Q.  And when was this email sent?

19    A.  May 18, 2016.

20          MR. KLEINMAN:  If we could show what has been marked

21    for identification as Government's Exhibit 535.

22       (Exhibit published to witness, counsel, and the Court.)

23    BY MR. KLEINMAN:

24    Q.  Mr. Leep, do you recognize this exhibit?

25    A.  Yes.

1   **Q.**  What is it?

2   **A.**  It's an email from Mike Rothenberg to me explaining the

3   renaming of another fund.

4   **Q.**  And was the information created in this document around

5   the time the email was sent?

6   **A.**  Yes.

7   **Q.**  And is it the regular practice of Rothenberg Ventures to

8   make such records while conducting its business?

9   **A.**  Yes.

10  **Q.**  And is this email kept in the regular course of business

11  at Rothenberg Ventures?

12  **A.**  Yes.

13  **Q.**  Is this a fair and accurate copy of that email?

14  **A.**  Yes.

15          **MR. KLEINMAN:**  The government moves to admit

16  Government's Exhibit 535.

17          **THE COURT:**  Any objection?

18          **MR. FAKHOURY:**  No, Your Honor.

19          **THE COURT:**  535 is admitted.

20      (Government's Exhibit 535 received in evidence.)

21              (Exhibit published.)

22  **BY MR. KLEINMAN:**

23  **Q.**  Who sent this email?

24  **A.**  Mike Rothenberg.

25  **Q.**  And who was this email to?

1    **A.**   Me.

2    **Q.**   And is this your -- was it sent to your personal email

3    address?

4    **A.**   Yes.

5    **Q.**   Why was this email sent to your personal email address?

6    **A.**   Because I'm receiving this as an LP, or investor, in the

7    fund.

8    **Q.**   And which fund is this email discussing?

9    **A.**   Rothenberg Ventures Fund II.

10   **Q.**   And when was this email sent?

11   **A.**   May 18, 2016.

12   **Q.**   So that is the same date as the email regarding the name

13   change of Fund I that you testified to, correct?

14   **A.**   Correct.

15   **Q.**   And what is the purpose of this email?

16   **A.**   To explain that the Rothenberg Ventures Fund II is being

17   renamed to Rothenberg Ventures 2014 Fund.

18          **MR. KLEINMAN:**  Okay.  We can take that exhibit off.

19   **Q.**   Now, Mr. Leep, you testified last week that you began to

20   consider in 2016 exiting Rothenberg Ventures -- withdrawn.

21          You testified that you -- you began to consider changing

22   your role at Rothenberg Ventures, correct?

23   **A.**   Correct.

24          **MR. KLEINMAN:**  If we could show what has been -- what

25   is in evidence as 533, page 41.

```
 1                       (Exhibit published.)

 2    BY MR. KLEINMAN:

 3    Q.  Mr. Leep, what is being conveyed in this text message?

 4    A.  In this text message, I'm sharing a draft of an email

 5    about the changing of my role, the transition from full-time

 6    to advisor at Rothenberg Ventures, with Mike Rothenberg as a

 7    heads-up to him.

 8            MR. KLEINMAN:  And if we can show page --

 9    Q.  One last question regarding this page.  This was on

10    August 5th, 2016, correct?

11    A.  Correct.

12            MR. KLEINMAN:  Now I want to go 11 days later to

13    August 16th, 2016.  If we could show the -- the following page

14    of 533, page 42.

15                       (Exhibit published.)

16    BY MR. KLEINMAN:

17    Q.  Mr. Leep, what is this a text message of?

18    A.  This is a text message from Rothenberg Ventures -- excuse

19    me -- from Mike Rothenberg asking Martin Mayo to connect with

20    me about some documents.

21    Q.  And if you can read this text message into the record.

22    A.  Mike Rothenberg writes, "Martin, can you please chat with

23    Tommy about the Rothenberg partnership LLC docs?"  That's on

24    August 16, 2016, at 12:03 a.m.

25         There's a message from Mike that is blank.
```

1          Martin then responds.

2     Q.   And if you could read the status of that message.

3     A.   The status is "unread."

4     Q.   And then what's the response?

5     A.   The response from Martin Mayo is, "Yes, will do.  Tommy,

6     hope you are well.  Let me know if you have time later today

7     or tomorrow morning.  Thanks."  That's 8/16/2016 at 12:04 a.m.

8          I respond, "I'll follow up separately.  Thanks."

9               **MR. KLEINMAN:**  And if we can go to the next page.

10                        (Exhibit published.)

11    **BY MR. KLEINMAN:**

12    Q.   This is a text message that same day, August 16th, 2016,

13    correct?

14    A.   Yes.

15    Q.   Can you please read these text messages into the record?

16    A.   Mike Rothenberg asks "Were you able to synch with Martin?

17    Want to make sure you get what you need."

18         I respond, "I'm going to talk with him tomorrow."

19         Mike responds, "Cool thank you."

20              **MR. KLEINMAN:**  And if we can go to the following

21    page.

22                        (Exhibit published.)

23              **MR. FAKHOURY:**  Your Honor, this would --

24                   (Off-the-record discussion.)

25              **MR. KLEINMAN:**  And one moment, if we can take this

 1    off.

 2         **THE COURT:**  Mr. Fakhoury.

 3         **MR. FAKHOURY:**  Thank you, Your Honor.

 4         **THE COURT:**  I think your microphone is not

 5    projecting.

 6         **THE CLERK:**  Yeah, it's not on, Your Honor.  My

 7    apologies.  It should be on now.

 8         **THE COURT:**  Okay.  Go ahead.

 9         **MR. FAKHOURY:**  Your Honor, this would be the time for

10    the instruction we discussed outside the presence of the jury.

11         **THE COURT:**  All right.

12      Members of the jury, I read you some jury instructions at

13    the beginning of the trial, and as I told you I'll read you a

14    larger set at the end and I'll give you those instructions at

15    writing -- excuse me -- in writing.

16      From time to time as the trial is going along, it might be

17    necessary for me to give you instructions about the evidence

18    you're receiving at that moment or about other matters that

19    are being raised in the trial.

20      At this time I will tell you that you're about to hear

21    testimony that the Securities and Exchange Commission

22    initiated an inquiry into the finances of Rothenberg Ventures

23    and you may hear additional such evidence in the future.

24      This evidence is being admitted solely as it pertains to

25    Mr. Rothenberg's motive or intent and is to be considered by

1    you solely for that purpose.

2        The fact that the SEC initiated an inquiry is not evidence

3    that Mr. Rothenberg did any of the acts charged in the

4    indictment.

5        Mr. Kleinman.

6            **MR. KLEINMAN:**  Yes.  Thank you, Your Honor.

7        If we can show Government's Exhibit 533, page 44.

8                          (Exhibit published.)

9    **BY MR. KLEINMAN:**

10   **Q.**  And if you could read this text message into the record.

11   **A.**  Mike Rothenberg writes, "Tommy, do you have what you need

12   to return the paperwork for us?  It's an important

13   housekeeping item and I want to be sure you have what you

14   need."  That's on August 17, 2016.

15       I respond, "Hey guys, I'm not going to do it.  With the

16   SEC inquiry and the CFO resigning, I don't want to enter into

17   a new agreement."

18   **Q.**  And in very general terms, what did you understand the new

19   agreement to be?

20   **A.**  I'm not sure.  I think it was kind of a --

21            **MR. FAKHOURY:**  Objection, speculation.

22            **THE COURT:**  Overruled.  He was presented with the

23   agreement presumably.

24       Were you given a copy of an agreement to review?

25            **THE WITNESS:**  Yes.

 1              **THE COURT:**  Okay.  Overruled.

 2              **THE WITNESS:**  I remember it being kind of a

 3    reconfiguration of some of the terms of my prior employment

 4    agreement with Rothenberg Ventures.

 5              **MR. KLEINMAN:**  And if we can now go to Government's

 6    Exhibit 533, the next page, page 45.

 7         Excuse me.

 8         If we could go back one page.

 9                        (Exhibit published.)

10    **BY MR. KLEINMAN:**

11    **Q.**  This last text was on August 17th, 2016, correct?

12    **A.**  Yes, sir.

13    **Q.**  Okay.

14              **MR. KLEINMAN:**  And now if we can go to the next page.

15                        (Exhibit published.)

16    **BY MR. KLEINMAN:**

17    **Q.**  So this text message is on August 20th, 2016, correct?

18    **A.**  Yes.

19    **Q.**  If you could read this text message chain into the record.

20    **A.**  I write, "Hey dude, saw your call.  Let's let things

21    settle down a bit and catch up after burning man."

22         Mike responds, "Can I just have two mins, not about the

23    stuff going on."

24         I respond, "Something we can do over text?  Just not in

25    the mood to get on the phone at the moment."

 1          Mike responds, "Yes.  Just an apology to you."

 2   **Q.**  Why were you not on the mood to get on the phone?

 3          **MR. FAKHOURY:**  Objection.

 4          **THE WITNESS:**  I didn't --

 5          **MR. FAKHOURY:**  Objection, irrelevant.

 6          **THE COURT:**  Overruled.

 7          **THE WITNESS:**  I didn't want to talk about the

 8   documents that Mike wanted me to sign.

 9          **MR. KLEINMAN:**  If we could show the next page,

10   page 46.

11                    (Exhibit published.)

12   **BY MR. KLEINMAN:**

13   **Q.**  Mr. Leep, can you please read this text message chain into

14   the record.

15   **A.**  Yes.

16          Mike Rothenberg writes, "Happy Labor Day and welcome back

17   from the Playa! I hope it was a wonderful burn for you."

18   That's on September 5th, 2016.

19          I respond, "Thanks man.  Good to be back in modern

20   civilization."

21          Mike writes, "Good to hear man.  I'm sorry I missed the

22   burn!  Would be nice to see you sometime this week perhaps at

23   the Battery or something."

24          I write, "It'd be great to catch up."

25          Mike responds, "Definitely."

 1          Mike writes, "Any day of the week good for you?"

 2          I write, "Thursday afternoon?"

 3          Mike writes, "Cool."

 4          I write, "Something like 6 or 7 work?"

 5          Mike says, "Yes perfect."

 6          Mike responds, "Battery?"

 7               **MR. KLEINMAN:**  And if we can go to the next page.

 8                      (Exhibit published.)

 9     **BY MR. KLEINMAN:**

10     **Q.**  And this is a continuation of that same text message

11     chain.

12               **MR. KLEINMAN:**  If we can pull up the full chain.

13               **THE WITNESS:**  I write --

14               **MR. KLEINMAN:**  Oh, no, no, no.  There's -- I'm sorry,

15     Ms. Margen, you have it right.  You had it right before.

16                      (Exhibit published.)

17     **BY MR. KLEINMAN:**

18     **Q.**  So this is a continuation of that September 5th, 2016 text

19     message chain, correct?

20     **A.**  Yes.

21     **Q.**  If you could please read this text message chain --

22     **A.**  Yes.

23     **Q.**  -- into the record.

24     **A.**  I write, "Let's do 6.  How about we figure out location as

25     we get closer?"

1      Mike responds, "Cool."

2      I write, "We could try a new spot."

3      Mike writes, "Yeah, one with fewer ears."

4   **Q.**  And if we can now go to this final portion of the text

5   message, did you, in fact, meet up with Mike Rothenberg?

6   **A.**  Yes.

7                          (Exhibit published.)

8   **BY MR. KLEINMAN:**

9   **Q.**  And was that on September 9th, 2016?

10  **A.**  Yes.

11          **MR. KLEINMAN:**  And if we can zoom out.

12  **Q.**  Now, Mr. Leep, when you met with Mike Rothenberg, what, if

13  anything, did he say regarding Rothenberg Ventures?

14  **A.**  Mike said that he -- he was concerned that he had done

15  something wrong and that he might get in trouble.  And he

16  might have used the phrase that he had done something illegal

17  and was scared about the ramifications.

18          **MR. KLEINMAN:**  Nothing further, Your Honor.

19      Thank you.

20          **THE COURT:**  Thank you, Mr. Kleinman.

21      Mr. Fakhoury, questions for Mr. Leep?

22          **MR. FAKHOURY:**  Yes, Your Honor.

23                      (Pause in the proceedings.)

24  / / /

25  / / /

1              **CROSS-EXAMINATION**

2    **BY MR. FAKHOURY:**

3    **Q.**  Good morning, Mr. Leep.

4    **A.**  Good morning.

5    **Q.**  I want to start by asking you a couple questions about

6    your experience with startups and the venture capital industry

7    in general.  Okay?  And then later we'll talk a little bit

8    more about your time at Rothenberg Ventures.  All right?

9         So you've testified that before joining Rothenberg

10   Ventures, you had experience in the venture capital industry,

11   right?

12   **A.**  Yes.

13   **Q.**  And since your time at Rothenberg Ventures, you continue

14   to have -- you continue to work in that industry, right?

15   **A.**  Yes.

16   **Q.**  You run your own venture capital firm called Jetstream,

17   right?

18   **A.**  Yes.

19   **Q.**  And you previously testified that you worked for VC firms

20   including Floodgate and Haystack, right?

21   **A.**  Yes.

22   **Q.**  Okay.

23        Now, Mr. Kleinman asked you some questions about VC funds

24   in general.  And so I wanted to talk about that a little bit.

25        VC firms basically invest in startup companies, right?

1    A.   Correct.

2    Q.   And startup companies for -- maybe for lack of a better

3    word, these are -- these are baby companies, right?

4    A.   Yes.

5    Q.   And you testified that it does take some time for startups

6    to grow, right?

7    A.   Correct.

8    Q.   And that they need some guidance, right?

9    A.   Yes.

10   Q.   It takes time and guidance for them to figure out their

11   businesses, right?

12   A.   That's often the case.

13   Q.   To figure out how to streamline their operations?

14   A.   Yes.

15   Q.   To figure out how to be efficient?

16   A.   Often, yes.

17   Q.   To figure out how to make money?

18   A.   Can't be.  It's not always the role of venture

19   capitalists, but they often need that kind of help.

20   Q.   Okay.  And last week you testified that the typical VC

21   fund lasts for ten years, right?

22   A.   Yes.

23   Q.   And that's sort of a reflection of how long it could take

24   sometimes -- not always -- but sometimes for a company to sort

25   of go through its growing pains, right?

1    **A.**   Yes.

2    **Q.**   And ultimately that's why VC investments are high risk,

3    high reward investments, right?

4    **A.**   Correct.

5    **Q.**   High risk because not a lot of these startups are going to

6    make it, right?

7    **A.**   Yes.

8    **Q.**   And high reward because if one of them takes off, it could

9    be a pretty significant return for investors, right?

10   **A.**   Yes.

11   **Q.**   Now, Rothenberg Ventures was a startup, right?

12   **A.**   A different kind of startup than the companies we were

13   investing in, but that is fair to say.

14   **Q.**   Okay.

15        **MR. FAKHOURY:**   Mr. Torres, I'm going to ask you to

16   pull up Exhibit 555.

17        And, Your Honor, I'd like to publish.  This one is

18   admitted into evidence.

19        **THE COURT:**   That's fine.  Counsel may publish an

20   admitted exhibit to the jury at any time without asking the

21   Court's permission.

22        **MR. FAKHOURY:**   Thank you, Your Honor.

23                  (Exhibit published.)

24   **BY MR. FAKHOURY:**

25   **Q.**   Okay.  Mr. Leep, I'm showing you what's been admitted as

1    Exhibit 555.  You testified about this slide deck last week.

2    Do you recall that testimony?

3    **A.**   Yes.

4    **Q.**   And do you recall the slide deck, right?

5    **A.**   Yes.

6    **Q.**   You helped put the slide deck together, correct?

7    **A.**   Yes.

8    **Q.**   Okay.

9              **MR. FAKHOURY:**  Mr. Torres, can you go to page 2,

10   please?

11                     (Exhibit published.)

12   **BY MR. FAKHOURY:**

13   **Q.**   And I mean right on the front of the slide, right, the

14   slide indicates that Rothenberg Ventures executes at startup

15   speed (indicating), right?

16   **A.**   That's right.

17                     (Exhibit published.)

18   **BY MR. FAKHOURY:**

19   **Q.**   Now you're aware that Rothenberg Ventures started in 2012,

20   right?

21   **A.**   Yes.

22   **Q.**   And that's when Mr. Rothenberg was still in business

23   school, correct?

24   **A.**   Correct.

25   **Q.**   Your father was Rothenberg Ventures' first employee,

1   correct?

2   **A.**   That sounds correct.

3   **Q.**   And you're aware that your father's home in Menlo Park was

4   the address for the kind of corporate formation documents for

5   the -- for Rothenberg Ventures, right?

6   **A.**   Yes.

7   **Q.**   And his address in Menlo Park was the address on bank

8   statements for Rothenberg Ventures at the beginning, right?

9   **A.**   I believe so.

10  **Q.**   Now, you testified that you lived with Mr. Rothenberg when

11  he returned to the Bay Area after business school, right?

12  **A.**   Yes.

13  **Q.**   Okay.

14       And that would have been in 2013 or so?  Does that sound

15  right?

16  **A.**   I don't remember exactly when it started.  But I know we

17  were -- I believe we were living together by 2014.

18  **Q.**   Okay.

19       At the time Rothenberg Ventures was founded or -- or sort

20  of starting up, it was primarily run out of Mr. Rothenberg's

21  home, right?

22  **A.**   Yes.  I guess depends on the -- the time period you're

23  referring to.

24  **Q.**   Sure.  Let me be a little more precise then.  So in -- we

25  already established that your father's home address in

1    Menlo Park was sort of the initial address provided in

2    official Rothenberg Ventures paperwork like bank statements

3    and Secretary of State certifications, right?

4    **A.**   That's correct.

5    **Q.**   Okay.  And then at some point you're aware that

6    Mr. Rothenberg purchased a condo in San Francisco, right?

7    **A.**   Yes.

8    **Q.**   And so when Mr. Rothenberg returned from business school

9    to the Bay Area, Rothenberg Ventures was run out of that condo

10   in around 2013, right?

11   **A.**   From what I remember, there was another office that was

12   not the condo, before I joined the firm, that was in

13   San Francisco.

14   **Q.**   Okay.  How about before that office, before you joined the

15   firm, do you know if you Mr. Rothenberg ran the fund from his

16   condo?

17   **A.**   I don't remember.

18   **Q.**   Okay.

19       Now, you joined Rothenberg Ventures in 2014, right?

20   **A.**   Yes.

21   **Q.**   And it was also around -- that was also around the time

22   you moved into the condo with Mr. Rothenberg, right?

23   **A.**   I believe so.

24   **Q.**   Okay.

25       Now, a minute ago, we had established that even before you

THOMAS ELWOOD LEEP - CROSS / FAKHOURY

1    joined Rothenberg Ventures, you had worked in the venture

2    capital industry before, correct?

3    **A.**   Yes.

4    **Q.**   And you came from Floodgate.  Do I have the timing right?

5    **A.**   Yes.

6    **Q.**   Okay.  And I believe you testified that Floodgate had

7    $50 million of -- $50 million worth of assets under management

8    at the time you left it.  Does that sound about right?

9    **A.**   It was approximately that much --

10   **Q.**   Okay.

11   **A.**   -- yeah.

12   **Q.**   Now you'd also previously worked at Intuit, right?

13   **A.**   Yes.

14   **Q.**   And there, they make TurboTax and QuickBooks, right?

15   **A.**   Correct.

16   **Q.**   They're a pretty big software company?

17   **A.**   Yes.

18   **Q.**   Okay.

19         And obviously you knew Mr. Rothenberg because you were

20   both students at Stanford together, right?

21   **A.**   Correct.

22   **Q.**   And roommates together at Stanford?

23   **A.**   Yes.

24   **Q.**   Okay.

25         Now, at the time you joined Rothenberg Ventures in 2014,

1  it had only been around for basically two years at that point,

2  right?

3  **A.**  That sounds about right.

4       **MR. FAKHOURY:**  Mr. Torres, can you jump to page 6 of

5  this exhibit.  This is Exhibit 555.

6                     (Exhibit published.)

7  **BY MR. FAKHOURY:**

8  **Q.**  Okay.  I wanted to talk about some of the folks on this

9  slide deck here.  And again, this is Exhibit 555 at 6.

10      This is a slide deck, again, you put -- you helped put

11  this slide deck together, right?

12 **A.**  Yes.

13 **Q.**  And this is a Rothenberg Ventures slide deck from 2014,

14 correct?

15 **A.**  Yes.

16 **Q.**  Okay.  That's you over here (indicating)?

17 **A.**  Correct.

18 **Q.**  Okay.

19      I wanted -- and this is your father, right?

20 **A.**  Yes.

21 **Q.**  Okay.

22      I wanted to talk about some of the folks on here.  The

23 first is this gentleman right here, Justin Allamano.  I might

24 be saying his name wrong.

25      Do you see who I'm referring to?

1    **A.**   Yes.

2    **Q.**   Okay.  And it says here underneath his name the title of

3    general counsel; do you see that?

4    **A.**   Yes.

5    **Q.**   Okay.  So Mr. Allamano is an attorney, right?

6    **A.**   From what I remember, yes.

7    **Q.**   Okay.  And he's effectively the inhouse attorney for

8    Rothenberg Ventures, right?

9    **A.**   I believe so.

10   **Q.**   Okay.

11        Now, on the bottom here is a list of -- well, is the

12   heading of "External."  Do you see that?

13   **A.**   Yes.

14   **Q.**   And this is a list of folks who are working with

15   Rothenberg Ventures but not necessarily employed by Rothenberg

16   Ventures, right?

17   **A.**   Correct.

18   **Q.**   Okay.

19        So let's go through a couple of these folks real quick.

20        The first person is Dan Friedland here.

21        Do you see that?

22   **A.**   Yes.

