UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 15** |
| | ) | |
| vs. | ) | NO. CR 20-00266-JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | **Pages 2789 - 2946** |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, October 30, 2023 |

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

APPEARANCES:

For Plaintiff:           THOMAS A. COLTHURST, ESQ.
                         Attorney for the United States
                         Acting under Authority conferred by
                         28 USC $515
                         1301 Clay Street, Suite 340S
                         Oakland, California  94612
                    BY:  BENJAMIN K. KLEINMAN,
                         KYLE F. WALDINGER,
                         NICHOLAS J. WALSH,
                         ASSISTANT UNITED STATES ATTORNEYS


For Defendant:           MOEEL LAH FAKHOURY LLP
                         1300 Clay Street, Suite 600
                         Oakland, California  94612
                    BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

                         Law Office of Nathaniel J. Torres
                         338 Fillmore Street #4
                         San Francisco, California  94117
                    BY:  NATHANIEL J. TORRES, ATTORNEY AT LAW


Reported By:             Pamela Batalo Hebel
                         CSR. No. 3593, FCRR, RMR


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

<u>I N D E X</u>

Monday, October 30, 2023 - Volume 15

**GOVERNMENT'S WITNESSES**                                    <u>PAGE</u>  <u>VOL.</u>

<u>FRANK, DAVID (RECALLED)</u>
(PREVIOUSLY SWORN)                                            2794  15
Direct Examination (Resumed) by Mr. Waldinger                2794  15
Cross-Examination by Mr. Fakhoury                            2851  15

<u>CHIU, DAVID</u>
(SWORN)                                                      2880  15
Direct Examination by Mr. Kleinman                          2882  15
Cross-Examination by Mr. Torres                             2917  15


**E X H I B I T S**


**GOVERNMENT'S EXHIBITS**                          <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

 188                                                     2798  15

 189                                                     2807  15

 190                                                     2810  15

 195                                                     2818  15

 203                                                     2832  15

 221                                                     2843  15

 222                                                     2845  15

 464                                                     2889  15

 466                                                     2894  15

 470                                                     2905  15

 471                                                     2907  15

 472                                                     2914  15

 590                                                     2829  15

# I N D E X

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 599 | | 2848 | 15 |
| 631 | | 2909 | 15 |

<u>**Monday - October 30, 2023**</u>                                        **8:56 a.m.**

### P R O C E E D I N G S

---000---

(Proceedings were heard in the presence of the jury:)

**THE COURT:**  Good morning.

**JURORS:**  Good morning.

**THE COURT:**  Traffic and the BART conspired against you this morning, but you don't care.  You're like an action movie where the person is in the Jeep and they're driving through and there are flames and projectiles coming in, you just blast all the way through.

If -- I think Ms. Lee probably said this.  If -- if one of our jurors had to take a Lyft or an Uber, if you get in that situation, it's are not your fault, you're just trying to do your jury service, usually we can get the jury office to reimburse you for that.  So you shouldn't have to do that out of pocket.

At some point this week, hopefully tomorrow I'll remember, I want to go to a place called Arizmendi.  It's in Oakland.  It's a worker-owned bakery.  It's been there a long time.  I think Oakland gets a bad rap personally.  So it's just my way of saying thank you to you.  I'm giving myself three days to remember.  So hopefully one of those days it will happen.

But I do want to thank you.  You've got more than half this trial under your belt for sure.  I'm not exactly sure when

1    it's going to end, but you're doing a great job and everybody

2    appreciates you.

3        I hope you had a restful weekend.  I don't actually

4    remember where -- we were in the middle of a witness.  I just

5    don't remember who the witness was.

6            **MR. WALDINGER:**  That's correct, Your Honor.  We are in

7    the middle of Mr. David Frank.

8            **THE COURT:**  That's right.  All right.  So we will

9    continue with that examination.

10           **THE CLERK:**  And, Your Honor, I'm sorry, before we

11   forget, now calling criminal matter CR-20-00266-JST, United

12   States vs. Michael Brent Rothenberg.

13       If you could just please state your appearance for the

14   record.

15           **MR. WALDINGER:**  Good morning, Your Honor.  Kyle

16   Waldinger, Nicholas Walsh and Benjamin Kleinman for the

17   United States.

18           **MR. FAKHOURY:**  Good morning, Your Honor.  Hanni

19   Fakhoury and Nate Torres on behalf of Mr. Rothenberg.

20           **THE COURT:**  And Mr. Rothenberg is present.

21       And all the jurors are in their assigned seats.

22       Good morning, Mr. Frank.

23           **THE WITNESS:**  Good morning.

24           **THE COURT:**  Would you come back up to the witness

25   stand and make yourself comfortable.  Take your mask off.  And

1    I will remind you that you're still under oath.

2                           **DAVID FRANK**,

3    called as a witness by the Government, having been previously

4    duly sworn, testified further as follows:

5                    **DIRECT EXAMINATION**   **(Resumed)**

6    **BY MR. WALDINGER:**

7    **Q.**   Good morning, Mr. Frank.

8    **A.**   Good morning.

9    **Q.**   I just want to do a quick recap.  I believe your testimony

10   on Thursday was that you met the defendant, Mike Rothenberg, in

11   about September of 2015.

12   **A.**   Yes, sir.

13   **Q.**   And is it true that after that you worked on his behalf

14   soliciting investments both for River Studios and for one or

15   more of his venture capital funds?

16   **A.**   That is correct.

17   **Q.**   When we left off on Friday, I was asking you about a

18   family office that I think you referred to as Dolby Ventures?

19   **A.**   That is correct.

20   **Q.**   And did you solicit investments into one of the funds or

21   into River Studios from Dolby Ventures?

22   **A.**   Both represented, yes.

23   **Q.**   Did Dolby Ventures make any investments?

24   **A.**   Yes, they did.

25   **Q.**   Where did they invest?

1   **A.**   In the venture fund.

2   **Q.**   Do you recall how much Dolby invested?

3   **A.**   It was about $500,000, approximately.

4   **Q.**   Another family office that you mentioned on Thursday was

5   Pilot Grove; is that correct?

6   **A.**   That is correct.

7   **Q.**   And the full name is Pilot Grove Management?

8   **A.**   That is correct.

9   **Q.**   Can you remind the jurors who or which family Pilot Grove

10   is associated with.

11   **A.**   Jack Binion.

12   **Q.**   That's in Las Vegas?

13   **A.**   That's in Las Vegas.

14   **Q.**   Did you also seek investments both to venture capital fund

15   and to River Studios from Pilot Grove?

16   **A.**   That is correct.

17   **Q.**   Who were the people that you dealt with at Pilot Grove?

18   **A.**   Dominic Polizzotto and Larry Weisman.

19   **Q.**   Did you have a prior relationship with them?

20   **A.**   That is correct.

21   **Q.**   And what was the nature of that prior relationship?

22   **A.**   It was scouting for the family in a variety of ventures

23   that were of interest to the family.

24   **Q.**   Do you recall when you first reached out to the folks at

25   Pilot Grove about Mr. Rothenberg?

1    **A.**    October of '15.

2    **Q.**    And how did you reach out to them?

3    **A.**    Email and a call.  I think it was a call.  I think the

4    original one was a call.

5    **Q.**    Okay.  And did you also send an email or multiple emails?

6    **A.**    That is correct.

7           **MR. WALDINGER:**  If we can pull up on the screen,

8    Ms. Margen, what's been marked only for identification purposes

9    as Exhibit 188.

10   **Q.**    And, Mr. Frank, that will come up on your screen.  You

11   also have a hard copy on the witness stand.

12          Is it true that Exhibit 188 is a multiple-page email -- or

13   it's a one-page email with an attachment and the exhibit is a

14   total of 20 pages?

15   **A.**    That is correct.

16   **Q.**    Do you recognize Exhibit 188?

17   **A.**    I do.

18   **Q.**    What is it, high level?

19   **A.**    It is an email dated --

20          **THE COURT:**  Something happen to the witness -- I see,

21   you're away from the mic.

22          **THE WITNESS:**  Yeah.  I'm sorry.

23          **MR. WALDINGER:**  Let's blow that up for you.

24          **THE COURT:**  You can also -- it bends down.  There you

25   go.

1    **THE WITNESS:**  It's an email dated October 9th from me

2   to Dominic Polizzotto and Larry Weisman.

3   **BY MR. WALDINGER:**

4   **Q.**   Were there any attachments to this email?

5   **A.**   Yes, there was.

6   **Q.**   What was attached?

7   **A.**   A copy of the presentation for Rothenberg Ventures.

8   **Q.**   Where did you get the information that's in the text of

9   the email?

10  **A.**   From Mike Rothenberg.

11  **Q.**   Where did you get the attachment to this email?

12  **A.**   From Mike Rothenberg.

13  **Q.**   Was Mike Rothenberg aware that you were providing the

14  information in the email and the attachment to potential

15  investors?

16  **A.**   Yes.

17  **Q.**   And does this email and its attachment appear to be a true

18  and correct copy of what you sent to Dominic Polizzotto and

19  Lawrence Weisman on October 9th of 2015?

20  **A.**   Yes, it is.

21      **MR. WALDINGER:**  Your Honor, I would move Exhibit 188

22  into evidence at this time.

23          **THE COURT:**  Any objection?

24          **MR. FAKHOURY:**  No, Your Honor.

25          **THE COURT:**  188 is admitted.

1     (Government's Exhibit 188 received in evidence.)

2       (Exhibit published to jury.)

3 **BY MR. WALDINGER:**

4 **Q.** So the email is up on the jurors' screens.

5    You just testified, Mr. Frank, that's the information in

6 this email you obtained from Mr. Rothenberg; is that correct?

7 **A.** That is correct.

8 **Q.** And one of the things that I'll ask you is did this email

9 relate both to River Studios and to the funds?

10 **A.** That is correct.

11 **Q.** With respect to River Studios, if you could -- do you see

12 the second paragraph there that starts "Let me know"?

13 **A.** Yes.

14 **Q.** Could you read the second sentence of that paragraph,

15 please.

16 **A.** "Mike can go over River Studios which he incubated out of

17 his own pocket and of course his VR investments with Rothenberg

18 Ventures.  (You can invest in River or the fund)."

19 **Q.** All right.  With respect to this phrase, "incubated out of

20 his own pocket," is that information that you obtained from the

21 defendant?

22 **A.** That is true.

23 **Q.** What was your understanding as to what the defendant meant

24 when he told you that he had incubated River Studios out of his

25 own pocket?

1           **MR. FAKHOURY:**  Objection.  Irrelevant.

2           **THE COURT:**  Overruled.  I think the witness testified

3    about this last Thursday.

4           **THE WITNESS:**  That the cost to begin launch and scale

5    River Studios was financially underwritten by Mike Rothenberg.

6    **BY MR. WALDINGER:**

7    **Q.**   There's some biographical information here in the next

8    paragraph.  I won't have you read that.  But I will ask you

9    where you got that information.

10   **A.**   From Mike Rothenberg.

11   **Q.**   Two more paragraphs down, there is -- it's the paragraph

12   that begins "Today Mike has built."  Do you see that?

13   **A.**   Yes.

14   **Q.**   At the end of that first line, could you read that

15   sentence that begins "He"?

16   **A.**   "He bootstrapped River Studios to understand and create

17   stories and VR which I thought you might find of great

18   interest."

19   **Q.**   Okay.  And "VR" in this context stands for what?

20   **A.**   Virtual reality.

21   **Q.**   Again, is this information that you obtained from the

22   defendant?

23   **A.**   Yes.

24   **Q.**   What did you understand the defendant to mean when he said

25   that he bootstrapped River Studios?

1   **A.**   He basically financially supported the studios himself.

2   **Q.**   Based on your conversations with the defendant, what was

3   your understanding with respect to whether River Studios had

4   obtained any investments from any of the venture capital funds

5   that the defendant managed?

6   **A.**   Can you repeat the question?

7   **Q.**   Based on your conversations with the defendant, what was

8   your understanding as to whether River Studios had received

9   investments from any of the venture capital funds that

10  Mr. Rothenberg managed?

11  **A.**   I was under the understanding that he had received no

12  other funding.

13  **Q.**   Meaning that he had received no funding from the venture

14  capital funds?

15  **A.**   That's right.

16  **Q.**   And when I say "he," I -- I really mean River Studios had

17  received no funding; correct?

18  **A.**   That is correct.

19  **Q.**   There is a PowerPoint deck attached to this email;

20  correct?

21  **A.**   That is correct.

22          **MR. WALDINGER:**   Ms. Margen, if we could go to the

23  second page of Exhibit 188.

24  **Q.**   The first page of the deck is labeled "Draft" and

25  September of 2015.  Do you see that, Mr. Frank?

1   **A.**   Yes.

2   **Q.**   Sorry.  I didn't hear your answer.

3   **A.**   I'm sorry.  Yes.

4   **Q.**   Where did you get the deck that was attached to the email

5   in Exhibit 188?

6   **A.**   Mike Rothenberg.

7        **MR. WALDINGER:**  Ms. Margen, if we could go to page 7

8   of Exhibit 188 and then blow that up.

9        Page 7 of Exhibit-- this -- yeah, that page right there.

10  **Q.**   Mr. Frank, what was your understanding as to what was

11  being displayed on this page of Exhibit 188, page 7?

12  **A.**   That Rothenberg Ventures invests in early stage founders,

13  they're building disruptive startups in various categories of

14  frontier tech, hardware, software, VR, AR, enterprise software,

15  and consumer and media.

16  **Q.**   Those are four areas, correct?

17  **A.**   That is correct.

18  **Q.**   And it looks like there are 12 companies listed in each

19  area.  Twelve times 4 is?

20  **A.**   Forty-eight.

21  **Q.**   Forty-eight companies listed.  What did you understand

22  these 48 companies' relationship to be with Rothenberg

23  Ventures?

24  **A.**   That Rothenberg Ventures and their executives had done the

25  research and decided to invest in those companies.

1    **Q.**   In other words, these were portfolio companies of the

2    venture capital funds?

3    **A.**   That is correct.

4    **Q.**   Do you see River Studios listed among any of the

5    48 portfolio companies on this page?

6    **A.**   I do not.

7            **MR. WALDINGER:**  Ms. Margen, if we could go to page 10

8    of this exhibit.  And blow that up.

9    **Q.**   This page is entitled "Example Investments."  Do you see

10   that, Mr. Frank?

11   **A.**   I do.

12   **Q.**   I'm going to direct your attention to the column that is

13   entitled "Cost."  Do you see that?

14   **A.**   Yes.

15   **Q.**   Do you have any observations about the general size --

16   well, strike that and let me ask a different question.

17       What do you understand "cost" to be in the context of this

18   page of Exhibit 188?

19           **MR. FAKHOURY:**  Objection.  Speculation.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  Costs would refer to the actual dollar

22   value of the investment into the company.

23   **BY MR. WALDINGER:**

24   **Q.**   In other words, how much money the funds had provided to

25   these listed portfolio companies?

1    **A.**    That is correct.

2    **Q.**    And what was your -- do you have observations as to the

3    general size of those investments?

4            **MR. FAKHOURY:**  Objection.  Speculation.

5            **THE COURT:**  Overruled.  Although actually, I don't

6    know if it's speculation, I'm not sure what the question means.

7    **BY MR. WALDINGER:**

8    **Q.**    Well, what are the size of the investments that are

9    listed, Mr. Frank?

10   **A.**    Are you talking about the sum total of all of them from

11   Matterport down to Dronebase is $1.5 million -- $1.575 million.

12   **Q.**    And how many companies are listed?

13   **A.**    Eight.

14   **Q.**    So that's an average of what?  About 1.6 divided by 8?

15   **A.**    Yeah.  About 275, 250, 200.

16   **Q.**    About 200; correct?

17   **A.**    Yeah.

18   **Q.**    Was that consistent with the conversations that you had

19   had with Mr. Rothenberg about his investment strategy?

20   **A.**    That would be correct.

21           **MR. WALDINGER:**  Ms. Margen, if we could now go to --

22   let's go to page 16 of this exhibit.  I'm going to blow that up

23   as well.

24   **Q.**    Do you -- I'm directing your attention to this box sort of

25   in the upper right related to Rothenberg Ventures.  Do you see

1  that?

2  **A.**   Yes.

3  **Q.**   What do you understand this box to be depicting?

4  **A.**   That Rothenberg Ventures invests in 30 companies in a

5  variety of businesses.

6  **Q.**   Thirty plus.

7  **A.**   Thirty plus.

8  **Q.**   And some of those 30-plus companies are -- their logos or

9  names are set forth in the box to the right; correct?

10  **A.**   That is correct.

11  **Q.**   Do you see River Studios listed within that box?

12  **A.**   I do not.

13       **MR. WALDINGER:**   And finally, Ms. Margen, if we could

14  go two more pages to page 18, please.

15       Page 18.   That's page 19, Ms. Margen.

16  **Q.**   What does this page of the deck depict, Mr. Frank?

17  **A.**   It's two categories of people on Rothenberg Ventures'

18  team.   There is the investment team and the operations team.

19  **Q.**   Based on your interactions with Mr. Rothenberg and the

20  folks at Rothenberg Ventures, did you have any observations

21  about how many people were determining or deciding what kinds

22  of investments to make?

23  **A.**   I was familiar that there was a team of people, and that

24  looks like the team that was in place to -- to vet investments

25  for the venture fund.

**Q.**   So not only Mr. Rothenberg, but at least five other people, according to this deck?

**A.**   Yes, that is correct.

**Q.**   Did you meet any of these other people?

**A.**   I met Brandon Farwell.

**Q.**   And was Mr. Farwell somebody that helped determine and vetted potential portfolio companies?

**A.**   He was the lead in most of it, but he had collaborations with Fran Hauser and other people, including Mike.

**Q.**   Very good.

         **MR. WALDINGER:**  Ms. Margen, if you could take Exhibit 188 down.

**Q.**   I think you may have testified about this, but let me just ask you, did you send more than one email to Dominic Polizzotto and Mr. Weisman about Mike Rothenberg, his funds and about River Studios?

**A.**   I did.

         **MR. WALDINGER:**  Ms. Margen, if we could pull up what's been marked for identification purposes only as Exhibit 189. And let's blow up the top half for my eyes and probably Mr Frank's eyes.

**Q.**   Is this another email that you sent?

**A.**   Yes, it is.

**Q.**   What's the date of this email?

**A.**   November 19th, 2015.

1   **Q.**   And is that email from you to Mr. Weisman and

2   Mr. Polizzotto?

3   **A.**   That is correct.

4   **Q.**   Is there any attachment to this email?

5   **A.**   I can't see it.

6   **Q.**   Okay.  Can you tell -- can you tell --

7   **A.**   There is -- I'm sorry.  There is an attachment.

8   **Q.**   -- from the header --

9   **A.**   It says RothenbergNBE.pdf.

10          **MR. WALDINGER:**  Ms. Margen, if we could dezoom this

11  and show Mr. Frank the attachment.  Just page down.

12  **Q.**   Does that appear to be the same or similar attachment that

13  you sent with respect to your prior -- prior email in

14  Exhibit 188?

15  **A.**   That is correct.

16  **Q.**   Again, going back -- well, let's start with the deck.

17          You obtained this deck from Mr. Rothenberg; correct?

18  **A.**   That is correct.

19  **Q.**   How about the information in the email?  Where did you

20  obtain that?

21  **A.**   Can you blow it up?  Okay.  Thanks.

22          From Mike Rothenberg.

23  **Q.**   Again, was Mr. Rothenberg aware that you were taking the

24  information that he provided to you and the deck that he

25  provided to you and soliciting investments?

1   **A.**   Yes, he was.

2           **MR. WALDINGER:**   Your Honor, I would move Exhibit 189

3   into evidence.

4           **THE COURT:**   Any objection?

5           **MR. FAKHOURY:**   No, Your Honor.

6           **THE COURT:**   189 is admitted.

7           (Government's Exhibit 189 received in evidence.)

8                   (Exhibit published to jury.)

9   **BY MR. WALDINGER:**

10  **Q.**   Again, this -- this email has similar language as the

11  prior email in Exhibit 188; correct?

12  **A.**   That is correct.

13  **Q.**   I want to point out a couple of things, whether or not

14  they're differences or not.

15          One of the things that you say, starting in the third full

16  paragraph, is that you were advising Mike on two ventures,

17  River Studios and his venture fund.   Do you see that?

18  **A.**   I do.

19  **Q.**   With respect to your advising, my question is what was the

20  nature of your advice and what were you trying to accomplish or

21  what was Mr. Rothenberg trying to have you accomplish through

22  your advice?

23  **A.**   The venture studio, it was finding appropriate matches

24  that would help him scale and -- and grow the -- the studio.

25  **Q.**   When you say "venture studios," are you talking about

1    River Studios?

2    **A.**   River Studios, yes.

3    **Q.**   Okay.  So to scale and grow, what's "scale" mean in this

4    context?

5    **A.**   The nature of the studios was a production company for

6    virtual reality content.  And so that content needs to be

7    bought by another entity.  It could be a cable company, a media

8    company, it could be a family office, series of businesses like

9    a casino group, or it could be movie studios.

10         And so by advising him, it was basically creating matches

11   that might be appropriate for the growth of the studio.

12   **Q.**   Got it.

13        And with respect to the fund, can you remind me what the

14   nature of your advice was with respect to the fund?

15   **A.**   It was doing the same.  He had his own team contacting

16   many people.  I was trying to provide areas where they were not

17   being contacted such as like family offices.

18   **Q.**   Based on your network.

19   **A.**   My network.

20   **Q.**   This same paragraph, you use the same language about

21   incubated; correct?

22   **A.**   That is correct.

23   **Q.**   And then a couple or three more paragraphs down, you use

24   the same language about bootstrapped.

25   **A.**   That is correct.

1    **Q.**   One thing I'll point out here is -- and this may not have

2    been in the prior exhibit -- in this paragraph that begins with

3    the -- with the phrase "I am advising," in the last sentence,

4    you use the phrase "his VR studio, River Studios."

5    **A.**   That is correct.

6    **Q.**   Does that reflect your understanding that Mr. Rothenberg

7    owned River Studios?

8    **A.**   I did.

9         **MR. WALDINGER:**  All right.  Ms. Margen, you can take

10   that down.

11        And let's pull up for identification purposes only

12   Exhibit 190, which has not been admitted into evidence.  And

13   let's just page through this.

14   **Q.**   Does this first page, Mr. Frank, appear to be an email?

15   **A.**   It does.

16   **Q.**   What's the date of that email?

17   **A.**   November 30th, 2015.

18   **Q.**   Was this email sent by you?

19   **A.**   It was.

20   **Q.**   Who did you send it to?

21   **A.**   To Larry Weisman.

22   **Q.**   So it was to Larry Weisman only?

23   **A.**   Uh-huh.

