UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 17** |
| | ) | |
| vs. | ) | NO. CR 20-00266-JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | **Pages 3138 - 3319** |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, November 1, 2023 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          THOMAS A. COLTHURST, ESQ.
                        Attorney for the United States
                        Acting under Authority conferred by
                        28 USC §515
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                    BY: BENJAMIN K. KLEINMAN,
                        KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For Defendant:          MOEEL LAH FAKHOURY LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612
                    BY: HANNI M. FAKHOURY, ATTORNEY AT LAW

                        Law Office of Nathaniel J. Torres
                        338 Fillmore Street #4
                        San Francisco, California  94117
                    BY: NATHANIEL J. TORRES, ATTORNEY AT LAW


Reported By:            Pamela Batalo Hebel
                        CSR. No. 3593, FCRR, RMR


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

<u>**I N D E X**</u>

Wednesday, November 1, 2023 - Volume 17

<u>**GOVERNMENT'S WITNESSES**</u>                              <u>**PAGE**</u>  <u>**VOL.**</u>

<u>POLIZZOTTO, DOMINIC</u>
(SWORN)                                                3142   17
Direct Examination by Mr. Waldinger                    3143   17
Cross-Examination by Mr. Fakhoury                      3224   17
Redirect Examination by Mr. Waldinger                  3245   17
Recross-Examination by Mr. Fakhoury                    3252   17

<u>HAASE, DAVID</u>
(SWORN)                                                3255   17
Direct Examination by Mr. Walsh                        3257   17

<u>**E X H I B I T S**</u>

| <u>GOVERNMENT'S EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 197 | | 3159 | 17 |
| 199 | | 3161 | 17 |
| 211 | | 3171 | 17 |
| 225 | | 3185 | 17 |
| 241 | | 3216 | 17 |
| 242 | | 3218 | 17 |
| 341 | | 3267 | 17 |
| 343 | | 3273 | 17 |
| 344 | | 3281 | 17 |
| 348 | | 3295 | 17 |
| 356 | | 3310 | 17 |
| 361 | | 3292 | 17 |
| 364 | | 3317 | 17 |

## I N D E X

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 579 | | 3270 | 17 |
| 632 | | 3193 | 17 |

| | |
|---|---|
1   | <u>**Wednesday - November 1, 2023**</u>                    <u>**8:36 a.m.**</u>

2   |        <u>**P R O C E E D I N G S**</u>

3   |          **---oOo---**

4   |  (Proceedings were heard in the presence of the jury:)

5   |    **THE CLERK:**  Your Honor, now calling CR 20-00266-JST,

6   | United States vs. Michael Brent Rothenberg.

7   |  If counsel could please come forward and state their

8   | appearances for the record, starting with the Government.

9   |    **MR. WALDINGER:**  Good morning, Your Honor.  Kyle

10  | Waldinger, Nick Walsh and Ben Kleinman for the United States.

11  |    **MR. FAKHOURY:**  Good morning, Your Honor.  Hanni

12  | Fakhoury and Nate Torres on behalf of Mr. Rothenberg.  He's

13  | present, Your Honor.

14  |    **THE COURT:**  Good morning.  And all the jurors are in

15  | their assigned seats.  Good morning to you.

16  |    **JURORS:**  Good morning.

17  |    **THE COURT:**  We finished up with the witness yesterday

18  | at the conclusion of the proceedings.  So, Mr. Waldinger, let

19  | me ask you who the Government's next witness is.

20  |    **MR. WALDINGER:**  Your Honor, the Government calls

21  | Mr. Dominic Polizzotto.

22  |    **THE COURT:**  All right.  Members of the jury, you heard

23  | and read a lot of Mr. Polizzotto's name yesterday.

24  |  Good morning, Mr. Polizzotto.  I'm going to ask you to

25  | come up here to the witness stand.  You can see my courtroom

1    deputy is already standing there.  If you would remain

2    standing, raise your right hand and face her, please.

3                          **DOMINIC POLIZZOTTO**,

4    called as a witness for the Government, having been duly sworn,

5    testified as follows:

6              **THE WITNESS:**  Yes, I do.

7              **THE CLERK:**  If you could please state and spell your

8    last name for the court reporter.

9              **THE WITNESS:**  My name is Dominic, last name is

10   Polizzotto, P- as in Peter, O-L-I-Z-Z-O-T-T-O.

11             **THE CLERK:**  Thank you so much.  You can be seated.

12             **THE COURT:**  Mr. Polizzotto, you can take your mask off

13   while you are testifying.  That way the jurors will be able to

14   see your expression, and you will be able to drink water

15   whenever you're thirsty, which you're welcome to do.

16        Have you ever testified before?

17             **THE WITNESS:**  Yes.

18             **THE COURT:**  Oh, okay.  Well, I will give you the

19   abbreviated version.

20        The court reporter can't take down noises and gestures.

21   You have to use whole words.  If you will wait until the

22   lawyers finish their questions, they'll wait until you finish

23   your answers.  That way two people won't talk at the same time

24   so the court reporter can make a record.

25        The jurors are deciding the case.  Obviously, it's a jury

1    trial.  The jurors go all the way back to that TV.  So if you

2    could keep your voice up, stay reasonably close to the

3    microphone, that would be helpful to them.

4        If you don't know the answer to a question, you can just

5    say "I don't know."  If you don't remember something, you can

6    just say "I don't remember."

7        If the lawyer asks you a question and it's not clear, you

8    should say "The question is not clear to me," or ask them to

9    rephrase which I'm sure they would be happy to do.

10       Does that all make sense?

11           **THE WITNESS:**  Yes.

12           **THE COURT:**  Very good.

13       Mr. Waldinger, your witness.

14           **MR. WALDINGER:**  Thank you, Your Honor.

15                       **DIRECT EXAMINATION**

16   **BY MR. WALDINGER:**

17   **Q.**   Good morning, Mr. Polizzotto.

18   **A.**   Good morning.

19   **Q.**   Where do you work?

20   **A.**   Pilot Grove Management.

21   **Q.**   How long have you worked at Pilot Grove Management?

22   **A.**   Eighteen, 19 years.

23           **THE COURT:**  Mr. Polizzotto, would you move the

24   microphone so it's in front of you.  Thanks.

25   / / /

**BY MR. WALDINGER:**

**Q.**   Since about 2004?

**A.**   Correct.

**Q.**   What's your position at Pilot Grove?

**A.**   I'm the CEO.

**Q.**   That's a family office; is that correct?

**A.**   Correct.

**Q.**   Are you also an attorney?

**A.**   I am.

**Q.**   Where did you work before you worked at Pilot Grove?

**A.**   I was general counsel for a company called Horseshoe Gaming.

**Q.**   Is there a relationship between Horseshoe Gaming and Pilot Grove?

**A.**   The owners of Horseshoe Gaming, 92 percent of that ownership was one family.  It was the Binion family.  They sold that business in 2004, and they asked me to continue on being their attorney and overseeing investments for them.

**Q.**   Where did you work before you worked at Horseshoe Gaming?

**A.**   I was at a law firm in Indianapolis, Indiana, Ice Miller.

**Q.**   What kind of work did you do for the law firm?

**A.**   Bankruptcy, turnaround work, largely debtor side work.

**Q.**   Did you also become acquainted with the folks at Horseshoe Gaming while you were at that firm in Indianapolis?

**A.**   I did.  They were clients of the firm.

1  **Q.**  So you're a lawyer.  Where did you go to law school?

2  **A.**  Valparaiso University.

3  **Q.**  That's in Indiana?

4  **A.**  Correct.

5  **Q.**  When did you graduate from Valparaiso?

6  **A.**  1990.

7  **Q.**  Where did you get your college degree from?

8  **A.**  The University of Illinois at Chicago.

9  **Q.**  Is it true you grew up in the Chicago area?

10  **A.**  That's correct.

11  **Q.**  What was your degree in at the University of Illinois,

12  Chicago?

13  **A.**  I have a bachelor's of science and economics.

14  **Q.**  Going back to your job at Pilot Grove, I think you said

15  you're the CEO?

16  **A.**  Correct.

17  **Q.**  Have you also acted as in-house counsel at times?

18  **A.**  I have.

19  **Q.**  This -- the jury is familiar, I think, with what a family

20  office is, but I wanted to ask you some questions about Pilot

21  Grove.

22       Is one of the things that Pilot Grove Management does is

23  to make and manage investments on behalf of the family?

24  **A.**  Yes.

25  **Q.**  And what kinds of investments has Pilot Grove made over

1    the years?

2    **A.**    It would be easier to identify what we didn't invest in.

3    The goal is to have a diversified portfolio.  So real estate

4    development, multifamily real estate, commercial real estate,

5    stocks and bonds, equities, private venture, angel investing,

6    private equity middle market, manufacturing-type businesses.

7         We also own -- directly own and operate a horse -- operate

8    currently a horse racetrack and a slot machine route in Wyoming

9    and real estate development projects in the greater Houston

10    area.

11    **Q.**    Okay.  So a pretty diversified portfolio?

12    **A.**    Yes.

13    **Q.**    And talking about you personally, so Pilot Grove

14    Management is in Las Vegas, Nevada; correct?

15    **A.**    Yes.

16    **Q.**    Is that where you live?

17    **A.**    It's my residence, but I travel a lot and I split my time

18    largely between the Chicagoland area and Las Vegas.

19    **Q.**    So you're in both places?

20    **A.**    Correct.

21    **Q.**    In 2015, did you become aware of an individual named Mike

22    Rothenberg as well as entities named Rothenberg Ventures

23    Management Company and River Studios?

24    **A.**    Yes.

25    **Q.**    How did you find out about Mr. Rothenberg, Rothenberg

1    Ventures, and River Studios?

2    **A.**    I received a call from a gentleman named David Frank.  I

3    did not know David.  It was kind of a call out of the blue.  He

4    had come across me probably on LinkedIn.  We ironically went to

5    the same high school but at different times.  I did not know

6    David.

7        David said he was kind of in the Silicon Valley area,

8    San Francisco Bay Area, and if we were interested in venture

9    opportunities, he had some things he would like to show us.

10   **Q.**    Is one of the things that he showed you related to

11   Mr. Rothenberg?

12   **A.**    Yes.  He made the introduction to Mr. Rothenberg and to

13   his companies.

14   **Q.**    Do you recall when that was?

15   **A.**    I get my years mixed up.  It was either the end of '14 or

16   the end of '15.

17   **Q.**    I put some documents up on the witness stand, and one of

18   them is marked United States Exhibit 188.  Do you see that

19   document?

20   **A.**    I do.

21   **Q.**    And we won't go into this in detail.

22       **MR. WALDINGER:**  Ms. Margen, if you could just pull up

23   the first page of that.  That is in evidence.

24   **Q.**    Mr. Polizzotto, does that refresh your recollection as to

25   when Mr. David Frank reached out to you?

1    **A.**    Yes.  At the last quarter of 2015.

2    **Q.**    This email is dated October 9th; is that right?

3    **A.**    Yes.

4    **Q.**    I won't ask you a lot of questions about this, but I will

5    ask whether you reviewed the materials that Mr. Frank provided

6    to you?

7    **A.**    Yes.

8    **Q.**    What was your understanding from reviewing the materials

9    about Mr. Rothenberg's relationship with the company River

10   Studios?

11   **A.**    My understanding from the materials was that

12   Mr. Rothenberg had created River Studios to produce content for

13   the augmented reality/virtual reality world, and that

14   Mr. Rothenberg owned it one hundred percent, but he needed

15   investors for a variety of reasons, but generally speaking, to

16   grow the company.

17   **Q.**    And this email shows that it was sent also to a man named

18   Lawrence Weisman?

19   **A.**    Correct.

20   **Q.**    You're aware that the jury has heard from Mr. Weisman?

21   **A.**    Yes.

22   **Q.**    And that's -- you know him as Larry?

23   **A.**    Yes.

24   **Q.**    Did Mr. Weisman do additional research on Mr. Rothenberg,

25   Rothenberg Ventures, and River Studios?

1    **A.**    Yes.

2    **Q.**    Did that include Mr. Weisman traveling here to the Bay

3    Area to visit Rothenberg Ventures and River Studios?

4    **A.**    Yes.

5    **Q.**    Did you ultimately, or at least in the short term, attend

6    a meeting in Las Vegas with Mr. Rothenberg?

7    **A.**    I did.

8    **Q.**    Do you recall when that was?

9    **A.**    The first week of January, 2016.

10            **MR. WALDINGER:**    Ms. Margen, let's pull up Exhibit 194,

11    which I believe is in evidence.  Let's blow up the top half of

12    that screen.

13    **Q.**    Mr. Polizzotto, does that email, Exhibit 194, anchor you

14    to the location and exact date of your meeting with

15    Mr. Rothenberg?

16    **A.**    Yes.

17    **Q.**    And when was that?

18    **A.**    We met -- we met on -- it looks like January 7th in the

19    Terrace Pointe Cafe at the Wynn Casino in Las Vegas.

20    **Q.**    What was going on in Las Vegas at that time?

21    **A.**    It was the Consumer Electronics Show.

22    **Q.**    Was it your understanding that Mr. Rothenberg was in town

23    because of that show?

24    **A.**    It was.

25    **Q.**    Was that the only meeting that you had with

1    Mr. Rothenberg?

2    **A.**    No.

3    **Q.**    When did you have other meetings with Mr. Rothenberg?

4    **A.**    We met with Mr. Rothenberg again beginning of February.

5    It was the week leading up to the Super Bowl.

6    **Q.**    That's February of 2016?

7    **A.**    Yes.

8    **Q.**    I'm going to ask you in a bit some questions about both of

9    those meetings, but I first want to ask you whether after this

10   meeting on January 7th at the Wynn, did you receive additional

11   information in the form of an email and a deck from Mr. Frank?

12   **A.**    I did.

13   **Q.**    And there should be, again, in the stack of documents in

14   front of you what's been marked as United States Exhibit 195.

15        **MR. WALDINGER:**    And if, Ms. Margen, we could bring

16   that up, please.

17   **Q.**    Mr. Polizzotto, do you recognize this as an email that you

18   received from Mr. Frank after your meeting with Mr. Rothenberg?

19   **A.**    I do.

20   **Q.**    Who else was at that meeting at the Wynn?

21   **A.**    It was Larry, myself, Mr. Rothenberg, and David Frank.

22   **Q.**    Do you recall what was discussed during that meeting?

23   **A.**    It was, you know, a general meet-and-greet since it was

24   the first time I had met Mr. Rothenberg.  It was also a pitch

25   from Mr. Rothenberg to make an investment in River Studios and

1    ancillarily a discussion of his funds?

2    **Q.**    Do you recall at that time your interest in making either

3    of those investments?

4    **A.**    I -- I had interest.  I, you know, needed to do more due

5    diligence, understand the structure, but I was interested in

6    pursuing it.

7    **Q.**    You testified earlier that you also had a meeting with

8    Mr. Rothenberg around the Super Bowl in 2016?

9    **A.**    Yes.

10   **Q.**    Was that here in the Bay Area?

11   **A.**    It was.  It was in Mr. Rothenberg's office.

12   **Q.**    So I want to ask you about the meetings that you had.  In

13   the -- in the document that we have up now, which is

14   Exhibit 195, there's a statement in the first line of the -- of

15   this bottom paragraph -- I should say there's a line in the

16   paragraph that begins "since the fall," and the line talks

17   about Mr. Rothenberg bootstrapping River Studios.  Do you see

18   that?

19   **A.**    I do.

20   **Q.**    And it says "bootstrapped out of his own pocket."

21       Did you ever have conversations with Mr. Rothenberg about

22   that fact?

23   **A.**    We had multiple conversations about that.

24   **Q.**    What did he say about his relationship personally and

25   financially with River Studios?

1    **A.**    Mr. Rothenberg explained that he was the sole owner of

2    River Studios and that he was contributing all of the capital

3    to date.  He was needing to increase the capital in the

4    company, and that's why he was willing to enter into agreements

5    with investors, but that he owned 100 percent of it and he was

6    responsible for all of its financials, he put all the money in.

7    **Q.**    Did you have concerns about -- concerns or questions about

8    his ownership?

9    **A.**    Yes.

10    **Q.**    And why was that?

11    **A.**    It -- it's fairly unusual to talk to folks of -- that

12    invest the way we do and see a company that is owned solely by

13    one person who's put all the money in and to have a company

14    that professed to be as advanced as it was with its

15    opportunities and find out that one person was responsible for

16    all of that.  It just seemed unusual.

17    **Q.**    Okay.  And were you asking him, then, questions?  Is that

18    why you were asking him questions about his ownership?

19    **A.**    I was asking him questions about his ownership for a

20    number of reasons.

21         The structure that had been proposed by David Frank and

22    Mr. Rothenberg was one where he would entertain selling

23    25 percent of the company, I think, for $20 million.  And so,

24    you know, I kind of had a multitude of concerns.

25         The first was the unusual nature of the company being

1    advanced as far as it is without other investors.

2         The second was I needed to know that what Mr. Rothenberg

3    was selling me was his to sell.

4         And thirdly, I needed to know, you know, that there were

5    really no other investors because at points in time in the

6    evolution of a company, you know, people who have put money in

7    expect to have a voice at the table and I needed to know who

8    those people would be, if they were people I'd want to be in

9    business with, if I thought they were rational, if they added

10   any value beyond just their dollars.

11        Those were probably the three primary things I was trying

12   to get at.

13   **Q.**   Okay.  And so it sounds like it wasn't just Mr. Rothenberg

14   saying things; it was you asking questions to get to those

15   three primary things that you said you were concerned about.

16   **A.**   Yeah.  I asked -- I asked a number of times.  I just -- as

17   I said, it was unusual and it surprised me.

18   **Q.**   Okay.  And what did Mr. Rothenberg say when you asked him

19   about his ownership and about whether there had been outside

20   funding?

21   **A.**   Mr. Rothenberg was consistent in his reputation --

22   representations to us that he owned one hundred percent of the

23   company and that he had provided all the financial resources

24   for the company himself.  There were no other investors.  It

25   was only him.

1          **MR. WALDINGER:** Staying on the exhibit that we have,

2    Exhibit 195, Ms. Margen, let's go to page 27, please.

3    **Q.** This page of Exhibit 195 is up on the screen. Do you see

4    that, Mr. Polizzotto?

5    **A.** I do.

6    **Q.** Is this consistent with your understanding of what

7    Mr. Rothenberg was looking for?

8    **A.** Yes.

9    **Q.** Can you -- can you again explain, with respect to River

10   Studios, what your understanding was based on the materials

11   that you reviewed and your conversations with Mr. Rothenberg

12   about why Mr. Rothenberg was seeking outside investment now for

13   River Studios.

14   **A.** I'm sorry. Can you ask that again. I'm not --

15   **Q.** That was a long question.

16   **A.** Yeah.

17   **Q.** What was your understanding as to why Mr. Rothenberg was

18   seeking outside investment at that time in early 2016 for River

19   Studios? What was he going to do with the money?

20   **A.** Primarily he -- so generally speaking, what we were told

21   by Mr. Rothenberg is there was significant opportunity in the

22   marketplace to acquire other studios and to get out in front of

23   the technology and kind of be first to market with great

24   virtual reality content.

25          When we talked specifically about what he would do with

1    the -- with the funds, it was buy other companies, smaller

2    virtual reality studios, produce content, you know, and, you

3    know, make payroll, keep the lights on.  You know, the general

4    costs of operating any business.

5    **Q.**   So payroll, keeping the lights on, that's often called

6    runway?

7    **A.**   Yes.  Yes.

8    **Q.**   And on this page of Exhibit 195, it specifically talks

9    about the primary use of capital, and I think you mentioned

10   acquiring smaller studios?

11   **A.**   Yes.

12   **Q.**   Is that consistent with this phrase "to roll up M&A talent

13   in VR"?

14   **A.**   Yes.

15   **Q.**   I think you also said that it was your understanding that

16   he wanted to produce more VR content?

17   **A.**   Correct.

18   **Q.**   Which sounds similar, at least, to "premium content

19   opportunities in the pipeline"?

20   **A.**   Yes.

21   **Q.**   At any -- at any point in any of the materials that you

22   reviewed or in any of your conversations with Mr. Rothenberg,

23   did he say anything along the lines of "I've -- I've put a lot

24   of money into the company and I'd like to get paid back and

25   that's one of the things that I want to do with any investment

1   from Pilot Grove"?

2   **A.**   No.

3   **Q.**   Did he ever tell you that he needed the funds to pay back

4   money that he had taken from his venture capital funds?

5   **A.**   No.

6   **Q.**   If Mr. Rothenberg had told you either of those things,

7   would that have mattered to your decision as to whether to

8   invest in River Studios?

9   **A.**   Yes.

10  **Q.**   Why would -- why would either of those facts have mattered

11  to you, Mr. Polizzotto?

12  **A.**   The -- the company needed money to grow, and if we're

13  putting money in only to have it go out to someone else who

14  lent it money or to Mr. Rothenberg, it wouldn't be in the

15  company to operate the company.  And, you know, the company

16  would be in the same position it had been in, but someone else

17  would have my money.

18      So that was, you know, one of the primary reasons I would

19  have not done it.

20      The other is, you know, depending on when he would have

21  told me that, right, I'd already been told the company has no

22  debt, the company has no other investors, "I'm the sole" -- I

23  being Mr. Rothenberg -- "I'm the sole money behind this.  I

24  have 100 percent ownership."

25  **Q.**   And then all of a sudden if you found out that were not

1    true, say in February of 2016, would that have caused you

2    concerns to learn that new fact?

3    **A.**    Without a doubt.  By that point, I'd been told that that

4    was the case so many times, I would have just walked away from

5    the transaction without exploring it any further because I

6    would have -- I would have felt like something was amiss and I

7    wouldn't have wanted any part of it.

8    **Q.**    But at this time in, I guess, we're in a deck now that you

9    received in January of 2016, at that point, your belief was

10   that Mr. Rothenberg owned a hundred percent of the company?

11   **A.**    Correct.

12   **Q.**    Again, that's because he told you that?

13   **A.**    Correct.

14   **Q.**    Did you begin the diligence process to look into an

15   investment in River Studios shortly after that meeting at the

16   Wynn on January 7th of 2016?

17   **A.**    Yes.

18          **MR. WALDINGER:**  Ms. Margen, if we could pull up what's

19   been marked, I think, for identification purposes only as

20   Exhibit 197.

21   **Q.**    And this should come up on your screen, Mr. Polizzotto.

22   **A.**    Yes.  Yes.

23   **Q.**    What is Exhibit 197?

24   **A.**    It is an email.

25   **Q.**    And what is the date of the email?

1    **A.**    January 13th, 2016.

2    **Q.**    Who were the sender and recipients?

3    **A.**    I was the sender.  I sent it to Mr. Rothenberg.  I carbon

4    copied David Frank and Larry Weisman.

5    **Q.**    Was this an email that you sent to Mr. Rothenberg

6    requesting diligence items with respect to River Studios?

7    **A.**    Yes.

8    **Q.**    Was this related to Pilot Grove's potential investment in

9    River Studios?

10    **A.**    Yes.

11    **Q.**    Are emails like this used at Pilot Grove in the regular

12    course of business?

13    **A.**    They are.

14    **Q.**    And does Pilot Grove keep and maintain emails such as

15    these in the regular course of business?

16    **A.**    Yes.

17    **Q.**    And in fact, because they were kept and maintained, Pilot

18    Grove was able to provide this to the Government in the course

19    of the investigation?

20    **A.**    Correct.

21          **MR. WALDINGER:**  Your Honor, I would move Exhibit 197

22    into evidence.

23          **THE COURT:**  Any objection?

24          **MR. FAKHOURY:**  No, Your Honor.

25          **THE COURT:**  197 is admitted.

1              (Government's Exhibit 197 received in evidence.)

2                      (Exhibit published to jury.)

3      BY MR. WALDINGER:

4      Q.   Mr. Polizzotto, we won't spend a lot of time on this, but

5      I do want to just point out, is this list of things that begins

6      "corporate records and general information" and ends

7      "accounting and financial reporting" sort of your standard

8      request at Pilot Grove?

9      A.   Yes.

10     Q.   Did you -- so you send this out to a lot of -- a lot of

11     people or entities that you're considering investing in?

12     A.   Correct.

13     Q.   And what is your belief as to whether all of those

14     recipients would be able to provide what's requested?

15     A.   I'm sorry.  Can you say that again?

16     Q.   Do you -- let me just -- let me ask a different question.

17          In the middle of the first paragraph here, you say, "We

18     understand that you have been running the business" -- or "the

19     company informally until now."

20          What was your understanding as to whether Mr. Rothenberg

21     would be able to give you a list of everything here?

22     A.   At that time, I fully assumed he didn't have everything.

23     When you have no -- when you have no partners and no lenders to

24     report to, you tend to be lax in your lending -- or in your

25     documentation.

1    **Q.**    And were you looking, however, to get as much information

2    as you could get?

3    **A.**    We were.

4            **MR. WALDINGER:**    Thank you, Ms. Margen.    We can take

5    that down.

6    **Q.**    Did it take Mr. Rothenberg some time before he began to

7    provide Pilot Grove and you and Mr. Weisman materials in

8    response to your request?

9    **A.**    Yeah.    There was a lag.    It didn't come quickly.

10   **Q.**    In the meantime, did you and Mr. Weisman schedule that

11   trip to San Francisco around Super Bowl time?

12   **A.**    We did.

13   **Q.**    In advance of that trip, did you receive an invitation to

14   attend the Super Bowl?

15   **A.**    We did.    I did.

16   **Q.**    Did you accept that invitation?

17   **A.**    No.

18   **Q.**    Do you recall the exact dates of your trip to

19   San Francisco?

20   **A.**    I do not.

21           **MR. WALDINGER:**    Let's -- Ms. Margen, let's pull up

22   what's been marked for identification purposes only as

23   Exhibit 199.

24   **Q.**    And, Mr. Polizzotto, I'll give you a copy of that.

25           What is this document, Exhibit 199?

1  **A.**    It is an itinerary for a trip.

2  **Q.**    And was this sent to you by your assistant?

3  **A.**    It was.

4  **Q.**    And is this the itinerary for your trip to San Francisco

5  in February of 2016?

6  **A.**    It is.

7  **Q.**    Was this also kept by Pilot Grove in the ordinary course

8  of business?

9  **A.**    Yes.

10         **MR. WALDINGER:**  Your Honor, I would move to admit

11  Exhibit 199.

12         **THE COURT:**  Any objection?

13         **MR. FAKHOURY:**  No, Your Honor.

14         **THE COURT:**  199 is admitted.

15         (Government's Exhibit 199 received in evidence.)

16                (Exhibit published to jury.)

17  **BY MR. WALDINGER:**

18  **Q.**    Does this refresh your recollection, Mr. Polizzotto,

19  starting on page 3, going to page 4 of the exhibit, as to the

20  potential days that you would have had a meeting with

21  Mr. Rothenberg?

22  **A.**    Yes.

23  **Q.**    And do you recall whether it was February 4th or

24  February 5th?

25  **A.**    It was February 5th.

1    **Q.**    Okay.  That's your recollection today?

2    **A.**    Yes.

3    **Q.**    What did you talk about during that meeting?

4    **A.**    We -- there was an open house of sorts going on, so we

5    experienced some of the technology, wore some of the virtual

6    reality glasses, watched other folks do it, wear the glasses

7    and participate in things like swinging a golf club.

8         And then we had a meeting with Mr. Rothenberg to discuss

9    the investment in River Studios.

10   **Q.**    And during that meeting, did Mr. Rothenberg say anything

11   again about his ownership in River Studios?

12   **A.**    He just confirmed, you know, the things he had told me

13   previously, he was the sole owner, there was no debt, there was

14   no other investors, partners.

15   **Q.**    At that time, in February-- early February of 2016, had

16   Pilot Grove yet made a commitment to invest in River Studios?

17   **A.**    No.

18        **MR. WALDINGER:**  Ms. Margen, if you could pull up

19   what's been marked as Exhibit 203.

20   **Q.**    Mr. Polizzotto, there may be a copy of that up there.  I'm

21   not sure.

22        This is already in evidence.  I hand you a copy of

23   Exhibit 203 as well.

24   **A.**    Up to you.  I can see it on the screen or you can hand it

25   to me.

**Q.**   What is Exhibit 203?

**A.**   It is an email.

**Q.**   And are there attachments to the email?

**A.**   There are.

**Q.**   What were the attachments?

**A.**   The attachments were the documents that were being sent by Mr. Rothenberg to us that represent what the deal would be.  It included a convertible promissory note and an investment -- investor deck.  And some other, you know -- a letter of intent with respect to the acquisition of Twisted Oak.

**Q.**   And some other diligence materials?

**A.**   Right.  Some other diligence materials.

**Q.**   The first page of the email refers to a meeting on February 5th; is that right?

**A.**   Yes.

**Q.**   In the second paragraph of the email, Mr. Rothenberg says, "If you would like an allocation before another investor takes the full round, let's hop on a call ASAP to finalize."

         Do you see that?

**A.**   I do.

**Q.**   Based on your discussions and interactions with Mr. Rothenberg in February of 2016, did there seem to be any time pressure with respect to your investment?

**A.**   Yeah.  He -- Mr. Rothenberg seemed urgent to kind of close the deal, both pushing from a timing perspective and pushing

1   that there were other investors who would, you know, fill the

2   round, so to speak, and there wouldn't be an opportunity for us

3   to invest.

4   **Q.**   This email is sent on February 17th, and you had -- you

5   had just been in San Francisco earlier that month; correct?

6   **A.**   Correct.

7   **Q.**   On February 17th of 2016, do you know where you were?

8   **A.**   I was in Illinois.

9   **Q.**   You were back in the Chicago --

10   **A.**   Chicagoland area, yeah.

11          **MR. WALDINGER:**   All right.   Ms. Margen, we can take

12   that down.

13          And let's pull up Exhibit 205, which I believe is also in

14   evidence.

15   **Q.**   I want to make sure that you have a copy of that as well,

16   Mr. Polizzotto.

17   **A.**   Thank you.

18   **Q.**   So Exhibit 205 is in evidence.   What is Exhibit 205?

19   **A.**   It is an email.

20   **Q.**   Is this also an email dated February 17th of 2016?

21   **A.**   It is.

22   **Q.**   Again, you've determined that you were in the state of

23   Illinois at that time?

24   **A.**   Yes.

25   **Q.**   Is this email addressed to you?

1    **A.**    It is.

2    **Q.**    And did you read this email on or about February 17th of

3    2016 when you were in Illinois?

4    **A.**    I did.

5    **Q.**    This email has a lot -- seems to have a lot of the same

6    information in terms of talking about a February 5th meeting;

7    correct?

8    **A.**    Yes.

9    **Q.**    And it also attaches a "Convertible Note"?

10   **A.**    Correct.

11   **Q.**    As well as an "Investor Presentation"?

12   **A.**    Yes.

13   **Q.**    And something called "Terms."

14   **A.**    Correct.

15   **Q.**    Do you see -- and those are listed here in the header.  Do

16   you see that?

17   **A.**    Yes.

18   **Q.**    With respect -- let me ask you some questions about the

19   convertible note.

20        What was your reaction to the convertible note when you

21   saw that, Mr. Polizzotto?

22   **A.**    I don't know if it was this time or the prior time, but

23   the note didn't represent the transaction we discussed.

24   **Q.**    Okay.  And what do you mean by that?

25   **A.**    We -- we had been talking about a direct investment in the

1    company where we would hold equity.  A convertible note is

2    something that allows to you eventually get equity, but you are

3    a lender and not an investor or owner when you make an

4    investment through a convertible note.  And then there was a

5    number of typos and other problems with the note in terms of

6    the language that was used.  But the big issue was it wasn't

7    the deal we had discussed.

8    **Q.**    Did you ultimately become comfortable with the convertible

9    note structure?

10   **A.**    Yes.

11   **Q.**    And in fact, later on in February, Pilot Grove or its

12   entity, Transcend VR, entered into a convertible note with Bend

13   Reality?

14   **A.**    That's correct.

15   **Q.**    What was Bend Reality?

16   **A.**    River Studios.

17   **Q.**    That's the legal name of the company?

18   **A.**    Yes.

19            **MR. WALDINGER:**  Just staying on Exhibit 205,

20   Ms. Margen, if you could dezoom that and page down a couple of

21   pages.

22   **Q.**    Page 3 here is the first page of the draft convertible

23   note; correct?

24   **A.**    Correct.

25            **MR. WALDINGER:**  And now, Ms. Margen, if we could go

1    just to the very last page of this exhibit, which is page 30, I

2    believe.

3    **Q.**    The last page, Mr. Polizzotto, is that the attachment that

4    was listed in the header as being the terms?

5    **A.**    Yes.

6    **Q.**    What did this slide depict to you?  What did you

7    understand this slide to mean?

8    **A.**    Many of the same representations, so River Studios is

9    looking to expand and scale up in the virtual reality world.

10   They were raising $20 million to do it.  Mr. Rothenberg would

11   give up 25 percent of the company for $20 million, and the use

12   of that money was going to be to develop content, expand

13   in-house, and do acquisitions of other studios and, as I said

14   before, keep the lights on, pay the employees, et cetera.

15   **Q.**    That's the general runway?

16   **A.**    Yes.

17   **Q.**    You testified just now that there was a bit of time

18   pressure from Mr. Rothenberg for Pilot Grove to make a

19   decision.

20   **A.**    Yes.

21   **Q.**    And the -- I think you said the reason given was that some

22   other investor may come in and fill up the round?

23   **A.**    Correct.

24   **Q.**    Did Mr. Rothenberg ever tell you that there was time

25   pressure for Pilot Grove to invest because he really needed to

1  put money back into the -- into a couple of venture capital

2  funds?

3  **A.**    No.

4  **Q.**    And did he ever tell you at this time, in February of --

5  or February 17th of 2016, that he needed to pull capital or

6  pull money out of the company in order to repay him for his

7  prior investment?

8  **A.**    No.

9  **Q.**    You've been at Pilot Grove since 2004?

10 **A.**    Correct.

11 **Q.**    At this time in 2016, roughly you'd had around 12 years of

12 experience in investing?

13 **A.**    Yes.

14 **Q.**    With respect to the uses of capital that are listed here

15 on the right-hand side of this slide that's the last page of

16 Exhibit 205, the question I'm going to ask you, Mr. Polizzotto,

17 is what a recipient of an investment -- let me start over.

18       Are the uses that a recipient of an investment is going to

19 make of your capital something that you consider at Pilot Grove

20 in determining whether to make the investment?

21 **A.**    Yes.

22 **Q.**    And can you explain that to the jury.  Why are the uses of

23 capital important for Pilot Grove in determining whether to

24 make an investment?

25 **A.**    So anytime you look at investments, it's fairly standard

1   that there will be a page identified usually as sources and

2   uses, where will the money come from and what will be done with

3   the money.

4        If I look at this in this example -- I look at this and it

5   says:  General runways, studio acquisition, produce content.

6   Those are consistent with what I had been told.

7        If I had looked at this and it said:  Produce content and

8   open up a chain of car washes, I would say, well, I don't want

9   a chain of car washes.  It's kind of a staid business.  This is

10  supposed to be cutting edge.

11       So you're always asking what is going to be done with the

12  money.  And usually you can build in some safeguards to make

13  sure that's done with the money.  We've done deals where, you

14  know, we say, well, when you go to buy that, call us and we'll

15  pay it for you; right?  It's a critical piece of information.

16       If -- if you don't have the piece of information, what's

17  going to be done with the money, or if you're being told

18  something and something else is done with the money, it's an --

19  it's an enormous problem.

20  Q.   Okay.

21       MR. WALDINGER:  Ms. Margen, we can take that down.

22  Q.   We've only -- we've only shown one page of a convertible

23  note, and I promise you, Mr. Polizzotto, that we won't see that

24  many more pages.  But I want to just make sure for the record

25  that I have some of the drafts in.

1       And I'm going to have you look at Exhibit 211.  This has

2  been marked for identification purposes only.  This is -- this

3  is a 23-page exhibit.

4       Mr. Polizzotto, what is Exhibit 211?

5  **A.**   It is an email.

6  **Q.**   And is it in fact an email chain?

7  **A.**   It is.

8  **Q.**   Who's on the email chain?

9  **A.**   Larry Weisman, Mike Rothenberg, a gentleman named Martin

10  Mayo.

11  **Q.**   And was this -- was this document kept by Pilot Grove in

12  the ordinary course of its business related to its investment

13  in River Studios?

14  **A.**   It was.

15  **Q.**   Are there attachments to this email?

16  **A.**   There are.

17  **Q.**   What are the attachments?

18  **A.**   A redline version of the convertible promissory note and a

19  clean version.

20  **Q.**   Were those versions of the note that were being sent to

21  Mr. Weisman by Mr. Rothenberg?

22  **A.**   Yes.

23       **MR. WALDINGER:**  Your Honor, I would move Exhibit 211

24  into evidence.

25       **THE COURT:**  Any objection?

1          **MR. FAKHOURY:**  No, Your Honor.

2          **THE COURT:**  211 is admitted.

3          (Government's Exhibit 211 received in evidence.)

4                    (Exhibit published to jury.)

5          **MR. WALDINGER:**  Let's just -- we're going to look at

6     the second page, Ms. Margen.

7     **Q.**   I just wanted to note the change here and see if you could

8     give a little flavor.  We haven't gone through this document,

9     previous versions of this document with you today, but if

10    you -- but do you recall that when this convertible note came

11    out for Mr. Rothenberg, there was a $10 million figure here?

12    **A.**   Yes.

13    **Q.**   And what -- what is the change being made here on this

14    page of Exhibit 211?

15    **A.**   It's going from 5 million to 2 million.

16    **Q.**   Was -- is that a reflection of Mr. Rothenberg only

17    allowing Pilot Grove to invest $2 million?  Or was it a

18    function of Pilot Grove only wanting to invest 2 million?

19    **A.**   It was a function of Pilot Grove's decision to reduce its

20    exposure.

21    **Q.**   Okay.  And so this edit, although it appears to have been

22    made on Mr. Rothenberg's side, reflects Pilot Grove's request?

23    **A.**   Correct.

24    **Q.**   All right.  Thank you.

25          **MR. WALDINGER:**  Ms. Margen, we can take that down.

1    **Q.**    At some point in -- later in February 2016, did

2    Mr. Rothenberg provide you and Mr. Weisman with what he called

3    pro forma financials?

4    **A.**    He did.

5          **MR. WALDINGER:**    Ms. Margen, if we could pull up

6    Exhibit 212, please.    This document is in evidence.

7    **Q.**    Do you see that on your screen, Mr. Polizzotto?

8    **A.**    I do.

9    **Q.**    Now, Mr.-- Mr. Weisman is the chief investment officer;

10   correct?

11   **A.**    Correct.

12   **Q.**    And did he review this document?

13   **A.**    Yes.

14   **Q.**    Did you review it as well?

15   **A.**    I did.

16         **MR. WALDINGER:**    Ms. Margen, if we could go to the

17   second page of Exhibit 212 and blow that up.    I think you can

18   blow up all the text and that should be big enough.

19   **Q.**    Did you have any observations back in February of 2016

20   when you reviewed this document, Mr. Polizzotto?

21   **A.**    I -- I did.

22   **Q.**    And what were your observations?

23   **A.**    My first observation is that the net income number for

24   2015 was negative, meaning the company is spending more than

25   it's making and somebody has to fill that hole to get the bills

1    paid.

2    **Q.**    Okay.

3    **A.**    Same is true for 2016.

4    **Q.**    So the 2016 column you understood as being a

5    forward-looking summary?

6    **A.**    Yes.

7    **Q.**    Did -- and it shows -- these are negative numbers when

8    they're in parentheses; correct?

9    **A.**    Correct.

10   **Q.**    So that was a negative 3.578 million and a negative

11   6.270 million?

12   **A.**    Correct.

13   **Q.**    Did that cause you any concerns when you saw that?

14   **A.**    Yes and no.  You know, the financial implication of those

15   two things are that, you know in the 2015 year they've -- the

16   company has spent, you know, an estimate of $3.5 million more

17   than it made.  And it implies that when you put the facts

18   together, Mr. Rothenberg, having told us he was -- owned a

19   hundred percent, there were no borrowers, there were no loans,

20   he put in all the money, that implies that he put in the

21   $3.5 million.

22       When I look at the 2016 year and it shows a negative

23   6.2 million, it implies that these items above that are

24   categorized are what our dollars and other people's dollars

25   presumably will be used for because that's how he's going to

1    get to -- that's how they're going to get into a position to

2    pay those bills as they come in 2016.

3    **Q.**   Okay.  From your investment and other people's

4    investments?

5    **A.**   Correct.

6    **Q.**   And it shows a cash position here of what?

7    **A.**   $452,000.

8    **Q.**   Reading this, what did you understand that cash position

9    to be or the date of when the company had that cash?

10   **A.**   20/31 [sic] of 2015.

11   **Q.**   Or 12/31?

12   **A.**   I'm sorry.  12/31, yeah.

13   **Q.**   So that reading this, it would be your understanding that

14   River Studios' bank account at the end of 2015 would show that

15   much cash?

16   **A.**   Correct.

17           **MR. WALDINGER:**  Okay.  We can take that down,

18   Ms. Margen.

19       And if we could pull up Exhibit 215, which is in evidence.

20   **Q.**   So the email that we just saw that attached the pro forma

21   financials, Mr. Polizzotto, I believe was sent in the morning

22   of February 24th of 2016.  Do you see that this email,

23   Exhibit 215, is sent later in the day?

24   **A.**   Correct.

25   **Q.**   Who is Robert Friedman?

1    **A.**    Robert Friedman is an attorney in New York who specializes

2    in fund investments and private equity investments,

3    representing clients in that regard.

4    **Q.**    Is that Pilot Grove's attorney?

5    **A.**    Yes.

6    **Q.**    Based on the status of the negotiations or the progress of

7    the negotiations, did you and Mr. Weisman have your attorney

8    add a capitalization term to this convertible promissory note?

9    **A.**    Yes.

10          **MR. WALDINGER:**    And, Ms. Margen, if we could go to

11    page 18 of Exhibit 215.  And blow up the middle part of that

12    page.

13    **Q.**    Could you just read this capitalization term for the jury,

14    Mr. Polizzotto.

15    **A.**    Yeah.  It says -- it's subsection (g), Capitalization.

16    "One hundred percent of the outstanding equity securities of

17    the company, all of which are common equity, are owned of

18    record and beneficially by Mike Rothenberg.  There are no

19    outstanding options, warrants, or other securities or rights to

20    acquire equity securities of the Company or which are

21    convertible into or exchangeable for equity securities of the

22    Company."

23    **Q.**    Again, was this a provision that was added to the

24    convertible promissory note by Pilot Grove?

25    **A.**    It was.

1    **Q.**    Was this an important provision of the agreement?

2    **A.**    Critical.

3    **Q.**    And why is that?

4    **A.**    It -- it is the representation that legally binds in

5    writing the honesty and representation that Mr. Rothenberg

6    owned one hundred percent of the company, that there were no

7    lenders to the company, there were no other partners in the

8    company, there were no other folks who could come in and

9    effectively claim to be a partner, claim to own part of it,

10   et cetera.

11   **Q.**    And you testified earlier, I think there were at least

12   three reasons why you, Dominic Polizzotto, wanted to know and

13   confirm that Mr. Rothenberg owned a hundred percent of this

14   company.

15   **A.**    Yes.

16   **Q.**    I believe there might have been at least one more round of

17   edits that we won't go through.

18           **MR. WALDINGER:**    And we'll go right now to Exhibit 217,

19   Ms. Margen.

20   **Q.**    This document is in evidence.

21           Mr. Polizzotto, do you recognize that as the executed

22   convertible promissory note?

23   **A.**    I do.

24   **Q.**    Did you sign this document?

25   **A.**    I did.

1   **Q.**   What page is that?

2   **A.**   Page -- page 11 of the document.

3   **Q.**   And page 12 of the exhibit?

4   **A.**   Correct.

5   **Q.**   Did Mr. Rothenberg also sign this document?

6   **A.**   He did.

7   **Q.**   And that's -- you're signed in what we call -- is it

8   called counterparts?

9   **A.**   Correct.

10  **Q.**   And that's on page 11 of the exhibit.

11  **A.**   Correct.

12  **Q.**   Was there also a personal guaranty made by Mr. Rothenberg?

13  **A.**   Yes.

14  **Q.**   And is that on page 13 and 14 of Exhibit 217?

15  **A.**   Yes.

16          **MR. WALDINGER:**  Very briefly, let's go, Ms. Margen, to

17  page 6 of Exhibit 217.

18  **Q.**   Do you see the capitalization term there?

19  **A.**   Yes.

20  **Q.**   Now, we had just seen it added in Exhibit 215.  I will

21  read what Exhibit 215 says in paragraph 5(g) and ask you if

22  it's different.

23          Exhibit 215 had said "one hundred percent of the

24  outstanding equity securities of the company, all of which are

25  common equity, are owned of record and beneficially by Mike

Rothenberg."

Was that changed between Exhibit 215 and the final version?

**A.**   It was.

**Q.**   Did you understand that to be a substantive difference?

**A.**   I did not.

**Q.**   What does it say now in that first sentence of paragraph (g)?

**A.**   "Mike Rothenberg holds One Hundred Percent of the equity interests of the company."

**Q.**   Did you understand that to mean that he owned River Studios?

**A.**   I did.

**Q.**   What is the date of the convertible promissory note in Exhibit 217?

**A.**   February 24th, 2016.

**Q.**   Did Pilot Grove or the entity that it created end up funding this note?

**A.**   Yes.

**Q.**   And was that on or about the next day?

**A.**   Correct.

**MR. WALDINGER:**   Ms. Margen, let's go to the first page of 217.

**Q.**   What was the name of the entity that Pilot Grove used?

**A.**   Transcend VR.

1    **Q.**   Why did Pilot Grove set up a separate entity to make this

2    investment instead of just Pilot Grove Management making the

3    investment itself?

4    **A.**   Pilot Grove Management manages money for a captive group

5    of people, and not everybody invests in the same amount in the

6    same businesses.  So, for instance, somebody who is 85 might be

7    invested in a bond portfolio and they may not care to invest in

8    something that has -- that will take a long time to pay off

9    because they may not live to see it pay off.

10       All of our investments are therefore, whether it was to

11   invest in River Studios or invest in an apartment community, we

12   form a different LLC to identify who the right investors are

13   and what amounts we have them become members of the LLC.  And

14   then that LLC turns around and invests in the ultimate

15   underlying project, in this case, River Studios.

16   **Q.**   Got it.

17       Okay.  And so I think you said the investment was shortly

18   after February 24th of 2016.

19   **A.**   Correct.

20   **Q.**   Was that made out of a bank account set up for

21   Transcend VR in Las Vegas?

22   **A.**   It was, yes.

23   **Q.**   What's your bank in Las Vegas?

24   **A.**   Bank of America.

25       **MR. WALDINGER:**  Ms. Margen, I would like you to pull

1    up Exhibit 62.  This document is in evidence.

2            And let's go, Ms. Margen, to page 72.

3    **Q.**   Do you think you've seen this bank statement before,

4    Mr. Polizzotto?

5    **A.**   No.

6    **Q.**   And the bank statement is for what entity?

7    **A.**   Bend Reality.

8    **Q.**   Which is another name for what -- what company?

9    **A.**   River Studios.

10   **Q.**   This is a statement for the period ending December 31st,

11   2015.  Do you see that?

12   **A.**   I do.

13   **Q.**   If you recall when we were looking at Exhibit 212, which

14   was Mr. Rothenberg sending pro forma financials --

15   **A.**   Yes.

16   **Q.**   -- do you recall what the cash position represented to

17   Pilot Grove at that time for River Studios was?

18   **A.**   I believe it was 454,000 or thereabout.

19   **Q.**   How much money is in River Studios or Bend Reality's bank

20   account, according to this statement, at the end of December of

21   2015?

22   **A.**   $84,480.

23   **Q.**   If you had known that, would that have affected your

24   decision after reviewing the pro forma financials in

25   Exhibit 212?

1    **A.**    Yes.

2    **Q.**    Why is that?

3    **A.**    It would have -- well, first of all, because it's

4    inaccurate, but it would have implied either a deliberate

5    intent to deceive or an inability to accurately grasp reality.

6        **MR. FAKHOURY:**  Objection.  Move to strike.

7    Argumentive.

8        **THE COURT:**  Denied.

9        **MR. WALDINGER:**  Ms. Margen, if we could go to page 93

10    of this same exhibit, please.

11        Sorry.  Exhibit 62, page 93.  And let's blow up the bottom

12    half.

13    **Q.**    Mr. Polizzotto, do you see an entry dated February 25th of

14    2016 in the amount of $2 million?

15    **A.**    I do.

16    **Q.**    Again, this bank statement is not in Pilot Grove's

17    possession; correct?

18    **A.**    Correct.

19    **Q.**    Can you tell whether this relates to Pilot Grove's

20    investment into River Studios?

21    **A.**    It does.

22    **Q.**    How do you know that?

23    **A.**    It has a reference to the sender and it says Transcend VR

24    LLC.

25    **Q.**    And Transcend VR again was the LLC that you just described

1   having set up?

2   **A.**    Correct.

3   **Q.**    Would you note for the jury, Mr. Polizzotto, what the

4   balance was before that $2 million deposit came in from

5   transcend?

6   **A.**    $8,967.

7   **Q.**    And what does the bank statement show as the first

8   transaction after Transcend's deposit?

9   **A.**    It is a wire out of $50,000.

10          **MR. WALDINGER:**  Ms. Margen, we can go to the top of

11   the next page.

12   **Q.**    And if you could note for the jury and for the record what

13   the next transaction listed on page 94 of Exhibit 62 is.

14   **A.**    It is a wire out for $1.7 million.

15   **Q.**    Can you tell who the beneficiary is?

16   **A.**    I can.  It was Mike Rothenberg.

17   **Q.**    That left a balance of how much?

18   **A.**    258,967.

19   **Q.**    Seeing that today, do you have a reaction to seeing the

20   transactions for 50,000 and 1.7 million dollars immediately

21   following and on the day of Transcend's investment?

22          **MR. FAKHOURY:**  Objection.  Argumentive.

23          **THE COURT:**  Overruled.

24   BY MR. WALDINGER:

25   **Q.**    You may answer.

1    **A.**    Ask it again, please.

2    **Q.**    Seeing those transactions that occurred on the same day as

3    Transcend's deposit of $1.7 million and $50,000, do you have a

4    reaction?

5    **A.**    I do.

6    **Q.**    What's your reaction?

7    **A.**    Fairly negative.    Obviously the money wasn't available to

8    Mr. Rothenberg before our deposit.    It became available, and

9    then he -- he took it in -- took all but 250,000 of it

10   immediately in two large chunks.    It connects the dots for me

11   on the urgency that Mr. Rothenberg was expressing.

12   **Q.**    Do you have -- you don't have any personal knowledge as to

13   what happened with those funds after it was sent to wherever it

14   was sent?

15   **A.**    I do not.

16        **MR. WALDINGER:**    You can take that down, Ms. Margen.

17   **Q.**    After Transcend VR's investment into Pilot Grove, did you

18   and Mr. Weisman stay in touch with the folks at Rothenberg

19   Ventures and Mr. Frank about things in general, about River

20   Studios, about potential investments?

21   **A.**    We did.

22   **Q.**    And what -- what happened in the weeks and months

23   following that $2 million investment?

24   **A.**    There were a number of discussions, but they culminated in

25   us committing to make an investment in the 2016 Fund that

1    Mr. Rothenberg ran.

2    **Q.**    Did Pilot Grove also do that through another LLC that it

3    set up?

4    **A.**    It did.

5    **Q.**    And do you recall the amount of the commitment and the

6    amount of the actual investment?

7    **A.**    We committed to make an investment of a million dollars,

8    and the initial wire of capital, I believe, was 600,000.

9    **Q.**    Was that in June of 2016?

10    **A.**    Yes.

11    **Q.**    In the -- in the months leading up to that, did -- did you

12    make any additional visits to San Francisco?

13    **A.**    I did.

14    **Q.**    And did you come to San Francisco to visit Rothenberg

15    Ventures or River Studios?

16    **A.**    Yes.

17    **Q.**    And do you recall when that was?

18    **A.**    I don't remember the exact dates.  It -- I think it -- it

19    was around an event called Founders Field Day.

20        **MR. WALDINGER:**  Ms. Margen, if you could pull up what

21    has been marked for identification as Exhibit 225, 225.

22    **Q.**    Mr. Polizzotto, that will come up on your screen.

23        What is Exhibit 225?

24    **A.**    It's an email.

25    **Q.**    Who is that email to and from?

1  **A.**    It's from Mike Rothenberg to myself and Larry Weisman, and

2  it cc's Jonah Loop.

3  **Q.**    Do you recall who Jonah Loop was?

4  **A.**    I do not.

5  **Q.**    Was this an email that was received by Pilot Grove in the

6  regular course of business and thereafter maintained by Pilot

7  Grove?

8  **A.**    It is, yes.

9  **Q.**    And is it also an email from the defendant?

10  **A.**    It is.

11        **MR. WALDINGER:**  Your Honor, I would move into evidence

12  Exhibit 225.

13        **THE COURT:**  Any objection?

14        **MR. FAKHOURY:**  No, Your Honor.

15        **THE COURT:**  225 is admitted.

16      (Government's Exhibit 225 received in evidence)

17            (Exhibit published to jury.)

18  **BY MR. WALDINGER:**

19  **Q.**    Just to -- I think you said that you may have attended

20  Founder Field Day?

21  **A.**    Yes.

22  **Q.**    Does this -- this email is dated May 11th; correct?

23  **A.**    Correct.

24  **Q.**    There's a reference in the second paragraph in which

25  Mr. Rothenberg says, "Will I see you at Founder Field Day on

1    Monday?"

2    **A.**    Yes.

3    **Q.**    Does that help place you or place that event in time for

4    you?

5    **A.**    It does.

6    **Q.**    It must have been shortly after May 11th of 2016?

7    **A.**    Yes.

8    **Q.**    There is also some information that Mr. Rothenberg

9    provides you in the first paragraph.  Could you read that for

10    the jury, Mr. Polizzotto.

11    **A.**    "Dominic and Larry, we have some huge things brewing at

12    River Studios.  Two million plus in booked revenue with Sony,

13    10 million in the pipeline, opening an L.A. office and taking

14    the top VR guys from Disney/Maker among other recent

15    all-stars...Your 3 million option can be exercised in a couple

16    of weeks if you'd like, and I think you'll find us surpassing

17    our expectations."

18    **Q.**    What is the reference to the $3 million option,

19    Mr. Polizzotto?

20    **A.**    We originally started at 10 -- you know, Mr. Rothenberg

21    was asking for 20 million.  We started at 10.  Came down to 5.

22    Ultimately invested 2.  And then were given the option to add

23    in the additional 3 if we wanted to, and there was a window of

24    time during which we could do it.

25    **Q.**    And then referring to this statement by Mr. Rothenberg,

1    what does it mean to you to have 2-million-plus in booked

2    revenue?  What is booked revenue?

3    **A.**   Booked revenue would mean that within the accounting

4    system they're using, they acknowledge that they're entitled to

5    receive that revenue or have already received it.

6    **Q.**   All right.  Thank you.

7            **MR. WALDINGER:**  We can take that down, Ms. Margen.

8    **Q.**   Mr. Polizzotto, we spent a little bit of time talking

9    about the capitalization term in the convertible promissory

10   note.

11   **A.**   Okay.

12   **Q.**   And so I want to ask you whether at any time did you

13   receive communications from the folks at Rothenberg Ventures

14   about changing that capitalization provision?

15   **A.**   The company did and it was forwarded on to me.  Pilot

16   Grove did and it was forwarded on to me.

17           **MR. WALDINGER:**  All right.  Let's pull up what's been

18   marked as Exhibit 234 and has been admitted into evidence.

19   **Q.**   This is an email from someone named Justin Grooms to Larry

20   Weisman.

21   **A.**   Correct.

22   **Q.**   Did Mr. Weisman forward this email to you after he

23   received it?

24   **A.**   He did.

25   **Q.**   The jury is familiar with this document, but I'll still go

1    to the second page because I want to get your reaction to the

2    capitalization provision here.

3        That was a proposed change that was sent to Mr. Weisman

4    regarding changing paragraph 5(g) in the note.

5    **A.**    Correct.

6    **Q.**    And if you could read that and read what it says for the

7    jury, please.

8    **A.**    "Capitalization.  Entities controlled by Mike Rothenberg

9    or entities controlled by such entities collectively hold one

10   hundred percent of the equity interests of the company."

11   **Q.**    So I'll just read into the record what the -- what

12   Exhibit 217 says, which is the executed convertible promissory

13   note.  That says, "Mike Rothenberg holds one hundred percent of

14   equity interests of the company.  There are no outstanding

15   options, warrants, other securities or rights to acquire equity

16   securities of the company or which are convertible into or

17   exchangeable for equity securities of the company."

18       So my first question is, the second sentence that I read,

19   the proposed amendment completely deletes that; correct?

20   **A.**    Correct.

21   **Q.**    And with respect to the first sentence, the first sentence

22   used to say "Mike Rothenberg holds one hundred percent of

23   equity interests of the company."

24       What is the difference between what I just read from

25   Exhibit 217 and what is set forth in Exhibit 234?

1  **A.**   Well -- well, the difference is 234, the amendment, is

2  basically asking to change the language in the original note

3  such that Mr. Rothenberg professes to have control of entities

4  that hold an interest in River Studios.

5  **Q.**   Does this provision say anything about Mr. Rothenberg

6  owning any of what he controls?

7  **A.**   No.

8  **Q.**   What was your reaction when you read this after

9  Mr. Weisman forwarded it to you?

10  **A.**   I believe I called Larry and yelled at him.

11  **Q.**   Why did you yell at that poor guy?

12  **A.**   I -- I just felt like one of the things that was critical

13  that had been clearly and unambiguously represented to us

14  during the course of our relationship with Mr. Rothenberg, out

15  of the blue without explanation, nobody called to explain it,

16  was sent over changing this critical term.  And I just -- I

17  felt like -- I felt like we had been conned.

18  **Q.**   Did you have any reaction to the fact that it was not sent

19  to you?

20  **A.**   I did.  I -- I'm the attorney.  Everybody on

21  Mr. Rothenberg's side knew I was an attorney.  You know,

22  protocol would dictate you send the legal document to the

23  attorney.

24  **Q.**   All right.  Thank you.

25          **MR. WALDINGER:**  Ms. Margen, you can take that down.

1    **Q.**   Do you know whether you or Mr. Weisman responded to

2    Mr. Grooms at that time?

3    **A.**   I don't think we responded.

4    **Q.**   Did you receive, then, directly an email from

5    Mr. Rothenberg a few days later?

6    **A.**   I did.

7            **MR. WALDINGER:**   Ms. Margen, if we could pull up what's

8    been marked and it's actually been admitted into evidence as

9    Exhibit 235.

10   **Q.**   Mr. Polizzotto, do you recognize this exhibit?

11   **A.**   I do.

12   **Q.**   This is an email chain?

13   **A.**   Correct.

14   **Q.**   The original email is from who?

15   **A.**   Mr. Rothenberg.

16   **Q.**   Who did Mr. Rothenberg send that email to?

17   **A.**   Me, Larry, and he copied Martin Mayo, Kathleen, it looks

18   like Goodhart and Bill Broome.

19   **Q.**   What did Mr. Rothenberg say in this email?

20   **A.**   He expressed a desire to get on the phone as quickly as

21   possible, indicated that, you know, the future of the company

22   was at stake.  He says, I come to you hat in hand because I am

23   embarrassed by putting us all in this position.

24   **Q.**   And then can you read the next paragraph?

25   **A.**   Sure.

1        "Rothenberg and River Studios" -- I'm sorry.

2        "Rothenberg Ventures and River Studios worked so closely

3   together that corporate housekeeping was poor and that created

4   confusion later, especially for me because I've confused

5   control and ownership with everything related to these

6   companies."

7   **Q.**   Again, you met with Mr. Rothenberg at least twice,

8   correct, prior to Transcend VR's investment?

9   **A.**   Correct.

10  **Q.**   In those conversations, did the topic of Mr. Rothenberg's

11  ownership of River Studios come up?

12  **A.**   Yes.

13  **Q.**   And did he make representations to you about his

14  ownership?

15  **A.**   He did, yes.

16  **Q.**   Did he ever tell you in those conversations that he needed

17  to go back and look at a cap table?

18  **A.**   He did not.

19  **Q.**   Did he say that corporate housekeeping was poor and that

20  he thought he owned it?

21  **A.**   No.

22  **Q.**   How sure was he -- how sure was he, based on your

23  impression, that he owned one hundred percent of River Studios?

24  **A.**   He was sure of it.

25  **Q.**   When you received this email on August 13th, do you recall

1   what day of the week that was?

2   **A.**   It was a Saturday.

3   **Q.**   This came early in the morning on a Saturday?

4   **A.**   It did.

5   **Q.**   Is this the kind of email that you like to get on a

6   Saturday morning?

7   **A.**   No.

8   **Q.**   What was your reaction?

9   **A.**   I -- as I said before, I felt like we were being conned.

10  And this -- this is when, you know, I went over the top.  I

11  went from I think we're being conned to, okay, we're being

12  conned.

13          **MR. WALDINGER:**   Ms. Margen, if you could take this

14  down and put up what's been marked for identification as

15  United States Exhibit 632.

16  **Q.**   And do you recognize this exhibit?

17  **A.**   I do.

18  **Q.**   What is that?

19  **A.**   This is an email from me to Larry.

20  **Q.**   And did you send it about six minutes after Mr. Rothenberg

21  sent the email that was in Exhibit 235?

22  **A.**   Yes.

23  **Q.**   And was this an email sent in the ordinary course of Pilot

24  Grove's business related to its investment in River Studios?

25  **A.**   It is.

1          **MR. WALDINGER:**  Your Honor, I would move Exhibit 632

2   into evidence.

3          **THE COURT:**  Any objection?

4          **MR. FAKHOURY:**  Irrelevant.

5          **THE COURT:**  632 is admitted.

6          (Government's Exhibit 632 received in evidence.)

7                  (Exhibit published to jury.)

8   **BY MR. WALDINGER:**

9   **Q.**  I'm not going to have you read it.  There's some

10  expletives here that reflect -- I think you said you went from

11  thinking you were -- had been conned to something else.  And --

12  **A.**  So when I sent the email, I -- as I said, it was in

13  reaction to the immediately prior email from Mr. Rothenberg,

14  and it was the tipping point for me.  It was when my brain said

15  there's something nefarious going on.

16         And I say in the email to Larry this confirms all of our

17  worst fears and suggests that we are in trouble.  And then I

18  had some cuss words.

19  **Q.**  Choice words.

20         Where did you go to high school again?

21  **A.**  I went to Fenwick High School in Oak Park, Illinois.

22  **Q.**  That's a Catholic school?

23  **A.**  It is a Catholic school.

24  **Q.**  What would the brothers and priests say and the nuns?

25  **A.**  Well, that was back in the day.  That would have probably

1    got me paddled pretty bad.

2    Q.   When you say "our worst fears," were those fears coming

3    out of -- coming out of the prior email that you guys -- or

4    that Mr. Weisman had received from Mr. Grooms?

5    A.   Yes.

6    Q.   Is it true that shortly after this email, articles began

7    to be published about Rothenberg Ventures and Mr. Rothenberg in

8    various tech publications?

9    A.   Yes.

10   Q.   Were emails that we just went through from August 10th and

11   August 13th, did they occur before those articles came out?

12   A.   They did.

13   Q.   I think, if we -- we don't have to go back, but

14   Exhibit 235 is an email chain.  And in that -- in

15   Mr. Rothenberg's email, he talks about hopping on the phone.

16   Do you recall that?

17   A.   I do.

18   Q.   Do you know whether there was, in fact, a conversation or

19   a telephone call with Mr. Rothenberg on his -- based on his

20   request?

21   A.   There was.

22   Q.   And do you recall if it occurred on that Saturday or on

23   another date?

24   A.   I believe it was on Saturday.

25           MR. WALDINGER:  So if we could call up what's been

1    marked -- or admitted into evidence as Exhibit 236.

2    **Q.**    This is an email dated August 16th from Mr. Weisman to

3    Mr. Rothenberg, and you're cc'd.

4        Do you see that, Mr. Polizzotto?

5    **A.**    I do.

6    **Q.**    Do you recall what -- what the subject of the conversation

7    was on that Saturday when you talked to Mr. Rothenberg?

8    **A.**    I do.

9    **Q.**    What did he say during that conversation?

10   **A.**    He revisited his email, apologized.  He went on to say

11   that his calculations were off, that we appear to own some

12   large percentage of the company, and that we just need to get

13   this straightened out.

14       And I was angry but restrained, and we asked for some

15   materials to help us understand, you know, who -- who are these

16   other entities and what -- what rights do they have.  And

17   Mr. Rothenberg said he would send that to us, he would send us

18   a capitalization table which should show all of the rights to

19   ownership.

20   **Q.**    And in this email that is Exhibit 236, Mr. Weisman, in

21   fact, says, "You were supposed to send us an explanation of the

22   capitalization of the company.  We have received no cap table

23   to date."

24       Was that correct at that time?

25   **A.**    Yes.

1  **Q.**   Did you ever get a cap table on River Studios from

2  Mr. Rothenberg?

3  **A.**   No.

4  **Q.**   I believe your testimony was that shortly after this,

5  articles began to appear in tech publications about Rothenberg

6  Ventures and Mr. Rothenberg; correct?

7  **A.**   Correct.

8  **Q.**   Following those articles, did Mr. Rothenberg send out

9  blast emails to LPs?

10  **A.**   He did.

11  **Q.**   In addition to being an investor in River Studios, was

12  Pilot Grove, through whatever entity it created, an LP?

13  **A.**   We were.

14  **Q.**   You were an LP in which fund?

15  **A.**   I believe the 2016 Fund.  That was the million dollars

16  committed, and I think 600 had been paid in at that time.

17  **Q.**   Okay.

18       **MR. WALDINGER:**  Ms. Margen, if we could pull up what's

19  been marked -- or has been admitted into evidence as

20  Exhibit 237.

21  **Q.**   Mr. Polizzotto, this is a two-page email.  Did you receive

22  this back in August of 2016?

23  **A.**   Yes.

24  **Q.**   Who is this email from?

25  **A.**   Mike Rothenberg.

1    **Q.**  Mr. Rothenberg lists, it looks like, about eight questions

2    here.  Do you see that?

3    **A.**  I do.

4    **Q.**  And in the -- in the next paragraph, what does he say

5    about answering the questions that he's listed?

6    **A.**  That the purpose of the letter is to answer the first

7    three questions, and the remaining questions will be answered

8    in subsequent communications over the next two days.

9    **Q.**  So the questions that he says he's answering are where is

10    the money, is management considering changing or adding

11    managers, and will there be an LP meeting.

12    **A.**  Correct.

13         **MR. WALDINGER:**  Ms. Margen, if we could go -- let's

14    stay here, let's blow up the bottom half of this page, the last

15    two paragraphs.

16    **Q.**  In the paragraph that begins "Of the funds raised to

17    date," in the next sentence Mr. Rothenberg says, "These numbers

18    are not precise and may be revised, but it's the best I can do

19    without the help of an accountant."

20        Did you have a reaction to the -- to the fact that the

21    numbers with respect to investments of LP funds could not be

22    precise at that time?

23    **A.**  Another big red flag.

24    **Q.**  Why is that a red flag?

25    **A.**  We deal with lots of investments.  I don't know of anybody

1   who could not tell you what they've invested and how much

2   they've invested, what they got in exchange for it.

3       You know, and he goes on to say I cannot do it without the

4   help of an accountant.  These -- these records and these

5   investments, you have to engage an accountant and keep one

6   engaged.  The fact that he suggests he didn't have the help of

7   an accountant is frightening.

8       **MR. WALDINGER:**  If you would go to the next page,

9   Ms. Margen, and just blow up the first couple of paragraphs --

10  or first three paragraphs, please.

11  **Q.**   With respect to the third paragraph there, what does it

12  say with respect to investments in River Studios?

13  **A.**   The first paragraph?

14  **Q.**   The third paragraph.  I'm sorry.

15  **A.**   The third.  I'm sorry.

16      "5 million over two years has been invested in River

17  Studios," and it goes on to say "which the Rothenberg Ventures

18  funds have the economic rights to.  Rothenberg Ventures

19  Management believes there could be meaningful upside potential

20  in River Studios for fund investors if it continues with the

21  external fundraising efforts."

22  **Q.**   So let me ask you, at this point in time -- or I guess

23  before August of 2016, you were an investor in River Studios.

24  **A.**   Correct.

25  **Q.**   Pilot Grove was?

1    **A.**    Correct.

2    **Q.**    Pilot Grove was also an investor in the 2016 Fund.

3    **A.**    Correct.

4    **Q.**    Do you recall receiving any information prior to August of

5    2016 that Mr. Rothenberg's funds that he managed had invested

6    in River Studios?

7    **A.**    No.

8    **THE COURT:**  Mr. Waldinger, any time in the next five

9    minutes.

10    **MR. WALDINGER:**  Very good, Your Honor.

11    **Q.**    With respect to this first -- first sentence of this

12    paragraph, reading that back in August of 2016, did you come to

13    a conclusion as to whether Mr. Rothenberg in fact owned one

14    hundred percent of River Studios?

15    **A.**    I concluded he did not.

16    **MR. WALDINGER:**  Ms. Margen, if we could blow up the

17    bottom two paragraphs on this page.

18    **Q.**    I think the second question that Mr. Rothenberg was

19    answering was is management considering changing or adding

20    managers.

21    What did Mr. Rothenberg say in this email on August 21st

22    that's in Exhibit 237?

23    **A.**    He says, "On the management front, I'm willing to take any

24    role that you as LPs would like me to take, whether it's

25    continuing on the management team and giving the reins of the

1   finances to someone else, departing from the management team,

2   or possibly help run River Studios to capture the maximum value

3   for your investment in the company."

4   **Q.**   Did Mr. Rothenberg step down from management at that time?

5   **A.**   He did not.

6   **Q.**   And then finally, he says in this email that he will

7   schedule a meeting Monday, August 29th, so that you can ask

8   questions and give input.  Did that meeting happen?

9   **A.**   I believe it did, yeah.

10  **Q.**   Do you recall whether you attended it or not?

11  **A.**   I attended.  I think there was one meeting and one lengthy

12  phone call.  I don't know if this is a reference to the meeting

13  I attended or not.

14  **Q.**   Okay.  All right.  Thank you.

15          **MR. WALDINGER:**  Your Honor, I think this would be a

16  good place to take a break.

17          **THE COURT:**  All right.  Members of the jury, let's

18  take our first recess.  Please remember my prior admonitions.

19          **THE CLERK:**  Please rise for the jury.

20      (Proceedings were heard out of presence of the jury:)

21          **THE COURT:**  All right.  We're outside the presence of

22  the jury.

23      Mr. Polizzotto, thanks for traveling to Oakland to give

24  your testimony.  I appreciate it.

25      Is Ms. Adkins here?  Ms. Adkins, I can't help but notice

1    in my email feed that you are often here.  Would you like a

2    stadium seat or something?  I know those wooden benches are not

3    very comfortable.  We have them lying around.  Would you like

4    one?

5           **MS. ADKINS:**  I appreciate it, but I'm fine.

6           **THE COURT:**  Thanks.

7      Mr. Waldinger, anything for the record?

8           **MR. WALDINGER:**  Nothing, Your Honor.

9           **THE COURT:**  Mr. Fakhoury?

10          **MR. FAKHOURY:**  No, Your Honor.

11          **THE COURT:**  Okay, thanks.  Let's take our recess.

12              (Recess taken at 10:04 a.m.)

13            (Proceedings resumed at 10:22 a.m.)

14      (Proceedings were heard in the presence of the jury:)

15          **THE COURT:**  All right.  Let's go back on the record.

16      All the jurors are in their assigned seats.

17      The parties and counsel are at counsel table.

18      Mr. Polizzotto -- do you say Polizzotto or Polizzotto?

19    How do you say it?

20          **THE WITNESS:**  Polizzotto.

21          **THE COURT:**  Polizzotto.  Thank you.

22      Mr. Polizzotto is still on the stand.

23      Mr. Waldinger, your witness.

24          **MR. WALDINGER:**  Thank you, Your Honor.

25   **Q.**  Mr. Polizzotto, when we broke, we had just finished going

```
 1   through Exhibit 237, which was an update letter sent to the LPs

 2   by Mr. Rothenberg.

 3        Do you recall receiving additional update letters after

 4   that?

 5   A.   Yes.

 6             MR. WALDINGER:  Ms. Margen, if we could pull up what's

 7   been admitted into evidence as Exhibit 238.

 8   Q.   Mr. Polizzotto, this is a four-page exhibit.  Do you

 9   recognize this?

10   A.   Yes.

11   Q.   What is this?

12   A.   It is another update.

13   Q.   What's the date of the update?

14   A.   August 23rd, 2016.

15   Q.   And there's a preamble to this update; correct?

16   A.   Correct.

17   Q.   Did you understand this -- although it says from investor

18   relations, did you understand this to be coming from

19   Mr. Rothenberg?

20   A.   Yes.

21             MR. WALDINGER:  If fact, if we could go to the last

22   page, Ms. Margen.

23   Q.   It says "Respectfully, Mike"?

24   A.   Yes.

25             MR. WALDINGER:  Ms. Margen, let's go back to the first
```

1  page.

2  **Q.**    In the preamble here, he says, "We work very hard to

3  invest the funds you entrusted to us, and Rothenberg Ventures

4  has many great investments."

5      Do you see that?

6  **A.**    I do.

7  **Q.**    Was it your understanding as an LP that you had, in fact,

8  entrusted, or that Pilot Grove had, in fact, entrusted money

9  with Mr. Rothenberg?

10  **A.**    Yes.

11  **Q.**    And why did you -- why did you feel that way?

12  **A.**    Well, we -- we invested $2 million in the convertible note

13  and so that was one place in which we entrusted Mr. Rothenberg

14  with money.  And then we put money in his 2016 Fund, 600,000 at

15  that time, and that was a second place where we entrusted

16  Mr. Rothenberg.

17  **Q.**    Did -- did you believe that Mr. Rothenberg, with respect

18  to the money invested in the fund, would act in the best

19  interests of the LPs?

20  **A.**    Yes.

21  **Q.**    And, in fact, that's what he says here, "We work very hard

22  to invest the funds you untrusted to us."

23  **A.**    Correct.

24      **MR. WALDINGER:**  If you could blow up the bottom half

25  of this page, Ms. Margen.  Just -- that's fine.

1    **Q.**   There's a statement here about River Accelerator and River

2    Studios.   What was your understanding as to the relationship

3    between Rothenberg Ventures, the River Accelerator, and River

4    Studios as to ownership and relationship?

5    **A.**   I -- I understood them to be under common control, but I

6    understood Rothenberg Ventures to be the venture funds

7    utilizing largely other people's money, which Mr. Rothenberg

8    and his other folks oversaw.

9        The River Accelerator was an extension of Ventures in that

10   it was my understanding it invested small sums of money but

11   provided advice, direction, introduction to some portfolio

12   companies which he hoped to grow such that they would become

13   successful and he -- the fund could invest more money.

14       And then I understood River Studios, perhaps not at this

15   time, by the time I got this email, but I originally understood

16   River Studios to be owned a hundred percent by Mr. Rothenberg,

17   and we were the only lender with our convertible note.

18       **MR. WALDINGER:**   Ms. Margen, if we could go to now the

19   second page of Exhibit 238 and blow up the first section, the

20   first three paragraphs.

21   **Q.**   In the previous email that was Exhibit 237,

22   Mr. Polizzotto, there was a statement about investing

23   approximately $5 million into River Studios.

24       Do you see a similar statement here?

25   **A.**   Yes.

1    **Q.**    In either of the emails, was there any specificity with

2    respect to which of the venture capital funds managed by

3    Mr. Rothenberg had actually invested?

4    **A.**    No.

5    **Q.**    And, again, based on your experiences in investing, is

6    that typically information that a fund manager should be able

7    to produce?

8    **A.**    Yes.

9    **Q.**    Does Mr. Rothenberg express any views here as to what is

10    being -- what the threats are to River Studios?

11    **A.**    No.

12    **Q.**    And what -- does he say anything about River Studios being

13    put in jeopardy?

14    **A.**    No.

15    **Q.**    I'll just have you look at the last paragraph or the last

16    sentence of the first paragraph.  What does he say there?

17    **A.**    He says, "Over the last few weeks, this has been put in

18    serious jeopardy by the vicious, tabloid-style press attacks

19    and internal uncertainty."

20    **Q.**    In the next paragraph, he says, "We need your help

21    stemming the tide of these attacks and helping to rebuild the

22    brand, especially for River Studios and the River Accelerator."

23        What did you take that request to mean?

24    **A.**    By this time, some of the LPs were contacting each other

25    and the press had been reaching out to people.  And, you know,

1    I took it to be a request to articulate confidence in

2    Mr. Rothenberg and in the Accelerator and River Studios and in

3    the venture funds.

4    **Q.**    And to express that confidence to the press and to other

5    LPs?

6    **A.**    Correct.

7           **MR. WALDINGER:**    Going to the next section, Ms. Margen.

8    If we could just blow up the first three paragraphs of that

9    section.   Of the next section, Ms. Margen.

10   **Q.**    This is a section titled "Accounting, Lessons Learned,

11   Marketing Strategy, and TechCrunch."

12          **MR. WALDINGER:**    And that's not blown up on the screen,

13   so let's just dezoom that and make sure we blow up the heading

14   and those three paragraphs.

15   **Q.**    Do you see that, Mr. Polizzotto?

16   **A.**    I do.

17   **Q.**    What is *TechCrunch*?

18   **A.**    It's a publication on tech companies, tech investments,

19   tech products.

20   **Q.**    Directing your attention to the second paragraph, if you

21   can read the first sentence of that second paragraph.

22   **A.**    "I was not focused enough on lean spending, particularly

23   when it came to staff.  I was too quick to hire and too slow to

24   fire."

25   **Q.**    All right.  Let me go back in time a little bit.

1    I think that you said that you attended Founder Field Day
2    back in May of 2016.
3    **A.**    Yes.
4    **Q.**    What was your -- what were your impressions overall
5    regarding that event, Founder Field Day?
6    **A.**    I found it to be over the top, almost to the point of
7    being ridiculous.
8    **Q.**    What was over the top about it?
9    **A.**    I couldn't wrap my head around why anybody would spend the
10    kind of money I assumed it would take to actually hold an event
11    on the field of a professional baseball stadium.
12    **Q.**    Your assumption was that that was not cheap?
13    **A.**    Correct.
14    **Q.**    About how many people were there?
15    **A.**    If I had to guess, 4- or 500.
16    **Q.**    Did you have to pay to buy a ticket to go?
17    **A.**    No.
18    **Q.**    And what was provided there for you?
19    **A.**    Well, you had the opportunity to kind of mix and mingle
20    with other investors.  There was a lunch.  You got to walk out
21    on the field.  Pretty much had the ballpark to yourself, which
22    I'm a sports guy so I found that part interesting.
23    **Q.**    You're more of a football guy than a baseball guy?
24    **A.**    Correct.
25    **Q.**    And did you take batting practice?

1    **A.**    No.

2    **Q.**    So your impression was that that was an expensive event?

3    **A.**    Yes.

4    **Q.**    Was Mr. Weisman there with you?

5    **A.**    He was.

6    **Q.**    Did you ask Mr. Rothenberg or have any conversation with

7    him at or around Founder Field Day about -- about your

8    observations, that this looked to be an expensive event?

9    **A.**    I did.

10    **Q.**    And what did you say to him and what did he say to you?

11    **A.**    I made a comment along the lines of, you know, "God, how

12    much does that cost to put that event on?"

13        And he kind of very nonchalantly said, "It really doesn't

14    cost much.  I have a suite.  If they're not using the stadium,

15    they give the suite owners a great deal to have these events.

16    It's not a big deal."

17    **Q.**    Okay.  And then at the -- I'll just note in this last

18    paragraph, what does Mr. Rothenberg say about not taking

19    adequate time to offboard employees?  If you could read that

20    entire sentence.

21    **A.**    "I have not taken adequate time to offboard employees,

22    leaving open the possibility for disgruntled employees and then

23    brutal press attacks."

24    **Q.**    Fair to say that there were a number of statements in this

25    email about the press?

1    A.    Yes.

2         MR. WALDINGER:  And in fact if we can go to the next

3    page, Ms. Margen, and blow up the top three paragraphs.

4    Q.    There's another statement here in this -- in the paragraph

5    that begins "Because we were successful," about the press.  Do

6    you see that?

7    A.    Yes.

8    Q.    Could you read those first two sentences of that

9    paragraph?

10   A.    "Because we were successful in raising the profile of the

11   firm, we became vulnerable to attack.  We did not tell enough

12   of our story or strategy first, allowing the press to strike."

13        MR. WALDINGER:  All right.  You can take that down,

14   Ms. Margen.

15   Q.    And there's a statement here -- there's a paragraph called

16   "SEC"?

17   A.    Yes.

18        MR. WALDINGER:  If you would blow up that paragraph,

19   Ms. Margen.

20   Q.    Could you read the last sentence of that paragraph.

21   A.    "It is in the best interests of you as LPs to let the SEC

22   know that this is an internal accounting issue that we are

23   handling so that we can make" -- "we can take the time

24   necessary to sort everything out."

25   Q.    Based on what you had learned in August of 2016, did you

1    believe that this was simply an internal accounting issue?

2              **MR. FAKHOURY:**  Objection.  Irrelevant.

3              **THE COURT:**  Overruled.

4              **MR. FAKHOURY:**  And speculation also.

5              **THE COURT:**  Overruled.

6         You can answer.

7              **THE WITNESS:**  Restate the question, please.

8    **BY MR. WALDINGER:**

9    **Q.**   Based on what you had learned in August of 2016, did you,

10   Mr. Polizzotto, believe that this was just an internal

11   accounting issue?

12   **A.**   No.

13   **Q.**   And what had happened in August of 2016 that led you to

14   conclude that it was more than just an internal accounting

15   issue?

16   **A.**   Well, I don't -- I don't recall the exact dates, but, you

17   know, it kind of started with the -- the amendment that changed

18   the fundamental piece of our agreement being sent to Larry

19   instead of me.  And it kind of just went downhill from there.

20        The discussions with Mr. Rothenberg kind of -- it -- it

21   became kind of death by a thousand cuts.  At some point in

22   there I learned that there was an SEC investigation going on.

23   You know, you don't -- you don't get there with kind of simple

24   internal accounting issues.

25              **MR. FAKHOURY:**  Objection --

1      **THE COURT:** Members of the jury, I'm going to reread

2  you an instruction.

3      Give me just a moment, please. I don't have it printed

4  out. I have it on my chambers hard drive, but I can bring it

5  up pretty quickly.

6                    (Pause in the proceedings.)

7      **THE COURT:** You have heard before and will hear

8  additional testimony that the Securities and Exchange

9  Commission, which is also called the SEC, conducted an inquiry

10 into the finances of Rothenberg Ventures Management Company

11 and/or one or more of the Rothenberg funds. This evidence is

12 being admitted solely as it pertains to Mr. Rothenberg's motive

13 or intent and is to be considered by you solely for that

14 purpose.

15     The fact that the SEC conducted an inquiry is not evidence

16 that Mr. Rothenberg did any of the acts charged in the

17 indictment.

18     Mr. Waldinger.

19         **MR. WALDINGER:** Thank you, Your Honor.

20     Ms. Margen, if we could now blow up the next two

21 paragraphs.

22 **Q.** Mr. Polizzotto, this section of the August 23rd, 2016

23 email that's in Exhibit 238 is entitled "Management

24 Transition." Do you see that?

25 **A.** Yes.

1    **Q.**    Would you read the first two sentences of that section.

2    **A.**    "In venture, reputation and confidence are paramount.  In

3    order to protect the firm's investments, reverse the trends and

4    regain momentum, I plan to step down as the manager of

5    Rothenberg Ventures at Monday's LP meeting."

6    **Q.**    Did that happen at the Monday LP meeting?

7    **A.**    No.

8    **Q.**    The next paragraph says that Mr. Rothenberg invested

9    $5 million into River Studios on your behalf.

10        Do you see that?

11    **A.**    Yes.

12        **MR. WALDINGER:**  Ms. Margen, if we could blow up the

13    last two paragraphs on this page.

14    **Q.**    You had just read the statement in which Mr. Rothenberg

15    said that he planned to step down as the manager of Rothenberg

16    Ventures at Monday's LP meeting.

17        This section is entitled "Next Steps."

18        Does Mr. Rothenberg say anything in this email about next

19    steps as they relate to a management transition?

20    **A.**    Well, he -- he talks about key departures, recruiting back

21    folks.  He talks -- he indicates that Justin Grooms and Brandon

22    Farwell are excellent leaders.  But he doesn't step down.

23    **Q.**    Right.  And he says that he believes that Mr. Farwell and

24    Mr. Grooms would be good fiduciaries?

25    **A.**    Yes.

1  **Q.**   Was there ever a time when you, as an LP, got to vote on

2  whether Mr. Farwell and Mr. Grooms could take over?

3  **A.**   No.

4  **Q.**   And that's because why?

5  **A.**   I don't think they stuck around to take those roles, and I

6  don't think Mr. Rothenberg offered to vacate his position.

7  **Q.**   All right.

8       **MR. WALDINGER:**  Ms. Margen, if -- I would like to --

9  could we blow up the -- just like this last paragraph of this

10 page and the top paragraph of the next page?  Is that

11 technically possible?

12      You know, let's just -- Ms. Margen, let's just blow up the

13 top of page 4 of Exhibit 238, because this is the wrong

14 exhibit.  Let's just blow up the top of page 4.

15 **Q.**   All right.  I'm going to read to you the bottom of page 3

16 which says -- the sentence begins "New management could focus

17 on liquidating smaller positions in the fund."  And so now

18 we're on to page 4.

19      Again, it says, "New management could focus on liquidating

20 smaller positions in the fund to help buy out smaller investors

21 to simplify the fund structure and to provide working capital

22 to the organization to streamline operations."

23      Do you see that?

24 **A.**   Yes.

25 **Q.**   At this point, Mr. Polizzotto, did you believe that it was

1    the purpose of the venture capital funds to provide working

2    capital to Rothenberg Ventures Management Company?

3            **MR. FAKHOURY:**  Objection.  Speculation.

4            **THE COURT:**  Overruled.

5            **THE WITNESS:**  I did not.

6    **BY MR. WALDINGER:**

7    **Q.**   And in this kind of venture capital structure, do the

8    funds exist to serve the management company, or does the

9    management company serve -- exist to serve the funds?

10   **A.**   The management company exists to serve the funds.

11   **Q.**   Because what kind of relationship does the management

12   company have with the funds?

13   **A.**   Well, they're to invest the funds, but they're to hold

14   them in a fiduciary capacity.  And there is a fee structure

15   agreed upon when an investor puts money in the fund and that

16   fee structure pays the manager.

17   **Q.**   Are you a fiduciary at Pilot Grove?

18   **A.**   I am.

19   **Q.**   What does that mean in doing your job and managing the

20   money that you manage on behalf of the family?

21           **MR. FAKHOURY:**  Objection.  Irrelevant.

22           **THE COURT:**  Overruled.

23           **THE WITNESS:**  It means I have to act in the best

24   interests of the family when dealing with their money, and most

25   importantly I can't be self-interested or use that money to

1    benefit myself in any way, or my friends and family.

2    BY MR. WALDINGER:

3    Q.  Is that, having that relationship, setting aside whether

4    you have a fiduciary relationship, are you required to make

5    honest representations to the family members?

6    A.  All the time.

7    Q.  And are you required to tell them things that you believe

8    they should know?

9    A.  Yes.

10   Q.  All right.

11           MR. WALDINGER:  Let's take that down, Ms. Margen.  And

12   we're -- I'm not sure if this is in evidence.  It's

13   Exhibit 241.

14       It's not in evidence, so this is marked for identification

15   purposes only.

16   Q.  Mr. Polizzotto, this is a one-page exhibit.  Do you

17   recognize this as another update letter?

18   A.  I do.

19   Q.  When was this sent?

20   A.  September 9th, 2016.

21   Q.  Was this provided to the Government by Pilot Grove?

22   A.  Yes.

23   Q.  And do you understand this to also be coming from

24   Mr. Rothenberg?

25   A.  Yes.

1    **Q.**   Is there -- is there an indication at the bottom of who

2    sent it?

3    **A.**   There is.

4    **Q.**   What does it say there?

5    **A.**   "Sincerely, Mike Rothenberg."

6            **MR. WALDINGER:**  Your Honor, I would move Exhibit 241

7    into evidence.

8            **THE COURT:**  Any objection?

9            **MR. FAKHOURY:**  No, Your Honor.

10           **THE COURT:**  241 is admitted.

11           (Government's Exhibit 241 received in evidence.)

12                   (Exhibit published to jury.)

13           **MR. WALDINGER:**  Ms. Margen, let's blow up, let's say

14    the top half of this page.

15        A little bit more.  That's fine.  That's fine, Ms. Margen.

16    **Q.**   Mr. Polizzotto, I just asked you some questions about

17    fiduciary duty.  Does this email, in the second paragraph,

18    indicate to you that Mr. Rothenberg understands -- understood

19    that he had that duty?

20    **A.**   Yes.

21    **Q.**   What does he say there?

22    **A.**   He says, "My first priority continues to be to protect

23    investors."

24    **Q.**   Is that your first priority as a fiduciary for Pilot

25    Grove?

1    **A.**    Yes.

2    **Q.**    He sets forth a recap of the LP meeting that occurred that

3    we've heard about?

4    **A.**    Yes.

5            **MR. WALDINGER:**    All right.    We can take that down,

6    Ms. Margen.

7        And, again, I would like you to bring up Exhibit 242,

8    which has not yet been admitted into evidence.

9    **Q.**    Mr. Polizzotto, do you recognize this exhibit?

10    **A.**    Yes.

11    **Q.**    Was it also provided to the Government by Pilot Grove?

12    **A.**    Yes.

13    **Q.**    Was it kept by Pilot Grove in the ordinary course of

14    business?

15    **A.**    Yes.

16    **Q.**    And who do you understand -- is this an email?

17    **A.**    It is.

18    **Q.**    Who do you understand this email to be from?

19    **A.**    Mike Rothenberg.

20    **Q.**    Does it have Mr. Rothenberg's name on it?

21    **A.**    Yes.

22    **Q.**    And how is it signed?

23    **A.**    "Sincerely, Mike Rothenberg."

24            **MR. WALDINGER:**    Your Honor, I would move Exhibit 242

25    into evidence.

1          **THE COURT:**  Any objection?

2          **MR. FAKHOURY:**  No, Your Honor.

3          **THE COURT:**  242 is admitted.

4          (Government's Exhibit 242 received in evidence.)

5                    (Exhibit published to jury.)

6          **MR. WALDINGER:**  Ms. Margen, if we could blow up all

7     the way down, say, two-thirds of the page.

8     **Q.**   With respect to this paragraph that talks about -- that

9     starts "We acknowledge," could you read that slowly for the

10    jury?

11    **A.**   "We acknowledge the unfortunate press coverage over the

12    past few weeks as well as the employee departures.  We continue

13    to focus on the fund instead of reacting to the press.  Like

14    other small venture capital firms, Frontier Tech Ventures now

15    has a lean model that can rely primarily on contractors

16    as-needed for the time being."

17    **Q.**   You stumbled there.  It looks like there was a bit of a

18    typo in that last sentence?

19    **A.**   Yes.

20    **Q.**   So this says that Frontier Tech Ventures now has a lean

21    model.  What is Frontier Tech Ventures?

22    **A.**   I believe it was a change from Rothenberg Ventures to

23    Frontier Tech, taking his name off of the entity.

24    **Q.**   And he says that the company now has a lean model?

25    **A.**   Yes.

1    **Q.**    Suggesting that it did not have a lean model before?

2    **A.**    Correct.

3         **MR. WALDINGER:**  Ms. Margen, we can take that down.

4    **Q.**    Mr. Polizzotto, I'd like to show you what's been admitted

5    into evidence as Exhibit 339.  This was not provided to the

6    Government --

7         Let me give you a copy of that.

8         This appears not to have been provided to the Government

9    by Pilot Grove, but it is in evidence.

10        Can you just take a minute to look at that document.

11        The whole Exhibit 339 is what?

12    **A.**    It's an email.

13    **Q.**    And does it appear to be an email to investors in the

14    2016 Fund?

15    **A.**    Yes.

16    **Q.**    Was Pilot Grove an investor in that fund?

17    **A.**    Yes.

18    **Q.**    Is there an attachment to the email?

19    **A.**    There is.

20    **Q.**    And what is that attachment?

21    **A.**    It's a list of the portfolio companies or the companies

22    into which the Rothenberg Ventures 2016 Fund invested.

23         **MR. WALDINGER:**  Ms. Margen, if we could blow up the

24    top half of the second page.

25    **Q.**    I want to -- Mr. Polizzotto, I'm guessing that you've seen

1    semiannual reports or lists like this quite a bit in your job

2    as CEO of Pilot Grove?

3    **A.**    Yes.

4    **Q.**    What is depicted here in Exhibit 339?

5    **A.**    It's the companies that Rothenberg Ventures 2016 invested

6    in.  It is the valuation of the held investment --

7    **Q.**    Let me stop you there.  So the companies that they

8    invested in would be the portfolio column?

9    **A.**    Yes.

10   **Q.**    And then I think you just said the -- are you referring to

11   the second column with what you just testified to, which is

12   titled "Valuation"?

13   **A.**    Yes.

14   **Q.**    What's valuation in this context?

15   **A.**    Valuation is the worth of the investment made currently.

16   So on day 1 an investment is made in a company.  The report

17   comes out on day 30, how much is that investment worth 30 days

18   later.

19   **Q.**    Is that -- how precise is that valuation figure, again in

20   the context of a venture capital fund?

21   **A.**    It's fairly precise, but it's an opinion by management.

22   **Q.**    That's because why?

23   **A.**    Private venture funds don't -- the underlying companies

24   don't readily trade anywhere, and so there's no public data to

25   turn to, to see what the equity markets or the bond markets

1    value the company as.

2    **Q.**    So if this, instead of saying Auro Robotics, said Apple,

3    you would have a pretty precise knowledge about what the

4    holdings were worth?

5    **A.**    Correct.

6    **Q.**    What about the cost basis column?  What is that?

7    **A.**    Cost basis is the amount of the investment or what did it

8    cost to invest.

9    **Q.**    So those would be the LP's funds?

10    **A.**    Yes.  Yes.

11    **Q.**    What does this report indicate as to the total amount of

12    investments made at this time by the 2016 Fund?

13    **A.**    $2,918,000.

14    **Q.**    Nope.  A little bit further down.

15    **A.**    Sorry.  12,000,696.

16    **Q.**    And the 2 million, what do you understand that to be?  Is

17    that just other portfolio companies?

18    **A.**    Yeah.  It's just other investments.  That's the amount

19    that was paid to make the other investments.

20    **Q.**    Do you see an entry for River Studios?

21    **A.**    I do.

22    **Q.**    And what is the number in the cost basis column?

23    **A.**    1,197,965.

24    **Q.**    So what does that mean to you in terms of what -- what

25    that 1.197 million represents?

**A.**    The amount of money that Rothenberg Ventures 2016 Fund invested to purchase a piece of or to own a piece of River Studios.

**Q.**    Again, prior to August of 2016, were you aware that the 2016 Fund or any of the funds managed by Mr. Rothenberg had invested money in River Studios?

**A.**    I was not.

**Q.**    And prior to August of 2016, did Mr. Rothenberg ever tell you that his funds had invested in River Studios?

**A.**    He did not.

**Q.**    The column, the valuation column for River Studios, has the exact same number as in the cost basis column.  Do you see that?

**A.**    I do.

**Q.**    So what does that mean in this context?

**A.**    It -- it means that in management's opinion, the value at the time of the report is equal to the amount paid for it.

**Q.**    Relying again on your experience as an investor, do you have any observations about the relative size of the 2016 Fund's investment in River Studios compared to other investments that the fund had made?

**A.**    It's -- it's noticeably larger than any other investment and it's disproportionately large as compared to the whole.

**Q.**    Having been told in or about January and February of 2016 that Mr. Rothenberg owned River Studios, do you have any

1  reaction to the fact that a fund that he managed invested

2  1 point -- nearly $1.2 million into River Studios?

3  A.    Well, my reaction is -- is that -- I had many reactions,

4  right?  One of which is we were never told that was the case.

5  Another of which is the investment is too large.  And to me the

6  most troubling, you're effectively taking other people's money

7  and investing it in yourself and not telling them that's what

8  you're doing or that's what you intend to do.

9  Q.    If that were happening with 2016 Fund money, would you

10  have wanted to know that before Pilot Grove invested in the

11  2016 Fund?

12  A.    Yes.

13  Q.    Why is that?

14  A.    I already felt like we had enough exposure to River

15  Studios, for one.  And secondly, it would suggest to me that

16  there were no other investors willing to put money in.

17  Q.    All right.

18      So we're a number of years following the date of this

19  update, which was 3/31/2017.

20      Do you know whether River Studios is still a going

21  concern?

22  A.    To my knowledge, it is not.

23  Q.    And what is the value, if any, of Transcend VR's/Pilot

24  Grove's investment into River Studios as you sit here today?

25  A.    It's worthless.

1          **MR. WALDINGER:**  Your Honor, I don't have any further

2    questions for Mr. Polizzotto.

3          **THE COURT:**  Mr. Fakhoury, cross-examination?

4          **MR. FAKHOURY:**  Yes.  Thank you.

5                        <u>**CROSS-EXAMINATION**</u>

6    **BY MR. FAKHOURY:**

7    **Q.**   Good morning, Mr. Polizzotto.

8    **A.**   Good morning.

9    **Q.**   You testified earlier that you were introduced to

10   Mr. Rothenberg through David Frank; correct?

11   **A.**   Yes.

12   **Q.**   And Mr. Frank had brought Pilot Grove other -- another

13   investment opportunity in the past; correct?

14   **A.**   Correct.

15   **Q.**   At the time that Mr. Frank made his initial outreach to

16   Pilot Grove, he was primarily focused on the Rothenberg

17   Ventures 2016 Fund; correct?

18   **A.**   David Frank?

19   **Q.**   Yes.

20   **A.**   I'm not sure.

21   **Q.**   Okay.

22          **MR. FAKHOURY:**  Let me ask Mr. Torres to pull up

23   Exhibit 188.

24   **Q.**   Okay, Mr. Polizzotto, I'm showing you what's been admitted

25   as Exhibit 188, and this is page 1 of that exhibit.  This is an

1    October 9, 2015 email from Mr. Frank to you and Mr. Weisman.

2    Do you see that, sir?

3    **A.**    Yes.

4    **Q.**    Okay.  And there's some discussion here, both about the

5    Rothenberg Ventures fund, as well as River Studios here in that

6    first paragraph; correct?

7    **A.**    Yes.

8    **Q.**    There's also an attachment, and maybe we can just go to

9    page 2 of this exhibit quickly, which has a slide deck related

10   to the Rothenberg Ventures 2016 Fund.  Do you see that, sir?

11   **A.**    Yes.

12   **MR. FAKHOURY:**  You can take that down, Mr. Torres.

13   **Q.**    Now, you testified that there was a little bit of

14   back-and-forth email with -- with Mr. Frank.

15   And ultimately Pilot Grove became more interested in

16   investing into River Studios; correct?

17   **A.**    Yes.

18   **Q.**    At that time -- so we're talking, you know, late 2015 and

19   early January of 2016, February of 2016, there was a feeling

20   that virtual reality and augmented reality would be sort of one

21   of the next big technologies; right?

22   **A.**    Yes.

23   **Q.**    At the time the -- the investment was being discussed, you

24   were aware and Pilot Grove more generally was aware of the

25   existence of the River Accelerator; correct?

1    **A.**    Yes.

2    **Q.**    And that presented another potential investment

3    opportunity for Pilot Grove who could have access to some of

4    these smaller companies within the Accelerator; correct?

5    **A.**    Correct.

6    **MR. FAKHOURY:**    Mr. Torres, can you pull up

7    Exhibit 195.

8    **Q.**    And let's just leave it there for a moment.

9    I can't recall if Mr. Waldinger walked you through this

10   exhibit, but this is an email dated January 7th, 2016, from

11   David Frank to you and Mr. Polizzotto [sic].  Do you see that?

12   **A.**    Yes.

13   **Q.**    And there's a reference here to meeting Mike and I today,

14   and you testified earlier about a meeting at the -- at a cafe

15   or restaurant in the Wynn Hotel; right?

16   **A.**    Correct.

17   **Q.**    And that would have been on January 7th, 2016; right?

18   **A.**    Correct.

19   **MR. FAKHOURY:**    Can we go to the second page of this

20   exhibit.

21   I'm sorry.  Can we actually go to the next page.

22   **Q.**    So attached to this email is two slide decks.  One is

23   the -- the one I'm showing you on the screen which is on page 3

24   which is relating to the venture capital funds; correct?

25   **A.**    Yes.

1        **MR. FAKHOURY:**  Okay.  Let's go to page 22 of this

2   exhibit.

3   **Q.**  There's a second slide deck attached to this email that is

4   a slide deck related to River Studios.  And this is page 22 of

5   the exhibit.  This is one of those slides; correct?

6   **A.**  Correct.

7   **Q.**  And on this slide, it indicates a "deep technological

8   advantage and close relationship with Rothenberg Ventures and

9   its River Program."

10        Do you see that on the slide?

11  **A.**  Yes.

12       **MR. FAKHOURY:**  Can he was go to Exhibit 205.

13  **Q.**  I'm showing you, sir, Exhibit 205, page 1.  This is an

14  email dated February 17 of 2016 from Mr. Rothenberg to you,

15  Mr. Weisman, and a cc to David Frank.

16       And there's a couple attachments here, including the

17  convertible note agreement which Mr. Waldinger talked to you

18  about.

19       There's also an investor presentation.  Do you see that?

20  **A.**  Yes.

21       **MR. FAKHOURY:**  Can we go to page 19 of this exhibit.

22  **Q.**  And, again, I'm showing you an excerpt of a River Studios

23  slide deck.

24       **MR. FAKHOURY:**  Can you scroll down, Mr. Torres.  Or

25  zoom out, actually.  It might be a little easier.  That's fine.

1    **Q.**   And at the bottom here, it talks about "Our relationship

2    with Rothenberg Ventures and the River Accelerator ensures that

3    we remain on the cutting edge of technology with unparalleled

4    access in the VR space."

5         Do you see that?

6    **A.**   Yes.

7              **MR. FAKHOURY:**  You can take that down.

8    **Q.**   Now, yesterday Mr. Weisman used the word "promoter" to

9    describe Mr. Frank.  And I'm going to assume that Pilot Grove

10   gets solicited about a lot of investments; correct?

11   **A.**   Yes.

12   **Q.**   Pilot Grove has a -- one billion dollars of assets under

13   management, at least as of 2015; right?

14   **A.**   Approximately, yes.

15   **Q.**   Okay.  And it's more today; correct?

16   **A.**   Correct.

17   **Q.**   So you probably get a lot of emails and pitches; right?

18   **A.**   Yes.

19   **Q.**   I showed you some slide decks.  And those sorts of slide

20   decks, those sort of materials are something you may use to

21   make a preliminary decision on whether a particular pitch or

22   investment opportunity is one worth pursuing; correct?

23   **A.**   Yes.

24   **Q.**   But ultimately, you do your own diligence; right?

25   **A.**   Correct.

1    **Q.**    And that can include asking for documents; right?

2    **A.**    Correct.

3    **Q.**    Talking to references?

4    **A.**    Yes.

5    **Q.**    Checking out the technology or whatever the investment is

6    purporting to be?

7    **A.**    Yes.

8    **Q.**    With respect to River Studios, you testified about

9    checking out the technology in San Francisco around the time of

10    the Super Bowl; right?

11    **A.**    Yes.

12    **Q.**    And I believe you testified about putting on like a VR

13    headset and playing a round of golf or something comparable;

14    right?

15    **A.**    Yes.

16    **Q.**    One of the other diligence items you may do is talk to the

17    people who work for the company that's potentially going to be

18    invested into; correct?

19    **A.**    Correct.

20    **Q.**    And while you were in San Francisco checking out the VR

21    technology, you had an opportunity to speak to some of the

22    employees at River Studios; correct?

23    **A.**    Yes.

24    **Q.**    Did you talk to an individual by the name of Sivan Iram?

25    Does that name sound familiar to you?

1    **A.**    No.

2    **Q.**    Okay.  How about Ewan Johnson?

3    **A.**    That sounds familiar.  I just want to be clear, you asked

4    the question when we were at River Studios.  I'm not sure what

5    it was.  It was -- it was Mr. Rothenberg's offices.

6    **Q.**    Okay.  And Mr. Rothenberg's offices were in San Francisco;

7    right?

8    **A.**    Yes.

9    **Q.**    Does the address 1062 Folsom Street sound right to you?

10    **A.**    Yes.

11    **Q.**    So we're talking about like a two-story brick building?

12    **A.**    Yes.

13    **Q.**    That's where you went to try out the technology?

14    **A.**    Correct.

15    **Q.**    Okay.  And I was asking a moment ago before you clarified

16    your answer about talking to some folks and just to make a

17    clear record on that, you didn't remember Mr. Iram, but you did

18    recognize the name Ewan Johnson; correct?

19    **A.**    Correct.

20        **MR. FAKHOURY:**  Mr. Torres, can you pull up

21    Exhibit 197.

22    **Q.**    Sir, I'm showing you Exhibit 197.  This is an email dated

23    January 13th of 2016 from you to Mr. Rothenberg, with a cc to

24    David Frank and Larry Weisman.

25        Do you see that, sir?

1    **A.**    Yes.

2    **Q.**    So we were talking a moment ago about diligence, and with

3    Mr. Waldinger you explained that this is a list of items that

4    you typically hope to get as part of the diligence process;

5    correct?

6    **A.**    Correct.

7    **Q.**    And you did -- you did testify that you don't expect to

8    receive all of the items on this list; correct?

9    **A.**    I don't remember if I testified to that.  I think the

10    natural process is, particularly the younger the company, there

11    are a number of things on this list that would come back as "we

12    don't have any" or "not applicable."

13    **Q.**    Okay.  Let me ask the question then in a different way.

14        This is sort of like a template; right?

15    **A.**    Correct.

16    **Q.**    And different companies are going to have differing

17    amounts of information responsive to this request; right?

18    **A.**    Yes.

19    **Q.**    And you just said right now a younger company or maybe

20    even a startup might not have all of these items that you're --

21    you're -- you're seeking; right?

22    **A.**    Correct.

23    **Q.**    There might also be a lag in the timing of which -- let

24    me -- let me try that again.

25        There also could be some delay in getting documents after

1    you make a request; right?

2    **A.**    Correct.

3    **Q.**    And it's not unusual for -- for smaller, informal

4    companies to have maybe a harder time getting some of these

5    documents than perhaps a more established institutional type of

6    company; right?

7    **A.**    Correct.

8         **MR. FAKHOURY:**    Could we pull up Exhibit 212.

9    **Q.**    Okay, sir.    I'm showing you Exhibit 212.    This is an email

10   dated February 24th, 2016, from Mr. Rothenberg -- from

11   Mr. Rothenberg, excuse me, to Mr. Weisman, with a cc to you.

12   And Mr. Waldinger showed you this, the second page of this,

13   which we're going to get to in a minute.

14   This is a response to Pilot Grove's request for diligence

15   documents; correct?

16   **A.**    Correct.

17        **MR. FAKHOURY:**    Can we go to the second page of this

18   exhibit.    Maybe we could zoom it out a little bit.    Okay.

19   **Q.**    And Mr. Waldinger talked to you a little bit about the top

20   part of the statement -- of the document and the bottom part.

21   So let's just sort of take them one at a time.

22   Up here on the top is an income statement, and you

23   testified that the numbers in parentheses is negative numbers;

24   correct?

25   **A.**    Yes.

1    **Q.**    There's a notation here for PF, and that just stands for

2    pro forma; correct?

3    **A.**    Correct.

4    **Q.**    And pro forma in general just means these aren't

5    necessarily audited; right?

6    **A.**    Correct.

7    **Q.**    Now, for 2015, there's a negative net income of

8    $3.5 million, approximately, here on the left-hand side of

9    these two columns; correct?

10    **A.**    Yes.

11    **Q.**    And then the projection for 2016 was a negative net income

12    of $6.2 million approximately; correct?

13    **A.**    Correct.

14    **Q.**    Now, these -- these negative income numbers are greater

15    than the ultimate $2 million investment that Pilot Grove made

16    into River Studios; correct?

17    **A.**    Yes.

18    **Q.**    And part of -- one of the purposes of investing into a

19    startup is to sort of -- and I think your testimony was to help

20    the company sort of bridge the gap in these negative numbers.

21    In other words, to kind of make up for the shortfall in income;

22    right?

23    **A.**    Yes.

24    **Q.**    At the time of the investment, you knew that River Studios

25    was looking for what we've sort of -- what is called runway;

1   right?

2   **A.**   Yes.

3   **Q.**   And you knew that River Studios was looking for other

4   investors as well; right?

5   **A.**   Yes.

6   **Q.**   And you knew that it would be a risky investment; right?

7   **A.**   Yes.

8          **MR. FAKHOURY:**   Can we scroll down a little bit.

9   **Q.**   Mr. Waldinger asked you about this number, the cash assets

10  of $452,313.   And he showed you a bank statement related to

11  Bend Reality LLC.

12         Before you testified today in court, had you seen that

13  Silicon Valley Bank bank statement before?

14  **A.**   I had not.

15  **Q.**   Have you seen any other Silicon Valley Bank statements

16  related to Rothenberg Ventures?

17  **A.**   No.

18  **Q.**   Do you know what this equity and retained earnings is and

19  what the reference to $1 million approximately here is?

20  **A.**   I do not.

21         **MR. FAKHOURY:**   Can we go back to the first page of

22  this exhibit.

23  **Q.**   So this email is dated February 24th of 2016; correct?

24  **A.**   Yes.

25  **Q.**   After receiving the financial statement, there was -- and

1    you testified a little bit about this -- some back-and-forth

2    negotiation about the terms of the -- of the convertible

3    promissory note.

4    A.    Yes.

5    Q.    And a convertible note is -- is just -- it's just a

6    contract; right?  To some degree?

7    A.    Yes.

8    Q.    And it can -- the terms of that note can be negotiated;

9    right?

10   A.    Correct.

11   Q.    And in this specific case, they were negotiated amongst

12   attorneys for Pilot Grove and attorneys for -- for

13   Mr. Rothenberg; right?

14   A.    Yes.

15   Q.    You testified about in other investments that Pilot Grove

16   had made that Pilot Grove had negotiated safeguards in

17   connection with the use of money.  And I think you gave an

18   example of a company wanting to purchase something or do a

19   particular transaction and you offering to call the company and

20   say we'll pay for it.  Do you recall that?

21   A.    I do, yeah.

22   Q.    So that would be an example of negotiating some of the

23   terms of a particular investment before it's made; right?

24   A.    Yes.

25   Q.    With respect to the specific promissory note, there

1   were -- one change that was made was the change in investment

2   amount from $5 million to $2 million; correct?

3   **A.**    Yes.

4   **Q.**    There was a change made to request a personal guaranty

5   from Mr. Rothenberg; correct?

6   **A.**    Correct.

7   **Q.**    There was also some change to the language regarding

8   capitalization.  Do you recall that?

9   **A.**    I do.

10  **Q.**    And then ultimately, the day after -- so let me back up a

11  second here.

12      This is Exhibit 212, page 1.  That financial form, you

13  received that on February 24th, 2016; right?

14  **A.**    Yes.

15  **Q.**    And the next day on February 25th, 2016, Pilot Grove wired

16  $2 million; correct?

17  **A.**    I believe that's right, yeah.

18  **Q.**    Okay.

19          **MR. FAKHOURY:**  Can you pull up Exhibit 62, Mr. Torres.

20  And go to page 90 of this exhibit.

21  **Q.**    Okay.  Mr. Waldinger showed you --

22          **MR. FAKHOURY:**  You can leave it here for a moment.

23  **Q.**    Mr. Waldinger showed you this exhibit, and I wanted to

24  ask -- run through it with you quickly.

25      So this is Exhibit 62, page 90.  This is a bank account

1    from Silicon Valley Bank in the name of Bend Reality LLC.  Do

2    you see that?

3    **A.**    Yes.

4    **Q.**    And it's an account ending in number 9185; correct?

5    **A.**    Correct.

6    **Q.**    Dated February 2016; right?

7    **A.**    Yes.

8        **MR. FAKHOURY:**  Let's go to page 93 of this exhibit,

9    towards the bottom.  And let's stop here for a second.

10   **Q.**    Mr. Waldinger asked you about these two transactions right

11   here, a February 25th, 2016 wire in to this account by

12   Transcend VR for $2 million; correct?

13   **A.**    Yes.

14   **Q.**    And then a wire out that same day to Mike Rothenberg in

15   the amount of $50,000.  Do you see that?

16   **A.**    Yes.

17       **MR. FAKHOURY:**  Can we go to the next page.  You can

18   just scroll down.  It's just going to be right at the top.

19   Thank you.

20   **Q.**    And Mr. Waldinger also asked you about this transaction

21   right here, which shows a wire out of $1.7 million, also on

22   February 25th, 2016, to Mike Rothenberg.  Do you see that, sir?

23   **A.**    Yes.

24       **MR. FAKHOURY:**  Can we pull up Exhibit 97.  This is

25   admitted into evidence.  And let's go to page 73.

1    **Q.**    Okay.  I'm showing you an exhibit that's been admitted.

2    This is Exhibit 73.  And this looks to be a Bank of America

3    bank statement for Michael Brent Rothenberg.  Do you see that?

4    **A.**    Yes.

5    **Q.**    It's an account ending in 2573; correct?

6    **A.**    Correct.

7    **Q.**    And it's dated -- it covers February 20, 2016 to

8    March 23rd, 2016?

9    **A.**    Yes.

10    **MR. FAKHOURY:**  Can we go to page 75 of this exhibit.

11    And let's leave it right here.

12    **Q.**    There is a wire in, so a deposit on this day of

13    $1.7 million.  And that would be February 25, 2016, from Bend

14    Reality.  Do you see that, sir?

15    **A.**    Yes.

16    **Q.**    And that's from a bank account at Silicon Valley Bank that

17    ends in 9185.  Do you see that?

18    **A.**    It says 9185, yes.

19    **Q.**    Okay.

20    **MR. FAKHOURY:**  Can we go to the next page.

21    **Q.**    On that same day, so we're talking about February 25th,

22    2016, there is a wire out of $1.7 million.  Do you see that,

23    sir?

24    **A.**    Yes.

25    **Q.**    And that's to a bank, a Silicon Valley Bank account that

1    ends in 8931?

2    **A.**    Yes.

3    **Q.**    And the beneficiary is listed as Rothenberg Ventures

4    Manage -- it's abbreviated but Rothenberg Ventures Manage?

5    **A.**    Yes.

6            **MR. FAKHOURY:**  Let's pull up Exhibit 63 and go to

7    page 369.

8        Can we zoom this up a little bit?  Thank you.

9    **Q.**    Okay.  Sir, I'm showing you -- this will be the last bank

10   statement.  I promise.

11       I'm showing you Exhibit 63.  This is a bank statement for

12   Rothenberg Ventures Management Company held at Silicon Valley

13   Bank; correct?

14   **A.**    Correct.

15   **Q.**    And it's dated February 2016?

16   **A.**    Yes.

17   **Q.**    Okay.

18           **MR. FAKHOURY:**  Let let's go to many page --

19   **Q.**    Oh, sorry.  And the last four digits of this account are

20   8931?

21   **A.**    Correct.

22           **MR. FAKHOURY:**  Can we go to page 375 of this exhibit.

23   **Q.**    And here on February 25th, 2016, there's a wire in to the

24   Rothenberg Ventures Management account of $1.7 million;

25   correct?

1    **A.**    Correct.

2    **Q.**    And that's sent by Michael Rothenberg; right?

3    **A.**    Yes.

4            **MR. FAKHOURY:**  You can take that down.

5    **Q.**    So we just went through some bank statements showing that

6    Pilot Grove made its investment into River Studios in

7    February 2016.

8            And after that investment, you testified about attending a

9    Founders Field Day at AT&T Park in San Francisco sometime in

10   the spring of 2016, May or April-- or May.  I can't remember

11   the exact date.  Do you recall that?

12   **A.**    Yes.

13   **Q.**    After attending Founders Field Day -- and I'll have a few

14   more questions about that in a little bit.  But after attending

15   Founders Field Day, Pilot Grove decided to make an investment

16   into the 2016 Fund; correct?

17   **A.**    Correct.

18   **Q.**    And it committed to investing a million dollars but

19   ultimately wired $600,000; right?

20   **A.**    Yes.

21   **Q.**    Mr. Waldinger walked you through some emails sent in

22   August of 2016, some emails from before the *TechCrunch* article

23   and some emails from after the *TechCrunch* article.  Do you

24   recall that?

25   **A.**    Yes.

1   **Q.**  So that's about six months after Pilot Grove's $2 million

2   investment into River Studios; right?

3   **A.**  Yes.

4        **MR. FAKHOURY:**  Can we pull up Exhibit 234.  Let's

5   leave it on this page.

6   **Q.**  This is page 1 of Exhibit 234.  This is an August 10, 2016

7   email from Justin Grooms to Mr. Weisman which was eventually

8   forwarded along to you.  Do you recall this email?

9   **A.**  Yes.

10        **MR. FAKHOURY:**  Let's go to the second page of this

11   email.  Can we scroll down a little bit.

12   **Q.**  So this was the proposed amendment to the convertible

13   promissory note that Mr. Waldinger asked you about.  And he --

14   he asked you about this section right here, section (g),

15   talking about capitalization.  Do you see that?

16   **A.**  Yes.

17   **Q.**  And this -- this purported to change the language in the

18   signed promissory note and to replace the language in

19   section 5(g) in the original note with -- with this language

20   which reads "Entities controlled by Mike Rothenberg or entities

21   controlled by such entities collectively hold one hundred

22   percent of the equity interests of the company."

23        You recall your testimony about that change; right?

24   **A.**  Yes.

25   **Q.**  And you're aware that Mr. Rothenberg controlled other

1  entities; right?

2  **A.**    Yes.

3  **Q.**    And that he owned other entities; correct?

4  **A.**    Yes.

5  **Q.**    And that he owned other entities that he controlled?

6  **A.**    Yes.

7      **MR. FAKHOURY:**  We could take that down.

8  **Q.**  So I said a moment ago that there was about a six-month

9  period of time between the investment in February 2016 and then

10  some email correspondence in August of 2016.  I just showed you

11  the email correspondence from before the article, the

12  *TechCrunch* article.

13      Mr. Waldinger asked you about some email correspondence

14  after the *TechCrunch* article listed in these LP updates.  Do

15  you recall that?

16  **A.**    Yes.

17  **Q.**    Now, in the six months between the initial investment --

18  let me rephrase that.

19      In the six months between the -- between Pilot Grove's

20  investment into River Studios and the August 2016 emails with

21  the updates about what was going on at Rothenberg Ventures,

22  River Studios continued to operate in that time frame; right?

23  **A.**    I really don't know.

24  **Q.**    Mr. Waldinger asked you about some language in one of the

25  investor updates concerning Rothenberg Ventures not having the

1    assistance of or needing the assistance of an accountant, and

2    your testimony was that was a little bit frightening to you.

3    Do you recall that?

4    **A.**    I do.

5    **Q.**    Okay.

6         Have you ever heard of a gentleman by the name of Tom

7    Leep?

8    **A.**    Yes.

9    **Q.**    And you knew he was a CFO for Rothenberg Ventures at some

10   point?

11   **A.**    I knew he had a role with Rothenberg Ventures.  He may

12   have been the CFO.  I just don't recall.

13   **Q.**    How about Lynne McMillan?  Does that name sound familiar

14   to you?

15   **A.**    Vaguely.

16   **Q.**    Okay.  How about David Haase?

17   **A.**    No.

18   **Q.**    Hannah Han or Hannah Han?

19   **A.**    No.

20   **Q.**    Mr. Waldinger asked you a little bit about the Founders

21   Field Day that you attended.  And, again, just to put it in --

22   and think about it from a calendar point of view, we're talking

23   about sometime in the spring of 2016; right?

24   **A.**    Yes.

25   **Q.**    And at that time, you -- you -- you split your time

1    between Chicago and Las Vegas, right?

2    **A.**    Correct.

3    **Q.**    And so, you know, obviously you eventually made your way

4    to San Francisco; right?

5    **A.**    Yes.

6    **Q.**    Were you in San Francisco for other business, personal or

7    professional, you know, and just happened to go to Founders

8    Field Day?  Or did you fly in specifically for Founders Field

9    Day, if you recall?

10    **A.**    I -- I think we made a point of coming in for Founders

11    Field Day.  We may -- we have a handful of investments with

12    different managers, and we always try to set up other meetings

13    while we're here.  But I think we were making a point of going

14    to Founders Field Day.

15    **Q.**    Okay.

16        One -- now, at the time you went to Founders Field Day --

17    and let me back up a second.

18        That would be you and Mr. Weisman came to Founders Field

19    Day in 2016; right?

20    **A.**    Correct.

21    **Q.**    And at the time you went to Founders Field Day, Pilot

22    Grove had invested into River Studios but had not yet made a

23    decision about whether to invest into the 2016 Fund; correct?

24    **A.**    Correct.

25    **Q.**    And one of the purposes of going to Founders Field Day was

1  to sort of help do that diligence and decide whether you wanted

2  to invest into the 2016 Fund; correct?

3  **A.**    Correct.

4  **Q.**    After attending Founders Field Day, ultimately Pilot Grove

5  did invest in the 2016 Fund; correct?

6  **A.**    Correct.

7  **Q.**    About a month afterwards, does that sound about right?

8  **A.**    Yeah.

9         **MR. FAKHOURY:**  May I have a moment, Your Honor?

10        **THE COURT:**  Yes.

11             (Defense counsel confer off the record).

12        **MR. FAKHOURY:**  I have no further questions.  Thank

13  you, Your Honor.

14        **THE COURT:**  Thank you, Mr. Fakhoury.

15     Mr. Waldinger, further questions for Mr. Polizzotto?

16        **MR. WALDINGER:**  I do have a few questions, Your Honor.

17                    **REDIRECT EXAMINATION**

18  **BY MR. WALDINGER:**

19  **Q.**    Mr. Polizzotto, Mr. Fakhoury started out by asking you

20  about the fact that when you invested, AR and VR was something

21  that was of interest to Pilot Grove.

22  **A.**    It was of interest to Pilot Grove.  I think what

23  Mr. Fakhoury asked was, was AR and VR the next big thing.

24  **Q.**    That's actually what the question was.  He asked you was

25  it the next big technology.

1    **A.**    Yes.

2    **Q.**    And were you also aware of the River Accelerator, I think

3    he asked you.

4    **A.**    Correct.

5    **Q.**    Were those things -- were those things that you considered

6    in determining whether to make an investment?

7    **A.**    What are the things you're referring to?  The Accelerator

8    and --

9            **THE COURT:**  I was going to ask you the same question.

10           **MR. WALDINGER:**  Sorry.

11   **Q.**    Were the fact -- did you take into account that AR and VR

12   was the next big technology and that Mr. Rothenberg had this

13   River Accelerator in determining whether to invest?

14   **A.**    Yes.

15   **Q.**    And so that might leave the impression that you were going

16   to invest no matter what.  Is that the case?

17   **A.**    No.

18   **Q.**    And what other things did you -- did you consider and rely

19   upon in making, say, your investment into River Studios?

20   **A.**    The investment in River Studios was -- we largely relied

21   on the fact that effectively there were only going to be two

22   seats at the table, at least at the time that we invested.  One

23   would be us, and one would be Mr. Rothenberg.  That was a huge

24   issue.

25          He had produced some VR content that we saw.  I think

1    there were music videos.  They were impressive.

2          Judging by what was happening in that industry, we wanted

3    to have an investment in the industry, but what was really

4    important with this particular investment is that there was no

5    one else involved and that Mike did seem -- Mr. Rothenberg did

6    seem to be on the cutting edge of the technology.

7    **Q.**    And was it related to the fact that there was no one else

8    involved, was it also important that Mr. Rothenberg had used

9    his own money to fund the company?

10   **A.**    Extremely important.  It's a demonstration of his own

11   belief in the technology and his own belief in his capacity.

12          **MR. WALDINGER:**  Ms. Margen -- so I'm going to move on

13   to a different topic.  Ms. Margen, if we could pull up

14   Exhibit 234.

15   **Q.**    Mr. Polizzotto, this is the email from Justin Grooms.  Do

16   you recall that?

17   **A.**    Yes.

18          **MR. WALDINGER:**  And, Ms. Margen, please go to the

19   second page, and blow up the capitalization term.

20   **Q.**    Mr. Polizzotto, Mr. Fakhoury asked you some questions

21   about the fact that you knew that Mr. Rothenberg controlled

22   other companies at the time that you invested.

23   **A.**    Correct.

24   **Q.**    And he asked you questions about whether you knew that

25   Mr. Rothenberg owned other companies at the time that you

1    invested.

2    **A.**    Yes.

3    **Q.**    I don't want those questions to leave the impression that

4    based on that knowledge, did you --

5            **THE COURT:**  Mr. Waldinger, it's not good to begin a

6    question with things that you don't want.

7            **MR. WALDINGER:**  Very good, Your Honor.

8            **THE COURT:**  Et cetera.  Yeah.

9    **BY MR. WALDINGER:**

10   **Q.**    Mr. Polizzotto, did you -- did you understand this

11   amendment to say anything about Mr. Rothenberg's ownership --

12   or what did you understand this amendment to say regarding

13   Mr. Rothenberg's ownership of River Studios?

14   **A.**    Well, it indicated to me that he didn't own it all and

15   that he was trying to indicate that although he didn't own it,

16   he controlled entities that owned it.  And, you know, there's

17   an enormous difference between ownership and control.

18   **Q.**    As he said later to you.

19   **A.**    Yes.

20   **Q.**    In fact, let's pull up -- let's pull up what I think we'll

21   call the paddling email, Exhibit 632.

22           In this email to you and Mr. Polizzotto [sic], could you

23   just read this last sentence that the defendant stated about

24   his ownership of River Studios.

25   **A.**    "The River Studios team is incredible, but for a fair and

1  successful future, we'll need to sync up to discuss.  I have no

2  need to own any piece of this or make any money on the company

3  I founded, but would like to discuss ASAP to reflect the fair

4  value of your investment and to protect it going forward."

5  **Q.**  All right.  Thank you.

6        **MR. WALDINGER:**  Ms. Margen, you can take that down.

7  **Q.**  And finally my final topic, Mr. Polizzotto, is that on

8  direct, I showed you Exhibit 62, which showed after

9  Transcend VR's $2 million wire into the Bend Reality bank

10 account, the two transfers to Mr. Rothenberg.  Do you recall

11 those?

12 **A.**  Yes.

13 **Q.**  On cross-examination, Mr. Fakhoury then showed you a

14 couple of more bank statements.  So I'd like to recap that real

15 quick.

16        **MR. WALDINGER:**  Ms. Margen, could you go to

17 Exhibit 97, page 73.

18       So this was Mr. Rothenberg's bank account statement.  Do

19 you see that, Mr. Polizzotto?

20 **A.**  Yes.

21        **MR. WALDINGER:**  Ms. Margen, please go forward to

22 page 75.

23 **Q.**  Mr. Fakhoury pointed out to you this February 25th, 2016

24 deposit from Bend Reality.  Do you see that?

25 **A.**  Yes.

1  **Q.**    What was the amount of that?

2  **A.**    1,700,000.

3  **Q.**    Again, the date of that deposit?

4  **A.**    February 25, 2016.

5  **Q.**    Was that the same day that Transcend VR wired $2 million

6  to Bend Reality?

7  **A.**    Yes.

8          **MR. WALDINGER:**    Ms. Margen, let's go forward to

9  page 76.

10  **Q.**    Mr. Fakhoury also pointed out this February 25th wire out.

11  Do you see that?

12  **A.**    Yes.

13  **Q.**    Is that the same day as the $1.7 million deposit that we

14  looked at on the prior page?

15  **A.**    Yes.

16  **Q.**    Can you tell the beneficiary from this account -- or from

17  this description?

18  **A.**    Rothenberg Ventures Management.

19  **Q.**    What is the amount of that wire out?

20  **A.**    1,700,000.

21          **MR. WALDINGER:**    Ms. Margen, let's go to Exhibit 63,

22  page 369.

23  **Q.**    Again, this is the Rothenberg Ventures Management Company

24  statement for February of 2016.  Do you see that?

25  **A.**    Yes.

1        **MR. WALDINGER:**  Could you please page down,

2    Ms. Margen, at least two pages.  And I think we need to go a

3    couple more, keep going, to February 25th.

4    **Q.**   All right.  On the top half of the page, do you see the

5    $1.7 million deposit?

6    **A.**   Yes.

7    **Q.**   Based on the flow of transactions that we've just gone

8    through, do you have any conclusions, back-of-the-envelope

9    conclusions, about the source, the ultimate source of this

10   $1.7 million deposit to Rothenberg Ventures Management Company?

11   **A.**   It's 1.7 of the $2 million we wired at the same time.

12   **Q.**   Did you think that your money, Pilot Grove's money, would

13   end up in the Rothenberg Ventures Management Company's account

14   the same day you sent it to Bend Reality?

15   **A.**   No.

16   **Q.**   There's a couple transactions here on this page that

17   Mr. Fakhoury did not point out to you.  And those are listed on

18   the account statement as happening before the $1.7 million

19   deposit.  Do you see those?

20   **A.**   I do.

21   **Q.**   Do you see what the effect of those transactions has on

22   the balance on the account?

23   **A.**   I do.  The balance has gone negative.

24   **Q.**   So based on that, do you have any conclusions about the

25   source, the ultimate source, of these two transactions?

1      **MR. FAKHOURY:**  Objection.  Speculation and outside the

2   scope.

3      **THE COURT:**  Sustained on the second ground.

4   **BY MR. WALDINGER:**

5   **Q.**   Do you know -- do you know what these two accounts are?

6      **MR. FAKHOURY:**  Objection.  Outside the scope.

7   Speculation.

8      **THE COURT:**  Sustained.

9      **MR. WALDINGER:**  All right.  I'll leave it there,

10  Your Honor.

11     **THE COURT:**  Thanks, Mr. Waldinger.

12     Mr. Fakhoury, further questions for this witness?

13     **MR. FAKHOURY:**  Very briefly, Your Honor.

14                  <u>**RECROSS-EXAMINATION**</u>

15  **BY MR. FAKHOURY:**

16  **Q.**   Mr. Torres is going to pull up Exhibit 205.  I wanted

17  to -- you -- well, let me ask a question.

18     On redirect, you -- you testified about Pilot Grove

19  relying on the idea that there would be two seats at the table

20  when making the decision to invest into River Studios.

21     Do you recall that statement you just made?

22  **A.**   Yeah.

23  **Q.**   And the two seats at the table would be Mr. Rothenberg and

24  Pilot Grove; correct?

25  **A.**   Correct.

1    **Q.**  Okay.

2        I'm showing you Exhibit 205.  This is a February 17, 2016

3    email from Mr. Rothenberg to you and Mr. Weisman, and there's a

4    number of attachments.  And I'm sure I've shown this to you or

5    perhaps Mr. Waldinger showed this to you, but you recall this

6    email?

7    **A.**  I do, yes.

8        **MR. FAKHOURY:**  Okay.  Can we go to page 30 of this

9    exhibit.

10   **Q.**  This is the last page of the slide deck related to River

11   Studios.  And there's sort of two columns here.  One is "Terms

12   of Fundraise" and the other is "Uses of Capital," and I want to

13   direct your attention to "Terms of Fundraise."

14       The first paragraph here says 5 to $10 million investments

15   from 2 to 3 value-added -- value-add investors with expertise

16   in media, content, distribution and VR.

17       Do you see that?

18   **A.**  I do.

19       **MR. FAKHOURY:**  I have no further questions.  Thank

20   you.

21       **THE COURT:**  Mr. Waldinger, anything within the scope.

22       **MR. WALDINGER:**  No, Your Honor.

23       **THE COURT:**  Mr. Polizzotto, thanks very much for your

24   testimony.  You're excused.

25       **THE WITNESS:**  Thank you.

1          **THE COURT:**  Members of the jury, that brings us right

2     exactly to the time for our second recess so we're going to go

3     ahead and take one.

4          Please remember my prior admonition.

5          **THE CLERK:**  Please rise for the jury.

6          (Proceedings were heard out of presence of the jury:)

7          **THE COURT:**  We're outside the presence of the jury.

8     Anything for the record, Mr. Waldinger?

9          **MR. WALDINGER:**  Our next witness, Your Honor, will be

10    David Haase, who we've heard about.

11         Also is this a day we're stopping early?

12         **THE COURT:**  It is not.  Reentry court occurs on the

13    second and fourth Wednesdays of the month only.

14         **MR. WALDINGER:**  Okay.  That was it from the

15    Government.

16         **THE COURT:**  Mr. Fakhoury, anything for the record?

17         **MR. FAKHOURY:**  No, Your Honor.  Thank you.

18         **THE COURT:**  You said the gentleman pronounces his name

19    Haase?

20         **MR. WALDINGER:**  I believe so.

21         **THE COURT:**  Madame Reporter, H-A-A-S-E, from the

22    witness list.

23         How long do we expect Mr. Haase's examination to take?

24         **MR. WALDINGER:**  I think it won't finish today and that

25    we'll continue him in the morning.

1          **THE COURT:**  I see.  I was going to ask you what he

2     does, but he'll tell me when we come back from our recess.

3        Let's be in recess.  Thank you.

4          **THE CLERK:**  Court is in recess.

5                    (Recess taken at 11:49 a.m.)

6                  (Proceedings resumed at 12:06 p.m.)

7        (Proceedings were heard in the presence of the jury:)

8          **THE COURT:**  Back on the record.

9        All the jurors are in their assigned seats.

10       The parties and counsel are at counsel table.

11       Mr. Walsh, the Government's next witness.

12         **MR. WALSH:**  Your Honor, the United States calls David

13    Haase.

14         **THE COURT:**  Good morning, Mr. Haase.

15       Let me ask you to come up here to the witness stand area

16    to my left.  When you get there, you'll see my courtroom deputy

17    is already there.  If you could remain standing, face her and

18    raise your right hand, please.

19                          **DAVID HAASE**,

20    called as a witness by the Government, having been duly sworn,

21    testified as follows:

22         **THE WITNESS:**  I do.

23         **THE CLERK:**  Thank you.

24       If could please state and spell your last name for the

25    court reporter.

1          **THE WITNESS:**  My name is David Scott Haase, the

2    Second.  H-A-A-S-E.

3          **THE CLERK:**  Thank you.  You can be seated.

4          **THE COURT:**  Thanks, Mr. Haase.

5     Go ahead and take your mask off while you're testifying.

6    We have some water there in case you get thirsty or your mouth

7    gets dry.

8          Have you ever testified before?

9          **THE WITNESS:**  I have, yes.

10         **THE COURT:**  Okay.  I'll give you the abbreviated

11   version then.

12         I need you to use whole words and not noises or gestures

13   like "uh-huh" or shaking your head.  So the court reporter can

14   get that down.

15         If you'll wait for the lawyers to finish their

16   questions -- excuse me -- yeah.  If you'll wait for the lawyers

17   to finish their questions, they'll wait for you to answer so we

18   don't have two people talking at once.

19         If you don't know the answer to a question, it's fine just

20   to say "I don't know."  If you don't remember something, fine

21   to say "I don't remember."

22         If a question is not clear to you, you should tell the

23   lawyers that.  I'm sure they will be happy to rephrase.

24         The folks over here on the left, that's our jury.  They're

25   the ones making the decision in the case.  You can see it's a

big jury box, it goes all the way back to that TV.  So if you could keep your voice up, stay reasonably close to the mic, you'll be helping them.

Does that all make sense?

**THE WITNESS:**  Yep.

**THE COURT:**  Mr. Walsh, your witness.

**MR. WALSH:**  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. WALSH:

Q.   Sir, where did you go to college?

A.   I went to Indiana University for undergrad.

**THE COURT:**  Pull that mic a little closer, please.

BY MR. WALSH:

Q.   Why don't you give that again?

A.   I went to Indiana University for undergrad.

Q.   What did you study at Indiana University?

A.   Finance and accounting.

Q.   And when did you graduate?

A.   In 2003.

Q.   While you were in college, did you do any internships?

A.   Yeah.  I interned at Microsoft in finance.

Q.   What were you doing?

A.   I was doing financial reporting for the Xbox division.

Q.   Did you get a free Xbox?

A.   Nope.  We had not launched it yet.

1    **Q.**    After you graduated, what did you do?

2    **A.**    I went to work for Eli Lilly and Company, which is a large

3    pharmaceutical company, first in sales and then in marketing

4    and then in business development.

5    **Q.**    Where were you working then?

6    **A.**    I was in Indianapolis, and then I -- I -- they sent me

7    back to business school which -- afterwards, and then I went

8    back to China with Lilly, so I was there for -- you know,

9    before and after business school.

10    **Q.**    During this time beforehand, though, it sounds like you

11    went to business school.  Where and when did you go to business

12    school?

13    **A.**    I went to Stanford for business school from 2006 to 2008.

14    **Q.**    And after you graduated from business school, what did do

15    you?

16    **A.**    I went back to Lilly for a couple of years in business

17    development.  I was working in China for a little bit.  And

18    then I worked on -- in the diabetes group with our

19    international affiliates.

20         And then I went to General Mills for a few years and did

21    general management there.

22         And then I left to work for an e-commerce company that

23    built sites and apps for small and mid-sized businesses.

24    **Q.**    Let me stop you there.  Just so we get this time frame

25    here, when did you leave Eli Lilly?

1    **A.**    I left Eli Lilly in 2010.

2    **Q.**    For how long were you at General Mills?

3    **A.**    I was there for about three years.

4    **Q.**    And you said you did general management.  What does that

5    mean?

6    **A.**    Yeah.  So I would run a brand team.  I worked on like the

7    fruit snacks team.  So we ran Fruit Roll-ups and Gushers and

8    Fruit By the Foot.  And I effectively was kind of like the CEO

9    of a, you know, little $500 million business.

10    **Q.**    And how long were you there?

11    **A.**    I was there for just under three years.

12    **Q.**    When you left, you said you went to a new company.  What

13    was the name of that company?

14    **A.**    Yeah.  I went to a company called Echidna.

15    **Q.**    Could you spell that for us, please?

16    **A.**    Yeah.  E-C-H-I-D-N-A.

17    **Q.**    What is Echidna?

18    **A.**    It is -- well, it's a small animal, but the company itself

19    I assume is more relevant here.  We were a systems integrator.

20    So we built sites and apps and had a few hundred engineers.

21    **Q.**    Okay.  And how long were you there?

22    **A.**    I was there for, I believe it was about two years.

23    **Q.**    If I'm following right, I think you've now landed us in

24    about 2015.  Were you in the San Francisco area?

25    **A.**    Yeah.  I came back to San Francisco in roughly 2015.

1    **Q.**    Came back.  Are you from the Bay Area?

2    **A.**    No.  But when I was in business school, I was here for a

3    couple years.

4    **Q.**    When you came back to the San Francisco Bay Area, where

5    did you go to work?

6    **A.**    I went to work at Berkeley Advanced Biotech which very

7    briefly I was there for just a few months.  It wasn't a good

8    fit.  And then I ended up buying a small CPA firm shortly

9    thereafter in August of 2015.

10    **Q.**    What's the name of that CPA firm?

11    **A.**    It was Peninsula Accounting.  We have since renamed it

12    Golden State Accounting.

13    **Q.**    Now, Peninsula Accounting, did you have any -- first of

14    all, you said CPA firm.  What is that?

15    **A.**    So we were an accounting firm that did taxes and general

16    accounting like bookkeeping or tax strategy, things like that.

17    **Q.**    And CPA stands for?

18    **A.**    Certified Public Accountant.

19    **Q.**    And there's a certification for those who pass it?

20    **A.**    Yep.  So I became a CPA after I bought the firm.

21    **Q.**    Okay.  Did you have any relationship to that -- to

22    Peninsula Accounting before you bought it?

23    **A.**    Yeah.  My mother ran it for just over a decade.

24    **Q.**    Now, when you joined Peninsula Accounting then, what role

25    did you have?

1    **A.**    Yeah.  So I bought the company.  I became the -- the

2    managing partner.  What I did, because I didn't have a

3    background in tax specifically, is really focus on our

4    accounting business.  So I did CFO services and bookkeeping

5    services for clients.  That's primarily what I spent my time

6    doing.

7    **Q.**    Let's talk about that.  What is the difference between --

8    well, let's just define them.  What is a bookkeeping service

9    and what is an accounting service?

10   **A.**    Yeah.  I mean there's a lot of overlap.  But, you know,

11   bookkeeping is generally keeping the books straight which is

12   really, you know, what accounting is.  It's records, financial

13   records, making sure that you are organizing what's happening

14   in the business at a transaction level into your reports that

15   investors and manager can understand.

16   **Q.**    And how about accounting then, how is that different?

17   **A.**    So I mean I think bookkeeping is a subset of accounting

18   effectively.  So accounting has a little bit broader scope with

19   controls and things like that that you might have in an

20   organization.  But bookkeeping is really just specifically the,

21   you know, building the financials.

22   **Q.**    I think you already told our jury, but once you had

23   acquired the firm, did you in fact get your Certified Public

24   Accountant certificate?

25   **A.**    I did, yep.

1    **Q.**    About when was that?

2    **A.**    I think it was a couple years later.  It was 2018 or '19,

3    if I remember correctly.

4    **Q.**    And you also said you renamed Peninsula Accounting.

5    **A.**    I did.

6    **Q.**    What's it called now?

7    **A.**    Golden State Accounting.

8    **Q.**    About how many people work at Golden State Accounting?

9    **A.**    We've got about 14 folks.

10    **Q.**    And what are the services that you are providing now at

11    Golden State?

12    **A.**    Yeah.  We still do the same thing.  So we have a

13    bookkeeping practice, we do tax and tax strategy for businesses

14    and business owners and high wealth individuals.

15    **Q.**    Now, with regard to these accounting services, what's --

16    do companies come to you to hire you, or how does this work?

17    **A.**    Yeah.  We -- we have about 85 clients where we do their

18    monthly financials.  And they do -- they come to us and hire us

19    to, you know, be the point from an accounting perspective on

20    building their financial reports.

21        And then we also do taxes for about a couple hundred

22    businesses as well.  So on an annual basis, you know, we file

23    their income taxes or sometimes we will file state -- sales tax

24    as well.

25    **Q.**    For startup companies, how -- how would you interface with

1    them?  How would that work?

2    **A.**    Yeah.  We work with a number of startups.  You know, being

3    in the Bay Area, that's a common thing around here.  And, you

4    know, I will be typically the point from a client communication

5    perspective.  And then I would have like a bookkeeper working

6    underneath me to do the actual bookkeeping for those clients.

7    **Q.**    Have you had any business with venture capital firms?

8    **A.**    I have, yeah.  I worked with Rothenberg Ventures, you

9    know, in 2015.

10   **Q.**    Got it.

11   **A.**    2016.  Excuse me.

12   **Q.**    How would your firm interact with a venture capital firm

13   as opposed to a startup?

14   **A.**    Yeah.  So venture capital firms have similar needs in

15   terms of, you know, obviously financial reporting, but they

16   also have a number of different complexities in that they have

17   different funds, you have different owners of those different

18   funds which really operate like independent companies.

19        And then you have, you know, effectively like an umbrella

20   company, like the management company that is in charge of

21   managing those investment funds.

22        So there's bookkeeping that needs to be done.  There's

23   also controls.  There's reporting.  We would do many of the

24   similar things that we would do with a startup, but just, you

25   know, there's more complexity involved.

1    **Q.**    All right.  And do you live in the Bay Area now, or where

2    are you coming from?

3    **A.**    No.  I live in San Diego currently.

4    **Q.**    Now, you've already alluded to the fact that you ended

5    up -- or I guess Peninsula Accounting ended up doing some

6    business with Rothenberg Ventures.

7        How is it that Peninsula Accounting and Rothenberg

8    Ventures Management Company connected?

9    **A.**    We received a call, I think originally, from -- from an

10    employee of Rothenberg Ventures, Katie Fanelli, who was looking

11    for a new accounting firm.  I think it was in March of 2016.

12    **Q.**    Did you have any prior contact or have you ever heard of

13    Rothenberg Ventures before then?

14    **A.**    No, I had not.

15    **Q.**    This was just a call out of the blue?

16    **A.**    That's right.

17    **Q.**    And what happened once Katie Fanelli reached out to you?

18    **A.**    Yeah.  We -- you know, my understanding was they were

19    interviewing a few different firms.  And so we set up an

20    introductory meeting, I think first with Katie, and then, you

21    know, that went well.  We ended up having a meeting with Mike

22    Rothenberg to kind of explore a fit between the firm and what

23    they were looking for with -- with the business.

24    **Q.**    Did you attend that meeting with Mike Rothenberg?

25    **A.**    I did.

1    **Q.**    And what was discussed at that initial screening meeting,

2    I guess?

3    **A.**    Yeah.  I mean just general qualification questions.

4    What's our background.  What's my background.  What kind of

5    businesses we had worked with in the past.  And what kind of,

6    you know -- or I guess our approach to how we do the work and

7    things like that.

8    **Q.**    All right.  And did Rothenberg Ventures end up hiring

9    Peninsula Accounting?

10    **A.**    They did.

11    **Q.**    Now, let's just talk about the time that you worked with

12    Rothenberg Ventures.  When was the beginning and when was the

13    end?

14    **A.**    Yeah.  I started working with them, I think it was

15    March of 2016, early March.  And I stopped working with them in

16    August of 2016.

17    **Q.**    Okay.  When you first started working with Rothenberg

18    Ventures, was that as an employee or some other status?

19    **A.**    We began as a -- as effectively a contractor.  You know,

20    they hired the firm to do bookkeeping for them.  And then, you

21    know, the -- we were working well together throughout March.

22    And then Mike asked me to come on full-time as an employee.  So

23    at first we were contracted as a firm, and then I became an

24    employee.

25    **Q.**    All right.  You said you began in -- Peninsula Accounting

1   at least began in March of 2016.

2           **MR. WALSH:**  I'd like to show you what's been marked as

3   Exhibit 341 for identification only, please.

4   **Q.**   Do you see this document?

5   **A.**   I do.

6   **Q.**   Do you recognize it?

7   **A.**   I do.

8   **Q.**   And what is it?

9   **A.**   This is an email from Mike Rothenberg to me at Peninsula

10  Accounting with some notes about -- you know, accounting notes

11  basically for, you know, while they were between accountants,

12  he's describing things that will help me catch up on the books.

13  **Q.**   Okay.  And while you were working at Peninsula Accounting

14  and as well later when you were working at Rothenberg Ventures,

15  did both of those entities use email to conduct business?

16  **A.**   We did.

17  **Q.**   In the regular course of its business?

18  **A.**   Absolutely.

19  **Q.**   And did both of those entities store those emails as well?

20  **A.**   We did.

21  **Q.**   And were those emails made at or near the times that are

22  stamped on the emails?

23  **A.**   They are, yeah.  They were.

24  **Q.**   And were they made by people with knowledge of the

25  contents of those emails?

1    **A.**    They were.

2              **MR. WALSH:**  Your Honor, I move into evidence

3    Exhibit 341.

4              **THE COURT:**  Any objection?

5              **MR. FAKHOURY:**  No, Your Honor.

6              **THE COURT:**  341 is admitted.

7              (Government's Exhibit 341 received in evidence.)

8                        (Exhibit published to jury.)

9    **BY MR. WALSH:**

10   **Q.**    Let's just blow up the header block here first.

11            All right.  So from whom and to whom --

12   **A.**    Sorry.

13   **Q.**    From whom and to whom is this email sent?

14   **A.**    This is from Mike Rothenberg to myself.

15   **Q.**    Okay.  And at this point, you've still got the Peninsula

16   Accounting email address?

17   **A.**    That's right.

18   **Q.**    What is the date of this email?

19   **A.**    Friday, March 4, 2016.

20   **Q.**    All right.  So this is at the very beginning of your time

21   with Rothenberg Ventures?

22   **A.**    That's right.

23            **MR. WALSH:**  If we could dezoom that, please.  And if

24   we could blow up the first half of that.

25   **Q.**    All right.  Here what's happening?  What's Michael

1    Rothenberg doing for you in this email?

2    **A.**    He's giving me some transactions that, you know, looked

3    like they happened in February, according to his notes, that

4    include, you know, payments that had been going, you know, out

5    from the company, payroll, some other payments that aren't

6    specified.  And then some transfers that Mike had made during,

7    you know, the February to it looks like River Studios.  I

8    assume that's what RS is for.  So that we could document those

9    things obviously in the preparation of, you know, the

10    financials.

11    **Q.**    All right.  And at a high level, is this how you received

12    information from Mr. Rothenberg about various transactions

13    during your time working with Rothenberg Ventures?

14    **A.**    Yeah.  This would have been a common, you know, way for us

15    to go back and forth on those things.

16    **Q.**    And -- all right.  And so these -- these are just two

17    dates that set out various transactions; is that right?

18    **A.**    That's right.

19    **Q.**    And I would just like to highlight to you the first

20    transaction that is listed there on February 25th of 2016.  If

21    you could just read that to the jury, just the first line.

22    **A.**    Yeah.  It says, "RS transferred 1.7 million to Mike."  And

23    then in parentheses it says "repayment of investment."

24    **Q.**    And then the last transaction there on February 25 of

25    2016?

**A.**    The last one says "Pilot Grove invested 2 million into RS."

**Q.**    And in context, that means what, RS?

**A.**    It should be River Studios.

**Q.**    All right.  And this type of email here, is this representative of the -- of how you would -- Mike Rothenberg controlled the information?

**A.**    Yeah.  And this would be a common -- this would have been a common piece of communication that we would have had between us.

    And, you know, I think what -- what's interesting here, we would obviously have bank records as well, but sometimes when you see a transfer from one account to the other, you don't know what those accounts are.  You may have a name or you may not have a name.  And so this would have been very common for Mike to say this is why we transferred money from here to here.

**Q.**    Okay.  Now, you mentioned that you were asked to come on full-time, though, at some point; is that right?

**A.**    That's right.

**Q.**    And did you end up signing a contract?

**A.**    I did.

**Q.**    I'd like to show you what's marked as Exhibit 579 for identification only.

    Do you recognize this document?

**A.**    I do.

1    **Q.**    What is this document?

2    **A.**    This was an employment agreement when I joined the

3    company.

4    **Q.**    And was it the case that both Rothenberg Ventures and

5    yourself kept this type of contract in the ordinary course of

6    business?

7    **A.**    Yes.

8    **Q.**    And was it made at or near the time or the date that is

9    indicated here on this document?

10   **A.**    It was.

11          **MR. WALSH:**   Your Honor, I move into evidence

12   Exhibit 579.

13          **THE COURT:**   Any objection?

14          **MR. FAKHOURY:**   No, Your Honor.

15          **THE COURT:**   579 is admitted.

16          (Government's Exhibit 579 received in evidence.)

17                  (Exhibit published to jury.)

18          **MR. WALSH:**   And if we could just blow up the top half

19   all the way down to before number 2 position.

20   **Q.**    All right.   What's the date of this document?

21   **A.**    April 1st, 2016.

22   **Q.**    And what does it indicate when your start date will be?

23   **A.**    The start date is April 18th in 2016.

24   **Q.**    That's the date of this employment, but you were already

25   working there; right?

1    **A.**    That's right.  As a contractor.

2    **Q.**    And it's between you and Mr. Rothenberg; is that right?

3    **A.**    That's right.

4    **Q.**    And the company here is what?

5    **A.**    Rothenberg Group LLC.

6    **Q.**    What was the compensation you were being paid?

7    **A.**    $250,000 per year.

8    **Q.**    And what was your scope of work?

9    **A.**    So my scope of work was to support the CEO, controlling

10    finance, accounting and tax.

11    **Q.**    And what was your title?

12    **A.**    The title was CFO.

13    **Q.**    Which stands for?

14    **A.**    Chief financial officer.

15    **Q.**    Okay.

16          **MR. WALSH:**  And if we could dezoom that, please.  And

17    go to page 6 of this exhibit.

18    **Q.**    Did you end up signing that document there at the bottom?

19    **A.**    I did.

20    **Q.**    And what date did you sign it?

21    **A.**    On April 3rd, 2016.

22    **Q.**    Okay.  Now, you were working there.  Was there someone

23    else from Peninsula Accounting that also was playing a role at

24    Rothenberg Ventures?

25    **A.**    Yeah.  I had a young woman named Hannah Han that worked

1    for me as well who was an employee of Peninsula but worked

2    exclusively on Rothenberg and the entities underneath

3    Rothenberg.

4        **MR. WALSH:**  And for our court reporter, that's Han,

5    H-A-N.

6    **Q.**    And what was her role?  What did she mostly do?

7    **A.**    She was the point on the bookkeeping, whereas I was

8    playing more of a finance role.

9        **MR. WALSH:**  Okay.  If I could dezoom this, please.

10       And I'd like to show you what's been marked Exhibit 343

11   for identification only.

12   **Q.**    Do you recognize this item?

13   **A.**    I do.

14   **Q.**    And just at a high level, what is this item?

15   **A.**    This is an email from me to Mike Rothenberg copying

16   Hannah, and effectively -- let's see.  It's got -- yeah,

17   base -- saying we're going to start a file for Rothenberg

18   Adventures, which was a new entity that we were talking about

19   breaking out underneath one of the other entities.

20   **Q.**    Is this another email that was kept in the regular course

21   of business at Rothenberg Ventures and Peninsula Accounting?

22   **A.**    Yes.

23   **Q.**    And was it made at or near the time of the email that is

24   dated there?

25   **A.**    Yes.

1    **Q.**  By people with knowledge of its contents?

2    **A.**  Yes.

3          **MR. WALSH:**  Your Honor, I move into evidence

4    Exhibit 343.

5          **THE COURT:**  Any objection?

6          **MR. FAKHOURY:**  No, Your Honor.

7          **THE COURT:**  343 is admitted.

8          (Government's Exhibit 343 received in evidence.)

9                (Exhibit published to jury.)

10          **MR. WALSH:**  All right.  If we could just blow up the

11    header block so we can get our...

12    **Q.**  Okay.  What is the date of this email?

13    **A.**  March 23rd, 2016.

14    **Q.**  Okay.  So this is before you had started working there as

15    a full-time employee?

16    **A.**  That's right.

17    **Q.**  And -- but this has -- is it Hannah or Hannah Han?

18    **A.**  Hannah.

19    **Q.**  Hannah Han.  Okay.  And this particular one, what is the

20    subject here?

21    **A.**  It's a response to Super Bowl receipt.

22    **Q.**  Okay.

23          **MR. WALSH:**  If we could dezoom that, please.  And blow

24    up the bottom email there on March 23rd.

25    **Q.**  So this is an earlier -- this is a string of emails,

1    right?  This is an earlier email in this string?

2    **A.**    Yes.

3    **Q.**    From whom and to whom is this sent?

4    **A.**    This is from Mike Rothenberg to it looks like to Savannah

5    who is one of his executive assistants.

6    **Q.**    Okay.  And what is the date of that email?

7    **A.**    March 23rd, 2016.

8    **Q.**    Okay.

9         **MR. WALSH:**  If we could dezoom that, please, and then

10    blow up the center email from Mike Rothenberg.  Thank you.

11    **Q.**    Okay.  Later that day, there's an email; is that right?

12    **A.**    Yes.  This is the same day, later on.

13    **Q.**    And from whom and to whom is this email sent?

14    **A.**    This is from Mike Rothenberg to me.

15    **Q.**    All right.  And what is he indicating here?  What is --

16    the first sentence, what does it say?  If you could just read

17    it.

18    **A.**    The first sentence says, "Dave, here are the expenses I

19    can think of so far for Rothenberg Adventures."

20    **Q.**    Now, did you know what Rothenberg Adventures was at this

21    time?

22    **A.**    I did not.

23    **Q.**    Did Mike Rothenberg explain to you what Rothenberg

24    Adventures was?

25    **A.**    I don't think so, before this email.  It was a new entity

1    to me, something that I wasn't aware existed.

2    **Q.**    And then what does the second sentence of this email say?

3    **A.**    The second sentence says, "Please be sure to transfer all

4    of these out of Rothenberg Ventures Management Co. LLC and Bend

5    Reality LLC as soon as possible."  In parentheses, "(This is a

6    big priority.)"

7    **Q.**    Okay.  And then he lists a series of items there in the

8    next few lines; is that right?

9    **A.**    That's right.

10    **Q.**    What are those purported to be?  What is he representing

11    that those are?

12    **A.**    One line says income, $400,000 for partnership and

13    sponsorship revenue.  And then it lists a number of people,

14    James Taylor, Collette Davis, Ish Simpson, Brian Furano,

15    $450,000.  River Racing, $600,000.  Warriors, $500,000, in

16    parentheses, $25,000 per month plus food and beverage, and then

17    Super Bowl week, $300,000.

18            **THE COURT:**  Mr. Haase, you're a bit of a fast talker.

19    Clear but very fast.  If you could slow down a tad, it would be

20    helpful to the reporter.

21            **THE WITNESS:**  Okay.

22            **THE COURT:**  Thanks.

23    **BY MR. WALSH:**

24    **Q.**    Let's focus in on the income.  If you could just read it

25    exactly as it says.  Income, colon, and what does it say?

1   **A.**   The income says $400,000, all partnerships, sponsorship,

2   revenue since January 2015.

3   **Q.**   What did you take that to mean?

4   **A.**   That the total income would be $400,000 that was paid for

5   by partners or sponsors.

6   **Q.**   Since January of 2015?

7   **A.**   That's right.

8   **Q.**   Until March of 2016?

9   **A.**   Yes.

10   **Q.**   All right.  At the bottom, there's a paragraph there.

11   Could you just read that to our jurors.

12   **A.**   The net is a $1.4 million loss.  And then it says should

13   be capitalized as a $1.4 million loan from me to Rothenberg

14   Adventures and net out with Rothenberg Ventures Management

15   Company and Bend Reality LLC as loans from them to me.

16   **Q.**   Okay.  There is a lot going on in that sentence.  Let's

17   just start off, let's just break it down.

18       Net -- there is a tilde there, $1.4 million loss.  What

19   does the tilde mean?

20   **A.**   That means approximately $1.4 million.

21   **Q.**   And the loss then is for Rothenberg Adventures?

22   **A.**   That's right.

23   **Q.**   What does "should be capitalized as a $1.4 million loan

24   from me to Rothenberg Adventures mean?

25   **A.**   What I took that to mean was that it would be

1    categorized -- there would be a loss on the profit and loss

2    statement, but there would be a corresponding loan from Mike to

3    Rothenberg Adventures.

4    **Q.**    And why would -- why would one do that?

5    **A.**    Well, there would be a question of who funded the loss.

6    And so on the balance sheet, you would need to have, you

7    know -- you would need to attribute basically who funded that

8    capital.  And so he's saying it came from him.

9    **Q.**    Okay.  And then the second part of the sentence says -- or

10   maybe the third part at this point, "and net out with

11   Rothenberg Ventures Management Company and Bend Reality LLC as

12   loans from them to me."

13       What does that mean?

14   **A.**    So that means that Rothenberg Ventures and Bend Reality

15   had loaned the $1.4 million or, you know, roughly that amount

16   to Mike.

17   **Q.**    And that he in turn was loaning it to Rothenberg

18   Adventures?

19   **A.**    That's right.

20   **Q.**    When you read that at the time, what did you -- what was

21   your reaction to that request?

22   **A.**    You know, at this time, I didn't know.  I was three weeks

23   into this, and so I didn't know a lot about the relationship

24   between the entities and Mike personally or the entities and

25   one another.

1    But that's a lot of money to be moving back and forth

2  between entities.  And then obviously he's being very

3  particular about the money coming from Rothenberg Ventures and

4  Bend Reality to him personally and then from him personally to

5  Rothenberg Adventures, which means that that's meaningful in

6  some way.

7  **Q.**  Okay.  And -- all right.

8      **MR. WALSH:**  Okay.  So if we can dezoom that, please.

9  **Q.**  Now, when you arrived there in March of 2016, could you

10 just tell the jurors what the status of the financials were,

11 that is, the financial documentation at Rothenberg Ventures

12 Management Company?

13 **A.**  When I arrived, there had been some time between

14 accounting firms or CFOs, I actually think both.  And so we had

15 a lot of catch up to do.  There was a lot of, you know,

16 documentation that needed to be caught up from the previous few

17 months.  And there was a lot of activity going on, you know,

18 you can see it in these emails that there's a lot of money

19 going back and forth and very significant sums of money.

20     So we were working as fast as we could to catch up very

21 quickly on some of the -- the finances.  I would say that they

22 were in a, you know, bit of disarray at the time.

23 **Q.**  What was your original assignment then when you started?

24 What were you trying to do?

25 **A.**  Yeah.  What -- what I was charged with was to -- to try to

1   create, you know, accurate financials for the different

2   entities.  And at the time we didn't have a great understanding

3   of what the different entities were.  So you can see Rothenberg

4   Adventures or Rothenberg Group, which is where my offer is

5   from.  There were -- there was a bit of a moving target in

6   terms of the names of the entities which made it very hard to

7   keep things straight between entities.

8   **Q.**   Did you have various -- what did you use to do these books

9   or to keep track of everything?

10  **A.**   We used QuickBooks.

11  **Q.**   And QuickBooks also can generate Excel spreadsheets as

12  well?

13  **A.**   Yes.  QuickBooks can export to Excel.

14  **Q.**   Did you in that initial time period then make efforts to

15  just make sense of the entities as best you could?

16  **A.**   Yeah.  We made significant efforts to make sense of the

17  entities.

18  **Q.**   All right.  And did you at some point create a spreadsheet

19  that sort of was a high level summary of Rothenberg Ventures

20  Management Company's finances?

21  **A.**   We did create a spreadsheet like that.

22  **Q.**   And did you eventually end up sending that to

23  Mr. Rothenberg in April of 2016?

24  **A.**   I did.

25  **Q.**   I'd like to show you what's been marked for identification

1    as Exhibit 344.

2         Do you recognize this item?

3    **A.**    I do.

4    **Q.**    And just is it an email?

5    **A.**    This is an email.

6    **Q.**    Right.  And does it have an attachment?

7    **A.**    It does have an attachment.

8    **Q.**    All right.  And is this an email that you sent to

9    Mr. Rothenberg in April of 2016?

10   **A.**    It is.

11   **Q.**    And was this kept and done in the regular course of

12   business at Rothenberg Ventures?

13   **A.**    Yes.

14        **MR. WALSH:**  Your Honor, I move into evidence

15   Exhibit 344.

16        **THE COURT:**  Any objection?

17        **MR. FAKHOURY:**  I'm assuming this is just the email;

18   right?

19        **MR. WALSH:**  And the attachment.

20        **MR. FAKHOURY:**  There is foundation laid on the email

21   but not on the attachment.  So that would be my objection.

22        **THE COURT:**  Sustained.

23   BY MR. WALSH:

24   **Q.**    Did this email attach an Excel spreadsheet?

25   **A.**    This email did attach an Excel spreadsheet.

1              **MR. WALSH:**  If we can pull up the Excel spreadsheet,

2   please, 344-002.

3   **Q.**   Is this -- do you recognize this item here?

4   **A.**   I do.

5   **Q.**   And is this the spreadsheet that was attached to that

6   email?

7   **A.**   This is the -- the spreadsheet that was attached to the

8   email.

9   **Q.**   All right.  And is this a spreadsheet that you helped

10  create along with Hannah Han?

11  **A.**   It is.

12  **Q.**   And was this part of your business at Rothenberg Ventures

13  as the CFO there?

14  **A.**   Yes.

15             **MR. WALSH:**  Your Honor, I move into evidence

16  Exhibit 344 and its attachment.

17             **THE COURT:**  Any objection?

18             **MR. FAKHOURY:**  No, Your Honor.

19             **THE COURT:**  344 is admitted.

20        (Government's Exhibit 344 received in evidence.)

21                  (Exhibit published to jury.)

22  **BY MR. WALSH:**

23  **Q.**   I think we need to go back to just the email so the jury

24  can see that first, please.

25        All right.  Is this the email that you were looking at

1    initially?

2    **A.**    Yes.

3    **Q.**    And from whom and to whom is this sent?

4    **A.**    This is from me to Mike Rothenberg.

5    **Q.**    What is the date of that email?

6    **A.**    It's dated April 11th, 2016.

7    **Q.**    All right.  No text at all other than your signature

8    block?

9    **A.**    That's right.

10   **Q.**    But at this point, you now do have a Rothenberg Ventures

11   email address?

12   **A.**    I do.

13   **Q.**    All right.

14          **MR. WALSH:**  If we can dezoom that, please, and go to

15   the Excel spreadsheet.

16   **Q.**    Okay.  Excel is difficult to explain, so let's just orient

17   everyone first off here.

18         There are a number of tabs at the bottom of this Excel

19   spreadsheet.  Do you see those?

20   **A.**    I do.

21          **MR. WALSH:**  And if we could click on the Summary 2015

22   tab.

23   **Q.**    What is being depicted, before we get into the details, in

24   this tab?

25   **A.**    This is a profit and loss statement for a number of

1    different entities related -- underneath Rothenberg -- the

2    Rothenberg Management group.

3    **Q.**    Okay.  And is it purporting to be for the entire year of

4    2015?

5    **A.**    It is.

6         **MR. WALSH:**  If we go to the next tab over, Summary

7    2016.

8    **Q.**    What is this tab representing?

9    **A.**    This is the first quarter of 2016 for the same group of

10   entities.

11   **Q.**    Okay.  We next have a tab one over entitled "RE."

12        **MR. WALSH:**  If we could click on that.

13   **Q.**    What is being represented in this tab?

14   **A.**    This is a Rothenberg Ventures profit and loss.

15        **MR. WALSH:**  If we go to the next tab over which is

16   entitled "RP."

17   **Q.**    What is being represented in this tab?

18   **A.**    This is a River Studios profit and loss.

19        **MR. WALSH:**  If we go to the next tab, please.  There's

20   a second tab.  It's now entitled "RS."  Oops, scroll down, if

21   we could scroll the opposite way.  The other way.  Sorry.

22   Thank you.  Sorry.

23   **Q.**    What is also on this tab?

24   **A.**    Yeah.  So the previous one was River Studios Productions,

25   and this one is River Studios.

1   **Q.**   All right.   And then there's a last tab here entitled RVM.

2   What's being totaled up here in RVM?

3   **A.**   This is Rothenberg Ventures Management.

4   **Q.**   Okay.   These last four tabs then are used to create the

5   two summaries for 2015 and the first quarter of 2016?

6   **A.**   That's right.

7   **Q.**   All right.

8          **MR. WALSH:**   Now that we got that oriented, let's go

9   back to summary 2015, please.   Thank you so much.

10  **Q.**   And in column A, what is being represented in those

11  various rows?

12  **A.**   So the rows are different categories of income and

13  expenses.

14  **Q.**   All right.   And then in row B -- or sorry -- column B, C,

15  D, and E, what is being represented in those columns?

16  **A.**   Those columns are the different entities that we just

17  talked about, and then a total to give you a summary view of

18  the different entities.

19  **Q.**   All right.   That's column F?

20  **A.**   That's right.

21  **Q.**   All right.   So for these entities here, the total income

22  then is listed in row -- for 2015 is listed in row 3?

23  **A.**   That's right.

24  **Q.**   And that's broken down by each entity; is that right?

25  **A.**   Exactly.

1  **Q.**   How much income had Rothenberg Ventures Management Company

2  made in 2015 according to your calculations?

3  **A.**   Just over $3 million.

4  **Q.**   Okay.  That's the -- all of the entities.  How about just

5  what Rothenberg Ventures Management Company, the column B,

6  entity?

7  **A.**   Rothenberg Ventures had $1.7 million in income.

8  **Q.**   All right.  If we move over to River productions in

9  column C, how much money in 2015 had that entity acquired?  Or

10  had obtained, I guess?

11  **A.**   River Productions had $400,000 of income.

12  **Q.**   If we go over to D, River Studios, how much income did

13  River Studios make for the entire year of 2015?

14  **A.**   $300,000.

15  **Q.**   And Real Estate, at the end here, column E, how much

16  income had been obtained in the entire year of 2015?

17  **A.**   $560,000.

18  **Q.**   And you already cut to the chase already, but what was the

19  total for all of those?

20  **A.**   $3 million total.

21  **Q.**   Okay.  In the expenses rows from 5 to 16, there is a whole

22  bunch of breakdowns of different types of expenses; is that

23  right?

24  **A.**   That's right.

25  **Q.**   Salaries and benefits and travel; is that right?

1    **A.**   Yep.

2    **Q.**   Let's focus in on salaries and wages for these entities,

3    and -- which is row 6.

4        How much in salaries for all -- let's just do all three

5    combined, was the total for that year of 2015?

6    **A.**   $2.7 million.

7    **Q.**   For travel and entertainment which is in row 8, how much

8    money had been spent for all of the entities combined?

9    **A.**   $1.3 million.

10   **Q.**   All right.  And so if we go to the total expenses then,

11   which includes various other items, which is in row 16, how --

12   what were the total expenses for Rothenberg Ventures Management

13   Company there in column B?

14   **A.**   In column B, $3.7 million of expenses.

15   **Q.**   For -- sorry.  For River Productions, what were the total

16   expenses for 2015?

17   **A.**   $1.3 million.

18   **Q.**   For River Studios, what was the total expenses for 2015?

19   **A.**   $3.2 million.

20   **Q.**   And the Real Estate entity there also has a total expense?

21   **A.**   Just over $100,000.

22   **Q.**   And so what were the total expenses for all of 2015 that

23   you calculated to be?

24   **A.**   We calculated $8.5 million of expenses.

25   **Q.**   All right.  The bottom rows, 8 through 27, then do some

1    accounting; is that right?

2    **A.**    That's right.

3    **Q.**    And for the net income, let's just define what that is.

4    What is net income?

5    **A.**    Net income is the net of your income and your expenses.

6    **Q.**    And so that's in row 27.  Rothenberg Ventures Management

7    Company for the entire year of 2015, what was its net income as

8    listed in column B?

9    **A.**    It's net income was a $2 million loss.

10    **Q.**    How about River Productions?

11    **A.**    River Productions lost just over $900,000.

12    **Q.**    About $948,000?

13    **A.**    That's right.

14    **Q.**    How about River Studios, what was its net income for the

15    entire year of 2015?

16    **A.**    River Studios lost just over 300 -- $3.1 million.

17    **Q.**    And then the Real Estate company, though, how did it do

18    for that year?

19    **A.**    The Real Estate company made $344,000.

20    **Q.**    And so when you totaled up all of the entities that you

21    could identify, their income, their expenses, what was the

22    grand total of money of net income for those entities for the

23    entire year of 2015?

24    **A.**    The total was a loss of just over $5.8 million.

25    **Q.**    Let's turn to tab No. 2, the summary of the first quarter

1  of 2016.

2      Does this profit and loss statement follow the same

3  organizational principles as the tab we were just looking at?

4  **A.**    It does.

5  **Q.**    And because of that, I think we can just go to the net

6  income for just the first quarter of 2016, which is all listed

7  out there in row 27.  Do you see that?

8  **A.**    I do.

9  **Q.**    For Rothenberg Ventures Management Company, just for the

10  first quarter of 2016, in column B there, what was the net

11  income for that entity?

12  **A.**    The net income was a loss of over $600,000.

13  **Q.**    About $621,000?

14  **A.**    That's right.

15  **Q.**    How about for River Productions, just for the first

16  quarter of 2016?

17  **A.**    River Productions lost $433,000.

18  **Q.**    And for River Studios, that first quarter of 2016, what

19  was its net income?

20  **A.**    River Studios lost $897,000.

21  **Q.**    And finally for Real Estate, what was its net income there

22  in the first quarter of 2016?

23  **A.**    The Real Estate company lost $88,000.

24  **Q.**    And so for the first quarter, all told, for all the

25  entities that you had identified at that point in time, what

1   was the net income at the Rothenberg Ventures entities?

2   **A.**   The loss in Q1 was $2,040,000.

3   **Q.**   And if there -- there are four quarters obviously in a

4   year.  If it kept at that rate, approximately how much net

5   income would have been projected for 2016?

6   **A.**   It would have been a loss of over $8 million.

7   **Q.**   Okay.  Now, you indicated that there were a lot of

8   different entities that you were trying to keep track of?

9   **A.**   Yes.

10   **Q.**   Could you just tell us a little bit about what was going

11   on with these entities?  How did you learn about these

12   entities?

13   **A.**   So I would ask Mike what the entities were.  We were

14   managing a lot of operating companies.  So there was a lot

15   going on.  There were a lot of employees, there were a lot of

16   transactions, a lot of transfers.  And, you know, we were going

17   back to Mike to figure out what the structure was and what it

18   was supposed to be over time.

19   **Q.**   Okay.  What did Mike tell you when you asked him about the

20   various entities and the structure at the various Rothenberg

21   and River entities?

22   **A.**   Mike would talk about the vision of the company and what

23   was structured in which way, which employees belonged to which

24   entity, which transfers were meant for which purposes, things

25   like that.  The structure was, you know, something that he had

1  the vision of, you know, by himself.

2  **Q.**  Did anyone other than Mr. Rothenberg have a sense of all

3  of the entities?

4  **A.**  I don't think anyone else had clarity on all of the

5  entities at that time.

6  **Q.**  It sounds like with Rothenberg Adventures, that was the

7  first time you had heard of it when you got that email back in

8  March of 2023 --

9  **A.**  That's right.

10  **Q.**  -- sorry, 2016?

11  **A.**  2016, yeah.

12  **Q.**  Were there other times when a new company or entity would

13  appear during your time while you were working with Rothenberg

14  Ventures?

15  **A.**  Yes.  There were times where names would change of the

16  entities, and there were also times where new entities would

17  pop up that I wasn't aware of previously.

18  **Q.**  Do you have any examples of that that come to mind of

19  entities that appeared that you had never heard of?

20  **A.**  There were a few.  But particularly the Real Estate

21  company which I knew very little about.  I didn't have a good

22  understanding of what the nature was of that company.  And

23  there were many times where I didn't know the nature of the

24  ownership of these different companies which is material as

25  well.

1    **Q.**   All right.  And did you seek from Mike Rothenberg

2    clarification and information about these entities?

3    **A.**   I did.

4    **Q.**   And over the course of the time you were there?

5    **A.**   Yes.  During the time I was there.

6    **Q.**   Did you eventually end up receiving a chart from Mike

7    Rothenberg that tried to explain the organizational structure

8    of the Rothenberg entities?

9    **A.**   Yes.

10    **Q.**   Sir --

11         **MR. WALSH:**  We can bring this down now, please.

12    **Q.**   Sir, I would like to show you what's been marked for

13    identification only as Exhibit 361.  Do you recognize this

14    document?

15    **A.**   I do.

16    **Q.**   What is this document, just at a high level?

17    **A.**   This is an organization structure of the different

18    Rothenberg entities.

19    **Q.**   And is this the organizational structure you received from

20    Mike Rothenberg while you were working at Rothenberg Ventures?

21    **A.**   It is.

22    **Q.**   And was this part of the regular course of business there

23    to make documentation like this?

24    **A.**   Yes.

25         **MR. WALSH:**  Your Honor, I move into evidence

1    Exhibit 361.

2                   **THE COURT:**  Any objection?

3                   **MR. FAKHOURY:**  No, Your Honor.

4                   **THE COURT:**  361 is admitted.

5              (Government's Exhibit 361 received in evidence.)

6                        (Exhibit published to jury.)

7    **BY MR. WALSH:**

8    **Q.**    Okay.  So you got this from Mike Rothenberg; right?

9    **A.**    I did.

10   **Q.**    Let's explain this to the jury.  What's going on here, if

11   we start on the far left?

12   **A.**    So the left would be where you begin to read the chart.

13   Rothenberg Group LLC is the ownership structure that owns the

14   entities that are to the right of that.

15   **Q.**    And it appears there is a big divide there between two

16   gray boxes.  What are those entitled?

17   **A.**    Rothenberg Management LLC and Rothenberg Company LLC.

18   **Q.**    And then there are some entities that are encircled by

19   dotted boxes.  Do you see those two?

20   **A.**    I do.

21   **Q.**    What did you understand those dotted boxes to be?

22   **A.**    My understanding was that those are different operating

23   companies or LLCs.

24   **Q.**    Within them?

25   **A.**    They would -- my understanding is that they were owned by

1   the entity on the left of those -- of those boxes.

2   **Q.**   So, for example, the Rothenberg Management LLC gray box

3   owned the three blue boxes to its right?

4   **A.**   That's right.

5   **Q.**   Okay.  And similarly for Rothenberg Company LLC, the boxes

6   to the right?

7   **A.**   Yes.

8   **Q.**   Some of these have lines, hard lines, that go to brown

9   boxes.  Do you see those?

10  **A.**   I do.

11  **Q.**   Or I guess on this it's called orange.  What -- what do

12  you understand that those orange or frankly look brown boxes?

13  **A.**   Those would be LLCs that are owned by, you know, wherever

14  the line originates.

15  **Q.**   All right.  And there is a little key here on the

16  right-hand side that purports to describe what the colors mean?

17  **A.**   Yes.  That's right.

18  **Q.**   Okay.  Now, of these -- when you got all of this -- this

19  chart from Mr. Rothenberg, did you know or had you heard of all

20  of these entities on this chart?

21  **A.**   No.

22  **Q.**   Were there entities on here that, even though you had been

23  working there for a while, you had never heard of?

24  **A.**   Absolutely.  A number of these I had never heard of.

25  **Q.**   Any in particular that you recall never having heard of

1    when you got this chart?

2    **A.**    River Basketball, River Sports, River Enterprises, River

3    Institute, Rothenberg Equity, those ones I had not heard of

4    before I saw the chart.

5    **Q.**    Okay.  Now, when you got this chart, did you then

6    disseminate it in order to try -- to your team?

7    **A.**    I did.

8    **Q.**    I'd like to show you --

9         **MR. WALSH:**    We can take this down, please.

10    **Q.**    -- show you what's been marked for identification as

11    Exhibit 348.

12         Do you recognize this item?

13    **A.**    I do.

14    **Q.**    What is this item?

15    **A.**    This is an email from me to the team with this -- the --

16    the chart.

17    **Q.**    All right.  And was this an email that you sent in the

18    regular course of business at Rothenberg Ventures and indeed at

19    Peninsula Accounting?

20    **A.**    Yes.

21    **Q.**    And was it made at or near the time that is stamped on

22    this email?

23    **A.**    Yes.

24    **Q.**    And was it made by a person with knowledge?

25    **A.**    Yes.

1          **MR. WALSH:**  Your Honor, I move into evidence

2     Exhibit 348.

3          **THE COURT:**  Any objection?

4          **MR. FAKHOURY:**  No, Your Honor.

5          **THE COURT:**  348 is admitted.

6          (Government's Exhibit 348 received in evidence.)

7               (Exhibit published to jury.)

8          **MR. WALSH:**  Okay.  If we could blow up the signature

9     or the header block, please.

10    **Q.**    From whom and to whom is this email sent?

11    **A.**    This email is from me to Amanda and Martin Mayo.

12    **Q.**    Now, who is Amanda at Rothenberg Ventures?

13    **A.**    Amanda was a contractor that we hired to do accounts

14    payable.

15    **Q.**    And who was Martin Mayo?

16    **A.**    Martin Mayo was a -- I believe was like a part-time

17    general counsel for us.

18    **Q.**    How about Mike Rothenberg?  He is cc'd there, right?

19    **A.**    Yeah, that's right.  Mike is cc'd.

20    **Q.**    What is the date of this email?

21    **A.**    June 3rd.

22    **Q.**    2016?

23    **A.**    2016.

24          **MR. WALSH:**  And you can dezoom that; please.  And just

25    blow up the text of that email, please, including the -- okay.

1    **Q.**    And what did you do with this email?  This is an email

2    that you sent.  What were you doing?

3    **A.**    I was asking the team to set up the appropriate accounts

4    to line up with this organizational structure.

5    **Q.**    Okay.  And it indicates that you were aware at least some

6    accounts did not exist at that time?

7    **A.**    That's right.  Some of these accounts did not exist.  Many

8    of them did not exist, but these two in particular were

9    operating companies that needed to be created.

10    **Q.**    And you have a reference to SVB.  Why that was there?

11    **A.**    We were trying to open those accounts with Silicon Valley

12    Bank which is where we kept most of our accounts.

13    **Q.**    And when you say accounts, you mean bank accounts?

14    **A.**    Bank accounts.

15    **Q.**    What did you ask of Martin?

16    **A.**    I asked Martin to send the formation documents.

17    **Q.**    What did you mean by that?

18    **A.**    I meant for him to draft and send us formation documents

19    for the new LLCs.

20    **Q.**    All right.

21             **MR. WALSH:**  And we can dezoom this, please.

22    **Q.**    That is the same chart there, but not in color; is that

23    right?

24    **A.**    Yes.

25    **Q.**    And did you send this email shortly after you finally

1    received that legal entity structure from Mike Rothenberg?

2    **A.**    Yes.

3    **Q.**    Okay.  Now I would like to talk to you a little bit about

4    decision-making at Rothenberg Ventures Management Company.

5    What -- who had decision-making authority at Rothenberg

6    Ventures?

7    **A.**    Mike had the primary decision-making authority.

8    **Q.**    And was he -- did he control almost all decisions?

9    **A.**    Yes.  Mike controlled nearly all of the decisions.

10   **Q.**    So I'd like to loop back then and -- to an exhibit that we

11   were looking at before, your employment contract, which is at

12   579, please, in evidence.

13        **MR. WALSH:**    And if we could blow up the bottom

14   paragraph, number 2.

15   **Q.**    So, for example, could you just read the last sentence of

16   this paragraph.

17   **A.**    "The company will reimburse you for all business-related

18   expenses incurred in accordance with company policies.

19   Individual expenses above $200 must be approved in advance in

20   writing as to amount and purpose by Mike Rothenberg."

21   **Q.**    You were the CFO of this organization; is that right?

22   **A.**    That's right.

23   **Q.**    And so nonetheless, anything over $200 had to go through

24   Mike Rothenberg?

25   **A.**    That's right.  Mike had really tight controls on spending

1    in particular.

2            MR. WALSH:  If we could dezoom that and go to page 2,

3    please.  And if we could blow up the "Paid Time Off" paragraph,

4    number 5.

5    Q.   And if -- in general, what is this "Paid Time Off"

6    paragraph talking about?

7    A.   This is the policy for how much paid time off a person can

8    take during the year.

9    Q.   If you could read the last sentence to the jury of this

10   paragraph.

11   A.   "Any additional unpaid time off may be provided as

12   required by applicable law or as approved by Mike Rothenberg."

13   Q.   What is your recollection of how time off was approved at

14   Rothenberg Ventures while you were working there?

15   A.   It needed to be approved by Mike directly, which was a bit

16   unusual, given that we had a lot of employees at that time.

17           MR. WALSH:  If we could dezoom this, please.

18       And I'd like to go back to another exhibit that we were

19   looking at, that first email back in March of 2016, which is

20   Exhibit 341.

21   Q.   And just to remind the jury, this is one of those first

22   emails that you got when you started working as a consultant

23   there?

24   A.   Yes.

25           MR. WALSH:  I would like, Ms. Margen, if we could blow

1    up the bottom part of this email.

2    Q.   Now, there's a heading here of March 4th, 2016, Expenses

3    Outstanding.  Do you see that?

4    A.   I do.

5    Q.   And it does list some various expenses.  And in --

6    consistent with having just started, in the second bullet point

7    with two dashes there, what's happening there?

8    A.   In the second bullet point?

9    Q.   Yeah.  Just if you could read it.

10   A.   The second bullet point says, "Pay all Expensify including

11   $45,000 for Mike.  You need Expensify access."

12   Q.   What is Expensify?

13   A.   Expensify was our expense reporting software where you

14   could reimburse employees.

15   Q.   And so having just started, you did not yet have access to

16   that; is that right?

17   A.   That's right.

18   Q.   And similar, the bullet point after that, it's talking

19   about payroll.  Do you see that?

20   A.   I do.

21   Q.   And it says you need Gusto access.  Do you remember what

22   Gusto was?

23   A.   Gusto was our payroll processing platform.

24   Q.   And you didn't have it yet?

25   A.   I did not.

**Q.**    If could just read this last bullet point to the jury,
please.

**A.**    "Confirm amount owed to Peninsula and that you won't send
wires to yourself without my approval."

**Q.**    Keep going.

**A.**    "We've given you access to SVB, so given the potential for
conflict of interest, please always get my approval for
payments to you even when you know I'll agree it's owed."  In
parentheses, "(Actually that should always be the case.)"

**Q.**    What is Mike Rothenberg saying here with regard to your
payments?

**A.**    That he needed to authorize any payments to Peninsula.

**Q.**    And this was during the time when Peninsula was a
contractor; right?

**A.**    That's right.

**Q.**    So you, as the CFO, you would be cutting a check to
yourself at Peninsula; right?

**A.**    That's right.

**Q.**    And did he identify that as a potential conflict of
interest to pay yourself?

**A.**    Yes.

**Q.**    And it's also illustrative of the level of control that
Mr. Rothenberg had on transactions; isn't that right?

**A.**    That's right.

**Q.**    All right.  I would now like to turn to a new topic, which

1  is information sharing at Rothenberg Ventures Management

2  Company while you were working there.

3      How was information controlled or shared at Rothenberg

4  Ventures?

5  **A.**   The information in terms of finances and legal structures

6  was very tightly controlled at Rothenberg Ventures.

7  **Q.**   Tightly controlled by whom?

8  **A.**   By Mike.

9  **Q.**   Mr. Rothenberg?

10 **A.**   Mr. Rothenberg.

11 **Q.**   And did he share all of the information that he had with

12 everyone at Rothenberg Ventures?

13 **A.**   No.  We were instructed not to share the financials with

14 certain people on the team.  For example, Geoff Rapoport who

15 was the general counsel or Brandon Farwell who was effectively

16 the head of the investment team, which I thought was a bit

17 unusual.

18 **Q.**   So let's just go into some examples then of this control

19 of information.  You said financials there.  Let's take this as

20 example number one, financials.  What do you mean by

21 financials?

22 **A.**   So I wasn't supposed to share information about salaries

23 or information about how much money had been raised or how much

24 money was being spent with other members of the team.  So

25 that's what I mean by financials.

**Q.**  And when you say you weren't supposed to, did someone tell you not to share that information?

**A.**  Yes.  Mike told me not to share that information.

**Q.**  And you are the CFO of this organization at that time; is that right?

**A.**  Yes.

**Q.**  You indicated that there were a couple of people in particular you were instructed not to share information with. First of which was Geoff Rapoport?

**A.**  That's right.

**Q.**  Who was that?

**A.**  Geoff was our general counsel at that time.

**Q.**  And what did Mike Rothenberg instruct you to do with regard to sharing financial information with Geoff Rapoport?

**A.**  He asked me not to share that information without his approval.

**Q.**  The general counsel of Rothenberg Ventures?

**A.**  That's right.

**Q.**  You also mentioned someone by the name of Brandon --

**THE COURT:**  Mr. Haase, our jurors actually may not know -- some of them may not know what a general counsel is or what that person does.  Would you please tell them, please.

**THE WITNESS:**  A general counsel is effectively the legal representation for a company.  So they would, you know, oversee any of the contracts that you sign, which in the case

1    of a venture company is the nature of the relationship with

2    your investors.  And they also deal with any legal issues that

3    arise.

4              **THE COURT:**  Thank you.

5    **BY MR. WALSH:**

6    **Q.**   I think you also mentioned Brandon Farwell, if I remember

7    correctly?

8    **A.**   I did.

9    **Q.**   Who was Brandon Farwell?

10   **A.**   Brandon was effectively the lead investor for us.  So he

11   was in charge of finding new companies to invest in.  Mike did

12   that as well.  But Brandon was one of the key people on that

13   team.

14   **Q.**   And what did Mr. Rothenberg instruct you with regard to

15   Brandon Farwell?

16   **A.**   He asked me not to share information with him without his

17   approval.

18   **Q.**   Any information or financial information?  Did he specify?

19   **A.**   Typically financial information.  In particular, you know,

20   fundraising information that related to how much we were

21   raising as well as how much we were spending.

22   **Q.**   Brandon Farwell was the chief investment -- fundraiser at

23   that time?

24   **A.**   That's right.

25   **Q.**   And Mike Rothenberg instructed you not to give him

1  information about fundraising?

2  **A.**   Yes.  That's right.  Not to share the reports with him.

3  **Q.**   Let's go to another example of information control at

4  Rothenberg Ventures which is did you become aware at some point

5  of a loan that Rothenberg Ventures had with Silicon Valley

6  Bank?

7  **A.**   I did.

8  **Q.**   How is it that you became aware of that?

9  **A.**   Mike described the loan to me.

10  **Q.**   What did he tell you about that loan?

11  **A.**   Mike told me that we had a deal with Silicon Valley Bank

12  where we could effectively loan management fees once we had

13  raised the money.  So if we raised money from investors, we

14  could immediately access management fees for the money that had

15  been raised.

16  **Q.**   And did he indicate anything about a collateral

17  requirement for that loan?

18  **A.**   Yes.  There was an account that I understood to be a

19  collateral account that we could not use that was at Silicon

20  Valley Bank.

21  **Q.**   What did Mike Rothenberg tell you about that collateral

22  account?

23  **A.**   He told me that it was a collateral account for that loan.

24  **Q.**   Did he tell you anything -- to you about what Silicon

25  Valley Bank required with regard to a salary in that collateral

1    account?

2    **A.**    Yeah.  He told me at one point that he was required to

3    take a salary of a million dollars per year in order to -- you

4    know, as part of the terms of the loan.

5    **Q.**    Did you ever actually see -- let's see here.  So my

6    co-counsel is reminding me or catching something.  I think you

7    said you could loan fees.  Did you actually mean borrow fees

8    from the Silicon Valley --

9    **A.**    Yes.  Sorry.  We could borrow those fees in advance.  The

10   fees for a venture firm are spread out over time.  And what

11   Mike told me was that we could access them faster because of a

12   loan that we were able to access from Silicon Valley Bank.  So

13   we would be borrowing those fees in advance.

14   **Q.**    And so did you ever actually see the loan documents for

15   Silicon Valley Bank loan?

16   **A.**    I did not.

17   **Q.**    Did you ask for it?

18   **A.**    I don't know if I asked for that specifically, but I would

19   have expected to have access to those documents.

20   **Q.**    Did you ever learn where the money came from that was in

21   that collateral account that you saw in the bank statements?

22   **A.**    I don't know where that money came from.

23   **Q.**    Another example I would like to ask you about is limited

24   partner agreements.  What's a limited partner agreement?

25   **A.**    A limited partner agreement is a contract that sets the

1    expectations between a venture firm and their investors who are

2    called limited partners.

3    **Q.**    And did you have access to the limited partner agreements?

4    **A.**    I did not have access to the limited partner agreements

5    for the majority of the time that I was there.

6    **Q.**    Who did have access to those?

7    **A.**    Our general counsel had access to them.

8    **Q.**    Which was Geoff Rapoport?

9    **A.**    That's right.

10    **Q.**    And did you ask Mr. Rothenberg to be able to see the

11    limited partner agreements?

12    **A.**    I did ask for access to the limited partner agreements.

13    **Q.**    And what did Mike Rothenberg tell you?

14    **A.**    He told me that I did not need access to those limited

15    partner agreements.

16    **Q.**    Those limited partner agreements, do they contain the fee

17    structures that the management company is paid by the funds

18    for?

19    **A.**    They contain the management fee structure and timing as

20    well as the scope of investments that you can make in the fund.

21    **Q.**    And is that important information as the CFO of a venture

22    capital firm?

23    **A.**    It's very important information.

24    **Q.**    At some point, you indicated you might have obtained

25    access to some of those agreements or one or more of them.  How

1    did that happen?

2    **A.**    Yeah.  Geoff and I agreed that he would show me, I think I

3    saw one of the limited partner agreements for one fund.  Each

4    fund can have a separate limited partner agreement.  And I

5    remember looking at one of them with Geoff, actually, in an

6    office one day, which we knew Mike would have been frustrated

7    about.

8    **Q.**    Now I'd also like to go to a last example of information

9    at Rothenberg Ventures which is meetings.  Were there meetings,

10   regular meetings, at Rothenberg Ventures?

11   **A.**    There were regular scheduled meetings.  There were a few

12   of those.  And then there were a lot of individual meetings

13   with Mike.

14   **Q.**    How -- could you just characterize who would be invited to

15   these various meetings?

16   **A.**    So there would be staff meetings where there were a lot of

17   folks, the majority of the team in the room or many of the

18   folks on the team.  And then there would be meetings where it

19   was really just one on one with Mike.

20   **Q.**    And was there anything noteworthy about some of those

21   meetings?  Were there topics addressed that made you think

22   about why individuals weren't invited to those meetings?

23   **A.**    There were.  I -- I thought it was strange that Geoff

24   wasn't in some of the meetings that I was in.  And the reason

25   for that is, you know, what we're describing with the limited

1    partner agreements, there are some legal implications that

2    where a contract did dictate when you could access funds or the

3    timing of those funds in terms of how you recognize them as

4    income.

5        So when an investor invests in a venture fund, you know,

6    your management fees are just a -- they're just a transfer

7    basically from the fund to the management company.  But the

8    timing of that transfer is dictated by that contract.

9        And so I thought it was strange that we didn't all meet

10   together to talk about that to make sure that we got the timing

11   of those transfers correct.

12   **Q.**   Were there other meetings like that where you thought it

13   was strange that certain individuals were not attending?

14   **A.**   Yes.  It was a pattern that I noticed in my time there

15   that there was a significant effort made to give information

16   one on one with individuals as opposed to doing it in a group

17   structure.

18   **Q.**   When you say there was a significant effort, a significant

19   effort by who?

20   **A.**   By Mike Rothenberg.

21   **Q.**   Now, by July of 2016, was Rothenberg Ventures focused on

22   fundraising for the 2016 Fund?

23   **A.**   Yes.

24   **Q.**   And at -- in July then, did you receive an email with

25   information about the 2016 Fund from Mike Rothenberg?

1    **A.**    Yes.

2    **Q.**    I would like to show you what's been marked as

3    Exhibit 356.

4        Do you recognize this item?

5    **A.**    I do.

6    **Q.**    And is this an email?

7    **A.**    Yes.

8    **Q.**    And is this one of these emails that was kept in the

9    regular course of business at Rothenberg Ventures?

10    **A.**    Yes.

11    **Q.**    Was it made at or near the time that is stamped on this

12    email?

13    **A.**    Yes.

14    **Q.**    And was it made by people with knowledge?

15    **A.**    Yes.

16    **Q.**    Does this email have an attachment?

17    **A.**    Yes.

18    **Q.**    And was that email attachment also made in the regular

19    course of business at Rothenberg Ventures?

20    **A.**    Yes.

21    **Q.**    By someone with knowledge?

22    **A.**    Yes.

23    **Q.**    At or near the time that is indicated in the title of that

24    attachment?

25    **A.**    Yes.

1          **MR. WALSH:**  Your Honor, I move into evidence

2     Exhibit 356 and its attachment.

3          **THE COURT:**  Any objection?

4          **MR. FAKHOURY:**  Not to the email but foundation on the

5     attachment.

6          **THE COURT:**  Overruled.  356 including its attachment

7     are admitted.

8          (Government's Exhibit 356 received in evidence.)

9               (Exhibit published to jury.)

10         **MR. WALSH:**  If we could just blow up the whole email

11    here.  Let's just do the whole thing.

12    **Q.**   From whom and to whom is this email sent?

13    **A.**   This is from Mike Rothenberg to myself, Martin Mayo, and

14    copying Ian Hathaway.

15    **Q.**   Who is Ian Hathaway?

16    **A.**   Ian Hathaway was on the finance team with me.

17    **Q.**   What is the date of this email?

18    **A.**   This is July 27th, 2016.

19    **Q.**   And what is the subject of this email?

20    **A.**   The subject is 2016 Fund Status Update.

21    **Q.**   It has an attachment there.  Let's just go to the text,

22    though.

23         What -- what is Mike Rothenberg writing to you about in

24    this email?

25    **A.**   He's attaching notes on the 2016 Fund, mostly from Geoff.

```
 1    The data needs to be checked, so he's asking us to check it.

 2    And he says he's not sure which documents they've received or

 3    which fundings we have or when.  So he's asking myself and

 4    Martin to piece it together.

 5    Q.   All right.  And then in the end, he is indicating they're

 6    working on a close in August?

 7    A.   That's right.

 8         MR. WALSH:  If we could dezoom this, please.  And if

 9    we could pull up the attachment, which is an Excel spreadsheet.

10    Q.   Okay.  Is this the attachment that was -- Mike Rothenberg

11    sent you that day?

12    A.   Yes.

13    Q.   Which was July 27th, 2016?

14    A.   Yep.

15    Q.   Okay.  This -- let's just orient everyone here.  There's a

16    whole bunch of rows and there's a whole bunch of columns.

17         What is being described overall in this chart?  What is

18    the purpose of this chart?

19    A.   This chart is to list the investors in the 2016 Fund.

20    Q.   And it was referred to as a cap table?

21    A.   Yes.

22    Q.   What is a cap table?

23    A.   A cap table is a table that describes the owners in a

24    particular organization, or investors.

25    Q.   Okay.  And so in column A, what's being listed there?
```

**A.**    Column A is the different investors in the fund.

**Q.**    Okay.  And then column B is listing what?

**A.**    Column B is the commitment that they had made to the fund, the total investment that they committed.

**Q.**    Okay.  Is that in contrast to column C that says funded? What does that mean?

**A.**    Column C is the amount that they've already funded.  Many venture funds, including Rothenberg Ventures, received their -- they received their funding over time so the entire commitment doesn't come upfront.

**Q.**    All right.  And then if we go all the way to column F, does that indicate a fund there?  What's being described there?

**A.**    Yeah.  Column F is the fund that the investment would go into.

**Q.**    Were there more than one fund for the 2016 Fund?

**A.**    Yes.  There's a main fund and a feeder fund listed here.

**Q.**    What is the feeder fund?

**A.**    The feeder fund, we use an unusual structure.  And to be honest, Geoff managed most of that for us.  But there were a number of transfers between funds that were happening.  And we had, as I recall, an onshore and an offshore fund for many of these where certain investors wanted their money to be held offshore for different reasons, for example, so they didn't have to report U.S. income.  And we had some Cayman funds as well.  So I think the feeder fund was essentially a fund that

1    could transfer between those two funds, if I remember

2    correctly.

3    **Q.**    You used the term onshore and offshore.  It's probably

4    obvious to everyone, but what do you mean by that?

5    **A.**    I mean in the U.S. versus outside the U.S.

6    **Q.**    There is a primary contact column there.  What's being

7    described there?

8    **A.**    The primary contact is the point of contact for that

9    investment group.

10    **Q.**    All right.  And then there's a "Notes" column all the way

11    over in column M.

12    **A.**    Yeah.  These are notes on, you know, specific exceptions

13    to the investments, things that needed to be noted.

14    **Q.**    Okay.  If we could scroll back, I'd like to draw your

15    attention first let's just talk about an example which is in

16    row 3.

17        Do you see there's an entity named ARCHina there?

18    **A.**    Yes.

19    **Q.**    And it indicates as you go across the primary contact is

20    who?

21    **A.**    Amy Huang.

22    **Q.**    And does it indicate there ARCHina's commitment and funded

23    columns there?

24    **A.**    Yes.  It indicates that they committed $5 million and

25    funded $3 million.

1    **Q.**   Okay.  So that's just an example, and that's for all of

2    these rows for the different investors; is that right?

3    **A.**   Yes.

4    **Q.**   I would like to draw your attention in particular to

5    column -- or row 5, please.  What is the entity indicated

6    there?

7    **A.**   The entity is "GP Commit" --

8    **Q.**   What is --

9    **A.**   -- which is the general partner commitment to the fund.

10   **Q.**   What is a general partner commitment to a fund?

11   **A.**   Many times a general partner, who is the person that

12   manages the fund, will -- will invest in their own fund.

13   **Q.**   All right.  And in this instance for the 2016 Fund, who

14   was the general partner?

15   **A.**   Mike Rothenberg was the general partner.

16   **Q.**   And what was his indicated commitment to the 2016 Fund?

17   **A.**   $2.5 million.

18   **Q.**   How much of that had he funded?

19   **A.**   Zero.

20   **Q.**   And if you go all the way over to the Notes section, what

21   is written there in the "Notes" section?

22   **A.**   The notes says "Funded from fees?"  Question mark.

23   **Q.**   All right.  What fees could that be referring to?

24          **MR. FAKHOURY:**  Objection.  Speculation.

25          **THE COURT:**  Do you know?

1          **THE WITNESS:**  Yes.

2          **THE COURT:**  Okay.  Overruled.

3          **THE WITNESS:**  Those would be management fees, I

4   presume.  There are no other fees that would be, you know, that

5   large.

6   **BY MR. WALSH:**

7   **Q.**   Would Mike Rothenberg personally be getting management

8   fees?

9          **MR. FAKHOURY:**  Objection.  Speculation.

10          **THE COURT:**  Did you -- I think you actually answered

11   this.  I know the answer from your testimony, but did you read

12   any of the partnership agreements regarding the fees to be paid

13   to the fund manager?

14          **THE WITNESS:**  I did, yes.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  Rothenberg Ventures Management received

17   the fees and not Mike directly.

18          **MR. WALSH:**  We can take down this exhibit, please.

19   **Q.**   Did you end up getting a second email --

20          **MR. WALSH:**  Well, actually if we go to Exhibit 356,

21   not the chart, but the email, please, briefly again.

22          And if we could just blow up the header there.

23   **Q.**   What is the date and time of this email?

24   **A.**   July 27th, 2016, 12:08 p.m.

25   **Q.**   And it's to you at your Rothenberg Ventures email address;

1    is that right?

2    **A.**    Yes.

3          **MR. WALSH:**  If we could dezoom that.

4    **Q.**    Did you end up getting another email shortly thereafter on

5    July 27th, 2016 from Michael Rothenberg?

6    **A.**    Yes.

7    **Q.**    I would like to show you what's been marked for

8    identification only as Exhibit 364.

9          Do you recognize this item?

10   **A.**    Yes.

11   **Q.**    And is this an email?

12   **A.**    Yes.

13   **Q.**    And from whom and to whom is it sent?

14   **A.**    This is an email from Mike Rothenberg to me.

15   **Q.**    All right.  And is it another of the emails that was kept

16   in the regular course of business at Rothenberg Ventures?

17   **A.**    Yes.

18   **Q.**    And was it made at or near the time that is stamped on

19   this email?

20   **A.**    Yes.

21   **Q.**    And was it made by a person with knowledge?

22   **A.**    Yes.

23          **MR. WALSH:**  I move into evidence Exhibit 364.

24          **THE COURT:**  Any objection?

25          **MR. FAKHOURY:**  No, Your Honor.

1          **THE COURT:**  364 is admitted.

2          (Government's Exhibit 364 received in evidence.)

3              (Exhibit published to jury.)

4          **MR. WALSH:**  If we could just blow up the whole email,

5     please.

6     **Q.**   All right.  You already told the jury it's from Mike

7     Rothenberg and to you, but at what address is -- is it being

8     sent?

9     **A.**   This is to my river.co email.

10    **Q.**   You had a separate River email address in addition to a

11    Rothenberg Ventures email address?

12    **A.**   Yes.

13    **Q.**   And what is the time of this email address -- email being

14    sent, date and time?

15    **A.**   July 27th, 2016, at 12:31 p.m.

16    **Q.**   So about 23 minutes after the email attaching the exhibit

17    that we were just looking at?

18    **A.**   Yes.

19    **Q.**   And what did Mike Rothenberg ask you to do in this

20    particular email here, or what was the content?

21    **A.**   He asked me to help with the following, and then he lists

22    wires that need to be made.

23    **Q.**   All right.  And I'd like to draw your attention to the

24    very first wire.  What is that wire -- if you could just read

25    that, what does it say?

1   **A.**   It says to wire $2,017,500 to ARCHina from the 2016 Fund.

2   **Q.**   Had that been reflected in the Excel spreadsheet that we

3   were just looking at and had been sent to you 20 minutes

4   before?

5   **A.**   Yes.

6   **Q.**   The wire back?

7   **A.**   Sorry.  The wire back had not been reflected.

8   **Q.**   I'd also like to draw your attention to the bottom heading

9   or paragraph there that's entitled "Next Steps."  Do you see

10  that?

11  **A.**   Yes.

12  **Q.**   What is Mike Rothenberg asking you to do there?  And if

13  you could just read it.

14  **A.**   It says find out net transfer to or from the 2015 Fund and

15  Management Co., 2016 Fund and Management Co., all fund net

16  transfers.

17  **Q.**   What did you take that to mean?

18  **A.**   I took it to mean that we needed to go back and look at

19  all of the transfers between the Management Company and the

20  funds for 2015 and 2016 and then the fund net transfers from

21  one fund to another.

22          **MR. WALSH:**  Your Honor, I am about to start on a new

23  topic, and I wonder whether, despite it being seven minutes

24  early, we might give the jury back their five minutes from

25  yesterday.

1        **THE COURT:**  We might do that.

2        Members of the jury, thanks for your close attention

3    today.  We are not able to finish this witness today.  We are

4    going to go ahead and break.

5        Please remember my prior admonitions.  I will see you

6    tomorrow bright and early.  Thank you.

7        **THE CLERK:**  Please rise for the jury.

8        (Proceedings were heard out of presence of the jury:)

9        **THE COURT:**  Thanks.

10    Mr. Haase, you can step down.

11    Mr. Walsh, anything for the record?

12        **MR. WALSH:**  No, Your Honor.

13        **THE COURT:**  Mr. Fakhoury, anything for the record?

14        **MR. FAKHOURY:**  No, Your Honor.  Thank you.

15        **THE COURT:**  Okay.  Thank you all.  We'll see you in

16    the morning.

17        **THE CLERK:**  Court is in recess.

18            (Proceedings adjourned at 1:25 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Wednesday, November 1, 2023


*Pamela Batalo Hebel*

_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter