UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 18** |
| | ) | |
| vs. | ) | NO. CR 20-00266-JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | **Pages 3320 - 3497** |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, November 2, 2023 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          THOMAS A. COLTHURST, ESQ.
                        Attorney for the United States
                        Acting under Authority conferred by
                        28 USC §515
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  BENJAMIN K. KLEINMAN,
                        KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For Defendant:          MOEEL LAH FAKHOURY LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

                        Law Office of Nathaniel J. Torres
                        338 Fillmore Street #4
                        San Francisco, California  94117
                   BY:  NATHANIEL J. TORRES, ATTORNEY AT LAW


Reported By:            Pamela Batalo Hebel
                        CSR. No. 3593, FCRR, RMR


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

<u>**I N D E X**</u>

Thursday, November 2, 2023 - Volume 18

**GOVERNMENT'S WITNESSES**                              <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**HAASE, DAVID (RECALLED)**</u>
(PREVIOUSLY SWORN)                                      3337   18
Direct Examination (Resumed) by Mr. Walsh              3337   18
Cross-Examination by Mr. Fakhoury                      3356   18

<u>**CORNELL-PAPE, ANNA**</u>
(SWORN)                                                 3380   18
Direct Examination by Mr. Walsh                        3381   18

<u>**STEARNS, JOHN**</u>
(SWORN)                                                 3400   18
Direct Examination by Mr. Kleinman                     3402   18
Cross-Examination by Mr. Fakhoury                      3411   18

<u>**GROOMS, JUSTIN**</u>
(SWORN)                                                 3416   18
Direct Examination by Mr. Kleinman                     3418   18
Cross-Examination by Mr. Torres                        3475   18

<u>**E X H I B I T S**</u>

| **GOVERNMENT'S EXHIBITS** | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 33 | | 3408 | 18 |
| 61 | | 3325 | 18 |
| 96 | | 3325 | 18 |
| 187 | | 3325 | 18 |
| 291 | | 3449 | 18 |
| 351 | | 3350 | 18 |
| 360 | | 3341 | 18 |
| 629 | | 3471 | 18 |
| 630 | | 3434 | 18 |

## I N D E X

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 634 | | 3406 | 18 |
| 635 | | 3407 | 18 |

| | |
|---|---|
| 1 | **Thursday - November 2, 2023**                    **8:07 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE CLERK:**  Your Honor, now calling CR 20-00266-JST, |
| 6 | United States vs. Michael Brent Rothenberg. |
| 7 | If counsel could please state their appearances for the |
| 8 | record, starting with the Government. |
| 9 | **MR. KLEINMAN:**  Good morning.  Benjamin Kleinman, |
| 10 | Nicholas Walsh and Kyle Waldinger for the United States. |
| 11 | **MR. FAKHOURY:**  Good morning, Your Honor.  Hanni |
| 12 | Fakhoury and Nate Torres for Mr. Rothenberg.  He's present, |
| 13 | Your Honor. |
| 14 | **THE COURT:**  Good morning.  We're outside the presence |
| 15 | of the jury.  What can I do for you? |
| 16 | **MR. KLEINMAN:**  So we've got a couple of matters. |
| 17 | We're going to be switching off here. |
| 18 | My initial issue is regarding the SEC paralegal witness |
| 19 | who the Government is going to call today to put in three |
| 20 | exhibits, two emails, one of which Your Honor has seen |
| 21 | pretrial, and then the QuickBooks records. |
| 22 | In preparing for this witness's testimony, he mentioned -- |
| 23 | **THE COURT:**  What is the witness's name? |
| 24 | **MR. KLEINMAN:**  John Stearns who goes by Tony.  He |
| 25 | mentioned that he remembers working with you when you were -- I |

1    don't remember if he said new or young associate at Morrison

2    Foerster.  And, you know, we're certainly not going to

3    obviously elicit that testimony, but I just wanted to make the

4    Court aware of that.

5         **THE COURT:**  Thank you.  He was a paralegal at Morrison

6    and Foerster?

7         **MR. KLEINMAN:**  Yes, Your Honor.

8         **THE COURT:**  For the record, I began working at

9    Morrison and Foerster in March of 1990, and I left at the end

10   of December 1992.  And I have no recollection of this person.

11       Anyway.  Okay.

12       **MR. KLEINMAN:**  That's it for the Government in terms

13   of this witness.

14       Just generally I also wanted to make Your Honor aware of

15   this just for the SEC instruction.  I've discussed this with

16   Mr. Fakhoury.  It's defense counsel's preference that the

17   instruction be read one time before the SEC witness takes the

18   stand.

19       **THE COURT:**  And what is the Government's position?

20       **MR. KLEINMAN:**  The Government agrees.  That's fine.

21       **THE COURT:**  Okay.  I'll do that.

22       **MR. KLEINMAN:**  That's it for me.  Thank you,

23   Your Honor.

24       **MR. WALSH:**  Good morning, Your Honor.

25       We have three exhibits I'd like to enter into evidence

1    now.  We have a public records certificate.  These are FDIC

2    certificates of insurance.  And I don't understand that there's

3    an objection because they do have the appropriate

4    documentation.

5        And I would move to admit Exhibits 61, 96, and 187 in

6    evidence.

7            **THE COURT:**  Mr. Fakhoury, is there any objection?

8            **MR. FAKHOURY:**  No, Your Honor.

9            **THE COURT:**  Exhibits 61, 96 and 187 are admitted.

10           **MR. WALSH:**  Thank you, Your Honor.

11       (Government's Exhibits 61, 96, 187 received in evidence.)

12           **MR. WALDINGER:**  I thought we would have an issue, but

13   I think we're okay.  I think the last witness today will be

14   Special Agent Ghio, and we'll be looking at bank records.

15   We've prepared a PowerPoint which I shared with Mr. Fakhoury.

16   He had some comments on it.  I've made some changes based on

17   his comments.

18       I gave him another copy this morning.  I would like to

19   give him more time to look at it if he has any issues.  But

20   right now my understanding is Mr. Fakhoury is okay with the

21   PowerPoint that I'm going to use to illustrate the movement of

22   money in bank accounts with Agent Ghio.  But I just wanted to

23   let the Court know that we've tried to resolve any issues with

24   it and I think we've done that.

25           **THE COURT:**  Mr. Fakhoury, where do you think the

1    parties are with regard to the matters that Mr. Waldinger just

2    identified?

3         **MR. FAKHOURY:**  I think he's right.  I am looking

4    through it.  I raised concerns and they've addressed concerns

5    I've raised.  I want to just take one final pass through it.  I

6    don't think I'm going to have an issue with it.

7         It's my understanding this is just a demonstrative and not

8    going in as evidence.  So it won't be admitted as an exhibit,

9    just an aid while Agent Ghio is testifying.

10        So I think -- preliminarily I think it will be fine, but

11   perhaps at the next break -- if we have 10 minutes before the

12   jury comes, I'll finish reviewing it and just be totally

13   confirmed about that.

14        **THE COURT:**  Very good.

15        I would also just like to say I appreciate the Government

16   making these materials available in advance, working with

17   Defense counsel to identify any objections and then cleaning up

18   the PowerPoint.

19        I think sometimes lawyers perceive incorrectly that they

20   get some advantage by ambushing their opponent, and in fact

21   it's the other way.  And so I appreciate the parties working

22   cooperatively.

23        **MR. WALDINGER:**  And then I do want to say,

24   Mr. Fakhoury was dealing with this.  I was emailing with him

25   probably after 10:00 last night, so he's done a good job in

1    addressing -- addressing it as well.

2              **THE COURT:**  Very good.  Thank you all.

3         Is there anything else we need to discuss before the

4    jurors come in?

5              **MR. WALDINGER:**  I think that's it, Your Honor.  We

6    have -- in addition to the SEC witness, Mr. Haase, FDIC witness

7    and then Agent Ghio.  And then that's all we have on tap today.

8    Oh, and Mr. Justin Grooms.  So we will be moving through a

9    number of witnesses today.  And then I think just two witnesses

10   next week?

11             **MR. KLEINMAN:**  That's correct.

12             **MR. WALDINGER:**  Is our -- is our hope.

13             **THE COURT:**  Wow.  So now let's -- you know, objects

14   come into view as you approach the objects.  So I guess my

15   question on the time estimate now would be not just what is the

16   furthest date that you think you might need, but what is the

17   soonest you think the Government could complete the

18   presentation of its evidence?  I think we need to know that.

19             **MR. WALDINGER:**  I would say end of the day on Tuesday

20   at the earliest.  Realistically possibly Wednesday, depending

21   on cross.

22        The witnesses that we have on tap next week, if Agent Ghio

23   may have to roll over until Monday, depending on the length of

24   his testimony.  Then we will go to Brandon Farwell who the

25   Court has heard about and then finish up with our expert,

1    Mr. Gerry Fujimoto.  I think that's going to be long.

2    Mr. Walsh is preparing that testimony.  That's going to be

3    long.  It could be a long cross on that.

4         But I would think that at the very latest the Government

5    would rest its case on Wednesday.

6              **THE COURT:**  So either Tuesday or Wednesday, you think.

7              **MR. WALDINGER:**  Yep.

8              **THE COURT:**  I understand that nothing is certain in

9    life, but that's helpful.

10        Mr. Fakhoury, does the defendant presently intend to put

11   on a case?

12             **MR. FAKHOURY:**  That is a hard question to answer,

13   Your Honor.  And I'm not trying to be cagey.

14             **THE COURT:**  Nor am I trying to lock you into anything.

15             **MR. FAKHOURY:**  I appreciate that.

16        I -- I suspect there is a possibility.

17             **THE COURT:**  And if the defendant were to put on a

18   case, by how much would it extend past the dates that the

19   Government has just described?

20             **MR. FAKHOURY:**  If the Government is closing -- excuse

21   me.  If the Government is resting -- let's take the farthest

22   out.

23             **THE COURT:**  Yes.  Let's say the Government goes until

24   sometime on Wednesday.

25             **MR. FAKHOURY:**  Right.  I would suspect we would -- we

1    would certainly -- we would certainly be having evidence on

2    Thursday.

3              THE COURT:  Okay.

4              MR. FAKHOURY:  Beyond Thursday I'm not entirely sure,

5    but perhaps maybe Monday.

6              THE COURT:  Let me -- let me road test with you all

7    some comments I might make to the jury now about timing because

8    I always invite my jurors to deliberate on Friday if they want

9    to, and I think I probably need to give them that speech today.

10             THE CLERK:  Judge, next Friday is Veterans Day and the

11   court is closed.

12             THE COURT:  Oh, yes.  Okay, that's not done.

13        Nonetheless, I think I would like to say to them:  Members

14   of the jury, there's some possibility -- there's some

15   possibility the evidence in this case will finish next week and

16   so let me just describe to you again what the different phases

17   of the trial are.  The evidence will finish, then I'll instruct

18   you on the law, then the lawyers will make closing arguments,

19   and then you'll retire to deliberate.

20        And that process is almost certainly going to extend into

21   the week after next, but it's possible you could be starting

22   your deliberations the beginning of that week.

23        And I don't know, it might be sometime later that week.

24   You should start thinking now about whether you would come in

25   on Friday, the 17th, if you are still deliberating at that

1   point.  And, again, you know, no guarantees, but what I'm

2   telling you is, having discussed this with counsel, it just

3   seems like you will have a significant period of deliberation

4   time before Thanksgiving week.

5       How does that sound?

6           MR. WALDINGER:  That sounds good.

7           MR. WALSH:  Another issue, Your Honor, is they may be

8   under the impression that they only deliberate 8:30 to 1:30 so

9   you might raise that with them as well.

10          THE COURT:  Oh, yes.  I always tell them that they

11  need to keep coming in at 8:30 but they are free to stay as

12  long as they all want to as long as they all want to do it.

13  I'll mention that, too.

14      Without in any way holding you to this because we will

15  have a separate discussion about it after you've had more time

16  to think, how long do you think your closing arguments will

17  take?

18      Mr. Waldinger, will you be giving the closing argument?

19          MR. WALDINGER:  My colleague.

20          THE COURT:  Mr. Kleinman will?

21          MR. KLEINMAN:  Yes, Your Honor.

22          THE COURT:  Mr. Kleinman, can I say what a pleasure it

23  has been having you in this trial.

24          MR. KLEINMAN:  Thank you, Your Honor.

25          THE COURT:  You're welcome.

1          What do you think?

2          **MR. KLEINMAN:**  I'm hoping less than two hours.  How

3     much less, I'm trying to be much less but --

4          **THE COURT:**  You're not going to get a lot of pushback

5     from me.

6          Mr. Fakhoury, what do you think, for you?

7          **MR. FAKHOURY:**  I would think probably 90 minutes.  I

8     don't know -- well, I would say at least an hour and likely

9     90 minutes, maybe a little more.  But I think 90 minutes is

10    probably about right.

11         **THE COURT:**  I was expecting something frankly in the

12    90-minute to two-hour range.  I think -- my guess is that this

13    jury is getting a little tired of "Here's the partnership

14    agreement," you know, "Did he ever tell you that he was going

15    to put the money in the...?"  You know.  But I get it.

16    Different counts in the indictment.  Every count is with

17    respect to a different investor.  Okay.

18         Having said that, there are a lot of exhibits in this

19    case, and there are a lot of individual transactions and there

20    are different counts.  And the jury is going to have to make a

21    finding as to each count.  So I'm not at all surprised by the

22    parties telling me, hey, it's 90 minutes to two hours.

23         That means that we can't get instruction and everybody's

24    closing argument done in one day.  That's fine.  Because let's

25    say you each took two hours.  That's our day.  And I -- I've

```
 1    just started working on the instructions.  That's actually what

 2    I was doing yesterday while I was presiding over your trial.

 3         But that's going to take longer than a half an hour.  I

 4    think it will be between half an hour and an hour.  I'm just

 5    thinking out loud.  Let's say we concluded -- well, let's talk.

 6         Wrapped up early enough on a Wednesday to allow me to

 7    instruct, then you just have Thursday.  Everybody does all

 8    their closing arguments.  That's what we do.  And we send

 9    everybody home and they come back and deliberate.  That's --

10    you know, that sort of works out neatly.  Whether that's the

11    way it's actually going to work out, I don't know.

12         I'll stop hypothesizing out loud.

13         Anything else before our jury comes in?

14              MR. KLEINMAN:  No, Your Honor.  Thank you.

15              MR. FAKHOURY:  No, Your Honor.  Thank you.

16              THE COURT:  Okay.  Thank you all.

17              THE CLERK:  Court is in recess.

18                   (Recess taken at 8:22 a.m.)

19                (Proceedings resumed at 8:42 a.m.)

20         (Proceedings were heard in the presence of the jury:)

21              THE COURT:  Good morning.

22              JURORS:  Good morning.

23              THE COURT:  All the jurors are in their assigned

24    seats.

25         The parties and counsel are at counsel table.
```

1        I want to give you what I think you'll regard as good news

2   about the timing of this case.

3        We -- today is our last trial day, as you know, it's a

4   Thursday.  And then we come back next week.  We go Monday

5   through Thursday.  It's likely that the evidence in the case

6   will finish toward the end of next week.  Right.

7        So that means that -- well, let me just walk you through

8   the steps again.  I told you before what they were, but I'll

9   just give you a reminder about the different steps in a trial.

10       So the biggest part by far is evidence presentation.

11  That's what we've mostly been doing.  When the evidence

12  finishes, then I have to read you some jury instructions.  And

13  you'll have your own written set, and it's a longer set than

14  the ones that I read in the beginning.  It will take somewhere

15  between 30 minutes and an hour just to read them out loud.  I

16  have to read them out loud.  I'm required to do that.

17       When that's done, then the lawyers get an opportunity to

18  make what's called a closing argument.  In the closing

19  argument, they go over the evidence that's been presented and

20  they argue to you what they think the evidence showed or didn't

21  show.

22       And because the Government has the burden of proof, the

23  Government gets to go first.  And then Mr. Rothenberg's lawyers

24  get a chance to go.  And then the Government gets the chance to

25  go last, because, like I said, it's their burden of proof.

1          Anyway, we had a lot of evidence in this case, and we're

2     not even done.  We have more than -- we have probably more than

3     another week of evidence to go.  So the closing arguments are

4     going to have to take a while because they have to walk you

5     through all that stuff.

6          So probably my instructing you and the closing arguments,

7     that's probably more than a full day.  Just all that stuff

8     together.  Because, remember, 8:30 to 1:30 with two breaks.

9     It's not -- we're efficient, but it's not a full, full day

10    here.

11         All that having been said, I think that you will start --

12    it's likely that you will start deliberating on Monday,

13    November 13th.  Maybe Tuesday, November 14th.

14         That's a lot sooner than I predicted at the beginning of

15    the case.  I have to say that happens.  We want to kind of

16    overpromise, under-deliver, that kind of thing, because we know

17    you have lives.

18         A couple things to start thinking about now.  The first is

19    what will your deliberation schedule be.  I want you to keep

20    coming in at 8:30 in the morning, but you can stay later than

21    1:30 if you want to.  That's a collective decision.  I'm not

22    involved in that.  You'll just tell me.

23         One of the things that will happen is as soon as the

24    lawyers finish their closing arguments, you will retire to the

25    jury room to start your deliberations, and you'll select a

1    presiding juror.  Right?  What we used to call a foreperson or
2    a foreman or forewomen.
3        And the presiding juror, one of the first decisions
4    they'll ask the group to make is "What's our schedule?"  It
5    could be that there are folks on the jury who they have
6    recurring obligations every afternoon, and they've been meeting
7    those obligations which they've been able to do because of our
8    schedule and they're just not able to stay later than 1:30.
9    Okay, fine.  Then just keep doing 8:30 to 1:30.
10        But you may decide you have more flexibility.  And
11    obviously the longer you work on a given day, the more likely
12    you are to end earlier, to get the work done earlier.  Right?
13    So that's -- it's a good time to start thinking about that so
14    it won't be a pop quiz.
15        The second thing is I don't know if you -- if your
16    deliberations will extend into November-- to the end of that
17    week.  But as I said when we were picking a jury, we're not in
18    session on Fridays except if the jury wants to when they're
19    deliberating.
20        Because I can still do my work.  I can have my criminal
21    calendar in here and the other things I'm doing.  And you can
22    be working and deliberating.
23        And, again, if -- if you haven't, you know, finished by
24    that time, you could come back on November 27th.  Either way.
25    It's up to you.  So this is another thing to start thinking

1    about.  And when we get there, that's when I'll ask you again.

2    So that's the last time I'll talk about that.

3        But I think it's good news.  I just wanted to update you

4    on the schedule.

5        Also I have a question from a juror which I'll just read

6    into the record.  Counsel have already seen the question.  And

7    the question is, quote:  What if anything does it mean to the

8    jury when an objection with a, quote, move to strike, close

9    quote, is sustained.  That's the question.

10       I'm going to read you a jury instruction that I read

11   earlier, and then I'll -- which I think is going to answer the

12   question, but then I'll talk about it a little bit.

13       The instruction says as follows:

14       "There are rules of evidence that control what can be

15   received in evidence.  When a lawyer asks a question or offers

16   an exhibit in evidence and a lawyer on the other side thinks

17   that is it is not permitted by the rules of evidence, that

18   lawyer may object.  If I overrule the objection, the question

19   may be answered or the exhibit received.  If I sustain the

20   objection, the question cannot be answered or the exhibit

21   cannot be received.

22       "Whenever I sustain an objection to a question, you must

23   ignore the question and must not answer" -- excuse me -- "and

24   must not guess what the answer would have been.  Sometimes I

25   may order that evidence be stricken from the record and that

1    you disregard or ignore the evidence.  That means that when

2    you're deciding the case, you must not consider the evidence

3    that I told you to disregard."

4        So it just means just forget the witness ever said that

5    and don't consider that in your deliberations.  That's --

6    that's what the effect of granting a motion to strike is.

7        Okay.  I think that's enough commentary from the bench

8    this morning.  We will continue with the presentation of

9    evidence.

10       Mr. Walsh.

11       Good morning, Mr. Haase.  Let me ask you to come back up

12   to the witness stand.

13       You can take your mask off once you get there, and I'll

14   remind you, you're still under oath.

15                          **DAVID HAASE**,

16   called as a witness for the Government, having been previously

17   duly sworn, testified further as follows:

18                   **DIRECT EXAMINATION**   (Resumed)

19   **BY MR. WALSH:**

20   **Q.**  All right.  We had left off in late July of 2016.  Do you

21   remember I was asking you a series of questions about that?

22   **A.**  Yes.

23   **Q.**  Okay.  And at some point in that time frame, did you learn

24   of a letter having been received from the SEC?

25   **A.**  I did.

1    **Q.**    All right.  How did you learn of it?

2    **A.**    Geoff Rapoport told me, who is our general counsel.

3    **Q.**    And why is it that you learned from him?

4    **A.**    At the time, you know, Mike was working from his office

5    more at that time -- sorry -- from his condo and so he wasn't

6    in the office.  And, you know, so I hadn't heard anything about

7    it through him which is who I would have expected to hear it

8    from.

9    **Q.**    About when did you hear about this letter?

10    **A.**    It probably would have been around August 1st, if I

11    remember correctly, something around there.

12    **Q.**    All right.  And what was Mike Rothenberg's response once

13    that letter had been received?

14    **A.**    Well, he started working from his condo more at that

15    point, and having people come over to the condo for meetings

16    instead of meeting in the office.  That's a big thing I

17    noticed.

18    **Q.**    Let's just stop right there.  You're talking about a

19    condo.  Was Mike Rothenberg's condo somewhere near the

20    Rothenberg Ventures' office building on Folsom?

21    **A.**    It was a few blocks away, yes.

22    **Q.**    So you could walk there from the office?

23    **A.**    Yep.

24    **Q.**    And what -- what did he start doing with regard to the

25    condo then?

**A.**    So we started having more meetings at the condo.  I think

we actually called it like -- like war meetings or war room or

something, and instead of meeting in the office, I think,

because of the private nature of some of those conversations.

**Q.**    And so when you had to meet with him, you would go to the

condo?

**A.**    Yes.  Typically he would have people go over there kind of

one at a time.

**Q.**    What did Mr. Rothenberg tell you about why he was doing

that?

**A.**    Well, I think, you know, obviously because we were talking

about things that he didn't want people to overhear.  But what

I thought was interesting is that when I went over there --

        **MR. FAKHOURY:**  Objection.  Irrelevant.

        **THE COURT:**  Overruled.  You can continue with your

answer, Mr. Haase.

        **THE WITNESS:**  When I went over, it was really unusual.

You know, like Mike was worried about people overhearing our

conversations.  And so specifically there were -- there was one

time I remember well where he said let's step outside.  I don't

want anyone to be able to hear this.  And we weren't near

anyone physically.  So I was, you know -- I think he assumed he

was being, like, surveilled.

BY MR. WALSH:

**Q.**    What did he say about -- what did Mike Rothenberg tell you

1    about the use of written communications like email or text?

2    **A.**    Yeah.  At that time, he asked us to refrain from using

3    email and text as much as possible.

4    **Q.**    Now, with regard to the SEC, once you learned of it, what

5    did you do?

6    **A.**    We started looking historically at the different funds and

7    the activity in those funds, which was something that we hadn't

8    previously focused on.  So we kind of went through the history

9    of what was going on.

10   **Q.**    All right.  I'd like to -- and did you create documents to

11   summarize the status of the funds?

12   **A.**    We did.

13   **Q.**    I would like to show you what's been marked for

14   identification only as Exhibit 360.  It's an Excel.

15        Do you recognize this document?

16   **A.**    I do.

17   **Q.**    And is it an Excel spreadsheet?

18   **A.**    Yes.

19   **Q.**    And is this one of the Excel spreadsheets that you and

20   Hannah -- Hannah Han was -- or were creating at this time

21   frame?

22   **A.**    Yes.

23   **Q.**    And was this the type of document that was used, Excel,

24   that is, and charts like this in the regular course of business

25   at Rothenberg Ventures?

1    **A.**    Yes.

2    **Q.**    And was it made at or near the time that is listed here on

3    this document?

4    **A.**    Yes.

5             **MR. WALSH:**   Your Honor, I move to admit Exhibit 360.

6             **THE COURT:**   Any objection?

7             **MR. FAKHOURY:**   No, Your Honor.

8             **THE COURT:**   360 is admitted.

9             (Government's Exhibit 360 received in evidence.)

10                      (Exhibit published to jury.)

11   **BY MR. WALSH:**

12   **Q.**    Okay.  So let's orient the jury again.  At the bottom

13   left-hand corner here there are four tabs.  Do you see those?

14   **A.**    I do.

15   **Q.**    And those each have a year?

16   **A.**    Yes.

17   **Q.**    2013, '14, '15 and '16.

18        Do those correspond -- what do those correspond to?

19   **A.**    Those would be the different funds that we were tracing

20   historically.

21   **Q.**    Okay.  And so we're right now --

22             **MR. WALSH:**   We have a non-working monitor apparently.

23             **THE COURT:**   Would you raise your hand if your monitor

24   is not working?  Mr. Fortenberry and Ms. Schwind.

25        Ms. Lee is on the way.

1      Is the monitor toward the end of the jury box, does that

2   one work?

3           **A JUROR:**  Yes.

4           **THE COURT:**  If Ms. Lee can't get yours working, maybe

5   you can just slide over.

6       Mr. Stocker, are you pointing to that one, does that one

7   not work?

8           **A JUROR:**  That one works.

9           **THE COURT:**  Oh, it does work.  I see.

10      Well, Mr. Fortenberry and Ms. Schwind, you are welcome to

11  sit wherever is comfortable for you and the monitor works.

12          **THE CLERK:**  I can call Rumar.

13          **THE COURT:**  Great.  Okay, we can do that at a break.

14  I think we're fine for now.

15      Great.  Mr. Walsh, I think the problem is solved for now.

16  You can continue.

17          **MR. WALSH:**  All right.

18          **THE COURT:**  Meanwhile, Ms. Arias has the most

19  comfortable seat on the plane.

20  **BY MR. WALSH:**

21  **Q.**   All right.  So I think we were saying that this is the --

22  we're on the 2013 tab; right?

23  **A.**   Yes.

24  **Q.**   And what, at a high level, is being described on this tab

25  of this spreadsheet?

1    **A.**    These would be effectively investments from the fund in,

2    you know, different co-funds.  And then there's an investor

3    list below that of individuals who invested in the fund.

4    **Q.**    Okay.

5            **MR. WALSH:**  And so if we could just scroll down,

6    Ms. Margen, so that we can see the section entitled "2013

7    Investments and Distributions By Fund," which was -- right

8    there.  If we could go back up to the one before, starting on

9    row 22 and down, if we could do that.  Perfect.

10    **Q.**    What -- is this what you're talking about here?  What's

11    going on in this section?

12    **A.**    Yeah.  This is a list of the limited partners or investors

13    on the left side, and what they had invested in.  Those are

14    different co-funds, I believe.  The RVF Co 1 and Co 2 and so

15    on.

16    **Q.**    And the jury has heard this, but what's a co-fund?

17    **A.**    It would be a fund that is related to the original fund.

18    So it's an independent LLC that they can invest in but

19    oftentimes alongside the 2013 overall fund.

20    **Q.**    All right.

21            **MR. WALSH:**  And then if we could scroll down again,

22    Ms. Margen, so that we start at row 58, perhaps.  Good enough.

23    **Q.**    What is on the left-hand side in columns B and C, what is

24    listed there with the title heading at row 1 -- 61?

25    **A.**    These would be the portfolio companies that the fund had

1    invested in.

2    **Q.**    And then in column C, what is listed there?

3    **A.**    Those are the dollar amounts of the investments.

4    **Q.**    All right.  If we then move over to columns F through M,

5    what is listed in those various columns?

6    **A.**    This is the investor list with the investments and then

7    the distributions that they had received back from the fund.

8            **MR. WALSH:**  All right.  If we could just scroll down

9    so that we can -- the jurors can just see all that.

10    **Q.**    I'd like to draw your attention in particular to row 116.

11    Do you see that row?

12    **A.**    I do.

13    **Q.**    And column F again is listing what?

14    **A.**    This lists Michael Rothenberg as the investor.

15    **Q.**    And how much money did he invest in the '13 Fund?

16    **A.**    $10,000.

17    **Q.**    And then finally, the -- if we go to row 129, is there a

18    totaling of the fund value there?

19    **A.**    There is.

20    **Q.**    And what is the totaling there?

21    **A.**    $4.776 million.

22    **Q.**    Okay.

23            **MR. WALSH:**  If we could go to the 2014 tab now,

24    please.

25    **Q.**    Is this -- what is being depicted in this tab?

1    **A.**    Similarly, this is the fund investments and distributions.

2    **Q.**    And in the section starting on row 14, what is being

3    described there?

4    **A.**    These would be investments and distributions by fund.

5         **MR. WALSH:**    And if we could then scroll down to row

6    41, please.

7    **Q.**    In columns B, C, and D, what's being described in that

8    section?

9    **A.**    So these are the individual investors in the fund and how

10   much they invested and the distributions that they received in

11   exchange.

12   **Q.**    And in columns G, H and I, what's being described in that

13   section?

14   **A.**    Those would be the portfolio companies that the fund had

15   invested in.

16        **MR. WALSH:**    And if we could scroll down, please.    All

17   right.

18   **Q.**    And in this section here that we're now looking at, I

19   would like to draw your attention to row 128.    Who is listed as

20   an investor in the 2014 Fund?

21   **A.**    Michael Rothenberg.

22   **Q.**    And how much did he put into that fund?

23   **A.**    $600,000.

24   **Q.**    And if we go all the way down to row 146, does it give a

25   total of all those investments?

**A.**    Yes.   The total is $11.745 million.

         **MR. WALSH:**  All right.  If we could go to tab 2015, please.

**Q.**    What's being described in this tab?

**A.**    This is the investments and distributions from the 2015 Fund.

**Q.**    All right.  And that, starting on row 18 there, what's in that section?

**A.**    So this is the investors, their investment and their distributions.

**Q.**    And if we go down to row 46 in columns B and C, what's being listed there?

**A.**    These are the investors in the actual fund.

**Q.**    And in columns E and F, what is being described there?

**A.**    Those would be the portfolio companies that the fund had invested in.

         **MR. WALSH:**  And if we could scroll down, please.

**Q.**    And I'd like to draw your attention to row 93, please.  And in columns B and C, who is listed as an investor there?

**A.**    Michael Rothenberg.

**Q.**    And how much money did he put in?

**A.**    $750,000.

**Q.**    And at this time in 2016, was there a total of the value of 2015 Fund that you calculated at row 105?

**A.**    $21.492 million.

1    **Q.**    I'd also like to draw your attention to row 98.  And in

2    particular, columns E and F.  Do you see that there?

3    **A.**    I do.

4    **Q.**    What is listed as a portfolio company in the 2015 Fund?

5    **A.**    River Studios.

6    **Q.**    And how much money was listed in column F as an investment

7    from the 2015 Fund into River Studios?

8    **A.**    $4 million.

9    **Q.**    All right.

10    Let's now turn to tab 2016, please.

11    Now, what's being described here in the 2016 tab?

12    **A.**    This would be the investments and distributions from the

13    2016 Fund.

14    **Q.**    Now, this is approximately August or the summer, at least,

15    of 2016; is that right?

16    **A.**    That's right.

17    **Q.**    So is the 2016 Fund still fundraising?

18    **A.**    Yes.

19    **Q.**    So this is where the fund stood at that time?

20    **A.**    That's right.

21    **Q.**    And I think if we scroll down, is there -- there's much

22    less data here in this chart; is that right?

23    **A.**    That's right.

24    **Q.**    Just so we're consistent in what we're talking about, if

25    we could scroll up just a little bit, what's being listed in

1    this chart starting at row 21?

2    **A.**    That would be a list of the investors in the fund.

3    **Q.**    Row 21 is a list of investors.    Okay.

4         **MR. WALSH:**    And then if we could scroll down.

5    **Q.**    And starting at row 52 in columns B and C, what's being

6    listed there?

7    **A.**    That is an investor list.

8    **Q.**    And in columns E and F, what's being listed there?

9    **A.**    Those are the portfolio companies that had been invested

10    in from the fund.

11    **Q.**    All right.

12         In the investor list in columns B and C, and in particular

13    column B, is there a listing of an investor, Michael

14    Rothenberg?

15    **A.**    There is not.

16    **Q.**    In columns -- in column E, is there -- I'd like to draw

17    your attention to row 74.    What is listed as a portfolio

18    company from the 2016 Fund?

19    **A.**    The Rothenberg Ventures 2015 Fund.

20    **Q.**    And what is the amount of money that is listed as an

21    investment from the '16 Fund into the '15 Fund?

22    **A.**    $6.4 million.

23    **Q.**    All right.    So this was part of your efforts to get a

24    handle on the various funds at that time; is that right?

25    **A.**    That's right.

**Q.**   Did you also make an effort to figure out what was going

on with River Studios?

**A.**   We did.

**Q.**   And now, what information did you seek about River

Studios?

**A.**   Well, we had the financials and so we said profit and

loss, as well as the amount invested from the different funds.

What we were looking for was the ownership structure of the

fund -- of River Studios.

**Q.**   And is there a type of document that would provide that

information?

**A.**   Yes.  A cap table.

**Q.**   Did you ask Mike Rothenberg for a cap table for River

Studios?

**A.**   I did.

**Q.**   Did you ask him many times?

**A.**   I did.  Yeah, I asked him repeatedly.

**Q.**   Did he give you, at least in your initial times, any cap

table?

**A.**   It took some time to get the cap table from him.  I didn't

get it immediately.  It took, I think, a couple weeks.

**Q.**   Did you eventually, though, get a cap table --

**A.**   I did.

**Q.**   -- directly from Mike Rothenberg?

**A.**   Yes.

1  **Q.**   Sir, I'd like to show you what's been marked for

2  identification --

3          **MR. WALSH:**  We can pull this down --

4       An Excel 351, Ms. Margen, please.

5  **Q.**   Do you recognize -- do you recognize this document?

6  **A.**   I do.

7  **Q.**   Is it an Excel spreadsheet?

8  **A.**   It is.

9  **Q.**   And is this the spreadsheet that Michael Rothenberg

10 eventually gave you when you asked him for a cap table for

11 River Studios?

12 **A.**   Yes.

13         **MR. WALSH:**  Your Honor, I move into evidence

14 Exhibit 351.

15         **THE COURT:**  Any objection?

16         **MR. FAKHOURY:**  No, Your Honor.

17         **THE COURT:**  351 is admitted.

18      (Government's Exhibit 351 received in evidence.)

19              (Exhibit published to jury.)

20 **BY MR. WALSH:**

21 **Q.**   Because we're in Excel, let's orient the jury here.

22      There does not appear to be more than one sheet in use

23 here; is that correct?

24 **A.**   That's right.

25 **Q.**   And so let's just describe what's going on here.

1          It says in the top A1, it says River Studios, parentheses,
2    post conversion.
3          What does that mean?
4    **A.**   This would be a projected cap table after an investment
5    round.  So it -- it is what the cap table would look like after
6    the investment.
7    **Q.**   Okay.  And then in column A, what's being described?
8    **A.**   Those are the owners of the company.
9    **Q.**   And in column B, what is being described?
10   **A.**   The initial investment of those owners.
11   **Q.**   In column C, what is being described?
12   **A.**   The shares that they own.
13   **Q.**   And is that relevant compared to their investment?
14   **A.**   Yes.
15   **Q.**   How is that related?
16   **A.**   Well, typically they'll receive shares based on how much
17   they invest.
18   **Q.**   What is column D describing?
19   **A.**   D is the percentage ownership of the company after the
20   round is complete.
21   **Q.**   And what is column E describing?
22   **A.**   E is the class of shares that they own.
23   **Q.**   We haven't talked about this much with the jury, but what
24   is share class?
25   **A.**   Shares have different rights, and so there are different

1  classes of shares.  Some might have preference in the event in

2  which you sell the company, for example, like a liquidity

3  preference, or they might have different voting rights.

4       So for those reasons, you have different classes of shares

5  often.

6  Q.   In -- in the New York Stock Exchange, those types of

7  shares that are circulating, is there -- what type of share is

8  that most commonly?

9  A.   Typically preferred shares for public companies would

10  have, you know, more rights than common shares.

11  Q.   Okay.  But common shares are what are normally traded on a

12  stock exchange?

13  A.   Yes.  That's right.

14  Q.   So a preferred share has additional rights?

15  A.   That's right.

16  Q.   Okay.

17       In here, did you know what was being said about class A

18  and class B common shares?

19  A.   I didn't have a definition of what the -- the different

20  rights were for these different classes.

21  Q.   Okay.

22       Let's go back over and focus on row 4.  Who is listed as

23  the owner of River Studios there?

24  A.   Mike Rothenberg.

25  Q.   In column B, is there a dollar figure of his initial

1    investment listed?

2    **A.**    There is not.

3    **Q.**    How many shares nonetheless is he listed in column C as

4    owning?

5    **A.**    3.2 million shares.

6    **Q.**    Which provided him in column D what percentage ownership?

7    **A.**    32 percent ownership.

8    **Q.**    Let's go to column -- sorry -- row 5.  Who is listed as

9    the owner of River Studios there?

10    **A.**    Transcend VR.

11    **Q.**    And what is listed as the initial investment from

12    Transcend VR?

13    **A.**    $5 million at a $90 million cap.

14    **Q.**    And how many shares did that translate to?

15    **A.**    555,000 shares.

16    **Q.**    And what percentage therefor?

17    **A.**    5 percent ownership.

18    **Q.**    I would like to draw your attention to row 6, please.

19         Who is listed as the owner of River Studios in that

20    column?

21    **A.**    This just says investor TBD.

22    **Q.**    What does that mean?

23    **A.**    To be determined.  So I took this to mean that this

24    investor had not been identified yet.

25    **Q.**    Let's go to row 7.  Who is listed as the owner there?

1    **A.**    Investor TBD again.

2    **Q.**    And you reached the same conclusion with regard to that

3    investor?

4    **A.**    Yes.

5    **Q.**    Let's go to row 8, please.  Who is listed as the owner

6    there?

7    **A.**    Dongxu.

8    **Q.**    Do you know what Dongxu is?

9    **A.**    It was a company that we were talking to at the time about

10   investing in River Studios.  I'd heard secondhand.  I didn't

11   talk to them directly.

12   **Q.**    Do you know if that investment ever occurred?

13   **A.**    I don't think it did.

14   **Q.**    When you received this table from Mike Rothenberg, what

15   conclusions did you draw based on the information contained

16   within this spreadsheet?

17   **A.**    Well, I was concerned because if you think about the post

18   conversion cap table, it's based on the pre-conversion cap

19   table typically.  So the new investors are added on the cap

20   table in addition to the original investors.

21       And the way I was reading this, because these other

22   investors had not invested, effectively Mike was currently the

23   one hundred percent owner of River Studios.  That's kind of how

24   I interpreted this table.

25   **Q.**    Because those in 6, 7 and 8 had yet to occur?

1    **A.**    That's right.

2    **Q.**    What valuation did Mr. Rothenberg suggest in row 15 was

3    the value of River Studios?

4    **A.**    The post money valuation here is $184 million.

5    **Q.**    All right.

6    Now, this is August of 2016.  What was happening, just as

7    a general level -- in a general way then at the end -- or

8    during those weeks of August, those first weeks of August?

9    **A.**    We were doing a historical analysis of the different

10    transactions to try to piece together what had happened and

11    pull together a response, you know, to the request for

12    information that we had received.

13    **Q.**    Did there come a time when you quit working at Rothenberg

14    Ventures?

15    **A.**    I did.  Around August 15th.

16    **Q.**    Why is it that you quit working there?

17    **A.**    We missed payroll right around the 15th of August because

18    Mike had taken the money out of the bank accounts.  And so I

19    was no longer willing to -- to work there because I was -- I

20    feared having personal liability for having people work and not

21    paying them on payday.

22    **Q.**    And you say Mike took the money out.  You mean Mike

23    Rothenberg; right?

24    **A.**    Yes.

25    **Q.**    And how is it that you know that he did that?

1    **A.**  I received a text one morning from Hannah, who was running

2    payroll, saying there's no money --

3              **MR. FAKHOURY:**  Objection.  Hearsay.

4              **THE COURT:**  Sustained.

5    BY MR. WALSH:

6    **Q.**  You came to conclude, though, that Mike Rothenberg had

7    taken the money out; is that right?

8    **A.**  I did.

9              **MR. FAKHOURY:**  Objection.  Calls for hearsay.

10             **THE COURT:**  Overruled.

11             **THE WITNESS:**  That's right.  I did.

12   BY MR. WALSH:

13   **Q.**  And so you quit?

14   **A.**  Yes.  That's right.

15             **MR. WALSH:**  Thank you very much.  I have no further

16   questions for this witness.

17             **THE COURT:**  Mr. Fakhoury, cross-examination?

18                     **CROSS-EXAMINATION**

19   BY MR. FAKHOURY:

20   **Q.**  Okay.  Good morning, Mr. Haase.

21   **A.**  Good morning.

22   **Q.**  You testified yesterday that in early 2016 or maybe in the

23   spring of 2016, rather, Ms. Fanelli reached out to you about

24   providing accounting services for Mr. Rothenberg; correct?

25   **A.**  Yes.

1    **Q.**    And that was while you were working at Peninsula

2    Accounting; correct?

3    **A.**    Yes.

4    **Q.**    You testified about some of your work experience before

5    working at Peninsula.  And you mentioned you worked at

6    Microsoft as an intern; right?

7    **A.**    Yes.

8    **Q.**    Eli Lilly?

9    **A.**    Yes.

10   **Q.**    General Mills?

11   **A.**    Yes.

12   **Q.**    And I think your testimony there was you were the CEO of a

13   little $500 million business; right?

14   **A.**    Yeah, effectively.

15   **Q.**    So those are obviously much, much larger companies than

16   the Rothenberg Group that you were brought on to work with;

17   right?

18   **A.**    That's right.

19   **Q.**    Peninsula Accounting, at that time, provided sort of like

20   outsourced CFO work.  And what I mean by that is some companies

21   may have an in-house chief financial officer; right?

22   **A.**    Yes.

23   **Q.**    So we just talked a moment ago about some of those very

24   large companies you worked for.  Microsoft, for example, has an

25   in-house chief financial officer; right?

**A.**    That's right.

**Q.**    Some companies may be smaller and don't necessarily need a dedicated in-house chief financial officer, and they may outsource that to another external business; right?

**A.**    That's right.

**Q.**    And that's one of the services that Peninsula Accounting offered, basically we can do your -- we can be your chief financial officer, you don't need to have one full-time on staff; right?

**A.**    That's right.

**Q.**    Now, in 2016, Mr. Rothenberg was -- was your first client for outsourced CFO services; right?

**A.**    It's possible, yes.  I don't know for sure but --

**Q.**    Okay.  How long had you worked with Peninsula before you were hired with Rothenberg Group?

**A.**    I was there about six months before I started with Rothenberg.

**Q.**    Had you worked with other VC funds providing accounting or financial services while you were at Peninsula before working with Rothenberg Group?

**A.**    We provided tax services for other venture firms, but not CFO services.

**Q.**    Okay.  So safe to say working with Rothenberg was the first time you worked in a chief financial officer role for a venture firm; correct?

1    **A.**    That's right.

2         **MR. FAKHOURY:**  Mr. Torres, can you pull up

3    Exhibit 579.

4    **Q.**   Mr. Haase, I'm showing you what has been admitted as

5    Exhibit 579.  And Mr. Walsh walked you through this document a

6    little bit yesterday, and I wanted to ask a couple questions.

7         Now, you testified, I think it was yesterday, that when

8    you initially started doing work for Rothenberg Group, it

9    was -- and we just talked about it -- through Peninsula

10   Accounting; right?

11   **A.**    Yes.

12   **Q.**   And that was sometime in March of 2016; correct?

13   **A.**    That's right.

14   **Q.**   And this letter is dated April 1st of 2016; right?

15   **A.**    Yes.

16   **Q.**   And this is talking about or -- this is an --

17        It's early in the morning.  Let me try that again.

18        This is an employment contract; right?

19   **A.**    Yes.

20   **Q.**   And the start date of this employment contract is April 18

21   of 2016; correct?

22   **A.**    Yes.

23        **MR. FAKHOURY:**  Can you scroll down, Mr. Torres.

24   **Q.**   And in terms of the scope of work, that's listed here as

25   support to CEO, finance, accounting, tax, payroll systems for

1    the entire Rothenberg Group family of companies; correct?

2    **A.**    Yes.

3    **Q.**    So this job offer was made on April 1st of 2016.  And you

4    testified yesterday that there was a need to do some catch-up

5    with accounting because there had been a little bit of a time

6    gap between accountants.  Do you recall that testimony?

7    **A.**    I do.

8    **Q.**    And you're aware that there was a financial -- I can't

9    actually remember her formal title, but -- well, let me ask it

10   this way.

11       You're familiar with someone by the name of Lynne

12   McMillan; right?

13   **A.**    I am.

14   **Q.**    And she was basically the last sort of in-house financial

15   person working with Rothenberg Group and River Studios and the

16   venture capital funds; right?

17   **A.**    That was my understanding.  There was also a consultant

18   named Tom Leep that was helping with the venture fund.

19   **Q.**    Okay.

20   **A.**    But my understanding was that Lynne was the last CFO.

21   **Q.**    Okay.  So another way to say that is you were sort of

22   brought in to take over Lynne's role to some degree; right?

23   **A.**    I don't know the scope of her role, but I think generally

24   speaking, that is likely.

25   **Q.**    Okay.  Do you know if Ms. McMillan left Rothenberg

1    Ventures sometime in February 2016?

2    **A.**    I don't know for sure.

3    **Q.**    You mentioned Tom Leep, and I wanted to ask a couple of

4    questions about that.

5        By Tom Leep, you're referring to Tom Leep, Senior;

6    correct?

7    **A.**    That's right.

8    **Q.**    And he has a son who also worked for Rothenberg Ventures,

9    Tommy Leep; right?

10   **A.**    Yes.

11   **Q.**    You said that Mr. Leep, Senior, was working as a

12   consultant for the venture capital fund; right?

13   **A.**    Yes.

14   **Q.**    And by "consultant," just to be a little clear about that,

15   he was working -- he was doing financial -- he was -- he was

16   providing financial services to the fund; correct?

17   **A.**    Yes.  I think generally that's true.

18        **MR. FAKHOURY:**  We can take this down.

19   **Q.**    You testified yesterday that when you -- when you joined,

20   the books were in a state -- and I think your word was, a state

21   of disarray.  Do you recall that?

22   **A.**    I do.

23   **Q.**    And you also testified that bookkeeping and accounting for

24   venture capital firms is -- is complex; right?

25   **A.**    Yes.

1    Q.    And you just explained a second ago that this was your

2    first time working in a -- working as a chief financial officer

3    for a venture capital firm; correct?

4    A.    Yes.

5    Q.    When -- when you were describing the complexity, you

6    mentioned that in a venture capital firm, there might be

7    different funds; right?

8    A.    Yes.

9    Q.    There might be different owners to those funds; right?

10    A.    Yes.

11    Q.    There might be different controls for each fund dictated

12    by the terms of the fund operating agreement, right?

13    A.    Yes.

14    Q.    You testified a little about the difference between

15    bookkeeping and finance, and I wanted to unpack that a little

16    bit.

17        One of the things a bookkeeper does is to make sure

18    transactions are sort of classified correctly.  Would that be

19    an accurate statement?

20    A.    Yes.

21    Q.    You testified about QuickBooks, which is accounting

22    software that helps financial professionals organize that

23    financial information; right?

24    A.    Yes.

25    Q.    And at a very high general level, and you know more about

1    QuickBooks than I do, QuickBooks allows a company or an

2    individual, but for our purposes let's say a company, to import

3    transactions -- financial transactions like bank debits and

4    credits or credit card statements -- transactions, and then

5    effectively categorize those transactions based on either the

6    baked-in criteria within QuickBooks or customized criteria a

7    business may make depending on the nature of their business;

8    right?

9    **A.**    Yes.

10   **Q.**    Mr. Walsh asked you, and you testified about, a woman by

11   the name of Hannah Han -- hopefully I'm saying that right --

12   who worked with you at Peninsula; correct?

13   **A.**    Yes.

14   **Q.**    She did most of the bookkeeping for Rothenberg Group and

15   Rothenberg Ventures; right?

16   **A.**    Yes.

17   **Q.**    You -- you said something that -- yesterday that I wanted

18   to unpack a little bit.

19        You testified yesterday that you can't always know the

20   reason behind a particular financial transaction just by

21   looking at a bank statement; right?

22   **A.**    Yes.

23   **Q.**    And that there is context needed to understand why a

24   particular transaction occurred; right?

25   **A.**    Yep.

1    **Q.**   We just said a minute ago that one of the things

2    QuickBooks helps with is -- allows accountants to classify

3    those transactions, input -- take that context that has been

4    supplied and assign where money or expenses or receipts or

5    whatever should go; right?

6    **A.**   Yes.

7    **Q.**   Now, you just testified a moment ago that Ms. Han did most

8    of the bookkeeping for Rothenberg Group and Rothenberg

9    Ventures; right?

10   **A.**   Yes.

11   **Q.**   And at your time at Rothenberg -- with -- with the

12   Rothenberg Group, you were not a member of the investments

13   team; right?

14   **A.**   That's right.

15   **Q.**   You weren't -- so you weren't sitting at pitch meetings or

16   soliciting investors; correct?

17   **A.**   Yes.

18   **Q.**   You weren't meeting or interacting with limited partners;

19   right?

20   **A.**   I interacted with some of them.  I mean, Brandon Farwell

21   was a limited partner who I interacted with daily.  But for the

22   most part, I wasn't in the meetings with external LPs.

23   **Q.**   Okay.

24        You testified Mr. Farwell was a limited partner.  He was

25   also effectively -- he was a co-worker; right?

1    **A.**    Yes.

2    **Q.**    Yesterday you testified about Mr. Rothenberg directing you

3    or explaining to you that you shouldn't share financial

4    information with other people.  Do you recall that?

5    **A.**    Yes.

6    **Q.**    And we just established a few minutes ago you were the

7    chief financial officer of Rothenberg Group; right?

8    **A.**    Yes.

9    **Q.**    And we just -- Mr. Walsh walked you through some of this.

10    You did have access to the QuickBooks; right?

11    **A.**    Yes.

12    **Q.**    And Ms. Han had access to the QuickBooks; right?

13    **A.**    Yes.

14    **Q.**    Within the access to the QuickBooks, you could see prior

15    entries made into the QuickBooks by Ms. McMillan; correct?

16    **A.**    Potentially.  I don't remember specifically seeing her

17    entries because it doesn't say who assigned them unless you go

18    to the audit tool.

19    **Q.**    Got it.

20    **A.**    But it's certainly possible that I did.

21    **Q.**    Okay.

22    **A.**    And likely.

23    **Q.**    You said a moment ago the books were in a state of

24    disarray, which I -- I understood, but you can correct me if I

25    understand it wrong, that you were able to see the -- the

1    books; right?

2    **A.**    I was.

3    **Q.**    And you were able to see the prior entries, even if you

4    weren't sure who made those prior entries; correct?

5    **A.**    Yes.

6    **Q.**    So just a second ago, you said it was possible you could

7    have seen entries made by Ms. McMillan; right?

8    **A.**    Yes.

9    **Q.**    And presumably you could have seen entries made by

10    Mr. Leep; right?

11    **A.**    Yes.

12    **Q.**    And any other contractor who was doing financial work for

13    Rothenberg Ventures, Rothenberg Group who had access to the

14    QuickBooks; right?

15    **A.**    That's right.

16    **Q.**    You had access to bank account information of Rothenberg

17    Group and Rothenberg Ventures at Silicon Valley Bank; correct?

18    **A.**    I did.

19    **Q.**    And you could log in online and look up account

20    information like a lot of banks have; right?

21    **A.**    Yes.

22    **Q.**    Within the list of online bank accounts at Silicon Valley

23    Bank would have been the account tied to the line of credit;

24    correct?

25    **A.**    Yes, I believe so.

1    **Q.**    There were other people who had access to bank account

2    information at Silicon Valley Bank; right?

3    **A.**    Yes.

4    **Q.**    That would include Ms. Han; right?

5    **A.**    Yes.

6    **Q.**    How about Amanda McCoy?

7    **A.**    Yes.

8    **Q.**    And she was somebody who also did accounting and financial

9    work for Rothenberg Group; right?

10    **A.**    Yeah.  She was an accounts payable clerk.

11    **Q.**    Okay.

12        Yesterday there was some testimony about Expensify, which

13    is -- my understanding is it allows a company to issue -- or

14    for employees to get reimbursed for expenses that they

15    incurred; right?

16    **A.**    Yes.

17    **Q.**    And you had access to the Expensify account; correct?

18    **A.**    I did.

19    **Q.**    There was also some testimony about Gusto, which is a

20    payroll processing; right?

21    **A.**    Yes.

22    **Q.**    And you had access to Gusto; correct?

23    **A.**    Yes.

24    **Q.**    In the -- in the categories of information that you

25    testified yesterday that Mr. Rothenberg asked you not to share

1    with other people, you mentioned salary information.  Do you

2    recall that?

3    **A.**    I do.

4    **Q.**    Have you shared salary information with other co-workers

5    on other jobs?

6    **A.**    I have in previous jobs.  Sometimes it's common and

7    sometimes it's not common.  Obviously every company has a

8    different rule about how to share that.

9    **Q.**    Okay.  While you were working at Rothenberg Group, did you

10   work primarily out of 1062 Folsom Street or did you work from

11   home or from the Peninsula Accounting offices?  Where did you

12   work?

13   **A.**    While I was an employee?

14   **Q.**    Yes.

15   **A.**    I think I primarily worked from the office.

16   **Q.**    By the office, you mean 1062 Folsom Street in

17   San Francisco; right?

18   **A.**    Yes.  Sorry.  The Rothenberg office.

19   **Q.**    And there were a lot of other people who worked out of

20   that building; right?

21   **A.**    Yes.

22   **Q.**    Brandon Farwell worked there.  Correct?

23   **A.**    Yes.

24   **Q.**    And I think you said a moment ago you talked to him almost

25   daily; right?

1    **A.**    Yes.

2    **Q.**    Did Justin Grooms work out of that office?

3    **A.**    Yes.

4    **Q.**    Did you talk to him daily?

5    **A.**    Most days, yes.

6    **Q.**    How about Geoff Rapoport?

7    **A.**    Yes.

8    **Q.**    Did you talk to him daily?

9    **A.**    Yes.

10    **Q.**    How about Tommy Leep?

11    **A.**    Tommy or Tom?

12    **Q.**    The son.

13    **A.**    The son, yes.  Tommy Leep, yes.

14    **Q.**    And how about Tom Leep, Senior, the father?

15    **A.**    Tom typically worked remotely, if I remember correctly.

16    **Q.**    Okay.

17         You had Mr. Farwell's cell phone number; right?

18    **A.**    Yes.

19    **Q.**    And you could -- you could text him if you wanted to;

20    right?

21    **A.**    Yes.

22    **Q.**    You could call him on the phone?

23    **A.**    Yes.

24    **Q.**    You had his email address?

25    **A.**    Yes.

1    **Q.**    You could email him; right?

2    **A.**    Yes.

3    **Q.**    You could do all of that with Justin Grooms as well;

4    right?

5    **A.**    Yes.

6    **Q.**    You could text him, call him, email him; right?

7    **A.**    Yes.

8    **Q.**    Same with Geoff Rapoport?

9    **A.**    Yes.

10   **Q.**    Tom Leep -- sorry -- Tommy Leep, how about Tommy Leep?

11   **A.**    I don't know if I had Tommy's phone number, but I could

12   get ahold of him if I needed to, and I had his email.

13   **Q.**    Okay.  You said that Tom Leep, Senior, primarily worked

14   remotely.  He lived in Menlo Park; correct?

15   **A.**    I believe so.  I don't know where he lived but I think in

16   the peninsula somewhere.

17   **Q.**    Okay.  And you could -- even though he wasn't at

18   1062 Folsom all the time, did he come into 1062 Folsom

19   occasionally?  Do you recall?

20   **A.**    I don't recall.  I don't think I met him in person, but

21   it's possible that I did.

22   **Q.**    Okay.  You could email him; right?

23   **A.**    Yes.

24   **Q.**    And you did in fact email him; right?

25   **A.**    Yes.

1    **Q.**   Did you have his phone number?

2    **A.**   I believe I did.

3    **Q.**   Mr. Walsh asked you about a limited partner agreement, and

4    you have seen limited partner agreements; right?

5    **A.**   Yes.

6    **Q.**   Mr. Rapoport showed one to you; correct?

7    **A.**   That's right.

8    **Q.**   In his office?

9    **A.**   I don't remember where we were at the time, but in the --

10   in the office at 1062 somewhere.

11   **Q.**   Okay.  So somewhere in the building.  You just can't

12   remember which office it was?

13   **A.**   Yes.

14   **Q.**   Got it.

15           **MR. FAKHOURY:**  Can we pull up Exhibit 356, the

16   spreadsheet, the Excel file.

17   **Q.**   Okay, sir.  I'm showing you what's admitted as

18   Exhibit 356.  Do you recall this exhibit?

19   **A.**   I do.

20   **Q.**   This is a spreadsheet that you testified about from

21   yesterday.  And I want to direct your attention to line 5.

22           **MR. FAKHOURY:**  Maybe Mr. Torres can just put the

23   cursor -- just click 5.  Yeah.

24   **Q.**   This says -- under the entity it says "GP Commit."  Do you

25   see that?

1  **A.**    Yes.

2  **Q.**    And the -- and GP stands for general partner; right?

3  **A.**    Yes.

4  **Q.**    And over here it says primary contact is Mike Rothenberg.

5  Do you see that?

6  **A.**    Yes.

7  **Q.**    Okay.

8        Now, this is -- this is a spreadsheet related to the 2016

9  Fund; correct?

10 **A.**    That's right.

11 **Q.**    And the general partner of the 2016 Fund was Rothenberg

12 Ventures Management Company; correct?

13 **A.**    I believe so.

14        **MR. FAKHOURY:**  I'm going to ask Mr. Torres to pull up

15 Exhibit 348, please.

16 **Q.**    Mr.-- Mr. Walsh asked you about this email yesterday.

17 This is an email dated June 3rd, 2016, from you to Amanda.  I'm

18 assuming that's Amanda McCoy; correct?

19 **A.**    Yes.

20 **Q.**    As well as Martin Mayo.  Do you see that?

21 **A.**    I do.

22 **Q.**    He's an attorney; right?

23 **A.**    Yes.

24 **Q.**    And cc'ing Mr. Rothenberg; right?

25 **A.**    Yes.

1    **Q.**   And this email references setting up accounts and opening

2    bank accounts for some of the entities listed within this

3    flowchart; right?

4    **A.**   Yes.

5    **Q.**   Now, not -- not all of these entities were ultimately set

6    up; right?

7    **A.**   I -- I believe they were not all set up, but I don't know

8    for sure what got set up after I left.

9    **Q.**   Okay.  Well, before you left, so I'm asking about at the

10    time you were there, these entities did not get set up; right?

11    **A.**   Some of them were set up and some of them were not, yes.

12    **Q.**   Okay.  Let me -- let me ask a better question.

13         **MR. FAKHOURY:**  And actually let's pull up Exhibit 361.

14    It's a little clearer to see there.

15    **Q.**   So, for example, there's an entity here that's called

16    River Basketball Association.

17       While you were at Rothenberg Group, this entity did not

18    get established; right?

19    **A.**   I don't think it was established.

20    **Q.**   Okay.

21       Another one is the River Institute Election Project LLC.

22    While you were there, that never got established; correct?

23    **A.**   I don't believe so.

24    **Q.**   Mr. Walsh asked you about an entity that was referenced in

25    an email titled "Rothenberg Adventures."  And to your

1   knowledge, while you were working with Rothenberg Group, that

2   entity was never established; right?

3   **A.**   I don't believe so, but I don't know for sure.

4   **Q.**   Okay.

5       Rothenberg Adventures is not even listed on this chart;

6   right?  And if you need a minute to take a look at it, take

7   your time.

8   **A.**   That's right.

9   **Q.**   Okay.  That's right, it's not listed on the chart; right?

10  **A.**   I don't see it listed on the chart.

11  **Q.**   Okay.

12      **MR. FAKHOURY:**  Can we pull up Exhibit 351.  This is

13  also an Excel spreadsheet.

14  **Q.**   You testified towards the end here with Mr. Walsh that

15  this was a capitalization table that Mr. Rothenberg gave to you

16  concerning River Studios; correct?

17  **A.**   Yes.

18  **Q.**   And obviously an investor TBD in lines 6 and 7 means

19  those -- there are not -- there is no entity that contributed

20  any money; right?

21  **A.**   That's my understanding.

22  **Q.**   Okay.  You talked a little bit about Dongxu where there

23  was some conversation about having them invest into River

24  Studios, but ultimately they did not invest; correct?

25  **A.**   That is my understanding.

1    **Q.**   Okay.  And that was your understanding from talking to

2    folks who were working on the investment side; right?

3    **A.**   Yes.

4    **Q.**   So that would be folks like Mr. Farwell and Mr. Grooms and

5    Mr. Flinn; right?  Dylan Flinn?

6    **A.**   I believe that Dongxu was being handled by Mike, but it's

7    possible that the other -- the other investment team members

8    were involved in those conversations.  I don't know.

9    **Q.**   Okay.  And ultimately, your testimony was, based on this

10    cap table Mr. Rothenberg would be the sole owner of River

11    Studios at the time you received this spreadsheet, based on

12    this cap table; right?

13    **A.**   That's how I would interpret this.

14    **Q.**   Okay.

15           **MR. FAKHOURY:**  We can take this down.

16    **Q.**   A little while ago I asked you about if you had seen any

17    of the limited partner agreements.  And you testified about

18    seeing the agreement for the 2016 Fund because Mr. Rapoport

19    showed it to you.  Do you recall that?

20    **A.**   I do.

21    **Q.**   Okay.  And you're aware that that agreement contained a

22    clause that said the 2016 Fund could invest in River Studios;

23    right?

24    **A.**   I believe that to be the case, but I don't remember

25    explicitly.  I read it, I believe, one or two times, if even

1    that.  And so I -- I have a vague recollection.  I think it

2    did, but I don't know for sure.

3    **Q.**    Okay.  You testified about a letter that -- from the SEC.

4    Do you recall that?

5    **A.**    I do.

6    **Q.**    And after that letter, things sort of changed quite a bit

7    at -- at Rothenberg Ventures and Rothenberg Group; right?

8    **A.**    That's right.

9    **Q.**    You testified about Mr. Rothenberg working from his condo

10   more frequently; right?

11   **A.**    Yes.

12   **Q.**    And you did explain that the condo was just a few blocks

13   away from 1062 Folsom; right?

14   **A.**    Yes.

15   **Q.**    You're aware that there was a *TechCrunch* article that came

16   out shortly after the SEC letter that had some negative

17   information about Rothenberg Ventures; right?

18   **A.**    Yes.

19   **Q.**    Had you left Rothenberg Group before the article or after

20   the article?  Do you recall?

21   **A.**    I don't recall.  I think I had left before.

22   **Q.**    Okay.

23        Other Rothenberg Group employees had started -- had --

24   were leaving around the time that you were leaving as well;

25   correct?

1    **A.**    Yes.

2                      (Pause in the proceedings.)

3    **BY MR. FAKHOURY:**

4    **Q.**    Now, you testified a moment ago that you ultimately

5    decided to resign from Rothenberg Ventures; correct?

6    **A.**    Yes.

7    **Q.**    And one of the reasons, you testified, was some concerns

8    about a missed payroll.  Do you recall that?

9    **A.**    I do.

10    **Q.**    And you had concerns about people not getting paid for

11    work; right?

12    **A.**    That's right.

13    **Q.**    You wanted to make sure people got paid for the work they

14    did; right?

15    **A.**    Yes.

16    **Q.**    You wanted to make sure you got paid for the work you did;

17    right?

18    **A.**    Yes.

19    **Q.**    As you were leaving Rothenberg Ventures, you decided to

20    put some charges on an American Express card belonging to

21    Mr. Rothenberg; correct?

22    **A.**    I did.

23    **Q.**    On his personal credit card; correct?

24    **A.**    It was a card that was used for business.  We all had AMEX

25    cards that we used for business.  So I don't know if it was

1    a -- I thought it was a business card, to be honest.  But Mike

2    used it very consistently for the business.

3    **Q.**    Okay.  And you made charges on that card shortly -- well,

4    let me ask you this.

5        You made charges on that card on the day you left?

6    **A.**    I don't know if it was the day that I left, but it was --

7    you know, it would have been around that time.

8    **Q.**    Okay.  You talked a bit about having daily interactions

9    with Mr. Farwell.  Did you have daily interactions with

10    Mr. Rapoport as well?

11    **A.**    Typically, when he was working there.

12    **Q.**    Okay.  How about Mr. Grooms?

13    **A.**    Typically.

14    **Q.**    Mr. Rapoport and Mr. Farwell and Mr. Grooms also left

15    Rothenberg Ventures in August of 2016; correct?  If you know.

16    **A.**    I know that Geoff did.  I don't know for sure about

17    Brandon.  But, yes, I mean, I think most of the group left in

18    August.

19    **Q.**    Okay.  And one of the things that was happening around

20    that time in August was you, Mr. Rapoport, Mr. Farwell, and

21    Mr. Grooms discussing setting up your own venture capital firm;

22    correct?

23    **A.**    That's right.

24    **Q.**    And potentially taking over the venture capital funds

25    managed by Rothenberg Ventures; right?

1   **A.**    That's right.

2   **Q.**    And that was while the fund was still operating and

3   managing under its current management; right?

4   **A.**    Well, Mike had taken all the money out of the bank

5   accounts.  And so whether or not it was operating I think is a

6   matter of perspective.  But the fund still existed at that

7   time.

8   **Q.**    Okay.  And one of the -- one of the things that you,

9   Mr. Rapoport, Mr. Farwell, and Mr. Grooms wanted to do was to

10  effectively assume control of those funds; right?  Of the -- of

11  the investment funds.  I should clarify that.

12  **A.**    Yeah.  We were interested in managing out the rest of

13  those investment funds for the investors.

14  **Q.**    Got it.

15          **MR. FAKHOURY:**  Can I have a minute, Your Honor?

16          **THE COURT:**  Yes.

17              (Defense counsel confer off the record.)

18          **MR. FAKHOURY:**  I have no further questions.  Thank

19  you.

20          **THE COURT:**  Thank you, Mr. Fakhoury.

21      Mr. Walsh, further questions for Mr. Haase?

22          **MR. WALSH:**  No, Your Honor.

23          **THE COURT:**  Mr. Haase, thanks very much for your

24  testimony.  You're excused.

25          **THE WITNESS:**  Thank you, sir.

1          THE COURT:  The Government's next witness, please.

2          MR. WALSH:  Your Honor, the United States calls Anna

3     Cornell-Pape.

4          THE COURT:  Good morning, Ms. Pape.  I'm going to ask

5     you to come up to the witness stand.  When you get there,

6     remain standing and face my courtroom deputy, please.

7                         ANNA CORNELL-PAPE,

8     called as a witness by the Government, having been duly sworn,

9     testified as follows:

10         THE WITNESS:  Yes.

11         THE CLERK:  Thank you.

12       If you could please state and spell your last name for the

13    court reporter.

14         THE WITNESS:  My last name is Cornell-Pape.  It's

15    C-O-R-N-E-L-L hyphen P-A-P-E.

16         THE COURT:  Good morning, Ms. Cornell-Pape.

17         THE WITNESS:  Good morning.

18         THE COURT:  You can take your mask off while you are

19    testifying so the jurors can see your expression.

20       There is water there in case you get thirsty.

21       Have you ever testified before?

22         THE WITNESS:  Yes, I have.

23         THE COURT:  Okay.  Well, I'll just give you the

24    summary version then.

25       If you could use whole words instead of noises and

```
 1    gestures such as "uh-huh" and "huh-uh," that would we helpful

 2    to the court reporter.  She is trying to make a record of the

 3    proceedings.

 4        Similarly if you will wait until the lawyers have finished

 5    their questions, they'll wait until you have finished your

 6    answers so only one person is talking at a time.

 7        The jurors are the ones deciding the case obviously.  You

 8    can see the jury box goes back quite a ways.  If could stay

 9    close to the microphone and keep your voice up, you will be

10    helping them.

11        If somebody asks you a question and you don't know the

12    answer, you can just say "I don't know."

13            THE WITNESS:  Okay.

14        THE COURT:  If you don't remember, you can just say "I

15    don't remember."

16        If a lawyer asks you a question and it's not clear, you

17    should feel free to tell them that and ask them to rephrase and

18    they will be glad to do that.

19        Does that all make sense?

20            THE WITNESS:  It makes sense.

21            THE COURT:  All right, Ms. Cornell-Pape.

22        Mr. Walsh, your witness.

23                          DIRECT EXAMINATION

24    BY MR. WALSH:

25    Q.   Where do you work?
```

1    **A.**    I work at the Federal Deposit Insurance Corporation or

2    FDIC.

3    **Q.**    What is FDIC?

4    **A.**    The FDIC is a quasi-governmental agency, and we insure

5    banks.

6    **Q.**    How long have you been at the FDIC?

7    **A.**    I have been at the FDIC since 1991, so 32 years.

8    **Q.**    What's your current title?

9    **A.**    I am currently acting assistant regional director.

10   **Q.**    What is the region that you are the acting assistant

11   director of?

12   **A.**    So it's the San Francisco region.  And the territory I am

13   responsible for is the greater San Francisco Bay Area as well

14   as the Pacific Islands.

15   **Q.**    All right.  And what are your duties as the acting

16   assistant regional director?

17   **A.**    My duties as acting assistant regional director, I am

18   responsible for a portfolio of institutions which I review

19   reports of examination, correspondence, and manage the

20   oversight of the institutions.

21   **Q.**    Okay.  We're going to circle back to that.

22       Let's just go back in time to college.  Where did you go

23   to college?

24   **A.**    I went to college at Cal State University Northridge.

25   **Q.**    What did you get your degree in?

**A.**    Business administration with an option in finance.

**Q.**    What is an option?  Is that like a minor?

**A.**    It -- it -- the business administration is the major with a -- I would say a focus, a focus in finance.

**Q.**    And out of college, where did you go to work?

**A.**    I went to work at the FDIC.

**Q.**    One place the whole time?

**A.**    The whole time.  I am a creature of habit.

**Q.**    Okay.  So when you started at the FDIC, what year was that?

**A.**    That was 1991.

**Q.**    And what was your role right at the beginning?

**A.**    I was an assistant examiner trainee.

**Q.**    Okay.  What is -- we've got an assistant and trainee in there.  So what is an examiner, just to start with that?

**A.**    An examiner is one of the employees who goes in and reviews the books, records, financial condition of a bank.

**Q.**    Got it.  And so you were an assistant examiner in training.  What does that mean?

**A.**    That means that -- well, it means they could fire me really easily.  But really it means that I was an entry-level position and that I was learning how to become an examiner.

**Q.**    Got it.

And then at some point did you lose your trainee status and just become an assistant examiner?

1    **A.**    After the first year, you lose the trainee, become an

2    assistant.  And then after you take an examination and you are

3    deemed worthy, then you can get your commission as an examiner.

4    **Q.**    So there's -- there's some concept of a commission?

5    **A.**    Yes.  You're commissioned.

6    **Q.**    What does that mean?

7    **A.**    That means that you go through a series of steps, which

8    include on-the-job training, writing what we call practice jobs

9    where you are in charge but you have someone overseeing you,

10    but you're essentially doing the work yourself.  And you have a

11    technical evaluation or examination that you have to pass.

12    **Q.**    What is a technical evaluation?

13    **A.**    It's a three -- no, now four -- it's a four-hour

14    examination that tests your knowledge of all of the

15    requirements that we expect an examiner to know.

16    **Q.**    Okay.  And at what point did you become a commissioned

17    examiner?

18    **A.**    I became a commissioned examiner in 1994.

19    **Q.**    How long were you a commissioned examiner at the FDIC?

20    **A.**    Well, technically I'm still a commissioned examiner

21    because you don't lose that.  Once you become commissioned,

22    you're still commissioned.  But I am no longer in the role of

23    an examiner.  I became a case manager in 1999.

24    **Q.**    So from '93 to '99 you were an examiner.  And what did you

25    do as an examiner?

1    **A.**    I examined banks.

2    **Q.**    And what did that entail?

3    **A.**    That entails going to the bank periodically.  We do a wide

4    variety of analysis on the institution.  The most similar thing

5    I can compare it to is an audit, although it's a little

6    different than an audit.

7        But we, in addition to assessing the books and records,

8    are they making entries appropriately, we look at their asset

9    quality, make sure that the assets that are on the bank's books

10   are able to be on the bank's books, which that's a lot of

11   complication to that.  But if something has no value anymore,

12   they have to write it off.

13       And we also make sure that they're complying with laws and

14   regulations.

15   **Q.**    And the whole point of that examination is what?  To

16   determine the strength of the bank?

17   **A.**    Yes.  To determine the -- we rate the banks.  We have a

18   rating system for financial institutions.  But to make sure

19   that they are following safe and sound banking procedures.

20   **Q.**    You mentioned you became a case manager in 1999.  How is

21   that different than the examiner role that you were performing?

22   **A.**    I -- as a case manager, I was a case manager special

23   activities.  I assisted on examinations.  But more frequently,

24   I would review exams, provide guidance and oversight to

25   examiners.  I would work on cases involving my expertise, which

1    involved anti-money laundering, sanctions issues, and fraud

2    issues.

3    **Q.**    How long did you have that case manager role?

4    **A.**    Sixteen years.

5    **Q.**    And if I'm doing my math, that gets us to 2015.  What role

6    did you take on in 2015?

7    **A.**    At that point, I became a manager, so I was a supervisory

8    examiner.

9    **Q.**    And what did you do?

10    **A.**    I examined banks and supervised people who were examining

11    banks.

12    **Q.**    And then at some point, did you become what you are now,

13    which is the acting assistant regional director?

14    **A.**    Yes.  September 11th of this year.

15    **Q.**    Oh, very recently.

16    **A.**    Very recently.

17    **Q.**    And in addition to all of that long career at the FDIC, do

18    you do any sort of trainings or teaching of -- in this field?

19    **A.**    I do.  I -- in addition to training examination staff for

20    on-the-job training, I also teach classes at the Federal

21    Financial Institutions Examination Council, or FFIEC.

22    **Q.**    That rolls off the tongue.

23    **A.**    Yes.  It's --

24    **Q.**    What is that?

25    **A.**    So the FFIEC is a group of interagency regulators.  And we

1    provide training to staff of the various federal and state

2    banking regulators, and the National Credit Union

3    Administration, which they regulate credit unions, not banks,

4    but they're very similar.

5    **Q.**    How long have you been doing that?

6    **A.**    I started doing that in 1999.

7    **Q.**    And are you doing it to this day?

8    **A.**    I am doing it to this day.

9    **Q.**    All right.

10        Now, you mentioned various regulators in that statement

11   that you were teaching how to do their examinations.  Let's

12   just start big picture.  How are banks regulated in the

13   United States?

14        **THE COURT:**  Mr. Walsh, any time in the next five

15   minutes.

16        **MR. WALSH:**  Actually, you know what?  Why don't we

17   stop here.

18        **THE COURT:**  I sensed there was a pivot there.

19        Members of the jury, we are going to take our morning

20   recess.  Please remember my prior admonitions.

21        **THE CLERK:**  Please rise for the jury.

22        (Proceedings were heard out of presence of the jury:)

23        **THE COURT:**  All right.  We're outside the presence of

24   the jury.

25        Mr. Walsh, anything for the record?

1          **MR. WALSH:**  No, Your Honor.

2          **THE COURT:**  Mr. Fakhoury?

3          **MR. FAKHOURY:**  No, Your Honor.

4          **THE CLERK:**  Court is in recess.

5               (Recess taken at 10:01 a.m.)

6          (Proceedings resumed at 10:20 a.m.)

7      (Proceedings were heard in the presence of the jury:)

8          **THE COURT:**  All right.  All the jurors are in their

9    assigned seats.

10      Ms. Cornell-Pape is still on the witness stand.

11      Mr. Walsh, your witness.

12   **BY MR. WALSH:**

13   **Q.**  We were just going to start the topic of how are banks

14   regulated in the United States.

15   **A.**  It's a little bit complicated.

16      There are two ways for a bank to become chartered.  They

17   can be a nationally chartered institution, which would be

18   through the Office of the Comptroller of the Currency, or they

19   could be a state chartered institution, so they can be

20   chartered through any of the 50 states as well as Puerto Rico

21   and Guam.  And in that case, they would have a federal

22   regulator which would either be the Federal Reserve or the

23   Federal Deposit Insurance Corporation.

24   **Q.**  So let's walk through that mess.  A nationally chartered

25   bank, what kind of a bank is that?

1    **A.**    A nationally chartered bank is -- they can be small, they

2    can be large, but the nationally chartered banks, because they

3    can be very easily interstate, they're some of the largest

4    institutions in the U.S.

5    **Q.**    Do you have an example of a type of bank like that?

6    **A.**    JPMorgan Chase is a national bank.

7    **Q.**    And you said -- now, those are regulated by a particular

8    entity?

9    **A.**    The Office of the Comptroller of the Currency, or the OCC.

10    **Q.**    And is that part of a larger department in the federal

11    government?

12    **A.**    It is part of the U.S. Treasury.

13    **Q.**    Okay.  And so the OCC is the primary regulator of those

14    types of banks.

15    **A.**    Yes.

16    **Q.**    Then we had state chartered banks; is that right?

17    **A.**    State chartered banks.

18    **Q.**    Including Puerto Rico and Guam.

19    **A.**    Yes.

20    **Q.**    Does each of the 50 states and Puerto Rico and Guam have

21    its own entity that regulates?

22    **A.**    They do.

23    **Q.**    And then on top of that, you mentioned federal regulators.

24    **A.**    Yes.

25    **Q.**    Two of which.  One of which you said was the Federal

1    Reserve?

2    **A.**    Yes.

3    **Q.**    What's the Federal Reserve?

4    **A.**    Well, the Federal Reserve is a banker's bank in a sense

5    because they provide a way to -- for banks to clear

6    transactions and they do monetary policy, but they also

7    regulate banks and bank holding companies, which we won't get

8    into the holding companies.

9    **Q.**    Okay.  So let's leave bank holding companies aside.

10    The Federal Reserve, when a state-chartered bank wants to

11    have the Federal Reserve as its regulator, is there some sort

12    of -- do they become -- what happens?  What is that said to be?

13    **A.**    They are a Fed member-bank.

14    **Q.**    So member of the Federal Reserve?

15    **A.**    Yes.

16    **Q.**    Why would a state-chartered bank want to be a member of

17    the Federal Reserve?

18    **A.**    There are perceived benefits associated with being a

19    member of the Federal Reserve.  Theoretically it's easier to

20    access the discount window if you're a member of the Federal

21    Reserve, although all banks can access the discount window at

22    the Federal Reserve.

23    **Q.**    The discount window, not really relevant for this case,

24    but since you brought it up, could you give us a one sentence

25    definition?

1   **A.**    Borrowing.  They can borrow money from the Federal

2   Reserve.

3   **Q.**    All right.  What's an example of a state-chartered member

4   of the Federal Reserve bank?

5   **A.**    Silicon Valley Bank.

6   **Q.**    Okay.  Now, let's go to -- you mentioned, though, there is

7   another regulator of state-chartered banks on the federal

8   level.  Is that you, the FDIC?

9   **A.**    That is the FDIC.

10  **Q.**    And so when the FDIC is the primary regulator for a

11  state-chartered bank, they are not members of the Federal

12  Reserve?

13  **A.**    Yes.  They're called state non-member banks.

14  **Q.**    And what's an example of that kind of a bank?

15  **A.**    Bank of the West and Mechanics Bank.

16  **Q.**    Okay.  In addition to that, all of those primary

17  regulators of banks -- and when you say primary regulators,

18  those are the people doing the examinations?

19  **A.**    Yes.  Well -- yes, they are.  They are the people doing

20  the examinations.

21  **Q.**    The FDIC has an additional role on top of all of that?

22  **A.**    Yes.

23  **Q.**    What is that role?

24  **A.**    We insure all of the banks.

25  **Q.**    When you say insure, what exactly are you insuring?

1    A.    If the bank fails, we pay depositors out up to $250,000

2    per person.

3    Q.    Okay.  Let's focus in on that.

4          Bank failure.  In the Great Depression, there were a lot

5    of bank failures; is that right?

6    A.    That is right.

7    Q.    Is that when the FDIC ended up being created?

8    A.    It is.

9    Q.    What was the purpose of the FDIC at that point?

10   A.    The purpose of the FDIC was to stabilize the financial

11   condition of the economy by providing individuals with

12   insurance at their banks so that they wouldn't lose all of

13   their life savings if the bank failed.

14   Q.    And in the Great Depression, lots of banks were failing?

15   A.    Lots of banks were failing.  They had to create a bank

16   holiday because so many banks were failing.

17         And in addition to banks being precariously financially

18   positioned, people were afraid because they had no insurance,

19   so they were taking their money out of banks.  If you take your

20   money out of banks, it causes them to fail.

21   Q.    Since the Great Depression, though, periodically, banks

22   have failed in the United States; is that right?

23   A.    That is right.

24   Q.    When that happens, the bank fails, what does the FDIC do?

25   A.    FDIC, we technically don't close down the bank.  The

1   chartering agency has to close down the bank.  So either the

2   OCC or the state in which the bank is chartered will close it

3   down.  And then we receive the bank from the chartering agency

4   once it's closed down.

5       So we take receivership of the institution.  And then we

6   manage that institution, depending -- we can do a sale of the

7   bank.  It may not be sellable in which case we'll pay out the

8   depositors.  Or we can also do a bridge bank, in which we run

9   the bank until we find a purchaser.

10  **Q.**   And in that case, though, anyone who has made a deposit in

11  that bank is insured?

12  **A.**   Up to $250,000.

13  **Q.**   And does that happen regardless of who is the primary

14  regulator of the bank?

15  **A.**   It happens for any regulated entity, except for the NCUA.

16  They have their own insurance.

17  **Q.**   You've mentioned that twice now so let's tell the jury

18  about that.  The NCUA, what is that?

19  **A.**   The National Credit Union Administration.

20  **Q.**   What does it do?

21  **A.**   It regulates and insures credit unions.

22  **Q.**   It's like the FDIC but for credit unions?

23  **A.**   Exactly.

24  **Q.**   Maybe this is obvious to everyone, but what's a credit

25  union as opposed to a bank?

**A.**   A credit union, technically they're for the members.   So you have to have a membership in your credit union.   And it's essentially owned by the people who hold deposits in the bank.

**Q.**   All right.   So now that we got all that set up, because of its role actually as the insurer of deposits, does FDIC also have a backup role?

**A.**   Yes.   We are the backup regulator for all institutions because we insure them and we take the risk.

**Q.**   All right.   Now, I'd like to turn your attention to three banks that are relevant in this case.   Foremost, Silicon Valley Bank.

**A.**   Yes.

**Q.**   Are you familiar with that bank?

**A.**   I am familiar with that bank.

**Q.**   It's been in the news?

**A.**   It has been in the news.

**Q.**   Before we even get into that, what kind of bank was that?

**A.**   That is a -- or was a state member bank.

**Q.**   And who was its primary regulator?

**A.**   The Federal Reserve.

**Q.**   All right.   And nonetheless, the FDIC, because of its role, had what -- what was its relation to the Silicon Valley Bank?

**A.**   We had backup regulatory authority for the institution, and we insured the institution.

1    **Q.**    Now, Silicon Valley Bank has made the press.  What

2    happened to the bank in this year?

3    **A.**    It failed on March 9th, 2023.

4    **Q.**    And so what did the FDIC do?

5    **A.**    We received the institution.  We created the Silicon

6    Valley Bridge Bank, which we ran as the receiver until we sold

7    off that institution.

8    **Q.**    To whom did the FDIC sell the various assets of the former

9    Silicon Valley Bank?

10   **A.**    We sold all of the deposits -- we ended up insuring all of

11   them.  We sold all the deposits and substantially all of the

12   assets to First Citizens Bank in Raleigh, North Carolina.

13   **Q.**    All right.  Now, I'd like to show you what's been marked

14   as Exhibit 61.  It's in evidence.

15        Do you recognize this item?

16   **A.**    Yes, I do.

17   **Q.**    What is this item?

18   **A.**    It is the Certificate of Insurance for Silicon Valley

19   Bank.

20   **Q.**    And this is the first that the jury has seen something

21   like this.  What is this document doing?

22   **A.**    It basically states that this institution does have

23   insurance by the FDIC, that it is insured, and when the

24   insurance began and if it ended.

25   **Q.**    Okay.  And I'd like to draw your attention to the bottom

down here.  Does it indicate when the FDIC began insuring the

Silicon Valley Bank?

**A.**    Yes, it does.

**Q.**    When was that?

**A.**    October 17th, 1983.

**Q.**    When did that federal insurance end for Silicon Valley

Bank?

**A.**    March 9th, 2023.

**Q.**    That's when the bank failed?

**A.**    That is when the bank failed.

**Q.**    And is it the case then that Silicon Valley Bank was

insured by the FDIC in November of 2015, December of 2015,

January of 2016, and February of 2016?

**A.**    Yes.  The FDIC insured Silicon Valley Bank during those

dates.

**Q.**    All right.  I'd like to turn your attention to a second

bank that's relevant in this case.  And in particular, I'd like

to draw your attention to a bank that I'm confident you've

heard of called Bank of America.

**A.**    Yes.

**Q.**    What type of bank is that?

**A.**    That is a national bank.

**Q.**    And so who is its primary regulator?

**A.**    Office of the Comptroller of Currency.

**Q.**    Nonetheless, did the FDIC have a role with that bank?

1    **A.**    Yes.  We insure that bank.

2    **Q.**    And I'd like to draw your attention to what's in evidence

3    as Exhibit 96.  Do you recognize this document?

4    **A.**    Yes, I do.

5    **Q.**    What is this document?

6    **A.**    This is the Certificate of Insurance for Bank of America.

7    **Q.**    And, again, does it indicate the dates on which Bank of

8    America was insured by the FDIC?

9    **A.**    Yes.  January 1st, 1934.

10   **Q.**    Is when it started?

11   **A.**    Is when it started.

12   **Q.**    That is the beginning of the FDIC?

13   **A.**    That was the beginning.

14   **Q.**    And does it have an end date?

15   **A.**    It does not have an end date because it is still insured

16   by the FDIC.

17   **Q.**    And to be clear, then, were the deposits at Bank of

18   America insured in February of 2016 by the FDIC?

19   **A.**    Yes, they were.

20   **Q.**    All right.  I'd like to turn your attention to a third

21   bank relevant in this case.  And it has the title Zions

22   Bancorporation.  Are you familiar with that bank?

23   **A.**    Yes, I am.

24   **Q.**    What type of bank is that?

25   **A.**    That is a national bank.

1    **Q.**    And therefore who is its primary regulator?

2    **A.**    Office of the Comptroller of the Currency.

3    **Q.**    And nonetheless, did the FDIC have a role with regard to

4    that bank?

5    **A.**    Yes.  We are the insurer.

6    **Q.**    All right.  I'd like to draw your attention to what has

7    been marked and is in evidence at 187.

8          What is this document?

9    **A.**    That is a Certificate of Insurance for Zions Bancorp.

10   **Q.**    And, again, does it indicate when that insurance from the

11   FDIC began?

12   **A.**    It began on January 1st, 1934.

13   **Q.**    Same date as Bank of America?

14   **A.**    Yes.

15   **Q.**    And that's because when the FDIC started?

16   **A.**    Yes.  You can't get insurance before January 1st, 1934.

17   **Q.**    And what does it indicate about the end date of that

18   insurance?

19   **A.**    There is no end date.  It is still insured.

20   **Q.**    Now, with regard to Zions Bancorporation, does it have

21   subsidiary banks?

22   **A.**    It does.

23   **Q.**    Are they wholly-owned?

24   **A.**    They are wholly-owned and therefore also insured.

25   **Q.**    And so in particular, I'd like to draw your attention to a

1    bank entitled -- or called California Bank & Trust.  Are you

2    familiar with that bank?

3    **A.**    Yes, I am.

4    **Q.**    And what is its relation to Zions Bancorporation?

5    **A.**    It is a wholly-owned subsidiary of Zions Bancorporation

6    since October of 1998.

7    **Q.**    And accordingly then, does the -- or did the FDIC begin

8    insuring the California Bank & Trust beginning in October of

9    1998?

10    **A.**    Yes, it did.

11    **Q.**    Does it continue to present?

12    **A.**    Yes, it does.

13    **Q.**    And in particular then, was California Bank & Trust and

14    indeed Zions Bancorporation insured by the FDIC in February of

15    2016?

16    **A.**    Yes, it was.

17             **MR. WALSH:**  I have no further questions for this

18    witness.

19             **THE COURT:**  Thank you, Mr. Walsh.

20        Mr. Fakhoury or Mr. Torres, cross-examination?

21             **MR. FAKHOURY:**  No, Your Honor.  Thank you.

22             **THE COURT:**  Ms. Cornell-Pape, thanks very much for

23    your testimony.  You can step down.

24             **THE WITNESS:**  Thank you.

25             **THE COURT:**  Government's next witness, please.

1          **MR. KLEINMAN:**  Yes, Your Honor.  The Government calls

2     to the stand John Stearns.

3          **THE COURT:**  Good morning, Mr. Stearns.  Let me ask you

4     to come up here to the witness stand area.  When you get there,

5     remain standing and raise your right hand and face my courtroom

6     deputy.

7          **THE WITNESS:**  Good morning, Your Honor.

8                          <u>**JOHN STEARNS**</u>,

9     called as a witness by the Government, having been duly sworn,

10    testified as follows:

11         **THE WITNESS:**  Yes.

12         **THE CLERK:**  Thank you.

13       If you could please state and spell your last name for the

14    core, please.

15         **THE WITNESS:**  Sure.  It's John, J-O-H-N, Anthony,

16    Stearns, S-T-E-A-R-N-S.

17         **THE CLERK:**  Thank you so much.  You can have a seat.

18         **THE COURT:**  Good morning, Mr. Stearns.

19       You can take your mask off.  It will be easier to testify

20    that way.  We've got some water there in case you get thirsty

21    or your mouth gets dry.

22       Have you ever testified before?

23         **THE WITNESS:**  Not direct testimony.  I portrayed a

24    witness as a deponent for a reading.

25         **THE COURT:**  I see.  Okay.  Well --

1          **THE WITNESS:**  I sat in this chair, but not like this.

2          **THE COURT:**  Members of the jury, I don't think we're

3     going to have deposition testimony here, but what Mr. Stearns

4     is referring to is -- and this is mostly in civil cases, the

5     testimony of a witness can be taken down in a conference room

6     with a court reporter there where the lawyers ask questions,

7     and then the transcript is put in a booklet.  And this witness

8     read from one of those booklets at a prior trial.  That's what

9     you heard.

10         Anyway, Mr. Stearns, just a few things about testifying to

11    make it easier for you and easier for the jury to understand.

12         We have a court reporter here taking things down and

13    making an official record.  She can't take down shakes of the

14    head or noises.  So in day-to-day conversation, we often will

15    say "uh-huh" or "huh-uh," or we'll shrug our shoulders, these

16    kinds of things.  She can't take any of that down.  So if you

17    could use whole words, that will be helping her out.

18         Similarly, she can only take down one person at a time.

19    The jury can only hear one person at a time.  We often

20    interrupt each other in conversation.  We know what the other

21    person is going to say so we just start talking before they're

22    done.

23         But in court, it's important for you to let the lawyers

24    finish their question before you answer.  If you do that,

25    they'll wait for you to finish your answer before they ask

1    another question.

2         The jury, these are the folks deciding the case, so it's

3    important that they hear you clearly.  If you could stay

4    relatively close to the microphone, keep your voice up, you

5    will be helping them.

6         If a lawyer asks you a question and you don't know the

7    answer, you can just say "I don't know."  And if you don't

8    remember something, similarly, you can just say "I don't

9    remember."

10        If a lawyer asks you a question and the question is not

11   clear to you, you should ask them to rephrase, and they'll be

12   happy to do that.

13        Does that make sense?

14             **THE WITNESS:**  Yes, it does.

15             **THE COURT:**  Very good.

16        Mr. Kleinman, your witness.

17             **MR. KLEINMAN:**  Yes, Your Honor.  Thank you.

18                         **DIRECT EXAMINATION**

19   **BY MR. KLEINMAN:**

20   **Q.**   Good morning, Mr. Stearns.

21   **A.**   Good morning, Mr. Kleinman.

22   **Q.**   Mr. Stearns, where do you work?

23   **A.**   I work for the Securities and Exchange Commission in

24   San Francisco.

25             **MR. KLEINMAN:**  Your Honor, at this time the parties

1    would jointly request that you read the instruction.

2           **THE COURT:**  Yes.  Thank you.

3        Members of the jury, I'm going to read to you a jury

4    instruction that I read to you previously, but it seems timely

5    for me to read it again now.  So give me just a moment.

6                      (Brief pause.)

7           **THE COURT:**  You have heard and will hear again

8    testimony that the Securities and Exchange Commission, which we

9    often call the SEC, conducted an inquiry into the finances of

10   Rothenberg Ventures Management Company and/or one or more of

11   the Rothenberg funds.  This evidence was admitted and is being

12   admitted solely as it pertains to Mr. Rothenberg's motive or

13   intent and is to be considered by you solely for that purpose.

14       The fact that the SEC conducted an inquiry is not evidence

15   that Mr. Rothenberg did any of the acts charged in the

16   indictment.

17       Mr. Kleinman.

18          **MR. KLEINMAN:**  Thank you, Your Honor.

19   **Q.**  Mr. Stearns, how long have you worked at the SEC?

20   **A.**  Since January 2013.

21   **Q.**  So that's approximately 11 years?

22   **A.**  Yeah.  Coming up on 11.

23   **Q.**  And, Mr. Stearns, what do you do for the SEC?

24   **A.**  I'm a paralegal specialist is my title.

25   **Q.**  What does that entail?

1    **A.**   It entails a lot of investigative work, checking out

2    companies and individuals, helping the attorneys prepare for

3    testimony and depositions.  But the bulk of my job is document

4    control, paperwork, files that come into us.  I'm in charge of

5    logging and maintaining a good chain of custody for.

6    **Q.**   And, Mr. Stearns, I don't know, it might be helpful if you

7    move the mic a little bit closer to you?

8    **A.**   Okay.

9    **Q.**   Turning your attention specifically now to February 3rd of

10   2017, did you receive materials from an attorney named Miranda

11   Kane who was representing Rothenberg Ventures Management

12   Company from the law firm Kane+Kimbell LLP?

13   **A.**   We did.

14   **Q.**   And did those materials contain the Bates-stamped numbers

15   already by the attorney, RVMC 00003563 to RVMC 00030851?

16   **A.**   Yes.

17       **THE COURT:**  Members of the jury, I think I told you

18   this before, but it's probably worth a reminder.  A Bates

19   number is a number that is placed on a document, usually in

20   litigation like this, by a party that's producing the document

21   or by a party that's received the documents.

22       And that's so everybody can just know what has been

23   produced and have an easy way of referring to a particular

24   page.

25       You've seen many documents already in this trial that had

1    additional numbers, sometimes two sets of numbers, affixed to

2    them that were not there when the document was originally

3    created.  This is just an easy, simple way of controlling,

4    knowing where the documents are, and being able to refer to

5    them.  So that's what Mr. Kleinman is referring to here.

6         Mr. Kleinman.

7              **MR. KLEINMAN:**  Thank you, Your Honor.

8    **Q.**    And, Mr. Stearns, did the letter also explain that the

9    Bates range previously referenced was Mike Rothenberg's emails

10   and attachments?

11   **A.**    It did.

12   **Q.**    Prior to your testimony today, have you reviewed trial

13   Exhibit 634?

14   **A.**    Yes, I have.

15   **Q.**    And did trial Exhibit 634 -- was that produced by attorney

16   Miranda Kane in the Bates range previously referenced?

17   **A.**    It was in that Bates range.

18              **MR. KLEINMAN:**  If we can show what has been marked for

19   identification as government's Exhibit 634.

20   **Q.**    Mr. Stearns, prior to your testimony today, have you

21   reviewed this document?

22   **A.**    Yes, I have.

23   **Q.**    And this document contains significant redactions, but the

24   redact -- other than the redactions, is this document a fair

25   and accurate copy of what you received from the attorney for

1    Rothenberg Ventures Management Company?

2    **A.**    It is.

3         **MR. KLEINMAN:**   The Government moves to admit

4    Exhibit 634.

5         **THE COURT:**   Any objection?

6         **MR. FAKHOURY:**   No, Your Honor.

7         **THE COURT:**   634 is admitted.

8         (Government's Exhibit 634 received in evidence.)

9              (Exhibit published to jury.)

10        **MR. KLEINMAN:**   No need to -- we can take this down,

11   Ms. Margen.   We'll circle back to this.

12        Ms. Margen, we can take this down.

13        Oh, thank you, Ms. Margen.

14   **Q.**   Additionally, prior to your testimony today, Mr. Stearns,

15   have you reviewed Government's Exhibit 635?

16   **A.**   Yes.

17        **MR. KLEINMAN:**   If we can put Government's Exhibit 635

18   up for identification.

19   **Q.**   Was this exhibit also included in the -- provided by the

20   attorney of Rothenberg Ventures Management Company?

21   **A.**   It was.

22   **Q.**   In that Bates range that we briefly testified about?

23   **A.**   Correct.   Yes.

24   **Q.**   Is this a fair and accurate copy?

25   **A.**   It is.

1          **MR. KLEINMAN:**  The Government moves to admit

2    Exhibit 635.

3          **THE COURT:**  Any objection?

4          **MR. FAKHOURY:**  No, Your Honor.

5          **THE COURT:**  635 is admitted.

6          (Government's Exhibit 635 received in evidence.)

7               (Exhibit published to jury.)

8          **MR. KLEINMAN:**  We can take that down, Ms. Margen.

9    **Q.**   Additionally, on August 7th, 2017, and August 14th, 2017,

10   did you receive two letters from the law firm Gibson Dunn who

11   stated that they were submitting files for their client,

12   Rothenberg Ventures?

13   **A.**   Yes.

14   **Q.**   And did those files consist of QuickBooks data files for

15   Rothenberg Ventures 2013, '14, '15, and 2016 Funds?

16   **A.**   They did.

17   **Q.**   Additionally, for the August 14th, 2017 letter, did the

18   attorney at Gibson Dunn provide QuickBook data file Rothenberg

19   Ventures Management Company -- from the Rothenberg Ventures

20   Management Company itself?

21   **A.**   He did.

22   **Q.**   Was that subsequently Bates-stamped by the SEC with Bates

23   stamps SEC-RV-E- six zeroes -1 through six zeroes -5?

24   **A.**   Yes.

25   **Q.**   Prior to your testimony today, have you reviewed

1  Government's trial Exhibit 33?

2  **A.**   Yes, I have.

3  **Q.**   And is that trial -- does that trial exhibit reflect those

4  Bates stamp ranges?

5  **A.**   It does.

6  **Q.**   Which is linked to that QuickBooks file submission?

7  **A.**   Yes.

8       **MR. KLEINMAN:**   The Government moves to admit trial

9  Exhibit 33.

10      **THE COURT:**   Any objection?

11      **MR. FAKHOURY:**   No, Your Honor.

12      **THE COURT:**   Exhibit 33 is admitted.

13      (Government's Exhibit 33 received in evidence.)

14      **MR. KLEINMAN:**   If we could put up trial Exhibit 635.

15          (Exhibit published to jury.)

16  **BY MR. KLEINMAN:**

17  **Q.**   Mr. Stearns, this was just admitted.

18      If you would, please, read -- this is an email chain, so

19  if we can start -- if you can read the -- just the date --

20  **A.**   Sure.

21  **Q.**   -- of the initial email.

22  **A.**   The date is Wednesday, August 12, 2015.

23  **Q.**   And who sent -- if you could read the name and email

24  address?

25  **A.**   Sure.  Philip Harvey, and his email is phil@coldplay.com.

1    **Q.**   If you can then read the Michael Rothenberg's response,

2    that line starting with "On Fri."

3    **A.**   Do you want me to read the date or...?

4    **Q.**   Yes.  If you could just read that top line, please.

5    **A.**   Okay.  Friday, or Fri, AUG14, 2015 at 2:46 p.m.

6    **Q.**   And if you could read the name and email address.

7    **A.**   It's Mike Rothenberg and the email is mike@river.co.

8    **Q.**   And then if you wouldn't mind reading into the record the

9    first line of the second paragraph.

10   **A.**   Sure.

11       "Delivering an ambition 2D music video along with the VR

12   experience and Coldplay app is a million dollar product, and

13   we've been working to take out all the costs we can without

14   sacrificing the quality."

15       Keep going?

16   **Q.**   Yes, please.

17   **A.**   "The priority is on the 2D video, and I think there will

18   need to be a financial partner or sponsor involved if we want

19   the label's participation to the project to be less than 500K

20   dollars given the ambition of Ben Mor's creative treatment,

21   even with River bearing the amount of the full VR experience

22   and app.  In meantime, we'll continue to work on driving down

23   costs and finding win-wins.  Thanks.  Mike."

24           **MR. KLEINMAN:**  And if we can zoom out.

25       And now go to the top.

1    **Q.**   Was there -- starting with the next email sent by Mike

2    Rothenberg, could you please read the "From" section,

3    Mr. Stearns?

4    **A.**   Sure.  From Mike Rothenberg, email is mike@river.co.

5    **Q.**   And the "Sent" section?

6    **A.**   Tuesday, August 18, 2015, 10:03 a.m.

7    **Q.**   And then if you can read the email into the record.

8    **A.**   "Dave/Phil, could we have a call today?  Either way, we'll

9    send over the proposal in the next few hours, including River

10   Studios contributing 500K plus for the project and India shoot.

11   Thanks.  Mike."

12         **MR. KLEINMAN:**  Ms. Margen, can we pull up Trial

13   Exhibit 634.  This was just admitted into evidence.

14                    (Exhibit published to jury.)

15   **BY MR. KLEINMAN:**

16   **Q.**   Mr. Stearns, if you can read the "From" section.

17   **A.**   From mikerothenberg@gmail.com on behalf of Mike Rothenberg

18   with an email mike@rothenbergventures.com.

19   **Q.**   And the "Sent" section?

20   **A.**   Wednesday, May 11, 2016, 7:29 p.m.

21   **Q.**   The "To" section?

22   **A.**   Mike Rothenberg, email mike@rothenbergventures.com.

23   **Q.**   Subject?

24   **A.**   "Urgent."

25         **MR. KLEINMAN:**  Okay.  If we can zoom out.

1    **Q.**    And now, I want to focus on the date of May 7th, 2016.

2         **MR. KLEINMAN:**  If we can go to page 9, Ms. Margen.

3    **Q.**    And if you can just read the first -- the first line.

4    **A.**    Okay.  "5/7/16, big themes."

5         **MR. KLEINMAN:**  And, Ms. Margen, we can zoom out.

6    Thank you.

7         And just so the jury can see, would you scroll down,

8    Ms. Margen, to the next page.

9    **Q.**    And there appear to be multiple notes, all under the date

10   5/7/2016; correct?

11   **A.**    Correct.

12        **MR. KLEINMAN:**  And, Ms. Margen, if we can go to

13   page 12.  And if we can expand page 12.

14   **Q.**    Could you please read the date.

15   **A.**    5/7/16.

16   **Q.**    And if you could read the last line?

17   **A.**    "Budgeting — use 2015 Fund as piggy bank?  Fees for

18   accelerator, et cetera?"

19   **Q.**    Thank you, Mr. Stearns.

20        **MR. KLEINMAN:**  Nothing further.

21        **THE COURT:**  Cross-examination?

22        **MR. FAKHOURY:**  Yes, thank you.

23                      <u>**CROSS-EXAMINATION**</u>

24   BY MR. FAKHOURY:

25   **Q.**    Just a few questions, Mr. Stearns.  Good morning.

1    **A.**    Good morning.

2         **MR. FAKHOURY:**  I'm going to have Mr. Torres pull up

3    Exhibit 634.

4    **Q.**    While we do -- while he's doing that, let me start by

5    asking you a couple questions.

6         You testified that Exhibit 634 was part of a production of

7    materials provided by the SEC from Mr. Rothenberg's attorneys;

8    correct?

9    **A.**    Correct.

10   **Q.**    And --

11        **MR. KLEINMAN:**  Objection.

12        **THE COURT:**  Can I see counsel at sidebar?

13        (Sidebar conference held without the reporter.)

14        **THE COURT:**  Counsel will rephrase.

15   **BY MR. FAKHOURY:**

16   **Q.**    I misspoke.  I slept a little too late last night.  Let

17   me -- let me try that again.

18        You testified that Exhibit 634 was -- was part of a

19   production of materials made by attorneys for Rothenberg

20   Ventures Management Company to the SEC; correct?

21   **A.**    Correct.

22   **Q.**    Okay.  I got it right this time.  All right.

23        And you testified that -- or Mr. Kleinman asked you about

24   some Bates page ranges in that production.  And -- and

25   Judge Tigar explained a little bit what a Bates page is.  But

1    just so we're all on the same page, a Bates page is -- it's

2    like adding page numbers to a book; right?

3    **A.**    Correct.

4    **Q.**    And your testimony was the Bates -- the Bates page range

5    consisted of RVMC 00, some number of zeros, 3563 to 30851;

6    correct?  Does that sound about right?

7    **A.**    3085 -- yes.  Yes.

8    **Q.**    That sounds right?

9    **A.**    Five digits, yes.

10   **Q.**    So approximately we're talking about 27,288 Bates pages of

11   material; right?

12   **A.**    Trust your math, yes.

13   **Q.**    Okay.

14         **THE COURT:**  I think that a more helpful nomenclature

15   might be Bates number.

16         **MR. FAKHOURY:**  Sure.

17         **THE COURT:**  And then pages.

18         **MR. FAKHOURY:**  Thank you, Your Honor.

19         And let's scroll down to the very bottom of this page

20   right here.  Yeah, we could stop right there.

21   **Q.**    I'm going to just focus you right here.

22   **A.**    Uh-huh.

23   **Q.**    Okay.

24   **A.**    Sorry.  Yes.

25   **Q.**    So, for example, this -- this has a number here of RVMC, a

1    bunch of zeros, 9196; right?

2    **A.**    Right.

3    **Q.**    So that's -- that means that this -- the first page of

4    this exhibit, of this document is -- is Bates number 9196;

5    right?

6    **A.**    That's right.

7    **Q.**    There's a second number attached underneath it that says

8    SEC-DOJ-EPROD-000-052412.  Do you see that?

9    **A.**    I do.

10   **Q.**    That is a Bates number that the SEC assigned to this

11   document; correct?

12   **A.**    That is correct.

13   **Q.**    And those numbers are sequential; right?

14   **A.**    They are.

15   **Q.**    And they are -- the SEC organizes material -- it collects

16   material from a lot of different sources; right?

17   **A.**    Right.

18   **Q.**    And it keeps that material organized by matter or by case

19   or investigation or whatever you want to call it; correct?

20   **A.**    That's the first level, yes.

21   **Q.**    Okay.  So -- so for this document, this would reflect that

22   this is document or page number -- really, page number 52412;

23   right?

24   **A.**    Right.

25           **MR. FAKHOURY:**  Can you pull up Exhibit 635,

1    Mr. Torres.

2    **Q.**   Mr. Kleinman asked you about this specific exhibit, which

3    is an email dated August 18 of 2015.

4        Can we scroll down to the bottom of this page.  And this

5    has a Bates number of RVMC 00006209; correct?

6    **A.**   That is correct.

7    **Q.**   So this would be page number 6209 out of the materials

8    produced by attorneys for RVMC; correct?

9    **A.**   Correct.

10           **MR. FAKHOURY:**  Can I have a quick moment, Your Honor.

11           **THE COURT:**  Yes.

12               (Defense counsel confer off the record.)

13           **MR. FAKHOURY:**  Nothing else.  Thank you, Your Honor.

14       Thank you, Mr. Stearns.

15           **THE COURT:**  Mr. Kleinman, further questions for this

16    witness?

17           **MR. KLEINMAN:**  No, Your Honor.  Thank you.

18           **THE COURT:**  Mr. Stearns, on and off.  Thank you for

19    your testimony.  You're excused.

20       The Government's next witness, please.

21           **MR. KLEINMAN:**  The Government calls to the stand

22    Justin Grooms.

23           **THE COURT:**  All right.  Good morning, Mr. Grooms.  I'm

24    going to ask you to come up here to the witness stand area

25    which is to my left.  You'll see my courtroom deputy is already

```
1   there.  If you could remain standing when you get there, face

2   her and raise your right hand, please.

3                         JUSTIN GROOMS,

4   called as a witness by the Government, having been duly sworn,

5   testified as follows:

6               THE WITNESS:  Yes.

7               THE CLERK:  If you could please state and spell your

8   last name for the court reporter.

9               THE WITNESS:  My last name?

10              THE CLERK:  Yes.

11              THE WITNESS:  My last name is Grooms, G-R-O-O-M-S.

12              THE CLERK:  Thank you.  You can have a seat.

13              THE COURT:  Mr. Grooms, you can take your mask off

14  while you are testifying.  It will make it easier for you to

15  talk and the jury will be able to understand you.

16      There's water there in case you get thirsty or your mouth

17  gets dry.

18              THE WITNESS:  Appreciate it.

19              THE COURT:  Have you ever testified before?

20              THE WITNESS:  Yes, I have.

21              THE COURT:  Well, I'll give you the -- I'll give you

22  the thumbnail version then.

23              THE WITNESS:  Okay.

24              THE COURT:  My helpful hints.

25      The court reporter is making an official record of the
```

1    proceedings.  We often communicate with each other using noises

2    and gestures.  We say "huh-uh."  We shrug our shoulders like

3    this (indicating).  She can't take down any of that.  So if you

4    could use whole words when you're testifying, that's would be

5    helpful.

6            THE WITNESS:  Okay.

7            THE COURT:  We also interrupt each other all the time

8    in day-to-day conversation.  It just makes things go faster.  A

9    jury can only listen to one person at a time, though.

10   Ms. Hebel can only take down one person at a time.  So if you

11   will wait for the lawyers to finish their questions, they'll

12   wait until you finish your answers.

13       If you could keep your voice up and stay reasonably close

14   to the microphone, that would be great.  I would love all the

15   jurors to be able to hear you clearly.

16           THE WITNESS:  Okay.

17           THE COURT:  If a lawyer asks you a question and you

18   don't know the answer, you just say "I don't know."  If they

19   ask you something you don't remember, you can just say "I don't

20   remember."

21       If they ask you a question that's not clear to you, you

22   should tell them it's not clear, ask them to rephrase.  They'll

23   be glad to do that.

24       Does that all make sense?

25           THE WITNESS:  Yes, sir.

1          **THE COURT:**  Mr. Kleinman, your witness.

2          **MR. KLEINMAN:**  Thank you, Your Honor.

3                        **DIRECT EXAMINATION**

4     BY MR. KLEINMAN:

5     **Q.**    Good morning, Mr. Grooms.  Where do you currently work?

6     **A.**    Bolt Financial here in San Francisco.

7     **Q.**    What is Bolt Financial?

8     **A.**    Bolt Financial is an e-commerce enablement company that

9     helps online merchants sell.

10    **Q.**    What do you do for them?

11    **A.**    I run the sales organization.  I'm the VP of global sales.

12    **Q.**    And are you -- you said it's a San Francisco-based

13    company.  Are you based here or somewhere else in terms of

14    where you live?

15    **A.**    I live in the Bay Area up in Marin.

16    **Q.**    And now let's take it all the way back.  Where did you

17    grow up?

18    **A.**    San Diego.

19    **Q.**    Where did you go to college?

20    **A.**    I went to UC San Diego and San Diego.

21    **Q.**    What did you study?

22    **A.**    Political science.

23    **Q.**    What year did you graduate?

24    **A.**    2003.

25    **Q.**    And after college, did you begin working?

1    **A.**    I did.

2    **Q.**    Where did you work?

3    **A.**    I worked at a tech company named Qualcomm in San Diego.

4    **Q.**    What did you do for Qualcomm?

5    **A.**    I was in a sales role at Qualcomm.

6    **Q.**    While you were working at Qualcomm, were you also pursuing

7    a graduate degree?

8    **A.**    I was.

9    **Q.**    Were you doing this part-time, full-time, or something

10   else?

11   **A.**    I was doing it part-time.

12   **Q.**    And as you were working part-time, you were also working

13   at Qualcomm, correct?

14   **A.**    That's correct.

15   **Q.**    Excuse me.  Studying part-time.

16       Did you ultimately choose to withdraw from the graduate

17   program?

18   **A.**    I did.

19   **Q.**    What was that graduate program?

20   **A.**    It was an MBA.

21   **Q.**    And what is Qualcomm?

22   **A.**    Qualcomm is a large Fortune 500 technology company.  They

23   focus in advanced technologies around communication systems,

24   developing patents that are then sold to phone companies and

25   other users.

1    Q.    How long were you at Qualcomm?

2    A.    I would say about four years, if memory serves.

3    Q.    After Qualcomm what did you do next?

4    A.    I had a series of other technology-related sales jobs with

5    kind of naturally increasing seniority over time.

6    Q.    And during this period, were you living in San Diego still

7    or somewhere else?

8    A.    For most of that time, I was living in San Diego.  And

9    then maybe toward the end, for a short period of time, I was

10    living in Austin, Texas.

11    Q.    So let's talk about Austin, Texas.  Turning your attention

12    specifically to August 2015, where did you begin working?

13    A.    August 2015, I began working at a company called Reaction

14    Housing in -- in Austin proper.

15    Q.    What did you do for Reaction Housing?

16    A.    I was their VP of sales.

17    Q.    What was Reaction Housing?

18    A.    Reaction Housing was a company that built rapidly

19    deployable emergency shelters that could be sent to hurricane

20    sites or other disasters to provide immediate housing to -- to

21    victims.

22    Q.    You just testified that at this time, you were living in

23    Austin, Texas.  Where was Reaction Housing located?

24    A.    In Austin, Texas.

25    Q.    And you just explained to the jury a little bit about what

1    Reaction Housing did.  Was it a for-profit company, nonprofit

2    company, or something else?

3    **A.**    It was a for-profit company.

4    **Q.**    And where -- was it a private company, a public company,

5    or something else?

6    **A.**    It was a private venture-backed company.

7    **Q.**    So you said venture-backed.  The jury has heard a lot

8    about what that means.  But specifically, how many different

9    venture capital companies had invested in Reaction Housing,

10   approximately?

11   **A.**    Approximately, you know, my recollection would be a couple

12   dozen overall had invested.  Small, large, yeah.

13   **Q.**    And of those companies and -- and their investments,

14   approximately how much in total had Reaction Housing raised?

15   **A.**    Tens of millions of dollars, yeah, I would say.

16   **Q.**    Fair to say between let's say 10 and $15 million?

17   **A.**    Yeah.  Absolutely.

18   **Q.**    As the VP of sales, did you have access to Reaction

19   Housing's cap table?

20   **A.**    Yes.

21   **Q.**    The jury has heard what a -- what a cap table is, but just

22   for the record, what is it?

23   **A.**    A cap table in general would be a document listing the

24   investors slash owners of a company, including their

25   proportional ownership and other details.

1  **Q.**   Had Reaction Housing attempted to and, in fact, raised

2  money throughout the duration of the company's existence?

3  **A.**   Yes.

4  **Q.**   I want to ask you about the initial fundraising efforts.

5       When you looked at the cap table, who was one of the

6  largest initial investors in the company?

7  **A.**   Rothenberg Ventures.

8  **Q.**   How much had Rothenberg Ventures invested?

9  **A.**   My -- my memory is about 400,000 or so.

10       **MR. KLEINMAN:**   And just so we can see -- see the

11  Reaction Housing logo, Ms. Margen, if you can pull up what is

12  in evidence as Trial Exhibit 554, page 6, this should be the

13  2016 Rothenberg Ventures fund deck.

14       And if we can -- Ms. Margen, if we can blow up this area.

15  **Q.**   Mr. Grooms, is this the Reaction Housing logo?

16  **A.**   It is, yes.

17  **Q.**   Okay.

18       **MR. KLEINMAN:**   Ms. Margen, we can -- we can take that

19  down.

20  **Q.**   Now, in terms of the cap table at Reaction Housing, did it

21  clearly lay out all of the different investors, when you saw

22  it?

23  **A.**   Yeah.  Yes, it did.

24  **Q.**   And why would that be important for a startup company or

25  any company, for that matter?

1    **A.**    In -- in -- in any company that I've been involved in, the

2    cap table is, you know, important that it accurately represents

3    the amount of money or other investments that different folks,

4    investors, have made into the company, outlining specifically

5    who -- who owns the company and in some cases any rights that

6    they have around that -- that ownership.  It's a core document.

7    **Q.**    I want to talk now about Reaction Housing --

8    **A.**    Okay.

9    **Q.**    -- specifically around end of 2015, beginning of 2016.

10        When you first joined the company, how many people worked

11    there?

12    **A.**    I -- I'd say about 50.

13    **Q.**    And in terms of Reaction Housing's unit production, can

14    you describe for the jury what had been produced?

15    **A.**    Sure.  You know, it's been a couple years, but there are a

16    couple numbers that stick out.

17        The company built maybe a dozen prototypes that were not

18    prototypes that could be sold.  We had built one -- we had

19    built one unit that was sold to the City of New Orleans, and

20    that was the totality of what had been sold.

21    **Q.**    So let's unpack that a little bit.

22        When you say different prototypes, what do you mean by

23    that?

24    **A.**    Internal test units.  You know, practice units to learn

25    how to build the product, the intent of which was just to --

1  for the manufacturing team to learn about the product, and then

2  they were disposed of afterwards.

3  **Q.**   And then in terms of actual units you could sell, how many

4  of those were produced?

5  **A.**   One.

6  **Q.**   And then in total for all of your time at Reaction

7  Housing, how many sales of these units had occurred?

8  **A.**   The whole time I was at reaction housing, one unit was

9  sold.

10  **Q.**   You were the VP of sales.  Can you please tell the jury a

11  little bit about the demand for the, I guess, for-profit

12  housing units?

13  **A.**   Yeah.  I think what we found in the market, unfortunately,

14  was that there -- there wasn't necessarily an appetite for

15  buying these types of shelters.  Potentially there was some

16  fundamental design flaws around the shelters.

17       Also house shelters are procured by government and

18  emergency agencies, tended to not align with how a company like

19  Reaction would need to produce and sell them.

20  **Q.**   Just in terms of cost, how much did it cost -- how much

21  did you sell one of these shelters for?

22  **A.**   Roughly all in about $20,000.

23  **Q.**   Now, really focusing in the beginning of 2016, what was

24  the financial situation at Reaction Housing?

25  **A.**   It went from bad to dire, I would say.  Cash flow was, as

1    you would imagine, not very good.  We were running out of cash.

2    My recollection is we expected to run out of cash in maybe

3    March or April of that year.  I can't remember specifically.

4          So it wasn't good, I would say.

5    **Q.**    And did Reaction Housing attempt to go through another

6    series of fundraising?

7    **A.**    Absolutely.  Very aggressively.

8    **Q.**    And the jury has heard this term quite a bit, series, but

9    could you just please state for the record what that is?

10   **A.**    A series of fundraising is just a specific -- another

11   fundraising event.  So we might go out on a series B, which

12   might be our second fundraising event where we're trying to

13   raise a specific amount of capital to fund the company with

14   maybe general goals of what we would do with that capital.  And

15   then that series would close.  And the company would go on with

16   doing its normal business until additional funding was needed

17   from some source.

18   **Q.**    What was the result of that series?

19   **A.**    It was completely unsuccessful.  I think the -- the market

20   signals that we'd seen to date were -- were strong, and all

21   sorts of investors that had come in and looked at us from, you

22   know, more sophisticated funds to maybe high net worth

23   individuals appreciated what we were trying to do but did not

24   think that the business was a business.

25   **Q.**    And to be clear, when you say the market signals were

1    strong, is it fair to say your testimony is that they were

2    strong in that the market was not interested in the --

3                    (Simultaneous colloquy.)

4             **THE WITNESS:**  Yes.  The -- the signals were very

5    definitive in that there was no demand for our type of product.

6    **BY MR. KLEINMAN:**

7    **Q.**   So after you -- the series -- the attempted series did not

8    go well, approximately how long would you say Reaction Housing

9    had in terms of money before it would go out of business?

10   **A.**   If it wasn't days, it would be maybe a couple weeks.

11   **Q.**   And you said this is around March of 2016; is that

12   correct?

13   **A.**   Around that time, yeah.

14   **Q.**   Okay.  And now while working for Reaction Housing in

15   March of 2016, did you meet someone by the name of Michael

16   Rothenberg?

17   **A.**   Yes, I did.

18   **Q.**   How did you end up meeting Michael Rothenberg?

19   **A.**   In one of our fundraising efforts, a group of investors

20   came to Austin to visit our facility, including an individual

21   named Brandon Farwell from Rothenberg Ventures.

22        Brandon approached me toward the end of our pitch meeting

23   with the investors and said that his boss, Mike, would like to

24   talk to me about a path forward for Reaction.

25   **Q.**   And in and around that time, did Michael Rothenberg travel

1    to Austin, Texas, to visit Reaction Housing?

2    **A.**    Yes.  I believe so.

3    **Q.**    And did you speak with Michael Rothenberg directly when he

4    came?

5    **A.**    Yes.

6    **Q.**    Can you please tell the jury what you discussed.

7    **A.**    Mike was generally aware of the condition of -- of the

8    company.  He understood that we had not been successful in

9    generating sales or shipping units.

10    **Q.**    And, Mr. Grooms, let me interject.  You just testified

11    Mike was generally aware.  If you could tell the jury

12    specifically what you told Mike about the state of affairs at

13    Reaction Housing.

14    **A.**    Sure.  In addition to the financial statements that Mike

15    would have seen, I and other members of our go-to-market team

16    were explicit with him that we were not able to sell this

17    product.  It was not -- people were not buying it and that we

18    had fundamental concerns about if the product was going to ever

19    be marketable in its current form.

20    **Q.**    And you said you had explicit conversations.  You just

21    outlined those for the jury.

22          Did you tell him how many units you'd been able to sell?

23    **A.**    Yeah.  Yes.

24    **Q.**    Did you tell him how hard you'd tried to sell the unit?

25    **A.**    Yes.  We had -- we had tried everything.

1    **Q.**   And did you tell him that there simply was not an interest

2    for this product?

3    **A.**   Yes.   My memory is that in many times in many different

4    ways, we told him that.

5    **Q.**   And yet what did Michael Rothenberg say to you?

6    **A.**   Mike, in a -- in a very, you know, passionate and

7    inspiring way, told me and -- and some of my colleagues that he

8    saw a vision for Reaction Housing and that too many companies

9    like Reaction Housing would zero out -- would go out of

10   business and -- and kind of give up too soon, and that he

11   thought that that was a problem with the market -- with the

12   venture capital market, that people would give up on companies

13   like Reaction too soon.

14   **Q.**   Did you --

15   **A.**   Sorry.

16   **Q.**   Mr. Grooms, it sounds like you've had multiple

17   conversations with Michael Rothenberg.  Did you have an

18   opportunity to ask him directly why he was -- or, rather, what

19   he planned to do with Reaction Housing?

20   **A.**   Yes, absolutely.  That was something we discussed many

21   times.

22   **Q.**   What was Michael Rothenberg's plan for Reaction Housing as

23   he described it to you?

24   **A.**   He wanted to bring Reaction Housing's core -- a small

25   group of Reaction Housing core staff, move them to

1    San Francisco, and fold it into this -- sorry, it's kind of --

2    this group of River companies that he operated and restart the

3    business.  You know, sort of giving it a fresh start or

4    extending its life span at the very least.

5    **Q.**    Let's break that down a little bit.

6        Did Michael Rothenberg tell you how much he planned to

7    spend to bring Reaction Housing to within the River system?

8    **A.**    Yes.  Constructively, yes.  He -- we discussed the amount

9    of money that would likely be necessary to buy the Reaction

10   intellectual property.  We discussed that we would need to hire

11   about half a dozen people which are reasonably well compensated

12   people.  So it turns into a significant amount.

13       And then that additional investment would be needed to

14   build these -- these products, which were not cheap to build.

15   **Q.**    Now, as you're having these conversations with Michael

16   Rothenberg, what then did Michael Rothenberg do?

17   **A.**    He did as he proposed.  He -- he acquired the IP to

18   Reaction Housing.  We hired six people, about, in San Francisco

19   to kind of rebirth the team, and folded it into this River

20   ecosystem of companies that he created and managed.

21   **Q.**    How much did he spend to essentially buy Reaction Housing?

22   **A.**    The IP was hundreds of thousands of dollars.  And the, you

23   know, combined income of six people of that caliber would have

24   been over a million dollars a year.

25   **Q.**    What other reasons, if any, did Michael Rothenberg say

1    regarding why he specifically wanted to buy Reaction Housing?

2    **A.**    He -- he said something that -- that made sense in context

3    of knowing how big the -- his position was on the cap table for

4    Reaction.  And the size of Mike's funds.  He said that Reaction

5    was a major investment for Rothenberg Ventures and that

6    Reaction's zeroing out prematurely or at all was -- was not

7    good for a portfolio that was otherwise performing well.

8    **Q.**    And did he explain -- when you say "not good," what did

9    he -- what did he mean?

10   **A.**    You don't want to issue an update to -- he did not want to

11   issue an update to LPs in the form of a, you know, quarterly

12   update or other type of statement that indicated that one of

13   his largest investor -- or largest investments had -- had

14   failed.

15   **Q.**    So when you say he didn't want to issue that update to

16   LPs, what do you mean by that?

17   **A.**    Well, if the company hadn't failed because it was still

18   alive in San Francisco, you wouldn't need to report that the

19   company had failed.

20   **Q.**    I believe you used the phrase "it would not be good."

21   When you say it would not be good, what did Michael Rothenberg

22   say in terms of who it would not be good for?  Is it not good

23   for the investors of the funds?  Is it not good for Michael

24   Rothenberg?  Did he explain anything about that?

25   **A.**    It's -- it's not good for the funds themselves, so the

1    various Rothenberg Ventures funds.  I don't recall which ones

2    specifically invested in Reaction, but it would not be good for

3    the fund to report a zero on a major investment like Reaction.

4    **Q.**  Because at that point, what would happen?

5    **A.**  Well, it makes it more difficult to fundraise.  It's -- I

6    mean, I think that it -- we would all -- it makes -- it is

7    easier to fundraise if you have more wins on your board and if

8    your -- your portfolios are performing.

9        Investors look at various different funds that they want

10   to -- venture capital funds they want to invest in.  And

11   besides the manager, past performance is a -- is a huge

12   indicator of where people want to put their money.

13   **Q.**  So fair to say this is spring of 2016, so if you're in the

14   middle of raising, let's say, a 2016 Fund, you don't -- this

15   might be a problem?

16          **MR. TORRES:**  Objection.  Speculation.

17          **THE COURT:**  Sustained.

18   **BY MR. KLEINMAN:**

19   **Q.**  Now, after Michael Rothenberg purchased Reaction Housing,

20   what did you do?

21   **A.**  I very -- very quickly, maybe in the time span of 72 hours

22   or so, moved with my newlywed wife to -- to San Francisco.

23   **Q.**  Okay.  Did you know anyone in San Francisco?

24   **A.**  I -- no.  Just my wife at that point.

25   **Q.**  Now, was this around April of 2016 then when you, I guess,

1   transitioned and started at Rothenberg Ventures?

2   **A.**    Yeah.  I think so.

3   **Q.**    And when you initially started working at Rothenberg

4   Ventures, what was your title?

5   **A.**    Yeah.  My -- my original title on day one there was the

6   president of River Enterprises, which was the new name for

7   Reaction Housing at that point.

8   **Q.**    What did your duties and responsibilities entail?

9   **A.**    My responsibilities were to initially hire a staff for

10  River Enterprises, so go through the legwork of getting that

11  team put together very initially.  But very quickly involved --

12  or evolved into essentially doing projects for Mike at

13  Mike's -- Mike's direction and request, a whole wide range of

14  projects.

15  **Q.**    So -- and I'm sorry, can you repeat what your title was

16  for -- under River Enterprises?

17  **A.**    President of River Enterprises.

18  **Q.**    So as the president of River Enterprises, what other

19  companies were involved in River Enterprises?

20  **A.**    Initially there -- there were no other companies.  But

21  very quickly, there was discussion around folding in some other

22  Rothenberg Ventures fund investments.  Soles -- another company

23  I can't remember off the top of my head that were presented to

24  me as being in similar situation to what -- what Reaction was

25  in of running out of money, unsuccessful in fundraising.  In

1    lieu of having these other two companies go out of business, it

2    would make more sense to try to bring them into River

3    Enterprises or the River ecosystem more broadly to, I suppose,

4    give them a second lease on life.

5    **Q.**   So this is, let's say, April of 2016, going into May of

6    2016.  Did your role shift away from president of River

7    Enterprises?

8    **A.**   Yeah.  Yes, it did.  Pretty -- pretty quickly my role

9    changed to being the chief operating officer of the overall

10   Rothenberg Group.

11          **MR. KLEINMAN:**  Ms. Margen, if we can pull up what has

12   been marked for identification as Government's Exhibit 630.

13   **Q.**   Mr. Grooms, do you recognize this exhibit?

14   **A.**   Yes, I do.

15   **Q.**   What do you recognize it to be?

16   **A.**   Employment agreement between Rothenberg and River and me.

17   **Q.**   And is this, in fact, your employment agreement when you

18   became the COO of Rothenberg Ventures?

19   **A.**   Yes.

20   **Q.**   And, again, prior to your testimony today, you have

21   reviewed this document; correct?

22   **A.**   I have.

23   **Q.**   Is this a fair and accurate copy?

24   **A.**   It is.

25          **MR. KLEINMAN:**  The Government moves into evidence

Exhibit 630.

**THE COURT:**  Any objection?

**MR. TORRES:**  No objection, Your Honor.

**THE COURT:**  630 is admitted.

(Government's Exhibit 630 received in evidence.)

(Exhibit published to jury.)

**MR. KLEINMAN:**  Ms. Margen, if we can just blow up the Summary of Terms.

**Q.**  So this document references a start date of April 5th, 2016.  Just to orient the jury, is this when you started at Rothenberg Ventures?

**A.**  Yes.

**Q.**  And now there's an offer expiration.  This is approximately two months later, June 7th, 2016.  Is this the date where you became the COO?

**A.**  Yes, thereabouts.

**Q.**  And if you can read into the record your position.

**A.**  COO and CRO.

**Q.**  What is a CRO?

**A.**  A chief revenue officer.  It's a sales position.

**Q.**  And most folks know this, but just for the record, what's a COO?

**A.**  A chief operating officer, it's a general management position.

**Q.**  You are listed as the employee; correct?

1    **A.**    That's correct.

2    **Q.**    And if you could read into the record your manager?

3    **A.**    CEO.

4    **Q.**    And who was the CEO at the time?

5    **A.**    Mike Rothenberg.

6    **Q.**    And what was your total compensation package?

7    **A.**    $200,000 per year.

8    **Q.**    Okay.

9         **MR. KLEINMAN:**  Thank you, Ms. Margen.  We can dezoom

10  this.

11        And if we can blow up 2, under "Responsibilities."

12  **Q.**    Mr. Grooms, if you can just read the last sentence into

13  the record.

14  **A.**    "Your key responsibilities will include global ecosystem

15  COO, CRO, and interim president of River Enterprises."

16  **Q.**    So fair to say at this point you had a lot of different

17  titles?

18  **A.**    A lot of different titles.

19  **Q.**    Okay.  But from the beginning of employment up through

20  this point, who were you reporting to?

21  **A.**    Mike.

22         **MR. KLEINMAN:**  Ms. Margen, we can take this exhibit

23  down.

24  **Q.**    So now let's focus on your time at Rothenberg Ventures

25  after June 7th of 2016.  What were your new duties and

1    responsibilities?

2    **A.**    My duties and responsibilities after that became even

3    broader than where they'd started.  At Mike's direction, I

4    would take on specific tasks that ranged from negotiating lease

5    deals to dealing with HR concerns inside of the company to, in

6    some cases, engaging with potential investors.  So a very wide

7    range of special projects.

8    **Q.**    Now, Mr. Grooms, did some of those projects now become

9    fundraising?

10   **A.**    Yes.

11   **Q.**    How would that work?  What was your role within

12   fundraising?

13   **A.**    If a specific opportunity came up that we could raise

14   funds around potentially, Mike would generate a list of target

15   prospective investors, so people that might potentially want to

16   invest in the opportunity.

17        He would prepare collateral, so sales collateral or

18   information about the opportunity.  And then instruct me, and I

19   suppose in some cases others, to go and contact those

20   individuals and essentially work to sell the opportunity to

21   secure their investment.

22   **Q.**    So we're going to talk about different types of

23   opportunities.  Additionally, did you have occasion to go and

24   accompany Mike Rothenberg himself to pitch meetings?

25   **A.**    Yes.

1   **Q.**  And were these pitch meetings for the 2016 Fund?

2   **A.**  I believe so, yes.

3   **Q.**  So, for example, turning your attention to June 15th of

4   2016, did you accompany Michael Rothenberg to a meeting with a

5   person named Andrew Palmer of Bel Air Management?

6   **A.**  Yes.  I believe I did.

7   **Q.**  And what was the purpose of that meeting?

8   **A.**  I believe the purpose of that meeting was to encourage

9   Mr. Palmer to invest in the 2016 Fund and to -- to do so

10  urgently.

11  **Q.**  And what did Michael Rothenberg say in that meeting?

12  **A.**  Can you be more specific?

13  **Q.**  Let's start with the 2016 Fund.  What did he say regarding

14  the 2016 Fund?

15  **A.**  The 2016 Fund was generally presented to potential

16  investors as being nearly full, ready for final people to come

17  in, with a short fuse on an opportunity.  Expectation that a

18  wide range of investments would be made in some leading,

19  emerging VR companies, virtual reality companies, that -- where

20  Mike had generated special relationships with the founders of

21  those companies.

22  **Q.**  During that meeting, what, if anything, did Michael

23  Rothenberg say regarding River Studios' ownership?

24  **A.**  It was not uncommon for people to ask around -- about

25  River Studios.  Mike was consistent in that River Studios was

1   funded by -- was owned and funded by -- by Mike.  I believe he

2   used the term "lock, stock, and barrel" in describing it.

3   Q.   And did Mr. Palmer ask Michael Rothenberg specific

4   questions regarding -- regarding staff and payroll?

5        **MR. TORRES:**  Objection.  Hearsay.

6        **THE COURT:**  I think the fact that they were said --

7   these are questions anyway.  I think the fact that they were

8   said has independent significance.

9        Overruled.

10  **BY MR. KLEINMAN:**

11  Q.   You may answer.

12  A.   Okay.  Can you repeat the question, please?

13  Q.   What questions did -- did Andrew Palmer ask Mike

14  Rothenberg questions about the staff and payroll?

15  A.   Yes.  He -- he did.  And this was also a very common

16  question.  The total number of staff between all of the

17  different Rothenberg and River companies was viewed by a lot of

18  investors as being exceptionally large given the size of the --

19  not only the funds that -- that Mike had raised, but also any

20  reasonable economics that investors would -- would expect Mike

21  to have been able to pull from those funds himself.

22  Q.   And yet how did Michael Rothenberg respond?  What did he

23  say?

24  A.   These types of questions would get Mike agitated in that

25  people didn't necessarily need to worry about how he was able

1  to manage his money internally.

2  **Q.**  And, I'm sorry, in terms of that, did -- Michael

3  Rothenberg said that; is that correct?

4  **A.**  Yes.  Mike got agitated that the questions were being

5  asked.

6  **Q.**  And then what specifically did he say?

7  **A.**  That he had various ways of getting money, including the

8  building that he owned and taking money out of that building,

9  distributions from earlier funds.  But generally that this

10  wasn't something that Mr. Palmer or anyone else needed to worry

11  about and that they should focus on if they wanted to invest in

12  this 2016 Fund or Mike would move on to the next prospect.

13  **Q.**  And how did Andrew Palmer respond to that?

14  **A.**  No one responded well to that type of thing.  And Andrew

15  Palmer did not respond well also.  It was a memorable meeting.

16  **Q.**  What, if anything, did Michael Rothenberg say about the

17  income generated from River Studios?

18  **A.**  Mike's representation of how much income was being

19  generated by River Studios was that it -- it substantially

20  underwrote a lot of the expenses related to River Studios.  We

21  had significant demand by big names on the -- on the outside

22  that wanted to do business with us.  We were the hottest ticket

23  in town.  Again kind of diminishing the need for anyone, I

24  think, to -- the -- the effect was people stopped asking

25  questions around River Studios.

1    Q.    So this was in the middle of June of 2016.  Let's go one

2    month later now to the middle of July of 2016.  At that point,

3    did Michael Rothenberg struggle to make payroll?

4    A.    Yes.

5    Q.    And at that point as the COO, did you observe a shift in

6    how paychecks were being issued or how salaries were being

7    paid?

8    A.    Yes.  They were -- they were atypical ways of people

9    getting paid, right, things that I had never been exposed to in

10   my career, including people were receiving payments --

11   paychecks from wire -- wires from different accounts.  So maybe

12   not the normal account that you would be paid from.

13       Some people were being issued paper checks for -- which

14   was not how we normally would pay people.

15       And then some people were asked to delay receipt of

16   their -- or to, you know, agree to receive their money later

17   than when they would normally expect to get paid.  Which was

18   different than what I had seen even there previously where we

19   had a fairly -- fairly traditional payroll system that would

20   direct deposit into people's accounts, I believe twice a month.

21   Yeah.

22   Q.    So fair to say at that point, July, middle of July 2016

23   marked a shift?

24   A.    Dramatic.

25   Q.    And so you started in April.  So you've only been there

1    for about three months or so.  Still focusing on the middle of
2    July 2016, did Michael Rothenberg approach you regarding a
3    special co-fund deal?
4    **A.**    Yes, he did.
5    **Q.**    What was that co-fund deal?
6    **A.**    It was an opportunity to -- for Rothenberg investors to
7    buy secondary shares from a company called Unity.  Secondary
8    shares being shares that are being resold by someone inside the
9    company.
10    **Q.**    And let me -- let me ask you.  Is this how Michael
11    Rothenberg described the deal directly to you in a
12    conversation, or something else?
13    **A.**    Directly to me in conversation.  And then supported by
14    emails speaking to the same.  Emails and presentation documents
15    and a lot of stuff.
16    **Q.**    The jury -- we're going to show the jury what is in
17    evidence regarding that email chain.  But focusing on those
18    conversations, could you please tell the jury what Michael
19    Rothenberg told you regarding this Unity deal and its urgency.
20    **A.**    That it was -- it was a very real deal.  It was a unique
21    opportunity that Rothenberg Ventures could bring to our LPs or
22    our investors that other people were not able to bring.
23        The fuse on the deal would be extremely short.  And that
24    if we did not collect an adequate amount of investment quickly
25    and close the deal, Unity would -- would move on and offer the

1   deal to -- to another venture firm.

2   **Q.**   What did Michael Rothenberg tell you about, on the Unity

3   side, what, if anything, they had agreed to in terms of this

4   deal?

5           **THE COURT:**  You mean what Unity had agreed to?

6           **MR. KLEINMAN:**  Yes, Your Honor.

7           **THE COURT:**  Yeah.

8           **THE WITNESS:**  You're asking what I was told Unity had

9   agreed to?

10  **BY MR. KLEINMAN:**

11  **Q.**   Yes.

12  **A.**   What Mike told me?  Mike told me that Unity had fully

13  agreed to the deal at the highest levels of their organization,

14  which would have been very -- which would have been a very big

15  deal to -- to have this type of opportunity.  And the only

16  gating item, the only thing getting between us and closing the

17  deal was getting investor commitment on our side to fund the

18  deal.

19  **Q.**   And what did Michael Rothenberg tell you to say to

20  potential investors?

21  **A.**   Exactly that, that this was a real deal approved at the

22  highest levels.  By that I mean C-level executives, CEO,

23  CFO-type folks, and that the only thing in the way between

24  closing this deal and the deal being done -- or closing the

25  deal and where we were at that point was raising money and

1  getting the money wired in so that we could pay -- pay Unity.

2  **Q.**  And what did Michael Rothenberg tell you to tell investors

3  regarding what would be done with their money once they

4  invested?

5  **A.**  Oh, that we would immediately invest it in -- in the deal.

6  That we needed to immediately invest it into the -- into the

7  Unity secondary.

8  **Q.**  So Michael Rothenberg told you to say that the moment they

9  invest, it's going to shares of the Unity deal; correct?

10  **A.**  Yes.  My -- yes.

11  **Q.**  And additionally did Michael Rothenberg reach out to you

12  via email regarding the Unity deal?

13  **A.**  Yes.  I would imagine multiple times.

14       **MR. KLEINMAN:**  If I could show what is in evidence as

15  Trial Exhibit 260.

16       **THE CLERK:**  Is this in evidence?

17       **MR. KLEINMAN:**  It's in evidence.  Yes.  Thank you,

18  Ms. Lee.

19  **Q.**  Mr. Grooms, this is an email from Michael Rothenberg;

20  correct?

21  **A.**  Yes.  Yes.

22  **Q.**  And it -- what is the date that it was sent?

23  **A.**  July 13th, 2016.

24  **Q.**  And you and a number of other people are included on this

25  email; correct?

1    **A.**    That's right.  That's right.

2    **Q.**    The jury has seen this email a few times.

3            **MR. KLEINMAN:**  If we could dezoom.

4    **Q.**    It also -- this email also included an attachment which

5    was a PowerPoint; is that correct?

6    **A.**    I believe so, yes.

7            **MR. KLEINMAN:**  And if we can just scroll down to the

8    second page.

9    **Q.**    The jury has seen this PowerPoint already, Mr. Grooms.

10   But was this the PowerPoint that Michael Rothenberg had created

11   and sent to you regarding the Unity deal?

12   **A.**    Yes, sir.

13   **Q.**    What did Michael Rothenberg say to do with this

14   PowerPoint?

15   **A.**    Mike wanted to get it in front of investors extremely

16   quickly after we had received confidentiality agreements from

17   the -- the individual investors.

18   **Q.**    I want to ask you a few questions about how you knew who

19   to reach out to.  Can you describe for the jury how that

20   process worked?

21   **A.**    Yeah.  It was -- it was pretty simple.  There was a

22   spreadsheet that Mike had prepared and distributed to the team

23   with indications of who to call, who was a priority, who was

24   maybe less of a priority.  And then expectations that we -- you

25   know, communicated expectations that we engage with those folks

```
1   instantly.
2            THE COURT:  Mr. Kleinman, any time in the next five
3   minutes.
4            MR. KLEINMAN:  Now is fine, Your Honor.
5            THE COURT:  Okay.  Very good.
6        Members of the jury, let's take our second recess of the
7   day.  We'll be in recess for 15 minutes.  Thank you.
8        (Proceedings were heard out of presence of the jury:)
9            THE COURT:  We're outside the presence of the jury.
10       Mr. Grooms, you can take a break, too, use the restroom,
11   stretch your legs.
12       Mr. Kleinman, anything for the record?
13           MR. KLEINMAN:  No, Your Honor, thank you.
14           THE COURT:  Mr. Torres?
15           MR. TORRES:  No, Your Honor.  Thank you.
16           THE COURT:  All right.  Thanks.  Let's be in recess.
17           THE CLERK:  Court is in recess.
18                   (Recess taken at 11:50 a.m.)
19                   (Proceedings resumed at 12:06 p.m.)
20       (Proceedings were heard in the presence of the jury:)
21           THE COURT:  All right.  Let's go back on the record.
22       All the jurors are in their assigned seats.
23       Mr. Grooms is still on the witness stand.
24       Mr. Kleinman, your witness.
25           MR. KLEINMAN:  Thank you, Your Honor.
```

1    **Q.**    So just to recap, Michael Rothenberg told you who to reach

2    out to; correct?

3    **A.**    Yes.

4    **Q.**    And Michael Rothenberg also told you what to say; correct?

5    **A.**    Yes.

6    **Q.**    And did you in fact do that at the pace that Michael

7    Rothenberg told you to?

8    **A.**    Yes.

9    **Q.**    So we were looking at the email from Government's

10    Exhibit 260 that Michael Rothenberg sent to you and others that

11    was on June 13th, 2015.

12        Let's go through.  That same day or the day after, did you

13    reach out to Theo Melas-Kyriazi and John Melas-Kyriazi?

14    **A.**    Yes, I think so.

15    **Q.**    And were they on the list that Michael Rothenberg

16    provided?

17    **A.**    Absolutely, yeah.

18    **Q.**    What did Michael Rothenberg say about why they were on the

19    list?

20    **A.**    It was a father and son.  They were friendly investors

21    with a good relationship and a high degree of liquidity, which

22    means they could move cash quickly without organizational

23    controls that larger investment groups might have.

24    **Q.**    Was that a theme in terms of who Michael Rothenberg told

25    you who to target in this -- in this deal?

1    **A.**    Yes.  We were generally looking at high net worth

2    individuals or people who could move cash unusually quickly.

3    **Q.**    Was Alexa Binns one of the people who you reached out to?

4    **A.**    Yes, she was.

5    **Q.**    Additionally, there was -- you had a colleague by the name

6    of Ewan Johnson; correct?

7    **A.**    That's right.

8    **Q.**    Did you -- as the COO, did you have occasion to

9    communicate with Ewan Johnson on numerous occasions?

10   **A.**    Frequently.

11   **Q.**    And was Ewan Johnson somebody who also invested in the

12   Unity deal?

13   **A.**    Yes, he was.

14   **Q.**    Now, that situation was a little different; correct?

15   **A.**    Yes.

16   **Q.**    How did that come to pass?

17   **A.**    Ewan was a, you know, close colleague and a friend.  He

18   was a senior leader in the River Studios organization.

19   Certainly not a high net worth individual like some of the

20   other folks we had targeted, but did have some -- some cash

21   that he could move quickly.  And he was a passionate believer

22   in the virtual reality space and -- and the gaming space that

23   Unity was in.  So this would have been an excellent match for

24   him.

25   **Q.**    And at this point, did you yourself believe that this deal

1    was a hundred percent real?

2    **A.**    Absolutely.  I would have invested in it if I could.

3    **Q.**    Showing you what has been marked for identification as

4    Government's Exhibit 291.

5        Mr. Grooms, do you recognize this document?

6    **A.**    Yes, I do.

7    **Q.**    What do you recognize it to be?

8    **A.**    This was an email string with -- with Nathan Hudson, one

9    of the potential investors in the Unity fund, who --

10   **Q.**    And -- excuse me.  And do you see your name and email

11   address?

12   **A.**    I do.

13       **MR. KLEINMAN:**  And if we can scroll to the last page,

14   Ms. Margen.

15       I'm sorry.  The second-to-last page.

16   **Q.**    And is this in fact an email chain?

17   **A.**    Yes.

18       **MR. KLEINMAN:**  And now if we can scroll to the last

19   page, Ms. Margen.

20   **Q.**    Do you see Michael Rothenberg's name and email address?

21   **A.**    Yes, I do.

22   **Q.**    Were emails kept in the regular course of business at

23   Rothenberg Ventures?

24   **A.**    Yes.

25   **Q.**    And is this email a fair and accurate copy?

1    A.    Yes.

2         MR. KLEINMAN:    The Government moves to admit

3    Exhibit 291.

4         THE COURT:    Any objection?

5         MR. TORRES:    No objection.

6         THE COURT:    291 is admitted.

7         (Government's Exhibit 291 received in evidence.)

8              (Exhibit published to jury.)

9         MR. KLEINMAN:    And let's just stay on this page,

10   Ms. Margen.

11   Q.    Mr. Grooms, is this typical of the types of emails that

12   were sent out regarding the Unity deal?

13   A.    Yes.  I think so.

14   Q.    If you can read this second paragraph into the record --

15   I'm sorry.  If you could start with the date and then the name

16   associated with the email address.

17   A.    Yes, I can do that.  The date was Tuesday, July 12th,

18   2016.  The email was sent from Mike Rothenberg at his email

19   address.  And would you like me to read the --

20   Q.    Yes, please.

21   A.    "We had a valuable co-investment opportunity come up for

22   our LPs in one of our startups (will be our largest holding,

23   backed by Sequoia as well) with a bit of a short fuse and

24   wanted to be sure you had an opportunity to take advantage of

25   it if interested."

1    **Q.**    So this was on July 12th of 2016.  So that was the day

2    before you had received even the PowerPoint for Unity; is that

3    correct?

4    **A.**    That's correct.

5         **MR. KLEINMAN:**  If we could now scroll to the next

6    page, Ms. Margen.

7    **Q.**    Did you end up speaking with Nathan Hudson regarding the

8    Unity deal?

9    **A.**    I did.

10   **Q.**    And how much did Nathan Hudson indicate that he would

11   invest?

12   **A.**    $100,000.

13        **MR. KLEINMAN:**  And now if we can scroll to the next

14   page, Ms. Margen.  Thank you.

15   **Q.**    And a few days later or a day later, did Nathan Hudson in

16   fact wire the investment?

17   **A.**    That's correct, he did.

18        **MR. KLEINMAN:**  We can take this down.

19   **Q.**    Mr. Grooms, you mentioned that you yourself believed that

20   the deal with Unity was -- was real and a good opportunity;

21   correct?

22   **A.**    Yes.

23   **Q.**    Why did you believe that?

24   **A.**    The investment opportunity made sense.  It made sense that

25   we would have an opportunity at Rothenberg Ventures to offer a

1    secondary or a portfolio company like Unity.

2         Mike seemed to have a lot of detail about the deal.  It

3    all lined with the types of deals that he told investors he

4    could get them access to in general.

5         And I saw email traffic directly from executives at Unity

6    where I was directly copied on the emails from folks like the

7    CFO of Unity, indicating that they were ready to move forward

8    with this and that all the approvals had been completed.

9         **MR. KLEINMAN:**  If we can show the jury what is in

10   evidence as Government's Exhibit 257.

11   **Q.**  So starting with this email chain, is this, Mr. Grooms,

12   the email chain that you were referring to regarding

13   conversations with people at Unity?

14   **A.**  Yes.  It's one of them.

15   **Q.**  And do you see the name Mike Foley?

16   **A.**  I do.

17   **Q.**  Who was Mike Foley?

18   **A.**  Mike was the chief financial officer at Unity.

19   **Q.**  And do you also see Michael Rothenberg --

20   **A.**  That's correct.

21   **Q.**  -- name and email address on this email chain; correct?

22   **A.**  Yes.

23   **Q.**  And as you just testified to and told the jury, your name

24   and email address is also on this email chain; correct?

25   **A.**  Yes, sir.

1    **Q.**    Now, you had described for the jury the pace that Michael

2    Rothenberg wanted this deal done.

3        After that slide deck was sent, how hard were you working

4    at this point?

5    **A.**    Around the clock.    It was -- I've been in sales for

6    20 years, and I've never seen such an aggressive pace of

7    getting deals closed and to -- and such an aggressive push to

8    get potential investors or buyers to move forward as quickly

9    and without as -- without as much information as we needed to

10   have here.

11   **Q.**    And were you in fact successful in getting a number of

12   people to invest?

13   **A.**    We were successful in getting a number of people to

14   invest, yeah.    Absolutely.

15       **MR. KLEINMAN:**    If we could show the jury page 4 of

16   this exhibit.

17   **Q.**    This is an email from Michael Foley where he says -- to

18   Michael Rothenberg where he says, "Mike, I understand you are

19   ready to proceed."

20       Is that consistent with the information that you were

21   providing to investors?

22   **A.**    Yes.

23   **Q.**    And is that consistent with the information that Michael

24   Rothenberg told you?

25   **A.**    Yes.

1   **Q.**   And yet --

2                        (Cell phone interruption.)

3           **A JUROR:**   Sorry.

4           **MR. KLEINMAN:**   No problem.

5   **Q.**   And yet what happened when the investments were made from

6   the investors?

7   **A.**   It became apparent that the money had not gone to Unity.

8   We were starting to get questions from Unity about why we

9   weren't moving forward.  This was at a time when I was under

10  the impression we had received most of the money that we needed

11  to get the deal -- the deal done.

12       And on the other side of the spectrum, we were starting to

13  get more and more questions from the investors themselves who

14  had wired us, in some case, very substantial amounts of money

15  about where their paperwork was about the completed deal.

16  **Q.**   And we're going to continue to talk about that and break

17  that down further.  But just to orient the jury in terms of the

18  timeline --

19          **MR. KLEINMAN:**   Ms. Margen, if we can go to the next

20  page.

21  **Q.**   -- is there an email from a Rothenberg Ventures colleague

22  Martin Mayo?

23  **A.**   Yes.

24  **Q.**   What is Martin Mayo asking for?

25  **A.**   He's saying, "I just wanted to follow up to the email

1   stream below to check on the draft stock transfer agreement."

2       That would be essentially the contract that would

3   memorialize the sale of the -- of the stock.

4   **Q.**   And then the next day, if you can please read the response

5   from the attorney at Fenwick & West.

6   **A.**   So Martin received a reply email from Unity's attorneys

7   saying, "Please find attached the draft stock transfer

8   agreement for your review."

9   **Q.**   And Michael Rothenberg was on that email?

10  **A.**   That's correct.

11  **Q.**   And this was one day later, July 21st, 2021 -- I'm

12  sorry -- 2016.

13  **A.**   Yes.  It was -- yeah, it was one day later.

14  **Q.**   So at this point, once you -- once you observed this

15  email, what did you think was going to happen?

16  **A.**   This is exciting.  This is a done -- a done deal.  We're

17  about to wrap this up.  To someone in a sales role, that's a

18  very exciting phase to be in of a deal.  I was looking forward

19  to celebrating.

20  **Q.**   And you had been working really hard, as you testified to.

21  What was the investor reaction?

22  **A.**   Enthusiastic.  This was -- this was a phenomenal

23  opportunity, a truly phenomenal opportunity.

24  **Q.**   And yet, if we can scroll to the next page, there wasn't a

25  response from Michael Rothenberg or anyone at Rothenberg

1   Ventures; correct?

2   **A.**   That's correct.

3   **Q.**   And if you can read the first sentence of the next email,

4   this is August 2nd of 2016.

5   **A.**   Yes.  It's Unity's lawyer asking Martin on our team,

6   "Wanted to check in to see if you had a chance to review the

7   agreement."

8            **MR. KLEINMAN:**  And if you can then please scroll up to

9   the next page.

10  **Q.**   So now this is August 10th of 2016.  Can you please read

11  that email into the record.

12  **A.**   Yeah.  Very similar email.

13       "Hi, Martin, wanted to check in to see if you have any

14  updates on your end.  Please let us know."

15  **Q.**   And now an email from Mike Foley on August 12th of 2016.

16  Can you please read that sentence into the record.

17  **A.**   Yes.

18       "We have not heard back on this doc we sent over three

19  weeks ago.  When can we expect a response?"

20  **Q.**   Now, at this point, it's now August 12th of 2016.  Were

21  investors reaching out to you asking for updates?

22  **A.**   Absolutely.

23  **Q.**   And as you were receiving these updates, what would you

24  do?

25  **A.**   Our practice was that if we received any inquiries from

1    investors from anyone on our leadership team, you took that

2    inquiry and sent it to Mike for guidance on how to reply.

3    **Q.**    And would these be conversations?

4    **A.**    If they were conversations, we would -- we would call Mike

5    or send him a text message giving him an overview of the

6    conversation.  If it was a text message or an email, it would

7    be forwarded to Mike directly.

8    **Q.**    And were investors following up one time or more than one

9    time?

10    **A.**    Incessantly is the word that comes to mind, I would say.

11    It got quite awkward.

12    **Q.**    And as you were bringing the -- this information about the

13    investors following up to Michael Rothenberg, what did he say?

14    **A.**    So are you specifically asking about them asking about the

15    status of the deal --

16    **Q.**    Yes.

17    **A.**    -- what they would say?

18    **Q.**    What did Michael Rothenberg say to you?  Let's start

19    initially.

20    **A.**    Okay.  Initially the questions around the status of the

21    deal were answered by saying there was -- we needed to tell the

22    investors that there was additional diligence work that was

23    being done, potentially by one of their -- their co-investors

24    or their peers or another person that was trying to invest in

25    the fund, and that's what was holding things up.

1          Or that for some of these investors, that they just didn't

2     quite understand how these things worked and that it would all

3     get settled out over time.

4     **Q.**   Did you then tell these investors what Mike told you?

5     **A.**   Sure.  Yeah.

6     **Q.**   How did they respond?

7     **A.**   Indignant, you know.  Professional, it was a professional

8     group of people, but they were extremely upset.  And I started

9     to feel like they didn't trust me or they thought that I was

10    misleading them.

11    **Q.**   And what was that experience like for you?

12    **A.**   New for me.  It had not been something I'd experienced in

13    my sales career before of just starting to feel like people

14    think I'm swindling them.  So it was -- it was very unpleasant.

15    **Q.**   And how many times did you follow up, approximately, with

16    Michael Rothenberg during this time period about why the money

17    was not being invested in the Unity deal?

18    **A.**   It was constant, I would say, multiple times a day we

19    would be talking about this.  We were getting a lot of inbound

20    from investors asking questions, a lot of inbound from Unity

21    asking questions.  And so it gave us a lot of opportunity to

22    discuss why isn't this moving forward.

23    **Q.**   Did you yourself begin to directly ask Michael Rothenberg

24    why the money is then not being returned to investors if the

25    deal is not going through?

1   **A.**   Yes.  Because investors had been asking for their money

2   back.

3   **Q.**   So initially the investors were asking just for follow-up,

4   right?

5   **A.**   That's right.

6   **Q.**   But then it turned to if the deal wasn't happening, the

7   investors began to ask for their money back.

8   **A.**   That's right.

9   **Q.**   And did you ask Michael Rothenberg directly why are we not

10  returning the investor money back?

11  **A.**   I did.

12  **Q.**   And what did Michael Rothenberg say to that?

13  **A.**   That the money had been spent and that it wasn't available

14  immediately to return to these investors, but that there were

15  going to be other resources coming available in the future and

16  we could make it right.

17          **MR. KLEINMAN:**  Ms. Margen, you can take down this

18  exhibit.  Thank you.

19  **Q.**   Now, towards the end of July of 2016, did you receive a

20  phone call from Michael Rothenberg?

21  **A.**   Yes, I did.

22  **Q.**   And in this particular phone call, what did he tell you to

23  do?

24  **A.**   I -- go ahead.

25          **MR. KLEINMAN:**  May I withdraw the question,

1    Your Honor?

2              **THE COURT:**  Sure.

3    **BY MR. KLEINMAN:**

4    **Q.**   So, Mr. Grooms, did Michael Rothenberg call you towards

5    the end of July of 2016 and ask if you can meet him in -- at

6    his condo the following day?

7    **A.**   Yes, he did.

8    **Q.**   And what was his tone on that -- during that phone call?

9    **A.**   I -- I remember it pretty distinctly because I was in the

10   car with -- with my wife on my way to go see a movie on a date

11   night.  And his -- and I had communicated that to him so it's

12   really stuck in my memory of, like, his urgency was -- for a

13   guy who is extremely urgent all the time, very hard worker, was

14   notably off the charts of -- of like this is -- this is

15   extremely urgent.

16         And then also like kind of notably it felt like he was

17   leaving something out of the conversation, didn't want to talk

18   in detail until we got together in person.

19         That was my -- it was a memorable phone call.

20   **Q.**   And then did you in fact tell him, "Sure, I'll" --

21                   (Simultaneous colloquy.)

22              **THE WITNESS:**  Yeah, of course.  Yeah, yeah.  I mean...

23   **BY MR. KLEINMAN:**

24   **Q.**   So did you in fact go to Michael Rothenberg's condo the

25   next day?

1    **A.**    Yeah, I did.

2    **Q.**    Can you please describe for the jury what happened then.

3    **A.**    Yeah.  So Mike had a -- had a -- had a nice townhouse in

4    kind of the SOMA area.  So went into -- to his house.  He was,

5    you know, pretty friendly in greeting me.  Asked me that -- you

6    know, leave my phone and stuff inside and then step outside

7    with -- with him to take a walk, which was unusual, but I guess

8    whatever.

9        And then when we got outside, he -- he patted me down,

10    which is something I'd never experienced before.  So pretty

11    memorable.

12        And then we -- we didn't really talk until we left the

13    kind of the townhouse complex and kind of walked a pretty long

14    loop around the SOMA neighborhood that we were -- that we were

15    in.  Yeah.

16    **Q.**    And, well, first off, what explanation, if any, did

17    Michael Rothenberg say regarding why he patted you down?

18    **A.**    Mike was concerned that the government was listening in on

19    the conversations, both potentially like I was wearing a wire

20    and that maybe the -- the condo and office were also bugged.

21    **Q.**    And after, I guess, Michael Rothenberg determined you were

22    not wearing a wire, what -- what did you discuss during that

23    walk?

24    **A.**    It was a -- it was -- it was an unusual conversation.

25        We -- we took a walk.  Mike discussed the fact that he had

1   been contacted by the SEC, who had questions around the -- I

2   don't know the specifics, but, you know, around the Rothenberg

3   ecosystems, the Rothenberg Ventures and River ecosystem

4   generally.

5       There was a -- Mike said that he felt that they had

6   collected information about him through a whistleblower and

7   that it was improper how they had done it and we would get to

8   the bottom of it and bring these folks to justice.

9   **Q.**   Without -- without --

10  **A.**   Sorry.

11  **Q.**   Excuse me.  Pardon for the --

12          **THE COURT:**  Mr. Grooms, had you finished your answer?

13          **THE WITNESS:**  I can stop there, yeah.  There's more to

14  the conversation, but it's -- yeah.

15  **BY MR. KLEINMAN:**

16  **Q.**   I wanted to ask you another question.  I just don't --

17  without getting into anything specific about the SEC, what --

18  what, if anything else, did you discuss during that

19  conversation?

20  **A.**   Mike wanted to know if I was onboard to -- to help him to

21  get through this process, that this was a time when you saw who

22  was onboard and who -- and who wasn't.

23      He reminded me that he was a -- a different type of -- of

24  VC and that that's what got him these amazing opportunities,

25  but to do that, sometimes you -- you at least have to bend the

1    rules, and that the system that was in place didn't accommodate

2    for the type of, you know, visionary investment and startup

3    development that he was -- that he was trying to do.

4        That -- that was uncomfortable or curious.

5        It -- the conversation then evolved to what, you know --

6    if -- if rules are being bent and things might be misunderstood

7    out of context, that -- specifically he wanted to know if I

8    could go and purchase hard drives and that presumably those

9    hard drives -- he asked if I could purchase hard drives and

10   then asked if we could get the company's laptops to the

11   company's driver so that we could -- so the driver could

12   accommodate getting rid of those laptops sometime soon.

13   **Q.**   Did Michael Rothenberg describe specifically how he

14   suggested his driver would get rid of these laptops?

15   **A.**   Yeah.  He would throw them off the Bay Bridge.

16   **Q.**   So let's break this down a little bit.

17       In terms of the hard drives, did Michael Rothenberg

18   explain to you -- these were external hard drives, correct?

19   **A.**   Yes.  External hard drives.

20   **Q.**   Did Michael Rothenberg explain to you why he wanted you to

21   purchase external hard drives?

22   **A.**   To -- to move the hard drive data from the laptops onto

23   the external hard drives so that he could keep the -- keep the

24   hard drives.

25   **Q.**   And then with these laptops, did Michael Rothenberg

1    explain whose laptops he wanted to collect?

2    **A.**    Everybody's.

3    **Q.**    Everybody in the company?

4    **A.**    From the top to the bottom.

5    **Q.**    And what did you say at that point?

6    **A.**    Well, this -- this -- we'd clearly crossed a line at this

7    point.  And I told him that I was all in to help him get

8    through this process, but that I would not do anything that

9    was -- that that was illegal and in fact I didn't understand

10   why, if he thought that this was a misunderstanding, that he

11   would want to keep anything from investigators and wouldn't

12   want to kind of collaboratively explain the situation.

13       I don't think that was the answer that he wanted to hear,

14   though.

15   **Q.**    And regarding you buying these hard drives, did Michael

16   Rothenberg explain why he wanted you to buy them versus

17   himself?

18   **A.**    It would -- that there would be scrutiny on him of what

19   his -- his activities were, but that me going to Best Buy and

20   buying something with cash would be more discreet.

21   **Q.**    Now, at this point in August of -- now it's -- so this is

22   end of July, and now it's August of 2016, where was Michael

23   Rothenberg now primarily working from?

24   **A.**    His -- his condo.  He had an office in his condo.

25   **Q.**    And at that point, did you have other -- another occasion

1  to visit Michael Rothenberg in his condo?

2  **A.**   Yes.  A couple times, I believe.

3  **Q.**   And what -- when you went to the condo, what, if anything

4  else, did you observe Michael Rothenberg to be doing?

5  **A.**   Mike had set up a -- a war room in the basement of his

6  condo with certain key staff, I would say, attorneys, finance

7  folks, administrative support.

8  **Q.**   And what did you observe Michael Rothenberg to be doing in

9  August of -- August of 2016?

10  **A.**   They were, you know, game planning on how to respond to

11  not only the government's inquiries, but also concerns around

12  bad press that was -- that was coming up and what the impact

13  would be on the investor community that -- that Rothenberg was

14  tied into.

15  **Q.**   Did Michael Rothenberg ever discuss with you the creation

16  of any documents?

17  **A.**   Yes.  There was a -- there was a discussion in -- in

18  general, and I think that other people were there, too, about a

19  lot of what was going on was a misunderstanding and potentially

20  attributable to sloppy recordkeeping, and that these things

21  could be -- could be fixed by catching up on documentation that

22  maybe should have been completed in the past.

23  **Q.**   And did you in fact see some of this documentation?

24  **A.**   Yes.

25  **Q.**   Who showed you that documentation?

1    **A.**    Mike showed me some of the documentation on his -- his

2    computer screen in his office in his condo, and then I believe

3    I saw some of the other documentation from -- from his --

4    from -- well, from his attorneys.

5    **Q.**    Now, focusing specifically on other types of activity

6    during this period, did Michael Rothenberg ask you to fire

7    anyone at Rothenberg Ventures?

8    **A.**    He did.

9    **Q.**    Who did Michael Rothenberg ask you to fire?

10   **A.**    Cisco Riordan.

11   **Q.**    Who was he?

12   **A.**    He ran our IT function at the company.

13   **Q.**    Okay.  Now, you've -- you started in April of 2016, so now

14   it's -- it's August.  This has been, fair to say, a pretty wild

15   introduction to San Francisco --

16   **A.**    Yes.

17   **Q.**    -- and the first -- the first couple months of living

18   here; right?

19   **A.**    That's very fair to say, yes.

20   **Q.**    Now, at this point, did you and others have discussions

21   with Michael Rothenberg about stepping down from Rothenberg

22   Ventures Management Company?

23   **A.**    Yes.  Many discussions.

24   **Q.**    And what ultimately, towards the end of August, did

25   Michael Rothenberg say he would do?

1    **A.**    Mike said that he would do two things primarily.    Convene

2    an investor advisory committee to give them more transparency

3    into the organization.    And then hand off operational control

4    of the Rothenberg Ventures side of the house especially, so

5    Rothenberg Ventures Group and the various investment funds

6    under it to a group of operators inside of the -- inside of the

7    company that I think were reasonably trusted by investors.

8    **Q.**    Now, before that, what -- did Michael Rothenberg also ask

9    you to send out some specific emails?

10    **A.**    Yes.

11    **Q.**    Showing you what is in evidence as Government's

12    Exhibit 234.

13         **MR. KLEINMAN:**    If we can blow up this email.

14    **Q.**    So this is an email on August 10th, 2016.    It's from you

15    to a person by the name of Lawrence Weisman.

16    **A.**    Yes.

17    **Q.**    And Michael Rothenberg is cc'd; correct?

18    **A.**    Yes.

19    **Q.**    Prior to your testimony today, you've reviewed this --

20    this email?

21    **A.**    I have, yes.

22    **Q.**    And this email also contains an attachment; correct?

23    **A.**    Yes.    It looks like it does.

24    **Q.**    Why did you send this email?

25    **A.**    Mike asked me -- well, all of these, Mike asked me to send

1  this specific email to -- to Mr. Weisman.

2  **Q.**  Prior to this email, had you had much contact with

3  Mr. Weisman?

4  **A.**  I was just -- I'm not sure that I had -- I think this was

5  the first time I had ever engaged with him.  I don't -- I

6  remember not even really knowing what Pilot Grove was.

7  **Q.**  And yet Michael Rothenberg specifically asked you to send

8  this email to this person; correct?

9  **A.**  That's right.

10  **Q.**  And what explanation, if any, did Michael Rothenberg give

11  about why he wanted you to send this email?

12  **A.**  Well, there was a couple things that I think we wanted to

13  do.  One was to clean up -- maybe a little bit part of the

14  theme of my previous answer was clean up the paperwork around

15  ownership of different companies.

16  **Q.**  Is that -- is that the explanation that Michael Rothenberg

17  told you?

18  **A.**  I don't remember if he specifically told me that.  Yeah.

19  **Q.**  And then at this point, how did you decide who to include

20  and who not to include on this -- on this email?

21          **MR. TORRES:**  Objection.  Speculation.

22          **THE COURT:**  Overruled.

23  BY MR. KLEINMAN:

24  **Q.**  You may answer.

25  **A.**  Mike told me who to email and what to email.

**Q.**   And during this time, did you know who Dominic Polizzotto was?

**A.**   No.  I don't know that I do.

**Q.**   That was my next question.  Do you know who Dominic Polizzotto is as you sit here today?

**A.**   No.

**Q.**   And in this email, you had testified that you understood the purpose of this to be part of cleaning up the paperwork. Did you understand that this attachment was part of these new contracts around ownership?

**A.**   Yes.

**Q.**   And now you cc'd only Michael Rothenberg.  Why did you only cc Michael Rothenberg and not include any attorneys or anybody else?  Who told you who to --

**A.**   Mike -- Mike specifically outlined who would be on email strings.  And in some cases, it wasn't -- it wasn't unusual for him to not want to include attorneys or people from our finance organization.

**Q.**   So as you thought about it then, you didn't think anything of it in terms of who -- who to write this to and who to -- who to cc?

**A.**   No.  It seemed normal.  Mike's a very hands-on person.  It makes sense that he would be the one copied.

**Q.**   And when you say hands-on in relation to who to send emails to, what do you mean by that?

**A.**    He was -- I guess I would use the term micromanaging.  I'm
not trying to say that in a pejorative way, just
detail-oriented on each individual action, who he wanted to
receive the message, what the timing should be, what the tone
should be.  In many cases the emails were ghost written.  So --

**Q.**    Ghost written in the sense that Mike would essentially
write the email for you.  Is that what you mean?

**A.**    Right, yeah.

        **MR. KLEINMAN:**  Ms. Margen, if we can zoom out and go
to the next page of this document.

**Q.**    The jury has seen this, but I just want to show the
attachment.  This is the River Studios LLC Amendment to
Convertible Promissory Note.

        And, Mr. Grooms, if you can just read this section here.

**A.**    Okay.  The one with the X next to it?

**Q.**    Yes.

**A.**    "Capitalization.  Entities controlled by Mike Rothenberg
or entities controlled by such entities collectively hold one
hundred percent of the equity interests in the company."

**Q.**    And, Mr. Grooms, did you see the original convertible
promissory note?

**A.**    I don't think so.

        **MR. KLEINMAN:**  We can take this down.

**Q.**    So this email was on August 10th of 2016.  Turning your
attention eight days later now, it's August 18th of 2016.  In

1    and around that time, what did Michael Rothenberg come to you

2    for regarding the finances?

3    **A.**    Around August 8th, 2016?

4    **Q.**    August 18th, 2016.

5           **MR. KLEINMAN:**  Ms. Margen, if we can put up for

6    identification Government's Exhibit 629.

7           Thank you, Ms. Margen.

8    **Q.**    Mr. Grooms, again turning your attention to in and around

9    August 18th, 2016, what did Michael Rothenberg ask of you

10   regarding the finances of the company?

11   **A.**    He asked me for a quarter million dollar loan.

12   **Q.**    Okay.  You have in front of you what has been marked for

13   identification as Government's Exhibit 629.

14          Mr. Grooms, do you recognize this document?

15   **A.**    Yes.

16   **Q.**    What do you recognize it to be?

17   **A.**    A loan agreement laying out his offer for me to loan him a

18   quarter million dollars.

19   **Q.**    Now, turning your attention again to this document, is --

20   prior to your testimony, have you reviewed this document?

21   **A.**    Yes.

22   **Q.**    Is this a fair and accurate copy of the loan agreement

23   that Michael Rothenberg asked you to engage in?

24   **A.**    Yes.

25          **MR. KLEINMAN:**  The Government moves to admit

1    Exhibit 629.

2              **THE COURT:**  Any objection?

3          **MR. TORRES:**  Irrelevant, Your Honor.

4          **THE COURT:**  629 is admitted.

5          (Government's Exhibit 629 received in evidence.)

6                    (Exhibit published to jury.)

7          **MR. KLEINMAN:**  And, Mr. Grooms, I see you pouring

8    water, so please take a drink break.

9         Ms. Margen, if we can blow up the top paragraph.

10   **Q.**   If you can just read the first paragraph into the record.

11   **A.**   "This loan agreement, this agreement, dated August 18th,

12   2016, is entered into by and between Mike Rothenberg,

13   712 Bryant Street, San Francisco, California, 94107,

14   hereinafter borrower, and Justin Grooms, hereinafter lender."

15   **Q.**   Thank you.

16         **MR. KLEINMAN:**  And we can zoom out.

17   **Q.**   And if you can read just the first line of point number 1.

18   **A.**   "Lender promises to loan $250,000 to borrower within one

19   day of the date hereof.  Such funding date," the funding date.

20         **MR. KLEINMAN:**  And if we can go to the third page, and

21   if we can blow up this portion.

22   **Q.**   Mr. Grooms, this section remains unsigned.  What -- what

23   did you say?

24   **A.**   I said no.

25   **Q.**   So at this point, what were you thinking regarding -- and

1  considering regarding your employment at Rothenberg Ventures

2  Management Company?

3  **A.**   I was ready to leave.

4  **Q.**   And, however, still at this point, did you believe and

5  understand that in fact Mike Rothenberg might leave the

6  company?

7  **A.**   I did.

8  **Q.**   And was that a motivating factor in terms of why you had

9  stayed up until this point?

10  **A.**   Absolutely.

11  **Q.**   How many discussions had you had about Michael Rothenberg

12  leaving the company?

13  **A.**   I would say it must have been half a dozen.

14       **THE COURT:**  Just so I can understand, Mr. Grooms, and

15  I think I do, but you -- part of your motivation with staying

16  was that you thought that Mr. Rothenberg was going to leave; is

17  that right?

18       **THE WITNESS:**  Yes, sir.

19       **THE COURT:**  Okay.

20    Mr. Kleinman, go ahead.

21       **MR. KLEINMAN:**  Thank you, Your Honor.

22    And if I could show the jury what is in evidence as

23  Government's Exhibit 238.

24    And if we can blow up the top part of this email.

25  **Q.**   Mr. Grooms, who is this email from?

1  **A.**   It's the Rothenberg Ventures Investor Relations email

2  list.

3  **Q.**   And we were just looking at that loan agreement from

4  August 18, 2016.  What is the date of this email?

5  **A.**   August 23rd, 2016.

6  **Q.**   And who is included in this email?

7  **A.**   It's primarily sent to Mike, and then a series of it

8  appears to be Rothenberg -- senior Rothenberg employees and

9  outside counsel.

10 **Q.**   And you see Brandon Farwell on this email as well as

11 yourself; correct?

12 **A.**   That's right, I do.

13      **MR. KLEINMAN:**  And, Ms. Margen, if we can go to --

14 excuse me.

15 **Q.**   What is the subject of this email?

16      **MR. KLEINMAN:**  No need to blow it up, Ms. Margen.

17      **THE WITNESS:**  Rothenberg Ventures LP Update Letter

18 Number 2.

19      **MR. KLEINMAN:**  If we can go to the third page.  And if

20 you can blow up this paragraph, Ms. Margen.

21 **Q.**   If you can read the first two sentences regarding "Next

22 steps."

23 **A.**   Yes.

24      "Let's work together to facilitate an orderly transition

25 of leadership.  My partner Brandon Farwell and COO Justin

1    Grooms are excellent leaders and would be good fiduciaries if

2    you, as LPs, supported that and if they wanted that."

3    **Q.**    And did you at that point believe that this transition

4    would in fact happen?

5    **A.**    I did.

6    **Q.**    And yet what happened?

7    **A.**    It did not happen.

8    **Q.**    Why ultimately did it not happen?

9    **A.**    I -- I came to believe that Mike -- I came to the

10   conclusion that Mike did not want to actually hand off the

11   operations to me and Brandon and that this was an effort to

12   diffuse the situation with LPs for a period of time.

13   **Q.**    You just testified that you came to that conclusion.

14   Mr. Grooms, what sorts of things did you ask Michael Rothenberg

15   for in order to take over the leadership positions?

16   **A.**    My recollection is that Brandon and I asked for broad

17   access to the books and access to outside counsel that the

18   company had used to discuss what the risks were that we would

19   be needing to manage going forward.

20   **Q.**    And when you say "the books," did that also include the

21   bank accounts?

22   **A.**    Yes.

23   **Q.**    And --

24   **A.**    Of course.

25   **Q.**    -- would -- did Michael Rothenberg provide those things?

1    **A.**    No.

2    **Q.**    So when Michael Rothenberg refused to step down and

3    refused to provide you with the information, including the

4    books and the bank accounts, what did you do?

5    **A.**    I decided to leave the company.

6              **MR. KLEINMAN:**  Nothing further.  Thank you.

7              **THE COURT:**  Mr. Torres, cross-examination?

8              **MR. TORRES:**  Yes, Your Honor.

9              **THE COURT:**  It might be stretch break time.

10                       (Stretch break.)

11             **THE COURT:**  All right.  Let's go ahead and take our

12    seats.

13                      <u>**CROSS-EXAMINATION**</u>

14    BY MR. TORRES:

15    **Q.**    Good afternoon, Mr. Grooms.

16    **A.**    Good afternoon.

17    **Q.**    You began some of your testimony earlier today with a

18    discussion of your current role at Bolt Financial; correct?

19    **A.**    That's right.

20    **Q.**    That's an e-commerce platform?

21    **A.**    Yes.

22    **Q.**    And your role is you run the sales organization for the

23    company; correct?

24    **A.**    I'm the VP of global sales.

25    **Q.**    VP of global sales.

1    **A.**    That's right.

2    **Q.**    And most of your work history is in sales; correct?

3    **A.**    Yes, sir.

4    **Q.**    Out of college, you started at Qualcomm in a sales role?

5    **A.**    Yes, sir.

6    **Q.**    Generally speaking, a sales role, your -- part of the job

7    is identifying potential customers; correct?

8    **A.**    In some cases.  In other cases not.

9    **Q.**    Well, what would the other cases be?  If you could just

10   give me an example.

11   **A.**    For instance, in my -- in my current role, potential

12   customers are provided by our business development organization

13   and fed into our sales organization who then pursues a list of

14   target customers.  Not atypical.

15   **Q.**    So the company might identify the customers for the sales

16   team?

17   **A.**    That's right.  Like a business development and marketing

18   team would generally create the list of target accounts.

19   **Q.**    And then the sales team would reach out to those

20   pre-identified targets, I suppose?

21   **A.**    That's right.  Yeah.

22   **Q.**    In the -- in the sales industry, there are often sales

23   goals; correct?

24   **A.**    That's correct.

25   **Q.**    Sales targets?

1    **A.**    That's correct.

2    **Q.**    Maybe just to use a broad example, there might be like a

3    quarterly target?

4    **A.**    Right.

5    **Q.**    To achieve a certain level of sales by a certain date?

6    **A.**    That's correct.

7    **Q.**    In your testimony earlier, you talked about your role as

8    vice president of sales at Reaction Housing.  Do I have that

9    correct?

10   **A.**    You do.

11   **Q.**    And was one of your primary responsibilities in that role

12   was to sell the product?

13   **A.**    That's correct.

14   **Q.**    And in that role as vice president, was it one of your

15   responsibilities to solicit investors in the company?

16   **A.**    No.

17   **Q.**    That was someone else's role within Reaction Housing?

18   **A.**    That's right.

19   **Q.**    In your testimony earlier, you identified Reaction Housing

20   as venture backed; correct?

21   **A.**    That's correct, yes.

22   **Q.**    And correct me if I'm wrong, I think you testified that

23   there were maybe two dozen or was it dozens of -- of investors

24   when you joined in August of '15?

25   **A.**    Yes.  I think I guessed that there were dozens of major

1    investors; probably not including a long list of angel

2    investors that are in -- minor.

3    Q.    More than one dozen investors at the time?

4    A.    I think so, yeah.  Easily.

5    Q.    And you testified that Reaction Housing had raised

6    somewhere between 10 and 15 million.

7    A.    I think.  That was my understanding, yes.

8    Q.    And at some point during your employment at Reaction

9    Housing, you learned that Rothenberg Ventures 2014 Fund was an

10   investor in Reaction Housing?

11   A.    I learned that Rothenberg Ventures, one of the funds, I

12   don't remember if I learned which fund it was.

13   Q.    That a fund of Rothenberg Ventures had invested in

14   Reaction Housing?

15   A.    Yes.  I learned that, yes.

16   Q.    And just briefly, Reaction Housing system was an emergency

17   response system?

18   A.    Generally, yes.

19   Q.    Designed to respond -- or was marketed as a tool to

20   respond to natural disasters.

21   A.    Yes.  Or -- or homelessness.  Those were the two prime

22   targets.

23   Q.    The idea was that there could be quick housing needs for

24   persons displaced by natural disasters or other events.

25   A.    Yes.  Yes.

1    **Q.**   And domestically, we had seen some things like that like

2    in New Orleans, for example.

3    **A.**   Yes.   In fact, the New Orleans hurricane was the

4    inspiration for the founder.

5    **Q.**   You testified earlier that in early 2016, Reaction Housing

6    was running out of cash, I believe you said.

7    **A.**   Yes, sir.

8    **Q.**   And in early 2016, Reaction Housing was still looking for

9    additional investors; correct?

10   **A.**   That's correct.

11   **Q.**   You testified that your introduction to Mr. Rothenberg was

12   through Brandon Farwell; correct?

13   **A.**   Yes.

14   **Q.**   And Mr. Farwell was a member of Rothenberg Ventures

15   investment team?

16   **A.**   Yes.   That's correct, he was.

17   **Q.**   And that initial meeting was in Austin; correct?

18   **A.**   That's correct.

19   **Q.**   That initial meeting was while -- let me start over.

20       While you testified that Reaction Housing was running out

21   of cash, it was still in the process of reaching out to

22   potential investors.

23   **A.**   Yes.   It was still in the process of that, yes.

24   **Q.**   And in those meetings, Reaction Housing was actively

25   trying to recruit new investors or additional investments

1   from -- from current investors; correct?

2   **A.**   That's correct.

3   **Q.**   Were you part of these presentations to investors?

4   **A.**   A few of them, yes.

5   **Q.**   Did you have -- did these presentations contain

6   presentation materials about the company?

7   **A.**   I would imagine they did.

8   **Q.**   You don't remember if they did?

9   **A.**   I don't remember if there were slide decks or anything

10  like that.

11  **Q.**   Do you remember in the meeting in which you -- Mr. Farwell

12  introduced himself to you, there were materials presented to

13  the investors?

14  **A.**   I don't remember that, but I would imagine it happened.

15  **Q.**   At that meeting, did you present to Mr. Farwell or you

16  were like in attendance at the presentation?

17  **A.**   I was -- I was not a presenter in the meeting with

18  Mr. Farwell.  I was in the group that was walking around

19  looking at the -- it was a large facility and there was a tour

20  that was part of it.

21  **Q.**   Because at the time your responsibility was primarily in

22  selling the product.

23  **A.**   That's right, yeah.

24  **Q.**   It wasn't your direct responsibility to identify or

25  solicit investors.

1    **A.**    Correct.

2    **Q.**    So you testified that after meeting Mr. Rothenberg, he

3    expressed interest in purchasing the intellectual property of

4    Reaction Housing?

5    **A.**    Yes.

6    **Q.**    Did you -- and he ultimately did purchase the intellectual

7    property; correct?

8    **A.**    He did, that's right.

9    **Q.**    Did you negotiate that sale?

10   **A.**    No.  I believe the transaction was handled in an auction

11   through a bankruptcy court.

12   **Q.**    You didn't -- you didn't negotiate any of the terms of the

13   transaction?

14   **A.**    No, I don't believe -- I don't believe so.  I don't

15   remember doing that.

16   **Q.**    Or the amount.

17   **A.**    I -- I kind of recall having an opinion about how much it

18   might be worth, but I don't remember the specifics of it.

19   **Q.**    So your input may have gone into it, but you did not set

20   the terms of the agreement; is that right?

21   **A.**    That's right.

22   **Q.**    So in the spring -- let's move to the spring of 2016.

23         Mr. Rothenberg offered you a job in San Francisco;

24   correct?

25   **A.**    Yes, he did.

1   **Q.**   And at the time, you were excited about the opportunity?

2   **A.**   I was thrilled.

3   **Q.**   Thrilled and excited enough to be willing to move you and

4   your wife to a new city; correct?

5   **A.**   Yes.

6   **Q.**   You were initially hired to run a new version of Reaction

7   Housing based in San Francisco; correct?

8   **A.**   That's correct.

9   **Q.**   And the proposed -- you -- let me start over.

10       You were hired as the president of River Enterprises?

11  **A.**   Yes, that's correct.

12  **Q.**   River Enterprises was going to be a new entity to run

13  Reaction Housing 2.0?

14  **A.**   Among other things, yes.

15  **Q.**   In your testimony earlier, you stated that this role

16  evolved into a COO position with Rothenberg Group?

17  **A.**   That's correct.

18  **Q.**   In your testimony, you reviewed your employment offer

19  letter?

20  **A.**   That's right.

21  **Q.**   Part of this role was to hire a new staff for River

22  Enterprises; correct?

23  **A.**   Yes.  That's right.

24  **Q.**   I believe there was also language in -- in the employment

25  letter about overseeing non-investment activity.  Does that

1   sound accurate?

2   **A.**   Yes.  I think so.

3   **Q.**   It also contained labels like -- titles of COO?

4   **A.**   COO, yes.

5   **Q.**   As well as CRO?

6   **A.**   That's correct.

7   **Q.**   Can you remind me what's CRO?

8   **A.**   Chief revenue officer.

9   **Q.**   In both your position as president of River Enterprises as

10  well as chief operating officer of Rothenberg Group, were you

11  based in Rothenberg Ventures' San Francisco office?

12  **A.**   Yes.

13  **Q.**   And we're talking about the office at 1062 Folsom Street;

14  correct?

15  **A.**   Yep.  That's right.

16  **Q.**   And on the day-to-day, this was your primary place of

17  work?

18  **A.**   That's right.

19  **Q.**   In this office, you worked alongside Brandon Farwell?

20  **A.**   I did.

21  **Q.**   Tommy Leep, Junior?

22  **A.**   Yes.

23  **Q.**   Did you meet Sophia Leal?

24  **A.**   I did, yes.

25  **Q.**   Geoff Rapoport?

```
 1    A.    Yeah.  Briefly, yes.

 2    Q.    David Haase?

 3    A.    Yes.

 4    Q.    Tom Leep, Senior?

 5    A.    I don't recall if I ever met Mr. Leep, Senior, personally,

 6    but potentially.

 7    Q.    But you knew that Tom Leep, Senior --

 8    A.    Existed?

 9    Q.    Yes.

10    A.    Yes.

11    Q.    And -- and at a minimum, consulted with Mr. Rothenberg?

12    A.    I knew that he had consulted and had a role.  I -- I don't

13    know to this day if he did after -- while I was there.  I don't

14    know.

15    Q.    So just so we have the time frame correct, you started --

16    you moved to San Francisco in the spring of 2016; correct?

17    A.    Yes, sir.

18    Q.    Was it March of 2016?

19    A.    It might have been March or early April.  I -- I could

20    find out.  I just don't remember.

21    Q.    I believe in the exhibit that -- Exhibit 630 was your

22    employment offer letter that you testified to.

23    A.    Yes.

24    Q.    I think it suggests a date of April 5th, 2016.  Does that

25    sound right?
```

1    **A.**    That sounds right for the date I started with Rothenberg.

2    The day I moved, I don't remember the exact day I moved.

3    **Q.**    But your start date with the Rothenberg entities was first

4    week of April?

5    **A.**    Yeah, exactly, yeah.

6    **Q.**    And you testified that you left your position in

7    mid August.

8    **A.**    Yes.  Yes.

9    **Q.**    I'd like to spend a few minutes talking about the Unity

10    co-investment deal.

11    **A.**    Okay.  Great.

12    **Q.**    In your testimony with Mr. Kleinman, you identified the

13    Unity Co-Investment Fund opportunity as an opportunity for

14    investors to buy secondary shares from Unity; correct?

15    **A.**    Yes, sir.  Yep.

16    **Q.**    And part of your role as the COO was that you were

17    involved in recruiting investors for the Unity co-fund

18    opportunity?

19    **A.**    What do you mean by recruiting?

20    **Q.**    Let me ask another question.

21    **A.**    Okay.

22    **Q.**    Part of your role was handling and managing correspondence

23    with potential investors in the Unity co-fund?

24    **A.**    Yes.  I would -- I would correspond with investors or

25    prospective investors that Mike had identified, yes.  I don't

```
1   know that I would handle corresponding.  But I would
2   correspond, yeah.
3   Q.   So -- let me ask a better question, actually.  So in
4   handling -- or you managed it?  I'm sorry if I misspoke.
5        Did you handle communications with potential investors?
6   A.   I would communicate with potential investors.  I don't
7   know if when you say "handling it," if like I managed it like I
8   had a strategy.  I didn't have that.  I would handle sending
9   the communications to investors that Mike had identified on his
10  target list.
11  Q.   You sent emails to potential investors --
12  A.   That's right.
13  Q.   -- regarding Unity?
14  A.   That's correct.
15  Q.   You took phone calls and participated in phone calls with
16  individuals that had been identified as potential investors?
17  A.   That's right.  Yes.
18  Q.   You also made reference to C-level executives at Unity
19  during your testimony; correct?
20  A.   Yes, sir.
21  Q.   The CEO of Unity at the time was a gentleman named John
22  Riccitiello.
23  A.   Yes, sir.
24  Q.   And you were aware that Mr. Riccitiello attended a Golden
25  State Warriors game with Mr. Rothenberg and other members of
```

1    Rothenberg Ventures in 2016?

2    **A.**    I seem to recall that, yes.

3    **Q.**    Unity was a gaming technology company; correct?

4    **A.**    Yes.  They -- they are.

5    **Q.**    You also testified and reviewed an exhibit that shows that

6    you were a part of email correspondence with the CFO of Unity

7    in July of 2016; correct?

8    **A.**    Yeah.  I was on an email string that included the CFO of

9    Unity, correct.

10   **Q.**    And that CFO was Michael Foley?

11   **A.**    Yes, sir.

12   **Q.**    That exhibit also contained some communication about a

13   stock purchase agreement; correct?

14   **A.**    That's correct, yes.

15   **Q.**    So this co-fund investment opportunity with Unity was for

16   the purchase of secondary stocks; correct?

17   **A.**    Yes, sir.

18   **Q.**    Were you aware of who Rothenberg Ventures was purchasing

19   the stocks from?

20   **A.**    Yes.  I believe the name was listed in one of the emails.

21   **Q.**    The name of the Unity employee that --

22   **A.**    Yes.  Or the Unity employee's spouse.  I can't remember

23   the detail.

24   **Q.**    There was email correspondence suggesting who the stocks

25   were being purchased from?

1    **A.**    Yes.

2    **Q.**    Mr. Grooms, these -- the email correspondence we've

3    reviewed in these exhibits, many of these are more than seven

4    years old; correct?

5    **A.**    That's right.

6    **Q.**    In preparation for your testimony today, you met with

7    attorneys for the Government in preparation of your testimony

8    today?

9    **A.**    Yes, sir.

10    **Q.**    And in that preparation, you reviewed documents.

11    **A.**    That's correct.

12        **MR. TORRES:**  Can we pull up Exhibit 291, please.

13    **Q.**    All right, Mr. Grooms.  This is Exhibit 291, an email you

14    testified about earlier.

15    **A.**    Yes.

16    **Q.**    It's an email string from August 7th, 2016, between Justin

17    Grooms, yourself, and a Nathan N. Hudson; correct?

18    **A.**    Yes, sir.

19        **MR. TORRES:**  Can we go to page 4, please.

20    **Q.**    Just briefly, sir, this -- this email is from Tuesday,

21    July 12th at -- this email is from July 12th, 2016, from

22    Mr. Rothenberg to Nathan Hudson and a Matt.

23    **A.**    Yeah.

24    **Q.**    And in the third paragraph, Mr. Rothenberg writes, "Justin

25    Grooms is running point for us on this.  It's possible it will

1    be allocated before the weekend."

2        Do you see that?

3    **A.**    I do.

4    **Q.**    There were similar emails to this made to other potential

5    investors; correct?

6    **A.**    That would make sense.

7    **Q.**    Mr. Rothenberg introducing you as the person running point

8    on the Unity deal.

9    **A.**    Yes.  I think it's a fairly common tactic to hand off to

10   salespeople.

11       **MR. TORRES:**  Go to page 2, please.  Scroll to the

12   bottom, please.

13   **Q.**    On July 13th, you sent an email to Nathan Hudson, and I

14   believe the Matt that was also on that email; correct?

15   **A.**    I'm sorry.  The what was on it?

16   **Q.**    And the gentleman named Matt that was on the email.

17   **A.**    Oh, okay.  Yeah.  Yes.  This is an email.  I don't

18   remember if -- yes.  Matt might have been on it.

19   **Q.**    Okay.  And just above that, there's a response from Nathan

20   Hudson identifying the amount that he's going to wire related

21   to the investment; correct?

22   **A.**    That's right.

23   **Q.**    Mr. Hudson committed a hundred thousand dollars to the

24   co-fund opportunity; correct?

25   **A.**    Yes, he did.

1    **Q.**    And Mr. Hudson was also an LP in other Rothenberg Ventures

2    funds?

3    **A.**    Yes.  I believe so.

4            **MR. TORRES:**  We can take that down, Mr. Fakhoury.

5    **Q.**    In your testimony earlier, sir, you testified about

6    meetings you had alongside Mr. Rothenberg with potential

7    investors in the 2016 Fund.

8    **A.**    Yes.  A couple.

9    **Q.**    You talked about some of the contents of those meetings;

10   correct?

11   **A.**    Yes.

12   **Q.**    At the time of those meetings, you didn't have access to

13   any of Mr. Rothenberg's personal bank accounts; correct?

14   **A.**    I -- no.

15   **Q.**    Or any of Mr. Rothenberg's real estate holdings?

16   **A.**    No.

17   **Q.**    Just a couple quick questions on your role as the COO --

18   **A.**    Okay.

19   **Q.**    -- of the Rothenberg Group.

20        So in your role as COO, you did not file any paperwork to

21   establish limited liability company status for any entities.

22   **A.**    Not that I remember, no.

23   **Q.**    And as the chief operating officer, you did not set up any

24   bank accounts for any Rothenberg Group entities?

25   **A.**    No.

1  **Q.**   It was not your responsibility to initiate any bank

2  transfers?

3  **A.**   Absolutely not.

4  **Q.**   And in your role, you were not responsible for payroll;

5  correct?

6  **A.**   No.

7           **MR. TORRES:**  Mr. Fakhoury, can we pull up Exhibit 234,

8  please.

9  **Q.**   Mr. Grooms, Exhibit 234 is an email from August 10th,

10 2016, from yourself to Larry Weisman and cc'ing Mr. Rothenberg;

11 correct?

12 **A.**   Yes, sir.

13 **Q.**   You started at Rothenberg -- you started at River

14 Enterprises and Rothenberg Group in April --

15 **A.**   That's right.

16 **Q.**   -- of 2016; right?

17 **A.**   Yes.

18 **Q.**   You were not an employee of River Studios; correct?

19 **A.**   No.

20 **Q.**   You're aware that Transcend VR or Pilot Grove entered into

21 a convertible note with River Studios in February of 2016?

22 **A.**   Yes.  To the extent that it was discussed in the amendment

23 to -- to that document.

24 **Q.**   To your knowledge, the proposed amendment was not signed

25 by Larry Weisman, was it?

1    **A.**   No.

2    **Q.**   It was not signed by anyone at Pilot Grove; correct?

3    **A.**   Not to my knowledge, no.

4          **MR. TORRES:**  You can take that exhibit down,

5    Mr. Fakhoury.

6    **Q.**   In your testimony earlier, sir, you discussed some

7    meetings that took place at Mr. Rothenberg's condo; correct?

8    **A.**   Yes, sir.

9    **Q.**   Mr. Rothenberg's condo was within walking distance of

10   1062 Folsom Street?

11   **A.**   Yeah.  At the right time of day, yes.

12                    (Laughter.)

13   **BY MR. TORRES:**

14   **Q.**   Good point.

15       You testified earlier that you worked with Tommy Leep;

16   correct?

17   **A.**   I knew -- knew Tommy.  I didn't -- our roles didn't

18   overlap very much.  But, yeah, I knew Tommy.

19   **Q.**   You both worked out of 1062 Folsom Street, Rothenberg

20   Ventures office?

21   **A.**   Yes.  Yeah.

22   **Q.**   Were you aware that Tommy Leep lived in Mr. Rothenberg's

23   condo?

24   **A.**   I was, yes.

25   **Q.**   You testified to a phone call you received in late

1  July from Mr. Rothenberg when you were on a date night;

2  correct?

3  **A.**    Yes.

4  **Q.**    And there was some urgency in Mr. Rothenberg's voice.

5  **A.**    Yes.

6  **Q.**    And you agreed to meet him the next day; correct?

7  **A.**    That's right.

8  **Q.**    And this meeting took place in July.

9  **A.**    Yes.

10  **Q.**    You discussed some of the contents of the conversation.

11  During this conversation, you learned of the SEC letter.

12  **A.**    I think that's the specific time I learned of the SEC

13  letter, yes.

14  **Q.**    Did you have more than one meeting with Mr. Rothenberg in

15  late July at his condominium?

16  **A.**    I'm -- I'm sure I did.

17  **Q.**    So you testified about a conversation taking place while

18  you guys were on a walk.  You and Mr. Rothenberg were on a

19  walk; correct?

20  **A.**    Yes.  That's right.

21  **Q.**    Related to that conversation, you didn't purchase any hard

22  drives?

23  **A.**    No.

24  **Q.**    You're not aware that anyone purchased any hard drives?

25  **A.**    No, I'm not aware of anyone doing that.

1    **Q.**    And you didn't quit after that meeting?

2    **A.**    No, I did not quit after that meeting.

3    **Q.**    And you're aware, sir, that attorneys for Rothenberg

4    Ventures Management Company provided approximately 27,000 pages

5    to the SEC in response to the letter.

6    **A.**    I was not aware of how much went over, no.

7    **Q.**    Things really changed at Rothenberg Ventures after the SEC

8    letter arrived; is that correct?

9    **A.**    Yes.  That's correct.

10   **Q.**    Is that a fair description --

11   **A.**    That's a fair thing to say, yes.

12   **Q.**    And shortly after receipt of the SEC letter, there were

13   press publications about Rothenberg Ventures.

14   **A.**    That's correct.

15   **Q.**    And you became aware of -- of those publications; correct?

16   **A.**    Absolutely.

17   **Q.**    Some of the press included quotes from anonymous

18   employees; correct?

19   **A.**    That's right.

20   **Q.**    As well as former employees?

21   **A.**    Yeah.  I believe so.

22        **MR. TORRES:**  May I have a minute, Your Honor?

23        **THE COURT:**  Yes.

24        (Defense counsel confer off the record.)

25        **MR. TORRES:**  Just a couple more questions, Your Honor.

1    Q.    At the end of your testimony with the Government, sir, you

2    testified to a $250,000 loan agreement that you received from

3    Mr. Rothenberg; correct?

4    A.    That's correct.

5    Q.    Did you produce that loan agreement to the Government?

6    A.    I -- I don't recall.  Sorry.

7    Q.    Just in closing, sir, when you learned about the SEC

8    letter that Rothenberg Ventures had received, you didn't quit;

9    correct?

10   A.    I did not.

11   Q.    After that meeting with Mr. Rothenberg in which you guys

12   took a walk around the block, you didn't quit after that

13   meeting; correct?

14   A.    That's correct.

15   Q.    After your discussion with Mr. Rothenberg about hard

16   drives, you didn't quit; correct?

17   A.    That's right.

18   Q.    You identified seeing a war room in his condominium on the

19   basement floor, I believe, is that correct?

20   A.    Yes.

21   Q.    After seeing this war room, you did not leave Rothenberg

22   Group; correct?

23   A.    That's correct.

24   Q.    You saw the negative press articles pertaining to

25   Rothenberg Ventures.  You didn't quit; correct?

1    **A.**    That's right.

2    **Q.**    You participated in conversations with fellow employees of

3    Rothenberg Ventures Group about taking over the management of

4    the Rothenberg Ventures funds; is that correct?

5    **A.**    Fellow employees including Mike, yes.

6    **Q.**    And when that did not happen, you quit.

7    **A.**    Yeah.   Contemporaneously to that, yes.

8              **MR. TORRES:**   Thank you, sir.

9         No more questions, Your Honor.

10             **THE COURT:**   Mr. Kleinman.

11             **MR. KLEINMAN:**   No, Your Honor.   Thank you.

12             **THE COURT:**   Thanks very much for your testimony.

13    You're excused.

14             **THE WITNESS:**   Thank you, sir.

15             **THE COURT:**   All right, members of the jury, well, we

16    have come right exactly to 1:30.   You completed another week of

17    evidence in this case.   As I told you, there's a very, very

18    likelihood the evidence will complete at some point next week.

19        Remember my prior admonitions.   You've heard a lot of

20    evidence, but you still haven't heard it all so please don't

21    make up your mind about anything.   We have to wait until we

22    have all the facts.

23        Continue not to ask anybody or go on the Internet to look

24    for any information about this case or any of the people

25    involved in it.   And enjoy the time away with your families or

1    your work or whatever it may be.

2         I'll see you bright and early on Monday morning.  Thank

3    you so much.

4              **THE CLERK:**  Please rise for the jury.

5         (Proceedings were heard out of presence of the jury:)

6              **THE COURT:**  All right.  We are outside the presence of

7    the jury.

8         Mr. Kleinman, anything for the record?

9              **MR. KLEINMAN:**  No, Your Honor.  Thank you.

10             **THE COURT:**  Mr. Fakhoury?

11             **MR. FAKHOURY:**  No, Your Honor.  Thank you.

12             **THE COURT:**  All right.  Thank you.

13             **THE CLERK:**  Court is in recess.

14                  (Proceedings adjourned at 1:32 p.m.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Thursday, November 2, 2023

_Pamela Batalo Hebel_

_____

Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter