UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          *ORIGINAL*

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 22** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | **Pages 4078 - 4265** |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, November 9, 2023 |

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

APPEARANCES:

| | | |
|---|---|---|
| For Plaintiff: | | THOMAS A. COLTHURST, ESQ. |
| | | Attorney for the United States |
| | | Acting under Authority conferred by |
| | | 28 USC §515 |
| | | 1301 Clay Street, Suite 340S |
| | | Oakland, California  94612 |
| | BY: | BENJAMIN K. KLEINMAN, |
| | | KYLE F. WALDINGER, |
| | | NICHOLAS J. WALSH, |
| | | ASSISTANT UNITED STATES ATTORNEYS |
| | | |
| For Defendant: | | MOEEL LAH FAKHOURY LLP |
| | | 1300 Clay Street, Suite 600 |
| | | Oakland, California  94612 |
| | BY: | HANNI M. FAKHOURY, ATTORNEY AT LAW |
| | | |
| | | Law Office of Nathaniel J. Torres |
| | | 338 Fillmore Street #4 |
| | | San Francisco, California  94117 |
| | BY: | NATHANIEL J. TORRES, ATTORNEY AT LAW |
| | | |
| Reported By: | | Raynee H. Mercado |
| | | CSR. No. 8258 |

Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## I N D E X

| DEFENDANT'S WITNESSES | | PAGE | VOL. |
|---|---|---|---|
| ROTHENBERG, MICHAEL | | | |
| (SWORN) | | 4086 | 22 |
| DIRECT EXAMINATION BY MR. FAKHOURY | | 4086 | 22 |
| CROSS-EXAMINATION BY MR. WALDINGER | | 4224 | 22 |

## E X H I B I T S

| GOVERNMENT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 522 | | | 4235 | 22 |

| DEFENDANT'S  EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 1002 | | | 4162 | 22 |

--o0o--

| | |
|---|---|
| 1 | **Thursday, November 9, 2023**                    **8:04 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | --oOo-- |
| 4 | |
| 5 |    (The following proceedings were heard out of the presence |
| 6 | of the jury:) |
| 7 |    **THE CLERK:**  Your Honor, now calling criminal matter |
| 8 | 20-266, United States v. Michael Brent Rothenberg. |
| 9 |    If counsel could please state their appearances for the |
| 10 | record, starting with the government. |
| 11 |    **MR. WALDINGER:**  Good morning, Your Honor.  Kyle |
| 12 | Waldinger, Nicholas Walsh, Benjamin Kleinman for the |
| 13 | government. |
| 14 |    We're joined as usual by Ms. Margen and Special Agent |
| 15 | Ghio. |
| 16 |    **MR. FAKHOURY:**  Good morning, Your Honor.  Hanni |
| 17 | Fakhoury and Nate Torres on behalf of Mr. Rothenberg.  He's |
| 18 | present, Your Honor. |
| 19 |    **THE COURT:**  Good morning. |
| 20 |    We're outside the presence of the jury. |
| 21 |    I understand that you have something to raise with the |
| 22 | Court. |
| 23 |    **MR. WALDINGER:**  Just it looks like the defendant is |
| 24 | going to testify.  In cross-examination, there will likely be |
| 25 | a question in terms of setting the timeline about when this |

 1    SEC letter was received.  And so the Court -- we'd ask the

 2    Court to give the limiting instruction at that time.

 3              **THE COURT:**  All right.  I will do so.

 4              **MR. WALDINGER:**  I think that was the main thing.

 5       I advised Mr. Fakhoury last night there were statements

 6    made during what we call proffer sessions by the defendant

 7    that the government may use if the defendant testifies, on

 8    cross-examination.

 9       Those were recorded interviews so we have recordings and

10    transcripts of those recordings to put on the ELMO for the

11    jury to follow along.  We would not be asking for the

12    transcripts to be admitted into evidence, just as an aid to

13    the jury if we -- if we use them.

14              **THE COURT:**  Okay.

15       Mr. Fakhoury, anything to add to all that?

16              **MR. FAKHOURY:**  No, Your Honor.

17              **THE COURT:**  Good morning, Larry.

18              **THE COURT SECURITY OFFICER:**  Good morning.

19              **THE COURT:**  Larry, I was -- remind me of your last

20    name?

21              **THE COURT SECURITY OFFICER:**  Watts, W-A-T-T-S.

22              **THE COURT:**  Thank you, Mr. Watts.

23       Mr. Watts is our Court Security Officer -- is one of our

24    Court Security Officers.

25       Mr. Watts, a juror yesterday reported to court staff that

1    it may be that somebody in the audience was taking photographs

2    or video of the proceedings.  And I'm going to admonish the

3    audience this morning that that is not allowed.

4        And if you observe that taking place, I would like you to

5    speak to the person in the audience and actually take them out

6    into the hallway if you feel that might be happening and just

7    remind them about the rules that the court has.

8        And if that doesn't solve the problem, I'd like you to

9    bring it to my attention.  Okay?

10              **THE COURT SECURITY OFFICER:**  Yes, sir.

11              **THE COURT:**  There we go.  Problem solved, I think.

12          **MR. WALDINGER:**  Yep.

13          **THE COURT:**  Thank you, gentlemen.

14          **MR. WALDINGER:**  Thank you, Your Honor.

15          **THE CLERK:**  Court is in recess.

16      (Recess taken at 8:07 A.M.; proceedings resumed at

17    8:31 A.M.)

18      (The following proceedings were heard in the presence of

19    the jury:)

20          **THE CLERK:**  You may be seated.

21          **THE COURT:**  Good morning.

22        **JURORS:**  Good morning.

23          **THE COURT:**  All the jurors are in their assigned

24    seats.

25        The parties and counsel are at counsel table.

1    Before we proceed with the taking of some more evidence, I

2    just wanted to make an announcement to the courtroom at large.

3    It was brought to my attention yesterday someone believed that

4    a member of the public may have been either photographing or

5    recording by video the proceedings in court yesterday.

6    Of course this is a public proceeding.  I'm very proud of

7    the way the United States Courts conduct their business in

8    public.  I think it contributes to the transparency that makes

9    our system of justice one of the best in the world.

10    But the rules of our court prohibit the recording by

11    photograph or sound or video of any kind these proceedings

12    from within the courtroom.

13    I will read you a sentence from the court's website.  It's

14    not the rule itself, but it is a summary of the rule and it's

15    there for members of the public and the media to read.

16    And it says, "No journalist or member of the public may

17    photograph or record any court proceeding under any

18    circumstances."

19    And I would add that that prohibition extends to

20    broadcasting.  So it would be additionally problematic if you

21    had recorded the proceedings here and then broadcast them in

22    any way, including by posting them on social media or another

23    Internet resource.

24    I say all this, I'm going on a little bit at length

25    because I just want this to be very clear.  So if you have

 1    recorded the proceedings in some way, you should delete that

 2    recording.  If you have broadcast them in some way and that

 3    media is still available, you should take it down.

 4        I have instructed the court security staff that if they

 5    observe a member of the public, if it appears to them that a

 6    member of the public or anybody else for that matter, member

 7    of the press, is recording the proceedings in some way, to

 8    simply ask that person to go outside into the hallway with

 9    court security staff and have a discussion about what is

10    occurring.

11        And if they conclude that you are violating the rule that

12    I just identified, they're just going to take your device and

13    put it in the marshal's office.  And you can get it back at

14    the end of the day when the marshals have nothing better to do

15    except return your device to you.

16        But I need all that to happen away from my attention and

17    the attention of these lawyers and the attention of the jurors

18    who are working so hard to resolve this case in a fair way.

19        So please honor that rule so we don't have any problems.

20    And that hopefully is the last thing that needs to be said

21    about any of that.

22        Okay.  Well, members of the jury, we concluded a witness

23    right at the day yesterday.

24        So let me ask the government to call its next witness,

25    please.

 1          **MR. WALDINGER:**  Your Honor, at this time the

 2   government would rest.

 3          **THE COURT:**  All right.  Members of the jury, that

 4   concludes the government's presentation of its evidence.

 5      It is now the defendant's opportunity, if he wishes to

 6   present a case.  As I reminded you yesterday, the defendant

 7   does not have any burden of proof and is not required to

 8   testify or present evidence.

 9      Mr. Fakhoury, does the defendant intend to present a

10   defense?

11          **MR. FAKHOURY:**  Yes, Your Honor.

12          **THE COURT:**  All right.  Would you call your first

13   witness, please.

14          **MR. FAKHOURY:**  I will.

15      And actually before I do that, Your Honor, I just, for the

16   record, make a motion under Rule 29.

17      But I'm ready to call my first witness.

18          **THE COURT:**  All right.  We can address that motion at

19   the next break.

20          **MR. FAKHOURY:**  The defense calls Michael Rothenberg.

21          **THE COURT:**  Mr. Rothenberg, you know exactly what I'm

22   going to say.  If you would just come up to the witness area

23   right here, remain standing and raise your right hand, please.

24

25   / / /

1          **MICHAEL ROTHENBERG,**

2    called as a witness by the defendant, having been duly sworn,

3    testified as follows:

4          **THE WITNESS:**  I do.

5          **THE CLERK:**  Thank you.

6       If you could please state and spell your last name for the

7    court reporter.

8          **THE WITNESS:**  Michael Rothenberg,

9    R-O-T-H-E-N-B-E-R-G.

10          **THE CLERK:**  You can have a seat here.

11          **THE WITNESS:**  Thank you.

12          **THE COURT:**  All right.  Mr. Rothenberg, you should

13    take your mask off while you're testifying.

14       As with Agent Ghio, you've heard me explain to witnesses

15    innumerable times how to proceed as a witness.

16       So go ahead and make yourself comfortable.

17       Mr. Fakhoury, your witness.

18          **THE WITNESS:**  Thank you, Your Honor.

19          **MR. FAKHOURY:**  Thank you, Your Honor.

20          **DIRECT EXAMINATION**

21    BY MR. FAKHOURY:

22    **Q.**  Good morning, Mr. Rothenberg.

23    **A.**  Good morning.

24    **Q.**  I'm just going to jump right into it.  And I'm going to

25    just start with my first question to you.  Did you lie to

1    investors because you wanted to be a Silicon Valley big shot?

2    **A.**  No, I did not.

3    **Q.**  Would you take a little bit out of a step back from the

4    mic because the voice is pretty loud there.

5    **A.**  Testing.  Is that okay?

6    **Q.**  Yes.  Thank you.

7         Mr. Rothenberg, did you intend to defraud Silicon Valley

8    Bank in connection with a line of credit you sought in

9    December 2015?

10   **A.**  No, I did not.

11   **Q.**  Did you intend to defraud Pilot Grove in connection with

12   its investment into River Studios in February 2016?

13   **A.**  No, I did not.

14   **Q.**  Did you intend to defraud investors who invested into the

15   Unity co-investment in July of 2016?

16   **A.**  No, I did not.

17   **Q.**  Did you intend to defraud investors who invested in the

18   2015 and 2016 Funds?

19   **A.**  No, I did not.

20   **Q.**  We're going to tackle each of those topics one by one,

21   generally and specifically.

22        Before we do that, I wanted to start at the beginning.

23        Where'd you grow up, Mr. Rothenberg?

24   **A.**  I grew up in Georgetown, Texas near Austin.

25   **Q.**  How was your childhood?

 1    **A.**   It was -- it was great.  I -- well, it was great.

 2    **Q.**   Did you enjoy school?

 3    **A.**   I loved school.

 4    **Q.**   How'd you do in school?

 5    **A.**   I did very well in school.  I really enjoyed it.

 6    **Q.**   We've heard a lot of testimony in this trial about the

 7    fact that you're a math Olympian.  What's a math Olympian?

 8    **A.**   I'm not sure there's a technical term for math Olympian,

 9    but when we're referring to it in this context, there's a --

10    there's an international competition called the International

11    Math Olympiad.  It's the closest thing that we have to

12    Olympics for math.

13         So we joke that that's mathletics because we always wanted

14    to be -- most of us wanted to be athletes, but we settled for

15    being mathletes.

16         But it's a competition in the U.S. that about 400,000 high

17    school and sometimes junior high students take.  And it's a

18    series of exams where 10,000 people get invited to the next

19    level, 300 people get invited to the next level.

20         And at the year that I went through that, there's about

21    30 people who get selected as math Olympians to spend time

22    training for the international math Olympian.

23         I was one of the -- and that's the 30 students across all

24    of the years of school.  So it's about five or six per year.

25    And then they -- we get trained together.  And it was one of

1   best experiences of my life.

2       And then there's about six people chosen who get to

3   compete.  I was not one of those.  But I made it to the level

4   of the 30.  And so we -- that group is called math Olympians.

5   So it's something I'm very proud of and was really cool to be

6   able to do.

7   **Q.**  How old were you when you participated in the math

8   Olympics?

9   **A.**  Some students get to do that when they're 13 or 14, but it

10  took me until I was 17.

11  **Q.**  When did you graduate high school?

12  **A.**  2002.

13  **Q.**  And after you graduated, what did you do?

14  **A.**  I went -- I went to college at Stanford.

15  **Q.**  Did you have to take out student loans to pay for college?

16  **A.**  I did.  It's very expensive.  But I also was able to pay

17  for part of it through some scholarships.  I also worked while

18  I was in college.

19  **Q.**  What did you do for work while you were in college?

20  **A.**  I started a tutoring company.  And I tutored mostly high

21  school, some junior high students, and also built that into a

22  group of about 15 tutors that were handling over a hundred

23  students, some of it pro bono.  It's called Cardinal Tutoring.

24  **Q.**  Cardinal after the Stanford mascot?

25  **A.**  That's right.

1    Q.   Was there a Rothenberg family trust when you were growing

2    up?

3    A.   Not that I know of.

4    Q.   What did you study at Stanford?

5    A.   The first -- the first year nobody declares a major.  You

6    get to take some classes and see what -- what you like.  I --

7    that was my first exposure to entrepreneurship.

8        And there's a track through the engineering program called

9    management science and engineering.  It's -- it was really a

10   spin-off of industrial engineering where you get to study an

11   engineering foundation, and then you take some business

12   classes and entrepreneurship classes.

13       So I studied -- I studied management science and

14   engineering.  It was very interesting to me.

15   Q.   Did you meet Tommy Leep and Brandon Farwell at Stanford?

16   A.   I did.

17   Q.   How did you meet them?

18   A.   Tommy Leep is -- is my age and my year.  And we met

19   freshman year.  We both joined the same fraternity, which is,

20   you know, at Stanford it's a little different than I think

21   other places.  It really just kind of means you live together.

22       And I met Brandon two years later.  He's -- he's two years

23   younger.  And we -- we were in the same -- Brandon joined the

24   Business Association of Stanford Entrepreneurial Students,

25   BASES.  I met him through that.  And he also -- actually

1    recruited him to join the fraternity.  So we -- I knew him

2    through that as well.

3    **Q.**  Did the three of you live together in the Stanford

4    fraternity house at around the same time?

5    **A.**  I was roommates with Tommy for a couple of quarters at

6    Stanford.  But we did live together in the same building.  I

7    was never roommates with Brandon, but we also overlapped, I

8    think, for -- I think his sophomore year and my senior year,

9    we were in the same building.

10   **Q.**  How long were you at Stanford?

11   **A.**  I was there for five years.

12   **Q.**  And what degrees did you get in the five years you were at

13   Stanford?

14   **A.**  There's a option at Stanford called a co-term where you

15   can work on a master's degree at the same time you're doing

16   your bachelor's degree and do -- and do that in five years.

17       A master's degree typically might be two extra years

18   otherwise.  So I did a master's as well as a bachelor's in

19   management science and engineering.  And I graduated in 2007.

20   **Q.**  And so when you graduated, you had both a bachelor's

21   degree and a master's degree?

22   **A.**  That's right.

23   **Q.**  What did you do after you graduated?

24   **A.**  After I graduated, I moved to San Francisco and I took a

25   job at a management consulting firm called Bain & Company.

1   **Q.**   What is management consulting?

2   **A.**   That's a good question.

3        Management consulting is a variety of things.  It's --

4   it's -- well, let me speak about what Bain & Company did

5   specifically in San Francisco.

6        The clients for Bain & Company tend to be tech companies

7   and -- and also -- and also large financial companies.  And

8   what -- what they'll do is a variety of usually strategy-type

9   projects and also board meeting preparation, mergers and

10  acquisition strategy.  It's a -- it's a kind of a bundle of

11  strategic types of problem solving.

12       And coming out of the school, my job was to be an analyst.

13  They called them associates.  But, you know, I'm -- I'm living

14  in PowerPoint and Excel spreadsheets, trying to take data and

15  inputs and turn it into slides.

16  **Q.**   Okay.

17       How long did you work at Bain & Company for?

18  **A.**   I was there for two years until 2009.

19  **Q.**   And then where did you go in 2009?

20  **A.**   2009, I -- I started working at a private equity firm in

21  Boston called Audax Group.

22  **Q.**   So we've heard a whole lot about the venture capital

23  industry.  You just used the word private equity.  Can you

24  explain what a private equity firm is generally and what Audax

25  did specifically?

ROTHENBERG - DIRECT / FAKHOURY

1    **A.**  I can try.

2         When -- that type of categorization of a company has to do

3    with the -- so what they -- what they have in common, private

4    equity, venture capital, real estate is a form of private

5    equity too.  What they have in common is the source of the

6    capital.

7         So public markets raise money publicly.  Anybody can buy

8    it.  Whereas private markets have a whole different set of

9    things going on.  But you can't just go to a stock exchange or

10   something and buy in.  And so we call that -- broadly we call

11   that private equity.

12        Within private equity, there -- there are buckets, I would

13   say.  You know, different -- different divisions, the large

14   of -- largest of which is real estate.  That's when people

15   talk about private equity, a lot of times that's a real

16   estate -- it's an asset class.

17        Then the second biggest group is leveraged buyouts.  So

18   these are firms -- these are private equity firms, we call

19   them, that will typically purchase majority shares in

20   smaller -- small to mid-size companies that are still private,

21   and try to help them grow, try to help them make more money.

22   Usually -- often try to get them to an IPO state so that they

23   can -- we call that liquidate when they get -- when they get

24   money.

25        And then the smallest of the private equity types of asset

1  class by far is venture capital.  And this is a -- when you're

2  looking at it from an overall perspective, a very small amount

3  of money relatively speaking goes to people we call venture

4  capitalists who -- who take -- who take the money that they

5  raise privately and then they invest them in very early stage

6  companies.  It's a very small portion of the pie.

7      But back to your question about Audax.  That's a fairly

8  large portion of the pie that is buying -- it's really buying

9  and selling companies.

10 **Q.**  How long did you work at Audax for?

11 **A.**  I was there for two years.

12 **Q.**  And what did you do after Audax?

13 **A.**  After Audax, I went business school at Harvard Business

14 School which was down the street from Audax.

15 **Q.**  Why did you -- well, let me back up.

16     I take it at Harvard you were studying to get a -- an MBA,

17 a Master's in Business Administration?

18 **A.**  That's correct.

19 **Q.**  Why did you want to get an MBA?

20 **A.**  Well, a -- in the business world, an MBA is -- it's --

21 it's -- it's a degree that gives you a lot of flexibility.

22 It's a -- it's a general degree.  It's a -- it's a master's of

23 business administration.  And it does open a lot of doors.

24     And the -- the two-year -- the two-year process,

25 educational process of getting the degree is -- well, it was

 1    wildly interesting to me.  It's 450 case studies.  It's a

 2    really cool way to learn.

 3        And I knew a lot of people who had MBAs.  And they always

 4    spoke highly of it.  I never met somebody who went to Harvard

 5    Business School that didn't really appreciate the process.

 6    And I thought that would be a dream.  It was a dream.

 7        And so I applied.  And when I got in, it was a no-brainer

 8    to -- to go.

 9    **Q.**  While you were in business school, were you working also

10    at Audax, or were you a full-time student?

11    **A.**  Oh, I was a full-time -- it's a full-time program.  I was

12    a full-time student.

13    **Q.**  Okay.  Do you remember taking classes with Professor Lena

14    Goldberg?

15    **A.**  Absolutely, I do.

16    **Q.**  How was -- how was that?

17    **A.**  She's a phenomenal professor.  I took multiple classes

18    with her.  She was -- she was amazing.

19    **Q.**  When you went into business school, did you have an idea

20    of what you wanted to do after business school?

21    **A.**  I -- I did not.  I mean, I had, you know, some idea of a

22    variety of things, but I really wanted to -- that was what --

23    partly what I wanted to do was figure that out.

24    **Q.**  At some point while you're in business school, did you

25    decide to start your own venture capital firm?

1    **A.**   Yes, I did.

2    **Q.**   Walk us through the thought process behind that.

3    **A.**   The first year at Harvard Business School was a general

4    program.  Everybody takes the same set of classes.

5         And the second year is all electives.  And there's quite a

6    variety.  And you can -- you can start to specialize your

7    second year.

8         And in my case, coming from Stanford background, I had

9    taken a lot of entrepreneurship classes at Stanford.  I was

10   very interested in that.  And a lot of the students that I met

11   through the various student organizations, especially the

12   Business Association of Stanford Entrepreneurial Students, and

13   especially the fraternity I was in, there were so many people

14   who went to go start companies.

15        It was -- I think I knew at that time -- when I went to

16   business school I was 27, and I think there were some -- I

17   counted something like 50 of my friends that had built

18   valuable businesses, which is still unbelievable.

19        And so I was interested in learning more about

20   entrepreneurship.  I did -- I did have some background in the

21   consulting and the finance, and I was looking for ways to

22   combine those passions, those interests.

23        So my second year, I took as my electives, I took as many

24   entrepreneurship classes as I could take.  And that did

25   include -- Professor Goldberg's class was the legal aspects of

1    entrepreneurship.  That was very interesting.  And she also

2    had legal aspects of management.  I took that too.

3        And I also took -- I mean there were -- there were -- you

4    didn't ask what classes I took, but there were -- there were

5    lots of entrepreneurship and venture capital classes.

6        And in the course of doing that, I was talking to

7    professors and other students, and -- I did -- there was a --

8    I do remember a demarcation point the first time that anybody

9    ever told me I -- I should consider being a venture

10   capitalist, if I may.

11   Q.  Well -- well, let me ask you this:  Had you ever worked in

12   the venture capital industry before?

13   A.  I had not.

14   Q.  You were just explaining a second ago about a demarcation

15   point where it really crystallized for you.  So you kind of

16   throw that out there, your decision to be a venture

17   capitalist.

18       So -- so what was that demarcation point?

19   A.  The point I was referring to was when I first even thought

20   about it.  I never -- I never considered venture capital as a

21   role I would do because at Stanford, I did get to meet some

22   venture capitalists.  I ran a speaker series.  And we got to

23   invite -- the two years that I was running it, I got to invite

24   46 speakers, and there were a lot of entrepreneurs and some

25   venture capitalists.  And so I had -- I had met venture

1    capitalists.

2        But they were all people who were very experienced.  And

3    almost all had built companies before, which makes a lot of

4    sense, if you're going to invest in companies, to know what

5    that process is like.  So that was the template for me about

6    what a venture capitalist was.

7        And the demarcation point where I -- where somebody first

8    told me that was a different professor.  When I was talking to

9    a different professor about what could be a good fit for me,

10   I -- I mentioned that there were 50 of my friends that had

11   built companies, and I listed some of them.  And that includes

12   Facebook and Instagram.  And the professor said that's -- he

13   said that's really unusual.  You should -- you should consider

14   trying to invest in those people.

15       And I said what do you mean?

16       He said, well, maybe you should start a venture capital

17   firm.

18       So that wasn't the time when I decided to do it, but that

19   was the first time somebody that -- you know, an authority

20   figure that I respected told me you really need to think about

21   this.

22   Q.  You just explained you'd never worked in the venture

23   capital industry and that you were starting to have an

24   interest in it.  So I guess I want to ask why start your own

25   venture capital firm instead of joining an established venture

1    capital firm right out of business school?

2    **A.**  Well, venture capital jobs are extremely hard to get.

3    There's very few of them.  And if your parents are not in the

4    industry, it's not very -- not very easy to get a job.  That's

5    typically how, in my opinion, it seems to be largely how

6    people get jobs in that industry.

7         So first of all, I'm not sure anyone would have hired me.

8         And secondly, there seemed to be a window of opportunity

9    where a lot of the people that I knew were building -- so I

10   had a personal network.  And the people that I knew were

11   starting companies.  It wasn't just the 50 I mentioned.  There

12   were others starting companies.  And I knew they were planning

13   to do that.  I was -- talked to people all the time about what

14   they were doing and what they wanted to do.

15        So I had in my mind also another list of several dozen

16   people that I thought I would love to invest in if I could.

17   They seemed to have some of the -- a lot of the same qualities

18   and traits that these other people had.  And it seemed like my

19   window for investing in these types of people had not passed.

20        So even though I missed the boat on the first 50, maybe --

21   maybe I wouldn't have to miss the boat on the next 50.  And --

22   so it had to do with my personal network.

23        If you go work for another venture capitalist, they don't

24   typically hire you because of your network.  They hire you to

25   be an analyst kind of like I was at Bain and at Audax.  And

1    then you work your way up.

2        And typically if you do that path, you don't ever get to

3    be a partner.  That's not what that path is.  You get to work

4    there for a couple years, then they kick you out, and you got

5    to go do something else.

6        Nobody really wants a venture capitalist that hasn't had

7    real world experience.  So you could do that, and then you're

8    thrown back into the -- into the pond.  And then you go do

9    something else.

10        And that's still a good job.  I would recommend it if

11    anybody can -- you know, has an interest in venture capital

12    and wants to do that.

13        But for me, if I wanted to try to invest in these people I

14    knew that were building companies, it looked like I needed to

15    take responsibility for that myself, see if there was interest

16    from other people in trying to fund that, and try to -- try to

17    put that together.

18    Q.  So at some point while you're in business school, you

19    decide to start your own venture capital firm.  And did you

20    get help on that endeavor from Professor Goldberg?

21    A.  Absolutely.  She was extremely helpful.

22    Q.  How so?

23    A.  In -- in the class that I took from her -- so there's a

24    couple ways.

25        One, the curriculum that she taught was -- was almost --

1    it was almost like mapped onto how to create a firm extremely

2    well.  It was -- it was nuts and bolts.  It was like:  You

3    have to file these forms, you have to -- you have to talk to

4    these people, you need to hire lawyers.  It was -- it was very

5    practical.

6        A lot of the Harvard Business School types of classes

7    are -- are case studies, which are examples.  So you go

8    through like, you know, they'll give you 15, 20 pages of -- of

9    very well thought out research type of case, and they'll try

10   to have you imagine that you're in that situation.  And

11   that's -- that's pretty interesting.

12       But her class was more practical like here's what you do.

13   And so she let me in that class, in both classes, and we did

14   an independent study.  She let me actually start building my

15   firm.  And she -- and she -- and we talked about that all the

16   time.

17   **Q.**  Did she help connect you with attorneys to help you

18   prepare documentation for your -- your first fund?

19   **A.**  She didn't make any introductions, but it was very clear

20   that the first thing you do is you hire an attorney, which is

21   what I did.

22   **Q.**  Which attorneys did you hire for that first fund?

23   **A.**  Well, I had no experience in venture capital.  And I -- I

24   knew that was a huge gap.  And so getting counsel and advice

25   is the best way to -- I think the -- I still think the best

 1    way to try to address that.

 2         And so I -- I -- I asked around to see who had really good

 3    reputations in Silicon Valley for, you know, big firms that

 4    could help startups.  And that also that believed in --

 5    believed in helping companies before they're big.

 6         So a lot of big firms only want to take big clients

 7    because they can pay them a lot.  But there are some firms

 8    that are willing to start with you when you're small and help

 9    you grow so that -- so they're still there -- you know, I

10    think so that they still have you as a client when you're

11    bigger.

12         And I found a law firm willing to do that called Orrick.

13    There's a few other names, I think, in there, but they go by

14    Orrick.  And they were very enthusiastic about my project

15    and -- and being my law firm.  And, you know, I think three of

16    the partners at the firm actually also invested.  They were

17    that supportive.

18    **Q.**  Okay.  Let's -- let's shift gears a little bit now and --

19    and get into some more specifics about the venture capital

20    fund and the venture capital firm that you started.

21         So it sounds like in 2012 or maybe in the early 2013,

22    you've decided to start this venture capital firm.  You named

23    it Rothenberg Ventures.  Why did you name it after yourself?

24    **A.**  Naming a firm is an interesting project.  I -- I mean my

25    process was I first -- first brainstormed a whole bunch of

1    names.  I talked to other people for ideas about, you know,

2    what kind of differentiation, what kind of thing we could try

3    to accomplish with the name.  And narrowed it down to two or

4    three.

5        And -- and then did -- and then did a search for -- you

6    know -- well, my lawyers -- well, I came to believe that you

7    need to look into whether your name is conflicted, if somebody

8    else has it or if they're too close to your -- to your

9    company.

10        And so the first names I really liked were in that

11    category.  Somebody else had them or something close enough.

12    So I couldn't do that.  And then I tried to do a few more, and

13    all the names I was interested in were taken.  So it's

14    difficult.

15        But then my first investor and one of my Stanford

16    professors both told me that I should consider naming it

17    Rothenberg Ventures, for two reasons, and -- well, I did name

18    it Rothenberg Ventures for these two reasons, which are, one,

19    you are allowed to call a firm your name.  That's even if

20    somebody else has that, that's okay.

21        So I didn't have to worry about stepping on anybody's

22    toes.  And two, from discussions with founders, I came to

23    believe that it was going to be a bit difficult for me to get

24    meetings if I was Mike Rothenberg from Red Mountain Ventures.

25    But if I was Mike Rothenberg from Rothenberg Ventures, I would

1    get meetings.

2        And -- and then, you know, that also makes it a more

3    valuable investment to the investors.  They would -- they

4    would be more likely to invest in something where they thought

5    I could get meetings.

6        So it became pretty obvious at that point that the best

7    path forward, especially given my age, was to call a spade a

8    spade.  This is -- I'm the only one here right now.  It's Mike

9    Rothenberg of Rothenberg Ventures.  Here I am.

10   **Q.**  You just said a second ago it would be hard to get

11   meetings, and you mentioned part of that being because of your

12   age.  Can you elaborate on that?  What do you mean by that?

13   **A.**  The most important project for venture capitalists is to

14   get access to identify and get access to great private

15   companies.  It's very difficult.

16       There's not -- well, by nature of it, there's not public

17   information.  And you have to -- you have to network.  You

18   have to talk to people.  You have to learn about what's going

19   on in the industry.  And you have to learn about these

20   startups.  And you have to -- also eventually have to be able

21   to meet thousands of them so --

22       Is everything okay?

23           **THE COURT:**  Everything is okay.  But members of the

24   jury, we're going to do as we've been doing.  I was waiting

25   for Mr. Rothenberg to finish.  We're going to take a stretch

 1    break.

 2                        (Stretch break.)

 3            **THE COURT:**  Thanks, everyone.

 4            **MR. FAKHOURY:**  May I continue, Your Honor?

 5            **THE COURT:**  Please.

 6            **MR. FAKHOURY:**  Thank you.

 7    **Q.**  So you talked about part of the reason you named it

 8    Rothenberg Ventures was to help you get meetings, and you

 9    explained a little bit about how -- or you were in the process

10    of explaining a little bit about how your young age might have

11    been an impediment.  And -- and --

12            Actually, let me -- let me shift gears for a second.

13            You talked briefly about wanting to -- that you'd met a

14    lot of people and you had -- you had a lot of associates,

15    friends, acquaintances who'd started their own companies.

16            And I guess my question is, what was the thesis or the

17    idea or the strategy, whatever you want to call it, behind the

18    investments that Rothenberg Ventures would make?

19    **A.**  Well, yeah.  This is a big -- this is a big question.

20            It is extremely difficult and also rare for individuals of

21    any age to build an enterprise that grows rapidly and -- and

22    can generate large returns.  It's extremely difficult.

23            The startup industry is built around the idea that there

24    are a few of these each year, few of these companies that grow

25    to be very large and valuable.  And if you can invest in a

 1    portfolio of companies, 20 to 25 in a fund, that if you can

 2    hit one or two of these, then the overall fund can generate

 3    returns from investors, which is what they're looking for.

 4        I'm sorry.  Could you ask the question again?

 5    **Q.**  Well, let me ask -- let me -- let me ask a -- let me ask

 6    it in a different way.

 7        Did -- did Rothenberg Ventures have an investment focus?

 8    **A.**  I see.

 9        What I was getting at is that there was -- there was --

10    there was a really important trend happening, I would say,

11    from maybe the time I graduated in 2007 through the time that

12    I started the firm which was 2012.  There was -- something was

13    happening which was the cost of building a business was

14    plummeting, tech business.

15        Before that, if you had wanted -- really before 2007, if

16    you wanted to build a tech company, you had to raise at least

17    $5 million because you had to build out all of the

18    infrastructure.  And by that I mean, you know, servers and all

19    this other stuff.

20        And so, you know, with Amazon Web Services and other types

21    of infrastructure that came along, you could -- as a startup,

22    you could scale as you built.

23        So that was a big change, meaning you needed a lot less

24    capital to get going, and if it was going, you could scale it

25    as you grew, which is a tremendous advantage.

1    That's what was happening then.  That meant that people

2    who wanted to start building companies with a small amount of

3    money, which relatively speaking, which would be in this case

4    less than $2 million, you could actually have a viable

5    business.

6    And so that opened the door for younger -- in my opinion,

7    for younger founders to try that out.  And I think that is why

8    there were a lot of younger people building more valuable

9    businesses because they were able to do it with less money.

10    And that's partly why, as a 27-year-old, my -- there were

11    a lot of people I knew that were doing that.  If it had been

12    ten years prior, that wouldn't have been the case, I think.

13    So I -- I think people, you know, roughly speaking between

14    the ages of -- well, born somewhere between 1982 and 1996 are

15    called millennials.  So all these people -- these -- there's

16    been some comments, not all positive in this trial, about

17    millennials.  But it's a good group, I promise.

18    These people were building companies and it was really

19    exciting.  And I knew a lot of them.  So my -- I believe that

20    the niche that I could try to hit that the experienced venture

21    capitalist couldn't hit as well was to invest in millennial

22    founders at an early stage.

23    Q.  When did you start raising money for the first fund?

24    Which during the trial we've sort of referred to

25    interchangeably as Fund I and the 2013 Fund.  So when did that

1  fundraising process start?

2  **A.**  The -- the summer -- there's one summer in between the two

3  years at business school, in my case this was 2012.  And

4  during that year, most -- most people try to test out what

5  they want to do when they graduate.  It's kind of a -- it's an

6  opportunity to do that.

7      So you can take an internship.  You can start a company.

8  You know, you could do something there.  And so I decided to

9  try to test out this idea about whether or not it might be

10 possible to build -- to build a venture fund.

11     So I spent that summer having conversations with people.

12 And at the end of that, decided in September of 2012 to -- to

13 start my firm.  And that's when I started raising my first

14 fund.  That -- but I didn't close the first fund until after I

15 graduated in 2013.

16 **Q.**  Okay.

17     Who were some of the early investors in that first fund?

18 **A.**  The first fund, I had about 50, five-zero, investors.  And

19 that included -- it did include Lena Goldberg and other

20 professors at Stanford and Harvard.  It included people that I

21 knew from Audax, from Bain & Company, people from Stanford.

22 Really just, you know, people that I had met along the way.

23     There were a lot of people that said they were -- they

24 couldn't wait to invest in me.  I -- it was a really very cool

25 time to -- to realize that that was there.  I didn't -- I

1    didn't know that all these people were going to be so

2    supportive.  It was really, really neat.

3    Q.  In -- throughout the trial, we've seen some of the -- the

4    paperwork connected with the formation of the first fund.  And

5    it had a home address of Tom Leep in Menlo Park.

6        Who -- who was Tom Leep?  Or who is Tom Leep?  Excuse me.

7    A.  At Stanford I was very close to Tommy Leep.  And I

8    mentioned we were roommates.  And in the course of our

9    friendship, I met his family, his whole family.  And his dad

10   is Tom Leep Senior.  Seemed to be a big fan of me.

11       And when he found out I was trying to start a venture

12   capital firm, he -- he offered to let me use his -- their home

13   address as my headquarters to start out.  Because I started

14   out at Harvard.

15       I didn't -- I knew that -- I thought that I would want to

16   build my firm where the epicenter of building startups is.

17   That's the Bay Area.  It's still the Bay Area.  It was then.

18   It is now.

19       And -- and so -- so to help me get started, he offered to

20   let me use their -- their home address as my official address.

21   So he -- you know, he got all the mail and aggregated that for

22   me.  I think he read it all too.

23       But that's how -- that's how that got started.

24   Q.  For that first fund, who decided on what companies would

25   be invested into?  In other words, who decided on what -- on

 1    who the portfolio companies would be?

 2    **A.**  I did.  The buck stopped with me.

 3    **Q.**  For that first fund, what was the management fee structure

 4    for that first fund?

 5    **A.**  Well, building a firm is difficult and expensive.  And I

 6    also was building a very -- at first a very -- it was very

 7    small.  I -- you know, there's a lot of venture capital funds

 8    that have 50 to 100 million dollars plus under management.

 9        In this case, my target for the first fund was 5 million.

10    It's extremely small.  And so to get that started, it was more

11    of a budget-based approach.  The idea was to charge one fee

12    upfront, and it was 17.75 percent.

13    **Q.**  We've -- we've heard some testimony that sort of the

14    market standard, or what's typical in a venture capital fund,

15    is the fee -- the management fee is 2 percent a year every

16    year for the ten-year life of the fund.

17        And it sounds like what you just said was your fee was --

18    the first fund's fee structure was different to help sort of

19    build the fund from the ground up; is that -- is that right?

20    **A.**  I think I would say it a little bit differently.

21    **Q.**  Okay.

22    **A.**  When talking to other venture capitalists and also

23    potential investors in my fund, what I came to learn was that

24    it -- that most people believed and I came to believe that it

25    was very difficult to run a venture firm for less than a

1    million dollars a year.

2        And so the bigger firms can -- if they're 50 million-plus,

3    they just charge 2 percent, which is a million dollars, and if

4    they're bigger than that, they charge more.

5        But there's -- there's a lot of costs of running a venture

6    firm no matter what the size is.  A lot of it is legal costs.

7    And -- and so there was less of an appetite to invest in my

8    fund if I was going to start out with less than a million a

9    year.  But because I wasn't going to be able to raise

10   50 million, that was a challenge.

11       So the way to solve that was to do an annual fund, charge

12   a higher fee upfront, don't -- instead of the 2 and 20, do it

13   all upfront, and then -- and then raise another fund the next

14   year.  That's how we solved that.

15   **Q.**  Okay.  How much money were you able to raise for the first

16   fund?

17   **A.**  It was just under 5 million.

18   **Q.**  Was there anyone helping you bring in investments for that

19   first fund?

20   **A.**  No. I mean there's a network of people, you're talking to

21   people all the time, but I was responsible for that and I was

22   the one raising the money.

23   **Q.**  What were some of the companies that the first fund

24   invested in?

25   **A.**  One of the first investments in 2012, actually before the

1    fund even closed, was SpaceX.  There was also a very early

2    investment in -- I think the first investment in a company

3    called Robinhood.  There was an early investment in a company

4    that I think became a billion-dollar company called

5    Matterport.  And about at least 20 others.

6    **Q.**  Okay.

7        It sounded like --

8    **A.**  Chubbies has been mentioned a lot.

9    **Q.**  Okay.

10   **A.**  That was in that fund.

11   **Q.**  Actually let's talk about Chubbies for a second.

12       You generally had talked about your investment strategy

13   being focused on startups, and we've heard a lot about VR and

14   AR and frontier technology.

15       Chubbies, they make clothes, right?

16   **A.**  E-commerce company that makes clothes.

17   **Q.**  Okay.  Was that an investment that was less about the

18   technology and more about the people behind it or the network

19   behind it?

20   **A.**  Absolutely.  I would -- I would say that in terms of how I

21   think about investing, it's always the people first, no matter

22   what they're building.  Certainly in the case of Chubbies.

23   **Q.**  Can you elaborate on that as it pertains to Chubbies

24   specifically?

25   **A.**  Yes.  It's extremely difficult to build a startup.  I

 1  mentioned that.  I may mention it again.  And to do it, you

 2  have to -- well, you have to be willing to walk through walls.

 3  There are walls everywhere.  Everything is difficult.  And you

 4  have to just solve problems, you know, like there's no

 5  tomorrow.

 6      And to do that, you have to have a lot of energy, a lot of

 7  good ideas.  It's really difficult.

 8      And so one of the things that I began to notice about the

 9  people who were succeeding at this is that they -- they

10  wouldn't quit.

11      I -- I believe that every startup has died, all of them,

12  including Facebook, including all the big ones, they all died

13  at some various moment.  And the founder in each circumstance

14  refused to let that happen, and they worked through it.  And

15  sometimes they do and sometimes they don't.  Usually they

16  don't.

17      But I believe that I knew a lot of people that I had

18  noticed that even in their life, they -- they just -- they

19  have positive attitudes.  They just -- you know, they get bad

20  news, they just work through it.  And they do it with a --

21  with a big energy.  And they do it by help -- you know,

22  getting help from their network.

23      And it is really inspiring.  And you know, if you know

24  people like that, you can't wait to invest in them.  You can't

25  believe how lucky you are if you get to invest in these

1    people.

2        And I notice they also were great at building companies.

3    My goodness, they were great at building companies.  And I

4    can't believe I got to know so many people like that.  It's

5    really a privilege.

6        So back to Chubbies.  I knew one of the founders really

7    well from Stanford.  He was also in my fraternity.  My

8    fraternity also had the guy that built Instagram.  This was a

9    group of people that built companies.

10        And this guy, his name is Rainer Castillo, is a force of

11    nature.  And it was -- he was the whole time I ever met him.

12    Anything he wanted to do, he got it done and he got it done

13    the right way.  It was impressive.

14        And this guy said I am going to build a company.  He came

15    from Gap so he had some specific knowledge of this particular

16    industry.  But he said I am going to build a company that has

17    the most radical shorts known to mankind.

18        And I couldn't believe anybody would say that.  What a

19    cool thing to say.  It's not -- never something that would

20    occur to me.

21        And then he -- he lived that.  He embodied that.  And my

22    goodness, he built that.

23    Q.   Okay.  So we've been talking a lot about the first fund,

24    the 2013 Fund.  And at some point, you graduated Harvard

25    Business School, right?

1    **A.**    I did.

2    **Q.**    When was that?

3    **A.**    2013.

4    **Q.**    Would that be sometime in like May or June of 2013?

5    **A.**    Graduation was in June of 2013.

6    **Q.**    Okay.

7         And after you graduated, what'd you do?  Where'd you go?

8    **A.**    I mentioned that I had started my firm and raising for my

9    first fund.  I had been doing that my second year at business

10   school.  So I was working while I was there.  It was very

11   time-consuming.

12        And so I -- I moved to San Francisco and focused on the

13   firm full-time.  It was the first time I got to focus on it

14   full-time.

15   **Q.**    When you moved to San Francisco, did you set up a

16   Rothenberg Ventures office?

17   **A.**    I did.

18   **Q.**    Where?

19   **A.**    Where was the first San Francisco office?

20   **Q.**    Yes.

21   **A.**    I think -- well, very early on, I don't know if it was

22   technically the first place, but it was -- it was really my --

23   my condo.

24   **Q.**    Did -- did, at some point, a more formal office get set up

25   outside of your condo?

1    **A.**   Yes.  We outgrew that pretty quickly.  I mean when you

2    have people that you're working with also, you know, coming to

3    your house, it's -- you don't get any privacy and it's kind of

4    stressful.

5        So as soon as possible, started renting some office space

6    in -- in SOMA, which is the South of Market neighborhood in

7    San Francisco.

8    **Q.**   Okay.  You mentioned a moment ago your condo.  That -- the

9    address of that condo was 712 Bryant Street in San Francisco,

10   right?

11   **A.**   That's a very good guess, that's correct.

12   **Q.**   And was Tommy Leep living with you at that time?

13   **A.**   Not when I started the firm, but he did come to live with

14   me soon after.

15   **Q.**   Okay.

16       We've -- we've talked about the first fund, the 2013 Fund.

17   Let's talk about the second fund, the 2014 Fund.

18       When did fundraising start for that fund?

19   **A.**   Well, I think everybody invests in your first fund is

20   always asking about if you're going to do a second fund.  So I

21   mean, you know, I always assumed that I would raise a -- a

22   second fund.  And I'm sure I was telling people about the

23   intent to do that.

24       But as far as like technically starting the fund, the -- I

25   think the way I think about what that moment is, is when you

1    engage with a law firm and you say please help me prepare some
2    documents, and this is -- this is what -- this is what the
3    fund is going to look like.

4        And then you talk to investors and try to come up with an
5    agreement that reflects your strategy, what you want to do,
6    and what all these people want to invest in.

7        That started in the fall of 2014.

8    **Q.** At that time, was Rothenberg Ventures growing?  And I mean
9    in terms of staffing, were more people joining the company?

10   **A.** There was a lot of excitement about the portfolio that I
11   was able to put together for the first fund and the kinds of
12   companies that wanted to have me as an investor.

13       So I mentioned before you have to be able to identify some
14   of these really good opportunities.  But that may not even be
15   the harder part.  The harder part is for them to want you to
16   invest.

17       These companies have a lot of options.  There's a lot of
18   great venture capitalists.  There's a lot of venture
19   capitalists with a lot of money and with successful track
20   records.

21       And if you're going to get the opportunity to invest in
22   these companies, they have to want you.  So the first fund was
23   a proof of concept that these companies wanted me involved,
24   and they were also growing readily rapidly.

25       So it was -- I --

1    Q.   Okay.

2    A.   Remind me what I was -- I'm sorry.

3    Q.   No problem.  Let me ask it -- it sounded like the first

4    fund, the 2013 Fund, Rothenberg Ventures pretty lean and

5    scrappy.

6    A.   Oh, was I growing.

7    Q.   Were you growing?  Were you hiring people to -- to help

8    with the second fund?

9    A.   Absolutely.

10   Q.   How many people were working for Rothenberg Ventures --

11   you mentioned the fall of 2014.

12        By the fall of 2014, how many people were working at

13   Rothenberg Ventures?

14   A.   Tom Leep Senior was the first to join.  He helped out with

15   accounting and finance from pretty much the beginning.

16        And then my first analyst was a gentleman by the name of

17   Dylan Flinn.  He came from Electronic Arts.  It was his first

18   venture capital foray.

19        There were just a small handful of people.  It was just a

20   few.

21   Q.   What was the target size of the second fund, the 2014

22   Fund?

23   A.   I don't -- you know, I don't remember what we started

24   with.  Usually you want to raise, I mean, as much as money as

25   you can.  But we ended up raising a little bit more than

1    10 million.

2        So I probably wanted to raise 20 or 25, but it ended up

3    being a little more than 10.

4        **MR. FAKHOURY:**  I'm going to ask Mr. Torres to pull up

5    Exhibit 19.  This is in evidence.  And can we go to page 2.

6        Actually, I'm sorry, can we go back up to the top here.

7                    (Exhibit published.)

8    **BY MR. FAKHOURY:**

9    **Q.**  Mr. Rothenberg, I'm showing you -- this is page 1 of

10   Exhibit 19.  And this is a Summary of Principal Terms for

11   Rothenberg Ventures Fund II.

12       Do you see that on your screen?

13   **A.**  I do.

14       **MR. FAKHOURY:**  Okay.  Now can we scroll to the second

15   page.

16       Or actually, you know what?  Let's just leave it here.

17   **Q.**  I wanted to ask you about the management fee for the

18   second fund.

19       So you just explained a moment ago that the management fee

20   for the first fund was 17.75 percent one time and upfront.

21   That was the 2013 Fund's management fee.

22       The 2014 Fund had a different management fee structure.

23   And it looks here that it was 2 percent per quarter for two

24   years, which would be 8 percent per year for the first two

25   years, plus half a percent per year for the remaining eight

1    years for a total of 20 percent over the ten-year life of the

2    fund.

3        And my first question is why did the management fee

4    structure change from Fund I to Fund II?

5    **A.**  It goes back to what I said earlier, that you really need

6    to raise, you know, a million dollars per year or something

7    like that.

8        So if the target is 10 to 20 million, which is what it

9    says on the first page, then you can -- you can charge less

10   than the 17.75 percent.

11       The goal -- the goal is to get to scale.  You get to

12   scale, you want to get to 50 million and 2 percent a year.

13   That's what you want to do.

14       You don't want -- you don't want to -- it's -- the more --

15   we did have a lot of terms that were different and, you know,

16   talked to all the investors about that.  But the fewer terms

17   that you can get that are unusual, the better.  It makes it

18   easier to talk to people.  It makes it easier to get on the

19   same page.

20       And, you know, I guess there -- I guess there was some

21   kind of risk that if your contract is really different, that

22   the government could misinterpret it and this could happen.

23   So you want to be as close as possible, not because you have

24   to, but because it makes things easier.

25       So for this fund, it was -- thinking we would raise 10 to

1    $20 million, you can charge -- you can charge less upfront.

2    This was designed to do that.

3        So, you know, the fund was around 12 million.  If you're

4    charging 8 percent a year, you're still -- you're still around

5    a million.  But it's not as high of a percent.

6    **Q.**  Okay.

7    **A.**  It's a budget-based approach as opposed to the

8    percentages, but you have to express it in percentages for

9    these fund documents.

10   **Q.**  Okay.  You said to get to scale.  I -- what do you mean by

11   that?

12   **A.**  Let's -- so let's just say it takes a million dollars to

13   run a fund a year.  It's not quite that simple, but just for

14   the sake of this.

15       If you have 50 million and you're -- and you're charging

16   1 million to do that, that's 2 percent.  If you have 5 million

17   and you're charging a million to do that, it's 20 percent.

18       So if you're the investor, you would prefer to have

19   2 percent of your money.  It's -- it's -- when I say scale,

20   when there's more investors and more capital, they share the

21   costs more so they have more of their -- ideally more returns.

22       So that's why you want to get to scale.

23   **Q.**  Who -- in the -- in the process of drafting these

24   documents and changing this management fee, what was the

25   process at Rothenberg Ventures for making changes like this?

1    **A.**   It's really time consuming to do these fund documents.

2        You know, I think by the fourth fund, it was hundreds of

3    pages.  And -- in trying to accommodate institutional

4    investors and trying to accommodate all the different things

5    people ask for.

6        What's the process, though?  This is -- so as the manager,

7    it's my discretion and my business judgment to try to decide

8    what terms would go into a contract.  I do that by talking to

9    the investors, by getting their feedback, and by talking to

10   lawyers.

11       So it's a -- it's a bit of a -- well, it's really a

12   negotiation.  And this fund was also -- it's called fund

13   formation is a business practice of certain legal

14   professionals.  So Orrick has a fund formation practice.  I

15   worked with Orrick to -- to take the feedback and the investor

16   interest from the first fund and build the second fund from

17   that.

18       So it does have a lot of overlap, but it's different.

19   Each fund was different.

20       **MR. FAKHOURY:**  Mr. Torres, we can take that down.

21   **Q.**   So we're now in 2014.  And that was the first year that

22   Rothenberg Ventures held Founders Field Day.  And I wanted

23   you -- or I want to ask you to explain what was the idea

24   behind Founders Field day?

25   **A.**   I mentioned before that the most important thing that a

1    venture firm can do is to try to identify these great

2    companies, potential great companies, and to -- to get the --

3    the founders' willingness to let you invest.

4        It is -- it is a privilege to invest.  You can't just say

5    I'm going to invest in you.  They have to want that.

6        And what I was learning in the first year or two is that

7    what the founders wanted besides money, which I was not able

8    to compete with the bigger firms on that, the bigger firms all

9    had more money.  So if I was going to compete -- and they

10   actually all had tremendously more experience.

11       So if you're trying to build a company where your

12   competitors have more experience and more money, you have to

13   find something that you can try to compete on.

14       And in this case, it was my network.  So the idea is I

15   know a lot of people that you may want to know, and I will do

16   my best to introduce you to all of those people, including the

17   other venture capitalists.

18       And -- and so if you let me invest in you or -- or have

19   the right to invest in you or think about investing in you, I

20   will do my best to facilitate the introductions, to help you

21   meet these people.

22       Another aspect is that your time does not scale.  Or, you

23   know, I have 24 hours in a day.  My observation is most people

24   seem to be in that situation.  So if you are trying to scale a

25   network, you can't spend all of your time making one-on-one

1    introductions.  It's impossible.  So you -- and you also want

2    to remove yourself as a middleman ideally.

3        So to do that, you bring people together.  Turns out

4    people know what to do when they're in the same spot.  If you

5    can have a -- a dinner, people know how to talk to people and

6    make the introductions they need if you can get some people

7    there that they want to know.

8        If you can -- if people are busy, then you may have to go

9    to a sports game for them to come.  But then if you can do

10   that, then they might be there for three hours, they might

11   make all those introductions, and there might be a ton of

12   deals that happen at that time.

13       If there were fewer than 100 deals that happened at a

14   Warriors game, I would be stunned.  It's one of the best

15   things you can possibly do to get people together.

16       And Founder Field Day was the best of all of those events.

17   Founder Field Day was tailor -- was tailored specifically.

18   Each Founder Field Day had more than 100 founders, usually

19   more than 200 founders and all of the people they wanted to

20   meet.

21       And if -- if they couldn't do a year of networking in a

22   day, they were -- they must have been asleep.  That's what

23   Founder Field Day was.

24   Q.  Was there a limited partner meeting at the 2014 Founders

25   Field Day?

1  **A.**  Absolutely.  Because Founder Field Day was the most

2  important day of the year for us, we wanted to do as much as

3  we could.

4      So we also invited all of our investors, very transparent

5  and open about letting them meet those companies.  A lot of

6  people who invested in Rothenberg Ventures wanted to invest in

7  Rothenberg Ventures to get access to our companies.

8      We let them do that themselves.  We didn't stand in the

9  way.  Some of how we did that was by inviting them to Founder

10 Field Day.  Most of the investors came.  So we had an investor

11 meeting which made it even more attractive for them to come.

12     And there would be different things going on, you know,

13 investor meetings.  Entrepreneurs would be having seminars.

14 And there's really quite a few -- you know, it was quite a few

15 opportunities for people, no matter who they were or what they

16 were interested in, to -- to make all those business

17 relationships they wanted.

18 **Q.**  How many -- and I know you can't give a specific number,

19 but I mean, estimate how many people do you think attended the

20 first Founders Field day in 2014?

21 **A.**  Probably 400.

22 **Q.**  Were there sponsors for Founders Field Day?

23 **A.**  Yes.

24 **Q.**  Who?

25 **A.**  Hewlett Packard was a big sponsor.  Silicon Valley Bank.

1    Perkins Coie.  Baker Avenue.  There were probably a dozen

2    others, too.

3    **Q.**  Perkins Coie, that's a law firm?

4    **A.**  It is.

5    **Q.**  About a month ago at the very beginning of our trial, the

6    first witness, Tommy Leep, testified about a Third Eye Blind

7    concert.  What was the thinking behind the Third Eye Blind

8    concert?

9    **A.**  So our -- really our biggest sponsor for Founder Field Day

10    from 2014 to 2016 was Hewlett Packard.  And they -- they

11    were -- they were interested in -- to some extent, they were

12    interested in being very hands-on with the types of activities

13    we did.

14        So in particular, they wanted to see -- they actually

15    asked us to do a concert.  And they were -- they wrote a

16    really big check to help make sure that happened.

17        And I mean at -- at the end of the day, the Founder Field

18    Day event itself was almost entirely business networking and

19    seminars.  You could -- you could -- if you wanted to, you

20    could swing a bat at home plate, which was really cool.  I

21    never got to do that.  I mean I could have, but I didn't make

22    time for that.

23        But other than that, it was almost entirely business

24    networking.  So the idea was that after that, could go do

25    something really fun.  And that -- in this case, it was go to

 1   a Third Eye Blind concert at the Fillmore sponsored by HP.

 2         **THE COURT:**  Mr. Fakhoury, it's been about another

 3   half an hour.

 4       Ladies and gentlemen, let's take another quick stretch

 5   break.

 6                         (Stretch break.)

 7         **THE COURT:**  All right.  Thank you.

 8       Mr. Fakhoury.

 9         **MR. FAKHOURY:**  Thank you, Your Honor.

10   **Q.**  Okay.  We've been talking about Founders Field Day.

11   You've already made reference to this, the -- a suite at

12   Oracle Arena where the Golden State Warriors play.

13       What was -- what was the idea behind having a suite at

14   Oracle Arena?

15   **A.**  I noticed in the first couple of years of running a firm

16   that if there were extreme -- well, there were extremely busy

17   people that we were trying to get the attention of.

18       Some of the other venture capitalists that we would like

19   to invest in our companies were very busy.  Some of the people

20   that were thinking about investing in my funds were extremely

21   busy.  And some of the founders that wanted -- I wanted to try

22   to invest in were extremely busy.

23       If you ask these people for meetings, you're lucky if you

24   get a response, but usually the answer is some form of let's

25   try to get that on the calendar in a year.

1    So, however, if you say I'd love to meet with you and also

2    you can come to a Warriors game and you can meet ten other

3    founders while you're there, or investors or the people you're

4    trying to meet, the answer is, "Absolutely.  What day?  I'm

5    there."

6    And so what I found was that if you -- if you bring people

7    together at a sporting event, especially the Warriors from

8    2014 to 2016 and probably a little bit beyond, you could --

9    you could -- you could get people together.

10   And the -- the secret sauce to -- to helping companies

11   grow once you've invested in them is making sure they meet the

12   people they need to meet.

13   I think there was an unusual number of Rothenberg Ventures

14   portfolio companies that did not die in the first 18 months.

15   I think if you look at the 18-month death record of startups,

16   it's at least 85-90 percent.

17   For Rothenberg Ventures, it was -- if it was 10 percent,

18   I'd be surprised.

19   How were these companies surviving 18 months-plus?  They

20   were good companies, but they were meeting the people they

21   needed to meet.  How often did they meet the people they

22   needed to meet at a Rothenberg Ventures event?  All the time.

23   Q.  Okay.  We've talked about some pretty big events like

24   Founders Field Day, the Warriors -- Warriors games.

25   Did Rothenberg Ventures have smaller events?

1    **A.**   Yes.

2    **Q.**   Like what?

3    **A.**   The most common smaller events we had were dinners or

4    sometimes Friday happy hours.

5    **Q.**   And what would -- what would be the purpose of these

6    dinners or -- or happy hours?

7    **A.**   The dinners would be often theme-based.  So, for example,

8    when we were trying to learn about venture capital -- virtual

9    reality to begin with, we would think about all the people

10   that we knew who had expertise in something we wanted to know

11   about.

12        And it was similar.  If you reach out -- and a lot of

13   times we didn't necessarily know these people very well yet.

14   You know, just like kind of heard of them.  That's pretty

15   cool, you know, you know about that.

16        But, again, everybody is really busy, extremely busy.  And

17   so if you say, "I'd love to pick your brain," you know, a lot

18   of times people are like, "What's in it for me?"

19        But if you say, "How about you come speak at a dinner

20   where other people want to hear about you speaking on a topic?

21   And by the way, we can feed you.  And I'll welcome you into my

22   home if you can do that," people want to do that.

23        So it was a really good way to -- the dinners were a good

24   way to have especially industry-specific-type functions.  And

25   the happy hours are a way to really widen the funnel and try

1    to meet up and just -- just see who is interested.

2        So those would be more open.  You could say, you know,

3    there -- there were a lot of people from -- in that time

4    period trying to meet us.

5        Because if you're a founder and you don't know anybody,

6    maybe you would want to go to a Rothenberg Ventures event and

7    meet 200 people that you'd want to know.

8        So happy hours could be, you know, 20 people, but they

9    could be, you know, 100 or more people.  People wanted to go

10   do that.

11       So we got to meet people like that.  They got to meet

12   people like that.  It's really -- again, I think it's the

13   secret sauce.

14   **Q.**  So in your view, there's a business purpose behind these

15   events?

16   **A.**  Absolutely.  These were business events.  They're not just

17   a business purpose.  These were business events.

18   **Q.**  Who approved -- who approved the expenses for these

19   events?

20   **A.**  I did.

21   **Q.**  And do you feel that these events were successful?

22   **A.**  There is no question that any success you attribute to any

23   of Rothenberg Ventures' investing strategy starts and ends

24   with the -- the event strategy.

25       That's a yes.

1    **Q.**   Okay.  All right.  So we -- we've been talking a bit about

2    2014.  I'm going to move ahead now to the next year, 2015.

3        How was -- how was Rothenberg Ventures doing in 2015?

4    **A.**   Rothenberg Ventures in 2015 was building even more

5    momentum.  I think the word was getting out.  We -- we heard

6    earlier testimony that we'd been ranked number one by a number

7    of publications in various -- you know, for frontier

8    technology, for the volume of investing, for the quality of

9    investing.  Those were all accolades that were coming in from

10    outside.

11        And in -- personally I was extremely excited about the

12    growth and about the companies coming in.  It was one of the

13    busiest times of my life, but also really interesting.

14        So we were growing like crazy.  We -- we started an

15    accelerator -- well, we started a lot of things, which we may

16    get into, and I was doing my best to try to stay on top of all

17    of it, but it was a lot and I needed as much help as I could

18    get.

19        We were also raising a third fund.

20    **Q.**   Okay.  Let's take each of those sort of piece by piece.

21        The first thing you said was it was growing.  And I wanted

22    to know what you meant by that.  Growing in what ways?

23    **A.**   Growing in -- so there -- various ways.  One, we were

24    growing in opportunities.  The number of startups that were

25    trying to get our attention, pitch to us was growing really

1    rapidly.

2        You -- you have to be able to -- you have -- you have to

3    try your best to -- with startups, if you want them to

4    continue to pitch to you or talk to you, you need to take

5    those meetings if you can.

6        If you get a lot of startups and they say, "We want to

7    meet somebody on your team," and you don't respond or you

8    don't meet with them, they stop doing that.

9        So it's really time-consuming.  That part does not scale.

10    You cannot just tell all the startups come all at once and

11    that's enough.  You have to meet with them.

12        To do that, you need a team.  So I had to hire people.

13    There were a tremendous number of one-on-one meetings.  And we

14    had a policy -- or at least I tried to make sure that my team

15    would always try to give some help, you know, some feedback

16    and introduction.  I wanted to make that valuable for the

17    startups that were meeting with us.

18        That's a big reason why we had a good -- they call that

19    deal flow, pipeline.  People knew that they could get a

20    meeting with us and that they would probably get something out

21    of it.  Maybe we would invest.  If not, they might get an

22    introduction or they might get an invitation to a valuable

23    event where they could meet 200 people that they needed to

24    meet.

25        So that really helped differentiate us to get -- these

1    companies wanted to meet us.  That and the pipeline is what

2    made that happen.  But it did require a relatively large team.

3    I do think we had one of the largest deal flow pipelines in

4    the early stage of venture capital.

5        And it was important -- it was important to me that we

6    tried to give people as much time and attention as we could.

7    But that does not scale.  You do need people.

8        So I was hiring people.  I was building out the team.  And

9    the complexity of running multiple funds, at this point having

10   more than a hundred investors, the investors were relatively

11   demanding.  They wanted attention, reports.  All of that.

12       So by 2015, I had more than 200 business relationships

13   with investors and companies we had invested in where every

14   one of those founders and investors believed that they could

15   get my attention at any time, and I did my best to do that.

16   It was getting to be very difficult.

17   Q.  We've heard some testimony that one of the things the 2015

18   Fund was trying to do was get institutional investors.  And

19   I'm wondering or hoping you can elaborate on that a little

20   bit.

21       First, what is an institutional investor?

22   A.  When you're on the fundraising side, like you're the

23   venture capital company or any other private equity company

24   that wants to raise money, you quickly learn that there's

25   basically two buckets of investors, the -- the way to think

1    about it.

2        There are people who make their own decision.  So it's one

3    decision-maker.  They typically are wealthy individuals.

4    Sometimes we call those family offices.  You've heard

5    testimony of people like that.

6        And they can meet with you and they can say, "I'm

7    interested, I'm in."  That's one group of people.

8        Your first two funds -- for us, but I think for almost

9    everybody I've ever heard of, those are the people who are

10   investing in funds one and two.

11       And the other group of people are people who make

12   decisions in groups.  So there's nobody who can just say yes.

13   They'll say, "I need to get a lot of information.  I need to

14   bring this back to my group."

15       Those processes are long.  Typically the amounts of money

16   are more.  And we call those institutional investors.  Those

17   could be corporations.  Those could be complicated family

18   offices.  Could be, if they have a group decision-making, they

19   could even be, you know, pension funds, they could be

20   sovereign wealth funds.  There's a lot of money -- that's

21   where almost all of the money is, is in institutional

22   investors.  The individual investors are a very small percent

23   of the totals.

24       But the institutional investors will almost never invest

25   in the first two funds.

1    So you might get through fund one and two with individual

2    investors, but if you're going to try to scale and grow, you

3    need to start attracting institutional investors and it's a

4    very different process, timeline, everything.

5    **Q.**  Did that -- did that add to some of the difficulties you

6    explained about trying to stay on top of everything?

7    **A.**  Tremendously.

8    **Q.**  How so?

9    **A.**  Well, first of all, their process is somewhere -- or as an

10    order of magnitude, longer and more time-consuming, meaning,

11    you know, if an individual investor takes a month to invest,

12    to decide to invest, an institutional investor will take a

13    year or more.

14    There were some institutional investors I talked to that

15    said we like to track you for five years so keep -- keep

16    giving us updates and meet with us consistently for five

17    years, and then we'll make a decision.

18    If an individual said that, you would laugh.  But some of

19    these institutional investors are writing $25 million checks

20    so you say yes, ma'am, yes, sir.  So those are long processes.

21    And then in those processes, they require a ton of

22    meetings.  They require a ton of diligence.  They want access.

23    They want to -- they want to visit.  They want to talk to your

24    startups.

25    There were -- I think when HTC -- we heard some testimony

 1    they invested in 2015.  They were one of our first

 2    institutional investors.  We set up meetings for them with

 3    almost all of our companies to -- before they invested.

 4         That is a tremendous amount of work.  It's a tremendous

 5    amount of time.  And it's a tremendous ask for your startups

 6    to do that.  So it was very difficult and it added a

 7    tremendous amount of complexity.

 8    Q.   Another thing we've heard about the 2015 Fund was that it

 9    was focused on virtual reality and augmented reality

10    technologies.

11         And I guess my first question is was it focused on that?

12    And the second question as a follow-on would be why?

13    A.   I do want to clarify something.

14         All of the venture capital funds had a very wide mandate.

15    That's what I communicated.  That's what was in our documents.

16    That's how we talked about it, that -- that was what we were

17    allowed to do.

18         However, I believe that when you see a trend and if you

19    can see it early, and if you can meet those people who are

20    building the trend, which was part of our strategy, you should

21    invest in it.

22         So what I noticed in the first fund and in the second

23    fund, we branded ourselves as the millennial venture firm.  We

24    were young.  The people we were investing in were not always

25    millennials.  Just also for the record, we invested in people

1    of all ages.  But it tended to be millennials who wanted us to

2    invest.  And so there was a lot of focus on that.

3        By the third fund, which was 2015, I had come to believe

4    that frontier technologies, meaning new technologies applied

5    to old problems, was a very interesting way to invest and --

6    and very valuable.

7        I had noticed that a lot of our best companies, SpaceX,

8    Matterport, et cetera, were these types of companies.

9        So I -- I thought if we brand this way, if we focus on

10   this type of thing, if we tell the market we're focused on

11   this type of thing, we may get more of these types of

12   opportunities.

13       So we became the frontier technology venture capital firm.

14       I'm going to let -- I'm going to pause there and let you

15   ask the next question.

16   Q.  Okay.  What was the target size of the 2015 Fund?

17   A.  I'm sure it was 25 to 50 million.  But it ended up being

18   just under 25 million.

19           MR. FAKHOURY:  Mr. Torres, can you pull up

20   Exhibit 22.

21                     (Exhibit published.)

22           MR. FAKHOURY:  And can you -- okay.

23   Q.  This is Exhibit 22, page 1.  This is in evidence.  This is

24   the Amended and Restated Operating Agreement of the 2015 Fund.

25       Do you see that?

 1    **A.**  I see it.

 2    **Q.**  Okay.

 3          **MR. FAKHOURY:**  Mr. Torres, can you go to page 38?

 4    And can you go down here, scroll down.  I think it's going to

 5    be all the way at the bottom.

 6        Keep going.

 7        Oh, keep going to number 4, expense calculation.

 8                      (Exhibit published.)

 9    **BY MR. FAKHOURY:**

10    **Q.**  Okay.  So we talked a moment ago about the fee structure

11    in the 2013 Fund, and we've talked about the fee structure in

12    the 2014 Fund.

13        I want to talk about the fee structure in the 2015 Fund.

14        And my first question is, the fee structure for the 2015

15    Fund was different than the '13 and '14 Funds, right?

16    **A.**  That's right.  All the funds were different.

17    **Q.**  Okay.  So I guess my first question is why was the 2015

18    Fund structure different than the 2013 and 2014 Fund

19    structures?

20    **A.**  We had ongoing conversations with the existing investors

21    and the next investors or potential investors.  So this is the

22    result -- the cumulation of discussions and negotiations with

23    dozens and dozens of investors and -- as well as their

24    lawyers.

25    **Q.**  Why did the 2015 Fund split up management expenses and

1   administrative expenses, if you recall?

2   **A.**  Well, a lot of times, there's -- there's a lot of

3   different buckets of expenses that a fund incurs.  And a lot

4   of times management and admin expenses are lumped together.

5   And I think for this fund, we just tried to break them out.

6       And it kind of highlights, I think, that administrative

7   expenses are really expensive.  In other words, this

8   administrative expense is more of what's, you know, meant to

9   be paid on day one.

10      And it's kind of drawing attention to the fact that the

11  admin alone, like that goes right out the door to lawyers and

12  things like that.  It's like you don't even get to do

13  operating capital with that.  It's kind of calling attention

14  to the fact that it's really expensive to run a fund.

15  **Q.**  It seems to me that each year, or each fund, rather,

16  2013 Fund, '14 Fund, '15 Fund, these agreements are getting

17  longer and more complicated.

18      Did you -- what did -- what do you think of that?

19  **A.**  I would -- I -- I love simple contracts.  And I -- you can

20  see in the first fund, I tried to make everything as simple as

21  possible.  It's the shortest one.  It's the one that I wrote

22  before talking to investors.

23      I got their input but, you know, some of their input was

24  we would invest more if you'd change all these terms.  And

25  each investor has an idea of ten terms you should change.

1       And in order to accommodate people writing bigger checks,

2   they have higher expectations, and then they also have more

3   opinions about your -- the terms you should put in.

4       So when I say these are the results of all these

5   discussions, each time it got -- it expounded.  And I turned

6   down more money than I raised because if I thought it was

7   too -- too complex or too onerous.

8       And I was willing to do that because I was playing the

9   long game.  I wanted to do this the rest of my life.  I

10  thought, you know what, it's okay if my first fund is small,

11  my second fund is small, my third fund is small, we'll get

12  there.

13      So this is -- even though it seems complex, the requests

14  were for it to be even more complex.

15  **Q.**  We've heard some testimony that the third fund is the

16  hardest fund to raise in the VC industry.  And you alluded to

17  that a little bit earlier.

18      I mean, would you agree that the third fund for Rothenberg

19  Ventures was the hardest to raise?

20  **A.**  I would.  I'm going to -- I'm going to give a little bit

21  of color to that.

22  **Q.**  Sure.

23  **A.**  The first two funds, you have friends and family and these

24  high net worth individuals that are willing to invest.  But by

25  and large, you know, investors want to allocate a certain

1    amount of money to you.  And then at that point, it's your job

2    to -- to really grow that.

3        So like, for example, they're willing to invest in you

4    again, but they would like to have that first back and then

5    they'll probably reinvest it in you.

6        But these are ten-year funds.  So in the first two funds,

7    you're not going to have time for these companies to grow and

8    to exit.  You may only be two or three or four years into your

9    ten-year cycle.

10       So those people are willing to keep investing in you, but

11   with the same money that they gave you.  So -- and that's

12   reasonable.

13       So you -- that's why I think it's typical, and in our

14   case, we started reaching out to institutional investors.

15   That's when you start to get there.

16       And you can because they'll look at your first two funds.

17   They'll do reference checks.  They'll talk to your companies.

18   They'll see if you're differentiated.  They'll see if you have

19   a strategy.  They'll see if it makes sense to invest in you.

20       So that's very difficult.  It's ten times the work, ten

21   times the time length.  And it's pretty famously, as you've

22   heard, a very difficult bridge to cross.

23           THE COURT:  Mr. Fakhoury, any time in the next five

24   minutes.

25           MR. FAKHOURY:  I was actually going to suggest this

 1    would be a good time.

 2            **THE COURT:**  Very good.  Members of the jury, let's

 3    take our first recess of the day.

 4        Please remember my prior admonitions.

 5            **THE CLERK:**  Please rise for the jury.

 6        (The following proceedings were heard out of the presence

 7    of the jury:)

 8            **THE COURT:**  All right.  We're outside the presence of

 9    the jury.

10        Mr. Fakhoury, anything for the record?

11            **MR. FAKHOURY:**  No, Your Honor.

12            **THE COURT:**  Mr. Waldinger?

13            **MR. WALDINGER:**  No, Your Honor.

14            **THE COURT:**  All right.  Thanks.  Let's be in recess.

15            **THE CLERK:**  Court is in recess.

16        (Recess taken at 10:00 A.M.; proceedings resumed at

17    10:17 A.M.)

18        (The following proceedings were heard in the presence of

19    the jury:)

20            **THE CLERK:**  You may be seated.

21            **THE COURT:**  All right.  Let's go back on the record.

22        All the jurors are in their assigned seats.

23        The parties and counsel are at counsel table.

24        Mr. Rothenberg is still on the stand.

25        Mr. Fakhoury, your witness.

 1          **MR. FAKHOURY:**  Thank you, Your Honor.

 2  **Q.**  Okay.  Mr. Rothenberg, when -- at the break we were -- we

 3  were in 2015.  And I want to now turn your attention to

 4  December of 2015.  And in particular, I want to talk a little

 5  bit about the -- the line of credit that Silicon Valley Bank

 6  issued to RVMC at that time.

 7      And I want to start by actually asking you as a general

 8  matter, what is RVMC?

 9  **A.**  When we have been referring to RVMC, we're talking about

10  Rothenberg Ventures Management Company LLC.  It's a LLC,

11  limited liability corporation, that I formed in September of

12  2012 to be the management company of the venture capital funds

13  that I intended to form.

14  **Q.**  Who owns -- or owned RVMC?

15  **A.**  Me.  I did sell a very small portion of it.

16  **Q.**  Okay.  Well, let me ask it, actually, in a little bit of a

17  different way.

18      At its inception, did you own RVMC?

19  **A.**  Yes.

20  **Q.**  And over time did you sell stakes of your ownership

21  interests in RVMC to other people?

22  **A.**  I did.  A very small amount.

23  **Q.**  Okay.  How much and to who?

24  **A.**  Less than 10 percent to a handful of people -- well, so

25  when -- when you're talking about -- is your question

1  ownership and equity stake specifically?

2  **Q.**  Well, let's start by -- let's start with ownership.  So

3  let's start there.

4  **A.**  Okay.

5      The -- well, the first person who was an owner other than

6  me was Tom Leep.  Tom Leep paid a small amount of money for

7  .1 percent of the management company.

8          **THE COURT:**  Mr. Rothenberg, do you mean Tom Leep, the

9  elder?

10          **THE WITNESS:**  Thank you, Your Honor.  Tom Leep

11  Senior, the elder.

12          **THE COURT:**  Yeah, okay.

13          **MR. FAKHOURY:**  Thank you, Your Honor.

14  **Q.**  Did -- did a person by the name of Regina Scully buy a

15  stake of -- or an ownership interest of RVMC?

16  **A.**  She -- she did.  She -- she invested, I believe, on a

17  convertible note.  So it wasn't -- it wasn't an ownership

18  stake, but it could convert to an ownership stake.

19  **Q.**  Okay.  How about Brandon Farwell?

20  **A.**  Brandon Farwell purchased some carry equity units, about

21  $250,000.  He did not buy any portion of the Management

22  Company, but he did buy a portion of some of the carried --

23  essentially -- I mean there's a technical aspect to this, but

24  essentially some of the carried interest.

25  **Q.**  Okay.  You used the word "carry equity unit."  What is a

1  carry equity unit?

2  **A.**  There -- there isn't a industry standard carry equity unit

3  per se.  But I came to understand that -- from discussions

4  with business people, lawyers, I came to understand that it --

5  it was pretty common for people who ran venture capital firms

6  to try to find a way to give some of the upside in the funds

7  to people who worked for them, typically.

8      And so in a company, a startup or even a bigger company,

9  that may be giving stock options, is a good analogy.  But in a

10  venture capital firm, you -- you might do -- you might -- it's

11  really a contract.  So it's a contract that says as the fund

12  performs, this is what we'll -- we'll pay out.

13      So technically it's actually a derivative, which means

14  it's a contract.  It's not the actual carry.  But we called

15  that a carry equity unit.

16      There were other venture firms that called that phantom

17  unit.  But I didn't like the word "phantom" so we went with

18  carry equity unit.

19  **Q.**  And by -- you mentioned upside.  By "upside," you mean the

20  profit from -- that the management company makes.  A carry

21  equity unit is a way to distribute that profit to an employee.

22  **A.**  That's exactly right.

23  **Q.**  Okay.

24      So we took a little detour to talk about RVMC and carry

25  equity units.  Let's -- let's get back to the bank loan.

1          And first let me ask, had Rothenberg Ventures banked with

2     Silicon Valley Bank before 2015?

3     **A.**   Yes.

4     **Q.**   Had the funds banked with Silicon Valley Bank since its

5     inception?

6     **A.**   Yes.  Since 2012.

7     **Q.**   At the end of 2015, how were things going at Rothenberg

8     Ventures?

9     **A.**   At the end of 2015, things were growing really rapidly.

10    The number of investments that we made in -- at the end of,

11    you know, in the fourth quarter of 2015 was several dozen.

12         And the -- we haven't gotten into this yet, but the River

13    Accelerator had just finished its second program.  That was a

14    lot.

15         And we -- I was trying to deal with the complexity we

16    mentioned earlier about raising a third fund, about trying to

17    professionalize the legal and finance aspects.

18         I'm not a lawyer.  I'm not trained as a lawyer.  But

19    these -- these types of agreements are complex.  So at the end

20    of 2015, we're launching the 2016 Fund, we're closing the

21    2015 Fund.  These are the two most complicated funds so far.

22         I'm also managing the 2015 Fund and investing out of the

23    2015 Fund.  I'm managing the 2014 Fund.  I'm managing the 2013

24    Fund.  I'm managing several co-funds, SPVs.  Those all have

25    their own investors, their own contracts.

1        I'm managing at least 100 different limited partners.  I'm

2    managing more than 100 portfolio investments.  I'm hiring

3    people.  It was a lot.

4    **Q.**  Okay.

5        Now, this -- by this point in time, so December 2015,

6    Rothenberg Ventures was about three and a half years old at

7    this point, right?

8        It had started -- your first investments were when you

9    were in business school in 2012, right?

10   **A.**  Yes.  The first fund closed in September of 2013.  So by

11   September of 2015, we were a whopping two years old.

12   **Q.**  Yeah.

13       In December of 2015, was Rothenberg Ventures in need of

14   cash?

15   **A.**  Yes.  I'd say so.

16   **Q.**  Why?

17   **A.**  Well, number one, growing pains.  I was expanding the

18   team.  I was -- I had hired a controller to help out Tom Leep.

19   That -- her name was Lynne McMillan.  She had a lot of ideas

20   that I was trying to implement.  Some of them involved

21   downsizing, making things smaller.  At the same time, I felt

22   like I needed more help to grow.

23       So there was -- there were a lot of decisions that I had

24   to make as the manager.  I was getting a lot of input.  And --

25       But one thing that became clear is that more cash means

 1   more ability to expand the team, get more help, manage the

 2   extremely rapidly growing business.

 3       It was very -- very exciting, too.  It was very clear to

 4   me that we had something very special.  It was clear to me

 5   because we heard that all day every day from almost everybody

 6   we talked to.

 7       It was -- it was absolutely electric.  It was also growing

 8   at breakneck speed.  We absolutely needed cash.

 9   **Q.**  You said you were getting a lot of input.  From who?

10   **A.**  I mentioned before that there was a lot of expectation and

11   possibly even demand from investors, from portfolio company

12   founders, from my team.

13       Also I spoke frequently to outside counsel, inside

14   counsel.  And I do think that's the -- that was the strength.

15       So by not having experience running a venture capital

16   firm, part of why I thought it was possible to even do so was

17   because I expected to get help and input, which I did.  It

18   was -- it was the absolute best thing about venture --

19   Rothenberg Ventures was the extremely high engagement.

20       So when I say there was a lot of demand, that's -- I'm not

21   saying that because I wasn't happy about that.  I'm saying

22   that because it was our best asset, but it was also very

23   difficult.  So it was conversations with all of those people

24   constantly.

25   **Q.**  Okay.

1    You mentioned earlier that Rothenberg Ventures had a

2    relationship with Silicon Valley Bank since its inception.

3    And can you explain a little bit more about that relationship

4    with the bank?

5    **A.**  Sure.

6    Silicon Valley Bank used to be a bank that focused on, I

7    think you could say it focused on the startup community, the

8    venture capital community.

9    They at one time had the best reputation for being the

10   bank to do business with.  They focused on that.  They had

11   individuals at their firm whose entire job was to do nothing

12   but meet venture capitalists, to meet startups and bring in

13   that business.  They were the best at that.

14   And as part of that, I found out about them very early on.

15   They were very good at that.  So one of the -- one of the

16   things that they did was they offered -- I mean, I guess you

17   could call it white glove service.  They were on call all the

18   time for anything that you wanted to talk about.

19   And that's -- I don't know if that's really common for

20   just a banking relationship when you're starting like as a

21   depositor.  Right?  So that was really cool.

22   And so I -- when I started my first -- when I started the

23   management company and the first fund, they were very

24   aggressive about wanting that business.  But they also

25   delivered on making things as simple as -- as possible.  They

 1    were very fast with anything we needed.

 2    **Q.** So we've seen in evidence some emails sent at the end of

 3    December of 2015 to a Michelle Jandu and a Jim Marshall at

 4    Silicon Valley Bank.

 5        And I guess my question is -- my first question is who was

 6    Jim Marshall?

 7    **A.** Jim Marshall was the first person I met at Silicon Valley

 8    Bank. He -- I mentioned earlier there were people who focused

 9    on, I think they call it outreach.

10        And I believe he was a managing director where his entire

11    job was to say schmooze. He's -- he's a schmoozing director.

12    And through that process, he was the one that identified

13    Rothenberg Ventures at the early stage to -- that and got us

14    to be a client.

15        He also invested a lot of time in building the

16    relationship and pitching us the next thing.

17        So Jim Marshall helped us open up our first accounts. And

18    then really the other fund accounts, too. And he was always

19    pitching me bank products like loans. His favorite things was

20    loans.

21            **MR. FAKHOURY:** I'm going to ask Mr. Torres to pull up

22    Exhibit 159. This is in evidence. And can you scroll all the

23    way to the bottom, basically to the first email in this chain.

24        Okay. Can you go back up.

25        Okay.

 1                          (Exhibit published.)

 2    **BY MR. FAKHOURY:**

 3    **Q.**  Mr. Rothenberg, I'm directing you to -- on your screen

 4    should be Exhibit 159.  This is page 10 of that exhibit.  This

 5    is the part I'm going to focus you on here (indicating).

 6         This is an email dated December 23rd of 2015 from you to

 7    Michelle Jandu and Jim Marshall, and it says the subject is

 8    "SVB LoC secured by cash."

 9         Do you recall sending this email?

10    **A.**  I do.

11    **Q.**  Okay.

12         Was this email the first time you had a conversation with

13    Mr. Marshall or Ms. Jandu about a line of credit generally,

14    not necessarily this specific line of credit, but just the

15    idea of RVMC getting a line of credit?

16    **A.**  It was not the first conversation, the second or the

17    tenth.

18    **Q.**  Okay.

19    **A.**  They had been talking to me constantly about wanting us to

20    do this.

21    **Q.**  I want to draw your attention to the date here of

22    December 23rd, 2015.  This is -- this is generally a pretty

23    sleepy time of the year for most businesses, right before

24    Christmas and New Year.

25         Why were you reaching out on this day in particular for a

1   line of credit?

2   **A.**   At this time, I didn't stop working or sleep that much.

3   So it wasn't sleepy for us.

4       But in terms of -- in the bank -- all of my interactions

5   with the bank, Silicon Valley Bank, through this point, they

6   were attentive all the time.  They -- they said they would be

7   and they -- they did deliver on that.

8       So in terms of sleepiness, I don't -- I don't think

9   anybody was sleeping here.  But I understand your point that

10  the end of the year is, you know, lots of holidays.

11      So at the end -- at the end of the year each year for us,

12  for Rothenberg Ventures, we would be looking at everything we

13  needed to try to do by the end of the year and what we need to

14  do at the beginning of the year and trying to wrap that up.

15      So it's a good time to look at your -- all of your

16  investment-type decisions, all of your cash positions, and

17  anything else on your to-do list.

18      And one of the items that I thought was appropriate to do

19  at that time was to take out a line of credit from

20  Silicon Valley Bank.  So I reached out.

21          **MR. FAKHOURY:**  Can we scroll up to page 7 of this

22  exhibit, Mr. Torres?

23                  (Exhibit published.)

24  **BY MR. FAKHOURY:**

25  **Q.**   Mr. Rothenberg, I'm going to direct your attention to this

1    email.  I'm going to ask you a couple questions about it in a

2    moment.

3        my first question is -- well, let me -- let me make a

4    record here.  We're on Exhibit 159 at page 7.

5        And on the screen is an email from you, I believe it's to

6    Ms. Lee, Ms. Judy Lee of Silicon Valley Bank, indicating:

7        "I will check with Lynne, but I believe the amount of

8    pre-funded fees is 5.192 million and we would like to draw up

9    to 95 percent of that cash (4.93 million) tomorrow.

10        "The calculations are 23.6 million fund times eight years

11    prefunded fees times 1.57 percent management fee per year plus

12    1 percent administrative fee per year equals 5.192 million."

13        Do you see that on your screen?

14   **A.**   I see it.

15   **Q.**   Okay.  My first question is this $23.6 million number here

16    for the calculations (indicating), where did you come up with

17    that number?

18   **A.**   The fund size.  When people say fund size and when we say

19    fund size, we are always talking about the amount that is

20    committed which includes funded in a fund.

21        So for example, if somebody commits a million dollars to a

22    fund, and they fund 400,000 of it on day one, you would say

23    that that's a million dollar -- that's a million dollars.

24        And so the 23.6 million is the total amount for the fund

25    that includes both funded and unfunded commitments.

1    **Q.**  You used the words "funded and unfunded," and I want to be

2    very clear about what you mean by that.

3         So by "funded" do you mean money that is sent, wired,

4    whatever, directly to the bank?  Is that what you mean when

5    you were saying "funded?"

6    **A.**  Right.  The reason why you can't look at just bank

7    accounts in order to figure out a fund size is because bank

8    accounts don't tell you what the contracts are or the

9    commitments are with investors.  So, yes.

10   **Q.**  And then "unfunded" would mean money that was committed

11   but not had -- but had not yet been collected by the venture

12   fund, correct?

13   **A.**  Yes, but the venture capital fund has a good faith reason

14   to believe it is going to be funded.

15   **Q.**  So you said this number included both the fund -- the

16   funded amount and the unfunded amount.  And -- and that's what

17   you believe, right?

18   **A.**  That's what I believe.

19   **Q.**  How much is the funded amount?  And how much did you

20   believe was the unfunded amount?

21   **A.**  This number I believed included a $10 million commitment

22   that was partially funded from the 2016 Fund to the 2015 Fund.

23   That was in the fund documents.  That was contracted.  That

24   was the expectation and the reality of the relationship

25   between those funds.

 1          It would -- it would be required to mention and include

 2     that in the fund size.  That's what I believed then.  That is

 3     what I believe now.

 4     **Q.**  Okay.

 5          We've been talking about fees.  There's another component

 6     to the line of credit, which is a collateral account that

 7     would be used to secure the line of credit.

 8          And my question to you is what did you believe was the

 9     source of money for the collateral account used to secure the

10     line of credit?

11     **A.**  I believed it was the 2015 Fund.

12     **Q.**  And why did you believe that?

13     **A.**  Because all of the money came from a 2015 Fund account.

14     **Q.**  Yesterday, Mr. Fujimoto testified about the movement of

15     money through various different bank accounts to eventually

16     fund the collateral account.

17          My first question is, as a general matter, why was money

18     moved around from account to account oftentimes on the same

19     day?

20     **A.**  As a general matter, money is fungible.  I believed money

21     is fungible.  I do still believe money is fungible.

22     **Q.**  Okay.  What do you mean by that?

23     **A.**  Fungibility is the interchangeability of an asset in this

24     case.  So cash.  If I give you a dollar and then you owe me a

25     dollar back, I don't look at the barcode to see if it's the

 1    exact same dollar I gave you.  It doesn't have to be.  Dollars

 2    are fungible.

 3    **Q.**  If money -- if you believe money is fungible, what role

 4    would that play, in your mind, in the movement of money from

 5    one account to another account?

 6    **A.**  At that time, I believed that your -- you keep track of

 7    the money in an accounting basis.  And then movement of money

 8    is helpful in the accounting, but it's not the same thing as

 9    accounting.  I would do it differently now.

10    **Q.**  When you say you tracked the money in an accounting basis,

11    what do you mean by that?

12    **A.**  I mean you -- when somebody invests in a fund, they --

13    they are buying a piece of the fund and you -- when you're

14    accounting for that, you -- you have a credit and a debit, and

15    in that case, it has to do -- I think I'm not sure I

16    understand your question exactly.

17    **Q.**  Let me -- let me ask a different -- let me ask maybe a

18    clearer question.

19         When you say you track the money in an accounting method,

20    do you mean QuickBooks?  Do you mean a spreadsheet?  Do you

21    mean on a piece of paper?  I guess that's what I'm trying to

22    get at.  What do you mean by that?

23    **A.**  We did keep the books in QuickBooks.

24         I didn't personally make any entries into QuickBooks at

25    any time.  But I did have accountants or in this -- at that

1    time period a CFO.  And when it comes to accounting, they

2    would of course look at the bank transactions.

3        But also we would see the contracts and we would have

4    discussions.  So somebody made an investment, you would make

5    sure that that was -- that they got credit for that.  And

6    then, you know, the fund gets credit for that, and then you

7    track what happens and so on.

8    Q.  I've been talking about the movement of money generally.

9    There has been evidence in trial about money being moved not

10   just amongst Rothenberg Ventures bank accounts at

11   Silicon Valley Bank, but also your personal bank account at

12   Bank of America.

13       Why would money be transferred from Rothenberg Ventures

14   bank accounts at Silicon Valley Bank into your personal bank

15   account?  And why would money come out of your personal bank

16   account into other Rothenberg Ventures bank accounts at

17   Silicon Valley Bank?

18   A.  Well, the primary reason is that all of these entities,

19   including myself, had business relationships.  There were

20   various business relationships between the various entities.

21       I would say, though, that especially having sat through

22   this last few weeks and last few years, I would not do it the

23   same way again.

24   Q.  Why is that?

25   A.  It was -- it was a mess.  It was also open for -- it was

1    not clear enough.

2    **Q.**  You mentioned --

3         **MR. FAKHOURY:**  You could take this down, Mr. Torres.

4    **Q.**  You mentioned Ms. McMillan who worked as a controller for

5    a period of time.

6         Why was she hired to join Rothenberg Ventures?

7    **A.**  Well, so at the time she was hired, the only person in my

8    finance, you know, department, I suppose, was Tom Leep Senior.

9    And there were a lot of transactions, there were a lot of

10   investments, there were a lot of investors.

11        And I -- you know, I believed that it was more than a

12   one-person job at that point.  And Tom Leep Senior was, I

13   believe, over 70 and expressed to me that he would like to

14   retire at some point.  And the way to do that would be to hire

15   a potential successor, help him out, and grow to the point

16   where he could retire.

17        And Ms. McMillan -- we interviewed a number of people.

18   And Ms. McMillan came from a -- I think she came from

19   basically kind of a finance-audit-type role.  And I thought we

20   needed some kind of professional input to help us

21   professionalize.  You could call it growing up.

22        At the time she was hired, the first fund was less than

23   two years old, and it was already a lot.  And so the idea

24   there was that she could help us professionalize.  And

25   she's -- she's a hard worker.  And we decided to hire her.  I

1    decided to hire her.

2    **Q.** Did the two of you -- well, let me -- let me back up a

3    second.

4        When she was hired, did she recommend you make some

5    changes to how -- not -- well -- well, let me ask it this way.

6        When she was hired, did she recommend to you that some

7    changes be made in the way Rothenberg Ventures was managing

8    its money?

9    **A.** Not right away.  But she -- we gave her full access to the

10   books.  Gave her a few weeks to get her mind around it, get --

11   you know, get a handle on it.  And then she started making a

12   lot of recommendations, which is what I was hoping she would

13   do.

14   **Q.** Did you take her recommendations?

15   **A.** I took the ones I thought I could.  I took a lot of her

16   recommendations.  She -- she was pretty thoughtful about it.

17   **Q.** Were there times where the two of you did not see eye to

18   eye on things?

19   **A.** Well, let -- let me -- let me say a little bit about my

20   management style just for a second.

21       I think that if you're going to run something like a

22   venture firm, you need people who are willing to question you.

23   It's just -- especially without experience.

24       So I -- I charged Ms. McMillan with questioning everything

25   she could.  I asked her to do that.  That was important.  She

```
 1    did do that.

 2           MR. FAKHOURY:  I'm going to ask Mr. Torres to pull up

 3    Exhibit 405.

 4        Oh, sorry.  Can you -- put this down for a second?

 5        Can I have a moment, Your Honor?

 6           THE COURT:  Yes.

 7        You know what I'm going to say, don't you?

 8                      (Stretch break.)

 9           THE COURT:  All right.  Let's retake our seats.

10        Mr. Fakhoury.

11           MR. FAKHOURY:  Thank you, Your Honor.

12        Okay.  Can we -- we've got the right exhibit now.

13        Can you zoom out, Mr. Torres.

14        And actually could we start at the top.

15                      (Exhibit published.)

16    BY MR. FAKHOURY:

17    Q.  Okay.  Mr. Rothenberg, I'm showing you what's been

18    admitted as Government's Exhibit 405.

19           MR. FAKHOURY:  And I'm going to ask Mr. Torres to

20    scroll down.

21        And keep going down here.

22        Right, that's fine here.

23    Q.  Eventually -- eventually Ms. McMillan resigned; is that

24    right?

25    A.  She did.
```

1    **Q.**  Okay.

2        And I believe she testified that part of it was -- and as

3    you just explained, the two of you sometimes didn't see eye to

4    eye on financial matters, correct?

5    **A.**  That's -- that's fair.

6    **Q.**  Okays.

7        I'd like to show you what's been marked -- it's not

8    admitted, but it's been marked as defense Exhibit 1001.

9           **MR. FAKHOURY:**  If we could just show it to just

10   Mr. Rothenberg.

11       And can you -- actually start -- let's -- let's start

12   here.

13       (Exhibit published to witness, counsel, and the Court.)

14   **BY MR. FAKHOURY:**

15   **Q.**  Mr. Rothenberg, can you -- without describing the

16   substance of what's going on here, just in general what is

17   this is document?

18   **A.**  This is as -- this is a internal email.  I don't even know

19   if it's internal.  This is a Rothenberg Ventures email.

20   **Q.**  Okay.  Is there is a date on the email?

21   **A.**  March 11th, 2016.

22   **Q.**  And who is this email from and who is it to?

23   **A.**  This is from Tom Leep Senior to me, Mike Rothenberg, as

24   well as James Joy.

25   **Q.**  And who is Mr. Joy?

 1   **A.**   Mr. Joy was an outside -- a bookkeeper.

 2   **Q.**   Okay.

 3          **MR. FAKHOURY:**  Can we scroll down.  We could stop

 4   here.

 5   **Q.**  This is the same email I just showed you a moment ago,

 6   Exhibit 405.  Does this look to be just a continuation of that

 7   email chain?

 8   **A.**   It does.

 9   **Q.**  Did RVMC use email in the regular course of its business?

10   **A.**   It did.

11   **Q.**  Or actually let me clarify.  Did Rothenberg Ventures as a

12   whole use email in the regular course of its business?

13   **A.**   Absolutely.

14   **Q.**  Was this email made at or near the time it was sent by

15   someone with knowledge?

16   **A.**   It was.

17   **Q.**  Was using and keeping email a regular practice of

18   Rothenberg Ventures' activity?

19   **A.**   Yes, it was.

20          **MR. FAKHOURY:**  Your Honor, I move to admit Defense

21   Exhibit 1001.

22          **THE COURT:**  Any objection?

23          **MR. WALDINGER:**  No objection, Your Honor.

24          **THE COURT:**  1001 is admitted.

25          (Defendant's Exhibit 1002 received in evidence.)

 1          **MR. FAKHOURY:**  Okay.  Could we publish this now.

 2      Okay.  And can we scroll down a moment.

 3                      (Exhibit published.)

 4  **BY MR. FAKHOURY:**

 5  **Q.**  I just showed you this in the government's exhibit.  The

 6  portion -- let me back up.

 7      I just showed you Government's Exhibit 405 which was

 8  Ms. McMillan's resignation email where she wrote, "Mike, I

 9  specifically asked you to not transfer the $175,000 from the

10  2016 Fund to the Management Company on Monday.  You made that

11  transfer yesterday despite my advice."

12      Do you see that?

13  **A.**  I see it.  I see it.

14  **Q.**  Okay.

15          **MR. FAKHOURY:**  Could we scroll up now.

16                      (Exhibit published.)

17  **BY MR. FAKHOURY:**

18  **Q.**  And it looks like -- well, why don't you -- why don't you

19  explain what happened on -- what your response was on

20  February 11th of 2016?

21      And you can just read the email you sent.

22  **A.**  Okay.  This is an email from me to Lynne McMillan

23  copying -- cc Tom Leep Senior, Brett Bechis, Neil Devani, and

24  Tommy Leep Junior.  It says:

25      "Lynne, we acknowledge the verbal resignation you tendered

1    to me and Brett on Tuesday effective then, as well as your

2    written confirmation of that resignation below.

3        "We wish you the best in your next project.  Mike."

4            **MR. FAKHOURY:**  Okay.  Could we scroll up, Mr. Torres.

5                    (Exhibit published.)

6    **BY MR. FAKHOURY:**

7    **Q.**  Can you read into the record this email sent Friday,

8    March 11, 2016.

9    **A.**  This is on the same thread.  This email is from me, Mike

10   Rothenberg.  I say:

11       "For our records, I am okay paying her two extra days if

12   Tom advises that, but she resigned February 9th, 2016, and we

13   accepted.  Her employment ended that day."

14           **MR. FAKHOURY:**  Okay.  Let's scroll up, Mr. Torres.

15                   (Exhibit published.)

16   **BY MR. FAKHOURY:**

17   **Q.**  And then let's -- could you explain and read into the

18   record this email that I've put in the green box here

19   (indicating).

20   **A.**  This email is also from me, Mike Rothenberg.  It's to Tom

21   Leep Senior and James Joy, again.  It -- it's on the same

22   thread.  And I say:

23       "In addition, the transfer she referred to is explicitly

24   allowed by our documents according to Neil."  And I mean

25   Devani who was on the thread earlier.  "She had already

1  resigned by that time, and I am not interested in enabling her

2  to rewrite history for the reason for her departure from this

3  company."

4          **MR. FAKHOURY:**  Can you scroll up to the top,

5  Mr. Torres.

6                  (Exhibit published.)

7  **BY MR. FAKHOURY:**

8  **Q.**  Did -- did Mr. Leep respond to this email?

9  **A.**  He did.

10 **Q.**  And that's his response here on the top?

11 **A.**  That's right.

12 **Q.**  Okay.

13         **MR. FAKHOURY:**  We could take that down.

14 **Q.**  All right.  I want to shift topics now.  We're sort of

15 moving along in the calendar.  So we've talked about the line

16 of credit in 2015.

17     And I want to turn the clock now to 2016 and talk about

18 Pilot Grove.

19     I guess my first question is did you intend to defraud

20 Pilot Grove in connection with its investment into River

21 Studios?

22 **A.**  No, I did not.

23 **Q.**  Pilot Grove also invested in the 2016 Fund, right?

24 **A.**  It did.

25 **Q.**  Did you intend to defraud Pilot Grove in connection with

1    its investment in the 2016 Fund?

2    **A.**  No, I did not.

3    **Q.**  We've heard a lot of testimony about River.  So I guess my

4    first question is what is River?

5    **A.**  Okay.

6         River -- River was -- I mean -- without talking about the

7    whole history of River, River was a brand that we used in

8    virtual reality and then frontier tech generally that -- that

9    had a variety of business activities that supported those

10   types of early stage frontier technologies.  The biggest two

11   were an accelerator program, River Accelerator, and studio,

12   River Studios.

13   **Q.**  We've heard the phrase River Studios -- excuse me.

14        We've heard the phrase "River" and "Bend Reality" used

15   interchangeably throughout trial.

16        And can you explain what is Bend Reality?  Where did that

17   come from?

18   **A.**  Okay.

19        This -- this is about the history.  So in late 2014, I

20   came to believe that the virtual reality technology was now

21   viable.  The large catalyst event that had happened in 2014

22   was the first large exit or sale, liquidity event, of a

23   virtual reality company occurred when Oculus was sold to

24   Facebook for $2 billion.

25        Very impressive team built that.  There is a technologist

 1   by the name of Michael Antonov, who testified in this trial,

 2   who helped build that.  It was very impressive.

 3       And what they showed was that the virtual technology was

 4   now viable, it had been around for decades, but it was now

 5   affordable and it worked without people getting nauseous.

 6       Before that, the frame rate was too slow and people

 7   sometimes got sick.  You don't want that experience.

 8       So when the Oculus came to market, or, you know, produced

 9   their product, it was viable.  And that was very exciting.

10   For a company that invests in early stage ventures, that's our

11   green light.

12       So the first thing we wanted to do was learn about the

13   industry and find ways to invest in it.  In late 2014, we --

14   when I say "we," I mean the investment team -- identified a

15   promising technology and VR creator, little company, in Bend,

16   Oregon, and engaged in discussions to try to find a way to

17   make that company part of the Rothenberg Ventures portfolio if

18   it wanted, and, in the course of that, formed a company called

19   Bend Reality to do just that.

20       To continue on with that, if I may?

21   **Q.**  Sure.

22   **A.**  Okay.

23       So the idea there was that a lot of times, early

24   technology -- early technologists who are very good at

25   building early stage tech do not also have the business skill

1    set.  It's really hard to have both.  And vice versa.

2    Business people usually can't build tech.

3        So sometimes our job as an early stage venture capitalist

4    is to try to help add the missing pieces.  In this case the

5    idea was form a company, acquire essentially, technically,

6    this -- this company, give stock to the -- to the -- to the

7    founder, to that team, and try to -- try to build it

8    organically.  This was one of the -- this was the first idea

9    for how to get a foray -- foray into virtual reality.

10        That -- that deal went so far as we sent a team out to

11    Bend, Oregon.  I did not attend that, but Tommy Leep Junior,

12    Dylan Flinn did.

13        They vetted the company, the technology.  They determined

14    that it was viable.  They tried it out basically.  And we

15    decided we were going to try to move forward with making an

16    investment in the company.  And so we formed Bend Reality.

17        There were lawyers involved.  There were always lots of

18    lawyers involved.  And we went so far as a negotiation to buy

19    the company, and it did ultimately fall through.

20        But the origin of Bend Reality came from Bend, Oregon.

21    And it was the first iteration of this business was thinking

22    of buying that company in Bend, Oregon.

23    **Q.**  Okay.

24        **MR. FAKHOURY:**  I'm going to ask Mr. Torres to pull up

25    Exhibit 62.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1                        (Exhibit published.)

 2              THE WITNESS:  River is next, but I'll --

 3   BY MR. FAKHOURY:

 4   Q.  We'll get there.

 5   A.  -- I'll wait.

 6   Q.  Yeah.

 7        Okay.  Mr. Rothenberg, I'm showing you what's been

 8   admitted as Exhibit 62.  And this is a Silicon Valley Bank

 9   statement for Bend Reality Inc. dated for November of 2014.

10        Do you see that?

11   A.  At -- yes, at Tom Leep Senior's address, that's right.

12   Q.  Okay.

13              MR. FAKHOURY:  Can we scroll, down, Mr. Torres.

14                        (Exhibit published.)

15   BY MR. FAKHOURY:

16   Q.  It shows here on November 24th, 2014, two wire

17   transfers -- or two internal transfers, rather, totaling

18   $250,000 with a notation of the first one says advance from

19   Fund II to Bend Reality.  The second says, Fund II to Bend

20   Reality convert -- presumably convertible note.

21        Do you see that?

22   A.  I see that.

23   Q.  What was going on here?

24   A.  It -- November of 2014, we were negotiating with the

25   company to see if we could acquire the company to help it

```
 1    grow.  And the contemplated transaction from inception was
 2    that the purpose of this vehicle, the Bend Reality Inc.
 3    vehicle, was for the funds, at this time the 2014 Fund, for
 4    the Fund to be able to invest in Bend Reality for the purposes
 5    of organically growing a company for the Fund's benefit.
 6  Q.  Okay.
 7         MR. FAKHOURY:  Can we -- can we go to the next month
 8    statement, Mr. Torres.  It might be page 3 or page 4.
 9         Oh, actually you can go down.
10         Oh, well sorry.  Let's just make this clear.
11                     (Exhibit published.)
12  BY MR. FAKHOURY:
13  Q.  This is page 4 of that same exhibit, so that's Exhibit 62.
14    And this is dated December 2014.  It's the same bank account,
15    9185.  But there's a different address here, an address in
16    Bend, Oregon.
17         Why is the address different?
18  A.  The company was based in Bend, Oregon.  So the idea was
19    for it to be in Bend, Oregon.
20         MR. FAKHOURY:  Can you scroll down, Mr. Torres.
21                     (Exhibit published.)
22  BY MR. FAKHOURY:
23  Q.  And I want to ask you, Mr. Rothenberg, here there's a
24    $250,000 debit in December of 2014 with a memo that says
25    return advance from Bend Reality to Fund II.
```

1        Do you see that?

2   **A.**   I see that.

3   **Q.**   So what is that?

4   **A.**   The deal fell through and the company returned the money

5   to the Fund.

6        **MR. FAKHOURY:**   Okay.   You could take that down,

7   Mr. Torres.

8   **Q.**   So after the deal fell through, what did you decide to do

9   with the Bend Reality name and the Bend Reality account?

10  **A.**   Well, the next idea we had to invest in the virtual

11  reality space was to form an accelerator, which we had not

12  done before, and try to identify a number of virtual reality

13  companies and invest in them all at the same time.

14       And we wanted to call that a name that was easy for people

15  to spell and, you know, and understand but wanted it to be

16  based on something.   So Rothenberg Ventures Virtual Reality is

17  RVVR, River.

18  **Q.**   Can you explain generally what an accelerator is?

19  **A.**   I can try.

20       It -- I mentioned earlier it's very difficult to grow

21  early stage companies.   The main problem, in my opinion, that

22  they have is not enough time in the day to do all the things

23  that they need to do.

24       However, there are a number of things that all startups

25  have to do that are somewhat commoditized meaning you don't

1    have to have specific expertise, you know, it's the same for

2    each company in other words.  So the special thing about a

3    company is usually the product or service it's trying to build

4    or offer.

5        The time-consuming thing is all of the nuts and bolts.

6    You know, even things like starting bank accounts, you know,

7    the documents to -- you know, the formation documents for the

8    company, the negotiations with -- well, not the negotiations

9    but the -- but the actual contracts that they have to do.

10       All that stuff is a bit -- it's not exactly cookie cutter,

11   but it's a lot of work, but it's the same for each startup.

12   And they all need real estate.  They need a place to work

13   from.  This is before a lot of people were remote.

14       And so the idea of accelerator is that you can offer a lot

15   of these things as a package.  So you can offer -- if you have

16   a real estate space, you could have a bunch of companies

17   working out of there sharing space.  They don't to have worry

18   about that.

19       They don't to have worry about signing its lease

20   contracts.  They can't, like, enter into three-year lease

21   contracts because they don't know how long they'll be around.

22       So it's very helpful for them to be able to go by the

23   desk.  It's very helpful for them to have access to -- we had

24   in-house lawyers.  They could just ask them stuff.  We didn't

25   bill them.  They could say, "What do I do about this?"  That's

1    extremely helpful.

2        They're -- they need to meet the same kind of people.  If

3    you have a demo day, you let investors come.  At the same time

4    they want to meet, you know, a dozen companies.  They don't

5    want to meet one.

6        So an accelerator brings all these companies together at a

7    similar stage and helps them get the same access to all of

8    those things they all need, take it off their plate, give them

9    a chance to spend their time and energy building their

10   company.

11   **Q.**  Okay.  We've talked about Bend Reality.  We've talked

12   about River Accelerator.  What was River Studios?

13   **A.**  So the -- the first thing we found out when starting a

14   technology accelerator is that one of the needs that all of

15   companies had in common was that they all needed technical

16   input.

17       And especially when building a new technology, a lot of

18   the problems that will be very basic and trivial later on are

19   nightmares early on.

20       So it was really almost immediately apparent that all of

21   these companies had very similar technological problems as

22   well as the other things I mentioned.

23       So River pretty quickly had to start hiring technologists.

24   And people who are technologists, meaning people who already

25   knew something about VR at the time, needed to continue to

 1    learn about VR in order to stay relevant.  So they needed to

 2    be building also.

 3        So very early on, River, which started -- the first thing

 4    we did was the accelerator, very quickly started hiring people

 5    to help out with the accelerator.  And also they wanted to and

 6    did build content.

 7    Q.  Who founded River Studios?

 8    A.  I did.

 9        I'd like to add that Bend Reality was the entity for

10    River.  That's the connection.

11    Q.  Okay.

12    A.  We did later change the name, but it was Bend Reality.

13    That's -- that's how that's connected.

14    Q.  When did the name change?

15    A.  Well, we started referring to it as River really early on,

16    like for the accelerator in early 2015.  But the actual legal

17    name change I think was March of 2016 because we had an

18    outside investor for the first time and made things more

19    clear.

20    Q.  Did you believe that you informed investors that River

21    referred to both the VR studio and the accelerator?

22    A.  There was no distinction from the accelerator and the

23    studio for the first year of its existence.  It was only

24    River.

25            MR. FAKHOURY:  Mr. Torres, can you pull up

 1    Exhibit 458?

 2              THE WITNESS:  I might add I did believe that.

 3    BY MR. FAKHOURY:

 4    Q.  Okay.

 5    A.  I also still believe that.

 6                   (Exhibit published.)

 7    BY MR. FAKHOURY:

 8    Q.  All right.  Mr. Rothenberg, I'm showing you Exhibit 458.

 9    This has been admitted into evidence.

10        And we're looking here at the first page.  These were

11    documents related to Michael Antonov of Tubus LLC's investment

12    into the 2015 Fund.  And there's an email here dated April 2nd

13    of 2015.  So this sort of trying to orient you here.

14              MR. FAKHOURY:  Can you scroll down, Mr. Torres, to

15    page -- I think it might be page 7.

16        Okay.  Perfect.

17                   (Exhibit published.)

18    Q.  Let's start here.  Mr. -- Mr. Rothenberg, this is the

19    Summary of Principal Terms for the 2015 Fund, and specifically

20    the documents given to Mr. Antonov.

21        Do you see that?

22    A.  I see that.

23              MR. FAKHOURY:  Okay.  Let's go to page 10.

24                   (Exhibit published.)

25    / / /

BY MR. FAKHOURY:

Q.  And let's stop here.  And there's a section here on related entities that's captioned "Bend Reality," and it says here at the bottom that the -- well, the paragraph reads:

    The manager manages Bend Reality LLC, a Delaware corporation, formed for the purpose of enhancing the manager's branding and positioning in the virtual reality sector primarily through the River brand which includes a virtual reality accelerator, a production studio and other business ventures.

    That's what that language says, correct?

A.  That's correct.

Q.  Is this an example in your mind of the relationship between the virtual reality accelerator and the production studio which was later called River Studios?

A.  That's about as clear as can be.

    This is a term sheet, by the way.  It's the first two pages of a long document.  And it's meant to draw attention to specific terms.  It doesn't have every term, but it's meant to make sure that anybody who sees these documents sees these terms.  And they always saw the term sheet.

            THE COURT:  Mr. Rothenberg, I'm going to ask you to confine your answers to the questions that are placed to you by counsel.

            THE WITNESS:  Yes, Your Honor.

BY MR. FAKHOURY:

Q.  You testified that at some point River Studios and the accelerator split.  And can you remind -- remind me when that was?

A.  Yes.  It was when we got -- when River got its first outside investor in late February of 2016.

Q.  Okay.

        MR. FAKHOURY:  We can take this down, Mr. Torres.

Q.  Okay.  Another question about River Studios is how was River Studios funded?

A.  I funded it.

Q.  How?

A.  We mentioned earlier that I raised money by selling some carry equity units to Mr. Farwell and others.  I also sold a stake in Rothenberg Ventures Management Company.  And I raised actually more than a couple million dollars doing that.  And I used that money to fund River Studios.

Q.  I want to turn to the Pilot Grove investment specifically.

    And start by asking you -- we heard testimony from David Frank.  Did Mr. Frank work as an employee for Rothenberg Ventures?

A.  Not at any time.

Q.  Why was he used or why was he reaching out to potential investors on behalf of both Rothenberg Venture VC funds and River Studios?

1    **A.**  I met him at a tech conference.  He approached me cold.  I

2    didn't know him.  And he expressed a lot of enthusiasm for

3    River Studios.  River Studios was also at that tech

4    conference.

5        He had tried the technology that we were building at River

6    Studios.  He met some of the team.  And he wanted to meet me.

7    He expressed a lot of enthusiasm.

8        And he said that he had a number of friends and potential

9    investors that were already interested in investing in River

10    Studios, and they had asked him to try to meet me so that that

11    connection could be made.

12        So he -- he was -- he was asking if he could make

13    introductions for us.  And I believe he was doing that to try

14    to get a job.

15            **MR. FAKHOURY:**  Mr. Torres, can you pull up

16    Exhibit 205.

17                        (Exhibit published.)

18    **BY MR. FAKHOURY:**

19    **Q.**  Okay.  Mr. Rothenberg, I'm showing you Exhibit 205.  This

20    is in evidence.

21        This is an email from you to Dominic Polizzotto and

22    Lawrence Weisman with Mr. Frank cc'd, dated February 17, 2016,

23    which has a couple of attachments on it.

24        Do you see that on your screen, sir?

25    **A.**  I see that.

 1            **MR. FAKHOURY:**  Okay.  Can we go to page 12 of this

 2    exhibit.

 3                        (Exhibit published.)

 4    **BY MR. FAKHOURY:**

 5    **Q.**  I wanted to ask you a couple questions about this investor

 6    slide presentation.  And actually my first question is did you

 7    produce these slides?

 8    **A.**  I think "produce" is a fair word, yes.

 9    **Q.**  Let's go to page 27.

10         Well, actually hold on a second.  You said "produce" is a

11    fair word.  I mean what -- what role did you play in putting

12    these slides together?

13    **A.**  I didn't make the individual slides, but they were made at

14    my direction.

15    **Q.**  Okay.

16    **A.**  So that's why I'm comfortable with the word "produce."

17            **MR. FAKHOURY:**  Okay.  Let's go to page 27 now.

18                        (Exhibit published.)

19    **BY MR. FAKHOURY:**

20    **Q.**  My first question about this slide deck is what -- what is

21    this trying to represent here?  I'm circling this middle part

22    of this page that has -- it says Rothenberg Ventures 2012,

23    River 2014, River Studios 2015, and has sort of an arrow.

24         What is -- what is going on here?

25    **A.**  Okay.

1        Well, I think the thing you circled is describing that in

2    2012, the venture capital firm was formed, Rothenberg

3    Ventures.

4        And then in 2014, Bend Reality, which became River, was

5    formed with the purposes of being -- you know, running a

6    frontier tech accelerator.

7        And then as an offshoot of that, in 2015, I built a

8    virtual reality production studio, and they're symbiotic.

9            **MR. FAKHOURY:**  Let's go to page 30 of this exhibit,

10    Mr. Torres, please.

11    **Q.**  I want to talk about both sides of this slide here.  Let's

12    start here at "Terms of Fundraise."

13                    (Exhibit published.)

14    **BY MR. FAKHOURY:**

15    **Q.**  The "Terms of Fundraise" indicates seeking two to three

16    value-add investors.  And I guess my question is was it ever

17    contemplated that Pilot Grove would be the only person at the

18    table at River Studios with you?

19    **A.**  No.

20    **Q.**  Is that why it says two to three value-add investors?

21    **A.**  It is.  I was trying to be very transparent that my goal

22    was to have multiple investors who added value, meaning could

23    make introductions, could help out the company in various

24    ways, not one investor.

25    **Q.**  Okay.

 1          Let's talk about the second column here for "Uses of

 2     Capital."  And there's a couple different items here.

 3          Let's start with two to three VR studio acquisitions

 4     similar to our acquisition of Twisted Oak in Halifax.

 5          So let me start by asking what was Twisted Oak?

 6     **A.**  I mentioned earlier that there was a potential deal with a

 7     small virtual reality shop in Bend, Oregon that fell through.

 8          We -- still at Rothenberg Ventures and in -- in the River

 9     Accelerator team kept a lot of conversations going with

10     various virtual reality studio shops in particular.

11          Some of them weren't quite ready for something like an

12     accelerator, but they still had valuable teams and valuable

13     technologists, in my opinion.

14          So one of those teams was called Twisted Oak.  They were

15     based in Halifax, Canada.  And we reached an agreement with

16     them in August of 2018.  River reached an agreement with

17     Twisted Oak for Twisted Oak to become part of River via an

18     acqui-hire, meaning start paying for them, just hire them

19     basically.

20     **Q.**  Okay.  You said -- you just said now August of 2018.  I'm

21     assuming you misspoke there.

22     **A.**  I did.  Thank you for letting me correct that.  I meant

23     2015.

24     **Q.**  Got it.

25          Were there other VR studios you were hoping to acquire?

1  A.  Yes.

2  Q.  There's a -- a phrase here at the bottom (indicating)

3  "general runway."

4      What did "general runway" mean to you at the time you sent

5  these slides to Mr. Weisman and Mr. Polizzotto?

6  A.  That's a catch-all phrase that means anything that the

7  manager sees fit that benefits the company.

8                      (Exhibit published.)

9  BY MR. FAKHOURY:

10 Q.  There's a commit date of February 22nd, 2016 and a wire

11 date of February 26, 2016.  Why these dates?

12 A.  This deck was made for any investors that were interested

13 in investing in River Studios, but this particular slide is

14 usually -- I would update this slide based on conversations

15 with the investors.

16     In this case, Pilot Grove had said that those were the

17 dates, if they were going to invest, that they would commit

18 and wire.  So we put that in the slide to be on the sage page.

19 Q.  Now, we've heard testimony that ultimately Pilot Grove

20 invested $2 million into River Studios.

21     And how -- how was that money used?

22 A.  It was used to buy carry equity units, as we mentioned

23 before, to attract talent, and some of it was used for general

24 runway.

25 Q.  There's been testimony in this trial, both from

1    Mr. Fujimoto and from Agent Ghio, about how that money that

2    came from Pilot Grove went through sort of a long-winded trail

3    into various bank accounts on the day that the money came in,

4    including your personal bank account.

5        So why -- why was money being moved around like that?

6    A.   First of all, I would not do it that way if I had the

7    chance to do it again.

8        Secondly, I believed money was fungible.  And as I

9    mentioned before, there were -- there were intercompany

10   agreements and relationships where at the time I believed that

11   some amount of money flowing through would help make that

12   clearer, which it did not, in retrospect.

13   Q.   After Pilot Grove's investment, were you able to find

14   other investors into River Studios?

15   A.   There was a lot of interest and I had a lot of meetings,

16   but there were -- there were no investors where -- there were

17   no other outside specific investors where there was agreement

18   reached and having them funded.

19   Q.   Okay.

20       Was there a decision made after Pilot Grove's investment

21   to have the 2015 Fund invest into River Studios?

22   A.   Yes, there was.  I made that decision.

23   Q.   Can you walk us through that decision?

24   A.   In my mind, from inception the purpose of the River

25   vehicle was to provide an avenue for the Fund to make more

 1    money, specifically in the virtual reality sector and, more

 2    broadly, technology.

 3        The River Accelerator was pretty successful in terms of

 4    its business model of attracting companies and getting

 5    warrants from those companies to be in River.

 6        And the purpose of River Studios became more clear that

 7    River Studios had its own business of the content and -- and

 8    of course Pilot Grove made a investment providing proof of

 9    outside investor.

10        So I had intended to have the fund invest in River Studios

11    from the beginning.  I expressed that, I believe, in the

12    contracts that we had with the investors, talked to investors

13    about that.

14        And in -- in my mind, getting an outside investor in River

15    Studios was the green light to have the fund invest in River

16    Studios, which I did on April 4th of 2016.

17    Q.  You testified a moment ago that you believed investors in

18    the 2015 Fund were informed that there could be an investment

19    in a River Studios; is that right?

20    A.  I do believe that.

21        MR. FAKHOURY:  Okay.  Mr. Torres, can you pull up

22    Exhibit 458.

23    BY MR. FAKHOURY:

24    Q.  This is back to --

25                    (Exhibit published.)

 1          **MR. FAKHOURY:**  And we're going to go to page 51.

 2   **Q.**  And just to orient ourselves here, this was some of the

 3   documents given to Mr. Antonov who invested in the 2015 Fund.

 4          **MR. FAKHOURY:**  So, Mr. Torres, can we can to page 51.

 5   And can you scroll down.

 6       And scroll down a little bit more.

 7       Okay.  Well, scroll back up.

 8                          (Exhibit published.)

 9   BY MR. FAKHOURY:

10   **Q.**  There's a section here labeled 4.4 Competing Activities.

11       Is -- and there's a big huge block paragraph.  But talks

12   about members, managers, affiliates engaging in, engaging,

13   investing in independently or with others, and it lists a

14   whole variety of funds, bank -- accounts, including Bend

15   Reality LLC.

16       At that -- at the time, did you believe that this was

17   informing investors into the 2015 Fund that their investment

18   could be -- that the fund could invest into Bend Reality or

19   River Studios?

20   **A.**  Yes, I believe that clause explicitly says that.

21          **MR. FAKHOURY:**  Okay.  Let's -- let's pull up

22   Exhibit 234.  This is also in evidence.

23                          (Exhibit published.)

24   BY MR. FAKHOURY:

25   **Q.**  Okay.  Mr. Rothenberg, we heard -- well, we heard some

1    testimony about a request to Pilot Grove in August of 2016

2    about amending their promissory note.  And this is an email

3    dated August 10th of 2016, from Justin Grooms to Mr. Weisman

4    and cc'ing you regarding some changes to -- a proposed change

5    to Pilot Grove's promissory note.

6        Do you -- do you remember why there was an effort to seek

7    this amendment?

8    **A.**  I don't specifically remember, but I can speculate.

9    **Q.**  Well, I don't want you to speculate.  If you don't

10   remember, that's fine.

11       Okay.  I'm going to show you now Exhibit 235.

12           **MR. FAKHOURY:**  And can you scroll down, Mr. Torres,

13   to this bigger email at the bottom here.  Yeah.

14       That's fine.  We could blow it up a little bit too.

15                       (Exhibit published.)

16   **BY MR. FAKHOURY:**

17   **Q.**  Okay.  Mr. Rothenberg, I'm showing you Exhibit 235,

18   page 1.  And I'm going to focus your attention on this email

19   dated August 13th of 2016 (indicating).

20       Do you remember sending this email?

21   **A.**  (Reviewing document.)

22       Yes, essentially.  Yes.

23   **Q.**  Okay.  What was going on at the time you sent this email?

24   **A.**  This email was sent in August of 2016.  We had -- at the

25   end of July had received an SEC letter that I was disclosing

1    to investors, to team members, to everybody I -- who had a

2    stake in my various ventures.

3        And it was causing massive panic.  People were leaving the

4    company.  Investors were pulling out.  And it was -- it was

5    total chaos.  That's what was happening, August 2016.

6    **Q.**  Okay.

7        Towards this part of your email (indicating), it says

8    "Rothenberg Ventures and River Studios worked so closely

9    together that corporate housekeeping was poor and that created

10   confusion later, especially for me because I've confused

11   control and ownership with everything related to these

12   companies."

13       That's -- that's what that portion of the exhibit says,

14   right?

15   **A.**  I see it.

16   **Q.**  What did you mean at the time when you -- when you said

17   "I've confused control and ownership"?

18   **A.**  This is extremely embarrassing because I felt like I had a

19   good handle on control and ownership up until this point.  And

20   then in August of 2016, I started receiving a lot of

21   conflicting opinions.  And I was genuinely confused at that

22   time.

23       And that's -- and now I'm literally having to tell the

24   world I was confused.  It's very -- it's very stressful.

25   **Q.**  Let's go to the next paragraph that says, "River Studios

1    was controlled by me since inception almost two years ago, but

2    after diving in deep in advance of the Series A, I now believe

3    to be wholly owned by the Rothenberg Ventures funds at the

4    time of your investment since it was funded entirely by LPs."

5        What did you mean by that?

6    **A.**  Up until this point, I thought that I had funded River

7    Studios.  I received some conflicting information that

8    possibly it was funded by LPs.  It was confusing to me.

9        And I felt like I had an obligation to disclose

10   immediately what I was learning.  Possibly moving too fast

11   here.  But my -- I was sharing my confusion with my -- with

12   the people who had a stake in my ventures so that I could try

13   to get their help and -- and to try to address it, try to --

14   try to make sure that I could do what I could to make people

15   happy.

16          **MR. FAKHOURY:**  Okay.  Let's -- Mr. Torres, can you

17   pull up Exhibit 238.

18                      (Exhibit published.)

19   **BY MR. FAKHOURY:**

20   **Q.**  Okay.  Mr. Rothenberg, I'm showing you Exhibit 238.  We've

21   seen --

22          **MR. FAKHOURY:**  Actually, I'm sorry, Mr. Torres, can

23   you pull up Exhibit 272.  My -- my apologies.

24        Okay.  Maybe we could zoom out a little bit.

25                      (Exhibit published.)

1    BY MR. FAKHOURY:

2    Q.  Okay.  I'm showing you Exhibit 272.  We've seen -- we've

3    seen this email come up in a -- in a number of -- with a

4    number of witnesses and in a number of exhibits.

5        First of all, let me just indicate that this is an email

6    from Investor Relations at Rothenberg Ventures dated

7    August 22nd, 2016.

8        And it's titled "Rothenberg Ventures LP Update Letter

9    Number 1."

10       Do you remember sending this email?

11   A.  (Reviewing document.)

12       I don't know if I sent it, but I certainly oversaw the

13   drafting of this, yes.

14   Q.  Okay.  And you -- you already testified a little bit about

15   August 2016 being sort of a time of chaos.  But more generally

16   what -- what was going on at the time -- or more specifically,

17   rather, what was going on at the time that this specific email

18   was sent?

19   A.  This was easily one of the worst weeks of my life.  In

20   addition to I felt like I had a pretty good team, and some of

21   people that had been with me for a long time relative to the

22   firm had left abruptly and usually because of the SEC

23   investigation.

24       I mean I was reeling, the firm was reeling.  And it looks

25   like -- based on the -- what it says here that this is when

1    the -- some really negative press had come out.  And that was

2    very damaging.

3         And then I was getting inundated with -- and appropriately

4    so, with questions from investors in particular and some of

5    our portfolio companies and people who care about me and care

6    about us, there were lots of inbound.

7         I wasn't even able to respond to all of the people who

8    were trying to ask what's going on, try to -- try to help.

9    And I felt extremely overwhelmed.  And I tried to handle that

10   by writing a mass letter.

11   Q.  You said there were -- there were key people who left.  Is

12   there anyone in particular you're thinking of?

13   A.  In -- in the -- in July and August, I lost Tom Leep

14   Senior, Tommy Leep Junior, Dave Haase had been helping out

15   with finance.  I had already lost Lynne McMillan.  So my whole

16   finance department was -- was decimated.  Yeah, I mean there

17   were others, too.

18        MR. FAKHOURY:  Let's scroll to the second page of

19   this exhibit.

20                    (Exhibit published.)

21   BY MR. FAKHOURY:

22   Q.  And let's focus here on this paragraph that says

23   "5 million over two years has been invested in River Studios,

24   which the Rothenberg Ventures funds have the economic rights

25   to."

1    My first question is what did you mean by "economic

2    rights"?

3    **A.**  I mention -- this is in the same, you know, ten-day period

4    of time that we -- that the other email where I was expressing

5    my confusion.

6    And I still -- at this point I believe I still wasn't

7    really sure what to make of the conflicting analysis that I

8    was getting from, you know, previous finance people, new

9    finance people, other people I was getting input from.

10    And so -- so I characterized the fund's relationship with

11    River Studios as economic rights because it's a kind of a

12    broad general term.  And it means -- it means that I believe

13    there's an economic relationship, but I'm not being specific

14    there.

15    **MR. FAKHOURY:**  Let's -- let's now go to Exhibit 238,

16    Mr. Torres.

17    (Exhibit published)

18    **BY MR. FAKHOURY:**

19    **Q.**  And can you -- and this is Exhibit 238, Mr. Rothenberg,

20    which is another email sent from Investor Relations on

21    Tuesday, August 23rd, 2016.

22    This looks to be an email sent later the same day as

23    the -- as the previous email.

24    Do you recall why there was a need to send a second email

25    out?

1    **A.**   (Reviewing document.)

2         Could you be clear what you mean by the previous email?

3    **Q.**   Sure.

4         **MR. FAKHOURY:**   Could we go back to Exhibit 272 for a

5    moment and scroll to the top.

6                    (Exhibit published.)

7    **BY MR. FAKHOURY:**

8    **Q.**   So this email, this is Exhibit 272, is dated August 22nd

9    at pretty early in the morning GMT time, although I can't even

10   figure out the math it would take to figure out what time that

11   would be in San Francisco.

12   **A.**   August 21.

13   **Q.**   Presumably this would have been on August 21st.  It's

14   labeled "Update Letter Number 1."

15         **MR. FAKHOURY:**   Now, can we go to Exhibit 238.

16                    (Exhibit published.)

17   **BY MR. FAKHOURY:**

18   **Q.**   This is Update Letter Number 2, and it looks to be just

19   the next day.

20         So why was there a need to send a second update letter

21   just a day after the first update letter?  If you recall.

22   **A.**   Well, in retrospect, there probably wasn't a need.  But I

23   felt like, from my perspective, a lot was happening.  I think

24   from other people's -- well, I can't -- so I felt like I

25   wanted to try to give updates almost in real time.  I'm not

 1    sure, that may have been too fast.  But I think this was two

 2    days later.

 3    **Q.**  Okay.

 4         **MR. FAKHOURY:**  Your Honor, I'm about to shift topics.

 5    I don't know -- I know we're at 11:40.  I don't know if this

 6    will a good time for a break.

 7         **THE COURT:**  I didn't mean to speak over you.

 8      Let's just move things up by five minutes.  That's fine.

 9      Members of the jury, let's take our second recess.

10         **THE CLERK:**  Please rise for the jury.

11      (The following proceedings were heard out of the presence

12    of the jury:)

13         **THE COURT:**  All right.  We're outside the presence of

14    the jury.

15      Mr. Fakhoury, anything for the record?

16         **MR. FAKHOURY:**  No, Your Honor.  Thank you.

17         **THE COURT:**  Mr. Waldinger?

18         **MR. WALDINGER:**  No, Your Honor.

19         **THE COURT:**  Mr. Fakhoury, any sense of how long your

20    direct will go?

21         **MR. FAKHOURY:**  I -- I -- at the pace we're going,

22    I'll probably finish today.  If you want a specific time

23    estimate, I would say at least another hour.

24      I don't know if the Court --

25         **THE COURT:**  Order of magnitude is fine.

 1          **MR. FAKHOURY:**  Okay.

 2          **THE COURT:**  I've been advised by the Clerk's Office

 3   that there -- they are aware of several protests that will be

 4   occurring today in the Bay Area related to the

 5   Israel-Palestinian conflict, including a protest that will

 6   occur at or near this building at 4:30 p.m.

 7      I know our trial will be long over by then, but I'm sure

 8   there are persons in the room here who might otherwise plan to

 9   be here at that time.

10      And we don't know or I don't -- I certainly don't know,

11   but the court administration doesn't know exactly what's going

12   to happen, but in prior like situations there have been a lot

13   of people and it has made it difficult to move around in

14   traffic and so forth.  So just kind of a word to the wise.

15      Let's be in recess.

16          **THE CLERK:**  Court is in recess.

17      (Recess taken at 11:43 A.M.; proceedings resumed at

18   12:01 P.M.)

19      (The following proceedings were heard in the presence of

20   the jury:)

21          **THE CLERK:**  You may be seated.

22          **THE COURT:**  All right.  Let's go back on the record.

23      All the jurors are in their assigned seats.

24      The parties and counsel are at counsel table.

25      Mr. Rothenberg is on the stand.

 1          Mr. Fakhoury, your witness.

 2              **MR. FAKHOURY:**  Thank you, Your Honor.

 3          Thank you, your Honor.  Excuse me.

 4          Okay.

 5     **Q.**  Mr. Rothenberg, I want to shift topics again.  We've

 6     talked about Silicon Valley Bank.  And we've talked about

 7     Pilot Grove.  So now I want to talk about Unity.

 8          And I want to start by asking first in general what is a

 9     co-investment vehicle or co-investment opportunity or special

10     purpose vehicle?  Some of these terms we've heard used

11     interchangeably at trial.

12     **A.**  Yes, we have.

13          A co-investment opportunity arises when the main fund,

14     which in this case was the 2013, 2014, 2015, 2016 Funds, when

15     the current main fund identified an investment opportunity

16     that we would like to make in the main fund, and we were able

17     to, with the permission of the company, secure a larger

18     investment opportunity than I intended for the main fund to

19     make.

20          And when there was extra investment opportunity, in some

21     of those cases, we would offer to the investors in that fund

22     the opportunity to invest specifically for that company.

23     That's called a co-invest.  And the way that that was

24     structured was called a special purpose vehicle.  So that's

25     the relationship between those phrases.

1    **Q.**  Prior to the Unity opportunity, what were some of the

2    other co-investment or special purpose vehicles that

3    Rothenberg Ventures funds had pursued and invested in?

4    **A.**  Rothenberg Ventures funds made two investments into

5    SpaceX.  They were secondary transactions in both cases.  Also

6    offered a co-investment by form -- by way of a special purpose

7    vehicle to investors.

8        Also the Matterport investment was -- also had a

9    co-investment for the investors in that fund.

10       And Chubbies also had a co-investment.

11       There were a few others, too.  Those -- those were

12   examples.

13   **Q.**  Okay.  So let's -- let's go back to Unity now

14   specifically.

15       How did Rothenberg Ventures get an opportunity to purchase

16   pre-IPO shares of Unity?

17   **A.**  Unity was my white whale.  It -- in the VR space in

18   particular, there was one extremely valuable company in my

19   opinion that was -- provided the underlying technology behind

20   a lot of the companies that we were interested in.

21       And that gave Unity Software a larger opportunity to scale

22   and to reach unicorn, or billion-dollar status.  So I was

23   aware of Unity for a long time and wanted to invest in it.

24       The only real way to invest in a company of that size

25   is -- a private company is through relationships.  And so the

 1    way that I wanted to try to invest in that company was by

 2    ideally meeting the CEO and forming a relationship.  And then

 3    if that went well, then I was hoping that the CEO would allow

 4    us to invest in his company.

 5    **Q.**  Were you able, in fact, to meet the CEO of Unity?

 6    **A.**  I was.

 7    **Q.**  What's his name?

 8    **A.**  John Riccitiello.

 9    **Q.**  And how is it that you and Mr. Riccitiello were able to

10    meet and chat and get together in that way?

11    **A.**  Well, at first I couldn't get on his calendar or get his

12    attention.

13         But it turns out that my first analyst by the name of

14    Dylan Flinn had worked really for him previously and knew him.

15    And so he was able to ask Mr. Riccitiello if he would like to

16    meet me.  And at first he was -- you know, respectfully

17    declined.

18         But -- but then I invited him to a Warriors games, and he

19    wanted to do that.  That's where I met him.

20              **MR. FAKHOURY:**  Okay.  Mr. Torres, could you pull up

21    Exhibit 250.

22         And we can just leave it here.

23                        (Exhibit published.)

24    **BY MR. FAKHOURY:**

25    **Q.**  Mr. Torres, I'm showing you Exhibit 250 which is -- this

 1    is the top of a longer email chain from it looks like

 2    May 2016.  And this top email's from John Riccitiello to Neil

 3    Devani and you and Mike Foley who testified at trial.

 4        Do you remember when roughly you first approached or met

 5    with Mr. Riccitiello?

 6    **A.**  I remember we were trying to neat with Mr. -- I was trying

 7    to meet Mr. Riccitiello since, you know, 2015.

 8        But I believe the actual meeting was around the time of

 9    this email.

10    **Q.**  Okay.

11        Why -- well, ultimately, as we've heard testimony, there

12    was some discussions about Rothenberg Ventures and buying

13    shares of an employee who was leaving Unity.

14        And I guess my question is why -- why did you decide to

15    pursue the Unity investment opportunity as a co-investment

16    rather than as an investment for the main fund?

17    **A.**  All co-investments were investments from the main fund.

18    And they would also -- they were -- there were situations that

19    I thought were in some ways particularly good investments, and

20    I could secure an extra opportunity to invest above what I --

21    I would have the fund invest.

22    **Q.**  Okay.

23    **A.**  So basically extra opportunity.

24    **Q.**  Who did you approach -- or who did you direct your team to

25    approach, or both, concerning the Unity co-investment

 1  opportunity?

 2  **A.**   Primarily everyone in the 2016 Fund who had expressed

 3  interest in co-invests.

 4  **Q.**   And how were those potential investors approached?

 5  **A.**   Phone calls, emails, texts, in person.

 6  **Q.**   Okay.

 7       Was this investment opportunity time-sensitive?

 8  **A.**   Extremely.

 9  **Q.**   Why?

10  **A.**   Because these opportunities are -- they're the holy grail

11  of investing.  If you can get access to a SpaceX or a Unity at

12  this time, there's a general belief -- I had a belief, I

13  believe others did too -- well, I had a belief that this was a

14  potential 5 to 10X company, meaning you could get five to ten

15  times your money if you invested in it.  But not the same risk

16  necessarily as a normal early stage startup because it was

17  already generating a tremendous amount of revenue.

18       So the chances that it was going to go to zero, in my

19  opinion, were low.  But the chances that it were going to --

20  it was growing rapidly as a pre-IPO company were high.

21  **Q.**   Okay.  So I asked you why was the investment opportunity

22  time sensitive.  And you explained how -- how the investment

23  opportunity was a good one.

24       So let me ask again why was it a time-sensitive

25  investment --

 1    **A.**  I'm sorry.

 2    **Q.**  -- opportunity?  No problem.

 3    **A.**  It was time-sensitive because there was a lot of demand

 4    for it, and if we didn't move quickly that we would lose the

 5    opportunity.

 6    **Q.**  And the demand came from the fact, I think as you were

 7    assuming a moment ago, that there was a real potential for

 8    significant return?

 9    **A.**  Yes, that's how they're connected.

10    **Q.**  Okay.

11              **THE COURT:**  Excuse me, Mr. Fakhoury.

12        Ms. Lee, do you know if there's a way of just turning off

13    the lights at the back of the courtroom?  We've got a light

14    that's flashing.

15              **THE CLERK:**  I am contacting someone to come and fix

16    it.

17              **THE COURT:**  Okay.  Terrific.

18              **THE CLERK:**  I'm not sure that I can turn it off.

19              **THE COURT:**  Yeah.

20        So members of the jury, even more encouragement than usual

21    just to focus on the witness and not the back half of the

22    courtroom where we have kind of a disco thing going on that

23    we'll try to address as quickly as we can.

24        Mr. Fakhoury, go ahead.

25              **A JUROR:**  It's keeping me awake.  Sorry, Your Honor.

```
 1              MR. FAKHOURY:  Okay.  Mr. Torres, can you pull up
 2   Exhibit 301.
 3                       (Exhibit published.)
 4   BY MR. FAKHOURY:
 5   Q.  Okay.  And we've seen versions of this slide deck.  Not
 6   versions.  We've seen this slide deck several times throughout
 7   trial.  This was a slide deck given to investors in the Unity
 8   Co-Fund, correct?
 9   A.  Yes, that's correct.
10   Q.  Okay.  Did you put these slides together?
11   A.  No, but they're at my direction.
12              MR. FAKHOURY:  Okay.  Let's go to page 5 of this
13   exhibit.
14                       (Exhibit published.)
15   BY MR. FAKHOURY:
16   Q.  Can you walk us through what's going on here on this
17   slide?  What is this slide -- or what did this slide mean to
18   you?
19   A.  This is -- this slide is about co-investment opportunities
20   generally for -- for giving -- first it gives three examples
21   of co-investment opportunities that Rothenberg Ventures had
22   provided in the past, and examples of their unrealized gains
23   3X, 3X, 5X.
24       And then it talks specifically about co-investment terms
25   for 2016 Fund co-investments, and in this case the Unity
```

1  co-invest.

2  **Q.**  There are references here to the main fund.  What did that

3  mean to you?

4  **A.**  I mentioned before that the co-investment opportunities

5  were offered to investors in the main fund, which was the --

6  the annual funds.  So 2013 Fund through 2016 Funds.  This

7  co-investment was offered in 2016 so the main fund refers to

8  the 2016 Fund.

9  **Q.**  Was it your belief that investors approached about the

10  Unity co-investment were agreeing to invest in the 2016 Fund?

11  **A.**  Well, definitely.  I mean the co-invests were only offered

12  to people who are investing in the 2016 Fund.  If -- if they

13  decided to invest in a co-invest, they had to also invest in

14  the 2016 Fund.  So, yes.

15      **MR. FAKHOURY:**  Let's go to Exhibit 254.

16  And can you scroll down, Mr. Torres.

17  Okay.  Let's -- sorry, go back up a little bit.

18  Okay.  You could stop here.

19                   (Exhibit published.)

20  **BY MR. FAKHOURY:**

21  **Q.**  Mr. Rothenberg, I'm showing you Exhibit 254.  And there's

22  a reference in -- this is an email that you sent concerning

23  the Unity --

24      **THE CLERK:**  Whoops, sorry.

25      **MR. FAKHOURY:**  No problem.

1    **Q.**  Concerning the Unity investment.  And it says here Mike

2    offered us an intro to Tony.

3       Mike, is that Mike Foley?

4    **A.**  It is.

5    **Q.**  Okay.  Who's Tony?

6    **A.**  Tony -- Tony was, I believe, an employee who was exiting

7    Unity.  And John Riccitiello had mentioned that Tony was --

8    was trying to sell -- was trying to sell his shares of Unity.

9    So there was a secondary opportunity if we wanted to buy those

10   shares.

11   **Q.**  Okay.  So the secondary opportunity was to buy Tony

12   Garcia's shares, correct?

13   **A.**  That's correct.

14   **Q.**  Did that sale ultimately happen?

15   **A.**  It did but not with us.

16   **Q.**  Okay.

17      Why didn't Rothenberg Ventures -- why was Rothenberg

18   Ventures unable to purchase Tony Garcia's shares?

19   **A.**  Well, Tony was trying to run an auction for the shares.

20   And at that time, I wasn't interested in an auction.  So he --

21   he went with somebody else.

22   **Q.**  Okay.

23      Now, there was a second opportunity shortly after this one

24   to buy Unity shares, right?

25   **A.**  That's right.

```
 1   Q.  And who -- where did that opportunity come from?  Or whose

 2   shares were potentially for sale?

 3   A.  Well, John Riccitiello set that up himself.  I think it

 4   may have been his shares or his -- possibly his spouse's.

 5   Q.  Okay.

 6       How far along in the process did that investment

 7   opportunity -- let me -- let me remove that question.

 8       So it sounds like there was an opportunity after the sale

 9   with Tony Garcia did not happen to purchase shares potentially

10   from Mr. Riccitiello's spouse.  How far along in the

11   investment process did the conversations go?

12   A.  It went all the way to their commitment and paperwork for

13   us and the ball was in our court to finish the deal.

14   Q.  Okay.

15           MR. FAKHOURY:  Mr. Torres, can you pull up

16   Exhibit 256.

17           THE WITNESS:  That was one of most exciting deals of

18   my life.

19                     (Exhibit published.)

20   BY MR. FAKHOURY:

21   Q.  Okay.  This is an email dated July 21st, 2016, from Nam

22   Kim to a number of people at Rothenberg Ventures including you

23   and cc'ing Mike Foley.

24       You just mentioned a second ago there were documents

25   prepared.  Is this what you're referring to when you mentioned
```

1   documents were prepared?

2   **A.**   Yes.   This is a very exciting email.

3   **Q.**   Okay.   Why is that?

4   **A.**   This is not -- before this point, you can have discussions

5   and they can be very serious to the point where you can even

6   get verbal commitments.   But until you have a stock transfer

7   agreement or whatever -- in this case, but whatever the

8   documents are to actually purchase, you don't -- you don't

9   know if they're going to get to this point.

10      You hope so.   You can have reason to believe so.   But when

11  you get this email, this is the green light, all-hands-on-deck

12  email.

13  **Q.**   Okay.

14      You testified that the ball was in your court, or in

15  Rothenberg Ventures' court.

16      What do you mean by that?

17  **A.**   I mean at this point, you -- you can -- if you -- so at

18  this point, if the stock transfer agreement reflects what your

19  understanding is, in other words, if you agree, then 99 out of

20  100 times if you sign that document and fund, the -- the

21  shares are yours.

22  **Q.**   Okay.

23      Was Rothenberg Ventures able to sign and fund this stock

24  purchase agreement?

25  **A.**   No.

1    Q.   Okay.  Why not?

2    A.   Because there's a very short window that you have to raise

3    the money and enter into agreements with the folks that you're

4    raising money from.  So you have to do both of those things.

5    And you have a short window to do that before the company

6    says, hey, this is taking too long, we're going to go with

7    someone else.

8    Q.   How much money did Rothenberg Ventures need to raise to

9    buy the shares from Ms. Riccitiello?

10   A.   I believe it was 14 to 17 million.

11   Q.   And was Rothenberg Ventures trying to raise that money?

12   A.   Absolutely.

13   Q.   Who -- who specifically was approached about raising -- or

14   investing in the Unity co-investment?

15   A.   Any investor in the 2016 Fund that expressed interest in

16   co-funds and any investor that was -- that had said they

17   wanted to invest in the 2016 Fund.

18        It's a good opportunity to close those investors.  You

19   say, hey, this is your moment, invest in the 2016 Fund and you

20   get this co-invest.

21        This was the most sought after co-invest we ever had.

22   Q.   Okay.

23        We've heard testimony at trial about some specific folks

24   who invested into these co-funds or -- let me rephrase that --

25   specific investors who were approached and ultimately wired

 1    money in connection with Unity.

 2        And I wanted to ask you about that in some more detail.

 3        So the Binns Family wired $100,000 for the Unity -- for

 4    the Unity co-investment.

 5        What happened to that money?

 6    **A.**  Let's see.  So the exhibit disappeared, but I assume I

 7    don't need that.

 8    **Q.**  Yeah.

 9    **A.**  Okay.

10    **Q.**  Don't worry about the exhibit.

11    **A.**  All right.

12        So this -- this was a -- moving quickly.  And on some

13    occasions when we were doing co-investments, we would -- if it

14    was moving quickly, we would use the Rothenberg Ventures

15    Management Company account ending in 8931 to collect the

16    money.  And it was -- that was on the fund deck that you just

17    showed.

18        So what happened to the money was they wired money in.

19    And I don't remember, you know, the exact date or whatnot, but

20    it went to the Management Company.

21    **Q.**  Let me ask the same question about money that was sent in

22    by GHF.  That would be John and Theo Melas-Kyriazi.  What

23    happened to their money?

24    **A.**  Same thing.  All of the Unity investors, their money went

25    to the Management Company.  Not always directly.  Sometimes

1    indirectly.

2    **Q.**   Okay.  So you said all of the Unity investors.  I take it

3    that means Ron and Lena Goldberg as well?

4    **A.**   I'm sorry.  In the case -- in the case of the GHF, though,

5    their money ended up going to the 2016 Fund after the

6    Management Company.

7    **Q.**   Okay.

8    **A.**   But, I'm sorry, you asked a question about Goldberg?

9    **Q.**   Yes.  So for Ron and Lena Goldberg, once they wired in

10   their money for the Unity co-investment, it sounds like that

11   money was also ultimately sent to RVMC's account?

12   **A.**   Either directly or indirectly, yes.

13   **Q.**   Okay.

14   **A.**   We didn't -- we didn't have time to open a Unity-specific

15   account.  So there wasn't a bank account specific for Unity at

16   that time yet.

17   **Q.**   Okay.  Ultimately, and you just testified a moment ago

18   that the sale of the shares didn't go through, in part because

19   of time.

20       Were there other reasons why you felt that the sale did

21   not happen?

22   **A.**   Absolutely.

23   **Q.**   What was that?

24   **A.**   The very next day we got an SEC letter.  And I started

25   telling investors we had that, and they stopped investing.

1    **Q.**  Anything else?

2    **A.**  Not being able to raise the money means we couldn't do the

3    deal.

4    **Q.**  Do you think any press articles that came out around that

5    time killed that deal a little bit?

6    **A.**  Well, I first believed that we were still going to be able

7    to get the deal done even with the SEC letter.  I -- I did not

8    think that that was going to stop the deal.  And at first,

9    even when disclosing that, people were still interested.

10       So that -- that went on for a couple weeks.  It was

11   harder.  It was slower to get people interested.

12       But then within two or three weeks, there was a really

13   negative press article, and that made it even harder.  The

14   reason why that made it harder was because the company then

15   didn't -- started to get cold feet.

16   **Q.**  By "the company," you mean Unity?

17   **A.**  That's right.  They were the -- they were the most

18   affected, as far as I could tell, by the press article.

19   **Q.**  We've heard testimony at trial that ultimately the -- the

20   folks who sent money for the Unity co-investment did get

21   their -- their money back, right?

22   **A.**  All of them.

23   **Q.**  It took a bit of time for -- for folks to get their money

24   back.

25       Why was there a delay in -- in getting that money back?

1   **A.**   At the time of July 2016, there was a lot of activity.

2   There were investors investing in various funds.  There was

3   interest in the co-funds.  The Management Company had a number

4   of robust business relationships bringing in revenue.  There

5   was a lot of money coming and going.

6        When we got the SEC letter, almost everything within, you

7   know, five weeks had stopped.  So once -- once you don't

8   have -- you know, once the money that you have contracted to

9   come in stops coming in, once you -- once people who are, you

10  know, who owe you money will stop paying it, once all of that

11  starts happening, everything kind of slows down, if not

12  freezes up.

13       It doesn't mean the value is not there.  I mean the --

14  value was still there.  The investments were made and so on.

15  But it's a liquidity issue that took a little bit of time in

16  some circumstances.

17  **Q.**   Where -- where did the money ultimately come from that was

18  used to repay the folks who invested in the Unity opportunity?

19  **A.**   Well, GHF was the biggest of the 1.35 million, and that

20  money went to the 2016 Fund.  And they were paid back from the

21  2016 Fund.

22  **Q.**   What about other potential investors?  Do you recall?

23  **A.**   We were -- their money went to RVMC.  And they were -- I

24  think they were all paid back from essentially RVMC or

25  indirectly or directly from RVMC.

 1    **Q.** Okay.

 2        How about Mr. Johnson?  There was some testimony about a

 3    credit card transaction and then it was frozen and then it was

 4    unfrozen.  What was going on there?

 5    **A.** Mr. Johnson was a bit of an unusual case because he was an

 6    employee at River Studios.  And he -- I think he wanted his

 7    money back pretty quickly.

 8        And I don't remember all the details of exactly why it was

 9    a credit card transaction, but I think it had to do with

10    speed.  And so he was paid back pretty quickly in August of

11    2016 via a credit card transaction.

12    **Q.** Okay.  I want to shift topics again.  And now I want to

13    talk about investors into the 2015 and 2016 Funds.

14            **MR. FAKHOURY:**  And I'm going to ask Mr. Torres to

15    pull up Exhibit 360.  This is an Excel spreadsheet.  And if

16    you could open it in Excel, please.

17        And can you pull up the tab on the bottom that says 2013.

18        And actually can you jolly down a little bit to the

19    bottom.

20        Yeah, perfect.

21                    (Exhibit published.)

22    **BY MR. FAKHOURY:**

23    **Q.** Okay.  Mr. Rothenberg, I'm showing you what's been

24    admitted as Exhibit 360.  This is a spreadsheet that has

25    different tabs on the bottom, one for each year relating to

1   the funds.  And we're looking at the tab for 2013.  And

2   there's a list here of investors.

3       These are a list of investors in the 2013 Fund, correct?

4   **A.**  That's what it looks like.

5   **Q.**  Okay.

6       And maybe Mr. -- and it starts under the names -- the

7   first investor is here at line 61.

8           **MR. FAKHOURY:**  If we could scroll down.

9                   (Exhibit published.)

10  **BY MR. FAKHOURY:**

11  **Q.**  The last investor at line 127.  So that looks to be

12  about -- well, 128, actually.  That looks to be about

13  67 individual investors into the 2013 Fund.  Is that right?

14  **A.**  Where do you see that?

15  **Q.**  Just kind of tallying up the lines.  We started at line 61

16  for the first investor, and the last investor is at line 128.

17  That would suggest that there's about 67 individual investors

18  if there's one investor per line.

19  **A.**  I see that.  I didn't prepare the spreadsheet, but I see

20  that.

21  **Q.**  Okay.

22      Let's do the same exercise for the 2014 Fund.

23          **MR. FAKHOURY:**  And again scroll down to the bottom,

24  Mr. Torres, please.

25      And we could actually -- could we go back up here.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1        (Exhibit published.)

2    BY MR. FAKHOURY:

3    Q.   This has here at line number 44 is the first individual

4    investor -- whoops -- to the 2014 Fund, starts at line 44.

5         If we scroll down, the last investor is 144.  So that's,

6    you know, if it's one investor per line, that's roughly 100

7    investors for the 2014 Fund?

8    A.   It is, but I mean I do see errors with this spreadsheet,

9    but that's what it says.

10   Q.   Okay.

11        Let's do 2015.

12            MR. FAKHOURY:  And again, scroll down.

13                      (Exhibit published.)

14   BY MR. FAKHOURY:

15   Q.   And again here line 48, if we scroll down to the bottom to

16   103, so a -- you know, about 55 investors or so.  Between 50

17   so 60?  I'm not a math Olympian.  So between 50 to 60

18   investors?

19   A.   Your subtraction is just fine, that's right.

20   Q.   Okay.

21        I want to focus specifically about --

22            MR. FAKHOURY:  We can take this down, Mr. Torres.

23   Q.   I want to focus specifically about some of the investors

24   we've heard about in this trial, and I wanted to actually

25   start with Natala Menezes.

 1      Did you talk to her in connection with her investment into

 2   the funds?  And I can't recall if it was the '15 or '16 Fund.

 3   But just as a general matter, were you part of the investment

 4   team who was pitching her to invest?

 5   **A.**  Well, I'm part of any team, I think, associated with

 6   Rothenberg Ventures.  But I did not talk to Mrs. Menezes --

 7   I'm sorry -- about investing in any of the funds.  I think she

 8   invested in the 2015 Fund.

 9   **Q.**  Okay.

10      The other investors I wanted to talk to you about are

11   ARCHina, HTC, Korea Investment Partners, CY Capital, Dolby,

12   GHF, and Tubus LLC.

13          **THE CLERK:**  They're fixing it.

14          **MR. FAKHOURY:**  No problem.

15          **THE COURT:**  Go ahead.

16      For the record, the light fluctuated briefly in the

17   courtroom.

18      Members of the jury, we had a light -- a lighting system

19   upgrade yesterday.  That's what it was called.  It was called

20   upgrade.  But I think there's just one bulb that's -- didn't

21   get installed properly or something.

22      So I apologize.  Ms. Lee is trying to fix it.  And we'll

23   just leave it the way it is for the rest of the day.

24      Mr. Fakhoury, go ahead.

25          **MR. FAKHOURY:**  Thank you, Your Honor.

1    **Q.**   So I mentioned some of the investors in the 2015 and '16

2    Funds that I wanted to talk to you about.

3        And I guess as a general matter, my first question is when

4    these investors make an investment into the fund, what was it

5    that you believed they were purchasing?

6    **A.**   I believe they were purchasing a pro rata stake in the

7    fund they were investing into.  I still believe that.

8    **Q.**   Okay.  What do you mean by that?

9    **A.**   I believe the -- the agreement that -- that I have when,

10   you know, as a manager of a fund with a potential investor in

11   the fund who becomes an actual investor is that they give a

12   certain amount of money, and that fraction of the whole fund

13   that that represents is their pro rata fraction of the fund.

14       So when they -- when they -- when they send the money,

15   what they got for that is a pro rata share in the fund.

16   That's what they own.

17   **Q.**   I've asked this question a couple times already relating

18   to other investors.

19       With respect to the investors into the 2015 and 2016 Funds

20   that we've heard from in this trial, we've seen testimony

21   about, again, the movement of money from account to account,

22   and including in some cases your own personal bank account.

23       Why were these investors' money transferred from account

24   to account and again sometimes into your own personal bank

25   account?

1    **A.**    Well, I'm glad you asked that question.

2        When an investor invests money in a fund and they send the

3    money, at the moment that that money is received, it ceases to

4    be their money.  What they receive is a share of the fund.

5    And at that moment it's the fund's money.

6        So when you say where did their money go, their money goes

7    into the fund, and then that money becomes the fund's money.

8    It is not simultaneously the individual's money who already

9    spent the money on a share of the fund and the fund's money.

10   It is just the fund's money at that point.

11       So their money went to the fund.  Period.  Full stop.

12   That's where their money is.

13   **Q.**    I have some tough questions I want to ask you,

14   Mr. Rothenberg.  I'm just going to go through them one by one.

15       Why did you buy a Super Bowl suite in February 2016?

16   **A.**    I bought a Warrior suite and a Super Bowl suite in order

17   to get the attention of people that otherwise would be very

18   difficult to get the attention of for the purposes of

19   furthering the funds' interests, getting access to

20   investments, getting access to investors.  And those are the

21   best, in my opinion, some of the best opportunities in the

22   world to do that.

23       I also didn't use fund money to do that.

24   **Q.**    Okay.  Let me ask you another question.

25       We heard testimony and saw records -- financial records

1    regarding a trip to Mexico with -- with Savannah Leggett and

2    your girlfriend and a whole bunch of other people.  What was

3    that about?

4    **A.**  I took a personal trip to Cabo with my girlfriend and her

5    sister.  And then I also, as a perk, tried to reward my EA at

6    the time who had been working night and day, and I wanted to

7    give her her a reward of going on a trip.

8        It was two separate trips at the same time.  We didn't

9    hang out when we were there.  It was, for all intents and

10   purposes, separate trips.  But it was a reward for her.  And

11   she brought some friends.

12   **Q.**  We've heard some testimony and also seen some bank records

13   and credit card statements about sending people to SFO and to

14   the Oakland Airport to buy copies of an unflattering article

15   that was published in *Bloomberg* in, I believe it was May of

16   2015 or June of 2015.  What was going on there?

17   **A.**  Well, I did actually go to the airport and flew to LA at

18   that time.  I saw that exhibit.  So I was -- I did make a

19   business trip at that time.

20       But there was a particularly damaging article, I thought,

21   that came out at that time.  Your reputation in a venture

22   capital firm is extremely important.  I think -- I think that

23   you should try -- you know, I mean, you know, here I am going

24   through this.  But, you know, you're -- it's really important

25   to try to -- let me see if I can say this differently.

1    I thought it was very harmful to have bad press.  And I

2    thought that it was -- it was a big disappointment too because

3    for that particular article, the reporter had said they were

4    writing an article about our portfolio companies and told me

5    that they thought it was an impressive portfolio and that that

6    was what the article was about.

7    And I thought that was really exciting.  I gave them

8    access to our company basically, let them -- let the reporter

9    meet people, introduced them to company founders, introduced

10    them to investors.  So I really kind of went out on a limb for

11    this reporter.  Gave them full access.

12    And what they did with that was they wrote a hit piece

13    about me and my firm instead of what they told me they would

14    write about which was the companies.  And that was incredibly

15    disappointing.  I also thought it was harmful.  And it was

16    also embarrassing.

17    But in terms of the airport thing, you know, I think

18    *Bloomberg* has a circulation of a million.  So it wasn't like I

19    thought there was any, you know, possibility of making any

20    impact on that.  I couldn't afford to buy a million copies of

21    *Bloomberg*.  But I thought if I could take a few of them out of

22    circulation at the airport, that might be a tiny little help.

23    **Q.**  Okay.

24    Have you ever patted down Justin Grooms?

25    **A.**  I -- I've never patted down him or anybody.

 1   **Q.**  Did you ask him to destroy hard drives?

 2   **A.**  Absolutely not.

 3            **THE COURT:**  Mr. Fakhoury, you might want to lean

 4   toward the microphone just a tad.

 5            **MR. FAKHOURY:**  Sure.  Sorry, Your Honor.  Thank you.

 6   **Q.**  There's been an accusation that's sort of run through this

 7   whole trial that Rothenberg Ventures just spent too much

 8   money.  Did Rothenberg Ventures spend too much money?

 9   **A.**  If I could do it again, I would spend less.

10   **Q.**  Why do you say that?

11   **A.**  The catch-22 is that you have to spend money to make

12   money.  There's no way around that, not in this business.

13        I think by my estimation, the venture capital business was

14   thriving.  It was essentially doubling every year.  That's an

15   incredible growth rate.  And in all the metrics, the

16   investment opportunities, the investments made.  That's a

17   hundred percent a year growth.  That's a lot.

18        To -- to -- to address that in part, I hired more people.

19   I thought more people would help.  I think that it's possible

20   that more experienced but fewer people could have been a

21   better strategy.

22   **Q.**  Another accusation that's been made is that -- and we

23   started with this -- is that you lied to investors because you

24   want to be -- you wanted to be a Silicon Valley big shot.  Is

25   that true?

1    **A.**  I didn't lie to investors.  And I've never even thought

2    about being a big shot until I heard that in this trial.

3    **Q.**  We've talked about a lot of different topics today.  We're

4    getting here towards the end.

5        Did you intend to defraud Silicon Valley Bank?

6    **A.**  I did not.

7    **Q.**  Did you intend or knowingly and intentionally submit a

8    false statement to Silicon Valley Bank?

9    **A.**  Absolutely not.

10   **Q.**  Did you intend to defraud Pilot Grove?

11   **A.**  Absolutely not.

12   **Q.**  Did you intend to defraud GHF?

13   **A.**  No, I did not.

14   **Q.**  Did you intend to defraud the Binns Family Partnership?

15   **A.**  I did not.

16   **Q.**  Did you intend to defraud Ewan Johnson and Sonoko Konishi?

17   **A.**  No, I did not.

18   **Q.**  Did you intend to defraud Natala Menezes?

19   **A.**  I did not.

20   **Q.**  Did you intend to defraud ARCHina?

21   **A.**  No, I did not.

22   **Q.**  HTC?

23   **A.**  No, I did not.

24   **Q.**  CY Capital?

25   **A.**  No, I did not.

ROTHENBERG - DIRECT / FAKHOURY

1   **Q.**   Korea Investment Partners?

2   **A.**   No.

3   **Q.**   Tubus LLC?

4   **A.**   No.

5   **Q.**   Did you believe everything you told the bank in connection

6   with the 2015 line of credit?

7   **A.**   I believed everything I told the bank in connection with

8   the line of credit.

9   **Q.**   Did you believe everything you told Pilot Grove at the

10  time they invested into River Studios?

11  **A.**   Absolutely I did.

12  **Q.**   Did you believe everything you told the investors who were

13  seeking to invest in the Unity opportunity?

14  **A.**   Always.

15  **Q.**   Did you believe everything you told investors who invested

16  into the 2015 and 2016 Funds?

17  **A.**   I believed everything I told investors who invested in the

18  2015 and 2016 Funds, yes.

19  **Q.**   Why did you want to take the witness stand in this case?

20  **A.**   Excuse me.

21      This is really difficult.  I know that I don't have to do

22  this technically.  I know that I have a right to remain

23  silent.  If I was on the jury, I would want to hear from me.

24  And so I trust the process.  I'm willing to put myself on a

25  limb.  Because my -- my future is at stake, I'm willing to do

ROTHENBERG - DIRECT / FAKHOURY

1    that.

2        I'm sorry.

3    **Q.**  Do you have pride in what you ultimately built?

4    **A.**  Yes.

5    **Q.**  Why?

6    **A.**  It started out as a project at business school.  It was a

7    cool little idea.  What if I could invest in my friends and

8    people I knew, too, and help them grow their companies.

9    Wouldn't that be neat?

10        What if my company was helping other people grow their

11    companies at the moment when they need it most?  I think

12    there's an inflection point.  I think our entire economy runs

13    off of having startups get -- get funded and then grow and

14    then become big companies and employ people, pay taxes.  This

15    is how it works.

16        But there's a moment in every company's life, a

17    live-or-die moment, when they get that first institutional

18    investor.  And when that person looks them in the eye and

19    says, yes, writes that check, it changes their future forever.

20    And I had an opportunity to be that moment for dozens and

21    dozens and dozens of companies, the live-or-die moment.  And

22    that was a privilege beyond belief.

23        And I could not -- I still can't believe I got to do that.

24    And it was the greatest, you know, business honor of my life

25    to be able to run a venture capital firm, have people trust me

1    with their money, to be able to invest in these startups.  And

2    my goodness, they grew.  It -- it was more successful than I

3    imagined.

4        And in the course of the -- of the project, of the venture

5    capital firm, I invested in almost 200 companies.  More than a

6    dozen of then reached a billion dollars in status.

7        The people that I employed, most -- a lot of them had

8    never had venture capital experience.  They -- they got that

9    experience.  And then many of them, if not most of them, are

10   still in the venture capital industry.  I gave them that shot

11   and they ran with it.

12       The companies ran with that.  My companies collectively

13   employed millions of people and have generated, how [sic]

14   knows how many millions of revenue for, you know, the -- the

15   companies -- for their investors and, you know, taxes and so

16   on.

17       You know, they get the credit for that, but I got to be a

18   part of it.  And when it comes to my investors, we heard

19   testimony that many -- many of them testified that they've

20   even made a return even as of now.  And so I'm proud of that

21   too.

22       Certainly it's very difficult being here, being a

23   defendant in a criminal trial.  But when I look at my

24   shareholders and my stakeholders, I'm glad I'm the only one

25   who's having to do this.  The buck stops with me.  I'm glad

1    that it worked out well for them.  And I'm proud of that.

2              **MR. FAKHOURY:**  May I have a moment, Your Honor?

3              **THE COURT:**  Yes.

4         Stretch break.

5                        (Stretch break.)

6              **THE COURT:**  Mr. Fakhoury.

7              **MR. FAKHOURY:**  I don't have any further questions,

8    Your Honor.  Thank you.

9              **THE COURT:**  Thank you, Mr. Fakhoury.

10        Cross-examination?

11             **MR. WALDINGER:**  Yes, Your Honor.

12                        <u>**CROSS-EXAMINATION**</u>

13   BY MR. WALDINGER:

14   **Q.**  Good afternoon, Mr. Rothenberg.

15   **A.**  Good afternoon.

16   **Q.**  I think one of the first thing that you testified to today

17   was that you were a math Olympian?

18   **A.**  Yes, sir.

19   **Q.**  Very competent?

20   **A.**  With math, yes, sir.

21   **Q.**  You went to Stanford?

22   **A.**  Yes, sir.

23   **Q.**  You went to Harvard?

24   **A.**  I did.

25   **Q.**  And your investors trusted you to be competent with their

1    money?

2    **A.**  Yes, sir.

3    **Q.**  They trusted you to handle it correctly?

4    **A.**  Yes, sir.

5    **Q.**  They trusted you to not misuse it?

6    **A.**  I assume so.

7    **Q.**  Well, don't you know that?

8    **A.**  It's not a specific thing you discuss, which is why I

9    assume so.

10   **Q.**  Well, you told them that you worked very hard to invest

11   the funds that they entrusted to you, correct?

12   **A.**  Yes, sir.

13   **Q.**  And that was in -- that was in the email that counsel just

14   showed you, update letter number 2, that you sent out on

15   August 23rd of 2016.

16   **A.**  I believe that's right.

17          **THE COURT:**  Mr. Waldinger, could you use exhibit

18   numbers for the benefit of those who might be taking notes.

19          **MR. WALDINGER:**  Sure.  The exhibit that I'm referring

20   to, there are several copies of this, Your Honor.

21   Exhibit 238.

22          **THE COURT:**  Thank you, sir.

23   BY MR. WALDINGER:

24   **Q.**  The LPs trusted you to give them accurate information?

25   **A.**  Yes, sir.

1    Q.  And the people who invested, Pilot Grove, who invested in

2    River Studios, also expected you to give them accurate

3    information, correct?

4    A.  I believe that's reasonable.

5    Q.  And all of those people trusted you to not be confused.

6    A.  I don't -- I don't think that's what they said.

7             MR. WALDINGER:  Let's -- Ms. Margen, let's pull up

8    trial Exhibit 234, which is in evidence.

9         And let's blow up the top half.

10                   (Exhibit published.)

11   BY MR. WALDINGER:

12   Q.  Mr. Rothenberg, Mr. Fakhoury asked you about this email

13   from Justin Grooms to Larry Weisman on August 10th of 2016.

14        I can't recall exactly your testimony, but I believe it

15   was that you didn't really remember much about this.  Is that

16   correct?

17   A.  I don't remember this specific email, no.

18   Q.  Well, at this time -- there's been testimony in this trial

19   that you controlled almost all aspects of the company

20   including communications with investors.

21        Justin Grooms would not have sent this email out without

22   talking to you, correct?

23   A.  Justin Grooms had a lot of autonomy.  So I didn't write

24   every email for everybody.  That would have been impossible

25   and negated the point of hiring anybody.

1  **Q.**  Is it your testimony to the jury that Justin Grooms sent

2  this email out of his own accord without talking with you?

3  **A.**  I think he -- I mean my testimony is that I don't remember

4  this specific email, not that -- not what Justin Grooms was

5  thinking.

6  **Q.**  Do you remember a conversation that Larry Weisman had with

7  you sometime before August 10th of 2016?

8  **A.**  Not particularly.  I believe it may have happened since he

9  wrote about it, but I don't remember it particularly.

10 **Q.**  In fact, didn't you tell Justin Grooms to send this email

11 and to not include Dominic Polizzotto?

12 **A.**  No, I don't think that's a fair assumption, no.

13 **Q.**  You didn't want Dominic to know about this because Dominic

14 is a lawyer.  Correct?

15 **A.**  Not correct.

16 **Q.**  Let's look.

17 **A.**  I would assume that if this went to Larry, it would go to

18 Dominic.  Those guys worked together.  So there's no -- no

19 world in which you send an email to Lawrence without it going

20 immediately to Dominic.  Nobody would think that.  Well, I

21 didn't think that.  I don't think that.

22 **Q.**  You testified about some kind of investment made by the

23 2015 Fund into River Studios in April of 2016.  Do you recall

24 that?

25 **A.**  I do.

1    Q.  Prior to this time, did you tell the other people who were

2    on the cap table, meaning Transcend VR, Larry Weisman and

3    Dominic Polizzotto, that that had happened?

4    A.  I told them that I intended to raise up to $20 million and

5    of which they invested too.  So they knew I was having active

6    discussions and was intending to raise more money, yes.

7    Q.  The question was:  Did you ever tell them prior to this

8    time that River Studios -- or excuse me -- that the 2015 Fund

9    had invested money into River Studios as you say today in

10   April of 2016?

11   A.  I know I told them in August of 2016.  I don't remember

12   how -- like the exact day I told them.

13   Q.  The truth is you didn't tell anybody about the funds'

14   investments into River Studios until August of 2016.

15   A.  That's not true.  That's not my testimony.

16   Q.  Who did you tell?

17   A.  Members Of my team.

18   Q.  Who?

19   A.  See, Geoff Rapaport, I'm sure knew.  He was the general

20   counsel.

21       I mean I don't specifically remember.

22   Q.  You didn't tell Tommy Leep?

23   A.  I may not have told Tommy.

24   Q.  You didn't Brandon Farwell?

25   A.  I did tell Brandon Farwell, but that may have been July.

1    Q.  At your condo?

2    A.  Quite possibly.

3    Q.  After you got the letter from the SEC?

4    A.  I don't remember if it was before or after.  It could have

5    been before.

6    Q.  When did you get the letter from the SEC?

7    A.  I believe that was late July.

8    Q.  July 21st, right?

9    A.  I don't think I saw it July 21st.

10   Q.  It was an email to you on July 21st, correct?

11   A.  There may be.  I don't -- I -- I received thousands of

12   emails.  I didn't always receive them -- I believe that letter

13   was also addressed to a lawyer.

14   Q.  That was -- that was an upsetting notification to get,

15   wasn't it?

16   A.  Absolutely, yes, sir.

17   Q.  Did you tell Sophie Liao that the fund or funds had

18   invested into River Studios?

19   A.  I may have.

20   Q.  You may have?

21   A.  I may have.

22   Q.  Didn't you tell many people prior to August of 2016 that

23   the River Studios was separate and had been funded entirely

24   with either your money or external funding?

25   A.  At what time period, sir?

1   **Q.**  Any time.

2   **A.**  I had funded it with my own money.  I did tell people

3   that.

4   **Q.**  After April of 2016, didn't you continue to tell people

5   that the funds had not put any money into River Studios?

6   **A.**  No, sir.  I don't believe that's right.

7   **Q.**  Who did you tell other than -- so you've said -- is it

8   your testimony that you told Geoff Rapaport after April of

9   2016 that you had had -- and before the SEC letter that there

10  had been an investment into River Studios?

11  **A.**  I believe he knew.  But what my testimony was, was that I

12  wasn't telling people I self-funded it after April of 2016.

13  **Q.**  You said Mr. Rapoport knew.  My question was did you tell

14  him?

15  **A.**  I believe I did.

16  **Q.**  When did you tell him?

17  **A.**  My -- my testimony is that it was probably around April of

18  2016.

19  **Q.**  Who else did you tell?

20  **A.**  At the time I don't remember it being a big deal.  So I

21  don't have a specific memory.  I told Brandon Farwell soon

22  after.  I told Sophie at some point.  I told Tommy by August.

23  We're talking about a three- or four-month period of time.

24      There's no -- there's no world in which you disclose

25  investments in real time to anybody.  You can't do that.  It's

1    not -- it's not even feasible nor is it an expectation.

2              **MR. WALDINGER:**  Let's pull up Exhibit 522, please.

3    This is not evidence.

4       (Exhibit published to witness, counsel, and the Court.)

5    **BY MR. WALDINGER:**

6    **Q.**  Mr. Rothenberg, do you recognize this document?

7    **A.**  It's a bit blurry, but it looks --

8                        (Simultaneous colloquy.)

9              **THE WITNESS:**  -- like a convertible promissory note.

10   May I see a hard copy?  Is that okay?

11   **BY MR. WALDINGER:**

12   **Q.**  I don't think we have a hard copy.

13             **MR. WALDINGER:**  Do we have a hard copy, Beth?

14             **THE COURT:**  Can the exhibit be magnified?  I think

15   that might solve the witness's problem.  The type will become

16   easier to read.

17                        (Exhibit published.)

18             **THE WITNESS:**  Okay.  I can -- I can make it out

19   basically.

20   **BY MR. WALDINGER:**

21   **Q.**  Is this the convertible promissory note that you were

22   testifying about on direct examination?

23   **A.**  I don't think so because this says -- well, let me --

24   actually I am having trouble reading it.

25       Could you give me a second?

1    Q.  Sure.

2    A.  I am having trouble making out some of those words.

3    Q.  Okay.

4        Wasn't this the document that you provided to the SEC in

5    response to requests from the SEC?

6    A.  I would believe you if you said that.  But, again, I

7    really can't read this.

8    Q.  It's blurry, isn't it?

9    A.  It is.  Yes, it is.

10           MR. WALDINGER:  Ms. Margen, let's blow up the bottom

11   half.

12       (Exhibit published to witness, counsel, and the Court.)

13           THE WITNESS:  Looks likes it was scanned in.

14           MR. WALDINGER:  All the way to the bottom half,

15   Ms. Margen, all the way down.

16       (Exhibit published to witness, counsel, and the Court.)

17   BY MR. WALDINGER:

18   Q.  Do you see this Bates number here?

19   A.  Yes, sir, I do.

20   Q.  That means it was produced to the SEC by your attorneys,

21   correct?

22   A.  Yes, sir.

23   Q.  By RVMC's attorneys.

24   A.  I believe so, yes, sir.

25   Q.  And this -- this says "Holder means Rothenberg Ventures

1   2015 Fund LLC," correct?

2   **A.**   Yes, sir, you're correct.

3   **Q.**   And so this -- this is the promissory note that you're

4   talking about with respect to the 2015 Fund -- Fund's

5   investment into River Studios?

6   **A.**   I believe that's right.  We produced thousands and

7   thousands and thousands of pages.  But that -- I believe

8   you're right.

9   **Q.**   Mr. Rothenberg, this is one of the most important

10  documents in your life right now.  And you don't know before

11  your testimony today whether the document that was marked as

12  Exhibit 522 is the convertible promissory note that you

13  testified about today on direct?  Is that what you're saying?

14  **A.**   I believe you're misstating my testimony, sir.

15  **Q.**   Is this the convertible promissory note that you testified

16  about earlier?

17  **A.**   It does look like it.  The reason why I'm hesitating is

18  that we also produced drafts, we produced so many documents,

19  that you're showing me a portion, a blurry portion of one page

20  and asking me to testify under oath if that's the exact

21  document I referred to earlier.

22       You brought this -- you brought this to my attention.  And

23  I'm saying I believe you're right, it does look like that.  If

24  on page 2, there's scribbles on it that I don't recognize, if

25  there's cross-outs, if this is a draft --

1          I'm sorry, I'll speak slower.

2     BY MR. WALDINGER:

3     Q.  Fair enough.  Fair enough, Mr. Rothenberg.

4          MR. WALDINGER:  Ms. Margen, let's page down.  We'll

5     just walk through the document.

6          (Exhibit published to witness, counsel, and the Court.)

7          MR. WALDINGER:  No scribbles on page 2.

8          Let's keep going.

9          No scribbles on page 3.

10         No scribbles on page 4.

11         Page 5 is the same.

12         Page 6.

13         Page 7.

14         Page 8.

15         Page 9.

16         And let's blow that up.

17         (Exhibit published to witness, counsel, and the Court.)

18    BY MR. WALDINGER:

19    Q.  Do you recognize those signatures?

20    A.  Yes, sir.  That's my signature.

21    Q.  Okay.

22         So I'll ask you again.  After having gone through nine

23    pages, is that the promissory note that you testified to

24    earlier?

25    A.  Yes, sir, it is.

1    **MR. WALDINGER:**  Your Honor, I would move Exhibit 522

2    into evidence.

3           **THE COURT:**  Any objection?

4           **MR. FAKHOURY:**  No, Your Honor.

5           **THE COURT:**  522 is admitted.

6        (Government's Exhibit 522 received in evidence.)

7    **BY MR. WALDINGER:**

8    **Q.**  And again, this was a document that your attorney

9    submitted to the Securities and Exchange Commission, correct?

10   **A.**  I believe that's right.

11   **Q.**  And is this -- we're on page 9.  This is your signature,

12   correct?

13   **A.**  Yes, sir.

14          **MR. WALDINGER:**  And, Ms. Margen, let's blow up those

15   signature blocks so that the jury can see them.

16                    (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**  So the borrower here is Bend Reality, correct?

19       (Indicating) In this promissory note, the borrower would

20   be Bend Reality, correct?

21   **A.**  Yes, sir.

22   **Q.**  And then the holder of the note, more commonly referred to

23   as the lender, is Rothenberg Ventures Management Company LLC

24   on behalf of Rothenberg Ventures 2015 Fund?

25   **A.**  And affiliates.

1   **Q.**  And affiliates.

2        And you're signing for both entities.

3   **A.**  Actually it says on behalf of.  So that means the

4   Rothenberg Ventures 2015 Fund.

5   **Q.**  So you're signing on behalf of the Fund and affiliates?

6   **A.**  I think that what it says is, is the signature is of the

7   manager of the Rothenberg Ventures Management Company on

8   behalf of the Rothenberg Ventures 2015 Fund.

9   **Q.**  Okay.  But for the record, it's your signature on both

10  sides of this transaction?

11  **A.**  Yes, sir, that's right.

12  **Q.**  Did you send out a notification to LPs, to Pilot Grove, to

13  anybody that this -- what I think we've heard in this trial is

14  a non-arm's length transaction, did you notify people about

15  this non-arm's length transaction outside of your company when

16  it occurred?

17  **A.**  What we told investors we would do is notify them on an

18  annual basis investments made.  And in this case, it was only

19  four months, not 12.  They were all notified by August of 2016

20  in four months, not 12.

21  **Q.**  In fact the first time investors learned that the funds

22  had invested -- had actually invested in River Studios was

23  when you started sending out emails after the press articles,

24  after the SEC letter on about August 22nd of 2016.  That's the

25  first time you told LPs.

1    **A.**  We told LPs what they were holding on an annual basis.

2    However, I accelerated that because I felt like transparency

3    was important.  So, yes, they found out about it sooner than

4    they otherwise might have and sooner than we had told them we

5    would.

6    **Q.**  So it sounds like the answer to my question is "Between

7    April 4th of 2016 and August 22nd of 2016, I did not tell LPs

8    that this had happened."

9    **A.**  Actually what I'm saying is that I proactively disclosed

10   this to my investors in August of 2016.  That's my testimony.

11   **Q.**  I understand that's what you're saying.  I'm trying to

12   establish in the period between --

13            **THE COURT:**  Counsel is entitled to a "yes" or a "no."

14            **THE WITNESS:**  Yes, sir.

15   **BY MR. WALDINGER:**

16   **Q.**  Did you tell investors between April of 2016 and August of

17   2016 that this note had occurred?

18   **A.**  I believe there were some investors I told.

19   **Q.**  Okay.  Which ones?

20   **A.**  I don't remember.  This --

21   **Q.**  You don't remember?

22   **A.**  I don't remember.

23   **Q.**  Again, you just testified that this was the most

24   important, you know, thing for you going on.  And have you

25   done any work to find out who those investors were?

1    **A.**  I don't believe I testified that.  I think that's

2    misstating my testimony, sir.

3    **Q.**  Sorry.

4        This is an important thing, correct?

5    **A.**  This?  Could you be -- this trial?  Absolutely it's

6    important.

7    **Q.**  What work did you do to find out which investors you told

8    before August 22nd of 2013 [sic]?

9    **A.**  This is the first time I realized you were going to ask me

10   that question.

11   **Q.**  In fact, the only investors that you had told --

12       **MR. WALDINGER:**  Let's take this down for a second.

13       **THE COURT:**  Mr. Rothenberg, I'll just remind you that

14   you have an absolute privilege not to disclose any

15   communications that you had with your attorney to prepare for

16   this trial, and that you should both exclude those

17   conversations in any answer that you give to these questions.

18   And you should also follow the instructions of your lawyer

19   during the trial if he gives you such instructions during the

20   questioning.

21       **THE WITNESS:**  Thank you, Your Honor.

22       **THE COURT:**  Mr. Waldinger.

23       **MR. WALDINGER:**  Ms. Margen, let's pull up Exhibit 235

24   which is in evidence.

25                    (Exhibit published.)

1    BY MR. WALDINGER:

2    **Q.**  Mr. Fakhoury asked you about this email.

3         **MR. WALDINGER:**  And, Ms. Margen, let's blow up the --

4    the middle email there.

5                    (Exhibit published.)

6    **BY MR. WALDINGER:**

7    **Q.**  You remember this email?

8    **A.**  Yes, sir.

9    **Q.**  So I guess it would be true that on August 13th, you told

10   Larry and Dominic.  You told Mr. Weisman and Mr. Polizzotto

11   that the funds had invested in River Studios, right?

12   **A.**  I told them that I believed I had as of the date of that

13   email, yes, sir.  Yes, sir.

14   **Q.**  But in this email, you didn't mention the convertible

15   promissory note, did you?

16   **A.**  I do not see a reference to that in this email, no.

17        **MR. WALDINGER:**  Okay.  Let's take that down,

18   Ms. Margen, and let's go back to Exhibit 522.

19       Let's blow up the text on the first page, Ms. Margen, the

20   whole printed text just to make it a little bit bigger.

21                    (Exhibit published.)

22   **BY MR. WALDINGER:**

23   **Q.**  The first thing that you said when you saw this exhibit,

24   Mr. Rothenberg, I think was, tell me if I'm misstating your

25   testimony, was that you couldn't read it.

1    **A.**  I think you did misstate it.  I said it's blurry.

2    **Q.**  It's blurry.  This is -- this is the quality of the copy

3    that was provided to the SEC, correct?

4    **A.**  According to the WELLS number, there may have been a

5    different copy presented.  We presented a lot of documents.

6    **Q.**  Okay.  Do you have a better copy of the convertible

7    promissory note that was entered into between the 2015 Fund

8    and Bend Reality?

9    **A.**  I assume so.

10   **Q.**  Okay.  Can you look for that over the weekend?

11   **A.**  Yes, sir, I can look.

12   **Q.**  This is dated April 4th of 2016.  What is the amount of

13   the note, Mr. Rothenberg?

14   **A.**  (Reviewing document.)

15       That -- that may be a defined term or a clause on a

16   different page.  At the top left it says 5 million, which

17   typically meant, and I believe it meant in this case, up to

18   5 million.

19   **Q.**  Okay.  Well, that's how much you say today River Studios

20   invested in Bend Reality on April 4th of 2016 through this

21   note, correct?

22   **A.**  I believe you may have misspoken.

23   **Q.**  Okay.  How much -- how much did Bend Reality get on

24   April 4th of 2016 from River Studios?

25   **A.**  Up to 5 million.  This does not mean that there's a

1    5 million transfer that day.

2    **Q.**  Oh, okay.  Was there a transfer at all that day?

3    **A.**  I -- I think there actually was a transfer the next day.

4    **Q.**  How much was that transfer for?

5    **A.**  If I recall, it was maybe 2.1 million.

6    **Q.**  Okay.  And you heard -- strike that.  I'll change the

7    question.

8        Do you know why the copy that the Securities and Exchange

9    Commission got from your attorneys is so blurry?

10    **A.**  I don't, but I -- it looks like a scan.

11    **Q.**  A scan.

12    **A.**  It looks like that to me.

13    **Q.**  Not a scam?

14    **A.**  Sir, a scan with an "N."

15    **Q.**  Okay.

16        Did the Securities and Exchange Commission ask you for the

17    Word version of this document?

18    **A.**  I -- I don't remember them doing that.

19            **THE COURT:**  You mean the Microsoft Word file?

20            **MR. WALDINGER:**  Correct.

21            **THE COURT:**  I think the witness understood the

22    question in that way also.

23            **THE WITNESS:**  I don't remember them doing that, no.

24    **BY MR. WALDINGER:**

25    **Q.**  Okay.

1          Again, I don't want to misstate your testimony.  This is a

2    $5 million note in which you said the next day $2 million -- a

3    $2 million wire went, correct?

4    **A.**  If I recall correctly, 2.1.

5    **Q.**  That would have been the biggest single investment on

6    any -- with respect to any portfolio company by any of your

7    funds at any time, correct?

8    **A.**  Any single company?  Not including co-invests, yes.

9    **Q.**  Which one?

10   **A.**  I said not including extra amounts raised from co-invests,

11   you're right.

12   **Q.**  So you didn't think that a $2.1 million wire investment

13   was out of the ordinary enough that you needed to let your LPs

14   know at that time?

15   **A.**  There were more than 150 investments made and we never

16   sent a real time notice to investors about any investment ever

17   made.  That would be very strange.

18        **MR. WALDINGER:**  Okay.  Ms. Margen, let's take

19   Exhibit 522 down.

20        And I'd like to go back to Exhibit 234 where we started.

21                  (Exhibit published.)

22   **BY MR. WALDINGER:**

23   **Q.**  This was the -- the email from Justin Grooms to

24   Mr. Weisman.  Do you recall that?

25   **A.**  I see that.

1    **Q.**  There are -- you can see that there are two attachments to

2    this email, Mr. Rothenberg?

3    **A.**  I see that.

4          **MR. WALDINGER:**  Ms. Margen, if we could take that

5    down and then up the next page.  And blow up the text.  And

6    we'll hope that that's big enough for everybody to read.

7                    (Exhibit published.)

8    **BY MR. WALDINGER:**

9    **Q.**  What is the title of this document, Mr. Rothenberg?

10   **A.**  It says "River Studios LLC Amendment to Convertible

11   Promissory Note."

12   **Q.**  You knew this was being drafted up, correct?

13   **A.**  I do not remember this draft.

14   **Q.**  How did this document come about?

15   **A.**  I don't know, but I could speculate.

16   **Q.**  Why do you think it came about?  Go ahead.

17   **A.**  Now may I speculate?  Okay.

18        At this time in August of 2016, we had hired an external

19   law firm, Wilson Sonsini, and they had permission to work with

20   Justin Grooms in looking through documents, trying to figure

21   out how to make sure that we had our books and records

22   up-to-date, and in advance of a series A raise.

23        So if I was speculating, I would say that Wilson Sonsini

24   may have drafted this, talking to Justin, and he decided to

25   send it.  I'm not sure I was involved in this more directly

1    than that.

2    Q.   Okay.  But going back to the first page -- and you heard

3    Mr. Grooms' testimony -- he refers to a conversation that

4    Mr. Weisman had with you.  He doesn't cc any attorneys from

5    Wilson Sonsini, does he?

6    A.   We actually heard from Mr. Weisman that he didn't remember

7    any conversation with me.  I remember that testimony.

8    Q.   That's correct.

9         But he's -- but Mr. Grooms refers to you.

10   A.   It appears he does.  I don't know what Mr. Grooms was

11   thinking.

12   Q.   Could have been some other Mike.

13   A.   I didn't say that.

14   Q.   And Mr. Grooms does not refer to any attorneys, correct?

15   A.   I do not see a reference specifically to attorneys in this

16   email.

17   Q.   He doesn't say anything about Wilson Sonsini.

18   A.   Correct.

19   Q.   All he says is "I've attached for Pilot Grove's

20   consideration and signature an amendment to convertible note

21   and the side letter."

22   A.   Right.  He doesn't say we.  He says "I've attached."

23   Q.   And he cc's you.

24   A.   I appear to be copied.

25   Q.   Do you recall receiving this email?

 1    **A.**  I do not.

 2            **MR. WALDINGER:**  Ms. Margen, let's go back to the

 3    second page.  And let's blow up the bottom half this time.

 4                      (Exhibit published.)

 5    **BY MR. WALDINGER:**

 6    **Q.**  Why were you changing the net equity financing?

 7    **A.**  I don't know.  I don't remember seeing this document ever.

 8    **Q.**  How about capitalization?

 9    **A.**  Same answer.

10    **Q.**  Why were you changing that?

11    **A.**  I testified that I don't know that I've ever seen this

12    document.

13    **Q.**  Well, you -- you --

14    **A.**  Before this trial.

15    **Q.**  Before this trial?

16    **A.**  Correct.

17    **Q.**  In fact, again, just to place this in the timeline, on

18    July 21st, or thereafter, you knew that the SEC had an

19    investigation of you?

20    **A.**  Shortly after.

21    **Q.**  And isn't it --

22    **A.**  I think it was -- sir, I believe it was an inquiry.  It

23    became an investigation later.  There's a distinction.

24    **Q.**  Okay.  So they -- they sent you an inquiry.

25    **A.**  I believe they did.  I have seen it.

1    Q.  That worried you.

2    A.  Absolutely it did.

3    Q.  You needed to clean up the books?

4    A.  I did not say that.

5    Q.  I'm asking the question.

6    A.  I believe that we conducted internal audit.  It's pretty

7    important when you get a -- you know, a letter from a

8    government agency, it's time to take a look at stuff, yeah,

9    absolutely.

10   Q.  Things were a mess, weren't they?

11   A.  I think you could say that.

12   Q.  Yeah.  Because you didn't respect the corporate forums.

13   You moved money, as you've just testified, between accounts

14   and treated it as an accounting issue.

15   A.  Could you break each piece apart?  I have different

16   thoughts on each one.  It's not my -- that collective thing is

17   not my testimony.

18   Q.  Okay.

19      Well, you -- you felt free during the time that you

20   managed the venture capital funds to move money between one

21   legal entity, say Fund I, and another legal entity, say your

22   real estate company, correct?

23   A.  There were different relationships between different

24   entities.

25   Q.  My question was, is it true or not that you felt free to

1   move money between, for example, Fund I and your real estate

2   company?

3   **A.**   I think "free" is the wrong word.

4   **Q.**   How did you feel about making those kinds of transfers?

5   **A.**   I'm happy to go transfer by transfer, but there was a

6   reason for each one.

7   **Q.**   Well, so money from Fund I and Fund II was transferred to

8   your real estate company to constitute a down payment for the

9   purchase of 1062 Folsom, correct?

10  **A.**   What exhibit are you -- I don't -- that's not what this

11  document says.

12  **Q.**   No.

13  **A.**   I'm not testifying to that.

14  **Q.**   You don't remember having done that?

15  **A.**   Could you -- if you're talking about something specific,

16  could we talk about it with an exhibit, please?

17  **Q.**   I'm just asking the question.  You say you don't remember.

18  Or I want to make sure that you don't remember.

19      So you don't -- as you sit here today, you don't remember

20  transferring $400,000 from one fund and 350,000 from another

21  fund to your real estate company so that you could make a down

22  payment for the purchase of 1062 Folsom in October of 2015?

23  **A.**   Could we please see -- if you're talking about something

24  specific, could we please see the exhibit so I can review it?

25  I want to be --

 1              THE COURT:  Mr. Waldinger --

 2                    (Simultaneous colloquy.)

 3              THE WITNESS:  -- very careful.

 4              THE COURT:  I beg your pardon for stepping on your

 5    testimony.

 6        Mr. Waldinger is asking you if you remember the

 7    transaction as you sit here now, without the aid of a

 8    document.  That's the pending question.

 9              THE WITNESS:  I'm not exactly sure what accounts

10    you're referring to.  I'm not denying it.  I'm just saying I

11    would like a refresher.

12              MR. WALDINGER:  Ms. Margen, let's pull up Exhibit 64.

13    And let's go to the second page.

14                    (Exhibit published.)

15    BY MR. WALDINGER:

16    Q.  Do you see what account this is for, Mr. Rothenberg?

17    A.  It says Fund I at the top.

18              MR. WALDINGER:  Okay.  And, Ms. Margen, let's go to

19    page 91.

20                    (Exhibit published.)

21    BY MR. WALDINGER:

22    Q.  This is still the Fund I account, correct?

23    A.  It says -- it says Fund I.

24    Q.  So that means it's the Fund I account?

25    A.  Yes.  Yes, sir.

1  **Q.**  And that's an account numbered ending 2623?

2  **A.**  Yes, sir.

3         **MR. WALDINGER:**  Ms. Margen, let's blow up the bottom

4  half of that page.

5                        (Exhibit published.)

6  **BY MR. WALDINGER:**

7  **Q.**  Do you see a $400,000 transfer on October 28th of 2015,

8  Mr. Rothenberg?

9  **A.**  I see that.  And 400,000 coming from the Management

10 Company.

11 **Q.**  Okay.

12     Do you recall what account the 7429 account is?

13 **A.**  I believe this shows a $400,000 transfer from the

14 Management Company and a $400,000 transfer to the real estate

15 company.  It's a net zero to the 2013 Fund.

16 **Q.**  Let me ask you -- here's my question:  Do you recall what

17 the 7429 account was?

18 **A.**  I believe that's the real estate company.

19        **MR. WALDINGER:**  Ms. Margen, let's pull that down.

20 **Q.**  And that's October 28th, right, Mr. -- Mr. Rothenberg?

21 **A.**  And October 30th.

22        **MR. WALDINGER:**  Let's go to Exhibit 65, Ms. Margen.

23 And we'll start at page 2.

24                        (Exhibit published.)

25 / / /

1    BY MR. WALDINGER:

2    Q.  And this is the Fund II account, correct, Mr. Rothenberg?

3    A.  This document you're showing me says Fund II at the top so

4    I believe so.

5         **MR. WALDINGER:**  Ms. Margen, let's go to page 78.

6         And blow up the bottom half.

7                       (Exhibit published.)

8    BY MR. WALDINGER:

9    Q.  This is for October of 2015, correct?

10   A.  That's what it says.

11   Q.  And do you see a transaction there for 350,000?

12   A.  I do.

13   Q.  Where did that money go?

14   A.  There's a -- I think you're referring to a transfer on

15   October 28th to account ending in 7429, the real estate

16   company.

17   Q.  And you made a point in the last exhibit of noting that

18   money came back from a different account a couple of days

19   later.  You can't do it on this account, can you?

20   A.  I don't know.  You're not showing me the next month or the

21   previous month.

22   Q.  Okay.  Let's -- let's page down.

23        Oh, before we go, this 528,000 (indicating), that was the

24   HelloGiggles exit?

25   A.  Let's see.  Continental stock transfer.  Um --

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    Q.   Or is that Sweet -- or is that a different one?

2    A.   I can't tell from -- from this document.

3    Q.   If this is an exit, who does that money belong to?

4    A.   I think -- I think you're referring to an exit from a

5    portfolio company to a fund.  And in that -- in that instance,

6    the -- the fund -- the money belongs to the fund.

7    Q.   And I'm referring to an October 19th transaction for

8    528,000 and change, correct?

9    A.   I see that.

10   Q.   The money doesn't belong to you?

11   A.   Correct.

12   Q.   It doesn't belong to the real estate company?

13   A.   At the time it comes in, no, but I do believe that the

14   transaction next is justified.  It's a separate transaction.

15   Q.   What's -- what do you think the next transaction is?

16   A.   The 2013 Fund and 2014 Funds had specific clauses in their

17   agreements that they were negotiated with the investors for

18   something called member payments.

19        And member payments are payments owed to Rothenberg

20   Ventures, whether that's the management co. or the real estate

21   co.  And those had not been collected as of this date.

22        I deferred those collections until this date.  And then at

23   the -- and in October, I recall that it was -- that we

24   collected the member payments.

25   Q.   If this is a member payment, why is it not going to the

1   Management Company?

2   **A.**   I said it could go to Rothenberg Ventures entity.  I mean

3   I owned Rothenberg Ventures and the real estate company.

4   There was not much of a distinction.

5   **Q.**   So is it your testimony that Fund II owed the Management

6   Company $350,000 at this point?

7   **A.**   It did, for member payments.  I also would do it

8   differently if I had another chance.

9   **Q.**   So when you say member payments, that's different than

10   management fees and administrative expenses?

11   **A.**   Yes, sir.  It's a separate clause in the contract.

12   **Q.**   How much -- and what would those member payments have been

13   for on top of the -- at this point, you're taking -- you've

14   taken 2 percent per quarter for the first two years in this

15   fund, correct?  For Fund II?

16   **A.**   Let's see.  At this point in October.

17          **THE COURT:**  You said per quarter, Mr. Waldinger; is

18   that right?

19   **BY MR. WALDINGER:**

20   **Q.**   It's 2 percent -- you took 2 percent -- the management

21   agreement provided for 2 percent per quarter for two years,

22   correct?

23   **A.**   I think that's right.  All of the agreements were

24   different, but I think that's right.

25   **Q.**   What other member payments -- why would Fund II owe any

1    money to the Management Company at this point in time,

2    October 28th of 2015?

3    **A.**  Because I deferred the payments.  So there were many

4    clauses about the kinds of money that could and should go back

5    and forth between the 2014 Fund and the 2013 Fund and the

6    Management Company.  And management and admin expenses is only

7    one of the clauses.

8         And the member payments I deferred so that the fund could

9    make more investments earlier.  And then in my judgment at a

10   later date when the fund was able to, it made those payments,

11   as you're seeing here.  Those are allowed, those are

12   negotiated, and they're in the contracts.

13   **Q.**  So with respect to the last -- the Exhibit 64, which was

14   the Fund II -- or Fund I account, if you're saying that that

15   $400,000 was a member payment also?

16   **A.**  I believe it was.

17   **Q.**  Then why was $400,000 round-tripped back to that account?

18            **MR. WALDINGER:**  Let's go back to go that page of

19   Exhibit 64, Ms. Margen, page 91 of Exhibit 64.

20            **THE WITNESS:**  Could you please define round-trip?

21                     (Exhibit published.)

22   **BY MR. WALDINGER:**

23   **Q.**  Why did $400,000 come back in?  If the first 400,000 that

24   went out was a member payment that Fund I owed to the

25   management company, which had apparently paid to your real

ROTHENBERG - CROSS / WALDINGER

1  estate company, why is the management company two days later

2  sending the same -- sending the same amount back to Fund I?

3  **A.**   Again, I would do this differently if I had a chance, but

4  I believe that this time that both the 2013 Fund and the 2014

5  Fund owed member payments.

6     What this transaction looks like is that the Management

7  Company sent $400,000 to the real estate company via the

8  2013 Fund.  This does not look like anything more than a

9  zero dollar footprint for the 2013 Fund.

10  **Q.**   Sorry.  Could you say that again?  The Management Company

11  sent $400,000 to the real estate company through the --

12  through the Fund I?

13  **A.**   That's what it looks like.

14  **Q.**   Even though the transaction from the Management Company

15  occurred two days later?

16  **A.**   Sure.  I mean 400 in, 400 out, that's what it looks like

17  to me.

18  **Q.**   Got it.  So I just want to nail you down here.  You have

19  management fees, management fees and expenses.  Fund I, it's

20  like 17.75 percent upfront.  Correct?

21  **A.**   17.75 percent, Fund I, that's correct.

22  **Q.**   And then a different structure for Fund II.

23     What your testimony is today is that on top of those

24  payments, both of those funds owed additional member payments

25  pursuant to the agreements to the Management Company?

 1  **A.**  The 17.75 percent was a management and admin fee.  It had

 2  nothing to do with member payments.  Those are separate

 3  expense -- separate clause in the contract, separate amount

 4  owed.

 5          **THE COURT:**  Mr. Waldinger, any time in the next five

 6  minutes.

 7          **MR. WALDINGER:**  Right.

 8  **Q.**  I just want an answer to my question, which is, what

 9  you're saying is that there were member payments that were

10  owed on top of the management fees and expenses.

11  **A.**  I would not say on top.  They're separate clauses,

12  separate things going on.

13  **Q.**  Your testimony is that there were member payments due in

14  addition to the defined management fees and expenses?

15  **A.**  Yes, it's different.  That's right.

16  **Q.**  And what were those member payments for?

17  **A.**  If you pull up the contracts, I'm happy to read the clause

18  out.  But it's -- it's described in the contract.

19  **Q.**  I'm talking about what -- what had the Management Company

20  done that it was entitled to some sort of extraordinary

21  expense?

22  **A.**  It's -- I did not testify it's an extraordinary expense.

23  It's an expense that is outlined in the contract.  There's no

24  extraordinary anywhere.

25  **Q.**  Okay.

 1          **MR. WALDINGER:**  All right.  Ms. Margen, if we could

 2   go back to Exhibit 65, and let's go to page 80.

 3      Or let's go to 78.  I'm sorry.

 4                    (Exhibit published.)

 5   BY MR. WALDINGER:

 6   **Q.**  So this is where we left off on the Fund II account.  So

 7   your testimony is that this $350,000 payment on October 28th

 8   is a member payment due from Fund II to the Management

 9   Company.

10   **A.**  That's what I believe.

11   **Q.**  And that it actually paid to your real estate company?

12   **A.**  This is -- that's what I believe.  I mean -- I haven't

13   thought about this in a long time, but that's what I believe.

14          **MR. WALDINGER:**  Could you go forward to page 80,

15   Ms. Margen.

16                    (Exhibit published.)

17   BY MR. WALDINGER:

18   **Q.**  Then there's another $200,000 payment.  That one's called

19   a loan.  That's not called a -- a member payment.

20      Is there a provision in the management agreements for the

21   funds to loan money to the manager?

22   **A.**  I doubt that was a loan.  I see the word there, but that

23   doesn't mean it was a loan.  That means whoever put that in

24   there wrote that word.  I -- that's all that means.

25   **Q.**  The funds couldn't loan money to the Management Company,

1    could they?

2    A.   There were actually clauses about that, but I'm not saying

3    this is a loan.

4             MR. WALDINGER:   Let's go forward to page 82,

5    Ms. Margen.

6                      (Exhibit published.)

7    BY MR. WALDINGER:

8    Q.   We've just seen transactions totaling 550,000.  550,000

9    then comes back to the management company.

10        Is that just a refund of that member payment?

11   A.   I don't know.  This looks like cherry-picking.  I'd have

12   to look at the whole thing.

13   Q.   It's the next transaction.

14   A.   That's your testimony.  Not mine.

15   Q.   Well, isn't it the next transaction?

16   A.   I don't know.  You're showing me two slides out of

17   thousands.

18             MR. WALDINGER:   Let's go -- Ms. Margen, let's --

19   Q.   So we have the $550,000 transaction.

20             MR. WALDINGER:   Go back, Ms. Margen, just -- let's go

21   back, Ms. Margen.

22   Q.   We have a 550,000 transaction.

23             MR. WALDINGER:   Go backwards, Ms. Margen.  Backwards.

24                      (Exhibit published.)

25   / / /

ROTHENBERG - CROSS / WALDINGER

1   BY MR. WALDINGER:

2   Q.  And then the prior transaction is 200,000.  Correct,

3   Mr. Rothenberg?

4   A.  I see a transaction on November 30th.  And then I think

5   you said the next one was -- I forgot the date but maybe

6   December 8th.  Is that what you're saying?

7           MR. WALDINGER:  Go back one, Ms. Margen, another.

8   Q.  And then 350.

9       So you've just seen now -- there's no cherry-picking -- a

10  $350,000 transaction, a $200,000 transaction followed by 550-

11  coming back.

12  A.  Okay.

13  Q.  Correct?

14  A.  That's what it looks like.

15          MR. WALDINGER:  And, Ms. Margen, just we'll finish up

16  with one last exhibit.  If you could go to Exhibit 67.

17      I'm sorry.  Exhibit 66, please.  And if we could go to

18  page 108.

19      And let's actually go back to 106, two pages up.

20              (Exhibit published.)

21  BY MR. WALDINGER:

22  Q.  Do you see this is 7429 account, Mr. Rothenberg?

23  A.  That's what it says.

24  Q.  And that's for the Rothenberg Ventures real estate

25  company?

1   **A.**   It says Rothenberg Ventures LLC.

2          **MR. WALDINGER:**   Ms. Margen, let's go back to 108.

3      And blow up the bottom half.

4                      (Exhibit published.)

5   **BY MR. WALDINGER:**

6   **Q.**   All right.  So we kind of went on this detour because I

7   asked you about -- I think the question I asked was whether

8   you felt free to move money between, say, Fund I and your real

9   estate company.

10      This document shows that you in fact did that.  That's my

11   question.  You moved money from Fund I which is 2623, and

12   Fund II which is 7483?

13   **A.**   This document is the other side of transactions that are

14   permitted by both fund accounts in which the 2013 Fund appears

15   to have paid an amount it owes for the member payments, and

16   the 2014 Fund appears to have done the same thing.

17      And then you also showed us that the management co.

18   reimbursed those anyway.  That's what this shows.

19   **Q.**   You did, in fact, move this amount of money from Fund I

20   and Fund II into the real estate company, correct?

21   **A.**   In behalf of the Rothenberg Ventures Management Company

22   member payments that were owed by the funds.

23   **Q.**   Yes or no, you did in fact move money from Fund I and

24   Fund II into the real estate company's account?

25   **A.**   I don't know who actually sent the wires, but I described

1    why those transactions are permitted.  So I'm not -- I do

2    not -- I did not send most wires, but I'll take responsibility

3    for wires sent, but I won't testify that I sent the wires.

4    **Q.**  You authorized these wires be sent, correct?

5    **A.**  I believe I authorized the payments to pay -- the funds to

6    pay payments owed for the member payments as outlined by the

7    contract.

8    **Q.**  And then the next transaction is a down payment for the

9    purchase of 1062 Folsom, correct?

10   **A.**  What it says is a transaction for First America Title

11   Company so it appears to have gone to a title company and it

12   was very likely in conjunction with that.  But I mean --

13   **Q.**  You don't remember the purchase of a multimillion dollar

14   building?

15   **A.**  Well, this is not multimillion.  This is 742,000.  And I

16   testified I believe it was to a title company for the purchase

17   of the building.

18   **Q.**  Okay.  Great.

19        **MR. WALDINGER:**  This is a good place to stop for

20   today, Your Honor.

21        **THE COURT:**  All right.  Members of the jury, you did

22   it.  You made it another week.

23        We didn't finish the evidence this week.  I thought we

24   were going to.  We'll finish it early next week.  Then we'll

25   do all the stuff I told you about.  I'll instruct you, you'll

 1    get some closing arguments.  I think you'll get the case to

 2    decide next week.

 3        I so appreciate your continued hard work and attention.

 4        We've had beautiful weather for the whole trial.  That's a

 5    coincidence.  I'm not taking credit for that.  We're going to

 6    keep having it this weekend so get outside because next week

 7    it's going to start raining.

 8        So anyway I hope you enjoy your three days away.  And

 9    remember my prior admonitions.  Keep an open mind.  Don't talk

10    to anybody about the case.  Don't look anything up on the

11    Internet or otherwise about the case.

12        And I'll see you on Monday morning.  Thank you.

13        **THE CLERK:**  Please rise for the jury.

14        (The following proceedings were heard out of the presence

15    of the jury:)

16        **THE COURT:**  All right.  We're outside the presence of

17    the jury.

18        Mr. Rothenberg, I need to admonish you, there were a

19    couple times during your testimony when I asked you to please

20    just answer Mr. Waldinger's question.  I felt the urge to do

21    that at a multiple of 20 or 30 times the times that I actually

22    did it.

23        If your lawyer feels that my comments to you are

24    inappropriate, he will object and I will pay close attention

25    to that objection.

1        However -- and I should say the reason that I did not

2   admonish you more frequently is that I'm very aware of the

3   outsized effect that a judge's comments can have on the jury's

4   consideration of the evidence, and I feel I should restrain

5   myself unless it's necessary for me to speak.

6        I don't have an opinion to give about whether your

7   continued answering way beyond the question or refusals to

8   answer the question are helping or hurting your cause.  That's

9   for you and your lawyer to talk about in private outside of my

10   hearing.

11        I do know that this jury is very well aware of the time

12   estimates that they have been given and that we appear for the

13   first time in the trial to have exceeded them.

14        Putting all that to one side, nine trial judges out of ten

15   would be giving you exactly the same speech I'm giving you

16   now, which is if this continues, my patience is going to wear

17   thin.  My tone will not change, but my admonitions will become

18   more frequent.

19        You can step down.

20        Mr. Fakhoury, outside the presence of the jury, you made

21   reference to a Rule 29 motion.  And the Court would entertain

22   any argument regarding that motion that you wish to make

23   unless you anticipate submitting something in writing --

24   excuse me -- in writing in which event we can discuss a

25   briefing schedule.

 1            **MR. FAKHOURY:**  I don't have anything to say now, Your

 2     Honor.  We could -- we could talk about a briefing schedule.

 3     We could talk about that later, too.

 4            **THE COURT:**  Well, at the rate we're going, it's not

 5     going to be a Rule 29 motion by the time all the briefs are

 6     in.  If there's nothing that's been prepared now, I would just

 7     ask you -- if there's nothing that's going to be submitted in

 8     writing now, I would just simply ask you to make argument in

 9     support of the motion.

10            **MR. FAKHOURY:**  Your Honor, I'm primarily just raising

11     it as a -- because I'm required to under Ninth Circuit law.

12        So that's really all I have to say about that for now.

13            **THE COURT:**  I find that the evidence viewed in the

14     light most favorable to the government in this case is

15     sufficient for a rational trier of fact to find guilt beyond a

16     reasonable doubt as to each of the counts of the indictment

17     that is presently before the jury, and I deny the motion.

18        Mr. Waldinger, further matters for the record?

19            **MR. WALDINGER:**  I don't think so, Your Honor.

20        On timing, I mean I think I still have some time left with

21     Mr. Rothenberg.  The three-day weekend -- or the three days --

22     it's not really going to be a weekend for me -- will help me

23     hone stuff.  So I hope to be efficient on that.

24        But I'm just trying to figure out timing for my

25     co-counsel.  I'm assuming we would then instruct.  There'll be

1    some redirect perhaps and recross.  That might take a while.

2    And instruct the jury.  I don't know if that's going to take

3    up the rest of Monday.

4         **THE COURT:**  Here's what's going to happen in light of

5    where we are on time.

6         When the examination of this witness is finished, I will

7    begin instructing the jury at that time.  If that occurs at

8    1:15 p.m. on an afternoon, I'll instruct the jury for

9    15 minutes and I will resume instructing them the following

10   day.

11        When I'm done instructing, the government will rise to its

12   feet and give its closing argument, et cetera.  And we will

13   use all of the minutes that are available to this jury because

14   at this point, that's what they expect of us.

15        **MR. WALDINGER:**  We'll be ready to do it.

16        **THE COURT:**  Very good.

17        Mr. Fakhoury, anything for the record?

18        **MR. FAKHOURY:**  One brief thing.  I moved an exhibit

19   in which I had marked as 1001, and I believe actually it

20   should have been marked 1002.

21        So I can -- I just wanted to put that on the record.  We

22   can -- we can make sure all the paperwork is -- and the

23   exhibit lists are sorted out, but I apologize for the

24   numbering error.

25        **THE COURT:**  Oh, that's fine.

1          **MR. FAKHOURY:**  That's the only thing, Your Honor.

2          **THE COURT:**  I'll make a note of that and put the note

3     on my computer screen.  I'll try to remember to advise the

4     jury when they come in that in their notes, if they had

5     written 1001, it's 1002.

6          And for now I'll simply say that the record will reflect

7     the change in number from 1001 to 1002.

8          **MR. FAKHOURY:**  Thank you, Your Honor.

9          **THE COURT:**  Thank you.  Court is in recess.

10          **THE CLERK:**  Court is in recess.

11          (Proceedings were concluded at 1:42 P.M.)

12                          --o0o--

13

14                  <u>**CERTIFICATE OF REPORTER**</u>

15

16          I certify that the foregoing is a correct transcript

17     from the record of proceedings in the above-entitled matter.

18     I further certify that I am neither counsel for, related to,

19     nor employed by any of the parties to the action in which this

20     hearing was taken, and further that I am not financially nor

21     otherwise interested in the outcome of the action.

22

23     _____

24          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25               Thursday, November 9, 2023

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*