UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA            *ORIGINAL*

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 23** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | **Pages 4266 - 4449** |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Monday, November 13, 2023 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiff:        THOMAS A. COLTHURST, ESQ.
                      Attorney for the United States
                      Acting under Authority conferred by
                      28 USC §515
                      1301 Clay Street, Suite 340S
                      Oakland, California  94612
                 BY:  BENJAMIN K. KLEINMAN,
                      KYLE F. WALDINGER,
                      NICHOLAS J. WALSH,
                      ASSISTANT UNITED STATES ATTORNEYS

For Defendant:        MOEEL LAH FAKHOURY LLP
                      1300 Clay Street, Suite 600
                      Oakland, California  94612
                 BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

                      Law Office of Nathaniel J. Torres
                      338 Fillmore Street #4
                      San Francisco, California  94117
                 BY:  NATHANIEL J. TORRES, ATTORNEY AT LAW

Reported By:          Raynee H. Mercado
                      CSR. No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

1                          **I N D E X**

2


3

4       **DEFENDANT'S WITNESSES**                        **PAGE**      **VOL.**

5       ROTHENBERG, MICHAEL

6       CROSS-EXAM (CONTINUED) BY MR. WALDINGER      4270        23

7       REDIRECT-EXAMINATION BY MR. FAKHOURY         4317        23

8


9


10      JURY INSTRUCTIONS                            4332        23

11      CLOSING ARGUMENT BY MR.  KLEINMAN            4360        23

12


13


14                          --o0o--

15


16


17


18


19


20


21


22


23


24


25

```
 1    Monday, November 13, 2023                        8:34 a.m.
 2                       P R O C E E D I N G S
 3                            --o0o--
 4        (The following proceedings were heard in the presence of
 5    the jury:)
 6             THE CLERK:  You may be seated.
 7             THE COURT:  All right.  Ms. Lee, would you call this
 8    case, please.
 9             THE CLERK:  Yes, sir.
10        Your Honor, now calling criminal matter 20266, United
11    States v. Michael Brent Rothenberg.
12        If counsel could please state their appearances for the
13    record, starting with the government.
14             MR. WALDINGER:  Good morning, Your Honor.  Kyle
15    Waldinger, Benjamin Kleinman, and Nicholas Walsh for the
16    United States.
17        We're joined at counsel table by our parallel, Beth
18    Margen, and Special Agent Anthony Ghio.
19             THE COURT:  Good morning.
20             MR. FAKHOURY:  Good morning, Your Honor.  Hanni
21    Fakhoury and Nate Torres on half of Mr. Rothenberg.  He's
22    present, Your Honor.
23             THE COURT:  Good morning.
24        Members of the jury, you may be wondering how can we start
25    court with the lawyers entering their appearance on some days
```

```
 1    and some days we just get right into it.  That's because I
 2    told you that we all get here -- well, I'll not say before you
 3    because many of you get here early, but everyone is required
 4    to be here at 8:00 o'clock.  So if there's something that we
 5    have to discuss we can deal with it without taking up your
 6    time that we would normally use for taking evidence.  So we
 7    got to get all that stuff out of the way.
 8        And most days, we have something to talk about.  So the
 9    lawyers enter their appearance at that time.
10        We just have a tradition in the court.  I mean, I don't
11    know why we have the tradition, we have a court reporter, she
12    can say just say everybody is here.  But that's just how we
13    have to start every court day with entering those appearances.
14        So today we didn't have anything to talk about at 8:00.
15    So I thought you might be curious.
16        I hope everybody had a great weekend.
17        All of our jurors are in their assigned seats.
18        The parties and counsel are at counsel table.
19        When we broke on Thursday, we were in the midst of
20    Mr. Rothenberg's cross-examination.  Mr. Waldinger was asking
21    the questions.  So I'll ask Mr. Rothenberg to come back up to
22    the stand and get comfortable.
23        Mr. Rothenberg, I'll remind you you're still under oath.
24        And when Mr. Rothenberg is comfortable, Mr. Waldinger,
25    your witness.
```

1    **MR. WALDINGER:**  Thank you, Your Honor.

2

3                            **MICHAEL ROTHENBERG,**

4    called as a witness for the DEFENDANT, having been previously

5    duly sworn, continued testifying as follows:

6                    **CROSS-EXAMINATION (Continued)**

7    **BY MR. WALDINGER:**

8    **Q.**  Mr. Rothenberg, good morning.

9    **A.**  Good morning.

10   **Q.**  I just want to start off with a few background questions

11   that I did not get to on Thursday.

12       I just want to confirm your phone number during the --

13   during the time that you managed Rothenberg Ventures

14   Management Company was (415) 774-6468 --

15   **A.**  Yes.

16   **Q.**  -- is that correct?

17   **A.**  Yes, sir.

18   **Q.**  And there's been testimony that you began Rothenberg

19   Ventures Management Company when you were still at Harvard

20   Business School; is that correct?

21   **A.**  Yes, sir.

22   **Q.**  Is that when you opened up the SVB accounts?

23   **A.**  Yes, sir.  While I was still in business school, that's

24   correct.

25   **Q.**  In Massachusetts?

 1    **A.**  Well, I came to San Francisco in the summer between my two

 2    years of business school.  I may have physically been in

 3    California, but I was still a student.  So I don't remember

 4    which state I was in when I physically opened it.

 5    **Q.**  Got it.

 6         And did SVB have branches in Boston?

 7    **A.**  I -- I don't know.  I never visited a branch in Boston if

 8    they have one.

 9    **Q.**  Okay.  And in -- with respect to your -- the people who

10    were LPs, were they just in California?

11    **A.**  No, sir.

12    **Q.**  And were they in other states outside of California?

13    **A.**  Yes, sir.  I believe so.

14    **Q.**  As well as in other countries?

15    **A.**  Eventually, yes.  Yes, sir.

16    **Q.**  For example, like CY Capital?

17    **A.**  Yes, sir, I believe so.

18             **MR. WALDINGER:**  All right.  Ms. Margen, could we pull

19    up Exhibit 69.  And let's go to page 81.

20                        (Exhibit published.)

21    **BY MR. WALDINGER:**

22    **Q.**  I'd like to just ask you some more background questions

23    here, Mr. Rothenberg.

24         This is the bank account statement for January of 2016 for

25    the Rothenberg Ventures 2015 Fund.  Do you see that?

1    **A.**  Yes, sir, I see that.

2    **Q.**  And that's an account number ending 3208?

3    **A.**  Yes.

4          **MR. WALDINGER:**  Ms. Margen, could we blow up the

5    bottom half of that starting with the account number.

6                    (Exhibit published.)

7    **BY MR. WALDINGER:**

8    **Q.**  Mr. Rothenberg, I just want to go through some

9    transactions here.  And my questions are for illustrative

10   purposes.

11       This first transaction in January of 2016 is to the 8931

12   account.

13       Do you see that?

14   **A.**  I see that.

15   **Q.**  And that's the Rothenberg Ventures Management Company

16   account?

17   **A.**  It is.

18   **Q.**  This transaction was for -- was for an amount of about

19   $1.1 million.

20       Do you see that?

21   **A.**  Yes.

22   **Q.**  The description listed as being 2016 fees, was that what

23   that transaction was for?

24   **A.**  I never wrote any of the memos so I -- and they did not

25   always correlate to what they were for.  So I -- I don't know.

1   **Q.**  So -- so my question was, was this amount of 1.1 million

2   for 2016 fees.  Is your answer that you don't know?

3   **A.**  I don't know.  And my answer is also that the memos did

4   not always correlate to what they were.

5   **Q.**  The next transaction on January 15th identifies Vicarious

6   Surgical Inc.

7       Do you see that?

8   **A.**  I do see that.

9   **Q.**  That's a January 15th debit for $200,000; is that correct?

10  **A.**  Yes, sir.

11  **Q.**  Does that represent an investment by the 2015 Fund in a

12  portfolio company known as Vicarious Surgical?

13  **A.**  I believe so.

14        **MR. WALDINGER:**  Ms. Margen, if we could go forward

15  two pages to page 83.  And we're in the same statement.  Let's

16  blow up the bottom half.

17                    (Exhibit published.)

18  **BY MR. WALDINGER:**

19  **Q.**  There are a number of other transactions here listed

20  beginning February 1st.

21      Do you see those, Mr. Rothenberg?  For 200,000; 100,000;

22  900 -- excuse me, $99,999.60; and $400,000?

23  **A.**  Yes, sir.

24  **Q.**  See those?

25  **A.**  I see them.

 1   **Q.** Are those investments by the 2015 Fund into portfolio

 2   companies?

 3   **A.** I believe they are.

 4          **MR. WALDINGER:** And, Ms. Margen, if we could go to

 5   page 85 now.

 6                    (Exhibit published.)

 7   **BY MR. WALDINGER:**

 8   **Q.** The last statement we were on was for February of 2016.

 9   This is for March of 2016.

10       And I'm directing your attention to the March 1st

11   transaction that has NearPod in the description line as well

12   as the March 2nd transaction that has VRChat in the

13   description. Those are for 60,000 and change and $100,000 and

14   change respect -- respectfully [sic].

15       Are those also for portfolio investments?

16   **A.** I think so, yes.

17          **MR. WALDINGER:** And, Ms. Margen, if we could now jump

18   forward to page 99 of the same exhibit.

19       And this is the -- 99, Ms. Margen, and let's blow up the

20   bottom half.

21                    (Exhibit published.)

22   **BY MR. WALDINGER:**

23   **Q.** Mr. Rothenberg, this is the August 2016 statement for the

24   2015 Fund's account. There are two deposits here. Do you see

25   those for 250,000 and 22,500?

1   **A.**  I do see them.

2   **Q.**  That brings the balance -- those two deposits bring the

3   balance of the account up to $500,000.

4       Do you see that?

5   **A.**  I do see that.

6   **Q.**  The next transaction again is -- says to VRBAN INC. in the

7   amount of $500,000.

8       That's another portfolio investment, correct?

9   **A.**  There was not a portfolio company called VRBAN, but that

10  probably is the legal name for one of the portfolio companies.

11  So I -- I think so.

12  **Q.**  And was there another portfolio company with "VR" in its

13  name?

14  **A.**  There were many.

15  **Q.**  Okay.

16      And so this is also a portfolio investment?

17  **A.**  I do believe so.

18  **Q.**  The one that has VRBAN in the title?

19  **A.**  I do believe so.

20  **Q.**  Okay.  Thank you.

21          **MR. WALDINGER:**  Ms. Margen, you can take that down

22  and let's go to Exhibit 212, please.

23      You could blow up the top half.

24                       (Exhibit published.)

25  / / /

 1   **BY MR. WALDINGER:**

 2   **Q.** Mr. Rothenberg, Exhibit 212 is a February 24, 2016 email

 3   to Larry Weisman and Dominic Polizzotto.  Do you see that?

 4   **A.** I see it.

 5   **Q.** Did you send this email?

 6   **A.** I believe I did.

 7   **Q.** There's an attachment to this email that I'd like to show

 8   you.

 9           **MR. WALDINGER:**  Ms. Margen, if we could go to the

10   second page and blow up the text, please, so that's a little

11   bigger.

12                   (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.** This is what you described in your email as the pro forma

15   financials for River Studios/Bend Reality, correct?

16   **A.** (Reviewing document.)

17       Correct.

18   **Q.** Your pro forma financials show a deficit in 2015 of more

19   than $3.5 million, correct?

20   **A.** The pro forma does, yes.

21   **Q.** And "pro forma" means what, in your mind?

22   **A.** Well, there's a note here that says that salaries and

23   wages include the Twisted Oaks acquisition and payroll.  So in

24   that case, it looks like this includes all of the Twisted Oaks

25   expenses from 2015 even prior to the acquisition.

1        A pro forma is meant to show what an entity or combined

2    entities would look like on a going forward and retrospective

3    basis based on a bunch of different -- one or more different

4    variables changing.

5        That's why it's a pro forma and not an actual.

6    **Q.** Was the amount of money that you personally put into River

7    Studios in 2015 approximately $3.5 million?

8    **A.** There's no reason why the amount of money put into River

9    would match that number because this is a pro forma for 2015,

10   and it includes a number of assumptions.

11   **Q.** How much --

12           **THE COURT:** Do you have the question in mind?

13           **THE WITNESS:** Sir?

14           **THE COURT:** Do you have the question in mind?

15       Would you reask it, Mr. Waldinger?

16   **BY MR. WALDINGER:**

17   **Q.** Did you put $3.5 million into River Studios in 2015, of

18   your own money?

19   **A.** I believe I put more than 2 million.  I don't know if it

20   was this exact number of my own money.

21   **Q.** Do you know what River Studios/Bend Reality's deficit was

22   net income in 2015 as you sit here today?

23   **A.** In 2015, River was River Accelerator and Studios.  I do

24   not know the exact number as I sit here today.

25   **Q.** There's nothing on the page that says anything about River

1   Accelerator, correct?

2   **A.**   Not correct.  Bend Reality LLC was River which was Studios

3   and Accelerator in 2015.

4   **Q.**   This also says on a pro forma basis on 12/31/2015 that you

5   had $452,313 in the Bend Reality -- on the Bend Reality

6   balance sheet, correct?

7   **A.**   On the pro forma, again that includes Twisted Oaks, yes.

8   **Q.**   You sent this email to Mr. Weisman and Mr. Polizzotto on

9   February 24th of 2016, correct?

10  **A.**   If that matches the email you just showed, then, yes,

11  that's correct.

12  **Q.**   And after you sent it, Mr. Weisman left you a voicemail

13  that indicated that he was concerned about the numbers that he

14  saw, correct?

15  **A.**   I -- I don't know if that's right.

16        **MR. WALDINGER:**  Ms. Margen, let's take this down.

17  And let's go to Exhibit 213 and let's blow up the top half.

18                    (Exhibit published.)

19  **BY MR. WALDINGER:**

20  **Q.**   Do you recognize this as an email chain.  Exhibit 212

21  encompassed this first email, and then there is a second email

22  that you sent on February 24th of 2016, correct?

23  **A.**   I see that, yes.

24  **Q.**   And you say to Mr. Weisman, "Larry, I returned your and

25  all left a message with your assistant.  As we've

1   discussed" -- I think you meant previously, "I have

2   self-funded the company, so the amount of cash at any given

3   time on the balance sheet is not indicative of runway (your

4   voicemail leads me to believe you may not be considering this

5   correctly)."

6       You said that, correct?

7   **A.**   I believe I did.

8   **Q.**   It's written on here.

9   **A.**   That's why I said I believe I did.

10  **Q.**   And you say here that you self-funded the company?

11  **A.**   Yes, sir.

12  **Q.**   In fact you -- you said it in the first email that you

13  sent earlier that day.

14      Do you see that?

15  **A.**   I see that.

16          **MR. WALDINGER:**   Ms. Margen, let's -- let's go

17  forward -- or let's take this down.

18      And let's please go to Exhibit 62.  And let's go to the

19  page 90.

20                      (Exhibit published.)

21  **BY MR. WALDINGER:**

22  **Q.**   Mr. Rothenberg, I'm showing you what's been admitted in

23  evidence as the Bend Reality LLC bank account statements.

24  This is for February of 2016.

25      Do you see that?

1    A.   I see that.

2    Q.   That's an account ending numbered -- or numbered ending

3    9185, correct?

4    A.   That's -- excuse me -- that's correct.

5         MR. WALDINGER:  Ms. Margen, let's go forward now to

6    page 93 of this exhibit.

7         And blow up the bottom half.

8                        (Exhibit published.)

9    BY MR. WALDINGER:

10   Q.   Mr. Rothenberg, on February 25th of 2016, the entity that

11   Pilot Grove had created to invest in the convertible note for

12   Bend Reality/River Studios sent Bend Reality $2 million,

13   correct?

14   A.   That's correct.

15   Q.   What was the balance in the Bend Reality account at that

16   time?

17        THE COURT:  Do you mean before or after it had

18   received money?

19   BY MR. WALDINGER:

20   Q.   Immediately before that deposit.

21   A.   It says $8,967.37.

22   Q.   After you received that $2 million, you transferred

23   $50,000 to your personal bank account at Bank of America,

24   correct?

25   A.   And then to Rothenberg Ventures Management Company the

 1  same day.  It's not shown here.

 2  **Q.**  Let me just ask my question again.

 3      After you received that $2 million, you transferred

 4  $50,000 to your personal bank account?

 5  **A.**  I'm sorry.  Yes, I see that.

 6          **MR. WALDINGER:**  Let's go to the next -- or page 94,

 7  Ms. Margen.

 8      And let's blow up the top half.

 9                       (Exhibit published.)

10  **BY MR. WALDINGER:**

11  **Q.**  And in addition, the same day you transferred 1.7 million

12  to your personal bank account.

13  **A.**  I see that.

14          **MR. WALDINGER:**  Ms. Margen, let's pull up

15  Exhibit 341.  This has been admitted into evidence, I believe.

16      And let's blow up the top half, let's just blow up the

17  text, please.

18                       (Exhibit published.)

19  **BY MR. WALDINGER:**

20  **Q.**  Mr. Rothenberg, this is an email that you sent on

21  March 4th of 2016 to David Haase, correct?

22  **A.**  Yes.  This looks like an email I sent to Dave Haase.

23  **Q.**  This was about a week after Bend Reality received

24  $2 million from Pilot Grove and Transcend, correct?

25  **A.**  Correct.  This is an email sent on March 4th.  That's

 1   right.

 2   Q.  In this email to David Haase, you said RS transferred

 3   1.7 million to Mike.  And then there's a note that says

 4   "repayment of investment."

 5   A.  I see that.

 6   Q.  You sent this email to David Haase, correct?

 7   A.  I believe so.

 8        MR. WALDINGER:  All right.  Ms. Margen, you can take

 9   that down.

10        And let's pull up Exhibit 235.

11        Let's blow up the middle email here from August 13th.  All

12   the way down -- all the way down.  There we go.

13                    (Exhibit published.)

14   BY MR. WALDINGER:

15   Q.  This is the email that you've been questioned about before

16   I believe both on direct examination and maybe in my initial

17   cross.

18        The question that I have is regarding this email that you

19   sent to Mr. Weisman and Mr. Polizzotto on August 13th of 2016.

20        Are you familiar with this email?

21   A.  Yes.  It's been shown several times in this trial.

22   Q.  In this email, you did not mention anything about the

23   convertible note dated April 4th of 2016, correct?

24   A.  There's no specific reference to April 4th in this email.

25   Q.  Or to a convertible note?

1    **A.**  Well, there's a paragraph about Rothenberg Ventures funds

2    investing so...

3    **Q.**  Are the words "convertible note" used?

4    **A.**  The description of the investment doesn't -- I don't see

5    it in here, but it does reference investment by the funds

6    pretty -- pretty specifically.

7         **MR. WALDINGER:**  Ms. Margen, let's take that down and

8    let's go to Exhibit 237.

9                    (Exhibit published.)

10   **BY MR. WALDINGER:**

11   **Q.**  Mr. Rothenberg, this is -- we have several versions of

12   this update letter to LPs in evidence.  I'm just showing you

13   one of them which is Exhibit 237.

14        **MR. WALDINGER:**  And, Ms. Margen, if we could go to

15   the second page and blow up the top half, please.

16                    (Exhibit published.)

17   **BY MR. WALDINGER:**

18   **Q.**  In the third paragraph, this is where you say the

19   $5 million over two years has been invested in River Studios.

20   Correct?

21   **A.**  I see that.

22   **Q.**  Again, there's no mention that a little more than four

23   months prior to this, there had been a convertible note.

24   **A.**  Well, it specifically says Rothenberg Ventures funds.  If

25   your question is about the specific document relating to this

1  paragraph, I don't see a reference to it.

2  Q.  I -- I think that you -- excuse me.  I believe your

3  testimony before was during the period, you were very -- you

4  were confused and receiving conflicting information?

5  A.  I believe that's right.

6  Q.  Were you confused as to whether you'd entered into or

7  whether Bend Reality had entered into a convertible note with

8  the 2015 Fund?

9  A.  Well, I don't remember everything I thought on this day.

10  But I think that the confusion came from the fact that I was

11  getting a lot of conflicting messages, especially -- I'm --

12  I've been instructed not to talk about specifically what I was

13  advised from attorneys, but attorneys were going through these

14  materials and I was getting conflicting information at this

15  time.  So I did believe what I wrote here.

16  Q.  But again, nothing in this paragraph or in this email says

17  anything about or specifically uses the words "convertible

18  note," correct?

19  A.  Do I see the phrase "convertible note"?  I do not.

20      MR. WALDINGER:  Ms. Margen, let's take this down and

21  go to Exhibit 238.

22                    (Exhibit published.)

23  BY MR. WALDINGER:

24  Q.  Again, this is update letter number 2 that has been shown

25  several times in the trial.

 1        I want to start with this section here that talks about

 2    Rothenberg Ventures examples.  These are examples of exits,

 3    correct?

 4    **A.**  (Reviewing document.)

 5        Yes, sir.  These are exits.

 6    **Q.**  And the exit -- what's supposed to happen with exit money?

 7    **A.**  The money is supposed to go from the company to the fund

 8    with exits.

 9    **Q.**  And then the fund should either reinvest those -- the exit

10    money or distribute it to investors, correct?

11    **A.**  There are many things that the fund can and sometimes

12    should do.  Those are two of many things that the fund manager

13    must consider.

14            **MR. WALDINGER:**  Ms. Margen, if we could go to the

15    second page and blow up the top half.

16                        (Exhibit published.)

17    **BY MR. WALDINGER:**

18    **Q.**  This is again your statement about Rothenberg Ventures

19    funds invested approximately $5 million into River Studios,

20    correct?

21    **A.**  I'm sorry.  Could you repeat the question?

22    **Q.**  This is your statement that the Rothenberg Ventures funds

23    invested approximately $5 million into River Studios, correct?

24    **A.**  Yes, that's what it says.

25    **Q.**  Did you mention anything about a convertible note in this

1  paragraph?

2  **A.**  I do not see the phrase "convertible note."

3  **MR. WALDINGER:**  All right, thank you, Ms. Margen.

4  You can take that down.

5  And let's blow up the bottom, say, two paragraphs.  Or

6  three paragraphs in this -- let's go to the bottom three

7  paragraphs, please.

8  (Exhibit published.)

9  **BY MR. WALDINGER:**

10  **Q.**  You state in this email that you were not focused enough

11  on lean spending, correct?

12  **A.**  I do say that.

13  **Q.**  And then you tell your LPs on August 23rd of 2016 that you

14  got 80 percent off the Super Bowl suite earlier that year,

15  correct?

16  **A.**  Yes, sir.  I'd been told that the suites were selling for

17  $1.25 million in the previous year.

18  **Q.**  That's not the -- you were not quoted a price of

19  $1.2 million at any time, were you?

20  **A.**  I was, sir.

21  **Q.**  And you saw the email chain between Savannah Leggett and

22  Brian Jeffcoat at Suite Experience.  Was there some other

23  quote, some other email in which you were told that the suite

24  was more than a million dollars?

25  **A.**  Yes, sir.  In 2015 that was my understanding.  And the

1   email you're referring to showed something like a 60 or

2   70 percent discount off of that.

3   **Q.**  And you also say in this email that River Studios was paid

4   to executive-produce a Coldplay video.  Do you see that?

5   **A.**  Yes, sir.  We were.

6   **Q.**  Where was that payment received?

7   **A.**  In the River Studios bank account.

8   **Q.**  In the Bend Reality bank account?

9   **A.**  Yes, sir.

10   **Q.**  How much did you receive?

11   **A.**  It was at least 90- to $100,000.

12         **MR. WALDINGER:**  Ms. Margen, if we could go to -- so

13   you can just pull this down, Ms. Margen.

14   **Q.**  So, Mr. Rothenberg, the convertible note that you've been

15   testifying about, it's your testimony that that was entered

16   into between River Studios/Bend Reality and the 2015 Fund on

17   April 4th of 2016, correct?

18   **A.**  Yes, sir.

19         **MR. WALDINGER:**  Ms. Margen, if you could pull up

20   Exhibit 225, which I believe is in evidence, and blow up the

21   top portion.

22                    (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**  This is an email that you sent on May 11 of 2016 to

25   Dominic Polizzotto and Lawrence Weisman, correct?

 1   **A.**   (Reviewing document.)

 2       It does appear to be so.  I don't remember this specific

 3   email, but it -- it says it's from me and I believe that.

 4   **Q.**   At this point in time, Pilot Grove, through Transcend VR,

 5   was an investor in River Studios?

 6   **A.**   They -- they were as of May 2016, that's right.

 7   **Q.**   And you say in this email that we have some huge things

 8   brewing at River Studios.

 9   **A.**   It does say that.

10   **Q.**   It says 2 million-plus in booked revenue?

11   **A.**   It does say that.

12   **Q.**   Is that revenue that has been deposited into Bend

13   Reality's bank account?

14   **A.**   My understanding what "booked revenue" was, was committed

15   revenue.  So it does not mean in the account, no.

16   **Q.**   You never got $2 million from Sony, did you?

17   **A.**   No, sir.  We did not.

18   **Q.**   In this email, you indicate that Pilot Grove's $3 million

19   option can be exercised in a couple of weeks.

20       Do you see that?

21   **A.**   I do see that.

22   **Q.**   And that's an option under the convertible note to give

23   Bend Reality $3 million more pursuant to that convertible

24   note.

25   **A.**   Which convertible note?  I'm sorry.

1    **Q.**  The convertible note that Transcend VR entered into with

2    Bend Reality in February of 2016.

3    **A.**  Yes, I believe that's right.

4    **Q.**  Nowhere in this email did you mention to Dominic

5    Polizzotto and Lawrence Weisman that a month before, there was

6    another convertible note and that the funds, your -- the fund

7    that you managed had invested into River Studios, correct?

8    **A.**  That's correct.  This is a very short email.

9          **MR. WALDINGER:**  Ms. Margen, let's pull this down and

10   let's go to Exhibit 69, page 89.

11                         (Exhibit published.)

12   **BY MR. WALDINGER:**

13   **Q.**  Mr. Rothenberg, this is the April 2016 bank account

14   statement for the 2015 Fund.

15        Do you see that?

16   **A.**  (Reviewing document.)

17        I do see that.

18          **MR. WALDINGER:**  Ms. Margen, let's blow up the bottom

19   half starting at the account number.

20                         (Exhibit published.)

21   **BY MR. WALDINGER:**

22   **Q.**  Mr. Rothenberg, you've testified about a $2.1 million

23   wire.  There is a $2.1 million wire here shown on April 5th of

24   2016.  Is that what your testimony related to?

25   **A.**  I believe it is.

1    **Q.** This transfer does not go to the Bend Reality account,

2    correct?

3    **A.** Not directly.

4    **Q.** It goes to the RVMC's -- the Rothenberg Ventures

5    Management Company's account, correct?

6    **A.** On behalf of River Studios, that's correct.

7    **Q.** This did not go directly from the 2015 Fund to Bend

8    Reality, correct?

9    **A.** Correct.  It does not go directly.

10            **MR. WALDINGER:**  And, Ms. Margen, if we could pull up

11    Exhibit 641 which is an Excel spreadsheet.

12                        (Exhibit published.)

13    **BY MR. WALDINGER:**

14    **Q.** That $2.1 million transfer was initially recorded in the

15    2015 Fund's books as professional fees, correct?

16    **A.** I don't know.  I didn't do the entries in the books.

17            **MR. WALDINGER:**  Ms. Margen, let's go to line 2370.

18        All right.  If we can go to 2370 and cursor across.

19                        (Exhibit published.)

20    **BY MR. WALDINGER:**

21    **Q.** So this is $2.1 million transaction.

22        Do you see that?

23    **A.** The thing you're circling, I see that.

24    **Q.** On April 5th of 2016.  Do you see that?

25    **A.** I do.

1   Q.   Recorded as professional fees.

2   A.   Yes.  Looks like a mistake.

3   Q.   This was not changed until after August of 2016, correct?

4   A.   It may have been changed when we did our internal audit.

5   Q.   And that internal audit occurred after you received the

6   letter from the SEC.

7   A.   We definitely did an internal audit after receiving that

8   letter, yes, sir.

9        MR. WALDINGER:  Ms. Margen, can you cursor to the

10  left, please, so that we can see the dates.  Stop right there.

11                    (Exhibit published.)

12  BY MR. WALDINGER:

13  Q.   In fact, somebody named Todd, on December 15th of 2016,

14  changed this entry to "portfolio investments."

15       Do you see that?

16  A.   That's what it says.  But I didn't make any of these

17  entries at any point.

18  Q.   Todd was an employee of an accounting firm that you hired

19  after the SEC letter to clean up the books.

20  A.   I don't know what Todd's relationship was with the

21  company, but I do know that we had somebody helping us from an

22  external company, called Todd.

23       MR. WALDINGER:  All right.  Ms. Margen, you can take

24  that down.

25  Q.   I'd like to change topics, Mr. Rothenberg.

1    Let's still stay in the 2016 time period.

2        **MR. WALDINGER:**  Ms. Margen, if you could bring up

3    Exhibit 485.

4                      (Exhibit published.)

5    **BY MR. WALDINGER:**

6    **Q.**  Do you recognize this email chain, Mr. Rothenberg?

7    **A.**  (Reviewing document.)

8        I do -- I do generally.

9        **MR. WALDINGER:**  Ms. Margen, let's blow up starting

10   from the top two-thirds -- bottom two-thirds, please.

11                      (Exhibit published.)

12   **BY MR. WALDINGER:**

13   **Q.**  On May 10th of 2016, Amy Huang from ARCHina was asking you

14   to send her back $1.3 million, correct?

15   **A.**  I guess at the top of this, it looks like the email is

16   coming from me, but I may be quoting her.

17   **Q.**  Well, let's -- let's go to the top.

18       This text that I'm highlighting here that begins the

19   paragraph "We can't be over 10 percent of any given fund,"

20   that's in blue, right?

21   **A.**  It is in blue.

22       **MR. WALDINGER:**  Ms. Margen, let's blow up the top

23   half of this document.

24                      (Exhibit published.)

25   / / /

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

BY MR. WALDINGER:

Q.  And the email is from Ms. Huang and she says, "My comments are below (blue)."

A.  I see that.  I -- so she's the one quoting me.  Yes, I see that now.

MR. WALDINGER:  All right.  Ms. Margen, let's blow up what we had blown up before.

(Exhibit published.)

BY MR. WALDINGER:

Q.  And so this blue text is Ms. Huang telling you that you need to wire her back and ARCHina back $1.3 million in May of 2016.

A.  Well, it looks like a request or a suggestion.

Q.  Well, in fact at the end of July, you sent back $2 million to Ms. Huang.  Correct?

A.  Actually I -- I don't remember the exact amount.  I would believe that, but I don't remember that.

MR. WALDINGER:  Ms. Margen, if we could go to Exhibit 76, page 18.

(Exhibit published.)

BY MR. WALDINGER:

Q.  Mr. Rothenberg, this is the Rothenberg Ventures 2016 Feeder Fund account, one of those accounts, for July of 2016 ending 0574.

Do you see that?

1    **A.**  I do see that.

2            **MR. WALDINGER:**  Ms. Margen, if you could blow up the

3    bottom half.

4                          (Exhibit published.)

5    **BY MR. WALDINGER:**

6    **Q.**  And you see there, Mr. Rothenberg, on July 27th, a

7    $2 million wire out to ARCHina Capital?

8    **A.**  Yes, sir.  2,017,500.

9            **MR. WALDINGER:**  All right, Ms. Margen, you can take

10   that down.

11   **Q.**  I'd like to ask you some questions about the Unity

12   transaction.

13       And, Ms. Margen, let's go to Exhibit 256 and blow up the

14   top half.

15                          (Exhibit published.)

16   **BY MR. WALDINGER:**

17   **Q.**  You recognize this as the email in which the attorney Nam

18   Kim from Fenwick and West sent Martin Mayo and several other

19   people from Rothenberg Ventures a copy of the draft stock

20   purchase agreement.

21   **A.**  Yes.  We were very excited to receive this email.

22   **Q.**  On July 21st of 2016?

23   **A.**  Yes, sir.

24   **Q.**  No response was given to Fenwick and West or to Unity for

25   about three weeks, correct?

1   **A.**  I don't know the amount of time.

2   **Q.**  Well, let me restate that.

3       Let's actually look at Exhibit 257.

4       And this is an email chain, Exhibit 257, that ends on

5   August 15th.

6           **MR. WALDINGER:**  If we could go to the third page,

7   Ms. Margen.

8                       (Exhibit published.)

9   **BY MR. WALDINGER:**

10  **Q.**  And this just repeats the Nam Kim email that we just saw

11  in Exhibit 256.

12      On July 21st, that's the date that the SEC emailed you and

13  counsel for Rothenberg Ventures its inquiry letter.

14  **A.**  I think this -- this time stamp might be different than

15  the last email you just showed me.

16      Your question is about the day that we received an SEC

17  letter.  I believe we received an SEC letter on July 22nd.

18  There may have been more than one letter.

19  **Q.**  Okay.

20      And you're right.  This time stamp says 4:19.  In

21  Exhibit 256, it says 1:18, and then has a GMT time in

22  parentheses.

23      Do you recall that?

24  **A.**  I think that's right.  The -- the minutes didn't match up,

25  or the hours.

 1    Q.   Okay.   GMT is Greenwich Mean Time?

 2    A.   That's my understanding.

 3    Q.   But you'll agree that you got the stock transfer agreement

 4    on July 21st.

 5    A.   Yes, sir.

 6         MR. WALDINGER:   Ms. Margen, let's page up and let's

 7    blow up the bottom half, please.

 8         Excuse me.

 9    Q.   On August 2nd, Faisal Rashid from Fenwick sends an email

10    wanting to check in.

11         Do you see that?

12    A.   I do see that.

13         MR. WALDINGER:   Ms. Margen, let's go to the next --

14    the first page, please.   And let's blow up starting from the

15    second email here to the bottom.

16                   (Exhibit published.)

17    BY MR. WALDINGER:

18    Q.   Mr. Mayo responds on August 5th, correct?

19    A.   I see that.

20    Q.   And then Mr. Rashid again circles back on August 10th.

21         Do you see that?

22    A.   I do see that.

23    Q.   Mr. Foley, who we heard from in this trial, follows up on

24    August 12th.

25         Do you see that?

ROTHENBERG - CROSS (CONTINUED)/ WALDINGER

 1   **A.**   I do.

 2   **Q.**   And then you respond three days later on August 15th,

 3   correct?

 4   **A.**   That's correct.

 5   **Q.**   At this time, the deal that you were talking about with

 6   Unity was north of $10 million, correct?

 7   **A.**   Yes, sir.

 8   **Q.**   Rothenberg Ventures didn't have $10 million at this time,

 9   correct?

10   **A.**   On an SPV you raise the money.  So it's something we were

11   trying to raise.

12   **Q.**   The question was Rothenberg Ventures did not have that

13   amount of money.

14   **A.**   It's not relevant here, but that's correct.

15   **Q.**   And you had received some money from investors by

16   August 15th, correct?

17   **A.**   I -- I believe we had.

18   **Q.**   You had received a million dollars from GHF?

19   **A.**   That's correct.

20   **Q.**   That's the Melas-Kyriazis?

21   **A.**   Also correct.

22   **Q.**   You'd received money from the Binns Family Limited

23   Partnership?

24   **A.**   Also correct.

25   **Q.**   You'd received money from Ewan Johnson and Sonoko Konishi?

1    **A.**   That -- that's right.

2    **Q.**   And you'd received money from Lena Goldberg and her

3    husband, Ronald Goldberg.

4    **A.**   Also correct.

5    **Q.**   All of that money that I just mentioned had been deposited

6    into an account and then transferred to the Rothenberg

7    Ventures Management Account, correct?

8    **A.**   Correct.  Or possibly sent directly to that account in

9    some of the cases, but that's right.

10         **MR. WALDINGER:**   Ms. Margen, let's go to Exhibit 67,

11   page 63.

12                       (Exhibit published.)

13   **BY MR. WALDINGER:**

14   **Q.**   Mr. Rothenberg, this is an account statement for July of

15   2016 for an account named Rothenberg Ventures Co-Fund I LLC.

16        Do you see that?

17   **A.**   I do see that.

18   **Q.**   That account is numbered ending 2235.

19        Do you see that?

20   **A.**   It does say that.

21         **MR. WALDINGER:**   Ms. Margen, let's blow up the bottom

22   half.

23                       (Exhibit published.)

24   **BY MR. WALDINGER:**

25   **Q.**   And so with respect to the investors that testified in

1    this trial -- or that that includes GHF, correct?

2    **A.**    It does include GHF.

3    **Q.**    On the day that GHF's money came into this account, it was

4    transferred to the Rothenberg Ventures Management Company's

5    operating account, correct?

6    **A.**    The 2235 account was the old Reaction account.  So it --

7    we didn't have time to open up a new one.  So we sent it to

8    the Management Co., that's correct.

9    **Q.**    Okay.  So again just so the record is cleaner, on the day

10    that GHF sent their money, a million dollars, that million

11    dollars was sent to the RVMC operating account?

12    **A.**    Right.  That's right.

13    **Q.**    And then there's an investment by somebody that you knew

14    from Texas named Nathanael Hudson, correct?

15    **A.**    I did not know him because he was in Texas.  I think he

16    may be in Texas.

17    **Q.**    There's an investment by somebody that you know named

18    Nathanael Hudson on July 18th, correct?

19    **A.**    That's right.

20    **Q.**    The Binns Family Limited Partnership invests on the 19th

21    of July?

22    **A.**    That's right.

23    **Q.**    Those two deposits are sent on July 19th also to the

24    Rothenberg Ventures Management Company account.

25    **A.**    Yes, they are.

1    **MR. WALDINGER:** Ms. Margen, let's go to the top of

2    the next -- or I think it's two pages forward.

3                        (Exhibit published.)

4    BY MR. WALDINGER:

5    **Q.** On July 21st, on or about the date that the SEC sent you

6    the letter, there was a wire from Sonoko Konishi, correct?

7    **A.** There is.

8    **Q.** And on July 21st, a wire from Ronald P. Goldberg?

9    **A.** There is.

10   **Q.** Those funds are transferred on August 1st to the

11   Rothenberg Ventures Management Company account, correct?

12   **A.** This doesn't say that.

13   **Q.** Let's go to page 67.

14                        (Exhibit published.)

15   BY MR. WALDINGER:

16   **Q.** This is the August statement for the account numbered

17   ending 2235.

18   **A.** Yes, sir.  This does say that.

19   **Q.** Leaving what balance in that account?

20   **A.** You're pointing at a number that says 150,000.

21       Now you're pointing at a number that says zero.

22   **Q.** And it says ending balance is zero.

23   **A.** The number you're pointing at is zero.

24   **Q.** We've seen some emails between you and lawyers for Unity.

25   At the time of those emails, say, around the middle of August,

1   the money that you had sent from this account to the

2   Rothenberg Ventures Management Company account had been spent,

3   correct?

4   **A.**  I would not characterize it like that.

5           **MR. WALDINGER:**  Ms. Margen, let's pull up Exhibit 63.

6           **THE COURT:**  Mr. Waldinger, I think we're going to

7   take a mid-session stretch break.

8           **MR. WALDINGER:**  Okay.

9                        (Stretch break.)

10          **THE COURT:**  Thank you, Mr. Waldinger.

11          **MR. WALDINGER:**  Ms. Margen, if we could go to

12  Exhibit 63, and I think we want page 443, please.

13                      (Exhibit published.)

14  **BY MR. WALDINGER:**

15  **Q.**  Mr. Rothenberg, do you recognize this as the Rothenberg

16  Ventures Management Company account statement for August of

17  2016?

18  **A.**  Yes, sir.

19  **Q.**  What's the opening balance on the account that month?

20  **A.**  I think it says $4,167.01.

21  **Q.**  It does say $4,167.01, correct?

22  **A.**  Still correct.

23          **MR. WALDINGER:**  Ms. Margen let's go to page 450 of

24  this exhibit.  And blow up the bottom half.

25                      (Exhibit published.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    BY MR. WALDINGER:

2    Q.  We've seen some emails between you and folks at Unity on

3    or about August 15th.

4        On August 15th of 2016, this account had $7,334.65,

5    correct?

6    A.  As of that particular transaction, yes.  There was a lot

7    of money coming and going.

8    Q.  In fact, you had spent all of the money that the

9    Melas-Kyriazis, the Binnses, Sonoko Konishi, and Ewan Johnson

10   and Lena and Ronald Goldberg had sent you, correct?

11   A.  Not correct.

12        MR. WALDINGER:  Ms. Margen, let's go the exhibit --

13   or excuse me -- page 427 of this statement.

14                    (Exhibit published.)

15   BY MR. WALDINGER:

16   Q.  This is the -- do you recognize this as the July statement

17   for the Rothenberg Ventures Management Company account?

18   A.  Yes, that's what it says.

19   Q.  What were the total debits that month?

20        MR. WALDINGER:  Ms. Margen, blow up the bottom half

21   for Mr. Rothenberg.

22                    (Exhibit published.)

23        THE WITNESS:  I think -- I think it says one point --

24   or $1,733,499.50.

25   / / /

1    BY MR. WALDINGER:

2    **Q.**  What were the total credits that month, Mr. Rothenberg?

3    **A.**  One -- it says right below that it says $1,720,385.96.

4    **Q.**  More than -- more than 65 percent of the -- of the amount

5    of credits in the account that month came from Unity

6    investors, correct?

7    **A.**  (Reviewing document.)

8    **Q.**  There had been $1 million that was transferred from the

9    2235 account and $150,000 from the Unity account.

10    **A.**  I -- I mean you're characterizing it that way.

11    **Q.**  If you had not made the transfers from the 2235 account,

12    all of the transactions that occurred this month could not

13    have occurred, correct?

14    **A.**  Not correct.

15    **Q.**  And how -- how is it that they could have occurred?

16    **A.**  There was a -- a lot of different transactions going on at

17    this time period with different accounts.  You're showing a --

18    a microcosm of that.

19    **Q.**  Are you saying that you had money in other accounts?

20    **A.**  I think there's been an abundance of testimony that

21    there's been a lot of accounts and a lot of money flowing,

22    yes, sir.

23    **Q.**  Which accounts did you -- if you had not put the GHF money

24    and the other 150,000 in this account this month, where would

25    you have gotten the money to pay the $1.733 million in debits?

1    **A.** There are a lot of different sources.  There was equity in

2    the real estate building.  There was -- we had in June we had

3    signed --

4    **Q.** I'll stop you there.

5    **A.** -- a million dollar deal with GM.

6    **Q.** Let me stop you there.

7    **A.** Okay.

8    **Q.** So equity in the building.  So you would have gotten --

9    you would have gotten a cash-out re-fi; is that what your

10   testimony is?

11   **A.** It's a possibility.

12   **Q.** Okay.  What are -- what's another source?

13   **A.** We'd just signed a deal with GM for a million dollars.

14   **Q.** That money never came in?

15   **A.** Because the SEC thing came, correct.

16   **Q.** Okay.  Where else would you have gotten money?

17   **A.** The -- had -- had we been permitted to continue the Unity

18   deal, there were management fees associated with that that

19   could have been as high as $750,000.

20   **Q.** Where else would you have gotten the money?

21   **A.** There were numerous sponsorships, including

22   Hewlett Packard that had agreed to pay us $250,000 that they

23   owed us at that time as well.

24   **Q.** Would you --

25   **A.** There are many others.

1   **Q.**  You didn't get a cash-out re-fi on the building, correct?

2   **A.**  We didn't -- we didn't need to, that's right.

3   **Q.**  You didn't need to because you used GHF's money.

4   **A.**  No, I wouldn't say that.

5   **Q.**  You -- you didn't get any money from GM.

6   **A.**  We did not.

7   **Q.**  You didn't get any money from HP.

8   **A.**  Well, we -- we did.  We received more than 300,000 from

9   them but not in this month.

10          **MR. WALDINGER:**  All right.  Ms. Margen, we can take

11  this down.

12  **Q.**  I believe on direct testimony, you said that you repaid

13  Ewan Johnson and Sonoko Konishi?

14  **A.**  Could you please repeat the question?

15  **Q.**  I believe on direct examination you said -- or you

16  suggested at least that you had repaid Ewan Johnson and Sonoko

17  Konishi?

18  **A.**  That -- that was a transaction I wasn't directly involved

19  in at the time.  But when Ewan Johnson said that he would like

20  me to pay him 50,000, I believe I did.

21  **Q.**  In fact, it was the head of River Studios at that time was

22  a guy named Jonah Loop?

23  **A.**  Right, that's correct.

24  **Q.**  Jonah Loop charged your -- your Black Card at *Amex*

25  $50,000?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   **A.**  I -- I believe that's right.  I used that card for

2   business, that's correct.

3   **Q.**  You gave him permission to do that?

4   **A.**  I think I did.

5   **Q.**  But then you challenged that transaction with *Amex*, didn't

6   you?

7   **A.**  That's not correct.  I asked them for paperwork because I

8   didn't get a receipt from Jonah.

9   **Q.**  And you heard that -- you heard the testimony from Ewan

10  Johnson that he didn't get his money back until 2017, correct?

11  **A.**  No.  The document you showed said that I -- I asked them

12  for paperwork, not that I tried to interfere with that.

13  **Q.**  The question that I had was you heard testimony from Ewan

14  Johnson that he did not get his money back until 2017,

15  correct?

16  **A.**  I think that's what he said.  That's surprising to me.

17          **MR. WALDINGER:**  Ms. Margen, if we could -- well, just

18  one second.

19  **Q.**  Cobalt Robotics, do you recall that company?

20  **A.**  Yes, sir.

21  **Q.**  That was a portfolio company of the 2016 Fund?

22  **A.**  That's correct.  Briefly.

23          **MR. WALDINGER:**  In fact, let's pull up Exhibit 77,

24  page -- let's just do page 70 -- or excuse me -- page 14.

25                          (Exhibit published.)

 1   BY MR. WALDINGER:

 2   Q.  Mr. Rothenberg, do you recognize this as the April 2016

 3   statement for 2016 Fund LP numbered ending 0815?

 4   A.  Yes.

 5        MR. WALDINGER:  Ms. Margen, let's go down two pages

 6   to page 16.

 7      And blow up the top half of the page.

 8                    (Exhibit published.)

 9   BY MR. WALDINGER:

10   Q.  On April 18th of 2016, Mr. Rothenberg, there's a debit for

11   $500,000 with the name Cobalt Robotics in the description.  Do

12   you see that?

13   A.  I see that.

14   Q.  Does that represent the 2016 Fund's investment into Cobalt

15   Robotics?

16   A.  Before we rescinded it, that's correct.

17   Q.  And when you say you rescinded it, Cobalt Robotics bought

18   back its shares from you in the fall of 2016.

19   A.  I don't remember the exact transaction structure.  But I

20   would agree with that characterization.

21        MR. WALDINGER:  Ms. Margen, let's go to page -- let's

22   go to page 34 of this same exhibit.

23                    (Exhibit published.)

24   BY MR. WALDINGER:

25   Q.  And in fact, so after the SEC letter and after the

1    negative articles that came out and after a number of emails

2    that you sent to investors, on October of 2016 -- or in

3    October of 2016, Cobalt Robotics bought back its shares,

4    correct?

5    **A.**  I think it's misleading to lump those things together.

6    This date is October 2016.

7    **Q.**  And -- but it is after all those other dates that I said,

8    correct?

9    **A.**  October 2016 is after August 2016, I would agree with

10   that.

11          **MR. WALDINGER:**  Let's blow up the bottom half here,

12   Ms. Margen.

13                      (Exhibit published.)

14   **BY MR. WALDINGER:**

15   **Q.**  Mr. Rothenberg, the opening balance on the 2016 Fund LP

16   account was zero dollars in October.

17   **A.**  Yes, sir.

18   **Q.**  $500,000 came in from Cobalt Robotics.

19       Correct?

20   **A.**  On October 20th, yes, sir.

21          **MR. WALDINGER:**  Ms. Margen, let's go two pages ahead.

22                      (Exhibit published.)

23   **BY MR. WALDINGER:**

24   **Q.**  The opening balance in November is 500,000.

25          **MR. WALDINGER:**  Let's blow up the bottom half.

1    **Q.**  And 250,000 goes out to the 2015 account; is that correct?

2    **A.**  Yes, sir.  It does -- it does say that.

3    **Q.**  Leaving a balance of 250,000?

4    **A.**  Yes, sir.

5         **MR. WALDINGER:**  Ms. Margen, let's go two more pages

6    to Exhibit -- or excuse me -- to page 38.

7        And let's blow up the bottom half.

8                    (Exhibit published.)

9    **BY MR. WALDINGER:**

10   **Q.**  And then some of that remaining balance from the Cobalt

11   Robotics exit goes to what you'd renamed your company,

12   Frontier Technology Venture Capital; is that right?

13   **A.**  I would not call it an exit.  It was rescinding an

14   investment.  It's different.

15   **Q.**  Well, it's money that the 2016 Fund had originally

16   invested in Cobalt Robotics, correct?

17   **A.**  No, sir.  Once an investment is made, the money that is

18   sent for the investment is exchanged in return for stock in a

19   company.  That's what the person -- that's what the entity --

20   that's what the 2016 Fund had once it invested in Cobalt.

21       Once that was rescinded, Cobalt received back its shares.

22   The fund received its money.  That money did not belong to

23   Cobalt.  It's not correct to characterize that as Cobalt's

24   money.

25   **Q.**  And I'm not calling it Cobalt's money, I don't think.  But

1    that 500,000 was 2016 Fund money, correct?

2    **A.**  That's right.

3    **Q.**  You used some of that money to pay back the Binnses,

4    correct?

5    **A.**  The -- so this is not my personal account.  This is a 2016

6    Fund account.  The 2016 Fund sent $100,000 to the Management

7    Company's account.  That's what that says.  8931.

8    **Q.**  With a note to pay back Binns?

9    **A.**  Again, I didn't write any of those notes, and a lot of

10   them don't correlate.

11   **Q.**  And in fact, on this date, December 9th of 2016, we've

12   heard testimony that the Binnses did receive a wire at their

13   Charles Schwab account, correct?

14   **A.**  I believe -- well, they did get paid back.

15   **Q.**  And they got paid back with money from this account, the

16   0815 account?

17   **A.**  That's not correct.

18   **Q.**  Where did you get paid back from if it wasn't from money

19   that originated from this account?

20   **A.**  That's -- that's the characterization that is misleading.

21   When the 2016 Fund does a transaction with RVMC, in this case,

22   that is -- that's an inter -- that -- that's an

23   interrelationship-type thing.

24        So the 2016 Fund, I don't know what this was for -- for

25   RVMC.  But, for example, if it's fees or a reimbursement of an

1  allowed fund expense, or whatever that is, that's -- that's a

2  transaction between RVMC and the 2016 Fund.

3     At that point, RVMC has funds in its account.  And if at

4  that point, RVMC bought back Binns, then that's a transaction

5  between RVMC and Binns.  It's -- it's not correct to

6  characterize that as a transaction from -- you know, Cobalt or

7  whatever.

8  **Q.**  All right.  Let's just take it one step at a time.

9     The $250,000 that was in this account comes from what

10 you're calling the rescinding of the Cobalt investment,

11 correct?

12 **A.**  So this money belongs to the fund.  And it's inappropriate

13 to call it Cobalt.  If --

14 **Q.**  All right --

15 **A.**  If -- if -- I'm sorry.  Go --

16 **Q.**  Mr. Rothenberg, my question is:  Does this $250,000 come

17 from the rescinding of the Cobalt transaction?

18 **A.**  There was a rescinding of the Cobalt transaction.  This is

19 2016 Fund money.

20 **Q.**  Okay.  And then there's $100,000 transfer with a

21 description that says "to pay back Binns."  That's my

22 question.

23 **A.**  Again, I'm quite sure that the 8931 account is not the

24 Binns.

25 **Q.**  My question is:  There's $100,000 debit with the

1    description "to pay back Binns."  Correct?

2    **A.**  Sir, I took an oath to tell the truth and the whole truth.

3    What this says here is that the $100,000 went to the RVMC

4    account.  There is a note that I did not write that says

5    "Binns."  And I'm quite sure that that account is not the

6    Binns account.

7    **Q.**  And once the money ended up in the 8931 account, it was in

8    fact used -- sent on to pay back the Binnses.

9    **A.**  Because this is such an important point in this case, I

10   will point out that I don't agree with that characterization

11   about whose money it is at that point.

12       When it's in the RVMC account, it is RVMC's money.  If

13   RVMC then bought out the Binns, that's a transaction between

14   RVMC and the Binns.

15   **Q.**  Let me just ask a more basic question.  In this account,

16   in the 0815 account, if there had not been a rescinding of the

17   Cobalt transaction, this $100,000 transfer could not have

18   occurred on that date, correct?

19          **MR. FAKHOURY:**  Objection, asked and answered and

20   argumentative.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  I do not agree with that

23   characterization.

24          **MR. WALDINGER:**  All right.  Ms. Margen, let's pull

25   this down and let's go to Exhibit 63, page 477.

 1                          (Exhibit published.)

 2   BY MR. WALDINGER:

 3   Q.  Mr. Rothenberg, this is the RVMC account for December of

 4   2016.  Do you see that?

 5   A.  Could you please repeat the question?

 6   Q.  This is the -- the RVMC account for December of 2016.

 7       Do you see that?

 8   A.  It says Frontier Technology Venture Capital LLC, which is

 9   the -- it is another name for Rothenberg Ventures Management

10   Company LLC.

11       So, yes, I just want to say for the record what the

12   statement says.

13   Q.  Thank you.

14       And you had changed the name of Rothenberg Ventures

15   Management Company back -- or to Frontier Technology Venture

16   Capital by this time.

17   A.  Yes, sir.  For about four months.

18           MR. WALDINGER:  Ms. Margen, let's go forward to

19   page 477.

20                          (Exhibit published.)

21   BY MR. WALDINGER:

22   Q.  This shows the $100,000 credit from the 0815 account that

23   we were just looking at.

24       Do you see that?

25   A.  Yes, sir.  I -- I see that.

1  **Q.**  What was the balance in the Frontier Technology Venture

2  Capital account before that $100,000 deposit?

3  **A.**  It says -- so again, there has been testimony that SVB put

4  these things out of order, that the balance doesn't correlate

5  to the -- the -- the -- each of these specific transactions.

6       So what I can do for you is read the amount you're

7  pointing at.  But I can't -- I mean we -- we already know that

8  doesn't correlate to the actual balance.

9       It says $698.66.

10  **Q.**  Okay.  And so then the $100,000 comes in, you see that,

11  from the 0815 2016 Fund account, correct?

12  **A.**  Yes, that's the same transaction, I believe, that we

13  looked at before.

14  **Q.**  And the same day, again with a description that says "To

15  Pay Back Binns," there's a transfer out to the 2235 account.

16  **A.**  Again, I am quite sure that the 2235 account is not the

17  Binns.  But I see the 100,000 and I see the account 2235.

18  **Q.**  Well, the Binnses were paid back out of the 2235 account,

19  correct?

20  **A.**  Well, sir, a minute ago you wanted me to say that it came

21  from the RVMC account.  And so I -- I just need to be very

22  clear.  I don't --

23                    (Off-the-record discussion.)

24            **THE WITNESS:**  I do not see this money in this account

25  in this transaction going to the Binns.  What I see is 100,000

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   on December 9th, 2016, going to an account 2235 which I'm

2   quite sure is not the Binns.

3           **MR. WALDINGER:**  Ms. Margen, let's go to Exhibit 67,

4   page 75.

5                       (Exhibit published.)

6   **BY MR. WALDINGER:**

7   **Q.**  All right.  We're back on the 2235 account.  This is the

8   account, you recall, that GHF, the Binnses, the Goldbergs,

9   Sonoko Konishi and Ewan Johnson deposited their funds,

10  correct?

11  **A.**  That sounds right.

12          **MR. WALDINGER:**  Let's blow up the bottom half.

13                       (Exhibit published.)

14  **BY MR. WALDINGER:**

15  **Q.**  Now, we see the deposit from the 8931 account which is the

16  Frontier Technology Venture Capital account, correct?

17  **A.**  I see a $100,000 request credit from 8931 the Management

18  Company account.

19  **Q.**  The opening balance that month was zero dollars, correct?

20  **A.**  It says zero dollars.

21  **Q.**  And you've heard testimony that this $100,000 to Charles

22  Schwab was to pay back the Binnses, correct?

23  **A.**  I'll -- I'll take your word for that.

24  **Q.**  Well, let's -- I don't want you to do that.

25          **MR. WALDINGER:**  Let's go to Exhibit 606, Ms. Margen.

1            (Exhibit published.)

2    BY MR. WALDINGER:

3    Q.   This was a document that Robert -- Roberto Amenta from the

4    Federal Reserve Bank of New York testified about.  And we

5    have -- it gives a date of December 9th of 2016, amount of

6    100,000 and Charles Schwab, which is all information that was

7    on the 2235 account statement that we just looked at, correct?

8    A.   I'm quite comfortable with this validating that the

9    Charles Schwab account that we looked at on December 9th is

10   the Binns.  This refreshes my memory.

11   Q.   Okay.  So we just walked through Cobalt rescinding going

12   into the 2016 Fund account, money moving to the Frontier

13   Technology Venture Capital account, money moving to the

14   2235 account.

15        Does that refresh your recollection that the money that

16   you obtained to pay back the Binnses came from the rescinding

17   of the Cobalt transaction by the 2016 Fund?

18   A.   That is absolutely incorrect to characterize it like that.

19   Q.   And Jim Binns specifically refused to sign paperwork that

20   was sent to him indicating that he was an investor in the

21   2016 Fund, correct?

22   A.   He decided not to invest in the 2016 Fund, that's correct.

23   Q.   And then when he was asking for his money back, your

24   lawyers sent him paperwork asking him to attest that he had

25   intended to invest in the 2016 Fund.

 1          Do you recall that testimony?

 2   **A.**  I don't remember what they sent, but we sent him the money

 3   back without requiring him to sign anything.  I'm sure of

 4   that.

 5   **Q.**  He wasn't an investor in the 2016 Fund, was he?

 6   **A.**  He would have had to have been to invest in Unity.  He had

 7   expressed an interest in Unity, and so therefore he expressed

 8   an interest in the 2016 Fund.

 9          He ultimately decided not to.  But I had a reasonable

10   belief that that's what he wanted to do because he had to do

11   that to invest in Unity which he had said he was interested

12   in.

13              **MR. WALDINGER:**  If I could have one second, Your

14   Honor.

15              **THE COURT:**  Yes.

16              **MR. WALDINGER:**  No further questions, Your Honor.

17              **THE COURT:**  Thank you, Mr. Waldinger.

18       Mr. Fakhoury?

19              **MR. FAKHOURY:**  Yes, thank you.

20                   (Pause in the proceedings.)

21                   <u>**REDIRECT EXAMINATION**</u>

22   BY MR. FAKHOURY:

23   **Q.**  Okay.  Good morning, Mr. Rothenberg.

24   **A.**  Good morning.

25              **MR. FAKHOURY:**  I'm going to ask Mr. Torres to pull up

1    Exhibit 212.

2                    (Pause in the proceedings.)

3            **MR. FAKHOURY:**  And can we go to the second page of

4    this exhibit.

5                    (Exhibit published.)

6    **BY MR. FAKHOURY:**

7    **Q.**  Okay.  Mr. Rothenberg, Mr. Waldinger asked you a question

8    this morning about whether the amount of money put into River

9    Studios would line up with this net income number here

10   (indicating) on the pro forma financial.

11       Do you recall Mr. Waldinger's questions about that?

12   **A.**  Yes, sir.

13   **Q.**  And I think your testimony was they would not necessarily

14   line up.

15       Did I say that right?

16   **A.**  They would not necessarily line up.

17   **Q.**  Why is that?

18   **A.**  Well, a pro forma -- the -- the name "pro forma" means

19   that there's assumptions.  So the first thing that you need to

20   know about a pro forma is that it's not the actual.

21       In this case, there's two statements I see below, the most

22   important of which is salary and wages include the Twisted

23   Oaks acquisition and payroll.

24       When a company acquires or acquihires another company, in

25   this case, August of 2015, it may be interesting and relevant

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    to know if the two companies had been together the whole year,

2    what would the income statement pro forma look like.  What

3    does it look like on a combined basis?  Because if you just

4    show from the acquisition onward, you're not going to

5    understand what the entity looks like on a going-forward

6    basis.

7        So, for example, even though I didn't prepare this income

8    statement, the -- the note there says that it includes another

9    seven months of Twisted Oaks losses effectively that are in

10   here.

11       So there's -- kind of like no way that that's the actual.

12   And it's not intended to be, and it doesn't say it is.

13   **Q.**  You used the phrase "aquahire" [sic].  Could you explain

14   what that means?

15   **A.**  I may have misspoke.  It's acquihire, not aqua -- not

16   water, not aquahire.

17   **Q.**  My apologies if I misheard it, but what does that concept

18   mean?

19   **A.**  Um, let's see.  So -- well, I think to put it simply, if a

20   company just starts paying payroll for another group of

21   people, those would be characterized as acquihires.  That's in

22   contrast to a more traditional acquisition where there may be

23   money spent purchasing the stock of a company.

24       So instead of doing that, if it's just a team that you

25   want, you may just start -- you may agree to start paying the

 1    people to work on your team, which is what -- substantially

 2    what this was as opposed to sending a, you know, amount of

 3    money to buy their stock.

 4    **Q.**  Okay.

 5         **MR. FAKHOURY:**  You could take this down, Mr. Torres.

 6    **Q.**  I'm going to ask you a different -- I want to ask you

 7    about a different topic, Mr. Rothenberg.

 8         **MR. FAKHOURY:**  And I'm going to ask Mr. Torres to

 9    pull up Exhibit 92.

10              (Pause in the proceedings.)

11         **MR. FAKHOURY:**  And could we go to page 93 of this

12    exhibit.

13       No, I'm sorry.  Exhibit 62.

14       That's Exhibit 92.

15              (Pause in the proceedings.)

16         **MR. FAKHOURY:**  And can we go to page 93, towards the

17    bottom of this page, please.

18       Actually let's go back up for a second.

19              (Exhibit published.)

20    **BY MR. FAKHOURY:**

21    **Q.**  Mr. Rothenberg, I'm showing you Exhibit 62.  This is a

22    Silicon Valley Bank account statement for the -- for an

23    account ending in 9185.  That would be the Bend Reality

24    account, correct?

25    **A.**  That's correct.

1    **Q.**  Okay.

2            **MR. FAKHOURY:**  Mr. Torres, can you scroll down.

3                        (Exhibit published.)

4    **BY MR. FAKHOURY:**

5    **Q.**  Okay.  Mr. Waldinger asked you about this $2 million wire

6    in from Transcend VR dated February 25th, 2016.

7        Do you see that?

8    **A.**  I do see that.

9    **Q.**  Okay.  And Mr. Waldinger also asked you about $50,000

10   being wired out shortly after.

11           **MR. FAKHOURY:**  And, Mr. Torres, could we go to the

12   next page.

13                        (Exhibit published.)

14   **BY MR. FAKHOURY:**

15   **Q.**  And then $1.7 million being wired out on the -- on the

16   25th to your account here.

17       Do you see that, sir?

18   **A.**  I see that.

19   **Q.**  Okay.

20           **MR. FAKHOURY:**  Okay.  Now, Mr. Torres, can you pull

21   up Exhibit 97.

22                        (Exhibit published.)

23           **MR. FAKHOURY:**  And can we -- okay.

24   **Q.**  And before we jump to the specific page, Mr. Rothenberg,

25   this appears to be a Bank of America statement for an account

1    ending in 2573.

2        Is this your -- is this a statement relating to your

3    personal bank account?

4    **A.**   Yes, I believe so.

5    **Q.**   Okay.

6            **MR. FAKHOURY:**  Can we go to page 76 of this exhibit.

7                         (Exhibit published.)

8    BY MR. FAKHOURY:

9    **Q.**   Up here on the top, could you indicate what it says here,

10   as a general matter what these transactions are showing here?

11   **A.**   It says withdrawals and other subtractions.

12   **Q.**   Okay.  And I want to point your attention to

13   February 25th, 2016.  There's a wire out of $1.7 million to an

14   account ending in 8931.  Which account is the account that

15   ends -- let me rephrase that.

16       What bank account at Silicon Valley Bank ends in 8931, if

17   you recall?

18   **A.**   Well, it says Rothenberg Ventures Management, I think,

19   Company.  And that's correct.

20   **Q.**   So that would be RVMC?

21   **A.**   That's right.

22           **MR. FAKHOURY:**  Okay.  Could we go back to Exhibit 62.

23       And let's go to page 68 of this exhibit.

24       And you can leave it right there.

25                         (Exhibit published.)

```
1    BY MR. FAKHOURY:

2    Q.  Mr. Waldinger asked you some questions about revenue from

3    producing virtual reality content.  And I wanted to start by

4    asking you the account ending in 9185 at Silicon Valley Bank,

5    we just looked at this a moment ago, this would be -- would

6    this be the Bend Reality bank account?

7    A.  Yes, that's right.

8    Q.  Could you -- sorry, my annotation is not working.

9        But there's an entry here on November 20, 2015 of a credit

10   of $33,000.

11   A.  Yes.

12   Q.  Could you just read what the description is for that?

13   A.  NBC Universal Med Vendor Payment.

14   Q.  And what's the date on that?

15   A.  November 20, 2015.

16        MR. FAKHOURY:  Could we go to page 75 of this

17   exhibit.

18        And could we scroll down here, there's a entry on

19   December 23rd, 2015, Mr. Torres.

20                    (Exhibit published.)

21   BY MR. FAKHOURY:

22   Q.  Mr. Rothenberg, could you read the entry here on

23   December 23rd, 2015, that's -- there's a -- there's a credit

24   of $13,461.  Could you just read the description there?

25   A.  It says "RSA Films Limited."
```

```
 1              MR. FAKHOURY:  Could we go to page 83 of this
 2     exhibit.
 3          We could stop here.
 4                       (Exhibit published.)
 5     BY MR. FAKHOURY:
 6     Q.  There's a -- there's a $20,000 credit, approximately
 7     $20,000 credit on January 13th of 2016.  Could you -- could
 8     you read the description of that entry, please, sir?
 9     A.  Yes.  This is also revenue.  "Electronics and
10     telecommunications."
11              MR. FAKHOURY:  Could you go to page 84.
12                       (Exhibit published.)
13     BY MR. FAKHOURY:
14     Q.  There's an entry here on January 19, 2016, of -- for a
15     credit of $33,000.  Could you read the description of that
16     one, sir?
17     A.  Yes.  This is more revenue from NBC Universal Med Vendor.
18              MR. FAKHOURY:  Okay.  Could we go to page 90 of this
19     exhibit?
20                       (Pause in the proceedings.)
21              MR. FAKHOURY:  We could stop there.
22                       (Exhibit published.)
23     BY MR. FAKHOURY:
24     Q.  Could you -- there's a $12,000 credit on February 3rd of
25     2016.  Could you read the description there?
```

1    **A.**   Yes.  This is more revenue from Electronics and

2    Telecommunications.

3          **MR. FAKHOURY:**  And could we go to page 93 of this

4    exhibit.

5                         (Exhibit published.)

6    **BY MR. FAKHOURY:**

7    **Q.**  And on the top here, there's a credit of $8,212.24 on

8    February 16.

9       Could you read the description of that wire in.

10   **A.**   Yes.  It's more revenue from Electronics and

11   Telecommunications.

12         **MR. FAKHOURY:**  Okay.  We could take that down,

13   Mr. Torres.

14   **Q.**  I wanted to ask a couple questions about the Unity

15   transaction.  Mr. Waldinger asked you some questions about

16   that.

17      He -- he asked you if the fund needed to raise more than

18   $10 million.  And I guess my first question is do you recall

19   how much needed to be raised in order -- excuse me -- in order

20   to purchase the shares that were being sold?

21   **A.**   Well, usually you get a number that you would like to

22   raise, and then if you don't raise all of that, then you can

23   ask them if you can do less.

24      In this case, I believe the total amount that we -- the

25   maximum that we had -- could raise for this was something like

1   14 to $17 million.

2   **Q.**  Okay.  And Mr. Waldinger had asked you about the fact that

3   Rothenberg Ventures had raised money from a number of

4   investors about -- pertaining to Unity.  And he specifically

5   referenced the Binns Family, Ewan Johnson, GHF, Mr. Hudson.  I

6   don't recall if he -- he mentioned Ms. Goldberg specifically.

7       But those were some of the investors that had raised --

8   that had brought in money hoping to invest into Unity,

9   correct?

10  **A.**  They were all interested in the Unity Co-Invest should it

11  happen.  They were also all aware it might not happen.

12  **Q.**  Okay.  Amongst those investors, so the ones that we've

13  specifically talked about just now this morning and that have

14  come up at trial, do you recall how much money had been raised

15  from those investors specific to Unity?

16  **A.**  From the investors you just mentioned, I believe the total

17  amount is 1.35 million.

18  **Q.**  Okay.

19          **THE COURT:**  Mr. Fakhoury, any time in the next five

20  minutes.

21          **MR. FAKHOURY:**  Okay, Your Honor.  Thank you.

22  **Q.**  Mr. Waldinger had asked you both on Thursday and again

23  this morning about the date Rothenberg Ventures received the

24  letter from the SEC.  That -- was that date July 21st, 2016?

25  **A.**  I do remember that there's a letter dated July 22nd.

1    There may also be one on the 21st.

2    Q.    Okay.

3         And Mr. Waldinger had shown you, and I -- I apologize, I

4    don't have the specific exhibit, but he'd shown you some email

5    correspondence with Unity's attorneys regarding a stock

6    purchase agreement.

7         And that was right around the time Rothenberg Ventures got

8    the SEC letter, correct?

9    A.    Unfortunately, yes.

10   Q.    Did Rothenberg Ventures receive other investments from --

11   in connection with Unity after the -- after it had received

12   the SEC letter?

13   A.    I recall there was still a tremendous amount of interest

14   and investors that wanted to invest, but I had to put that --

15   I had to talk to lawyers, figure out what the SEC letter meant

16   before we had to, you know, focus on that for a minute.

17   Q.    Is that -- is that no?

18   A.    There was no more money that came in.

19   Q.    After the SEC letter?

20   A.    Correct.

21            MR. FAKHOURY:  Can I have a minute, Your Honor?

22            THE COURT:  Yes.

23                (Pause in the proceedings.)

24            MR. FAKHOURY:  I don't have any further questions,

25   Your Honor.

 1            THE COURT:  Thank you, Mr. Fakhoury.

 2        Mr. Waldinger?

 3            MR. WALDINGER:  There will be no recross, Your Honor.

 4            THE COURT:  All right.

 5        Mr. Rothenberg, you're excused as a witness.  Thank you.

 6    You can step down.

 7            THE WITNESS:  Thank you, Your Honor.

 8            THE COURT:  Mr. Fakhoury, the defendant's next

 9    witness.

10            MR. FAKHOURY:  Your Honor, the defense rests.

11            THE COURT:  Members of the jury, it just happened.

12    We went from one phase of the trial to the next phase.

13        The government has rested its case and the defendant has

14    rested his case.  And so you'll remember from my prior

15    comments to you that the next phase is for me to instruct you

16    on the law.  And then after that, the lawyers will be able to

17    make closing arguments to you.

18        I predict that you will have this case to begin deciding

19    sometime tomorrow morning.

20        So we're going to go ahead and take our first recess.

21        You still can't make up your mind even though you've heard

22    all the evidence, because you need to listen to the closing

23    arguments of the lawyers and you need to listen to each other

24    express your views on what happened in this trial.  Then you

25    can make up your mind.

```
1          So keep an open mind still.  Remember not to talk about
2     the case with anybody, including each other, or look things up
3     on the Internet or otherwise.
4          And let's take our 15-minute break.  And when we come
5     back, I'll instruct you.  Thank you.
6               THE CLERK:  Please rise for the jury.
7          (The following proceedings were heard out of the presence
8     of the jury:)
9               THE COURT:  Mr. Waldinger -- we're outside the
10    presence of the jury.  Mr. Waldinger, anything for the record?
11              MR. WALDINGER:  No, Your Honor.
12              THE COURT:  Mr. Fakhoury?
13              MR. FAKHOURY:  Your Honor, I think I'm required to
14    renew my Rule 29.  I don't need to be heard on it.  I just
15    want to make that request on the record.
16              THE COURT:  Thank you, Mr. Fakhoury.  The Rule 29
17    motion is denied.
18         Let's be in recess.
19              THE CLERK:  Court is in recess.
20         (Recess taken at 10:03 A.M.; proceedings resumed at
21    10:20 A.M.)
22         (The following proceedings were heard in the presence of
23    the jury:)
24              THE CLERK:  You may be seated.
25              THE COURT:  All right.  Let's go on the record.
```

1    All the jurors are in their assigned seats.

2    The parties and counsel are at counsel table.

3    Members of the jury, now I'll instruct you on the law.  I

4    just will remind you that you took an oath to follow the law

5    when you were sworn in as jurors.

6    I'm going to read the instructions to you.  Ms. Lee is

7    also going to give each of you your own written set.  The

8    written set is like your notes in the following way.  It's

9    personal to you.  You should put your initials or your name on

10   it so you know whose set is whose.

11   We all learn differently.  Isn't that interesting?  Some

12   of us learn best -- well, maybe I'll let Ms. Lee finish

13   passing these out.

14                    (Pause in the proceedings.)

15            THE COURT:  Okay.  And do counsel have their sets

16   also?

17            THE CLERK:  Yes.

18            THE COURT:  It looks like we're ready to proceed.

19   So as I started to say, we all learn differently.  Some of

20   us are auditory learners.  So if we hear the information,

21   we're more likely to understand it and remember it.  Some of

22   us are visual learners.  Some of us actually will learn best

23   if we're reading something and someone is saying it at the

24   same time.

25   So you'll absorb this jury instruction information in

 1    whatever way is best for you.

 2        Some of you won't look at the instructions, you'll just

 3    look at me while I'm talking.  Some of you will have your

 4    heads down the whole time, you'll just be reading.  And some

 5    of you will go back and forth.  Whatever works for you is

 6    fine.

 7        I am required to read the instructions to you.  As you'll

 8    see, there's some legalese in there, but they're attempted --

 9    how to say this.  They're meant to be written as much as

10    possible in a more conversational style.

11        But they are the law.  And I'm required to read them to

12    you as they're written.  I'll depart from the instructions a

13    couple of times probably to make comments that I think might

14    be helpful to you.  But mostly I'm just going to be reading.

15        Actually, I'm going to take this mask off so you see how

16    much clearer I am now.  So that you can hear me and so my

17    throat doesn't get too dry while I'm reading the instructions.

18        These stretch breaks have been very helpful, I think,

19    during the trial.  I've had more stretch breaks in this trial

20    probably than any other trial I've had by a lot.  Because the

21    information can be a little dry sometimes.  It just helps

22    everybody pay attention.

23        So I'll keep my eyes out.  We might have a stretch break

24    at some point.  I never know exactly how long it's going to

25    take to read the instructions.

1      Last thing I'll say is that I will read the instructions,

2   and then we'll go to closing arguments.  I mentioned to you

3   once before, the government gets to go first and last because

4   it's their burden of proof.  So the government will make their

5   closing argument.  And then the defendant will make his

6   closing argument.  And then the government has a chance to

7   make a rebuttal argument.

8      We might change our second break schedule a little bit

9   just depending on where people are in their arguments so that

10  we can won't step on a point that somebody's trying to make,

11  but we'll cross that bridge when we get to it.

12     Oh, as you'll hear me say in a second, or more than a

13  second, nobody's ever going to read your notes when you're

14  done with the trial.  You can just leave them in the jury

15  room, and then somebody will come by and collect them.  And

16  I'll see they're destroyed.  We'll shred them.

17     Same thing is true with your copy of these instructions.

18  So if you want to make notes on your set of instructions about

19  things I've said or things that you remember from the trial

20  that might be helpful, you go ahead and write on those

21  instructions anything that you want, and it will be private to

22  you.

23     The Court will now instruct jury.

24                    **JURY INSTRUCTIONS**

25          **THE COURT:**  Members of the jury, now that you've

1    heard all the evidence, it's my duty to instruct you on the

2    law that applies to this case.  A copy of these instructions

3    will be available in the jury room for you to consult.

4        That's actually each of you will have your own copy, and

5    you already do.

6        It is your duty to weigh and to evaluate all the evidence

7    received in the case and, in that process, to decide the

8    facts.

9        It is also your duty to apply the law as I give it to you

10    to the facts as you find them whether you agree with the law

11    or not.  You must decide the case solely on the evidence and

12    the law.  You will recall that you took an oath promising to

13    do so at the beginning of the case.

14        You should also not be influenced by any person's race,

15    color, religious beliefs, national ancestry, sexual

16    orientation, gender identity, gender, or economic

17    circumstances.

18        Also do not allow yourselves to be influenced by personal

19    likes or dislikes, sympathy, prejudice, fear, public opinion,

20    or biases including unconscious biases.  Unconscious biases

21    are stereotypes, attitudes, or preferences that people may

22    consciously reject but may be expressed without conscious

23    awareness, control, or intention.

24        You must follow all of these instructions and not single

25    out some and ignore others.  They're all important.  Please do

1  not read into these instructions or anything I may have said

2  or done any suggestion as to what verdict you should return.

3  That is a matter entirely up to you.

4       I'm going to underscore that last point a little bit.  You

5  know that I'm up here working on my other cases and clearing

6  emails people are sending me.  I have so many cases.  I wish I

7  didn't have to do that, but I do have to do that.

8       There are a couple of reasons why it's important for you

9  not to base your verdict on anything that may think I thought

10 about the evidence.  The first is while you're looking at me

11 and observing my expression, it may have nothing to do with

12 what's going on on the witness stand because I have a lot of

13 other information that's coming at me up here.

14      But a much more important reason is I'm not the trier of

15 fact.  You're the trier of fact.  So what I think about the

16 evidence, even if you guess that correctly, is completely

17 irrelevant.  You just have to decide the case based on what

18 you think of the evidence and what you learn in deliberations

19 with your fellow jurors.

20      The indictment is not evidence.  The defendant has pleaded

21 not guilty to the charges.  The defendant is presumed to be

22 innocent unless and until the government proves the defendant

23 guilty beyond a reasonable doubt.

24      In addition, the defendant does not have to testify or

25 present any evidence.  The defendant does not have to prove

1    innocence.  The government has the burden of proving every

2    element of the charges beyond a reasonable doubt.

3        The defendant has testified.  You should treat this

4    testimony just as you would the testimony of any other

5    witness.

6        Proof beyond a reasonable doubt is proof that leaves you

7    firmly convinced the defendant is guilty.  It is not required

8    that the government prove guilt beyond all possible doubt.  A

9    reasonable doubt is a doubt based upon reason and common sense

10   and is not based purely on speculation.  It may arise from a

11   careful and impartial consideration of all the evidence or

12   from lack of evidence.

13       If after a careful and impartial consideration of all the

14   evidence you are not convinced beyond a reasonable doubt that

15   the defendant is guilty, it is your duty to find the defendant

16   not guilty.

17       On the other hand, if after a careful and impartial

18   consideration of all the evidence you are convinced beyond a

19   reasonable doubt that the defendant is guilty, it is your duty

20   to find the defendant guilty.

21       The evidence you are to consider in deciding what the

22   facts are consists of, first, the sworn testimony of any

23   witness; second, the exhibits received in evidence; and third,

24   any facts to which the parties have agreed or stipulated.

25       In reaching your verdict, you may consider only testimony

1  received, the parties agreed-upon stipulations, and exhibits

2  placed into evidence.

3      The following things are not evidence and you may not

4  consider them in deciding what the facts are:

5      One, questions, statements, objections, and arguments by

6  the lawyers are not evidence.  The lawyers are not witnesses.

7  Although you must consider a lawyer's questions to understand

8  the answers of a witness, the lawyers' questions are not

9  evidence.  Similarly, what the lawyers said in their opening

10 statements, will say in their closing arguments, and have said

11 at other times is intended to help you interpret the evidence,

12 but it's not evidence.

13     If the facts as you remember them differ from the way the

14 lawyers state them, your memory of them controls.

15     Second, any testimony that I have excluded, stricken, or

16 instructed you to disregard is not evidence.

17     In addition, some evidence was received only for a limited

18 purpose.  When I have instructed you to consider certain

19 evidence in a limited way, you must do so.

20     Third, anything you may have seen or heard when the court

21 was not in session is not evidence.  You're to decide the case

22 solely on the evidence received at the trial.

23     Evidence may be direct or circumstantial.

24     Direct evidence is direct proof of a fact such as

25 testimony by a witness about what that witness personally saw,

1    heard, or did.

2        Circumstantial evidence is indirect evidence, that is, it

3    is proof of one or more facts from which you can find another

4    fact.

5        I'll give you an example.  Let's say that a witness on the

6    witness stand testified, "I saw a jet plane flying across the

7    sky.  I saw the plane flying across the sky."  That would be

8    direct evidence because that's something that the witness

9    actually saw and then told you about.

10       A different witness might say, "I saw the white trail that

11   jet planes often leave in the sky."  But the witness didn't

12   see the actual jet plane.  That would be circumstantial

13   evidence because the witness gave you a fact from which you

14   could find another fact, and that is based on having seen the

15   jet trail in the sky, I conclude that a jet flew across the

16   sky.

17       You are to consider both direct and circumstantial

18   evidence.  Either can be used to prove any fact.  The law

19   makes no distinction between the weight to be given to either

20   direct or circumstantial evidence.  It is for you to decide

21   how much weight to give any evidence.

22       In deciding the facts in this case, you may have to decide

23   which testimony to believe and which testimony not to believe.

24   You may believe everything a witness says or part of it or

25   none of it.

1    In considering the testimony of any witness, you may take

2  into account the following:

3    First, the opportunity and ability of the witness to see

4  or hear or know the things testified to; second, the witness's

5  memory; third, the witness's manner while testifying; fourth,

6  the witness's interest in the outcome of the case, if any;

7  fifth, the witness's bias or prejudice, if any; sixth, whether

8  other evidence contradicted the witness's testimony; seventh,

9  the reasonableness of the witness's testimony in light of all

10  the evidence; and eighth, any other factors that bear on

11  believability.

12    Sometimes a witness may say something that is not

13  consistent with something else he or she said.  Sometimes

14  different witnesses will give different versions of what

15  happened.  People often forget things or make mistakes in what

16  they remember.  Also two people may see the same event but

17  remember it differently.  You may consider these differences,

18  but do not decide the testimony is untrue just because it

19  differs from other testimony.

20    However, if you decide that a witness has deliberately

21  testified untruthfully about something important, you may

22  choose not to believe anything that witness said.

23    On the other hand, if you think the witness testified

24  untruthfully about some things but told the truth about

25  others, you may accept the part you think is true and ignore

1   the rest.

2       The weight of the evidence as to a fact does not

3   necessarily depend on the number of witnesses who testify.

4   What is important is how believable the witnesses were and how

5   much weight you think their testimony deserves.

6       You've heard testimony from Gerald T. Fujimoto who

7   testified about his opinions and the reasons for those

8   opinions.  This opinion testimony was allowed because of the

9   specialized knowledge, skill, experience, training, or

10  education of this witness.

11      Such opinion testimony should be judged like any other

12  testimony.  You may accept it or reject it and give it as much

13  weight as you think it deserves considering the witness's

14  knowledge, skill, experience, training, or education, the

15  reasons given for the opinion, and all the other evidence in

16  the case.

17      During the trial, certain charts and summaries were shown

18  to you to help explain the evidence in the case.  These charts

19  and summaries were not admitted into evidence and will not go

20  into the jury room with you.

21      They are not themselves evidence or proof of any facts.

22  If they do not correctly reflect the facts or figures shown by

23  the evidence in the case, you should disregard these charts

24  and summaries and determine the facts from the underlying

25  evidence.

1          You're here only to determine whether the defendant is

2     guilty or not guilty of the charges in the indictment.  The

3     defendant is not on trial for any conduct or offense not

4     charged in the indictment.

5          A separate crime is charged against the defendant in each

6     count.  You must decide each count separately.  Your verdict

7     on one count should not control your verdict on any other

8     count.

9          The indictment charges that the offenses alleged were

10    committed "in or about" or "on or about" certain dates.

11    Although it is necessary for the government to prove beyond a

12    reasonable doubt that the offense was committed on a date

13    reasonably near the date alleged in the indictment, it is not

14    necessary for the government to prove that the offense was

15    committed precisely on the date charged.

16         The defendant is charged in Count Three of the indictment

17    with bank fraud in violation of section 1344 of Title 18 of

18    the United States Code.  Because there are two distinct

19    methods by which this crime can be committed, in order for the

20    defendant to be found guilty of that charge, the government

21    must prove beyond a reasonable doubt each of the elements in

22    Method A or Method B or both.

23         Method A.  First, the defendant knowingly executed a

24    scheme to defraud Silicon Valley Bank, a financial

25    institution, as to a material matter.

1     Second, the defendant acted with the intent to defraud

2  Silicon Valley Bank, that is, with the intent to deceive and

3  cheat.

4     And third, Silicon Valley Bank was insured by the Federal

5  Deposit Insurance Corporation.

6     A scheme to defraud means any deliberate plan of action or

7  course of conduct by which someone intends to deceive and

8  cheat, in other words, to deprive the victim of money or

9  property by means of deception.

10     It is not necessary for the government to prove that a

11  financial institution was the only or sole victim of the

12  scheme to defraud.

13     It also is not necessary for the government to prove that

14  the defendant was actually successful in defrauding any

15  financial institution.

16     Finally, it is not necessary for the government to prove

17  that any financial institution lost any money or property as a

18  result of the scheme to defraud.

19     Method B.  First, the defendant knowingly carried out a

20  scheme or plan to obtain money or property from Silicon Valley

21  Bank, a financial institution, by making false statements or

22  promises.

23     Second, the defendant knew that the statements or promises

24  were false.

25     Third, the statements or promises were material, that is,

they had a natural tendency to influence or were capable of influencing a financial institution to part with money or property.

Fourth, the defendant acted with the intent to defraud Silicon Valley Bank, that is, with the intent to deceive and cheat.

Fifth, Silicon Valley Bank was insured by the Federal Deposit Insurance Corporation.

An act is done knowingly for this charge if the defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident.

The government is not required to prove that the defendant knew that his acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions along with all the other evidence in deciding whether the defendant acted knowingly.

A scheme to defraud means any deliberate plan of action or course of conduct by which someone intends to deceive and cheat, in other words, to deprive the victim of money or property by means of deception.

It is not necessary for the government to prove that a financial institution was the only or sole victim of the scheme to defraud.

It is also not necessary for the government to prove that the defendant was actually successful in defrauding any

1    financial institution.

2        Finally, it is not necessary for the government to prove

3    that any financial institution lost any money or property as a

4    result of the scheme to defraud.

5        The defendant is charged in Count Four of the indictment

6    with making false statements to a federally insured financial

7    institution, Silicon Valley Bank, for the purpose of

8    influencing Silicon Valley Bank in violation of section 1014

9    of Title 18 of the United States Code.

10        For the defendant to be found guilty of that charge, the

11    government must prove each of the following elements beyond a

12    reasonable doubt:

13        First, the defendant made a false statement or report to a

14    financial institution insured by the Federal Deposit Insurance

15    Corporation, also called the FDIC, specifically Silicon Valley

16    Bank.

17        Second, the defendant made the false statement or report

18    to Silicon Valley Bank knowing it was false, with all of you

19    agreeing as to the specific false statement or report.

20        And third, the defendant did so for the purpose of

21    influencing in any way the action of Silicon Valley Bank.

22        It is not necessary, however, to prove that Silicon Valley

23    Bank was in fact influenced or misled or that Silicon Valley

24    Bank was exposed to a risk of loss.  What must be proved is

25    that the defendant intended to influence Silicon Valley Bank

1    by the false statement.

2        An act is done knowingly for this charge if the defendant

3    is aware of the act and does not act or fail to act through

4    ignorance, mistake, or accident.

5        The government is not required to prove that the defendant

6    knew that his acts or omissions were unlawful.  You may

7    consider evidence of the defendant's words, acts, or omissions

8    along with all the other -- excuse me -- along with all the

9    other evidence in deciding whether the defendant acted

10   knowingly.

11       The defendant is charged in Counts Five to Seven of the

12   indictment with wire fraud in violation of section 1343 of

13   Title 18 of the United States Code.

14       For the defendant to be found guilty of that charge, the

15   government must prove each of the following elements beyond a

16   reasonable doubt:

17       First, the defendant knowingly participated in, devised

18   and intended to devise a scheme or plan to defraud or a scheme

19   or plan for obtaining money or property by means of false or

20   fraudulent pretenses, representations, or promises.  Deceitful

21   statements of half-truths may constitute false or fraudulent

22   representations.

23       Second, the statements made as part of the scheme were

24   material, that is, they had a natural tendency to influence or

25   were capable of influencing a person to part with money or

1    property.

2        Third, the defendant acted with the intent to defraud,

3    that is, the intent to deceive and cheat.

4        And fourth, the defendant used or caused to be used an

5    interstate or foreign wire communication to carry out or

6    attempt to carry out an essential part of the scheme.

7        The government need not prove that the defendant caused

8    the actual loss of money or property.

9        In determining whether a scheme to defraud exists, you may

10    consider not only the defendant's words and statements, but

11    also the circumstances in which they are used as a whole.

12        An act is done knowingly for these charges if the

13    defendant is aware of the act and does not act or fail to act

14    through ignorance, mistake, or accident.

15        The government is not required to prove that the defendant

16    knew that his acts or omissions were unlawful.  You may

17    consider evidence of the defendant's words, acts, or

18    omissions, along with all the other evidence, in deciding

19    whether the defendant acted knowingly.

20        A wiring is caused when one person knows that a wire will

21    be used in the ordinary course of business or when one can

22    reasonably foresee such use.

23        It need not have been reasonably foreseeable to the

24    defendant that the wire communication would be interstate or

25    foreign in nature.  Rather it must have been reasonably

1    foreseeable to the defendant that some wire communication

2    would occur in furtherance of the scheme, and an interstate or

3    foreign wire communication must have actually occurred in

4    furtherance of the scheme.

5        The defendant is charged in Counts Eight to Eleven of the

6    indictment with money laundering in violation of section 1957

7    of Title 18 of the United States Code.  For the defendant to

8    be found guilty of that charge, the government must prove each

9    of the following elements beyond a reasonable doubt:

10       First, the defendant knowingly engaged or attempted to

11   engage in a monetary transaction.

12       Second, the defendant knew the transaction involved

13   criminally derived property.

14       Third, the property had a value greater than $10,000.

15       Fourth, the property was in fact derived from the wire

16   fraud scheme alleged in Counts Five to Seven.

17       And fifth, the transaction occurred in the United States.

18       The term "monetary transaction" means the deposit,

19   withdrawal, transfer, exchange, in or affecting interstate

20   commerce, of funds or a monetary instrument by, through, or to

21   a financial institution.

22       The term "financial institution" means for these counts a

23   bank insured by the Federal Deposit Insurance Corporation.

24       The term "criminally derived property" means any property

25   constituting or derived from the proceeds obtained from a

1    criminal offense.

2        The government must prove that the defendant knew that the

3    property involved in the monetary transaction constituted or

4    was derived from proceeds obtained by some criminal offense.

5        The government does not have to prove that the defendant

6    knew the precise nature of that criminal offense or knew the

7    property involved in the transaction represented the proceeds

8    of the wire fraud scheme alleged in Counts Five to Seven.

9        Although the government must prove that, of the property

10   at issue, more than $10,000 was criminally derived, the

11   government does not to have prove that all the property at

12   issue was criminally derived.

13       I think it's a stretch break time, just like a real quick

14   up and down.

15       We're more than halfway through.

16                    (Stretch break.)

17       **THE COURT:**  Turning to jury instruction number 18.

18       The defendant is charged in Counts Twelve to Twenty-three

19   of the indictment with wire fraud in violation of section 1343

20   of Title 18 of the United States Code.

21       These counts are slightly different than the wire fraud

22   counts I explained to you for Counts Five to Seven.  For the

23   defendant to be found guilty of one of these wire fraud

24   charges, the government must prove each of the following

25   elements beyond a reasonable doubt:

1        First, the defendant knowingly participated in, devised

2   and intended to devise a scheme or plan to defraud or a scheme

3   or plan for obtaining money or property by means of false or

4   fraudulent pretenses, representations, or promises or omitted

5   facts.  Deceitful statements of half-truths may constitute

6   false or fraudulent representations.

7        Second, the statements made or facts omitted as part of

8   the scheme were material; that is, they had a natural tendency

9   to influence or were capable of influencing a person to part

10  with money or property.

11       Third, the defendant acted with the intent to defraud;

12  that is, the intent to deceive and cheat.

13       And fourth, the defendant used or caused to be used an

14  interstate or foreign wire communication to carry out or

15  attempt to carry out an essential part of the scheme.  The

16  government need not prove that the defendant caused the actual

17  loss of money or property.

18       In determining whether a scheme to defraud exists, you may

19  consider not only the defendant's words and statements, but

20  also the circumstances in which they are used as a whole.

21       An act is done knowingly for these charges if the

22  defendant is aware of the act and does not act or fail to act

23  through ignorance, mistake, or accident.  The government is

24  not required to prove that the defendant knew that his acts or

25  omissions were unlawful.  You may consider evidence of the

 1    defendant's words, acts, or omissions along with all the other

 2    evidence in deciding whether the defendant acted knowingly.

 3        To convict the defendant of wire fraud based on omissions

 4    of material facts, you must find that the defendant had a duty

 5    to disclose the omitted facts arising out of a relationship of

 6    trust.  That duty can arise -- excuse me.  That duty can arise

 7    either out of a formal fiduciary relationship or an informal

 8    trusting relationship in which one party acts for the benefit

 9    of another and induces the trusting party to relax the care

10    and vigilance that it would ordinarily exercise.

11        A fiduciary duty exists whenever one entity places special

12    trust and confidence in another person, the fiduciary, in

13    reliance that the fiduciary will exercise his discretion and

14    expertise with the utmost honesty and forthrightness in the

15    interests of the entity such that the entity relaxes the care

16    and vigilance that it would ordinarily exercise, and the

17    fiduciary knowingly accepts that special trust and confidence

18    and thereafter undertakes to act on behalf of the other person

19    based on such reliance.

20        The mere fact that a business relationship arises between

21    two persons does not mean that either owes a fiduciary duty to

22    the other.

23        If one person engages or employs another, and thereafter

24    directs, supervises, or approves the other's actions, the

25    person so employed is not necessarily a fiduciary.  Rather, as

1   previously stated, it is only when one party places and the

2   other accepts a special trust and confidence, usually

3   involving the exercise of professional expertise and

4   discretion, that a fiduciary relationship exists.

5       A wiring is caused when one knows that a wire will be used

6   in the ordinary course of business or when one can reasonably

7   foresee such use.

8       It need not have been reasonably foreseeable to the

9   defendant that the wire communication would be interstate or

10  foreign in nature.  Rather, it must have been reasonably

11  foreseeable to the defendant that some wire communication

12  would occur in furtherance of the scheme and an Internet --

13  excuse me -- and an interstate or foreign wire communication

14  must have actually occurred in furtherance of the scheme.

15      A defendant may be found guilty of the crimes charged even

16  if the defendant did not personally commit the acts

17  constituting the crime if the defendant willfully caused an

18  act to be done that, if directly performed by him, would be an

19  offense against the United States.

20      A defendant who puts in motion or causes the commission of

21  an indispensable element of the offense may be found guilty as

22  if he had committed this element himself.

23      You may determine whether the defendant had an honest,

24  good faith belief in the truth of the specific

25  misrepresentations alleged in the indictment in determining

1    whether or not the defendant acted with intent to defraud.

2    However, a defendant's belief that the victim of the fraud

3    will be paid in the future or will sustain no economic loss is

4    no defense to the crimes charged in the indictment.

5        You have heard testimony that the Securities and Exchange

6    Commission, also called the SEC, conducted an inquiry into the

7    finances of Rothenberg Ventures Management Company and/or one

8    or more of the Rothenberg funds.  This evidence was admitted

9    solely as it pertains to Mr. Rothenberg's motive or intent and

10   is to be considered by you solely for that purpose.  The fact

11   that the SEC conducted an inquiry is not evidence that

12   Mr. Rothenberg did any of the acts charged in the indictment.

13       An alleged victim's negligence or carelessness is not a

14   defense to wire fraud.  You have heard evidence regarding

15   investors' processes for deciding whether to invest money in

16   one or more entities associated with Michael Rothenberg,

17   including the Rothenberg Ventures Funds, River Studios, Bend

18   Reality and/or Frontier Tech.

19       You are to consider this evidence to the extent that it

20   helps you determine whether Mr. Rothenberg made false or

21   fraudulent statements, representations, or promises as part of

22   a scheme or plan to defraud as explained in the separate

23   instruction regarding wire fraud.

24       You may also consider this evidence to the extent that it

25   helps you determine whether the statements made as part of the

1    alleged scheme were material; that is, whether they had a

2    natural tendency to influence or were capable of influencing a

3    person to part with money or property.

4        If you find that the government has proven the elements of

5    wire fraud, then whether there were additional things the

6    investors could have done to avoid being impacted by the

7    alleged misstatements and/or omissions is irrelevant to your

8    verdict.

9        An alleged victim's negligence or carelessness is not a

10   defense to the crimes of bank fraud or making false statements

11   to a financial institution.

12       You've heard evidence regarding Silicon Valley Bank's

13   processes for deciding whether to lend money.  You are to

14   consider this evidence to the extent that it helps you

15   determine whether Mr. Rothenberg made false or fraudulent

16   statements, representations, or promises.

17       You may also consider this evidence to the extent that it

18   helps you determine whether the statements were material; that

19   is, whether they had a natural tendency to influence or were

20   capable of influencing a financial institution to part with

21   money or property.

22       If you find that the government has proven the elements of

23   bank fraud, then whether there were additional things

24   Silicon Valley Bank could have done to avoid being impacted by

25   the alleged misstatements is irrelevant to your verdict.

1       Similarly, if you find that the government has proven the

2   elements of making false statements to a financial

3   institution, then whether there were additional things

4   Silicon Valley Bank could have done to avoid being impacted by

5   the alleged misstatements is irrelevant to your verdict.

6       When you begin your deliberations, elect one member of the

7   jury as your presiding juror who will preside over the

8   deliberations and speak for you here in court.

9       And I'll just make a comment here.  I've done a lot of

10   trials.  I think it's -- I'll offer for your consideration

11   that one thing to look for in selecting a foreperson, which we

12   also call the presiding juror, foreman, forewoman -- there are

13   different terms -- the one thing to consider in selecting your

14   presiding juror is:  Is this someone that can make sure

15   everyone's voice is heard in the conversation?  Does the

16   person have that kind of personality?

17       Because there's this wonderful power in having so many

18   people from different backgrounds and different perspectives

19   look at the same evidence and hear the same arguments, and one

20   job that your foreperson will have is to make sure that

21   everyone is able to make their contribution to that process.

22       Returning to instruction 24.

23       You'll then discuss the case with your fellow jurors to

24   reach agreement if you can do so.  Your verdict, whether

25   guilty or not guilty, must be unanimous.  Each of you must

1    decide the case for yourself, but you should do so only after

2    you have considered all the evidence, discussed it fully with

3    the other jurors, and listened to the views of your fellow

4    jurors.

5        Do not be afraid to change your opinion if the discussion

6    persuades you that you should, but do not come to a decision

7    simply because other jurors think it is right.  It is

8    important that you attempt to reach a unanimous verdict, but

9    of course only if each of you can do so after having made your

10   own conscientious decision.  Do not change an honest belief

11   about the weight and effect of the evidence simply to reach a

12   verdict.

13       Perform these duties fairly and impartially.  You should

14   also not be influenced by any person's race, color, religious

15   beliefs, national ancestry, sexual orientation, gender

16   identity, gender, or economic circumstances.

17       Also do not allow yourself to be influenced by personal

18   likes or dislikes, sympathy, prejudice, fear, public opinion,

19   or biases, including unconscious biases.  Unconscious biases

20   are stereotypes, attitudes, or preferences that people may

21   consciously reject but may be expressed without conscious

22   awareness, control, or intention.

23       It is your duty as jurors to consult with one another and

24   to deliberate with one another with a view toward reaching an

25   agreement if you can do so.

1    During your deliberations, you should not hesitate to

2    reexamine your own views and change your opinion if you become

3    persuaded that it is wrong.

4    Because you must base your verdict only on the evidence

5    received in the case and on these instructions, I'll remind

6    you, as I have done a couple times a day, that you must not be

7    exposed to any other information about the case or to the

8    issues it involves.  Except for discussing the case with your

9    fellow jurors during your deliberations, do not communicate

10    with anyone in any way, and do not let anyone else communicate

11    with you in any way, about the merits of the case or anything

12    to do with it.

13    This restriction includes discussing the case in person,

14    in writing, by phone, tablet, computer, or any other means,

15    via email, text messaging, or any Internet chat room, blog,

16    website, or any other forms of social media.

17    This restriction applies to communicating with your family

18    members, your employer, the media or press, and the people

19    involved in the trial.  If you're asked or approached in any

20    way about your jury service or anything about this case, you

21    must respond that you've been ordered not to discuss the

22    matter and report the contact to the Court, which means tell

23    Ms. Lee and she'll tell me about it.

24    Do not read, watch, or listen to any news or media

25    accounts or commentary about the case or anything to do with

1    it.

2        Do not do any research such as consulting dictionaries,

3    searching the Internet, or using other reference materials.

4    And do not make any investigation or in any other way try to

5    learn about the case on your own.

6        The law requires these restrictions to ensure the parties

7    have a fair trial based on the same evidence that each party

8    has had an opportunity to address.  A juror who violates these

9    restrictions jeopardizes the fairness of these proceedings,

10   and a mistrial could result that would require the entire

11   process to start over.  If any juror is exposed to any outside

12   information, please notify the Court immediately.

13       Some of you have taken notes during the trial.  Whether or

14   not you took notes, you should rely on your own memory of what

15   was said.  Notes are only to assist your memory.  You should

16   not be overly influenced by your notes or those of your fellow

17   jurors.

18       The punishment provided by law for this crime is for the

19   court to decide.  You may not consider punishment in deciding

20   whether the government has proved its case against the

21   defendant beyond a reasonable doubt.

22       A verdict form has been prepared for you.  I think you all

23   got copies of the verdict form too?  You did.

24       After you've reached unanimous agreement on a verdict,

25   your foreperson should complete the verdict form according to

1  your deliberations, sign and date it, and advise the Courtroom

2  Deputy that you're ready to return to the courtroom.

3    If it becomes necessary during your deliberations to

4  communicate with me, you may send a note through the Courtroom

5  Deputy signed by any one or more of you.  No member of the

6  jury should ever attempt to communicate with me except by a

7  signed writing.  And I will respond to the jury concerning the

8  case only in writing or here in open court.

9    If you send out a question, I will consult with the

10  lawyers before answering it, which may take some time.  You

11  may continue your deliberations while waiting for the answer

12  to any question.

13    Remember that you're not to tell anyone, including me, how

14  the jury stands numerically or otherwise on any question

15  submitted to you, including the question of the guilt of the

16  defendant, until after you've reached a unanimous verdict or

17  have been discharged.

18    I'll say just one thing about this jury instruction

19  number 29.

20    It happens -- sometimes -- well, first two things.  When

21  we get a question from the jury -- and by "we," I mean when

22  the lawyers and I get a question from the jury, it is the most

23  important thing that's happening in the universe for us at

24  that time.  Because we are very well aware that you are trying

25  very hard to reach a verdict, and we do not want to slow down

1    that process in any way.  We want to be as helpful to you as

2    we can.  We all want that.

3        So we will -- we, in every case, are trying to get you an

4    answer as quickly as we can.  As I'm sure you appreciate,

5    though, the lawyers don't always agree on what the answers

6    should be.  And on top of that, sometimes there's additional

7    legal research or other things that have to be done before we

8    can formulate an answer and provide it to you.

9        So please know that's why it says in there, you know,

10   we -- please know we're working very hard when we get your

11   question even if you don't get the answer back right away.

12       The other thing I'd ask you to -- the other thing I want

13   to comment is where it says you can continue your

14   deliberations.  Very often the Court will receive a question,

15   "What's the meaning of this?" that kind of thing, and the jury

16   sends out the question and then they continue deliberating.

17   And then they'll send out a note that says, "You know what, we

18   don't have the question anymore.  We figured it out

19   ourselves."

20       I've had actually more than one case where we were working

21   on the answer to a question and the jury said, "We have a

22   verdict."  Because they had figured out another way of getting

23   where they needed to get or they figured out the answer

24   themselves.

25       So when it asks you to continue deliberating, it's not

1   just an empty sort of, you know, please do this.  There's a

2   lot of smart people in the room, and very often you'll

3   discover that you don't actually need an answer from us.

4       So those are the instructions in the case.  Thank you for

5   your close attention.  I'm going to put my mask back on.

6       As I told you, it's now the time for counsel to make their

7   closing arguments in the case.  What they say to you is not

8   evidence, but it can be a very, very helpful overview of the

9   two sides' views of the evidence that you've heard over these

10  last many weeks.

11      I always enjoyed giving a closing argument when I was a

12  lawyer, and it's still one of my favorite parts of the case.

13  So I hope you'll pay close attention.

14      Mr. Kleinman, will you be giving the government's closing

15  argument?

16          **MR. KLEINMAN:**  Yes, Your Honor.

17          **THE COURT:**  All right.  Mr. Kleinman, you have the

18  microphone whenever you're ready.

19          **MR. KLEINMAN:**  Thank you, Your Honor.

20          **THE COURT:**  And Mr. Kleinman, following up on my

21  earlier comment, and I'll say the same thing to -- will it be

22  Mr. Fakhoury?

23          **MR. FAKHOURY:**  Yes, Your Honor.

24          **THE COURT:**  -- to Mr. Fakhoury when it gets to be

25  your turn, normally we would break at 11:45.  If you want to

1   signal to the Court -- not now -- but as that time gets

2   closer, that you'd like to adjust that break, the same thing

3   for Mr. Fakhoury, just let me know.

4          **MR. KLEINMAN:**  Yes, Your Honor.  Thank you.

5       Raynee, is this all right?

6          **THE COURT REPORTER:**  Yes.

7          **MR. KLEINMAN:**  Okay.

8                      **CLOSING ARGUMENT**

9                 (Demonstrative published.)

10         **MR. KLEINMAN:**  "Okay, we're being conned."  That was

11  Dominic Polizzotto's reaction when he learned that the

12  defendant had lied to him over and over again.

13      And why did the defendant lie?  For money.  To get him and

14  Pilot Grove to invest in River Studios.  That's why we're

15  here.  At its core, that's the fraud in this case, the

16  defendant's lies for money.

17      There are multiple victims, multiple investors, and

18  multiple lies.

19                 (Demonstrative published.)

20         **MR. KLEINMAN:**  And it's helpful, as we go through the

21  evidence and we go through the case, to think about the

22  different groups of victims and then the different lies that

23  are associated with each group.

24      We have Silicon Valley Bank.  Then Pilot Grove, the

25  investors in River Studios.  The investors in the Unity

1    Co-Fund.  The investors in the 2015 Fund.  And then the

2    investors in the 2016 Fund.

3        There are different lies.  They are interconnected.  But

4    the purpose is the same.  Lies for money.

5                    (Demonstrative published.)

6        MR. KLEINMAN:  And there are really, in this case,

7    two chapters.  Chapter one, 2013, '14, and '15 out of control

8    spending.  That's not the crime.  But one leads to the other.

9        2015, 2016, now you have the fraud.  You have what happens

10   when the defendant runs out of money because of the

11   out-of-control spending.  And the spending continued.

12                   (Demonstrative published.)

13       MR. KLEINMAN:  So let's start at the beginning.

14       To understand this case, to understand the first chapter,

15   you need to know the basics of the Rothenberg business plan.

16   It's very simple and it's very expensive.

17                   (Demonstrative published.)

18       MR. KLEINMAN:  And we saw this over and over again,

19   multiple exhibits.

20                   (Demonstrative published.)

21       MR. KLEINMAN:  PowerPoint after PowerPoint after

22   PowerPoint slide, these slide decks.

23                   (Demonstrative published.)

24       MR. KLEINMAN:  First point.  The defendant was a

25   millennial.  In that first deck in 2014, he was born in 1984,

1    it's 2014, 30 years old.  And he says, he claims he has access

2    to millenial geniuses from his Harvard and Stanford networks.

3                    (Demonstrative published.)

4          MR. KLEINMAN:  And he gives you a timeline.

5          2001, he was a math Olympian and a varsity athlete.

6          Now, again, we are not here to judge whether being a math

7    Olympian or a varsity athlete, listing high school

8    accomplishments, is the best business plan.  I think it's

9    clear it's not.  But what we are going to do is look at how

10   this plan affected those who gave him money and those who he

11   was trying to get money from.

12         What was the fund sizes in relation to this business plan?

13                    (Demonstrative published.)

14         MR. KLEINMAN:  He wants you to know, graduated from

15   Stanford, got his bachelor's and his master's.

16         He knew Kevin Systrom, the founder of Instagram.

17                    (Demonstrative published.)

18         MR. KLEINMAN:  He was involved in a college club

19   called the Entrepreneurial Thought Leader Club.  And one of

20   the speakers at one time was Mark Zuckerberg.

21         Now to be clear, the defendant isn't involved, he's not

22   like an original investor in Facebook or Instagram, but his

23   claim here is that he connected these two people via email

24   once.

25         This is the pitch.

 1                    (Demonstrative published.)

 2          **MR. KLEINMAN:**  He knows people.  He runs in these

 3     circles.

 4          He went on to work at Bain as a consultant.

 5          Then he went to Harvard Business School.

 6          Again, back to that networking, Stanford and Harvard.

 7          2012 he starts the fund.  He invests in 40 portfolio

 8     companies approximately.

 9                    (Demonstrative published.)

10          **MR. KLEINMAN:**  Now it's 2014, he's raising his second

11     fund.  He's got a ten-person team.  And he's hosted his first

12     Founder Field Day where he rented out all of Giants stadium.

13          That's the pitch.  That's the plan.

14          And it continues.  He said he's going to take advantage of

15     his network.

16                    (Demonstrative published.)

17          **MR. KLEINMAN:**  He lists a variety of people in that

18     network.  One of these people goes on to be a victim in this

19     case, Lena Goldberg.

20          But he understands the importance of his network and

21     highlighting those people and taking advantage of them.

22                    (Demonstrative published.)

23          **MR. KLEINMAN:**  Part of the pitch is the idea of the

24     "Transitive Property of Amazing."  Here it is.  It's the 2015

25     Fund.  He says, "We believe in the transitive property of

1    amazing."

2       It kind of sounds like VC speak.  But this is the concept

3    "where we ask amazing people in our network 'who and what else

4    is amazing?'"  That's the pitch.

5       If you look at this slide, I've translated it for you.

6    It's commonly known as networking.  It's just networking.

7    That's -- that's all this is.  The transitive property of

8    amazing is just tapping into his network.

9                (Demonstrative published.)

10        **MR. KLEINMAN:**  He's the millennial venture fund.  The

11    millenial venture capital fund.  But the thing is if you're

12    just talking about networking, that's going to last one fund,

13    maybe two funds.

14       So in 2015, you see the shift, right, you've tapped into

15    your network.  Now you have to have another idea.  So the

16    defendant, in 2015, moved into frontier tech and virtual

17    reality.  So now they're the millenial, frontier tech, virtual

18    reality firm.

19                (Demonstrative published.)

20        **MR. KLEINMAN:**  But at its core, what the defendant

21    wanted his investors to know, as he highlighted in this slide,

22    the core of the investment strategy, it boils down to trust.

23       And the idea is simple.  His investors, they trust the

24    defendant.  He understands the importance of trust.  And then

25    you should give me money because I'll find other people who I

1    trust.  The core here is trust.

2        And then he introduces the concept of the highest quality

3    of quality.

4                (Demonstrative published.)

5        MR. KLEINMAN:  There it is.  The highest quality of

6    quality events.  And there were many events.  That's another

7    part of this strategy.  Founder Field Day.  Weekly tech talks.

8    Puppy happy hours where they would get puppies and bring them

9    to the office.  Monthly luminary dinners.  A Fall Founder

10   Retreat.

11       Again, this is just the strategy.  The question is:  How

12   does this compare to the amount raised and then the spending?

13               (Demonstrative published.)

14       MR. KLEINMAN:  A big part of this case is the large

15   staff.  In 2014 it's a ten-person team.

16       And let's just pause.  This is the first time we're

17   talking about the team.  It's a ten-person team.  It's got one

18   executive assistant.

19               (Demonstrative published.)

20       MR. KLEINMAN:  This is the 2015 Fund deck.  Now it's

21   a 20-person team.  Just one year later.  Now he's got two

22   executive assistants, a head of events, and a race car driver

23   who is to compete in events and drive him around South by

24   Southwest.

25               (Demonstrative published.)

1          **MR. KLEINMAN:**  Highlights celebrity connections.

2    Marshawn Lynch, Ludacris.

3          The question is, again, when an investor sees this slide

4    or any of these other slides:  How much do they give?  How big

5    is the fund?  And how does that compare to the spending?

6          So let's take a look.

7          This is Lynne McMillan, her testimony.

8          "Q.  How about fundraising?

9          "It wasn't anywhere close to being fully funded."

10         You saw the defendant's fund size goals.  That was what he

11   needed to hit.  It wasn't anywhere close to being fully

12   funded.

13                     (Demonstrative published.)

14         **MR. KLEINMAN:**  Here are the results.

15         These include the co-funds and the main fund, $6 million,

16   $12 million, $14 million.  And these are the amount of fees

17   that he was allowed to take through September of 2018.  These

18   fees needed to last him all the way up until that time.

19                     (Demonstrative published.)

20         **MR. KLEINMAN:**  So now, this is the next part, this is

21   the out-of-control spending in 2013, '14, and '15.

22         But we know from our own lives -- you don't just leave

23   your common sense at the door, you bring your experiences with

24   you -- it's budgeting 101.  Out-of-control spending compared

25   to what?  Relative to the fund sizes.

 1              (Demonstrative published.)

 2         **MR. KLEINMAN:**  So let's just take a couple of these

 3    employment contracts.

 4         Tommy Leep, $120,000.  Brandon Farwell, $120,000.  Lynne

 5    McMillan, $110,000.

 6         Now to be sure, not everybody made 110- or $120,000.  But

 7    let's just say on average, people made, let's say between

 8    $80,000 and $120,000.  So on average $100,000.

 9         Well, if you hire ten people, that's a million dollars a

10    year.  You saw how much he was bringing in.

11         And it just kept on getting bigger and bigger and bigger.

12         2015, in April, it's 20 people.

13              (Demonstrative published.)

14         **MR. KLEINMAN:**  And that didn't even list everybody.

15    You've got, in 2015, as we just said, two executive

16    assistants, a race car driver, a head of events.  And now in

17    addition, people who are not listed, Gloria Suvaco, a personal

18    assistant who comes around, clean's the defendant's apartment,

19    gives him haircuts, helps Mike run Mike.

20         There's nothing wrong with having a personal assistant,

21    but you have to do it with your own money.

22              (Demonstrative published.)

23         **MR. KLEINMAN:**  And it just kept on getting bigger and

24    bigger and bigger.  March 3, 2015, 25 people.  You saw that

25    all-hands meeting email.

1    Couple months later, June 2nd, 2015, now we're up to

2    36 people.

3              (Demonstrative published.)

4         **MR. KLEINMAN:**   In 2016 you have this text from Tommy

5    Leep.  46 people.

6         And again, that math doesn't add up, what the defendant is

7    taking in versus what he's spending.

8              (Demonstrative published.)

9         **MR. KLEINMAN:**   And let's just give you a little

10   comparison.

11        This was a case about venture capital.  We learned a lot

12   about venture capital.  And we also heard from a lot of

13   different people in the industry who run a broad range of

14   different funds.  Sophia Liao.  She's got $4 million in her

15   first fund, about eight to ten in the second fund.  Just

16   herself initially.  And then she's able to take on one other

17   person who was a partner and then an executive assistant.

18        Tommy Leep, 10 million-dollar fund, one person.

19        Alexa Binns, she worked at a couple different funds.  They

20   were all about $15 million.  Four people.

21        Brandon Farwell.  A $100 million fund.  Three people.

22        Pascal Levensohn, $500 million fund.  Ten people.

23        Sangwoo Lee, between 3.5 and $4 billion.  Six employees in

24   the United States, one of whom was part-time.  And 100 -- I'm

25   sorry -- and 100 people worldwide.

1   Jed Feldman at Thrive Capital.  Eight funds.  $15 billion.

2   75 employees.

3   You got a sense in this case of what the industry can

4   support, the industry standards based on the economics.  The

5   defendant was walking around like he was a Jed Feldman, but

6   his funds were in the Sophie Liao range.  That's what they

7   could support.

8                    (Demonstrative published.)

9        **MR. KLEINMAN:**  And these big events, we learned they

10  have a huge cost.  We actually learned in this case how much

11  it costs to rent out Giants stadium with a discount.  $117,000

12  for one day.

13       It's not the crime yet.  But we can see where it's headed.

14  He's going to run out of money.  And that bill, again we know

15  this from our own lives, you spend it, that bill comes due.

16       Here it is.  Final payment due today, $117,000.  And this

17  is the 2016 bill.  We heard from Tommy Leep it's basically the

18  same throughout.

19                    (Demonstrative published.)

20       **MR. KLEINMAN:**  Now, we've got that Third Eye Blind

21  concert.  We heard about that.  I guess the strategy here is

22  have a free concert and people may come.  It's all about how

23  much he brought in.

24       And I am certain, and it -- it appears it's fun.  You're

25  at the stage, you've rented out the Fillmore, you've got the

1    microphone in your hand.  I have no doubt that this was a fun

2    night.

3        But the question is could he afford it?  And what were the

4    inevitable consequences?  And what did he do once he ran out

5    of money?

6        Didn't stop there.  Right?  You don't just pay for Third

7    Eye Blind.  You have to pay for renting out the entire

8    Fillmore.  This is just the initial payment, 12.5 thousand

9    dollars, comes to another $25,000 in total.

10                    (Demonstrative published.)

11        **MR. KLEINMAN:**  It just kept on going.  Here's the

12    20,000 for Third Eye Blind.

13        Gotham Club.  Didn't spend much time analyzing or thinking

14    about it.  He was in.

15        Rose Bowl $75,000.

16                    (Demonstrative published.)

17        **MR. KLEINMAN:**  And the defendant is saying with a

18    straight face, he is telling you that this was the business

19    strategy.

20        Now, some of these things may be for the business

21    strategy.  Others might have been more fun.  You can think

22    about that, where it falls.  But certainly we're starting to

23    see as we get closer to 2015 -- to the end of 2015, the

24    blurred lines between what's business and what's kind of fun

25    and maybe a party.

1          (Demonstrative published.)

2          **MR. KLEINMAN:**  But it wasn't like the Rose Bowl was

3    new.  Here's 2014.

4      "Mike Rothenberg:  You and I will go to all three World

5    Series games!

6      "Tommy Leep:  Woohoo!"

7      He's happy.  He's pumped up.

8          (Demonstrative published.)

9          **MR. KLEINMAN:**  The defendant can't remember ever

10   blowing $20,000 that fast.

11          (Demonstrative published.)

12          **MR. KLEINMAN:**  It wasn't just that.  Here's one of

13   the luminary dinners or maybe a happy hour.  $2,000,

14   20 guests.

15     Here's Lynne McMillan, Warriors suite, $300,000 a year.

16     $39,000.  This is right at the end of 2015.  $39,000 for

17   the dinner and includes a comedian and a DJ.

18     Whether, as a business decision, the defendant needed to

19   have a comedian and a DJ and a $39,000 event, we don't know.

20   That's the defendant's strategy.

21     The question is:  What did he do when he ran out of money?

22          (Demonstrative published.)

23          **MR. KLEINMAN:**  Race car driver, fully employed by the

24   defendant.

25          (Demonstrative published.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1          **MR. KLEINMAN:**  The defendant, with these very small

 2   funds, bought a building.  He bought a building in SOMA.  And

 3   we learned how much that building costs.  $4.5 million.

 4          He bought a $4.5 million building, which we know from just

 5   our own experience with mortgages, you have a huge down

 6   payment of over $700,000.  And it's not like after you put

 7   down your down payment, there's no more bills, you own the

 8   space.  That mortgage comes due.

 9          $27,000 mortgage now every month.

10                    (Demonstrative published.)

11          **MR. KLEINMAN:**  And then River Studios, the biggest

12   expenditure of them all.

13          First, if you want to know what's really going on in a

14   company, ask the employees who are in the company, the people

15   who actually know.  They'll tell you.

16          Here's Ewan Johnson.  River Studios -- the defendant told

17   Ewan Johnson River Studios was fully funded by himself.

18                    (Demonstrative published.)

19          **MR. KLEINMAN:**  And it followed the same pattern as

20   the way the defendant ran the Management Company.  Started

21   when Ewan Johnson started in 2015, four employees.  By the

22   time Ewan Johnson left in 2016, we're just talking about a

23   year later, over 30 employees.

24                    (Demonstrative published.)

25          **MR. KLEINMAN:**  And of course, and this was one of the

 1    problems, there are no controls when you're self-dealing.

 2    Everything was funneled through Mike.  All decisions, all

 3    expenses.  That's Ewan Johnson.

 4                    (Demonstrative published.)

 5         **MR. KLEINMAN:**  Ewan Johnson, who had a lot of

 6    experience, told you there's no way it could not have covered

 7    the operating expenses, whatever content was created.  We just

 8    saw some of that in the -- this morning.  The defendant was

 9    pointing out to -- pointing out an $8,000 invoice received.

10    There's no way it could not have covered the operating

11    expenses.

12                    (Demonstrative published.)

13         **MR. KLEINMAN:**  And part of this strategy on top of

14    all that, on top of the employees, was to pay to produce their

15    own content.

16         Let's go through this.

17         "Q.  Were there some virtual reality music videos produced

18    by River Studios at the time you were there?

19         "A.  Yes, there were.

20         "Q.  Who did you produce those for?

21         "Ewan Johnson:  There were videos produced for will-i-am

22    and for Coldplay."

23         So you're like:  Okay.  All right.  Well, maybe -- maybe

24    this is a thing.  I mean those are big names.

25                    (Demonstrative published.)

1    **MR. KLEINMAN:**  "Q.  With respect to those videos, did

2    River Studios receive payment for the production of those or

3    did River Studios have to pay to produce those videos?

4    "Ewan Johnson:  It was my understanding that we paid for

5    the production."

6    In this deal, River Studios is paying Coldplay.

7    But it's not just Ewan Johnson's memory that you have to

8    go off of, although it's very clear.

9    (Demonstrative published.)

10    **MR. KLEINMAN:**  Here's the defendant's own email.

11    Michael Rothenberg, August 18th, 2015.  We're now getting very

12    close to that Silicon Valley Bank fraud.

13    River Studios contributing over $500,000 for the project

14    and India shoot.

15    It just doesn't work.

16    (Demonstrative published.)

17    **MR. KLEINMAN:**  And as an aside, this argument that

18    somehow River Studios was part of the River Accelerator is

19    totally unsupported by the evidence in this case.

20    Again, you want to know what's going on inside a company,

21    ask the people who actually work there.

22    Ewan Johnson:  "And was River Studios part of the River

23    Accelerator?

24    "No, it wasn't, in my understanding."

25    (Demonstrative published.)

1    **MR. KLEINMAN:**  Brandon Farwell:  "And where did you

2    come to that conclusion that River Accelerator and River

3    Studios were separate?

4        "Because I would ask.  I would ask -- I asked Mike, hey,

5    how are -- you know, what's the relationship between these

6    institutions here?  I know I'm being asked to fundraise for

7    the funds.  Obviously the Rothenberg Ventures funds should be

8    investing in startups," i.e., portfolio companies, "not in

9    companies that Mike starts.  And he would always tell me we

10   have separate external investors for the studio or that he's

11   helping support the studio himself."

12       Two employees within the company saying the exact same

13   thing.

14                   (Demonstrative published.)

15       **MR. KLEINMAN:**  And you saw the River Accelerator

16   slide deck itself.  River Studios wasn't listed.  River

17   Studios was never listed.  Witness after witness we asked,

18   where's River Studios?

19       This is the actual River Accelerator slide deck.  River

20   Studios isn't in there.

21                   (Demonstrative published.)

22       **MR. KLEINMAN:**  And yet the defendant is still

23   claiming, despite the actual -- now this is the River Studios

24   slide deck -- that these three separate bubbles with totally

25   different dates were somehow the same.  Totally unsupported by

 1   the evidence.

 2                     (Exhibit published.

 3        **MR. KLEINMAN:**  Here it is.  2012 Rothenberg Ventures,

 4   2014 the River Accelerator, 2015 River Studios.  And this deck

 5   was in February of 2016.  Before Pilot Grove's investment.

 6                     (Demonstrative published.)

 7        **MR. KLEINMAN:**  Here it is in another deck.  Separate

 8   bubbles completely.

 9      There's no indication that these were the same entities.

10   Not from the employees who worked there, not from the people

11   who invested, and not from the slide decks themselves.

12      But this case is also about the defendant ignoring all the

13   early warning signs.  This didn't just spring up on him.

14                     (Demonstrative published.)

15        **MR. KLEINMAN:**  Here's his own texts.

16      Michael Rothenberg:  Any leads on the carnival sponsors?

17      This is way back in 2014.

18      We have $10,000 in hard costs and are losing $6,000 in

19   cash right now.

20      That's not a good ratio.

21                     (Demonstrative published.)

22        **MR. KLEINMAN:**  Tommy Leep, the director of the

23   community outreach and the San Francisco office, very clear,

24   "the sponsorship was less than the total cost."

25      Same thing with Lynne McMillan.

 1                  (Demonstrative published.)

 2        **MR. KLEINMAN:**  And this email is important.  The

 3   email that she's quoting from, that she's referring to, those

 4   are the defendant's own words at the top, right after the

 5   *Bloomberg* article came out.

 6        He says that "these events were not funded by monies our

 7   LPs entrusted" -- entrusted.  He understands the concept of

 8   trust -- "with us."

 9        Lynne McMillan:  Is this true, as it is said....

10        No.  Simple answer.  No.

11                  (Demonstrative published.)

12        **MR. KLEINMAN:**  Now, we go to the bank accounts.  The

13   bank accounts, that's empirical evidence.  That's clear.

14        Let's see how he's doing.  This is June 2015.  This is the

15   month that he had taken all of the 2015 management and

16   administrative fees for the 2015 Fund -- that's supposed to

17   last him to the beginning of 2025, the end of 2024.  This is

18   when he had taken all of that, that was supposed to last him

19   ten years, in six months.

20                  (Demonstrative published.)

21        **MR. KLEINMAN:**  Look at this statement.  He didn't

22   have the money.  He was spending all of the money.

23        And at this point, he had begun to dip into the funds,

24   begun to take the money from the funds, not just management

25   fees.

1              (Demonstrative published.)

2        **MR. KLEINMAN:**  And his financial advisors saw this

3   coming.  This was clear.

4      "We've lost $50,000 on 10 to 12 suites so far this

5   season."

6      "Lynne has had enough."

7      That's that same month, that's 2015, that we just saw.

8              (Demonstrative published.)

9        **MR. KLEINMAN:**  Here's another early warning sign.

10  This is a letter from the banker at the Bank of San Francisco.

11  You could not ask for a better, clearer letter to a --

12  somebody who's in their thirties headed down the wrong path to

13  hit the brakes.

14      Michael Rothenberg had responded in his usual angry way,

15  his indignant way, when asked simple reporting questions.  And

16  this was the response.

17              (Demonstrative published.)

18        **MR. KLEINMAN:**  "I can tell that you are under a lot

19  of stress both with this transaction and with the other

20  growth" of your business -- "that your business is

21  experiencing."

22      "I feel like our recent dealings are leading us towards

23  adversarial positions which is a major red flag in bringing

24  any new relationship into the bank.  The proposed loans we

25  discussed have a ten-year term.  Our groups will need to

 1   cooperate" with each other "today and tomorrow and in good

 2   times as well as bad times."

 3       You receive a letter like that and you're headed down the

 4   wrong path, that's an early warning sign.  That should be

 5   taken seriously, and you should hit the brakes.

 6                    (Demonstrative published.)

 7       **MR. KLEINMAN:**  But he goes on.  And "With respect to

 8   financial reporting, the bank is most concerned with your

 9   ability to manage the business through inaccurate [sic]

10   internal reporting" -- excuse me -- "through accurate internal

11   reporting."

12       "It is a red-flag when a business is not able to produce

13   timely and accurate internal reports."

14       He specifically says this is a red flag.  Stop.  What's

15   happening?

16       Ignored.

17       He also lists in this paragraph it's like every single one

18   of my customers can do this.  Why can't you?  What's happening

19   here?

20                    (Demonstrative published.)

21       **MR. KLEINMAN:**  And then we saw the string of emails

22   in November 2015.  And now it's starts to get very clear.

23   Things start to get dire.

24       Lynne McMillan.  Explicit emails.  She's the director of

25   finance.  There are net shortfalls.  And what are the net

1    shortfalls?  They're in the millions.  This is November 20,

2    2015.

3        Three days later, November 23rd, 2015.  "These balances

4    are very concerning particularly given the fact that we've

5    taken 26.5 percent of the fees" in 2015.  That's that 2015

6    Fund.  Remember they only get around 27 percent, 27.5 percent.

7    They've -- according to Lynne McMillan's calculations, they've

8    taken all of it.  This is supposed to last until the end of

9    2024, a date we haven't even hit yet as we sit here today.

10       "Very concerning."

11       But this email also gives you insight into how much money

12   was being spent.  "Projected cash burn from now until the end

13   of year," and its November 23rd so that's roughly a month, a

14   month and a week, $700,000 to $750,000.

15       And it keeps on going.

16                   (Demonstrative published.)

17       **MR. KLEINMAN:**  Same email chain.  "The magic number

18   right now for the Management Company is" $2.5 million.

19       But she also uses a specific phrase.  And I want to pause

20   here.  The amount it owes to the fund.  And now there's two

21   funds.

22       So now you know the defendant has started dipping into

23   multiple funds.  2.1 to the 2015 Fund.  The managed [sic]

24   company has now started to owe the funds money.  How does that

25   work?  And it's not just the 2015 Fund, there's $350,000 to

1   Fund II.

2                   (Demonstrative published.)

3           **MR. KLEINMAN:**  Lynne McMillan described the situation

4   as dire.

5       What did the defendant do a couple weeks later?

6       He went to the Rose Bowl.  And this was after, as you can

7   see from this transcript, she told him unequivocally in email

8   and via conversation we're in trouble, this is a dire

9   situation.

10                  (Demonstrative published.)

11          **MR. KLEINMAN:**  How did the defendant react?

12      "Lynne has started questioning every decision I make.

13  It's really frustrating."

14      "I need to not be distracted by my team questioning

15  everything I do this month."

16      Just steamrolls over Lynne McMillan.  Does not listen.

17                  (Demonstrative published.)

18          **MR. KLEINMAN:**  And he goes.  We saw the price.  What

19  was Lynne's response to this Rose Bowl email thread?  It's in

20  black and white in an email.  I don't even know where that

21  $75,000 would come from.

22                  (Demonstrative published.)

23          **MR. KLEINMAN:**  Next month.  Now that cash pressure is

24  really getting great.  If he raises a $15,000 fund, Lynne

25  McMillan breaks it down -- excuse me -- a $15 million fund.

1    If Lynne McMillan tells him explicitly:  Here's a table.

2  Here's a chart.  If you raise a $15 million fund, we're going

3  to be in debt.  We're going to have both debt to the fund and

4  a projected cash shortfall, and both of them are going to be

5  in the millions.

6    Keep in mind he never raised the $15 million fund.  He

7  didn't even get $15 million in the 2015 Fund.

8    That's December 17th.

9             (Demonstrative published.)

10    **MR. KLEINMAN:**  Now, the defendant attempted, had it

11  in his mind that he was going to go to Asia, go to China, and

12  that was going to be an influx of cash.

13    Well, we saw the results.  And we saw the results before

14  the loan to SVB.  We saw the results before the loan to

15  Silicon Valley Bank.

16    "China was rough, man.  We'll debrief."

17             (Demonstrative published.)

18    **MR. KLEINMAN:**  And it's not like it got better.

19  Here's an email from 2016.  This is Sophie Liao giving her

20  update and analysis of how the fundraising was going.

21    Attitude:  They think we're a little bit too pushy.

22    That desperation when you need that money, that doesn't

23  sell.  But also that initial idea in the 2013, 2014 Funds of,

24  hey, I'm going to connect with people from my network who know

25  me from college, that's kind of a one-trick pony, right?

 1    That's -- that will last you one fund, maybe two funds.  But

 2    then your network's tapped.

 3                    (Demonstrative published.)

 4          MR. KLEINMAN:  What's Huace's analysis?  The

 5    portfolio companies that you say you can get access to, we can

 6    get access to those without you.

 7                    (Demonstrative published.)

 8          MR. KLEINMAN:  And it just keeps on getting worse.

 9    Now at this point, the defendant's running out of money

10    imminently.

11                    (Demonstrative published.)

12          MR. KLEINMAN:  We're now December 21st, 2015.  He

13    starts giving strict orders.  They're out of money.  Move

14    everything you can, even fundings for portfolio companies.

15    They're no longer able -- "portcos" is portfolio companies.

16    They're no longer able to do the basic thing that a venture

17    capital firm is meant to do, invest in venture capital

18    startups.  He's tapped.

19       He's asking:  Let me know what penalty we have from

20    SweetIQ if we don't fund by December 31st.  As in don't give

21    the money.  He wants to know because he's contemplating not

22    giving over the money.  He wants to know the balances.  He

23    wants her to give all other numbers.  And she does.

24                    (Demonstrative published.)

25          MR. KLEINMAN:  What's the problem?

1          Okay.  I've moved all the money, but there's going to be

2     forced conversion so that they're no longer getting in early

3     and getting the good stock, the point of the venture capital

4     firm.

5          But also there's going to be reputational damage.  There's

6     going to be relationship damage.  It's not working.  He's out

7     of money.

8          She also says, hey, this is the current cash, $200,000.

9     And the bare minimum expenses, this is including not actually

10    doing the job of the venture capital firm, which is to fund,

11    is $70,000.

12         They're out of money at this point.

13         What's raised?  This is now December 21st.  $13.1 million.

14         And now in December, you see the same analysis with the

15    bank accounts.

16                   (Demonstrative published.)

17         **MR. KLEINMAN:**  He's out of money in all of the

18    accounts.

19         Except for the 2015.  Why?

20                   (Demonstrative published.)

21         **MR. KLEINMAN:**  Right?  That ending balance

22    $5 million.  Why?  Because he got a $4 million loan from

23    Silicon Valley Bank.  That's Counts Three and Four.  That's

24    the bank fraud.

25                   (Demonstrative published.)

1          **MR. KLEINMAN:**  So here it is, December 23rd, 2015,

2     it's 12:19 p.m., Lynne McMillan lays it out.  We're dead in

3     the water.  These are the steps that need to happen.  They

4     must happen.

5                    (Demonstrative published.)

6          **MR. KLEINMAN:**  And what's that step?  Move the money

7     and get a bank loan.

8          She says approximately $3.6 million.

9          And what does the management company have to do?  It has

10     to take that money -- and she lays it out -- and repay the

11     2015 Fund.

12          Now we're up to $3.65 million.

13          She says this is what needs to happen or we're done.

14          And this is the defendant's choice.

15                    (Demonstrative published.)

16          **MR. KLEINMAN:**  That email also lays out this is the

17     fund size, it's December 23rd, $3.1 million, this is how many

18     fees we've taken, over 6 million, and these are the total

19     2015 fees we were allowed to take all the way through 2024.

20     $4 million.  And even after that, there's a remaining debt of

21     $1.2 million.

22                    (Demonstrative published.)

23          **MR. KLEINMAN:**  He overspent.

24          She says what -- this is what needs to happen.

25          And we heard from Brandon Farwell.  If the management

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1    company goes out of business, the money is still in the

 2    investments.  Maybe there are a variety of consequences for

 3    the defendant, but we're not at the crime yet.  We're at the

 4    day it starts.

 5        When I say we're not at the crime yet, we're not at the

 6    crime with Silicon Valley Bank yet.  Money had already been

 7    funneled away.

 8        But this is it, December 23rd, 2015.  It's noon.  He's got

 9    a choice.

10                    (Demonstrative published.)

11        **MR. KLEINMAN:**  And in that desperation, in that

12    moment, this is the pressure, this is the choice, this is what

13    he needs, he needs the loan or they're going out of business,

14    this was the defendant's answer as to what was going on in

15    that moment.

16        "Why were you reaching out on this day in particular for a

17    line of credit?"

18                    (Demonstrative published.)

19        **MR. KLEINMAN:**  Well, the end of year is a good time

20    to look at your to-do list.

21        That answer does not match the desperation that had

22    occurred.  That is not a credible answer.  This was not like,

23    oh, you know, I have to -- on my to-do list just before I head

24    out for you, you know, Christmas Eve or Christmas just to get

25    this done.

1          (Demonstrative published.)

2          **MR. KLEINMAN:**  But in truth, early on, the defendant

3    was self-aware.  He knew.  He knew he was on the wrong path

4    early.  This is a text chain from 2014.

5          "Do you see any downside to adding Stephanie, Jordan, and

6    Adam Snell to the website?

7          "I was worried about institutional LPs wondering how we

8    have such a big team."

9          That's his text in 2014.  He knows the problem and he knew

10   it early.

11          (Demonstrative published.)

12          **MR. KLEINMAN:**  So now we have our first crime.  Count

13   Three, bank fraud, and Count Four, making false statements to

14   a financial institution.

15          It starts on December 23rd, 2015, five hours after that

16   email from Lynne McMillan.

17          **MR. KLEINMAN:**  Your Honor, it's 11:45.  Would you

18   like...

19          **THE COURT:**  All right.  If that's a convenient time

20   for you, I'm sure it is for our jurors as well.

21          Let's go ahead and take our second recess.

22          Please remember my prior admonitions.

23          **THE CLERK:**  Please rise for the jury.

24          (The following proceedings were heard out of the presence

25   of the jury:)

```
 1            THE CLERK:  You may be seated.

 2            THE COURT:  Oh, okay.  I thought she was going to say

 3     let's be in recess.

 4        Anything for the record?

 5            MR. KLEINMAN:  No, Your Honor.  Thank you.

 6            THE COURT:  Mr. Fakhoury?

 7            MR. FAKHOURY:  Your Honor, I have one request.

 8        My understanding from Mr. Kleinman is that his closing

 9     should take about two hours.  I think we're about 45 minutes

10     of the way through it.  And if we have a 15-minute recess we'd

11     be back at 12:00.  And I would imagine he would probably end

12     around 1:15.

13        I'm wondering if the Court would allow me to give my

14     entire closing starting at 8:30 tomorrow rather than start

15     15 minutes of it and -- and pick up tomorrow.

16            THE COURT:  Let's do this.  Let's plan on just having

17     a sidebar when Mr. Kleinman finishes.

18            MR. FAKHOURY:  Sure.

19            THE COURT:  Because we don't know when that's going

20     to be.  And then at that time, you can indicate to the Court,

21     you know, what course of action you're hoping we'll take.

22            MR. FAKHOURY:  That's fine, Your Honor.  Thank you.

23            THE COURT:  Okay.  Good.  Thanks.

24            THE CLERK:  Court is in recess.

25        (Recess taken at 11:47 A.M.; proceedings resumed at
```

```
1    12:03 P.M.)

2         (The following proceedings were heard in the presence of

3    the jury:)

4              THE CLERK:  You may be seated.

5              THE COURT:  All right.  All the jurors are in their

6    assigned seats.

7         The parties and counsel are at counsel table.

8         Mr. Kleinman, you can continue your closing argument.

9              MR. KLEINMAN:  Thank you, Your Honor.

10                   (Demonstrative published.)

11             MR. KLEINMAN:  So now we're at Counts Three and Four,

12   bank fraud and making false statements to a financial

13   institution.  These are separate but similar charges.

14                   (Demonstrative published.)

15             MR. KLEINMAN:  So there's two problems.  He's run out

16   of money.  We just covered that.  But also if you remember

17   those K-1 documents are due, right?  Those year-end tax

18   documents are due.  And if it shows that the defendant spent

19   all the money, that's going to be a huge problem.  So there

20   needs to be an influx of cash into the 2015 Fund.

21                   (Demonstrative published.)

22             MR. KLEINMAN:  So what's his solution?

23        Defraud Silicon Valley Bank.  The last week of

24   December 2015, he reached out to the bankers at SVB and asked

25   about getting a line of credit.  He quickly obtained that line
```

1   of credit.  But he secured it with 14.5 -- excuse me --

2   $14.25 [sic] million in cash.

3       And he used that money, that $4 million loan, to make the

4   2015 accounting books look okay to investors.

5              (Demonstrative published.)

6          MR. KLEINMAN:  So bank fraud.  Judge Tigar just read

7   through the elements.  I'm not going to go through each and

8   every element and repeat what Judge Tigar just read to you.

9   You also have copies of the elements here.

10      But there are two methods, method A and method B.  And the

11  government can prove either method A of bank fraud, method B

12  of bank fraud, or both.

13             (Demonstrative published.)

14         MR. KLEINMAN:  Here are the elements.  I'm not going

15  to focus on all of them.  For example, it's not really in

16  dispute that Silicon Valley Bank, at the time of the fraud,

17  was federally insured.  You heard from Christy Cornell-Pape.

18      I'm going to focus on the scheme to defraud and then the

19  defendant's intent.

20             (Demonstrative published.)

21         MR. KLEINMAN:  This is the definition of a scheme to

22  defraud.  You have that definition in your instructions.

23  Someone intends to deceive and cheat.

24             (Demonstrative published.)

25         MR. KLEINMAN:  Method B, similar but overlapping.

1    I'm going to focus on intent to deceive and cheat and making

2    statements or promises that were false.

3                    (Demonstrative published.)

4        **MR. KLEINMAN:**  So what are the lies?

5        In the beginning, I talked about the core groups of

6    victims.  Here are the core lies.

7        Lie number one, he lied about the fund size, how big the

8    2015 Fund was.  And then he also lied that there were

9    prefunded fees.

10       Now it's entirely unclear whether prefunded fees

11   whatsoever are allowed, that you're allowed to take more than

12   what's in the contracts.

13       But that actually doesn't even matter in this case because

14   he took all of the fees that could possibly be allowed and

15   then some within just the first basically half of 2015.

16       So there absolutely are not prefunded fees whatsoever.

17   Everything had been taken.

18                    (Demonstrative published.)

19       **MR. KLEINMAN:**  Here's the email.  This is the core

20   email.  It lays out the two lies:  Lie number one that there

21   were prefunded fees.  Lie number two, it's a $23.6 million

22   fund.

23       And I'm going to ask you as we go through this, keep that

24   number in mind of $23 million.  It's going to come up a number

25   of times.

1              (Demonstrative published.)

2         **MR. KLEINMAN:**  Here are the actual results.  This is

3    black and white.  Again, the empirical evidence of bank

4    accounts.

5         How much did he actually raise in 2015 at the time of this

6    email?  A little over $12 million.

7         It's indisputable.  It is not $23.6 million.

8              (Demonstrative published.)

9         **MR. KLEINMAN:**  How big was the lie?  How much more

10   was it?  Gerry Fujimoto told you.  It's an 82.6 percent

11   difference.  It's way inflated.

12             (Demonstrative published.)

13        **MR. KLEINMAN:**  And again, this is how much the

14   defendant was allowed to take in the life, the entire life, of

15   the 2015 Fund, about $3 million -- $3.8 million.  Supposed to

16   last him until 2024.

17        And if you look, in 2016 there was another $1.1 million

18   that two investors, you heard from Gerry Fujimoto, had

19   invested into the 2015 Fund.  So the total actually became

20   14 million which makes absolutely no difference in terms of

21   the lie here in terms of whether he had raised $23.6 million.

22        Let's keep on going.

23             (Demonstrative published.)

24        **MR. KLEINMAN:**  So 3.8 million.  That's what he's

25   allowed to take through 2024, through a date that has not

1    already happened.  He exceeded that amount in July.  He had

2    taken $4.9 million by July of 2015.

3                    (Demonstrative published.)

4         MR. KLEINMAN:  The defendant deceived Silicon Valley

5    Bank into believing that the collateral for the $4 million

6    loan was those prefunded fees.  It wasn't.  It couldn't have

7    been.  He'd spent it all six months earlier.  So where'd it

8    come from?

9                    (Demonstrative published.)

10        MR. KLEINMAN:  Well, it can't be prefunded fees.  So

11   it came from investors and from the other funds.  We're going

12   to come back to this slide quite a bit because this starts the

13   cycle.

14                   (Demonstrative published.)

15        MR. KLEINMAN:  So you see this is where the money

16   came from.

17                   (Demonstrative published.)

18        MR. KLEINMAN:  So how do we know defendant's intent?

19   Well, the defendant knew the overall financial picture in 2015

20   because he was told by Lynne McMillan repeatedly.  We saw the

21   lead-up to those emails.  It was getting more and more worse

22   [sic].  "Dire."  "Shortfall."  "This is what needs to happen."

23   Over and over and over again.

24                   (Demonstrative published.)

25        MR. KLEINMAN:  But also the timing.  And this is why

1   I emphasize December 23rd, 2015, the very day the defendant

2   reaches out to Silicon Valley Bank.  That's that email from

3   Lynne McMillan where he was told that they'd already spent all

4   of the fees they could possibly take for the entire life of

5   the fund.  That was that email that we just saw before the

6   break.  That $6 million figure.

7                    (Demonstrative published.)

8          MR. KLEINMAN:  Here it is.  December 23rd.  That's

9   the fund size.  This is that same email.  That's the

10  $6 million figure in terms of fees taken to date.  And then

11  that $4 million figure, that's what they were allowed to take

12  up through 2024.

13                   (Demonstrative published.)

14         MR. KLEINMAN:  So again, December 23rd, 2015.  And

15  here's the email.  December 23rd, 2015, at around 6:00 p.m.

16  Mountain Standard Time, so 5:00 p.m. Pacific.  Five hours

17  later, the defendant reaches out to Silicon Valley Bank.

18  Email from Mike Rothenberg.  You have the date there.

19      When does he need the loan?  Today or tomorrow.  Is

20  someone available this week, today or tomorrow, to help set up

21  a line of credit secured by cash?

22      So that cash needs to come from somewhere.

23      Some of our LPs have paid some future management fees

24  early.

25      Totally untrue.  He'd spent them all.

1    There's also no indication that any of them had signed up

2    for the defendant spending all of the fees for the entire life

3    of the fund within six months.  There's no evidence to that

4    effect whatsoever because they didn't.  That's not what

5    happened.  That's one of the lies.

6        But this line of credit needs to handle, needs to address

7    a specific problem.  So it needs to allow the management

8    company to draw on it up to 95 percent.

9        This is one of the lies.  The LPs have paid future

10    management fees early.

11        This was the defendant's choice.  This is the moment where

12    it switches from the defendant being a bad businessman to

13    defrauding Silicon Valley Bank, to fraud.

14                    (Demonstrative published.)

15        **MR. KLEINMAN:**  And he didn't pick $23.6 million out

16    of thin air, not by any means.

17        Here's December 17th, 2015.  We saw a little bit of this

18    email a moment ago.  Things were getting really bad.  It's

19    from Lynne McMillan to Mike Rothenberg.

20        This is how much the fund is.  It's 13.1 million.  These

21    are the fees taken to date.  More than what we can take.

22    There's a shortfall.  She uses the word "2015 Fund shortfall."

23        And look at this chart.  He didn't pick 13 [sic] million

24    out of thin air.  Let's walk through this.

25        On December 17th, 23 million was going to be the number

 1    that got him out of the shortfalls, both the projected cash

 2    shortfall for the bills that were going to keep on coming in

 3    the business, but also the debt to the fund.

 4        And this is December 17th.  So as time goes on, remember

 5    the loan is not issued until December 30th, it's going to need

 6    to be a little bit more.  Turns out to be -- what's the lie to

 7    Silicon Valley Bank?  23.6.  It's the only number that works

 8    in Lynne McMillan's chart.

 9        That's another factor.  That's how you know the defendant

10    intended to deceive.

11                    (Demonstrative published.)

12        MR. KLEINMAN:  You heard in the elements, you heard

13    from Judge Tigar, materiality is one of the elements.  Lying

14    about the fund, is significant?

15        "It would be very significant."  Frank Amoroso.

16        "For this amount, would you have approved this specific

17    loan if the fund size was 13.1 million?"

18        "No."

19        That's materiality right there.  He told you.  No.

20                    (Demonstrative published.)

21        MR. KLEINMAN:  "If the source of the cash from the

22    collateral funds came from the 2013 and 2014 Funds," and not

23    the prefunded fees, "would you have approved this loan?"

24        "No."

25        And we saw that chart.  We know where the source of the

 1    collateral funds actually came from.

 2                    (Demonstrative published.)

 3          **MR. KLEINMAN:**  Also material to the bank.

 4        Here's another email from Mike Rothenberg.  Now it's

 5    December 24th, 2015.

 6        "Members have prepaid somewhere between 1.7 and $5 million

 7    of expenses, which we have in cash" -- he does not.  We saw

 8    the bank accounts -- "and will fund the recently opened

 9    account."

10        This is a very clear email.  He says we have it in cash

11    and this is what will fund the recently opened account.

12        We know that's not true.

13                    (Demonstrative published.)

14          **MR. KLEINMAN:**  But just in case you need to hear from

15    it from Frank Amoroso himself, here he is.

16        "Which we have in cash and will fund the recently opened

17    account."  What does that mean?

18        "They had already received and had that cash in their

19    possession."

20        That's what the defendant emailed so of course that's what

21    the bank believed.

22        The defendant's statements, the defendant's lies is the

23    heart of the fraud.

24                    (Demonstrative published.)

25          **MR. KLEINMAN:**  The defendant has provided and put

1    forth this explanation of funded versus committed.  I'm just

2    going to address this really quickly.

3        It's not credible whatsoever.  The defendant expressly

4    stated in the email that we just saw to Silicon Valley Bank

5    the management fees were prefunded.  That means, as he himself

6    said, we have the cash in hand.

7        To say now that, well, it wasn't -- it wasn't cash in

8    hand, it was cash I was going to receive is totally

9    inconsistent with the email.

10        And the defendant required investors to pay their full

11    commitments up front in the 2015 Fund.

12                    (Demonstrative published.)

13        **MR. KLEINMAN:**  And the 2015 Fund bank account doesn't

14    reflect the multiple payments of committed capital that's

15    coming over time, but rather it reflects the full funding

16    consistent with the 2015 Fund investors' testimony.

17        So the bank accounts are consistent with the testimony

18    that you heard:  I paid the full -- my full commitment up

19    front.

20        Let's go through those bank accounts really quickly.

21                    (Demonstrative published.)

22        **MR. KLEINMAN:**  Michael Antonov.  He committed

23    $1.25 million.  And you see the bank account.  He gave

24    $1.25 million.  It's not a one-off.

25        Natala Menezes, same thing.  She committed $100,000.  She

1   funded $100,000.

2       That's how the 2015 Fund worked.  And that's also what the

3   evidence is in this case.

4       Additionally, we have the 2015 Fund through 2018.  There's

5   no additional commitments that come in.

6                    (Demonstrative published.)

7       **MR. KLEINMAN:**  The source of the money.  The

8   defendant said it's from the recent closed 2015 account.

9   Frank Amoroso testified to that.  And Frank Amoroso said I

10  understood, because what the defendant said that these were

11  prepaid management fees from the 2015 Fund.  That's very

12  clear.

13      The defendant has put forth this additional argument that

14  what he meant was also the 2016 Fund, not just the 2015 Fund.

15  That's not credible.  It's inconsistent with what Frank

16  Amoroso testified to.  And it's certainly material.

17                   (Demonstrative published.)

18      **MR. KLEINMAN:**  In this email or at this point or in

19  any conversation, had Mr. Rothenberg ever mentioned anything

20  about fees from the 2015 [sic] Fund.  No.  Never mentioned in

21  any conversation.  Never mentioned it in any email.

22                   (Demonstrative published.)

23      **MR. KLEINMAN:**  It didn't happen.

24      Here it is.

25      "If the fees were coming from, let's say, both a 2015 and

1    2016 separate funds, is that something the bank would need to

2    know about prior to deciding whether or not to issue the loan?

3        "Certainly.

4        "And did the bank ever receive any information to that

5    effect from the defendant?

6        "No, we did not."

7                        (Demonstrative published.)

8            MR. KLEINMAN:  But also Frank Amoroso's testimony is

9    entirely consistent with the emails that you saw yourself.

10   Here's an email chain with Mike Rothenberg, Judy Lee, Frank

11   Amoroso.  He attaches an operating agreement.  What operating

12   agreement did he attach?  The operating agreement of the

13   2015 Fund.

14       Why would you -- you would also, if this was about the

15   2015 and 2016 Funds, you'd have attached both operating

16   agreements.  He only attaches the 2015 Fund, which

17   incidentally is not what the bank was actually asking for.

18   But it gives you insight into what the defendant was telling

19   the bank and what the defendant in fact told the bank.

20                        (Demonstrative published.)

21           MR. KLEINMAN:  Here's another part of the email.  The

22   defendant, what does he say?

23       He's going to pay off.  And where is the balance going to

24   go back to?  The 2015 Fund.

25       Consistent with the emails, consistent with the testimony,

1   it's all about the 2015 Fund.

2       Commingling the 2016 and the 2015 Funds would not have

3   been allowed by Silicon Valley Bank.  They would have needed

4   to know that.  The defendant never said that to them.

5                    (Demonstrative published.)

6       MR. KLEINMAN:  Let's look at the main email.  What's

7   the fee structure that he highlights?  This is -- this is 1.75

8   and 1 percent, that's the 2015 Fund structure.

9                    (Demonstrative published.)

10      MR. KLEINMAN:  This is the 2016 Fund admin fee and

11  structure.  It's totally different.

12      He didn't include that in the emails.

13      And the eight years of prefunded fees, well, we learned

14  it's not prefunded.  But also the eight years made sense

15  because in the 2015 Fund, you had to take both -- the

16  defendant was allowed to take both 2015 and 2016 up front.

17      That's where that just over 13 percent comes in.

18                    (Demonstrative published.)

19      MR. KLEINMAN:  But also the 2016 Fund investing in

20  the 2015 Fund has zero effect, none, on the management fees.

21  It has no bearing.

22                    (Demonstrative published.)

23      MR. KLEINMAN:  The 2016 Fund had its own management

24  fees.  And while by 2016, funds were allowed to invest in each

25  other -- the 2016 Fund was at least -- you can't take fees

 1   twice.

 2       So if the 2016 Fund invests in the portfolio companies in

 3   the 2015 Fund, that has nothing to do with management fees.

 4   You can't take 2016 Fund management fees, invest the 2016's

 5   money into the 2015 Fund, and then take another round of

 6   management fees on top of that.  It's double-dipping.  It's

 7   not allowed.  Nobody agreed to that.

 8       And more importantly, he never mentioned any of this to

 9   Silicon Valley Bank.  It's totally unsupported by the

10   evidence.

11                 (Demonstrative published.)

12       MR. KLEINMAN:  Now why is this such a big deal?  Why

13   is that double-dipping point such a big deal?

14       Well, the 2016 Fund didn't have prefunded fees.  It had a

15   totally different structure.  And Lynne knew that.

16       This is a couple months later.  Now it's February 2016.

17       "Mike, I specifically asked you not to transfer the

18   $175,000 from the 2016 Fund to the Management Company..."

19                 (Demonstrative published.)

20       MR. KLEINMAN:  Let's track this -- this conversation

21   from Lynne McMillan.

22       "What was your problem with that transfer?

23       "Well, I specifically told Mike not to move that money

24   because that's not the way the 2016 Fund worked...."

25       "Just to refresh everybody's recollection, the reason that

1  the 2016 Fund was different is that the fees were billed on

2  top of capital contribution, invoiced separately, and

3  deposited into a separate account, correct?"

4      "Correct."

5      The 2016 Fund is structured entirely differently.

6                  (Demonstrative published.)

7      **MR. KLEINMAN:**  And we saw what a bill looks like.

8  David Chiu testified he received this bill.  He paid it.  This

9  is for the 2016 and 2017 management and admin fees.

10     Now, Count Four is similar.

11                 (Demonstrative published.)

12     **MR. KLEINMAN:**  These are the elements of making a

13 false statement to a financial institution.  I'm not going to

14 go through them.  But this is linked to the defendant acting

15 for the purpose of influencing the actions of Silicon Valley

16 Bank.

17     And that's clear in this case.

18                 (Demonstrative published.)

19     **MR. KLEINMAN:**  To be clear, it's not necessary for

20 the government to prove that Silicon Valley Bank was in fact

21 influenced or misled, although the evidence clearly shows that

22 they were.

23                 (Demonstrative published.)

24     **MR. KLEINMAN:**  What must be proven is the defendant

25 intended to influence.

 1              (Demonstrative published.)

 2         **MR. KLEINMAN:**  Now, we saw where the money came from.

 3    This is an important turning point in this case.

 4         So now we've got this cycle, this scheme to use new

 5    investor money to repay previous debts.

 6              (Demonstrative published.)

 7         **MR. KLEINMAN:**  Let's take an example.  Where did the

 8    money come from [sic] the collateral account.  2013, 2014

 9    Funds.  So now there needs to be a new investor.  In comes

10    Pilot Grove.  Two million dollars comes in.  Whoops.  Where

11    does it end up?  Paying back the 2013 and 2014 Funds, the

12    money used for the collateral account.

13         And this is the cycle.  Investor A invests.  Investor A's

14    money is misused and not invested.  So now there's a debt.

15    You need new investor money to repay the old.

16         Investor B invests.  Investor B's money is not invested

17    but instead used to cover the misuse of Investor A's money.

18         We know what's coming.  Now new investor money is needed

19    to pay back the misuse of investor B's money.

20         In comes investor C.

21              (Demonstrative published.)

22         **MR. KLEINMAN:**  Same situation.  And even actually the

23    cash pressure became so great that it falls apart.

24         But you constantly need new investor money, new money to

25    pay back the previous misuse.

1    So now let's turn to Pilot Grove.

2              (Demonstrative published.)

3        **MR. KLEINMAN:**  And their $2 million-dollar investment

4    in River Studios.

5        So the defendant has now defrauded Silicon Valley Bank,

6    but he had to use all that money.  It's locked up in a

7    collateral account.  And that money was not for a collateral

8    account, it was to make portfolio company investments, it was

9    taken from the funds.

10             (Demonstrative published.)

11       **MR. KLEINMAN:**  So the Silicon Valley Bank bank loan

12   did not fix the problem.

13       So now here comes the solution.  Raise money.  New money

14   needs to come in.  Defraud investors who thought they were

15   investing in River Studios.

16       In 2016, in February, Rothenberg convinced Larry Weisman

17   and Dominic Polizzotto at Pilot Grove Management to invest

18   $2 million.

19       He lied to Pilot Grove.  And here are the lies.

20             (Demonstrative published.)

21       **MR. KLEINMAN:**  Lie number one:  He said that he had

22   self-funded and fully owned, meaning owned it all, River

23   Studios.

24       Different -- now different group of investors, different

25   lies.  This one is he lied that he self-funded and owned it.

 1   This is untrue.

 2       He also lied when he said how the $2 million would be

 3   used.

 4                    (Demonstrative published.)

 5       **MR. KLEINMAN:**  Those are the two lies.

 6       And we'll also track what he actually used the money for.

 7   That's going to be Counts Eight through Eleven, that's the

 8   money laundering.

 9                    (Demonstrative published.)

10       **MR. KLEINMAN:**  So let's go to the wire fraud, Counts

11   Five to Seven.

12       Judge Tigar read these elements.  I'm not going to go

13   through each of them.  But I am going to focus on that the

14   defendant intended to devise -- intended to devise a scheme or

15   plan to defraud or a scheme or plan for obtaining money or

16   property.

17       And I'm also going to address the defendant's intent.

18                    (Demonstrative published.)

19       **MR. KLEINMAN:**  So first point.  The defendant sent

20   Pilot Grove a PowerPoint presentation indicating how the

21   investments would be used.

22       Count Five is this email.  February 17th, 2016.  This is

23   the email with the attachments.

24       Here's the defendant.  February 17, 2016:

25       "I've attached everything we discussed in our last meeting

 1    on" February 5th, 2016.

 2                    (Demonstrative published.)

 3          **MR. KLEINMAN:**  Here's the slide from the PowerPoint.

 4    This lists on the right side the four reasons, the four things

 5    that the defendant is going to use Pilot Grove's money for.

 6                    (Demonstrative published.)

 7          **MR. KLEINMAN:**  Here's Lawrence, he goes by Larry,

 8    Larry Weisman on the defendant's lies and whether or not they

 9    were material.

10          Says:  "Yes, because he was just -- if we were doing it in

11    that context, we would just be repaying spent money."

12          What is he talking about?  What's the question?

13          "Would those two facts that I've given you, that," one,

14    "Mr. Rothenberg was going -- would have used the money to

15    repay" back "the venture capital funds or to repay himself,

16    have mattered to you, Larry Weisman, in determining whether to

17    make an investment in River Studios?"

18          Would it have mattered?

19          Absolutely.

20          Larry Weisman:  "If we were doing it in that context, we

21    would just be repaying spent money.  The money wouldn't be

22    used for anything, basically to repay a debt he owed to

23    somebody else.  So it had no value to us."

24          This is the cycle.

25                    (Demonstrative published.)

1      **MR. KLEINMAN:** Here's the other lie.

2      "There -- and again, had Mr. Rothenberg told you prior to

3  you receiving this that he intended to take some of Pilot

4  Grove's investment to repay himself?

5      "No.

6      "Did he tell you he intended to take some of Pilot Grove's

7  investment to repay money he had taken from his venture

8  capital funds?

9      "No."

10     And of course he didn't because nobody, and specifically

11 nobody at Pilot Grove, would have invested.

12                    (Demonstrative published.)

13         **MR. KLEINMAN:** The defendant had a clear motive to

14 lie.

15     Here's another lie. The defendant represented to Pilot

16 Grove that he self-funded River Studios.

17     Here's the email. We saw this email this morning. This

18 is February 4th, 2016. This is the second count, Count Six of

19 wire fraud.

20     "As we have discussed previously, I have self-funded the

21 company." Mike Rothenberg on February 20th.

22     Another email, February 24th.

23     "Note also that I self-funded the company in 2015 and

24 continue to do so."

25     Those are the emails, black and white. That's what the

 1    defendant said, and it was a complete lie.

 2                (Demonstrative published.)

 3         MR. KLEINMAN:   "How much of River Studios' funding

 4    was derived from sources other than Mr. Rothenberg?"

 5         How clear was the lie?  It was very clear.  41.2 percent

 6    had come from the funds, 2015 Fund outside investors through

 7    RVMC, 2015 Fund outside investors through Rothenberg Ventures

 8    LLC, other funding from Rothenberg Ventures LLC.

 9         In no way did the defendant self-fund River Studios.

10                (Demonstrative published.)

11         MR. KLEINMAN:   And you also have the testimony

12    supporting the email that we just saw perfectly corroborating

13    that email.  He said in an unequivocal way he owned it, he

14    bootstrapped it since college, and no one had ever funded

15    another dollar into River Studios.

16         Very clear.  Complete lie.

17                (Demonstrative published.)

18         MR. KLEINMAN:   And this was also material.

19         Larry Weisman:  "I would never have made that investment."

20         He acts as a -- in a fiduciary capacity on behalf of

21    others.  And why would he have made that investment if he

22    could have gotten that same exposure by investing into the

23    fund itself?  It wouldn't make any sense.  It was absolutely

24    material.

25         And he also, as he testified to, as Dominic Polizzotto

 1    testified to, they would want to see that cap table.  They

 2    want to know who the other owners are.

 3                     (Demonstrative published.)

 4         MR. KLEINMAN:  And that's in addition to the

 5    self-dealing problem.

 6         Witness after witness, victim after victim in this case

 7    told you I wouldn't invest, I would need to know that.

 8    There's a self-dealing problem.  What are the controls?  I

 9    need to -- that's absolutely material to me.  I need to know

10    that.

11                     (Demonstrative published.)

12         MR. KLEINMAN:  So how much of the $2 million

13    investment into River Studios was spent on each of the

14    following uses of capital?  Here are the four.

15                     (Demonstrative published.)

16         MR. KLEINMAN:  $2 million investment comes in.

17                     (Demonstrative published.)

18         MR. KLEINMAN:  Hits on February 25th, 2016.

19                     (Demonstrative published.)

20         MR. KLEINMAN:  Goes from Transcend VR, wires in, it's

21    into the Bend Reality bank account.  You'd expect it to sit

22    there and maybe go out to Coldplay or, you know, whatever

23    else.

24                     (Demonstrative published.)

25         MR. KLEINMAN:  $1.7 million immediately leaves that

1    account that same day.  The timing also shows you the

2    defendant's intent.

3              (Demonstrative published.)

4         **MR. KLEINMAN:**  Here's the breakdown.

5       You heard from Gerry Fujimoto.  $2 million comes in on

6    February 25th, 2016.  How much is used for the four allotted

7    uses of capital?  Just over $200,000.  The rest?  Used for a

8    variety of other things.

9              (Demonstrative published.)

10        **MR. KLEINMAN:**  So if it wasn't used for that, what

11   was it used for?

12             (Demonstrative published.)

13        **MR. KLEINMAN:**  Used to pay back the funds, the

14   mortgage, the defendant himself.

15             (Demonstrative published.)

16        **MR. KLEINMAN:**  This is very clear.  I'm not going to

17   spend much time on this.  But the emails and the $2 million

18   wire, that was interstate.  Larry Weisman stated he was in

19   Las Vegas at the time of the two emails.

20      Dominic Polizzotto stated he was in the Chicago area and

21   splits his time between Chicago and Las Vegas.

22      And then in terms of the actual wire itself, Roberto

23   Amenta of the Federal Reserve Bank of New York explained that

24   all Fedwires, all wires go through Texas and New Jersey.  So

25   we have the interstate nexus here.

 1                    (Demonstrative published.)

 2          **MR. KLEINMAN:**  And he needed this money.  The

 3   defendant needed new money to repay his previous misuse.

 4          This was the account balance right before that wire hit.

 5   February 24th, $33,000.  He needed that money.  So you saw it

 6   hit Bend Reality's bank account, went straight to the

 7   operating account.

 8                    (Demonstrative published.)

 9          **MR. KLEINMAN:**  So now that's the money laundering.

10   Excuse me.  That leads us to the money laundering.

11          The money laundering here is tracking what was actually

12   done with -- with the money, if not to be used for those four

13   specified purposes.

14                    (Demonstrative published.)

15          **MR. KLEINMAN:**  Here are the elements.  I'm not going

16   to go through all of these elements.  Judge Tigar has

17   explained them to you, and you have the packet.

18          I'm going to talk about how the defendant knowingly

19   engaged or attempted to engage in this monetary transaction.

20                    (Demonstrative published.)

21          **MR. KLEINMAN:**  So $2 million come into Pilot Grove.

22   Count Eight.  It's used to pay back 2013 Fund, that money

23   which was used for the collateral account.  That's your first

24   count of money laundering.

25          Count Nine, Pilot Grove's money used to pay back the 2014

1   Fund.

2                    (Demonstrative published.)

3        **MR. KLEINMAN:**  That's your second count of money

4   laundering.

5        Count Ten, goes into Mr. Rothenberg's personal bank

6   account.  $80,000.

7                    (Demonstrative published.)

8        **MR. KLEINMAN:**  And Count Eleven, it's used to pay the

9   mortgage.

10       None of these purposes were outlined.  This is not why

11  Pilot Grove invested $2 million in River Studios in what they

12  thought was the defendant's company.

13       So now we're on to Unity.

14                   (Demonstrative published.)

15       **MR. KLEINMAN:**  Same problem.  He still needed to

16  recoup from spending too much money.

17       One thing that's clear about this case, now we're in July

18  of 2016, is the defendant also never stops spending money.  So

19  in addition to it getting worse and worse and worse, you'll

20  remember, and we'll go into this, after taking out a

21  $4 million loan from Silicon Valley Bank, he goes to the Super

22  Bowl.

23       And the defendant took the stand and said with a straight

24  face that was for business purposes, that was a necessary

25  business purpose.  And he didn't have that money.  That's not

1    credible.

2        And again he's not on trial for being a bad businessman,

3    but he is on trial for what he did and the lies that he told

4    to get investor money when he ran out of it.

5                    (Demonstrative published.)

6        **MR. KLEINMAN:**  So here's the problem.  He still needs

7    money.  Solution:  Defraud investors by taking their money to

8    purchase the untraded stock in Unity Software.

9        It's of particular note, and I just want to pause here for

10   a second, for who he targeted.  We're going to come back to

11   this point, but he targeted his coworker, his friends, his

12   professor, the people who gave him his start and trusted him,

13   and he lied to the investors to obtain a total of

14   $1.35 million.

15                   (Demonstrative published.)

16       **MR. KLEINMAN:**  And it was used for other purposes.

17   Look at these balances in July of 2016.  $4,000 in the

18   Rothenberg Ventures Management Company fund.

19       Fund I, zero.

20                   (Demonstrative published.)

21       **MR. KLEINMAN:**  Fund II zero.

22                   (Demonstrative published.)

23       **MR. KLEINMAN:**  2015 Fund, he'd gotten a $4 million

24   loan.  We saw the balance in December.  It was about

25   $5 million.  Now it's $227,000.

```
 1                     (Demonstrative published.)

 2          MR. KLEINMAN:  The 2016 Fund, zero.

 3      He's out of money again.  He's defrauded Pilot Grove.

 4  He's defrauded Silicon Valley Bank.

 5                     (Demonstrative published.)

 6          MR. KLEINMAN:  And then these wire fraud counts,

 7  they're a little different than Pilot Grove because they also

 8  include both affirmative lies, but also it includes but it's

 9  not limited to omissions, lying by omission, not telling

10  investors.

11                     (Demonstrative published.)

12          MR. KLEINMAN:  Here are the elements.

13      And I'll just note these are the same elements 12 through

14  15, it's going to be the same elements as Counts Sixteen

15  through Twenty-three.  These are the wire fraud counts.

16                     (Demonstrative published.)

17          MR. KLEINMAN:  To convict the defendant of wire

18  fraud, it's based on omissions of material facts, we must find

19  that the defendant had a duty to disclose the omitted facts

20  arising out of a relationship of trust.  And this is

21  important.  That duty can arise either out of a formal

22  fiduciary duty -- but it doesn't need to be, it an "or" -- or

23  an informal trusting relationship.

24                     (Demonstrative published.)

25          MR. KLEINMAN:  Now, here are -- here's the use of
```

 1   13 -- the $1.35 million of outside investor money for the

 2   Unity purpose.

 3       Zero goes to Unity.  We heard that time and time again.

 4              (Demonstrative published.)

 5       **MR. KLEINMAN:**  So Count Twelve, these are the false

 6   statements to GHF.  That was John and Theo Melas-Kyriazis.

 7   That's a $100 million -- excuse me -- a $1 million investment

 8   in July -- on July 15th, 2016.

 9              (Demonstrative published.)

10       **MR. KLEINMAN:**  $1 million comes in, ends up in the

11   operating account, and it's used for all these reasons below,

12   portfolio companies, not Unity, operating and fund

13   expenditures, 156,000 into Mr. Rothenberg's personal bank

14   account, River Studios expenditures.

15       Not in any way, shape, or form for what Mr. Rothenberg

16   said the money was going to be used for.

17              (Demonstrative published.)

18       **MR. KLEINMAN:**  Next count, Count Thirteen.  This is

19   the Binns.  $100,000.  It's on July 19, 2016.

20              (Demonstrative published.)

21       **MR. KLEINMAN:**  Natanael Hudson and the Binns Limited

22   Partnership combined, end up filtered incidentally through the

23   Unity Co-Fund to the operating account, not used to purchase

24   Unity stock, used to handle all those other purposes below,

25   none of which the defendant said that their money was going to

 1    be used for.

 2                    (Demonstrative published.)

 3         **MR. KLEINMAN:**  Fourteen.  $50,000 investment from his

 4    own employee, Ewan Johnson, on July 21st, 2016.

 5        That wire hits.

 6                    (Demonstrative published.)

 7         **MR. KLEINMAN:**  This wire he doesn't move right away.

 8    What just happened around then?  He'd gotten a letter from the

 9    SEC.

10                    (Demonstrative published.)

11         **MR. KLEINMAN:**  That wire hits on July 21st, 2016.

12    But that cash pressure is great.  And he does move it

13    August 1st, 2016.  $150,000 hits that operating account, used

14    for other purposes, not for what Mr. Rothenberg said.

15                    (Demonstrative published.)

16         **MR. KLEINMAN:**  Count Fifteen, misled and false

17    statements -- excuse me -- made to Lena and Ronald Goldberg,

18    $100,000.  That investment hits on July 21st, 2016.

19                    (Demonstrative published.)

20         **MR. KLEINMAN:**  Filtered along with Ewan Johnson and

21    Sonoko Konishi's money into the operating account, then for

22    other purposes, not what Mr. Rothenberg said.

23                    (Demonstrative published.)

24         **MR. KLEINMAN:**  We're going to come back to this

25    concept.  But to be clear, if Mr. Rothenberg provides the

1    PowerPoint, tells Justin Grooms and everybody else what to

2    say, the defendant is responsible for that.

3              (Demonstrative published.)

4         **MR. KLEINMAN:**  It's also important to note because

5    now there's been this concept of, oh, all these people were

6    definitely investing into the 2016 Fund, that's totally

7    untrue.  It's contrary to the evidence that you heard in this

8    case.  Two of these Unity investors unequivocally stated that

9    they had considered and declined to invest in the 2016 Fund.

10             (Demonstrative published.)

11        **MR. KLEINMAN:**  That's Alexa and James Binns.  John

12   and Theo Melas-Kyriazis.

13        It's totally untrue.

14             (Demonstrative published.)

15        **MR. KLEINMAN:**  Now, the investors in the 2015 Fund

16   and the 2016 Fund.

17             (Demonstrative published.)

18        **MR. KLEINMAN:**  Rothenberg was regularly meeting with

19   investors trying to raise money for investments in those

20   funds.

21             (Demonstrative published.)

22        **MR. KLEINMAN:**  Rothenberg consistently lied to them

23   all and failed to tell them important facts about how their

24   money would be used.  And remember this also includes any

25   omissions -- any material omissions.  Excuse me.

1          (Demonstrative published.)

2          **MR. KLEINMAN:**  Rothenberg lied to them about how the

3    money would be used.  This is a simple back and forth.

4    Similar to Unity.  Give us the money, give us your money.  We

5    are going to invest in portfolio companies, VR, frontier tech.

6          And then doesn't do that, uses it for totally different

7    purposes.

8          (Demonstrative published.)

9          **MR. KLEINMAN:**  And he mostly used it to keep River

10   Studios operating.  And that's why we asked over and over

11   again:  Would you have invested if you knew that he was going

12   to move the money to a company that he wholly owned, operated

13   and controlled?

14         No, absolutely not.  There would be no controls.  There

15   would be a conflict.

16         (Demonstrative published.)

17         **MR. KLEINMAN:**  Count Sixteen, wire fraud, Rothenberg

18   misled and made false statements to Michael Antonov.  We've

19   seen this wire come in already.  This is April 6th, 2015.

20         Only 7.2 percent was invested in portfolio companies.  It

21   was used for the operating expenses for River Studios and for

22   his personal bank account.  $376,000 goes into his personal

23   bank account.

24         (Demonstrative published.)

25         **MR. KLEINMAN:**  Count Seventeen.  This is GHF, Theo

1    Melas-Kyriazis, million dollar investment in the 2015 Fund.

2    It's April 28th, 2015.  Less than half was invested in

3    portfolio companies.  Used for the same things that Michael

4    Antonov's money was used for.

5                    (Demonstrative published.)

6              MR. KLEINMAN:  The defendant filtered money through

7    all of these different accounts, which you heard.  You

8    wouldn't expect to see and didn't really make any sense for

9    these types of investment funds.  It should all go to one

10   fund, maybe taken out for the management fees, and then the

11   rest just invested in portfolio companies.  Moving money like

12   this doesn't make any sense.

13                   (Demonstrative published.)

14             MR. KLEINMAN:  Count Eighteen, wire fraud.  You have

15   HTC.  It's a $2 million investment, July 31st, 2015.  Only

16   4 percent was invested in portfolio companies.  The rest used

17   in the same ways that we just went over.

18        Here's the chart.  HTC, the wire hits.

19        I'm just going to pause here for a moment.

20        Look how much money immediately goes to the main operating

21   account.  $1.92 million.  Why would that much money leave the

22   fund and go to the operating account?  There's no question

23   that the defendant intended to deceive these investors.  And

24   only 4 percent is invested.

25        And you saw on the stand Praveen Gupta's reaction.  He was

1    like, "Did you say 4 percent?"

2         Yeah, only 4 percent invested.

3                   (Demonstrative published.)

4         **MR. KLEINMAN:**  Count Nineteen, Dolby Family Ventures.

5    Now we're into the 2016 Fund.  $500,000.

6         None invested in portfolio companies.  Zero.

7         Instead, used for the same purposes that we've gone over.

8                   (Demonstrative published.)

9         **MR. KLEINMAN:**  Zero dollars for portfolio companies.

10   And this is now in 2016.  So now he's well into the scheme to

11   defraud, well into having the need to use new investor money

12   to pay back previous misuse.

13                  (Demonstrative published.)

14        **MR. KLEINMAN:**  Count Twenty-two, wire fraud, Natala

15   Menezes.  She's a 2015 Fund investor, $100,000.

16        I want you to note this date.  I'd ask that you note that

17   December 24th, 2015, when did that wire come in?  Right around

18   the time where he was going to pay for that collateral

19   account.  And that's where the money was used for.

20                  (Demonstrative published.)

21        **MR. KLEINMAN:**  Zero dollars goes to portfolio

22   companies.  It all goes to the collateral account.  He needed

23   to raise $4.25 million to get that loan.

24                  (Demonstrative published.)

25        **MR. KLEINMAN:**  I began to touch on this with Justin

1    Grooms.  But here it is.

2        The defendant may be found guilty of the crimes charged

3    even if the defendant did not personally commit the acts

4    constituting the crime if the defendant willfully caused an

5    act to be done that if directly performed by him would be an

6    offense against the United States.

7        So if you caused the act to be done, that counts.

8                    (Demonstrative published.)

9        **MR. KLEINMAN:**  And obviously if he puts it in motion

10   or causes the commission of an indispensable element of the

11   offense, he may be found guilty as if had committed the

12   element himself.

13           **THE COURT:**  Mr. Kleinman, I'm sorry to trespass on

14   your argument, but this might be a good time for our

15   mid-session stretch break.

16           **MR. KLEINMAN:**  Absolutely, Your Honor.

17                    (Stretch break.)

18           **THE COURT:**  Thank you, Mr. Kleinman.

19           **MR. KLEINMAN:**  Thank you.

20                    (Demonstrative published.)

21        **MR. KLEINMAN:**  And what is this linked to?  The claim

22   that the defendant, when he says, "Oh, well, I never spoke to

23   Natala Menezes," it doesn't matter.

24                    (Demonstrative published.)

25           **MR. KLEINMAN:**  Count Twenty-one, wire fraud.  He

1  defrauded CY Capital.  And again I'd ask you to note when this

2  wire comes in, December 24, 2015, CY Capital, you heard from

3  David Chiu, invested $625,000.

4                    (Demonstrative published.)

5           MR. KLEINMAN:  None of it was invested in portfolio

6  companies.  Mr. Rothenberg lied.  Instead the money was used

7  for the collateral account.

8                    (Demonstrative published.)

9           MR. KLEINMAN:  And here's the analysis.  Zero dollars

10 into the 2016 portfolio companies.

11     2021 -- excuse me.  Count Twenty-two, ARCHina.

12     Now it's a $3 million investment into the 2016 Fund on

13 December 28th, 2015.  They think, like all the investors,

14 investing in portfolio companies.  By now you know what's

15 coming.  Instead about $2.3 million was used as part of the

16 $4.2 million collateral securing the SVB line of credit.  And

17 the remaining 700,000 was used in 2015 Fund portfolio

18 companies.

19                    (Demonstrative published.)

20          MR. KLEINMAN:  Totally not what she had thought she

21 was investing in.  And like all the investors, every single

22 investor said, no, I would not have invested if it was used to

23 go to his personal expenses, to repay other debts, to River

24 Studios, that would be self-dealing.  They all said the same

25 thing.

 1                    (Demonstrative published.)

 2        **MR. KLEINMAN:**  Last one, Korea Investment Partners.

 3   Ms. Levin [sic] made false statements to Korea Investment

 4   Partners to get $1.8 million in the 2016 Fund on July 27,

 5   2016.

 6       None was invested in portfolio companies.  The money was

 7   used to now pay back ARCHina.

 8                    (Demonstrative published.)

 9        **MR. KLEINMAN:**  Korea Investment Partners was

10   unequivocal.  Sangwoo Lee told you, No, I would not have

11   invested this money if it wasn't going to the portfolio

12   companies.  That was the purpose of the venture capital funds.

13   This is clear.

14                    (Demonstrative published.)

15        **MR. KLEINMAN:**  So here's the summary.  This is how

16   much -- you heard Gerry Fujimoto's testimony.  But this is how

17   much went in to these various places.

18       And I'll just note that 20 percent, $1.6 million, went to

19   the defendant's personal bank account.

20                    (Demonstrative published.)

21        **MR. KLEINMAN:**  And the defendant in no way whatsoever

22   disclosed that he was investing the 2015 and 2016 Fund

23   investors' money into River Studios.

24       You saw this time and time again in this trial.

25                    (Demonstrative published.)

1          **MR. KLEINMAN:**  Defense would come up, read a specific

2     section, and it never said what everybody would be at least

3     expecting it to say, which is that "I will be" -- "I will be

4     investing this money into River Studios, a company that I

5     100 percent own."

6          Instead, it said things like this.  "The manager manages

7     Rothenberg Ventures Funds I and Fund II."  But telling

8     investors you have other companies or saying this is in the

9     conflict section is not the same as telling investors you are

10    investing in your own company.  Simply listing conflicts or

11    listing potential competition isn't actually telling them that

12    they've invested.

13                    (Demonstrative published.)

14         **MR. KLEINMAN:**  Let's take a look at this.  Bend

15    Reality.  This paragraph was read time and time again.  Let's

16    go through this:

17         The purpose of Bend Reality is to enhance the manager's

18    branding and positioning.  It makes a couple points here.

19         One, it includes a virtual reality accelerator.

20         Two, and separately I would note, a production studio.

21         And three, other business ventures.

22         Telling investors the River brand includes a production

23    studio is not the same as telling investors the River

24    Accelerator and River Studios are the same thing or that he's

25    investing in River Studios.

 1                    (Demonstrative published.)

 2          **MR. KLEINMAN:**  And here was the general clause that

 3   defense read over and over again.  "The Members, the Manager

 4   and their respective affiliates, may make investments on

 5   behalf of themselves or other funds which they manage."

 6                    (Demonstrative published.)

 7          **MR. KLEINMAN:**  "Some of these investments could be

 8   suitable for the Fund.  However, the Fund will derive no

 9   economic benefit from such investments made by the other

10   parties except to the extent the Fund invests in such

11   investments."

12       Telling investors you may invest in other companies is not

13   the same as telling investors you are investing in your own

14   company.  None of the clauses in any way laid out that the

15   defendant was investing in his other companies.

16                    (Demonstrative published.)

17          **MR. KLEINMAN:**  And here's disclosure, according to

18   Michael Rothenberg, and you were shown this last page of the

19   slide over and over again.  And then defense would

20   specifically read it.  And it never disclosed anything.

21       They would read the section that investing in a venture

22   capital fund is a high risk.

23       But what that meant when they read it was that you're

24   investing in startups so the companies are risky, not that

25   giving your money to Michael Rothenberg is risky because he

1    might take it and use it for his own purposes.  That's not

2    what that paragraph meant.

3         This is not disclosure.  And nothing was disclosed.

4                    (Demonstrative published.)

5         MR. KLEINMAN:  Now, my last section here is that the

6    defendant's behavior shows his intent.  And here, you analyze

7    the defendant's behavior, you analyze the crimes in this case,

8    as you would any other way in your life.  You take all of the

9    evidence together, you analyze it.  It's not just A, it's A

10   and B.  It's not just A and B.  It's A, B, and C.  And you

11   analyze it.  And taken together it unquestionably shows his

12   intent.

13        First, the defendant had total control of the company, but

14   he also compartmentalized people.  That gives you insight into

15   his intent.  David Haase testified that he was not allowed to

16   see the management agreements, the Silicon Valley loan

17   documents.  He was the CFO.  Why would Michael Rothenberg not

18   want David Haase to see the management agreements, the loan

19   documents?

20        And then meetings were scheduled, which he testified to,

21   without important and relevant employees invited, like legal,

22   Brandon Farwell.

23                    (Demonstrative published.)

24        MR. KLEINMAN:  The defendant told David Haase not to

25   share financial information with others.  And he specifically

 1    testified that the defendant told him not to share it with

 2    Brandon Farwell.

 3        Brandon Farwell, who was busy and working hard to raise

 4    the funds, he graduated from Harvard Business School, he would

 5    have spotted this a mile away.  He specifically singled out

 6    Brandon Farwell.

 7        The defendant told Ewan Johnson not to share employment

 8    contracts.

 9                    (Demonstrative published.)

10        MR. KLEINMAN:  Meaning the -- the contracts with

11    either Coldplay or -- or anyone else.

12        All decisions rested with Michael Rothenberg, investments,

13    fundraising, pitch deck dissemination, employee leave, expense

14    approvals.  Michael Rothenberg controlled the bank accounts,

15    the internal financial records, and you saw how those were

16    changed, and communications with everyone outside of RVMC.  He

17    had total control.  It was his company.

18        And here's an example.  David Haase, CFO, here's his

19    employment contract.  This is how he had total control of the

20    spending.

21        Expenses above $200 must be approved in advance, in

22    writing as to the amount and purpose by Mike Rothenberg.

23        No question.  He controlled it.  Control was important.

24    He needed to keep a tight control given the schemes that we

25    just saw.  And he did so.

 1    You see it in the employment contract.  You see it in the

 2  text messages to Tommy Leep.  Tommy Leep is requesting -- this

 3  is in May of 2016 -- full color print on expedited notices,

 4  $1,900.  Approved.

 5    Total control.

 6                    (Demonstrative published.)

 7    **MR. KLEINMAN:**  This is another important aspect of

 8  this case.  The defendant told different lies at different

 9  times.  And when you're telling different lies and you're

10  changing your story, that gives you insight into the

11  defendant's intent.  This wasn't just some sort of

12  miscommunication or some sort of mistake.  Because he changed

13  so frequently.

14                    (Demonstrative published.)

15    **MR. KLEINMAN:**  2015 and '16 Fund investors, tells

16  them there's no investment in River Studios.  Later tells them

17  there's actually a $5 million investment in River Studios.

18    Tells Larry Weisman and Dominic Polizzotto he self-funned

19  River Studios.  Then tells them, "I confused ownership and

20  control."

21    Totally different.

22    He tells Rothenberg Ventures staff he self-funded River

23  Studios.

24                    (Demonstrative published.)

25    **MR. KLEINMAN:**  Here was Ewan Johnson's reaction.

 1        "Q.  Were there reasons why you wanted to resign effective

 2    immediately?

 3        "Yes.  Mike had mis -- in my opinion, Mike had

 4    misrepresented to me the funding of the studio.  When he had

 5    originally hired me, he said that he was funding the studio

 6    entirely from his own personal account.

 7        "When I became aware around this time that he was using

 8    money from Rothenberg Ventures funds, that felt to me like a

 9    breach of fiduciary duty that he wasn't using the funds

10    appropriately."

11        And as I said in the beginning, if you want to know what's

12    happening inside of the company, ask the employees.

13                    (Demonstrative published.)

14        MR. KLEINMAN:  And how did Ewan Johnson describe this

15    difference in what he was first told versus what had actually

16    happened?

17        He gets this email, August 13, 2016.  "The ownership of

18    River Studios...has been entirely the Rothenberg Ventures

19    Funds and Pilot Grove rather than me personally, even though"

20    I thought "I controlled it."

21                    (Demonstrative published.)

22        MR. KLEINMAN:  Ewan Johnson, it's a complete 180.

23    Directly opposite.

24        Different lies, different people shows you his intent.

25    This wasn't a mistake.

1          (Demonstrative published.)

2          **MR. KLEINMAN:**  The defendant also lied to David

3    Haase.  He needed to.  He needed to justify the amount he was

4    taking.

5          (Demonstrative published.)

6          **MR. KLEINMAN:**  This is how Michael Rothenberg

7    explained the Silicon Valley Bank loan to David Haase.

8       "So if we raised money from investors, we could

9    immediately access management fees for the money that had been

10   raised."

11      That's the total opposite of how the 2016 Fund worked.

12   That's also ridiculous, and it's totally incongruent with what

13   Frank Amoroso told you.  You couldn't just immediately access

14   the fees.  That wasn't part of the Silicon Valley Bank loan.

15      But it gets even more extreme.

16      "Q.  Did he tell you anything -- to you about what

17   Silicon Valley Bank required with regard to a salary in that

18   collateral attack?

19      "Yeah.  He told me at one point that he was required to

20   take a salary of a million dollars per year...."

21      That was part of the loan.  That was Silicon Valley Bank

22   required the defendant to take a million dollar -- a million

23   dollar salary a year.  That is totally untrue.  It's

24   unsupported by the evidence in this case.  It is a flat-out

25   lie.

1        And again, you take all of this information together.

2        He plundered his company.

3                    (Demonstrative published.)

4            MR. KLEINMAN:   What was the result of his behavior?

5        We -- David Haase:  "We missed payroll right around the

6    15th of August because Mike had taken the money out of the

7    bank accounts."

8        He just plundered his company.  He took all the money.

9                    (Demonstrative published.)

10           MR. KLEINMAN:   But this wasn't the first time.  And

11   missing payroll also teaches you about the defendant's intent.

12   It put him on notice that what he was doing was wrong, that he

13   was in the -- going in the wrong direction, and he kept on

14   doing it anyway.

15       He took 250 -- this is Lynne McMillan right around the

16   time of the Super Bowl.

17       "He took $250,000 and then could only put back 50,000.  So

18   there was $200,000 missing.  And I wasn't able to make payroll

19   the next day because of it.  And I was very, very upset."

20       It's upsetting.  She's the director of finance.  She feels

21   a responsibility and ownership, and the defendant took it.  He

22   took that money in February of 2016.

23                    (Demonstrative published.)

24           MR. KLEINMAN:   And who did he leave to kind of pick

25   up the pieces?  Lynne McMillan.  She withheld her own payroll

1    so others could be paid.

2        That gives you insight into the defendant's intent.  He

3    knew what he was doing.

4                    (Demonstrative published.)

5        **MR. KLEINMAN:**  Wasn't the only person who said that.

6        Here's Ewan Johnson.  "The week after the Super Bowl,

7    payroll was not made."

8        What did Mike say about that?

9        "He said there was something around moving money between

10   bank accounts."

11       Totally dishonest as to why payroll was missed.  The

12   defendant just lied.  He lied to his own employees.  And he

13   lied to his investors.  And he lied to Silicon Valley Bank.

14                   (Demonstrative published.)

15       **MR. KLEINMAN:**  Here's the defendant's text.  This is

16   June 2015.  He's sort of co-opting the -- the title.  I think

17   that's fair to say that he didn't -- he didn't write this

18   title himself.  But it shows you the blurred line here between

19   business and partying.

20       "I do what I love.  Business feels like a party to me.  In

21   that sense, I want to be Silicon Valley's party animal."

22       And here it is.

23                   (Demonstrative published.)

24       **MR. KLEINMAN:**  He absolutely unequivocally did not

25   have this money.  He didn't have the money because Lynne

1    McMillan told him.  And he had just taken out a $4 million

2    loan to make the books look okay for those K-1's just a few

3    months before this.  He was absolutely on notice for his

4    actions.

5                   (Demonstrative published.)

6         **MR. KLEINMAN:**  And he continued to misuse investor

7    money.  That wasn't the only time.  The defendant went on

8    vacation with Unity investor money.

9         Here's Special Agent Charles Wescott.

10        "What was your back-of-the-envelope calculation for the

11   total" for the airline and everything else?

12        For the Cabo San Lucas charges, for American Express, you

13   remember when Charles Wescott walked you through all those

14   bank accounts.  Those were longer days, but it was important

15   because it shows you where the money went.

16        Charles Wescott:  "Approximately $35,000."

17        This is in July of 2016.

18                   (Demonstrative published.)

19        **MR. KLEINMAN:**  Here it is, July of 2016.  Here's the

20   main operating account ending in 8931.

21        Look at the beginning balance.  There's $17,000 in July.

22   Then those million dollar -- $1.3 million wires hit.

23        He takes out $200,000, puts it into his own personal

24   account and uses some of that money to pay off the American

25   Express bill for that Cabo San Lucas vacation for his

1    executive assistant, ten of her friends, the defendant's

2    girlfriend, the defendant, and the defendant's girlfriend's

3    sister.

4                    (Demonstrative published.)

5         **MR. KLEINMAN:**  The defendant plundered his company.

6    Here -- here's Special Agent Wescott.

7    "Where did it come from?

8    "It looks like the originator for the deposit was

9    Rothenberg Ventures... I take that to mean Management

10   Company -- with account ending 8931.

11   "Was there another $200,000 transfer?

12   "Yes.

13   "When was that?

14   "July 21st.  July 1st of 2016.

15   "Without the second $200,000 deposit from Rothenberg

16   Ventures Management Company, could this transaction have been

17   done?  In other words -- in other words would there have been

18   sufficient funds in the account?"

19   This is talking about paying off that American Express

20   account.

21   "No."

22                    (Demonstrative published.)

23        **MR. KLEINMAN:**  The defendant's concern about the

24   recordings also show and give you insight into his guilt.

25   When the SEC letter hits, he moves his office to his

1    condominium.  He meets outside, not just with Justin Grooms,

2    but with David Haase as well.  He patted down Justin Grooms.

3    And he has a secretive meeting with Tommy Leep.

4        It's not just that all of this testimony corroborates and

5    confirms what happened, but you also have a text message from

6    Tommy Leep.  And what does the defendant say?

7        Here's Tommy Leep.  "Let's do 6.  How about we figure out

8    a location as we get closer?"

9        Michael Rothenberg:  "Cool."

10    Tommy Leep:  "We could try a new spot."

11    Mike Rothenberg:  "Yeah, one with fewer ears."

12                        (Demonstrative published.)

13        **MR. KLEINMAN:**  "Q.  Did the defendant ever tell you

14    that he was borrowing money -- that the Management Company was

15    borrowing money from the funds?"

16    Brandon Farwell:  "No, he never told me that."

17    "Why would it be alarming?"

18    Brandon Farwell:  "Because the money is not owed -- or

19    allowed to be taken by the Management Company.  It is used --

20    it should be used for the two purposes we already discussed,

21    which would be to send it back to the investors or to be

22    reused as subsequent investments out of the fund, not into the

23    Management Company."

24        That statement stands in stark contrast with the testimony

25    that you heard when the defendant took the stand.  He was like

1    all of a sudden it's not the investors' money.

2                  (Demonstrative published.)

3         **MR. KLEINMAN:**  "If you had learned that at this

4    time" -- this is a follow-on -- "what would have been your

5    reaction?"

6         Brandon Farwell:  "Surprise, frustration, alarm bells.  If

7    we had an LP advisory committee, I would have gone to them and

8    said this is -- something's wrong here, check this.  Unusual."

9                  (Demonstrative published.)

10        **MR. KLEINMAN:**  The disclosures in this case when the

11   defendant finally comes clean is also important, also gives

12   you insight into his intent.  Here's the -- here's the first

13   LP letter.  He only informed investors about his self-dealing

14   after the SEC letter.

15                  (Demonstrative published.)

16        **MR. KLEINMAN:**  Let's just take a look at this list.

17   The defendant says the purpose of this letter is to address

18   the first three questions.  Well, what are the questions?

19   Where's the money?  Is management considering changing or

20   adding managers?  Will there be an LP meeting?

21        And then the actual questions that people want to know.

22   How accurate is the *TechCrunch* article?  Is there an SEC

23   investigation?  What is being done to safeguard our

24   investment?  What is the current state of the company's

25   finances?  Contact information for the fund's accountants and

1  legal advisors?

2      What does he address?  Will there be an LP meeting?

3      He's not ready to speak to the LPs.  That gives you

4  insight into his intent.

5                  (Demonstrative published.)

6      **MR. KLEINMAN:**  He also attempted to conceal or

7  destroy evidence.  Bought *Bloomberg* magazines off the shelves.

8  That shows you his intent.  He doesn't want people to read

9  about this analysis about the events and everything like that.

10     But also he wipes Ewan Johnson's phone.  Ewan Johnson said

11 that he had to download this software onto his personal phone,

12 and then there was that remote reset.

13     And what did the defendant send right before that remote

14 reset occurred?  This picture.  Leonardo DiCaprio in *The Great*

15 *Gatsby*.  This was right after the article came out that Ewan

16 Johnson recalls being the downfall of the virtual Gatsby.

17     Which is very similar to what he asked of Justin Grooms.

18 Justin Grooms said absolutely not, but he asked Justin Grooms

19 to purchase external hard drives so the computers could be

20 destroyed.

21     Ewan Johnson had a very similar experience really with

22 Justin Grooms.  But also changing the 2015 corporate books.

23                  (Demonstrative published.)

24     **MR. KLEINMAN:**  And here it is.  Modifications to the

25 2015 Fund.  It goes from "Professional Fees" to "Portfolio

1   Investment, 'Name' River Studios" to just "Investment-River

2   Studios."  He changed the books after to try and cover his

3   tracks.

4                    (Demonstrative published.)

5           **MR. KLEINMAN:**  And this was not the first time that

6   we heard about that in this case.

7       He asked Tommy Leep to sign a document regarding Tommy

8   Leep's partnership.

9                    (Demonstrative published.)

10          **MR. KLEINMAN:**  He tried to sneak in and ask Larry

11  Weisman to sign that promissory note.  Didn't include Dominic

12  Polizzotto.  Didn't include the attorney.  Just Larry Weisman

13  on August 10th of 2016.

14      And you heard from Larry Weisman and Justin Grooms, they

15  both said, "I don't know who that person is."  The defendant

16  asked them to do it.

17                   (Demonstrative published.)

18          **MR. KLEINMAN:**  Here it is.

19      "I've attached for Pilot Grove's consideration and

20  signature an Amendment to Convertible Note and Side Letter...

21  return these documents quickly."

22                   (Demonstrative published.)

23          **MR. KLEINMAN:**  And here it is.  A total shift.

24      At first Mike Rothenberg holds 100 percent of the equity

25  interest in the company.  Now, it's "Entities controlled by

 1    Mike Rothenberg or entities controlled by such entities

 2    collectively hold 100 percent of the equity interests of the

 3    company."

 4       He tried to get the defendant to quickly -- the defendant

 5    tried to get Larry Weisman to quickly sign this document.

 6       And by the way, this is the same thing that we saw, now

 7    it's Tommy Leep, Larry Weisman, James Binns testified about

 8    the same thing.  He tried to get James Binns to sign that

 9    document, that he was somehow an investor in the 2016 Fund.

10    Totally untrue.

11               (Demonstrative published.)

12       **MR. KLEINMAN:**  He also took steps to conceal the

13    truth.  When Lynne, after she saw that he took that $175,000,

14    she was like, this is wrong, you can't do this.  And she spoke

15    out.  Here's the text.

16       "Lynne told Fran something that upset Fran.  I'm trying to

17    figure it out.

18       "We will have to terminate Lynne immediately.  I'll fill

19    you in."

20               (Demonstrative published.)

21       **MR. KLEINMAN:**  Here it is.  So that was same day,

22    February 11, 2016.

23       Mike Rothenberg:  Please cut off Lynne's access to

24    email/gmail and everything else ASAP while she's on paid

25    leave.  She hasn't formally quit yet, but her behavior doesn't

1    warrant access in the interim.  Please confirm when done."

2        He's trying to contain, control, and conceal.

3                    (Demonstrative published.)

4        **MR. KLEINMAN:**  Now later that day.  "James and Neal

5    are fully in the loop.  Your dad is too but not very

6    supportive.

7        "Yes, containment is everything."

8        The defendant knew what he was doing.

9                    (Demonstrative published.)

10        **MR. KLEINMAN:**  Now, Mike Rothenberg goes on to say

11    the next day:  "I wish your dad would stop alarming people."

12        How does he handle it?

13        "I don't see how I can have him work here anymore.  One

14    event like this isn't worth a hundred good ones."

15        Same treatment.

16        The defendant also was specific with that Unity investment

17    in terms of who he targeted.  He targeted people who trusted

18    him, who he had the relationship with.

19        Here's Justin Grooms on who John and Theo Melas-Kyriazis

20    were:  "It was a father and son.  They were friendly investors

21    with a good relationship and a high degree of liquidity."

22        They had to be friendly, they had to have a good

23    relationship, and they had to have that liquidity.

24                    (Demonstrative published.)

25        **MR. KLEINMAN:**  The defendant also stalled.  His

1   actions over time show you his intent.  What he told -- how he

2   told Justin Grooms to handle and respond to investors shows

3   you his intent.

4                    (Demonstrative published.)

5          **MR. KLEINMAN:**  And he left his own employees to take

6   the heat.

7       Justin Grooms said:  I was put in this position where I

8   was telling them these things and they would -- they would get

9   frustrated and then it shifted and they didn't trust me and

10  they thought that I was misleading them.

11      He didn't even address it directly.

12                   (Demonstrative published.)

13         **MR. KLEINMAN:**  So the defendant first slow rolls and

14  then he lies to the investors.

15      It's perfectly laid out in Theo Melas-Kyriazis' email:

16  GHF's 1 million in funds that had been explicitly wired for

17  the Unity investment.  He just learned had instead been

18  invested in the Rothenberg 2016 Fund.  They had unequivocally

19  said I do not want to be part of that fund.  And why?  We

20  heard this from many investors.  Because they couldn't get any

21  updates.  It was a black box.

22      That gives you insight into the defendant's intent.  He

23  says this is shocking news, a breach of trust and

24  misappropriation.  You were evasive.  Refused to communicate

25  to us the whereabouts of GHF's $1 million.

1    Not only did the money leave that account right away, we

2    saw that, but the defendant refused to communicate.  That

3    shows you his intent, that he was evasive.  And it was

4    shocking.  It was a breach of trust.

5              (Demonstrative published.)

6         **MR. KLEINMAN:**  There were also Rothenberg's own

7    admissions.

8         Here's Tommy Leep.  This is when they -- they met in

9    that -- on that park bench.

10        "He was concerned he had done something wrong and that he

11   might get in trouble.  He might have used the phrase that he

12   had done something illegal and was scared about the

13   ramifications."

14        But that wasn't it to Justin Grooms:  "Sometimes you --

15   you at least have to bend the rules, and that the system that

16   was in place didn't accommodate for the type of, you know,

17   visionary investment and startup development that he was --

18   that he was trying to do."

19        The defendant's own email to himself.

20              (Demonstrative published.)

21        **MR. KLEINMAN:**  He was using that app Toodaloo with

22   that to-do list.  And perhaps this is an email from that app.

23   Either way you saw this email:  Budgeting, use 2015 Fund as a

24   piggy bank?

25        It's an email to himself.  And that's exactly what he did.

1    Then to Brandon Farwell.  Brandon Farwell is trying to get

2    an update.  John and Theo Melas-Kyriazis are -- are his

3    friends.  Mike flippantly says, "It looks like the

4    Melas-Kyriazis now have an investment in the 2016 Fund."

5                    (Demonstrative published.)

6        MR. KLEINMAN:  And here's critical testimony from

7    Ewan Johnson.  The defendant admitted to lying to his

8    investors.

9                    (Demonstrative published.)

10       MR. KLEINMAN:  "[O]ur studio in LA.  On a car trip

11   from that studio to a dinner, he said to me that he had used

12   some funds from the Rothenberg Ventures Funds for the studio

13   and that while it wasn't strictly spelled out in the funds

14   that he was allowed to do it because he was the general

15   partner...and he indicated to me that the LPs were not aware

16   it was done."

17       When that SEC letter hits, he starts to confess.  He

18   starts to tell people.  Ewan Johnson, Brandon Farwell, Tommy

19   Leep, Justin Grooms, the email to himself.

20                    (Demonstrative published.)

21       MR. KLEINMAN:  Justin Grooms directly confronts him.

22       And what did Michael Rothenberg say to that?  That the

23   money had been spent and that it wasn't available immediately

24   to return to these investors but that there were going to be

25   other resources coming in the future and he could make it

 1    right.  He could make it right meaning he knew he did

 2    something wrong.

 3        But here's the situation in this case.

 4                (Demonstrative published.)

 5        MR. KLEINMAN:  We know what those other resources

 6    were.  That was the money from the Robinhood exit.

 7        He didn't even give the investors their returns.  What's

 8    the point of saying you have great investments, they're so

 9    good at this, and you don't even give your investors the

10    returns?

11                (Demonstrative published.)

12        MR. KLEINMAN:  Question.

13        "Q.  As a limited partner in the 2013 Fund, did you

14    receive any of this money from the 2017 sale of...Robinhood

15    stock?"

16        Alexa Binns:  No.

17        Same questions to Jim Binns:  No.

18        Same question to Brandon Farwell:  No.

19                (Demonstrative published.)

20        MR. KLEINMAN:  Here's Special Agent Charles Wescott:

21    What was the purpose?

22        "It was to show that the flow of the Robinhood exit money

23    and how it was ultimately paid to GHF."

24        Because at that point, with the SEC letter there's not new

25    investments, but he's still in that cycle.  So he doesn't even

 1    give his investors in that first fund, his professors, his

 2    friends, he doesn't given them their money.

 3                    (Demonstrative published.)

 4            MR. KLEINMAN:  And these are who trusted him and this

 5    is that Robinhood sale.

 6                    (Demonstrative published.)

 7            MR. KLEINMAN:  And he never stopped spending.  2015,

 8    2016.  From January 2015 to March of 2016, this is just shy of

 9    $2 million.  For River Racing at $600,000.

10        But you also saw how he handled it.  He continued to

11    manipulate, continued to lie, even internally, which gives you

12    insight into his intent.

13        "Net $1.4 million loss, should be capitalized as a

14    $1.4 million loan."

15                    (Demonstrative published.)

16            MR. KLEINMAN:  Here's 2015.  Total expenses,

17    $8 million.  What's the result?  $5.8 million loss.

18        This is from David Haase.  And it's a loss across the

19    board.  2,900,000.  $3 million loss at River Studios.

20        Okay.  Look at the salary.  $1.2 million for the

21    management and $1.3 million for River Studios.

22        The spending never stops.

23                    (Demonstrative published.)

24            MR. KLEINMAN:  So then the first quarter of 2016,

25    okay, there's some income.  $151,000.  Okay.

1          Well, that's -- that's income.

2          Those are the expenses, over $2 million.  Another above

3    2 million dollar loss in the next quarter.

4                    (Demonstrative published.)

5          **MR. KLEINMAN:**  And as we saw time and time again, the

6    defendant wired money to cover prior misuse.

7          This was the scheme.  This was the cycle.

8                    (Demonstrative published.)

9          **MR. KLEINMAN:**  In this email from Michael Rothenberg

10   on July 27th of 2016.  Immediate wires $2 million to ARCHina

11   from the 2016 Fund.  $20,000 to ARCHina from the Management

12   Company.  He needs to pay back ARCHina.

13         $47,000 from the Management Company to now Rothenberg

14   Ventures 2014 Fund.  Paying back 2013 Fund.  You see the cycle

15   in the defendant's own email.

16         And what does he have to hold?  Not only the payment to

17   ARCHina, but he can't even invest in the portfolio companies

18   because he's misused the money so badly.  And he's lied and

19   he's deceived.  And he's the middle of this scheme.

20                    (Demonstrative published.)

21         **MR. KLEINMAN:**  And this is the result.  This is the

22   end result.  When everything is settled, what is the

23   unexplained difference that Gerry Fujimoto told you?

24   $18 million unexplained difference.

25         I ask that you take all of the evidence that has been

1    shown to you and you find the defendant guilty.

2        Thank you.

3            **THE COURT:**  Thank you, Mr. Kleinman.

4        Members of the jury, it's just about exactly 1:30 so we're

5    going to stop for today.  You'll get the case tomorrow.  I

6    don't know exactly when, but you obviously will get it

7    tomorrow and you will be able to begin your deliberations.

8        The first thing you'll do is to select a foreperson.  The

9    second thing you'll do -- well, the second thing you might do

10    is eat lunch depending on what time it is because now we're

11    actually allowed to feed you.  So you're going to get lunch

12    tomorrow.

13        Anyway anything you will do fairly quickly after convening

14    as a jury is you'll send out a note signed by your foreperson

15    indicating what your schedule will be.  As I told you, you

16    should continue to arrive by 8:30, but you can stay later than

17    1:30 if you want to and you're able to, if everyone in your

18    group is able to and you feel that that will speed up your

19    ability to arrive at a verdict.

20        Our court security staff requires anybody who's not

21    working here to be out of the building by 4:30.  So that would

22    be a cap on what time you could stay if you wanted to.

23        But I want to emphasize I'm not asking you to do anything.

24    I am very grateful for your service thus far.  And if you want

25    to keep coming in 8:30 to 1:30, that's certainly your right.

1    This is just an additional option that you have.  And I just

2    wanted to allow you to start thinking about it.

3       So thanks again for your hard work and close attention.

4    And I will see you tomorrow morning at 8:30.

5            **THE CLERK:**  Please rise for the jury.

6       (The following proceedings were heard out of the presence

7    of the jury:)

8            **THE COURT:**  All right.  Mr. Kleinman, anything for

9    the record?

10           **MR. KLEINMAN:**  No, Your Honor.  Thank you.

11           **THE COURT:**  Mr. Fakhoury, anything for the record?

12           **MR. FAKHOURY:**  No, Your Honor.  Thank you.

13           **THE COURT:**  All right.  Thanks.  Let's be in recess.

14           **THE CLERK:**  Court is in recess.

15           (Proceedings were concluded at 1:31 P.M.)

16                         --o0o--

17

18

19

20

21

22

23

24

25

1

2
## CERTIFICATE OF REPORTER

3

4
     I certify that the foregoing is a correct transcript

5
from the record of proceedings in the above-entitled matter.

6
I further certify that I am neither counsel for, related to,

7
nor employed by any of the parties to the action in which this

8
hearing was taken, and further that I am not financially nor

9
otherwise interested in the outcome of the action.

10

11
_____

12
    Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13
       Monday, November 13, 2023

14

15

16

17

18

19

20

21

22

23

24

25