UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**ORIGINAL**

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 24** |
| | ) | |
| vs. | ) | NO. CR 20-00266JST |
| | ) | |
| MICHAEL BRENT ROTHENBERG, | ) | **Pages 4450 - 4555** |
| a/k/a MIKE ROTHENBERG, | ) | |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, November 14, 2023 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiff:          THOMAS A. COLTHURST, ESQ.
                        Attorney for the United States
                        Acting under Authority conferred by
                        28 USC §515
                        1301 Clay Street, Suite 340S
                        Oakland, California  94612
                   BY:  BENJAMIN K. KLEINMAN,
                        KYLE F. WALDINGER,
                        NICHOLAS J. WALSH,
                        ASSISTANT UNITED STATES ATTORNEYS


For Defendant:          MOEEL LAH FAKHOURY LLP
                        1300 Clay Street, Suite 600
                        Oakland, California  94612
                   BY:  HANNI M. FAKHOURY, ATTORNEY AT LAW

                        Law Office of Nathaniel J. Torres
                        338 Fillmore Street #4
                        San Francisco, California  94117
                   BY:  NATHANIEL J. TORRES, ATTORNEY AT LAW


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**I N D E X**

|                                              | PAGE | VOL. |
| -------------------------------------------- | ---- | ---- |
| CLOSING ARGUMENT BY MR. FAKHOURY             | 4457 | 24   |
| REBUTTAL CLOSING ARGUMENT BY MR. WALDINGER   | 4514 | 24   |

--o0o--

```
 1   Tuesday, November 14, 2023                         8:06 a.m.
 2                       P R O C E E D I N G S
 3                           --o0o--
 4       (The following proceedings were heard out of the presence
 5   of the jury:)
 6           THE CLERK:  Your Honor, now calling criminal matter
 7   20-266, United States v. Michael Brent Rothenberg.
 8       If counsel could please state their appearances for the
 9   record, starting with the government.
10           MR. WALSH:  Good morning, Your Honor.  Nicholas
11   Walsh, Benjamin Kleinman, Kyle Waldinger, for the government,
12   along with Special Agent Anthony Ghio and Beth Margen at
13   counsel table.
14           THE COURT:  Good morning.
15           MR. FAKHOURY:  Good morning, Your Honor.  Hanni
16   Fakhoury and Nate Torres for Mr. Rothenberg who's present,
17   Your Honor.
18           THE COURT:  Good morning.
19       What's on your mind?
20           MR. WALSH:  Your Honor, I'm confident Your Honor is
21   aware of the situation last night here at the federal
22   building.  And the government would like to make a clear
23   record about the state of the courthouse with regard to the
24   access to the public.
25       It is the government's understanding that while the
```

 1    federal building, the two towers that are adjoining our

 2    courthouse, are closed to the public today, the courthouse

 3    remains open to any and all individuals who wish to attend

 4    court.

 5        Your Honor, I have an email, which I've already showed to

 6    Mr. Fakhoury, that I wonder if Your Honor might take into --

 7    not as an exhibit in this case but as a document relevant to

 8    this case -- shouldn't go to the jury of course -- that states

 9    unequivocally that the courthouse will remain open to the

10    public at this time, the last sentence of that email.

11        Additionally, Your Honor, I just want to make clear that

12    members of the public have already made it into the courtroom

13    and that accordingly that this is an open proceeding before

14    the court, open to the public, and that we would be able to

15    proceed under those circumstances, Your Honor.

16            **THE COURT:**  Thanks.  Let me read the email.

17                (Pause in the proceedings.)

18            **THE COURT:**  The document that Mr. Walsh handed me

19    appears on its face to be an email from someone at the

20    Internal Revenue Service named Leon Wells.  Mr. Wells

21    identifies himself as the facility security committee

22    designated official for the Ronald V. Dellums Federal

23    Building.

24        And in the email he indicates that he is exercising his

25    discretionary authority to restrict access to the building due

1    to the possibility of further civil disturbances occurring.

2        The events that Mr. Walsh referred to are as follows:  At

3    more or less 4:00 p.m. yesterday afternoon, a large group of

4    protestors, fewer than a thousand but numbering in the

5    hundreds, gained access to the federal building complex,

6    initially by going into the rotunda which separates the two

7    federal buildings, and then breaching security in the other

8    tower that doesn't contain the court, which I think is the

9    south tower but I'm not sure about that.  Anyway.  And then

10   eventually making their way into this tower where the court is

11   located.  But by that time, all the people in this tower had

12   been evacuated by the marshal's service.  And we all locked

13   our doors and my understanding is essentially nothing

14   happened.

15       Eventually, the protestors were cleared by a combination

16   of the Federal Protective Service and the Oakland Police

17   Department.  I'm understanding that this was an act of civil

18   disobedience.  I've not heard reports of any damage.  The

19   protesters knew they were going to be arrested, and they were

20   arrested and they were escorted from the building.

21       So there's no surprise to me in reading this email from

22   Mr. Wells.  But he does state quite clearly in paragraph 3 of

23   his email, "The courthouse will remain open to the public at

24   this time.  Mail and deliveries will continue as usual."

25       And I can see two members of the public in attendance at

```
 1   this proceeding currently.
 2       So I don't have any reason to believe that public access
 3   to this trial has been eliminated or substantially diminished.
 4       Mr. Fakhoury, do you want to make a record?
 5           MR. FAKHOURY:  No, Your Honor.  Thank you.
 6           THE COURT:  I'm going to ask that this email that
 7   Mr. Walsh handed me be made an exhibit to this morning's
 8   hearing and become part of the official record of the trial,
 9   although as Mr. Walsh indicated there's no reason for it to go
10   to the jury.
11           THE CLERK:  Yes, sir.
12           THE COURT:  Nor do I feel -- well, I probably will
13   say something to the jury just because it's weird.  They're
14   coming into the building and the circumstances are different
15   than they normally are, and I think I would just like to
16   assure -- reassure them that there are no on -- there's no
17   ongoing disturbance, that there was a peaceful protest
18   yesterday, that the protestors are no longer here and that
19   they shouldn't pay any mind to that, there's nothing to worry
20   about.
21       So other matters for the Court's attention this morning?
22           MR. WALSH:  I do not believe so, not from the
23   government, Your Honor.
24           MR. FAKHOURY:  No other matters.
25       On -- on the point about informing the jury, I think
```

1    that's fine.  And I think the Court was going to do this

2    anyway, but just to make clear, I would ask that the jurors be

3    informed, you know, that civil disobedience or protest has

4    nothing to do with the trial.  It's pertaining to --

5            **THE COURT:**  Oh, it hadn't even crossed my mind, but

6    it's not a bad point.

7        Mr. Walsh, any comment?

8            **MR. WALSH:**  No.  I think that's totally appropriate.

9            **THE COURT:**  Okay.

10       Gentlemen, anything further?

11           **MR. WALSH:**  Not from the government, Your Honor.

12           **MR. FAKHOURY:**  No, Your Honor.  Thank you.

13           **THE COURT:**  All right.  Very good.  Thank you.

14           **THE CLERK:**  Court is in recess.

15       (Recess taken at 8:12 A.M.; proceedings resumed at

16   8:38 A.M.)

17       (The following proceedings were heard in the presence of

18   the jury:)

19           **THE CLERK:**  Please be seated.

20           **THE COURT:**  Good morning.

21           **JURORS:**  Good morning.

22           **THE COURT:**  The jurors are in their assigned seats.

23       The parties and counsel are at counsel table.

24       Members of the jury, you may have noticed as you came in

25   we have some extra security precautions and access to some

```
 1    other parts of the federal building complex are restricted.

 2        Obviously that has nothing to do with this trial

 3    whatsoever.  Yesterday afternoon at about 4:00 o'clock, a

 4    large group of protestors entered the rotunda in between the

 5    two federal buildings and occupied portions of both the north

 6    and south towers for a few hours.  And hung some banners and

 7    did some other things.

 8        It was peaceful civil disobedience.  They didn't damage

 9    anything.  And after a few hours, the Oakland Police

10    Department and the Federal Protective Service were successful

11    in removing them from the building.  So that's what that is.

12    I didn't want you to be alarmed.

13        The courthouse -- although parts of the federal complex

14    are closed today, the courthouse itself remains open to the

15    public and we're doing our business as usual.  So don't pay

16    that any mind.

17        Mr. Fakhoury, would the defendant like to make a closing

18    argument this morning?

19            MR. FAKHOURY:  Yes, Your Honor.  Thank you.

20            THE COURT:  All right.  Thank you.  You have the

21    floor.

22            MR. FAKHOURY:  Thank you, Your Honor.

23                (Pause in the proceedings.)

24                    CLOSING ARGUMENT

25            MR. FAKHOURY:  For the last seven weeks, the federal
```

1    government has tried to turn a business dispute into a

2    criminal case.  It has tried to turn a contract dispute

3    between sophisticated parties and their lawyers into a crime

4    with all the serious consequences to Mr. Rothenberg that flow

5    from that decision.

6        For the last seven weeks, the federal government has tried

7    to turn investors who knew the risks with investing in a

8    startup, and of all the things that Rothenberg Ventures was,

9    it was most of all a startup, investors who, through their

10   wealth and their experience, felt comfortable and could afford

11   to invest, the government has tried to turn these investors

12   into crime victims with the theory that even though they made

13   money from their investments and they may continue to make

14   money from their investments in the future, that it's a crime

15   investors didn't make more money.

16       For seven weeks, the government has tried to turn a

17   legitimate business into a Ponzi scheme to claim that

18   $18 million worth of expenses is somehow missing.

19       But make no mistake, ladies and gentlemen, Rothenberg

20   Ventures was a legitimate business.  But it was a young one.

21   It was a startup.  It was a baby business.  And in 2015, like

22   a lot of young businesses, Rothenberg Ventures was going

23   through growing pains.

24       I started giving my kids an allowance this year.  My kids

25   are ten and eight.  And they get $5 a week.  I want them to

1    learn how to use their money wisely, to budget, to save, to be

2    smart with their money.  But my eight-year-old son, he loves

3    basketball cards.

4              **MR. KLEINMAN:**  Objection, Your Honor.

5              **THE COURT:**  I'll allow it.

6              **MR. FAKHOURY:**  And my ten-year-old daughter loves

7    quirky earrings.

8         Part of growing up is learning how to plan and manage your

9    finances.  And that's exactly what's going on here.

10        Now I know at first glance, you may be skeptical of that

11   analogy.  Mr. Rothenberg is not ten years old.  He's a

12   Stanford and Harvard alumni.  We're not talking about

13   basketball cards or earrings.  We're talking about millions of

14   dollars.

15        But just because Mr. Rothenberg went to prestigious

16   universities, was a math Olympian, was good at picking

17   investments didn't mean he had completely figured out how to

18   run a company or manage a business.  They don't really teach

19   that in business school.  You have to go and do it in the real

20   world, maybe even struggle a little bit before you finally

21   figure it out.

22        Mr. Levensohn from Dolby Family Ventures testified early

23   in the trial that he learned everything about investing

24   running his first fund.  And that's exactly what

25   Mr. Rothenberg was doing.  He was running his first fund and

1    he was learning how to do it.

2         Lots of people and lots of businesses get on a treadmill

3    of debt, as Mr. Walsh described it in opening statement.  The

4    government's theory in this case turns all those people and

5    the steps they take to get off that treadmill of debt into

6    fraudsters and criminals.

7         Now, the government is wrong.  It's not a crime to spend

8    too much money.  It's not a crime for people to interpret

9    contracts differently.  And it's not a crime to have business

10   disagreements.

11        The business dispute the government's brought you is not a

12   crime.  And so the only verdict in this case is that

13   Mr. Rothenberg is not guilty of all counts.

14        Before we dive into the details, I wanted to talk a little

15   bit about the concept of reasonable doubt.  It's the highest

16   standard in our legal system for a good reason.  Because even

17   though this sure looks like a civil business dispute, we're

18   here in a criminal jury trial.

19        This is not a lawsuit between Silicon Valley Bank and

20   Mr. Rothenberg.  This isn't a lawsuit between Pilot Grove and

21   Mr. Rothenberg.  And it's not a lawsuit between investors and

22   Mr. Rothenberg.  This is a criminal case brought by the

23   federal government against Mr. Rothenberg.

24        And our Constitution recognizes that there's a power

25   imbalance when the government prosecutes an individual.  So it

 1    places the burden of proof as to each and every element on

 2    each and every count on the government.  It doesn't just bear

 3    the burden of proof.  It bears the burden of proving

 4    Mr. Rothenberg's guilt beyond a reasonable doubt.

 5       The fact that Mr. Rothenberg gave up his right to remain

 6    silent and went up and took the witness stand and was

 7    cross-examined doesn't change that.  The burden continues to

 8    stay on the government to prove each and every element of each

 9    and every count beyond a reasonable doubt.

10       So what does reasonable doubt mean?  We hear this phrase a

11    lot.  Maybe you've heard it on TV.  You've heard it throughout

12    this trial.  What does that mean?

13                    (Demonstrative published.)

14       **MR. FAKHOURY:**  This comes out of the jury

15    instructions that Judge Tigar gave you yesterday and that you

16    have the packet in front -- with you.

17       Reasonable doubt is proof that leaves you firmly convinced

18    that Mr. Rothenberg is guilty.

19                    (Demonstrative published.)

20       **MR. FAKHOURY:**  And it's doubt based upon reason and

21    common sense and not purely on speculation.  And it may arise

22    from a careful and impartial consideration of all the evidence

23    or from the lack of evidence.

24       You don't -- you don't check your common sense and reason

25    when you came into this courtroom to be jurors.  And I know it

```
 1    is inconvenient to serve as a juror.  And frankly, this case

 2    has required you to go above and beyond the average juror

 3    because of how long this trial has been.

 4        And on behalf of --

 5            THE COURT:  Members of the jury -- hold on a second.

 6        I know we have the rules that we have, but I have a juror

 7    who's coughing.

 8        Ms. Lee, would you bring the juror some water, please?

 9            A JUROR:  Sorry about that.

10            THE COURT:  Apologize for the interruption,

11    Mr. Fakhoury.

12            MR. FAKHOURY:  No problem at all.

13            A JUROR:  Thank you.  I did not mean to interrupt

14    you.

15            MR. FAKHOURY:  It's no problem.

16            A JUROR:  Thanks.

17            THE COURT:  Mr. Stocker, we do all the things we do,

18    but eventually our bodies take charge so....

19            A JUROR:  Thank you.

20            THE COURT:  All right.  Mr. Fakhoury, go ahead.

21            MR. FAKHOURY:  Thank you, Your Honor.

22        On behalf of Mr. Rothenberg, Mr. Torres and myself, I want

23    to thank you for your service, for your sacrifice, for coming

24    here on time for seven weeks, sitting through some dry

25    testimony, dealing with a fire drill.
```

1       But now it's decision time, time for you to process all

2   that evidence we've heard, all that testimony, and apply it to

3   those packet of jury instructions that Judge Tigar read to you

4   yesterday.

5       As Judge Tigar said during jury selection back on

6   October 2nd and 3rd, I don't think anyone in this courtroom,

7   litigants, Mr. Rothenberg, the attorneys, we don't want jurors

8   who don't have something better to do with their time.

9       You were chosen by the parties here because of your life

10  experiences, because of your opinions, because of your ability

11  to be fair and impartial, to keep an open mind, to carefully

12  consider and scrutinize everything you've heard in this

13  courtroom, and to scrutinize and consider everything you

14  didn't hear in the courtroom.

15      Like the instruction says, reasonable doubt arises from a

16  careful and impartial consideration of the evidence.  But it

17  can also arise from the careful and impartial consideration of

18  the lack of evidence.

19      You can't solve a puzzle with just a few pieces.  You got

20  to look at the whole picture.  So you have to take the time to

21  review all the evidence, all the exhibits, the documents, go

22  back and look through your notes, recall the testimony from

23  all the witnesses, including Mr. Rothenberg, who, though not

24  required to say a thing, gave up his constitutional right to

25  remain silent, took the witness stand.  He was cross-examined

1    by an experienced and seasoned prosecutor.

2        If there's something you wish you had, a person you wish

3    you heard from, a document you want to see, that's on the

4    government regardless of the fact that Mr. Rothenberg

5    testified.

6                    (Demonstrative published.)

7        **MR. FAKHOURY:**  I want to start by giving a little

8    overview, where I'm hoping to go in my time with you this

9    morning.  There's several different crimes before you,

10    generally speaking.  And I've sort of -- tracking the way the

11    government has -- has presented it, kind of grouped them into

12    four broad categories.

13        There are counts related to Silicon Valley Bank.  That's

14    Counts Three and Four.  Counts related to Pilot Grove, Counts

15    Five through Eleven, counts related to Unity, that's Counts

16    Twelve through Fifteen, and then counts relating to the 2015

17    and '16 Fund investors which are in Counts Sixteen through

18    Twenty-three.

19        We're going to go through each of these element by element

20    and kind of general category by general category.  But there's

21    one common thread that runs through all of this, one main

22    issue that this case -- that this case ultimately rises and

23    falls on, and that's the issue of whether Mr. Rothenberg had a

24    scheme and had the intent to defraud.

25                    (Demonstrative published.)

 1         **MR. FAKHOURY:**  That's something you're going to see

 2     throughout the case.  I'll start by very quickly just showing

 3     the two bank fraud instructions you've been given.

 4         And in red you can see here "scheme to defraud," intent

 5     to "deceive and cheat" for bank fraud method A.  For bank

 6     fraud method B, it's "scheme or plan to obtain money or

 7     property" with "the intent to deceive and cheat."

 8                     (Demonstrative published.)

 9         **MR. FAKHOURY:**  And then with wire fraud, which covers

10     the remainder of the counts, the intent to "devise a scheme or

11     plan to defraud" and the "intent to deceive and cheat."

12         Now I want to give a little caveat to that.

13         Count Four, which is making a false statement to a bank,

14     doesn't require an intent to defraud, requires something very

15     similar, though.  It requires the purpose of influencing the

16     actions of Silicon Valley Bank.

17         And as for Counts Eight through Eleven, the money

18     laundering counts, those counts require that the property, the

19     money, be derived from the wire fraud charged in Counts Five

20     and Seven.

21         In other words, the government must prove beyond a

22     reasonable doubt that the wire fraud charged in Counts Five

23     through Seven occurred in order for you to convict

24     Mr. Rothenberg on the money laundering on Counts Eight through

25     Eleven.  They basically rise and fall together.

1        If you find the government hasn't proven beyond a

2    reasonable doubt that Mr. Rothenberg committed wire fraud with

3    respect to Pilot Grove, then you necessarily have to find the

4    government has failed to prove money laundering.

5        Now, there's several important things for you to consider

6    within these two distinct and separate ideas of a scheme to

7    defraud and an intent to defraud.

8        A scheme to defraud means a plan or course of action.

9    This is looking at Mr. Rothenberg's actions.

10                      (Demonstrative published.)

11        **MR. FAKHOURY:**  And one of the instructions you've

12    been given is that in determining whether a scheme to defraud

13    exists, you may consider not only the defendant's words and

14    statements but also the circumstances in which they are used

15    as a whole.

16        Now here, those circumstances include the operating and

17    management agreements that govern the relationship between the

18    investors and the specific funds, between the funds and

19    Rothenberg Ventures Management Company, and between Rothenberg

20    Ventures Management Company and Mr. Rothenberg.

21        Earlier in the trial, the government spent some time with

22    their witnesses on these agreements.  But as the trial went

23    on, it spent less and less time with them.  And in its closing

24    argument, it didn't really focus on them all that much except

25    a little bit towards the ends.

1          Now these agreements, these contracts, which are written

2     and negotiated by big law -- by lawyers from big major law

3     firms, they may be long, they may be boring to read.

4               **MR. KLEINMAN:**  Objection, Your Honor.

5               **THE COURT:**  Members of the jury, there has not been

6     any evidence in this case regarding the legal advice received

7     by Mr. Rothenberg or any of the investors into any of the

8     Rothenberg investment vehicles.

9          Go ahead, please.

10              **MR. FAKHOURY:**  These agreements are important in

11    understanding Mr. Rothenberg's words and statements.

12         Now, that scheme to defraud.  Let's talk quickly about

13    intent to defraud.

14         The intent to defraud is a plan or course of action, a

15    scheme -- excuse me -- is a plan -- let me -- let me start

16    over there.

17         An intent to defraud means that the plan or the course of

18    action -- in other words the scheme -- is intended to deceive

19    and cheat.

20         Now, it's not deceive or cheat.  It's deceive and cheat.

21    Intent requires you to figure out what was in Mr. Rothenberg's

22    head at the time of the investments.  What was in his mind?

23    What did he know?  What was his -- what was his intent?

24         And these questions can't be answered by looking solely at

25    bank statements, by simplifying thousands of pages of bank

1    records into flowcharts with arrows, by after the fact

2    forensic accounting, by cherry-picking a handful of emails out

3    of thousands of pages and by focusing on flashy events.

4        The government said if you wanted to know what's happening

5    in a company, ask its employees.  Well, if you want to know

6    what's going on in Mr. Rothenberg's head, ask him directly.

7    And I did.  And he testified he did not have the intent to

8    defraud anyone.

9                    (Demonstrative published.)

10        MR. FAKHOURY:  Another instruction you've been given

11   is about the belief in the truth of a statement.  "You may

12   determine whether the defendant had an honest, good faith

13   belief in the truth of the specific misrepresentations alleged

14   in the indictment in determining whether or not the defendant

15   acted with intent to defraud."

16        In other words, as you're determining Mr. Rothenberg's

17   knowledge and intent, remember that if he believes a

18   statement, then that could be considered by you whether he had

19   the intent to defraud.

20        Now, these crucial elements about scheme and intent to

21   defraud permeate every single count of this case.  That

22   doesn't mean you should -- you shouldn't consider the other

23   elements.  And I'll say more about other elements as we go

24   through these specific counts.

25        But ultimately, the government's failed to prove beyond a

1    reasonable doubt that Mr. Rothenberg had an intent to defraud,

2    and that's the end of the story.  Remember, it just takes one

3    element.  If you're not convinced beyond a reasonable doubt on

4    just one element -- and you're all here as jurors because

5    you're reasonable people and your doubts are reasonable

6    ones -- then Mr. Rothenberg is not guilty.

7        Before we dive a little deeper into the specific elements,

8    I want to elaborate on what I said at the beginning about

9    Rothenberg Ventures being a startup.

10       It was a young company going through growing pains in

11   2015.  It was a startup, a baby business, a Harvard Business

12   School project that was less than three years old in mid 2015.

13       The government's dismissive about it now, but it was ahead

14   of its time.  It was one of the first micro VC's.  Something

15   Alexa Binns testified about very early on at the trial.

16       It made good investments.  SpaceX, Robinhood, Matterport.

17   It identified virtual reality as a future of technology long

18   before you could walk into Costco and buy a VR Meta headset.

19       It had educated bright young people from the best

20   universities, Stanford and Harvard, working for it.  Obviously

21   that's Mr. Rothenberg, but others too.

22       It had sophisticated investors, limited partners, wealthy,

23   connected people who invested before and made money on their

24   investments with Rothenberg Ventures.

25       All these people who came and testified said

1    Mr. Rothenberg worked hard, he was bright, he had good ideas.

2        Mr. Weisman from -- from Pilot Grove testified that part

3    of what made Rothenberg Ventures attractive was Mr. Rothenberg

4    himself.  He'd become a leader in virtual reality in

5    particular.

6        Rothenberg Ventures was good at marketing itself.  It had

7    positive press that investors and others in the tech community

8    were paying attention to.  Part of its strategy was to throw

9    big events that got attention.

10        The government claims this was just fun.  I guess only the

11    federal government would use the word "fun" as an insult, as

12    some sort of proof of a crime.

13        Yeah, it was fun.  Like Mr. Rothenberg said, it's a lot

14    easier to get people, busy people, to take time out of their

15    busy schedules to do something fun than sit in a meeting in a

16    stuffy conference room, and it frankly worked.

17        Mr. Weisman, again from Pilot Grove, testified himself

18    that part of the reason that he and Mr. Polizzotto went to

19    Founders Field Day in 2016 was to scope it out, the portfolio,

20    the accelerator companies.  And they walked away impressed and

21    decided to invest in the 2016 Fund.

22        Now, look, not everybody cared for it.  David Chiu from

23    CY Capital testified he didn't really care for Founders Field

24    Day, but he was really the only witness who wasn't impressed

25    with it.  Reasonable minds could differ on it.  But it's clear

1    there was a business purpose behind the event.

2        It's the same thing with the Golden State Warriors suite.

3    Ms. Huang, Amy Huang, from ARCHina, testified she went to a

4    game.  So did Natala Menezes.

5        As Mr. Farwell himself explained, the Unity deal, which

6    we'll talk about in a moment later, came about because the CEO

7    Unity, John Riccitiello, met with Mr. Rothenberg at a Warriors

8    game.

9        So let's jump to 2015 when Mr. Rothenberg was 31 years

10    old.  Now, the government wants to compare Mr. Rothenberg to

11    bigger, more established funds like Thrive Capital which has

12    billions of dollars of assets under management.  That's just

13    inaccurate and unfair.

14        In 2015, Rothenberg Ventures was a scrappy startup.  It

15    was growing and experiencing growing pains.  Its financials

16    were a mess.  It had less controls than a bigger, more

17    established venture capital fund.

18        There weren't corporate American Express cards, but

19    personal ones on Mr. Rothenberg's personal credit.  And to his

20    credit, Mr. Rothenberg recognized it was a mess.  And that's

21    why he hired Lynne Dimmick -- who at the time her last name

22    was McMillan, I'm going to call her Ms. Dimmick -- to

23    specifically institute controls and to help clean things up,

24    which is a pretty bad way to commit fraud, I might add.

25        In 2015, Rothenberg Ventures was raising its third fund.

1    Sophie Liao and Brandon Farwell both told you that the third

2    fund is the hardest.  Your network is tapped.  You got to find

3    new sources of investment.

4        By doing an annual fund, Rothenberg Ventures was

5    constantly fundraising, which was its own challenge.  And the

6    upfront management fees brought a lot of money at the

7    beginning, but how would the funds manage the fact it wasn't

8    going to get any more money over the life of the fund?  So

9    it's no surprise that the fee structure changed from fund to

10   fund.  This was a work in progress, trying to find the right

11   formula to make this work.

12       In 2015, Rothenberg Ventures was getting bigger investors,

13   institutional investors, corporations, foreign investors.  And

14   that led to more back and forth negotiation, more lawyers,

15   stricter demands, like ARCHina not being more than 10 percent

16   of any given fund.  Longer operating agreements.  Feeder funds

17   for foreign investors.  You have all of them in evidence.

18       I wanted to show you an example of what I'm talking about.

19   This is Exhibit 11.  You're going to have this in the jury

20   room with you.  These are the fund documents concerning the

21   2013 Fund, and the total is about 58 pages.

22       By 2015 as the fund was raising for the 2016 Fund, you

23   have Exhibit 26 which are the fund docs.  This is 132 pages.

24   The agreements doubled, more than doubled in size in just

25   three years (indicating).

1        Now, as the situation was unfolding in 2015 -- and this is

2   a crucial piece of this story -- remember what Ms. Dimmick

3   told Mr. Rothenberg.

4                     (Demonstrative published.)

5        **MR. FAKHOURY:**  "The first conversation was right

6   after I started and figured out the financial position of the

7   firm.  We had a conversation about cutting back spending and

8   really picking up the fundraising.  I think that was probably

9   June of 2015."

10       Ms. Dimmick told Mr. Rothenberg they needed to cut

11  spending and pick up fundraising.

12       Let's think about this for a second outside of the venture

13  capital world.  And let's just take any generic business.  In

14  fact, I'll use one I like, Best Buy, the electronic store.

15  It's almost black Friday.

16       Best Buy can cut its spending by laying off employees or

17  maybe closing stores or reducing its hours.  That's one part

18  of what Ms. Dimmick was talking about.

19       How does Best Buy bring in more money?  It has a couple

20  options.  It can raise its prices.  A TV that cost $500 today

21  costs $550 tomorrow.  Okay?  Customers don't generally like

22  that.

23       Well, another way to bring in more revenue is to sell more

24  stuff.  Best Buy does that by trying to get more people into

25  its stores.  Maybe they run a promotion or a sale.  Next

 1    week's Thanksgiving.  That's why I've got Best Buy on my mind.

 2    The day after Thanksgiving is Black Friday.  That $500 TV is

 3    going to be $300.  It's a good deal.

 4        Best Buy is going to make less money on the sale of that

 5    TV than it would otherwise.  But the whole point is to bring

 6    more people in the door and get sales in some other way.  A TV

 7    needs a warranty, an HDMI cable, a sound bar.  Maybe they sell

 8    a credit card while you're there.  That's Best Buy.

 9        How does a venture capital fund bring in more money?

10    Can't really raise its prices.  Fees are fixed by contract.

11    So the only way is to raise more money, bring in more

12    investment.  And that's what Ms. Dimmick explained.

13        Raising more money when you're a venture capital fund is

14    not fraud.  It's exactly what needed to be done.  And it's the

15    entire point of a venture capital fund.

16        So that's the situation with Rothenberg Ventures leading

17    into December 2015 and the first set of counts the government

18    has charged in this case --

19                (Demonstrative published.)

20        **MR. FAKHOURY:**  -- which concern Silicon Valley Bank.

21        The jury instruction talk about two different methods by

22    which the government can prove this crime.  And I wanted to

23    stress that your decision has to be unanimous as to each

24    element of at least one of these methods.  You can't mix and

25    match the elements, although they're pretty similar.

1      Bank fraud method A, this is not a direct quote from the

2   jury instructions, this is paraphrasing it.  If there's any

3   conflict, the instructions that have been given to you by

4   Judge Tigar in that written packet are the ones that control.

5   Okay?

6      Bank fraud method A requires that Mr. Rothenberg knowingly

7   execute a scheme to defraud as to a material matter, requires

8   an intent to defraud meaning the intent to deceive and cheat,

9   and it requires that Silicon Valley Bank was insured by the

10  FDIC.

11     I'm not going to spend any time talking about the FDIC

12  part of it.  Okay?

13     Bank fraud method B requires the government prove beyond a

14  reasonable doubt that Mr. Rothenberg knowingly carried out a

15  scheme or plan to obtain money or property by false statements

16  or promises, knowledge that the statements or promises were

17  false, the statements or promises were material, there was an

18  intent to defraud meaning an intent to deceive and cheat, and

19  that the bank was again insured by the FDIC.  And just like in

20  method A, I'm not going to spend any time talking about the

21  FDIC part of it.

22     And then the third count is the false statement count

23  which requires the government prove a false statement was made

24  to a financial institution insured by the FDIC, the statement

25  was known to be false with all of you agreeing on the specific

1    false statement, and that the purpose was to influence

2    Silicon Valley Bank's actions.

3        I'm going to start by talking about a knowing false

4    statement because both bank fraud, under either method, and

5    false statement both require a knowingly made false statement.

6                    (Demonstrative published.)

7        **MR. FAKHOURY:**  This is the crux of the government's

8    alleged false statement that Mr. Rothenberg made to the bank

9    in December of 2015.  "I will check with Lynne, but I believe

10    the amount of prefunded fees is $5.192 million and we would

11    like to draw up to 95 percent of that cash (4.93 million)

12    tomorrow."

13        The government's theory is that Mr. Rothenberg knowingly

14    lied about the amount of money the 2015 Fund had raised and

15    the source of money used to collateralize that line of credit.

16    And it's wrong about both.

17        Let's start with the size of the fund.  It's pretty clear

18    this was an estimate.  It says "check with Lynne."  It says "I

19    believe."  And that matters because for something to be

20    definitively false, then there must be something that is

21    definitively true.

22        By the way, note that Mr. Rothenberg is wrong about the

23    fee amount.  It says 1.75 percent management fee a year plus a

24    1 point -- 1 percent administrative fee per year for eight

25    years, which if you tally it up is 22 percent.

```
 1                    (Demonstrative published.)
 2          MR. FAKHOURY:  Mr. Fujimoto explained the 2015 Fund
 3   had a 27-1/2 percent fee over the ten-year life of the fund.
 4                    (Demonstrative published.)
 5          MR. FAKHOURY:  Anyway let's get back to the amount of
 6   money raised by the 2015 Fund.
 7       It was an estimate because it was contemplated that the
 8   fund size would grow even in December of 2015.  This is
 9   Exhibit 150, page 1.  You have this in evidence.
10       Ms. Dimmick sends an email to Mr. Rothenberg on
11   December 17, 2016, recognizing this and noting that at the
12   bottom here (indicating), talking about the 2015 Fund's final
13   raise figure.
14       This email continues to the next page -- and we may have
15   seen this yesterday when Mr. Kleinman was speaking with you --
16   about how the total raise would increase.
17                    (Demonstrative published.)
18          MR. FAKHOURY:  And here's an important part about
19   this.  Ms. Dimmick gives a $10 million range.  And that's
20   important because it was explained to investors that the
21   2016 Fund would invest $10 million into the 2015 Fund.
22                    (Demonstrative published.)
23          MR. FAKHOURY:  And that was explained to investors
24   before the Silicon Valley Bank investment.  This is from
25   Exhibit 416.  This is an email dated December 15 of 2015 to --
```

1    from Mr. Devani to Mr. Levensohn of Dolby Family Ventures.

2    This was in connection with Dolby's investment into the fund,

3    the 2016 Fund.  And there's a whole bunch of documents

4    attached to this exhibit.

5        Page 121 is the beginning of the limited partnership

6    agreement.

7                    (Demonstrative published.)

8        **MR. FAKHOURY:**  And on page 151 of that document, up

9    here on the -- up here on the top makes very clear the

10   2016 Fund is going to invest up to $10 million into the

11   2015 Fund.

12       The circumstances surrounding the words and statements

13   made by Mr. Rothenberg matter for assessing whether he has a

14   scheme to defraud.

15       And by the way, Ms. Dimmick herself understood that.

16                    (Demonstrative published.)

17       **MR. FAKHOURY:**  If you look at Exhibit 152 -- I'm sure

18   you recall this email -- she's lumped together several

19   2016 Fund investors into the total amount of money and

20   combined it with the 2015 Fund.

21       So you can see here we've got the 2015 Fund plus

22   investments by 2016 Fund investors including three we've

23   specifically heard from at trial.

24       So that's where the $23 million Mr. Rothenberg told the

25   bank came from.  The 13 million already raised by the fund and

1        the $10 million from the 2016 Fund.

2            Yesterday, the government claimed that number was the

3        break even point.  But that's just not right.

4                        (Demonstrative published.)

5            **MR. FAKHOURY:**  By the way, in Exhibit 159, which is

6        the main exhibit detailing the correspondence between

7        Mr. Rothenberg and Silicon Valley Bank, Ms. Dimmick's on this

8        email chain.

9            She never testified she told Mr. Rothenberg his numbers to

10       the bank were wrong, despite there being evidence she knew

11       what he was saying about the size of fund.

12           And ultimately don't forget that the most important issue

13       in this case is what did Mr. Rothenberg know, what did he

14       think, and what did he intend.  In other words, what was in

15       his head?

16           Yesterday, the government complained there was no evidence

17       that Mr. Rothenberg ever told Silicon Valley Bank that the

18       2016 Fund was going to invest into the 2015 Fund.

19           But there's also no evidence that Silicon Valley Bank

20       asked for a specific fund size number.  No evidence it asked

21       for the fund size to be calculated as of a particular date.

22       No evidence it asked for the fund size to only include funded

23       capital, not committed capital.  No evidence it asked for

24       investor lists.  No evidence it asked for QuickBook records.

25           Look, Mr. Rothenberg's a smart guy.  He's a math Olympian.

1    He went to Stanford.  He went to Harvard.  Lots of testimony

2    about how he hard he worked, how bright he is.

3        But just because you're smart doesn't mean you know

4    everything.  I'm a lawyer.  I don't think you want to get

5    medical advice from me.  I don't think you'd ask your doctor

6    for legal advice.

7        Mr. Rothenberg can't read the bank's mind about what

8    specific number it cared about.  And all that means is there's

9    no evidence to show beyond a reasonable doubt that

10   Mr. Rothenberg knowingly made a false statement to the bank

11   concerning the size of the fund.

12       Let's take a look at the government's alleged second false

13   statement, the source of the money.

14       The government claims Mr. Rothenberg knowingly lied to the

15   bank when it said the source of funds for the collateral

16   account was fees when really it was money from other funds,

17   Ms. Menezes, CY Capital, and ARCHina.

18       Behind that claim is a premise that is important to the

19   entire case.  The premise is -- the government's premise is

20   that money sent by an investor and deposited into a particular

21   fund continues to not only belong to the investor but is

22   somehow separated when it sits in the bank as if it's in a

23   little bucket for each individual investor at the bank.

24       That premise is wrong when it comes to how Mr. Rothenberg

25   and the staff at Rothenberg Ventures viewed money in the bank

1    in real time.

2         Mr. Rothenberg testified that he believed that when an

3    investor sent money to invest into a particular fund, they

4    were purchasing a pro rata share of the fund.

5         Mr. Farwell actually said the same thing as well.  You

6    could see it here on the bottom.

7                   (Demonstrative published.)

8         **MR. FAKHOURY:**  "Q.  In a venture capital fund, an

9    investment buys an investor a pro rata share of the fund,

10   right?

11        "A.  Yes."

12        Once an investor sends money to the fund, it belongs -- it

13   becomes the fund's money.  And in exchange, the investor gets

14   a share of the fund.  And that's why they're called a limited

15   partner.  They own a piece of the fund.

16        So the idea that it was Menezes' -- Ms. Menezes' money or

17   ARCHina's money or CY Capital's money that went to the fund

18   collateral account is incorrect.  That's accounting.

19        And the only two witnesses who viewed the money this way

20   are Agent Ghio and Mr. Fujimoto.  And both are trained

21   investigators working with and on half of the government.

22   Agent Ghio, case agent, worked for the IRS for a long time.

23        Mr. Fujimoto, paid more than $300,000 by the government to

24   make an after-the-fact assessment based on a selected set of

25   documents given to him by the government for the specific

1    purpose of supporting its prosecution.

2        I don't quibble with the fact that they are trained and

3    they are experienced, but they cannot tell us what was

4    happening at Rothenberg Ventures in real time and what

5    Mr. Rothenberg, or anyone else at Rothenberg Ventures for that

6    matter, thought at the time the money was sent to the bank.

7        In fact, there's no evidence whatsoever that

8    Mr. Rothenberg, Ms. Dimmick, Tom Leep, or anyone else at

9    Rothenberg Ventures viewed the money wired by investors this

10   way in real time at the moment.

11                    (Demonstrative published.)

12        **MR. FAKHOURY:**  Again, Ms. Dimmick was combining all

13   these amounts together to calculate the total size of the fund

14   and the amount of fees Rothenberg Ventures was due.

15        And that's because she understood, just like

16   Mr. Rothenberg testified, that once money was sent to the fund

17   it belonged to the fund, which could use the money as allowed

18   under the terms of the operating agreements.

19        So the government's claim that Mr. Rothenberg lied about

20   the source of the money to fund the collateral account is just

21   wrong.  As I said a second ago, once investors sent money to

22   the fund, it belonged to the fund, including the management

23   and administrative fees to be taken.

24        And the fact that specific investors testified they

25   received distributions from their investments undercuts that

 1    theory as well.

 2        Here's a specific example.

 3              (Demonstrative published.)

 4        **MR. FAKHOURY:**  This is from Mr. Gupta who was --

 5    testified about HTC's investment.  According to the

 6    government, only 4 percent of HTC's, I believe it was a

 7    $2 million investment was put into portfolio companies.

 8        Mr. Gupta testified that HTC received somewhere between a

 9    1.5 to 2X return.  In other words, it's received back more

10    than $2 million.  So how could the money both be spent but

11    also invested?  How can it bring in returns and continue to

12    have residual value that may even result in future

13    distributions -- further distributions in the future.

14        Any disagreement about how the fund could use its money --

15    could use the money is governed by the operating and

16    management agreements.  And again, maybe there's a civil case

17    here or a business dispute or a contract dispute.  But we're

18    here in a criminal jury trial.

19        So ultimately, the government has failed to prove beyond a

20    reasonable doubt that Mr. Rothenberg knowingly made a false

21    statement to Silicon Valley Bank with respect to either the

22    size of the 2015 Fund or the source of funds used to fund the

23    collateral account.

24        Now that's just the first element out of the three that we

25    care about.

1     So let's turn to the second element the government has

2     failed to prove beyond a reasonable doubt.

3     And that is Mr. Rothenberg had neither a plan to defraud

4     nor an intent to defraud the bank.  Now, again, these are two

5     separate concepts.  The plan, also called the scheme, that's

6     one part of it, the second part is the intent, the mind state

7     to deceive and cheat.  And again it's deceive and cheat, not

8     or cheat.  It's a plan to lie to get something you're not

9     otherwise entitled to.

10     The government's failed to prove beyond a reasonable doubt

11     that Mr. Rothenberg engaged in either a scheme or had the

12     intent to deceive and cheat.

13     Now first, everything happened in the open, which is a

14     very bad way to commit fraud.  In other words, there's no

15     deception.

16     And as I explained earlier, Mr. Rothenberg believes in

17     good faith everything he's saying is correct, which is why he,

18     like any other reasonable person who believes what they're

19     saying, would say it out in the open.

20     Importantly there's no evidence that other people with

21     insight into the financial situation -- and I'm talking

22     specifically about Ms. Dimmick and Mr. Leep -- told them that

23     anything he was saying to the bank was wrong.

24     Ms. Dimmick is a former forensic accountant.  And she was

25     on email chains not only with the bank but with ARCHina and CY

```
 1   Capital.
 2        Ms. Dimmick and Mr. Leep, for that matter, had completed
 3   and uninstructed access to the Silicon Valley Bank accounts
 4   this entire time and could see money coming and going.
 5   Ms. Dimmick and Mr. Leep had complete and unrestricted access
 6   to the QuickBooks records.
 7        So in addition to being transparent with his finance team,
 8   Mr. Rothenberg was also dealing with the fund's bank,
 9   Silicon Valley Bank, who had complete insight and access into
10   Rothenberg Ventures financial situation.
11        And here's what Mr. Amoroso testified about, and it
12   continues over on a couple pages so bear with me here for a
13   minute.
14                    (Demonstrative published.)
15        MR. FAKHOURY:  It says here towards the bottom on
16   line 22, "[Y]ou could have seen that information?"  We're
17   talking about account holding -- bank account information.
18        "Certainly."
19        "Did you see that information?
20        "That the accounts were there?  Yes.
21        "How about the balances in the accounts?
22        "Yes.  We would have had access to the balances.
23        "How about the inflows and outflows of money from those
24   accounts?"
25        MR. KLEINMAN:  Objection, Your Honor, per the
```

 1    in limine.

 2              **THE COURT:**  Could I see counsel at sidebar briefly.

 3                   (Sidebar conference not reported.)

 4              **THE COURT:**  Counsel may proceed.

 5         **MR. FAKHOURY:**  Thank you, Your Honor.

 6      So, Mr. Amoroso, we've got his testimony up here.  He

 7    testified:

 8         "We would have had access to the balances.

 9         "How about the inflows and outflows of money from those

10    accounts?

11         "Yes.  We would have been able to see that."

12         That was about the Management Company.

13         The next section talks about the fund, the 2015 Fund.

14         "Would you be able to have seen all of that...?

15         "Yes, provided all of the accounts were at SVB."

16         Whoops, went too far.  There we go.

17                   (Demonstrative published.)

18         **MR. FAKHOURY:**  So --

19         **THE COURT:**  Members of the jury, I instructed you

20    earlier that the negligence of the bank or the failure of the

21    bank to do or not do something that it could have done is not

22    relevant to the charges in the case.

23      Mr. Fakhoury?

24         **MR. FAKHOURY:**  Thank you, Your Honor.

25      The point I'm trying to make here is if you want to commit

1    fraud, you'd go to a different bank that doesn't have access

2    to your financial information.  And that suggests or proves --

3    shows that there's neither a scheme or intent to defraud.

4        There's a second reason that there's no scheme or intent

5    to defraud.  And that is because the government has tried to

6    conflate the timing of the investments from Ms. Menezes,

7    CY Capital, and ARCHina with the bank loan.

8        The government is suggesting at the time these investments

9    were solicited, the real purpose was not to invest the money

10   but to secretly fund the collateral account connected to the

11   line of credit.  But these are separate events that have

12   nothing to do with each other.

13       The three investments were in the work for months -- were

14   in the works for months, long before Mr. Rothenberg reached

15   out to Silicon Valley Bank to get the line of credit.

16       In other words, these investments were not solicited

17   because there was a different need for the money than what was

18   told to investors.  And this is a problem that runs through

19   other counts as I'll discuss a little later.

20       Money was solicited because Rothenberg Ventures was a

21   venture capital firm and that's what it did, solicited

22   investments.

23       The fact that Rothenberg Ventures was also a startup, had

24   bills it needed to pay doesn't say anything about the purpose

25   of soliciting the investments.  It doesn't mean that

1    soliciting the investments was for the purpose of doing

2    something else with the money other than invest it.

3        Again, the specific investments the government has focused

4    on, so Ms. Menezes, ARCHina, and CY Capital, involved multiple

5    people at Rothenberg Ventures, including Ms. Dimmick, Tommy

6    Leep, Mr. Devani, the general counsel at the time for

7    Rothenberg Ventures.

8        Ms. Menezes testified that she had conversations over 2014

9    and 2015 with Mr. Leep about investing into the fund.  And

10   ultimately when that investment comes in, Ms. Dimmick is aware

11   of it.  (Demonstrative published.)

12       **MR. FAKHOURY:**  As for CY Capital, Mr. Chiu testified

13   he met with Mr. Rothenberg and other folks from Rothenberg

14   Ventures in October 2015 in Hong Kong, which -- and the folks

15   include Ms. Dimmick and Mr. Devani.

16       And his testimony was that by November of 2015 he had made

17   the decision to invest.  And they're in evidence of several

18   emails back and forth exhibits before the ultimate money was

19   received by Rothenberg Ventures on December 21st, 2015.  And,

20   again, Ms. Dimmick is the one handling processing of the wire.

21       The same thing with ARCHina.  Ms. Huang testified that

22   there had been an discussion about an investment with

23   Rothenberg Ventures since the fall of 2015.  And there was

24   actually a significant amount of back and forth over the terms

25   of the investment.

1    And ultimately, if you recall, ARCHina negotiated a side

2    letter, sort of a separate agreement from the main agreement

3    that generally governed investments into the fund.

4    So there's been no testimony from either Tommy Leep or

5    Ms. Dimmick -- we haven't heard from Mr. Devani at all -- that

6    anything about these investments was deceitful or for the

7    purpose of funding the collateral account tied to the

8    Silicon Valley Bank line of credit.

9    Now, look, obviously Ms. Dimmick didn't see eye to eye

10    with Mr. Rothenberg and she ultimately left the company, but

11    that happens all the time in business.  It doesn't mean that a

12    crime took place.

13    Nothing about these investments coming in around the time

14    of the loan means that these investments were part of any

15    scheme to defraud Silicon Valley Bank.

16    So that covers two of the three elements, a knowing false

17    statement and a scheme to defraud.

18    Let's talk about the third element, materiality.

19    (Demonstrative published.)

20    **MR. FAKHOURY:**  Again, this is the crux of the

21    government's case concerning Silicon Valley Bank, this

22    statement right here.

23    The government's failed to prove beyond a reasonable doubt

24    that this statement was material to the bank.  A $4.25 million

25    line of credit is not underwritten and approved over email.

1    That would be negligent and that would be ridiculous and

2    there's no indication that Silicon Valley Bank would do that.

3                    (Demonstrative published.)

4           **MR. FAKHOURY:**   In fact, Mr. Amoroso testified there

5    was an underwriting process.  And I just showed you a moment

6    ago that the bank had complete insight into all the bank

7    statements for the Management Company and the funds.  I won't

8    read through it again.

9                    (Demonstrative published.)

10          **MR. FAKHOURY:**   There was a complete internal

11   underwriting process that took place.  We just haven't seen

12   any of those documents.

13       Mr. Rothenberg's email didn't matter the bank [sic].  The

14   fact that Mr. Rothenberg said the amount of fees was

15   $5.192 million didn't matter because it saw the statements.

16   And in fact that's reflected by the fact they didn't issue a

17   line of credit for 95 percent of that number.

18       Ninety-five percent of $5.192 million is $4.9 million.

19   But the final line of credit was for $4.25 million.  So

20   obviously they're using a different number than the one in the

21   email that Mr. Rothenberg sent.

22       So again to recap, the government's failed to prove beyond

23   a reasonable doubt that Mr. Rothenberg knowingly made a false

24   statement, had a scheme or intent to defraud, and that the

25   statement in the email was material to the bank.

```
1          So he's not guilty of bank fraud as charged in Count
2     Three.  And he's not guilty of making a false statement to the
3     bank as charged in Count Four.
4          All right.  That's Silicon Valley Bank.  Let's talk about
5     Pilot Grove.
6                    (Demonstrative published.)
7          MR. FAKHOURY:  Here are the jury instructions.  Again
8     this is a paraphrase.  The specific instructions given to you
9     by Judge Tigar control.
10         But to paraphrase here, these are the elements of wire
11    fraud.  Again, I'm not going to spend a lot of time talking
12    about use of a wire.
13                   (Demonstrative published.)
14         MR. FAKHOURY:  These are the elements for money
15    laundering.  Really for -- for my time with you today, I'm
16    going to be focusing here on criminally derived property which
17    generally means in order to find money laundering counts, you
18    have to find that Mr. Rothenberg committed the wire fraud
19    charged against Pilot Grove.
20         Now, what are the two lies that the government claims
21    Mr. Rothenberg said to Pilot Grove in connection with its
22    $2 million investment into River Studios?
23         So the first claim is that Mr. Rothenberg lied about
24    self-funding River Studios.  And the second is that he lied to
25    Pilot Grove to tell them he was going to use the investment to
```

 1    produce content, acquire other companies, and general runway,

 2    and didn't use the money for that purpose.

 3        And the government's wrong about both.  And we'll take

 4    each one at a time.

 5        Before I do that, I wanted to make some general

 6    observations about River Studios.  This is not some secret

 7    shadow company.  There is a clear connection between

 8    Rothenberg Ventures, River Studios, and the Accelerator.

 9                        (Demonstrative published.)

10        **MR. FAKHOURY:**  From Mr. Frank's email to Pilot Grove,

11    talks about here's the overview of Rothenberg Ventures

12    featuring the River Studios.

13                        (Demonstrative published.)

14        **MR. FAKHOURY:**  Mr. Weisman testified that the

15    connection between River Studios and the Accelerator was one

16    of the reasons they wanted to invest in the first place.  They

17    wanted access to the Accelerator's portfolio companies in

18    order to potentially invest.

19        And there's some transcript up here for you.  And at the

20    top -- I'll just sort of paraphrase it.  At the top, it

21    says -- Mr. Weisman explains that there was an intriguing

22    proposition with the way Mr. Rothenberg had set up the

23    investment opportunities into the virtual reality companies.

24        Mr. Weisman agrees with that.

25        I think it was Mr. Waldinger used the analogy of shots on

1    goal.  I like that analogy.  Mr. Weisman agreed.

2                   (Demonstrative published.)

3             **MR. FAKHOURY:**  And here's the -- here's the important

4    part.  And you could see the answer here from Mr. Weisman at

5    the bottom.

6        Well, first, he acknowledges there was an opportunity to

7    get access to the little -- to all the companies and that it

8    was important that Mike Rothenberg was behind shepherding that

9    process and in his Accelerator Program helping those small

10   companies to expand and grow.

11       In other words, this was sort of all part of what was

12   going on, of what intrigued Pilot Grove.

13       Now, this is in connection with the investment into River

14   Studios.  The investment into the 2016 Fund came later, six

15   months later -- or about four months later in the summer of

16   2016 after Mr. Weisman and Mr. Polizzotto had been invited to

17   the Super Bowl and after they'd attended Founders Field Day

18   and were impressed with what they saw.

19       We've heard testimony that River Studios and Rothenberg

20   Ventures and the Accelerator, for that matter, were all housed

21   in the same building at 1062 Folsom.

22       And Lena Goldberg testified about trying on a River

23   headset -- a virtual reality headset in April 2016 when she

24   visited the Rothenberg Ventures offices.

25                   (Demonstrative published.)

```
1          MR. FAKHOURY:  Ms. Dimmick testified about needing to
2   divide expenses between River Studios and Rothenberg Ventures
3   employees, and I apologize that it's a little small to see
4   that, but this is an email dated September 29, 2015 talking
5   about that.
6          And, again, we've heard from Ms. Dimmick, we've heard from
7   Mr. Haase, Tom Leep.  We've heard testimony about Tom Leep.
8   All these folks have access to River Studios' bank statements
9   at Silicon Valley Bank.
10         Now, the summary and offering memos, those long boring
11  contracts, all specifically mention the connection between
12  Mr. Rothenberg and River Studios.  Here's an example.
13                   (Demonstrative published.)
14         MR. FAKHOURY:  This is from Exhibit 458.  This is the
15  Summary of Principal Terms for the 2015 Fund -- for the 2015
16  Fund given to Mr. Antonov, the guy who started Oculus.
17                   (Demonstrative published.)
18         MR. FAKHOURY:  And it specifically -- whoops -- it
19  specifically talks about Bend Reality.
20         Later in the documents, there's a section on competing
21  activities that specifically calls out Bend Reality LLC.
22                   (Demonstrative published.)
23         MR. FAKHOURY:  In the 2016 Fund summary, this is from
24  Exhibit 412 which is the summary sent to Dolby Family
25  Ventures, that's Mr. Levensohn testified about that, again a
```

 1    reference to Bend Reality.

 2                    (Demonstrative published.)

 3          **MR. FAKHOURY:**  A second reference to Bend Reality

 4    under the general conflict of interest related entities

 5    section.

 6                    (Demonstrative published.)

 7          **MR. FAKHOURY:**  And then as an exhibit, a specific

 8    reference to Bend Reality in the -- in the longer operating

 9    docs.

10                    (Demonstrative published.)

11          **MR. FAKHOURY:**  And in fact, the slides given to Pilot

12    Grove draw a clear link between Rothenberg Ventures and River

13    Studios.  We're talking about an ecosystem that touches on all

14    three components.  LPs from the fund, partnerships through the

15    Accelerator, content through the Studio.

16        So that's sort of the general lay of the land.

17        Let's talk about whether Mr. Rothenberg lied to Pilot

18    Grove about self-funding River Studios.  It's clear to me that

19    there was confusion all around this deal.  Mr. Polizzotto

20    testified that he thought there was going to be two seats at

21    the table, Pilot Grove and Mr. Rothenberg.

22                    (Demonstrative published.)

23          **MR. FAKHOURY:**  That is not what Mr. Rothenberg said

24    to Pilot Grove because he said he was trying to raise money

25    from two to three value-added investors.

```
 1              (Demonstrative published.)

 2         MR. FAKHOURY:   Later when everything sort of blows up

 3    in August of 2016, Mr. Rothenberg told Mr. Weisman and

 4    Mr. Polizzotto that the Rothenberg Ventures funds are wholly

 5    owned by River -- that the -- sorry, excuse me -- that the

 6    Rothenberg Ventures funds wholly owned River Studios.

 7       Well, we saw Mr. Fujimoto's analysis.  That's just not

 8    correct.

 9              (Demonstrative published.)

10         MR. FAKHOURY:   So between Mr. Rothenberg's statement

11    that he confused ownership and control, and the fact that

12    Mr. Fujimoto testified that Mr. Rothenberg funded the majority

13    of River Studios before Pilot Grove's investment, it's clear

14    that Mr. Rothenberg didn't knowingly provide false information

15    to Pilot Grove about who owned River Studios.

16       Let's turn to the second point about the use of money,

17    which really goes to a separate element, specifically whether

18    Mr. Rothenberg had a scheme and intent to defraud.

19       And, again, we heard it from Mr. Rothenberg directly.  He

20    did not intend to defraud Pilot Grove.

21       Being confused is not the same as being a cheater.  And

22    the government has failed to present any other evidence that

23    proves beyond a reasonable doubt that Mr. Rothenberg had

24    either a scheme or the intent to defraud Pilot Grove about how

25    its money would be used.
```

1        The government's analysis has focused on how Pilot Grove's

2   $2 million was used on February 25th and February 26th.

3        But as I explained earlier, this tracing or forensic

4   accounting is not how anyone at Rothenberg Ventures, and

5   particularly Mr. Rothenberg, viewed money in real time.

6        More importantly, there's no way $2 million would be used

7   so quickly.  That's not the way the real world works.

8        Here's an example.  Let's say you go to a bank.  You want

9   to do a cash-out refinance of your home because you want to do

10  some home renovations.  You want to put in a new kitchen.

11       After the loan closes, the refinance, say you got $50,000

12  for your renovations.  You do not commit fraud if you don't

13  start the renovation work the second you get the money.  Maybe

14  your contractor has a delay.  Maybe an emergency came up and

15  you need the money for something else.  Maybe the cost of

16  materials went up.  You decided to change your plans.

17       It's the same thing with Pilot Grove.  They didn't expect

18  that the money would be used the day after it was invested.

19  There was no testimony from Mr. Weisman or Mr. Polizzotto that

20  they were asking for updates or expected all these things to

21  be done the next day or even within a few weeks.

22       This was going to be a long-term relationship.  And it

23  makes sense because it takes time to acquire other companies

24  and to produce virtual reality content.

25       As for general runway, you have the River Studios bank

account statements.  It's Exhibit 62.  You'll see plenty of
money spent on runway after Pilot Grove's investment in
February 2016 for expenses.

                    (Demonstrative published.)

          MR. FAKHOURY:  Highlighted a couple.  Here's one in
March.  And I know that's small.  My apologies.  March 2016, a
payment to Ewan Johnson who testified in trial.

     Here's another one in April 2016, a wire out to Twisted
Oak in the amount of $76,000.

     These are just two out of many examples.  You can go
through those statements and review them for yourself.

     The government's made a big deal of the fact that River
had only $8,967 in its bank account at the time of the
investment, but it actually supports the idea that the
investment was needed for general runway.

     Plus Mr. Rothenberg's statements and actions after the
investment, and in particular in August 2016, demonstrate he
wasn't trying to cheat Pilot Grove.  He reached out to Pilot
Grove hat in hand.

     We heard testimony from Mr. Farwell that Mr. Rothenberg
reached out to him to discuss options.  Mr. Rothenberg --
we've seen many copies of this -- sent emails to his limited
partners explaining the situation after the *TechCrunch* article
was published.

                    (Demonstrative published.)

```
 1           MR. FAKHOURY:  These aren't the actions of a cheater
 2      because they just invite more scrutiny.  So don't lose sight
 3      of the forest from the trees.
 4           There's no question, and as Mr. Rothenberg himself
 5      admitted, corporate housekeeping was poor.  I think
 6      Ms. Dimmick testified that when she started, financial
 7      situation was a mess.  She -- she used the phrase "herding
 8      cats."  Said she had to walk around the block when she first
 9      started.
10           Ultimately, remember, you may determine whether the
11      defendant had an honest, good faith belief in the truth of the
12      specific misrepresentations alleged in the indictment in
13      determining whether or not the defendant acted with the intent
14      to defraud.
15           So Mr. Rothenberg believed what he was saying because
16      things were a mess and he was stretched thin, you can consider
17      that.
18                    (Demonstrative published.)
19           MR. FAKHOURY:  And by the way, Mr. Weisman himself
20      noted Mr. Rothenberg was just scattered about, juggling a
21      million things at once.
22           And we heard testimony from Ms. Goldberg that when she
23      visited Rothenberg Ventures in April 2016, Mr. Rothenberg
24      appeared tired to her.
25           So to recap, the government's failed to prove beyond a
```

```
1   reasonable doubt that Mr. Rothenberg knowingly made a false
2   statement to Pilot Grove or had a scheme or intent to defraud
3   Pilot Grove.  And he's not guilty of the wire fraud in Counts
4   Five through Seven and in turn the money laundering charge in
5   Counts Eight through Eleven because the transaction didn't
6   involve criminally derived property.
7        Okay.  Let's talk about Unity.
8        Again, here are the elements of wire fraud.
9                    (Demonstrative published.)
10        MR. FAKHOURY:  Again, if I had it wrong on the slide,
11   what you have in your packet controls.
12        The government claims that Mr. Rothenberg had a scheme to
13   defraud investors into Unity by soliciting investments but
14   ultimately not buying any Unity shares.
15        The government is really suggesting that the Unity deal
16   wasn't real, that he knew -- that Mr. Rothenberg knew that but
17   solicited investments anyway intending to use them for
18   something else.  And that is absolutely not at all what
19   happened.
20        So let's walk through it piece by piece.
21                    (Demonstrative published.)
22        MR. FAKHOURY:  First, keep in mind the only reason
23   Rothenberg Ventures even had a chance to get Unity shares was
24   because the CEO of Unity was introduced to Mr. Rothenberg by
25   his former employee and a current Rothenberg Ventures
```

1    employee, Dylan Flinn, out of -- and attended a Warriors game.

2    And Mr. Farwell testified about that.

3        And that by itself proves the premise at the heart of

4    Rothenberg Ventures business strategy.  You can network at fun

5    event like a Golden State Warriors game and do business.

6                    (Demonstrative published.)

7        **MR. FAKHOURY:**  Next, Unity's CEO, John Riccitiello,

8    is the one who proposed to Rothenberg Ventures a secondary

9    sale of stock on May 25, 2016, weeks before any investments

10   were solicited and investors were reached out to.

11       This is an amazing investment opportunity.  It's a pre-IPO

12   unicorn, a company with a $1 billion valuation.  Of course

13   Rothenberg Ventures wanted to get in on this deal even if it's

14   a bigger deal than others they'd done in the past.  It's

15   ambitious.  But that's the industry.  That's how startups

16   scale.

17       It was Mr. Riccitiello that connected Rothenberg Ventures

18   to Mike Foley to help with the sale.  And we saw the emails

19   and heard from Mr. Foley directly.

20       First Rothenberg Ventures tried to buy shares from an

21   employee named Tony Garcia.

22                    (Demonstrative published.)

23       **MR. FAKHOURY:**  And in this exhibit, Exhibit 253, we

24   could see that Mr. Rothenberg was trying to negotiate down the

25   stock price, but Mr. Garcia wasn't interested.  And he made a

```
 1        sale to someone else at the price he wanted days later.  Okay?
 2            When that didn't work, Rothenberg Ventures tried to buy
 3        shares from Robina Riccitiello, Mr. Riccitiello's -- I believe
 4        it was his ex-wife.  The total size of the stock sale was
 5        $14 million.  He needed to raise that money very quickly.
 6            And so Mr. Rothenberg and Rothenberg Ventures reached out
 7        to investors like GHF and the Binns Family Partnership and the
 8        Goldbergs, all of whom had invested with Rothenberg Ventures
 9        in the past.
10            Additionally, Mr. Farwell testified he sought out
11        institutional investors like a sovereign wealth fund and had
12        even offered the opportunity to Mr. Johnson, the River Studios
13        employee.
14            The point is this:  The deal progressed to the point where
15        legal paperwork was drawn up by Unity.  And the date of this
16        email really important, it's July 21st, 2016.  This is the
17        first email from Unity to Rothenberg Ventures with the stock
18        purchase paperwork.
19            That's sent around the same time Rothenberg Ventures
20        received the SEC letter.  And we heard from Mr. Rothenberg, I
21        think even Mr. Farwell said something similar, that things
22        certainly changed once the firm got the SEC letter.
23                        (Demonstrative published.)
24            MR. FAKHOURY:  Ultimately, as Mr. Foley, explained to
25        Mr. Rothenberg, the deal fell through for two reasons.
```

1          First, it took Rothenberg Ventures too long to raise the

2    money it needed to buy the shares.  $14 million is a

3    significant amount of money, especially in a quick time frame.

4          And as I just mentioned a moment ago, once it got the SEC

5    letter, it became much harder for Rothenberg Ventures to raise

6    money.  It was still a scrappy startup figuring this out.

7          There's been some testimony about Rothenberg Ventures

8    rushing investors to send their money in.  But, look, as a

9    general matter, soliciting an investment is just like trying

10   to make any other sale.  There's lots of competition for

11   people's dollars.

12         Putting time pressure is a sales strategy.  You ever been

13   to a car dealership?  Or a coupon has an expiration date, a

14   limited time offer.  The fact that a salesperson uses time as

15   a sales tactic doesn't mean they're desperate for cash.

16         Now as for the Unity investment specifically, all the time

17   pressure came from Unity.  They could sell to anyone.  And the

18   first deal had already been scuttled because Rothenberg

19   Ventures couldn't raise the money within days.

20         No one complained about the time crunch at the time the

21   investments were made because they understood that's how this

22   goes.  They all sent money quickly because they understood the

23   deal wasn't going to be there forever.  They only complained

24   about that later, after the *TechCrunch* article came out and

25   after they've had to come here in court and testify in a

 1    criminal case.

 2        So, yeah, absolutely time was of the essence.  And nothing

 3    about that's unusual.

 4        And, again, the second reason the deal didn't go through

 5    is that bad press ended up making Unity, who did not need

 6    Rothenberg Ventures as much as Rothenberg Ventures needed

 7    Unity, not want to do the deal.

 8        Mr. Foley said it point blank.  The deal wasn't worth his

 9    time and energy.  There were plenty of other people who wanted

10    the buy the shares.

11        Now, look, everyone involved is disappointed the deal

12    didn't gone through.  They all would have made a ton of money.

13    John and Theo Melas-Kyriazis from GHF testified they thought

14    it could be a 10X return.

15        Recall Rothenberg Ventures was trying to buy the shares at

16    a price of about $14 a share.  Mr. Foley testified that after

17    the IPO, he sold his shares for a $192 a share.  That's a 13X

18    return if an investor had waited that long.  It was a lost

19    opportunity, but it wasn't a fraud.

20        Mr. Rothenberg had neither a scheme nor an intent to

21    deceive and cheat any of these investors, as he told you

22    directly when he took the stand.

23        And it wasn't just a lost opportunity for the investors.

24    It was a lost opportunity for Mr. Rothenberg and Rothenberg

25    Ventures.

1    Ultimately, each of the folks who attempted to invest into

2    Unity got their money back.

3    And so the government has failed to prove beyond a

4    reasonable doubt that Mr. Rothenberg had any intent to defraud

5    the folks who sent money for the Unity investment opportunity,

6    and he's not guilty of Counts Twelve through Fifteen.

7    Last section here.  2015 and '16 Fund investors.  Again

8    here are the wire fraud instructions.

9                    (Demonstrative published.)

10            **MR. FAKHOURY:**  Not going to focus on use of a wire.

11    At its core, the government has made two allegations

12    concerning the '15 and '16 Fund investors.

13    The first is that despite promising to invest their money

14    into portfolio companies, the money was not in fact invested.

15    And second, that he failed to disclose to investors their

16    money would be invested into River Studios which

17    Mr. Rothenberg controlled.  And, again, the government is

18    wrong about both.

19    On the first claim, that the investment didn't happen

20    right away, well, it's going to take time.  And we already

21    talked a little bit about this a moment ago when I was talking

22    about Pilot Grove.

23    But don't forget, venture capital funds are ten-year

24    funds.

25    Mr. Chiu, who was a 2006 -- of CY Capital, which was a

1    2016 Fund investor, was told explicitly fund deployment cycle

2    is intended to be approximately two years.  That's just one

3    example.

                    (Demonstrative published.)

4

5          MR. FAKHOURY:  The management agreements made clear

6    that the general partner, Rothenberg Ventures Management

7    Company, which is controlled and owned by Mr. Rothenberg, had

8    discretion on when and how to deploy capital.

9       Everyone saw that Rothenberg Ventures had a lot of staff

10   and threw big parties, big events, but no one had a problem

11   until the press, till the SEC letter.  Everyone freaked out

12   understandably.  It's scary, it's disruptive when the federal

13   government comes and knocks on a business's door.

14      On the investment into River Studios, again I showed this

15   earlier.

                    (Demonstrative published.)

16

17         MR. FAKHOURY:  I'll be quick.  Investors were advised

18   there was a related entity.  It shows up in the operating

19   docs.  Those last two were for the '15 Fund.

                    (Demonstrative published.)

20

21         MR. FAKHOURY:  This is for the '16 Fund.

22      Maybe the language could have been written clearer.  But

23   ultimately what matters is what did Mr. Rothenberg think at

24   the time, what was in his mind.  And in his mind, the

25   relationship was disclosed.

1    Investors don't get to choose how their funds get invested

2    anyway.  The whole point of a venture capital fund is to have

3    the general partner use its discretion and leverage its

4    connections to make the investments.

5    Investors get something for it because they maybe get

6    access to deals they may not otherwise have.  Or they get

7    access to the phrase "deal flow."  It's a phrase I never heard

8    before this trial before, but I feel like I have a better

9    understanding of it.  To be in the room with other companies,

10    to have access to small companies and other investors.

11    (Demonstrative published.)

12    **MR. FAKHOURY:**  I want to end by addressing a few

13    stray comments the government made towards the end of its

14    closing to show just how hard the government is stretching to

15    turn this business dispute into a criminal case.

16    Maybe they're trying to insert some drama into what is

17    otherwise a boring business and contract dispute.

18    The government claims that Mr. Rothenberg tried to conceal

19    and destroy evidence in a *Bloomberg* article.  How is a news

20    article evidence?  It was bad press.

21    Mr. Rothenberg made a business decision to spend less than

22    a thousand dollars to try and remove it off of an airport

23    newsstand on a given day.  Maybe not the smartest idea in the

24    world.  Wasn't going to scrub it off the Internet or get rid

25    of every issue.  But I can understand why thinking -- thinking

1    that it might be a good use of less than $1,000 to get rid of

2    bad press is an expense.  Because we saw how the *TechCrunch*

3    article effectively destroyed Rothenberg Ventures.

4         More importantly, the *Bloomberg* article was published in

5    May 2015, not '16.  It was published more than a year before

6    the SEC letter, before the *TechCrunch* article, months before

7    the bulk of the investments that have been referenced in

8    trial.

9         The government made note of the fact that Mr. Rothenberg

10   had asked Ms. Dimmick what the penalty would be if they did

11   not fund SweetIQ, one of the portfolio companies, towards the

12   end of 2015.  Well, here's the bank statement.

13                  (Demonstrative published.)

14        **MR. FAKHOURY:**  They funded SweetIQ.  That's

15   Exhibit 6980.

16        The government got into evidence a GIF -- I think it's

17   GIF, not a JIF (phonetic), but a GIF -- of Leonardo DiCaprio

18   as part of Mr. Johnson's testimony regarding his phone being

19   remotely wiped.

20        And Mr. Johnson also testified he agreed to have his phone

21   wiped remotely and to have that on his phone when he joined

22   River Studios because he's dealing with a lot of intellectual

23   property.

24        Mr. Grooms claimed that Mr. Rothenberg asked him to

25   destroy hard drives.  There's not a single piece of evidence

1    that anything like that happened.  Mr. Grooms himself admitted

2    that.  When I asked Mr. Farwell about it, he had no idea what

3    I was talking about.

4        Considering that we know that Rothenberg Ventures produced

5    more than 27,000 pages of emails from Mr. Rothenberg, let

6    alone thousands of other pages to the SEC, suggests the

7    government had plenty of data.

8        Out of those 27,000 pages of emails, the government

9    plucked a single email about River Studios contributing

10   $500,000 to shoot a Coldplay video.

11       Despite all the financial tracing it's done, can't

12   actually prove that Rothen -- that River Studios actually

13   contributed $500,000 to the video.  Hasn't pulled any other

14   emails or signed documents about it.  And the only actual

15   piece of evidence about it beyond this email is here,

16   Exhibit 62.

17                   (Demonstrative published.)

18       **MR. FAKHOURY:**  Page 56, the Bend Reality bank

19   statement, October 2015, showing a payment of $93,000 from

20   Warner Music, which is the parent company for Parlophone, the

21   subsidiary mentioned in the prior email --

22                   (Demonstrative published.)

23       **MR. FAKHOURY:**  -- paying River Studios $93,000 in

24   October 2015, three months after that email.  And that's

25   exactly what Mr. Rothenberg told you when he was questioned on

 1    cross-examination.

 2        The government's repeatedly claimed that Mr. Rothenberg

 3    siloed employees, kept them from sharing information.  That is

 4    not at all supported by the evidence.

 5        Tom Leep had full access to the bank statements.  Tom Leep

 6    had full access to the QuickBook records.  Ms. Dimmick had

 7    full access to the bank statements and QuickBook records.  So

 8    did David Haase, who had full access to the bank statements

 9    and QuickBook records.

10        We heard testimony from Mr. Haase and Mr. Grooms and

11    Mr. Farwell that in August '16 -- in August of 2016, excuse

12    me, they talked together freely about trying to take control

13    of Rothenberg Ventures after the *TechCrunch* article.

14        Mr. Haase had testified that Mr. Rothenberg wouldn't allow

15    him to see the operating agreements, but then acknowledged he

16    did in fact see them in Geoff Rapaport's office.

17        There's been some testimony about payroll.  There's

18    actually been conflicting testimony about it.

19        Mr. Farwell, who worked for Rothenberg Ventures longer

20    than Ms. McMillan and longer than Mr. Haase, testified

21    Rothenberg Ventures never missed payroll the two years he

22    worked there.

23                    (Demonstrative published.)

24        **MR. FAKHOURY:**  The government keeps bringing up the

25    Rose Bowl.  There's no evidence that Rothenberg Ventures

 1    actually paid for a Rose Bowl suite.  You have tons of bank

 2    records.  You can look through them, find it.  You won't.

 3    There was some discussion about it primarily led by Tommy

 4    Leep.  But there's no wire, no bank record, no signed

 5    contract.  You better believe that if the Rose Bowl had been

 6    paid for by Rothenberg Ventures Funds, you would have seen it.

 7        The government showed you text messages between

 8    Mr. Rothenberg and Tommy Leep in February 2016 suggesting that

 9    Mr. Rothenberg wanted to fire Tom Leep Senior and Ms. Dimmick.

10    And neither happened.

11        Ms. Dimmick resigned of her own free will.  Tom Leep

12    Senior was still working for Rothenberg Ventures in the spring

13    of 2016.

14        And actually how the government handled Ms. Dimmick's

15    resignation email in this trial actually highlights, I think,

16    the problem I've been trying to allude to.

17                    (Demonstrative published.)

18        **MR. FAKHOURY:**  Again, I apologize that this is small.

19    You have these in evidence.

20        On the left-hand side here is defense Exhibit 405 --

21    excuse me -- Government's Exhibit 405, which was Ms. Dimmick's

22    resignation email.

23        On the right-hand side is Exhibit 1002 which we put into

24    evidence through Mr. Rothenberg.  It's the same emails.  You

25    can seem the same Bates page numbers on the bottom.  But one

1    of them is redacted and one is not.  A part missing from the

2    government's exhibit goes to the exact issue that this case is

3    all about.

4                    (Demonstrative published.)

5         MR. FAKHOURY:  "[T]he transfer she referred to is

6    explicitly allowed by our documents, according to Neil."

7         March 11, 2016, from Mr. Rothenberg to Tom Leep.

8         And in the defense exhibit, you could see that Mr. Leep

9    responds to Mr. Rothenberg.

10                   (Demonstrative published.)

11        MR. FAKHOURY:  The government has tried to focus your

12   attention on shiny objects, splashy events, rather than drill

13   into details.  The contracts, the details, what Mr. Rothenberg

14   thought he could do are what matters most of all in this case.

15        Ladies and gentlemen, it has been a privilege to spend the

16   last seven weeks with you in this courtroom.

17        Mr. Rothenberg and Mr. Torres and I are humbled, and we

18   are appreciative of the time you've taken out of your busy

19   lives and your schedules to sit as jurors in this lengthy

20   case.

21        We are particularly grateful for your willingness to

22   endure to not look for a way out of your jury service.

23        Mr. Rothenberg is a son, a brother, an uncle, a Texan, an

24   entrepreneur, but he is not a fraudster.  He had no scheme to

25   defraud.  He had no intent to defraud.  He believed what he

1     said.  He believed he had the discretion.  And I ask you to

2     return a not guilty verdict on all counts.

3        Thank you.

4            THE COURT:  Thank you, Mr. Fakhoury.

5        Members of the jury, let's take our first recess.

6            THE CLERK:  Please rise for the jury.

7        (The following proceedings were heard out of the presence

8     of the jury:)

9            THE COURT:  Mr. Fakhoury, anything for the record?

10           MR. FAKHOURY:  No, Your Honor.  Thank you.

11           THE COURT:  Mr. Kleinman?

12           MR. KLEINMAN:  No, Your Honor.  Thank you.

13           THE COURT:  All right.  Thanks.

14           THE CLERK:  Court is in recess.

15       (Recess taken at 9:59 A.M.; proceedings resumed at

16    10:23 A.M.)

17       (The following proceedings were heard in the presence of

18    the jury:)

19           THE CLERK:  You may be seated.

20           THE COURT:  All right.  Let's go back on the record.

21       All the jurors are in their assigned seats.

22       The parties and counsel are at counsel table.

23       Who will give the rebuttal argument for the United States?

24           MR. WALDINGER:  It will be me, Your Honor.

25           THE COURT:  Mr. Waldinger, you have the floor.

1    **REBUTTAL CLOSING ARGUMENT**

2    **MR. WALDINGER:**  Thank you, Your Honor.

3    Ladies and gentlemen of the jury, now it's the

4    government's opportunity to give what's called the rebuttal

5    argument.  We do have the burden beyond a reasonable doubt as

6    to each and every element of the offense.  And the government

7    has proven the defendant's guilt beyond a reasonable doubt.

8    I want to take this opportunity to go through a few points

9    to rebut some of the arguments made by Mr. Fakhoury and to

10   help you in your deliberations.

11   One of the things -- or two of the things that

12   Mr. Fakhoury talked about pretty much at the outset of his

13   closing argument was about the defendant's knowledge, and then

14   he said that a common thread throughout all of these schemes

15   was that the defendant did not have a scheme or an intent to

16   defraud.

17   So I want to address both of those at the outset.

18   I also want to talk about things that the defendant said

19   and did that showed that he knew that what he was doing was

20   wrong and fraudulent.

21   I want to address some specific aspects of the SVB loan,

22   particularly the source of collateral, and I want to talk

23   about River Studios.

24   And River Studios crosscuts a lot of what was going on in

25   this case.  As you heard time and again, Pilot Grove, Dominic

1    Polizzotto and Larry Weisman were told that the defendant had

2    fully funded River Studios.

3        In addition, investors in the 2015 and 2016 Fund, many of

4    them were asked whether they knew that fund money would be

5    invested in River Studios, a company owned by the defendant,

6    and so that's a big part of the case and I want to talk about

7    that.

8        So that's a little roadmap to this rebuttal argument.

9                    (Demonstrative published.)

10        **MR. WALDINGER:**  I want to start, as I said, with the

11    defendant's knowledge.  The defendant knew what he was doing.

12    He's not a dumb guy.

13                    (Demonstrative published.)

14        **MR. WALDINGER:**  He was not super young when he

15    started this.  He was -- had been out of college for a while,

16    out of business school, had worked.  You've heard time and

17    again that the defendant was a math Olympian.

18        And this case is about money and movements of money and

19    imbalances between accounts.  Money moving from one fund to

20    the Management Company.  Money moving from another fund to

21    another company.  And then money moving back.  The reason it's

22    moving back is that the defendant knew that money was owed,

23    that he had dipped into these funds.

24        He knew what he was doing.  He was good with math.  He had

25    a bachelor's degree and a master's degree from Stanford in

 1    management science and engineering.

 2                (Demonstrative published.)

 3        **MR. WALDINGER:**  After Stanford he went and worked at

 4    Bain Consulting and in private security at a place called

 5    Audax.  And then he went to business school.  He got an MBA, a

 6    master's of business administration, from Harvard Business

 7    School.

 8        I think one of the first things that Mr. Fakhoury said in

 9    his closing argument was something along the lines of they

10    don't teach you how to run a business at business school.

11        Whether that is true or not, what we do know is that the

12    defendant went to business school.  And he dug in deep.  He

13    took classes, required classes.  You've heard the first year

14    you have to take a class on legal and corporate

15    accountability.

16        You heard from Lena Goldberg that he took classes with her

17    and an independent study that was -- formed the basis of

18    Rothenberg Ventures Management Company.  He studied what he

19    ended up doing.

20        And it is not believable for you to conclude that the

21    defendant did not know what he was doing when he ran

22    Rothenberg Ventures Management Company.

23                (Demonstrative published.)

24        **MR. WALDINGER:**  Once he got there and started it, the

25    whole business is about owning other companies, getting shares

1    in other companies.  He understands when money goes into a

2    company, it's about investment into the company.

3        Again, River Studios, we'll talk about it.

4                    (Demonstrative published.)

5        **MR. WALDINGER:**  There's been abundant testimony that

6    the defendant was involved in every aspect of Rothenberg

7    Ventures Management Company's business.  Things didn't happen

8    without his knowledge.  Things didn't happen without his

9    approval.

10        He was the -- he was the person pulling the strings.

11    Nothing happened without the defendant knowing it.

12                    (Demonstrative published.)

13        **MR. WALDINGER:**  This is someone who would not confuse

14    ownership and control.  He knew exactly what he was doing

15    prior to obtaining Pilot Grove's investment in February of

16    2016.  He knew he had to tell Larry Weisman and Dominic

17    Polizzotto that he owned the company because that was

18    important to them.  But he knew based on the flow of money

19    before -- and you've heard from Gerry Fujimoto -- that

20    something like 40 percent of River Studios operations before

21    that date had been funded by 2015 Fund investors.  The

22    defendant didn't confuse ownership and control.  That's an

23    admission for sure later on in August of 2016, but it's also a

24    lie.

25                    (Demonstrative published.)

1          **MR. WALDINGER:**  This is also someone that would know

2     that his investors, the LPs, the limited partners, would want

3     to know if their money was being invested into a company owned

4     by the defendant.

5          And I want to pause right there.  I just said the term

6     "their money."  Okay.  True enough, when any of these

7     investors put money into a fund, it became the fund's money.

8     But they would not have put their money, their money would not

9     have become the fund's money, if the defendant had not

10    misrepresented to them about what would happen with their

11    money, if he had omitted to tell the fund investors what he

12    was going to do with their money, if he had not hidden from

13    the fund investors what he was doing with their money.

14         You heard time and again that a venture capital fund

15    investing into a company owned by the fund manager would be

16    extremely unusual, a conflict of interest, a big problem that

17    needed to be disclosed to investors.

18         Mr. Fakhoury said it was.  We'll talk about some of those

19    fund provisions.  None -- all the investors that testified

20    said they didn't know.  So it comes down, as Mr. Fakhoury

21    said, to what the defendant thought.

22         Again, this is a defendant who is a smart guy.  He knows

23    what he's doing.

24                    (Demonstrative published.)

25          **MR. WALDINGER:**  The other thing that Mr. Fakhoury

1   said was about Mr. Rothenberg's intent.  And so I want to

2   spend a little time on that because I think it's important and

3   it crosscuts everything that the defendant did certainly

4   beginning in 2015, early 2015.

5                    (Demonstrative published.)

6           MR. WALDINGER:  By April of 2015, the defendant knows

7   that his, quote, unquote, business plan is failing.  Now

8   remember this is a business plan that based on a $5 million

9   fund, his first fund, he rented out AT&T Park, Giants Stadium.

10   That's the business plan.

11      The business plan is when he's raising the second fund,

12   let's buy an entire season's worth of suites at Oracle Arena

13   where the Warriors played at that time.  The business plan was

14   to hire, hire, hire.

15      Yes, you can compare this to Thrive Capital.  Yes, you can

16   compare it to other venture capital firms.  That gives you a

17   sense of whether the defendant was out over his skis on

18   spending.  He admitted in the August 2016 emails that he sent

19   to his own investors.  He said, "I was not focused enough on

20   lean spending."

21      By April of 2015, he knew his business plan was failing.

22   As Gerry Fujimoto testified, you can see in the defendant's

23   bank accounts that he took $2 million from the 2015 Fund that

24   month.  That was about a $1.8 million overpayment by April of

25   2015.

1     He knew by April of 2015 -- the same month, by the way

2  that Michael Antonov invested his funds in the 2015 Fund --

3  Mr. Rothenberg knew at that time that his business plan was

4  failing.

5     So what did he do?  Well, there's a *Bloomberg* article.

6  You haven't seen that article.  It's not in evidence.  You

7  heard that it referred to him as a party animal.  What did he

8  try to do?

9     Well, with Special Agent Wescott, I went through some of

10 the records.  It wasn't just Mr. Rothenberg going to the

11 airport.  You heard testimony that he had people buy tickets.

12 And you saw evidence of one-way tickets being purchased by

13 several people to get through security to buy up those

14 articles.

15    Again, no doubt, it's silly, foolish, doomed to fail on a

16 magazine like *Bloomberg* that is published all over the country

17 and perhaps the world and is available online.  But it shows

18 his intent to defraud.  It shows he's trying to conceal

19 information about his spending from LPs and potential LPs.

20    Because the question that anybody would ask is, "If I

21 give -- if I'm giving my money to a party animal, is he

22 spending it correctly?"

23              (Demonstrative published.)

24         **MR. WALDINGER:**  He was -- after that article came

25 out, the defendant -- this is Exhibit 375 -- sent out an email

1    to investors that contained misleading statements, if not

2    outright lies.

3        "Rothenberg Ventures has 13 employees, not over 25."

4        We've already seen an all-hands email from March of this

5    year that had 25 people on it.  There was an all-hands email

6    from a little after this, maybe a day or two, with more than

7    35.  He's lying to investors.

8        He says, you know, and it's clear on the testimony you've

9    heard in this trial that Rothenberg Ventures threw a lot of

10   events, not just Founder Field Day, not just puppy happy

11   hours, not just Warriors suites.  And there would be

12   legitimate questions.

13       So what does he say to investors?  "All the costs of every

14   event we host," we have partners for.  And that "these events

15   are NOT funded with money our LPs entrusted with us."

16       Heard testimony from at least a couple of witnesses that

17   in fact sponsorships did not cover all of these events.

18       And what does he do?  He blames the press.  Same thing he

19   does in August of 2016 when his firm implodes.  He calls it

20   lazy journalism.

21               (Demonstrative published.)

22           MR. WALDINGER:  There's an exhibit in evidence, 583,

23   that came in through Brandon Farwell.  We didn't spend a lot

24   of time with Mr. Farwell on it, but it shows Mr. Rothenberg's

25   back and forth with the reporter named Adam Satariano.  And

1   Mr. Satariano asks Mr. Rothenberg just about whether he took

2   an Uber or Lyft home from the Warriors game.

3       How does Mr. Rothenberg respond?  Well, he responds to

4   that question, but also has to try to mislead the reporter,

5   where he says, "We occasionally host a group to a sports game

6   when we can secure a spot to take a group (such as the suite

7   you came to)."

8       Well, you know that's a lie.  You know that's misleading.

9   You've heard that they spent $300,000 on a full season of

10  suites at Oracle Arena.

11      He is trying to hide from the press so that LPs and

12  potential LPs don't find out how much money he's spending.  He

13  knows his business plan is failing, and he says -- he attacks

14  the press, says it's just you a caricature of what we are.

15                  (Demonstrative published.)

16       **MR. WALDINGER:**  His intent to defraud is shown

17  throughout his behavior in 2015 and 2016.

18      Undisputed testimony that he took excess fees, money from

19  the 2015 Fund in 2015 and in 2016.  At the same time, he was

20  sending out decks that touted Rothenberg Ventures as having a,

21  quote, best in class fee structure with lower fees than funds

22  of similar size.

23      Whether that's true or not, if you're taking $6 million in

24  fees from the 2015 Fund when you're owed much less than that,

25  that's again -- shows your intent to defraud.

1            (Demonstrative published.)

2        **MR. WALDINGER:**  Again here's the chart from the

3    excess fees.  He's taking excess fees throughout 2015 from the

4    2015 Fund.

5            (Demonstrative published.)

6        **MR. WALDINGER:**  That continues in 2016.

7        I'm sorry this is so small.

8        We have a million dollars.  You can tell from the

9    correspondence with Lynne McMillan that this was planned and

10   based on the line of credit that was obtained from SVB.  And

11   that was -- I think you can conclude that that was supposed to

12   be the entire fees for 2016 for the 2015 Fund.

13       But what does he do?  He continues to take money until,

14   boy, it really drops off around the middle of July.  And

15   you've heard testimony.  Sometime in late July he gets a

16   letter from the SEC.  And that also animates his actions.  It

17   shows that he knows people are going to be looking at what

18   he's been doing.

19       Again in 2016, a total of $6.7 million in fees, according

20   to Gerry Fujimoto.

21            (Demonstrative published.)

22       **MR. WALDINGER:**  And this is the deck that I'm talking

23   about, this was I think Exhibit 188, where he touts his best

24   in class fee structure.  He tries to attract investors but not

25   tell them that he doesn't actually stick to the fee structure.

1              (Demonstrative published.)

2        **MR. WALDINGER:**  You've heard also abundant testimony

3    that from the inception of River Studios sometime in late '14

4    or 2015, I'm not -- your recollection controls.  Until about

5    August of 2016, he told numerous people that River Studios,

6    which was also known as Bend Reality, had been self-funded by

7    him or had external funding or was separate from the venture

8    capital funds and was not funded by the funds.

9        There's no testimony by anybody other than the defendant

10   that anybody knew prior to about August of 2016 that fund

11   money was going into River Studios.

12             (Demonstrative published.)

13        **MR. WALDINGER:**  Indeed he sends out annual reports.

14   And you saw these come in through Brandon Farwell in February

15   and March of 2016.  These fund annual reports say nothing

16   about fund money going into River Studios.

17             (Demonstrative published.)

18        **MR. WALDINGER:**  And I'll talk about this more.  The

19   evidence shows that it did flow freely.  Gerry Fujimoto

20   testified prior to Pilot Grove's investment, again about

21   40 percent of 2015 Fund investors' money goes into River

22   Studios.

23             (Demonstrative published.)

24        **MR. WALDINGER:**  Here's one of the annual reports.

25   This is Exhibit 393.

1    (Demonstrative published.)

2        **MR. WALDINGER:**  It lists all the portfolio companies,

3    or at least most of them.  Nowhere is River Studios listed on

4    March 31st of 2016.

5        And by the way, this is dated March 31st of 2016.  We

6    don't have a date for when this was sent out.  I submit that

7    you can assume it was sometime after March 31st.  Yet on -- on

8    April 4th, according to the defendant, that's the first time

9    there was a fund investment into River Studios.  You saw that

10    convertible note.

11        I submit to you that that was a post hoc, an

12    after-the-fact, justification for money.

13        The defendant talked about a $2.1 million wire.  Look at

14    that closely.  There is a $2.1 million wire from the 2015 Fund

15    on April 5th of 2016.

16        That, according to the defendant, is the first fund

17    investment in River Studios.  What's the problem with that?

18    Unlike every other investment that happens from a venture

19    capital fund, it doesn't go directly to Bend Reality.

20        I went through this with Mr. Rothenberg on cross.  When

21    there's a portfolio investment, you saw examples, it goes

22    directly from the fund to the portfolio company.  That's not

23    what happened with that $2.1 million wire.  It was just -- let

24    me go back.

25        It was just -- oh, where is this?

1           I can't find the --

2                    (Demonstrative published.)

3           **MR. WALDINGER:**  Here we go.

4       It was just part of the pattern that had been developed

5   already and was being developed in 2016 about excess funds

6   going from the 2015 Fund to the Management Company.

7       This $2.1 million that the defendant now says is an

8   investment by the 2015 Fund into River Studios didn't go to

9   River Studios.  It went to his Management Company.

10      Moreover, you heard testimony that it was not recorded in

11  the books as an investment.  It was recorded in the QuickBooks

12  records as professional fees, excess management fees.  And

13  only after the jig was up was -- were the QuickBooks records

14  changed.  Only sometime after August of 2016.

15                   (Demonstrative published.)

16          **MR. WALDINGER:**  So fund money flowed freely to Bend

17  Reality.

18      It's made up that there was a formal investment in April

19  of 2016.  You know it because a month later, the defendant

20  sent an email to the only other outside investors in River

21  Studios at that time, Dominic Polizzotto and Larry Weisman

22  through Pilot Grove and Transcend.  He asked for money from

23  them.  He told them how great things are at River Studios.

24      He didn't mention in that May email that, oh, by the way,

25  I wanted to let you know, the Fund -- the 2015 Fund entered

1    into a convertible promissory note in the amount of $5 million

2    with River Studios and has already invested 2.1 million.

3    Doesn't mention that.

4        Well, why doesn't he mention it?  Because the

5    $2.1 million, in the defendant's mind at that point, was just

6    him stealing money from the fund to run his Management

7    Company.  And because he doesn't come up with that excuse

8    until the SEC comes into the picture and people start asking

9    questions.

10                    (Demonstrative published.)

11        MR. WALDINGER:  The fund documents also did not

12    say -- Mr. Fakhoury touched on this, there was some

13    cross-examination on this -- yes, Bend Reality was mentioned

14    in some of the fund documents.

15                    (Demonstrative published.)

16        MR. WALDINGER:  But let's look at them.  And I've

17    given you them here, Exhibit 22, page 15, Exhibit 373,

18    page 51.  This is the 2015 Fund Operating Agreement.

19        The part of this agreement that talks about Bend Reality

20    is not in a conflicts of interest section.  It's not in a

21    potential investment section.  It's in a competing activities

22    section, meaning it's a disclosure that the defendant owns and

23    controls other companies that may compete in investments with

24    the 2015 Fund, and that the 2015 Fund will receive no -- shall

25    not have any right in or to such other ventures or activities

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    or to the income or proceeds derived therefrom.  That's all

2    that provision says.  That says nothing about the defendant,

3    through the 2015 Fund, investing in River Studios.

4        Again, Bend Reality is mentioned exactly once in the

5    2015 Fund agreement.  It says nothing about the 2015 Fund

6    investing in Bend Reality.

7        I want to take a second to talk about the fund documents.

8        That does not -- the fund documents do not absolve the

9    defendant of misrepresentations that were made to investors.

10   He knows -- he knew, regardless of whatever language was in

11   here, that a fund investor would want to know if their money

12   was going to be used to invest in a company owned by the

13   defendant.  He knew that.  And the fact they cannot, the

14   investors cannot, sign away their right to not be defrauded.

15       The 2015 Summary of Principal Terms, this is not a legal

16   document perhaps, it's not signed.  It's a summary of what

17   it's about.  This has a little more information about Bend

18   Reality.

19                    (Demonstrative published.)

20            **MR. WALDINGER:**  But again, it says nothing -- this is

21   page 6 of Exhibit 373.  It says nothing about the 2015 Fund

22   investing in Bend Reality.

23                    (Demonstrative published.)

24            **MR. WALDINGER:**  There's a Confidential Private

25   Offering Memorandum.  This page may not be correct.  I have --

1    I have page 6.  It's somewhere in Exhibit 373.

2                    (Demonstrative published.)

3          **MR. WALDINGER:**  Again it does say in the Confidential

4    Private Offering Memorandum that there's a potential conflict

5    or possible conflict.  But again, it says nothing about the

6    2015 Fund investing in Bend Reality.

7          The 2016 Fund has similar terms.

8                    (Demonstrative published.)

9          **MR. WALDINGER:**  The other thing that I think is

10   important for you to look at in terms of whether the defendant

11   had an intent to defraud in this case is the movement of money

12   from one legal entity to another, from Fund I to the

13   Management Company and back to Fund I.

14         I think you can conclude from what you've seen through the

15   testimony and from Gerry Fujimoto's summary and from Agent

16   Ghio's testimony that the money just moved freely.  Whenever

17   the defendant needed it in one place, he moved it from where

18   he had the money to where he needed it without regard to

19   whether that was the proper use of the funds.

20                    (Demonstrative published.)

21         **MR. WALDINGER:**  You saw it happened when he wanted to

22   fund the collateral account.  To get the line of credit, to

23   pull down a $4 million line of credit, he needed to put

24   $4.25 million at SVB.  To come up with that money, he pulled

25   from it a bunch of different sources including Fund I and

1    Fund II.  We saw it both with Lynne McMillan and on

2    cross-examination of the defendant.  He used money from Fund I

3    and Fund II to come up with the down payment on the building

4    at 1062 Folsom.

5        And the evidence shows that throughout this time, he used

6    money wherever he had it to pay RVMC's, River Studios', or his

7    real estate company's operating expenses.

8                    (Demonstrative published.)

9        **MR. WALDINGER:**  He testified, the defendant, that

10   money is fungible.

11                   (Demonstrative published.)

12       **MR. WALDINGER:**  But the defendant's duty to the fund

13   investors, to his LPs was not fungible or something that he

14   could wish away.

15       And one thing that the defendant, although he -- although

16   the defense has thrown up the fund documents and says that

17   they absolve him, one of the things that the fund documents do

18   provide, very important, and addresses this routine movement

19   of money.

20                   (Demonstrative published.)

21       **MR. WALDINGER:**  The Fund I Operating Agreement.  This

22   is Exhibit 11, page 39, section 8.4.  I had to blow this up so

23   it's readable.  That's why it looks like this.

24       It says "The Board of Managers shall maintain the funds of

25   the Company in one or more separate bank accounts in the name

1    of the Company."  And here's the kicker.  "And shall not

2    permit the funds of the Company to be commingled in any

3    fashion with the funds of any other person."

4        And "the Company" here, remember, is not -- this is the

5    operating agreement for Fund I.  So the company is not RVMC.

6    The company is Fund I.

7        The defendant is the manager, and he's agreed in the

8    Fund I operating agreement to not permit the funds of the

9    company to be commingled in any fashion.

10       Gee, what does Fund II say?  Same thing.  Exhibit 19, page

11   48, First Amended and Restated Operating Agreement.

12       The Manager "shall not permit the funds of the Company to

13   be commingled in any fashion with the funds of any other

14   person."

15       This might be one reason why the defendant didn't want

16   people like David Haase to get a copy of the operating

17   agreements.

18                    (Demonstrative published.)

19       **MR. WALDINGER:**  Exhibit 373 is a 2015 Fund Amended

20   and Restated Operating Agreement.  It says the same thing

21   about commingling.

22       You cannot look at this case and not conclude that the

23   defendant commingled money whenever he wished and wherever he

24   needed it.

25                    (Demonstrative published.)

1    **MR. WALDINGER:**  Prime example.  This is maybe

2    exhibit -- I don't know -- 27.  This is what he did with the

3    Unity investors' money.

4                    (Demonstrative published.)

5            **MR. WALDINGER:**  The Unity investors were told that

6    setup of separate fund called the 2016 Fund Co-Fund Unity LLC,

7    and that it had been formed and that the purpose was to invest

8    in a special purpose vehicle that will purchase equity

9    securities of Unity Software Inc.  That's what they were told.

10                   (Demonstrative published.)

11           **MR. WALDINGER:**  They were told to send their money.

12   The -- the deck said one thing.  It was the deck told them to

13   send it to the 8931 account, the RVMC operating account.  I

14   think you've seen evidence that there was a correction to that

15   because certainly most of the investors sent it to this

16   account, Exhibit 66, entitled Rothenberg Ventures CO-I LLC.

17   There are a lot of records for this account.  This account had

18   been in place for a long time.

19       But in July of 2016, it started out with a zero balance.

20   And it's first deposit was a million dollars from GHF, the

21   Melas-Kyriazis.

22       The same day -- again we've heard -- we've heard that

23   sometimes the transactions are out of order at SVB, but never

24   that they're incorrect in terms of the amounts or the dates.

25   So the same day, that million dollars goes out.  We have

1    50,000 coming in on the 18th from somebody you didn't hear

2    from, Nathanael Hudson.  And the 19th, the Binnses deposit

3    money.

4        And that same day 150,000 goes out.  Where does it go?  It

5    goes to the RVMC account, to the RVMC's operating account

6    because he needed the money there.

7        July 21st, money comes in from Sonoko Konishi, who is the

8    wife of Ewan Johnson.  I believe the same day, money comes in

9    from Lena and Ronald Goldberg -- or Ronald Goldberg, the

10   husband of Lena Goldberg.  That's around the day that the SEC

11   letter comes.  So the defendant hangs onto it in there for a

12   while.

13       But ultimately he needs it, and it gets sent also to the

14   RVMC account on August 1st.  And you can look at it and you

15   can see that some of that money that was sent at the beginning

16   of August that included Sonoko Konishi's money and Ronald

17   Goldberg's money, this is in Exhibit 63, the RVMC account,

18   it's used to go to a fund and used to fund part of an

19   investment that's not Unity.  And it's clear nobody thought

20   that they were giving money for anything but a Unity

21   investment.

22                    (Demonstrative published.)

23           MR. WALDINGER:  Again, he had to lie because he

24   needed the money.  You can look at the accounts.  The RVMC

25   account is Exhibit 63 numbered ending 8931.

1      That month, in July, there were $1.733 million in

2   expenses.  The deposits that came in from Unity investors that

3   month totaled 1.15 million.  That's almost two-thirds of the

4   money that the defendant had to spend that month came from

5   Unity investors.

6      Mr. Rothenberg had $4,167.01 in this company at the end of

7   that month.

8                    (Demonstrative published.)

9          **MR. WALDINGER:**  Bend Reality, you've heard about it.

10  Did he have any money there?  Well, he had $590,000 in

11  expenses in the month of July.  Ended up with $1,578 at Bend

12  Reality.

13     He had a real estate company.  You've heard about that.

14  Not much money there.

15                   (Demonstrative published.)

16         **MR. WALDINGER:**  His personal BofA account, these

17  balances end not on month-end but on July 21st and

18  August 23rd.  He's got a little money on August -- or

19  July 21st.  It's all gone.  Down to $2,809 by August 23rd.

20     So that's why he took the Unity money.  And he knew, he

21  knew when it came in that he wasn't going to use it for the

22  Unity deal.  Whatever he was -- whatever the defendant was

23  trying to do with Unity, whatever he hoped to accomplish,

24  whatever sovereign investment fund he hoped to get money from,

25  that doesn't matter because you know what he knew is that he

 1   was not going to use any of the money that went into this 2235

 2   account --

 3                    (Demonstrative published.)

 4        **MR. WALDINGER:**  -- for what he told these investors,

 5   for what he told the Melas-Kyriazis, for what he told the

 6   Binns Family Limited Partnership, for what he told Sonoko

 7   Konishi and her husband, Ewan Johnson, and for what he told

 8   his business school professor, Lena Goldberg.

 9      He knew at the time that he was not going to use the money

10   for what he intended -- for what it was intended.

11                    (Demonstrative published.)

12        **MR. WALDINGER:**  When it all came crashing down for

13   the defendant, he had to also mislead investors.  And you saw

14   multiple versions of emails that were sent, update number one,

15   update number two.

16                    (Demonstrative published.)

17        **MR. WALDINGER:**  At that point, this is the first time

18   that people find out that $5 million -- 5 million -- has gone

19   from the funds, does not specify which funds or when.

20      If it were truthful that the defendant had entered into a

21   convertible promissory note with himself, remember that

22   convertible note was signed by him for both parties, signed by

23   him on behalf of Bend Reality, signed by him on behalf of the

24   2015 Fund.  He knew that that had happened.  Yet in August of

25   2016, he didn't mention that.  Very light on details of what

1   had happened.

2       He lied about the Super Bowl suite.  The only evidence

3   that you have that he got it down from a million dollars is

4   his own testimony.  And I submit to you that it's not

5   believable.  Look at the -- look at the exhibits from Suite

6   Experience Group.  And the email chain from Savannah Leggett

7   and the individual from Suite Experience Group showing it was

8   not an 80 percent discount.  It was less than a 40 percent

9   discount.

10      Why did he tell this lie to investors in 2016?  Because

11  now they're finding out he's taken their money and put it into

12  River Studios, something he owned.  Then all of a sudden,

13  well, wait a minute, what about all of this spending that

14  you've been doing for the last year, two years?

15      He's got to lie to them about his spending.  And then he

16  says -- he has the audacity to say in this email that this --

17  it was $250,000 to go to the Super Bowl.  He has the audacity

18  to say that had something like measurable business outcomes.

19      You have heard no testimony that Draymond Green invested

20  money into River Studios or Klay Thompson or anybody who was

21  at the Super Bowl suite that day.

22      The defendant knew -- maybe that was part of his business

23  plan, but he knew at that point in time, in February of 2016,

24  that his business plan was failing.  When Lynne McMillan told

25  him you need to send money back, Lynne McMillan didn't know he

1    was going to the Super Bowl.  She just knew he had taken money

2    out of the RVMC account.  And she said you have to send money

3    back.  Otherwise we can't make payroll.

4        And her testimony -- let's be clear on what the testimony

5    of Lynne McMillan was on payroll.  She said the only way they

6    were able to make payroll is that she got the defendant to

7    send 50,000 back and that she didn't pay herself.

8                    (Demonstrative published.)

9        **MR. WALDINGER:**  Talked about getting paid for a

10   Coldplay video.  You saw today, Exhibit 62, Mr. Fakhoury

11   showed you $93,000 coming in to make a Coldplay video.  Yet

12   the other exhibit shows that the cost of that would have been

13   much more.

14       And you can look at Exhibit 118 which has been admitted

15   into evidence.  I did not go through this with Special Agent

16   Wescott, but these are AMEX statements.  There's a reference

17   in the email, Exhibit 635, about an India shoot related to the

18   Coldplay video.  And you can see in Exhibit 118 starting at

19   pages 84 going through at least 115, a large number of

20   expenses for travel just for Mr. Rothenberg and Katie Fanelli

21   to go to India, Mumbai, and stay at the Four Seasons.

22       Ewan Johnson testified that the company had to pay to make

23   that -- to make that video.

24       Again, he's lying to investors in 2016.

25                    (Demonstrative published.)

1          **MR. WALDINGER:**    Mr. Fakhoury said that nobody

2     complained about being rushed until they testified in this

3     trial.  That's not really true.  I think you can see in the

4     correspondence that the Melas-Kyriazis sent when they were

5     asking for their money back in August of 2016, that they had

6     been rushed, and then it was a hurry-up-and-wait situation.

7          The defendant told them that their money had been invested

8     in the 2016 Fund.  Not true.  He tried to get the Binnses,

9     through his attorney, to sign some document that said that

10    they -- Binnses had intended to invest in the 2016 Fund.  Jim

11    Binns refused to do it.

12         And, yes, the defendant -- Mr. Fakhoury said that they got

13    their money back.  Well, let's talk about it.

14         So I guess money's fungible.  They got their money back.

15    Their dollars had been spent.  Their dollars were gone.  What

16    the Melas-Kyriazis got back and what the Binnses got back was

17    somebody else's money.  But I guess if money's fungible, it

18    doesn't really matter.

19         And there was some testimony through Special Agent Wescott

20    and you heard from Jed Feldman from Thrive Capital about the

21    2013 Fund selling $2 million worth of Robinhood stock.

22         Follow that money from when it comes into Exhibit 64,

23    which is the Fund 2013 account.  It flows through directly to

24    RVMC.  And also through Fund II, Exhibit 65.  The RVMC account

25    is Exhibit 63.

1      You keep following that money, it ends up in the 2016 Fund

2   account.  And that's where the Melas-Kyriazis are paid back

3   from the fund that they didn't invest in.

4      So the money that the Melas-Kyriazis got was not their

5   money, quote, unquote, their money.  That was somebody else's

6   money.  Those were from exits.  At least part of it, you can

7   look and see, came from Robinhood, came from Fund I investors.

8      Same with the Binnses.  I went through this on

9   cross-examination with Mr. Rothenberg.  Maybe it didn't make

10   sense, maybe it did.  But the Binnses, again, Jim Binns,

11   America's dad, refused to sign that agreement that said that

12   he'd invested in the 2016 Fund.  But that's where their money

13   came from.

14      There was questions about a Cobalt Robotics rescinding.

15   So 2016 Fund investors had put money into the 2016 Fund.  It

16   invested in Cobalt Robotics.  Cobalt Robotics bought back

17   their shares.  500,000 out from 2016 Fund investors.  500,000

18   comes back in.  And I went through this with Mr. Rothenberg.

19   It comes back in in October of 2016, again after things

20   implode for Mr. Rothenberg.

21      So what does he do with it?  You can just follow the

22   money.  It's not hard.  Mr. Rothenberg wouldn't admit it, but

23   he takes Cobalt Robotics money and funnels it through various

24   accounts so it ends up paying the Binnses back from the

25   original account that they invested in.

1   He didn't give the Binnses their money.  He gave them

2   somebody else's money.  It shows his intent to defraud.

3   (Demonstrative published.)

4   **MR. WALDINGER:**  Mr. Rothenberg also took several

5   actions that show his recognition of wrongdoing.  He admitted

6   various things to people before 20 -- August of 2013 -- excuse

7   me.  Before August 13 of 2016, Mr. Kleinman talked about this

8   in his closing argument, that this is the testimony of Ewan

9   Johnson.

10   (Demonstrative published.)

11   **MR. WALDINGER:**  In which the defendant told Ewan

12   Johnson that the investors were not aware that -- that their

13   money, that fund money had been put into River Studios.

14   (Demonstrative published.)

15   **MR. WALDINGER:**  Heard a lot about the "I come to you

16   humbly hat in hand" email.  This is a recognition of his

17   wrongdoing.  He tries to downplay it by saying he's confused.

18   But it's an admission that in fact what the evidence has

19   shown, what Gerry Fujimoto has testified to, is that at least

20   a good chunk of River Studios was funded by the Funds.

21   (Demonstrative published.)

22   **MR. WALDINGER:**  Same day, August 13th, the defendant

23   says similar things to Ewan Johnson, Jonah Loop, and Devin

24   Horsman.

25   (Demonstrative published.)

1    **MR. WALDINGER:**  He Admits it to the LPs on

2    August 21st and August 23rd.  He says $5 million have been

3    invested.  All of that comes -- all of this that I've labeled

4    "recognition of wrongdoing" comes after the defendant gets the

5    letter from the SEC.

6                       (Demonstrative published.)

7        **MR. WALDINGER:**  Also after receiving the SEC letter,

8    creates the war room at the condo.  Tells people not to use

9    email and text.  Pats down Justin Grooms.

10       Justin Grooms says that the defendant told him that

11   sometimes you have to bend the rules.  Walked outside for some

12   conversations.

13       And here's -- here's a good point for you to think about.

14   There was some evidence that the defendant originally told

15   investors that he was going to step down and that he

16   ultimately didn't do so.

17       You should ask yourself, one of the reasons why he did not

18   do it was because doing so would mean providing access to the

19   books and records of the Funds and RVMC to his replacements.

20       And you heard testimony that that was one of the things

21   that people would have wanted to see if they were going to

22   take over managing the funds.  Want to know what their

23   exposure was, what their liabilities were.  They never saw it.

24       Remember, none of these people who worked for the

25   defendant other than his finance people saw what he was doing

1    with the money.

2        There's no evidence that anybody knew that the defendant

3    had moved GHF's money out of that account as soon as it came

4    in.

5        The defendant did not step down because he knew that it

6    would -- it would be clear what he'd been doing for the last

7    two years to whoever looked at the books after he stepped

8    down.

9        He also had a conversation with Tommy Leep that he was

10   concerned that he had done something wrong and might get in

11   trouble.

12                  (Demonstrative published.)

13        **MR. WALDINGER:**  And then Lena Goldberg.  This is the

14   person, as I said at the beginning, he did an independent

15   study with Lena Goldberg about this business, about studying

16   the fund documents and how to do this kind of business, a

17   venture capital business.

18        He had a close relationship with Lena Goldberg.  She was

19   one of his first investors.  She visited River Studios.  She

20   clearly kept in touch with him.

21        She asked him some -- some tough questions.  So after one

22   of these update emails goes out, she sends him an email

23   responding to one of the update emails on September 1st of

24   2016.  This is Exhibit 335.  And Ms. Goldberg says, "I have

25   several unanswered questions to which I hope you will be able

1    to respond."

2        And she sets out a grid that is exactly what people wanted

3    to know, how much had you raised, how much management fees had

4    you taken.

5        These are basic principles about running a venture capital

6    fund, things that the defendant knew.  She's not -- she

7    doesn't say, "I know that we didn't cover this at all in

8    Harvard Business School and this might be news to you."  She

9    asked that question.

10                    (Demonstrative published.)

11        **MR. WALDINGER:**  She also asked, among other

12    questions:  Are there good records showing the LLC's ownership

13    interests in River Studios?

14        Remember, the defendant has said $5 million over two

15    years.

16        What exactly is the nature of the economic interest?

17    Well, he could have answered that question because he knew at

18    least that there was, according to his testimony, there had

19    been a convertible note in April.  He doesn't tell her that.

20    Again convertible note made up later.

21                    (Demonstrative published.)

22        **MR. WALDINGER:**  And then with respect to the 2016

23    Fund IV, and the Unity Co-Investment, she says, "Can you

24    confirm that it's been invested or being held in cash for

25    future investments?"

1       And that's key, right?  If you're -- everyone expected

2   that the money that they contributed would be used and held

3   for the purpose that it was being raised for.

4       Crickets to the 9/1/2016 email.  No evidence of any

5   response from the defendant.

6                   (Demonstrative published.)

7           MR. WALDINGER:  Same email chain.  Ms. Goldberg, on

8   September 10th, reads an article and asks some questions,

9   tough questions.

10      Can you confirm that all of the money net of management

11  fees attributable to and only to the Unity Co-Investment, that

12  we and presumably other investors wired to you for the Unity

13  Co-Investment has, in fact, either A, been invested in Unity,

14  or B, is being held in separate deposits or accounts that are

15  earmarked for that purpose and unencumbered in any way?

16      No evidence of any response.

17                  (Demonstrative published.)

18          MR. WALDINGER:  That is evidence of his knowledge of

19  wrongdoing.

20      He doesn't respond to his Harvard Business School

21  professor, his mentor.

22                  (Demonstrative published.)

23          MR. WALDINGER:  He has a motive.  We've gone through

24  this.

25                  (Demonstrative published.)

1   **MR. WALDINGER:**  Purchase the building.  We went

2   through this with a couple of witnesses.  He takes money, 7483

3   is Fund II.  2623 is Fund I.  I believe the defendant talked

4   about "member payments."  There may be provisions in the

5   agreements.  There is provisions in the agreements for

6   extraordinary expenses.  But these are not those.

7      And you know that because this money gets sent back to the

8   funds.  Every time the defendant takes money from Fund I and

9   Fund II, he needs to send it back.

10                  (Demonstrative published.)

11      **MR. WALDINGER:**  Talked about the growth of employees.

12  The K-1 tax documents.  The 2015 Fund has to be trued up

13  before the end of the year.  Otherwise the investors are going

14  to go crazy.

15                  (Demonstrative published.)

16      **MR. WALDINGER:**  This is just -- you have the summary

17  from Gerry Fujimoto about how much money before February of

18  2016 goes into the fund -- goes into River Studios.  Excuse

19  me.

20      This is just an illustration.  And I have a little bit

21  more later of really when it picks up, June of 2015.

22      And this is money going from the RVMC account to the River

23  Studios account.  River Studios is taking a lot of money.

24  It's growing.  There's four -- four people, five people.  Ewan

25  Johnson starts.  It grows.  It ends up being 30 people.

1          (Demonstrative published.)

2      **MR. WALDINGER:**  Lynne McMillan testified early on

3  basically what was going on was that there was a lot of cash

4  going out and not a lot of cash coming in.  The funds were

5  quite small so I was concerned with how we were going to go

6  pay all of the outgoing expenses.

7      And the money had to come from somewhere.  So where did he

8  go?  The defendant went to friends, classmates and their

9  families.  He went to investors with deep pockets.  Went to

10  the Bank of San Francisco.  This was Exhibit 562.

11      Once the Bank of San Francisco guy, John Dzida, D-Z-I-D-A,

12  started asking questions, you'll see in the Bank of San

13  Francisco account records, the defendant moves his money out

14  of there and is no longer talking about getting a loan from

15  Bank of San Francisco.

16      He goes to Silicon Valley Bank.  He goes to his own

17  employees.

18          (Demonstrative published.)

19      **MR. WALDINGER:**  Gets money from Ewan Johnson to

20  invest in Unity.  And he goes to the piggy banks.  You've

21  heard -- you've seen testimony of the email from the defendant

22  that came in through Mr. Stearns from the SEC, which the

23  defendant sends himself an email talking about the 2015 Fund

24  and using it as a piggy bank.  That's exactly what he was

25  doing with the funds at all times.  Not just the 2015 Fund.

1        (Demonstrative published.)

2        **MR. WALDINGER:**  That's where he went for money.

3     My co-counsel tells me I've been going for 40 minutes.  I

4  could go on a lot longer.  But this has been a long trial.

5  And we're on our seventh week.  You've learned a lot about the

6  venture capital industry.  You've learned a little bit about

7  forensic accounting.  You've learned what carry is and

8  portfolio companies.

9        And you've learned about how one venture capitalist

10  operated in the middle part of the last decade.

11        Mr. Fakhoury ended his closing argument by saying

12  something along the lines of what the defendant thought he

13  could do is central to this case.  And Mr. Fakhoury's point

14  was that the defendant thought he could do it, thought he

15  could do what he did.

16        And I guess -- or I submit the thought -- he thought it

17  was okay.

18        I submit to you that the evidence does show that the

19  defendant -- what the defendant thought is central to the case

20  and what he did is central to the case.  But he thought and he

21  knew -- he knew what was right and wrong.  He thought he could

22  do whatever he wanted because the investors would never find

23  out because he controlled all the information at Rothenberg

24  Ventures.

25        He thought he could do whatever he wanted even if it meant

1    deceiving Silicon Valley Bank, deceiving the folks at Pilot

2    Grove, deceiving the Unity investors, and deceiving other fund

3    investors.

4        The last thing I'll say is that Mr. Fakhoury put up an

5    instruction a couple of times, but he only read half of it.

6    And the instruction is instruction number 20 which says you

7    may determine whether the defendant had an honest good faith

8    belief in the truth of the specific misrepresentations alleged

9    in the indictment in determining whether or not the defendant

10   acted with intent to defraud.

11       The second part of that instruction, instruction

12   number 20, is important, which says:  However, a defendant's

13   belief that the victim of the fraud will be paid in the future

14   or will sustain no economic loss is no defense to the crimes

15   charged in the indictment.

16       In each of these cases, in each of these instances, SVB,

17   Pilot Grove, Unity, the 2015 and 2016 Fund investors, the

18   government has proven beyond a reasonable doubt that the

19   defendant made false statements, executed a scheme to defraud,

20   made misrepresentations to those investors that were material

21   or made misrepresentations to the bank that were material and

22   that he did so with the intent to defraud, which is the intent

23   to deceive and to cheat.

24       With respect to each of the wire fraud counts, we've shown

25   that there was an interstate movement of money -- or excuse

1    me -- an interstate communication, emails, or movements of

2    money.

3        We've shown with respect to the money laundering charges

4    that those -- that the money involved in that was more than

5    $10,000 and traced back to Pilot Grove's money.

6        For all of these reasons, for all the evidence you've

7    seen, based on everything that Mr. Kleinman argued to you

8    yesterday and based on the arguments that I've made to you

9    today, I ask you to find the defendant guilty of each and

10   every charge of the indictment.

11       Thank you.

12           **THE COURT:**  Thank you, Mr. Waldinger.

13       Members of the jury, that concludes counsel's closing

14   arguments, and the case is now yours to decide.

15       Good news is starting today we have lunch for you.

16       I'll be waiting for a note from you that just indicates to

17   me and the persons on my court staff and the lawyers and

18   Mr. Rothenberg what schedule you want to have during your

19   deliberations.

20       I join counsel in thanking you for your service.  This is

21   a particularly long trial.  But I think that there's a lot of

22   interesting testimony.  But let's not kid ourselves, there's

23   sometimes when it was kind of dry too.  And you really hung in

24   there.  So I know the job is not done yet, but I want just to

25   extend my thanks to you again.

1     Mr. Fortenberry, man, thanks for keeping yourself healthy

2  and being our one alternate.  If you'll just stick around

3  after the jurors go back into the jury room, I just want to

4  have a brief discussion with you.

5     So members of the jury -- well, let's all rise for this

6  jury.

7     Ms. Lee will take you back into the jury deliberation

8  room.

9         **THE CLERK:**  Please rise for the jury.

10     (The following proceedings were heard out of the presence

11  of the jury:)

12             (Alternate juror remains in the courtroom.)

13         **THE COURT:**  Okay.  Everybody can take their seats.

14     Regular jurors are in the jury room.

15     Mr. Fortenberry, I'm going to take my mask off so you can

16  hear me clearly.

17     You, I know, live in Oakland and you're a

18  telecommunications manager for AT&T; is that right?

19         **ALTERNATE JUROR:**  That's correct.

20         **THE COURT:**  And, sir, where is your office located?

21         **ALTERNATE JUROR:**  Actually my office is located in

22  Santa Clara.

23         **THE COURT:**  Oh, wow.  Okay.  So you have something of

24  a commute every day.

25         **ALTERNATE JUROR:**  Yeah, when I go in.  I don't have

 1   to go in every day.

 2          **THE COURT:**  I see.  Okay.  Well, I'm just going to

 3   ask you to give your cell phone number to Ms. Lee.  If -- if

 4   we need you, she'll call you and we'll just ask you to come in

 5   right away.

 6       So you're welcome to go back to work.  If you could just

 7   tell your employer you might be called out on short notice,

 8   that'd be great.

 9          **ALTERNATE JUROR:**  They know.

10          **THE COURT:**  I don't think I've ever seen an alternate

11   have such good humor and pay such close attention as you.  And

12   it's such a long trial also.  And you know I feel bad about

13   not allowing you to go to your friend's funeral.  I've never

14   had to do that before either.

15       I don't know if I'm going to see you again.

16       I'll tell you what, this has never happened to me before.

17   I was kind of rooting for somebody to catch a bad cold or

18   something.  You know what I mean?

19                      (Laughter.)

20          **THE COURT:**  Just because I felt like I could tell

21   you're working so hard as a juror, I know you're a good juror,

22   and I wanted you to have that payoff of the deliberations

23   if -- you know, when we got to that stage.

24       I won't say anything more about that because, who knows,

25   maybe you will be substituted in.  I don't know.

 1          But if not, I just want to say that you make me proud to

 2    have this job.

 3          **ALTERNATE JUROR:**  Thanks for the opportunity.

 4          **THE COURT:**  You know, I think -- the trial lawyers

 5    sometimes get in the newspaper, the judges sometimes get in

 6    the newspaper even if we don't want to be in the newspaper.

 7    And it's folks like you day in, day out keep the machine

 8    rolling along.  So thank you again.

 9          And, Ms. Lee, do we already have this gentlemen's cell

10    phone number?

11          **THE CLERK:**  I do, but I'm going to confirm it with

12    him.

13          **THE COURT:**  Okay.  Very good.

14          Mr. Fortenberry, would you like someone on my staff to

15    give you a call if the jury reaches a verdict and tell you

16    what the verdict was?

17          **ALTERNATE JUROR:**  Yes.

18          **THE COURT:**  Okay, very good.

19          And I would like to write a thank you letter to your

20    employer or your family, as the case may be.  I'll write a

21    thank you letter to you.

22          If I do see you again, thanks for being on standby.  And

23    if I don't see you again, thank you so much for your service.

24          Let's all rise.

25          **THE CLERK:**  Please rise for the juror.

```
 1              ALTERNATE JUROR:  Thank you.
 2         (The following proceedings were heard out of the presence
 3    of the jury:)
 4              THE COURT:  All right.  We're outside the presence of
 5    the regular jurors and also the alternate.
 6         Mr. Waldinger, anything for the record?
 7              MR. WALDINGER:  Nothing, Your Honor.
 8              THE COURT:  Mr. Fakhoury?
 9              MR. FAKHOURY:  I wasn't sure -- I don't know if the
10    jury needs to be -- a bailiff needs to be sworn in for the
11    jury.  I'm not sure if we need to do that.
12              THE COURT:  Oh, that's a good thought.  I do need to
13    do that.
14              MR. FAKHOURY:  But beyond that, nothing else, Your
15    Honor.
16              THE COURT:  Ms. Kannan, would you go knock on the
17    jury --
18         Oh, wait.  Ms. Lee, I need to swear you in as a bailiff.
19              THE CLERK:  I'm sorry.
20              THE COURT:  Mr. Fakhoury reminded me.  I've never
21    forgotten this before.  I have to swear you in as the bailiff
22    for this jury.
23              THE CLERK:  Oh, right.
24              THE COURT:  I appreciate that, Mr. Fakhoury.
25              MR. FAKHOURY:  Sure, Your Honor.
```

```
 1              THE COURT:  You think after doing X number of trials

 2   and being as old as I am, I could remember.

 3              THE CLERK:  Sorry, Judge.  I'm just trying to find it

 4   for you.  Here you go.

 5              THE COURT:  Ms. Lee, would you raise your right hand,

 6   please.

 7        Do you solemnly swear or affirm that you will well and

 8   truly keep every person sworn on this jury in some private and

 9   convenient place and will not suffer any person to speak to

10   them nor speak to them yourself without leave of the Court

11   except to ask them whether they have agreed upon their verdict

12   or until they have been discharged by the Court so help you

13   God or so you affirm.

14              THE CLERK:  I affirm.

15              THE COURT:  All right.  Thank you.

16              THE CLERK:  Thank you, Judge.

17              THE COURT:  Okay.  Mr. Fakhoury, anything else?

18              MR. FAKHOURY:  No, Your Honor.  Thank you.

19              THE COURT:  So I think everybody needs to be in the

20   building for the rest of the day.

21        And I'll order that you remain in the building for the

22   rest of the day.  It's 11 -- it's just a couple minutes shy of

23   11:30.

24        My suggestion is actually for now you might as well just

25   stay in the courtroom because I think we're going to get a
```

1    note back from the jury very quickly about their schedule.

2    And then after that, if you want to wander around the building

3    somewhere, that's fine.

4        I'll go back into chambers and wait for that note.

5        Thank you.

6            THE CLERK:  Court is in recess.

7     (Court in recess at 11:29 a.m. while the jury deliberates.)

8        (The following proceedings were heard out of the presence

9    of the jury:)

10            THE COURT:  All right.  Let's go on the record.

11        We're outside the presence of the jury.

12        The counsel -- excuse me.  Counsel and the parties are at

13    counsel table.

14        This won't take very long.

15        I just wanted to place on the record that your presiding

16    juror is Ms. Arias, and that their first note, which will be

17    made an exhibit to this proceeding, says that the schedule

18    will remain Monday through Thursday, 8:30 to 1:30.  So that's

19    the schedule.

20        Thanks.  That's all I have.

21            MR. WALDINGER:  All right.  Thank you.

22            THE CLERK:  Court is in recess.

23     (Court in recess while the jury continues to deliberate.)

24            (Proceedings were concluded at 1:30 P.M.)

25                        --o0o--

**CERTIFICATE OF REPORTER**

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Tuesday, November 14, 2023

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*