MOEEL LAH FAKHOURY LLP
Hanni M. Fakhoury (State Bar No. 252629)
2006 Kala Bagai Way, Suite 16
Berkeley, CA 94704
Telephone: (510) 500-9994
Email: hanni@mlf-llp.com

LAW OFFICE OF NATHANIEL J. TORRES (State Bar No. 253968)
338 Fillmore Street, #4
San Francisco, CA 94117
Telephone: (415) 290-6290
Email: nathanieltorres3131@gmail.com

Attorneys for Michael Rothenberg

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | Case No.: 4:20-CR-00266-JST |
|---|---|
| Plaintiff, | **DEFENDANT'S RULE 29(C) MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS 3-23** |
| v. | |
| MICHAEL ROTHENBERG, | **Court:** Courtroom 6, 2nd Floor |
| Defendant. | **Hearing Date:** March 1, 2024 |
| | **Hearing Time:** 9:30 a.m. |

**TO: MATTHEW M. YELOVICH, UNITED STATES ATTORNEY UNDER 28 U.S.C. § 515; KYLE F. WALDINGER, ASSISTANT UNITED STATES ATTORNEY; NICHOLAS J. WALSH, ASSISTANT UNITED STATES ATTORNEY; AND BENJAMIN K. KLEINMAN, ASSISTANT UNITED STATES ATTORNEY.**

PLEASE TAKE NOTICE that Defendant Michael Rothenberg hereby moves this Court for a judgment of acquittal on Counts Three through Twenty-Three of the Superseding Indictment. This motion is based upon this memorandum of points and authorities and accompanying exhibits, Federal Rule of Criminal Procedure 29(c), and all other applicable constitutional, statutory, and case authority, and all evidence and argument that may be presented at the hearing of this motion, to be held on March 1, 2024, at 9:30 a.m.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................... 1

STATEMENT OF FACTS .................................................................................................................. 1

ARGUMENT ....................................................................................................................................... 2

    A.    There was insufficient evidence of an intent to defraud. ................................................... 2

    B.    A judgment of acquittal must be entered on Counts 3-23. ............................................... 4

        1.    Counts 3-4: SVB ...................................................................................................... 4

            a.    Mr. Rothenberg neither schemed nor intended to defraud SVB .............. 5

            b.    There was insufficient evidence of a knowingly made false statement .... 6

            c.    The statement "the amount of pre-funded fees is $5.192m" was immaterial. ................................................................................................ 7

        2.    Counts 5-11: Pilot Grove ........................................................................................ 8

        3.    Counts 12-15: Unity ................................................................................................ 9

        4.    Count 16-23: 2015 and 2016 Fund Investors ....................................................... 10

CONCLUSION .................................................................................................................................. 12

# TABLE OF AUTHORITIES

### Cases

*Jackson v. Virginia*, 443 U.S. 307 (1979) ........................................................................................ 2

*Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005) ............................................................................. 2

*United States v. Galecki*, ___ F.4th ___, 2023 WL 8903137 (9th Cir. 2023) ........................................ 7

*United States v. Molinaro*, 11 F.3d 853 (9th Cir. 1993) ............................................................ 4, 6, 9, 11

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc) ............................................................. 2

*United States v. Nukida*, 8 F.3d 665 (9th Cir. 1993) ...................................................................... 2

### Statutes

18 U.S.C. § 1014 ......................................................................................................................... 1, 5

18 U.S.C. § 1343 ................................................................................................................. 1, 8, 9, 10

18 U.S.C. § 1344 ......................................................................................................................... 1, 5

18 U.S.C. § 1957 ......................................................................................................................... 1, 9

### Rules

Federal Rule of Criminal Procedure 29 ............................................................................................. 1, 2

**INTRODUCTION**

Pursuant to Federal Rule of Criminal Procedure 29(c), Michael Rothenberg moves this Court to enter a judgment of acquittal on Counts Three through Twenty-Three of the superseding indictment. This motion follows the guilty verdict returned by the jury on these counts on November 16, 2023. Dkt. 337, 339.

As detailed below, there was insufficient evidence to convict Mr. Rothenberg of bank fraud (18 U.S.C. § 1344), false statements to a bank (18 U.S.C. § 1014), wire fraud (18 U.S.C. § 1343), and money laundering (18 U.S.C. § 1957) based on the evidence presented by the government at trial. This Court should thus enter a judgment of acquittal on Counts Three through Twenty-Three.

**STATEMENT OF FACTS**

Mr. Rothenberg was charged in a 23-count superseding indictment, issued August 20, 2020, with a variety of fraud offenses. Dkt. 15. On October 25, 2021, this Court severed Count One, charging Mr. Rothenberg with bank fraud in violation of 18 U.S.C. § 1344, and Count Two, charging false statements to a bank in violation of 18 U.S.C. § 1014, from the remainder of the charges in the superseding indictment for trial. Dkt. 101. Counts One and Two proceeded to trial in November 2022, resulting in a mistrial after jurors were deadlocked and could not reach a unanimous decision. Dkt. 205

Counts Three through Twenty-Three proceeded to a seven-week jury trial held from October 3, 2023 to November 16, 2023. The government presented the testimony of 32 witnesses over twenty trial days, admitted 306 exhibits, and rested on November 9, 2023. Tr. Vol. 22 at 4085:1-2. Mr. Rothenberg raised a Rule 29 motion at the close of the government's case. Tr. Vol. 22 at 4085:15-17. After Mr. Rothenberg exercised his constitutional right to testify, the defense rested its case on November 13, 2023 and renewed its Rule 29 motion, which the Court denied. Tr. Vol. 23 at 4329:13-17. After three days of deliberations, the jury returned a guilty verdict on November 16, 2023. Tr. Vol. 26 at 4569:8-4574:13; Dkt. 337, 339.

The parties submitted a stipulation and proposed order setting a briefing schedule on post-trial motions on November 30, 2023, which the Court denied. Dkt. 349, 350. The parties submitted a revised stipulation and proposed order on December 5, 2023, which the Court granted that same day.

Dkt. 352, 353. More specific facts concerning the charged conduct are detailed below.

**ARGUMENT**

Federal Rule of Criminal Procedure 29 requires a trial court to enter a judgment of acquittal if "the evidence is insufficient to sustain the conviction." Fed. R. Crim. P. 29(a). A court must enter a judgment of acquittal if the evidence, viewed in the light most favorable to the government, would not permit any rational trier of fact to conclude that the defendant was guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). The Court may also enter a judgment of acquittal "after a guilty verdict or after the court discharges the jury." Fed. R. Cim. P. 29(c)(1).

Rule 29 "is an important safeguard to the defendant" that "tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir. 1993) (quotations and citations omitted). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc). "A 'reasonable' inference is one that is supported by a chain of logic, rather than…mere speculation dressed up in the guise of evidence." *Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005).

The government alleged four different "schemes to defraud," concerning (1) an approximately $4 million line of credit issued by Silicon Valley Bank ("SVB") in December 2015; (2) a $2 million investment by Pilot Grove Management Company into River Studios in February 2016; (3) July 2016 investments into a co-investment fund hoping to buy privately held, pre-IPO shares of Unity Software, Inc.; and (4) investments made by certain investors into Rothenberg Ventures' ("RV") 2015 and 2016 Funds. But the evidence—even viewed in the light most favorable to the government—would not allow any rational trier of fact to find Mr. Rothenberg guilty on any of these counts as explained below.

A. **There was insufficient evidence of an intent to defraud.**

The central issue at trial was whether Mr. Rothenberg had an intent to defraud SVB, Pilot Grove and other RV investors. But as Mr. Rothenberg testified directly, he did not intend to defraud any of those entities or individuals. Reporter's Transcript ("Tr.") Vol. 22 at 4087:2-19.

Instead, the evidence demonstrated that RV was, in the words of former employee Brandon Farwell, a "pretty scrappy startup." Tr. Vol. 20 at 3786:25-3787:1. At the time of the events at issue in trial, specifically from mid-2015 through late summer 2016, RV was raising its third fund, the hardest fund for a venture capital firm to raise. Tr. Vol. 14 at 2751: 6-9 (Sophia Liao testifying "raising money for the third fund is the most difficult"); Tr. Vol. 20 at 3829:10-12 (Farwell agreeing that "by the third fund, it starts to get a little bit harder" to fundraise").

Its recordkeeping, as Mr. Rothenberg acknowledged, was a "mess," which prompted him to hire Lynne McMillan—a former auditor—to get "professional input to help us professionalize. You could call it growing up." Tr. Vol. 22 at 4157:25, 4158:20-21. Ms. McMillan testified she was hired to "put controls in place where…controls were not present." Tr. Vol. 5 at 1001:21-25. Her "first conversation [with Mr. Rothenberg] was right after I started and figured out the financial position of the firm. We had a conversation about cutting back spending and really picking up the fundraising." Tr. Vol. 4 at 832:13-16. She testified that "there was pretty lofty goals for…the new funds in terms of cash we wanted to raise. And there was a lot of work to be done." Tr. Vol. 4 at 833:12-14. As Tommy Leep testified, "there [was] an attempt to raise funds in Asia in the last quarter of 2015." Tr. Vol. 4 at 721:8-9. The evidence demonstrated Mr. Rothenberg was working tirelessly on RV. Investor Lena Goldberg testified Mr. Rothenberg "looked very tired to me. And I remember asking him was he getting enough sleep." Tr. Vol. 8 at 1517: 7-8. Pilot Grove's Lawrence Weisman wrote in an email to Dominic Polizzotto that Mr. Rothenberg was "juggling a million things at once." Exh. 208-1.

Ultimately, the business of a venture capital firm is to raise and deploy capital, and with that background and understanding, there was insufficient evidence that RV's fundraising was for the purpose of anything more than continuing to grow the funds, make more investments, and earn fees to support RV's operations. That was precisely what the evidence demonstrated that Mr. Rothenberg and other RV staff told investors money invested into RV's funds would be used for. As Lena Goldberg testified, Mr. Rothenberg "was very upbeat about the opportunities," but was stretched thin in managing the business. Tr. Vol. 8 at 1517: 13-14.

Critically, the absence of an intent to defraud was demonstrated by the fact that all the financial

transactions at issue in this case were done in the open. Multiple people had access to RV's financial information, such as bank account information and QuickBooks records, including Tom Leep, Sr., Lynne McMillan, David Haase and Hannah Han. *See* Tr. Vol. 5 at 1002:12-1004:8 (McMillan testifying she had real time access to banking and QuickBooks records until the day she resigned); Tr. Vol. 5 at 1003:3-5 (McMillan testifying "Leep also had access in the same way"); Tr. Vol. 18 at 3365:9-22 (Haase testifying he and Han had "access to the Quickbooks"); Tr. Vol. 18 at 3366:16-3367:10 (Haase testifying that he, Han and accounts payable clerk Amanda McCoy had access to SVB bank account information, including the line of credit). When the SEC's investigation became public through a leak to *TechCrunch*, Mr. Rothenberg directly addressed investors about the situation, which only invited more scrutiny. *See* Exh. 237 (Aug. 21, 2016 "Rothenberg Ventures LP Update Letter #1"); Exh. 238 (Aug. 23, 2016 "Rothenberg Ventures LP Update Letter #2"). He explained to Pilot Grove that he was coming to them "humbly hat in hand" because "corporate housekeeping was poor and that created confusion later." Exh. 235-1.

In sum, the evidence demonstrated that Mr. Rothenberg had an "honest, good-faith belief in the truth" of what he was saying, which negates an intent to defraud. *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993) (quotation and citations omitted). Since the case hinged entirely on Mr. Rothenberg's intent, and since there was insufficient evidence of an intent to defraud, a judgment of acquittal should be entered on Counts 3-23.

**B.   A judgment of acquittal must be entered on Counts 3-23.**

As noted above, each of the alleged "schemes" charged by the government required proof beyond a reasonable doubt that Mr. Rothenberg had an "intent to defraud." Arguments specific to each alleged "scheme" charged by the government follows.

**1.   Counts 3-4: SVB**

Counts Three and Four concerned an approximately $4 million line of credit issued by SVB to RVMC in December 2015. Dkt. 15 at ¶¶ 31-35. Specifically, the government alleged that Mr. Rothenberg intended to defraud SVB by sending what it described in closing as the "core email" on December 28, 2015, stating that "the amount of pre-funded fees is $5.192m." Tr. Vol. 23 at 4391:19-22 ("This is the core email. It lays out the two lies: Lie number one that there were prefunded fees.

1    Lie number two, it's a $23.6 million fund."); Exh. 159-7.

2    Count Three charged bank fraud, in violation of 18 U.S.C. § 1344. Dkt. 15 at ¶¶ 31-33. The jury was instructed on two different "methods" of bank fraud; under Method A, the government was required to prove that (1) Mr. Rothenberg knowingly executed a scheme to defraud; (2) Mr. Rothenberg acted with the intent to defraud; and (3) SVB was insured by the FDIC. Tr. Vol. 23 at 4340:23-4341:18; Dkt. 338 at 16. Under Method B, the government was required to prove that (1) Mr. Rothenberg carried out a scheme or plan to obtain money from SVB by making false statements; (2) Mr. Rothenberg knew the statements were false; (3) the statements were material; (4) Mr. Rothenberg acted with the intent to defraud; and (5) SVB was insured by the FDIC. Tr. Vol. 23 at 4341:19-4343:4; Dkt. 338 at 16.

Count Four charged making a false statement to a bank, in violation of 18 U.S.C. § 1014. Dkt. 15 at ¶¶ 34-35. That crime has three elements: (1) the defendant made a false statement or report to bank; (2) the defendant knew the statement was false; and (3) the defendant did so for the purpose of influencing the bank. Tr. Vol. 23 at 4343:10-434410; Dkt. 338 at 18.

The government failed to carry its burden of proof as to either crime.

      **a.**    **Mr. Rothenberg neither schemed nor intended to defraud SVB.**

There was insufficient evidence of a "scheme" to defraud SVB. The government attempted to carry its burden on this element by conflating the timing of investments from Natala Menezes, CY Capital and ARChina with the SVB loan, to argue that Mr. Rothenberg defrauded investors of their money by using it to fund the SVB collateral account, and by defrauding SVB by misrepresenting the source of the money to fund the collateral account. But the evidence demonstrated the investments and the loan had nothing to do with each other. Menezes testified she had been having an "ongoing conversation" about investing over 2014 and 2015. Tr. Vol. 16 at 2977:8-10. CY Capital had met with RV representatives in October 2015 about a potential investment, and ultimately made the decision to invest on November 25, 2015, approximately a month before Mr. Rothenberg approached SVB about a line of credit. Exh. 464-1. Similarly, ARChina had been discussing an investment with RV since the fall of 2015, complete with significant back and forth between ARChina's lawyers and RV about a "side letter." The investments were not solicited because there was a different need for

the money than what was explained to investors. Ms. McMillan, who participated in the discussions around all three of these investments, and was present in Asia when CY Capital's investment was solicited, never testified that there was anything deceitful or improper about these investments. Instead, these investments were consistent with the purpose of a VC fund, namely, to raise and deploy capital.

Nor, as explained earlier, did Mr. Rothenberg intend to defraud SVB. Instead, he had an "honest, good-faith belief in the truth" of what he was saying. *Molinaro*, 11 F.3d at 863. The statement "the amount of pre-funded fees is $5.192m" was made openly in an email Ms. McMillan was copied on. Exh. 159-2. The SVB banker overseeing the line of credit, Frank Amoroso, testified the bank had access to the accounts held by Rothenberg Ventures Management Company ("RVMC") and the 2015 Fund, and specifically "had access to the balances." Tr. Vol. 6 at 1144:13-1145:9. It would be reasonable for Mr. Rothenberg to assume the bank had access to this information, thus undermining the claim that he had an intent to defraud SVB.

Conversely, there was no evidence through either exhibits or witness testimony that SVB asked for a specific fund size, or the size of the fund "as of" a certain date. There was no evidence that the bank wanted to know the size of the fund measured by funded capital instead of committed capital. Nor was there any evidence that the bank asked for any detailed financial information—beyond what it already had access to through its own internal records since RVMC and the 2015 Fund banked at SVB—that would have shed more insight into the amount of pre-funded fees.

Thus, there was insufficient evidence of either a scheme or intent to defraud.

        **b.**        **There was insufficient evidence of a knowingly made false statement.**

For both bank fraud and making a false statement to a bank, the government was required to prove beyond a reasonable doubt that Mr. Rothenberg knowingly made a false statement to the bank. The government failed to prove the statement "the amount of pre-funded fees is $5.192m" was false, and that Mr. Rothenberg knew the statement was false. Exh. 159-7. In fact, the evidence demonstrated that Mr. Rothenberg miscalculated the size of the fee based on a $23.6 million fund, telling SVB the total amount of fees was 22% (1.75% management fee/year and 1% management fee/year for eight years) when expert witness Gerald Fujimoto testified it was really 27.5%. Tr. Vol.

21 at 3902:19-22.

Mr. Rothenberg represented to SVB from the very beginning that this was an "estimate," that he needed to "check with" Ms. McMillan, and stated what he—as explained above, incorrectly—"believe[d]" was the amount of fees. Exh. 159-7. At the time of Mr. Rothenberg's conversations with SVB, it was contemplated the size of the 2015 Fund would grow. Ms. McMillan emailed Mr. Rothenberg financial information about the size of the 2015 Fund on December 17, 2015, making clear that even as of that late date, she was unsure of the "2015 Fund's final raise figure." Exh. 150-1. That was because investors into the 2016 Fund had been informed the 2016 Fund was going to invest up to $10 million into the 2015 Fund. Exh. 416-151. Ms. McMillan's own emails to Mr. Rothenberg in December 2015 included capital supplied by investors in the 2016 Fund, including Dolby Family Ventures, CY Capital and ARChina, within the size of the 2015 Fund. Exh. 152-1. Combing the anticipated $10 million coming from the 2016 Fund to the $13 million in the 2015 Fund as of December 23, 2015, adds up to approximately $23 million, the amount represented to SVB was the size of the fund. Exh. 152-1.

Thus, there was insufficient evidence that Mr. Rothenberg knowingly made a false statement in connection with the line of credit from SVB and a judgment of acquittal should be entered on Counts 3 and 4.

   c. **The statement "the amount of pre-funded fees is $5.192m" was immaterial.**

Additionally, the government failed to prove beyond a reasonable doubt that the statement "the amount of pre-funded fees is $5.192m" was material to the bank's decision to issue the line of credit. Exh. 159-7. When "assessing whether Defendants made a 'material falsehood' for the purpose of obtaining money or property, materiality is judged in relation to the persons to whom the statement is addressed." *United States v. Galecki*, ___ F.4th ___, 2023 WL 8903137, at *17 (9th Cir. 2023).

The specific dollar amount in the statement was immaterial to SVB. First, as Frank Amoroso testified, SVB had access to the balances in both the RVMC and 2015 Fund accounts because those accounts were held by SVB. Tr. Vol. 6 at 1144:13-1145:9. The government assumes SVB would accept an email from Mr. Rothenberg at face value without undergoing its own underwriting process before approving a line of credit, which is incorrect as a general matter, and contradicts Amoroso's

own testimony that the loan had gone through an "underwriting and approval process" where the "bank had requested information from the borrower" which "was processed by the underwriters at the bank." Tr. Vol. 6 at 1157:24-1158:8. The immateriality of the email is further demonstrated by the fact that the final loan amount of $4.25 million—consisting of 95% of the collateral—would mean a fund size of $4.9 million, not $5.192 million as detailed in the email sent by Mr. Rothenberg. Exh. 159-7.

Because the evidence presented by the government at trial failed to prove beyond a reasonable doubt the statement about the fund size made by Mr. Rothenberg in the December 28, 2015 email was "material" to the bank, this Court should enter a judgment of acquittal on Count 3.

### 2. Counts 5-11: Pilot Grove

Counts 5-11, concerned Pilot Grove's $2 million investment into River Studios. Dkt. 15 at ¶¶ 36-41. Counts 5-7 accused Mr. Rothenberg of wire fraud, in violation of 18 U.S.C. § 1343. Dkt. 15 at ¶¶ 36-39. The jury was instructed over Mr. Rothenberg's objection that these counts did not allege an "omissions theory" of wire fraud. Dkt. 255 at 73-75. Thus, the jury was instructed that the government was required to prove beyond a reasonable doubt that (1) Mr. Rothenberg devised a scheme to defraud using false statements; (2) the statements made in furtherance of the scheme to defraud were material; (3) Mr. Rothenberg had the intent to defraud; and (4) Mr. Rothenberg used or caused to be used an interstate or foreign wire. Tr. Vol at 4344:14-4346:4; Dkt. 338 at 16.

There was insufficient evidence to support a conviction for wire fraud. First, as explained earlier, the government failed to present sufficient evidence that he had an intent to defraud. Second, there was insufficient evidence that Mr. Rothenberg knowingly made a false statement.

The government alleged Mr. Rothenberg made two false statements. First, "He said that he had self-funded and fully owned, meaning owned it all, River Studios." Tr. Vol. 23 at 4405:21-23. But there was insufficient evidence that Mr. Rothenberg knowingly provided false information. As Mr. Rothenberg told Larry Weisman and Dominic Polizzotto over email on August 13, 2016, because "corporate housekeeping was poor," that "created confusion later" when he "confused control and ownership" of RV and River Studios. Exh. 235-1. Mr. Rothenberg said in that same email that River Studios was "wholly owned by the Rothenberg Ventures funds at the time of your investment since it

was funded entirely by [limited partners]," yet Fujimoto testified more than half of the money that funded River Studios before Pilot Grove's investment came from Mr. Rothenberg himself. Tr. Vol. 3955:14-17. Rather than demonstrate beyond a reasonable doubt that Mr. Rothenberg knowingly made a false statement, the evidence demonstrated confusion on both sides about the transaction. Polizzotto himself believed Pilot Grove's investment would result in there being "two seats at the table" when the slide deck concerning Pilot Grove's investment made clear River Studios was looking for "2-3 value-add investors." Tr. Vol. 17 at 3246:21-22; Exh. 205-30.

The government claimed Mr. Rothenberg "also lied when he said how the $2 million would be used." Tr. Vol. 23 at 4406:2-3. But Pilot Grove's investment was spent as promised on "general runway," including payments and reimbursements to River Studios employees and vendors such as Ewan Johnson, and payments for River Studios' acquisition of another virtual reality production studio, Twisted Oak. *See* Exh. 62-102. The government focused its analysis of Pilot Grove's investment on February 25 and 26, 2016, days after it was made. But there was no way $2 million was going to be used so quickly, and the parties contemplated a long-term relationship with each other.

Thus, there was insufficient evidence of either an intent to defraud or a knowingly made false statement. The evidence suggested instead that Mr. Rothenberg had an "honest, good-faith belief in the truth" of what he was saying. *Molinaro*, 11 F.3d at 863. A judgment of acquittal should be entered on Counts 5-7.

Counts 8-11 accused Mr. Rothenberg of money laundering, in violation of 18 U.S.C. § 1957. Dkt. 15 at ¶¶ 40-41. To support a conviction for money laundering, the government was required to prove beyond a reasonable doubt that the money "constitute[ed]" or was "derived from, the proceeds" of the wire fraud charged in Counts 5-7. Tr. Vol. 23 at 4346:24-4347:1; Dkt. 338 at 21. Because, as described above, there was insufficient evidence of wire fraud, there necessarily was insufficient evidence of money laundering, and thus a judgment of acquittal must be entered on Counts 8-11.

3.   **Counts 12-15: Unity**

Counts 12-15 accused Mr. Rothenberg of wire fraud, in violation of 18 U.S.C. § 1343, in connection with a potential investment into Unity Software. Dkt. 15 at ¶¶ 42-45. Every investor who

provided money for the potential Unity deal had their money returned to them.

Because this Count did allege an omissions theory of liability, the jury was instructed that the government had to prove the following elements beyond a reasonable doubt: (1) Mr. Rothenberg devised a scheme to defraud using false statements or omitting facts (and had a duty to disclose the omitted fact); (2) the statements made or facts omitted in furtherance of the scheme to defraud were material; (3) Mr. Rothenberg had the intent to defraud; and (4) Mr. Rothenberg used or caused to be used an interstate or foreign wire. Tr. Vol. 23 at 4348-2350:22; Dkt. 338 at 22.

The government's premise was that Mr. Rothenberg "lied to the investors to obtain a total of $1.35 million" that "was used for other purposes." Tr. Vol. 23 at 4414:13-16. But the evidence demonstrated that a deal was in the works; it just could not be completed. Ultimately, no sale occurred because RV was in turmoil in July 2016 after it had been notified it was under investigation by the SEC, and then after an employee leaked that news to *TechCrunch*. Unity's CFO Mike Foley told Mr. Rothenberg directly the sale was not going to happen because "this transaction is taking a lot longer than I expected" and because "the media article/PR on your firm has caused concern on our end." Exh. 259-3. Ultimately, the money raised was not used to buy Unity shares because Unity changed its mind about the deal after the investments were solicited.

The government's allegations assumes the Unity deal was an imaginary one, that was never intended to be consummated. But the evidence presented at trial demonstrated otherwise. It was the CEO of Unity, John Riccitiello, who proposed RV purchase shares, through a secondary sale, in May 2016. Exh. 250-2. Negotiations went back and forth for a period between Foley and RV to the point that legal paperwork was drafted by Unity's attorneys for RV to review and sign. Exh. 256-1. All the time pressure to close the deal came from Unity, who had a long list of people that wanted to invest in the company pre-IPO, and who did not need RV as much as RV needed Unity.

In sum, there was no intent to defraud the investors in connection with Unity, and so a judgment of acquittal must be entered on Counts 12-15.

4. **Count 16-23: 2015 and 2016 Fund Investors**

Finally, Counts 16-23 accused Mr. Rothenberg of wire fraud, in violation of 18 U.S.C. § 1343, in connection with certain investors into the 2015 and 2016 Funds. Dkt. 15 at ¶¶ 46-49. Like the

potential Unity investors, the testifying 2015 and 2016 Fund investors explained to the jury they had made a return greater than their investment; in other words, these investors did not lose any money.

The elements for these counts were the same as the elements for Counts 12-15, described earlier. Tr. Vol. 23 at 4348-2350:22; Dkt. 338 at 22. The government claimed Mr. Rothenberg "consistently lied to them all and failed to tell them important facts about how their money would be used," including "that he was investing the 2015 and 2016 Fund investors' money into River Studios." Tr. Vol. 23 at 4424:21-23; *id.* at 4418:22-25. But there was insufficient evidence to support that claim.

First, investors were told it would take time for investments to be made. For example, David Chu of CY Capital was told "the fund deployment cycle is intended to be ~2 years." Exh. 466-1. Given that sort of specific instruction and the nature of the VC industry more generally, no investor could expect the Fund would make investments within a day or two of when an investor sent capital to purchase a pro rata ownership share of the fund. *See* Tr. Vol. 20 at 3784:9-11 (Farwell agreeing that "in a venture capital fund, an investment buys an investor a pro rata share of the fund."). As the owner of the manager of the fund, Mr. Rothenberg was vested with discretion on when and how to deploy capital, provided it was consistent with the management and operating agreements.

As for the Fund's investments into River Studios, numerous contracts and agreements referenced the fact that River Studios (and its predecessor, Bend Reality), was managed by Mr. Rothenberg and related to RV. *See, e.g.,* Exh. 412-32, Exh. 458-10. Even if the language could and should have been clearer, the evidence demonstrated that Mr. Rothenberg certainly believed the relationship was sufficiently disclosed to investors. And as noted earlier, because he had an "honest, good-faith belief in the truth" of what he was saying, there was no intent to defraud. *Molinaro*, 11 F.3d at 863.

Because there was insufficient evidence that Mr. Rothenberg intended to defraud investors into the 2015 and 2016 Fund, a judgment of acquittal should be entered on Counts 16-23.

# CONCLUSION

Mr. Rothenberg respectfully requests this Court grant him a judgment of acquittal on Counts 3-23.

Dated: January 12, 2024

Respectfully submitted,

MOEEL LAH FAKHOURY LLP

Hanni M. Fakhoury
Nathaniel J. Torres
Attorneys for Michael Rothenberg