1  MATTHEW M. YELOVICH (NYBN 4897013)
   Attorney for the United States
2  Acting under Authority Conferred by 28 U.S.C. § 515

3  BENJAMIN K. KLEINMAN (NYBN 5358189)
   KYLE F. WALDINGER (CABN 298752)
4  NICHOLAS J. WALSH (CABN 314290)
   Assistant United States Attorneys
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-7200
7       Email: benjamin.kleinman2@usdoj.gov
        Email: kyle.waldinger@usdoj.gov
8       Email: nicholas.walsh@usdoj.gov

9  Attorneys for the United States of America

10

11                    UNITED STATES DISTRICT COURT

12                   NORTHERN DISTRICT OF CALIFORNIA

13                          OAKLAND DIVISION

14

15  UNITED STATES OF AMERICA,              )   No. 20-CR-00266 JST
                                           )
16          Plaintiff,                     )   **UNITED STATES' OPPOSITION TO**
                                           )   **DEFENDANT'S RENEWED RULE 29 MOTION**
17      v.                                 )   **AND RULE 33 MOTION**
                                           )
18  MICHAEL BRENT ROTHENBERG,              )
            a/k/a MIKE ROTHENBERG,         )   Court:      Hon. Jon S. Tigar, Courtroom 6
19                                         )   Hearing:    May 17, 2024, 9:30 a.m.
            Defendant.                     )
20  ────────────────────────────────────  )

21

22

23

24

25

26

27

28

UNITED STATES' OPP. TO DEF.'S RENEWED RULE 29 & RULE 33 MTN.
20-CR-00266 JST

1

## <u>TABLE OF CONTENTS</u>

2   TABLE OF AUTHORITIES..................................................................................................ii

3   INTRODUCTION...............................................................................................................1

4   RELEVANT PROCEDURAL HISTORY .........................................................................2

5   LEGAL STANDARDS ......................................................................................................3

6       I.    The Standard for a Motion Pursuant to Rule 29 of the Federal Rules of
    Criminal Procedure..................................................................................3

7

8       II.    The Standard for a Motion Pursuant to Rule 33 of the Federal Rules of
    Criminal Procedure..................................................................................3

9   ARGUMENT .....................................................................................................................5

10      I.    *Milheiser's* Facts, Theory of Fraud, and Jury Instructions Distinguish it from
    Rothenberg's Frauds and the Jury Instructions Given in this Trial.......................6

11

12          A.    The Federal Fraud Statutes Proscribe a Broad Range of
        Misrepresentations in the Context of Investment Fraud and Bank
        Fraud..............................................................................6

13

        B.    Rothenberg's Fiduciary Duties Distinguish this Case from *Milheiser*................11

14          C.    The Jury was Required to Find More than Mere Deceit.....................................12

15

16      II.    The Evidence was Overwhelming that the Misrepresentations Made by
    Rothenberg Were Central to the Nature of the Bargain for the Unity Investors,
    the 2015 and 2016 Fund Investors, Pilot Grove, and Silicon Valley Bank.....................13

17

18          A.    Rothenberg's Lie that He Would Purchase Unity Securities was
        Central to the Bargain He Struck with the Unity Investors.............................14

19          B.    Rothenberg's False Statement that He Would Invest in Frontier Edge
        Technology Companies was Fundamental to the Bargain He Made

20          with the 2015 and 2016 Fund Investors...............................................15

21          C.    Rothenberg's Lies to Pilot Grove that He Owned 100% of River
        Studios and that He Would Use Pilot's Grove Money Exclusively to

22          Improve River Studios were Central to the Investment Bargain He
        Made with Pilot Grove...............................................................19

23

24          D.    Rothenberg's False Statements about the Size of the 2015 Fund and
        the Source of the Line of Credit Collateral Were Material Because
        They Went to the Nature of His Bargain with Silicon Valley Bank...................22

25

26      III.    No New Trial is Warranted Because There was No Instructional Error........................24

27      IV.    Given the Vast and Devastating Evidence Adduced in this Case, Any Error
    was Harmless...............................................................................24

28  CONCLUSION.................................................................................................................25

1

# TABLE OF AUTHORITIES

2

## Cases

3

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ........................................................................................... 10

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ....................................................................... 10, 20

*Harmon*,
  537 Fed. App'x. 719 (9th Cir. 2013) ................................................................. 25

*Henderson v. Kibbe*,
  431 U.S. 145 (1977) ............................................................................................ 5

*In re Sadia, S.A. Sec. Litig.*,
  269 F.R.D. 298 (S.D.N.Y. 2010) ................................................................. 10, 20

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ............................................................................................ 3

*Jones v. United States*,
  527 U.S. 373 (1999) ............................................................................................ 4

*Neder v. United States*,
  527 U.S. 1 (1999) ............................................................................................. 24

*SEC v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) ............................................................................ 10

*Shaw v. United States*,
  580 U.S. 63 (2016) .......................................................................................... 8, 9

*United States v. Alston*,
  974 F.2d 1206 (9th Cir. 1992) ............................................................................ 4

*United States v. Andrino-Carillo*,
  63 F.3d 922 (9th Cir. 1995), *cert. denied*, 516 U.S. 1064 (1996) ...................... 3

*United States v. Bhagat*,
  436 F.3d 1140 (9th Cir. 2006) ............................................................................ 5

*United States v. Bruchhausen*,
  977 F.2d 464 (9th Cir. 1992) ........................................................................... 5, 9

*United States v. Chen*,
  754 F.2d 817 (9th Cir. 1985) .............................................................................. 4

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Davis,*
767 Fed. App'x. 714 (11th Cir. 2019)..............................................21

*United States v. DeJarnette,*
741 F.3d 971 (9th Cir. 2013)............................................................4

*United States v. Eaglin,*
571 F.2d 1069 (9th Cir. 1977)..........................................................3

*United States v. Gay,*
967 F.2d 322 (9th Cir. 1992)............................................................6

*United States v. Gonzalez-Aparicio,*
663 F.3d 419 (9th Cir. 2011)............................................................5

*United States v. Harder,*
116 F. Supp. 3d 1197 (D. Or. 2015)................................................20

*United States v. Hinkson,*
585 F.3d 1247 (9th Cir. 2009)..........................................................4

*United States v. Jinian,*
2011 WL 5056978 (N.D. Cal. Oct. 24, 2011), *aff'd* 725 F.3d 954 (9th Cir. 2013)............................4

*United States v. Kellington,*
217 F.3d 1084 (9th Cir. 2000)..........................................................4

*United States v. Laurienti,*
611 F.3d 530 (9th Cir. 2010)..........................................................17

*United States v. LeVeque,*
283 F.3d 1098 (9th Cir. 2002)........................................................12

*United States v. Lindsay,*
931 F.3d 852 (9th Cir. 2019)............................................................4

*United States v. Milheiser,*
___ F.4th ___, 2024 WL 1517377 (9th Cir. Apr. 9, 2024).......................passim

*United States v. Miller,*
953 F.3d 1095 (9th Cir. 2020)....................................................1, 12

*United States v. Moses,*
496 F.3d 984 (9th Cir. 2007)............................................................4

*United States v. Nelson,*
419 F.2d 1237 (9th Cir. 1969)..........................................................3

*United States v. Nevils,*
598 F.3d 1158 (9th Cir. 2010)..........................................................3

*United States v. Recio*,
   371 F.3d 1093 (9th Cir. 2004) ................................................................................ 5

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970) ......................................................................... 10, 12

*United States v. Reyes*,
   660 F.3d 454 (9th Cir. 2011) ................................................................................ 10

*United States v. Reyes-Alvarado*,
   963 F.2d 1184 (9th Cir. 1992) ................................................................................ 3

*United States v. Rocha*,
   598 F.3d 1144 (9th Cir. 2010) ................................................................................ 3

*United States v. Tarallo*,
   380 F.3d 1174 (9th Cir. 2004) ..................................................................... 8, 20, 24

*United States v. Vaccarelli*,
   2020 WL 1329695 (D. Conn. Mar. 23, 2020),
   *aff'd and dismissed in part* 2021 WL 4805218 (2d Cir. 2021) .................................. 10, 15

*United States v. Yates*,
   16 F.4th 256 (9th Cir. 2021) .......................................................................... 5, 8, 9

## **Rules**

Federal Rule of Criminal Procedure 29 .............................................................. passim

Federal Rule of Criminal Procedure 30 .................................................................. 4

Federal Rule of Criminal Procedure 33 .............................................................. passim

Federal Rule of Criminal Procedure 52 .................................................................. 4

1

**INTRODUCTION**

2    The defendant Michael Rothenberg has filed renewed Rule 29 and Rule 33 motions.  Dkt. 384.

3    These motions are based on the Ninth Circuit's recent decision in *United States v. Milheiser*, ___ F.4th

4    ___, 2024 WL 1517377 (9th Cir. Apr. 9, 2024).  Rothenberg's primary argument is that, based on

5    *Milheiser*, "there was insufficient evidence that any misrepresentations went to the 'nature of the

6    bargain'" into which any of Rothenberg's alleged victims entered.  Dkt. 384, at 7:18-20 (quoting

7    *Milheiser*).  Because of this, Rothenberg contends that the Court should enter a judgment of acquittal

8    under Rule 29 as to Counts Three and Five through Twenty-Three.  *Id.*  In the alternative, Rothenberg

9    argues that the Court should order a new trial under Rule 33 because "the jury instructions . . . did not

10   inform the jury that 'to support a conviction for fraud, a false statement must directly or indirectly

11   deceive the victim about the nature of the bargain.'"  *Id.* at 7:20-23.

12   The Court should deny the defendant's motions, for several reasons.

13   Foremost, *Milheiser* is distinguishable from this case in at least three important ways.  First,

14   *Milheiser* dealt with what the court described as an "overbroad theory of fraud" pertaining to inducing

15   the sale of *commodities*.  In this case, Rothenberg's fraud primarily was to induce *investments*, which, as

16   the *Milheiser* court itself held, "are by nature speculative," *Milheiser*, 2024 WL 1517377, at *7, and thus

17   the "nature of the bargain" is broad.  Second, *Milheiser* concerned an arms-length transaction for

18   commodities, whereas Rothenberg sat in a position of fiduciary responsibility for most of his victims.

19   *Milheiser* therefore did not consider the impact of a defendant's duties of care and loyalty and the

20   prohibition on self-dealing on the materiality determination.  Third, the *Milheiser* jury was instructed

21   that it could find an intent to defraud if the government proved that the defendants had *either* the intent

22   to deceive *or* the intent to cheat.  *Milheiser*, 2024 WL 1517377, at *4.  This instruction was contrary to

23   *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020).  In contrast, the jury in this case was instructed

24   that it had to find that Rothenberg had *both* the intent to deceive *and* the intent to cheat.  Thus, the jury

25   necessarily found more than just that Rothenberg had told some lie; it also found that Rothenberg

26   intended to cheat the victims, a finding that required the jury to conclude that Rothenberg's

27   misrepresentations went to the "nature of the bargain."  *Milheiser* is simply inapplicable to this case.

28

However, even if the Court were to find that *Milheiser* applies to the facts and circumstances of this case, the evidence in this case overwhelmingly proved that the misrepresentations upon which the government relied at trial were central to the nature of the bargain that Rothenberg struck with (1) Silicon Valley Bank (Count Three); (2) Pilot Grove (Counts Five through Seven); (3) the Unity investors (Counts Twelve through Fifteen); and (4) the 2015 and 2016 Fund investors (Counts Sixteen through Twenty-Three).  Witness after witness told the jury why the misrepresentations made by Rothenberg mattered in the context of each deal.  The jury was presented with documentary evidence in the form of emails, transaction documents, bank statements, and other records that, taken together with the witness testimony and common sense, proved that the representations now challenged by Rothenberg naturally went to the "nature of the bargain."  Simply put, none of the misrepresentations that the government relied upon at closing were collateral in any way.

Finally, although the Court should find that the government's theory of fraud here was not overbroad and that there was no error in how it conducted the trial and instructed the jury, even if there was error, that error was harmless beyond a reasonable doubt because of the overwhelming evidence that Rothenberg's misrepresentations and omissions were material and because of the vast array of admitted evidence proving that Rothenberg was guilty of each crime alleged.

## RELEVANT PROCEDURAL HISTORY

Rothenberg was charged in a 23-count Indictment on August 20, 2020.  Dkt. 15.  Trial on Counts Three to Twenty-Three began on October 3, 2023.  On November 16, 2023, seven weeks later, the jury returned a guilty verdict on all 21 counts.  RT 4569:7 to 4574:13; Dkt. 339.

After trial, in February and March 2024, the parties submitted briefing on Rothenberg's motions for acquittal pursuant to Rule 29 and for a new trial pursuant to Rule 33.  *See* Dkts. 364-365 & 369-373. The Court heard oral arguments on those motions on March 1, 2024.  Dkt. 376.  It denied Rothenberg's Rule 33 motion for a new trial by Order dated March 6, 2024.  Dkt. 378.  A week later, the Court denied Rothenberg's Rule 29 motion for judgment of acquittal by Order dated March 14, 2024.  Dkt. 380.

The defendant filed the instant motions on April 19, 2024, Dkt. 384, pursuant to the briefing schedule set by the Court on April 18, 2024, Dkt. 383.  This Opposition is timely filed in compliance with that briefing schedule.

1

**LEGAL STANDARDS**

2

**I.      The Standard for a Motion Pursuant to Rule 29 of the Federal Rules of Criminal Procedure**

3

Rule 29 of the Federal Rules of Criminal Procedure states in pertinent part that "[i]f the jury has

4

returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  Fed. R. Crim. P.

5

29(c)(2).  A Rule 29 motion is basically a challenge to the sufficiency of the evidence.

6

It is well settled that the Court must deny the defendant's Rule 29 motion if, "after viewing the

7

evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

8

essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319

9

(1979) (emphasis in original); *see also United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010)

10

(quoting *Jackson*); *United States v. Andrino-Carillo*, 63 F.3d 922, 924 (9th Cir. 1995), *cert. denied*, 516

11

U.S. 1064 (1996) ("All reasonable inferences from the facts must be drawn in favor of the

12

Government.") (citing *Jackson*).  Under this standard, a district court must bear in mind that "it is the

13

exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and

14

draw reasonable inferences from proven facts."  *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir.

15

1969).  This means that "the government does not need to rebut all reasonable interpretations of the

16

evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of

17

guilt beyond a reasonable doubt.'"  *Nevils*, 598 F.3d at 1164 (quoting *Jackson*); *see also id.* at 1165

18

("'[i]n determining the sufficiency of circumstantial evidence, the question is not whether the evidence

19

excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive

20

at its conclusion'") (quoting *United States v. Eaglin*, 571 F.2d 1069, 1076 (9th Cir. 1977)); *United States*

21

*v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992) ("circumstantial evidence and inferences drawn

22

from it may be sufficient to sustain a conviction") (citation omitted).  Nevertheless, "evidence is

23

insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the

24

government's case, or where there is a total failure of proof of a requisite element."  *Nevils*, 598 F.3d at

25

1167.  For all these reasons, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the

26

evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

27

**II.     The Standard for a Motion Pursuant to Rule 33 of the Federal Rules of Criminal Procedure**

28

Under Federal Rule of Criminal Procedure 33, the Court may, upon the defendant's motion,

vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  In general, "[a] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (quotation omitted).  For example, when evaluating a motion for a new trial, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *Id.*  "By the plain terms of Rule 33, however, th[e] Court's focus must be whether failing to grant a new trial would result in manifest injustice." *United States v. Jinian*, 2011 WL 5056978, at *7 (N.D. Cal. Oct. 24, 2011) (White, J.), *aff'd* 725 F.3d 954 (9th Cir. 2013).

In general, a court should grant a motion for a new trial only in "exceptional circumstances," *United States v. Chen*, 754 F.2d 817, 821 (9th Cir. 1985), in which "a serious miscarriage of justice may have occurred," *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).  A decision to grant a new trial is "within the sound discretion of the district court." *Alston*, 974 F.2d at 1212 (quotation omitted). Indeed, so long as the trial court has applied the appropriate legal rule, its resolution of a motion for a new trial will only be overturned if it "resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (*en banc*).

In general, the court of appeals reviews both a district court's denial of a motion for a new trial and its formulation of the jury instructions for abuse of discretion.  *United States v. Moses*, 496 F.3d 984, 987 (9th Cir. 2007) (denial of motion); *United States v. Lindsay*, 931 F.3d 852, 859 (9th Cir. 2019) (jury instructions); *see also id.* (*de novo* review whether jury instructions misstated or omitted an element).  However, in the context of claimed instructional errors that have not been preserved by objection, appellate review is governed by Federal Rule of Criminal Procedure 30(d), which refers to Rule 52(b), establishing that review is under the plain error standard.[1]  At trial, Rothenberg did not object to the materiality portion of the instructions, so the court of appeals will review any claim of instructional error under a plain error standard.  *See Jones v. United States*, 527 U.S. 373, 388 (1999);

---

[1] Claims of instructional error that were preserved by objection at trial are subject to harmless error analysis on appeal.  *See United States v. DeJarnette*, 741 F.3d 971, 983 (9th Cir. 2013).

1   *United States v. Bhagat*, 436 F.3d 1140, 1147 (9th Cir. 2006); *see also United States v. Recio*, 371 F.3d

2   1093, 1100 (9th Cir. 2004) ("plain error test . . . applies on direct appeal even where an intervening

3   change in the law is the source of the error").   Under the plain error standard, relief is not warranted

4   unless there has been: (1) error, (2) that was plain, (3) that affected substantial rights, and (4) that

5   seriously affected the fairness, integrity, or public reputation of the judicial proceedings.  *See United*

6   *States v. Gonzalez-Aparicio*, 663 F.3d 419, 428 (9th Cir. 2011).  "It is the rare case in which an improper

7   instruction will justify reversal of a criminal conviction when no objection has been made in the trial

8   court."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

9   **ARGUMENT**

10          Rothenberg has filed renewed Rule 29 and Rule 33 motions based on the Ninth Circuit's recent

11   decision in *Milheiser*.  The Court should deny both of the defendant's motions.

12          *As an initial matter*, *Milheiser* is distinguishable from this case.  First, *Milheiser* deals most

13   directly with the cases involving alleged fraud to induce the sale of *commodities*, such as toner

14   cartridges.  Similarly, the defendant's motion and *Milheiser*'s reasoning rely in large part on Ninth

15   Circuit cases related to the deprivation of accurate information (*United States v. Yates*, 16 F.4th 256 (9th

16   Cir. 2021)) and to deceit regarding the disposition of goods sold (*United States v. Bruchhausen*, 977

17   F.2d 464 (9th Cir. 1992)).  *Milheiser*, *Yates*, and *Bruchhausen* relate to bargains and transactions that are

18   fundamentally different than the deals at issue in this case, so those cases and their specific holdings are

19   largely inapplicable.  Second, *Milheiser* concerned an arms-length transaction for commodities, whereas

20   Rothenberg sat in a position of fiduciary responsibility for most of his victims, and therefore did not

21   consider the impact of a defendant's duties of care and loyalty and the prohibition on self-dealing on the

22   materiality determination.  Third, in *Milheiser*, the jury was instructed that it could find an intent to

23   defraud if the government proved that the defendants had *either* the intent to deceive *or* the intent to

24   cheat.  *Milheiser*, 2024 WL 1517377, at *4.  In this case, in contrast to *Milheiser*, the jury was instructed

25   that it had to find that Rothenberg had *both* the intent to deceive *and* the intent to cheat.  Thus, the jury

26   necessarily found that Rothenberg intended to cheat the victims and therefore was properly focused on

27   considering whether Rothenberg's misrepresentations went to the "nature of the bargain."

28          *As a second matter*, the evidence in this case overwhelmingly showed that the misrepresentations

upon which the government relied at trial were central to the nature of the bargain that Rothenberg struck with (1) Silicon Valley Bank; (2) Pilot Grove; (3) the Unity investors; and (4) the 2015 and 2016 Fund investors.  The evidence at trial exposed the sharp disconnect between the sunny falsehoods that Rothenberg delivered to his victims and the dark reality of his financial affairs and his financial mismanagement.  Accordingly, all of the representations challenged by Rothenberg naturally went to the "nature of the bargain"; these were not collateral matters, or "mere puffing."  *United States v. Gay*, 967 F.2d 322, 329 (9th Cir. 1992) ("'Puffing' concerns expressions of opinion, as opposed to the knowingly false statements of fact which the law proscribes.") (citation omitted).

*As a final matter*, although the Court should find no overbreadth in the government's theory of fraud and no error in how it conducted the trial and instructed the jury, even if there was error, that error was harmless beyond a reasonable doubt because of the overwhelming evidence proving that Rothenberg was guilty of each crime alleged.

**I.    *Milheiser's* Facts, Theory of Fraud, and Jury Instructions Distinguish it from Rothenberg's Frauds and the Jury Instructions Given in this Trial.**

   **A.    The Federal Fraud Statutes Proscribe a Broad Range of Misrepresentations in the Context of Investment Fraud and Bank Fraud.**

      **1.    Summary of *United States v. Milheiser*.**

In *Milheiser*, the defendants each owned or managed a company that telemarketed printer toner. Each sales company worked closely with the same toner supplier, which, in turn, controlled price ranges, fulfilled orders, resolved complaints, and held mandatory meetings with all of the sales companies. *Milheiser*, 2024 WL 1517377, at *2.  Each company would call a business, falsely imply that it was the business's regular toner supplier, falsely state that the price of toner was going up, and then urge the business to lock in an order at the old rate. *Id.* at *1.  The defendants were charged with mail fraud and conspiracy.  At trial, the defendants moved for a judgment of acquittal, arguing that the alleged misrepresentations did not go to the heart of the bargain and thus could not constitute mail fraud. The court denied the motion, and the defendants were convicted on all counts. *Id.* at *3.

On appeal, the defendants argued that the government had presented an overbroad theory of fraud to the jury.  They argued that "any misrepresentation about the identity of one of the bargaining parties did not deprive businesses of the benefit of the bargain because the businesses all received the

toner at the agreed price." *Id.* The Ninth Circuit reversed and remanded, holding that not just any lie constitutes fraud; instead, the lie must go to the "nature of the bargain." *Id.* at *7. The panel explained that a misrepresentation will meet this standard "if it goes to price or quality, or otherwise to essential aspects of the transaction." *Id.* The court further explained that "[w]hether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue." *Id.* In so holding, the panel explained that a "nature of the bargain" requirement would "properly exclude[] from liability cases in which a defendant's misrepresentations about collateral matters may have led to the transaction but the buyer still got the product that she expected at the price she expected." *Id.* Thus, in *Milheiser*, because the victim-businesses received toner at the price for which they had agreed to pay, the court held that the government's theory of fraud was overbroad and reversed the defendants' convictions. *Id.* at *7-*8.

The *Milheiser* court did *not* find instructional error. Rather, its holding was based on the government's assertion of an overbroad theory of fraud at trial. *Milheiser*'s commentary on the instructions given to the jury went to whether those instructions remedied the government's overbroad presentation of fraud to the jury. *Id.* at *8.

### 2. *Milheiser* Itself and Other Cases Demonstrate that the Federal Fraud Statutes Make a Broad Range of Misrepresentations "Material" in the Investment Fraud and Bank Fraud Contexts.

*Milheiser* dealt most directly with misrepresentations made to induce the purchase of commodities like toner cartridges. For "speculative" transactions, such as investments, *Milheiser* recognized that the fraud statutes proscribed and encompassed a broader range of lies intended to induce action on the part of investors. *See, e.g.*, *Milheiser*, 2024 WL 1517377, at *7 ("Because investments are by nature speculative, whether the investment advisor has a large and successful operation will inform the nature of the bargain – it is relevant information about the value of the investor's purchase." (citing cases)). Thus, *Milheiser* recognized that misrepresentations that are not material in the sale-of-goods context may be material in other contexts. *See id.* ("By contrast, the size or success of a company selling a commodity would not necessarily affect the value of that commodity.").

*Milheiser* was not the first Ninth Circuit opinion to recognize that the fraud statutes may be broadly read to prohibit the use of misrepresentations intended and used to separate victims from their money outside of the commodity context. The courts have held that representations about what will be

done with investments, as well as an investment company's *bona fides* and business practices, are central to a reasonable investor's decision to part with money. For example, the Ninth Circuit held in *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004), that a defendant's lies to make his "business appear to be a 'pretty big operation' . . .had a natural tendency to influence a potential investor's decision" and thus "were material." *Id.* at 1183 (cited in *Milheiser*, 2024 WL 1517377, at *7). Indeed, in a portion of *Tarallo* not cited by *Milheiser*, the Ninth Circuit held that Tarallo's "false statement that the invested funds would be placed in a trust and would be safe there was material." *Id.* at 1182; *see also id.* ("Such a statement has a natural tendency to influence a potential investor's decision to invest, and a reasonable investor would find the level of risk to be important in deciding whether to invest.").

The misrepresentation as to how investments would be handled found to be material in *Tarallo* is the exact type of misrepresentation here. That is, Rothenberg falsely led each of the investor-victims to believe that their investments would be used in a particular way. *Tarallo* makes clear that such conduct falls squarely within the scope of the federal fraud statutes. *See id.* ("For securities fraud, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision."); *id.* at 1183 ("The standards we cite above clearly allow for a broader class of conduct to be considered material.").[2] And although *Tarallo* most directly addresses investment-fraud cases, *Milheiser* acknowledged that "[w]hether a misrepresentation goes to the nature of the bargain may depend on the specific transaction." *Milheiser*, 2024 WL 1517377, at *7. Like investment-fraud cases, lines of credit (such as the one Rothenberg obtained from SVB) do not involve the simple exchange of money for a commodity but rather involve the extension of credit based on a lender's underwriting guidelines and a borrower's representations about sources of repayment and/or collateral.

The defendant's reliance on the portion of *Milheiser* that cites *United States v. Yates*, 16 F.4th 256 (9th Cir. 2021), is unavailing. In *Yates*, the Ninth Circuit held that "[a] scheme to defraud 'must be one to deceive the bank *and* deprive it of something of value,' that is, money or property." *Id.* at 264 (quoting *Shaw v. United States*, 580 U.S. 63, 72 (2016)) (emphasis in original). The *Yates* court held that the evidence was legally insufficient where the government argued that the primary purpose of the

---

[2] Rothenberg does not cite, let alone attempt to distinguish, *Tarallo*.

conspiracy was to conceal the true financial condition of the bank from the board of directors. *Id.* at 265 ("'the right to make an informed business decision' and the 'intangible right to make an informed lending decision' cannot" "constitute 'something of value'") (citation omitted); *see also id.* ("There is no cognizable property interest in 'the ethereal right to accurate information.'") (citation omitted). The convictions in this case, however, do not rest on the premise that Rothenberg simply deceived the victims by depriving them of accurate information. Rather, the instructions permitted the jury to find Rothenberg guilty only if the scheme also contemplated that he intended to "cheat" the investors and SVB. *See* Section IC, *infra.* Moreover, the "thing of value" here was not "ethereal" but was the *tangible* money that the investors and SVB gave to Rothenberg based on his misrepresentations. In short, the evidence showed that Rothenberg's scheme contemplated the deprivation of the alleged victims' money, not just the deprivation of their right to accurate information.

Similarly, both the defendant and *Milheiser* cite *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), but that case is largely inapposite here. *Bruchhausen* concerned the application of the federal fraud statutes to buyers who deceived sellers about the use to which the goods being bought at full price would be put – a matter that, in the context of that case, was not an essential term of the bargain. *Id.* at 466-68 (false assurances that purchased equipment would not be sent to certain foreign countries). The Ninth Circuit found that the deception did not constitute fraud because the seller had no property interest "in the disposition of goods it no longer owns." *Id.* at 468. The only "loss" in *Bruchhausen*, therefore, was the seller's control over the destination of the sale. This case does not involve a buyer's deception about the ultimate disposition of goods he purchased at fair market value. Rather, the deception related to how money would be handled and invested (as to the investors) and the reasons for the loan and the source of collateral (as to SVB). In all of the counts in this case, the "thing of value" was the actual dollars that the victims gave to Rothenberg.

Rothenberg reads too much into, and quotes too little of, the phrase in *Milheiser* about false statements that cause someone "'to engage in transactions [they] would otherwise avoid.'" Dkt. 384, at 10:12-14 (quoting *Milheiser*, 2024 WL 1517377, at *6). Of course, many or most material misstatements are either intended to, or actually do, induce a victim "to engage in transactions [they] would otherwise avoid." What *Milheiser* actually said was that it was concerned with hinging

materiality on statements that "do *no more* than cause" someone to engage in a transaction that they would otherwise avoid. *Milheiser*, 2024 WL 1517377, at *6 (emphasis added). In other words, *Milheiser* held that a misrepresentation that induces a victim to act but that relates to "no more" than a collateral matter is not material. But *Milheiser* does not exclude misrepresentations about fundamental aspects of a transaction that also serve to induce action on the part of the victim.

Beyond *Tarallo* and *Milheiser*, there are other cases that support the conclusion that the concept of materiality is broadly defined in the investment fraud context. For example, in *United States v. Reyes*, 660 F.3d 454 (9th Cir. 2011), the Ninth Circuit held that, "[f]or an omission to be material, 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Id.* at 468 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.") (internal citations and quotation marks omitted); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge."); *accord United States v. Vaccarelli*, 2020 WL 1329695, at *4 (D. Conn. Mar. 23, 2020), *aff'd and dismissed in part* 2021 WL 4805218 (2d Cir. 2021) ("Defendant made material misrepresentations regarding where the clients' money was being invested – and often, the fact that it would be invested. . . . Defendant['s argument] that neither his victims nor an objectively reasonable investor would consider his misrepresentations . . . to be material or essential to the bargain . . . is patently unreasonable . . . ."); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 315 (S.D.N.Y. 2010) ("Common sense, the testimony of the Class Representatives, and other court decisions, suggest that risk taking is material to investors."); *cf. also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180, 1182 (2d Cir. 1970) (acknowledging that a scheme can be unlawful when misrepresentations are shown to be capable of "influencing [the victim's] assessment of the value of the bargain to him" or there is a "suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered").

**B.** **Rothenberg's Fiduciary Duties Distinguish this Case from *Milheiser*.**

Rothenberg's case is further distinguishable from *Milheiser* because Rothenberg (unlike the toner suppliers in *Milheiser*) had a fiduciary relationship with the Unity investors and with the 2015 and 2016 Fund investors. As numerous witnesses explained, Rothenberg, as the general partner of venture capital funds, had a duty to put the interests of his investors ahead of his own. *See, e.g.*, RT 1296:11-13 (A. Binns: "So your fiduciary duty is to your limited partners, to – to make decisions that have their best interests in mind."); RT 1781:19-22 (Johnson: "When I became aware around this time that he was using money from Rothenberg Ventures funds [for River Studios], that felt to me like a breach of fiduciary duty that he wasn't using the funds appropriately."); RT 2390:6-24 (Lee: explaining that, in venture capital industry, fiduciary duty is "very, very important"); *cf. also* RT 1819:14-16 (Feldman: explaining that, in venture capital industry, "we raise money from investors and we are their fiduciaries, we invest it on their behalves"). Rothenberg's duties to his investors in this regard included the duty to keep them apprised of relevant facts. *See* RT 1183:21-23 (Levensohn: explaining that duty of good faith requires a general partner to "communicate with your limited partner and you're transparent, you tell them [*i.e.*, the limited partners] what's going on"); RT 1493:15-18 (Goldberg: "The duty of candor is a duty to make certain that in dealing with the beneficiary on important decisions, that all relevant information is given to the beneficiary to enable that beneficiary to make an informed decision."). Rothenberg well understood that he had a fiduciary duty to his investors. *See, e.g.*, Tr. Ex. 241 ("My first priority continues to be to protect investors."); Tr. Ex. 242 ("Our first priority continues to be to protect investors."); *see also* RT 1494 (Goldberg testimony that fiduciary duties are "covered extensively" at Harvard Business School).

How Rothenberg handled investor's money in his management of the Unity Co-Fund and the 2015 and 2016 Funds was central to the relationship with those investors. Accordingly, the fact that Rothenberg had a fiduciary duty to the Unity investors and to the 2015 and 2016 Fund investors further distinguishes this case from *Milheiser*. In *Milheiser*, the court of appeals essentially looked at the relationship between the toner suppliers and their customers as a purely arm's-length, transactional one. *Milheiser* has limited applicability to a good portion of this case because Rothenberg's relationships with his investors were neither arm's-length nor transactional, but were ongoing relationships in which

Rothenberg's investors "placed[] special trust and confidence" in him.  Dkt. 338, Instr. 18.

## C.   The Jury was Required to Find More than Mere Deceit.

The case is yet again distinguishable from *Milheiser* because, unlike in *Milheiser*, the jury in this case was required to find something more than mere deceit.  As set forth in the instructions the Court provided to the jury at the beginning of the case and again before their deliberations, the jury was required to find that Rothenberg had the requisite intent to defraud, which required *both* that he intended to deceive the victims *and* that he intended to cheat them.  *See, e.g.*, RT 507:5-7, 507:23-25, 509:9-10, 510:20-21 (preliminary instructions); Dkt. 338 (final instructions).

In contrast, the jury in *Milheiser* was instructed that it could find that the government had proven the third element if it found *either* that the defendant had the intent to deceive *or* the intent to cheat. *Milheiser*, 2024 WL 1517377, at *4.  This instruction was contrary to *Miller*, 953 F.3d at 1095, which held that "a defendant must act with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions.  In other words, a defendant must intend to deceive *and* cheat."  *Id.* at 1101 (emphasis in original).  The instructions in *Milheiser did* tell the jury that an intent to defraud included "an intent to deceive a consumer *and* deprive the consumer of something of value," *id.* (emphasis added).  But this phraseology did not include the term "cheat" (which implies wrongfulness and something more than mere deprivation), and, in any event, arguably did not overcome the improper use of "or" in the third element. *See Miller*, 953 F.3d at 1095.

In this case, because the jury was instructed that it had to find that Rothenberg had *both* the intent to deceive *and* the intent to cheat, the jury necessarily found more than just that Rothenberg had told some lie; it also found that he intended to cheat the victims.  Although *Milheiser* dealt with materiality, whether a defendant had the requisite intent to defraud is closely tied to the question of whether the defendant's misrepresentations were material.  *See, e.g., United States v. LeVeque*, 283 F.3d 1098, 1105 (9th Cir. 2002) ("The fact that defendants' misrepresentations were capable of affecting McMaster's understanding of the bargain, and of influencing his decision to part with his money, supports a finding of intent to defraud."); *accord Regent Office Supply*, 421 F.2d at 1183 (linking intent to defraud to materiality).  Accordingly, the jury's finding in this regard shows that it was properly

1   focused on whether Rothenberg's misrepresentations went to the "nature of the bargain."[3]

2                                              *   *   *

3          Because *Milheiser* dealt with an "overbroad theory of fraud" regarding the sale of commodities

4   (and not with a run-of-the-mill fraud regarding investments and lines of credit), because there was no

5   fiduciary relationship between the parties in *Milheiser* (unlike in this case as to many of the counts), and

6   because the jury in *Milheiser* was not instructed to find an intent to cheat (unlike the jury in this case),

7   *Milheiser* is distinguishable on multiple grounds.

8   **II.    The Evidence was Overwhelming that the Misrepresentations Made by Rothenberg Were
            Central to the Nature of the Bargain for the Unity Investors, the 2015 and 2016 Fund
9           Investors, Pilot Grove, and Silicon Valley Bank.**

10         Rothenberg's essential argument is that there was insufficient evidence to conclude that the

11  representations he made to the Unity investors, the 2015 and 2016 Fund investors, Pilot Grove, and

12  Silicon Valley Bank went the "nature of the bargain" with respect to each of the transactions at issue.

13  As noted in Section I, his argument is without merit because cases from the Ninth Circuit and other

14  courts support the conclusion that a broad range of misrepresentations intended to obtain investments or

15  loans can be material, because Rothenberg had a fiduciary duty to many of the victims, and because the

16  jury necessarily found that he had the intent to cheat the victims.  But that argument is doubly without

17  merit under the specific facts of this case because the investors' testimony at trial demonstrated that

18  what Rothenberg did with their money was fundamental to their investment decision and fundamental to

19  the bargain that they struck with him.  Similarly, the testimony of Frank Amoroso, the former SVB

20  employee, showed that Rothenberg's representations about the size of the 2015 Fund, the source of the

21  line of credit collateral, and whether Rothenberg had already spent all of the fees that RVMC was due

22  from the 2015 Fund were also fundamental to SVB's decision as to whether to fund the line of credit.

23  Indeed, in many instances, the representations to investors or to SVB that the defendant now claims

24  were immaterial were reduced to writing and literally part of the bargain.

25

26         [3] The jury was also instructed regarding the evidence that had been presented about the
    investors' and SVB's "processes for deciding whether" to invest money or extend a loan.  *See* Dkt. 338,
27  Instr. 22 & 23.  Among other things, the Court instructed the jury that it could consider the evidence of
    the investors' and SVB's decisionmaking process in its materiality determination.  This additional
28  instruction supports the conclusion that, unlike the jury in *Milheiser*, the jury in this case was properly
    focused by the Court and the parties on the nature of the bargain.

UNITED STATES' OPP. TO DEF.'S RENEWED RULE 29 & RULE 33 MTN.
20-CR-00266 JST                              13

1

2

### A.  Rothenberg's Lie that He Would Purchase Unity Securities was Central to the Bargain He Struck with the Unity Investors.

3

Despite Rothenberg's contention, *see* Dkt. 384, at 10:6-8, the government's jury arguments about

4 the Unity investors focused on his misrepresentations about how the Unity investors' money would be

5 used. *See, e.g.*, RT 4415:25 to 4417:22; RT 4532:5-9; RT 4533:4-21, RT 4534-35.  At no point did the

6 government specifically argue that the jury should rely on misrepresentations Rothenberg made to the

7 Unity investors about his alleged ownership of River Studios, or any other collateral misrepresentations,

8 in order to conclude that Rothenberg had made material misrepresentations to those investors.

9

The evidence at trial showed that the money contributed by Unity investors was not used to

10 purchase Unity stock, was not kept segregated, and was spent on other things.  The evidence was

11 overwhelming that these actions were all contrary to the bargain.  The Unity investors testified that,

12 based on their conversations with Rothenberg, RVMC employees, and the documentation they received,

13 it was clear that the funds they provided to Rothenberg would be used solely to purchase of Unity stock.

14 *See, e.g.*, RT 1334:2-12 (A. Binns: "I understood that the reason this needed to move fast was because

15 the money was going to be invested in Unity immediately. . . .  The minute it's clear that the deal isn't

16 going to go through [the Binnses would get their money back]."); RT 1407:17-19 (J. Binns: purpose was

17 "[t]o invest in Unity"); RT 1544:8-9 (Goldberg: "We understood the money would be used for the

18 purchase of equity securities in Unity."); RT 1753:10-14 (Johnson: "My understanding that the funds

19 were going to be used solely for the purchase of shares within Unity, pre-IPO shares, that the funds were

20 going to be held in [a separate] escrow . . . account."); RT 2231:17-18 (T. Melas-Kyriazi: "It was clearly

21 an investment that was solely in Unity.  There was no question about that."); RT 2250-51 (T. Melas-

22 Kyriazi: "absolutely a categorical no" when asked if GHF would have invested if he had known that

23 none of the money would go to purchase Unity stock); RT 2309:11-13 (J. Melas-Kyriazi: "if we were to

24 invest into this  this entity, that the entity would then subsequently purchase shares of Unity, Inc."); *see*

25 *also* Tr. Ex. 302 ("The Fund will invest in a special purpose vehicle that will purchase equity securities

26 of Unity Software, Inc."); Tr. Ex. 321 (PowerPoint deck re: "Unity Co-Fund").

27

The Unity investors' reactions upon learning that no purchase of Unity stock had gone forward

28 only underlined the fact that such a purchase was fundamental to the bargain.  For example, when

Rothenberg told the Melas-Kyriazis that GHF's money had not been invested in Unity stock but had been invested into an entirely different vehicle (the 2016 Fund), the Melas-Kyriazis found Rothenberg's stated use of their money to be "unacceptable," "alarming," "unsettling," and a "serious breach of our trust and a big problem." RT 2231:15, 2232:3-13, 2330:13, 2334:1-2.

Similarly, when the Binnses asked for their Unity investment to be returned, they were asked to sign a letter purportedly memorializing their understanding prior to investing that there was a possibility that the Unity investment would not be consummated and that, if that happened, their money would be invested in the 2016 Fund. *See* Tr. Ex. 308. The Binnses refused to sign that letter agreement because it was "not true," RT 1343:20, 1415:15-16, 1416:6-8, *i.e.*, did not reflect the bargain.

When Lena Goldberg learned through a newspaper article that RVMC had not purchased any Unity stock, she emailed Rothenberg and told him she found this to be "quite disturbing" and asked for confirmation that her money either had been invested in Unity or held in separate accounts "earmarked for that purpose and unencumbered in any way." Tr. Ex. 335; RT 1567. Again, this contemporaneous reaction by a Unity investor to Rothenberg's purported failure to use invested funds in a particular way establishes that the stated use of investment funds went to the heart of the bargain in this case.

Based on all of this evidence, and to borrow *Vaccarelli*'s phrasing, it is "patently unreasonable" to argue that Rothenberg's misrepresentations about what he would do with the Unity investors' money were neither material nor essential to the bargain. 2020 WL 1329695, at *4. The fact that the Unity investors' money was returned to them, *see* Dkt. 384, at 3:10-11, is not a defense to fraud. On the contrary, the ultimate repayments to the Unity investors in response to their requests shows that Rothenberg himself knew that the purchase of Unity stock was central to the nature of the bargain.

For all of these reasons, the government presented overwhelming evidence at trial that the use to which Rothenberg would put the Unity investors' funds went to the nature of the bargain.

**B.    Rothenberg's False Statement that He Would Invest in Frontier Edge Technology Companies was Fundamental to the Bargain He Made with the 2015 and 2016 Fund Investors.**

Just as the defendant used the Unity investors' money in ways contrary to the nature of that bargain, the evidence also showed that Rothenberg's use of Fund money contravened the 2015 and 2016 Fund investors' core understandings of how their investments would be handled. In closing argument,

the government focused on the fact that "Rothenberg consistently lied to them all [*i.e.*, the 2015 and 2016 Fund investors] and failed to tell them important facts about how their money would be used."  RT 4418:22-24.[4]  These misrepresentations and omissions were proven by Rothenberg's taking of excess fees from the 2015 Fund and 2016 Fund, using Fund money to pay for the operations of River Studios, and using Fund money for other purposes (such as to secure RVMC's line of credit from SVB).  As explained at length in the United States' original Rule 29 Opposition, Dkt. 371, only 7.2% of Antonov's money was invested into portfolio companies of the 2015 Fund, RT 3992:6-10; only 48.9% of GHF's money was invested into portfolio companies of the 2015 Fund, RT 4022:6-18; only 4.0% of HTC's money was invested into portfolio companies of the 2015 Fund, RT 3998:19-22; none of Dolby Family Ventures' money was invested in portfolio companies of the 2016 Fund, RT 4000:20-23; none of Menezes' money was invested into portfolio companies of the 2015 Fund, RT 3936:4-6; none of CY Capital Limited's money was invested into portfolio companies of the 2016 Fund, RT 3939:11-14; none of ARCHina's money was invested into portfolio companies of the 2016 Fund, RT 3940:21 to 3941:18; 3942:1-17; and none of KIP's money was invested into portfolio companies of the 2016 Fund, RT 3951:6 to 3953:12.  In short, there was abundant evidence that showed that these uses of money were contrary to the nature of the bargain that Rothenberg struck with the 2015 and 2016 Fund investors.

As to Rothenberg's fees, the trial evidence showed that Rothenberg had taken more money in fees than RVMC was allowed under the various management agreements.  *See, e.g.*, RT 944:15 to 945:1 (McMillan); RT 3926:3-21 (Fujimoto) (by July 2015, RVMC took more money from 2015 Fund than it would earn over entire ten-year life of the Fund); RT 3912:5-8 (Fujimoto: shortfall across all funds as of September 2018 was $18.7 million).  The percentage of money that an investment manager takes from

---

[4] Rothenberg argues that the government had "two theories" regarding the misrepresentations made to Pilot Grove, the Unity investors, and the 2015 and 2016 Fund investors: "(1) the ownership of River Studios and (2) how investors' money would be used." Dkt. 384, at 10:6-8.  While this generally describes the government's arguments as to the misrepresentations made to Pilot Grove, *see* Section IIC, *infra*, the contention that the government's theory of fraud as to the Unity investors focused on "the ownership of River Studios" is simply not true, as explained in Section IIA, *supra*.  Rothenberg's "two theory" framework also does not accurately describe the government's arguments as to the 2015 and 2016 Fund investors.  Instead, the government's closing argument focused on Rothenberg's misrepresentations and omissions about how investor money would be and had been used.  His contrary use of investor money manifested itself in numerous ways, which included him taking excess fees, spending investor money on River Studios, and spending investor money for other purposes.

an investment "off the top" is fundamental to the investment decision, as the Ninth Circuit has recognized. *See United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010) ("In deciding whether to buy a given stock, a reasonable investor would consider it important that, in contrast to the purchase of most stocks, the broker would receive a 5% commission from the purchase of this particular (house) stock."). Indeed, Rothenberg himself recognized that the fees that a general partner takes is a core consideration in the investment decision because he included assertions about them in his promotional materials. *See, e.g.*, Tr. Ex. 188-0017 ("Best in class fee structure with lower fees than funds of similar size"); *see also id.* ("Team receives economic upside only when our LPs and our funds do").

Moreover, the amount of fees that Rothenberg would take for managing the Funds was not some amorphous concept that was never at play in the relationship between Rothenberg and his investors. On the contrary, the governing documents for each Fund specified how much money Rothenberg was entitled to take each year and over the life of the Fund. *See, e.g.*, Tr. Ex. 22-0039 (2015 Fund); Tr. Ex. 26-0025 to -0027 (2016 Fund). Although the Fund documents gave Rothenberg discretion in how to invest the LP's money, these and other provisions placed important guiderails on that discretion, made clear that only a certain amount of money contributed by LPs would be paid to RVMC for fees, and provided that each Fund's deposits would not be commingled with those of other companies (such as River Studios). *See id.* at Tr. Ex. 22-0037. Accordingly, the Fund agreements themselves show that Rothenberg's use of Fund money, the amount of fees that he was entitled to, and how he handled the LPs' investments were central to the nature of the bargain. Simply put, there can be no better proof of what the "bargain" was than to look at the actual written agreements. On these facts, it would be fantastical for Rothenberg to claim that his taking of excess fees did not go to the nature of the bargain.

With respect to the investment of Fund money into River Studios (which the defendant claimed to own), investor after investor testified that they were not aware and did not contemplate that the 2015 Fund or 2016 Fund would invest in River Studios, and that they were "surprised" when they learned this fact.[5] *See, e.g.*, RT 1239:7-20 & 1252:6-7 (Levensohn: "That would also be completely out of the

---

[5] Of course, the fact that Rothenberg used Fund money to pay for River Studios' and other non-Fund-related expenses goes hand-in-hand with, and was one of the reasons for, Rothenberg's taking of excess fees from the Funds. This interaction between the taking of excess fees and the inappropriate use of Fund money is but one example of how the evidence of fraud was intertwined in this case.

scope.  It'd make no sense."); RT 1554:8-18 (Goldberg: "I was surprised because I was unaware that Rothenberg Ventures was investing in River Studios . . . .  [I]t would be highly unusual . . . to have the partnerships investing not in startups started up by third parties, but in a company he himself owned."); RT 2143:16 to 2144:18 (Gupta: "Q. … Did he ever tell you he was going to invest in an entity called River Studios?  A. No."); RT 2322-23 (J. Melas-Kyriazi: "I was surprised to hear that Rothenberg Ventures 2015 Fund had invested into River Studios, as I -- I -- I was not aware of that information and I don't believe that information was in our reports that we had been sent by Rothenberg Ventures previously for the 2015 Fund."); RT 2456:9-17 (Lee: "Q. … Did you see anything in the materials provided to KIP at the time of its investment that the 2016 Fund would invest in River Studios or any entity owned by Mr. Rothenberg?  A. No."); RT 2526:17-21 (Antonov: "Q. Finally, would you have invested in the 2015 Fund if Mr. Rothenberg had told you that some of your money would have gone to an entity called River Studios?  A. Likely not.  I would be concerned and want to ask what it is."); RT 2652:4-5 & 2653:2 (Huang: "I had no knowledge that the funds invested in River Studios."; "I was quite surprised."); RT 2915:5-8 (Chiu: "Q. Was this [August 2016] the first time that you had learned that Rothenberg Ventures had in fact invested money into this entity called River Studios?  A. Yes.").

Indeed, Pascal Levensohn of Dolby Family Ventures testified that he was offered a chance to invest directly in River Studios, and he declined, saying it would make "zero sense."  RT 1235:16 to 1236:7.  GHF likewise later refused to invest in River Studios.  RT 2378:9-10 (J. Melas-Kyriazi: "Rothenberg ask[ed] to divert our investment from Unity into River Studios, which we declined.").  Michael Antonov indicated that he would have declined had he been presented the option to invest in River Studios.  RT 2527:6 to 23 ("when this is taking place in 2014, I did not believe one could make money and sustainable business on video-style passive content in VR [such as River Studios]").

Importantly, the testimony of Levensohn and Goldberg established that how a venture capitalist handled money was at the heart of the bargain between a venture capitalist and his investors.  Levensohn, who had more than 30 years' experience in the venture capital industry, managed his own venture capital funds, and managed the Dolby family office, RT 1177:5-11 & 1184:5-7, testified that the prohibition on a venture capital general partner (such as Rothenberg) commingling funds was "fundamental" to the general partner's duties of care, loyalty, and good faith.  RT 1183:6-1184:17.

Levenson also explained in some detail about the concept of the fiduciary duty. Similarly, Goldberg, who had been executive vice president and general counsel of Fidelity and had been a lecturer at Harvard Business School for more than decade, RT 1480-81, explained the concept of fiduciary duty to the jury. RT 1492-94. Goldberg explained to the jury that she found Rothenberg's use of Fund money to invest into his own company (River Studios) to "be highly unusual, to say the least," and tied that opinion to the prohibition on "self-dealing." RT 1554:9 to 1555:1; *see also* RT 1564:21-25 ("[T]o do it [*i.e.*, use Fund money to invest in River Studios] without expressly stating, 'This is my venture, the partnerships are going to invest in it,' and how much they're going to get for it, that would really run against the duty of candor because it's a material point when you're self-dealing.").

All told, the jury heard abundant evidence that Rothenberg affirmatively lied to investors and potential investors about how he would handle their money and then failed to disclose material information about he was actually spending that money (including by putting it into River Studios). The jury was provided with both general testimony about a fund manager's duties and responsibilities to investors and specific testimony from Rothenberg's investors. The investors' testimony clearly showed that how Rothenberg spent their money was central to the relationship.

**C.      Rothenberg's Lies to Pilot Grove that He Owned 100% of River Studios and that He Would Use Pilot's Grove Money Exclusively to Improve River Studios were Central to the Investment Bargain He Made with Pilot Grove.**

The evidence also showed that the misrepresentations made to Pilot Grove about Rothenberg's 100% ownership interest in River Studios, how River Studios' operations had been funded, and what Rothenberg and River Studios would do with Pilot Grove's investment all went to the nature of the bargain between Pilot Grove and Rothenberg.

For example, the Pilot Grove witnesses were told time and again that Rothenberg had "boot strapped" River Studios "out of his own pocket," and that, by virtue of that fact, he was its 100% owner. *See, e.g.*, RT 2764:21 to 2765:14, RT 2770:25 to 2771:16, RT 2798:14 to 2800:18 & Tr. Ex. 188 (Frank); RT 3061:9-18 (Weisman) & Tr. Ex. 212; RT 3065:14-21 (Weisman) & Tr. Ex. 213. These representations led Pilot Grove to believe that no Fund money had gone into River Studios, and that the only way for Pilot Grove to invest in River Studios was to make a direct investment. Larry Weisman stated that, if he had known that Rothenberg's Funds "had invested in River Studios, I would never had

made the investment [directly into River Studios]. . . .  If I could have gotten that exposure by just investing in the fund, I would never have taken the additional risk of investing in the studio directly on its own."  RT 3019:12-18.  Moreover, Dominic Polizzotto explained in various ways why the representation about outside funding and Rothenberg's ownership were important to the decision as to whether to invest.  RT 3153:2-3 ("I needed to know that what Mr. Rothenberg was selling me was his to sell."); RT 3153:4-9 ("I needed to know, you know, that there were really no other investors because . . . people who have put money in expect to have a voice at the table and I needed to know who those people would be, if they were people I'd want to be in business with."); RT 3157:4-5 (explaining that "I would have just walked away from the transaction without exploring it any further" if he had discovered in February 2016 that Rothenberg did not own 100% of company).  This testimony, which directly addressed Pilot Grove's perception of perceived risk regarding the transaction, goes to the heart of the investment decision.  *See, e.g.*, *Tarrallo*, 380 F.3d at 1182 ("a reasonable investor would find the level of risk to be important in deciding whether to invest"); *United States v. Harder*, 116 F. Supp. 3d 1197, 1226 (D. Or. 2015) ("Had these material misrepresentations or misleading half-truths not been made, or had these material omissions been timely and fully disclosed, the investors would have had the opportunity themselves to weigh the benefits of their contemplated investments alongside the relevant risks."); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. at 315 ("Common sense, the testimony of the Class Representatives, and other court decisions, suggest that risk taking is material to investors.").  Similarly, the Pilot Grove witnesses also explained why they perceived Rothenberg's 100% ownership of River Studios and no prior outside funding to be a strategic advantage that counseled *for* making the investment (which again relates to perceived risks and benefits).  *See* RT 3019:1-7 ("it would provide us with a strategic advantage in any potential new companies or investments that he made or in any of the content he created"); *see also* RT 3038:16-20; *Berson*, 527 F.3d at 985 ("[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.") (internal citations and quotation marks omitted).

The fact that Rothenberg was the 100% owner of River Studios and that he had provided the cash to fund River Studios' operations was so important to Pilot Grove that it demanded that a warrant be added to the convertible promissory note representing as much.  *See* Tr. Ex. 217-0006, ¶ 5(g).  It is

1    nonsensical to argue that a warrant provision specifically negotiated for and set forth in the *written*

2    *bargain itself* does not go to the nature of the bargain.  But lest there be any uncertainty, Pilot Grove's

3    reaction to the falsity of this representation removes any doubt.  Specifically, in August 2016,

4    Rothenberg reached out to Polizzotto and Weisman, first through his employee Justin Grooms, and then

5    directly.  Among other things, Rothenberg told Polizzotto and Weisman that he believed River Studios

6    to have been "wholly owned by the Rothenberg Ventures funds at the time of [Pilot Grove's] investment

7    since it was funded entirely by LPs." Tr. Ex. 235.  Polizzotto's contemporaneous and colorful reaction

8    to this news established that the ownership structure was a fundamental part of the bargain.  *See, e.g.*, Tr.

9    Ex. 632.  Indeed, when Grooms approached Weisman about amending the warrant provision in the

10   promissory note, Polizzotto explained to the jury that that proposed amendment "changed the

11   fundamental piece of our agreement."  RT 3210:17-18; Tr. Ex. 234 (email from Grooms to Weisman).

12          With respect to the uses to which Pilot Grove's money would be put, that, too, was fundamental

13   to the bargain.  As Weisman explained, the purpose of the investment was to grow the River Studios

14   business, RT 3012:5 to 3014:6, not to provide money to Rothenberg so that he could pay back money to

15   Fund I and Fund II and otherwise support his other operations, RT 3014:15 to 3017:8.  As Weisman

16   explained, if Rothenberg used Pilot Grove's investment to pay himself back for his prior investments

17   into River Studios or to repay money taken from the Funds, that would mean that Rothenberg "can't

18   build a studio . . . can't deliver more creative content . . . can't fund any accretive acquisitions" with

19   Pilot Grove's money.  RT 3016:19-24.  The evidence was unequivocal that Rothenberg's intended use

20   of Pilot Grove's money was central to the nature of the bargain with Pilot Grove.  As Weisman

21   explained, Pilot Grove knew that there was a level of risk involved in the transaction, but its assessment

22   of the risk assumed that Rothenberg would actually use Pilot Grove's money to "proceed[] down the

23   path of doing accretive acquisitions and creating content, not by taking the money and putting it

24   somewhere else."  RT 3039:25 to 3040:3; *see also United States v. Davis*, 767 Fed. App'x. 714, 725

25   (11th Cir. 2019) ("These misrepresentations are material because they go to the heart of the riskiness of

26   the investment, so they have the natural tendency to influence, or be capable of influencing, reasonable

27   people making decisions about where and how to invest their money.")

28          For all of these reasons, the government presented overwhelming evidence at trial that

Rothenberg's representations about his ownership and funding of River Studios and the use to which River Studios would put Pilot Grove's investment went to the nature of the bargain.

**D.    Rothenberg's False Statements about the Size of the 2015 Fund and the Source of the Line of Credit Collateral Were Material Because They Went to the Nature of His Bargain with Silicon Valley Bank.**

In his motion, Rothenberg attempts to convert a complicated collateralized line of credit transaction into a simple commodity transaction in order to make it appear that *Milheiser* should control. He contends that "the evidence presented at trial demonstrated that the 'bargain' was SVB would issue a line of credit provided $4.25 million was placed into a collateral account.  SVB got its bargain…."  Dkt. 384 at 9.  He is wrong.

Foremost, under Rothenberg's theory of what *Milheiser* means, bank fraud is not possible if a collateralized loan or line of credit is funded by the bank.  That is, the victim bank will always have gotten its bargain, no matter what lies were told to the bank by the fraudster, if the bank funds a loan or the line of credit.  To pick one easy-to-imagine example: a fraudster obtains a loan from a bank secured by a mortgage on a house that the fraudster says is his but is in fact an unknowing third party's house; the fraudster then defaults; under Rothenberg's theory, since the bank funded the loan and received collateral, there is no fraud, even though the house that serves as collateral is not lawfully available for foreclosure.  Certainly, *Milheiser* did not render the bank fraud statute meaningless.

Second, Rothenberg overlooks the fundamental nature of the transaction at issue when attempting to recast his complicated collateralized line of credit transaction into a simple commodity purchase.  A line of credit can be drawn on and repaid over time; it is not a one-and-done commodity purchase; it requires the issuing bank to determine whether its would-be customer is trustworthy enough to warrant a long-term relationship.  It requires a bank to know that the collateral it has been given rights to as a remedy for failing to pay back the line of credit will, in fact, be available, with clean title, for seizure in the event of a default.  Accordingly, the provenance of the collateral is central to the bargain a bank strikes with a customer when extending a line of credit to that customer.

Thus, contrary to the defendant's assertion, Rothenberg's lies were material to SVB because they went to the nature of the bargain, as Frank Amoroso explained in various ways.  For example, Amoroso testified that if he knew the size of the 2015 Fund was only about $13 million (instead of the $23.6

million Rothenberg represented), he would not have approved and underwritten the $4 million line of credit that Rothenberg ultimately obtained. *See* RT 1081:25 to 1082:3. Amoroso explained that this difference in Fund size would have been "very significant," RT 1081:5, because it would have meant that "[t]he loan would not underwrite at the same amount," RT 1081:23-24, and would have to have been smaller, RT 1082:3. *See also* RT 1096:19-21 ("At a minimum, it would reduce the dollar amount by 45-ish percent if it would even underwrite at that lower dollar amount."); RT 1096:22-24 (no approval of $4 million loan on a fund size of $13.17 million). Amoroso also testified that if the bank knew the source of the collateral came from the 2013 and 2014 Funds, the loan would not have been approved as "commingling of funds is not allowed." RT 1096:25 to 1097:3. Therefore, Rothenberg's lies were material, and his motion makes no effort to contend with Amoroso's clear testimony.

The evidence at trial also showed that SVB required Rothenberg to make representations about the cash collateral that he was providing. Specifically, the Loan and Security Agreement contained a representation that RVMC "had good title to the collateral." RT 1121:8-11; Tr. Ex. 173. As Amoroso explained, this provision meant that "the cash [in the collateral account] is owned by the borrower. It's the borrower's cash and no one else's." RT 1121:15-16. Yet, the evidence was undisputed that the collateral funds came from other sources (such as Fund I/2013 Fund and Fund II/2014 Fund). Furthermore, it was also clear that RVMC had already taken all of the fees that it was owed by the 2015 Fund, so none of this money represented "prepaid fees" that would be due to RVMC in the future. In light of fact that SVB included this provision in the written agreement, Rothenberg cannot persuasively argue that the true source of the cash collateral did not go to the nature of the bargain.

In short, if the "nature of the bargain" was simply "Rothenberg gives SVB $4.25 million in collateral and SVB extends a $4 million line of credit," then there would have been no need for SVB to (1) ask Rothenberg to provide the 2015 Fund and RVMC operating agreements, *see, e.g.*, Tr. Ex. 600 & RT 1115, and (2) have Rothenberg sign a lengthy Loan and Security Agreement containing numerous representations about the truthfulness of his assertions and regarding title to the collateral, *see* Tr. Ex. 173. Instead, the arc of the parties' discussions and negotiations in December 2015 shows that SVB was concerned with understanding Rothenberg's business, the Fund at issue, and the nature of collateral. The evidence presented and the government's arguments to the jury were focused on these core matters.

1

2    * * *

     For all of these reasons, the evidence at trial showed that SVB, Pilot Grove, the Unity investors,

3    and the Fund investors did not get what they bargained for. This case is simply not about "gaining

4    access to customers in order to pitch an otherwise honest product." *Tarallo*, 380 F.3d at 1183.

5    **III.    No New Trial is Warranted Because There was No Instructional Error**

6         With regard to Rothenberg's motion for a new trial under Rule 33, there was no instructional

7    error here. As noted above, the *Milheiser* court did *not* find instructional error. Rather, its holding was

8    based on the government's assertion of an overbroad theory of fraud at trial. *Milheiser's* commentary

9    on the instructions given to the jury went to whether those instructions *remedied* the government's

10   overbroad presentation of fraud to the jury. *Milheiser*, 2024 WL 1517377, at *8. Therefore, Rothenberg

11   is incorrect when he asserts that the jury instructions here "misstated a crucial element of the offense."

12   Dkt. 384 at 12. The *Milheiser* court did not so hold.

13        In this case, the Court's instruction to the jury regarding materiality was based on the standard

14   enunciated by the Supreme Court in *Neder v. United States*, 527 U.S. 1 (1999), which stated that, "[i]n

15   general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of

16   influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 16 (citation

17   omitted). There is no intervening Supreme Court case since *Neder* that casts doubt on this formulation

18   of "materiality." Although *Milheiser* found this definition to be insufficient to cure an overbroad theory

19   of fraud in the specific context of that case and of the government's arguments to the jury, the Court's

20   instructions in this case properly focused the jury on, and the government's arguments were tied to, the

21   nature of each bargain, and the evidence of materiality and of fraud in general was overwhelming.

22   **IV.    Given the Vast and Devastating Evidence Adduced in this Case, Any Error was Harmless.**

23        As set out above and in the United States' oppositions to Rothenberg's original Rule 29 and Rule

24   33 motions, Dkts. 369 & 371, and the Court's orders denying his motions, Dkts. 378 & 380, the volume,

25   trustworthiness, and weight of the evidence adduced at trial against Rothenberg provided overwhelming

26   support to find him guilty beyond a reasonable doubt as to every count. Furthermore, Rothenberg's

27   main defense was that he lacked the intent to defraud, not that the government's theory of fraud was

28   overbroad or that his misrepresentations to investors were not material. (The defense did, however,

argue immateriality as to SVB.)  *Cf. United States v. Harmon*, 537 Fed. App'x. 719, 720 (9th Cir. 2013) ("[Harmon's] principal defense was that she had no knowledge that the funds came from unlawful activity, not that the funds did not derive from unlawful activity or that unlawful activity never took place . . . .") (holding that district court committed legal error in granting new trial motion based on faulty instructions).

Accordingly, even if the Court were to find that the government presented an overbroad theory of fraud or that there was an error in the conduct of the trial or the instructions given to the jury – and the Court should not find any overbreadth or error at all, as argued above – those things would not have affected the verdict in this case.  Any rational jury would have found Rothenberg guilty beyond a reasonable doubt on the evidence presented, and thus, any error was harmless.[6]

## CONCLUSION

For the reasons set out above, the United States respectfully requests that the Court deny Rothenberg's renewed motions for a judgment of acquittal and for a new trial.  In short, the Ninth Circuit's recent opinion in *Milheiser* simply does not apply to this case, and even if it did, the evidence introduced at trial met the requirements of *Milheiser*.

DATED:  May 3, 2024

Respectfully submitted,

MATTHEW M. YELOVICH
Attorney for the United States
pursuant to 28 U.S.C. § 515

_____/s/_____
BENJAMIN K. KLEINMAN
KYLE F. WALDINGER
NICHOLAS J. WALSH
Assistant United States Attorneys

---

[6] As noted in the Legal Standards Section, because Rothenberg did not object to the materiality portion of the instructions in this case, any claim that he might raise in this regard on appeal should be reviewed for plain error, which is a higher hurdle for Rothenberg than harmless error.  In this Opposition, the United States argues under the harmless error framework because any error that is harmless also would not meet the plain error standard.