1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,                Case No. 20-cr-00266-JST-1

                    Plaintiff,
8
                                              **ORDER DENYING DEFENDANT'S**
9            v.                               **MOTIONS FOR NEW TRIAL AND**
                                              **JUDGMENT OF ACQUITTAL**
10   MICHAEL BRENT ROTHENBERG,
                                              Re: ECF No. 384
                    Defendant.
11

12

13          On November 16, 2023, a jury convicted Defendant Michael Brent Rothenberg of 21

14   violations of federal criminal law, including bank fraud, false statements to a financial institution,

15   wire fraud, and money laundering.  ECF No. 339.  Thereafter, Rothenberg filed motions for new

16   trial and judgment of acquittal, ECF Nos. 364, 365, which the Court denied, ECF Nos. 378, 380.

17          Rothenberg now renews his motions pursuant to Rules 29 and 33 of the Federal Rules of

18   Criminal Procedure and the Ninth Circuit's intervening decision in *United States v. Milheiser*, 98

19   F.4th 935 (9th Cir. 2024).  ECF No. 384.  He argues that the Government offered insufficient

20   evidence that his misrepresentations to Silicon Valley Bank and various fund investors "went to

21   the 'nature of the bargain.'"  *Id.* at 11 (quoting *Milheiser*, 98 F.4th at 944).  In the alternative, he

22   argues that the Court should grant a new trial "because the jury instructions here, like the

23   instructions in *Milheiser*, did not inform the jury that 'to support a conviction for fraud, a false

24   statement must directly or indirectly deceive the victim about the nature of the bargain.'"  *Id.*

25   (quoting *Milheiser*, 98 F.4th at 945).

26          The Court will deny the motions.

27

28

# I.     BACKGROUND

## A.     Factual Background

### 1.     Rothenberg's Business

In 2012, Rothenberg founded a Silicon Valley venture capital firm, Rothenberg Ventures Management Company ("RVMC").  Trial Tr., vol. 22, 4102:18–4104:9.  Through RVMC, Rothenberg managed several capital investment funds and co-funds.[1]  As relevant here, these included four main funds: the 2013 Fund, the 2014 Fund, the 2015 Fund, and the 2016 Fund.  *See* Trial Tr., vol. 3, 597:5–11; 628:15–20; 653:3–7; Trial Tr., vol. 4, 717:1–10.  He also founded other companies, including one that sponsored a race car driver ("River Sports"); a business accelerator ("River Accelerator"), and a virtual reality content production company ("River Studios").  Trial Tr., vol. 4, 718–719; Trial Tr., vol. 7, 1314; Trial Tr., vol. 22, 4166.  These three entities were sometimes referred to collectively as the "River Ecosystem."  Trial Tr., vol. 15, 2875–2876; Trial Tr., vol. 20, 3772; Tr. Ex. 238.

### 2.     Indictment

On August 20, 2020, Rothenberg was charged in a 23-count indictment alleging as follows:[2]

- Bank fraud in violation of 18 U.S.C. § 1344 (Count One) (Silicon Valley Bank);

- False statements to a financial institution in violation of 18 U.S.C. § 1014 (Count Two) (Silicon Valley Bank);

- Bank fraud in violation of 18 U.S.C. § 1344 (Count Three) (Silicon Valley Bank);

- False statements to a financial institution in violation of 18 U.S.C. § 1014 (Count Four) (Silicon Valley Bank);

- Wire fraud in violation of 18 U.S.C. § 1343 (Counts Five through Seven) (Pilot Grove Management/Transcend VR);

- Money laundering in violation of 18 U.S.C. § 1957 (Counts Eight through Eleven);

---

[1] A "co-fund" invests in one specific company instead of a portfolio of different companies.  *See* Trial Tr., vol. 7, 1307:5–1308:23.

[2] The Court omits the indictment's aiding and abetting language for simplicity.

United States District Court
Northern District of California

- Wire fraud in violation of 18 U.S.C. §§ 1343 (Counts 12 through 15) (Unity Technologies);

- Wire fraud in violation of 18 U.S.C. §§ 1343 (Counts 16 through 23) (2015 and 2016 Rothenberg Fund).

ECF No. 15.  On October 25, 2021, the Court severed Counts One and Two from the remaining counts.  ECF No. 101.  Those two counts went to trial in November 2022, but the Court granted a mistrial after the jury could not reach a verdict.  ECF No. 205.

### B.      Procedural Background

#### 1.      Trial

Trial on Counts Three to Twenty-Three began on October 3, 2023.  At the close of the Government's case, Rothenberg made an oral motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the Court denied.  Trial Tr., vol. 22, 4085:15–19, 4263:4–17.  After the conclusion of the Government's case, Rothenberg testified in his own defense, and the defense rested.  Trial Tr., vol. 22–23.  Rothenberg then renewed his oral motion for a judgment of acquittal, which the Court again denied.  Trial Tr., vol. 23, 4329:13–17.

#### 2.      Jury Instructions and Verdict

Following the conclusion of the evidence, the Court instructed the jury.  The instructions regarding bank fraud and wire fraud both used the same definition of materiality.  ECF No. 338 at 16, 19, 22.  Using the language of the Ninth Circuit's Model Criminal Jury Instructions, the Court instructed the jury that "the statements or promises [must have been] material; that is, they had a natural tendency to influence, or were capable of influencing, [a financial institution or a person] to part with money or property."  ECF No. 338; *see also* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit (2022 ed.), Instrs. 15.35, 15.36.  Rothenberg did not object to the jury instructions on materiality or suggest alternative instructions.  ECF No. 255.

After seven weeks of trial, and three days of deliberations, the jury returned a guilty verdict on all 21 counts.  ECF No. 339.

United States District Court
Northern District of California

3

### 3.     Post-Trial Motions

After trial, Rothenberg moved for a judgment of acquittal, based on insufficient evidence, and a new trial, based on violations of his right to confrontation and his right to a fair and impartial jury.  ECF Nos. 364, 365.  The Court heard oral argument on both motions on March 1, 2024, ECF No. 376, and thereafter denied the motions.  ECF Nos. 378, 380.

### 4.     *United States v. Milheiser*

On April 9, 2024, after the proceedings summarized above, the Ninth Circuit decided *United States v. Milheiser*, 98 F.4th 935 (9th Cir. 2024).  In that case, defendants had owned or managed sales companies that telemarketed printer toner.  *Id.* at 938.  A sales company representative would call a business and "insinuate that she was calling from the business's regular supplier of toner."  *Id.* at 939.  "The sales company representative would then claim that her company had failed to report a recent increase in the price of toner, but that if the business placed an order, it could lock in the purported original price."  *Id.*  "The sales company would fax an order confirmation form to any business that agreed to buy toner."  *Id.*  "The form reiterated the toner price that had been quoted on the phone."  *Id.*  The form also stated that the sales company might not be affiliated with the business's regular toner supplier and might offer different prices from the regular supplier.  *Id.*  After the business signed the form, a supplier common to all defendants shipped the toner.  *Id.*  "There was no evidence . . . that any businesses did not receive the toner or that any of the toner had defects."  *Id.*

A grand jury indicted defendants for mail fraud and conspiracy.  *Id.* at 938.  The Government argued that defendants were liable for material misrepresentations that had induced the victims to part with money, "even though the misrepresentation concern[ed] something other than price or quality."  *Id.* at 940.  The Government also contended that a conviction for mail fraud "requires only that a defendant make a false statement that would be expected to and did cause someone to turn over money—'[w]hen you lie to somebody on an important fact that causes them to give you money, you have defrauded them.'"  *Id.* at 945.  Defendants responded that the Government's theory of fraud was overbroad because the misrepresentation of a seller's identity did not deceive businesses about the "nature" of the bargain, given that the businesses all received

4

United States District Court
Northern District of California

toner at the agreed-upon price.  *Id.* at 940.

The defendants proposed a supplemental jury instruction that would have specifically required that the misrepresentation go to the nature of the bargain, but the district court rejected the proposed instruction.  *Id.*  Instead, the court instructed the jury on materiality using the Ninth Circuit model jury instructions:  that "the statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, [a financial institution or a person] to part with money or property."  *Id.*  The jury found the defendants guilty of mail fraud and conspiracy.  *Id.*  The defendants appealed their convictions, arguing that "the Government presented an overbroad theory of fraud to the jury" for the reasons set forth above.  *Id.*

The Ninth Circuit agreed that the government's theory of fraud was overbroad.  *Id.* at 938.  The court held that "not just any lie that secures a sale constitutes fraud, and that the lie must instead go to the nature of the bargain."  *Id.* at 944.  The court found that "[w]hether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue."  *Id.*  The court also held that the "jury instructions did not remedy the problem," because "[t]he instructions did not tell the jury that, to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain."  *Id.* at 945.

### 5.      Renewed Rule 29 and 33 Motions

Rothenberg now renews his Rule 29 and 33 motions based on *Milheiser*.  He makes two principal arguments.  First, he argues that this Court, based on *Milheiser*, should grant Rothenberg a judgment of acquittal on Count Three, and Counts Five to Twenty-Three because there was "insufficient evidence that any misrepresentations went to the 'nature of the bargain.'"  ECF No. 384 at 11.  In the alternative, he argues the Court should grant a new trial "because the jury instructions here, like the instructions in *Milheiser*, did not inform the jury that 'to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain.'"  *Id.* (quoting *Milheiser*, 98 F.4th at 945).

The Court addresses these arguments in turn.  Additional facts, and a discussion of the evidence produced at trial, are included below as necessary to address Rothenberg's arguments.

## II.    THE SCOPE OF *MILHEISER*

As an initial matter, the parties dispute *Milheiser*'s scope. The Government attempts to distinguish *Milheiser* on the grounds that it concerned commodities, and that *Milheiser* and the cases on which it relies "relate to bargains and transactions that are fundamentally different than the deals at issue in this case." ECF No. 385 at 10. Rothenberg responds that "*Milheiser* applies to any federal fraud statute, regardless of whether classified as 'commodities' or 'investment' or something else." ECF No. 386 at 5.

Neither position accurately fully captures *Milheiser*'s import. While it is accurate to say that *Milheiser* applies to any fraud *statute*, the *Milheiser* court also made clear that how it applies in a particular case will vary by the type of *transaction*. *Milheiser*, 98 F.4th at 944 ("Whether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue."). For example, with respect to the purchase of a commodity, the size or value of the company selling that commodity might not be material to a purchaser. *Id.* at 945. With respect to investments, by contrast, "[b]ecause investments are by nature speculative, whether the investment advisor has a large and successful operation will inform the nature of the bargain—it is relevant information about the value of the investor's purchase." *Id.* at 944. In making this point, the *Milheiser* court looked to *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004). In *Tarallo*, the defendant made two false statements: "that the invested funds would be placed in a trust and would be safe there" and that "he was in an office in Washington, D.C." *Id.* at 1182–1183. The *Tarallo* court held that materiality was satisfied because these statements "influence[d] a potential investor's decision to invest, and a reasonable investor would find the level of risk to be important in deciding whether to invest." *Id.* at 1182. Thus, in evaluating Rothenberg's arguments and the evidence adduced at trial, the Court considers whether the information at issue was material to the particular kind of transaction at issue, whether it was a loan (Silicon Valley Bank) or a fund investment (Pilot Grove, Unity investors, and 2015 and 2016 Fund investors).

## III.    RULE 29

### A.    Legal Standard

A court may enter a judgment of acquittal of any offense for which the evidence is

6

insufficient to sustain a conviction.  Fed. R. Crim. P. 29(a).  To resolve a Rule 29 motion, the

Court conducts the following two-step inquiry:

> First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution . . . [W]hen faced with a record of historical facts that supports conflicting inferences a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

> Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow *any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.  This second step protects against rare occasions in which a properly instructed jury may . . . convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]  More than a mere modicum of evidence is required to support a verdict.  At this second step, however, a reviewing court may not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, only whether any rational trier of fact could have made that finding[.]

*United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (internal citations and quotation

marks omitted) (emphasis in original).  "In ruling on a Rule 29(c) motion, a district court must

bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses,

resolve evidentiary conflicts, and draw reasonable inferences from proven facts."  *United States v.

Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (citation and internal quotation marks omitted).

"Circumstantial evidence is sufficient to sustain a conviction, and the government's evidence need

not exclude every reasonable hypothesis consistent with innocence."  *United States v. Talbert*, 710

F.2d 528, 530 (9th Cir. 1983) (citations omitted).  For all these reasons, "[t]he hurdle to overturn a

jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v.

Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

### B.     Discussion

Rothenberg argues, based on *Milheiser*, that there was "insufficient evidence that any

purported statements to" SVB, Pilot Grove, Unity, and the 2015 and 2016 Fund investors "went to

the 'nature of the bargain.'"  ECF No. 384 at 12–14.  The Government responds that there is

overwhelming evidence that: (1) there was an agreement between Rothenberg and each victim,

and (2) that Rothenberg's misrepresentations and omissions went to the core of that bargain.  ECF No. 385 at 18–29.

As Rothenberg notes, "the specific facts surrounding the transaction must be analyzed to discern what is its 'essential aspect' and the 'nature of the bargain' contemplated between the parties."  ECF No. 386 at 5.  The Court therefore reviews the evidence below.  Often, the actual written agreements between the parties provide proof of the bargain.

As an overarching matter, however, Defendant's argument that the money was returned to investors, *see* ECF No. 384 at 7, is not a defense to fraud.  *United States v. Molinaro*, 11 F.3d 853, 863 (9th Cir. 1993) (quoting *United States v. Benny,* 786 F.2d 1410, 1417 (9th Cir. 1986)).

### 1.    Silicon Valley Bank

The Government argues that Rothenberg deceived Silicon Valley Bank ("SVB") to obtain a $4 million loan by pledging as collateral $4.25 million comprised of what he told the bank were available prepaid management fees from the 2015 Fund, which he represented totaled $5.192 million.  Trial Tr., vol. 23, 4391–4393; Tr. Ex. 159-0007.  The Government's theory of fraud with respect to SVB focused on two lies: "Lie number one that there were prefunded fees.  Lie number two, it's a $23.6 million fund."  *Id.*, 4391:19–22.  That is, the Government argued that these two lies were material to SVB because a bank needs to know "that the collateral it has been given rights to as a remedy for failing to pay back the line of credit will, in fact, be available, with clean title, for seizure in the event of a default."  ECF No. 385 at 27; *see also* Trial Tr., vol. 23, 4396:12–23.

Rothenberg responds that these lies were not central to the bargain.  He contends that while the "statements about the size of the fund or the source of the collateral were important to SVB, that is not enough."  ECF No. 384 at 13.  He maintains that "the 'bargain' was SVB would issue a line of credit provided $4.25 million was placed in a collateral account.  SVB got its bargain: money was placed in a collateral account and so it extended a line of credit."  *Id.*  Rothenberg also contends that SVB's "pre-existing relationship with Mr. Rothenberg that predated the line of credit," meant that "the statements made in connection with the line of credit did not speak to the "nature of the bargain."  ECF No. 386 at 8.

1    The question for this Court is whether Rothenberg's misrepresentations go to the "nature

2  of the bargain."

3    First, the Government introduced the Loan and Security Agreement into evidence, Tr. Ex.

4  173, and SVB Senior Relationship Manager Frank Amoroso explained relevant clauses, Trial Tr.,

5  vol. 6, 1093–1174.  The Loan and Security Agreement contained an important representation

6  regarding the collateral—Section 5.2 states "Borrower has good title to the Collateral, free of

7  Liens except Permitted Liens."  Tr. Ex. 173-0008.  The Government asked Amoroso why this

8  clause was important:

> Q. What does it mean that the borrower is certifying that they have
> good title to the collateral free of liens except permitted liens?
> A. It means in this instance that the cash is owned by the borrower.
> It's the borrower's cash and no one else's.
> Q. And why is that important to the bank?
> A. Because you are making a loan to this legal entity, and that legal
> entity needs to also, in this case, pledge the collateral.
> Q. So if the cash to secure the loan actually belonged to someone else
> and not the borrower, would the bank approve that loan?
> A. No, not as—not as structured.

Trial Tr., vol. 6, 1121:12–24.

    Second, with respect to the amount of prefunded fees, Amoroso testified that it was

important to know the source of the funds in the collateral account because it was the bank's

primary source of repayment.

> Q: If I were to tell you that the defendant had already spent all of the
> management fees from the entire ten-year life of the 2015 Fund by
> the time this email was sent, would you have approved this loan?
> A. No.  It would have not been possible.
> Q. Why not?
> A. Since our primary source of repayment would have been the—
> that cash from those management fees and they essentially no longer
> existed, then you had no primary source of repayment.

Trial Tr., vol. 6, 1095:24–1096:9.  He testified that if the bank knew the source of the collateral

came from the 2013 and 2014 Funds, the loan would not have been approved as "commingling of

funds is not allowed."  *Id.*, 1096:25–1097:3.

    Third, Amoroso explained that fund size is significant because "there are certain

underwriting guidelines . . . [and] one of the primary operands in the equation that you take into

account is what's the fund size."  Trial Tr., vol. 5, 1080:3–7.  Accordingly, Amoroso testified that

9

he would not have approved the loan if he knew the true fund size was $13 million. *Id.*, 1080:12–1082:3.

> Q: If in fact the 2015 Fund was not $23.6 million, but was in fact approximately $13.1 million, would that be significant as to whether you would fund a line of credit for 95 percent of this approximately $5 million?
> A. Yes, it would be very significant.
> Q. And why would it be very significant?
> A. Because then you would have essentially 55 percent of the collateral that was being claimed in the form of cash collateral.

*Id.*, 1080:25–1081:9.

Amoroso also testified that if the fund size was smaller, the "[t]he loan would not underwrite at the same amount," *id.*, 1081:23–24, and that "[a]t a minimum, it would reduce the dollar amount by 45-ish percent if it would even underwrite at that lower dollar amount," Trial Tr., vol. 6, 1096:19–21.

The evidence ultimately showed that the 2015 Fund had $13.17 million in assets under management and the total allowable management fees were $4,861,425, but Rothenberg had already taken $6,065,000. Tr. Exs. 572, 152. Thus, whatever money Rothenberg ultimately put into the cash collateral account, he did not have good title to the collateral.

A rational jury could easily have concluded that overall fund size which formed the basis of the size of the collateral account, and the title to the cash in the account were "essential aspects" of the transaction between SVB and Rothenberg because they determined a borrower's ability to repay the loan. A rational jury could have then concluded, beyond a reasonable doubt, that Rothenberg's representations regarding the source and size of the fund deceived SVB about the nature of the bargain.

Defendant argues that the Government's theory of fraud fails because SVB ultimately received its bargain—a fully funded cash collateral account, and depriving SVB of accurate information cannot constitute fraud. ECF No. 384 at 13 (relying on *Milheiser*, 98 F.4th at 944 (citing *United States v. Yates*, 16 F.4th 256, 265 (9th Cir. 2021))).

In *Yates*, the government argued that the "defendants—facing pressure from the FDIC and economic uncertainty due to the 2008 financial crisis—had conspired to defraud the bank." 16

F.4th at 263.  Specifically, the government presented an "accurate-information theory"—that is, they argued that "[o]ne of the purposes of the conspiracy . . . was to conceal the true financial condition of the Bank and to create a better financial picture."  *Id.* at 264–65.  "[T]he government told the jury that the defendants sought to deprive the bank and the board of directors of accurate financial information in the bank's books and records, and that without that information . . . the board could not properly analyze the risks posed by the various borrowers who are late."  *Id.* at 265 (internal quotation marks omitted).  The government argued in closing that the information was material because the board "relies on the accuracy of financial records to perform its duties."  *Id.*

The Ninth Circuit held that "the accurate-information theory is legally insufficient," and "there is no cognizable property interest in 'the ethereal right to accurate information.'"  *Id.*  *Yates* also held that "[r]ecognizing accurate information as property would transform all deception into fraud . . . Rather, the scheme must be one to deceive the bank *and* deprive it of something of value."  *Id.* (internal citations omitted).

Unlike *Yates*, SVB's interest in this case was not "ethereal."  The "something of value" in this case was a tangible loan from SVB to Rothenberg—not merely depriving the bank of accurate information.  The Government presented evidence that Rothenberg's misrepresentations affected the ultimate size of the loan that SVB gave Rothenberg, and the title to collateral that SVB received.  Trial Tr., vol. 6, 1095:24–1097:3.  Furthermore, in closing the Government argued that "Defendant deceived Silicon Valley Bank into believing that the collateral for the $4 million loan was those prefunded fees.  It wasn't.  It couldn't have been.  He'd spent it all six months earlier."  Trial Tr., vol. 23, 4393:4–8, 4396:12–25.  Thus, unlike *Yates*, the Government's theory in this case focused not only on Rothenberg's misrepresentations to the bank, but also how his misrepresentations deprived the bank of tangible loan assets (where the loan size relied on Rothenberg's representations) and deprived the bank of collateral with good title.  *C.f. Yates*, 16 F.4th at 266.

### 2.     The Pilot Grove, Unity and 2015 and 2016 Fund Investors

The remaining counts in the indictment concern the Pilot Grove, Unity and 2015 and 2016

Fund investors.  Rothenberg contends that "[t]he government presented, effectively, two theories in connection with the Pilot Grove, Unity and 2015 and 2016 Fund investors: that Mr. Rothenberg made misrepresentations concerning (1) the ownership of River Studios and (2) how investors' money would be used."  ECF No. 384 at 14.  Rothenberg argues as follows regarding the first theory:

> The first theory—concerning the ownership of River Studios—did not speak to the "nature of the bargain."  Even if investors, as the government told the jury, "would want to see that cap table," "want to know who the other owners are," and "need to know . . . what are the controls?" that is not enough to support a fraud conviction.  As explained in *Milheiser*, making a false statement that causes someone "to engage in transactions it would otherwise avoid" is not a violation of "the mail or wire fraud statutes."

*Id.* (relying on *Milheiser*, 98 F.4th at 944 (quoting *United States v. Guertin*, 67 F.4th 445, 452 (D.C. Cir. 2023))).  As for the government's "second theory—that there were misrepresentations made about how solicited funds would be used"—Rothenberg argues that it "might be closer to satisfying the 'nature of the bargain' requirement."  *Id.*  But the problem is that "a verdict that may be based on a legally invalid ground must ordinarily be set aside."  *Id.* (citation omitted).

The Court addresses these arguments as they apply to each group of investors.

### a.     Pilot Grove

Pilot Grove Management LLC and its related entity, Transcend VR LLC (collectively, "Pilot Grove") was an investment firm located in Las Vegas, Nevada.  Trial Tr., vol. 16, 3070:14–20.  In 2016, Rothenberg met with representatives of Pilot Grove to solicit an investment in River Studios.  Rothenberg told them that the primary use of capital raised by River Studios would be to "fund the premium content opportunities in the pipeline and to roll up M&A talent in VR."  Tr. Ex. 195-0027.  The Government alleges that Rothenberg devised a scheme to defraud investors from Pilot Grove by lying about (1) self-funding River Studios; and (2) the purpose for which investors' funds would be used.  Trial Tr., vol. 23, 4406:25–4409:16.  The Government argued to the jury that these two lies were material to Pilot Grove and that Pilot Grove investors would not have invested if they knew that (1) their investments would be used to repay Rothenberg's pre-existing debts, *id.*, 4407:20–24, or (2) if he had not self-funded it, *id.*, 4409:19– 4410:10.

United States District Court
Northern District of California

1  Rothenberg argues that the first lie was not central to the bargain—that is, "even if the investors . .

2  . 'would want to see that cap table,' 'want to know who the other owners are,' and 'need to know .

3  . . what are the controls?' that is not enough to support a fraud conviction."  ECF No. 384 at 14.

4  He also argues that while the second lie (misrepresentations about how the solicited funds would

5  be used) may have pertained to the "nature of the bargain," because the "jury was not required to

6  make a specific finding as to which of the two theories it was relying on when it convicted, the

7  verdict may rest on a legally invalid theory."  *Id.*

8         The evidence adduced at trial shows that Rothenberg's misrepresentations to the Pilot

9  Grove investors were central to the "nature of the bargain."

10        First, the evidence showed that Rothenberg repeatedly told Pilot Grove's representatives,

11  Chief Investment Officer Lawrence Weisman and its Chief Executive Officer Dominic Polizzato,

12  that he "self-funded the company in 2015 and continue[s] to do so."  Tr. Ex. 212; *see also* Trial

13  Tr., vol. 16, 3055:12–14 ("Q. And -- and did you ask Mr. Rothenberg for a cap table?  A. I did.

14  And he said there is no cap table because he owns a hundred percent of the equity.").  That

15  representation was important to Pilot Grove:

16              Q. And I think your testimony was that he told you he owned it and
                that he had no prior outside investors; is that correct?
17              A. That's correct.
                Q. Was that an important fact to you, Larry Weisman?
18              A. Absolutely.
                Q. Why was that important?
19              A. Because it would provide us with a strategic advantage in any
                potential new companies or investments that he made or in any of
20              the content he created.  And typically when you limit the number of
                outside investors, it affords you greater opportunity in your
21              investment and greater connectivity with Mike directly.

22  Trial Tr., vol. 16, 3018:21–3019:7.

23        That representation was so important to Pilot Grove that they included it in the Convertible

24  Promissory Note between Rothenberg and Pilot Grove.  Weisman and Polizzato explained that

25  they had negotiated with Rothenberg to include Clause 5(g) in the Convertible Promissory Note

26  which states: "Mike Rothenberg holds One Hundred Percent (100%) of equity interests of the

27  Company."  Trial Tr., vol. 16, 3055:12–16; Tr. Ex. 215-0018; Tr. Ex. 217-0006.  That they

28  required Rothenberg's representation regarding ownership to be made in writing shows that it

13

went to the nature of the bargain.

The Convertible Promissory Note was not the only evidence showing the importance of this representation.  Weisman and Polizzato explained in their testimony that Rothenberg's representations were material because they impacted Pilot Grove's risk assessment of River Studios (including the ultimate control they could exercise over the company).

> I guess if I knew his funds had invested in River Studios, I would never have made the investment . . . I could have gotten that exposure by just investing in the fund, I would never have taken the additional risk of investing in the studio directly on its own. I could have made a bigger investment into the fund.

Trial Tr., vol. 16, 3019:12–18.

> I needed to know that what Mr. Rothenberg was selling me was his to sell. . . . I needed to know, you know, that there were really no other investors because at points in time in the evolution of a company, you know, people who have put money in expect to have a voice at the table and I needed to know who those people would be, if they were people I'd want to be in business with, if I thought they were rational, if they added any value beyond just their dollars.

Trial Tr., vol. 17, 3153:2–10.

Polizzato also testified that Rothenberg communicated that he would use investors' money for general runway—that is, to "buy other companies, smaller virtual reality studios, produce content, make payroll, keep the lights on . . . the general costs of operating any business."  Trial Tr., vol. 17, 3154:17–3155:4.  Polizzato testified that Rothenberg never told him that capital was needed to repay prior investments.  *Id.*, 3156:3–9.  Similarly, Weisman testified that if Rothenberg had told him the true purpose of the funds—that is, to pay himself back for his own investment into River Studios, it "would have been a big red flag because the value of [Pilot Grove's] contribution would . . . just be a band aid on money he had expended for himself.  So [Pilot Grove] would get no value out of it.  *No one would invest money in those circumstances*."  Trial Tr., vol. 16, 3014:21–3015:2; *see also id.*, 3016:11–24 ("Q. So the question was if Mr. Rothenberg had told you that he was going to take a large chunk of Pilot Grove's money and use it to pay back money that he had taken from venture capital fund, would that have caused you any concern?  A. Yes.  Q. Why would it have caused you concerns?  A. Because it—it would go in direct opposition with the stated purposes that he—it would go—it would be in contrast with what he said he was

14

going to do with the money, how he would build a studio.  If he is paying himself back, he can't build a studio.  He can't deliver more creative content.  He can't fund any accretive acquisitions.").  Weisman testified that the only reason Pilot Grove would make any investment in the first place is to achieve the objectives promised by the entity accepting the investment:

> [T]he only reason we would make an investment with this high degree of risk, fully understanding the company can go bankrupt because it cannot perform on its objectives, but expecting that it will try and comport with its representations about what it's going to do with the money.

Trial Tr., vol. 16, 3053:5–9.

The representations to Pilot Grove were false.  Ultimately, the evidence showed that only 57.5% of River Studios' operations had been funded by Rothenberg, with the remainder coming from the 2015 Fund.  Trial Tr., vol. 21, 3955–3956.  Furthermore, the evidence showed that when Pilot Grove's money was wired to River Studios, Rothenberg immediately transferred more than $1.7 million of Pilot Grove's investment to the accounts of the 2013 Fund and 2014 Fund to pay those funds' prior debts.  Trial Tr., vol. 19, 3523–3526.

From this evidence, a rational jury could have properly concluded that ownership of River Studios and purported use of the capital were critical to Pilot Grove's risk assessment of the venture.  *See Tarallo*, 380 F.3d at 1182 (a "reasonable investor would find the level of risk to be important in deciding whether to invest").  A rational jury could have also concluded, based on negotiations between Pilot Grove and Rothenberg, that the capitalization and ownership structure of River Studios was an "essential aspect" of the transaction that was memorialized in the contract.  Thus, a rational jury could have then concluded beyond a reasonable doubt that Rothenberg's representations regarding capitalization and fund use deceived Pilot Grove about the nature of the bargain.

### 3.    Unity Investors[3]

In these counts, the Government alleges that Rothenberg solicited and received funds from

---

[3] With regards to Unity and 2015–2016 Fund investors, the Government argues, and Defendant does not dispute, that Rothenberg was a fiduciary.  ECF No. 386 at 6; ECF No. 387 at 6.  Thus, Rothenberg's omissions of material facts may also be considered.

investors to purchase the untraded stock of a privately held company called Unity Technologies ("Unity") when, in fact, he planned to use their money to satisfy the other debts in his business. ECF No. 15 ¶¶ 43–45; *see also* Trial Tr., vol. 23, 4414–4418.  Rothenberg argues that the Government presented his ownership of River Studios as a material misrepresentation to Unity investors.  ECF No. 384 at 14.  Rothenberg argues that while the second lie (misrepresentations about how the solicited funds would be used) may have pertained to the "nature of the bargain," because the "jury was not required to make a specific finding as to which of the two theories it was relying on when it convicted, the verdict may rest on a legally invalid theory."  *Id.*; *see also* ECF No. 386 at 7.

The evidence is undisputed that Rothenberg misrepresented that he would use investor money to buy Unity untraded stock.  The 2016 Unity Co-Fund Operating Agreement clearly stated that "[t]he Fund will invest in a special purpose vehicle that will purchase equity securities of Unity Software, Inc."  Tr. Ex. 302.

The Unity investors all believed that, pursuant to the Operating Agreement and Rothenberg's representations, their funds would be used to purchase only Unity stock.  *See* Trial Tr., vol. 7, 1334:2–4 (A. Binns) ("I understood that the reason this needed to move fast was because the money was going to be invested in Unity immediately."); Trial Tr., vol. 8, 1544:8–9 (Goldberg) ("We understood the money would be used for the purchase of equity securities in Unity."); Trial Tr., vol. 9, 1753:10–14 (Johnson) ("My understanding that the funds were going to be used solely for the purchase of shares within Unity, pre-IPO shares, that the funds were going to be held in [a separate] escrow . . . account."); Trial Tr., vol. 11, 2231:17–18 (T. Melas-Kyriazi) ("It was clearly an investment that was solely in Unity.  There was no question about that.").

The evidence at trial showed that of the "$1.35 million of outside investor money [that was raised] for the Unity purpose[,] Zero [went] to Unity."  Trial Tr., vol. 23, 4415–4416.  The Government argued that the purchase of the available Unity stock would have cost approximately $14 million, Trial Tr., vol. 9, 1678:10–12, but Rothenberg never raised even close to that amount, Trial Tr., vol. 21, at 3984–3988 (Fujimoto).  Furthermore, although Rothenberg told investors he would place their funds in a Unity co-investment vehicle, he instead transferred them into the

16

United States District Court
Northern District of California

RVMC operating account and then to other accounts or spent them on operating expenses.  *Id.*; *see also e.g.,* Tr. Ex. 67-0063; Tr. Ex. 63-0434 to -0438 (showing that funds transferred by the Binns Family Limited Partnership and GHF for the Unity investment were transferred to the main RVMC account and then to other accounts).  Rothenberg thereby both misrepresented the purpose for which he would invest the funds, and violated his fiduciary obligations by failing to disclose that he was transferring funds to an entity he controlled.  Trial Tr., vol. 23, 4416–4418.  The Government argued in summation that Rothenberg's misrepresentations and omissions were material to investors because they would not have invested if they knew the money would not be used for the Unity purchase.  *Id.*, 4418:4–9.

Based on this evidence, a rational trier of fact could conclude that the Unity investors specifically invested in the co-fund for the explicit purpose of investing in the acquisition of Unity stock, and that therefore, the purported use of their funds was fundamental to their bargain with Rothenberg.  As a result, a rational trier of fact could also conclude that Rothenberg's omissions and ultimate use of the funds to pay back other debts he owed, deceived the Unity investors about the nature of the bargain.

This leaves only Rothenberg's argument that because the government presented evidence that Rothenberg misrepresented his ownership in River Studios, that the jury might have convicted Rothenberg with regard to the Unity fund investors based on that misrepresentation, and not the misrepresentation as to how Rothenberg would invest their money.  There is no support in the record for this argument.  As the government says in its opposition, "[a]t no point did the government specifically argue that the jury should rely on misrepresentations Rothenberg made to the Unity investors about his alleged ownership of River Studios, or any other collateral misrepresentations, in order to conclude that Rothenberg had made material misrepresentations to those investors."  ECF No. 385 at 19.  Rothenberg does not address the point in his reply.

### 4.    2015 and 2016 Fund Investors

The Government contends that with respect to investments in the 2015 and 2016 Funds, Rothenberg solicited money for investment in portfolio companies, but then used them for a variety of other, improper purposes: taking excess management fees, using Funds money to pay

17

for the operation of River Studios, securing RVMC's line of credit from SVB, and other purposes. ECF No. 15 ¶¶ 47–49; Trial Tr., vol. 23, 4419–4422; *see generally* Trial Tr., vol. 21, 3934–3936, 3989–4001, 4020–4022 (Fujimoto explaining the use of investor funds for purposes other than investing in portfolio companies).  The Government argued that Rothenberg's lie was material to investors because they would not have invested if they knew the money would not be used for purchase of portfolio companies and would instead be used to secure collateral and other purposes. Trial Tr., vol. 23, at 4423:21–25.  As in the case of Unity, Rothenberg argues that the Government presented his ownership of River Studios as a material misrepresentation to 2015 and 2016 Fund investors.  ECF No. 384 at 14.  Rothenberg argues that while the second lie (misrepresentations about how the solicited funds would be used) may have pertained to the "nature of the bargain," because the "jury was not required to make a specific finding as to which of the two theories it was relying on when it convicted, the verdict may rest on a legally invalid theory."  *Id.*; *see also* ECF No. 386 at 7.

The question for this Court is whether Rothenberg's misrepresentation about the use of the funds goes to the "nature of the bargain" between the 2015 and 2016 Fund investors and Rothenberg.  That point is not really in dispute.

First, witnesses testified that the purpose of the 2015 and 2016 Funds was to invest in portfolio companies.  *See e.g.,* Trial Tr., vol. 16, 2971:6–8 (Menezes) ("my purpose with my investment was to invest in portfolio companies and sort of diversify the way in which my money was being, you know, used.").  In fact, some witnesses who ultimately invested in the 2015 and 2016 Funds said they were presented with the opportunity to invest directly in River Studios and declined.  *See e.g.,* Trial Tr., vol. 6, at 1235:16–1236:7 (Levensohn) (stating that investing in River Studios made "zero sense" because "as a matter of policy, Dolby doesn't invest in content nor does Dolby Family Ventures.").

Second, the Government entered into evidence the Operating Agreements for the 2015 and 2016 Funds that Rothenberg provided investors.  Tr. Ex. 22 (2015 Fund); Tr. Ex. 26 (2016 Fund). These documents specified the percentage of funds that could be taken as management fees.  Tr. Ex. 22-0039; Tr. Ex. 26-0025 to -0027.

United States District Court
Northern District of California

Third, the Government introduced evidence that Rothenberg had a fiduciary obligation to these investors.  Pascal Levensohn from Dolby Family Ventures testified that "fiduciary duty boils down to one thing, which is if I give you money to manage for me, and you have discretion over that money and it's in your custody, you have the obligation . . . to make sure that my interests are ahead of yours.  Meaning you can't act in your own personal self-interest if it's going to put me at risk or disadvantage me."  Trial Tr., vol. 6, 1182:13–19.  Rothenberg agrees that his fiduciary duty is one fact to be considered in assessing "whether a misrepresentation goes to the nature of the bargain" depending "on the specific transaction at issue."  ECF No. 386 at 6.

Evidence adduced at trial also demonstrated that Rothenberg (1) failed to disclose material information about how he was spending money raised from these investors, including breaching his fiduciary duties by self-dealing—that is, directing investor funds to River Studios[4] without informing them of his ownership interests; (2) despite the fund operating agreements, using the invested money for management fees in excess of what was allowed, or for purposes wholly unrelated to investing in the portfolio companies (including for Rothenberg's personal bank accounts and for funding the collateral account for SVB's loan):

- 7.2% of investor Michael Antonov's money was invested in portfolio companies of the 2015 Fund, while 92.8% was transferred to RVMC and spent on RVMC operating expenses, transferred to Rothenberg's personal account, or spent on River Studios operating expenses.  Trial Tr., vol. 21, 3991:16–3992:10; Tr. Ex. 69-0045 (showing same-day transfer of funds).

- 48.9% of investor GHF's money was invested in portfolio companies of the 2015 Fund, Trial Tr., vol. 21, 4022:14–15, while 51.1% was transferred the same day initially to RVMC and then to Rothenberg's personal account.  *Id.*, 3992:17–3996:1; Tr. Ex. 69-0045 (showing same-day transfer of funds); Tr. Ex. 63-0253 to -0254; Tr. Ex. 97-0011.

- 4.0% of investor HTC's money was invested in portfolio companies of the 2015 Fund, Trial Tr., vol. 21, 4022:16–17, while 96% was transferred the same day to RVMC where portions were used for the payment of operating expenses, with the remainder transferred either to

---

[4] The Government raised River Studios in closing argument to demonstrate that Rothenberg breached his fiduciary duties to the 2015 and 2016 Fund investors.  Trial Tr., vol. 23, 4419:9–15.

1    Rothenberg's personal account or to River Studios.  *Id.*, 3997:17–3998:22; Tr. Ex. 69-0059

2    (showing receipt of funds and then transfer of funds to RVMC main account); Tr. Ex. 63-0297 to -

3    0298 (funds moving from RVMC main account to River Studios/Bend Reality); Tr. Ex. 97-0031.

4        •    None of investor Natala Menezes's money was invested in portfolio companies.

5    Trial Tr., vol. 21, 3936:4–6.  Instead, it was all transferred the same day to fund the SVB collateral

6    account.  *Id.*, 3935:16–25, 3937:4–6, 3942:1–12; Tr. Ex. 69-0079 (showing amount received and

7    then transferred as part of larger transfer to RVMC main account).

8        •    None of investor Korea Investment Partners' money was invested in portfolio

9    companies.  Trial Tr., vol. 21, 3951:6–3952:19.  Rather, it was transferred the same day to repay

10   investor ARCHina.  *Id.*; Tr. Ex. 76-0018 (showing amount received from Korea Investment

11   Partners, and then being transferred as part of a larger amount to ARCHina).

12       A rational trier of fact could conclude that the 2015 and 2016 Fund investors specifically

13   invested in the 2015 and 2016 Funds for the explicit purpose of investing in portfolio companies

14   (and Rothenberg does not argue otherwise).  The same jury could also conclude that his omissions

15   about the funds were material.  *See United States v. Harder*, 116 F. Supp. 3d 1197, 1226 (D. Or.

16   2015) ("Had these material misrepresentations or misleading half-truths not been made or had

17   these material omissions been timely and fully disclosed, the investors would have had the

18   opportunity themselves to weigh the benefits of their contemplated investments alongside the

19   relevant risks.").

20       In sum, viewing the evidence in the light most favorable to the Government, the Court

21   finds that any rational trier of fact would find, beyond a reasonable doubt, that Rothenberg's

22   representations and omissions went to the nature of the bargain between Rothenberg and SVB,

23   Pilot Grove, Unity investors, and the 2015 and 2016 Fund investors.[5]

24       Accordingly, the Court denies Rothenberg's motion for a new trial.

25   _____

26   [5] Once again, the Court is left with Rothenberg's argument that because the government presented
     evidence that Rothenberg misrepresented his ownership in River Studios, that the jury might have
27   convicted Rothenberg with regard to the 2015 and 2016 investors based on that misrepresentation,
     not the misrepresentation as to how Rothenberg would invest their money.  Once again, there is no
28   support in the record for this argument.  Rothenberg provides no citations to evidence or argument
     from which the jury could have reached this conclusion.

United States District Court
Northern District of California

IV.     **RULE 33**

Rothenberg moves for a new trial based on instructional error.  ECF No. 384 at 15.  He argues that because the Court used the same Ninth Circuit model jury instructions at issue in *Milheiser*, "the jury instructions here misstated a crucial element of the offense" such that "a new trial with jury instructions that correctly explain that fraud requires a false statement that deceives the victim about the 'nature of the bargain' is necessary." *Id.* at 15–16.

A.     **Legal Standard**

Under Federal Rule of Criminal Procedure 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[A] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal.  The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses . . . .  If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (internal citations and quotation marks omitted).  A decision to grant a new trial is "within the sound discretion of the district court." *Id.* at 1212 (quotation omitted).

A "motion for new trial under Rule 33 may be granted for failure to give proper jury instructions." *United States v. Kramer*, 5:16-CR-00322-EJD, 2020 WL 5408165, at *5 (N.D. Cal. Sep. 9, 2020).  "An error in misdescribing or omitting an element of the offense in a jury instruction is harmless if it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *United States v. Thongsy*, 577 F.3d 1036, 1043 (9th Cir. 2009) (quoting *Neder v. United States*, 527 U.S. 1, 18 (1999)).  "The '[u]se of a model jury instruction does not preclude a finding of error.'" *Bearchild v. Cobban*, 947 F.3d 1130, 1142 (9th Cir. 2020) (quoting *Dang v. Cross*, 422 F.3d 800, 805 (9th Cir. 2005)).

However, "[w]here a defendant fails properly to object to a jury instruction or to an

omission from a jury instruction, we review for plain error." *United States v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000). "A trial court commits plain error when (1) there is error, (2) that is plain[,] i.e., clear and obvious, and (3) the error affects substantial rights[,] i.e., affects the outcome of the proceedings." *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016) (internal quotation marks and alterations omitted). The plain error standard applies to an unpreserved issue "even where an intervening change in the law is the source of the error." *United States v. Christensen*, 828 F.3d 763, 779 (9th Cir. 2015).

"It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

**B.       Discussion**

Rothenberg did not object to the materiality instruction in this case. Accordingly, the Court reviews whether there was instructional error under the plain error standard and determines whether: a) there was error, b) the error was clear and obvious and c) the error affected substantial rights.

**a.       Error**

"In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Walter-Eze*, 869 F.3d 891, 911 (9th Cir. 2017). Thus, "the adequacy of jury instructions is not determined by the giving of any one instruction, but by examining the instructions as a whole." *United States v. Ancheta*, 38 F.3d 1114, 1116 (9th Cir. 1994) (quoting *United States v. Boekelman*, 594 F.2d 1238, 1240 (9th Cir. 1979)).

Rothenberg argues that "the Ninth Circuit's model jury instruction defining "materiality" given to the jury in this case do[es] not accurately state the law," because after *Milheiser*, the instruction "did not tell the jury that, to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain." ECF No. 384 at 5, 16. The Government responds that there are two flaws with Rothenberg's argument. First, the Government contends that "[t]he *Milheiser* court did not find instructional error." ECF No. 385 at

United States District Court
Northern District of California

12, 29. Rather, the Government claims the *Milheiser* decision was "based on the government's assertion of an overbroad theory of fraud at trial." *Id.* The Government argues that the "Court's instruction to the jury regarding materiality was based on the standard set by the Supreme Court in *Neder*, 527 U.S. 1," and there is "no intervening Supreme Court case . . . that casts doubt on this formulation of 'materiality.'" *Id.* at 29. Second, the Government urges the Court to read the materiality instruction in the context of the additional instructions regarding alleged victim conduct to find that "unlike the jury in *Milheiser*, the jury in this case was properly focused by the Court and the parties on the nature of the bargain." *Id.* at 17, 18 n.3.

The Court briefly summarizes its relevant instructions. The Court instructed the jury that "statements or promises were material; that is, they had a natural tendency to influence, or were capable of influencing, [a financial institution or a person] to part with money or property." ECF No. 338 at 16, 19, 22. In addition, Jury Instruction 22—titled "Wire Fraud—Alleged Victim's Conduct" instructed the jury that it could consider "the investors' processes for deciding whether to invest money in one or more entities associated with Michael Rothenberg . . . to the extent that it helps you determine whether the statements made as part of the alleged scheme were material." *Id.* at 27. Similarly, Jury Instruction 23—titled "Bank Fraud and False Statements to a Financial Institution—Alleged Victim's Conduct" instructed the jury that it could consider "evidence regarding Silicon Valley Bank's processes for deciding whether to lend money to the extent that it helps you determine whether the statements were material." *Id.* at 28. Finally, the instructions also required the jury to find that Rothenberg had an "intent to deceive and cheat" in order to find that he had an intent to defraud as required by the statute. *Id.* at 16, 19, 22.

First, Rothenberg is correct that *Milheiser* constitutes a change in the law of the Ninth Circuit. *Milheiser* clearly states that the model instruction on materiality is incomplete, and the jury must be instructed that "to support a conviction for fraud, a false statement must directly or indirectly deceive the victim about the nature of the bargain." *Milheiser*, 98 F.4th at 945. The jury instruction in this case did not capture the full breadth of the Government's burden. *See Christensen*, 828 F.3d at 787 (holding that jury instructions constituted plain error because "although it was not obvious to the district court at the time," the Ninth Circuit later decided a case

1   that changed the standard.)

2       Second, the Court finds that the other instructions given to the jury did not remedy the

3   incomplete materiality definition.  The instructions regarding victim conduct ensured that the jury

4   did not improperly consider victim negligence in deciding the counts on wire or bank fraud.  The

5   instructions allowed the jury to determine whether lenders or investors had "policies or practices

6   that intentionally disregard[ed] facts" which would have been "relevant and admissible to show

7   that the facts were not material."  *United States v. Wagner*, No. 2:10-CR-00399-MMD, 2012 WL

8   4482403, at *2 (D. Nev. Sept. 26, 2012) (finding that "[i]f the lenders would have approved the

9   loans even were the alleged incentives disclosed, and if the incentives would not have had a

10  natural tendency to influence or been capable of influencing the lenders, [defendant's]

11  misrepresentations would not be material."); *see also United States v. Holmes*, No. 5:18-CR-

12  00258-EJD-1, 2021 WL 2044470, at *48 (N.D. Cal. May 22, 2021) (finding that "the way victims

13  reacted to alleged misrepresentations . . . is highly relevant to their credibility.")  However, neither

14  instruction pertained squarely to the nature of the bargain, and did not, as the Ninth Circuit

15  requires, "repeatedly and exhaustively remind[] the jury of the proper legal standard" regarding

16  materiality.  *Ancheta*, 38 F.3d at 1117.  Furthermore, the instruction that the jury must find

17  Rothenberg had an intent to defraud—that is, an intent to deceive and cheat, does not "cure [] any

18  defect regarding an instruction on the different element of materiality."  ECF No. 386 at 6.

19  Although the "jury was instructed it had to find an intent to cheat," this finding does not

20  necessitate or subsume a finding that Rothenberg's misstatement went to the "nature of the

21  bargain" between the parties.  *Id.*

22       Accordingly, the Court concludes that there was instructional error.

23               **b.**    **Clear and Obvious**

24       Next, the Court considers if the instructional error was plain—i.e., clear and obvious.  If a

25  district court relied on Ninth Circuit Model Jury Instructions for "wire fraud," and "there was then

26  no controlling case law" explaining the proper standard, the error was not "clear and obvious."

27  *Kramer*, 2020 WL 5408165, at *6 (citing *Shields* 844 F.3d at 823).

28       As in *Shields*, this Court relied on the Ninth Circuit Model Jury Instructions for wire fraud

United States District Court
Northern District of California

1    (instruction 15.35), which did not include a materiality definition that considered the nature of the

2    bargain.  *Shields*, 844 F.3d at 823.  The Court "followed the Model Instructions, the defendants

3    did not object," and at the time of the instruction, "there was then no controlling case law" stating

4    that the Government had to prove that the false statement must directly or indirectly deceive the

5    victim about the nature of the bargain.  *Id.*  Thus, the Court's instructional error was not "clear and

6    obvious."  *Id.*

### c.    Affects Substantial Rights

8         Finally, Rothenberg must show that the "the error affects substantial rights [i.e., affects the

9    outcome of the proceedings]."  *Id.*  Rothenberg argues that the Government did not present

10   sufficient evidence that his false statements "directly or indirectly deceive[d] the victim about the

11   nature of the bargain," such that the jury could have found in his favor if properly instructed.  ECF

12   No. 384 at 12–14.

13        To determine whether the error affected "substantial rights," "[a court] must 'conduct a

14   thorough examination' of all the evidence in the record and ask whether the omitted element was

15   supported by sufficient evidence."  *United States v. Conti*, 804 F.3d 977, 981–82 (9th Cir. 2015)

16   (citing *Neder*, 527 U.S. at 19).  "Cases that have upheld convictions rendered on incomplete or

17   erroneous jury instructions have relied on 'strong and convincing evidence' that the prosecution

18   has adequately proved the missing element of the crime."  *Id.* (internal citations omitted).  Courts

19   "must also consider whether the defendant contested the omitted element and raised evidence

20   sufficient to support a contrary finding, and finally whether the jury verdict would have been the

21   same absent the error."  *Id.* (internal citations and quotation marks omitted).

22        As described above in Section III.B, a review of the trial record regarding the omitted

23   element (that Rothenberg's misrepresentations and omissions deceived the victims about the

24   nature of the bargain) shows that the Government presented overwhelming evidence on this

25   element during trial.  The Court finds that the jury would have convicted Rothenberg even if it had

26   been properly instructed because of the volume and weight of evidence adduced against

27   Rothenberg in the trial record.

28        In sum, the Court concludes that even if it committed error in giving the incomplete

25

materiality instruction, such error was not plain, and Rothenberg has not met his burden in showing that a different instruction would affect the outcome of the trial.  The Government's evidence that Rothenberg's representations and omissions went to the nature of the bargain is overwhelming.  Accordingly, the Court denies Rothenberg's motion for a new trial.

## CONCLUSION

For the foregoing reasons, the Court denies Rothenberg's motions for a judgment of acquittal and for a new trial.

**IT IS SO ORDERED.**

Dated:  August 7, 2024



_____
JON S. TIGAR
United States District Judge