DAVID SARRATT (SBN 332438)
EMMA CHESSEN (SBN 365130)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628
dsarratt@debevoise.com

Attorneys for Defendant
MICHAEL BRENT ROTHENBERG

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL BRENT ROTHENBERG,<br><br>Defendant. | Case No. 4:20-cr-00266-JST<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR NEW TRIAL**<br><br>Date: October 21, 2026<br>Time: 1:30 PM<br><br>**The Honorable Jon S. Tigar** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 4

II. ARGUMENT ........ 5

A. The Government Does Not Dispute That Counsel Never Consulted a Forensic Accountant, and Its Own Authority Shows That Such a Choice Is Unreasonable. ........ 5

1. The Government Concedes That Trial Counsel Did Not Consult an Expert. ........ 5

2. Trial Counsel Could Not Have Made the Strategic Choices the Government Suggests Without Consulting an Expert. ........ 5

3. The Government’s Catalog of Trial Counsel's Other Work Is Irrelevant to Whether His Failure to Consult an Expert Was a Fundamental Error. ........ 8

B. The Government's Prejudice Arguments Are Contradicted by Its Own Trial Strategy. ........ 9

1. The Government's “Overwhelming Evidence” Argument Concedes That This Was an Accounting Case Tried Through Three CPAs. ........ 9

2. The Government Now Calls Fujimoto a Summary Witness; It Tried the Case as Though He Were Indispensable. ........ 11

3. The Government Ignores That Peat's Review Was Limited on Its Face, and Dismisses Findings That Moved Its Central Figure by Millions. ........ 12

III. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

## Cases

*Alcala v. Woodford*,
334 F.3d 862 (9th Cir. 2003) ........ 7

*Bible v. Ryan*,
571 F.3d 860 (9th Cir. 2009) ........ 15

*Bragg v. Galaza*,
242 F.3d 1082 (9th Cir. 2001) ........ 14

*Clark v. Lewis*,
1 F.3d 814 (9th Cir. 1993) ........ 15

*Djerf v. Ryan*,
931 F.3d 870 (9th Cir. 2019) ........ 14

*Doe v. Ayers*,
782 F.3d 425 (9th Cir. 2015) ........ 8

*Duncan v. Ornoski*,
528 F.3d 1222 (9th Cir. 2008) ........ 5, 6

*Grisby v. Blodgett*,
130 F.3d 365 (9th Cir. 1997) ........ 14

*Harris By and Through Ramseyer v. Wood*,
64 F.3d 1432 (9th Cir. 1995) ........ 5

*Kimmelman v. Morrison*,
477 U.S. 365 (1986) ........ 7, 8

*Neiss v. Bludworth*,
114 F.4th 1038 (9th Cir. 2024) ........ 8

*Rogers v. Dzurenda*,
25 F.4th 1171 (9th Cir. 2022) ........ 8

*Strickland v. Washington*,
466 U.S. 668 (1984) ........ 4, 5, 6, 7, 8, 9

*Thornell v. Jones*,
602 U.S. 154 (2024) ........ 14

*Weeden v. Johnson*,
854 F.3d 1063 (9th Cir. 2017) ........ 7

# I. INTRODUCTION

The government does not, and cannot, deny the fundamental error in this case. Trial counsel did not consult an accounting expert at any point in his representation of Mr. Rothenberg. Because it cannot refute this fact, the government attempts to reframe the failure to consult an expert as part of a broader strategic decision. At the same time, the government attempts to recast its own expert as irrelevant to its case. Neither is accurate.

There is no dispute as to the test for claims of ineffective assistance of counsel. *See* Motion for a New Trial (Mot.), ECF No. 457 at 9; Government's Opposition (Opp.), ECF No. 461 at 7. The Court must find that (1) "counsel's performance was deficient" and (2) the deficiency was "so serious as to deprive the defendant of a fair trial." *See* Opp. at 7; *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The government cannot defeat either prong.

*First*, the government concedes the fact that trial counsel did not consult or retain an accounting expert. Opp. at 9. Instead, the government argues that trial counsel made a strategic decision not to consult an expert after a thorough investigation of the law and facts. Opp. at 12. But trial counsel could not have thoroughly investigated an accounting case without accounting expertise, and he had none. Trial counsel is not a Certified Public Accountant (CPA), and neither is Mr. Rothenberg. A choice made without the information required to evaluate it is not a strategic choice, and *Strickland's* deference to counsel's strategic decisions does not reach it.

*Second*, the government cannot show that trial counsel's failure made no difference in the outcome. Its opposition describes a case proved through the accounting testimony of three CPAs, two of whom trial counsel knew would testify months before trial. Opp. at 17-22. It then minimizes its own expert's role, recasting Mr. Fujimoto as a summary witness whose work "largely could have been given by a lay witness," despite the government paying him at least $385,000 to conduct his accounting analysis. Opp. at 23. And it dismisses Mr. Peat's findings as "quibbling around the edges" while conceding that Mr. Peat's explicitly preliminary analysis placed up to $11.6 million (or more) of the $18.8 million unexplained shortfall calculated by Mr. Fujimoto into potentially legitimate uses. Opp. at 24-25. The jury never heard any of that disagreement because trial counsel never investigated it.

Accordingly, the Court should grant Mr. Rothenberg's motion for a new trial under Federal Rule of Criminal Procedure 33.

## II. ARGUMENT

### A. The Government Does Not Dispute That Counsel Never Consulted a Forensic Accountant, and Its Own Authority Shows That Such a Choice Is Unreasonable.

The first prong of the *Strickland* test asks whether counsel's performance fell below an objective standard of reasonableness. *See Duncan v. Ornoski*, 528 F.3d 1222, 1233-34 (9th Cir. 2008). The inquiry is measured against "prevailing professional norms" and judged "from counsel's perspective at the time." *Strickland*, 466 U.S. at 688-89. Here, trial counsel erred by failing to consult an accounting expert, which prevented him from making an informed strategic choice. That failure is deficient on its own, and trial counsel's performance elsewhere in the case does not cure it.

#### 1. The Government Concedes That Trial Counsel Did Not Consult an Expert.

The government does not contest that trial counsel failed to consult or retain an accounting expert in preparation for or during the trial. In fact, its opposition plainly states, "there was no need to consult with a forensic accounting expert," and "trial counsel did not retain one." *See* Opp. at 12. The government's declaration from the Special Agent present at an interview with trial counsel reiterated the same assertion "that defense did not require a forensic accounting expert, and thus, [trial counsel] did not consult with one." Declaration of Charles Wescott (Wescott Decl.), ¶ 27. This is an undisputed deficiency, and that alone is enough to satisfy the first prong. *See Harris By and Through Ramseyer v. Wood*, 64 F.3d 1432, 1435-36 (9th Cir. 1995) (citing failures to obtain an expert or an independent evaluation of the evidence each as "undisputed deficiencies" below an objective standard of reasonableness).

#### 2. Trial Counsel Could Not Have Made the Strategic Choices the Government Suggests Without Consulting an Expert.

The government argues that trial counsel's failure to consult an expert is "virtually unchallengeable" because trial counsel formed his strategy "after a thorough investigation of law and facts." *See* Opp. at 12; *Strickland*, 466 U.S. at 690-91. The government also suggests that,

even if there was a "less than complete investigation," trial counsel's actions were reasonable to the extent that "reasonable professional judgments support the limitations on investigation." *Id.* *Strickland* plainly states that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. Given that trial counsel neither consulted an accounting expert, nor is he an accountant himself, he could not have conducted a reasonable investigation of the facts. And if trial counsel's investigation was merely "less than complete," the government must still identify the reasonable professional judgment that justified stopping the investigation where he did. It identifies none.

First, trial counsel did not conduct a "thorough investigation of the law and facts." The government notes that trial counsel "read and parsed" the Fujimoto Report produced in both the SEC matter and this case and then discussed the Report "at length" with Mr. Rothenberg. *See* Opp. at 10; Wescott Decl. ¶ 15. This merely acknowledges the centrality of Mr. Fujimoto's analysis to the case, but is by no means a reason not to consult a defense expert. Mr. Fujimoto's report filed in this case alone was 169 pages, analyzing years of transactions to support his conclusion that there was an "unexplained difference" of $18.8 million in Mr. Rothenberg's funds. *See* Trial Tr. vol. 21, 3912:8. Neither trial counsel nor Mr. Rothenberg is a CPA with the expertise required to properly scrutinize such a report. Nor was the jury equipped to analyze and understand such voluminous records on its own, lending the opinions of an expert even more weight. Even if trial counsel could make sense of Mr. Fujimoto's report as a lay person, he did not have the requisite expertise to know whether there were meaningful disagreements to be had with Mr. Fujimoto's analysis.

A thorough or "reasonable" investigation of the law and facts necessarily requires consultation with an expert when counsel does not have the expertise to investigate themselves. *See Duncan*, 528 F.3d at 1235 ("It is especially important for counsel to seek the advice of an expert when he has no knowledge or expertise about the field."). Trial counsel admitted to the government that he was "concerned" about a forensic accountant's potential conclusions because a prior expert (not one that he consulted) had found Mr. Fujimoto's report "too conservative." *See* Wescott Decl. ¶ 21. That concern was itself a prediction about what a forensic accountant would

conclude, with no evidence for that prediction. *See Duncan*, 528 F.3d at 1235 ("When defense counsel merely believes certain testimony *might* not be helpful, no reasonable basis exists for deciding not to investigate.").

Second, the government argues that even if trial counsel did not base his strategy on a thorough investigation, a strategy based on a "less than complete investigation" was reasonable when based on trial counsel's professional judgment. *See* Opp. at 12. The government explains that trial counsel strategically chose not to retain an expert because he believed a "battle of the experts" would not appeal to the jury. *Id.* at 11. Trial counsel knew that not only would Mr. Fujimoto be testifying, but two additional CPAs who worked with Mr. Rothenberg would be testifying as well. Trial counsel thus assumed that there would be a "battle of the experts" without knowing whether or to what extent another expert would disagree with Mr. Fujimoto or the other CPAs, showing that trial counsel was again making accounting predictions with no expertise to do so. *See* Wescott Decl. ¶¶ 21-22. His choice instead was to pursue a separate strategy without the critical accounting expertise he needed to make that decision. *See Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017) (emphasizing that counsel's investigation "must determine trial strategy, not the other way around"). Notably, trial counsel told Mr. Rothenberg after the trial that "he should have retained an expert"—an assertion that the government also does not dispute in its opposition. Declaration of Michael Brent Rothenberg at ¶ 2.

As this remark reveals, trial counsel *did* suspect that another accounting expert would disagree with the government's three CPA witnesses, and prevailing norms required him to investigate further. *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (concluding that the adversarial testing process "will not function properly unless defense counsel has done some investigation into the prosecution's case"); *Alcala v. Woodford*, 334 F.3d 862, 892 (9th Cir. 2003) (finding that trial counsel was deficient in his decision "'simply to rely on' the prosecution's investigation as 'the sole source of information on the subject'").

While the Court must evaluate the reasonableness of counsel's actions without the benefit of hindsight, trial counsel admits that at the time, he knew this would be an accounting case. *See* Wescott Decl. ¶¶ 22-23; *Strickland*, 466 U.S. at 689. Instead of properly investigating the issues

prior to forming his strategy, counsel selected a strategy without any knowledge of what a competing expert could say and therefore failed to adequately challenge the prosecution's experts at trial. *See Rogers v. Dzurenda*, 25 F.4th 1171, 1187 (9th Cir. 2022) ("[T]rial counsel can be ineffective for failing to challenge a prosecution expert.").

### 3. The Government's Catalog of Trial Counsel's Other Work Is Irrelevant to Whether His Failure to Consult an Expert Was a Fundamental Error.

The government argues that Mr. Rothenberg is isolating a single decision of trial counsel's and asking the Court to "ignore" the overall performance of trial counsel. Opp. at 13. But Mr. Rothenberg's motion does not suggest that every aspect of trial counsel's performance was deficient, nor does *Strickland* require it to. For a claim of ineffective assistance, a defendant must identify "acts or omissions of counsel that are alleged not to have been the result of professional judgment," and the court must determine whether those identified acts were "outside the range of professionally competent assistance." *See Strickland*, 466 U.S. at 690. Courts have reiterated time and again that a "single, serious error" is enough. *See Kimmelman v. Morrison*, 477 U.S. at 383; *see also Neiss v. Bludworth*, 114 F.4th 1038, 1047 (9th Cir. 2024) (holding that counsel can be deficient in omitting a winning argument, "even while zealously pressing other strong (but unsuccessful) claims").

The fundamental error asserted in Mr. Rothenberg's motion is trial counsel's failure to consult an accounting expert prior to trial. The fact that trial counsel is an accomplished attorney with "numerous triumphs" on behalf of Mr. Rothenberg at the pleading stage is irrelevant. *See* Opp. at 13. Early triumphs do not prevent attorneys from later making errors that are outside of the range of an objective standard of reasonableness. *See, e.g.*, *Doe v. Ayers*, 782 F.3d 425, 441 (9th Cir. 2015) (explaining that hiring an expert in one phase of a case "does not discharge" counsel's duties in the next phase). The government also spends pages of its Opposition explaining trial counsel's zealous advocacy at trial, highlighting the ways in which counsel otherwise performed with skill and sincere effort. Opp. at 14-16. Trial counsel's performance during trial cannot negate the clear and undisputed failure to investigate the accounting issues by consulting a defense expert before trial. The government's own authority supports this point. *See*

*Kimmelman*, 477 U.S. at 386 ("Counsel's performance at trial, while generally creditable enough, suggests no better explanation for this apparent and pervasive failure to 'make reasonable investigations'").

**B. The Government's Prejudice Arguments Are Contradicted by Its Own Trial Strategy.**

To establish prejudice, Mr. Rothenberg must show a reasonable probability that, but for trial counsel's failure to consult an accounting expert, the result of the trial would have been different. *See Strickland*, 466 U.S. at 694; Opp. at 8. The government offers three answers to Mr. Rothenberg's evidence of prejudice, and none of them can be squared with its own record citations. The government starts by describing a case proved through the accounting testimony of three CPAs, then recasts its central accounting witness as merely a summary witness, and finally faults Mr. Peat for the limits of his review. Ultimately, the government cannot escape the fact that this was an accounting case where a competing accounting expert could have directly challenged the government's expert, and thereby its theory of the case, and thus undermined confidence in the outcome.

**1. The Government's "Overwhelming Evidence" Argument Concedes That This Was an Accounting Case Tried Through Three CPAs.**

The government begins its prejudice argument by suggesting that the evidence was so "overwhelming," "powerful and utterly convincing" that Mr. Rothenberg could not have been prejudiced by trial counsel's failure to consult an expert. Opp. at 17. But the government's cited evidence reveals what the government and Mr. Rothenberg both believe to be at the core of the case: accounting.

Out of 32 witnesses, the two witnesses the government cites as examples of the most convincing testimony against Mr. Rothenberg are Lynne McMillan Dimmick and David Haase, Mr. Rothenberg's former Chief Financial Officers and *both certified public accountants*. *See* Opp. at 17. The government stresses that Ms. McMillan and Mr. Haase are "certified public accountants from top accounting programs" and spends five pages of its opposition recounting their testimony about fee entitlements and tallies of income and expenditures for all Rothenberg entities. *See id.* at 17-22. The government offers Ms. McMillan, Mr. Haase, and later

Mr. Fujimoto as proof that no forensic accounting expert could have changed the outcome. *See id.* at 22.

The government's argument defeats itself. By relying on the evidence of three CPAs, the government concedes that it proved its case through accounting testimony. All three CPAs leaned on their expertise and provided accounting analysis throughout their testimonies. Mr. Haase, for example, began his testimony with background about his education and credentials and was then asked to define what "CPA stands for" and the difference between a "bookkeeping service and… an accounting service." *See* Trial Tr. vol. 17, 3260:17, 3261:7-9. Similarly, Ms. McMillan was used to explain exhibits, including one that showed "the account set up to invoice and collect fees" related to fund investments. *See* Trial Tr. vol. 5, 912:18-19. So, while the government offered three witnesses to explain a range of accounting concepts to the jury, the defense offered none.

While Mr. Rothenberg did not address Ms. McMillan or Mr. Haase in his initial motion, their testimony only underscores trial counsel's error. Trial counsel knew that Ms. McMillan and Mr. Haase were likely going to testify that "Rothenberg significantly overspent" and that such testimony "could lend further support to Fujimoto's analysis." Wescott Decl. ¶ 25. Like the government, trial counsel knew the case would come down to accounting. Yet he still did not consult an expert. Mr. Peat's declaration emphasizes how significantly an expert could have undermined the entirety of the government's theory, including Ms. McMillan and Mr. Haase's testimonies. Mr. Peat suggests that Mr. Fujimoto's ability to "identify and quantify legitimate uses of investor funds for the River Accelerator Program" relied on the "completeness and accuracy of QuickBooks accounting records," which Mr. Haase had left "in a complete state of disarray." Declaration of Greggory Peat (Peat Decl.) ¶ 32, Fn. 50. Although trial counsel questioned Mr. Haase on the "disarray," Trial Tr. vol. 18, 3365:23-3366:1, he did not have the expertise to explain to the jury how those accounting records called into question the government's conclusion of an $18.8 million "unexplained difference." *See* Trial Tr. vol. 23, 4447:21-24. More broadly, Ms. McMillan and Mr. Haase both speak to specific fund investments and uses as fact, *see, e.g.,* Trial Tr. vol. 5, 913:11-915:1, even though Mr. Peat emphasizes that it could be misleading to review the use and source of discrete investments without analyzing the

records at the "Fund" level. Peat Decl. ¶ 46.

Given the imbalance of accounting expertise at trial, the jury could only rely on the government's experts to explain these complex accounting concepts. With all of the accounting expertise representing only the government's case, the jury likely drew the reasonable inference that there was no accounting expert willing to defend Mr. Rothenberg, a fundamental misimpression that could have led the jury to conclude there was no real dispute. Therefore, there is a reasonable probability that had trial counsel consulted or retained its own expert, the result would have been different.

**2. The Government Now Calls Fujimoto a Summary Witness; It Tried the Case as Though He Were Indispensable.**

The government continues its prejudice argument by minimizing the importance of its own expert witness. The government describes Mr. Fujimoto as testifying "chiefly as a summary witness." *See* Opp. at 24. Within his alleged role as a "summary witness," Mr. Fujimoto provided testimony that "largely could have been given by a lay witness," according to the government. Opp. at 23. Confusingly, two paragraphs earlier, the government explains that Mr. Fujimoto has skills as a forensic accounting expert "that easily fall outside of the purview of the jury." *Id.* Both cannot be true.

The record resolves the tension between the two assertions. Mr. Fujimoto was the last witness the government called before closing, and his testimony spanned almost two full days. *See* Trial Tr. vols. 20 and 21. The government invoked his $18 million figure in its opening statement and his name in its summation. *See* Trial Tr. vol. 3, 526:13-16; Trial Tr. vol. 23, 4392:9-10. It closed by asking the jury to convict on the strength of the "unexplained difference that Gerry Fujimoto told you." *See* Trial Tr. vol. 23, 4447:21-4448:1. Still, the best evidence of Mr. Fujimoto's importance to the government's case is his payment. The government paid Mr. Fujimoto approximately $385,000 for over 900 hours of work, a figure that it does not address in its opposition and likely does not include the amount he was paid for his work for the U.S. Securities and Exchange Commission in the related civil matter. *See* Mot. at 11; Trial Tr. vol. 20, 3856:14-22. It is unclear why the government would spend such a sum for an expert to do "basic

algebra." *See* Opp. at 23. In explaining trial counsel's failure to consult an expert, the government suggested that trial counsel decided on a strategy that would make it a waste of "time, money, and attention" to consult an expert. *See* Opp. at 16. If that is so, the opposite is true. An attorney who spends that much time, money, and attention on an expert, as the government did here, does so because they believed the expert is crucial to their case.

The contention that Mr. Fujimoto was doing "basic algebra" and that his testimony could have been given by a lay witness is simply contrary to the record. Mr. Peat's declaration shows how complicated some of the analyses can be and explains where there were "discretionary uses of judgment" in Mr. Fujimoto's analysis. *See* Peat Decl. ¶ 49. Mr. Fujimoto himself claims that he did not utilize his "experience as a CPA" in this matter, but then goes on to describe how, as a CPA, he was "tasked to perform additional procedures on the underlying accounting" to determine whether Mr. Rothenberg made a "misstatement" about the underlying accounting records. *See* Fujimoto Declaration (Fujimoto Decl.) ¶¶ 13, 32-33. Mr. Fujimoto was undeniably using his accounting expertise at every step, which is why the government used him as their "summary" witness.

### 3. The Government Ignores That Peat's Review Was Limited on Its Face, and Dismisses Findings That Moved Its Central Figure by Millions.

The government's remaining argument is that Mr. Peat's declaration is "tepid and speculative" and amounts to "quibbling around the edges," such that prejudice cannot be established. Opp. at 22, 24. Though the government does not acknowledge this fact in its opposition, Mr. Peat's analysis for purposes of this motion was explicitly preliminary and was limited by a fixed fee and timeframe to evaluate Mr. Fujimoto's findings—both a fraction of the time and expense the government devoted to Mr. Fujimoto's work. Peat Decl. ¶ 6 (review limited to 120 hours and $66,000 in fees). His declaration is explicit that the constraint shaped his work. For example, he did not independently review the bank records bearing on fees earned versus fees taken "given the limited time afforded for [the] review." *Id.* at ¶ 41. He states that "significantly more time would be required" for this review ordinarily, in line with the many hundreds of hours spent by the government's expert. *See id.* at ¶ 33.

Mr. Peat's findings are not "quibbling around the edges," as the government contends, but instead just scratching the surface. *See* Opp. at 24. The government and Mr. Fujimoto argue that Mr. Peat's declaration does not undermine and "in fact supports" Mr. Fujimoto's analysis. Opp. at 24. This fundamentally mischaracterizes Mr. Peat's findings. In only 120 hours of work, Mr. Peat was able to conclude that up to $11.6 million (or more) of the $18.8 million "asset shortfall" "may have been used for legitimate business purposes," Peat Decl. ¶ 36, and also identified significant methodological failures that called into question Mr. Fujimoto's overall approach. Mr. Fujimoto failed to account for indirect investments in the River Accelerator Program and did not examine Mr. Rothenberg's personal accounts to find those legitimate, indirect expenditures, which Mr. Fujimoto conceded. *See* Peat Decl. ¶ 31; Fujimoto Decl. ¶ 89 ("I did not audit individual line items within Mr. Rothenberg's personal bank account statements."). Mr. Fujimoto also assumed cash outflows for "other Rothenberg Entities" were improper, despite at least one of those entities being a part of the River Accelerator Program. Peat Decl. ¶ 32. These failures alone account for up to $8.5 million of legitimate investments that Mr. Fujimoto included in his $18.8 million "asset shortfall." Peat Decl. ¶ 36.

Mr. Peat also explains alternative methods of cash tracing to Mr. Fujimoto's chosen "hybrid" "First-In, First-Out" (FIFO) method and how the different methods come to different conclusions. Peat Decl. ¶¶ 42-58. For example, where Mr. Fujimoto's method determined that $125,000 of the Dolby Investment was used for payments from Mr. Rothenberg's personal accounts, a traditional FIFO method would have resulted in none of the investment being used for those purposes. Peat Decl. ¶ 55. Similarly, for the GHF investment, the Fujimoto report concluded that $488,694 was invested into 2015 Fund portfolio companies, whereas Mr. Peat's application of the LIFO method (Last-In, First-Out) concluded that $655,715 was invested into portfolio companies. *See* Fujimoto Decl. ¶¶ 142-43. The government misstates these findings, saying that Mr. Peat confirms Mr. Fujimoto's conclusions and that "no more than half was invested under any cash tracing methodology," despite two of the four methodologies concluding more than $500,000 of the $1,000,000 was invested into portfolio companies. *See* Opp. at 25.

The Dolby and GHF examples prove Mr. Peat's point that no method is optimal in

commingling cases—like venture funds—but that using two or more methods would provide the trier of fact "with a menu of potential findings." Peat Decl. ¶ 51. Mr. Fujimoto responds in his declaration that his method "is the most logical," but he does not deny that the other methods are "commonly used by forensic accountants in practice." *See* Fujimoto Decl. ¶ 128; Peat Decl. ¶ 42. Crucially, Mr. Peat asserts that he would need significantly more time to identify additional areas of disagreement. Peat Decl. ¶ 17.

The point of this motion is not to resolve who is right between Mr. Peat and Mr. Fujimoto. That should be for the jury. For purposes of this motion, the Court need only assess the clear direction of Mr. Peat's declaration and whether such a competing expert would have created a "reasonable probability of a different result." *See Thornell v. Jones*, 602 U.S. 154, 164 (2024). Mr. Peat conducted an independent (albeit preliminary) analysis as a well-regarded, well-qualified forensic expert and came up with a starkly different result than Mr. Fujimoto. Peat Decl., App. A. Mr. Peat holds the same credentials as Mr. Fujimoto and has served as a forensic accounting expert on behalf of the federal government. Peat Decl. ¶¶ 1, 3. Mr. Fujimoto even accepted Mr. Peat's alternative methods as "commonly used by forensic accountants." Fujimoto Decl. ¶ 128. A jury that heard Mr. Fujimoto's testimony and methods challenged and contradicted in real time by a comparably credentialed accountant might reasonably have reached a different result on the same counts, or at the very least have harbored a reasonable doubt. Indeed, given the centrality of accounting in the government's case, it is difficult to imagine that a bona fide disagreement between two equally credentialed experts could not have raised a reasonable doubt in the jury.

Here again, the government's own authorities contradict its position. In *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997), the ineffective assistance claim rested on conjecture about what DNA test results that counsel failed to request might have been, but with no updated test results before the court to consider. Here there is a declaration from a named expert setting out his methodology, the records he reviewed, the records Mr. Fujimoto did not, and quantified ranges, all showing there would have been conflicting expert testimony before the jury. *See* Peat Decl. The court similarly dismissed the claims in *Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) and *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001), because the defendants failed to

identify any additional evidence witness testimony would have provided. Here, as noted, Mr. Peat's declaration points to examples of methodological failure and alternative accounting that could have been provided as additional evidence to the jury. *Bible v. Ryan*, 571 F.3d 860, 871 (9th Cir. 2009), rejected a claim built on an unproven theory that the defendant suffered from an organic brain disorder, again with no supporting expert analysis. Finally, in *Clark v. Lewis*, 1 F.3d 814, 823 (9th Cir. 1993), the court rejected the ineffective assistance claim because the defendant provided no evidence that his plea negotiation would have gone differently but for counsel's alleged failure. None of these cases involved a documented methodological critique of a testifying expert by a qualified counterpart, going to a central issue in the case. *See* Mot. at 20; Opp. at 8-9, 26. Had counsel presented such an expert here, the jury would have had an alternative expert lens through which to view the case, rather than simply the government's; it is not the Court's role on this motion to assess how the jury would have resolved that dispute, but simply to recognize that it would have been a starkly different choice for the jury to resolve. That is sufficient to undermine confidence in the outcome of the trial.

## III. CONCLUSION

For the foregoing reasons, the Court should grant Defendant a new trial.

Dated: October 7, 2026

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: */s/ David Sarratt*

DAVID SARRATT (SBN 332438)
EMMA CHESSEN (SBN 365130)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628
dsarratt@debevoise.com

Attorneys for Defendant
MICHAEL BRENT ROTHENBERG