United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
Plaintiff,

v.

MICHAEL BRENT ROTHENBERG,
Defendant.

Case No. 20-cr-00266-JST-1

**ORDER DENYING MOTION FOR A NEW TRIAL**

Re: ECF No. 457

On November 16, 2023, a jury convicted Defendant Michael Brent Rothenberg of 21 violations of federal criminal law, including bank fraud, false statements to a financial institution, wire fraud, and money laundering. ECF No. 339. Rothenberg now moves for a new trial, arguing his trial counsel's failure to consult with or retain a forensic accounting expert amounted to ineffective assistance of counsel. ECF No. 457. The Court will deny the motion.

## I. BACKGROUND

### A. Factual Background

In 2012, Rothenberg started a Silicon Valley venture capital firm called Rothenberg Ventures Management Company ("RVMC"). ECF No. 333, Trial Tr., vol. 22, 4102:18–4104:9. Through RVMC, Rothenberg managed several capital investment funds and co-funds. As relevant here, these included four main funds: the 2013 Fund, the 2014 Fund, the 2015 Fund, and the 2016 Fund. ECF No. 289, Trial Tr., vol. 3, 597:5–11, 628:15–20, 653:3–7; ECF No. 290, Trial Tr., vol. 4, 717:1–10. He also founded other companies, including a business accelerator ("River Accelerator") and a virtual reality content production company ("River Studios"). ECF No. 290, Trial Tr., vol. 4, 718:19–719:22; ECF No. 333, Trial Tr., vol. 22, 4166:6–24.

**B. Procedural Background**

On August 20, 2020, Rothenberg was charged in a 23-count indictment alleging as follows:[1]

- Bank fraud in violation of 18 U.S.C. § 1344 (Count One) (Silicon Valley Bank) ("SVB");
- False statements to a financial institution in violation of 18 U.S.C. § 1014 (Count Two) (SVB);
- Bank fraud in violation of 18 U.S.C. § 1344 (Count Three) (SVB);
- False statements to a financial institution in violation of 18 U.S.C. § 1014 (Count Four) (SVB);
- Wire fraud in violation of 18 U.S.C. § 1343 (Counts Five through Seven) (Pilot Grove Management/Transcend VR);
- Money laundering in violation of 18 U.S.C. § 1957 (Counts Eight through Eleven);
- Wire fraud in violation of 18 U.S.C. § 1343 (Counts 12 through 15) (Unity Technologies);
- Wire fraud in violation of 18 U.S.C. § 1343 (Counts 16 through 23) (2015 and 2016 Funds).

ECF No. 15. On October 25, 2021, the Court severed Counts One and Two from the remaining counts. ECF No. 101. Those two counts went to trial in November 2022, but the Court granted a mistrial after the jury could not reach a verdict. ECF No. 205.

Trial on the remaining 21 counts began on October 3, 2023. Over the course of the seven-week trial, the government presented the testimony of 32 witnesses and the Court admitted 306 exhibits. ECF Nos. 281–345, 355–60. Among the witnesses who testified at trial as to each count in the indictment were:

- Counts Three and Four: SVB Senior Relationship Manager Frank Amoroso;
- Counts Five through Seven: Pilot Grove Chief Executive Officer Dominic Polizzotto; Pilot

[1] The Court omits the indictment's aiding and abetting language for simplicity.

Grove Chief Investment Officer Lawrence Weisman;

- Counts Eight through Eleven: former River Studios employee Ewan Johnson; Lawrence Weisman; Dominic Polizzotto;
- Counts 12 through 15: Michael Foley, Unity Technologies; John Melas-Kyriazi, GHF, Inc.; Theo Melas-Kyriazi, GHF, Inc.; Alexa Binns, Binns Family Limited Partnership; James Binns, Binns Family Limited Partnership; Ewan Johnson, investor; Lena Goldberg, investor;
- Counts 16 through 23: Michael Antonov, investor; Praveen Gupta, HTC Corporation; Pascal Levensohn, Dolby Family Ventures; Natala Menezes, investor; David Chiu, CY Capital; Amy Huang, ARCHina Capital Partners; Sangwoo Lee, Korea Investment Partners.

ECF Nos. 293–94, 297, 300–02, 305, 307, 309, 311, 313, 315. The jury also heard from Special Agent Anthony Ghio, ECF No. 327, as well as former RVMC employees David Haase (chief financial officer), Justin Grooms (chief operating officer), Lynne McMillan Dimmick (chief financial officer), Tommy Leep (limited partner and consultant), and Brandon Farwell (partner and head of enterprise investments), ECF Nos. 289–90, 293, 315, 317, 327–28.

The government's final witness was forensic accounting expert Gerald Fujimoto, who testified over the course of two days about the movement of money into and out of the various Rothenberg funds, the Rothenberg co-funds, and Rothenberg's personal accounts. ECF No. 328, Trial Tr., vol. 20, 3841:14–3885:2; ECF No. 329, Trial Tr., vol. 21, 3895:7–4072:11. Fujimoto also produced an extensive expert report in anticipation of trial. *See* ECF No. 328, Trial Tr., vol. 20, 3855:20–3856:22.

At the close of the government's case, Rothenberg made an oral motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the Court denied. ECF No. 333, Trial Tr., vol. 22, 4085:15–19, 4263:4–17. Rothenberg then testified in his own defense, and the defense rested. ECF Nos. 333, 342. Rothenberg then renewed his oral motion for a judgment of acquittal, which the Court again denied. ECF No. 342, Trial Tr., vol. 23, 4329:13–17. After three days of deliberation, the jury returned a guilty verdict on all 21 counts. ECF No. 339.

On January 12, 2024, Rothenberg moved for a judgment of acquittal based on allegedly insufficient evidence, ECF No. 364, and a new trial based on alleged violations of his right to confrontation and a fair and impartial jury, ECF No. 365. The Court denied both motions. ECF Nos. 378, 380. Rothenberg renewed these motions on April 19, 2024, ECF No. 384, and the Court again denied them, ECF No. 395.

## II. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to grant a new trial is "within the sound discretion of the district court." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citation modified). A motion for a new trial based on a claim of ineffective assistance of counsel is within the district court's jurisdiction to decide on the merits. *See United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984).

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. Accordingly, to prevail on a claim of ineffectiveness of counsel, a defendant must show two things.

First, the defendant must show "that counsel's performance was deficient," meaning it "fell below an objective standard of reasonableness" under "prevailing professional norms." *Id.* at 687–88. "A court considering a claim on ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 689)).

Second, the defendant must establish "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. This requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Though the defendant need not show that "counsel's deficient conduct more likely than not altered the outcome of the case," *id.* at 693, "[t]he likelihood of a different result must be substantial, not just conceivable," *Harrington*, 562 U.S. at 112. "This does not require a showing

that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 693, 697). "In determining whether a defendant was prejudiced by counsel's inadequate representation, we examine the evidence that could have been presented to the jury had counsel performed competently and compare that to the evidence that the jury actually heard." *Duncan v. Ornoski*, 528 F.3d 1222, 1239–40 (9th Cir. 2008); *see also Rios v. Rocha*, 299 F.3d 796, 808–09 (9th Cir. 2002) (instructing that prejudice "must be considered in light of the strength of the government's case" (citation modified)). "If the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan*, 528 F.3d at 1240 (quoting *Strickland*, 466 U.S. at 694).

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

## III. DISCUSSION

Rothenberg argues his trial counsel was constitutionally ineffective under *Strickland* because counsel "failed to consult a forensic accounting expert for any purpose in preparation for trial." ECF No. 457 at 5. Because the Court finds Rothenberg has not met his burden to show this decision prejudiced his defense, it declines to address whether the decision constituted deficient performance. *See Strickland*, 466 U.S. at 697.

At a high level, Rothenberg argues he was prejudiced by his trial counsel's decision not to consult an accounting expert because "the case presented at trial was an accounting case, hinging on the tracing and interpretation of complex flows of money between investment funds, related business entities and banks." ECF No. 457 at 6. More specifically, Rothenberg's prejudice argument focuses on the expert report and testimony of Fujimoto, the government's forensic accounting expert, whose two days of trial testimony Rothenberg describes as the "centerpiece" of the government's case. ECF No. 457 at 5–6. Rothenberg contends that a competing defense

expert could have "fairly tested and countered" Fujimoto's testimony, "allowing the jury to weigh both views." *Id.* at 6. In support of this argument, Rothenberg presents the declaration of Greggory Peat, a Certified Public Accountant ("CPA") and senior managing director at FTI Consulting whom Rothenberg engaged to review Fujimoto's report and testimony. *Id.* at 6. Rothenberg urges that Peat's findings "meaningfully undermine Mr. Fujimoto's analysis." ECF No. 457 at 14.

The Court disagrees. The Court acknowledges the important role Fujimoto played in the government's preparation for trial and, ultimately, in its presentation at trial of evidence about Rothenberg's use of funds. *See* ECF No. 457 at 5–7. But the Court finds that Peat's criticisms of Fujimoto's analysis raise at most a "conceivable" possibility that a competing defense expert would have yielded a different result, which is not enough to meet Rothenberg's burden. *See Harrington*, 562 U.S. at 112. The Court addresses each of Peat's principal conclusions in turn.

First, Peat challenges Fujimoto's conclusion that Rothenberg's spending resulted in an overall $18.8 million shortfall. ECF No. 457-3 ¶¶ 24–36. Peat asserts that this calculation may have failed to account for the possibility that some of Rothenberg's challenged expenses were actually incurred for permissible purposes. *Id.* Specifically, Peat asserts that this total may have undercounted (1) permissible "indirect investments" in the River Accelerator Program, *id.* ¶¶ 27–33, and (2) permissible legal expenditures associated with Rothenberg's "rights to seek indemnification from the Funds and to pursue legal actions on behalf of the Funds," *id.* ¶¶ 33–36. Based on his review of Fujimoto's report, Peat concludes that "between $4.2 million and $11.6 million (or more) of the $18.8 million 'asset shortfall' may have been used for legitimate business purposes." *Id.* ¶ 36.

The Court finds the evidence unpersuasive for several reasons. First, Peat's findings on this point are, at best, tentative. He concludes that certain funds "*may* have been used for legitimate business purposes," *id.* (emphasis added), and that, if true, this would "render[] Mr. Fujimoto's conclusion regarding the $18.8 million 'asset shortfall' unreliable and *potentially overstated*," *id.* ¶ 31 (emphasis added). Notably, he does not point to a single calculation in Fujimoto's report that he confidently concludes was erroneous. For example, he asserts that

Fujimoto may have failed to account for expenses that were actually "indirect investments" in the River Accelerator Program authorized by the 2015 and 2016 Fund Agreements, which provided that such investments could take the form of "the provision and use of specialized equipment, real estate, events, services provided by employees or contractors, or other expenditures." *Id.* ¶¶ 28–29. He explains that Fujimoto's assumption that most cash outflows to "Other Rothenberg Entities" were improper would be erroneous if some of those expenditures were "related to indirect investments in the River Accelerator Program and within the bounds of the relevant Fund Agreements' terms." *Id.* ¶ 32. Peat does not, however, identify any specific transactions that Fujimoto assumed were improper and that Peat believes were actually permissible outflows to the River Accelerator Program. *See id.*

Similarly, Peat asserts that Fujimoto failed to account for the possibility that Rothenberg "used his personal credit card and bank account to pay for indirect expenses related to the River Accelerator Program" and, accordingly, that certain payments to Rothenberg were in fact reimbursements for permissible expenses. *Id.* ¶ 31. Peat's conclusion that this may undermine Fujimoto's findings, however, is largely speculative. He explains, without support, that that "it is [his] understanding" that Rothenberg used his personal credit card in this manner and that "Rothenberg then sought reimbursement for such businesses expense." *Id.* He further explains that Fujimoto did not analyze Rothenberg's "personal accounts to identify and attribute cash outflows to the River Accelerator Program." *Id.* But, critically, it does not appear that Peat analyzed Rothenberg's personal accounts either. Again, he points to no specific payments that he has reason to believe were actually reimbursements for permissible expenses. *See id.*

But the much larger point is that, even assuming Peat is correct that Fujimoto miscounted the overall shortfall by $4.2 to $11.6 million, Rothenberg has not shown a "reasonable probability" that presenting this evidence at trial would have affected the outcome. *See Strickland*, 466 U.S. at 694. Peat's analysis does not support the conclusion that there was *no* shortfall—only that the shortfall may have actually been between $7.2 and $14.6 million. *See* ECF No. 457-3 ¶ 36. Rothenberg never explains how this finding, if presented to and credited by the jury, would undermine the government's proof as to any of the specific offenses with which he was charged.

Critically, Rothenberg was not charged with causing an $18.8 million shortfall. *See* ECF No. 15 at 10–22. He was charged with, and then convicted of, 21 offenses based on specific transactions that involved obtaining money from banks and investors by false and fraudulent pretenses. ECF No. 15 at 10–22; ECF No. 339. Only one of these charges—that for money laundering under 18 U.S.C. § 1957—required the government to prove a threshold monetary amount, and that threshold amount was only $10,000. *See* 18 U.S.C. § 1957. If, in fact, the overall shortfall was only $14.6 million, or only $7.2 million, is there a reasonable probability the government would not have been able to establish some or all of the elements required to prove any of these charges? Rothenberg does not say. Absent such a showing, the Court cannot conclude the possibility of a different outcome is anything more than "conceivable." *See Harrington*, 562 U.S. at 112; *cf. Duncan*, 528 F.3d at 1235 (finding prejudice in failure to investigate and present "potentially exonerating" evidence).

Second, Peat challenges Fujimoto's conclusions regarding Rothenberg's representations to SVB. Rothenberg was convicted of defrauding SVB by representing to the bank when seeking a $4 million loan that the 2015 Fund had, as of December 28, 2015, raised $23.6 million. ECF No. 339 at 1; *see* ECF No. 15 at 10–11. Based on this number, Rothenberg further represented to SVB that the 2015 Fund had $5.192 of prepaid management fees. *Id.* At trial, Fujimoto testified that the 2015 Fund had only raised $12.9 million, not $23.6 million, at the time Rothenberg made those representations. ECF No. 329, Trial Tr. vol. 21, 4018:4–7. Peat asserts that Fujimoto's calculation failed to account for certain terms of the relevant fund agreements. ECF No. 457-3 ¶¶ 37–39. First, Peat points to a provision of the 2015 Fund Operating Agreement that allowed management fees to be calculated based in part on "unfunded Capital Commitments," which Peat estimates could account for an additional $1.1 million. *Id.* ¶ 38. Second, Peat points to a provision of the 2016 Fund Operating Agreement earmarking $10 million for future investment in the 2015 Fund. *Id.* ¶¶ 38–39. Peat explains that a calculation of the 2015 Fund size that includes both the unfunded commitments and the $10 million expected from the 2016 Fund yields a total of $24 million, "a figure notably consistent with the $23.6 million amount Mr. Rothenberg represented to SVB during the process of applying for the line of credit." *Id.* ¶ 40.

The problem, however, is that Rothenberg already made this argument at trial. When asked on the stand how he came up with the $23.6 million estimate, Rothenberg testified, "This number I believed included a $10 million commitment that was partially funded from the 2016 Fund to the 2015 Fund. That was in the fund documents. That was contracted. That was the expectation and the reality of the relationship between those funds." ECF No. 333, Trial tr. vol. 22, 4153:15–4155:3. In finding that Rothenberg had defrauded SVB, the jury—which had in evidence the documents on which Rothenberg was relying—rejected this argument, and Rothenberg has not shown that an accounting expert would have changed this outcome.

Next, Peat challenges Fujimoto's cash-tracing methodology and conclusions. Peat acknowledges he did not have time to perform "a comprehensive, independent source-and-use analysis to affirmatively opine on or rebut Mr. Fujimoto's conclusions." *Id.* ¶ 44. Accordingly, Peat raises only high-level "critiques of Mr. Fujimoto's opinions and methodologies based on [his] understanding of the Fujimoto Report and the limited analyses [he has] performed to date." *Id.* The Court does not find these critiques persuasive.

First, Peat criticizes Fujimoto's application of a cash-tracing method to discrete investments. *Id.* ¶¶ 45–47. He explains that this approach "may have been misleading" because fund investments are pooled and, thus, Rothenberg was "responsible for utilizing investor funds, *as a whole*, in a manner that complies with the terms of the Fund Agreements." *Id.* ¶ 45 (emphasis added). According to Peat, the better approach would have been to analyze the use of investor proceeds at the fund level. *Id.* ¶ 46. That may be so. But, at most, Peat's critique suggests that a different approach *could have* yielded a different result. He offers no further evidence suggesting that his proposed approach *would have* yielded a different result, much less that this result would be different enough to undermine confidence in the outcome. The Court cannot find prejudice based on "mere speculation that witness testimony 'might have given information helpful to' the defense." *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) (quoting *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)).

Peat likewise faults Fujimoto for failing to use "a pure application" of the First-In, First-Out ("FIFO") cash-tracing method. ECF No. 457-3 ¶¶ 48–49. According to Peat, Fujimoto

instead applied a combination of FIFO and specific-identification methodologies, which allowed Fujimoto to exercise discretionary judgment "in cases where the FIFO methodology appeared to be counter to what the actual transaction was intended to accomplish." *Id.* ¶ 43. Peat's findings on this point are, again, speculative. Peat admits that he is "unable to express any opinions on Mr. Fujimoto's judgment itself at this time," and thus he concludes only that "incorporating discretionary uses of judgment into a cash tracing analysis *can* expose Mr. Fujimoto's analysis to inconsistencies and instances of flawed decision-making." *Id.* ¶ 49 (emphasis added). Absent any showing that this approach *did* expose Fujimoto's analysis to such errors, and that a different approach would have yielded a materially different conclusion, this criticism is unpersuasive. *See Djerf*, 931 F.3d at 881.

Peat also criticizes Fujimoto for applying only one cash-tracing methodology—the hybrid FIFO method described above—rather than offering "the trier of fact with a menu of potential fundings and the ability to assess which methodology is more suited to the specific issues at hand." ECF No. 457-3 ¶ 51. To illustrate his point, Peat analyzes two investments in the 2015 and 2016 Funds—namely, a $500,000 investment from Dolby Family Ventures and a $1 million investment from GHF Investment—using four alternative methodologies. *Id.* ¶¶ 53–57.

This analysis does not support a finding of prejudice. To understand why, it bears summarizing the government's theory as to these investments. The government argued at trial that Rothenberg solicited money for the 2015 and 2016 Funds by leading would-be investors to believe he would invest their money in portfolio companies. *See, e.g.*, ECF No. 342, Trial Tr., vol. 23, 4415–4425. Witnesses who had invested in the funds testified to this effect. *See, e.g.*, ECF No. 309, Trial Tr., vol. 4, 2659:6–2660:5 (Amy Huang testifying that she believed her money would be invested in "frontier technology companies"); ECF No. 313, Trial Tr., vol. 16, 2971:6–8 (Natala Menezes testifying that the "purpose" of her "investment was to invest in portfolio companies"). Some witnesses, including Pascal Levensohn, the senior managing director of Dolby Family Ventures, also testified that they had explicitly declined to invest in River Studios, Rothenberg's virtual reality company. *See* ECF No. 294, Trial Tr., vol. 6, 1235:16–1236:7 (Levensohn stating that investing in River Studios made "zero sense" because "as a matter of

policy, Dolby doesn't invest in content nor does Dolby Family Ventures"). The government argued that Rothenberg nonetheless used much of the money in these funds for other, improper purposes, including paying for the operation of River Studios, taking excessive management fees, and securing RVMC's line of credit from SVB. *See, e.g.*, ECF No. 329, Trial Tr., vol. 21, 3934–3936, 3989–4001, 4020–4022 (Fujimoto explaining the use of investor funds for purposes other than investing in portfolio companies).

Critically, none of the four alternative cash-tracing methodologies that Peat tests appears to undermine the conclusion that Rothenberg misused these funds. Peat's first example is the $500,000 investment from Dolby Family Ventures. ECF No. 457-3 ¶¶ 54–55. Applying the FIFO method, Fujimoto concluded that $0 of this amount was invested in portfolio companies. *Id.* ¶ 54. Three of the four alternative methods Peat applies yield exactly the same result. *Id.* The fourth method indicates that only $60,115 of the $500,000 was invested in portfolio companies. *Id.* Moreover, four of the five cash-tracing methods indicate that at least some of the Dolby investment went to River Studios, despite Levensohn's testimony that Dolby had declined the opportunity to invest directly in River Studios. *See id.*; ECF No. 294, Trial Tr., vol. 6, 1235:16–1236:7. Rothenberg offers no reason, and the Court can discern none, why presenting these alternative findings to a jury would undermine the government's evidence that he misused the Dolby investment. Peat's second example, a $1 million investment from GHF Investment, is similarly uncompelling. *See* ECF No. 457-3 ¶¶ 56–57. Fujimoto's FIFO methodology estimated that $488,694 of this amount was invested in portfolio companies. *Id.* ¶ 56. Under Peat's four alternative methodologies, the estimates range from $392,872 to $655,715. *Id.* Again, Rothenberg does not explain how even the most generous of these estimates, if true, would undermine the conclusion that he misused these funds intended for investment in portfolio companies.

Peat's final criticism is that Fujimoto exceeded "the permissible scope of expert testimony for a forensic accounting expert" by, according to Peat, improperly opining on the occurrence of fraud in his expert report. *Id.* ¶¶ 19–23. Rothenberg contends that a competing accounting expert would have recognized the impropriety of Fujimoto's conclusions because rules of professional

conduct applicable to CPAs make clear that "providing opinions about the existence of fraud goes beyond the scope of professional competence." ECF No. 457 at 19. The Court does not find this argument compelling. Experts in general are prohibited from opining on ultimate issues, *see* Fed. R. Evid. 704, and thus the Court fails to see how an accounting expert would have been more qualified than trial counsel to recognize such an error, if in fact there was one.[2] More importantly, the jury never saw Fujimoto's expert report, ECF No. 461-2 at 6, and Rothenberg does not contend that Fujimoto made these same conclusions when he testified at trial. The Court thus fails to see how any allegedly improper statements in Fujimoto's report would have any bearing on the jury's findings.

In sum, the Court finds that Peat's conclusions are insufficient to show prejudice. At most, they indicate that an accounting expert may have been able to assist the defense in questioning Fujimoto's methods and offering adjustments to the size, but not the net negative outcome, of Fujimoto's calculations. But nothing in Peat's assessment supports a "reasonable probability" that a defense expert would have offered evidence sufficient to raise a reasonable doubt as to any of the elements of the crimes with which Rothenberg was charged and convicted. *See Strickland*, 466 U.S. at 694. Accordingly, trial counsel's failure to consult such an expert did not "so undermine[] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *See id.* at 686.

This conclusion is reinforced by "the strength of the government's case." *See Rios*, 299 F.3d at 809. The Court has examined much of the relevant evidence in its previous orders denying Rothenberg's other post-trial motions, *see, e.g.*, ECF No. 380 (order denying motion for judgment of acquittal); ECF No. 395 (order denying renewed motions for new trial and judgment of acquittal), and thus it will not replow that ground here. It suffices to note that the government called 32 witnesses over the seven-week trial, including dozens of former RVMC investors, employees, and associates. *See* ECF Nos. 289–90, 293–94, 297, 300–02, 305, 307, 309, 311, 313,

---

[2] Fujimoto submits a responsive declaration disputing Peat's charge that he opined on the existence of fraud. ECF No. 461-2 ¶¶ 19–38. Because the Court finds that Peat's criticism, even if true, would not affect the outcome of the trial, it declines to weigh in on the merits of this dispute.

315, 317, 327–28.

Rothenberg acknowledges only two of those witnesses, former RVMC chief financial officers Lynne McMillan Dimmick and David Haase, both of whom testified at length about Rothenberg's misuse of funds. *See* ECF No. 290, Trial Tr., vol. 4, 788–886 (McMillan testifying); ECF No. 293, Trial Tr., vol. 5, 895–1044 (same); ECF No. 315, Trial Tr., vol. 17, 3255–3318 (Haase testifying). Rothenberg points out that McMillan and Haase are also CPAs, which, he contends, confirms that the government "proved its case through accounting testimony." ECF No. 462 at 10. This argument ignores that McMillan and Haase both testified as lay witnesses about their personal experiences at the company. *See, e.g.*, ECF No. 293, Trial Tr., vol. 5, 974:14–984:24 (McMillan recalling that she "withheld [her] own payroll to be able to pay the rest of the" staff after Rothenberg wired himself $250,000 that she believed he used to purchase Super Bowl tickets). More importantly, it ignores the 30 other lay witnesses who testified about their own experiences with Rothenberg and RVMC. Nowhere does Rothenberg explain how a defense expert would have been able to overcome the testimony of those witnesses.

Because Rothenberg has not met his burden to show prejudice, the Court finds that Rothenberg's trial counsel was not constitutionally ineffective. *See Strickland*, 466 U.S. at 694. Accordingly, "the interest of justice" does not require a new trial. *See* Fed. R. Crim. P. 33(a).

**CONCLUSION**

For the foregoing reasons, the Court denies Rothenberg's motion for a new trial.

**IT IS SO ORDERED.**

Dated: October 22, 2026

JON S. TIGAR
United States District Judge