23   **Q.**   And he has the title of company counsel?

24   **A.**   Yes.

25   **Q.**   So he's an attorney, right?

1    **A.**   I -- I assume so.

2    **Q.**   Okay.

3         How about the person next to him -- oops.  I didn't go a

4    good job there.  There we go.

5         Libby Lefever, company counsel also?

6    **A.**   Yes.

7    **Q.**   Okay.  And then we've got Steve Malvey here.  He's a tax

8    attorney, right?

9    **A.**   Yes.

10   **Q.**   Okay.

11        You see here there's a reference to Orrick.  Do you see

12   that?

13   **A.**   Yes.

14   **Q.**   Okay.  And Orrick is a pretty large law firm?

15   **A.**   Yes.

16   **Q.**   Okay.

17        There's also a reference down here to Sensiba San Filippo.

18        Do you see that?

19   **A.**   Yes.

20   **Q.**   They're a major accounting firm here in the Bay Area?

21   **A.**   I don't remember.

22   **Q.**   Okay.

23        And there's a reference here to John Volk, an accountant.

24   Do you see that?

25   **A.**   Yes.

 1   **Q.**  Okay.  So these were all some of the folks, external folks

 2   doing work on Rothenberg Ventures' behalf, right?

 3   **A.**  Yes.

 4                    (Pause in the proceedings.)

 5   **BY MR. FAKHOURY:**

 6   **Q.**  Okay.  I want to shift gears a little bit and talk about

 7   events at Rothenberg Ventures.  Okay?

 8       Now, part of the strategy at Rothenberg Ventures was to

 9   focus on millennial founders.  Does that sound about right?

10   **A.**  Yes.

11   **Q.**  Okay.  And so we're all on the same page here, by

12   "millennials," we're talking about people basically born in

13   the 1980's?

14   **A.**  Sounds about right.

15   **Q.**  Effectively?

16   **A.**  Roughly.

17   **Q.**  Okay.  So people of your generation, right?

18   **A.**  Yes.

19   **Q.**  Okay.

20          **MR. FAKHOURY:**  Mr. Torres, can you go to page 7 of

21   this exhibit.

22                    (Exhibit published.)

23   **BY MR. FAKHOURY:**

24   **Q.**  And part of -- and let me, again, just so we're all on the

25   same page here, this is a slide deck that was given to

1    investors, right?

2    **A.**   Correct.

3    **Q.**   Okay.

4         And here at the -- kind of at the top here, under the

5    Rothenberg Ventures investment advantage is the phrase

6    "access."

7         Do you see that?

8    **A.**   Yes.

9    **Q.**   And it talks about introductions.

10        Do you see that?

11   **A.**   Yes.

12   **Q.**   So obviously that means networking was kind of a major

13   part of Rothenberg Ventures' strategy, right?

14   **A.**   Yes.

15   **Q.**   And your role as a chief connector -- I think I got the

16   title right -- but part of your role was to help facilitate

17   these introductions and networking events and access, right?

18   **A.**   Yes.

19   **Q.**   Now, you have a master's degree from Stanford, right?

20   **A.**   Yes.

21   **Q.**   And that's in economic sociology?

22   **A.**   Correct.

23   **Q.**   And that's basically the study of social interactions that

24   facilitate business.  How'd I do with --

25   **A.**   That would -- that certainly is part of it.

1  Q.  Okay.

2  A.  Yes.

3  Q.  So you have a pretty good grasp on the social science of

4  networking.  Maybe that's one way to say it.

5  A.  I think that's fair to say.

6  Q.  Okay.

7       MR. FAKHOURY:  Could we go to page 3 of this exhibit,

8  Mr. Torres?

9                      (Exhibit published.)

10      MR. FAKHOURY:  Oops, I have the wrong page.  I'm

11  sorry.  You know what.  Never mind.

12     Can you actually jump to page 9 of this exhibit.  My

13  apologies.

14                      (Exhibit published.)

15  BY MR. FAKHOURY:

16  Q.  And given RV, Rothenberg Ventures', focus on networking

17  and access, the slides explain to investors that there's over

18  a hundred founder events a year, right?

19  A.  Yes.

20  Q.  And you talked -- now Mr. Kleinman asked you a lot about

21  some of those bigger events like Founders Field Day for

22  example, but there were a lot of smaller events too, right?

23  A.  Yes.

24  Q.  There were happy hours?

25  A.  Yes.

THOMAS ELWOOD LEEP - CROSS / FAKHOURY

1   Q.   Tech demonstrations?

2   A.   Yes.

3   Q.   Where founders or folks in the portfolio companies would

4   come and showcase what they're working on, right?

5   A.   Yes.

6   Q.   You talked a little bit with Mr. Kleinman about virtual

7   reality and augmented reality.  And some events that were

8   hosted by Rothenberg Ventures included opportunities for

9   people to try out VR and AR technologies, right?

10  A.   Yes.

11  Q.   And in 2014, 2015, that was still a pretty new thing?

12  A.   Yes.

13  Q.   Okay.

14       Apple wasn't making its super-expensive headset at that

15  point?

16  A.   Right.

17  Q.   Okay.

18       And the idea behind some of these events was to bring both

19  founders and investors together in the same place, right?

20  A.   As one of the ideas, yes.

21  Q.   Okay.  And -- and kind of taking a step back from that,

22  the ultimate goal was to encourage investors to invest, right?

23  A.   Also one of -- one of the strategies.

24  Q.   Okay.

25  A.   One of the goals, I would say.

1   **Q.**  Another strategy was to convey that Rothenberg Ventures

2   had a very strong network, right?

3   **A.**  Yes.

4           **THE COURT:**  Mr. Fakhoury, anytime in the next five

5   minutes.

6           **MR. FAKHOURY:**  Okay.

7   **Q.**  And what that really meant was part of the strategy was

8   for people to know that Rothenberg Ventures sort of knew a lot

9   of the important founders and important investors in this sort

10  of -- I think you used the word ecosystem.  Does that sound

11  about right?

12  **A.**  Yes.

13  **Q.**  In other words, in this niche, in this specific investing

14  and technology space.

15  **A.**  I'd say that's a fair characterization.

16  **Q.**  Okay.

17          **MR. FAKHOURY:**  This would be a good time, Your Honor.

18          **THE COURT:**  All right.  Members of the jury, let's go

19  ahead and take our first 15-minute break.

20      Remember my prior admonitions, which are keep an open

21  mind, don't communicate with anybody, don't look anything up.

22      And we'll see you in 15 minutes.

23          **THE CLERK:**  Please rise for the jury.

24      (The following proceedings were heard out of the presence

25  of the jury:)

1          **THE COURT:**  All right.  We're outside the presence of

2     the jury.  Mr. Leep, you can step down and take a break.

3          Is there anything anyone wishes to place on the record?

4          Mr. Kleinman?

5          **MR. KLEINMAN:**  Nothing from the government.  Thank

6     you, Your Honor.

7          **THE COURT:**  Mr. Fakhoury?

8          **MR. FAKHOURY:**  No, Your Honor.  Thank you.

9          **THE COURT:**  All right.  Thanks.  Let's be in recess.

10          **THE CLERK:**  Court is in recess.

11          (Recess taken at 10:01 A.M.; proceedings resumed at

12     10:21 A.M.)

13          (The following proceedings were heard in the presence of

14     the jury:)

15          **THE CLERK:**  You may be seated.

16          **THE COURT:**  All right.  All the jurors are in their

17     assigned seats.  Mr. Leep is still on the witness stand.

18          Mr. Fakhoury, your witness.

19          **MR. FAKHOURY:**  Thank you, Your Honor.

20     **Q.**  Okay.  Mr. Leep, when we took our break, we were talking

21     about events at Rothenberg Ventures.  And we were talking

22     about the strategy behind the events.

23          Now, one of those strategies was also to grow the firm's

24     profile, right?

25     **A.**  Yes.

1    **Q.**  And I believe you testified that part of that involved

2    wanting to do things that were exciting and grandiose, right?

3    **A.**  Yes.

4    **Q.**  And the strategy worked, right?

5    **A.**  In what sense?

6    **Q.**  Well, people wanted to go to the events, right?

7    **A.**  Yes.

8              **MR. FAKHOURY:**  Mr. Torres, can you pull up

9    Exhibit 533.  And go to page 13, please.

10                     (Exhibit published.)

11   **BY MR. FAKHOURY:**

12   **Q.**  I want to talk about this text message exchange dated

13   July 28, 2014.  You can see that on your screen?

14   **A.**  Yes.

15   **Q.**  Okay.  And this is Exhibit 533 at page 13.  This has

16   already been admitted into evidence.

17       This is about an event called carnival.  Do you see that?

18   **A.**  Yes.

19   **Q.**  And my recollection was you testified that this event was

20   at Brandon Farwell's parents' house, right?

21   **A.**  As I remember, yes.

22   **Q.**  Okay.  And his parents have a pretty nice house?

23   **A.**  Yes.

24   **Q.**  Where is that house?

25   **A.**  I believe it's in Atherton, California.

1   Q.   Okay.  That's a pretty wealthy part of the Bay Area?

2   A.   Yes.  It might be Menlo Park or Atherton.  I don't

3   remember precisely.

4   Q.   Okay.

5        I want to direct your attention to this text message from

6   Mr. Rothenberg dated July 28, 2014 where he says, "Looks like

7   SVB, Perkins Coie, and HP, with MK from First Republic

8   attending."

9        Do you see that?

10  A.   Yes.

11  Q.   I want to talk about some of those folks there.  SVB,

12  that's Silicon Valley Bank, right?

13  A.   Yes.

14  Q.   Okay.  Perkins Coie, that is a law firm, right?

15  A.   Yes.

16  Q.   HP, I think everybody knows what HP is.  They're the

17  computer printer company?

18  A.   Yes.

19  Q.   And do you know who MK is?

20  A.   Yes.  I know who she is.

21  Q.   Okay.  Is she somebody who works for First Republic?

22  A.   I believe she did at the time.

23  Q.   Okay.  And First Republic is also a bank or was a bank?

24  A.   I think so.  Yes.  They were a bank at the time.

25  Q.   Okay.

1   They've been now purchased by JP Morgan Chase, right?

2   **A.** I don't know off the top of my head.

3   **Q.** Okay.  No problem.  All right.

4   I think it's safe to say that the strategy behind some of

5   these events is a little bit different than some of the

6   bigger, more established venture capital firms in the

7   Bay Area, right?

8   **A.** It was at the time.

9   **Q.** And part of that is, again we've already talked about

10  this, Rothenberg Ventures was sort of aimed towards

11  millennials, younger people, right?

12  **A.** Yes.

13       **MR. FAKHOURY:**  Mr. Torres, can we go to Exhibit 555.

14  And go to page 1.

15                    (Exhibit published.)

16  **BY MR. FAKHOURY:**

17  **Q.** Again, just to really make clear, you know, we're talking

18  about the millennial venture firm for millennial founders,

19  right?

20  **A.** Yes.

21       **MR. FAKHOURY:**  Mr. Torres, can you go to page 7.

22                    (Exhibit published.)

23  **BY MR. FAKHOURY:**

24  **Q.** And again we've already talked about this so I'll be

25  quick.

 1        Access is a part of the strategy being advertised to

 2    investors, right?

 3    **A.**  Yes.

 4    **Q.**  Okay.

 5        Now, we've -- we've heard a lot of testimony about

 6    Founders Field Day so I want to talk a little bit about that.

 7            **MR. FAKHOURY:**  Mr. Torres, can you go to page 12 of

 8    this exhibit.

 9                        (Exhibit published.)

10    **BY MR. FAKHOURY:**

11    **Q.**  Now you were tasked with helping to plan and organize

12    Founders' Field Day, right?

13    **A.**  Yes.

14    **Q.**  And there were three Founders Field Days, correct?

15    **A.**  Yes.

16    **Q.**  This is a picture from the 2014 Founders Field Day, right?

17    **A.**  Yes.

18    **Q.**  And that was what initially brought you on to Rothenberg

19    Ventures to help plan this specific event, correct?

20    **A.**  Yes.

21    **Q.**  Now, this is a picture obviously from that event with all

22    the attendees of the event, correct?

23    **A.**  Yes.

24    **Q.**  And at that event, there were -- and I believe you

25    testified about this -- there were presentations, right?

1   **A.**   Yes.

2   **Q.**   And there were panel discussions and little breakout

3   rooms, right?

4   **A.**   Yes.   There were kind of working sessions.   They're like

5   panel discussions.

6   **Q.**   Okay.   So sort of like a conference, right?

7   **A.**   Yes.

8   **Q.**   Okay.

9        Now there was also a networking component, right?

10  **A.**   Yes.

11  **Q.**   And the event was a successful event, right?

12  **A.**   Yes.

13  **Q.**   And people had a good time?

14  **A.**   I would say so.

15  **Q.**   And people learned about Rothenberg Ventures, right?

16  **A.**   Yes.

17  **Q.**   Mr. Kleinman asked you a little bit about sponsorships,

18  and I want to talk to you a little bit about that.

19        **MR. FAKHOURY:**   Mr. Torres, can you go to Exhibit 540.

20  This has been admitted.

21                  (Exhibit published.)

22        **MR. FAKHOURY:**   And could you scroll -- well, actually

23  I'm sorry, before -- before you scroll down, Mr. Torres.

24  **Q.**   Mr. Leep, you see the exhibit on the screen.   This is a --

25  this is an email sent to you from Joe Wadlington.

1          Do you see this?

2     **A.**   Yes.

3     **Q.**   Okay.

4               **MR. FAKHOURY:**  And can you go to the second page.

5                    (Exhibit published.)

6     **BY MR. FAKHOURY:**

7     **Q.**   This is a -- now, this is a -- a solicitation for

8     sponsorship for Founders Field Day, correct?

9     **A.**   Yes.

10    **Q.**   Did you help put this together?

11    **A.**   I believe so.

12    **Q.**   Okay.

13         And this is specifically proposing that Silicon Valley

14    Banks [sic] sponsor a Founders Field Day, correct?

15    **A.**   Yes.

16    **Q.**   And Silicon Valley Bank did in fact write a check for

17    Founders Field Day, correct?

18    **A.**   I believe so.

19    **Q.**   That was a $30,000 check, right?

20    **A.**   That sounds about right.

21    **Q.**   And you're aware that other companies throughout your time

22    at Rothenberg Ventures sponsored Rothenberg Ventures events,

23    correct?

24    **A.**   Yes.

25    **Q.**   And some of those companies included Fidelity, the

1    financial services industry, right?  Or financial services

2    company, excuse me.

3    **A.**  I don't -- I don't remember.

4    **Q.**  Okay.

5        How about HP?  You're aware that HP provided sponsorship

6    to Rothenberg Ventures events, right?

7    **A.**  Yes.

8            **MR. FAKHOURY:**  Mr. Torres, can you go back to

9    Exhibit 533.

10       And can you go to page 8.

11                        (Exhibit published.)

12   **BY MR. FAKHOURY:**

13   **Q.**  I wanted to clarify -- I wanted to ask you some questions

14   about some of the text messages that we've seen.  Okay?

15       Now, on page 8 here is text messages referencing the World

16   Series in October 2014.  Do you see that?

17   **A.**  Yes.

18   **Q.**  Okay.  And in October 2014, the San Francisco Giants were

19   in the World Series, right?

20   **A.**  I believe so.

21   **Q.**  Okay.

22       Now, by October 2014, you and Mr. Rothenberg had lived

23   together for many years, right?

24   **A.**  Yes.

25   **Q.**  So let me -- let me clarify that.  You'd lived together

1    while you were in -- undergrads in college, right?

2    **A.**  Yes.

3    **Q.**  You'd lived together while you were in grad school also at

4    Stanford, right?

5    **A.**  Yes.

6    **Q.**  And in October of 2014, you were living with

7    Mr. Rothenberg in San Francisco, right?

8    **A.**  Correct.

9    **Q.**  And I believe you testified he was one of your best

10   friends, right?

11   **A.**  Yes.

12          **MR. FAKHOURY:**  Mr. Torres, can you jump to page 21 of

13   this exhibit.

14                    (Exhibit published.)

15   **BY MR. FAKHOURY:**

16   **Q.**  I want to show you an exhibit -- a text message we've

17   already seen dated June 2nd, 2015, talking about -- from

18   Mr. Rothenberg.  Do you see the text message on your screen?

19   **A.**  Yes.

20   **Q.**  It says, "I do what I love.  Business feels like a party

21   to me.  In that sense, I want to be Silicon Valley's party

22   animal."  Do you see that?

23   **A.**  Yes.

24   **Q.**  You testified last week about a *Bloomberg* article that was

25   published in May of 2015 about Rothenberg Ventures, right?

THOMAS ELWOOD LEEP - CROSS / FAKHOURY

1  A.  Yes.

2  Q.  And you're aware that -- and you testified that

3  Mr. Rothenberg was not happy about that article, right?

4  A.  Yes.

5  Q.  Okay.  And you're aware that that article was titled, "The

6  Valley's Party Animal," right?

7  A.  Something like that.  I don't -- I don't remember the

8  exact words.

9  Q.  Okay.

10      And this text message was after that article was published

11  right?

12  A.  I believe so.

13  Q.  Okay.

14          MR. FAKHOURY:  I don't need the screen anymore.

15      Oh, actually, I'm sorry.  I do.  I apologize.  There was a

16  couple other questions I wanted to ask that I skipped.  I'm

17  sorry.  Give me one second.

18  Q.  Okay.  I wanted to talk to you a little bit about your

19  status as an investor in the funds.  Okay?

20      And you testified that you were -- you were a limited

21  partner in the 2013 Fund, right?

22  A.  Yes.

23  Q.  And we saw some correspondence sent to your personal email

24  account when the 2013 Fund changed its name, right?

25  A.  Yes.

THOMAS ELWOOD LEEP - CROSS / FAKHOURY

1    Q.   You're also -- you were also a limited partner in the

2    2014 Fund, right?

3    A.   Correct.

4    Q.   Are you a limited partner in any other funds?

5    A.   The 2015 Fund as well.

6    Q.   Okay.

7         Now, those -- those funds still exist, right?

8    A.   Yes.

9    Q.   And they're -- they're currently managed by JR Eppler and

10   Burke Robinson, right?

11   A.   Yes.

12   Q.   Now, the -- like most VC funds, the 2013 Fund is a

13   ten-year fund, right?

14   A.   Yes.

15   Q.   And it's 2023, right?

16   A.   Um-hmm.

17   Q.   So you should be getting a return on that investment soon,

18   right?

19   A.   I hope so.

20   Q.   Okay.  Has that happened yet?

21   A.   There have been some distributions from that fund to the

22   LP's in that fund.

23   Q.   Okay.

24        Have there been distributions from any of the other funds

25   to which you're a limited partner?

1   A.   I believe so, but I don't recall which ones.

2   Q.   Okay.

3        Last week you testified about the management fee structure

4   of the 2013 Fund.

5        Do you recall that?

6   A.   Yes.

7   Q.   And both in connection with your work with Rothenberg

8   Ventures and as a limited partner of the 2013 Fund, you're

9   aware that those -- that fee structure is set out in the

10  fund's offering memo, right?

11  A.   Yes.

12  Q.   Sometimes those are called confidential private offering

13  memorandums, right?

14  A.   Yes.

15  Q.   And as a manager of your own VC fund now, you also have

16  familiarity and understanding with confidential private

17  offering memorandums generally, right?

18  A.   Yes.

19  Q.   So you're familiar that an offering memo dictates the

20  terms of the investment to potential investors, right?

21  A.   Yes.

22  Q.   And these are generally given to investors before they

23  invest, right?

24  A.   Yes.

25  Q.   You're aware these offering memos are generally written by

1    lawyers, right?

2    **A.**  Yes.

3    **Q.**  Now, the 2013 -- your investment in the 2013 Fund, the way

4    I understand it, but you can correct me if I'm wrong, that

5    investment was originally made by your father, right?

6    **A.**  Yes.

7    **Q.**  And then he transferred that investment to you, correct?

8    **A.**  Correct.

9    **Q.**  And so as a limited partner, you were given the

10   confidential fund offering memo for the 2013 Fund, right?

11   **A.**  I believe so.

12   **Q.**  Okay.

13   **A.**  I believe I -- yeah, I believe so.

14   **Q.**  Okay.  And you've already testified that you knew about

15   the fee structure in that fund, right?

16   **A.**  Yes.

17   **Q.**  Which comes from the fund offering memo, right?

18   **A.**  Yes.

19   **Q.**  And you're familiar with the other terms of that fund

20   offering memo, right?

21   **A.**  I'm -- the ones that I spoke to, yes.  Depends what terms

22   you're talking about.

23   **Q.**  Okay.  Well, let me ask a couple questions about that

24   then.

25   **A.**  Okay.

1   Q.   So you know that the 2013 Fund has a manager, right?

2   A.   Yes.

3   Q.   And you know that the -- the manager of that fund is

4   Rothenberg Ventures Management Company, right?

5   A.   That sounds right.

6   Q.   Okay.

7        You know that Rothenberg Ventures Management Company is

8   owned by Mr. Rothenberg, right?

9   A.   Yes.

10  Q.   And you know that as the -- and by you, I mean you,

11  Mr. Leep, but also you as a limited partner -- you know that

12  the founder of the fund and the owner of the manager,

13  Rothenberg Ventures Management Company, so talking about

14  Mr. Rothenberg, he makes all final decisions regarding

15  strategy and day-to-day operations of the fund on behalf of

16  the Management Company, right?

17  A.   Yes.

18  Q.   We talked a little bit about management fees and that in

19  the 2013 Fund, the management fees were paid up front.  Do you

20  recall that?

21  A.   Yes.

22  Q.   And part of the reason for that was the 2013 Fund was

23  basically the first major fund of Rothenberg Ventures, right?

24  A.   Yes.

25  Q.   And like any startup, it needed money to operate so kind

1    of took the money at the front end, right?

2    **A.**   The fund did take the money at the front end.

3    **Q.**   Okay.

4        Now, we used the term "management fee."  And you're aware

5    that the -- the management fee for the 2013 Fund is intended

6    to cover expenses --

7                            (Coughing.)

8    **BY MR. FAKHOURY:**

9    **Q.**   -- the manager incurs in connection with the fund's

10   activities, right?

11   **A.**   I'm sorry.  Could you repeat the question, please?

12   **Q.**   Sure.

13       You're aware that the management fee in the 2013 Fund is

14   intended to cover expenses the manager incurs in connection

15   with the fund's activities?

16   **A.**   Yes.

17   **Q.**   And that includes salaries, right?

18   **A.**   Yes.

19   **Q.**   Overhead?

20   **A.**   Yes.

21   **Q.**   Costs and expenses that are incurred, right?

22       I'm sorry.  What was that?

23   **A.**   Yes.

24   **Q.**   Okay.

25       You're aware that the fund operating agreement has a

THOMAS ELWOOD LEEP - CROSS / FAKHOURY

1   section called indemnification, right?

2   **A.**   I don't remember.

3   **Q.**   Okay.  Are you familiar with the concept of

4   indemnification?

5   **A.**   Broadly, yes.

6   **Q.**   Okay.  It's one of those fancy legal words that lawyers

7   like to use.

8        Are you aware that indemnification generally means an

9   obligation to cover legal expenses incurred by someone else?

10       Does that sound about right to you?

11   **A.**   Broadly, yes.

12   **Q.**   Okay.

13       We talked about this before.  Investing in a VC fund is

14   a -- is a risky investment, right?

15   **A.**   Yes.

16   **Q.**   And we already established part of that is because

17   startups are somewhat of a risky investment, right?

18   **A.**   Could you clarify the question?

19   **Q.**   Sure.

20       Part of the reason that VC funds are risky investments is

21   because startups are risky investments and VC funds primarily

22   invest in startups.

23       Does that sound right?

24   **A.**   Yes.

25   **Q.**   Okay.

1      And you're aware that the 2013 Fund advised LP's like you

2   that there's no assurance that an LP will receive a

3   distribution from the fund, right?

4   **A.**   Correct.

5   **Q.**   Now, you just testified you have in fact received a

6   distribution, correct?

7   **A.**   Yes.

8   **Q.**   Okay.

9      LP's, you're aware that LP's are informed that the fund

10  may find it necessary to sell its investment at a discount,

11  right?

12  **A.**   Sorry.  Could you repeat the question?

13  **Q.**   Sure.

14     As an LP, you're aware that the fund told investors in the

15  offering memo that the fund may find it necessary to sell its

16  investment at a discount, right?

17  **A.**   I don't remember.

18  **Q.**   Okay.

19     You are familiar with the fund offering memo, right?

20  **A.**   Yes.

21  **Q.**   You've reviewed that offering memo?

22  **A.**   Yes.

23  **Q.**   You've reviewed it before your testimony today?

24  **A.**   Yes.

25  **Q.**   Okay.

1    Would it refresh your recollection if you took a look at

2   that offering memo?

3   **A.**   Yes.

4   **Q.**   Okay.

5        **MR. FAKHOURY:**   Your Honor, this is not admitted.

6   It's a marked exhibit, but it's not admitted so I'd just ask

7   that it be shown only to the witness.  This would be

8   Exhibit 9.

9        And let's go to Page ten.

10       (Exhibit published to witness, counsel, and the Court.)

11  **BY MR. FAKHOURY:**

12  **Q.**   So, Mr. Leep, I'm going to -- I'm going to show you

13  something.  I don't want you to read it out loud.  I just want

14  you to read it to yourself.  And when you're done reading it

15  to yourself, just let me -- just look up or let me know, and

16  then I'm going to ask you a question.  Okay?

17  **A.**   Okay.

18  **Q.**   So I'm going to direct your attention to Page 10.

19       **MR. FAKHOURY:**   Kind of scroll down a little bit,

20  Mr. Torres.

21       (Exhibit published to witness, counsel, and the Court.)

22  **BY MR. FAKHOURY:**

23  **Q.**   And do you see a Roman numeral three?

24  **A.**   Yes.

25       **MR. FAKHOURY:**   You know, could you go to the next

1    page, actually.

2        (Exhibit published to witness, counsel, and the Court.)

3    **BY MR. FAKHOURY:**

4    **Q.**  Okay.  I'm going to ask you to review this just to

5    yourself, Mr. Leep.  Don't read it out loud, okay?

6    **A.**  Okay.

7    **Q.**  And when you're done, just look up.  Okay.

8    **A.**  (Reviewing document.)

9        Okay.

10   **Q.**  Okay.  You've had a chance to review it?

11   **A.**  Yes.

12   **Q.**  Does that refresh your recollection?

13   **A.**  Yes.

14        **MR. FAKHOURY:**  Okay.  Mr. Torres, you can take that

15   down.

16   **Q.**  Okay.  So let me ask -- let me ask a couple questions now.

17       So you're aware that the offering memo advises investors

18   that the fund may find it necessary to sell its investment at

19   a discount or to sell over extended periods of time, right?

20   **A.**  Yes.

21   **Q.**  You're aware that the -- the offering memo advises LP's

22   like you that the fund's investment generally will not be sold

23   for a number of years and will remain relatively illiquid and

24   difficult to value, correct?

25   **A.**  Yes.

1   **Q.**   Illiquid, that's a -- that's a funny finance term, but

2   that just means there's not actual cash sitting around that

3   somebody can access, right?

4   **A.**   Correct.

5   **Q.**   Conversely, liquid would mean the $10 I have sitting in my

6   wallet in cash, right?

7   **A.**   Right.

8   **Q.**   Okay.

9        And kind of the offering memo makes clear that there can

10  be no assurance that the fund will in fact make an investment

11  in any opportunity that the manager may review.

12       Do you recall seeing that?

13  **A.**   Yes.

14  **Q.**   The offering memo explained to LP's like you that by

15  investing, the LP is relying on the manager, right?

16  **A.**   Yes.

17  **Q.**   And the manager here would be Mr. Rothenberg, right?

18  **A.**   Yes.

19  **Q.**   To make all final decisions regarding the strategy,

20  investments, and day-to-day operations of the fund, right?

21  **A.**   Yes.

22  **Q.**   The offering memo explains to an LP like you that a

23  potential investor has to be willing to entrust all aspects of

24  the management to the manager if it wants to invest, right?

25  **A.**   Yes.

1    **Q.**  The offering memo advises investors about potential

2    conflicts of interest, right?

3    **A.**  Yes.

4    **Q.**  And the 2013 Fund memo specifically advised LP's that

5    Mr. Rothenberg is working on numerous ideas for startup

6    ventures, right?

7    **A.**  I don't remember.

8    **Q.**  Okay.  Would it refresh your recollection to take a look

9    at that memo again?

10   **A.**  Yes.

11          **MR. FAKHOURY:**  Okay.  Could we pull up Exhibit 9

12   again but not publish to the jury.  And let's go to page 14.

13      (Exhibit published to witness, counsel, and the Court.)

14   **BY MR. FAKHOURY:**

15   **Q.**  And so similar exercise here, Mr. Leep, I'm going to ask

16   you to just review this portion.  Don't read it out loud.  And

17   when you you're done reviewing, just look up and -- and let me

18   know that you've had a chance to take a look at it.

19   **A.**  (Reviewing document.)

20      Okay.

21   **Q.**  Okay.  You've had a chance to look at that?

22   **A.**  Yes.

23   **Q.**  And is your memory refreshed?

24   **A.**  Yes.

25   **Q.**  Okay.

1      **MR. FAKHOURY:**  Mr. Torres, you can take that down.

2   **Q.**  So we were talking about conflicts of interest.  So now

3   that you've had a chance to review that, you're aware that the

4   2013 Fund specifically advised investors that Mr. Rothenberg

5   was working on numerous ideas for startup ventures, right?

6   **A.**  Yes.

7   **Q.**  It advised investors that Mr. Rothenberg expects in the

8   future he may provide services to portfolio companies in

9   exchange for a payment of a fee, right?

10  **A.**  Yes.

11  **Q.**  It advised generally there might be conflicts arising out

12  of the fund with its manager and the operators and their

13  affiliates, right?

14  **A.**  Yes.

15  **Q.**  And it advised that the members, so that's the limited

16  partners, the operator, that's Rothenberg Ventures Management

17  Company, and the manager, which is Mr. Rothenberg, and their

18  respective affiliates may make investments on behalf of

19  themselves or other funds which they manage while also making

20  investments on behalf of the fund, right?

21  **A.**  Yes.

22  **Q.**  The 2013 Fund explained that the fund may invest in some

23  investments and startup ventures in which the operator

24  individually already has a stake, right?

25  **A.**  Yes.

1  **Q.**  And the operator again being Rothenberg Ventures

2  Management Company, right?

3  **A.**  Yes.

4  **Q.**  And Rothenberg Ventures Management Company is owned and

5  controlled by Mr. Rothenberg, right?

6  **A.**  Yes.

7  **Q.**  And the operating agreement advised that investors in the

8  fund will not receive any of the benefit related to the

9  existing members' or the operators' stake in these ventures,

10 right?

11 **A.**  Yes.

12 **Q.**  Okay.  I'm going to shift gears now a little bit and talk

13 a little bit about some of your testimony around your decision

14 to leave Rothenberg Ventures.

15     Now, you testified that in 2016, you made the decision to

16 leave, right?

17 **A.**  Yes.

18 **Q.**  And initially, there was a -- a change in your title,

19 right?

20 **A.**  Yes.

21 **Q.**  You went from director of community and partner to

22 advisor, right?

23 **A.**  Yes.

24 **Q.**  And that was in the spring of 2016?

25 **A.**  I forget exactly when the time was.  I believe it was in

1    the mid-year of 2016.

2    **Q.** Okay.  So like maybe May, June, July, in general that sort

3    of time frame?

4    **A.** Let's see.

5       Can you repeat the question?

6    **Q.** Sure.

7       I'm trying to getting a grasp on the timing of when you

8    decided you wanted to leave.  And I know -- we don't have to

9    talk about precise days.  So you said sort of in the -- in the

10   middle of 2016.  So I said, you know, sometime maybe between

11   May and July of 2016; does that seem right?

12   **A.** That sounds roughly correct.

13   **Q.** Okay.

14      There's kind of a lot going on at Rothenberg Ventures at

15   that time?

16   **A.** Yes.

17   **Q.** Okay.

18          **MR. FAKHOURY:**  Mr. Torres, can you pull up

19   Exhibit 555.  This is admitted.

20      And let's go to Page 6.

21                    (Exhibit published.)

22   **BY MR. FAKHOURY:**

23   **Q.** So this is the 2014 slide deck which we've talked a little

24   bit about before.  And it looks like there's 12 employees at

25   the time, right?

1    **A.**  Yes.

2    **Q.**  Okay.

3          **MR. FAKHOURY:**  Mr. Torres, can you pull up

4    Exhibit 558.

5        And go to page three.

6          **THE CLERK:**  Is that in?

7          **MR. FAKHOURY:**  It is.

8                    (Exhibit published.)

9    **BY MR. FAKHOURY:**

10   **Q.**  And this is a slide deck roughly a year later, right?

11   **A.**  Yes.

12   **Q.**  And by -- this slide has 20 employees?

13   **A.**  Yes.

14   **Q.**  Mr. Kleinman showed you a calendar invite that had a lot

15   more than 20 people on it.

16       Do you recall that?

17   **A.**  Yes.

18   **Q.**  Okay.  You have to forgive me.  I don't remember the

19   exhibit number.

20       It seemed like Mr. Rothenberg was pretty busy at that

21   time?

22   **A.**  Yes.

23   **Q.**  And I mean, you lived with him, right?

24   **A.**  Yes.

25   **Q.**  And so you could see he was working hard?

1    **A.**  Yes.

2    **Q.**  A lot of emails sitting in his inbox?

3    **A.**  I assume so.

4    **Q.**  Okay.

5        A lot of people were demanding his time?

6    **A.**  Yes.

7            **MR. FAKHOURY:**  Can I have a minute, Your Honor?

8            **THE COURT:**  Yes.

9                    (Pause in the proceedings.)

10           **MR. FAKHOURY:**  Just have a few more questions and

11   then I'll be done.

12   **Q.**  Towards the end of your direct testimony, you -- you

13   testified about meeting up with Mr. Rothenberg in September of

14   2016.

15       Do you recall that?

16   **A.**  Yes.

17   **Q.**  And your testimony was that he thought he might be in

18   trouble and he had done something illegal.

19       Do you recall that testimony?

20   **A.**  Yes.

21   **Q.**  Okay.  And at that time, we had seen a prior text message

22   concerning an SEC inquiry.

23       Do you recall that?

24   **A.**  Yes.

25   **Q.**  And -- I mean you're aware of SEC, right?

1    A.   Yes.

2    Q.   And they regulate securities laws, correct?

3    A.   Yes.

4    Q.   Okay.

5         **MR. FAKHOURY:**  I think that's all I have, Your Honor.

6    Thank you.

7         **THE COURT:**  Thank you, Mr. Fakhoury.

8       Mr. Kleinman, redirect?

9         **MR. KLEINMAN:**  Yes, Your Honor.

10                       **REDIRECT EXAMINATION**

11   BY MR. KLEINMAN:

12   Q.   So, Mr. Leep, do you remember when Mr. Fakhoury was asking

13   you questions about Rothenberg Ventures management and the

14   strategy?

15   A.   Yes.

16   Q.   You remember those questions?

17       And Mr. Fakhoury asked you, he said, "The strategy worked,

18   correct?"

19       And I believe you said, "It depends.  Can you clarify?"

20       And then Mr. Fakhoury asked you, "Well, people attended

21   the events, correct?"

22   A.   Yes.

23   Q.   And you said, "Yes."

24   A.   Yes.

25   Q.   Now I want to ask you a few more questions about that.  To

1   be clear, you didn't have access to the Rothenberg Venture

2   bank accounts?

3   **A.**  Correct.

4   **Q.**  So you don't actually know if it financially worked,

5   correct?

6   **A.**  Correct.

7   **Q.**  And did the defendant ever explain how he had enough money

8   for these events or employees?

9   **A.**  No.

10  **Q.**  Now, remember when Mr. Fakhoury was asking you questions

11  about distribution because you are a member of the funds,

12  correct?

13  **A.**  Yes.

14  **Q.**  Now -- and additionally he showed you some of the

15  documents related to the -- the funds, correct?

16  **A.**  Yes.

17  **Q.**  Now to be clear, if there was an exit in the fund, who

18  would be entitled to that money?

19  **A.**  The LP's, the investors.

20  **Q.**  And if there was an exit but the LP's did not receive that

21  money, that would be contrary to the agreement, correct?

22  **A.**  From my understanding, yes.

23  **Q.**  And now, Mr. Fakhoury asked you a number of questions

24  about conflicts of interest.  And he showed you some

25  additional documentation, correct?

1   A.   Yes.

2   Q.   Now, if the funds were investing in certain companies,

3   that would need to be disclosed, correct?

4   A.   Yes.

5   Q.   And if one of those companies was wholly owned by

6   Mr. Rothenberg, that would also need to be disclosed, correct?

7   A.   I would expect so.

8           MR. KLEINMAN:   One moment, Your Honor.

9                   (Pause in the proceedings.)

10          MR. KLEINMAN:   Nothing further.   Thank you.

11          THE COURT:   Mr. Fakhoury, recross?

12          MR. FAKHOURY:   Very briefly.

13                  <u>RECROSS-EXAMINATION</u>

14   BY MR. FAKHOURY:

15   Q.   Mr. Kleinman just asked you some questions about

16   disclosures, right?

17   A.   Yes.

18   Q.   And the fund operating agreement that you and I discussed,

19   that is disclosed to investors, correct?

20   A.   Yes.

21   Q.   That is disclosed to investors before they make their

22   investment, right?

23   A.   Yes.

24          MR. FAKHOURY:   Nothing further, Your Honor.

25          THE COURT:   Mr. Kleinman, anything within the scope?

1    **MR. KLEINMAN:**  No, Your Honor.  Thank you.

2         **THE COURT:**  Mr. Leep [sic], is there any reason why

3    this witness may not be excused?

4         **MR. KLEINMAN:**  No, Your Honor, thank you.

5         **MR. FAKHOURY:**  No, Your Honor.

6         **THE COURT:**  Mr. Leep, thanks very much for your

7    testimony.  You are excused.

8         **THE WITNESS:**  Thank you.

9         **THE COURT:**  Government's next witness, please.

10        **MR. WALDINGER:**  Your Honor, the government at this

11   time will call Ms. Lynne McMillan Dimmick.

12        **THE COURT:**  Good morning, Ms. Dimmick.  Let me ask

13   you to come up to the witness stand.  You can see my courtroom

14   deputy is already there.  And when you get there, if you would

15   just remain standing, raise your right hand and face her,

16   please.

17                    **LYNNE MCMILLAN DIMMICK,**

18   called as a witness for the plaintiff, having been duly sworn,

19   testified as follows:

20        **THE WITNESS:**  I do.

21        **THE CLERK:**  Thank you.

22      If you could please state and spell your last name for the

23   court reporter.

24        **THE WITNESS:**  Sure.  It's Lynne Dimmick, L-Y-N-N-E,

25   D-I-M-M-I-C-K.

 1          **THE CLERK:**  Thank you.

 2          **THE COURT:**  Ms. Dimmick, you can take your mask off

 3   if you like while you're testifying.

 4      Have you ever testified in a court before?

 5          **THE WITNESS:**  Just once, a long time ago.

 6          **THE COURT:**  Well, I won't ask you what that was.

 7   I'll give you what are probably just a few reminders because

 8   you probably got told this before.

 9      Giving testimony in court is pretty much like day-to-day

10   conversation, but it's different in a few ways.  The first is

11   that the attorneys will be asking you questions and you'll

12   answer those questions.

13      In day-to-day conversation, we use noises and gestures

14   instead of words, all the time.  So we might say "uh-huh" or

15   "uh-uh" or we might shrug our shoulders like this or shake our

16   head.

17      The court reporter is making a record of the proceedings.

18   She cannot take down any of that.  So if you could use words

19   in responding to the questions, that'd be helpful.

20      Second thing is we are constantly interrupting each other.

21   So somebody might say to me, "Did you see that football game?"

22   And they know that I'm a fan of Alabama, and I don't even wait

23   for them to finish their sentence because they're asking me

24   about a game I just saw.  They say, "Did you see that

25   football" -- and I might say, "Yeah, could you believe what

1    happened in the third quarter," da-da-da.  And then they

2    interrupt me and we go back and forth.

3        But in court we can't interrupt each other because the

4    court reporter can only take down one person at a time.  So if

5    you'll wait till the lawyer has finished talking totally

6    before you answer, they'll wait until you finish talking

7    totally before they ask you another question.

8        It will be helpful if you could keep your voice up and

9    stay pretty close to the microphone.  All these folks over

10   here on our left are on our jury.  They extend all the way

11   back to that rail, you can see, so it's important that they be

12   able to hear you.

13       If you don't know the answer to something, just say you

14   don't know.  If you don't remember, just say you don't

15   remember.

16       You probably won't hear me ask any questions.  If you do,

17   it's probably because I didn't hear you clearly.

18       Does that all make sense?

19           **THE WITNESS:**  Yes, sir.

20           **THE COURT:**  All right.  Mr. Waldinger, your witness.

21       **MR. WALDINGER:**  Thank you, Your Honor.

22                        **DIRECT EXAMINATION**

23   BY MR. WALDINGER:

24   **Q.**  Good morning, Ms. Dimmick.

25   **A.**  Hello.

1   **Q.**  Is it true that you worked at a company called Rothenberg

2   Ventures Management Company, or RVMC, from about May of 2015

3   to about February of 2016?

4   **A.**  Yes.  That's correct.

5   **Q.**  When you worked at RVMC, was your name Lynne McMillan?

6   **A.**  Yes, sir.

7   **Q.**  And is it your understanding that many of the documents

8   that we may go through today such as emails have the name

9   Lynne McMillan on them?

10  **A.**  Yes.

11  **Q.**  Is it also true that the folks that you worked with at

12  RVMC knew you as Lynne McMillan?

13  **A.**  Yes.

14  **Q.**  Okay.  So is it okay if I refer to you today as

15  Ms. McMillan?

16  **A.**  Yes.

17  **Q.**  When you worked at RVMC, who was the person that ran that

18  company?

19  **A.**  Mike Rothenberg.

20  **Q.**  Do you see Mr. Rothenberg in the courtroom today?

21  **A.**  Yes.  I see him at the defense table.

22  **Q.**  And could you point out where he's sitting at the defense

23  table or a piece of clothing he's wearing?

24  **A.**  Looks like he's wearing a red or pink tie.

25  **Q.**  And is he the person on the left at that table?

1    **A.**   Yes.

2           **MR. WALDINGER:**   Your Honor, may the record reflect

3    that Ms. McMillan has identified the defendant.

4           **THE COURT:**   It shall so reflect.

5    BY MR. WALDINGER:

6    **Q.**   Ms. McMillan, did you grow up in California?

7    **A.**   No, sir.

8    **Q.**   Where did you grow up?

9    **A.**   I was to born in Peoria, Illinois.

10   **Q.**   All right.  And Peoria is not necessarily famous for this,

11   but if the jurors drive by a construction site or a road work

12   project, there'll probably going to see a piece of

13   yellow-colored heavy machinery that might come from Peoria?

14   **A.**   That's correct.

15   **Q.**   And what's that machinery?

16   **A.**   Caterpillar.

17   **Q.**   And Caterpillar was founded in Peoria and they still make

18   a lot of Caterpillar products there?

19   **A.**   Correct.

20   **Q.**   And we live in a big urban area here, but there is

21   agriculture outside of the Bay Area.  I think I'm pointing

22   toward wine country.  Around Peoria, is that wine country?

23   **A.**   No, sir.

24   **Q.**   What's around Peoria?

25   **A.**   Well, we're famous for corn and soybeans, wheat.

DIMMICK - DIRECT / WALDINGER

1   **Q.**  Hogs?

2   **A.**  Hogs.  The animals.

3   **Q.**  And there's some wind farms now?

4   **A.**  Sure.

5   **Q.**  So fair to say you come from middle America?

6   **A.**  Yes.

7   **Q.**  So the jury may be thinking -- the jury's heard some

8   testimony already about Stanford University.  And they may

9   think that Lynne McMillan got from middle America to Northern

10  California by going to Stanford.  Is that were you went to

11  college?

12  **A.**  No, sir.

13  **Q.**  Where did you go to college?

14  **A.**  I went to the University of Illinois.

15  **Q.**  And that's a Big Ten school?

16  **A.**  Yes.

17  **Q.**  Did you get a degree from Illinois?

18  **A.**  I did.

19  **Q.**  What is your degree in?

20  **A.**  I have a bachelor's degree of science in finance and a

21  bachelor's degree of science in accounting.

22  **Q.**  When did you receive -- did you receive those degrees at

23  the same time?

24  **A.**  Yes.  In May of 2009.

25  **Q.**  Now, Illinois is one of the top ranked private or public

1  undergraduate accounting programs, correct?

2  **A.**  Correct.

3  **Q.**  Can you, while we're on the topic, can you describe

4  generally, I don't want to put you on the spot, the difference

5  between accounting and finance?

6  **A.**  Well, accounting is more just keeping track of all of the

7  numbers, whereas I think of finance more forecasting future

8  numbers if you will.  That's how I tend to think of it.

9  **Q.**  Okay.

10  And I'm going to ask another question.  What's the

11  difference in your mind between accounting and the term

12  "bookkeeping"?

13  **A.**  I think of bookkeeping as just entering in invoices into a

14  general ledger system and not providing a lot of analysis or

15  commentary on that.  Paying the bills, doing the day-to-day

16  bookkeeping, if you will.

17  Whereas I think of accounting as being a bit more

18  strategic, providing management reporting, offering advice and

19  other -- other strategies to management.

20  **Q.**  Are there certain principles that accountants apply, for

21  example, in the United States about how to practice their

22  profession of accounting?

23  **A.**  Yes.

24  **Q.**  And what are those principles called?

25  **A.**  It's called Generally Accepted Accounting Principles,

 1 | GAAP.

 2 | **Q.**   G-A-A-P or GAAP?

 3 | **A.**   Yeah.

 4 | **Q.**   So I'd just like to ask you some -- again some background

 5 | questions.  If -- if you have separate companies or LLC's that

 6 | are -- that are associated with each other, would it be the

 7 | practice for each of those companies to run its own set of

 8 | accounting records?

 9 | **A.**   Yes.  Each entity should have its own set of books and

10 | records.

11 | **Q.**   And those books and records, when there are transactions

12 | between those related companies, do the books -- are the books

13 | and records supposed to memorialize those transactions?

14 | **A.**   Yes.  You should keep track of intercompany transactions.

15 | **Q.**   Should they be classified pursuant to GAAP?

16 | **A.**   Yes.

17 | **Q.**   Did the topic of fiduciary duty come up when you were back

18 | at the University of Illinois?

19 | **A.**   Yes.

20 | **Q.**   Could you tell the jury generally what a fiduciary duty

21 | is?

22 | **A.**   The responsibility to use your best guidance and judgment

23 | in terms of managing money or interests of other stakeholders.

24 | **Q.**   So you went to the University of Illinois, got degrees in

25 | finance and accounting, correct?

1    **A.**   Yes.

2    **Q.**   There's a thing called CPA, or Certified Public

3    Accountant.   Are you a Certified Public Accountant?

4    **A.**   Yes.

5    **Q.**   When did you become a CPA?

6    **A.**   2010 is when I completed the CPA exam.

7    **Q.**   Have you been -- and I don't know this answer.   Lawyers

8    are -- are barred, what we called barred in each state.   Is

9    that the same thing in -- in CPA land?

10   **A.**   Yes.   So originally, I was licensed in Illinois.   And now

11   I'm licensed in California.

12   **Q.**   Have you been a licensed CPA since 2010 to today?

13   **A.**   Yes.

14   **Q.**   Ms. McMillan, while we're on the topic of education, did

15   you get any graduate education after Illinois?

16   **A.**   No, sir.

17   **Q.**   I would like to ask you some questions a little bit about

18   your professional background.

19       What did you do when you graduated in 2009?

20   **A.**   My first job was as a financial analyst at a big

21   Fortune 500 company.

22   **Q.**   What was the name of that company?

23   **A.**   Eli Lilly.

24   **Q.**   Where did you work for Eli Lilly?

25   **A.**   In Indianapolis, Indiana.

1    **Q.**   A couple of hours from where you went to college?

2    **A.**   Correct.

3    **Q.**   Where is the University of Illinois?

4    **A.**   It's in Champaign, Illinois, which is about two hours

5    south of Chicago.

6    **Q.**   And Urbana?

7    **A.**   Same.

8    **Q.**   So you -- you said that you worked at a big Fortune 500

9    company which was Eli Lilly.  Fair to call that big pharma?

10   **A.**   Yes, sir.

11   **Q.**   How long were you there again?

12   **A.**   A little over a year I spent there.

13   **Q.**   What did you do then?

14   **A.**   I was responsible for all of our manufacturing costs,

15   doing the analysis, making accruals, and really understanding

16   that entire portfolio of where they manufactured all of the

17   drugs in -- in the U.S.

18   **Q.**   When you left Eli Lilly, why did you go then?

19   **A.**   Well, I was thinking of going to law school, so I decided

20   to spend some time as a paralegal at a law firm in

21   Washington, D.C.

22   **Q.**   What was the name of that law firm?

23   **A.**   Davis Polk & Wardwell, I believe.

24   **Q.**   All right.  So you -- is that a big law firm?

25   **A.**   Yes.

1    Q.   Fair to call that big law?

2    A.   Yes.

3    Q.   Are you -- did you go to law school?

4    A.   No, I didn't.

5    Q.   Did that experience convince you you did not want to

6    become a lawyer?

7    A.   Yes, it did.  No offense.

8    Q.   How long were you at Davis Polk & Wardwell?

9    A.   I was also there for a little over a year.

10   Q.   Did they wear white shoes at that law firm?

11   A.   They did not wear white shoes despite popular commentary.

12   Q.   That's sort of described as a white shoe law firm

13   sometimes?

14   A.   Right.

15   Q.   Where did you go after Davis Polk?

16   A.   I went to work on a political campaign in Boston.

17   Q.   And was that for Governor or Senator Romney?

18   A.   Yes.

19   Q.   Was that for I guess Senator Romney's presidential

20   campaign?

21   A.   Correct.

22   Q.   What kind of work did you do?

23   A.   I was the controller for the finance organization.  So I

24   managed all of the fundraising contracts, managed all the

25   money coming in, and managed all of the expenses related to

1   all of the fundraising events and such.

2   **Q.**   I can't believe that that's now 11, 12 years ago.

3       So what did you do after working on the Romney campaign?

4   **A.**   I went to work at Deloitte Financial Advisory Services.

5   **Q.**   Is that related to the Deloitte accounting firm?

6   **A.**   Yes.

7   **Q.**   Is that set up as a separate company, or is it a

8   subsidiary of Deloitte, the accounting firm?

9   **A.**   I believe they're separate entities.  For audit purposes,

10   Deloitte and Touche is separate, but they're run as one, one

11   big business.

12   **Q.**   Got it.

13       And on the big theme, Deloitte is one of the big four

14   accounting firms?

15   **A.**   Correct.

16   **Q.**   What did -- so you said you worked at Deloitte in

17   consulting or...?

18   **A.**   I was really more in their forensic investigations group

19   so doing all sorts of different type of financial

20   investigations.

21   **Q.**   Okay.

22       So you didn't -- a lot of times when people think of a --

23   an accounting firm, particularly the big four accounting

24   firms, you think of audits of public companies.  That's not

25   what you did?

1   **A.**   Correct.  I was not an auditor.

2   **Q.**   And forensic accounting or forensic investigation has to

3   do then with what?

4   **A.**   Well, generally, if there's a question that either a

5   company has or a law enforcement agency has, they want to

6   follow the money, if you will.  So they hire forensic

7   accountants to come in and trace the money through all of the

8   different venues from maybe illicit source of funds all the

9   way through to the receiver of the funds.

10      So forensic accounting is just doing any kind of

11   investigation that involves following the money, if you will.

12   **Q.**   I was going to ask.  Follow the money, that's what you

13   were doing?

14   **A.**   Yes.

15   **Q.**   Where did you work when you worked at Deloitte?

16   **A.**   I had several clients over my tenure there.  The first

17   major client I worked on was the Lehman Brothers bankruptcy

18   work.  So I spent about six or eight months doing that.

19      And then I got staffed on a government project that was

20   for the U.S. State Department where we were investigating visa

21   and passport fraud and related crimes.

22      And then after that, I did smaller, shorter engagements.

23   So investigating a group of dairy farmers who were defrauding

24   the government.  Investigating -- doing some internal

25   investigations at major corporations to see if there was

1    insiders violating corporate policies and profiting for

2    themselves.

3    **Q.**  Okay.  And did you complete this work?  Were you moving

4    around or were you are based in one place for Deloitte?

5    **A.**  No.  I moved around.  So I started in Washington, D.C.

6    And then I moved to Miami to work for the State Department.

7    And then I moved here when that engagement was over to

8    San Francisco in around October of 2014, I believe.

9    **Q.**  When you came to, then, San Francisco in October of 2014,

10   you were still with Deloitte?

11   **A.**  Correct.

12   **Q.**  You said you worked on the Lehman Brothers' bankruptcy.

13   Just to get the timeline, Lehman Brothers failed before the --

14   before the turn of the last decade.

15   **A.**  Correct.

16   **Q.**  Before 2010, but you were still working on stuff after you

17   went to Deloitte after the Romney campaign?

18   **A.**  It went on for a very, very long time.  Yes.

19   **Q.**  You testified previously, Ms. McMillan, that you started

20   at RVMC in about, I believe you said May of 2015.  Is that

21   correct?

22   **A.**  Yes.

23   **Q.**  Did you go to RVMC directly from Deloitte?

24   **A.**  Yes.

25   **Q.**  You also testified that you left RVMC in about February of

1   2016.  I won't go into details about what you've done since

2   then, but I will have the jury -- or I will have you tell the

3   jury where you're working today?

4   **A.**   Sure.  I work for Alphabet as -- as an accountant for a

5   subsidiary of Alphabet.

6   **Q.**   Alphabet, a lot of people would think of as Google?

7   **A.**   Google's parent, correct.

8   **Q.**   How did you come to find out about RVMC?

9   **A.**   Through a friend of a friend that worked there at the

10   time.

11   **Q.**   What was that friend's name or friend of a friend's name?

12   **A.**   The friend of a friend that worked there, his name was

13   Henry Pfirrman, and our mutual friend, her name was Sarah.

14   **Q.**   Do you remember how to spell Henry's surname?

15   **A.**   It's a little funky.  I believe it's P-F-I-R-M-A-N [sic].

16   **Q.**   And so a silent PF at the beginning?

17   **A.**   I think -- I believe so, yeah.

18   **Q.**   Did you -- what did you learn about the job or about the

19   company from Mr. Pfirrman?

20   **A.**   Well, that it was just this very exciting, young, sort of

21   millennial venture capitalist firm, and that their existing

22   finance person was getting ready to retire so they needed

23   someone to come in and -- and replace that person.

24   **Q.**   Did you ultimately learn who that existing finance person

25   was?

1   **A.**   Yes.   That was Tom Leep.

2   **Q.**   Did you have to -- so you ultimately started working for

3   RVMC, correct?

4   **A.**   Yes.

5   **Q.**   Did you have to interview for that job?

6   **A.**   Yes.

7   **Q.**   Who did you interview with?

8   **A.**   I definitely interviewed with Brett Bechis who was the

9   director of operations and Neil Devani who was the general

10  counsel.   I also met with Tom Leep.   And I also interviewed

11  with Mike Rothenberg.

12  **Q.**   And is Bechis spelled B-E-C-H-I-S?

13  **A.**   Yes.

14  **Q.**   And Mr. Devani's last name, is that spelled D-E-V-A-N-I?

15  **A.**   Yes.

16  **Q.**   When you met with the defendant as part of your job

17  interview process, did he tell you what he was looking for in

18  an employee or as a finance employee?

19  **A.**   I believe so, yes.

20  **Q.**   What was your understanding as to what they needed you to

21  do?

22  **A.**   Really, you know, managing all of the different entities,

23  keeping control of -- of the budgets and helping with a lot of

24  the administrative work that's involved with having all of

25  these funds with lots of different investors and lots of

1    different portfolio companies.

2    Q.   Okay.  And earlier when I was asking you about your

3    college education, I asked you some questions about finance

4    and about accounting and about bookkeeping.  Was it your

5    understanding that all of those things would be part of what

6    you would be doing, accounting, bookkeeping, and finance?

7    A.   Yes.

8    Q.   I assume that you were offered the job and took it?

9    A.   Yes.

10   Q.   What did you understand about what RVMC was and what it

11   did at that time?

12   A.   I understood it to really be investing in early stage

13   technology companies with a wide -- wide breadth of types of

14   companies and -- and sectors.

15   Q.   Did RVMC -- strike that.

16        Did you understand that RVMC itself was investing or that

17   there were other entities that were investing?

18   A.   Well, I understood that there were different funds that

19   RVMC managed that were -- the funds were actually doing the

20   investing.

21   Q.   Did you understand that the funds were separate legal

22   entities from RVMC?

23   A.   Yes.

24   Q.   Did the money in the funds' bank accounts belong to RVMC?

25   A.   No.  It belonged to the funds.

1    Q.  Was there also a company there called River Studios?

2    A.  Yes.  It was actually named Bend Reality LLC, if I recall

3    at the time.  But it was doing business as River Studios, yes.

4    Q.  Thank you for that.  So sometimes companies have a legal

5    name, for example, with the Secretary of State, correct?

6    A.  Correct.

7    Q.  And are what you -- is what you're saying is that River

8    Studios' legal name was Bend Reality?

9    A.  Correct.

10   Q.  And then often companies like that have a dba, or doing

11   business as, after their name.  And are what you're saying --

12   is what you're saying is that Bend Reality did business as

13   River Studios?

14   A.  Yes.

15   Q.  What did you understand Bend Reality or River Studios to

16   be?

17   A.  Well, when I started, I really honestly didn't know.  And

18   it -- I understood more over time, but when I started I -- I

19   really didn't know.

20   Q.  Fair to say that Bend Reality slash River Studios was --

21   was not a venture capital investor?

22   A.  Correct.

23   Q.  So I guess I'll ask now like, you know, after working at

24   big pharma and big law and a big presidential campaign and a

25   big four accounting firm, why did Lynne McMillan decide to go

1   to what I think is fair to say a pretty small place?

2   **A.**  Well, you know, I'd only been in San Francisco about six

3   months.  And I really just got the urge and the itch, if you

4   will, to do something different, to work in the startup

5   ecosystem.  And I really liked the people that I -- that I

6   interviewed with.  I was really impressed by Mike.  And his

7   background was very impressive.  And I was just really excited

8   to take a risk and -- and try something new.

9          **MR. WALDINGER:**  I am going to ask Ms. Margen to call

10  up -- this document has not been admitted as an exhibit.

11     If we could call up United States Exhibit 561, please.

12     (Exhibit published to witness, counsel, and the Court.)

13  **BY MR. WALDINGER:**

14  **Q.**  And, Ms. McMillan, that should come up on your screen.  It

15  may --

16         **MR. WALDINGER:**  Let's just try to blow this part up

17  so that Ms. McMillan can see it better, Ms. Margen.

18     (Exhibit published to witness, counsel, and the Court.)

19  **BY MR. WALDINGER:**

20  **Q.**  Ms. McMillan, this is -- this is -- this document is a

21  15-page document.

22         **MR. WALDINGER:**  And it may be easier if I approach

23  the witness, Your Honor, and show her -- give her a copy of

24  it, if you don't mind.

25         **THE COURT:**  You may.

1          **MR. WALDINGER:**  (Handing document.)

2   **Q.**  Ms. McMillan, take a look at that document and when you're

3   done looking through it, just look back up at me.

4   **A.**  (Reviewing document.)

5   **Q.**  Ms. McMillan, what is this document?

6   **A.**  This is my original employment agreement at Rothenberg

7   Ventures.

8   **Q.**  Does it include your initials on most of the pages?

9   **A.**  Yes.

10  **Q.**  And did you sign this employment agreement?

11  **A.**  Yes.

12          **MR. WALDINGER:**  Your Honor, I'd move Exhibit 561 into

13  evidence.

14          **THE COURT:**  Any objection?

15          **MR. FAKHOURY:**  No objection.  Sorry, Your Honor.  No

16  objection.

17          **THE COURT:**  561 is admitted.

18      (Government's Exhibit 561 received in evidence.)

19                  (Exhibit published.)

20  **BY MR. WALDINGER:**

21  **Q.**  I just want to ask you a few questions about this

22  document, Ms. McMillan.

23      On the first page, is this an accurate -- the 5/25 of

24  2015, is that about the time that you started?

25  **A.**  That sounds about right, yes.

1  **Q.**  Who was your direct supervisor at RVMC?

2  **A.**  I -- well, I worked with Tom a lot, but Mike was my

3  supervisor.

4          **MR. WALDINGER:**  Ms. Margen, let's just blow up this

5  part here (indicating).

6                    (Exhibit published.)

7  **BY MR. WALDINGER:**

8  **Q.**  This document says that your compensation was $110,000 a

9  year; is that correct?

10 **A.**  Yes.

11 **Q.**  How does that compare for the market at that time for

12 accountants with your experience and credentials,

13 Ms. McMillan?

14 **A.**  That felt -- that felt fair at the time.  It was a raise

15 from where I was -- what I was previously making.  But I

16 was -- I was happy with that compensation.

17          **MR. WALDINGER:**  Ms. Margen, could we then now blow up

18 the bottom of that page.

19                    (Exhibit published.)

20 **BY MR. WALDINGER:**

21 **Q.**  This is paragraph 2 of page 1 of 561.  I just want to

22 point out, does this paragraph identify who the legal entity

23 was that employed you?

24 **A.**  Yes.

25 **Q.**  And what is that?

1  **A.**  Rothenberg Ventures Management Company LLC.

2  **Q.**  And finally, I want to highlight the last sentence here

3  that says that the company will reimburse you for all

4  business-related expenses incurred in accordance with company

5  policy, individual expenses above $200 must be approved in

6  writing as to amount.  And it says and -- approved in advance

7  in writing as to amount and purpose by Mike Rothenberg.

8      Is that how things operated at Rothenberg Ventures with

9  respect to expenses incurred by employees?

10  **A.**  Generally I think so, that Mike had to approve employee

11  expenses, yes.

12      **MR. WALDINGER:**  Ms. Margen, if we could go to page 5

13  of this exhibit.

14                  (Exhibit published.)

15  **BY MR. WALDINGER:**

16  **Q.**  Ms. McMillan, did you read this -- did you read this

17  employment agreement closely?

18  **A.**  Yes, I did.

19  **Q.**  Did you make edits to it?

20  **A.**  Yes.

21  **Q.**  Are those exhibited here on this page?

22  **A.**  Yes.

23  **Q.**  What are the edits that you made there?

24  **A.**  Well, I think it was just a typo, but it -- there was a

25  reference to a consulting agreement, and I wanted to be clear

1     that my employment would be that of an employee and not a

2     consultant.

3          **MR. WALDINGER:**  Thank you, Ms. Margen.  You can take

4     that exhibit down.

5     **Q.**  Ms. McMillan, on the employment agreement, I -- I think

6     that the definition of your role was called finance.  Did you

7     have a separate position title when you started at RVMC?

8     **A.**  I believe my first title was controller.  I think that's

9     what my original title was, yeah.

10    **Q.**  Did that change after a while?

11    **A.**  And eventually, my title changed to be, I think it was

12    finance director -- director of finance.

13    **Q.**  I believe you testified that you worked with Tom Leep; is

14    that correct?

15    **A.**  Yes.

16    **Q.**  And did you communicate also with the defendant regarding

17    finance, accounting, and bookkeeping matters?

18    **A.**  Yes.

19    **Q.**  Did you get any instructions from the defendant as to

20    whether you should or could communicate with other employees

21    about those kinds of matters?

22    **A.**  Yes.  I was told to not communicate with other employees

23    about finance matters.

24    **Q.**  Did he tell you why he did not want you to do that?

25    **A.**  Not that I recall, no.

1  **Q.**  Did anyone report to you at RVMC, in other words, did you

2  supervise anybody?

3  **A.**  No, I didn't.

4  **Q.**  Ms. McMillan, do you recall whether and how you and

5  Mr. Leep divided the work?

6  **A.**  I don't recall exactly how we divided the work.  No.

7  **Q.**  After I asked you some questions about what you thought

8  the job was --

9          **THE COURT:**  Ms. Dimmick, I have to ask -- or McMillan

10  I guess we're saying here -- I have to ask you a question.  I

11  think the jury is wondering.  You've been talking about a

12  gentleman called Tom Leep who worked at RVMC, correct?

13          **THE WITNESS:**  Correct.

14          **THE COURT:**  And at the founding of the company, as I

15  understand it or at some time thereafter, there were two Tom

16  Leeps.

17          **THE WITNESS:**  Yes.

18          **THE COURT:**  There was the older Tom Leep and the

19  younger Tom Leep, correct?

20          **THE WITNESS:**  Correct.

21          **THE COURT:**  And when you talk about taking over for

22  somebody, was it the younger or the older?

23          **THE WITNESS:**  The older.  So the older Tom Leep went

24  by Tom.  And the younger Tom Leep went by Tommy.

25          **THE COURT:**  And Tom Leep, the older, is the person

 1   who had, to your understanding, had been doing finance?

 2              **THE WITNESS:**  Yes.

 3              **THE COURT:**  Thanks.

 4       Mr. Waldinger.

 5              **MR. WALDINGER:**  Thank you, Your Honor.

 6   **Q.**  And it's Tom Leep, I think you testified, was -- was

 7   planning to retire?

 8   **A.**  Correct.

 9   **Q.**  Did Mr. Tom Leep, the older, in fact leave the company

10   before you left?

11   **A.**  I don't think so, no.  He continued to kind of be

12   part-time like while I was there, or maybe full-time but not

13   as involved in the day-to-day.

14       And I think even after I left, he was still -- was still

15   helping out, yes.

16   **Q.**  Okay.  So you retired before Tom Leep retired?

17   **A.**  Sort of, yes.

18   **Q.**  When you -- I think you testified as to what you thought

19   the job was going to be.  And now I just want to have you

20   explain like once you started actually working in the job,

21   what did the job turn out to be as the controller or the

22   director of finance for RVMC?

23   **A.**  It turned out to be a lot of herding cats, for lack of a

24   better term.  So really trying to manage and insert some sort

25   of controls on the -- the finances of the -- the companies.

```
1   Q.  What kinds of controls needed to be applied or inserted?

2   A.  There just weren't a whole lot of controls at all

3   honestly.  So just the overall management of the budgets, the

4   approval process to -- to spend money, just the cash

5   management was all lacking in sort of basic -- basic controls.

6   Q.  How soon after you started did you make that observation?

7   A.  It didn't take long to dig into the finances and dig into

8   the -- the QuickBooks account to realize the -- the cash

9   issues.  Probably a couple weeks.

10  Q.  Was there any moment early on where you became, for lack

11  of a better word, upset?

12  A.  Well, even the first week was a rough week because of

13  other things that were going on at the firm.  And, yes, I

14  think one of my first jobs was to sort of untangle all of the

15  intercompany balances.  And once I did that and I realized how

16  they were all owing each other money left and right, I got

17  very upset with the level of spending at the company.  And I

18  just -- I realized that the spending was just out of control.

19  Q.  Did you have to take a time-out?

20  A.  I recall that I was -- I had to like get up and walk

21  around the block because I was -- I was very worked up when I

22  realized the state of affairs.

23  Q.  Had you seen anything like those books at Eli Lilly?

24  A.  No.

25  Q.  At the Romney campaign?
```

1    **A.**   No.

2    **Q.**   You talked about your observations of intercompany

3    balances, and I want to pull that apart a little bit.

4         What companies are you talking about?

5    **A.**   All of the entities.  So there was the Management Company.

6    There was another company that really kind of managed Mike's

7    real estate interests.  I think that was called just

8    Rothenberg Investments or maybe just Rothenberg Ventures.  And

9    then there were separate entities for the funds.  There's two

10   or three funds at the time.  And then there was also the Bend

11   Reality/River Studios entity.  So about six or seven entities,

12   I think.

13   **Q.**   So I -- I think you said that your observation was that

14   something about intercompany balances.  So with -- so we're

15   talking about two or three funds, Bend Reality, this real

16   estate company, and RVMC at a minimum.

17        What did you observe with respect to those intercompany

18   balances?

19   **A.**   Well, it seemed like there was a lot of cash being just

20   moved around, both between those entities and also to Mike

21   personally.  And I didn't have a ledger to keep track of

22   Mike's own in and out balances.  But there was just a lot of

23   in and outs coming from those accounts to one another and also

24   to -- to Mike in the form of either loan payments to him, or

25   he would reimburse the company and -- and call that a loan to

1    the company.  So a lot of just sort of strange balances going

2    on.

3    **Q.**  When you say payments to the defendant, did you have

4    visibility into his bank accounts?

5    **A.**  No.

6    **Q.**  Do you know where his -- he banked?

7    **A.**  I don't recall, no.

8    **Q.**  All right.  We can get to that.

9        You talked about seeing a lot of ins and outs.

10       And I'm going to be a little bit of a devil's advocate

11   which is you have a company that's operating, there are going

12   to be expenses, correct?

13   **A.**  Sure.

14   **Q.**  And so what's wrong with ins and outs and moving -- and

15   money moving around, moving in, moving out?

16   **A.**  It just doesn't seem like the balances that were owed

17   between the entities were necessarily appropriate for the type

18   of entities that they were.

19       And -- and you're right.  You know, you can move cash

20   between entities if they all have the same owner, but the way

21   that they were accounted for didn't really seem to be correct

22   to me.

23   **Q.**  So RVMC was a venture capital management company, correct?

24   **A.**  Yes.

25   **Q.**  Was it the manager of what was then called Fund I, what

1    was then called Fund II, and when you started working, the

2    2015 Fund?

3    **A.**   Yes.

4    **Q.**   In your mind, was there a fiduciary relationship between

5    RVMC and those funds?

6                **MR. FAKHOURY:**  Objection, irrelevant.

7                **THE COURT:**  Overruled.

8                **THE WITNESS:**  Yes.  Definitely.

9    BY MR. WALDINGER:

10   **Q.**   Did you see ins and outs between the funds' bank accounts

11   and RVMC's bank accounts that caused you concern?

12   **A.**   I don't remember exactly.  I just remember thinking these

13   funds -- none of these businesses should have all of these

14   balances owed back and forth to Mike.  Like this is -- or

15   between each other.  So I don't remember exactly which company

16   owed other companies.  I just remember thinking that it seemed

17   strange.

18   **Q.**   Did it seem that the money should move in a more orderly

19   fashion than it was moving?

20   **A.**   Yes.

21   **Q.**   You talked about this point where you had to get up and

22   walk around the building.  Do you remember that?

23   **A.**   Yes.

24   **Q.**   Where was the building?

25   **A.**   It was on Folsom Street in SOMA, I think between Sixth and

1    Seventh Streets, if I recall.

2    **Q.**  And if I give you the address of 1062 Folsom, does that

3    sound right?

4    **A.**  Yes.

5    **Q.**  We've been -- oh, let me ask you about the accounting.

6        Was there a particular accounting program that RVMC used?

7    **A.**  Yes.  It used QuickBooks.

8    **Q.**  Was that accounting program used by all of what you call

9    the entities?

10   **A.**  Yes.

11   **Q.**  Who had access to the QuickBooks?

12   **A.**  I believe it was just Tom and myself.  I can't remember if

13   Mike had access or not.

14   **Q.**  And generally with QuickBooks, are you able to generate

15   reports and get data out of QuickBooks?

16   **A.**  Yes.

17   **Q.**  The information that is in QuickBooks comes from where,

18   Ms. McMillan?

19   **A.**  Comes from information that you either import or manually

20   type in.

21   **Q.**  Does it -- does it tend to, at least with respect to the

22   numbers that are entered, coincide with what's going on in the

23   entities' bank accounts?

24   **A.**  Yes, it should.

25   **Q.**  Were -- so you testified about what you observed.  Was --

1    was the -- were the transactions that you saw occurring and

2    that happened at all these entities important to your work as

3    the controller or the director of finance for RVMC?

4    A.   Yes.

5    Q.   Why was that important?

6    A.   Well, I felt it was important that we understood the real

7    balances, like the full balance sheet picture of all of the

8    entities to just make sure we would have enough cash to pay

9    our bills, enough funds to cover paying employees, to just

10   manage the entire operation.

11   Q.   When we're talking about the difference between

12   bookkeeping and accounting and finance, that last thing you

13   just said is -- is more about the finance arm, about making

14   sure that we can finance our operations, correct?

15   A.   Correct.

16   Q.   Were you able to view the transactions that were taking

17   place in the entities' bank accounts, for example, like

18   looking online or by accessing the bank statements?

19   A.   Yes.

20   Q.   Where did the entities generally bank at that time?

21   A.   I believe they all were banking at Silicon Valley Bank.

22        MR. WALDINGER:   Ms. Margen, I'd like you to pull up

23   United States Exhibit 63, which has been admitted into

24   evidence earlier today, if I can --

25                    (Exhibit published.)

1          **MR. WALDINGER:**  Yeah.

2          And let's go to the second page.  In fact let's go to

3     page 277.

4          And if you could then once we get there -- oops.

5          277, Ms. Margen.

6          There we go.  Let's blow up the top half of that,

7     Ms. Margen.

8                         (Exhibit published.)

9     **BY MR. WALDINGER:**

10    **Q.**  Ms. McMillan, we're starting here because this is

11    June 2015, correct?

12    **A.**  Yes.

13    **Q.**  Do you recognize this as the periodic monthly statement

14    for Rothenberg Ventures Management Company?

15    **A.**  Yes.

16    **Q.**  What bank is this?

17    **A.**  Silicon Valley Bank.

18    **Q.**  We'll probably talk in your testimony a little bit about

19    account numbers.  The account number ended 8931; is that

20    correct?

21    **A.**  Yes.

22    **Q.**  I imagine that -- or tell me if I'm wrong.  Did these

23    account numbers become familiar to you after a while?

24    **A.**  Yes.

25    **Q.**  I'd like to -- to walk through -- excuse me -- this

```
 1   exhibit a little bit.
 2           MR. WALDINGER:  Let's stay right here, Ms. Margen.
 3                    (Exhibit published.)
 4   BY MR. WALDINGER:
 5   Q.  What were the debits in -- well, first let me ask you.  Do
 6   you recall this as being the main or one of the main operating
 7   accounts for the Management Company?
 8   A.  Yes.
 9   Q.  What were the expenditures or the debits out of that
10   account for the month of June 2015?
11   A.  (Reviewing document.)
12           MR. WALDINGER:  Ms. Margen, we'll have to put that
13   down and blow up this middle section (indicating).
14                    (Exhibit published.)
15           THE WITNESS:  So the debits are $584,714.84.
16           MR. WALDINGER:  Thank you.  Let's go to page 279,
17   Ms. Margen.
18           THE COURT:  Mr. Waldinger, any time in the next five
19   minutes.
20           MR. WALDINGER:  All right.  Thank you, Your Honor.
21      Ms. Margen, let's just blow up from June 1st down.
22      I'm sorry.  June 2nd down.
23                    (Exhibit published.)
24   BY MR. WALDINGER:
25   Q.  Ms. McMillan, this account statement has some entries
```

1    related to Expensify.

2         What is or what was Expensify?

3    **A.**  It was the expense management tool we used for employees

4    to get reimbursed for business expenses.

5    **Q.**  By my -- by my eye, it looks like this lists

6    reimbursements for no less than five different employees.

7         Was Ishmail Simpson at RVMC or a related company?

8    **A.**  Yes.

9    **Q.**  Skye Jordan?

10   **A.**  I don't remember if she was a contractor or an employee at

11   that point, but, yes, she worked for RVMC.

12   **Q.**  And we have a Jordan Eichelber [sic] or is that Jordan

13   Eichelberry?

14   **A.**  That person I actually don't remember.  I'm not sure who

15   that is.

16   **Q.**  But that person received an Expensify payment of $595?

17   **A.**  Yes.

18   **Q.**  Who was Dylan Flinn?

19   **A.**  Dylan was the investment -- on the investment team.

20   **Q.**  Brandon Farwell?

21   **A.**  Also on the invest -- investment team.

22        **MR. WALDINGER:**  Ms. Margen, let's now go to page 281.

23   Let's blow it up starting at June 10th to the bottom.

24                   (Exhibit published.)

25   / / /

1    BY MR. WALDINGER:

2    Q.   Ms. McMillan, this page has additional Expensify entries.

3    Some of these people we saw on the previous page, correct?

4    A.   Yes.

5    Q.   I'd like to point out what appear to be new ones.

6         Is -- was Gloria Suvaco an employee or a contractor?

7    A.   Yes.  I believe she was an employee.

8    Q.   Megan Ruiz?

9    A.   Also an employee, I believe.

10   Q.   There's somebody named Holly?

11   A.   Yes, she was an employee.

12   Q.   Who was Georgia Kinne?

13   A.   Also an employee.

14   Q.   What was her job?

15   A.   She was one of Mike's assistants.

16   Q.   Did Mike have more than one assistant?

17   A.   Yes.

18   Q.   How many did he have when you were there?

19   A.   Well, I know -- just looking at this page, Gloria and

20   Megan were both assistants.  So I think -- and people came and

21   left -- came and went, but I think generally he had about

22   three doing different jobs of course, but they all reported to

23   him.

24   Q.   Neil Devani, was he an employee or a contractor?

25   A.   Yes.

1    **Q.**  There's somebody named Anarghya?

2    **A.**  Yes.  Employee.

3    **Q.**  Who is Francesca Hauser?

4    **A.**  She was a -- a partner.  So she wasn't actually an

5    employee, but she was an investor and -- and partner.

6         **MR. WALDINGER:**  Your Honor, we'll do one more page

7    here, and then I would ask for a break.

8         Ms. Margen, if we could do page 283.

9         Let's just do the top half of this page.

10                        (Exhibit published.)

11   **BY MR. WALDINGER:**

12   **Q.**  Ms. McMillan, I just wanted to go through some additional

13   Expensify payments.

14        Was Kevin O'Neill an employee?

15   **A.**  I don't recall if he was an employee or a contractor.

16   But --

17   **Q.**  How about Taylor Ray?

18   **A.**  I believe he was an intern.

19   **Q.**  The next entry helps us know how to spell Mr. Pfirrman's

20   name?

21   **A.**  Yes.  He was an employee.

22   **Q.**  So at least a double R?

23   **A.**  Yes.

24   **Q.**  P-F-I-R-R-M-A-N.

25   **A.**  Yeah.

1    **Q.**   Is that correct?

2    **A.**   Yes.

3    **Q.**   And then Thomas Leep, do you know whether that's Tom Leep

4    or Tommy Leep?

5    **A.**   I'm not sure, no.

6            **MR. WALDINGER:**   All right.  Your Honor, I think this

7    is a good spot for a break.

8            **THE COURT:**   All right.  Members of the jury, let's

9    take our second and final 15-minute break of the day.

10       Please remember my prior admonitions.

11           **THE CLERK:**   Please rise for the jury.

12       (The following proceedings were heard out of the presence

13   of the jury:)

14           **THE COURT:**   Okay.  Ms. Dimmick, you can step down and

15   take a break just like everybody else.

16       Mr. Waldinger, anything to place on the record?

17           **MR. WALDINGER:**   I don't have anything, Your Honor.

18           **THE COURT:**   Mr. Fakhoury?

19           **MR. FAKHOURY:**   No, Your Honor.

20           **THE COURT:**   All right.  Thanks.  Let's be in recess.

21           **THE CLERK:**   Court is in recess.

22       (Recess taken at 11:48 A.M.; proceedings resumed at

23   12:06 P.M.)

24       (The following proceedings were heard in the presence of

25   the jury:)

 1              **THE CLERK:**  You may be seated.

 2              **THE COURT:**  All right.  Let's go back on the record.

 3      All the jurors are in their assigned seats.  The parties and

 4      counsel are at counsel table.  Ms. Dimmick is still on the

 5      witness stand.

 6          Mr. Waldinger, your witness.

 7              **MR. WALDINGER:**  Thank you, Your Honor.

 8          Ms. Margen, let's go back to I think it was trial

 9      Exhibit 63, page 281.

10                      (Exhibit published.)

11      **BY MR. WALDINGER:**

12      **Q.**  So, Ms. McMillan, we have been walking through some

13      Expensify transactions and I'm asking you those questions for

14      illustrative purposes.  There's --

15              **MR. WALDINGER:**  Ms. Margen, if we could blow up the

16      top half, please.

17                      (Exhibit published.)

18      **BY MR. WALDINGER:**

19      **Q.**  There's also an Expensify entry here.  Can you tell from

20      the entry who that was for (indicating)?

21      **A.**  It looks like that was for Mike Rothenberg.

22      **Q.**  What was that line item, the amount?

23      **A.**  $57,996.24.

24      **Q.**  On a monthly basis, based on your familiarity with RVMC's

25      financial transactions, would these sort of reimbursement

 1  payments be fairly typical or at least not atypical for RVMC

 2  during the time that you worked there?

 3  **A.**   Yes.  Fairly typical.

 4  **Q.**   What kinds of things were employees or -- or contractors

 5  like Gloria and Megan and Skye getting reimbursed for, if you

 6  recall?

 7  **A.**   I don't recall offhand.  But, you know, things for events,

 8  any kind of errand that Mike might have sent them on.  It

 9  could be a number of things.  Travel.

10  **Q.**   How about for Mr. Rothenberg, what sort of things would he

11  be getting reimbursed for?

12  **A.**   I -- have no idea what's in that 57,000 number, but it

13  could have been also a variety of things.

14          **MR. FAKHOURY:**  Objection, speculation.

15          **THE COURT:**  Sustained.

16          **MR. FAKHOURY:**  Move to strike the answer.

17          **THE COURT:**  The motion is granted.

18  BY MR. WALDINGER:

19  **Q.**   Ms. McMillan, did -- did employees have American Express

20  accounts that were in their names?

21  **A.**   No.

22  **Q.**   And -- but that -- do you know whether they got

23  American Express bills that they needed to get reimbursed for?

24  **A.**   No, not that I know of.

25  **Q.**   Okay.

```
 1          Would it -- and would it surprise you if you received

 2    Expensify payments?

 3    A.  Me personally?

 4    Q.  Correct.

 5    A.  I don't recall.  It wouldn't surprise me, but it would be

 6    for -- I didn't have a lot of expenses that I recall.

 7              MR. WALDINGER:  Let's just go to page 1 of this

 8    exhibit, Ms. Margen.

 9         And blow up the bottom half -- excuse me, I'm sorry,

10    Ms. Margen.  Page 277.

11         And blow up the bottom half.

12                        (Exhibit published.)

13    BY MR. WALDINGER:

14    Q.  There's -- there's one for you here on June 1st,

15    correct --

16    A.  Yes.

17    Q.  -- Ms. McMillan?

18    A.  Yes.

19    Q.  Fair to say that your memory is that you didn't have that

20    many?

21    A.  I think that's fair, yes.

22              MR. WALDINGER:  Ms. Margen, let's go to page 3 again.

23    Excuse me, I keep saying the wrong page number.  Page 279.

24         The top of that page, please.

25                        (Exhibit published.)
```

1    BY MR. WALDINGER:

2    Q.   Ms. McMillan, do you recall what Anthem Blue was?

3    A.   I believe that was payment for insurance for employees.

4    Q.   Health insurance?

5    A.   Yes.  I think so.

6    Q.   Did RVMC pay a portion of employees' health insurance

7    premiums?

8    A.   Yes.

9         MR. WALDINGER:  Ms. Margen, let's go to -- of this

10   exhibit, page 282.

11        And blow up the top half of that page.

12             (Exhibit published.)

13   BY MR. WALDINGER:

14   Q.   Ms. McMillan, do you see some entries here for something

15   called ZenPayroll?

16   A.   Yes.

17   Q.   Do you recall whether ZenPayroll was a portfolio company

18   of any of the funds?

19   A.   I think it was, yes.

20   Q.   Would -- would these have been investments into the

21   portfolio company, or would they have been for some other

22   purpose?

23   A.   This looks like actually using the services.  So using --

24   ZenPayroll was a payroll processing company.  So this looks

25   like actual payroll payments via ZenPayroll and not the

 1    funding of the company.

 2    Q.  Did it work such that RVMC paid ZenPayroll and then

 3    payments -- paychecks to employees were issued by ZenPayroll?

 4    A.  Yes.

 5    Q.  How often did RVMC pay its employees?

 6    A.  I believe it was twice a month.  But I don't recall if it

 7    was biweekly or just twice a month.  I can't remember.

 8    Q.  Right.

 9         Sometimes if it's -- if it's biweekly, that means there

10    are two months where you get three paychecks?

11    A.  Correct.

12    Q.  And then some companies just do it twice a month.

13    A.  Correct.

14    Q.  I think I already asked you this question, but we've gone

15    through some of the expenditures for expenses, for health --

16    health insurance, for payroll.  Were these expenses that RVMC

17    had to generally pay every month?

18    A.  Yes, I believe so.

19    Q.  In addition to those expenses, did you observe any other

20    kinds of expenses being incurred at RVMC?

21    A.  Can you give me an example?

22    Q.  Well, let me -- let me ask you.  Did you -- you talked

23    earlier about this concept of finance and making sure that the

24    company could make -- make its payments.

25         Did that include making payments to reimburse employees?

1   **A.**   Yes.

2   **Q.**   Did it include making payments to pay them their paychecks

3   twice a month?

4   **A.**   Yes.

5   **Q.**   Did it include making sure that you could pay the

6   employer's portion of their health insurance?

7   **A.**   Yes.

8   **Q.**   Did you observe any spending that was occurring at RVMC

9   that presented a challenge to you as the controller or the

10   director of finance in meeting those basic objectives of

11   reimbursement, payroll, and health insurance?

12   **A.**   There were other big expenses besides those that was --

13   were paid every month, yes.

14   **Q.**   How about sporting event expenditures?

15   **A.**   Yes.   Major expenses for tickets to sporting events.

16   **Q.**   Do you recall what sporting events?

17   **A.**   I recall there was tickets to the Giants, the

18   San Francisco Giants and also the Golden State Warriors.

19   **Q.**   When you say tickets, do you know whether those tickets

20   included any -- any premium packages such as Skye boxes or

21   suites?

22   **A.**   They were suites, yes.

23   **Q.**   Do you recall what the price of the Warriors suite was?

24   **A.**   I -- I recall it was about $300,000 a year, at the time.

25   **Q.**   Do you recall what the name of the -- of the venue was

 1   with respect -- was there -- were there tickets to the Giants?

 2   **A.**   Yes.

 3   **Q.**   Do you recall what the venue was called there?

 4   **A.**   It keeps changing.  Is it -- is it Oracle, I think now.

 5   **Q.**   Oracle Park?

 6   **A.**   Where the Giants play, yeah.

 7   **Q.**   What do you -- do you recall the name?  So at the time it

 8   may have been called AT&T Park?

 9   **A.**   Perhaps.

10   **Q.**   Do you recall the name of the specific venue within AT&T

11   Park where RVMC had purchased tickets or access?

12   **A.**   Well, they had a suite to -- they had a full season suite

13   to the Warriors when they played in Oakland.  And then the

14   Giants, they had a -- I think it was a quarter season or a

15   partial season suite to the Giants home stadium, AT&T or

16   Oracle.

17   **Q.**   Do you recall how much that cost?

18   **A.**   I don't recall how much that cost, no.

19   **Q.**   Did the -- did the level of -- strike that.

20       You testified earlier that you saw a lot of ins and outs

21   and that concerned you, correct?

22   **A.**   Yes.

23   **Q.**   Did the level of spending, including the spending that

24   we've just gone through, concern you?

25   **A.**   Yes.

1    **Q.**  Why did that concern you?

2    **A.**  There was a lot of cash going out and not a lot of cash

3    coming in.  And the funds were quite small.  So I was

4    concerned how we were going to pay all of the outgoing

5    expenses.

6    **Q.**  Did you have any discussions with the defendant about

7    that?

8    **A.**  Yes.

9    **Q.**  When did you -- did you have more than one discussion with

10   him?

11   **A.**  Yes.

12   **Q.**  When did you start having discussions with him about that?

13   **A.**  The first conversation was right after I started and

14   figured out the financial position of the firm.  We had a

15   conversation about cutting back spending and really picking up

16   the fundraising.  I think that was probably June of 2015.

17   **Q.**  So there are two parts to that answer.  He -- you talked

18   with him about cutting spending and increasing fundraising,

19   correct?

20   **A.**  Correct.

21   **Q.**  Let's start with the cutting the spending.  Did that

22   happen?

23   **A.**  Yes, actually.

24   **Q.**  What happened?

25   **A.**  He let a couple people go.  And also made an effort to

1    sell some of the -- the suites that he had.  So he would sell

2    suites to third parties.  Those are two examples I -- I

3    recall.

4    **Q.**  Okay.  And when you say letting people go, it means

5    basically firing people or not renewing their employment

6    contract?

7    **A.**  Correct.

8    **Q.**  Did that solve the problem?

9    **A.**  Long-term, no, did not solve any problems.

10   **Q.**  How about fundraising, what did you observe with respect

11   to that?

12   **A.**  That there was pretty lofty goals for the -- the new funds

13   in terms of cash we wanted to raise.  And there was a lot of

14   work to be done.  It wasn't anywhere close to being fully

15   funded, if you will.

16   **Q.**  I'll ask you some more questions about that in a bit.

17          **MR. WALDINGER:**  Ms. Margen, if you could go to, on

18   this exhibit, page 318 and blow up the top.

19                     (Exhibit published.)

20   **BY MR. WALDINGER:**

21   **Q.**  Again, Ms. McMillan, this is the bank account statements

22   for the Management Company, correct, RVMC?

23   **A.**  Yes.

24   **Q.**  And I'd like to direct your attention to the first entry

25   which is for September 10th of 2015.  Does this name Suite

 1  Experience ring a bell to you?

 2  **A.**  I believe that's who managed the suites at the Warriors

 3  games.  I believe.

 4  **Q.**  For this entry, there is a $4,515 credit.  Is that an

 5  instance -- do you recall whether that is an instance of

 6  Mr. Rothenberg selling one of the -- the suites for a game?

 7  **A.**  I don't recall.

 8  **Q.**  Okay.

 9          **MR. WALDINGER:**  Let's take that down, Ms. Margen.

10      On this same exhibit, Ms. Margen, let's -- let's go to

11  Page 280, please, on the bottom half of the page.

12                      (Exhibit published.)

13  **BY MR. WALDINGER:**

14  **Q.**  Ms. McMillan, there is an entry for June 9th that says

15  book transfer debit in the amount of $50,000.  Do you see

16  that?

17  **A.**  Yes.

18  **Q.**  It says -- I'll just have you read it.  What does it say

19  here where I'm circling it?

20  **A.**  To account 3301219185.

21  **Q.**  Do you recall what the 9185 account was?

22  **A.**  No, I don't.

23          **MR. WALDINGER:**  Ms. Margen, if we could pull up --

24          **THE COURT:**  Before we do that, what's a book transfer

25  debit?  What is that?

1          **THE WITNESS:**  I believe that just means that was cash

2   going out to another account from this account.

3          **THE COURT:**  Thanks.

4   BY MR. WALDINGER:

5   **Q.**  Was that a term, sort of a prepopulated term that SVB had?

6   **A.**  Yes, I believe so.

7          **MR. WALDINGER:**  Ms. Margen, let's go to Exhibit 62,

8   please.  This has also been admitted into evidence.  And we

9   won't -- we won't go to any specific page other than the

10  second page.

11      And let's blow up the top half.  And please include the

12  account number.

13                      (Exhibit published.)

14  BY MR. WALDINGER:

15  **Q.**  This is an account ending 9185.  Do you see that?

16  **A.**  Yes.

17  **Q.**  Does that refresh your recollection as to what entity was

18  associated with the account ending 9185?

19  **A.**  Yes.  It looks like that's Bend Reality.  River Studios.

20  **Q.**  So going back, we had looked at a transaction of a book

21  transfer debit to this account 9185 on June 9th of $50,000.

22      Why would RVMC have been sending $50,000 to Bend Reality

23  at that time?

24  **A.**  I don't know for sure, but probably because --

25          **MR. FAKHOURY:**  Objection, speculation.

 1          **THE COURT:**  Overruled.

 2          **THE WITNESS:**  But probably because they needed money

 3    in the Bend Reality account.

 4    **BY MR. WALDINGER:**

 5    **Q.**  Was Bend Reality or River Studios a portfolio company, to

 6    your knowledge, of any of the venture capital funds managed by

 7    RVMC?

 8    **A.**  No.

 9    **Q.**  Were you familiar with Bend Reality's finances?

10    **A.**  Yes.

11    **Q.**  Can you describe for the jury how much income Bend

12    Reality/River Studios was making at the time, say, starting

13    when you started in mid 2015?

14    **A.**  When I started, I don't believe Bend Reality was making

15    any income.

16    **Q.**  And what was your understanding -- strike that.

17          Did River Studios have employees and have to pay employees

18    and pay expenses, all the things we've seen for RVMC?

19    **A.**  Yes.

20    **Q.**  Was Bend Reality able to do that or -- strike that.

21          Where did Bend Reality get the money to do those things?

22    **A.**  From Mike.

23    **Q.**  And was that money that -- or how do you know that?

24    **A.**  That's -- well, Mike told me that he was the -- funder,

25    backer of Bend Reality.

1    **Q.**   In Bend Reality's bank accounts, could you see money

2    coming in from Mr. Rothenberg's bank account?

3    **A.**   Yes, I believe so.

4    **Q.**   And also in RVMC's bank accounts, could you see money

5    going out to Mr. Rothenberg's personal bank accounts?

6    **A.**   Yes.

7    **Q.**   I think you testified earlier that money was paid out of

8    RVMC's account to Mike personally?

9    **A.**   Correct.

10   **Q.**   Did -- was that always recorded as income to

11   Mr. Rothenberg?

12   **A.**   In terms of on the Management Company's books?

13   **Q.**   Correct.

14   **A.**   I -- I believe he did get a draw that was his income, but

15   then there was other times he would just move money that

16   wasn't part of his salary.  It was more like a loan to

17   himself.

18   **Q.**   With respect to -- you talked about intercompany balances.

19   Were you also looking at the balances between RVMC and

20   Mr. Rothenberg personally?

21   **A.**   Yes.

22   **Q.**   So -- so in addition to the entities, the individual was

23   part of your analysis.

24   **A.**   To the extent where he had loaned money back and forth

25   between himself, but excluding those payments that had been

1    made as -- as salary payments, yes.

2    Q.  Got it.

3        Again just to remind the juror -- jury, did you have

4    access at any time to look at Mr. Rothenberg's personal bank

5    accounts?

6    A.  No.

7    Q.  I'd like to just go through some of the other bank

8    accounts.

9            MR. WALDINGER:  And, Ms. Margen, if we could pull up

10   Exhibit 64.

11       And let's go, Ms. Margen, to page 85 of this exhibit.

12       Let's blow up the top half to here (indicating).

13               (Exhibit published.)

14   BY MR. WALDINGER:

15   Q.  Can you recognize what entity this bank account relates

16   to?

17   A.  Yes.  It looks like the first fund's bank account.

18   Q.  What were -- what were the last four digits of that fund's

19   bank account number?

20   A.  Looks like 2623.

21   Q.  At this point, this fund had been in existence for at

22   least a couple of years, correct?

23   A.  Yes.

24   Q.  At this time -- or do you remember the fee structure of

25   Fund I?

 1    **A.**  Not off the top of my head, no.

 2    **Q.**  Okay.

 3         **MR. WALDINGER:**  Ms. Margen, let's go to Exhibit 65,

 4    please.

 5         And again, let's just -- on this one, let's go to page 70.

 6         And let's do the whole -- all the way down to the bottom

 7    there where my -- where the green arrow.

 8         Let's get the name.  Let's redo that, Ms. Margen, and get

 9    the name of the bank account.

10         There we go.

11                        (Exhibit published.)

12    **BY MR. WALDINGER:**

13    **Q.**  So Exhibit 64 is for what entity and what account number?

14    **A.**  It looks like the second fund and account 7483.

15    **Q.**  Ms. McMillan, on June 26th of 2015, there is an entry for

16    a book transfer debit to the account that I believe you

17    testified the 9185 account was Bend Reality's account.  Do you

18    see that?

19    **A.**  Yes.

20    **Q.**  Why -- do you know -- let me just ask you.  Do you know

21    why Fund II would have been sending money to the River Studios

22    or Bend Reality bank account at that point?

23    **A.**  I don't know, no.

24    **Q.**  You've -- and again you've testified it was your

25    understanding --

 1              **THE COURT:**  Mr. Waldinger, which exhibit number is

 2      this again, please?

 3              **MR. WALDINGER:**  Sorry, Your Honor.  This is

 4      Exhibit 65, I believe.

 5              **THE COURT:**  Thanks.

 6      **BY MR. WALDINGER:**

 7      **Q.**  Again, you've testified that to your understanding, River

 8      Studios was not a portfolio company of any of the funds?

 9      **A.**  Correct.

10      **Q.**  Were these the kinds of imbalances or balances that you

11      were tracking once you started at RVMC, Ms. McMillan?

12      **A.**  Yes.

13      **Q.**  And are these the kinds of balances or imbalances that

14      caused you concern?

15      **A.**  Yes.

16      **Q.**  With respect to the movements of money, did both you and

17      Mr. Leep Senior have access to all of the Rothenberg Ventures'

18      and the funds' and the Bend Reality's bank accounts?

19      **A.**  Yes.

20      **Q.**  Could you and Mr. Leep make transactions?

21      **A.**  Yes.

22      **Q.**  And did you make transactions?

23      **A.**  Yes.

24      **Q.**  Did you do so ever of your own accord?

25      **A.**  No, always directed by -- by Mike.

1   **Q.**   Did Mr. Rothenberg, the defendant, have any -- have access

2   to these bank accounts?

3   **A.**   Yes.

4   **Q.**   Did he have the ability to move money between accounts?

5   **A.**   Yes.

6   **Q.**   Do you know that he did that?

7   **A.**   Yes, he did.

8   **Q.**   How do you know that?

9   **A.**   He would either tell me that he did or I would see that he

10  did when I was doing bank statement reconciliations.

11           **MR. WALDINGER:**   Ms. Margen, let's go to Exhibit 65,

12  and I would like to go to page 78.

13       And I would like to do the top half so that we can see the

14  bank account, the name, the bank account number, and the money

15  moving.   Good.

16                     (Exhibit published.)

17           **MR. WALDINGER:**   I'm sorry.   I got the wrong exhibit,

18  Ms. Margen.   Sixty-six, please.

19       And let's go to page 108.

20       Oops, sorry.   Make that 106, please.

21       Let's blow up that half again so that Ms. McMillan can see

22  it.

23                     (Exhibit published.)

24  **BY MR. WALDINGER:**

25  **Q.**  Ms. McMillan, I believe you testified earlier about a

1   company named Rothenberg Ventures?

2   **A.**   Yes.

3   **Q.**   Is this the company that you talked about?

4   **A.**   Yes, it looks like it.

5   **Q.**   Could you remind the jury what Rothenberg Ventures was and

6   whether it was different than Rothenberg Ventures Management

7   Company?

8   **A.**   Yes.   It was a -- really a real estate entity that

9   collected rent on different properties that Mike owned.

10  **Q.**   Who owned or managed Rothenberg Ventures LLC?

11  **A.**   Mike.

12  **Q.**   Do you recall whether any of the funds invested in this

13  company, in Rothenberg Ventures LLC?

14  **A.**   Not that I know of or recall, no.

15          **MR. WALDINGER:**   All right.   We'll come back to this

16  one, Ms. Margen.

17      I'd like to now pull up Exhibit 69.   And let's go to page

18  47.

19      Let's blow up the top half again.

20                  (Exhibit published.)

21  **BY MR. WALDINGER:**

22  **Q.**   Ms. McMillan, do you recognize this account?

23  **A.**   Yes.

24  **Q.**   What entity is this an account statement for?

25  **A.**   The 2015 Fund.

1    **Q.**  This would have been the statement that was issued sort of

2    right around the time you started, correct?

3    **A.**  Yes.

4    **Q.**  I just want to -- what is the account number here?

5    **A.**  3208.

6          **MR. WALDINGER:**  Ms. Margen, let's blow up now the

7    bottom half of the page.

8                        (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**  So there are -- one of the first two entries on May 1st is

11   what's called a book transfer credit.  What's that?

12   **A.**  That's a transfer from another account.

13   **Q.**  And this -- the accounts for both of those are 8931.  Do

14   you recognize that as the RVMC's operating account?

15   **A.**  Yes.

16   **Q.**  Is -- would this be the typical kind of flow that would

17   happen between the Management Company and a venture capital

18   fund, Ms. McMillan?

19   **A.**  Describe typical.  Typical for Rothenberg Ventures?  Or --

20   **Q.**  That's a good question.

21       Based on your understanding of how a venture capital

22   management company would work, would this -- in general would

23   this be a typical flow of cash?

24          **MR. FAKHOURY:**  Objection, calls for speculation.

25          **THE COURT:**  Overruled.

1  **BY MR. WALDINGER:**

2  **Q.**  You may answer.

3  **A.**  No, I don't think this is a typical fund's flow of a

4  regular venture capital firm.

5  **Q.**  And was this typical at Rothenberg Ventures Management

6  Company?

7  **A.**  Yes.

8  **Q.**  Was that because of the need to correct imbalances?

9  **A.**  Yes.

10  **Q.**  Or to attempt to correct imbalances?

11  **A.**  Yes.

12  **Q.**  This page also we -- we looked at the 9185 account.  Do

13  you recall that as the -- being the Bend Reality account?

14  **A.**  Yes.

15  **Q.**  What's recorded there on May 1st of 2015?

16  **A.**  A hundred-thousand-dollar transfer from the fund to Bend

17  Reality.

18  **Q.**  Again, were you aware that the 2015 Fund was investing in

19  Bend Reality?

20  **A.**  No, I wasn't.

21  **Q.**  Were these -- was this kind of transfer the kind of

22  imbalance that you were tracking in your job as controller and

23  director of finance at Rothenberg Ventures?

24  **A.**  Yes.

25  **Q.**  One of the things that you testified about earlier were

1    your conversations with Mr. Rothenberg about reducing

2    spending, correct?

3    **A.**   Yes.

4    **Q.**   And the other part was about raising money?

5    **A.**   Yes.

6    **Q.**   In 2015, in the middle of 2015, did he get some

7    investments into the 2015 Fund?

8    **A.**   Yes.

9    **Q.**   Were those investments -- was the 2015 Fund the fund that

10   Mr. Rothenberg was actively raising money during much of 2015?

11   **A.**   Yes.

12   **Q.**   And were the management fees that Rothenberg Ventures

13   entitled to, was that the main source of operating income for

14   the Management Company?

15   **A.**   Yes.

16        **MR. WALDINGER:**   Ms. Margen, I just want to walk

17   through some pages here.  Let's go to page 49.

18                  (Exhibit published.)

19   **BY MR. WALDINGER:**

20   **Q.**   Do you recall throughout 2015 --

21        **MR. WALDINGER:**   Excuse me.  Let's go -- let's go

22   forward to after Ms. McMillan started working.  So let's go to

23   page 53.

24                  (Exhibit published.)

25   / / /

1    BY MR. WALDINGER:

2    **Q.**  You started working at the end of May, correct?

3    **A.**  Yes.

4    **Q.**  So I just want to remind you, you recall that the

5    Management Company's account number ends 8931?

6    **A.**  Yes.

7    **Q.**  And do you recall throughout June and July of 2015, there

8    were a number of transfers from the 2015 Fund to the

9    Management Company?

10   **A.**  Yes.

11   **Q.**  So let's just walk through a couple.  Do you see a couple

12   on this page, page 53?

13   **A.**  Yes.

14   **Q.**  What were those for?

15   **A.**  That looks like sending $150,000 to the Management

16   Company.

17   **Q.**  Is there a second transaction?

18   **A.**  Yes, but it looks like it didn't go through.

19   **Q.**  Why do you think that?

20   **A.**  Because there was not enough cash in that account.

21           **THE COURT:**  Ms. McMillan, you see that -- that entry

22   that you're referring to from June 12, 2015 is in italics?

23           **THE WITNESS:**  Yes.

24           **THE COURT:**  Does the fact that it's in italics mean

25   anything to you?

1              **THE WITNESS:**  I think that that means that it didn't

2    go through.  I'm not --

3    **BY MR. WALDINGER:**

4    **Q.**  Well, let me ask you.

5    **A.**  I'm not positive but -- or maybe it didn't go through

6    until the -- the next $50,000 in cleared.

7    **Q.**  Is it possible that the italics simply refers to a

8    negative balance?

9    **A.**  Yes, that's also possible.

10   **Q.**  Because on the same day, June 12th, what happens with

11   respect to Robert W. Inch?

12   **A.**  A new $50,000 comes in.

13   **Q.**  What is the balance in the account after that 50,000 comes

14   in?

15   **A.**  $292.47.

16   **Q.**  Which is the same balance that existed before the $50,000

17   transaction that's in italics, correct?

18   **A.**  Yes.

19   **Q.**  So do you want to amend your testimony with respect to

20   whether you think this $50,000 transaction went through?

21   **A.**  It looks like it did go through, yes.

22   **Q.**  And while we're on this page, why would somebody like

23   Robert W. Inch, Junior and Jane S. Inch be putting money into

24   the 2015 Fund's bank account?

25   **A.**  They were probably just investing in that -- in that fund.

1    Q.   This is what you would call an LP?

2    A.   Yes.

3    Q.   Even though most of these entities were not limited

4    partnerships but were limited liability companies, did folks

5    at RVMC still call them LP's?

6    A.   Yes.

7         MR. WALDINGER:   Ms. Margen, let's go to page 55.

8    And the bottom of the page, please.

9                   (Exhibit published.)

10   BY MR. WALDINGER:

11   Q.   Ms. McMillan, do you see another book transfer debit to

12   the 8931 account?

13   A.   Yes.

14   Q.   That sends the account into a negative balance again,

15   correct?

16   A.   Yes.

17   Q.   Until the same day there is a deposit from Chun R. Ding?

18   A.   Yes.

19   Q.   Would Chun R. Ding also be an LP?

20   A.   Most likely, yes.

21        MR. WALDINGER:   Ms. Margen, page 57, please.   And

22   let's start from here (indicating) and go down here

23   (indicating).

24                   (Exhibit published.)

25   / / /

1    **BY MR. WALDINGER:**

2    **Q.**   Do you also see a number of transactions here of transfers

3    to the 8931 account?

4    **A.**   Yes.

5    **Q.**   That's 49,000, correct?

6    **A.**   Yes.

7    **Q.**   20,000, correct?

8    **A.**   Yes.

9    **Q.**   25,000?

10   **A.**   Yes.

11   **Q.**   215,000?

12   **A.**   Yes.

13   **Q.**   And then there's another entry for 7429 account.  I put

14   this up earlier and I can put this account statement back up

15   for you.  Do you recall the 7429 account being the Rothenberg

16   Ventures or real estate account?

17   **A.**   Yes.

18   **Q.**   Again, did -- did the 2015 Fund invest in Rothenberg

19   Ventures, the real estate company?

20   **A.**   No.

21   **Q.**   Would this have created an imbalance that you would have

22   had to track?

23   **A.**   Yes, but it looks like it was fixed on the next line.

24   **Q.**   Okay.  Right there (indicating)?

25   **A.**   Yeah.

1    Q.   Comes back.  Do you recall this transaction?

2    A.   I don't, but it's -- it's possible it was an accident.

3    Q.   Got it.

4         MR. WALDINGER:   Let's go -- I'm going to skip some

5    pages and go to page 59, Ms. Margen.

6         And let's start at the 25,000 and go all the way to the

7    bottom.

8                        (Exhibit published.)

9    BY MR. WALDINGER:

10   Q.   Do you see additional transfers to the 8931 account, the

11   RVMC operating account?

12   A.   Yes.

13   Q.   What are those amounts in?

14   A.   $25,000.  $100,000.  $1.92 million.

15   Q.   Okay.

16   A.   That's it.

17   Q.   And again the $1.92 million looks likes it sends the

18   account into a negative balance?

19   A.   Yes.

20   Q.   Which is corrected by what, Ms. McMillan?

21   A.   An investment of $1,999,975.

22   Q.   Who does it appear that that investment is from?

23   A.   HTC.

24         MR. WALDINGER:   And just for the record, Ms. Margen,

25   can we just page down to the very first page of the next

1    month, so two pages.

2                          (Exhibit published.)

3    BY MR. WALDINGER:

4    Q.   I just want to point out here, do you see another

5    $25 investment by HTC?

6    A.   Yes.

7    Q.   So that brings it up to an even million -- or excuse me --

8    an even 2 million from HTC?

9    A.   Two million, yes.

10   Q.   Did RVMC, to your memory, need all of those transfers to

11   pay its bills?

12   A.   Mostly likely, yes.

13   Q.   Was there a 2016 Fund when you started?

14   A.   I don't remember when it started.  We were starting to set

15   it up shortly after I started, but I don't think it existed

16   when I started, no.

17   Q.   I want to talk to you a little bit about management fees.

18          MR. WALDINGER:  Ms. Margen, we can take this exhibit

19   down.

20   Q.   Do you recall today, Ms. McMillan, what the management fee

21   structure was for the 2015 Fund?

22   A.   Generally, I think I believe it was entitled to receive

23   the full life of the fund's fees in the first two years, from

24   what I recall.  But I'm fuzzy on the exact percentages.

25          MR. WALDINGER:  Okay.  Ms. Margen, let's go to

1   Exhibit 22, please.

2       And this has not been admitted into evidence.

3       (Exhibit published to witness, counsel, and the Court.)

4   **BY MR. WALDINGER:**

5   **Q.**  And, Ms. McMillan, do you -- do you recognize this

6   document?

7   **A.**  Yes.

8   **Q.**  And what is it?

9   **A.**  It's the operating agreement of the 2015 Fund.

10  **Q.**  Does -- and did all of the funds have operating

11  agreements?

12  **A.**  Yes.

13  **Q.**  Did those operating agreements include as exhibits

14  management agreements?

15  **A.**  Yes.

16      **MR. WALDINGER:**  And, Ms. Margen, I think we want to

17  go to page 38 of Exhibit 32.

18                      (Exhibit published.)

19  **BY MR. WALDINGER:**

20  **Q.**  And do you recognize this?

21  **A.**  Yes.

22  **Q.**  What is this?

23  **A.**  This is the management agreement that includes the -- the

24  fee agreement.

25  **Q.**  Okay.

1    And if we paged through this entire exhibit -- did you

2    have an opportunity to review Exhibit 22 before your testimony

3    today?

4    **A.**   A little bit, yes.

5    **Q.**   And is Exhibit 22 an accurate reflection of the operating

6    agreement --

7        **MR. WALDINGER:**   If we could go to page 1 again,

8    Ms. -- Ms. Margen.

9    **BY MR. WALDINGER:**

10   **Q.**   -- of the operating agreement, Ms. McMillan, that was in

11   effect at RVMC with respect to the 2015 Fund?

12   **A.**   Yes, I believe so.

13   **Q.**   Okay.  And the -- on page 38, the Amended and Restated

14   Management Agreement, that's the management agreement that was

15   in effect as of March of 2015; is that correct?

16   **A.**   Yes.

17       **MR. WALDINGER:**   Your Honor, I'd move Unites States

18   Exhibit 22 into evidence.

19       **THE COURT:**   Any objection?

20       **MR. FAKHOURY:**   No, Your Honor.

21       **THE COURT:**   Exhibit 22 is admitted.

22   (Plaintiff's Exhibit 22 received in evidence).

23       **MR. WALDINGER:**   So let's go -- let's stay right here,

24   Ms. Margen.

25   **Q.**   So this is an exhibit to the operating agreement, correct?

1   **A.**   Correct.

2   **Q.**   And the name of this document is called what?

3   **A.**   The Amended and Restated Management Agreement.

4   **Q.**   Is there a date?

5   **A.**   March blank, 2015.

6   **Q.**   Is this agreement between the Management Company and the

7   fund?

8   **A.**   Yes.

9   **Q.**   Is this the agreement that governed how much money the

10  Management Company was entitled to take from the fund?

11  **A.**   Yes.

12  **Q.**   There are sections here.  Section 2A is about payment of

13  expenses and management expenses, and Section 2B is regarding

14  administrative expenses, correct?

15  **A.**   Yes.

16         **MR. WALDINGER:**   Ms. Margen, I think we want to now go

17  to the second page.  Or the next page, I'm sorry, the next

18  page of this exhibit.  So that would be page 39.  Page 39.

19      Okay.  Let's blow up the part that is paragraph 4,

20  Ms. Margen, all of paragraph 4.

21                     (Exhibit published.)

22  **BY MR. WALDINGER:**

23  **Q.**   Let's -- let me ask you first, Ms. McMillan, were there

24  kinds of expenses that RVMC could take from the 2015 Fund?

25  And were those called management expenses and administrative

1    expenses?

2    **A.**  Yes.

3    **Q.**  Let's start with the administrative expense on the bottom.

4    Could you read that provision and tell me what it provides

5    with respect to how much and when RVMC could take the

6    administrative expense.

7    **A.**  Sure.

8        "The company will pay the management company a fee to

9    cover administrative expenses of the company as described

10   above in section 2B, administrative expenses, on capital

11   raised by the company equal to 1 percent per year for ten

12   years on the sum of each member's capital commitment plus, to

13   the extent applicable, each member's unfunded capital

14   commitment.  Such expense will be payable from each member's

15   initial capital contribution to the company, by the company to

16   the management company in the year of a member's initial

17   investment in the company."

18   **Q.**  So is it fair to say that under this provision, RVMC could

19   take a total of 10 percent of the member's, meaning

20   investor's, entire capital commitment?

21   **A.**  Up front, yes.

22   **Q.**  And that's up front.

23   **A.**  Yes.

24   **Q.**  Why do you -- and where do you get the up front language?

25   **A.**  I -- because it says in the year of the initial investment

1    of the company.

2    Q.   So from that, that last phrase, that's where you draw the

3    conclusion that the company could take all 10 percent up

4    front.

5    A.   Correct.

6    Q.   And then never again, correct?

7    A.   Correct.

8    Q.   All right.  Let's go back to the management expenses then.

9         What did the management agreement provide for with respect

10   to the payment of management expenses from the 2015 Fund to

11   RVMC?

12   A.   "The company will pay the management company an expense

13   fee, management expenses, on capital raised by the company

14   equal to 1.75 percent per year for ten years on the sum of

15   each member's capital contributions plus, to the extent

16   applicable, each member's unfunded capital commitment."

17   Q.   Let me stop you there.  So 1.75 percent per year times

18   ten, that's easy math.  What's that?

19   A.   17.5 percent.

20   Q.   And that's 17.5 percent on what figure?

21   A.   On the capital contribution.

22   Q.   Including monies that had not yet been paid by the

23   investor?

24   A.   Correct.

25   Q.   Just what their commitment was?

DIMMICK - DIRECT / WALDINGER

1    **A.**   Yes.

2    **Q.**   And so what -- when were those -- where was that

3    1.75 percent per year payable?  Was it all payable up front,

4    all 17.5 percent?  Or was there a different formula for that?

5    **A.**   Should I continue reading the next --

6    **Q.**   Well, let me --

7    **A.**   -- sentence?

8    **Q.**   Why don't you start here with, "The management expense

9    will be payable."

10   **A.**   "The management expense will be payable from each member's

11   capital contributions by the company to the management company

12   on a yearly basis over ten years as follows:  1.75 percent of

13   the sum of a member's aggregate capital contribution, plus to

14   the extent applicable, each member's unfunded capital

15   commitment with amounts that are due within one year of the

16   date the member first invests to be paid to the management

17   company on the date the member first invests such that two

18   years' worth of the expense fee can be paid to the management

19   company from each member's initial capital contribution."

20   **Q.**   All right.  I'll stop you there.

21        So fair to say that that phrase that's in the

22   parenthetical, in between parentheses, is the takeaway here?

23   **A.**   Yes.

24   **Q.**   And what does that mean?

25   **A.**   That two years' worth of the expense fee can be paid or

1    taken from the Management Company on that full capital

2    contribution.

3    Q.  At -- up front?

4    A.  Yes.

5    Q.  1.75 times 2 is what?

6    A.  3.5.

7    Q.  So the first year at the time of -- of a member's or an

8    investor's capital contribution, RVMC could take 3.5 percent

9    of their total commitment?

10   A.  Correct.

11   Q.  And they could also take 10 percent of the commitment for

12   fees?

13   A.  Yes.

14   Q.  Or excuse me.  Administrative expenses?

15   A.  Yes.

16   Q.  Adding those together, what's that amount?

17   A.  13.5 percent.

18        MR. WALDINGER:  Going back to -- Ms. Margen, let's go

19   back to Exhibit 63.

20        And we'll go to page 59.

21        I'm sorry.  Exhibit 69.  And 59.

22                  (Exhibit published.)

23   BY MR. WALDINGER:

24   Q.  We talked about this page before, Ms. McMillan.

25        You spoke previously about the HTC contribution that was

1    on July 31st.  Do you see that?

2    **A.**  Yes.

3    **Q.**  On that same day, how much money was sent from the 2015

4    Fund to the Management Company?

5    **A.**  1.92 million.

6    **Q.**  Were these part of the -- was this part of the imbalance

7    that you were tracking between the 2015 Fund and the

8    Management Company?

9    **A.**  Yes.

10   **Q.**  I asked you a couple questions about the 2016 Fund, and I

11   want to go back to that.

12       Was that set up differently in terms of bank accounts than

13   the other funds?

14   **A.**  Yes.

15   **Q.**  How was that different?

16   **A.**  Unlike the 2015 Fund, this fund was taking fees on top of

17   the capital contributions funded to a different account,

18   different bank account.

19   **Q.**  So you say with respect to the 2015 Fund, management fees

20   and administrative expenses were being taken out of the

21   investors' capital contribution?

22   **A.**  Correct.

23   **Q.**  And can you explain again how that was different for the

24   2016 Fund?

25   **A.**  In the 2016 Fund, you had to send two separate wires.  So

1    we didn't just deduct fees out of the capital contribution.

2    We took the capital contribution and then sent an invoice, a

3    separate invoice for the fees, and then the fees were wired

4    separately.

5    Q.  Okay.  So I'm going to give you an example.  If I invested

6    $100 in the 2015 Fund, that would be all I would have to pay?

7    A.  Correct.

8    Q.  And RVMC would be able to take $13.50 out of it the first

9    year?

10   A.  Yes.

11   Q.  And through the total life of the fund, out of my $100,

12   RVMC could take 27?

13   A.  Correct.

14   Q.  With respect to the 2016 Fund, do you recall what the

15   management expenses were for that fund?

16   A.  Not off the top of my head, no.

17   Q.  Okay.

18       If -- but if I invested $100 in the 2016 Fund, are you

19   saying that whatever the management expense percentage was, my

20   payment would be on top of the hundred?

21   A.  Correct.

22   Q.  And did you have discussions with Mr. Rothenberg about

23   that structure?

24   A.  I don't believe I even decided that structure.  I think

25   that was something that the -- the lawyers came up with

1    because this fund was designed to be bigger and take more

2    institutional investor money.

3    **Q.**  When I asked you whether you had discussions with him

4    about it, I just wanted to know whether you -- do you know

5    whether he was aware that that was the structure of the 2016

6    Fund?

7    **A.**  Yes, he was aware.

8    **Q.**  And are you aware of that from discussions that you had

9    with him?

10   **A.**  Yes.

11   **Q.**  So he knew that the 2016 Fund's structure for getting

12   management fees and administrative expenses was different than

13   the 2015 Fund structure?

14   **A.**  Yes.  He reviewed the funds docs also.

15                       (Pause in the proceedings.)

16   **BY MR. WALDINGER:**

17   **Q.**  I want to circle back to one of the things that you

18   mentioned that was happening at the time that you started at

19   the company.  I can't remember what you said, Ms. McMillan,

20   but you said there was something going on when you started at

21   the company.

22       Do you recall what that was?

23   **A.**  Yes.  The -- the week that I started, there was an article

24   that came out about the company that wasn't very flattering.

25   **Q.**  Do you recall where that article was?

1    **A.**  Where it was published?

2    **Q.**  Correct.

3    **A.**  I believe it was in *Bloomberg*.

4    **Q.**  Was that published like in a magazine?

5    **A.**  Yes, and online.

6    **Q.**  Did you observe any reactions from Mr. Rothenberg with

7    respect to that article?

8    **A.**  Yes.  I know he sent an email out to investors in response

9    to it.  And he also had people go buy the -- buy the physical

10   magazine.

11   **Q.**  Did you -- did that include at San Francisco International

12   Airport?

13   **A.**  Yes.

14   **Q.**  Were you involved in reimbursing people who had to buy

15   airline tickets?

16   **A.**  Yes.  I recall seeing those come through on Expensify.

17   **Q.**  And so why would people have to buy airline tickets in

18   order to buy the Bloomberg --

19   **A.**  To get --

20   **Q.**  -- magazine?

21   **A.**  To get through security to be able to then go to the

22   stores within the airport.

23   **Q.**  Did Mr. Rothenberg ever tell you that he wouldn't approve

24   those expense reimbursements?

25   **A.**  Not that I recall, no.

1    **Q.**  Do you recall who went to the airport to do that?

2    **A.**  I don't remember exact -- exact names, no.

3    **Q.**  Okay.

4         And do you -- do you remember any other actions that

5    Mr. Rothenberg took?  So you said people bought up magazines?

6    **A.**  Yes.

7    **Q.**  He sent out an email to investors?

8    **A.**  Yes.

9    **Q.**  Do you remember any other actions that he took in response

10   to the *Bloomberg* article?

11   **A.**  That's all I recall.

12   **Q.**  Okay.

13            **MR. WALDINGER:**  This exhibit has not been admitted,

14   but I'd ask you to pull it up, Ms. Margen.  That's

15   Exhibit 375.

16        (Exhibit published to witness, counsel, and the Court.)

17   **BY MR. WALDINGER:**

18   **Q.**  And if you could just take a look at it, Ms. McMillan, and

19   we can page -- we can page through this.  This is a two-page

20   exhibit.

21        Do you recognize this document?

22   **A.**  Yes.

23   **Q.**  What is it?

24   **A.**  It looks like the -- the note that he sent to investors

25   after the article came out.

1    **Q.**   Okay.

2         And did you see the note or the email that he sent out to

3    investors?

4    **A.**   I don't remember.  I'm not sure.

5    **Q.**   Okay.

6         But you knew that he did it?

7    **A.**   Yes.

8    **Q.**   And Rothenberg Ventures had a -- had an email system?

9    **A.**   Yes.

10   **Q.**   Is this the kind of document that's made -- was made at or

11   around the time that the events that it's talking about

12   happened?

13   **A.**   Yes, looks like it.

14   **Q.**   And was it regular practice of Rothenberg Ventures to have

15   emails such as this and to keep them in the ordinary course of

16   business?

17   **A.**   Yes.

18   **Q.**   And to your memory, does this look like the email that

19   Mr. Rothenberg sent to investors?

20   **A.**   Yes.

21        **MR. WALDINGER:**  Your Honor, I'd move Exhibit 375 into

22   evidence.

23        **THE COURT:**  Any objection?

24        **MR. FAKHOURY:**  Yes, insufficient foundation.

25        **THE COURT:**  Overruled.  Exhibit 375 is admitted.  The

 1   witness testified that she saw the email contemporaneously.

 2           (Government's Exhibit 375 received in evidence.)

 3   BY MR. WALDINGER:

 4   Q.  Ms. McMillan, with respect to this email, what is the date

 5   of it?

 6   A.  June 1st, 2015.

 7   Q.  I won't go through it in detail.  But Mr. Rothenberg does

 8   say here that the article was biased and not well researched,

 9   correct?

10   A.  Yes.

11           MR. WALDINGER:  Ms. Margen, if we could blow up the

12   bottom half of this page.

13                     (Exhibit published.)

14   BY MR. WALDINGER:

15   Q.  There's some bullet points here, and I want to ask you

16   about the second one.

17       At this time -- or this second bullet point says,

18   "Rothenberg Ventures has 13 employees."  Do you know whether

19   that was true at that time, just for Rothenberg Ventures

20   Management Company?

21   A.  That's possible.  I don't recall exactly who was employed

22   by Bend Reality and who was employed by Rothenberg Ventures.

23   I'm just not sure.  I just don't remember the exact number of

24   employees at the time.

25   Q.  Okay.

 1        Were there -- in addition to the employees at Rothenberg

 2   Ventures Management Company, were there also employees at

 3   River Studios?

 4   **A.**  Yes.

 5   **Q.**  And based on your testimony, was -- was River Studios able

 6   to pay for those employees without getting subsidization from

 7   outside -- outside sources?

 8   **A.**  No.

 9   **Q.**  There's also another bullet point here that says, "We are

10   fortunate to have partners to cover all the costs of every

11   event we host.  To be clear, these events were not funded by

12   monies our LP's entrusted with us."

13        Do you see that?

14   **A.**  Yes.

15   **Q.**  Were you able to track at this time the amount of, say,

16   sponsorships that were coming in from outside sources?

17   **A.**  Yes.

18   **Q.**  Is it true that there were some sponsorships?

19   **A.**  Yes.

20   **Q.**  Is it true, as it said in this email, that those partners

21   covered all the costs of every event?

22   **A.**  I don't think that's true, no.

23        **MR. WALDINGER:**  We can take that down, Ms. Margen.

24   Let's pull up -- I want to explore the issue of the number

25   of employees so let's pull up Exhibit 567.

1          And, Your Honor, may I approach?

2               **THE COURT:**  Yes.

3     **BY MR. WALDINGER:**

4     **Q.**  Ms. McMillan, I'm giving you a copy of what's been marked

5     as United States Exhibit 567.  And it may have been some time

6     since you saw this document so please take a look at it, and

7     when you're done looking at it, let me know.

8          (Exhibit published to witness, counsel, and the Court.)

9               **THE WITNESS:**  I skimmed it.  I didn't read every word

10    but --

11    **BY MR. WALDINGER:**

12    **Q.**  Okay.  Do you recognize this document?

13    **A.**  Yes.

14    **Q.**  What is it?

15    **A.**  It looks like an allocation that I did in September of

16    2015 to attempt to allocate the expenses of employees that

17    were working for one entity but employed by another, and

18    trying to split their time so that the entities had the

19    correct amount of payroll expense on their books.

20    **Q.**  And the allocation that you're talking about, was that an

21    Excel attachment to something else?

22    **A.**  Yes.  That's an Excel attachment to the email, it looks

23    like.

24    **Q.**  And the date of the email was what?

25    **A.**  September 29th, 2015.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **Q.**   Who are the "From" and "To" on the email?

2    **A.**   It's from myself to Mike Rothenberg.

3    **Q.**   With respect to this kind of document, again were -- were

4    emails such as this done in the ordinary course of business at

5    Rothenberg Ventures Management Company?

6    **A.**   Yes.

7    **Q.**   And was this email made at or around the time of the

8    events that it memorializes?

9    **A.**   Yes.

10   **Q.**   And was it the practice of RVMC to -- to keep these emails

11   and their attachments in the ordinary course of business?

12   **A.**   I believe so, yes.

13   **Q.**   Does this appear to be a fair and accurate copy of the

14   email and its attachment that you sent to Mr. Rothenberg on

15   September 29th of 2015?

16   **A.**   It looks like it, yes.

17          **MR. WALDINGER:**   Your Honor, at this time I'd move

18   Exhibit 567 into evidence.

19          **THE COURT:**   Any objection?

20          **MR. FAKHOURY:**   Just renew my in lim, Your Honor.

21          **THE COURT:**   567 is admitted.

22       (Government's Exhibit 567 received in evidence.)

23          **MR. WALDINGER:**   All right.   Ms. Margen, let's just do

24   the top half here so that everybody can read it a little bit

25   better.   More, please.

1          There we have --

2                    (Exhibit published.)

3     BY MR. WALDINGER:

4     Q.   Okay.  So can you explain to the jury first in this email

5     what you were explaining to Mr. Rothenberg?

6     A.   Sure.  I'm just explaining that even though these people

7     were employed by either Bend Reality or the Management

8     Company, we were going to do an allocation to the opposite

9     company to account for the time those people spent working on

10    the other company.

11    Q.   And that's the kind of thing accountants do?

12    A.   Yes.

13    Q.   At this time, again, I'll ask you a question I've asked

14    you before.  Was Bend Reality receiving any significant

15    revenues from sales of its product?

16    A.   Not that I'm aware of.  They did eventually make a little

17    bit of consulting income, but I don't remember exactly when

18    that started.  And I don't recall that to be particularly

19    material.

20    Q.   All right.

21         MR. WALDINGER:  And, Ms. Margen, let's go -- I'm not

22    sure of the page.  I think it's the next-to-the-last page of

23    this document.

24         Oh, I think you may have to pull up the Excel.

25         Let me pivot to the -- to the ELMO, Your Honor.

1          And I'm going to take that exhibit back from you.

2          Okay.  Okay.  All right.

3                        (Exhibit published.)

4     BY MR. WALDINGER:

5     Q.  Let me do this one.  All right.  This is a page of the

6     Excel that was attached to your email, correct?

7     A.  Correct.

8     Q.  Does the top here where it says "Payroll," are those the

9     individuals or -- who did those individuals work for, do you

10    recall?

11    A.  That looks like a -- well, I'm not sure because some of

12    those people definitely worked for Bend Reality, the folks at

13    the bottom.  And the people at the top definitely worked for

14    the Management Company.

15    Q.  Okay.  And this is the column where you're -- you're

16    allocating percentages, correct?

17    A.  Correct.

18    Q.  And you're also looking at health insurance and allocating

19    to BR, which is Bend Reality; is that right?

20    A.  Yes.

21    Q.  I think you've already testified that RVMC played [sic]

22    health insurance?

23    A.  Yes.

24    Q.  The next page shows life insurance.  Was that another

25    expense?

1    **A.**  Yes.

2                         (Exhibit published.)

3    **BY MR. WALDINGER:**

4    **Q.**  Dental insurance?

5    **A.**  Yes.

6                         (Exhibit published.)

7    **BY MR. WALDINGER:**

8    **Q.**  And then finally on the last page of that Excel, vision

9    insurance.

10   **A.**  Yes.

11   **Q.**  All right.  Thank you.

12        Ms. McMillan, as you went through 2015, did you -- and as

13   you were approaching the end of that year, did you have

14   concerns about those imbalances that you have testified about

15   before?

16   **A.**  Yes.

17   **Q.**  Again, what -- did any of those concerns have to do with

18   the kind of year-end reporting that a company like RVMC does

19   to its investors?

20   **A.**  Yes.

21   **Q.**  And what kind of year-end reporting are we talking about?

22   **A.**  So all the investors receive a K-1 at the end of the year,

23   just noting what their investment is and the expenses related

24   to that investment.

25   **Q.**  And a K-1 is a, for lack of a better term, an IRS

DIMMICK - DIRECT / WALDINGER

1   document?

2   **A.**  Yes.

3   **Q.**  It's a tax-related document?

4   **A.**  Yes.

5   **Q.**  In late 2015 -- strike that.

6       I believe your testimony earlier was that your

7   calculations were that RVMC -- strike that.

8       I think you testified earlier that RVMC could take in the

9   first year a total of 13.5 percent of members' capital

10  contributions?

11  **A.**  Yes.

12  **Q.**  Or capital commitments.

13  **A.**  Yes.

14  **Q.**  In late 2015, did you determine that RVMC had gone above

15  that amount?

16  **A.**  Yes.

17  **Q.**  How -- strike that.

18      Was that going to affect what the K-1's looked like?

19  **A.**  Yes, because the K-1 would reflect the expenses related to

20  the investment which would include the fees.

21  **Q.**  Do you -- can you explain to the jurors in a little more

22  detail what -- what is reported on the K-1 exactly?

23  **A.**  Sure.  So if you have income from an investment, that will

24  show up on the K-1 because the government wants to tax you on

25  that, of course.  And if you have expenses related to the

1   investment, that will also show up on the K-1.  So you might

2   be able to have a tax deduction for that.  The management fees

3   are one of those types of investment expenses.

4   **Q.**  So if you were going to issue accurate K-1's and had taken

5   management fees of X amount, they should be divvied up between

6   all of the investors and put on each investor's K-1?

7   **A.**  Yes.

8   **Q.**  And let's get into this -- the weeds a little bit more.

9       Each investor gets a K-1.

10  **A.**  Yes.

11  **Q.**  And if I'm an investor in the 2015 Fund and Mr. Kleinman

12  is an investor, I don't get to see his K-1.

13  **A.**  Correct.

14  **Q.**  And those are all issued by RVMC?

15  **A.**  Correct.

16  **Q.**  If I invest, to use the same example, $100, that's going

17  to be listed on the K-1?

18  **A.**  I can't remember if the exact investment is listed or just

19  the expenses and income associated with it.

20  **Q.**  Okay.

21          **THE COURT:**  Ms. McMillan, I wonder if Mr. Waldinger

22  misspoke.  He said the K-1 is -- the K-1's are issued by RVMC,

23  but wouldn't they be issued by the --

24          **THE WITNESS:**  Should be --

25          **THE COURT:**  -- individuals funds in which the LP's

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    have invested?

2           THE WITNESS:  Correct, yes.  RVMC would be

3    responsible for making sure they get sent out.

4           THE COURT:  Got it.

5           THE WITNESS:  But the name on the K-1 should be from

6    the fund itself.  You're correct.

7           THE COURT:  Thank you.

8           MR. WALDINGER:  Thank you, Your Honor.

9      And I did misspoke.

10   Q.  So the K-1s are issued in the name of each fund.

11   A.  Correct.

12   Q.  It's the Management Company that's responsible for getting

13   those out?

14   A.  Yes.

15   Q.  And calculating what the numbers should be?

16   A.  Yes.

17   Q.  With respect to the 2015 Fund, what was it looking like

18   the numbers were going to be on those K-1's as of November of

19   2015?

20   A.  Based on the amount raised at the time and the amount of

21   funds -- or fees taken at the time, it looked like it would be

22   more than the -- the 13.5 percent of the fund.

23   Q.  Was that of concern to you?

24   A.  Yes.

25   Q.  Why?

1    **A.**   Because I didn't want to end the year with any of those

2    imbalances between the funds.  And certainly didn't want to

3    end the year with the Management Company overcharging any of

4    the funds.

5    **Q.**   Did you have a discussion with Mr. Rothenberg about that?

6    **A.**   We had a lot of discussions at that time about -- about

7    those imbalances, yes.

8    **Q.**   Okay.

9           **MR. WALDINGER:**   Let me have Ms. Margen bring up

10   what's been marked as United States Exhibit 569.  This has not

11   yet been admitted into evidence.

12      (Exhibit published to witness, counsel, and the Court.)

13   **BY MR. WALDINGER:**

14   **Q.**   Ms. McMillan, what is this is document, high level?

15   **A.**   It's a -- a high-level summary of the cash movement that

16   needed to happen the last six weeks of the year or so to clear

17   out these -- these balances between the accounts.

18   **Q.**   Let me go even higher level, like at the

19   animal-vegetable-mineral level.  What kind of document are you

20   looking at?

21   **A.**   Just an email from me to Mike copying Tom Leep.

22   **Q.**   And is it an email chain?

23   **A.**   Yes.

24   **Q.**   What do the -- there's only one date here, but what is the

25   date in the entire email chain?

1   **A.**   November 20th, 2015.

2   **Q.**   Who started this email chain?

3   **A.**   It looks like I started it.

4   **Q.**   And did it include a response from Mr. Rothenberg?

5   **A.**   Yes.

6   **Q.**   Did Mr. Rothenberg and Mr. Leep both receive the last

7   email that you sent?

8   **A.**   Yes.

9   **Q.**   And that's again on November 20th of 2015?

10  **A.**   Yes.

11  **Q.**   Was it the ordinary practice at RVMC to send

12  correspondence such as this including correspondence regarding

13  the financial status of the company?

14  **A.**   Yes.

15  **Q.**   And were these emails kept in the ordinary course of

16  business at RVMC?

17  **A.**   Yes.

18  **Q.**   Does this appear to be a true and accurate copy of an

19  email chain between you and Mr. Rothenberg and the senior

20  Mr. Leep on November 20th of 2015?

21  **A.**   Yes.

22          **MR. WALDINGER:**  Your Honor, I'd move United States

23  Exhibit 569 into evidence.

24          **THE COURT:**  Any objection?

25          **MR. FAKHOURY:**  No, Your Honor.

```
 1              THE COURT:  569 is admitted.

 2        (Government's Exhibit 569 received in evidence.)

 3              MR. WALDINGER:  Ms. Margen, let's blow up the bottom

 4     half starting at Mr. Rothenberg's response.

 5                       (Exhibit published.)

 6     BY MR. WALDINGER:

 7     Q.  In your email, you say that, "Tom and I" -- I'm assuming

 8     you are referring to the senior Mr. Leep?

 9     A.  Yes.

10     Q.  And you say, "Tom and I have both independently reviewed

11     all of the intercompany transactions and came to the following

12     conclusions:  These numbers will change a bit before the end

13     of the year, but here's what needs to be happen."

14          So first of all, I'd like to ask you what do you mean by

15     "here's what" -- "here's what needs to happen."

16          And if you need to talk about anything below, go ahead and

17     do that.

18     A.  I think I just mean that these are the steps that we

19     recommend taking in order to clear these balances once and for

20     all so that we're in good shape by the end of the year.

21     Q.  Let's start with number 1, which is "Bend Reality repays

22     Mike at least 2.1M of the 3.3M debt."  What's that?

23     A.  That means that Mike had paid or put cash into Bend

24     Reality of 3.3 million and he needed to get at least

25     2.1 million of that cash back in order to complete the other
```

1    steps.

2    Q.  So -- so that's step number one.  You say he needed to do

3    that in order to complete the other steps.  Does that relate

4    to step two?

5    A.  Yes.

6    Q.  Why is that?

7    A.  Because he needed that cash to give it back to the

8    Management Company.

9    Q.  I think you testified earlier that there were -- there

10   were payments from RVMC to Mr. Rothenberg that were not

11   necessarily a draw or income to Mr. Rothenberg but that were

12   loans or advances; is that right?

13   A.  Correct.

14   Q.  So is this 2.1 million, you saying that he needed to get

15   back some of that money?

16   A.  Yes.

17   Q.  Was that -- so step one was needed so that step two could

18   happen?

19   A.  Yes.

20   Q.  Was step two needed so that step three could happen?

21   A.  Yes.

22   Q.  What was step three?

23   A.  Step three is the Management Company returning

24   $2.184 million back to the 2015 Fund.

25   Q.  And we have -- we went through in just a little bit of

1    detail some of those movements from the 2015 Fund bank account

2    to the RVMC bank account back in, say, June and July of 2015?

3   **A.** Correct.

4   **Q.** Were those some of the transactions that had created this

5    need to put $2.184 million back in that fund?

6   **A.** Yes.

7   **Q.** How about management company returns 350K to Fund II?

8   **A.** Yes.  I don't remember exactly what the source of that

9    cash was originally or what it was used for, but that's how

10   much the management company owed to Fund II at that time.

11   **Q.** Do you recall Mr. Rothenberg purchasing the building at

12   1062 Folsom in 2015?

13   **A.** Yes.

14   **Q.** Do you know whether that $350,000 was related to that?

15   **A.** It could have been, yes.

16        **MR. WALDINGER:**  Ms. Margen, if we could just take

17   this exhibit down at the moment and go to Exhibit 66, which

18   has been admitted into evidence.

19      And let's go to page 108.

20      And blow up the bottom half.

21            (Exhibit published.)

22   **BY MR. WALDINGER:**

23   **Q.** Ms. McMillan, do you see a transaction for $742,577.41 on

24   October 28th of 2015?

25   **A.** Yes.

1  **Q.** Who is the recipient -- or is that a debit or a credit?

2  **A.** It looks like a debit out of that account.

3  **Q.** Do you see who the beneficiary of that debit is?

4  **A.** First American Title Company.

5  **Q.** What is First American Title Company?

6  **A.** I believe that's the title company that managed the sale

7  of the building.

8  **Q.** Or with -- or with respect to Rothenberg Ventures, the

9  purchase of the building?

10  **A.** Correct.

11         **MR. WALDINGER:** And just to clarify what account

12  we're on, Ms. Margen, let's -- let's just go back to page 106

13  of this to remind the jury what Exhibit 66 is for.

14                 (Exhibit published.)

15  **BY MR. WALDINGER:**

16  **Q.** This says Rothenberg Ventures.  Remind the jury again the

17  difference between Rothenberg Ventures and Rothenberg Ventures

18  Management Company.

19  **A.** Rothenberg Ventures is the real estate company.

20  **Q.** This was owned by Mr. Rothenberg, correct?

21  **A.** Correct.

22         **MR. WALDINGER:** Let's go back to 108, Ms. Margen.

23                 (Exhibit published.)

24  **BY MR. WALDINGER:**

25  **Q.** Looking at this $742,000 transaction, does that refresh

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    your recollection as to whether and when Mr. Rothenberg,

2    through Rothenberg Ventures, the real estate company,

3    purchased the building at 1062 Folsom?

4    **A.**   Yes.  It was around that time.

5    **Q.**   Do you see transactions going into that account right

6    before that -- that $742,000 debit?

7    **A.**   Yes.

8    **Q.**   Do you see -- see the bank accounts where those are from?

9    **A.**   Yes.

10   **Q.**   And do you recall that one of those accounts was Fund II

11   and one of those accounts was Fund I?  I believe you -- we've

12   seen both of these account numbers earlier today.

13   **A.**   Yes, that looks familiar.

14   **Q.**   So is it possible on that last exhibit that we saw that

15   this 350,000 is the 350,000 that's in your list?

16   **A.**   Yes.  It seems likely.

17   **Q.**   Let me ask you, not to beat a dead horse, but did the

18   funds, Fund I or Fund II, invest in Rothenberg Ventures, the

19   real estate company?

20   **A.**   No.

21   **Q.**   Were -- did you ever see any loan paperwork --

22   **A.**   No.

23   **Q.**    -- documenting a loan between Fund I and Fund II and

24   Rothenberg Ventures?

25   **A.**   No.

1    **Q.**  And would Rothenberg Ventures been able to make this

2    transfer to First American Title Company without those

3    additions?

4    **A.**  No.

5    **Q.**  What was the balance in that account before the 350,000

6    and $400,000 transfers?

7    **A.**  $22,159.37.

8    **Q.**  Not enough to fund a $742,000 wire?

9    **A.**  Correct.

10            **MR. WALDINGER:**  Ms. Margen, let's go back to

11   Exhibit 569.

12                    (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.**  All right.  So we just took a detour and we're back to

15   Exhibit 569.

16            **MR. WALDINGER:**  Let's blow that bottom half up again,

17   Ms. Margen.

18                    (Exhibit published.)

19   **BY MR. WALDINGER:**

20   **Q.**  We just -- the detour was related to the Management

21   Company returning $350,000 to Fund II.

22        Do you recall today we saw another transfer on that last

23   bank statement, I think it was Exhibit 66, of $400,000?

24   **A.**  Yes.

25   **Q.**  Do you recall whether that was paid back already at this

 1   time?

 2   **A.**   I don't remember, no.

 3   **Q.**   Okay.

 4          **THE COURT:**   Mr. Waldinger, any time in the next five

 5   minutes.

 6          **MR. WALDINGER:**   Thank you, Your Honor.   I'll try to

 7   finish this email.

 8   **Q.**   What's line 5 here, Ms. McMillan?

 9   **A.**   That indicates that the real estate company needs to repay

10   the Management Company for the $750,000 purchase of -- of the

11   building.

12   **Q.**   Okay.   1062 is the address.

13   **A.**   Yes.

14   **Q.**   And then separately it looks like -- well, let me ask you,

15   "real estate" refers to what company?

16   **A.**   The real estate company.

17   **Q.**   And that's just called Rothenberg Ventures LLC?

18   **A.**   Correct.

19   **Q.**   So line 6 indicates that that real estate company owes

20   Mr. Rothenberg $286,000?

21   **A.**   Yes.

22   **Q.**   Did Mr. Rothenberg respond to this email?

23   **A.**   Yes.

24   **Q.**   What did he say?

25   **A.**   He said, "Thanks, Lynne.   What are the shortfalls in each

 1   account to pull this off, i.e., 2.1 million in Bend and one

 2   million in real estate."

 3   **Q.**  Okay.

 4       And he actually said "net shortfalls," right?

 5   **A.**  Yes.

 6   **Q.**  Where did this email, your email come from?  Did it come

 7   from out of the blue with respect to Mr. Rothenberg, or did it

 8   come from discussions or after discussions you had with him?

 9   **A.**  Well, it looks like it was after discussions that I had

10   with Tom to try to come up with a plan to clear the balances

11   by the end of the year.

12   **Q.**  Before this time, before November 20th of 2015, was

13   Mr. Rothenberg aware of these imbalances?

14   **A.**  Yes.  We had frequent conversations about the -- the

15   balances.

16   **Q.**  And did he understand the need to correct the imbalances?

17   **A.**  Yes.

18   **Q.**  And did that include the need to do so not only for -- to

19   adhere to basic accounting principles, but also to make sure

20   the K-1's looked good?

21   **A.**  Yes.  To comply with the -- the operating agreement.

22   **Q.**  He did not want the investors to know that you've taken

23   too many fees?

24   **A.**  Correct.

25           **MR. WALDINGER:**  Let's go to the top of this document,

 1    Ms. Margen.

 2                      (Exhibit published.)

 3    **BY MR. WALDINGER:**

 4    **Q.**  You respond to Mr. Rothenberg's email, correct?

 5    **A.**  Correct.

 6    **Q.**  And what do you say?

 7    **A.**  I say, "It's really like 750,000 from the real estate

 8    company.  It's not ideal, but I think it's fine if the real

 9    estate company owes you 286,000 at the end of the year.  And

10    then 2.1 million as of today from Bend Reality/you.  The magic

11    number right now for the Management Company is 2.534 million,

12    the amount it owes to the funds, 2.184 to the 2015 Fund, 350K

13    to Fund II.

14        "Current 2015 Fund commitments through the end of the year

15    are 1.6 million including Monday's 500,000."

16    **Q.**  What's a fund commitment, Ms. McMillan?

17    **A.**  I believe that's just folks that had committed to

18    investing in the fund but hadn't necessarily sent the cash

19    yet.

20    **Q.**  Got it.

21        And so you're -- you talk about a magic number being

22    $2.534 million, correct?

23    **A.**  Yes.

24    **Q.**  And that is the number that you needed to get back into

25    fund -- the 2015 Fund plus into Fund II, correct?

DIMMICK – DIRECT / WALDINGER

1   **A.**  Yes.

2   **Q.**  All right.

3         **MR. WALDINGER:**  Your Honor, I think this would be a

4   good place.  We've gone over a couple minutes, but we finished

5   the email.

6         **THE COURT:**  Very good.  Members of the jury, we're

7   going to break for the day.  Thanks so much for your close

8   attention and your hard work.

9      Remember my prior admonitions.  The easiest thing is just

10  not to think about the case.  Then the admonitions become much

11  easier to follow.

12     If anybody asks you about your jury service, you can tell

13  them about how long you think the case is going to take and

14  you're seated on the jury, and that's about it.

15     Don't look anything up on the Internet.  Keep an open

16  mind.  You haven't heard all the evidence yet.

17     And I will see you tomorrow morning.  Thank you.

18         **THE CLERK:**  Please rise for the jury.

19     (The following proceedings were heard out of the presence

20  of the jury:)

21         **THE COURT:**  Okay.  We're outside the presence of the

22  jury.

23     Ms. Dimmick, thanks.  I'll ask you to come back tomorrow.

24  I appreciate your testimony so far.  You can step down now.

25     I wanted to let counsel know that I want to stop early by

1   ten minutes tomorrow and on October 25th and on November 8th.

2   I am a judge on our reentry court.  There's a staff meeting

3   that goes from 1:00 to 1:30, most of which I'll miss, and then

4   that court starts at 1:30.  So I need to create some time for

5   me just to talk to my colleagues for five minutes and then be

6   on time when that court starts.

7            **MR. WALDINGER:**  So that's tomorrow, the 11th, and

8   what were the other two dates, Your Honor?

9            **THE COURT:**  October 25th and November 8th.  Drug --

10  excuse me.  Reentry court occurs on the second and fourth

11  Wednesdays of every month.

12      I anticipate we actually will be in session the Wednesday

13  before Thanksgiving, but I do not anticipate that this trial

14  will be in session because I told our jurors that we would not

15  be.

16      Mr. Waldinger, anything to place on the record for the

17  government?

18            **MR. WALDINGER:**  I don't believe so, Your Honor.

19            **THE COURT:**  Mr. Fakhoury?

20            **MR. FAKHOURY:**  Nothing, Your Honor.  Thank you.

21            **THE COURT:**  Do we have a thought about when the

22  government will oppose the defendant's motion not to talk

23  about the trip to Mexico?

24            **MR. WALDINGER:**  We haven't talked.  I don't know if

25  these guys have talked to Mr. Fakhoury, but we can do that,

1    try to do it today if Mr. Fakhoury is available.

2              **THE COURT:**  Yeah, that's fine.  You can just let me

3    know tomorrow.  It doesn't sound like it's a rush.

4         Thank you all.

5              **MR. WALDINGER:**  Thank you, Your Honor.

6              **THE COURT:**  Let's be in recess.

7              **THE CLERK:**  Court is in recess.

8              (Proceedings were concluded at 1:35 P.M.)

9                        --o0o--

10

11

12                    <u>**CERTIFICATE OF REPORTER**</u>

13

14              I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16   I further certify that I am neither counsel for, related to,

17   nor employed by any of the parties to the action in which this

18   hearing was taken, and further that I am not financially nor

19   otherwise interested in the outcome of the action.

20

21   _____

22        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

23               Tuesday, October 10, 2023

24

25