24   **Q.**   Is that correct?

25   **A.**   That is correct.

1   **Q.**   Can you tell from the header that there was an attachment?

2   **A.**   Yes.

3          **MR. WALDINGER:**   And, Ms. Margen, let's page down.

4   **Q.**   Does that appear to be same or similar attachment that was

5   in the prior two exhibits, 188 and 189?

6   **A.**   That is correct.

7   **Q.**   Going back to the first page, does this email that's on

8   the first page of Exhibit 190 contain information that was

9   provided to you by Mr. Rothenberg?

10  **A.**   That is correct.

11  **Q.**   And was he aware that you were taking that information and

12  communicating it to potential investors?

13  **A.**   That is correct.

14         **MR. WALDINGER:**   Your Honor, I would move to admit

15  Exhibit 190.

16         **THE COURT:**   Any objection?

17         **MR. FAKHOURY:**   No, Your Honor.

18         **THE COURT:**   190 is admitted.

19         (Government's Exhibit 190 received in evidence.)

20              (Exhibit published to jury.)

21  BY MR. WALDINGER:

22  **Q.**   Mr. Frank, this email is slightly different than the prior

23  two we've seen because it's only to Mr. Weisman; correct?

24  **A.**   That is correct.

25  **Q.**   And the first sentence says something -- the second

1    sentence of the first paragraph says "This will be for our

2    visit," and then it uses the abbreviation for Wednesday.

3         What was going on at this time, Mr. Frank?

4    A.   There was a demo day happening on Wednesday.

5    Q.   This email was sent on what date?

6    A.   November 30th, 2015.

7    Q.   Was that shortly before this demo day?

8    A.   That is correct.

9    Q.   There's also some information here about a fourth fund.

10   You've already testified to this, so I'll just ask you, was

11   this information about raising $100 million for the fourth fund

12   information that you received from Mr. Rothenberg?

13   A.   That is correct.

14   Q.   Now, you talked about a demo day, and what is a demo day?

15   A.   A demo day is when you have a series of companies that

16   make short presentations in front of an audience that usually

17   is comprised of strategic and investors.  Strategics would be

18   actual companies.  And then investors would be either private

19   investors or venture capital firms -- funds.

20   Q.   You referred to "our visit Wednesday."  Does that mean

21   that both you and Mr. Weisman were visiting?

22   A.   That is correct.

23   Q.   Do you recall, in addition to demo day, whether there

24   was -- were any meetings with Mr. Rothenberg during that time?

25   A.   Yes.  There was a meeting the day before demo day.

1  **Q.**   And is it possible that the meeting was on Wednesday and

2  the demo day on Thursday?

3  **A.**   Yes.

4  **Q.**   Is that what happened that week?

5  **A.**   Yes.

6  **Q.**   And do you recall today what day of the week

7  November 30th, the date of this email, was?

8  **A.**   I don't remember the day.

9  **Q.**   All right.  Was it -- was it the same week, just shortly

10  before the visit?

11  **A.**   That is correct.

12  **Q.**   Were you -- did you attend both the meeting with

13  Mr. Rothenberg and the demo day?

14  **A.**   To my knowledge, yes.

15  **Q.**   I want to ask you about the meeting with Mr. Rothenberg.

16  Where did that occur?

17  **A.**   In his office.

18  **Q.**   Who was present?

19  **A.**   Larry Weisman and myself.

20  **Q.**   Do you recall generally what was discussed in that meeting

21  on that Wednesday?

22  **A.**   It was both the venture fund and River Studios and the

23  nature of how he looks at venture capital investing and the

24  River Studios.

25  **Q.**   What did Mr. Rothenberg say about how he looked at the

1  nature of venture capital investing?

2  **A.**   He would mention that you can invest either in a red ocean

3  type environment where there's lots of competition or you can

4  invest in a blue ocean market where there is less competition,

5  and he preferred investing in blue ocean markets where there

6  was less competition.

7  **Q.**   With respect to River Studios, do you recall what he said

8  about that during that meeting?

9  **A.**   It was basically what he was doing with the studios.   What

10  he was doing with natures of the businesses he had been

11  involved with and his -- his prospects for the future of other

12  things he wanted to do.

13  **Q.**   And what kinds of prospects were those with respect to

14  River Studios?

15  **A.**   They would be doing content involving stars like Coldplay,

16  Björk, and people like that, and other types of situations.

17  But I think the ones that he had mentioned the most would be

18  Coldplay and Björk.

19  **Q.**   Did he indicate during that meeting that he was looking

20  for outside investors into River Studios?

21  **A.**   Yes.

22  **Q.**   All right.   Thank you.

23       **MR. WALDINGER:**   Ms. Margen, you can take this exhibit

24  down, Exhibit 190.

25  **Q.**   Mr. Frank, after that, did you set up a meeting with

1  Mr. Rothenberg, Mr. Polizzotto, and Mr. Weisman in Las Vegas?

2  **A.**   I did.

3  **Q.**   When was that, if you recall?

4  **A.**   It was January 6th, 2016.

5  **Q.**   Okay.  And what was -- what was happening -- was there

6  anything happening in Las Vegas at that time?

7  **A.**   It was CES.

8  **Q.**   What is CES?

9  **A.**   It stands for the Consumer Electronics Show, and it's one

10 of the largest conventions in the world, attended by a hundred

11 thousand people from technology to tech -- to actual companies.

12 So the Intels, you know, all your major companies, television,

13 Sony, you know, Motorola.  You know, everybody basically has a

14 booth there.

15 **Q.**   Was -- was Mr. Rothenberg going to be at CES?

16 **A.**   He was -- to my knowledge, he was basically taking

17 meetings in areas outside of where the convention was.  CES is

18 held in the Las Vegas Convention Center and also the Sands.

19 Those meetings that he was having were basically at other

20 places outside of the actual convention.

21 **Q.**   So it sounds like he was going to be in Las Vegas, not

22 necessarily at CES?

23        **A JUROR:**  I'm having a bit of an issue.  I can't hear

24 or understand the witness.

25        **THE COURT:**  I see.  Okay.  Mr. Frank, did you hear

1    that?

2            **THE WITNESS:**  Yes, I did.  Is this better?

3            **THE COURT:**  Yes.

4            **THE WITNESS:**  I think it's because it doesn't take my

5    voice better from one angle to the other.  Do you want me to

6    repeat what I said?

7            **A JUROR:**  Please.

8            **THE WITNESS:**  Can you repeat the question?

9            **THE COURT:**  Let's reask the question, and then we'll

10   have a clear record.

11           **MR. WALDINGER:**  Thank you.

12   **Q.**   Let me just back up a little bit.  And I apologize.

13        You should feel free to look at the jury instead of me.

14        Taking you back, you said you set up a meeting in

15   January of 2016?

16   **A.**   That is correct.

17   **Q.**   And what was going on in Las Vegas was something called

18   the Consumer Electronics Show?

19   **A.**   That is correct.

20   **Q.**   Mr. Rothenberg was taking meetings outside of CES, I

21   believe you said?

22   **A.**   That is correct.

23   **Q.**   And is one of the meetings that you set up was between him

24   and Mr. Polizzotto and Mr. Weisman?

25   **A.**   That is correct.

```
1    Q.    What was the purpose of that meeting?

2    A.    It was to talk about the venture fund and River Studios.

3    Q.    Did that meeting, in fact, take place?

4    A.    That is correct.

5    Q.    Who was there?

6    A.    It was Mike, Larry Weisman, Dominic Polizzotto, myself.

7    And I think there was one of Mike's assistants was there.

8         MR. WALDINGER:  Ms. Margen, if you could pull up

9    Exhibit 195, please.

10        This has just been marked for identification purposes

11   only.  And blow that up.

12   Q.    So first I'll ask you, Mr. Weisman [sic], if just looking

13   at the date here and -- and the sentence that I'm

14   highlighting -- if you would take a look at that, and I'll ask

15   you whether that refreshes your recollection as to the date

16   that that meeting occurred.

17   A.    Yes.

18   Q.    And what was the date of the meeting in Las Vegas?

19   A.    To my recollection, it was January 6th.

20   Q.    Okay.  And but this email is dated what date?

21   A.    January the 7th.

22   Q.    And --

23   A.    And, yeah.  It says, "Thank you for meeting Mike and I

24   today."  So I might be wrong on the date.  So it might be the

25   7th.  I thought it was on the 6th.
```

1   **Q.**   Okay.  Let's go through this email a little bit.  This is

2   an email dated January 7th of 2016; correct?

3   **A.**   That is correct.

4   **Q.**   Who was the email from and to?

5   **A.**   The email is from me to Larry Weisman and Dominic

6   Polizzotto.

7   **Q.**   Can you tell from the header information whether any

8   attachment or attachments were attached to this email?

9   **A.**   The subject matter of the email is River Studios Deck and

10   then Rothenberg.  River Studios PDF.

11   **Q.**   How many decks appear to be attached?

12   **A.**   I can't tell unless I see the attachments.  I think it's

13   two.

14   **Q.**   Okay.  And with respect to the information that's in the

15   bulk of the email at the bottom, was that information that you

16   obtained from Mr. Rothenberg?

17   **A.**   That is correct.

18         **MR. WALDINGER:**  Ms. Margen, if we could take this down

19   and page through to show Mr. Frank the decks.

20   **Q.**   This appears to be the first attachment.  Do you see that?

21   **A.**   I do.

22         **MR. WALDINGER:**  And, Ms. Margen, just keep paging

23   down.

24   **Q.**   This is a similar deck to what you've -- was attached to

25   the prior emails; correct?

1    **A.**   That is correct.

2            **MR. WALDINGER:**  And then, Ms. Margen, let's stop at

3    page 20.

4    **Q.**   All right.  Does this appear to be on page 20 where a

5    second deck begins?

6    **A.**   Yes.  That is correct.

7    **Q.**   Did you obtain both of the decks that are attached to your

8    email of January 7th from the defendant?

9    **A.**   I did.

10   **Q.**   And did he know that you were providing those decks and

11   the information in the email to Mr. Polizzotto and Mr. Weisman?

12   **A.**   He did.

13           **MR. WALDINGER:**  Your Honor, I would move Exhibit 195

14   into evidence.

15           **THE COURT:**  Any objection?

16           **MR. FAKHOURY:**  No, Your Honor.

17           **THE COURT:**  195 is admitted.

18           (Government's Exhibit 195 received in evidence.)

19           **MR. WALDINGER:**  Ms. Margen, let's go back to the first

20   page.  And blow that up.

21                   (Exhibit published to jury.)

22   BY MR. WALDINGER:

23   **Q.**   Again in the first line of the bottom area, you use the

24   term "bootstrapped."  Do you see that?

25   **A.**   I do.

1    **Q.**   Again, we've seen that before.  What did you understand --

2    strike that.

3         Was that information that you obtained from the defendant,

4    the bootstrapping out of his own pocket?

5    **A.**   That all the costs --

6    **Q.**   Well, let me stop -- the question was:  Was that

7    information that you obtained from the defendant?

8    **A.**   Yes.

9    **Q.**   And what did you take it to mean when he said bootstrapped

10   out of his own pocket?

11   **A.**   He was paying for all the expenses himself.

12        **MR. WALDINGER:**  Ms. Margen, if we could now go to the

13   deck, the first deck.

14   **Q.**   I just want to point out, Mr. Frank, the prior decks that

15   we've seen had "Draft" on them and I believe were dated

16   September of 2015.  Do you see here that the draft legend has

17   been removed and the date updated to October?

18   **A.**   I do.

19   **Q.**   Again, this was a deck that you obtained from the

20   defendant; correct?

21   **A.**   I did.

22        **MR. WALDINGER:**  Ms. Margen, let's now go to the

23   investor deck starting at page 20.

24   **Q.**   Was there a reason why you were now attaching an investor

25   deck regarding River Studios after that meeting on or about

1    January 7th of 2016?

2    **A.**    Mike was emphasizing the investment in River Studios.

3    **Q.**    Did Mr. Polizzotto and Mr. Weisman express more interest

4    in the studios than in the funds at that time, if you recall?

5    **A.**    To my recollection, it was 50/50.  More toward the studio,

6    but it was -- it was kind of 50/50.  Because they were

7    basically there to get to know him and know all the things that

8    he was doing, but the intent really was to talk about River

9    Studios.

10   **Q.**    Got it.

11            **MR. WALDINGER:**  Ms. Margen, let's page down in this

12   deck slowly.  And keep going.

13   **Q.**    So this just has information about River Studios; is that

14   correct, Mr. Frank?

15   **A.**    That is correct.

16            **MR. WALDINGER:**  Let's do one more page, Ms. Margen.

17   And stop there.

18   **Q.**    This slide indicates 30 VR experts in three locations.

19   Does it indicate the locations that it's referring to?

20   **A.**    It does.

21   **Q.**    Where are those?

22   **A.**    San Francisco, Los Angeles, and Canada.

23   **Q.**    Does the 30 VR experts -- does that comport with your

24   understanding of the number of employees or contractors that

25   River Studios had at that time?

1    **A.**    That is correct.

2    **Q.**    Did you meet any of the folks on this page other than

3    Mr. Rothenberg?

4    **A.**    Sivan Iram.

5    **Q.**    What was his role at River Studios?

6    **A.**    General manager and basically like the person who is in

7    charge of most of the activities at River Studios.

8    **Q.**    What is Mr. Rothenberg's role at River Studios listed as

9    on this deck?

10   **A.**    Founder and CEO.

11       **MR. WALDINGER:**   Ms. Margen, if we could go forward to

12   page 25.

13   **Q.**    This -- this slide is titled "Top 4 M&A Opportunities."

14   Could you explain to the jury what M&A is?

15   **A.**    M stands for merger.  A stands for acquisition.

16   **Q.**    What was your understanding, based on your review of this

17   deck and your conversations with Mr. Rothenberg, as to what

18   this M and A reference was to?

19   **A.**    He wanted to acquire those companies listed, a

20   Canadian-based studio, a Russian-based VR studio, a U.S.-based

21   VR studio, and a South American VR studio.  There were

22   discussions with all of those.  And that was one of his

23   intentions.

24   **Q.**    Was that one of the uses that Mr. Rothenberg wanted to

25   make of any investment money?

1    **A.**    That is correct.

2    **Q.**    The first one listed here is a Canada-based studio with

3    12 developers.   In brackets after that it says "complete."

4              **MR. WALDINGER:**  I will have Ms. Margen go to the next

5    page of this deck.

6    **Q.**    And ask you if you were aware of Mr. Rothenberg's -- or

7    I'll just ask you if you were aware of the facts that are set

8    forth on this page of the deck?

9    **A.**    I was.

10   **Q.**    And what are those facts?

11   **A.**    It was an M and A activity involving Twisted Oak Studios

12   located in Halifax, Nova Scotia.

13   **Q.**    Was it your understanding that Mr. Rothenberg had acquired

14   that studio back in August of 2015?

15   **A.**    I was because on the slide before it says "complete."

16             **MR. WALDINGER:**  Ms. Margen, if we could go to the next

17   page.

18   **Q.**  Mr. Frank, this slide in the deck is titled "Opportunity."

19   I want to just focus your attention on the first bullet point,

20   which is labeled 1.

21   **A.**    Uh-huh.

22   **Q.**    Could you read that for the jury, please.

23   **A.**    "River Studios is conducting a private raise of

24   $20 million for 25 percent of River Studios.   The primary use

25   of capital will be to fund the premium content opportunities in

the pipeline and to roll up mergers and acquisition talent in

VR."

**Q.**   What did you understand this phrase "primary use of

capital" to mean?

**A.**   Investment into River Studios would be used for that use.

**Q.**   And when you say "investment into River Studios," that

would be the investment that is being solicited -- or that was

being solicited from Pilot Grove and from Mr. Polizzotto and

from Mr. Weisman?

**A.**   That is correct.

**Q.**   Have you -- did you have experience before this time,

Mr. Frank, in soliciting investments on behalf of startups from

investors such as Pilot Grove?

**A.**   Can you repeat that question.

**Q.**   Did you have experience at this time acting on behalf of

startups in soliciting investments from investors such as Pilot

Grove?

**A.**   That is correct.

**Q.**   And is information about what an investment will be used

for something that investors take into account in determining

whether to invest?

**A.**   That is correct.

**Q.**   Why is that?

**A.**   Investors want to know the use of proceeds.  And so the

person who is -- or the company has to tell them if we're

1    raising money and we're going to apply it in these particular

2    ways.

3    **Q.**   An investor typically, in other words, wants to know what

4    their money is going to be used for?

5    **A.**   That is correct.

6    **Q.**   And if it's going to be used for one thing, that might be

7    okay for the investor, but if it's going to be used for another

8    thing, that might not be okay.

9    **A.**   That is correct.

10             **MR. WALDINGER:**   Ms. Margen, you can take that down.

11   **Q.**   At some point, Mr. Frank, did you understand that Pilot

12   Grove, through Mr. Polizzotto and Mr. Weisman, intended to

13   invest in some fashion in River Studios?

14   **A.**   Yes.

15   **Q.**   And was that in the weeks or so following that meeting at

16   CES?

17   **A.**   That is correct.

18   **Q.**   I just want to ask you, was there a point where you turned

19   over the diligence process to Mr. Rothenberg and to Mr. Weisman

20   and Mr. Polizzotto?

21   **A.**   That is correct.

22   **Q.**   And could you describe what -- what you think of when I

23   say the term "diligence process"?

24   **A.**   That means reference checking, use of proceeds, where you

25   are now and where you're going.

1    **Q.**    And where you are now, does that include financials?

2    **A.**    That is true.

3    **Q.**    Based on your experience with Pilot Grove at that time,

4    did they conduct due diligence?

5    **A.**    Yes, they did.

6    **Q.**    And -- let me ask a different question.

7         Super Bowl 50 was in Santa Clara in February of 2016;

8    correct?

9    **A.**    That is correct.

10   **Q.**    Did Mr. Rothenberg post any events at River Studios or

11   Rothenberg Ventures with respect to the Super Bowl?

12   **A.**    Yes, he did.

13   **Q.**    And what kind of events were those?

14   **A.**    He had a -- a booth or a -- a suite.  He had a series of

15   tickets for the Super Bowl.

16   **Q.**    At the game?

17   **A.**    At the game.

18   **Q.**    For a suite or a skybox?

19   **A.**    That's right.

20   **Q.**    Did he host any events at River Studios or Rothenberg

21   Ventures?

22   **A.**    Yes, he did.

23   **Q.**    What kind of events did he host there?

24   **A.**    He would have either a demo day or an open house.  He

25   would give tours of the studio to prospective investors or

1    customers.

2    **Q.**   Do you recall whether Mr. Weisman and Mr. Polizzotto from

3    Pilot Grove came to San Francisco to attend any of those events

4    at Rothenberg Ventures or River Studios?

5    **A.**   Yes, he did.

6    **Q.**   And I'm using -- I'm saying both Rothenberg Ventures and

7    River Studios.  Were those businesses located in the same

8    building?

9    **A.**   Yes, they were.

10   **Q.**   That was at 1062 Folsom?

11   **A.**   Yes.  That's correct.

12   **Q.**   You said that Mr. Polizzotto and Mr. Weisman came.  Did

13   you attend any of the events at Folsom Street with them?

14   **A.**   Yes.

15   **Q.**   What kind of events did you attend with them?

16   **A.**   It was a demo day.

17   **Q.**   Do you recall whether there were any additional meetings

18   with Mr.-- between Mr. Weisman, Mr. Polizzotto, and

19   Mr. Rothenberg at that time?

20   **A.**   I can't recollect -- I can't recollect it.

21   **Q.**   You testified earlier that the defendant had a skybox or a

22   suite at the actual Super Bowl game.

23   **A.**   That is correct.

24   **Q.**   At this time, had Pilot Grove yet invested in River

25   Studios?  Had they put any money in at that point?

1  **A.**  I can't correct -- I can't -- they were in the process of

2  doing it.  I can't remember the time between the actual

3  investment and the invitation to the Super Bowl.  I -- to my

4  recollection, they had.

5  **Q.**  Okay.

6  **A.**  So...

7  **Q.**  Let me show you something.  It's --

8         **MR. WALDINGER:**  Ms. Margen, if you could just pull up,

9  it's for identification purposes only, Exhibit 203.

10 **Q.**  And I'll hand you a physical copy.  If you could just take

11 a look at that.

12      Mr. Frank, this is an email from Mr. Rothenberg; correct?

13 **A.**  That is correct.

14 **Q.**  With the subject line "Complete Diligence"?

15 **A.**  That is correct.

16 **Q.**  Does reading this email, which is dated February 17th,

17 does that refresh your recollection with respect to whether

18 Pilot Grove had invested already at the Super Bowl -- by the

19 time of the Super Bowl, earlier that month, or whether it was

20 still in process at the time of the Super Bowl?

21 **A.**  It indicates that the investment was still in process.

22 **Q.**  Very good.

23      Let me take Exhibit 203 back from you.

24      **MR. WALDINGER:**  Ms. Margen, you can take that down.

25 Thank you.

1   **Q.**   So at the time of the Super Bowl, Pilot Grove's investment

2   was still in process; correct?

3   **A.**   That is correct.

4   **Q.**   You mentioned something in an answer to my question about

5   an invitation to the Super Bowl.  What were you referring to

6   there?

7   **A.**   Inviting Larry Weisman and Dominic Polizzotto to be a

8   guest of Mike Rothenberg at the Super Bowl.

9   **Q.**   Who invited them?

10  **A.**   Mike Rothenberg.

11  **Q.**   Did you pass on that investment -- or excuse me -- pass on

12  that invitation?

13  **A.**   I did.

14          **MR. WALDINGER:**  Ms. Margen, if we could pull up what's

15  been marked as Exhibit 590 for identification purposes only.

16  And let's blow that up.

17  **Q.**   This is a one-page email, Mr. Frank.  In general, what

18  kind of document are you looking at?

19  **A.**   It's an email dated February the 3rd, 2016, from myself to

20  Mike Rothenberg, Larry Weisman, and Dominic Polizzotto.

21  **Q.**   I didn't mention this before, but this lists your email

22  address as df@peqvc.com.  Do you see that?

23  **A.**   I do.

24  **Q.**   Was that the email address or one of the email addresses

25  that you used at that time?

1    **A.**    That is correct.

2    **Q.**    What does "peqvc" stand for, if anything?

3    **A.**    Private equity ventures capital.

4    **Q.**    Was this an email that Mr. Rothenberg asked you to send to

5    Mr. Weisman and Mr. Polizzotto?

6    **A.**    He did.

7    **Q.**    And was it sent on or about February 3rd, 2016?

8    **A.**    Yes.

9    **Q.**    And is this an accurate copy of that email?

10   **A.**    That is correct.

11          **MR. WALDINGER:**  Your Honor, I would move Exhibit 590

12   into evidence.

13          **THE COURT:**  Any objection?

14          **MR. FAKHOURY:**  No, Your Honor.

15          **THE COURT:**  590 is admitted.

16       (Government's Exhibit 590 received in evidence.)

17                 (Exhibit published to jury.)

18   **BY MR. WALDINGER:**

19   **Q.**    Could you just read this email into the record, Mr. Frank.

20   **A.**    "Hey Larry and Dominic, Happy Wednesday and welcome to the

21   friendly confines of Silicon Valley.  Mike Rothenberg and folks

22   from Rothenberg Ventures and River Studios are excited to

23   extend an invitation to you to come share his suite at Super

24   Bowl 50 and hang with Golden State Warrior All Stars Dramond

25   Green, Klay Thompson and really other fun people.  I have

```
 1    limited tickets so please let me know ASAP if you would like to

 2    attend."

 3    Q.   Did Mr. Rothenberg tell you why he wanted you to invite

 4    Mr. Weisman and Mr. Polizzotto to the Super Bowl?

 5    A.   I can't recollect if he mentioned a reason.  He basically

 6    thought it would be a good idea to extend an invitation to them

 7    since he had the tickets.

 8    Q.   Did he have you invite anybody else?

 9    A.   Yes.

10    Q.   Do you recall who else he had you invite?

11    A.   Just people who were executives at other companies and

12    venture funds.

13    Q.   And were those other people also potential investors?

14    A.   Yes.

15    Q.   Did you go to the Super Bowl?

16    A.   No.

17    Q.   Do you remember whether Mr. Weisman and Mr. Polizzotto

18    accepted this invitation?

19    A.   I don't think they did.

20    Q.   Do you know whether in fact, Mr. Rothenberg was able to

21    get Dramond Green and Klay Thompson to go?

22    A.   I don't remember if they did or not.

23              MR. WALDINGER:  All right.  Ms. Margen, we can take

24    that down.

25         I am going to bring back up Exhibit 203, Ms. Margen.
```

1    **Q.**   This was something that I used to refresh your

2    recollection, Mr. Frank, that's not yet been admitted into

3    evidence.

4         Let me hand you a copy of it.

5    **A.**   Uh-huh.  Thank you.

6    **Q.**   This is a 64-page document; correct?

7    **A.**   That is correct.

8    **Q.**   What is this document in general, this exhibit?

9    **A.**   Attachments of River Studios convertible note agreement,

10   investor presentation.

11   **Q.**   Let's back up.

12        The first page, what is the first page of Exhibit 203?

13   **A.**   It's an email sent from Mike Rothenberg to Dominic

14   Polizzotto and Larry Weisman, and I was copied on the email.

15   **Q.**   What's the date of the email?

16   **A.**   It's February 17th, 2016.

17   **Q.**   The email address is mike@river.co?

18   **A.**   That is correct.

19   **Q.**   Is that one of the email addresses that Mr. Rothenberg

20   used?

21   **A.**   That is correct.

22   **Q.**   Was this email sent by Mr. Rothenberg with respect to

23   Pilot Grove's potential investment in River Studios?

24   **A.**   That is correct.

25            **MR. WALDINGER:**  Your Honor, I would move Exhibit 203

1   into evidence.

2           **THE COURT:**  Any objection?

3           **MR. FAKHOURY:**  No, Your Honor.

4           **THE COURT:**  203 is admitted.

5       (Government's Exhibit 203 received in evidence.)

6               (Exhibit published to jury.)

7   **BY MR. WALDINGER:**

8   **Q.**   So this is the email that we used to refresh your

9   recollection before.  This refers to a meeting on February 5th.

10  Do you see that?

11  **A.**   I do.

12  **Q.**   I think your testimony was you can't recall whether there

13  was a meeting or whether you were -- or perhaps whether you

14  were present.  Is that right?

15  **A.**   That is correct.

16  **Q.**   Again, you've testified about diligence.  Is this an email

17  in which Mr. Rothenberg is sending Mr. Polizzotto and

18  Mr. Weisman diligence materials?

19  **A.**   That is correct.

20  **Q.**   I don't want to spend a lot of time on this, but I do want

21  to point out --

22          **MR. WALDINGER:**  If we can go to -- if we could page

23  down, Ms. Margen, to the first attachment.  Whoop.  Let's go up

24  one.

25  **Q.**   Do you see this second page?

1    **A.**   I do.

2    **Q.**   It's titled "River Studios Wire Information."  Do you see

3    that?

4    **A.**   I do.

5    **Q.**   Do you know the relationship between Bend Reality and

6    River Studios?

7    **A.**   I do not.

8    **Q.**   Okay.  And did you -- have you seen in the course of your

9    work for Mr. Rothenberg -- see sometimes "River Studios" and

10   "Bend Reality" used interchangeably?

11   **A.**   I do not.

12   **Q.**   Okay.  So you don't recall that?

13   **A.**   I do not.

14   **Q.**   Okay.  But -- but what does this page say with respect to

15   wire information?  What is wire information?

16   **A.**   Wire information is where River Studios receives their

17   funds.  So if you're wiring funds, the information of where to

18   wire the money to.

19        **MR. WALDINGER:**  If we could go to the next page.

20   Let's go back up.  I'm sorry.  We don't have to blow that up.

21   **Q.**   And so you take this to mean that any investments into

22   River Studios would be sent to an account in the name of Bend

23   Reality LLC?

24   **A.**   That is correct.

25        **MR. WALDINGER:**  Ms. Margen, let's go to the next page.

1    **Q.**   This first document is called "Convertible Promissory

2    Note."   The jury may have heard about convertible notes before,

3    but if you could give your understanding of what a convertible

4    promissory note is, for the jury.

5    **A.**   Well, a promissory note is a loan.   So convertible is that

6    if you give money on a convertible, it converts into something

7    else at your option.

8    **Q.**   And often in this context, it would convert into stock.

9    **A.**   Into equity, yes, that is correct.

10         **MR. WALDINGER:**   Ms. Margen, if we could go to page 33.

11   **Q.**   Do you see this?   This was something that was attached to

12   Mr. Rothenberg's email of diligence materials.   Do you see

13   that?

14   **A.**   I do.

15   **Q.**   This is kind of hard to read, but in general, what does

16   this appear to you to be?

17   **A.**   It's a flow chart of personnel, entities within River

18   Studios, creative technology and business.

19   **Q.**   Very good.   And does that comport in general with your

20   understanding as to the size of River Studios at this time?

21   **A.**   Yes, it does.

22         **MR. WALDINGER:**   Thank you, Ms. Margen.   You can take

23   that down.

24   **Q.**   So at this time, Exhibit 203, Mr. Frank, was an email

25   dated February 17th of 2016.   Does that indicate to you that at

```
 1   that time Pilot Grove had still not made an investment in River
 2   Studios?
 3   A.   That is correct.
 4   Q.   At -- at any time, whether in February or earlier, had
 5   Mr. Rothenberg expressed any frustration to you about the
 6   length of time it was taking for Pilot Grove to make a
 7   decision?
 8   A.   Yes, he did.
 9   Q.   And do you recall -- strike that.
10        Was that on a single occasion or more than one occasion?
11   A.   On more than one occasion.
12   Q.   When were those occasions?
13   A.   They were during the process.  I can't recollect the date,
14   but I would get a phone call from him and he was sounding upset
15   or hyper concerned on why it's taking so long.
16   Q.   What did he say with respect to that?
17   A.   "Why are they taking so long?"
18   Q.   Okay.  So literally he would say why is he taking so long?
19   A.   I can act it out if you want, but it's like, "Why are you
20   taking so long?  Why are they taking so long?"
21   Q.   Well, you're sort of being animated.  Is that an accurate
22   reflection of how Mr. Rothenberg asked you that question?
23   A.   He was extremely -- I wouldn't say hysterical but
24   borderline, just like, "Why are they taking so long?"
25   Q.   Did you -- did he tell you why he was asking that
```

1    question?

2    **A.**    No.

3    **Q.**    But your observation was that, fair to say, there was some

4    frustration in Mr. Rothenberg about the length of time it was

5    taking for Pilot Grove to decide?

6    **A.**    That is correct.

7    **Q.**    All right.

8          **THE COURT:**  Mr. Waldinger, any time in the next five

9    minutes.

10         **MR. WALDINGER:**  All right.  Thank you, Your Honor.

11   **Q.**    Do you know whether Pilot Grove did, in fact, invest money

12   in River Studios?

13   **A.**    Yes -- yes, they did.

14   **Q.**    Do you have a good memory today of when that was?

15   **A.**    I do not.  It was probably sometime towards the end of

16   February, but I don't remember the exact date.

17   **Q.**    It was February of 2016?

18   **A.**    That's correct.

19   **Q.**    Did you receive any payment from Mr. Rothenberg that was

20   related to Pilot Grove's investment?

21   **A.**    I did.

22   **Q.**    Do you recall when that was?

23   **A.**    It was sometime the second week in March, third week in

24   March.

25         **MR. WALDINGER:**  Ms. Margen --

1          **THE WITNESS:**  I can't -- I can't remember.

2          **MR. WALDINGER:**  Okay.

3      Ms. Margen, could we pull up Exhibit 62, which is already

4  in evidence, and go to page 101.  And blow up the top half.

5  **Q.**   Mr. Frank, you see this is an account statement from

6  March of 2016 regarding an account ending 9185, which I will

7  show to you in a bit, Mr. Frank, is from an account in the name

8  of Bend Reality.

9      Do you see a wire transfer for $40,000?

10 **A.**   I do.

11 **Q.**   And is that the payment that you were talking about?

12 **A.**   That is correct.

13 **Q.**   How do you know that?  Does it have the name of your

14 company?

15 **A.**   Yes, it does.

16 **Q.**   And again, what's the name of that?

17 **A.**   PEQVC.

18          **MR. WALDINGER:**  Ms. Margen, if we could just go up to

19 page 98 so that we can see.

20 **Q.**   This is the account of Bend Reality; correct?

21 **A.**   That is correct.

22          **MR. WALDINGER:**  Your Honor, this -- I don't have that

23 many more questions for Mr. Frank, but I think this is a good

24 place to stop for our break.

25          **THE COURT:**  Okay.  Very good.

```
1          Members of the jury, let's go ahead and take our first
2    break of the day.  Thank you.
3          THE CLERK:  Please rise for the jury.
4          (Proceedings were heard out of presence of the jury:)
5          THE COURT:  Mr. Waldinger, anything for the record?
6          MR. WALDINGER:  Nothing from the Government,
7    Your Honor.
8          THE COURT:  Mr. Fakhoury?
9          MR. FAKHOURY:  No, Your Honor.
10         THE COURT:  My goal is to get you a set of jury
11   instructions by the end of the week.  It will mostly be what
12   you've already submitted to me.  There are a couple of things
13   that I have seen in the questioning I want to address.
14         You should think about whether there are further
15   modifications you think are necessary in light of the way the
16   evidence has come in and whether we will need to have any kind
17   of discussion that would be longer than the time we normally
18   reserve for ourselves.  Thanks.
19         THE CLERK:  Court is in recess.
20               (Recess taken at 10:03 a.m.)
21               (Proceedings resumed at 10:18 a.m.)
22         (Proceedings were heard in the presence of the jury:)
23         THE COURT:  Let's go back on the record.
24   Mr. Frank is still on the stand.
25         All the jurors are in their assigned seats.
```

1          The parties and counsel are at counsel table.

2          Mr. Waldinger, your witness.

3               **MR. WALDINGER:**  Thank you, Your Honor.

4          Ms. Margen, if we could pull up again Exhibit 195 and go

5     to page 22.

6     **Q.**   Mr. Frank, this was the email that you sent on

7     January 7th.  Do you recall that?

8     **A.**   Yes.

9     **Q.**   And -- I'm sorry, Ms. Margen.  If we could -- I have the

10    wrong page.  If we could go -- I think it's five more pages,

11    please, 27.

12              **MR. FAKHOURY:**  Your Honor, my apologies for -- can I

13    speak to Mr. Waldinger for a second?

14              **THE COURT:**  Sidebar?

15              **MR. FAKHOURY:**  Yes.

16         (Sidebar conference held without the court reporter.)

17              **THE COURT:**  Mr. Frank, could I ask you to remove your

18    mask while you're testifying.  Thank you.

19    **BY MR. WALDINGER:**

20    **Q.**   All right.  So we're on page 27 of Exhibit 195.

21         Mr. Frank, do you recall this page of the deck?

22    **A.**   I do.

23    **Q.**   I asked you some specific questions about the first bullet

24    point.  Do you see that?

25    **A.**   I do.

1  **Q.**   This had representations in it about the primary use of

2  capital; correct?

3  **A.**   Yes, it does.

4  **Q.**   Right before the break, I believe you testified that Pilot

5  Grove did end up investing into River Studios.  Do you recall

6  that?

7  **A.**   I do.

8  **Q.**   I believe your testimony was sometime in -- later in

9  February.

10 **A.**   I do.

11 **Q.**   Was it your understanding from this deck that's up,

12 Exhibit 195, and your conversations with Mr. Rothenberg that

13 the money invested by Pilot Grove would be used to fund premium

14 content opportunities in the pipeline and to roll up M and A

15 talent in VR?

16 **A.**   That is correct.

17 **Q.**   What did you understand it to mean to roll up M and A

18 talent in VR?

19 **A.**   Roll up means acquire other companies similar in the

20 sector and bring them into River Studios and to hire talent to

21 be a part of the studio.

22 **Q.**   Did Mr. Rothenberg ever tell you that he intended to use

23 Pilot Grove's investment for other purposes?

24 **A.**   No, he did not.

25 **Q.**   Did he ever tell you that he intended to use Pilot Grove's

1   money to repay money he'd taken from Fund I and Fund II?

2          **MR. FAKHOURY:**  Objection.  Asked and answered.

3          **THE WITNESS:**  He did not.

4          **THE COURT:**  Overruled.

5      Sorry.  You can answer.

6          **THE WITNESS:**  He did not.

7          **MR. WALDINGER:**  All right.  Let's take this down,

8   Ms. Margen.

9   **Q.**   Mr. Frank, did you, in addition to soliciting an

10  investment from Pilot Grove for River Studios, did you solicit

11  and help obtain an investment from Pilot Grove into

12  Mr. Rothenberg's 2016 Fund?

13  **A.**   That is correct.

14         **MR. WALDINGER:**  Ms. Margen, if you could pull up on

15  the screen what has been marked only for identification

16  purposes as Exhibit 221.  And blow up the top half of that.

17  **Q.**   Exhibit 221 is a multipage exhibit; correct?

18  **A.**   That is correct.

19  **Q.**   What is the first page of Exhibit 221?

20  **A.**   The attachment has RothenbergNBC.pdf -- NBE.pdf.

21  **Q.**   In general, though, what kind of document is the first

22  page of Exhibit 221?  What is it?

23  **A.**   It's Rothenberg Ventures and the -- also -- just

24  Rothenberg Ventures, the leading investor in AR/VR new tech

25  fund.

1    **Q.**    I'm asking a more general question.

2    **A.**    What.

3    **Q.**    This Exhibit 221 is a copy of something.  What is it a

4    copy of?

5    **A.**    I just see the letter.  If there is an attachment, it's

6    probably an attachment of the venture fund itself.

7              **THE COURT:**  I think Mr. Waldinger might be asking you

8    if it's an email?

9              **THE WITNESS:**  I'm sorry.  It's an email dated the 26th

10   of March 2016 to Larry Weisman and Dominic Polizzotto.

11             **MR. WALDINGER:**  Thank you, Your Honor.

12   **Q.**    So this is an email?

13             **THE COURT:**  We've established that.

14             **MR. WALDINGER:**  Okay.

15   **Q.**    Let's just forget the last two minutes.

16        Is there an attachment to this email?

17   **A.**    Yes, there is.

18   **Q.**    And is that a deck that was provided to you by

19   Mr. Rothenberg?

20   **A.**    Yes, it is.

21   **Q.**    And does this relate to venture capital fund investments?

22   **A.**    That is correct.

23   **Q.**    Again, I've asked you these questions numerous times.  The

24   information in the email and the deck itself, did you receive

25   that from Mr. Rothenberg?

1    **A.**   I did.

2    **Q.**   And did he know that you were using that information in

3    that deck to solicit investments from individuals and entities

4    such as Pilot Grove?

5    **A.**   He did.

6             **MR. WALDINGER:**  Your Honor, I would just move to admit

7    Exhibit 221.

8             **THE COURT:**  Any objection?

9             **MR. FAKHOURY:**  No, Your Honor.

10            **THE COURT:**  221 is admitted.

11           (Government's Exhibit 221 received in evidence.)

12                    (Exhibit published to jury.)

13   **BY MR. WALDINGER:**

14   **Q.**   I don't want to spend a lot of time on this, Mr. Frank,

15   but in the first paragraph, it says, "We are fully allocated on

16   the 100M and have indications of interest from 250M."

17        What does that mean?

18   **A.**   It means that he was fully allocated on the original

19   $100 million and he actually had indications of interest from

20   other investors for up to $250 million.

21   **Q.**   Again, did you receive that information from

22   Mr. Rothenberg?

23   **A.**   I did.

24   **Q.**   Based on your experience, do you -- do you know why -- do

25   you know whether an investor would like to be part of a bigger

1    fund or part of a fund that has indications of interest above

2    the allocation?

3            **MR. FAKHOURY:**  Objection.  Speculation.  Irrelevant.

4            **THE COURT:**  Overruled.

5    **BY MR. WALDINGER:**

6    **Q.**   You may answer.

7    **A.**   There's two things at play.  One, a venture fund is an

8    investment in a multiple series of companies where your risk is

9    spread out over many companies.  In the situation where you

10   have an indication the venture is greater than the actual fund,

11   it means that there is a lot of interest in the fund.

12   **Q.**   Okay.

13           **MR. WALDINGER:**  You can take that down, Ms. Margen.

14   And let's put Exhibit 222.

15       This has been marked for identification purposes only.

16   **Q.**   I'm just going to ask you, is this an email?

17   **A.**   Yes, it is.

18   **Q.**   Is there an attachment to the email?

19           **MR. WALDINGER:**  Ms. Margen, page down.

20   **A.**   If you can blow it up, please.  Thanks.

21       Yes.  It's an attachment of Rothenberg Ventures fund.

22           **MR. WALDINGER:**  Go back to the first page, Ms. Margen,

23   and blow that up for Mr. Frank.

24   **Q.**   Is this another email that you sent to Mr. Weisman and

25   Mr. Polizzotto about Mr. Rothenberg's fund?

**A.**   It is.

**Q.**   And is the information in this email derived from information that you got from Mr. Rothenberg?

**A.**   It is.

**Q.**   Is the deck a deck that you received from Mr. Rothenberg?

**A.**   It is.

**Q.**   And did he know that you were use that information in that deck to solicit investments on his behalf?

**A.**   Yes.

        **MR. WALDINGER:**   Your Honor, I would move Exhibit 222 into evidence.

        **THE COURT:**   Any objection?

        **MR. FAKHOURY:**   No, Your Honor.

        **THE COURT:**   222 is admitted.

        (Government's Exhibit 222 received in evidence.)

              (Exhibit published to jury.)

**BY MR. WALDINGER:**

**Q.**   Mr. Frank, based on -- or after you sent these emails to Mr. Weisman and Mr. Polizzotto, do you know whether Pilot Grove also invested in the 2016 Fund?

**A.**   Yes, they did.

**Q.**   Do you recall what their overall capital commitment was?

**A.**   I think it was $1 million.

**Q.**   Right before the break, you testified, and we saw in the Bend Reality bank statement a wire to you of $40,000.  Do you

1    recall that?

2    **A.**    Yes, I do.

3    **Q.**    That was a payment from Bend Reality to you?

4    **A.**    That is correct.

5    **Q.**    Did you understand that to be a payment related to your

6    successful solicitation of an investment into River Studios?

7    **A.**    That is correct.

8    **Q.**    You testified earlier that you also did work with respect

9    to the Dolby Ventures investment?

10   **A.**    That is correct.

11   **Q.**    And we've just seen a couple of emails of you soliciting

12   fund investment from Pilot Grove, which were Exhibits 222 and,

13   I believe, 221.

14       Did you seek payment from Mr. Rothenberg for those

15   investments, for the Dolby and the Pilot Grove investments into

16   the 2016 Fund?

17   **A.**    I can't recollect if I did.

18   **Q.**    Okay.  And did you -- did you seek payment from the folks

19   at Pilot Grove for those investments?

20   **A.**    Yes, I did.

21   **Q.**    Or for their investment?

22   **A.**    Yes, I did:

23   **Q.**    And let me show you what's been marked --

24       **MR. WALDINGER:**  If you could pull up on the screen,

25   Ms. Margen, Exhibit 599.  This is two-page exhibit.

**Q.**   The first page is an email; is that correct?

**A.**   That is correct.

**Q.**   And the second page appears to be the attachment to the email?

**A.**   That is correct.

**Q.**   The attachment is what kind of document?

**A.**   It's a text from Mike Rothenberg to me.

**Q.**   Is that a screenshot that you took of that text?

**A.**   I can't recollect if I took a screenshot of it, but, yes.

**Q.**   Is it a copy of a text message that Mr. Rothenberg sent to you?

**A.**   That is correct.

**Q.**   Going back to the first page and blowing that up, what kind of document is this on the first page?  Is it an email?

**A.**   It's an email from me to Larry Weisman and Dominic Polizzotto.

**Q.**   What's the date of this email?

**A.**   It's dated June 13th, 2016.

**Q.**   Was this an email in which you were seeking payment from Mr. Polizzotto and Mr. Weisman with respect to their -- to Pilot Grove's investment into River Studios -- excuse me -- into the Rothenberg Ventures fund?

**A.**   That is correct.

**Q.**   And is a true and accurate copy of the email that you sent to them?

1  **A.**   That is correct.

2          **MR. WALDINGER:**  Your Honor, I would move Exhibit 599

3  into evidence.

4          **THE COURT:**  Any objection?

5          **MR. FAKHOURY:**  Irrelevant.

6          **THE COURT:**  Overruled.  599 is admitted.

7          (Government's Exhibit 599 received in evidence.)

8                  (Exhibit published to jury.)

9  **BY MR. WALDINGER:**

10 **Q.**   The first -- the first paragraph of this email is you

11 expressing your thanks for investing in Rothenberg Ventures.

12 Do you see that?

13 **A.**   I do.

14 **Q.**   Could you read the second paragraph that begins "Mike's

15 fund"?

16 **A.**   "Mike's fund is not set up to pay out fees.  See attached

17 text from Mike sent to me June 7th.  So I wanted to ask and

18 would greatly appreciate if you could pay out to PEQVC my fee

19 of 2 percent of that $1 million, or $20,000.  For that fee, of

20 course, I track and interview and meet with tech companies in

21 this fund and will inform you of which ones I think are the

22 best.  I am frequently at Rothenberg Ventures and also River

23 Studios, too.  Thank you again for investing in Rothenberg

24 Ventures."

25 **Q.**   Do you recall whether Pilot Grove and Mr. Polizzotto and

1    Mr. Weisman ever paid you that 2 percent?

2    **A.**   They did not.

3    **Q.**   And with respect -- this email that you sent to them

4    refers to an attached text, and it says that Mike sent to me

5    June 7th.  Is that text the attachment to this email?

6    **A.**   That is correct.

7    **Q.**   And does -- was that text sent to you on June 7th of 2016

8    by Mr. Rothenberg?

9    **A.**   That is correct.

10        **MR. WALDINGER:**  Ms. Margen, if we could go to the

11   second page.  And let's blow up the text part.

12   **Q.**   I'm presuming Mr. Rothenberg -- this is part of a text

13   string.  We don't see what Mr. Rothenberg is responding to

14   here; correct?

15   **A.**   That is correct.

16   **Q.**   Could you read -- could you read the first paragraph of

17   this text.

18   **A.**   "Also that's great news if they are investing one million

19   in the VC fund."

20   **Q.**   And who do you believe that's referring to, the "they"?

21   **A.**   Pilot Grove.

22   **Q.**   All right.  Keep going.

23   **A.**   "We can't pay any commission on that due to broker-dealer

24   laws and that the investment goes towards investing in the

25   companies by the way, but if they decide to exercise any of

1    their option in River Studios, that would be wise for them and

2    mutually beneficial."

3    **Q.**   So why was Mr. Rothenberg sending you that text?

4            **MR. FAKHOURY:**  Objection, speculation.

5            **THE COURT:**  Sustained.

6    **BY MR. WALDINGER:**

7    **Q.**   Had you, prior to -- prior to Mr. Rothenberg's text that

8    you just read, asked him -- excuse me -- asked him for payment

9    with respect to Pilot Grove's $1 million investment?

10   **A.**   That is correct.

11   **Q.**   Was this his response to your request?

12   **A.**   That is his response to my request.  He denied it.

13   **Q.**   And did he say -- did he provide two reasons why he could

14   not pay you?

15   **A.**   He did.

16   **Q.**   The first one was what?

17   **A.**   "We can't pay any commission on that due to broker-dealer

18   laws and that the investment goes towards investing in the

19   companies."

20   **Q.**   So the second part -- there's two reason.  One, can't pay

21   any commission on that due to broker-dealer laws; correct?

22   **A.**   That is correct.

23   **Q.**   Ask the second reason was what?

24   **A.**   And that the investment goes towards investing in the

25   companies.

1   **Q.**   And you said "by the way" --

2   **A.**   By the way.

3   **Q.**   BTW.

4   **A.**   BTW, by the way.

5   **Q.**   So that's Mr. Rothenberg telling you that Pilot Grove's

6   investment should be used for investing in companies?

7   **A.**   That's right.

8          **MR. WALDINGER:**   If I could have one second,

9   Your Honor.

10          **THE COURT:**   Yep.

11          **MR. WALDINGER:**   No further questions for Mr. Frank.

12          **THE COURT:**   Thank you, Mr. Waldinger.

13       Mr. Fakhoury.

14          **MR. FAKHOURY:**   Thank you, Your Honor.

15                        <u>**CROSS-EXAMINATION**</u>

16   **BY MR. FAKHOURY:**

17   **Q.**   Good morning, Mr. Frank.

18   **A.**   Good morning.

19   **Q.**   Last week you testified that you were an advisor to

20   technology companies; correct?

21   **A.**   That is correct.

22   **Q.**   And Mr. Waldinger asked you some questions about the

23   concept of scaling.  And one of the things that you advise

24   technology companies on is this concept of scaling; right?

25   **A.**   Well, scaling, monetization, execution and strategy is

1    what I usually do.

2    **Q.**    Okay.  By scaling, that is the idea of growing a company;

3    correct?

4    **A.**    That is correct.

5    **Q.**    One way companies grow is by increasing their customer

6    base; correct?

7    **A.**    That is correct.

8    **Q.**    And your testimony last week talking about this in a

9    general sense was as companies get more customers, the -- the

10   original founder won't need to support the company personally

11   out of their own pocket.  Do you recall that?

12   **A.**    I do not recall that, no.

13   **Q.**    Okay.  You don't recall that testimony last week?

14   **A.**    I recall that I testified.  I don't remember that specific

15   point.

16   **Q.**    Okay.

17       There's another concept you've testified about a little

18   bit, which is the idea of scouting for other companies.  Are

19   you familiar with the concept of scouting; right?

20   **A.**    Yes.

21   **Q.**    And that's essentially that you look for smaller companies

22   that larger companies would be interested in; right?

23   **A.**    In investing in, yes.

24   **Q.**    Okay.

25   **A.**    Or acquiring.

1    **Q.**   Okay.  So let's unpack both of those.

2         So one part of the scouting would be for -- for you to go

3    look for a smaller company that a larger company may want to

4    invest in; right?  Is that a "yes"?

5    **A.**   Yes.

6    **Q.**   Okay.  We've got to answer for the court reporter.  Okay?

7         And you just explained right now another purpose would be

8    for a larger company to buy the smaller company, let's say;

9    right?

10   **A.**   Uh-huh.  Yes, that's correct.

11   **Q.**   Okay.  And ultimately even that kind of scouting is also

12   ultimately done for scaling; right?

13   **A.**   That is true.

14   **Q.**   In other words, acquisition is one way a company could

15   scale; right?

16   **A.**   That is true.

17   **Q.**   And investment from an outside investor is a way a company

18   could scale; right?

19   **A.**   That is true.

20   **Q.**   And I think it was Mr. Waldinger who asked you that a

21   startup either grows or dies.  Do you recall his question on

22   that?

23   **A.**   I don't.

24   **Q.**   Okay.

25        You testified that some of the companies that you had --

1   some of the larger companies you had scouted for included

2   Disney; right?

3   **A.**   (Witness nods head.)

4   **Q.**   Is that a "yes"?

5   **A.**   That is correct.

6   **Q.**   Okay.  Liberty Global Media?

7   **A.**   That is correct.

8   **Q.**   That's the company that's the Comcast of Europe?

9   **A.**   That is correct.

10   **Q.**   That everybody likes them, surprisingly?

11   **A.**   I think so, yes.

12   **Q.**   Okay.  You also testified about Liberty Media?

13   **A.**   That is correct.

14   **Q.**   And you testified they owned the Atlanta Braves, the

15   baseball team?

16   **A.**   To my knowledge, I thought they did, yes.

17   **Q.**   Okay.  Last week you also talked about some other

18   companies you reached out to in connection with River Studios

19   and Rothenberg Ventures, and you mentioned a few.  One of them

20   you mentioned was Virgin, and I assume you were talking about

21   the airline?

22   **A.**   No.  It's Richard Branson's company.

23   **Q.**   Okay.  Got it.  And Virgin is a big company, but it has

24   other companies underneath it, including like Virgin Atlantic

25   Airways and -- does that sound right to you?

1    **A.**   Virgin owns a lot of different businesses.  They have a

2    venture fund.  And they invest in a lot of different things.

3    And they were actually an invitee of mine to come to River

4    Studios and to Rothenberg Ventures during events.

5    **Q.**   Okay.

6    **A.**   I think it was demo days.

7    **Q.**   Okay.  Okay.

8        Now, so these are very large companies; right?

9    **A.**   Uh-huh, yes.

10   **Q.**   Disney -- Disney is a pretty big company; right?

11   **A.**   Yes.

12   **Q.**   Now, last week you testified River Studios was, to use

13   your words, a small fledgling startup.  Do you remember

14   testifying about that?

15   **A.**   I do.

16   **Q.**   And as a startup, right, it would need to either grow or

17   die; correct?

18   **A.**   That is correct.

19   **Q.**   Okay.  Let's talk a little more specifically about your

20   involvement with River Studios.  Okay?

21       On Thursday, you testified about an event in San Francisco

22   called TechCrunch Disrupt.  Do you recall that event?

23   **A.**   I do.

24   **Q.**   And you testified that at that event, River Studios had

25   a -- either a booth or a table or some sort of demonstration;

1  right?

2  **A.**   That's correct.

3  **Q.**   And their booth or table was in the area where there were

4  other virtual reality and augmented reality startups setting up

5  booths and demos as well, right?

6  **A.**   There was a whole room full of them, yes.  It was called,

7  I think, the AR/VR room or -- yeah.

8  **Q.**   Okay.  You -- you used the word "them," and by "them," you

9  mean other virtual reality, augmented reality startups, right?

10  **A.**   That is correct.

11  **Q.**   Now, you saw a demonstration of the -- of the technology

12  and of the content that River Studios was producing at that

13  event; correct?

14  **A.**   That is correct.

15  **Q.**   And you were impressed; right?

16  **A.**   Yes, I was.

17  **Q.**   And your thinking was you could pitch River Studios to

18  some of those companies we had just talked about a few moments

19  ago; right?

20  **A.**   I was working off of a shopping list of what people were

21  looking for.  And my reason for being that day at that room was

22  because Liberty Global Media had told me that that was a sector

23  of interest.  So, yes, we were interested in that area.

24       And basically I'm going through the entire conference, and

25  I see the room, and I basically texted the people at Liberty

```
1    Global Media:  Do you have any interest in AR/VR?

2         Yes, we do.

3         Okay, good.  I'll stick around.

4         So that's why I did my loop around the room.

5    Q.   Okay.  So to unpack that a little bit --

6    A.   Uh-huh.

7    Q.   -- you were at TechCrunch Disrupt looking out for

8    interesting AR, so augmented reality, and virtual reality

9    companies or technologies on behalf of Liberty Media; right?

10   A.   Yes.

11   Q.   And you testified there's a booth set up with a lot of

12   demonstrations; right?

13   A.   Yes.

14   Q.   Is that yes?

15   A.   Sorry.

16   Q.   No problem.

17        And ultimately one of those demonstrations was the River

18   Studios demonstration, and you were impressed with it; correct?

19   A.   That's correct.

20   Q.   Now, at some point, you asked to speak to whoever was sort

21   of in charge or running River Studios; right?

22   A.   That is correct.

23   Q.   And that -- and you were told ultimately that was

24   Mr. Rothenberg; correct?

25   A.   That is correct.
```

1    **Q.**   Now, you had heard of Mr. Rothenberg before; right?

2    **A.**   That is correct.

3    **Q.**   And you knew he ran a venture capital firm?

4    **A.**   That is correct.

5    **Q.**   You knew the venture capital firm was focused on

6    millennials; right?

7    **A.**   I -- I was under the understanding that it was invested in

8    frontier tech.

9    **Q.**   Okay.

10   **A.**   Which is AR/VR and things related to that business.

11   **Q.**   Okay.  You testified last week that he had been popularly

12   covered in the press?

13   **A.**   That is correct.

14   **Q.**   And ultimately you met with him and talked with him in

15   a -- in a patio area sort of set aside for people to have

16   conversations; right?

17   **A.**   That is correct.

18   **Q.**   Now, the two of you talked about River Studios; right?

19   **A.**   Rothenberg Ventures and River Studios.

20   **Q.**   Okay.  So let me -- let me back up a second.

21        In that little patio area, you talked about both

22   Rothenberg Ventures and River Studios.  By "Rothenberg

23   Ventures," do you mean his venture capital fund?

24   **A.**   That is correct.

25   **Q.**   Okay.  And then again you just said it a second ago, you

1    also talked about River Studios; right?

2    **A.**   That is correct.

3    **Q.**   Now, ultimately you agreed to help find investors for both

4    River Studios and the venture capital fund; right?

5    **A.**   That is correct.

6    **Q.**   You testified this morning that with respect to the fund,

7    the venture capital fund, that part of what you could bring to

8    the table, so to speak, was -- sort of had a different network

9    than the folks at Rothenberg Ventures; right?

10   **A.**   That is correct.

11   **Q.**   Rothenberg Ventures, the network that their folks had, was

12   sort of geared around Stanford; right?

13   **A.**   Not necessarily.  Their network was pretty extensive.

14   **Q.**   Okay.  But you felt that, hey, I've got other folks in my

15   network that they may not have in their network; right?

16   **A.**   I think in our conversations, Mike wanted to know what I

17   did and who I knew.  And I told him that I used to be in

18   television broadcasting and I always stayed in touch with media

19   companies and I did scouting for a lot of them.  And I thought

20   that based on the nature of these companies saying this is what

21   we have -- interested in, that there was some value there.

22   **Q.**   Okay.

23        Mr. Waldinger asked you about a couple of introductions

24   you made on Mr. Rothenberg's behalf.  One of them was to the

25   Dolby family; correct?

**A.**   That is correct.

**Q.**   And they ultimately invested in the 2016 Fund; right?

**A.**   That is correct.

**Q.**   Their investment -- the Dolby Family Ventures investment was $500,000; right?

**A.**   That is correct.

**Q.**   You didn't receive a commission from the Dolby Family Ventures for their investment into the Rothenberg Ventures fund; correct?

**A.**   I did not.

**Q.**   Did you ask them for one?

**A.**   Did I ask the Dolby family for one?

**Q.**   Yes.

**A.**   I can't remember.

**Q.**   Did you ask Mr. Rothenberg for a commission for your -- for the fact that the Dolby Family Ventures invested into the Rothenberg Ventures fund?

**A.**   I can't remember.

**Q.**   Okay.  And today your testimony -- and last week your testimony has primarily been around an investment made by Pilot Grove.

You testified -- well, let me back up a second.

You made an introduction -- let me strike that again.

You introduced the Pilot Grove folks to the Rothenberg Ventures fund and to River Studios; correct?

1    **A.**    That is correct.

2    **Q.**    And you testified that Pilot Grove is the family office

3    for the Binion family; correct?

4    **A.**    That is correct.

5    **Q.**    And that family office -- you talked about a

6    Mr. Polizzotto and a Mr. Weisman.  They are the -- they're sort

7    of in charge of investments for -- for that family office;

8    right?

9    **A.**    That is correct.

10   **Q.**    Jack Binion is the sort of the head of the family

11   connected to the family fund; right?

12   **A.**    He is the father.

13   **Q.**    He's the father, right.  And his father was Benny Binion;

14   right?

15   **A.**    I think so, yes.

16   **Q.**    Okay.  Do you know anything about Benny Binion?

17   **A.**    A little bit.

18   **Q.**    He's the guy who created the World Series of Poker; right?

19   **A.**    I think so.

20   **Q.**    I'm going to show you a couple documents in a minute, and

21   before I do that, I wanted to touch upon something

22   Mr. Waldinger asked you about.

23          You testified about some emails and some slide decks that

24   you passed along to potential investors, including Mr. Weisman

25   and Mr. Polizzotto with Pilot Grove.  So that's sort of what

1     I'm going to ask you about next.  Okay?

2          Now, you testified that you got the substance of those

3     emails from Mr. Rothenberg; correct?

4     **A.**   That is correct.

5     **Q.**   And you got the slides from Mr. Rothenberg; right?

6     **A.**   That is correct.

7     **Q.**   How would you and Mr. Rothenberg communicate?  Would you

8     communicate by email?

9     **A.**   That is correct.

10    **Q.**   Would you communicate verbally by telephone?

11    **A.**   That is correct.

12    **Q.**   Would you communicate by text message?

13    **A.**   That is correct.

14    **Q.**   You testified that you got the slides from Mr. Rothenberg.

15    You don't know who actually made those slides, though, do you?

16    **A.**   I do not, no.

17    **Q.**   Okay.

18         **MR. FAKHOURY:**  Mr. Torres, can you pull up

19    Exhibit 221.

20    **Q.**   Okay.  Mr. Frank, I'm showing you what's been admitted as

21    Exhibit 221.  Mr. Waldinger asked you some questions about it.

22         And just to orient ourselves, this is an email dated

23    March 28, 2016.  Do you see that, sir?

24    **A.**   Yes, I do.

25    **Q.**   Okay.  And this is an email from you to Mr. Weisman and

1    Mr. Polizzotto; correct?

2    **A.**   That is correct.

3    **Q.**   Now, March 28, 2016, that would have been after Pilot

4    Grove invested into River Studios; correct?

5    **A.**   That is correct.

6    **Q.**   And before it had invested into the 2016 Fund; correct?

7    **A.**   Repeat that question again.

8    **Q.**   Sure.

9        The date of this email is March 28th, 2016; right?

10   **A.**   Right.

11   **Q.**   And so you just said a moment ago, March 28, 2016, was

12   after Pilot Grove invested into River Studios; correct?

13   **A.**   That is correct.

14   **Q.**   So the question now is:  This email dated March 28, 2016,

15   this is -- this email was sent before Pilot Grove invested into

16   the 2016 Fund.

17   **A.**   That is true.

18   **Q.**   Okay.

19       Now, your testimony was you got this email from

20   Mr. Rothenberg; correct?

21   **A.**   That is correct.

22   **Q.**   Okay.  Do you know who Katie Fanelli is down here?

23   **A.**   I do.

24   **Q.**   Who is Ms. Fanelli?

25   **A.**   Mike Rothenberg's assistant.

1    **Q.**   Okay.  It looks to me like -- was this email originally

2    sent to you by Ms. Fanelli?  Do you recall?

3    **A.**   I do not recall.  I do recall that the email I sent from

4    me to Larry and Dominic, Katie Fanelli was always copied on

5    emails from Michael Rothenberg.

6    **Q.**   Okay.

7    **A.**   Usually.

8    **Q.**   Okay.  Do you have any recollection about this email

9    specifically?

10   **A.**   Just that I sent it.

11   **Q.**   Okay.

12          **MR. FAKHOURY:**  Can we pull up Exhibit 222.  You can

13   leave it right there.

14   **Q.**   Mr. Frank, this is an email dated April 1st, 2016, so just

15   a few days after the email in Exhibit 221.

16          This is an email from you to Mr. Weisman and

17   Mr. Polizzotto; correct?

18   **A.**   That is correct.

19   **Q.**   And, again, this is an email sent before Pilot Grove

20   invested into the 2016 Fund; right?

21   **A.**   That is correct.

22   **Q.**   Okay.

23          **MR. FAKHOURY:**  Can you scroll down a little bit,

24   Mr. Torres.  Okay.  You can stop there.

25   **Q.**   And, again, Ms. Fanelli is on this email here at the

1    bottom.  Do you see that?

2    **A.**   That is correct.

3    **Q.**   Or her signature block, I should add.

4    **A.**   That is correct.

5    **Q.**   Okay.

6          **MR. FAKHOURY:**  You can take that down.

7    **Q.**   Okay.  Let's talk a little bit more about River Studios.

8    And we were talking earlier about part of what you do as an

9    advisor is to help companies scale; right?

10   **A.**   Uh-huh.  That's correct.

11   **Q.**   Okay.  And you offered to help Mr. Rothenberg scale River

12   Studios; right?

13   **A.**   That is correct.

14   **Q.**   Okay.  And to monetize River Studios; correct?

15   **A.**   Grow the studio, yes, that is correct.

16   **Q.**   Now, you weren't an employee of Rothenberg Ventures;

17   correct?

18   **A.**   I was not.

19   **Q.**   You're not -- you weren't an employee of River Studios

20   either; right?

21   **A.**   I was not.

22   **Q.**   You were not like a 1099 contractor with them either;

23   correct?

24   **A.**   To my knowledge, no.

25   **Q.**   Okay.  And I -- and I said with either.  And to be clear,

1    I mean you were not a 1099 contractor with Rothenberg Ventures;

2    right?

3    **A.**    That is correct.

4    **Q.**    And you were not a 1099 contractor with River Studios;

5    right?

6    **A.**    That is correct.

7    **Q.**    Monetization, now part of your hope in making these

8    connections was you would get paid a commission if a deal was

9    done; right?

10   **A.**    That is correct.

11   **Q.**    Now, you testified both last week and today that at the

12   time -- at this time frame -- so we've roughly been talking

13   about October 2015 into the summer of 2016.

14        Your testimony was at that time, River Studios was run by

15   a gentleman named Sivan Iram.  Do you recall that?

16   **A.**    He was the general manager, yes?

17   **Q.**    So he was the general manager of River Studios at that

18   time?

19   **A.**    That is correct.

20   **Q.**    And you testified that you met him personally; right?

21   **A.**    While I was going through the offices at River Studios and

22   also at Rothenberg Ventures.  And I think Mike Rothenberg

23   introduced me to him.

24   **Q.**    Okay.  You -- you just mentioned right now the offices.

25   And I know Mr. Waldinger asked you about this.  But by

1    "offices," you're referring to the office at 1062 Folsom Street

2    in San Francisco; correct?

3    **A.**   That is correct.

4         **MR. FAKHOURY:**  Mr. Torres, can you pull up

5    Exhibit 195.

6    **Q.**   Okay.  I'm going to show you some slides in a minute, but

7    I want to orient ourselves here.

8         Mr. Frank, I'm showing you what's been admitted as

9    Exhibit 195, and we're at page 1.

10        This is an email dated January 7th, 2016, from you to

11   Mr. Weisman and Mr. Polizzotto.  Do you see that?

12   **A.**   I do.

13        **MR. FAKHOURY:**  And can we go to page 20 of this

14   exhibit.

15   **Q.**   Okay.  Mr. Waldinger asked you some questions about this

16   River Studios slide deck.  And so I wanted to just run through

17   a couple pages of it with you.

18        **MR. FAKHOURY:**  Can we go to page 21.

19   **Q.**   Okay.  I'm showing you, sir, what's been admitted as

20   Exhibit 195, page 21.  And this top slide -- the heading of

21   this slide says "The River Brand."  Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   And there are sort of three different, I guess you could

24   call them maybe bullet points or lines.  The first says

25   "Technology, proprietary content with close relationships to

1    25 plus virtual reality companies."

2         Do you see that?

3    **A.**   Yes, I do.

4    **Q.**   And that's a reference to the River Accelerator; correct?

5    **A.**   To my recollection, yes.

6    **Q.**   Okay.  The second is this section here that says

7    Experiences, and it talks about Björk, Coldplay, Beyonce, NBC,

8    NBA, and River Racing.  Do you see that?

9    **A.**   That is correct.

10   **Q.**   And the third line talks about the River Accelerator

11   Program, companies laser focused on frontier technology and

12   content.  Do you see that?

13   **A.**   I do.

14        **MR. FAKHOURY:**  Can we go to the next page.

15        Okay.  You can stop here.

16   **Q.**   This section -- this is page 22 of Exhibit 195, and this

17   is captioned "River Studios Mission," and I want to direct your

18   attention to the second sort of bullet point, if we could call

19   it that.

20        It says, "We use our deep technological advantage and

21   close relationship with Rothenberg Ventures and its River

22   program to create stories that connect, engage and inspire."

23        Do you see that?

24   **A.**   Yes, I do.

25        **MR. FAKHOURY:**  Can we go to the next page.

1    **Q.**   We were just talking a moment ago about Sivan Iram, the

2    general manager.   That's this gentleman right here.   Do you see

3    that?

4    **A.**   I do.

5    **Q.**   Okay.   Last week, Mr. Waldinger asked you if you had heard

6    of or knew a gentleman by the name of Ewan, and I'm circling a

7    gentleman here.   Have you ever met or spoken with this

8    individual here?

9    **A.**   I might have.   I don't remember.   But there were a lot of

10   people I was introduced to when I was going through the office,

11   and there was a lot of people there, so...

12   **Q.**   Okay.

13           **MR. FAKHOURY:**   Can we go to the next page.   That would

14   be page 24.

15   **Q.**   This is a section called "Partners."   And it has two --

16   two kind of dividing lines.   One is -- one says "Rothenberg

17   Ventures Portfolio Companies."   Do you see that?

18   **A.**   I do.

19   **Q.**   And then the other side says "Rothenberg Ventures LPs."

20   Do you see that?

21   **A.**   I do.

22           **MR. FAKHOURY:**   We can take that down.

23           Actually, I'm sorry.   Can we pull that exhibit back up.

24   That's Exhibit 195.   My apologies.   And can we actually go to

25   page 2 of this exhibit.   Why don't we actually go to the third

1   page.

2        We -- you could stop there.

3   **Q.**   We -- the very first page of this exhibit was an email

4   dated January 7th, 2016, which had two attachments.

5        Do you recall that email?

6   **A.**   I do.

7   **Q.**   And I just showed you some of the slides from one of those

8   attachments related to River Studios.   This is the other slide

9   deck that was attached relating to the Rothenberg Ventures

10  fund.   Do you see that on your screen, sir?

11  **A.**   I do.

12  **Q.**   And Mr. Waldinger asked you some questions about that.

13           **MR. FAKHOURY:**   And I'm going to ask Mr. Torres to turn

14  to page 8 of this exhibit.

15       And can you scroll down a little bit.   Okay.   You can stop

16  there for now.

17  **Q.**   Mr. Waldinger asked you about this exhibit which lists

18  portfolio companies in the Rothenberg Ventures funds.   Do you

19  recall that?

20  **A.**   I do.

21  **Q.**   And down here at the bottom, it indicates that this is a

22  featured selection of Rothenberg Ventures portfolio -- it's

23  missing the word "companies," but portfolio from 2013 Fund,

24  2014 Fund, and 2015 Fund.   Do you see that?

25  **A.**   I do.

1      **MR. FAKHOURY:**  Okay.  Now we can take that exhibit

2  off.

3  **Q.**  You testified -- Mr. Waldinger asked you some questions

4  about the idea that Mr. Rothenberg bootstrapped River Studios.

5  Do you recall his questions to you on that point?

6  **A.**  I do.

7  **Q.**  And your testimony was that you understood that to mean

8  that he founded it and supported it financially; correct?

9  **A.**  That is correct.

10  **Q.**  We've seen a couple emails from you, and those emails had

11  several PowerPoint or slide decks; right?

12  **A.**  That is correct.

13  **Q.**  While you were working on these -- let me rephrase that.

14      While you were communicating with Pilot Grove -- let's use

15  them specifically for a moment -- you weren't -- you didn't see

16  any bank statements concerning Rothenberg Ventures, did you?

17  **A.**  Never.

18  **Q.**  Mr. Waldinger showed you an excerpt of a Silicon Valley

19  Bank bank statement.  Today is the first time you've seen that

20  exhibit; right?

21  **A.**  Yes.

22  **Q.**  You didn't see any bank statements concerning River

23  Studios; correct?

24  **A.**  No.

25  **Q.**  You didn't see any ownership documents or contractual

1  paperwork; right?

2  **A.**   No.

3  **Q.**   You didn't have access to the Rothenberg Ventures bank

4  accounts, presumably?

5  **A.**   No.

6  **Q.**   Or River Studios bank accounts?

7  **A.**   No.

8  **Q.**   Once you make an introduction, you sort of stay out of the

9  specific negotiations over the deal; right?

10  **A.**   Yes.

11  **Q.**   And I think you testified -- you testified generally about

12  the idea of diligence.  And my recollection of your testimony

13  was you turned the diligence for the Pilot Grove investment

14  over to Mr. Polizzotto and Mr. Weisman; correct?

15  **A.**   It's not that I turned it over.  It's that they took over

16  the whole process.  So it's not like I turn over anything.

17  It's they take the direction to do what they want to do.  And

18  they were doing what they wanted to do and controlled the

19  process of diligence.

20  **Q.**   Okay.  So maybe another way -- maybe a better way for me

21  to say it is not that you turned it over to them; it's that you

22  were never going to be involved with diligence to begin with?

23  **A.**   That is true.

24  **Q.**   So I was just asking now about Pilot Grove.  I'm assuming

25  everything you've just said about the negotiation and the

1  diligence would also apply for Dolby Family Ventures as well;

2  correct?

3  **A.**   That would be correct.

4  **Q.**   And just -- I realize that's maybe not the clearest

5  question.

6      By -- when I said everything you just said, I mean just as

7  you were not involved with negotiating the deal with Pilot

8  Grove, you were not involved in negotiations between Rothenberg

9  Ventures and Dolby Family Ventures; right?

10 **A.**   That is correct.

11 **Q.**   And you were -- it was sort of not your responsibility to

12 be involved in the diligence process for Dolby Family Ventures;

13 right?

14 **A.**   That is correct.

15      **MR. FAKHOURY:**   Can we pull up Exhibit 203.

16 **Q.**   Mr. Frank, I'm showing you what's been admitted as

17 Exhibit 203.   We're at page 1 of this exhibit.

18      And Mr. Waldinger asked you some questions about it, and I

19 have a couple follow-up.

20      This is -- just to lay the groundwork here, this is an

21 email dated February 17, 2016; correct?

22 **A.**   That is correct.

23 **Q.**   And it's an email sent from Mr. Rothenberg to

24 Mr. Polizzotto and Mr. Weisman, and you're in the cc; correct?

25 **A.**   That is correct.

1    **Q.**   The subject of this email is "River Studios Complete

2    Diligence."  Do you see that?

3    **A.**   That is correct.

4    **Q.**   And there was a couple attachments to this email, which --

5    which you received those attachments; correct?

6    **A.**   I don't correct -- I don't recall if I got the

7    attachments.

8    **Q.**   Okay.  You're on this email, though, correct?

9    **A.**   Yes, I am.

10   **Q.**   Let's go to page 3 of this exhibit.

11         You testified a little bit about what a convertible

12   promissory note is.  And so this on the screen here -- this is

13   again page 3 of Exhibit 203 -- is a convertible promissory note

14   sent by Mr. Rothenberg to Mr. Polizzotto and Mr. Weisman;

15   correct?

16   **A.**   That is correct.

17   **Q.**   Okay.

18         **MR. FAKHOURY:**  Can we scroll down a little bit.

19         Can you go back up for a second.

20   **Q.**   Okay.  Now, the amount here is for $10 million.  Do you

21   see that?

22   **A.**   That is correct.

23   **Q.**   Ultimately Pilot Grove invested $2 million into River

24   Studios; correct?

25   **A.**   That is correct.

1    **Q.**    Here under section (d), it says "'Holder' means

2    Rothenberg Ventures 2015 Fund, LLC."

3        Do you see that?

4    **A.**    Yes, I do.

5    **Q.**    Now, ultimately, you know that this is not the promissory

6    note that was ultimately signed by Pilot Grove; correct?

7    **A.**    That is correct.

8        **MR. FAKHOURY:**  Can we go to page 19 of this exhibit.

9    **Q.**    And within this -- these set of attachments that were sent

10   to Mr. Polizzotto and Mr. Weisman, it looks like there's

11   another slide deck.  And so this is page 19 of Exhibit 203.

12       And just sort of like we did with the other slide deck,

13   this one has a -- again, I'm going to call it a bullet point

14   that says "Our relationship with Rothenberg Ventures and the

15   River Accelerator ensures we remain on the" -- it's a little

16   hard to read because of the colors, but do you generally see

17   that that's what it says?

18   **A.**    Yes, I do.

19       **MR. FAKHOURY:**  Can we go to page 27 of this exhibit.

20       Can we scroll down a little bit.

21   **Q.**    This is page 27 of Exhibit 203.  And -- and this -- this

22   slide is captioned "We've created the world's leading VR

23   ecosystem via investments, LP relationships, strategic

24   partnerships, and..."  And, again, it's not entirely clear what

25   follows after the "and," but you do see that exhibit, sir?

1    **A.**    Yes, I do.

2    **Q.**    And it talks about Rothenberg Ventures, a venture capital

3    firm, correct?

4    **A.**    Yes, it does.

5    **Q.**    River, a frontier tech accelerator, right?

6    **A.**    Yes, it does.

7    **Q.**    And River Studios, a virtual reality production studio;

8    right?

9    **A.**    Yes, it does.

10           **MR. FAKHOURY:**   Can we go to page 54 of this exhibit.

11   **Q.**    Another one of the attachments to that email that

12   Mr. Waldinger showed you is this letter of intent for

13   acquisition of Twisted Oak Technologies.   Do you see that, sir?

14   **A.**    Yes, I do.

15   **Q.**    Okay.   And one of the slide decks and something you

16   testified about was River Studios purchasing a Canadian virtual

17   reality studio based out of Nova Scotia.   Do you recall that?

18   **A.**    That was in the deck, yes.

19   **Q.**    And this -- this confidential letter of intent is directed

20   to Twisted Oak Technologies based in Halifax, Nova Scotia;

21   correct?

22   **A.**    That is correct.

23   **Q.**    And there is some references -- there is a person

24   referenced here by the name of Devin Horsman.   Does that name

25   sound familiar to you?

1    **A.**   No.

2           **MR. FAKHOURY:**   You can take that down, Mr. Torres.

3    **Q.**   Mr. Waldinger asked you some questions about the Super

4    Bowl.   And my recollection of your testimony was that you were

5    asked to invite Mr. Polizzotto and Mr. Weisman to attend the

6    Super Bowl game; correct?

7    **A.**   That is correct.

8    **Q.**   And that invitation was made before Pilot Grove had

9    decided to make its investment into River Studios; correct?

10   **A.**   I think that is correct.

11   **Q.**   And similarly, it would have been before Pilot Grove had

12   made -- had decided to make an investment into the -- into the

13   2016 Fund as well; right?

14   **A.**   That is correct.

15   **Q.**   And just to kind of step back a moment, at the time you

16   initially reached out to Pilot Grove, you had suggested to them

17   to invest into both River Studios and the 2016 Fund; correct?

18   **A.**   That is correct.

19   **Q.**   And I believe your testimony was they were maybe 50/50 in

20   terms of which one they wanted to invest in; correct?

21   **A.**   To my knowledge, they were looking at both of them

22   equally.

23   **Q.**   Okay.

24        Mr. Waldinger asked you if there were other folks that you

25   were asked to invite to the Super Bowl, and your testimony was

1  you were asked to invite other people, but you couldn't --

2  well, let me -- let me back up.

3       You were asked to invite other people to the Super Bowl by

4  Mr. Rothenberg; right?

5  **A.**   That is correct.

6  **Q.**   And by "other people," we're talking about other potential

7  investors; correct?

8  **A.**   That would be correct.

9  **Q.**   Do you recall if he asked you to invite someone by the

10  name of Mark Goldstein to attend the Super Bowl?

11  **A.**   That would be correct.

12  **Q.**   And Mark Goldstein is an advisor for Mark Benioff; right?

13  **A.**   That is correct.

14  **Q.**   And Mr. Benioff is the CEO of Salesforce; correct?

15  **A.**   That is correct.

16  **Q.**   That's a pretty large technology company; right?

17  **A.**   That is correct.

18            **MR. FAKHOURY:**   Can I have a minute, Your Honor?

19            **THE COURT:**   Yeah.  Yes.

20            (Defense counsel confer off the record.)

21            **THE COURT:**   Mr. Fakhoury, your minute is elapsing.

22            **MR. FAKHOURY:**   I'm done.  Sorry.  Thank you.

23  **Q.**   Do you remember any other potential investors you invited

24  to the Super Bowl?

25  **A.**   There was a handful, but it was last minute, so it was

1    difficult task because usually people make, you know, their

2    schedules, they commit them in advance.  There was a handful,

3    but not a lot.

4    **Q.**   By "handful," do you mean five, ten, how many?

5    **A.**   I really don't remember.  Maybe five.

6    **Q.**   Okay.

7    **A.**   Could be more.  I don't remember.  I'm sorry.

8    **Q.**   Okay.  No, no problem.

9         **MR. FAKHOURY:**  I don't have any other questions.

10        **THE COURT:**  Thank you, Mr. Fakhoury.

11        Mr. Waldinger?

12        **MR. WALDINGER:**  No questions, Your Honor.

13        **THE COURT:**  Mr. Frank, thank you very much for your

14   testimony.

15        **THE WITNESS:**  Thank you very much.

16        **THE COURT:**  You're excused as a witness.

17        **THE WITNESS:**  Thank you.

18        **THE COURT:**  Mr. Waldinger, the Government's next

19   witness, please.

20        **MR. KLEINMAN:**  The Government calls David Chiu.

21        **THE COURT:**  All right.

22        Good morning, Mr. Chiu.  Let me ask you to come up here.

23   You can see my courtroom deputy is standing nearby.  If you

24   could come to where she is and just remain standing, face her

25   and raise your right hand, please.

**DAVID CHIU**,

called as a witness by the Government, having been duly sworn,

testified as follows:

   **THE WITNESS:**  I do.

   **THE CLERK:**  Thank you.  If you could please state and

spell your last name for the court reporter.

   **THE WITNESS:**  Chiu, C-H-I-U.

  Can I take my --

   **THE COURT:**  You can, actually, Mr. Chiu.  You can take

your mask off while you're testifying.

  Go ahead and have a seat.  Make yourself comfortable,

please.  There is water there in case you get thirsty or your

mouth gets dry while you are testifying.

  Mr. Chiu, have you ever testified before?

   **THE WITNESS:**  No.  This is the first time and

hopefully the last.  I came a long way for this.

   **THE COURT:**  I don't have any control over the second

part, but I can help you a little bit with the first part.

  Testifying is very much like just having a conversation,

but there are a few ways in which it is different.

  One is that in regular conversation, we use noises and

gestures all the time.  So if I disagree with you, I might

shake my head from side to side.  If I don't know, I might

shrug my shoulders, etc.  We also use noises, so I might say

"uh-huh" or "huh-uh."

1        But the court reporter is making a record of the

2   proceedings and she can't take down noises or gestures so I

3   need to use whole words if you would, please.

4        Also we interrupt each other in conversation because we

5   know what the other person is going to say.  So we usually

6   start -- so we will often start talking before the other person

7   is done.

8        But, again, we have a court reporter who is trying to make

9   a record.  She can only take down one person at a time.  So if

10  you'll wait for the lawyers to finish their questions, they

11  will wait until you've finished your answers.

12       The jurors here to your left are the ones making the

13  decision in the case.  You can see they go all the way back to

14  that television.  So if could keep your voice and stay close to

15  the microphone, that will be helpful to them.

16       If you don't know the answer to a question, you can just

17  say you don't know.  If you don't remember something, you can

18  just say "I don't remember."

19       And if the lawyers ask you a question that's not clear,

20  perfectly fine for you to say "I don't understand the

21  question," or ask them to rephrase it.

22       Does that all make sense?

23            **THE WITNESS:**  Yes, sir.

24            **THE COURT:**  Mr. Kleinman, your witness.

25            **MR. KLEINMAN:**  Thank you, Your Honor.

1                    <u>**DIRECT EXAMINATION**</u>

2     **BY MR. KLEINMAN:**

3     **Q.**   Good morning, Mr. Chiu.

4     **A.**   Good morning.

5     **Q.**   Mr. Chiu, where are you coming from?

6     **A.**   I came from Hong Kong.

7     **Q.**   Where did you grow up?

8     **A.**   I grew up in Hong Kong.

9     **Q.**   Where did you go to college?

10    **A.**   I went to university in London.

11    **Q.**   And what did you study?

12    **A.**   I studied law, but I never practiced.  It's a tough thing

13    to do.

14    **Q.**   Fair enough.

15        So you did not end up practicing law.  What did you end up

16    doing?

17    **A.**   I became an accountant.

18    **Q.**   And after college, where did you work?

19    **A.**   I worked at PriceWaterhouse.  It is called PWC now, which

20    is PriceWaterhouseCoopers.  I worked in the London office.

21    **Q.**   What did do you there?

22    **A.**   I was an auditor.

23    **Q.**   What's an auditor?

24    **A.**   Auditor looks at financial statements and examine them and

25    determine whether you can -- you know, the statements are true

1    and fair.

2    **Q.**   And did you transfer to a different location from PWC

3    London?

4    **A.**   Yes, I did.

5    **Q.**   Where did you go?

6    **A.**   I went to Toronto.

7    **Q.**   And so when you went to Toronto, you were also working at

8    PWC?

9    **A.**   Yes.  For another two years.

10   **Q.**   What did do you after that?

11   **A.**   I went to work for a bank.

12   **Q.**   Which bank?

13   **A.**   Bank of Montreal.

14   **Q.**   And what were you doing for the Bank of Montreal?

15   **A.**   I was also doing auditing.

16   **Q.**   And after your time at the Bank of Montreal, what did you

17   do next?

18   **A.**   I went home to join the family business.

19   **Q.**   What is the family business?

20   **A.**   The family business at that time was the distribution of

21   two major Japanese brands.  One was Sony and the other was a

22   Japanese air conditioning brand called Daikin.

23   **Q.**   Did the family business go on to sell one of those --

24   **A.**   Yes.

25   **Q.**   -- products?

1    **A.**   We -- we -- we sold the Sony business back to Sony, back

2    in the late '90s.

3    **Q.**   So fair to say you timed that pretty well?

4    **A.**   Yeah.  I mean, at that time, you know, they had the -- the

5    Trinitron TV, for those who are old enough to remember.  And

6    they had the Walkman which, again, for those who are old enough

7    to remember.  So we -- we sold at the peak.

8    **Q.**   I think some folks do remember.

9        Now, after the -- after you sold the Sony part of the

10    business, what did your family business go on to form?

11    **A.**   The -- because there were proceeds, there were money, so

12    we actually set up a family office to -- to run the money.

13    **Q.**   What was the name of that family office?

14    **A.**   CY Capital.

15    **Q.**   And what was the purpose of CY Capital?

16    **A.**   To --

17    **Q.**   What was the purpose of CY Capital?

18    **A.**   To invest.

19    **Q.**   Invest in what sorts of things?

20    **A.**   A variety of things from hedge funds, property, to -- to

21    venture capital.

22    **Q.**   And now CY Capital, what does that stand for?

23    **A.**   It's abbreviation for the -- the family company, which is

24    called Chung Yuen.

25    **Q.**   Is that your surname, your family's -- a link to your

1    family's surname?

2    **A.**    No, no, it's not.

3         **MR. KLEINMAN:**   Just, Madam Reporter, that's C-H-U-N-G

4    and then Y-U-E-N.

5    **Q.**    Now, turning your attention to the fall, specifically

6    October of 2015, did you come to be introduced to a person by

7    the name of Michael Rothenberg?

8    **A.**    Yes, I did.

9    **Q.**    How was that introduction made?

10   **A.**    There was another family office, the principal was a

11   gentleman called Darrin Woo, and Darrin introduced

12   Mr. Rothenberg to me.

13   **Q.**    And at that point in the fall of 2015, what was your role

14   at CY Capital?

15   **A.**    I was the chief investment officer, the managing director

16   effectively.

17   **Q.**    What were your duties and responsibilities in that role?

18   **A.**    To decide -- to meet with managers and to decide whether

19   to allocate money to that manager.

20   **Q.**    Did you end up having an in-person meeting with Michael

21   Rothenberg?

22   **A.**    Yes, I did.

23   **Q.**    And was that in and around October 27, 2015?

24   **A.**    Yes.

25   **Q.**    Can you please describe that meeting to the jury.

1    **A.**   It was in the executive level of the Island Shangri-La in

2    Hong Kong.  And there were, I think, at least three tables.

3    Each one had a staff of Rothenberg Ventures in it.  And then --

4    and then Mr. Rothenberg was moving between one -- amongst the

5    tables, so one at a time, and -- and talking to prospective

6    investors.

7    **Q.**   So just so the jury can further visualize the meeting, you

8    just testified that there were a variety of tables at this, I

9    guess, executive room at the Shangri-La Hotel; is that

10   correct --

11   **A.**   Executive lounge --

12             **THE COURT:**  Gentlemen, let me just remind you only one

13   person can speak at a time.

14             **THE WITNESS:**  I'm sorry.

15   **BY MR. KLEINMAN:**

16   **Q.**   Was that at the executive room or lounge at the Shangri-La

17   Hotel?

18   **A.**   Yes, it was.

19   **Q.**   And you just testified that there were a variety of tables

20   there; correct?

21   **A.**   Yes.

22   **Q.**   Now, you were seated at one table; correct?

23   **A.**   Yes.

24   **Q.**   And who was seated at these other tables?

25   **A.**   Well, there -- there were representatives from Rothenberg

1    Ventures and -- and there were prospective investors there.

2    Q.    So at your table, there was another representative from --

3    A.    Yes.

4    Q.    -- Rothenberg Ventures; is that correct?

5    A.    Yes.

6    Q.    And then that was the same setup but with other

7    prospective investors for other tables; correct?

8    A.    Yes.

9    Q.    Now, what was Michael Rothenberg doing in this meeting?

10   A.    He was explaining his venture fund to -- to each of the

11   prospective investors.

12   Q.    And as he explained his venture fund, was he going from

13   table to table or speaking to everybody simultaneously or

14   something else?

15   A.    He was going from table to table.

16   Q.    Were there any other investors at your specific table?

17   A.    No.

18   Q.    And starting now with the fund, how did Mr. Rothenberg

19   describe his venture capital fund?

20   A.    He explained that he is -- he was always trying to be

21   ahead of the next trend.  So, in other words, he -- he was

22   able -- he said he was able to predict what the next

23   opportunity set would be at that time.  And the -- the -- the

24   opportunity set was in AR and VR, meaning augmented reality and

25   virtual reality.

**Q.**   And which fund was Michael Rothenberg raising at that
time?

**A.**   I believe it was the 2016 Fund.

**Q.**   What specifically did Michael Rothenberg tell you he was
going to do with your money if you invested and became a
limited partner in the fund?

**A.**   He was going to invest the committed capital to AR and VR
companies.

      **THE COURT:**  Mr. Chiu, would you mind moving that
microphone just a little closer to yourself.

      **THE WITNESS:**  Is that better?

      **THE COURT:**  That's very good.  Thanks.

      **THE WITNESS:**  Okay.

**BY MR. KLEINMAN:**

**Q.**   What did Michael Rothenberg tell you about the fund size?

**A.**   I think he was trying to raise about $80 million.

      **MR. KLEINMAN:**  If I could show the witness what has
been marked for identification as Government's Exhibit 464.

      **THE WITNESS:**  I see.  Okay.

**BY MR. KLEINMAN:**

**Q.**   Mr. Chiu, do you recognize this document?

**A.**   Yes, I do.

**Q.**   Prior to your -- to your testimony today, have you
reviewed this document?

**A.**   Yes.

1   **Q.**   Do you see your name and email address?

2   **A.**   Yes.

3   **Q.**   Do you see Mike Rothenberg's name and email address?

4   **A.**   Yes.

5   **Q.**   Mr. Chiu, is it in the regular course of CY Capital's

6   business to keep and maintain emails?

7   **A.**   Yes.

8   **Q.**   And does this email also contain two attachments?

9   **A.**   Yes, it does.

10          **MR. KLEINMAN:**   The Government moves to admit trial

11  Exhibit 464.

12          **THE COURT:**   Any objection?

13          **MR. TORRES:**   No objection.

14          **THE COURT:**   464 is admitted.

15          (Government's Exhibit 464 received in evidence.)

16                  (Exhibit published to jury.)

17  **BY MR. KLEINMAN:**

18  **Q.**   Mr. Chiu, if you could just read the first sentence into

19  the record?

20  **A.**   "Great meeting you tonight.  Thanks for making time for us

21  on such short notice.  As promised, our term sheet and

22  presentation are attached here."

23  **Q.**   So this was in and around October 27th; correct?

24  **A.**   Yes.

25          **MR. KLEINMAN:**   And if we can now go to the second

1    page.

2    **Q.**   Mr. Chiu, this document is the Summary of Principal Terms

3    for the 2016 Fund; correct?

4    **A.**   Yes.

5    **Q.**   And if you could read into the record the "Fund Size."

6    **A.**   "The target size of the fund is 60 million to 80 million

7    in capital commitments."

8    **Q.**   Now, you received this document after you met with Michael

9    Rothenberg; correct?

10   **A.**   Correct.

11   **Q.**   Is this statement consistent with what Michael Rothenberg

12   told you in that meeting?

13   **A.**   Yes, it was.

14            **MR. KLEINMAN:**   If we can go to page 4, Ms. Margen.

15   **Q.**   And what was the management fees listed?

16   **A.**   Two percent.

17   **Q.**   And was there also an administrative fee?

18   **A.**   0.5 percent.

19   **Q.**   I'm sorry.  You're -- you're correct.

20        And if we can actually read the management fee sentence

21   into the record, starting with "Limited partners," the

22   management fee sentence starting with "Limited partners."

23   **A.**   "Limited partners will contribute" -- is that the one?

24   **Q.**   Yeah.  That's fine, thank you.

25   **A.**   -- "an amount equal to two percent of their investment

1    contributions each year for the first five years and one

2    percent investment contributions for each of the remaining five

3    years."

4            **MR. KLEINMAN:**  If we can now go to page 6, Ms. Margen.

5    **Q.**   Additionally, Mr. Chiu, there was a section called

6    "Information on Related Entities and Potential Conflicts of

7    Interest."  Is that correct?

8    **A.**   Yes.

9    **Q.**   Now, what did you understand this section to mean?

10   **A.**   From reading the -- the information, the text there, it --

11   it simply means that Rothenberg Ventures is providing some

12   information on -- on potential conflicts of interest and

13   related entities.  Nothing more than that, I think.

14   **Q.**   Does -- is it your understanding or does this summary of

15   terms indicate that Michael Rothenberg would invest in these

16   listed conflicts of interest without telling you?

17   **A.**   No.

18   **Q.**   Would that be an issue for you?

19   **A.**   Yes, it would.

20           **MR. KLEINMAN:**  Additionally, if we can go to the next

21   page.

22   **Q.**   The jury has seen a variety of these PowerPoints, but this

23   is the PowerPoint that you also went through during your

24   meeting in and around October 27, 2015; correct?

25   **A.**   Yes.

1    **Q.**   During your meeting with Michael Rothenberg, did he at any

2    time tell you that he was going to invest in the companies in

3    which he specifically stated he had a conflict of interest

4    with?

5    **A.**   Sorry.  Could you repeat the question?

6    **Q.**   At any time during your meeting with Michael Rothenberg,

7    did he tell you that he was going to invest the 2016 Funds in

8    companies in which he specifically stated he had a conflict of

9    interest with?

10   **A.**   No, he did not.

11   **Q.**   I want to return to Michael Rothenberg during this two --

12   during this October 2015 meeting.

13        How did he appear to you?

14        **MR. TORRES:**  Objection, irrelevant.

15        **THE COURT:**  Overruled.

16        **THE WITNESS:**  The first thing that Mr.--

17        **THE COURT:**  Just so I'm keeping track, this is the

18   meeting at the Shangri-La Hotel?

19        **MR. KLEINMAN:**  That's correct, Your Honor.

20        **THE COURT:**  Okay, thanks.  Sorry for the interruption.

21        **THE WITNESS:**  The first impression I had of

22   Mr. Rothenberg he was very enthusiastic.  He was also very

23   intelligent.  He was able to answer a lot of the questions I

24   posed to him.  And he was also extremely keen to try to get as

25   many investors from Asia as possible.

**BY MR. KLEINMAN:**

**Q.**   And you posed a variety of questions during that meeting; correct?

**A.**   Yes, I did.

**Q.**   And Michael Rothenberg answered all of them enthusiastically and in a confident manner; fair to say?

**A.**   Totally.

**Q.**   After that meeting, what were you considering regarding -- as to whether or not to invest?

**A.**   I -- I was impressed with his presentation.  And this was an area at that time that had started to become interesting so that clearly it was one of the funds that we wanted to consider to invest.

           **MR. KLEINMAN:**   If I could show what has been marked for identification as Government's Exhibit 466.

**Q.**   Mr. Chiu, do you recognize this document?

**A.**   Yes, I do.

**Q.**   What do you recognize it to be?

**A.**   It's an email that was addressed -- well, to -- to Mr. Rothenberg, but it's meant for me, with documents on subscriptions.

**Q.**   And do you see your name and email address?

**A.**   Yes, I do.

**Q.**   Do you see Mike Rothenberg's name and email address?

**A.**   Yes.

1   **Q.**   Are emails kept and maintained in the regular course of

2   business at CY Capital?

3   **A.**   Yes.

4            **MR. KLEINMAN:**   The Government moves to admit

5   Exhibit 466.

6            **THE COURT:**   Any objection?

7            **MR. TORRES:**   No objection.

8            **THE COURT:**   466 is admitted.

9         (Government's Exhibit 466 received in evidence.)

10                  (Exhibit published to jury.)

11  **BY MR. KLEINMAN:**

12  **Q.**   So if we can start -- since this is an email, it starts at

13  the bottom.

14           **MR. KLEINMAN:**   Ms. Margen, if we can go to page 5.

15  And if we can blow up the first email here.   Thank you,

16  Ms. Margen.

17  **Q.**   So just so the jury is following, this email is the email

18  that we were just reviewing following the meeting on

19  October 27, 2015; correct?

20  **A.**   It is correct.

21  **Q.**   Okay.   So that's the bottom of this email chain; right?

22  **A.**   Yes.

23           **MR. KLEINMAN:**   Okay.   If we could unzoom this.

24  **Q.**   Now, fair to say, Rothenberg Ventures followed up with you

25  after this meeting multiple times; right?

1    **A.**   Yes.

2             **MR. KLEINMAN:**   Okay.   Let's go to the next page,

3    page 4.   And if we can blow up this middle email here.

4         Just the middle email.   Perfect.

5    **Q.**   So now this is November 11th, 2015.

6         Who is Katie Fanelli?

7    **A.**   Katie was one of Rothenberg Ventures staff.

8    **Q.**   And if you can read this email into the record.

9    **A.**   "Hi, David, I hope this message finds you well.   I'm

10   reaching out because allocations in the fund are filling up

11   quickly and I'd like to let you know the process in case you

12   are interested in investing before the window of opportunity to

13   invest closes."

14   **Q.**   Let's talk about this -- this phrase, "allocations in the

15   fund are filling up quickly."   What does that mean?

16   **A.**   My understanding is that the fund is reaching the limit of

17   the -- the intended committed capital.

18   **Q.**   So we just saw an exhibit, the Summary of Principal Terms.

19   What was the fund size?

20   **A.**   Sixty to 80.

21   **Q.**   Million dollars?

22   **A.**   Million dollars, yes.

23   **Q.**   So how does that relate to the phrase "allocations in the

24   fund are filling up quickly"?

25   **A.**   It means that it is filling up almost to 80 million.

1   **Q.**   And the phrase in this context "before the window of

2   opportunity to invest closes," what does that mean as it

3   relates to venture capital and your conversations at Rothenberg

4   Ventures?

5   **A.**   It usually means that once it gets to the 80 million, they

6   will not accept new capital.

7   **Q.**   How does this email compare to your conversation with

8   Michael Rothenberg directly at the Shangri-La Hotel?

9   **A.**   It is consistent in that sense, that -- that they are

10   accepting a lot of commitments and you have to react fast, or I

11   have to react fast.

12   **Q.**   And is that something that Michael Rothenberg in fact told

13   you?

14   **A.**   Yes.

15         **MR. KLEINMAN:**   If we can go to page 3.

16   **Q.**   So now it's about 10 days later.

17         **MR. KLEINMAN:**   If we can blow up the bottom email.

18   **Q.**   So this is November 21st, 2015; correct?

19   **A.**   Yes.

20   **Q.**   Same email chain?

21   **A.**   Yes.

22   **Q.**   Okay.  And if you can please read the first sentence in

23   the second paragraph into the record.

24   **A.**   "Please note our process, as allocations in the fund are

25   coming in quickly and the opportunity to invest is on a time

1    limited basis."

2            **MR. KLEINMAN:**  Okay.  If we can zoom out.

3        And, Ms. Margen, we cut out the top part of this message.

4    I would just like to blow up the whole message, the -- the --

5    no.  Thank you.

6        And just blow up the whole -- whole message again.

7    **Q.**  Mr. Chiu, can you please note who this email was from?

8    **A.**  Mr. Neil Devani.

9    **Q.**  And he was a person at Rothenberg Ventures; correct?

10   **A.**  Yes.

11   **Q.**  And you're included on this email?

12   **A.**  Yes.

13   **Q.**  Who is Priscilla Wong?

14   **A.**  My personal assistant.

15   **Q.**  And additionally, Michael Rothenberg is one of the people

16   who are cc'd on this email; correct?

17   **A.**  Yes.

18   **Q.**  And now you just testified to this, but did you take the

19   meaning to be, as you just testified, about regarding

20   allocations?

21   **A.**  Yes.

22   **Q.**  So now it's 10 days later.  What was your current

23   understanding about the window of opportunity to invest in

24   Rothenberg Ventures?

25   **A.**  That the window is closing, that they are reaching the

1    limit?

2    **Q.**   The limit of what?

3    **A.**   Of -- of the size of the fund limit of $80 million.

4          **MR. KLEINMAN:**  If we could zoom out.

5    Okay, that's not going to happen.

6    If we can now zoom in to this last email on top.  Nope.

7          **THE COURT:**  Mr. Kleinman, any time in the next five

8    minutes.

9          **MR. KLEINMAN:**  Thank you, Your Honor.  I'll just

10   finish up this -- this email.

11   **Q.**   So now it's four days later on Wednesday, November 25th,

12   2015.  Do you in fact reply to the team at Rothenberg Ventures?

13   **A.**   Yes, I did.

14   **Q.**   And if you can read your second sentence into the record.

15   **A.**   "I'm interested to put in an allocation."

16   **Q.**   And the next sentence.

17   **A.**   Sorry.  "Please advise the minimum size for family office

18   as we are a relatively small investor."

19          **MR. KLEINMAN:**  Your Honor, I think this is a fine

20   place.

21          **THE COURT:**  Very good.

22   Members of the jury, we're going to take our second and

23   final 15-minute break.

24   As I remind you periodically, it is important that you

25   decide the case based solely on the evidence and the law

1   presented here.  So don't talk about the case with each other,

2   don't seek information from the Internet or any other source

3   outside the courtroom.  Keep an open mind.

4        Let's take our break.

5        **THE CLERK:**  Please rise for the jury.

6        (Proceedings were heard out of presence of the jury:)

7        **THE COURT:**  Mr. Kleinman -- we're outside the presence

8   of the jury.

9        Mr. Kleinman, anything for the record?

10       **MR. KLEINMAN:**  No, Your Honor.  Thank you.

11       **THE COURT:**  Mr. Fakhoury or Mr. Torres?

12       **MR. TORRES:**  No, Your Honor.

13       **THE COURT:**  I'm just going to be up here at the bench

14  for a minute because I succeeded in lowering my chair all the

15  way.  So that will take me a minute, but we're on break.

16       **THE CLERK:**  Court is in recess.

17            (Recess taken at 11:50 a.m.)

18            (Proceedings resumed at 12:09 p.m.)

19       (Proceedings were heard in the presence of the jury:)

20       **THE COURT:**  All right.  Let's go back on the record.

21       All the jurors are in their assigned seats.

22       Mr. Chiu is still on the witness stand.

23       The parties and counsel are at counsel table.

24       Mr. Kleinman, your witness.

25       **MR. KLEINMAN:**  Thank you, Your Honor.

1    Q.   So, Mr. Chiu, where we left off before the break is that

2    you requested and wrote, "Please advise the minimum size for a

3    family office as we are a relatively small investor"; correct?

4    A.   Yes.

5    Q.   This was on Wednesday, November 25th, 2015?

6    A.   Yes.

7    Q.   Going to the next page.

8         MR. KLEINMAN:   And if we can blow up the bottom email.

9    Ms. Margen, if we could blow up the bottom email to include

10   the -- and just scroll all the way down to the bottom, right, a

11   little bit.  That's fine.  Good.

12        Ms. Margen, I believe this is page -- page 3.  If we could

13   go to -- the page up, page 2.

14        Perfect.  Thank you, Ms. Margen.

15   Q.   So, Mr. Chiu, did you receive a response to your email?

16   A.   Yes, I did.

17   Q.   Okay.  Who was the email from?

18   A.   Neil Devani.

19   Q.   And who was it to?

20   A.   To -- to myself.

21   Q.   And who was cc'd?

22   A.   Priscilla Wong, Katie Fanelli, Lynne McMillan, and Mike

23   Rothenberg.

24   Q.   And did the folks at Rothenberg Ventures make what

25   appeared to be a special allowance for you?

1    **A.**   Yes, they did.

2    **Q.**   If you could read this into the record, let's start with

3    just the first paragraph.

4    **A.**   "Thanks for confirming your interest.  For family offices,

5    our minimum is 5 million.  However, as you are a new investor,

6    we can waive this for you."

7    **Q.**   And then if you can read now the next two sentences.

8    **A.**   "What amount are you interested in at this time?  I

9    believe we previously discussed 1 million."

10   **Q.**   And finally, were you also told that Mike will be in

11   Hong Kong?

12   **A.**   Yes.

13   **Q.**   When were you told that he would be in Hong Kong?

14   **A.**   When was I told?

15   **Q.**   Sorry.  When would Michael Rothenberg be in Hong Kong?

16   **A.**   On December 14th to 16th.

17   **Q.**   Additionally, was there a time limit regarding when you

18   had to make this allocation?

19   **A.**   Friday, November 27.  And then to sign by December 14th,

20   2015, and wire the funds three days later, December 17th, 2015.

21   **Q.**   And ultimately, Mr. Chiu, as you testified, you did decide

22   to invest; correct?

23   **A.**   Yes.

24       **MR. KLEINMAN:**  If we can now go one page up.

25   **Q.**   And in the previous page, you replied on December 1st,

1    2015, "Happy to confirm $1 million," correct?

2    **A.**   Yes.

3    **Q.**   And now this is a few days later on December 3rd, 2015.

4    Rothenberg Ventures provided what they called a full set of

5    diligence materials prior to you wiring this money; correct?

6    **A.**   Yes.

7    **Q.**   I want to talk about this full set of diligence materials.

8         Did that include access to Rothenberg bank statements?

9    His -- access to the Rothenberg bank accounts, to your memory?

10   **A.**   I don't think so.

11   **Q.**   Now, after -- was -- to your memory, was it information

12   that Rothenberg Ventures provided?

13   **A.**   Yes.

14   **Q.**   And now turning to December 6th, 2015, did you pose a

15   question?

16   **A.**   Yes, I did.

17   **Q.**   What was that question?

18   **A.**   The question was to ask if this is going to be funded a

19   hundred percent day one.  And it was unusual because there will

20   be a cash drag.

21   **Q.**   What do you mean by that?

22   **A.**   Well, if -- if the money is not deployed immediately, and

23   given, at that time interest, rates were at zero, it would

24   be -- it would be idle money and it would affect the IRR.  It's

25   a bit complicated, but the moment you give money to a fund, it

1    should immediately deploy it so that, you know, it starts

2    making a return, hopefully.

3    **Q.**   And why did you ask this question specifically?

4    **A.**   Because in the -- in the -- in the -- in the early email,

5    they asked for a wire three days after the -- the signing of

6    the documents.

7    **Q.**   In your experience, why did that request make you write

8    this email?

9    **A.**   It -- it -- it's unusual.

10   **Q.**   Now, for the reasons you just stated; correct?

11   **A.**   Yes.

12          **MR. KLEINMAN:**   Now, if we can blow up the email on

13   December 7th, 2015.

14   **Q.**   You received a response to your question; correct?

15   **A.**   Yes.

16   **Q.**   If you can read -- we'll take this in order -- the first

17   paragraph into the record.

18   **A.**   "Only the half investable capital plus expenses plus

19   deposit is due at initial close for individuals and family

20   offices.  For a million dollar commitment, you may choose the

21   option to pay half, 500,000, at initial close along with the

22   first year expenses, two percent management and zero percent

23   administration, which comes to $25,000.

24   **Q.**   Is that 0.5 percent administration?  Is that 0.5 --

25   **A.**   Yes, 0.5.

1    **Q.**   Additionally, the email asks for 10 percent also paid as a
2    deposit to help ensure the second funding; correct?
3    **A.**   Yes.
4    **Q.**   And how much is that?
5    **A.**   A hundred thousand dollars.
6    **Q.**   So in total, what was the amount that you were to have to
7    pay at closing to be an LP in the 2016 Rothenberg fund?
8    **A.**   $625,000.
9    **Q.**   I want to break this down a little further.
10   If we could focus now on the line that says 12/17/2015,
11   600,000 plus $25,000.
12   So in this fund, in the 2016 Fund, how were the management
13   fees called?  Were they within the capital commitment, or were
14   you billed separately in this fund?
15   **A.**   I was billed separately.
16   **Q.**   Now, just to give the jury a sense, has CY Capital
17   invested in other funds?
18   **A.**   Yes.
19   **Q.**   How does this structure of the 2016 Fund compare to those
20   other funds?
21   **A.**   In terms of...?
22   **Q.**   The management fees being billed separately.
23   **A.**   It's not usual.
24   **Q.**   It also gave a due date for the remaining million dollars
25   in capital.  When was that due date?

1    **A.**   The remaining 400,000, not the million dollars?

2    **Q.**   Yes.  The remaining $400,000.

3    **A.**   January the 1st, 2017, will be when it will be called.

4           **MR. KLEINMAN:**  If we can pull up what has been marked

5    for identification as Government's Exhibit 470.

6    **Q.**   Mr. Chiu, do you recognize this document?

7    **A.**   Yes.

8    **Q.**   What do you recognize it to be?

9    **A.**   It's an email from Lynne McMillan to Lee Ming Tai.

10   **Q.**   Are you cc'd on that email?

11   **A.**   Yes.

12   **Q.**   Is Mike Rothenberg cc'd on this email?

13   **A.**   Yes.

14   **Q.**   Did CY Capital keep and maintain emails in the regular

15   course of its business?

16   **A.**   Yes.

17           **MR. KLEINMAN:**  The Government moves to admit

18   Government's Exhibit 470.

19           **THE COURT:**  Any objection?

20           **MR. TORRES:**  No objection, Your Honor.

21           **THE COURT:**  470 is admitted.

22        (Government's Exhibit 470 received in evidence.)

23                  (Exhibit published to jury.)

24   BY MR. KLEINMAN:

25   **Q.**   So ultimately --

1          **MR. KLEINMAN:**  If we can blow up this December 21st,

2     2015 email.

3          That's -- that's fine, Ms. Margen.  You can blow up the...

4     **Q.**   So ultimately, Mr. Chiu, on December-- at the end of

5     December of 2015, that's when CY Capital made the $625,000

6     wire; correct?

7     **A.**   Correct.

8     **Q.**   Who is Ming Tai Lee?

9     **A.**   He is our group financial controller.

10    **Q.**   And when was that wire set to arrive?

11    **A.**   December 23rd.

12    **Q.**   And this is, to be clear, December 23rd, 2015; right?

13    **A.**   Yes.

14         **MR. KLEINMAN:**  If we can pull up Government's

15    Exhibit 471.

16    **Q.**   So at that point, breaking down that first payment,

17    Mr. Chiu, it was the $600,000 in principal commitment; right?

18    **A.**   Yes.

19    **Q.**   And then there was that additional $25,000; right?

20    **A.**   Yes.

21    **Q.**   And what did that cover, according to the email from

22    Rothenberg Ventures?  The email that we were just looking at,

23    what did that cover?

24    **A.**   The first capital call plus the management fees.

25    **Q.**   And yet -- now turning your attention to what has been

1   marked for identification as Government's Exhibit 471, do you

2   recognize this document?

3   **A.**   Yes.

4   **Q.**   What do you recognize it to be?

5   **A.**   It's an email by Katie Fanelli to myself and Lee Ming Tai.

6   **Q.**   And do you see Michael Rothenberg is cc'd on this email?

7   **A.**   It is.

8   **Q.**   Was it in the regular course of business for CY Capital to

9   keep and maintain emails?

10  **A.**   Yes.

11         **MR. KLEINMAN:**   The Government moves to admit

12  Exhibit 471.

13         **THE COURT:**   Any objection?

14         **MR. TORRES:**   No objection, Your Honor.

15         **THE COURT:**   471 is admitted.

16         (Government's Exhibit 471 received in evidence.)

17                    (Exhibit published to jury.)

18         **MR. KLEINMAN:**   Okay.   Now, if we can go to the next

19  page on this email.   And pull up the bottom email.   A little

20  further down.   Perfect.

21         Thank you, Ms. Margen.

22  **Q.**   On February 17th, 2016, you got an email; correct?

23  **A.**   Correct.

24  **Q.**   Who sent you that email?

25  **A.**   Mike Rothenberg.

1    **Q.**   If you can please read that email into the record.

2    **A.**   "We just noticed that we haven't sent an invoice to you

3    for the expenses owed to the funds yet, so Katie will send you

4    that now to streamline.

5        "Two additional updates.

6        "1) Please save the date for May 16, 2016 for our annual

7    LP meeting and Founder Field Day held at AT&T Park.

8        "We are creating online LP portal where we'll share

9    information on the fund as it becomes available.  It will be

10   live before the LP meeting."

11   **Q.**   So let's start with the invoice that Michael Rothenberg

12   sent to you.  Did this email come with an attachment for an

13   invoice?

14        **MR. KLEINMAN:**   If we could unzoom and scroll down to

15   the next page.  The page after, please.

16   **A.**   It -- it did.

17   **Q.**   And what was this invoice for?

18   **A.**   It was for the 2016 year one expense and 2017 year two

19   expense.

20   **Q.**   And did that also include the administrative fees?

21   **A.**   Yes.

22   **Q.**   And what was the total amount?

23   **A.**   $31,250.

24   **Q.**   And despite having just paid $625,000, did you also pay

25   this amount?

1    **A.**   We did.

2    **Q.**   As you sit here today, can you explain why you were billed

3    for this amount?

4    **A.**   That's very unusual.  I -- I cannot find explanation for

5    that.

6    **Q.**   Now, that previous email also mentioned Founder Field Day.

7         **MR. KLEINMAN:**  If we could pull up what has been

8    marked as Government's Exhibit 631.

9         Mr. Chiu, do you recognize this email?

10   **A.**   Yes.

11   **Q.**   What do you recognize it to be?

12   **A.**   It's an email from Brandon Farwell to myself regarding the

13   LP meeting.

14   **Q.**   And was this LP meeting also linked to Founder Field Day?

15   **A.**   Yes.

16   **Q.**   And do you see Mike Rothenberg's name on this email chain

17   as well?

18   **A.**   Yes.

19         **MR. KLEINMAN:**  The Government moves to admit

20   Exhibit 631.

21         **THE COURT:**  Any objection?

22         **MR. TORRES:**  No objection, Your Honor.

23         **THE COURT:**  631 is admitted.

24         (Government's Exhibit 631 received in evidence.)

25   / / /

1              MR. KLEINMAN:  And just for context, Ms. Margen, if we

2      can go to page 3.

3                      (Exhibit published to jury.)

4      BY MR. KLEINMAN:

5      Q.    Mr. Chiu, when was Founder Field Day?

6      A.    May 16, 2016.

7      Q.    And what was the purpose of this email?  Was it to let you

8      know when it was?

9      A.    Yes.

10     Q.    Now, you responded to this string of emails.

11             MR. KLEINMAN:  If we can go to the first page and blow

12     up that bottom email.

13     Q.    Mr. Chiu, what was your response?

14     A.    Shall I read it?

15     Q.    Yes, please.

16     A.    "I hope you are well.  I wanted to find out a bit more

17     about the event.  Will there be any presentation on the

18     portfolio or portfolio companies?  For your information, I

19     shall be there for only one day and would like to make best use

20     of my time there and have other meetings, so it will be helpful

21     if you can let me have a rundown of the agenda so as to plan my

22     schedule."

23     Q.    Mr. Chiu, why were you asking will there be any

24     presentation on the portfolio or the portfolio companies?

25     A.    Generally annual meetings, annual LP meetings would

2911

1  include a -- include presentation of what the fund has invested

2  in, and in some cases, some of the portfolio companies would do

3  presentations.

4  **Q.**   And why, as an investor, would you want to know that?

5  **A.**   This is -- this is the basic information that one would

6  need at least once annually.

7  **Q.**   Now, this is April 29th, 2016.  You made your wire, you

8  just testified, in -- on December 23rd of 2015.  What was

9  your -- what was the communication like after you provided your

10  commitment to Rothenberg Ventures?

11  **A.**   Not -- not -- not great.  Not a lot.

12  **Q.**   What do you mean by that?

13  **A.**   There wasn't -- there -- there wasn't a lot of information

14  from -- from Rothenberg Ventures.

15  **Q.**   Regarding what?

16  **A.**   Investments being made.

17       **MR. KLEINMAN:**  And if we can unzoom.  And if we can

18  blow up the top page.

19  **Q.**   And just read the -- that second sentence there.

20  **A.**   "We will have our LP meeting in the morning from 9:30 to

21  11:30 a.m.  Then lunch on the field with batting practice."

22  **Q.**   Of this part of the schedule, what was the part that you

23  were interested in?

24  **A.**   The LP meeting between 9:30 to 11:30.

25  **Q.**   Did you in fact attend Founder Field Day?

1    **A.**    Yes, I did.

2    **Q.**    Can you please tell the jury what your experience was

3    like?

4    **A.**    It -- it was somewhat surreal because when I got there,

5    there was a stand built on the baseball field with

6    Mr. Rothenberg standing there.  And there were a lot of people

7    in the stadium.  I'm not entirely sure if they're all LPs, but

8    I suspect not.

9         And then Mr. Rothenberg was making a -- a speech.  And

10   then -- and then we went to a separate room at the back of the

11   stadium, which is -- which I thought was supposedly to be the

12   LP meeting, but it was very light on details.

13        I -- I -- I always try to write contemporaneous notes of

14   meetings, and there were no notes for my part.  So clearly it

15   wasn't the kind of LP meeting that I was used to.

16        And the other thing that struck me was, you know, the

17   event must have cost a lot of money.  And, you know, the fund

18   size, it doesn't appear to justify the kind of money that is

19   being -- that was being spent.

20   **Q.**    And this would even be in the fund size, as you understood

21   it then, to be between 60 and $80 million --

22   **A.**    Yes.

23   **Q.**    -- correct?

24        Is that correct?

25   **A.**    Yes.

1   **Q.**   So at that meeting, were you able to ascertain whether or

2   not your money had been invested, and if it had been, what it

3   was invested in?

4   **A.**   I did not get any information in that meeting.

5   **Q.**   We saw the -- the jury saw a previous email during your

6   testimony that there was something that was being built called

7   an LP portal.

8   **A.**   Yes.

9   **Q.**   Can you please describe your experience with the LP

10  portal.

11  **A.**   I cannot because I could not remember if there was one,

12  but I -- I'm not a hundred percent sure of that.

13  **Q.**   And now turning your attention to a few months later, now

14  August 21st, 2016.

15         **MR. KLEINMAN:**   And if we could pull up what is in

16  evidence, I believe it's Government Exhibit 472.

17         If we could pull up for identification 472.

18  **Q.**   Mr. Chiu, do you -- do you see this document?

19  **A.**   Yes.

20  **Q.**   What is this document?

21  **A.**   It was an email from Mike Rothenberg to limited partners.

22  **Q.**   And do you also see who sent the email at the top?

23  **A.**   I did, in reply to his email.

24  **Q.**   So you see Mike Rothenberg's name --

25  **A.**   Yes.

1    **Q.**    -- and email address?

2         And, again, was email kept in the regular course of

3    business at CY Capital?

4    **A.**    Yes.

5              **MR. KLEINMAN:**   The Government moves Exhibit 472 into

6    evidence.

7              **THE COURT:**   Any objection?

8              **MR. TORRES:**   No objection, Your Honor.

9              **THE COURT:**   472 is admitted.

10         (Government's Exhibit 472 received in evidence.)

11                   (Exhibit published to jury.)

12   **BY MR. KLEINMAN:**

13   **Q.**    So, Mr. Chiu, you just testified that you sent a response

14   to Mike Rothenberg.  But let's talk about the first email.

15        What was -- what was this email regarding?

16   **A.**    It was an email from Mr. Rothenberg explaining the -- an

17   article that appeared in TechCrunch on a -- on an investigation

18   by the SEC.

19             **MR. KLEINMAN:**   And if we can now scroll down.

20   **Q.**    The jury has seen this email before, but if you could read

21   into the record just the first sentence of -- of that, I guess,

22   third-to-last paragraph that starts with "Five million over two

23   years"?

24   **A.**    "Five million over two years has been invested in River

25   Studios, which Rothenberg Ventures funds have the economic

1   rights to.   Rothenberg Ventures Management believes there could

2   be meaningful upside potential in River Studios for fund

3   investors if it continues with its external fundraising

4   efforts."

5   **Q.**   Was this the first time that you had learned that

6   Rothenberg Ventures had in fact invested money into this entity

7   called River Studios?

8   **A.**   Yes.

9   **Q.**   And you responded to this email; correct?

10  **A.**   Yes.

11       **MR. KLEINMAN:**   If we can go to the top of the page.

12  **Q.**   What was your response?

13  **A.**   I said, "As an overseas LP, I would welcome an opportunity

14  to speak to you at a time convenient."

15  **Q.**   Did you end up speaking with Michael Rothenberg directly?

16  **A.**   I cannot remember.

17  **Q.**   Were there times since your investment when you spoke with

18  Michael Rothenberg regarding your -- regarding your investment?

19  **A.**   Yes.

20  **Q.**   And what did you ask Michael Rothenberg?

21  **A.**   I -- I actually met him a few times in -- in San Francisco

22  subsequent to -- to this email.

23  **Q.**   Thank you, Mr. Chiu.   That's what I was referring to,

24  those subsequent meetings after this email.

25       What did you ask Michael Rothenberg during those meetings?

1    **A.**   Basically the status of the investment as well as of the

2    investigation.

3    **Q.**   And focusing just on the investment, were you -- what did

4    Michael Rothenberg say to you regarding the investments?

5    **A.**   That they're -- they're doing very well.

6    **Q.**   And was he able to provide any detail regarding what he

7    had invested in?

8    **A.**   Not in -- in much detail.

9    **Q.**   It was just a general statement --

10   **A.**   Yes.

11   **Q.**   -- correct?

12        So were you at that time and during these meetings able to

13   ascertain where your money had went at that point?

14   **A.**   No.   No.

15   **Q.**   Just one last question, Mr. Chiu.

16        If Michael Rothenberg had told you that your money was

17   going to be used to go to a collateral account in a bank so

18   that Michael Rothenberg and Rothenberg Ventures Management

19   Company could take out a $4 million loan, would you have

20   invested?

21            **MR. TORRES:**   Objection.   Speculation.

22            **THE COURT:**   Overruled.

23            **THE WITNESS:**   Definitely not.

24            **MR. KLEINMAN:**   Nothing further, Your Honor.   Thank

25   you.

1          **THE COURT:**  Thank you, Mr. Kleinman.

2       Mr. Torres, cross-examination?

3          **MR. TORRES:**  Yes, Your Honor.

4                    **CROSS-EXAMINATION**

5    **BY MR. TORRES:**

6    **Q.**   Good afternoon, Mr. Chiu.

7    **A.**   Good afternoon.

8    **Q.**   In your testimony earlier, you identified CY Capital

9    operates out of Hong Kong; correct?

10   **A.**   Yes.

11   **Q.**   CY Capital is a -- CY Capital Limited is a British Virgin

12   Islands company?

13   **A.**   That is correct.

14   **Q.**   You also testified that CY Capital is a family office.

15   **A.**   Yes.

16   **Q.**   And as well as still a business operating in the

17   distribution industry; is that accurate?

18   **A.**   No.

19   **Q.**   No.  How would you describe the CY Capital --

20   **A.**   CY Capital is a subsidiary of Chung Yuen.

21   **Q.**   Chung Yuen's business is -- is in distribution?

22   **A.**   That's correct.

23   **Q.**   And it still operates to this day?

24   **A.**   Yes.

25   **Q.**   Mr. Chiu, you established CY Capital family office in the

1    early 2000s; is that correct?

2    **A.**    That is correct.

3    **Q.**    And just in a rough time frame, CY Capital has been making

4    investments for over 20 years.

5    **A.**    That is correct.

6    **Q.**    What is the amount of assets under management for CY

7    Capital?

8    **A.**    Now?

9    **Q.**    Yes.

10    **A.**    Between hundred to 200 million.

11    **Q.**    Between 100 and 200 million?

12    And, Mr. Chiu, you are the chief investment officer for CY

13    Capital; correct?

14    **A.**    Yes.

15    **Q.**    And in your role as chief investment officer, it's your

16    responsibility to speak to fund managers; correct?

17    **A.**    Correct.

18    **Q.**    You evaluate the quality of the manager?

19    **A.**    Yes.

20    **Q.**    And you ultimately make the decisions on whether to invest

21    with a fund manager or not; correct?

22    **A.**    Yes.

23    **Q.**    And you've served in this role as chief investment officer

24    since the family office's inception?

25    **A.**    Correct.

1  **Q.**    You testified that you became aware of Mr. Rothenberg

2  through an associate named Darrin Woo; is that correct?

3  **A.**    Correct.

4  **Q.**    You share leads with Mr. Woo?

5  **A.**    Sometimes.

6  **Q.**    And he shares leads with you?

7  **A.**    Yes.

8  **Q.**    When Mr. Woo shared Rothenberg Ventures with you, was

9  Mr. Woo an investor in Rothenberg Ventures?

10  **A.**    At the time, I was not aware that he was, but I understand

11  he became an investor.  I have no recollection as to when I

12  found out he was an investor.

13  **Q.**    So at the time he introduced you to Rothenberg Ventures,

14  you're unaware if Mr. Woo was an investor in Rothenberg

15  Ventures funds?

16  **A.**    I was not aware, to the best of my under -- belief or

17  recollection.

18  **Q.**    But you've subsequently learned that Mr. Woo is an

19  investor in Rothenberg Ventures funds?

20  **A.**    I believe so, yes.

21  **Q.**    You testified that your first meeting with Mr. Rothenberg

22  was in October of 2015; correct?

23  **A.**    Yes.

24  **Q.**    And that was in Hong Kong.

25  **A.**    Yes.

1    **Q.**    In the Shangri-La Hotel.

2    **A.**    Yes.

3    **Q.**    You had more than one meeting with Mr. Rothenberg in

4    Hong Kong; is that correct?

5    **A.**    More than one on the first meeting?

6    **Q.**    More than one meeting -- you met with Mr. Rothenberg on

7    more than one occasion --

8    **A.**    Yes.

9    **Q.**    -- in Hong Kong?

10   **A.**    Yes.

11   **Q.**    But the first meeting, to your recollection, is

12   October 27th, 2015.

13   **A.**    Yes.  The emails --

14   **Q.**    I'm not trying to trick you on the dates.  I think that's

15   the date of the email.

16   **A.**    Yes.

17   **Q.**    Okay.  In the last week of October.

18   **A.**    Yes.

19   **Q.**    During that initial meeting with Mr. Rothenberg, there was

20   other members of Rothenberg Ventures' staff in attendance as

21   well; correct?

22   **A.**    Yes.

23   **Q.**    In your testimony with Mr. Kleinberg [sic] you mentioned

24   that your initial impression of Mr. Rothenberg is that you were

25   impressed; correct?

1    **A.**   Yes.

2    **Q.**   He seemed educated in the field of virtual reality?

3    **A.**   Yes.

4    **Q.**   And he seemed knowledgeable of the loose term "frontier

5    technologies" or --

6    **A.**   Yes.

7    **Q.**   During that initial meeting with Mr. Rothenberg, he

8    discussed virtual reality; correct?

9    **A.**   He did.

10   **Q.**   As well as augmented reality technologies?

11   **A.**   Yes.

12   **Q.**   And, again, that initial meeting was in late October of

13   2015.

14   **A.**   Yes.

15   **Q.**   CY Capital ultimately committed $1 million to the

16   Rothenberg Ventures 2016 Fund; correct?

17   **A.**   Yes.

18   **Q.**   And in late December, you wired $625,000 to the Rothenberg

19   Ventures 2016 Feeder Fund; correct?

20   **A.**   Yes.

21   **Q.**   I believe that was December 24th, 2016, or around there.

22   **A.**   But --

23   **Q.**   Late December.

24   **A.**   Late December, yes.

25   **Q.**   So you committed $1 million, but the first wire was for

1    600,000 -- $625,000.

2    **A.**   Yes.

3    **Q.**   At the time of your commitment, the funds -- the 2000 --

4    let me start over.

5        At the time of your December 2015 commitment, the 2016

6    Fund was managed by the Rothenberg Ventures Management Company;

7    correct?

8    **A.**   Yes.   That was not a question that I actually asked

9    Mr. Rothenberg.

10   **Q.**   Have you since learned that?

11   **A.**   I have not found out who was the manager, but it was

12   Mr. Rothenberg who actually was the person behind the venture

13   fund to invest.

14   **Q.**   So Mr. Rothenberg was the -- was the --

15   **A.**   The GP.

16   **Q.**   -- the GP of Rothenberg Ventures?

17   **A.**   That's my understanding.

18   **Q.**   And it was your understanding that Mr. Rothenberg was the

19   GP of the Rothenberg Ventures 2016 Fund?

20   **A.**   True.

21   **Q.**   And as the GP, Mr. Rothenberg would be identifying

22   potential investments for the fund; correct?

23   **A.**   Yes.

24   **Q.**   And as the GP of the 2016 Fund, Mr. Rothenberg would be

25   making those investment decisions as well; correct?

1  **A.**   Yes.

2  **Q.**   Let me take a quick step back, Mr. Chiu, and make sure I'm

3  understanding kind of the mechanics of becoming an LP in a

4  venture fund.

5       You would consider yourself an experienced investor.

6       Would you consider yourself an experienced investor?

7  **A.**   Back in 2015 or now?

8  **Q.**   In 2015.

9  **A.**   Okay.  At that time, most of my exposure were in hedge

10  funds.  So in hedge funds, yes.  But in venture capital, I

11  wouldn't consider that time I was a particularly experienced

12  investor.

13  **Q.**   Understood.

14       As we sit here today in 2023, has your experience as an

15  investor in venture funds increased?

16  **A.**   Yes.

17  **Q.**   So in late December 2015, CY Capital wired $625,000 to the

18  Rothenberg Ventures 2016 Fund; correct?

19  **A.**   Yes.

20  **Q.**   This was CY Capital's first investment in a Rothenberg

21  Ventures fund; correct?

22  **A.**   Yes.

23  **Q.**   In exchange for the investment, CY Capital became a

24  limited partner, or an LP, in the 2016 Fund; correct?

25  **A.**   Yes.

1   **Q.**   And Mr. Rothenberg was the GP, or the general partner, of

2   the 2016 Fund; correct?

3   **A.**   Yes.

4   **Q.**   As an LP in the 2016 Fund, you as an individual do not

5   expect to make investments on behalf of the fund; correct?

6   **A.**   Yes.

7   **Q.**   You do expect to make investments?

8   **A.**   No.  No, sorry.  You asked me whether it was correct.

9   **Q.**   Oh, okay.

10  **A.**   So I said yes.

11  **Q.**   That was a bad question for me.  I apologize.

12       As an LP -- let me start over.

13       LPs in the 2016 Fund do not make investments on behalf of

14  the fund.

15  **A.**   LPs do not.

16  **Q.**   The investments are made by the manager; correct?

17  **A.**   Yes.

18  **Q.**   So when an LP invests in a fund, in exchange the LP

19  receives a pro rata ownership stake in the fund.  Is that the

20  right terminology?

21  **A.**   I would say so, yes.

22  **Q.**   So in exchange for the investment, the LP receives a

23  percentage of the fund -- the value of the entire fund.

24       **MR. KLEINMAN:**  Objection.  Asked and answered.

25       **THE COURT:**  Overruled.

1           **THE WITNESS:**  Yes.

2      **BY MR. TORRES:**

3      **Q.**   So just as a very simple example, Mr. Chiu, if -- if I

4      am -- if I am raising a $100 fund on a Friday morning, and my

5      goal is to raise $100 in the fund -- are you with me so far?

6      **A.**   I think so.

7      **Q.**   Okay.  So I'm going to raise a $100 fund to invest in

8      lemonade stands.  Okay.

9           On Friday morning, I send out promotional materials saying

10     that I am raising $100 and I'm going to invest in lemonade

11     stands.  Okay?

12     **A.**   Yes.

13     **Q.**   On Friday evening, I get 10 commitments.  Each individual

14     says they're going to send me $10 to invest in the fund.  So I

15     close the fund on Friday night.  Are you with me?

16     **A.**   Yes.

17     **Q.**   Okay.  So I have 10 LPs.  And I've -- and I've had $100

18     committed.

19     **A.**   Yes.

20     **Q.**   Nine of those -- okay.

21          At this stage, I have 10 LPs and $100 committed; correct?

22     **A.**   Yes.

23     **Q.**   Each LP at this stage has a 10 percent pro rata ownership

24     stake in the fund; correct?

25     **A.**   Yes.

1    **Q.**   On Friday night, 9 of the 10 commits -- committed LPs wire

2    their $10 to the fund.

3            **MR. KLEINMAN:**  Your Honor, objection.

4            **THE COURT:**  I want to see counsel at sidebar.

5        (Sidebar conference held without the court reporter.)

6            **THE COURT:**  The objection will be overruled.

7    **BY MR. TORRES:**

8    **Q.**   All right.  Just briefly, Mr. Chiu.  We've got 10 LPs in

9    the $100 fund.  Nine of them wire the money on Friday night.

10   It lands in the fund's bank account on Saturday morning.  And

11   the $90 is invested in 90 lemonade stands across the

12   United States.

13       Each of the LPs owns 10 percent of the fund value at that

14   point; correct?

15   **A.**   Yes.

16   **Q.**   Mr. Fakhoury, my co-counsel, was the last individual -- he

17   was traveling, he was unable to wire the money until Sunday

18   night.  He wires the $10 on Sunday evening.  It lands in my

19   bank account.  On Monday morning, I buy one additional company

20   for $10.

21   **A.**   Okay.

22   **Q.**   Each of the 10 LPs at that point still have 10 percent of

23   the -- 10 percent pro rata ownership stake of the fund;

24   correct?

25   **A.**   Yes.

1    **Q.**   Thank you.

2         Mr. Chiu, in your testimony you testified to a few email

3    exchanges and exhibits presented by the Government; correct?

4    **A.**   Yes.

5    **Q.**   I have a few questions about a couple of those exhibits.

6    Okay?

7              **MR. TORRES:**  Mr. Fakhoury, can we pull up Exhibit 464,

8    please.

9    **Q.**   Exhibit 464, sir, is an email from October 27th, 2015,

10   from Neil Devani to yourself, Priscilla Wong, I believe, was

11   her last name, Katie Fanelli, Lynne McMillan, and

12   Mr. Rothenberg, with the subject Rothenberg Ventures and CY

13   Capital.

14        Do you see that, sir?

15   **A.**   Yes.

16   **Q.**   And this email had two attachments, a 2016 Fund Term Sheet

17   as well as a Rothenberg Ventures presentation, which I believe

18   was like a slide deck; correct?

19   **A.**   I believe so, yes.

20   **Q.**   And this email is from Neil Devani, general counsel for

21   Rothenberg Ventures; correct?

22   **A.**   Yes.

23   **Q.**   And in the first line, Mr.-- excuse me -- Mr. Devani makes

24   reference to "Great meeting you tonight.  Thanks for taking

25   time for us on such short notice."

1          Did you meet Mr. Devani in Hong Kong, sir?

2     **A.**   I -- I must have, from what -- what that email suggested.

3     **Q.**   This email also cc's Katie Fanelli and Lynne McMillan.   Do

4     you recall meeting them at this meeting as well?

5     **A.**   I am not sure.   There were, as I said, employees of

6     Rothenberg Ventures there.   I -- I did not get their business

7     cards, so I cannot recall.

8     **Q.**   And this meeting was in October-- or the email is

9     October 27th, 2015; correct?

10    **A.**   Yes.

11    **Q.**   Roughly two months before CY Capital wired money to

12    Rothenberg Ventures 2016 --

13    **A.**   Correct.

14    **Q.**   -- Fund?

15          **MR. TORRES:**   Can we go to page 2 of this exhibit,

16    please.

17    **Q.**   Page 2 of Exhibit 464 is a Summary of Principal Terms for

18    the 2016 Fund.   Do you see that, sir?

19    **A.**   Yes.

20          **MR. TORRES:**   Scroll down, please.

21    **Q.**   You testified earlier to the fund size.

22    **A.**   Yes.

23    **Q.**   It states the target fund size is 60 to 80 million;

24    correct?

25    **A.**   Yes.

1          **MR. TORRES:**  Can we go to page 7, please.

2     **Q.**   Page 7 is the first page of the second attachment to the

3     email in Exhibit 464.

4          **MR. TORRES:**  I'm sorry.  That was my mistake.

5     Can we go back to page 2, Mr. Fakhoury.

6     **Q.**   On page 2, it identifies the purpose of the 2016 Fund is

7     to invest primarily in equity securities, including convertible

8     debt securities of privately held companies.

9     Do you see that, sir?

10    **A.**   Yes.

11    **Q.**   Just below that section, there's a section on the general

12    partner, and it identifies the fund's general partner is

13    Rothenberg Ventures 2016 Fund, General Partner, a Delaware LLC;

14    correct?

15    **A.**   Yes.

16         **MR. TORRES:**  On page 3, please, can you scroll up

17    to -- the management section, please, on the bottom.  There you

18    go.  Thank you, Mr. Fakhoury.

19    **Q.**   On the bottom of page 3, there is a section titled

20    "Management," and it reads "The general partner has the

21    exclusive authority to manage and operate the fund, including

22    the delegation of such management and operation.  Limited

23    partners will not participate in the management of the fund,

24    act for the fund, or vote on fund matters except as

25    specifically provided under applicable law or in the

1    partnership agreement."

2          Do you see that, sir?

3    A.   Yes.

4          **MR. TORRES:**  Can we go to page 4, please.

5    Q.   On the top of page 4, there is a reference to River

6    Program investment.  Do you see that, sir?

7    A.   Yes.

8          **MR. TORRES:**  Can we go to page 6, please.

9    Q.   At the top of page 6, you testified to this earlier,

10   identifies information on related entities and potential

11   conflicts of interest.  Do you see that, sir?

12   A.   Yes.

13   Q.   The first paragraph just briefly identifies Funds I, II,

14   and III.  Those are Rothenberg Ventures Fund I, Rothenberg

15   Ventures Fund II, and Rothenberg Ventures Fund III.  Do you see

16   that, sir?

17   A.   Yes.

18   Q.   There's also a reference to co-investment funds.  Do you

19   see that?

20   A.   Yes.

21   Q.   Real estate activities.

22   A.   Yes.

23   Q.   And the fourth paragraph makes a reference to Bend

24   Reality; correct?

25   A.   Yes.

1   **Q.**   The Bend Reality paragraph reads, "Mike Rothenberg manages

2   Bend Reality LLC, a Delaware corporation, also doing business

3   as River Studios, River Racing, River Store, and River House,

4   formed for the purpose of enhancing the General Partner's

5   branding and positioning in the virtual reality sector

6   primarily through the River brand, which includes a virtual

7   reality accelerator, a production studio, a racing team, an

8   online store, and other business ventures."

9        Do you see that, sir?

10  **A.**   Yes.

11       **MR. TORRES:**   Page 7, please, Mr. Fakhoury.

12  **Q.**   Page 7, Exhibit 464, is the front page of the second

13  attachment to the email entitled Rothenberg Ventures

14  October 2015.   It's a slide deck presentation.

15       **MR. TORRES:**   Page 9, please, Mr. Fakhoury.

16  **Q.**   Exhibit 464, page 9, the top of the page reads "Founders

17  under 35 build the world's most valuable tech companies,

18  including 62 percent of the top 50 in the NASDAQ."

19       Do you see that, sir?

20  **A.**   Yes.

21  **Q.**   These were examples of startups founded by -- with -- this

22  is -- let me start over.

23       On the right side of the slide, there are examples of

24  startups with millennial -- with millennial founders; correct?

25  **A.**   Yes.

1   **Q.**   On the left side provides some example of public companies

2   with founders under 35; correct?

3   **A.**   Yes.

4          **MR. TORRES:**   Page 10, please.

5   **Q.**   Exhibit 464 page 10, the top reads, "Millennials benefit

6   from advice from our 150...LPs:   Experienced Founders,

7   Investors, and Executives."

8          Do you see that, sir?

9   **A.**   Yes.

10          **MR. TORRES:**   Page 15, please, Mr. Fakhoury.

11   **Q.**   And page 15, sir, just provides some example investments

12   made by Rothenberg Ventures since 2013; correct?

13   **A.**   Yes.

14          **MR. TORRES:**   Page 19, please.

15   **Q.**   Exhibit 464, page 19, reads at the top "In 2015,

16   Rothenberg Ventures launched River, the fastest way to grow

17   frontier tech startups."

18          On the right side of the slide, sir, there is some example

19   of frontier tech investments in VR to date.

20          Do you see that?

21   **A.**   Yes.

22   **Q.**   And the "30 plus" is a sample of some of the investments

23   in VR to date; correct?

24   **A.**   Yes.

25          **MR. TORRES:**   Page 21, please.

1  **Q.**   Exhibit 464, page 21, the top reads "Our team builds

2  differentiated networks, performs quality due diligence, and

3  offers operational support."

4       Do you see that, sir?

5  **A.**   Yes.

6  **Q.**   On the left side of the slide, there's an investment team;

7  correct?

8  **A.**   Yes.

9  **Q.**   Bottom left corner is Neil Devani; correct?

10  **A.**   Yes.

11  **Q.**   He was the gentleman on the October 2015 email; correct?

12  **A.**   Yes.

13  **Q.**   He's identified as general counsel for Rothenberg

14  Ventures?

15  **A.**   Yes.

16       **MR. TORRES:**   Page 23, please, Mr. Fakhoury.

17  **Q.**   On the last page of this presentation or slide deck,

18  there's some fine print, probably written by attorneys;

19  correct?

20       **MR. KLEINMAN:**   Objection.

21       **THE COURT:**   Overruled.

22       **THE WITNESS:**   Probably.

23  BY MR. TORRES:

24  **Q.**   Let me just direct your attention to the fifth paragraph

25  on page 23 of Exhibit 464 reads, "The fund's investments will

1   be characterized by a high degree of risk, volatility and

2   illiquidity.  A prospective purchaser should thoroughly review

3   the information contained herein and the terms of the fund's

4   limited partnership agreement and subscription agreement and

5   carefully consider whether an investment in the fund is

6   suitable to the investor's financial situation and goals."

7        Do you see that, sir?

8   A.   Yes.

9        **MR. TORRES:**  Mr. Fakhoury, can you bring up

10  Exhibit 470, please.

11  Q.   In your testimony earlier, sir, you testified to some of

12  the contents of Exhibit 470.  470 is -- at the top is an email

13  from Lynne McMillan to Lee Ming Tai, yourself cc'd, as well as

14  Katie Fanelli, Mike Rothenberg, and Neil Devani.

15       Do you see that, sir?

16  A.   Yes.

17       **MR. TORRES:**  Go to page 5, please.

18       Scroll down, please.  Okay.  You can stop right there.

19  Q.   Just briefly, sir, this email at the bottom of page 5 is

20  the email from Neil Devani to yourself on October 27th, 2015.

21  This appears to be a different email string from that initial

22  email from Neil Devani to yourself after the meeting in

23  Hong Kong.  Do you see that?

24       **MR. TORRES:**  Can you scroll up, Mr. Fakhoury, so he

25  can see the email in its -- I'm sorry.  Scroll down.

1      **THE WITNESS:**  This appear to be the same email.

2    **BY MR. TORRES:**

3    **Q.**    That's right.  That's right.

4           **MR. TORRES:**  Scroll up, please.  You can stop right

5    there.

6    **Q.**    On October 11th, Katie Fanelli of Rothenberg Ventures

7    emailed you a follow-up email; correct?

8    **A.**    That's November 11th --

9    **Q.**    No --

10   **A.**    -- it appears.

11   **Q.**    Yes, sir.  November 11th.

12   **A.**    Okay.  Yes.

13   **Q.**    In your testimony earlier, you talked about her reference.

14   She was asking if you would like to request a specific

15   allocation amount; correct?

16   **A.**    Yes.

17   **Q.**    In point 2 of her email, she also points out -- she also

18   writes, "If you're not interested in investing in the fund,

19   please let us know."

20         Do you see that, sir?

21   **A.**    Yes.

22   **Q.**    And Katie Fanelli was the chief of staff for the

23   San Francisco office of Rothenberg Ventures; correct?

24   **A.**    From what you're telling me, yes.  I -- I have no way of

25   knowing.

1    **Q.**   Okay.

2         **MR. TORRES:**  Scroll up, please.  Right -- there we go.

3    **Q.**   On November 20th, 2015, there's an email from yourself to

4    Katie, apologizing for the delay and a request if Rothenberg

5    Ventures has a data room that they can put you -- you can

6    access for due diligence information; correct?

7    **A.**   Yes.

8    **Q.**   The "DD" in this information stands for due diligence;

9    correct?

10   **A.**   Yes.

11        **MR. TORRES:**  Scroll up, please, Mr. Fakhoury.

12   **Q.**   On November 21st, 2015, Neil Devani responds to your email

13   addressing yourself as well as Priscilla, letting you know that

14   you should have received an email with instructions on how to

15   access the data room.  Do you see that?

16   **A.**   Yes.

17   **Q.**   In this paragraph here, Mr. Devani also states, "If you

18   are considering investing, you may request for us to hold a

19   specific allocation amount for you up to four weeks while you

20   complete your diligence."

21        Do you see that, sir?

22   **A.**   Yes.

23        **MR. TORRES:**  Scroll to the next email, please.

24   **Q.**   On November 25th, 2015, you respond, sir -- you write an

25   email to Neil Devani.  And in that email, you identify that you

1    are interested to put in an allocation and ask for the minimum

2    size for a family office as you are a relatively small

3    investor; correct?

4    **A.**   Yes.

5    **Q.**   The next day, November 26th, 2015, Mr. Devani responds and

6    makes reference to, in the second paragraph, "I believe we

7    previously discussed $1 million."

8         Do you see that, sir?

9    **A.**   Yes.

10        **MR. TORRES:**  Scroll up to page 2, please.

11        Scroll to the bottom of this page, please.

12        Yeah.  I'm sorry.  The top of page 3, please.

13   **Q.**   Exhibit 470, top of page 3, there's an email, Tuesday,

14   December 1st, 2015, to Neil Devani from yourself, "Happy to

15   confirm $1 million."

16        Do you see that, sir?

17   **A.**   Yes.

18        **MR. TORRES:**  Can we now scroll to page 2, please.

19   **Q.**   On December 2nd, Mike -- Mr. Rothenberg responds "Thanks

20   David, welcome aboard.  Neil and Lynne will help you complete

21   your investment.  We appreciate your support."

22        Do you see that, sir?

23   **A.**   Yes.

24   **Q.**   The next day on December 3rd, Neil Devani writes an email

25   notifying that you have access to the data room.  "You'll find

1  a full set of diligence materials as well as our fund documents

2  there.  I've also attached the latter here for convenience."

3      Do you see that, sir?

4  **A.**   Yes.

5  **Q.**   On December 6th, as you testified earlier, you had some

6  questions about the 100 percent commitment on day one; correct?

7  **A.**   Funding.

8  **Q.**   The funding on day one.

9  **A.**   Yes.

10 **Q.**   Pardon me.

11      **MR. TORRES:**  Scroll up, please.

12 **Q.**   On December 7th, 2015, Mr. Rothenberg responds to your

13 email; correct?

14 **A.**   Yes.  Mr. Rothenberg -- no.  Yes, yes, yes.  Sorry.

15 You're pointing to the --

16 **Q.**   I'm sorry.  Let me clear these.

17 **A.**   Yes.

18 **Q.**   On December 7th, 2015, Mr. Rothenberg responds to your

19 email; correct?

20 **A.**   Yes.

21 **Q.**   In the last paragraph here or the bottom paragraph of his

22 response, he writes, "The fund deployment cycle is intended to

23 be approximately two years."

24      Do you see that, sir?

25 **A.**   Yes.

1          **MR. TORRES:**  Can we go to Exhibit 466, please.

2     **Q.**   In your testimony earlier, sir, you testified to

3     Exhibit 466.  Do you recall that?  It's an email -- the top of

4     the chain is a December 14th, 2015 email from Neil Devani to

5     Mike Rothenberg, cc'ing yourself, Lee Ming Tai, Katie Fanelli,

6     Priscilla Wong, and Lynne McMillan.

7          Do you see that, sir?

8     **A.**   Have we not just talked about this document?  I may -- I

9     thought that you were talking -- that we just discussed this

10    document.

11    **Q.**   We were previously discussing Exhibit 464.

12    **A.**   Oh, okay.

13    **Q.**   This is Exhibit 466.  But you are correct, there are some

14    overlaps --

15    **A.**   Right.

16    **Q.**   -- in these emails.

17         So the way the documents were produced, they contain some

18    of the emails but not the full chain.  And some of them contain

19    specific exhibits while others don't.

20    **A.**   Okay.  Right.

21    **Q.**   There are some attachments to this email; correct?

22    **A.**   Yes.

23    **Q.**   I'm going to specifically ask you a few questions about

24    the attachments to this email.

25    **A.**   Sure.

1      **MR. TORRES:**  If we can go to page 14, please.

2   **Q.**   Page 14 of Exhibit 466 is an attachment to the email.  And

3   this is the front page of the attachment titled "Rothenberg

4   Ventures 2016 Feeder Fund LP, Amended and Restated Exempted

5   Limited Partnership Agreement."

6      Do you see that, sir?

7   **A.**   Yes.

8      **MR. TORRES:**  Page 38, please.

9   **Q.**   Page 38 of the agreement has a section titled "8.1,

10  Management."

11     Do you see that, sir?

12  **A.**   Yes.

13  **Q.**   And the first sentence identifies "The General Manager

14  [sic] shall have the sole and exclusive right to manage,

15  control and conduct the affairs of the Partnership and to do

16  any and all acts on behalf of the Partnership..."

17     Do you see that, sir?

18  **A.**   Yes.

19     **MR. TORRES:**  Scroll up on page 38 to section 8.4,

20  please.

21     **THE COURT:**  Mr. Torres, about how much longer do you

22  think you have with this witness?

23     **MR. TORRES:**  Eleven minutes.

24     **THE COURT:**  Mr. Kleinman, do you think you'll have

25  redirect?

1          **MR. KLEINMAN:**  No.

2          **THE COURT:**  Okay.  Go ahead.

3   **BY MR. TORRES:**

4   **Q.**   Section 8.4 is titled "Investment Opportunities,

5   Investment Restrictions, Conflicts of Interest."

6          Do you see that, sir?

7   **A.**   Yes.

8          **MR. TORRES:**  Can you scroll down to page 39,

9   section 8 -- 8.4(b -- (b)(1).

10  **Q.**   It reads, "The General Partner may, in its sole

11  discretion, effect the sale of all or substantially all of the

12  assets of the Partnership in a single transaction or series of

13  related transactions to one or more private investors, groups,

14  partnerships, or corporations..."

15         Do you see that, sir?

16  **A.**   Yes.

17  **Q.**   8.4 section (b)(2) reads "May, from time to time, cause

18  the Partnership to loan to the General Partner...or the

19  Management Company on an unsecured basis a loan..." with

20  further language in that paragraph.  Do you see that, sir?

21  **A.**   Yes.

22         **MR. TORRES:**  Page 55, please.

23  **Q.**   Page 55, section 15.4 titled "Indemnification."  Do you

24  see that, sir?

25  **A.**   Yes.

1          **MR. TORRES:**  Go to page 62, please.

2    **Q.**    And -- finally for this document, sir, page 62,

3    Exhibit 466, section 15.16 titled "Discretion" reads,

4    "Notwithstanding any other provision of this Agreement or any

5    applicable provision of law or equity, whenever the General

6    Partner is permitted or required pursuant to this Agreement to

7    make a decision or act in any manner in its 'sole discretion,'

8    'discretion' or under the grant of similar authority or

9    latitude, the General Partner shall be entitled to consider

10   only such interests and factors as it desires, including its

11   own interests, and shall, to the fullest extent permitted by

12   applicable law, have no duty (including any fiduciary duty) or

13   obligation to give any consideration to any interest or factors

14   affecting the Partnership, the Limited Partners or any other

15   Person, or in its 'good faith' or under another expressed

16   standard, the General Partner shall act under such express

17   standard and shall not be subject to any other or different

18   standards."

19         Do you see that, sir?

20   **A.**    Yes.

21          **MR. TORRES:**  Pull up Exhibit 471, please.

22   **Q.**    In your testimony earlier, sir, you testified about the

23   contents of Exhibit 471, which is an email from Katie Fanelli

24   to yourself, Lee Ming Tai, Mr. Rothenberg, on February 18th,

25   2016.  Do you remember this exhibit, sir?

1    **A.**   Yes.

2    **Q.**   This correspondence had to do with a CY Capital invoice;

3    correct, sir?

4    **A.**   Yes.

5    **Q.**   CY Capital paid this invoice, sir?

6    **A.**   I believe so, yes.

7         **MR. TORRES:**  You can take the exhibit down,

8    Mr. Fakhoury.

9    **Q.**   Mr. Chiu, in preparation for your testimony today, you met

10   with attorneys for the Government; correct?

11   **A.**   Yes.

12   **Q.**   And in those meetings, you reviewed these documents?

13   **A.**   Yes.

14   **Q.**   As you sit here today, sir, you're aware that Rothenberg

15   Ventures 2016 Fund is now under new management; correct?

16   **A.**   Yes.

17   **Q.**   And that management -- excuse me.  Let me start over.

18        The Rothenberg Ventures funds are now managed by Burke

19   Robinson and JR Eppler; correct?

20   **A.**   Yes.

21   **Q.**   The -- the Rothenberg Ventures 2016 Fund has an LP

22   Advisory Board; correct?

23   **A.**   Yes.

24   **Q.**   And you're a member of that LP Advisory Board?

25   **A.**   Yes.

**Q.**   Mr. Chiu, as an LP of the 2016 Fund, have you received any distributions from investments into the 2016 Fund?

**A.**   Can you repeat the question again?

**Q.**   Sure.

As an LP of the 2016 Fund, has CY Capital received any distributions from its investments into the 2016 Fund?

**A.**   I believe we have.

**Q.**   Do you know the amount?

**A.**   I do not have it with me, no.

**Q.**   Have you received any quarterly updates or investment updates from Rothenberg Ventures Management?

**A.**   You mean now?

**Q.**   Yes.

**A.**   I don't think they were quarterly, but there were updates.

**Q.**   You've received some updates?

**A.**   Yeah.

            **MR. TORRES:**  One minute, Your Honor.

            **THE COURT:**  Yes.

                 (Defense counsel confer off the record.)

            **MR. TORRES:**  Thank you, Mr. Chiu.

        No further questions, Your Honor.

            **THE COURT:**  Thanks, Mr. Torres.

        Mr. Kleinman, redirect?

            **MR. KLEINMAN:**  No, Your Honor.  Thank you.

            **THE COURT:**  Mr. Chiu, thanks very much for your

1    testimony.  And thank you for coming from Hong Kong to give it.

2    You're excused as a witness.

3              **THE WITNESS:**  The pleasure is mine.  Thank you.

4              **THE COURT:**  All right.  Members of the jury, we are

5    just a couple minutes shy of our normal stopping place so I

6    think it makes sense to break now.

7         Remember my prior admonitions.  Enjoy your evening, and I

8    will see you tomorrow morning.  Thank you.

9              **THE CLERK:**  Please rise for the jury.

10             **THE COURT:**  Members of the jury, let me say one more

11   thing on the record.

12        When I thank a witness, it's not an endorsement of their

13   testimony.  Fortunately I don't have to decide what the facts

14   are.  You get to make that decision.  But I thank out of

15   courtesy and recognition of our witnesses.  In the interests of

16   justice, it's appropriate for me to say something.  Thank you.

17        (Proceedings were heard out of presence of the jury:)

18             **THE COURT:**  All right, Mr. Chiu.  You're welcome to

19   step down, if you like.

20        And we are outside the presence of the jury.

21        Mr. Kleinman, anything for the record?

22             **MR. KLEINMAN:**  No, Your Honor.  Thank you.

23             **THE COURT:**  Mr. Torres?

24             **MR. TORRES:**  No, Your Honor.

25             **THE COURT:**  On the Government's side, how are we

1    feeling about our time estimate?

2            **MR. KLEINMAN:**  We're feeling very good, Your Honor.

3    Do you want me to --

4            **THE COURT:**  Be more specific?

5            **MR. KLEINMAN:**  -- be more specific?  Give you an

6    estimate?

7            **THE COURT:**  It will not surprise you to learn that I

8    would like you to be more specific.

9            **MR. KLEINMAN:**  Potentially I think we're certainly --

10   we certainly think we can rest next week.  It's -- it's unclear

11   exactly what day.  Perhaps Wednesday or Thursday.

12           **THE COURT:**  Okay.  Just want to check periodically.

13   Thank you all.

14           **THE CLERK:**  Court is in recess.

15                  (Proceedings adjourned at 1:29 p.m.)

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, October 30, 2023

_Pamela Batalo Hebel_

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter